**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| v. | ) | EX PARTE MOTION FOR |
| | ) | TEMPORARY RESTRAINING ORDER |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and through undersigned counsel, and submit their Memorandum of Points and Authorities in Support of their Ex Parte Motion for Temporary Restraining Order.

| | |
|---|---|
| Dated: September 13, 2010 | Respectfully submitted, |
| | |
| Alan Gura (admitted pro hac vice) | David G. Sigale (Atty. ID# 6238103) |
| Gura & Possessky, PLLC | Law Firm of David G. Sigale, P.C. |
| 101 N. Columbus Street, Suite 405 | 4300 Commerce Court, Suite 300-3 |
| Alexandria, VA 22314 | Lisle, IL 60532 |
| 703.835.9085/Fax 703.997.7665 | 630.452.4547/Fax 630.596.4445 |
| | |
| By: /s/ Alan Gura/ | By: /s/ David G. Sigale/ |
|     Alan Gura |     David G. Sigale |
| | |
| | Attorneys for Plaintiffs |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER

INTRODUCTION

On August 24, the Court denied without prejudice Plaintiffs' previous application for a temporary restraining order, on grounds that Plaintiffs had not yet established irreparable harm for two reasons: first, the individual plaintiffs were able to move beyond the city's borders to get training, and in fact Plaintiff Ezell had done so; and the mobile range "can't get here yet . . . [it] looks like it's coming at the earliest mid-September." Tr., 8/25/10, at 75, l. 14-23.

"But that is a denial without prejudice, meaning that it can be soon enough an irreparable injury." *Id.*, at 76, l. 1-2. "I also am saying to the plaintiffs, this is a denial without prejudice. This is one that you can bring again." *Id.*, at 76, l. 11-12.

Following the Court's guidance, Plaintiffs now move for a temporary restraining order.

As the Court has recently considered the issues before, this brief is not intended to recount the entire dispute among the parties, but rather, focuses primarily on addressing the Court's stated concerns and the Defendant's arguments. Considering recent events, Plaintiffs also clarify and stress certain aspects of the relief requested.

STATEMENT OF FACTS

*Background*: Defendant requires all gun owners to obtain range training in order to register their firearms, and periodically renew such registrations. The logic of this requirement is obvious: gun training saves lives. People who do not know how to use their guns are a danger to themselves and to others. On this common-sense point there is no dispute. Yet Defendants have also banned all gun ranges open to the public.

1

The gun range ban, apparently unique in the United States, covers the entire City of Chicago – the third largest city in the United States, encompassing an area over 230 square miles, and home to nearly three million people. *See* Request for Judicial Notice.

Defendant has imposed an October 12 deadline for people to obtain range training if they wish to register their currently owned firearms. Chi. Mun. Code § 8-20-140(d)(2). Registration certificates issued under the old law remain valid, but upon their expiration, range training is required for renewal, and thereafter every three years. Chi. Mun. Code § 8-20-110(d) (requiring CFP upon expiration of pre-*McDonald* registration). Defendant claims that existing certificates expiring before October 12 are nonetheless extended to that date – but makes no such claim regarding registrations expiring October 13 and thereafter.

*The Range Training Shortage*: Plaintiff Second Amendment Foundation, Inc. ("SAF") has approximately 1,700 members in Chicago. Versnel Decl., ¶ 2. Plaintiff Illinois State Rifle Association has 1,144 members in Chicago. Pearson Decl., ¶ 3. By definition, these individuals are interested in advancing the exercise of Second Amendment rights. Most of them own guns. Versnel Decl., ¶ 2; Pearson Decl., ¶ 3. Assuming a complete overlap in these organization's memberships, Plaintiffs have approximately 1,700 members whose ability to register guns expires October 12, and whose currently registered guns will become unregistrable absent range training by July 11 (one year from the ordinance's effective date) – a daily average of almost 5 people. Of course, not all members of the public impacted by the range ban are motivated to join Plaintiff organizations.

Current range facilities are inadequate to train all the people who require training. Plaintiff ISRA's Executive Director, Richard Pearson, is in a position to know. *See* Pearson

Decl., ¶ 7. This information is now verified by a third party whose deposition was noticed by Defendant:[1] Andre Queen, Executive Director of Fidelity Investigative Training Academy. Fidelity, a state-licensed investigative and security academy in Chicago, offers the CFP course to Chicago residents. Queen Decl., ¶¶ 1-2. But Fidelity's ability to provide range training is limited because the suburban ranges are locking out Chicago-based instructors, so that they can keep the CFP training market for themselves. Queen Decl., ¶ 3. What ranges are available to Fidelity are beginning to charge high fees and compete with Fidelity's business, offer limited facilities, and are a significant distance from the city. *Id.* The lack of adequate range facilities costs Fidelity customers, both because there is simply not enough range time to take on the students that it can serve, and because the cost and time associated with using the ranges that are available discourages customers. Queen Decl., ¶ 4.

Accordingly, Fidelity is interested in sharing the mobile range that the Plaintiffs in this case are bringing to Chicago, and is also interested in bringing in its own mobile range, at least until it can construct its own permanent range in Chicago. Queen Decl., ¶ 5.

*The Mobile Range*: A great portion of Ms. Versnel's deposition was consumed by counsel's arguments with Ms. Versnel that the SAF-Blue Line contract did not truly allow SAF to bring a range to Chicago and utilize it for training, and speculating that Blue Line would be too busy to visit Chicago. Fortunately, counsel did not dwell on this topic at the uneventful deposition of Jerry Tilbor, Blue Line's principal. In any case, there exists zero doubt in the parties' minds as to what they have contracted to do. "Blue Line has a contract with the Second

---

[1] In response to the Court's concern about the volume of accelerated discovery, Defendant advised the Court that discovery would be limited to the Plaintiffs. Tr., 8/23/10, p. 18, l. 19-24. When Defendant finally started discovery a week later, it noticed 5 third party depositions.

Amendment Foundation (SAF) to operate the Blue Line range in Chicago, so that members of the general public may obtain the range training required by the City of Chicago to own guns. Blue Line fully endorses SAF's project. The Blue Line range is perfect for this application." Tilbor Decl., ¶ 10. Nor can Blue Line refuse to provide the range to SAF throughout the contract year, Tilbor Decl., ¶ 12, nor does Blue Line see any reason why it would not make future visits to Chicago throughout the contract year. Tilbor Decl., ¶ 13.

If the Court grants relief, the range will operate in Chicago on September 24. Plaintiff has paid the first half of the non-refundable $15,000 fee, and Mr. Tilbor is prepared to begin heading toward Chicago in nine days. Versnel Decl., ¶¶ 13, 15; Tilbor Decl., ¶¶ 12, 14 . As the range has three positions, Plaintiffs can save the Second Amendment rights of twenty-four Chicagoans each eight-hour day, assuming only one trainee per lane per hour.

Blue Line's range was constructed by Meggitt Training Systems. The range appears from the outside as a plain, unmarked truck trailer, and on the inside it contains three shooting lanes and a range-master office. The range is equipped with a state of the art HEPA air filtration system, a bullet trap, is fully bullet-proof, and is insulated for sound, so that gunfire inside the range sounds no louder than a nail gun on the outside. The range interior is lined with foam. Tilbor Decl., ¶ 3. Apart from the fact that the Blue Line range is mobile, it is no different than any gun range that exists inside a fixed structure. Tilbor Decl., ¶ 4.

No one has ever been injured by a bullet fired inside the Blue Line range. Tilbor Decl., ¶ 5. Although most of Blue Line's customers are law enforcement departments who need range facilities to maintain their officers' firearms qualifications, Blue Line also rents the range to the civilian market. There are no features or characteristics of the range that make it unsuitable for

4

the public. For example, every fall, the Blue Line range is parked outside of a sporting goods store in Kittery, Maine, where members of the public use it for recreation, and to try out different kinds of guns and ammunition. Tilbor Decl., ¶ 6.

Blue Line's range can be parked and operated on any flat surface. There are no special parking requirements. If the range fits in a parking spot, it can be safely operated there. Tilbor Decl., ¶ 7. In many locations, the range's muffled noise does not rise above the general background noise. It has been operated five feet from a house without incident. Tilbor Decl., ¶ 8.

When the range arrives, there will be two places to park it. Owing to Defendant's discovery of Plaintiffs' first landlord, Plaintiffs lost their lease on the property where the range would be situated, effective November 1. Versnel Decl., ¶¶ 7-9.[2] However, Plaintiffs still have possession of this land through October 31. Versnel Decl., ¶ 9; Exh. C. The City claims, irrationally, that the lease's termination in November renders impossible the mobile range's operation earlier. In an abundance of caution, and also because the Plaintiffs would like to continue operating a mobile range in Chicago beyond October 31, SAF has leased additional property effective September 15. Versnel Decl., ¶¶ 10-12; Exh. D.

Blue Line does not need to inspect property before operating in it, but has examined satellite images of the Accurate Perforating property, and the property located at 6300-6400 South Bell, and concluded that these appear to be ideal places to operate the range. The Accurate Perforating parking lot is next to a major highway and factories. The Bell lot is a large vacant lot next to a railroad. Tilbor Decl., ¶¶ 7, 9. Chicago has a great deal of suitable, vacant land.

---

[2]Business owners can be expected to dislike the city's notices to discuss under oath "the zoning, licensing and/or permitted purposes" of their factories. Exh. E.

5

While Plaintiffs can – and have – taken the steps *currently* necessary and available to operate the range on September 24 (at significant cost), final arrangements require injunctive relief. The law challenged forbids the very existence of a range within city limits; thus, the range cannot enter the city absent injunctive relief. Moreover, without injunctive relief, Plaintiffs are limited in their ability to schedule their trainers, inform their members and the general public of the range's availability, schedule individuals for training, and add the range's location to ISRA's range insurance policy. Versnel Decl., ¶ 14; Pearson Decl., ¶ 9. Indeed, as a practical matter, these steps must be taken only when Plaintiffs know that the range can open its doors September 24, so that it can immediately begin serving people.

The bottom line is clear: Plaintiffs have concrete and imminent plans to bring a mobile training range to Chicago on September 24, for immediate operation, providing range training necessary for compliance with the city's looming gun registration deadlines. If a temporary restraining order is issued, trainers and trainees will be scheduled, and the range will commence operations immediately upon its arrival next week.

## SUMMARY OF ARGUMENT

Although Plaintiffs maintain that a complete and total gun range ban violates the core of the Second Amendment right, obviating the need to locate a standard of review, Plaintiffs would nonetheless prevail under the intermediate scrutiny standard referenced by the Court. Quite simply, there is no substantial government interest in banning gun ranges, let alone any such interest. To the contrary, the city concedes that range training is *required* for public safety.

The irreparable harm is plain: without adequate gun training, people get injured and killed. Without training, people cannot register their guns in Chicago and thus lose the ability to

defend themselves and their families from violent crime. And training itself is constitutionally-protected activity, both because use of a gun at a range is secured by the Second Amendment, and because, as found by the Fourth Circuit, gun training is protected First Amendment speech.

ARGUMENT

I. PLAINTIFFS WILL PREVAIL ON THE MERITS OF THEIR CLAIMS.

There is no need to recount at length the reasoning why using guns at a range is constitutionally protected. "The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right." *District of Columbia* v. *Heller*, 128 S. Ct. 2783, 2812 (2008). The provision of gun training for a state-issued permit is protected First Amendment speech. *Edwards* v. *City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999).

Plaintiffs reserve their arguments that a flat ban on protected activity requires no standard of review analysis, and that in any event, the appropriate standard would be strict scrutiny. But the end result is the same under intermediate scrutiny, which requires that the there be a "strong showing" that the regulation is "substantially related to an important governmental objective." *United States v. Skoien*, 2010 U.S. App. Lexis 14262 at *10 (7th Cir. July 13, 2010) (en banc) (citations omitted).

Quite simply, there is no important governmental objective in banning gun ranges. Defendant has offered only that banning ranges reduces people's desire to transport guns, but this makes no sense, as it has the effect of causing people to drive longer distances with their guns, and in any event, the law requires that guns be inoperable and locked away while driving. The

concern with "arms being discharged en masse and with great frequency," Tr., 8/23/10, p. 51, l. 25 - p.52, l.1, is simply circular reasoning. The city wants to ban gun ranges because it does not want them to operate. But since gun ranges are protected by the Constitution, general opposition to their existence is unavailing. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 128 S. Ct. at 2822. "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 177 L. Ed.2d 894, 924 (2010) (citation omitted).

But the amorphous fears of gun ranges are not merely irrelevant; they are rejected at law. The Illinois Court of Appeals, for example, held shooting at a range is not an ultrahazardous activity because, inter alia,

> the risk of harm to persons or property, even though great, can be virtually eliminated by the exercise of reasonable or even "utmost" care under the circumstances . . . the use of firearms is a matter of common usage and the harm posed comes from their misuse rather than from their inherent nature alone . . . the location [of a range is assumed] appropriate for such activity in the absence of further factual allegations . . . particularly describing the area as inappropriate for the target practice [and] target practice is of some social utility to the community . . .

*Miller* v. *Civil Constructors*, 272 Ill. App. 3d 263, 271, 651 N.E.2d 239 (Ill. App. 1995). The same court has upheld Illinois' range protection statute. *Miller v. Fulton County Zoning Bd. of Appeals*, 337 Ill. App. 3d 210, 785 N.E.2d 532 (Ill. App. 2003). A gun range becomes unusually dangerous if one runs into the line of fire, but that is also true of vehicular traffic.

II.     PLAINTIFFS AND THE PUBLIC SUFFER IRREPARABLE HARM.

The facts indicate that there is a range shortage that is discouraging people from

complying with the city's laws and exercising their rights. Defendant's claims that the harm in this case can be reduced to money damages, and thus is not subject to preliminary injunctive relief, is baseless. Irreparable harm is presumed in many "money damages" cases. *See, e.g*, *Computer Assocs. Int'l* v. *Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004) (trade secret misappropriation and copyright infringement). Irreparable harm is also presumed in First Amendment cases, " *National People's Action* v. *Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990), and there is no reason to suppose the same is not true of Second Amendment cases, although the question appears to be one of first impression.

The government could not claim money damages are adequate to compensate for the seizure of Bibles, though they are never mentioned in the text of the First Amendment. "Arms," however, are spelled out as protected in the Second Amendment. And money damages will not compensate for people who are dead and injured because they had no gun with which to defend themselves, or because someone was not proficient in the use of their gun.

Going to the suburbs is not option. The Constitution, with its Bill of Rights, is in full effect in the City of Chicago. *See McDonald*. Chicago cannot exclude itself from the United States, and violate the rights of its citizens, by telling them to vote with their feet. The idea that individuals should simply go to the suburbs to exercise their rights is nothing more than what the Supreme Court has rejected, yet again, in *McDonald*, the idea that constitutional rights may be abandoned because "conditions and problems differ from locality to locality." *McDonald*, 177 L. Ed. 2d at 924. The only condition that matters is one that applies uniformly in Chicago and its suburbs: the operative, functioning condition of the Constitution.

In the First Amendment context, "[i] is not sufficient to say that neighboring communities

9

permit the type of speech that the challenged ordinance bans . . . .the government may not simply point to neighboring communities that permit the speech as a defense to their ordinance that bans that type of speech from its jurisdiction." *Palmetto Props., Inc.* v. *County of DuPage*, 160 F. Supp. 2d 876, 883 (N.D. Il. 2001) (citing *Schad* v. *Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) ("[One] is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place") (quoting *Schneider* v. *State*, 308 U.S. 147, 163 (1939))

      Gun training is speech, but the concept works for all constitutional rights. Chicago could not, for example, ban abortion clinics on the grounds that they are available in the suburbs. *Cf. Carey* v. *Population Svcs.*, 431 U.S. 678, 689 (1977) ("the restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition") (footnotes omitted). Gun ranges are places of the Second Amendment and, to the extent that training is conducted there, the First. They are protected from complete bans.

III.    OTHER LAWS, INCLUDING ZONING, ARE IRRELEVANT.

      Defendant's counsel have strenuously argued that even were the range ban struck down, gun ranges would nonetheless remain illegal under a slew of other laws, most emphatically the zoning code, which allegedly forbids all that it does not permit. Under this theory, the range ban is superfluous, as might be a large portion of the criminal code.

      The argument fails on three critical levels. *First,* it ignores that Plaintiffs have anticipated this sort of tactic by requesting an injunction from the application of "any other law" achieving

10

the same unconstitutional effect. The city cannot dress up a range ban under the guise of some other restriction, else the Court would be powerless to order the city to do anything. The city would always just invent another legal mechanism to circumvent any ruling. But the city has enacted a range ban for a reason: it wanted to ban ranges, because obviously, it did not feel it had achieved that effect through existing laws.[3]

*Second*, a bigger problem with the zoning argument is that the Supreme Court forbids the use of zoning to extinguish constitutional rights. In the landmark case of *Renton* v. *Playtime Theaters, Inc.*, 475 U.S. 41 (1986), the Supreme Court upheld restrictive zoning of adult establishments, to the extent these businesses were regulated for their secondary effects. Yet recognizing that these businesses nonetheless engaged in protected expression, the Court held: "the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city." *Renton*, 475 U.S. at 53. Ever since, adult zoning ordinances are measured largely by whether they effectively prohibit adult establishments, or merely limit their location pursuant to constitutional standards. *See*, *e.g. BBI Enters.* v. *City of Chicago*, 874 F. Supp. 890, 895 (N.D. Ill. 1995).

Of course gun ranges are not pornographic establishments. Lawful gun owners who would obtain a CFP must undergo multiple background checks, and all instructors are state-certified police trainers. The only secondary effects of a gun range, apart from noise that can be, as in the Blue Line range, mitigated, is the offense such establishments give to gun rights opponents. Even in the adult bookstore context, courts require regulators to come up with actual

---

[3]Had the city chosen to regulate gun ranges rather than ban them, this would have been a very different case, had it been filed at all. Plaintiffs do not suggest that the city is powerless to regulate ranges, but neither is the city required to do so, and regulation has yet to occur.

evidence justifying the regulation, not merely "the conjecture of their attorneys." *Palmetto*, 160 F. Supp. 2d at 882. Counsel's description of "arms being discharged en masse and with great frequency," Tr., 8/23/10, p. 51, l. 25 - p.52, l.1, does not even amount to a conjectural harm at a gun range, any more than "gasoline set ablaze en masse and with great frequency" could be used to describe internal combustion engines driven along a highway.

But there is a more profound problem with the city's zoning arguments: it describes an economic system in which there are no property rights. Under the city's argument, there would be no right to do anything with land, even unpack a tent, in the absence of governmental permission. And under this view, churches exist in Chicago not because they are protected by the First Amendment, but by the grace of the city council's permission. This is simply not the law. Without getting into an extended discussion of the concept of property, it is enough to note that the Supreme Court has ruled that when the government deprives a property owner of all expected uses of the property, a taking is effected under the Fifth Amendment. *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003 (1992).

A gun range is plainly consistent with the Accurate Perforating and Bell lands, which are industrial in character. If the city wants to zone for gun ranges, it is welcome to do so consistent with constitutional principles. But if the zoning law were read as a complete city-wide ban, then it, too, must be enjoined, just like the more explicit range ban challenged by Plaintiffs.

CONCLUSION

The irreparable harm is plain. Defendant lacks even an argument to sustain its unconstitutional law. Respectfully, Plaintiffs pray that the temporary restraining order be issued so that the range can operate as scheduled next week.

Dated: September 13, 2010 　　　　　　　　　　Respectfully submitted,

| Alan Gura (admitted pro hac vice) | David G. Sigale (Atty. ID# 6238103) |
| Gura & Possessky, PLLC | Law Firm of David G. Sigale, P.C. |
| 101 N. Columbus Street, Suite 405 | 4300 Commerce Court, Suite 300-3 |
| Alexandria, VA 22314 | Lisle, IL 60532 |
| 703.835.9085/Fax 703.997.7665 | 630.452.4547/Fax 630.596.4445 |

By: 　/s/ Alan Gura/　　　　　　　　　　By: 　　/s/ David G. Sigale/　　　　
　　　Alan Gura　　　　　　　　　　　　　　　David G. Sigale
　　　　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs

13

CERTIFICATE OF SERVICE

    The undersigned, an attorney of record for the plaintiffs, hereby certifies that on September 13, 2010, he served a copy of the above Memorandum of Points and Authorities in Support of the Motion for Temporary Restraining Order, and this certificate of service, on:

    Andrew W. Worseck
    City of Chicago Department of Law
    30 N. LaSalle Street, Suite 900
    Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).

    /s/ Alan Gura
    Alan Gura