# Exhibit A

Juliane Versnel September 2, 2010

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


EZELL, et al,                           )

                Plaintiffs,   ) No. 10-CV-5135

         vs.                      ) Judge

CITY OF CHICAGO,                        ) Virginia M.

              Defendants.    ) Kendall


         The deposition of JULIANE VERSNEL,
called as a witness for examination, taken pursuant
to the Federal Rules of Civil Procedure of the
United States District Courts pertaining to the
taking of depositions, taken before LISA C. HAMALA,
a Notary Public within and for the County of Cook,
State of Illinois, and a Certified Shorthand
Reporter of said state, CSR No. 84-3335, at Suite
1230, 30 North LaSalle Street, Chicago, Illinois,
on the 2nd day of September, A.D. 2010, at 1:40
p.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

2

1     PRESENT:

2

3          GURA & POSSESSKY, P.L.L.C.,

4          (101 North Columbus Street,  Suite 405,

5          Arlington, Virginia 22314,

6          703-835-9085), by:

7          MR. ALAN GURA,

8          alan@gurapossessky.com,

9                  -and-

10         LAW FIRM OF DAVID G. SIGALE, P.C.,

11         (Corporate West 1,

12         4300 Commerce Court, Suite 300-3,

13         Lisle, Illinois 60532,

14         630-452-4547), by:

15         MR. DAVID G. SIGALE,

16         dsigale@sigalelaw.com,

17             appeared on behalf of the Plaintiffs;

18

19

20

21

22

23

24



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

3

```
 1     PRESENT: (Continued)

 2

 3          CORPORATION COUNSEL

 4          CITY OF CHICAGO,

 5          (30 North LaSalle Street, Suite 1230,

 6          Chicago, Illinois 60602,

 7          312-744-4216), by:

 8          MR. ANDREW WORSECK,

 9          aworseck@cityofchicago.org,

10              appeared on behalf of the Defendants.

11

12     ALSO PRESENT:

13          MR. RICHARD PEARSON,

14              Illinois State Rifle Association.

15

16

17

18

19

20

21

22

23     REPORTED BY:   LISA C. HAMALA, CSR.

24                    Illinois CSR No. 84-3335.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

84

1        MR. GURA:   Objection.   Calls for speculation.

2   BY THE WITNESS:

3        A.    The truck can't come to Chicago until it

4   is legal for it to come to Chicago, so I don't know

5   what those dates will be.

6   BY MR. WORSECK:

7        Q.    Assume it was legal for the truck to be

8   in Chicago.   Assume you win your preliminary

9   injunction.   The judge's orders remain in force.

10            When will the truck be in Chicago?

11       A.    September 24 through October 1, I think.

12       Q.    One week?

13       A.    Yes.

14       Q.    It will be here for one week, and then

15   it will leave?

16       A.    Yes.

17       Q.    It will leave on October 2nd or

18   October 1st?

19       A.    Approximately.

20       Q.    How long will it be gone?

21       MR. GURA:   Objection.   Calls for speculation.

22   BY THE WITNESS:

23       A.    I don't know.

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

87

1    days.  At which point it would leave.  Mr. Tilbor,

2    Blue Line Corporation, would go to his next client.

3    BY MR. WORSECK:

4        Q.    You don't know when it would come back

5    to Chicago after it leaves?

6        A.    A second time?

7        MR. GURA:  Objection.  Calls for speculation.

8    BY THE WITNESS:

9        A.    It's impossible to determine that.

10   BY MR. WORSECK:

11       Q.    You don't even know if it would come

12   back after it leaves, correct?

13       MR. GURA:  Objection.  Calls for speculation.

14           You may answer that.

15   BY THE WITNESS:

16       A.    If we found it was extremely beneficial

17   in our fight to allow the citizens of Chicago to

18   exercise their second amendment right, we would

19   make arrangements for it to return.

20           The day would have to be determined

21   based on availability.

22   BY MR. WORSECK:

23       Q.    As you sit here now, SAF does not have

24   any specific contractual right to demand this truck



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                              September 2, 2010

88

1    come back to Chicago at any specific period of

2    time, or ever?

3         A.    Sorry.  That's not the way it reads in

4    Terms of Use.

5         MR. GURA:  The contract speaks for itself.

6    BY MR. WORSECK:

7         Q.    What about the Terms of Use provision

8    creates a problem with my question?

9         A.    The agreement that we signed says "The

10   rights provided for in this agreement shall be for

11   the periodic use of the trailer for a period of one

12   year from the date of this agreement as necessary

13   for firearms training, qualifications or general

14   use by the client as scheduled in advance by

15   written agreement of the parties."

16        It says it is good for a year.  I assume

17   we can bring it back subject to its availability

18   until July 25, 2011.

19        Q.    And you don't know what that future

20   availability is?

21        A.    No.

22        Q.    And to bring it back in the future

23   pursuant to this Term of Use provision, you have to

24   schedule it in advance by a written agreement?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1      Q.     Would that be applied to the $15,000

2   that would be due for the week the truck is in

3   town?

4      A.     I don't recall.

5      Q.     If the truck isn't here for say four

6   weeks, you don't have to pay $60,000 to Blue Line,

7   right?  You sort of pay as you go?

8      A.     No.  No.  The day I tell you to put the

9   truck on the road to come to Chicago is the day I

10   have to pay him $15,000, whether it is in Chicago

11   or not.

12      Q.     That $15,000 buys you one week of truck?

13      A.     Yes.

14      Q.     If that truck has to leave at the end of

15   that week, the meter stops ticking?  You don't owe

16   Jerry anything?

17      A.     I would have paid him $15,000.

18      Q.     You don't owe another $15,000 for the

19   following week because the truck is not here?

20      A.     We have a one-week contract at this

21   point, and he has somewhere else to go.

22      Q.     Where is your one-week contract?

23      A.     That may be a verbal understanding.

24      Q.     Is there any written agreement



Toll Free: 800.708.8087
Facsimile: 312.673.8138

**ESQUIRE**
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

91

1     scheduling in advance the truck's schedule in

2     Chicago that the SAF and Blue Line have executed?

3          A.    Oral communications.

4          Q.    Those oral communications have led to a

5     one-week contract?

6          A.    Yes.

7          Q.    Embodied in a one-week contract?

8          A.    Yes, an initial one week in Chicago.

9          Q.    You don't have any contract, be it oral

10    or written, for the truck to be here at any

11    particular point in time after that week?

12         A.    We have an option based on No. 3 to

13    request it.

14         Q.    You have no contract in place today for

15    the truck to come back after the one week that it

16    will be here, right?

17         MR. GURA:  Objection.  That misstates the

18    witness's testimony.  It is contrary to the record.

19         There are many people in Chicago that

20    understand options contracts.

21         MR. WORSECK:  She is the one bringing in these

22    subsidiary one-week contracts to the written

23    contract.

24         I'm trying to figure out what they are,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

93

1        MR. GURA:  That's fine.

2               Answer in a non-argumentative way.

3    BY THE WITNESS:

4        A.    My understanding is this.  This is a

5    service agreement.  He is agreeing to provide a

6    service.

7               This allows me to request those services

8    for one year.  If they are not available at the

9    specific time that I request, then we have the

10   opportunity to go forward and choose another date.

11   BY MR. WORSECK:

12       Q.    And any of those future dates are up in

13   the air at this point?

14       A.    Yes.

15       Q.    There's no specific date --

16       MR. WORSECK:  Asked and answered.

17   BY MR. WORSECK:

18       Q.    -- that exists today other than this

19   one-week period in September?

20       MR. GURA:  Objection.  Asked and answered.

21   You just asked the very same question.

22   BY MR. WORSECK:

23       Q.    -- where you have the contractual right

24   to demand the truck to be in Chicago.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

204

```
 1    STATE OF ILLINOIS )
 2                      )  SS:
 3    COUNTY OF C O O K )
 4              I, LISA C. HAMALA, a Notary Public
 5    within and for the County of Cook, State of
 6    Illinois, and a Certified Shorthand Reporter of
 7    said state, do hereby certify:
 8              That previous to the commencement of the
 9    examination of the witness, the witness was duly
10    sworn to testify the whole truth concerning the
11    matters herein;
12              That the foregoing deposition transcript
13    was reported stenographically by me, was thereafter
14    reduced to typewriting under my personal direction
15    and constitutes a true record of the testimony
16    given and the proceedings had;
17              That the said deposition was taken
18    before me at the time and place specified;
19              That I am not a relative or employee or
20    attorney or counsel, nor a relative or employee of
21    such attorney or counsel for any of the parties
22    hereto, nor interested directly or indirectly in
23    the outcome of this action.
24              IN WITNESS WHEREOF, I do hereunto set my
```



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                September 2, 2010

205

1    hand of Chicago, Illinois, this 7th day of

2    September, 2010.

3                    *Lisa Christine Hamala*

4            Notary Public, Cook County, Illinois.

5            My commission expires August 23, 2012.

6

7

8    C.S.R. Certificate No. 84-3335.

9

```
OFFICIAL SEAL
LISA CHRISTINE HAMALA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-23-2012
```

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO REGIONAL COUNCIL OF CARPENTERS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 CV 3372 |
| | ) | |
| JAMES REILLY, as Trustee of the Metropolitan Pier and Exposition Authority; METROPOLITAN PIER AND EXPOSITION AUTHORITY, a body politic and municipal corporation, and LISA MADIGAN, as Attorney General for the State of Illinois | ) ) ) ) ) ) | |
| | ) | The Honorable |
| Defendants. | ) | RONALD A. GUZMAN, |
| | ) | Judge Presiding. |

## ILLINOIS ATTORNEY GENERAL'S MOTION
## TO REASSIGN RELATED CASE PURSUANT TO LOCAL RULE 40.4

Two different labor unions have filed two separate complaints, naming the same defendants, and raising the same legal challenges to the same Illinois statutes. Because the cases filed by the Chicago Regional Council of Carpenters ("Carpenters") and Local 727, International Brotherhood of Teamsters ("Teamsters") arise from the same statute and involve overlapping issues of fact and law, they are related and should be reassigned pursuant to Local Rule 40.4.

### BACKGROUND

Public Acts 96-898 and 96-899 became effective on May 28, 2010. Teamster's Compl. ¶ 1.[1] On June 2, 2010, the Carpenters sued to have P.A. 96-898 declared unconstitutional. Carpenters Compl. ¶ 2. On June 9, 2010, the Carpenters filed an amended complaint, alleging

---

[1] In accordance with LR 40.4(c), a copy of the Teamsters' complaint is attached to this motion.

1

that P.A. 86-899 also was unconstitutional. Carpenters' Am. Compl. ¶ 2. On June 7, 2010, the

Teamsters sued to have P.A. 96-898 and P.A. 96-899 declared unconstitutional. Teamsters'

Compl. ¶ 1.

The Carpenters and the Teamsters sued the same Defendants: James Reilly, the

administrator of the Metropolitan Pier and Exposition Authority ("Authority"), the Authority,

and the Illinois Attorney General, Lisa Madigan, in her official capacity. *Compare* Carpenters'

Compl. *with* Teamsters' Compl.

Both the Carpenters and the Teamsters alleged that P.A. 898 and 899 were preempted by

the National Labor Relations Act. Carpenters' Am. Compl. Counts I-II; Teamster's Compl.

Count III. Both alleged that the Acts unconstitutionally impaired their contractual rights under

certain collective bargaining agreements. Carpenters' Am. Compl. Counts III-IV; Teamsters'

Compl. Counts I-II. Both alleged violations of the equal protection clause because the Acts

allegedly discriminated against union employees in favor of non-union employees. Carpenters'

Am. Compl. Count V; Teamsters' Compl. Count IV. Both alleged violations of the Illinois

Constitution's prohibition on "special legislation." Carpenters' Am. Compl. Count VII;

Teamsters' Compl. Count V. And both complaints alleged that the Acts were unenforceable

because they conflicted with the Illinois State Labor Relations Act. Carpenters' Am. Compl.

Count VIII; Teamsters' Compl. Count VII.

The Illinois Attorney General now moves pursuant to Local Rule 40.4 to reassign the

Teamsters' case, which is the higher-numbered complaint.

## DISCUSSION

Local Rule 40.4 provides for the reassignment of related cases. Under section (a) of the rule, two cases are related if, *inter alia*, they "involve some of the same issues of fact or law," or "grow out of the same transaction or occurrence." Two related cases should be assigned to the judge presiding over the lower-numbered case if

> (1) both cases are pending in the this Court;

> (2) the handling of both cases by the same judge is likely to result in substantial saving of judicial time and effort;

> (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and

> (4) the cases are susceptible to disposition in a single proceeding.

LR 40.4 (b).

All of the conditions set forth in Local Rule 40.4 are met. The cases share common legal and factual issues because all of the claims in both complaints challenge the same Illinois statutes, and the plaintiffs' legal claims are duplicative.

The cases are both pending in the United States District Court for the Northern District of Illinois. They are susceptible to disposition in a single proceeding because it makes obvious sense to resolve the same legal claims in the same proceeding. Indeed, doing so will save substantial judicial resources because only one, rather than two, judges will be necessary to adjudicate the legal issues involved in this case. Lastly, this motion to reassign is being filed before the defendants have filed any responsive pleadings so no judicial effort has yet been expended on either case.

Local Rule 40.4 states that a motion to reassign based on relatedness "should not generally be filed until after the answer or motions in lieu of answer." However, because the Teamsters, the plaintiff in the higher numbered case, filed a motion for a preliminary injunction, and set that motion for a hearing on June 21, 2010, it is likely that a substantial amount of judicial resources will be expended on the Teamsters' case before defendants file an answer or otherwise plead. Thus, this early filing is consistent with the purpose underlying Rule 40.4, which is to foster judicial economy and avoid wasting judicial resources.

Respectfully Submitted,

**LISA MADIGAN**
Attorney General
State of Illinois

By: /s/Paul Berks
**PAUL BERKS**
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312)814-2575

# EXHIBIT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LOCAL 727, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | Judge |
| METROPOLITAN PIER AND EXPOSITION AUTHORITY, JAMES REILLY, as Trustee of the Metropolitan Pier and Exposition Authority, and LISA MADIGAN, as Attorney General for the State of Illinois, | ) ) ) ) ) ) | Mag. Judge: |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff, LOCAL 727, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

("IBT") by and through its attorneys Marvin Gittler, Margaret Angelucci and Ryan Hagerty of

Asher, Gittler, & D'Alba, Ltd. complains of Defendants METROPOLITAN PIER AND

EXPOSITION AUTHORITY ("MPEA"), JAMES REILLY, as Trustee of the Metropolitan Pier

and Exposition Authority, and LISA MADIGAN, as Attorney General for the State of Illinois

(collectively "Defendants") as follows:

## NATURE OF THE ACTION

1.     This is an action for declaratory judgment and an injunction to declare certain

sections of Public Acts 898 and 899 (Senate Bills 28 and 3215), which amend the Metropolitan

Pier and Exposition Authority Act ("MPEA Act") and which were approved by the legislature

and enacted by the Governor of the State of Illinois on May 28, 2010, to be unconstitutional and

1

therefore null and void, under the Constitutions of the United States and the State of Illinios; and to enjoin Defendants from enforcing or acting under color of said sections of Senate Bills 28 and 3215. True and correct copies of Senate Bills 28 and 3215 are attached hereto as Exhibits A and B.

## JURISDICTION AND VENUE

2.     Count I and II arise under the Declaratory Judgment Act, 28 U.S.C. §2201, 42 U.S.C. §1983 and Article I, §10 of the Constitution of the United States. Count III arises under the Declaratory Judgment Act, 28 U.S.C. §2201, 29 U.S.C. §158, *et seq* and the Supremacy Clause of the United States Constitution, Article VI, Clause 2. Count IV arises under the Declaratory Judgment Act, 28 U.S.C. §2201, 42 U.S.C. §1983 and the Equal Protection Clause of the Fifth and Fourteenth Amendments to the Constitution of the United States. Counts V and VI arise under Article IV, §13 of the Illinois Constitution. Count VII arises under the Illinois State Labor Relations Act, 5 ILCS 315/1, *et seq.*

3.     Jurisdiction of Counts I-II is conferred on this Court by 28 U.S.C. §§1331 and 1343. This Court has supplemental jurisdiction of Count III pursuant to 28 U.S.C. §1367. Venue within this judicial district is proper under 28 U.S.C. § 1391(b).

## PARTIES

4.     Plaintiff Local 727 is an unincorporated labor organization which is the exclusive bargaining representative of employees employed by the MPEA and private contractors working in the trade show industry, including but not limited to Global Experience Specialists ("GES") and Freeman Decorating.

2

5.　　Plaintiff Local 727 is a labor organization as defined by the National Labor Relations Act ("NLRA"), 29 U.S.C. 152(5).

6.　　Defendant MPEA is a municipal corporation and has its principal office in the City of Chicago. (70 ILCS 210/3 (2010)

7.　　Defendant JAMES REILLY is the Trustee of the Defendant MPEA as designated by the legislature and is sued in his official capacity as Trustee.  As Trustee, Defendant Reilly has the responsibility to "to ensure the proper administration of the authority." (70 ILCS 210/14.5 (2010), including the implementation and enforcement of the MPEA Act, as amended.

8.　　Defendant LISA MADIGAN is the Attorney General of the State of Illinois.  As Attorney General, Defendant Madigan has the responsibility to enforce the laws passed by the General Assembly of the State of Illinois. (Illinois Constitution 1970 Article V, Section 15), including the implementation and enforcement of the MPEA Act, as amended.

## ALLEGATIONS COMMON TO ALL COUNTS

9.　　The MPEA is a political subdivision of the State of Illinois subject to the plenary authority of the Illinois General Assembly.

10.　　The MPEA owns and operates McCormick Place and Navy Pier, both of which are located in the City of Chicago.

11.　　The MPEA Act, as amended, defines "union employees" as follows:

"union employees" means workers represented by a labor organization, as defined in the National Labor Relations Act, providing skilled labor services to exhibitors, a show manager, or a show contractor on Authority premises.

70 ILCS 210/5.4(b).

3

12.     The MPEA employs workers under a collective bargaining agreement ("MPEA Agreement") entered into and currently in effect with Local 727, IBT.  A true and correct copy of the MPEA agreement which has an expiration date of December 31, 2011  is attached as Exhibit C.

13.     MPEA also rents space at its facilities to trade show managers who organize and sponsor tradeshows.

14.     Tradeshow managers have agreements with general contractors who are responsible for among other things constructing and dismantling the booths, transporting equipment and materials.

15.     General Contractors performing work at MPEA facilities employ private sector workers under collective bargaining agreements ("Tradeshow Agreement") entered into and currently in effect with Local 727, IBT.  A true and correct copy of the Tradeshow Agreement has an expiration date of December 31, 2013 and is attached as Exhibit D.

16.     Members of Local 727, who work under the MPEA and Tradeshow Agreements(Exhibits C and D) are workers represented by a labor organization, providing skilled labor services to exhibitors, a show manager, or a show contractor on Authority premises . These members are classified as "union employees" under the the MPEA Act, as amended.

17.     Members of Local 727, who work under the MPEA Agreement are public employees as defined under the Illinois State Labor Relations Act ("ISLRA").  5 ILCS 315/3(n).

18.     The ISLRA provides that employees as defined therein have the right to form, join or assist unions and to engage in other concerted activities for the purpose of collective

4

bargaining on such matters as wages, hours and terms and conditions of employment. 5 ILCS 315/6

19.     Members of Local 727 who work under the Tradeshow Agreement are employees within the meaning of the NLRA, 29 U.S.C. 152(3)

20.     The NLRA provides that employees as defined therein have the right to form, join or assist unions and to engage in other concerted activities for the purpose of collective bargaining on such matters as wages, hours and terms and conditions of employment. 29 U.S.C. §§ 157 and 158(a).

21.     The MPEA Act, as amended, specifically regulates, restricts and impairs the ability of union employees to negotiate with their employers with respect to wages, hours and working conditions for work performed on the premises of the MPEA as follows:

**70 ILCS 210/5.4(c):**

(1)     Consistent with safety and the skills and training necessary to perform the task, as determined by the Authority, an exhibitor and exhibitor employees are permitted in a booth of any size with the use of the exhibitor's ladders and hand tools to:

    (i)     set-up and dismantle exhibits displayed on Authority premises;

    (ii)     assemble and disassemble materials, machinery, or equipment on Authority premises; and

    (iii)     install all signs, graphics, props, balloons, other decorative items, and the exhibitor's own drapery, including the skirting of exhibitor tables, on the Authority's premises.

(2)     An exhibitor and exhibitor employees are permitted in a booth of any size to deliver, set-up, plug in, interconnect, and operate an exhibitor's electrical equipment, computers, audio-visual devices, and other equipment.

(3)     An exhibitor and exhibitor employees are permitted in a booth of any

5

size to skid, position, and re-skid all exhibitor material, machinery, and equipment on Authority premises.

(5)     The Authority shall designate areas, in its discretion, where exhibitors may unload and load exhibitor materials from privately owned vehicles at Authority premises with the use of non-motorized hand trucks and dollies.

(6)     On Monday through Friday for any consecutive 8-hour period during the hours of 6:00 a.m. and 10:00 p.m., union employees on authority premises shall be paid straight-time hourly wages plus fringe benefits. Union employees shall be paid straight-time and a half hourly wages plus fringe benefits for labor services provided after any consecutive 8-hour period; provided, however, that between the hours of midnight and 6:00 a.m. union employees shall be paid double straight-time wages plus fringe benefits for labor services.

(12)    The Authority has the power to determine, after consultation with the advisory council, the work jurisdiction and scope of work of union employees on Authority premises during the move-in, move-out, and run of a show, provided that any affected labor organization may contest the authority's determination through a binding decision of an independent, third-party arbitrator. When making the determination, the Authority or arbitrator, as the case may be, shall consider the training and skills required to perform the task, past practices on Authority premises, safety, and the need for efficiency and exhibitor satisfaction. These factors shall be considered in their totality and not in isolation. Nothing in this item permits the Authority to eliminate any labor organization representing union employees that provide labor services on the move-in, move-out, and run of the show as of the effective date of this amendatory act of the 96th General Assembly.

(13)    During the run of a show, all stewards of union employees shall be working stewards. Subject to the discretion of the authority, no more than one working steward per labor organization representing union employees providing labor services on authority premises shall be used per building and per show.

(14)    An exhibitor or show manager may request by name specific union employees to provide labor services on authority premises consistent with all state and federal laws. Union employees requested by an exhibitor shall take priority over union employees requested by a show manager.

(16)    Crew sizes for any task or operation shall not exceed 2 persons unless, after consultation with the Advisory Council, the Authority determines otherwise based on the task, skills, and training required to perform the task and on safety.

6

(19) A show manager or contractor shall charge an exhibitor only for labor services provided by union employees on Authority premises on a minimum half-hour basis.

70 ILCS 210/5.4(c).

22. The MPEA Act does not similarly restrict the ability of non-union employees to negotiate with their employer with respect to wages, hours and working conditions for work performed on the MPEA premises.

23. The amendments to the MPEA Act set and regulate labor policy on MPEA premises, and, therefore, interfere with national labor policy as established by the NLRA

24. The amendments to the MPEA Act are unlimited in duration, and, therefore, interfere with rights granted in the ISLRA and NLRA allowing employers and unions to negotiate collective bargaining agreements regarding wages, hours and terms and conditions of employment. 29 U.S.C. 157 and 5 ILCS 315/6.

25. The amendments to the MPEA Act are not narrowly tailored for one particular show or particular job or a specific project and mandate conditions of employment that are normally reserved for free and open negotiation between employers and labor organizations under the ISLRA and NLRA. 29 U.S.C. 157 and 5 ILCS 315/6.

26 Determination of private sector work jurisdiction and related disputes between labor organizations representing employees of the same employer or working in the same facility is reserved to the National Labor Relations Board pursuant to the jurisdictional dispute provisions of the NLRA. 29 U.S.C. §§158(b)(4) and 160(b)

27.     The jurisdictional dispute provisions of the MPEA Act, as amended, interfere with the federal labor policy by directing such disputes to the MPEA and a third party arbitrator. 70 ILCS 210/5.4(c)(12).

28.     The amendments to the MPEA Act specifically targets union employees for discriminatory treatment and arbitrarily fails to regulate the ability of similarly situated non-union employees to negotiate with respect to wages, hours or conditions of employment.

## COUNT I
## CONTRACT IMPAIRMENT
## (TRADE SHOW AGREEMENT)

Plaintiff incorporates by reference paragraphs 1 through 28 above as if fully set out in this Count I.

29.     There is currently a collective bargaining agreement between Local 727 and private contractors ( Exhibit D known as the "Trade Show Agreement")

30.     The Trade Show Agreement has a term of January 1, 2009 through December 31, 2013, and currently remains in full force and effect.

31.     The Trade Show Agreement Agreement contains provisions concerning the terms of wages, hours, and working conditions of union employees which are substantially different and which are more favorable to union employees than the terms of the wages, hours, and working conditions of the MPEA Act, as amended.

32.     Pursuant to Section 26.1 of the Trade Show Agreement, the parties agreed that the Company would "recognize the historical jurisdiction of the Teamsters work." (Exhibit D, §26.1).

33. Section 26.1 of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(1)-(3), (5) and (12), by allowing exhibitors and contractors to perform work historically within the exclusive jurisdiction of Local 727.

34. Pursuant to Section 2.1 (b) of the Trade Show Agreement, the parties agreed that the Company would employ all Referral Employees on the terms and conditions stated within the contract. (Exhibit D, §2.1(j))

35. Pursuant to Section 2.1(j) of the Trade Show Agreement, the parties agreed that Local 727 would make every reasonable effort to meet the <u>Contractors</u> request (by name) for Dock, Traffic and Leadmen Personnel. The parties agreed that the Company would rotate those requests. (Exhibit D, §2.1(j)(emphasis added)

36. Section 2.1 of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(14), as it now allow exhibitors to request union personnel by name, that such requests will take precedence over requests by Contractors, and it does not require any employee rotation.

37. Pursuant to Section 5.3(g) of the Trade Show Agreement, the parties agreed that the Union Steward shall be a working steward with 6 bargaining unit members or less per floor. (Exhibit D, §5.3(g))

38. Section 5.3(g) of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(13), as it limits the number of stewards to one per building and per show.

39. Pursuant to Section 14.1 of the Trade Show Agreement, the parties agreed to compensate employees for a guaranteed number of hours. (Exhibit D, §14.1)

9

40.     Section 14.1 of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(19), as it limits charges only for labor services provided by union employees.

41.     Pursuant to Section 14.3(a) of the Trade Show Agreement, the parties agreed to compensate employees at time and one-half for work performed before 8:00 a.m. and after 4:30 p.m. (Exhibit D, §14.3(a))

42.     Section 14.3(a) of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(6), as it prohibits certain overtime payments.

43.     Pursuant to a Trade Show Agreement Letter of Understanding, effective January 1, 2012, work historically performed by three man crews could be performed by two man crews (unless the Company chose otherwise) (Exhibit D, Letter of Understanding)

44.     The Letter of Understanding of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(16), as it immediately limits the crew size to 2.

45.     Pursuant to Section 10.1 of the Trade Show Agreement, the parties agreed that there would be no reduction or elimination of standards, privileges and benefits throughout the period of the agreement. (Exhibit D, §10.1)

46.     Section 10.1 of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4© , by all the aforementioned restrictions referenced in ¶¶ 23 and 34-46 above.

47. By reason of the foregoing, the MPEA Act, as amended, violates the Contracts Clause of the United States Constitution, Article I, Section 10, because it substantially impairs an existing contracts between the Plaintiff and private contractors

48. By reason of the foregoing, the MPEA Act, as amended, violates the Contracts Clause of the United States Constitution, Article I, Section 10 because it violates contractual rights which induced Local 727 on behalf of its members, to enter into the collective bargaining agreements with the private contractors, which were voted on and ratified by Local 727 members..

49. Defendants are acting under color of state law to violate the rights of the Plaintiff as guaranteed by the United States Constitution and pursuant to 42 U.S.C. 1983, this Court may grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A. Declaring that the MPEA Act, as amended, violates the Contracts Clause of the United States Constitution, Article I, Section 10, Clause 1 because it substantially impairs an existing contract between Local 727 and the private contractors and for that reason is unconstitutional and void.

B. Declaring that Defendants have acted under color of state law in infringing on the rights of Local 727 and its membership and are entitled to relief under 42 U.S.C. 1983.

C. Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendments to the MPEA Act.

D. Enter a judgment for money damages for lost wages and fringe benefit

11

contributions for each and every member of the collective bargaining unit who lost employment, wages and/or fringe benefits by reason of the unconstitutional amendments to the MPEA Act.

E.   Grant Local 727 leave to file their petition for costs and attorneys fees pursuant to 42 U.S.C. 1988.

**COUNT II**
**CONTRACT IMPAIRMENT**
**(MPEA AGREEMENT)**

Plaintiff incorporates by reference paragraphs 1 through 49 above as if fully set out in this Count II.

50.   There is currently a collective bargaining agreement between Local 727 and MPEA (Exhibit C) identified as "MPEA Agreement".

51.   The MPEA Agreement was entered into by Local 727's predecessor, Local 714, IBT and as successor, Local 727 and its members are entitled to the benefits of the MPEA Agreement I. (Exhibit C, Article 17)

52.   The MPEA Agreement has a term of January 1, 2007 through December 31, 2011, and currently remains in full force and effect.

53.   The MPEA Agreement contains provisions concerning the wages, hours, and working conditions of union employees which are substantially different and which are more favorable to union employees than the terms of the wages, hours, and working conditions of the MPEA Act, as amended.

54.   Pursuant to Section 11.1 of the MPEA Agreement, the parties agreed to compensate employees for a guaranteed number of hours on Saturdays. (Exhibit C, §11.1)

12

55.     Section 11.1 of the MPEA Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(19), as it limits charges only for labor services provided by union employees.

56.     Pursuant to Section 15.1 of the MPEA Agreement I, the parties agreed that the MPEA would not assign bargaining unit work outside of the bargaining unit. (Exhibit C, §15.1)

57.     Section 15.1 of the Trade Show Agreement was substantially impaired by MPEA Act, as amended, 70 ILCS 210/5.4(c)(1)-(3), (5) by allowing exhibitors and contractors to perform bargaining unit work.

58.     By reason of the foregoing, the MPEA Act, as amended, violates the Contracts Clause of the United States Constitution, Article I, Section 10, because it substantially impairs an existing contracts between Local 727 and the Defendant MPEA.

59.     By reason of the foregoing, the MPEA Act, as amended, violates the Contracts Clause of the United States Constitution, Article I, Section 10 because it violates contractual rights which induced Local 727 on behalf of its members to enter into the collective bargaining agreement with the Defendant MPEA.

60.     Defendants are acting under color of state law to violate the rights of Local 727 as guaranteed by the United States Constitution and pursuant to 42 U.S.C. 1983, this Court may grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.      Declaring that the MPEA Act, as amended, violates the violates the  Contracts Clause of the United States Constitution, Article I, Section 10,  because it substantially impairs

an existing contract between Local 727 and the MPEA and for that reason is unconstitutional and void.

B.      Declaring that Defendants have acted under color of state law in infringing on the rights of Local 727 and its membership and are entitled to relief under 42 U.S.C. 1983.

C.      Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendments to the MPEA Act.

D.      Enter a judgment for money damages for lost employment, wages and fringe benefits and/or contributions for each and every member of the collective bargaining unit who lost employment, wages and fringe benefit contributions by reason of the unconstitutional amendments to the MPEA Act.

E.      Grant Plaintiff leave to file their petition for costs and attorneys fees pursuant to 42 U.S.C. 1988.

**COUNT III**
**PREEMPTION**

Plaintiff incorporates by reference paragraphs 1 through 60 above, as if fully set out in this Count III.

61.     Congress has regulated the field of labor relations by passing the National Labor Relations Act, 29 U.S.C. 151, *et seq* ("NLRA") and by that legislation Congress has enacted an integrated and comprehensive scheme of regulation of labor relations in the private sector.

62.     By the enactment of the NLRA, states are preempted from enacting legislation which would regulate or otherwise interfere with the ability of private sector employees to

14

Case: 1:09-cv-03872 Document #: 21 Filed: 06/07/10 Page 33 of 22 PageID #:93

negotiate with their private employer with respect to the terms of wages, hours and working conditions.

63.     The MPEA Act, as amended, unlawfully regulates the ability of Local 727 to negotiate with employers with respect to the union employee's wages, hours and working conditions.

64.     The MPEA Act, as amended, violates the Supremacy Clause of the United States Constitution, Article VI, Clause 2, and for that reason is unconstitutional and void.

65.     Defendants are acting under color of state law in their violation of the rights of Local 727 as guaranteed by the United States Constitution and pursuant to 42 U.S.C. 1983 this Court may grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.     Declaring that the MPEA Act, as amended, is preempted by the NLRA,

B.     Declaring that the MPEA Act, as amended, violates the violates the Supremacy Clause of the United States Constitution, Article VI, Clause 2, and for that reason is unconstitutional and void.

C.     Declaring that Defendants have acted under color of state law in infringing on the rights of Plaintiff and its members and Plaintiff is entitled to relief under 42 U.S.C. 1983.

D.     Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendments to the MPEA Act.

E.     Enter a judgment for money damages lost employment, wages and fringe benefits and/or contributions for each and every member of the collective bargaining unit who lost

employment, wages and fringe benefits and/or contributions by reason of the unconstitutional amendments to the MPEA Act.

F.    Grant Plaintiff leave to file their petition for costs and attorneys fees pursuant to 42 U.S.C. 1988.

## COUNT IV
## EQUAL PROTECTION – ARBITRARY CLASSIFICATION

Plaintiff incorporates by reference paragraphs 1 through 65 above as if fully set out in this Count IV.

66.    The MPEA Act, as amended, defines "union employees" and provides those employees with fewer and less favorable rights than non-union employees.

67.    Union employees are prohibited from bargaining for wages, hours, and terms and conditions of employment more favorable than those set forth in the MPEA Act, as amended.

68.    Similarly situated non-union employees are not similarly prohibited from bargaining for wages, hours, and terms and conditions of employment more favorable than those set forth in the MPEA Act, as amended.

69.    The MPEA Act, as amended, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because the amendments create a legislative classification of "union employees" that is unreasonable and arbitrary.

70.    Defendants are acting under color of state law to violate the rights of Local 727 as guaranteed by the United States Constitution and pursuant to 42 U.S.C. 1983 this Court may grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

16

A.    Declaring that the MPEA Act, as amended, creates an unreasonable and arbitrary classification of "union employees".

B.    Declaring that the MPEA Act, as amended, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because the amendments create a legislative classification of "union employees" which is unreasonable and arbitrary and for that reason the above specified amendments to the MPEA Act are unconstitutional and void.

C.    Declaring that Defendants have acted under color of state law in infringing on the rights of Plaintiff and its membership and are entitled to relief under 42 U.S.C. 1983.

D.    Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendments to the MPEA Act.

E.    Enter a judgment for money damages, lost employment, wages and fringe benefits and/or contributions for each and every member of the collective bargaining unit who lost employment, wages and fringe benefit contributions by reason of the unconstitutional amendments to the MPEA Act.

F.    Grant Local 727 leave to file their petition for costs and attorneys fees pursuant to 42 U.S.C. 1988.

## COUNT V
## ILLINOIS CONSTITUTION
## SPECIAL LEGISLATION ("UNION EMPLOYEES")

Plaintiff incorporates by reference paragraphs 1 through 70 above, as if fully set out in this Count V.

71.    The Illinois Constitution of 1970, Article IV, Section 13 bans special legislation and states the following:

17

The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination.

72.     The Illinois Constitution of 1970, Article IV, Section 13 prohibits legislation which discriminates in favor of a select class of persons and against a similarly situated disfavored class of persons.

73.     The MPEA Act, as amended, treats "union employees" more restrictively and less favorably than it does non-union employees who are performing similar work.

74.     The MPEA Act, as amended, discriminates in favor of non-union employees without a sound and reasonable basis and is prohibited as special legislation under Article IV, Section 13 of the Illinois Constitution of 1970.

75.     Defendants are acting under color of state law to violate the rights of Local 727 as guaranteed by the Illinois Constitution of 1970 and pursuant to Article IV, Section 13, this Court is authorized to grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.     Declaring that the MPEA Act, as amended, creates an arbitrary and irrational classification of "union employees" which classification discriminates in favor of union employees and discriminates against similarly situated non-union employees without a sound and reasonable basis.

B.     Declaring that the MPEA Act, as amended, violates the Article IV, Section 13 of the Illinois Constitution of 1970 because the amendments create a legislative classification of unreasonably favors non-union employees and discriminates against similarly situated union employees.

18

C.    Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendments to the MPEA Act.

D.    Enter a judgment for money damages, lost employment, wages and fringe benefits and/or contributions for each and every member of the collective bargaining unit who lost employment, wages and fringe benefit contributions by reason of the unconstitutional amendments to the MPEA Act.

## COUNT VI
## ILLINOIS CONSTITUTION
## SPECIAL LEGISLATION (JAMES REILLY)

Plaintiff incorporates by reference paragraphs 1 through 75 above, as if fully set out in this Count VI.

76.    The MPEA Act, as amended, specifically appoints Defendant James Reilly to the position of Trustee of the MPEA . 70 ILCS 210/4.5:

As provided in Senate Bill 28 of the 96th General Assembly, the Trustee of the Authority is James Reilly . . . .

77.    The MPEA Act, as amended, discriminates in favor of Defendant Reilly without a sound and reasonable basis and is prohibited as special legislation under Article IV, Section 13 of the Illinois Constitution of 1970.

78.    The appointment of a Trustee for the MPEA could have been achieved without the specific legislative appointment of Defendant Reilly and is prohibited as special legislation under Article IV, Section 13 of the Illinois Constitution of 1970.

79.    Defendants are either enforcing the above specified amendments to the MPEA Act or are threatening to enforce those amendments. They are acting under color of state law to

violate the rights of Local 727 as guaranteed by the Illinois Constitution of 1970 and pursuant to

Article IV, Section 13, this Court is authorized to grant relief.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.      Declaring that the MPEA Act, as amended, discriminates in favor of Defendant

Reilly without a sound and reasonable basis.

B.      Declaring that the MPEA Act, as amended, violates the Article IV, Section 13 of

the Illinois Constitution of 1970 because the amendment discriminates in favor of Defendant

Reilly without a sound and reasonable basis.

C.      Enter a permanent injunction prohibiting Defendants from enforcing the above

specified amendment to the MPEA Act.

## COUNT VII
## ILLINOIS STATE LABOR RELATIONS ACT

Plaintiff incorporates by reference paragraphs 1 through 79 above, as if fully set out in

this Count VII.

80.     There is currently a collective bargaining agreement between Local 727 and

MPEA (attached as Exhibit C identified as "MPEA Agreement")

81.     The MPEA Agreement has a term of January 1, 2007 through December 31, 2011,

and currently remains in full force and effect.

82.     The ISLRA provides that:

in case of any conflict between the provisions of this Act and any other law . . . ,
relating to wages, hours and conditions of employment and employment relations,
the provisions of this Act or any collective bargaining agreement negotiated
thereunder shall prevail and control. 5 ILCS 315/15.

20

83.     The MPEA Act contains provisions concerning the terms of wages, hours, and working conditions of union employees which are substantially different than the rights provided in the MPEA Agreement.

84.     By reason of the foregoing, the MPEA Act, as amended, is in direct conflict with the MPEA Agreement.

85.     Due to the conflict the MPEA Agreement and the terms contained therein shall prevail and control.

WHEREFORE, Plaintiff prays that this Court enter an Order:

A.      Declaring that the MPEA Act, as amended, is in conflict with the MPEA Agreement.

B.      Declaring that the MPEA Agreement shall prevail and control.

C.      Enter a permanent injunction prohibiting Defendants from enforcing the above specified amendment to the MPEA Act.

D.      Enter a judgment for money damages, lost wages and fringe benefit contributions for each and every member of the collective bargaining unit who lost wages and fringe benefit contributions by reason of the amendments to the MPEA Act.

Respectfully submitted,

/s/ Margaret Angelucci
Marvin Gittler
Margaret Angelucci
Ryan Hagerty
Asher, Gittler & D'Alba
200 W. Jackson, Suite 1900
Chicago, Illinois 60606

21

# Exhibit C

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 4.0.3
### Eastern Division

Local 727, International Brotherhood of
Teamsters

                      Plaintiff,

v.                                     Case No.: 1:10−cv−03484
                                     Honorable Virginia M.
                                     Kendall

Metropolitan Pier and Exposition Authority, et
al.

                      Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, July 19, 2010:

      MINUTE entry before Honorable Virginia M. Kendall:Preliminary injunction
hearing date of 7/22/2010 is stricken pending ruling by Judge Guzman on the motion for
relatedness. Status hearing is set for 8/25/2010 at 09:00 AM.Mailed notice(jms, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at *www.ilnd.uscourts.gov*.

# Exhibit D

1

2

3

4      UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
5        EASTERN DIVISION

6

7

LOCAL 727, INTERNATIONAL    Case No. 1:10-cv-03484
8 BROTHERHOOD OF TEAMSTERS,

9  Plaintiff,       Chicago, Illinois
            July 28, 2010
10    v.        Motion for Temporary
            Restraining Order
11

METROPOLITAN PIER AND
12 EXPOSITION AUTHORITY, et al.,

13  Defendants.
  -------------------------------

14

15    TRANSCRIPT OF MOTION FOR TEMPORARY RESTRAINING ORDER
      BEFORE THE HONORABLE VIRGINIA M. KENDALL
16       UNITED STATES DISTRICT JUDGE

17

18 APPEARANCES:

19

20 For the Plaintiff:  Asher, Gittler, Greenfield,
          Cohen & D'Alba
21        By: Marvin Gittler,
          Margaret A. Angelucci, and
22         Ryan A. Hagerty
        200 W. Jackson Blvd., Ste. 1900
23       Chicago, IL 60606
        (312) 263-1500
24

25

1

2

3    <u>APPEARANCES (Cont'd)</u>:

4

5    For the Defendants:      Franczek Radelet PC
     MPEA and                By:  Michael A. Warner, Jr., and
6    James Reilly                  Sally J. Scott
                             300 S. Wacker Dr., Ste.  3400
7                            Chicago, IL 60606
                             (312) 986-0300
8

9    For the Defendant:       Illinois Attorney General's Office
10   Lisa Madigan            By:  Paul Berks, and
                                  Thomas A. Ioppolo
11                           100 W. Randolph St., 13th Fl.
                             Chicago, IL 60601
12                           (773) 343-3778

13

14

     <u>COURT REPORTER</u>:         FEDERAL OFFICIAL COURT REPORTER
15                           April M. Metzler, RPR, CRR, FCRR
                             219 South Dearborn St., Rm. 2318-A
16                           Chicago, IL 60604
                             (312) 408-5154
17                           April_Metzler@ilnd.uscourts.gov

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by notereading.

| | | |
|---|---|---|
| 09:25:26 | 1 | (Commenced at 9:25 a.m.) |
| 09:25:26 | 2 | THE CLERK:  10C3484, Local 727, International |
| 09:25:32 | 3 | Brotherhood of Teamsters versus Metropolitan Pier and |
| 09:25:41 | 4 | Exposition Authority. |
| 09:25:41 | 5 | MR. GITTLER:  Good morning, your Honor.  Marvin -- |
| 09:25:41 | 6 | THE COURT:  Hold on just one second. |
| 09:25:41 | 7 | (Discussion had off the record.) |
| 09:25:47 | 8 | THE COURT:  Gentlemen, just move aside for just a |
| 09:25:48 | 9 | second and let's see if we can recall, because you're going to |
| 09:25:51 | 10 | take longer -- we want to recall a case that's just a status. |
| 09:31:33 | 11 | (Recess taken.) |
| 09:31:33 | 12 | THE COURT:  All right.  Let's try again for the TRO. |
| 09:31:37 | 13 | THE CLERK:  10C3484, Local 727, International |
| 09:31:43 | 14 | Brotherhood of Teamsters versus Metropolitan Pier and |
| 09:31:45 | 15 | Exposition Authority. |
| 09:31:45 | 16 | MR. GITTLER:  Good morning, your Honor.  Marvin |
| 09:31:46 | 17 | Gittler, Local 727, plaintiff. |
| 09:31:49 | 18 | THE COURT:  Okay.  Good morning. |
| 09:31:51 | 19 | MS. ANGELUCCI:  Good morning, your Honor.  Margaret |
| 09:31:53 | 20 | Angelucci. |
| 09:31:53 | 21 | THE COURT:  I missed your last name. |
| 09:31:54 | 22 | MS. ANGELUCCI:  Angelucci, A-n-g-e-l-u-c-c-i. |
| 09:31:58 | 23 | THE COURT:  All right.  Good morning, Ms. Angelucci. |
| 09:32:00 | 24 | MR. HAGERTY:  Good morning, your Honor.  Ryan Hagerty |
| 09:32:02 | 25 | on behalf of the plaintiff. |

| | | |
|---|---|---|
| 09:32:02 | 1 | THE COURT: Okay. Good morning, Mr. Hagerty. |
| 09:32:04 | 2 | MR. WARNER: Good morning, your Honor. Michael |
| 09:32:07 | 3 | Warner on behalf of Metropolitan Pier and Exposition Authority |
| 09:32:09 | 4 | and James Reilly. |
| 09:32:10 | 5 | THE COURT: Good morning. |
| 09:32:11 | 6 | MS. SCOTT: Good morning. Sally Scott on behalf of |
| 09:32:14 | 7 | Metropolitan Pier and Exposition Authority and James Reilly. |
| 09:32:16 | 8 | THE COURT: Okay. Good morning. |
| 09:32:18 | 9 | MR. BERKS: Paul Berks on behalf of Lisa Madigan, the |
| 09:32:22 | 10 | Attorney General. |
| 09:32:22 | 11 | THE COURT: Good morning. Berks with a plural, |
| 09:32:23 | 12 | right? |
| 09:32:24 | 13 | MR. BERKS: B-e-r-k-s. |
| 09:32:25 | 14 | THE COURT: Okay. |
| 09:32:28 | 15 | MR. IOPPOLO: And Thomas Ioppolo also on behalf of |
| 09:32:31 | 16 | the Attorney General, Lisa Madigan. |
| 09:32:33 | 17 | THE COURT: Good morning, folks. |
| 09:32:34 | 18 | MR. IOPPOLO: Good morning, your Honor. |
| 09:32:34 | 19 | THE COURT: Okay. Well, I was hoping that Judge |
| 09:32:38 | 20 | Guzman would rule. I called Judge Guzman to ask him about the |
| 09:32:40 | 21 | relatedness issue. There is no reason -- I am an efficient |
| 09:32:45 | 22 | judge but there is no reason to do two times the work for two |
| 09:32:47 | 23 | of us, so that's why I had asked him about the relatedness |
| 09:32:51 | 24 | motion. |
| 09:32:51 | 25 | He said that he wasn't ready to rule on it. That's |

| 09:32:55 | 1 | why I moved your preliminary injunction motion.  I can't |
| 09:32:58 | 2 | imagine it's going to take too long for him to get to it, but |
| 09:33:03 | 3 | that was my intent in the sua sponte order that moved the |
| 09:33:09 | 4 | preliminary injunction. |
| 09:33:09 | 5 | But now, of course, we have the TRO where |
| 09:33:14 | 6 | defendants -- or, rather, plaintiffs -- excuse me -- are |
| 09:33:16 | 7 | alleging that factors have changed since the original filing, |
| 09:33:21 | 8 | because certain individuals have asserted that they will be |
| 09:33:26 | 9 | impacted in invoking this change in the statute, which they |
| 09:33:30 | 10 | believe will cause them harm. |
| 09:33:31 | 11 | So I will deal with the TRO now, and we'll still wait |
| 09:33:37 | 12 | for the preliminary injunction issue, depending on whether |
| 09:33:43 | 13 | Judge Guzman takes it or not, which I think you're going to |
| 09:33:46 | 14 | hear shortly.  I can't imagine it's going to take you too |
| 09:33:49 | 15 | long, but today we'll do the TRO. |
| 09:33:51 | 16 | So let me hear, first, from the plaintiffs as to why |
| 09:33:53 | 17 | you believe that you -- and I have received the motion and the |
| 09:33:58 | 18 | response and all the exhibits.  So I think I'm all set for |
| 09:34:02 | 19 | you. |
| 09:34:03 | 20 | MR. GITTLER:  Your Honor, if you'll allow, we -- or I |
| 09:34:08 | 21 | received the response to the TRO motion late yesterday.  I was |
| 09:34:14 | 22 | out of town until about 8:00 o'clock last night.  I went over |
| 09:34:21 | 23 | it, but my partners -- I may want to ask them to add to any |
| 09:34:29 | 24 | points that I may miss. |
| 09:34:31 | 25 | THE COURT:  Your colleagues? |

09:34:32   1          MR. GITTLER:  My colleagues.

09:34:33   2          THE COURT:  Oh, that's fine, your partners, that's

09:34:35   3   fine.

09:34:35   4          MR. GITTLER:  My brains actually.

09:34:37   5          (Laughter.)

09:34:39   6          MR. GITTLER:  Basically --

09:34:39   7          THE COURT:  Oh, I read it on the treadmill this

09:34:42   8   morning at 6:00, so ...

09:34:44   9          (Laughter.)

09:34:45   10         THE COURT:  So I don't know.  I didn't talk to my

09:34:47   11  partners or colleagues over here yet either.  So let's just

09:34:51   12  move forward and hear what your position is.

09:34:53   13         MR. GITTLER:  Thank you, your Honor.

09:34:55   14         Your Honor, the -- our presence today in a sense was

09:35:01   15  anticipated.  I will say, as you indicate, that I was

09:35:05   16  surprised that we haven't resolved the reassignment issue at

09:35:13   17  this point, and --

09:35:14   18         THE COURT:  You know, it's not a big issue.

09:35:17   19  Different judges do things differently.  I move things along

09:35:21   20  quickly.  I gave you the schedule quickly.  But even in my

09:35:25   21  desire to be efficient, it is shooting myself in the foot if

09:35:28   22  he is going to take it, and it's his call as to whether he

09:35:32   23  takes it.

09:35:33   24         So for a preliminary injunction, we have a little bit

09:35:35   25  of time to rule on those issues.  So if this motion was solely

| | | |
|---|---|---|
| 09:35:40 | 1 | triggered by a desire to move it along, I will be |
| 09:35:46 | 2 | disappointed.  If it is triggered by what you believe is |
| 09:35:50 | 3 | changed circumstances leading to irreparable injury, that's |
| 09:35:54 | 4 | why I'm dealing with it now for you. |
| 09:35:56 | 5 | MR. GITTLER:  And that, indeed, is our belief, your |
| 09:35:56 | 6 | Honor. |
| 09:35:59 | 7 | THE COURT:  Okay. |
| 09:35:59 | 8 | MR. GITTLER:  We've got approximately -- depending |
| 09:36:03 | 9 | upon which contract one looks at -- about 6- to 700 employees |
| 09:36:10 | 10 | covered by the trade agreement and another several hundred, |
| 09:36:17 | 11 | and at times maybe even more than that, covered by the MPEA |
| 09:36:23 | 12 | agreement. |
| 09:36:24 | 13 | We received information, as your Honor noted, that |
| 09:36:27 | 14 | effective August 1 the MPEA, along with the show managers, |
| 09:36:41 | 15 | show contractors, and, I assume, the exhibitors are going to |
| 09:36:46 | 16 | implement these rules, which were legislated about a month |
| 09:36:53 | 17 | ago, which rules will adversely affect our jurisdiction, our |
| 09:37:00 | 18 | jobs. |
| 09:37:02 | 19 | And I might point out that with jurisdiction and |
| 09:37:05 | 20 | jobs, by changing our contract to allow individuals or |
| 09:37:13 | 21 | companies with whom we have no relationship to do our work, it |
| 09:37:19 | 22 | will be ne'er impossible for us to monitor what losses may |
| 09:37:26 | 23 | attend to affected employees.  We just won't know who they |
| 09:37:32 | 24 | are. |
| 09:37:32 | 25 | And that point was made in a somewhat different |

09:37:35  1  context in our initial filings in the preliminary and are

09:37:41  2  contained in those documents.

09:37:43  3       THE COURT:  All right.  Let's cut to the chase.

09:37:45  4       In order to get a TRO, you need to allege that you

09:37:50  5  have an inadequate remedy at law.  And we know that you have a

09:37:53  6  lawsuit filed, that I will handle or Judge Guzman will handle.

09:37:59  7  We also know that money damages are available to you with that

09:38:05  8  lawsuit, if you were to win that lawsuit.  So we know that

09:38:09  9  those are available.

09:38:09  10       So you need to address what is the inadequate remedy

09:38:13  11  at law and the irreparable injury.  Because the way you stated

09:38:22  12  it in your brief is that is, quote, Harm of one or more of the

09:38:23  13  constitutional violations argued by plaintiffs -- which is

09:38:27  14  really nebulous and circular;

09:38:29  15       Harm in the form of interference with the right to

09:38:32  16  bargain -- which appears not to be the case, since both of the

09:38:35  17  individual firms that have contacted your clients have said

09:38:40  18  that they will bargain with you;

09:38:42  19       And harm in the form of damage of plaintiff's

09:38:45  20  reputation as an effective bargaining agent -- which doesn't

09:38:48  21  appear to exist if there is the ability to bargain;

09:38:54  22       Damage to plaintiff's relationship with its

09:38:56  23  membership -- that's an interesting one, which I would like to

09:38:59  24  hear more about.  I have not seen that as being substantiating

09:39:05  25  a TRO.

| | | |
|---|---|---|
| 09:39:05 | 1 | And then the likely loss of healthcare eligibility, |
| 09:39:09 | 2 | which is based on, from my review of the documents, a rather |
| 09:39:14 | 3 | speculative assessment that the employees will not be able to |
| 09:39:18 | 4 | work the same number of hours. |
| 09:39:20 | 5 | And when we do all of these harms and we're balancing |
| 09:39:25 | 6 | the damages to the defendants versus the plaintiffs, which is |
| 09:39:29 | 7 | one of our last factors, and taking into account society's |
| 09:39:37 | 8 | good as well, I have to ask a few questions, such as, number |
| 09:39:42 | 9 | one, if we're losing business over at the Metropolitan Pier -- |
| 09:39:47 | 10 | or McCormick Place, I'll say, I don't know if that's an |
| 09:39:50 | 11 | appropriate thing to call it anymore, whether there's so many |
| 09:39:53 | 12 | titles -- if we're losing business regularly and the |
| 09:39:56 | 13 | legislation comes in, and now we see signs, as documented to |
| 09:39:59 | 14 | me, that there may be an increase in business, if you're |
| 09:40:04 | 15 | losing business, wouldn't you be losing hours worked as it is? |
| 09:40:09 | 16 | So the harm is already being incurred pre-legislation for loss |
| 09:40:16 | 17 | of business that would result in less health benefits if there |
| 09:40:21 | 18 | were less hours, and now we might actually be eradicating that |
| 09:40:25 | 19 | harm because we have more business coming in. |
| 09:40:27 | 20 | So those are all of my initial thoughts. And since |
| 09:40:30 | 21 | this is a TRO, why don't you cut to the chase and address |
| 09:40:33 | 22 | those initial concerns. |
| 09:40:34 | 23 | MR. GITTLER: As far as those issues are concerned, |
| 09:40:38 | 24 | your Honor, there are several responses. One, the obligation |
| 09:40:44 | 25 | to bargain that is referred to in the two letters, it is an |

09:40:55   1   obligation that, in our view, merely, one, does not refute

09:41:07   2   irreparable harm. It is an admission of the impairment.

09:41:13   3        They're saying that we have impaired -- we have

09:41:20   4   alleged nine specific subjects of bargaining in our contracts

09:41:26   5   that cannot be enforced. The employers have said they cannot

09:41:33   6   and will not discuss these issues --

09:41:36   7        THE COURT: And can you put those nine specific -- I

09:41:39   8   read the contract. What are the nine specific impairments?

09:41:46   9   Because I thought it had to do with who was allowed to put

09:41:49   10   certain things up in the booths, size of the booths,

09:41:54   11   et cetera.

09:41:54   12        MR. GITTLER: It includes that. It includes -- that

09:42:00   13   listing -- can I have just one moment?

09:42:02   14        THE COURT: Absolutely. I think I do need to have

09:42:05   15   some meat on the bones for this, because it's only in regard

09:42:09   16   to what you're not allowed to do any longer, under your

09:42:14   17   agreement, that we can assess whether you're being harmed

09:42:18   18   irreparably, or if you are being harmed to the extent that you

09:42:21   19   have a lawsuit that may seek damages. And if you've got a

09:42:24   20   lawsuit that may seek damages, then we don't have equitable

09:42:28   21   relief. We just have work to do. So let's talk about the

09:42:31   22   equitable relief.

09:42:31   23        (No response.)

09:42:38   24        THE COURT: Just a nutshell. You don't have to be

09:42:39   25   very specific. Can you help me with that?

| | | |
|---|---|---|
| 09:42:41 | 1 | MS. ANGELUCCI: Sure. I think one of the biggest |
| 09:42:43 | 2 | issues is the work jurisdiction issue. |
| 09:42:44 | 3 | THE COURT: Okay. Which is what? |
| 09:42:45 | 4 | MS. ANGELUCCI: Historically, the Teamsters have been |
| 09:42:48 | 5 | given exclusive authority to perform certain work, docks, |
| 09:42:52 | 6 | delivering things to the exhibitors within the McCormick Place |
| 09:42:55 | 7 | area. Under the legislation now, the exhibitors, the |
| 09:42:58 | .8 | contractors, and pretty much anybody else can now do the |
| 09:43:01 | 9 | jurisdictional work of the Teamsters. |
| 09:43:03 | 10 | So with regard to the new shows generating work, |
| 09:43:07 | 11 | well, if everybody can do our work, we're not going to be |
| 09:43:09 | 12 | there to do it in the first place. So we've pretty much lost |
| 09:43:12 | 13 | the ability to do the work in its entirety. That's one of |
| 09:43:15 | 14 | the -- and one of the most important impairments. |
| 09:43:18 | 15 | The second impairment is -- and this is found in |
| 09:43:21 | 16 | several different areas, but the decrease of overtime hours. |
| 09:43:26 | 17 | I think there's three different sections under 5.4(c) that |
| 09:43:30 | 18 | directly impact that. |
| 09:43:31 | 19 | The two other sections deal with jurisdictional |
| 09:43:34 | 20 | disputes. Now, MPEA is saying, There's a jurisdictional |
| 09:43:39 | 21 | dispute between anybody. We're resolving it. So if Teamsters |
| 09:43:42 | 22 | come up and say, Look, they're doing our work, MPEA gets to |
| 09:43:47 | 23 | decide whether or not that's a valid dispute. Historically |
| 09:43:50 | 24 | that's been decided by the NLRB. |
| 09:43:53 | 25 | Additionally, there's violations of the contract that |

09:43:55  1   talk about the referral system.  727 has a referral system.

09:43:59  2   Employees are on the books to get the work, and that has been

09:44:03  3   a function of contractors requesting employees through the

09:44:06  4   referral system.

09:44:07  5           Now that has changed and the exhibitors are now able

09:44:11  6   to -- and MPEA is now able to go to the referral system and

09:44:16  7   make direct --

09:44:16  8           MR. WARNER:  Your Honor, if I may, on that one point,

09:44:19  9   the referral -- the ability of exhibitors to request

09:44:23  10  employees, that is not being implemented on August 1st.

09:44:26  11          MS. ANGELUCCI:  We were not aware of that.

09:44:28  12          THE COURT:  Okay.

09:44:28  13          MR. WARNER:  It's in the memo -- it's in the notice

09:44:30  14  that they -- that -- the rules that are being implemented is

09:44:34  15  in the notice.  They attached it as part of their motion.

09:44:36  16          THE COURT:  Okay.

09:44:39  17          MR. GITTLER:  Do you know when will it be?

09:44:40  18          MR. WARNER:  No.  For some of the reasons that

09:44:43  19  plaintiff points out, there's complexities into how to come up

09:44:47  20  with the mechanism for exhibitors to do that and to coordinate

09:44:51  21  things with all the parties, so that particular part of the

09:44:55  22  statute is going to take some time.  They're working on

09:44:57  23  developing a process.  They may have -- I imagine they

09:45:00  24  probably even talked to the Teamsters representatives about

09:45:03  25  that.  But there's been --

| | | |
|---|---|---|
| 09:45:05 | 1 | MS. ANGELUCCI:  Not that we know of. |
| 09:45:06 | 2 | THE COURT:  Okay. |
| 09:45:07 | 3 | MR. GITTLER:  As of this morning, your Honor -- |
| 09:45:08 | 4 | THE COURT:  Okay.  This is the way we're going to do |
| 09:45:10 | 5 | it, folks.  You're speaking right now.  What's your name |
| 09:45:12 | 6 | again? |
| 09:45:12 | 7 | MS. ANGELUCCI:  Margaret Angelucci. |
| 09:45:14 | 8 | THE COURT:  All right.  She's speaking right now, and |
| 09:45:16 | 9 | I'll give you a chance to respond.  All right.  So referral |
| 09:45:18 | 10 | system, you can respond to that in a minute. |
| 09:45:20 | 11 | What else? |
| 09:45:20 | 12 | MS. ANGELUCCI:  There's a change in the crew size. |
| 09:45:22 | 13 | The Teamsters have negotiated that effective in 2012 they |
| 09:45:26 | 14 | would agree that certain work could be quanitified, crew sizes |
| 09:45:29 | 15 | made up of two men or women.  They -- under the legislation, |
| 09:45:33 | 16 | it's implemented immediately that that crew size is reduced to |
| 09:45:36 | 17 | two.  So we're now cut out by, obviously, 30 percent of the |
| 09:45:39 | 18 | work. |
| 09:45:39 | 19 | THE COURT:  Okay. |
| 09:45:40 | 20 | MS. ANGELUCCI:  And I believe the last one is the |
| 09:45:43 | 21 | ability to have union representation on the floors.  Under the |
| 09:45:48 | 22 | contract, there was one steward for every six employees.  Now, |
| 09:45:53 | 23 | under the legislation, there's one steward for an entire show |
| 09:45:57 | 24 | per floor.  So that has significantly limited our ability to |
| 09:46:00 | 25 | represent our members, because we don't have representatives |

| | | |
|---|---|---|
| 09:46:02 | 1 | out there ready and able to address the issues of our members. |
| 09:46:06 | 2 | THE COURT: Okay. All right. Now that we have that, |
| 09:46:09 | 3 | so those are the harms. And why are -- why is any one of |
| 09:46:17 | 4 | those harms one that is irreparable and not capable of being |
| 09:46:22 | 5 | redressed through monetary damages? |
| 09:46:28 | 6 | MR. GITTLER: The reason behind that, your Honor, as |
| 09:46:33 | 7 | I indicated a few moments ago, there is no way with the |
| 09:46:37 | 8 | exception of some of the crew size reductions -- and only |
| 09:46:44 | 9 | some -- but there's no way we can monitor how and who this |
| 09:46:51 | 10 | work is going to be lost or lost to. We have no relationship |
| 09:46:57 | 11 | with the exhibitors, that is, we have no contractual |
| 09:47:01 | 12 | relationship with the exhibitors. We have no relationship |
| 09:47:03 | 13 | with the show managers. We do have a contract relationship |
| 09:47:09 | 14 | with the contractor. The contractor, I don't know -- |
| 09:47:15 | 15 | THE COURT: So what is impaired then? |
| 09:47:20 | 16 | MR. GITTLER: What is impaired -- |
| 09:47:21 | 17 | THE COURT: You have to articulate -- |
| 09:47:23 | 18 | MR. GITTLER: What is impaired are those terms of our |
| 09:47:27 | 19 | contract, which gave us the legal right to do this work where |
| 09:47:34 | 20 | others could not. |
| 09:47:35 | 21 | THE COURT: And that's remedy that can be redressed |
| 09:47:39 | 22 | with monetary damages. |
| 09:47:40 | 23 | MR. GITTLER: But, your Honor, we have no way to |
| 09:47:42 | 24 | identify individuals who are going to be adversely affected. |
| 09:47:49 | 25 | That is a key issue for us. |

| | | |
|---|---|---|
| 09:47:54 | 1 | Additionally -- |
| 09:47:54 | 2 | THE COURT: I don't understand that. I'm sorry. Can |
| 09:47:56 | 3 | you explain what you mean by that? |
| 09:47:58 | 4 | MS. ANGELUCCI: Let me take a crack. |
| 09:47:59 | 5 | THE COURT: Sure. |
| 09:48:00 | 6 | MR. GITTLER: Go ahead. |
| 09:48:01 | 7 | MS. ANGELUCCI: The -- when the exhibitors are doing |
| 09:48:03 | 8 | the work, there's no way for us to identify that employee John |
| 09:48:08 | 9 | Doe would have done that work but for the violation of the |
| 09:48:11 | 10 | contract. |
| 09:48:11 | 11 | In addition, if we're not in there, there's no way |
| 09:48:14 | 12 | for us to quantify the number of people that would have been |
| 09:48:17 | 13 | doing the work or the hours that would have been performed. |
| 09:48:20 | 14 | THE COURT: Well, you're not prohibited from being |
| 09:48:22 | 15 | there. You're still there. The hours -- you're limited, |
| 09:48:26 | 16 | right? |
| 09:48:26 | 17 | I mean, my understanding of the legislation is that |
| 09:48:29 | 18 | it gives broader ability for others to do what was primarily |
| 09:48:36 | 19 | union work before, so that an exhibitor, for example, in a 300 |
| 09:48:41 | 20 | or less square foot exhibit, can now put up a poster or lights |
| 09:48:46 | 21 | hanging or whatever else, where they before would have to |
| 09:48:49 | 22 | require a union person to come in. |
| 09:48:51 | 23 | MS. ANGELUCCI: That's kind of the work of the |
| 09:48:53 | 24 | carpenters, but I understand what you're saying. |
| 09:48:54 | 25 | THE COURT: Okay. So that's my limited |

| | | |
|---|---|---|
| 09:48:57 | 1 | understanding.  I'm just trying to make it like -- put some |
| 09:49:00 | 2 | meat on the bones.  So if that's the situation or the scenario |
| 09:49:04 | 3 | then, you would have documentation of all exhibitors within |
| 09:49:09 | 4 | the show, right? |
| 09:49:10 | 5 | MS. ANGELUCCI:  Well -- |
| 09:49:11 | 6 | THE COURT:  And you're on the floor, right? |
| 09:49:13 | 7 | MS. ANGELUCCI:  We don't know.  I mean, if they're |
| 09:49:15 | 8 | doing our work, we don't even know if we're going to be there. |
| 09:49:19 | 9 | THE COURT:  Oh, you're assuming that all of the |
| 09:49:20 | 10 | exhibitors can do all of their own work and will not even be |
| 09:49:21 | 11 | there? |
| 09:49:21 | 12 | MS. ANGELUCCI:  Under the legislation, there's |
| 09:49:24 | 13 | nothing that prohibits the exhibitors from doing all the work. |
| 09:49:27 | 14 | There's nothing that says, If you do X amount of work, then -- |
| 09:49:31 | 15 | THE COURT:  Well, that's not what your motion |
| 09:49:33 | 16 | alleged, that you are being completely removed from McCormick |
| 09:49:36 | 17 | Place. |
| 09:49:36 | 18 | MS. ANGELUCCI:  I mean, at this point, because -- |
| 09:49:37 | 19 | THE COURT:  But isn't that speculation? |
| 09:49:39 | 20 | MS. ANGELUCCI:  We don't know what's going to happen. |
| 09:49:40 | 21 | THE COURT:  Okay. |
| 09:49:41 | 22 | MS. ANGELUCCI:  I mean, under the legislation, |
| 09:49:41 | 23 | there's no limitation on that. |
| 09:49:44 | 24 | Also, to follow up on the irreparable harm -- |
| 09:49:44 | 25 | THE COURT:  Well, there is a limitation under the |

| | | |
|---|---|---|
| 09:49:47 | 1 | legislation, right?  I mean, the legislation defines when |
| 09:49:51 | 2 | someone else can do work that you say you normally had the |
| 09:49:54 | 3 | ability to do, and it doesn't take all work away. |
| 09:49:58 | 4 | MR. GITTLER:  It doesn't define when, your Honor. |
| 09:49:59 | 5 | THE COURT:  It defines what the work is. |
| 09:50:01 | 6 | MS. ANGELUCCI:  The only -- |
| 09:50:02 | 7 | MR. GITTLER:  But not when. |
| 09:50:04 | 8 | THE COURT:  Well, what's the distinction with you, |
| 09:50:07 | 9 | Counselor? |
| 09:50:07 | 10 | MR. GITTLER:  The distinction is, as I said -- and |
| 09:50:11 | 11 | apparently not clear enough -- there is no way to police the |
| 09:50:18 | 12 | impairment done to our members.  We can't say, Who did -- Who |
| 09:50:27 | 13 | did our work?  We can't go around and police the exhibits. |
| 09:50:34 | 14 | Technically, your Honor's point -- and I understand |
| 09:50:38 | 15 | it -- is that somebody's going to lose a job, therefore, |
| 09:50:43 | 16 | somebody's going to lose money, therefore we have a remedy at |
| 09:50:47 | 17 | law. |
| 09:50:48 | 18 | We don't know, your Honor, who's going to lose the |
| 09:50:51 | 19 | job -- |
| 09:50:52 | 20 | THE COURT:  But that's speculation of damages.  It's |
| 09:50:55 | 21 | not irreparable harm.  That's speculative damages, which maybe |
| 09:50:59 | 22 | you would need to call in an expert to quantify for you.  I |
| 09:51:02 | 23 | mean, in order to get equitable relief, you have to have -- to |
| 09:51:06 | 24 | me, the strongest part that you have for equitable relief is |
| 09:51:10 | 25 | your interference with your right to bargain.  And that is |

| | | |
|---|---|---|
| 09:51:17 | 1 | unfortunately addressed, I think, in those letters saying, |
| 09:51:21 | 2 | We're still willing to bargain. |
| 09:51:22 | 3 | MS. ANGELUCCI: Your Honor, on -- following up on the |
| 09:51:25 | 4 | irreparable harm, being able to quantify what the damages are, |
| 09:51:29 | 5 | even if that were accurate, which we obviously take issue |
| 09:51:32 | 6 | with, the -- we don't -- who would we sue? GES and Freeman |
| 09:51:39 | 7 | are the largest show managers. They haven't put in -- |
| 09:51:40 | 8 | THE COURT: Well, you're not suing the exhibitors. |
| 09:51:42 | 9 | You're suing -- |
| 09:51:43 | 10 | MS. ANGELUCCI: We can't -- |
| 09:51:44 | 11 | THE COURT: No, but that's not your remedy. |
| 09:51:46 | 12 | Let me hear from the defense. |
| 09:51:48 | 13 | MR. WARNER: Okay. First of all, the issue they |
| 09:51:53 | 14 | raise regarding they can't sue exhibitors raises a huge and |
| 09:51:59 | 15 | insurmountable hurdle for their case on the merits. |
| 09:52:02 | 16 | As you pointed out, your Honor, and as plaintiff |
| 09:52:05 | 17 | pointed out, they have no contractual relationship with the |
| 09:52:08 | 18 | exhibitors. That ruins all -- their entire case. They're |
| 09:52:14 | 19 | alleging a contractual impairment. The provision that they're |
| 09:52:18 | 20 | relying on is a provision in the collective bargaining |
| 09:52:21 | 21 | agreement between the Teamsters and the contractors that |
| 09:52:25 | 22 | employ the Teamsters. |
| 09:52:26 | 23 | That provision says: The company, i.e., the |
| 09:52:31 | 24 | contractor, agrees to recognize the historical jurisdiction of |
| 09:52:35 | 25 | Teamsters work. That provision is not affected in any way by |

09:52:38   1   this legislation.  The contractor, if any bit of work -- if an

09:52:42   2   exhibitor hires out a contractor to do any bit of work that

09:52:45   3   falls within the type of work that the Teamsters traditionally

09:52:48   4   do, the Teamsters are doing that work.

09:52:51   5           Plus, there's still a lot of work for Teamsters to do

09:52:54   6   in that regard, where exhibitors are going to continue to hire

09:52:58   7   and need to hire contractors to have union labor to do the

09:53:02   8   work.

09:53:02   9           In the legislation, exhibitors are prohibited from

09:53:10   10  using any equipment, motorized equipment to unload vehicles,

09:53:14   11  unload trucks.  As you may know, your Honor, shows that occur

09:53:17   12  at McCormick Place, the booths, the exhibits, the equipment

09:53:20   13  that's exhibited, they're huge.  There's no way that that

09:53:23   14  equipment is not getting in the building without the

09:53:27   15  assistance of the Teamsters.

09:53:30   16          THE COURT:  So what, in your opinion, is the

09:53:33   17  limitation that the -- what was the purpose of the

09:53:35   18  legislation?

09:53:36   19          MR. WARNER:  Your Honor, quite simply, when -- on the

09:53:39   20  work rules and the rules that allow exhibitors now to do work

09:53:43   21  on their own property, it's as simple as:  I am a small

09:53:48   22  exhibitor.  Everything I need is packed in my car.  I can

09:53:51   23  carry it.  I can carry it myself into the facility.  Under the

09:53:56   24  old regime, that exhibitor had to hire a contractor to then

09:54:04   25  have a Teamster carry the stuff in for him.

09:54:05 1        What the law says is, Common sense proposition.  I,

09:54:09 2  as a small exhibitor, who probably couldn't afford to attend

09:54:12 3  this show, if I had to pay a contractor to do this work for

09:54:15 4  me, can now attend the show.  I can do my own work.  If I'm

09:54:18 5  perfectly capable of it, if I don't need equipment to do it,

09:54:22 6  if I'm not pulling up semis to the dock to unload my booths

09:54:26 7  and exhibits, I can do that.

09:54:28 8        And when you go -- and I refer you, your Honor, to

09:54:31 9  the chart that's attached as Exhibit G to our preliminary

09:54:36 10  injunction response.  In that chart we go provision by

09:54:41 11  provision.  We identify and cite verbatim the provision of the

09:54:48 12  statute that the Teamsters claim is impairing their

09:54:51 13  contractual relationships.  And then in the middle column we

09:54:56 14  identify the contract- -- the contract provision that they

09:54:59 15  claim is being impaired.

09:55:02 16        And when you go through all of these, what you end up

09:55:08 17  with, the only true conflict -- and we'll concede that this is

09:55:14 18  where it does require a change in what is under their current

09:55:18 19  collective bargaining agreement -- is with the overtime

09:55:19 20  provisions.  And those changes are minimal.

09:55:25 21        The real -- the only change here is that between the

09:55:30 22  hours of 6:00 a.m. and 8:00 a.m. where an employee used to

09:55:39 23  be -- used to be able to earn time and a half, they now get

09:55:42 24  straight time.  Between the hours of 4:30 and 10:00 p.m., they

09:55:46 25  now also get straight time rather than time and a half.  If

09:55:50  1   this is the only possible conflict, that is patently able to

09:55:57  2   be figured out in terms of money damages.

09:56:02  3          If an employee who works those hours who would have

09:56:06  4   gotten overtime under the collective bargaining agreement but

09:56:08  5   does not under the new statute, you can always figure that out

09:56:12  6   later:  hours worked by time and a half.

09:56:15  7          MR. GITTLER:  Your Honor, that -- that is not an

09:56:18  8   accurate statement of the statute.  There are no limits.

09:56:23  9   There had been, by the way, a 300-square-foot limit.  That's

09:56:28  10  just been totally eliminated.

09:56:30  11         They can now -- they, the exhibitors --

09:56:32  12         MR. WARNER:  Your Honor, if I --

09:56:32  13         THE COURT:  In a minute.  I'll give you a chance.

09:56:34  14         MR. GITTLER:  -- can now do whatever work they, the

09:56:40  15  exhibitor, feels regardless of its impact on our membership.

09:56:48  16         The representation --

09:56:52  17         THE COURT:  I find that to be a rather strong

09:56:54  18  statement from reading the new rules that I read, because the

09:57:13  19  in-booth work, if it was -- if you could no longer do any

09:57:18  20  work, then why wouldn't it simply be you don't ever have to

09:57:22  21  use union contractors?  I mean, are you essentially saying

09:57:25  22  that all of your workers are out?  I find that hard to

09:57:29  23  believe.

09:57:29  24         What about the big equipment?  What about the loading

09:57:32  25  and unloading at the docks?

09:57:34  1        MR. GITTLER:  I don't think I said all will.

09:57:38  2        THE COURT:  All what?

09:57:39  3        MR. GITTLER:  I didn't say all will be out of work.

09:57:43  4   Legally now they can put our members out of work.  Will it

09:57:51  5   happen?  Your Honor, I have represented labor organizations

09:57:57  6   who have worked for employees in companies that at the time

09:58:05  7   nobody ever fathomed they would go out of business.  I was

09:58:09  8   just having a conversation relating to Montgomery Ward and

09:58:13  9   Company.

09:58:14  10       There are companies that are going out of business

09:58:17  11  every day of the week.  I can't speculate on how many will be

09:58:24  12  affected.  I can say to your Honor, as we have in the briefs

09:58:29  13  and in the filings, that what was legally protected is no

09:58:36  14  longer legally protected, and there lies the potential harm.

09:58:43  15       And to use that and counsel's argument as a segue to

09:58:49  16  what I believe is an even more significant point, a point

09:58:54  17  which your Honor touched upon just a few moments ago, what

09:59:00  18  they have done is intruded into our ability to enforce and

09:59:12  19  negotiate terms and conditions, which are mandatory subjects

09:59:17  20  of bargaining, which the NLRB -- over which the NLRB has

09:59:25  21  jurisdiction and which almost every Court that has considered

09:59:30  22  the issue -- and I believe all Courts that have considered the

09:59:34  23  issue -- once you intrude into the bargaining process, a state

09:59:41  24  government, when you intrude into a bargaining process, you

09:59:47  25  lose your authority, you lose your jurisdiction, you lose --

| | | |
|---|---|---|
| 09:59:52 | 1 | you are preempted from violating the rules of the marketplace |
| 09:59:59 | 2 | between union and employer, or -- excuse me -- and you are |
| 10:00:08 | 3 | also preempted because -- and it's been said here -- you |
| 10:00:15 | 4 | either have or arguably will commit an unfair labor practice. |
| 10:00:22 | 5 | The latter is the Garmon preemption that we have argued |
| 10:00:26 | 6 | extensively in the briefs. The former is what is referred to |
| 10:00:30 | 7 | as the Machinists preemption. |
| 10:00:34 | 8 | The Machinists preemption -- and I don't think it's |
| 10:00:38 | 9 | an oversimplification -- says, Congress intended to leave |
| 10:00:43 | 10 | bargaining between employers and unions covered by the Act to |
| 10:00:51 | 11 | the free forces of the market, negotiate and agree upon what |
| 10:00:57 | 12 | serves your interest, but the state cannot intrude into that. |
| 10:01:04 | 13 | The minute you do, you're preempted. The state does not have |
| 10:01:09 | 14 | the authority. |
| 10:01:10 | 15 | The Garmon preemption is the one that says, among |
| 10:01:15 | 16 | other things, If you unilaterally change your terms and |
| 10:01:20 | 17 | conditions of employment, you have almost certainly but at |
| 10:01:25 | 18 | least arguably committed an unfair labor practice. What we |
| 10:01:30 | 19 | have here, your Honor, is not only a change but a change over |
| 10:01:36 | 20 | which the general assembly, the MPEA, and now two of our |
| 10:01:45 | 21 | contractors have said, We cannot bargain with you about. We |
| 10:01:51 | 22 | cannot bargain with you about crew size. We cannot bargain |
| 10:01:55 | 23 | with you about overtime. We won't even let you bargain about |
| 10:02:00 | 24 | the number of representatives you have on the floor to ensure |
| 10:02:04 | 25 | that your rights are protected. |

| | | |
|---|---|---|
| 10:02:07 | 1 | This is something over which, we believe, the state |
| 10:02:14 | 2 | authority had no right to intrude or to rule. |
| 10:02:20 | 3 | THE COURT: But that's not what they said. |
| 10:02:22 | 4 | MR. GITTLER: I'm sorry? |
| 10:02:22 | 5 | THE COURT: They said, Well, we can't change the law, |
| 10:02:24 | 6 | as it impacts our collective bargaining agreements. We |
| 10:02:27 | 7 | will -- we are willing to meet with you to bargain over the |
| 10:02:31 | 8 | effects of the Reform Act on our employees and your members, |
| 10:02:35 | 9 | so -- |
| 10:02:35 | 10 | MR. GITTLER: But what will we bargain over? |
| 10:02:35 | 11 | THE COURT: I don't know. I don't know. |
| 10:02:37 | 12 | MR. GITTLER: Excuse me. |
| 10:02:38 | 13 | MS. ANGELUCCI: Your Honor, there's -- there's a |
| 10:02:39 | 14 | difference between issue bargaining, which is bargaining over |
| 10:02:43 | 15 | crew size, overtime, jurisdiction, and impact bargaining or |
| 10:02:47 | 16 | effects bargaining. They're entirely two different things. |
| 10:02:49 | 17 | What that letter is saying is, We cannot bargain |
| 10:02:53 | 18 | about the issue about overtime. What we can bargain is how |
| 10:02:55 | 19 | it's going to affect your members. That's entirely different. |
| 10:02:58 | 20 | The fact that we can't even bargain about the |
| 10:03:01 | 21 | underlying issue is the problem. We can't bargain overtime; |
| 10:03:06 | 22 | that's in contradiction to the legislation. We can't bargain |
| 10:03:09 | 23 | jurisdiction; that's in contradiction to the legislation. All |
| 10:03:12 | 24 | of those things are what is preempted. And the impact or the |
| 10:03:16 | 25 | effects bargaining is something entirely different, as |

| | | |
|---|---|---|
| 10:03:19 | 1 | recognized under the NLRA, and that's what those letters say. |
| 10:03:22 | 2 | THE COURT: Okay. Defense? |
| 10:03:26 | 3 | MR. WARNER: First of all, on the preemption issue, |
| 10:03:30 | 4 | Mr. Gittler doesn't even address that the core issue here, and |
| 10:03:34 | 5 | that is the market participant defense. It's beyond question |
| 10:03:39 | 6 | here that this state in passing this legislation was acting in |
| 10:03:44 | 7 | its capacity as owner and operator of McCormick Place, whose |
| 10:03:50 | 8 | mission is to obtain revenue from rent for show managers and |
| 10:03:56 | 9 | exhibitors who come to McCormick Place to put on shows and |
| 10:03:59 | 10 | then derivatively use those shows to benefit the entire |
| 10:04:06 | 11 | Chicago-area economy, provide jobs, including Teamsters jobs, |
| 10:04:11 | 12 | and including jobs for a lot of other entities and employees |
| 10:04:15 | 13 | that support the tourism and trade show industry. |
| 10:04:21 | 14 | This is squarely within the market participant |
| 10:04:24 | 15 | doctrine. You can't get any more market oriented than the |
| 10:04:29 | 16 | intent of the legislation here. What prompted the legislation |
| 10:04:35 | 17 | were customers, exhibitors, and show managers complaining, We |
| 10:04:39 | 18 | don't like the way you do business. It's too expensive. It's |
| 10:04:43 | 19 | too burdensome. It's too much of a hassle. We're going to |
| 10:04:45 | 20 | take our business elsewhere, if you don't change things. |
| 10:04:49 | 21 | What did the legislature do? They listened to their |
| 10:04:52 | 22 | customers and they changed things. |
| 10:04:52 | 23 | MR. GITTLER: Well, your Honor -- |
| 10:04:54 | 24 | MR. WARNER: That's market -- |
| 10:04:54 | 25 | THE COURT: No, I give him his chance now. |

10:04:56  1        MR. WARNER:  That is market participant.

10:05:01  2        MR. GITTLER:  That is -- excuse me.

10:05:02  3        MR. WARNER:  By definition, under the <u>Boston Harbor</u>

10:05:05  4   case and the other cases cited in our brief, that immediately

10:05:10  5   takes it out of the Garmon and Machinists preemption

10:05:13  6   doctrines.  We don't even need to get to the steps that

10:05:17  7   Mr. Gittler is talking about.

10:05:18  8        More over, on the jurisdictional issues, union

10:05:22  9   jurisdiction, governed by the NLRA, governed by the terms of

10:05:26  10  the collective bargaining agreement, again, governs the

10:05:29  11  relationship between the union, on the one hand, and the

10:05:33  12  employer, on the other.  Nothing in this legislation impacts

10:05:38  13  that or impairs it in any way.  The legislation says

10:05:43  14  exhibitors, who Mr. Gittler concedes, the union has no

10:05:48  15  contractual relationship with those exhibitors.  Exhibitors

10:05:52  16  can do their own work.  They don't have to give it to

10:05:54  17  contractors, who can then give it to union employees to do.

10:05:56  18        Now, we will concede, once a contractor who is under

10:06:01  19  the collective bargaining agreement, the trade show agreement

10:06:04  20  with the Teamsters, is hired by an exhibitor, that is

10:06:08  21  Teamsters work.  That is when the NLRA, that is when it kicks

10:06:14  22  in, that is when the collective bargaining agreement kicks in.

10:06:16  23        Mr. Gittler has asserted no right either under the

10:06:20  24  NLRA or under his -- under the Teamsters collective bargaining

10:06:25  25  agreement that allows him to legally assert that they have a

10:06:29   1   legal right or constitutional right to work from exhibitors

10:06:35   2   that exhibitors don't want to give contractors.

10:06:37   3        Now, historically a regime has developed where it's

10:06:42   4   been in the best interests, frankly, of both the contractors

10:06:46   5   and the unions to say, If you're going -- it's our work, give

10:06:50   6   us the work.

10:06:51   7        The law changes that.  It changes the relationship

10:06:54   8   between the exhibitor and contractor.  It doesn't change the

10:06:58   9   relationship between the contractor and the union.  It doesn't

10:07:01  10   change the union's contractual jurisdiction under the

10:07:05  11   collective bargaining agreement.

10:07:05  12        MR. GITTLER:  That's not correct, your Honor.

10:07:07  13        MR. BERKS:  Your Honor, I have to add something on

10:07:09  14   behalf of the Attorney General as well.

10:07:10  15        THE COURT:  We're on the defendant's side right now,

10:07:12  16   sir, and I really try very hard to give everybody their

10:07:15  17   chance.  So hold your tongue until I give it back to you.

10:07:18  18        All right.  Go ahead.

10:07:21  19        MR. WARNER:  Go ahead.

10:07:21  20        MR. BERKS:  Paul Berks on behalf of the Attorney

10:07:24  21   General, and there's just one issue that I need to raise on

10:07:26  22   behalf of the Attorney General, which is that we have raised

10:07:27  23   an Eleventh Amendment immunity defense.  We have no role in

10:07:31  24   enforcing this statute.  And as the attachments to their TRO

10:07:34  25   motion make clear, the letters that are going out are going

10:07:39   1   out from the Authority.  They're not being vetted.  They're

10:07:41   2   not being signed by the Attorney General.

10:07:44   3        We don't have any horse in this race, frankly.  We

10:07:46   4   don't have any role in this dispute right now.  We've raised

10:07:50   5   the Eleventh Amendment in opposition to their preliminary

10:07:53   6   injunction.  We'll be raising it in a motion to dismiss

10:07:57   7   tomorrow.

10:07:57   8        To the extent that a TRO is being contemplated here,

10:07:59   9   we want to make it clear that it should not enjoin the

10:08:03  10   Attorney General from doing anything, as she has Eleventh

10:08:06  11   Amendment immunity, which does limit the authority of the

10:08:08  12   Court.  So that defense is sort of necessarily preliminary to

10:08:11  13   any order that might impact our rights.

10:08:15  14        I could speak on the merits.  I think Mr. Warner's

10:08:18  15   doing a fine job.  I don't know that you need a cacophony of

10:08:21  16   voices, but I wanted to make sure that the Attorney General's

10:08:24  17   immunity was before the Court.

10:08:26  18        THE COURT:  Well, I think to the extent that the

10:08:28  19   Attorney General has any position, it would be the validation

10:08:31  20   that was given in support of the preliminary injunction

10:08:34  21   response saying that the trade shows had left, so many trade

10:08:40  22   shows had left McCormick Place, so that the drop in business

10:08:43  23   had been significant and was considered to be a significant

10:08:47  24   harm to the city.

10:08:48  25        So under the prong of the TRO, which has me taking

| | | |
|---|---|---|
| 10:08:52 | 1 | into account the public interest and whether it's served by |
| 10:08:56 | 2 | granting or denying the relief I think is what -- is one area |
| 10:09:00 | 3 | that to the extent that the Attorney General's position is |
| 10:09:03 | 4 | there, in substantiating the legislation, which may not even |
| 10:09:08 | 5 | be presented from you, but maybe from defendants -- |
| 10:09:11 | 6 | MR. BERKS:  No, your Honor, that's correct. |
| 10:09:12 | 7 | THE COURT:  -- shows that now we have also an -- now |
| 10:09:15 | 8 | we have new trade show vendors or contractors, however you |
| 10:09:21 | 9 | call them, who are coming back to the city with the |
| 10:09:25 | 10 | understanding that these new reforms are in place.  And I |
| 10:09:29 | 11 | think that is a factor that has to be addressed under the TRO |
| 10:09:33 | 12 | standard. |
| 10:09:33 | 13 | Let me go back to you, sir, Mr. Gittler, because |
| 10:09:37 | 14 | you'd like to say that -- |
| 10:09:39 | 15 | MR. WARNER:  If I may respond -- |
| 10:09:40 | 16 | MR. GITTLER:  Thank you, your Honor. |
| 10:09:41 | 17 | MR. WARNER:  -- to a couple other points Mr. Gittler |
| 10:09:43 | 18 | made in his last round -- |
| 10:09:43 | 19 | THE COURT:  Okay.  Because you're not done yet? |
| 10:09:45 | 20 | Okay, Mr. Warner, finish up. |
| 10:09:47 | 21 | MR. WARNER:  Okay.  Going back to -- contrary to what |
| 10:09:49 | 22 | Mr. Gittler said, there are limits in the statute as to what |
| 10:09:53 | 23 | work exhibitors can perform.  Specifically -- now I have to |
| 10:10:02 | 24 | find it.  This is in, I believe, 5.4(c), subsection 4. |
| 10:10:08 | 25 | An exhibitor -- exhibitor employees are prohibited at |

10:10:12   1   any time from using scooters, fork lifts, pallet jacks,

10:10:16   2   condors, scissor lifts, or motorized dollies, or similar

10:10:19   3   motorized or hydraulic equipment on Authority premises.

10:10:24   4   More over, the provision that the -- the only

10:10:27   5   provision in the exhibitor bill of rights governing what work

10:10:30   6   exhibitors can now do that really directly impacts the

10:10:34   7   Teamsters work is the following provision, and let me read it

10:10:38   8   for you.

10:10:39   9   The Authority shall designate areas in its discretion

10:10:43   10   where exhibitors may unload and load exhibitor materials from

10:10:47   11   privately owned vehicles at Authority premises with the use of

10:10:50   12   nonmotorized hand trucks and dollies. Again, this is the

10:10:54   13   situation of an exhibitor who has -- who can unload their own

10:11:00   14   equipment where they don't need additional help doing it.

10:11:03   15   There's another limit on the work that exhibitors can

10:11:05   16   do. An exhibitor can only do its own work with its own

10:11:12   17   employees that have been employed by the exhibitor for at

10:11:17   18   least six months. And there's an audit process in place to

10:11:20   19   check that to make sure that exhibitors aren't bringing in

10:11:24   20   temporary labor or day labor to do that work.

10:11:26   21   So there are tremendous limits on this. If -- if an

10:11:31   22   exhibitor has a lot of equipment that its own people can't

10:11:37   23   unload, they need to go to the Teamsters. That doesn't

10:11:41   24   change. There's plenty of work for everybody.

10:11:43   25   The other point I'd like to make is, again, in the --

| | | |
|---|---|---|
| 10:11:53 | 1 | on the issue of whether damage to reputation with their |
| 10:11:57 | 2 | members is any sort of irreparable harm.  Page 12 of our |
| 10:12:03 | 3 | response brief addresses that, as does the <u>East St. Louis</u> |
| 10:12:08 | 4 | <u>Laborers' versus Bellon Wrecking</u> case, 414 F.3d page 704, |
| 10:12:13 | 5 | where the Seventh Circuit stated:  Given the frequency of |
| 10:12:16 | 6 | litigation between unions and employers, union members likely |
| 10:12:20 | 7 | understand that lawsuits take time to resolve disputes and |
| 10:12:23 | 8 | that the absence of an immediate victory does not imply |
| 10:12:28 | 9 | defeat. |
| 10:12:28 | 10 | Unions litigate, arbitrate on behalf of their members |
| 10:12:32 | 11 | all the time.  They litigate the various -- very issues we're |
| 10:12:36 | 12 | talking about here today.  And they get compensation for their |
| 10:12:39 | 13 | members in the form of money damages. |
| 10:12:41 | 14 | Contracting out work, giving work to somebody who the |
| 10:12:47 | 15 | union claims belongs to -- work that they claim belongs to the |
| 10:12:51 | 16 | union.  That is a common issue in dispute between employers |
| 10:12:55 | 17 | and unions.  That is always resolved at arbitration or |
| 10:13:01 | 18 | litigation by an award of money damages.  The parties sit down |
| 10:13:06 | 19 | and calculate, okay, what work would the employer have had to |
| 10:13:13 | 20 | have given to its union employees had this work not been done |
| 10:13:18 | 21 | by somebody else? |
| 10:13:19 | 22 | It is not a difficult thing to do.  It's done all the |
| 10:13:22 | 23 | time.  The fact that the work is being given to third parties |
| 10:13:25 | 24 | doesn't preclude establishing that.  The Court has subpoena |
| 10:13:30 | 25 | powers to get that information. |

10:13:33   1      And, moreover, the statute itself provides for the

10:13:36   2   collection of the information that would be necessary to make

10:13:39   3   those calculations.

10:13:41   4      There's an audit process in place, under the statute,

10:13:46   5   designed to determine what impact is the legislation having on

10:13:50   6   McCormick Place operations.  Are cost savings resulting?  That

10:13:56   7   data could be used to work any issue out that may come up in

10:14:01   8   the future regarding calculation of damages or resolving

10:14:07   9   things through further litigation, if it comes to that.

10:14:10   10      THE COURT:  Okay.  Are you done now, Mr. Warner?

10:14:12   11      MR. WARNER:  Yes, your Honor.

10:14:13   12      THE COURT:  Okay.  So, Mr. Gittler, you can reply.

10:14:16   13      MR. GITTLER:  Thank you, your Honor.  On the last

10:14:17   14   point, if there is no contract clause requiring or allowing

10:14:25   15   performance of the work, there is no remedy that the union

10:14:31   16   has.  We have submitted cases that establish that arbitrators

10:14:40   17   cannot and will not rule against public policy, as stated in

10:14:45   18   local laws, in state laws.  That is just not an accurate

10:14:56   19   statement except in this sense, that what counsel has

10:15:00   20   acknowledged is that things should be the same, but they're

10:15:05   21   really not.

10:15:06   22      The notion that counsel comes to you claiming to

10:15:12   23   represent a market participant in this case is, I think, more

10:15:20   24   than unfair.  I think it's a distortion.  The <u>Boston Harbor</u>

10:15:28   25   case, which is the lead case that established the proposition

10:15:32   1   counsel is arguing for, was a case where a public entity who

10:15:39   2   is responsible for the Boston Harbor tunnel, the Boston Harbor

10:15:46   3   cleanup said to a general manager, We want to eliminate labor

10:15:55   4   disputes, negotiate a contract with the affected unions.  Once

10:16:06   5   that contract was negotiated, the question was never, your

10:16:13   6   Honor, Does Boston Harbor or any contractor being brought in

10:16:18   7   have a right to change the contract.  That was never the

10:16:24   8   issue.  It has never been an issue in a project labor

10:16:27   9   agreement.

10:16:27   10        The Lavin case, which counsel cited to you in our

10:16:32   11   briefing, your Honor, that was our case.  That was a case

10:16:37   12   where the terms and conditions of employment were accepted by

10:16:44   13   not only the public entity or the employer, but accepted by

10:16:49   14   the contractors that wanted to bid on the work.  They didn't

10:16:53   15   come in and say, We want to do this work, We want to do it

10:17:00   16   under this contract, but we insist that the terms of the

10:17:07   17   contract, the collective bargaining agreement, be changed.

10:17:10   18   That never happened.  It never happened in a project labor

10:17:14   19   agreement case.

10:17:16   20        And that is exactly the harm done by allowing

10:17:21   21   preempted parties to regulate the terms and conditions of

10:17:27   22   employment, because that's the unique thing the general

10:17:31   23   assembly did here.

10:17:34   24        They didn't say to McCormick Place, Go negotiate a

10:17:39   25   contract that you think your clients or your users, whatever

10:17:44  1    term you want to use, would be happy with.  They didn't say

10:17:49  2    that.  The general assembly said that the contracts that have

10:17:55  3    been negotiated cannot be enforced.  The terms and conditions

10:18:00  4    that were negotiated are void.  They are unenforceable.  That

10:18:06  5    is not being a market participant.

10:18:10  6          The general assembly --

10:18:11  7          THE COURT:  But in the <u>Boston Harbor</u> case essentially

10:18:14  8    what they did is they came in and they said, In spite of the

10:18:17  9    fact that unions are there and can negotiate for the different

10:18:22  10   labor aspects of the restoration project, here's the labor

10:18:26  11   agreement.  We're requiring you to enter into this project

10:18:29  12   labor agreement based upon our needs, since we own this

10:18:34  13   property, and we have to look out for the best interests of

10:18:37  14   the people that we're going to require you to enter into this,

10:18:41  15   which would impinge upon the same labor concerns that you

10:18:46  16   would have, if you were trying to negotiate the project as

10:18:50  17   union workers working on the harbor.

10:18:53  18         So the union workers were not able to get the same

10:18:57  19   type of union contract that they normally would have under

10:19:02  20   <u>Boston Harbor</u>, because they would have required them to enter

10:19:06  21   into this labor agreement.

10:19:08  22         So I'm not -- I think this is a very complicated

10:19:12  23   issue.  I think that it is not one that is <u>generally addressed</u>

10:19:18  24   every day.  But I'm not convinced that I have the slam-dunk

10:19:27  25   infringement that you see, nor am I convinced, necessarily,

10:19:31  1    that it is a private market participant, although I see many

10:19:38  2    similarities to the <u>Boston Harbor</u> case, because in that case,

10:19:43  3    similarly to McCormick Place, the city owns McCormick Place.

10:19:47  4    The city sees the drop in business, which is documented in the

10:19:51  5    response to the preliminary injunction and to the TRO.  The

10:19:55  6    city then -- the state then imposes new terms that enable the

10:20:01  7    business to increase and it is tailored to a particular

10:20:06  8    project, which is what <u>Boston Harbor</u> did.  And it is for a

10:20:13  9    window of -- or concern that is being addressed specifically

10:20:20  10   by the legislature at that time.

10:20:21  11       So if they're acting as motivated by this drop in

10:20:26  12   business, which is well-documented, it's possible <u>Boston</u>

10:20:30  13   <u>Harbor</u> does apply.  I don't know today.

10:20:33  14       MR. GITTLER:  Well, your Honor, if you don't know, it

10:20:36  15   is only my fault for not being clear enough.

10:20:38  16       THE COURT:  But if I don't know today, then I have

10:20:41  17   to -- the four prongs of the TRO today are these:  It's

10:20:45  18   extraordinary relief, as you all know; and the extraordinary

10:20:48  19   relief has to give me a clear showing, and you carry the

10:20:52  20   burden of persuasion, so right now that's a problem.

10:20:55  21   Second -- and that's just on the merits of the case.  Whether

10:20:58  22   there's a valid defense, I'm not sure, to the issue of the

10:21:01  23   preemption.

10:21:02  24       But more importantly, what I have presented -- what I

10:21:06  25   do have presented before me is a case which shows that damages

10:21:12  1   may be arising.  They may be hard to ascertain, but they can

10:21:15  2   be remedied with money.  Those are money damages.

10:21:20  3        So if your members are losing jobs or losing money,

10:21:25  4   it's possible that it can be remedied with dollars.  And it

10:21:30  5   appears that under the contract there is a mechanism in place

10:21:34  6   to help determine what those dollars are.  So in determining

10:21:38  7   whether there's irreparable harm, I need to take into account

10:21:41  8   whether you have relief elsewhere, and I think that money

10:21:46  9   relief is one such relief.

10:21:47  10       And then I must take into account the balancing of

10:21:51  11  the public interest, and I think the one factor that I do have

10:21:54  12  before me is sufficient evidence to show that the public

10:21:58  13  interest in trying to bring trade shows back to the City of

10:22:02  14  Chicago in order to have money come into the city both for the

10:22:08  15  union members who work there as well as the city has been

10:22:11  16  documented, that's definitely here in response to your motion.

10:22:15  17  So that actually is weighing in favor of defendants and not

10:22:18  18  weighing in favor of plaintiffs, because it's a much greater

10:22:22  19  impact to the community than to simply the members who are

10:22:27  20  losing types of jobs at McCormick Place.

10:22:30  21       So I don't believe today you've met your burden to

10:22:33  22  get a TRO, based upon those findings, but I am more than happy

10:22:38  23  to dig into this meaty and interesting issue on a preliminary

10:22:42  24  injunction, as I was before.  And so I will keep open-minded

10:22:48  25  and read all of the cases on a more advanced level, if this

| | | |
|---|---|---|
| 10:22:51 | 1 | case stays with me. |
| 10:22:53 | 2 | So the motion for temporary restraining order is |
| 10:22:54 | 3 | denied today for failure to prove by a clear showing that you |
| 10:23:04 | 4 | have success on the merits -- likelihood of success on the |
| 10:23:07 | 5 | merits and inadequate remedy at law, which I believe you have. |
| 10:23:11 | 6 | Okay.  Thank you. |
| 10:23:13 | 7 | MR. WARNER:  Thank you, your Honor. |
| 10:23:13 | 8 | MS. ANGELUCCI:  Thank you, your Honor. |
| 10:23:14 | 9 | (Concluded at 10:23 a.m.) |
| | 10 | - - - |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | C E R T I F I C A T E |
| | 16 | |
| | 17 | I certify that the foregoing is a correct transcript from |
| | 18 | the record of proceedings in the above-entitled matter. |
| | 19 | |
| | 20 | /s/April M. Metzler, RPR, CRR, FCRR   July 28, 2010 |
| | 21 | April M. Metzler, RPR, CRR, FCRR       Date |
| | 22 | Official Federal Court Reporter |
| | 23 | |
| | 24 | |
| | 25 | |

## /

**/s/April** [1] - 37:20

## 1

**1** [1] - 7:14
**100** [1] - 2:11
**10:00** [1] - 20:24
**10:23** [1] - 37:9
**10C3484** [2] - 3:2, 3:13
**12** [1] - 31:2
**13th** [1] - 2:11
**1900** [1] - 1:22
**1:10-cv-03484** [1] - 1:7
**1st** [1] - 12:10

## 2

**200** [1] - 1:22
**2010** [2] - 1:9, 37:20
**2012** [1] - 13:13
**219** [1] - 2:15
**2318-A** [1] - 2:15
**263-1500** [1] - 1:23
**28** [2] - 1:9, 37:20

## 3

**30** [1] - 13:17
**300** [2] - 2:6, 15:19
**300-square-foot** [1] - 21:9
**312** [3] - 1:23, 2:7, 2:16
**3400** [1] - 2:6
**343-3778** [1] - 2:12

## 4

**4** [1] - 29:24
**408-5154** [1] - 2:16
**414** [1] - 31:4
**4:30** [1] - 20:24

## 5

**5.4(c** [2] - 11:17, 29:24

## 6

**6** [1] - 7:9
**60601** [1] - 2:11
**60604** [1] - 2:16
**60606** [2] - 1:23, 2:7
**6:00** [2] - 6:8, 20:22

## 7

**700** [1] - 7:9
**704** [1] - 31:4
**727** [5] - 1:7, 3:2, 3:13, 3:17, 12:1
**773** [1] - 2:12

## 8

**8:00** [2] - 5:22, 20:22

## 9

**986-0300** [1] - 2:7
**9:25** [1] - 3:1

## A

**A-n-g-e-l-u-c-c-i** [1] - 3:22
**a.m** [4] - 3:1, 20:22, 37:9
**ability** [8] - 8:21, 11:13, 12:9, 13:21, 13:24, 15:18, 17:3, 22:18
**able** [8] - 9:3, 12:5, 12:6, 14:1, 18:4, 20:23, 21:1, 34:18
**above-entitled** [1] - 37:18
**absence** [1] - 31:8
**Absolutely** [1] - 10:14
**accepted** [2] - 33:12, 33:13
**account** [4] - 9:7, 29:1, 36:7, 36:10
**accurate** [3] - 18:5, 21:8, 32:18
**acknowledged** [1] - 32:20
**Act** [2] - 23:10, 24:8
**acting** [2] - 25:6, 35:11
**add** [2] - 5:23, 27:13
**addition** [1] - 15:11
**additional** [1] - 30:14
**Additionally** [2] - 11:25, 15:1
**address** [4] - 8:10, 9:21, 14:1, 25:4
**addressed** [4] - 18:1, 29:11, 34:23, 35:9
**addresses** [1] - 31:3
**admission** [1] - 10:2
**advanced** [1] - 36:25
**adversely** [2] - 7:17, 14:24
**affect** [2] - 7:17, 24:19
**affected** [5] - 7:23, 14:24, 18:25, 22:12, 33:4
**afford** [1] - 20:2
**agent** [1] - 8:20
**ago** [3] - 7:17, 14:7, 22:17
**agree** [2] - 13:14, 23:11
**agreement** [18] - 7:10, 7:12, 10:17, 18:21, 20:19, 21:4, 26:10, 26:19, 26:22, 26:25, 27:11, 33:9, 33:17, 33:19, 34:11, 34:12, 34:21
**agreements** [1] - 24:6
**agrees** [1] - 18:24

**ahead** [3] - 15:6, 27:18, 27:19
**al** [1] - 1:12
**allege** [1] - 8:4
**alleged** [2] - 10:4, 16:16
**alleging** [2] - 5:7, 18:19
**allow** [3] - 5:20, 7:20, 19:20
**allowed** [2] - 10:9, 10:16
**allowing** [2] - 32:14, 33:20
**allows** [1] - 26:25
**almost** [2] - 22:21, 23:17
**Amendment** [3] - 27:23, 28:5, 28:11
**amount** [1] - 16:14
**AND** [1] - 1:11
**ANGELUCCI** [23] - 3:19, 3:22, 11:1, 11:4, 12:11, 13:1, 13:7, 13:12, 13:20, 15:4, 15:7, 15:23, 16:5, 16:7, 16:12, 16:18, 16:20, 16:22, 17:6, 18:3, 18:10, 24:13, 37:8
**Angelucci** [5] - 1:21, 3:20, 3:22, 3:23, 13:7
**anticipated** [1] - 6:15
**appear** [1] - 8:21
**APPEARANCES** [2] - 1:18, 2:3
**apply** [1] - 35:13
**appropriate** [1] - 9:11
**April** [2] - 2:15, 37:21
**April_Metzler@ilnd.uscourts.gov** [1] - 2:17
**arbitrate** [1] - 31:10
**arbitration** [1] - 31:17
**arbitrators** [1] - 32:16
**area** [3] - 11:7, 25:11, 29:2
**areas** [2] - 11:16, 30:9
**arguably** [2] - 23:4, 23:18
**argued** [2] - 8:13, 23:5
**arguing** [1] - 33:1
**argument** [1] - 22:15
**arising** [1] - 36:1
**articulate** [1] - 14:17
**ascertain** [1] - 36:1
**Asher** [1] - 1:20
**aside** [1] - 3:8
**aspects** [1] - 34:10
**assembly** [4] - 23:20, 33:23, 34:2, 34:6
**assert** [1] - 26:25
**asserted** [2] - 5:8, 26:23
**assess** [1] - 10:17
**assessment** [1] - 9:3
**assistance** [1] - 19:15
**assume** [1] - 7:15
**assuming** [1] - 16:9
**attached** [2] - 12:15, 20:9
**attachments** [1] - 27:24
**attend** [3] - 7:23, 20:2, 20:4
**Attorney** [7] - 2:9, 4:10, 4:16, 27:14, 27:20, 27:22, 28:2, 28:10, 28:16, 28:19, 29:3
**audit** [2] - 30:18, 32:4
**August** [2] - 7:14, 12:10

authority [5] - 11:5, 22:25, 23:14, 24:2, 28:11
AUTHORITY [1] - 1:12
Authority [8] - 3:4, 3:15, 4:3, 4:7, 28:1, 30:3, 30:9, 30:11
available [2] - 8:7, 8:9
award [1] - 31:18
aware [1] - 12:11

**B**

B-e-r-k-s [1] - 4:13
balancing [2] - 9:5, 36:10
bargain [17] - 8:16, 8:18, 8:21, 9:25, 17:25, 18:2, 23:21, 23:22, 23:23, 24:7, 24:10, 24:17, 24:18, 24:20, 24:21, 24:22
bargaining [21] - 8:20, 10:4, 18:20, 20:19, 21:4, 22:20, 22:23, 22:24, 23:10, 24:6, 24:14, 24:15, 24:16, 24:25, 26:10, 26:19, 26:22, 26:24, 27:11, 33:17
based [3] - 9:2, 34:12, 36:22
BEFORE [1] - 1:15
behalf [9] - 3:25, 4:3, 4:6, 4:9, 4:15, 27:14, 27:20, 27:22, 31:10
behind [1] - 14:6
belief [1] - 7:5
Bellon [1] - 31:4
belongs [2] - 31:15
benefit [1] - 25:10
benefits [1] - 9:17
BERKS [5] - 4:9, 4:13, 27:13, 27:20, 29:6
Berks [4] - 2:10, 4:9, 4:11, 27:20
best [2] - 27:4, 34:13
Between [1] - 20:24
between [11] - 11:21, 18:21, 20:21, 23:2, 23:10, 24:14, 26:11, 27:8, 27:9, 31:6, 31:16
beyond [1] - 25:5
bid [1] - 33:14
big [2] - 6:18, 21:24
biggest [1] - 11:1
bill [1] - 30:5
bit [3] - 6:24, 19:1, 19:2
Blvd [1] - 1:22
bones [2] - 10:15, 16:2
books [1] - 12:2
booth [1] - 21:19
booths [4] - 10:10, 19:12, 20:6
Boston [10] - 26:3, 32:24, 33:2, 33:6, 34:7, 34:20, 35:2, 35:8, 35:12
brains [1] - 6:4
brief [3] - 8:12, 26:4, 31:3
briefing [1] - 33:11
briefs [2] - 22:12, 23:6
bring [1] - 36:13
bringing [1] - 30:19
broader [1] - 15:18

Brotherhood [2] - 3:3, 3:14
BROTHERHOOD [1] - 1:8
brought [1] - 33:6
building [1] - 19:14
burden [2] - 35:20, 36:21
burdensome [1] - 25:19
business [14] - 9:9, 9:12, 9:14, 9:15, 9:17, 9:19, 22:7, 22:10, 25:18, 25:20, 28:22, 35:4, 35:7, 35:12

**C**

cacophony [1] - 28:15
calculate [1] - 31:19
calculation [1] - 32:8
calculations [1] - 32:3
cannot [9] - 10:5, 23:12, 23:21, 23:22, 24:17, 32:17, 34:3
capable [2] - 14:4, 20:5
capacity [1] - 25:7
car [1] - 19:22
carpenters [1] - 15:24
carry [4] - 19:23, 19:25, 35:19
Case [1] - 1:7
case [20] - 3:10, 8:16, 18:15, 18:18, 26:4, 31:4, 32:23, 32:25, 33:1, 33:10, 33:11, 33:19, 34:7, 35:2, 35:21, 35:25, 37:1
cases [3] - 26:4, 32:16, 36:25
certain [4] - 5:8, 10:10, 11:5, 13:14
certainly [1] - 23:17
certify [1] - 37:17
cetera [1] - 10:11
chance [4] - 13:9, 21:13, 25:25, 27:17
change [13] - 5:9, 13:12, 20:18, 20:21, 23:16, 23:19, 24:5, 25:20, 27:8, 27:10, 30:24, 33:7
changed [5] - 5:7, 7:3, 12:5, 25:22, 33:17
changes [3] - 20:20, 27:7
changing [1] - 7:20
chart [2] - 20:9, 20:10
chase [2] - 8:3, 9:21
check [1] - 30:19
Chicago [7] - 1:9, 1:23, 2:7, 2:11, 2:16, 25:11, 36:14
Chicago-area [1] - 25:11
Circuit [1] - 31:5
circular [1] - 8:14
circumstances [1] - 7:3
cite [1] - 20:11
cited [2] - 26:4, 33:10
City [1] - 36:13
city [7] - 28:24, 29:9, 35:3, 35:4, 35:6, 36:14, 36:15
claim [3] - 20:12, 20:15, 31:15
claiming [1] - 32:22
claims [1] - 31:15
clause [1] - 32:14

cleanup [1] - 33:3
clear [6] - 17:11, 27:25, 28:9, 35:15, 35:19, 37:3
CLERK [2] - 3:2, 3:13
clients [2] - 8:17, 33:25
Cohen [1] - 1:20
colleagues [3] - 5:25, 6:1, 6:11
collection [1] - 33:2
collective [10] - 18:20, 20:19, 21:4, 24:6, 26:10, 26:19, 26:22, 26:24, 27:11, 33:17
column [1] - 20:13
coming [2] - 9:19, 29:9
Commenced [1] - 3:1
commit [1] - 23:4
committed [1] - 23:18
Common [1] - 20:1
common [1] - 31:16
community [1] - 36:19
companies [3] - 7:21, 22:6, 22:10
Company [1] - 22:9
company [1] - 18:23
compensation [1] - 31:12
complaining [1] - 25:17
completely [1] - 16:16
complexities [1] - 12:19
complicated [1] - 34:22
concede [2] - 20:17, 26:18
concedes [1] - 26:14
concern [1] - 35:9
concerned [1] - 9:23
concerns [2] - 9:22, 34:15
Concluded [1] - 37:9
conditions [5] - 22:19, 23:17, 33:12, 33:21, 34:3
condors [1] - 30:2
conflict [2] - 20:17, 21:1
Congress [1] - 23:9
considered [3] - 22:21, 22:22, 28:23
constitutional [2] - 8:13, 27:1
Cont'd [1] - 2:3
contacted [1] - 8:17
contained [1] - 8:2
contemplated [1] - 28:8
context [1] - 8:1
continue [1] - 19:6
contract [19] - 7:9, 7:20, 10:8, 11:25, 13:22, 14:13, 14:19, 15:10, 20:14, 32:14, 33:4, 33:5, 33:7, 33:16, 33:17, 33:25, 34:19, 36:5
Contracting [1] - 31:14
contractor [11] - 14:14, 18:24, 19:1, 19:2, 19:24, 20:3, 26:18, 27:8, 27:9, 33:6
contractors [12] - 7:15, 11:8, 12:3, 18:21, 19:7, 21:21, 23:21, 26:17, 27:2, 27:4, 29:8, 33:14
contracts [2] - 10:4, 34:2
contractual [6] - 14:11, 18:17, 18:19,

20:13, 26:15, 27:10
contradiction [2] - 24:22, 24:23
contrary [1] - 29:21
conversation [1] - 22:8
convinced [2] - 34:24, 34:25
coordinate [1] - 12:20
core [1] - 25:4
correct [3] - 27:12, 29:6, 37:17
cost [1] - 32:6
counsel [4] - 32:19, 32:22, 33:1, 33:10
counsel's [1] - 22:15
Counselor [1] - 17:9
couple [1] - 29:17
course [1] - 5:5
COURT [69] - 1:4, 2:14, 3:6, 3:8, 3:12, 3:18, 3:21, 3:23, 4:1, 4:5, 4:8, 4:11, 4:14, 4:17, 4:19, 5:25, 6:2, 6:7, 6:10, 6:18, 7:7, 8:3, 10:7, 10:14, 10:24, 11:3, 12:12, 12:16, 13:2, 13:4, 13:8, 13:19, 14:2, 14:15, 14:17, 14:21, 15:2, 15:5, 15:14, 15:25, 16:6, 16:9, 16:15, 16:19, 16:21, 16:25, 17:5, 17:8, 17:20, 18:8, 18:11, 19:16, 21:13, 21:17, 22:2, 24:3, 24:5, 24:11, 25:2, 25:25, 27:15, 28:18, 29:7, 29:19, 32:10, 32:12, 34:7, 35:16
Court [5] - 22:21, 28:12, 28:17, 31:24, 37:22
Courts [1] - 22:22
covered [3] - 7:10, 7:11, 23:10
crack [1] - 15:4
crew [6] - 13:12, 13:14, 13:16, 14:8, 23:22, 24:15
CRR [3] - 2:15, 37:20, 37:21
current [1] - 20:18
customers [2] - 25:17, 25:22
cut [3] - 8:3, 9:21, 13:17

## D

D'Alba [1] - 1:20
damage [2] - 8:19, 31:1
Damage [1] - 8:22
damages [15] - 8:7, 9:6, 10:19, 10:20, 14:5, 14:22, 17:20, 17:21, 18:4, 21:2, 31:13, 31:18, 32:8, 35:25, 36:2
data [1] - 32:7
Date [1] - 37:21
deal [2] - 5:11, 11:19
dealing [1] - 7:4
Dearborn [1] - 2:15
decide [1] - 11:23
decided [1] - 11:24
decrease [1] - 11:16
defeat [1] - 31:9
Defendant [1] - 2:9
defendant's [1] - 27:15
Defendants [2] - 1:13, 2:5
defendants [4] - 5:6, 9:6, 29:5, 36:17
Defense [1] - 25:2

defense [5] - 18:12, 25:5, 27:23, 28:12, 35:22
define [1] - 17:4
defines [2] - 17:1, 17:5
definitely [1] - 36:16
definition [1] - 26:3
delivering [1] - 11:6
denied [1] - 37:3
denying [1] - 29:2
derivatively [1] - 25:10
designate [1] - 30:9
designed [1] - 32:5
desire [2] - 6:21, 7:1
determine [2] - 32:5, 36:6
determining [1] - 36:6
developed [1] - 27:3
developing [1] - 12:23
difference [1] - 24:14
different [7] - 7:25, 11:16, 11:17, 24:16, 24:19, 24:25, 34:9
Different [1] - 6:19
differently [1] - 6:19
difficult [1] - 31:22
dig [1] - 36:23
direct [1] - 12:7
directly [2] - 11:18, 30:6
disappointed [1] - 7:2
discretion [1] - 30:9
discuss [1] - 10:6
Discussion [1] - 3:7
dismiss [1] - 28:6
dispute [4] - 11:21, 11:23, 28:4, 31:16
disputes [3] - 11:20, 31:7, 33:4
distinction [2] - 17:8, 17:10
distortion [1] - 32:24
DISTRICT [3] - 1:4, 1:4, 1:16
DIVISION [1] - 1:5
dock [1] - 20:6
docks [2] - 11:5, 21:25
doctrine [1] - 25:15
doctrines [1] - 26:6
documentation [1] - 16:3
documented [4] - 9:13, 35:4, 35:12, 36:16
documents [2] - 8:2, 9:2
Doe [1] - 15:9
dollars [2] - 36:4, 36:6
dollies [2] - 30:2, 30:12
done [8] - 15:9, 17:12, 22:18, 29:19, 31:20, 31:22, 32:10, 33:20
down [1] - 31:18
Dr [1] - 2:6
drop [3] - 28:22, 35:4, 35:11
dunk [1] - 34:24

## E

earn [1] - 20:23

East [1] - 31:3
EASTERN [1] - 1:5
economy [1] - 25:11
effective [3] - 7:14, 8:20, 13:13
effects [2] - 24:8, 24:16, 24:25
efficient [2] - 4:21, 6:21
either [3] - 6:11, 23:4, 26:23
Eleventh [3] - 27:23, 28:5, 28:10
eligibility [1] - 9:1
eliminate [1] - 33:3
eliminated [1] - 21:10
elsewhere [2] - 25:20, 36:8
employ [1] - 18:22
employed [1] - 30:17
employee [3] - 15:8, 20:22, 21:3
Employees [1] - 12:2
employees [13] - 7:9, 7:23, 9:3, 12:3, 12:10, 13:22, 22:6, 24:8, 25:12, 26:17, 29:25, 30:17, 31:20
employer [4] - 23:2, 26:12, 31:19, 33:13
employers [4] - 10:5, 23:10, 31:6, 31:16
employment [3] - 23:17, 33:12, 33:22
enable [1] - 35:6
end [1] - 20:16
enforce [1] - 22:18
enforced [2] - 10:5, 34:3
enforcing [1] - 27:24
enjoin [1] - 28:9
ensure [1] - 23:24
enter [3] - 34:11, 34:14, 34:20
entire [3] - 13:23, 18:18, 25:10
entirely [3] - 24:16, 24:19, 24:25
entirety [1] - 11:13
entities [1] - 25:12
entitled [1] - 37:18
entity [2] - 33:1, 33:13
equipment [9] - 19:10, 19:12, 19:14, 20:5, 21:24, 30:3, 30:14, 30:22
equitable [4] - 10:20, 10:22, 17:23, 17:24
eradicating [1] - 9:18
essentially [2] - 21:21, 34:7
establish [1] - 32:16
established [1] - 32:25
establishing [1] - 31:24
et [2] - 1:12, 10:11
evidence [1] - 36:12
exactly [1] - 33:20
example [1] - 15:19
except [1] - 32:19
exception [1] - 14:8
exclusive [1] - 11:5
Excuse [1] - 24:12
excuse [3] - 5:6, 23:2, 26:2
Exhibit [1] - 20:9
exhibit [1] - 15:20
exhibited [1] - 19:13

exhibitor [16] - 15:19, 19:2, 19:22, 19:24, 20:2, 21:15, 26:20, 27:8, 29:25, 30:5, 30:10, 30:13, 30:16, 30:17, 30:22
exhibitors [30] - 7:15, 11:6, 11:7, 12:5, 12:9, 12:20, 14:11, 14:12, 15:7, 16:3, 16:10, 16:13, 18:8, 18:14, 18:18, 19:6, 19:9, 19:20, 21:11, 25:9, 25:17, 26:14, 26:15, 27:1, 27:2, 29:23, 30:6, 30:10, 30:15, 30:19
Exhibitors [1] - 26:15
exhibits [4] - 5:18, 17:13, 19:12, 20:7
exist [1] - 8:21
expensive [1] - 25:18
expert [1] - 17:22
explain [1] - 15:3
EXPOSITION [1] - 1:12
Exposition [4] - 3:4, 3:15, 4:3, 4:7
extensively [1] - 23:6
extent [4] - 10:18, 28:8, 28:18, 29:3
extraordinary [2] - 35:18

## F

F.3d [1] - 31:4
facility [1] - 19:23
fact [3] - 24:20, 31:23, 34:9
factor [2] - 29:11, 36:11
factors [2] - 5:7, 9:7
failure [1] - 37:3
falls [1] - 19:3
far [1] - 9:23
fathomed [1] - 22:7
fault [1] - 35:15
favor [2] - 36:17, 36:18
FCRR [3] - 2:15, 37:20, 37:21
Federal [1] - 37:22
FEDERAL [1] - 2:14
few [3] - 9:8, 14:7, 22:17
figure [1] - 21:5
figured [1] - 21:2
filed [1] - 8:6
filing [1] - 5:7
filings [2] - 8:1, 22:13
findings [1] - 36:22
fine [3] - 6:2, 6:3, 28:15
finish [1] - 29:20
firms [1] - 8:17
First [2] - 18:13, 25:3
first [2] - 5:16, 11:12
FI [1] - 2:11
floor [3] - 13:24, 16:6, 23:24
floors [1] - 13:21
folks [2] - 4:17, 13:5
follow [1] - 16:24
following [2] - 18:3, 30:7
foot [2] - 6:21, 15:20
FOR [1] - 1:15
forces [1] - 23:11
foregoing [1] - 37:17

fork [1] - 30:1
form [3] - 8:15, 8:19, 31:13
former [1] - 23:6
forward [1] - 6:12
four [1] - 35:17
Franczek [1] - 2:5
frankly [2] - 27:4, 28:3
free [1] - 23:11
Freeman [1] - 18:6
frequency [1] - 31:5
function [1] - 12:3
future [1] - 32:8

## G

Garmon [3] - 23:5, 23:15, 26:5
General [8] - 4:10, 4:16, 27:14, 27:21, 27:22, 28:2, 28:10, 28:19
general [2] - 23:20, 33:3, 33:22, 34:2, 34:6
General's [3] - 2:9, 28:16, 29:3
generally [1] - 34:23
generating [1] - 11:10
Gentlemen [1] - 3:8
GES [1] - 18:6
GITTLER [34] - 3:5, 3:16, 5:20, 6:1, 6:4, 6:6, 6:13, 7:5, 7:8, 9:23, 10:12, 12:17, 13:3, 14:6, 14:16, 14:18, 14:23, 15:6, 17:4, 17:7, 17:10, 21:7, 21:14, 22:1, 22:3, 24:4, 24:10, 24:12, 25:23, 26:2, 27:12, 29:16, 32:13, 35:14
Gittler [11] - 1:20, 1:21, 3:17, 25:4, 26:7, 26:14, 26:23, 29:13, 29:17, 29:22, 32:12
given [4] - 11:5, 28:20, 31:20, 31:23
Given [1] - 31:5
governed [2] - 26:9
governing [1] - 30:5
government [1] - 22:24
governs [1] - 26:10
granting [1] - 29:2
greater [1] - 36:18
Greenfield [1] - 1:20
Guzman [4] - 4:20, 5:13, 8:6

## H

Hagerty [1] - 1:22, 3:24, 4:1
HAGERTY [1] - 3:24
half [3] - 20:23, 20:25, 21:6
hand [2] - 26:11, 30:12
handle [2] - 8:6
hanging [1] - 15:21
happy [2] - 34:1, 36:22
Harbor [10] - 26:3, 32:24, 33:2, 33:6, 34:7, 34:20, 35:2, 35:8, 35:13
harbor [1] - 34:17
hard [1] - 21:22, 27:16, 36:1

harm [13] - 5:10, 8:19, 9:16, 9:19, 10:2, 16:24, 17:21, 18:4, 22:14, 28:24, 31:2, 33:20, 36:7
Harm [2] - 8:12, 8:15
harmed [2] - 10:17, 10:18
harms [3] - 9:5, 14:3, 14:4
hassle [1] - 25:19
health [1] - 9:17
healthcare [1] - 9:1
hear [5] - 5:14, 5:16, 6:12, 8:24, 18:12
help [3] - 10:25, 30:14, 36:6
hire [3] - 19:6, 19:7, 19:24
hired [1] - 26:20
hires [1] - 19:2
historical [1] - 18:24
historically [1] - 27:3
Historically [2] - 11:4, 11:23
Hold [1] - 3:6
hold [1] - 27:17
Honor [42] - 3:5, 3:16, 3:19, 3:24, 4:2, 4:18, 5:20, 6:13, 6:14, 7:6, 7:13, 9:24, 12:8, 13:3, 14:6, 14:23, 17:4, 17:18, 18:3, 18:16, 19:11, 19:19, 20:8, 21:7, 21:12, 22:5, 22:12, 22:17, 23:19, 24:13, 25:23, 27:12, 27:13, 29:6, 29:16, 32:11, 32:13, 33:6, 33:11, 35:14, 37:7, 37:8
Honor's [1] - 17:14
HONORABLE [1] - 1:15
hoping [1] - 4:19
horse [1] - 28:3
hours [10] - 9:4, 9:15, 9:18, 11:16, 15:13, 15:15, 20:22, 20:24, 21:3, 21:6
huge [2] - 18:14, 19:13
hundred [1] - 7:10
hurdle [1] - 18:15
hydraulic [1] - 30:3

## I

i.e [1] - 18:23
identify [4] - 14:24, 15:8, 20:11, 20:14
IL [4] - 1:23, 2:7, 2:11, 2:16
ILLINOIS [1] - 1:4
Illinois [2] - 1:9, 2:9
imagine [3] - 5:2, 5:14, 12:23
immediate [1] - 31:8
immediately [2] - 13:16, 26:4
immunity [3] - 27:23, 28:11, 28:17
impact [7] - 11:18, 21:15, 24:15, 24:24, 28:13, 32:5, 36:19
impacted [1] - 5:9
impacts [3] - 24:6, 26:12, 30:6
impaired [5] - 10:3, 14:15, 14:16, 14:18, 20:15
impairing [1] - 20:12
impairment [4] - 10:2, 11:15, 17:12, 18:19
impairments [2] - 10:8, 11:14
impairs [1] - 26:13

**impinge** [1] - 34:15
**implement** [1] - 7:16
**implemented** [3] - 12:10, 12:14, 13:16
**imply** [1] - 31:8
**important** [1] - 11:14
**importantly** [1] - 35:24
**imposes** [1] - 35:6
**impossible** [1] - 7:22
**in-booth** [1] - 21:19
**inadequate** [3] - 8:5, 8:10, 37:5
**includes** [2] - 10:12
**including** [2] - 25:11, 25:12
**increase** [2] - 9:14, 35:7
**incurred** [1] - 9:16
**indeed** [1] - 7:5
**indicate** [1] - 6:15
**indicated** [1] - 14:7
**individual** [1] - 8:17
**individuals** [3] - 5:8, 7:20, 14:24
**industry** [1] - 25:13
**information** [3] - 7:13, 31:25, 32:2
**infringement** [1] - 34:25
**initial** [3] - 8:1, 9:20, 9:22
**injunction** [9] - 5:1, 5:4, 5:12, 6:24, 20:10, 28:6, 28:20, 35:5, 36:24
**injury** [2] - 7:3, 8:11
**insist** [1] - 33:16
**insurmountable** [1] - 18:15
**intended** [1] - 23:9
**intent** [2] - 5:3, 25:16
**interest** [4] - 23:12, 29:1, 36:11, 36:13
**interesting** [2] - 8:23, 36:23
**interests** [2] - 27:4, 34:13
**interference** [2] - 8:15, 17:25
**International** [2] - 3:2, 3:13
**INTERNATIONAL** [1] - 1:7
**intrude** [4] - 22:23, 22:24, 23:12, 24:2
**intruded** [1] - 22:18
**invoking** [1] - 5:9
**Ioppolo** [2] - 2:10, 4:15
**IOPPOLO** [2] - 4:15, 4:18
**irreparable** [9] - 7:3, 8:11, 10:2, 14:4, 16:24, 17:21, 18:4, 31:2, 36:7
**irreparably** [1] - 10:18
**issue** [24] - 4:21, 5:12, 6:16, 6:18, 11:2, 14:25, 18:5, 18:13, 22:22, 22:23, 24:14, 24:18, 24:21, 25:3, 25:4, 27:21, 31:1, 31:16, 32:7, 33:8, 34:23, 35:22, 36:23
**issues** [7] - 6:25, 9:23, 10:6, 11:2, 14:1, 26:8, 31:11
**itself** [1] - 32:1

**J**

**jacks** [1] - 30:1
**Jackson** [1] - 1:22
**James** [3] - 2:6, 4:4, 4:7
**job** [3] - 17:15, 17:19, 28:15

**jobs** [7] - 7:18, 7:20, 25:11, 25:12, 36:3, 36:20
**John** [1] - 15:8
**Jr** [1] - 2:5
**Judge** [4] - 4:19, 4:20, 5:13, 8:6
**JUDGE** [1] - 1:16
**judge** [1] - 4:22
**judges** [1] - 6:19
**July** [2] - 1:9, 37:20
**jurisdiction** [10] - 7:17, 7:19, 11:2, 18:24, 22:21, 22:25, 24:15, 24:23, 26:9, 27:10
**jurisdictional** [4] - 11:9, 11:19, 11:20, 26:8

**K**

**keep** [1] - 36:24
**KENDALL** [1] - 1:15
**key** [1] - 14:25
**kicks** [2] - 26:21, 26:22
**kind** [1] - 15:23

**L**

**labor** [14] - 19:7, 22:5, 23:4, 23:18, 30:20, 33:3, 33:8, 33:18, 34:10, 34:12, 34:15, 34:21
**Laborers'** [1] - 31:4
**largest** [1] - 18:7
**last** [6] - 3:21, 5:22, 9:7, 13:20, 29:18, 32:13
**late** [1] - 5:21
**latter** [1] - 23:5
**Laughter** [2] - 6:5, 6:9
**Lavin** [1] - 33:10
**law** [7] - 8:5, 8:11, 17:17, 20:1, 24:5, 27:7, 37:5
**laws** [2] - 32:18
**lawsuit** [5] - 8:6, 8:8, 10:19, 10:20
**lawsuits** [1] - 31:7
**lead** [1] - 32:25
**leading** [1] - 7:3
**least** [2] - 23:18, 30:18
**leave** [1] - 23:9
**left** [2] - 28:21, 28:22
**legal** [2] - 14:19, 27:1
**Legally** [1] - 22:4
**legally** [3] - 22:13, 22:14, 26:25
**legislated** [1] - 7:16
**legislation** [22] - 9:13, 9:16, 11:7, 13:15, 13:23, 15:17, 16:12, 16:22, 17:1, 19:1, 19:9, 19:18, 24:22, 24:23, 25:6, 25:16, 26:12, 26:13, 29:4, 32:5
**legislature** [2] - 25:21, 35:10
**less** [3] - 9:17, 9:18, 15:20
**letter** [1] - 24:17
**letters** [4] - 9:25, 18:1, 25:1, 27:25

**level** [1] - 36:25
**lies** [1] - 22:14
**lifts** [2] - 30:1, 30:2
**lights** [1] - 15:20
**likelihood** [1] - 37:4
**likely** [2] - 9:1, 31:6
**limit** [3] - 21:9, 28:11, 30:15
**limitation** [3] - 16:23, 16:25, 19:17
**limited** [3] - 13:24, 15:15, 15:25
**limits** [3] - 21:8, 29:22, 30:21
**Lisa** [3] - 2:10, 4:9, 4:16
**listened** [1] - 25:21
**listing** [1] - 10:13
**litigate** [2] - 31:10, 31:11
**litigation** [3] - 31:6, 31:18, 32:9
**load** [1] - 30:10
**loading** [1] - 21:24
**local** [1] - 32:18
**LOCAL** [1] - 1:7
**Local** [3] - 3:2, 3:13, 3:17
**Look** [1] - 11:22
**look** [1] - 34:13
**looks** [1] - 7:9
**lose** [6] - 17:15, 17:16, 17:18, 22:25
**losing** [7] - 9:9, 9:12, 9:15, 36:3, 36:20
**loss** [2] - 9:1, 9:16
**losses** [1] - 7:22
**lost** [3] - 11:12, 14:10
**Louis** [1] - 31:3

**M**

**Machinists** [3] - 23:7, 23:8, 26:5
**Madigan** [3] - 2:10, 4:9, 4:16
**manager** [1] - 33:3
**managers** [5] - 7:14, 14:13, 18:7, 25:8, 25:17
**mandatory** [1] - 22:19
**Margaret** [3] - 1:21, 3:19, 13:7
**market** [9] - 23:11, 25:5, 25:14, 25:15, 25:24, 26:1, 32:23, 34:5, 35:1
**marketplace** [1] - 23:1
**Marvin** [3] - 1:21, 3:5, 3:16
**materials** [1] - 30:10
**matter** [1] - 37:18
**McCormick** [12] - 9:10, 11:6, 16:16, 19:12, 25:7, 25:9, 28:22, 32:6, 33:24, 35:3, 36:20
**mean** [8] - 15:3, 15:17, 16:7, 16:18, 16:22, 17:1, 17:23, 21:21
**meat** [2] - 10:15, 16:2
**meaty** [1] - 36:23
**mechanical** [1] - 2:24
**mechanism** [2] - 12:20, 36:5
**meet** [1] - 24:7
**members** [13] - 13:25, 14:1, 17:12, 22:4, 24:8, 24:19, 31:2, 31:6, 31:10, 31:13, 36:3, 36:15, 36:19
**membership** [2] - 8:23, 21:15

memo [1] - 12:13
men [1] - 13:15
merely [1] - 10:1
merits [5] - 18:15, 28:14, 35:21, 37:4, 37:5
met [1] - 36:21
Metropolitan [5] - 3:3, 3:14, 4:3, 4:7, 9:9
METROPOLITAN [1] - 1:11
Metzler [3] - 2:15, 37:20, 37:21
Michael [2] - 2:5, 4:2
middle [1] - 20:13
might [3] - 7:19, 9:18, 28:13
minded [1] - 36:24
minimal [1] - 20:20
minute [3] - 13:10, 21:13, 23:13
miss [1] - 5:24
missed [1] - 3:21
mission [1] - 25:8
moment [1] - 10:13
moments [2] - 14:7, 22:17
monetary [2] - 14:5, 14:22
money [10] - 8:7, 17:16, 21:2, 31:13, 31:18, 36:2, 36:3, 36:8, 36:14
monitor [2] - 7:22, 14:9
Montgomery [1] - 22:8
month [1] - 7:16
months [1] - 30:18
moreover [1] - 32:1
morning [16] - 3:5, 3:16, 3:18, 3:19, 3:23, 3:24, 4:1, 4:2, 4:5, 4:6, 4:8, 4:11, 4:17, 4:18, 6:8, 13:3
most [4] - 11:14
Motion [1] - 1:10
motion [11] - 4:24, 5:1, 5:17, 5:21, 6:25, 12:15, 16:15, 27:25, 28:6, 36:16, 37:2
MOTION [1] - 1:15
motivated [1] - 35:11
motorized [3] - 19:10, 30:2, 30:3
move [4] - 3:8, 6:12, 6:19, 7:1
moved [2] - 5:1, 5:3
MPEA [7] - 2:5, 7:11, 7:14, 11:20, 11:22, 12:6, 23:20
MR [59] - 3:5, 3:16, 3:24, 4:2, 4:9, 4:13, 4:15, 4:18, 5:20, 6:1, 6:4, 6:6, 6:13, 7:5, 7:8, 9:23, 10:12, 12:8, 12:13, 12:17, 12:18, 13:3, 14:6, 14:16, 14:18, 14:23, 15:6, 17:4, 17:7, 17:10, 18:13, 19:19, 21:7, 21:12, 21:14, 22:1, 22:3, 24:4, 24:10, 24:12, 25:3, 25:23, 25:24, 26:1, 26:2, 26:3, 27:12, 27:13, 27:19, 27:20, 29:6, 29:15, 29:16, 29:17, 29:21, 32:11, 32:13, 35:14, 37:7
MS [24] - 3:19, 3:22, 4:6, 11:1, 11:4, 12:11, 13:1, 13:7, 13:12, 13:20, 15:4, 15:7, 15:23, 16:5, 16:7, 16:12, 16:18, 16:20, 16:22, 17:6, 18:3, 18:10, 24:13, 37:8
must [1] - 36:10

N

name [2] - 3:21, 13:5
ne'er [1] - 7:22
nebulous [1] - 8:14
necessarily [2] - 28:12, 34:25
necessary [1] - 32:2
need [13] - 8:4, 8:10, 10:14, 17:22, 19:7, 19:22, 20:5, 26:6, 27:21, 28:15, 30:14, 30:23, 36:7
needs [1] - 34:12
negotiate [6] - 22:19, 23:11, 33:4, 33:24, 34:9, 34:16
negotiated [4] - 13:13, 33:5, 34:3, 34:4
never [5] - 33:5, 33:7, 33:8, 33:18
new [6] - 11:10, 21:5, 21:18, 29:8, 29:10, 35:6
night [1] - 5:22
nine [3] - 10:4, 10:7, 10:8
NLRA [4] - 25:1, 26:9, 26:21, 26:24
NLRB [3] - 11:24, 22:20
nobody [1] - 22:7
nonmotorized [1] - 30:12
normally [2] - 17:2, 34:19
NORTHERN [1] - 1:4
noted [1] - 7:13
notereading [1] - 2:25
Nothing [1] - 26:12
nothing [2] - 16:13, 16:14
notice [2] - 12:13, 12:15
notion [1] - 32:22
number [2] - 9:4, 9:8, 15:12, 23:24
nutshell [1] - 10:24

O

o'clock [1] - 5:22
obligation [2] - 9:24, 10:1
obtain [1] - 25:8
obviously [2] - 13:17, 18:5
occur [1] - 19:11
OF [3] - 1:4, 1:8, 1:15
Office [1] - 2:9
Official [1] - 37:22
OFFICIAL [1] - 2:14
old [1] - 19:24
Once [1] - 33:4
once [2] - 22:23, 26:18
one [24] - 3:6, 7:9, 8:12, 8:23, 9:7, 9:9, 10:1, 10:13, 11:1, 11:13, 11:14, 12:8, 13:20, 13:22, 13:23, 14:3, 14:4, 23:15, 26:11, 27:21, 29:2, 34:23, 36:9, 36:11
One [1] - 9:24
open [1] - 36:24
open-minded [1] - 36:24
operations [1] - 32:6
operator [1] - 25:7
opinion [1] - 19:16

opposition [1] - 28:5
Order [1] - 1:10
order [6] - 5:3, 8:4, 17:23, 28:13, 36:14, 37:2
ORDER [1] - 1:15
organizations [1] - 22:5
oriented [1] - 25:15
original [1] - 5:7
oversimplification [1] - 23:9
overtime [7] - 11:16, 20:19, 21:4, 23:23, 24:15, 24:18, 24:21
own [9] - 16:10, 19:21, 20:4, 26:16, 30:13, 30:16, 30:22, 34:12
owned [1] - 30:11
owner [1] - 25:7
owns [1] - 35:3

P

p.m [1] - 20:24
packed [1] - 19:22
Page [1] - 31:2
page [1] - 31:4
pallet [1] - 30:1
part [3] - 12:15, 12:21, 17:24
participant [6] - 25:5, 25:14, 26:1, 32:23, 34:5, 35:1
particular [2] - 12:21, 35:7
parties [4] - 12:21, 31:18, 31:23, 33:21
partners [3] - 5:23, 6:2, 6:11
passing [1] - 25:6
patently [1] - 21:1
Paul [3] - 2:10, 4:9, 27:20
pay [1] - 20:3
PC [1] - 2:5
people [3] - 15:12, 30:22, 34:14
per [1] - 13:24
percent [1] - 13:17
perfectly [1] - 20:5
perform [2] - 11:5, 29:23
performance [1] - 32:15
performed [1] - 15:13
person [1] - 15:22
persuasion [1] - 35:20
PIER [1] - 1:11
Pier [5] - 3:3, 3:14, 4:3, 4:7, 9:9
Place [12] - 9:10, 11:6, 16:17, 19:12, 25:7, 25:9, 28:22, 32:6, 33:24, 35:3, 36:20
place [5] - 11:12, 29:10, 30:18, 32:4, 36:5
plaintiff [4] - 3:17, 3:25, 12:19, 18:16
Plaintiff [2] - 1:9, 1:20
plaintiff's [2] - 8:19, 8:22
plaintiffs [5] - 5:6, 5:16, 8:13, 9:6, 36:18
plenty [1] - 30:24
plural [1] - 4:11
Plus [1] - 19:5

point [10] - 6:17, 7:19, 7:25, 12:8, 16:18, 17:14, 22:16, 30:25, 32:14
pointed [2] - 18:16, 18:17
points [5] - 5:24, 12:19, 29:17
police [2] - 17:11, 17:13
policy [1] - 32:17
position [3] - 6:12, 28:19, 29:3
possible [3] - 21:1, 35:12, 36:4
poster [1] - 15:20
potential [1] - 22:14
powers [1] - 31:25
practice [2] - 23:4, 23:18
pre [1] - 9:16
pre-legislation [1] - 9:16
preclude [1] - 31:24
preempted [5] - 23:1, 23:3, 23:13, 24:24, 33:21
preemption [7] - 23:5, 23:7, 23:8, 23:15, 25:3, 26:5, 35:23
preliminary [11] - 5:1, 5:4, 5:12, 6:24, 8:1, 20:9, 28:5, 28:12, 28:20, 35:5, 36:23
premises [2] - 30:3, 30:11
presence [1] - 6:14
presented [3] - 29:5, 35:24, 35:25
pretty [2] - 11:8, 11:12
primarily [1] - 15:18
private [1] - 35:1
privately [1] - 30:11
problem [2] - 24:21, 35:20
Proceedings [1] - 2:24
proceedings [1] - 37:18
process [5] - 12:23, 22:23, 22:24, 30:18, 32:4
produced [1] - 2:25
prohibited [3] - 15:14, 19:9, 29:25
prohibits [1] - 16:13
project [6] - 33:8, 33:18, 34:10, 34:11, 34:16, 35:8
prompted [1] - 25:16
prong [1] - 28:25
prongs [1] - 35:17
property [2] - 19:21, 34:13
proposition [2] - 20:1, 32:25
protected [3] - 22:13, 22:14, 23:25
prove [1] - 37:3
provide [1] - 25:11
provides [1] - 32:1
provision [11] - 18:19, 18:20, 18:23, 18:25, 20:10, 20:11, 20:14, 30:4, 30:5, 30:7
provisions [1] - 20:20
public [6] - 29:1, 32:17, 33:1, 33:13, 36:11, 36:12
pulling [1] - 20:6
purpose [1] - 19:17
put [7] - 10:7, 10:9, 15:20, 16:1, 18:7, 22:4, 25:9

**Q**

quanitified [1] - 13:14
quantify [3] - 15:12, 17:22, 18:4
questions [1] - 9:8
quickly [2] - 6:20
quite [1] - 19:19
quote [1] - 8:12

**R**

race [1] - 28:3
Radelet [1] - 2:5
raise [2] - 18:14, 27:21
raised [2] - 27:22, 28:4
raises [1] - 18:14
raising [1] - 28:6
Randolph [1] - 2:11
rather [4] - 5:6, 9:2, 20:25, 21:17
read [5] - 6:7, 10:8, 21:18, 30:7, 36:25
reading [1] - 21:18
ready [2] - 4:25, 14:1
real [1] - 20:21
really [4] - 8:14, 27:16, 30:6, 32:21
reason [3] - 4:21, 4:22, 14:6
reasons [1] - 12:18
reassignment [1] - 6:16
received [3] - 5:17, 5:21, 7:13
Recess [1] - 3:11
recognize [1] - 18:24
recognized [1] - 25:1
record [2] - 3:7, 37:18
recorded [1] - 2:24
redressed [2] - 14:5, 14:21
reduced [1] - 13:16
reductions [1] - 14:8
refer [1] - 20:8
referral [5] - 12:1, 12:4, 12:6, 12:9, 13:9
referred [2] - 9:25, 23:6
Reform [1] - 24:8
reforms [1] - 29:10
refute [1] - 10:1
regard [3] - 10:15, 11:10, 19:6
regarding [2] - 18:14, 32:8
regardless [1] - 21:15
regime [2] - 19:24, 27:3
regularly [1] - 9:12
regulate [1] - 33:21
Reilly [3] - 2:6, 4:4, 4:7
relatedness [2] - 4:21, 4:23
relating [1] - 22:8
relationship [11] - 7:21, 8:22, 14:10, 14:12, 14:13, 18:17, 26:11, 26:15, 27:7, 27:9
relationships [1] - 20:13
relief [10] - 10:21, 10:22, 17:23, 17:24, 29:2, 35:18, 35:19, 36:8, 36:9

relying [1] - 18:20
remedied [2] - 36:2, 36:4
remedy [7] - 8:5, 8:10, 14:21, 17:16, 18:11, 32:15, 37:5
removed [1] - 16:16
rent [1] - 25:8
reply [1] - 32:12
Reporter [1] - 37:22
REPORTER [2] - 2:14
represent [2] - 13:25, 32:23
representation [2] - 13:21, 21:16
representatives [3] - 12:24, 13:25, 23:24
represented [1] - 22:5
reputation [2] - 8:20, 31:1
request [1] - 12:9
requesting [1] - 12:3
require [3] - 15:22, 20:18, 34:14
required [1] - 34:20
requiring [2] - 32:14, 34:11
resolve [1] - 31:7
resolved [2] - 6:16, 31:17
resolving [2] - 11:21, 32:8
respond [3] - 13:9, 13:10, 29:15
response [8] - 5:18, 5:21, 10:23, 20:10, 28:21, 31:3, 35:5, 36:16
responses [1] - 9:24
responsible [1] - 33:2
restoration [1] - 34:10
Restraining [1] - 1:10
restraining [1] - 37:2
RESTRAINING [1] - 1:15
result [1] - 9:17
resulting [1] - 32:6
revenue [1] - 25:8
review [1] - 9:2
rights [3] - 23:25, 28:13, 30:5
Rm [1] - 2:15
role [2] - 27:23, 28:4
round [1] - 29:18
RPR [3] - 2:15, 37:20, 37:21
ruins [1] - 18:18
rule [5] - 4:20, 4:25, 6:25, 24:2, 32:17
rules [7] - 7:16, 7:17, 12:14, 19:20, 21:18, 23:1
Ryan [2] - 1:22, 3:24

**S**

Sally [2] - 2:6, 4:6
savings [1] - 32:6
scenario [1] - 16:2
schedule [1] - 6:20
scissor [1] - 30:2
scooters [1] - 30:1
SCOTT [1] - 4:6
Scott [2] - 2:6, 4:6
Second [1] - 35:21

second [3] - 3:6, 3:9, 11:15
sections [2] - 11:17, 11:19
see [4] - 3:9, 9:13, 34:25, 35:1
seek [2] - 10:19, 10:20
sees [1] - 35:4
segue [1] - 22:15
semis [1] - 20:6
sense [3] - 6:14, 20:1, 32:19
served [1] - 29:1
serves [1] - 23:12
set [1] - 5:18
Seventh [1] - 31:5
several [3] - 7:10, 9:24, 11:16
shall [1] - 30:9
shooting [1] - 6:21
shortly [1] - 5:14
show [14] - 7:14, 7:15, 13:23, 14:13, 16:4, 18:7, 20:3, 20:4, 25:8, 25:13, 25:17, 26:19, 29:8, 36:12
showing [2] - 35:19, 37:3
shows [9] - 11:10, 19:11, 25:9, 25:10, 28:21, 28:22, 29:7, 35:25, 36:13
side [1] - 27:15
signed [1] - 28:2
significant [2] - 22:16, 28:23
significantly [1] - 13:24
signs [1] - 9:13
similar [1] - 30:2
similarities [1] - 35:2
similarly [1] - 35:3
simple [1] - 19:21
simply [3] - 19:19, 21:20, 36:19
sit [1] - 31:18
situation [2] - 16:2, 30:13
six [2] - 13:22, 30:18
size [6] - 10:10, 13:12, 13:16, 14:8, 23:22, 24:15
sizes [1] - 13:14
slam [1] - 34:24
slam-dunk [1] - 34:24
small [2] - 19:21, 20:2
society's [1] - 9:7
solely [1] - 6:25
someone [1] - 17:2
somewhat [1] - 7:25
sorry [2] - 15:2, 24:4
sort [2] - 28:12, 31:2
South [1] - 2:15
speaking [2] - 13:5, 13:8
specific [4] - 10:4, 10:7, 10:8, 10:25
specifically [1] - 35:9
Specifically [1] - 29:23
speculate [1] - 22:11
speculation [2] - 16:19, 17:20
speculative [2] - 9:3, 17:21
spite [1] - 34:8
sponte [1] - 5:3
square [1] - 15:20
squarely [1] - 25:14

St [3] - 2:11, 2:15, 31:3
standard [1] - 29:12
state [7] - 22:23, 23:12, 23:13, 24:1, 25:6, 32:18, 35:6
statement [3] - 21:8, 21:18, 32:19
STATES [2] - 1:4, 1:16
status [1] - 3:10
statute [9] - 5:9, 12:22, 20:12, 21:5, 21:8, 27:24, 29:22, 32:1, 32:4
stays [1] - 37:1
Ste [2] - 1:22, 2:6
stenography [1] - 2:24
steps [1] - 26:6
steward [2] - 13:22, 13:23
still [4] - 5:11, 15:15, 18:2, 19:5
straight [2] - 20:24, 20:25
strong [1] - 21:17
strongest [1] - 17:24
stuff [1] - 19:25
sua [1] - 5:3
subjects [2] - 10:4, 22:19
submitted [1] - 32:16
subpoena [1] - 31:24
subsection [1] - 29:24
substantiating [2] - 8:24, 29:4
success [1] - 37:4
sue [2] - 18:6, 18:14
sufficient [1] - 36:12
suing [2] - 18:8, 18:9
support [2] - 25:13, 28:20
surprised [1] - 6:16
system [5] - 12:1, 12:4, 12:6, 13:10

## T

tailored [1] - 35:7
Teamster [1] - 19:25
Teamsters [21] - 3:3, 3:14, 11:4, 11:9, 11:21, 12:24, 13:13, 18:21, 18:22, 18:25, 19:3, 19:4, 19:5, 19:15, 20:12, 25:11, 26:20, 26:21, 26:24, 30:7, 30:23
TEAMSTERS [1] - 1:8
Technically [1] - 17:14
Temporary [1] - 1:10
temporary [2] - 30:20, 37:2
TEMPORARY [1] - 1:15
term [1] - 34:1
terms [10] - 14:18, 21:2, 22:19, 23:16, 26:9, 33:12, 33:16, 33:21, 34:3, 35:6
THE [69] - 1:15, 3:2, 3:6, 3:8, 3:12, 3:13, 3:18, 3:21, 3:23, 4:1, 4:5, 4:8, 4:11, 4:14, 4:17, 4:19, 5:25, 6:2, 6:7, 6:10, 6:18, 7:7, 8:3, 10:7, 10:14, 10:24, 11:3, 12:12, 12:16, 13:2, 13:4, 13:8, 13:19, 14:2, 14:15, 14:17, 14:21, 15:2, 15:5, 15:14, 15:25, 16:6, 16:9, 16:15, 16:19, 16:21, 16:25, 17:5, 17:8, 17:20, 18:8, 18:11, 19:16, 21:13, 21:17, 22:2, 24:3, 24:5, 24:11, 25:2, 25:25, 27:15,

28:18, 29:7, 29:19, 32:10, 32:12, 34:7, 35:16
therefore [2] - 17:15, 17:16
third [1] - 31:23
Thomas [2] - 2:10, 4:15
thoughts [1] - 9:20
three [1] - 11:17
titles [1] - 9:12
today [6] - 5:15, 6:14, 31:12, 35:13, 35:16, 35:17, 36:21, 37:3
tomorrow [1] - 28:7
tongue [1] - 27:17
totally [1] - 21:10
touched [1] - 22:17
tourism [1] - 25:13
town [1] - 5:22
trade [7] - 7:10, 25:13, 26:19, 28:21, 29:8, 36:13
traditionally [1] - 19:3
transcript [2] - 2:24, 37:17
TRANSCRIPT [1] - 1:15
treadmill [1] - 6:7
tremendous [1] - 30:21
triggered [2] - 7:1, 7:2
TRO [15] - 3:12, 5:5, 5:11, 5:15, 5:21, 8:4, 8:25, 9:21, 27:24, 28:8, 28:25, 29:11, 35:5, 35:17, 36:22
trucks [2] - 19:11, 30:12
true [1] - 20:17
try [2] - 3:12, 27:16
trying [3] - 16:1, 34:16, 36:13
tunnel [1] - 33:2
two [8] - 4:22, 9:25, 11:19, 13:15, 13:17, 23:20, 24:16
type [2] - 19:3, 34:19
types [1] - 36:20

## U

under [22] - 10:16, 11:17, 13:15, 13:23, 16:22, 16:25, 20:18, 21:4, 21:5, 25:1, 26:3, 26:18, 26:23, 26:24, 27:10, 28:25, 29:11, 32:4, 33:16, 34:19, 36:5
Under [4] - 11:7, 13:21, 16:12, 19:23
underlying [1] - 24:21
unenforceable [1] - 34:4
unfair [3] - 23:4, 23:18, 32:24
unfortunately [1] - 18:1
unilaterally [1] - 23:16
union [20] - 13:21, 15:19, 15:22, 19:7, 21:21, 23:2, 26:8, 26:11, 26:14, 26:17, 27:9, 31:6, 31:15, 31:16, 31:20, 32:15, 34:17, 34:18, 34:19, 36:15
union's [1] - 27:10
unions [6] - 23:10, 27:5, 31:6, 31:17, 33:4, 34:9
Unions [1] - 31:10
unique [1] - 33:22
UNITED [2] - 1:4, 1:16

**unload** [6] - 19:10, 19:11, 20:6, 30:10, 30:13, 30:23
**unloading** [1] - 21:25
**up** [11] - 10:10, 11:22, 12:19, 13:15, 15:20, 16:24, 18:3, 20:6, 20:16, 29:20, 32:7
**users** [1] - 33:25

## V

**valid** [2] - 11:23, 35:22
**validation** [1] - 28:19
**various** [1] - 31:11
**vehicles** [2] - 19:10, 30:11
**vendors** [1] - 29:8
**verbatim** [1] - 20:11
**versus** [4] - 3:3, 3:14, 9:6, 31:4
**vetted** [1] - 28:1
**victory** [1] - 31:8
**view** [1] - 10:1
**violating** [1] - 23:1
**violation** [1] - 15:9
**violations** [2] - 8:13, 11:25
**VIRGINIA** [1] - 1:15
**voices** [1] - 28:16
**void** [1] - 34:4

## W

**Wacker** [1] - 2:6
**wait** [1] - 5:11
**Ward** [1] - 22:8
**WARNER** [17] - 4:2, 12:8, 12:13, 12:18, 18:13, 19:19, 21:12, 25:3, 25:24, 26:1, 26:3, 27:19, 29:15, 29:17, 29:21, 32:11, 37:7
**Warner** [4] - 2:5, 4:3, 29:20, 32:10
**Warner's** [1] - 28:14
**week** [1] - 22:11
**weighing** [2] - 36:17, 36:18
**well-documented** [1] - 35:12
**willing** [2] - 18:2, 24:7
**win** [1] - 8:8
**window** [1] - 35:9
**women** [1] - 13:15
**workers** [3] - 21:22, 34:17, 34:18
**works** [1] - 21:3
**Wrecking** [1] - 31:4

## Y

**yesterday** [1] - 5:21