**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EZELL, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-5135** |
| | ) | **Judge Virginia M. Kendall** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR A TEMPORARY RESTRAINING ORDER

Defendant City of Chicago (the "City"), by its attorney, Mara S. Georges, Corporation Counsel for the City of Chicago, hereby submits its Memorandum in Opposition to Plaintiffs' Second Motion for a Temporary Restraining Order.

## INTRODUCTION

In their third emergency motion filed in the last two weeks, and their second motion for a temporary restraining order, Plaintiffs claim that the potential arrival of a mobile firing range on September 24 somehow creates irreparable harm. On August 24, 2010, this Court found that Plaintiffs had not shown that they would suffer irreparable injury because they had the ability to get training outside the borders of the City. *See* Transcript of Proceedings dated August 24, 2010, attached hereto as Exhibit A, at 75. The arrival of a mobile training range on September 24 does not change that finding. A mobile range might be a potential remedy for the alleged harm Plaintiffs claim to suffer, but the remedy cannot possibly make the alleged harm irreparable. Therefore, as explained below, Plaintiffs cannot show that they will suffer irreparable harm or that they have an inadequate remedy at law if they were to prevail on the merits of this case. In addition, Plaintiffs do

not have a likelihood of prevailing on the merits, and, in any event, the balance of harms and the public interest weigh heavily against allowing firing ranges into the City before any final decision on the merits. This is particularly true in this case, where the discovery that has taken place shows that Plaintiffs have no careful plans on where they will place the mobile range and how they will run it.

## FACTUAL BACKGROUND

The mobile shooting range will "be operated by SAF in conjunction with ISRA's state-certified firearms trainers." Declaration of Julianne Versnel dated August 15, 2010, attached as Exhibit B, ¶ 6. However, SAF has never managed or operated a shooting range. Deposition of Julianne Versnel, attached as Exhibit C, at 25.[1] SAF will not staff any employee to the range, and it has not even decided who at SAF will oversee the range from afar. *Id.* at 65-66. SAF claims that ISRA will be in charge of operating the range and training customers. *Id.* at 41-44. But SAF does not know whether ISRA has ever operated a mobile range before. *Id.* at 34. In fact, ISRA has not. Deposition of Richard Pearson, attached as Exhibit D, at 36. Nor does SAF know who at ISRA will be responsible for what happens at the range, what rules the ISRA range master would apply, or what state, county, or local laws would apply. Ex. C at 42, 43, 124-26.[2] There are no written agreements between SAF and ISRA regarding the mobile range. Ex. D at 56. Indeed, ISRA does not have a single document relating to the endeavor with SAF. *Id.* at 51.

---

[1] Indeed, prior to this case, SAF had never even contracted for a mobile shooting range. Ex. C at 24. It also does not know whether it needs a license to operate a shooting range in Illinois, nor did it try to find out. *Id.* at 30-31.

[2] For its part, ISRA never attempted to find out whether SAF had any prior experience with operating a mobile range. Ex. D at 102.

Aside from agreeing to help run the range, ISRA has not discussed with SAF "any specifics about specific roles that ISRA would play" at the range. *Id.* at 57. While Mr. Pearson, ISRA's Executive Director, testified that ISRA will in fact set the safety protocols for the mobile range (*id.* at 68, 99-100), he has yet to do so (*id.* at 68) and has never done so for a mobile range. *Id.* at 36, 69.[3] Nor has he "spoken to anyone that has any experience in operating a mobile shooting range or being a range master . . . or a trainer at a mobile shooting range." *Id.* at 106. And while "[t]he layout of the particular range" impacts what the rules of the range will be (*id.* at 27-28), Mr. Pearson has never even seen a mobile range. *Id.* at 36, 68-69. Nor has he communicated with Blue Line, the supplier of the mobile range, about it, and does not know whether it has ever been used for civilian training. *Id.* at 61, 104, 113-14. He also has not visited the site where the range would be placed, and he does not know where on the site it would be placed. *Id.* at 111-12. Moreover, the ISRA person responsible for inspecting the trailer and replacing worn insulation and bullet traps so that bullets will not escape the trailer will "[p]robably not" have done those tasks before on a mobile range. *Id.* at 183-84.

Other critical gaps in the protocol remain. For instance, SAF and ISRA have not discussed how customers will be armed. *Id.* at 70. According to SAF, "[t]he range would not supply firearms" and customers will have to bring their own. Ex. C at 53, 123. ISRA, on the other hand, testified that the range *will* supply the arms and that customers *will not* be allowed to bring their own. Ex. D at 70. Moreover, SAF has not determined what "logistics" would be used to respond to crowds sitting in the parking lot outside the range with their weapons. Ex. C at 123-24. For his part, Mr. Pearson "ha[d] no idea" whether customers bringing their own weapons would be turned away. Ex. D at 122.

[3] Further, Mr. Pearson is not a state-licensed firearms instructor. Ex. D at 42-43.

Further, Mr. Pearson testified that port-o-potties would be provided to allow customers to wash lead residue from their hands that can "penetrate their skin." *Id.* at 153. But he had not contacted any port-o-potty providers (*id.* at 180), and Larry Cohen, the Chairman of Accurate Perforating, testified that port-o-potties would not be permitted on the Accurate site. Deposition of Larry Cohen, attached as Exhibit E, at 63.

Problems also beset the two locations chosen by Plaintiffs to operate the range. SAF asserts that it has leased land from Accurate Perforating. Ex. B, ¶ 5. However, Mr. Cohen, testified that Accurate does not own the property, and that the lease (even if valid) merely grants the right to store the trailer, but not to open it to the public. Ex. E, at 40, 42, 64-65, 100-01. Indeed, the lease states that its "purpose" is "storage" for "one trailer." Ex. B, Ex. B thereto, at 1.[4]

Plaintiffs now assert that they have just leased a second location (at 6300-6400 South Bell) to operate the trailer. Declaration of Julianne Versnel dated September 12, 2010, attached as Exhibit F, ¶¶ 10-11.[5] However, the purported lease is not signed by the property owner. *Id.* at Ex. D. Moreover, Plaintiffs' description of the site as "industrial" is grossly misleading. Plaintiffs' Memorandum of Points and Authorities ("TRO Mem."), at 12. While noting that one side borders a railroad yard, they omit that a swath of single-family homes spans another side, and that three

---

[4] Moreover, the lease states that SAF has "examined and knows the condition of the Premises." Ex. B at Ex. B, ¶ 2. In fact, SAF has never visited the property (JV Dep, at 106), much less examined it. Ex. C at 140-41. Ms. Versnel could not even recall whether she has ever seen a photograph of the location. *Id.* at 128. She does not know whether the parcel is a parking lot, or something else (*id.* at 133) or whether it is surrounded by fences or gates. *Id.* at 192. And SAF's contract with Blue Line Corporation for provision of the trailer states that SAF's "authorized agent" – namely, Ms. Versnel – will designate a place on the site where the trailer can be safely placed. Ex. B at Ex. A, ¶¶ 2.C., 5.B. However, Versnel has not done this, either. Ex. C at 106-07. The Blue Line contract further requires SAF to acquire adequate insurance to cover its employees, but SAF has not approached any insurance carriers. *Id.* 110-11.

[5] The City has not yet had the opportunity to conduct discovery regarding this new location.

schools and three churches are within mere blocks of the site.[6]

ISRA has not talked to anyone at the City regarding the mobile range. Ex. D at 57, 64. It has made no attempt to see what Chicago zoning, building code, safety services, or environmental provisions would apply to the range. *Id.* at 103-05. Nor has it inquired whether a building permit, business license, or City inspection would be necessary. *Id.* Mr. Pearson does not even know whether range staff will check whether customers are entitled under Chicago law to handle firearms. *Id.* at 119.[7]

Mr. Pearson contends that there is "a severe shortage or range time within a hundred miles of the City of Chicago." Declaration of Richard Pearson dated September 12, 2010, attached as Exhibit H, ¶ 7 . However, this claim is not supported by any documents. Ex. D at 49-51. Nor has Mr. Pearson learned this from range operators, seen any evidence of overcrowding at a range, or spoken with any customer who was delayed or turned away by a range. *Id.* at 80-81. Rather, Mr. Pearson contends the statement is supported by the experience of two individuals, but he acknowledged that they were able to get their training, and that he did not know how long they had to wait. *Id.* at 78-80. Mr. Pearson further contends that the statement is supported by the mere fact that there are 105,000 FOID card holders in Chicago, which means that there is a "tremendous" number of people seeking training. *Id.* at 78-79. But he acknowledged that he "[has] no idea" how

---

[6] *See* Exhibit G hereto (satellite image of neighborhood; site is bordered in red; single family homes are bordered in yellow; schools are bordered in blue; and churches are marked by green dots).

[7] In light of Plaintiffs' utter lack of knowledge and preparation, the half-baked mobile range plan appears to be the handiwork of Plaintiffs' counsel. Indeed, when Mr. Pearson was asked "[w]hose idea was it for the ISRA to partner with the SAF on this mobile shooting range project," he answered "I will skip that question" and "[t]hat would be in the privileged area." Ex. D at 96-97. Plaintiffs' counsel directed Mr. Pearson not to answer the question, and repeated the instruction when Mr. Pearson was asked "[w]as it Mr. Gura's idea or Mr. Sigale's idea?" *Id.* at 97.

many of these people need training by October 12, or even how many of them want to register a firearm in Chicago. *Id.* at 80-81. Indeed, he is "not aware of any instance where a Chicago resident who wanted to register a gun in Chicago was not able to obtain the necessary training at a range outside of Chicago." *Id.* at 84-85. Indeed, there are at least 19 range training providers with 50 miles of Chicago. *See* Argument, Part II.B.2, *infra*.

The range ban has not impacted the information ISRA conveys in Chicago or the ways it coveys it. Ex. D at 134. The range ban prevents ISRA only from operating a facility where guns are discharged. *Id.* at 133. ISRA is free to open facilities for firearms discussion and education, and to distribute firearms information and literature. *Id.* at 132-33. In particular, ISRA is able to provide in Chicago the exact same firearms instruction it provides at its "picnic pavilion" in Bonfield, Illinois, which "isn't the range." *Id.* at 20, 134. The instruction includes safe gun use, storage, loading, posture, and aiming. *Id.* at 16-17, 21-22. It does not require students to actually handle firearms. *Id.* at 18. Indeed, handling is prohibited because of "safety" concerns: instructors "don't know if [the students] have any experience" handling firearms, and "we don't want them fooling around with anything else other than listening to the instructor." *Id.* at 18, 20. Instead, instructors use various visual aids and literature. *Id.* at 19. And firearm grip, stance, side alignment, aim, and holstering can all be taught through use of a "blue gun," which is simply a plastic replica of a firearm given to students. *Id.* at 21-22.

## STANDARD

A TRO is treated the same as a preliminary injunction. Both are "an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing." *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp. 2d 798, 803 (N.D. Ill.

2008). To prevail, the moving party must demonstrate "(1) a reasonable likelihood of success on the merits, and (2) no adequate remedy at law and irreparable harm if the preliminary relief is denied." *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F. 3d 1153, 1156 (7th Cir. 1996). "If the moving party clears these hurdles, the court must then consider: (3) the irreparable harm the non-moving party will suffer if the injunction is granted balanced against the irreparable harm the moving party will suffer if the injunction is denied, and (4) the public interest, i.e. the effect that granting or denying the injunction will have on non-parties." *Id.* The purpose of this balancing is "to minimize the cost of potential error." *Girl Scouts of Manitou Council v. Girl Scouts of the U.S.A.*, 549 F.3d 1079,1086 (7th Cir. 2008).

## ARGUMENT

### I. There Is No Irreparable Harm To Plaintiffs And Plaintiffs Have An Adequate Remedy At Law.

"A harm is 'irreparable' if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Girl Scouts*, 549 F.3d at 1089. Plaintiffs cannot meet their burden of showing that they will suffer irreparable harm. The individual plaintiffs in this case will not suffer any irreparable harm if they must go to the suburbs for one hour of range training in order to obtain a CFP. Ms. Ezell has already completed her one hour of training at a firing range in the suburbs and has her CFP. Deposition of Rhonda Ezell, attached as Exhibit I, at 33, 36. Mr. Brown goes to a suburban gun range in Morton Grove between 250 to 270 times a year in the winter months and has been to the ISRA range in Bonfield, Illinois about 10 times in the last year. Deposition of Joseph Brown, attached as Exhibit J, at 14, 27. At deposition, he testified that he had not completed his training because "I have not gotten around to it." *Id.*. at 44. Mr. Hespen testified at deposition that he had

been to the ISRA range in Bonfield about 10 times in the past year, but had not yet completed the training required for a CFP because he had heard that the City's ordinance might be amended to allow retired police officers, like him, to get their CFP without training. Deposition of William Hespen, attached as Exhibit K, at 42-43. When he was asked if he would obtain the training outside the City if the ordinance was not amended, he said "Absolutely." *Id.* at 43. He is able to drive outside the City to go to firing ranges. *Id.* at 34. In fact, there are approximately nineteen gun ranges located in the suburbs, *see* Argument, Part II.B.2, *infra*, including ranges accessible by public transportation, and businesses in the City that offer classroom training and arrange for range training in nearby suburbs.[8] The arrival of a mobile range that will be here for only a few days and can only accommodate three people at a time will not change these facts or create any irreparable harm. Moreover, any harm resulting from a trip to the suburbs can be remedied with money damages after a trial. *See Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir. 2004) (the belief that "money is never an adequate remedy for a constitutional wrong . . . is incorrect").

The other Plaintiffs also fail to meet their burden of showing irreparable harm. Neither SAF nor ISRA are able to identify any member who is unable to obtain range training in the suburbs in

---

[8] Plaintiffs claim that there is a shortage of range space in the Chicago area, but they have no evidence to support this claim. They rely on a Declaration from ISRA's Executive Director, Richard Pearson. *See* TRO Mem. at 2-3. At his deposition, however, Mr. Pearson admitted that he had no personal knowledge to support his statement, other than having heard that a few people who trained at one facility in Chicago had "scheduling problems," information he described as "hearsay," and that he counted all the FOID card holders in Chicago and assumed they would all need range training right away. He conceded, though, that he did not know how many were seeking training and that he had no knowledge of overcrowding at any ranges. *See* Ex. D at 78-81. Plaintiffs also rely on a declaration from the owner of a gun training facility located in the City, who stated that he has few options to train his clients at suburban ranges, not because there are not enough ranges, but because suburban ranges "are locking out Chicago-based instructors, so that they can keep the CFP training market for themselves." Declaration of Andre Queen dated September 12, 2010, attached as Exhibit L, ¶ 3. This doesn't mean that there is a shortage of range space, but rather that suburban range owners want to do the training themselves.

order to obtain a CFP. They make the sweeping claim that all of their members in the City will lose the ability to register their guns without range training, *see* TRO Mem. at 2, but they make no effort to explain why these members have not or cannot obtain range training in suburban Chicago, like the individual plaintiffs. Their failure to come forward with even one individual who cannot obtain range training is telling.[9]

Moreover, the organizations themselves will not suffer irreparable harm. The Supreme Court has said that the Second Amendment confers "an *individual* right to keep and bear arms." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2799 (2008) (emphasis added). Organizations like SAF and ISRA do not have a Second Amendment right at all, much less a Second Amendment right to operate a gun range, and Plaintiffs cite no authority to the contrary. In addition, Action Target, Inc., which designs and builds gun ranges, has no Second Amendment right to design and construct a gun range in Chicago. Therefore, SAF, ISRA and Action Target will not suffer any harm, much less irreparable harm due to the ban on gun ranges. Again, the possible arrival of a mobile range does not change the fact that these entities are not suffering irreparable harm.

Plaintiffs have argued that any alleged violation of their Second Amendment rights constitutes irreparable harm. They cannot cite any support for this radical claim. The City has not found even a single case in which a court has held that a violation of the Second Amendment itself constitutes irreparable harm. Moreover, the Supreme Court in *McDonald v. City of Chicago*, 130 S. St. 3020 (2010), did not treat Second Amendment rights as an urgent matter. Although the City's

---

[9] Plaintiffs also make the hyperbolic claim that without adequate training, "people get injured and killed," and assert that this amounts to irreparable harm. This is speculation and does not constitute irreparable harm to any of Plaintiffs. Moreover, the City has not denied anyone training; it requires training. Any injury that might result from lack of training is not caused by the City's ordinance.

ordinance was challenged in the case before it, after the Court held that the Second Amendment was incorporated through the Fourteenth Amendment, it remanded the case to the lower courts without striking down the City's ordinance. *See id.* at 3050. It could have struck down the ordinance itself, or expedited the remand if there was any urgency. Furthermore, McDonald involved the core Second Amendment right to keep a handgun in the home for self defense. If even the core right did not merit immediate action, certainly the alleged peripheral right to have a shooting range available does not either.

To the extent that any of Plaintiffs are relying on the First Amendment to claim irreparable harm, their claim fails because the City's ordinance does not prevent any plaintiff from talking about or teaching anything about guns. The only thing the ordinance keeps plaintiffs from doing is shooting guns at a gun range, and no court has ever held that shooting a gun is an activity protected by the First Amendment.[10] That makes sense, because shooting guns is not expressive activity.

Plaintiffs attempt to make much of what they refer to as the "October 12 deadline," TRO Mem. at 2, without acknowledging what the "deadline" actually is. It is a benefit to people who owned guns in violation of the previous law and want to obtain a CFP, not a detriment. Section 8-20-140(d)(2) of the City's Responsible Gun Owner Ordinance allows a person to obtain a CFP for previously illegal firearms that were kept in the City but not registered under the City's prior

---

[10] Plaintiffs cite *Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999), for the proposition that gun training at a range is protected First Amendment speech. *See* TRO Mem. at 7. *Edwards* was an employment case in which the court concluded, at an early stage in the litigation, *id.* at 248, that the plaintiff had stated a claim that he had been suspended from his employment in retaliation for "express[ing] his personal views on and advocacy of firearms safety," by teaching a gun safety course in his off-duty hours. *Id* at 238. The court noted, in passing, that the instruction he provided was "presumably verbal as well as some written instructions accompanied by physical demonstrations." *Id.* at 247. The court, however, did not say that the physical demonstrations involved shooting a gun, nor did it hold that shooting a gun was expressive activity protected by the First Amendment.

ordinance.[11] Surely, this Court cannot find irreparable harm results from a deadline for an amnesty period allowing individuals who were in violation of the previous law to comply with the new ordinance. Moreover, this amnesty period does not apply to firearms owned by a Chicago resident that are kept outside of Chicago. Section 8-20-140(d)(1) allows the individual who has firearms kept outside the City to apply for a CFP after bringing the firearm into the City. In addition, Chicago Police Department regulations provide that anyone whose firearm registration expires before October 12, like Hespen, may submit an application for a CFP by October 12, 2010. *See* City of Chicago Department of Police Rules and Regulations, Firearms - Chapter 8-20, Rule 5.3, attached as Exhibit M. Moreover, although this deadline looms in Plaintiffs' view, it is a problem of Plaintiffs' own making, since training is readily available and Plaintiffs have failed identified who cannot obtain training by October 12.

In any event, the amnesty period does not affect the Second Amendment right to have a handgun in the home for self defense. People are free to acquire firearms at any time in accordance with the ordinance and apply for a CFP within 5 days of taking possession of the firearm in the City. *See* Chicago Mun. Code § 8-20-140(d)(1). At the very worst, if some unidentified individual were to lose the right to apply for a CFP for a particular lawfully kept firearm, the loss of that firearm could be remedied by money damages. That person would have an adequate remedy at law. Neither

---

[11] That section provides:

> Notwithstanding any provision of this chapter to the contrary, a person has 90 days after the effective date of this 2010 ordinance to register a firearm, including a handgun, which had not been previously registered; provided that the person and firearm meet all the requirements of this ordinance.

Municipal Code of Chicago, 8-20-140(d)(2), attached as Exhibit N.

that person, nor any other person, would lose their Second Amendment right to acquire a handgun and apply for a CFP.

## II. Plaintiffs Do Not Have A Likelihood of Success on the Merits.

### A. Plaintiffs Cannot Prevail on Their First Amendment Claims.

As discussed above, Plaintiffs have no likelihood of prevailing on the merits of their First Amendment claims because the City's Ordinance does not place any restrictions whatsoever on speaking, teaching, learning, or communicating about guns, or otherwise prohibit Plaintiffs' expression of speech in any manner. The Ordinance's only prohibition is on the *activity* of actually shooting guns at a gun range within the City limits.

Not one court has ever held that the act of shooting a gun is an activity protected by the First Amendment. In fact, Plaintiffs themselves do not even advance this argument, instead arguing only broadly that "[g]un training is speech." TRO Mem, p. 10. But Plaintiffs can engage in, and in fact some already have received, all forms of gun training within the City, short of shooting a live firearm. Ms. Ezell testified that she attended a four-hour gun safety training class at Fidelity Investigative Training Academy ("Fidelity"), located in the City. Ex. I. at 38-39. Mr. Queen, the Executive Director of Fidelity, testified about the content of these training classes, stating that the instructors employ handouts, power points, and demonstrations to impart a great deal of information regarding the safe and responsible use of firearms. Deposition of Andre Queen, attached as Exhibit O, at 29-33. Likewise, Mr. Pearson testified that ISRA is free to open facilities for firearms discussion and education and to distribute firearms information and literature, including safe gun use, storage, loading, posture, and aiming, in Chicago. Ex. D at 16-17, 21-22, 132-34.

For this reason, Plaintiffs' reliance on *Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir.

1999), is entirely misplaced. The *Edwards* court did not hold that shooting a gun was expressive activity protected by the First Amendment. Rather, it held that advocacy of firearm safety, including teaching a gun safety course where information was presumably provided both verbally and through written instruction, was protected speech. *Id*. at 247. This is precisely the type of training that is available to all Chicago residents, and that Ms. Ezell received. Nothing in the Ordinance prevents, circumscribes, or interferes with this expression, and Plaintiffs' First Amendment claims therefore have no merit and no likelihood of success.

### B. Plaintiffs Cannot Prevail on Their Second Amendment Claims.

#### 1. The Organizational Plaintiffs Cannot Prevail on Any of Their Constitutional Claims.

Because the *Heller* Court only recognized the Second Amendment as protecting an *individual* right to keep and bear arms for purposes of self defense, *see* 128 S. Ct. at 2799, Plaintiffs SAF, ISRA, and Action Target do not possess any right protected by the Second Amendment. They therefore have no likelihood of success on their Second Amendment claims.

#### 2. The Individual Plaintiffs Have No Likelihood of Success on Their Second Amendment Claims.

Plaintiffs Ezell, Hespen, and Brown similarly have no likelihood of prevailing on their claims that the City's ban on firearms ranges violates their Second Amendment rights. In *Heller*, the Supreme Court invalidated a District of Columbia law that banned possession of a handgun in the home for self-defense and required lawfully owned firearms in the home to be kept inoperable. *Id.* at 2817-18. In striking down the District's law, the Court did not identify what level of scrutiny applied to legislation implicating the Second Amendment right except to state that the District's handgun prohibition would fail constitutional muster "[u]nder any of the standards of scrutiny that

[the Court has] applied to enumerated constitutional rights." *Id.* at 2817.

Following incorporation of the Second Amendment right recognized in *Heller*, *see McDonald v. City of Chicago*,130 S. Ct. 3020 (2010), the Seventh Circuit ruled that 18 U.S.C. § 922(g)(9), which prohibits individuals convicted of misdemeanor domestic violence from possessing firearms, passes constitutional muster. *See United States v. Skoien*, No. 08-3770, 2010 WL 2735747 (7th Cir. July 13, 2010) (en banc). In upholding the categorical exclusion from firearm possession, the *Skoien* Court expressly declined to "get more deeply into the 'levels of scrutiny' quagmire," because it found that the goal of § 922(g)(9) -- to prevent "armed mayhem" -- is an important government objective and there is a substantial relation between § 922(g)(9) and that objective. *Id.* at *3. In two subsequent cases, the Seventh Circuit ruled that categorical exclusions from possession of firearms are subject to intermediate scrutiny, which requires that the challenged law must be "substantially related to an important governmental objective." *See United States v. Yancey*, No. 09-1138, 2010 WL 3447736, at *2 (7th Cir. Sept. 3, 2010) (ruling that 18 U.S.C. § 922(g)(3), which prohibits an individual who is an unlawful user of or an addict of any controlled substance from possession of a firearm, passes intermediate scrutiny); *United States v. Williams*, No.09-3174, 2010 WL 3035483 (7th Cir. Aug. 5, 2010) (holding that 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms, passes intermediate scrutiny).

Although the Seventh Circuit has required that laws prohibiting an individual from possessing a firearm satisfy intermediate scrutiny, it has explicitly "reserve[d] the question whether a different kind of firearm regulation might require a different approach." *Yancey*, 2010 WL 3447736, at *2; *see Williams*, 2010 WL 3035483, at *6 (examining the categorical exclusion from firearm possession "using the intermediate scrutiny framework without determining that it would

be the precise test applicable to all challenges to gun restrictions"). Thus, what level of scrutiny applies to the City's prohibition of firing ranges in its borders – which is *not* a categorical exclusion from possession of firearms – is a question of first impression.

Intermediate scrutiny is not the appropriate level of scrutiny for the Court to apply to the City's ban on firing ranges. Because the Seventh Circuit has only applied intermediate scrutiny to laws that absolutely prohibit an individual from possession of a firearm under any circumstance, it should not apply that standard to the City's ban on firing ranges which does not stop any citizen from exercising his or her Second Amendment right. The Court should instead review the firing range ban under either a "reasonable regulation" standard, which is the consensus in States that recognize a firearms right, *see* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 716-17 (2007), or the "undue burden" standard adopted to evaluate restrictions on a woman's constitutional right to an abortion. *See Yancey*, 2010 WL 3447736, at *3 (finding that prior state jurisprudence, as surveyed by Winkler, is relevant to assessing Second Amendment claims).

Under the "reasonable regulation" standard, the Court "identifies the underlying governmental objectives and weig[hs] those goals against the burden on the individual." *Id.*; *see, e.g., Benjamin v. Bailey*, 662 A.2d 1226, 1233 (Conn. 1995); *Robertson v. City & County of Denver*, 874 P.2d 325, 329-30 (Colo. 1994); *Mosby v. Devine*, 851 A.2d 1031, 1044 (R.I. 2004). The City's ban on the operation of firearms ranges within its borders easily meets the "reasonable regulation" standard. Firearms ranges pose considerable public safety, health, and environmental concerns, and the Chicago City Council has determined that these risks warrant a ban on the operation of ranges in the City. And SAF's proposal to bring a mobile range into the City raises heightened concerns because SAF does not have a fully-vetted plan that addresses the myriad public safety issues, not the

least of which is that the 6331 S. Bell location SAF has selected for operating the mobile range is directly across the street from single family homes and is in close proximity to an elementary school and a church. *See* Statement of Facts, *supra*.

This substantial interest far outweighs any purported burden on Plaintiffs. Ezell was able to obtain her one hour of range time in the Chicago suburbs and has legally registered her handgun with the City. *See* Ex. I at 33, 36. Hespen testified that he has traveled 56 miles each way to the ISRA shooting range in Bonfield, Illinois about 10 times in the past year and that he is able to drive outside the City to go to other firing ranges. *See* Ex. K at 34, 42-43. Indeed, Hespen stated that he would "absolutely" travel outside the City to obtain his one hour of range training if necessary. *Id.* at 34-25. Brown similarly testified that he goes to a suburban range in Morton Grove, Illinois between 250 to 270 times a year and has also visited the ISRA Bonfield range about 10 times in the past year. *See* Ex. J at 27. Finally, there are at least 19 ranges in close proximity of the City. *See, e.g.*, Ex. K at 56, 59, 61-63; Ex. J at 42-44; Ex. D at 40-41, 170-176; http://www.wheretoshoot.org, produced by the National Shooting Sports Foundation, attached as Exhibit P. Plaintiffs therefore cannot claim that they are burdened in any significant way by traveling to the Chicago suburbs to obtain their one hour of range training.

The City's ban also easily satisfies the undue burden test, adopted by the Supreme Court in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992), for use in evaluating restrictions placed on a woman's constitutional right to abortion. Under the undue burden standard, a state may enact legislation advancing its interests provided that legislation does not "place a substantial obstacle in the path" of an individual seeking to exercise her constitutional rights. *Id.* As discussed above, Plaintiffs' own actions demonstrate that the City has not placed "a substantial obstacle" in

Plaintiffs' paths by requiring they obtain their one hour of training outside the City. Moreover, the large number of ranges within close proximity to the City eliminates any concern that the unidentified members of SAF or ISRA cannot obtain their one hour of range training.

As a result, Plaintiffs Ezell, Hespen, and Brown have no likelihood of success on the merits of their Second Amendment claims, and their request for a temporary restraining order therefore fails.

## III. The Balance of Harms and the Public Interest Weigh Heavily Against Preliminary Relief.

Only if this Court finds that Plaintiffs have met their burden of showing irreparable harm, an inadequate remedy at law and likelihood of success on the merits, should it then balance Plaintiffs injury and likelihood of success on the merits against the possible injury to the City and the public interest. *See*, *e.g.*, *Girl Scouts of Manitou*, 549 F.3d at1086. The purpose of this balancing is "to minimize the cost of potential error." *Id.* Here, the lack of planning by Plaintiffs, as well as the potential for people to show up with firearms at mobile gun ranges at whatever place in the City someone chooses to place the range weighs heavily against granting interim relief in this case.

Plaintiffs are asking this Court to enjoin the enforcement of numerous provisions of the City's ordinance, including the provision making it unlawful to carry a handgun outside the person's home, *see* Chicago Mun. Code § 8-20-020, to allow them to bring a mobile range into the City to be placed in locations they chose. But if this Court were to enjoin the enforcement of the provision that bars gun ranges in the City, anyone, not just Plaintiffs, will be able to bring mobile ranges into the City. Because the City has not allowed gun ranges in the City, it currently has no regulatory scheme for ranges. More specifically, there is no provision in the Zoning Code allowing gun ranges

in appropriate areas; no provision in the Municipal Code and no regulations governing who may own and operate a gun range and how it should operate; and no environmental regulations even though gun ranges emit and dispose of lead, a hazardous substance.[12]  If this Court were to grant preliminary relief in this case, it would be allowing gun ranges in the City before the City had any opportunity to enact regulatory provisions.  This Court would be allowing anyone to bring in a gun range to any location, regardless of how irresponsible that person is, no matter where they chose to place it.  It would be allowing anyone, even gang members, to carry firearms to the range.  The dangers to the City, its public safety enforcement and the public interest are obvious and weigh against any preliminary relief in this case.

Plaintiffs have not carefully thought through the implications of their own ever-changing plans.  Plaintiffs, for example, have represented to this Court that they have a lease to place the mobile range on a lot next to a railroad.  *See* TRO Mem. at 5.  Plaintiffs failed, however, to let this Court know that although there is a railroad on one side of the lot, on the other side is a full block of single family homes, a church and an elementary school.  If the City were to allow any such property use in the area, the owners of the neighboring properties would be entitled to notice and an opportunity to be heard in accordance with due process.  Plaintiffs, however, ask this Court to issue an order that would force a firing range upon these single family homeowners, church-goers, and parents of elementary school children.  This Court should not do so.

Neither SAF nor ISRA has any firm plans for how they will operate the range.  Mr. Pearson,

---

[12] Plaintiffs may claim that the City should simply tell them what to do or create regulations immediately, but that is not the way local government works.  City officials do not willy-nilly pronounce regulations from the top of their heads.  Zoning and licensing, for example require action by the City Council, which takes time and must comply with due process.

Executive Director of ISRA, has not yet developed the safety protocol. Ex. D at 68. He further testified that he had not discussed any specifics regarding operation of the range with SAF. Ex. D at 57, despite the fact that the complaint alleges that SAF would operate the range in conjunction with trainers from ISRA, *see* Complaint at ¶ 40. While ISRA claimed it would have weapons at the range, Ms. Versnel of SAF testified at deposition that people would bring their own firearms. Ex. C. at 123-24. In any event, Plaintiffs seek to strike down the provision of the ordinance that prohibits carrying firearms, so this Court would be allowing anyone to carry firearms to ranges in the City, even if ISRA plans on having weapons at the range.

Finally, the mobile range from Blue Line will be here only for a few days, from September 24 to September 30, according to Mr. Tilbor, or October 1, according to Ms. Versnel. It has only three positions for shooting at any time. At the most, it would only allow training of a limited number of people. Any benefit to Plaintiffs is heavily outweighed by the harms to the City and to the public interest if injunctive relief is granted.

## CONCLUSION

For all the above reasons, Plaintiffs' *Ex Parte* Motion For a Temporary Restraining Order should be denied.

Date: September 15, 2010	Respectfully submitted,

        MARA S. GEORGES,
        Corporation Counsel for the City of Chicago

        By:   /s/ William Macy Aguiar
                  Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975 / 7129 / 4216

Attorneys for Defendants