# Exhibit A

71

09:52:01

1

2

3

4                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
5                         EASTERN DIVISION

6

7

RHONDA EZELL, et al.,              Case No. 1:10-cv-05135
8
    Plaintiffs,                    Chicago, Illinois
9                                  August 24, 2010
        v.                         Emergency Motion for TRO
10
CITY OF CHICAGO,
11
    Defendant.
12  ---------------------------------

13

                          VOLUME 2
14       TRANSCRIPT OF EMERGENCY MOTION FOR TRO
        BEFORE THE HONORABLE VIRGINIA M. KENDALL
15          UNITED STATES DISTRICT JUDGE

16

17  APPEARANCES:

18

For the Plaintiffs:    Gura & Possessky, PLLC
19                     By:  Alan Gura
                       101 N. Columbus St., Ste. 405
20                     Alexandria, VA 22314
                       (703) 835-9085
21
                          - and -
22
                       Law Firm of David G. Sigale, P.C.
23                     By:  David G. Sigale
                       4300 Commerce Ct., Ste. 300-3
24                     Lisle, IL 60532
                       (630) 452-4547
25

1

2

3  <u>APPEARANCES</u>:

4

5  For the Defendant:          Chicago Corporation Counsel
                                By:  Andrew W. Worseck, and
6                                    William M. Aguiar
                                30 N. LaSalle Street
7                               Chicago, IL 60602
                                (312) 744-2784

8

9  <u>COURT REPORTER</u>:         FEDERAL OFFICIAL COURT REPORTER
                                April M. Metzler, RPR, CRR, FCRR
10                              219 South Dearborn St., Rm. 2318-A
                                Chicago, IL 60604
11                              (312) 408-5154
                                April_Metzler@ilnd.uscourts.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Proceedings recorded by mechanical stenography; transcript
    produced by notereading.

| | | |
|---|---|---|
| 09:53:08 | 1 | intermediate scrutiny. |
| 09:53:10 | 2 | And so in looking at the cases that were presented to |
| 09:53:12 | 3 | me both orally and in the papers, I note that the plaintiffs' |
| 09:53:19 | 4 | position that strict scrutiny should apply is not supported in |
| 09:53:24 | 5 | any particular case as of yet. I think this issue as to |
| 09:53:28 | 6 | whether the use of a weapon in a particular location comes |
| 09:53:32 | 7 | from the core value of the Second Amendment, as defined in |
| 09:53:37 | 8 | McDonald and Heller, is not set forth in any other subsequent |
| 09:53:41 | 9 | case to that or in that case in particular. |
| 09:53:43 | 10 | I think that the cases that have looked at it |
| 09:53:47 | 11 | subsequent to those cases have looked at a class of prohibited |
| 09:53:50 | 12 | individuals and they have looked at a class of weapons or they |
| 09:53:57 | 13 | have looked at, right, different type of weapons, such as the |
| 09:54:01 | 14 | obliterated serial number, the Third Circuit case. And so |
| 09:54:06 | 15 | each of those cases that have looked at the scrutiny to be |
| 09:54:08 | 16 | applied in those settings have applied an intermediate |
| 09:54:12 | 17 | scrutiny. |
| 09:54:12 | 18 | And I think to be on the safe side, the Court is |
| 09:54:16 | 19 | inclined to apply an intermediate scrutiny, although I think |
| 09:54:20 | 20 | the City probably could make an argument that the lower level |
| 09:54:27 | 21 | of scrutiny is available to them still, although they haven't |
| 09:54:31 | 22 | really done that or certainly haven't elucidated that. |
| 09:54:36 | 23 | So we start then with an understanding, from my |
| 09:54:38 | 24 | perspective, that we are not looking at this from a strict |
| 09:54:43 | 25 | scrutiny standard but we are looking at it from an |

| | | |
|---|---|---|
| 09:54:46 | 1 | intermediate scrutiny standard. |
| 09:54:47 | 2 | The City, though, has problems with that in that if |
| 09:54:50 | 3 | we are looking at time, place, manner restrictions, we have an |
| 09:54:57 | 4 | absolute ban on all firing ranges within the City. We don't |
| 09:55:01 | 5 | have any details about where one might be placed or how one |
| 09:55:05 | 6 | might be placed. |
| 09:55:06 | 7 | So that is my analysis of your scrutiny standard. So |
| 09:55:11 | 8 | moving forward I think that will be one main issue to address, |
| 09:55:16 | 9 | is the level of scrutiny to be applied. This Court will apply |
| 09:55:20 | 10 | intermediate scrutiny today. |
| 09:55:22 | 11 | Now, have we irreparable injury and inadequate remedy |
| 09:55:29 | 12 | at law today? I don't think so. I don't think you have it |
| 09:55:32 | 13 | today. I'll tell you why. |
| 09:55:34 | 14 | I think that right now under an intermediate scrutiny |
| 09:55:39 | 15 | standard what you have is you have the ability of your |
| 09:55:41 | 16 | plaintiffs, who are the individual plaintiffs, to move outside |
| 09:55:45 | 17 | of the borders of the city to get their training before |
| 09:55:48 | 18 | October 8th. And so they do have a remedy and an avenue and |
| 09:55:54 | 19 | they have been doing that, according to their affidavits. |
| 09:55:57 | 20 | As far as the firing range, the mobile one, it can't |
| 09:56:02 | 21 | get here yet. According to your own representations, it is a |
| 09:56:08 | 22 | contracted vehicle that looks like it's coming at the earliest |
| 09:56:12 | 23 | mid-September. For that reason, there is no immediate as of |
| 09:56:16 | 24 | June -- or what is today -- August 24th injury that is |
| 09:56:21 | 25 | irreparable. |

| | |
|---|---|
| 09:56:23 | 1 |
| 09:56:27 | 2 |
| 09:56:32 | 3 |
| 09:56:37 | 4 |
| 09:56:40 | 5 |
| 09:56:46 | 6 |
| 09:56:48 | 7 |
| 09:56:53 | 8 |
| 09:56:58 | 9 |
| 09:57:02 | 10 |
| 09:57:03 | 11 |
| 09:57:06 | 12 |
| 09:57:10 | 13 |
| 09:57:14 | 14 |
| 09:57:18 | 15 |
| 09:57:20 | 16 |
| 09:57:24 | 17 |
| 09:57:28 | 18 |
| 09:57:35 | 19 |
| 09:57:41 | 20 |
| 09:57:45 | 21 |
| 09:57:49 | 22 |
| 09:57:53 | 23 |
| 09:57:56 | 24 |
| 9:57:59 | 25 |

But that is a denial without prejudice, meaning that it can be soon enough an irreparable injury. And I think that this changes my previous ruling yesterday about the preliminary injunction, because I gave the City time to do this discovery. And now I see that it would much better benefit the parties and the Court to address it on a much more expedited basis. And so I want to change my discovery rulings, so that we get a completely briefed preliminary injunction motion before the Court before that October 8th ruling.

I also am saying to the plaintiffs, this is a denial without prejudice. This is one that you can bring again, which should raise a concern on the City's part as far as this intermediate scrutiny analysis, because when you apply it, you'll see that we have some issues as to whether or not you have any reasonable time, place, manner bases.

I also feel like the City needs to give me in future filings a more elucidated basis for its reasons for eliminating them within the borders. It is so atypical from the other cases that I read in that when we were looking at restrictions in the 922 context, for example, we were saying, If you're a felon, you can't have a weapon. If you possess this type of weapon, you can't. If you have an obliterated serial number, you can't possess this. So we are very categorically looking.

1     MR. GURA:  Thank you, your Honor.

2     MR. WORSECK:  Thank you, your Honor.

3     MR. AGUIAR:  Thank you, your Honor.

4     MR. SIGALE:  Thank you, your Honor.

5     (Concluded at 10:04 a.m.)

6                              - - -

7

8

9

10

11

12                C E R T I F I C A T E

13

14     I certify that the foregoing is a correct transcript from

15  the record of proceedings in the above-entitled matter.

16

17  /s/April M. Metzler, RPR, CRR, FCRR    August 24, 2010

18  April M. Metzler, RPR, CRR, FCRR    Date

19  Official Federal Court Reporter

20

21

22

23

24

25

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-C- |
| | ) | |
| Plaintiffs, | ) | DECLARATION OF |
| | ) | JULIANNE VERSNEL |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DECLARATION OF JULIANNE VERSNEL

I, Julianne Versnel, am competent to state, and declare the following based on my personal knowledge:

1.      I am the Director of Operations of the Second Amendment Foundation ("SAF").

2.      SAF is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including many in Chicago. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control.

3.      SAF members and supporters in Chicago are among the individuals who need immediate range training to maintain their ability to keep firearms for self-defense under Chicago's new firearms ordinance.

4.      Not every gun is suitable for every person. It is quite obviously better for potential gun owners, and in the interest of public safety, that prospective gun buyers experience a variety of guns, or at least, those guns they are considering, *before* actually making their purchases. And many people are introduced to shooting and gun ownership by visiting a range prior to deciding to purchase a gun.

5.      To fulfill SAF's organizational objectives, and serve our members and supporters, SAF has placed a deposit guaranteeing the availability, for immediate delivery, of a mobile range facility, fully compliant with all federal environmental and safety standards, which contains three rifle positions within a forty-eight foot truck trailer. A copy of this contract is attached hereto as Exhibit A. SAF has also secured a commercial space for the location of this range within Chicago. A copy of this lease agreement is attached hereto as Exhibit B. SAF plans to secure additional parking locations  so that convenient range training may be provided to gun owners throughout the length and breadth of the City of Chicago.

6.      The mobile range facility would be operated by SAF in conjunction with ISRA's state-certified firearms trainers.

7.      But for the criminal enactments challenged in this complaint, SAF and ISRA would begin operating the mobile range within the City of Chicago by the end of September, 2010, but refrain from doing so for fear of arrest, prosecution, fine and incarceration of our principals and employees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the *15* day of August, 2010

Julianne Versnel

# BLUE LINE Corp.

P.O. Box 121 · Sudbury, MA 01776 · 978-927-0911

## SERVICE AGREEMENT

1. **PARTIES:** This Agreement is between Blue Line Corporation, a Massachusetts corporation, and the undersigned Client.

2. **DEFINITIONS:**

   A. OWNER shall mean Blue Line Corporation, its officers, directors, stockholders, principals, agents, employees, contractors, successors and assigns.

   B. CLIENT shall mean the Town, Business, Agency, Company, University, College, Police Department or Other Entity and its officers and employees, which use the 48-foot trailer owned and operated by Owner as a mobile firearms training range (hereafter the "TRAILER").

   C. AUTHORIZED AGENT shall mean the person(s) signing this Agreement on behalf of the CLIENT who represents and warrants that he/she has full legal authority to sign this Agreement on behalf of said CLIENT.

3. **TERM OF USE:** The rights provided for in this Agreement shall be for the periodic use of the TRAILER for a period of one (1) year from the date of this Agreement as necessary for firearms training, qualifications or general use by the CLIENT as scheduled in advance by written agreement of the parties.

4. **USAGE FEE:** The CLIENT shall pay OWNER a fee as set forth in the quote or proposal for services rendered within the terms noted on the invoice. Quotes or proposals may have to be adjusted throughout the year of this contract when the needs of the CLIENT change from the previous rental, or if OWNER related costs rise throughout the year of this contract, such as fuel costs, labor or supplies.

5. **OWNER'S OBLIGATIONS:**

   A. The OWNER shall maintain the TRAILER, and all systems and facilities provided therein, in such condition as shall provide for safe use for the purpose for which it is intended, that is, as a firearms training and qualification range.

   B. The OWNER shall deliver the TRAILER to the property, or other designated area, of the CLIENT as scheduled and shall temporarily locate it in a safe manner in a position designated by the AUTHORIZED AGENT. The OWNER and/or the OWNER'S designee shall be responsible for opening and securely closing and locking the TRAILER on each day that it is to be available to the CLIENT for use under this Agreement, and shall provide employees, servants or agents on the site of the TRAILER at all times when it is "in use" by the CLIENT.

   C. NO firearms of any kind shall be left on the site or in the TRAILER when the TRAILER is not in active use by the CLIENT.

   D. The OWNER agrees to carry adequate insurance to cover its employees and other personnel assigned by it and for whom it is responsible who are on the site of, or inside the TRAILER, during its use. Said insurance is to be in effect at the time the TRAILER is located on the property of the CLIENT or in use by CLIENT as a firing range.

   E. To the extent permitted by law, the OWNER shall indemnify, defend, and hold the CLIENT harmless from and against any and all losses, property damage, personal injury, claims, demands, liabilities, actions, causes of actions, costs and expenses, including attorney's fees, arising out of the OWNER'S breach of this Agreement or the intentional misconduct of the OWNER, or its employees, servants or agents.

6. **CLIENT'S OBLIGATIONS:**

   A. The CLIENT shall assign certified firearms instructors or contract out with certified firearms instructors to supervise the instruction and qualification of the members of the CLIENT who uses the firearms training range for training purposes located within the TRAILER.

   B. The CLIENT agrees to carry adequate insurance to cover its employees and other personnel assigned by it and for whom it is responsible when in use of the TRAILER as a firearms training range, or firing range

   C. NO firearms of any kind shall be left on the site or in the TRAILER when the TRAILER is not in active use by the CLIENT.

   D. To the fullest extent permitted by law, the CLIENT shall indemnify, defend, and hold the OWNER harmless from and against any and all losses, property damage, personal injury, claims, demands, liabilities, actions, causes of actions, costs and expenses, including attorney's fees, arising out of the CLIENT'S breach of this Agreement or the negligence or misconduct of the CLIENT, or its employees, servants or agents.

7. **TERMINATION:** Either party hereto may terminate this Agreement at any time for any reason by providing the non-terminating party with written notice stating the termination date, which shall not be sooner than ten days from the issuance of the said notice. Said notice shall be delivered in hand or sent via certified mail, return receipt requested, to the address set forth at the end of this Agreement. Upon receipt of the notice, the non-terminating party shall cease to incur additional expenses in connection with this Agreement. Upon such termination, the OWNER shall remove the TRAILER from the property of the CLIENT within seventy-two (72) hours, and shall be entitled to compensation for any use of the TRAILER or expenses incurred in the management, marketing, sales, delivery and removal of the TRAILER to the CLIENT prior to the termination date.

8. **GOVERNING LAW:** This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Massachusetts or any state where the TRAILER is in use.

9. **ENTIRE AGREEMENT:** This Agreement, including all quotes and proposals, constitutes the entire agreement between the parties with respect to the matter described. This Agreement supersedes all prior agreements, negotiations and representations, either written or oral, and shall not be modified or amended except by a written document executed by the parties hereto.

10. **ASSIGNMENT:** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this 26 day of July, 2010.

OWNER:                                          CLIENT:

**BLUE LINE CORPORATION**                       **Second Amendment Foundation**


By: _____       By: _____
Name:  Jerry Tilbor                             Name: Julianne Versnel
Title:   President                              Title: Director of Operations

P.O. Box 121 Sudbury, MA  01776                 12500 NE 10th Place, Bellevue, WA  98005

_____                     _____
(Print Address for Notice Purposes)             (Print Address for Notice Purposes)

INDUSTRIAL BUILDING LEASE
(For Use in Illinois)

NO. 1201
FEBRUARY, 1986

GEORGE E. COLE
LEGAL FORMS

CAUTION: Consult a lawyer before using or acting under this form. Neither the publisher nor the seller of this form makes any warranty with respect thereto, including any warranty of merchantability or fitness for a particular purpose.

# INDUSTRIAL BUILDING LEASE

| DATE OF LEASE | TERM OF LEASE | | MONTHLY RENT |
|---|---|---|---|
| | BEGINNING | ENDING | |
| August 12, 2010 | September 15, 2010 | *MONTH TO MONTH* | $2,500 |

Location of Premises
3333 W. 36ᵗʰ St., Chicago IL  60632

Purpose
Trailer Storage  *FOR ONE TRAILER*

| LESSEE | | LESSOR | |
|---|---|---|---|
| NAME | Second Amendment Foundation | NAME AND | Accurate Perforating Corporation |
| | 12500 NE 10ᵗʰ Pl | BUSINESS | 3636 S. Kedzie Ave. |
| ADDRESS | Bellevue, WA  98005 | ADDRESS | Chicago, IL  60632 |

In consideration of the mutual covenants and agreements herein stated, Lessor hereby leases to Lessee and Lessee hereby leases from Lessor solely for the above purpose the premises designated above (the "Premises"), together with the appurtenances thereto, for the above Term.

**RENT**

1. Lessee shall pay Lessor or Lessor's agent as rent for the Premises the sum stated above, monthly in advance, until termination of this lease, at Lessor's address stated above or such other address as Lessor may designate in writing.

**CONDITION AND UPKEEP OF PREMISES**

2. Lessee has examined and knows the condition of the Premises and has received the same in good order and repair, and acknowledges that no representations as to the condition and repair thereof have been made by Lessor, or his agent, prior to or at the execution of this lease that are not herein expressed; Lessee will keep the Premises including all appurtenances, in good repair, replacing all broken glass with glass of the same size and quality as that broken, and will replace all damaged plumbing fixtures with others of equal quality and will keep the Premises, including adjoining alleys, in a clean and healthful condition according to the applicable municipal ordinances and the direction of the proper public officers during the term of this lease at Lessee's expense, and will without injury to the roof, remove all snow and ice from the same when necessary, and will remove the snow and ice from the sidewalk abutting the Premises; and upon the termination of this lease in any way, will yield up the Premises to Lessor, in good condition and repair, loss by fire and ordinary wear excepted, and will deliver the keys therefor at the place of payment of said rent.

**LESSEE NOT TO MISUSE; SUBLET; ASSIGNMENT**

3. Lessee will not allow the Premises to be used for any purpose that will increase the rate of insurance thereon, nor for any purpose other than that hereinbefore specified, and will not load floors with machinery or goods beyond the floor load rating prescribed by applicable municipal ordinances, and will not allow the Premises to be occupied in whole, or in part, by any other person, and will not sublet the same or any part thereof, nor assign this lease without in each case the written consent of the Lessor first had, and Lessee will not permit the Premises to be used for any unlawful purpose, or for any purpose that will injure the reputation of the building or increase the fire hazard of the building, or disturb the tenants or the neighborhood, and will not permit the same to remain vacant or unoccupied for more than ten consecutive days; and will not allow any signs, cards or placards to be placed thereon, nor permit any alteration of or addition to any part of the Premises, except by written consent of Lessor; all alterations and additions to the Premises shall remain for the benefit of Lessor unless otherwise provided in the consent aforesaid.

**MECHANIC'S LIEN**

4. Lessee will not permit any mechanic's lien or liens to be placed upon the Premises or any building or improvement thereon during the term hereof, and in case of the filing of such lien Lessee will promptly pay same. If default in payment thereof shall continue for thirty (30) days after written notice thereof from Lessor to the Lessee, the Lessor shall have the right and privilege at Lessor's option of paying the same or any portion thereof without inquiry as to the validity thereof, and any amounts so paid, including expenses and interest, shall be so much additional indebtedness hereunder due from Lessee to Lessor and shall be repaid to Lessor immediately on rendition of bill therefor.

PAGE ONE

| | |
|---|---|
| **INDEMNITY FOR ACCIDENTS** | 5. Lessee covenants and agrees that he will protect and save and keep the Lessor forever harmless and indemnified against and from any penalty or damages or charges imposed for any violation of any laws or ordinances whether occasioned by the neglect of Lessee or those holding under Lessee, and that Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, cost, damage or expense, arising out of or from any accident or other occurrence on or about the Premises, causing injury to any person or property whomsoever or whatsoever and will protect, indemnify and save and keep harmless the Lessor against and from any and all claims and against and from any and all loss, cost, damage or expense arising out of any failure of Lessee in any respect to comply with and perform all the requirements and provisions hereof. |
| **NON LIABILITY OF LESSOR** | 6. Except as provided by Illinois statute, Lessor shall not be liable for any damage occasioned by failure to keep the Premises in repair, nor for any damage done or occasioned by or from plumbing, gas, water, sprinkler, steam or other pipes or sewerage or the bursting, leaking or running of any pipes, tank or plumbing fixtures, in above, upon or about Premises or any building or improvement thereon nor for any damage occasioned by water, snow or ice being upon or coming through the roof, skylights, trap door or otherwise, nor for any damage arising from acts of neglect of any owners or occupants of adjacent or contiguous property. |
| **WATER GAS AND ELECTRIC CHARGES** | 7. Lessee will pay, in addition to the rent above specified, all water rents, gas and electric light and power bills taxed, levied or charged on the Premises, for and during the time for which this lease is granted, and in case said water rents and bills for gas, electric light and power shall not be paid when due, Lessor shall have the right to pay the same, which amounts so paid, together with any sums paid by Lessor to keep the Premises in a clean and healthy condition, as above specified, are declared to be so much additional rent and payable with the installment of rent next due thereafter. |
| **KEEP PREMISES IN REPAIR** | 8. Lessor shall not be obliged to incur any expense for repairing any improvements upon said demised premises or connected therewith, and the Lessee at his own expense will keep all improvements in good repair (injury by fire, or other causes beyond Lessee's control excepted) as well as in a good tenantable and wholesome condition, and will comply with all local or general regulations, laws and ordinances applicable , thereto as well as lawful requirements of all competent authorities in that behalf, Lessee will, as far as possible, keep said improvements from deterioration due to ordinary wear and from falling temporarily out of repair. If Lessee does not make repairs as required hereunder promptly and adequately, Lessor may but need not make such repairs and pay the costs thereof, and such costs shall be so much additional rent immediately due from and payable by Lessee to Lessor. |
| **ACCESS TO PREMISES** | 9. Lessee will allow Lessor free access to the Premises for the purpose of examining or exhibiting the same, or to make any needful repairs, or alterations thereof which Lessor may see fit to make and will allow to have placed upon the Premises at all times notice of "For Sale" and "To Rent", and will not interfere with the same. |
| **ABANDONMENT AND RELETTING** | 10. If Lessee shall abandon or vacate the Premises, or if Lessee's right to occupy the Premises be terminated by Lessor by reason of Lessee's breach of any of the covenants herein, the same may be re-let by Lessor for such rent and upon such terms as Lessor may deem fit, subject to Illinois statute; and if a sufficient sum shall not thus be realized monthly, after paying the expenses of such re-letting and collecting to satisfy the rent hereby reserved, Lessee agrees to satisfy and pay all deficiency monthly during the remaining period of this lease. |
| **HOLDING OVER** | 11. Lessee will, at the termination of this lease by lapse of time or otherwise, yield up immediate possession to Lessor, and failing so to do, will pay as liquidated damages, for the whole time such possession is withheld, the sum of ($150) one Hundred Fifty Dollars ($ 150.00 ) per day; but the provisions of this clause shall not be held as a waiver by Lessor of any right of re-entry as hereinafter set forth; nor shall the receipt of said rent or any part thereof, or any other act in apparent affirmance of tenancy, operate as a waiver of the right to forfeit this lease and the term hereby granted for the period still unexpired, for a breach of any of the covenants herein. |
| **EXTRA FIRE HAZARD** | 12. There shall not be allowed, kept, or used on the Premises any inflammable or explosive liquids or materials save such as may be necessary for use in the business of the Lessee, and in such case, any such substances shall be delivered and stored in amount, and used, in accordance with the rules of the applicable Board of Underwriters and statutes and ordinances now or hereafter in force. |
| **DEFAULT BY LESSEE** | 13. If default be made in the payment of the above rent, or any part thereof, or in any of the covenances herein contained to be kept by the Lessee, Lessor may at any time thereafter at his election declare said term ended and reenter the Premises or any part thereof, with or (to the extent permitted by law) without notice or process of law, and remove Lessee or any persons occupying the same, without prejudice to any remedies which might otherwise be used for arrears of rent, and Lessor shall have at all times the right to distrain from rent due, and shall a valid and first lien upon all personal property which Lessee now owns, or may hereafter acquire or have an interest in, which is by law subject to such distraint, as security for payment of the rent herein reserved. |
| **NO RENT DEDUCTION OR SET OFF** | 14. Lessee's covenant to pay rent is and shall be independent of each and every other covenant of this lease. Lessee agrees that any claim by Lessee against Lessor shall not be deducted from rent not set off against any claims for rent in any action. . |
| **RENT AFTER NOTICE OF SUIT** | 15. It is further agreed, by the parties hereto, that after the service of notice, or the commencement of a suit or after final judgment for possession of the Premises, Lessor may receive and collect any rent due, and that payment of said rent shall not waive or affect said notice, said suit, or said judgment. |

PAGE TWO

**PAYMENT OF COSTS**

16. Lessee will pay and discharge all reasonable costs, attorney's fees and expenses that shall be made and incurred by Lessor in enforcing the covenants and agreements of this lease.

**RIGHTS CUMULATIVE**

17. The rights and remedies of Lessor under this lease are cumulative. The exercise or use of any one or more thereof shall not bar Lessor from exercise or use of any other right or remedy provided herein or otherwise provided by law, nor shall exercise not use of any right or remedy by Lessor waive any other right or remedy.

**FIRE AND CASUALTY**

18. In case the Premises shall be rendered untenantable during the term of this lease by fire or other casualty, Lessor at his option may terminate the lease or repair the Premises within 60 days thereafter. If Lessor elects to repair, this lease shall remain in effect provided such repairs are completed within said time. If Lessor shall not have repaired the Premises within said time, then at the end of such time the term hereby created shall terminate. If this lease is terminated by reason of fire or casualty as herein specified, rent shall be apportioned and paid to the day of such fire or other casualty.

**SUBORDINATION**

19. This lease is subordinate to all mortgages which may now or hereafter affect the Premises.

**PLURALS; SUCCESSORS**

20. The words "Lessor" and "Lessee" wherever herein occurring and used shall be construed to mean "Lessors" and "Lessees" in case more than one person constitutes either party to this lease; and all the covenants and agreements contained shall be binding upon, and inure to, their respective successors, heirs, executors, administrators and assigns and may be exercised by his or their attorney or agent.

**SEVERABILITY**

21. Wherever possible each provision of this lease shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this lease shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this lease.

If this instrument is executed by a corporation, such execution has been authorized by a duly adopted resolution of the Board of Directors of such corporation.

This lease consists of ___3___ pages numbered 1 to ___3___ , including a rider consisting of ___none___ pages, identified by Lessor and Lessee.

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the Date of Lease stated above.

LESSEE:

_____ (SEAL)

_____ (SEAL)

LESSOR:

_____ (SEAL)

_____ (SEAL)

# Exhibit C

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

EZELL, et al,                    )

                Plaintiffs,  ) No. 10-CV-5135

       vs.                    ) Judge

CITY OF CHICAGO,              ) Virginia M.

            Defendants.  ) Kendall


      The deposition of JULIANE VERSNEL,
called as a witness for examination, taken pursuant
to the Federal Rules of Civil Procedure of the
United States District Courts pertaining to the
taking of depositions, taken before LISA C. HAMALA,
a Notary Public within and for the County of Cook,
State of Illinois, and a Certified Shorthand
Reporter of said state, CSR No. 84-3335, at Suite
1230, 30 North LaSalle Street, Chicago, Illinois,
on the 2nd day of September, A.D. 2010, at 1:40
p.m.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                               September 2, 2010

2

1      PRESENT:

2

3          GURA & POSSESSKY, P.L.L.C.,

4          (101 North Columbus Street,   Suite 405,

5          Arlington, Virginia 22314,

6          703-835-9085), by:

7          MR. ALAN GURA,

8          alan@gurapossessky.com,

9                  -and-

10         LAW FIRM OF DAVID G. SIGALE, P.C.,

11         (Corporate West 1,

12         4300 Commerce Court, Suite 300-3,

13         Lisle, Illinois 60532,

14         630-452-4547), by:

15         MR. DAVID G. SIGALE,

16         dsigale@sigalelaw.com,

17             appeared on behalf of the Plaintiffs;

18

19

20

21

22

23

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                September 2, 2010

3

1    PRESENT: (Continued)

2

3         CORPORATION COUNSEL

4         CITY OF CHICAGO,

5         (30 North LaSalle Street, Suite 1230,

6         Chicago, Illinois 60602,

7         312-744-4216), by:

8         MR. ANDREW WORSECK,

9         aworseck@cityofchicago.org,

10             appeared on behalf of the Defendants.

11

12    ALSO PRESENT:

13         MR. RICHARD PEARSON,

14             Illinois State Rifle Association.

15

16

17

18

19

20

21

22

23    REPORTED BY:   LISA C. HAMALA, CSR.

24             Illinois CSR No. 84-3335.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

                                                                24

1    provision or operation of a shooting range, is that

2    correct?

3        A.    That's correct.

4        Q.    So operation of a shooting --

5    THE WITNESS:  I have a problem.

6    MR. GURA:  Okay.

7    THE WITNESS:  I have a problem because --

8        MR. GURA:  Could you read the last question

9    and answer.

10                  (WHEREUPON, the record was read by

11                  the reporter as requested.)

12   BY THE WITNESS:

13       A.    The question is overly broad.

14   BY MR. WORSECK:

15       Q.    How can I make it a better question?

16       A.    The SAF has never contracted for a

17   mobile firing range until we did with Blue Line.

18       Q.    That's the contract at issue in this

19   case?

20       A.    Yes.

21       Q.    Has the SAF ever contracted for

22   operation or use of a stationary bricks and mortar

23   shooting range, outdoor stationary shooting range?

24       A.    The SAF has contracted for the use of an



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

25

1    outdoor shooting range.  For the use.

2         Q.    Aside from the use of an outdoor

3    shooting range, there are no other contracts that

4    the SAF has entered into with respect to shooting

5    ranges, excluding this contract at issue in this

6    case?

7         A.    That's correct.

8         Q.    Has the SAF ever managed or operated a

9    shooting range of any type anywhere?

10        A.    No.

11        Q.    So the management and operation of

12   shooting ranges really isn't one of the SAF's

13   purposes, is that correct?

14        MR. GURA:  Objection.  Argumentative.  Assumes

15   facts not in evidence.

16             You may answer it.

17   BY THE WITNESS:

18        A.    Please repeat that.

19             (WHEREUPON, the record was read by

20             the reporter as requested.)

21        MR. GURA:  I objected that that's

22   argumentative and assumes facts not in evidence.

23   BY THE WITNESS:

24        A.    It is part of our education, legal



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

30

1    BY THE WITNESS:

2         A.    I don't know.

3    BY MR. WORSECK:

4         Q.    So you're contracting for the operation

5    of a shooting range in Illinois, and you don't know

6    if a license is required for that enterprise?

7         A.    Let's step back.

8              Are you talking about the individuals,

9    or now have we moved on to an item?

10        Q.    I'm talking about the enterprise.

11        A.    Define "enterprise" for me.

12        Q.    This mobile shooting range that's going

13   to be in the back of a truck.  You may have

14   individuals coming in there on various days of the

15   week to teach individuals in the use of firearms.

16             Is a license needed by the SAF, who is

17   the contracting entity for this shooting range and

18   the operating entity of the shooting range, to

19   actually operate the shooting range in Illinois?

20        MR. GURA:  Objection.  Calls for a legal

21   opinion.

22             If you were to ask me, I might give you

23   an answer because I'm a lawyer.  This is not my

24   deposition, but it is Ms. Versnel's deposition.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                          September 2, 2010

31

1   BY THE WITNESS:

2        A.    I don't know.

3   BY MR. WORSECK:

4        Q.    Did you think it was important that you

5   look into that question before you signed a

6   contract to operate a shooting range in Illinois?

7        MR. GURA:  Objection.  Attorney-client

8   communication at this point.

9        MR. WORSECK:  I asked did she think it was

10  important.  What's in her head is not

11  attorney-client privilege.

12       MR. GURA:  Well, I don't want you going there.

13       MR. WORSECK:  When I get close, you can

14  object.

15  BY THE WITNESS:

16       A.    No.

17  BY MR. WORSECK:

18       Q.    You did not think it was important?

19       A.    No.

20       Q.    How did the idea of bringing a mobile

21  shooting range into Chicago come about?

22       A.    It was an outgrowth of the proposed

23  ordinances that the City of Chicago circulated on

24  approximately July 1, 2010.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

34

1    been a partner with the SAF for a long time.  They

2    were a co-plaintiff with us in McDonald's vs.

3    Chicago.

4         Q.    Whose idea was it to team up with ISRA

5    with respect to the operation of this range?

6         A.    Mr. Moran, Mr. Pearson, Mr. Gottlieb,

7    myself.

8         Q.    Has ISRA ever operated a mobile shooting

9    range?

10        MR. GURA:  Objection.  Calls for speculation.

11   Lacks foundation.

12   BY THE WITNESS:

13        A.    I don't know.

14   BY MR. WORSECK:

15        Q.    When deciding to team up with ISRA for

16   the operation of a mobile shooting range in

17   Chicago, you didn't bother to find out if ISRA ever

18   operated a mobile shooting range anywhere, is that

19   correct?

20        MR. GURA:  Objection.  Argumentative at this

21   point.

22   BY THE WITNESS:

23        A.    Would you rephrase that.

24



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

42

1    before you figure out who is going to do what on

2    this range?

3          A.    There is an agreement in principle upon

4    roles.

5          Q.    What is that agreement?

6          A.    That ISRA would take a large role in

7    providing the certified trainers and meeting the

8    requirements in terms of personnel for the City of

9    Chicago.  The SAF would provide other assistance --

10   other assistance as needed.

11         Q.    Is this arrangement written down

12   anywhere?

13         A.    No.

14         Q.    Who are the people on both sides, SAF

15   and ISRA, that came to this arrangement?

16         A.    To the best of my knowledge, myself,

17   Alan Gottlieb, Richard Pearson.

18         Q.    Is Mr. Pearson sort of the ISRA point

19   person when it comes to operation of this range in

20   Chicago?

21         A.    Yes.

22         Q.    Is he going to be overseeing its

23   operation when it is open to the public, if it is?

24         MR. GURA:  Objection.  Calls for speculation.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

1    Lacks foundation.  Vague and ambiguous as to what

2    you mean by overseeing.

3            The ISRA has operated a firearms range

4    for many years.  Mr. Pearson is the organization's

5    executive director.

6            I'm not sure how they would consider

7    themselves to be overseeing his oversight.  This

8    witness is not qualified to speak to internal ISRA

9    management.

10   BY MR. WORSECK:

11       Q.    If this range opens in Chicago, who is

12   going to be the ISRA person responsible for that?

13       A.    ISRA would have to decide that.  I don't

14   know.

15       Q.    Again, you did not think it important to

16   find out who at ISRA would be responsible for the

17   operation of this range, even though, as you just

18   explained to me, ISRA is going to be the

19   responsible party as between ISRA and the SAF in

20   terms of operating the range and training people in

21   the range?

22       MR. GURA:  Objection.  Relevance.

23            I don't understand the relevance of the

24   question.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

53

1      Q.    Sure.   Again, hours of operation.
2  Number of customers that can use it at one time.
3  Kinds of guns that could be used at the range.
4  Where the guns would be stored.
5           Could people bring their own, or is the
6  range going to supply guns?
7      A.    The range would not supply firearms.
8  The number of people we could put through
9  specifically, where people might stand to come in
10 and other items are dictated and could not be
11 determined until the City of Chicago allowed us to
12 make final arrangements to bring the unit in.
13     Q.    These were all topics that you discussed
14 with ISRA?
15     A.    I discussed with ISRA that there were
16 decisions concerning the specific mechanics of
17 operation within the City of Chicago with the
18 exception of the requirements to have a range
19 master and certified trainers whom at the Chicago
20 police license requirements on premises.
21           The rest is dictated by the City of
22 Chicago.   We are unable to proceed upon
23 hypotheticals.
24     Q.    What are those hypotheticals?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                          September 2, 2010

65

1    we are all clear.  That's on the record.  We don't

2    need to rewrite this now.

3    BY MR. WORSECK:

4         Q.    Subject to that change and the typo, any

5    other changes?

6         A.    No.

7         Q.    I want to go back to the definition of

8    operation that I was using most recently, namely

9    opening the mobile truck for use by the public.

10        THE WITNESS:  I'm just too literal.  I have

11   four children.  They ask questions until they get

12   the answer.  They change words and different

13   things --

14        MR. WORSECK:  Lawyers do that, too.

15   BY THE WITNESS:

16        A.    Does this mean physically opening,

17   starting operation?

18   BY MR. WORSECK:

19        Q.    Should you prevail on your preliminary

20   injunction and should Chicago be required to allow

21   this range to open under some set of circumstances,

22   is there anyone at the SAF that will be sort of the

23   day-to-day person in charge of or overseeing what

24   goes on at that site?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

66

1          A.     No one from the SAF, to the best of my

2    knowledge, would be physically in Illinois.

3          Q.     Is there anyone back at SAF headquarters

4    or anywhere else in the country that would be

5    responsible for overseeing or be a point person or

6    getting a nightly phone call with an update as to

7    what happens on that site?

8          MR. GURA:   Objection.   Calls for speculation.

9    BY THE WITNESS:

10         A.     Yes.

11   BY MR. WORSECK:

12         Q.     Who would that person be?

13         A.     I believe that it could be one of three

14   people.

15         Q.     Who?

16         A.     Alan Gottlieb, me, and it is possible it

17   could be Massad Ayoob.

18         Q.     But that decision has not been made as

19   to who that particular person would be?

20         A.     No.

21         Q.     I would like to refer you back to

22   Exhibit No. 1, the Declaration.

23         Exhibit A thereto is the Blue Line

24   contract, and talks a little about this.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                September 2, 2010

106

 1      client," etcetera.

 2              So SAF is the client.  You're the

 3      authorized agent because you signed the contract.

 4          A.      Okay.

 5          Q.      Paragraph 5B basically says that the

 6      authorized agent, namely you, will designate a

 7      temporary location for the truck where it will be

 8      placed in a safe manner.

 9          A.      Okay.

10          Q.      Have you made that designation yet?

11          MR. GURA:  Objection.  Assumes facts not in

12      evidence.

13              The truck isn't there.

14          MR. WORSECK:  We're talking about the place it

15      would be put.

16      BY THE WITNESS:

17          A.      We have leased land that, to the best of

18      our ability, and in checking with the owner, meets

19      this criteria.

20      BY MR. WORSECK:

21          Q.      Have you visited the site?

22          A.      No.

23          Q.      Have you identified any particular spot

24      on the site where this truck can be located in a



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                         September 2, 2010

107

1  safe manner?

2      A.    No.

3      Q.    To your knowledge, has anyone selected

4  such a site at this property?

5      MR. GURA:  Objection.  I think it is asked and

6  answered.

7  BY THE WITNESS:

8      A.    When we looked for property to lease, we

9  entered into the lease agreement, and we disclosed

10  to the owner of the property what we were going to

11  do with the property and other information

12  concerning the size of the item, space requirements

13  to put it in, how loud it would be, the sound.

14      MR. WORSECK:  Again, I'm trying to move this

15  along.

16      MR. GURA:  No, you're not.

17  BY MR. WORSECK:

18      Q.    You're asking a Federal judge to order

19  this mobile truck shooting range be immediately

20  placed in Chicago.

21           To your knowledge, has anyone picked the

22  particular spot on the land that you have signed a

23  lease for where this truck will be located in a

24  safe manner?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

110

1        Q.      Paragraph 6, "Client"s Obligations,"
2   Subparagraph A, "The client shall assign certified
3   firearms instructors or contract out with certified
4   firearms instructors."
5               Aside from generally talking with ISRA
6   about ISRA providing instructors, has any
7   particular selection been made of specific
8   individuals that would be the instructors?
9        A.      No.
10       Q.      Paragraph 6, Subparagraph B, "The client
11  agrees to carry insurance to cover its employees
12  and other personnel assigned by it and for whom it
13  is responsible when in use of the trailer as a
14  firearms training range or firing range."
15              Has SAF acquired that insurance?
16       A.      It doesn't have the trailer or the
17  place, so you can't get insurance for it without
18  that information.
19       Q.      Has SAF had any discussions with any
20  insurance carriers about an insurance policy that
21  would meet these obligations?
22       A.      There has been discussion of which
23  options to use to procure the proper insurance.
24       Q.      Are those internal SAF discussions?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

111

1          A.    Yes.

2          Q.    No insurance agents have been approached

3     about a policy that would meet these obligations?

4          A.    No.

5          Q.    Do you know how much that insurance

6     would cost in a ballpark figure?

7          A.    I have no idea.

8          Q.    Would it cover members of the public

9     that would show up to use the range?

10         A.    Yes.

11         Q.    Why do you say that?

12         A.    Because we will have to get liability

13    insurance.  To the best of my knowledge, the

14    insurance company is going to want us to have

15    liability insurance.

16              It would be injudicious of us not to be

17    carrying liability insurance.

18         Q.    The SAF's plans are to acquire insurance

19    that would cover members of the public using the

20    range?

21         A.    Yes.

22         Q.    Have you had any discussions about that

23    form of insurance, insurance that would cover

24    members of the public with any insurance companies



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

123

1    people in the trailer.

2              There would also be an appropriate

3    number of instructors and a range master.

4    BY MR. WORSECK:

5        Q.    Would more than three members of the

6    public be allowed in the trailer at once?

7        MR. GURA:  Objection.  Asked and answered.

8    Calls for speculation.  Lacks foundation.

9    BY THE WITNESS:

10       A.    The range master will have to make those

11   determinations.

12   BY MR. WORSECK:

13       Q.    What will be done with members of the

14   public who can't get into the trailer?

15             Say you have 50 people show up on a

16   Saturday afternoon.

17       A.    Logistics have not been determined.

18       Q.    The range does not provide weapons?

19       A.    No.

20       Q.    The people have to bring their own

21   weapons, is that correct?

22       A.    That's correct.

23       Q.    You could have 50 people on a Saturday

24   afternoon sitting in a parking lot with weapons,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                        September 2, 2010

124

1    correct?

2        A.    The logistics have not been determined.

3        Q.    I understand there's a one-hour range

4    training component to the City's CFP application

5    process.

6              Would the members of the public be

7    allowed to spend more than an hour during any one

8    visit to the truck?

9        A.    The specific logistics have not been

10   determined.  However, since our goal is to provide

11   the individuals in Chicago with the necessary range

12   time to get their Chicago pistol or firearm permit,

13   one hour would appear to be the most judicious use

14   of the resources.

15       Q.    Will members of the public who are

16   bringing their weapons to the site be required to

17   follow any particular protocol with respect to the

18   storage or carrying or use of weapons while waiting

19   to get into the truck?

20       A.    Members of the general public will have

21   to follow the laws of Illinois and laws of Cook

22   County and laws of the City of Chicago.

23             They will also have to follow the safe

24   storage policies and any other policy as to be



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                     September 2, 2010

125

1    determined by the range master.

2         Q.    Do you know what any of those are?

3         MR. GURA:  Objection.  What "those" are you

4    referring to?  That's compound.

5    BY MR. WORSECK:

6         Q.    Do you know what those are?

7         MR. GURA:  "Those" refers to a whole list of

8    four --

9         MR. WORSECK:  Read that last answer.

10                    (WHEREUPON, the record was read by

11                    the reporter as requested.)

12        MR. GURA:  I counted five or so -- calls for

13   legal opinion.  The witness lacks foundation to

14   whatever the range master will order.

15   BY MR. WORSECK:

16        Q.    My question is, again, do you know what

17   those are?

18        A.    I don't know the specific laws of the

19   State of Illinois for transport of firearms.  I

20   don't know the specific laws of Cook County for the

21   transport of firearms.

22             I do not know what the laws are of the

23   City of Chicago in terms of safe transport of

24   firearms.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                September 2, 2010

126

1           I can't know what the range master will

2     determine is necessary.  The range master has the

3     discretion to do what he feels makes the area most

4     safe.

5           Q.     Would a fee be charged to the members of

6     the public that want to use this range?

7           A.     Our hope is there is no fee charged.

8           Q.     But that will be something that the SAF

9     decides?

10          A.     Yes.  It is our desire there be no fee

11    charged.

12          Q.     What factors would impact whether a fee

13    is charged?

14          MR. GURA:  Objection.  Calls for speculation.

15    BY THE WITNESS:

16          A.     Whether a fee is charged will be

17    dependent upon the cost of the range master and

18    certified firearms instructors.

19    BY MR. WORSECK:

20          Q.     Any other factors?

21          A.     No.

22          Q.     Let's talk about the other contract

23    attached to your Declaration, the lease for the

24    site with Accurate Perforating Corporation.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

128

1        Q.      Does this area look familiar to you?

2        A.      No.

3        Q.      Do you recognize any of the buildings or

4    streets?

5        A.      No.

6        Q.      Have you ever looked at an overhead shot

7    of this property that's the subject of your

8    contract?

9        A.      No.

10        Q.      Have you ever looked at any photographs

11    of the property?

12        A.      I don't recall.

13        Q.      Can you identify on this photograph the

14    parcel of land that's the subject of your lease.

15        MR. GURA:  Objection.  Irrelevant.  Lacks

16    foundation.

17    BY THE WITNESS:

18        A.      You told me it is up here (indicating).

19        MR. GURA:  The witness stated she is not

20    familiar --

21    BY MR. WORSECK:

22        Q.      I was pointing up here (indicating).

23        A.      Okay.  No.

24        Q.      Can you identify on this photograph the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

133

1    concerns he had with that?

2         A.     He told me the noise would not be a

3    problem since there are loud noises coming out of

4    his place already.

5              I told him, as Jerry told me, it would

6    sound like a nail gun.  He said there was not a

7    problem.

8              We discussed that this would be

9    month-to-month as we did not know when the City

10   would allow us to bring it in.  That it could come

11   at any time.  That it was empty.

12        Q.     The parking lot was empty?

13        A.     The parcel of land.  I don't know what

14   it is.

15        Q.     The lease, as you said, is

16   month-to-month, and it could be terminated by

17   either party on a monthly basis, is that correct?

18        A.     I'm sure there is some clause about how

19   many days notice you have to give, but I don't know

20   off the top of my head.

21        Q.     Generally speaking, either party could

22   terminate the lease?

23        A.     On a monthly basis, yes.

24        Q.     How was Accurate Perforating selected or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                September 2, 2010

140

1         That was the date you initialed this and

2    sent it back.

3         A.    I spoke with Larry Cohen.  I left a

4    message for him late one evening on the Accurate

5    Perforating voicemail.  He called me back on

6    Thursday, August 26.  I was in San Francisco.

7         We discussed changing the date.  He was

8    amenable to the change of the date.  I told him

9    when I got back, I would send him the change.

10        Q.    That was the last communication?

11        A.    Yes.

12        Q.    If we can look back at Exhibit B to your

13   your Declaration.

14        "Lessee has examined and knows the

15   condition of the premises.  Has received the same

16   in good order and repair and acknowledges that no

17   representations as to the condition and repair

18   thereof have been made by the lessor or his agent

19   prior to or at the execution of the lease that are

20   not herein expressed."

21        You see that?

22        A.    Yes.

23        Q.    You have not, nor has anyone else at SAF

24   examined the premises, is that correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                September 2, 2010

141

1        A.      That's correct.

2        Q.      You have not received those premises

3    yet, have you?

4        A.      No, not yet.

5        Q.      What's the City of Chicago zoning

6    district classification that applies to this

7    property?

8        MR. GURA:  Objection.  Calls for speculation.

9    Calls for legal opinion.

10            It's completely irrelevant to this

11   lawsuit and our claims.

12   BY THE WITNESS:

13       A.      I don't know.

14   BY MR. WORSECK:

15       Q.      Do you know if the zoning classification

16   that applies permits shooting ranges?

17       MR. GURA:  Objection.  Asked and answered.

18   She told you she doesn't know what the

19   classification is.  How would she know what it

20   permits or doesn't?

21   BY THE WITNESS:

22       A.      Shooting ranges are illegal within the

23   city of Chicago.

24       MR. GURA:  I would also like to object that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                September 2, 2010

192

1    to do with the Jerry of Blue Line --

2         MR. GURA:  It is subject to the objections and

3    subject to the continuing obligation to provide

4    things.

5              It is understood by counsel, especially

6    given the extreme time constraints, perfection may

7    not be achieved, although we hope.

8         MR. WORSECK:  I'm noting for the record, as to

9    Exhibit No. 6, the document request responses, you

10   did not make any corrections to the document

11   subject to these discussions we had about.

12        MR. GURA:  You didn't change anything?

13        THE WITNESS:  No.

14        MR. WORSECK:  Okay.

15   BY MR. WORSECK:

16        Q.    Two more questions.

17              Are there any fences or gates that

18   surround the parking lot at Accurate Perforating?

19        A.    I have no idea.  I don't know.

20        Q.    Do you know anything about the specific

21   specifications of the shooting stalls in the truck

22   in terms of what they are made out of, how dense

23   they are, whether or not they prevent bullets going

24   laterally from one position to another?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

204

1    STATE OF ILLINOIS )

2                     )  SS:

3    COUNTY OF C O O K )

4              I, LISA C. HAMALA, a Notary Public

5    within and for the County of Cook, State of

6    Illinois, and a Certified Shorthand Reporter of

7    said state, do hereby certify:

8              That previous to the commencement of the

9    examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12             That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony

16   given and the proceedings had;

17             That the said deposition was taken

18   before me at the time and place specified;

19             That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in

23   the outcome of this action.

24             IN WITNESS WHEREOF, I do hereunto set my



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juliane Versnel                                    September 2, 2010

205

1    hand of Chicago, Illinois, this 7th day of

2    September, 2010.

3

4                    Notary Public, Cook County, Illinois.

5                    My commission expires August 23, 2012.

6

7

8    C.S.R. Certificate No. 84-3335.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com