# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| EZELL, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 10-CV-5135 |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Date: September 20, 2010

Respectfully submitted,

MARA S. GEORGES,
Corporation Counsel for the City of Chicago

By:  /s/ William Macy Aguiar
     Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975 / 7129 / 4216

Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................ 2

STANDARD .......................................................................................................... 7

ARGUMENT ........................................................................................................ 8

CONCLUSION .................................................................................................... 25

### FACTUAL BACKGROUND

I.      The Responsible Gun Owners Ordinance ........................................................ 2

II.     The Individual Plaintiffs and the Members of the Organizational Plaintiffs Either
        Have or Can Comply with the Requirements of the Ordinance ......................... 4

III.    SAF's Plans To Operate a Mobile Firearms Range Within the City of Chicago ............... 6

### STANDARD

### ARGUMENT

I.      There Is No Irreparable Harm To Plaintiffs And Plaintiffs Have An Adequate
        Remedy At Law .............................................................................................. 8

        A.      Individual Plaintiffs Have Not Suffered Any Irreparable Harm ........................... 8

        B.      There Is No Presumption That Alleged Second Amendment Violations Are
                Irreparable ..................................................................................... 10

II.     Plaintiffs Do Not Have A Likelihood of Success on the Merits ....................... 11

        A.      Plaintiffs Cannot Prevail on Their First Amendment Claims ............................ 11

B.     Plaintiffs Cannot Prevail on Their Second Amendment Claims ......................... 12

     1.     The Organizational Plaintiffs Cannot Prevail on Any of Their Constitutional Claims ............................................................. 12

     2.     The Individual Plaintiffs Have No Likelihood of Success on Their Second Amendment Claims ...................................................... 13

         i.     The Second Amendment does not protect an individual right to train or to visit or operate a firearms range .................................. 13

         ii.     The City's ordinance does not violate the Second Amendment .. 16

III.     The Balance of Harms and the Public Interest Weigh Heavily Against Preliminary Relief .......................................................................................... 22

CONCLUSION ............................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Aircraft Owners & Pilots Ass'n v. Hinson*, 96 C 5793, slip op. (N.D. Ill. Sept. 27, 1996),
  *aff'd*, 102 F.3d 1421 (7th Cir. 1996) ............................................................... 25

*Benjamin v. Bailey*, 662 A.2d 1226 (Conn. 1995) ..................................... 18

*Campbell v. Miller*, 373 F.3d 834 (7th Cir. 2004) .................................. 11

*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008) ....................... *Passim*

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) ..................... 12

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................... 10

*Girl Scouts of Manitou Council v. Girl Scouts of the U.S.A.*, 549 F.3d 1079 (7th Cir. 2008) .. 8, 22

*Goodman, D.C. v. Il. Dept. of Financial and Professional Regulation*,
  430 F.3d 432 (7th Cir. 2005) ............................................................... 7

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ........................................... 7

*McDonald v. City of Chicago*, 130 S. Ct. 3120 (2010) .......................... *Passim*

*Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153 (7th Cir. 1996) .............. 1, 8

*Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004) ........................................... 18

*Newsom v. Norris*, 888 F.2d 371 (6th Cir. 1989) .................................. 11

*Northern Indiana Gun & Outdoor Shows, Inc.*, 104 F. Supp.2d 1009 (N.D. Ind. 2000) ............ 11

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) ..................... 20

*Robertson v. City & County of Denver*, 874 P.2d 325 (Colo. 1994) ............... 18

*Roland Mach. Co., v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984) ...... 8

*Rust Environment & Infrastructure v. Teunissen*, 131 F.3d 1210 (7th Cir. 1997) ............... 2, 8, 22

*Smith v. People of the State of California*, 361 U.S. 147 (1960)  ................................ 15

*Thomas Nelson, Inc. v. Henry Regnery Co.*, 375 F. Supp. 335 (N.D. Ill. 1974) ....................... 1, 8

*United States v. Skoien*, --- F.3d ---, 2010 WL 2735747 (7th Cir. 2010) *(en banc)* ........ 13, 14, 16

*United States v. Williams*, ---F.3d ---, No.09-3174, 2010 WL 3035483
   (7th Cir. Aug. 5, 2010) ..................................................................... 17, 21

*United States v. Yancey*, ---F.3d ---,  No. 09-1138, 2010 WL 3447736
   (7th Cir. Sept. 3, 2010) ..................................................................... 17, 18, 20

*Young v. American Mini Theaters, Inc.*, 427 U.S. 50 (1976) ..................................... 15

## STATUTORY PROVISIONS

### City of Chicago

8-20-020 ........................................................................................... 23

8-20-110(a) ........................................................................................ 3

8-20-110(d) ........................................................................................ 3

8-20-120(a)(7) ..................................................................................... 3

8-20-140(d)(1) ..................................................................................... 3

8-20-140(d)(2) ..................................................................................... 4

8-20-280 ........................................................................................... 4

CPD Rules and Regulations, Firearms - Chapter 8-20, Rule 5.3 ................................... 4

## LEGAL TREATISES

Winkler, Adam, *Scrutinizing the Second Amendment,* 105 Mich. L. Rev. 683 (2007) .............. 17

## INTRODUCTION

The standards for a preliminary injunction are the same as the standards for a temporary restraining order. The party seeking the injunction bears the burden of showing irreparable harm, an inadequate remedy at law, and likelihood of success on the merits. *See, e.g.*, *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996). Plaintiffs have twice failed to show that they will suffer irreparable harm and have no adequate remedy at law. At the first hearing on this case, Plaintiffs' counsel told this Court that if he could not convince the Court that day that there was irreparable harm, there was no point in holding a preliminary injunction hearing because Plaintiffs could not "do a better job after discovery of showing that we have irreparable harm. I think we've made the same point on irreparable harm that we would make a month from now." Transcript of Proceedings dated August 23, 2010, attached as Exhibit A, at 41. There was no irreparable harm when Plaintiffs filed their first motion for a temporary restraining order, and none when Plaintiffs filed their second. Nothing has changed: Plaintiffs still cannot show that they will suffer irreparable harm and that they have no adequate remedy at law. As a result, Plaintiffs cannot meet their burden and their motion should be denied.

Plaintiffs also will fail to show a likelihood of success on the merits. No court has held that operating a firing range or shooting guns at a firing range is an activity that falls within the Second Amendment. This Court should decline to decide this question of first impression on a preliminary record. *See Thomas Nelson, Inc. v. Henry Regnery Co.*, 375 F. Supp. 335, 338 n.1 (N.D. Ill. 1974) (Bauer, J.) ("[A] court should ordinarily decline to decide novel questions of law on less than a complete record. . . . [T]he presence of a novel legal question may bar preliminary relief which might otherwise be appropriate.").

In any event, Plaintiffs cannot show that gun ranges are within the protection of the Second

Amendment. The Supreme Court has recognized only the right to possess handguns in the home for purposes of self-defense. Although the City's Responsible Gun Owner Ordinance (the "Ordinance"), attached as Exhibit B, requires training, that requirement does not bring firing ranges within the scope of the Second Amendment; a municipal ordinance cannot alter the meaning and scope of the United States Constitution. And even if a ban on gun ranges touches upon the Second Amendment right to a handgun in the home, the Ordinance satisfies the standard of review that this Court should apply.

Finally, Plaintiffs also bear the burden of showing that the balance of the harms and the public interest weigh in their favor. *See Rust Env't & Infrastructure v. Teunissen*, 131 F.3d 1210,1213 (7th Cir. 1997). Plaintiffs cannot meet this burden. The balance of harms and the public interest weigh heavily against preliminary relief in this case. Plaintiffs ask this Court to enjoin enforcement of numerous firearms restrictions in the Ordinance to allow them to bring a mobile firing range into the City to be placed in locations of their choosing. Because the City has not allowed firing ranges, it currently has no regulations in place for ranges. In the absence of regulations, not just Plaintiffs, but anyone, no matter how inexperienced or irresponsible, could bring in a range, place it anywhere, and operate it without safeguards for the users and the public. This Court should not allow that to happen.

## FACTUAL BACKGROUND

### I.     The Responsible Gun Owners Ordinance.

On June 28, 2010, the Supreme Court determined that an individual's Second Amendment right to possess a handgun in the home for self-defense, first recognized in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), applies to the states. *See McDonald v. City of Chicago*, 130 S. Ct.

3020 (2010). The Chicago City Council thereafter determined that "it is essential [that the City] promptly pass an ordinance that provides for the reasonable regulation of firearms in compliance with the rulings of the United States Supreme Court, but still is effective in protecting the public from the potentially deadly consequences of gun violence in our City." *See* Ex. A, p.1. On July 2, 2010, the Chicago City Council passed the Ordinance.

The Ordinance requires Chicago residents to obtain a Chicago Firearms Permit ("CFP") before legally possessing a firearm in the City. *See* Chicago Mun. Code § 8-20-110(a). An application for a CFP must include, *inter alia*,

> an affidavit signed by a firearm instructor certified by the State of Illinois to provide firearm training courses attesting that the applicant has completed a firearm safety and training course, which, at a minimum, provides one hour of range training and four hours of classroom instruction . . . .

*Id.* § 8-20-120(a)(7). Once an individual obtains a CFP, he or she may take possession of a firearm within the City provided he or she files an application for a firearm registration certificate within five business days after taking possession of the firearm. *Id.* § 8-20-140(d)(1). Any individual who held a valid firearm registration certificate issued before the effective date of the Ordinance is exempt from acquiring a CFP until such time as the registration certificate expires. *Id.* § 8-20-110(d). Such an individual will be in compliance with the Ordinance provided he or she files an application for a CFP on or before the expiration date of the registration certificate. *Id.*

The City also enacted an amnesty provision that provides:

> Notwithstanding any provision of this chapter to the contrary, a person has 90 days after the effective date of this 2010 ordinance to register a firearm, including a handgun, which had not been previously registered; provided that the person and firearm meet all the requirements of this ordinance.

3

*Id.* § 8-20-140(d)(2). Thus, an individual who possesses a firearm in the City that has not been previously registered may make that firearm lawful if he or she complies with the Ordinance by October 12. *See id.* And the City's Department of Police ("CPD"), pursuant to duly-enacted regulations, has provided that an individual will be allowed to take advantage of the amnesty so long as he or she submits an application for a CFP by October 12. *See* CPD Rules and Regulations, Firearms - Chapter 8-20, Rule 5.3, attached as Exhibit C. Moreover, the CPD regulations extend the deadline for anyone whose firearm registration expires before October 12 to submit an application for a CFP until October 12, 2010. *Id.* at Rule 5.3.

Finally, the Ordinance prohibits the operation of "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged" in the City. Chicago Mun. Code § 8-20-280.

## II. The Individual Plaintiffs and the Members of the Organizational Plaintiffs Either Have or Can Comply with the Requirements of the Ordinance.

At the hearing on Plaintiff's motion for a preliminary injunction, the City will establish the following facts. Plaintiff Rhonda Ezell is a Chicago resident who obtained a CFP on or about July 27, 2010 and who registered a Ruger GP100 handgun with the City on August 5, 2010. She obtained her required four hours of classroom instruction at the Fidelity Training Academy, located within the City, and her one hour of range training at GAT Guns in Dundee, Illinois.

Plaintiff William Hespen is a Chicago resident and a 38-year veteran of the CPD who retired earlier this year. He currently possesses in the City six handguns for which the registration expires on June 16, 2011. Mr. Hespen also currently has registered with the City six additional handguns, five shotguns, and thirteen rifles, for which the registration expires on October 8, 2010. He has visited the outdoor range operated by Plaintiff Illinois State Rifle Association ("ISRA") in Bonfield,

4

Illinois about ten times in the past year and regularly (and without difficulty) drives to gun shops with firing ranges in the Chicago suburban area. Mr. Hespen has not yet completed the training required for a CFP because he had heard that the City's Ordinance might be amended to allow retired police officers, like him, to get their CFP without training, but he has the ability to obtain the training outside the City and will do so if the Ordinance is not amended.

Plaintiff Joseph Brown is a Chicago resident who stores two firearms outside the City but wishes to bring one of them into the City. He goes to a suburban firing range in Morton Grove, Illinois between 250 to 270 times a year and has been to the ISRA range in Bonfield, Illinois about 10 times in the last year. Mr. Brown has the ability to obtain the one hour of range training in the Chicago suburbs but has not yet "gotten around to it."

Plaintiffs ISRA and Second Amendment Foundation ("SAF") purport to have members who reside in Chicago who cannot obtain in the suburbs the one hour of range training necessary to apply for a CFP. However, neither ISRA nor SAF can identify any such members. Moreover, ISRA and SAF claim that the firing ranges located in the Chicago suburbs cannot adequately serve the number of Chicago residents seeking to obtain the one hour of range training in order to apply for a CFP, but neither ISRA nor SAF can identify any Chicago members -- or any other Chicago residents, for that matter -- who have been unable to obtain training in the suburbs due to supposed overcrowding. To the contrary, there are at least eighteen firing ranges located within 50 miles of the City, including ranges accessible by public transportation, and there are businesses in the City that offer classroom training and arrange for range training in nearby suburbs.

Plaintiff Action Target, Inc. designs and constructs firing ranges but has no current plans to construct a range in Chicago, which would take, at a minimum, approximately nine months to a year.

5

### III.    SAF's Plans To Operate a Mobile Firearm range Within the City of Chicago.

Although SAF executed a one year contract with Blue Line Corp. pursuant to which SAF will have "periodic use" of Blue Line's mobile range for the period of one year, SAF has not reserved use of the truck for any dates after October 1, 2010. SAF's plans to operate the mobile range within the City have not been properly vetted and therefore pose considerable threats to public safety. SAF has never managed or operated a shooting range. SAF will not staff any employee to the range and has not even decided who at SAF will oversee the range from afar. Although SAF intends to place ISRA in charge of operating the range and training customers, SAF does not know who at ISRA will be responsible for what happens at the range, what rules the ISRA range master will apply, or what state, county, or local laws would govern. Indeed, SAF and ISRA have not reduced to writing any agreement between them regarding operation of the mobile range.

Additionally, ISRA has never operated a mobile range before. Although Richard Pearson, ISRA's Executive Director, will set the safety protocols for operation of the mobile range, he is not a state-certified firearms instructor, has never seen a mobile range before, nor has he spoken to anyone that has any experience in operating a mobile shooting range. Mr. Pearson has yet to draft the safety protocols that will govern operation of the mobile range, and other critical gaps in protocol remain. For instance, ISRA and SAF have not reached agreement whether to allow customers to bring their own weapons to the mobile range, and, if allowed, what protocols would be used to respond to crowds sitting in the parking lot outside the range with their weapons.

In addition, myriad problems beset the two locations chosen by SAF to operate the range. Neither SAF nor ISRA has visited or examined either location. Although SAF asserts that it has leased land from Accurate Perforating ("Accurate"), Accurate does not own the property in question

and the lease (even if valid) merely grants the right to store the trailer, but not to operate a firing range or to open the trailer to the public. The Accurate lease instead provides only for "storage" of "one trailer." Furthermore, although Mr. Pearson testified that port-o-potties would be needed to allow customers to wash lead residue from their hands, Accurate will not permit port-o-potties on its property. SAF does not have a signed lease from the property owner for the second proposed location at 6300-6400 South Bell.[1] Moreover, while SAF describes this site as "industrial," single-family homes are located directly across the street and three schools and three churches are within mere blocks of the site.

Finally, neither SAF nor ISRA has made any effort to determine what existing Chicago zoning, building code, safety services, or environmental provisions would apply to the range. SAF and ISRA have also failed to inquire whether a building permit, business license, or City inspection would be necessary.

## STANDARD

"'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'" *Goodman, D.C. v. Il. Dept. of Fin. & Prof'l Reg.*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The moving party must show that (1) it has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm without injunctive relief; (4) the irreparable harm suffered without injunctive relief outweighs the irreparable harm the defendant will suffer if injunctive relief is granted; and (5) the injunction will

---

[1] Because this site was not disclosed until September 9, 2010 in an e-mail to the City's counsel, the City has not yet had an opportunity to conduct any discovery regarding it.

7

not harm the public interest. *Rust*, 131 F.3d at 1213. To prevail, the moving party "must satisfy each element of this five-part test." *Id.* The court, however, need not reach the balance of the harms and the public interest if the moving party fails to carry the burden on any of the first three parts of the test. *See Mil-Mar*, 75 F.3d at 1156. Preliminary relief is inappropriate in cases involving novel questions of law. *See Thomas Nelson*, 375 F. Supp. at 338 n.1.

## ARGUMENT

I. **There Is No Irreparable Harm To Plaintiffs And Plaintiffs Have An Adequate Remedy At Law.**

A. **The Individual Plaintiffs Have Not Suffered Any Irreparable Harm.**

"A harm is 'irreparable' if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Girl Scouts of Manitou Council v. Girl Scouts of the U.S.A.*, 549 F.3d 1079,1089 (7th Cir. 2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). Plaintiffs cannot meet their burden of showing that they will suffer irreparable harm if they must go to the suburbs for one hour of range training in order to obtain a CFP. The evidence will show that Ms. Ezell has already completed her one hour of training at a firing range in the suburbs, obtained her CFP, and registered a handgun with the City. The evidence will show that Mr. Brown goes to a suburban gun range in Morton Grove between 250 to 270 times a year, has been to the ISRA range in Bonfield, Illinois about 10 times in the last year, and has not completed his one hour of range training because he has not "gotten around to it." Mr. Hespen, the evidence will demonstrate, has also visited the ISRA range in Bonfield about ten times in the past year and regularly drives to gun shops with firing ranges in the Chicago suburban area. Mr. Hespen has not yet completed the training required for a CFP, but he has the ability to obtain the training outside the City and will do

8

so in lieu of risking losing his previously-registered firearms. Finally, neither SAF nor ISRA can identify any member who is unable to obtain range training in the suburbs in order to obtain a CFP.[2] As a result, Plaintiffs cannot possibly claim that a trip to the Chicago suburbs for one hour has caused them irreparable harm, and any cost Plaintiffs incurred in traveling to the suburbs can be remedied with money damages after trial.

Plaintiffs claim that the October 12 "deadline" will cause them harm, but October 12 is the amnesty date by which an individual who has possession of an unregistered firearm -- or who has a registered firearm and that registration expires before October 12 -- and wishes to retain possession of *that firearm* may comply with the Ordinance. If some unidentified individual were to miss that date, he or she would only lose the right to register that particular firearm. And that person would have an adequate remedy at law because the loss of that firearm could be remedied by money damages. Neither that person, nor any other person, would lose their Second Amendment right to acquire a different firearm and apply for a CFP, and they could do that at any time they wish. Moreover, although this deadline looms in Plaintiffs' view, it is a problem of Plaintiffs' own making, because the evidence will demonstrate that training is readily available. In sum, the amnesty period does not affect the Second Amendment right to have a handgun in the home for self-defense, and people are free to acquire firearms at any time in accordance with the Ordinance and apply for a CFP within five days of taking possession of the firearm in the City.

Finally, to the extent that any of Plaintiffs are relying on the First Amendment to claim irreparable harm, their claim fails because the Ordinance does not prevent any Plaintiff from talking

---

[2] As set forth in Part II.B.1, *infra*, SAF, ISRA, and Action Target do not have Second Amendment rights and therefore will not suffer any harm, much less irreparable harm, due to the City's ban on gun ranges.

9

about or teaching anything about guns. The only thing the Ordinance keeps Plaintiffs from doing is shooting guns at a gun range, and no court has ever held that shooting a gun is an activity protected by the First Amendment. *See* pp. 12-13, *infra*.

**B.      There Is No Presumption That Alleged Second Amendment Violations Are Irreparable.**

Plaintiffs have argued that any alleged violation of their Second Amendment rights constitutes irreparable harm. They cannot cite any support for this radical argument. Not a single court has held that alleged violations of the Second Amendment are presumed irreparable. The Supreme Court in *McDonald v. City of Chicago*, 130 S. Ct. 3120 (2010), did not treat the Second Amendment right to possess a handgun in the home for self-defense as an urgent matter. Although the City's prior handgun ban was challenged in *McDonald*, the Court merely held that the Second Amendment was incorporated through the Fourteenth Amendment, and then remanded the case to the lower courts without striking down the ordinance. *Id.* at 3050. It could have struck down the ordinance itself or expedited remand if Second Amendment rights were an urgent matter. If the right to a handgun in the home for self-protection did not merit immediate action, certainly the alleged right to have a shooting range in the City does not require immediate action for preliminary relief.

Plaintiffs analogize their claim to First Amendment violations, which are presumed to be irreparable. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976). First Amendment claims are treated differently, however, because of their unique nature. As the Court explained in *Elrod*, the loss of First Amendment freedoms for even a minimal time constitutes irreparable injury because the timeliness of speech can be important to secure people's "right to the free discussion of public events and public measures . . . ." *Id.* at 373 n.29. The reason for "stringent protection of First Amendment

10

rights . . . is the intangible nature or the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly from exercising those rights in the future." *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989).

Other than the First Amendment, constitutional violations are not presumed irreparable. The Seventh Circuit has emphasized that money damages are an adequate remedy for constitutional violations. *See Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir. 2004). This Court should reject Plaintiffs' novel and unsupported claim that any alleged violation of their Second Amendment rights, even a right as peripheral as shooting at a gun range, should be presumed irreparable.

## II. Plaintiffs Do Not Have A Likelihood of Success on the Merits.

### A. Plaintiffs Cannot Prevail on Their First Amendment Claims.

As discussed above, Plaintiffs have no likelihood of prevailing on the merits of their First Amendment claim because the Ordinance does not place any restrictions whatsoever on Plaintiffs' expression or speech, including speaking, teaching, learning, or communicating about guns. The Ordinance's only prohibition is on the *activity* of actually shooting guns at a gun range within the City limits.

Not a single court has ever held that the act of shooting a gun is an activity protected by the First Amendment.[3] In fact, Plaintiffs only broadly argue that gun training is speech. But Plaintiffs can engage in, and in fact some already have received, all forms of gun training within the City, short of shooting a live firearm. For example, Ezell attended a four-hour gun safety training class in the

---

[3] In *Northern Indiana Gun & Outdoor Shows, Inc.*, 104 F. Supp.2d 1009, 1013-14 (N.D. Ind. 2000), for example, the court held that the conduct of bringing guns to a gun show did not convey a particular message or contain an expressive component, and thus fell outside the scope of the First Amendment. If merely bringing a gun to a gun show is not protected, certainly shooting guns at a firing range is not.

11

City, and these training classes impart a great deal of information regarding the safe and responsible use of firearms. The evidence will also show that ISRA is free to open facilities for firearms discussion and education, including safe gun use, storage, loading, posture, and aiming, to use replica firearms to teach firearms handling, and to distribute firearms information and literature, all within Chicago.

For this reason, Plaintiffs' reliance on *Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999), is entirely misplaced. The *Edwards* court did not hold that shooting a gun was expressive activity protected by the First Amendment. Rather, it held that advocacy of firearm safety, including teaching a gun safety course where information was presumably provided both verbally, through written instruction, and physical demonstration was protected speech. *Id.* at 247. This is precisely the type of training that is available to all Chicago residents, and that Ms. Ezell received. Nothing in the Ordinance prevents, circumscribes, or interferes with this expression, and Plaintiffs' First Amendment claims therefore have no merit and no likelihood of success.

**B.      Plaintiffs Cannot Prevail on Their Second Amendment Claims.**

**1.      The Organizational Plaintiffs Have No Second Amendment Claim.**

Because the *Heller* Court only recognized the Second Amendment as protecting an *individual* right to keep and bear arms for purposes of self-defense, *see* 128 S. Ct. at 2799, Plaintiffs SAF, ISRA, and Action Target themselves do not possess any right protected by the Second Amendment. They therefore have no likelihood of success on their Second Amendment claims.

12

2.  **The Individual Plaintiffs Have No Likelihood of Success on Their Second Amendment Claims.**

    i.  **The Second Amendment does not protect an individual right to use or operate a firearm range.**

Plaintiffs Ezell, Hespen, and Brown have no likelihood of prevailing on their Second Amendment claims. There is no Second Amendment right to shooting ranges. The Second Amendment, as construed in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), protects "the right to possess a handgun in the home for the purpose of self-defense." *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3050 (2010) (plurality opinion). *See also United States v. Skoien*, --- F.3d ---, 2010 WL 2735747, at *1 (7th Cir. July 13, 2010) (*en banc*) (right to "keep[] operable handguns at home for self-defense"). *Heller* established no more than this. Indeed, *Heller* "warns readers not to treat [it] as containing broader holdings than the Court set out to establish." *Skoien*, 2010 WL 2735747, at *1 (quoting *Heller,* 128 S. Ct. at 2816-17 & n.26 (cautioning that opinion should not be read to "cast doubt" on various "presumptively lawful" restrictions on arms use)). *See also McDonald*, 130 S. Ct. at 3047 (plurality opinion) ("repeat[ing]" *Heller*'s "assurances").

Plaintiffs do not identify any case holding that shooting ranges are protected under the Second Amendment. Instead, they rely on snippets from two 19th-century treatises cited in *Heller*. *See* Pl. Mem. at 11. This *dicta* does not aid Plaintiffs for two reasons. First, "general expressions" in *Heller* "must be read in light of the subject under consideration." *Skoien*, 2010 WL 2735747, at *1. And the subject of shooting ranges was simply not before the Court in *Heller*. Rather, the question was whether the Second Amendment protects only a right to possess arms "in connection with militia service," or whether it also protects "an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as

13

self-defense within the home." *Heller*, 128 S. Ct. at 2789. It was in the context of addressing *this* question that the Court cited the treatises. *See id.* at 2811 ("Every late-19th-century legal scholar that we have read interpreted the Second Amendment to secure an individual right unconnected with militia service.").

Second, the Court made clear that its interpretive task was to discern the "original understanding" of the Second Amendment at the time of its ratification in 1791. *Heller*, 128 S. Ct. at 2816. The Court proceeded from the premise that "the Constitution was written to be understood by the voters" and that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2788, 2821. *See also McDonald*, 130 S. Ct. at 3048 (plurality opinion) (*Heller* presented question of Amendment's "original meaning"); *Skoien*, 2010 WL 2735747, at *2. The views of two treatise writers in the late 19th-century do not control what the ratifying public understood the Second Amendment to mean in 1791.[4]

Tellingly, Plaintiffs do not cite the portion of *Heller* that copiously analyzed the actual text of the Second Amendment as it was originally understood. *See Heller*, 128 S. Ct. at 2789-99.[5]

---

[4] Moreover, the treatise snippets refer to training in the context of explaining that training was necessary for the militia to be able to function effectively. *See Heller*, 128 S. Ct. at 2812 ("Some general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war"); *id.* at 2811 ("this enables government to have a well-regulated militia"); *see also id.* at 2815 ("Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves . . . .") (citation omitted). Plaintiffs do not advance any militia-related purpose for their desire to shoot at ranges.

[5] Plaintiffs do contend that the Second Amendment's prefatory clause, which refers to a "well-regulated militia," encompasses the "imposition of proper discipline and training." Pl. Mem., at 11 (citing *Heller*, 128 S. Ct. at 2800). But *Heller* is clear that the Amendment's prefatory clause "does not limit or expand the scope of the [Amendment's] operative clause." *Heller*, 128 S. Ct. at 2789. Moreover, Plaintiffs here do not seek a right to military training. Nor does protection of a right to "impose" training on the militia confer a right on private citizens to train for non-military purposes.

14

Nothing in that analysis suggests that the Amendment encompasses shooting ranges. For this reason, Plaintiffs' recourse to the protection accorded bookstores and adult establishments under the First Amendment is unavailing. Those businesses are expressly protected under the First Amendment's terms. *See Smith v. California*, 361 U.S. 147, 149-50 (1960) ("the free publication and dissemination of books" are "very familiar applications" of the "liberty of the press and of speech"); *see also Young v. American Mini Theaters, Inc.*, 427 U.S. 50, 70 (1976) (erotic materials "that have some arguably artistic value" are protected under First Amendment).

Moreover, protection of First Amendment establishments is necessary to reduce indirect censorship and the "chilling" of First Amendment freedoms. *See Smith*, 361 U.S. at 153-54 (bookstore restrictions would reduce "public's access to reading matter" and allow State to restrict materials that it "could not constitutionally suppress directly"). As shown *supra*, however, there is no evidence that a ban on shooting ranges precludes or even chills residents' desire or ability to possess arms for self-defense. Nor must the City allow shooting ranges simply because they may enhance one's ability to use arms for self-defense. The Second Amendment is not a right to use weapons "in any manner whatsoever and for whatever purpose," *Heller*, 128 S. Ct. at 2816, and it permits restrictions that impact self-defense. For instance, machine guns can be banned even though they would be more useful for self-defense than handguns. *See id.* at 2817. And various prohibitions on arms-related activity outside the home, such as carrying and the sale of arms, are "presumptively lawful," *id.* at 2816-17 & n.26, even though the ability to possess and use arms for self-defense would be more robust absent these restrictions.

Finally, the mere fact that the City Council found that a minimum level of firearm training should be a condition to gun ownership in Chicago and recognized it as beneficial to public safety

does not make shooting ranges one of the rights protected by the Second Amendment. No local government, or any governmental body for that matter, can expand or diminish the scope of constitutional rights, and this Court need look no further than *Heller* for this point. *See id.* at 2821 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.").

**ii.    The Ordinance does not violate the Second Amendment.**

To the extent the Court finds that requiring range training in light of the ban on firing ranges within the City implicates the Second Amendment right to possess arms in the home for self-defense, the Court must determine (i) what level of judicial scrutiny to apply; and (ii) whether the City's Ordinance satisfies that level of scrutiny. The level of scrutiny to apply to this requirement is a question of first impression. In *Heller*, the Supreme Court did not identify what level of scrutiny applied to legislation implicating the Second Amendment right to possession of an operable handgun in home for self-defense except to state that the District's handgun prohibition would fail constitutional muster "[u]nder any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights." *Id.* at 2817. Following incorporation of the Second Amendment right recognized in *Heller*, *see McDonald*, the Seventh Circuit ruled that 18 U.S.C. § 922(g)(9), which prohibits individuals convicted of misdemeanor domestic violence from possessing firearms, passes constitutional muster. *See Skoien*, 2010 WL 2735747. In upholding that categorical exclusion from firearm possession, the *Skoien* Court expressly declined to "get more deeply into the 'levels of scrutiny' quagmire." *Id.* at *3. In two subsequent cases, the Seventh Circuit again ruled that other categorical exclusions from possession of firearms are subject to intermediate scrutiny.

16

*See United States v. Yancey*, --- F.3d ---, No. 09-1138, 2010 WL 3447736, at *2 (7th Cir. Sept. 3, 2010) (ruling that 18 U.S.C. § 922(g)(3), which prohibits an individual who is an unlawful user of or an addict of any controlled substance from possession of a firearm, passes intermediate scrutiny); *United States v. Williams*, ---- F.3d ----, No.09-3174, 2010 WL 3035483, at * 6 (7th Cir. Aug. 5, 2010) (holding that 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms, passes intermediate scrutiny).

Although the Seventh Circuit has required that laws categorically prohibiting an individual from possessing a firearm satisfy intermediate scrutiny, it has explicitly "reserve[d] the question whether a different kind of firearm regulation might require a different approach." *Yancey*, 2010 WL 3447736, at *2. *See Williams*, 2010 WL 3035483, at *6 (applying intermediate scrutiny to the categorical exclusion from firearm possession "without determining that it would be the precise test applicable to all challenges to gun restrictions"). The Seventh Circuit could have ruled -- in *Skoien*, *Williams*, or *Yancey* -- that *all* restrictions on firearm possession are subject to intermediate scrutiny, but it declined to do so, strongly suggesting that a less stringent form of review than intermediate scrutiny is appropriate when the there is no categorical exclusion from exercising the Second Amendment right.

The long-held consensus of the forty-two States that recognize an individual firearm right is that a "reasonable regulation" on the firearm right is constitutional. *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 716-17 (2007). Adoption of this state consensus is appropriate in this case for two reasons. First, the federal courts have virtually no experience in considering firearms rights at all, much less in evaluating the proper standard to apply. Indeed, it was only two years ago in *Heller* that the Court first construed the Second Amendment as

17

conferring an individual firearms right at all. On the other hand, most state courts have long construed their constitutions to confer an individual arms right, and they have considerable expertise in evaluating restrictions on that right. This court "should not lightly disregard this wealth of experience," *see id.* at 715, 716-17, and nothing in *Heller* precludes the court from doing so as to the claims presented in this case. Indeed, the Seventh Circuit, in *Yancey*, found that prior state jurisprudence, as surveyed by Winkler, is relevant to assessing Second Amendment claims. *See* 2010 WL 3447736, at *3. Second, the reasonable regulation standard is on its own merit the proper standard. It acknowledges that firearms regulation "requires highly complex socio-economic considerations" and "multi-factor judgments" that "courts are not institutionally equipped to make." Winkler, *supra*, at 715. When, as here, a regulation does not wholly ban arms possession but merely regulates the periphery of the right, courts should not apply a more exacting standard that would intrude upon and second-guess the City's regulatory expertise. *See id.* at 732. The reasonable regulation standard, which "identif[ies] the underlying governmental objectives and weig[hs] those goals against the burden on the individual," accommodates this complexity and local expertise. *Id.* at 716-17. *See, e.g., Benjamin v. Bailey*, 662 A.2d 1226, 1233 (Conn. 1995); *Robertson v. City & County of Denver*, 874 P.2d 325, 329-30 (Colo. 1994); *Mosby v. Devine*, 851 A.2d 1031, 1044 (R.I. 2004).

The City's ban on firearm ranges easily satisfies the "reasonable regulation" standard. The evidence will show that the City, in enacting the Ordinance, created a comprehensive scheme that acknowledged an individual's right to possess a firearm in the home for self-defense, but limited the impact that a proliferation of firearms has on public health, safety, and welfare. The evidence will show that restrictions on the carrying and use of firearms outside the home, like the City's ban on

18

firing ranges, serves this objective by prohibiting a concentration of individuals with firearms in one location and reducing opportunities for illegal transfer of firearms, theft, and gun trafficking. The evidence will also show that firearm ranges create complicated and difficult regulatory challenges that the City has not yet addressed and could not address without significant ongoing cost. Moreover, the evidence will show that SAF's proposal to bring a mobile range into the City raises serious concerns because SAF does not have a fully-vetted plan that addresses myriad public safety issues, including the operation of the mobile range directly across the street from single family homes and in close proximity to an elementary school and a church. For these reasons, the evidence will demonstrate that the City's objectives in banning gun ranges are substantial and important.

The evidence will show that the City's important interests in prohibiting firearm ranges far outweigh any purported burden on Plaintiffs. The evidence will demonstrate that there are at least 18 firing ranges within 50 miles from the City's borders and that Chicago residents can and do use those ranges. The evidence will also show that Ezell was able to obtain her one hour of range time in the Chicago suburbs and has legally registered her handgun with the City. The evidence will also show that Hespen routinely travels to suburban firing ranges and that he is willing and able to travel outside the City to obtain his one hour of range training, if necessary. The evidence will further show that Brown routinely travels to suburban ranges and that he is able to travel outside of the City to obtain his one hour of range training. As a result, Plaintiffs will not be able to demonstrate that the City's prohibition on firing ranges is not a "reasonable" restriction on their Second Amendment right to a firearm in the home for self-defense.

The Court may also evaluate the City's firing range ban using the "undue burden" test, adopted by the Supreme Court in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992),

for use in evaluating restrictions placed on a woman's fundamental constitutional right to abortion. There is no reason to conclude that the right to possess a handgun in the home for the purpose of self-defense enshrined in the Second Amendment warrants greater protections than the liberty interests protected by the Due Process Clause. Indeed, the Supreme Court recognized in *Casey* that "not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right," *id.* at 873, and held that a state may enact legislation advancing its interests provided that legislation does not "place a substantial obstacle in the path" of an individual seeking to exercise a constitutional right. *Id.* at 878.[6] The evidence will demonstrate that the City has not placed any obstacle -- much less a substantial one -- in Plaintiffs' paths by requiring that they obtain their one hour of range training outside the City. As discussed above, the evidence will show that Plaintiffs either have completed the range training in the suburbs or easily have the means and ability to do so. Moreover, the evidence will show that the large number of ranges within close proximity to the City eliminates any concern that any yet-to-be identified members of SAF or ISRA cannot obtain their one hour of range training.

In light of the Seventh Circuit's rulings in *Skoien*, *William*, and *Yancey*, it would be inappropriate for the Court to use intermediate scrutiny to evaluate the City's ban on firing ranges. The Seventh Circuit has only applied intermediate scrutiny to laws that absolutely prohibit an individual from possession of a firearm and has explicitly left open the question of what level of scrutiny would apply to other types of gun regulations. *See Yancey*, 2010 WL 3447736, at *2; *Williams*, 2010 WL 3035483, at *6. The City's ban does not categorically preclude anyone from

---

[6] Firearms also clearly implicate the state's interest in human life, an interest that underlies the Ordinance. Thus, like abortion restrictions, the City's restrictions should stand so long as they do not unduly burden the Second Amendment right.

possessing a firearm; it instead requires that an individual obtain the hour of range training in the Chicago suburbs. In light of this fact – and that the Seventh Circuit explicitly declined to adopt intermediate scrutiny for all gun regulations despite having three occasions to do so – this Court should not use intermediate scrutiny to evaluate the constitutionality of the City's ban on firearm ranges.

To the extent the Court does apply intermediate scrutiny, however, the City's range ban satisfies the standard. "To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Williams*, 2010 WL 3035483, at *6. The City's objective -- to limit the impact that a proliferation of firearms has on public health, safety, and welfare -- is undoubtedly an important one. Furthermore, the evidence will show that the City's objective is substantially advanced by the ban on firing ranges because it prohibits individuals with firearms from congregating in one location, reduces the opportunities for illegal transfer of firearms, theft, and gun trafficking, and limits the carrying of firearms outside of the home. The evidence will also show that the ban eliminates the need to integrate the operation of firing ranges into the City's otherwise established regulatory schemes. For these reasons, the City's Ordinance survives intermediate scrutiny.

Finally, because the Seventh Circuit did not use strict scrutiny to review laws banning certain individuals from firearm possession, there is absolutely no merit to Plaintiffs' argument that the Court should evaluate the City's ban using strict scrutiny. In light of *Skoien*, *Williams*, and *Yancey*, there can be no doubt that the Seventh Circuit would not require review of the City's ban on firing ranges under strict scrutiny.

21

As a result, Plaintiffs Ezell, Hespen, and Brown have no likelihood of success on the merits of their Second Amendment claims, and their request for a preliminary injunction should therefore be denied.

### III. The Balance of Harms and the Public Interest Weigh Heavily Against Preliminary Relief.

When the Court balances Plaintiffs' purported injury against the injury to the City and the public interest, there can be no question that entry of a preliminary injunction would be inappropriate. The purpose of this balancing is "to minimize the cost of potential error." *See, e.g.,* *Girl Scouts*, 549 F.3d at 1086. Plaintiffs bear the burden of proof on this balancing. *See Rust*, 131 F.3d at 1213. Here, Plaintiffs will suffer no irreparable harm if their motion is denied.

As discussed in Part I, the Individual Plaintiffs cannot claim any harm resulting from the City's ban on firing ranges, SAF and ISRA cannot identify any of their members who have suffered any harm, and no court has held that harm is to be presumed, even if there were a Second Amendment violation. And as set forth above, the October 12 "deadline" does not harm Plaintiffs in any way that cannot be compensated through money damages. Moreover, there is no benefit to Plaintiffs in granting their motion for preliminary relief, as the requested injunction will not cure the purported October 12 problem. The evidence will show that there are no current plans for SAF to bring the Blue Line mobile range to Chicago after October 1, and, even if it were in Chicago sometime before October 12, the mobile range can only accommodate three individuals at one time. In sum, Plaintiffs cannot identify any harm -- or any significant benefit to them -- that warrants entry of preliminary relief against the City.

On the other hand, the City and the public will suffer immeasurable harm if Plaintiffs are

granted the preliminary relief they seek. First, Plaintiffs ask this Court to enjoin not only the ban on firearm ranges, but also other provisions of the Ordinance, including the provision making it unlawful to carry a handgun outside the person's home, *see* Chicago Mun. Code § 8-20-020. The evidence will show that the consequences of enjoining those provisions of the Ordinance pose considerable public safety concerns, including, but not limited to, essentially permitting open carrying of firearms throughout the City.

But even if this Court were only to enjoin the range ban, there will still be substantial harm to the City and the public interest it is charged with preserving. The evidence will show that the City has no laws or regulations that permit firing ranges or regulate their operation. The evidence will show that there is no provision in the Zoning Code allowing gun ranges in appropriate areas, no laws or regulations governing who may own and operate a gun range and how the range should operate, and no environmental regulations even though gun ranges emit and collect lead, a hazardous substance.[7] If this Court were to grant preliminary relief, it would be allowing gun ranges in the City before the City had any opportunity to enact regulations governing the many public safety problems ranges present. This Court should not disrupt the City's current regulations governing zoning, licensing, and the environment by allowing completely unregulated firing ranges – particularly mobile ranges – to move into the City.

Moreover, this Court's order would allow anyone to bring in a gun range to any location, regardless of how irresponsible that person is, no matter where they chose to place it. It would allow

---

[7] Plaintiffs may claim that the City should simply tell them what to do or create regulations immediately, but that is not the way local government works. City officials do not willy-nilly pronounce regulations from the top of their heads. Zoning and licensing, for example require action by the City Council, which takes time and must comply with due process.

anyone, even gang members, to carry firearms to the range. The dangers to the City, its public safety enforcement, and the public interest are obvious and weigh against any preliminary relief in this case.

Plaintiffs' "plan" to bring a mobile range into the City unquestionably would also cause the City harm in light of the haphazard, ill-conceived, and ever-changing nature of that plan. As discussed more fully in the Statement of Facts, *supra*, the evidence will show that neither SAF nor ISRA has any firm plans for how they will operate the range. The evidence will show that no safety protocol has been developed and that SAF and ISRA have yet to decide whether to allow members of the public to use their own firearms. The evidence will also demonstrate that SAF has not carefully considered the places it plans to locate and operate the mobile range. For example, SAF proposes to locate the mobile range at 6300-6400 S. Bell, despite the fact that single family homes are directly across the street and a church and an elementary school are located less than a block away. This Court must consider the safety risks to the residents of those single family homes, elementary school-aged children, and churchgoers before granting a preliminary injunction. Plaintiffs' irresponsibility in selecting locations should not be sanctioned by this Court.

Finally, an injunction would cause significant harm to the public interest. The Chicago City Council has made a decision to ban firing ranges from operating within the City as part of a larger comprehensive regulatory scheme, which includes licensing, zoning, and environmental regulation of entities that do business within the City. Those legislative enactments were made in the public interest, and any action by this Court which erroneously interferes with the decisions of the Chicago residents' elected representatives would cause harm to the public interest and should therefore be made with great caution. *See Aircraft Owners & Pilots Ass'n v. Hinson*, 96 C 5793, slip op. at 41-42 (N.D. Ill. Sept. 27, 1996) ("action of a court, which erroneously interferes with the governance

decisions of the people's elected representatives . . . causes irreparable harm" and damages the public

interest) (attached as Exhibit D), *aff'd*, 102 F.3d 1421 (7th Cir. 1996). In this case, because the City's

ban on firing ranges is a question of first impression – and Plaintiffs have not demonstrated any harm

– the Court should deny Plaintiffs' motion.

## CONCLUSION

For all the above reasons, Plaintiffs' Motion for a Preliminary Injunction should be denied.

Date: September 20, 2010                    Respectfully submitted,

                                            MARA S. GEORGES,
                                            Corporation Counsel for the City of Chicago

                                    By:     /s/ William Macy Aguiar
                                            Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975  / 7129 / 4216

Attorneys for Defendants