# EXHIBIT A

03:22:02

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RHONDA EZELL, et al.,                Case No. 1:10-cv-05135

  Plaintiffs,                    Chicago, Illinois
                                     August 23, 2010
     v.                          Emergency Motion for TRO

CITY OF CHICAGO,

  Defendant.
--------------------------------

VOLUME 1-B
TRANSCRIPT OF EMERGENCY MOTION FOR TRO
BEFORE THE HONORABLE VIRGINIA M. KENDALL
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Plaintiffs:     Gura & Possessky, PLLC
                        By:  Alan Gura
                        101 N. Columbus St., Ste. 405
                        Alexandria, VA 22314
                        (703) 835-9085

                          - and -

                        Law Firm of David G. Sigale, P.C.
                        By:  David G. Sigale
                        4300 Commerce Ct., Ste. 300-3
                        Lisle, IL 60532
                        (630) 452-4547

1
2

**APPEARANCES**:

3
4

For the Defendant:     Chicago Corporation Counsel
5                      By:   Andrew W. Worseck, and
6                            William M. Aguiar
                       30 N. LaSalle Street
7                      Chicago, IL 60602
                       (312) 744-2784
8

9   **COURT REPORTER**:     FEDERAL OFFICIAL COURT REPORTER
10                      April M. Metzler, RPR, CRR, FCRR
                       219 South Dearborn St., Rm. 2318-A
11                      Chicago, IL 60604
                       (312) 408-5154
12                      April_Metzler@ilnd.uscourts.gov

13
14
15
16
17
18
19
20
21
22
23
24

25   Proceedings recorded by mechanical stenography; transcript
     produced by notereading.

| | | |
|---|---|---|
| 04:13:45 | 1 | (Laughter.) |
| 04:13:46 | 2 | THE COURT: It's just an overused oral argument |
| 04:13:49 | 3 | expression. |
| 04:13:50 | 4 | MR. GURA: I'm happy it took me this long to use it. |
| 04:13:53 | 5 | THE COURT: It's no problem. |
| 04:13:54 | 6 | MR. GURA: We can think of a -- it contradicts. |
| 04:13:57 | 7 | THE COURT: It contradicts -- |
| 04:13:59 | 8 | MR. GURA: It squarely contradicts -- |
| 04:14:01 | 9 | THE COURT: It squarely contradicts the holding of |
| 04:14:02 | 10 | the case. |
| 04:14:02 | 11 | MR. GURA: The holding of McDonald. |
| 04:14:02 | 12 | THE COURT: There you go. |
| 04:14:03 | 13 | MR. GURA: And as a practical matter -- just as a |
| 04:14:07 | 14 | housekeeping matter, your Honor -- if everything I say here |
| 04:14:10 | 15 | today cannot convince you, your Honor, that we're entitled to |
| 04:14:16 | 16 | a temporary restraining order, then as a practical matter I'm |
| 04:14:21 | 17 | not sure what the point of the accelerated discovery and |
| 04:14:27 | 18 | preliminary injunction schedule would be. |
| 04:14:29 | 19 | The Court should probably proceed -- I don't think we |
| 04:14:33 | 20 | can do a better job after discovery of showing that we have |
| 04:14:36 | 21 | irreparable harm. I think we've made the same point on |
| 04:14:39 | 22 | irreparable harm that we would make a month from now. The |
| 04:14:45 | 23 | harm exists. It's every bit as harmful today as it will be |
| 04:14:50 | 24 | tomorrow and -- |
| 04:14:50 | 25 | THE COURT: But it wasn't as harmful to you when you |

# EXHIBIT B

# ORDINANCE

**WHEREAS,** A recent study by the Centers for Disease Control and Prevention found that in the United States there were 30,896 deaths from firearms in 2006, making firearms one of the top ten causes of death in the country; and

**WHEREAS,** Annually, more than 100,000 people in our nation are shot or killed with a firearm, with more than 3,000 of these victims being children or teenagers; and

**WHEREAS,** The United States is one of the few remaining developed nations that places only a minimal restrictions on the sale or possession of firearms; and

**WHEREAS,** Firearm-related injuries and deaths are the cause of significant social and economic costs to the City and our communities and have a severe impact on our criminal justice and health care systems; and

**WHEREAS,** In 2009, in the City there were 1,815 aggravated batteries with a firearm, of which 83 were shootings inside a residence, and there were 379 murders with a firearm, of which 34 were murders involving a firearm inside a home; and

**WHEREAS,** Between the beginning of this year and June, 15, 2010, there were 742 aggravated batteries with a firearm, of which 36 took place inside a residence, and 152 murders with a firearm, of which 19 were inside a residence; and

**WHEREAS,** Given the dangerous and deadly nature of handguns, in 1982 the City of Chicago enacted a ban on registering handguns as a method to protect public safety and the health and welfare of its residents; and

**WHEREAS,** In 2008, the Supreme Court of the United States decided the case of *District of Columbia v. Heller*, which held that the Second Amendment to the United States Constitution protects an individual right to possess a firearm unconnected with service in the militia; and

**WHEREAS,** After the *Heller* decision, the City's handgun registration ban was challenged in the case of *McDonald v. the City of Chicago*; and

**WHEREAS,** On June 28, 2010, the Supreme Court issued its opinion in the *McDonald* case and ruled that the Second Amendment's right to possess a handgun for self-defense in the home also applied to the states; and

**WHEREAS,** Although the State of Illinois has already enacted several laws to regulate the sale and possession of firearms, these laws are not sufficient to protect the City from the unique and heightened risk of firearm violence, especially handgun violence, endemic in densely populated urban areas; and

**WHEREAS,** In order to provide for the ongoing protection of the public welfare and safety, it is essential for the City Council of the City of Chicago to promptly pass an ordinance that provides for reasonable regulation of firearms in compliance with the rulings of the United States Supreme Court, but still is effective in protecting the public from the potentially deadly consequences of gun violence in our City; and

**WHEREAS,** When a gun is registered with the City, certain personal identifying information, such as the registrant's address, is obtained so that a first responder can be advised that a gun is present in that home. In order to protect the privacy and safety of people registering guns, any information provided in the registration procedure should not be available to the public. The City is requesting that Illinois Attorney General Lisa Madigan issue an opinion, as expeditiously as possible, on whether the information provided to the City for gun registration is exempt from disclosure under the Illinois Freedom of Information Act, 5 ILCS 140, et seq.; and

**WHEREAS,** As a consequence of the United States Supreme Court decisions in *Heller* and *McDonald*, it is anticipated that gun ownership in many communities, including large urban areas, will increase. To ensure public safety and the welfare of a community, it is essential that local law enforcement agencies be made aware of any gun brought into their jurisdictions. Therefore, the United States Congress must pass a law mandating that the Bureau of Alcohol, Tobacco, Firearms and Explosives timely notify a local law enforcement agency of any purchase or sale of a firearm by a resident of that community; and

**WHEREAS,** In addition, the ability to have handguns in a home will expose taxpayers to greater costs and expenses associated with the increased number of incidents involving a first responder entering a home where a gun is present. In order to minimize the impact of these costs to the taxpayers, the United States Congress and the State of Illinois must pass laws that grant immunity for the City and its first responders from any civil liability for any accidental or lawfully intentional actions by the first responders in responding to a situation in a home where a gun is present and the first responder perceives a danger caused by the presence of the gun; now, therefore,

### BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF CHICAGO:

**SECTION 1.** Chapter 2-14 of the Municipal Code of Chicago is hereby amended by deleting the language struck through, and by adding the language underscored, as follows:

**2-14-132 Impoundment.**
(1) Whenever the owner of a vehicle seized and impounded pursuant to Sections 3-46-076, 3-56-155, 4-68-195, 9-80-220 or 9-112-555 of this Code (for purposes of this section, the "status-related offense sections"), or Sections 7-24-225, 7-24-226, 7-28-390, 7-28-440, 7-38-115(c-5), 8-4-130, 8-8-060, 8-20-015, 8-20-070, 9-12-090, 9-76-145, 9-80-240, 9-92-035, 11-4-1410, 11-4-1500 or 15-20-270 of this Code (for purposes of this section, the "use-related offense sections") requests a preliminary hearing in person and in writing at the department of administrative hearings, within 15 days after the vehicle is seized and impounded, an administrative law officer of the department of administrative hearings shall conduct such preliminary hearing within 48 hours of request, excluding Saturdays, Sundays and legal holidays, unless the vehicle was seized and impounded pursuant to Section 7-24-225 and the department of police determines that it must retain custody of the vehicle under the applicable state or federal forfeiture law. If, after the hearing, the administrative law officer determines that there is probable cause to believe that the vehicle was used in a violation of this Code for which seizure and impound applies, or, if the impoundment is pursuant to Section 9-92-035, that the subject vehicle is eligible for impoundment under that section, the administrative law officer shall order the continued impoundment of the vehicle as provided in this section unless the owner of the vehicle pays to the city the amount of the administrative penalty prescribed for the code violation plus fees for towing and storing the vehicle. If the vehicle is also subject to immobilization for unpaid parking and/or compliance violations, the owner of the vehicle must also pay the amounts due for all such outstanding violations prior to the release of the vehicle. If

the administrative law officer determines there is no such probable cause, or, if the impoundment is pursuant to Section 9-92-035, that the subject vehicle has previously been determined not to be eligible for impoundment under that section, the vehicle will be returned without penalty or other fees.

*(omitted text is unaffected by this ordinance)*

**2-14-190   Municipal hearings division – Jurisdiction.**
        (a)        The department of administrative hearings is authorized to establish a system of administrative adjudication for the enforcement of all provisions of the Municipal Code that are not adjudicated by the vehicle, buildings, environmental safety or consumer affairs hearings divisions, except that it shall not adjudicate violations of the following chapters and sections: chapter 4-92 (Massage Establishments and Massage Services); chapter 4-144 (Weapons); and Section 7-28-190 (Health Nuisances – Throwing Objects into Roadways); ~~chapter 8-20 (Weapons), other than Section 8-20-015 (Unlawful Firearm in Motor Vehicle – Impoundment); and chapter 8-24 (Firearms and Other Weapons)~~.

*(omitted text is unaffected by this ordinance)*

        **SECTION 2.**   Chapter 2-84 of the Municipal Code of Chicago is hereby amended by adding a new section 2-84-075, as follows:

**2-84-075 Sale of firearms and ammunition authorized by the superintendent.**
        Notwithstanding any other provision of this code to the contrary, the superintendent may authorize the sale of firearms or ammunition by a person issued a federal firearms license to a member of the police department, if that member is authorized to carry such firearm or ammunition. Such sales shall be conducted at department of police facilities.

        **SECTION 3.**   Title 4 of the Municipal Code of Chicago is hereby amended by adding a new section 4-144-065, by adding the language underscored, and by deleting the language struck through, as follows:

**4-144-010   License – Required.**
        It shall be unlawful for any person to engage in the business of selling, or to sell, ~~or~~ give away or otherwise transfer, any ~~pistol, revolver or other firearm,~~ dagger, stiletto, billie, derringer, bowie knife, dirk, stun gun or taser, as defined in Section 24-1 of the Illinois Criminal Code, 720 ILCS 5/24-1, or other deadly weapon which can be carried or concealed on the person, or any ammunition, as that term is defined in Section 8-20-010, without securing a weapons dealer license. The license required by this chapter shall be in addition to any other license required by law.  It shall be unlawful for any person licensed under this chapter to engage in the business of selling, or to sell, give away or otherwise transfer, any firearm as that term is defined in Section 8-20-010.

**4-144-061   Sale of certain handgun ammunition prohibited.**
        Except as allowed by section 8-20-100(e) ~~subsection (e) of Section 8-20-170 of this Code~~, it shall be unlawful for any person to sell, offer for sale, expose for sale, barter or give away to any person within the city, any armor piercing or .50 caliber ammunition ~~of the following calibers and types:~~

                ~~.45 automatic~~
                ~~.380 automatic~~
                ~~.38 special~~

~~.357 magnum~~
~~.25 caliber~~
~~.22 caliber, including .22 long~~
~~9 millimeter~~

~~Any other ammunition, regardless of the designation by the manufacturer, distributor or seller, that is capable of being used as a substitute for any of the foregoing.~~

**4-144-062   Sale of <u>ammunition to minors-prohibited.</u> ~~handguns without childproofing or safety devices prohibited.~~**

No person licensed under this chapter shall sell or otherwise transfer any ammunition to a person who is under the age of 18.

~~Except as allowed by subsection (e) of Section 8-20-170 of this Code, it shall be unlawful for any person to sell, barter or give away to any person any handgun which does not contain:~~

~~(1)   A safety mechanism to hinder the use of the handgun by unauthorized users. Such devices shall include, but shall not be limited to, trigger locks, combination handle locks, and solenoid use-limitation devices, and~~

~~(2)   A load indicator device that provides reasonable warning to potential users such that users even unfamiliar with the weapon would be forewarned and would understand the nature of the warning.~~

~~Safety mechanism means a design adaption or nondetachable accessory that lessens the likelihood of unanticipated use of the handgun by other than the owner of the handgun and those specifically authorized by the owner to use the handgun.~~

~~A trigger lock means a device that when locked in place by means of a key, prevents a potential user from pulling the trigger of the handgun without first removing the trigger lock by use of the trigger lock's key.~~

~~A combination handle lock means a device that is part of the handgun which precludes the use of the handgun unless the combination tumblers are properly aligned.~~

~~A solenoid use-limitation device means a device which precludes, by use of a solenoid, the firing of the handgun unless a magnet of the appropriate strength is placed in proximity to the handle of the weapon.~~

~~A load indicator means a device which plainly indicates that a bullet is placed in the handgun in a way that pulling the trigger or otherwise handling the handgun may result in detonation.~~

**<u>4-144-065 Sale of metal piercing bullets.</u>**

No person licensed under this chapter shall sell, offer for sale, expose for sale, barter, give away or otherwise transfer any metal piercing bullets, as that term is defined in section 8-20-010.

**SECTION 4.**   Chapter 8-20, Articles I and II, section 8-20-010 through and including section 8-20-260 of the Municipal Code of Chicago are deleted in their entirety and replaced with the following language;

**ARTICLE I.   DEFINITIONS.**

**8-20-010 Definitions:**

For purposes of this chapter the following terms shall apply:

"The Act" means the Illinois Firearm Owners Identification Card Act, 430 ILCS 65/1 et seq., as amended.

"Ammunition" means any self-contained cartridge or shotgun shell, by whatever name known, which is designed to be used or adaptable to use in a firearm; excluding however;
> (1) any ammunition used exclusively for line-throwing, signaling, or safety and required or recommended by the United States Coast Guard or Interstate Commerce Commission; or
> (2) any ammunition designed exclusively for use with a stud or rivet driver or other similar industrial ammunition.

"Antique firearm" has the same meaning ascribed to that term in 18 U.S.C. § 921(a)(16).

"Assault weapon" means:
(1) A semiautomatic rifle that has the ability to accept a detachable magazine and has one or more of the following:
> (i)   a folding or telescoping stock
> (ii)  a handgun grip which protrudes conspicuously beneath the action
> (iii) a bayonet mount
> (iv) a flash suppressor or a barrel having a threaded muzzle
> (v)   a grenade launcher; or

(2) A semiautomatic shotgun that has one or more of the following:
> (i)   a folding or telescoping stock
> (ii)  a handgun grip which protrudes conspicuously beneath the action
> (iii) a fixed magazine capacity in excess of 5 rounds
> (iv) an ability to accept a detachable magazine; or

(3) A semiautomatic handgun that has an ability to accept a detachable magazine and has one or more of the following:
> (i)   an ammunition magazine that attaches to thehandgun outside thehandgun grip
>
> (ii)  a barrel having a threaded muzzle
> (iii) a shroud that is attached to, or partially or completely encircles the barrel, and permits the shooter to hold the firearm with the non-trigger hand without being burned;
> (iv) a manufactured weight of 50 ounces or more when the handgun is unloaded
> (v) a semiautomatic version of an automatic firearm.

"Chicago Firearm Permit" or "CFP" means the permit issued by the City which allows a person to possess a firearm.

"Corrections officer" means wardens, superintendents and keepers of prisons, penitentiaries, jails and other institutions for the detention of persons accused or convicted of an offense.

"Department" means the department of police.

"Dwelling unit" has the same meaning ascribed to that term in section 17-17-0248.

"Duty-related firearm" shall mean any firearm which is authorized by any law enforcement agency or employer to be utilized by their personnel in the performance of their official duties.

"Firearm" means any device, by whatever name known, which is designed or restored to expel a projectile or projectiles by the action of any explosive, expansion of gas or escape of gas. Provided, that such term shall not include:

    (1)  any pneumatic gun, spring gun, paint ball gun or B-B gun which either expels a single globular projectile not exceeding .18 inch in diameter and which has a maximum muzzle velocity of less than 700 feet per second or breakable paint balls containing washable marking colors;

    (2)  any device used exclusively for line-throwing, signaling, or safety and required or recommended by the United States Coast Guard or Interstate Commerce Commission; or

    (3)  any device used exclusively for firing explosives, rivets, stud cartridges, or any similar industrial ammunition.

"Firearm case" means any firearm case, carrying box, shipping box or other similar container that is designed for the safe transportation of the firearm.

"FOID" means the Firearm Owner's Identification Card issued pursuant to the Act.

"Handgun" means a firearm designed to be held and fired by the use of a single hand, and includes a combination of parts from which such firearm can be assembled.

"High capacity magazine" means any ammunition magazine having a capacity of more than 12 rounds of ammunition.

"Home" means the inside of a person's dwelling unit which is traditionally used for living purposes, including the basement and attic. A "home" does not include: (i) any garage, including an attached garage, on the lot; (ii) any space outside the dwelling unit, including any stairs, porches, back, side or front yard space, or common areas; or (iii) any dormitory, hotel, or group living, as that term is defined in section 17-17-0102-A.

"Laser sight accessory" means a laser sighting device which is either integrated into a firearm or capable of being attached to a firearm.

"Lawful transportation" means the transportation of a firearm by a person:

    (1) in compliance with section 8-20-090; or

    (2) who has a valid FOID card, a CFP and firearm registration certificate, if applicable, and the firearm is: (i) broken down in a nonfunctioning state; (ii) not immediately accessible; and (iii) unloaded and in a firearm case.

"Long gun" means any firearm, other than a handgun.

"Machine gun" means any firearm which can fire multiple rounds of ammunition by a single function of the firing device or one press of the trigger.

"Metal piercing bullet" means any bullet that is manufactured with other than a lead or

lead alloy core, or ammunition of which the bullet itself is wholly composed of, or machined from, a metal or metal alloy other than lead, or any other bullet that is manufactured to defeat or penetrate bullet resistant properties of soft body armor or any other type of bullet resistant clothing which meets the minimum requirements of the current National Institute for Justice Standards for "Ballistic Resistance of Police Body Armor."

"Organization" means partnership, company, corporation or other business entity, or any group or association of two or more persons united for a common purpose.

"Peace officer" means any person who by virtue of his office or public employment is vested by law with a duty to maintain public order or make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses.

"Retired department police officer" means a person who is retired from the department in good standing and without any disciplinary charges pending, and who is, or is eligible to become, an annuitant of the Policemen's Annuity and Benefit Fund of the City of Chicago.

"Sawed-off shotgun" means a shotgun having one or more barrels less than 18 inches in length and any weapon made from a shotgun, whether by alteration, modification or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

"Security personnel" means special agents employed by a railroad or public utility to perform police functions, guards of armored car companies, watchmen, security guards or persons regularly employed in a commercial or industrial operation for the protection of persons employed by, or property related to, such commercial or industrial operation; and watchmen while in the performance of the duties of their employment.

"Short-barreled rifle" means a rifle having one or more barrels less than 16 inches in length, and any weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

"Superintendent" means the superintendent of the department or his designated representative.

"Safety mechanism" means a design adaption or nondetachable accessory that lessens the likelihood of unanticipated use of the handgun.

"Trigger lock" means a device that when locked in place by means of a key, prevents a potential user from pulling the trigger of the firearm without first removing the trigger lock by use of the trigger lock's key.

"Unregisterable firearm" means any firearm listed in section 8-20-170.

"Unsafe handgun" means any handgun that is listed on the superintendent's roster of unsafe handguns because, in the determination of the superintendent, the handgun is unsafe due to its size, ability to be concealed, detectability, quality of manufacturing, quality of materials, ballistic accuracy, weight, reliability, caliber, or other factors which makes the design or operation of the handgun otherwise inappropriate for lawful use.

"Violent crime" has the same meaning ascribed to that term in the Rights of Crime Victims and Witnesses Act, 725 ILCS 120/1, et seq., as amended.

## ARTICLE II.  POSSESSION OF FIREARMS

**8-20-020 Unlawful possession of handguns.**

(a) It is unlawful for any person to carry or possess a handgun, except when in the person's home.

(b) The provisions of this section shall not apply to:

(1) peace officers, and any person summoned by a peace officer to assist in making arrests or preserving the peace, while assisting such officer;

(2) corrections officers while in the performance of their official duty, or while commuting between their homes and places of employment;

(3) members of the Armed Services or Reserve Forces of the United States or the Illinois National Guard or the Reserve Officers Training Corps, while in the performance of their official duty;

(4) security personnel;

(5) persons licensed as private security contractors, private detectives, or private alarm contractors, or employed by an agency certified by the Illinois Department of Professional Regulation;

(6) persons regularly employed in a commercial or industrial operation as a security guard for the protection of persons employed and private property related to such commercial or industrial operation, while in the performance of their duties or traveling between sites or properties belonging to the employer, and who, as a security guard, is registered with the Illinois Department of Professional Regulation;

(7) persons employed by a financial institution for the protection of other employees and property related to such financial institution, while in the performance of their duties, commuting between their homes and places of employment, or traveling between sites or properties owned or operated by such financial institution;

(8) persons employed by an armored car company to drive an armored car, while in the performance of their duties;

(9) persons who have been classified as peace officers pursuant to the Peace Officer Fire Investigation Act;

(10) investigators of the Office of the State's Attorneys Appellate Prosecutor authorized by the board of governors of the Office of the State's Attorneys Appellate Prosecutor to carry weapons pursuant to Section 7.06 of the State's Attorneys Appellate Prosecutor's Act;

(11) special investigators appointed by a State's Attorney under Section 3-9005 of the Counties Code;

(12) probation officers while in the performance of their duties, or while

- 8 -

commuting between their homes, places of employment or specific locations that are part of their assigned duties, with the consent of the chief judge of the circuit for which they are employed;

(13) court security officers while in the performance of their official duties, or while commuting between their homes and places of employment, with the consent of the sheriff;

(14) persons employed as an armed security guard at a nuclear energy, storage, weapons or development site or facility regulated by the Nuclear Regulatory Commission who have completed the background screening and training mandated by the rules and regulations of the Nuclear Regulatory Commission;

(15) duly authorized military or civil organizations while parading, with the special permission of the Governor;

(16) persons engaged in the manufacture, transportation, or sale of firearms to persons authorized under this subsection to possess those firearms;

(17) a person while engaged in the lawful transportation of a firearm.

**8-20-030 Unlawful possession of long guns.**
(a) It is unlawful for any person to carry or possess a long gun, except when in the person's home or fixed place of business.

(b)   The provisions of this section shall not apply to:
(1) any person listed in section 8-20-020(b); or
(2) any duly licensed hunter who has a valid FOID card, a CFP and firearm registration certificate, while engaged in hunting in an area where hunting is permitted.

**8-20-035 Unlawful possession of unregisterable firearms.**
(a) It is unlawful for any person to carry or posses any unregisterable firearm.

(b)   The provisions of this section shall not apply to corrections officers, members of the armed forces of the United States, or the organized militia of this or any other state, and peace officers, to the extent that any such person is otherwise authorized to acquire or possess assault weapons, and is acting within the scope of his duties, or to any person while engaged in the manufacturing, transportation or sale of assault weapons to people authorized to possess them under this section.

(c) Notwithstanding the provisions of subsection (a), those firearms listed in section 8-20-170(a) may be possessed and used by the department for training and tactical operation, as authorized by the superintendent.

(d) Any firearm carried or possessed in violation of this section is hereby declared to be contraband and shall be seized by and forfeited to the city.

**8-20-040 Firearms kept or maintained in a home.**
Subject to section 8-20-050, every person who keeps or possesses a firearm in his home shall keep no more than one firearm in his home assembled and operable.  If more than one

- 9 -

person in the home has a valid CFP and registration certificate, each person with a valid CFP and registration certificate is entitled to have one such firearm assembled and operable in the home. All other firearms kept or possessed by that person in his home shall be broken down in a nonfunctioning state or shall have a trigger lock or other mechanism, other than the firearm safety mechanism, designed to render the firearm temporarily inoperable.

The provisions of this section shall not apply to peace officers.

**8-20-050 Firearms- Protection of minors.**

(a) It is unlawful for any person to keep or possess any firearm or ammunition in his home if the person knows or has reason to believe that a minor under the age of 18 years is likely to gain access to the firearm or ammunition, unless:

(1) the person is physically present in the home and the firearm is either being held by the person or is physically secured on the person's body;

(2) the firearm is secured by a trigger lock or other mechanism, other than the firearm safety mechanism, designed to render a firearm temporarily inoperable; or

(3) the firearm and ammunition are placed in a securely locked box or container.

(b) No person shall be punished for a violation of this section under the following circumstances:

(1) if the minor gains access to the firearm and uses it in a lawful act of self-defense or defense of another; or

(2) if the minor gains access to the firearm because of an unlawful entry of the premises by the minor or another person.

The provisions of this section shall not apply to peace officers.

**8-20-060   Possession of a laser sight accessory, firearm silencer or muffler.**

(a) It is unlawful for any person to carry, possess, display for sale, sell or otherwise transfer any laser sight accessory, or a firearm silencer or muffler.

(b) The provisions of this section shall not apply to any members of the armed forces of the United States, or the organized militia of this or any other state, or peace officers, to the extent that any such person is otherwise authorized to acquire or possess a laser sight accessory, or firearm silencer or muffler, and is acting within the scope of his duties.

(c) Any laser sight accessory, or firearm silencer or muffler, carried, possessed, displayed or sold in violation of this section is hereby declared to be contraband and shall be seized by and forfeited to the city.

**8-20-070 Unlawful firearm, laser sight accessory, or firearm silencer or muffler in a motor vehicle – Impoundment.**

(a) The owner of record of any motor vehicle that contains a firearm registered to a person who is not the driver or occupant of the vehicle, an unregistered firearm, a firearm that is not being lawfully transported, an unregisterable firearm, a laser sight accessory, or a firearm silencer or muffler, shall be liable to the city for an administrative penalty of $1,000.00 plus any towing and storage fees applicable under Section 9-92-080. Any such vehicle shall be subject to seizure and impoundment pursuant to this section.

(b) Whenever a police officer has probable cause to believe that a vehicle is subject to seizure and impoundment pursuant to this section, the police officer shall provide for the towing of the vehicle to a facility controlled by the city or its agents. Before or at the time the vehicle is towed, the police officer shall notify any person identifying himself as the owner of the vehicle at the time of the alleged violation, of the fact of the seizure and of the vehicle owner's right to request a vehicle impoundment hearing to be conducted under Section 2-14-132 of this Code.

(c) The provisions of Section 2-14-132 shall apply whenever a motor vehicle is seized and impounded pursuant to this section.

**8-20-080 Possession of ammunition.**
(a) It is unlawful for any person to carry or possess any ammunition in the city, unless the person:

(1) has a valid CFP and registration certificate for a firearm of the same gauge or caliber as the ammunition possessed, and while in possession of the ammunition, has the CFP and registration certificate in his possession when he is not in his home, or, when he is in his home, has the CFP and registration certificate readily available in his home; or

(2) is a licensed weapons dealer; or

(3) is a person listed in section 8-20-020(b).

(b) Any ammunition carried or possessed in violation of this section is hereby declared to be contraband and shall be seized by and forfeited to the city.

**8-20-085 High capacity magazines and metal piercing bullets – Sale and possession prohibited – Exceptions.**
(a) It is unlawful for any person to carry, possess, sell, offer or display for sale, or otherwise transfer any high capacity magazine or metal piercing bullets. This section shall not apply to corrections officers, members of the armed forces of the United States, or the organized militia of this or any other state, and peace officers, to the extent that any such person is otherwise authorized to acquire or possess metal piercing bullets, and is acting within the scope of his duties, or to any person while in the manufacturing, transportation or sale of high capacity magazines or metal piercing bullets to people authorized to possess them under this section.

(b) Any high capacity magazine or metal piercing bullets carried, possessed, displayed, sold or otherwise transferred in violation of this section is hereby declared to be contraband and shall be seized by and forfeited to the city.

**8-20-090 Interstate transportation of firearms.**
It shall not be a violation of this chapter if a person transporting a firearm or ammunition while engaged in interstate travel is in compliance with 18 U.S.C.A. §926A. There shall be a rebuttable presumption that any person within the city for more than 24 hours is not engaged in interstate travel, and is subject to the provisions of this chapter.

**8-20-100 Permissible sales and transfers of firearms and ammunition.**
(a) Except as authorized by subsection (e) and section 2-84-075, no firearm may be sold, acquired or otherwise transferred within the city, except through inheritance of the firearm.

(b)   No ammunition may be sold or otherwise transferred within the city, except through a licensed weapons dealer, or as otherwise allowed by this code.

(c)   No firearm or ammunition shall be security for, or be taken or received by way of any mortgage, deposit, pledge or pawn.

(d)   No person may loan, borrow, give or rent to or from another person, any firearm or ammunition except in accordance with this chapter.

(e)   Notwithstanding any other provision of this section, a peace officer may sell or transfer any lawfully held firearm or ammunition to another peace officer in accordance with the other provisions of this chapter.

**ARTICLE III.   PERMITS FOR AND REGISTRATION OF FIREARMS.**

**8-20-110 CFP-Required**
(a)   Subject to subsection (d), it is unlawful for any person to carry or possess a firearm without a CFP.

(b) No CFP application shall be approved unless the applicant:

(1) is 21 years of age or older; provided that an application of a person 18 years or older but less than 21 may be approved if the person has the written consent of his parent or legal guardian to possess and acquire a firearm or firearm ammunition and that he has never been convicted of a misdemeanor, other than a traffic offense or adjudged a delinquent; provided that such parent or legal guardian is not an individual prohibited from having a FOID or CFP, and that the parent files an affidavit with the department attesting that the parent is not an individual prohibited from having a FOID or CFP;

(2) possesses a valid Illinois FOID;

(3) has not been convicted by a court in any jurisdiction of:
(i)   a violent crime,
(ii)   two or more offenses for driving under the influence of alcohol or other drugs; or
(iii) an unlawful use of a weapon that is a firearm;

(4) has vision better than or equal to that required to obtain a valid driver's license under the standards established by the Illinois Vehicle Code;

(5) is not otherwise ineligible to possess a firearm under any federal, state or local law, statute or ordinance; and

(6) has not been convicted, adjudicated, admitted to, or found liable for a violation of section 8-20-060 or 8-20-100.

(c)   Each CFP issued shall be accompanied by a copy of this ordinance.

(d)   Any person who has a valid firearm registration certificate issued before the effective date of this 2010 ordinance shall be exempted from acquiring a CFP until the expiration of the registration certificate; provided that upon the expiration of the registration certificate, the person

shall be required to obtain a CFP. Any such person who has submitted an application for a CFP prior to or on the date of the expiration of his current registration certificate shall be deemed to be in compliance with the requirement for a CFP while his application is pending.

(e) The provisions of this section shall not apply to any person listed in section 8-20-020(b)(1)-(16) or a person engaged in interstate travel in compliance with section 8-20-100.

**8-20-120   CFP-application**

(a)  An applicant for a CFP shall submit an application to the superintendent on a form or in a manner prescribed by the superintendent. The application shall include the following:

(1)  name, residential address and telephone number of the applicant;

(2)  the applicant's date of birth and sex;

(3)  the applicant's Illinois firearm owner's identification number and a copy of the applicant's FOID card;

(4)  evidence that the applicant meets the criteria of section 8-20-110;

(5)  two identical photographs of the applicant taken within 30 days immediately prior to the date of filing the application, equivalent to passport size, showing the full face, head and shoulders of the applicant in a clear and distinguishing manner;

(6) the applicant's Illinois driver's license number and a copy of the applicant's driver's license or Illinois identification card;

(7) an affidavit signed by a firearm instructor certified by the State of Illinois to provide firearm training courses attesting that the applicant has completed a firearm safety and training course, which, at a minimum, provides one hour of range training and four hours of classroom instruction that is in compliance with the requirements of the classroom instruction course, as established in rules and regulations; and

(8) any other information as the superintendent shall find reasonably necessary to effectuate the purpose of this chapter and to arrive at a fair determination as to whether the terms of this chapter have been complied with.

The superintendent shall be the custodian of all applications for CFPs under this chapter.

(b) The applicant shall submit to fingerprinting in accordance with procedures established in rules and regulations promulgated by the superintendent.

(c)  For an application for a CFP submitted within 180 days of the effective date of this 2010 ordinance, the superintendent shall either approve or deny such application no later than 120 days after the date the application is submitted, unless good cause is shown.  For an application for a CFP submitted thereafter, the superintendent shall either approve or deny an application within 45 days from the date the application is submitted, unless good cause is shown.  An application shall not be deemed submitted until the applicant provides all the required information or documentation.

(d) All CFPs issued by the superintendent shall contain the applicant's name, date of birth, sex, and signature. Each CFP shall have the expiration date boldly and conspicuously displayed on the face of the CFP.

**8-20-130    CFP card-fee and expiration.**
(a) A CFP card shall expire 3 years after the date of issuance.

(b) The fee shall be $100.00.

(c) The CFP fee shall not be applicable to any resident of the city who is a retired department police officer.

**8-20-140    Firearm registration certificate-required**
(a) Subject to subsection (d), it is unlawful for any person to carry or possess a firearm without a firearm registration certificate.

(b) No application for a registration certificate shall be approved unless the applicant has been issued a valid CFP; provided no CFP shall be required for the issuance of a registration certificate if the person is an exempt person pursuant to section 8-20-110(e).

(c)    An applicant for a registration certificate shall submit an application to the superintendent on a form or in a manner prescribed by the superintendent. The application shall include the following:

> (1) name, telephone number and the address at which the firearm shall be located;

> (2) a copy of the applicant's CFP and Illinois FOID card;

> (3) the name of the manufacturer, the caliber or gauge, the model, type and the serial number identification of the firearm to be registered;

> (4) the source from which the firearm was obtained;

> (5) the address at which the firearm will be located;

> (6) if an antique firearm, the year of manufacture of the firearm;

> (7) the date the firearm was acquired; and

> (8) any other information as the superintendent shall find reasonably necessary to effectuate the purpose of this chapter and to arrive at a fair determination as to whether the terms of this chapter have been complied with.

The superintendent shall be the custodian of all applications for registration certificates under this chapter.

(d)    (1) Subject to subsection (d)(2), an application for a registration certificate shall be submitted no later than 5 business days after a person takes possession within the city of a firearm from any source; provided that any applicant who has submitted a complete application within the required 5 business days shall be considered in compliance with this subsection until his registration certificate is

- 14 -

either approved or denied.

(2) Notwithstanding any provision of this chapter to the contrary, a person has 90 days after the effective date of this 2010 ordinance to register a firearm, including a handgun, which had not been previously registered; provided that the person and firearm meet all the requirements of this ordinance.

(e)     For an application for a firearm registration certificate submitted within 180 days after the effective date of this 2010 ordinance, the superintendent shall either approve or deny such  application no later than 45 days after the date the application is submitted.  For an application for a firearm registration certificate submitted thereafter, the superintendent shall either approve or deny the application within 21 days of the submission of the application, unless good cause is shown.   An application shall not be deemed submitted until the applicant provides all the required information or documentation.

(f) The provisions of this section shall not apply to:

(1)   firearms owned or under the direct control or custody of any federal, state or local governmental authority maintained in the course of its official duties;

(2)   duty-related firearms owned and possessed by peace officers who are not residents of the city;

(3) duty-related firearms owned or possessed by corrections officers and who are not residents of the city;

(4) firearms owned, manufactured or possessed by licensed manufacturers of firearms, bulk transporters or licensed sellers of firearms at wholesale or retail, provided that such persons have federal firearms license;

(5) any nonresident of the city participating in any lawful recreational firearm-related activity in the city, or on his way to or from such activity in another jurisdiction; provided that such firearm shall be (i) broken down in a nonfunctioning state; (ii) not immediately accessible; and (iii) unloaded and in a firearm case;

(6) persons licensed as private security contractors, security guards, private detectives, or private alarm contractors, or employed by an agency certified as such by the Department of Professional Regulation;

(7) duty-related firearms of investigators of the Office of the State's Attorneys Appellate Prosecutor authorized by the board of governors of the Office of the State's Attorneys Appellate Prosecutor to carry weapons pursuant to Section 7.06 of the State's Attorneys Appellate Prosecutor's Act;

(8) duty-related firearms of special investigators appointed by a State's Attorney under Section 3-9005 of the Counties Code;

(9) firearms being transported by a person engaged in interstate travel in compliance with section 8-20-100; or

(10) those persons summoned by a peace officer to assist in making an arrest or preserving the peace while actually engaged in assisting the peace officer.

(g) Each registration certificate issued shall contain a unique registration certificate number, the person's name, the address at which the firearm will be located, and any other information the superintendent deems necessary to identify the person and the firearm.

**8-20-145 Registration certificates- expiration.**
(a) A registration certificate issued prior to the effective date of this 2010 ordinance shall remain in effect until its expiration.

(b) For registration certificates issued after the effective date of this 2010 ordinance, a registration certificate shall expire on the same date as the date of the expiration of the CFP issued to that person.

(c) A person shall file an annual registration report with the superintendent on a form, and in a manner, prescribed by the superintendent. The annual registration report shall set forth such information as required by the superintendent in rules and regulations. If a person has multiple registration certificates, the superintendent may align the dates for the annual registration reports to the same reporting date and combine such annual registration reports into one report.

Failure to file an annual registration report may result in revocation of a person's CFP or registration certificate, and may cause that firearm to become unregisterable to that person.

**8-20-150 Application fees.**
(a) A nonrefundable application fee of $15.00 shall be payable for each firearm registered. The fee shall accompany each initial application for a registration certificate.

(b) Any person who files an annual registration report late shall pay a late filing fee of $60.00.

(c) The application fee shall not be applicable to: (1) any duty-related firearm of a peace officer domiciled in the city, or (2) any duty-related firearm that was registered to that retired department police officer at the time of the his separation from active duty in the department.

**8-20-160 Restrictions on issuance of registration certificates.**
(a) Subject to subsections(b) and (c), the superintendent shall issue no more than one firearm registration certificate to a person for a handgun during any 30-day period; provided that the superintendent may permit a person first becoming a city resident to register more than one handgun if those handguns were lawfully owned in another jurisdiction for a period of 6 months prior to the date of application.

(b) In addition to a registration certificate for a handgun pursuant to subsection (a), an applicant may be issued a registration certificate for:
> (1) any firearm possessed by an applicant that was lawfully registered on the date of the enactment of this ordinance;

> (2) any long gun which is eligible to be registered; or

> (3) any antique firearm, including antique handguns.

The burden of proving that a firearm is an antique firearm shall be on the applicant.

(c) In addition to a registration certificate for a handgun pursuant to subsection (a), a retired department police officer may be issued a registration certificate for each duty-related handgun that was registered to that retired department police officer at the time of the his separation from active duty in the department.

**8-20-170  Unregisterable firearms.**

No registration certificate shall be approved for any of the following types of firearms:

(a) a sawed-off shotgun, .50 caliber rifle, machine gun, or short-barreled rifle;

(b) an unsafe handgun;

(c) a firearm that becomes unregisterable under the provisions of this chapter; provided that it shall only be unregistrerable for that person; or

(d)  assault weapons, unless they are owned by a person who is entitled to carry or possess them pursuant to section 8-20-035.

**8-20-180 CFP and registration certificate-General provisions.**

(a)    After issuance of a CFP or a registration certificate to a person, the person shall examine the CFP or registration certificate to insure that the information thereon is correct. If the information is incorrect in any respect, the person shall return it to the superintendent with a signed statement showing the nature of the error. The superintendent shall correct the error if it occurred as a result of the superintendent's administrative process.

In the event that the error resulted from incorrect information contained in the application, the person shall submit an amended application setting forth the correct information and a statement explaining the error in the original application.

(b) A CFP and the registration certificate shall be valid only for the person to whom it was issued.

(c) A registration certificate shall only be valid for the address on the registration certificate.  Except in the lawful transportation of a firearm, a person shall not carry or possess any firearm at any location other than that authorized by the registration certificate.

(d) A CFP or registration certificate shall not be subject to sale, assignment, or transfer, voluntary or involuntary.

(e)  Any application for a CFP or a registration certificate shall be held in abeyance when there is a criminal proceeding for a violent crime, or an offense involving a weapon, or a proceeding to deny or revoke a CFP or firearm registration certificate pending against the person, until such proceeding has terminated.

**8-20-185 Additional duties.**

(a) Every person issued a CFP or a firearm registration certificate, in addition to any other requirements of this code, shall immediately notify the department in a manner prescribed by the superintendent of:

(1) the destruction of his firearm, or when the person knows, or should have known, that his firearm is lost, stolen or otherwise missing;

(2) the loss, theft or destruction of the CFP or registration certificate within 72 hours of the discovery of such loss, theft, or destruction;

(3) a change in any of the information appearing on the CFP or firearm registration certificate;

(4) the sale, transfer, inheritance, or other disposition of the firearm not less than 48 hours prior to delivery.

(b) Every person issued a CFP or a firearm registration certificate, in addition to any other requirements of this code, shall:

(1) immediately return to the superintendent his copy of the registration certificate for any firearm which is lost, stolen, destroyed or otherwise disposed of; and

(2) keep all information current. Any change in required information shall be reported, on a form and in manner prescribed by the superintendent, within 24 hours after the change.

**8-20-190 Denials and revocations.**

(a) An application for a CFP or a registration certificate shall be denied for any of the following reasons:

(1) any of the eligibility criteria of this chapter are not currently met;

(2) the firearm is an unregisterable firearm;

(3) the information furnished on or in connection with the application for a CFP or a registration certificate is false or misleading; or

(4) the person fails to respond to any additional information, or investigation inquiries, requested by the superintendent regarding any application.

(b) A registration certificate shall be revoked:

(1) when the firearm becomes an unregisterable firearm; or

(2) if the CFP of the person was revoked.

(c) A CFP shall be revoked if any of the eligibility criteria of this chapter are not currently met.

(d) A CFP or registration certificate may be denied or revoked for a violation of this chapter, or any rules or regulations promulgated hereunder.

(e) The CFP and all registration certificates of any person convicted of a felony after the issuance of a CFP or registration certificate to that person shall be automatically revoked by operation of law, without a further hearing. The person shall immediately dispose of all firearms by:

(i) peaceably surrendering to the department all firearms for which a registration certificate was issued;

    (ii)   removing such firearm from the city; or

    (iii)   otherwise lawfully disposing of his interest in such firearm.

    The person shall submit to the superintendent evidence of the disposition of any such firearm in accordance with rules and regulations promulgated by the superintendent.

**8-20-200   Procedure for denial.**

    (a)   If an application for a CFP or a registration certificate is denied by the superintendent, the superintendent shall notify the person making such application, in writing, of the denial.   The notice of denial shall:

    (1) set forth the basis of the denial;

    (2) include a statement that within ten days of the notice of denial, the person is entitled to request a hearing, in person and in writing, at the department of administrative hearings;

    (3) include a statement that the person is entitled to appear at the hearing to testify, present documents, including affidavits, and any other evidence to contest the denial;

    (4) include a statement that if the person fails to request a hearing within ten days, the person is deemed to have conceded the validity of the reason stated in the notice and the denial shall become final;

    (5) include a certificate of service; and

    (6) include an oath or affirmation by the superintendent certifying the correctness of the facts set forth in the notice of denial.

    (b)   The person, within ten days after notice is sent of the denial, may file with the department of administrative hearings a request for a hearing. Such hearing request shall be made in person, and in writing, at the department of administrative hearings.  An administrative law officer of the department of administrative hearings shall conduct such hearing within 72 hours of the request, excluding Saturdays, Sundays, and legal holidays.

    (c) The department of administrative hearings shall conclude the hearing no later than 7 days after the commencement of the hearing.

    (d) Based upon the evidence contained in the record, an administrative law officer of the department of administrative hearings shall, within 5 days of the conclusion of the hearing, issue written findings and enter an order granting or denying the application.  A copy of the findings and order shall be served upon the person and all parties appearing or represented at the hearing.

    (e)   If the person does not request a hearing within ten days after the notification of the denial is sent, the person shall be deemed to have conceded the validity of the reason stated in the notice and the denial shall become final.

    (f)   Within three days after all the time for hearings or appeals has expired, the person shall:

    (1) peaceably surrender to the department the firearm for which the registration

certificate was denied;

(2)   remove such firearm from the city; or

(3)   otherwise lawfully dispose of his interest in such firearm.

The person shall submit to the superintendent evidence of the disposition of any such firearm in accordance with rules and regulations promulgated by the superintendent.
**8-20-205    Procedure for revocation.**

(a) Except in cases where a CFP or registration certificate is automatically revoked pursuant to section 8-20-190(e), if, in the determination of the superintendent, a CFP or a registration certificate   should be revoked, he shall notify the person whose CFP or registration certificate is the subject of such revocation, in writing, of the proposed revocation. The notice shall:

(1) set forth the basis for the revocation;

(2) specify the location, date, and time for a hearing on the revocation;

(3 include a statement that the person is entitled to appear at the hearing to testify, present documents, including affidavits, and any other evidence to contest the proposed revocation;

(4) include a statement that failure of the person to appear at the hearing may include an entry of an order revoking the person's CFP or registration certificate;

(5) include a certificate of service; and

(6) include an oath or affirmation by the superintendent certifying the correctness of the facts set forth in the notice.

(b) The department of administrative hearings shall convene the hearing at the location and on the date and time specified in the revocation notice.

(c) Based upon the evidence contained in the record, an administrative law officer of the department of administrative hearings shall, within 5 days of the conclusion of the hearing, issue written findings and enter an order granting or denying the proposed revocation.   A copy of the findings and order shall be served upon the person and all parties appearing or represented at the hearing.

(d)   Within three days after notification of a decision unfavorable to the person, and all time for appeals has expired, the person shall:

(1) for revocation of a registration certificate:
(i) peaceably surrender to the department the firearm for which the registration certificate was revoked;

(ii)   remove such firearm from the city; or

(iii)   otherwise lawfully dispose of his interest in such firearm.

(2) for revocation of a CFP, dispose of all firearms in accordance with subsection

(d)(1).

The person shall submit to the superintendent evidence of the disposition of any such firearm in accordance with rules and regulations promulgated by the superintendent.

(e) In cases where a CFP or registration certificate is automatically revoked pursuant to section 8-20-190(e), the superintendent shall notify the person of the automatic revocation of the person's CFP or registration certificate. Within three days after notification of the automatic revocation, the person may file with the department of administrative hearings a request, in writing, for a hearing on the sole issue of identity and whether he was the person so convicted. It shall be a rebuttable presumption that the person whose CFP or registration certificate was automatically revoked is the same person who was convicted of a felony.

An administrative law officer of the department of administrative hearings shall conduct such hearing within 5 days of the request for a hearing.

Based upon the evidence contained in the record, an administrative law officer of the department of hearings shall, within 5 days of the conclusion of the hearing, issue written findings as to sole issue of the identity of the person. A copy of the findings and order shall be served upon the person and all parties appearing or represented at the hearing.

If the person does not request a hearing within three days after the notification, the person shall be deemed to have conceded the validity of the identification.

**8-20-210 Automatic revocation of registration certificates.**
If, after a hearing, a CFP issued to a person is revoked, all firearm registration certificates issued to that person shall automatically be revoked and the person shall comply with section 8-20-205(d) for disposition of the firearms.

**ARTICLE IV.   Miscellaneous Provisions.**

**8-20-220   False information – Forgery – Alteration.**
(a) It is unlawful for any person purchasing any firearm or ammunition, or applying for any CFP or registration certificate, or, in giving any information pursuant to the requirements of this chapter, to knowingly give false information or offer false information or evidence of identity.

(b) It is unlawful for any person to forge or materially alter any application for a CFP or firearm registration certificate.

(c) It is unlawful for any person to forge or materially alter a CFP or a firearm registration certificate.

(d) It is unlawful for any person to knowingly possess a forged or materially altered CFP or firearm registration certificate.

(f)    It is unlawful for any person to knowingly make any false statement, submit any false information or misrepresent any information required in this chapter.

**8-20-230   Notice.**
For the purposes of this chapter, service of any notice, finding or decision upon a person shall be completed by any of the following methods by:

- 21 -

(a) personal delivery of a copy of such notice, finding or decision to the person;

(b) leaving a copy of such notice, finding or decision at the address identified on the application for a CFP or registration certificate; or

(c) mailing, by first class mail, a copy of the notice, finding or decision to the address identified on the application for a CFP or registration certificate, in which case service shall be complete as of the date the notice was mailed.

**8-20-240 Posting of unsafe handguns.**

(a) The superintendent shall post on the department's web site the roster of unsafe handguns.

(b) No less than 10 days prior to placing any handgun on the roster of unsafe handguns, the superintendent shall post on the department's web site the type or model of the handgun that will be placed on the roster.

**8-20-250 Seizure and forfeiture of firearms, ammunition, laser sight accessories and firearm silencers and mufflers-Authority and destruction.**

The superintendent has the authority to seize any firearm, assault weapon, ammunition, laser sight accessories, or firearm silencer or muffler carried or possessed in violation of this chapter or any applicable state or federal law. Such items are hereby declared contraband and shall be seized by and forfeited to the city.

Whenever any firearm, ammunition, laser sight accessories, or firearm silencer or muffler is surrendered or forfeited pursuant to the terms of this chapter, or any applicable state or federal law, the superintendent shall ascertain whether such firearm, ammunition, assault weapon, laser sight accessories, or firearm silencer or muffler is needed as evidence in any matter. All such items which are not required for evidence shall be destroyed at the direction of the superintendent; provided that those firearms and ammunition that the superintendent shall deem to be of use to the department may be retained for the use of the department. A record of the date and method of destruction and an inventory of the firearm or ammunition so destroyed shall be maintained.

**8-20-260    Rules and regulations.**

The superintendent has the authority to promulgate rules and regulations for the implementation of this chapter and to prescribe all forms and the information required. All rules and regulations promulgated by the superintendent pursuant to this chapter shall be posted on the department's web site.

**8-20-270    Acquisition or possession prohibited by law.**

Nothing in this chapter shall make lawful the acquisition or possession of firearms or ammunition which is otherwise prohibited by law.

**8-20-280 Prohibition on shooting galleries and target ranges.**

Shooting galleries, firearm ranges, or any other place where firearms are discharged are prohibited; provided that this provision shall not apply to any governmental agency. The discharge of a firearm in an area where hunting is permitted shall not be a violation of this section.

**8-20-290 Severability.**

If any provision or term of this chapter, or any application thereof, is held invalid, the invalidity shall not affect other applications of the provisions or terms of this chapter which

reasonably can be given effect without the invalid provision or term for the application thereof.

**ARTICLE V.   VIOLATION OF CHAPTER PROVISIONS.**

**8-20-300    Violation – Penalty.**
    (a) Any person who violates section 8-20-020, 8-20-030, 8-20-035, 8-20-060, 8-20-080 or 8-20-110 shall upon conviction be fined not less than $1,000.00 nor more than $5000.00 and be incarcerated for a term not less than 20 days nor more than 90 days.  Each day that such violation exists shall constitute a separate and distinct offense.

    (b) Unless another fine or penalty is specifically provided, any person who violates any provision of this chapter, or any rule or regulation promulgated hereunder, shall upon conviction or a finding of liability for the first offense, be fined not less than $1,000.00, nor more than $5,000.00, or be incarcerated for not less than 20 days nor more than 90 days, or both.  Any subsequent conviction for a violation of this chapter shall be punishable by a fine of not less than $5,000.00 and not more than $10,000.00, and by incarceration for a term of not less than 30 days, nor more than six months.  Each day that such violation exists shall constitute a separate and distinct offense.

    (c) In addition to any other fine or penalty provided in this chapter, the CFP or registration certificate of any person who violates any provision of this chapter, or rule or regulation promulgated hereunder, may be revoked.  Any person whose CFP is revoked shall not be eligible for a CFP for 5 years from the date of the revocation; provided that the superintendent may waive this restriction if, in the determination of the superintendent, the applicant has demonstrated that the applicant has good reason to fear injury to his person or property.

    (d)  Upon the determination that a person has violated any provision of this chapter or any rule or regulation promulgated hereunder, the superintendent may institute an administrative adjudication proceeding with the department of administrative hearings by forwarding a copy of a notice of violation or a notice of hearing, which has been properly served, to the department of administrative hearings.

    **SECTION 5.**  The renumbering and amending of the sections in Chapter 8-20 are not intended to invalidate, alter, or otherwise affect in any way any action taken, or could have been taken, based upon those sections, nor shall it be construed to affect any offense or act committed,   action or claim arising under those sections, penalty, forfeiture, or punishment incurred, except that any proceedings after the effective date of this 2010 ordinance shall conform, insofar as practicable, to the ordinance in effect at the time of the proceedings.

    **SECTION 6.**  Title 8 of the Municipal Code of Chicago is hereby amended by adding a new section 8-24-005, by deleting sections 8-24-025 and 8-24-026, by deleting the language struck through, and by adding the language underscored, as follows:

**8-16-090    Firearms for minors.**
    No person shall sell, loan, or furnish to any minor any ~~gun, pistol or other firearm, or~~ any toy gun, toy pistol, or other toy firearm in which any explosive substance can be used~~, within the city; except that minors may be permitted, with the consent of their parents or guardians, to use firearms on the premises of a duly licensed shooting gallery, gun club, or rifle club, or to shoot game birds in accordance with the provisions of Section 8-24-050 of this Code~~.

**8-24-005 Definitions**
    For the purposes of this Chapter, the following definitions apply:

- 23 -

"Corrections officers," "firearm" and "peace officer" have the meaning ascribed to those terms in section 8-20-010.

**8-24-010  Discharging firearms.**

No person shall fire or discharge any ~~gun, pistol, or other~~ firearm within the city, except in the lawful self-defense or defense of another ~~upon premises used by a duly licensed shooting gallery, gun club, or rifle club,~~ or in accordance with the provisions of Section 8-24-050 of this Code.

No cannon or piece of artillery shall be discharged or fired off in any public way or other public place within the city, except upon the express permission of the city council.

Any person violating any of the provisions of this section shall be fined not less than $~~250.00~~ 500.00 nor more than $~~500.00~~ 1,000.00 for each offense.

The provisions of this section shall not apply to persons listed in section 8-20-020 (b)(1)-(15). ~~sheriffs, coroners, constables, members of the police force, or other peace officers engaged in the discharge of their official duties, or to any person summoned by any of such officers to assist in making arrests or preserving the peace while such person so summoned is engaged in assisting such officer.~~

**8-24-020  Carrying dangerous weapons.**

(a) No person shall sell, offer for sale, keep, possess, loan or give to any person any knife, the blade of which is released by a spring mechanism, including knives known as "switch-blades", any blackjack, slingshot, sandclub, sandbag, metal knuckles or bludgeon.  No person shall sell, offer for sale, loan or give to any person 18 years of age or under any type or kind of knife, any blade of which is two inches in length or longer.

(b) [Reserved]  ~~No person shall sell, manufacture, purchase, possess or carry any weapon from which eight or more shots or bullets may be discharged by a single function of the firing device.~~

(c) No person shall carry or possess any knife, the blade of which is released by a spring mechanism, including knives known as "switch-blades", any blackjack, slingshot, sandclub, sandbag, metal knuckles or bludgeon. No person 18 years of age or under shall carry or possess any knife, the blade of which is two inches in length or longer.

(d) No person shall carry or possess with intent to use same unlawfully against another a dagger, dirk, billy, dangerous knife, razor, stiletto or other dangerous or deadly weapon.

(e) [Reserved]  ~~No person shall carry concealed on or about his person a pistol, revolver, derringer or other firearm. Provided, however, that this provision shall not apply to the following officers while engaged in the discharge of their official duties: sheriffs, coroners, constables, policemen or other duly constituted police officers and wardens, superintendents and keepers of prisons, penitentiaries, jails and other institutions for the detention of persons accused or convicted of crime; nor to the following employees or agents while engaged in the discharge of the duties of their employment: conductors, baggagemen, messengers, drivers, watchmen, special agents and policemen employed by railroads or express companies; nor to persons lawfully summoned by an officer to assist in making arrests or preserving the peace, while so engaged in assisting such officer.~~

(f) No person shall carry concealed on or about his person a or dagger, dirk, stiletto, bowie knife, commando knife, any blade of which is released by a spring mechanism, including knives known as "switch-blades" or any other type or kind of knife, any blade of which is more than two and one-half inches in length, ordinary razor or other dangerous weapon except that no person 18 years of age or under shall carry concealed on or about his person, any knife, the blade of which is two inches in length or longer. Provided, however, that this provision shall not apply to the following officers while engaged in the discharge of their official duties: sheriffs, coroners, <u>peace officers</u> ~~constables, policemen or other duly constituted police officers~~ and <u>corrections officers</u> ~~wardens, superintendents and keepers of prisons, penitentiaries, jails and other institutions for the detention of persons accused or convicted of crime~~; nor to the following employees or agents while engaged in the discharge of the duties of their employment: conductors, baggagemen, messengers, drivers, watchmen, special agents and policemen employed by railroads or express companies; nor to persons lawfully summoned by an officer to assist in making arrests or preserving the peace, while so engaged in assisting such officer.

(g) Any person violating the provisions of subsections (a), (c), (d) or (f) of this section shall be fined $200.00 for each offense, or shall be punished by imprisonment for a period not to exceed six months, or by both such fine and imprisonment. ~~Any person violating the provisions of subsections (b) or (e) of this section shall be subject to a fine of $300.00 for each offense, and a mandatory minimum sentence of not less than five days imprisonment nor more than six months imprisonment for a first offense; a mandatory minimum sentence of not less than fifteen days imprisonment nor more than six months imprisonment for a second offense; and a mandatory minimum sentence of not less than thirty days imprisonment nor more than six months imprisonment for a third or subsequent offense.~~

(h) ~~In addition to all other penalties, weapons~~ <u>Any weapons</u> used in violation of this section are hereby declared contraband and shall be seized by and forfeited to~~, and confiscated by,~~ the city.

## 8-24-021  Sale, display and use of utility knives.
(a)  As used in this section, a "utility knife" is a knife consisting of a grip and single-edged sharp blade of the type typically used to cut such resistant surfaces as rugs, cardboard boxes, linoleum flooring and the like.

(b)  No person shall display or offer for sale any utility knife except by placing the knife either (1) in an area immediately accessible only to an employee of the establishment, and beyond the reach of any customer less than seven feet tall; or (b <u>2</u>) in a locked display cabinet, which can only be opened by an employee of the establishment.

*(omitted text is unaffected by this ordinance)*

## ~~8-24-025  Assault weapons or ammunition – Sale prohibited – Exceptions.~~

(a) No person shall sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or assault ammunition, as those terms are defined in Chapter 8-20 of this Code. This section shall not apply to any officer, agent, or employee of this or any other municipality or state or of the United States, members of the armed forces of the United States, or the organized militia of this or any other state, and peace officers as defined in this Code to the extent that any such person is otherwise authorized to acquire or possess an assault weapon or assault ammunition and is acting within the scope of his or her duties. In addition, this section shall not apply to the acquisition or possession of assault ammunition by persons employed to provide security for armored carriers or mobile check cashing services while in the course of such duties, while commuting directly to or from the person's place of employment, and while at the person's home, if the assault ammunition (1) is acquired or possessed for use with a weapon that the person has been authorized to carry under Section 28 of the Illinois Private Detective, Private Alarm and Private Security Act of 1983; and (2) consists of an ammunition magazine that has a capacity of 15 or fewer rounds of ammunition.

(b) Any assault weapon or assault ammunition possessed, sold or transferred in violation of subsection (a) is hereby declared to be contraband and shall be seized, and disposed of in accordance with the provisions of Section 8-20-220.

(c) Any person found in violation of this section shall be subject to a fine of not less than $500.00 nor more than $1,000.00 for each offense, and a mandatory minimum sentence of not less than five days imprisonment nor more than six months imprisonment for a first offense; a mandatory minimum sentence of not less than fifteen days imprisonment nor more than six months imprisonment for a second offense; and a mandatory minimum sentence of not less than thirty days imprisonment nor more than six months imprisonment for a third or subsequent offense.

(d) Any person who, prior to the effective date of the ordinance codified in this section, was legally in possession of an assault weapon or assault ammunition prohibited by this section shall have 14 days from the effective date of the ordinance codified in this section to do any of the following without being subject to prosecution hereunder:
(1) To remove the assault weapon or ammunition from within the limits of the City of Chicago; or
(2) To modify the assault weapon either to render it permanently inoperable or to permanently make it a device no longer defined as an assault weapon; or
(3) To surrender the assault weapon or ammunition to the superintendent of police or his designee for disposal in accordance with Section 8-20-220.

**8-24-026 Fragmenting bullets and metal piercing bullets – Sale prohibited – Exceptions.**
(a) No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any fragmenting bullets, metal piercing bullets, or disc projectile ammunition. This section shall not apply to any officer, agent, or employee of this or any other municipality or state or of the United States, members of the armed forces of the United States, or the organized militia of this or any other state, and peace officers as defined in this Code to the extent that any such person is otherwise authorized to acquire or possess fragmenting bullets, metal piercing bullets, or disc projectile ammunition and is acting within the scope of his or her duties.

(b) Any fragmenting bullets, metal piercing bullets, or disc projectile ammunition manufactured, possessed, sold or transferred in violation of subsection (a) are hereby declared to be contraband and shall be seized and disposed of in accordance with the provisions of Section 8-20-220.

~~(c)     Any person found in violation of this section shall be sentenced to not more than six months imprisonment or fined $500.00, or both.~~

**8-24-027     Disguised firearms prohibited.**

(a)     No person shall purchase, acquire, sell, offer or expose for sale, or possess any firearm that is designed, constructed, modified or disguised to resemble any other object.

(b)     Any person who violates subsection (a) of this section ~~shall be guilty of a misdemeanor, and~~ shall be <u>incarcerated</u> ~~subject to incarceration~~ for not less than 30 days and not more than 180 days for each offense. Each day of a continuing violation, and each purchase, acquisition, sale, offering or exposing for sale, or possession of a different firearm described in subsection (a) shall constitute a separate and distinct offense.

(c)     Nothing in this section suspends, repeals or alters any other provision of this Code which limits, restricts or prohibits the purchase, acquisition, sale, offering or exposure for sale, or possession of a firearm.

SECTION 7. The Municipal Code of Chicago is hereby amended by adding a new chapter 8-26, as follows:

**Chapter 8-26 Gun Offender Registration Ordinance**
**8-26-010     Definitions:**

For purposes of this chapter, the following definitions apply:

"Corrections facility" has the same meaning ascribed to that term in 720 ILCS 5/3-1-2.

"Conviction" or "convicted" means an adjudication by a court of competent jurisdiction that a person is guilty, and includes the sentence by the court, of the gun offense.

"Gun offender" or "offender" means any person convicted of a gun offense that is subject to the provisions of this chapter.

"Gun offense" means a criminal conviction of an offense for an unlawful use of a weapon that included a firearm under 720 ILCS 5/24, or criminal possession of a firearm in violation of any federal, state or local law.

"Department," "firearm," and "superintendent" have the meaning ascribed to those terms in section 8-20-010.

**8-26-020 Duty to register and to verity.**

(a) A gun offender who resides within the city, or remains in the city to work or attend school, shall register with the superintendent within 48 hours of either: (1) release, if the gun offender receives a sentence of imprisonment; or (2) the time sentence is imposed, if the sentence does not include imprisonment.

(b) The form and manner of registration shall be as provided in rules and regulations.

(c) The registration shall include the following information;
    (1) the person's name, date of birth, and sex;
    (2) the address where the gun offender resides, works, or attends school;
    (3) any other legal name;
    (4) copy of a driver's license or non-driver's photo identification card;

(5) a photograph of the gun offender;

(6) a description of the offense for which the offender was convicted;

(7) the name and address of the offender's place of work, or expected place of work, including the name and phone number of his supervisor;

(8) the name and address of any educational institution which the offender attends or expects to attend; and

(9) any other information that the superintendent shall find reasonably necessary to effect the purpose of this chapter.

The gun offender shall sign a statement under oath attesting to the accuracy of the information required in this subsection.

(d) The superintendent may photograph the gun offender and require the gun offender to provide such documentation as the superintendent considers acceptable to verify any information required pursuant to this chapter.

(d) The gun offender shall submit to fingerprinting in accordance with rules and regulations promulgated by the superintendent.

## 8-26-030 Initial and annual registration.

(a) For the initial registration, a gun offender shall personally appear to register at such office of the police that the superintendent may direct.

(b) No later than 20 days after the one-year anniversary of the gun offender's initial registration, the gun offender shall personally appear at such office of the police that the superintendent may direct for the purpose of verifying the information required in this chapter.

(c) If a gun offender required to register under this chapter is confined to any federal, state or local correctional center, residential treatment center, hospital, or institution throughout the 20-day period set forth in subsection (b), the gun offender shall personally appear as required by this subsection within 48 hours of release.

## 8-26-040 Registration period.

A gun offender shall comply with the requirements of this chapter for a period beginning when he is required to register and continuing until 4 years from the date of conviction, or 4 years after the expiration of any time being served on probation, parole, supervised release, or conditional release, or 4 years after the gun offender is unconditionally released from a correctional facility, prison, hospital or other place of confinement, whichever is last. The registration period is tolled any time the gun offender fails to register or otherwise fails to comply with the requirements of this chapter.

## 8-26-050 Duty to report.

A gun offender shall report any change in information required by this chapter with 48 hours of such change, in a manner and in a form prescribed by the superintendent.

## 8-26-060 Creation of gun offender registry.

(a) The superintendent is authorized to collect and maintain gun offender information obtained pursuant to this chapter.

(b) The superintendent shall create and maintain a registry of gun offenders registered pursuant to the provisions of this chapter.

(c) The superintendent is authorized to make the gun offender registry available to any other city sister agencies or any regional or national government-established gun offender registry and may accept files from such registries.

**8-26-070 Cooperation with other agencies.**

The superintendent is authorized to cooperate with the judiciary and state and other city sister agencies to facilitate the implementation of this chapter. Assistance and cooperation in the implementation of this chapter shall be provided by other city departments upon the request of the superintendent.

**8-26-080 Gun offender community notification.**

The superintendent shall post the gun offender registry on the department's web site, and must make the information contained in the registry database searchable with a mapping system which identifies registered gun offenders within 5 miles of an identified address. The information shall be updated as deemed necessary by the superintendent.

**8-26-090    Rules and regulations.**

The superintendent has the authority to promulgate rules and regulations for the implementation of this chapter and to prescribe all forms and the information required.

**8-26-100 Violation-Penalty.**

Any person who violates any provision of this chapter, or rule or regulation promulgated hereunder, shall, upon conviction, be fined not less than $300.00 nor more than $500.00 or be incarcerated for a term not to exceed six months, or both. Each day that such violation exists shall constitute a separate and distinct offense.

**8-26-110 Severability.**

If any provision or term of this chapter, or any application thereof, is held invalid, the invalidity shall not affect other applications of the provisions or terms of this chapter which reasonably can be given effect without the invalid provision or term for the application thereof.

**SECTION 8.** This ordinance shall take effect 10 days after its passage and approval.

# EXHIBIT  C

CITY OF CHICAGO
DEPARTMENT OF POLICE

RULES AND REGULATIONS
FIREARMS- CHAPTER 8-20

These rules shall be effective on July 12, 2010.

The Superintendent, pursuant to Chapter 8-20 of the Municipal Code of Chicago, hereby promulgates the following the Rules and Regulations.

**RULE I      DEFINITIONS**

**1.1** "Chicago Firearm Permit" or "CFP" means the permit issued by the City which allows a person to possess a firearm.

**1.2** "FOID" means the Firearm Owner's Identification Card issued pursuant to the Illinois Firearm Owners Identification Card Act, 430 ILCS 65/1 et seq., as amended.

**1.3** "Department" means the Chicago Police Department.

**1.4.** "Police Headquarters" means the Chicago Police Headquarters, located at 3510 South Michigan Avenue, Chicago, Illinois, 60653

**1.5** "State certified firearms instructor" means a person approved by the Illinois Department of Financial and Professional Regulation to instruct firearm safety and training courses.

**RULE 2      TRAINING**
**2.1**  Every applicant for a CFP shall submit an affidavit signed by a state certified firearms instructor, attesting that the applicant has completed a firearm safety and training course which complies with rule 2.2.

A copy of the affidavit to be completed by the firearms instructor may be downloaded from the department's web site at www.chicagopolice.org.

**2.2**  The firearm safety and training course shall consist of 1 hour of range training and 4 hours of classroom training, which shall include all of the following:
(a) instruction in the dangers of misuse of firearms, and their care, cleaning and storage and safety rules;
(b) practice firing on a range with live ammunition;
(c) instruction in the legal use of firearms; and
(d) a presentation of the ethical and moral considerations necessary for any person who possesses a firearm.

**RULE III     CHICAGO FIREARM PERMITS**
**3.1**  A person applying for a CFP shall file the application in person at Police Headquarters, Monday through Friday (closed on holidays) between the hours of 8:30 a.m. and 3:30 p.m..

A copy of the CFP application may be downloaded from the department's web site

at www.chicagopolice.org.

**3.2** When submitting the CFP application, the applicant shall bring the following:

(a)   the applicant's Illinois firearm owner's identification number and a copy of the applicant's FOID card;

(b)   two identical photographs of the applicant taken within 30 days immediately prior to the date of filing the application, equivalent to passport size, showing the full face, head and shoulders of the applicant in a clear and distinguishing manner;

(c) the applicant's Illinois driver's license number or Illinois identification card, and a copy of the applicant's driver's license or Illinois identification card;

(d) an affidavit signed by a state certified firearms instructor to provide firearm training courses which includes the following information:

(1) the name and signature of the applicant;
(2) the name, address and phone number of the instructor;
(3) the location where the training occurred;
(4) a statement that the training provided at least one hour of range training and four hours of classroom instruction that is in compliance with rule 2.2;
(5) a statement that the applicant successfully completed the training; and
(6) a statement attesting to the correctness of the information provided in the affidavit.

(e), if the applicant does not have a valid Illinois driver's license, a letter signed by a licensed optometrist or ophthalmologist, attesting that the applicant has vision better than or equal to that required to obtain a valid Illinois driver's license under the standards established in the Illinois Vehicle Code.

**3.3**   For an application of a person 18 years or older but less than 21 years old, the applicant shall submit an affidavit from the applicant's parent or legal guardian.   The affidavit shall include the following:

(a) the applicant's age;
(b) a statement that the applicant has never been convicted of a misdemeanor, other than a traffic offense or been adjudged a delinquent;
(c) a statement that the parent or legal guardian consents to the applicant possessing a firearm;
(d) a statement that the parent or legal guardian is not an individual prohibited from having a FOID or CFP; and
(e) an attestation as to the correctness of the information on the affidavit.

If consent is given by a legal guardian, the applicant shall submit a certified copy of the guardianship court order.

**3.4**   After submitting a complete application, the applicant shall submit to fingerprinting.

**3.5**   An application shall not be considered complete until all the required information and fingerprints are submitted.

**RULE IV   Firearm Registration Certificates**

**4.1**   An applicant shall submit a complete firearm registration application.   The application may be obtained either in person at Police Headquarters, Monday through Friday (closed holidays) between the hours of 8:30 a.m. and 3:30 p.m., or may be downloaded from the Department's web site at www.chicagopolice.org.

**4.2**   The firearm registration application may be either submitted in person at Police Headquarters, or may be mailed to:

> Chicago Police Headquarters
> Gun Registration Program, Unit 163
> Room 1027SE
> 3510 South Michigan Avenue
> Chicago, Illinois 60653

**4.3**   Any applicant who is exempt from obtaining a CFP shall submit evidence, as required by the superintendent, demonstrating the basis for the exemption.   Such evidence may include, but is not limited to, an identification card or license issued by a governmental agency in the United States.

**4.4**   An annual registration report shall be submitted either in person at Police Headquarters or mailed to the address listed in Rule 4.2.

**4.5**   Any applicant who has recently moved into the city shall provide evidence of such recent relocation, which may include, but not be limited to, a driver's license, utility bills, a lease, and any other information requested by the superintendent.

**RULE V        90 day grace period-calculation**

**5.1**   For purposes of calculating the 90-day grace period pursuant to section 8-20-140(d)(2), with respect to any applicant who submits an application for a CFP prior to October 12, 2010, and such application is subsequently approved, the applicant shall be eligible to register each firearm possessed by the applicant prior to July 12, 2010; provided that the firearm meets the requirements of the ordinance.

**5.2**   An applicant who submits an application for a registration certificate for a firearm owned by the applicant prior July 12, 2010 shall submit evidence that the firearm was owned by the applicant prior to July 12, 2010.   Such evidence may include, but is not limited to, a receipt showing the date the firearm was purchased, or an affidavit in which the applicant attests that the applicant owned the firearm prior to July 12, 2010.

**5.3**   For any registration certificate issued prior to July 12, 2010 and expiring on or before October 12, 2010, if the person issued the registration certificate submits an application for a CFP prior to October 12, 2010, the expiration date of the registration certificate shall be deemed to be extended until the superintendent either approves or denies the person's CFP application, and if applicable, the person's application for a registration certificate.   If the CFP application is denied, the person shall immediately dispose of the firearm in accordance with the provisions of the ordinance.

**RULE VI   Destruction and disposal of firearms**

**6.1**   If a CFP or registration certificate is lost, stolen or destroyed, the person shall file a police report within 72 hours of the discovery of such loss, theft or destruction.

- 3 -

**6.2**   If a firearm is lost, missing or stolen, the person shall file a police report immediately.

**6.3**   If a person sells, transfers, permanently removes from the city, or otherwise disposes of a firearm, the person shall submit a firearms disposition form. The form shall be submitted either in person at Police Headquarters, or mailed to the address listed in Rule 4.2.

**6.4**   Any person whose CFP or firearm registration certificate is revoked shall immediately dispose of the firearm in accordance with the ordinance, and submit a firearms disposition form in accordance with Rule 6.3.

**RULE VII Change of information**

**7.1**   Every person issued a CFP or registration certificate shall keep all information required by the ordinance current.   Any change in such information shall be reported to the superintendent by submitting an amended CFP or registration certificate application either in person at Police Headquarters, or by mailing an amended application to the address listed in Rule 4.2.

**RULE VIII Revocation of a CFP or registration certificate**

**8.1**   Every person whose CFP or registration certificate has been revoked shall immediately return the revoked CFP or registration certificate to the department either in person at Police Headquarters, or by mailing the revoked CFP or registration certificate to the address listed in Rule 4.2.

**8.2**   Any CFP or registration certificate that is revoked shall be seized by the department.

**RULE IX Surrender of firearms**

**9.1**   Any person issued a CFP or registration certificate who wishes to surrender the firearm to the Chicago Police Department may do so by calling 911.

# EXHIBIT  D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AIRCRAFT OWNERS AND PILOTS )
ASSOCIATION, RUFUS A. HUNT, )
DONALD K. IRMIGER III, )
SUNSTONE FINANCIAL GROUP, )
UNISON INDUSTRIES, L.P., )
STEVEN G. WHITNEY, COLEMAN )
HOLT and SCOTT GALLAGHER, )
)
      Plaintiffs, )
)
       v. )      No. 96 C 5793
)
DAVID R. HINSON, in his capacity as )
Administrator of the Federal Aviation )
Administration, THE FEDERAL )
AVIATION ADMINISTRATION, THE )
CHICAGO PARK DISTRICT, )
and CITY OF CHICAGO, )
)
      Defendants. )

## RULING ON PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

Plaintiffs, Aircraft Owners and Pilots Association ("AOPA"), Rufus A. Hunt,

Donald K. Irmiger III, Sunstone Financial Group, Unison Industries, L.P., Steven G.

Whitney, Coleman Holt and Scott Gallagher, brought this action against David R. Hinson,

in his capacity as Administrator of the Federal Aviation Administration, The Federal

Aviation Administration, The Chicago Park District and the City of Chicago seeking to

enjoin the closing of Meigs Field, scheduled to take place at 10 p.m. on September 30, 1996,

when the City's 50-year lease with The Chicago Park District for the Meigs Field site

expires. Plaintiffs are users of Meigs Field (including persons who use the airport as a site

for teaching inner-city youngsters about aviation and business persons from within and without Illinois who use Meigs Field as a convenient means of commuting to Chicago for business purposes), taxpayers and persons who will be affected by any additional noise and pollution which may be caused by the diversion of Meigs' flights to Midway Airport. The court on September 12 granted the motion of the State of Illinois to intervene as a party plaintiff. Plaintiffs seek, by means of the injunction against the closing of Meigs, to compel the FAA to keep the Meigs control tower in operation, the Park District to allow the continued use of the Meigs site by the City following the lease's expiration and the City to continue to operate Meigs pending the preparation of an environmental impact statement by the FAA and/or a trial on the merits. As is clear, the relief requested contains a mix of prohibitory and mandatory elements.

The claims of the private and State plaintiffs can be summarized as follows: Under the National Environmental Policy Act, 42 U.S.C. §4321 et seq. ("NEPA"), a federal agency must prepare an Environmental Impact Statement ("EIS") for any "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(C). It is alleged that the FAA made a decision to permit the closure of Meigs Field in violation of certain undertakings and assurances made by the City in a series of federal grant applications, that that decision was a "major federal action" significantly affecting the quality of the human environment, and that, never having prepared an Environmental Assessment ("EA") or an EIS, the FAA violated NEPA. In this connection, plaintiffs contend that closing Meigs Field will result in the diversion of traffic to Midway and, to a

2

lesser extent, other area airports, and will cause delay, noise and pollution and other deleterious environmental consequences.

The private plaintiffs contend in addition:

(1) Closing Meigs will violate the terms of federal and state permits.

(2) Closing Meigs will violate the Public Trust doctrine because it will materially interfere with interstate commerce, materially interfere with navigation, and contravene federal policy. It is contended that the closing of Meigs Field fails to satisfy Illinois law standards for changing the use of property held subject to the public trust.

(3) Closing Meigs will violate the conditions contained in federal and state grants to the City.

(4) Closing Meigs will violate the Interstate Commerce Clause of the Constitution.

The evidence presented at the hearing indicated that in 1903, the Illinois legislature vested title to certain submerged lands in the South Park Commissioners, predecessor to the Chicago Park District, with the requirement that the land be used "[f]or public purposes" and that it "become a part of the public park or parks" under the South Park Commissioners' control. (City Ex. 1 at §4.) Northerly Island, the site of Meigs Field, was constructed from these submerged lands during the period 1920-22, and by resolution of the South Park Commissioners was part of a group of parklands named in honor of Daniel Hudson Burnham as Burnham Park.

Title to Northerly Island and the submerged lands on which it was built was transferred to the Park District when it was created in 1933. 70 ILCS 1505/12. The Park District is an independent municipal corporation. 70 ILCS 1505/1. It is governed by a board of commissioners, who in turn elect a president and vice-president, and may take action only upon the affirmative vote of four or more commissioners. 70 ILCS 1505/4. Park District commissioners are appointed by the Mayor of Chicago and approved by the City Council and serve for five years. 70 ILCS 1505/3.

In 1935, the legislature authorized any park district with title to certain lands including reclaimed lake bottom to convey that land to any city or village for the purpose of operating an airport. 70 ILCS 1300/1. On February 17, 1946, in response to a petition by the City of Chicago and after public hearing, the Illinois Department of Aeronautics issued an Order approving the "temporary, experimental operation" of an airport on Northerly Island. (City Ex. 2 at 4-5.) On September 17, 1946, the Park District leased Northerly Island to the City for a term of fifty years. This lease expires on September 30, 1996.

In connection with the construction of Meigs Field, the Park District and the City sought and obtained permits from the State and the federal government to undertake work (primarily related to wall construction and fill) to make Northerly Island suitable for airport purposes.

In 1972 and 1976, the City and State entered into two grant agreements with the FAA relating to Midway Airport. (City Exs. 3 and 4.) These grant agreements have been made an issue by both sides of this dispute, each side contending that the provisions of

4

the grant agreements and the City's and FAA's conduct in relation to them are relevant to the instant dispute.  At that time, the land on which Midway was operated was leased from the Chicago Board of Education pursuant to a lease expiring on December 31, 1980.  Both of these grant agreements contained paragraphs clearly obligating the City to acquire free and clear title to Midway Airport:

> The Sponsor covenants and agrees that it will acquire from the Board of Education of the City of Chicago either title in fee to the property comprising Midway Airport . . . free and clear of any reversionary interest, lien, easement, lease or other encumbrances, which, in the opinion of the [FAA], would create an undue risk that might deprive the Sponsor of possession or control of the airport, interfere with its use for public airport purposes or make it impossible for the Sponsor to carry out the agreement and assurances in the Project Application, or, in lieu thereof, provide assurances, satisfactory to the FAA, that this airport will continue to be operated and maintained as a public airport for a period of not less than 25 years, or more, subsequent to the expiration of its present lease with the Board of Education of the City of Chicago on 31 December 1980.

(City Ex. 3 at par. 24; City Ex. 4 at par. 22.)

On January 7, 1981, George Grote, Chief of the Chicago Airport District Office of the FAA, wrote to Thomas Kapsalis, Commissioner of the Chicago Department of Aviation, stating as follows respecting the recent expiration of the Midway lease and the City's failure to acquire the long-term property interest in the site necessary to assure continued operation of Midway.  Grote stated that Chicago was out of compliance with the relevant terms and conditions of the grant agreements, and could return to a state of compliance by executing a long-term lease or acquiring the property.  Kapsalis stated:

> We have available a wide range of actions which we may take in case of non-compliance.  Included among (but not limited to)

5

these are withholding of payments due on existing grants and refusal to issue new grants. Either of the foregoing remedies may be applied against the specific airport involved or against any and all other airports operated by the same sponsor.

In view of your sincere desire to resolve this issue and your progress to date, only minimal sanctions will be imposed now. Outstanding payments due on ADAP Project No. 8-17-0025-05, which is the only Midway project not financially closed, will be withheld and no new Grant Offers will be issued. New legislation is pending which will allow continued issuance of Grants for airport development. When that legislation is passed, the City will qualify for Federal funding at Midway if the non-compliance matter is resolved.

Our decision to limit the sanctions to be imposed immediately, as set forth above, do not limit us from expanding our actions to include other airports operated by the City of Chicago. In order to avoid such an expansion of sanctions, we must require that the City take certain steps: 1) execution of an interim or extended lease for the Midway Airport property, to protect existing interests during the period of negotiations leading to a permanent solution to the problem, with evidence of same to be furnished this office, and 2) a schedule of anticipated actions to acquire the property interest with expected dates of accomplishment. A monthly report will also be needed, beginning on January 31, 1981, showing progress made. Satisfactory progress will be necessary to avoid further sanctions.

We appreciate your courtesy and attention to this matter. Since a return by the City to a status of full compliance is in our mutual best interests we will extend every reasonable effort to assist the City in any way possible.

(State Ex. 3.)

The City responded by exercising its powers of condemnation to acquire title to Midway.

In 1986, 1987, 1988 and 1989, the City and State entered into four grant agreements with the FAA by which the City obtained slightly more than $1 million for use at Meigs Field to resurface the runway (1986), build a helicopter pad and pedestrian canopy (1987), and acquire snow removal equipment (1988 and 1989). (Complaint Exs. 40–43.) These grant agreements incorporated the representations made by the City in its grant application, as federal law required. Specifically, where the application form set forth, "Applicant intends to acquire the site through ... ." and gave as the choices eminent domain, negotiated purchase or other, the City checked negotiated purchase and wrote in "or new lease agreement." The City indicated that the lease had a fifty-year term, had eight years to run and was renewable. A copy of the lease was attached to each application. Moreover, the application required a form "assurance" that the applicant "holds good title, satisfactory to the Secretary, to the landing area of the airport or site thereof, or will give assurance satisfactory to the Secretary that good title will be acquired." Another assurance provided:

> The terms, conditions and assurances of the grant agreement shall remain in full force and effect throughout the useful life of the facilities developed or equipment acquired for an airport development . . . project . . ., but in any event not to exceed twenty (20) years from the date of acceptance of a grant offer of Federal funds for the project.

(Section V, B(1).)

The grants themselves contained the following language added by the parties for the particular circumstances of these grants:

It is understood and agreed by and between the parties hereto that the sponsor shall reimburse FAA for the remaining useful life of any improvements made hereunder if a long term lease or purchase agreement for the airport is not entered into prior to the current lease expiration in 1996.

The Park District was not a party to the grant agreements. No environmental assessment or EIS was prepared by the FAA or any other entity in connection with the grant agreements or was otherwise contemplated by the grant agreements.

At the same time as it entered into the various Meigs Field grant agreements, the City entered into four "Agency and Participation" agreements with the State that provide that the State will contribute five percent of the costs of the improvements contemplated by the grant agreements. (City Exs. 9-12.) In these agreements with the State, the City certifies "that it will have acquired clear title in fee simple to all real estate upon which construction work is to be performed . . . ." (Par. 20.) The agreements further state, "Any grant under this agreement shall be valid for the useful life of the above-described project or for twenty years, whichever is longer." Moreover, the agreements provided:

It is understood and agreed by and between the parties hereto that the sponsor shall reimburse the Division for the remaining useful life of any improvements made hereunder if a long term lease or purchase agreement for the airport is not entered into prior to the current lease expiration in 1996.

(Par. 26.)

On numerous occasions during the 1980's, through numerous mayoral administrations, the City broached with the FAA the subject of closing Meigs Field.

In letters introduced in evidence dating back to the 1970's, the FAA consistently made clear its opposition to any closing of Meigs Field. Typical is this January 13, 1981 letter from Langhorne Bond, FAA Administrator, to Mayor Jane Byrne:

> I am writing to express the Federal Aviation Administration's (FAA) firm opposition to the closing of Meigs Field. Such a closing would compromise safety and cut down capacity in the Chicago metropolitan system of airports.
>
> After the midair collision in San Diego more than two years ago, the FAA set out on an expanded nationwide program to promote satellite airports: landing fields near large hubs that would attract general aviation aircraft. This would cut the risk of collision by keeping high and lower performance aircraft out of each other's way as much as possible. Meigs Field now plays this important role.
>
> Transferring flights from Meigs to other Chicago airports would cause more delays, noise, atmospheric pollution, and wasted fuel in the Chicago metropolitan system of airports, particularly at Midway and O'Hare.
>
> Meigs Field is important, not only to Chicago but also to the Nation. That is why since 1970 the United States entered into three grants agreements with the city of Chicago to provide funds for the development of the airport. In each of the grant contracts the city agreed to operate Meigs Field as an airport for 20 years. The most recent agreement extends to 1996.
>
> Releasing the city from its obligation—even if it were contemplated by FAA—could have significant environmental consequences. Under existing law, an action of this type would require a formal assessment of the environmental, social, and economic impacts of the closure. This assessment would include an examination of the impact of the intended future use of the property as well as the impact caused by the transfer of aircraft operations to other Chicago area airports. Public hearings would be a required part of such an assessment. No Federal decision allowing the city to close Meigs Field could precede completion of this process.

9

> Meigs cannot be treated in isolation. It must remain open to serve the needs of both Chicago and the Nation. Accordingly, as you were recently advised by our Great Lakes Regional Director, Wayne Barlow, the Federal Aviation Administration will exercise all its legal remedies to hold the city of Chicago to its obligation to operate Meigs as an airport in the interest of aviation safety and aviation progress.

(State Ex. 4.) See also State Exs. 40 (December 14, 1973), 5 (February 6, 1981), 6 (August 25, 1982), 7 (October 4, 1983), 8 (February 25, 1983), 9 (June 12, 1985), and 13 (March 12, 1992). In this correspondence, the FAA repeatedly took the position that it opposed any closure, that closure would require an EA and possibly an EIS and that the various federal grants contained assurances that the airport would be operated for twenty years from the date of the grant acceptances. In at least one letter (State Ex. 7), the FAA took the position that if the airport were closed temporarily to allow for a World's Fair, the FAA would require an extension of the twenty-year period for the period of time during which the airport was closed. The March 12, 1992 letter stated, "At the time of the Grant offer, we were advised the City was actively pursuing either purchase or a long-term lease for the Meigs site." (State Ex. 13.)

In August 1993, David R. Mosena, the City's Aviation Commissioner, met with David Hinson, Administrator of the FAA. At the conclusion of a follow-up letter covering many aviation-related matters, Mosena wrote:

> Meigs Field is owned by the Chicago Park District and is presently operated as an airport under a lease between the City of Chicago, as airport operator, and the District. This lease expires in September, 1996. It is not certain whether the District will agree to renew this lease. Mayor Daley has stated publicly, on a number of occasions, that he favors the

conversion of Meigs Field into a National Park (or a State or local park) upon the expiration of this lease. The City of Chicago is currently studying the feasibility of such a conversion and the effects of such a conversion on aviation. We will be seeking your cooperation in permitting us to achieve Mayor Daley's goal.

(State Ex. 16.)

On May 2, 1994, an FAA official in the Chicago region wrote to a third party:

In September 1992, the Mayor of the City [of] Chicago, Richard M. Daley, publicly stated that he wants to close Meigs Field as an airport when the City's lease for this Chicago Public Park District property expires on September 30, 1996. Neither the Chicago Airports District Office (CHI-ADO) nor the Illinois Division of Aeronautics (IDA) have received formal notification concerning closure of Meigs Field . . . .

* * *

FAA further advised that it has legal options to resolve any breach of contractual commitment [sic] made by the City, and that FAA expects the City to work towards renewal of their lease with the Chicago Park District in order to keep Meigs Field operational. . . .

(State Ex. 17.)

In the spring of 1996, the City of Chicago hired Kenneth Quinn, a Washington lawyer-lobbyist, to represent the City's interest in the closing of Meigs with the FAA. Quinn had a number of conversations with David Bennett, FAA Director of Airport Safety and Standards, in which he attempted, ultimately successfully, to persuade the FAA of Chicago's view that if the Park District lease were not renewed, the City's contractual commitments under the grant agreements would be satisfied by the City's reimbursement of the value of the remaining useful life of the improvements funded by the grants.

11

At some point in the spring of 1996, David Hinson, speaking in Chicago, reportedly told reporters that the closing of Meigs was an entirely local matter. The evidence indicated that various FAA staff persons believed this statement was incorrect. David Bennett, who testified at this hearing, characterized Administrator Hinson's statement as an oversimplification.

On March 1, 1996, the Park District formally notified the City, through David Mosena, that the Park District would not renew the Meigs lease. (State Ex. 24.)

On June 25, 1996, the City formally notified the FAA that the Park District had notified the City that the lease would not be renewed and stated, "Following the expiration of the lease, the City will reimburse the FAA by check for the remaining useful life of equipment and facilities at Meigs funded by FAA grants." (State Ex. 27.)

On July 26, 1996, Hugh Murphy, Commissioner of Aviation, wrote to David Hinson to respond to a letter sent to Hinson by the Illinois Department of Transportation (IDOT). Explaining that the Meigs site is owned by the Park District, Murphy stated that "neither the City nor the FAA has the power to 'prevent' Meigs' closure. The future of Meigs is entirely in the hands of the Park District, and the Park District has ruled out unequivocally the continued use of Meigs as an airport. Placing the City in noncompliance status, as IDOT suggests, thus will not induce the Park District to change its position." (State Ex. 29.)

On August 2, 1996, the FAA responded to Murphy in pertinent part as follows:

For each of above projects, the City entered into a grant agreement in which the City agreed to certain standard assurances, including the following:

> Assurance 5.

> b. It [the sponsor] will not sell, lease, encumber or otherwise transfer or dispose of any part of its title or other interests in the property shown on Exhibit A to this application . . . for the duration of the terms, conditions, and assurances in the grant agreement without approval of the Secretary.

> Assurance 22.

> a. It will make its airport available as an airport for public use on fair and reasonable terms, and without unjust discrimination, to all types, kinds, and classes of aeronautical uses.

In the last grant issued in September 1989, the grant agreement also contained the following special condition:

> It is understood and agreed by and between the parties hereto that the sponsor shall reimburse FAA for the remaining useful life of any improvement made hereunder if a long term lease or purchase agreement for the airport is not entered into prior to the current lease expiration in 1996.

In the more typical case in which the sponsoring airport proprietor has the legal authority to continue operation of the airport, but wishes to close it, the sponsor must request the FAA to release the sponsor from its obligations under the grant agreement. The assurances include an obligation to maintain the facility as a public use airport for the useful life of the facilities and equipment funded by the grant. Here, because the City will not have the legal authority to occupy and operate the airport after the expiration of the CPD lease, the FAA understands that the ability to keep the airport open is not within the unilateral power of the City, and the closure of the airport cannot be considered to be inconsistent with the City's assurance. as

13

recently as 1989 to operate the facility as a public airport. Accordingly, the FAA does not have before it a decision on whether to permit the closure of a facility.

The City does have remaining obligations under the Federal grants listed above, however. Federal investment in airport facilities through the AIP obligates the sponsor to comply with Federal grant assurances for the life of the facility, not to exceed 20 years (except in the case of a land purchase, which does not apply in the Meigs situation). Because the airport will close substantially before the end of the useful life of the facilities funded by AIP grants, some portion of the obligation to the Federal government under the grants remains.

As evident from the special condition described above, the FAA and the City considered the possibility that the airport could close while there were remaining obligations under the grant assurances. The FAA and the City provided that those obligations would be discharged by payment of an amount representing the value of the remaining useful life of the facilities and equipment purchased with the grants. The City is currently preparing an estimate of the remaining useful life of facilities financed by AIP grants, if the City maintains that the useful life of any of the facilities involved is less than 20 years.

If the equipment purchased with AIP funds would be transferred to either Midway Airport or O'Hare International Airport for continuing use, no repayment would be necessary. . . .

*    *    *

When we have agreed on the remaining useful life of the Meigs Field facilities funded by Federal grants and approved the City's plan for reinvestment of a corresponding amount in appropriate local airport projects (and assuming no change in the CPD decision not to renew the airport lease), we will issue the City a release from any remaining Federal obligations under the above-listed grant agreements.

A few things are very clear. First, the Park District owns the Meigs property and does not wish to renew the City's lease. Second, the evidence demonstrates clearly that

14

the City does not wish to continue the operation of the airport and has taken no action to seek a renewal of the lease. Further, in the past, when the City sought to close the airport even though there were years remaining on the lease, the FAA was able to persuade the City not to do so, sometimes by threatening sanctions. Indeed, in the case of Midway, when the City's lease ran out, the FAA was able to persuade the City to acquire the property through threat of sanctions. This time, the City appears to have persuaded the FAA that the Park District's unwillingness to renew the Meigs lease essentially absolves the City of further obligation to run the airport, and its assurances under its grant agreements can be adequately satisfied by reimbursement of federal monies, as set forth in what this court will refer to as the lease contingency clause added by the parties to the grant agreements. The FAA has taken the position that it has no power to force the City to continue to operate because the Park District will not renew the lease.

Certain statutes and regulatory provisions relate to the obligations of a federal grantee to continue to operate an airport. 49 U.S.C. §47106(b) provides that the Secretary of Transportation may approve a grant application "only if the Secretary is satisfied that . . . the sponsor, a public agency, or the Government holds good title to the areas of the airport used or intended to be used for the landing, taking off, or surface maneuvering of aircraft, or that good title will be acquired." (The predecessor statute, 49 U.S.C. §2208(b)(2), provided, "No project grant application for airport development may be approved by the Secretary unless the sponsor, a public agency, or the United States or an agency thereof holds good title, satisfactory to the Secretary, to the landing area of the

airport or site therefor, or gives assurance satisfactory to the Secretary that good title will be acquired.") "Good title" is not defined. Further, 14 C.F.R. Ch. 1 §152 Appx. D (17) provides that assurances made in the grant application "shall remain in full force and effect throughout the useful life of the facilities developed under this Project, but in any event not to exceed twenty (20) years from the date of said acceptance of an offer of Federal aid for the Project. . . . Any breach of these covenants on the part of the sponsor may result in the suspension or termination of, or refusal to grant Federal assistance under, FAA administered programs, or such other action which may be necessary to enforce the rights of the United States under this agreement." (Emphasis added.)

An October 2, 1989 order of the Department of Transportation (Order 5190.6A) "covers the requirements and procedures to release, cancel or modify any of the sponsor's conditions or assurances as contained in a FAAP/ADAP/AIP grant agreement." (The general provisions relating to the Administrator's authority to release, modify, reform or amend all or part of any airport agreement and the legislative basis for such authority have not been provided to the court, and the court has not been able, as of this date, to obtain them independently.) However, Section 7-20, titled "Release of Entire Airport" has been provided to us by the parties. It states:

> a. Approval Authority. The concurrence of the Associate Administrator for Airports (ARP-1) is required before granting any release from the obligations of a grant agreement which would enable a sponsor to abandon or dispose of an entire airport for non-airport purposes. Each request to release an entire airport shall be considered by ARP-1 on a case-by-case basis without limitation to the guidelines contained herein. A copy of the sponsor's request, including exhibits and documents

16

related thereto, and a copy of the regional summary statement (paragraph 7-6a) justifying the action, if recommended, shall be provided.

(Exhibit 13 in "Cases, Statutes, Regulations and Orders Cited in Plaintiffs' Memorandum of Law in Support of Their Motion for Temporary Restraining Order and Preliminary Injunction.)


## CONCLUSIONS OF LAW

(Count I is treated below.)

### Count II - Section 1983 and the AAIA

Plaintiffs have pled a private right of action under 42 U.S.C. 1983 for an alleged violation of the Airport and Airways Improvement Act (the "AAIA") and regulations. The current AAIA is codified at 49 U.S.C. 47101 et seq., and supersedes the prior AAIA, 49 U.S.C. App. 2201 et seq. Specifically, plaintiffs allege that the City and the Park District violated the grant assurances incorporated in the grant agreements. In the current AAIA, 49 U.S.C. §47107 provides that project grant application approval from the Secretary of Transportation is conditioned on assurances about airport operations. 49 U.S.C. §47111(f) provides that for the violation of a grant assurance under chapter 471, the Secretary of Transportation may apply to the district court. 49 U.S.C. §47107 is substantially similar to former 49 U.S.C. App. 2210.

The United States Supreme Court has outlined two prerequisites for an action under 42 U.S.C. §1983: (1) the statute creates enforceable rights; and (2) the statute does

not foreclose private enforcement. *Suter v. Artist M.*, 503 U.S. 347 (1992). A review of applicable cases and legislative history indicates that the AAIA does not satisfy this test and therefore plaintiffs have no private right of action.

The courts, including several circuit courts, have held that there is no private right of action when evaluating 49 U.S.C. App. 2210, the predecessor statute of the current AAIA. These courts specifically relied on the language of the statute and its legislative history to determine that Congress intended to establish an exclusive administrative enforcement scheme. The "lack of any reference in the legislative history to the creation of rights in favor of those impacted by airport projects, the express references to existing methods of enforcement of the statutory conditions, and the emphasis on the responsibilities of the Secretary" indicate that the AAIA does not create an actionable right under 42 U.S.C. §1983. <u>Beachy v. Board of Aviation Comm'rs of the City of Kokomo, Ind.</u>, 699 F.Supp. 742, 749 (S.D. Ind. 1988).

The First Circuit, in <u>New England Legal Found. v. Massachusetts Port Authority</u>, 883 F.2d 157, 168-69 (1st Cir. 1989), held that "unambiguous circuit precedent [citations omitted] as well as the clear language of the statute" indicate that there is no private right of action under 49 U.S.C. App. 2210. The Court specifically considered 49 U.S.C. App. 2210(b) which provided in part that: "To insure compliance with this section, the Secretary shall prescribe such project sponsorship requirements, consistent with the terms of this title, as the Secretary considers necessary." This language is almost identical to the language in 49 U.S.C. §47107(g)(A). Furthermore, the First Circuit considered the opening

18

language of §2210 which provided that as a condition of approval of a project grant application, the Secretary shall receive written assurances "satisfactory to the Secretary" as outlined in the statute. 49 U.S.C. §47107(a) uses substantially similar language to entrust the administration of grant assurances to the Secretary.

See also Interface Group, Inc. v. Massachusetts Port Authority, 816 F.2d 9, 15 (1st Cir. 1987) (holding that Congress provided an alternative enforcement scheme inconsistent with a private right of action under the AAIA when it imposed duties on the Secretary); Northwest Airlines, Inc. v. County of Kent, 955 F.2d 1054, 1058-59 (6th Cir. 1992), aff'd 510 U.S. 355 (1994) (holding that application of the factors in Cort v. Ash, 422 U.S. 66 (1975), indicate that Congress intended there would be no private right of action under the AAIA); Arrow Airways, Inc. v. Dade County, 749 F.2d 1489, 1491 (11th Cir. 1985) (finding no express or implied cause of action under the grant assurance provisions of the former AAIA).

Plaintiffs have not cited, nor has this court found, any legislative history for the current AAIA on the issue of a private right of action which would be inconsistent with the legislative history of the former AAIA. See Hillman Flying Service v. City of Roanoke, 652 F.Supp. 1142, 1148-49 (W.D. Va. 1987), aff'd 846 F.2d 71 (4th Cir. 1988) (finding that the legislative history and statutory language provide evidence that the former AAIA confers no express or implied right that could be a basis for a private action under 42 U.S.C. §1983); Interface Group, 816 F.2d at 15 (citing legislative history of the former AAIA which refers only to the right of air carriers "to consult" with the Secretary).

19

This court agrees with the courts cited above that the legislative history and the statutory language of the former and current AAIA preclude a private right of action under 42 U.S.C. §1983. If anything, the current AAIA provides even more support for the preclusion of a private right of action because 49 U.S.C. §47111(f), for which this court has found no parallel provision in the former Act, explicitly grants the right to seek judicial enforcement for a grant assurance violation to the Secretary of Transportation.

Count III - Interference With Interstate Commerce and Navigation

In their complaint, the plaintiffs allege a violation of the Commerce Clause of the United States Constitution, Article 6, Clause 2.

As an initial matter, this court notes that the Commerce Clause of the United States Constitution is Article 1, Section 8, Clause 3. However, it appears from Plaintiffs' Memorandum of Law in Support of their Motion for Temporary Restraining Order, as well as their reply brief, that plaintiffs have abandoned this direct federal Commerce Clause action originally alleged in Count III. Instead, in the memorandum of law and reply brief, plaintiffs rely on an alleged violation of the Public Trust Doctrine as it relates to commerce and navigation. As a result, this court will discuss the merits of the plaintiffs' direct Commerce Clause action in conjunction with this court's subsequent discussion of plaintiffs' Commerce Clause claim under 42 U.S.C. §1983 (see Count IV, infra).

20

The substance of plaintiffs' Count III argument, as articulated in their briefs, is that the closure of Meigs Field interferes with commerce and navigation, which in and of itself is a violation of the public trust doctrine.

Plaintiffs have failed to prove sufficient interference with commerce and navigation. In fact, plaintiffs provided no evidence of interference with navigation. The Illinois Supreme Court case cited by plaintiffs, Bowes v. City of Chicago, 3 Ill.2d 175, 186, 120 N.E.2d 15, 22 (1954), cert. denied, 348 U.S. 857 (1954), determined that "the State holds title to submerged lands subject to a trust the purpose of which is to protect all of the interests and benefits of the public in the navigable waters within the State of Illinois." Similarly, in Illinois Central Railroad v. Illinois, 146 U.S. 387, 452 (1892), the United States Supreme Court found that the state's title to submerged lands was "a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein." To prove a violation of this public trust, plaintiffs would then need to show that the use of Northerly Island as a park would "materially interfere with the use of the waters for navigation." Bowes at 186, 120 N.E.2d at 22. However, there was no evidence presented by plaintiffs that dedication of Northerly Island as a public park would in any way interfere with the use of the adjoining waters for navigation, commerce and fishing.

21

Count IV - Section 1983 and Commerce Clause (Art. I., §8, Cl. 2)

Though plaintiffs' Commerce Clause claim in Count IV of their complaint was alleged as a claim under 42 U.S.C. §1983, it appears from their subsequent briefs that plaintiffs may have combined their direct Commerce Clause action (originally Count III of the complaint) with their Commerce Clause action under 42 U.S.C. §1983. The court will address both at this time. The relevant underlying facts and substance of the direct Commerce Clause action and the related action under 42 U.S.C. §1983 are identical.

The Commerce Clause "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce." South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 87 (1984). In a dormant Commerce Clause action, individuals injured by state action in violation of this limitation may sue for injunctive relief. Dennis, 498 U.S. 439, 447 (1991). In Dennis, the U.S. Supreme Court held that a plaintiff may also bring a Commerce Clause action under 42 U.S.C. §1983. The significance of this decision in Commerce Clause litigation is simply "that a 1983 claim may permit dormant Commerce Clause plaintiffs to recover attorney's fees and expenses under 42 U.S.C. 1988." Dennis, 498 U.S. at 464 (Kennedy, J., dissenting).

The Commerce Clause grants to Congress the power "to regulate commerce . . . among the several States." U.S. Const. Art. I, Sec. 8, Cl. 3. Unless the action of the City and the Park District can be characterized as a "regulation," there is no commerce

clause violation. Plaintiffs have failed to cite any case which did not involve a codified statute or regulation, either legislative or administrative.

Assuming arguendo that the closing of Meigs could be construed as regulation, the relevant standard for evaluating the Commerce Clause action in this case is clear: "Where the statute [or regulation] regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citations omitted] If a legitimate local purpose is found, then the question becomes one of degree." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

Here plaintiffs failed to show an appreciable burden on interstate commerce. The legitimate local interest in and benefits of a park system are evident. By contrast, the resulting burden on interstate commerce is slight and therefore not excessive in relation to the local benefit. The closing of Meigs Field provides potentially burdened individuals, who constitute both Chicago and non-Chicago residents and Illinois and non-Illinois residents, with viable alternatives such as: (1) flying in or out of another nearby airport such as Midway or (2) choosing another form of transportation. The testimony of one of plaintiffs' witnesses, a business executive, that her transportation time between Milwaukee and Chicago would be increased by approximately one hour if Meigs were closed, thereby interfering in her opinion with corporate efficiency and productivity, does not rise to the level of an excessive burden. The 50,000 or so operations serviced by Meigs Field can and will be

absorbed elsewhere. The only "burden" that this court finds is a non-actionable burden of potential but not prohibitory inconvenience.

The City of Chicago and the Chicago Park District argue that they were not acting as regulators but instead as "market participants" as outlined in <u>Hughes v. Alexandria Scrap Corp.</u>, 426 U.S. 794 (1976), and subsequent Supreme Court doctrine. "Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." <u>Hughes</u> at 810. Given the court's conclusions above, the court does not find it necessary to reach this issue.

## Count V - Taxpayer Action

Certain plaintiffs, as taxpayers, seek to enjoin the expenditure of funds by a municipality which is allegedly in violation of civil laws and the public trust. To bring such a suit, plaintiff taxpayers must bring "a good-faith pocketbook action;" in other words there must be an underlying "illegal use of tax revenues." <u>Clay v. Fort Wayne Community Schools</u>, 76 F.3d 873, 879 (7th Cir. 1996) (citing <u>Doremus v. Bd. of Education of Borough of Hawthorne</u>, 342 U.S. 429 (1952)).

At the outset, this court notes that this Count relies in large part on the causes of action alleged in the other five Counts and as such is duplicative. Insofar as those underlying causes of action (specifically the alleged violations of FAA regulations, public trust and state permits) are disposed of elsewhere in this ruling, plaintiffs cannot rely on

them as a basis on which to bring a taxpayer action. Plaintiffs reference violations of the State Rivers, Lakes and Streams Act (615 ILCS 5/1 et seq.) and the Chicago Park District Act (70 ILCS 1505/26.4), but this court is not convinced, without further legal development by plaintiffs, that these statutes are applicable in this case.

However, even assuming plaintiffs adequately prove an underlying violation of civil law or the public trust by defendants, plaintiffs would still need to meet an additional requirement. There must be more than "pure speculation" on the part of the taxpayers that the lawsuit would result in "actual tax relief." ASARCO Inc. v. Kadish, 490 U.S. 605, 614 (1989). If "[t]he possibility that taxpayers will receive any direct pecuniary relief from this lawsuit is 'remote, fluctuating and uncertain,'" then the alleged injury is not "likely to be redressed by a favorable decision." Id. (Citations omitted.) In this case, plaintiffs failed to offer evidence or prove that they would receive any pecuniary relief as taxpayers from a favorable result in this lawsuit.

## Count VI - Violation of the Public Trust

There is no dispute between the parties that Northerly Island is owned by the Chicago Park District. Title to this land is held by the Chicago Park District as successor to the South Park Commissioners, in whom title was vested under a 1903 Act for the Enlargement and Connection of Parks and Boulevards. The 1903 Act enables the Park District to extend parks over public waters, without interference to navigation, and vests title to such extensions and the submerged lands in the Park District "for public purposes" to be

maintained and controlled "in the manner provided by law for the government and maintenance of other parks . . . under its control."

The permits issued by the State and Federal authorities in 1947 and 1963 are permits to construct a sheet piling wall and deposit sand filling to enlarge Northerly Island for airport purposes and to construct a stone fill bulkhead as an extension to Meigs Field. On their faces, the permits do not obligate the City or Park District to operate an airport on Northerly Island but instead give permission to operate an airport.

Similarly the two statutes passed by the state legislature in 1935 are permissive statutes. The Park District Airport Site Act (70 ILCS 1300/1) states that any park commissioners, park board or board of park commissioners "may grant, convey or release" lands adjacent to waters or submerged lands to cities who are authorized to establish, maintain and regulate airports in, over and upon public waters. A related statute (65 ILCS 5/11-102-1 et seq.) conversely states that cities meeting the specified population requirement (currently 500,000) "may" maintain airports on such lands.

Plaintiffs have not cited any authority nor convinced this court that the permits or statutes cited impose a binding obligation on the City and the Park District to operate an airport which in turn might invoke the public trust doctrine under Illinois law. These subsequent permits and statutes do not override the grant by the 1903 Act to use the land "for public purposes." The construction and maintenance of a public park is a public purpose consistent with this grant of authority to the Park District.

26

A 27

In <u>Wade v. Kramer</u>, 121 Ill.App.3d 377, 379-81, 459 N.E.2d 1025, 1027-28 (Ill.App. 4th Dist. 1984), the Illinois appellate court evaluated an alleged violation of the public trust doctrine by reviewing Illinois cases, many of which were cited in the parties' briefs in this case. This court notes that, pursuant to the authority outlined in <u>Wade</u>, under Illinois law property can be transferred from one public use to another without violating the public trust doctrine, even if the earlier use is completely destroyed. <u>Id.</u>

## Count I - Claim Under the National Environmental Policy Act

Plaintiffs' most significant claim, and the only claim asserted by the State of Illinois, is that the failure of FAA to prepare an environmental impact statement violated NEPA. Pursuant to NEPA, a federal agency must prepare an environmental impact statement for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(C). The primary issue to which the parties' briefs and arguments have been addressed is whether the FAA committed a major federal action in connection with the proposed closing of Meigs.

Plaintiffs assert that the major federal action committed by the FAA which made an EIS necessary was the August 2, 1996 letter of Louis Yates, Manager, Chicago Airports District Office (State Ex. 30), that stated that while the FAA had consistently opposed the closure of Meigs in the past, the expiration of the Park District lease and the Park District's decision not to renew changed the situation. Manager Yates stated:

> In the more typical case in which the sponsoring airport proprietor has the legal authority to continue operation of the

27

airport, but wishes to close it, the sponsor must request the FAA to release the sponsor from its obligations under the grant agreement. The assurances include an obligation to maintain the facility as a public use airport for the useful life of the facilities and equipment funded by the grant. Here, because the City will not have legal authority to occupy and operate the airport after the expiration of the CPD lease, the FAA understands that the ability to keep the airport open is not within the unilateral power of the City, and the closure of the airport cannot be considered to be inconsistent with the City's assurance as recently as 1989 to operate the facility as a public airport. Accordingly, the FAA does not have before it a decision on whether to permit the closure of a facility.

Yates indicated that this was the special contingency anticipated in the grant assurances, and the relief provided in the grant assurances, reimbursement for the remaining useful life of the improvements funded by the grants, was appropriate, except to the extent the City could transfer equipment purchased with grant funds to other City airports. Yates further stated:

> When we have agreed on the remaining useful life of the Meigs Field facilities funded by Federal grants and approved the City's plan for reinvestment of a corresponding amount in appropriate local airport projects (and assuming no change in the CPD decision not to renew the airport lease), we will issue the City a release from any remaining Federal obligations under the above-listed grant agreements.

The court notes that the letter, though signed by Yates, was actually drafted by David Bennett, FAA Director of Airport Safety and Standards.

Plaintiffs contend that the FAA's decision not to compel the City (through sanctions or threat of sanctions or a suit for specific performance or otherwise) to operate the airport for the useful life of the improvements, was a major federal action. The defendants maintain that the FAA lacked discretionary authority to force the City to operate

28

an airport on property in which it possessed no interest, and in the absence of such discretionary authority, there can be no major federal action. In defendants' view, the City has no further ability to occupy the premises and is therefore unable to continue to operate the airport. They maintain that the only power possessed by the FAA was the power to impose sanctions, not including specific performance since the land was reverting back to its owner. They maintain that this kind of enforcement authority, which requires the agency to determine whether it wishes to attempt to sanction and if so, how, is the kind of enforcement authority which is not subject to judicial review.

Federal regulations implementing NEPA provide a definition of the term "Major Federal Action":

> *Major Federal action* includes actions with effects that may be major and which potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (sec. 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

40 C.F.R. §1508.18.

Further, the regulations state that major federal actions include the financing or approval of specific projects, including actions approved by permit or other regulatory decision, **as well as** federal and federally assisted activities. Id. The regulations also state that actions include "Approval of specific projects, such as construction or management activities . . . ." The bringing of judicial or administrative civil or criminal enforcement

29

actions is specifically excluded, but no mention is made of how decisions not to bring such actions are to be treated.

As far as this court can tell, the case law provides no bright lines for application to novel situations of the definition of major federal actions. There are some generally agreed-upon principles, however. As the Ninth Circuit has recently stated, "the key to determining whether there was major federal action was the extent of the federal involvement." Ramsey v. Kantor, 1996 WL 529462, at *7 (9th Cir. Sept. 19, 1996). Where a federal permit is a prerequisite for a project with an adverse impact on the environment, the issuance of the permit constitutes a major federal action. Id. On the other hand, numerous decisions hold that when a federal agency has the power to halt non-federal action, but declines to exercise it, that does not constitute major federal action. See State of Alaska v. Andrus, 591 F.2d 537 (9th Cir. 1979), and cases cited therein. Similarly, it is well-established that when a private party advises a federal agency of action it intends to take, and the agency reviews the proposal and approves it (under circumstances where the approval is not required for the action to go forward), there is no major federal action. State of New Jersey v. Long Island Power Authority, 30 F.3d 403, 416-417 (3d Cir. 1994). Defendants claim that that is all that happened here, a contention which the court finds to be an oversimplification.

Another line of cases is also pertinent to the determination of whether the FAA's August 2 letter constituted major federal action. In Heckler v. Chaney, 470 U.S. 821 (1985), the Supreme Court held that agency decisions not to institute enforcement

30

proceedings are generally unreviewable under the Administrative Procedure Act. Such decisions are considered unsuitable for judicial review because of the complicated balancing of factors that such a decision entails. The agency must assess first, whether a violation has occurred, whether enforcement is an appropriate use of agency resources, whether the agency is likely to succeed if it acts and whether the enforcement action fits the agency's overall policies. This involves an ordering of priorities that the agency can accomplish more appropriately than can the courts. Id. at 831-832. An exception to the unreviewability of enforcement decisions exists when there is discernible "law to apply" to guide the court in reviewing the agency's exercise of its decisionmaking power. Plaintiffs assert that, in this case, there is "law to apply" in the form of the regulations pertaining to "Release of Entire Airport."

It is also important to note that when an agency makes a decision that its action is not a major federal action, that decision is reviewed for reasonableness. Sugarloaf Citizens Ass'n v. FERC, 959 F.2d 508, 512 (4th Cir. 1992); Goos v. ICC, 911 F.2d 1283, 1291 (8th Cir. 1990).

In Goos, supra, the ICC determined that its issuance of a Notice of Interim Trail Use in connection with the conversion of property from rail use to trail use under 16 U.S.C. §1247(d), was not a major federal action requiring an EA or EIS. After holding that this decision was reviewable by a reasonableness standard, the court affirmed the ICC's decision. The court held that there can be no major federal action when the federal agency is without legal or factual control over a non-federal project. Control depends on whether

31

some federal action is a condition precedent to accomplishment of an entire non-federal project. This factor in turn depends heavily on the degree of discretion exercisable by the federal agency with respect to the allegedly non-federal action. Discussing other authorities, the Eighth Circuit said that the cases "establish that major federal action occurs when a federal agency 'has discretion in its 'enabling' decision to consider environmental consequences and that decision forms the legal predicate for another party's impact on the environment.'" Id. at 1295 (citation omitted). The reason that the federal agency must have such discretion in order to bring the NEPA requirements into play is that the purpose of requiring an EIS is to inform agency decisionmaking. In dealing with nondiscretionary acts, an EIS would have no role to play. Cases finding major federal action, the court noted, emphasize authority to exercise discretion over the outcome.

In the case at bar, the FAA concluded that it had no discretion to exercise in connection with the Meigs closing. It concluded that due to the decision of the Park District not to renew the lease, the City had no further control over the site and that under the parties' grant agreements, this was a contingency that had been specifically provided for by providing for monetary reimbursement. That the record is not entirely clear as to whether the FAA believed it had discretion to decide whether to take any enforcement action in this situation, or whether it read the contract as dictating that its remedy was collection of monies equivalent to the value of the remaining useful life of the improvements, does not matter because this court does not find "law to apply" to the question of the propriety of the FAA's decision to rely on the contractual remedy, rather than seeking other means of enforcement.

32

The court concludes that the FAA's determination that it had no discretion to exercise over whether the City should continue to occupy the premises and operate the airport was a reasonable one, and that in fact it had no discretion in this matter. Its August 2 notice therefore did not constitute major federal action.

The court notes that a number of cases indicate that major federal action exists when an agency has power to influence or control a non-federal action. Plaintiffs maintain that the FAA has the power to influence or control the City's action in continuing to operate Meigs or not, by threatening the wide array of sanctions it invoked in connection with the City's loss of its Midway lease years ago. But this court is persuaded that this is not the kind of influence or control the cases refer to. The federal government always has the power to influence local action by offering or threatening the withdrawal of all manner of federal grants and subsidies. Instead, this court reads these cases to mean that the federal agency must have, in the words of the Goos court, legal or factual control in the sense of the legitimate right, by statute, regulation or agreement, to participate in the decision to be made, not just to threaten enforcement activity if a non-federal party's conduct impairs the interests of the Government. The FAA had no--absolutely no--role to play in the Park District's decision not to renew the lease, and it determined, on a reasonable basis as is explained below, that it had no basis for forcing the City to continue to operate despite the Park District's decision. To see the reasonableness of the FAA's conclusion that, unlike the Midway situation, it could not compel the City to *do something* (like condemn the land) in

order to continue to operate, it is necessary to look at the contractual relationship established by the grant agreements.

As pointed out above, the grant agreements contained standard assurances as to the City's intention to acquire the property or renew its lease, and standard assurances that it would continue to operate for twenty years or the useful life of the improvements. In the grant itself, the parties added a non-standard clause, a contingent remedy in the event that "a long term lease or purchase agreement for the airport is not entered into prior to the current lease expiration in 1996." The FAA concluded that these grant agreements failed to create an enforceable duty on the part of the City to attempt to negotiate a lease or purchase. (Preliminary Injunction Hearing testimony of David Bennett, FAA Director of Airport Safety and Standards, at 13.) Principles of contract interpretation demonstrate that its conclusion was a reasonable one.

The court begins by noting that the grant agreements are ambiguous, because while they contain assurances that the lease is renewable and the City intends to renew it, they also specifically provide for the non-renewal of the lease. (Plaintiffs have suggested a way of reconciling the terms. At closing argument they suggested that the reimbursement provision might be the FAA's way of protecting its interests if the City lost its lease and there was some delay in accomplishing condemnation. If the City's right to operate became uncertain due to loss of the lease, it was argued, the FAA could insist on reimbursement while the uncertainties of condemnation proceedings were pursued. The court finds this interpretation strained and improbable. It is difficult to imagine how the FAA could insist

34

on reimbursement while the City attempted to continue to operate the airport.) It is a well-established rule that specific provisions trump general ones, and specifically drafted provisions take precedence over standard, form ones. It was reasonable for the FAA to conclude that in the face of these provisions, it was unlikely that any court would hold the City to a duty to continue to operate the airport, particularly given that the specifically-anticipated contingency, non-renewal, had occurred.

Plaintiffs argue that the underlying statute in this case, 49 U.S.C. §47106(b), renders this interpretation contrary to law, and that a court, construing this federal agreement, must reject the FAA's interpretation because it fails to comply with statutory directives. While the court accepts the plaintiff's argument that it would be improper for a court to accept an agency interpretation of a contract that was contrary to the agency's governing law, the court does not agree that the statute compels the result plaintiffs seek. First, good title is not defined, and could well encompass a lease. Second, the determination whether good title exists is committed to the discretion of the Secretary ("if the Secretary is satisfied that . . ." or "satisfactory to the Secretary"). Third, the statute is most naturally read as requiring that the sponsor or a public agency or the Government holds good title. At all relevant times, a public agency, the Park District, held absolute title. While regulations dictate that assurances made in the grant application are to remain in force throughout the useful life of the facilities paid for by the grant, the court finds no basis for believing that this regulation would render illegal the FAA's decision to include the contingency clause in the grant and ultimately apply it. The court therefore cannot agree

35

with the plaintiffs that the FAA's approach to the City's lease situation was contrary to congressional mandate.

Finally, plaintiffs argue that the August 2 letter was essentially a "release of an entire airport" within the meaning of the October 2, 1989 order of the Department of Transportation (Order 5190.6A). The court understands the FAA to concede that if this was indeed a release within the meaning of this Order, an EA or EIS would have been necessary. But the FAA maintains that no release within the meaning of the Order was involved, despite the fact that in the August 2, letter, Yates stated, "When we have agreed on the remaining useful life of the Meigs Field facilities funded by Federal grants and approved the City's plan for reinvestment of a corresponding amount in appropriate local airport projects (and assuming no change in the CPD decision not to renew the airport lease), we will issue the City a release from any remaining Federal obligations under the above-listed grant agreements." The FAA's position that the August 2 letter did not constitute a release is again that the FAA had no control over the closure of Meigs because of the expiration of the lease. David Bennett testified that if it were within the unilateral power of the City to keep the airport open, closure would require that the City come to the FAA to request release from the assurance to operate the airport, but inasmuch as the City did not have the unilateral power to continue to operate the airport, the release procedure was inapplicable. (Tr. of Sept. 24 at 21.) In Bennett's words, "the City lost its right to occupy the property, and that happened by operation of the expiration of the lease, and there was no FAA permission or other action in this case." (Id. at 22.)

36

In the court's view, this is the most difficult question on the merits this case raises. Nevertheless, it is the court's view that it is unlikely that plaintiffs will prevail. Most obviously, the "Release of Entire Airport" provision in the October 2, 1989 Order speaks of "granting any release from the obligations of a grant agreement which would enable a sponsor to abandon or dispose of an entire airport for non-airport purposes." If the FAA's view of the contractual situation was correct, that the City could not continue to operate the airport because of the Park District's decision not to renew the lease, then there was no enabling for the FAA to do at all. This was the FAA's view: it had no role to play in enabling or not enabling the City to dispose of the airport for non-airport purposes. The only question the FAA had open to it, as it viewed the situation, was whether, apart from the issue of the City operating the airport, there were means to protect the federal government's interest. The grant agreements contained the lease contingency clause, and the FAA maintains that the release referred to in the August 2 letter was nothing like a release of an entire airport but was something perhaps equally well-described as an accord and satisfaction: the contingency clause reimbursement obligations would be released, *once they were satisfied.* As was the case above, the court finds that the FAA's conclusion that there was no "Release of Entire Airport" decision required of the FAA was not only reasonable but very probably correct.

Behind all of plaintiffs' arguments is the sometimes articulated and sometimes not articulated suggestion that the Park District's decision not to renew the lease was no arms-length landlord-tenant decision as to the City, and that the City had essentially total

power to control that decision but chose not to. Similarly, the suggestion has been made that the FAA did not make any independent decision here, but was somehow improperly influenced by the City.

With respect to the suggestion of an improper connection between the Park District and the City, the court notes that nothing has been introduced in evidence which would in any way derogate from the Park District's independent status. We note that the City appears to have made no effort to obtain renewal of the lease, so if, as the plaintiffs argue and the FAA disputes, the lease contingency clause should have been subordinated to an implied duty of good faith in connection with the City's expressions of intent in its grant applications, the plaintiffs would prevail without a showing of any concerted action by the Park District and the City. With respect to the suggestions concerning the FAA, the court notes that nothing has been proven except that, in the face of the expiration of the lease and the routine and the ordinary and perfectly lawful importunings of the City's representatives, the FAA came to conclude that the legal position urged upon it by the City was correct. Nothing in the record establishes any impropriety in this regard. Plaintiffs have asserted, however, that in the course of discovery, they hope to gather proof of these matters.

What is the Status Quo?

The parties have engaged in considerable argument about whether the plaintiffs seek a mandatory injunction, forcing the parties to continue to operate an airport they do not wish to operate, or simply seek to preserve the status quo, described by the plaintiffs as an undemolished airport. The court concludes that the requested injunction has prohibitory and

38

mandatory elements. To the extent that plaintiffs seek an injunction with mandatory elements, many cases indicate that they carry the burden of showing that the law and facts clearly favor them. However, the court has not considered the arguably mandatory elements of the proposed injunction in assessing plaintiff's burden.

Likelihood of Success on the Merits

Any consideration of this issue must begin by recognizing that the parties have raised complex and novel issues. All involve a complicated nexus of statutes, regulations and contractual undertakings. In some instances, the court has been able to obtain only excerpts of relevant materials. Realizing that neither the parties nor the court have had time for reflective consideration of the issues, the court concludes that on this record, it is unlikely for the reasons set forth above that plaintiffs will ultimately prevail. In a matter of this complexity, however, with no time for factual or even careful legal development, it is difficult to say with confidence that plaintiffs would "have no case on the merits." See generally Mil-Mar Shoe Co., Inc. v. Shonac Corp., 75 F.3d 1153, 1156 (7th Cir. 1996). The court cannot conclude that plaintiffs have no case on the merits, but from all the materials before it, it concludes that their chances of prevailing are remote at best.

Irreparable Injury

Plaintiffs seek to preserve Meigs Field as an airport, at least pending completion of an Environmental Impact Study. If the closing of Meigs is not enjoined, it is probable that the airport will be destroyed before any trial on the merits can be had. The

39

injuries asserted by plaintiffs, particularly related to their use and enjoyment of the airport, cannot be addressed by a damages remedy and the airport cannot realistically, once demolished, be rebuilt. Plaintiffs have clearly shown irreparable injury.

In addition, while the court notes that the evidence was extremely inconclusive with respect to whether diversion of Meigs' flights would cause significant amounts of delay, noise or environmental degradation, there was some evidence that the closing of Meigs would cause such effects. To the extent delay, noise and environmental degradation result from the closure of Meigs, the plaintiffs and the larger public would be irreparably injured.

Balance of Harms

The relief requested against all parties involves some elements of a mandatory injunction. The FAA would be ordered to run the control tower, the City to operate the airport (the State has alleged but has not proven that it has the right to assume operation of the airport, and the court cannot therefore rely on that allegation) and the Park District to deploy its land for a purpose it opposes. These are potentially irreparable injuries. Beyond this, the court finds little if any potential harm from the issuance of an injunction to the FAA or, with the exception stated below, to the City.

The case is different with respect to the Park District. The Park District has embarked upon an extensive and temporally and financially integrated series of improvements to the lakefront which depend upon its plans for Northerly Island. A series of expensive and complex projects would be delayed or impaired if an injunction were to prevent work on

40

Northerly Island from going forward. Additionally, the Park District is about to issue bonds for harbor improvements at three Chicago harbors, including harbor improvements for Northerly Island. An injunction would likely halt this bond issue, since none of the plans and drawings involved in it could be implemented. In addition, were the harbor improvements not accomplished as planned by next summer, the Park District would be unable to assess its planned higher user fees, which it is depending upon to cover the bonds' debt service. The Park District and the public would be irreparably injured were the Park District's plans derailed by an injunction. Moreover, the Park District would be deprived of the use and enjoyment of an extremely unique parcel of land which it owns and wishes to utilize. The cases are legion that recognize this as significant irreparable injury.

In addition, the court believes that an injunction would cause significant irreparable injury to both the Park District and the City in another sense. The public officials who run the City and the Park District have made governance decisions which presumably are, in their view, in the public interest. The private plaintiffs and the State seek to have this court prohibit the implementation of their plans. It is this court's view that the action of a court, which erroneously interferes with the governance decisions of the people's elected representatives, causes those representatives, and the public, irreparable injury, whether or not those elected officials' view of the public interest is correct. Decisions to interfere in such matters should accordingly be made with great caution.

## The Public Interest

Both sides of this dispute have raised serious issues of the public interest. The court, for reasons stated in its discussion above of the balance of harms, believes that judicial interference with local governance decisions is, unless on firm statutory or constitutional ground, potentially very damaging to the public interest. In addition, the defendants, as well as amici, the Friends of the Park et al., have eloquently asserted the public's interest in the speedy completion of the planned public park facilities on Northerly Island.

The private parties and the State have asserted not only the public interest in the use and enjoyment of Meigs Field and in the safe, efficient and environmentally-optimal operation of the Chicago Airport system. They have also asserted the significant public interest in the policies behind NEPA. We note in addition that there is a strong public interest in having governmental officials properly carry out their statutory duties, and if the plaintiffs are right that the FAA failed in its obligations under NEPA, the public interest would favor an injunction.

In short, both sides speak eloquently for the public interest.

## CONCLUSION

The court would have been very happy to have decided this case after more deliberate preparation by the parties and more deliberate consideration by the court. But in the court's view, this case really involves primarily narrow questions of law, however

42

complex, and the public interest would be seriously disserved were the complexity of the issues responsible for any additional delay in the resolution of this controversy.

Accordingly, balancing the equities involved, the court concludes that given the serious irreparable injury an erroneous decision would cause to both sides, the key issue must be the strength of plaintiffs' showing of likelihood of success. It is the court's conclusion that plaintiffs' showing is not strong enough to justify the harm an injunction would cause to the defendants, particularly the Park District, even given the irreparable injury the plaintiffs would face were an injunction improperly denied. Accordingly, the motion for a temporary restraining order and preliminary injunction is denied.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: October  1 , 1996     nunc pro tunc September 27, 1996

43