# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RHONDA EZELL, et al, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 10-CV-5135 |
| ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, ) | |
| ) | |
| Defendant. ) | |

## BRIEF OF THE NATIONAL RIFLE ASSOCIATION
## AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS

Stephen Kolodziej
Atty. ID# 6216375
BRENNER FORD MONROE & SCOTT LTD.
33 N. Dearborn St., Suite 300
Chicago, IL 60602
(312) 781-1970

Charles J. Cooper
David H. Thompson
Jesse Panuccio
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600

*Counsel for Amicus Curiae*
*The National Rifle Association*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTEREST OF AMICUS CURIAE ..................................................................................................... 1

BACKGROUND AND SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT ........................................................................................................................................ 3

CONCLUSION .................................................................................................................................. 12

# **TABLE OF AUTHORITIES**

**Cases** **Page**

*Burdick v. Takushi*, 504 U.S. 428 (1992)..................................................................................8

*Clark v. Jeter*, 486 U.S. 456 (1988)..........................................................................................5

*D'Cruz v. BATFE*, No. 5:10-cv-140-C (N.D. Tex. filed Sept. 8, 2010) .........................................1

*D'Cruz v. McCraw*, No. 5:10-cv-141-C (N.D. Tex. filed Sept. 8, 2010) ......................................1

*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008)...................................................... *passim*

*Heller v. District of Columbia*, No. 10-7036 (D.C. Cir. appeal filed Apr. 1, 2010).........................1

*Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999)....................................................6

*McDonald v. Chicago*, 130 S. Ct. 3020 (2010) ......................................................2, 6, 7, 8, 10

*Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335
    (D.C. Cir. 1998)...................................................................................................................6

*Owner-Operator Independent Drivers, et al. v. Lindley*, No. 2:10-cv-2010
    (E.D. Cal. filed July 28, 2010).............................................................................................1

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ......................................5

*Peruta v. County of San Diego*, No. 3:09-cv-02371 (S.D. Cal. filed Oct. 23, 2009).......................1

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)..................................................8

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .................................................5

*Thompson v. Western States Medical Center*, 535 U.S. 357 (2002)..........................................8

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) ......................................................8

*Ullmann v. United States*, 350 U.S. 422 (1956)......................................................................11

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938).........................................................5

*United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009) .............................................3, 7

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)..............................................................9

*United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) .................................................3

*United States v. Skoien*, __ F.3d __, No. 08-3770, 2010 U.S. App. LEXIS 14262
    (7th Cir. July 13, 2010)..............................................................................................4, 9, 10

*United States v. Stevens*, 130 S. Ct. 1577 (2010)...................................................................9, 10

*United States v. Virginia*, 518 U.S. 515 (1996) .............................................................................10

*United States v. Williams*, __ F.3d __, No. 09-3174, 2010 U.S. App. LEXIS 16194
    (7th Cir. Aug. 5, 2010) .........................................................................................................4

*United States v. Yancey*, __ F.3d __, No. 09-1138, 2010 U.S. App. LEXIS 18442

(7th Cir. Sept. 3, 2010) ........................................................................................................ 4

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ..........................................................................................................11

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
    471 U.S. 626 (1985) ............................................................................................................6

**Other**

Municipal Code of Chicago § 8-20-110 ........................................................................................2

Municipal Code of Chicago § 8-20-120 ........................................................................................2

Municipal Code of Chicago § 8-20-280 ........................................................................................2

Municipal Code of Chicago § 8-24-010 ........................................................................................2

FEDERALIST NO. 29 .......................................................................................................................4

Letter XVIII, *Letters from the Federal Farmer to the Republic* 124 (W. Bennett ed. 1978) ..........4

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:*
    *An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443 (2009) ...............9

**INTEREST OF AMICUS CURIAE**

The NRA is America's foremost and oldest defender of Second Amendment rights. Founded in 1871, the NRA today has approximately four million members and its programs reach millions more. The NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA also collects and publishes real-life examples of citizens from all walks of life whose lawful possession of firearms enabled them to protect themselves from violent criminals. The NRA's membership includes Chicago residents.

The NRA and its members have numerous interests that will be substantially affected by the outcome of this litigation. First and foremost, the NRA's Chicago members' Second Amendment rights are directly infringed by the City's ban on firearms ranges and training. Range training allows NRA members to become proficient at the safe and effective handling of firearms. Ensuring that this Court applies the appropriate standard of review to Plaintiffs' challenge is thus critically important to the NRA and its Chicago members.

Second, the NRA and/or its members are often litigants in cases raising Second Amendment issues, and the appropriate post-*Heller* standard of review is a central feature of many, if not all, of these cases. *See, e.g.*, *Heller v. District of Columbia*, No. 10-7036 (D.C. Cir. appeal filed Apr. 1, 2010); *D'Cruz v. BATFE*, No. 5:10-cv-140-C (N.D. Tex. filed Sept. 8, 2010), *D'Cruz v. McCraw*, No. 5:10-cv-141-C, (N.D. Tex. filed Sept. 8, 2010); *Peruta v. County of San Diego*, No. 3:09-cv-02371 (S.D. Cal. filed Oct. 23, 2009); *Owner-Operator Independent Drivers, et al. v. Lindley*, No. 2:10-cv-2010 (E.D. Cal. filed July 28, 2010).

## BACKGROUND AND SUMMARY OF ARGUMENT

The Supreme Court has declared that the Second Amendment preserves the fundamental right to keep and bear arms. *See District of Columbia v. Heller*, 128 S. Ct. 2783 (2008); *McDonald v. Chicago*, 130 S. Ct. 3020 (2010). The City of Chicago has long objected to, and banned, its residents' exercise of their Second Amendment rights. In grudging acknowledgement that *Heller* and *McDonald* would require the City to do *something* about its patently unconstitutional total handgun ban, the Mayor and City Council hastily amended the City's firearms ordinances to ban *most* but not all exercise of Second Amendment rights. At issue in this case is the City's complete ban on training with a firearm. *See* Municipal Code of Chicago § 8-20-280 ("Shooting galleries, firearm ranges, or any other place where firearms are discharged are prohibited…."); *id.* § 8-24-010 ("No person shall fire or discharge any firearm within the city, except in the [sic] lawful self-defense or defense of another…."). Enactment of the law was akin to recognizing that the First Amendment prohibits a ban on books but then banning literacy. And this ban is particularly pernicious and perverse because the City *requires* a resident to obtain range training before he or she may possess, keep, or carry a firearm in the City. *Id.* §§ 8-20-110, -120. In other words, the City now conditions the right to keep and bear arms on obtaining range training but simultaneously bans range training.

The Plaintiffs—law-abiding residents of Chicago—challenge this ban as an infringement of their rights under the Second and Fourteenth Amendments. The case thus presents the question of what analytical framework lower courts should utilize in adjudicating Second Amendment challenges after *Heller* and *McDonald*. In *McDonald*, the Supreme Court specifically rebuffed Chicago's contention that Second Amendment rights are subject to "interest balancing," 130 S. Ct. at 3047 (plurality) (citing *Heller*, 128 S. Ct. at 2820-21), and informed the

City that it could no longer view the right to keep and bear arms "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *id.* at 3044. Ignoring these holdings, the City still maintains that Second Amendment rights are not to be protected by the courts with the same vigilance as other rights. Instead, the City amazingly suggests that rational basis scrutiny or interest-balancing—both of which the Supreme Court has now *twice* rejected— are the appropriate analytical frameworks in Second Amendment cases.

As demonstrated below, the question after *Heller* and *McDonald* is not whether strict scrutiny or lesser scrutiny applies to Second Amendment challenges, but whether tiers-of-scrutiny analysis should be applied instead of, or in addition to, the historically sensitive analysis employed in *Heller*. If a tiers-of-scrutiny framework is to be adopted, however, *Heller* and *McDonald* allow only for strict scrutiny.

## **ARGUMENT**

Generally, the Supreme Court reviews constitutional challenges within the familiar tiers-of-scrutiny framework, wherein laws that infringe on constitutional rights are subject to heightened scrutiny and those that do not are subject to deferential rational-basis review. In *District of Columbia v. Heller*, however, the Court eschewed levels of scrutiny in favor of a more historically sensitive analysis. *See* 128 S. Ct. 2783, 2817-18 (2008). Subsequent to *Heller* some lower courts have nonetheless proceeded to analyze Second Amendment claims under the tiers-of-scrutiny framework, and there has been some debate as to whether intermediate or strict scrutiny applies. *Compare United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009) (applying strict scrutiny), *with United States v. Miller*, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009) (applying intermediate scrutiny on theory that Second Amendment rights are not fundamental). The Seventh Circuit has reserved the question, at least with respect to all cases

3


not concerning disarmament of criminals. *See United States v. Skoien*, __ F.3d __, No. 08-3770, 2010 U.S. App. LEXIS 14262, at *11 (7th Cir. July 13, 2010) (en banc) (assuming without deciding that intermediate scrutiny applied to law banning possession by those convicted of misdemeanor crimes of domestic violence and refusing to "get more deeply into the 'levels of scrutiny' quagmire"); *United States v. Williams*, __ F.3d __, No. 09-3174, 2010 U.S. App. LEXIS 16194, at *16 (7th Cir. Aug. 5, 2010) (applying intermediate scrutiny to felon-in-possession statute "without determining that it would be the precise test applicable to all challenges to gun restrictions"); *United States v. Yancey*, __ F.3d __, No. 09-1138, 2010 U.S. App. LEXIS 18442, at *5-6 (7th Cir. Sept. 3, 2010) (applying *Skoien* "framework" to challenge to ban on firearms possession by unlawful drug user but "again reserve[ing] the question whether a different kind of firearm regulation might require a different approach").[1]

---

[1] Remarkably, it is the City's position that the Seventh Circuit's reservation implies that bans on the exercise of Second Amendment rights of law-abiding citizens should be subject to *lesser* scrutiny than bans relating to criminals. This contention turns *Heller* on its head. The Supreme Court recognized that exercise of the right to keep and bear arms by law-abiding citizens is at the very core of the Second Amendment, 128 S. Ct. at 2821, whereas bans pertaining to convicted criminals and other dangerous persons may be outside the scope of the right as a historical matter, *id.* at 2816-17.

At bottom, the City is really arguing that the right to train with a firearm—to become proficient in the "use [of] arms in defense of hearth and home," *id.* at 2821—is outside the scope of the Second Amendment. There is little to this argument. As the Supreme Court explained in *Heller*, the Second Amendment's prefatory clause, while not "suggest[ing] that preserving the militia was the only reason Americans valued the ancient right," does show that the founding generation believed that codification of the right would "prevent elimination of the militia," 128 S. Ct. at 2801, which consisted of "all males physically capable of acting in concert for the common defense," *id.* at 2799. The prefatory clause's reference to a "well-regulated militia" was thus a reference to "'the body of the people, *trained* to arms.'" *Id.* at 2800 (citing Va. Declaration of Rights § 13 (1776), in 7 Thorpe 3812, 3814) (emphasis added). *See also id.* ("the adjective 'well-regulated' implies nothing more than the imposition of proper discipline and *training*") (emphasis added). *See also* FEDERALIST NO. 29 (the federal army cannot be a threat to the people "while there is a large body of citizens, little, if at all, inferior to them in discipline and the use of arms"); Letter XVIII, *Letters from the Federal Farmer to the Republic* 124 (W. Bennett ed. 1978) ("[T]o preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them."). The founding

While *Heller* did not definitively fix the methodology for reviewing Second Amendment challenges, the debate that remains open is not between strict and intermediate scrutiny, but between strict scrutiny and the framework applied in *Heller*. In this regard, it is noteworthy that the Chief Justice, a member of the *Heller* majority, expressly suggested at oral argument in *Heller* that the inquiry into levels of scrutiny was atextual and unhelpful. *See* Tr. of Oral Argument at 44, *Heller*, 128 S. Ct. 2783. If a level-of-scrutiny analysis is to be employed in Second Amendment cases going forward, however, *Heller* and *McDonald* create no great mystery on what type of scrutiny applies.

When a law interferes with "fundamental constitutional rights," it is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973). *See also id.* at 17 (if a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution, [it] thereby requir[es] strict judicial scrutiny"); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("classifications affecting fundamental rights … are given the most exacting scrutiny"); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution"); *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938) ("There

---

generation thus clearly understood that for the right to keep and bear arms to mean anything at all, the people had to become proficient with those arms.

The same goes for the generation that incorporated the Second Amendment against the states. For example, *Heller* credited two significant constitutional treatises penned by Thomas Cooley as representative of the Reconstruction-era understanding of the right to keep and bear arms. In "his 1880 work, General Principles of Constitutional Law," Cooley explained: "'to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms.'" *Heller*, 128 S. Ct. at 2811-12 (quoting page 271). And in his "massively popular 1868 Treatise on Constitutional Limitations, Cooley explained that "'[t]he alternative to a standing army is 'a well-regulated militia,' but this cannot exist unless the people are trained to bearing arms.'" 128 S. Ct. at 2811 (quoting page 350).

5

may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments ….").[2]

*Heller* explained that Blackstone "cited the arms provision of the [English] Bill of Rights as one of the fundamental rights of Englishmen," and that "[b]y the time of the founding, the right to have arms had become fundamental for English subjects." 128 S. Ct. at 2798. And it was this fundamental "pre-existing right" that the Second Amendment "codified." *Id.* at 2797 (emphasis omitted). Thus, it is unsurprising that the Court, in *McDonald*, explained that the "decision in *Heller* points unmistakably to [an affirmative] answer" to the question of "whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty." *McDonald*, 130 S. Ct. at 3036. Indeed, *McDonald* laid to rest any doubt on this question, declaring that "the right to bear arms was fundamental to the newly formed system of government." *Id.* at 3037. *See also id.* ("This is surely powerful evidence that the right was regarded as fundamental in the sense relevant here."); *id.* at 3041 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental."); *id.* at 3042 ("In sum, it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights

---

[2] *See also Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 n.14 (1985) ("governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied"); *Hutchins v. District of Columbia*, 188 F.3d 531, 536 (D.C. Cir. 1999) ("any government impingement on a *substantive* fundamental right to free movement would be measured under a strict scrutiny standard"); *Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335, 1340 (D.C. Cir. 1998) (citing *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966), for "holding that strict scrutiny applies to classifications that burden fundamental rights").

6

necessary to our system of ordered liberty.").[3]  Accordingly, regulatory burdens on the fundamental rights secured by the Second Amendment are subject to strict scrutiny.  *See Engstrum*, 609 F. Supp. 2d at 1231-32.

This conclusion is buttressed by the fact that while the *Heller* Court did not engage in a traditional strict-scrutiny analysis, it did explicitly and definitively reject application of rational basis review[4] and also Justice Breyer's proposed "interest-balancing" approach, which was, at least implicitly, a form of intermediate scrutiny.  *See Heller*, 128 S. Ct. at 2821; *McDonald*, 130 S. Ct. at 3050 (plurality) ("[W]hile [Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion.").  Justice Breyer denominated his test "interest-balancing," rather than intermediate scrutiny, not because he was adopting a less demanding test, but because of his view that the government's interest in regulating firearms—some version of protecting the safety and lives of the public—would always be important or compelling.  Thus, in Justice Breyer's view, whether the standard of review were strict (compelling) or intermediate (important), the government interest would always be sufficient and application of the test would involve a search for the appropriate degree

---

[3] *See also id.* at 3037 ("The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights."); *id.* at 3038 n.17 ("Abolitionists and Republicans were not alone in believing that the right to keep and bear arms was a fundamental right"); *id.* at 3040 (holding that the 39th Congress's "efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental"); *id.* at 3041 ("In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection."); *id.* at 3059 (Thomas, J., concurring in part and in judgment) (agreeing that "the right to keep and bear arms … is 'fundamental' to the American 'scheme of ordered liberty.'").

[4] 128 S. Ct. at 2818 n.27 ("Obviously, the [rational basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms….  If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

7

of fit, i.e., interest-balancing. *See Heller*, 128 S. Ct. at 2851-52 ("I would simply adopt such an interest-balancing inquiry explicitly."). There is, however, no doubt that in defending his approach, Justice Breyer relied on cases such as *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997), and *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), which are undeniably intermediate scrutiny cases. *See Heller*, 128 S. Ct. at 2852 (Breyer, J., dissenting). Even more revealingly, Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Heller*, 128 S. Ct. at 2852 (Breyer, J., dissenting). That is the case on which the United States principally relied in advocating that the Court adopt intermediate scrutiny. *See* Brief of United States at 8, 24, 28, *Heller*, 128 S. Ct. 2783. Thus, Justice Breyer's interest-balancing test is nothing other than intermediate scrutiny, and the Court's rejection of that approach in *Heller* and *McDonald* forecloses this Court from adopting intermediate scrutiny in Second Amendment cases.[5]

Contrary to Justice Breyer's rejected *dissenting* suggestion, *Heller*, 128 S. Ct. at 2851 (Breyer, J., dissenting), *Heller*'s underlying logic—that the right is subject to strict scrutiny—is entirely consistent with its dictum stating that certain types of restrictions, such as possession by

---

[5] Ignoring this repeated holding, the City would have this Court adopt the interest-balancing inherent in the Supreme Court's abortion cases—the "undue burden" framework. But the Court adopted the undue-burden test in the abortion context because there are two rights at stake in such cases, not one, and thus interest-balancing is inherent in the nature of "the central holding of *Roe*" itself. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 871-72 (1992) (plurality) ("[I]t must be remembered that *Roe v. Wade* speaks with clarity in establishing not only the woman's liberty but also the State's important and legitimate interest in potential life.") (quotation marks omitted). This is why, "subsequent to viability, the State … may … regulate, and even proscribe, abortion." *Id.* at 879 (quotation marks omitted). In the Second Amendment context, however, the Supreme Court has now twice made clear that such balancing is not inherent in the nature of the right. *Heller*, 128 S. Ct. at 2821 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach…. The Second Amendment … is the very *product* of an interest-balancing by the people…."); *id.* at 2822 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."); *McDonald*, 130 S. Ct. at 3045, 3047 (plurality).

8

felons and the mentally ill, are "presumptively lawful," *Heller*, 128 S. Ct. at 2817 & n.26. First, a state's interest in prohibiting firearm possession by violent felons and the insane is self-evidently compelling. Thus, it was of no great moment that the *Heller* Court, in dicta, suggested that in future cases the government might easily prove that it considered and acted upon a compelling interest justifying these laws. This Court need not over-read "presumptively lawful" to mean more than that.

Second, the *Heller* Court may simply have been stating that based on its preliminary historical research, these laws appear to fall outside the bounds of the right as understood at the time of the Founding, with future cases and briefing available to test that proposition and refine and sharpen the precise contours of the right as understood at the Founding. *See id.* at 2821 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different. … [T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("[W]e think the better reading, based on the text and structure of *Heller*, is … that these longstanding limitations are exceptions to the right to bear arms."); *Skoien*, __ F.3d at __, 2010 U.S. App. LEXIS 14262, at *6 ("That *some* categorical limits are proper is part of the original meaning …."); *United States v. Stevens*, 130 S. Ct. 1577, 1584-86 (2010) (categories of speech not protected by First Amendment are based on historical exemptions at time of the Framing and not judicial interest balancing); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1449 (2009) ("Sometimes, a constitutional right

9

isn't violated by a restriction because the restriction is outside the terms of the right as set forth by the constitution."). Indeed, in his concurring opinion in *McDonald*, Justice Scalia specifically explained that "[t]he traditional restrictions [on the right to keep and bear arms] go to show the scope of the right, not its lack of fundamental character." *McDonald*, 130 S. Ct. at 3056 (Scalia, J., concurring). Strict scrutiny in the First Amendment context, after all, is not foreclosed by the recognition that there are reasonable limits on the scope of the right. *See United States v. Stevens*, 130 S. Ct. 1577, 1584-86 (2010).

Third, the logic behind the suggestion—that *Heller*'s recognition of "presumptively lawful" regulations precludes application of strict scrutiny—would also preclude application of intermediate scrutiny. It is rational-basis review that affords a presumption of legality to challenged regulations, putting the burden of proof on the party challenging the regulation. But intermediate scrutiny, like strict scrutiny, puts the burden on the government to justify the challenged regulation. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 519 (1996). This reality only further suggests that this dicta in *Heller* was not a coded instruction to lower courts to apply intermediate scrutiny, but rather was simply a preliminary statement of what logic and historical research might bear out in future cases. *Skoien*, __ F.3d at __, 2010 U.S. App. LEXIS 14262, at *5 ("We do not think it profitable to parse these passages of *Heller* as if they contained an answer …. They are precautionary language …. [T]he Justices have told us that the matters have been left open.");

To conclude, as some courts have in the wake of *Heller*, that Second Amendment rights deserve some lesser protection than other fundamental constitutional rights is to conclude, contrary to what *is* explicit in *Heller* and *McDonald*, that Second Amendment rights are not fundamental and exist on a lower plateau than other constitutional rights. But no enumerated

10

constitutional right is "less 'fundamental' than" others, and there is "no principled basis on which to create a hierarchy of constitutional values …." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982). "To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution." *Ullmann v. United States*, 350 U.S. 422, 428-29 (1956). Accordingly, the Court in *Heller* repeatedly treated the Second Amendment right with equal dignity to that afforded other fundamental rights. *See* 128 S. Ct. at 2791-92 (Second Amendment, like First Amendment, extends protections to instruments that were not in existence at Founding); *id.* at 2797 ("Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right"); *id.* at 2799, 2816 (Second Amendment, like other constitutional rights, has historical boundaries); *id.* at 2821 (holding that the "Second Amendment is no different" from the First Amendment, in that it was the product of interest-balancing by the People). And in *McDonald*, the Court flatly "reject[ed]" the argument "that the Second Amendment should be singled out for special—and specially unfavorable—treatment." *Id.* at 3043.. *See also id.* at 3044 (plurality) (rejecting argument that the Second Amendment right should be "treat[ed] … as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

Thus, if a level-of-scrutiny analysis is to apply, it is strict scrutiny that governs judicial review of government burdens on Second Amendment rights, as with other fundamental constitutional rights. In such cases, a reviewing court must first ask whether the challenged law burdens a right within the scope of the Second Amendment as originally understood and, if so, then whether the law serves a compelling state interest through narrowly tailored means. In any

11

event, whether this Court applies strict scrutiny or an approach more akin to *Heller* itself, there is no doubt that the flat bans at issue in this case are unconstitutional.

## **CONCLUSION**

For the foregoing reasons, Amicus respectfully submits that the Second Amendment challenge in this case should, can only, be reviewed pursuant to the framework followed in *Heller*, 128 S. Ct. 2783, or strict scrutiny.

Dated: October 1, 2010                                                     Respectfully submitted,


| | |
|---|---|
| Stephen Kolodziej | s/ Charles J. Cooper |
| Atty. ID # 6216375 | Charles J. Cooper* |
| BRENNER FORD MONROE & SCOTT LTD. | David H. Thompson* |
| 33 N. Dearborn St., Suite 300 | Jesse Panuccio* |
| Chicago, IL 60602 | COOPER & KIRK, PLLC |
| Tel: (312) 781-1970 | 1523 New Hampshire Ave., NW |
| Fax: (312)781-9202 | Washington, D.C. 20036 |
| Email: skolodziej@brennerlawfirm.com | Tel: (202) 220-9600 |
| | Fax: (202) 220-9601 |
| | Email: ccooper@cooperkirk.com |
| | |
| | *Motion for admission *pro hac vice* forthcoming |
| | |
| | *Counsel for Amicus Curiae* |
| | *The National Rifle Association* |

## **CERTIFICATE OF SERVICE**

I, Charles J. Cooper, hereby certify that on this 1st day of October, 2010, I caused a copy of the foregoing to be served by electronic filing on:

Counsel for Plaintiffs

| | |
|---|---|
| Alan Gura | David G. Sigale |
| GURA & POSSESSKY, PLLC | LAW FIRM OF DAVID G. SIGALE |
| 101 N. Columbus St. | Corporate West I |
| Suite 405 | 4300 Commerce Court, Suite 300-3 |
| Alexandria, VA 22314 | Lisle, IL 60532 |
| (703) 835-9085 | (630) 452-4547 |
| Email: alan@gurapossessky.com | dsigale@sigalelaw.com |

Counsel for Defendant

Michael A. Forti
Andrew W. Worseck
Mardell Nereim
Rebecca Alfert Hirsch
William Macy Aguiar
CITY OF CHICAGO, DEPARTMENT OF LAW
Constitutional and Commercial Litigation Division
30 N. LaSalle St., Suite 1230
Chicago, IL 60602
(312) 744-9010
mforti@cityofchicago.org
aworseck@cityofchicago.org
mnereim@cityofchicago.org
rebecca.alfert@cityofchicago.org
waguiar@cityofchicago.org

                                                      s/ Charles J. Cooper
                                                     Charles J. Cooper