04:10:16

                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION


RHONDA EZELL, et al.,              Case No. 1:10-cv-05135

   Plaintiffs,                     Chicago, Illinois
                                   September 15, 2010
        v.                         Emergency Motion for TRO

CITY OF CHICAGO,

   Defendant.
------------------------------


                          VOLUME 1
            TRANSCRIPT OF EMERGENCY MOTION FOR TRO
           BEFORE THE HONORABLE VIRGINIA M. KENDALL
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:    Gura & Possessky, PLLC
                       By:  Alan Gura
                       101 N. Columbus St., Ste. 405
                       Alexandria, VA 22314
                       (703) 835-9085

                          - and -

                       Law Firm of David G. Sigale, P.C.
                       By:  David G. Sigale
                       4300 Commerce Ct., Ste. 300-3
                       Lisle, IL 60532
                       (630) 452-4547

```
 1
 2    APPEARANCES:
 3
 4
      For the Defendant:     Chicago Corporation Counsel
 5                           By:  Andrew W. Worseck,
                                  Michael A. Forti, and
 6                                Rebecca A. Hirsch
                           30 N. LaSalle Street
 7                         Chicago, IL 60602
                           (312) 744-2784
 8
 9
      COURT REPORTER:        FEDERAL OFFICIAL COURT REPORTER
10                           April M. Metzler, RPR, CRR, FCRR
                             219 South Dearborn St., Rm. 2318-A
11                           Chicago, IL 60604
                             (312) 408-5154
12                           April_Metzler@ilnd.uscourts.gov
13
14
15
16
17
18
19
20
21
22
23
24
      Proceedings recorded by mechanical stenography; transcript
25    produced by notereading.
```

| | | |
|---|---|---|
| 04:23:49 | 1 | (Commenced at 4:23 p.m.) |
| 04:23:49 | 2 | THE CLERK: This is case 10C5153, Ezell versus City |
| 04:23:57 | 3 | of Chicago. |
| 04:23:57 | 4 | THE COURT: Folks, come on. |
| 04:24:00 | 5 | MR. GURA: Good afternoon, your Honor. Alan Gura for |
| 04:24:02 | 6 | the plaintiffs. |
| 04:24:03 | 7 | THE COURT: Good afternoon, Mr. Gura. |
| 04:24:04 | 8 | MR. GURA: I'm sorry. |
| 04:24:05 | 9 | MR. SIGALE: Good afternoon, your Honor. David |
| 04:24:06 | 10 | Sigale, S-i-g-a-l-e, on behalf of plaintiffs. |
| 04:24:08 | 11 | THE COURT: Good afternoon, Mr. Sigale. |
| 04:24:10 | 12 | MR. WORSECK: Good afternoon, your Honor. Andrew |
| 04:24:12 | 13 | Worseck for the City. |
| 04:24:13 | 14 | THE COURT: Good afternoon. |
| 04:24:13 | 15 | MS. HIRSCH: Good afternoon, your Honor. Rebecca |
| 04:24:15 | 16 | Hirsch for the City. |
| 04:24:16 | 17 | THE COURT: Good afternoon. |
| 04:24:17 | 18 | MR. FORTI: Good afternoon, your Honor. Michael |
| 04:24:18 | 19 | Forti, F-o-r-t-i, on behalf of the City. |
| 04:24:21 | 20 | THE COURT: Good afternoon, folks. |
| 04:24:22 | 21 | All right. You have a new temporary restraining |
| 04:24:27 | 22 | order request from the plaintiffs here, and I have been |
| 04:24:32 | 23 | peppered with various positions over the last few hours. |
| 04:24:37 | 24 | So let's begin with you, Mr. Gura, and what your |
| 04:24:41 | 25 | changed circumstances are that you believe merit that I should |

04:24:45  1   reconsider the denial that I entered, what, about a week ago,

04:24:49  2   right?

04:24:49  3           MR. GURA:  That's correct, your Honor.

04:24:50  4           THE COURT:  Okay.

04:24:50  5           MR. GURA:  Well, your Honor, we read the transcript

04:24:52  6   of the hearing from last time very carefully, and we tried to

04:24:55  7   address the Court's concerns very specifically.

04:24:57  8           It seemed that the Court had two concerns.  The first

04:25:01  9   concern was that the Court stated that the plaintiffs were

04:25:05  10  themselves able to and, in fact, Ms. Ezell had completed

04:25:10  11  training outside the city.  And so it seemed that their

04:25:15  12  specific individual harm, as far as the individual plaintiffs

04:25:17  13  were concerned, might not be all that imminent.

04:25:21  14          However, the Court did seem to accept the argument

04:25:26  15  that there is a great possibility owing to the City's

04:25:29  16  deadlines and the lack of range capacity in the area that

04:25:34  17  people will be losing their ability to register guns and

04:25:38  18  exercise their Second Amendment rights --

04:25:40  19          THE COURT:  Okay.  Let's just not even worry -- you

04:25:43  20  have a TRO today.

04:25:45  21          MR. GURA:  That's right.

04:25:47  22          THE COURT:  So tell me what's different that --

04:25:49  23          MR. GURA:  Sure.  The second thing is -- and the

04:25:51  24  Court's concern was that the range could not get here fast

04:25:54  25  enough.  The Court stated that the range --

04:25:55  1    THE COURT:  You're just going to do it your way and
04:25:57  2    not mine.
04:25:57  3         MR. GURA:  I'm sorry.
04:25:58  4         THE COURT:  What's changed since you were here last
04:26:00  5    time?
04:26:00  6         MR. GURA:  What's changed is we have now shown --
04:26:02  7    we've shown the Court two additional things.
04:26:03  8         THE COURT:  Okay.
04:26:03  9         MR. GURA:  First, we have testimony from Mr. Queen,
04:26:07  10   who is a local state certified firearms instructor.  And
04:26:12  11   Mr. Queen, not really the plaintiffs now, is testifying that
04:26:16  12   in his business he is unable to serve customers.  People are
04:26:19  13   being turned away.  And he is actually being locked out of the
04:26:23  14   local suburban ranges.  He is unable to provide the service
04:26:26  15   because of the lack of range training facilities.
04:26:29  16        In fact, we did not seek out Mr. Queen.  Mr. Queen
04:26:34  17   sought us out.  He called us up, because he received a
04:26:36  18   deposition notice from the defendant and said, Hey, this is a
04:26:39  19   great idea.  I was thinking of bringing in a range myself.
04:26:44  20   Can I use yours?
04:26:46  21        THE COURT:  Okay.  Let's cite for me to the -- you
04:26:46  22   know, you've given me five inches of materials in the last 24
04:26:49  23   hours --
04:26:50  24        MR. GURA:  Sure.  Mr. Queen has a very brief
04:26:52  25   declaration.

| | | |
|---|---|---|
| 04:26:53 | 1 | THE COURT: And it is? |
| 04:26:55 | 2 | MR. GURA: And ... |
| 04:26:55 | 3 | THE COURT: Where is it in the filings? |
| 04:26:58 | 4 | MR. GURA: It is something that was filed |
| 04:27:00 | 5 | yesterday -- |
| 04:27:00 | 6 | THE COURT: Separately? |
| 04:27:02 | 7 | MR. GURA: It was linked to the -- I did bring a |
| 04:27:06 | 8 | paper courtesy copies to the Court the other day as well. |
| 04:27:09 | 9 | THE COURT: Right. I have read everything. Now, who |
| 04:27:11 | 10 | gave me the tabbed copy? Is that the City? |
| 04:27:14 | 11 | MR. WORSECK: Those are our exhibits that -- |
| 04:27:15 | 12 | THE COURT: Okay. These are the defendant's |
| 04:27:17 | 13 | exhibits. So I need some direction to find the statement of |
| 04:27:21 | 14 | Mr. Queen, which I've read and I want to refer to. |
| 04:27:24 | 15 | MR. GURA: Sure. Great. |
| 04:27:26 | 16 | And I believe it was in paragraphs 3 that he was -- |
| 04:27:30 | 17 | well, let me get it myself, your Honor. |
| 04:27:33 | 18 | MR. SIGALE: Your Honor, if I may. It's document |
| 04:27:37 | 19 | 25-2, attached to the motion for temporary restraining order |
| 04:27:42 | 20 | that was filed on September 13th. |
| 04:27:44 | 21 | THE COURT: Okay. |
| 04:27:50 | 22 | MR. GURA: And, your Honor -- oh ... |
| 04:27:57 | 23 | THE COURT: Got it. |
| 04:27:58 | 24 | MR. GURA: Okay. |
| 04:27:58 | 25 | THE COURT: Okay. |

| | | |
|---|---|---|
| 04:28:00 | 1 | MR. GURA: And we see here in the third paragraph |
| 04:28:08 | 2 | Mr. Queen testifies that his ability to provide range training |
| 04:28:12 | 3 | is limited, because of the shortage of range capacity. |
| 04:28:16 | 4 | He then further testifies in paragraph 4 of the |
| 04:28:18 | 5 | declaration, the lack of adequate range facilities costs us |
| 04:28:21 | 6 | customers, both because there is simply not enough range |
| 04:28:25 | 7 | time to take on the students we can serve and because the cost |
| 04:28:27 | 8 | and time associated with using the ranges that are available |
| 04:28:30 | 9 | discourages customers. |
| 04:28:31 | 10 | THE COURT: Right. Which is all interesting, but not |
| 04:28:34 | 11 | really going to the heart of the issue. Whether he is not |
| 04:28:38 | 12 | being permitted to be a firearms instructor at a suburban |
| 04:28:44 | 13 | facility is really a loss of -- I'm not even sure what it is, |
| 04:28:48 | 14 | whether he's been discriminated against or not being allowed |
| 04:28:51 | 15 | to shoot at a suburban range. |
| 04:28:53 | 16 | That's different from whether others are not able to |
| 04:28:56 | 17 | possess a firearm, because they haven't been able to go to the |
| 04:29:01 | 18 | firing range. And the second one, the fact that the suburban |
| 04:29:07 | 19 | ranges are making money and maybe even increasing -- sounds |
| 04:29:10 | 20 | like maybe a bit of capitalism going on -- but it doesn't |
| 04:29:13 | 21 | sound to me like that impacts the analysis -- |
| 04:29:16 | 22 | MR. GURA: Your Honor -- |
| 04:29:17 | 23 | THE COURT: -- to -- |
| 04:29:18 | 24 | MR. GURA: -- impact the analysis. The injury here |
| 04:29:20 | 25 | is not the injury to Mr. Queen's business. The injury is to |

| | |
|---|---|
| 04:29:23 | 1 |
| 04:29:25 | 2 |
| 04:29:28 | 3 |
| 04:29:30 | 4 |
| 04:29:33 | 5 |
| 04:29:37 | 6 |
| 04:29:38 | 7 |
| 04:29:40 | 8 |
| 04:29:43 | 9 |
| 04:29:45 | 10 |
| 04:29:47 | 11 |
| 04:29:50 | 12 |
| 04:29:53 | 13 |
| 04:29:57 | 14 |
| 04:30:02 | 15 |
| 04:30:04 | 16 |
| 04:30:07 | 17 |
| 04:30:11 | 18 |
| 04:30:14 | 19 |
| 04:30:19 | 20 |
| 04:30:22 | 21 |
| 04:30:23 | 22 |
| 04:30:24 | 23 |
| 04:30:27 | 24 |
| 04:30:31 | 25 |

1  his customers who are discouraged.

2       As the Supreme Court found in the Carey versus

3  Population Services case that we cited --

4       THE COURT:  Why are his customers discouraged?

5  Because he comes back and says, I can't train you because I

6  don't have a facility.

7       MR. GURA:  Well, then they know it's not available.

8  And also when you increase the --

9       THE COURT:  But they could go to the facility where

10  he was just turned down to teach, right?

11       MR. GURA:  Mr. Queen also testified that it's the

12  time associated with using those ranges, the distance, the

13  extra cost.  The Supreme Court has found before in the Carey

14  versus Population Services case that we cited that when you

15  restrict access to something that's constitutionally

16  protected, you inhibit price competition.  You cause people to

17  be frustrated in their ability to choose to exercise that

18  right.  And so it's not the injury to Fidelity's business.

19  It's the injury to the people who would but for the difficulty

20  in obtaining this product use the product which is, in fact,

21  constitutionally protected.

22       THE COURT:  But I think that's a different case.

23  That's not the case that we have.  We're not -- you filed a

24  case saying, People can't possess because they can't get their

25  firing range training done.

04:30:33  1    But Mr. Queen's case is, I'm being limited in my

04:30:38  2  business because I can't access the ranges and I'd like to

04:30:43  3  teach students.  But he couldn't teach students before in the

04:30:45  4  city, so now he's going to have to prove a loss of business

04:30:49  5  and he's also going to have to show that somehow because they

04:30:53  6  are charging his students more that they are harmed.  But

04:30:57  7  that's also -- he doesn't have standing to do that, so --

04:31:02  8    MR. GURA:  Well, your Honor, typically in abortion

04:31:02  9  cases it's the doctors who are suing.  In First Amendment

04:31:06  10  cases it's the newspapers and bookstores who are suing, not

04:31:08  11  the people who read and consume and obtain the services.

04:31:12  12    And what he is simply saying is, Look, there are

04:31:12  13  people out there who want to do this --

04:31:14  14    THE COURT:  But he still has to have standing.

04:31:16  15    MR. GURA:  He is not suing.  What he is doing, he's

04:31:18  16  describing the harm that the public is experiencing.

04:31:20  17    THE COURT:  Right.  But it's not the harm that you

04:31:22  18  charged in your TRO.  It's a different harm.

04:31:24  19    MR. GURA:  It is, because if -- the other thing that

04:31:26  20  we submitted, in connection with our TRO, we've submitted new

04:31:30  21  declarations from Julian Versnel and Richard Pearson --

04:31:33  22    THE COURT:  Okay.

04:31:34  23    MR. GURA:  -- who are respectively --

04:31:36  24    THE COURT:  Okay.  Let's talk about Mr. Pearson's

04:31:38  25  first.

|   |   |
|---|---|
| 04:31:38 | 1 |
| 04:31:41 | 2 |
| 04:31:44 | 3 |
| 04:31:47 | 4 |
| 04:31:50 | 5 |
| 04:31:52 | 6 |
| 04:31:56 | 7 |
| 04:32:00 | 8 |
| 04:32:02 | 9 |
| 04:32:05 | 10 |
| 04:32:07 | 11 |
| 04:32:09 | 12 |
| 04:32:12 | 13 |
| 04:32:16 | 14 |
| 04:32:18 | 15 |
| 04:32:23 | 16 |
| 04:32:23 | 17 |
| 04:32:26 | 18 |
| 04:32:29 | 19 |
| 04:32:31 | 20 |
| 04:32:34 | 21 |
| 04:32:36 | 22 |
| 04:32:38 | 23 |
| 04:32:38 | 24 |
| 04:32:38 | 25 |

MR. GURA: Well, there are only two very -- there are very specific narrow small facts in there, and that is they are declaring to the number of members that they have in the City of Chicago. And if we assume a complete overlap of the membership of these two organizations, we're talking about 1700 people out there who can be expected to lose their ability to register firearms, if they are currently possessed, by October 12th. And if they were previously registered throughout the year, an average of five -- almost five people a day who are members and supporters of our --

THE COURT: Well, you could be a member of the association and not be a possessor of a weapon that hasn't been approved, right? So -- or even a possessor of a weapon, you could be a member and not even possess. So this declaration doesn't tell me how many members have not been certified, right?

MR. GURA: The declaration states that there was approximately -- we know -- and by the way, not everyone who wants to exercise this right is going to be a member of the plaintiff organizations. But we do know --

THE COURT: Wait. Say that again. Everyone who wants to exercise his right is not going to be a member.

MR. GURA: Well, no, there are many people in Chicago --

THE COURT: Oh, sure, that makes sense.

| | |
|---|---|
| 04:32:40 | 1 |
| 04:32:42 | 2 |

04:32:40    1    MR. GURA: -- join our groups just because they want

04:32:42    2    to exercise the right to keep and bear arms.

04:32:45    3    THE COURT: Oh, you're making an assumption that if

04:32:47    4    you're a member of the NRA, you possess.

04:32:50    5    MR. GURA: Well, I don't represent the NRA, but what

04:32:53    6    I am saying is it's not an assumption --

04:32:53    7    THE COURT: Oh, I'm sorry, of the ISRA, that you

04:32:57    8    possess.

04:32:58    9    MR. GURA: It's not an assumption. There's testimony

04:33:01    10    from the people who run the organizations who say, Look, we're

04:33:04    11    the Second Amendment Foundation, we're the Illinois State

04:33:07    12    Rifle Association, the people who join our groups are gun

04:33:10    13    owners --

04:33:10    14    THE COURT: Okay. Makes sense. But of those gun

04:33:14    15    owners which ones have not been certified?

04:33:15    16    MR. GURA: Well, we have -- we do know that all of

04:33:19    17    them require range training effective July 12th and by

04:33:25    18    July 12th of next year.

04:33:26    19    THE COURT: Yes, but what if 95 percent of them

04:33:29    20    completed it already?

04:33:29    21    MR. GURA: We still have the ability to represent the

04:33:31    22    interest, the representational standing of the other

04:33:33    23    5 percent.

04:33:34    24    THE COURT: Okay. But then that may be a few hundred

04:33:37    25    people in the next few -- it's just all conjecture right now.

04:33:40 1    MR. GURA:  Well, what's not conjecture is this.

04:33:44 2  There are definitely people out there who are seeking to obey

04:33:47 3  the city's laws and to register their firearms.

04:33:49 4    THE COURT:  I hope so.

04:33:50 5    MR. GURA:  They definitely want to.  We're not -- and

04:33:53 6  this is -- you know, there are comments in the brief that was

04:33:55 7  filed at 315 that, Well, this is about gang members with guns.

04:33:58 8  And I've heard the same thing in the McDonald case.  None of

04:34:02 9  members are gang members.  Okay.  Gang members are not

04:34:04 10  interested in complying with the law --

04:34:05 11    THE COURT:  I don't think that we have that issue

04:34:06 12  here.  I don't think the gang issue is the issue for this

04:34:10 13  case.  It may be a different case, but not the one before me.

04:34:12 14    MR. GURA:  That's right.  I was just responding to

04:34:15 15  the other side's allegations.

04:34:16 16    But what's important is this.  We know that people

04:34:22 17  out there are trying to comply with the law.

04:34:23 18    THE COURT:  Okay.

04:34:23 19    MR. GURA:  They are struggling to do so, because the

04:34:26 20  City has taken the entire surface area of Chicago, 231 square

04:34:30 21  miles, and said, This is a range-free zone.  That causes a

04:34:35 22  lack of price competition.  It causes range time to be in

04:34:38 23  short supply.  It causes --

04:34:40 24    THE COURT:  That was not part of the TRO, a lack of

04:34:43 25  price competition --

| | |
|---|---|
| 04:34:44 | 1 |
| 04:34:45 | 2 |
| 04:34:48 | 3 |
| 04:34:49 | 4 |
| 04:34:52 | 5 |
| 04:34:56 | 6 |
| 04:34:59 | 7 |
| 04:35:04 | 8 |
| 04:35:07 | 9 |
| 04:35:12 | 10 |
| 04:35:13 | 11 |
| 04:35:15 | 12 |
| 04:35:16 | 13 |
| 04:35:19 | 14 |
| 04:35:20 | 15 |
| 04:35:20 | 16 |
| 04:35:21 | 17 |
| 04:35:26 | 18 |
| 04:35:29 | 19 |
| 04:35:32 | 20 |
| 04:35:35 | 21 |
| 04:35:38 | 22 |
| 04:35:42 | 23 |
| 04:35:46 | 24 |
| 04:35:49 | 25 |

MR. GURA:  Well, I'm saying --

THE COURT:  I mean, it may, and Mr. -- the first one.

MR. GURA:  -- is harming --

THE COURT:  Mr. Queen may have that issue now.  But your issue is Second Amendment right is being impinged, because they cannot possess if they cannot get certified.  And the harm is, I can't possess my weapon.  And you said it was linked to the core value of possession, and that if I can't certify in Chicago, I can't possess in Chicago, and, therefore, violates the Constitution.

MR. GURA:  That's right.  And we're simply showing that there's a shortage.

THE COURT:  Okay.  So let's go to Ms. Versnel's declaration.

MR. GURA:  Sure.

THE COURT:  That's another new one.

MR. GURA:  And, again, I only cited the important new facts in that declaration -- well, for this issue -- is simply the membership numbers of the Second Amendment Foundation. Look, we do have actual people here who are trying to comply. And these are the people who need -- you know, it's not so much about whether Mr. Brown could do it or whether Mr. Hespen can do it or whether Ms. Ezell can do it.  It's whether if you list another thousand, 2,000-odd names whether they could all do it in time.

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

04:35:51   1      THE COURT:  But do you have to have someone who has

04:35:53   2   standing over individuals.  So there is one interesting fact

04:35:56   3   change that concerns the Court are the ones who have actually

04:35:58   4   gotten their certification.

04:36:00   5      So if I read it correctly, it sounds like everybody's

04:36:05   6   received their certification except one; is that correct?

04:36:08   7      MR. GURA:  No.  Actually, to my knowledge, the only

04:36:11   8   individual named plaintiff who's received the certification so

04:36:14   9   far is Ms. Ezell.  I don't believe that Mr. Brown or

04:36:18  10   Mr. Hespen have yet accomplished this.  They are hoping to be

04:36:22  11   able to use the facilities that we're bringing to Chicago for

04:36:26  12   that purpose.

04:36:26  13      THE COURT:  And what's their reason for not being

04:36:29  14   able to travel outside, other than that they don't think they

04:36:31  15   should have to?  What's the hardship of traveling outside of

04:36:34  16   the boundary?

04:36:35  17      MR. GURA:  Well, the hardship, as it is recognized by

04:36:37  18   the Supreme Court repeatedly in cases that we've cited, is

04:36:40  19   that when a person has a constitutional right to do something,

04:36:42  20   they cannot be asked to exercise it somewhere else.

04:36:46  21      THE COURT:  Well, they can, of course, in the First

04:36:48  22   Amendment setting in and many First Amendment settings, you

04:36:51  23   have reasonable time, place, and manner restrictions.  So if

04:36:53  24   you have a constitutional right, you know, we are going back

04:36:55  25   to our core issue and whether or not the training is linked to

| | |
|---|---|
| 04:37:02 | 1 |

the core value of possession within your home, which is the

one that the Constitution has -- excuse me -- the Supreme

Court has recognized.  That's the core one that's been

recognized.

MR. GURA:  Yes, but --

THE COURT:  You know, we -- I just get frustrated

with always jumping to broader statements that I don't think

are accurate statements of constitutional law, let alone this

case.

MR. GURA:  Well, here's what the Supreme Court has

said -- actually, this is the -- this is Palmetto Props versus

County of DuPage, a Northern District of Illinois case, we

cited.  It's on page -- starts at the bottom of page 9 into

page 10 of our brief.  And I'll quote:  It is not sufficient

to say -- this is a First Amendment context, but I think it

works for the Second Amendment or any other right as well --

it is not sufficient to say that neighboring communities

permit the type of speech that the challenged ordinance bans.

The Government may not simply point to neighboring communities

that permit the speech as a defense to the ordinance that bans

that type of speech from its jurisdiction.  And then it cites

a number of Supreme Court cases, and I'll quote --

THE COURT:  But that's the problem, because they

haven't banned your right to possess.  They can possess in

their home.  They have banned the right to get certified.

04:38:09  1      MR. GURA:  Okay.

04:38:09  2      THE COURT:  And that's why we have to keep going back

04:38:12  3  to -- well, they haven't even banned the right to get

04:38:15  4  certified.  They say, You must get certified.  They just

04:38:15  5  aren't making it happen.  They are not allowing you to get

04:38:19  6  certified within their boarders.

04:38:20  7      So, you know, just to mush it all together and say

04:38:23  8  banning First Amendment rights or banning Second Amendment

04:38:26  9  rights, let's get really specific.  Is there a case out there,

04:38:29  10  a case out there that links certification or any type of

04:38:36  11  affiliation of your possession to the core value?  Because --

04:38:40  12      MR. GURA:  Yes.

04:38:40  13      THE COURT:  -- every case I find is whether you are a

04:38:43  14  drug addict and you're limited, whether you are a mentally ill

04:38:48  15  person and you are limited, whether you are someone who has

04:38:51  16  been convicted of a felony and you're limited.

04:38:53  17      But those are all regarding the individual status and

04:38:58  18  whether that Second Amendment can apply due to that status.

04:39:02  19  And I haven't found something analogous.  Can you give me that

04:39:05  20  analogy?

04:39:07  21      MR. GURA:  Yes.  There's a wonderful case, D.C.

04:39:10  22  versus Heller, and Heller states -- and I'm quoting here, and

04:39:12  23  this is an internal quote quoting another source, but it is a

04:39:16  24  part of the case, that people who practice in safe places the

04:39:19  25  use of their guns are exercising the constitutional right to

04:39:22  1    keep and bear arms.  And that -- and I think it's fairly plain

04:39:26  2    that if you have the right to a gun -- and clearly the Second

04:39:31  3    Amendment secures the right to have arms to some people --

04:39:33  4         THE COURT:  But couldn't we say -- let's analogize

04:39:35  5    that statement to First Amendment.

04:39:38  6         MR. GURA:  Sure.

04:39:38  7         THE COURT:  People who are practicing their First

04:39:41  8    Amendment rights in a public place are exercising their First

04:39:46  9    Amendment right to speak publicly on an issue.  I mean, can't

04:39:48  10   we just say the same thing?  And we still have, in the First

04:39:52  11   Amendment context, certain ability to limit the time, place,

04:39:57  12   manner of certain types of speech and where they are taking

04:40:01  13   place.

04:40:01  14        So we have to keep coming back to, what Court has

04:40:07  15   said that the training certification or something like the

04:40:12  16   training certification is core to the possession?  Isn't that

04:40:16  17   the issue here?

04:40:17  18        MR. GURA:  Well, the problem, your Honor, is that the

04:40:19  19   training requirement is unique to Chicago.

04:40:22  20        THE COURT:  Right.

04:40:22  21        MR. GURA:  It's not something that we're going to

04:40:23  22   have a lot of precedent on --

04:40:25  23        THE COURT:  I understand that, yes.

04:40:26  24        MR. GURA:  Chicago is very proud of one thing, and

04:40:29  25   they have been very up front about it.  They are very happy to

04:40:33  1  explain to this Court and anyone else that they have the

04:40:35  2  strictest most impossible law in the country, and this is a

04:40:39  3  part of it.  And this is purely a mechanism -- this is massive

04:40:42  4  resistance.  There's no other word for it.

04:40:44  5       This is their argument with Heller.  This is their

04:40:47  6  argument with McDonald.  This is the way they are going to

04:40:50  7  frustrate and get in the way of people exercising their

04:40:52  8  rights.  They are going to come up with a requirement that

04:40:54  9  people have a difficult time complying with.  And we know in

04:40:56  10  the abortion context undue burdens are struck down.  In the

04:40:58  11  First Amendment context, if you place -- also, it's not called

04:41:01  12  undue burdens.  When you take a constitutional right and you

04:41:05  13  frustrate it, you don't quite ban it, but you play games and

04:41:08  14  make it difficult for people to exercise, the Supreme Court

04:41:10  15  will say, Enough.  It fails some local scrutiny, at the very

04:41:14  16  least -- of course, we claim that -- I'm not going to get into

04:41:15  17  our earlier argument, because the Court doesn't want to hear

04:41:18  18  it and that's fine.

04:41:19  19       But --

04:41:20  20       THE COURT:  Well, it's all part of the record.  I

04:41:21  21  have it.

04:41:22  22       MR. GURA:  There is some level of review.  According

04:41:24  23  to the Court, it would be intermediate scrutiny.  We accept

04:41:26  24  that for purposes of this argument, because we would win under

04:41:30  25  intermediate scrutiny, which requires a strong showing, an

04:41:32   1    actual strong showing there's an important, a substantial

04:41:36   2    governmental interest and that this law is related to that

04:41:40   3    interest.

04:41:40   4          Now, we haven't had any showing, let alone a strong

04:41:43   5    one, that it's okay to require everyone to get training and

04:41:46   6    then ban the training.  That simply makes absolutely no sense.

04:41:49   7          The closest analogy that we can find -- and we are in

04:41:52   8    a new -- well, it's not a new constitutional provision, but

04:41:55   9    it's new to the Courts wrestling with it, is City of Renton

04:42:00  10    versus Playtime Theaters.

04:42:01  11          And this is something that is extremely

04:42:04  12    well-established.  In the First Amendment context, we know

04:42:07  13    that pornographic establishments have secondary effects.  The

04:42:11  14    Courts consider what they sell to people to be protected by

04:42:14  15    the First Amendment, but it also tends to impact the

04:42:17  16    neighborhood around -- by the way, in a way that gun ranges do

04:42:20  17    not.

04:42:20  18          So how do the Courts wrestle with this?  The Court in

04:42:24  19    City of Renton said, The Government can regulate the secondary

04:42:28  20    effects of these places.  They can restrict where they are

04:42:31  21    located.  They can bunch them all together.  They can cause

04:42:33  22    them to be disbursed.  They can do all kinds of things.  But

04:42:36  23    there's one thing that the Government cannot do.  They can't

04:42:39  24    ban all of them.

04:42:40  25          And so all these cases, all these adult zoning cases

| | | |
|---|---|---|
| 04:42:44 | 1 | always come down to this one question -- |
| 04:42:46 | 2 | THE COURT:  But doesn't banning all of them ban the |
| 04:42:49 | 3 | possession of adult pornography within the boundary? |
| 04:42:51 | 4 | MR. GURA:  Yes, it does.  And banning all gun range |
| 04:42:53 | 5 | training -- well, it doesn't ban possession, because |
| 04:42:55 | 6 | presumably you can go buy it somewhere else. |
| 04:42:57 | 7 | But the Supreme Court said, That's not enough.  You |
| 04:42:59 | 8 | have to let these people operate within your city somewhere. |
| 04:43:03 | 9 | And here we have an activity, which is |
| 04:43:05 | 10 | constitutionally protected.  It is claimed to have all kinds |
| 04:43:09 | 11 | of these nefarious imagined secondary effects, which it does |
| 04:43:12 | 12 | not.  But that's a different issue for a different case. |
| 04:43:14 | 13 | Nonetheless, even if it's true, you must allow it to |
| 04:43:19 | 14 | operate somewhere, and here they're not allowed to operate |
| 04:43:21 | 15 | anywhere. |
| 04:43:22 | 16 | If we were talking about -- |
| 04:43:23 | 17 | THE COURT:  Okay.  Let's stop for just a second, |
| 04:43:25 | 18 | okay, because you're doing the same argument that I listened |
| 04:43:28 | 19 | to a week ago, and let's go back again. |
| 04:43:31 | 20 | Is there anything other -- any other fact that has |
| 04:43:35 | 21 | changed since we addressed this? |
| 04:43:36 | 22 | MR. GURA:  Yes. |
| 04:43:37 | 23 | THE COURT:  Because, as you know, I am desperately |
| 04:43:39 | 24 | awaiting your preliminary injunction materials. |
| 04:43:42 | 25 | MR. GURA:  Good. |

| | |
|---|---|
| 04:43:43 | 1 |
| 04:43:45 | 2 |
| 04:43:49 | 3 |
| 04:43:52 | 4 |
| 04:43:57 | 5 |

04:43:43    1    THE COURT:  So I would rather be looking at this, as
04:43:45    2    a judge would like to look at it, with all of the facts and
04:43:49    3    all of the law in front of me than having another rush to the
04:43:52    4    courthouse and another pile of paper to decide on an emergency
04:43:57    5    basis.
04:43:57    6            MR. GURA:  Sure.
04:43:57    7            THE COURT:  So what's the emergency that changed?
04:43:59    8            MR. GURA:  The emergency is this, your Honor, and
04:44:00    9    this is something that's changed absolutely.  The Court last
04:44:03   10    time was concerned that the plans to bring the range were too
04:44:06   11    distant and not sufficiently well-established --
04:44:08   12            THE COURT:  Well, no.  That they were established, I
04:44:11   13    think, that you informed me, and I took for granted that that
04:44:16   14    was accurate that it was coming in at the end of September.
04:44:17   15    And now I guess it's earlier.  Is that right?
04:44:19   16            MR. GURA:  It is coming now on September 24th.  It is
04:44:22   17    going to be here, and it's going to be operating and it's
04:44:25   18    going to be training people.  So it's really very simple.  On
04:44:27   19    September 24th we can save the rights of at least 24 people in
04:44:31   20    an eight-hour day, probably more.
04:44:33   21            THE COURT:  Okay.
04:44:34   22            MR. GURA:  And if we don't get the injunctive relief,
04:44:36   23    we will not save those people's rights.  It's that simple.
04:44:39   24            THE COURT:  All right.  Let me hear from the other
04:44:40   25    side now.  Okay.  Who wants to pick up the ball first.

| | | |
|---|---|---|
| 04:44:43 | 1 | MR. WORSECK:  I'll pick it up, your Honor. |
| 04:44:44 | 2 | THE COURT:  Okay. |
| 04:44:44 | 3 | MR. WORSECK:  To answer your question, nothing |
| 04:44:47 | 4 | material to the issues before you has changed since the last |
| 04:44:50 | 5 | TRO was filed.  Most critically nothing has changed with |
| 04:44:54 | 6 | respect to the fact that none of these plaintiffs have |
| 04:44:57 | 7 | demonstrated irreparable harm. |
| 04:44:59 | 8 | The declarations they submitted last time on their |
| 04:45:02 | 9 | face established that they did not have irreparable harm and |
| 04:45:05 | 10 | we have since deposed them, and those depositions have merely |
| 04:45:08 | 11 | confirmed what was clear at the outset, that they have no |
| 04:45:11 | 12 | irreparable harm. |
| 04:45:12 | 13 | These individual plaintiffs are quite able to go to |
| 04:45:15 | 14 | the suburbs.  Plaintiff Brown goes 250 times a year to ranges |
| 04:45:19 | 15 | in the suburbs. |
| 04:45:20 | 16 | Plaintiff -- |
| 04:45:21 | 17 | THE COURT:  But should he have to -- should they have |
| 04:45:24 | 18 | to go to the suburbs? |
| 04:45:25 | 19 | MR. WORSECK:  Well, the issue of irreparable harm is |
| 04:45:27 | 20 | whether or not they can do it for purposes of -- |
| 04:45:30 | 21 | THE COURT:  Well, what about the <u>Renton versus</u> |
| 04:45:32 | 22 | <u>Playtime</u> case?  The sense that there is no place to view your |
| 04:45:36 | 23 | adult pornography protected by the First Amendment.  You have |
| 04:45:40 | 24 | essentially impinged upon that core value of the First |
| 04:45:44 | 25 | Amendment. |

| | | |
|---|---|---|
| 04:45:44 | 1 | MR. WORSECK:  With respect to adult establishments in |
| 04:45:48 | 2 | the First Amendment, there has been a determination that that |
| 04:45:49 | 3 | activity is protected by the First Amendment. |
| 04:45:51 | 4 | This question -- excuse me.  This case presents that |
| 04:45:54 | 5 | very question.  Is the conduct protected by the constitutional |
| 04:45:58 | 6 | provision at issue?  Does the Second Amendment protect a right |
| 04:46:01 | 7 | to operate gun ranges or to visit gun ranges?  So that |
| 04:46:05 | 8 | question is the merits issue before you.  It has nothing to do |
| 04:46:10 | 9 | with the irreparable harm question. |
| 04:46:11 | 10 | THE COURT:  And when is it to be fully briefed before |
| 04:46:13 | 11 | me? |
| 04:46:13 | 12 | (No response.) |
| 04:46:15 | 13 | THE COURT:  The preliminary injunction, when is it |
| 04:46:17 | 14 | fully briefed? |
| 04:46:18 | 15 | MR. WORSECK:  Our -- |
| 04:46:19 | 16 | MR. FORTI:  Well, your Honor, if I can speak to that. |
| 04:46:22 | 17 | In another paper that we filed with you -- |
| 04:46:24 | 18 | THE COURT:  You want to move it over to Judge Guzman |
| 04:46:27 | 19 | as related or -- |
| 04:46:27 | 20 | MR. FORTI:  No, apart from that -- |
| 04:46:28 | 21 | THE COURT:  Okay. |
| 04:46:28 | 22 | MR. FORTI:  -- we are making the argument that given |
| 04:46:30 | 23 | plaintiff is now having his second bite of the apple, and |
| 04:46:34 | 24 | we've explained depending on how this Court rules on the TRO, |
| 04:46:37 | 25 | there's no reason to keep to the October 1st date, and we've |

04:46:40  1  laid that out.

04:46:41  2      We would ask the Court if it decides that a third

04:46:44  3  bite of the apple is appropriate for Mr. Gura's plaintiffs

04:46:47  4  that we have more time to, in an expeditious way, finish

04:46:51  5  discovery that has been forced in a very tight frame --

04:46:54  6      THE COURT:  Well, it's forced because of this

04:46:57  7  deadline of this truck.  And all I'm trying to do is get the

04:47:01  8  issue before me in a manner where I can, with the facts and

04:47:05  9  the law, decide it.

04:47:06  10      And I frankly feel a bit derailed doing that having

04:47:11  11  to turn once again to what appears to me to be a reheated

04:47:15  12  argument as opposed to new facts.

04:47:17  13      MR. FORTI:  Well, your Honor --

04:47:18  14      THE COURT:  I mean, it could have been maybe even

04:47:20  15  filed as a notice of changed circumstances or a motion to

04:47:24  16  expedite the briefing schedule, or something, rather than a

04:47:28  17  brand new TRO based upon one gun trainer who says, He's losing

04:47:35  18  business and a statement that we have lots of members, both of

04:47:38  19  which seem pretty obvious.  And then, finally, a new date for

04:47:43  20  the truck coming in.

04:47:44  21      MR. GURA:  Well, your Honor, it seemed to me that

04:47:46  22  last time the Court repeatedly advised us that the TRO was not

04:47:51  23  without prejudice.  I was repeatedly advised we could try

04:47:54  24  again as we got close to mid-September.  And we do have more

04:47:57  25  concrete facts about the truck now, which is arriving on

| | | |
|---|---|---|
| 04:48:00 | 1 | September 24th.  I'm not sure how we could get relief from the |
| 04:48:03 | 2 | Court before September 24th without seeking the TRO, because |
| 04:48:05 | 3 | the preliminary injunction is set for October 1st. |
| 04:48:07 | 4 | THE COURT:  Go ahead. |
| 04:48:09 | 5 | MR. GURA:  And -- |
| 04:48:10 | 6 | THE COURT:  No, it's his turn. |
| 04:48:11 | 7 | MR. FORTI:  Well, your Honor, let me go back to my |
| 04:48:13 | 8 | colleague.  But I want to say something just following up on |
| 04:48:16 | 9 | something Mr. Worseck said, again, in perhaps plainer |
| 04:48:18 | 10 | language.  And, that is, the City of Renton and the First |
| 04:48:22 | 11 | Amendment cases, that's because adult use is the essential |
| 04:48:25 | 12 | part of the First Amendment.  And as you have pointed out |
| 04:48:27 | 13 | quite nicely, one of the issues you're grappling with, since |
| 04:48:31 | 14 | the decision in Heller and McDonald, is what is the core part? |
| 04:48:34 | 15 | Plaintiff would like you to assume that operating |
| 04:48:37 | 16 | ranges is an integral part of the Second Amendment.  No Court |
| 04:48:40 | 17 | has held that.  So the City of Renton case and other First |
| 04:48:45 | 18 | Amendment cases that talk about adult use are really quite far |
| 04:48:47 | 19 | afield, because it's very well established that adult use is |
| 04:48:51 | 20 | an integral part, although albeit on the infringe, I think, |
| 04:48:55 | 21 | some Supreme Court cases say, but it's an integral part.  So |
| 04:48:59 | 22 | their banning adult uses is completely different than banning |
| 04:49:03 | 23 | of the firearms. |
| 04:49:04 | 24 | THE COURT:  How so?  Can you distinguish it for me? |
| 04:49:07 | 25 | MR. FORTI:  I think I can, your Honor.  Because in |

04:49:09  1   the City of Renton the focus is whether or not adult activity,

04:49:11  2   which is, as we all know, sort of a euphemism for what goes on

04:49:16  3   in most likely a gentlemen's club.  And the Court has held

04:49:20  4   that expressive dancing is at the fringes of the First

04:49:26  5   Amendment, because the dancing is a manifestation of someone's

04:49:29  6   sense of their body and perhaps played to music.

04:49:32  7          And the Supreme Court has said repeatedly, you know,

04:49:34  8   Some of us may not like that, but that itself is protected

04:49:39  9   speech, the actual dancing.

04:49:40  10         So if a municipality, like the City of Renton,

04:49:45  11  decides, We're going to have a complete ban over all adult

04:49:49  12  use, which is the essential part of the First Amendment, it

04:49:52  13  makes imminent sense and we would not quarrel with a

04:49:56  14  prohibition there.

04:49:56  15         But as you pointed out from the very beginning,

04:50:00  16  Judge, you're absolutely correct.  One of the challenges

04:50:02  17  presented here is whether the core, as we've said, which is

04:50:06  18  following McDonald and Heller -- the right to possess a gun in

04:50:10  19  your home for self defense -- whether this more tangential

04:50:15  20  requirement of firing range use, whether that's actually part

04:50:18  21  of the core or not.

04:50:19  22         So I would think -- and hopefully I've explained it

04:50:22  23  clearly enough -- that in the City of Renton case, there's no

04:50:26  24  question.  It's uncontroverted that the First Amendment is at

04:50:29  25  the heart of the adult use club.  So, of course, it can't be

| | | |
|---|---|---|
| 04:50:32 | 1 | banned. |
| 04:50:33 | 2 | THE COURT: But the problem is that you have put the |
| 04:50:39 | 3 | possession, linked the possession to the certification at a |
| 04:50:46 | 4 | firing range. So you have almost brought it into the core use |
| 04:50:49 | 5 | by saying, You cannot have this weapon in your home unless |
| 04:50:53 | 6 | it's certified. |
| 04:50:55 | 7 | MR. FORTI: Well, we would recognize, your Honor -- |
| 04:50:56 | 8 | and notwithstanding -- |
| 04:50:57 | 9 | THE COURT: Unless you are certified. Excuse me. |
| 04:50:59 | 10 | MR. FORTI: Right. Notwithstanding the rhetoric of |
| 04:51:01 | 11 | our esteemed counsel, if the impediment were so high that, in |
| 04:51:06 | 12 | fact, people could not get their training cards, then |
| 04:51:10 | 13 | plaintiff might have a valid point. But as we've pointed out |
| 04:51:13 | 14 | in our papers, based on the discovery to date and our own |
| 04:51:17 | 15 | research, there are over nineteen ranges within 50 miles of |
| 04:51:21 | 16 | Chicago. And we think the record will demonstrate in these |
| 04:51:25 | 17 | papers and when we have a preliminary injunction hearing that |
| 04:51:28 | 18 | there is relative easy access. |
| 04:51:30 | 19 | Now, that may not justify why we've got the ban, but |
| 04:51:34 | 20 | if we're, as Mr. Worseck said, focused on the first prong, |
| 04:51:37 | 21 | which the plaintiff has the burden of overcoming, which is |
| 04:51:40 | 22 | irreparable harm, we continue to pose the question. And based |
| 04:51:44 | 23 | on your prior ruling, there was no irreparable harm two weeks |
| 04:51:48 | 24 | ago. We would submit there's no irreparable harm today. And, |
| 04:51:52 | 25 | not surprisingly, on October 1st or whenever we have the |

04:51:55  1   hearing, based on this analysis, there's not going to be any

04:51:58  2   irreparable harm there.

04:51:59  3          And we've also tried to point out, looking at your

04:52:03  4   statements very carefully and as we've said in our brief, the

04:52:06  5   arrival of the truck has to do with a potential remedy where

04:52:10  6   you could perhaps, because the truck will be here, give the

04:52:13  7   plaintiffs a remedy.  But the plaintiffs are confusing the

04:52:16  8   arrival of the truck as somehow transforming the question of

04:52:21  9   irreparable harm.

04:52:23  10         And as we point out in our papers -- and Mr. Worseck

04:52:27  11  can do better than I -- there's no relationship between

04:52:30  12  proving irreparable harm and the arrival of the truck.  The

04:52:31  13  truck does not make the harm more irreparable.  It simply

04:52:35  14  means that if you choose and if you have the -- otherwise a

04:52:39  15  legitimate legal basis for doing so, you can give them the

04:52:42  16  remedy.

04:52:43  17         So I understand why the plaintiffs think the truck

04:52:46  18  arrival changes things, but in reality, if you think of

04:52:49  19  whether the first prong of a TRO or a preliminary injunction

04:52:52  20  is satisfied, which is have the plaintiffs suffered

04:52:56  21  irreparable harm, truck or no truck, we would submit that the

04:52:59  22  answer is no.

04:53:02  23         THE COURT:  Okay.  Do you want to add something?

04:53:04  24         MR. WORSECK:  I have nothing to add to that

04:53:06  25  particular point, but I would like to say a few things about

| | | |
|---|---|---|
| 04:53:09 | 1 | this October 12th date. |
| 04:53:10 | 2 | THE COURT: Okay. |
| 04:53:11 | 3 | MR. WORSECK: And -- |
| 04:53:13 | 4 | THE COURT: Which is the date of the statute that you |
| 04:53:15 | 5 | have to be certified. |
| 04:53:16 | 6 | MR. WORSECK: It is a date that basically says, If |
| 04:53:20 | 7 | you already have a gun that is illegally possessed or was |
| 04:53:23 | 8 | unlawfully registered but has expired in the past three |
| 04:53:30 | 9 | months, you need to reregister that gun by October 12th. |
| 04:53:32 | 10 | THE COURT: All right. |
| 04:53:32 | 11 | MR. WORSECK: The only thing that October 12th does, |
| 04:53:34 | 12 | if you blow that date, is prevent you from registering a |
| 04:53:38 | 13 | particular gun. It in no way impacts your ability to get a |
| 04:53:43 | 14 | CFP permit, to become a valid firearms holder licensed by the |
| 04:53:47 | 15 | city. It in no way impacts your ability to register any other |
| 04:53:51 | 16 | firearm that you lawfully acquire, pursuant to the ordinance. |
| 04:53:54 | 17 | The only thing it does is prevent you from |
| 04:53:57 | 18 | maintaining lawful possession of old arms, if you blow the |
| 04:54:01 | 19 | day. |
| 04:54:02 | 20 | THE COURT: Right, but the Second Amendment says I |
| 04:54:04 | 21 | can have those -- |
| 04:54:05 | 22 | MR. WORSECK: Well -- |
| 04:54:05 | 23 | THE COURT: -- so -- |
| 04:54:06 | 24 | MR. WORSECK: -- again, this goes to the irreparable |
| 04:54:08 | 25 | harm injury -- |

| | | |
|---|---|---|
| 04:54:09 | 1 | THE COURT: So I'm in my house. I have five weapons, |
| 04:54:11 | 2 | and I can't get the firing range in Chicago, because there's |
| 04:54:14 | 3 | no firing ranges even though Chicago says I need to have my |
| 04:54:18 | 4 | certification done in the next few weeks. So then what |
| 04:54:22 | 5 | happens? Then why -- I guess it goes back to the same |
| 04:54:26 | 6 | question of -- I mean, I assume the police are going to knock |
| 04:54:31 | 7 | on my door and take my weapons away, because they probably |
| 04:54:34 | 8 | aren't aware of those weapons, but that's not the point. |
| 04:54:37 | 9 | The point is, is that the City's linked that |
| 04:54:41 | 10 | certification of training with that possession. |
| 04:54:44 | 11 | MR. WORSECK: And if you lose that possession, that |
| 04:54:47 | 12 | is fully reparable through money damages after trial. Again, |
| 04:54:50 | 13 | we're looking here -- |
| 04:54:51 | 14 | THE COURT: At the TRO issue. |
| 04:54:52 | 15 | MR. WORSECK: It's a TRO issue. The October 12th |
| 04:54:55 | 16 | date, at most, will prevent some people from maintaining |
| 04:54:58 | 17 | possession of some weapons. It will not deprive those very |
| 04:55:02 | 18 | same people of their Second Amendment core right. |
| 04:55:04 | 19 | THE COURT: But then if they go out to get a new |
| 04:55:06 | 20 | weapon, don't they have to go through training? |
| 04:55:08 | 21 | MR. WORSECK: They would have to go through training, |
| 04:55:10 | 22 | but everyone has to go through training to possess a weapon -- |
| 04:55:12 | 23 | THE COURT: And they can't do that in the City of |
| 04:55:13 | 24 | Chicago. |
| 04:55:13 | 25 | MR. WORSECK: They can't do that in the City of |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | |
|---|---|
| 04:55:15 | 1 |
| 04:55:17 | 2 |
| 04:55:20 | 3 |
| 04:55:21 | 4 |
| 04:55:25 | 5 |
| 04:55:26 | 6 |
| 04:55:27 | 7 |
| 04:55:28 | 8 |
| 04:55:28 | 9 |
| 04:55:30 | 10 |
| 04:55:34 | 11 |
| 04:55:34 | 12 |
| 04:55:36 | 13 |
| 04:55:36 | 14 |
| 04:55:38 | 15 |
| 04:55:42 | 16 |
| 04:55:46 | 17 |
| 04:55:47 | 18 |
| 04:55:51 | 19 |
| 04:55:52 | 20 |
| 04:55:55 | 21 |
| 04:55:58 | 22 |
| 04:56:01 | 23 |
| 04:56:04 | 24 |
| 04:56:08 | 25 |

Chicago, but they can do that any time they want.  They can do it on October 13th.  They can do it on December 31st --

THE COURT:  Then the deadline isn't looming.

Okay.  All right.  Do you want to add anything?  You haven't said anything?

MS. HIRSCH:  No.

THE COURT:  Okay.  So Mr. Gura -- oh, wait.  I'm sorry.  You're not done.

MR. WORSECK:  I have one other point, your Honor, and I just want to speak to the Heller case, which Mr. Gura --

THE COURT:  Right.

MR. WORSECK:  It's the only precedent --

THE COURT:  Right.

MR. WORSECK:  -- he's invoked for this idea --

THE COURT:  Well, and then the analogous case of Renton, by analogy, though, by Renton.

MR. WORSECK:  Sure.  The only Second Amendment precedent he has invoked for the notion that the Second Amendment protects a right to use shooting ranges is Heller.

Heller addressed the question of whether you have a right to possess weapons in the home.  It did not address anything more than that.  The provisions that he's quoted, the segments of the opinion that he's quoted in his brief are dicta from the opinion.  They are references to nineteenth century treatises.

04:56:08　1　　　　The question in Heller was, What did the Second

04:56:12　2　Amendment mean in 1791, to the extent the Supreme Court was

04:56:15　3　saying things about what nineteenth century treatise writers

04:56:19　4　thought about the Second Amendment, it was totally beyond the

04:56:21　5　issues of the case and totally irrelevant to the issues in

04:56:24　6　that case.

04:56:25　7　　　　And the discussion of training was within the context

04:56:28　8　of the real core issue in Heller, which is is the Second

04:56:32　9　Amendment right individual or collective?

04:56:33　10　　　　And by saying that people thought that it had been

04:56:39　11　recognized in history, that people could do things like shoot

04:56:42　12　guns and train with guns, that showed that they were

04:56:45　13　exercising an individual right.  So none of that language from

04:56:49　14　Heller, which, again, is dicta and far beyond the issues of

04:56:52　15　the case, answers the question that's in this case, namely,

04:56:55　16　whether the Second Amendment protects the right to use

04:56:58　17　shooting ranges.

04:56:58　18　　　　THE COURT:  Okay.  Mr. --

04:57:01　19　　　　MR. GURA:  Your Honor, first of all, the other side

04:57:03　20　always thinks that everything in Heller is dicta except for

04:57:05　21　the actual judgment, and that's just not the way the law

04:57:08　22　works --

04:57:08　23　　　　THE COURT:  That's what they want --

04:57:10　24　　　　MR. GURA:  It's like saying Marjorie versus Madison

04:57:13　25　is only about the delivery of judicial commissions that are

04:57:16  1  stuck in the president's desk.  That's really not what the

04:57:18  2  holding was about.

04:57:19  3      And Heller describes the right to keep and bear arms.

04:57:23  4  And I think it's fairly obvious to most people that if you

04:57:25  5  have a right to have a gun, you have the right to use it.

04:57:27  6      THE COURT:  Well, what do you think Heller does?

04:57:29  7      MR. GURA:  I think Heller secures the --

04:57:31  8      THE COURT:  Holds, what does it hold?

04:57:32  9      MR. GURA:  The holding of Heller is that there is a

04:57:36  10 traditionally understood right to keep and bear arms, which is

04:57:39  11 constitutionally secured.  And the Court then described that

04:57:41  12 right, and it held that that right has several aspects.

04:57:46  13      First, the Court struck down a ban on functional

04:57:49  14 firearms, because the Court held that self defense is the core

04:57:53  15 of the right and so the Government cannot regulate the use of

04:57:57  16 guns in self defense in a way that impedes that right.  Which

04:58:01  17 I think really speaks to irreparable harm here, because we're

04:58:04  18 not talking about somebody having access to a security in

04:58:07  19 their copy right or some kind of employment relationship.

04:58:10  20      We're talking about the ability to defend one's self

04:58:13  21 against violent crime and to defend the sanctity of your home

04:58:16  22 and the lives of and well-being of your family.  And that is

04:58:20  23 very much irreparable harm, if someone deprives you of that

04:58:23  24 kind of right.  The loss and sense of security and, God

04:58:27  25 forbid, the -- if something actually should occur --

04:58:29  1    THE COURT:  Okay.  Right now you would agree, I think

04:58:32  2  that all of you would say, We agree that the -- there's a

04:58:36  3  constitutional right under Heller that you may have this

04:58:38  4  possession of a firearm to defend yourself within your home.

04:58:42  5  I think you all agree on that.

04:58:44  6    (Nodding.)

04:58:44  7    THE COURT:  So now what more do you think Heller

04:58:46  8  holds?

04:58:47  9    MR. GURA:  I also believe that Heller -- well,

04:58:49  10  there's a lot of things that Heller holds.  For example,

04:58:52  11  Heller described there's an argument that the District of

04:58:55  12  Columbia made that the term bearing arms had a unique military

04:59:00  13  idiomatic meaning, meaning to go into battle and soldier.

04:59:00  14    And the Supreme Court examined that language and

04:59:05  15  rejected it.  Instead they adopted some language from an

04:59:07  16  opinion by Justice Ginsburg and said, No, bearing arms means

04:59:12  17  to carry them and they cite four nineteenth century cases

04:59:16  18  about the carrying, we don't have a carrying case here.  But

04:59:18  19  Heller held a lot of things.

04:59:19  20    But the basic core aspect of Heller is that there's

04:59:22  21  an individual right to have a gun.  And in describing that

04:59:24  22  right the Court struck down a functional firearms ban, because

04:59:28  23  there was an understanding that you can also do things with

04:59:31  24  your gun, like use it.

04:59:32  25    And one of the ways that you use a gun is by going to

04:59:35   1   a range and practicing with it, because if you can't practice

04:59:37   2   with your gun, you don't know how to use it, which is why a

04:59:41   3   training requirement that might actually make some sense, but

04:59:43   4   then banning all training does not.

04:59:45   5        And now if I'm wrong and if it is true that somehow

04:59:48   6   going to a gun range is not part of the Second Amendment

04:59:52   7   right, then I think the Court's commentary is still very

04:59:54   8   correct which is they made it a part of the possession by

04:59:57   9   requiring this hurdle in order to exercise the right.  That's

05:00:01  10   the law of the City of Chicago.

05:00:02  11        And so when Chicago says, If you want to exercise a

05:00:05  12   constitutional right, you must do X, and then they make X

05:00:09  13   impossible, difficult, burdensome and harass you in doing it,

05:00:13  14   then at that point it starts to trigger --

05:00:14  15        THE COURT:  But that -- therein lies the rub.  The

05:00:19  16   difficult, impossible, burdensome analysis for me, because --

05:00:22  17        MR. GURA:  And at that point they need to show --

05:00:23  18   it's not for us to --

05:00:25  19        THE COURT:  Well, it's for you to show that it is

05:00:30  20   overly burdensome in the sense that you are harmed --

05:00:33  21        MR. GURA:  Sure.

05:00:34  22        THE COURT:  -- irreparably injured.

05:00:37  23        MR. GURA:  Well, it is, in fact, a burden on people

05:00:38  24   to tell them that they need to spend money, travel, go

05:00:43  25   somewhere, and, you know, engage in some cost and expense and

05:00:48  1    time.  Time, which we know that the people who are providing

05:00:50  2    the training are not telling us is discouraging individuals,

05:00:54  3    as Mr. Queen's declaration gives us evidence of that.

05:00:57  4         Because he's saying, This is what the public out

05:00:58  5    there is saying.  They are saying, They don't want to do this.

05:01:01  6    They're saying this hurts them.  And it's not about his

05:01:03  7    business, which there is a consequence.

05:01:05  8         But there's one thing I really want to address, also,

05:01:07  9    which is there's been a statement here which I find very

05:01:10  10   difficult to comprehend, and that is this.  There's a

05:01:13  11   suggestion made that somehow adult establishments are much

05:01:20  12   more within the protection of the First Amendment than gun

05:01:24  13   ranges are within the protection of the Second Amendment.

05:01:26  14        That, I think, is --

05:01:28  15        THE COURT:  No, I think that the -- I was really

05:01:31  16   pushing you both for analogies as to why is the use of -- I

05:01:39  17   don't even know what to call it -- dancing, provocative

05:01:42  18   dancing, whatever you want to call it -- why is that core to

05:01:46  19   the First Amendment, as opposed to the safe certification at a

05:01:53  20   firing range core to the Second Amendment?  And he was

05:01:55  21   distinguishing it for me.

05:01:56  22        So I don't think he is saying, Oh, you know, it's

05:01:59  23   more constitutional to have a dirty dancing establishment than

05:02:03  24   it is to possess a firearm.  That's just not there.  Plus I

05:02:07  25   goaded him on to give me the analogy.

| | |
|---|---|
| 05:02:10 | 1 |
| 05:02:15 | 2 |
| 05:02:21 | 3 |
| 05:02:24 | 4 |
| 05:02:26 | 5 |
| 05:02:28 | 6 |
| 05:02:30 | 7 |
| 05:02:31 | 8 |
| 05:02:34 | 9 |
| 05:02:36 | 10 |
| 05:02:39 | 11 |
| 05:02:42 | 12 |
| 05:02:46 | 13 |
| 05:02:51 | 14 |
| 05:02:54 | 15 |
| 05:02:59 | 16 |
| 05:03:02 | 17 |
| 05:03:06 | 18 |
| 05:03:09 | 19 |
| 05:03:09 | 20 |
| 05:03:11 | 21 |
| 05:03:14 | 22 |
| 05:03:17 | 23 |
| 05:03:20 | 24 |
| 05:03:29 | 25 |

But I'll ask you the reverse then.  Why is it that the firing range use is core to the possession, under the Second Amendment, for protection within your home?  If I were to limit it to that, can you do that?

MR. GURA:  Yes, because if you don't know how to use your gun, you're not going to be able to exercise that right of protection.

People need to be proficient in their use of their gun.  They need to be familiar with it, comfortable with it.  They need to know how it works.  And the only way that you can be effectively trained, as the City of Chicago recognizes in their law, is to have live fire, not simulated ammunition, not laser tag, actual live firing ammunition with an actual gun at a range.  And if you don't have that, you're not going to be a very good -- a very responsible or very safe user of firearms.

You might shoot somebody that you shouldn't be shooting, maybe yourself, you're more prone to accidents, and you're not going to be able in a time of crisis, in a time of need to be effective with that right.

I mean, it's like anything else.  Practice makes you better.  And, in fact, practice is so important to the City of Chicago that they mandate it.  And so I think that they have conceded that it's -- that there's a value --

THE COURT:  But could you possess and be a bad shot, someone who doesn't -- someone who's not well trained?  That's

05:03:32  1    this issue of whether the training goes to the core.

05:03:35  2          And believe me, I raised the issue myself.  I think

05:03:40  3    that therein lies the rub for the City's problem that they

05:03:43  4    have linked the training to the possession, and so it almost

05:03:48  5    is a bit of a Catch-22 for your argument.

05:03:52  6          MR. FORTI:  Your Honor, if I could suggest, I think

05:03:54  7    we'll all agree that training might be a good thing and it may

05:03:57  8    be desirable.

05:03:57  9          But that doesn't answer the question, whether it's

05:03:59  10   part of the Second Amendment.  And let me point out to the

05:04:02  11   Court, in the Heller 2 case, where the Washington, D.C.

05:04:06  12   ordinance was challenged and that ordinance was held --

05:04:10  13   upheld -- and I believe Mr. Gura is quite familiar with that

05:04:12  14   case.  They are -- those challenging Washington, D.C.'s

05:04:16  15   ordinance where -- which required training in Washington --

05:04:20  16   they didn't have a prohibition on ranges but interestingly

05:04:23  17   enough there are no ranges in Washington, D.C.

05:04:25  18         But in Heller II, those opposing the training

05:04:31  19   requirement and those opposing registration didn't, in fact,

05:04:36  20   say, Oh, training is part of the Second Amendment because it's

05:04:38  21   so important.  Instead, they challenged D.C. and said, It's an

05:04:42  22   unconstitutional barrier.

05:04:45  23         Now, there the District Court in Heller II upheld the

05:04:49  24   requirement for training because the Court found it to be

05:04:52  25   furthering a substantial interest of the city.  But no Court

| | |
|---|---|
| 05:04:57 | 1 |
| 05:05:00 | 2 |
| 05:05:02 | 3 |
| 05:05:06 | 4 |
| 05:05:08 | 5 |
| 05:05:11 | 6 |
| 05:05:14 | 7 |
| 05:05:17 | 8 |
| 05:05:22 | 9 |
| 05:05:26 | 10 |
| 05:05:30 | 11 |
| 05:05:33 | 12 |
| 05:05:36 | 13 |
| 05:05:40 | 14 |
| 05:05:43 | 15 |
| 05:05:45 | 16 |
| 05:05:48 | 17 |
| 05:05:51 | 18 |
| 05:05:52 | 19 |
| 05:05:55 | 20 |
| 05:05:56 | 21 |
| 05:05:57 | 22 |
| 05:06:00 | 23 |
| 05:06:03 | 24 |
| 05:06:06 | 25 |

has said that training is an integral part of the right.  I think you've got it absolutely right.

It may be a good thing, but if you're a sloppy shoot, in fact, I don't think Mr. Gura would be saying this, that the Second Amendment doesn't apply if you're simply a sloppy shooter.  I'd be quite surprised if he said that.

So it may be important to have training, but it doesn't go to the core and certainly <u>Heller</u>, <u>McDonald</u>, and most importantly, the two or three Seventh Circuit cases which apply here, all of the Seventh Circuit cases have all said that the right applies to the right to self defense in the home with a handgun, nothing more than that.

So at least this circuit hasn't adopted the broader language that Mr. Gura is suggesting that you adopt.

MR. GURA:  Your Honor, just to correct the record, I'm not involved in <u>Heller II</u>.  I've never filed anything in it.  And so I do not make any of those arguments of which I am not actually all that much familiar with --

THE COURT:  Oh, maybe he was just assuming you are familiar with all --

MR. FORTI:  I'm assuming you've read the case --

THE COURT:  -- gun litigation throughout the country.

MR. GURA:  Well, I don't even wish that were true and it's not.

I think it's fairly obvious that if you have -- well,

05:06:10    1   let's look at the functional firearms ban that was struck down

05:06:13    2   in Heller.  The Supreme Court struck down a requirement that

05:06:18    3   D.C. had to store guns in a certain manner, because they

05:06:21    4   recognize that the requirements on storage were so burdensome

05:06:25    5   that they would prevent people from being able to quickly and

05:06:28    6   effectively use their guns for self defense.

05:06:31    7           The Supreme Court didn't ban all safe storage laws,

05:06:35    8   and I have never taken that position.  In fact, I have filed

05:06:37    9   things on safe storage, and I'm okay with safe storage.

05:06:39   10           The problem with the D.C. law is it went so far that,

05:06:43   11   as the Supreme Court sort of mocked the argument there,

05:06:47   12   there's no way to actually access the gun in an effective

05:06:50   13   manner.

05:06:51   14           And what the City of Chicago's done is they have

05:06:52   15   recognized that you cannot be safe and effective in having a

05:06:56   16   firearm unless you get training, and so we are going to

05:06:59   17   require people to get training.  They believe in training so

05:07:02   18   much that they require it --

05:07:03   19           THE COURT:  Right.  You'd be in a different situation

05:07:06   20   if the statute said nothing about the firing ranges.

05:07:09   21           Then you would be in the D.C. case where training was

05:07:13   22   required but there were no ranges in the city, because there

05:07:16   23   would be no ranges.  And then you would have to deal with his

05:07:19   24   truck when it came in as to whether or not, based upon all of

05:07:22   25   the other regulations that the city has, it could be present,

05:07:25  1  right?

05:07:25  2  MR. FORTI:  No question, your Honor.  It would be an

05:07:28  3  easier case and we wouldn't be here if there -- if the

05:07:30  4  ordinance were silent on that.

05:07:32  5  Nevertheless, at least in our view, it doesn't

05:07:35  6  present -- and, again, we have to go back to why are we here

05:07:38  7  on the TRO -- it doesn't present a question of irreparable

05:07:42  8  harm.  No Court has held that irreparable harm is to be

05:07:46  9  presumed, and that's where we have a fundamental difference.

05:07:49  10  THE COURT:  Right.

05:07:50  11  MR. FORTI:  I think Mr. Gura's asserted that

05:07:51  12  irreparable harm should be presumed.  And we have taken the --

05:07:55  13  quite the opposite view that no Court has ever held that, and

05:07:57  14  as to the First Amendment violations, no Court has held that

05:07:59  15  as well.

05:08:00  16  THE COURT:  And, of course, to me, the Court

05:08:01  17  listening to all of these wonderful arguments and all of your

05:08:05  18  talent, I would like to spend the time to analyze that issue

05:08:08  19  and give you a thorough thoughtful opinion, and -- which is

05:08:12  20  why I set the preliminary injunction schedule so that I could

05:08:16  21  do so.

05:08:16  22  All right.  But meanwhile, that is not the way we

05:08:19  23  have it.  So I will -- I have been on trial, as you know, and

05:08:24  24  was out of town yesterday when you filed this.  So I will have

05:08:28  25  to see you tomorrow for ruling on the TRO, because I am going

| | |
|---|---|
| 05:08:32 | 1 |
| 05:08:37 | 2 |
| 05:08:41 | 3 |
| 05:08:45 | 4 |
| 05:08:49 | 5 |
| 05:08:50 | 6 |
| 05:08:53 | 7 |
| 05:09:03 | 8 |
| 05:09:03 | 9 |
| 05:09:07 | 10 |
| 05:09:10 | 11 |
| 05:09:10 | 12 |
| 05:09:12 | 13 |
| 05:09:15 | 14 |
| 05:09:18 | 15 |
| 05:09:21 | 16 |
| 05:09:22 | 17 |
| 05:09:22 | 18 |
| 05:09:24 | 19 |
| 05:09:24 | 20 |
| 05:09:26 | 21 |
| 05:09:29 | 22 |
| 05:09:33 | 23 |
| 05:09:34 | 24 |
| 05:09:41 | 25 |

1  to review the 3:15 filing -- and for the Court's record, this
2  was scheduled for 4:00 o'clock, so that we know that there is
3  just a little bit of time that elapsed between the latest
4  filings and the Court's hearing.  And I'll review these
5  tonight and then see you all tomorrow.
6         But let me check my schedule, because I still remain
7  on call -- I mean, on trial tomorrow.  So let's see what we
8  have.
9         Okay.  I think, folks, same time, same place,
10  4:00 o'clock tomorrow afternoon.
11               MR. GURA:  Thank you, your Honor.
12               THE COURT:  And is that fine -- pardon?
13               MR. GURA:  It's fine with Mr. Sigale.  I'm afraid
14  that I am going to have to say good-bye at this point.  I have
15  other numerous obligations in Washington tomorrow to appear in
16  different places --
17               THE COURT:  Okay.
18               MR. GURA:  -- and so Mr. Sigale will be able to
19  handle that.
20               THE COURT:  Okay.  And I didn't even give you an
21  opportunity, Mr. Sigale.  Did you want to say anything today?
22  I actually gave the silent opposing counsel something.  Did
23  you want to add anything at all?
24               MR. SIGALE:  Well, you -- just two quick things, your
25  Honor.  The testimony's been kind of clear from all the

05:09:43  1   depositions that have come out that there are some firing

05:09:47  2   lanes in Lyons and some in Des Plaines and some in Elmwood

05:09:51  3   Park.

05:09:51  4              THE COURT:  Okay.

05:09:51  5              MR. SIGALE:  Some of them that Mr. Queen testified

05:09:53  6   about that he is being shut out from, in his efforts to run

05:09:58  7   Fidelity Investigative Training Academy.

05:09:59  8              Once you get past that, you're talking about Aurora.

05:10:02  9   You're talking about Plainfield.  You're talking about

05:10:06  10  Bonfield, Illinois, down near Kankakee, which is where the

05:10:10  11  ISRA outdoor range is --

05:10:11  12             THE COURT:  You just mentioned three places that I

05:10:14  13  have jurors who reside there are coming to court every day for

05:10:19  14  trial in the Northern District of Illinois.

05:10:21  15             MR. SIGALE:  And I appreciate that there might be

05:10:22  16  individuals, you know, in -- that have those circumstances.

05:10:28  17  But I live out near that way, and, I mean, I can tell you that

05:10:32  18  during drive times, it's at least two hours.

05:10:36  19             THE COURT:  Oh, right.  One of the jurors told me

05:10:37  20  that it took him two and a half hours to get to court each day

05:10:41  21  for the trial.

05:10:42  22             MR. SIGALE:  And we're alleging obviously, you know,

05:10:44  23  an imposition on constitutional rights and it's, you know,

05:10:48  24  asking them to go two and a half hours each way, two hours

05:10:51  25  each way, two and a half, I mean, that's pretty severe.

05:10:55  1          The other thing I just wanted to point out to the

05:10:58  2   Court, I was here before the Court on the emergency --

05:11:01  3          THE COURT:  Right.

05:11:02  4          MR. SIGALE:  -- discovery motion.

05:11:03  5          THE COURT:  And did that all get resolved with the

05:11:05  6   Boston deposition?

05:11:06  7          MR. SIGALE:  Well, Mr. Gura may be able to speak more

05:11:08  8   to that, but I think more to the point there's the issue that

05:11:12  9   the City has maintained that they want to keep all the

05:11:17  10  depositions open.  They have filed the motion to scrap the

05:11:21  11  preliminary injunction schedule, which I hope the Court is not

05:11:24  12  going to do.

05:11:24  13         I have been at nine of these depositions in the last

05:11:27  14  ten days.  Mr. Forti made a statement that he doesn't think

05:11:32  15  there's irreparable harm and he doesn't think in two weeks

05:11:34  16  there's going to be irreparable harm.  I think that kind of

05:11:37  17  goes to the point of why then do we need to scrap the

05:11:42  18  preliminary injunction schedule?  Why do we need to extend

05:11:44  19  discovery?

05:11:45  20         They're claiming there are -- in their opinion they

05:11:48  21  have already got all the information they need.  I think that

05:11:51  22  that kind of settles that issue.

05:11:53  23         THE COURT:  Settles what issue?

05:11:56  24         MR. SIGALE:  The issue of keeping the preliminary

05:11:57  25  injunction hearing --

| | | |
|---|---|---|
| 05:11:58 | 1 | THE COURT:  Oh, okay. |
| 05:11:59 | 2 | MR. SIGALE:  -- on and keeping the discovery closure |
| 05:12:02 | 3 | date -- |
| 05:12:02 | 4 | THE COURT:  Right.  I haven't ruled on that.  I have |
| 05:12:04 | 5 | been focusing on your TRO -- |
| 05:12:06 | 6 | MR. SIGALE:  Absolutely. |
| 05:12:06 | 7 | THE COURT:  -- rather than the most recently filed |
| 05:12:08 | 8 | motion, and then there's the motion for relatedness, I |
| 05:12:11 | 9 | believe.  And I believe poor Judge Guzman also received my |
| 05:12:16 | 10 | last emergency TRO, as related, when the City moved it to him |
| 05:12:21 | 11 | regarding the McCormick Place contracts clause, another |
| 05:12:27 | 12 | constitutional matter.  So I would hate to dump on him |
| 05:12:30 | 13 | anything that I should be doing myself. |
| 05:12:34 | 14 | Anyway, I will review this and see all of you |
| 05:12:36 | 15 | tomorrow.  And did you motion up the motion for stay of |
| 05:12:39 | 16 | discovery or extension of discovery on the regular call? |
| 05:12:43 | 17 | MR. FORTI:  No, your Honor.  We noticed it up for |
| 05:12:45 | 18 | 4:00 o'clock today. |
| 05:12:45 | 19 | THE COURT:  Oh, you did.  Okay.  I have not reviewed |
| 05:12:48 | 20 | it.  I don't intend to -- |
| 05:12:51 | 21 | MR. FORTI:  Well, it's secondary to this main issue. |
| 05:12:52 | 22 | THE COURT:  Okay.  I'll give you a ruling tomorrow. |
| 05:12:54 | 23 | Safe travels to D.C.  Mr. Sigale is perfectly capable of |
| 05:12:58 | 24 | filling in. |
| 05:12:58 | 25 | MR. GURA:  Absolutely. |

05:12:59    1          THE COURT:  I'll see you then.

05:12:59    2          MR. GURA:  Thank you, your Honor.

05:13:01    3          THE COURT:  Thanks.

05:13:01    4          (Adjourned at 5:13 p.m.)

05:13:01    5                              - - -

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154