12:55:19

1
2
3
4                    UNITED STATES DISTRICT COURT
5                    NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION
6
7
    RHONDA EZELL, et al.,              Case No. 1:10-cv-05135
8
       Plaintiffs,                     Chicago, Illinois
9                                      October 1, 2010
           v.                          Motion for Preliminary
10                                     Injunction

11   CITY OF CHICAGO,

12      Defendant.
    -------------------------------
13

14                              VOLUME 1
          TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION
15          BEFORE THE HONORABLE VIRGINIA M. KENDALL
                    UNITED STATES DISTRICT JUDGE
16

17
    APPEARANCES:
18

19   For the Plaintiffs:     Gura & Possessky, PLLC
                             By:  Alan Gura
20                           101 N. Columbus St., Ste. 405
                             Alexandria, VA 22314
21                           (703) 835-9085

22                               - and -

23                           Law Firm of David G. Sigale, P.C.
                             By:  David G. Sigale
24                           4300 Commerce Ct., Ste. 300-3
                             Lisle, IL 60532
25                           (630) 452-4547

```
 1

 2
        APPEARANCES:
 3

 4
        For the Defendant:      Chicago Corporation Counsel
 5                              By:  William M. Aguiar,
                                     Michael A. Forti,
 6                                   Rebecca Alfert Hirsch,
                                     Mardell Nereim, and
 7                                   Andrew W. Worseck
                                30 N. LaSalle Street
 8                              Chicago, IL 60602
                                (312) 744-2784
 9

10      Also Present:           Stephen A. Kolodziej
                                Brenner, Ford, Monroe & Scott, Ltd.
11

12                              Richard Pearson,
                                Illinois State Rifle Association;
13
                                Julianne Versnel,
14                              Second Amendment Foundation;

15                              Christopher Hart,
                                Action Target
16

17
        COURT REPORTER:         FEDERAL OFFICIAL COURT REPORTER
18                              April M. Metzler, RPR, CRR, FCRR
                                219 South Dearborn St., Rm. 2318-A
19                              Chicago, IL 60604
                                (312) 408-5154
20                              April_Metzler@ilnd.uscourts.gov

21

22

23

24
        Proceedings recorded by mechanical stenography; transcript
25      produced by notereading.
```

1 <u>I N D E X</u>

2

<u>DESCRIPTION</u>                                                  <u>PAGE</u>

3

4
   MR. GURA, OPENING STATEMENT                               9

5

6    MR. AGUIAR, OPENING STATEMENT                            16

7
   CHRISTOPHER HART, DIRECT EXAMINATION                     32
8    BY MR. GURA

9
   CHRISTOPHER HART, CROSS-EXAMINATION                      52
10   BY MR. FORTI

11
   CHRISTOPHER HART, REDIRECT EXAMINATION                   82
12   BY MR. GURA

13
   JULIANNE VERSNEL, DIRECT EXAMINATION                     85
14   BY MR. SIGALE

15
   JULIANNE VERSNEL, CROSS-EXAMINATION                      97
16   BY MR. WORSECK

17
   JULIANNE VERSNEL, REDIRECT EXAMINATION                  123
18   BY MR. SIGALE

19
   RICHARD PEARSON, DIRECT EXAMINATION                     129
20   BY MR. SIGALE

21
   RICHARD PEARSON, CROSS-EXAMINATION                      148
22   BY MR. WORSECK

23
   RICHARD PEARSON, REDIRECT EXAMINATION                   167
24   BY MR. SIGALE

25

| | | |
|---|---|---|
| 12:59:48 | 1 | (Commenced at 1:19 p.m.) |
| 01:19:11 | 2 | THE COURT: Okay, folks. 10C5135. We're here for |
| 01:19:16 | 3 | preliminary hearing. Let's start with putting everyone's name |
| 01:19:19 | 4 | on the record. Excuse my short delay. I have to move my |
| 01:19:24 | 5 | belongings from my chambers to the courtroom each time I do |
| 01:19:29 | 6 | something, so it's a little -- it's taking a little longer |
| 01:19:32 | 7 | than usual. |
| 01:19:33 | 8 | You may proceed. |
| 01:19:34 | 9 | MR. GURA: Good afternoon, your Honor. Alan Gura for |
| 01:19:37 | 10 | the plaintiffs. |
| 01:19:37 | 11 | MR. SIGALE: Good afternoon, your Honor. David |
| 01:19:39 | 12 | Sigale, S-i-g-a-l-e, on behalf of the plaintiffs. |
| 01:19:40 | 13 | THE COURT: Good morning. |
| 01:19:43 | 14 | MR. GURA: And we're just informing the Court, |
| 01:19:45 | 15 | there's a third-party that wants to make a motion in this |
| 01:19:47 | 16 | case. |
| 01:19:47 | 17 | THE COURT: Okay. Who is that? |
| 01:19:48 | 18 | MR. GURA: And that is this fellow here, Mr. Steve |
| 01:19:52 | 19 | Kolodziej. |
| 01:19:52 | 20 | MR. KOLODZIEJ: Good afternoon, your Honor. Do you |
| 01:19:53 | 21 | want to ... |
| 01:19:53 | 22 | THE COURT: Okay, folks. |
| 01:19:55 | 23 | MR. AGUIAR: Good afternoon, your Honor. William |
| 01:19:57 | 24 | Aguiar -- |
| 01:19:57 | 25 | THE COURT: I'll let the third party, who's not |

| | | |
|---|---|---|
| 01:19:59 | 1 | appearing, direct the judge as to what I should do next. |
| 01:19:59 | 2 | (Laughter.) |
| 01:20:05 | 3 | THE COURT:  Okay.  Go ahead. |
| 01:20:05 | 4 | MR. AGUIAR:  Good afternoon, your Honor.  William |
| 01:20:06 | 5 | Aguiar, A-g-u-i-a-r, on behalf of the City. |
| 01:20:09 | 6 | MS. HIRSCH:  Good afternoon, your Honor.  Rebecca |
| 01:20:11 | 7 | Hirsch on behalf of the City. |
| 01:20:12 | 8 | THE COURT:  All right. |
| 01:20:12 | 9 | MR. FORTI:  Good afternoon, your Honor.  Michael |
| 01:20:13 | 10 | Forti, F-o-r-t-i, on behalf of the City. |
| 01:20:16 | 11 | MS. NEREIM:  Good afternoon, your Honor.  Mardell |
| 01:20:17 | 12 | Nereim, M-a-r-d-e-l-l N-e-r-e-i-m, on behalf of the City. |
| 01:20:25 | 13 | MR. WORSECK:  And good afternoon, your Honor.  Andrew |
| 01:20:27 | 14 | Worseck on behalf of the City. |
| 01:20:28 | 15 | THE COURT:  Good afternoon.  I want to make sure I |
| 01:20:29 | 16 | have your name.  Is it Mardell Nereim? |
| 01:20:29 | 17 | MS. NEREIM:  Mardell Nereim. |
| 01:20:34 | 18 | THE COURT:  Nereim.  Okay. |
| 01:20:35 | 19 | All right.  Sir? |
| 01:20:36 | 20 | MR. KOLODZIEJ:  I'm sorry, your Honor.  I'm Steve |
| 01:20:38 | 21 | Kolodziej, K-o-l-o-d-z-i-e-j.  I'm counsel for the National |
| 01:20:43 | 22 | Rifle Association.  I've been attending the hearings in this |
| 01:20:45 | 23 | case, and I noted that earlier this week the Court again |
| 01:20:49 | 24 | raised the question of level of scrutiny to be applied |
| 01:20:52 | 25 | analyzing this case. |

| | |
|---|---|
| 01:20:53 | 1 |
| 01:20:56 | 2 |
| 01:21:01 | 3 |
| 01:21:04 | 4 |
| 01:21:07 | 5 |
| 01:21:11 | 6 |
| 01:21:13 | 7 |
| 01:21:17 | 8 |
| 01:21:17 | 9 |
| 01:21:20 | 10 |
| 01:21:23 | 11 |
| 01:21:24 | 12 |
| 01:21:26 | 13 |
| 01:21:30 | 14 |
| 01:21:31 | 15 |
| 01:21:35 | 16 |
| 01:21:38 | 17 |
| 01:21:39 | 18 |
| 01:21:43 | 19 |
| 01:21:46 | 20 |
| 01:21:50 | 21 |
| 01:21:53 | 22 |
| 01:21:56 | 23 |
| 01:22:00 | 24 |
| 01:22:04 | 25 |

The NRA and its members have a substantial interest in this issue. They're litigating it in courts across the country. And the Court has not yet come to rest on that issue or if you find additional discussion on the issue helpful, we're prepared to file and request leave to file an amicus brief limited to a discussion of the appropriate framework for analysis of Second Amendment challenges after Heller and McDonald.

We have a motion for leave to file instanter and a proposed brief ready, and if it please the Court, we are prepared to file that.

THE COURT: Okay. Is there an objection to the filing of an amicus brief from the NRA? Right, the NRA?

MR. KOLODZIEJ: Yes.

MR. FORTI: Your Honor, the only objection we would have is that counsel, as it turns out, also is representing the defendants in a case I mentioned to this Court before, which is the Benson case pending in front of Judge Guzman. There will be ample time for counsel to present those arguments in the Benson case in front of Judge Guzman.

It was a tactical move by our friends on the other side to separate these cases, so I would think the best time for them to file such a motion -- or such a paper would be as we proceed in the Benson case not on preliminary relief in this case.

01:22:04  1    THE COURT:  Okay.  It's just -- is the memo solely on

01:22:08  2  the level of scrutiny?

01:22:09  3    MR. KOLODZIEJ:  It is, your Honor.  And to clarify, I

01:22:12  4  am not here -- I am local counsel in the <u>Benson</u> case.  The NRA

01:22:15  5  is not a party to the <u>Benson</u> case.  I am here on behalf of the

01:22:18  6  National Rifle Association.

01:22:19  7    THE COURT:  Right.  And -- but he is saying that you

01:22:22  8  have moved in that case to participate as an amicus; is that

01:22:26  9  correct?  Or to file in that case?

01:22:28  10    MR. KOLODZIEJ:  No.

01:22:28  11    THE COURT:  Oh, you have not.

01:22:30  12    You're saying that's the appropriate place for them

01:22:32  13  to do so?

01:22:33  14    MR. FORTI:  Yes.

01:22:33  15    THE COURT:  Okay.  So since you are going to stick

01:22:36  16  around, as I know, I'll take your amicus motion under

01:22:40  17  advisement today, probably take a look to see if it is the

01:22:44  18  kind of thing that would be beneficial to the Court's review.

01:22:47  19  And I'll just give you a short ruling by mail, and you're

01:22:50  20  invited, of course, as a member of the public to participate

01:22:52  21  in the sense of observing today.  But I'll make a ruling later

01:22:56  22  about the amicus brief.  Okay.

01:22:58  23    MR. KOLODZIEJ:  Thank you, your Honor.  And just for

01:23:00  24  procedures sake, we have not yet filed this on the CM/ECF

01:23:04  25  system.

| | | |
|---|---|---|
| 01:23:04 | 1 | THE COURT:  Right. |
| 01:23:05 | 2 | MR. KOLODZIEJ:  Should we do that and then deliver a |
| 01:23:07 | 3 | copy to you? |
| 01:23:08 | 4 | THE COURT:  Right.  You can give me a courtesy copy, |
| 01:23:10 | 5 | and then -- you can give it to my staff here.  And then in |
| 01:23:14 | 6 | part of my review and taking under your oral motion under |
| 01:23:17 | 7 | advisement will be to skim it and see if the issues are |
| 01:23:20 | 8 | relevant and helpful, because that's the analysis, under |
| 01:23:24 | 9 | amicus, to see if whether it would be beneficial to the |
| 01:23:27 | 10 | Court's analysis.  And if it is, I will then issue an order |
| 01:23:30 | 11 | which permits you to file and we'll have the staff call you, |
| 01:23:33 | 12 | and then you can CM/ECF file it, because you really don't have |
| 01:23:37 | 13 | permission as of this date. |
| 01:23:38 | 14 | MR. KOLODZIEJ:  Understood.  We have motion for leave |
| 01:23:40 | 15 | to file instanter attached to this. |
| 01:23:42 | 16 | THE COURT:  Okay. |
| 01:23:42 | 17 | MR. KOLODZIEJ:  So we can file that today. |
| 01:23:44 | 18 | THE COURT:  That's fine.  That's what you can do. |
| 01:23:45 | 19 | Right. |
| 01:23:46 | 20 | MR. KOLODZIEJ:  And I'll give a copy to all counsel. |
| 01:23:48 | 21 | THE COURT:  All right.  Thank you. |
| 01:23:49 | 22 | All right, folks.  Are we ready to proceed with our |
| 01:23:52 | 23 | hearing? |
| 01:23:53 | 24 | MR. GURA:  Yes, we are. |
| 01:23:54 | 25 | MR. SIGALE:  Yes, your Honor. |

01:23:55  1       THE COURT:  Okay.  So what I had said, Mr. Gura, when

01:23:57  2  you were not here but I'm sure Mr. Sigale conveyed to you, we

01:24:00  3  are going to have short opening statements.  Then we'll move

01:24:03  4  to the witness procedure, and then I will permit closing

01:24:07  5  arguments as well.  Okay.

01:24:07  6       MR. GURA:  Fantastic.

01:24:08  7       THE COURT:  All right.  So let us begin.  Everyone

01:24:11  8  can have a seat.

01:24:12  9       And the movant, who is the plaintiff here, can move

01:24:16  10  for preliminary injunction, by making an opening statement.

01:24:20  11  Will that be you, Mr. Gura?

01:24:22  12       MR. GURA:  Yes, it will.  And I'll try to keep it

01:24:24  13  extremely brief, your Honor.

01:24:26  14       THE COURT:  Okay.

01:24:26  15       MR. GURA:  Thank you so much.

01:24:26  16                    - - -

01:24:28  17          MR. GURA, OPENING STATEMENT

01:24:28  18       MR. GURA:  Although we believe that the case is

01:24:29  19  currently ready for final judgment one way or the other, we

01:24:33  20  will, of course, reserve the legal argument for that until

01:24:35  21  later in the proceeding.

01:24:36  22       For now, it's sufficient only to advise the Court

01:24:39  23  that the evidence will show that we are entitled to at least a

01:24:43  24  preliminary injunction.  And although both sides have worked

01:24:46  25  very hard to put this hearing together and a number of

01:24:49  1   witnesses will be presented, there are two pieces of written

01:24:52  2   evidence that we believe are conclusive and I wish to draw the

01:24:55  3   Court's attention to those very briefly.

01:24:57  4        These are both pieces of evidence that have been

01:25:00  5   received only very recently by us, but we think that they're

01:25:04  6   extremely important.  First I will draw the Court's attention

01:25:07  7   to Defendant's Exhibit number 4.  In Defendant's Exhibit 4, is

01:25:10  8   the City Council's committee on police and fire, the findings

01:25:13  9   of the hearing that were held on this ordinance.  And the

01:25:19  10  findings are not ones with which we would usually agree with.

01:25:24  11  That's neither here nor there.

01:25:25  12        The only interesting thing about this, though, and

01:25:28  13  what is, I think, dispositive is that on paragraph 4, there is

01:25:31  14  a notation -- and I'm quoting here from the report:  Public

01:25:34  15  safety requires that firearm owners complete a certified

01:25:37  16  firearms training course that includes both classroom

01:25:41  17  instruction and range training.  So there's an acknowledgment

01:25:43  18  that range training is required for public safety.

01:25:46  19        The other thing that is significant --

01:25:48  20        THE COURT:  Wait.  Hold on.  Can I stop you?

01:25:50  21        MR. GURA:  Sure.

01:25:51  22        THE COURT:  So paragraph 4 you said --

01:25:52  23        MR. GURA:  At the very end of paragraph 4.  It's on

01:25:54  24  page 2.

01:25:55  25        THE COURT:  On page 2.

01:25:56   1              MR. GURA:  Right of the subset --

01:25:56   2              THE COURT:  Of the subset 4.

01:25:58   3              MR. GURA:  Yes.

01:25:58   4              THE COURT:  Okay.

01:25:59   5              MR. GURA:  Just the very last sentence.

01:26:00   6              THE COURT:  Got it.  Okay.  Thank you.

01:26:01   7              MR. GURA:  So that's an acknowledgment actually, and

01:26:05   8 I'm not sure this is even disputed, that the training is

01:26:08   9 required for public safety.

01:26:09  10              The second thing that is very notable by this exhibit

01:26:12  11 is what it does not contain.  There's not a single finding

01:26:16  12 anywhere here and nowhere in the record that we've seen that

01:26:18  13 links the range ban to any interest of the City.

01:26:22  14              In fact, there are no findings discussing the range

01:26:25  15 ban at all.  And I submit that it's going to be very

01:26:29  16 difficult, regardless of which level of review is utilized by

01:26:32  17 the Court, and this is a standard of review case, it's going

01:26:36  18 to be difficult to show there's a linkage between a

01:26:38  19 governmental interest and the law at issue when the City

01:26:41  20 itself has failed to even locate one.

01:26:44  21              The second critical item of evidence, which has also

01:26:47  22 been submitted in writing, is something that we submitted --

01:26:51  23 this would be our last exhibit.  And I apologize.  It was

01:26:54  24 exhibited as an exhibit to the Court.  We literally did not

01:26:58  25 have time to mark it, but it is very critical.  And that is a

01:27:02   1    transcript excerpt from the City Council's proceedings.

01:27:05   2        THE COURT: And do I have that?

01:27:06   3        MR. GURA: Yes. Your Honor should have it. We

01:27:09   4    delivered it to the Court --

01:27:11   5        THE COURT: In the plaintiffs' exhibits?

01:27:12   6        MR. GURA: We delivered it to the Court along with

01:27:14   7    our exhibits and deposition excerpts.

01:27:16   8        THE COURT: Okay.

01:27:17   9        MR. GURA: And it's -- the cover page is marked with

01:27:19  10    the word copy. It looks like this, your Honor.

01:27:22  11        THE COURT: Yes.

01:27:23  12        MR. GURA: And it's from the City of Chicago

01:27:27  13    committee on police and fire, report of proceedings.

01:27:30  14        THE COURT: Hold on.

01:27:32  15        MR. GURA: The City gave us a couple days ago this

01:27:35  16    transcript, and we looked through it and found some very

01:27:38  17    interesting material.

01:27:39  18        And what's critical about this -- there are a number

01:27:43  19    of things -- but I would just draw the Court's attention to

01:27:46  20    the testimony of police report Jody Weiss.

01:27:50  21        On page 87, line 3, Superintendent Weiss testifies

01:28:03  22    that there are approximately 13,500 police officers in the

01:28:07  23    City of Chicago that need annual range training. And he calls

01:28:10  24    this a challenge, given the City's current range facilities.

01:28:14  25        The evidence will show that the City has six gun

| 01:28:18 | 1 | ranges that the police use, and we'll talk about those during |

ranges that the police use, and we'll talk about those during
the hearing.

He does state -- and I'm quoting here on the
preceding page, page 86, line 6 -- that shooting -- and that
is a quote -- shooting is a very perishable skill.  And we
would not disagree with that.

And moving back further along the transcript, doing
this slightly backwards, on page 81, lines 10 through 11.
There's a question asked of Superintendant Weiss about how
many registered guns are there in Chicago, if he knows.  And
this is on June 29th, so this is one day after the McDonald
decision.

Superintendant Weiss testified that they have 95,700
registered weapons.  And as for the number of people that
these weapons would belong to or do belong to, we can turn to
page 95 of this excerpt.  And here, starting at line 3 and
through line 15, the Superintendant testifies, That it's
difficult to model how many people would, in fact, go ahead
and obtain firearms.  But the City is using an assumption of
10 percent of the population, meaning 300,000 people.  And he
then testifies that the -- when he's asked whether the City's
existing range facilities could be used for such training, he
says that it will overwhelm them.  The ventilation system
would be overpowered, he says, on line 12, almost immediately.
And so, of course, the City was not willing to allow the

01:29:51 1   public to use the six police ranges for gun training.

01:29:54 2         But what we have here is, I think, the beginning and

01:29:58 3   end of the case.  You have a police force with over 13,000

01:30:02 4   officers who must train annually.  They find it a challenge

01:30:06 5   with six ranges.  There's an admission that shooting is a

01:30:09 6   perishable skill.  And we know now that -- at least as of

01:30:13 7   June 29th -- there were nearly 96,000 firearms registered.

01:30:18 8   All of those firearms need to have range training when those

01:30:21 9   certificates expire within the course of a year.

01:30:23 10         And if 300,000 registrants must qualify, then, you

01:30:29 11   know, I think the math is there.  So I think those things are

01:30:33 12   important.  And that's the kind of evidence, I believe, your

01:30:36 13   Honor would find useful.

01:30:38 14         In closing of this opening statement -- because I do

01:30:40 15   want to get on to the witnesses -- I would just say the

01:30:43 16   testimony will demonstrate that we do have an actual real plan

01:30:46 17   to bring relief to the people.  The range that we propose to

01:30:50 18   bring is safe and so would other ranges that would be

01:30:54 19   constructed by plaintiff, Action Target, and none of this will

01:30:59 20   harm the public.

01:30:59 21         On the other side we're going to hear a lot about the

01:31:02 22   need to regulate commercial gun ranges.  Leaving aside the

01:31:06 23   philosophical topic about whether there is a need to regulate,

01:31:10 24   we don't have a problem with the regulation, but we would only

01:31:13 25   point out to the Court that the City has failed to regulate.

| | | |
|---|---|---|
| 01:31:15 | 1 | They have banned completely.  And that is really the heart of |
| 01:31:18 | 2 | this case. |
| 01:31:18 | 3 | If some regulation were proposed or enacted, we may |
| 01:31:22 | 4 | not be here, because it might be perfectly fine.  It's hard |
| 01:31:25 | 5 | for us to speculate about things that have yet to occur. |
| 01:31:28 | 6 | All we care about is the fact that it's completely |
| 01:31:30 | 7 | banned.  If the City wants to go ahead and issue regulations, |
| 01:31:31 | 8 | that's great.  We may or may not follow up on that. |
| 01:31:34 | 9 | So with that, I'd like to go ahead and call our first |
| 01:31:37 | 10 | witness. |
| 01:31:37 | 11 | THE COURT:  Okay.  You may do so. |
| 01:31:39 | 12 | MR. GURA:  Sure.  And just for -- we didn't notice |
| 01:31:41 | 13 | this in the transcript, yet.  But joining us at counsel table |
| 01:31:45 | 14 | are three parties, essentially.  We have Richard Pearson, from |
| 01:31:48 | 15 | the Illinois State Rifle Association; Julianne Versnel, from |
| 01:31:51 | 16 | the Second Amendment Foundation; and Christopher Hart from |
| 01:31:54 | 17 | Action Target. |
| 01:31:55 | 18 | THE COURT:  Okay. |
| 01:31:56 | 19 | MR. AGUIAR:  Your Honor, before he proceeds with his |
| 01:31:56 | 20 | case, the City has a chance to have an opening, correct? |
| 01:31:58 | 21 | THE COURT:  Of course, they do. |
| 01:31:59 | 22 | MR. AGUIAR:  Thank you. |
| 01:32:00 | 23 | THE COURT:  And we don't have -- do we have witnesses |
| 01:32:03 | 24 | here, though?  Because, remember, we did have a motion to |
| 01:32:06 | 25 | exclude witnesses.  I just see some people.  I don't know who |

| | |
|---|---|
| 01:32:08 | 1 |
| 01:32:09 | 2 |
| 01:32:11 | 3 |
| 01:32:15 | 4 |
| 01:32:16 | 5 |
| 01:32:18 | 6 |
| 01:32:21 | 7 |
| 01:32:23 | 8 |
| 01:32:23 | 9 |
| 01:32:27 | 10 |
| 01:32:27 | 11 |
| 01:32:29 | 12 |
| 01:32:29 | 13 |
| 01:32:31 | 14 |
| 01:32:33 | 15 |
| 01:32:38 | 16 |
| 01:32:40 | 17 |
| 01:32:42 | 18 |
| 01:32:44 | 19 |
| 01:32:48 | 20 |
| 01:32:52 | 21 |
| 01:32:55 | 22 |
| 01:32:59 | 23 |
| 01:33:04 | 24 |
| 01:33:08 | 25 |

1 they are, so --

2 MR. AGUIAR: Your Honor, the City has brought with it

3 Sergeant Bartoli, who will be testifying today, but he is the

4 City's representative for today's proceeding.

5 THE COURT: Okay. All right. Anyone else?

6 MR. AGUIAR: No, your Honor.

7 THE COURT: Okay. All right then. Let the City have

8 an opening statement before you do that.

9 - - -

10 MR. AGUIAR, OPENING STATEMENT

11 MR. AGUIAR: Thank you, your Honor, and good

12 afternoon again.

13 THE COURT: Good afternoon.

14 MR. AGUIAR: In McDonald versus City of Chicago, the

15 United States Supreme Court ruled that an individual's Second

16 Amendment right to possess a handgun in the home for self

17 defense applies to the states.

18 To comply with the Supreme Court's ruling but to

19 protect the public from the potentially deadly consequences of

20 gun violence, the City of Chicago enacted the responsible gun

21 owners ordinance on July 2nd, 2010.

22 The ordinance requires Chicago residents to obtain a

23 Chicago Firearms Permit, otherwise known as a CFP, before

24 taking possession of a firearm in the City of Chicago. And to

25 obtain a CFP an individual must submit an affidavit from a

01:33:12  1   state certified firearms instructor that the individual

01:33:16  2   completed a five-hour firearms safety and training course,

01:33:20  3   which includes four hours of classroom instruction and one

01:33:24  4   hour of range training.

01:33:25  5          Section 8-20-280 of the ordinance prohibits firing

01:33:32  6   ranges or shooting galleries from operating in the City.

01:33:36  7   Plaintiffs ask this Court to preliminarily enjoin the City

01:33:39  8   from enforcing Section 8-20-280.  But that is not the only

01:33:44  9   thing plaintiffs are asking this Court to enjoin.

01:33:47  10         Plaintiffs are also asking this Court to enjoin

01:33:52  11  several other provisions of the ordinance, including, but not

01:33:56  12  limited to, the CFP requirement, the firearm registration

01:33:59  13  requirement, the prohibition against carrying firearms outside

01:34:01  14  the home, and the prohibition against ammunition outside the

01:34:06  15  home.

01:34:06  16         To prevail on their preliminary injunction motion,

01:34:10  17  plaintiffs must satisfy five distinct and separate elements.

01:34:14  18  First, plaintiffs must prove irreparable harm.  Second,

01:34:20  19  plaintiffs must show that they do not have an adequate remedy

01:34:25  20  at law.  Third, they must show a likelihood of success on the

01:34:29  21  merits.  Fourth, plaintiffs must prove that the harms to

01:34:33  22  plaintiffs in the absence of an injunction far outweighs the

01:34:36  23  harm to the City, if an injunction is granted.  And, finally,

01:34:40  24  plaintiffs must prove that the granting of the injunction

01:34:44  25  would be in the public interest.  If plaintiffs fail to prove

| | |
|---|---|
| 01:34:47 | 1 |
| 01:34:51 | 2 |

any one of these five elements, the Court must deny the
preliminary injunction.

The evidence, which includes live testimony,
deposition designations, and declaration, will demonstrate
that plaintiffs cannot prevail on any of these five elements.

I will first address the requirement of irreparable
harm.  You will not hear any evidence that plaintiffs have
suffered any irreparable harm whatsoever.  To the contrary,
the evidence will show that plaintiffs have not suffered
irreparable harm.  The deposition testimony of Ms. Ezell will
demonstrate that she completed the four hours of classroom
instruction and that she completed the one hour of range
training.

The evidence will show that she submitted an
application for a CFP and that application was granted.  The
evidence will show that Ms. Ezell submitted a registration
certificate for a firearm and the City approved that
registration application.

And a stipulation between the parties will show that
should Ms. Ezell wish to continue to practice with her
firearm, there are fourteen firing ranges in the Chicago
suburban area she could use.  Indeed, I have blown up for you
Defendant's Exhibit number 21.  As Exhibit 21 shows, the
evidence will show that Ms. Ezell lives at 1002 East
Marquette, and on Defendant's Exhibit 21 that is marked with

| | |
|---|---|
| 01:36:22 | 1 |

the letter A.

The evidence will show that just fourteen miles from her home is Chuck's Gun Shop, and that is represented on Exhibit 21 with the number 1. The evidence will also show that just fifteen miles from Ms. Ezell's residence is an entity called Sporting Arms and Supply, Inc., and that is shown on Defendant's Exhibit 21 with the number 8.

With respect to plaintiff Joseph Brown, his deposition testimony will show that he is a Chicago resident who stores two firearms outside of the city but who wishes to bring those firearms into the city.

THE COURT: What was that exhibit number?

MR. AGUIAR: 21, your Honor.

THE COURT: Thank you.

MR. AGUIAR: Moreover, Mr. Brown's deposition testimony will demonstrate that he goes to a suburban gun range in Morton Grove, Illinois between 250 and 270 times a year and has been to a range operated by the Illinois State Rifle Association in Bonfield, Illinois approximately ten times in the past year. The evidence will show that Mr. Brown has had the ability to obtain the one hour of range training necessary to obtain a CFP but that he has chosen not to do so.

The deposition testimony of plaintiff William Hespen will show that he currently possesses in the city six handguns for which the registration expires on June 6, 2011 and that he

01:37:54  1   possesses an additional eighteen firearms in the city for
01:37:54  2   which the registration expires on October 8th, 2010.
01:37:59  3        Mr. Hespen, the evidence will show, has obtained and
01:38:03  4   completed the application for a CFP but has not yet completed
01:38:07  5   the City's training requirement, because he is waiting to find
01:38:10  6   out if the City Council is going to amend the ordinance to
01:38:14  7   exempt retired police officers from doing the training
01:38:17  8   requirement.
01:38:18  9        The evidence will show that Mr. Hespen is prepared
01:38:22  10  and able to obtain the training required to get a CFP,
01:38:26  11  including the one hour of range training, if the City Council
01:38:29  12  does not amend the ordinance.  Moreover, Mr. Hespen's
01:38:33  13  testimony will demonstrate that he, like Mr. Brown, has used
01:38:38  14  the Illinois State Rifle Association's range in Bonfield,
01:38:41  15  Illinois about ten times in the past year and that he
01:38:44  16  regularly, and without any difficulty whatsoever, drives to
01:38:48  17  suburban gun ranges -- excuse me -- suburban gun stores that
01:38:54  18  have gun ranges.
01:38:54  19       The evidence will also show that plaintiffs ISRA and
01:38:58  20  Second Amendment Foundation cannot identify any members by
01:39:01  21  name who cannot obtain the one hour of range training in the
01:39:05  22  Chicago suburbs.  Indeed, as Exhibit -- Defense Exhibit 21
01:39:09  23  shows, there are fourteen firing ranges within a 50-mile
01:39:16  24  radius of the city's borders.
01:39:22  25       Moreover, the evidence will show that there are

01:39:24   1 businesses in the City of Chicago that offer the four-hour

01:39:28   2 classroom instruction component of the City's training

01:39:30   3 requirement.

01:39:33   4       Moreover, as the City argues in its memorandum in

01:39:37   5 opposition to plaintiffs' motion, there is no basis for this

01:39:40   6 Court, even if it were to find a Second Amendment violation,

01:39:42   7 to conclude that the violation is presumed to be irreparable.

01:39:47   8       Finally, you will not hear any evidence demonstrating

01:39:50   9 the City has harmed any First Amendment rights of the

01:39:52 10 plaintiffs at all.  The evidence will show that the City does

01:39:57 11 not bar anyone from talking about, teaching about, or thinking

01:39:59 12 about guns.  The City only prohibits the shooting of guns at a

01:40:04 13 firing range, an activity which is not protected by the First

01:40:08 14 Amendment.

01:40:08 15       In sum, you may hear argument that there is

01:40:10 16 irreparable harm, but you won't hear any evidence that

01:40:14 17 plaintiffs have actually suffered any irreparable harm.

01:40:17 18       With respect to the second element that plaintiffs

01:40:19 19 must prove, that is, the adequate remedy at law component,

01:40:23 20 they must show that they are without an adequate remedy at

01:40:26 21 law.  The evidence will show, however, that plaintiffs do have

01:40:29 22 an adequate remedy at law.

01:40:31 23       With respect to any trips plaintiffs have to make to

01:40:35 24 the Chicago suburbs to obtain their training, such as filling

01:40:37 25 up their cars with gas, such expenses are fully compensable

01:40:41  1   with money damages.  Moreover, the deposition evidence will

01:40:46  2   demonstrate that neither Ms. Ezell nor Mr. Brown is in danger

01:40:50  3   of losing the right to possess any particular firearm in the

01:40:54  4   city.  With respect to Mr. Hespen, the plaintiff -- excuse

01:40:56  5   me -- the evidence will show that Mr. Hespen is no danger of

01:41:00  6   incurring any injury which money damages are inadequate.

01:41:04  7           The City enacted an amnesty provision that allows a

01:41:07  8   person who possesses previously unregistered firearms or

01:41:11  9   firearms for which the registration expires before October 12

01:41:16  10  to register those specific firearms, if they apply for a CFP

01:41:20  11  by October 12th.

01:41:22  12          Thus, if Mr. Hespen chooses not to apply for a CFP by

01:41:26  13  October 12th, he will only lose the right to possess eighteen

01:41:31  14  of those 24 firearms he currently has in the city.  He will

01:41:36  15  not lose the right to possess another firearm he may acquire

01:41:39  16  in the future.

01:41:40  17          THE COURT:  But he has to go to a firearm range for

01:41:44  18  that too, though, right?

01:41:45  19          MR. AGUIAR:  He would still have to go to a firing

01:41:47  20  range for that, your Honor.

01:41:47  21          And the loss of those eighteen firearms would be

01:41:49  22  fully compensable with money damages.  And, finally, the

01:41:53  23  Seventh Circuit has held that money damages may be appropriate

01:41:56  24  for constitutional violations.  The evidence will, therefore,

01:42:00  25  show that plaintiffs have an adequate remedy at law.

01:42:04 1    I will now move on to the third element plaintiffs
01:42:07 2 must prove.  That element is a likelihood of success on the
01:42:11 3 merits.  As discussed more fully in the City's memorandum in
01:42:15 4 opposition to plaintiffs' motion, plaintiffs do not have a
01:42:17 5 likelihood of success on the merits.
01:42:20 6    First, none of the plaintiffs can prevail on the
01:42:23 7 First Amendment claims, because the City has not restricted
01:42:26 8 any expression, speech, or activity protected by the First
01:42:30 9 Amendment.
01:42:30 10    Second, the Illinois State Rifle Association, the
01:42:34 11 Second Amendment Foundation, and Action Target do not have
01:42:38 12 Second Amendment rights, because the Second Amendment, as
01:42:41 13 announced by the Supreme Court in <u>Heller</u>, only protects an
01:42:44 14 individual right to a firearm in the home for self defense.
01:42:52 15 They are organizations, and, therefore, do not have Second
01:42:52 16 Amendment rights.
01:42:52 17    Third, plaintiffs Ezell, Hespen, and Brown have no
01:42:56 18 likelihood of success on the merits of their Second Amendment
01:42:59 19 claim, because the Second Amendment does not confer a right to
01:43:02 20 shooting ranges or to train with a firearm.  But even if the
01:43:07 21 Court finds that the City's ordinance has implicated the
01:43:11 22 Second Amendment right to a handgun in the home for self
01:43:14 23 defense by requiring range training but banning firing ranges,
01:43:18 24 the City's ordinance is still constitutional.
01:43:20 25    The Seventh Circuit has only applied intermediate

01:43:24  1    scrutiny to laws that categorically ban possession of

01:43:30  2    firearms, and those bans on possession clearly implicate the

01:43:33  3    Second Amendment right announced in <u>Heller</u>.  Thus, what level

01:43:35  4    of scrutiny this Court should apply to a firearm regulation

01:43:39  5    that is not a categorical ban on the possession of firearms is

01:43:43  6    a question of first impression.

01:43:45  7          The Court, therefore, has two inquiries.  The first,

01:43:48  8    it must determine what level of scrutiny to apply to the

01:43:51  9    City's ordinance.  Second, it must determine whether the

01:43:55  10   City's ordinance satisfies that level of scrutiny.  In our

01:44:00  11   memorandum we offer two alternative levels of scrutiny for the

01:44:04  12   Court to apply.

01:44:06  13         First, the City's ban on firing ranges easily

01:44:08  14   satisfies the reasonable regulation standard, which has long

01:44:11  15   been used by the 42 states which recognize an individual

01:44:16  16   firearm right.  The evidence will show that the City's ban on

01:44:21  17   firing ranges is a reasonable restriction on plaintiffs'

01:44:25  18   Second Amendment rights to possess a handgun in the home for

01:44:27  19   self defense.  Again, the evidence will show that there are

01:44:30  20   fourteen firing ranges within a 50-mile radius of the City's

01:44:35  21   borders at which plaintiffs can obtain their training.

01:44:38  22         Alternatively, the ban on gun ranges also survives a

01:44:40  23   more rigorous test used to evaluate restrictions placed on a

01:44:43  24   woman's fundamental constitutional right to an abortion.  That

01:44:47  25   test asked whether a restriction on the right creates an undue

01:44:51 1 burden to the exercise of that right. Again, the evidence

01:44:56 2 will show that the City has not unduly burdened plaintiffs

01:44:59 3 exercise of their Second Amendment right.

01:45:01 4 Because the Seventh Circuit has expressly declined to

01:45:06 5 adopt intermediate scrutiny as the standard for anything but a

01:45:10 6 categorical ban of the possession of firearms, this Court

01:45:13 7 should decline to do so. But even if this Court does apply

01:45:17 8 intermediate scrutiny, the City's range ban satisfies that

01:45:22 9 standard. Under intermediate scrutiny, a regulation must be

01:45:25 10 substantially related to an important Government interest.

01:45:28 11 In this case the evidence will show that the City has

01:45:30 12 a legitimate Government interest in protecting the health,

01:45:34 13 safety, and welfare of its citizens, and the gun range ban is

01:45:38 14 substantially related to that interest. For these reasons,

01:45:42 15 plaintiffs do not have a likelihood of success on the merits,

01:45:45 16 and the injunction can be denied for that reason alone.

01:45:48 17 The fourth distinct element plaintiffs must satisfy

01:45:52 18 in order to receive an injunction is the balance of the

01:45:55 19 hardships. Again, this element requires the Court to balance

01:45:58 20 the harm to the plaintiffs and the absence of an injunction

01:46:01 21 against the harm to the City if the injunction is granted.

01:46:06 22 And as I've already discussed, the evidence will not show any

01:46:10 23 irreparable harm to the plaintiffs if the injunction is

01:46:12 24 denied.

01:46:13 25 Moreover, the evidence will show that injunction will

01:46:17   1   not even really benefit the plaintiffs. Plaintiffs raise this

01:46:20   2   October 12 deadline as a justification for granting them this

01:46:25   3   injunctive relief. But under the City's Ordinance and the

01:46:27   4   police department regulations, the October 12th date is a red

01:46:30   5   herring because, again, that date is only the date by which a

01:46:33   6   resident must apply for CFP or lose the right to possess

01:46:39   7   either a previously unregistered firearm or a registered

01:46:41   8   firearm whose registration expires before October 12. It does

01:46:46   9   not prohibit a citizen from possessing any other firearm in

01:46:50  10   the City.

01:46:50  11           But even if that date were relevant, which it isn't,

01:46:54  12   but even if it were, the evidence will show that the only

01:46:58  13   remedy plaintiffs have proposed is bringing a mobile range

01:47:02  14   from Blue Line Corporation into the city. The evidence will

01:47:06  15   show, however, that the plaintiffs have arranged for the

01:47:09  16   mobile range to be here only for a few short days in October

01:47:12  17   before -- excuse me -- before October 12th. Moreover, the

01:47:17  18   evidence will show that the mobile firing range can only

01:47:20  19   accommodate three individuals at a time. Therefore, very few

01:47:23  20   Chicago citizens can obtain training at the mobile range

01:47:27  21   before October 12th.

01:47:29  22           On the other hand, your Honor, the evidence will show

01:47:32  23   a measurable concrete harm to the City and its citizens if the

01:47:36  24   City's ban on firing ranges is enjoined and plaintiffs become

01:47:41  25   free to bring this mobile range into the City's borders.

01:47:45 1    You will hear testimony from Patty Scudiero, the

01:47:48 2 City's commissioner of zoning and land use planning and zoning

01:47:52 3 administrator that the City's ordinance does not provide for

01:47:55 4 gun ranges, and, therefore, prohibits them.

01:47:57 5    Ms. Scudiero will further testify that gun ranges are

01:48:01 6 an intense use, from a zoning perspective, and would only be

01:48:05 7 acceptable in the city's manufacturing districts, and only

01:48:08 8 then as a special use approved by the Chicago zoning board of

01:48:13 9 appeals.

01:48:13 10    Ms. Scudiero will also testify that allowing ranges

01:48:17 11 in the city without having proper zoning regulations in place,

01:48:20 12 which is what plaintiffs are actually seeking here, poses

01:48:24 13 considerable dangers to the city and its citizens because,

01:48:27 14 among other reasons, ranges would be allowed to locate next to

01:48:31 15 or in the vicinity of sensitive areas, such as residential

01:48:34 16 communities, schools, and churches.

01:48:37 17    Ms. Scudiero will further testify that there are

01:48:39 18 other zoning considerations, such as setbacks, parking,

01:48:43 19 fencing, height that would need to be put in place to ensure

01:48:47 20 the safety of both the nearby area and those citizens who

01:48:50 21 actually come to the range to practice.

01:48:56 22    Ms. Scudiero will further testify that the property

01:48:57 23 at 6300 South Bell, which plaintiffs propose to place this

01:49:01 24 mobile range at, is not an appropriate location.  Ms. Scudiero

01:49:04 25 will testify that the neighborhood directly to the west of

01:49:07   1   this property is zoned residential and that there are

01:49:10   2   single-family homes directly across the street.  Ms. Scudiero

01:49:14   3   will further testify that this property is within one block of

01:49:18   4   an active church and within two blocks of an elementary

01:49:22   5   school.

01:49:22   6         You will hear testimony from Sergeant Dan Bartoli,

01:49:25   7   the former range master for the Chicago Police Department.

01:49:29   8   Sergeant Bartoli will testify that allowing mobile gun ranges

01:49:31   9   in the city poses a threat to public safety.  He will testify

01:49:35  10  that strict safety protocols must be in place to control the

01:49:39  11  area surrounding the mobile range, including, but not limited

01:49:43  12  to, limiting access to the property, installation of a fixed

01:49:46  13  fence that is not see-through, parking separate and apart from

01:49:49  14  a staging area designated for assembly and disassembly of

01:49:54  15  firearms, separate personnel to monitor the ingress and egress

01:49:58  16  from the property and to monitor the staging area and to

01:50:02  17  supervise the crowds.

01:50:02  18        Sergeant Bartoli will also testify as to the

01:50:05  19  inappropriateness of the two locations plaintiffs have

01:50:08  20  presented to this Court on which they want to place the mobile

01:50:12  21  range.  The evidence from the City's declarations will also

01:50:15  22  show that permitting firearm ranges in the city without proper

01:50:19  23  building code, licensing, and environmental regulations will

01:50:23  24  also cause considerable harm to the city.

01:50:27  25        Finally, the evidence will show that the City and its

01:50:29   1   citizens will be severely harmed if plaintiffs are allowed to

01:50:32   2   proceed with their plan to bring the Blue Line range to the

01:50:35   3   city.

01:50:36   4         The evidence will show that the plans plaintiffs have

01:50:39   5   presented are not fully -- have not been properly vetted.  The

01:50:43   6   evidence will show that SAF has never managed or operated a

01:50:46   7   shooting range.  The evidence will show that SAF intends to

01:50:49   8   put ISRA in charge of operating the range and training

01:50:53   9   customers, but that SAF does not know who at ISRA will be

01:50:58  10  responsible for what happens at the range or what rules the

01:51:01  11  ISRA range master will apply.  The evidence will further show

01:51:06  12  that ISRA has never operated a mobile range before, and as yet

01:51:09  13  to draft the safety protocols that will govern the operation

01:51:12  14  of this range.

01:51:13  15        The evidence will show that it is uncertain, as I

01:51:16  16  stand here today, whether customers will be allowed to bring

01:51:19  17  their own firearms to the site or whether they will be

01:51:23  18  supplied to the customers.  Moreover, there is no evidence

01:51:26  19  demonstrating what protocols will be put in place to control a

01:51:30  20  large number of people who may or may not have their firearms

01:51:33  21  with them.

01:51:34  22        The deposition evidence will also show that the owner

01:51:37  23  of the mobile range does not realize that lead is released

01:51:42  24  into the interior of the range when guns are discharged, and

01:51:46  25  he has not changed the air filter, which actually prevents

01:51:48  1  those harmful emissions from escaping into the environment, in

01:51:52  2  the nearly two years he has owned this range.

01:51:54  3          Moreover, the deposition evidence will show that the

01:51:56  4  owner of the mobile range does not know whether there are OSHA

01:52:00  5  or EPA regulations that govern the mobile range, and whether

01:52:03  6  the range is compliant with those regulations despite

01:52:05  7  statements on the webpage -- on his webpage to the contrary.

01:52:09  8          The evidence will also show that myriad problems

01:52:12  9  beset the two locations chosen by SAF to operate the range.

01:52:16  10  The evidence will show that neither SAF or ISRA has visited or

01:52:23  11  examined either location.

01:52:25  12          With respect to the lease with Accurate, the evidence

01:52:26  13  will show that Accurate does not own the property in question

01:52:29  14  and the lease, even if it's valid, merely grants the right to

01:52:33  15  store the trailer but not to operate a firing range or to open

01:52:37  16  the trailer to the public.

01:52:38  17          With respect to the second location at Bell Street,

01:52:41  18  the evidence will show that plaintiffs spent one day selecting

01:52:45  19  this location for the mobile range and they leased it without

01:52:49  20  ever seeing it.  Moreover, the evidence will show that this

01:52:52  21  site is in the city's Englewood area and is considered by the

01:52:56  22  Chicago Police Department to be a high-crime area.

01:52:59  23          And, again, the evidence will show that this site is

01:53:03  24  directly across the street from single-family homes and within

01:53:05  25  less than a block of an active church and less than two blocks

| | | |
|---|---|---|
| 01:53:09 | 1 | of an elementary school.  The evidence will therefore show, |
| 01:53:13 | 2 | your Honor, that the City will suffer great harm if plaintiffs |
| 01:53:16 | 3 | are allowed to proceed with their plan to bring this mobile |
| 01:53:20 | 4 | range into the City of Chicago. |
| 01:53:22 | 5 | And, finally, the fifth element plaintiffs must prove |
| 01:53:26 | 6 | in order to receive a preliminary injunction is that this |
| 01:53:28 | 7 | injunction will not harm the public interest.  The harms I've |
| 01:53:31 | 8 | just discussed demonstrate that they cannot prevail on this |
| 01:53:34 | 9 | element.  Moreover, the Chicago City Council has made a |
| 01:53:39 | 10 | decision to ban firing ranges from operating within the city. |
| 01:53:45 | 11 | The City has a comprehensive regulatory scheme which |
| 01:53:49 | 12 | includes licensing, zoning, and environmental regulations into |
| 01:53:53 | 13 | which firing ranges would have to be incorporated.  This |
| 01:53:57 | 14 | regulatory scheme was made in the public interest, and any |
| 01:53:59 | 15 | action by this Court allowing it unregulated and potentially |
| 01:54:03 | 16 | hazardous operation in the city would erroneously and unduly |
| 01:54:07 | 17 | interfere with the decisions of the Chicago residents' elected |
| 01:54:11 | 18 | representatives and would cause harm to the public interest. |
| 01:54:14 | 19 | In conclusion, the evidence will show that plaintiffs |
| 01:54:17 | 20 | cannot prevail on any of the five separate and distinct |
| 01:54:20 | 21 | elements necessary to receive injunctive relief, and the City |
| 01:54:24 | 22 | therefore will respectfully request that the Court deny |
| 01:54:26 | 23 | plaintiffs' motion. |
| 01:54:28 | 24 | Thank you. |
| 01:54:29 | 25 | THE COURT:  Thank you. |

01:54:30  1        Okay.  Now, you may call your first witness,

01:54:34  2  Mr. Gura.

01:54:34  3        MR. GURA:  Christopher Hart.

01:54:36  4        THE COURT:  Right up here, sir.

01:54:42  5        (Witness takes the stand.)

01:54:42  6        THE COURT:  Please raise your right hand.

01:54:49  7        (The witness was sworn.)

01:54:49  8        THE COURT:  Okay.  You may proceed.

01:54:49  9                    - - -

01:54:49  10       CHRISTOPHER HART, DIRECT EXAMINATION

01:54:49  11  BY MR. GURA:

01:54:54  12  Q.  Good afternoon, Mr. Hart.

01:54:54  13       Mr. Hart, can you please tell the Court, what do you

01:54:56  14  do for a living?

01:54:57  15  A.  I'm the Midwest range consultant for Action Target.

01:55:00  16  Q.  Okay.  And what is Action Target?  What is Action Target's

01:55:03  17  business?

01:55:04  18  A.  We manufacture, install, and supervise the installation of

01:55:08  19  firing range equipment, both civilian, military, and law

01:55:11  20  enforcement.

01:55:11  21  Q.  Okay.  And what do you do as part of your job description?

01:55:14  22  A.  I find new customers.  I do sales.  I oversee the

01:55:17  23  construction of the equipment and also the installation.

01:55:20  24  Q.  Okay.  Do you do any business in Chicago for Action

01:55:23  25  Target?

| | | |
|---|---|---|
| 01:55:23 | 1 | A. Yes, we've done several ranges. |
| 01:55:25 | 2 | Q. Okay. Let's discuss some of the ranges that you've |
| 01:55:29 | 3 | installed in Chicago. |
| 01:55:29 | 4 | Can you please describe some of those? |
| 01:55:30 | 5 | A. Yes. The U.S. Postal Service at 743 South Canal. |
| 01:55:35 | 6 | Q. Okay. |
| 01:55:36 | 7 | A. The Federal Reserve Bank at 230 South LaSalle. |
| 01:55:39 | 8 | Q. Okay. |
| 01:55:39 | 9 | A. The Brinks Security range is at 919 South California |
| 01:55:44 | 10 | Avenue. |
| 01:55:44 | 11 | Q. Okay. And are there any ranges that perhaps Action Target |
| 01:55:48 | 12 | did not build but which you either retrofitted or supplied in |
| 01:55:52 | 13 | Chicago? |
| 01:55:52 | 14 | A. Yes. I have several estimates out that are pending for -- |
| 01:55:55 | 15 | one is for the federal -- or the federal Air Marshals at |
| 01:55:57 | 16 | O'Hare in Chicago, and the other is for U.S. Customs and |
| 01:56:03 | 17 | Border Protection on 610 South Canal. |
| 01:56:04 | 18 | Q. Okay. Let's talk first about the Air Marshal range. |
| 01:56:08 | 19 | Have you visited the Air Marshal range? |
| 01:56:09 | 20 | A. I've been there several times. |
| 01:56:10 | 21 | Q. Okay. Do you remember the address for that Air Marshal |
| 01:56:12 | 22 | range? |
| 01:56:12 | 23 | A. It's 899 Upper Express Drive, Chicago, Illinois, and I |
| 01:56:16 | 24 | believe it's 60018. |
| 01:56:17 | 25 | Q. Okay. Can you please describe the structure in which this |

| | | |
|---|---|---|
| 01:56:20 | 1 | range is located? |
| 01:56:20 | 2 | A.  It's located in an office building, along with the offices |
| 01:56:23 | 3 | of the Air Marshals and in an office park. |
| 01:56:26 | 4 | Q.  Okay.  Now, what is surrounding this office park? |
| 01:56:28 | 5 | A.  On the south side is the runways at O'Hare.  On the east |
| 01:56:32 | 6 | and west, I believe, there's some office buildings for other |
| 01:56:36 | 7 | companies.  And to the north side is I-90, Touhy Avenue, Lake |
| 01:56:43 | 8 | Park Golf Course and some residential. |
| 01:56:44 | 9 | Q.  Okay.  Let's talk about the postal inspector's range.  I |
| 01:56:48 | 10 | believe you mentioned it's at 743 South Canal. |
| 01:56:51 | 11 | Have you visited that range? |
| 01:56:52 | 12 | A.  I've been there many times. |
| 01:56:54 | 13 | Q.  Okay.  What is around that neighborhood? |
| 01:56:55 | 14 | A.  A block away you've got the -- well, across the way is the |
| 01:56:59 | 15 | Chicago Port Authority offices.  There's a children's |
| 01:57:02 | 16 | playground as part of that building on the north side, which |
| 01:57:04 | 17 | is an outdoor playground.  Across the street from that is a |
| 01:57:08 | 18 | Holiday Inn, two restaurants.  And on the south side of that |
| 01:57:11 | 19 | building is the Polk Street Pub.  I've eaten there before. |
| 01:57:15 | 20 | Q.  Okay.  And let's talk about -- there's another range you |
| 01:57:17 | 21 | mentioned, the U.S. Customs and Border Protection. |
| 01:57:21 | 22 | Is that -- what's the address there? |
| 01:57:22 | 23 | A.  It's 610 South Canal.  It's across the street and one |
| 01:57:26 | 24 | block south from the postal service. |
| 01:57:28 | 25 | Q.  Okay.  And let's talk about the range at 230 South |

01:57:31 1 LaSalle.

01:57:31 2 Can you please describe the structure that that's in?

01:57:34 3 A.  Yes.  The Federal Reserve Bank, it's a high-rise office

01:57:37 4 building.  Our range is on the seventeenth floor, which I

01:57:40 5 believe is the top floor, and buildings on both sides are

01:57:43 6 office buildings, high-rise.

01:57:45 7 Q.  Okay.  And just for the record, can you briefly describe

01:57:47 8 the kind of neighborhood that 230 South LaSalle is located in?

01:57:51 9 A.  Yeah, it's a downtown office district.

01:57:54 10 Q.  Okay.  Fantastic.

01:57:55 11 Let's talk about the Brinks range, and I'd like to

01:58:00 12 correct the record here.  In your declaration you stated that

01:58:03 13 it was at 4420 South Tripp and today you've corrected that to

01:58:03 14 919 South California.

01:58:07 15 Can you please explain how that occurred?

01:58:08 16 A.  Yes.  I joined Action Target in 2005.  This range was

01:58:11 17 built in 2003.  The address that was in our computer system

01:58:15 18 for this Brinks range was 4420 South Tripp.  That's what I

01:58:19 19 believed to be the correct range -- or address for the range.

01:58:22 20 And I called my coworker that sold the range to them, who no

01:58:25 21 longer works for us, and he corrected me that it was 919 South

01:58:29 22 California.

01:58:29 23 Q.  Okay.  Now, aside from these ranges and these other

01:58:35 24 issues, have you sold any range equipment to other

01:58:38 25 governmental entities in Chicago?

01:58:40  1   A.  Yes.  We've sold clearing traps to the FBI for their

01:58:43  2   offices and Chicago PD has purchased paper targets, steel

01:58:47  3   targets, tactical breach doors.

01:58:50  4   Q.  Okay.  So do you have -- aside from marketing and selling

01:58:52  5   things to the Chicago Police Department, does Action Target

01:58:54  6   have any other relationship with the Chicago Police Department

01:58:57  7   or Chicago police personnel?

01:58:59  8   A.  We do.  I'm in contact with them roughly every three to

01:59:02  9   six months for different reasons.  They come out to our law

01:59:06  10  enforcement training camp in Provo, Utah, which we host.  We

01:59:10  11  had two CPD officers attend two weeks ago, September 13th

01:59:14  12  through the 17th, and we also had one or two last year, I

01:59:18  13  believe.

01:59:18  14  Q.  Okay.  Are there any events that you hold here locally

01:59:22  15  that you interact with the police?

01:59:24  16  A.  There are.  At least annually I host a two-day shooting

01:59:28  17  range development seminar where we go over shooting range

01:59:31  18  development and every year I've had a CPD officer attend.  I

01:59:35  19  believe next week I have one, which is -- it's Tuesday and

01:59:37  20  Thursday -- or Tuesday and Wednesday of next week.

01:59:40  21  Q.  Now, apart from dealing with Government governmental

01:59:44  22  entities and security companies, do you market any other --

01:59:46  23  any commercial ranges?

01:59:47  24  A.  We do.

01:59:47  25  Q.  Have you marketed any commercial ranges in the Chicago

01:59:50    1    area?

01:59:50    2    A.  I have.  We built Mega Sports in Plainfield, which was

01:59:55    3    constructed twelve years ago, and I also have pending

01:59:58    4    estimates out with G.A.T. Guns in Dundee, as well as a new Gun

02:00:03    5    World range in Lombard.

02:00:04    6    Q.  Okay.  In your dealings with your Chicago-area customers,

02:00:08    7    has the topic of constructing a range inside the city limits

02:00:11    8    ever come up?

02:00:12    9    A.  It has several times.

02:00:13    10    Q.  Okay.  Do you believe that you can sell a range in

02:00:15    11    Chicago?

02:00:15    12    A.  I do.

02:00:17    13    Q.  Okay.  You believe there's a market for selling commercial

02:00:20    14    gun ranges in Chicago?

02:00:21    15    A.  I do.

02:00:22    16    Q.  Okay.  And if Action Target is to prevail in this lawsuit,

02:00:25    17    will you go ahead and market and sell and install ranges in

02:00:28    18    the City of Chicago?

02:00:29    19    A.  Yes, we will.

02:00:29    20    Q.  Okay.  Does Action Target build any mobile ranges?

02:00:32    21    A.  We do.

02:00:34    22    Q.  Okay.  Are they the same as your brick-and-mortar ranges?

02:00:37    23    What might be the differences or similarities between a mobile

02:00:40    24    range and a brick-and-mortar range?

02:00:42    25    A.  It's the exact same indoor range equipment.  It's just

| | | |
|---|---|---|
| 02:00:45 | 1 | scaled to fit in a trailer as opposed to a brick-and-mortar |
| 02:00:48 | 2 | range. |
| 02:00:48 | 3 | Q.  Okay.  Is Action Target currently constructing a mobile |
| 02:00:51 | 4 | range? |
| 02:00:51 | 5 | A.  We are. |
| 02:00:51 | 6 | Q.  And who might be that customer? |
| 02:00:54 | 7 | A.  I believe it's Las Vegas Corrections in Nevada. |
| 02:00:57 | 8 | Q.  Okay.  How frequently are these mobile ranges used, these |
| 02:01:01 | 9 | things that you see in the industry? |
| 02:01:02 | 10 | A.  They're quite common.  I understand that our competitor, |
| 02:01:06 | 11 | Meggitt, has sold over a hundred of these mobile ranges. |
| 02:01:08 | 12 | Q.  Okay.  And have you seen any Meggitt ranges in the Chicago |
| 02:01:11 | 13 | area? |
| 02:01:12 | 14 | A.  I have.  Every year I see one in Wheeling, and it's the |
| 02:01:14 | 15 | Westin North Chicago Conference Center where we hold the |
| 02:01:18 | 16 | ILEETA conference, that's the International Law Enforcement |
| 02:01:23 | 17 | Educators and Trainers Association.  And that trailer range is |
| 02:01:24 | 18 | parked there every year, the last three years, on the -- in |
| 02:01:27 | 19 | the parking lot, on the side of the hotel, and they use it |
| 02:01:30 | 20 | every day for live fire. |
| 02:01:32 | 21 | Q.  Okay.  Can civilians use mobile ranges? |
| 02:01:37 | 22 | A.  Yes. |
| 02:01:37 | 23 | Q.  Okay.  Has Action Target sold any mobile ranges that it |
| 02:01:40 | 24 | knows to be used by civilians? |
| 02:01:42 | 25 | A.  I'm aware of one, Arms to Bear in Sparks, Nevada. |

| | | |
|---|---|---|
| 02:01:46 | 1 | Q. Okay. And what do they do at that range? |
| 02:01:48 | 2 | A. They use that as a mobile training range for both law |
| 02:01:51 | 3 | enforcement agencies and for civilian concealed carry classes. |
| 02:01:54 | 4 | Q. Okay. Let's talk a little bit about Action Target's |
| 02:01:56 | 5 | competitors. |
| 02:01:58 | 6 | Are you familiar with your competitors in the |
| 02:01:59 | 7 | business? |
| 02:01:59 | 8 | A. I certainly am. |
| 02:02:01 | 9 | Q. Okay. Who are some of your competitors? |
| 02:02:03 | 10 | A. In terms of mobile ranges? |
| 02:02:05 | 11 | Q. Well, both mobile and fixed. |
| 02:02:07 | 12 | A. Meggitt Range Systems are the two major mobile range |
| 02:02:11 | 13 | companies. |
| 02:02:11 | 14 | Q. Okay. Was Meggitt ever known as anything else before? |
| 02:02:14 | 15 | A. They were. They have been known as Caswell. I believe |
| 02:02:17 | 16 | the Meggitt Company purchased Caswell in the past ten years, |
| 02:02:20 | 17 | and prior to that it was Detroit Armor that was purchased by |
| 02:02:24 | 18 | Caswell. |
| 02:02:24 | 19 | Q. Do you see any Caswell equipment locally in Chicago still? |
| 02:02:26 | 20 | A. All over, right here in Chicago at the academy, 1300 West |
| 02:02:31 | 21 | Jackson -- |
| 02:02:31 | 22 | Q. Okay. |
| 02:02:31 | 23 | A. -- has Meggitt and Caswell equipment. |
| 02:02:34 | 24 | Q. Okay. Assuming that a range is well built to your |
| 02:02:38 | 25 | standards, is a gun range incompatible with any neighboring |

02:02:42  1  uses?

02:02:43  2  A.  No, in fact we've --

02:02:44  3       MR. FORTI:  Objection, your Honor.  I think there's a

02:02:46  4  lack of foundation.

02:02:47  5       THE COURT:  I agree.  Can you lay a better foundation

02:02:51  6  first?  Sustained.

02:02:51  7       MR. GURA:  Sure.

02:02:52  8  BY MR. GURA:

02:02:52  9  Q.  Are you concerned -- when you construct a fixed range, are

02:02:56  10  you concerned about the neighboring uses?

02:02:58  11  A.  No.

02:02:58  12  Q.  Okay.  Can you please give some examples of uses that

02:03:02  13  occur next to or in the vicinity of the ranges that you've

02:03:06  14  constructed?

02:03:06  15  A.  Sure --

02:03:08  16       MR. FORTI:  Same objection, your Honor, lack of

02:03:09  17  foundation.

02:03:10  18       THE COURT:  It's the same ruling.

02:03:11  19       So we have a two-part issue.  You need to have him

02:03:14  20  lay the foundation about how he's knowledgeable about what --

02:03:18  21  how it's constructed and then also what it would be compatible

02:03:23  22  with.  So you're going to have to lay those double foundations

02:03:26  23  for that to come in.

02:03:28  24       MR. GURA:  Okay.

02:03:28  25  BY MR. GURA:

| | | |
|---|---|---|
| 02:03:29 | 1 | Q.  It's part of your job, you've testified -- do you go out |
| 02:03:32 | 2 | and meet with people who wish to construct ranges? |
| 02:03:35 | 3 | A.  Yes, and architects for public projects. |
| 02:03:37 | 4 | Q.  Okay.  And do you ever survey the sites then where the |
| 02:03:40 | 5 | ranges are proposed? |
| 02:03:42 | 6 | A.  Yes. |
| 02:03:42 | 7 | Q.  And you have discussions with the architects and engineers |
| 02:03:45 | 8 | and other people who are in charge of the project? |
| 02:03:47 | 9 | A.  Yes, I do. |
| 02:03:48 | 10 | Q.  Okay.  And as part of your discussions do you talk about |
| 02:03:50 | 11 | the dimensions of the range, for example? |
| 02:03:54 | 12 | A.  We do.  It's very critical to fit all of the equipment. |
| 02:03:57 | 13 | Q.  Okay.  Do you discuss the materials that are used in the |
| 02:03:59 | 14 | construction? |
| 02:03:59 | 15 | A.  We do.  The architect expects the ceiling structure to |
| 02:04:05 | 16 | handle the weight loads that we submit to them. |
| 02:04:06 | 17 | Q.  Okay.  So it's fair to say that you, as part of the range |
| 02:04:09 | 18 | construction business, you work closely with architects and |
| 02:04:12 | 19 | other people who are in the business of putting this range |
| 02:04:14 | 20 | together, that's correct? |
| 02:04:16 | 21 | A.  Yes, very closely. |
| 02:04:17 | 22 | Q.  Okay.  And as part of the considerations that you engage |
| 02:04:20 | 23 | in, when you're designing a range and trying to figure out how |
| 02:04:23 | 24 | it might be constructed, do you consider at all what other |
| 02:04:26 | 25 | uses that property might have? |

| | |
|---|---|
| 02:04:28 | 1 |
| 02:04:31 | 2 |
| 02:04:35 | 3 |
| 02:04:42 | 4 |
| 02:04:45 | 5 |
| 02:04:47 | 6 |
| 02:04:48 | 7 |
| 02:04:49 | 8 |
| 02:04:50 | 9 |
| 02:04:56 | 10 |
| 02:05:03 | 11 |
| 02:05:08 | 12 |
| 02:05:08 | 13 |
| 02:05:10 | 14 |
| 02:05:13 | 15 |
| 02:05:14 | 16 |
| 02:05:14 | 17 |
| 02:05:16 | 18 |
| 02:05:17 | 19 |
| 02:05:18 | 20 |
| 02:05:21 | 21 |
| 02:05:22 | 22 |
| 02:05:22 | 23 |
| 02:05:23 | 24 |
| 02:05:24 | 25 |

A.  Yes, sound and parking are usually the major issues that come up with city councils and with architects.

Q.  Okay.  Can you discuss some of the -- some of the neighboring uses that you've encountered in the course of your dealing with constructing ranges?

A.  Yes, we've done --

MR. FORTI:  Objection, your Honor.  I think we have the same problem.

THE COURT:  I think we have a problem here regarding what this range is comprised of.  Can he testify regarding what actually is used, as far as the materials?

MR. GURA:  Sure.

BY MR. GURA:

Q.  Are you familiar with the materials that are used to construct ranges?

A.  Yes, I am.

Q.  Okay.  And you're familiar with the equipment that goes into the ranges?

A.  Yes.

Q.  And it's your business to know how that equipment functions and what impact it might have upon other materials in neighboring --

THE COURT:  Okay.  What is it, though?

BY MR. GURA:

Q.  Can you describe what a range -- let's do this -- you're

| | | |
|---|---|---|
| 02:05:26 | 1 | right, your Honor -- |
| 02:05:27 | 2 | THE COURT:  Let's just find out -- |
| 02:05:27 | 3 | BY MR. GURA: |
| 02:05:28 | 4 | Q.  What typically goes into building a range? |
| 02:05:31 | 5 | A.  Generally concrete side walls or a ballistic steel is used |
| 02:05:35 | 6 | to make it ballistically secure. |
| 02:05:39 | 7 | Q.  Okay.  And what equipment do you then install? |
| 02:05:42 | 8 | A.  Once we have the range box, we install ceiling baffles, |
| 02:05:46 | 9 | side wall baffles in some cases, a bullet trap is absolutely |
| 02:05:49 | 10 | necessary, and sometimes shooting stalls and target systems. |
| 02:05:54 | 11 | Q.  Okay.  And what are all these things designed to do?  What |
| 02:05:56 | 12 | your concerns -- let me back up one step actually. |
| 02:05:59 | 13 | When you select these various things that you've |
| 02:06:04 | 14 | described, what are you concerned about? |
| 02:06:05 | 15 | A.  We want to contain the bullet. |
| 02:06:08 | 16 | Q.  Okay. |
| 02:06:08 | 17 | THE COURT:  What is a bullet trap? |
| 02:06:09 | 18 | BY MR. GURA: |
| 02:06:10 | 19 | Q.  What is a bullet trap? |
| 02:06:11 | 20 | A.  A bullet trap is a bullet collection system.  It has to |
| 02:06:14 | 21 | both stop the bullet and make it easy to retrieve the lead, |
| 02:06:17 | 22 | when the time comes to collect the lead. |
| 02:06:19 | 23 | THE COURT:  And what is that comprised of? |
| 02:06:23 | 24 | THE WITNESS:  Generally either sloped steel plates of |
| 02:06:26 | 25 | A/R steel, which is hardened steel, or a granulated rubber of |

02:06:28  1  some type.  Those are the most popular right now.

02:06:30  2       THE COURT:  Okay.  And where are they within the

02:06:33  3  structure?

02:06:34  4       THE WITNESS:  They are at the back end of the range

02:06:36  5  behind the targets where you're shooting.  They have to

02:06:39  6  capture the rounds.

02:06:40  7       THE COURT:  Okay.  Thanks.

02:06:41  8  BY MR. GURA:

02:06:41  9  Q.  Okay.  So it's fair to say then that you're in charge --

02:06:46  10  or you're concerned with supplying material that contains the

02:06:48  11  bullets?

02:06:49  12  A.  That's correct.

02:06:50  13  Q.  Okay.  And so one of your concerns is that bullets do not

02:06:53  14  travel outside the range; is that fair to say?

02:06:55  15  A.  Yes.

02:06:55  16  Q.  Okay.  What other concerns do you have?  You mentioned

02:06:58  17  noise, is that a --

02:06:59  18  A.  Sound is a concern.  And the construction of the range

02:07:01  19  walls and ceiling have a lot to do with how sound is

02:07:05  20  transmitted outside the building.

02:07:07  21  Q.  Okay.  And I'll ask this again:  What neighboring uses

02:07:14  22  then have you found to be compatible, given your knowledge of

02:07:17  23  what material goes into the range, given your involvement in

02:07:21  24  the design of a range, given the supervision of the

02:07:24  25  construction of ranges that you testified to earlier, what

| | | |
|---|---|---|
| 02:07:27 | 1 | type of uses have you found to be compatible with shooting |
| 02:07:31 | 2 | ranges? |
| 02:07:32 | 3 | MR. FORTI: Same objection, your Honor. I think |
| 02:07:34 | 4 | we've only established that this witness can talk about, if |
| 02:07:39 | 5 | you will, the ingredients that go into the construction of the |
| 02:07:42 | 6 | range. But he has not -- there's been no foundation |
| 02:07:45 | 7 | established as to any expertise the witness might have in |
| 02:07:47 | 8 | terms of talking about the relationship between the range and |
| 02:07:50 | 9 | the surrounding area. |
| 02:07:51 | 10 | THE COURT: Right. I think it's -- the proper |
| 02:07:54 | 11 | objection may be that it's conclusion that is based upon -- of |
| 02:07:58 | 12 | the compatibility of the neighborhood. He can conclude, based |
| 02:08:02 | 13 | upon his own experience, where these ranges have been placed. |
| 02:08:06 | 14 | MR. GURA: Okay. We can ask that. |
| 02:08:06 | 15 | THE COURT: That he can say, because he's in the |
| 02:08:08 | 16 | field. So he can certainly say, This is what it's comprised |
| 02:08:12 | 17 | of and this is where we put them. But he can't make the |
| 02:08:14 | 18 | conclusion, based upon a 702 expert analysis, that, I believe |
| 02:08:18 | 19 | that it's compatible because. |
| 02:08:20 | 20 | MR. GURA: Okay. |
| 02:08:20 | 21 | THE COURT: So I think that will cure your problem. |
| 02:08:22 | 22 | Thank you. |
| 02:08:22 | 23 | MR. GURA: Thank you so much, your Honor. |
| 02:08:24 | 24 | BY MR. GURA: |
| 02:08:24 | 25 | Q. Where have these ranges been put? Next to what kind of |

02:08:28    1    uses have you experienced these ranges being placed?

02:08:28    2    A.  Varied locations.  Very popular are strip malls.  We've

02:08:32    3    done several in -- we have one in a Target parking lot next to

02:08:36    4    a steakhouse and a mattress company.  We have another one that

02:08:39    5    shares a parking lot with a Sam's Club warehouse.

02:08:42    6            We have a range in Waikiki, Honolulu, Hawaii, which

02:08:47    7    is right in a popular strip mall right off the beach.

02:08:50    8            THE COURT:  Maybe we all need to go see that one.

02:08:52    9            MR. GURA:  That would be great.

02:08:53   10            (Laughter.)

02:08:54   11            THE WITNESS:  Another critical one is a federal range

02:08:58   12    we did in St. Louis, the Federal Reserve Bank.  And that range

02:09:01   13    is rifle rated.  It does share a wall with the gym that the

02:09:05   14    employees use.

02:09:06   15    BY MR. GURA:

02:09:06   16    Q.  Okay.  All these places you've described are commercial in

02:09:10   17    character.

02:09:10   18            Does Action Target ever build ranges in a residential

02:09:14   19    neighborhood?

02:09:14   20    A.  We've done many, yes.

02:09:15   21    Q.  What kind of ranges go into residential neighborhoods?

02:09:18   22    A.  Generally an indoor range, two to three positions or even

02:09:22   23    one.  And I've done one in Miami right off the bay.  Estimates

02:09:26   24    for one in Atlanta, in Milwaukee, and we've done three in

02:09:30   25    Utah, one in Salt Lake City, one in Park City, Utah and one in

02:09:35 1    Mapleton.

02:09:37 2    Q.  And just to clarify when I -- what kind of structures are

02:09:40 3    these ranges located in, since --

02:09:41 4    A.  It's in the home.  It's constructed usually as part of the

02:09:44 5    basement.

02:09:45 6    Q.  Okay.

02:09:46 7         THE COURT:  I just have a clarifying question.

02:09:48 8         So when we were just discussing all of the ranges,

02:09:51 9    the locations, we were not talking about mobile ranges?

02:09:54 10        THE WITNESS:  Those are permanent home ranges.

02:09:56 11        THE COURT:  Permanent ranges.

02:09:58 12        THE WITNESS:  Yes.

02:09:58 13        THE COURT:  Okay.

02:09:59 14   BY MR. GURA:

02:09:59 15   Q.  You mentioned earlier that cities are often concerned

02:10:02 16   about noise and parking.  Let's talk about noise for a moment.

02:10:05 17        Have you found -- has Action Target done anything to

02:10:10 18   address the noise issues in your business?

02:10:12 19   A.  Generally --

02:10:13 20        MR. FORTI:  Objection, your Honor.  I don't think

02:10:15 21   this witness -- a proper foundation has been laid in terms of

02:10:19 22   his ability to comment on noise, other than what items are

02:10:22 23   used to construct the ranges, various ranges that he's talked

02:10:27 24   about.

02:10:27 25        THE COURT:  Okay.  I'll take that objection as

| | | |
|---|---|---|
| 02:10:29 | 1 | another foundation objection.  That's sustained. |
| 02:10:31 | 2 | MR. GURA:  Okay. |
| 02:10:32 | 3 | THE COURT:  And now you'll need to lay his experience |
| 02:10:35 | 4 | there. |
| 02:10:35 | 5 | MR. GURA:  Sure. |
| 02:10:35 | 6 | BY MR. GURA: |
| 02:10:36 | 7 | Q.  Have you ever installed equipment that's designed to |
| 02:10:38 | 8 | address noise issues? |
| 02:10:39 | 9 | A.  Yes, we have. |
| 02:10:40 | 10 | Q.  And have you found that equipment to be successful? |
| 02:10:42 | 11 | A.  Yes. |
| 02:10:43 | 12 | Q.  Thank you. |
| 02:10:46 | 13 | Finally, this is to address something that might be |
| 02:10:50 | 14 | designated in a deposition so the Court -- if this sounds |
| 02:10:53 | 15 | random, it actually does go to something that's been |
| 02:10:56 | 16 | designated -- I think it's been designated by the defendants. |
| 02:10:59 | 17 | Are you experienced with firearms? |
| 02:11:02 | 18 | A.  I am. |
| 02:11:03 | 19 | Q.  And as part of your business, do you need to know how |
| 02:11:06 | 20 | ammunition functions and what it contains? |
| 02:11:08 | 21 | A.  Absolutely. |
| 02:11:09 | 22 | Q.  Okay.  Is cordite used in ammunition? |
| 02:11:12 | 23 | A.  Not to my knowledge, no. |
| 02:11:13 | 24 | Q.  Has cordite ever been used in ammunition? |
| 02:11:17 | 25 | A.  In the U.S. I don't believe it's ever been used in |

02:11:20  1   ammunition.  In other countries prior to World War II, it was

02:11:26  2   used in some quantities.

02:11:26  3   Q.  Perfect.

02:11:27  4         And going back to the issue of gun ranges, has Action

02:11:29  5   Target ever experienced issues with crime occurring at gun

02:11:32  6   ranges?

02:11:32  7   A.  Not to my knowledge, no.

02:11:33  8   Q.  Okay.  And let's talk about accidents at gun ranges or

02:11:36  9   accidents at gun ranges you've constructed.  Those, would you

02:11:40  10  say, are they commonplace or are they rare?

02:11:43  11        MR. FORTI:  Objection, your Honor.  Again, a

02:11:44  12  foundation objection.

02:11:46  13        THE COURT:  Okay.  Sustained.

02:11:48  14  BY MR. GURA:

02:11:48  15  Q.  Are you aware of any accidents at Action Target ranges?

02:11:51  16  A.  I'm not.

02:11:52  17        MR. FORTI:  Same objection.

02:11:53  18        THE COURT:  Okay.  I don't know what his experience

02:11:55  19  is in knowing what accidents there would be.  So you're going

02:11:59  20  to have to lay that foundation as to how he would know, how he

02:12:03  21  gathered it, what his basis for his knowledge is.  So it's

02:12:07  22  sustained.

02:12:07  23        MR. FORTI:  Thank you.

02:12:08  24  BY MR. GURA:

02:12:08  25  Q.  Is safety something you're concerned with when you design

02:12:10　1　and sell ranges?

02:12:11　2　A.　Absolutely.

02:12:13　3　Q.　Okay.　And as part of your job, do you study the way the

02:12:19　4　different designs and different equipment impact safety?

02:12:21　5　A.　Yes, we do.

02:12:23　6　Q.　Okay.　And is it something that you monitor or do you --

02:12:28　7　were you -- are you involved in monitoring the way that the

02:12:33　8　Action Target ranges operate after you sell them?

02:12:35　9　A.　No, we're not.

02:12:36　10　Q.　Okay.　But you do interact with your customers once you

02:12:41　11　complete the range; is that correct?

02:12:42　12　A.　Yes, that's right.

02:12:44　13　Q.　Okay.　Are you -- are you aware of any accidents occurring

02:12:47　14　at Action Target ranges?

02:12:48　15　A.　I'm not.

02:12:49　16　　　　THE COURT:　Okay.　That's -- I assume he's standing

02:12:51　17　for an objection.

02:12:52　18　　　　MR. FORTI:　Yes, your Honor.

02:12:53　19　　　　THE COURT:　Based upon speculation --

02:12:53　20　　　　MR. FORTI:　Yes.

02:12:54　21　　　　THE COURT:　-- this time, right.

02:12:56　22　　　　MR. FORTI:　Yes.

02:12:57　23　　　　THE COURT:　Sustained.

02:12:59　24　　　　All right.　You can go on.

02:13:00　25　BY MR. GURA:

02:13:00  1   Q.  Last question.

02:13:01  2        Are you aware -- as someone who sells gun ranges, as

02:13:04  3   someone who has installed gun ranges, as somebody who has

02:13:07  4   helped work on the design of gun ranges, are you aware -- is

02:13:09  5   there anything that you're aware of that would indicate to you

02:13:12  6   that a gun range could not be placed in the City of Chicago?

02:13:15  7   A.  No.

02:13:15  8        MR. FORTI:  Same objection, your Honor.  It's a

02:13:18  9   foundation and I think it's speculative.

02:13:19  10        MR. GURA:  I think he has the ability to testify

02:13:21  11   about his business and whether his business is compatible with

02:13:24  12   the city.  He's sold it.  He knows what he does.

02:13:27  13        THE COURT:  Right.  He has -- the problem with the

02:13:30  14   question is that it is broadly speaking.  It's assuming that

02:13:35  15   he has an overarching knowledge.

02:13:38  16        If you have, for example, all of the information

02:13:41  17   coming from these ranges -- they had to report to you once a

02:13:44  18   year whether there were accidents and whether the city had any

02:13:48  19   problems with them -- then he might have the basis to conclude

02:13:51  20   that everything is fine and dandy, but you don't have that

02:13:55  21   foundation.

02:13:55  22        MR. GURA:  I believe I asked him whether he's aware

02:13:58  23   of any reason, not whether he has surveyed anything.  It's

02:14:02  24   whether in his -- this is a man who builds, designs, and sells

02:14:08  25   gun ranges.  He does them here in the city, does them in the

| | | |
|---|---|---|
| 02:14:09 | 1 | suburbs, is he aware of any reason why what he does now could |
| 02:14:13 | 2 | not occur here in the city. |
| 02:14:13 | 3 | THE COURT: Right. Okay. So the concept then is the |
| 02:14:17 | 4 | same, going back to his previous experience as to whether or |
| 02:14:21 | 5 | not he was aware of any reasons in the past. He's not |
| 02:14:23 | 6 | collecting that information. So how does he know what -- |
| 02:14:26 | 7 | MR. GURA: Is he aware of any -- |
| 02:14:28 | 8 | THE COURT: All right. The objection is sustained. |
| 02:14:29 | 9 | MR. GURA: Okay. Nothing further. |
| 02:14:29 | 10 | - - - |
| 02:14:29 | 11 | CHRISTOPHER HART, CROSS-EXAMINATION |
| 02:14:46 | 12 | BY MR. FORTI: |
| 02:14:46 | 13 | Q. Good afternoon, Mr. Hart. |
| 02:15:11 | 14 | A. Good afternoon. |
| 02:15:12 | 15 | Q. Mr. Hart, you graduated from Brigham Young University in |
| 02:15:16 | 16 | 2006; is that correct? |
| 02:15:17 | 17 | A. That's correct. |
| 02:15:17 | 18 | Q. And your degree was in international relations? |
| 02:15:21 | 19 | A. Yes. |
| 02:15:22 | 20 | Q. And when did you begin work at Action Target? |
| 02:15:24 | 21 | A. 2005. |
| 02:15:26 | 22 | Q. So you were still at Brigham Young when you started at |
| 02:15:31 | 23 | Action Target; is that correct? |
| 02:15:32 | 24 | A. That's correct. |
| 02:15:32 | 25 | Q. And what was your first position at Action Target? |

02:15:35 1  A.  Sales associate of the southeast territory.

02:15:38 2  Q.  And that was in the period of 2005 through 2007; is that

02:15:43 3  right?

02:15:43 4  A.  Yes.

02:15:43 5  Q.  And what were your responsibilities as the sales rep for

02:15:44 6  the southeast region?

02:15:45 7  A.  The same responsibilities I have now, but I handled

02:15:48 8  smaller projects.

02:15:50 9  Q.  All right.  Now, while you were at Brigham Young

02:15:53 10 University, you didn't take any classes in land use, did you?

02:15:56 11 A.  No.

02:15:57 12        MR. GURA:  Objection, relevance.

02:15:58 13        THE COURT:  I didn't hear you, and you need to stand.

02:16:00 14        MR. GURA:  Objection, relevance.

02:16:01 15        THE COURT:  Oh, okay.

02:16:02 16        MR. GURA:  We weren't asking about land uses.  I

02:16:04 17 don't see how Mr. Forti should.

02:16:05 18        THE COURT:  But he did -- he talked about where they

02:16:08 19 were located, so it's proper cross.  Overruled.

02:16:12 20        MR. FORTI:  Thank you.

02:16:15 21 BY MR. FORTI:

02:16:15 22 Q.  Nor have you taken any classes in urban planning?

02:16:17 23 A.  No.

02:16:17 24 Q.  Or zoning?

02:16:17 25 A.  No.

| | |
|---|---|
| 02:16:17 | 1 |
| 02:16:19 | 2 |
| 02:16:19 | 3 |
| 02:16:23 | 4 |
| 02:16:23 | 5 |
| 02:16:29 | 6 |
| 02:16:33 | 7 |
| 02:16:33 | 8 |
| 02:16:33 | 9 |
| 02:16:36 | 10 |
| 02:16:40 | 11 |
| 02:16:40 | 12 |
| 02:16:43 | 13 |
| 02:16:46 | 14 |
| 02:16:51 | 15 |
| 02:16:53 | 16 |
| 02:16:56 | 17 |
| 02:16:58 | 18 |
| 02:17:00 | 19 |
| 02:17:01 | 20 |
| 02:17:06 | 21 |
| 02:17:09 | 22 |
| 02:17:12 | 23 |
| 02:17:12 | 24 |
| 02:17:16 | 25 |

          MR. GURA:  Your Honor, same objection.  He's not a
zoning expert.
          THE COURT:  He just said that.  Overruled.
BY MR. FORTI:
Q.  And after your graduation from Brigham Young University in
2006, you haven't had any other formal education; isn't that
right?
A.  That's right.
Q.  All right.  And since joining Action Target, you have not
worked in any land use capacity, have you?
A.  No.
Q.  All right.  What are your current job responsibilities as
the Midwest territory manager?
A.  I find new customers, sell them equipment, oversee the
manufacturing and installation of the equipment.
Q.  And is it accurate to say that as part of that
responsibility you are responsible for designing the range
layouts for customers?
A.  That's correct.
Q.  All right.  And you are currently the only -- you're the
current manager in the Midwest region.  You don't have any
other sale associates working for you, do you?
A.  That's correct.
Q.  You just have one sales assistant, and her job was only
recently announced?

| | | |
|---|---|---|
| 02:17:17 | 1 | A.  Yes. |
| 02:17:17 | 2 | Q.  All right.  Now, what division of Action Target are you |
| 02:17:21 | 3 | with? |
| 02:17:22 | 4 | A.  Law enforcement, commercial. |
| 02:17:23 | 5 | Q.  All right.  And the law enforcement division provides for |
| 02:17:27 | 6 | sales in both law enforcement and civilian sales, yes? |
| 02:17:31 | 7 | A.  Yes. |
| 02:17:32 | 8 | Q.  And the region that you do it in is how many states in the |
| 02:17:36 | 9 | Midwest? |
| 02:17:36 | 10 | A.  Seven Midwestern states. |
| 02:17:38 | 11 | Q.  And what were those states? |
| 02:17:39 | 12 | A.  Minnesota, Wisconsin, Illinois, Missouri, Iowa, Nebraska. |
| 02:17:43 | 13 | Q.  All right.  Is it accurate to say -- |
| 02:17:45 | 14 | A.  And Kansas. |
| 02:17:46 | 15 | Q.  I'm sorry.  Did I interrupt? |
| 02:17:48 | 16 | A.  Kansas as well. |
| 02:17:49 | 17 | Q.  All right.  Is it accurate to say that the mission of the |
| 02:17:52 | 18 | law enforcement division is to provide quality training |
| 02:17:55 | 19 | equipment to both law enforcement and civilian markets? |
| 02:17:59 | 20 | A.  Yes. |
| 02:17:59 | 21 | Q.  All right.  Now, isn't it true, Mr. Hart, that Action |
| 02:18:07 | 22 | Target, and particularly you, do not get involved in zoning |
| 02:18:10 | 23 | regulations? |
| 02:18:14 | 24 | A.  That's true. |
| 02:18:15 | 25 | Q.  In fact, contrary to what Action Target says on its |

02:18:18    1    website, That they provide assistance in zoning, you

02:18:22    2    acknowledge that that is an untrue statement; isn't that

02:18:25    3    correct?

02:18:25    4            MR. GURA:  Objection.  Misstates the testimony.  He's

02:18:27    5    talking about his own experience.

02:18:28    6            THE COURT:  Okay.  Sustained.

02:18:32    7    BY MR. FORTI:

02:18:32    8    Q.  You believe that Action Target does not provide zoning

02:18:36    9    assistance to its customers; isn't that true?

02:18:38   10            MR. GURA:  Objection, argumentative, same question.

02:18:40   11            MR. FORTI:  Your Honor, it's cross.

02:18:42   12            THE COURT:  It's overruled.

02:18:45   13    BY MR. FORTI:

02:18:45   14    Q.  Your answer, please?

02:18:46   15    A.  Yes.  We do testify at city council meetings.  We do not

02:18:51   16    advise our customers on zoning.

02:18:52   17    Q.  Because, We don't get involved with zoning regulations;

02:18:56   18    isn't that right?

02:18:57   19    A.  Correct.

02:19:02   20    Q.  Now, during the course of your direct, there was a

02:19:08   21    discussion about your involvement in several government

02:19:12   22    facilities here in Chicago.  You remember that testimony?

02:19:15   23    A.  Yes.

02:19:16   24    Q.  All right.  And I believe the first one was the Federal

02:19:19   25    Air Marshal facility, correct?

| | | |
|---|---|---|
| 02:19:20 | 1 | A.  Yes. |
| 02:19:21 | 2 | Q.  All right.  Now, you did not -- you and Action Target did |
| 02:19:24 | 3 | not have any role in the selection or location of that |
| 02:19:27 | 4 | property; is that right? |
| 02:19:29 | 5 | A.  Correct. |
| 02:19:29 | 6 | Q.  You simply provided retrofitting for that location? |
| 02:19:32 | 7 | A.  We have not provided retrofitting for that location. |
| 02:19:34 | 8 | Q.  Your only plan is to provide retrofitting.  So you had |
| 02:19:38 | 9 | nothing to do with the location? |
| 02:19:39 | 10 | A.  No. |
| 02:19:39 | 11 | Q.  Or its suitability of that location? |
| 02:19:42 | 12 | A.  No. |
| 02:19:42 | 13 | Q.  Because you came on the scene after the site was already |
| 02:19:45 | 14 | in operation, correct? |
| 02:19:46 | 15 | A.  With the range in operation, yes. |
| 02:19:48 | 16 | Q.  Yes. |
| 02:19:48 | 17 | And let's talk about the postal range at 743 South |
| 02:19:51 | 18 | Canal.  You -- Action Target and you played no role in the |
| 02:19:55 | 19 | location of the range at the postal range; isn't that right? |
| 02:19:58 | 20 | A.  That's right. |
| 02:19:59 | 21 | Q.  Because that building was already there? |
| 02:20:01 | 22 | A.  Yes. |
| 02:20:01 | 23 | Q.  And your goal is only to provide retrofitting, if you get |
| 02:20:05 | 24 | the business, at the postal range; is that right? |
| 02:20:08 | 25 | A.  Or a new range. |

| | | |
|---|---|---|
| 02:20:08 | 1 | Q.  Or a new range. |
| 02:20:09 | 2 | All right.  Likewise, when we go to the U.S. Customs |
| 02:20:12 | 3 | at 610 South Canal, you played no role in the selection of the |
| 02:20:15 | 4 | property, right? |
| 02:20:16 | 5 | A.  No, it's existing. |
| 02:20:17 | 6 | Q.  All right.  And same thing with the Federal Reserve at |
| 02:20:20 | 7 | 230 South LaSalle, Action Target and you played no role in the |
| 02:20:25 | 8 | selection of that property? |
| 02:20:26 | 9 | A.  No. |
| 02:20:26 | 10 | Q.  It was long -- it was in establishment long before you |
| 02:20:29 | 11 | came on the scene? |
| 02:20:30 | 12 | A.  Yes. |
| 02:20:31 | 13 | Q.  All right.  Now, we mentioned Brinks.  Isn't it true, |
| 02:20:34 | 14 | Mr. Hart, that you've had no contacts -- contact with Brinks |
| 02:20:38 | 15 | since 2000- -- since the early 2000s? |
| 02:20:42 | 16 | A.  2008. |
| 02:20:42 | 17 | Q.  2008. |
| 02:20:43 | 18 | And at the time -- the last time you had contact with |
| 02:20:46 | 19 | Brinks, you thought that they were on Tripp Avenue; is that |
| 02:20:50 | 20 | correct? |
| 02:20:50 | 21 | A.  Yes. |
| 02:20:51 | 22 | Q.  You actually haven't been to the new location of Brinks, |
| 02:20:54 | 23 | have you? |
| 02:20:54 | 24 | A.  I have not. |
| 02:20:55 | 25 | Q.  In fact, other than what someone told you, we don't even |

| | |
|---|---|
| 02:20:58 | 1 know if Brinks, in fact, has a location at this new address; |
| 02:21:02 | 2 isn't that true? |
| 02:21:03 | 3 MR. GURA: Objection. |
| 02:21:04 | 4 THE COURT: Sustained. |
| 02:21:06 | 5 BY MR. FORTI: |
| 02:21:06 | 6 Q. You haven't been to the new Brinks facility, have you? |
| 02:21:09 | 7 MR. GURA: Objection, asked and answered. |
| 02:21:10 | 8 THE COURT: That's sustained. He answered that one. |
| 02:21:15 | 9 MR. FORTI: All right. |
| 02:21:26 | 10 BY MR. FORTI: |
| 02:21:26 | 11 Q. Now, based on your experience in the Chicago area, Action |
| 02:21:34 | 12 Target hasn't had much success in developing private ranges |
| 02:21:40 | 13 out in the suburbs; isn't that correct? |
| 02:21:43 | 14 MR. GURA: Objection, argumentative, ambiguous. What |
| 02:21:47 | 15 is much success, define success? |
| 02:21:49 | 16 THE COURT: Okay. I'll give you that. Sustained. |
| 02:21:51 | 17 MR. FORTI: All right. |
| 02:21:53 | 18 BY MR. FORTI: |
| 02:21:53 | 19 Q. Let's talk about the success or lack thereof you've had in |
| 02:21:57 | 20 the suburbs in the construction of ranges. |
| 02:22:01 | 21 All right. First, with respect to outdoor ranges, |
| 02:22:04 | 22 what outdoor ranges has Action Target developed since you've |
| 02:22:09 | 23 been the Midwest regional manager? |
| 02:22:11 | 24 A. In Chicago? |
| 02:22:12 | 25 Q. In the suburban area. |

02:22:13  1  A.  In the suburban area, no outdoor ranges.

02:22:16  2  Q.  All right.  Then with -- when we talk about indoor ranges,

02:22:19  3  you've had some success on the law enforcement side; isn't

02:22:22  4  that right?

02:22:22  5  A.  That's right.

02:22:23  6  Q.  All right.  And I believe you've had success with a range

02:22:30  7  in Wheeling; is that right?

02:22:32  8  A.  Yes.

02:22:33  9  Q.  And for the Wheeling police?

02:22:35  10  A.  Yes.

02:22:35  11  Q.  And for the Buffalo Grove police?

02:22:38  12  A.  Yes.

02:22:38  13  Q.  And for the Hoffman Estates police?

02:22:41  14  A.  Yes.

02:22:42  15  Q.  And the Skokie police?

02:22:43  16  A.  Yes.

02:22:44  17  Q.  And the Elk Grove Village police?

02:22:46  18  A.  Yes.

02:22:47  19  Q.  And Aurora?

02:22:48  20  A.  Yes.

02:22:49  21  Q.  All right.  And as far as you know, none of those police

02:22:54  22  entities are open to the public; is that correct?

02:22:57  23  A.  Correct, to my knowledge.

02:22:58  24  Q.  All right.  In fact, based on your experience in the

02:23:03  25  industry, Mr. Hart, isn't it true that with the exception of

02:23:06 1   two ranges in the state of Utah, you know of no police range

02:23:12 2   that is -- or law enforcement range that is open to the

02:23:15 3   public?

02:23:15 4   A.  I believe in my deposition I had one more, Kirkwood,

02:23:19 5   Missouri.

02:23:19 6   Q.  And what do you recall about Kirkwood?

02:23:21 7   A.  I met with them earlier this year, and I remember them

02:23:25 8   telling me that they opened the range to the public on

02:23:27 9   Saturdays, I believe.

02:23:31 10  Q.  Okay.  One second, please.

02:23:40 11       You have never been to the Kirkwood facility, have

02:23:43 12  you?

02:23:43 13  A.  Yes, I have.

02:23:44 14  Q.  Oh, you have?

02:23:44 15       All right.  Wait one second.

02:23:53 16       All right.  What is the basis for your belief that

02:23:56 17  the Kirkwood Police Department allows laypeople to use their

02:24:01 18  facility?

02:24:02 19  A.  The officer I met with to retrofit their equipment, he

02:24:06 20  mentioned that they did open it to the public.

02:24:08 21  Q.  But you can't verify that, can you?

02:24:10 22  A.  I don't --

02:24:11 23       MR. GURA:  Objection, argumentative.

02:24:12 24       THE COURT:  Okay.

02:24:13 25       MR. GURA:  Testified, verified, he talked.  How is he

02:24:16 1 supposed to know?

02:24:16 2       THE COURT: Just the argumentative is all I need.

02:24:19 3       Okay. Overruled, go ahead.

02:24:21 4 BY MR. FORTI:

02:24:21 5 Q. Can you verify it?

02:24:22 6 A. No, I cannot.

02:24:23 7 Q. You can't verify it.

02:24:24 8       That's consistent then with your deposition

02:24:27 9 testimony, isn't it?

02:24:28 10 A. Yes.

02:24:28 11 Q. Okay.

02:24:30 12       MR. GURA: Objection. Has his deposition testimony

02:24:32 13 been read?

02:24:33 14       THE COURT: It has not. If he knows it, though, is

02:24:36 15 the question --

02:24:37 16       MR. GURA: Okay.

02:24:37 17       THE COURT: -- so maybe you prepared him well.

02:24:41 18 BY MR. FORTI:

02:24:41 19 Q. Now, Mr. Hart, you've talked about your -- Action Target's

02:24:46 20 business in a variety of places throughout the United States,

02:24:50 21 based on the questions asked by your counsel.

02:24:54 22       In the course of your work you recognize, don't you,

02:25:00 23 that zoning laws vary throughout the United States; isn't that

02:25:04 24 true?

02:25:07 25 A. Yes.

| | | |
|---|---|---|
| 02:25:07 | 1 | Q.  All right.  And zoning laws for Chicago may be quite |
| 02:25:08 | 2 | different even than zone- -- if you know, that zoning laws in |
| 02:25:12 | 3 | Chicago are quite -- |
| 02:25:13 | 4 | MR. GURA:  Objection. |
| 02:25:14 | 5 | MR. FORTI:  Excuse me, if I can finish my question. |
| 02:25:16 | 6 | BY MR. FORTI: |
| 02:25:16 | 7 | Q.  Zoning -- if you know, the zoning laws in Chicago are |
| 02:25:19 | 8 | different even than the zoning laws in the suburbs of Chicago; |
| 02:25:23 | 9 | isn't that true? |
| 02:25:23 | 10 | MR. GURA:  Objection, calls for speculation, calls |
| 02:25:25 | 11 | for a legal conclusion.  He's not an expert on the zoning |
| 02:25:28 | 12 | laws. |
| 02:25:28 | 13 | MR. FORTI:  If you could reread the question.  I'm |
| 02:25:30 | 14 | sorry, Judge. |
| 02:25:30 | 15 | THE COURT:  You need that question read back to you? |
| 02:25:31 | 16 | You just said it yourself. |
| 02:25:34 | 17 | MR. FORTI:  No.  But I'm suggesting if counsel would |
| 02:25:36 | 18 | hear the question it is not calling for any legal conclusion. |
| 02:25:37 | 19 | THE COURT:  Folks, can I just tell you something? |
| 02:25:39 | 20 | I'm so happy we don't have a jury in the box, because I would |
| 02:25:42 | 21 | have you at sidebar and tell you all to take a deep breath, |
| 02:25:46 | 22 | but I'll tell you right now in the open court. |
| 02:25:48 | 23 | It's outside of his knowledge.  You've established |
| 02:25:51 | 24 | that.  You objected to him going into the zoning.  He says he |
| 02:25:55 | 25 | doesn't know the zoning laws.  The objection is sustained and |

02:25:57  1  move on to something else.  But you can argue that to me later

02:26:00  2  on.

02:26:01  3          MR. FORTI:  Thank you, Judge.

02:26:01  4          THE COURT:  But I get it.  So move on to facts.

02:26:04  5          MR. FORTI:  Very good.

02:26:05  6          Your Honor, at this time I would -- because I'd like

02:26:08  7  to show the witness -- we would move for the admission of

02:26:12  8  Defendant's Exhibit 3 and Defendant's Exhibit 21, both of

02:26:18  9  which the plaintiffs had no objection.

02:26:20  10          THE COURT:  Okay.  If there's no objection, that's

02:26:28  11  the gun range list and the map and those would be admitted.

02:26:32  12          MR. FORTI:  Thank you, Judge.

02:26:35  13  BY MR. FORTI:

02:26:35  14  Q.  Now, in the course of your travels in the Chicago area,

02:26:38  15  Mr. Hart, you're familiar, are you not, with many of the

02:26:41  16  ranges in the greater Chicagoland area, correct?

02:26:44  17  A.  I've been to many of them, yes.

02:26:46  18  Q.  All right.  So, for example, if I can direct your

02:26:49  19  attention to number 10 Mega Sports in Plainfield, you're

02:26:53  20  familiar with that; isn't that right?

02:26:54  21  A.  Yes.

02:26:55  22  Q.  All right.  And then you're also familiar with the J.R.'s

02:27:00  23  Shooting, which is also on this map, correct?

02:27:02  24  A.  Yes.

02:27:03  25  Q.  All right.  And as well -- you're also familiar with the

| | | |
|---|---|---|
| 02:27:06 | 1 | gun range at Maxon's; is that right? |
| 02:27:10 | 2 | A.  I've never been there. |
| 02:27:11 | 3 | Q.  But you're familiar with it? |
| 02:27:12 | 4 | A.  I've heard of it, yes. |
| 02:27:14 | 5 | Q.  Yes. |
| 02:27:14 | 6 | Okay.  And same thing with G.A.T.'s, which is here, |
| 02:27:16 | 7 | number 14, in Dundee.  You're familiar with that? |
| 02:27:18 | 8 | A.  Yes. |
| 02:27:18 | 9 | Q.  And you've been there? |
| 02:27:19 | 10 | A.  I have been there. |
| 02:27:19 | 11 | Q.  All right.  And then you've heard secondhand about a |
| 02:27:22 | 12 | Midwest range; isn't that right? |
| 02:27:23 | 13 | A.  Yes. |
| 02:27:24 | 14 | Q.  Although you haven't been to it? |
| 02:27:25 | 15 | A.  No. |
| 02:27:26 | 16 | Q.  And, also, you've heard about that there's going to be a |
| 02:27:29 | 17 | new Gun World that had previously been in Bensenville that's |
| 02:27:33 | 18 | going to reopen in Lombard? |
| 02:27:35 | 19 | A.  I've been there, yes. |
| 02:27:36 | 20 | Q.  All right.  Thank you. |
| 02:27:37 | 21 | When you look at this chart, you see that there's |
| 02:27:40 | 22 | several other names, and if -- let me show you a smaller |
| 02:27:43 | 23 | version of that.  And if you could just peruse this to see if |
| 02:27:48 | 24 | you are aware of any of these other gun ranges. |
| 02:27:53 | 25 | A.  You want me to read them off? |

| | | |
|---|---|---|
| 02:27:54 | 1 | Q. No, no. Just look at it and see if there are any others, |
| 02:27:58 | 2 | by looking at the map, that you now are aware of. |
| 02:28:00 | 3 | A. Bells Guns, I've seen that closed site, which is in |
| 02:28:05 | 4 | Schiller Park or Des Plaines -- or it says Franklin Park, but |
| 02:28:09 | 5 | it's -- it's over there on Mannheim. |
| 02:28:11 | 6 | Q. But that's closed? |
| 02:28:13 | 7 | A. Yeah. |
| 02:28:13 | 8 | Q. Anything else? |
| 02:28:14 | 9 | A. Chuck's Guns I'm not aware of. |
| 02:28:17 | 10 | Q. Any that you are aware of, any others? |
| 02:28:20 | 11 | A. Illinois Gun Works, I've never been there. |
| 02:28:24 | 12 | Q. Again, my question is are you aware of them, not whether |
| 02:28:28 | 13 | you've been to them? |
| 02:28:28 | 14 | A. As of this court case, I've heard of them. |
| 02:28:30 | 15 | Q. Okay. |
| 02:28:30 | 16 | A. Glenwood Guns and Range, I was not aware of them. |
| 02:28:34 | 17 | Midwest Guns, I have heard of. |
| 02:28:36 | 18 | Sporting Arms and Supply, I did not know about. |
| 02:28:40 | 19 | H.P. Shooting Center, I did not know about. |
| 02:28:43 | 20 | The Outdoorsman Sports Shop, I did not know about. |
| 02:28:47 | 21 | Rink's Guns and Sport, no. |
| 02:28:49 | 22 | And J.R. and G.A.T., I did know about. |
| 02:28:53 | 23 | Bass Pro, I did not know about. |
| 02:28:54 | 24 | Q. Okay. Thank you very much. |
| 02:29:34 | 25 | Mr. Hart, since you've served as the Midwest |

| | | |
|---|---|---|
| 02:29:37 | 1 | territory manager, is it true that you spend approximately |
| 02:29:42 | 2 | 10 percent of your time on commercial projects? |
| 02:29:45 | 3 | A. That's not correct. |
| 02:29:46 | 4 | Q. All right. How much time do you spend on commercial |
| 02:29:48 | 5 | projects, as opposed to military and law enforcement? |
| 02:29:51 | 6 | A. I would rephrase it. I would say that 10 percent of our |
| 02:29:54 | 7 | business is commercial. It's not the time I spend. |
| 02:29:55 | 8 | Q. All right. 10 percent of your business. And so that |
| 02:29:58 | 9 | means in terms of the customers that you have? |
| 02:30:00 | 10 | A. Roughly, yes. |
| 02:30:04 | 11 | Q. And 20 percent are military? |
| 02:30:05 | 12 | A. I don't have any military customers. We were talking |
| 02:30:07 | 13 | about the company, in general, not myself. |
| 02:30:10 | 14 | Q. Okay. For you, because we're focusing in on the Midwest |
| 02:30:13 | 15 | here, what percentage of your business is commercial? |
| 02:30:15 | 16 | A. Sold or my time spent? |
| 02:30:17 | 17 | Q. The business, your business, in terms of managing clients |
| 02:30:20 | 18 | in the Midwest or trying to solicit new clients, what |
| 02:30:24 | 19 | percentage of your -- of the business is commercial? |
| 02:30:26 | 20 | A. It's roughly 10 percent. |
| 02:30:29 | 21 | Q. All right. And what percent, that same question, is for |
| 02:30:31 | 22 | law enforcement? |
| 02:30:32 | 23 | A. Usually the rest. |
| 02:30:33 | 24 | Q. So that would be 90? |
| 02:30:34 | 25 | A. It would be 90, but I also have federal customers that I |

02:30:37  1    take care of.

02:30:38  2    Q.  So you do have -- okay.  And what percentage would that

02:30:40  3    be?

02:30:40  4    A.  I put that around 10 to 20 percent.

02:30:45  5    Q.  Okay.  So the majority of your time is spent in law

02:30:50  6    enforcement and not commercial; is that right?

02:30:51  7    A.  That's correct.

02:30:52  8    Q.  All right.  Now, during your direct examination, you

02:31:03  9    indicated that you've had contacts over the years with various

02:31:08  10   people who have expressed an interest to you in, perhaps,

02:31:13  11   developing permanent ranges in Chicago absent a ban; is that

02:31:19  12   correct, is that an accurate summary of your testimony?

02:31:22  13   A.  Yes.

02:31:22  14   Q.  All right.  Now, you're not including Barry Seldon

02:31:27  15   (phonetic) in that list, are you?

02:31:29  16   A.  No.

02:31:29  17   Q.  All right.  And you're not including a contact that you

02:31:31  18   had in 2005 with Anthony Provensano (phonetic), are you?

02:31:36  19   A.  I think you're correct.  I never had a contact with him.

02:31:39  20   The company did.

02:31:40  21   Q.  All right.  Is Dick Lawdic (phonetic) one of the people

02:31:42  22   that you're referring to as expressing an interest in opening

02:31:47  23   a range?

02:31:47  24   A.  I know a Dan Lawdic.

02:31:50  25   Q.  Dan Lawdic, my apologies.

| | | |
|---|---|---|
| 02:31:52 | 1 | A.  Yes. |
| 02:31:53 | 2 | Q.  All right.  And he expressed an interest in opening a |
| 02:31:55 | 3 | range after you contacted him sometime after July 16th of this |
| 02:32:00 | 4 | year; isn't that right? |
| 02:32:01 | 5 | A.  He wanted to open a range prior to that.  My conversation |
| 02:32:04 | 6 | with him was, Would you like to do one in Chicago. |
| 02:32:07 | 7 | Q.  Right. |
| 02:32:07 | 8 | Because he had an interest in opening a range in |
| 02:32:09 | 9 | Maywood, right? |
| 02:32:10 | 10 | A.  I believe so. |
| 02:32:11 | 11 | Q.  And that's in suburban Chicago? |
| 02:32:13 | 12 | A.  Yes. |
| 02:32:13 | 13 | Q.  Not in the city? |
| 02:32:15 | 14 | A.  Yes. |
| 02:32:15 | 15 | Q.  So after July 16th, though, he then expressed to you an |
| 02:32:19 | 16 | interest in opening a range in Chicago, correct? |
| 02:32:22 | 17 | A.  I believe Dan had a site further west in the suburbs and |
| 02:32:27 | 18 | another customer had the Maywood address.  I think we're |
| 02:32:29 | 19 | incorrect there. |
| 02:32:30 | 20 | Q.  All right.  But let's go back to my question, which is, he |
| 02:32:33 | 21 | expressed some interest in a City of Chicago location? |
| 02:32:36 | 22 | A.  He did. |
| 02:32:38 | 23 | Q.  After July 16? |
| 02:32:39 | 24 | A.  On July 16. |
| 02:32:40 | 25 | Q.  On July 16. |

| | | |
|---|---|---|
| 02:32:41 | 1 | And the reason you spoke to Mr. Lawdic after |
| 02:32:45 | 2 | July 16th, was that was after you had a conversation with |
| 02:32:49 | 3 | Ms. Versnel, who was looking for plaintiffs to join this |
| 02:32:54 | 4 | lawsuit? |
| 02:32:55 | 5 | A.  Yes. |
| 02:32:55 | 6 | Q.  All right.  And that conversation was less than five |
| 02:32:57 | 7 | minutes with Mr. Lawdic, wasn't it? |
| 02:32:59 | 8 | A.  Yes. |
| 02:33:00 | 9 | Q.  All right.  And he didn't tell you in that conversation |
| 02:33:02 | 10 | that he had funding for any range in Chicago, did he? |
| 02:33:06 | 11 | A.  No.  I don't question my customer's financial |
| 02:33:09 | 12 | responsibilities. |
| 02:33:09 | 13 | Q.  All right.  He didn't tell you that he had identified any |
| 02:33:11 | 14 | possible land purchase for such a site, did he? |
| 02:33:14 | 15 | A.  No. |
| 02:33:15 | 16 | Q.  And he didn't tell you he had an architect for the |
| 02:33:17 | 17 | facility? |
| 02:33:18 | 18 | A.  No. |
| 02:33:18 | 19 | Q.  And he didn't tell you he had a general contractor? |
| 02:33:21 | 20 | A.  No. |
| 02:33:21 | 21 | Q.  In fact, he didn't even ask you in this conversation for |
| 02:33:25 | 22 | Action Target to submit a bid? |
| 02:33:27 | 23 | A.  No. |
| 02:33:28 | 24 | Q.  And you've had no follow-up, other than that one |
| 02:33:30 | 25 | five-minute conversation since July 16th; isn't that right? |

02:33:35  1    A.  That's correct.

02:33:35  2    Q.  Okay.  Let's -- does Mr. Grove (phonetic) fit in the list

02:33:40  3    of people who have expressed an interest to you in opening a

02:33:44  4    permanent range in Chicago?

02:33:46  5    A.  Yes.

02:33:47  6    Q.  All right.  When was the first time you contacted

02:33:50  7    Mr. Grove?

02:33:50  8    A.  I believe he called me around -- I think he called me

02:33:55  9    around that July 16th date.

02:33:56  10   Q.  All right.  And that was a cold call, was it not?

02:33:59  11   A.  Yes.  He had cold called me and I called him back about

02:34:03  12   doing a range in Chicago.

02:34:19  13   Q.  And that conversation lasted less than five minutes; is

02:34:23  14   that correct?

02:34:23  15   A.  Yes.

02:34:23  16   Q.  All right.  And did you discuss with him what the costs

02:34:27  17   might possibly be for opening a range in Chicago?

02:34:30  18   A.  I don't recall if we did or not.

02:34:32  19   Q.  All right.  At the end of that conversation with

02:34:37  20   Mr. Grove -- at the end of that conversation he didn't tell

02:34:39  21   you that he would like Action Target to submit a bid, did he?

02:34:44  22   A.  No.

02:34:48  23   Q.  Do you recall, Mr. Hart, that you, in fact, told Mr. Grove

02:34:54  24   that it would generally cost, I say, 30- to $40,000 per lane?

02:34:59  25   A.  I don't recall.  That's generally what I would discuss

| | | |
|---|---|---|
| 02:35:01 | 1 | with a customer like that. |
| 02:35:06 | 2 | Q. Is there anything I can show you which might refresh your |
| 02:35:10 | 3 | recollection? |
| 02:35:10 | 4 | A. Please do. |
| 02:35:11 | 5 | Q. That you did, in fact -- let me show you -- |
| 02:35:14 | 6 | MR. SIGALE: Your Honor -- |
| 02:35:16 | 7 | MR. FORTI: I'm trying to refresh his recollection, |
| 02:35:16 | 8 | Judge. |
| 02:35:19 | 9 | THE COURT: Well, it's not your witness. It's his |
| 02:35:21 | 10 | witness. What's your objection? |
| 02:35:22 | 11 | MR. GURA: Well, we're going to object. I'm not sure |
| 02:35:23 | 12 | this is a proper use of a deposition. If he's going to read |
| 02:35:25 | 13 | from the deposition, we'd like to know -- |
| 02:35:25 | 14 | THE COURT: Okay. So there's impeachment. And |
| 02:35:27 | 15 | impeachment is you ask him the question, and if he denies the |
| 02:35:30 | 16 | question, then you impeach. If there's refreshing |
| 02:35:34 | 17 | recollection, you ask him a question, he says he doesn't |
| 02:35:36 | 18 | understand and you ask him whether -- there's two different |
| 02:35:37 | 19 | animals. He's refreshing recollection. So overruled. |
| 02:35:40 | 20 | MR. FORTI: Thank you very much, Judge. |
| 02:35:44 | 21 | BY MR. FORTI: |
| 02:35:44 | 22 | Q. Let me show you page 203 of your deposition, which was |
| 02:35:54 | 23 | taken earlier this month, and see if this question and answer |
| 02:35:59 | 24 | refreshes your recollection about whether you gave Mr. Grove a |
| 02:36:03 | 25 | price quote. |

| | | |
|---|---|---|
| 02:36:12 | 1 | A.  30- to 40,000 per lane. |
| 02:36:14 | 2 | Q.  Does that refresh your recollection? |
| 02:36:17 | 3 | A.  That's generally what I would discuss with a customer. |
| 02:36:19 | 4 | Q.  All right.  Do you recall Mr. Grove's reaction when you |
| 02:36:22 | 5 | told him it was 30- to 40,000 per lane? |
| 02:36:25 | 6 | A.  I don't recall. |
| 02:36:26 | 7 | Q.  Okay.  And since -- other than that one contact with |
| 02:36:32 | 8 | Mr. Grove, you haven't had any other contacts with him; is |
| 02:36:36 | 9 | that right? |
| 02:36:36 | 10 | A.  That's correct. |
| 02:36:37 | 11 | Q.  All right.  So we've covered Mr. Grove.  We've covered |
| 02:36:43 | 12 | Mr. Lawdic. |
| 02:36:44 | 13 | Do you include in that list of people Shawn McNulty |
| 02:36:47 | 14 | (phonetic) as someone who has expressed an interest in opening |
| 02:36:50 | 15 | a permanent range in Chicago? |
| 02:36:52 | 16 | A.  Yes. |
| 02:36:52 | 17 | Q.  All right.  And he doesn't have -- he certainly did not |
| 02:36:55 | 18 | have funding for a Hoffman Estates project that he was |
| 02:36:57 | 19 | interested in doing; isn't that right? |
| 02:36:59 | 20 | A.  I'm not aware. |
| 02:37:00 | 21 | Q.  You're not aware of his lack of funding for -- |
| 02:37:03 | 22 | A.  I know that -- |
| 02:37:04 | 23 | Q.  -- a Hoffman Estates range? |
| 02:37:06 | 24 | A.  I know that he was trying to secure funding. |
| 02:37:09 | 25 | Q.  And as far as you know he didn't have it? |

02:37:11  1   A.  It didn't happen.

02:37:14  2   Q.  Okay.  Now, you called Shawn McNulty after July 16th;

02:37:18  3   isn't that right?

02:37:19  4   A.  Yes.

02:37:19  5   Q.  And that was in order to find people who might also be

02:37:22  6   plaintiffs in this lawsuit; isn't that right?

02:37:24  7   A.  Yes.

02:37:25  8   Q.  And you haven't had any subsequent conversations with

02:37:28  9   Mr. McNulty about his interest in opening a range; isn't that

02:37:31  10  right?

02:37:31  11  A.  That's correct.

02:37:32  12  Q.  All right.  And he didn't have an architect, did he?

02:37:35  13  A.  Not that I'm aware of.

02:37:36  14  Q.  He didn't have --

02:37:38  15  A.  Oh, he did have an architect for his project.

02:37:40  16  Q.  But he didn't say he had an architect for a Chicago

02:37:43  17  project?

02:37:43  18  A.  No, not that I'm aware of.

02:37:46  19  Q.  All right.  He didn't have any land scoped out as a

02:37:46  20  possible location?

02:37:46  21  A.  Not in Chicago.

02:37:48  22  Q.  All right.  Given the lack of specifics, is it accurate to

02:37:50  23  say, Mr. Hart, that at most he expressed a general interest in

02:37:54  24  opening a range?

02:37:55  25  A.  I'm not sure.

| | | |
|---|---|---|
| 02:37:56 | 1 | Q.  You're not sure whether that would be general -- would you |
| 02:37:58 | 2 | think it's specific? |
| 02:37:59 | 3 | A.  It would be -- |
| 02:38:00 | 4 | MR. GURA:  Objection, vague and ambiguous. |
| 02:38:03 | 5 | THE COURT:  Okay.  It's cross.  Overruled. |
| 02:38:05 | 6 | THE WITNESS:  Yes, that could be a general |
| 02:38:07 | 7 | speculation. |
| 02:38:08 | 8 | BY MR. FORTI: |
| 02:38:08 | 9 | Q.  A general interest? |
| 02:38:09 | 10 | A.  General interest in a range. |
| 02:38:11 | 11 | Q.  All right.  And I take it that Scott Lewandowski |
| 02:38:16 | 12 | (phonetic) might be someone else who expressed an interest to |
| 02:38:19 | 13 | you about opening a Chicago range; isn't that right? |
| 02:38:22 | 14 | A.  Yes. |
| 02:38:22 | 15 | Q.  But like the others you've only had one contact with him, |
| 02:38:25 | 16 | right? |
| 02:38:26 | 17 | A.  I've had many contacts.  But since that July 16th, yes, |
| 02:38:29 | 18 | about the Chicago range, that's the only one. |
| 02:38:32 | 19 | Q.  And that, too, was in order to look for plaintiffs for |
| 02:38:34 | 20 | this lawsuit? |
| 02:38:35 | 21 | A.  Yes. |
| 02:38:35 | 22 | Q.  All right.  And no specifics were discussed about the |
| 02:38:37 | 23 | possibility of where he would locate? |
| 02:38:40 | 24 | A.  He discussed a -- he wanted to put it near O'Hare in an |
| 02:38:44 | 25 | industrial zone, but beyond that we did not discuss location. |

02:38:48  1    Q.  All right.

02:38:48  2             THE COURT:  I just am curious about this whole area

02:38:52  3    of direct and cross, whether other individuals have expressed

02:38:56  4    an interest in putting a firing range in is really not the

02:39:01  5    immediate issue in the preliminary injunction.  The issue --

02:39:04  6    because that's such a broad question.  The issue right now is

02:39:10  7    the City prohibiting them from having a firing range?

02:39:14  8             So is it in the balancing of harms that you're

02:39:16  9    putting this?

02:39:17  10            MR. FORTI:  Your Honor, the only reason that we have

02:39:20  11   addressed this in the cross is because it was -- first, it was

02:39:24  12   raised in the direct as expressing an interest --

02:39:26  13            THE COURT:  Right.  But can you tell me what it goes

02:39:28  14   to?  Because if you don't think it's relevant, you wouldn't

02:39:31  15   even cross on it.

02:39:32  16            MR. FORTI:  In terms of the elements of the -- in

02:39:35  17   terms of the elements of the preliminary injunction, the

02:39:37  18   relevance is minimal.  And, fortunately, I'm finished with

02:39:41  19   that area --

02:39:41  20            THE COURT:  Okay.

02:39:42  21            MR. FORTI:  -- of inquiry.

02:39:43  22            THE COURT:  Well, never mind then.  We'll move on.  I

02:39:46  23   asked too late.

02:39:47  24            MR. FORTI:  Yeah.

02:39:47  25            (Laughter.)

| | | |
|---|---|---|
| 02:39:48 | 1 | MR. FORTI:  Thank you, Judge. |
| 02:40:00 | 2 | BY MR. FORTI: |
| 02:40:00 | 3 | Q.  Let's talk very briefly about a topic that also, perhaps, |
| 02:40:02 | 4 | is not particularly germane to the issues in the preliminary |
| 02:40:03 | 5 | injunction but I will keep it very brief. |
| 02:40:05 | 6 | Based on your experience, Mr. Hart, and I think |
| 02:40:08 | 7 | you've even testified during this cross-examination, you |
| 02:40:14 | 8 | calculate how expensive a range is, based on costs per aisle; |
| 02:40:20 | 9 | is that right? |
| 02:40:20 | 10 | A.  That's a general pricing.  The size of the structure, the |
| 02:40:24 | 11 | ceiling's height, there's many factors that go into our |
| 02:40:28 | 12 | estimates when we actually bid a range. |
| 02:40:30 | 13 | Q.  And your estimates for indoor ranges roughly go between |
| 02:40:34 | 14 | 35- to 50,000 per range -- per aisle? |
| 02:40:37 | 15 | A.  If you include the ventilation, yes. |
| 02:40:40 | 16 | Q.  Oh, that includes the ventilation? |
| 02:40:42 | 17 | A.  That's correct. |
| 02:40:43 | 18 | Q.  I thought, Mr. Hart, that that did not include |
| 02:40:47 | 19 | ventilation? |
| 02:40:48 | 20 | A.  Not that I'm aware of, no. |
| 02:40:52 | 21 | Q.  All right.  Well, we'll get back to that in a second. |
| 02:40:54 | 22 | Am I correct in using the term aisle?  That probably |
| 02:40:57 | 23 | doesn't sound right. |
| 02:40:57 | 24 | A.  Shooting position or shooting lane. |
| 02:40:59 | 25 | Q.  Shooting lane. |

| | | |
|---|---|---|
| 02:41:00 | 1 | So it's 35- to 50,000 per shooting range? |
| 02:41:04 | 2 | A.  I think it was 30 to 50. |
| 02:41:07 | 3 | Q.  Well, let's go with 30 to 50.  We won't quibble yet. |
| 02:41:10 | 4 | So if you have three lines, then that would be |
| 02:41:14 | 5 | $150,000, correct? |
| 02:41:16 | 6 | A.  Yes. |
| 02:41:16 | 7 | Q.  And that's to retrofit the range, right, for your product? |
| 02:41:20 | 8 | A.  It depends on what product they're replacing. |
| 02:41:23 | 9 | Q.  All right.  It doesn't include the purchase of the land, |
| 02:41:25 | 10 | right? |
| 02:41:26 | 11 | A.  No. |
| 02:41:26 | 12 | Q.  And it doesn't include the operation of the actual range |
| 02:41:30 | 13 | with employees, does it? |
| 02:41:31 | 14 | A.  No. |
| 02:41:32 | 15 | Q.  And it doesn't include insurance? |
| 02:41:34 | 16 | A.  No. |
| 02:41:34 | 17 | Q.  It only includes what Action Target is providing, correct? |
| 02:41:40 | 18 | A.  That's correct. |
| 02:41:41 | 19 | Q.  All right.  And, in fact, Action Target doesn't provide |
| 02:41:45 | 20 | the ventilation, typically, does it? |
| 02:41:47 | 21 | A.  Not directly. |
| 02:41:49 | 22 | Q.  It's subcontracted? |
| 02:41:50 | 23 | A.  That's right. |
| 02:41:51 | 24 | Q.  And who is the typical subcontractor that Action Target |
| 02:41:54 | 25 | uses? |

02:41:55 | 1 | A. Always Cary's (phonetic) Range Ventilation.
02:41:58 | 2 | Q. Cary's.
02:41:59 | 3 | And they come up with their own price that has to be
02:42:03 | 4 | added on to the ranges; isn't that correct?
02:42:07 | 5 | A. Yes.
02:42:07 | 6 | Q. So, in fact -- and that cost typically for ventilation is
02:42:10 | 7 | 13- to $27,000, right?
02:42:13 | 8 | A. Yes, but it can fall within that 30-to-50 range --
02:42:16 | 9 | Q. All right.
02:42:16 | 10 | A. -- depending on the variables.
02:42:18 | 11 | Q. All right. But you -- isn't it true that you get to the
02:42:22 | 12 | higher end of the ventilation cost if you include both air
02:42:25 | 13 | conditioning and heating?
02:42:26 | 14 | A. That's correct.
02:42:27 | 15 | MR. GURA: Objection, your Honor, the relevance and
02:42:29 | 16 | also 403 at this point. This is -- I was hoping we could
02:42:32 | 17 | finish it this afternoon.
02:42:33 | 18 | THE COURT: Oh, I know. I'm assuming that the
02:42:36 | 19 | relevance goes to the issue of health and safety. Is that --
02:42:39 | 20 | because you mentioned it in his opening statement regarding --
02:42:42 | 21 | MR. FORTI: No, your Honor. It goes to the overall
02:42:45 | 22 | expense. I think one of our positions is, is that even if
02:42:48 | 23 | there is a ban banning ranges in Chicago, the reality is
02:42:53 | 24 | there's a financial inhibitor which makes -- ranges aren't
02:42:57 | 25 | likely to come in because of the -- because of the market,

02:43:00    1    regardless of there being any ban or not.

02:43:03    2         THE COURT:  Well, then it goes back to your issue of

02:43:05    3    bringing people out who want to come in and put a range in and

02:43:09    4    having contact with them already, so --

02:43:11    5         MR. FORTI:  I think they opened the door.

02:43:12    6         MR. GURA:  Well, your Honor, is he suggesting that

02:43:14    7    Action Target's business is not viable?  I mean, they sell

02:43:16    8    ranges all over the place.

02:43:17    9         THE COURT:  Right.  Well, you suggested on direct

02:43:19   10    through him that there's individuals and companies out there

02:43:24   11    that want to bring these -- start up these ranges and pretty

02:43:27   12    much ready to go, chomp at the bit to do so.  So his area of

02:43:32   13    cross now is to show that it's exorbitant, I suppose, so --

02:43:36   14         MR. GURA:  Well, I would then just stress 403, your

02:43:39   15    Honor, because there's -- I understand that but even if it's

02:43:42   16    relevant, it's time consuming.

02:43:43   17         THE COURT:  I would say this much relevance for my

02:43:45   18    analysis to cut to the chase --

02:43:47   19         MR. FORTI:  Your Honor --

02:43:48   20         THE COURT:  -- a little leeway and we'll move on.

02:43:50   21         MR. FORTI:  Yes, I will move from that entirely,

02:43:53   22    Judge, and go to just the related point.

02:43:54   23         THE COURT:  Right.

02:43:54   24    BY MR. FORTI:

02:43:56   25    Q.  Based on your experience, Mr. Hart, the construction of

02:43:59  1   mobile ranges in the Action Target -- based on your experience

02:44:04  2   at Action Target, takes at least 60 to 90 days, right?

02:44:06  3   A.  Yes.

02:44:07  4   Q.  Yeah.

02:44:07  5        But it takes much, much longer, at least nine to

02:44:10  6   twelve months, for the construction of permanent ranges; isn't

02:44:13  7   that right?

02:44:13  8   A.  I believe it was six to twelve.  But it could be -- yes,

02:44:16  9   that could be correct.

02:44:17  10  Q.  Well, in terms of law enforcement ranges, you've even

02:44:21  11  testified already that it's more than a year typically; isn't

02:44:24  12  that right?

02:44:24  13  A.  If they have to construct the whole police station, we

02:44:26  14  have to wait for them to build it before we can install the

02:44:30  15  range, yes.

02:44:31  16            MR. FORTI:  All right.  Just one second, Judge.

02:44:34  17            THE COURT:  Okay.

02:44:34  18            MR. FORTI:  No further questions, your Honor.

02:44:36  19            THE COURT:  Okay.

02:44:36  20            MR. FORTI:  Thank you, Mr. Hart.

02:44:38  21            THE COURT:  You may be excused.

02:44:40  22            MR. GURA:  Your Honor, redirect?

02:44:40  23            THE COURT:  Oh, I'm sorry.  You have something to

02:44:42  24  redirect.  Go ahead.  It was just that there was such a long

02:44:47  25  pause.

| | | |
|---|---|---|
| 02:44:47 | 1 | MR. FORTI:  I apologize. |
| 02:44:49 | 2 | MR. GURA:  I understand, your Honor.  We've both |
| 02:44:50 | 3 | worked really hard to -- |
| 02:44:51 | 4 | THE COURT:  I appreciate that. |
| 02:44:52 | 5 | MR. GURA:  We really want to -- there's a lot of |
| 02:44:54 | 6 | stuff on paper -- all right. |
| 02:44:56 | 7 | THE COURT:  All of which you can be assured has been |
| 02:44:59 | 8 | read already, so ... |
| 02:44:59 | 9 | MR. GURA:  That's wonderful.  That's great.  I |
| 02:45:01 | 10 | appreciate that, your Honor.  It does mean a lot to us.  We do |
| 02:45:04 | 11 | take seriously our presentation -- |
| 02:45:06 | 12 | THE COURT:  No problem.  Go ahead.  That's what I do. |
| 02:45:06 | 13 | - - - |
| 02:45:06 | 14 | CHRISTOPHER HART, REDIRECT EXAMINATION |
| 02:45:06 | 15 | BY MR. GURA: |
| 02:45:11 | 16 | Q.  Mr. Hart, as part of your designing of ranges, do |
| 02:45:15 | 17 | customers express what kind of shooting they want at the |
| 02:45:17 | 18 | range? |
| 02:45:18 | 19 | A.  Absolutely. |
| 02:45:18 | 20 | Q.  Okay.  And so it's your job to know then whether the range |
| 02:45:22 | 21 | can accommodate the kind of shooting that people want, |
| 02:45:25 | 22 | correct? |
| 02:45:25 | 23 | A.  That's right.  There's different equipment for different |
| 02:45:27 | 24 | uses. |
| 02:45:28 | 25 | Q.  Okay.  How popular is handgun equipment -- handgun range |

02:45:33   1   equipment?

02:45:33   2   A.  Basically every range does handgun.

02:45:36   3   Q.  Okay.  And would you say that your customers primarily are

02:45:40   4   interested in providing handgun practice to people?

02:45:43   5           MR. FORTI:  Your Honor, I hate to object, but now

02:45:46   6   we're venturing into areas outside of cross.

02:45:49   7           THE COURT:  Okay.

02:45:49   8           MR. GURA:  No, it's not --

02:45:51   9           THE COURT:  Okay.  It's sustained for leading.  But

02:45:53   10  you may go ahead and ask him what his customers are asking

02:45:56   11  for.  Overruled as to the other.

02:45:58   12  BY MR. GURA:

02:45:59   13  Q.  Mr. Forti suggested that you had not been too successful

02:46:03   14  in the Chicago area over recent years.

02:46:06   15          Are you aware of the legal status of handgun

02:46:10   16  ownership in the Chicago area over the last few years?

02:46:12   17  A.  Yes.  I know it's been a question.

02:46:17   18          MR. GURA:  Okay.  And I would ask the Court to take

02:46:19   19  judicial notice then until very recently handguns were banned

02:46:23   20  in the City of Chicago and many of its suburbs.

02:46:25   21          THE COURT:  I can do that.

02:46:27   22  BY MR. GURA:

02:46:29   23  Q.  Okay.  And now that you know that handguns were banned in

02:46:30   24  this area, would you imagine that would impact the ability to

02:46:34   25  sell handgun ranges in the city?

| | | |
|---|---|---|
| 02:46:36 | 1 | MR. FORTI: Objection, your Honor. |
| 02:46:37 | 2 | THE COURT: Okay. That's speculation and that's |
| 02:46:39 | 3 | sustained. |
| 02:46:39 | 4 | MR. GURA: Okay. I have nothing further. |
| 02:46:41 | 5 | THE COURT: Okay. All right. Do you have any |
| 02:46:42 | 6 | recross on that, Mr. Forti. |
| 02:46:44 | 7 | MR. FORTI: I would not risk it, Judge. |
| 02:46:46 | 8 | (Laughter.) |
| 02:46:48 | 9 | THE COURT: Okay. It makes me sound hard. |
| 02:46:50 | 10 | Okay. You can call your next witness. You may now |
| 02:46:53 | 11 | step down, sir. |
| 02:46:55 | 12 | (Witness leaves the stand.) |
| 02:46:55 | 13 | MR. SIGALE: Your Honor, plaintiffs call Julianne |
| 02:46:57 | 14 | Versnel. |
| 02:46:58 | 15 | THE COURT: Okay. |
| 02:47:06 | 16 | (Witness takes the stand.) |
| 02:47:08 | 17 | THE COURT: Right up here. |
| 02:47:11 | 18 | Okay. Please raise your right hand. |
| 02:47:20 | 19 | (The witness was sworn.) |
| 02:47:20 | 20 | THE COURT: Okay. You'll have to keep your voice up |
| 02:47:22 | 21 | nice and strong. |
| 02:47:23 | 22 | THE WITNESS: Thank you. |
| 02:47:30 | 23 | MR. SIGALE: May I proceed? |
| 02:47:31 | 24 | THE COURT: You may proceed, Mr. Sigale. |
| 02:47:32 | 25 | MR. SIGALE: Thank you, your Honor. |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 02:47:33 | 1  | - - -                                                        |
| 02:47:33 | 2  | JULIANNE VERSNEL, DIRECT EXAMINATION                         |
| 02:47:33 | 3  | BY MR. SIGALE:                                               |
| 02:47:33 | 4  | Q.  Please state your name and spell your last name for the  |
| 02:47:35 | 5  | record, please?                                              |
| 02:47:35 | 6  | A.  Julianne Versnel, V-, like in Victor, e-r-s-n-e-l.       |
| 02:47:40 | 7  | Q.  Ms. Versnel, are you currently employed?                 |
| 02:47:42 | 8  | A.  Yes, I am employed by the Second Amendment Foundation.   |
| 02:47:47 | 9  | Q.  Okay.  And what is your title with the Second Amendment  |
| 02:47:52 | 10 | Foundation?                                                  |
| 02:47:52 | 11 | A.  I am director of operations.                            |
| 02:47:52 | 12 | Q.  Okay.  What's the business address of the Second Amendment |
| 02:47:58 | 13 | Foundation?                                                  |
| 02:47:58 | 14 | A.  12500 Northeast 10th Place, Bellevue, B-e-l-l-e-v-u-e,   |
| 02:48:04 | 15 | Washington 98005.                                            |
| 02:48:11 | 16 | Q.  Ms. Versnel, what does Second Amendment Foundation do?   |
| 02:48:13 | 17 | What's its purpose?                                          |
| 02:48:14 | 18 | A.  The Second Amendment Foundation is a 501(c)(3)           |
| 02:48:18 | 19 | organization that is involved in education, research,        |
| 02:48:25 | 20 | publishing, and legal defense, and legal advocacy in terms of |
| 02:48:29 | 21 | Second Amendment areas.                                      |
| 02:48:34 | 22 | Q.  Okay.  How many members does Second Amendment Foundation |
| 02:48:38 | 23 | have in America?                                             |
| 02:48:40 | 24 | A.  About 650,000.                                           |
| 02:48:42 | 25 | Q.  And in the Chicago area -- I'm sorry -- strike the       |

02:48:46  1   question.

02:48:46  2        And how many members does Second Amendment Foundation

02:48:49  3   have in Chicago?

02:48:50  4   A.  Within the city limits, approximately 1700.

02:48:56  5   Q.  Okay.  How long have you been involved with the Second

02:49:04  6   Amendment Foundation?

02:49:04  7   A.  Since 1976.

02:49:07  8   Q.  Okay.  Why did you -- strike that.

02:49:17  9        Do you believe that the Second Amendment Foundation's

02:49:20  10  work is important, as it pertains to the Second Amendment?

02:49:24  11  A.  I think that the Second Amendment Foundation's work is

02:49:29  12  critical, yes.  We were the organization that funded the

02:49:34  13  McDonald v. Chicago lawsuit that overturned the Chicago

02:49:38  14  handgun ban.

02:49:43  15  Q.  And just for the Court, your personal interest.  Why are

02:49:46  16  you involved in this since 1976?  Why is this important to

02:49:50  17  you?

02:49:50  18  A.  Because it's an important civil right.  It's one that's

02:49:53  19  overlooked far too often.  I think it is a particular

02:49:58  20  importance to women, because I think they have the right to

02:50:03  21  choose on how they are going to protect themselves, protect

02:50:07  22  their bodies, protect their children.  It's a very important

02:50:10  23  thing to me.

02:50:13  24  Q.  Can you describe for the Court what director of operations

02:50:19  25  does?  What is your job description?

02:50:25  1   A.  I'm like a project manager.  I do everything from

02:50:31  2   organizing a conference that we have for approximately 600

02:50:36  3   people every year, which was last weekend.  I also oversee

02:50:41  4   some publications.  I'm the publisher of the Women and Guns

02:50:46  5   magazine.  I'm also the publisher of the Journal in Firearms

02:50:49  6   and Public Policy.  I've done that for about the last twenty

02:50:52  7   years.

02:50:52  8        I also represent the Second Amendment Foundation on

02:50:56  9   the executive committee of the world form for the future of

02:51:00  10  shooting forms activities.  I also represent the Foundation at

02:51:05  11  the U.N. arms trade treaty meetings, the U.N.'s program of

02:51:10  12  actions meetings, and the EU and -- meetings concerning

02:51:15  13  firearms protocol and trade.

02:51:22  14  Q.  Would you describe yourself as well-versed in the legal

02:51:29  15  issues and the public policy issues surrounding the Second

02:51:34  16  Amendment?

02:51:34  17  A.  Pretty well-versed, yes.

02:51:36  18  Q.  Okay.  For starters, did you -- are you familiar with the

02:51:44  19  ruling in the McDonald versus City of Chicago case?

02:51:48  20  A.  Yes, I'm familiar with it.

02:51:50  21  Q.  Okay.  And your involve- -- Second Amendment Foundation is

02:51:55  22  also involved in other legal action really around the country,

02:51:59  23  regarding the Second Amendment issues, correct?

02:52:01  24  A.  Correct.

02:52:02  25  Q.  Okay.  Why was Second Amendment Foundation a participant

02:52:12   1   in the McDonald versus City of Chicago case?  I mean, you're

02:52:15   2   out in Washington State.  Why was your organization involved

02:52:20   3   in that case?

02:52:20   4   A.  The Second Amendment Foundation is a national

02:52:25   5   organization.  We have, as I said, 1700 members in the City of

02:52:31   6   Chicago, but we have a broader mission statement.  And, that

02:52:35   7   is, to bring the legal right to keep and bear arms -- to keep

02:52:43   8   it alive, to keep it free to all eligible Americans.

02:52:49   9   Q.  Okay.  Are you familiar with the recently passed by

02:53:00   10  Chicago the Responsible Firearm Owners Ordinance, which was

02:53:06   11  enacted on, I believe, June 30th of this year and effective as

02:53:11   12  of July 12th?  Are you familiar with that ordinance?

02:53:14   13  A.  I've read it, yes.

02:53:16   14  Q.  Okay.  Let me back up one second with you, Ms. Versnel.

02:53:26   15         You testified that you're familiar in your capacity

02:53:29   16  with Second Amendment Foundation with legal issues and the

02:53:33   17  policy.

02:53:33   18         Do you have any familiarity with firearms themselves?

02:53:37   19  A.  Yes, I do.

02:53:38   20  Q.  Okay.  Can you explain for the Court where that

02:53:43   21  familiarity comes from?

02:53:45   22  A.  I started duck hunting with my father when I was about ten

02:53:51   23  or eleven years old, just down the river where the Mississippi

02:53:56   24  and the Missouri and the Cuivre River come together.

02:53:59   25         I also went skeet and trapshooting.  I was the eldest

| | | |
|---|---|---|
| 02:54:04 | 1 | of six children and the first four were girls, so by default I |
| 02:54:08 | 2 | went with my father. |
| 02:54:10 | 3 | Q. Okay. And is that firearms experience limited then to |
| 02:54:15 | 4 | your youth with your father, or has that continued into |
| 02:54:22 | 5 | adulthood? |
| 02:54:23 | 6 | A. I enjoy sport shooting. I do not do any skeet or trap |
| 02:54:28 | 7 | anymore, just primarily handguns, rifles every once in a |
| 02:54:32 | 8 | while, but mostly handguns. |
| 02:54:34 | 9 | Q. Okay. And can you describe for the Court -- sorry -- what |
| 02:54:37 | 10 | you mean by sport shooting? |
| 02:54:39 | 11 | A. Target shooting, competitions, just shooting for fun. |
| 02:54:49 | 12 | Q. Okay. Based on that experience, as you described, with |
| 02:54:56 | 13 | firearms, are you familiar with safety protocols for handling |
| 02:54:59 | 14 | firearms? |
| 02:55:00 | 15 | A. Yes, I am. |
| 02:55:00 | 16 | Q. Can you describe some of those safety protocols for the |
| 02:55:04 | 17 | Court? |
| 02:55:06 | 18 | A. Always check to see if a firearm is unloaded; always point |
| 02:55:13 | 19 | downrange; don't put your finger on the trigger unless you |
| 02:55:17 | 20 | want to shoot; keep your gun clean; store it in a safe, |
| 02:55:23 | 21 | responsible manner; check your safety; wear eye and ear |
| 02:55:30 | 22 | protection; wash your hands after you shoot. |
| 02:55:33 | 23 | Q. Okay. In the realm of knowing how to use a firearm, where |
| 02:55:45 | 24 | on the priority list would you put safety? |
| 02:55:48 | 25 | A. Top. |

02:55:49   1   Q.  Okay.  So let me go back now to the new Chicago firearms

02:55:58   2   ordinance.

02:55:59   3            Okay.  You're familiar with it?

02:56:01   4   A.  Yes, I am familiar with it.

02:56:03   5   Q.  Okay.  Are you familiar with any training requirements

02:56:08   6   that are contained in the new ordinance?  And if so, if you

02:56:12   7   would describe them for the Court.

02:56:14   8   A.  In order to get a Chicago Firearms Permit, an individual

02:56:19   9   must complete four hours in a classroom with training and then

02:56:22   10  one hour on a live range.

02:56:24   11  Q.  Okay.  Are you or the Second Amendment Foundation opposed

02:56:33   12  to the concept of training?

02:56:35   13  A.  No, not at all.

02:56:36   14  Q.  Okay.

02:56:37   15  A.  A prudent individual would always train, any new sport,

02:56:41   16  any new firearm they would train again.

02:56:45   17  Q.  Okay.  Are you opposed then to the concept of the

02:56:53   18  combination -- and I'm meaning this in general terms,

02:56:58   19  Ms. Versnel -- are you opposed to the combination, in general,

02:57:01   20  that the ordinance requires?  Which is some classroom training

02:57:04   21  and some live range training.

02:57:06   22  A.  Not at all.

02:57:07   23  Q.  Okay.  In your experience in, I guess, 34 years with

02:57:12   24  Second Amendment Foundation plus your experience as a youth in

02:57:17   25  learning how to properly use and handle a firearm, is

| | | |
|---|---|---|
| 02:57:23 | 1 | classroom training enough? |
| 02:57:24 | 2 | A.  No, it's not enough. |
| 02:57:25 | 3 | Q.  Can you explain -- can you explain for the Court what you |
| 02:57:29 | 4 | mean by that? |
| 02:57:31 | 5 | A.  Classroom training is essential so that the person knows |
| 02:57:38 | 6 | the reality.  It's like learning to drive a car.  You can take |
| 02:57:42 | 7 | driver's ed.  They can put you in a classroom.  They can show |
| 02:57:46 | 8 | you movies and whatever else.  But until you get on the road, |
| 02:57:49 | 9 | 'til you're actually behind a vehicle before you know what the |
| 02:57:52 | 10 | vehicle can do or anything else, you're just not safe.  You |
| 02:57:55 | 11 | need to have an actual practical experience also. |
| 02:58:10 | 12 | Q.  So do you believe that when, say, for example -- I mean, |
| 02:58:16 | 13 | you were here in the courtroom.  You heard the City argue that |
| 02:58:21 | 14 | nothing is stopping people from talking about firearms or |
| 02:58:25 | 15 | reading about them, or thinking about them. |
| 02:58:29 | 16 | Based on all your experience, is that enough for |
| 02:58:32 | 17 | people to safely learn to use firearms? |
| 02:58:36 | 18 | MR. WORSECK:  Objection, your Honor, foundation. |
| 02:58:40 | 19 | MR. SIGALE:  Okay. |
| 02:58:45 | 20 | THE COURT:  I'm -- now, I'm wondering about the |
| 02:58:48 | 21 | relevance here.  What her beliefs are regarding the statute or |
| 02:58:52 | 22 | the ordinance, do you have something factual that you are |
| 02:58:56 | 23 | going to be asking her, other than her use of weapons?  This |
| 02:59:00 | 24 | is just not relevant again. |
| 02:59:02 | 25 | Her personal -- that's what I have to decide. |

| | | |
|---|---|---|
| 02:59:05 | 1 | Whether she thinks it's a good thing or a bad thing or if it's |
| 02:59:08 | 2 | safe or not is irrelevant, unless she's a 702 expert, and |
| 02:59:12 | 3 | she's not. |
| 02:59:12 | 4 | MR. SIGALE: Okay. |
| 02:59:26 | 5 | BY MR. SIGALE: |
| 02:59:26 | 6 | Q. Is Second Amendment Foundation an actor in the efforts in |
| 02:59:36 | 7 | this lawsuit to bring a mobile range to Chicago? |
| 02:59:40 | 8 | A. Yes. |
| 02:59:41 | 9 | Q. Okay. What has Second Amendment Foundation done as an |
| 02:59:46 | 10 | actor in those efforts? |
| 02:59:48 | 11 | A. The Second Amendment Foundation has coordinated with other |
| 02:59:55 | 12 | plaintiffs, and we have secured two locations within the city |
| 03:00:05 | 13 | limits of Chicago, and we have secured with contract a mobile |
| 03:00:11 | 14 | range to come to the City of Chicago. |
| 03:00:14 | 15 | Q. Okay. Why has Second Amendment undertaken those efforts? |
| 03:00:25 | 16 | A. Because we feel it is very, very important that the |
| 03:00:28 | 17 | individuals be able to get the Chicago Firearms Permit, and |
| 03:00:31 | 18 | with the one hour of classroom time required, having to leave |
| 03:00:38 | 19 | the city is an onerous burden. |
| 03:00:43 | 20 | We also feel that in the larger picture it is very |
| 03:00:46 | 21 | important for people to be able to keep up their shooting |
| 03:00:49 | 22 | skills, improve their shooting skills, or just enjoy the |
| 03:00:53 | 23 | shooting sports, if they should wish. We believe that's |
| 03:00:59 | 24 | covered by the Second Amendment rights. |
| 03:01:02 | 25 | Q. Okay. And did Second Amendment Foundation enter into a |

| | | |
|---|---|---|
| 03:01:05 | 1 | contract with Blue Line Corporation, a supplier of mobile |
| 03:01:10 | 2 | ranges for that purpose? |
| 03:01:11 | 3 | A.  Yes, we did. |
| 03:01:14 | 4 | MR. SIGALE:  Okay.  And, your Honor, the contract |
| 03:01:16 | 5 | between Second Amendment Foundation and Blue Line Corporation |
| 03:01:19 | 6 | has been submitted as an exhibit to this Court. |
| 03:01:21 | 7 | THE COURT:  Okay. |
| 03:01:24 | 8 | MR. SIGALE:  All right. |
| 03:01:24 | 9 | THE COURT:  Do you have the exhibit number? |
| 03:01:25 | 10 | MR. SIGALE:  It's exhibit number 1, actually, your |
| 03:01:25 | 11 | Honor. |
| 03:01:25 | 12 | THE COURT:  Okay. |
| 03:01:25 | 13 | BY MR. SIGALE: |
| 03:01:29 | 14 | Q.  Ms. Versnel, the -- you mentioned two pieces of property. |
| 03:01:38 | 15 | Is the first the -- if I may, your Honor -- which |
| 03:01:46 | 16 | I'll represent is Exhibit 2 to the Court, the -- what's been |
| 03:01:52 | 17 | labeled the Accurate Perforating property at 3333 West 36th |
| 03:01:58 | 18 | Street in Chicago. |
| 03:01:59 | 19 | A.  Correct. |
| 03:01:59 | 20 | Q.  Okay.  And the second one is the 6331 South Bell property |
| 03:02:11 | 21 | in Chicago as well? |
| 03:02:12 | 22 | A.  Correct. |
| 03:02:12 | 23 | Q.  Is that correct? |
| 03:02:12 | 24 | MR. SIGALE:  And that is Exhibit 4, I believe, your |
| 03:02:12 | 25 | Honor. |

BY MR. SIGALE:

Q.  Are you familiar -- strike that.

        Has Second Amendment Foundation taken any steps in bringing this range, in its efforts to bring this mobile range to Chicago for the purposes you described, to make sure that it's operated safely?

        MR. WORSECK:  Objection, your Honor, foundation.

        THE COURT:  Sustained.

BY MR. SIGALE:

Q.  Ms. Versnel, have you personally spoken with anybody regarding the -- regarding safety and -- safety procedures at the proposed mobile range?

A.  Yes, I have.

Q.  Okay.  And who have you spoken to?

A.  Richard Pearson.

Q.  And for the Court, who is Richard Pearson?

A.  He is the executive director of the Illinois State Rifle Association.

Q.  Okay.  And can you describe for the Court the safety issues you've -- strike that.

        What is your understanding regarding Illinois State Rifle Association's role in the safe operation of the mobile range?

A.  The Illinois State Rifle Association would be responsible for the actual management of the range while in Chicago.

| | |
|---|---|
| 03:04:08 | 1 |
| 03:04:21 | 2 |
| 03:04:23 | 3 |
| 03:04:25 | 4 |
| 03:04:28 | 5 |
| 03:04:34 | 6 |
| 03:04:35 | 7 |
| 03:04:41 | 8 |
| 03:04:46 | 9 |
| 03:04:51 | 10 |
| 03:04:51 | 11 |
| 03:04:53 | 12 |
| 03:04:57 | 13 |
| 03:04:58 | 14 |
| 03:05:01 | 15 |
| 03:05:06 | 16 |
| 03:05:08 | 17 |
| 03:05:10 | 18 |
| 03:05:14 | 19 |
| 03:05:14 | 20 |
| 03:05:16 | 21 |
| 03:05:17 | 22 |
| 03:05:40 | 23 |
| 03:05:41 | 24 |
| 03:05:46 | 25 |

1  Q.  Okay.  Does -- ISRA being responsible for the operation,
2  does that include the logistics of operating the range?
3  A.  Can you be more specific, please?
4  Q.  The hours, the personnel?
5  A.  Yes, yes.  ISRA would make the final determination on all
6  those items.
7  Q.  Okay.  Are you confident, as you sit here, that the
8  Illinois State Rifle Association is capable of safely
9  operating this mobile range?
10          MR. WORSECK:  Objection, your Honor, foundation.
11          THE COURT:  Sustained.  It's not relevant either.
12  What is the relevance of whether she thinks they can do a good
13  job?
14          MR. SIGALE:  To the extent that the City is arguing
15  that the Second Amendment Foundation is recklessly attempting
16  to undertake this --
17          THE COURT:  So then we're going to call in ten
18  witnesses who say they can't do a good job?  That's just not
19  relevant.
20          MR. SIGALE:  Well, I hope the City isn't going to do
21  that.  That's fine.
22          THE COURT:  All right.  Sustained.
23  BY MR. SIGALE:
24  Q.  Do you have an understanding of who would be -- who would
25  be invited to use the mobile range?

03:05:50  1   A.  Yes, I do.

03:05:51  2   Q.  Okay.  And can you describe for the Court who those people

03:05:54  3   would be?

03:05:55  4   A.  The individuals could be scheduled to use the mobile range

03:05:59  5   if they had -- had completed or had scheduled a -- the

03:06:06  6   four-hour class that was required, so that they would come in

03:06:09  7   and they would just use the one-hour range time, so that they

03:06:13  8   could get their Chicago Firearms Permit.  But they would have

03:06:17  9   to have either completed or have a firm scheduled class for

03:06:22  10  the four-hour permit [sic].

03:06:25  11          MR. SIGALE:  Okay.  May I have one moment, your

03:06:25  12  Honor?

03:06:27  13          THE COURT:  Sure.

03:06:38  14          MR. SIGALE:  Your Honor, I have nothing more for this

03:06:41  15  witness at this time.

03:06:41  16          THE COURT:  Okay.  We're going to take a short break,

03:06:43  17  okay, ten minutes.  Thanks.

03:35:49  18          (Recess taken.)

03:35:49  19          THE COURT:  Okay.  Is there any cross-examination?

03:35:51  20          MR. WORSECK:  Yes, your Honor.

03:35:57  21          Your Honor, initially, I'd like to raise a

03:35:59  22  housekeeping matter with you.  We may have some direct

03:36:04  23  examination of Ms. Versnel that might be deemed beyond the

03:36:07  24  scope of plaintiffs' direct, and, therefore, not appropriate

03:36:10  25  for our cross-examination.  How would you like me to proceed?

| | | |
|---|---|---|
| 03:36:14 | 1 | THE COURT:  You can just put it in.  It doesn't |
| 03:36:16 | 2 | matter.  In civil trials we do this all of the time. |
| 03:36:20 | 3 | MR. WORSECK:  Okay.  Thank you. |
| 03:36:20 | 4 | - - - |
| 03:36:20 | 5 | JULIANNE VERSNEL, CROSS-EXAMINATION |
| 03:36:25 | 6 | BY MR. WORSECK: |
| 03:36:25 | 7 | Q.  Good afternoon, Ms. Versnel. |
| 03:36:43 | 8 | A.  Good afternoon. |
| 03:36:44 | 9 | Q.  You testified earlier about SAF being a national |
| 03:36:48 | 10 | organization.  Do you remember that? |
| 03:36:51 | 11 | A.  Yes. |
| 03:36:52 | 12 | Q.  And I believe you said it has 650,000 members nationwide? |
| 03:36:57 | 13 | A.  Approximately. |
| 03:36:57 | 14 | Q.  Approximately. |
| 03:36:59 | 15 | And despite its nationwide scope, isn't it true that |
| 03:37:03 | 16 | SAF has never operated a shooting range of any type anywhere |
| 03:37:07 | 17 | in the country? |
| 03:37:09 | 18 | MR. SIGALE:  Objection, your Honor, relevance. |
| 03:37:12 | 19 | THE COURT:  Overruled. |
| 03:37:14 | 20 | THE WITNESS:  No. |
| 03:37:16 | 21 | BY MR. WORSECK: |
| 03:37:16 | 22 | Q.  That's not true? |
| 03:37:18 | 23 | A.  I'm sorry.  I thought I was -- |
| 03:37:20 | 24 | Q.  Has SAF ever operated a shooting range in the United |
| 03:37:24 | 25 | States? |

| | | |
|---|---|---|
| 03:37:24 | 1 | A. No. |
| 03:37:25 | 2 | Q. Including a mobile range? |
| 03:37:27 | 3 | A. Including a mobile range. |
| 03:37:34 | 4 | Q. And prior to entering into the contract with Blue Line |
| 03:37:40 | 5 | that's at issue in this case, SAF had never even -- never even |
| 03:37:43 | 6 | contracted for the supply of a mobile range before; isn't that |
| 03:37:49 | 7 | true? |
| 03:37:50 | 8 | MR. SIGALE: Objection, your Honor. |
| 03:37:51 | 9 | THE COURT: Overruled. |
| 03:37:56 | 10 | THE WITNESS: No, they had not entered into a |
| 03:37:58 | 11 | contract. |
| 03:38:00 | 12 | BY MR. WORSECK: |
| 03:38:00 | 13 | Q. I'm sorry? |
| 03:38:01 | 14 | A. No, they had not entered into a contract for a mobile |
| 03:38:05 | 15 | range. |
| 03:38:06 | 16 | Q. And if the mobile range is allowed to operate in Chicago, |
| 03:38:11 | 17 | SAF will not have anyone in Chicago overseeing that operation, |
| 03:38:16 | 18 | will they? |
| 03:38:21 | 19 | A. They'll have somebody here. |
| 03:38:23 | 20 | Q. They will? |
| 03:38:23 | 21 | A. Yeah. |
| 03:38:28 | 22 | Q. At the time you filed this lawsuit and we took your |
| 03:38:33 | 23 | deposition in early September, isn't it true that SAF had not |
| 03:38:39 | 24 | decided that it would have someone on site in Chicago with |
| 03:38:43 | 25 | respect to the mobile range? |

| | | |
|---|---|---|
| 03:38:46 | 1 | A.  I don't think we had decided at that point, no. |
| 03:38:52 | 2 | Q.  And you, yourself, are not a firearms instructor, are you? |
| 03:38:55 | 3 | A.  No, I am not. |
| 03:38:57 | 4 | Q.  And you've never been one? |
| 03:38:58 | 5 | A.  No, I have not. |
| 03:39:02 | 6 | Q.  Does Illinois require a license to operate a shooting |
| 03:39:06 | 7 | range? |
| 03:39:07 | 8 | MR. SIGALE:  Objection, your Honor, foundation. |
| 03:39:09 | 9 | THE COURT:  All right.  Sustained.  It's not relevant |
| 03:39:13 | 10 | to -- it's speculation for her.  We get back down the same |
| 03:39:16 | 11 | path of what is her -- what does it matter if she knows |
| 03:39:21 | 12 | whether Illinois requires it? |
| 03:39:23 | 13 | MR. WORSECK:  Your Honor, as the signatory for the |
| 03:39:25 | 14 | plaintiff that is going to operate the shooting range, I think |
| 03:39:29 | 15 | it's relevant as to whether or not -- |
| 03:39:30 | 16 | THE COURT:  Okay.  Then lay the foundation. |
| 03:39:34 | 17 | MR. WORSECK:  Excuse me -- lay a foundation? |
| 03:39:35 | 18 | THE COURT:  Then lay the foundation. |
| 03:39:40 | 19 | BY MR. WORSECK: |
| 03:39:40 | 20 | Q.  In your experience, Ms. Versnel, is it necessary for |
| 03:39:44 | 21 | entities that operate businesses to, from time to time, need |
| 03:39:48 | 22 | licenses from governmental entities? |
| 03:39:50 | 23 | MR. SIGALE:  Objection, your Honor, relevance, |
| 03:39:52 | 24 | foundation, speculation. |
| 03:39:53 | 25 | THE COURT:  Okay.  Overruled.  I just ruled a second |

| | | |
|---|---|---|
| 03:39:57 | 1 | ago that he could lay the foundation, so overruled. |
| 03:40:00 | 2 | THE WITNESS: Yes. |
| 03:40:02 | 3 | BY MR. WORSECK: |
| 03:40:02 | 4 | Q. Okay. And based on that experience, it was possible that |
| 03:40:09 | 5 | Illinois would require SAF to have a license for a shooting |
| 03:40:13 | 6 | range in Illinois? |
| 03:40:14 | 7 | A. Correct. |
| 03:40:15 | 8 | Q. And prior to contracting to operate a shooting range in |
| 03:40:20 | 9 | Illinois, did you find out whether Illinois requires a license |
| 03:40:24 | 10 | for that enterprise? |
| 03:40:35 | 11 | A. We inquired as to whether a business license was required |
| 03:40:40 | 12 | in the City of Chicago. |
| 03:40:42 | 13 | Q. And I'm talking about a shooting range license by the |
| 03:40:48 | 14 | State of Illinois. |
| 03:40:49 | 15 | A. No, I do not know about the State of Illinois. |
| 03:41:07 | 16 | Q. Now, you've contracted with the -- strike that. |
| 03:41:11 | 17 | You have an arrangement with the Illinois State Rifle |
| 03:41:16 | 18 | Association, sort of a partnership arrangement, with respect |
| 03:41:18 | 19 | to the operation of this range in Chicago, correct? |
| 03:41:20 | 20 | A. Yes. |
| 03:41:23 | 21 | Q. And isn't it true that the Illinois State Rifle |
| 03:41:26 | 22 | Association has never operated a mobile shooting range before? |
| 03:41:31 | 23 | A. I don't know. |
| 03:41:37 | 24 | Q. So before agreeing to partner with the Illinois State |
| 03:41:42 | 25 | Rifle Association, you did not try to find out whether they |

| | | |
|---|---|---|
| 03:41:44 | 1 | had any experience with operating mobile shooting ranges? |
| 03:41:52 | 2 | MR. SIGALE:  Your Honor, objection as to relevance. |
| 03:41:55 | 3 | THE COURT:  Overruled.  It goes to the contract. |
| 03:42:04 | 4 | THE WITNESS:  Can you repeat the question, please? |
| 03:42:06 | 5 | MR. WORSECK:  Could you read it back, please? |
| 03:42:18 | 6 | (Record read.) |
| 03:42:18 | 7 | THE WITNESS:  No. |
| 03:42:20 | 8 | MR. WORSECK:  Thank you, your Honor. |
| 03:42:39 | 9 | BY MR. WORSECK: |
| 03:42:39 | 10 | Q.  Now, about the contract that you have with Blue Line |
| 03:42:43 | 11 | Corporation for the mobile trailer, isn't it true that to the |
| 03:42:50 | 12 | extent you think that trailer is safe, that's based on |
| 03:42:54 | 13 | conversations and communications you had with Jerry Tilbor, |
| 03:42:58 | 14 | who is the owner of the Blue Line Corporation? |
| 03:43:08 | 15 | A.  Yes, and other research I did on Meggitt mobile ranges. |
| 03:43:14 | 16 | Q.  Okay.  But I'm talking about the trailer that Blue Line |
| 03:43:17 | 17 | has that you've contracted for. |
| 03:43:19 | 18 | A.  Yes. |
| 03:43:19 | 19 | Q.  That was just based on your talks and maybe some e-mails |
| 03:43:23 | 20 | and so forth with Mr. Tilbor? |
| 03:43:26 | 21 | A.  Yes. |
| 03:43:27 | 22 | Q.  Aside from relying on what you learned from Mr. Tilbor |
| 03:43:31 | 23 | about his range, have you done anything else in terms of |
| 03:43:37 | 24 | looking at whether the range is safe? |
| 03:43:43 | 25 | A.  No. |

03:43:57 1 Q. And as we sit here today, isn't it true that you do not

03:44:02 2 know whether members of the public in Chicago who might want

03:44:05 3 to come use the mobile range would be allowed to use their own

03:44:08 4 firearms at the range?

03:44:10 5 A. We have determined that firearms will be supplied at the

03:44:17 6 range to the individuals who come.

03:44:19 7 Q. Okay. But what if someone brings their own --

03:44:22 8 A. They will not be allowed to bring their own gun. They

03:44:25 9 will not be allowed to bring that gun into the facility.

03:44:28 10 Q. Okay. What will happen if they refuse to leave the

03:44:33 11 facility, because they have their own gun with them?

03:44:40 12 MR. SIGALE: Your Honor, objection.

03:44:42 13 THE COURT: Sustained, speculation.

03:44:43 14 MR. SIGALE: Thank you.

03:44:58 15 BY MR. WORSECK:

03:44:58 16 Q. Have you discussed with anyone the response or the

03:45:04 17 protocol that would be used if people bring their guns to the

03:45:08 18 range site and don't want to leave if they are told to leave?

03:45:13 19 A. Yes.

03:45:14 20 Q. Who have you discussed that with?

03:45:16 21 A. Richard Pearson.

03:45:18 22 Q. And what is the protocol?

03:45:21 23 A. We'll have security on site.

03:45:24 24 Q. Security, like security guards?

03:45:26 25 A. Yes.

03:45:30 1  Q.  When did you discuss that with Mr. Pearson?

03:45:33 2  A.  Yesterday.

03:45:37 3  Q.  Prior to yesterday had you ever discussed that topic with

03:45:39 4  Mr. Pearson?

03:45:40 5  A.  No, I had not.

03:45:48 6  Q.  So before you filed your lawsuit, asking for an immediate

03:45:51 7  injunctive order allowing operation of a mobile shooting range

03:45:55 8  in Chicago, you had not discussed that issue with Mr. Pearson?

03:45:59 9       MR. SIGALE:  Your Honor, I'm sorry, but it's been

03:46:01 10  asked and answered.

03:46:01 11       THE COURT:  Okay.  Sustained.  You don't have to

03:46:03 12  apologize just object.

03:46:04 13       MR. SIGALE:  Thanks.  I know the Court wants to -- I

03:46:08 14  don't want ...

03:46:16 15  BY MR. WORSECK:

03:46:16 16  Q.  Ms. Versnel, isn't it true that the contract that SAF has

03:46:20 17  with Blue Line, nothing in the contract speaks to any specific

03:46:24 18  dates that Blue Line would provide the trailer to Chicago,

03:46:28 19  correct?

03:46:28 20  A.  Correct.

03:46:30 21  Q.  And according to the contract, before the truck can come

03:46:35 22  to Chicago, SAF would need to enter into a separate written

03:46:40 23  agreement regarding scheduling with Blue Line?

03:46:42 24  A.  There is no written agreement.

03:46:44 25  Q.  Well, the -- my question was:  Does the contract require

03:46:47 1 that?

03:46:47 2 A.  No.

03:46:48 3 Q.  It does not require that?

03:46:49 4 A.  No.

03:47:14 5 Q.  And you don't have any written agreements with Blue Line

03:47:16 6 as to specific dates that Blue Line would supply the truck to

03:47:20 7 Chicago, correct?

03:47:21 8 A.  No written agreements.

03:47:31 9 Q.  Based on your understanding, when would the Blue Line

03:47:37 10 trailer first be available to come to Chicago?

03:47:40 11 A.  My most recent knowledge is that the Blue Line trailer

03:47:44 12 would be available to come to Chicago approximately

03:47:49 13 October 6th.

03:47:51 14 Q.  Have you put in a request for it to come here on the 6th?

03:47:55 15 A.  Mr. Tilbor and I discussed it, yes.

03:47:59 16 Q.  But have you committed to wanting the truck on the 6th?

03:48:02 17 A.  We have reserved the truck for the 6th, yes.

03:48:05 18 Q.  You have reserved it?

03:48:07 19 A.  Yes.

03:48:12 20 Q.  So is the truck going to come here on the 6th?

03:48:15 21 A.  It's illegal -- it is illegal for it to come into the City

03:48:21 22 of Chicago because ranges are illegal.

03:48:28 23 Q.  So you have not asked Blue Line to send the truck here on

03:48:34 24 the 6th yet, have you?

03:48:38 25         MR. SIGALE:  Your Honor, asked and answered.

03:48:39  1    THE COURT:  Sustained.

03:48:52  2  BY MR. WORSECK:

03:48:52  3  Q.  Are you waiting for the Court to rule in this case before

03:48:55  4  you ask Mr. Tilbor to bring the truck here?

03:49:01  5  A.  Yes.

03:49:17  6  Q.  Now, SAF has a board of directors, correct?

03:49:20  7  A.  Correct -- excuse me, board of trustees.

03:49:24  8  Q.  A board of trustees.

03:49:35  9      And you testified earlier about a contract that SAF

03:49:39  10  had entered into with Accurate Perforating Corporation?

03:49:43  11  A.  Correct.

03:49:45  12  Q.  And isn't it true that the top of the first page of that

03:49:50  13  contract reads, Purpose, colon, trailer storage for one

03:49:57  14  trailer?

03:49:58  15  A.  I have to see it, please.

03:49:59  16  Q.  Would that refresh your recollection?

03:50:00  17  A.  That would refresh my recollection, thank you.

03:50:11  18      THE COURT:  And just for the record, put the exhibit

03:50:14  19  number in.

03:50:15  20      MR. WORSECK:  Yes.  This is Plaintiffs' Exhibit 2.

03:50:16  21      THE COURT:  Okay.  You may approach.

03:50:27  22      THE WITNESS:  Yes, it's written and it says for one

03:50:29  23  trailer.

03:50:31  24  BY MR. WORSECK:

03:50:31  25  Q.  And it says, Purpose, trailer storage for one trailer,

03:50:35   1   correct?

03:50:36   2   A. Yes.

03:50:39   3   Q. Nothing in the contract talks about operation of the

03:50:43   4   trailer as a mobile range, does it?

03:50:45   5   A. No, it does not.

03:50:55   6   Q. And isn't it true that in paragraph 2 of the contract it

03:50:59   7   states that: Lessee has examined and knows the condition of

03:51:03   8   the premises?

03:51:06   9   A. I don't have the contract in front of me.

03:51:08  10   Q. Would it refresh your recollection if you saw the

03:51:10  11   contract?

03:51:11  12   A. Yes. (Reviewing exhibit.)

03:51:21  13       THE COURT: Anyone have a copy of the contract so she

03:51:24  14   can have it on the stand while you --

03:51:26  15       THE WITNESS: Yes.

03:51:27  16       THE COURT: -- can refer to it.

03:51:31  17       There you go. Then you can take your binder back.

03:51:33  18   It's not necessarily the proper protocol, but go ahead and

03:51:37  19   look at it and we'll move along.

03:51:39  20       MR. WORSECK: I actually don't have any questions,

03:51:43  21   your Honor, on this.

03:51:43  22       THE COURT: Oh, okay. Whenever I get a brilliant

03:51:46  23   idea to move it along, it's the end of the area.

03:51:48  24       (Laughter.)

03:51:51  25   BY MR. WORSECK:

| | | |
|---|---|---|
| 03:51:51 | 1 | Q.  So I'm not sure if we caught your answer, Ms. Versnel. |
| 03:51:54 | 2 | THE COURT:  We didn't. |
| 03:51:56 | 3 | BY MR. WORSECK: |
| 03:51:56 | 4 | Q.  And I think the question was:  Isn't it true that |
| 03:51:58 | 5 | paragraph 2 of the contract says, Lessee has examined and |
| 03:52:03 | 6 | knows the condition of the premises? |
| 03:52:04 | 7 | A.  Yes. |
| 03:52:07 | 8 | Q.  And SAF is the lessee, correct? |
| 03:52:10 | 9 | A.  Correct. |
| 03:52:10 | 10 | Q.  And you signed this contract on behalf of the lessee? |
| 03:52:14 | 11 | A.  Correct. |
| 03:52:14 | 12 | Q.  Have you ever examined the Accurate Perforating premises? |
| 03:52:17 | 13 | A.  No. |
| 03:52:18 | 14 | Q.  Has anyone from SAF ever examined the Accurate Perforating |
| 03:52:22 | 15 | premises? |
| 03:52:23 | 16 | MR. SIGALE:  Your Honor, objection.  Is counsel |
| 03:52:25 | 17 | pursuing a breach of contract claim on behalf of the landlord? |
| 03:52:28 | 18 | THE COURT:  It's overruled. |
| 03:52:35 | 19 | THE WITNESS:  No, nobody's looked at it. |
| 03:52:59 | 20 | BY MR. WORSECK: |
| 03:52:59 | 21 | Q.  Before you signed the contract with Accurate Perforating, |
| 03:53:03 | 22 | did you have any discussions with the Illinois State Rifle |
| 03:53:08 | 23 | Association about whether they thought the Accurate |
| 03:53:11 | 24 | Perforating property would be an appropriate or safe location |
| 03:53:15 | 25 | for a mobile shooting range? |

| | | |
|---|---|---|
| 03:53:25 | 1 | A.  I believe it was discussed on a conference call where |
| 03:53:30 | 2 | there were a number of people present.  I don't recall |
| 03:53:33 | 3 | exactly. |
| 03:53:38 | 4 | Q.  You don't recall anything that was said about that? |
| 03:53:44 | 5 | A.  Not specifically, no. |
| 03:53:58 | 6 | Q.  And isn't it true that Accurate Perforating has terminated |
| 03:54:05 | 7 | the lease effective October 31st of this year? |
| 03:54:09 | 8 | A.  Correct. |
| 03:54:12 | 9 | Q.  And you learned about that termination on September 7th of |
| 03:54:16 | 10 | this year? |
| 03:54:21 | 11 | A.  I'll assume you've got the right date.  I don't know off |
| 03:54:24 | 12 | the top of my head. |
| 03:54:25 | 13 | Q.  Would it refresh your recollection if I showed you one of |
| 03:54:28 | 14 | the declarations you submitted in this case? |
| 03:54:32 | 15 | A.  Certainly. |
| 03:54:40 | 16 | MR. WORSECK:  Your Honor, I would like to approach |
| 03:54:41 | 17 | the witness and show her Defendant's Exhibit 22. |
| 03:54:45 | 18 | THE COURT:  That's fine.  You don't need to ask. |
| 03:54:53 | 19 | MR. WORSECK:  And I have extra copies. |
| 03:55:13 | 20 | I'm sorry, your Honor.  I gave her the wrong |
| 03:55:15 | 21 | declaration. |
| 03:55:15 | 22 | THE COURT:  Can you direct her to a part of her |
| 03:55:18 | 23 | declaration? |
| 03:55:19 | 24 | MR. WORSECK:  I gave her the wrong declaration. |
| 03:55:21 | 25 | THE COURT:  Oh, that's why it's confusing then. |

03:55:56  1   THE WITNESS:  I received a phone call from

03:55:59  2   Mr. Cohen's attorney.  Actually, I received a voice-mail from

03:56:04  3   Mr. Cohen's attorney that Mr. Cohen would be notifying me that

03:56:08  4   he was going to terminate the lease.

03:56:11  5   BY MR. WORSECK:

03:56:11  6   Q.  Okay.  My question was, Did you learn that on

03:56:14  7   September 7th?  And if you need your recollection refreshed, I

03:56:23  8   would direct you to paragraph 8 of Exhibit 22.

03:56:36  9   A.  I received a phone call from Mr. Cohen's attorney on

03:56:39  10  September 7th and he left a voice-mail for me actually that

03:56:43  11  the contract would be terminated.

03:56:45  12  Q.  Okay.  So on September 7th you had notice that the

03:56:48  13  contract would be terminated?

03:56:49  14  A.  Yes.

03:56:49  15       MR. SIGALE:  Objection, your Honor, asked and

03:56:52  16  answered.

03:56:52  17       THE COURT:  Oh, it's fine.  Overruled.  It took us a

03:56:55  18  while to get there, so he just restated the one that he asked.

03:57:01  19  Go ahead.

03:57:05  20       THE WITNESS:  I thought I answered it.

03:57:11  21       (Record read.)

03:57:11  22       MR. WORSECK:  Oh, I'm sorry.  I didn't catch that

03:57:13  23  answer.

03:57:15  24       THE COURT:  It's on the record.

03:57:16  25       MR. WORSECK:  I apologize, your Honor.

| | |
|---|---|
| 03:57:18 | 1 |
| 03:57:18 | 2 |
| 03:57:23 | 3 |
| 03:57:26 | 4 |
| 03:57:27 | 5 |
| 03:57:27 | 6 |
| 03:57:31 | 7 |
| 03:57:38 | 8 |
| 03:57:41 | 9 |
| 03:57:47 | 10 |
| 03:57:54 | 11 |
| 03:57:59 | 12 |
| 03:58:00 | 13 |
| 03:58:01 | 14 |
| 03:58:06 | 15 |
| 03:58:09 | 16 |
| 03:58:15 | 17 |
| 03:58:15 | 18 |
| 03:58:19 | 19 |
| 03:58:34 | 20 |
| 03:58:37 | 21 |
| 03:58:39 | 22 |
| 03:58:42 | 23 |
| 03:58:52 | 24 |
| 03:58:59 | 25 |

BY MR. WORSECK:

Q.  So after you learned that the contract with Accurate Perforating would be terminated, you started to look for a new site; is that correct?

A.  Correct.

Q.  And on September 8th, the very next day, you made an inquiry on Loop Net about property at the South Bell location in Chicago?

A.  Yes.

Q.  And by September 9th, which was the very next day, you had an agreement in principle to lease the South Bell property, correct?

A.  Correct.

Q.  So at most two days elapsed between the time that you learned the Accurate lease would be terminated and you had agreed to a new lease for a new parcel of property, correct?

A.  Correct.

Q.  You were very eager to find a new location, right?

A.  Correct.

Q.  And it took you at most just two days to find a new property in the City of Chicago that you thought would be appropriate to operate a mobile shooting range, correct?

A.  Correct.

Q.  And the lease that you entered into for the South Bell property was entered into just a few days before your lawyers

| | | |
|---|---|---|
| 03:59:03 | 1 | filed the second motion for a temporary restraining order in |
| 03:59:08 | 2 | this case; isn't that true? |
| 03:59:08 | 3 | MR. SIGALE: Objection as to foundation, your Honor. |
| 03:59:11 | 4 | THE COURT: Okay. Overruled. |
| 03:59:13 | 5 | THE WITNESS: I -- I was out of the country from |
| 03:59:17 | 6 | September 12th through 18th, so I don't know what day the |
| 03:59:30 | 7 | restraining -- what day it was filed. |
| 03:59:33 | 8 | BY MR. WORSECK: |
| 03:59:33 | 9 | Q. You're aware that your lawyers filed a second -- |
| 03:59:37 | 10 | A. Yes. |
| 03:59:39 | 11 | Q. -- motion for a temporary restraining order? |
| 03:59:41 | 12 | A. Yes. |
| 03:59:47 | 13 | Q. When you signed the lease for the South Bell property, did |
| 03:59:52 | 14 | you know that that property was in the Englewood neighborhood |
| 03:59:54 | 15 | of Chicago? |
| 03:59:55 | 16 | A. Yes, I did. |
| 04:00:03 | 17 | Q. And you signed that lease without having any conversations |
| 04:00:05 | 18 | or communications with the property owner of that property, |
| 04:00:08 | 19 | correct? |
| 04:00:09 | 20 | A. Correct. |
| 04:00:10 | 21 | Q. That's Mr. Gillespie? |
| 04:00:12 | 22 | A. Correct. |
| 04:00:13 | 23 | Q. And you've never talked to Mr. Gillespie about this |
| 04:00:16 | 24 | property, have you? |
| 04:00:18 | 25 | A. I spoke with him after his deposition yesterday. |

| 04:00:21 | 1 | Q.  You spoke with him yesterday? |
| 04:00:24 | 2 | A.  Yes. |
| 04:00:24 | 3 | Q.  And we took your deposition yesterday, too, didn't we? |
| 04:00:25 | 4 | A.  Yes. |
| 04:00:26 | 5 | Q.  That was the first time you spoke with Mr. Gillespie about |
| 04:00:28 | 6 | this property? |
| 04:00:29 | 7 | A.  Yes. |
| 04:00:43 | 8 | Q.  So it's fair to say that at the time you entered into the |
| 04:00:45 | 9 | lease with Mr. Gillespie for the South Bell location, you did |
| 04:00:49 | 10 | not have any discussions with him about your wanting to bring |
| 04:00:54 | 11 | a mobile shooting range on to his property and opening it to |
| 04:00:58 | 12 | members of the public for shooting? |
| 04:01:00 | 13 | A.  I dealt with -- he listed his property through a real |
| 04:01:05 | 14 | estate agent, and I had extensive communication and |
| 04:01:08 | 15 | discussions with the real estate agent. |
| 04:01:10 | 16 | Q.  My question was, Did you have those discussions with |
| 04:01:13 | 17 | Mr. Gillespie, the property owner? |
| 04:01:15 | 18 | MR. SIGALE:  Your Honor, objection.  If the real |
| 04:01:17 | 19 | estate agent was acting on behalf of Mr. Gillespie, then she, |
| 04:01:20 | 20 | in essence, was having conversations with Mr. Gillespie. |
| 04:01:23 | 21 | THE COURT:  But that's not the question that was |
| 04:01:25 | 22 | asked.  Overruled. |
| 04:01:29 | 23 | You can answer the question, which is ... |
| 04:01:37 | 24 | (Record read.) |
| 04:01:37 | 25 | THE WITNESS:  No. |

04:01:39  1  BY MR. WORSECK:

04:01:39  2  Q.  You didn't ask him about whether the property has fences

04:01:47  3  or gates, did you?

04:01:56  4  A.  I did not ask Mr. Gillespie about that.

04:02:03  5  Q.  You didn't discuss it with him at all?

04:02:05  6  A.  Not with Mr. Gillespie, no.

04:02:08  7  Q.  You didn't discuss anything about the property with

04:02:12  8  Mr. Gillespie?

04:02:14  9      MR. SIGALE:  Your Honor, asked and answered.

04:02:15  10      THE COURT:  Overruled.

04:02:17  11      THE WITNESS:  No, I did not speak with Mr. Gillespie.

04:02:21  12  BY MR. WORSECK:

04:02:21  13  Q.  And at that time -- again, we're looking at the time you

04:02:25  14  entered into the contract with Mr. Gillespie -- you didn't

04:02:28  15  know whether he had ever allowed a shooting range to operate

04:02:32  16  on his property, correct?

04:02:38  17  A.  Correct.

04:02:40  18  Q.  You didn't know if he even knew anything about mobile

04:02:44  19  shooting ranges, correct?

04:02:48  20      MR. SIGALE:  Your Honor, relevance objection.

04:02:50  21      THE COURT:  It's speculation.  Sustained.

04:03:02  22  BY MR. WORSECK:

04:03:02  23  Q.  You didn't know if a mobile shooting range or any shooting

04:03:05  24  range had ever operated on that South Bell site, before

04:03:09  25  entering into the contract, did you?

04:03:11   1        MR. SIGALE:  Your Honor, same objection.

04:03:12   2        THE COURT:  That one's different.  Overruled.

04:03:15   3        THE WITNESS:  I would speculate that none had

04:03:17   4 operated, since they were illegal in the City of Chicago.

04:03:23   5 BY MR. WORSECK:

04:03:23   6 Q.  You didn't look into that issue.  You just speculated?

04:03:26   7 A.  I speculated, yes.

04:03:33   8 Q.  And you weren't present during any communications that

04:03:36   9 might have taken place between Mr. Solarte, who you said was

04:03:41  10 the real estate agent for the South Bell property, and

04:03:44  11 Mr. Gillespie, who was the owner of the South Bell property,

04:03:47  12 about the lease or about the mobile range?

04:03:49  13 A.  No, I was not present.

04:03:54  14 Q.  And you haven't even visited the South Bell location, have

04:03:57  15 you?

04:03:57  16 A.  No, I have not.

04:04:03  17 Q.  But you are aware that there are single-family homes right

04:04:06  18 across the street from it, correct?

04:04:08  19 A.  Yes, I am.

04:04:09  20 Q.  And you knew that before you signed the lease for the

04:04:12  21 property, didn't you?

04:04:14  22 A.  Yes, I did.

04:04:27  23 Q.  And do you recall Blue Line Corporation sending you a

04:04:32  24 proposal letter that suggested, Keeping away from close

04:04:37  25 residential homes where there are known sensitive people?

| | | |
|---|---|---|
| 04:04:47 | 1 | A.  If you say I got it, I guess I got it.  I don't have it in |
| 04:04:53 | 2 | front of me. |
| 04:04:54 | 3 | Q.  Would it refresh your recollection if you took a look at |
| 04:04:56 | 4 | it? |
| 04:04:57 | 5 | A.  Sure.  Thank you. |
| 04:05:15 | 6 | Yes, it says that. |
| 04:05:19 | 7 | Q.  And you received this letter from Blue Line months before |
| 04:05:22 | 8 | you signed the lease for the South Bell property, correct? |
| 04:05:26 | 9 | A.  Yes. |
| 04:05:35 | 10 | Q.  And you're aware that there are multiple schools |
| 04:05:40 | 11 | surrounding the South Bell property? |
| 04:05:42 | 12 | A.  There is -- |
| 04:05:44 | 13 | MR. SIGALE:  Objection as to foundation, your Honor. |
| 04:05:47 | 14 | THE COURT:  Okay.  If you are aware, based upon your |
| 04:05:50 | 15 | experience in this contract, you may answer the question.  She |
| 04:05:53 | 16 | was aware there were residences around there, so my guess is |
| 04:05:58 | 17 | foundation is laid.  Overruled. |
| 04:06:00 | 18 | THE WITNESS:  There is a school two blocks -- |
| 04:06:07 | 19 | approximately two blocks -- about 500 feet from the west side |
| 04:06:12 | 20 | of the property. |
| 04:06:14 | 21 | BY MR. WORSECK: |
| 04:06:14 | 22 | Q.  Are you aware of any other schools in the neighborhood? |
| 04:06:21 | 23 | A.  Not within a three- or four-block area, no, I'm not. |
| 04:06:26 | 24 | Q.  And are you aware of any churches within, let's say, |
| 04:06:30 | 25 | that -- let's say a five-block radius of the property? |

| | | |
|---|---|---|
| 04:06:33 | 1 | A. There is a church on the corner of 60-something and Bell. |
| 04:06:43 | 2 | Q. Is that the only one you're aware of? |
| 04:06:45 | 3 | A. That's the only one I am aware of in that -- in that |
| 04:06:48 | 4 | three- or four-block area, yes. |
| 04:06:51 | 5 | Q. Do you know anything about the crime rate in the |
| 04:06:53 | 6 | neighborhood where the South Bell property is located? |
| 04:06:56 | 7 | A. It's high. |
| 04:06:58 | 8 | Q. When did you learn that? |
| 04:07:02 | 9 | A. When I researched the property. |
| 04:07:04 | 10 | Q. Was that before you signed the contract? |
| 04:07:06 | 11 | A. Yes, it was. |
| 04:07:14 | 12 | Q. You don't know anything about how heavy the foot traffic |
| 04:07:19 | 13 | is that goes by the South Bell property or how heavy the |
| 04:07:22 | 14 | vehicle traffic is that goes by the property, do you? |
| 04:07:26 | 15 | A. I can speculate. |
| 04:07:28 | 16 | Q. You can speculate about that? |
| 04:07:29 | 17 | THE COURT: We don't need that. We don't do that. |
| 04:07:37 | 18 | No speculation. |
| 04:07:43 | 19 | BY MR. WORSECK: |
| 04:07:43 | 20 | Q. Now, isn't it true -- we've talked about the Accurate |
| 04:07:47 | 21 | Perforating site. And that contract is still valid, in your |
| 04:07:49 | 22 | view, through October 31st, correct? |
| 04:07:51 | 23 | A. Correct. |
| 04:07:52 | 24 | Q. And you also have a second contract for the property at |
| 04:07:55 | 25 | South Bell, correct? |

| | | |
|---|---|---|
| 04:07:56 | 1 | A.  Correct. |
| 04:07:57 | 2 | Q.  Isn't it true that you have not decided which of those two |
| 04:08:00 | 3 | sites you would put the truck, if it became lawful to bring it |
| 04:08:04 | 4 | into Chicago? |
| 04:08:07 | 5 | A.  No, we have not decided. |
| 04:08:08 | 6 | Q.  You are waiting for the Court to make her ruling.  And if |
| 04:08:11 | 7 | she rules in your favor, then you'll decide which of the two |
| 04:08:14 | 8 | properties to use? |
| 04:08:18 | 9 | A.  Correct. |
| 04:08:22 | 10 | Q.  So in terms of what the Court should focus on, in terms of |
| 04:08:26 | 11 | the two properties, you can't tell her Honor today, in terms |
| 04:08:32 | 12 | of evaluating all the issues in this case, whether she should |
| 04:08:34 | 13 | focus on the Accurate property or whether she should focus on |
| 04:08:38 | 14 | the South Bell property? |
| 04:08:40 | 15 | A.  No, I cannot. |
| 04:08:58 | 16 | Q.  And we've already talked about your dealings with Blue |
| 04:09:04 | 17 | Line Corporation, which is one company that supplies mobile |
| 04:09:07 | 18 | shooting ranges. |
| 04:09:09 | 19 | But isn't it true that you have had communications |
| 04:09:12 | 20 | with other companies that supply mobile shooting ranges? |
| 04:09:16 | 21 | A.  Correct. |
| 04:09:16 | 22 | Q.  One of those is Action Target? |
| 04:09:20 | 23 | A.  Correct. |
| 04:09:21 | 24 | Q.  And another one is a company called Arms to Bear? |
| 04:09:24 | 25 | A.  Correct. |

| | | |
|---|---|---|
| 04:09:27 | 1 | Q. And the reason why you've been talking to these other |
| 04:09:29 | 2 | companies is because you might bring some other truck to |
| 04:09:34 | 3 | Chicago? |
| 04:09:36 | 4 | A. (No response.) |
| 04:09:37 | 5 | Q. You might bring the Blue Line truck; you've got a contract |
| 04:09:40 | 6 | for that. But you might find a better deal somewhere else; |
| 04:09:43 | 7 | you might find a better truck somewhere else; you might find |
| 04:09:46 | 8 | better dates somewhere else. So you just want to see what |
| 04:09:48 | 9 | other options are out there? |
| 04:09:50 | 10 | MR. SIGALE: Objection, your Honor, speculation. |
| 04:09:51 | 11 | THE COURT: I'd say that's a multiple compound |
| 04:09:54 | 12 | question too, so -- |
| 04:09:56 | 13 | MR. WORSECK: Fair enough, your Honor. |
| 04:09:57 | 14 | THE COURT: Sustained. I'm not sure what her answer |
| 04:09:59 | 15 | would have been, to which part. |
| 04:10:01 | 16 | (Laughter.) |
| 04:10:03 | 17 | THE COURT: How about just the last question. You |
| 04:10:06 | 18 | want to keep your options open? |
| 04:10:08 | 19 | BY MR. WORSECK: |
| 04:10:08 | 20 | Q. You'd like to keep your options open, Ms. Versnel? |
| 04:10:11 | 21 | A. Yes. |
| 04:10:14 | 22 | Q. In your view, if you find a better arrangement somewhere |
| 04:10:16 | 23 | else, you would bring that truck to Chicago, were it to become |
| 04:10:20 | 24 | lawful to have mobile shooting ranges in the city, correct? |
| 04:10:23 | 25 | MR. SIGALE: Your Honor, speculation. |

| | | |
|---|---|---|
| 04:10:25 | 1 | THE COURT:  I think it is, but doesn't it go to your |
| 04:10:27 | 2 | theory that if you get my ruling, you want to come in with |
| 04:10:33 | 3 | whatever vehicle you have? |
| 04:10:33 | 4 | MR. GURA:  Yes, but -- |
| 04:10:35 | 5 | THE COURT:  Right. |
| 04:10:35 | 6 | MR. GURA:  -- I would say asked and answered. |
| 04:10:36 | 7 | THE COURT:  Okay.  That's fine.  I think we all know |
| 04:10:39 | 8 | that.  I think you've been saying it as a representative -- |
| 04:10:41 | 9 | MR. GURA:  Sure. |
| 04:10:42 | 10 | THE COURT:  -- of the party, and that's the Court's |
| 04:10:43 | 11 | understanding. |
| 04:10:44 | 12 | MR. GURA:  Sure. |
| 04:10:44 | 13 | THE COURT:  So you can move on.  So I guess that's a |
| 04:10:49 | 14 | sustaining of your objection. |
| 04:10:50 | 15 | MR. SIGALE:  Thank you, your Honor. |
| 04:10:51 | 16 | BY MR. WORSECK: |
| 04:10:51 | 17 | Q.  And the prayer for relief in this case that you're asking |
| 04:10:56 | 18 | the Court to grant isn't limited just to the Blue Line |
| 04:11:00 | 19 | trailer, correct?  It would allow you to bring in, say, a |
| 04:11:05 | 20 | trailer from Arms to Bear or a trailer from Action Target? |
| 04:11:11 | 21 | A.  Yes. |
| 04:11:13 | 22 | Q.  And it would, in fact, allow a completely separate entity |
| 04:11:19 | 23 | to bring in a shooting range into Chicago, correct? |
| 04:11:22 | 24 | MR. SIGALE:  Your Honor -- |
| 04:11:24 | 25 | THE COURT:  That's speculation.  It's really the |

04:11:28  1  impact of my ruling, if the Court were to rule that way.  So

04:11:31  2  what she intends to do with the ruling is relevant, and they

04:11:35  3  have been arguing it.  What others may do is outside of her

04:11:38  4  ken, so that's sustained.  And you can argue that to me.

04:11:46  5       MR. WORSECK:  Thank you, your Honor.

04:11:52  6  BY MR. WORSECK:

04:11:52  7  Q.  SAF would not have any control over a separate entity that

04:11:56  8  wanted to operate a mobile shooting range in Chicago, would

04:11:59  9  it?

04:12:02  10 A.  No.

04:12:08  11 Q.  And SAF would have no way of knowing if the operators of a

04:12:11  12 completely separate mobile shooting range had criminal

04:12:16  13 records, where they might want to put the range, whether that

04:12:19  14 was in a good neighborhood, a safe neighborhood, what kind of

04:12:24  15 safety protocols those other owners would use for their mobile

04:12:26  16 range?

04:12:27  17      MR. SIGALE:  Your Honor, I object to speculation.  I

04:12:29  18 object to the form of the question.

04:12:30  19      THE COURT:  It's overruled.  In the sense of whether

04:12:33  20 she has any control over the other operators is asked and

04:12:38  21 answered.  She doesn't -- SAF doesn't, rather, and so there's

04:12:42  22 no need to go any further.

04:12:44  23      You want to move to another area?

04:12:47  24      MR. WORSECK:  Your Honor, if I may just have a few

04:12:49  25 moments to confer with counsel?

| | | |
|---|---|---|
| 04:12:51 | 1 | THE COURT: Sure. |
| 04:13:37 | 2 | MR. WORSECK: Just a few more questions, your Honor. |
| 04:13:37 | 3 | THE COURT: Okay. |
| 04:13:41 | 4 | BY MR. WORSECK: |
| 04:13:41 | 5 | Q. Ms. Versnel, we talked about the discussions you have had |
| 04:13:46 | 6 | with Blue Line about October 6th as being the date where the |
| 04:13:50 | 7 | trailer could be available to come to Chicago. Do you |
| 04:13:52 | 8 | remember that? |
| 04:13:53 | 9 | A. Correct. |
| 04:13:54 | 10 | Q. How long would the trailer be here, if it comes here on |
| 04:13:57 | 11 | the 6th? |
| 04:14:02 | 12 | A. That hasn't entirely been determined at this point. |
| 04:14:11 | 13 | Q. So you don't know how short a period of time it would be |
| 04:14:14 | 14 | here or how long a period of time it would be here? |
| 04:14:16 | 15 | A. Minimally it would be here seven days. |
| 04:14:20 | 16 | Q. And after that seven days, it hasn't been decided yet? |
| 04:14:24 | 17 | A. It would depend upon availability. |
| 04:14:27 | 18 | Q. And when you say, It would depend upon availability, |
| 04:14:32 | 19 | you're referring to whether Blue Line, which is the supplier |
| 04:14:35 | 20 | of the truck, would have other clients that it needs to |
| 04:14:38 | 21 | satisfy? |
| 04:14:39 | 22 | A. Correct. |
| 04:14:39 | 23 | Q. So it really depends on what Blue Line's calendar looks |
| 04:14:44 | 24 | like? |
| 04:14:45 | 25 | A. Correct. |

| | | |
|---|---|---|
| 04:14:48 | 1 | Q.  Are there any other dates that you've even discussed with |
| 04:14:51 | 2 | Blue Line, aside from that October 6th period that would last |
| 04:14:55 | 3 | one week -- |
| 04:14:56 | 4 | A.  Many dates -- |
| 04:14:57 | 5 | Q.  -- for when the trailer might come back to Chicago? |
| 04:14:59 | 6 | A.  We've discussed many dates. |
| 04:15:00 | 7 | Q.  What dates? |
| 04:15:01 | 8 | A.  We have discussed dates in November, December, January, |
| 04:15:07 | 9 | February. |
| 04:15:16 | 10 | Q.  And Blue Line has not committed to supply the truck during |
| 04:15:20 | 11 | any of those periods, has it? |
| 04:15:22 | 12 | A.  No, they have not. |
| 04:15:28 | 13 | Q.  And we talked just a minute ago about Blue Line talking to |
| 04:15:33 | 14 | some -- excuse me -- SAF talking to some other suppliers of |
| 04:15:38 | 15 | mobile shooting ranges? |
| 04:15:40 | 16 | A.  Yes. |
| 04:15:40 | 17 | Q.  And we talked about wanting to keep your options open.  Do |
| 04:15:45 | 18 | you remember that? |
| 04:15:45 | 19 | A.  Yes. |
| 04:15:46 | 20 | Q.  What kind of factors would you take into account when |
| 04:15:50 | 21 | deciding to go with another company that supplies mobile |
| 04:15:54 | 22 | shooting ranges? |
| 04:15:59 | 23 | A.  Safety, availability, reputation. |
| 04:16:11 | 24 | Q.  And as far as sites in the city where that -- where some |
| 04:16:15 | 25 | other trailer would be placed, what kind of factors would you |

| | | |
|---|---|---|
| 04:16:19 | 1 | take into account in picking a site? |
| 04:16:23 | 2 | A.  For any future mobile ranges that we might bring into the |
| 04:16:33 | 3 | city, we would use the -- all interest that we gain from this |
| 04:16:40 | 4 | first foray in helping us to determine that. |
| 04:16:44 | 5 | Q.  Okay.  So this first foray is a learning experience for |
| 04:16:47 | 6 | you? |
| 04:16:48 | 7 | MR. SIGALE:  Objection as to argumentative. |
| 04:16:51 | 8 | THE COURT:  Overruled. |
| 04:16:54 | 9 | THE WITNESS:  Yes. |
| 04:16:56 | 10 | MR. WORSECK:  Nothing further, your Honor. |
| 04:16:59 | 11 | THE COURT:  Okay.  Cross -- or redirect, excuse me, |
| 04:17:02 | 12 | Mr. Sigale? |
| 04:17:02 | 13 | MR. SIGALE:  Thank you, your Honor. |
| 04:17:05 | 14 | - - - |
| 04:17:05 | 15 | JULIANNE VERSNEL, REDIRECT EXAMINATION |
| 04:17:05 | 16 | BY MR. SIGALE: |
| 04:17:20 | 17 | Q.  Ms. Versnel, when you were speaking with Larry Cohen |
| 04:17:27 | 18 | regarding the Accurate Perforating site, did you tell |
| 04:17:33 | 19 | Mr. Cohen what Second Amendment Foundation was intending to |
| 04:17:39 | 20 | use the property for? |
| 04:17:40 | 21 | A.  Yes, I did. |
| 04:17:41 | 22 | MR. WORSECK:  Objection, your Honor, beyond the scope |
| 04:17:43 | 23 | of the cross. |
| 04:17:44 | 24 | MR. SIGALE:  Actually, she -- |
| 04:17:45 | 25 | THE COURT:  Overruled. |

| | | |
|---|---|---|
| 04:17:47 | 1 | MR. SIGALE:  Thank you, your Honor. |
| 04:17:48 | 2 | THE COURT:  Thanks. |
| 04:17:51 | 3 | BY MR. SIGALE: |
| 04:17:51 | 4 | Q.  I'm sorry, Ms. Versnel? |
| 04:17:52 | 5 | A.  Yes, I did. |
| 04:17:53 | 6 | Q.  What did you tell Mr. Cohen? |
| 04:17:55 | 7 | A.  I told him that we would like to bring a mobile shooting |
| 04:18:00 | 8 | range into the City of Chicago.  I told him that it was |
| 04:18:03 | 9 | currently illegal to have a shooting range in the City of |
| 04:18:07 | 10 | Chicago.  I told him that we would -- we discussed the noise |
| 04:18:20 | 11 | that would come from the mobile shooting range.  We discussed |
| 04:18:25 | 12 | the location of the property.  We discussed that it was paved. |
| 04:18:32 | 13 | We discussed a number of things. |
| 04:18:43 | 14 | Q.  These topics that you discussed, do you believe they go to |
| 04:18:50 | 15 | the topic of suitability of the site for the purpose of the |
| 04:18:53 | 16 | mobile range? |
| 04:18:54 | 17 | A.  Yes, I do. |
| 04:18:55 | 18 | Q.  Okay.  When you spoke to Mr. Solarte, the real estate |
| 04:19:06 | 19 | agent for Gillespie Properties L.L.C., the owner of the Bell |
| 04:19:12 | 20 | site, did you tell Mr. Solarte what Second Amendment |
| 04:19:17 | 21 | Foundation's intentions were for the property? |
| 04:19:20 | 22 | A.  Yes, I did. |
| 04:19:21 | 23 | Q.  Okay.  Did what -- for lack of a better phrase -- security |
| 04:19:35 | 24 | features are you aware of with regard to the Bell property |
| 04:19:38 | 25 | site that, in your mind, went to the suitability issue? |

04:19:42  1        MR. WORSECK:  Objection, your Honor, foundation,

04:19:45  2  potential hearsay.

04:19:46  3        THE COURT:  Well, we are in hearsay land, which

04:19:49  4  wasn't objected to before.  But are we talking about the

04:19:52  5  conversation that was just had?

04:19:54  6        MR. SIGALE:  No.  I'm asking -- I'll rephrase the

04:19:56  7  question.

04:19:56  8        THE COURT:  Okay.  So sustained as to foundation, and

04:19:59  9  we'll find out whether or not we're going into hearsay.

04:20:02  10  BY MR. SIGALE:

04:20:03  11  Q.  Did you make any attempts to decide if the Bell site would

04:20:09  12  be suitable for mobile range purposes?

04:20:11  13  A.  Yes, I did.

04:20:12  14  Q.  Can you describe those for the Court?

04:20:14  15  A.  I contracted -- contacted Mr. Solarte and went over

04:20:23  16  detailed information concerning the site.  The fact it was

04:20:30  17  paved, the size, what its prior use was, the fact that there

04:20:34  18  was -- the railroad yards were to the east, the fact that

04:20:40  19  there's barbed wire on the fence.

04:20:44  20        I also Google Mapped it, Google Streeted it,

04:20:48  21  Redfinned it, Zillowed it, and checked on the City of

04:20:51  22  Chicago's zoning website to determine its land use zoning.

04:21:00  23        MR. WORSECK:  Objection, your Honor, and move to

04:21:01  24  strike the preceding answer, except for the bit regarding what

04:21:05  25  was on the City of Chicago website as hearsay.

04:21:07 1    THE COURT:  Overruled.  It was, What steps did you

04:21:10 2    take, and she answered that that's what she took.  So it

04:21:14 3    didn't go to what was conveyed to her from another individual.

04:21:17 4    MR. WORSECK:  I understood her -- the content of her

04:21:19 5    answer to be information that she did not know going in but

04:21:22 6    that she had learned from other sources, which would be

04:21:25 7    hearsay.

04:21:26 8    THE COURT:  It's not.  It's not the way it was

04:21:29 9    answered.  It's overruled.  I read it very carefully.

04:21:34 10    MR. SIGALE:  Thank you, your Honor.

04:21:35 11  BY MR. SIGALE:

04:21:36 12  Q.  To your understanding, based on the personal research you

04:21:39 13  did, what is the Bell property -- the Bell lot zoned?

04:21:45 14  A.  M1 slash -- dash 2.

04:21:51 15  Q.  Okay.  And in a word what does -- to your understanding,

04:21:55 16  what does the M stand for?

04:21:57 17  A.  Multiuse, light industry.

04:22:00 18  Q.  Okay.  Okay.  Just to address Mr. Worseck's question about

04:22:17 19  people walking on to the property.

04:22:19 20    Would, to your understanding, would walk-ons be

04:22:23 21  allowed on to the mobile range site?

04:22:26 22  A.  No.  We plan on it being by appointment only.

04:22:29 23    MR. SIGALE:  Okay.  Nothing else.  Thank you.

04:22:31 24    THE COURT:  Okay.

04:22:33 25    MR. WORSECK:  Nothing further, your Honor.

| | | |
|---|---|---|
| 04:22:35 | 1 | THE COURT:  Okay.  You may step down now. |
| 04:22:37 | 2 | (Witness leaves the stand.) |
| 04:22:37 | 3 | THE COURT:  And you can call your next witness. |
| 04:22:39 | 4 | And to supplement my ruling on the hearsay, it's most |
| 04:22:42 | 5 | likely not being offered for the truth of the matter asserted |
| 04:22:46 | 6 | but, rather, how she reacted in making this decision or |
| 04:22:48 | 7 | contract whether or not it had pavement or whether or not it |
| 04:22:52 | 8 | didn't, those are factors in her deciding whether to contract, |
| 04:22:56 | 9 | so that's an alternative basis for the answer. |
| 04:22:59 | 10 | Okay.  Your next witness? |
| 04:23:02 | 11 | MR. SIGALE:  Your Honor, may I approach for a second? |
| 04:23:04 | 12 | THE COURT:  Sure. |
| 04:23:05 | 13 | MR. SIGALE:  Thank you. |
| 04:23:06 | 14 | Your Honor, the next witness that plaintiff was |
| 04:23:08 | 15 | planning on calling was Richard Pearson, the president -- I'm |
| 04:23:11 | 16 | sorry -- executive director of the Illinois State Rifle |
| 04:23:14 | 17 | Association. |
| 04:23:15 | 18 | In the hopes of, you know, understanding what the |
| 04:23:18 | 19 | Court said regarding Ms. Versnel earlier and in the judicial |
| 04:23:24 | 20 | economy category, the plaintiffs would like to make a proffer |
| 04:23:30 | 21 | regarding what Mr. Pearson's testimony would be. |
| 04:23:32 | 22 | THE COURT:  Okay.  And let me clarify then what my |
| 04:23:35 | 23 | ruling was.  It's not about time here and efficiency.  It was |
| 04:23:38 | 24 | a relevance issue. |
| 04:23:39 | 25 | Her understanding, your previous witness' |

04:23:42  1   understanding of the statute or whether it would be safe or

04:23:46  2   whether it would be difficult or what others might be doing,

04:23:50  3   all of that is irrelevant.

04:23:51  4        What's relevant for this hearing purposes is are the

04:23:54  5   facts.  So the fact of her contract, the fact of what she can

04:23:58  6   do with bringing in the truck, when she's going to bring in

04:24:01  7   the truck.

04:24:01  8        So if he's coming in to give his perception, that's

04:24:06  9   not really helpful to the Court, because you're all going to

04:24:10  10  argue that from the facts that I have.

04:24:12  11       So you can proffer -- is there an objection to having

04:24:16  12  him proffer anything?

04:24:17  13       MR. WORSECK:  We would only want to reserve the

04:24:19  14  opportunity to conduct cross-examination.

04:24:21  15       THE COURT:  Well, we don't know what you're going to

04:24:23  16  proffer yet, right, so you haven't seen proffer?

04:24:25  17       MR. WORSECK:  Correct.

04:24:26  18       THE COURT:  Okay.  So we're in an area then where you

04:24:30  19  can proceed to do that.

04:24:32  20       You can always call him as an adverse witness, if

04:24:36  21  that proffer is not appropriate for your liking.

04:24:39  22       Is he here?

04:24:41  23       MR. SIGALE:  Mr. Pearson, he's right here.

04:24:43  24       THE COURT:  Oh, all right, Mr. Pearson, all right.

04:24:45  25  So go ahead and proceed and then let's see how it plays out.

| 04:24:48 | 1 | MR. SIGALE: Your Honor, in light of what you just |
| 04:24:50 | 2 | said, if I could have one second? |
| 04:24:51 | 3 | THE COURT: Sure, go right ahead. |
| 04:25:03 | 4 | MR. SIGALE: Your Honor, in light of what the Court |
| 04:25:04 | 5 | just said, maybe it would, perhaps, be easier to call |
| 04:25:08 | 6 | Mr. Pearson to the stand so -- |
| 04:25:09 | 7 | THE COURT: Okay. I tried to save the trouble, but |
| 04:25:11 | 8 | sometimes it gets too complicated. |
| 04:25:13 | 9 | Okay. You may take the stand, sir. |
| 04:25:24 | 10 | (Witness takes the stand.) |
| 04:25:24 | 11 | THE COURT: So please raise your right hand. |
| 04:25:30 | 12 | (The witness was sworn.) |
| 04:25:30 | 13 | THE COURT: Okay. Right there. |
| 04:25:32 | 14 | You may proceed, Mr. Sigale. |
| 04:25:34 | 15 | MR. SIGALE: Thank you, your Honor. |
| 04:25:38 | 16 | - - - |
| 04:25:38 | 17 | RICHARD PEARSON, DIRECT EXAMINATION |
| 04:25:38 | 18 | BY MR. SIGALE: |
| 04:25:39 | 19 | Q. Will you state your name and spell your last name for the |
| 04:25:41 | 20 | record, please? |
| 04:25:42 | 21 | A. Richard Pearson, P-e-a-r-s-o-n. |
| 04:25:46 | 22 | Q. Are you employed, Mr. Pearson? |
| 04:25:47 | 23 | A. I am. |
| 04:25:49 | 24 | Q. And what is that occupation? |
| 04:25:53 | 25 | A. Say again? |

| | | |
|---|---|---|
| 04:25:54 | 1 | Q. What is your occupation? |
| 04:25:55 | 2 | A. I'm executive director of the Illinois State Rifle |
| 04:25:57 | 3 | Association. |
| 04:25:57 | 4 | Q. Okay. And is there a business address for that? |
| 04:25:59 | 5 | A. 420 East Locust Street, Chatsworth, Illinois 60921. |
| 04:26:05 | 6 | Q. Okay. And briefly, if possible, what is the purpose of |
| 04:26:16 | 7 | the Illinois State Rifle Association? |
| 04:26:17 | 8 | A. Purpose of the Illinois State Rifle Association is to |
| 04:26:21 | 9 | promote safety and marksmanship for gun owners and the general |
| 04:26:28 | 10 | public. |
| 04:26:29 | 11 | Q. And your job description is the executive director? |
| 04:26:32 | 12 | A. To oversee all the operations. |
| 04:26:35 | 13 | Q. And what operations would those be? |
| 04:26:37 | 14 | A. We have, of course, education and training. We have |
| 04:26:42 | 15 | legislative operations, publications, shooting disciplines, |
| 04:26:46 | 16 | which is the competition end of it, grants. And we have |
| 04:26:56 | 17 | the -- with the, I'll say, legislative operations. |
| 04:27:01 | 18 | Q. Okay. Does the Illinois State Rifle Association own a |
| 04:27:04 | 19 | shooting range? |
| 04:27:05 | 20 | A. Yes. |
| 04:27:05 | 21 | Q. It does. |
| 04:27:06 | 22 | Where is that? |
| 04:27:06 | 23 | A. It's in Bonfield, Illinois, which is just west of |
| 04:27:09 | 24 | Kankakee. |
| 04:27:10 | 25 | Q. Okay. And to the extent that you know, Mr. Pearson, how |

04:27:14  1  far away is that from the city limits of Chicago?

04:27:17  2  A.  Roughly 60 miles.

04:27:19  3  Q.  Okay.  Do you have any responsibilities or role with

04:27:23  4  regard to the ISRA range?

04:27:27  5  A.  Yes.

04:27:27  6  Q.  Can you describe those for the Court?

04:27:29  7  A.  I am the executive director, so I'm in charge of all

04:27:33  8  operations.

04:27:33  9  Q.  Okay.  Now --

04:27:34  10  A.  Including the range.

04:27:35  11  Q.  What operations specifically would be taking place on the

04:27:39  12  ISRA range?

04:27:39  13  A.  We have all of the competitions.  We have the membership

04:27:44  14  operation, as part of the range.  We have education and

04:27:47  15  training, as part of the range.  We have maintenance, as part

04:27:52  16  of the range.  We have the supervision of the stewardship

04:27:56  17  program, which is the lead remission program, as part of the

04:28:05  18  range.

04:28:09  19  Q.  What types of topics are covered in the education and

04:28:12  20  training part of the range?

04:28:15  21  A.  We use the range to educate new shooters, train shooters,

04:28:23  22  which means they practice, they develop their skills.  We have

04:28:27  23  enhanced clinics.  We have beginning clinics.  We have

04:28:30  24  intermediate clinics to help shooters improve their skills.

04:28:39  25  Q.  And on the list of things that the -- are taught on the

| | | |
|---|---|---|
| 04:28:47 | 1 | ISRA range, where does safety fall on that list? |
| 04:28:50 | 2 | A.  Number one. |
| 04:28:53 | 3 | Q.  Now, you've heard Ms. Versnel earlier testify about |
| 04:29:00 | 4 | certain safety protocols that she follows. |
| 04:29:04 | 5 | Did you hear that testimony? |
| 04:29:05 | 6 | A.  Yes. |
| 04:29:06 | 7 | Q.  Okay.  Would you agree with those safety protocols? |
| 04:29:10 | 8 | A.  Yes. |
| 04:29:10 | 9 | Q.  Okay.  And would you agree that those safety protocols |
| 04:29:15 | 10 | that Ms. Versnel mentioned earlier are important for safety |
| 04:29:19 | 11 | purposes? |
| 04:29:20 | 12 | A.  Yes. |
| 04:29:22 | 13 | Q.  How long have you been involved in the Illinois State |
| 04:29:29 | 14 | Rifle Association? |
| 04:29:29 | 15 | A.  I joined first in 1973. |
| 04:29:33 | 16 | Q.  Okay.  And did you have firearms experience before that? |
| 04:29:37 | 17 | A.  Yes.  I was trained to shoot by my father very young and |
| 04:29:45 | 18 | was on the rifle team in college.  And so I hunted a lot, did |
| 04:29:51 | 19 | a lot of target shooting, that sort of thing. |
| 04:29:55 | 20 | Q.  Okay.  So fair to say you are familiar with the safety -- |
| 04:29:58 | 21 | with the use and handling of firearms? |
| 04:30:02 | 22 | A.  Yes. |
| 04:30:03 | 23 | Q.  Okay.  Are you aware -- strike that. |
| 04:30:17 | 24 | Are you familiar with the mobile range of -- that is |
| 04:30:23 | 25 | the subject of today's hearing? |

04:30:26   1   A.  I have only viewed it on the website.

04:30:29   2   Q.  Okay.  But you're familiar with the concept of the mobile

04:30:32   3   range and you're aware of the issue that is before the Court

04:30:35   4   today?

04:30:36   5   A.  Yes.

04:30:36   6   Q.  Okay.  Does Illinois State Rifle Association have any

04:30:44   7   planned involvement with regard to the mobile range, should

04:30:48   8   the Court allow it to come into the Chicago city limits?

04:30:53   9   A.  Yes.  We intend to operate the range.

04:30:55   10  Q.  Okay.  And by we, are -- strike that.

04:31:01   11      Who is the person from Illinois State Rifle

04:31:06   12  Association who will be planning the safety protocols and the

04:31:12   13  operational protocols for the range?

04:31:14   14  A.  I will.

04:31:15   15  Q.  Okay.  So fair to say that if I want to know what's going

04:31:20   16  to happen on that -- what the intended planning is for that

04:31:25   17  mobile range, you're the person to ask?

04:31:27   18  A.  Yes.

04:31:27   19  Q.  Okay.  Have you been -- well, strike that.

04:31:37   20      Can you please say for the Court, what are some of

04:31:45   21  the logistical issues that the Illinois State Rifle

04:31:48   22  Association and that you are working on planning?

04:31:56   23  A.  Well, we need to be sure you have instructors in line,

04:32:00   24  range officers in line, probably a clerical person to assist

04:32:03   25  in just checking people off, a security person in line.  We

| | | |
|---|---|---|
| 04:32:09 | 1 | need to have all the educational materials there, safety |
| 04:32:14 | 2 | materials, like ear plugs, glasses, that sort of thing. |
| 04:32:17 | 3 | We intend to supply the firearms to the range and the |
| 04:32:20 | 4 | ammunition, so we will have all that in place. We have got a |
| 04:32:23 | 5 | couple of pop-ups to help register people when they come in |
| 04:32:28 | 6 | case there's inclement weather, getting port-a-potties, hand |
| 04:32:33 | 7 | washing stations, that sort of thing. |
| 04:32:34 | 8 | Q. Can you explain for the Court, by the way, why hand |
| 04:32:38 | 9 | washing stations would be important? |
| 04:32:39 | 10 | A. Hand washing stations? |
| 04:32:41 | 11 | Q. Yes. |
| 04:32:41 | 12 | A. You have to wash your hands after handling a firearm, so |
| 04:32:46 | 13 | there's no residue from the firearm that can get into your |
| 04:32:50 | 14 | pores. It has to be washed in cold water. |
| 04:32:52 | 15 | Q. Okay. |
| 04:32:52 | 16 | THE COURT: From the ammunition rather than the |
| 04:32:54 | 17 | firearm, right? |
| 04:32:55 | 18 | THE WITNESS: No, the firearm and the ammunition -- |
| 04:32:58 | 19 | THE COURT: From the firearm itself? |
| 04:32:59 | 20 | THE WITNESS: Yeah, firearm will get the residue from |
| 04:33:00 | 21 | the ammunition on it also. |
| 04:33:08 | 22 | THE COURT: Right. |
| 04:33:08 | 23 | BY MR. SIGALE: |
| 04:33:09 | 24 | Q. Have you seen the Bell property? |
| 04:33:13 | 25 | A. Yes. |

04:33:13　1　Q.　That is -- that there is -- is the subject of the contract

04:33:17　2　between Gillespie Properties and Second Amendment Foundation?

04:33:20　3　A.　Yes.

04:33:20　4　Q.　Okay.　Can you describe the site for the Court?

04:33:24　5　A.　It's a parking lot that's up against a railroad

04:33:30　6　embankment.　It has two fences.　It has a chain-link fence

04:33:35　7　that's -- I wasn't able to measure it, but I'd say it's twelve

04:33:39　8　feet high.　And then inside that it has an electrified fence.

04:33:43　9　It has a gate, solid gate, which has heavy padlocks on it.

04:33:50　10　Q.　Okay.

04:33:51　11　　　　　THE COURT:　Can you remind me of the address again?

04:33:54　12　Do you remember the address?

04:33:55　13　　　　　THE WITNESS:　It is 60- -- 6331?　I don't remember.

04:34:01　14　　　　　MR. SIGALE:　If I may, your Honor?　It's 6331 South

04:34:04　15　Bell Avenue.

04:34:04　16　　　　　THE COURT:　South what?

04:34:06　17　　　　　MR. SIGALE:　Bell.

04:34:06　18　　　　　THE COURT:　Bell.　Thank you.

04:34:17　19　BY MR. SIGALE:

04:34:18　20　Q.　Does the Illinois State Rifle Association have insurance

04:34:23　21　for its outdoor range in Bonfield?

04:34:26　22　A.　Yes.

04:34:26　23　Q.　Okay.　Does the -- is the Illinois State Rifle

04:34:30　24　Association, will they be able to obtain insurance for the

04:34:36　25　mobile range that they would be operating, if the Court allows

04:34:40 | 1 | it?

04:34:41 | 2 | A.  I have notified the insurance company that we'll be

04:34:44 | 3 | operating a mobile range, yes.

04:34:46 | 4 | Q.  Okay.

04:34:46 | 5 | A.  And the location.

04:34:48 | 6 | Q.  Okay.  And just for the record, what is the insurance

04:34:52 | 7 | policy limits on the Bonfield range that you would be looking

04:34:56 | 8 | to expand to for the mobile range?

04:34:59 | 9 | A.  Basic general liability limit is one million, two million,

04:35:03 | 10 | and has a five million umbrella over the top of it.

04:35:06 | 11 | Q.  Okay.  And does Illinois State Rifle Association or -- if

04:35:10 | 12 | I say you, you understand I'm asking you on behalf of the

04:35:13 | 13 | Illinois State Rifle Association?

04:35:16 | 14 | A.  Yes.

04:35:16 | 15 | Q.  Do you have plans or protocols for whether or not there

04:35:22 | 16 | will be walk-ins versus appointments?

04:35:24 | 17 | A.  Yes.

04:35:25 | 18 | Q.  And can you explain what those would be?

04:35:27 | 19 | A.  No walk-ins, appointments only.

04:35:32 | 20 | Q.  Okay.  And should the Court allow -- should the Court

04:35:37 | 21 | allow this, who would have -- who, of the public, would have

04:35:43 | 22 | priority for receiving this training on the range?

04:35:48 | 23 | A.  Well, first of all, those that would have to receive it by

04:35:51 | 24 | the 12th of October, they would have the first priority.  And

04:35:57 | 25 | they would still have to have their FOID card and have their

04:36:01   1   class either taken or scheduled, and they'd have to produce

04:36:05   2   evidence of that at the time of registration.

04:36:09   3   Q.  Okay.

04:36:10   4   A.  And then after October 12th, it would be those who

04:36:16   5   registered with the same requirements, but we wouldn't have to

04:36:19   6   worry about the grandfathering clause.

04:36:22   7   Q.  Based on your review of the Meggitt trailer owned by Blue

04:36:28   8   Line Corporation, can you describe some of the features, as

04:36:31   9   you understand them, for the Court, of that trailer?

04:36:33   10              MR. WORSECK:  Objection, your Honor, foundation and

04:36:35   11   mischaracterizes prior testimony.

04:36:35   12              (Record read.)

04:36:45   13              THE COURT:  What's the mischaracterization?

04:36:46   14              MR. WORSECK:  The witness testified he looked at a

04:36:48   15   website but not that he looked at the trailer itself.

04:36:51   16              THE COURT:  Okay.  All right.  I'll sustain it for

04:36:53   17   foundation.

04:36:54   18              Can you lay a foundation for his knowledge of the

04:36:57   19   trailer?

04:36:57   20              MR. SIGALE:  Yes, your Honor.

04:37:01   21   BY MR. SIGALE:

04:37:01   22   Q.  Mr. Pearson, did you review the Blue Line Corporation

04:37:05   23   website?

04:37:06   24   A.  Yes.

04:37:06   25   Q.  Did the Blue Line Corporation website have a webpage or

| | | |
|---|---|---|
| 04:37:13 | 1 | content on one of its pages regarding the features of its |
| 04:37:17 | 2 | trailer? |
| 04:37:18 | 3 | A.  Yes. |
| 04:37:19 | 4 | Q.  Okay.  Based on your review of that information, can you |
| 04:37:25 | 5 | describe for the Court the Blue Line mobile range? |
| 04:37:29 | 6 | MR. WORSECK:  Objection, your Honor, hearsay. |
| 04:37:30 | 7 | THE COURT:  Okay.  Is this the trailer that he's |
| 04:37:33 | 8 | contracted for? |
| 04:37:35 | 9 | MR. SIGALE:  Yes. |
| 04:37:35 | 10 | THE COURT:  Okay.  So it will be overruled, based |
| 04:37:38 | 11 | upon the fact that what features of the Blue Line trailer are |
| 04:37:42 | 12 | you aware of that you contracted for, right? |
| 04:37:45 | 13 | MR. SIGALE:  Yes. |
| 04:37:45 | 14 | THE COURT:  It's not for the truth of the matter that |
| 04:37:47 | 15 | the Blue Line trailer actually has them, but for his knowledge |
| 04:37:50 | 16 | of what he believes he was contracting for. |
| 04:37:55 | 17 | MR. SIGALE:  (Nodding.) |
| 04:37:56 | 18 | THE COURT:  And what's your objection to that? |
| 04:37:58 | 19 | MR. WORSECK:  Again on the hearsay issue, he's free |
| 04:38:01 | 20 | to, I suppose, testify about the words and images he saw on a |
| 04:38:05 | 21 | website.  But as to whether or not those are actually the |
| 04:38:07 | 22 | features of the trailer would be hearsay. |
| 04:38:09 | 23 | THE COURT:  And that's exactly what I just said. |
| 04:38:11 | 24 | MR. WORSECK:  Okay. |
| 04:38:12 | 25 | THE COURT:  I said, If he's going to testify |

| | | |
|---|---|---|
| 04:38:15 | 1 | regarding what the features are for the truth of the matter |
| 04:38:18 | 2 | that those are the features, that would be hearsay. |
| 04:38:20 | 3 | If he's going to testify that I contracted with this |
| 04:38:23 | 4 | to bring this trailer in, based upon my understanding that the |
| 04:38:26 | 5 | trailer would have A, B, C, and D features, that's based upon |
| 04:38:30 | 6 | his reasoning and his response to what he observed, not that |
| 04:38:35 | 7 | it's for the truth that it actually has those features. |
| 04:38:38 | 8 | So you can proceed. |
| 04:38:39 | 9 | MR. SIGALE: Thank you, your Honor. |
| 04:38:41 | 10 | BY MR. SIGALE: |
| 04:38:41 | 11 | Q. Go ahead -- if you can, Mr. Pearson. |
| 04:38:43 | 12 | A. Okay. The rear of the trailer contains a bullet trap |
| 04:38:48 | 13 | that'll stop the bullets -- |
| 04:38:50 | 14 | THE COURT: Okay. That's the wrong answer, because |
| 04:38:52 | 15 | I've only -- I've limited him to say why he contracted with |
| 04:38:57 | 16 | this particular company and what features he believed he was |
| 04:39:01 | 17 | getting in his contract. |
| 04:39:02 | 18 | He can't say affirmatively, This is what the trailer |
| 04:39:05 | 19 | has, that's hearsay, because the website is saying that, not |
| 04:39:10 | 20 | him. |
| 04:39:10 | 21 | Do you see the distinction? |
| 04:39:13 | 22 | MR. SIGALE: I see the distinction, your Honor. |
| 04:39:17 | 23 | THE COURT: Because that's an important one for the |
| 04:39:19 | 24 | record. |
| 04:39:19 | 25 | Because they can challenge whether the features |

04:39:22  1   actually exist in the trailer, if they want to.  I don't know

04:39:22  2   if that's what you intend to do, but you can.  You can't have

04:39:25  3   him saying that those are the actual features of the trailer,

04:39:29  4   unless he has the foundation to do it, and my understanding is

04:39:32  5   he only looked at a website.

04:39:36  6            MR. SIGALE:  Okay.

04:39:37  7   BY MR. SIGALE:

04:39:38  8   Q.  Mr. Pearson, let me rephrase.

04:39:39  9            Before -- strike that.

04:39:44  10           As part of becoming involved in this with Second

04:39:49  11  Amendment Foundation, did you want to reassure yourself that

04:39:54  12  the trailer would be safe for use?

04:39:58  13  A.  Yes.

04:39:59  14  Q.  And did you review the website of the Blue Line

04:40:03  15  Corporation to learn about the features of this mobile range?

04:40:07  16  A.  Yes.

04:40:08  17  Q.  And based on that review, did you conclude that the range

04:40:14  18  would be satisfactory for ISRA's purposes to become involved

04:40:18  19  with?

04:40:19  20  A.  Yes.

04:40:20  21  Q.  Okay.  There's been questions in the past here about

04:40:30  22  supplying firearms to the enrollees versus them bringing their

04:40:38  23  own.

04:40:38  24           Can you explain to the Court why Illinois State Rifle

04:40:42  25  Association has made the decision to supply the firearms

04:40:45   1   versus having people bring their own?

04:40:49   2   A.  Well, there are several reasons.  One is the

04:40:52   3   transportation issue inside the City of Chicago.  Some people

04:40:55   4   may transfer their -- or excuse me -- transport their firearms

04:40:58   5   to the range, and they may not know how to properly do it, so

04:41:04   6   they could be arrested.  And if they do that, they would lose

04:41:07   7   their firearm privileges.

04:41:08   8        There's the problem of people who don't have a

04:41:09   9   firearm but want to be trained would like to have some

04:41:12   10  experience with those -- with firearms before they come.

04:41:16   11       There's a problem of having a great variety of

04:41:20   12  firearms in a one-hour period, so we've chosen to limit it to

04:41:24   13  two types, revolvers and pistols and just one example of each,

04:41:29   14  so that people can learn the operational features of those in

04:41:33   15  general and then apply them to what they want to get.

04:41:36   16       There's a problem of making sure we have the proper

04:41:39   17  ammunition available.  So if we have -- if we supply the

04:41:45   18  firearms, we know what ammunition goes in them.

04:41:48   19       There's the problem of making sure the firearm's safe

04:41:51   20  to operate, and so we know ours are.

04:41:53   21       There's a problem making sure that they are clean so

04:41:57   22  that they work properly, and those will be.

04:41:59   23       So -- there's also the problem people who have

04:42:04   24  antique firearms now must go through the class, so they have

04:42:08   25  nothing to shoot, even though they probably don't shoot their

04:42:12  1  firearms, so we have a way to supply them with firearms.

04:42:17  2  Q.  Okay.

04:42:17  3  A.  So it solves all those problems.

04:42:20  4  Q.  Okay.  Do you have experience attending -- the ISRA range

04:42:27  5  is an outdoor range in Bonfield, correct?

04:42:30  6  A.  Yes.

04:42:30  7  Q.  Do you have experience visiting indoor ranges?

04:42:32  8  A.  Yes.

04:42:33  9  Q.  Okay.  Approximately how many, as best you can?

04:42:38  10  A.  50 maybe.

04:42:42  11  Q.  Okay.  Have you ever heard on any of the indoor ranges

04:42:44  12  that you've visited, of your personal experience, have you

04:42:49  13  ever heard of a bullet escaping out the back of the indoor

04:42:53  14  range?

04:42:54  15  A.  No.

04:42:55  16  Q.  Nevertheless, for the ultimate safety concern, have you

04:43:02  17  looked at the Bell property site to determine the best spot on

04:43:07  18  the site and the best direction to face the range just for

04:43:17  19  that ultimate safety concern?  Have you looked for that?

04:43:21  20  A.  Yes.

04:43:21  21          MR. WORSECK:  Objection, your Honor, foundation.

04:43:22  22          THE COURT:  Okay.  Have you looked at the Bell

04:43:22  23  property to determine the best site and the best direction.

04:43:31  24          All right.  I'll sustain it in the sense has he gone

04:43:34  25  out there and observed it.  Is that what you're saying for

| | | |
|---|---|---|
| 04:43:37 | 1 | his -- |
| 04:43:38 | 2 | MR. WORSECK: I was thinking more the premise of the |
| 04:43:40 | 3 | question is that Mr. Pearson knows what the best |
| 04:43:43 | 4 | configuration -- |
| 04:43:44 | 5 | THE COURT: Oh. |
| 04:43:44 | 6 | MR. WORSECK: -- of a mobile range would be, and I |
| 04:43:46 | 7 | don't think the foundation has been laid -- |
| 04:43:48 | 8 | THE COURT: Okay. Sustained. |
| 04:43:48 | 9 | MR. WORSECK: -- that he knows anything about -- |
| 04:43:50 | 10 | THE COURT: I sustained it, so you can stop. |
| 04:43:52 | 11 | Go ahead. You have to lay a foundation. |
| 04:43:55 | 12 | MR. SIGALE: Okay. |
| 04:44:12 | 13 | BY MR. SIGALE: |
| 04:44:13 | 14 | Q. Mr. Pearson, you visited the Bell property site, correct? |
| 04:44:17 | 15 | A. Yes. |
| 04:44:18 | 16 | Q. Okay. Did you form -- strike that. |
| 04:44:23 | 17 | Did you make any lay observations that if, for the |
| 04:44:30 | 18 | ultimate safety concern, a bullet were to go out the back of |
| 04:44:36 | 19 | the trailer -- even though you've never heard of it before, |
| 04:44:38 | 20 | but if -- did you make a lay observation of what would be the |
| 04:44:43 | 21 | best spot on the site to put the trailer? |
| 04:44:47 | 22 | MR. WORSECK: Same objection, your Honor, foundation. |
| 04:44:49 | 23 | THE COURT: Okay. It's the same objection. The |
| 04:44:51 | 24 | foundation is to whether he would be an individual, based upon |
| 04:44:55 | 25 | his experience and training, that would know what the best |

| | | |
|---|---|---|
| 04:44:59 | 1 | direction and layout for putting one of these mobile ranges |
| 04:45:03 | 2 | is. |
| 04:45:03 | 3 | We know he can contract for one.  We know he's been |
| 04:45:07 | 4 | to a lot of ranges, but does he know about the placement?  It |
| 04:45:12 | 5 | might have been a better question for your other witness. |
| 04:45:15 | 6 | Can he lay that foundation?  I don't know. |
| 04:45:21 | 7 | Sustained. |
| 04:45:21 | 8 | MR. SIGALE:  Sure. |
| 04:45:26 | 9 | BY MR. SIGALE: |
| 04:45:26 | 10 | Q.  Mr. Pearson, to the -- on the west of the lot past the |
| 04:45:41 | 11 | barbed wire fence, there are some single-family homes, |
| 04:45:47 | 12 | correct? |
| 04:45:47 | 13 | A.  On the west side, yes. |
| 04:45:49 | 14 | Q.  West side. |
| 04:45:49 | 15 | And to -- what would be directly south of the |
| 04:45:58 | 16 | contracted-for area? |
| 04:45:58 | 17 | A.  Another lot. |
| 04:45:59 | 18 | Q.  Okay.  And what would be to the right -- to the east? |
| 04:46:02 | 19 | A.  To the east a railroad embankment. |
| 04:46:05 | 20 | Q.  Okay.  What about to the -- I'm sorry. |
| 04:46:07 | 21 | Say again? |
| 04:46:08 | 22 | A.  The railroad embankment. |
| 04:46:10 | 23 | Q.  Okay.  And that railroad embankment, to your observation, |
| 04:46:14 | 24 | was approximately how high? |
| 04:46:17 | 25 | A.  Oh.  Well, sixteen feet high. |

| | | |
|---|---|---|
| 04:46:29 | 1 | MR. SIGALE:  Okay.  And -- you know, that's fine.  If |
| 04:46:30 | 2 | I may have one more moment, your Honor. |
| 04:46:32 | 3 | THE COURT:  Okay.  That's fine. |
| 04:47:08 | 4 | (Discussion had off the record.) |
| 04:47:08 | 5 | THE COURT:  Go ahead. |
| 04:47:16 | 6 | BY MR. SIGALE: |
| 04:47:16 | 7 | Q.  Is there a spot on the Bell site that if, the ultimate |
| 04:47:24 | 8 | safety concern, a bullet were to go out the back, it would |
| 04:47:27 | 9 | land in the railroad embankment? |
| 04:47:31 | 10 | A.  Yes. |
| 04:47:31 | 11 | Q.  And can you describe for the Court what that spot is on |
| 04:47:34 | 12 | the site and what direction the trailer would have to be |
| 04:47:39 | 13 | facing in order for that to happen? |
| 04:47:41 | 14 | A.  It would have to be facing along the east side of the |
| 04:47:45 | 15 | property facing slightly northeast. |
| 04:47:49 | 16 | MR. SIGALE:  Okay.  Thank you. |
| 04:47:49 | 17 | THE COURT:  Okay.  Cross-examination? |
| 04:47:54 | 18 | MR. WORSECK:  Your Honor, if I may make two |
| 04:47:56 | 19 | suggestions? |
| 04:47:56 | 20 | THE COURT:  Sure. |
| 04:47:57 | 21 | MR. WORSECK:  One is based in the interest of |
| 04:48:00 | 22 | everyone's economy, if I could take five minutes to look over |
| 04:48:03 | 23 | my outline for the cross, I anticipated a lengthier direct, |
| 04:48:07 | 24 | and I think I can shave a lot out of my outline that I |
| 04:48:11 | 25 | think -- |

04:48:11  1     THE COURT:  Take few minutes, is that what you want

04:48:13  2  to do?

04:48:13  3     MR. WORSECK:  Yes.  And also we have some

04:48:15  4  administrative housekeeping with respect to introducing some

04:48:19  5  exhibits.

04:48:19  6     THE COURT:  Okay.  You can have your five minutes.

04:48:21  7     MR. WORSECK:  Thank you.

04:48:23  8     MS. HIRSCH:  Your Honor, the City would like to

04:48:27  9  introduce as part of our cross of plaintiffs' case in chief

04:48:30  10  four exhibits that we have submitted to you and that have been

04:48:33  11  stipulated.

04:48:33  12     THE COURT:  Okay.

04:48:35  13     MS. HIRSCH:  Those are exhibits -- if that's okay at

04:48:38  14  this time -- exhibit number 20, which is a stipulation between

04:48:41  15  the parties regarding plaintiff Ezell.

04:48:48  16     THE COURT:  I don't think I have that.

04:48:54  17     MS. HIRSCH:  It's Exhibit 20.

04:48:56  18     THE COURT:  Oh, I'm sorry.

04:48:58  19     MS. HIRSCH:  We were introducing ...

04:49:02  20     THE COURT:  Okay.

04:49:04  21     MS. HIRSCH:  Exhibit 26, which is designated

04:49:07  22  deposition testimony from plaintiff Brown.

04:49:11  23     THE COURT:  Okay.

04:49:12  24     MS. HIRSCH:  Exhibit number 28, which is designated

04:49:15  25  deposition testimony from plaintiff Ezell.

| | | |
|---|---|---|
| 04:49:17 | 1 | THE COURT: Okay. |
| 04:49:18 | 2 | MS. HIRSCH: And Exhibit 29, which is deposition |
| 04:49:22 | 3 | testimony from plaintiff Hespen. |
| 04:49:24 | 4 | THE COURT: Okay. |
| 04:49:24 | 5 | MS. HIRSCH: Thank you. |
| 04:49:25 | 6 | THE COURT: Any objection? |
| 04:49:25 | 7 | MR. GURA: Not really an objection, your Honor. |
| 04:49:27 | 8 | Perhaps, I didn't understand what we agreed to. We agreed, as |
| 04:49:30 | 9 | a measure of economy, to -- some of the witnesses could |
| 04:49:35 | 10 | testify by designating portions of depositions. As far as |
| 04:49:36 | 11 | we're concerned, it's before the Court. I don't know that it |
| 04:49:39 | 12 | needs to be moved in. I think the Court already has it, so -- |
| 04:49:43 | 13 | you know, I don't -- |
| 04:49:43 | 14 | THE COURT: Well, so far I have two binders with a |
| 04:49:46 | 15 | lot of exhibits that have not been mentioned yet. |
| 04:49:48 | 16 | MR. GURA: Sure. |
| 04:49:49 | 17 | THE COURT: Have you all agreed to the admissibility |
| 04:49:51 | 18 | of each other's exhibits within the binder? |
| 04:49:52 | 19 | MR. GURA: Most of them we have. These are not |
| 04:49:55 | 20 | objectionable to us. It's just the way we submitted it -- we |
| 04:49:58 | 21 | had deposition designations as well, and we simply submitted |
| 04:50:01 | 22 | them as deposition designations. We don't see them as |
| 04:50:07 | 23 | exhibits. We believe they're before the Court properly and we |
| 04:50:10 | 24 | fully agree to have -- |
| 04:50:10 | 25 | THE COURT: A cleaner record would be to have |

| | |
|---|---|
| 04:50:13 | 1 |
| 04:50:17 | 2 |
| 04:50:20 | 3 |
| 04:50:23 | 4 |
| 04:50:27 | 5 |
| 04:50:29 | 6 |
| 04:50:29 | 7 |
| 04:50:31 | 8 |
| 04:50:34 | 9 |
| 04:50:38 | 10 |
| 04:50:38 | 11 |
| 04:50:40 | 12 |
| 04:50:41 | 13 |
| 04:50:44 | 14 |
| 04:50:45 | 15 |
| 04:50:45 | 16 |
| 04:50:47 | 17 |
| 04:50:50 | 18 |
| 04:50:51 | 19 |
| 04:58:33 | 20 |
| 04:58:33 | 21 |
| 04:58:36 | 22 |
| 04:58:36 | 23 |
| 04:58:36 | 24 |
| 04:58:41 | 25 |

1   everything identified and admitted.

2          So these are admitted right now.  And what we'll do

3   is I'll give everybody a chance to make sure that they are

4   going to agree regarding what's in these binders for me.  I

5   have two binders full of exhibits.

6          MR. GURA:  Sure.

7          THE COURT:  I don't know if you each have objections

8   to the others, but if not, what we'll do at the end is we'll

9   move them through on the record so you have a nice record.

10  Okay.

11         MR. GURA:  Okay.  I think it sounds like it's a

12  matter of putting numbers --

13         THE COURT:  It is.  It's a matter of semantics right

14  now, but these can come in.

15         MR. GURA:  Thanks.

16         THE COURT:  And I'll give you a few more minutes,

17  because I said five, so I think we used two.  All right.

18         MR. WORSECK:  Thank you.

19         THE COURT:  All right.  We'll take short break.

20         (Recess taken.)

21         THE COURT:  Okay.  Mr. Worseck, are you all set?

22         MR. WORSECK:  Yes, your Honor.  Thank you.

23                    - - -

24             RICHARD PEARSON, CROSS-EXAMINATION

25  BY MR. WORSECK:

04:58:41  1  Q.  Good afternoon, Mr. Pearson.

04:58:51  2  A.  Good afternoon.

04:58:52  3  Q.  Good to see you again.

04:58:56  4        You are not licensed by the State of Illinois as a

04:59:00  5  firearms instructor, are you?

04:59:01  6  A.  No.

04:59:02  7  Q.  And you never have been, have you?

04:59:04  8  A.  No.

04:59:06  9  Q.  You're the person who is going to write up the safety

04:59:10  10  protocol for the mobile range in Chicago, right?

04:59:13  11  A.  Yes.

04:59:14  12  Q.  And you haven't done that yet, have you?

04:59:16  13  A.  No.

04:59:18  14  Q.  You've never developed a safety protocol for a mobile

04:59:22  15  range before, have you?

04:59:23  16  A.  No.

04:59:25  17  Q.  And ISRA, as an entity, has never operated a mobile

04:59:31  18  shooting range before, has it?

04:59:33  19  A.  No.

04:59:33  20  Q.  You, yourself personally, have never had any association,

04:59:37  21  operational or otherwise, with a mobile shooting range, have

04:59:40  22  you?

04:59:40  23  A.  No.

04:59:42  24  Q.  You've never seen a mobile shooting range in person, have

04:59:45  25  you?

| | | |
|---|---|---|
| 04:59:45 | 1 | A. No. |
| 04:59:45 | 2 | Q. Including the Blue Line trailer that SAF has contracted |
| 04:59:48 | 3 | for in this case? |
| 04:59:50 | 4 | A. No. |
| 04:59:53 | 5 | Q. You haven't spoken to anyone at Blue Line about their |
| 04:59:56 | 6 | trailer, have you? |
| 04:59:57 | 7 | A. No. |
| 05:00:00 | 8 | Q. You haven't spoken to anyone who has experience in |
| 05:00:03 | 9 | operating or locating mobile shooting ranges, have you? |
| 05:00:11 | 10 | A. Yes, I have. |
| 05:00:12 | 11 | Q. You have? |
| 05:00:14 | 12 | When did you do that? |
| 05:00:15 | 13 | A. Today. |
| 05:00:16 | 14 | Q. Before today you had never done that? |
| 05:00:19 | 15 | A. Correct. |
| 05:00:23 | 16 | Q. You've never been a range master at a mobile shooting |
| 05:00:26 | 17 | range, have you? |
| 05:00:27 | 18 | A. No. |
| 05:00:29 | 19 | Q. You've never even trained people at a mobile shooting |
| 05:00:32 | 20 | range? |
| 05:00:33 | 21 | A. No. |
| 05:00:47 | 22 | Q. You haven't had any communications with anyone at the City |
| 05:00:53 | 23 | of Chicago, aside from us lawyers in the case, regarding the |
| 05:00:56 | 24 | mobile shooting range, have you? |
| 05:00:58 | 25 | A. No. |

05:00:59　1　Q.　You haven't tried to get any information from the City

05:01:02　2　about their views on the safety of the mobile shooting range?

05:01:05　3　A.　No.

05:01:12　4　Q.　Now, before your attorney asked you some questions about

05:01:16　5　what Ms. Versnel talked about in her direct testimony about

05:01:21　6　some general safety protocols that apply to the handling of

05:01:27　7　firearms.　Do you remember that --

05:01:29　8　A.　Yes.

05:01:29　9　Q.　-- that question?

05:01:30　10　　　　　And those very general protocols are basically best

05:01:36　11　practices that you would apply anywhere, correct?

05:01:38　12　A.　Yes.

05:01:39　13　Q.　To any sort of range?

05:01:40　14　A.　Yes.

05:01:41　15　Q.　But isn't it also true that safety protocols need to be

05:01:46　16　specific to the particular range at issue as well?

05:01:51　17　A.　They need to be adjusted or maybe even modified and/or

05:01:54　18　added to, yeah.

05:01:56　19　Q.　Okay.　So the conditions and circumstances within a given

05:02:00　20　range will influence the eventual safety protocol that one

05:02:05　21　would create for that range?

05:02:08　22　A.　Yes.

05:02:11　23　Q.　Things like the fencing and gates surrounding a range

05:02:17　24　would influence a safety protocol, correct?

05:02:21　25　A.　Yes.

05:02:21  1  Q.  And the amount of space in the parking lot would influence

05:02:25  2  the protocol?

05:02:26  3  A.  Yes.

05:02:27  4  Q.  And the amount of parking provided to patrons would

05:02:31  5  influence the protocol?

05:02:32  6  A.  Yes.

05:02:33  7  Q.  And the amount of foot traffic through the site would

05:02:36  8  influence the protocol?

05:02:37  9  A.  Yes.

05:02:38  10  Q.  And whether there are other structures or businesses

05:02:43  11  nearby the site would influence the protocol?

05:02:46  12  A.  Maybe.

05:02:48  13  Q.  When would they influence a protocol?

05:02:52  14  A.  I can't think of any time that they would, if the range is

05:02:56  15  constructed properly.

05:03:03  16  Q.  And as far as you're aware, there's been no decision made

05:03:06  17  as to whether to locate the mobile shooting range at the

05:03:09  18  Accurate Perforating site or the South Bell site, correct?

05:03:13  19  A.  I don't know of any decision, yes.

05:03:18  20  Q.  Have you visited the Accurate Perforating site?

05:03:24  21  A.  No.

05:03:24  22  Q.  Have you talked to anyone at Accurate Perforating about

05:03:28  23  the layout of their site?

05:03:29  24  A.  No.

05:03:29  25  Q.  Or about how many employees are at the site?

| | | |
|---|---|---|
| 05:03:31 | 1 | A. No. |
| 05:03:31 | 2 | Q. Or about how many businesses operate on that property? |
| 05:03:34 | 3 | A. No. |
| 05:03:34 | 4 | Q. Or about how many members of the public wander through the |
| 05:03:37 | 5 | site on a daily basis? |
| 05:03:39 | 6 | A. No. |
| 05:03:44 | 7 | Q. Do you know anything about those issues, as they relate to |
| 05:03:47 | 8 | the Accurate Perforating site, whether you talked to anyone at |
| 05:03:50 | 9 | accurate or whether you learned it from some other source? |
| 05:03:53 | 10 | A. I saw a Google Map of it once, but that's it. |
| 05:03:56 | 11 | Q. The Google Map didn't tell you how many people walk |
| 05:03:59 | 12 | through the site on a daily basis, did it? |
| 05:04:01 | 13 | A. No. |
| 05:04:01 | 14 | Q. It didn't tell you how many employees the businesses have, |
| 05:04:04 | 15 | did it? |
| 05:04:05 | 16 | A. No. |
| 05:04:13 | 17 | Q. Do you know anything about the crime rate surrounding |
| 05:04:19 | 18 | either the Accurate Perforating property or the South Bell |
| 05:04:24 | 19 | property? |
| 05:04:26 | 20 | MR. SIGALE: I'll object as to relevance, your Honor. |
| 05:04:29 | 21 | THE COURT: What is your proffer for the relevance of |
| 05:04:32 | 22 | the crime rate? |
| 05:04:33 | 23 | MR. WORSECK: I would submit that the crime rate in |
| 05:04:39 | 24 | which a shooting range is located would be a safety concern, |
| 05:04:42 | 25 | that would influence a safety protocol for the range. |

| | | |
|---|---|---|
| 05:04:45 | 1 | THE COURT: Can you put meat on the bones? What, |
| 05:04:48 | 2 | that someone is going to shoot outside of the range, or what's |
| 05:04:52 | 3 | the idea? |
| 05:04:54 | 4 | MR. WORSECK: Mr. Pearson -- if I may proceed? |
| 05:04:58 | 5 | THE COURT: No, I'm asking you for the proffer. Put |
| 05:05:01 | 6 | meat on the bones of why a higher crime rate would impact the |
| 05:05:06 | 7 | location of a firing range. |
| 05:05:07 | 8 | MR. WORSECK: Firing ranges are places where you have |
| 05:05:10 | 9 | lots of guns, and criminals like to steal guns. And -- |
| 05:05:14 | 10 | THE COURT: Oh, so they are going to break into the |
| 05:05:16 | 11 | firing range? |
| 05:05:17 | 12 | MR. WORSECK: They could break into the range. They |
| 05:05:19 | 13 | could rob patrons of the range -- |
| 05:05:22 | 14 | THE COURT: Okay. |
| 05:05:22 | 15 | MR. WORSECK: -- once they leave the range, knowing |
| 05:05:23 | 16 | that patron just came -- |
| 05:05:24 | 17 | THE COURT: Has a weapon. |
| 05:05:25 | 18 | MR. WORSECK: Exactly. |
| 05:05:26 | 19 | THE COURT: I'll give you a little limited leeway. |
| 05:05:30 | 20 | Overruled. |
| 05:05:33 | 21 | BY MR. WORSECK: |
| 05:05:33 | 22 | Q. Mr. Pearson, in your experience, do crime rates influence |
| 05:05:37 | 23 | safety protocols for shooting ranges? |
| 05:05:39 | 24 | MR. SIGALE: Objection as to foundation and |
| 05:05:41 | 25 | speculation. |

| | | |
|---|---|---|
| 05:05:42 | 1 | THE COURT:  Okay.  Overruled.  In his experience. |
| 05:05:45 | 2 | THE WITNESS:  No. |
| 05:05:46 | 3 | THE COURT:  Is that a factor he considers? |
| 05:05:48 | 4 | THE WITNESS:  Is that the right answer, let me think. |
| 05:05:51 | 5 | I don't have any experience in that.  I'm not |
| 05:05:59 | 6 | answering this right, but ... |
| 05:06:00 | 7 | BY MR. WORSECK: |
| 05:06:00 | 8 | Q.  In writing up safety protocols, you've never tried to |
| 05:06:03 | 9 | figure out what the crime rate is for a neighborhood where a |
| 05:06:06 | 10 | site is located? |
| 05:06:07 | 11 | A.  No. |
| 05:06:10 | 12 | Q.  And you've never had to address how to design a safety |
| 05:06:13 | 13 | protocol that would respond to the rate of crime surrounding a |
| 05:06:18 | 14 | shooting range? |
| 05:06:20 | 15 | A.  No. |
| 05:06:43 | 16 | Q.  You haven't designed the protocol with respect to how |
| 05:06:49 | 17 | people who get injured in the mobile shooting range would make |
| 05:06:52 | 18 | it to the hospital, have you? |
| 05:06:54 | 19 | MR. SIGALE:  Objection, your Honor, foundation, |
| 05:06:56 | 20 | speculation. |
| 05:06:57 | 21 | THE COURT:  Sustained. |
| 05:07:00 | 22 | BY MR. WORSECK: |
| 05:07:00 | 23 | Q.  Mr. Pearson, in designing safety protocols, do you need to |
| 05:07:04 | 24 | take into account how to get injured patrons to the hospital, |
| 05:07:08 | 25 | as part of the emergency response aspect of the safety |

| | | |
|---|---|---|
| 05:07:12 | 1 | protocol? |
| 05:07:14 | 2 | A.  True. |
| 05:07:16 | 3 | Q.  And have you figured that out for the two sites at issue |
| 05:07:22 | 4 | in this case, the Accurate Perforating site or the South Bell |
| 05:07:26 | 5 | site? |
| 05:07:32 | 6 | A.  Other than the standard procedures one follows, no. |
| 05:07:36 | 7 | Q.  What's the closest hospital to the Accurate Perforating |
| 05:07:39 | 8 | site? |
| 05:07:40 | 9 | A.  I don't know. |
| 05:07:40 | 10 | Q.  What's the closest hospital to the South Bell site? |
| 05:07:44 | 11 | A.  I do not know. |
| 05:07:59 | 12 | Q.  Do you know whether the owner of the Accurate Perforating |
| 05:08:02 | 13 | site will allow port-a-potties or washing facilities to be put |
| 05:08:06 | 14 | on the site? |
| 05:08:06 | 15 | THE WITNESS:  No. |
| 05:08:09 | 16 | MR. SIGALE:  Objection, your Honor, foundation. |
| 05:08:09 | 17 | THE COURT:  Overruled, based upon his work with that |
| 05:08:12 | 18 | site. |
| 05:08:14 | 19 | BY MR. WORSECK: |
| 05:08:14 | 20 | Q.  And do you know whether the owner of the South Bell |
| 05:08:17 | 21 | property will allow port-a-potties or washing facilities to be |
| 05:08:21 | 22 | put on the site? |
| 05:08:21 | 23 | A.  No. |
| 05:08:22 | 24 | Q.  What if those owners don't allow port-a-potties or washing |
| 05:08:27 | 25 | facilities on their site, what will you do? |

05:08:32  1   A.  We'll have to look for another site.

05:08:38  2   Q.  And that's because washing is very important to safety on

05:08:41  3   shooting ranges, correct?

05:08:42  4   A.  Yeah.  So is the other stuff.

05:08:49  5   Q.  What will you do if people come to either of the two sites

05:08:53  6   in the case bringing their own weapons and refuse to leave?

05:08:57  7   A.  Well, we have a security guard there, so we'll call the

05:09:00  8   police.

05:09:00  9   Q.  So you'll call the police?

05:09:01  10  A.  Right.

05:09:17  11  Q.  And are you going to need to -- strike that.

05:09:20  12       I understand that the mobile shooting range will be

05:09:23  13  placed in the parking lot and that parking lot might have a

05:09:26  14  fence around it or some other perimeter.

05:09:29  15       Are you going to need to put up a separate perimeter

05:09:33  16  around the trailer itself on the interior of the lot?

05:09:38  17  A.  I wouldn't think so.

05:09:51  18  Q.  Where will the patrons to the mobile shooting range be

05:09:56  19  given the guns that the range will be supplying?

05:09:59  20  A.  Inside the range.

05:10:11  21  Q.  Where inside the range?

05:10:13  22  A.  In the shooting booth.

05:10:16  23  Q.  Can you describe what the shooting booth is?

05:10:19  24  A.  Shooting booth is an area that's got walls on both sides

05:10:27  25  of it.  In the front of it is the target and behind it is the

05:10:34  1  range control room.  And in that area the range -- excuse

05:10:40  2  me -- the instructor and the range safety officers operate.

05:10:47  3  And so there's a little booth that's about four foot wide and

05:10:50  4  about four foot deep, is bulletproof on both sides, has a

05:10:56  5  table there to place the firearm on.

05:11:03  6  Q.  How much time will a patron be allowed to spend in the

05:11:07  7  mobile trailer?

05:11:10  8  A.  Probably about an hour and five minutes.

05:11:15  9  Q.  What will the five minutes be for?  If I'm proper -- if

05:11:18  10  it's proper for me to assume that the one hour is going to be

05:11:21  11  the one-hour shooting training, what do you need the other

05:11:24  12  five minutes for?

05:11:25  13  A.  We might want to discuss the rules before we start.  We

05:11:29  14  might want to keep them there for a little bit longer, just

05:11:33  15  depends on the person, depends on the ...

05:11:35  16  Q.  Okay.  So you don't have a policy or protocol in place for

05:11:38  17  how much time you will spend talking to the patrons or

05:11:41  18  instructing the patrons before they step up to the shooting

05:11:44  19  line, do you?

05:11:45  20  A.  Well, part of the instructing will be on the shooting

05:11:48  21  line.  That's how you teach shooting at a range.  You have to

05:11:51  22  instruct them while they are doing it, instruct them on

05:11:54  23  stance, grip, trigger, pull, side alignment, breathing, safety

05:11:58  24  handling, loading and unloading, all that has to be done in

05:12:02  25  the booth.

05:12:02  1   Q.  Okay.  But I'm talking about before they step up to the

05:12:04  2   line.

05:12:04  3          You don't have a plan in place for how much time you

05:12:07  4   will spend with patrons or what exactly --

05:12:10  5   A.  Before they step up to the line?

05:12:11  6   Q.  I'm sorry?

05:12:11  7   A.  The basic plan is before they step up to the line, we'll

05:12:16  8   go over the safety -- general safety rules, then we'll tell

05:12:21  9   them that they will receive the firearm, not to touch the

05:12:25  10  firearm, not to load the firearm, that all will be -- all that

05:12:29  11  instruction will come inside the booth.  Soon, when they are

05:12:32  12  ready, when they have their ear and eye protection in place,

05:12:36  13  then we'll begin.

05:12:37  14  Q.  Okay.  And that'll take five minutes?

05:12:41  15          MR. SIGALE:  Objection, as to speculation.

05:12:41  16          THE COURT:  All right.  Overruled.

05:12:47  17          Okay.  The answer when he asked you, And that'll take

05:12:50  18  five minutes, what was your answer, sir?

05:12:52  19          THE WITNESS:  It will take about five minutes.

05:12:58  20  BY MR. WORSECK:

05:12:58  21  Q.  Will you do anything to see whether a patron has completed

05:13:04  22  the classroom portion of the Chicago training requirement,

05:13:08  23  before they come out to the mobile range?

05:13:10  24  A.  If they have completed the classroom portion, we'll ask

05:13:14  25  for a certificate showing that they completed the classroom

05:13:17 1 portion, same thing they would turn in at the Chicago police.

05:13:21 2 If they haven't, then they would have to have the reservation

05:13:27 3 or a verification that they are in a school someplace.

05:13:31 4 Q. Can you describe that reservation or verification --

05:13:35 5 A. Identifying from a school, like whatever, the only one

05:13:41 6 that comes to mind is Fidelity Training Academy, that they

05:13:46 7 have enrolled, and that they intend to take the class and

05:13:47 8 they've paid the money.

05:13:48 9 Q. So you won't require any particular patron to have

05:13:51 10 completed any classroom training at all, before being able to

05:13:56 11 step up to the firing line in the mobile trailer, correct?

05:13:59 12        MR. SIGALE: Your Honor, asked and answered.

05:14:00 13        THE COURT: Okay. Overruled.

05:14:03 14        THE WITNESS: Not at this time, no.

05:14:17 15 BY MR. WORSECK:

05:14:17 16 Q. And you spoke earlier about giving a priority to people

05:14:21 17 who needed to get their training before October 12th?

05:14:23 18 A. Yes.

05:14:23 19 Q. Do you remember that?

05:14:25 20        How many people in Chicago have guns that they need

05:14:28 21 to register by October 12th?

05:14:32 22 A. I don't know the exact number.

05:14:41 23 Q. How many people in Chicago have guns that, under the

05:14:45 24 previous ordinance, might have been illegally possessed but

05:14:50 25 wanted to take advantage of the amnesty period that expires on

05:14:55 1  October 12th?

05:14:55 2  A.  I have no idea.

05:15:11 3  Q.  And if some other entity were to operate a mobile trailer

05:15:16 4  in Chicago, you would have no control over how they go about

05:15:20 5  their business, would you?

05:15:21 6  A.  I'm sorry.  Would you repeat that?

05:15:22 7  Q.  Sure.

05:15:22 8       If some other entity or company or person wanted to

05:15:27 9  operate a mobile shooting range in Chicago, you and ISRA would

05:15:32 10 have no control over how they run their shop?

05:15:35 11 A.  No.

05:15:39 12 Q.  So as to the things that ISRA believes will result in a

05:15:46 13 safe operation for the Blue Line trailer, you have no way of

05:15:50 14 knowing if another range operator would follow any of those

05:15:54 15 safety protocols?

05:15:55 16 A.  No.

05:16:22 17 Q.  You stated before that ISRA will be supplying two

05:16:26 18 different types of firearms --

05:16:28 19 A.  Yes.

05:16:28 20 Q.  -- to patrons?

05:16:29 21 A.  A semi-automatic pistol and revolver.

05:16:33 22 Q.  Do you know what make and model?

05:16:35 23 A.  There'll be a Ruger Mark III.  It's a .22 caliber

05:16:40 24 semi-automatic pistols, and there will be model 67 and model

05:16:45 25 60 Smith and Wesson revolvers, .38 caliber.

| | | |
|---|---|---|
| 05:16:59 | 1 | Q.  And the Chicago ban on shooting ranges doesn't prevent |
| 05:17:05 | 2 | ISRA members from meeting in Chicago and talking about |
| 05:17:10 | 3 | firearms issues, does it? |
| 05:17:12 | 4 | A.  No. |
| 05:17:13 | 5 | Q.  Including firearms safety? |
| 05:17:16 | 6 | A.  No. |
| 05:17:18 | 7 | Q.  They're free to meet in people's houses or in bars or in |
| 05:17:23 | 8 | restaurants? |
| 05:17:23 | 9 | A.  Yes. |
| 05:17:24 | 10 | Q.  And ISRA could set up an office, if it wanted to, and |
| 05:17:28 | 11 | sponsor educational events regarding firearms, couldn't it? |
| 05:17:32 | 12 | A.  Yes. |
| 05:17:45 | 13 | Q.  And since the Chicago range ban went into effect, ISRA has |
| 05:17:50 | 14 | been free to continue whatever practices it had previously |
| 05:17:55 | 15 | regarding dissemination of literature about firearms, |
| 05:17:59 | 16 | operating a website and talking about firearms, giving out |
| 05:18:03 | 17 | pamphlets, sending out mailers, all of that activity has been |
| 05:18:08 | 18 | in no way impacted from the ban on shooting ranges, has it? |
| 05:18:13 | 19 | A.  No. |
| 05:18:16 | 20 | Q.  And at the Bonfield range, isn't it true that numerous |
| 05:18:24 | 21 | types of information about gun handling and gun safety are |
| 05:18:27 | 22 | communicated to students before they ever hold a gun in their |
| 05:18:33 | 23 | hand? |
| 05:18:33 | 24 | A.  Yes. |
| 05:18:38 | 25 | Q.  And some of those topics are how to safely store a gun? |

| | | |
|---|---|---|
| 05:18:43 | 1 | A. Yes. |
| 05:18:43 | 2 | Q. And how to safely load a gun? |
| 05:18:46 | 3 | A. Yes. |
| 05:18:47 | 4 | Q. And how to safely hold the gun? |
| 05:18:49 | 5 | A. Yes. |
| 05:18:49 | 6 | Q. And how to safely aim the gun? |
| 05:18:52 | 7 | A. Yes. |
| 05:18:55 | 8 | Q. And you have something that you call a blue gun, which is |
| 05:18:58 | 9 | just a plastic replica of a gun that students can actually |
| 05:19:03 | 10 | practice holding and aiming and holstering and all those sorts |
| 05:19:06 | 11 | of things, don't you? |
| 05:19:08 | 12 | A. Yes. |
| 05:19:11 | 13 | Q. And this training is conducted in what's called the picnic |
| 05:19:18 | 14 | pavilion at the Bonfield range? |
| 05:19:20 | 15 | A. Yes, and on the range, both. |
| 05:19:22 | 16 | Q. In the picnic pavilion students aren't allowed to handle |
| 05:19:27 | 17 | weapons, are they? |
| 05:19:28 | 18 | A. No. |
| 05:19:28 | 19 | Q. Why not? |
| 05:19:29 | 20 | A. Safety reasons. |
| 05:19:32 | 21 | Q. What are some of the safety concerns? |
| 05:19:34 | 22 | A. Well, that -- somebody might have a loaded firearm or that |
| 05:19:39 | 23 | they might damage it or they might handle it in an improper |
| 05:19:45 | 24 | way. |
| 05:19:51 | 25 | Q. And all of these forms of training that we just discussed |

05:19:55  1   could be conducted in Chicago by ISRA, if it wanted to,

05:20:00  2   correct?

05:20:01  3          MR. SIGALE:  Objection, as to calls for a legal

05:20:03  4   conclusion, your Honor.

05:20:05  5          THE COURT:  Overruled.

05:20:06  6          THE WITNESS:  Yeah.  I don't know.  I don't know.

05:20:11  7   You're talking about the handling of firearms.

05:20:14  8   BY MR. WORSECK:

05:20:14  9   Q.  All of the stuff we just discussed regarding instruction

05:20:17  10  to students and handling the blue gun and how to safely store

05:20:20  11  a gun and how to safely load a gun and how to safely handle a

05:20:24  12  gun, you don't need to be in a shooting range to do that, do

05:20:27  13  you?

05:20:27  14  A.  Using a blue gun, right.  Is that what you're asking?

05:20:30  15  Q.  And everything else I just listed.

05:20:32  16  A.  Using a blue gun, no, that would have to be on a range.

05:20:36  17  Q.  And the dialog portion of training, you don't need to be

05:20:40  18  in the shooting range to do that either, do you?

05:20:44  19  A.  Yes, you do eventually, because when students are doing

05:20:50  20  something improperly, you have to correct them.  There's no

05:20:52  21  way to do that other than actual firing.

05:21:06  22          MR. WORSECK:  One moment, your Honor.

05:21:49  23  BY MR. WORSECK:

05:21:49  24  Q.  Mr. Pearson, will guns be stored overnight in the mobile

05:21:54  25  range?

05:21:54  1  A.  No.

05:21:58  2  Q.  And do you remember our discussion earlier about needing

05:22:03  3  to look at specific factors of a specific location when

05:22:06  4  designing a safety protocol?

05:22:09  5  A.  Yes.

05:22:11  6  Q.  And you'll have to wait until the Blue Line trailer gets

05:22:15  7  to Chicago and gets plopped in one of these two sites, before

05:22:19  8  you can finalize the safety protocol, won't you?

05:22:23  9  A.  Yes.

05:22:25  10  Q.  And it'll take you some time to do those adjustments?

05:22:28  11  A.  Not very long.

05:22:30  12  Q.  Okay.  How long?

05:22:32  13  A.  Probably fifteen minutes.

05:22:34  14  Q.  That's all you'll need?

05:22:35  15  A.  All I'll need.

05:22:41  16  Q.  Is that how long you usually spend when you're drafting

05:22:44  17  and finalizing safety protocols?

05:22:46  18       MR. SIGALE:  Objection, your Honor, argumentative,

05:22:46  19  your Honor.

05:22:50  20       THE COURT:  Overruled.

05:22:51  21       THE WITNESS:  Well, it's -- all the safety protocols

05:22:53  22  are standard.  The only thing you have to do is make some site

05:22:57  23  adjustments, which are very small.

05:23:01  24  BY MR. WORSECK:

05:23:01  25  Q.  So you've never seen a Blue Line -- strike that.

| | | |
|---|---|---|
| 05:23:04 | 1 | You've never seen a mobile trailer at all, and you |
| 05:23:07 | 2 | certainly haven't seen one at either of these locations that |
| 05:23:10 | 3 | are at issue in Chicago.  And all you'll need is fifteen |
| 05:23:13 | 4 | minutes to figure out and finalize the safety protocol? |
| 05:23:16 | 5 | THE WITNESS:  Probably. |
| 05:23:17 | 6 | MR. SIGALE:  Objection, your Honor, argumentative. |
| 05:23:18 | 7 | THE COURT:  All right.  Sustained. |
| 05:23:26 | 8 | BY MR. WORSECK: |
| 05:23:26 | 9 | Q.  And you're not going to submit that to the Court or to the |
| 05:23:29 | 10 | City, are you?  We're just going to have to rely on you and |
| 05:23:32 | 11 | hope that you do a good job with that, aren't we? |
| 05:23:36 | 12 | MR. SIGALE:  Objection, your Honor, argumentative. |
| 05:23:38 | 13 | THE COURT:  It's sustained. |
| 05:23:39 | 14 | MR. WORSECK:  Nothing further, your Honor. |
| 05:23:40 | 15 | THE COURT:  Okay.  I have a few questions. |
| 05:23:42 | 16 | So when an individual goes to the range, she won't |
| 05:23:47 | 17 | have her gun with her? |
| 05:23:49 | 18 | THE WITNESS:  No. |
| 05:23:49 | 19 | THE COURT:  You'll have a gun there.  So each |
| 05:23:52 | 20 | individual possesses a different kind of gun, I assume, or |
| 05:23:56 | 21 | many different kinds.  So do you train the individual on the |
| 05:24:00 | 22 | type of gun that she possesses? |
| 05:24:02 | 23 | THE WITNESS:  No.  There's not enough time to do |
| 05:24:04 | 24 | that, so we'll train them on the two basic types, which is |
| 05:24:08 | 25 | semi-automatics and revolvers -- |

| | | |
|---|---|---|
| 05:24:09 | 1 | THE COURT:  Okay. |
| 05:24:09 | 2 | THE WITNESS:  -- and give them the general principles |
| 05:24:11 | 3 | of each one of those. |
| 05:24:12 | 4 | THE COURT:  Okay.  So if I possess only a shotgun or |
| 05:24:16 | 5 | only a rifle, I'm not trained on that?  I'm trained on a |
| 05:24:19 | 6 | handgun? |
| 05:24:22 | 7 | THE WITNESS:  In this case, yes. |
| 05:24:23 | 8 | THE COURT:  Okay.  All right.  Anybody have follow-up |
| 05:24:26 | 9 | questions, based upon my few questions? |
| 05:24:28 | 10 | (No response.) |
| 05:24:29 | 11 | THE COURT:  All right.  Then you -- do you have |
| 05:24:31 | 12 | anything else? |
| 05:24:31 | 13 | MR. SIGALE:  I do have something, your Honor -- |
| 05:24:34 | 14 | THE COURT:  Okay.  Go ahead. |
| 05:24:34 | 15 | MR. SIGALE:  -- if I may, your Honor? |
| 05:24:39 | 16 | - - - |
| 05:24:39 | 17 | RICHARD PEARSON, REDIRECT EXAMINATION |
| 05:24:39 | 18 | BY MR. SIGALE: |
| 05:24:43 | 19 | Q.  Mr. Pearson, will you be teaching the class -- the CFP |
| 05:24:49 | 20 | class that is the point of this mobile range and the point of |
| 05:24:52 | 21 | this hearing?  Would you be teaching that? |
| 05:24:57 | 22 | A.  No.  A certified instructor would be teaching the class. |
| 05:24:59 | 23 | Q.  Okay.  So does -- has the Illinois State Rifle |
| 05:25:04 | 24 | Association, or you on its behalf, spoken to any instructors |
| 05:25:10 | 25 | regarding lining them up to teach this class in the event that |

| | | |
|---|---|---|
| 05:25:14 | 1 | this mobile range is allowed to operate? |
| 05:25:16 | 2 | A. Yes. |
| 05:25:17 | 3 | Q. How many? |
| 05:25:17 | 4 | A. Four. |
| 05:25:18 | 5 | Q. Okay. And these state certified instructors, to your |
| 05:25:32 | 6 | knowledge -- or to your understanding, is it their |
| 05:25:35 | 7 | determination how they will teach the class? |
| 05:25:39 | 8 | A. We will work together on that. |
| 05:25:41 | 9 | Q. Okay. So some of them -- some of them might have prepared |
| 05:25:46 | 10 | their own materials? |
| 05:25:47 | 11 | A. Yes. |
| 05:25:48 | 12 | Q. And, in fact, one of them actually did prepare his own -- |
| 05:25:51 | 13 | has prepared his own materials, correct? |
| 05:25:54 | 14 | A. Correct, yes. |
| 05:25:54 | 15 | Q. Okay. And the others, presumably who are state certified, |
| 05:26:02 | 16 | will have training materials in place before they teach the |
| 05:26:04 | 17 | class? |
| 05:26:05 | 18 | A. They'll have access to the manual. |
| 05:26:08 | 19 | Q. Okay. To your understanding, are the physics, let's say, |
| 05:26:20 | 20 | of shooting ranges the same? |
| 05:26:24 | 21 | MR. WORSECK: Objection, your Honor, vague and |
| 05:26:25 | 22 | foundation. |
| 05:26:26 | 23 | THE COURT: Sustained, on especially physics. |
| 05:26:29 | 24 | MR. SIGALE: Okay. |
| 05:26:32 | 25 | BY MR. SIGALE: |

| | |
|---|---|
| 05:26:33 | 1 |
| 05:26:39 | 2 |
| 05:26:44 | 3 |
| 05:26:47 | 4 |
| 05:26:49 | 5 |
| 05:26:53 | 6 |
| 05:26:57 | 7 |
| 05:26:58 | 8 |
| 05:27:12 | 9 |
| 05:27:16 | 10 |
| 05:27:18 | 11 |
| 05:27:22 | 12 |
| 05:27:25 | 13 |
| 05:27:28 | 14 |
| 05:27:31 | 15 |
| 05:27:34 | 16 |
| 05:27:34 | 17 |
| 05:27:38 | 18 |
| 05:27:40 | 19 |
| 05:27:43 | 20 |
| 05:27:45 | 21 |
| 05:27:47 | 22 |
| 05:27:48 | 23 |
| 05:27:51 | 24 |
| 05:27:53 | 25 |

Q.  The principles of operating a shooting range, the safety procedures -- well, we'll stick with the safety procedures.

        The things you described, do those apply -- the things you described earlier, the safety procedures -- don't put your finger on the trigger, only point down the line -- are those followed at any shooting range that you've ever been to?

A.  Yes.

Q.  I just want to briefly go to a point that Mr. Worseck asked you about before.

        Is there a lot of crime in Bonfield, Illinois?

A.  No.

Q.  As long as you were being asked to speculate before, is it also possible that criminals might stay far away from somewhere where they know that there's a shooting range going on?

A.  That's true, they tend to do that.

        THE COURT:  I don't think we were speculating about what the criminals were going to do.  The question was whether there was a crime rate in the area.

        MR. SIGALE:  Well, there were a question about do criminals like to steal guns.

        THE COURT:  It actually wasn't that question, but that's okay.  You can move on.

BY MR. SIGALE:

| | |
|---|---|
| 05:27:53 | 1 |
| 05:27:56 | 2 |
| 05:27:57 | 3 |
| 05:27:58 | 4 |
| 05:27:59 | 5 |
| 05:28:05 | 6 |
| 05:28:11 | 7 |
| 05:28:17 | 8 |
| 05:28:20 | 9 |
| 05:28:25 | 10 |
| 05:28:30 | 11 |
| 05:28:34 | 12 |
| 05:28:39 | 13 |
| 05:28:42 | 14 |
| 05:28:42 | 15 |
| 05:28:48 | 16 |
| 05:28:51 | 17 |
| 05:28:56 | 18 |
| 05:29:01 | 19 |
| 05:29:03 | 20 |
| 05:29:07 | 21 |
| 05:29:11 | 22 |
| 05:29:16 | 23 |
| 05:29:20 | 24 |
| 05:29:23 | 25 |

Q.  You had mentioned that there were standard procedures for injury-type emergencies?

A.  Yes.

Q.  Can you describe what those are?

A.  Yes.  The range officer, the instructors board develop an operating procedure.  The first one is that one of them, predetermined, will take care of the injured party.  The security officer will stand at the gate and direct the ambulance and the other emergency vehicles that might come in. And then the -- of course, one of the people will be calling 9-1-1.  So we have one tending to the victim, one on the phone with 9-1-1, and one directing the ambulance or other emergency personnel to the scene.

Q.  Okay.

A.  You will find that all of us are first aid trained, and so I am familiar with treating gunshot wounds, which, of course, is the issue here.  So we're all trained in it.

Q.  So if something were to happen your -- you and the staff there would be trained to deal with it?

A.  Yes.

Q.  Mr. Worseck asked you a little bit earlier about the picnic pavilion area at the ISRA range and the talking about -- the talking instruction and the blue gun.

        Is that training done -- is that instruction done in conjunction with the live fire training on the range?

| | |
|---|---|
| 05:29:26 | 1 |
| 05:29:29 | 2 |
| 05:29:37 | 3 |
| 05:29:42 | 4 |
| 05:29:44 | 5 |
| 05:29:48 | 6 |
| 05:29:50 | 7 |

A.   Yes.   They go to the live fire training after that.

Q.   Okay.   In your experience can proper safety instruction and training take place without live fire training?

A.   Not completely.

Q.   Do you need -- in order to be fully properly trained with safety, do you need live fire training?

A.   Yes.

8      MR. SIGALE:   Nothing further.   Thank you, your Honor.

9      THE COURT:   Why?

10      THE WITNESS:   Because there's no other way to deal with it than on a range.   And so you have to learn how to unload it, make it safe, if it malfunctions.

13      THE COURT:   I see.

14      Okay.   Did you want to ask any questions beyond that, based upon mine?

16      MR. SIGALE:   No, that's fine, your Honor.   Thank you.

17      THE COURT:   Okay.   Do you want to cross at all?

18      MR. WORSECK:   No, your Honor.

19      THE COURT:   Okay.   Sir, then you can step down.

20      (Witness leaves the stand.)

21      THE COURT:   Well, as much as I would love to spend the weekend with all of you, it is almost 5:30.   So who can tell me where we are standing as far as the rest of our witnesses?

25      MR. GURA:   Well, that is our final witness.

| | | |
|---|---|---|
| 05:30:32 | 1 | THE COURT:  That's your case.  Okay. |
| 05:30:33 | 2 | MR. GURA:  And that's our case.  Everything else, of |
| 05:30:35 | 3 | course, is in papers. |
| 05:30:36 | 4 | THE COURT:  Okay. |
| 05:30:37 | 5 | MR. GURA:  I believe there's two witnesses -- |
| 05:30:38 | 6 | THE COURT:  And you have the officer? |
| 05:30:39 | 7 | MR. AGUIAR:  We have two witnesses, your Honor. |
| 05:30:41 | 8 | THE COURT:  Okay.  We'll have to reconvene on Monday. |
| 05:30:44 | 9 | All right.  Now, can everyone come back at |
| 05:30:47 | 10 | approximately 9:30 in the morning on Monday, after my call? |
| 05:30:52 | 11 | MR. SIGALE:  Yes, your Honor.  I certainly can be |
| 05:30:55 | 12 | here. |
| 05:30:55 | 13 | THE COURT:  Okay. |
| 05:30:55 | 14 | MR. GURA:  I can. |
| 05:30:56 | 15 | MR. AGUIAR:  Your Honor, I believe we can be here, |
| 05:31:00 | 16 | but before we get to that point, I believe we would like to |
| 05:31:02 | 17 | make a motion at the close of plaintiffs' case. |
| 05:31:03 | 18 | THE COURT:  Okay.  We'll deal with that in a minute. |
| 05:31:06 | 19 | Can everyone come back here on Monday at 9:30. |
| 05:31:08 | 20 | MR. WORSECK:  Yes. |
| 05:31:09 | 21 | MR. AGUIAR:  Yes, your Honor. |
| 05:31:10 | 22 | THE COURT:  All right then.  We'll reconvene it, if |
| 05:31:11 | 23 | we need to, because we still have arguments, which would be at |
| 05:31:14 | 24 | 9:30. |
| 05:31:14 | 25 | Okay.  Now, you can make the motion. |

05:31:17    1        MS. HIRSCH:  Your Honor, at this time we would like

05:31:20    2   to make a motion under Rule 52(c), and I'm happy to make that

05:31:24    3   now or revisit that Monday morning, whatever your Honor --

05:31:26    4        THE COURT:  You know, I'm thinking let's do it on

05:31:28    5   Monday morning.  Okay.

05:31:30    6        MS. HIRSCH:  Okay.

05:31:31    7        THE COURT:  And -- it's already late in the day.  I

05:31:33    8   unfortunately have two other functions to go to this evening,

05:31:37    9   so my day is still going and full.

05:31:39   10        So let's reconvene on Monday at 9:30.  What I would

05:31:43   11   like you all to do is to discuss your exhibits, so that you

05:31:47   12   can make a decision as to whether all the binders that I have

05:31:50   13   are binders that I can accept and review as evidence that

05:31:53   14   you've agreed to.  And if so, then you can just put together

05:31:57   15   an exhibit list that's agreed to.  If there's any that you

05:32:01   16   don't have that are -- or anything you're going to disagree

05:32:04   17   to, you can raise that during the course of Monday.

05:32:06   18        MR. GURA:  Okay.  Your Honor, for the rest of the day

05:32:07   19   on Monday, what's the schedule like throughout the day?

05:32:09   20        THE COURT:  So, yes, I can tell you that, just in

05:32:12   21   case it meanders.  Monday from -- right after my call is when

05:32:21   22   I'll begin.  So I have a 9:00 a.m. call.  And then I can go

05:32:25   23   until approximately 11:15.  I am hosting a judges/clerks lunch

05:32:32   24   here in the building, at lunch, and then I have a 1:30 very

05:32:36   25   short criminal call.  So that would be done by 1:45.  And from

05:32:40  1    1:45 'til 5:00 is now available.

05:32:42  2         Remember, I had put you on a Friday because of the

05:32:46  3    patent case that settled last Friday, so that's why I now have

05:32:49  4    this time to continue.

05:32:51  5         So you have probably a good solid hour and a half to

05:32:55  6    two in the morning, and a good solid two and a half to three

05:33:00  7    and a half in the afternoon.  So I can't imagine we wouldn't

05:33:03  8    finish Monday.

05:33:04  9         MR. GURA:  I would hope -- if it's 5:15 or 5:30 --

05:33:09  10        THE COURT:  You want to be done.

05:33:10  11        MR. GURA:  -- I've got to be done by Monday.

05:33:12  12        THE COURT:  Okay.  Well -- right.  It sounds to me

05:33:16  13   like we're on track.  Unfortunately I do have this function at

05:33:19  14   lunchtime, and I always have a 1:30 criminal call, but it's

05:33:23  15   very short.  So we'll just have you if -- I doubt we'll finish

05:33:29  16   with everything Monday morning, but you'll be able to start

05:33:32  17   back up at 1:30 and then we have from 1:30 'til 5:00 to do

05:33:36  18   that.

05:33:36  19        Okay.  We'll make it 4:00, so you can get to the

05:33:40  20   airport faster.

05:33:41  21        MR. GURA:  Sure.

05:33:41  22        THE COURT:  Okay.

05:33:42  23        MR. GURA:  Thank you.

05:33:43  24        THE COURT:  Provided it's not raining.  You're D.C.,

05:33:45  25   right?

05:33:45  1      MR. GURA:  That's right D.C.

05:33:46  2      THE COURT:  Which was terribly -- we had Justice

05:33:50  3  Kennedy here yesterday from D.C., he came for Judge

05:33:55  4  Feinerman's investiture ceremony, so he apparently had seen

05:33:58  5  the weather and flew out and made it.  But what I've been

05:34:04  6  hearing from D.C. is that the weather is terrible out there.

05:34:05  7      MR. GURA:  I left just before then, it was just

05:34:07  8  drizzling.

05:34:08  9      THE COURT:  Okay.  I think they had some bad weather.

05:34:10  10     MR. GURA:  Thanks for scheduling this during a

05:34:12  11  monsoon.

05:34:12  12     THE COURT:  Right, did it just to aggravate.

05:34:14  13     MR. GURA:  No, it was good.

05:34:15  14     THE COURT:  All right.  Anything else?

05:34:16  15     MS. HIRSCH:  No, your Honor.

05:34:18  16     THE COURT:  Okay.  Have a nice weekend everyone.

05:34:19  17  Thank you.

05:34:27  18     MR. GURA:  Oh, your Honor, real quick?  The witness

05:34:28  19  may be excused, right?

05:34:29  20     THE COURT:  Yes -- well, gentlemen -- oh, ladies and

05:34:30  21  gentlemen, do any of those witnesses, are they going to be

05:34:32  22  called in your case?

05:34:33  23     MR. FORTI:  No, your Honor.

05:34:34  24     THE COURT:  Okay.  So then you may be excused so that

05:34:36  25  you don't need to be back here on Monday.

05:34:38   1          MR. GURA:   Thank you, your Honor.

05:34:39   2          (Adjourned at 5:34 p.m.)

05:34:39   3                              - - -

05:34:39   4

           5

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25