09:46:29

```
 1
 2
 3
 4                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 5                       EASTERN DIVISION
 6
 7   RHONDA EZELL, et al.,        Case No. 1:10-cv-05135
 8     Plaintiffs,                Chicago, Illinois
                                  October 4, 2010
 9          v.                    Motion for Preliminary
                                  Injunction
10
     CITY OF CHICAGO,
11
       Defendant.
12   -------------------------------
13
                          VOLUME 2-A
14       TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION
         BEFORE THE HONORABLE VIRGINIA M. KENDALL
15              UNITED STATES DISTRICT JUDGE
16
17   APPEARANCES:
18
     For the Plaintiffs:   Gura & Possessky, PLLC
19                         By:  Alan Gura
                           101 N. Columbus St., Ste. 405
20                         Alexandria, VA 22314
                           (703) 835-9085
21
                              - and -
22
                           Law Firm of David G. Sigale, P.C.
23                         By:  David G. Sigale
                           4300 Commerce Ct., Ste. 300-3
24                         Lisle, IL 60532
                           (630) 452-4547
25
```

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

1

2
APPEARANCES:
3

4
For the Defendant:      Chicago Corporation Counsel
5                       By:  William M. Aguiar,
                             Michael A. Forti,
6                            Rebecca Alfert Hirsch,
                             Mardell Nereim, and
7                            Andrew W. Worseck
                        30 N. LaSalle Street
8                       Chicago, IL 60602
                        (312) 744-2784
9

10

11   COURT REPORTER:        FEDERAL OFFICIAL COURT REPORTER
                            April M. Metzler, RPR, CRR, FCRR
12                          219 South Dearborn St., Rm. 2318-A
                            Chicago, IL 60604
13                          (312) 408-5154
                            April_Metzler@ilnd.uscourts.gov
14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by notereading.

1 <u>I N D E X</u>

2

3

4 <u>DESCRIPTION</u>                                                    <u>PAGE</u>

5

6 DEFENDANT'S RULE 52(c) MOTION                                    181
  BY MS. HIRSCH
7

8 PLAINTIFFS' RESPONSE TO RULE 52(c) MOTION                        183
  BY MR. GURA
9

10 DEFENDANT'S REPLY TO RULE 52(c) MOTION                          189
   BY MS. NEREIM
11

12 PATRICIA SCUDIERO, DIRECT EXAMINATION                           190
   BY MR. AGUIAR
13

14 PATRICIA SCUDIERO, CROSS-EXAMINATION                            215
   BY MR. SIGALE
15

16 PATRICIA SCUDIERO, REDIRECT EXAMINATION                         225
   BY MR. AGUIAR
17

18 DANIEL BARTOLI, DIRECT EXAMINATION                              226
   BY MR. AGUIAR
19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:46:41 | 1 | (Resumed at 9:46 a.m.) |
| 09:46:41 | 2 | THE CLERK:  Case number 10C5135, Ezell versus City of |
| 09:46:52 | 3 | Chicago. |
| 09:46:52 | 4 | MR. SIGALE:  Good morning, your Honor. |
| 09:46:53 | 5 | THE COURT:  Good morning. |
| 09:46:54 | 6 | MR. SIGALE:  David Sigale, S-i-g-a-l-e, on behalf of |
| 09:46:57 | 7 | the plaintiffs. |
| 09:46:57 | 8 | THE COURT:  Good morning. |
| 09:46:59 | 9 | MS. HIRSCH:  Good morning, your Honor.  Rebecca |
| 09:47:01 | 10 | Hirsch on behalf of defendant. |
| 09:47:01 | 11 | THE COURT:  Good morning. |
| 09:47:01 | 12 | MR. AGUIAR:  Good morning, your Honor.  William |
| 09:47:02 | 13 | Aguiar on behalf of the City. |
| 09:47:05 | 14 | THE COURT:  Good morning. |
| 09:47:05 | 15 | MS. NEREIM:  Good morning, your Honor.  Mardell |
| 09:47:05 | 16 | Nereim, M-a-r-d-e-l-l N-a-r-e-i-m, on behalf of the City. |
| 09:47:11 | 17 | THE COURT:  Good morning. |
| 09:47:11 | 18 | MR. WORSECK:  Good morning, your Honor.  Andrew |
| 09:47:13 | 19 | Worseck for the City. |
| 09:47:14 | 20 | THE COURT:  Good morning. |
| 09:47:14 | 21 | MR. FORTI:  Good morning, your Honor.  Michael Forti |
| 09:47:16 | 22 | on behalf of the City. |
| 09:47:16 | 23 | THE COURT:  Okay.  Good morning. |
| 09:47:18 | 24 | Did Mr. Gura leave you -- |
| 09:47:19 | 25 | MR. SIGALE:  At -- |

| | |
|---|---|
| 09:47:20 | 1 |
| 09:47:21 | 2 |
| 09:47:26 | 3 |
| 09:47:28 | 4 |
| 09:47:30 | 5 |
| 09:47:33 | 6 |
| 09:47:35 | 7 |
| 09:47:37 | 8 |
| 09:47:40 | 9 |
| 09:47:42 | 10 |
| 09:47:42 | 11 |
| 09:47:42 | 12 |
| 09:47:46 | 13 |
| 09:47:49 | 14 |
| 09:47:49 | 15 |
| 09:47:53 | 16 |
| 09:47:55 | 17 |
| 09:47:56 | 18 |
| 09:48:02 | 19 |
| 09:48:06 | 20 |
| 09:48:08 | 21 |
| 09:48:12 | 22 |
| 09:48:13 | 23 |
| 09:48:19 | 24 |
| 09:48:20 | 25 |

THE COURT: -- in the lurch?

MR. SIGALE: I'm sure he was leaving me -- glad to do that on Friday, but, no, your Honor. At the risk of doing all this again, he's probably in the elevator on the way up.

THE COURT: Okay. All right. Are we ready to proceed with the defendant's case?

MS. HIRSCH: Your Honor, before we proceed with defendant's case, we would like to make a Rule 52(c) motion.

THE COURT: Oh, right. Thank you. Go ahead. You can do that. The rest of you can sit down.

- - -

DEFENDANT'S RULE 52(c) MOTION

BY MS. HIRSCH: I have a copy of the rule, if you would like to see it. But as, I think, your Honor is aware, that allows for you to enter judgement against plaintiff if they fail to satisfy their burden on any one required element of their case.

And irreparable harm is a separate and distinct element for plaintiffs to be able to get injunctive relief, your Honor. And plaintiffs have failed to meet this burden. They failed to meet it twice before. And nothing we heard on Friday has changed that.

(Enter Mr. Gura.)

MS. HIRSCH: Plaintiffs produced three witnesses here on Friday. They were the three organizational witnesses.

| | |
|---|---|
| 09:48:24 | 1 |
| 09:48:27 | 2 |
| 09:48:31 | 3 |

None of them could actually speak to the irreparable harm of any individual who could not -- not able to get training within the City.

At most, Ms. Versnel said that it would be an onerous burden on members of Chicago, but SAF nor ISRA has identified one member who can't actually get to the suburbs and get this training. And on top of that, her speculation -- she doesn't live in Chicago -- is not evidence of irreparable harm.

The three individual plaintiffs did not testify here Friday, and I think that's telling. We have submitted their deposition testimony, and as that testimony shows, there is absolutely no irreparable injury to any one of them.

I'd like to direct your Honor to the specific places where that testimony is. Ms. Ezell's testimony is document 28 for -- Defendant's Exhibit. And she's already -- she testified she's already received her training, has already received her CFP, and has already registered her gun. And you can find that on pages 33 and 36.

Mr. Brown, whose deposition testimony is Exhibit number 26, he testified that he visits suburban ranges hundreds of times a year and the reason he hasn't gotten his training yet is because he hasn't gotten around to it. And you can find that at pages 14, 27, and 44.

And, finally, with Mr. Hespen, which is Defendant's Exhibit 29, he said that he was waiting to see if the City was

| | |
|---|---|
| 09:50:06 | 1 |
| 09:50:10 | 2 |
| 09:50:13 | 3 |
| 09:50:16 | 4 |
| 09:50:21 | 5 |
| 09:50:24 | 6 |
| 09:50:29 | 7 |
| 09:50:34 | 8 |
| 09:50:39 | 9 |
| 09:50:39 | 10 |
| 09:50:42 | 11 |
| 09:50:45 | 12 |
| 09:50:49 | 13 |
| 09:50:53 | 14 |
| 09:50:59 | 15 |
| 09:51:01 | 16 |
| 09:51:08 | 17 |
| 09:51:12 | 18 |
| 09:51:15 | 19 |
| 09:51:21 | 20 |
| 09:51:21 | 21 |
| 09:51:21 | 22 |
| 09:51:21 | 23 |
| 09:51:23 | 24 |
| 09:51:24 | 25 |

1 going to amend the ordinance to permit retired police officers
2 an exemption from their requirement. But if they did not,
3 that he would absolutely go to the suburbs to get his
4 training. And you can find that at pages 42 and 43.
5 And, finally, with respect to the October 12th
6 deadline, your Honor, that is merely an amnesty provision that
7 allows that if guns aren't registered by that date, then
8 potentially a plaintiff may lose his right to register a
9 specific handgun.
10 The only plaintiff in this case that is even in that
11 position is Mr. Hespen. He's in that position because of his
12 own doing, and at most he will lose the right to register a
13 specific handgun, but he can still get his CFP and register
14 for other guns. That is an adequate remedy at law for him.
15 And finally, your Honor, there's been no evidence
16 whatsoever in this case that any plaintiff has -- that the gun
17 range ban infringes on any First Amendment rights whatsoever.
18 Because of the lack of any irreparable harm, the City
19 respectfully moves for Rule 50 -- 52(c) judgment. Thank you,
20 your Honor.
21 THE COURT: Okay. Response? Good morning.
22 - - -
23 PLAINTIFFS' RESPONSE TO RULE 52(c) MOTION
24 BY MR. GURA: Good morning, your Honor. Sorry I'm a
25 little bit late. I had two canceled flights this morning.

| | | |
|---|---|---|
| 09:51:28 | 1 | At first, I would welcome, to some degree, the |
| 09:51:32 | 2 | Rule 52(c) motion by the City, because it inherently concedes |
| 09:51:37 | 3 | something that we have been saying all along, which is that |
| 09:51:39 | 4 | this case is ready for a decision on the merits as a matter of |
| 09:51:43 | 5 | law. |
| 09:51:43 | 6 | Rule 52(c) states that motions under that provision |
| 09:51:47 | 7 | are available only during a nonjury trial.  And we have always |
| 09:51:53 | 8 | maintained and continue to maintain that the Court should |
| 09:51:56 | 9 | invoke Rule 65(a)(2) to advance the hearing to a trial on the |
| 09:52:01 | 10 | merits for the simple reason that neither party could probably |
| 09:52:05 | 11 | say anything else about the law here.  And we believe that the |
| 09:52:09 | 12 | law -- both sides believe that the law directs a certain |
| 09:52:13 | 13 | conclusion. |
| 09:52:14 | 14 | And so with the City's invocation of Rule 52(c), I |
| 09:52:21 | 15 | think it's fair to say that we are definitely in a nonjury |
| 09:52:24 | 16 | trial not merely a preliminary injunction hearing, and that |
| 09:52:27 | 17 | opens the door for the Court to rule, even in the absence of a |
| 09:52:32 | 18 | finding of irreparable harm, because the Court could rule one |
| 09:52:34 | 19 | way or the other that the City either has no defense and its |
| 09:52:38 | 20 | laws are simply unconstitutional, or it could rule that we |
| 09:52:41 | 21 | failed to state a claim.  And we would -- we would suggest |
| 09:52:46 | 22 | that that type of decision is available.  However, with |
| 09:52:49 | 23 | respect to irreparable harm, I do believe we have irreparable |
| 09:52:54 | 24 | harm here.  We have several ways of showing irreparable harm. |
| 09:53:00 | 25 | First of all, I go back to the testimony that we |

09:53:05   1   noted at the beginning of the hearing from Superintendent Jody

09:53:09   2   Weiss. The question here is not whether any one individual

09:53:15   3   can go ahead and drive 50 miles to exercise a constitutional

09:53:19   4   right. That would be the same whether we speak of any

09:53:24   5   constitutional right.

09:53:25   6           The question here is to whether 300,000 people can do it

09:53:29   7   and whether they can do it by the City's deadlines. And when

09:53:33   8   we have the testimony of the police superintendent who states

09:53:36   9   that he struggles to certify 13,500 police officers with the

09:53:42   10   range facilities that exist at the police department,

09:53:49   11   mathematically it becomes obvious that to have the entire

09:53:54   12   population of Chicago access this type of training is not

09:53:59   13   going to be possible.

09:54:00   14           Moreover, the fact that costs are increased, I think,

09:54:03   15   is self-evident, and that in itself is usually enough for

09:54:07   16   irreparable harm as a constitutional matter. It does cost

09:54:11   17   more time and money to put gas in the car, to travel

09:54:15   18   somewhere, to go ahead and exercise this right. And in, for

09:54:21   19   example, Grosjean versus American Press, the Supreme Court

09:54:24   20   ruled a long time ago that a 2 percent tax on the gross

09:54:28   21   receipts of newspaper advertising was obviously going to

09:54:33   22   violate the First Amendment, because it imposes a cost on the

09:54:37   23   exercise of First Amendment rights.

09:54:38   24           We have many decisions in the books that say that

09:54:43   25   when you tax a constitutional right, you are violating it and

09:54:47    1    that causes harm.  So, of course, the City uses language in

09:54:52    2    its deposition questions like, you know, Is this going to

09:54:54    3    cause a financial hardship.  And, no, driving 50 miles to the

09:54:58    4    range is not going to bankrupt any of our plaintiffs.  But

09:55:02    5    nonetheless it is imposing a needless cost on a constitutional

09:55:07    6    right.

09:55:07    7            And I take strong issue with the idea that money

09:55:12    8    damages here are sufficient, because they are not.  We have to

09:55:17    9    recall what the Second Amendment right is designed to

09:55:22   10    guarantee.  It's designed to guarantee access to self defense.

09:55:26   11    If people don't have proficiency with their firearms, because

09:55:31   12    they are unable to practice frequently, if they are unable to

09:55:36   13    obtain a firearm because they were not able to get -- or they

09:55:39   14    were burdened in getting the required training, then the

09:55:42   15    result of that can be serious bodily harm or even death.

09:55:45   16            The City likes to cite the Campbell case from the

09:55:50   17    Seventh Circuit, which in passing stated, It's not always the

09:55:54   18    case that a denial of constitutional rights is irreparable

09:56:00   19    with money damages, and that's as good -- as far as it goes.

09:56:03   20    But let's remember what the Campbell case was about.

09:56:07   21            This was a search and seizure case where the

09:56:09   22    plaintiff claimed that he was subjected to a full body cavity

09:56:11   23    search on a simple marijuana possession arrest.  And the Court

09:56:14   24    held that damages are a normal and adequate response to an

09:56:18   25    improper search and seizure, often enough, and also the Court

09:56:23  1    found that it was not likely to repeat as a circumstance,

09:56:28  2    because Mr. Campbell claimed that he was not a drug user, and

09:56:31  3    so this might have been a little bit speculative to go ahead

09:56:34  4    and obtain injunctive relief against a police search and

09:56:40  5    seizure tactic.

09:56:42  6            Judge Williams, I think, had the better of it in the

09:56:44  7    dissent stating that, Of course, invasions of personal privacy

09:56:46  8    inherent in a body cavity search are extreme and perhaps this

09:56:49  9    is not irreparable with money damages.  But be that as it may,

09:56:54  10   the fact is that I don't think Campbell would have turned out

09:56:57  11   the same way if instead of merely a very onerous search, which

09:57:03  12   was the harm there, would have been bodily injury or death

09:57:07  13   resulting from someone who is not proficient in the use of

09:57:09  14   firearms.

09:57:09  15           So I think when we remember what the Second Amendment

09:57:13  16   is about, we remember that this actually is a matter of life

09:57:17  17   and death for people and that training is important and it's

09:57:20  18   so important that the City requires it.

09:57:22  19           As far as the First Amendment argument is concerned,

09:57:25  20   we haven't talked a whole lot about that.  There's one Fourth

09:57:29  21   Circuit case that seems to be directly on point.  The City in

09:57:33  22   its pleading surmised, without looking it up, that the

09:57:36  23   training in that case did not involve the actual firing of a

09:57:38  24   gun.  Of course, it does.  We looked at the statute.  It was

09:57:42  25   irrelevant to the issue and very much requires the live firing

09:57:46   1    of a gun.

09:57:46   2            And the Fourth Circuit held -- what is really not a

09:57:49   3    very controversial point -- which is that training is speech,

09:57:53   4    and when you train someone in doing something, you are

09:57:56   5    exercising your First Amendment rights to provide

09:57:59   6    instructions.  Obviously, people at a gun range who are trying

09:58:02   7    to qualify for the CFP are there to receive instruction.

09:58:05   8            We are not claiming that there's a First Amendment

09:58:08   9    right to fire a gun.  Of course, that would be silly.  Just

09:58:11   10   like there's no First Amendment to drive a car.  However,

09:58:14   11   going to a driver's license course would probably qualify as

09:58:22   12   First Amendment activity, and I don't think the City has

09:58:25   13   really any defense to that.

09:58:26   14           We could argue much more extensively on the legal

09:58:30   15   points, which I look forward to doing.  The City cannot really

09:58:36   16   establish any defense in this case, as far as likelihood of

09:58:42   17   success on the merits.  And that is because if we look at the

09:58:47   18   record, we he see this entire range ban is an afterthought.

09:58:51   19           We have a lot of conjecture of counsel that this is

09:58:54   20   necessary to protect the public health and safety, but the

09:58:56   21   only people who actually didn't say anything about it were the

09:58:59   22   City Council and the witnesses they heard from.  And, again,

09:59:02   23   the excerpts from the Committee on Police and Fire hearing are

09:59:09   24   quite telling.

09:59:11   25           We have here a question -- this is on page 48, line

| | | |
|---|---|---|
| 09:59:19 | 1 | 17 of the excerpts from the Committee on Police and Fire -- |
| 09:59:23 | 2 | where Alderman Dowell was saying, you know, I was thinking |
| 09:59:27 | 3 | more in lines of private companies that might see this as an |
| 09:59:27 | 4 | opportunity to make money. You know, can we have these |
| 09:59:30 | 5 | facilities where people go ahead and shoot? |
| 09:59:31 | 6 | And here's what Corporation Counsel Georges |
| 09:59:35 | 7 | responded, starting on line 22, page 48. And there are |
| 09:59:41 | 8 | certainly very stringent zoning requirements that need to be |
| 09:59:41 | 9 | met and things such as that. So, you know, there is |
| 09:59:43 | 10 | regulation that can be done. Well, we don't disagree with |
| 09:59:46 | 11 | that -- |
| 09:59:46 | 12 | THE COURT: Okay. I feel as though we are doing our |
| 09:59:49 | 13 | closing arguments for the entire thing -- |
| 09:59:51 | 14 | MR. GURA: Okay. |
| 09:59:52 | 15 | THE COURT: -- which the beauty of having a hearing |
| 09:59:54 | 16 | and not a jury in the box is that I can take the directed |
| 09:59:58 | 17 | verdict under advisement, which is what I am going to do. |
| 10:00:00 | 18 | So let's just move on to the defendant's case and |
| 10:00:02 | 19 | call your next witness. |
| 10:00:03 | 20 | MR. GURA: Thanks. |
| 10:00:03 | 21 | - - - |
| 10:00:03 | 22 | DEFENDANT'S REPLY TO RULE 52(c) MOTION |
| 10:00:07 | 23 | BY MS. NEREIM: Your Honor, could I just address |
| 10:00:08 | 24 | Mr. Gura's request that this Court consolidate this hearing |
| 10:00:11 | 25 | with a hearing on the merits under Rule 65? |

| | | |
|---|---|---|
| 10:00:14 | 1 | THE COURT:  Sure.  Go ahead. |
| 10:00:15 | 2 | MS. NEREIM:  Okay.  Because, your Honor, although |
| 10:00:18 | 3 | Mr. Gura's correct that Rule 65(a)(2) does allow |
| 10:00:22 | 4 | consolidation, the case law under Rule 65(a)(2) is very clear |
| 10:00:26 | 5 | that the parties have to have notice from the Court that the |
| 10:00:32 | 6 | Court is going to consolidate, in order to prepare their case |
| 10:00:35 | 7 | and have time prepare their case on the merits.  And we have |
| 10:00:38 | 8 | not had that notice from the Court. |
| 10:00:40 | 9 | THE COURT:  I didn't give it.  That's not the posture |
| 10:00:43 | 10 | that we're in. |
| 10:00:44 | 11 | MS. NEREIM:  Right, and we would be prejudiced if |
| 10:00:47 | 12 | this -- |
| 10:00:47 | 13 | THE COURT:  Right. |
| 10:00:49 | 14 | MS. NEREIM:  -- were, because we would -- for |
| 10:00:49 | 15 | example, if we knew this was on the merits, we would have had |
| 10:00:53 | 16 | experts.  We would have had amicus -- |
| 10:00:55 | 17 | THE COURT:  Right, I understand.  Yes, that's not the |
| 10:00:57 | 18 | posture that we're in.  I know where you're at. |
| 10:01:00 | 19 | MS. NEREIM:  Thank you, your Honor. |
| 10:01:01 | 20 | THE COURT:  Okay.  Call your next witness. |
| 10:01:15 | 21 | (Witness takes the stand.) |
| 10:01:15 | 22 | THE COURT:  Hi, right up here. |
| 10:01:15 | 23 | (The witness was sworn.) |
| 10:01:15 | 24 | - - - |
| 10:01:15 | 25 | PATRICIA SCUDIERO, DIRECT EXAMINATION |

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| | | |
|---|---|---|
| 10:01:15 | 1 | BY MR. AGUIAR: |
| 10:01:32 | 2 | Q.  Would the witness please state and spell her full name for |
| 10:01:33 | 3 | the record? |
| 10:01:33 | 4 | A.  Patricia A. Scudiero, S-c-u-d-, as in David, -i-e-r-o. |
| 10:01:39 | 5 | Q.  Good morning, Ms. Scudiero. |
| 10:01:40 | 6 | A.  Good morning. |
| 10:01:43 | 7 | Q.  Are you currently the commissioner of the City's |
| 10:01:43 | 8 | department of zoning and land use planning? |
| 10:01:46 | 9 | A.  I am. |
| 10:01:46 | 10 | Q.  How long have you been the commissioner of the City's |
| 10:01:48 | 11 | department of zoning and land use planning? |
| 10:01:50 | 12 | A.  I've been the commissioner since appointment in December |
| 10:01:53 | 13 | of 2008. |
| 10:01:56 | 14 | Q.  Would you please describe what the department of zoning |
| 10:01:59 | 15 | and land use planning does? |
| 10:02:00 | 16 | A.  Yes.  We monitor and enforce the Chicago zoning ordinance. |
| 10:02:05 | 17 | We also review and inspect all properties.  We review all |
| 10:02:11 | 18 | building permit applications.  We draft legislation for the |
| 10:02:16 | 19 | Chicago zoning ordinance, and we review all sites prior to the |
| 10:02:21 | 20 | issuance of occupancies. |
| 10:02:23 | 21 | Q.  What are your responsibilities as the commissioner of the |
| 10:02:26 | 22 | department of zoning and land use planning? |
| 10:02:29 | 23 | A.  I have a department of approximately 70 individuals.  We |
| 10:02:32 | 24 | review all land use throughout the city.  I supervise all of |
| 10:02:39 | 25 | those individuals and make recommendations to the City Council |

| | | |
|---|---|---|
| 10:02:42 | 1 | on zoning changes, plan developments, requests for text |
| 10:02:47 | 2 | amendment changes. I go to sites and do site visits. I |
| 10:02:52 | 3 | testify at the committee on zoning in regards to all land use |
| 10:02:57 | 4 | applications. |
| 10:02:59 | 5 | Q. In addition to being the commissioner of the department of |
| 10:03:02 | 6 | zoning and land use planning, are you also currently the |
| 10:03:04 | 7 | City's zoning administrator? |
| 10:03:06 | 8 | A. I am. |
| 10:03:07 | 9 | Q. When did you become the City's zoning administrator? |
| 10:03:09 | 10 | A. In February of 2006 by appointment. |
| 10:03:12 | 11 | Q. And what are your responsibilities as the City's zoning |
| 10:03:15 | 12 | administrator? |
| 10:03:15 | 13 | A. To enforce the Chicago zoning ordinance, which is Title 17 |
| 10:03:19 | 14 | of the Municipal Code. |
| 10:03:21 | 15 | Q. And before you became the city's zoning administrator, |
| 10:03:24 | 16 | what did you do? |
| 10:03:25 | 17 | A. I was an assistant commissioner in the then-department of |
| 10:03:28 | 18 | planning and development. |
| 10:03:30 | 19 | Q. You say the then-department of planning and development. |
| 10:03:36 | 20 | Does that still exist? |
| 10:03:36 | 21 | A. No, it does not. |
| 10:03:36 | 22 | Q. What happened to it? |
| 10:03:36 | 23 | A. The department of planning and development was, sort of, |
| 10:03:40 | 24 | dissected. Parts of it became the department of community |
| 10:03:44 | 25 | development, and the other part of it, the planning part of |

| | |
|---|---|
| 10:03:47 | 1 |
| 10:03:50 | 2 |
| 10:03:52 | 3 |
| 10:03:53 | 4 |
| 10:03:54 | 5 |
| 10:03:57 | 6 |
| 10:03:59 | 7 |
| 10:04:03 | 8 |
| 10:04:07 | 9 |
| 10:04:10 | 10 |
| 10:04:13 | 11 |
| 10:04:13 | 12 |
| 10:04:18 | 13 |
| 10:04:20 | 14 |
| 10:04:22 | 15 |
| 10:04:23 | 16 |
| 10:04:24 | 17 |
| 10:04:25 | 18 |
| 10:04:30 | 19 |
| 10:04:32 | 20 |
| 10:04:35 | 21 |
| 10:04:36 | 22 |
| 10:04:37 | 23 |
| 10:04:41 | 24 |
| 10:04:45 | 25 |

1  it, was merged into the department of zoning.

2  Q.  And that is now the department of zoning and land use

3  planning?

4  A.  That is correct.

5  Q.  Okay.  What were your responsibilities as an assistant

6  commissioner in the department of planning and development?

7  A.  I coordinated all the project administrators and project

8  managers of the department.  We oversaw all of the plan

9  developments that went through the City of Chicago.

10  Q.  And for how long were you an assistant commissioner in

11  DPD?

12  A.  Until -- from 2004 until 2006.

13  Q.  And before you were an assistant commissioner in the

14  department of plan planning and development, did you also work

15  with the City?

16  A.  I did.

17  Q.  What did you do?

18  A.  From 1989 until 2004, I worked for the City Council

19  committee on zoning.

20  Q.  And would you please explain to me what you did for the

21  committee on zoning?

22  A.  I coordinated all of the City Council committee on zoning

23  meetings, which were public hearings.  They were held monthly,

24  sometimes twice a month.  All legislation that goes through

25  the committee on zoning includes text amendments and all

| | | |
|---|---|---|
| 10:04:48 | 1 | requests for changes of zoning throughout the city. |
| 10:04:53 | 2 | Q.  I believe you testified earlier that one of your |
| 10:04:55 | 3 | responsibilities as the zoning administrator is to enforce the |
| 10:04:58 | 4 | City's zoning ordinance; is that correct? |
| 10:05:00 | 5 | A.  That is correct. |
| 10:05:01 | 6 | Q.  Do you know who enacted the City's zoning ordinance? |
| 10:05:05 | 7 | A.  The City Council. |
| 10:05:05 | 8 | Q.  Do you know when it was first enacted? |
| 10:05:08 | 9 | A.  In 1957. |
| 10:05:10 | 10 | Q.  Do you know whether the zoning ordinance has been amended |
| 10:05:12 | 11 | since 1957? |
| 10:05:13 | 12 | A.  It's amended continuously, but an overall amendment went |
| 10:05:17 | 13 | through the City Council in 2004. |
| 10:05:20 | 14 | Q.  Did you have any role with the 2004 amendment? |
| 10:05:24 | 15 | A.  I worked for the committee on zoning at the time.  The |
| 10:05:26 | 16 | committee was charged with reviewing all of the documents that |
| 10:05:32 | 17 | were put forward as the new amendment.  We also -- the person |
| 10:05:36 | 18 | that I worked for was the chairman of the mayor's zoning |
| 10:05:39 | 19 | reform commission, and there were four years of community |
| 10:05:42 | 20 | meetings and weekly meetings in order to write the new code. |
| 10:05:47 | 21 | I participated in a great deal of those meetings over four |
| 10:05:50 | 22 | years. |
| 10:05:51 | 23 | Q.  Okay.  Based on your experience in zoning for the City of |
| 10:05:56 | 24 | Chicago, would you please explain how the Chicago zoning |
| 10:05:59 | 25 | ordinance works? |

| | |
|---|---|
| 10:06:00 | 1 |
| 10:06:04 | 2 |
| 10:06:08 | 3 |
| 10:06:12 | 4 |
| 10:06:15 | 5 |
| 10:06:18 | 6 |
| 10:06:21 | 7 |
| 10:06:25 | 8 |
| 10:06:31 | 9 |
| 10:06:39 | 10 |
| 10:06:39 | 11 |
| 10:06:42 | 12 |
| 10:06:46 | 13 |
| 10:06:47 | 14 |
| 10:06:50 | 15 |
| 10:06:51 | 16 |
| 10:06:55 | 17 |
| 10:06:58 | 18 |
| 10:07:02 | 19 |
| 10:07:06 | 20 |
| 10:07:10 | 21 |
| 10:07:10 | 22 |
| 10:07:12 | 23 |
| 10:07:13 | 24 |
| 10:07:13 | 25 |

A.  Sure.  Every property in the City of Chicago is zoned for something.  There are classifications that are residential, business, commercial, downtown, manufacturing, plan manufacturing districts, and plan developments.  Each property is zoned for something, meaning that something -- that the Chicago zoning ordinance proscribes what can be built on that property.  Uses are proscribed in the code and also has heights, floor area ratios, setbacks, landscaping mandates, the zoning ordinance will dictate what can be put on a site.

        Like I said, each site is zoned for something.  It's what creates or city.  It's what creates our neighborhoods, from the most intense manufacturing down to the simplest single-family home.

Q.  Do you know whether the Chicago zoning ordinance has a specific purpose and intent?

A.  It does.  There are many intents and purposes of the Chicago zoning ordinance from promoting the health, safety, and welfare of the city and its residents, to maintaining a character of existing residential communities, to trying to promote vibrant business districts.  There are a number of purposes.

        MR. AGUIAR:  Your Honor, I would like to use Defendant's Exhibit 19 with the witness.

        THE COURT:  Okay.

        MR. AGUIAR:  I, therefore, would like to move to

| | |
|---|---|
| 10:07:15 | 1 |
| 10:07:20 | 2 |
| 10:07:23 | 3 |
| 10:07:38 | 4 |
| 10:07:40 | 5 |
| 10:07:43 | 6 |
| 10:07:43 | 7 |
| 10:07:45 | 8 |
| 10:07:46 | 9 |
| 10:07:48 | 10 |
| 10:07:48 | 11 |
| 10:08:21 | 12 |
| 10:08:21 | 13 |
| 10:08:24 | 14 |
| 10:08:24 | 15 |
| 10:08:24 | 16 |
| 10:08:28 | 17 |
| 10:08:28 | 18 |
| 10:08:30 | 19 |
| 10:08:32 | 20 |
| 10:08:33 | 21 |
| 10:08:35 | 22 |
| 10:08:38 | 23 |
| 10:08:38 | 24 |
| 10:08:41 | 25 |

admit Defendant's Exhibit 19.  At this time I believe that plaintiffs only have a relevancy objection.

THE COURT:  Okay.  Is that correct?

MR. GURA:  Yeah.  We believe this whole testimony is irrelevant, but it's not what we're talking about this morning, your Honor.

THE COURT:  Okay.  It's overruled and so it will be admitted and you can testify.

MR. AGUIAR:  May I approach the witness, your Honor?

THE COURT:  You can.

MR. AGUIAR:  Thank you.

BY MR. AGUIAR:

Q.  Ms. Scudiero, do you recognize Defendant's Exhibit 19?

A.  Yes.

Q.  What is it?

A.  It's the introductory provisions of the Chicago zoning ordinance.

Q.  On the right-hand side you'll see where it says section 17-1-500?

A.  Yes.

Q.  Is this the provision of the Chicago zoning ordinance which sets forth the purpose and intent of the ordinance?

A.  It is.

Q.  And is one of the purposes set forth there to promote the public health, safety, and welfare?

| | | |
|---|---|---|
| 10:08:43 | 1 | A.  Yes. |
| 10:08:44 | 2 | Q.  And is another purpose to preserve the overall quality of |
| 10:08:46 | 3 | life for residents and visitors? |
| 10:08:49 | 4 | A.  Yes. |
| 10:08:49 | 5 | Q.  And is another purpose to protect the character of |
| 10:08:51 | 6 | established residential neighborhoods? |
| 10:08:53 | 7 | A.  Yes. |
| 10:08:53 | 8 | Q.  And is another purpose to maintain orderly and compatible |
| 10:08:56 | 9 | land use and development patterns? |
| 10:08:58 | 10 | A.  Yes. |
| 10:08:59 | 11 | Q.  And based on your experience, does the zoning ordinance |
| 10:09:02 | 12 | advance the purposes and intents set forth in section |
| 10:09:06 | 13 | 17-1-500? |
| 10:09:06 | 14 | A.  Yes, it does. |
| 10:09:10 | 15 | Q.  Ms. Scudiero, based on your experience in working with the |
| 10:09:14 | 16 | Chicago zoning ordinance, what does it mean if a particular |
| 10:09:17 | 17 | use of property is not provided for in the zoning ordinance? |
| 10:09:20 | 18 | A.  That use is prohibited. |
| 10:09:23 | 19 | Q.  In your tenure as commissioner of the department of zoning |
| 10:09:27 | 20 | and land use planning and as the City's zoning administrator, |
| 10:09:31 | 21 | has, ever, a new use arisen that hasn't been provided for in |
| 10:09:36 | 22 | the zoning ordinance? |
| 10:09:37 | 23 | A.  Yes. |
| 10:09:37 | 24 | Q.  Could you give me an example? |
| 10:09:38 | 25 | A.  Certainly.  In the past few years, we have been asked to |

| | |
|---|---|
| 10:09:43 | 1 |
| 10:09:51 | 2 |
| 10:09:56 | 3 |
| 10:09:58 | 4 |
| 10:09:59 | 5 |
| 10:10:00 | 6 |
| 10:10:03 | 7 |
| 10:10:07 | 8 |
| 10:10:08 | 9 |
| 10:10:08 | 10 |
| 10:10:10 | 11 |
| 10:10:15 | 12 |
| 10:10:18 | 13 |
| 10:10:23 | 14 |
| 10:10:26 | 15 |
| 10:10:27 | 16 |
| 10:10:31 | 17 |
| 10:10:35 | 18 |
| 10:10:38 | 19 |
| 10:10:41 | 20 |
| 10:10:44 | 21 |
| 10:10:45 | 22 |
| 10:10:48 | 23 |
| 10:10:51 | 24 |
| 10:10:54 | 25 |

1  look at wind turbines, solar rays, vacation rentals, and

2  children's activities facilities.

3  Q.  And have these new uses come to your attention?

4  A.  They have.

5  Q.  And how do they come to your attention?

6  A.  Through the City Council.

7  Q.  Do you or your office play any role in assessing these new

8  uses?

9  A.  Yes, we do.

10  Q.  And what role do you play?

11  A.  When a new use comes forward to us, we do the research in

12  order to find if it has an appropriate place in the Chicago

13  zoning ordinance by first, normally, creating a definition,

14  trying to define exactly what it is that the City Council is

15  looking for.

16       From there we'll do a best case study.  We'll look at

17  other cities, some the size of ours, some smaller than others

18  and see if they have enacted any ordinances that match the one

19  that we are looking at.  And then we make assessments, what

20  zoning districts should that use go into, what's appropriate,

21  what's not.

22       We proscribe things from the parking ratios attached

23  to it, to how tall they should be, what the setbacks should

24  be, what the landscaping requirements would be with it.

25  Q.  And what do you generally do with that assessment?

| | | |
|---|---|---|
| 10:10:56 | 1 | A.  We give our recommendations to the City Council. |
| 10:11:00 | 2 | THE COURT:  So do we have a wind turbine zoning now, |
| 10:11:03 | 3 | or no? |
| 10:11:04 | 4 | THE WITNESS:  We don't yet, because the testers that |
| 10:11:08 | 5 | have been put in the ground have not produced enough wind to |
| 10:11:12 | 6 | sufficiently give power to anything. |
| 10:11:15 | 7 | THE COURT:  We always learn something in court every |
| 10:11:20 | 8 | day, right? |
| 10:11:22 | 9 | Go ahead. |
| 10:11:22 | 10 | BY MR. AGUIAR: |
| 10:11:23 | 11 | Q.  Ms. Scudiero, does the Chicago zoning ordinance contain |
| 10:11:26 | 12 | property uses that you've never been to or have any personal |
| 10:11:30 | 13 | experience with? |
| 10:11:31 | 14 | A.  Yes. |
| 10:11:31 | 15 | Q.  Could you give me some examples? |
| 10:11:33 | 16 | A.  Sure.  I've never been to a rock crushing facility.  I've |
| 10:11:38 | 17 | never been to an incinerator.  I've never been to a strip |
| 10:11:42 | 18 | club.  I'm sure there are more. |
| 10:11:46 | 19 | Q.  But it is still your job, as the City's zoning |
| 10:11:49 | 20 | administrator, to enforce the zoning ordinance as to those |
| 10:11:52 | 21 | uses? |
| 10:11:52 | 22 | A.  Yes. |
| 10:11:53 | 23 | Q.  And you believe you are competent to administer those |
| 10:11:56 | 24 | zoning ordinances as to those uses? |
| 10:11:59 | 25 | A.  Yes, I do. |

| | | |
|---|---|---|
| 10:11:59 | 1 | Q. Does the Chicago zoning ordinance currently provide in any |
| 10:12:02 | 2 | way for a gun range? |
| 10:12:03 | 3 | A. No. |
| 10:12:04 | 4 | Q. Does the fact that the Chicago zoning ordinance omits gun |
| 10:12:09 | 5 | ranges mean anything? |
| 10:12:10 | 6 | A. It means it's prohibited. |
| 10:12:13 | 7 | Q. Was that your decision to prohibit gun ranges? |
| 10:12:15 | 8 | A. No, it was the City Council's. |
| 10:12:18 | 9 | Q. Ms. Scudiero, have you ever been to a gun range? |
| 10:12:20 | 10 | A. No. |
| 10:12:21 | 11 | Q. Have you ever studied or read any literature about gun |
| 10:12:24 | 12 | ranges? |
| 10:12:24 | 13 | A. No. |
| 10:12:28 | 14 | Q. What is your understanding, as you sit here today, of what |
| 10:12:29 | 15 | actually transpires at a gun range? |
| 10:12:32 | 16 | A. It's my understanding that -- |
| 10:12:34 | 17 | MR. SIGALE: Objection as to speculation. |
| 10:12:36 | 18 | THE COURT: Sustained. Never been there, so ... |
| 10:12:40 | 19 | BY MR. AGUIAR: |
| 10:12:40 | 20 | Q. Ms. Scudiero, do you have any understanding of what |
| 10:12:43 | 21 | happens at a gun range? |
| 10:12:44 | 22 | MR. SIGALE: Objection, your Honor. |
| 10:12:45 | 23 | THE COURT: What's the relevance of that then? |
| 10:12:47 | 24 | Unless she's had it in her position as far as it coming before |
| 10:12:51 | 25 | her. |

| | |
|---|---|
| 10:12:52 | 1 |
| 10:12:54 | 2 |
| 10:12:56 | 3 |
| 10:12:59 | 4 |
| 10:13:02 | 5 |
| 10:13:03 | 6 |
| 10:13:05 | 7 |
| 10:13:09 | 8 |
| 10:13:18 | 9 |
| 10:13:21 | 10 |
| 10:13:25 | 11 |
| 10:13:28 | 12 |
| 10:13:31 | 13 |
| 10:13:56 | 14 |
| 10:13:58 | 15 |
| 10:13:59 | 16 |
| 10:14:01 | 17 |
| 10:14:04 | 18 |
| 10:14:08 | 19 |
| 10:14:11 | 20 |
| 10:14:15 | 21 |
| 10:14:17 | 22 |
| 10:14:21 | 23 |
| 10:14:22 | 24 |
| 10:14:25 | 25 |

MR. AGUIAR:  Your Honor, Ms. Scudiero is about to testify as to the effect that gun ranges are going to have if they come into the city.  I believe that there's been no testimony in this case to date as to actually what happens at a gun range.  I believe that --

THE COURT:  Okay.  The objection is sustained as to foundation.  You're going to be have to be able to prove that she has some basis for giving that opinion.

Has she reviewed gun ranges?  Has she discussed it in her position?

I'll let you take a break and talk to your team, if you want.

MR. AGUIAR:  Thank you.

Your Honor, if I may?

THE COURT:  Sure.

MR. AGUIAR:  The reasons why I asked Ms. Scudiero questions about uses that aren't in the zoning ordinance, that she hasn't been to yet, she is still charged with enforcing, goes to this exact issue.  In her job she is oftentimes required to look at uses that she has no personal experience on and to render opinions to City Council and others about those uses.  Now, that's why the foundation was laid.

With respect to the gun ranges --

THE COURT:  So the foundation is laid to lack of knowledge that I opine on.  But she hasn't opined on this type

For a copy of this transcript, contact April Metzler, CRR
at (312) 408-5154

| 10:14:29 | 1 | of incident before. |
| 10:14:30 | 2 | MR. AGUIAR:  But she's oftentimes -- |
| 10:14:31 | 3 | THE COURT:  I mean, this type of location before. |
| 10:14:33 | 4 | MR. AGUIAR:  She's oftentimes required to do that in |
| 10:14:36 | 5 | her job.  Her job is to anticipate uses, which come into the |
| 10:14:39 | 6 | city, and to advise people as to how those uses will impact |
| 10:14:43 | 7 | the City of Chicago from a zoning perspective. |
| 10:14:45 | 8 | THE COURT:  Okay.  Let's put meat on the bones. |
| 10:14:47 | 9 | Let's take the rock crushing facility.  Maybe she never went |
| 10:14:50 | 10 | to a rock crushing facility, but she has a foundation that at |
| 10:14:54 | 11 | some point a rock crushing facility attempted to come into the |
| 10:14:58 | 12 | city.  She reviewed what a rock crushing facility does and |
| 10:15:02 | 13 | made a determination as to how that might impact the |
| 10:15:06 | 14 | community. |
| 10:15:06 | 15 | So unless you can lay a foundation that she somehow |
| 10:15:10 | 16 | has reviewed what a gun range does and how it would impact the |
| 10:15:15 | 17 | community, I don't know if you have the proper witness here. |
| 10:15:19 | 18 | MR. AGUIAR:  Your Honor, Ms. Scudiero is going to |
| 10:15:21 | 19 | testify as to her understanding of what a gun range is.  If |
| 10:15:24 | 20 | that understanding proves to be incorrect or somehow testimony |
| 10:15:30 | 21 | has shown that it's incorrect, that would go to the weight the |
| 10:15:33 | 22 | Court affords the testimony, not its admissibility. |
| 10:15:35 | 23 | If she testifies as to what her understanding is and |
| 10:15:37 | 24 | that's wrong, then you don't have to regard her testimony at |
| 10:15:39 | 25 | all. |

| | | |
|---|---|---|
| 10:15:39 | 1 | THE COURT:  You don't need to object.  His objection |
| 10:15:41 | 2 | is still standing. |
| 10:15:44 | 3 | I think that you are on shaky ground.  I'll give you |
| 10:15:48 | 4 | a little leeway, and let's see what she can do. |
| 10:15:55 | 5 | BY MR. AGUIAR: |
| 10:15:56 | 6 | Q.  Ms. Scudiero, have you reviewed what happens at a gun |
| 10:16:00 | 7 | range? |
| 10:16:00 | 8 | THE COURT:  That's a fair question. |
| 10:16:02 | 9 | MR. SIGALE:  Okay. |
| 10:16:02 | 10 | THE COURT:  Overruled. |
| 10:16:03 | 11 | THE WITNESS:  Since I was asked to testify, I've been |
| 10:16:06 | 12 | sort of trying to put my arms around what a gun range does. |
| 10:16:09 | 13 | I've never been to one. |
| 10:16:10 | 14 | BY MR. AGUIAR: |
| 10:16:11 | 15 | Q.  What have you determined happens at a gun range? |
| 10:16:13 | 16 | MR. SIGALE:  Objection, foundation. |
| 10:16:14 | 17 | THE COURT:  Foundation, sustained. |
| 10:16:15 | 18 | BY MR. AGUIAR: |
| 10:16:16 | 19 | Q.  What have you done to put your arms around the idea of |
| 10:16:18 | 20 | what happens at a gun range? |
| 10:16:23 | 21 | A.  Just from my general knowledge of what people -- what I |
| 10:16:26 | 22 | imagine what people would do there is they would go there to |
| 10:16:31 | 23 | either learn how to shoot a gun or practice shooting a gun. |
| 10:16:33 | 24 | Q.  Anything else? |
| 10:16:35 | 25 | A.  I imagine they either bring their own gun there or use a |

10:16:38  1  gun that's on site.

10:16:39  2       MR. SIGALE:  Your Honor, I'm going to move to strike

10:16:41  3  any testimony based on speculation, that includes the word

10:16:45  4  imagine.

10:16:46  5       THE COURT:  Okay.  I'm going to let her testify, and

10:16:51  6  I'll be the judge of whether there's any weight to be given to

10:16:54  7  it or merit.  It's nebulous at this point, so I'll let you

10:17:01  8  have some leeway to see what you can do with it.

10:17:07  9  BY MR. AGUIAR:

10:17:08 10  Q.  Ms. Scudiero, based on your understanding that you've

10:17:11 11  stated here today as to what happens at a gun range, in your

10:17:14 12  21 years of experience with zoning in the City of Chicago, in

10:17:17 13  what zoning classification do you believe that a gun range

10:17:20 14  should be allowed in the city?

10:17:22 15  A.  As with uses that could pose the possibility of being

10:17:29 16  intense, we would put them in an intensive use category, and

10:17:32 17  we would ask that they be put into a manufacturing district.

10:17:37 18  Q.  You testified you would think it's an intense use.

10:17:40 19       What is an intense use from a zoning perspective?

10:17:43 20  A.  From a zoning perspective, an intense use is a use that

10:17:48 21  could pose a threat to the health, safety, and welfare of our

10:17:52 22  city's residents.  And the way the zoning code works, we have

10:17:56 23  zoning districts that are created throughout the city where,

10:18:01 24  you know, the residential uses are for people who, obviously,

10:18:04 25  they're living there, they're attending school there or church

| | |
|---|---|
| 10:18:07 | 1 |
| 10:18:07 | 2 |
| 10:18:10 | 3 |
| 10:18:13 | 4 |
| 10:18:17 | 5 |
| 10:18:20 | 6 |
| 10:18:25 | 7 |

there.

The next use category is the business use where people do their daily shopping, business use also allows for residential above them. You know, as you leave those districts, you start getting into more intense uses, commercial districts, manufacturing districts, plan manufacturing districts.

We try to keep intense uses into those manufacturing districts, because they are the furthest point away from the residents where they live.

Q. Could you please give some examples of what would be an intense use from a zoning perspective?

A. Certainly. Taverns are intense uses. Rock crushing facilities are intense uses. Salvage yards, incinerators, those are intense uses. They're kept at the periphery of the city normally, so that they are kept away from the residential areas.

Q. What about adult uses, are they considered an intense use?

A. They are.

Q. What about facilities that have drive-through facilities?

A. Drive-through facilities are considered an intense use, in as they require a special use permit in all the districts that they exist throughout the city.

Q. Again, based on your zoning experience and your stated understanding of what happens at a gun range, why do you think

10:19:19  1  a gun range would only be appropriate in a manufacturing

10:19:22  2  district?

10:19:23  3  A.  It's to keep --

10:19:24  4       MR. SIGALE:  I'm going to object.  I'm going to

10:19:27  5  object -- I don't believe a proper foundation has been laid.

10:19:30  6       THE COURT:  Yes, overruled, based upon what I said

10:19:33  7  before.

10:19:37  8       THE WITNESS:  The manufacturing districts are, again,

10:19:41  9  normally the furthest point away from the residential

10:19:44  10 districts, in order to protect the people who are residing in

10:19:48  11 the residential districts of the manufacturing -- as I said,

10:19:52  12 the manufacturing districts house the intense uses throughout

10:19:54  13 the city.

10:19:56  14 BY MR. AGUIAR:

10:19:56  15 Q.  And, again, based on your zoning experience and your

10:20:00  16 stated understanding of what happens at a gun range, are there

10:20:03  17 any zoning classifications that you do not believe it would be

10:20:06  18 appropriate to place a firing range in close proximity to?

10:20:10  19 A.  No, other than the M.

10:20:14  20 Q.  Let me rephrase my question.

10:20:16  21      Based, again, on your experience in zoning --

10:20:19  22 A.  Yes.

10:20:20  23 Q.  -- and your stated understanding of what happens at a gun

10:20:24  24 range, are there any zoning classifications you would not want

10:20:28  25 a firing range near?

| | |
|---|---|
| 10:20:30 | 1 |
| 10:20:32 | 2 |
| 10:20:36 | 3 |
| 10:20:38 | 4 |
| 10:20:40 | 5 |
| 10:20:45 | 6 |
| 10:20:50 | 7 |
| 10:20:53 | 8 |
| 10:20:57 | 9 |
| 10:21:01 | 10 |
| 10:21:05 | 11 |
| 10:21:08 | 12 |
| 10:21:12 | 13 |
| 10:21:15 | 14 |
| 10:21:17 | 15 |
| 10:21:20 | 16 |
| 10:21:23 | 17 |
| 10:21:27 | 18 |
| 10:21:28 | 19 |
| 10:21:30 | 20 |
| 10:21:32 | 21 |
| 10:21:34 | 22 |
| 10:21:35 | 23 |
| 10:21:42 | 24 |
| 10:21:45 | 25 |

A.  Any district that would have a residential component to it, which would be the R districts, the B and C districts also permit some residential uses.

Q.  And why is that?

A.  Those districts, the B and C districts specifically, permit residential uses in them.  The C1 and C2 districts specifically permit residential uses.  The C3 district does not permit it.  It's used as buffer between the manufacturing districts and every other district.  There should be some sort of buffer between all of the zoning ordinance classified intense uses and its residential communities.

Q.  Now, you testified that the only zoning district in which you believe it would be appropriate to place a firing range in would be a manufacturing district.

        Based on your experience in zoning and, again, your stated understanding of what happens at a firing range, should a firing range be automatically allowed in a manufacturing district, in your opinion?

A.  In my opinion, no.

Q.  How would it be allowed then?

A.  It should be allowed as a special use.

Q.  And what is a special use?

A.  A special use permit is issued by the Chicago zoning board of appeals.  The zoning board of appeals would review the case -- it's an additional review -- review the case and do a

| | | |
|---|---|---|
| 10:21:50 | 1 | thorough investigation of it and deem whether a special use |
| 10:21:54 | 2 | permit should be granted for a specific site, and many, many |
| 10:21:58 | 3 | uses require special uses in the Chicago zoning ordinance. |
| 10:22:02 | 4 | Q.  What use is -- what things require a special use permit? |
| 10:22:05 | 5 | A.  Drive-through facilities throughout the city require a |
| 10:22:08 | 6 | special use permit, churches in the B and C district require |
| 10:22:12 | 7 | special use, nail salons, adult uses, taverns in some cases. |
| 10:22:19 | 8 | Q.  You mentioned the zoning board of appeals.  What is the |
| 10:22:23 | 9 | zoning board of appeals? |
| 10:22:24 | 10 | A.  The zoning board of appeals is a group of experts that are |
| 10:22:27 | 11 | appointed by the mayor, affirmed by the City Council, to serve |
| 10:22:31 | 12 | on the board.  And they meet monthly -- the Board of Appeals |
| 10:22:36 | 13 | meets monthly and hears requests for variations, special uses, |
| 10:22:39 | 14 | and appeals. |
| 10:22:41 | 15 | Q.  To become -- or to receive approval to be a special use, |
| 10:22:45 | 16 | is there a specific procedure that must be followed? |
| 10:22:48 | 17 | A.  Yes, a denial is issued by my department.  That denial is |
| 10:22:51 | 18 | used to file a special use application with the zoning board |
| 10:22:55 | 19 | of appeals.  That special use application is processed by the |
| 10:22:58 | 20 | board and a public hearing is set for that. |
| 10:23:02 | 21 | Q.  Based on your zoning experience and, again, your stated |
| 10:23:06 | 22 | understanding of what happens at a firing range, do you |
| 10:23:10 | 23 | believe that there are any dangers to the City's public |
| 10:23:11 | 24 | health, safety, and welfare if ranges are allowed to enter the |
| 10:23:15 | 25 | city without zoning regulation? |

| | |
|---|---|
| 10:23:18 | 1 A. As with all the uses, without regulation there's little or |
| 10:23:23 | 2 no control. The zoning code proscribes what those controls |
| 10:23:28 | 3 should be for all uses, so it would put proscriptions on |
| 10:23:34 | 4 where, how big. |
| 10:23:36 | 5 Q. And why would -- why do you have a concern about allowing |
| 10:23:39 | 6 firing ranges to go anywhere in the city? |
| 10:23:42 | 7 A. It really is the control factor. There is, with any use |
| 10:23:47 | 8 in the city, there are a number of people that will visit |
| 10:23:50 | 9 sites by putting controls on. It puts a proscription on for |
| 10:23:54 | 10 how many parking spaces should be provided, what sort of |
| 10:23:57 | 11 safety measures should be put in place as far as setbacks, and |
| 10:24:01 | 12 screening, you know, as far as how many trees should be put |
| 10:24:08 | 13 in, sort of, act as a buffer, how tall the facility can be. |
| 10:24:12 | 14 There are various things that could be put in place when there |
| 10:24:16 | 15 are restrictions. |
| 10:24:17 | 16 Q. Okay. And would you be more concerned if a firing range |
| 10:24:24 | 17 were mobile as opposed to a traditional brick-and-mortar |
| 10:24:29 | 18 range? |
| 10:24:29 | 19 A. There would be no controls in place. It would give the |
| 10:24:32 | 20 impression then the range could be put anywhere without |
| 10:24:36 | 21 knowing what those restrictions were. It would be sort of |
| 10:24:43 | 22 null and void that they could put it anywhere at any time |
| 10:24:44 | 23 without following some sort of guide and could pose a safety |
| 10:24:50 | 24 issue as well, because there would be no specific rules that |
| 10:24:54 | 25 it would be following. |

Case: 1:10-cv-05135 Document #: 75 Filed: 10/08/10 Page 34 of 73 PageID #:1323

10:24:59 1  Q.  One of the locations plaintiffs intend or have testified

10:25:03 2  they'd like to place a mobile range is the 6300 block of South

10:25:09 3  Bell street.  Are you familiar with that address?

10:25:10 4  A.  I am.

10:25:11 5  Q.  And how are you familiar with that address?

10:25:13 6  A.  I have reviewed aerial photos, on-site photos, and the

10:25:18 7  Chicago zoning ordinance map of the site.

10:25:23 8         MR. AGUIAR:  Your Honor, I am going -- I would like

10:25:24 9  to use defense exhibits, I believe, 5 and 6 with the witness.

10:25:28 10         THE COURT:  Okay.

10:25:28 11         MR. AGUIAR:  So at this time I would like for them to

10:25:30 12  be moved into evidence, and I don't believe there's an

10:25:33 13  objection.

10:25:39 14         MR. GURA:  No objection, your Honor.

10:25:43 15         THE COURT:  Okay.  They'll be admitted.

10:25:48 16  BY MR. AGUIAR:

10:25:49 17  Q.  Ms. Scudiero, would you please turn to Exhibit 5 that's in

10:25:53 18  your binder.

10:26:05 19         Ms. Scudiero, based on your study of the 6300 block

10:26:10 20  of South Bell, is Exhibit 5 an accurate aerial map of the

10:26:14 21  property and the surrounding area?

10:26:16 22  A.  It is.

10:26:16 23  Q.  Ms. Scudiero, I direct your attention to the area that's

10:26:20 24  bordered in red.  Do you know what that area is?

10:26:22 25  A.  That's the 6300 and 6400 blocks of South Bell.

| | | |
|---|---|---|
| 10:26:25 | 1 | Q.  Okay.  Do you know what the area bordered by yellow is? |
| 10:26:29 | 2 | A.  Yes.  That's the adjacent residential property zoned RS2, |
| 10:26:37 | 3 | predominantly single-family homes, directly across the street |
| 10:26:41 | 4 | from the 6300-6400 Bell site. |
| 10:26:44 | 5 | Q.  And does the area bordered in yellow represent the entire |
| 10:26:47 | 6 | residential neighborhood or just a portion of it? |
| 10:26:48 | 7 | A.  It's just a portion of it. |
| 10:26:50 | 8 | Q.  Okay.  Ms. Scudiero, the Defendant's Exhibit 5 has three |
| 10:26:54 | 9 | areas that are marked in blue.  Do you see those? |
| 10:26:57 | 10 | A.  Yes. |
| 10:26:57 | 11 | Q.  Do you know what those blue areas represent? |
| 10:27:00 | 12 | A.  Those are schools. |
| 10:27:02 | 13 | Q.  Okay.  I'd like to direct your attention to the blue area |
| 10:27:09 | 14 | immediately adjacent to the area bordered in yellow.  Do you |
| 10:27:09 | 15 | see that area? |
| 10:27:10 | 16 | A.  Yes. |
| 10:27:12 | 17 | Q.  Do you happen to know what school is in that area? |
| 10:27:15 | 18 | A.  I believe it's Claremont Academy. |
| 10:27:17 | 19 | Q.  And what kind of school is Claremont Academy? |
| 10:27:19 | 20 | A.  It's an elementary school. |
| 10:27:21 | 21 | Q.  Ms. Scudiero, I'd also like to direct your attention to a |
| 10:27:25 | 22 | few green dots that appear on the map.  Do you see those green |
| 10:27:26 | 23 | dots? |
| 10:27:26 | 24 | A.  Yes. |
| 10:27:27 | 25 | Q.  And do you know what those green dots represent? |

| | | |
|---|---|---|
| 10:27:29 | 1 | A.  Those are churches. |
| 10:27:31 | 2 | Q.  Okay.  Are those active churches? |
| 10:27:34 | 3 | A.  Yes, they are. |
| 10:27:37 | 4 | Q.  Based on the area depicted in this aerial map, your 21 |
| 10:27:42 | 5 | years of zoning experience with the City of Chicago, and your |
| 10:27:47 | 6 | stated understanding of what happens at firing ranges, do you |
| 10:27:50 | 7 | believe that 6300 South Bell is an appropriate location for a |
| 10:27:54 | 8 | shooting range, from a zoning perspective? |
| 10:27:57 | 9 | A.  From a zoning perspective, no. |
| 10:27:59 | 10 | Q.  And why not? |
| 10:28:00 | 11 | A.  There are residential -- |
| 10:28:01 | 12 | MR. SIGALE:  Your Honor, I'm just going to object on |
| 10:28:04 | 13 | spec- -- the witness has been speculating. |
| 10:28:07 | 14 | THE COURT:  I know.  But it's a standing objection, |
| 10:28:09 | 15 | and I said I would take it all and give it the weight that it |
| 10:28:13 | 16 | deserves, so it's overruled. |
| 10:28:14 | 17 | MR. SIGALE:  Okay.  Your Honor, I just -- |
| 10:28:16 | 18 | THE COURT:  Your record is fine. |
| 10:28:17 | 19 | MR. SIGALE:  Thank you, your Honor. |
| 10:28:18 | 20 | BY MR. AGUIAR: |
| 10:28:18 | 21 | Q.  Why not? |
| 10:28:19 | 22 | A.  There are single-family homes directly across the street |
| 10:28:23 | 23 | from this site.  It's zoned residential.  There -- the |
| 10:28:33 | 24 | manufacturing use across the site could pose an intense issue |
| 10:28:39 | 25 | for the health, safety, and welfare of the people that live |

| | | |
|---|---|---|
| 10:28:42 | 1 | directly across the street from the site. |
| 10:28:45 | 2 | Q.  What about the presence of a church and an elementary |
| 10:28:48 | 3 | school, does that impact your opinion at all? |
| 10:28:52 | 4 | A.  The church is within a half a block.  The school is within |
| 10:28:55 | 5 | about 6-, 700 feet of the site, again, could cause an issue |
| 10:29:02 | 6 | for the health, safety, and welfare of the elementary school |
| 10:29:05 | 7 | students and the people attending church in those locations. |
| 10:29:09 | 8 | Q.  Ms. Scudiero, could you please turn to Defendant's |
| 10:29:12 | 9 | Exhibit 6.  And if you would take a moment and look at the |
| 10:29:19 | 10 | photographs that are a part of Defendant's Exhibit 6, please. |
| 10:29:23 | 11 | A.  Okay. |
| 10:29:27 | 12 | Q.  Would you -- have you had a chance to look at those |
| 10:29:30 | 13 | pictures, Ms. Scudiero? |
| 10:29:32 | 14 | A.  I have. |
| 10:29:33 | 15 | Q.  Okay.  What do these photographs show? |
| 10:29:36 | 16 | A.  They show the single-family homes directly across the |
| 10:29:39 | 17 | street from 6300 and 6400 Bell, predominant single-family |
| 10:29:45 | 18 | homes.  There could be a two-unit mixed in, but very |
| 10:29:48 | 19 | single-family home oriented RS2 district, typical. |
| 10:29:52 | 20 | Q.  And does Defendant's Exhibit 6 also include a picture of |
| 10:29:56 | 21 | the Claremont Academy you spoke about a moment ago? |
| 10:29:59 | 22 | A.  It does. |
| 10:29:59 | 23 | Q.  And does it also include photographs of the church within |
| 10:30:02 | 24 | a half block that you also mentioned? |
| 10:30:09 | 25 | A.  It does. |

| | | |
|---|---|---|
| 10:30:11 | 1 | Q.  Okay.  And do these photographs have any impact on your |
| 10:30:14 | 2 | conclusion -- or your opinion, excuse me, that 6300 South Bell |
| 10:30:18 | 3 | is an inappropriate location for the mobile range, from a |
| 10:30:21 | 4 | zoning perspective? |
| 10:30:22 | 5 | A.  These photographs reinforce that opinion. |
| 10:30:26 | 6 | Q.  Okay.  Ms. Scudiero, there's been testimony in this case |
| 10:30:29 | 7 | that there are firing ranges located within federal buildings |
| 10:30:32 | 8 | in Chicago. |
| 10:30:34 | 9 | Does your office have any jurisdiction to enforce the |
| 10:30:39 | 10 | City's zoning ordinance with respect to those firing ranges? |
| 10:30:43 | 11 | A.  No, it does not. |
| 10:30:44 | 12 | Q.  Why not? |
| 10:30:44 | 13 | A.  The federal government is exempt from the zoning |
| 10:30:47 | 14 | provisions. |
| 10:30:48 | 15 | Q.  Ms. Scudiero, do you know whether there are firing ranges |
| 10:30:51 | 16 | at any Chicago Police Department facilities? |
| 10:30:53 | 17 | A.  I have been told there are. |
| 10:30:55 | 18 | Q.  Okay.  Again, based on your experience in zoning and your |
| 10:30:59 | 19 | understanding of gun ranges stated here today, do the gun |
| 10:31:05 | 20 | ranges at Chicago Police Department cause a problem, from a |
| 10:31:09 | 21 | zoning perspective? |
| 10:31:10 | 22 | A.  No. |
| 10:31:11 | 23 | Q.  And why not? |
| 10:31:12 | 24 | A.  From what I'm told, those are used by sworn police |
| 10:31:15 | 25 | officers at the site.  The public is not allowed in to use |

| | |
|---|---|
| 10:31:17 | 1 those facilities at all. |
| 10:31:21 | 2       MR. AGUIAR:  Okay.  One moment, your Honor?  Thank |
| 10:31:22 | 3 you. |
| 10:31:22 | 4 BY MR. AGUIAR: |
| 10:32:27 | 5 Q.  Ms. Scudiero, just one final question. |
| 10:32:29 | 6       You spoke earlier about certain uses in the City's |
| 10:32:32 | 7 zoning ordinance require a special use? |
| 10:32:34 | 8 A.  Yes. |
| 10:32:35 | 9 Q.  Do neighbors typically get notice when a special use |
| 10:32:38 | 10 application has been filed? |
| 10:32:39 | 11 A.  They do.  Neighbors are noticed.  There's a publication in |
| 10:32:43 | 12 the newspaper, and the website also publishes prior to the |
| 10:32:47 | 13 hearing. |
| 10:32:47 | 14 Q.  And are they given an opportunity to be heard on that |
| 10:32:49 | 15 special use application? |
| 10:32:51 | 16 A.  It is a public hearing.  The public is welcome, encouraged |
| 10:32:55 | 17 to come, and give testimony at those community hearings. |
| 10:32:58 | 18       MR. AGUIAR:  Thank you.  I have nothing further at |
| 10:33:00 | 19 this time, your Honor. |
| 10:33:02 | 20       THE COURT:  Okay.  Mr. Sigale? |
| 10:33:02 | 21       MR. SIGALE:  Thank you, your Honor. |
| 10:33:04 | 22        - - - |
| 10:33:04 | 23      PATRICIA SCUDIERO, CROSS-EXAMINATION |
| 10:33:04 | 24 BY MR. SIGALE: |
| 10:33:10 | 25 Q.  Good morning, Commissioner. |

| | | |
|---|---|---|
| 10:33:11 | 1 | A.  Good morning. |
| 10:33:12 | 2 | Q.  All right.  So part of your job description, as |
| 10:33:16 | 3 | commissioner of the City's department of zoning and land use |
| 10:33:19 | 4 | planning, is to review all land use throughout the city and |
| 10:33:22 | 5 | all zoning cases as of right, correct? |
| 10:33:25 | 6 | A.  That's correct. |
| 10:33:25 | 7 | Q.  And you also have reviewability over all policies and |
| 10:33:30 | 8 | ordinance changes, when they are related to zoning and land |
| 10:33:33 | 9 | use planning? |
| 10:33:34 | 10 | A.  That is correct. |
| 10:33:35 | 11 | Q.  And your job duties, as the City's zoning administrator, |
| 10:33:38 | 12 | which is a separate job, is to maintain and enforce the zoning |
| 10:33:42 | 13 | code? |
| 10:33:43 | 14 | A.  That is correct. |
| 10:33:43 | 15 | Q.  And you do not write zoning ordinances? |
| 10:33:46 | 16 | A.  I do not write zoning ordinances. |
| 10:33:48 | 17 | Q.  The Law Department of the City, in conjunction with the |
| 10:33:50 | 18 | City Council, writes the zoning ordinances? |
| 10:33:53 | 19 | A.  That is correct. |
| 10:33:54 | 20 | Q.  But under the zoning code, you make recommendations about |
| 10:33:58 | 21 | zoning ordinances to the City's committee on zoning, |
| 10:34:02 | 22 | specifically the chairman of the committee, which then chooses |
| 10:34:05 | 23 | whether or not to take the recommendations to the City |
| 10:34:08 | 24 | Council? |
| 10:34:08 | 25 | A.  That is correct. |

10:34:08   1   Q.  And the City Council votes on the proposed ordinance,
10:34:14   2   based at least in part on your recommendation?
10:34:14   3   A.  I would hope so.
10:34:16   4   Q.  Okay.  And you make these recommendations either upon
10:34:21   5   request or upon an application for a zoning change; is that
10:34:25   6   true?
10:34:25   7   A.  That is correct.
10:34:26   8   Q.  All right.  And with that said, it's correct that you had
10:34:30   9   no participation in any form in the writing or enactment of
10:34:34  10   the City's new firearm ordinance?
10:34:36  11   A.  That is correct.
10:34:37  12   Q.  You had no discussion about the new firearms ordinance
10:34:40  13   with anyone from or on behalf of the City's committee on
10:34:45  14   zoning?
10:34:45  15   A.  That is correct.
10:34:46  16   Q.  And you had no discussion about the new firearms ordinance
10:34:48  17   with the mayor or anyone acting on his behalf?
10:34:52  18   A.  That's correct.
10:34:54  19   Q.  Now, for a proposed use in the City of Chicago the zoning
10:34:57  20   administrator would be contacted to start a review as to the
10:35:01  21   best and appropriate locations and zoning classifications for
10:35:04  22   that use?
10:35:04  23   A.  That is correct.
10:35:05  24   Q.  And that zoning administrator is you, correct?
10:35:08  25   A.  It is.

| | | |
|---|---|---|
| 10:35:08 | 1 | Q.  So you'd be the go-to person? |
| 10:35:10 | 2 | A.  I would be. |
| 10:35:11 | 3 | Q.  All right.  Now, as I -- just to clarify from before, you |
| 10:35:14 | 4 | have no experience with using firing ranges and you've never |
| 10:35:19 | 5 | been to one; is that correct? |
| 10:35:20 | 6 | A.  That is correct. |
| 10:35:21 | 7 | Q.  And you have no experience or education with either the |
| 10:35:26 | 8 | structure or the operation of firing ranges? |
| 10:35:29 | 9 | A.  That is correct. |
| 10:35:30 | 10 | Q.  And that's true whether we're talking about a mobile |
| 10:35:33 | 11 | firing range or a permanent brick-and-mortar-type firing |
| 10:35:37 | 12 | range? |
| 10:35:37 | 13 | A.  That is correct. |
| 10:35:38 | 14 | Q.  Okay.  And you've never in your life investigated firing |
| 10:35:42 | 15 | ranges for zoning purposes? |
| 10:35:44 | 16 | A.  That's true. |
| 10:35:45 | 17 | Q.  You have no knowledge of firing ranges, other than the |
| 10:35:49 | 18 | fact that firearms are used there; is that fair to say? |
| 10:35:52 | 19 | A.  Only my personal knowledge, yes. |
| 10:35:54 | 20 | Q.  Okay.  Now, the City's zoning code bans firing ranges |
| 10:35:59 | 21 | completely by not including them in the code as a permitted |
| 10:36:02 | 22 | use? |
| 10:36:02 | 23 | A.  That's correct. |
| 10:36:03 | 24 | Q.  And the zoning code doesn't mention them and, therefore, |
| 10:36:06 | 25 | they are banned? |

| | | |
|---|---|---|
| 10:36:07 | 1 | A.  That's correct, they are prohibited. |
| 10:36:08 | 2 | Q.  Okay.  Now, you did not have a vote in the City zoning |
| 10:36:12 | 3 | code's ban on firing ranges insofar as it bans them by failure |
| 10:36:16 | 4 | to include them? |
| 10:36:17 | 5 | A.  I have no vote. |
| 10:36:19 | 6 | Q.  Correct? |
| 10:36:20 | 7 | A.  Correct. |
| 10:36:20 | 8 | Q.  And you didn't make, with regard to that portion of the |
| 10:36:22 | 9 | zoning code that excludes firing ranges by omitting them, you |
| 10:36:27 | 10 | didn't make any recommendations to anybody regarding that |
| 10:36:30 | 11 | portion of the zoning code, true? |
| 10:36:32 | 12 | A.  That is correct. |
| 10:36:34 | 13 | Q.  And regarding the City's new firearms ordinance, at no |
| 10:36:38 | 14 | time prior to June 30th of this year did you have a |
| 10:36:40 | 15 | conversation with anyone regarding the topic of firing ranges |
| 10:36:45 | 16 | and zoning, true? |
| 10:36:46 | 17 | A.  That's correct. |
| 10:36:47 | 18 | Q.  No City Council members ever contacted you regarding how |
| 10:36:50 | 19 | other cities are zoned for firing ranges, true? |
| 10:36:54 | 20 | A.  True. |
| 10:36:55 | 21 | Q.  And you have no idea if any other cities in America ban |
| 10:36:59 | 22 | gun ranges; is that true? |
| 10:37:00 | 23 | A.  That's true. |
| 10:37:01 | 24 | Q.  And you have no knowledge as to -- if a firing range may |
| 10:37:08 | 25 | or may not emit any noise or fumes or smells.  You don't have |

| | | |
|---|---|---|
| 10:37:14 | 1 | any idea as to -- any knowledge about any of that, as pertains |
| 10:37:18 | 2 | to a firing range, including whether there are any at all; is |
| 10:37:22 | 3 | that true? |
| 10:37:22 | 4 | A.  That's true. |
| 10:37:23 | 5 | Q.  And you testified about your concerns about placing a |
| 10:37:27 | 6 | firing range at 6331 South Bell. |
| 10:37:31 | 7 | Do you recall a discussion you and I had regarding a |
| 10:37:33 | 8 | firing range at Area 1 police headquarters at 5101 South |
| 10:37:40 | 9 | Wentworth? |
| 10:37:40 | 10 | A.  I recall that conversation. |
| 10:37:42 | 11 | Q.  And you recall that we looked on a map, a Google Map, |
| 10:37:47 | 12 | showing that address, 5101 South Wentworth? |
| 10:37:50 | 13 | A.  I recall that. |
| 10:37:50 | 14 | Q.  And do you recall that across the railroad tracks from |
| 10:37:55 | 15 | that Area 1 headquarters were four churches and a school? |
| 10:37:56 | 16 | A.  I recall that. |
| 10:37:58 | 17 | Q.  And do you recall the same discussion that we had |
| 10:37:59 | 18 | regarding the Area 2 police headquarters -- |
| 10:38:02 | 19 | MR. AGUIAR:  Your Honor -- |
| 10:38:02 | 20 | BY MR. SIGALE: |
| 10:38:04 | 21 | Q.  -- at 727 East 111th Street? |
| 10:38:04 | 22 | MR. AGUIAR:  Objection, your Honor.  He's talking |
| 10:38:05 | 23 | about Ms. Scudiero's deposition, what happened in her |
| 10:38:08 | 24 | deposition. |
| 10:38:08 | 25 | THE COURT:  What's the basis for the objection? |

| | |
|---|---|
| 10:38:11 | 1 |
| 10:38:12 | 2 |
| 10:38:16 | 3 |
| 10:38:19 | 4 |
| 10:38:19 | 5 |
| 10:38:20 | 6 |
| 10:38:26 | 7 |
| 10:38:28 | 8 |
| 10:38:30 | 9 |
| 10:38:33 | 10 |
| 10:38:34 | 11 |
| 10:38:35 | 12 |
| 10:38:37 | 13 |
| 10:38:40 | 14 |
| 10:38:44 | 15 |
| 10:38:44 | 16 |
| 10:38:48 | 17 |
| 10:38:51 | 18 |
| 10:38:56 | 19 |
| 10:38:56 | 20 |
| 10:38:56 | 21 |
| 10:39:00 | 22 |
| 10:39:02 | 23 |
| 10:39:02 | 24 |
| 10:39:03 | 25 |

MR. AGUIAR:  Foundation here.

THE COURT:  It's overruled.  He can cross-examine her about previous statements.

MR. SIGALE:  Thank you, your Honor.

BY MR. SIGALE:

Q.  Do you recall that discussion, Commissioner, 727 East 111th Street, Area 2 headquarters?

A.  I recall the conversation.

Q.  And you recall that near those headquarters was the Smurfit-Stone Container Corporation, the University of Chicago, and residential housing?

A.  I recall the conversation, yes.

Q.  And you recall a discussion -- similar discussion about Area 3 headquarters, 2452 West Belmont Avenue?

A.  Yes.

Q.  And that in the immediate vicinity of those headquarters is the Cook County Municipal Court, the Devry Institute of Technology, Toys"R"Us, Blockbuster Video, and a residential area?

A.  I recall it.

Q.  And the same question regarding the Area 4 headquarters at 3151 West Harrison?

A.  Yes.

Q.  You recall that discussion?

A.  I do.

10:39:04   1   Q.  And we looked at a map and we saw that near there was the

10:39:07   2   Cook County Criminal Court, the Jens Jensen Public School, and

10:39:11   3   three churches, yes?

10:39:12   4   A.  Yes, I recall that.

10:39:15   5   Q.  And luckily there's only five area headquarters, because

10:39:19   6   then I can move on.

10:39:20   7          But you recall the discussion we had about Area 5

10:39:23   8   headquarters at 5555 West Grand Avenue, yes?

10:39:26   9   A.  I do recall it, yes.

10:39:27  10   Q.  And you recall that across the street from Area 5

10:39:31  11   headquarters is a park, a vocational school, and across from

10:39:34  12   the park is an elementary school, and in that vicinity is also

10:39:37  13   a residential area, correct?

10:39:40  14   A.  Yes, I recall that.

10:39:41  15   Q.  And you recall that the police academy -- Chicago Police

10:39:44  16   Academy at 1300 West Jackson is adjacent to Whitney Young High

10:39:49  17   School to the west and a park to the north?

10:39:51  18   A.  I recall that, yes.

10:39:53  19   Q.  Okay.  And you have never heard a complaint, from a zoning

10:39:56  20   perspective, from anyone representing any person or entity

10:40:02  21   residing or working near any of those police facilities with

10:40:06  22   any type of complaint regarding a firing range on those

10:40:10  23   premises; is that true?

10:40:11  24   A.  That's what I testified, correct.

10:40:13  25   Q.  Okay.  And, likewise, you've never heard from anyone

| | | |
|---|---|---|
| 10:40:17 | 1 | complaining about a firing range at 230 South LaSalle Street, |
| 10:40:20 | 2 | 743 -- I'm sorry -- 230 South LaSalle, 743 South Canal Street, |
| 10:40:26 | 3 | 610 South Canal Street, or 899 Upper Express Drive, which as |
| 10:40:32 | 4 | we talked about is up near O'Hare.  You've never heard from |
| 10:40:35 | 5 | anyone complaining about a firing range at any of those |
| 10:40:39 | 6 | locations, true? |
| 10:40:39 | 7 | A.  That is correct. |
| 10:40:40 | 8 | Q.  In fact, before last week when we had the discussion I was |
| 10:40:47 | 9 | referring to, you had no idea that there might be firing |
| 10:40:51 | 10 | ranges at any of those locations; is that true? |
| 10:40:53 | 11 | A.  That's what I testified, yes. |
| 10:40:55 | 12 | Q.  Now, actually, you would recommend that firing ranges be |
| 10:41:04 | 13 | zoned C3 or higher, which includes the M zones; is that |
| 10:41:09 | 14 | accurate? |
| 10:41:10 | 15 | A.  I recommended that the firing ranges be considered for the |
| 10:41:15 | 16 | manufacturing zones.  What I said was the only district |
| 10:41:18 | 17 | that -- of the Cs that didn't permit residential was C3. |
| 10:41:28 | 18 | Q.  Okay.  Now, permitted uses in M districts, you said, |
| 10:41:33 | 19 | include tavern -- taverns? |
| 10:41:36 | 20 | A.  Taverns. |
| 10:41:36 | 21 | Q.  Light industry? |
| 10:41:37 | 22 | A.  Light industries. |
| 10:41:39 | 23 | Q.  Catering offices? |
| 10:41:41 | 24 | A.  Yes. |
| 10:41:41 | 25 | Q.  As well as the other things you testified before? |

| | |
|---|---|
| 10:41:44 | 1 |
| 10:41:44 | 2 |
| 10:41:51 | 3 |
| 10:41:54 | 4 |
| 10:41:56 | 5 |
| 10:41:57 | 6 |
| 10:42:00 | 7 |
| 10:42:06 | 8 |
| 10:42:08 | 9 |
| 10:42:10 | 10 |
| 10:42:16 | 11 |
| 10:42:21 | 12 |
| 10:42:27 | 13 |
| 10:42:28 | 14 |
| 10:42:33 | 15 |
| 10:42:34 | 16 |
| 10:42:37 | 17 |
| 10:42:41 | 18 |
| 10:42:45 | 19 |
| 10:42:47 | 20 |
| 10:42:50 | 21 |
| 10:42:53 | 22 |
| 10:42:54 | 23 |
| 10:42:57 | 24 |
| 10:43:01 | 25 |

A.   Yes.

Q.   Now, you described -- based on the knowledge as you've described it of firing ranges, you would describe that as -- you'd label it as an intense use?

A.   That is correct.

Q.   And your concerns that you talked about with regards to intense uses, as you described them earlier, apply to all uses you deem intense; is that fair to say?

A.   That's fair.

Q.   And all -- and putting -- strike that.

     But putting firing ranges in the M districts, even as a special use, is not feasible because the City Council banned them; is that correct?

A.   The Chicago zoning ordinance prohibits it, so it is correct.

Q.   Okay.  And all of your concerns about zoning for firing ranges, as you've described them today, would you have told them to the City Council or the chairman of the City's committee on zoning had you been asked?

          MR. AGUIAR:  Objection, speculation, your Honor.

          THE COURT:  All right.  Sustained.

BY MR. SIGALE:

Q.   The concerns that you talked about with regard to intense uses, as you described earlier, until you spoke to your attorneys and me, as you described earlier that you were asked

```
10:43:05   1   to testify, you didn't say any of this to anyone; is that
10:43:08   2   true?
10:43:08   3   A.  That's true.
10:43:09   4   Q.  And that's because nobody ever asked you; is that correct?
10:43:13   5   A.  That's correct.
10:43:15   6          MR. SIGALE:  Okay.  Thank you.  Nothing further.
10:43:17   7          THE COURT:  Okay.  Any redirect?
10:43:18   8          MR. AGUIAR:  One moment, your Honor?
10:43:33   9          THE COURT:  Okay.
10:43:33  10                              - - -
10:43:33  11              PATRICIA SCUDIERO, REDIRECT EXAMINATION
10:43:33  12   BY MR. AGUIAR:
10:43:45  13   Q.  Ms. Scudiero, if another non-zoning ordinance, like the
10:43:49  14   Responsible Gun Owners Ordinance, bars some use in the city,
10:43:54  15   would zoning typically weigh-in on those?
10:43:57  16   A.  No.
10:44:00  17          MR. AGUIAR:  That's all, your Honor.
10:44:01  18          THE COURT:  Okay.  You may step down.
10:44:02  19          THE WITNESS:  Thank you.
10:44:05  20          (Witness leaves the stand.)
10:44:05  21          THE COURT:  All right.  Call your next witness,
10:44:06  22   please.
10:44:13  23          MR. AGUIAR:  Your Honor, the City calls Sergeant Dan
10:44:15  24   Bartoli.
10:44:27  25          (Witness takes the stand.)
```

|  |  |  |
|---|---|---|
| 10:44:27 | 1 | THE COURT:  Please raise your right hand. |
| 10:44:33 | 2 | (The witness was sworn.) |
| 10:44:33 | 3 | THE COURT:  Okay. |
| 10:44:37 | 4 | - - - |
| 10:44:37 | 5 | DANIEL BARTOLI, DIRECT EXAMINATION |
| 10:44:37 | 6 | BY MR. AGUIAR: |
| 10:44:41 | 7 | Q.  Would the witness please state his name for the record? |
| 10:44:43 | 8 | A.  Daniel Bartoli, B-a-r-t-o-l-i. |
| 10:44:46 | 9 | Q.  Good morning, Sergeant Bartoli. |
| 10:44:49 | 10 | A.  Good morning. |
| 10:44:49 | 11 | Q.  Are you currently a member of the Chicago Police |
| 10:44:51 | 12 | Department? |
| 10:44:51 | 13 | A.  I am. |
| 10:44:52 | 14 | Q.  When did you start with the Chicago Police Department? |
| 10:44:54 | 15 | A.  January 3rd, 1995. |
| 10:44:57 | 16 | Q.  And have you been continuously employed by the Chicago |
| 10:45:00 | 17 | Police Department ever since? |
| 10:45:00 | 18 | A.  I have. |
| 10:45:02 | 19 | Q.  What was your first position with the police department? |
| 10:45:04 | 20 | A.  I was an officer -- I was recruited into education |
| 10:45:09 | 21 | division training for the first six months. |
| 10:45:11 | 22 | Q.  And then what was your next position? |
| 10:45:13 | 23 | A.  I went to be a patrol officer in the 25th district. |
| 10:45:16 | 24 | Q.  For how long were you a patrolman? |
| 10:45:18 | 25 | A.  I was a patrolman in the 25th and 15th district until |

| | | |
|---|---|---|
| 10:45:22 | 1 | approximately the year 2000. |
| 10:45:23 | 2 | Q.  And after being patrolman what did you do next for the |
| 10:45:26 | 3 | police department? |
| 10:45:27 | 4 | A.  I was assigned to the education and training division for |
| 10:45:30 | 5 | a 90-day detail to do simulator training. |
| 10:45:34 | 6 | Q.  When you say simulator training, what do you mean by that? |
| 10:45:37 | 7 | A.  A simulator is basically a movie that plays scenarios |
| 10:45:41 | 8 | where officers learn proper use of force, target |
| 10:45:46 | 9 | discrimination, and basically shoot- and no-shoot type |
| 10:45:49 | 10 | scenarios. |
| 10:45:50 | 11 | Q.  And, again, how long were you a simulator instructor? |
| 10:45:53 | 12 | A.  90 days. |
| 10:45:54 | 13 | Q.  And after that what did you do for the police department? |
| 10:45:57 | 14 | A.  I returned to the 25th district. |
| 10:45:59 | 15 | Q.  As a patrolman? |
| 10:46:00 | 16 | A.  As a patrolman. |
| 10:46:01 | 17 | Q.  And how long were you a patrolman in the 25th district |
| 10:46:04 | 18 | after that? |
| 10:46:04 | 19 | A.  'Til 2001 when I was called back to the education and |
| 10:46:08 | 20 | training division. |
| 10:46:10 | 21 | Q.  And what did you do for that division? |
| 10:46:12 | 22 | A.  We started a street survival course for officers in |
| 10:46:17 | 23 | patrol. |
| 10:46:18 | 24 | Q.  What is a street survival course? |
| 10:46:21 | 25 | A.  It basically went over proper building entry, traffic stop |

10:46:26  1  procedures, ethics, use of force.

10:46:34  2  Q.  And how long did you work on that project?

10:46:36  3  A.  I worked on that project for approximately four months.

10:46:40  4  Q.  And what did you do next for the police department after

10:46:42  5  that?

10:46:42  6  A.  I then became a firearms instructor.

10:46:48  7  Q.  And what were your responsibilities as a firearms

10:46:52  8  instructor?

10:46:52  9  A.  I did all in-service training and some recruit training.

10:47:01  10  Q.  When you say in-service training, what does that

10:47:04  11  compromise?

10:47:05  12  A.  Basically officers receive a three-and-a-half hour

10:47:08  13  in-service training.  We attempt to do the officers, at least

10:47:15  14  a quarter -- a quarter of our staff once a year where they

10:47:18  15  receive some sort of tactical training with their firearms.  I

10:47:22  16  also did primary qualification, alternate qualification, and

10:47:25  17  shotgun training.

10:47:27  18  Q.  Let's break that down a little bit.

10:47:29  19  A.  Sorry.

10:47:30  20  Q.  You said it's about half of the staff.

10:47:32  21      Approximately how many sworn police officers are

10:47:33  22  there on the force?

10:47:35  23  A.  13,500.

10:47:38  24  Q.  Okay.  You say it's a three-and-a-half hour in-service

10:47:41  25  training?

| | | |
|---|---|---|
| 10:47:41 | 1 | A.  Correct. |
| 10:47:41 | 2 | Q.  What does that -- what composes that training? |
| 10:47:44 | 3 | A.  Well, depending on the year, the course changes.  Some |
| 10:47:48 | 4 | years we concentrate on low-light shooting.  Some years we |
| 10:47:51 | 5 | concentrate on barricade shooting.  Some years we concentrate |
| 10:47:54 | 6 | on basic target discrimination, multiple targets.  It depends |
| 10:47:58 | 7 | on the year. |
| 10:48:00 | 8 | Q.  You mentioned something about primary qualifications? |
| 10:48:04 | 9 | A.  Yes. |
| 10:48:04 | 10 | Q.  What is a primary qualification? |
| 10:48:06 | 11 | A.  Officers are required to shoot their proscribed weapon |
| 10:48:10 | 12 | once a year and complete a basic marksmanship course. |
| 10:48:13 | 13 | Q.  Okay.  And what is -- what composes that course? |
| 10:48:15 | 14 | A.  It's a 30-round course of fire, basically testing their |
| 10:48:19 | 15 | basic marksmanship, sight alignment, trigger control. |
| 10:48:23 | 16 | Q.  And all officers are required to complete that? |
| 10:48:26 | 17 | A.  Yes. |
| 10:48:26 | 18 | Q.  Is that on a yearly basis? |
| 10:48:28 | 19 | A.  Annual, yes. |
| 10:48:29 | 20 | Q.  Annual. |
| 10:48:31 | 21 | For how long were you a firearms instructor with the |
| 10:48:39 | 22 | City's police department? |
| 10:48:40 | 23 | A.  Until I made sergeant in 2007. |
| 10:48:43 | 24 | Q.  When you made sergeant in 2007, what did you do? |
| 10:48:45 | 25 | A.  After I completed the training process, I went to the |

| | | |
|---|---|---|
| 10:48:49 | 1 | 11th district as a patrol sergeant. |
| 10:48:53 | 2 | Q.  And how long were you a patrol sergeant in the |
| 10:48:58 | 3 | 11th district? |
| 10:48:58 | 4 | A.  Until 2008 when I was called back to the education and |
| 10:49:02 | 5 | training division. |
| 10:49:03 | 6 | Q.  Okay.  What were your responsibilities as the patrol |
| 10:49:05 | 7 | sergeant in the 11th district? |
| 10:49:06 | 8 | A.  I monitored field units responding to calls, crime scene |
| 10:49:11 | 9 | investigation, domestic violence. |
| 10:49:14 | 10 | Q.  Approximately how many officers did you have authority |
| 10:49:16 | 11 | over while you were the patrol sergeant? |
| 10:49:18 | 12 | A.  Depending on the day I would have anywhere from five |
| 10:49:24 | 13 | two-man cars to, at times depending on manpower needs, up to |
| 10:49:27 | 14 | eleven. |
| 10:49:30 | 15 | Q.  And in 2008 you returned to the education department; is |
| 10:49:34 | 16 | that correct? |
| 10:49:34 | 17 | A.  Correct, education and training division. |
| 10:49:37 | 18 | Q.  Thank you. |
| 10:49:38 | 19 | And what was your role at the education division? |
| 10:49:40 | 20 | A.  At that time the superintendent wanted to start a carving |
| 10:49:45 | 21 | program, patrol carving program, and I was put in charge of |
| 10:49:48 | 22 | that project. |
| 10:49:51 | 23 | Q.  What is a controlled carving program? |
| 10:49:52 | 24 | A.  It's a patrol carving.  It's a rifle program for patrol |
| 10:49:54 | 25 | officers in the field. |

| 10:49:59 | 1 | Q. What does that program do? |
| 10:50:00 | 2 | A. It trains officers in proper use of the patrol carving, |
| 10:50:05 | 3 | the rifle. |
| 10:50:07 | 4 | Q. And for how long were you in charge of the carving |
| 10:50:10 | 5 | program? |
| 10:50:10 | 6 | A. I did that for about a year and a half. |
| 10:50:20 | 7 | Q. And then what did you do? |
| 10:50:22 | 8 | A. Then I became the range master at the Chicago Police |
| 10:50:28 | 9 | Department. |
| 10:50:28 | 10 | Q. What were your responsibilities as range master of the |
| 10:50:31 | 11 | Chicago Police Department? |
| 10:50:32 | 12 | A. Basically, I supervise all firearms training within the |
| 10:50:37 | 13 | Chicago Police Department. |
| 10:50:49 | 14 | Q. Are you currently the range master for the Chicago Police |
| 10:50:52 | 15 | Department? |
| 10:50:52 | 16 | A. I am not. |
| 10:50:54 | 17 | Q. When did you stop being the range master? |
| 10:50:56 | 18 | A. Two weeks ago. |
| 10:50:57 | 19 | Q. And what is your current position in the Chicago Police |
| 10:51:00 | 20 | Department? |
| 10:51:00 | 21 | A. I review policy for the superintendent. |
| 10:51:04 | 22 | Q. Do you know how many ranges the Chicago Police Department |
| 10:51:06 | 23 | has? |
| 10:51:07 | 24 | A. Six. |
| 10:51:08 | 25 | Q. And are those in the city? |

| | | |
|---|---|---|
| 10:51:09 | 1 | A.  Those are in the city. |
| 10:51:11 | 2 | Q.  Where are the ranges located? |
| 10:51:13 | 3 | A.  All the police areas and the education and training |
| 10:51:16 | 4 | division. |
| 10:51:18 | 5 | Q.  Is the use of ranges limited to CPD personnel only? |
| 10:51:22 | 6 | A.  And military personnel. |
| 10:51:25 | 7 | Q.  Anybody else? |
| 10:51:26 | 8 | A.  Outside agencies, outside police agencies. |
| 10:51:29 | 9 | Q.  Okay.  Can civilians or members of the public use the |
| 10:51:33 | 10 | ranges? |
| 10:51:34 | 11 | A.  No. |
| 10:51:36 | 12 | Q.  Is there any security at the CPD firing ranges? |
| 10:51:39 | 13 | A.  Yes.  Every desk has sworn personnel at the desk that |
| 10:51:45 | 14 | you'd have to walk by. |
| 10:51:47 | 15 | Q.  And are those sworn officers there 24 hours a day, seven |
| 10:51:53 | 16 | days a week? |
| 10:51:54 | 17 | A.  Yes, they are. |
| 10:51:55 | 18 | Q.  Are there any protocols in Chicago on how the police |
| 10:51:58 | 19 | department ranges operate? |
| 10:51:59 | 20 | A.  Yes, there are. |
| 10:52:00 | 21 | Q.  Could you describe for me what those protocols are? |
| 10:52:03 | 22 | A.  They are standard operating procedures for all of our |
| 10:52:06 | 23 | ranges.  They include basic safe weapon handling.  There's |
| 10:52:11 | 24 | posters on every door outlying safe weapon procedures.  And |
| 10:52:16 | 25 | basically from recruit training on, officers are instilled |

| | | |
|---|---|---|
| 10:52:20 | 1 | those safe handling techniques. |
| 10:52:24 | 2 | Q.  Do you know who drafted the operating procedure for the |
| 10:52:27 | 3 | ranges? |
| 10:52:28 | 4 | A.  No, I do not. |
| 10:52:31 | 5 | Q.  Those were in existence when you were the range master? |
| 10:52:36 | 6 | A.  Yes. |
| 10:52:36 | 7 | Q.  And while you were the range master, did the ranges comply |
| 10:52:39 | 8 | with that protocol? |
| 10:52:40 | 9 | A.  Yes. |
| 10:52:40 | 10 | Q.  Are any of the police department's firing ranges mobile? |
| 10:52:46 | 11 | A.  No. |
| 10:52:47 | 12 | Q.  Sergeant Bartoli, are you aware that in this case |
| 10:52:50 | 13 | plaintiffs propose to bring a mobile firing range into the |
| 10:52:54 | 14 | City of Chicago? |
| 10:52:54 | 15 | A.  I am. |
| 10:52:55 | 16 | Q.  And based on your experience as a firearms instructor and |
| 10:52:59 | 17 | as a range master for the Chicago Police Department, as well |
| 10:53:01 | 18 | as your many other experiences with the Chicago Police |
| 10:53:04 | 19 | Department, could the presence of a mobile range pose any |
| 10:53:06 | 20 | threat to the public health, safety, and welfare? |
| 10:53:09 | 21 | MR. GURA:  Objection, lacks foundation as to mobile |
| 10:53:12 | 22 | ranges. |
| 10:53:12 | 23 | THE COURT:  Okay.  Overruled. |
| 10:53:14 | 24 | THE WITNESS:  Yes. |
| 10:53:15 | 25 | BY MR. AGUIAR: |

| | | |
|---|---|---|
| 10:53:15 | 1 | Q.  How could a mobile range pose a threat to the public |
| 10:53:18 | 2 | safety? |
| 10:53:19 | 3 | A.  When you talk about a mobile range, you have a facility |
| 10:53:24 | 4 | that is in the public, as opposed to enclosed in some sort of |
| 10:53:29 | 5 | building, and traffic management around that facility would be |
| 10:53:32 | 6 | a great concern to any range master or firearms instructor. |
| 10:53:37 | 7 | Q.  What do you mean by traffic management? |
| 10:53:39 | 8 | A.  Well, you're going to have people coming and going from |
| 10:53:41 | 9 | that facility and due to the fact of overlapping classes, |
| 10:53:47 | 10 | numerous people coming for training, bystanders stopping by, |
| 10:53:51 | 11 | and other unforeseen casual observers would be a great concern |
| 10:53:57 | 12 | to officers conducting any kind of training. |
| 10:54:00 | 13 | Q.  Are there ways to limit or control some of these problems |
| 10:54:07 | 14 | you foresee? |
| 10:54:08 | 15 | A.  Certainly. |
| 10:54:09 | 16 | Q.  And what would those be? |
| 10:54:10 | 17 | A.  At a bear minimal [sic], you'd have to have some sort of |
| 10:54:14 | 18 | permanent fencing that was unable to be seen through.  You'd |
| 10:54:19 | 19 | have to have locations separate from where live fire training |
| 10:54:23 | 20 | was occurring and classroom training was occurring.  You'd |
| 10:54:25 | 21 | have to have parking lots that were secure, so that people |
| 10:54:28 | 22 | could remove equipment from their vehicle, transport that |
| 10:54:32 | 23 | equipment to a training area, and from a training area to a |
| 10:54:35 | 24 | live fire area.  You'd also have a need to have locations for |
| 10:54:40 | 25 | safe loading, unloading, and handling of weapons. |

| | |
|---|---|
| 10:54:47 | 1 |
| 10:54:50 | 2 |
| 10:54:52 | 3 |
| 10:54:56 | 4 |
| 10:54:58 | 5 |
| 10:55:00 | 6 |
| 10:55:03 | 7 |
| 10:55:09 | 8 |
| 10:55:12 | 9 |
| 10:55:14 | 10 |
| 10:55:18 | 11 |
| 10:55:19 | 12 |
| 10:55:19 | 13 |
| 10:55:22 | 14 |
| 10:55:24 | 15 |
| 10:55:28 | 16 |
| 10:55:31 | 17 |
| 10:55:34 | 18 |
| 10:55:38 | 19 |
| 10:55:41 | 20 |
| 10:55:45 | 21 |
| 10:55:48 | 22 |
| 10:55:51 | 23 |
| 10:55:54 | 24 |
| 10:55:58 | 25 |

Q.  I'd like to break that down a little bit with you and ask you some questions about what you just testified to.

You said there'd need to be permanent fencing.  Why is that?

A.  Well, in my experience as a patrol officer, if you look at construction sites that have temporary fencing, that's commonly blown over or pushed over.  Permanent fencing that is seated in the ground would reduce that likelihood of the fencing being comprised.

Q.  You mentioned it should not be see-through.  Why should the fence not be see-through?

A.  Well, as a firearms instructor, you have a lot of duties. And that duty is safety to your students, to your firearms instructors, and to the public.

That being said, as people are curious, like people are, standing by a fence looking through to see what was happening there would be of great concern.

Q.  You testified that you need a separate location for the loading/unloading of weapons.  Why is that?

A.  Loading and unloading of weapons is a great concern to any firearms instructor, due to unintentional discharges.  You want to make sure that it is in a safe location and that the students are actually performing the task at hand without obstruction or without intrusion from bystanders or other people.

| | |
|---|---|
| 10:55:59 | 1 |
| 10:56:02 | 2 |
| 10:56:03 | 3 |
| 10:56:06 | 4 |
| 10:56:10 | 5 |
| 10:56:11 | 6 |
| 10:56:13 | 7 |
| 10:56:15 | 8 |
| 10:56:19 | 9 |
| 10:56:19 | 10 |
| 10:56:22 | 11 |
| 10:56:25 | 12 |
| 10:56:28 | 13 |
| 10:56:31 | 14 |
| 10:56:34 | 15 |
| 10:56:38 | 16 |
| 10:56:40 | 17 |
| 10:56:43 | 18 |
| 10:56:47 | 19 |
| 10:56:49 | 20 |
| 10:56:52 | 21 |
| 10:56:54 | 22 |
| 10:56:57 | 23 |
| 10:57:00 | 24 |
| 10:57:03 | 25 |

Q.  And where should this location be in relationship to a range?

A.  That would depend on the facility.

Q.  Okay.  Should it be next to the range or away from the range?

A.  It would be separate from the live fire range, but in the general vicinity of it.

Q.  Okay.  Would this area be next to parking or away from parking?

A.  You would want it to be separate from your parking to avoid people wandering off to their cars when they are supposed to be concentrating on one specific task.

Q.  You also testified about the parking lots need to be secure.  In what way should the parking lots be secure?

A.  Well, you'd definitely want participants' cars secured, due to the fact that there would be assumption that firearms would be in those cars, and you wouldn't want people worried about what's going to happen to their cars when they are using firearms in training.

Q.  So there would be a threat to the people -- potential threat to people who are coming to the range?

        MR. GURA:  Objection, calls for speculation.

        THE COURT:  Overruled.  I'll allow him to testify based upon his understanding.

        THE WITNESS:  There would be assumption that firearms

| | |
|---|---|
| 10:57:05 | 1 |
| 10:57:09 | 2 |
| 10:57:15 | 3 |
| 10:57:16 | 4 |
| 10:57:22 | 5 |
| 10:57:29 | 6 |
| 10:57:30 | 7 |
| 10:57:33 | 8 |
| 10:57:34 | 9 |
| 10:57:37 | 10 |
| 10:57:37 | 11 |
| 10:57:41 | 12 |
| 10:57:42 | 13 |
| 10:57:43 | 14 |
| 10:57:47 | 15 |
| 10:57:53 | 16 |
| 10:57:54 | 17 |
| 10:57:56 | 18 |
| 10:58:00 | 19 |
| 10:58:06 | 20 |
| 10:58:09 | 21 |
| 10:58:11 | 22 |
| 10:58:14 | 23 |
| 10:58:18 | 24 |
| 10:58:22 | 25 |

1  would be in those cars.  And in my experience as a police

2  officer, criminals want firearms to do their job as criminals.

3  BY MR. AGUIAR:

4  Q.  Does the manner of ingress and egress to the site cause

5  you any concern -- or could it cause you concern?

6  A.  To a general site?

7  Q.  To the site where the mobile range would be located.

8       MR. GURA:  Objection, calls for speculation and lacks

9  foundation again.  I don't know what site he's talking about

10  and --

11       THE COURT:  Okay.  I'll allow -- sustained on that

12  ground, on foundation.

13  BY MR. AGUIAR:

14  Q.  In determining whether a location is safe for a range to

15  be located, do you look at whether -- the ingress and egress

16  to the site?

17  A.  If I was in charge of planning where a range was put, yes,

18  I would look for how people get to and from the range

19  location, yes.

20  Q.  Is there an amount of ingress and egress which is

21  acceptable for this range to be a safe location?

22  A.  One entrance would be your best bet, yes.

23  Q.  Would more than one entrance cause a potential concern?

24  A.  The more entrances you have, the more uncontrolled traffic

25  could potentially come up on your training facility and cause

| | | |
|---|---|---|
| 10:58:25 | 1 | unsafe conditions, especially when handling firearms. |
| 10:58:32 | 2 | Q.  Sergeant Bartoli, you were in court here last Friday, were |
| 10:58:36 | 3 | you not? |
| 10:58:36 | 4 | A.  I was. |
| 10:58:37 | 5 | Q.  Did you hear the testimony of Mr. Pearson from the |
| 10:58:40 | 6 | Illinois State Rifle Association? |
| 10:58:41 | 7 | A.  I did. |
| 10:58:43 | 8 | Q.  And did you hear his testimony that they determined they |
| 10:58:47 | 9 | would not allow people to bring their own firearms to the site |
| 10:58:50 | 10 | in question? |
| 10:58:51 | 11 | A.  I did. |
| 10:58:52 | 12 | Q.  And that they would supply the firearms? |
| 10:58:54 | 13 | A.  I did. |
| 10:58:55 | 14 | Q.  And that they would have two different firearms available |
| 10:58:58 | 15 | for people to shoot with? |
| 10:59:00 | 16 | A.  I did. |
| 10:59:03 | 17 | Q.  Even though Illinois State Rifle Association is saying |
| 10:59:07 | 18 | they would supply the guns, do you still have a concern that |
| 10:59:11 | 19 | the presence of the guns would cause a threat to the public |
| 10:59:13 | 20 | health, safety, and welfare? |
| 10:59:14 | 21 | MR. GURA:  Objection, calls for speculation. |
| 10:59:16 | 22 | THE COURT:  I'll let him answer.  Overruled. |
| 10:59:20 | 23 | THE WITNESS:  I'm sorry.  What guns, sir? |
| 10:59:23 | 24 | BY MR. AGUIAR: |
| 10:59:24 | 25 | Q.  Illinois State Rifle Association -- the -- Mr. Pearson |

| | | |
|---|---|---|
| 10:59:27 | 1 | from Illinois State Rifle Association testified they would be |
| 10:59:31 | 2 | supplying the firearms to be able to train with at the site. |
| 10:59:35 | 3 | Did you hear that testimony? |
| 10:59:36 | 4 | A. Yes. |
| 10:59:37 | 5 | Q. Okay. Even though people are not bringing their own |
| 10:59:40 | 6 | weapons to the site, is there still a concern for the safety |
| 10:59:45 | 7 | at the site, even if people aren't bringing their own weapons? |
| 10:59:48 | 8 | A. Yes. |
| 10:59:48 | 9 | Q. What is that concern? |
| 10:59:50 | 10 | A. Well, the fact that you're traveling to and from a site |
| 10:59:54 | 11 | with weapons could be a target of crime. |
| 11:00:03 | 12 | Q. In your role as range master for the Chicago Police |
| 11:00:06 | 13 | Department, do people always follow the instructions that you |
| 11:00:09 | 14 | give them? |
| 11:00:09 | 15 | A. No. |
| 11:00:10 | 16 | Q. Okay. Could you give me some examples of people not |
| 11:00:15 | 17 | following your instructions? |
| 11:00:16 | 18 | MR. GURA: Objection, relevance. |
| 11:00:17 | 19 | THE COURT: Overruled. |
| 11:00:20 | 20 | THE WITNESS: There's many examples. Officers coming |
| 11:00:24 | 21 | to the range are always told not to take their weapons out of |
| 11:00:27 | 22 | the holster until directed by a range officer; they do. |
| 11:00:30 | 23 | Officers are always bringing extra equipment to the range for |
| 11:00:33 | 24 | you to evaluate. Officers are coming to the ranges with |
| 11:00:36 | 25 | weapons that they are directed not to, just for your opinion |

| | | |
|---|---|---|
| 11:00:39 | 1 | as an expert.  There's numerous -- I mean, you tell people and |
| 11:00:43 | 2 | give them specific instructions all the time, and people tend |
| 11:00:46 | 3 | to do what they feel is in their best interest. |
| 11:00:49 | 4 | BY MR. AGUIAR: |
| 11:00:49 | 5 | Q.  So if someone were to bring -- were instructed not to |
| 11:00:53 | 6 | bring a firearm, is it possible they would actually bring a |
| 11:00:55 | 7 | firearm to the site? |
| 11:00:56 | 8 | A.  I believe they would, yes. |
| 11:01:09 | 9 | Q.  In your experience as range master for the Chicago Police |
| 11:01:12 | 10 | Department, what type of personnel would be necessary to |
| 11:01:15 | 11 | maintain a safe range area? |
| 11:01:17 | 12 | A.  When we run a live fire range, we have a one-to-three |
| 11:01:22 | 13 | safety officer ratio.  We'd have one safety officer for every |
| 11:01:26 | 14 | three shooters, if they are new shooters.  We'd also have one |
| 11:01:31 | 15 | officer that strictly controls the line or gives commands on |
| 11:01:34 | 16 | what the person should do on a live fire range.  We'd also |
| 11:01:38 | 17 | have one person that would be designated as the classroom or |
| 11:01:40 | 18 | the primary instructor.  And we'd also have at least one |
| 11:01:41 | 19 | person to control traffic.  By traffic, I mean, people coming |
| 11:01:44 | 20 | to and from the range, people loading, unloading, handling |
| 11:01:48 | 21 | weapons, overlapping classes, and situations like that. |
| 11:01:52 | 22 | Q.  And would this be the minimal personnel needed to maintain |
| 11:01:56 | 23 | a safe range? |
| 11:01:56 | 24 | A.  That would be a minimal standard, yes. |
| 11:01:59 | 25 | Q.  Okay.  Could the manner in which people congregate at the |

| | |
|---|---|
| 11:02:04 | 1 | range be a safety concern? |
| 11:02:06 | 2 | A.  Yes. |
| 11:02:06 | 3 | Q.  How so? |
| 11:02:08 | 4 | A.  The more people you have congregating in between classes, |
| 11:02:12 | 5 | the more they get involved in your actual training.  People |
| 11:02:15 | 6 | tend to, when their time is not occupied, get bored during |
| 11:02:21 | 7 | training, wandering to cars.  There's always a potential for |
| 11:02:25 | 8 | someone to seek advice with their weapons when they should not |
| 11:02:30 | 9 | be doing so. |
| 11:02:32 | 10 | Q.  Are there any measures that should be taken to alleviate |
| 11:02:36 | 11 | this concern? |
| 11:02:37 | 12 | A.  Well, a traffic manager is very important, someone that |
| 11:02:40 | 13 | just -- his only duty is to make sure that the people that are |
| 11:02:44 | 14 | standing around doing nothing are being monitored so that they |
| 11:02:47 | 15 | don't cause a safety issue. |
| 11:02:50 | 16 | Q.  Does a safe firing range require any other types of |
| 11:02:54 | 17 | facilities besides just the range? |
| 11:02:56 | 18 | A.  Washroom facilities are always important.  People |
| 11:03:01 | 19 | obviously need to use restrooms.  When they use restrooms, |
| 11:03:05 | 20 | they wander off.  You definitely want restroom facilities on |
| 11:03:08 | 21 | the premise.  And running water is a must, due to washing lead |
| 11:03:17 | 22 | contaminants off your hands with soap. |
| 11:03:19 | 23 | Q.  What kind of water do you need to use to wash your hands? |
| 11:03:22 | 24 | A.  The general rule of thumb is lucrative amounts of water |
| 11:03:27 | 25 | and soap, cold running water to keep your pores closed so that |

| 11:03:30 | 1 | you don't actually get lead contaminant through your pores. |

you don't actually get lead contaminant through your pores.

11:03:30  1  you don't actually get lead contaminant through your pores.
11:03:35  2  Q.  Sergeant Bartoli, are you familiar with port-a-potties?
11:03:39  3  A.  I am.
11:03:39  4  Q.  And are you familiar with mobile hand washing facilities?
11:03:43  5  A.  I am.
11:03:43  6  Q.  Do these facilities provide the amount of water necessary
11:03:48  7  to completely clean your hands of any lead contaminants, in
11:03:51  8  your experience?
11:03:51  9       MR. GURA:  Objection, he lacks foundation as an
11:03:54 10  expert.
11:03:54 11       THE COURT:  I think that calls for speculation and I
11:03:58 12  don't know if he has the ability to testify.  Sustained.
11:04:02 13  About whether a water versus a -- what do you call these
11:04:06 14  things, these gel -- like Purell would break down gunpowder
11:04:10 15  residue.  So sustained, unless he can lay that foundation.
11:04:19 16  BY MR. AGUIAR:
11:04:21 17  Q.  Sergeant Bartoli, have you ever -- strike that.
11:04:33 18       Sergeant Bartoli, would you be comfortable using a
11:04:36 19  port-a-potty or a mobile hand washing facility to wipe the
11:04:39 20  residue off your hands after firing a firearm?
11:04:42 21       MR. GURA:  Objection, relevance --
11:04:43 22       THE COURT:  That's sustained.
11:04:45 23       MR. GURA:  -- does he feel comfortable.
11:04:46 24       THE COURT:  It was good try, though.
11:04:48 25       MR. AGUIAR:  Thank you.

| | | |
|---|---|---|
| 11:04:53 | 1 | BY MR. AGUIAR: |
| 11:04:53 | 2 | Q. Does the Chicago Police Department use port-a-potties or |
| 11:04:57 | 3 | mobile hand washing facilities to wipe the gun residue off of |
| 11:05:01 | 4 | people's hands? |
| 11:05:02 | 5 | MR. GURA: Objection, relevance, because we're |
| 11:05:04 | 6 | talking about a mobile range or a stationary range. |
| 11:05:07 | 7 | THE COURT: Okay. Overruled. I don't think they |
| 11:05:08 | 8 | have a mobile range, right? |
| 11:05:09 | 9 | MR. AGUIAR: That's what he testified to. |
| 11:05:11 | 10 | THE COURT: So it's regarding stationary ranges. He |
| 11:05:13 | 11 | may answer. |
| 11:05:14 | 12 | THE WITNESS: We do not. |
| 11:05:32 | 13 | BY MR. AGUIAR: |
| 11:05:33 | 14 | Q. Based on your experience as a range master and as a |
| 11:05:37 | 15 | firearms instructor, should a range have a standard operating |
| 11:05:38 | 16 | procedure or protocol? |
| 11:05:40 | 17 | A. Absolutely. |
| 11:05:42 | 18 | Q. And why? |
| 11:05:44 | 19 | A. So that your firearms instructors all have the same basis |
| 11:05:48 | 20 | for how to run that range and operate that location. Also, |
| 11:05:52 | 21 | proper lesson plans in place and on file in case your firearms |
| 11:05:59 | 22 | instructors lose track of what direction they were taking the |
| 11:06:01 | 23 | class for references. |
| 11:06:02 | 24 | Q. Have you ever been involved in drafting a standard |
| 11:06:05 | 25 | operating procedure for a firearm range? |

| | | |
|---|---|---|
| 11:06:07 | 1 | A. I have. |
| 11:06:08 | 2 | Q. And when was that? |
| 11:06:09 | 3 | A. When I started the patrol carving program. |
| 11:06:15 | 4 | Q. And based on your experience what should be in a standard |
| 11:06:18 | 5 | operating procedure? |
| 11:06:19 | 6 | A. Well, all the basic safety standards for a range. And in |
| 11:06:25 | 7 | any event of a catastrophic accident, such as somebody shot, a |
| 11:06:28 | 8 | medical plan on where to take a person, and if you can take |
| 11:06:32 | 9 | them, in case you don't have any time, who calls 9-1-1, who's |
| 11:06:37 | 10 | in charge of the scene, whose roles are traffic, versus line |
| 11:06:41 | 11 | management, versus safety officers. |
| 11:06:45 | 12 | Q. And should the rules take into account whether the range |
| 11:06:49 | 13 | will be used by less experienced shooters instead of more |
| 11:06:52 | 14 | experienced shooters? |
| 11:06:53 | 15 | A. Yeah. We go from a one-to-three ratio for new shooters to |
| 11:06:58 | 16 | a one-to-five ratio for safety officers. And depending on how |
| 11:07:03 | 17 | much training they have received, we actually can increase |
| 11:07:05 | 18 | that to about a one-and-seven. |
| 11:07:09 | 19 | Q. And, again, you were here on Friday to hear Mr. Pearson |
| 11:07:14 | 20 | testify? |
| 11:07:15 | 21 | A. I did -- I was. |
| 11:07:17 | 22 | Q. And did you hear him testify that he would only need about |
| 11:07:23 | 23 | fifteen minutes to modify his standard operating procedure, |
| 11:07:27 | 24 | once he arrived at the site? |
| 11:07:29 | 25 | A. I did. |

| | | |
|---|---|---|
| 11:07:29 | 1 | Q.  You heard that. |
| 11:07:31 | 2 | Based on your experience as the CPD training |
| 11:07:34 | 3 | master -- excuse me -- trainer and a range master, and as |
| 11:07:37 | 4 | someone who has drafted a standard operating procedure before, |
| 11:07:40 | 5 | is fifteen minutes sufficient time to adjust a safety |
| 11:07:43 | 6 | procedure? |
| 11:07:43 | 7 | MR. GURA:  Objection, calls for speculation, calls |
| 11:07:45 | 8 | for expert opinion. |
| 11:07:46 | 9 | THE COURT:  Okay.  Overruled.  Well, he's testifying |
| 11:07:48 | 10 | with special knowledge already, so he may answer. |
| 11:07:51 | 11 | THE WITNESS:  I do not believe that's enough time. |
| 11:07:53 | 12 | BY MR. AGUIAR: |
| 11:07:53 | 13 | Q.  Why not? |
| 11:07:54 | 14 | A.  When you're starting up a new facility, there's many |
| 11:07:57 | 15 | concerns.  And as soon as you show up to a range -- I've ran |
| 11:08:02 | 16 | lines on many outdoor ranges.  You have to do a search of the |
| 11:08:06 | 17 | berm to make sure there's no rocks in there, a search of the |
| 11:08:09 | 18 | location, adjusting of where your tables go.  Moving equipment |
| 11:08:12 | 19 | takes a substantial amount of time. |
| 11:08:13 | 20 | If I was to set up a brand new location, I would do |
| 11:08:16 | 21 | that with two, three days, it would take. |
| 11:08:20 | 22 | Q.  Is that minimum? |
| 11:08:23 | 23 | A.  Yeah.  I believe I can get it done in two days having |
| 11:08:27 | 24 | equipment delivered, fencing adjusted, logistics involved in |
| 11:08:32 | 25 | setting up a brand new facility. |

| | |
|---|---|
| 11:08:34 | 1 |
| 11:08:38 | 2 |
| 11:08:41 | 3 |
| 11:08:42 | 4 |
| 11:08:46 | 5 |
| 11:08:48 | 6 |
| 11:08:51 | 7 |
| 11:08:55 | 8 |
| 11:08:59 | 9 |
| 11:09:02 | 10 |
| 11:09:04 | 11 |
| 11:09:07 | 12 |
| 11:09:10 | 13 |
| 11:09:16 | 14 |
| 11:09:21 | 15 |
| 11:09:24 | 16 |
| 11:09:25 | 17 |
| 11:09:27 | 18 |
| 11:09:32 | 19 |
| 11:09:32 | 20 |
| 11:09:34 | 21 |
| 11:09:35 | 22 |
| 11:09:38 | 23 |
| 11:09:40 | 24 |
| 11:09:41 | 25 |

Q.  And if this standard operating procedure is not in place, could there be harm to the city and its residents?

A.  Oh, I believe so, yeah.

Q.  Could you explain to me what kind of harm would come from not having a standard operating procedure in place?

A.  If people are free to wander around and do stuff uncontrolled, there's always the potential for an accident. We've had accidents in our ranges throughout the city and throughout their history, and to keep it at a minimal [sic], you want to put in standard operating procedures, and that's with law enforcement officers that are trained already.  When you start dealing with people that have received little or no training, that risk increases.

Q.  If firearms are transported in a broken-down state to a range, is there still a safety concern for the people going to range?

A.  I would have --

        MR. GURA:  Objection, relevance.  Firearms need to be transported even if people are outside the city.

        THE COURT:  I didn't hear what you said.  Relevance because why?

        MR. GURA:  Because people would still need to transport arms even if the range ban is effected.  If it means you're going to a range outside of the city, they are just transporting firearms for longer --

| | | |
|---|---|---|
| 11:09:42 | 1 | THE COURT:  Right, so that's actually relevant so |
| 11:09:44 | 2 | overruled. |
| 11:09:45 | 3 | THE WITNESS:  I'm sorry.  Could you repeat the |
| 11:09:47 | 4 | question, sir? |
| 11:09:49 | 5 | BY MR. AGUIAR: |
| 11:09:49 | 6 | Q.  If guns are transported in a broken-down state to this |
| 11:09:53 | 7 | site, is there a safety concern for people going to the range? |
| 11:09:57 | 8 | A.  Yes. |
| 11:09:58 | 9 | Q.  And what is that concern? |
| 11:10:00 | 10 | A.  Victims of crime. |
| 11:10:01 | 11 | Q.  What do you mean by that? |
| 11:10:04 | 12 | A.  A facility that's known as a live fire range is assumed |
| 11:10:07 | 13 | that weapons will be transported to and from that facility, |
| 11:10:10 | 14 | which could substantially increase the people going to and |
| 11:10:14 | 15 | from that vicinity as people for victims of crime for people |
| 11:10:18 | 16 | who want to obtain firearms. |
| 11:10:20 | 17 | Q.  And based on your experience with the Chicago Police |
| 11:10:24 | 18 | Department, even if people aren't transporting their firearms |
| 11:10:27 | 19 | to the range, is there a safety concern for those people? |
| 11:10:29 | 20 | A.  Well, there's assumption that they would be -- |
| 11:10:32 | 21 | Q.  Assumption by whom? |
| 11:10:34 | 22 | A.  By the potential offenders. |
| 11:10:37 | 23 | Q.  So they would be a safety risk for them? |
| 11:10:39 | 24 | A.  Certainly. |
| 11:10:42 | 25 | Q.  Are you aware that one of the locations that plaintiffs |

11:10:44  1    propose to place the mobile range is 3333 West 36th Street in

11:10:52  2    Chicago.

11:10:53  3    A.   Yes.

11:10:53  4    Q.   And how are you familiar with this property?

11:10:56  5    A.   Aerial photos.

11:11:12  6              MR. AGUIAR:  Okay.  Your Honor, I would like to use

11:11:14  7    Defendant's Exhibit 16 with the witness, so at this time I

11:11:15  8    would like for it to be moved into evidence.

11:11:18  9              THE COURT:  Okay.

11:11:18  10             MR. AGUIAR:  I don't believe there's an objection.

11:11:21  11             MR. GURA:  No.

11:11:21  12             THE COURT:  Okay.  It will be admitted.

11:11:24  13   BY MR. AGUIAR:

11:11:24  14   Q.   Sergeant Bartoli, would you please turn to Defendant's

11:11:26  15   Exhibit 16 in that binder?

11:11:37  16   A.   Okay.

11:11:39  17   Q.   Based on your examining of an aerial map of the 3333 West

11:11:47  18   36th location, does Defendant's Exhibit 16 depict the area in

11:11:51  19   question?

11:11:51  20   A.   That is the same photo I viewed, yes -- or similar to, I'm

11:11:56  21   sorry.

11:11:56  22   Q.   Okay.  Did the photo you looked at have the red markings

11:11:59  23   on it?

11:12:00  24   A.   The one I'm looking at now does, yes.

11:12:03  25   Q.   But the one you looked at previous did not?

| | | |
|---|---|---|
| 11:12:04 | 1 | A.  It did not, no. |
| 11:12:06 | 2 | Q.  Okay.  Based on your experience as a trainer and a range |
| 11:12:09 | 3 | master for CPD, would the operation of a mobile range on this |
| 11:12:13 | 4 | property be of a concern to public safety? |
| 11:12:19 | 5 | A.  It would depend where it was, yes. |
| 11:12:22 | 6 | Q.  Okay.  What do you mean by, It would depend on where it |
| 11:12:26 | 7 | was? |
| 11:12:26 | 8 | A.  Well, this, to me, looks like a very large factory with a |
| 11:12:30 | 9 | lot of occupants, and controlling that traffic would be a |
| 11:12:33 | 10 | public safety issue. |
| 11:12:37 | 11 | THE COURT:  Unfortunately, folks, this is where I |
| 11:12:39 | 12 | have to stop, because of my commitments.  So -- and we have a |
| 11:12:43 | 13 | long break until 1:30.  That's unfortunate, but that's the way |
| 11:12:47 | 14 | it is.  So I'll see you back here at 1:30.  All right. |
| 11:12:50 | 15 | MR. GURA:  Thank you, your Honor. |
| 11:12:50 | 16 | MR. AGUIAR:  Thank you, your Honor. |
| 11:12:52 | 17 | (Lunch recess taken at 11:12 a.m.) |
| 11:12:52 | 18 | - - - |
| 11:12:52 | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |