01:52:30

1

2

3

4        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
5              EASTERN DIVISION

6

7    RHONDA EZELL, et al.,          Case No. 1:10-cv-05135

8      Plaintiffs,                  Chicago, Illinois
                                    October 4, 2010
9         v.                        Motion for Preliminary
                                    Injunction
10
     CITY OF CHICAGO,
11
       Defendant.
12   -------------------------------

13
                         VOLUME 2-B
14   TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION
          BEFORE THE HONORABLE VIRGINIA M. KENDALL
15              UNITED STATES DISTRICT JUDGE

16

17   APPEARANCES:

18
     For the Plaintiffs:    Gura & Possessky, PLLC
19                          By:  Alan Gura
                            101 N. Columbus St., Ste. 405
20                          Alexandria, VA 22314
                            (703) 835-9085
21
                               - and -
22
                            Law Firm of David G. Sigale, P.C.
23                          By:  David G. Sigale
                            4300 Commerce Ct., Ste. 300-3
24                          Lisle, IL 60532
                            (630) 452-4547
25

         For a copy of this transcript, contact April Metzler, CRR
                          at (312) 408-5154

<u>APPEARANCES</u>:


For the Defendant:       Chicago Corporation Counsel
                         By:  William M. Aguiar,
                              Michael A. Forti,
                              Rebecca Alfert Hirsch,
                              Mardell Nereim, and
                              Andrew W. Worseck
                         30 N. LaSalle Street
                         Chicago, IL 60602
                         (312) 744-2784



<u>COURT REPORTER</u>:       FEDERAL OFFICIAL COURT REPORTER
                         April M. Metzler, RPR, CRR, FCRR
                         219 South Dearborn St., Rm. 2318-A
                         Chicago, IL 60604
                         (312) 408-5154
                         April_Metzler@ilnd.uscourts.gov
















**Proceedings recorded by mechanical stenography; transcript produced by notereading.**

**I N D E X**

DESCRIPTION                                                    PAGE

DANIEL BARTOLI, DIRECT EXAMINATION (Continued)                253
BY MR. AGUIAR

DANIEL BARTOLI, CROSS-EXAMINATION                             262
BY MR. GURA

DANIEL BARTOLI, REDIRECT EXAMINATION                          276
BY MR. AGUIAR

MR. GURA, CLOSING ARGUMENT                                    286

MR. WORSECK, CLOSING ARGUMENT                                 314

MR. GURA, FINAL ARGUMENT                                      350

|       |    |                                                                         |
|-------|----|-------------------------------------------------------------------------|
|          | 1  | (Resumed at 1:52 p.m.)                                               |
| 01:52:41 | 2  | THE COURT:  Okay.  All set?                                          |
| 01:52:42 | 3  | MR. AGUIAR:  Yes, I am, your Honor.                                  |
| 01:52:43 | 4  | THE COURT:  You may pick it up where you left off.                  |
| 01:52:45 | 5  | MR. AGUIAR:  Thank you.                                              |
| 01:52:45 | 6  | - - -                                                               |
| 01:52:45 | 7  | DANIEL BARTOLI, DIRECT EXAMINATION (Continued)                      |
| 01:52:45 | 8  | BY MR. AGUIAR:                                                       |
| 01:52:49 | 9  | Q.  Good afternoon, Sergeant Bartoli.                               |
| 01:52:50 | 10 | A.  Good afternoon.                                                  |
| 01:52:51 | 11 | Q.  Before the break we were discussing the property at 3333        |
| 01:52:56 | 12 | West 36th Street.  Do you recall our conversation?                  |
| 01:52:59 | 13 | A.  I do.                                                            |
| 01:52:59 | 14 | Q.  From hereinafter I'm going to refer to that property as         |
| 01:53:01 | 15 | the Accurate site.  That's been the common description we've        |
| 01:53:05 | 16 | been giving that in this case so far.  So I'm going to refer        |
| 01:53:07 | 17 | to it as the Accurate site from this point forward in our           |
| 01:53:11 | 18 | conversation this afternoon.                                         |
| 01:53:14 | 19 | You testified before the break that operation of a             |
| 01:53:17 | 20 | mobile range on the Accurate site would be a concern of public      |
| 01:53:21 | 21 | safety?                                                              |
| 01:53:21 | 22 | A.  Yes, I did.                                                      |
| 01:53:22 | 23 | Q.  And you listed your reasons for that, did you not?              |
| 01:53:24 | 24 | A.  I believe so, yes.                                               |
| 01:53:25 | 25 | Q.  Okay.  There has been deposition testimony in this case         |

01:53:28   1    from Larry Cohen of Accurate Perforating that there are

01:53:32   2    approximately eight functioning businesses on this site.

01:53:36   3          Does that fact change your opinion as to the

01:53:39   4    appropriateness of this location a mobile range?

01:53:42   5    A.  No, it does not.

01:53:43   6    Q.  Does it impact your opinion at all?

01:53:46   7    A.  It does.

01:53:47   8    Q.  How so?

01:53:48   9    A.  It actually raises more concern of people that are not

01:53:53   10   involved in your training coming and being bystanders,

01:53:57   11   inquisitive and interfering with the training that would go on

01:54:01   12   at a mobile -- at a range at that location.

01:54:03   13   Q.  There has also been evidence in this case from Larry Cohen

01:54:07   14   of Accurate Perforating that one of the businesses on this

01:54:11   15   site has approximately 100 employees.

01:54:14   16         Does that fact change your opinion as to the

01:54:16   17   appropriateness of the location for a mobile range?

01:54:19   18   A.  It would be the same.

01:54:19   19   Q.  The same?

01:54:20   20   A.  Yeah.

01:54:21   21   Q.  Okay.  There's also been evidence in this case from Larry

01:54:26   22   Cohen of Accurate Perforating that the gate to the property is

01:54:30   23   sometimes or rarely closed -- is sometimes not closed, excuse

01:54:34   24   me.  Does that fact change your opinion as to the

01:54:35   25   appropriateness of this location?

| | | |
|---|---|---|
| 01:54:37 | 1 | A. It does. |
| 01:54:38 | 2 | Q. How so? |
| 01:54:40 | 3 | A. Controlling your access to a range is extremely important. |
| 01:54:43 | 4 | Q. So what impact would the fact that this gate is not closed |
| 01:54:47 | 5 | have? |
| 01:54:48 | 6 | A. It would actually raise security concerns about who would |
| 01:54:52 | 7 | be coming to and from the property. |
| 01:54:56 | 8 | Q. Are you aware of another location that plaintiffs have |
| 01:55:00 | 9 | proposed for the mobile range is 6300 South Bell Street? |
| 01:55:04 | 10 | A. I am. |
| 01:55:04 | 11 | Q. Are you familiar with the property at 6300 South Bell |
| 01:55:06 | 12 | Street? |
| 01:55:06 | 13 | A. From an aerial photo, a map. |
| 01:55:08 | 14 | Q. So you are familiar with it? |
| 01:55:09 | 15 | A. Yes, I am. |
| 01:55:10 | 16 | Q. Any other way you're familiar with the property? |
| 01:55:12 | 17 | A. No, that's the only way. |
| 01:55:14 | 18 | Q. Okay. Do you know what Chicago neighborhood the property |
| 01:55:17 | 19 | is located in? |
| 01:55:17 | 20 | A. I'm sorry. Can you repeat that? |
| 01:55:18 | 21 | Q. Certainly. |
| 01:55:19 | 22 | Do you know what Chicago neighborhood the property is |
| 01:55:21 | 23 | located in? |
| 01:55:22 | 24 | A. I believe it's the 7th district. |
| 01:55:25 | 25 | Q. Okay. And what neighborhood is that in general, do you |

01:55:29  1  know?

01:55:29  2  A.  Englewood, if I'm not mistaken.

01:55:41  3  Q.  Would you please turn to Defendant's Exhibit 5?

01:55:48  4  A.  5?

01:55:50  5  Q.  Yes.

01:56:00  6  A.  Okay.

01:56:00  7  Q.  Do you recognize Defendant's Exhibit 5?

01:56:03  8  A.  That is the first time I've seen this one.

01:56:05  9  Q.  Okay.  I'll represent to you there's been testimony in

01:56:09  10  this case, this is the aerial map of 6300 South Bell Street.

01:56:15  11        Now, looking at the map and based on your experience

01:56:18  12  as a trainer and range master for the Chicago Police

01:56:21  13  Department, would the area in red on Defendant's Exhibit 5 be

01:56:25  14  an appropriate location for this mobile range?

01:56:28  15  A.  It would raise concern due to the residences across the

01:56:31  16  street.

01:56:31  17  Q.  Okay.  Any other reason why there would be a concern about

01:56:34  18  placing the mobile range on this site?

01:56:36  19  A.  I'd have to examine the area with the train cars behind

01:56:40  20  that red location, obviously -- apparently, to the south to

01:56:44  21  see the security of the area between the red box and the train

01:56:49  22  cars.

01:56:50  23  Q.  Okay.  Anything else about the neighborhood that would

01:56:54  24  cause a concern to you about putting a mobile range in the

01:56:56  25  area marked in red?

| | | |
|---|---|---|
| 01:56:58 | 1 | A.  I'm not exactly sure what all those vehicles are parked on |
| 01:57:01 | 2 | that location. |
| 01:57:02 | 3 | Q.  And what would -- |
| 01:57:03 | 4 | A.  Apparent vehicles. |
| 01:57:05 | 5 | Q.  And what about the vehicles parked in the location would |
| 01:57:08 | 6 | give you concern? |
| 01:57:10 | 7 | A.  I'd have to know what their function is there, and -- I'd |
| 01:57:15 | 8 | need to know what their function is there. |
| 01:57:19 | 9 | Q.  Is there anything else about this location that would give |
| 01:57:24 | 10 | you pause to allow a mobile range to operate on this area |
| 01:57:27 | 11 | located in red? |
| 01:57:29 | 12 | A.  Nothing that jumps out at me at this time. |
| 01:57:32 | 13 | Q.  Okay.  Sergeant Bartoli, in your role as an instructor of |
| 01:57:44 | 14 | firearms for the CPD, did you provide training to Chicago |
| 01:57:49 | 15 | Police Department recruits? |
| 01:57:50 | 16 | A.  I did. |
| 01:57:51 | 17 | Q.  Okay.  Are recruits required to be trained in the |
| 01:57:56 | 18 | classroom before using the firing range? |
| 01:57:58 | 19 | A.  They are. |
| 01:57:58 | 20 | Q.  And could you describe for me what that classroom |
| 01:58:03 | 21 | instruction is? |
| 01:58:03 | 22 | A.  Before recruits fire any live fire ammunition on a range, |
| 01:58:07 | 23 | they do approximately seventeen hours of classroom |
| 01:58:10 | 24 | instruction.  That includes all the fundamentals of shooting, |
| 01:58:14 | 25 | holster draw, loading, unloading techniques, malfunction |

01:58:18 1  clearing, basic range protocol, basic safety briefings, basic

01:58:24 2  protection, hearing protection, good range practices, good

01:58:29 3  firearms handling on and off duty.

01:58:32 4  Q.  Is there a reason -- strike that.

01:58:34 5          Do you know if there's a reason why the classroom

01:58:37 6  instruction precedes the use of the actual firing range?

01:58:43 7  A.    Yeah.  You have to teach people what they are going to do

01:58:45 8  before you ask them to demonstrate a skill.

01:58:54 9  Q.  Do you know whether there's a protocol in place for the

01:58:59 10 police department officers to remove residue after shooting at

01:59:05 11 a police department firing range?

01:59:08 12 A.  Yes, there is.

01:59:08 13 Q.  What is that protocol?

01:59:09 14 A.  To wash your hands with lucrative amounts of cold running

01:59:13 15 water and soap.

01:59:15 16 Q.  Okay.  In your experience as the range master with the

01:59:18 17 Chicago Police Department and as an instructor for the Chicago

01:59:21 18 Police Department, does the Chicago Police Department use any

01:59:23 19 kind of hand sanitizers or gels to remove lead contaminants

01:59:29 20 from the hands?

01:59:30 21 A.  We do not.

01:59:33 22 Q.  Do you know what facilities the officers use to remove the

01:59:36 23 lead from their hands?

01:59:38 24 A.  Washrooms, normal washrooms.

01:59:41 25 Q.  Are there washrooms at the Chicago Police Department

| | | |
|---|---|---|
| 01:59:44 | 1 | facilities? |
| 01:59:44 | 2 | A. Yes, there are. |
| 01:59:46 | 3 | Q. Okay. Do you know what the source of the water used to |
| 01:59:48 | 4 | remove the lead from the officer's hands is? |
| 01:59:50 | 5 | MR. GURA: Objection, relevance, 403 also, source of |
| 01:59:53 | 6 | the water and washroom. |
| 01:59:54 | 7 | THE COURT: Overruled. |
| 01:59:56 | 8 | THE WITNESS: City of Chicago water. |
| 01:59:59 | 9 | BY MR. AGUIAR: |
| 02:00:00 | 10 | Q. Okay. And have you used those facilities yourself to |
| 02:00:02 | 11 | remove lead from your hands after firing a gun? |
| 02:00:05 | 12 | A. Yes, I have. |
| 02:00:06 | 13 | Q. Based on your own use of these facilities, how would you |
| 02:00:11 | 14 | describe the intensity of the water flow that comes out of |
| 02:00:13 | 15 | those facilities? |
| 02:00:15 | 16 | A. The same as -- lucrative, flowing. |
| 02:00:23 | 17 | Q. So average use? |
| 02:00:24 | 18 | A. Average use, yeah -- yes. |
| 02:00:29 | 19 | Q. Based on your experience as a firearms instructor and the |
| 02:00:33 | 20 | CPD range master, is the intensity of water flow important to |
| 02:00:40 | 21 | the removal of lead from the hands? |
| 02:00:43 | 22 | MR. GURA: Objection, lacks foundation. This is |
| 02:00:45 | 23 | starting to become expert opinion. |
| 02:00:52 | 24 | THE COURT: Okay. It's odd. Sustained. It's not |
| 02:00:54 | 25 | helpful. |

| | | |
|---|---|---|
| 02:00:54 | 1 | MR. AGUIAR: Your Honor, the testimony is important, |
| 02:00:57 | 2 | because we're trying to establish here that without the proper |
| 02:01:02 | 3 | hand washing facilities members of the public could be harmed |
| 02:01:05 | 4 | by the use of -- |
| 02:01:06 | 5 | THE COURT: But he's not a chemist. He doesn't know |
| 02:01:09 | 6 | what force of water would dissolve residue on his hands. All |
| 02:01:13 | 7 | he knows is what he uses in his firing range, what he thinks |
| 02:01:17 | 8 | is effective in his firing range, and he's already testified |
| 02:01:20 | 9 | to that. |
| 02:01:21 | 10 | So now he's heading into 702 land where he's |
| 02:01:26 | 11 | testifying about whether or not a certain level of water |
| 02:01:29 | 12 | pressure is going to clean people's hands of the residue. I |
| 02:01:34 | 13 | get the point. It's been made. You can move on. |
| 02:01:43 | 14 | BY MR. AGUIAR: |
| 02:01:43 | 15 | Q. Sergeant Bartoli, in your lifetime, have you ever used a |
| 02:01:46 | 16 | port-a-potty? |
| 02:01:48 | 17 | MR. GURA: Objection, relevance. |
| 02:01:49 | 18 | THE COURT: Sustained. |
| 02:01:51 | 19 | MR. AGUIAR: Your Honor, what we're -- again, what we |
| 02:01:54 | 20 | are trying to establish here is that -- |
| 02:01:55 | 21 | THE COURT: I can't believe Sergeant Bartoli has |
| 02:01:57 | 22 | never used a port-a-potty, but you can try. Even Judge |
| 02:02:03 | 23 | Kendall has used a port-a-potty. |
| 02:02:04 | 24 | (Laughter.) |
| 02:02:05 | 25 | THE COURT: So -- |

02:02:05  1        MR. AGUIAR:  That's my point.  I have used one.  You

02:02:08  2   have used one.  Sergeant Bartoli is fully able to testify

02:02:11  3   under 701 as to his use of a port-a-potty and what he

02:02:16  4   perceives to be the water which comes out of those little hand

02:02:18  5   faucets.  He can lay 701 testimony on that.

02:02:20  6        THE COURT:  Sustained.  I get the point.  Move on.

02:02:30  7        MR. AGUIAR:  Your Honor, may I make a proffer at this

02:02:32  8   time?

02:02:32  9        THE COURT:  Yes, you may.

02:02:34  10        MR. AGUIAR:  Thank you.

02:02:34  11        If Sergeant Bartoli were permitted to testify in this

02:02:39  12   area, he would testify that the flow of water is critical to

02:02:43  13   the safe removal of all that -- contaminants that appear on

02:02:47  14   someone's hands after firing a firearm.  He would further

02:02:50  15   testify, based on his own use of port-a-potties and the hand

02:02:53  16   washing facilities that accompany them, that the water flow

02:02:56  17   that flows from those facilities is insufficient to properly

02:03:00  18   remove the lead residue which appears on someone's hands after

02:03:05  19   firing a firearm.

02:03:06  20        THE COURT:  Okay.  Move on.

02:03:07  21        What are you standing for?

02:03:09  22        MR. GURA:  Nothing, your Honor, nothing.

02:03:10  23        THE COURT:  You don't have an objection to his

02:03:13  24   proffer, do you?

02:03:13  25        MR. GURA:  Well, I think this calls for -- he can

| | | |
|---|---|---|
| 02:03:16 | 1 | proffer -- |
| 02:03:16 | 2 | THE COURT:  No, no, he can proffer for his record, |
| 02:03:18 | 3 | right, so he did. |
| 02:03:19 | 4 | MR. AGUIAR:  One moment, your Honor. |
| 02:03:25 | 5 | Nothing further at this time, your Honor. |
| 02:03:28 | 6 | THE COURT:  Okay.  Cross-examination? |
| 02:03:30 | 7 | MR. GURA:  Sure.  Thank you. |
| 02:03:30 | 8 | - - - |
| 02:03:30 | 9 | DANIEL BARTOLI, CROSS-EXAMINATION |
| 02:03:30 | 10 | BY MR. GURA: |
| 02:03:40 | 11 | Q.  Good afternoon, Sergeant Bartoli. |
| 02:03:42 | 12 | A.  Good afternoon. |
| 02:03:43 | 13 | Q.  Sergeant Bartoli, obviously, you're a police officer.  You |
| 02:03:46 | 14 | testified that you've been on patrol before. |
| 02:03:50 | 15 | Have you trained with firearms yourself as part of |
| 02:03:52 | 16 | being a police officer? |
| 02:03:53 | 17 | A.  I have. |
| 02:03:53 | 18 | Q.  Why do you train with firearms? |
| 02:03:57 | 19 | A.  In the event that I have to use them to protect my life or |
| 02:04:00 | 20 | someone else's life. |
| 02:04:01 | 21 | Q.  Is it fair then to say that if you don't train |
| 02:04:05 | 22 | sufficiently with firearms you may not be in a position to |
| 02:04:06 | 23 | adequately defend yourself or other people? |
| 02:04:09 | 24 | A.  Yes, it would be fair to say that. |
| 02:04:11 | 25 | Q.  And is it also fair to say that training also helps |

02:04:14  1   prevent accidents?

02:04:17  2   A.  Yes, it would be fair to say that.

02:04:18  3   Q.  Okay.  Is training -- strike that.

02:04:22  4        Is proficiency with firearms a perishable skill?

02:04:26  5   Is -- does the training have to be maintained at a certain

02:04:29  6   level?

02:04:30  7   A.  Yes, it does.

02:04:30  8   Q.  Okay.  And so -- and does it matter how much a person is

02:04:34  9   trained with a firearm?

02:04:36  10  A.  It depends on the person.

02:04:37  11  Q.  Okay.  But is there usually a correlation that -- it's

02:04:40  12  true that the more training a person has the safer they are

02:04:43  13  with firearms; is that a fair statement?

02:04:46  14        MR. AGUIAR:  Objection, your Honor.

02:04:47  15        THE COURT:  Basis?

02:04:47  16        MR. AGUIAR:  Are we talking about members of the CPD

02:04:49  17  training or members of the public?

02:04:51  18        THE COURT:  So is it a foundation objection?

02:04:53  19        MR. AGUIAR:  It's a vague ambiguous foundation.

02:04:55  20        THE COURT:  Okay.  Sustained.

02:04:59  21  BY MR. GURA:

02:05:00  22  Q.  If a police officer hypothetically would train for one

02:05:05  23  hour every three years with his or her firearm, would that

02:05:09  24  officer be less or more safe than an officer who trains one

02:05:14  25  hour every year?

| | |
|---|---|
| 02:05:14 | 1 |
| 02:05:16 | 2 |
| 02:05:20 | 3 |
| 02:05:24 | 4 |
| 02:05:27 | 5 |
| 02:05:31 | 6 |
| 02:05:37 | 7 |
| 02:05:40 | 8 |
| 02:05:44 | 9 |
| 02:05:49 | 10 |
| 02:05:52 | 11 |
| 02:05:55 | 12 |
| 02:05:59 | 13 |
| 02:06:01 | 14 |
| 02:06:04 | 15 |
| 02:06:05 | 16 |
| 02:06:05 | 17 |
| 02:06:09 | 18 |
| 02:06:11 | 19 |
| 02:06:15 | 20 |
| 02:06:15 | 21 |
| 02:06:16 | 22 |
| 02:06:17 | 23 |
| 02:06:18 | 24 |
| 02:06:22 | 25 |

MR. AGUIAR:  Objection, speculation.

THE COURT:  Okay.  Well, you did proffer him -- you are all in this land of 702.  First of all, he's a firearms expert.  Do you agree that he's a firearms expert?  I mean, you have him testifying about whether his beliefs of safe training and everything else was outside the realm of the average individual.  Then, of course, you went into the whether or not water can wash off the residue from the hands. But now he's cross-examining him on those conclusions that he's just testified to, which, to me, is fair game.

So if we are going to stand up now and say, Everything is speculation, after he's come to conclusions about what a safe officer needs to do within the firing range, we are going to have a very long cross-examination here.

MR. AGUIAR:  Your Honor, I'll withdraw the objection.

THE COURT:  Okay.

MR. GURA:  Thank you, your Honor.

THE WITNESS:  I'm apologetic, but you're going to have to reread that question.  I'm sorry about that.

BY MR. GURA:

Q.  Sure.

If a police officer trains for one hour -- hypothetically, if a police officer trains for one hour every three years, and then there's another police officer who only trains -- well, who trains for one hour every year, as opposed

| | | |
|---|---|---|
| 02:06:25 | 1 | to every three years, could you say, generally speaking, that |
| 02:06:29 | 2 | the officer who trains more frequently is going to be safer |
| 02:06:34 | 3 | with the firearm? |
| 02:06:38 | 4 | A.  That depends on the person, but that's a fair statement. |
| 02:06:40 | 5 | Q.  And do you suppose that this increased safety with |
| 02:06:43 | 6 | increased training is a principle that works with human beings |
| 02:06:48 | 7 | in general, or does it work only for police officers? |
| 02:06:51 | 8 | A.  Human beings in general. |
| 02:06:53 | 9 | Q.  Okay.  Now, when you go out as a police officer and you |
| 02:06:58 | 10 | interact with the public, it's fair to say, is it not, that on |
| 02:07:04 | 11 | occasion you may interact with individuals who have firearms; |
| 02:07:08 | 12 | is that correct?  You might meet people, homeowners who |
| 02:07:12 | 13 | have -- |
| 02:07:12 | 14 | A.  Oh, yes. |
| 02:07:15 | 15 | Q.  Would you prefer that these individuals are well-trained |
| 02:07:20 | 16 | in the use of firearms, or would you prefer that they be |
| 02:07:23 | 17 | not -- |
| 02:07:23 | 18 | MR. AGUIAR:  Objection, your Honor, foundation. |
| 02:07:24 | 19 | THE COURT:  Yes, that's sustained.  It's really not |
| 02:07:28 | 20 | relevant what he prefers. |
| 02:07:29 | 21 | MR. GURA:  Okay. |
| 02:07:33 | 22 | BY MR. GURA: |
| 02:07:34 | 23 | Q.  Is it important for officer safety in the City of Chicago |
| 02:07:37 | 24 | that members of the public who have guns are trained in the |
| 02:07:41 | 25 | use of those guns and know how to use them safely? |

02:07:44  1    MR. AGUIAR:  Objection, relevance, your Honor.

02:07:48  2    THE COURT:  I think it's outside the scope of what

02:07:51  3  his testimony is.  So that's sustained.  It may be relevant to

02:07:57  4  your argument.

02:07:58  5    MR. GURA:  Sure.  Well, I think it's a fair point.  I

02:08:02  6  can move on.

02:08:03  7    THE COURT:  Well, you all think everything is

02:08:05  8  relevant.  It's just whether it comes from this person on the

02:08:07  9  stand.

02:08:08  10    MR. GURA:  Sure, sure.

02:08:08  11    THE COURT:  So that's been our issue the entire

02:08:10  12  preliminary hearing.

02:08:11  13    MR. GURA:  Well -- I really want to advance this

02:08:15  14  quickly, so I'll try to move on as quickly as I can, your

02:08:18  15  Honor, and not argue forever on these things.

02:08:21  16    Let's just clean up the record a bit here, Officer.

02:08:23  17  BY MR. GURA:

02:08:24  18  Q.  You testified that there is a police firearms range in

02:08:27  19  every one of the area headquarters, as well as the training

02:08:30  20  academy; is that correct?

02:08:31  21  A.  Correct.

02:08:31  22  Q.  Okay.  And just for the record, it's true that the Area 1

02:08:35  23  range exists at 5101 South Wentworth?

02:08:39  24  A.  Correct.

02:08:39  25  Q.  How many lanes exist?  How many shooting positions are at

| | | |
|---|---|---|
| 02:08:42 | 1 | that location? |
| 02:08:43 | 2 | A. Five. |
| 02:08:45 | 3 | Q. And it's true then that the Area 2 range is located at |
| 02:08:49 | 4 | 727 East 111th? |
| 02:08:53 | 5 | A. I -- yes, I would assume that's the address, yes. |
| 02:08:56 | 6 | Q. And how many lanes are there -- |
| 02:08:58 | 7 | A. Five also. |
| 02:08:59 | 8 | Q. Five. |
| 02:08:59 | 9 | And Area 3, the Area 3 range, is that located at |
| 02:09:05 | 10 | 2452 West Belmont? |
| 02:09:06 | 11 | A. Yes. |
| 02:09:06 | 12 | Q. And how many lanes are there? |
| 02:09:08 | 13 | A. Five. |
| 02:09:10 | 14 | Q. The Area 4 headquarters range, is that located at |
| 02:09:14 | 15 | 3151 West Harrison? |
| 02:09:15 | 16 | A. Yes. |
| 02:09:15 | 17 | Q. And how many lanes are there? |
| 02:09:17 | 18 | A. Five. |
| 02:09:20 | 19 | Q. How about the Area 5 headquarters on 5555 West Grand, is |
| 02:09:27 | 20 | that where the range exists for Area 5? |
| 02:09:30 | 21 | A. Yes. |
| 02:09:31 | 22 | Q. And how many lanes are there? |
| 02:09:32 | 23 | A. Five. |
| 02:09:33 | 24 | Q. And finally at the training academy at 1300 West Jackson, |
| 02:09:38 | 25 | there's a gun range there as well, right? |

| | | |
|---|---|---|
| 02:09:41 | 1 | A.  Yes. |
| 02:09:41 | 2 | Q.  Okay.  And how many lanes exist there? |
| 02:09:42 | 3 | A.  There's two ranges, ten lanes each. |
| 02:09:45 | 4 | Q.  Two ranges at ten lanes each. |
| 02:09:49 | 5 | So you've testified there are, I guess, twenty lanes |
| 02:09:53 | 6 | at the West Jackson.  And then, I guess, a total of 45 lanes |
| 02:09:59 | 7 | total that the Chicago Police Department has for its officers |
| 02:10:02 | 8 | to train at, correct, if we have five each in Areas 1 through |
| 02:10:09 | 9 | 5 -- |
| 02:10:09 | 10 | A.  Yes. |
| 02:10:09 | 11 | Q.  -- that's 25? |
| 02:10:10 | 12 | A.  Yes. |
| 02:10:11 | 13 | Q.  Okay.  Is this a sufficient number of lanes to train and |
| 02:10:18 | 14 | keep qualified the Chicago police force? |
| 02:10:22 | 15 | A.  I believe no. |
| 02:10:24 | 16 | Q.  And, in fact, the Chicago police have been looking at |
| 02:10:28 | 17 | adding range capacity recently; is that correct? |
| 02:10:30 | 18 | MR. AGUIAR:  Your Honor, outside the scope of the |
| 02:10:32 | 19 | direct. |
| 02:10:32 | 20 | MR. GURA:  Oh, this goes to -- |
| 02:10:34 | 21 | THE COURT:  Overruled. |
| 02:10:37 | 22 | THE WITNESS:  Yes. |
| 02:10:40 | 23 | BY MR. GURA: |
| 02:10:40 | 24 | Q.  How many more lanes do the Chicago police require for its |
| 02:10:46 | 25 | 13,500 officers? |

| | |
|---|---|
| 02:10:48 | 1 |

A.  It would all depend on how much you wanted to train.

Q.  To train them adequately.  I mean, you're the range master.

A.  That's a very difficult question to answer.  I mean ...

Q.  To train them safely, to make sure that they're safe and they know how to use the firearms efficiently and effectively.

A.  I mean, obviously, I'm the range master of the Chicago Police Department, and I want more lanes.  But I would be hard-pressed to answer that question to come up with a figure off the top of my head.  I mean, that would be, I personally believe, irresponsible.  I mean ...

          MR. GURA:  Okay.

          THE COURT:  How about this question:  Do you ever have officers who cannot get trained within the period of time that they are required to be trained?  Because don't they need to have training periodically, in order to stay capable of carrying a firearm, or is that not accurate?

          THE WITNESS:  Yes.  We attempt to train 5,000 officers a year --

          THE COURT:  Okay.

          THE WITNESS:  -- which is about one-third of our department.

          THE COURT:  Okay.  And is there ever a difficulty in getting that done so far?

          THE WITNESS:  Yes.

02:11:48  1    THE COURT:  Okay.  And then do they go longer periods

02:11:52  2  of time before they get their training done?

02:11:54  3    THE WITNESS:  We tend to just start over and hope

02:11:57  4  that we get the people the next year around.

02:11:59  5    THE COURT:  Okay.

02:12:01  6  BY MR. GURA:

02:12:02  7  Q.  To follow up --

02:12:03  8  A.  Sorry.

02:12:04  9  Q.  -- on the Court's questions, is public safety or officer

02:12:08  10  safety endangered by the fact that you're unable to train

02:12:13  11  everyone that you would like to train --

02:12:15  12  A.  I don't believe endangered.

02:12:17  13  Q.  Okay.  Is officer safety hurt by the fact that you cannot

02:12:21  14  train all the officers with your existing range facilities?

02:12:24  15  A.  I don't believe hurt.

02:12:25  16  Q.  Okay.  Is it diminished in any way?

02:12:28  17  A.  You can always be enhanced.  I do not believe it's

02:12:32  18  diminished.

02:12:32  19  Q.  Okay.  Is it where you would like for it to be?

02:12:34  20  A.  Oh, no, I'd like for people to train more, but ...

02:12:38  21  Q.  And why is that?

02:12:39  22  A.  Because the better training you get, the more safer the

02:12:44  23  officer is.

02:12:45  24  Q.  Okay.  Let's go back to these locations of these various

02:12:49  25  ranges that the city police department operates.

| | | |
|---|---|---|
| 02:12:49 | 1 | Do these ranges impact the existing neighborhoods in |
| 02:12:59 | 2 | which they are located in any negative way? |
| 02:13:00 | 3 | A.  I don't believe they do. |
| 02:13:04 | 4 | Q.  Now, as far as civilian training for people seeking a |
| 02:13:08 | 5 | Chicago Firearms Permit is concerned, is it just anybody who |
| 02:13:12 | 6 | can provide the training, or is there a requirement under the |
| 02:13:15 | 7 | law as to who can provide the training? |
| 02:13:17 | 8 | A.  I'm pretty sure there's a requirement. |
| 02:13:19 | 9 | Q.  And what's that requirement? |
| 02:13:20 | 10 | A.  It's a certified firearms instructor, but I don't exactly |
| 02:13:24 | 11 | recall who certifies -- |
| 02:13:25 | 12 | Q.  Certified by whom, you don't recall? |
| 02:13:27 | 13 | A.  It's a state certified, but I don't recall who. |
| 02:13:30 | 14 | Q.  Are you aware of what is required to become a state |
| 02:13:33 | 15 | certified instructor in Illinois? |
| 02:13:36 | 16 | A.  I know -- I'm aware of what certifies you as a law |
| 02:13:41 | 17 | enforcement firearms instructor in the State of Illinois. |
| 02:13:43 | 18 | Q.  Okay.  And what is that? |
| 02:13:44 | 19 | A.  You have to take a 40-hour firearms instructor course. |
| 02:13:50 | 20 | Q.  Okay.  And who provides that certification? |
| 02:13:50 | 21 | A.  There's different entities that have their lesson plans on |
| 02:13:54 | 22 | file with the Illinois Law Enforcement Training Boards and |
| 02:13:57 | 23 | Standards that can administer that 40-hour course. |
| 02:13:59 | 24 | Q.  Okay.  And, in fact, isn't it true that a person has to |
| 02:14:03 | 25 | apply to be a police officer, essentially, in order to take |

| | | |
|---|---|---|
| 02:14:08 | 1 | that course, as a trainer, as a police trainer? |
| 02:14:11 | 2 | A. That's Chicago Police Department standard procedure, yes. |
| 02:14:14 | 3 | Q. I'm talking about the State of Illinois. |
| 02:14:19 | 4 | In order to become a State of Illinois certified |
| 02:14:23 | 5 | firearms trainer, what do you have to do? What qualifies you |
| 02:14:24 | 6 | to even apply for that course? |
| 02:14:26 | 7 | MR. AGUIAR: Objection, foundation. |
| 02:14:27 | 8 | THE COURT: Yes, sustained. I don't know if he has |
| 02:14:29 | 9 | that understanding. |
| 02:14:30 | 10 | You can explore it, if you want. |
| 02:14:30 | 11 | MR. GURA: Okay. |
| 02:14:32 | 12 | THE COURT: Find out whether he can lay it, but I |
| 02:14:35 | 13 | don't know. |
| 02:14:35 | 14 | MR. GURA: Sure. |
| 02:14:37 | 15 | BY MR. GURA: |
| 02:14:37 | 16 | Q. If -- it's your understanding, though, you've testified at |
| 02:14:40 | 17 | least that in order to sign off on a CFP training certificate |
| 02:14:45 | 18 | for a civilian in Chicago, one has to be a state certified |
| 02:14:48 | 19 | instructor, correct? |
| 02:14:49 | 20 | A. I believe so, yes. |
| 02:14:51 | 21 | Q. Okay. Do you have any reason to believe that state |
| 02:14:54 | 22 | certified instructors would be reckless or not careful in the |
| 02:14:59 | 23 | way that they provide the training? |
| 02:15:00 | 24 | MR. AGUIAR: Objection, foundation. |
| 02:15:01 | 25 | THE COURT: Sustained. |

| | | |
|---|---|---|
| 02:15:05 | 1 | BY MR. GURA: |
| 02:15:05 | 2 | Q.  Do you believe that the state certification has value?  Do |
| 02:15:09 | 3 | you think that it actually achieves its purpose of qualifying |
| 02:15:14 | 4 | adequate instructors? |
| 02:15:15 | 5 | MR. AGUIAR:  Objection, foundation and relevance. |
| 02:15:16 | 6 | THE COURT:  It's sustained on relevance grounds. |
| 02:15:20 | 7 | MR. GURA:  Okay. |
| 02:15:21 | 8 | BY MR. GURA: |
| 02:15:22 | 9 | Q.  What does it take to become a firearms instructor for the |
| 02:15:25 | 10 | City of Chicago Police Department? |
| 02:15:26 | 11 | A.  You have to be certified by either Chicago Police |
| 02:15:29 | 12 | Department, the FBI, or NEMT. |
| 02:15:35 | 13 | THE COURT:  What's NEMT? |
| 02:15:37 | 14 | THE WITNESS:  Northeast Mobile Training unit -- I'd |
| 02:15:40 | 15 | have to write the acronym down. |
| 02:15:42 | 16 | THE COURT:  That's fine. |
| 02:15:43 | 17 | BY MR. GURA: |
| 02:15:44 | 18 | Q.  The Northeast Mobile Training unit? |
| 02:15:44 | 19 | A.  NEMT, yes, Northeast Mobile Training unit.  It's a law |
| 02:15:45 | 20 | enforcement training unit. |
| 02:15:46 | 21 | Q.  And how does that function? |
| 02:15:48 | 22 | A.  It's basically the northern half of the state's law |
| 02:15:54 | 23 | enforcement trainer for firearms and tactics and use of force |
| 02:15:57 | 24 | and carbines and rifles. |
| 02:16:10 | 25 | Q.  You are aware that the State of Illinois certifies |

| | | |
|---|---|---|
| 02:16:13 | 1 | firearms instructors, correct? |
| 02:16:14 | 2 | A. Yes. |
| 02:16:17 | 3 | Q. And you're aware that the City of Chicago requires that |
| 02:16:19 | 4 | certification in order to properly train Chicago civilians -- |
| 02:16:25 | 5 | A. Yes. |
| 02:16:25 | 6 | Q. -- for the -- okay. |
| 02:16:28 | 7 | Do you have any reason to believe that that |
| 02:16:30 | 8 | certification for the instructors is inadequate? |
| 02:16:33 | 9 | MR. AGUIAR: Objection, foundation. |
| 02:16:35 | 10 | THE COURT: Sustained. |
| 02:16:35 | 11 | MR. GURA: I asked him if he had any reason to |
| 02:16:43 | 12 | believe. |
| 02:16:43 | 13 | THE COURT: Is there a question pending? |
| 02:16:44 | 14 | MR. GURA: Yes, your Honor. I asked him if he had |
| 02:16:46 | 15 | any reason to believe that there was something wrong with that |
| 02:16:49 | 16 | instruction. |
| 02:16:49 | 17 | THE COURT: It's not relevant. Sustained. |
| 02:16:52 | 18 | MR. GURA: Okay. |
| 02:16:56 | 19 | THE COURT: His opinion about other training just is |
| 02:17:00 | 20 | not relevant. |
| 02:17:01 | 21 | MR. GURA: Okay. |
| 02:17:06 | 22 | BY MR. GURA: |
| 02:17:07 | 23 | Q. Do you have experience with state certified instructors? |
| 02:17:11 | 24 | A. Certified through who, sir? |
| 02:17:13 | 25 | Q. The State of Illinois. |

02:17:15  1        People who are certified by the State of Illinois,

02:17:17  2  the people who are required to train civilians in Chicago.

02:17:20  3  A.  No.

02:17:20  4        MR. AGUIAR:  Objection on relevance.

02:17:22  5        THE COURT:  Okay.  Can I just look at that one again?

02:17:28  6        MR. GURA:  I want to know if he is experienced with

02:17:30  7  the people who would be doing the training.  He testified a

02:17:33  8  lot about the protocols --

02:17:34  9        THE COURT:  Within your work or within his?

02:17:36  10        MR. GURA:  Well, within our work because he testified

02:17:38  11  about our work.

02:17:38  12        THE COURT:  Okay.  All right.  I'll give him some

02:17:40  13  leeway.  Overruled.

02:17:42  14  BY MR. GURA:

02:17:43  15  Q.  Are you familiar with the kind of training conducted by

02:17:46  16  state certified instructors?

02:17:49  17  A.  For civilians, sir?

02:17:50  18  Q.  Yes.

02:17:51  19  A.  No.

02:17:53  20  Q.  Are you familiar with how they might run their course?

02:17:57  21        MR. AGUIAR:  Objection, foundation.

02:17:58  22        THE COURT:  It's asked and answered.  Sustained.

02:18:02  23        MR. GURA:  Okay.  All right.

02:18:12  24        Let me just go over my notes.

02:18:18  25        One moment, your Honor?

02:18:25    1           THE COURT:  Okay.

02:18:25    2           MR. AGUIAR:  One moment, your Honor -- oh, I thought

02:18:28    3   he was done.  I'm sorry.

02:18:32    4           MR. GURA:  Nothing further.  Thanks.

02:18:34    5           THE COURT:  Okay.  Redirect?

02:18:44    6           (No response.)

02:18:44    7           THE COURT:  Maybe too many cooks in the kitchen over

02:18:46    8   there, huh?

02:18:47    9           MR. AGUIAR:  We decide by committee.

02:18:50   10           THE COURT:  Okay.

02:18:51   11                            - - -

02:18:51   12           DANIEL BARTOLI, REDIRECT EXAMINATION

02:18:51   13   BY MR. AGUIAR:

02:18:52   14   Q.  Officer Bartoli, you were talking about the Chicago Police

02:18:56   15   Department training with Mr. Gura a moment ago.

02:18:59   16           Can you describe what that training entails?

02:19:04   17   A.  Every police officer starts with an -- 80 hours of

02:19:07   18   firearms training as a recruit.  Then they go to qualifying

02:19:13   19   once a year with their proscribed weapon minimally.  Then any

02:19:17   20   weapon they decide to carry on the street, they need to

02:19:20   21   qualify with once a year.  And then we attempt to train at

02:19:23   22   least one-third of our department every year in some sort of

02:19:26   23   in-service continuing education firearms training.

02:19:29   24   Q.  Okay.  Let's start with the 80 hours of training.  That's

02:19:33   25   what every recruit gets at the Chicago Police Academy?

| | |
|---|---|
| 02:19:36 | 1 |
| 02:19:37 | 2 |
| 02:19:40 | 3 |
| 02:19:44 | 4 |
| 02:19:47 | 5 |
| 02:19:51 | 6 |
| 02:19:55 | 7 |
| 02:20:02 | 8 |
| 02:20:11 | 9 |
| 02:20:14 | 10 |
| 02:20:15 | 11 |
| 02:20:18 | 12 |
| 02:20:21 | 13 |
| 02:20:26 | 14 |
| 02:20:31 | 15 |
| 02:20:33 | 16 |
| 02:20:36 | 17 |
| 02:20:38 | 18 |
| 02:20:41 | 19 |
| 02:20:46 | 20 |
| 02:20:50 | 21 |
| 02:20:52 | 22 |
| 02:20:58 | 23 |
| 02:21:05 | 24 |
| 02:21:05 | 25 |

A.   Yes.

Q.   Could you break down how that 80 hours is spent?

A.   The first 40 hours prepares the recruit in safe firearms handling and goes all the way to the state certified firearms course that they have to pass with the 70 percent or more. During that time they go over all the malfunction clearing, safe weapon handling, holster draw, reloading techniques, and basic good firearms practices.

Q.   Do the recruits do any kind of drills during this 80 hours of training?

A.   Yes.   After they pass the state-mandated firearms course, they go into more tactical training where they actually do moving and shooting, verbal commands, multiple targets, shooting from behind barricade, shooting with flashlights, low-light shooting, similar to what most law enforcement officers would have to perform on the street in defense of their life or someone else's life.

Q.   Is there any part of that 80 hours which involves learning how to use, like, the use-of-force instruction?

A.   Use in force is taught throughout the academy in almost all parts of our curriculum, including firearms.

Q.   Okay.   You mentioned also that each officer must qualify once he or she used -- any weapon he or she may use in the field; is that correct?

A.   Correct.

| | | |
|---|---|---|
| 02:21:06 | 1 | Q. How does one qualify to use a particular weapon with the |
| 02:21:10 | 2 | Chicago Police Department? |
| 02:21:11 | 3 | A. They would come into an Area range. They would receive a |
| 02:21:14 | 4 | videotape on certain amount of training that is being |
| 02:21:18 | 5 | conducted that year. Last year I believe it was weapon locks |
| 02:21:23 | 6 | and keeping your firearms safe from young children. And then |
| 02:21:27 | 7 | they would shoot a minimum 30-round course and score 70 |
| 02:21:32 | 8 | percent or above on that. |
| 02:21:33 | 9 | Q. Okay. And that's for all CPD officers? |
| 02:21:36 | 10 | A. Yes, all sworn CPD officers. |
| 02:21:38 | 11 | Q. Okay. And I think last you talked about every year you |
| 02:21:43 | 12 | try to train one-third of the police force; is that correct? |
| 02:21:47 | 13 | A. Correct. |
| 02:21:48 | 14 | Q. That's about 5,000 members, you said? |
| 02:21:50 | 15 | A. Approximately. |
| 02:21:50 | 16 | Q. Okay. What does that training involve? |
| 02:21:52 | 17 | A. It depends on the year, but in years past we've trained |
| 02:21:56 | 18 | with flashlights. We've trained barricades. We've trained |
| 02:22:00 | 19 | close-quarter combat. We've instituted talking, verbal |
| 02:22:05 | 20 | commands, target discrimination, shoot/no-shoot scenarios. |
| 02:22:13 | 21 | Q. And it's different every year? |
| 02:22:15 | 22 | A. Yes, generally it's different every year. |
| 02:22:17 | 23 | Q. Who selects what curriculum will be taught during that |
| 02:22:22 | 24 | training session? |
| 02:22:22 | 25 | A. It starts with the range master and then it's presented to |

02:22:25  1   the ADS of the education training division.

02:22:29  2           MR. AGUIAR:  Okay.  Nothing further, your Honor.

02:22:32  3           THE COURT:  The committee wasn't giving you any

02:22:34  4   feedback there.

02:22:35  5           MR. AGUIAR:  I know.

02:22:36  6           THE COURT:  All right.  Anything else, Mr. Gura?

02:22:38  7           MR. GURA:  No, your Honor.

02:22:39  8           THE COURT:  All right.  Sir, you can step down then.

02:22:41  9   Thank you.

02:22:42  10          THE WITNESS:  Thank you, your Honor.

02:22:44  11          (Witness leaves the stand.)

02:22:44  12          THE COURT:  All right.  Anything else from you, the

02:22:46  13  City?

02:22:47  14          MR. AGUIAR:  Your Honor, Mr. Forti would like to

02:22:49  15  address a couple housekeeping matters.

02:22:50  16          THE COURT:  Okay.

02:22:51  17          MR. FORTI:  Your Honor, I think we've concluded our

02:22:53  18  case in chief.  I just wanted to follow up on the admission of

02:22:56  19  the exhibits.

02:22:57  20          THE COURT:  Okay.  Please do that.

02:22:59  21          MR. FORTI:  So that we can resolve -- I believe per

02:23:01  22  your instruction we gave -- the City gave you three notebooks

02:23:05  23  all of which are -- just contain multiple copies of the same

02:23:09  24  documents.

02:23:10  25          We are asking to move a total of 22 exhibits in, some

02:23:14  1   of which have already been admitted.

02:23:16  2          THE COURT:  Okay.  Which are the three -- or wait.

02:23:20  3   No, 31 is what I have.

02:23:21  4          Which are the ones you're not moving in, it would

02:23:24  5   probably be better.

02:23:26  6          MR. FORTI:  Exactly.

02:23:26  7          We're asking to admit all exhibits except for the

02:23:30  8   following nine, which are numbers:  8, 8 is out; 9 is out; 10;

02:23:36  9   11; 12; 13; 14 all out; 17 is out; and 22 is out.  That -- I

02:23:48  10  believe, that's nine and with simple math that leaves us with

02:23:52  11  then moving to admit all 22.

02:23:56  12         THE COURT:  Okay.  And is there any objection to

02:23:58  13  those?

02:23:58  14         MR. GURA:  Your Honor, we only object to exhibit

02:24:00  15  number 7.

02:24:00  16         THE COURT:  Okay.

02:24:01  17         MR. GURA:  That's the only one we object to, and I

02:24:03  18  would like to be heard on that --

02:24:05  19         THE COURT:  Okay.  Go ahead.

02:24:06  20         MR. GURA:  -- briefly, though.

02:24:07  21         THE COURT:  Okay.

02:24:10  22         MR. FORTI:  Would you like my comments afterwards,

02:24:14  23  Judge?  These are the selected excerpts from the testimony of

02:24:19  24  the committee on police and fire.

02:24:20  25         THE COURT:  Okay.  Okay.  Mr. Gura, didn't you quote

| | | |
|---|---|---|
| 02:24:21 | 1 | from them. |
| 02:24:22 | 2 | MR. GURA: We quoted from our own excerpts. |
| 02:24:24 | 3 | THE COURT: Oh, I see. |
| 02:24:25 | 4 | MR. GURA: And the difference between our excerpts |
| 02:24:27 | 5 | and their excerpts is that our excerpts relate to gun ranges |
| 02:24:29 | 6 | and training. |
| 02:24:29 | 7 | THE COURT: Okay. |
| 02:24:30 | 8 | MR. GURA: And their excerpts do not, which is why we |
| 02:24:32 | 9 | are objecting to them. |
| 02:24:33 | 10 | THE COURT: Okay. |
| 02:24:33 | 11 | MR. GURA: They have absolutely nothing to do with |
| 02:24:36 | 12 | anything in this case. There's a lot of -- the standard |
| 02:24:38 | 13 | antigun bias and hysteria in here about guns are bad and they |
| 02:24:43 | 14 | cause crime and mayors don't like them and handguns are bad |
| 02:24:46 | 15 | and McDonald is wrong. |
| 02:24:47 | 16 | But there's absolutely nothing here about gun ranges |
| 02:24:50 | 17 | or training, so it's not relevant. That's our objection. |
| 02:24:52 | 18 | That's all I have to say about -- |
| 02:24:54 | 19 | THE COURT: Well, I didn't see guns are bad. I did |
| 02:24:56 | 20 | see things like 98 percent of firearms homicides involved |
| 02:25:01 | 21 | handguns. I did see reasons for banning gun dealers in the |
| 02:25:07 | 22 | city. I did see percentages regarding purchasing a permit |
| 02:25:16 | 23 | before finding a handgun, tracing handguns. |
| 02:25:26 | 24 | I'm assuming -- well, let me hear from you, |
| 02:25:28 | 25 | Mr. Forti, give me your -- |

02:25:29    1          MR. FORTI:  Your Honor, apart from the disparaging

02:25:32    2   comment about hysteria, we'll leave that aside.  Most of the

02:25:35    3   sections that we cite overall talk about the importance of an

02:25:39    4   overall licensing scheme.

02:25:40    5          And if we sort of go back to the big picture here,

02:25:43    6   the training requirement, which is sort of at the root of this

02:25:46    7   litigation, is just one part of that licensing scheme.  So

02:25:50    8   that I think is certainly relevant.

02:25:51    9          We talk about the dangers of open carrying of

02:25:55   10   weapons, based on the relief requested by the plaintiffs.

02:25:58   11   That comes into play.

02:25:59   12          We talk about the risks of loss and theft, due to

02:26:02   13   weapons generally, and the problems of guns outside of the

02:26:06   14   home.  I think the ban on the prohibition on gun dealers in

02:26:10   15   many ways can be analogized to the ban on gun ranges.

02:26:14   16          So long story short, I certainly think it's as

02:26:17   17   relevant, maybe not as favorable, to the plaintiff, but it's

02:26:19   18   as relevant as the sections they are requesting inclusion of.

02:26:22   19          THE COURT:  Okay.  Short reply, Mr. Gura?  Anything?

02:26:25   20          MR. GURA:  Short reply, we don't contest licensing.

02:26:27   21   We don't contest the training requirement even.  And, in fact,

02:26:33   22   the only thing that we object it -- everything we object to is

02:26:36   23   related directly to the operation of a gun range and that's

02:26:40   24   it.

02:26:40   25          So all these other things -- there's discussion in

| | | |
|---|---|---|
| 02:26:43 | 1 | there about assault weapons, all these other things, they are |
| 02:26:46 | 2 | just not part of this case, your Honor, and so we don't think |
| 02:26:50 | 3 | it's relevant, but ... |
| 02:26:52 | 4 | THE COURT: Okay. I am going to admit them, over |
| 02:26:54 | 5 | your objection. |
| 02:26:55 | 6 | And that leaves us all of the exhibits except 8, |
| 02:27:01 | 7 | 9, 10, 11, 12, 13, 14, 17, and 22 of Defendants is admitted. |
| 02:27:06 | 8 | And how about yours then for the plaintiffs? |
| 02:27:09 | 9 | MR. GURA: Let me have a moment? I'm not sure we |
| 02:27:12 | 10 | used all of them. To the extent we did, maybe we can ... |
| 02:27:32 | 11 | Well, we would move for the admission of our |
| 02:27:36 | 12 | Exhibits 1 through, I believe we have, 6, with the excerpts |
| 02:27:45 | 13 | from the City Council hearing that we've designated, as well |
| 02:27:50 | 14 | as, of course, the designated deposition testimony that we've |
| 02:27:54 | 15 | submitted from five depositions. And we have, of course, no |
| 02:27:56 | 16 | objection to the City's deposition designations as well that |
| 02:28:00 | 17 | Mr. Forti has not yet mentioned but -- |
| 02:28:02 | 18 | THE COURT: Okay. |
| 02:28:02 | 19 | MR. GURA: -- we, of course, have no objection to it. |
| 02:28:04 | 20 | THE COURT: All right. Any objection to these? |
| 02:28:06 | 21 | MR. AGUIAR: No, your Honor. But I think Mr. Gura |
| 02:28:08 | 22 | also would like, I'm guessing, to include the declarations -- |
| 02:28:15 | 23 | I believe he has -- |
| 02:28:15 | 24 | MR. GURA: Oh, yes. Thank you so much. |
| 02:28:16 | 25 | THE COURT: He's got three: Mr. Hespen, Tilbor, and |

02:28:21  1   Queen.

02:28:21  2          MR. GURA:  Yes.  And we believe the declarations --

02:28:23  3   they have already been filed with various other papers and

02:28:25  4   they're on the record, so they're in one way or the other.

02:28:28  5          THE COURT:  All right.  So those will be admitted as

02:28:30  6   well.

02:28:30  7          MR. GURA:  Thank you, your Honor.

02:28:30  8          MR. FORTI:  Just for our sake, Judge, could Mr. Gura

02:28:33  9   just tell us what the total number is, we'll guess --

02:28:36  10         THE COURT:  I have fifteen; is that correct?

02:28:39  11         MR. FORTI:  I don't know.

02:28:40  12         MR. GURA:  That sounds correct to me.  We have --

02:28:42  13         THE COURT:  I have the Blue Line service agreement,

02:28:44  14  the Accurate Perforating building lease, the lease

02:28:48  15  termination, the land lease, the map of 36th Street, those

02:28:52  16  three declarations you just mentioned, the City of Chicago

02:28:57  17  committee on police and fire report, a different one, I

02:29:00  18  assume, and then the deposition testimony of Ezell, Tilbor,

02:29:03  19  Hespen, Brown, Cohen, and Rush.

02:29:06  20         MR. FORTI:  Where I differ, Judge -- I'm sorry,

02:29:09  21  Mr. Gura -- where I differ is I believe they've advised us

02:29:11  22  that there were going to be five declarations --

02:29:13  23         THE COURT:  Oh, I don't --

02:29:14  24         MR. GURA:  We have five, in fact, and did submit

02:29:17  25  five.  There are declarations from Ezell, Brown, Hespen,

| | | |
|---|---|---|
| 02:29:20 | 1 | Tilbor, and Queen, all of which have been filed in previous |
| 02:29:23 | 2 | other stages of this case. |
| 02:29:26 | 3 | MR. FORTI: Which doesn't do much for us here, but |
| 02:29:29 | 4 | that's a different story. |
| 02:29:32 | 5 | MR. GURA: We submit those again. |
| 02:29:34 | 6 | THE COURT: So we'd have to add to my list the |
| 02:29:37 | 7 | declaration that was previously filed by Ezell and Brown, and |
| 02:29:43 | 8 | then I think I would have five. |
| 02:29:45 | 9 | MR. FORTI: That's my count, so I think then -- |
| 02:29:48 | 10 | THE COURT: So I'm at 17. |
| 02:29:49 | 11 | MR. FORTI: So am I. |
| 02:29:50 | 12 | THE COURT: Okay. |
| 02:29:50 | 13 | MR. GURA: Ezell, Brown, Hespen, Tilbor, Queen. |
| 02:29:53 | 14 | THE COURT: Okay. So that'll be your seventeen |
| 02:29:58 | 15 | exhibits. |
| 02:29:58 | 16 | MR. FORTI: Thank you. |
| 02:29:58 | 17 | MR. GURA: Thank you, your Honor. |
| 02:29:58 | 18 | THE COURT: All right. Anything else from the City? |
| 02:30:00 | 19 | MR. FORTI: No, your Honor. |
| 02:30:01 | 20 | THE COURT: Okay. So are we ready to do a little |
| 02:30:04 | 21 | summation? |
| 02:30:05 | 22 | MR. GURA: Yes, your Honor. |
| 02:30:05 | 23 | THE COURT: Do you need five minutes to regroup, or |
| 02:30:07 | 24 | are you all set? |
| 02:30:09 | 25 | MR. GURA: It's up to the Court, your Honor. |

| | | |
|---|---|---|
| 02:30:10 | 1 | THE COURT:  If you're ready to go, you can go. |
| 02:30:12 | 2 | MR. GURA:  I'm ready to go, sure. |
| 02:30:14 | 3 | THE COURT:  Okay. |
| 02:30:15 | 4 | - - - |
| 02:30:16 | 5 | MR. GURA, CLOSING ARGUMENT |
| 02:30:16 | 6 | MR. GURA:  I will try to make it a little summation. |
| 02:30:26 | 7 | I believe the Court has been very indulgent and patient with |
| 02:30:29 | 8 | both sides and -- |
| 02:30:30 | 9 | THE COURT:  It's no problem. |
| 02:30:31 | 10 | MR. GURA:  -- spent, I think, a good amount of time |
| 02:30:35 | 11 | with the case. |
| 02:30:39 | 12 | THE COURT:  It's an interesting case. |
| 02:30:41 | 13 | MR. GURA:  I'm glad we can -- I speak for both |
| 02:30:44 | 14 | parties.  I'm sure the lawyers are always happy to present |
| 02:30:47 | 15 | interesting cases to the Court, and we know that judges don't |
| 02:30:49 | 16 | get to necessarily pick their cases that get filed, so ... |
| 02:30:52 | 17 | THE COURT:  All right.  Go ahead. |
| 02:30:53 | 18 | MR. GURA:  All right.  First of all, I would like to |
| 02:30:56 | 19 | address a couple preliminary matters that the City has raised |
| 02:31:02 | 20 | in some of its opposition.  I think to some extent I think the |
| 02:31:06 | 21 | City might be misconstruing the complaint itself. |
| 02:31:09 | 22 | We have here an action on behalf of three |
| 02:31:12 | 23 | individuals, two membership organizations, as well as a |
| 02:31:15 | 24 | company which is in the business of constructing ranges.  And |
| 02:31:19 | 25 | there's a great deal of argument about how, Well, these |

02:31:23　1　specific individuals, Ezell, Brown, and Hespen, either have or

02:31:27　2　can without too much effort, according to the City, go ahead

02:31:32　3　and -- and go get themselves trained and get their CFPs.

02:31:37　4　　　I think that sort of misses the point of the

02:31:40　5　complaint to a large extent.  The complaint, in paragraphs 5

02:31:46　6　and 6, note that ISRA and SAF, the Illinois State Rifle

02:31:50　7　Association and Second Amendment Foundation, are membership

02:31:52　8　organizations who we're suing on behalf of themselves and

02:31:55　9　their members.

02:31:56　10　　　In paragraph 36 of the complaint we speak about how

02:31:58　11　they have members in Chicago who were impacted by the law.

02:32:01　12　Paragraph 37 they state that they expend resources in dealing

02:32:06　13　with these laws as they are contacted and as part of their

02:32:10　14　mission they provide guidance with how to deal with some of

02:32:15　15　these types of laws.

02:32:16　16　　　And, of course, paragraphs 38 and 39, they again

02:32:19　17　recite in the complaint that their members are impacted.

02:32:22　18　　　There is absolutely no question --

02:32:25　19　　　THE COURT:  But isn't that the whole point, that if

02:32:28　20　Ezell, Brown, and Hespen, as representative members, are not

02:32:31　21　impacted in that they can go to someplace else, it isn't a

02:32:37　22　superfluous issue, but, rather, the issue about whether you

02:32:41　23　are having an impact on your membership.

02:32:43　24　　　MR. GURA:  Well, the issue is this --

02:32:44　25　　　THE COURT:  An adverse impact, of course.

02:32:46　1　　　　　MR. GURA:  Well, first of all, we believe that part

02:32:48　2　of the harm, as I'll get to, is that being told to go

02:32:50　3　somewhere else to do it is part of the harm.  The imposition

02:32:53　4　of the cost, of being told to travel, the fact that you are

02:32:57　5　prevented from accessing ranges that are close to you, it

02:33:01　6　necessarily makes access to training more expensive and it

02:33:08　7　tends to make it less available to people.

02:33:14　8　　　　　But more the point while one or two or three

02:33:18　9　individuals, you can always pick someone -- you can always

02:33:20　10　pick the trees in the forest and yet miss the entire

02:33:24　11　topography.  And, that is, that there are about 2.8 million

02:33:29　12　people in the City of Chicago.  Some of them are going to want

02:33:32　13　to exercise the right to keep and bear arms.  And the police

02:33:36　14　believe, Jody Weiss has testified --

02:33:40　15　　　　　THE COURT:  Weiss.

02:33:41　16　　　　　MR. GURA:  Weiss, sorry.

02:33:44　17　　　　　You know, I think in many ways he might have been our

02:33:47　18　best witness in that hearing, that they expect 300,000 people

02:33:50　19　would take advantage of this law.  Yet if we do the math, it's

02:33:54　20　very clear that people -- even the police department struggles

02:33:57　21　with its range capacity that we just learned more about, and

02:34:00　22　it's not a mystery that the individual members of the public,

02:34:05　23　given the fact that they are forbidden from doing any training

02:34:09　24　within the entire City of Chicago, which is a fairly large

02:34:11　25　city, obviously, it does impact adversely their access to

02:34:15  1   range training.

02:34:17  2        As a matter of law, what I would like to point out

02:34:20  3   very briefly, of course, is -- as the Court knows, it is not a

02:34:24  4   controversial principle that organizations can, in fact, sue

02:34:28  5   to vindicate the rights of their members.  And I think we have

02:34:32  6   representational standing here, quite easily, under Warth v.

02:34:37  7   Seldin, and all the other well-established cases in the civil

02:34:40  8   rights field.

02:34:41  9        Of course, we also have organizational harm in the

02:34:46  10  sense that these are groups that deal with the gun control

02:34:49  11  laws and they do expend their energy and time in trying to

02:34:53  12  counsel people and help their members and members of the

02:34:56  13  public and navigate these laws.

02:35:00  14        And under the well-established organizational

02:35:02  15  standing cases, I think that these -- these organizations can

02:35:09  16  proceed as well.  And that's something that the City hasn't

02:35:11  17  quite exactly briefed necessarily, but I think it's worth

02:35:14  18  mentioning, since they have mentioned it as well, and

02:35:17  19  depending on what argument we hear from them, I may go into

02:35:19  20  this at greater length.

02:35:21  21        Having said that, let's just go quickly, as quickly

02:35:24  22  as I can, through the various aspects of the preliminary

02:35:28  23  injunctive motion that we need to establish.

02:35:29  24        First of all, let's talk about success on the merits.

02:35:32  25  I think it's important to note at the outset that contrary to

| | |
|---|---|
| 02:35:35 | 1 |
| 02:35:39 | 2 |
| 02:35:44 | 3 |
| 02:35:47 | 4 |
| 02:35:50 | 5 |
| 02:35:54 | 6 |
| 02:35:56 | 7 |
| 02:35:59 | 8 |

1  what the City has said, the Second Amendment secures far more

2  than the right simply to have a gun in the home, to quote the

3  Seventh Circuit in U.S. versus Skoien.  Quote, the Second

4  Amendment creates individual rights, one of which is keeping

5  operable handguns at home for self defense.  What other

6  entitlements the Second Amendment creates and what regulations

7  legislation may establish were left open, referencing the

8  Heller case.

9       Now, we would take issue with the idea that the

10  Second Amendment creates rights as opposed to codifies or

11  secures rights that were thought to be preexistent.  That's

12  really not important, though, because the bottom line is, is

13  that the Seventh Circuit recognizes what I think a lot of

14  people recognize, including the dissenters in Heller and

15  McDonald themselves, which is that it's not simply limited to

16  what you are doing inside the home.

17       McDonald, for example, spoke of the Second Amendment

18  applying, quote, Most notably for self defense within the

19  home.

20       And, again, while that is true, Heller said, quote,

21  That the home is, quote, Where the need for defense of self,

22  family, and property is most acute, and I don't think we would

23  necessarily argue with that, nonetheless, the idea that the

24  Second Amendment is cabined uniquely within the home is simply

25  not supported by the Seventh Circuit precedent.  It's not

| | |
|---|---|
| 02:36:52 | 1 |
| 02:36:54 | 2 |
| 02:36:58 | 3 |
| 02:37:02 | 4 |
| 02:37:06 | 5 |
| 02:37:10 | 6 |
| 02:37:14 | 7 |

supported by the Supreme Court precedent.

In fact, the Supreme Court advised perhaps not surprisingly that -- and here I'm quoting Heller, Americans die with the ancient right for self defense and hunting.  And McDonald told us that, quote, The seller's dependence on game for food and economic livelihood moreover undergirded the state constitutional guarantees of the same right.

So, of course, hunting is not something that occurs within the home.  At least the things that we hunt inside the home, usually we don't do that with firearms.

So it's fairly obvious that the Second Amendment applies outside the home.  And if it applies outside the home, the most obvious place that it would apply would be within a gun range.  As long as there have been guns, people would obviously want to go out and use them somewhere, and a place you use a gun is use it at a gun range.  If you're not actually engaged in hunting or self defense.

And that's why the Heller Court itself observed in elucidating some of the sources that illustrate the right. Heller observed that people -- a citizen who practices in safe places the use of a gun is exercising the right.  And even, again, the dissenters in Heller recognize that recreation and other lawful purposes were recognized.

So I think that we start from a fairly well-established idea that gun ranges practicing the use of

| | | |
|---|---|---|
| 02:38:17 | 1 | one's firearm at a range is Second Amendment protected |
| 02:38:21 | 2 | activity. |
| 02:38:21 | 3 | We believe our first argument is that's really where |
| 02:38:25 | 4 | the case ends.  Because once you have a right that's |
| 02:38:29 | 5 | established and you have a clear prohibition on the right, |
| 02:38:32 | 6 | there's really not much else for the Court to do, which is, of |
| 02:38:35 | 7 | course, the motive analysis that the Supreme Court itself used |
| 02:38:37 | 8 | in Heller to deal with the functional firearms ban. |
| 02:38:40 | 9 | Of course, there are cases that use so-called |
| 02:38:45 | 10 | standards of review.  And those are helpful to Courts, and |
| 02:38:48 | 11 | they do apply in some Second Amendment cases, just like they |
| 02:38:51 | 12 | apply in some, although not all, First Amendment cases, some, |
| 02:38:55 | 13 | although not all, Fourth Amendment cases. |
| 02:38:57 | 14 | If the Court were to look at this as a level of |
| 02:39:00 | 15 | review case, then I still think that we have absolute success |
| 02:39:05 | 16 | on the merits, because regardless of which level of review you |
| 02:39:10 | 17 | utilize, the City cannot possibly meet its burden. |
| 02:39:14 | 18 | I will say very little about rational basis.  I |
| 02:39:17 | 19 | believe the argument that rational basis applies is frivolous |
| 02:39:21 | 20 | at this point.  The Supreme Court has clearly rejected it. |
| 02:39:23 | 21 | We have some Courts now speaking of strict scrutiny |
| 02:39:27 | 22 | and some Courts applying, at least on occasion, intermediate |
| 02:39:31 | 23 | scrutiny. |
| 02:39:31 | 24 | Now, the Seventh Circuit has applied intermediate |
| 02:39:34 | 25 | scrutiny -- |

| | | |
|---|---|---|
| 02:39:35 | 1 | THE COURT:  In what -- but you have to be specific |
| 02:39:36 | 2 | there. |
| 02:39:36 | 3 | MR. GURA:  Sure. |
| 02:39:36 | 4 | THE COURT:  In what types of instances are you saying |
| 02:39:39 | 5 | some Courts are speaking of strict and some are speaking of |
| 02:39:42 | 6 | intermediate? |
| 02:39:43 | 7 | MR. GURA:  Strict scrutiny is applied when Courts |
| 02:39:47 | 8 | focus on the fact that the Supreme Court has repeatedly said |
| 02:39:50 | 9 | that the right is a fundamental right.  In fact, that was the |
| 02:39:52 | 10 | big import of the McDonald case that was just decided.  And |
| 02:39:56 | 11 | it's very well established that fundamental rights are |
| 02:39:59 | 12 | entitled to strict scrutiny.  That is not the end of all gun |
| 02:40:02 | 13 | laws, because very frequently the Government will have a very |
| 02:40:06 | 14 | compelling interest in enacting the gun laws. |
| 02:40:08 | 15 | And, in fact, in Heller there were certain categories |
| 02:40:11 | 16 | of laws that were recognized to be presumptively lawful.  And |
| 02:40:19 | 17 | it's not important whether they're presumptively lawful |
| 02:40:21 | 18 | because they are traditionally outside the scope of the right, |
| 02:40:24 | 19 | or whether they are presumptively lawful simply because it's |
| 02:40:28 | 20 | so well-established that the State has such a powerful |
| 02:40:30 | 21 | interest in, for example, keeping guns out of the hands of |
| 02:40:34 | 22 | criminals or insane people. |
| 02:40:35 | 23 | But however we look at that language, the fact is |
| 02:40:39 | 24 | that the right to keep and bear arms has been identified by |
| 02:40:41 | 25 | the Court as fundamental.  What the Seventh Circuit has done |

| | |
|---|---|
| 02:40:46 | 1 |
| 02:40:51 | 2 |
| 02:40:53 | 3 |
| 02:40:59 | 4 |
| 02:41:00 | 5 |

1  is they have left open the idea that strict scrutiny might

2  apply in other cases.  But in the cases that they have

3  received, they applied intermediate scrutiny, based upon the

4  fact that all the cases they have dealt with so far have been

5  within these presumptive lawful exceptions of Heller.

6          For example, a ban on felons having guns, a ban on

7  violent domestic misdemeanants having guns, a ban on drug

8  abusers having guns, all of those were intermediate scrutiny

9  cases in the Seventh Circuit.

10          The Seventh Circuit did state twice in passing that

11  other cases might have different levels of review applied.

12  And, specifically, those cases referenced overbreadth-type

13  analysis for crimes that may not be super violent.

14          Well, overbreadth is a form of strict scrutiny.  It

15  requires that there not be a lesser, stricter alternative and

16  that the law be narrowly tailored.

17          It really is difficult to imagine that the Seventh

18  Circuit would say that criminals and lunatics and drug abusers

19  are entitled to the protection of intermediate scrutiny, when

20  it comes to firearms, but law abiding people who, have done

21  nothing wrong, are entitled to less protection.

22          I think that actually what the Seventh Circuit was

23  saying was the opposite, that even if we take criminals and

24  drug abusers and felons and lunatics and we say, Well, that's

25  presumptively lawful, we'll apply intermediate scrutiny, the

02:42:18  1    fact is that for law abiding people something else might be

02:42:21  2    reserved.

02:42:22  3         But in any event, even if we have intermediate

02:42:24  4    scrutiny, even if we have intermediate scrutiny, this is where

02:42:25  5    the City's defense completely falls apart.  The record

02:42:31  6    indicates now -- and, again, our Exhibit 6, I think, is

02:42:35  7    conclusive on this, and I think Ms. Scudiero's testimony is

02:42:38  8    now conclusive on this -- the record indicates that the City

02:42:43  9    never identified any interest that it had in banning gun

02:42:48  10   ranges.  It never analyzed the impact of banning gun ranges.

02:42:52  11   It never considered the matter.  It never studied the matter.

02:42:55  12   It made no findings on the matter.

02:42:58  13        This was a complete afterthought.  We have very

02:43:00  14   little in the record -- and although the exhibit that we

02:43:03  15   challenged recently contained a great deal of material about

02:43:06  16   assault weapons and other things that have no bearing on the

02:43:09  17   case, it's a little odd that we are the ones in the position

02:43:13  18   of introducing the City Council's testimony and the hearing

02:43:17  19   report on the issue at the heart of this case, which is gun

02:43:20  20   ranges.

02:43:20  21        And so we begin on our Exhibit 6, page 47, at line

02:43:31  22   21, where Alderman Dowell is asking Corporation Counsel Mara

02:43:36  23   Georges:  Okay.  And then my second question is you mentioned

02:43:38  24   that would be prohibited in the City of Chicago to have a gun

02:43:41  25   dealership.  What about shooting range facilities?  Could

02:43:44 1 people come into Chicago and construct those kinds of

02:43:46 2 facilities?

02:43:47 3 And here the corporation counsel answers, that what

02:43:50 4 she was trying to get across was, quote, That they could,

02:43:53 5 quote, Limit what we allow to operate in our city, however is

02:43:57 6 reasonable as decided by the City Council.

02:43:59 7 I submit that that's the rational basis test in

02:44:05 8 operation, that is not accurate. But, in any event, it's also

02:44:07 9 not a very detailed answer. The corporation counsel simply

02:44:11 10 said, You can do what you want.

02:44:14 11 When she was pressed about this down the page,

02:44:16 12 beginning on page 48, line 22. She stated: And there are

02:44:21 13 certainly very stringent zoning requirements that need to be

02:44:24 14 met and things such as that. So, you know, there is

02:44:26 15 regulation that can be done.

02:44:28 16 And, again, we don't contest that regulation can be

02:44:31 17 done. We don't contest that zoning can be done. The problem

02:44:34 18 is that it wasn't done. Nothing was done, and nobody asked

02:44:38 19 Patty Scudiero whether -- for any opinion on this. She never

02:44:41 20 studied it. She never thought about it. There's no evidence

02:44:45 21 in the record that City Council thought about it.

02:44:46 22 And when the findings were made, which are contained

02:44:49 23 in Defendant's Exhibit 4, it says that training is very

02:44:52 24 important for public safety, but it says absolutely nothing

02:44:55 25 about the banning of shooting ranges.

02:44:57  1      So we are in a position now where this is essentially

02:44:59  2  an afterthought, and we have a lot of arguments from counsel

02:45:02  3  that are speculative and imaginary where they are trying to

02:45:05  4  conjure post hoc some problem with gun ranges, which we all

02:45:10  5  know exist throughout the United States in a variety of

02:45:14  6  settings.  The testimony on that has been very clear.

02:45:15  7      And I cannot stress this enough, your Honor --

02:45:17  8      THE COURT:  Not problems exist, but that gun ranges

02:45:19  9  exist.

02:45:19  10     MR. GURA:  That gun ranges exist, that's right.

02:45:20  11     THE COURT:  So the wording choice there --

02:45:23  12     MR. GURA:  Sure.

02:45:23  13     But there is no -- we have no problem with the idea

02:45:28  14 of the City regulating gun ranges.  This is not a case where

02:45:32  15 we are claiming to be above the authority of the City Council.

02:45:35  16 There are things that the City Council can do, and should the

02:45:38  17 City Council do those things, we may not come back.

02:45:41  18     I mean, it's hard to speculate on a law that hasn't

02:45:44  19 been passed.  But we do know what they did pass, because the

02:45:47  20 statute that we're challenging is very self-evident on its

02:45:50  21 face.  And as Ms. Scudiero testified, everything is banned

02:45:53  22 which is not permitted.  In this case the zoning laws in

02:45:58  23 addition to the explicit range ban ban all ranges.

02:46:04  24     That takes us into Playtime Theaters versus City of

02:46:06  25 Renton.  Here, we have the use of zoning and other tools to

| | | |
|---|---|---|
| 02:46:09 | 1 | prohibit entirely something which must be allowed to function |
| 02:46:15 | 2 | somewhere as a matter of constitutional right.  So we think |
| 02:46:20 | 3 | the City has absolutely no defense here. |
| 02:46:23 | 4 | In the brief that the City filed, they then try to |
| 02:46:26 | 5 | come up with the reasons that the City Council didn't bother |
| 02:46:28 | 6 | coming up with.  For example, we're told that gun ranges must |
| 02:46:32 | 7 | be banned because it's important to limit the impact of the |
| 02:46:36 | 8 | proliferation of firearms.  Well, that's really an argument |
| 02:46:41 | 9 | with Heller itself.  There's no doubt that firearms are |
| 02:46:48 | 10 | protected by the Second Amendment.  That's been established. |
| 02:46:50 | 11 | I know not everybody likes that, not everybody agrees with |
| 02:46:53 | 12 | that, but it's there. |
| 02:46:54 | 13 | And so there's a constitutional judgment that the |
| 02:46:57 | 14 | proliferation of firearms is a good thing.  It's something |
| 02:47:00 | 15 | we've chosen to elevate in our Bill of Rights and something |
| 02:47:03 | 16 | that we've protected.  The City thinks that the Second |
| 02:47:06 | 17 | Amendment is a bad idea or maybe Heller and McDonald were |
| 02:47:09 | 18 | wrong.  We get that. |
| 02:47:10 | 19 | But the bottom line is that limiting the negative |
| 02:47:15 | 20 | impact of an exercise of a constitutional right is really not |
| 02:47:16 | 21 | an excuse to ban the entire right whatsoever.  And, in fact, |
| 02:47:21 | 22 | we then get other sub-ideas in the brief, Well, we have to |
| 02:47:26 | 23 | limit the illegal transfer of guns, we have to limit gun |
| 02:47:29 | 24 | trafficking, we have to limit theft.  We agree with that. |
| 02:47:33 | 25 | Those are all bad things. |

02:47:35  1    They want to limit carrying guns, which while we
02:47:38  2  think carrying is a constitutionally protected activity, it's
02:47:41  3  neither here nor there, because we're not asking for the right
02:47:44  4  to carry guns.  We're not asking for the right to carry loaded
02:47:47  5  guns in public for self defense; that would be a very
02:47:50  6  different lawsuit.  We are simply asking for the right to
02:47:53  7  transport a gun to a gun range where it, on the range, can be
02:47:54  8  used and then, in compliance with city law, taken home.
02:47:58  9    So these -- you know, carrying is not an issue, and
02:48:00  10  the other things, there's no link between gun trafficking and
02:48:04  11  gun ranges.  There's no link between illegal transfers of guns
02:48:07  12  and gun ranges.  There's no link between theft and gun ranges.
02:48:11  13  And, of course, it's terrible if people would steal firearms,
02:48:14  14  but the fact is that if -- you have the right to go to a
02:48:19  15  firearm range and if, lo and behold as -- you have the right
02:48:23  16  to do many things in life.
02:48:24  17    You have the right to walk down the street.  There's
02:48:28  18  a risk of you might get mugged.  That's a very negative
02:48:31  19  consequence of walking down the street, but it doesn't mean we
02:48:31  20  can ban walking down the street.
02:48:31  21    Likewise with firearms ranges.  You have the right to
02:48:33  22  go to one.  You -- it increases public safety to use one, to
02:48:37  23  train in one, and it can't be banned simply because a crime
02:48:41  24  might occur that's tangentially related --
02:48:42  25    THE COURT:  But the facts that I've heard, over the

02:48:44  1   course of the last two days, are that the people aren't going

02:48:49  2   to be bringing their guns to the firing range.  According to

02:48:52  3   the way the firing range is set up, right?  That he's going to

02:48:56  4   have --

02:48:56  5          MR. GURA:  That's right.

02:48:57  6          THE COURT:  -- his few weapons that you shoot from,

02:48:59  7   and so you don't bring your own weapon to be -- to the firing

02:49:03  8   range, according to --

02:49:04  9          MR. GURA:  The remedy that we're proposing would not

02:49:07  10  involve people bringing their own guns.  So this kind of

02:49:11  11  concern, even if it were a valid concern, is not valid to the

02:49:15  12  way that we are going to try to address the relief here.  And,

02:49:18  13  of course -- so I would agree with the Court.

02:49:19  14          But beyond that, of course, there is the statement,

02:49:24  15  very clear statement from McDonald recently, which is that

02:49:27  16  social cost arguments are simply not relevant to the

02:49:31  17  determination of whether something is protected as a

02:49:34  18  constitutional right.

02:49:35  19          That -- the Supreme Court went on at length to

02:49:39  20  explain that every right in the Bill of Rights has certain

02:49:43  21  social costs, if we respect -- for example, the Fourth

02:49:47  22  Amendment has a severe social cost, in terms of impeding the

02:49:52  23  police's ability to detect crime and catch criminals.  There

02:49:55  24  are people who go free because, they, you know, perhaps

02:49:58  25  weren't Mirandized properly, perhaps a search was not

02:50:03  1   conducted properly.

02:50:03  2        So we realize there are always costs and perhaps

02:50:07  3   consequences to limiting the ability of the government to act

02:50:09  4   in certain ways.  All the same, we have chosen to live in a

02:50:15  5   country where the government is limited in certain was.  Some

02:50:15  6   of those are listed out, and one of those items on the list is

02:50:19  7   the Second Amendment.

02:50:19  8        And so the idea that, Well, there's a social cost and

02:50:23  9   we're -- at this locality and we can simply ban something

02:50:26  10  because we have determined that it's too expensive to deal

02:50:30  11  with it is not really a constitutional argument.  That is,

02:50:32  12  perhaps, an argument for for or against ratifying the Second

02:50:36  13  Amendment, but it's not an argument to deal with something

02:50:38  14  that's already in our Bill of Rights.

02:50:40  15       And, finally, at least with gun ranges, we know that

02:50:44  16  this state has come to a very opposite conclusion in the city.

02:50:48  17  We've cited repeatedly the case of <u>Miller versus Civil</u>

02:50:53  18  <u>Constructors</u>, 272 Ill.App.3d 263, where the Appellate Courts

02:50:59  19  in Illinois have held quite clearly that gun ranges are not

02:51:02  20  ultrahazardous, they are beneficial to society, and without

02:51:07  21  more the fact that someone has a range is not going to be a

02:51:11  22  problem in society.

02:51:12  23       So I think that we have established that not only is

02:51:16  24  the use of a gun at a range constitutionally protected

02:51:21  25  activity, but there is absolutely no link whatsoever between

02:51:24 1  any interest that the government might have simply because,

02:51:28 2  for starters, they have not even identified any harm and they

02:51:33 3  have not identified any link to the harm under any level of

02:51:36 4  review.

02:51:36 5         So what's the irreparable harm here?  Well, we have

02:51:40 6  several flavors of irreparable harm, all of which I think are

02:51:43 7  serious.  First, as I noted a little bit earlier this morning,

02:51:47 8  money damages are not going to be sufficient to deal with

02:51:52 9  someone who has lost their right of self defense.

02:51:54 10        When someone is deprived of the right of self

02:51:59 11 defense, that means that they are vulnerable.  Their families

02:52:02 12 are vulnerable.  Their home is vulnerable.  Ms. Ezell

02:52:05 13 testified that she felt very vulnerable obviously with her

02:52:10 14 three burglaries, at least one of which, as I recall, she was

02:52:14 15 home for.  So we have --

02:52:15 16        THE COURT:  But that's assuming that they cannot at

02:52:18 17 all get certified.

02:52:19 18        MR. GURA:  It's assuming two things.  One, your

02:52:22 19 Honor's correct, they cannot get certified because there's

02:52:25 20 been discouragement in the form of additional costs,

02:52:28 21 additional expense in getting the certification.  The second

02:52:32 22 harm is even if they have been certified, the fact that they

02:52:35 23 are deprived of the ability to train on a regular basis is

02:52:41 24 itself a harm.  Because what do we know from the

02:52:44 25 superintendent's testimony, from Sergeant Bartoli's testimony,

02:52:47  1  and from just plain common sense?  Training is a perishable

02:52:51  2  skill.  The more you do it, the better you are, the safer you

02:52:54  3  are.

02:52:54  4          THE COURT:  But they could go to one of the fourteen

02:52:56  5  shops and train every day if they wanted to.

02:52:59  6          MR. GURA:  But it's harder to go every day to one of

02:53:01  7  the fourteen shops if you have to drive extra long, put more

02:53:06  8  gas in the car and deal with it because it's farther away.

02:53:09  9          THE COURT:  But isn't that the money damages issue

02:53:11  10 then?

02:53:11  11         MR. GURA:  No.  Because if you are deprived of --

02:53:14  12 suppose you have your gun and you're not able to go train with

02:53:17  13 it as much as you would like.  You're discouraged from

02:53:20  14 training because there's traffic and there's expense, so you

02:53:22  15 simply don't do it as much.  And then one day an accident

02:53:26  16 occurs or somebody breaks into the home and the person can't

02:53:30  17 use the gun as effectively as they otherwise would for lack of

02:53:33  18 proficiency and for lack of training, money damages are not

02:53:37  19 going to be an adequate remedy for bringing back somebody's

02:53:40  20 life or for undoing the cost.  The real impact --

02:53:42  21         THE COURT:  Oh, but now you're framing the issue

02:53:44  22 differently.  Now, you're saying essentially that you have a

02:53:47  23 Second Amendment right to be trained to be a proficient

02:53:51  24 shooter in your home, as opposed to simply possess a weapon in

02:53:55  25 your home.

| | | |
|---|---|---|
| 02:53:57 | 1 | MR. GURA: Oh, absolutely. In fact, the -- we've |
| 02:53:57 | 2 | always said that -- well, there's -- well, there are two |
| 02:54:00 | 3 | things we've identified. |
| 02:54:01 | 4 | Number 1, yes, you have the right to actually have |
| 02:54:04 | 5 | the gun in the house and for that training is required, and so |
| 02:54:07 | 6 | hampering training is irreparable harm. |
| 02:54:09 | 7 | The second aspect of the harm is also -- as the |
| 02:54:12 | 8 | Heller court recognized in striking down the storage |
| 02:54:17 | 9 | requirements in the District of Columbia, the so-called |
| 02:54:20 | 10 | functional firearms ban, they recognized that these onerous |
| 02:54:25 | 11 | provisions with the way the District of Columbia required that |
| 02:54:28 | 12 | people deal with firearms hampered the ability of people to |
| 02:54:32 | 13 | use those guns in self defense. Recall -- |
| 02:54:35 | 14 | THE COURT: But in order to make that argument, |
| 02:54:37 | 15 | aren't you essentially saying then that -- you're almost |
| 02:54:41 | 16 | taking a position that would say, I can only possess if I am |
| 02:54:48 | 17 | trained, as opposed to -- I can't believe that your -- |
| 02:54:51 | 18 | MR. GURA: No. |
| 02:54:51 | 19 | THE COURT: -- constituency wouldn't want you to take |
| 02:54:54 | 20 | a position that says, We want to possess regardless of how |
| 02:54:58 | 21 | good a shot we are, regardless of how much we're trained. We |
| 02:55:02 | 22 | want to be able to possess the weapon under the Second |
| 02:55:04 | 23 | Amendment, right? |
| 02:55:04 | 24 | MR. GURA: That is true. But beyond wanting to |
| 02:55:07 | 25 | possess the weapon is a desire to be able to use it |

02:55:10  1  effectively.  The possession is the first step.  If you have

02:55:15  2  the gun, then you're, you know, a good part of the way of

02:55:18  3  where you need to be.  Because obviously without a gun you're

02:55:21  4  far more defenseless.

02:55:23  5       But once you have the gun, it is an aspect of the

02:55:27  6  Second Amendment right, and the right is rooted in self

02:55:30  7  defense and self preservation, that you can use it

02:55:32  8  effectively.  And what we know from Heller is that laws that

02:55:35  9  hamper the ability of a person to use the gun in a safe and

02:55:38  10  effective manner violate the Second Amendment.

02:55:41  11       Remember, in Heller there was the handgun ban, which

02:55:44  12  a lot of the media focused on and certainly that's an

02:55:46  13  interesting issue.  But the other aspect of Heller was the

02:55:48  14  functional firearms ban.  Washington, D.C. allowed people to

02:55:52  15  have rifles and shotguns, but they never allowed them to keep

02:55:55  16  them in an operative state.

02:55:57  17       The -- what they claimed was a safe storage law was a

02:56:01  18  law that was so onerous that the Supreme Court decided that it

02:56:06  19  actually interfered with people's ability to use the guns that

02:56:10  20  they were already permitted to have in the way that the Second

02:56:13  21  Amendment intended them to be used.  And so that's why that

02:56:16  22  law was struck down.

02:56:17  23       And so it's not simply --

02:56:18  24       THE COURT:  So if you compare those harms, you have

02:56:21  25  to parallel to what the irreparable injury was there versus

02:56:27  1    the harm that you have, which is your firearms owners must go

02:56:33  2    outside of Chicago to train for an hour.

02:56:36  3            MR. GURA:  The harm is that people should be able to

02:56:42  4    maintain their proficiency and their skill with their firearm.

02:56:47  5    And we've had testimony as to that from all the individual

02:56:50  6    plaintiffs, that they want to be able to practice on a regular

02:56:52  7    basis and making them drive will reduce the opportunity for

02:56:56  8    doing that.

02:56:57  9            And it's not -- I don't think that it's a hard --

02:56:57  10   strike that.

02:57:10  11           It's sort of an obvious concept to Courts oftentimes

02:57:14  12   that when a burden is placed upon the exercise of a

02:57:17  13   constitutional right, if the government makes that exercise

02:57:20  14   more expensive and more burdensome or more costly, then that

02:57:24  15   right is being violated.  And, of course, the leading case on

02:57:26  16   that is Grosjean versus American Press, which I cited briefly

02:57:31  17   this morning, 297 U.S. 233, the classic First Amendment case

02:57:36  18   about what happens when the state decides to impose a tax, a

02:57:41  19   nominal tax on the gross receipts of advertising in ads for

02:57:45  20   publications exceeding 20,000 in circulation.

02:57:48  21           And the Supreme Court didn't spend any time at all

02:57:51  22   really in analyzing exactly how much impact that 2 percent tax

02:57:56  23   carried.  They simply said, This is impermissible.  It's clear

02:58:00  24   that the tax will discourage advertising and discourage

02:58:03  25   circulation, and in a very short and perfunct opinion simply

02:58:10   1   instruct it down.

02:58:11   2        Likewise, <u>Murdock versus Pennsylvania</u>, a few years

02:58:14   3   later.  Jehovah's Witnesses could not be required to obtain a

02:58:19   4   license for distribution of religious material.  Why?  Because

02:58:22   5   the Court said, You cannot tax the exercise of a

02:58:26   6   constitutional right.

02:58:26   7        And so here what we have is we have a tax imposed on

02:58:29   8   the exercise of a constitutional right.  Namely, we are

02:58:31   9   telling people that they must pay extra money in gas, in

02:58:35   10  travel, they must expend more time to do something for no

02:58:39   11  reason that the government can identify at all.

02:58:43   12       And let's not forget.  If Chicago can do it, then so

02:58:46   13  can all the suburbs, right?  I mean, if it's constitutional

02:58:49   14  for Chicago to ban gun ranges, then presumably it would be

02:58:53   15  constitutional for the State of Illinois to ban gun ranges.

02:58:55   16  And now we're no longer talking about whether people need to

02:58:58   17  drive five miles.  We're talking about whether people drive to

02:59:00   18  Wisconsin or Indiana, assuming, hopefully that those states

02:59:04   19  don't follow suit as well.

02:59:05   20       But we can't make those kinds of deals.  We can't

02:59:08   21  exclude people from a constitutional right on the grounds that

02:59:12   22  they can go somewhere else and practice it.  And, again,

02:59:15   23  that's also well-established in the various cases that we have

02:59:16   24  cited as well.

02:59:17   25       So we have here the following types of irreparable

02:59:22  1  harm.   Number 1, people with guns are unable, they are

02:59:26  2  discouraged from training with their guns, and maintaining

02:59:29  3  proficiency.   That leads to death and injury and all kinds of

02:59:33  4  tragedies when Second Amendment rights are violated.

02:59:36  5       Number 2, obviously, there's discouragement in terms

02:59:39  6  of people being able to access the training, which is a

02:59:42  7  prerequisite to the very possession of a firearm in one's

02:59:46  8  home.

02:59:47  9       And, here -- I know the Court's been skeptical of

02:59:51  10  Andre Queen's declaration, but I'm going to try one more time

02:59:55  11  just to briefly state for the record -- that the issue is not

02:59:56  12  the harm that the law has on Queen's business.   The issue is

02:59:58  13  that he testified that people are discouraged.   In his

03:00:00  14  experience -- he knows the market -- the cost and expense of

03:00:03  15  traveling outside the city impacts people's desire and

03:00:05  16  willingness to do it and the testimony is, I think, conclusive

03:00:10  17  as to that.

03:00:11  18       And, finally, before I forget, of course, there is

03:00:15  19  the First Amendment harm.   And, again, this is not something

03:00:16  20  on which there is a lot of law and sometimes these issues are

03:00:19  21  not as interesting to the public as Second Amendment issues,

03:00:24  22  but we do have very good authority from the Fourth Circuit in

03:00:27  23  Edwards versus City of Goldsboro, where the Fourth Circuit

03:00:31  24  actually reversed the judge that I clerked for.

03:00:33  25       THE COURT:  But you weren't clerking for him --

| | |
|---|---|
| 03:00:35 | 1 |
| 03:00:37 | 2 |
| 03:00:45 | 3 |
| 03:00:49 | 4 |
| 03:00:53 | 5 |
| 03:00:53 | 6 |
| 03:00:57 | 7 |
| 03:00:59 | 8 |
| 03:01:03 | 9 |
| 03:01:05 | 10 |
| 03:01:06 | 11 |
| 03:01:10 | 12 |
| 03:01:13 | 13 |
| 03:01:15 | 14 |
| 03:01:21 | 15 |
| 03:01:26 | 16 |
| 03:01:29 | 17 |
| 03:01:33 | 18 |
| 03:01:37 | 19 |
| 03:01:40 | 20 |
| 03:01:41 | 21 |
| 03:01:45 | 22 |
| 03:01:47 | 23 |
| 03:01:52 | 24 |
| 03:01:56 | 25 |

MR. GURA:  No, no that was after my time.

Where again you had a police officer who was retaliated against for teaching a gun training class for people who wanted to obtain a North Carolina permit to carry a handgun.

And the Court said, Look, we know that the First Amendment protects training.  This is training.  This is the highest level of protected speech.  And just because it's demonstrative and just because it involves weapons doesn't change that analysis.

And so I -- you know, the City keeps saying, Well, firing a gun is not protected by the First Amendment.  And, of course, I agree with that.  We agree with that.  Of course, the First Amendment doesn't protect any kinds of conduct as such.  But when conduct is expressive, then it's protected and there's, you know, tons of case law on that.  And there's really -- the only response they had to the Edwards case was, Well, we presume, presumably, that there was no firing of guns involved in that case.  Well, the North Carolina general statutes say differently.

So I think we have a First Amendment harm as well.  And then, as we know, when the First Amendment is implicated, the irreparable harm is presumed.  I am not aware of any case law right now that talks about whether there's a presumption of harm in the Second Amendment field, when a Second Amendment

03:01:59   1   right is violated.  But, your Honor, I would submit that given

03:02:02   2   the Supreme Court's language in describing the interests

03:02:04   3   protected by the Second Amendment, it is fair to suppose that,

03:02:09   4   yes, when Second Amendment rights are violated, there is

03:02:12   5   irreparable harm.

03:02:13   6           And, finally, there's not much to say about the issue

03:02:16   7   of the public --

03:02:17   8           THE COURT:  Well, are you using the Renton argument

03:02:20   9   for the First Amendment analysis as well, saying essentially

03:02:24   10  because they can't train within the city's borders, because

03:02:30   11  there is no place within the city's borders, they can't

03:02:31   12  discuss the training of the firearms within the city's

03:02:35   13  borders?

03:02:35   14          MR. GURA:  The Renton argument goes to both the first

03:02:38   15  and Second Amendment arguments.  It goes to the First

03:02:41   16  Amendment argument to the extent that training -- it's not a

03:02:43   17  matter of simply discussion.  What's banned here is not

03:02:45   18  discussion.  We agree with the City.  They haven't banned the

03:02:48   19  four-hour classroom aspect of it, when, I suppose, we should

03:02:52   20  be pleased with that.

03:02:53   21          But the -- but they did ban sitting down with an

03:02:59   22  instructor who is showing a person how to operate a firearm.

03:03:03   23  That is training and that is banned.  And so since that is

03:03:07   24  protected First Amendment activity, just like the Court found

03:03:10   25  certain adult establishments are protected First Amendment

| | |
|---|---|
| 03:03:14 | 1 |
| 03:03:18 | 2 |
| 03:03:19 | 3 |
| 03:03:22 | 4 |
| 03:03:26 | 5 |
| 03:03:29 | 6 |
| 03:03:32 | 7 |
| 03:03:35 | 8 |
| 03:03:38 | 9 |
| 03:03:43 | 10 |
| 03:03:47 | 11 |
| 03:03:47 | 12 |
| 03:03:50 | 13 |
| 03:03:54 | 14 |
| 03:03:58 | 15 |
| 03:04:01 | 16 |
| 03:04:02 | 17 |
| 03:04:05 | 18 |
| 03:04:09 | 19 |
| 03:04:11 | 20 |
| 03:04:15 | 21 |
| 03:04:18 | 22 |
| 03:04:22 | 23 |
| 03:04:22 | 24 |
| 03:04:24 | 25 |

activity, it doesn't have any less protection than those adult establishments.

And so if you want a zone for any secondary effects that might exist, you can do that, so long as there is no total elimination of the ability to conduct it.

Renton is also relevant for the Second Amendment argument, because it's a general principle of constitutional law that zoning is an authorized and appropriate manner of regulating land uses.  The Supreme Court upheld that back in 1926.  Nobody contests that today.  Certainly we have no position on that.

But just like any other kind of regulation, it can't be stretched to outright prohibit the exercise of a constitutional right, and so in the zoning field, Renton controls both.  If you have a right to do it, you should be able to do it somewhere.

Now, the City has the ability and the power to study it, to make findings, to make conclusions, to have Ms. Scudiero think about the matter some more, perhaps have some conversations with the City Council, and come to an ordinance that we might never challenge in a billion years. But that's not what they did.  What they did is enacted a complete ban.

And, finally, the public harm.  I don't think there's much else to say about it.  The City acknowledges that people

03:04:28　1　are dangerous if they don't have training with their guns.

03:04:32　2　There's no doubt about that. And there's no disagreement with

03:04:35　3　that.

03:04:35　4　　　Also, we would submit that the Second Amendment tells

03:04:39　5　us that there is a public safety aspect to people being able

03:04:44　6　to exercise their right to keep and bear arms. The City

03:04:48　7　disagrees, but the Second Amendment has been ratified and so

03:04:50　8　has the Fourteenth Amendment which applies it.

03:04:53　9　　　And so the public is harmed, generally speaking, when

03:04:56　10　this profoundly important fundamental right, which is designed

03:04:57　11　to secure people's basic health, welfare, and safety is

03:05:01　12　violated.

03:05:02　13　　　And all the conjectural stuff about -- I mean, the

03:05:07　14　port-a-potties discussion was really, I think, very

03:05:10　15　representative of exactly where we are in this case. You

03:05:13　16　know, it's a little bit silly, but then so are many of the

03:05:16　17　arguments about, you know, what if this happens, what if that

03:05:19　18　happens.

03:05:22　19　　　The fact of the matter is that this is all wild

03:05:23　20　speculation. Any training here would be done by state

03:05:26　21　certified trainers. It would be done by -- in a facility

03:05:31　22　that's of the type used by law enforcement all the time.

03:05:35　23　Virtually the entire rest of the United States has gun

03:05:37　24　training and gun ranges with, you know, none of these --

03:05:42　25　there's no evidence that, you know, we've certainly seen no

| | | |
|---|---|---|
| 03:05:45 | 1 | evidence that gun ranges are some kind of unacceptable risk, |
| 03:05:48 | 2 | and even the state courts have held that they're a protected |
| 03:05:54 | 3 | land use. |
| 03:05:54 | 4 | And so, you know, I think the City here keeps running |
| 03:05:57 | 5 | into the basic problem, which is that the use of guns is |
| 03:06:00 | 6 | protected by the Constitution.  And no matter how much they |
| 03:06:03 | 7 | say that it's an unacceptable risk and horrible and terrible, |
| 03:06:06 | 8 | the fact that it's in the Constitution and it cannot be banned |
| 03:06:09 | 9 | entirely, the very fact that it's in the Constitution is a |
| 03:06:12 | 10 | recognition that it serves the public interest and people be |
| 03:06:15 | 11 | allowed to engage in this behavior.  Thank you. |
| 03:06:17 | 12 | THE COURT:  Have you all read the Seventh Circuit |
| 03:06:20 | 13 | decision that came down on Friday on <u>Annex Book versus</u> |
| 03:06:24 | 14 | <u>Indianapolis</u>? |
| 03:06:25 | 15 | (No response.) |
| 03:06:25 | 16 | THE COURT:  So the Seventh Circuit just commented on |
| 03:06:28 | 17 | a pornography case involving -- referring to the <u>Renton</u> case |
| 03:06:33 | 18 | and whether the City of Indianapolis provided sufficient proof |
| 03:06:37 | 19 | to offset a preliminary injunction.  So it might be something |
| 03:06:42 | 20 | to be interested in, since we have been discussing <u>Renton</u> as |
| 03:06:47 | 21 | we move along. |
| 03:06:48 | 22 | Okay.  Thank you, Mr. Gura. |
| 03:06:49 | 23 | MR. GURA:  Thank you, your Honor. |
| 03:06:52 | 24 | THE COURT:  Who's going to argue for the defendant? |
| 03:06:55 | 25 | MR. WORSECK:  I will, your Honor. |

| | | |
|---|---|---|
| 03:06:55 | 1 | - - - |
| 03:06:59 | 2 | MR. WORSECK, CLOSING ARGUMENT |
| 03:06:59 | 3 | MR. WORSECK:  Thank you, your Honor.  Like |
| 03:07:01 | 4 | plaintiffs, we very much appreciate the -- |
| 03:07:03 | 5 | THE COURT:  It's no problem.  This is what I do. |
| 03:07:07 | 6 | Don't worry about it. |
| 03:07:08 | 7 | MR. WORSECK:  -- attention you've given us over the |
| 03:07:09 | 8 | six or seven weeks. |
| 03:07:10 | 9 | THE COURT:  I think you've done a little bit more |
| 03:07:12 | 10 | work on it than I have. |
| 03:07:14 | 11 | MR. WORSECK:  Your Honor, the fact that three months |
| 03:07:17 | 12 | ago the Chicago City Council determined that one hour of range |
| 03:07:21 | 13 | training is a good policy, does not and cannot make shooting |
| 03:07:26 | 14 | ranges part of the Second Amendment, which was passed over 200 |
| 03:07:30 | 15 | years ago. |
| 03:07:31 | 16 | The _Heller_ decision is clear that modern developments |
| 03:07:34 | 17 | in the decisions of legislatures cannot change the meaning or |
| 03:07:38 | 18 | the scope of that amendment.  And that point is fatal to the |
| 03:07:40 | 19 | plaintiffs' argument -- |
| 03:07:41 | 20 | THE COURT:  You know, I'm going to come right to the |
| 03:07:43 | 21 | chase with you, which is, of course, that I think we'd be |
| 03:07:47 | 22 | having a different situation if it weren't for the fact that |
| 03:07:51 | 23 | the City is the one requiring that you possess only after |
| 03:07:55 | 24 | you've had your shooting range training.  And then the City's |
| 03:07:58 | 25 | prohibiting you from getting to a shooting range within its |

03:08:02  1    borders.

03:08:02  2          So you need to really focus on that.  Because you

03:08:07  3    agree that it would be different if you didn't have that

03:08:10  4    complete prohibition, right?

03:08:12  5          MR. WORSECK:  On the ranges?

03:08:14  6          THE COURT:  Right.

03:08:15  7          MR. WORSECK:  Your Honor, if I may address that this

03:08:17  8    way.  I really think that there's two different merits issues

03:08:20  9    going on here and plaintiffs have only really advanced one of

03:08:25  10   them, and that is the proposition that shooting ranges are in

03:08:28  11   and of themselves protected under the Second Amendment, and we

03:08:31  12   just think that that is wrong.

03:08:32  13          There's nothing in <u>Heller</u> or <u>McDonald</u> that indicates

03:08:34  14   that shooting ranges would be protected under the Second

03:08:37  15   Amendment.  So -- and we've talked about that in our brief,

03:08:40  16   and we've talked about that at prior hearings in the case.

03:08:44  17          Now, the concern that you raise, the one-hour

03:08:46  18   training requirement in order to get your CFP, that relates to

03:08:50  19   a different right, a right that we admit is protected under

03:08:54  20   the Second Amendment, and that's the right to possess arms in

03:08:56  21   your home for self defense.

03:08:58  22          And the analysis at that point would then be whether

03:09:03  23   or not the one-hour training requirement impermissibly

03:09:07  24   infringes or burdens your right to have arms in the home for

03:09:11  25   self defense.

03:09:12  1    And the plaintiffs have submitted that strict

03:09:16  2  scrutiny ought to apply.  And taking a step back from that,

03:09:21  3  they say, Well, even if you look at intermediate scrutiny, we

03:09:24  4  still win.

03:09:26  5    We think it's clear from the trend in the Seventh

03:09:29  6  Circuit cases that have come down since <u>Heller</u> and <u>McDonald</u>

03:09:31  7  that they are very much leaving the issue of standards of

03:09:33  8  scrutiny open.  They are taking baby steps, if you will, when

03:09:37  9  it comes to analyzing the particular discrete claims that are

03:09:45  10  presented in the cases that come before them, and they have

03:09:45  11  basically said that, Let's slow down.  Let's not make grand

03:09:50  12  pronouncements about standards of scrutiny or even on the

03:09:51  13  merits issue about the scope of the Second Amendment and we

03:09:54  14  need to look at the facts and the claims raised in the cases

03:09:57  15  before us.

03:09:57  16    So that takes us to the facts --

03:09:59  17    THE COURT:  Well, that's nice and easy for the

03:10:02  18  Appellate Court to say.  But when you're analyzing facts, you

03:10:05  19  have to apply them under some framework of the law, and so we

03:10:11  20  need to analyze it under a particular framework --

03:10:14  21    MR. WORSECK:  Yes.

03:10:15  22    THE COURT:  -- and be guided by what is out there

03:10:17  23  currently.

03:10:18  24    MR. WORSECK:  Yes.

03:10:19  25    Well, let me talk briefly first about strict

| | |
|---|---|
| 03:10:23 | 1 |
| 03:10:27 | 2 |
| 03:10:30 | 3 |
| 03:10:34 | 4 |

scrutiny. And the plaintiffs are simply incorrect that strict
scrutiny would apply simply because we have an enumerated
right in the Bill of Rights in this case. That is not the
rule by any stretch of the imagination.

THE COURT: How do you separate out the possession
from the Second Amendment to not have strict scrutiny apply?
How are you separating out the training at the firing range
from the core, if the City said, You can't possess unless you
do your training?

MR. WORSECK: We think that the most important
fact -- I would submit the starting point, if you will, for
looking at the standard of scrutiny issue is the fact that we
do not have a ban here on the right to possess arms in the
home for self defense.

The City's requirement merely places a condition on
that. So because we don't have a ban, we merely have a
condition, we submit that strict scrutiny is not the proper
starting point.

The proper starting point, when you have a condition
as opposed to a ban, we would submit, is either the reasonable
regulations standard or the undue burdens standard. And the
reasonable regulation standard is attractive in this
particular instance --

THE COURT: But constructively there is -- there can
be points where the ordinance that you've drafted and approved

03:11:48  1  of constructively prohibits anyone from possessing within the

03:11:54  2  borders, if they stayed within the borders.

03:11:57  3          So if you look at the Renton case -- I'm trying to

03:12:01  4  have you analyze the Second Amendment right, because if you

03:12:08  5  parallel it to Renton, you have done what Renton did in the

03:12:13  6  sense that you can't get your training within the borders.  No

03:12:17  7  firing range for the public is within the borders.  So if I

03:12:21  8  can't possess unless I have my firing range training, I can't

03:12:25  9  get my job done here.  I can't possess here in the city and do

03:12:29  10  what you want me to do within the city's borders.

03:12:32  11          MR. WORSECK:  Yes.  The Renton analysis, your Honor,

03:12:34  12  which is a form of time, place, and manner analysis, really

03:12:38  13  comes into play once the Court has declared that something is

03:12:42  14  protected by the Constitution.  Because shooting ranges are

03:12:45  15  not protected by the Second Amendment, we don't think that the

03:12:48  16  Renton analysis is --

03:12:49  17          THE COURT:  But possessing a weapon is, and

03:12:51  18  possessing a weapon by you is that it must be with training at

03:12:54  19  a firing range.

03:12:55  20          MR. WORSECK:  Yes.  But we don't ban the possession

03:12:58  21  in the home.  We simply place a condition on it.

03:13:00  22          And there are standards of scrutiny that the Courts

03:13:02  23  have long developed for addressing that kind of imposition on

03:13:05  24  a right, the reasonable regulations standard and the undue

03:13:08  25  burdens standard.

03:13:09  1     The reasonable regulations standard is not the same

03:13:12  2  as rational basis, and that's clear from the Adam Winkler

03:13:17  3  article that we cite in our brief.  The reasonable regulations

03:13:19  4  standard actually does look at the burden that is placed on

03:13:22  5  the individual.  That's something that rational basis does not

03:13:25  6  do.  In that sense it's like the undue burdens standard.  They

03:13:29  7  do look at the impositions put on individuals.

03:13:31  8     But the -- it was --

03:13:33  9     THE COURT:  But the cases that are decided by the

03:13:36  10  Seventh Circuit using intermediate scrutiny are cases that are

03:13:40  11  a prohibition -- for example, you are prohibited because

03:13:42  12  you're a felon; you're prohibited -- and I take issue with

03:13:46  13  your use of the word lunatic, because you're mentally disabled

03:13:50  14  or something similar.  And so we have a nice defined group of

03:13:55  15  individuals that we can rationalize.

03:13:58  16     Here, we're simply saying, You can't get your

03:14:03  17  training in the city because we're not going to give you

03:14:05  18  training in the city, but you can't possess without it.

03:14:07  19     So how are you paralleling -- how are you making that

03:14:11  20  distinction?

03:14:12  21     (No response.)

03:14:13  22     THE COURT:  We're not in the land of either -- we're

03:14:15  23  not in the straight <u>Heller</u> land of possess within my home and

03:14:18  24  we're not in prohibited felon standard.

03:14:23  25     MR. WORSECK:  Correct.

03:14:24    1      THE COURT:  And I feel like you're not defining what

03:14:27    2   is the right, because you don't want to because the Seventh

03:14:30    3   Circuit doesn't want to because it's taking baby steps, but I

03:14:33    4   have to.

03:14:33    5      MR. WORSECK:  No.  I think, your Honor, we would say

03:14:35    6   the right is this.  It is a right to have a weapon in your

03:14:38    7   home for self defense, a handgun or some other lawful weapon.

03:14:41    8   And as a condition of getting that handgun or other weapon you

03:14:44    9   need to have one hour of training.

03:14:46   10      Now, you're correct that that one-hour training --

03:14:49   11   range training is not available in the city.  But that

03:14:52   12   comes -- that is essentially an issue that goes to whether the

03:14:57   13   condition is onerous.  It doesn't go to the issue of whether

03:15:03   14   or not the one hour of training is something that needs to be

03:15:05   15   in the city or outside the city or whether or not it's

03:15:08   16   protected, because we believe that the training itself is not

03:15:11   17   protected.

03:15:12   18      The issue is whether or not the training is a

03:15:14   19   burdensome condition, and that requires a very close look at

03:15:18   20   the facts of the case.  And in this case there are no facts,

03:15:21   21   there's no evidence whatsoever that traveling to the suburbs

03:15:24   22   places an insurmountable or undue burden or a substantial

03:15:29   23   obstacle in the paths of Chicagoans who want to register

03:15:32   24   weapons for self defense in their home.

03:15:33   25      Further, we heard a lot from Mr. Gura about the

03:15:38    1    irreparable nature of not being able to protect yourself in

03:15:41    2    the home and people are going to die.  That is just rhetoric.

03:15:44    3    There is no evidence at all in this case of anyone being

03:15:47    4    unable to properly defend themselves, adequately defend

03:15:51    5    themselves, even being discouraged or chilled from defending

03:15:55    6    themselves as a result of this one-hour-every-three-years

03:15:59    7    training requirement.

03:15:59    8            And we think that on the -- on that issue, Judge, of

03:16:04    9    irreparable harm, that's really where the case of the

03:16:06   10    plaintiffs falters most clearly.  And that, again, is an issue

03:16:09   11    that they need to establish separately and independently from

03:16:12   12    the merits issue, which is the only issue that they really

03:16:16   13    seem to want to talk about.

03:16:18   14            The standards in this preliminary injunction

03:16:22   15    proceeding are the same that applied to the two previous TRO

03:16:25   16    proceedings that plaintiffs brought.  And in both of those

03:16:29   17    cases your Honor determined, after looking carefully at the

03:16:32   18    record before your Honor, that there is no irreparable harm in

03:16:36   19    this case.  And for that reason alone the City is entitled to

03:16:39   20    a denial of plaintiffs' motion.  That's clear from the Seventh

03:16:43   21    Circuit case that we cited in our brief, the Mil-Mar case,

03:16:50   22    that failure to establish that distinct element of the

03:16:54   23    preliminary injunction elements is alone grounds for denying

03:16:59   24    the motion.

03:17:00   25            And also on this issue of irreparable harm, I think

03:17:06   1   the McDonald decision itself speaks most clearly to this and

03:17:10   2   provides the best answer from the Supreme Court about how --

03:17:14   3   just how they view this right.

03:17:16   4         In that case, in the McDonald case, unlike this case

03:17:19   5   which just raises an incidental burden on the right to possess

03:17:24   6   arms in the home, that case addressed Chicago's handgun ban,

03:17:27   7   which was a complete prohibition on possession of arms in the

03:17:30   8   home.

03:17:31   9         And after the Supreme Court determined that the

03:17:35   10  Second Amendment is incorporated, it was pretty clear that

03:17:39   11  Chicago had a losing position on the merits of its handgun

03:17:42   12  ban.  But even though Chicago had a losing position on the

03:17:45   13  merits, on the issue of whether or not there was some sort of

03:17:48   14  irreparable harm that needed to be addressed immediately, the

03:17:52   15  Supreme Court was pretty clear that it didn't think that it

03:17:55   16  existed in that case.

03:17:56   17        The Court itself did not strike down the handgun ban.

03:18:01   18  It did not order any sort of preliminary relief.  It didn't

03:18:04   19  even order an expedited remand.  It simply remanded the case

03:18:08   20  for the lower courts to address in the usual course of their

03:18:11   21  scheduling of remand proceedings.

03:18:13   22        And again, your Honor, the second prong of the

03:18:25   23  preliminary injunction case is adequate remedy at law.  There

03:18:28   24  is no evidence that the burdens, such as they may be, on the

03:18:31   25  individual plaintiffs cannot be compensated by damages after

03:18:35  1    trial.

03:18:36  2          The only harms at issue are travel to the suburbs,

03:18:40  3    that may be a time issue, that may be a gas issue, and so

03:18:43  4    forth, all of that can be compensated with damages after

03:18:47  5    trial.  There's no evidence that it can't be.

03:18:54  6          And again, your Honor, I would like to say a little

03:18:59  7    bit more about the standards of scrutiny that we're advancing

03:19:02  8    in this case.  It was only two years ago that we learned that

03:19:04  9    the Second Amendment protects an individual's rights.  It was

03:19:07  10   only two years ago that the Federal Courts had to start really

03:19:09  11   grappling with Second Amendment issues, as they relate to

03:19:13  12   individual rights and figuring out what standards of scrutiny

03:19:15  13   apply.

03:19:16  14         On the other hand, the state courts have been doing

03:19:19  15   this for years, for decades under the individual arms rights

03:19:23  16   provisions of their own Constitutions.  They have a real

03:19:27  17   expertise and experience in dealing with arms regulation and

03:19:31  18   the burdens that it might place on the individual right to

03:19:35  19   arms.  And they have reached a consensus that the reasonable

03:19:40  20   regulation standard is the best standard for addressing those

03:19:42  21   claims, at least insofar as the claim raised does not present

03:19:45  22   the issue of an all-out ban of a right to possess an arm.

03:19:50  23         State courts are replete with cases dealing --

03:19:56  24   regulation around the margins of the arms right, in terms of

03:19:57  25   what particular types of guns can be possessed, what types of

03:20:00  1  ammunition can be possessed, where they can be carried, who

03:20:03  2  can possess them, how they need to be stored, how they can be

03:20:07  3  transferred, how they can be sold.  Those are all conditions

03:20:11  4  on the right to arms as opposed to bans.

03:20:14  5         And the reasonable regulations standard the state

03:20:17  6  courts have used to address those types of claims, which is

03:20:20  7  the kind of claim we have in this case, we submit is the best

03:20:24  8  standard, because it takes proper notice and accommodation for

03:20:29  9  the state's significant interests in protecting the public

03:20:33  10  safety, health, and welfare while giving, of course, due

03:20:37  11  recognition to the individual's right to possess an arm

03:20:40  12  without inappropriate burdens.  And that, again, is exactly

03:20:43  13  what we have here.

03:20:45  14         And for that same reason the undue burdens standard

03:20:48  15  could be applied.  That's a standard that's used to address

03:20:51  16  infringements on a woman's fundamental right to choose an

03:20:55  17  abortion.  Here, we have a claim of a fundamental right to

03:21:00  18  possess an arm.  If that standard is good enough in that

03:21:03  19  context, in the abortion context, we think it's perfectly

03:21:07  20  appropriate in this context.

03:21:08  21         Both contexts are motivated by the state's interest

03:21:12  22  in protecting life, and both contexts raise claims about

03:21:16  23  individual autonomy to protect one's body.  We think there's a

03:21:21  24  nice correlation between those two contexts that would warrant

03:21:26  25  the undue burdens standard applying here.

03:21:33  1      And on the merits issue now, your Honor, as we've

03:21:38  2  argued before, Heller does not answer this question as to

03:21:42  3  whether ranges are protected under the Second Amendment.  We

03:21:46  4  think there's no basis in Heller for finding that they are.

03:21:49  5  Heller addressed very different issues than those we have

03:21:53  6  here.

03:21:54  7      It addressed whether or not the Second Amendment

03:21:56  8  confers an individual right, as opposed to a collective right

03:22:00  9  connected to the militia.  It addressed whether or not you

03:22:04  10  have an individual right to possess arms in the home.  Those

03:22:06  11  were the two questions that Heller addressed, and it spent a

03:22:11  12  lot of ink addressing those questions.

03:22:11  13      It was free to spill even more ink talking about

03:22:16  14  shooting ranges had it thought that that was necessary or

03:22:18  15  appropriate, and it did not.  In fact, the ink that it did

03:22:21  16  spill was to the end of explaining that, again, courts should

03:22:26  17  take baby steps in these claims.  Many forms of regulation are

03:22:31  18  presumptively lawful, and further questions about the scope of

03:22:34  19  the Second Amendment will need to wait 'til another day.

03:22:44  20      On the issue of the justifications of this ban, your

03:22:51  21  Honor, we think it's clear from the record developed before

03:22:54  22  the City Council that there are ample reasons supporting this

03:23:01  23  particular ban on shooting ranges.  Now, although it's not

03:23:03  24  necessary for the City to have those bases established in the

03:23:06  25  legislative record, under the intermediate scrutiny standard

03:23:10  1  or the lesser standards.  And that's clear from the Seventh

03:23:12  2  Circuit cases addressing the Second Amendment, which apply

03:23:17  3  intermediate scrutiny.

03:23:18  4         They bring in all kinds of sources in the course of

03:23:24  5  their analysis that were not before the legislature at the

03:23:27  6  time that the laws were passed.  But here we do have a record

03:23:30  7  before the City Council.  And it's clear if you look at that

03:23:33  8  record in toto that the -- there's one thing to the City's new

03:23:39  9  gun ordinance is that it is in the public safety, health, and

03:23:46  10  welfare to limit the carrying and use of guns outside the

03:23:51  11  home.  That's a very serious problem in Chicago.

03:23:53  12         THE COURT:  Well, what do you believe are the facts

03:23:56  13  that you established that showed that it was dangerous or

03:24:02  14  unhealthy for the gun range to be within your borders?

03:24:08  15         MR. WORSECK:  The testimony before the City Council

03:24:14  16  from a number of different witnesses, and those witnesses are

03:24:18  17  in the excerpts from the Council proceedings that we've

03:24:20  18  submitted to your Honor, talk about the severe problems you

03:24:25  19  have once guns leave the home.  There were witnesses who

03:24:28  20  testified about the dangers of carrying weapons in general.

03:24:31  21  There were witnesses who talked about --

03:24:34  22         THE COURT:  But aren't they going to leave the home

03:24:37  23  to go across the border to go to Aurora or Oshkosh or wherever

03:24:42  24  they are going to be to be trained?

03:24:44  25         MR. WORSECK:  Well, the reason why it's a special

03:24:46 1   problem in Chicago, if you were to allow -- if there were gun

03:24:50 2   ranges in Chicago, is that all of those people would be

03:24:52 3   congregating at one spot in Chicago, especially if this mobile

03:24:56 4   range is brought in.  There's going to be one spot in the

03:24:59 5   whole city, a mobile range in a parking lot --

03:25:01 6           THE COURT:  But they're not saying you're bringing

03:25:03 7   your gun to their range.  You're just going to show up and

03:25:06 8   they're going to have the three or four guns laid out and

03:25:08 9   teach you.

03:25:09 10          MR. WORSECK:  Well, you heard from Mr. Pearson

03:25:11 11  himself that it's possible that patrons would bring their own

03:25:14 12  guns.  And if they did that, he wasn't sure how they would

03:25:18 13  respond.  He would have to call the police.  And now you're

03:25:21 14  dragging in the police to help quell the situation where

03:25:24 15  you've got people with guns in the parking lot.

03:25:27 16          THE COURT:  So what is the City's position about

03:25:31 17  traveling with guns that creates more of a problem, the travel

03:25:32 18  with the gun or the congregating of individuals with guns in

03:25:35 19  one location?

03:25:36 20          MR. WORSECK:  Well, they're linked.  In order to

03:25:38 21  congregate with guns, you need to bring them to the place of

03:25:41 22  congregation.  And it's -- shooting ranges would give a

03:25:45 23  reason, it would be an attract -- you know, people -- if

03:25:48 24  there's no shooting ranges in Chicago, people might not have a

03:25:50 25  reason to transport their guns.  And now that there's shooting

03:25:53    1    ranges in Chicago --

03:25:54    2         THE COURT:  Well, no, they need to transport their

03:25:57    3    guns, right, in order to go to other --

03:25:58    4         MR. WORSECK:  Well, they would transport them to the

03:26:00    5    suburbs; they wouldn't transport them to a single spot in the

03:26:02    6    city where --

03:26:02    7         THE COURT:  So you're not arguing that the

03:26:04    8    transportation of the gun itself is the harm?

03:26:07    9         MR. WORSECK:  It's a combination.  It's the

03:26:09    10   transportation and the congregating.

03:26:10    11        You heard from --

03:26:11    12        THE COURT:  Well, you can't really argue just the

03:26:14    13   transportation, because they have to leave the city with their

03:26:16    14   guns as it is.

03:26:17    15        MR. WORSECK:  Well, Sergeant Bartoli testified that

03:26:22    16   one of the concerns with gun ranges is theft, and criminals

03:26:25    17   will case out the range and they will take note of the cars

03:26:28    18   coming and going, assume that those cars have weapons in them.

03:26:32    19   So once the patron leaves the range, who knows what's going to

03:26:36    20   happen once they get a few blocks away?  They could --

03:26:39    21        THE COURT:  Based on what?  He didn't give us any

03:26:41    22   examples of that, any studies of that, any incidents that

03:26:44    23   occurred under his watch, right?

03:26:47    24        MR. WORSECK:  I believe he said based on his

03:26:52    25   experience that the theft of arms is a very serious problem in

03:26:53    1    the city.

03:26:53    2            THE COURT:  It's a risk.  He didn't give me any

03:26:56    3    concrete examples.  That's what he said, it was a risk.  He

03:27:00    4    conjectured that criminals would congregate around a gun shop,

03:27:04    5    a firing range, because that's where people go with guns.  And

03:27:10    6    so the likelihood of having a potential victim of theft of a

03:27:13    7    firearm is greater, because you'd be there.

03:27:16    8            MR. WORSECK:  Right.

03:27:16    9            THE COURT:  But he didn't give me any facts about

03:27:20   10    that, right?

03:27:20   11            MR. WORSECK:  Well, I think it was within his

03:27:22   12    proficiency and experience as a police officer in the city to

03:27:27   13    testify on that matter.

03:27:28   14            But we also have the congregation --

03:27:30   15            THE COURT:  Well, to testify maybe.  But he still --

03:27:32   16    was also -- it would be in his knowledge, I would assume, as

03:27:36   17    to whether there's thefts.  He doesn't have any ranges.

03:27:39   18            He didn't say, There's thefts of weapons outside the

03:27:46   19    firing ranges for the police.  We just assume they won't go

03:27:50   20    after the police.  Is that it?

03:27:51   21            MR. WORSECK:  Well, police departments and police

03:27:54   22    stations and police ranges, we would submit, your Honor, are a

03:27:57   23    very different animal from ranges open to the public.  They

03:28:00   24    are controlled environments.

03:28:01   25            You did hear testimony that they are staffed 24/7 by

| | |
|---|---|
| 03:28:05 | 1 |
| 03:28:12 | 2 |
| 03:28:15 | 3 |
| 03:28:20 | 4 |
| 03:28:20 | 5 |
| 03:28:22 | 6 |
| 03:28:27 | 7 |
| 03:28:31 | 8 |
| 03:28:31 | 9 |
| 03:28:34 | 10 |
| 03:28:35 | 11 |
| 03:28:38 | 12 |
| 03:28:40 | 13 |
| 03:28:44 | 14 |
| 03:28:47 | 15 |
| 03:28:50 | 16 |
| 03:28:53 | 17 |
| 03:28:56 | 18 |
| 03:29:00 | 19 |
| 03:29:01 | 20 |
| 03:29:04 | 21 |
| 03:29:08 | 22 |
| 03:29:12 | 23 |
| 03:29:16 | 24 |
| 03:29:16 | 25 |

1  a guard, a CPD officer.  The people using the ranges, police
2  officers, are highly trained.  They are professionals.  You
3  heard about the hour -- the 80 hours of training that recruits
4  go through.
5        THE COURT:  Okay.  So the one harm so far that you've
6  elucidated, on shaky ground, is that someone may steal
7  weapons, criminals may steal weapons outside of the range.
8        MR. WORSECK:  Well, there's also --
9        THE COURT:  Summarize your other facts that you've
10 presented.
11       MR. WORSECK:  There's also the issue of congregation
12 at the range itself.  We heard lots of testimony about the
13 serious safety issues that plopping down a mobile trailer in a
14 parking lot are going to present, in terms of security and
15 safety, not only of the patrons of the site, but of passersby,
16 interested parties, employees of the businesses on the site,
17 customers of the businesses on the site, all being around a
18 place where guns are being transported, carried, congregating,
19 and shot.
20       And the thing to keep in mind, your Honor, is even if
21 the plaintiffs are going to supply the weapons at their mobile
22 range, there's no guarantee, and they have no protocol in
23 place for ensuring the customers don't bring weapons to that
24 range.
25       But even more importantly, the injunction they are

03:29:19   1    seeking in this case is an injunction of the ban in toto.

03:29:23   2    That would allow any entity to come into the city and open up

03:29:27   3    a shooting range and run it the way they want to run it

03:29:29   4    without any supervision by the City.

03:29:31   5            So the fact that the plaintiffs may think they are

03:29:33   6    doing themselves a favor by supplying the guns, rather than

03:29:36   7    having the patrons bring them, provides no assurance that some

03:29:40   8    other operator wouldn't require the patrons to bring their

03:29:45   9    weapons.  And then, again, you would have the same problems

03:29:47   10   with transportation and congregating at the range site.

03:29:55   11           And the connection, your Honor, between

03:29:59   12   transportation and the ban on ranges itself is something that

03:30:03   13   the plaintiffs' scope of relief acknowledges itself.  They are

03:30:06   14   not seeking just an in toto ban on gun ranges.  They are

03:30:12   15   seeking an injunction against numerous other provisions in the

03:30:16   16   City's ordinance, including the transportation ban and the

03:30:18   17   restrictions on carrying guns outside your home and the

03:30:21   18   requirements of having a CFP and registered firearms.

03:30:24   19           They realize that they need to open those floodgates

03:30:27   20   in order to get the kind of relief they want to have in terms

03:30:31   21   of having people come to the range and use the range.

03:30:38   22           And, you know, the problems of congregating with

03:30:44   23   weapons are very serious, because they -- and this is

03:30:47   24   testimony that was elicited in the City Council -- they will

03:30:51   25   turn -- there's a strong likelihood that every day

03:30:54  1  interpersonal conflicts will turn violent, if people have

03:30:57  2  guns.  Where two people are arguing in a parking lot may just

03:31:02  3  result in some fisticuffs, or maybe not even that, if people

03:31:05  4  have weapons, tensions escalate, fears escalate, and you can

03:31:09  5  have deadly consequences.  That was evidence from numerous

03:31:12  6  witnesses and the findings themselves of the City Council that

03:31:16  7  was presented before the City Council.

03:31:17  8          And Mr. Pearson himself, again, testified that if

03:31:25  9  they had problems, they would call the police.  That is an

03:31:28  10  imposition on the CPD.  It places CPD officers at risk.

03:31:32  11  There's no reason why they should be called out and that

03:31:35  12  burden should be put on the City to police these mobile ranges

03:31:40  13  in parking lots, when the plaintiffs have not -- as I think

03:31:44  14  was very clear from Mr. Pearson's testimony -- not come

03:31:47  15  anywhere near -- anywhere close to doing the proper homework

03:31:51  16  for setting up these ranges safely.

03:31:53  17          Your Honor, on the First Amendment issues that have

03:32:00  18  been raised in this case, plaintiffs, they made the argument

03:32:02  19  in their closing, they've made the argument in their briefs,

03:32:05  20  they have put on no evidence of a First Amendment case.

03:32:08  21          There's no evidence that speech rights or education

03:32:11  22  rights or training rights are being denied by anyone on the

03:32:17  23  City's ban on shooting ranges.  The only thing that's barred

03:32:21  24  is the discharge of a gun.  Discharge is not speech.

03:32:24  25          Mr. Gura said, Well, we submit -- we agree that the

03:32:27 1 shooting a gun is not speech, but it can have an expressive

03:32:31 2 component to it. I just don't -- that's too fine a

03:32:35 3 distinction --

03:32:35 4        THE COURT: Like panhandling under the Supreme Court

03:32:38 5 decision, is that the idea? Expressive component of shooting

03:32:41 6 the weapon or panhandling.

03:32:43 7        MR. WORSECK: Well, if it suddenly becomes --

03:32:45 8        THE COURT: A component is an expressive --

03:32:48 9        MR. WORSECK: -- becomes First Amendment expression

03:32:51 10 to shoot a gun, you're going to open a lot of floodgates.

03:32:54 11 You're going to have claims by revelers --

03:32:56 12        THE COURT: Okay.

03:32:57 13        MR. WORSECK: -- on New Year's that may have had a

03:32:58 14 few cocktails, that they can go out in their front yard and

03:33:01 15 shoot off their guns to express themselves. You will have

03:33:05 16 claims by people at rallies -- you know, counter-protesters at

03:33:09 17 rallies in Chicago claiming that they have a right to shoot

03:33:11 18 their gun in the air to express themselves.

03:33:14 19        It quite frankly is just an untenable theory. And,

03:33:18 20 again, the plaintiffs have put on no First Amendment case at

03:33:21 21 all. There's no evidence of any denial of First Amendment

03:33:25 22 rights to any plaintiff in this case.

03:33:29 23        On the Edwards case from the Fourth Circuit, which is

03:33:33 24 really the only precedent that the plaintiffs rely on for this

03:33:36 25 proposition that the shooting ranges are First Amendment

03:33:41 1  protected conduct.  That case simply did not address that

03:33:45 2  issue.  It was a case about workplace retaliation.  It was a

03:33:48 3  case about an employee who was disciplined by his boss, when

03:33:54 4  he was teaching a course that his boss didn't like.

03:33:57 5       It was on a 12(b)(6) motion.  The Court just said,

03:34:01 6  Generally looking at this whole package of what this plaintiff

03:34:04 7  wants to do, which included classroom training,

03:34:09 8  demonstrations, handouts, and so forth, we think that for

03:34:13 9  purposes of a motion to dismiss this might be First Amendment

03:34:16 10 conduct.

03:34:17 11      Perhaps the best proof that the Court did not

03:34:20 12 seriously address, much less hold, that the shooting of guns

03:34:24 13 and shooting ranges is protected under the First Amendment is

03:34:27 14 that plaintiffs have to go outside the four corners of the

03:34:30 15 opinion to make that proposition to the Court by pulling the

03:34:37 16 North Carolina statute, they say, requires range training in

03:34:41 17 order to get the certification.  If they have to go outside

03:34:45 18 the opinion to make that proposition and to prove that point,

03:34:48 19 that's pretty clear that the Court itself in the case was not

03:34:51 20 concerned about with it and certainly was not making the

03:34:54 21 holding that the discharge of weapons is First Amendment

03:34:57 22 protected conduct.

03:35:03 23      Your Honor, on the final issue, the balance of the

03:35:05 24 hardships, and this, again, is an independent issue under the

03:35:10 25 preliminary injunction.  It's one that the plaintiffs have the

03:35:12  1   burden of establishing.  This factor clearly weighs in favor

03:35:16  2   of the City.

03:35:21  3          The plaintiffs have the burden of showing that

03:35:22  4   denying the injunction would cause greater harm to them than

03:35:27  5   granting the injunction would cause to the City.  We've talked

03:35:29  6   already about how there's no evidence at all of any harm to

03:35:33  7   the plaintiffs by denying the injunction.  There's no

03:35:37  8   irreparable harm.  There's no harm on the facts.  There's no

03:35:40  9   reason to apply presumptions of harm when we have a factual

03:35:44  10  record that clearly shows no harm to the plaintiffs.

03:35:46  11         On the other hand, there are numerous harms that will

03:35:51  12  beset the City, if your Honor grants the injunction.  The

03:35:55  13  first harm is that there are no regulations in place to

03:35:59  14  address shooting ranges --

03:36:01  15         THE COURT:  But doesn't that just simply mean that if

03:36:05  16  I were to rule that they -- that you are required to allow

03:36:10  17  them to have ranges within the City, that they would bring in

03:36:14  18  their truck and then the City would say, It's not governed by

03:36:18  19  any zoning and so it can't be here?  I mean, isn't that really

03:36:22  20  the practical impact of what would happen?

03:36:24  21         MR. WORSECK:  Well, as we read their complaint, you

03:36:27  22  know, they are not asking for the right to bring a truck here

03:36:29  23  and have it shuttered for nine months or a year while the City

03:36:33  24  passes regulations.

03:36:34  25         THE COURT:  Right.  But just practically speaking --

03:36:36  1    I know what they are asking, but, I mean, the scope of -- I

03:36:38  2    can't order the City to do something except to say that the

03:36:41  3    injunction would be that you must permit a firing range within

03:36:47  4    the City.  Let's say that's the ruling.

03:36:49  5         Then wouldn't you have all of your normal remedies in

03:36:55  6    zoning and all of your other challenges to him?  What I'm

03:37:00  7    saying -- I know that wouldn't make you happy, Mr. Gura.  You

03:37:04  8    want me to say everything has got to come in regardless.  But

03:37:08  9    isn't that the practical impact of what would happen here?

03:37:11  10        MR. WORSECK:  Well, assuming that the City would have

03:37:13  11   the full breadth of its normal powers under the zoning code,

03:37:17  12   the building code, et cetera, to police the public safety,

03:37:21  13   health, and welfare, we would have to ask basically, What's

03:37:24  14   the point of granting an injunction on a preliminary basis if

03:37:27  15   the range isn't even going to open?  I mean, really, why are

03:37:32  16   we even here, if that's all that would happen?  There's really

03:37:35  17   no point.

03:37:35  18        The consequence that would flow from that is that it

03:37:38  19   would force the City to start, perhaps, drafting

03:37:40  20   regulations --

03:37:41  21        THE COURT:  Right.

03:37:42  22        MR. WORSECK:   -- which all of our declarations that

03:37:44  23   we've submitted into evidence from the various representatives

03:37:47  24   of City departments establish will take months.

03:37:50  25        These departments need to investigate the issue.

| | | |
|---|---|---|
| 03:37:53 | 1 | They need to familiarize themselves with the issue. They need |
| 03:37:57 | 2 | to research other jurisdictions. They need to prepare their |
| 03:37:59 | 3 | own regulations. They need to go before City Council |
| 03:38:03 | 4 | committees, they need to be passed by City Council. That will |
| 03:38:08 | 5 | take months, if not more than twelve months. |
| 03:38:10 | 6 | And there's -- it would be improper to put the City |
| 03:38:13 | 7 | to that burden on a preliminary basis in the context of a |
| 03:38:17 | 8 | preliminary injunction ruling. If the range isn't going to |
| 03:38:19 | 9 | open, yet, the City would start -- would be put to the burden |
| 03:38:22 | 10 | of developing regulations, that is basically giving the |
| 03:38:25 | 11 | plaintiffs the ultimate relief that they would seek. And |
| 03:38:28 | 12 | that's something that should await final judgment on the |
| 03:38:31 | 13 | merits. It should not be ordered on a preliminary basis, when |
| 03:38:35 | 14 | the plaintiffs would not be getting any benefit. The range |
| 03:38:39 | 15 | would be closed, and no one would be getting trained. |
| 03:38:45 | 16 | And, your Honor, with respect to the mobile range, |
| 03:38:50 | 17 | that's a separate and distinct harm that would beset the City, |
| 03:38:54 | 18 | if you were to grant the preliminary injunction. And, again, |
| 03:39:00 | 19 | it's clear from the testimony that the plaintiffs have simply |
| 03:39:04 | 20 | not done their homework and have not taken this seriously. I |
| 03:39:08 | 21 | mean, they really haven't. |
| 03:39:10 | 22 | And it shows, also what will happen when you don't |
| 03:39:14 | 23 | have regulations. It's only because the plaintiffs filed the |
| 03:39:17 | 24 | lawsuit and your Honor granted discovery that the City was |
| 03:39:20 | 25 | able to learn anything about this mobile range. |

03:39:23　1　　　　　In the absence of regulation, if some other company

03:39:26　2　were to come in with a mobile range, who's to say that the

03:39:29　3　City would know anything about it before it starts opening.

03:39:32　4　There would be no way that anyone could be confident that the

03:39:35　5　operation would be run safely.

03:39:38　6　　　　　And the record is clear that the plaintiffs' mobile

03:39:40　7　range plan is at best half-baked.  It's been chaotic in its

03:39:46　8　formulation, and it frankly is cavalier.

03:39:49　9　　　　　You heard testimony from Sergeant Bartoli about the

03:39:53　10　importance of having a detailed finalized prepared safety

03:39:56　11　protocol to address not only the four corners of a shooting

03:40:00　12　range, but the environment around the range, the parking lots,

03:40:04　13　the ingress and egress, where people are going to stand, where

03:40:09　14　they are going to park, where you are loading and unloading

03:40:12　15　station is going to be, how many people you need to sort of

03:40:15　16　guide customers around the space, how many trainers you need,

03:40:19　17　what kind of ratio do you need, how many security personnel do

03:40:24　18　you need.

03:40:24　19　　　　　The plaintiffs have come nowhere close to presenting

03:40:30　20　anything approaching a finalized planned safety protocol for

03:40:34　21　this mobile range.  They haven't generated a protocol as a

03:40:38　22　general matter.  They haven't even picked the site that they

03:40:41　23　would use this mobile range at.

03:40:43　24　　　　　And you heard testimony from both the plaintiffs'

03:40:46　25　side and from the City, that the site -- the specifics of the

| | |
|---|---|
| 03:40:49 | 1 |
| 03:40:53 | 2 |

site you're operating in are very much important to how your

safety protocol is going to look.

Plaintiffs are waiting for you to rule, and then they
will get around to developing their safety protocol.  That has
things exactly backwards.  They should be presenting to your
Honor a coherent vetted safety plan now, so that your Honor
can see if that would be appropriate.  They're instead waiting
for you to rule, and then hopefully they will get around to
it.

The operators of the range itself, your Honor, are
very problematic.  The SAF has no experience at all with
running any sort of shooting range, but it was the SAF who
took it upon itself to pick these two sites in the city as
being good locations for a mobile shooting range.  Ms. Versnel
thought it was appropriate to sign a contract with Accurate
Perforating, even though that company has a hundred employees,
there are eight other businesses that operate on its property.

THE COURT:  But the testimony was that these mobile
ranges are next to Sam's Clubs and residences and shopping
malls and in parking lots, and there's not been any
difficulties with them in those places.  That was not
challenged in any effective way, right?  That -- that's the
way it stands right now from the first witness we heard from.

MR. WORSECK:  I believe that testimony was about
stationary ranges, your Honor.

| | | |
|---|---|---|
| 03:42:17 | 1 | THE COURT:  No -- |
| 03:42:17 | 2 | MR. WORSECK:  Being -- |
| 03:42:19 | 3 | THE COURT:  -- about some of the mobile ranges being |
| 03:42:23 | 4 | next to places that were businesses.  I mean, there's not been |
| 03:42:28 | 5 | a conclusion from anyone that a mobile range next to a |
| 03:42:35 | 6 | shopping mall is dangerous.  I haven't heard that testimony. |
| 03:42:39 | 7 | MR. WORSECK:  We -- what we have in this case on the |
| 03:42:42 | 8 | facts, your Honor, are the two sites that plaintiffs have |
| 03:42:45 | 9 | chosen.  We're not talking about shopping malls.  We're |
| 03:42:48 | 10 | talking about -- |
| 03:42:48 | 11 | THE COURT:  No.  What we have on the facts is a man |
| 03:42:50 | 12 | who stood here and told this Court that those mobile ranges |
| 03:42:54 | 13 | are placed in places where there's high-traffic area, and it |
| 03:43:00 | 14 | goes against your argument that it's so dangerous to place one |
| 03:43:03 | 15 | of these here, and that they don't have any problems with it. |
| 03:43:07 | 16 | Then we have two locations proposed where they can go |
| 03:43:11 | 17 | and conjecture as to whether it's going to be placed in one |
| 03:43:15 | 18 | angle or another angle, near the railroad tracks, near the |
| 03:43:19 | 19 | residences, et cetera, but not one bullet has left those other |
| 03:43:22 | 20 | ranges and caused harm to anyone.  Those are the facts. |
| 03:43:25 | 21 | MR. WORSECK:  Well, your Honor, we don't know, |
| 03:43:27 | 22 | because the plaintiffs haven't presented their safety plan, |
| 03:43:30 | 23 | how they would run the operation at these two sites.  And |
| 03:43:33 | 24 | Mr. Hart, who I believe your Honor is referring to, did not |
| 03:43:36 | 25 | pick these sites.  He did not pick this range.  That was |

03:43:40 1   Ms. Versnel.  She is the person who signed these contracts.

03:43:43 2   She picked this company.  She picked these sites, and she has

03:43:46 3   no experience in doing any of that for shooting ranges,

03:43:49 4   certainly not mobile shooting ranges.

03:43:52 5           She picked the Accurate Perforating site, as I said,

03:43:56 6   even though it's got a hundred employees, there are eight

03:43:59 7   businesses on site, there are customers coming and going to

03:44:03 8   those businesses.  The gate is almost always left open.

03:44:05 9   That's not proper security for the location.

03:44:08 10          And I know we've heard a lot of talk today about

03:44:11 11  port-a-potties, but both Mr. Pearson and Sergeant Bartoli

03:44:15 12  agree that washing your hands is very important to get the

03:44:20 13  lead off your hands.  Now, whether port-a-potties are

03:44:23 14  sufficient for that or whether or not you need a stronger

03:44:23 15  water flow, et cetera, for that, the fact is that as to

03:44:26 16  Accurate Perforating they will not allow port-a-potties on the

03:44:29 17  site.  So you are not going to be able to allow the patrons of

03:44:34 18  the range to wash their hands and remove lead.

03:44:36 19          As to the South Bell location, again, this is one

03:44:39 20  that Ms. Versnel decided was appropriate.  She picked it in

03:44:44 21  just two days.  She was hot to trot after she learned that the

03:44:47 22  Accurate Perforating lease would be terminated.

03:44:49 23          It's right across the street from single-family

03:44:52 24  homes, and she picked the site knowing that it was across the

03:44:56 25  street from single-family homes and knowing that Blue Line,

| | |
|---|---|
| 03:45:00 | 1 |
| 03:45:03 | 2 |

the company that runs this trailer, advised against placing

the range against -- close to single-family homes.

ISRA, which is the plaintiff that will have the

The site is also very close to various schools and

churches.  And you heard testimony from the City witnesses,

especially Commissioner Scudiero, that it would not be

appropriate to run a shooting range at that location, given

the surrounding neighborhood.  It's a high-crime neighborhood.

And common sense says that you don't set up an operation that

calls for bringing guns and using guns in a high-crime

neighborhood.  Even if the patrons of the site are perfectly

law abiding, you don't put that kind of operation in the

middle of Englewood.

ISRA, which is the plaintiff that will have the

responsibility for making sure this thing goes off without a

hitch, it has no experience in running a mobile shooting

range.  It has no experience in creating the safety protocol

for a mobile shooting range.  Mr. Pearson has never even seen

a mobile shooting range.  Yet he claimed that he only needs

fifteen minutes to get a safety plan in place.  It just belies

common sense, your Honor.

The plaintiffs have relied exclusively -- I should

say SAF has relied exclusively on information it's learned

from Blue Line about how safe this truck is.  Mr. Pearson

himself did not have any communications with Mr. Tilbor at

Blue Line, but Ms. Versnel did, and she is basically relying

03:46:33    1    on what he said and what the website said about the truck.

03:46:36    2    But from the Tilbor deposition designations that we've

03:46:41    3    submitted, it's clear that even he himself is woefully

03:46:45    4    ignorant about his own truck.

03:46:47    5          He never changed the lead filter in the truck.  He

03:46:50    6    didn't even know that lead was released into the air space

03:46:53    7    inside the truck, and he didn't know whether OSHA or EPA

03:46:57    8    regulations governed his mobile shooting range.

03:46:59    9          The contract with Blue Line contains nothing

03:47:04   10    indicating that this range is appropriate for civilian use,

03:47:07   11    contains nothing indicating the safety procedures or

03:47:11   12    precautions that should be used for the range --

03:47:13   13        THE COURT:  And is that one of the cited reasons that

03:47:17   14    the City had in its statute to say, We're not going to have

03:47:21   15    any ranges within the city because of the contamination to

03:47:25   16    civilians?  I don't see that in the testimony before the

03:47:30   17    committee.

03:47:30   18        MR. WORSECK:  No.  I'm speaking about the harm that

03:47:34   19    would beset the City under the balance of the hardships were

03:47:37   20    your Judge [sic] to grant the plaintiffs the relief they are

03:47:40   21    seeking.  This is a very pragmatic fact-based question, which

03:47:45   22    is what the balance of the hardships prong really is.  It puts

03:47:49   23    all the legal niceties to the side.  It puts to the side

03:47:52   24    whether there was sufficient evidence before the City Council

03:47:55   25    to justify the legislation, and it looks at what is going to

| | | |
|---|---|---|
| 03:47:58 | 1 | happen -- |
| 03:47:58 | 2 | THE COURT: That's not what I was saying. That's not |
| 03:48:01 | 3 | what I was arguing or saying. |
| 03:48:03 | 4 | Go ahead. Go on. |
| 03:48:05 | 5 | MR. WORSECK: Thank you. Again, your Honor, the |
| 03:48:10 | 6 | third harm that the City would experience, were you to grant |
| 03:48:14 | 7 | an injunction, would be the enjoining of the other provisions |
| 03:48:18 | 8 | of the firearms ordinance aside from simply the ban on |
| 03:48:22 | 9 | shooting ranges. |
| 03:48:23 | 10 | I've talked about this a little bit already, but |
| 03:48:27 | 11 | plaintiffs really gloss over how broad the relief that they |
| 03:48:31 | 12 | are seeking is. They are seeking to enjoin numerous other |
| 03:48:35 | 13 | provisions, restrictions on carrying, transportation, |
| 03:48:38 | 14 | possession outside the home, transfer, et cetera, that would |
| 03:48:43 | 15 | create plenty of opportunities for citizens of Chicago -- who |
| 03:48:48 | 16 | have no intention of using this mobile range -- from using |
| 03:48:52 | 17 | their guns for improper purposes. |
| 03:48:54 | 18 | The CFP requirement is one of the provisions that the |
| 03:48:58 | 19 | plaintiffs are seeking to enjoin. That would mean that no one |
| 03:49:01 | 20 | needs to get a permit to have a gun in Chicago. That goes -- |
| 03:49:04 | 21 | that flies in the face of the City's ordinance. They also |
| 03:49:09 | 22 | look to enjoin the registration requirement. That would mean |
| 03:49:13 | 23 | that guns don't have to be registered and that would thwart |
| 03:49:16 | 24 | the City's interests in being able to track the use of -- to |
| 03:49:21 | 25 | trace guns that are used in crime. |

03:49:23 1      It helps officers know when they respond to a call,

03:49:27 2  an emergency call, whether or not the home they are responding

03:49:29 3  to has a gun in it.  So, you know, it's not just the fact that

03:49:35 4  the City doesn't have regulations in place for shooting

03:49:38 5  ranges.  It's not just the fact that this mobile range is a

03:49:42 6  real Pandora's box that the plaintiffs are asking your Honor

03:49:45 7  to warrant, because --

03:49:46 8      THE COURT:  So the City's going to put in all CFPs

03:49:50 9  within its computer system for the police officers, so that

03:49:53 10  they know that there's a gun in the house before they go to a

03:49:56 11  house?

03:49:58 12      MR. WORSECK:  It's my understanding that that -- at

03:50:01 13  least under current technology, that that is a manual

03:50:06 14  interchange between the dispatcher and the responding officer.

03:50:09 15  I don't think it's computerized yet.  But the information,

03:50:12 16  whether it be translated over the radio -- I mean, transferred

03:50:15 17  over the radio or the computer system is information that

03:50:17 18  first responders want to have.

03:50:21 19      THE COURT:  And the City's going to give it to them?

03:50:24 20  That's what you just said, that one of the reasons of

03:50:27 21  balancing the harms is that they will have this information.

03:50:30 22      MR. WORSECK:  I believe they already do have it, your

03:50:30 23  Honor.

03:50:33 24      THE COURT:  Okay.  You just don't know if it's in

03:50:35 25  the -- okay.

| | |
|---|---|
| 03:50:36 | 1 |
| 03:50:39 | 2 |
| 03:50:42 | 3 |
| 03:50:46 | 4 |
| 03:50:48 | 5 |
| 03:50:52 | 6 |
| 03:50:57 | 7 |
| 03:51:00 | 8 |
| 03:51:04 | 9 |
| 03:51:09 | 10 |

MR. WORSECK:  But I do believe that that is already in place, as we speak.

And, again, your Honor, in the face of all these hardships to the City, there is really no benefit at all that would come to the plaintiffs by granting this injunction.

Again, the record is clear that citizens in Chicago, who want to get training, who want to possess their weapons, who want to get their CFP, who want to have arms in the home for self defense are perfectly able to do so by traveling to the suburbs.

If your Honor were not to authorize the mobile range but were inclined to allow stationary ranges to be built, that's something that we learned from Mr. Hart's testimony takes at least nine to twelve months.  There will be no ranges any time soon in Chicago, even with an injunction.  There will be no ability for plaintiffs to get training in Chicago by October 12th even with the injunction.

And plaintiffs have had about six, seven weeks now to find a Chicago resident who cannot get training in the suburbs, to find a Chicago resident who is irreparably harmed or unduly burdened by having to travel to the suburbs.  They have not done that.

Perhaps the most sympathetic plaintiff they have presented is Ms. Ezell, who suffers from various medical conditions.  She already has her CFP.  She got her training.

03:52:07  1  She has her CFP.  She has her gun.  She is perfectly entitled

03:52:10  2  and able to exercise her right to self defense in the home.

03:52:24  3       Your Honor, one final point I would like to make, and

03:52:25  4  this goes to the last factor of the preliminary injunction

03:52:28  5  analysis.  And that looks at the harm to the public interest,

03:52:37  6  as essentially distinct from the harm to the City.

03:52:39  7       We think there's a lot of overlap between the two.

03:52:41  8  The harm to the public would be the exact same harms that

03:52:44  9  would beset the City by allowing this mobile range to open, by

03:52:50 10  allowing ranges in general to open.  But even beyond those

03:52:54 11  there is a separate and distinct harm to the public interest,

03:52:57 12  and that is that an injunction, especially on a preliminary

03:53:03 13  basis, would take issue with the kind of city that Chicago is

03:53:07 14  as a city.

03:53:08 15       And I'm not talking about a city that has vigorous

03:53:11 16  gun regulation, but I'm talking about Chicago being a city

03:53:15 17  where businesses and enterprises are highly regulated.

03:53:18 18  Chicago has determined, through its City Council, that having

03:53:21 19  a vigorous regulation -- zoning regulations, building code

03:53:26 20  regulations, environmental regulations -- of businesses is the

03:53:29 21  best way to have optimal public health, safety, and welfare in

03:53:34 22  the city.

03:53:34 23       Chicago is not Houston.  The plaintiffs like to say,

03:53:38 24  Well, Houston doesn't have zoning, and they get along just

03:53:41 25  fine.  Chicago is not Houston.  Chicago has determined that

03:53:44   1    regulations lead to more public health and welfare than no

03:53:50   2    regulations.

03:53:51   3           Even with respect to First Amendment conduct in the

03:53:54   4    city, Chicago has vigorous regulations.  For instance, if you

03:53:58   5    want to hold a parade downtown or anywhere in the city, you

03:54:02   6    need to go through a permitting process.  And, of course,

03:54:05   7    we've talked earlier about adult uses.  Those are highly

03:54:08   8    regulated in the city.

03:54:09   9           But by allowing ranges to operate without any

03:54:12   10    regulation by the City, the Court would be acting contrary to

03:54:16   11    the decision of the people of Chicago that they wish to live

03:54:19   12    in a city that has regulation.  And that would be directly

03:54:23   13    contrary to the legislature's judgment that business and

03:54:26   14    activities taking place be ordered and regulated.

03:54:29   15           And we pointed this out in our response brief, but

03:54:33   16    Judge Gottschall found exactly this kind of harm to the public

03:54:36   17    interest to be grounds for counseling against preliminary

03:54:43   18    injunctive relief.

03:54:44   19           THE COURT:  In what case?

03:54:46   20           MR. WORSECK:  That is in the Aircraft Owners case,

03:54:48   21    your Honor.  We cite that in our response brief.

03:54:54   22           Your Honor, I just want to close with, again, on the

03:54:59   23    five factors of the preliminary injunction analysis, the

03:55:03   24    plaintiffs make an argument only with respect to one.

03:55:06   25           We think at most it's an open question on likelihood

| | | |
|---|---|---|
| 03:55:09 | 1 | of success on the merits. We think, actually, the analysis is |
| 03:55:15 | 2 | in our favor, once you apply the undue burdens standard or the |
| 03:55:19 | 3 | reasonable regulation standard. The requirement that once |
| 03:55:22 | 4 | every three years you need to travel to the suburbs to receive |
| 03:55:26 | 5 | one hour of training is not an undue or onerous burden on the |
| 03:55:30 | 6 | right to possess arms in the home for self defense. |
| 03:55:32 | 7 | But even if it were, even if the plaintiffs were |
| 03:55:35 | 8 | completely correct about their merits position, that is only |
| 03:55:40 | 9 | one of the five factors that must be independently |
| 03:55:43 | 10 | established. On the remaining four, it's clear that the City |
| 03:55:46 | 11 | has the better of the argument. |
| 03:55:46 | 12 | There is no irreparable harm whatsoever. There is no |
| 03:55:50 | 13 | evidence that anyone is being denied the ability to defend |
| 03:55:54 | 14 | themselves. There is no evidence that a single person in |
| 03:55:57 | 15 | Chicago has been harmed, has been shot in their home, has been |
| 03:56:01 | 16 | burglarized, because they had to travel to the suburbs for one |
| 03:56:05 | 17 | hour of range training. |
| 03:56:07 | 18 | There is no evidence that the burdens on the |
| 03:56:11 | 19 | plaintiffs are not compensable by damages after trial. The |
| 03:56:14 | 20 | harms to the City are significant and real and would be |
| 03:56:18 | 21 | immediate. The plaintiffs want to open this range on |
| 03:56:21 | 22 | Wednesday, your Honor. That's two days from now. Without a |
| 03:56:24 | 23 | safety plan, without any experience in operating mobile |
| 03:56:28 | 24 | ranges, with no regulations in place whatsoever by -- in the |
| 03:56:31 | 25 | City devoted to the proper standards and operation of shooting |

| | |
|---|---|
| 03:56:37 | 1 |
| 03:56:40 | 2 |
| 03:56:43 | 3 |
| 03:56:49 | 4 |
| 03:56:53 | 5 |
| 03:56:58 | 6 |
| 03:57:00 | 7 |
| 03:57:01 | 8 |
| 03:57:03 | 9 |
| 03:57:07 | 10 |
| 03:57:07 | 11 |
| 03:57:08 | 12 |
| 03:57:08 | 13 |
| 03:57:10 | 14 |
| 03:57:13 | 15 |
| 03:57:15 | 16 |
| 03:57:18 | 17 |
| 03:57:24 | 18 |
| 03:57:25 | 19 |
| 03:57:28 | 20 |
| 03:57:32 | 21 |
| 03:57:36 | 22 |
| 03:57:40 | 23 |
| 03:57:42 | 24 |
| 03:57:46 | 25 |

1  ranges.  And, again, as I just said, your Honor, the harm to

2  the City -- to the public interest would be significant.

3          Your Honor, Ms. Versnel called this whole endeavor a

4  foray and a learning experience.  This is not the time or the

5  place to sanction plaintiffs' foray and learning experience

6  with mobile shooting ranges.

7          Thank you.

8          THE COURT:  Thank you.

9          Okay.  Mr. Gura, a very, very short rebuttal, because

10  I think I've heard it.

11                          - - -

12                  MR. GURA, FINAL ARGUMENT

13          MR. GURA:  Sure, extremely short, your Honor.  I'm

14  aware of the time.

15          First of all, I think that the City does not

16  accurately represent the prayer for relief that we've

17  requested.  We are not requesting the abolition of the CFP

18  requirement or of the carrying ban or anything else.  It's

19  really very limited.  It's limited to the application of laws.

20  And I'm quoting here from paragraph 2 of our prayer for

21  relief, As against the ordinary operation and use of gun

22  ranges open to the public and the loan or rental of functional

23  firearms within gun ranges open to the public.

24          The idea is that the instructor can hand the student

25  a gun with which to train, and that is not a crime of giving

| | |
|---|---|
| 03:57:50 | 1 |
| 03:57:54 | 2 |
| 03:57:56 | 3 |
| 03:57:59 | 4 |
| 03:58:02 | 5 |
| 03:58:07 | 6 |
| 03:58:14 | 7 |
| 03:58:22 | 8 |
| 03:58:23 | 9 |
| 03:58:26 | 10 |
| 03:58:28 | 11 |
| 03:58:31 | 12 |
| 03:58:33 | 13 |
| 03:58:36 | 14 |
| 03:58:40 | 15 |
| 03:58:44 | 16 |
| 03:58:48 | 17 |
| 03:58:50 | 18 |
| 03:58:55 | 19 |
| 03:58:58 | 20 |
| 03:59:01 | 21 |
| 03:59:05 | 22 |
| 03:59:08 | 23 |
| 03:59:09 | 24 |
| 03:59:12 | 25 |

1 someone a gun without a CFP, because obviously they are there

2 so they can get the training so they can get their CFP.

3        THE COURT:  I think, and I may be wrong about this,

4 but they are elucidating the Municipal Code sections that you

5 set forth in that second paragraph prayer for relief.  So that

6 you are seeking from me to enjoin the enforcement of all of

7 those subsections of 820.  So it's 20, 30, 80, 100, 110, 140,

8 and 10.

9        MR. GURA:  Yes, but only within the confines of a gun

10 range, because those are things that, for example, one of

11 those code provisions -- and I believe it's the last one

12 there -- prohibits the discharge of a firearm.

13        Of course, we do not agree that people should be able

14 to shoot their guns in the air on the street or at each other.

15 We have no problems with the law that bans the discharge of

16 guns, except as inside a firing range when you are getting

17 training, because that's part of the training.

18        And so it's really as applied and it's very narrow.

19 In fact, the old version of this very same code had an

20 exception for shooting guns inside of a gun range or a

21 shooting gallery.  And what the City Council did a few weeks

22 ago, a few months ago is it crossed that exception out

23 essentially.

24        And so, really, all we're doing is we're saying, We

25 want to be able to operate a gun range.  The City can require

| | | |
|---|---|---|
| 03:59:15 | 1 | the CFPs.  Obviously we're here to train for them.  They can |
| 03:59:18 | 2 | do all these things.  We're not challenging all of these |
| 03:59:22 | 3 | things.  We just don't want to have a tickey-tack type of |
| 03:59:25 | 4 | violation inside of a gun range.  If the instructor gives a |
| 03:59:28 | 5 | student a gun outside the gun range, and then they both go |
| 03:59:32 | 6 | shooting them into the air, they can be arrested.  We're not |
| 03:59:34 | 7 | seeking to enjoin, you know, that kind of prohibition. |
| 03:59:38 | 8 | So I think that they are -- we wouldn't want to |
| 03:59:41 | 9 | enjoin all of these things.  There are some laws that are -- |
| 03:59:47 | 10 | that we don't agree with, as a matter of public policy, but |
| 03:59:51 | 11 | they are constitutional.  There are some laws that may be |
| 03:59:54 | 12 | unconstitutional, but they are not worth litigating over.  We |
| 03:59:57 | 13 | have only chosen to litigate the ban on the operation of a gun |
| 04:00:00 | 14 | range. |
| 04:00:01 | 15 | And so we are looking at those things that restrict |
| 04:00:03 | 16 | the operation of a gun range, and only as applied to the |
| 04:00:06 | 17 | operation of a gun range do we want those things enjoined. |
| 04:00:09 | 18 | And even then it leaves open the possibility, which we do not |
| 04:00:13 | 19 | contest at all, that the City can, in fact, go ahead and |
| 04:00:16 | 20 | regulate gun ranges.  They can zone for gun ranges.  They can |
| 04:00:20 | 21 | go ahead and do all these things that they want to do, |
| 04:00:23 | 22 | provided that they stay within constitutional guidelines. |
| 04:00:27 | 23 | And, you know, it's hard to speculate about what they |
| 04:00:30 | 24 | haven't done.  I suppose that they can easily come up with any |
| 04:00:33 | 25 | number of regulations that we would not think to challenge. |

| | |
|---|---|
| 04:00:37 | 1 |
| 04:00:41 | 2 |
| 04:00:45 | 3 |
| 04:00:53 | 4 |
| 04:00:53 | 5 |
| 04:00:56 | 6 |
| 04:00:59 | 7 |
| 04:01:02 | 8 |
| 04:01:05 | 9 |
| 04:01:08 | 10 |

So it's very important for us simply to clarify that.

Just to clarify, I believe Mr. Hart's testimony was that ILEETA, the International Law Enforcement and Educators Training Association, which is a very well recognized group of firearms instructors, law trainers. They have an annual conference here in Wheeling, and they place the Meggitt training systems range in the parking lot of the Westin, and they go have contests and shooting all day long. And that does not seem to impact the Westin or the surrounding neighborhood.

I would, however, take really brief issue with one thing that Mr. Worseck said about what he believes to be common sense, and that is there was a statement that it might not be sensible to place gun training -- to make gun training available in a high-crime neighborhood.

Your Honor, we would submit that a high-crime neighborhood is the perfect place to have a gun range where people can go get certified for training with firearms, because it's the law abiding people who live in high-crime neighborhoods -- and most people, even in the highest-crime neighborhoods are law abiding -- and need most acutely their Second Amendment rights to defend themselves. And I believe that that's where the service would be most useful and most beneficial to folks.

Rhonda Ezell does not live in a low-crime

| | | |
|---|---|---|
| 04:01:56 | 1 | neighborhood.  Obviously, with three burglaries, it's hard to |
| 04:02:00 | 2 | say anything to the contrary. |
| 04:02:01 | 3 | So this is, you know -- we are providing a public |
| 04:02:06 | 4 | service to people who need it.  We are trying to make sure |
| 04:02:08 | 5 | that people can exercise a fundamental constitutional right. |
| 04:02:12 | 6 | And, you know, I believe that we have a plan for doing that. |
| 04:02:15 | 7 | And I believe that the Court has been extraordinarily |
| 04:02:18 | 8 | patient, and I'm sure I could speak for both sides in saying |
| 04:02:22 | 9 | that we appreciate your Honor listening to this case and |
| 04:02:25 | 10 | listening to both sides.  And we will now await your Honor's |
| 04:02:29 | 11 | decision. |
| 04:02:30 | 12 | THE COURT:  Okay.  All right, folks.  Thank you for |
| 04:02:32 | 13 | your presentations and your evidence, and I will rule shortly. |
| 04:02:37 | 14 | MR. GURA:  Thank you. |
| 04:02:37 | 15 | THE COURT:  Thanks. |
| 04:02:39 | 16 | MR. WORSECK:  Thank you. |
| | 17 | (Concluded at 4:02 p.m.) |
| | 18 | - - - |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1
2
3
4              C E R T I F I C A T E
5
6      I certify that the foregoing is a correct transcript from
7    the record of proceedings in the above-entitled matter.
8
9    /s/April M. Metzler, RPR, CRR, FCRR   October 4, 2010
10   April M. Metzler, RPR, CRR, FCRR       Date
11   Official Federal Court Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25