**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA EZELL, et al., | ) | Case No. 10-CV-5135 |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN OPPOSITION TO |
| v. | ) | DEFENDANT'S MOTION TO DISMISS |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
<u>DEFENDANT'S MOTION TO DISMISS</u>

COME NOW the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action

Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and

through undersigned counsel, and submit their Memorandum of Points and Authorities in

Opposition to Defendant's Motion to Dismiss.

Dated: October 28, 2010            Respectfully submitted,

| | |
|---|---|
| Alan Gura (admitted pro hac vice) | David G. Sigale (Atty. ID# 6238103) |
| Gura & Possessky, PLLC | Law Firm of David G. Sigale, P.C. |
| 101 N. Columbus Street, Suite 405 | 4300 Commerce Court, Suite 300-3 |
| Alexandria, VA 22314 | Lisle, IL 60532 |
| 703.835.9085/Fax 703.997.7665 | 630.452.4547/Fax 630.596.4445 |

By: /s/ Alan Gura/ _____     By: /s/ David G. Sigale/ _____
      Alan Gura                                   David G. Sigale

                                        Attorneys for Plaintiffs

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

PRELIMINARY STATEMENT

Defendant City of Chicago mandates that individuals wishing to possess firearms obtain a Chicago Firearms Permit. This permit can only be issued to applicants who first complete range training, and the process must be repeated every three years. Existing firearm registrants must obtain the new permit, and training, upon expiration of their current permits.

Notwithstanding its mandate that prospective gun owners obtain, and maintain, training at a gun range, the City bans the operation of gun ranges.

The gun range ban is flatly unconstitutional. The Second Amendment guarantees the right to train with firearms so that individuals can be safe and proficient in their use, in addition to securing the right to engage in recreational shooting. If there is a right to keep and bear arms – and there most certainly is such a fundamental, individual right secured in our Constitution – there is inherent within that right, a right to actually *use* arms for traditional lawful purposes. There is absolutely nothing more basic, more plain, more obviously inherent in the possession of guns than the use of those guns at a gun range. Gun ranges may be regulated in the interest of public health and safety, but a complete ban on gun ranges is unconstitutional.

Even were there no right to use guns at a gun range, there is obviously a right to use guns for self-defense in the home, and a law banning gun ranges unconstitutionally impedes the exercise of self-defense in the home by making that exercise less likely to succeed.

1

Nor is it constitutional to mandate training as a condition of gun ownership, and then ban the training. Although strict scrutiny secures gun rights, the prohibition of a gun licensing pre-requisite fails any level of scrutiny.

The range ban also violates the First Amendment. The Supreme Court has just reaffirmed that training individuals is protected First Amendment activity, and as the Fourth Circuit held, gun training, specifically, is protected speech.

Finally, there is no question that membership organizations can file civil rights cases, both to assert the rights of their members, and their own organizational interests in advancing their causes. Additionally, corporate entities can and do file civil rights cases to defend their own rights, and the rights of their customers, to engage in constitutionally-protected activity.

## ARGUMENT

I.     THE USE AND OPERATION OF GUN RANGES LIE AT THE SECOND AMENDMENT'S CORE.

"[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). Unsurprisingly, the Supreme Court has noted that the rights to use and operate a gun range are inherent in the Second Amendment: "The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practices in safe places the use of it, and in due time teaches his sons to do the same*, exercises his individual right." *District of Columbia* v. *Heller*, 128 S. Ct. at 2812 (citation omitted) (emphasis added).

2

"[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms . . ." *Heller*, 128 S. Ct. at 2811-12 (citation omitted). Indeed, to the extent the availability of "[a] well-regulated militia" supplies a reason for the right's codification, U.S. Const. amend. II, "the adjective 'well-regulated' implies nothing more than the imposition of proper discipline and training." *Heller*, 128 S. Ct. at 2800. "The militia consisted of the people bearing their own arms when called to active service, arms which they kept and hence knew how to use." *United States* v. *Emerson*, 270 F.3d 203, 235 (5th Cir. 2001). "An effective militia requires not only that people have guns, but that they be able to shoot them with more danger to their adversaries than themselves." *Silveira* v. *Lockyer*, 328 F.3d 567, 587 (9th Cir. 2003) (Kleinfeld, J., dissenting).

In *Heller*, neither the D.C. Circuit nor the Supreme Court bothered to engage in any balancing test or other extended analysis before striking down Washington, D.C.'s ban on the possession of functional firearms for self-defense, as that law literally contradicted a "core" aspect of Second Amendment rights. *Heller*, 128 S. Ct. at 2818. A complete ban on gun ranges and traditional gun range activity must meet the same fate.

The Seventh Circuit has already rejected the City's argument that the Second Amendment limits its protection only to gun possession within the home: "[T]he Second Amendment creates individual rights, *one of which* is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open [in *Heller*]." *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (emphasis added).

3

Although Plaintiffs take issue with the concept that the Second Amendment "creates" rights as opposed to preserving pre-existing rights, the basic idea – that the Second Amendment is not limited to the home – is incontrovertible. Although *Heller* does not require invalidating all laws regulating guns in public, "*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Ca. 2010).

The Second Amendment applies "*most notably* for self-defense within the home,*"* *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 3044 (2010) (plurality op.) (emphasis added), "where the need for defense of self, family, and property is most acute," *Heller*, 128 S. Ct. at 2717, but not exclusively so. For example, "Americans valued the ancient right [to keep and bear arms] . . . for self-defense *and hunting*." *Heller*, 128 S. Ct. at 2801 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27. Hunting does not occur inside the home.

Describing Second Amendment rights, the Supreme Court invoked Senator Sumner's famous "Bleeding Kansas" speech: "The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest." *Heller*, 128 S. Ct. at 2807 (citation omitted). And in setting out the common-use test for protected arms, the Supreme Court has made clear that the Second Amendment secures arms possessed "for lawful purposes like self defense." *Heller*, 128 S. Ct. at 2815.

Indeed, the Supreme Court was all but forced to declare the Second Amendment applies outside the home, given the way in which the District of Columbia litigated its case. The District

4

offered that the term "bear arms" had an exclusive idiomatic meaning, effectively, to soldier or go into battle, and that "keep and bear arms" was a unitary concept referring only to a right to possess weapons in the context of military duty  The Supreme Court was required to address this argument to reach its judgment, and rejected it. "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 128 S. Ct. at 2793 (citations omitted). To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 128 S. Ct. at 2793 (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)); Black's Law Dictionary 214 (6th Ed. 1998)); *see also Heller*, 128 S. Ct. at 2804 ("the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms . . ."), at 2817 ("the right to keep *and carry* arms") (emphasis added). "[B]ear arms means . . . simply the carrying of arms . . ." *Heller*, at 2796.

Having defined the Second Amendment's language as including a right to "carry" guns for self-defense, the Supreme Court helpfully noted several exceptions that prove the rule. Explaining that this right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 128 S. Ct. at 2816 (citations omitted), the Court confirmed that there is a right to carry at least some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *id.*, at 2817 n.26, "laws forbidding the carrying of firearms in sensitive places," *id.*, at 2817, confirming both that such "presumptions" may be overcome in appropriate circumstances, and that carrying bans are *not* presumptively lawful in non-sensitive places.

All of this activity takes place outside the home.

It is difficult to imagine that practicing the use of guns at a range is not among the "other entitlements" of the Second Amendment outside the home. *Skoien*, at 640. Even the dissenters in *Heller* recognized the majority to have secured a right to arms for "self-defense, *recreation, and other lawful purposes*." *Heller*, 128 S. Ct. at 2845 n.38 (Stevens, J., dissenting) (emphasis added), at 2869 (Breyer, J., dissenting).

Leaving recreation aside, it is beyond dispute that practicing with one's gun at a range tends to increase proficiency and effectiveness. A homeowner wishing to exercise the right of self defense with a firearm would be at a severe disadvantage in doing so absent access to a gun range for practice.

II.     REGARDLESS OF WHICH, IF ANY, STANDARD OF REVIEW IS UTILIZED, THE
        RANGE BAN IS PRESUMPTIVELY UNCONSTITUTIONAL.

Because the challenged laws forbid the exercise of protected activity, without more, they must be struck down. *See Heller*, 128 S. Ct. at 2818 (Functional firearm ban "makes it impossible for citizens to use [firearms] for the core lawful purpose of self-defense and is hence unconstitutional."). But even if the case is governed by some standard of review – any standard of review -- the outcome is the same.

The Supreme Court emphatically rejected the notion that rational basis has any place at all in Second Amendment analysis. "There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments . . ." *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152, n. 4 (1938). Quoting this famous footnote, the Supreme Court recently added, "[T]he [rational basis] test could not be used to evaluate the

6

extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, *or the right to keep and bear arms*." *Heller*, 128 S. Ct. at 2818 n.27 (citing *Carolene Prods.*) (emphasis added). "If a rational basis were enough, the Second Amendment would not do anything." *Skoien*, 614 F.3d at 641.

Finally, removing all doubt as to the presumptive invalidity of nontraditional gun laws, the Supreme Court confirmed that the Second Amendment secures a fundamental right. *McDonald*, 130 S. Ct. at 3042 (plurality opinion) & 3059 (Thomas, J., concurring). "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). Under this analysis, the government carries the burden of proving the law "furthers a compelling interest and is narrowly tailored to achieve that interest," *Citizens United* v. *FEC*, 130 S. Ct. 876, 898 (2010) (citation omitted), a burden that cannot be met where less restrictive alternatives are available to achieve the same purpose. *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004); *see also United States* v. *Engstrum*, 609 F. Supp. 2d 1227, 1331-32 (D. Utah 2009) (applying strict scrutiny in Second Amendment analysis).

The Seventh Circuit has applied intermediate scrutiny in Second Amendment challenges to laws arguably falling within *Heller*'s list of longstanding prohibitions that may be presumptively lawful. But it is wrong to suggest that the Seventh Circuit has reserved for the peaceful, law-abiding people a *lower* level of review than is employed for violent felons, drug abusers, and other dangerous individuals arguably covered by a presumptive exception. The Seventh Circuit has suggested overbreadth is a possible alternative mode of analysis. *United States* v. *Yancey*, 2010 U.S. App. LEXIS 18442 at *10 (7th Cir. Sep. 3, 2010); *United States* v. *Williams*, 616 F.3d 685 (7th Cir. 2010). Overbreadth is a strict scrutiny doctrine.

7

The motion to dismiss fails to disclose *any* governmental interest in banning gun ranges. Defendant has posited that gun ranges are dangerous, but this argument has all been post-hoc rationalization for a law upon which the city council did not even bother making any finding. This is a forbidden exercise of the rational basis test. It cannot be sustained, especially given the incredibly broad application of the law. If there is any sort of harm that is caused by gun ranges, then the government should regulate them in a manner narrowly tailored to address whatever harm they supposedly cause.

> [T]he risk of harm to persons or property, even though great, can be virtually eliminated by the exercise of reasonable or even "utmost" care under the circumstances . . . the use of firearms is a matter of common usage and the harm posed comes from their misuse rather than from their inherent nature alone . . . the location [of a range is assumed] appropriate for such activity in the absence of further factual allegations . . . particularly describing the area as inappropriate for the target practice [and] target practice is of some social utility to the community . . .

*Miller* v. *Civil Constructors*, 272 Ill. App. 3d 263, 271, 651 N.E.2d 239 (Ill. App. 1995).[1]

Defendant has attempted to justify its gun ban by reference to the zoning laws.[2] The Court should ignore such argument because "this asserted governmental interest is a mere restatement of the prohibition itself, not a justification for it." *Church of Lukumi Babalu Aye* v. *City of*

---

[1]Some of Defendant's previously asserted interests are absurd. The notion that there is any harm from people driving through the city with locked, disassembled, and unloaded guns in the trunks of their cars – even if it could be accepted – would not sustain a gun range ban that increases the distances traveled by people to go to a gun range (the City has also suggested Plaintiff Ezell should use public transportation to take her gun to the range). The idea that gun ranges are attractive to criminal activity defies common sense and experience. In any event, "[t]he theft argument is paternalistic. Why can't customers make their own assessments of risk? . . . there is no 'thieves veto'" of constitutionally-protected activity. *New Albany DVD, LLC* v. *City of New Albany*, 581 F.3d 556, 560 (7th Cir. 2009).

[2]The Court may recall that Defendant's zoning authority testified she had absolutely nothing to do with the range ban's enactment, and had never studied or considered the issue of gun range zoning.

*Hialeah*, 508 U.S. 520, 539 n.* (1993). In any event, the Supreme Court forbids the use of zoning to extinguish constitutional rights. In the landmark case of *Renton* v. *Playtime Theaters, Inc.*, 475 U.S. 41 (1986), the Supreme Court upheld restrictive zoning of adult establishments, to the extent these businesses were regulated for their secondary effects. Yet recognizing that these businesses nonetheless engaged in protected expression, the Court held: "the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city." *Renton*, 475 U.S. at 53. Ever since, adult zoning ordinances are measured largely by whether they effectively prohibit adult establishments, or merely limit their location pursuant to constitutional standards. *See*, *e.g. BBI Enters.* v. *City of Chicago*, 874 F. Supp. 890, 895 (N.D. Ill. 1995).

Of course gun ranges are not pornographic establishments. Lawful gun owners who would obtain a CFP must undergo multiple background checks, and all instructors are state-certified police trainers. The only secondary effects of a gun range, apart from noise that can be mitigated, is the offense such establishments give to gun rights opponents. Even in the adult bookstore context, regulators must come up with actual evidence justifying the regulation, not merely "the conjecture of their attorneys." *Palmetto Properties, Inc.* v. *County of DuPage*, 160 F. Supp. 2d 876, 882 (N.D. Ill. 2001); *see also Annex Books, Inc.* v. *City of Indianapolis*, 2010 U.S. App. LEXIS 20214 (7th Cir. Oct. 1, 2010).

III.  THE FIRST AMENDMENT GUARANTEES A RIGHT TO PROVIDE AND RECEIVE INSTRUCTION IN THE USE OF FIREARMS AT A GUN RANGE.

The Supreme Court has long recognized that teaching and learning are protected by the First Amendment. *See*, *e.g. Keyishian* v. *Board of Regents*, 385 U.S. 589, 603 (1967) (First

Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom"); *Sweezy* v. *New Hampshire*, 354 U.S. 234, 249-50 (1957) (plurality) ("right to lecture . . .could not be seriously debated," and noting that "teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding").

One week before the Supreme Court decided *McDonald*, the high court also decided *Holder* v. *Humanitarian Law Project*, 130 S. Ct. 2705 (2010). *Holder* considered the question of whether Congress could ban, as material support for terrorist organizations, "plaintiffs' speech to [terrorist] groups [that] imparts a 'specific skill' or communicates advice derived from 'specialized knowledge.'" *Holder*, at 2724. Rejecting the government's arguments that such training and educational efforts were merely conduct with some communicative aspects, *Holder*, at 2724, the Court nonetheless upheld, under strict scrutiny, a prohibition on the provision of material support "in the form of speech" to designated terrorist organizations, *id.*: "direct training" in "specific skills" of advocacy, and "teach[ing]" how to "present claims for relief." *Holder*, at 2729.

Of course, teaching and learning, the conveyance and receipt of knowledge, are not limited to advocacy or expression. "Even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection." *Universal City Studios* v. *Corley*, 273 F.3d 429, 446 (2d Cir. 2001) (citations omitted). And protected teaching includes demonstrative and experiential conduct, not strictly oral conversation. For example, "instructing children on the topics of geography and fiber arts is a form of speech protected under the First Amendment." *Goulart* v. *Meadows*, 345 F.3d 239, 248 (4th Cir. 2003).

10

As is the provision of hands-on gun training. *Edwards* v. *City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999). In *Edwards*, a police officer asserted a valid First Amendment claim challenging his punishment for teaching a handgun safety class, completion of which was required for individuals wishing to obtain state permits to carry guns. "[T]he form of the [officer's] speech, presumably verbal as well as some written instruction accompanied by physical demonstrations . . . was entitled to protection." *Edwards*, 178 F.3d at 247. Indeed, because the speech concerned "a categorically public issue, the proper method of safely carrying a concealed handgun, knowledge of which is a prerequisite to obtaining a state permit . . . it occupies the highest rung of the hierarchy of First Amendment values." *Id.* (citation omitted).

This argument has been made by Plaintiffs repeatedly, specifically, and emphatically, in various pleadings and in open court, and Defendant has never responded to it except by speculating – incorrectly – that the training at issue in *Edwards* did not involve the firing of guns at a range.  It did. *See* N.C. Gen. Stat. § 14-415.12(a)(4). Defendant has also mischaracterized the argument as a claim that the First Amendment protects, without more, the shooting of guns, but this description has no basis in the complaint or in Plaintiffs' argument, which specifically disclaimed and rejected it.

Even if the gun training and range use were merely conduct, the range ban's impact on gun education would nonetheless constitute a First Amendment violation. Because the range ban and associated laws undeniably burden expression, the laws can only survive if they are

> within the constitutional power of the Government; if [they] further[] an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

11

*United States* v. *O'Brien*, 391 U.S. 367, 377 (1968). The laws fail all four factors. It is not within the city's constitutional power to ban all gun ranges— doing so violates the Second Amendment. The city has no interest, let alone an important or substantial one, in banning all gun ranges. It maintains its own ranges, has historically had ranges open to the public, and initiated the ban only as a form of resisting *McDonald*. Indeed, the governmental interest here is precisely the suppression of gun education. And even if the city's actions were merely a form of regulating gun range activity in furtherance of some legitimate interest, a total ban is plainly overbroad.

IV.    PLAINTIFF MEMBERSHIP ORGANIZATIONS PLAINLY STATE A SECOND
       AMENDMENT CLAIM.

"There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth* v. *Seldin*, 422 U.S. 490, 511 (1975). When a group is forced to spend resources, devoting its time and energy to dealing with certain conduct, it has standing to challenge that conduct. *See*, *e.g.*, *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982).

SAF and ISRA educate, research, and publish about gun control and its consequences. They have to educate their members, and the public, about the government's enforcement of gun laws. When people have questions about the government's firearms policies, they turn to SAF and ISRA. The government's enforcement of the challenged provisions thus directly impacts the organizations. *Bellwood* v. *Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990). Accordingly, SAF and ISRA have organizational standing in this case, and assert claims, on their on their own behalf.

Even more plainly, an association may bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to

12

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *United Food & Commercial Workers Union Local 751* v. *Brown Group*, Inc., 517 U.S. 544, 553 (1996) (citation omitted).

The first prong is easily met: the individual plaintiffs are members and supporters of SAF and ISRA. As they have standing, so do the organizations. *See, e.g. Springfield Branch, NAACP* v. *City of Springfield*, 139 F. Supp. 2d 990, 993 (C.D. Ill. 2001) (concluding that NAACP clearly had standing with respect to racial discrimination claims, where two African-American members were plaintiffs). Indeed, since many SAF and ISRA members are impacted by the challenged laws, representational standing is apparent. The second prong of the representational standing test, that the interests at issue in the litigation are "germane to the organization's purpose," is self-evidently met here.

The third and final prong of the associational standing test is that neither the claim asserted nor the relief requested requires the participation of all individual members in the lawsuit. "[S]o long as the nature of the claim and the relief sought does not make individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Warth*, 422 U.S. at 511. That each individual member's claim for relief may differ based on unique facts does not prevent an association from seeking injunctive and declaratory relief relating to the standards to be applied in such cases. *International Union, United Auto., etc.* v. *Brock*, 477 U.S. 274, 288 (1986); *see also Retired Chicago Police Ass'n* v. *City of Chicago*, 7 F.3d 584, 601 (7th Cir. 1994). This case involves no individualized determinations whatsoever,

13

but is and will be constrained to the simple and straightforward legal questions in the Complaint. Therefore, no individualized proof will be necessary and the participation of individual SAF and ISRA members will not be required. As nothing about this case will require the participation of every SAF and ISRA member, the third and final representational standing element is met.

## V.     ORGANIZATIONS CAN ASSERT CONSTITUTIONAL RIGHTS.

Defendant asserts that "organizations do not possess the rights of individuals," Motion at ¶ 9, but tellingly, this argument is only made against the Second Amendment challenges, not the First Amendment claim.[3]

The argument is frivolous. It is limited to the Second Amendment claim only because the Second Amendment field is too young to have yet produced an example of the constitutional principle in action: "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function."*Craig* v. *Boren*, 429 U.S. 190, 195 (1976) (citations omitted).

A full list of cases demonstrating this concept would be long indeed. For the First Amendment, *see, e.g. Annex Books*, *supra*; *City of Renton*, *supra; BBI Enters., supra; Palmetto Properties, supra.* For abortion rights, *see Stenberg* v. *Carhart*, 530 U.S. 914, 922 (2000) (male abortion provider has standing to assert abortion right); *Planned Parenthood* v. *Casey*, 505 U.S. 833, 845 (1992) (plaintiffs asserting abortion rights: "five abortion clinics and one physician representing himself as well as a class of physicians who provide abortion services"). For

---

[3]Organizations indeed have First Amendment rights. *See, e.g. Citizens United, supra; Church of Lukumi Babalu Aye, supra.* Defendant may not agree with Plaintiffs' First Amendment claim, but that is a different argument than asserting that Plaintiffs are incapable of asserting First Amendment rights.

contraceptives, *see Carey* v. *Population Svcs.*, 431 U.S. 678 (1977) ("a corporation primarily engaged in the mail-order retail sale of nomedical contraceptive devices"). For the Equal Protection Clause (gender discrimination), *see Craig*, 429 U.S. at 192 ("a licensed vendor of 3.2% beer").

If a bookstore can pursue a First Amendment challenge to restrictions on pornography, and if an abortion clinic can assert the right to abortion, it defies credulity to assert that an organizational entity that constructs, operates, or supplies a gun range cannot assert a Second Amendment claim. After all, it is not the bookstore that views pornography, nor is it the abortion clinic that engages in family planning decisions. But their customers do, and the right to provide the products and services are thus protected.

CONCLUSION

Defendant's motion to dismiss must be denied.

Dated: October 28, 2010                    Respectfully submitted,

Alan Gura (admitted pro hac vice)          David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC                     Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405          4300 Commerce Court, Suite 300-3
Alexandria, VA 22314                       Lisle, IL 60532
703.835.9085/Fax 703.997.7665             630.452.4547/Fax 630.596.4445

By: /s/ Alan Gura/                         By: /s/ David G. Sigale/
     Alan Gura                                  David G. Sigale

                                           Attorneys for Plaintiffs

15

<u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney of record for the plaintiffs, hereby certifies that on October 28, 2010, he served a copy of the above Memorandum of Points and Authorities, and this certificate of service, on:

Andrew W. Worseck
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602

by electronic means pursuant to Electronic Case Filing (ECF).


/s/ Alan Gura
Alan Gura