# EXHIBIT A

## O R D I N A N C E

### BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF CHICAGO:

**SECTION 1.** Section 4-4-021 of the Municipal Code of Chicago is hereby amended by adding the language underscored as follows:

**4-4-021  Terms and renewals of licenses.**
Unless a specific term for a license is otherwise provided for in this title, a licensee may elect to have the term of a license expire at the end of two years or four years; provided that the term of any license issued pursuant to Chapter 4-60, 4-72, 4-92, 4-144, 4-151, 4-156, 4-208, 4-209 or 4-388 shall expire at the end of two years; provided further that the term of all licenses issued for a licensed location to a person who has also been issued a license pursuant to Chapter 4-60, 4-72, 4-92, 4-144, 4-156, 4-208, 4-209 or 4-388 for that location shall expire at the end of two years. When a licensee adds an additional license at an existing licensed location, the commissioner is authorized to align the expiration date of any additional license, as provided for in rules and regulations, and to prorate the fee for such additional license, if applicable.

(omitted text is unaffected by this ordinance)

**SECTION 2.**  Section 4-5-010 of the Municipal Code of Chicago is hereby amended by adding the language underscored as follows:

**4-5-010  Establishment of license fees.**
This chapter shall establish fees for various licenses created by this title unless otherwise provided. The following fees shall apply for the specified licenses. The chapter in which each fee requirement is created is also provided. Unless otherwise stated, fees shall be assessed every two years.

(omitted text is unaffected by this ordinance)

(82) [Reserved.] Shooting range facility                    $4,000.00

(omitted text is unaffected by this ordinance)

**SECTION 3.**  The Municipal Code of Chicago is hereby amended by adding a new Chapter 4-151, as follows:

### CHAPTER 4-151 Shooting Range Facility license.

**4-151-010 Definitions.**
As used in this Chapter, unless the context requires otherwise:

"Ammunition," " CFP," "firearm" and "FOID" have the meanings ascribed to the terms in Section 8-20-010.

"Applicant" means any person who is required to be disclosed pursuant to section 4-151-030(b).

"Building" has the same definition ascribed to that term in section 17-17-0223.

"Commissioner" means the commissioner of business affairs and consumer protection.

"Completely enclosed building" has the same definition ascribed to that term in section 17-0239.

"Department" means the department of business affairs and consumer protection.

"Employee" means a person employed to work at, and who is located at, a shooting range facility.

"Manager" means a person employed to manage a shooting range facility.

"Mobile shooting range" means a shooting range capable of being transported, usually by means of a vehicle or trailer, as those terms are defined in section 9-4-010, or some other type of shipping container.

"Shooting range patron" means any person present in a shooting range facility, including a person who utilizes the shooting range for the discharging of firearms at a target; but a "shooting range patron" does not include a licensee, manager, employee, or any independent contractor hired to clean or maintain the shooting range facility.

"Range master" means the individual charged with the responsibility of insuring that the range activities adhere to all rules and regulations for the health and safety of persons at the shooting range.

"Shooting range" or "range" means an area that contains shooting stations or firing lines, target areas, and other related components for discharging firearms at a target.

"Shooting range facility" means a public or private shooting range and the premises on which the shooting range is located and includes all the buildings, structures, parking areas, and other associated improvements located on the premises. A "shooting range facility" includes any shooting range facility operated or managed by members of a private club or organization for the benefit of its members.

"Superintendent" means the superintendent of police.

**4-151-020  License – Required.**
It shall be unlawful for any person to conduct, maintain, or operate a shooting range without first securing a shooting range facility license under this chapter. The license required by this chapter shall be in addition to any other license required by law.

The license shall be valid only for the premises for which it was originally issued and only to the person to whom it was issued.  The license shall not be subject to sale, assignment, or transfer, voluntary or involuntary.

The license shall be displayed in a conspicuous place in the shooting range facility.

**4-151-030  License – Application and issuance procedures.**
(a) An application for a shooting range facility license shall be made in conformity with the

provisions of this chapter and the general requirements of Chapter 4-4 relating to applications for licenses. No original or renewal license shall be issued to any applicant or licensee unless all persons required to be disclosed as applicants meet the eligibility requirements.

(b) The application shall be in writing, signed by the applicant if an individual. If the applicant is a partnership or corporation, the application shall be signed by an officer or partner. If the applicant is a limited liability company managed by managers, the application shall be signed by a manager. If the applicant is a limited liability company managed by its members, the application shall be signed by a member. The application shall be verified by oath or affidavit, and shall include the following statements and information:

(1) in the case of an individual: the name, date of birth, residence address, current telephone number and social security number of the applicant; in the case of a partnership, limited partnership, corporation, limited liability company or other legal entity: the date of its organization or incorporation; the objects for which it was organized or incorporated; the name, residence address, date of birth and social security numbers of any person owning directly or beneficially any percentage of ownership therein, provided, however, that if the partnership, limited partnership, corporation, limited liability company or other legal entity is publicly traded on an exchange within the meaning of the Securities Exchange Act of 1934, the names, residence addresses, social security numbers, dates of birth and percentage of interest of the three members who own the highest percentage of interest therein and of any other members who hold a five percent or greater interest therein; and, where applicable, the names, residence addresses, dates of birth and social security numbers of all principal officers and directors; if the entity is a manager- managed limited liability company, the names, residence addresses, dates of birth and social security numbers of all managers; and the name and current telephone number of any authorized agent; and in all cases: the name, address, and a brief description of any work performed by any person in connection with the preparation and filing of the application, including but not limited to, any attorney, accountant, consultant, expediter, promoter or lobbyist;

(2) the character of the business of the applicant and the length of time the applicant has been in a business of that character, or in the case of a corporation, the date of incorporation;

(3) the location and description of the premises or place of business which is to be operated under such license;

(4) the name and address of the owner of the premises. If the premises are leased:
(A) a copy of the lease, which must include a statement of the building owner indicating that the owner agrees to the use of the building for the operation of a shooting range facility;

(B) the name, address and telephone number of the owner of the premises, including the name and address of the beneficiary if title to the premises is held by a person as trustee and if known to the applicant;

(5) the name and identity of all individuals who will be managers of the shooting range facility and a copy of every agreement for the management of the shooting range facility;

(6) the applicant's, manager's and employees' federal firearms license, CFP and FOID card numbers;

(7) a statement as to whether the applicant, manager or any employee is disqualified

to receive a license by reason of any provision of this chapter or other provisions of this Code or the laws of the state of Illinois;

(8) a statement as to whether the applicant, manager, any employee, or the building owner in the case of a leased building, has ever been convicted, or found liable in an administrative adjudication, of a felony, a misdemeanor involving a firearm, or any other law concerning the manufacture, possession or sale of firearms;

(9) a statement as to whether any previous license for the operation of a shooting range facility issued by any jurisdiction to the applicant or the manager has been revoked, the date of the revocation and the reasons for the revocation;

(10) any other information that the commissioner or the superintendent may require to implement the requirements of this chapter.

(c) The commissioner shall forward the application to the departments of buildings, fire, police, and environment. Before a license shall be issued, the departments of buildings, fire, police, and environment shall inspect the premises for which the license is sought to determine whether the shooting range facility is in compliance with the provisions of this code and the rules and regulations promulgated thereunder relating to health and sanitation, buildings, public safety, environment and fire prevention.

(d) The applicant and every manager of the shooting range facility shall submit to fingerprinting by the department.

(e) At the time an application is originally filed for a shooting range facility license, the applicant shall pay the license fee required by Section 4-5-010 and, no later than 30 days after payment of the license fee, shall submit to the department all required documentation, as prescribed by the rules and regulations of the department, necessary to complete the license application.

If the applicant submits all required documentation in a timely manner, the commissioner shall review the application materials and shall approve or deny the application within 60 days after all required documentation has been submitted.

If the applicant fails to submit all required documentation within 30 days after payment of the license fee, the application shall deem incomplete and no further action shall be taken on the application, unless the applicant reactivates the application within six months after the original application is filed by: (i) submitting all required documentation necessary to complete the application process: and (ii) paying a $500.00 application reactivation fee. If the applicant reactivates the license application in accordance with the requirements of this subsection, the commissioner shall review the application materials and shall approve or deny the application within 60 days after all required documentation has been submitted and the application reactivation is fee paid.

If the commissioner deems the license application to be incomplete and the applicant fails to reactivate the application in accordance with the requirements of this subsection, or, if the applicant withdraws the application, the application shall expire and the applicant shall forfeit the license fee and, if applicable, the license application reactivation fee. If the license application expires or is withdrawn, a new application for a license, accompanied by the license fee and all required documentation prescribed by the rules and regulations of the department, shall be

required to obtain a license under this chapter.

(f) The commissioner may deny an application for a shooting range facility license if the issuance or renewal of such license would have a deleterious impact on the health, safety or welfare of the community in which the shooting range facility is or will be located. A deleterious impact is presumed to exist whenever there have been a substantial number of arrests within 500 feet of the applicant's premises (measured from the nearest exterior wall of the premises) within the previous two years, unless the applicant has adopted a plan of operation that will provide reasonable assurance that the issuance of the license will not have a deleterious impact.

If the applicant is seeking a shooting range facility license for a premises and the commissioner finds that, for the subject premises identified in the application within the previous two years, a license application has been denied under this subsection (f) because the commissioner has determined that issuance of the license would have a deleterious impact on the health, safety or welfare of the community, the application shall be denied unless the applicant can prove to the commissioner by clear and convincing evidence that applicant has devised a plan of operation that will provide reasonable assurance that the issuance of the license will not have a deleterious impact.

In any case in which the commissioner finds that an application must be denied under this subsection (f), the commissioner shall notify the applicant of that finding and afford the applicant 20 days in which to submit a plan of operation, and the time for a final ruling on the application shall be stayed until 35 days after the period in which the plan may be submitted has expired. The plan may include conditions upon the applicant's operation of the premises that are useful or necessary to mitigate a deleterious impact, including but not limited to providing security personnel, restricted hours of operation, providing outdoor lighting, the display of signs, or any other reasonable restrictions. An applicant's failure to adhere to a written plan of operation approved by the commissioner pursuant to this subsection shall constitute a basis to impose a fine and to suspend or revoke any shooting range facility license subsequently issued, as appropriate.

For purpose of this subsection (f), "deleterious impact" has the same meaning ascribed to that term in section 4-60-010.

(g) At the time an application for a license is originally filed or subsequently renewed, the applicant or licensee shall provide proof to the department that the applicant or licensee has obtained the insurance required pursuant to section 4-151-070.

(h) No original or renewal license shall be issued to any applicant or licensee if any person owning, either directly or indirectly, more than five percent of the interest in the applicant or licensee owes a debt within the meaning of Section 4-4-150(a) of this Code.

(i) Within five days of the payment of the license fees pursuant to this chapter, the commissioner shall notify the alderman of the ward in which the premises described in such license is located.

(j) Except as otherwise provided in this section, if a change in any information required in subsection (b) of this section occurs at any time during a license period, the licensee shall file a statement, executed in the same manner as an application, indicating the nature and effective date of the change. The supplemental statement shall be filed within 30 days after the change takes effect.

(k) Whenever any changes occur in the officers of the licensee, the licensee shall notify the department in accordance with the procedures set forth in this subsection. For purposes of this subsection, the term "officer of the licensee" or "officers of the licensee" means the members of a partnership, the officers, directors, managers or shareholders of a corporation, or the managers or managing members of a limited liability company or other legal entity licensed pursuant to this chapter.

(1) if any officer of the licensee is removed from office in accordance with the bylaws, operating agreement, partnership agreement for the licensee, pursuant to law or court order, by reason of death, or for any other reason, and such officer is not replaced, then the licensee shall notify the department of the change by notarized letter within 30 days of the effective date of the change; provided, however, that if the person removed from office but not replaced owned five percent or more of the interest in the licensee at the time of his or her removal from office, the licensee shall comply with item (3) of this subsection. The licensee shall submit any additional information pertaining to the removal of any officer requested by the commissioner within 10 days of such request.

(2) if any officer of the licensee is removed from office in accordance with the bylaws, operating agreement or partnership agreement for the licensee, pursuant to law or court order, by reason of death or for any other reason, and the person removed from office is replaced by a person who has no ownership interest in the licensee or who owns less than five percent of the ownership interest in the licensee, then the licensee shall notify the department of the change by filing with the department a change of officer form provided by the department within 30 days of the effective date of the change. The person replacing the removed officer shall be fingerprinted as required by subsection (d), and the licensee shall submit to the department of business affairs and consumer protection, along with the change of officer form, the following: (i) proof that the person replacing the removed officer has been fingerprinted; (ii) a fee of $100.00 which the commissioner is authorized to assess; and (iii) any other supplementary materials prescribed by the rules and regulations of the department.

(3) if any officer of the licensee owning directly or beneficially more than five percent of the interest in the licensee is removed from office in accordance with the bylaws, operating agreement or partnership agreement for the licensee, pursuant to law or court order, by reason of death or for any other reason, and such officer is replaced, or if five percent or more of the ownership interest in the licensee changes hands or is transferred to a non-licensee, the licensee shall notify the department by submitting to the department within 30 days of the effective date of the change: (i) a change of officers/shareholders application in conformity with the requirements of this chapter; and (ii) a fee of $250.00 which the commissioner is authorized to assess. All new partners, officers, directors, managers, managing members, shareholders or any other person owning directly or beneficially more than five percent of the interest in a licensee shall satisfy all of the eligibility requirements for a licensee as provided in this chapter. Failure to comply with the requirements of this subsection shall be grounds for revocation of any shooting range facility license held by such licensee.

(4) if a change in the officers of the licensee of the type described in items (1) or (2) of this subsection takes place at the same time that a change in the officers of the licensee of the type described in item (3) of subsection occurs, the licensee shall be required to comply with the requirements of item (3) of this subsection (k) only.

**4-151-040 Qualifications for licenses.**

No license shall be issued under this chapter if the applicant, the manager, or any employee:

(a) Is under 21 years of age;

(b) Has ever been convicted of a felony;

(c) Has ever been convicted of a misdemeanor involving a firearm, or any other violation of law concerning the manufacture, use, possession or sale of firearms;

(d) Does not possess a valid CFP, Illinois FOID card and any necessary federal firearms license;

(e) Has within the previous five years submitted false or misleading information in connection with any application for a license relating to the sale or possession of firearms.

**4-151-050 License denial or renewal.**

A license or a renewal of a license shall be denied or revoked for any of the following reasons:

(a) The applicant's license under this chapter, or any other license for the manufacture, sale, use or possession of firearms, has been revoked for cause.

(b) A license issued under this chapter for the location described in the application has been revoked for any cause within one year of the date of the application.

(c) The applicant makes any false, misleading or fraudulent statement or misrepresents any fact in the license application, or uses any scheme or subterfuge for the purpose of evading any provision of this chapter.

(d) The applicant, manager, or any employee has admitted or been found guilty or liable in any judicial or administrative proceeding of: (i) a felony of any nature, or any offense, however classified, that would have been a felony under Illinois law when committed; (ii) a misdemeanor involving a firearm; or (iii) any other violation of law concerning the manufacture, possession, use or sale of firearms.

(e) The applicant, licensee, or manager, who at the time of application or renewal of any license issued pursuant to this chapter, would not be eligible for such license upon a first application.

(f) An applicant whose license issued under this chapter has been revoked for cause if such revocation occurred with 5 years of the date of application;

**4-151-060 Inspections.**

Every shooting range facility shall be open at all reasonable times for inspection by the departments of buildings, environment, police, business affairs and consumer protection, and fire.

**4-151-070 Insurance Requirements.**

The licensee shall obtain and keep current at all times, liability insurance for the operation of the premises described in such application or license in the aggregate amount of $1,000,000.00. The insurance policy required by this section shall be for a term of at least 12 months, and shall be co-extensive with the first 12 months of the applicable license period. Thereafter, the licensee shall continue to maintain such insurance policy in full force and effect for the duration of the

- 7 -

two-year license period. The licensee shall keep proof of the required insurance at the shooting range facility at all times and, upon demand, shall produce such proof for inspection by an authorized city official. Each policy of insurance required under this section shall include a provision requiring 30 days' advance notice to the commissioner prior to termination or lapse of the policy. Failure to comply with this section shall be grounds for the suspension or revocation of the license for a single offense in accordance with the requirements of Section 4-4-280 of this Code.

## 4-151-080 Shooting ranges-indoors.

No outdoor shooting ranges are permitted. All shooting ranges shall be located indoors in completely enclosed buildings.

No mobile shooting range is permitted regardless of whether the mobile shooting range has been immobilized or located within a completely enclosed building.

## 4-151-090 Hours of operations.

Shooting range facilities may operate only between the hours of 9 a.m. and 8 p.m. No person shall operate, or permit the operation, of a shooting range facility during any other time.

## 4-151-100 Standards of operation.

(a) No firearm shall be discharged in the shooting range if the type of firearm or caliber of ammunition is not suitable or safe for use at the shooting range. The discharge of firearms shall only be permitted in the shooting range. The range master shall inspect all firearms and ammunition, whether supplied by the licensee or brought by a shooting range patron to the shooting range facility, to determine whether the firearm and ammunition are safe and in good operating condition and are of a caliber appropriate for the design of the shooting range and backstop.

(b) A range master shall be on duty during all operating hours of shooting range facility. Prior to permitting anyone to discharge a firearm, the range master shall ensure that no person is in the direct fire zone. There shall be a minimum of 1 range master for every 3 shooting range patrons who are discharge a firearm from the firing line.

(c) No person shall be permitted to enter or leave the shooting range facility with a loaded firearm.

(d) No person under the age of 18 shall be permitted in the shooting range facility. The licensee shall require every shooting range patron to provide a driver's license or other government-issued identification showing the person's name, date of birth, and photograph.

(e) No person, other than the range master, licensee, manager or employee shall be permitted beyond the firing points; provided that this provision does not apply to any independent contractor hired to clean or maintain the shooting range facility.

All doors, gates and entrances between the firing points and backstop shall be securely locked at any time that a person is engaged in shooting on the range.

(f) No person shall be permitted to enter or remain at the shooting range facility if he appears to the range master to be under the influence of alcohol, narcotics, or controlled substances, or if he is engaging in conduct which the range master reasonably deems to pose a hazard to himself or others.

(g) (1) Every person possessing a firearm at a shooting range facility, including all shooting range patrons, shall have a CFP and a FOID card, unless the person is an exempt person under section 8-20-110(e) or (f). The licensee or manager shall require every shooting range patron claiming to be an exempt person under section 8-20-110(e) or (f) to provide evidence of such exemption, and to provide a FOID card.

(2) Notwithstanding subsection (g)(1), a CFP shall not be required of a shooting range patron while the shooting range patron is receiving the one-hour firearm range training in compliance with section 8-20-120. This exception only applies for a one-time, one-hour period while the shooting range patron is receiving the range training portion of the required firearm safety and training course.

(h) No other weapons, other than firearms, shall be discharged in the shooting range.

(i) Protective eye wear and hearing protection shall be provided to every range master, manager, employee and shooting range patron while such person is located in the shooting range. The protective eye wear and hearing protection must be worn at all times when a person in the shooting range is discharging a firearm.

(j) No ammunition shall be reloaded at the shooting range facility.

(k) A manager must be in charge of the shooting range facility at all times other than those times when an individual licensee is in charge.

(l) Every firearm possessed at the shooting range facility shall be registered in compliance with chapter 8-20 and the licensee shall not permit any unregistered firearm at the shooting range facility, whether possessed by the licensee or brought to the facility by a shooting range patron, unless the firearm is exempted from registration pursuant to section 8-20-140(f). The licensee shall require proof that any firearm possessed at the shooting range facility is registered or exempt from registration pursuant to section 8-20-140 (f).

(m) Every shooting range facility shall be in compliance with the applicable building, environmental and fire code requirements, including any rule or regulations promulgated thereunder.

**4-151-110 Safety plan.**
(a) Every application for a license under this chapter must be accompanied by a safety plan meeting the requirements of this section. The safety plan must be approved by the superintendent.

(b) The plan shall provide evidence satisfactory to the superintendent of: (i) the installation and maintenance of adequate exterior lighting; (ii) the installation and maintenance of interior and exterior surveillance cameras installed at each building; (iii) the installation of an alarm system ; (iv) protocols for the safe display of and storage of firearms and ammunition; and (v) the employment of adequately trained personnel and qualifications of the range masters; all in accordance with rules prescribed by the superintendent. Recordings from the surveillance camera required by clause (ii) shall be maintained for not less than 30 days and shall be made available to members of the department of police. The failure to submit an approved safety plan as required by this section shall be grounds to deny an application for a license under this chapter or renewal thereof. The failure to adequately implement or maintain an approved safety plan under this section shall be grounds for suspension or revocation of the license and shall be grounds for the city to recover its costs resulting from such failure under chapter 1-20. Notwithstanding any other ordinance to

the contrary, the city shall not impose a fee for any surveillance camera installed pursuant to this section solely because the camera or its wiring is in any portion of the public way.

**4-151-120  Restricted areas.**
No premises licensed under this chapter may be located, as measured from property line to property line:

(a) Within 1,000 feet of another premises licensed as a shooting range facility;

(b) Within 1,000 feet of any zoning district zoned for residential use, including a planned development, that authorizes such residential use; or

(c) Within 1,000 feet of any school, day-care facility, park, place of worship, any premises licensed for the retail sale of liquor, children's activities facility, library, museum or hospital.

**4-151-130    Prohibited activities.**
(a) No licensee shall permit any alcoholic beverages, narcotics or controlled substances to be brought to, or consumed at, the shooting range facility, or permit the conduct of any activities at the shooting range facility for which a public place of amusement license is required under Section 4-156-300.

(b) No licensee shall permit any activity at the shooting range facility that is not in conformance with this chapter, or chapters 8-20 or 8-24, or with any federal or state law or regulation concerning the transfer or possession of firearms or ammunition.

(c) No licensee shall allow any illegal activity at the shooting range facility. The violation of the provisions of this chapter, or chapters 8-20 or 8-24, or of any criminal statute of the state of Illinois by the licensee, or by any employee, partner, agent or independent contractor of the licensee while at the shooting range facility may be grounds for revocation or suspension of the license issued under this chapter.

(d) It is the affirmative duty of a licensee to report promptly to the police department all illegal activity reported to or observed by the licensee on or within sight of the shooting range facility; to answer fully and truthfully all questions of an identified police officer who inquires or investigates concerning persons or events in or around the shooting range facility; to cooperate with the police in any such inquiry or investigation, including the giving of oral or written statements to the police at reasonable times and locations in the course of investigations; and to sign a complaint against any person whom the licensee observes in any illegal conduct or activity on or within sight of the shooting range facility.

(e) For purposes of this section, "licensee" includes the manager of the premises and any employee, partner, agent or independent contractor of the licensee. For purposes of a license revocation and suspension, the licensee shall be strictly liable for violations or impermissible conduct of any employee, partner, agent or independent contractor of the licensee, regardless of actual or constructive knowledge.

**4-151-140    License revocation; wait for new license.**
When any license issued pursuant to this chapter has been revoked for any cause, no license shall be granted under this chapter for those premises to any person for the period of one year thereafter, unless the revocation order was entered as to the licensee only.

**4-151-150 Exemptions.**
　　The provisions of this chapter shall not apply to any shooting range facility operated by:
　　　　(1)　any federal, state or local law enforcement agency;
　　　　(2) the armed forces of the United States, including the Reserves; or
　　　　(3) an entity licensed by the State of Illinois under the Private Detective, Private Alarm, Private Security, Fingerprint Vendor, and Locksmith Act of 2004, 225 ILCS 447/35-5, et seq, as amended, to the extent that such licensed agency is permitted under state law to operate a shooting range and that the licensed agency is in compliance with those laws; provided further that the shooting range facility is used exclusively for employees of such licensed agency and is not open to the public.

**4-151-160 Range Masters-Qualifications and duties.**
　　a) Every range master shall:
　　　　1) have completed a course in firearm safety and instruction;
　　　　2) be familiar with applicable federal, state and local laws and regulations pertaining to firearms;
　　　　3) have experience in range operations and management; and
　　　　4) be proficient in firearm utilization and instruction.

　　b) A range master is responsible:
　　　　1) for the operation and maintenance of the shooting range;
　　　　2) to inspect all firearms and ammunition for safe functions and operation;
　　　　3) to ensure all firearms and ammunition at the shooting range facility are stored in compliance with all applicable laws and rules and regulations; and
　　　　4) to ensure that no firearms or ammunition which cannot be safely discharged in the shooting range due to the range's design and construction are not discharged in the shooting range.

**4-151-170 Registration of firearms and sale of ammunition.**
　　(a) A licensee shall not provide or otherwise give a shooting range patron a firearm for the patron's use at the shooting range; except that the licensee may provide a firearm to a shooting range patron only for the purpose of receiving the one-hour range training required for a CFP.　All such firearms provided to the shooting range patrons shall be registered pursuant to section 8-20-140.

　　(b) A licensee may sell ammunition to a shooting range patron only for use at the shooting range.　The licensee shall ensure that no shooting range patron leaves the shooting range facility with any ammunition purchased from the licensee.

**4-151-180 Regulations.**
　　The commissioner shall have the authority to promulgate rules and regulations necessary to implement the requirements of this chapter.

　　The superintendent shall have the authority to promulgate rules and regulations necessary to implement the requirements of this chapter for the operation of shooting range facilities relating to the safety plan, the safe storage and handling of firearms and ammunition, range masters qualifications; type and caliber of firearms and ammunition; and any other area pertaining to the safe operation of the shooting range.

**4-151-190 Violation – Penalty.**
　　Except where otherwise specifically provided, any person violating any of the provisions of

this chapter, or any rule or regulation promulgated thereunder, shall be fined not less than $500.00 nor more than $5,000.00 for each offense, or may be incarcerated for a term not to exceed 180 days, or both fined and incarcerated. A separate and distinct offense shall be held to have been committed each day any person continues to violate any of the provisions hereof.

SECTION 4. Chapter 8-20 of the Municipal Code of Chicago is hereby amended by deleting section 8-20-280, by adding the language underscored and by deleting the language struck through, as follows:

**8-20-010 Definitions.**
For purposes of this chapter the following terms shall apply:
"The Act" means the Illinois Firearm Owners Identification Card Act, 430 ILCS 65/1 et seq., as amended.

(omitted text is unaffected by this ordinance)

"Lawful transportation" means the transportation of a firearm by a person:
(1) in compliance with section 8-20-090; or
(2) who has a valid FOID card, a CFP and firearm registration certificate, if applicable, and the firearm is: (i) broken down in a nonfunctioning state; (ii) not immediately accessible; and (iii) unloaded and in a firearm case.

"Licensed shooting range facility" means a shooting range facility, as that term is defined in section 4-151-010, that has been issued a shooting range facility license pursuant to chapter 4-151.

"Long gun" means any firearm, other than a handgun.

(omitted text is unaffected by this ordinance)

"Range Master" and "Shooting range patron" have the meaning ascribed to those terms in section 4-151-010.

"Violent crime" has the same meaning ascribed to that term in the Rights of Crime Victims and Witnesses Act, 725 ILCS 120/1, et seq., as amended.

**8-20-020 Unlawful possession of handguns.**
(a)    It is unlawful for any person to carry or possess a handgun, except when in the person's home.

(b)    The provisions of this section shall not apply to:

(omitted text is unaffected by this ordinance)

(17) a person while engaged in the lawful transportation of a firearm.
(18) a range master, manager or employee, as those terms are defined in section 4-151-010, of a licensed shooting range facility, or a shooting range patron of a licensed shooting range facility, while at the licensed shooting range facility.

**8-20-080 Possession of ammunition.**

(a) It is unlawful for any person to carry or possess any ammunition in the city, unless the person:

(1) has a valid CFP and registration certificate for a firearm of the same gauge or caliber as the ammunition possessed, and while in possession of the ammunition, has the CFP and registration certificate in his possession when he is not in his home, or, when he is in his home, has the CFP and registration certificate readily available in his home; or

(2) is a licensed weapons dealer; ~~or~~

(3) is a person listed in section 8-20-020(b);

(4) is a range master, manager or employee, as those terms are defined in section 4-151-010, of a licensed shooting range facility, and the ammunition is stored at and for use at the licensed shooting range facility; or

(5) is a shooting range patron at a licensed shooting range facility.

(b) Any ammunition carried or possessed in violation of this section is hereby declared to be contraband and shall be seized by and forfeited to the city.

**8-20-100 Permissible sales and transfers of firearms and ammunition.**

(a) Except as authorized by subsection (e) and section 2-84-075, no firearm may be sold, acquired or otherwise transferred within the city, except through inheritance of the firearm.

(b) No ammunition may be sold or otherwise transferred within the city, except through a licensed weapons dealer, or as otherwise allowed by this code.

(c) No firearm or ammunition shall be security for, or be taken or received by way of any mortgage, deposit, pledge or pawn.

(d) No person may loan, borrow, give or rent to or from another person, any firearm or ammunition except in accordance with this chapter.

(e) Notwithstanding any other provision of this section, a peace officer may sell or transfer any lawfully held firearm or ammunition to another peace officer in accordance with the other provisions of this chapter.

(f) Notwithstanding any other provision of this section, a range master, manager or employee, as those terms are defined in section 4-151-010, of a licensed shooting range facility may sell ammunition, or provide a firearm to, a shooting range patron in compliance with section 4-151-170.

**8-20-110 CFP – Required.**

(a) Subject to subsection (d), it is unlawful for any person to carry or possess a firearm without a CFP.

(omitted text is unaffected by this ordinance)

(e) The provisions of this section shall not apply to any person listed in section 8-20-020(b)(1) – (16) or a person engaged in interstate travel in compliance with section 8-20-100.

(f) Notwithstanding any other provision of this section, a CFP shall not be required of a shooting range patron at a licensed shooting range facility while the shooting range patron is receiving the one-hour range training in compliance with this section. This exception only applies

for a one-time one-hour period while the shooting range patron is receiving the range training portion of the required firearm safety and training course.

**8-20-140  Firearm registration certificate – Required.**
(a)      Subject to subsection (d), it is unlawful for any person to carry or possess a firearm without a firearm registration certificate.

(omitted text is unaffected by this ordinance)

(f) Notwithstanding any other provision of this section, a shooting range patron at a licensed shooting range facility who is provided a firearm by the range master, manager or employee, as those terms are defined in section 4-151-010, of a licensed shooting range facility shall be in compliance with this section if the firearm is registered to the person issued a license for the shooting range facility in accordance with chapter 4-151.

~~8-20-280  Prohibition on shooting galleries and target ranges~~
~~Shooting galleries, firearm ranges, or any other place where firearms are discharged are prohibited; provided that this provision shall not apply to any governmental agency. The discharge of a firearm in an area where hunting is permitted shall not be a violation of this section.~~

SECTION 5.  Chapter 8-24 of the Municipal Code of Chicago is hereby amended by adding the language underscored and by deleting the language struck through, as follows:

**8-24-005  Definitions.**
For the purposes of this Chapter, the following definitions apply:

"Corrections officers," "firearm," ~~and~~ "peace officer," "shooting range patron" and "licensed shooting range facility" have the meaning ascribed to those terms in section 8-20-010.

**8-24-010  Discharging firearms.**
No person shall fire or discharge any firearm within the city, except in the lawful self-defense or defense of another, or in accordance with the provisions of Section 8-24-050 of this Code.

No cannon or piece of artillery shall be discharged or fired off in any public way or other public place within the city, except upon the express permission of the city council.

Any person violating any of the provisions of this section shall be fined not less than $500.00 nor more than $1,000.00 for each offense.

The provisions of this section shall not apply to:
(1)  persons listed in section 8-20-020(b)(1)– (15);
(2) a range master, manager or employee, as those terms are defined in section 4-151-010, and a shooting range patron, at a licensed shooting range facility; or
(3) a firearm instructor certified by the State of Illinois who is instructing a shooting range patron for the firearm safety and training course required by section 8-20-120 at a licensed shooting range facility.

SECTION 6.  Chapter 11-4 of the Municipal Code of Chicago is hereby amended by adding new sections 11-4-260 and 11-4-1095, as follows:

**11-4-260 Environmental Standards for Shooting Range Facilities.**
(a) For purpose of this section, the terms "shooting range" and "shooting range facility" have the meaning ascribed to those terms in section 4-151-010.

(b) The commissioner is authorized to promulgate rules and regulations for the cleaning of, sound and air quality control at, and discharge of particulate matter and waste from shooting ranges and shooting range facilities.

(c) In addition to any other fine or penalty provided, any person who violates any rule or regulation promulgated under this section shall be fined not less than $300.00 nor more than $1,000.00.

**11-4-1095 Interceptors at shooting range facilities.**
Interceptors and separators located in shooting ranges and shooting range facilities, as those terms are defined in section 4-151-010, shall be operated and maintained in accordance with the manufacturer's recommendation to ensure that the devices will continue to perform in accordance with all applicable local, state and federal discharge standards. Accumulated material from interceptors, separators, and downstream manholes shall be sampled for waste characterization and disposed of in accordance with all local, state, and federal laws and regulations.

SECTION 7. Chapter 11-16 of the Municipal Code of Chicago is hereby amended by adding a new section 11-16-135 as follows:

**11-16-135 Discharge of waste water from shooting range facilities.**
(a) For purpose of this section, the term "shooting range facility" has the meaning ascribed to that term in section 4-151-010.

(b) The commissioner of water management shall promulgate rules and regulations pertaining to the proper discharge of waste water from a shooting range facility.

(c) In addition to any other applicable local, state or federal law or standard, no person shall discharge or cause to be discharged into any portion of the sewer system or waterway any waste water in violation of the rules and regulations promulgated under this section.

(d) Any person who violates this section shall promptly notify the department. Such person shall clean up and dispose of the prohibited substance subject to department approval and in conformity with the requirements of this Code, all rules and regulations promulgated thereunder and all other applicable laws. If the prohibited substance is not cleaned up and disposed of in compliance with the requirements of this section, the commissioner shall cause the prohibited substance to be cleaned up and disposed of at the person's expense. Such person shall pay the city in full for any costs and expenses which the city incurs in connection with the performance of that work.

(e) Any person who violates this section or any rule or regulation promulgated thereunder shall be fined $500.00.

SECTION 8. Chapter 13-96 of the Municipal Code of Chicago is hereby amended by adding a new Article XXII Shooting Ranges, section 13-96-1130 through and including section 13-96-1240, as follows:

**Article XXII Shooting Ranges**.

**13-96-1130  Definitions.**
        For purposes of this Article XXII, the following definitions apply:

        "Building," "shooting range," "shooting range facility," "mobile shooting range," "shooting range patron" and "range master" have the same meaning ascribed to those terms in section 4-151-010.

        "Ancillary spaces" means the uses associated with the operations of the shooting range facility outside of the shooting range, which directly support the operations of the shooting range. "Ancillary spaces" may include, but are not limited to, an office, classroom, locker facilities, washroom facilities, and spectator space.

        "Ammunition and Firearm" have the meaning ascribed to those terms in section 8-20-010.

        "Firing line" means the point where a person stands or positions himself to discharge a firearm.

        "Rear wall" means the wall located in a shooting range that is parallel to, and opposite from, the wall where the bullet trap/backstop is located.

        "Shooting booth" means the space between fixed panels along the firing line designed to protect someone discharging a firearm from an adjacent person discharging a firearm.

        "Shooting position" means the space along the firing line designated for an individual shooting range patron to use when discharging a firearm.

**13-96-1140  General Requirements.**
        (a)  Every shooting range erected, constructed within an existing building, or substantially rehabilitated after the date of the enactment of chapter 4-151shall comply with all applicable provisions of this code and with the special provisions of this Article XXII.

        (b)  Every shooting range facility erected, constructed within an existing building, or substantially rehabilitated after the date of the enactment of chapter 4-151shall comply with the requirements of this Article XXII and the applicable code requirements for the specific use of the space as determined by chapter 13-56.

        (c)  Where a more specific or restrictive requirement is provided in this section than found elsewhere in the code, the requirements in this section shall govern.

**13-96-1150 Permits required**.
        It shall be unlawful to proceed with the construction, installation, enlargement or alteration of a shooting range facility without first obtaining a permit from the building commissioner and other required departments.

        The permit fee for the initial installation and inspection shall be in the amount required by section 13-32-310.

        The permit application shall include drawings and documents that fully describe all features of the shooting range facility and the shooting range, the construction, the installed equipment and

all required ballistic safety features, along with all supporting documents to fully describe the building, all appurtenances and the intended caliber of ballistics.

## 13-96-1160  Enclosure requirements.

(a) A shooting range must be totally enclosed with contiguous walls, a ceiling, and a floor that separate the shooting range from the shooting range facility and any other uses located in the building.   Except as provided in subsection (b) of this section, the enclosure shall be penetration-proof for the heaviest caliber of ammunition used on the firing range fired point blank into the enclosure at 90 degrees to the surface.  Enclosure walls, floors, ceiling assemblies, doors and opening protective assemblies for the shooting range shall be designed and constructed with materials and assemblies sufficient to stop all bullets fired or projectiles from penetrating beyond the shooting range enclosure.

(b) The rear wall shall be designed and constructed of materials, assemblies, and opening protectives strong enough to be capable of stopping a ricochet of a bullet, fragment or back splatter, from penetrating beyond the wall.

## 13-96-1170 Ancillary spaces.

Ancillary spaces shall be contiguous to the shooting range and directly support the operations of the shooting range. These spaces shall be separated from the shooting range with appropriate means to diminish contamination from the by-products of the shooting range and be protected from any projectiles straying from the shooting range.

## 13-96-1180 Occupancy requirements.

(a) A shooting range facility occupancy classification shall be as provided in chapter 13-56, based on the occupancy of the shooting range facility's ancillary spaces. The most restrictive ancillary space occupancy which is greater than 5% of the total shooting range facility area shall govern the occupancy classification.

A shooting range facility shall comply with the applicable code requirements for the specific use of the space as determined by chapter 13-56 and this section.  The amount of area per person shall be determined by sections 13-56-310 and 13-56-320, or as otherwise determined by this Article.

(b) A shooting range shall be a Miscellaneous type J occupancy. The occupancy calculation to determine the occupancy count of the shooting range shall be determined by calculating the amount of area behind the firing line between the firing line and the perimeter of the enclosure protecting the remaining shooting range facility from projectiles and dividing that area by 20 square feet.  Where the firing line is not stationary, the area shall be based on the average distance between the extreme firing line locations and the perimeter of the shooting range enclosure.

(c)  The occupancy count shall be used to determine the required number and size of the exits. The area between the firing line and the bullet trap/backstop shall be unoccupied and shall not be counted in the occupancy load calculations or be considered for exiting travel distance.

## 13-96-1185 Height and Area limitations.

(a)  The height and area limitations of a shooting range facility shall be as provided in chapter 13-48, and the occupancy classification of the shooting range facility shall be determined in section 13-96-1180. In calculating the maximum allowable height and area of the shooting range facility, the total area in the shooting range, including the area from the firing line to the wall behind the backstop/bullet trap, shall be included in such calculations.

(b) The maximum height of every shooting range erected or constructed within a new or existing building shall be one-story or 20 feet, whichever is less, and the maximum area shall match the limitations for H-3 garage classifications in Table 13-48-070.

**13-96-1190 Shooting range facility requirements.**

(a) The shooting range facility must comply with all applicable code sections as determined by the occupancy classification. Where the ancillary spaces are under the direct control and management of the owner of the shooting range, no mixed occupancy separation is required between the shooting range and the ancillary spaces. Where the ancillary spaces are not under the direct control and management of the owner of the shooting range, or where the shooting range is constructed without ancillary spaces, the mixed occupancy separation shall be as set forth in Table 13-56-280. The shooting range occupancy classification to determine required mixed occupancy separations shall be Class E Business. The need for mixed occupancy separations is not determined by the amount of area occupied by the ancillary spaces as a percent of the total area of the shooting range facility.

(b) Exiting for the shooting range facility shall not be through the shooting range.

(c) (1) The shooting range facility may include the following uses: office space, mercantile, training, classroom or spectator space, general patron use space, locker rooms including showers, range master booth, storage of ammunition, and storage of firearms.

(2) The shooting range facility shall include the following uses:
    a) a shooting range;
    b) security entrance;
    c) toilet facilities in compliance with chapter 18-29 and section 13-96-1220; and
    d) if ammunition or firearms are stored, a magazine or hazardous storage facility appropriate for the type and amount of ammunition or firearms, as provided in rules and regulations promulgated by the police or fire department;

(d) All occupancies within the shooting range facility must be protected from any projectiles straying from the shooting range.

**13-96-1200 Shooting range requirements.**

a) Every shooting range shall be separated from the rest of the shooting range facility or other occupancies with a separation that prevents projectiles from straying from the shooting range.

b) Every shooting range shall comply with the following:

1) area requirement - the shooting range shall have minimum ceiling height of 8 feet. The area between the firing line and the rear wall shall be at a minimum adequate to accommodate a designated exit path beyond the depth of the area occupied by the shooting range patron and any appurtenances. The exit path shall be in addition to area required for shooting range patrons to easily and directly move from one shooting booth or shooting position to another along the firing line without disturbing another shooting range patron and the area required for the range master to monitor operations;

2) sound control - the noise emanating from the shooting range to areas outside of the shooting range facility shall be in compliance with Article XXI of Chapter 11-4, sections 11-4-2700 through and including 11-4-2920, Environmental Noise and Vibration Control, for environmental noise. The maximum noise emanating from the shooting range facility into contiguous areas shall not be more than 55 dB. The shooting range shall conform to the

requirements of The Occupational Noise Exposure Standard Section 1910.95 of 29 CFR Part 1910 and shall be designed and constructed to contain noise generated from the discharge of firearms. The shooting range shall be provided with air-borne and structure-borne sound absorbing materials. Surface applied or suspended acoustical materials shall comply with section 15-8-420. The materials shall be designed to permit easy cleaning and access for periodic replacement;

3) special ballistic protectives - the shooting range shall have ceiling baffles, deflector plates and floor guards of appropriate materials, such as steel plate covered with wood or other materials, which are designed with sufficient bullet resistive strength, thickness, and configuration to function safely for the type and caliber of firearms and ammunition used within the shooting range. Such protectives shall be permanently located and anchored to protect the building structure, lighting fixtures, HVAC ductwork and appurtenances, plumbing hose bibbs, floor drains and cleaning apparatus, ceilings, target carrier apparatus or other range appurtenances or assemblies to protect against ricochets or back splatter and to re-direct the projectiles to the backstop;

4) bullet trap/backstop - the shooting range shall have a permanent, fixed, proprietary manufactured bullet trap system capable of stopping and containing the bullets or projectiles from any firearms discharged at the shooting range. The bullet trap shall be designed and constructed of appropriate bullet resistive, durable materials, such as steel plate. The bullet trap shall be capable of functioning safely for the type, amount and duration of firearm usage at the shooting range. The bullet trap shall cover the entire space between the two side walls of the shooting range and provide complete coverage for all firing positions from floor to the underside of the structural ceiling assembly. Bullet trap systems which utilize rubber chunks, blocks, sheets, layered rubber, laminated carpeting or other materials potentially subject to combustion, shall be fire-treated to be fire-resistive and meet the flame spread requirements of Class 1, unless the building is equipped with an approved automated sprinkler system, in which case Class 2 requirements shall apply. Mobile or temporary bullet traps/backstops are prohibited;

5) exit pathways - exits and exit pathways serving the shooting range shall not require occupants to pass beyond the firing line and cross through the firing range area. The area from the firing line to the back of the backstop/bullet trap shall not be included in the exiting travel distances. No exits shall be located in this area;

6) no doors or windows downrange - no doors or windows shall be located in the shooting range in the space between the back face of the bullet trap to a point five feet behind the firing line located the farthest distance from the bullet trap/backstop;

7) floors, ceilings, and walls - the floors, ceilings, and walls of every shooting range shall be constructed of smooth non-porous materials to facilitate effective maintenance and cleaning and removal of lead particulate. The floors of the shooting range shall be constructed to slope at a minimum of one-fourth inch (1/4") per foot from the firing line toward the backstop/bullet trap;

8) shooting booths - where shooting booth separations are provided, the shooting booth panels shall be constructed of permanently fixed, cleanable, non-porous materials. The shooting booths shall be constructed to provide an impenetrable protective barrier between people at the shooting booths and to protect against the effects of ejected bullet casings and muzzle blast; and

9) range master booth - where a range master booth is provided, the shooting range shall be limited in size to the area that can be directly visible to the range master at all times. The

range master booth shall be constructed to provide:

    (i) protection from any projectiles straying from the shooting range;

    (ii) clear visibility of all firing positions at the shooting range;

    (iii) ready access to the shooting range;

    (iv) acoustical protection and separation for the range master;

    (v) protection from exposure to lead particulate from the shooting range, as provided for in rules and regulations promulgated by the department of environment; and

    (vi) immediate access to and use of the shooting range communication system.

**13-96-1210 Ventilation requirements.**

    In addition to general building ventilation and heat requirements applicable to a shooting range facility, the shooting range shall be provided with an engineered ventilation system that complies with OSHA Lead Standard for General Industry, 29 CFR 1910.1025. This system shall be a Total Air Exhaust system utilizing 100% fresh make up air. All air from the shooting range shall be completely exhausted. The exhausted air shall be filtered and cleaned, in compliance with regulations promulgated by the department of the environment, to remove all lead particulate before exhausting to the open atmosphere. The shooting range HVAC system shall conform to the following requirements:

    (a) The ventilation system shall provide a horizontal laminar air flow from floor to ceiling at the firing line of 75 fpm. The flow supply air shall be directed away from shooters at the firing line downrange towards the backstop/bullet trap area. Twenty-five percent of the airflow shall be exhausted 15 feet downrange from the firing line and the other 75% shall be exhausted at the apex of the backstop/bullet trap.

    (b) The entire shooting range shall be maintained at a slightly negative pressure with respect to adjacent areas to prevent the escape of contaminants. Exhaust air shall exceed supplied air by a minimum of 10%.

    (c ) The shooting range shall be designed and constructed with separation walls, doors, windows and assemblies with related gaskets and sealing materials sufficient to close off the shooting range from the shooting range facility to provide the air pressures required for the range HVAC /exhaust system to operate correctly.

    (d) Where a shooting range facility contains multiple shooting ranges, each shooting range shall be constructed with a separate HVAC /exhaust system.

    (e) The supply and exhaust systems shall be electrically interlocked to turn on each system at the same time.

    (f) The HVAC/exhaust system shall operate at one fan speed only.

    (g) The HVAC/exhaust system shall be commissioned prior to initial operation and a regular schedule of maintenance and system adjustment shall be included in the description of the ventilation system as part of the permit application. For purposes of this subsection (g), "commissioned" has the same meaning ascribed to that term in American Society of Heating, Refrigeration, and Air-conditioning Engineers Guideline 0-2005.

    (h) All other ventilation, refrigeration and heating systems for the shooting range facility shall conform to the requirements of Chapter 18-28.

**13-96-1220 Plumbing requirements.**

(a) Every shooting range facility shall meet all applicable plumbing code requirements of chapter 18-29.

The occupancy calculation to determine the required number of plumbing fixtures for the shooting range facility shall be as provided in chapter 13-56.

(b) The shooting range shall have a hose bibb installed with backflow protection that complies with the rules and regulations promulgated by the department of water management. The discharge of any waste from the shooting range shall be in compliance with all applicable local, state or federal laws or standards, and shall comply with the requirements of Articles 7, 8 and 11 of chapter 18-29 to prevent the discharge of any prohibited waste from entering into any sewer, watercourse, natural outlet or waters.

(c) Floor drains installed at the backstop/bullet trap shall collect lead and other hazardous waste materials in a separate drainage system to an approved collection device or treatment system that is in compliance with all applicable local, state or federal laws or standards.

(d) Interceptors or separators shall be installed to recover solids from metal particles, metal chips, shavings, plaster, stone, clay, sand cinder, ashes, glass, gravel, oily or greasy residual waste and similar materials in separating lighter than water waste from heavier than water waste or waste from soiled water to prevent such matter from entering the drain line. The size, type, location and construction material of each interceptor and of each separator shall be designed and installed in accordance with the manufacturer's instruction, the rules and regulations promulgated by the departments of water management and environment, and the requirements of section 18-29-1003 based on the anticipated conditions of use.

(e) Waste that does not require treatment or separation need not be discharged into any interceptor or separator and may be in a separate line until after the interceptor or separator but must connect to the building sewer before the public way. Waste from the shooting range facility which does not have a lead contamination level of more than 0.5 mg/L is not required to discharge into an interceptor or separator. All interceptors and all separators shall be installed in an accessible location to permit the convenient removal of the lid and internal contents and to permit service and maintenance. Unless otherwise approved, all interceptors and separators shall have an inspection manhole located outside on private property to permit observation, measurement and sampling downstream of the interceptors or separators.

(f) Grease traps approved by the department of buildings shall have the waste retention capacity indicated in Table 18-29-1003.3.6 for the flow-through rated indicated.

**13-96-1230 Electrical requirements.**

(a) Every shooting range facility shall be constructed with a type II (battery pack) emergency lighting in conformance with the requirements of Article 700 of chapter 18-27.

(b) The shooting range shall be constructed to be free of excessive glare and major differences in light levels. Floors and ceilings shall be designed to provide light reflection.

(c) The lighting design and construction of every shooting range shall include the following:

1) General lighting shall provide uniform light levels over the entire range area and adjoining areas;

2) Local lighting shall supplement general lighting along the firing line to provide better visibility;

3) Semi-direct lighting shall be provided to direct 60 to 90 percent of the lighting on the target.

**13-96-1240 Rules and Regulations.**
The commissioner is authorized to promulgate rules and regulations for the administration and enforcement of this Article, including rules and regulations pertaining to the construction and permit requirements of shooting ranges and shooting range facilities.

SECTION 9.  Chapter 15-4 of the Municipal Code of Chicago is hereby amended by adding a new section 15-4-985, as follows:

**15-4-985 Storage of ammunition.**
(a) For purpose of this section, the terms "ammunition" and "shooting range facility" have the meaning ascribed to those terms in section 4-151-010.

(b) The fire commissioner is authorized to promulgate rules and regulations for the storage of ammunition at shooting range facilities.

(c) Any person who violates a rule and regulation promulgated pursuant to this section shall be fined not less than $200.00 nor more than $500.00.  A separate and distinct offense shall be deemed to have been committed each day any person continues to violate any of the provisions hereof.

SECTION 10.  Section 17-3-0207 of the Municipal Code of Chicago is hereby amended by adding the language underscored and by deleting the language struck through, as follows:

17-3-0207 Use Table and Standards.

| USE GROUP | | Zoning Districts | | | | | | Use Standard | Parking Standard |
|---|---|---|---|---|---|---|---|---|---|
| Use Category | | B1 | B2 | B3 | C1 | C2 | C3 | | |
| Specific Use Type | | | | | | | | | |
| P= permitted by-right   S = special use approval required   PD = planned development approval required   - = Not allowed | | | | | | | | | |

*(omitted text is unaffected by this ordinance)*

| QQ. Sports and Recreation, Participant | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1. | Outdoor | - | - | P | - | P | P | § 17-10-020 7-M |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2. | Indoor | P | P | P | P | P | P | | § 17-10-020 7-M |
| 3. | Amusement Arcades | - | - | P | P | P | P | § 17-9-0102 | § 17-10-020 7-M |
| 4. | Entertainment Cabaret | - | - | S | S | S | P | | § 17-10-020 7-M |
| 5. | Children's Activities Facility | P | P | P | P | P | P | | § 17-10-020 7-T |
| 5 6 | Hookah Bar | S | S | S | S | S | S | | § 17-10-020 7-T |
| 7 | Shooting range facility | - | - | - | - | - | - | | |
| | | | | | | | | |

*(omitted text is unaffected by this ordinance)*

**SECTION 11.** Section 17-5-0207 of the Municipal Code of Chicago is hereby amended by adding the language underscored and by deleting the language struck through, as follows:

**17-5-0207 Use Table and Standards.**

| USE GROUP | | District | | | Use Standard | Parking Standard |
|---|---|---|---|---|---|---|
| Use Category | | M1 | M2 | M3 | | |
| | Specific Use Type | | | | | |
| P= permitted by-right   S = special use approval required   PD = planned development approval required   - = Not allowed | | | | | | |
| RESIDENTIAL | | | | | | |
| A. Group Living | | | | | | |
| 1. | Temporary Overnight Shelter | S | S | | § 17-9-0115 | § 17-10-0207-Q |
| 2. | Transitional Shelters | S | S | | § 17-9-0115 | § 17-10-0207-Q |

*(omitted text is unaffected by this ordinance)*

| | District | | | | |
|---|---|---|---|---|---|
| Z. Residential Storage Warehouse | P | P | P | | § 17-10-0207-Q |
| AA. Retail Sales, General | P | P | P | Accessory sales of goods produced on-site: not to exceed 20% of on-site GFA | § 17-10-0207-M |

| BB. Sports and Recreation, Participant | S | S | S | | § 17-10-0207-M |
| 1. Shooting range facility | S | S | S | | § 17-10-0207-M |
| CC. Vehicle Sales and Service | | | | | |

*(omitted text is unaffected by this ordinance)*

**SECTION 12.** Chapter 17-17 of the Municipal Code of Chicago is hereby amended by adding a new section 17-17-02155.5 and by inserting the language underscored, as follows:

*(omitted text is unaffected by this ordinance)*

17-17-0104-Z Sports and Recreation, Participant. Provision of sports or recreation primarily by and for participants. (Spectators would be incidental and on a nonrecurring basis). The following are participant sports and recreation use types (for either general or personal use):

*(omitted text is unaffected by this ordinance)*

3.  Indoor. Participant sport and recreation uses conducted within an enclosed building, other than arcades and entertainment cabarets. Typical uses include bowling alleys, billiard parlors, <u>shooting range facilities,</u> and physical fitness centers.

*(omitted text is unaffected by this ordinance)*

17-17-02155 Setback, Side. See "side setback".

<u>17-17-02155.5 Shooting range facility. "Shooting range facility" means a public or private shooting range and the premises on which the shooting range is located and includes all the buildings, structures, parking areas, and other associated improvements located on the premises. A "shooting range facility" includes any shooting range facility operated or managed by members of a private club or organization for the benefit of its members. A "shooting range facility" shall not include any shooting range facility operated by any federal, state or local law enforcement agency or by the armed forces of the United States, including the Reserves.</u>

17-17-02156 Side Property Line. Any property line that is not a front property line or a rear property line.

*(omitted text is unaffected by this ordinance)*

**SECTION 13.** This ordinance takes effect 10 days after its passage and publication.

# EXHIBIT B

# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-3525

RHONDA EZELL, et al.,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 cv 5135—**Virginia M. Kendall**, *Judge.*

ARGUED APRIL 4, 2011—DECIDED JULY 6, 2011*

Before KANNE, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* For nearly three decades, the
City of Chicago had several ordinances in place
"effectively banning handgun possession by almost all
private citizens." *McDonald v. City of Chicago*, 130 S. Ct. 3020,
3026 (2010). In 2008 the Supreme Court struck
down a similar District of Columbia law on an original-

---

* This opinion is released in typescript; a printed version will
follow.

meaning interpretation of the Second Amendment.[1] *District of Columbia v. Heller*, 554 U.S. 570, 635-36 (2008). *Heller* held that the Amendment secures an individual right to keep and bear arms, the core component of which is the right to possess operable firearms—handguns included—for self-defense, most notably in the home. *Id.* at 592-95, 599, 628-29.

Soon after the Court's decision in *Heller*, Chicago's handgun ban was challenged. *McDonald*, 130 S. Ct. at 3027. The foundational question in that litigation was whether the Second Amendment applies to the States and subsidiary local governments. *Id.* at 3026. The Supreme Court gave an affirmative answer: The Second Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *Id.* at 3050. In the wake of *McDonald*, the Chicago City Council lifted the City's laws banning handgun possession and adopted the Responsible Gun Owners Ordinance in their place.

The plaintiffs here challenge the City Council's treatment of firing ranges. The Ordinance mandates one hour of range training as a prerequisite to lawful gun ownership, *see* CHI. MUN. CODE § 8-20-120, yet at the same time prohibits all firing ranges in the city, *see id.* § 8-20-080. The plaintiffs contend that the Second Amend-

---

[1] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

ment protects the right to maintain proficiency in firearm use—including the right to practice marksmanship at a range—and the City's total ban on firing ranges is unconstitutional. They add that the Ordinance severely burdens the core Second Amendment right to possess firearms for self-defense because it conditions possession on range training but simultaneously forbids range training everywhere in the city. Finally, they mount a First Amendment challenge to the Ordinance on the theory that range training is protected expression. The plaintiffs asked for a preliminary injunction, but the district court denied this request.

We reverse. The court's decision turned on several legal errors. To be fair, the standards for evaluating Second Amendment claims are just emerging, and this type of litigation is quite new. Still, the judge's decision reflects misunderstandings about the nature of the plaintiffs' harm, the structure of this kind of constitutional claim, and the proper decision method for evaluating alleged infringements of Second Amendment rights. On the present record, the plaintiffs are entitled to a preliminary injunction against the firing-range ban. The harm to their Second Amendment rights cannot be remedied by damages, their challenge has a strong likelihood of success on the merits, and the City's claimed harm to the public interest is based entirely on speculation.

# I. Background

## A. Chicago's Responsible Gun Owners Ordinance

The day after the Supreme Court decided *McDonald*, the Chicago City Council's Committee on Police and Fire held a hearing to explore possible legislative responses to the decision. A Chicago alderman asked the City's legal counsel what could be done about firearms possession and other gun-related activity in the city, including shooting ranges. The City's Corporation Counsel replied that the Council could "limit what we allow to operate in our city however is reasonable as decided by the City Council."

The Committee quickly convened hearings and took testimony about the problem of gun violence in Chicago. Witnesses included academic experts on the issue of gun violence in general; community organizers and gun-control advocates; and law-enforcement officers, including Jody Weis, then the Superintendent of the Chicago Police Department. Based on these hearings, the Committee made recommendations to the City Council about how it should regulate firearm possession and other firearm-related activity.

The Council immediately took up the Committee's recommendations and, just four days after *McDonald* was decided, repealed the City's laws banning handgun possession and unanimously adopted the Responsible Gun Owners Ordinance. *See Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago, Ill.*, Nos. 10-3957, 10-3965 & 11-1016, 2011 WL 2150785, at *1 (7th Cir. June 2, 2011). The new Ordinance—a sweeping array of firearm restrictions—took effect

on July 12, 2010. To give a sense of its scope: The Ordinance prohibits handgun possession outside the home, CHI. MUN. CODE § 8-20-020, and the possession of long guns outside the home or the owner's fixed place of business, *id.* § 8-20-030. It forbids the sale or other transfer of firearms except through inheritance or between peace officers. *Id.* § 8-20-100. A person may have "no more than one firearm in his home assembled and operable." *Id.* § 8-20-040. The Ordinance bans certain kinds of firearms, including assault weapons and "unsafe handgun[s]," as well as certain firearm accessories and types of ammunition. *Id.* §§ 8-20-060, 8-20-085, 8-20-170.

The Ordinance also contains an elaborate permitting regime. It prohibits the possession of any firearm without a Chicago Firearm Permit. CHI. MUN. CODE § 8-20-110(a). (Certain public-safety and private-security professionals are exempt.) In addition, all firearms must have a registration certificate, and to register a firearm, the owner must have a valid Permit.[2] *Id.* at § 8-20-140(a), (b). To apply

---

[2] Once issued, a Chicago Firearm Permit is valid for three years. CHI. MUN. CODE § 8-20-130(a). Any registration certificate expires with the Permit. The Permit fee is $100; the registration certificate fee is $15. *Id.* §§ 8-20-130(b), 8-20-150(a). An application for a registration certificate must be submitted "no later than 5 business days after a person takes possession within the city of a firearm from any source," *id.* § 8-20-140(d), and registration certificates are subject to an annual reporting requirement, *id.* § 8-20-145(c). Failure to file an annual report regarding each registered firearm "may result" in revocation of the owner's
                                                                        (continued...)

for a Permit, a person must have an Illinois Firearm Owner's Identification Card. *Id.* § 8-20-110(b)(2). Only those 21 years of age or older may apply for a Permit, except that a person between the ages of 18 and 20 may apply with the written consent of a parent or legal guardian if the parent or guardian is not prohibited from having a Permit or a Firearm Owner's Identification Card. *Id.* § 8-20-110(b)(1). Persons convicted of certain crimes may not obtain a Permit. *Id.* § 8-20-110(b)(3) (disqualifying persons convicted of any violent crime, a second or subsequent drunk-driving offense, or an offense relating to the unlawful use of a firearm). Other lawsuits challenging these and other provisions of the Ordinance are currently pending in the District Court for the Northern District of Illinois. *See, e.g., Second Amendment Arms v. City of Chicago*, No. 10 C 4257 (N.D. Ill. filed July 9, 2010); *Benson v. City of Chicago*, No. 10 C 4184 (N.D. Ill. filed July 6, 2010).

As relevant here, permits are conditioned upon completion of a certified firearm-safety course. Applicants must submit an affidavit signed by a state-certified firearm instructor attesting that the applicant has completed a certified firearm-safety and training course that provides at least four hours of classroom instruction and one hour of range training.[3] CHI. MUN. CODE § 8-20-

---

[2] (...continued)
registration certificate, his Permit, or both. *Id.* § 8-20-145.

[3] The Ordinance provided a 90-day "grandfathering" period after its effective date during which previously acquired firearms
(continued...)

120(a)(7). At the same time, however, the Ordinance prohibits all "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged." *Id.* § 8-20-280. The Ordinance also prohibits the "discharge [of] any firearm within the city," making no exception for controlled shooting at a firing range—because, of course, firing ranges are banned throughout the city.[4] *Id.* § 8-24-010.

Violations are punishable by a fine of $1,000 to $5,000 and incarceration for a term of "not less than 20 days nor more than 90 days," and "[e]ach day that such violation exists shall constitute a separate and distinct offense." CHI. MUN. CODE § 8-20-300(a), (b). The penalties go up for subsequent convictions. *Id.* § 8-20-300(b) (For "[a]ny subsequent conviction," the penalty is a fine of $5,000 to $10,000 and incarceration for a term of "not less than 30 days, nor more than six months.").

The firing-range ban does not apply to governmental agencies. *Id.* § 8-20-280. The federal government operates four indoor firing ranges in Chicago, and the Chicago Police Department operates five. Apparently, the City also exempts private security companies; there are

---

[3] (...continued)
could be registered. CHI. MUN. CODE § 8-20-140(d)(2). To take advantage of this provision, a firearm owner had to complete all of the prerequisites for a Permit, including a firearm-safety course with one hour of range training.

[4] There are exceptions for discharging a firearm in self-defense or in defense of another, and also for game-bird hunting in certain limited areas of the city. *Id.* § 8-24-010.

two indoor firing ranges operated by private security
companies in Chicago.[5]

## B. The Litigation

The plaintiffs are three Chicago residents, Rhonda
Ezell, William Hespen, and Joseph Brown; and three
organizations, Action Target, Inc.; the Second Amend-
ment Foundation, Inc.; and the Illinois State Rifle Associa-
tion. Action Target designs, builds, and furnishes
firing ranges throughout the United States and would like to
do so in Chicago. The Second Amendment Foundation and
the Illinois Rifle Association are nonprofit associations
whose members are firearms enthusiasts; among other
activities, these organizations advocate for Second Amend-
ment rights and have made arrangements to try to bring a
mobile firing range to Chicago.

The plaintiffs sought a temporary restraining order
("TRO"), a preliminary injunction, and a permanent injunc-
tion against the City's ban on firing ranges, and correspond-
ing declaratory relief invalidating the ban. The district court
twice denied a TRO, finding that the plaintiffs were

---

[5] We say "apparently" because it is not clear whether the
exception allowing private security companies to operate
firing ranges is codified. The Ordinance contains an exemp-
tion for private security contractors at section 8-20-020(b), but this
exemption appears to apply only to the provision of the Ordi-
nance making it "unlawful for any person to carry or possess a
handgun, except when in the person's home," *id.* § 8-20-020(a),
not to section 8-20-280, the provision banning firing ranges.

No. 10-3525                                                    9

not irreparably harmed. The parties conducted expedited
discovery, and the court held a two-day hearing on the
preliminary-injunction motion. The plaintiffs presented
the testimony of representatives of Action Target, the
Second Amendment Foundation, and the Illinois Rifle
Association. Declarations from the three individual plain-
tiffs were already in the record, so they did not testify.

The City called two witnesses: Sergeant Daniel Bartoli,
a former rangemaster for the Chicago Police Department,
and Patricia Scudiero, Chicago's Zoning Commissioner.
Bartoli testified that firing ranges can carry a risk of
injury from unintentional discharge and raised concerns
about criminals seeking to steal firearms from range
users. He also explained the possible problem of contamina-
tion from lead residue left on range users' hands after
shooting. He identified various measures that a firing range
should take to reduce these risks. To prevent theft, he said
a range should have a secure parking lot and only one
entrance into its facilities. To avoid injury from uninten-
tional discharge, a range should provide a separate location
for the loading and unloading of firearms and should erect
a permanent, opaque fence to deter bystanders from
congregating around the facility. He also said a range
should have running water onsite so users can wash lead
residue from their hands after shooting.

Scudiero testified that Chicago's zoning code prohibits all
property uses not expressly permitted and contains

Case: 1:10-cv-05135 Document #: 114-1 Filed: 07/29/11 Page 36 of 85 PageID #:1832
Case: 10-3525     Document: 31     Filed: 07/06/2011     Pages: 59

no provision for gun ranges.[6] If firing ranges were
added as a permitted use, she said they should be classified
as an "intensive use" under the Code. An "intensive use,"
she explained, is a use "that could pose a threat to
the health, safety and welfare" of city residents and there-
fore may be located only in a manufacturing district; even
then, intensive uses are allowed only by special-use permit,
not presumptively. On cross-examination Scudiero admitted
she has never been to a firing range. She acknowledged as
well that the governmental firing ranges within the city are
not limited to manufacturing districts; they are located near
churches, schools, university buildings, residential housing,
a county courthouse, retail stores, and parks. She has not
received any complaints from the public about these ranges.

The City introduced evidence that there are 14 firing
ranges open to the public and located within 50 miles
of its borders. Of these, seven are located within
25 miles of the city, and five are located within 5 miles of the
city.

Because the legal issues in the case had been fully briefed,

---

[6] *See* CHI. MUN. CODE §§ 17-2-0204 (Residential Districts
section stating: "Uses that are not listed in the [corresponding
use] table are . . . prohibited."), 17-3-0204 (Business & Com-
mercial Districts section stating the same), 17-4-0204 (Down-
town Districts section stating the same), 17-5-0204 (Manufactur-
ing Districts section stating the same), 17-6-0403-C
(Special Purpose Districts section stating the same). Apparently,
the City does not interpret the "Sports and Recreation" special-
use category allowed in manufacturing districts, *see id.*
§ 17-5-0207, to include firing ranges.

the plaintiffs asked the court to consider the preliminary-injunction hearing as a trial on the merits. *See* FED. R. CIV. P. 65(a)(2) (permitting the court to "advance the trial on the merits and consolidate it with the [preliminary-injunction] hearing"). The court declined to do so and took the matter under advisement.

## C. The Decision Below

Soon after the hearing, the district court issued a decision denying preliminary injunctive relief because the plaintiffs were neither irreparably harmed nor likely to succeed on the merits. The court's decision is a bit hard to follow; standing and merits inquiries are mixed in with the court's evaluation of irreparable harm. As we will explain, the court made several critical legal errors. To see how the decision got off-track requires that we identify its key holdings.

The judge began by "declin[ing] to adopt the intermediate scrutiny standard" of review, but held in the alternative that "even if" intermediate scrutiny applied, the "[p]laintiffs still fail to meet their burden of demonstrating irreparable harm." The judge said the organizational plaintiffs "do not have the necessary standing to demonstrate their irreparable harm" because *Heller* and *McDonald* addressed an individual's right to possess a firearm" but "did not address an organization's right." Again, the court purported to enter an alternative holding: "Even if" the organizations had standing to assert a claim under *Heller* and *McDonald,* they "failed to present sufficient evidence . . . that their constituency has been unable to comply with the statute." The court held that none of the plaintiffs were suffering irreparable

harm because the injury in question was limited to the minor cost and inconvenience of having to travel outside the city to obtain the range training necessary to qualify for a Permit and money damages would be sufficient to compensate the plaintiffs for this travel-related injury if they ultimately prevailed.

On the plaintiffs' likelihood of success on the merits, the judge was skeptical that the firing-range ban violated anyone's Second Amendment rights: "Suggesting that firing a weapon at a firing range is tantamount to possessing a weapon within one's residence for self-defense would be establishing law that has not yet been expanded to that breadth." If the Second Amendment was implicated at all, the judge characterized the claim as a minor dispute about an inconvenient permit requirement: "[T]he [c]ity's boundaries are merely artificial borders allegedly preventing an individual from obtaining a [firearm] permit . . . ." The court concluded that the City's evidence about "stray bullets," potential theft, and lead contamination was sufficient to show that "the safety of its citizens is at risk when compared to the minimal inconvenience of traveling outside of the [c]ity for a one-hour course."

Finally, the judge concluded that the balance of harms favored the City because the "potential harmful effects of firing ranges" outweighed any inconvenience the plaintiffs might experience from having to travel to ranges outside of Chicago. The court summarily rejected the plaintiffs' First Amendment claim, finding it underdeveloped. Alternatively, the court held that the range ban did not appear to implicate any expressive message.

The plaintiffs appealed. *See* 28 U.S.C. § 1292(a)(1) (authorizing immediate appeal of a decision granting or denying injunctive relief).

## II. Analysis

To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 619 (7th Cir. 2004); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied. *Christian Legal Soc'y*, 453 F.3d at 859. We review the court's legal conclusions de novo, its findings of fact for clear error, and its balancing of the injunction factors for an abuse of discretion. *Id.*

The district court got off on the wrong foot by accepting the City's argument that its ban on firing ranges causes only minimal harm to the plaintiffs—nothing more than the minor expense and inconvenience of traveling to one of 14 firing ranges located within 50 miles of the city limits—and this harm can be adequately compensated by money damages. This characterization of the plaintiffs' injury fundamentally misunderstands the form of this claim

No. 10-3525

and rests on the mistaken premise that range training
does not implicate the Second Amendment *at all*, or at
most only minimally. The City's confused approach to
this case led the district court to make legal errors on several
fronts: (1) the organizational plaintiffs' standing; (2) the
nature of the plaintiffs' harm; (3) the scope of the Second
Amendment right as recognized in *Heller* and applied to the
States in *McDonald*; and (4) the structure and standards
for judicial review of laws alleged to infringe Second
Amendment rights.

### A. Standing

We start with the organizational plaintiffs' standing.
Article III restricts the judicial power to actual "Cases" and
" Controversies," a limitation understood to confine the
federal judiciary to "the traditional role of Anglo-
American courts, which is to redress or prevent actual or
imminently threatened injury to persons caused by
private or official violation of the law." *Summers v. Earth
Island Inst.*, 129 S. Ct. 1142, 1148 (2009); *see also Lujan v.
Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992); U.S. CONST.
art. III, § 1. The doctrine of standing enforces this limitation.
*Summers*, 129 S. Ct. at 1149; *Lujan*, 504 U.S. at 559-60.
"Standing exists when the plaintiff suffers an actual or
impending injury, no matter how small; the injury is caused
by the defendant's acts; and a judicial decision in the
plaintiff's favor would redress the injury." *Bauer v. Shepard*,
620 F.3d 704, 708 (7th Cir. 2010) (citing *Summers*, 129 S. Ct.
1142, and *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83
(1998)).

No. 10-3525                                                    15

We note first that the district court did not address the individual plaintiffs' standing, probably because it is not in serious doubt. Ezell, Hespen, and Brown are Chicago residents who own firearms and want to maintain proficiency in their use via target practice at a firing range. Ezell is the victim of three attempted burglaries and applied for a Chicago Firearm Permit to keep a handgun in her home for protection. Hespen is a retired Chicago police detective who maintains a collection of handguns, shotguns, and rifles. Brown is a U.S. Army veteran who was honorably discharged after service in World War II; he is currently chairman of the Marksmanship Committee of the Illinois unit of the American Legion and teaches a junior firearms course at an American Legion post outside the city. Ezell and Hespen left the city to complete the range training necessary to apply for a Permit to legalize their firearm possession in the city. Brown owns a firearm that he keeps outside the city's limits because he does not have a Permit.

The plaintiffs—all of them—frame their Second Amendment claim in two ways. First, they contend that the Amendment protects the right of law-abiding people to maintain proficiency in firearm use via marksmanship practice and the City's absolute ban on firing ranges violates this right. Second, they contend that the range ban impermissibly burdens the core Second Amendment right to possess firearms in the home for self-defense because it prohibits, everywhere in the city, the means of satisfying a condition the City imposes for lawful firearm possession. They seek a declaration that the range ban is invalid and an injunction blocking its enforcement.

No. 10-3525

Ezell and Hespen took affirmative steps to comply
with the Ordinance's permitting process by completing
the range-training requirement outside the city. Brown
did not, so he must keep his firearm outside the city
to avoid violating the Ordinance. For all three the City's ban
on firing ranges inflicts continuous harm to their claimed
right to engage in range training and interferes with their
right to possess firearms for self-defense. These injuries
easily support Article III standing.

Moreover, this is a pre-enforcement challenge to the
Ordinance. The plaintiffs contend that the City's ban on
firing ranges is wholly incompatible with the Second
Amendment. It is well-established that "pre-enforcement
challenges . . . are within Article III." *Brandt v. Vill. of
Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010). The plaintiffs
need not violate the Ordinance and risk prosecution in order
to challenge it. *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir.
2010) ("A person need not risk arrest before bringing a pre-
enforcement challenge . . . ."). The very "existence of a
statute implies a threat to prosecute, so pre-enforcement
challenges are proper, because a probability of future injury
counts as 'injury' for the purpose of standing." *Bauer*, 620
F.3d at 708. The City did not question the individual plain-
tiffs' standing; their injury is clear.

Regarding the organizational plaintiffs, however, the
City's argument led the district court astray. The City
emphasized that the Second Amendment protects an
individual right, not an organizational one, and this
point led the court to conclude that "the organizations
do not have the necessary standing to demonstrate their

No. 10-3525                                              17

irreparable harm."[7] This was error. Action Target, as a
supplier of firing-range facilities, is harmed by the firing-
range ban and is also permitted to "act[] as [an] advo-
cate[] of the rights of third parties who seek access to"
its services. *See Craig v. Boren*, 429 U.S. 190, 195 (1976)
(allowing beer vendor to challenge alcohol regulation based
on its patrons' equal-protection rights); *see also Pierce v. Soc'y
of Sisters*, 268 U.S. 510, 536 (1925) (allowing private schools
to assert parents' rights to direct the education of their
children and citing "other cases where injunctions have
issued to protect business enterprises against interference
with the freedom of patrons or customers"); *Mainstreet Org.
of Realtors v. Calumet City*, 505 F.3d 742, 746-47 (7th Cir.
2007). The Second Amendment Foundation and the Illinois
Rifle Association have many members who reside in
Chicago and easily meet the requirements for associational
standing: (1) their members would otherwise have standing
to sue in their own right; (2) the interests the associations
seek to protect are germane to their organizational pur-
poses; and (3) neither the claim asserted nor the relief re-
quested requires the participation of individual associa-

---

[7] The district court's emphasis on the organizational plain-
tiffs' standing is puzzling. As we have noted, it's clear the
individual plaintiffs have standing. Where at least one
plaintiff has standing, jurisdiction is secure and the court will
adjudicate the case whether the additional plaintiffs have
standing or not. *See Vill. of Arlington Heights v. Metro. Hous. Dev.
Corp.*, 429 U.S. 252, 264 (1977); *Bond v. Utreras*, 585 F.3d 1061, 1070
(7th Cir. 2009); *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 530-31
(7th Cir. 1988).

tion members in the lawsuit. *See United Food &
Commercial Workers Union Local 751 v. Brown Group*, 517
U.S. 544, 553 (1996); *Hunt v. Wash. State Apple Adver.
Comm'n*, 432 U.S. 333, 343 (1977); *Disability Rights Wis. v.
Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 801-02
(7th Cir. 2008).

The district court held in the alternative that the organiza-
tional plaintiffs "failed to present sufficient evidence
to support their position that their constituency has been
unable to comply with the statute." More specifically,
the court held that the plaintiffs failed to produce "evidence
of any one resident [of Chicago] who has been unable to
travel to . . . a range [or] has been unable to obtain [the]
range training" required for a Permit. It's not clear whether
these observations were directed at standing or the merits
of the motion for a preliminary injunction; this discussion
appears in the court's evaluation of irreparable harm. Either
way, the point is irrelevant. Nothing depends on this kind
of evidence. The availability of range training outside the
city neither defeats the organizational plaintiffs' standing
nor has anything to do with merits of the claim. The ques-
tion is not whether or how easily Chicago residents can
comply with the range-training requirement by
traveling outside the city; the plaintiffs are not seeking
an injunction against the range-training requirement. The
pertinent question is whether the Second Amendment
prevents the City Council from banning firing ranges
everywhere in the city; that ranges are present in neigh-
boring jurisdictions has no bearing on this question.

## B. Irreparable Harm and Adequacy of Remedy at Law

The City's misplaced focus on the availability of firing ranges outside the city also infected the district court's evaluation of irreparable harm. The judge's primary reason for rejecting the plaintiffs' request for a preliminary injunction was that they had "failed to establish the irreparable harm they have suffered by requiring them to travel outside of the [c]ity's borders to obtain their firing[-]range permits." The judge thus framed the relevant harm as strictly limited to incidental travel burdens associated with satisfying the Ordinance's range-training requirement. The judge noted that for at least some—perhaps many—Chicago residents, complying with the range-training requirement did not appear to pose much of a hardship at all. She observed that it might actually be easier for some Chicagoans to travel to a firing range in the suburbs than to one located, say, at the opposite end of the city if ranges were permitted to locate within city limits. The judge thought it significant that none of the individual plaintiffs had "testif[ied] that s/he was unable to travel outside of the [c]ity's borders to obtain the one-hour range training and all three have shown that they are capable of doing so and have done so in the past." The court held that although the Ordinance may force the plaintiffs to travel longer distances to use a firing range, this was a "quantifiable expense that can be easily calculated as damages."

This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly

mistaken assumption. In the First Amendment context, the Supreme Court long ago made it clear that "'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) (quoting *Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939)). The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

Focusing on individual travel harms was mistaken for another equally fundamental reason. The plaintiffs have challenged the firing-range ban on its face, not merely as applied in their particular circumstances. In a facial constitutional challenge, individual application facts do not matter. Once standing is established, the plaintiff's personal situation becomes irrelevant. It is enough that "[w]e have only the [statute] itself" and the "statement of basis and purpose that accompanied its promulgation." *Reno v. Flores*, 507 U.S. 292, 300-01 (1993); *see also* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. 1209, 1238 (2010) ("[F]acial challenges are to constitutional law what res ipsa loquitur is to facts—in a facial challenge, *lex ipsa loquitur*: the law speaks for itself."); David L. Franklin, *Facial Challenges, Legislative Purpose, and the Commerce Clause*, 92 IOWA L. REV. 41, 58 (2006) ("A valid-rule facial challenge asserts that a statute is invalid on its face as written and authoritatively construed, when measured

against the applicable substantive constitutional doctrine, without reference to the facts or circumstances of particular applications."); Mark E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement,* 48 AM. U. L. REV. 359, 387 (1998) ("[A] valid rule facial challenge directs judicial scrutiny to the terms of the statute itself, and demonstrates that those terms, measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contains a constitutional infirmity that invalidates the statute in its entirety.").

Though she did not specifically mention it, the judge might have had the *Salerno* principle in mind when she limited her focus to individual travel harms. Under *Salerno* a law is not facially unconstitutional unless it "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 (2008) (citing *United States v. Salerno,* 481 U.S. 739, 745 (1987)). Stated differently, "[a] person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present."[8] *United States v. Skoien,* 614 F.3d 638, 645

---

[8] We noted in *Skoien* that "the *Salerno* principle has been controversial" and does not apply to all facial challenges: "[T]he Justices have allowed 'overbreadth' arguments when dealing with laws that restrict speech and reach substantially more conduct than the justifications advanced for the statute support . . . ." *United States v. Skoien,* 614 F.3d 638, 645 (7th Cir. 2010) (en banc) (citing *United States v. Stevens,* 130 S. Ct. 1577, 1587 (2010)). Overbreadth claims are a distinct type of facial challenge. *Stevens,* 130 S. Ct. at 1587

(continued...)

No. 10-3525

(7th Cir. 2010) (en banc) (citing *Salerno*, 481 U.S. at 745).

Here, the judge zeroed in on the occasional expense and inconvenience of having to travel to a firing range in the suburbs, but that's not the relevant constitutional harm. The plaintiffs contend that the Second Amendment protects the right to maintain proficiency in firearm use—including the right to train at a range—and the City's complete ban on range training violates this right. They also claim that the range ban impermissibly burdens the core Second Amendment right to possess firearms at home for protection because the Ordinance conditions lawful possession on range training but makes it impossible to satisfy this condition anywhere in the city. If they're right, then the range ban was unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books. These are not application-specific harms calling for individual remedies.

In a facial challenge like this one, the claimed constitutional violation inheres in the terms of the statute, not its application. *See* Rosenkranz, *The Subjects of the Constitution*, 62 STAN. L. REV. at 1229-38. The remedy is necessarily directed at the statute itself and *must* be injunc-

---

[8] (...continued)
("In the First Amendment context, . . . this Court recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a *substantial number* of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" (emphasis added) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008))).

No. 10-3525                                    23

tive and declaratory; a successful facial attack means
the statute is wholly invalid and cannot be applied *to
anyone*. Chicago's law, if unconstitutional, is unconstitu-
tional *without regard* to its application—or *in all* its ap-
plications, as *Salerno* requires. That is, the City Council
violated the Second Amendment when it made this law;
its very existence stands as a fixed harm to every Chica-
goan's Second Amendment right to maintain proficiency
in firearm use by training at a range. This kind of constitu-
tional harm is not measured by whether a particular per-
son's gasoline or mass-transit bill is higher because he must
travel to a firing range in the suburbs rather than one in the
city, as the district court seemed to think. Whatever else the
*Salerno* principle might mean for this case, it neither requires
nor supports the district court's approach to irreparable
harm.[9]

---

[9] For different views of the *Salerno* doctrine and the structure
of the facial and as-applied forms of judicial review, see generally
Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62
STAN. L. REV. 1209, 1242-50 (2010); David L. Franklin, *Facial
Challenges, Legislative Purpose, and the Commerce Clause*, 92 IOWA L.
REV. 41, 58 (2006); Matthew D. Adler, *Rights, Rules, and the
Structure of Constitutional Adjudication: A Response to Professor
Fallon*, 113 HARV. L. REV. 1371 (2000); Richard H. Fallon, Jr., *As-
Applied and Facial Challenges and Third-Party Standing*, 113 HARV.
L. REV. 1321 (2000); Mark E. Isserles, *Overcoming Overbreadth:
Facial Challenges and the Valid Rule Requirement*, 48 AM. U. L. REV.
359 (1998); Michael C. Dorf, *Facial Challenges to State and Federal
Statutes*, 46 STAN. L. REV. 235 (1994); Henry P. Monaghan,
(continued...)

Beyond this crucial point about the form of the claim, for some kinds of constitutional violations, irreparable harm is presumed. *See* 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). This is particularly true in First Amendment claims. *See, e.g., Christian Legal Soc'y*, 453 F.3d at 867 ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries . . . ." (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976))). The loss of a First Amendment right is frequently presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 548 (6th Cir. 2010) (internal alteration and quotation marks omitted); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592-95. Infringements of this right cannot be compensated by damages.[10]

---

[9]  (...continued)
*Harmless Error and the Valid Rule Requirement*, 1989 SUP. CT. REV. 195.

[10] The City cites our opinion in *Campbell v. Miller*, 373 F.3d
(continued...)

No. 10-3525                                                    25

---

[10] (...continued)

834, 835 (7th Cir. 2004), which cautioned against the assump-
tion "that money never is an adequate remedy for a constitutional
wrong." But *Campbell* concerned a Fourth Amendment
unreasonable-search claim—a claim properly characterized as
"a constitutional tort" and "often . . . analogized to (other)
personal-injury litigation." *Id.* In *Campbell* the plaintiff contended
that jail officers violated the Fourth Amendment by subjecting
him to an unreasonable search; the proper, fully adequate remedy
for that kind of constitutional violation is damages. The constitu-
tional claim here is quite different. The plaintiffs do not contend
that a city official violated the Second Amendment by enforcing
the range ban against them; they contend that the City Council
violated the Second Amendment by enacting the firing-range ban
in the first place. If they prevail, the *only* appropriate remedy is
a declaration that the firing-range ban is invalid and an injunction
forbidding its enforcement.

The City also cites the First Circuit's decision in *Public Service
Co. of New Hampshire v. Town of West Newbury*, 835 F.2d 380,
382 (1st Cir. 1987). In *Public Service Co.*, local regulators ordered a
nuclear power plant to remove utility poles from its property
because they were too high. The plant owner sued, alleging a
denial of due process. The First Circuit noted that the "alleged
denial of procedural due process, without more, does not
automatically trigger" a finding of irreparable harm. *Id.* The court
then affirmed the denial of preliminary injunctive relief because
"the prospects of any irreparable damage were speculative" and
the owner had little likelihood of success on the merits. *Id.* at 383.
*Public Service Co.*, like *Campbell*, does not help the City. An
improper order requiring the removal of utility poles can easily
be remedied by damages—not so with the constitutional viola-
(continued...)

In short, for reasons related to the form of the claim
and the substance of the Second Amendment right, the
plaintiffs' harm is properly regarded as irreparable and
having no adequate remedy at law.

## C. Likelihood of Success on the Merits

Having rejected the plaintiffs' claim of irreparable
harm, the district court only summarily addressed
whether they were likely to succeed on the merits. Early
on in her decision, the judge said she would not apply
intermediate scrutiny to evaluate the constitutionality of the
range ban—and by implication, rejected *any* form
of heightened review. When she later returned to the merits,
the judge suggested that banning range training might not
implicate anyone's Second Amendment rights *at all*. She
observed that although Chicago requires range training as
a prerequisite to firearm possession, "the City does not have
the ability to create a Constitutional right to that training."
Instead, the judge thought the key question was "whether
the individual's right to possess firearms within his resi-
dence expands to the right to train with that same firearm in
a firing range located within the [c]ity's borders." This
statement of the question ends the court's discussion of the
merits.

There are several problems with this analysis. First, it
is incomplete. The judge identified but did not evaluate

---

[10] (...continued)
tions alleged here.

the Second Amendment merits question. More importantly, the court framed the inquiry the wrong way. Finally, it was a mistake to reject heightened scrutiny. The judge was evidently concerned about the novelty of Second Amendment litigation and proceeded from a default position in favor of the City. The concern is understandable, but the default position cannot be reconciled with *Heller*.

### 1. *Heller, McDonald,* and a framework for Second Amendment litigation

It's true that Second Amendment litigation is new, and Chicago's ordinance is unlike any firearms law that has received appellate review since *Heller*. But that doesn't mean we are without a framework for how to proceed. The Supreme Court's approach to deciding *Heller* points in a general direction. Although the critical question in *Heller*—whether the Amendment secures an individual or collective right—was interpretive rather than doctrinal, the Court's decision method is instructive.

With little precedent to synthesize, *Heller* focused almost exclusively on the original public meaning of the Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification. This inquiry led the Court to conclude that the Second Amendment secures a pre-existing natural right to keep and bear arms; that the right is personal and not limited to militia service; and that the "central component of the right" is the right of armed self-defense, most notably in the home. *Heller*, 554 U.S. at 595, 599-600; *see also McDonald*, 130 S. Ct.

at 3036-37, 3044. On this understanding the Court invalidated the District of Columbia's ban on handgun possession, as well as its requirement that all firearms in the home be kept inoperable. *Heller*, 554 U.S. at 629-35. The Court said these laws were unconstitutional "[u]nder any . . . standard[] of scrutiny" because "the inherent right of self-defense has been central to the Second Amendment right" and the District's restrictions "extend[] . . . to the home, where the need for defense of self, family, and property is most acute." *Id.* at 628-29. That was enough to decide the case. The Court resolved the Second Amendment challenge in *Heller* without specifying any doctrinal "test" for resolving future claims.

For our purposes, however, we know that *Heller*'s reference to "any standard of scrutiny" means any *heightened* standard of scrutiny; the Court specifically excluded rational-basis review. *Id.* at 628-29 & n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *see also Skoien*, 614 F.3d at 641 ("If a rational basis were enough [to justify a firearms law], the Second Amendment would not do anything . . . because a rational basis is essential for legislation in general."). Beyond that, the Court was not explicit about how Second Amendment challenges should be adjudicated now that the historic debate about the Amendment's status as an individual-rights guarantee has been settled. *Heller*, 554 U.S. at 635 ("[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the

entire field . . . ."). Instead, the Court concluded that
"whatever else [the Second Amendment] leaves to
future evaluation, it surely elevates above all other interests
the right of law-abiding, responsible citizens to use arms in
defense of hearth and home." *Id.*

And in a much-noted passage, the Court carved out
some exceptions:

> [N]othing in our opinion should be taken to cast
> doubt on longstanding prohibitions on the possession of
> firearms by felons and the mentally ill, or
> laws forbidding the carrying of firearms in sensitive
> places such as schools and government buildings, or
> laws imposing conditions and qualifications on the
> commercial sale of arms.

*Id.* at 626-27. The Court added that this list of "presump-
tively lawful regulatory measures" was illustrative, not
exhaustive. *Id.* at 627 n.26; *see also McDonald*, 130 S. Ct. at
3047 (repeating *Heller*'s "assurances" about exceptions).

These now-familiar passages from *Heller* hold several
key insights about judicial review of laws alleged to infringe
Second Amendment rights. First, the threshold inquiry in
some Second Amendment cases will be a "scope" question:
Is the restricted activity protected by the Second Amend-
ment in the first place? *See* Eugene Volokh, *Implementing the
Right to Keep and Bear Arms for Self-Defense: An Analytical
Framework and a Research Agenda*, 56 UCLA L. REV. 1443,
1449. The answer requires a textual and historical inquiry
into original meaning. *Heller*, 554 U.S. at 634-35 ("Constitu-
tional rights are enshrined with the scope they were under-
stood to have when the people adopted them, whether or

not future legislatures or (yes) even future judges think that
scope too broad."); *McDonald*, 130 S. Ct. at 3047 ("[T]he
scope of the Second Amendment right" is determined by
textual and historical inquiry, not interest-balancing.).

*McDonald* confirms that when state- or local-govern-
ment action is challenged, the focus of the original-meaning
inquiry is carried forward in time; the Second Amendment's
scope as a limitation on the States depends on how the right
was understood when the Fourteenth Amendment was
ratified. *See McDonald*, 130 S. Ct. at 3038-42. Setting aside the
ongoing debate about which part of the Fourteenth Amend-
ment does the work of incorporation, and how, *see id.* at
3030-31 (plurality opinion of Alito, J.); *id.* at 3058-80
(Thomas, J., concurring); *id.* at 3089-99 (Stevens, J., dissent-
ing); *id.* at 3120-21 (Breyer, J., dissenting), this wider histori-
cal lens is required if we are to follow the Court's lead in
resolving questions about the scope of the Second Amend-
ment by consulting its original public meaning as both a
starting point and an important constraint on the analysis.
*See Heller,* 554 U.S. at 610-19; *McDonald,* 130 S. Ct. at 3038-
42.[11]

---

[11] On this aspect of originalist interpretive method as applied
to the Second Amendment, see generally AKHIL REED AMAR,
THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 215-30, 257-
67 (1998); Brannon P. Denning & Glenn H. Reynolds, *Five Takes
on* McDonald v. Chicago, 26 J.L & POL. 273, 285-87 (2011);
Josh Blackmun & Ilya Shapiro, *Keeping Pandora's Box Sealed:
Privileges or Immunities,* The Constitution in 2020, *and Properly
Extending the Right to Keep and Bear Arms to the States,* 8 GEO. J.L.
(continued...)

The Supreme Court's free-speech jurisprudence contains a parallel for this kind of threshold "scope" inquiry. The Court has long recognized that certain "well-defined and narrowly limited classes of speech"—e.g., obscenity, defamation, fraud, incitement—are categorically "outside the reach" of the First Amendment. *United States v. Stevens*, 130 S. Ct. 1577, 1584-85 (2010); *see also Brown v. Entm't Merchants Ass'n*, No. 08-1448, 2011 WL 2518809, at *3-4 (June 27, 2011). When the Court has "identified categories of speech as fully outside the protection of the First Amendment, it has not been on the basis of a simple cost-benefit analysis." *Stevens*, 130 S. Ct. at 1586. Instead, some categories of speech are unprotected as a matter of history and legal tradition. *Id.* So too with the Second Amendment.

---

[11] (...continued)
& PUB. POL'Y 1, 51-57 (2010); Clayton E. Cramer, Nicholas J. Johnson & George A. Mocsary, *"This Right Is Not Allowed by Governments That Are Afraid of the People": The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. 823, 824-25 (2010); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 TEX. L. REV. 7, 11-17, 50-54 (2008); Randy E. Barnett, *Was the Right to Keep and Bear Arms Conditioned on Service in an Organized Militia?*, 83 TEX. L. REV. 237, 266-70 (2004); David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. REV. 1359; Stephen P. Halbrook, *Personal Security, Personal Liberty, and "The Constitutional Right to Bear Arms": Visions of the Framers of the Fourteenth Amendment*, 5 SETON HALL CONST. L.J. 341 (1995).

*Heller* suggests that some federal gun laws will survive Second Amendment challenge because they regulate activity falling outside the terms of the right as publicly understood when the Bill of Rights was ratified; *McDonald* confirms that if the claim concerns a state or local law, the "scope" question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified. *Heller,* 554 U.S. at 625-28; *McDonald,* 130 S. Ct. at 3038-47. Accordingly, if the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.

If the government cannot establish this—if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights. *Heller*'s reference to "any . . . standard[] of scrutiny" suggests as much. 554 U.S. at 628-29. *McDonald* emphasized that the Second Amendment "limits[,] but by no means eliminates," governmental discretion to regulate activity falling within the scope of the right. 130 S. Ct. at 3046 (emphasis and parentheses omitted). Deciding whether the government has transgressed the limits imposed by the Second Amendment—that is, whether it has "infringed" the right to keep and bear arms—requires the court to evaluate the regulatory means the government has chosen and the public-benefits end it seeks to

achieve. Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right. *See generally*, Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. REV. at 1454-72 (explaining the scope, burden, and danger-reduction justifications for firearm regulations post- *Heller*); Nelson Lund, *The Second Amendment*, Heller, *and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1372-75 (2009); Adam Winkler, Heller's *Catch-22*, 56 UCLA L. REV. 1551, 1571-73 (2009); Lawrence B. Solum, District of Columbia v. Heller *and Originalism*, 103 NW. U. L. REV. 923, 979-80 (2009); Glenn H. Reynolds & Brannon P. Denning, Heller's *Future in the Lower Courts*, 102 NW. U. L. REV. 2035, 2042-44 (2008).

Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional. *Heller*, 554 U.S. at 628-35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a free-standing 'interest-balancing' approach."); *McDonald*, 130 S. Ct. at 3047-48. For all other cases, however, we are left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights; the answer to the Second Amendment "infringement" question depends on the government's ability to satisfy whatever standard of means-end scrutiny is held to apply.

The approach outlined here does not undermine *Skoien*, 614 F.3d at 639-43, or *United States v. Williams*, 616 F.3d 685, 691-93 (7th Cir. 2010), both of which touched on the historical "scope" question before applying a form of intermediate scrutiny. And this general framework has been followed by the Third, Fourth, and Tenth Circuits in other Second Amendment cases.[12] *See United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) ("As we read *Heller*, it suggests a two-pronged approach to Second Amendment challenges. First, we ask whether the challenged law imposes a burden on conduct falling within the

---

[12] The Ninth Circuit recently adopted a somewhat different framework for Second Amendment claims. In *Nordyke v. King*, a divided panel announced a gatekeeping "substantial burden" test before the court will apply heightened scrutiny. No. 07-15763, 2011 WL 1632063, at *4-6 (9th Cir. May 2, 2011) (O'Scannlain, J.). Under this approach only laws that substantially burden Second Amendment rights will get some form of heightened judicial review. *Id.* The *Nordyke* majority specifically deferred judgment on "what type of heightened scrutiny applies to laws that substantially burden Second Amendment rights." *Id.* at *6 n.9. Judge Gould, concurring in *Nordyke*, would apply heightened scrutiny "only [to] arms regulations falling within the core purposes of the Second Amendment, that is, regulations aimed at restricting defense of the home, resistance of tyrannous government, and protection of country." *Id.* at *15. All other firearms laws, he said, should be reviewed for reasonableness, *id.*, although by this he meant the sort of reasonableness review that applies in the First Amendment context, not the deferential rational-basis review that applies to all laws, *id.* at *16.

scope of the Second Amendment's guarantee. . . . If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny."); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (A "two-part approach to Second Amendment claims seems appropriate under *Heller*, as explained by . . . the now-vacated *Skoien* panel opinion . . . ."); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010) (same). Each of these cases involved a Second Amendment challenge asserted as a defense to a federal prosecution under 18 U.S.C. § 922, but we think the same principles apply here. *McDonald* reiterated that the Court has long since "abandoned 'the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights.' " 130 S. Ct. at 3035 (quoting *Malloy v. Hogan*, 378 U.S. 1, 10-11 (1964)).

### 2.   Applying the framework to Chicago's firing-range ban

The plaintiffs challenge only the City's ban on firing ranges, so our first question is whether range training is categorically unprotected by the Second Amendment. *Heller* and *McDonald* suggest to the contrary. The Court emphasized in both cases that the "central component" of the Second Amendment is the right to keep and bear arms for defense of self, family, and home. *Heller*, 554 U.S. at 599; *McDonald*, 130 S. Ct. at 3048. The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training

and practice that make it effective. Several passages in *Heller* support this understanding. Examining post-Civil War legal commentaries to confirm the founding-era "individual right" understanding of the Second Amendment, the Court quoted at length from the "massively popular 1868 Treatise on Constitutional Limitations" by judge and professor Thomas Cooley: "[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them . . . ; it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." 554 U.S. at 616, 617-18 (internal quotation marks omitted); *see also id.* at 619 ("'No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right.'" (quoting BENJAMIN VAUGHAN ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF THE LEADING TOPICS IN THE LAW OF THE LAND 333 (1880))).

Indeed, the City considers live firing-range training so critical to responsible firearm ownership that it mandates this training as a condition of lawful firearm possession. At the same time, however, the City insists in this litigation that range training is categorically outside the scope of the Second Amendment and may be completely prohibited. There is an obvious contradiction here, but we will set it aside for the moment and consider the City's support for its categorical position. The City points to a number of founding-era, antebellum, and Reconstruction state and local laws that limited the discharge of firearms in urban environments. As we have noted, the most relevant histori-cal period for questions about the scope of the Second

Amendment as applied to the States is the period leading up to and surrounding the ratification of the Fourteenth Amendment. That point aside, most of the statutes cited by the City are not specific to controlled target practice and, in any event, contained significant carveouts and exemptions.

For example, the City cites a 1790 Ohio statute that prohibited the discharge of a firearm before sunrise, after sunset, or within one-quarter of a mile from the nearest building. Act of Aug. 4, 1790, Ch. XIII, § 4, in 1 The Statutes of Ohio and of the Northwestern Territory 104 (Chase ed. 1833). This statute is not directly related to controlled target practice. A similar 1746 statute limiting the discharge of firearms in Boston provided an exception for target practice: City residents could "fir[e] at a Mark or Target for the Exercise of their Skill and Judgment . . . at the lower End of the Common" if they obtained permission from the "Field Officers of the Regiment in Boston"; they could also "fir[e] at a Mark from the Several Batteries in" Boston with permission from the "Captain General." Act of May 28, 1746, Ch. X, in Acts and Laws of the Massachusetts Bay 208 (Kneeland ed. 1746).

The City cites other eighteenth- and nineteenth-century statutes regulating the discharge of firearms in cities, but most of these allowed citizens to obtain a permit or license to engage in firearms practice from the governor or city council.[13] That was the case under the

---

[13] *See* Act of Aug. 26, 1721, § IV, in A Digest of the Acts of

(continued...)

Philadelphia Act of August 26, 1721, § 4, one of the very
statutes the Supreme Court considered in *Heller* and deemed
"a licensing regime." 554 U.S. at 633. In short, these laws
were merely *regulatory* measures, distinguishable from the
City's absolute *prohibition* on firing ranges. *See id.* at 632, 574
(founding-era statute that "restricted the firing of guns
within the city limits to at least some degree" did not
support the District of Columbia's "general[] prohibit[ion]
on the possession of handguns"). These "time, place, and
manner" regulations do not support the City's position that

-------------------

[13] (...continued)
Assembly Relating to the City of Philadelphia 183 (Duane ed.
1856) (hereinafter Philadelphia Digest) (providing for "governor's
special license"); Act of Feb. 9, 1750-51, ch. 388, in 1 Laws of the
Commonwealth of Pennsylvania 312 (Carey ed. 1803) (providing
for "Governor's special license"); Ordinance of June 7, 1813, § V,
in Philadelphia Digest 188 (providing for permission from the
board of commissioners); Ordinance of Sept. 8, 1851, § IX, in
Philadelphia Digest 419 (providing for permission from the
president of the board of commissioners); Ordinance of 1854, ch.
5, § 20, in Revised Ordinances of the City of Manchester, N.H. 59
(Gage ed. 1859) (providing for "permission of the Mayor and
Aldermen in writing"); Act of Feb. 14, 1855, § 78, in Private Laws
of the State of Illinois 144 (Bailhache ed. 1861) (providing for
"permission from the mayor or common council"); Bylaw, Title
XI, ch. IV, in Charter and By-Laws of the City of New Haven,
Conn. 90 (Benham ed. 1865) (providing for "permission . . . of the
Mayor, or some one or more of the Aldermen"); Ordinance of
June 12, 1869, § 17, in Laws and Ordinances Governing the City
of St. Joseph, Mo. 110 (Grubb ed. 1869) (providing for "permis-
sion from the city council or written permission from the
mayor").

target practice is categorically unprotected.

To be sure, a few of the eighteenth- and nineteenth-century statutes cited by the City might accurately be described as general prohibitions on discharging firearms within cities. Three of these, however, had clear fire-suppression purposes and do not support the proposition that target practice at a safely sited and properly equipped firing range enjoys no Second Amendment protection whatsoever.[14] Only two—a Baltimore statute from 1826 and an Ohio statute from 1831—flatly prohibited the discharge of firearms based on concerns unrelated to fire suppression, in contrast to the other regulatory laws we have mentioned.[15] Cf. Heller, 554 U.S. at 632 ("[W]e would

---

[14] See Act of Apr. 22, 1786, in The New York Daily Advertiser, Dec. 30, 1788 (prohibiting discharge of firearms "for the more effectual prevention of FIRES in the city of New York"); Ordinance of July 1, 1817, art. 12, in Ordinances of the City of New Orleans 62, 68 (prohibiting the discharge of firearms for the "Prevention of fires"); Ordinance of Apr. 18, 1881, ch. XV, art. XX, § 1298, in Municipal Code of Chicago 307 (Jamieson ed. 1881) (prohibiting firearms discharge under article governing "Firearms, Fireworks and Cannons").

[15] See Ordinance of Mar. 9, 1826, § 6, in Baltimore Gazette and Daily Advertiser, Dec. 17, 1827 ("[I]f any person shall fire or discharge any Gun or Pistol or fire arms within the City, unless it be on some occasion of Military parade and then by order of some officer having the command, every such person, for every such offense, shall forfeit and pay a sum not exceeding five dollars."); Acts of Feb. 17, 1831, § 6, in 29 Acts of a

(continued...)

not stake our interpretation of the Second Amendment upon
a single law . . . that contradicts the overwhelming weight
of other evidence . . . ."). This falls far short of establishing
that target practice is wholly outside the Second Amend-
ment as it was understood when incorporated as a limita-
tion on the States.

We proceed, then, to the second inquiry, which asks
whether the City's restriction on range training survives
Second Amendment scrutiny. As we have explained,
this requires us to select an appropriate standard of re-
view. Although the Supreme Court did not do so in either
*Heller* or *McDonald*, the Court *did* make it clear that the
deferential rational-basis standard is out, and with it the
presumption of constitutionality. *Heller*, 554 U.S. at 628 n.27
(citing *United States v. Carolene Prods.*, 304 U.S. 144, 152 n.4
(1938)). This necessarily means that the City bears the
burden of justifying its action under *some* heightened
standard of judicial review.

The district court specifically decided against an inter-
mediate standard of scrutiny but did not settle on any other,
then sided with the City "even if" intermediate scrutiny
applied. A choice must be made. The City urges us to
import the "undue burden" test from the Court's abortion
cases, *see, e.g., Planned Parenthood of Se. Pa. v. Casey*, 505 U.S.

---

[15] (...continued)
General Nature of the State of Ohio 162 (Olmsted ed. 1831)
(subjecting "any person or persons [who] shall shoot or fire a gun
at a target within the limits of any recorded town plat" to a fine
"not exceeding five dollars, nor less than fifty cents").

833, 876-79 (1992), but we decline the invitation. Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, *see Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S. Ct. at 3045, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context, *see Skoien*, 614 F.3d at 641; *id.* at 649 (Sykes, J., dissenting); *Chester*, 628 F.3d at 682; *Marzzarella*, 614 F.3d at 89 n.4; *see also* Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. REV. at 1449, 1452, 1454-55; Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. REV. at 1376; Winkler, *Heller's Catch-22*, 56 UCLA L. REV. at 1572.

In free-speech cases, the applicable standard of judicial review depends on the nature and degree of the governmental burden on the First Amendment right and sometimes also on the specific iteration of the right. For example, "[c]ontent-based regulations are presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and thus get strict scrutiny, which means that the law must be narrowly tailored to serve a compelling governmental interest, *id.* at 395; *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, Nos. 10-238, 10-239, 2011 WL 2518813, at *9 (June 27, 2011). Likewise, "[l]aws that burden political speech are subject to strict scrutiny." *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010) (internal quotation marks omitted). On the other hand, "time, place, and manner" regulations on speech need only be "reasonable" and "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The Supreme Court also uses a tiered standard

of review in its speech-forum doctrine; regulations in a traditional public or designated public forum get strict scrutiny, while regulations in a nonpublic forum "must not discriminate on the basis of viewpoint and 'must be reasonable in light of the forum's purpose.'" *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 864 (7th Cir. 2008) (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001)).

In election-law cases, regulations affecting the expressive association rights of voters, candidates, and parties are subject to a fluctuating standard of review that varies with the severity of the burden on the right; laws imposing severe burdens get strict scrutiny, while more modest regulatory measures need only be reasonable, politically neutral, and justified by an important governmental interest. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190-91 (2008); *Wash. State Grange*, 552 U.S. at 451-52; *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006). "First Amendment challenges to disclosure requirements in the electoral context"—for example, laws compelling the disclosure of the names of petition signers—are reviewed "under what has been termed 'exacting scrutiny.'" *Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010). This standard of review requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (internal quotation marks omitted).

Similarly, restrictions imposed on adult bookstores are reviewed under an intermediate standard of scrutiny

that requires the municipality to present "evidence that
the restrictions actually have public benefits great enough
to justify any curtailment of speech." *Annex Books, Inc.
v. City of Indianapolis*, 581 F.3d 460, 462 (7th Cir. 2009) (citing
*Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), and
*Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)). And in
commercial-speech cases, the Court applies an intermediate
standard of review that accounts for the "subordinate
position" that commercial speech occupies "in the scale of
First Amendment values." *Bd. of Trs. of State Univ. of N.Y. v.
Fox*, 492 U.S. 469, 477 (1989). In this context intermediate
scrutiny requires "a fit between the legislature's ends and
the means chosen to accomplish those ends, . . . a fit that is
not necessarily perfect, but reasonable; that represents not
necessarily the single best disposition but one whose
scope is in proportion to the interest served." *Id.* at 480
(internal quotation marks and citation omitted); *see also
Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 2472796,
at *13 (June 23, 2011) (To justify commercial-speech re-
strictions, "the State must show at least that the statute
directly advances a substantial governmental interest
and that the measure is drawn to achieve that interest.").

Labels aside, we can distill this First Amendment doctrine
and extrapolate a few general principles to the Second
Amendment context. First, a severe burden on the core
Second Amendment right of armed self-defense will require
an extremely strong public-interest justification and a close
fit between the government's means and its end. Second,
laws restricting activity lying closer to the margins of the
Second Amendment right, laws that merely regulate rather
than restrict, and modest burdens on the right may be more

easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

In *Skoien* we required a "form of strong showing"—a/k/a "intermediate scrutiny"—in a Second Amendment challenge to a prosecution under 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by persons convicted of a domestic-violence misdemeanor. 614 F.3d at 641. We held that "logic and data" established a "substantial relation" between dispossessing domestic-violence misdemeanants and the important governmental goal of "preventing armed mayhem." *Id.* at 642. Intermediate scrutiny was appropriate in *Skoien* because the claim was not made by a "law-abiding, responsible citizen" as in *Heller*, 554 U.S. at 635; nor did the case involve the central self-defense component of the right, *Skoien*, 614 F.3d at 645.

Here, in contrast, the plaintiffs *are* the "law-abiding, responsible citizens" whose Second Amendment rights are entitled to full solicitude under *Heller*, and their claim comes much closer to implicating the core of the Second Amendment right. The City's firing-range ban is not merely regulatory; it *prohibits* the "law-abiding, responsible citizens" of Chicago from engaging in target practice in the controlled environment of a firing range. This is a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense. That the City conditions gun possession on range training is an additional reason to closely scrutinize the range ban. All this suggests that a more rigorous showing than that applied in *Skoien* should be required, if not quite "strict

scrutiny." To be appropriately respectful of the individual rights at issue in this case, the City bears the burden of establishing a strong public-interest justification for its ban on range training: The City must establish a close fit between the range ban and the actual public interests it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights. Stated differently, the City must demonstrate that civilian target practice at a firing range creates such genuine and serious risks to public safety that prohibiting range training throughout the city is justified.

At this stage of the proceedings, the City has not come close to satisfying this standard. In the district court, the City presented no data or expert opinion to support the range ban, so we have no way to evaluate the seriousness of its claimed public-safety concerns. Indeed, on this record those concerns are entirely speculative and, in any event, can be addressed through sensible zoning and other appropriately tailored regulations. That much is apparent from the testimony of the City's own witnesses, particularly Sergeant Bartoli, who testified to several common-sense range safety measures that could be adopted short of a complete ban.

The City maintains that firing ranges create the risk of accidental death or injury and attract thieves wanting to steal firearms. But it produced no evidence to establish that these are realistic concerns, much less that they warrant a total prohibition on firing ranges. In the First Amendment context, the government must supply actual, reliable evidence to justify restricting protected expression based on secondary public-safety effects. *See Alameda Books,*

*Inc.*, 535 U.S. at 438 (A municipality defending zoning restrictions on adult bookstores cannot "get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance."); *see also Annex Books, Inc. v. City of Indianapolis*, 624 F.3d 368, 369 (7th Cir. 2010) (affirming preliminary injunction where a city's "empirical support for [an] ordinance [limiting the hours of operation of an adult bookstore] was too weak"); *New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 560-61 (7th Cir. 2009) (affirming preliminary injunction where municipality offered only "anecdotal justifications" for adult zoning regulation and emphasizing the necessity of assessing the seriousness of the municipality's concerns about litter and theft).

By analogy here, the City produced no empirical evidence whatsoever and rested its entire defense of the range ban on speculation about accidents and theft. Much of the focus in the district court was on the possible hazards of mobile firing ranges. The City hypothesized that one cause of range-related injury could be stray bullets, but this seems highly implausible insofar as a properly equipped indoor firing range is concerned. The district court credited the plaintiffs' evidence that "mobile ranges are next to Sam's Clubs and residences and shopping malls and in parking lots, and there's not been any difficulties with them in those places." Commissioner Scudiero acknowledged that the law-enforcement and private-security firing ranges in Chicago are located near schools, churches, parks, and stores, and they operate safely in those locations. And Sergeant Bartoli testified about the availability of

straightforward range-design measures that can effec-
tively guard against accidental injury. He mentioned,
for example, that ranges should be fenced and should
designate appropriate locations for the loading and unload-
ing of firearms. Other precautionary measures might
include limiting the concentration of people and firearms in
a range's facilities, the times when firearms can be loaded,
and the types of ammunition allowed. *See also, e.g.,* NRA
RANGE SOURCE BOOK (providing "basic and advanced
guidance to assist in the planning, design, construction and
maintenance of shooting range facilities"),
http://www.nrahq.org/shootingrange/sourcebook.asp (last
visited June 2, 2011); FLA. STAT. § 823.16(6) (2011) (referenc-
ing the safety standards of the NRA *Range Source Book*);
KAN. ADMIN. REGS. § 115-22-1(b) (2011) (same); MINN. STAT.
§ 87A.02 (2010) (same); NEB. REV. STAT. § 37-1302(4) (2010)
(same); OHIO ADMIN. CODE 1501: 31-29-03(D) (2011) (same).

At the preliminary-injunction hearing, the City high-
lighted an additional public-safety concern also limited
to mobile ranges: the risk of contamination from lead
residue left on range users' hands after firing a gun. Ser-
geant Bartoli was asked a series of questions about
the importance of hand-washing after shooting; he said that
"lucrative amounts of [cold running] water and soap" were
required to ensure that lead contaminants were removed.
The City argued below that mobile firing ranges might not
be sufficiently equipped for this purpose, suggesting that
mobile ranges would have inadequate restroom facilities
and might have to rely on "port-a-potties." This sparked a
discussion about the adequacy of the water supply available
at a standard "port-a-potty." The City continued on this

topic until the judge cut it short by acknowledging her own familiarity with "port-a-potties." On appeal the City raised but did not dwell on its concern about lead contamination. For good reason: It cannot be taken seriously as a justification for banishing all firing ranges from the city. To raise it at all suggests pretext.

Perhaps the City can muster sufficient evidence to justify banning firing ranges everywhere in the city, though that seems quite unlikely. As the record comes to us at this stage of the proceedings, the firing-range ban is wholly out of proportion to the public interests the City claims it serves. Accordingly, the plaintiffs' Second Amendment claim has a strong likelihood of success on the merits.

## D.  Balance of Harms

The remaining consideration for preliminary injunctive relief is the balance of harms. It should be clear from the foregoing discussion that the harms invoked by the City are entirely speculative and in any event may be addressed by more closely tailored regulatory measures. Properly regulated firing ranges open to the public should not pose significant threats to public health and safety. On the other side of the scale, the plaintiffs have established a strong likelihood that they are suffering violations of their Second Amendment rights every day the range ban is in effect. The balance of harms favors the plaintiffs.

The plaintiffs asked the district court to enjoin the enforcement of *Chicago Municipal Code* § 8-20-280—the prohibition

on "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged." They are entitled to a preliminary injunction to that effect. To be effective, however, the injunction must also prevent the City from enforcing other provisions of the Ordinance that operate indirectly to prohibit range training. The plaintiffs have identified several provisions of the Ordinance that implicate activities integral to range training: CHI. MUN. CODE §§ 8-20-020 (prohibiting the possession of handguns outside the home), 8-20-030 (prohibiting the possession of long guns outside the home or business), 8-20-080 (prohibiting the possession of ammunition without a corresponding permit and registration certificate), 8-20-100 (prohibiting the transfer of firearms and ammunition except through inheritance), 8-24-010 (prohibiting the discharge of firearms except for self-defense, defense of another, or hunting). To the extent that these provisions prohibit law-abiding, responsible citizens from using a firing range in the city, the preliminary injunction should include them as well. Similarly, the injunction should prohibit the City from using its zoning code to exclude firing ranges from locating anywhere in the city.

Finally, because range training is required for the issuance of a Chicago Firearm Permit, a registration certificate, and ultimately, for lawful possession of any firearm, *see* CHI. MUN. CODE §§ 8-20-110(a), 8-20-140(a)-(b), the firing-range ban implicates not only the right to train at a range but also the core Second Amendment right to possess firearms for self-defense. Accordingly, the preliminary injunction should include sections 8-20-110(a) and 8-20-140(a) to the extent that those provisions operate to prohibit otherwise eligible

persons from "carry[ing] or possess[ing] a firearm" at a range without a Permit or registration certificate while they are trying to complete the range-training prerequisite for lawful firearm possession.

Those are the bounds of the proposed preliminary injunction, which should be entered upon remand. The City worries that entering an order enjoining the range ban would allow "anyone [to] park a mobile range any-where, anytime"; shoddy ranges operated by unlicensed instructors and lacking adequate hand-washing facilities could crop up in Chicago's most dangerous neighborhoods. To the contrary, a preliminary injunction against the range ban does not open the door to a parade of firing-range horribles. *Cf. McDonald*, 130 S. Ct. at 3047 ("Despite munici-pal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms."). The City may promulgate zoning and safety regulations governing the operation of ranges not inconsistent with the Second Amendment rights of its citizens; the plaintiffs may chal-lenge those regulations, but not based on the terms of this injunction. As for the City's concern about a "regulatory vacuum" between the issuance of the preliminary injunction and the promulgation of firing-range zoning and safety reg-ulations, we note that it faced a similar dilemma after the Supreme Court decided *McDonald*. The sky did not fall. The City Council moved with dispatch and enacted the Ordinance just four days later.

The plaintiffs have established their entitlement to a preliminary injunction based on their Second Amend-ment claim, so we need not address the alternative argu-ment that range training is protected expression under

No. 10-3525                                        51

the First Amendment. Given the strong likelihood of success on the former claim, the latter claim seems like surplusage.

For the foregoing reasons, we REVERSE the district court's order denying the plaintiffs' motion for a preliminary injunction and REMAND with instructions to enter a preliminary injunction consistent with this opinion.

ROVNER, *Circuit Judge*, concurring in the judgment. Stung by the result of *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the City quickly enacted an ordinance that was too clever by half. Recognizing that a complete gun ban would no longer survive Supreme Court review, the City required all gun owners to obtain training that included one hour of live-range instruction, and then banned all live ranges within City limits.[1] This was not so much a nod to the importance of live-range training as it was a

---

[1] As the majority clarifies, the City grants exceptions for ranges in a few select circumstances such as ranges used by law enforcement personnel. None of these ranges are open to the public in general or to the plaintiffs in particular.

thumbing of the municipal nose at the Supreme Court. The effect of the ordinance is another complete ban on gun ownership within City limits. That residents may travel outside the jurisdiction to fulfill the training requirement is irrelevant to the validity of the ordinance inside the City. In this I agree with the majority: given the framework of *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald*, the City may not condition gun ownership for self-defense in the home on a prerequisite that the City renders impossible to fulfill within the City limits. The plaintiffs have a strong likelihood of success on the merits of that claim and the district court should have granted an injunction against the operation of the ordinance to the extent that it imposed an impossible pre-condition on gun owner-ship for self-defense in the home. There are two obvious ways for the City to remedy this problem: it may either drop the requirement for one hour of live range training or it may permit live-range training within the City limits.

Even if the City were to drop the live-range require-ment, though, the plaintiffs claim an independent Second Amendment right to maintain proficiency in firearm use by practicing live-range shooting. The majority goes much farther than is required or justified, however, in finding that the plaintiffs' claim for live- range training is so closely allied to "core" Second Amendment rights that a standard akin to strict scrutiny should be applied. Granted, the right to use a firearm in the home for self-defense would be seriously impaired if gun owners were prevented from obtaining the training necessary to use their weapons safely for that purpose. We do not yet know how a complete ban on any firearms training would be received by the Supreme

Court, but *Heller* and *McDonald* strongly suggest that a comprehensive training ban would not pass constitutional muster. But the City has not banned all firearms training; it has banned only one type of training. There is no ban on classroom training. There is no ban on training with a simulator and several realistic simulators are commercially available, complete with guns that mimic the recoil of firearms discharging live ammunition. *See e.g.* http://www.virtrasystems.com/law-enforcement-training/virtra-range-le (last visited July 6, 2011); http://www.meggitttrainingsystems.com/main.php?id=25 &name=LE_Virtual_Bluefire_Weapons (last visited June 24, 2011); http://www.ontargetfirearmstraining.com/ simulator.php (last visited July 6, 2011). It is possible that, with simulated training, technology will obviate the need for live-range training. In any case, the limited record to date suggests that even the City considers live-range training necessary to the safe operation of guns in the home for self-defense. A complete ban on live ranges in the City, therefore, is unlikely to withstand scrutiny under any standard of review. The plaintiffs have a strong likelihood of succeeding on the merits of this claim. Public safety interests apply on both sides of the balance: there are obvious safety risks associated with operating live shooting ranges (more on that later), but there are perhaps equally compelling safety interests in ensuring that gun owners possess the skills necessary to handle their weapons safely. On the record as it currently stands, the district court should have enjoined that part of the ordinance banning all live ranges within City limits. For that reason, I concur in the judgment.

I write separately because the majority adopts a standard of review on the range ban that is more stringent than is justified by the text or the history of the Second Amendment. Although the majority characterizes this aspect of the ordinance as a complete ban on an activity "implicating the core of the Second Amendment right," a more accurate characterization would be a regulation in training, an area ancillary to a core right. *Ante*, at 45. A right to maintain proficiency in firearms handling is not the same as the right to practice at a live gun range. As such, I cannot agree that "a more rigorous showing than that applied in *Skoien*, should be required, if not quite 'strict scrutiny.'" *Ante*, at 46. *Skoien* required the government to demonstrate that the statute at issue served an "important government objective," and that there was a "substantial relationship" between the challenged legislation and that objective. *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1674 (2011).

The majority's analysis of laws in effect during the time period surrounding the adoption of the Second and Fourteenth Amendments helps to prove the point that no scrutiny beyond that described in *Skoien* is necessary. The majority concedes that the City has presented us with "a number of founding-era, antebellum, and Reconstruction state and local laws that limited the discharge of firearms in urban environments." *Ante*, at 37. Some jurisdictions enacted outright bans on discharging firearms in city limits. Some laws limited the time, place and manner of firearms discharges. Some laws required permission from a government authority before

discharging firearms in urban areas. The majority finds
these laws irrelevant to the Second Amendment
analysis here because they are "not specific to controlled
target practice and, in any event, contained significant
carveouts and exemptions." *Ante,* at 37-38. The majority also
distinguishes them as regulatory measures rather
than outright bans on firing ranges. Finally, the majority
dismisses some of the laws because they were clearly aimed
at fire suppression, which the majority believes would not
be a concern at a safely sited and properly equipped firing
range.

But these observations contravene rather than support the
majority's ensuing analysis. First of all, none of the 18th and
19th century jurisdictions cited by the City and dismissed by
the majority were apparently concerned that banning or
limiting the discharge of firearms within city limits would
seriously impinge the rights of gun owners or limit their
ability to learn how to safely use their weapons. Citizens
living in densely populated areas had few legitimate
reasons to discharge their firearms near their homes, and
likely used them mostly when out in the country. Opportu-
nities to hunt and practice outside of city limits were likely
adequate for training purposes. Given the majority's nod to
the relevance of historical regulation, curt dismissal of
actual regulations of firearms discharges in urban areas is
inappropriate.

Second, as I noted above, many of these jurisdictions
regulated the time, place and manner of gun discharges. For
example, as the majority itself points out, one
statute prohibited the discharge of firearms before
sunrise, after sunset, or within one quarter mile of the

nearest building. Others prohibited firearms discharge without specific permissions and only then at specific locations. The "time, place and manner" framework of the First Amendment seems well-suited to the regulation of live-range training within a densely populated urban area. A complete ban on live-range training in Chicago, of course, likely would not survive under the intermediate scrutiny applied to restrictions on time, place and manner, especially because the City itself concedes the importance of this training to the safe operation of firearms for self-defense in the home. Indeed, the City allows ranges to operate in some of the most densely populated parts of the City, albeit strictly for the use of law enforcement and trained security personnel. The majority purports to distinguish time, place and manner restrictions and other regulations on the grounds that the City's ordinance is a complete ban, but the ban on live ranges affects only one aspect of firearms training. The intermediate scrutiny applied to time, place and manner restrictions is both adequate and appropriate in these circumstances.

Finally, that some of those early laws were concerned with fire suppression does not mean that they are irrelevant to our analysis today. On the contrary, these laws inform us that public safety was a paramount value to our ancestors, a value that, in some circumstances, trumped the Second Amendment right to discharge a firearm in a particular place. Analogizing to the First Amendment context, a categorical limit is sometimes appropriate, as in the case of bans on obscenity, defamation, and incitement to crime. *See Skoien*, 614 F.3d at 641. In the same way that a person may not with impunity cry out "Fire!" in a crowded theater, a

person in 18th century New York, and 19th century Chicago and New Orleans could not fire a gun in the tinder boxes that these cities had become. *See* Footnote 14 above. If we are to acknowledge the historical context and the values of the period when the Second and Fourteenth Amendments were adopted, then we must accept and apply the full understanding of the citizenry at that time. In the instance of firearms ordinances which concerned themselves with fire safety, we must acknowledge that public safety was seen to supercede gun rights at times. Although fire is no longer the primary public safety concern when firearms are discharged within City limits, historical context tells us that cities may take public safety into account in setting reasonable time, place and manner restrictions on the discharge of firearms within City limits.

The majority's summary dismissal of the City's concern for public safety related to live gun ranges is to my mind naive. One need only perform a simple internet search on "gun range accidents" to see the myriad ways that gun owners manage to shoot themselves and others while practicing in these supposedly safe environments. From dropping a loaded gun in a parking lot to losing control of a strong weapon on recoil, gun owners have caused considerable damage to themselves and others at live gun ranges. To say that the City's concerns for safety are "entirely speculative" is unfounded. *Ante,* at 46. The plaintiffs themselves "do not doubt that gun ranges may be regulated in the interest of public safety." Reply Brief at 22. *See also* Reply Brief at 26-27 (conceding that the City may except certain parts of the City, set range distances from other uses, require a license or permission for target practice, and

regulate the operation and location of gun ranges). The
plaintiffs' concessions regarding gun range regulations are
by no means a complete list of restrictions the City may
impose on gun ranges. At this stage of the litigation,
the City has not yet had an opportunity to develop a
full record on the safety issues raised by placing live
gun ranges in an urban environment. Common sense
tells us that guns are inherently dangerous; responsible gun
owners treat them with great care. Unfortunately, not all
gun owners are responsible. The City has a right
to impose reasonable time, place and manner restric-
tions on the operation of live ranges in the interest
of public safety and other legitimate governmental concerns.

As for the remaining parts of the ordinance challenged by
the plaintiffs, I agree that, to the extent that these provisions
entirely prohibit gun owners from practicing at live ranges,
they must be enjoined for the time being. As far as I can tell,
though, the plaintiffs have not presented any evidence
demonstrating, for example, that prohibiting gun owners
from possessing guns outside the home will impinge on
their ability to practice at a range. As the plaintiffs' own
witnesses testified, some ranges lend patrons guns with
which to practice. But if the ordinance both prohibits gun
owners from transporting their own weapons and prevents
ranges from lending weapons for practice, then those
aspects of the ordinance must be enjoined.

The ordinance admittedly was designed to make
gun ownership as difficult as possible. The City has legiti-
mate, indeed overwhelming, concerns about the prevalence
of gun violence within City limits. But the Supreme Court
has now spoken in *Heller* and *McDonald* on the Second

No. 10-3525                                                    59

Amendment right to possess a gun in the home for self-
defense and the City must come to terms with that reality.
Any regulation on firearms ownership must respect that
right. For that reason, I respectfully concur in the judgment.

_____