IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EZELL, ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 10-CV-5135 |
| | ) Judge Virginia M. Kendall |
| CITY OF CHICAGO, | ) |
| | ) |
| Defendant. | ) |

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO COMPEL

Defendant City of Chicago ("City"), by its attorney, Stephen R. Patton, Corporation Counsel of the City, hereby responds to Plaintiffs' F.R.Civ.P. 37(a)(3)(B) Motion to Compel ("Motion").

### SUMMARY

Plaintiffs' Motion largely seeks discovery into wholly irrelevant matters, attempts to force the City to create information that does not already exist, and quibbles with the sufficiency of certain of the City's discovery responses. Upon further consideration, and as discussed herein, the City has agreed to augment its response to certain requests, but no further response is required as to most of them.

### ARGUMENT

**I. Additional Discovery Of The Legislative Process Is Improper.**

Plaintiffs seek to compel responses to Interrogatory Nos. 1, 2, and 14, and Request for Production No. 1. Motion at 1, 7. Interrogatory No. 1 states "Identify all individuals who participated in the process of creation of the Gun Range Ordinance." Motion, Exhibit 1 thereto,

at 3. Interrogatory No. 2 states "For each individual identified in response to interrogatory #1, describe the individual's participation." *Id.* at 4. Interrogatory No. 14 states "Identify any laws upon which the Gun Ran[ge] Ordinance is modeled." *Id.* at 13. Request for Production No. 1 seeks production of "[a]ll documents relied upon in the formulation of the Gun Range Ordinance." Motion, Exhibit 2 thereto, at 3.

The City has already produced the duly-constituted legislative record for the Gun Range Ordinance ("Ordinance"). It has produced the transcripts and/or recordings, and other documentary records, that exist for the July 5 and September 6, 2011 hearings conducted by the City Council Committee on Public Safety, at which the Ordinance was initially introduced and subsequently amended. These records disclose what transpired at the hearings, including which witnesses and Council members participated and what they said or did. The City has also produced the pages from the City Council's Journal of Proceedings reflecting the July 6 and September 8, 2011 City Council meetings at which the Ordinance and its later amendments were enacted. These records reflect how each Council member voted. A video recording of the September 8 meeting is also available on the City Clerk's website.

Discovery beyond this duly-constituted record is improper, for two reasons. First, it is not relevant to the claims at issue. Second, any minimal relevance is far outweighed by the burden of responding.

**1.   The history of the legislative process is irrelevant.**

Plaintiffs offer no reason why, beyond the information already contained in the duly-constituted legislative history, discovery of the persons involved in the Ordinance's creation, the level of their participation, and all documents relied upon by anyone in the Ordinance's

2

formation is relevant. Indeed, it is not. A statute's validity under the Second Amendment does not turn on how it was passed or what went into its formation. Instead, courts examine other factors, such as how the statute impacts the Second Amendment right at issue, and whether a proper governmental interest sufficiently supports the statute. *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008), the seminal Second Amendment case, did not examine the legislative history of the challenged law at all. Rather, the Court first identified the Second Amendment right invovled, concluding that the Amendment protects "the right to possess a handgun in the home for the purpose of self-defense." *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3050 (2010) (plurality opinion) (discussing *Heller*). The Court then examined the law at issue – the District of Columbia's handgun ban – and found it invalid because of the way it restricted the right. In its operation, it "totally ban[ned] handgun possession in the home." *Heller*, 128 S.Ct. at 2817.

Similarly, the Seventh Circuit's Second Amendment cases do not tarry with who or what was involved in a statute's passage, or what information was relied upon during that process. *See United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010); *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (*en banc*). Even though these cases reviewed the challenged laws under intermediate scrutiny, they did not scrutinize any facet of the legislative process. The Seventh Circuit merely asked whether the regulation at issue was substantially related to an important governmental objective. *See, e.g., Skoien*, 614 F.3d at 641. And, in answering that question in the affirmative, the Seventh Circuit invoked materials (such as data compilations and studies) that were not even part of the legislative record – indeed, that were created *after* the statute was enacted. *See Yancey*, 621 F.3d at 683-687; *Williams*, 616

3

F.3d at 693-94; *Skoien*, 614 F.3d at 643-44. For instance, in the course of upholding the 1996 federal ban on firearms possession by domestic violence misdemeanants, *Skoien* cited studies from 1997, 1999, 2001-2005, and 2009; at the same time, it did not at all ask whether the enacting Congress had *any* data or evidence before it, much less whether its was reliable or sufficient, or whether any particular legislator had reviewed it. *See Skoien*, 614 F.3d at 643-44. What ultimately mattered was whether some basis for supporting the statute could be found at the time of litigation. The formation of the legislative record was entirely beside the point.

*Ezell v. Chicago*, 651 F.3d 684 (7th Cir. 2011) is no different in this regard. To be sure, *Ezell* applied a more rigorous form of scrutiny than did the *Skoien* line of cases, based on the particular claim before it. *See Ezell* 651 F.3d at 708-09 (a complete ban on range training would require the City to show a "strong public-interest justification" and a close fit between the ban and the interests it serves). But nothing in *Ezell* indicates that the legislative process is relevant to even this more heightened scrutiny. The court merely referenced the usual forms of evidence that a municipality would amass in litigation to satisfy its burden, such as "data or expert opinion." *Id*. at 709.

In short, regardless of the level of scrutiny that applies to the City's regulation of firing ranges,[1] the legislative process beyond that found in the duly-constituted legislative history will

---

[1] Unlike *Yancey*, *Williams*, and *Skoien*, this case does not present a regulation that categorically bans the exercise of a Second Amendment right. Rather, it involves mere regulation of the exercise of that right. Accordingly, a lesser form of scrutiny should apply here. But, even under intermediate scrutiny, it is clear that the instant discovery remains unwarranted, as the Seventh Circuit's Second Amendment intermediate scrutiny cases provide no support for inquiry into the legislative process. Nor would such inquiry be warranted under strict scrutiny. *See United States v. Marzzarella*, 614 F.3d. 85, 99 (3rd Cir. 2010) (asking whether provision is "narrowly tailored to serve a compelling state interest," and answering those questions without scrutinizing the legislative process).

remain irrelevant. To the extent that the level of scrutiny requires the City to justify its regulations, the City will simply have to make a showing in court based on logic, data, and/or other evidence. Since the Aldermen and other City officials need not have had these (or any other materials) during the Ordinance's formation, examining the legislative process to see if they did or if they relied upon them is irrelevant and unnecessary.

Indeed, Judge Chang reached this very conclusion in *Benson v. Chicago*, 10-CV-4184 (N.D. Ill.). *Benson*, like this case, raises Second Amendment challenges to the City's firearms regulations enacted after *McDonald*. The *Benson* plaintiffs sought information "regarding the drafting of the Ordinance, including but not limited to who was involved, what was discussed, whether any other language or alternative regulations were discussed or considered, and the reasons why the text of the Ordinance was selected." Exhibit A hereto [Mar. 17, 2011 *Benson* order], at 1. Judge Chang denied the plaintiffs' motion to compel this discovery. He ruled that even though it was "not yet clear" what level of scrutiny would apply, "the object of scrutiny will *not* be the subjective purposes or motives of the individual alderman, the Mayor, and their staffs." *Id*. "Rather, the scrutiny will focus on the objective purpose of the legislation, as determined by its text, structure, and legislative history (in the form of Council and committee hearing transcripts and materials)." *Id*. As noted above, the City has already produced these materials from the legislative history.

Finally, while Plaintiffs argue that the Ordinance lacks a statement of purpose, that is neither here nor there. *Ezell* suggested that a statement of purpose could be relevant to assessing irreparable harm in a preliminary injunction context, *see* 651 F.3d at 697, but the Seventh Circuit's approach to resolution of the merits does not turn on whether the statute contains a

5

statement of purpose, and, if not, whether the process leading to the statute's enactment otherwise reveals a purpose. As discussed above, it merely asks whether a valid purpose can be identified and substantiated during the course of litigation. In any event, it should be evident that the Ordinance's purpose is protection of the public safety, health, and welfare. If Plaintiffs remain in doubt about this, there are much narrower ways to discover the purpose served by the Ordinance, such as tendering an interrogatory asking the City to identify it. This is far superior to individualized discovery into every person somehow involved with the Ordinance's creation. *See also United States v. Mitra*, 405 F.3d 492, 495 (7th Cir. 2005) (a public body is a "'they' not an 'it'; a committee lacks a brain (or, rather, has so many brains with so many different objectives that it is almost facetious to impute a joint goal or purpose to the collectivity")); *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1293 (7th Cir. 1996) ("Government actions may be taken for a multiplicity of reasons, and any number of people may be involved in authorizing the action.").[2]

### 2. Discovery of the legislative process is unduly burdensome.

Not only is discovery into the legislative process irrelevant, it would also saddle the City with immense logistical burdens. The City has 50 Aldermen, each with his or her own staff. Numerous other officials and employees within the City's executive departments, such as the Police Department and the Buildings Department, potentially participated in the creation or passage of the Ordinance. Each of these individuals would need to be canvassed to see whether

---

[2] In addition, the motives of individual legislators have long been held to be irrelevant in constitutional analysis. *See DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 828 (7th Cir. 1999) (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)); *Grossbaum*, 100 F.3d at 1293 (7th Cir. 1996); *United States v. Soderna*, 82 F.3d 1370, 1375 (7th Cir. 1996); *D.G. Restaurant Corp. v. City of Myrtle Beach*, 953 F.2d 140, 146 (4th Cir. 1992).

they possess information or other discovery in any way relating to drafting or passage of the Ordinance or its legislative hearings, and would need to exhaustively search their files and email for all responsive documents. The resulting City-wide burden and intrusion into the duties of busy public officials would be immense. Further burden will result from the need to log responsive documents that are privileged, as a vast majority of them are likely to be covered by the legislative privilege, *see, e.g., Bogan v. Scott-Harris*, 523 U.S. 44 (1998); *Biblia Abierta v. Banks*, 129 F.3d 899 (7th Cir. 1997); *Laurel Park Community, LLC v. City of Tumwater*, 2010 WL 1474073 (W.D. Wash. 2010), the executive and/or deliberative process privileges, *see United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993); *Hongsermeier v. Commissioner of Internal Rev.*, 621 F.3d 890, 904 (9th Cir. 2010), or other privileges, such as attorney-client privilege, attorney work-product doctrine, or the consultant privilege.

The burden and distraction this discovery would place upon important City personnel – particularly members of the City Council and the staff of executive departments responsible for public safety – far outweighs any minimal relevance the discovery might have. Again, as Judge Chang found in the exact same context, "even if the internal legislators' process was somehow relevant, it would be unduly burdensome to root around for the information in the offices of the multi–member Council, the Mayor, and the staff members." Exhibit A hereto, at 2. On the other hand, the detriment to Plaintiffs is minimal, if it exists at all. As noted above, the City has already produced the duly-constituted legislative history. Plaintiffs therefore know what information was and was before the City Council, as well as any alternative regulations or drafting language considered by the Council.

**II.     Requests That The City Has Sufficiently Answered Or Will Answer.**

Plaintiffs also take issue with the City's responses to various other requests. The City has agreed to further respond to a couple of these, but its answers to the rest are sufficient.

**1.     CPD ranges.**

<u>Interrogatory Nos. 4, 5, 11 &12; Requests for Admission Nos. 1, 3 & 4</u>. These discovery requests focus on whether existing ranges satisfy various standards and requirements set forth in the Ordinance.

Interrogatory No. 4 asks, for each gun range currently operating in Chicago, whether the range "would be in full compliance with all zoning, noise, and construction standards set forth in the [Ordinance] were the [Ordinance] applicable to it." Motion, Exhibit 1 thereto, at 5.

Interrogatory No. 5 asks, as to those ranges that do not presently meet the zoning requirements were those requirements applicable to it, that the City "identify all factors that would cause that [range] to not be in compliance with the zoning requirements." *Id*.

Interrogatory No. 11 asks, for each range currently operated by the City that does not meet the environmental standards set forth in the Ordinance or regulations were they applicable to that range, that the City "identify the manner in which each such [range] would fail to meet" the standards. *Id*. at 12. Interrogatory No. 12 asks the City to "describe all steps scheduled to be taken to bring that [range] within" the standards. *Id*.

As to those standards actually at issue,[3] the City has already answered to the extent that it

---

[3] Plaintiffs' requests are vague and overbroad to the extent that they ask about "all" "standards" or "requirements" set forth in the Ordinance, since there are numerous provisions in the Ordinance that could be deemed a standard or requirement, and since only a handful of those standards are actually identified and challenged in the Amended Complaint. *See* Amended Complaint, ¶ 25.

possesses knowledge or information sufficient to enable it to answer, and has indicated that it cannot answer beyond this. *See* Motion, Exhibit 1 thereto, at 5-7, 12-13; Exhibit B hereto [correspondence from City to Plaintiffs], at 3. For instance, in response to Interrogatory No. 5, the City identified the three Chicago Police Department ranges that are not located within zoning districts permitted under the Ordinance. *See* Motion, Exhibit 1 thereto, at 6.[4] And, after further consideration, the City represents that it will answer (by May 4) Request for Admission No. 1, which asks whether the CPD's ranges are within 500 feet of a sensitive location listed in MCC 4-15-120.

At the same time, the City lacks information as to whether the CPD's existing ranges satisfy the other standards challenged in the lawsuit. This should not be surprising, since those ranges are exempt from those standards, *see* MCC 4-151-150 *&* 13-96-1140, something that the Interrogatories themselves acknowledge. *See also* Motion, Exhibit 1 thereto, at 5-6, 11-12; Exhibit B hereto, at 3. Consequently, the City has not determined whether the CPD ranges comply with the environmental and construction standards challenged in the lawsuit. *Id.*

Plaintiffs cavalierly posit that answers to these questions are "readily available as soon as somebody looks." Motion at 9. Surely more than a "look" would be needed: Scientific tests or analyses by construction and environmental experts would be necessary. Plaintiffs cite no authority showing that the City, in responding to discovery requests, is obligated to undertake these measures, much less create *any* data or information that does not already exist. Indeed,

---

[4] Plaintiffs state that "[t]hough [the City] answered as to some [CPD ranges], it did not as to the rest." Motion, at 4. This misstates the record. Interrogatory No. 5 seeks identification of the factors that would cause a CPD range to not be in compliance with the zoning requirement only as to those ranges "that could not presently meet the zoning requirements." Thus, it does not call for a response as to all CPD ranges, but only those that do not meet the zoning requirements.

9

there is no such requirement. "Under the federal rules, a party is under no obligation to create information for another." *Hicks v. Arthur*, 159 F.R.D. 468, 469-70 (E.D. Pa. 1995) (denying motion to compel interrogatory response where defendant "does not have the information that plaintiffs seek" and would need "to conduct a survey" of its employees in order to respond). *See also Miller v. Pruneda*, 236 F.R.D. 277, 282 (N.D. W.Va. 2004) (responding party is required only to "provide information that is available to it" and need not "make extensive investigations or conduct complex research"); *Alliance to End Repression v. Rochford*, 75 F.R.D. 430, 431 (N.D. Ill. 1976) (City of Chicago not required to conduct audit in order to answer interrogatory). *Cf. Thompson v. Lantz*, 2009 WL 3157561, at *1 (D. Conn. Sept. 25, 2009) (party "cannot be compelled to create . . . new documents solely for their production").

For these reasons, the City also lacks, and need not create, the information necessary to respond to the disputed portions of Request for Admission No. 3 (whether the CPD's ranges comply with the Ordinance's "construction standards") and No. 4 (whether the CPD's ranges comply with the Ordinance's "environmental standards"). *See* Motion, at 9. Indeed, Fed. R. Civ. P. 36(a)(4) requires only that a responding party utilize knowledge that "it knows or can readily obtain."

    2.    **Denial of a range license.**

<u>Interrogatories No. 16 & 17</u>: Plaintiffs assert that the City has failed to sufficiently respond to Interrogatory No. 16 because it has not identified the criteria used by the Commissioner of Business Affairs and Consumer Protection when determining whether a "deleterious impact on the health, safety, or welfare of the community" exists that would warrant denial of a range license under MCC 4-151-030(f). *See* Motion, Exhibit 1 thereto, at 14. Not so.

The City indicated that the phrase "deleterious impact" in MCC 4-151-030(f) has the same meaning ascribed to that phrase in MCC 4-60-010. *See id*. MCC 4-60-010, in turn, lists various criteria: It defines "deleterious impact" as "an adverse effect on the value of any property, an increased risk of violations of law, or a risk of a substantial increase in noise, litter, or vehicular congestion." Further, the City responded that MCC 4-151-030(f) itself contains additional criteria: It states that a deleterious impact is presumed to exist "whenever there have been a substantial number of arrests within 500 feet of the applicant's premises (measured from the nearest exterior wall of the premises) within the previous two years, unless the applicant has adopted a plan of operation that will provide reasonable assurance that the issuance of the license will not have a deleterious impact." *See* Motion, Exhibit 1 thereto, at 14. Finally, the City answered that there are no statutory criteria beyond these. *See id*. As a whole, this response sufficiently answers the interrogatory.

As to Interrogatory No. 17, Plaintiffs argue that the City has failed to identify criteria used to determine whether a "substantial number of arrests" exists under MCC 4-151-030(f). Motion, at 6. Again, the City's answer is sufficient. The City indicated that such determination is made by the Commissioner of the Department of Business Affairs and Consumer Protection and that MCC 4-151-010(f) does not set forth statutory criteria to be used in making this determination. *See* Motion, Exhibit 1 thereto, at 14-15.

### 3. Property uses operating at more than 55dB.

<u>Interrogatory No. 18 & Request for Admission No. 13</u>: Interrogatory No. 18 seeks a list of all property uses that are allowed to operate in the city above 55dB. Motion, at 7. The City responded by indicating that this can be determined by reviewing the City's Municipal Code.

11

*See* Motion, Exhibit 1 thereto, at 15. The City's laws allowing or restricting uses above 55dB are a matter of public record, and Plaintiffs' attorneys are just as able as the City's to review the Code and identify those provisions that prohibit uses that operate at above 55dB. Plaintiffs cite no authority for why this burden should be foisted upon the City, and, as explained above, the City is not obligated to create information for Plaintiffs that it does not already have.

Similarly, the City has no further obligation to respond to Request for Admission No. 13, which asks the City to admit or deny that the City allows "many" uses of property that exceed 55dB. Motion, Exhibit 3 thereto, at 10. In this instance, the word "many" is vague and does not amount to a statement of fact that the City can admit or deny. Whether the City allows such uses, and the precise number of them that it allows, can be obtained by Plaintiffs should they simply choose to review the Code. Litigation over whether that number should be characterized as "many" in a discovery request response would be a waste of resources for all involved.

    **4.**    **Scientific studies and empirical evidence demonstrating secondary effects.**

<u>Request for Admission No. 6</u>: This request seeks an admission that the City lacks "scientific studies or other empirical evidence demonstrating secondary effects of gun ranges justifying" the challenged Ordinance restrictions. Motion, Exhibit 3 thereto, at 7. This request is objectionable and unanswerable to the extent it uses labels like "scientific," "empirical," and "secondary effects," as they are vague. Further, the request does not seek an admission or denial as to an issue of fact, but as to the argumentative proposition that the City's evidence does not "demonstrate" secondary effects or "justify" the Ordinance.

In any event, the City answered this request by denying that it "lacks any information" supporting the Ordinance. *Id*. at 8. Plaintiffs quarrel over the sufficiency of this answer, but the

dispute is now moot: The City has produced (in responding to Request for Production No. 3) the documents it has supporting its denial of Request for Admission No. 6. (The City has also produced documents in response to Request for Production No. 4, which seeks documents relating to actual threats to public health, welfare, or safety posed by ranges in the City.)[5] Since Plaintiffs will have the actual documents themselves, there is no need for litigation over whether they should be characterized as "scientific" or "empirical" for purposes of framing an answer to a request for admission; the Plaintiffs will be free to characterize these materials as they wish and to argue that they do not demonstrate secondary effects.

### 5. "Sampling" of firearms.

Request for Admission No. 12: This request seeks an admission that it is "in the interest of public safety that individuals be able to sample firearms prior to purchasing them." Motion, Exhibit 3 thereto, at 10. This is an improper request, as the phrases "public safety" and "sample" are not clear. Plaintiffs have not indicated what they have in mind when they speak of sampling, and an item may be sampled in any number of ways. Nor have Plaintiffs explained the way in which they believe public safety is served by the "sampling" of firearms, something that the City must know before it can determine whether to agree with or reject the proposition.

### 6. Parcels where a range may be located.

Interrogatory No. 13: This request asks the City to identify all land parcels on which a

---

[5] Regarding Requests for Production Nos. 3 & 4, Plaintiffs assert that they are entitled to a statement from the City as to whether "such production [is] complete." Motion, at 8. Plaintiffs cite no authority for this proposition, and, indeed, Rule 34 contains no such requirement. In any event, the City represents that, to the best of its knowledge, it has produced all responsive, non-privileged documents of which it is aware. And, of course, the City will seasonably supplement its production if it becomes aware of additional responsive materials. *See* Fed. R. Civ. P. 26(e).

"shooting range facility" could operate in compliance with the Ordinance's zoning requirements. Motion, Exhibit 1 thereto, at 13. The City has agreed to produce responsive information that it already has in its possession, such as the map used at the July 5, 2011 meeting of the City Council Committee on Public Safety (even though this map may not fully reflect all responsive parcels and was later superceded by an amendment to the Ordinance that reduced from 1000 feet to 500 feet the distance that a range must be from sensitive areas, such as churches and schools). *See* Exhibit B hereto, at 3. However, the interrogatory is improper the extent that it requires the City go beyond this and create information that it does not already have. Such an undertaking would be extremely burdensome, and Plaintiffs are just as able as the City to review a City map, locate zoning districts in which ranges are permitted, and determine whether those locations are within 500 feet of sensitive uses.

    7.    **Closure of ranges.**

Interrogatory No. 6: This interrogatory asks whether, as to a currently-existing range that does not meet the City's zoning requirements, whether the City "intend[s]" to close the range. Motion, Exhibit 1 thereto, at 7. Although the City responded that, as to the CPD ranges, it does not intend to close them, *see id.* at 7-8, an interrogatory asking for the City to state its "intent" as to any range beyond those maintained by the City is improper. The term "intent" is vague. Further, answering would require the City to formulate a position on a matter of prospective law enforcement, something that is within the City's prosecutorial discretion and may be impacted by any number of factors that can change on a daily basis. Moreover, the request is irrelevant. Whether the City intends to close a potentially non-conforming range operated by a third party has no bearing on whether the Ordinance's requirements unconstitutionally burden range

14

operation or whether the regulations are supported by a sufficient public-interest basis.

        **8.    Range application disclosures.**

Interrogatory No. 15: This interrogatory asks the City to identify the reasons for requiring a range applicant to disclose the various categories of persons and related information described in MCC 4-151-030(b). *See* Motion, Exhibit 1 thereto, at 13. The City has agreed to answer this interrogatory and will do so by May 4.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the City respectfully requests that the Court deny Plaintiffs' Motion to Compel.

Date: April 17, 2012                          Respectfully submitted,

                                                          STEPHEN R. PATTON,
                                                          Corporation Counsel for the City of Chicago

                                        By:    /s/ Andrew Worseck
                                                      Assistant Corporation Counsel

Michael A. Forti
Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9018 / 6975 / 7129 / 4216

Attorneys for Defendants

15

## **CERTIFICATE OF SERVICE**

I, Andrew Worseck, an attorney, hereby certify that on April 17, 2012, I caused a copy of the forgoing **Defendant's Response to Plaintiffs' Motion to Compel** to be served via ECF on:

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street
Suite 405
Alexandria, VA 22314

David G. Sigale
Law Firm of David G. Sigale, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL 60137

/s/ Andrew Worseck