**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RHONDA EZELL, et al.,** | ) | |
| | ) | **Case No. 10 CV 5135** |
| Plaintiffs, | ) | |
| **v.** | ) | **Hon. Virginia M. Kendall** |
| | ) | |
| **CITY OF CHICAGO,** | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Mardell Nereim
William M. Aguiar
Andrew W. Worseck
Rebecca Alfert Hirsch
Mary Eileen Cunniff Wells
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 742-0260

Attorneys for Defendant

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................1

PROCEDURAL BACKGROUND......................................................................................2

LEGAL STANDARD..........................................................................................................5

ARGUMENT.......................................................................................................................6

I.      Analytical Framework............................................................................................6

II.     The City's Regulations Are Constitutional.........................................................9

        A.     The Regulations Serve Important Governmental Objectives of Protecting the Health and Safety of Its Citizens...........................................................9

        B.     Each Provision Is Substantially Related to Important Governmental Goals...12

                1.     Zoning Regulations...............................................................................12

                2.     Construction Requirements..................................................................14

                        a.     Ballistic-proof walls and doors..............................................15

                        b.     Ventilation requirements........................................................17

                        c.     Cleaning methods....................................................................19

                        d.     Sound protection.....................................................................21

                        e.     Storage of firearms and ammunition......................................23

                        f.     Promulgation of rules by commissioner.................................24

                  3.     Business Operations..............................................................................25

                          a.     Range patrons must be 18 years or older................................25

                          b.     Operating hours.......................................................................27

                          c.     Sales of firearms at gun ranges..............................................28

       **d.**      **Range master presence**....................................................................31

       **e.**      **Range patrons cannot leave with ammunition purchased at range**..........................................................32

       **f.**       **Deleterious impact standard**..........................................................33

**III.**   **Plaintiffs Cannot Show that The Ordinance Makes it Impossible for Shooting Ranges to Open in The City**....................................................35

**IV.**   **Plaintiffs' First Amendment Claim Has No Merit**........................................37

**CONCLUSION**................................................................................................38

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........................................................5

*Bellotti v. Baird*, 443 U.S. 622 (1979)........................................................26

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)........................................................5, 6

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)........................................................11

*City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41 (1986)........................................................14

*Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003)........................................................10

*DiMa Corp. v. Town of Hallie*, 185 F.3d 823 (7th Cir. 1999)........................................................11, 28

*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008)........................................................6, 11

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)........................................................6, 7, 8

*Federation of Ad. Ind. Reprs., Inc. v. City of Chicago*, 326 F.3d 924 (7th Cir. 2003)........................................................2

*Fischer v. Avanade, Inc.*, 519 F.3d 393 (7th Cir. 2008)........................................................6

*G.M. Enterps, Inc. v. Town of St. Joseph*, 350 F.3d 631 (7th Cir. 2003)........................................................11

*Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198 (1st Cir. 2002)........................................................38

*Hall v. Garcia*, No. 10-03799, 2011 WL 995933 (N.D. Cal. March 17, 2011)........................................................14

*In re Willett*, 544 F.3d 787 (7th Cir. 2008)........................................................22

*Insolia v. Philip Morris, Inc.*, 216 F.3d 596 (7th Cir. 2000)........................................................5

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)........................................................35, 38

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)........................................................8, 20-21

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013)........................................................16-17, 28

*Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588 (7th Cir. 2007)........................................................5

*Lossman v. Pekarske*, 707 F.2d 288 (7th Cir. 1983)...........................................................................35

*McDonald v. Chicago*, 130 S. Ct. 3020 (2010)..........................................................................6, 11

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985)..............................................10

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)...........................................................................7

*Mt. Healthy City Sch. Dist. Bd. Of Ed. v. Doyle*, 429 U.S. 274 (1977)........................................35

*New York v. Ferber*, 485 U.S. 747 (1982)....................................................................................26

*North Avenue Novelties, Inc. v. City of Chicago*, 88 F.3d 441 (7th Cir. 1996)..............................14

*NRA v. BATF,* 700 F.3d 185 (5th Cir. 2012)...............................................................................8, 27

*NRA v. McCraw*, 719 F.3d 338 (5th Cir. 2013)..............................................................................27

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992)......................................................................17

*Schall v. Martin*, 467 U.S. 253 (1984).........................................................................................10

*Teixeira v. County of Alameda*, No. 12-03288, 2013 WL 4804756 (N.D. Cal. Sept. 9, 2013)...........14

*Thomas v. Chicago Park Dist.*, 227 F.2d 921 (7th Cir. 2000), *aff'd*, 534 U.S. 316 (2002).............34

*Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180 (1997)..............................................10, 11, 20

*United States v. Decastro,* 682 F.3d 160 (2d Cir. 2012)...............................................................7, 8

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)................................................................8

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)...........................................................8

*United States v. Salerno*, 481 U.S. 739 (1987)..............................................................................10

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010).........................................................9, 10, 11

*United Transp. Union–Ill. Legislative Bd. v. Surface Transp. Bd.*, 169 F.3d 474 (7th Cir. 1999)...22

*Woollard v. Gallagher,* 712 F.3d 865 (4th Cir. 2013)....................................................................20

## Ordinances and Rules

Chicago Mun. Code § 4-144-010.................................................................................28-29

Chicago Mun. Code § 4-151-010, *et seq*.......................................23, 25, 27, 31, 32, 33

Chicago Mun. Code § 8-20-100..................................................................................28

Chicago Mun. Code § 11-4-260.................................................................................24

Chicago Mun. Code § 13-96-1160, *et seq*......................................15, 17, 20, 21, 22, 23

Chicago Mun. Code § 15-4-985.................................................................................23

Chicago Mun. Code § 17-1-0501, *et seq*....................................................................13

Chicago Mun. Code § 17-5-0207.................................................................................12

Chicago Mun. Code § 17-9-0120.................................................................................12

Chicago Mun. Code § 19-9-0101.................................................................................14

FED. R. CIV. P. 56(c)...................................................................................................5

FED. R. EVID. 702......................................................................................................16

# INTRODUCTION

Plaintiffs challenge the City's regulatory scheme allowing shooting ranges to open and operate in the City, subject to reasonable licensing, construction, and operation requirements designed to promote the health, safety, and well-being of its citizens. Plaintiffs acknowledge, in theory, that regulations are the price of doing business, but do not accept them in practice. Plaintiffs believe that shooting ranges should be open 24 hours a day, in residential neighborhoods with schools, libraries, or churches nearby, and free from even the most basic, industry-recommended guidelines for safe construction and operation. This unfettered right is not what the Second Amendment guarantees, nor is it what the Seventh Circuit mandated when it heard this case previously on appeal.

Plaintiffs claim that the regulations infringe their Second Amendment rights by making it economically infeasible to open a shooting range in Chicago, but this is entirely unsupported by the record. After over two years of discovery, Plaintiffs have failed to identify a single individual poised to open a range who was prevented from doing so only because of the City's regulations. And although Plaintiffs challenge more than 18 separate regulations, they have failed to produce one bit of evidence showing that a single regulation actually results in increased costs, what those costs are, or that the regulation is otherwise difficult (further yet, impossible) to comply with. Without mooring their hypothetical concerns to actual evidence, Plaintiffs cannot show any burden – much less a substantial one – to their Second Amendment rights.

The City has a strong interest in protecting its citizens from the known dangers of shooting ranges, including the environmental hazards of lead and noise pollution and the risk of accidental injury, theft, and violent crime. And, in contrast to the weak tea served up by Plaintiffs, the City has

ample evidence showing how each challenged regulation is reasonably calculated to combat these dangers. For these reasons, discussed fully below, the regulations do not unconstitutionally burden Plaintiffs' Second Amendment rights, and summary judgment should be granted in the City's favor.

## PROCEDURAL BACKGROUND

Plaintiffs brought this lawsuit on August 16, 2010, originally challenging the City's ban on shooting ranges (MCC § 8-20-280) as a violation of their First and Second Amendment rights. On October 12, 2010, after an expedited hearing, the Court denied Plaintiffs' motion for preliminary injunction, and Plaintiffs appealed. On July 6, 2011, the Seventh Circuit reversed the Court's ruling and held that the ban likely violated Plaintiffs' Second Amendment rights to maintain firearm proficiency by training at a range. *See Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). That same day, the City repealed § 8-20-280 and enacted a new series of regulations allowing shooting ranges to operate within the City, and amending other provisions to allow the use of firearms at ranges. Three sections of the City's Municipal Code combine to comprise the City's regulations permitting firing range operations: (1) business licensing (§ 4-151-010, *et seq*.); (2) building requirements (§ 13-96-1160, *et seq*.); and (3) zoning (§ 17-5-0207) (collectively, the "Ordinance").

On October 15, 2011, and again on February 4, 2013, Plaintiffs amended their complaint to challenge numerous provisions of the Ordinance. The Ordinance has also been amended several times during the last two years, most recently on September 11, 2013. Because Plaintiffs failed to amend their Complaint to reflect these changes, several of their challenges are to provisions that have been either amended or removed entirely, rendering them moot. *See, e.g., Federation of Ad. Ind. Reprs., Inc. v. City of Chicago*, 326 F.3d 924, 930 (7th Cir. 2003) ("repeal, expiration, or significant amendment to challenged legislation ends the ongoing controversy and renders moot a plaintiff's

request for injunctive relief").[1]  Plaintiffs' Complaint thus challenges the following live provisions:

- the provision allowing the commissioner of the City's Department of Business Affairs and Consumer Protection to deny a shooting range license application based on the "deleterious impact" to the surrounding neighborhood (§ 4-151-030(f));

- the requirement that shooting ranges may operate between 9 a.m. and 8 p.m., daily (§ 4-151-090);

- the requirement that range patrons must be 18 years or older (§ 4-151-100(d));

- the requirement that a range master be present during all operating hours (§ 4-151-100(b));

- the requirement that range patrons have FOID cards, if required by state law (§ 4-151-100(g)(1));[2]

- the requirement that range patrons may not leave with ammunition purchased at the firing range (§ 4-151-170(b));[3]

- the requirement that gun ranges be 500 feet from residential zones, schools, day-care facilities, places of worship, places licensed for the retail sale of alcohol, children's activity facilities, museums, libraries, or hospitals, and 100 feet from another gun range (§ 17-9-0120);[4]

- the requirement that gun ranges be located only in manufacturing districts with special use approval (§ 17-5-0207);

- the requirement that the firing range be constructed with materials sufficient to stop

---

[1] The provisions Plaintiffs challenged that are no longer at issue are: (1) § 4-151-030(b), imposing CFP, FOID, and fingerprinting requirements on a broad definition of "applicants" for firing range licenses; (2) § 4-151-100(n), imposing record keeping requirements for shooting range patrons; (3) § 4-151-100(g)(1) and § 8-20-110, prohibiting persons who do not have CFP cards from possessing firearms or using a range; and (4) § 4-151-170(g), prohibiting firearm rentals.

[2] The requirement challenged by Plaintiffs that all range patrons possess valid CFP cards was eliminated on September 11, 2013.

[3] This provision was amended to remove the prohibition against loaning or renting firearms within the firing range.

[4] This provision was amended in January, 2013, lowering the permissible distance between two firing ranges from 500 to 100 feet.

all bullets or projectiles from penetrating beyond the enclosure (such as with armor plating) (§ 13-96-1160(a));

- the requirement that ammunition and firearms be stored in a magazine or other hazardous storage facility appropriate for the type and amount, and as provided by rules and regulations promulgated by the police or fire department (§ 13-96-1190);

- the requirement that the floors, ceilings, and walls of the firing range be constructed with smooth, non-porous materials to effectuate maintenance and cleaning, and also have airborne and structure borne sound absorbing material suspended or applied (§ 13-96-1200(b)(2) and (7));

- the requirement that the floors slope at a minimum of 1/4 inch per foot (§ 13-96-1200(b)(7));

- the requirement that the maximum noise emanating from the firing range be no more than 55 db when measured from a distance of 100 feet or more from the source and no more than 70 db when measured from 10 feet or more from the source (§ 13-96-1200(b)(2));[5]

- the requirement that where a shooting range facility contains multiple ranges at one location, it have separate ventilation and exhaust systems for each range (§ 13-96-1210(d));

- the requirement that the air supply and exhaust systems be electrically interlocked to turn on each system at the same time (§ 13-96-1210(e));

- the requirement that the firing range have a hose bib with backflow protection and floor drains installed at the bullet traps to collect lead and other hazardous materials in a separate drainage system (§§ 13-96-1220(b) and (c)); and

- the provision allowing the City's relevant commissioner to promulgate rules and regulations regarding the cleaning of, sound and air quality control at, and discharge of waste from firing ranges (§ 11-4-260).

Plaintiffs also challenge the City's more broadly applicable regulations banning the sale and transfer

of firearms (§ 8-20-100) and banning the business of selling or transferring firearms (§ 4-144-010),

---

[5] This provision was amended to eliminate the "contiguous areas" language challenged in Plaintiffs' Complaint.

presumably only to the extent these regulations affect firing ranges.[6]

Plaintiffs allege that all of the above regulatory provisions "work to effectively prohibit ranges from opening and operating by unjustifiably burdening their construction, operation, and use." Second Am. Compl., ¶ 25. In other words, Plaintiffs theorize that the provisions operate as a *de facto* ban, making it impossible for a gun range to open in the City. Alternatively, Plaintiffs argue that, to the extent range construction, operation and use might be "technically feasible," each challenged regulation, on its own, unjustifiably burdens their Second Amendment rights. *Id*.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A material fact is one that is outcome determinative and "significantly probative" under governing law, not "merely colorable." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). *See also Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). While the moving party has the burden of showing that the evidence, taken in the light most favorable to the non-moving party, demonstrates that the movant is entitled to judgment, the non-movant "must do more than baldly deny the reasonable inferences and facts presented by" the movant. *Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 594 (7th Cir. 2007). Thus, Plaintiffs cannot rest on bare allegations or a mere claim that an issue of fact exists; they must provide evidence showing that a genuine issue of material fact exists.

_____

[6] Plaintiffs' Complaint does not limit their challenge to the sale of firearms to firing ranges specifically – indeed, their prayer for relief asks for the provisions to be declared unconstitutional and enjoined generally – but they have, throughout this litigation, limited their claims to the effect of the regulations on firing ranges only.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Fischer v. Avanade, Inc.,* 519 F.3d 393, 401 (7th Cir. 2008) (favor to the nonmoving party does not extend to drawing "inferences that are supported by only speculation or conjecture") (internal citations omitted).

## ARGUMENT

### I. Analytical Framework

In *District of Columbia v. Heller*, the Supreme Court established that the Second Amendment's core is the use of arms "in defense of hearth and home." 128 S. Ct. 2783 (2008). It is not a right to keep and carry firearms "in any manner whatsoever" and "for whatever purpose." *Id*. at 2816. Nor does the Amendment "cast doubt" on various "longstanding" restrictions, which are "presumptively lawful." *Id*. at 2816-17 & n. 26. "[E]xamples" of valid restrictions are laws prohibiting carrying concealed weapons or carrying in "sensitive places such as schools and government buildings," and laws "regulating the storage of firearms to prevent accidents." *Id*. at 2816-17 & n. 26, 2820. And in finding the Second Amendment incorporated against state and local governments, the Court "repeat[ed] those assurances." *McDonald v. Chicago*, 130 S. Ct. 3020, 3047 (2010) (plurality opinion).

The Seventh Circuit set forth the analytical framework for approaching Second Amendment claims while determining the preliminary injunction appeal in this case, stating that it entails a two-step inquiry. *Ezell,* 651 F.3d at 701. First, the court determines whether the regulated activity is covered by the Amendment at all – that is, whether it is within the Amendment's "scope." *Id.* This "requires a textual and historical inquiry" into the Amendment's "original meaning" – that is, "how the Amendment was understood at the time of ratification." *Id*. at 700, 701. If the activity falls outside the scope, "the analysis can stop there; the regulated activity is categorically unprotected, and

the law is not subject to further Second Amendment review." *Id.* at 703. If the activity falls within the Amendment's scope, the second inquiry is triggered: Whether the regulation satisfies means-end scrutiny. This requires "select[ion of] an appropriate standard of review." *Id.* at 706. There is no one-size-fits-all approach; rather, the standard in a given case depends on a sliding scale. *Id.* at 708. A "severe burden" on the core Second Amendment right of armed self-defense "will require an extremely strong public-interest justification and a close fit between the government's means and its ends." *Id.* On the other hand, "laws restricting activity closer to the margins" of the right, "laws that merely regulate rather than restrict," and "modest burdens" on the right "may be more easily justified." How much more easily justified depends on "the relative severity of the burden and its proximity to the core of the right." *Id.*

Applying this two-step inquiry, the panel in *Ezell* held that the City's now-repealed ban on firing ranges likely severely burdened Plaintiffs' Second Amendment rights to maintain proficiency in firearm use via target practice, and that the City failed to justify this burden with "extremely strong public-interest justifications" and a close fit between the City's means and ends. *Id.* at 706, 709, 710. This heightened standard of review no longer applies to Plaintiffs' claims, however. First, *Ezell* involved a complete ban on firing ranges. While categorical bans on protected Second Amendment activity are subject to a stricter level of scrutiny, mere regulatory measures are "more easily justified." *Id.* at 708. *See also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (finding state carrying ban unconstitutional but allowing time for state to enact "reasonable limitations, consistent with public safety"). Indeed, the City is unaware of any court applying this almost-strict level of scrutiny to regulations that merely regulate, but do not prohibit, Second Amendment activity. *See, e.g., United States v. Decastro,* 682 F.3d 160, 166 (2d Cir. 2012) (federal regulation governing

transportation of firearms not subject to heightened scrutiny because it imposed only a "marginal, incremental or even appreciable restraint on the right to keep and bear arms"); *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012) (intermediate scrutiny applies to regulations that burden but do not ban Second Amendment rights); *NRA v. BATF,* 700 F.3d 185, 206 (5th Cir. 2012) (same); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (same); *United States v. Marzzarella*, 614 F.3d 85, 96-97 (3d Cir. 2010) (same).

Furthermore, key to *Ezell*'s reasoning that the ban imposed a severe burden on Plaintiffs was that, at the same time the City banned ranges, it simultaneously required one hour of range training in order to obtain a CFP and lawfully possess a gun. *See Ezell,* 651 F.3d at 708 ("[t]hat the City conditions gun possession on range training is an additional reason to closely scrutinize the range ban"); *see also id*. at 712 (J. Rovner, concurring) (agreeing with majority to extent that City "imposed an impossible pre-condition on gun ownership for defense of the home," but finding majority went "much farther than is required or justified, however, in finding that the Plaintiffs' claim for live-range training is so closely allied to "core" Second Amendment rights that a standard akin to strict scrutiny should be applied"). The City no longer demands such live-range training; it has eliminated the CFP requirement altogether. SOF ¶ 9.[7]

Neither the complete ban on firing ranges nor the pre-condition of training remain. Thus, the standard previously applied in *Ezell* is now inappropriate, and the Ordinance is "more easily justified." Just how much more easily justified is an open question – courts in this Circuit have not articulated the standard to apply to routine business regulations that place modest, but not undue,

---

[7] References to paragraph numbers of Defendant's Local Rule 56.1(a)(3) Statement of Material Facts are denoted as "SOF __" herein.

burdens on Plaintiffs' core Second Amendment right to keep and bear firearms for self-defense. Although the City believes that, because, Plaintiffs cannot show a substantial burden on their rights, the regulations should not be subject to heightened scrutiny at all, they are, at most, subject to an intermediate level of scrutiny. *See, e.g., United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010). The City does not concede that intermediate scrutiny is the appropriate standard; however, for purposes of this motion, the City applies that standard since it is easily satisfied. Regulations are valid under Second Amendment intermediate scrutiny so long as they are "substantially related to an important government objective." *Skoien*, 614 F.3d at 641.

## II. The City's Regulations Are Constitutional.

Each challenged regulation in the Ordinance easily satisfies intermediate scrutiny. As an initial matter, Plaintiffs have not substantiated their allegations that the Ordinance burdens their Second Amendment rights with any real proof. And even if the Ordinance places some minimal constraints on the construction and day-to-day operations of firing ranges (as all regulations invariably do), it burdens only the margins – not the core – of Plaintiffs' right to possess firearms for self-defense or to train with firearms to maintain proficiency. Furthermore, as shown below, all of the regulations are substantially related to the City's important goals of protecting the health, safety, and welfare of its citizens.

### A. The Regulations Serve Important Governmental Objectives of Protecting the Health and Safety of Its Citizens.

Indoor firing ranges pose a variety of dangers to employees and patrons, including exposure to lead particles and toxic fumes, hazardous noise levels, and misfired weapons or ricocheting bullets. SOF ¶ 23. And these inherent risks extend beyond a range's four walls: Air and noise

pollution can affect the surrounding areas, especially if the range is poorly constructed or not operated properly. SOF ¶¶ 20, 48. In addition, ranges that store a large amount of firearms or ammunition can be targeted for theft, which in turn can lead to an increase in violent crime. SOF ¶¶ 77, 78, 86.

It is beyond dispute that combating these recognized dangers, and thereby protecting the health, safety, and welfare of its citizens, is an important, if not compelling, governmental interest. *See, e.g., United States v. Salerno*, 481 U.S. 739, 750 (1987) (government's interest in protecting community from crime "compelling"); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (state and local governments "traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons") (internal citations omitted); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted."); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 765 (7th Cir. 2003) ("There is no question that Chicago – like any population center – has a substantial interest in regulating the use of its land and that [the zoning code] promotes that interest.").

The City is afforded wide latitude in determining whether the Ordinance's regulations are substantially related to these important goals: It need not prove that the restrictions actually work. "*Heller* did not suggest that [a regulation] would be effective only if the statute's benefits are first established by admissible evidence," and there is no requirement of "proof, satisfactory to a court," that a regulation is "vital to the public safety." *Skoien*, 614 F.3d at 641. *See also Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 211 (1997) (government not required to prove that it is correct "as an objective matter"). Rather, a substantial relationship can be shown with nothing

more than "logic and data." *Skoien*, 614 F.3d at 642.

Nor must the City's logic or data perfectly match the regulation. If the Second Amendment "leaves [cities] a variety of tools for combating" gun violence, *Heller*, 128 S. Ct. at 2822, "by no means eliminates" the ability of cities "to devise solutions to social problems that suit local needs and values," *McDonald*, 130 S. Ct. at 3046, and allows that "state and local experimentation with reasonable firearms regulations will continue," *id.*, Chicago must have leeway to adopt policies that may be novel or extend beyond current research findings or other evidence. Indeed, "[a] municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439-40 (2002) (plurality opinion). Accordingly, the City need not prove the efficacy of the regulations or support them with admissible evidence.

For these reasons, summary judgment may be granted even if Plaintiffs submit evidence suggesting that the City's regulations may not have the intended benefit. *See Turner,* 520 U.S. at 211 (court is "simply to determine whether the [applicable standard] is satisfied," and it can be met even when one can "draw[] two inconsistent conclusions from the evidence"). For instance, in *DiMa Corp. v. Town of Hallie*, 185 F.3d 823 (7th Cir. 1999), the plaintiff's expert evidence was "irrelevant" on summary judgment, because the court's task was not to "discover the objective truth," but only to ensure that there was "some evidence" supporting the town's conclusions. *Id.* at 831. *See also G.M. Enter., Inc. v. Town of St. Joseph*, 350 F.3d 631, 639 (7th Cir. 2003) (affirming summary judgment for Town even though plaintiff's evidence "arguably undermin[ed] the Town's inference of the correlation of adult entertainment and adverse secondary effects, including a study

that questions the methodology employed in the numerous studies relied upon by the [Town]").

**B.    Each Provision Is Substantially Related to Important Governmental Goals.**

The record in this case irrefutably establishes that each challenged provision of the Ordinance is substantially related to the City's stated important goals, and thus satisfies intermediate scrutiny.

1.    <u>Zoning Regulations</u>

Plaintiffs challenge the Ordinance's two zoning requirements: (I) ranges are permitted only in M1, M2, and M3 zoning districts as a special use (§ 17-5-0207); and (ii) ranges may not locate with 100 feet of an existing range or within 500 feet of any residential zoning district or any pre-existing school, day-care facility, place of worship, premises licenced for the retail sale of liquor, children's activities facility, library, museum, or hospital (§ 17-9-0120).  Although Plaintiffs assert that these provisions burden their Second Amendment rights by making it impossible for a range to locate in Chicago, they have not one scintilla of evidence demonstrating that the regulations have any such effect.  Neither Plaintiffs nor their proffered experts examined the City's manufacturing districts in any fashion or ascertained what land in the City would meet the Ordinance's zoning requirements.  SOF ¶¶ 21, 22.  The City's evidence, however, demonstrates that of the approximately 32,000 acres in the City zoned for business, commercial, and manufacturing uses, 3,386 acres of property – which translates into roughly 1,900 parcels – meet the requirements of §§ 17-5-0207 and 17-9-0120.  SOF ¶¶ 13, 14.  Plaintiffs have no evidence that any of these locations, which amount to approximately 10.6% of land in the City zoned for business, commercial, and manufacturing uses, SOF ¶ 14, is insufficient.  SOF ¶¶ 21, 22.  In fact, a potential customer of Action Target testified that he found a property that complied with the zoning requirements.  SOF ¶ 21.  Likewise, Plaintiffs have no evidence that it would be economically infeasible to open and operate a range in a

manufacturing district.  SOF ¶¶ 21, 22.  Plaintiffs have therefore failed to offer any evidence that the Ordinance's zoning requirements have any impact at all, much less burden the ability of a range to open in Chicago.

Even if there were a burden, that burden is easily justified by the City's substantial interest in protecting public safety and residential communities and preventing harm.  The purposes of the City's Zoning Ordinance ("CZO") include "promoting the public, health, safety and general welfare," § 17-1-0501, "protecting the overall quality of life for residents and visitors," *id.* § 17-1-0502, "protecting the character of established residential neighborhoods," *id.* § 17-1-0503, and "maintaining orderly and compatible land use and development patterns," *id.* § 17-1-0508.  Because ranges necessarily involve the use of firearms and ammunition – and their transportation to and from – the City classifies ranges as a high impact use.  SOF ¶¶ 15, 16.  And the CZO places all high intensity uses in manufacturing districts, which are typically located significant distances from residential and attendant uses.  SOF ¶ 16.  In addition, lead residue, if not properly contained, can spread beyond the range to surrounding areas and harm humans if the range is in populated areas.  SOF ¶ 20.  To protect public health and the City's residential communities, the City allows firing ranges to locate only in manufacturing districts as a special use.  SOF ¶¶ 15, 16.  Indeed, even Plaintiffs and their experts concede that ranges are suited for manufacturing and industrial districts.  SOF ¶ 19.  Thus, § 17-5-0207 substantially furthers an important interest of the City.

Preventing lead exposure by requiring that ranges locate at least 500 feet from residential uses and other uses such as schools, libraries, churches, and establishments serving alcohol and 100 feet from other shooting ranges ensures that ranges do not operate in manufacturing districts that might happen to be near residential areas and places where large numbers of people congregate.

13

SOF ¶¶ 15, 17.  Evidence also demonstrates that ranges may attract criminal activity due to the presence of firearms and ammunition.  SOF ¶ 18.  Moreover, even Plaintiffs' experts concede that ranges, if not operated properly, pose a risk of fire or explosions.  SOF ¶ 20.  The City, by placing ranges at least 500 feet from these sensitive areas, many of which are places where children congregate, and 100 feet from one another, has therefore reduced the likelihood that any possible negative effects from ranges will affect those areas.[8]  SOF ¶ 17.  Indeed, similar regulations passed by other municipal entities have been upheld as constitutional.  *See Teixeira v. County of Alameda,* No. 12-03288, 2013 WL 4804756, *7-8 (N.D. Cal. Sept. 9, 2013) (upholding county ordinance prohibiting gun store from being located within 500 feet of residential district, school, establishment that sells liquor, or other gun store as presumptively valid regulatory measure);  *Hall v. Garcia*, No. 10-03799, 2011 WL 995933, *4-5 (N.D. Cal.  March 17, 2011) (upholding 1000-foot gun-free zone around school).  Similar restrictions have also passed muster in the First Amendment context.  *See, e.g., City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 46-54 (1986) (upholding zoning restriction of adult movie theater 1000 feet away from sensitive areas under the First Amendment);  *North Avenue Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445 (7th Cir. 1996) (upholding zoning restrictions on adult use that left only one to three percent of land available).

In light of the important interests served by the City's zoning regulations and Plaintiffs' failure to provide any evidence of burden, §§ 17-5-0207 and 17-9-0120 are constitutional.

2.  <u>Construction Requirements</u>

Plaintiffs challenge a series of construction requirements enacted to ensure that ranges are

---

[8]  The CZO also provides that adult uses cannot be located within 1,000 feet of another existing adult use, any zoning district that is zoned for residential use, any pre-existing school or religious assembly establishment, or any planned manufacturing district.  *See* MCC § 19-9-0101-A -D.

structurally sound to protect those within and outside the range, and that they provide adequate protection from environmental hazards. Plaintiffs attack these provisions primarily because they may impose additional start-up or operational costs, but have failed to substantiate their claims of increased costs with any concrete evidence. Furthermore, even assuming they could show additional costs, the City's regulations are justified by important safety and health concerns.

### a. Ballistic-proof walls and doors

MCC § 13-96-1160(a) requires that, except for the rear walls, "[e]nclosure walls, floors, ceiling assemblies, doors and opening protective assemblies for the shooting range shall be designed and constructed with materials and assemblies sufficient to stop all bullets or projectiles from penetrating beyond the shooting range enclosure." In plain speak, this provision requires that walls, floors, and ceilings be ballistic-proof – *i.e.*, that they can withstand and protect against stray bullet shots. SOF ¶ 28. The importance of having a ballistic-strength structure is widely recognized – and recommended – throughout the industry: The NRA Source Book for range construction provides that "[i]ndoor ranges must be housed in a building furnished with electricity and built of impenetrable walls, floor, and ceiling." SOF ¶ 30. Action Target agrees: "[A]ll ranges should have ballistic walls." *Id*.

Conceding that ballistic walls serve important safety goals, Plaintiffs complain that the City requires too much of a good thing: It requires ballistic-proof materials on areas not likely to receive bullet strikes or that are already protected by bullet traps, and this adds additional costs to the range. SOF Ex, 15, p. 6; *see also* SOF ¶ 32. But this provision is not extraneous – it protects those areas in the event of an errant bullet strike, shoddy wall construction, or bullet trap failure. SOF ¶ 28. It therefore provides an added layer of safety for patrons, employees, and those who may be entering

or leaving the range.

Plaintiffs do not produce any evidence substantiating their claim that this provision makes it impossible or economically infeasible to open or operate a range. Neither of Plaintiffs' preferred experts has experience with or expertise in the economic feasibility of firing ranges. SOF ¶ 10. Mr. Giordano primarily advises ranges about safety issues and is not involved in the design, construction, or costs of building a range whatsoever. *Id*. Mr. Kramer is an architect and an expert in range design, but has no experience with a range's revenue stream or profit margins. *Id*. Accordingly, because they lack the requisite knowledge and expertise to opine on matters regarding the business or economics of a range, and because their opinions are not based on sufficient facts or data, they do not qualify as expert witnesses regarding the economic feasibility of a range given this– or any– provision under FED. R. EVID. 702, and their opinions should therefore be disregarded.[9]

Even if the Court considers their testimony, however, this provision does not impose an undue, much less unconstitutional, burden. Mr. Kramer raises this only as a potential issue, and then could only guess that the cost of an armor-plated door would be around $7,000 to $10,000, and the cost of making the rear wall behind the bullet trap "maybe $200 a linear foot of length of the back wall." SOF ¶ 32. Considering the fact that range construction is already an extremely expensive endeavor that can run between $3 million and $20 million (SOF ¶ 24), the incremental costs of armor-plating side walls and doors is insignificant. And when measured against the safety goals this provision serves, the minimal increased costs are easily justified. *See, e.g.*, *Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013) ("Indeed, the fact that the licensing regime makes

---

[9] For the same reason, Kramer and Giordano's opinions regarding the alleged economic burdens imposed by other regulations in the Ordinance should likewise be disregarded.

16

the exercise of one's Second Amendment rights more expensive does not necessarily mean that it 'substantially burdens' that right."); *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992) ("The fact that a law which serves a valid purpose . . . has the incidental effect of making it more difficult or more expensive to [exercise the right] cannot be enough to invalidate it.").

### b. Ventilation requirements

Plaintiffs challenge two of the City's ventilation requirements: (a) MCC § 13-96-1210(d), requiring that each shooting range have a separate ventilation and exhaust system; and (b) MCC § 13-96-1210(e), requiring that the supply and exhaust systems be electrically interlocked to turn on at the same time.

Plaintiffs do not claim that these requirements make it impossible to open a firing range. SOF ¶ 37. Instead, they contend that the separate ventilation requirement increases the construction costs of building a shooting range facility if that facility houses multiple ranges. *Id.* But Plaintiffs fail again to substantiate these additional costs. Mr. Hart could only guess. SOF ¶ 36. And, while Mr. Kramer "estimates" that it would be approximately $65,000-$70,000, he could not recall the basis for that estimate. SOF ¶ 37. In any event, this incremental cost would only apply to a shooting range facility that has more than one shooting range. This would occur only in the case a range was built in a pre-existing building where the configuration precluded putting all of the desired shooting lanes in one room; this provision can be planned around with new construction and many existing buildings. SOF ¶ 37.

Even if Plaintiffs had concrete proof of an increased financial burden, however, such burden is readily justified when considering the paramount role adequate ventilation systems play in protecting the health of range employees and users. Exposure to lead and other toxic fumes and

17

particulates is one of the most significant health hazards in an indoor range. SOF ¶ 23. Lead particulate is released into the air from the primer detonation, the powder combustion, and the lead portion of the bullet. *Id*. Numerous studies have documented elevated blood lead levels in firing range employees and instructors. *Id*. Proper ventilation systems are essential to minimize this health risk: According to the National Institute for Occupational Health and Safety ("NIOSH"), ventilation is "the most important engineering control for protection against primary lead exposure in indoor firing ranges." SOF ¶ 35; *see also* Whole Building Design Guide, SOF ¶ 35, Ex. 29 ("The supply and exhaust air system is critical to the operation of an indoor range and the health of building inhabitants."). Indeed, Action Target would not even consider constructing a range without a quality ventilation system. SOF ¶ 36.

Both of the Ordinance's ventilation requirements are designed to reduce exposure to lead particulates and fumes. First, § 13-96-1210(e)'s requirement that the supply and exhaust systems be electrically interlocked to turn on together helps eliminate the "human error" factor of turning one system on without the other, which can result in unsafe air quality. SOF ¶¶ 34, 39. Health organizations and industry guidelines recommend interlocking exhaust systems for this very reason: "Exhaust and supply fans should be interlocked so that all fans operate at the same time during active range use." SOF ¶ 40; *see also* Ex. 29 ("Supply and exhaust fans must have control interlocks to ensure simultaneous operation."). Plaintiffs concede that "[i]nterlocking is standard practice in the industry." SOF ¶ 40; *see also* Ex. 15, p. 8. And requiring separate ventilation systems for each range helps prevent "the circulation of contaminated air to other areas of the building." SOF ¶¶ 34, 35. Mr. Hart agrees that "it is good to have a separate [ventilation] system for each range bay[.]" SOF ¶ 36.

Plaintiffs half-heartedly criticize the interlocking ventilation system requirement because it could lead to a power spike which could "result in a localized power grid failure." SOF Ex. 15, p. 8; *see also* SOF ¶ 42. This challenge is based on a purely hypothetical contingency that is easily dismissed. Mr. Kramer admits that he was only speculating as to the possibility of a power grid failure, that he has no knowledge or expertise with power grids in general (or Chicago's in particular), and has "no idea" whether this would actually have an impact in Chicago. SOF ¶ 42. Not only is this potential issue pure conjecture, but it also would not impact Plaintiffs' Second Amendment rights whatsoever. A power grid failure would be a City-wide accident affecting all business; it is not a regulation that imposes any burden on the Plaintiffs' right to train with firearms. The City's ventilation requirements pass constitutional muster and should be upheld.

  *c. Cleaning methods*

Effective cleaning of range surfaces is essential to minimizing the risk of lead exposure to employees and patrons. Lead from contaminated surfaces and firearms discharge can get on people's skin and hands; lead-contaminated hands, in turn, can lead to ingestion of lead while handling food, beverages, and other items that contact the mouth. SOF ¶ 23. While the industry recognizes both wet and dry methods of cleaning, the U.S. Department of Energy Gun Range Manual states that "wet cleaning is preferred when floor drains are available." SOF ¶ 44, Ex. 36, p. 20. "Keeping materials wet during cleaning operations reduces or eliminates release of microscopic dust particles." *Id*. When a range is cleaned with the wet method, multiple industry sources all recommend or require a sloped floor to help the water collect lead particles and flow towards the drain. SOF ¶ 44. The Ordinance adopts the wet cleaning approach, with sloped floors and floor drains to ensure effective cleaning and removal of lead particulates. Specifically, the Ordinance requires: (a) that the range

floors slope at a minimum of 1/4 inch per foot (§ 13-96-1200(b)(7)); and (b) that the firing range have a hose bib with backflow protection and floor drains installed at the bullet traps to collect lead and other hazardous materials in a separate drainage system (§§ 13-96-1220(b) and (c)).

Plaintiffs agree that it is technically possible to comply with this provision. SOF ¶ 45. And they have no evidence that these cleaning methods burden their Second Amendment rights in any manner – either by increased cost,[10] or by curtailing their ability to access and use the range. Instead, Plaintiffs argue that these two provisions are unconstitutional because the wet cleaning method has recently been deemed unsafe. SOF Ex. 15, p. 8. Plaintiffs' claim that a HEPA vacuum is now the preferred cleaning method, since certain green powder residue, when wet, does not lose its combustibility, and can therefore potentially start a fire or explosion in the drain. *Id.* But even though the NRA recently changed its recommendation, wet cleaning with a sloped floor and floor drain remains the recommended cleaning method by other industry sources. SOF ¶ 44. Furthermore, where there is sound evidence supporting the City's chosen method, it does not matter that one of many trade groups may now disagree, and the Court is not to determine which method is the safest. *See, e.g.*, *Turner,* 520 U.S. at 211 (government satisfied standard even when one can "draw[] two inconsistent conclusions from the evidence"); *Woollard v. Gallagher,* 712 F.3d 865, 881 (4th Cir. 2013) (plaintiffs' evidence that other measures would be more effective for public safety was not relevant; court declined to substitute this evidence for legislature's judgment in upholding state handgun permitting scheme); *see also Kachalsky*, 701 F.3d at 99 ("It is the legislature's job, not ours,

---

[10] Mr. Kramer speculated that building a sloped floor may cost "a little more than having a level floor," and that he estimated the costs of adding a sloped floor to an existing building might be around $20 per square foot. SOF ¶ 46. But there are additional costs associated with the use of a HEPA vacuum as well, and these costs may "cancel each other out." SOF ¶ 45.

to weigh conflicting evidence and make policy judgments."). Thus, Plaintiffs' challenge to this provision has no merit and it should be upheld.

### d. Sound protection

Discharge of firearms in indoor ranges can produce dangerous noise levels of over 140dB sound pressure. SOF ¶ 53. Studies show that exposure to high noise levels at firing ranges can cause hearing loss, particularly among employees and instructors who are subject to daily or prolonged exposure. *Id*. Accordingly, NIOSH cautions that effective noise controls are "imperative to reducing noise-induced hearing loss among firing range operators, employees, and users." SOF ¶ 53. Dangerous noise levels are not confined to the interior of the shooting range, however; they can also travel outdoors and beyond the shooting range property. SOF ¶ 48. As a result, maximum noise emanation levels are commonly used to protect the general public from hazardous range noise. *Id*. Maximum noise levels also ensure that individuals in surrounding areas are not disturbed by consistent, loud noises out of their control. *Id*.

The Ordinance's sound provisions – requiring the interior of the facility to be equipped with structure-borne and air-borne sound absorbing materials (§ 13-96-1200(b)(7)), and setting the maximum noise emanation level at 55 dB when measured 100 ft away from the facility (or 70 dB if within 10 ft) (§ 13-96-1200(b)(2)) – are designed to protect against these documented harms. Plaintiffs do not challenge the need, or even the cost, of such measures. Rather, they contend that § 13-96-1200(b) sets up an "impossibility," because the City requires the range to be constructed of smooth, non-porous materials (a provision they do not challenge), while also requiring that the range have "airborne and structure borne sound absorbing material suspended or applied." *Compare* §§ 13-96-1200(b)(2) and (b)(7). Because sound absorbing materials are, by definition, porous, Plaintiffs

argue it would be impossible to comply with both provisions simultaneously.

Plaintiffs have manufactured a claim that depends upon reading nonexistent requirements into the Ordinance. Far from demanding that the firing range be constructed of *both* porous and nonporous materials, § 13-96-1200(b)(2) requires only that the sound-absorbing materials be "applied or suspended;" in other words, applied *to* or suspended *over* the otherwise nonporous building materials. This commonsense reading of the provision's plain language is consistent with industry recommendations for applying accoustical material to walls, windows, doors, ventilation ducts, and ceilings, *see* SOF ¶ 53, as well as the City's own departmental interpretation. SOF ¶ 52. Courts must defer to an agency's interpretation of a statute so long as it is "a reasonable construction of the statute." *United Transp. Union–Ill. Legis. Bd. v. Surface Transp. Bd.*, 169 F.3d 474, 476 (7th Cir. 1999). In contrast, nothing in the provision's plain language supports Plaintiffs' overly-broad interpretation. To the contrary, Plaintiffs' illogical interpretation clashes with the well-settled principle of statutory construction that courts "are obliged to read statutory provisions at issue in such a way as to avoid a conflict between them if such a construction is possible and reasonable." *In re Willett*, 544 F.3d 787, 792 (7th Cir. 2008). It is possible to comply with these two provisions in tandem, and Plaintiffs have no evidence to the contrary, much less evidence otherwise showing a burden to their constitutional rights.

Plaintiffs' challenge to the maximum noise emanation level of 55dB is likewise illusory. Plaintiffs argue it is an "unreasonable imposition," since other businesses in manufacturing districts are exempt from noise level requirements. SOF ¶ 50; *see also* SOF Ex. 15, p. 7. But there is no imposition at all: The regulation does not apply to ranges when they are open for business. Like all of the City's noise regulations for businesses, the regulation applies only from 8 p.m. to 6 a.m, SOF

¶ 47, and shooting ranges can be operational only between 9 a.m. and 8 p.m.  And even if the restriction applied during a range's business hours, Plaintiffs concede it that it does not make it economically infeasible to open a range.  SOF ¶ 50.  Indeed, Plaintiffs concede that "it is unlikely" that the noise levels would exceed the 55dB limit, and this issue is only a "philosophical" concern. SOF ¶¶ 49, 50.

        *e.*     *Storage of firearms and ammunition*

Plaintiffs challenge § 13-96-1190(c)(2)(d), which states that a "shooting range facility shall include . . . if ammunition or firearms are stored, a magazine or hazardous storage facility appropriate for the type and amount of ammunition or firearms, as provided in rules and regulations promulgated by the police or fire department."  Based on this plain language, either the police or fire department will issue rules and regulations specifying the exact storage requirements for firearms and ammunition at ranges. This provision is in concert with § 4-151-175(b), which provides that "[f]irearms shall be stored separately from ammunition.  Storage of firearms and ammunition shall comply with an approved safety plan pursuant to Section 4-151-110, Section 15-4-985, and any applicable rule or regulation."[11]  The police and fire departments have not yet promulgated rules and regulations, however, and Plaintiffs concede that they therefore do not know what the requirements or cost of compliance will be.  SOF ¶¶ 57, 58.  Indeed, Mr. Kramer concedes that he was just "issue spotting" when he identified § 13-96-1190(c)(2)(d) in his report and it was an "exercise in trying to

---

    [11]  Section 4-151-110 provides that "[e]very application for a license under this chapter must be accompanied by a safety plan," approved by the Superintendent of Police in consultation with the executive director of emergency management and communications and the fire commissioner.  MCC § 4-151-110(a). The safety plan shall provide, inter alia, "protocols for the safe display of and storage of firearms and ammunition" *Id.* § 4-151-110(b).  Under § 15-4-985, the "fire commissioner is authorized to promulgate rules and regulations for the storage of ammunition at shooting range facilities."

read the future." SOF ¶ 58. As a result, Plaintiffs' claim is premature and not ripe for adjudication.

And even if Plaintiffs' claim were ripe, they fall far short of proving that § 13-96-1190(c)(2)(d) burdens their Second Amendment rights. At the outset, Plaintiffs have produced no evidence demonstrating that compliance with § 13-96-1190(c)(2)(d) is impossible and, in fact, concede otherwise. SOF ¶ 58. Plaintiffs likewise fail to produce any evidence showing that compliance with § 13-96-1190(c)(2)(d) makes a range cost-prohibitive. Neither Plaintiffs nor their experts know or made any effort to determine what the cost of compliance is or whether that potential cost would keep interested range owners from pursuing a range in Chicago. *Id*. Plaintiffs have therefore not demonstrated that § 13-96-1190(c)(2)(d) imposes a burden whatsoever on their Second Amendment rights.

Finally, even if there were a burden, the regulation would be justified. The theft of guns and ammunition at ranges and their subsequent use in criminal activity is common, SOF ¶ 78, and the City has an important interest in preventing theft from ranges. Moreover, storing large amounts of ammunition is a fire and explosion risk, and the City has an important interest in preventing this too. SOF ¶ 56. Section 13-96-1190(c)(2)(d) substantially advances that interest by allowing the police and fire departments to promulgate rules and regulations for the storage of firearms and ammunition. SOF ¶ 56.

### f. *Promulgation of rules by commissioner*

Finally, Plaintiffs challenge § 11-4-260(b), which allows the City's relevant commissioner to promulgate rules and regulations regarding the cleaning of, sound and air quality control at, and discharge of waste from shooting ranges. It is an obvious, and important, function of the City's building commissioner to have the authority to enact regulations to address future public health or

24

environmental concerns as they arise.  SOF ¶ 62.  Plaintiffs' experts agree that ranges are highly

regulated by federal, state, *and local* governments because of the potentially dangerous activity there.

SOF ¶ 60.

Plaintiffs contend that this provision may cause a "regulatory conflict" between local and

federal environmental laws, such as those promulgated by the EPA or OSHA.  SOF Ex. 15, p. 6.  No

City regulations, however, have been promulgated.  SOF ¶ 62.  Plaintiffs admit that this is a

"hypothetical objection" based on past experience, and they are not sure it would even occur.  SOF

¶ 62.  Thus, like above, this claim is pure conjecture and not ripe for adjudication.  And, even

assuming, *arguendo,* that the commissioner promulgated rules, and that those rules conflicted with

federal laws, Plaintiffs have produced no evidence showing how this "regulatory conflict" would

burden their Second Amendment rights.

3.    Business Operations

The third category of regulations Plaintiffs challenge are licensing and operating regulations

designed to ensure that the shooting range, as a business open to the public, has certain built-in

protections for the common welfare of the patrons and the public at large.   As shown below, all of

these serve important governmental purposes.

a.     *Range patrons must be 18 years or older*

Section 4-151-100(d) of the Ordinance prohibits anyone under the age of 18 from entering

the shooting range facility.  Plaintiffs claim that this provision negatively impacts a range's

profitability by excluding revenue derived from youth programming and adults who cannot use the

range without bringing their minor children with them, and minors working in a range.  SOF ¶ 67.

Plaintiffs have absolutely no evidence showing that this provision has any impact on a

shooting range's bottom line. There is certainly no evidence that this provision makes it impossible or even unprofitable to operate a range. SOF ¶¶66, 67. Mr. Hart testified that this provision would not impact what Action Target would do involving gun ranges in the City. SOF ¶ 66. Neither of Plaintiffs' experts studied the issue, gathered any data regarding the impact of prohibiting minors from the range, or calculated the potential loss of revenue. SOF ¶ 67. And none of the individual Plaintiffs testified that this provision would impact their ability to use a range in Chicago. SOF ¶ 66.

And even if the restriction imposes a burden on a range's profitability, it is justified by important interests. For one, it avoids potential difficulties with ensuring the proper supervision and care of minors in the hazardous setting of a shooting range. SOF ¶ 65. Indeed, the Supreme Court has recognized "the peculiar vulnerability of children [and] their inability to make critical, informed decisions" (i.e., judgment) regarding safety, *Bellotti v. Baird*, 443 U.S. 622, 634 (1979), and the City has a keen interest in protecting minors – one of the most vulnerable segments of the population – from the potential dangers of lead exposure and firearm accidents. *See New York v. Ferber*, 458 U.S. 747, 756-57 (1982) ("It is evident . . . that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling . . . even when the laws have operated in the sensitive area of constitutionally protected rights."). Lead exposure is especially dangerous to children six and younger because lead is toxic to the brain and can cause permanent damage. SOF ¶ 23. And children are more susceptible to ingesting lead particles by touching contaminated surfaces and transferring them to their mouths. *Id.* Because lead contamination can extend beyond the firing lanes themselves, and because patrons will be entering the facility with firearms that can be accidentally dropped or left laying on counters or other surfaces, it is commonsense to prohibit

minors from the facility entirely.

Indeed, age-based firearm safety measures are so rooted in history that some courts have questioned whether they even fall within the scope of the Second Amendment at all. *See, e.g., NRA v. McCraw*, 719 F.3d 338, 347-49 (5th Cir. 2013) (age-based restrictions on access to and use of firearms enacted to safeguard public are "part of a succession of 'longstanding prohibitions' that are likely outside the scope of the Second Amendment"). At the very least, these historically recognized safety measures pass intermediate scrutiny. *Id*. at 349; *see also BATF,* 700 F.3d at 204 (federal law preventing federally-licensed gun dealers from selling firearms to anyone under age of 21 constitutional; historical evidence of longstanding tradition of "age-and-safety based restrictions on the ability to access firearms"). And the risks to minors is even more removed here: If there is no constitutionally protected right for minors to access or use firearms, then certainly the City's provisions restricting them from entering a facility designed solely for those purposes is even further afield from the Second Amendment's protections.

### b.    Operating hours

Section 4-151-090 allows shooting ranges to be open seven days a week, from 9:00 a.m. to 8:00 p.m. Again, Plaintiffs do not claim, and have no evidence, that this provision makes it impossible, or even unprofitable, to open a range in the City. SOF ¶ 71. Mr. Kramer merely "guess[es]" that it will cut into the revenue stream, and admits that the costs affiliated with keeping the range open late at night might even exceed the income generated. SOF ¶ 71. Nor do Plaintiffs have any evidence showing that the regulation actually burdens Plaintiffs' right to train at a shooting range. Being open 11 hours a day, 7 days a week provides ample opportunity to practice and maintain proficiency with firearms. No individual Plaintiff testified that they would not be able to

visit a range between these hours. Plaintiffs' own witnesses confirm that most shooting ranges have operating hours consistent with the City's regulations. SOF ¶ 70. Plaintiffs simply prefer that shooting ranges be permitted to operate 24 hours a day for the convenience of potential patrons, and to optimize the shooting range's revenue stream. SOF Ex. 15, p. 3. But there is no evidence showing how this provision burdens – much less substantially burdens – any of the Plaintiffs' Second Amendment rights. *See, e.g., Kwong*, 723 F.3d at 167 (licensing fee not substantial burden on Second Amendment rights "especially considering that plaintiffs have put forth *no evidence* to support their position that the fee is prohibitively expensive") (emphasis in original).

Even if Plaintiffs could show that § 4-151-090 burdened the profitability of ranges or individuals' ability to use a range during their preferred hours, the City has strong justifications for it. The City limits the hours of operation of many types of business establishments to reduce pedestrian and vehicle traffic and disturbances at night. SOF ¶ 69. The hours limitation also reduces the number of hours that Chicago police officers or other first responders would be called to a firing range in response to a firearm misuse or injury. *Id.* Moreover, it helps protect the safety of the range patrons because they are more likely to be targeted for theft of their firearms and ammunition later at night. *Id.* These safety goals amply justify the City's restrictions on the operational hours. *See, e.g., DiMa Corp.*, 185 F.3d at 830-31 (upholding regulation of adult bookstore operating hours where plaintiff had no evidence of impact on profits and municipality showed interest in preventing secondary effects such as crime and decreased property values).

                *c.*        *Sales of firearms at gun ranges*

Two provisions of the Ordinance prevent the sale of firearms at ranges: (1) § 8-20-100, which bans the sale and transfer of firearms throughout the City; and (2) § 4-144-010, which

prohibits the business of selling or transferring firearms throughout the City.

Plaintiffs do not contend that this prohibition impacts their ability to train and maintain firearm proficiency; the individual Plaintiffs can use their own guns or rent them from the range. SOF ¶ 80. Instead, Plaintiffs contend that the sale of firearms is an essential component of a range's profit-margin; without the ability to generate income from the sale of firearms, ranges may be economically unfeasible. SOF Ex. 15, p. 4. But the evidence simply does not support this argument. Ranges generate profit in a number of ways, including target lane rental, firearms rental, the sale of ammunition, training classes, and the sale of firearms equipment and accessories. SOF ¶ 79. Neither Plaintiffs nor their experts made any attempt to evaluate or study what percentage of gun range revenue is attributable to firearm sales, and thus have "really couldn't [say] what the impact [of the prohibition on gun sales] would be [from an economic standpoint]." SOF ¶ 81. Mr. Hart attempted to make rough calculations, but admits that he did not conduct any investigation and does not really know how the sale of firearms impacts the range's profitability. SOF ¶ 80. What the undisputed evidence does show, however, is that ranges *can* operate without selling guns. Contrary to what is stated in his report, Mr. Giordano is aware of a public outdoor range that does not sell firearms, and generates income from target training and ammunition sales. SOF ¶ 81. And Action Target is aware of two such ranges – a private range in Illinois and a commercial range in Nebraska – that operate without gun sales. SOF ¶ 80. Further, ISRA operates its range as a private club that covers costs through an annual fee, which is another viable business model. SOF ¶ 79. Thus, it is clear that gun ranges can, and do, operate without the sale of firearms.

In turn, the City has a powerful interest in preventing the dangers associated with the sale of firearms. The City's expert on this issue, Dr. Philip Cook, the ITT/Sanford Professor of Public

Policy at Duke University, who has studied the causes and effects of firearms violence for over 35 years, opined that these restrictions plausibly serve the City's very strong interest in combating violent crime and reducing the social and economic costs of gun violence.  SOF ¶ 73.

Dr. Cook explains that the type of weapon used in an assault or robbery affects the likelihood that the victim will be killed.  SOF ¶ 74.  Referred to as the "instrumentality" effect, he concludes that the victim is much more likely to suffer severe injuries and die if the perpetrator uses a firearm instead of a knife or club or other weapon.  *Id*.  The City's sales restriction reduces the prevalence of firearms, thus reducing the likelihood of this violent crime, in at least three distinct ways.  First, eliminating direct points of sale helps maintain the high transaction costs of purchasing firearms in the underground market (such as price), which in turn makes it more difficult for criminals to obtain them.  SOF ¶ 75.  Indeed, Chicago has "a relatively low prevalence of gun ownership. . . .[W]ith the exception of some gang members, most criminals in Chicago lack guns and have difficulty obtaining one."  *Id*.  Second, it helps reduce the direct sales of firearms to criminals or straw purchasers by licensed gun dealers who flaunt federal regulations, a well-documented problem.  SOF ¶ 76.  And third, it eliminates a source of theft; gun stores and firing ranges are often targeted by criminals for their large stockpile of weapons, which then get absorbed in the underground, illegal market.  SOF ¶¶ 77-78.  Accordingly, Dr. Cook opined that, in his expert opinion, it is reasonable that the City's ban on gun sales at shooting ranges will have an overall effect on reducing violent crime within the City.  SOF ¶ 75.

Therefore, Plaintiffs have failed to produce evidence quantifying the amount of lost profits attributable to this regulation, and even if they had, this decrease is not enough to outweigh the strong public safety justifications for the City's restrictions. This provision should be upheld.

### d.    *Range master presence*

Section 4-151-100(b) requires that "[a] range master shall be on duty during all operating hours of the shooting range facility."  Range masters are responsible for supervising all safety issues at the firing range, including ensuring safe handling of firearms by employees and patrons, and ensuring that the range is in compliance with all applicable safety regulations. MCC §§ 4-151-010 and 4-151-160; *see also* SOF ¶ 82.  Having a range master present is key to the range's overall safety:  The way a range is operated has "a very dramatic effect" on whether a range is safe.  SOF ¶ 63.  Even if a range is constructed properly, it can be a hazard if not *operated* properly.  *Id.* (firing range safety implies, among other things, having the proper employees and managers with requisite knowledge).  Accordingly, this provision serves the City's substantial interest in ensuring that the day-to-day operations of the range are supervised in the proper manner to minimize accidents and other health risks.

Plaintiffs do not challenge the wisdom and need for a range master; they take issue with the regulation only to the extent it requires the range master to be present during all operating hours of the range, instead of only the hours the shooting range is actually in use.  SOF ¶ 84; *see also* SOF Ex. 15, p. 3.  Plaintiffs do not contend that this provision makes it impossible or economically infeasible to open a range in the City.  SOF ¶¶ 83, 84.  At most, they complain that it is "unreasonable."   SOF Ex. 15, p. 3.  But Plaintiffs' complaint, yet again, is unsubstantiated. Plaintiffs have no idea what this additional cost would be, SOF ¶¶ 83, 84, nor do they offer proof showing that firing ranges typically are open for any appreciable hours when the ranges are not in use.  Hypothetically, a firing range may include a snack bar or gathering place that stays open a little later than the range itself, but even then, the extra cost to have the range master present during these

times would be minimal. This hardly burdens Plaintiffs' Second Amendment rights to train at a range.

And even if it did, having a range master present at all times serves important, and necessary, safety functions: Even if the firing range is not technically open, but people are otherwise gathered at the facility, they may choose not to follow the rules and decide to use the range anyway. SOF ¶ 83. Furthermore, accidents can occur in other areas of the shooting range facility, or during clean up, and the range master is uniquely qualified to handle these situations. Thus, the provision serves a strong safety purpose and it should be upheld.

e.     *Range patrons cannot leave with ammunition purchased at range*

Plaintiffs also claim that § 4-151-170(b), which provides that a range "may sell ammunition to a shooting range patron only for use at the shooting range [and that it] shall ensure that no shooting range patron leaves the shooting range facility with any ammunition purchased" at the range, burdens their Second Amendment rights because it makes it impossible for a range to locate in Chicago. But just like the other provisions Plaintiffs challenge, Plaintiffs fail to produce any evidence demonstrating that § 4-151-170(b) has any such effect.

Plaintiffs' concern is not that individuals wishing to train are forced to buy ammunition that they will be unable to use: § 4-151-175(a) expressly permits a range to store a patron's ammunition for later use. SOF ¶ 85. Rather, it is that a range will be unable to sell ammunition that can be carried and used outside the range. SOF Ex. 15, p. 5. They assert that this limitation will negatively affect profitability and therefore preclude ranges from opening in Chicago, but they have no evidence to support this conclusion. Plaintiffs and their proffered experts do not know nor have they studied or examined what percentage of a range's profit is derived from sales of ammunition not used on site

and, assuming that such sales are an integral part of a range's business, what volume of sales is necessary to make a range a viable concern.  SOF ¶¶ 87, 88.  Indeed, Plaintiffs' expert testified that he was "just spotting an issue that may affect revenue" but that he did not know for sure if it would.  SOF ¶ 88.  Plaintiffs' assertion that § 4-151-170(b) burdens their Second Amendment rights accordingly lacks any basis in the record.

And even if there were a burden, the City has an important public safety interest in ensuring that ammunition bought at a range by a qualified person is not later given or sold to a criminal who cannot lawfully possess ammunition.  SOF ¶ 86.  Stopping such "straw purchases" of ammunition prevents ammunition from falling into criminal hands and therefore assists the City in its efforts to reduce gun violence.  Moreover, not allowing a patron to leave a range with ammunition bought there reduces the likelihood that the patron will be targeted for theft of the ammunition.  SOF ¶ 86.  Thus, § 4-151-170(b) substantially furthers these interests, and Plaintiffs' claim – based on nothing more than "issue spotting" – fails.

### f.    Deleterious impact standard

Finally, Plaintiffs challenge § 4-151-030(f), which permits the City's Commissioner of Business Affairs and Consumer Protection to deny an application for a shooting range license if the issuance or renewal of such license would have a "deleterious impact" on the health, safety, or welfare of the community in which the shooting range facility is or will be located.  This provision's purpose is to allow the commissioner to make an informed decision to deny a firing range license based on factors that are not in the license application but, based on the commissioner's knowledge and experience, would have a negative impact on the neighborhood, the residents, and the range itself.  SOF ¶ 90.  For example, it is possible that the chosen location is in a high crime neighborhood

that cannot sustain another high impact business; because the Chicago Police Department does not review license applications, the commissioner would be the only gatekeeper able to protect that neighborhood. For the same reasons, this standard is used by the City for other license applications such as sales of alcoholic beverages or public way permits. SOF ¶ 90. Morever, to the extent a license is denied on this basis, the decision would be subject to administrative (and then judicial) review, thus providing safeguards for applicants who believe the commissioner acted outside the scope of her discretion. SOF ¶ 91; *see also Thomas v. Chicago Park Dist.,* 227 F.3d 921, 926 (7th Cir. 1997) (permit scheme did not vest park official with too much discretion where, *inter alia,* decision subject to judicial review).

Plaintiffs' complaint with this provision is hypothetical only: they worry that it *could* dissuade financial lenders or potential owners from opening a range due to the uncertainty of having a business license approved. SOF ¶ 92. They have no evidence supporting this speculative theory, however. Plaintiffs' experts admit they did not discuss this issue with any financial institutions or potential business owners, nor did they rely on any studies, reports, or data in reaching their conclusion. SOF ¶ 92. No potential range owner has been denied a license on this basis. And there is no shortage of liquor stores open in the City, despite being subject to this same standard. SOF ¶ 90. Plaintiffs are not entitled to absolute certainty in every step of the license application process, and this provision is not unconstitutionally burdensome.

Accordingly, Plaintiffs have failed to show that *any* of the individual provisions make it impossible for a firing range to open in the City. Nor is there any evidence that the provisions actually burden or impact Plaintiffs' Second Amendment rights in any palpable way. In contrast, the City has shown that each of these provisions are justified by important governmental interests.

Summary judgment should be granted in the City's favor.

### III. Plaintiffs Cannot Show that The Ordinance Makes it Impossible for Shooting Ranges to Open in The City.

As shown above, none of the individual regulations make it impossible for a firing range to open in the City. Plaintiffs' alternate legal theory – that the regulations taken together "effectively prohibit" firing ranges from operating in the City – likewise has no teeth, and can be dispensed with expeditiously.

To prove that the Ordinance has created a *de facto* ban on firing ranges, Plaintiffs cannot rest on the fact that no firing ranges have been built in the City since the regulations went into effect. Rather, they must point to direct proof that the Ordinance itself is the cause. *See, e.g., Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) ("elementary principles of legal causation [ ] are as applicable to constitutional torts as common law torts. . ."); *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983) (plaintiff cannot recover in § 1983 claims without establishing causation in fact); *see also Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977) (plaintiff cannot recover if injury would have occurred anyway). Plaintiffs have no such evidence. Indeed, far from showing that it is impossible for all would-be ranges to open, Plaintiffs have no evidence showing that the Ordinance prevented even one single, identifiable individual, who had the desire, means, and ability to construct and operate a range, from doing so.

None of the individual Plaintiffs in this case are interested in opening or operating a firing range in the City. SOF ¶¶ 1-3. SAF has never built, operated, or managed a shooting range and has no interest in doing so. SOF ¶ 5. ISRA operates an outdoor range in Bonfield, Illinois, but it has never operated an indoor range and has only talked about opening a possible range in Chicago, but

taken no actual steps to do so. SOF ¶ 6. And, while Action Target identified several people who contacted them and expressed initial interest in opening a range, none of them took any real steps, or were in a financial position, to move forward with their plans. SOF ¶¶ 93, 94. For example, Mr. Gordon and Mr. Kuczmierczyk testified that they did not have the capital to put into opening a range, had not completed any business plans, and had not tried to determine what locations were viable. SOF ¶ 94. Mr. Robuck testified that he had found a location that met the zoning requirements, but he had problems negotiating the lease with the property owners and has put the project on the back-burner. SOF ¶ 96. And Mr. Queen, the owner of Fidelity Security and Investigative Services, testified that he wanted to retrofit the basement space of Fidelity to offer private training programs to security officers pursuant to its state license. SOF ¶ 95. Thus, none of these witnesses support Plaintiffs' theory that the Ordinance prevented a firing range from opening. And even if a few individuals decide that it is too costly or inconvenient for *them* to proceed – and there is no evidence that any aspirant with a serious desire and plan has reached this conclusion – that does not mean that the City's regulations have made it impossible for *all* would-be operators to proceed.

Nor do Plaintiffs' experts help with this claim. While they opine that the Ordinance "might" make it impossible, they do not actually know that it would be impossible, or even imprudent, to open a firing range in the City. SOF ¶ 11. Mr. Kramer testified that it is his "perception" that the Ordinance may affect a potential gun range from opening up, but "he does not know for certain that it actually has the impact [he is] thinking it may have." SOF ¶ 11. Mr. Giordano testified that he "does not actually know whether a range subject to the Ordinance could be open and run as a viable business. SOF ¶ 11. Neither of them tied their opinions to any studies, investigation, or actual numbers, nor did they speak with any individuals who actually wanted to open a range in Chicago.

*Id*.  Thus, Plaintiffs' experts offer nothing more than pure speculation on whether the Ordinance makes it impossible to open a range.

In fact, there are many other possible factors that could have contributed to the lack of a shooting range being built in the City in the last two years, including high start-up costs and the unfriendly economic climate.  Range construction is exceedingly expensive no matter the specific regulations:  it can begin at about $3 million, and could go up to $20 million "before it started getting really fancy." SOF ¶ 24.  And not only are the start-up costs high, but the risky nature of the business makes finding financing especially difficult.  Mr. Hart testified that he had been involved in over 30 capitalization deals outside of Chicago, but that all of them were denied because of the high risk. SOF ¶ 25.  And the economy has not been favorable to established businesses over the last few years, much less to new ones without an established market.  Plaintiffs do not even attempt to discount these factors; indeed, Mr. Kramer admits that the bad economy could be the reason that no firing range has opened since the ban was lifted.  SOF ¶ 11.

In sum, Plaintiffs have produced no direct or reliable evidence showing that the City's regulations actually thwarted the plans of any ready, willing, and able range owner or operator, much less that they "effectively prohibit" firing ranges from opening in Chicago.  The City is entitled to summary judgment on this claim.

## IV.  Plaintiffs' First Amendment Claim Has No Merit.

Plaintiffs' First Amendment claim fails for at least three separate reasons.  As an initial matter, not one court has held that the act of shooting a gun for practice or training is protected speech under the First Amendment, and there is no basis to do so here:  Plaintiffs have no evidence that they intend to convey a specific message or protected expressive activity through the act of

37

target practice.  *See Gun Owners' Action League, Inc. v. Swift,* 284 F.3d 198, 210-12 (1st Cir. 2002) ("No court has recognized target shooting as a constitutionally protected form of expression."). Second, even assuming the act of firing a gun were protected speech, Plaintiffs cannot show that the Ordinance itself actually prevents Plaintiffs from engaging in this conduct.  *See, e.g., Jones,* 856 F.2d at 993 (causation required for any constitutional tort claim).   And third, even further assuming, *arguendo*, that the Ordinance somehow impacted Plaintiffs' First Amendment rights, it is a content-neutral law that, for all of the reasons discussed above, survives intermediate scrutiny.  *See Gun Owners' Action League,* 284 F.3d at 212 (law that prohibited shooting at targets depicting human images was constitutional even if fell under First Amendment's scope because it was content-neutral and satisfied intermediate scrutiny).   Thus, Plaintiffs' First Amendment claim has no evidentiary support and would require the Court to expand the First Amendment beyond its recognized scope. The City is entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court grant it summary judgment on Plaintiff's Second Amended Complaint and grant it all other relief the Court deems just and appropriate.

Stephen R. Patton
Corporation Counsel City of Chicago


By:     /s/ Rebecca Hirsch_____
        One of Its Attorneys

Mardell Nereim
William M. Aguiar
Andrew W. Worseck
Rebecca Alfert Hirsch
Mary Eileen Cunniff Wells
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 742-0260
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I, Rebecca Hirsch, an attorney, hereby certify that on this, the 5th day of December, 2013, I caused a copy of the forgoing **Defendant's Memorandum of Law In Support of Its Motion For Summary Judgment** to be served via electronic notification on:

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street
Suite 405
Alexandria, VA 22314
Fax No. 703-997-7665

David G. Sigale
Law Firm of David G. Sigale, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL
Fax No. 630-596-4445

/s/ Rebecca Alfert Hirsch