**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EZELL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 10-CV-5135** |
| | ) | **Judge Virginia M. Kendall** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS

Defendant City of Chicago (the "City"), by its counsel, Stephen R. Patton, Corporation Counsel of the City of Chicago, hereby submits its Local Rule 56.1(a)(3) statement of material facts to which there is no genuine issue and which entitle Defendant to judgment as a matter of law.

**I.      Parties**

1.      Plaintiff Rhonda Ezell ("Ezell") is a resident of Chicago, Illinois.  Ex. 1, SAC ¶ 1. Ezell has never worked at firing range, never operated or managed a firing range, and has no experience in constructing firing ranges.  Ex. 2, Ezell Dep. at 21.

2.      Plaintiff Joseph I. Brown ("Brown") is a resident of Chicago, Illinois.  Ex. 1, SAC ¶ 2.  Brown does not have any experience constructing or building gun ranges.  Ex. 3, Brown Dep. at 43.  Brown has not read the City's July 6, 2011 Ordinance regulating shooting ranges.  *Id.* at 19.

3.      Plaintiff William Hespen ("Hespen") is a resident of Chicago, Illinois.  Ex. 1, SAC ¶ 3.  Hespen does not have a plan to open a gun range, has no experience or training in designing or operating a range, and has never worked at range apart from being a volunteer range safety officer at the Illinois State Rifle Association ("ISRA") range in Bonfield, Illinois.  Ex. 4, Hespen Dep. at 15, 19.

4.    Plaintiff Action Target, Inc. ("Action Target") is a Delaware corporation that designs and builds gun ranges and manufactures and sells gun range equipment and supplies. Ex. 1, SAC ¶ 4. Christopher Hart is the Midwest Territory Manager and Range Consultant for Action Target. Ex. 5, Hart Dep. 1 at 12. Hart and Action Target are involved in the design, construction, installation, and maintenance of ranges. Ex. 6, Hart Dep. 3 at 23. Action Target operates its own range that is solely for the use of Action Target employees and their customers. *Id.* at 23, 57.

5.    Plaintiff Second Amendment Foundation, Inc. ("SAF") is an organization incorporated under the laws of Washington that focuses on Second Amendment education, research, publishing, and legal action. Ex. 1, SAC ¶ 5. Julianne Versnel is the director of operations for SAF. Ex. 7, Versnel Dep. at 3. SAF has never built, operated, or managed a shooting range and has not applied to do so in Chicago; SAF does not want to build, manage, or operate a range in Chicago. *Id.* at 13. SAF seeks only to provide education about Second Amendment rights and safety at gun ranges. *Id.* at 15-16.

6.    Plaintiff ISRA is an organization existing under the laws of Illinois that supports gun ownership and possession through education, outreach, and litigation. Ex. 1, SAC ¶ 6. Richard Pearson is the Executive Director of ISRA. Ex. 8, Pearson Dep. at 3. ISRA owns and operates a members-only outdoor gun range in Bonfield, Illinois. *Id.* at 5, 10. ISRA has never constructed, owned, or operated an indoor gun range. *Id.* at 22-23. ISRA does not have any intention of building a range in Chicago under the City's current regulations for gun ranges. *Id.* at 42. Even if the regulations challenged in this case were eliminated, ISRA is uncertain whether it would attempt to open a range in Chicago. *Id.* at 43, 115-16. ISRA has made no attempt to figure out how much it would cost to build a range that complied with the various regulations. *Id.* at 30. ISRA has some

money to fund the construction of a Chicago range, but would have to borrow the rest; ISRA has not talked to any lenders, bankers, or financial providers. *Id.* at 33. ISRA has not put anything regarding a business plan "on paper." *Id.* at 34.

7.  The City of Chicago is a municipal corporation existing under the laws of Illinois.

## II.  Jurisdiction and Venue

8.  Plaintiffs' Second Amended Complaint seeks redress for alleged violations of the First, Second, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper under 28 U.S.C. § 1391(b) because the City of Chicago is located in this district and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## III.  Chicago's Gun Range Ordinance

9.  The City Council of Chicago established a comprehensive regulatory scheme for shooting ranges (the "Ordinance") on July 6, 2011, through the addition or amendment of licensing provisions, building code provisions, environmental regulations, fire protection regulations, and zoning regulations in the Municipal Code of Chicago. Ex. 9, July 2011 Ordinance. The purpose of the Ordinance is "to put in place reasonable City-crafted restrictions and requirements on the operation and use of shooting ranges within the City," and "various City departments including Buildings, Police, Fire and Environment [] had input into the regulatory scheme." Ex. 10, Committee on Public Safety meeting, Jul. 5, 2011, at 8-9. The Ordinance was amended on September 8, 2011, January 17, 2013, and September 11, 2013. Ex. 11, Sept. 2011 Amendments; Ex. 12, Jan. 2013 Amendments; Ex. 13, Sept. 2013 Amendments; Ex. 14, Chart. The September 2013 Amendments to the Ordinance eliminated the CFP requirement entirely. Ex. 13, Sept. 2013

Amendments, at 19.

## IV. Plaintiffs' Proffered Experts

10.    Jack Giordano is a shooting range safety and health specialist for Kramer One, Inc. Ex. 15, KramerOne Rpt. at 11.  In this capacity, Giordano primarily deals with safety issues that arise from the utilization of shooting ranges and with federal and state health regulations that may apply to ranges.  Ex. 16, Giordano Dep. at 21-23.  Giordano does not design ranges; he is not an architect or engineer.  *Id.* at 24.  Giordano has never owned a firing range, been a business manager or financial officer of a range, or attempted to open a range.  Ex. 16, Giordano Dep. at 68.  Lorin Kramer is the senior principal of Kramer One, Inc. and a licensed architect.  Ex. 15, KramerOne Rpt. at 9.  Kramer has never owned or been involved in the day-to-day operations of a range.  Ex. 17, Kramer Dep. at 45, 49.  Kramer and Giordano are not economists and do not have business degrees. Ex. 16, Giordano Dep. at 16; Ex. 17, Kramer Dep. at 14.  They do not get involved in the business operation of ranges or in the profits and revenues projected in their clients' business plans.  Ex. 16, Giordano Dep. at 29, 57; Ex. 17, Kramer Dep. at 51.  They are involved in the "operation" of ranges: i.e., how people use ranges.  Ex. 16, Giordano Dep. at 57.

11.    In creating their report, Kramer and Giordano listed the parts of the Ordinance that they have a "concern" with and "feel" are not reasonable.  Ex. 16, Giordano Dep. at 79.  Their opinions are not based on conversations with anybody about the Ordinance; they did not conduct any market research and made no inquiries as to the practical impact of the City's regulations.  Ex. 17, Kramer Dep. at 327.  Kramer has not spoken with anyone who has actually contemplated opening a range in Chicago, and the Ordinance's impact on a range's ability to open, if any, is "speculation" at this point.  Ex. 17, Kramer Dep. at 315, 327.  A reason no range has opened since the prohibition

was lifted could be the bad economy. *Id.* at 315. Although they opine that the Ordinance is more restrictive than the regulations in other jurisdictions, neither Giordano nor Kramer did any research regarding regulations in other jurisdictions. Ex. 16, Giordano Dep. at 83; Ex. 17, Kramer Dep. at 75-76. Similarly, Kramer and Giordano's statement that they are "unaware of any jurisdiction, other than the City of Chicago," that has the requirements challenged here (aside from limitations on hours of operation of outdoor ranges, gun rental, and sound level limits) was not based on any research. Ex. 16, Giordano Dep. at 84. They did not attempt to calculate the additional costs the challenged regulations would add to the construction or operation of a range to support their opinion that they "doubt it would be a prudent business venture to construct a shooting range facility in the City of Chicago, under the current regulations"; they are just "speculating." Ex. 17, Kramer Dep. at 78-79. Giordano and Kramer do not actually know whether a range subject to the challenged provisions of the Ordinance can be open and run as a viable business. Ex. 16, Giordano Dep. at 84-86; Ex. 17, Kramer Dep. at 77. Kramer testified that the changes to the Ordinance have lessened some of the burden. Ex. 17, Kramer Dep. at 292. Kramer's statements regarding the difficulty posed by the regulatory scheme are just his "perceptions"; he does not know for certain that the regulatory scheme will have the impact he thinks it may have. *Id.* at 292-93.

## V.     Zoning Regulations

12.     Under Section 17-5-0207, shooting ranges are allowed in a manufacturing district as a special use. Section 17-9-0120 provides that:

> Shooting ranges may not be located in any of the following areas of locations:
> 17-9-0120-A within 100 feet of another shooting range;
> 17-9-0121-B within 500 feet of any zoning district that is zoned for residential use, including a planned development that authorizes residential use;
> 17-9-0121-C within 500 feet of any pre-existing school, day-care facility, place of

worship, premises licensed for the retail sale of liquor, children's activities facility, library, museum of hospital.[1]

Section 17-9-0120 previously was codified at Section 4-151-120 and provided that shooting ranges could not be located within 500 feet of another shooting range. Ex. 11, Sept. 2011 Amendments.

13. Steven Valenziano is the Assistant Zoning Commissioner in the City of Chicago's Department of Housing and Economic Development ("DHED"). Ex. 18, Valenziano Dep. at 6. He has worked on zoning and land use planning issues with the City for over twenty years. *Id.* at 9. The City's current zoning maps are available in its geomapping system, as are all of the current locations for the uses listed in Section 17-9-0120.[2] *Id.* at 31-33. DHED maintains the mapping system with assistance from other City departments, such as Business Affairs and Consumer Protection ("BACP"). *Id.* at 33-35. Under Valenziano's supervision and direction, an employee of DHED created a map showing the land that meets the zoning requirements of Sections 17-5-207 and 17-9-0120 using the City's geomapping system. *Id.* at 28, 31-32; Ex. 19, DHED Map.

14. The map shows that the City has a total of 148,161 acres of property, including streets, alleys, and expressways. Ex. 18, Valenziano Dep. at 43. The areas in white on the map are not zoned for business, commercial, or manufacturing uses; they include areas zoned for residential use, or parks and forest preserves. *Id.* at 39-40. There are approximately 32,000 acres (exclusive of streets, alleys, and expressways) in the City that are zoned as business districts, commercial business districts, manufacturing districts, planned manufacturing districts, and downtown districts.

---

[1] There is an error in the Municipal Code regarding this provision: Sections 17-9-120(A) and (B) are mislabeled as Sections 17-9-101(A) and (B).

[2] Valenziano's deposition testimony refers to the provisions in Section 4-151-120, which are now found in Section 17-9-120.

*Id.* at 57-58. These areas are shown on the map in gray. Ex. 18, Valenziano Dep. at 38-39, Ex. 19, DHED Map. Of the 32,000 acres zoned for business, commercial, and manufacturing, 3,386 acres of property meet the requirements of Sections 17-5-207 and 17-9-0120. Ex. 18, Valenziano Dep. at 42-43. These areas are shown in red on the map. *Id.*; Ex. 19, DHED Map. In calculating the 3,386 available acres, Valenziano excluded streets, alleys, and expressways. Ex. 18, Valenziano Dep. at 43. He also excluded all properties that he determined in his judgment to be too small to be usable. *Id.* at 44-45, 50. Valenziano calculated that the 3,386 available acres translate into approximately 1,900 parcels of property in the City of Chicago that meet the requirements of Sections 17-5-207 and 17-9-0120. *Id.* at 47-48.

15.     Patti Scudiero is the City's Zoning Administrator and Managing Deputy Commissioner for the Bureau of Planning and Zoning within the City's DHED. Ex. 20, Scudiero Dep. at 8. The principal purpose of the Zoning Ordinance is to promote the health, safety, and welfare of the City's communities. *Id.* at 21; MCC § 17-1-0501. It does so by classifying and segregating uses, which aims to protect residents from whatever impact the uses would have. Ex. 20, Scudiero Dep. at 21. Manufacturing districts are the "farthest away from people's homes, school children, churches, various activities [and] residential districts." *Id.* at 21-22. "[T]herefore, the purpose of the zoning code is maintained by putting any use that could have an impact on the residential communities the furthest away from it." *Id.* at 22.

16.     Regarding the Ordinance's requirement that gun ranges be placed in manufacturing districts as special uses, Scudiero testified that the involvement of guns and ammunition in gun ranges, as well as the transportation of guns and ammunition to the range, could have an impact on the health, safety, and welfare of individuals surrounding a gun range. Ex. 20, Scudiero Dep. at 22.

As a result, shooting ranges are considered "high impact," and like other "uses that are high impact, the [manufacturing] district affords sort of a distance away from the residential communities in most areas of the city." *Id.* at 22. The special use process also allows an additional layer of transparency and process to the siting of a gun range because it requires a public hearing before the Zoning Board of Appeals ("ZBA") to determine whether the use should be allowed. *Id.* at 13-14. The City's Zoning Ordinance lays out the criteria the ZBA must use in determining whether to grant a special use. *Id.* at 14-15. The criteria and process for a special use are the same for all special uses. *Id.* at 15.

17.     Subpart (B) of Section 17-9-0120 keeps areas where there is the movement of guns and ammunition and potential for criminal activity as far from residential uses as possible. Ex. 20, Scudiero Dep. at 43-44. The uses identified in subpart (C) relate to the "common theme of most of the activities named"—assembly, "meaning multitudes of people gathering, whether it be to worship, to go to school, to . . . get healthcare" and "in some cases children being involved in those assembly areas." *Id.* at 46. Subpart (C) therefore protects large assemblies of people from the impact of criminal activity as well as combustion or an implosion at the range. *Id.* at 47-48. The Chicago Municipal Code provides distance requirements for uses other than gun ranges, such as adult uses, which cannot be within 1,000 feet of another adult use, residential district, or church. *Id.*; MCC § 17-9-0101.

18.     Sergeant Kevin Johnson has been with the Chicago Police Department ("CPD") for almost 22 years and was a supervising sergeant of CPD's Chicago Anti-Gun Enforcement ("CAGE") Team from 2008 to 2012. Ex. 21, Johnson Dep. at 8, 14-15. The primary purpose of CAGE is to investigate illegal firearms trafficking in Chicago. *Id.* at 16. Gun ranges necessarily involve the

presence of weapons and ammunition, which is an "inherent public safety issue." *Id.* at 145. Gun ranges provide the opportunity for theft of guns from gun-owners who transport guns and ammunition to and from the range. *Id.* at 45. The 500-foot distance requirement set forth in Section 17-9-0120(B) and (C) reduces the chance that any crime associated with the range would impact the areas and uses therein. *Id.* at 167. The requirement of the buffer zone between gun ranges in Subpart (A) serves to decrease the possibility that criminals will congregate in the area for purposes of either stealing firearms from the ranges or from the patrons and employees of such ranges. Ex. 22, Defs.' Resp. to Pls.' Interrog., at 7.

19. According to the National Rifle Association ("NRA"), "[a] reasonable satisfaction of [a shooting range's goals and] needs can only be achieved when one considers the entire context in which a particular facility will be operating, the type of shooting sports that will be conducted, the rules and controls that will be employed, the overall physical design of the range, *and last, but not least, all aspects of the surrounding environment (terrain, population density, etc.).*" Ex. 23, NRA Range Source Book, at I-3 (emphasis added). Gun ranges are compatible with industrial use, and many gun ranges are located in industrial parks. Ex. 16, Giordano Dep. at 304; Ex. 6, Hart Dep. 3 at 139 (ranges are suited for manufacturing districts).

20. According to the National Institute for Occupational Health and Safety ("NIOSH"), shooting ranges can pose environmental risks for surrounding areas. Ex. 24, NIOSH Alert Apr. 2009, at 15. If lead-contaminated air is released outside a gun range building and left unmanaged, the exterior walls of the building and surrounding grounds and waterways can become contaminated. *Id.* This lead "can be re-aerosolized and result in subsequent contamination of the firing range or other buildings, and present unwanted hazards to humans if the range is in a populated area." *Id.*

Used air filters from gun ranges often contain lead in sufficient quantity to classify the used filter as a hazardous waste under the Resource Conservation and Recovery Act. *Id.* at 15-16; *see also* Ex. 23, NRA Range Source Book at I-5-8--I-5-10. Flash fires are not uncommon in indoor ranges. Ex. 16, Giordano Dep. at 232; *see also* Ex. 25, Articles about gun range fires.

21. None of the Plaintiffs have studied Chicago zoning maps or done any analysis to determine what properties in the City comply with sections 17-5-207 and 17-9-0120. Ex. 2, Ezell Dep. at 71; Ex. 3, Brown Dep. at 36; Ex. 4, Hespen Dep. at 39-40; Ex. 8, Pearson Dep. at 74; Ex. 7, Versnel Dep. at 46-47; Ex. 6, Hart Dep. 3 at 138. According to Hart, the City's zoning regulations do not make it impossible to open a range. Ex. 26, Hart Dep. 2 at 66-67. One potential Action Target customer found a location that satisfied the City's zoning requirements. Ex. 27, Robuck Dep. at 9. Hart has not studied whether ranges in commercial areas fare better than ranges in other areas. Ex. 6, Hart Dep. 3 at 138.

22. Neither Kramer nor Giordano has studied the City's manufacturing districts or where a range could actually locate under sections 17-5-207 and 17-9-0120. Ex. 16, Giordano Dep. at 166-67; Ex. 17, Kramer Dep. at 146-47. Giordano has "absolutely no idea whatsoever how much land is actually available in the City of Chicago" under these provisions. Ex. 16, Giordano Dep. at 167. Kramer does not know if the zoning ordinance makes it economically infeasible to open or operate a range. Ex. 17, Kramer Dep. at 147.

## VI.  Construction Requirements

23. Gun ranges can be dangerous places. Ex. 16, Giordano Dep. at 21. Potential dangers include contact with lead and other potentially toxic fumes and dust, exposure to hazardous noise levels, and risks from misfired weapons or ricocheting bullets. Ex. 5, Hart Dep. 1 at 39; Ex. 28,

NIOSH Report Jan. 2010, at 1; Ex. 29, Whole Building Design Guide at 1. Lead contamination may be a problem both on indoor and outdoor ranges, but most potentially significant human exposure occurs at indoor gun ranges. Ex. 23, NRA Range Source Book at III-2-13. Lead particulate is released from the primer detonation, the powder combustion, and the lead portion of the bullet. *Id.* (citing OSHA standards). Gun range employers, workers, and customers are potentially exposed to lead and the increased risks of potential toxic health effects from lead. Ex. 24, NIOSH Alert Apr. 2009, at 11; *see also* Ex. 23, NRA Range Source Book at III-2-13 (citing OSHA standards); Ex. 16, Giordano Dep. at 30; Ex. 5, Hart Dep. 1 at 38-40. Investigations of exposure to lead and other contaminants at indoor firing ranges have documented elevated blood lead levels—particularly among employees and instructors. Ex. 24, NIOSH Alert Apr. 2009, at 2. Not only can lead be inhaled, it can get on people's skin, especially the hands, from contaminated surfaces and firearms discharge; lead-contaminated hands, in turn, can contribute to ingestion of lead while handling food, beverages, and other items that contact the mouth. *Id.* at 3-4; Ex. 23, NRA Range Source Book at III-2-13. NIOSH research shows that washing hands with soap and water is not completely effective in removing lead from the surface of the skin. Ex. 24, NIOSH Alert Apr. 2009, at 4. Exposure to lead is especially dangerous to children ages six and younger because lead is toxic to the brain and can cause permanent damage. Ex. 30, Washington Dept. of Labor and Industries at 1.

24. Shooting range construction is "much more" expensive than typical construction. Ex. 16, Giordano Dep. at 285. According to the NRA, "[p]lanning for indoor ranges is often complicated by changes in design and substantial increases in cost," Ex. 23, NRA Range Source Book at III-1-8, and "converting existing buildings to indoor range use generally requires difficult and costly modifications." *Id.* at III-1-9. Kramer estimated that the cost to construct an indoor

shooting range in a major metropolitan area would "start at about $3 million" and "could go up to $20 million investment before it started getting really fancy."  Ex. 17, Kramer Dep. at 297.

25.     It is generally "very tough to find financing for a shooting range."  Ex. 6, Hart Dep. 3 at 45.  Hart has been involved in over thirty capitalization deals for potential gun ranges outside of Chicago, but all were denied because of the high risk associated with gun ranges.  *Id.* at 47-48.

26.     Hart said that it is "just a guess" that opening a range in Chicago would cost more than elsewhere.  Ex. 6, Hart Dep. 3 at 164.  Neither SAF nor ISRA is aware of any estimate of the overall cost overall to build a shooting range in Chicago that complied with all of the requirements in the Ordinance or how much it would cost overall to build a shooting range in Chicago assuming that the challenged provisions did not exist.  Ex. 7, Versnel Dep. at 75-77; Ex. 8, Pearson Dep. at 84.

**A.     Ballistic-proof walls and doors: MCC § 13-96-1160(a)**

27.     Section 13-96-1160(a) provides that:

(a)  A shooting range must be totally enclosed with contiguous walls, a ceiling, and a floor that separate the shooting range from the shooting range facility and any other uses located in the building.  Except as provided in subsection (b) of this section, the enclosure shall be penetration-proof for the heaviest caliber of ammunition used on the firing range fired point blank into the enclosure at 90 degrees to the surface.  Enclosure walls, floors, ceiling assemblies, doors and opening protective assemblies for the shooting range shall be designed and constructed with materials and assemblies sufficient to stop all bullets fired or projectiles from penetrating beyond the shooting range enclosure.

(b)  The rear wall shall be designed and constructed of materials, assemblies, and opening protectives strong enough to be capable of stopping a ricochet of a bullet, fragment or back splatter, from penetrating beyond the wall.

28.     Robert Fahlstrom is the Manager of Regulatory Review in the City of Chicago's Department of Buildings, a position he has held for over seven years.  Ex. 31, Fahlstrom Decl. ¶ 1.

According to Fahlstrom, the purpose behind this provision is to help reduce the risk of injury to firing range patrons and to those members of the public who may congregate near a firing range in the event of an errant bullet strike, shoddy wall construction, bullet trap failure, or in the event a bullet trap has been dissembled for maintenance. *Id.* ¶ 4. The provision accomplishes this through requiring ballistic-proof walls, floors and ceilings to ensure that the firing range structure can withstand and protect against stray bullet shots. *Id.*

29. The Building Code provisions of the Ordinance were derived from NIOSH reports, the NRA Range Source Book, the U.S. Department of Energy range manual, the U.S. military handbook for shooting ranges, and other codes and ordinances. Ex. 32, Fahlstrom Dep. at 15-17, 45-46. Range designers consult the NRA Range Source Book, NIOSH, OSHA, and any documents specific to the client. Ex. 17, Kramer Dep. at 61-62. The NRA Source Book is a "good guide" for range design. Ex. 6, Hart Dep. 3 at 153.

30. According to the NRA Source Book, "[i]ndoor ranges must be housed in a building furnished with electricity and built of impenetrable walls, floor and ceiling." Ex. 23, NRA Range Source Book at I-3-22; *id.* at III-2-7. All ranges should have ballistic walls, Ex. 26, Hart Dep. 2 at 90, and it is "not uncommon" for the wall behind the shooter to have "some kind of ballistic controls[.]" Ex. 6, Hart Dep. 3 at 82-83. Hart has seen evidence of either ricochets or direct hits to the back wall behind the shooter. Ex. 6, Hart Dep. 3 at 87-88. Granular rubber bullet traps can cause bullet ricochets if the trap becomes too full of spent lead. Ex. 5, Hart Dep. 1 at 268-69.

31. No actual or potential customers of Action Target have complained about Section 13-96-1160(a). Ex. 6, Hart Dep. 3 at 88. Ezell, Brown, Hespen, SAF, and ISRA have no personal knowledge regarding the technical aspect of this provision. Ex. 33, Stipulation.

32.     Giordano defers to Kramer on this issue, but stated that "the entire envelope, as far as walls go, are usually impenetrable[.]"  Ex. 16, Giordano Dep. at 195.  Kramer does not believe that it is wrong to require the whole back wall and any door there to be armored or bullet proof; he just objects to any cost it may add.  Ex. 17, Kramer Dep. at 188-90.  He estimates the cost of an armored door to be $7,000-$10,000, *id.* at 193, and the cost of making the rear wall behind the bullet trap penetration proof "maybe $200 a linear foot of length of the back wall" in an already-existing building.  *Id.* at 196.  This is just a "potential" issue, not one that will definitely exist.  *Id.* at 191.

### B.     Separate ventilation systems for each range: MCC § 13-96-1210(d)

33.     Section 13-96-1210(d) provides that "[w]here a shooting range facility contains multiple shooting ranges, each shooting range shall be provided with a separate ventilation and exhaust system."  This section does not apply to all ranges; it only applies to gun range facilities in which there are multiple ranges.  MCC § 13-96-1210(d); Ex. 17, Kramer Dep. at 256; Ex. 31, Fahlstrom Decl. ¶ 5.

34.     The purpose behind Section 13-96-1210(d) is to minimize the potential lead exposure at firing ranges as much as possible.  Ex. 31, Fahlstrom Decl. ¶ 5.  Section 13-96-1210(d) helps to achieve the other ventilation requirements found in the Ordinance, and prevents the circulation of contaminated air to other areas of a gun range facility.  *Id.*

35.     According to NIOSH, "[v]entilation is the most important engineering control for protection against primary lead exposure in indoor firing ranges.  Well-designed supply air and exhaust ventilation systems have been shown to control exposures to lead fumes and dust in firing ranges[.]"  Ex. 24, NIOSH Alert Apr. 2009, at 13; *see also* Ex. 29, Whole Building Design Guide at 1 ("The supply and exhaust air system is critical to the operation of an indoor range and the health

of building inhabitants."). The New Jersey Public Employees Occupational Safety and Health Act requires that each range have its own ventilation system "to prevent the circulation of contaminated air to other areas of the building." Ex. 34, N.J.A.C. § 12:100-8.5(e).

36. Chris Hart would not install a range without a quality ventilation system. Ex. 5, Hart Dep. 1 at 38. Hart told a potential customer that "it is good to have a separate [ventilation] system for each range bay[.]" Ex. 35, Email, Hart Dep. 2, Ex. 3 at 2. No customer of Action Target has complained about this provision. Ex. 6, Hart Dep. 3 at 113. His cost estimate for the "separate systems" requirement is a "guess," an "approximation." Ex. 6, Hart Dep. 3 at 112. Ezell, Brown, Hespen, SAF, and ISRA have no personal knowledge regarding the technical aspect of this provision. Ex. 33, Stipulation.

37. Giordano does not have the expertise to opine on Section 17-96-1210(d). Ex. 16, Giordano Dep. at 222. Kramer's objection is to the additional costs associated with a requiring a second range ventilation system. Ex. 17, Kramer Dep. at 254. Kramer estimates the additional cost to be $65,000-$70,000, but he could not identify whether the estimate was based on an estimate from a past project or a conversation with someone at an HVAC business that does work at gun ranges. *Id.* at 258. This provision does not make it impossible to open a range. *Id.* It would mainly apply in situations in which the configuration of an existing building precluded putting all of the desired shooting lanes in one room; this provision can be planned around with new construction and many existing buildings. Ex. 15, KramerOne Rpt.; Ex. 17, Kramer Dep. at 255-57.

## C. Interlocked ventilation systems: MCC §13-96-1210(e)

38. Section 13-96-1210(e) states that "[t]he supply and exhaust systems shall be electrically interlocked to turn on each system at the same time."

39.     The purpose behind Section 13-96-1210(e) is to add a layer of safety by eliminating the possibility of human error in failing to turn on the exhaust system.  Ex. 31, Fahlstrom Decl. ¶ 6. If the supply and exhaust systems of a range are not in simultaneous operation, there can be increased toxic fumes in the firing range facility.  *Id.*

40.     Interlocking is standard practice in the industry, Ex. 15, KramerOne Rpt. at 8, so that all fan systems operate at the same time during active range use.  Ex. 24, NIOSH Alert Apr. 2009, at 16.  "Monitoring and control systems that ensure proper operation of ventilation systems" are "important parts" of the ventilation system.  Ex. 24, NIOSH Alert Apr. 2009, at 13.  Likewise, "[s]upply and exhaust fan systems must have control interlocks to ensure simultaneous operation." Ex. 29, Whole Building Design Guide at 1.  The New Jersey Public Employees Occupational Safety and Health Act also requires that "[t]he supply and exhaust systems shall be electrically interlocked, thereby eliminating an error in turning one system on and not the other."  Ex. 34, N.J.A.C. § 12:100-8.5(f).  The NRA Range Source Book advises that gun ranges may require the installation of "heavy duty" electrical wiring "both internally and externally to accommodate the added power needs for range ventilation, heating, lighting, and target carrier mechanisms."  Ex. 23, NRA Range Source Book at I-1-30; *see also* Ex. 36, U.S. Dept. of Energy, at 16.

41.     Hart does not have experience in this area and just "speculat[es]" that requiring interlocking could be a problem.  Ex. 6, Hart Dep. 3 at 119-20.  No customer of Action Target has complained about this provision.  *Id.* at 120.  According to Hart, this provision does not make it impossible to open a range in Chicago.  *Id.* Ezell, Brown, Hespen, SAF, and ISRA have no personal knowledge regarding the technical aspect of this provision.  Ex. 33, Stipulation.

42.     Kramer is not an electrician nor has he ever worked for a power company or

addressed a power grid failure. Ex. 17, Kramer Dep. at 272-73. Kramer has "no idea" whether the interlocking of the systems would actually have an impact on the power grid in Chicago. *Id.* at 269, 271. His concern is "speculation" based only on a presentation by the owner of an HVAC business at an NRA conference. *Id.* at 269-270. Giordano is not qualified to address this issue. Ex. 16, Giordano Dep. at 227.

### D. Cleaning methods—sloped floor, hose bib, and drain requirements: MCC §§ 13-96-1200(b)(7) and 13-96-1220(b)-(c)

43.    Section 13-96-1200(b)(7) states, in relevant part, that "[t]he floors of the shooting range shall be constructed to slope at a minimum of one-fourth inch (1/4") per foot from the firing line toward the backstop/bullet trap[.]" Section 13-96-1220 requires:

> (b)  The shooting range shall have a hose bib installed with backflow protection that complies with the rules and regulations promulgated by the department of water management. The discharge of any waste from the shooting range shall be in compliance with all applicable local, state or federal laws or standards, and shall comply with the requirements of Articles 7, 8 and 11 of Chapter 18-29 to prevent the discharge of any prohibited waste from entering into any sewer, watercourse, natural outlet or waters.
>
> (c)  Floor drains installed at the backstop/bullet trap shall collect lead and other hazardous waste materials in a separate drainage system to an approved collection device or treatment system that is in compliance with all applicable local, state or federal laws or standards.

44.    The 2004 edition of the NRA Range Source Book, the Whole Building Design Guide, and the U.S. Department of Energy gun range manual all recommend or require a sloped floor. Ex. 23, NRA Range Source Book at I-1-24, I-1-26; Ex. 29, Whole Building Design Guide at 2; Ex. 36, U.S. Dept. of Energy, at 22. Sloped floors "allow for wet cleaning of that concrete floor surface . . . in the safe as possible manner." Ex. 32, Fahlstrom Dep. at 24. In order to protect workers and shooters at firing ranges, NIOSH recommends, among other things, "keep[ing] the firing range and

other workplace areas clean using proper cleaning procedures such as wet sweeping and HEPA vacuuming of surfaces[.]" Ex. 28, NIOSH Report, Jan. 2010, at 3. The U.S. Department of Energy gun range manual states that "both dry and wet methods can be used to clean the range. The method selected depends upon the frequency of use. The wet method is preferred when floor drains are available, and keeping materials wet during cleaning operations reduces or eliminates release of microscopic dust particles." Ex. 36, U.S. Dept. of Energy, at 20. The City of Lafayette, Indiana, requires a sloped floor and drain in new-construction gun ranges. Ex. 37, Lafayette Municipal Code § 4.13.080(B). The New Jersey Public Employees Occupational Safety and Health Act requires that "[e]ach firing range [] be equipped with a floor drain and trap to facilitate cleaning by a wet method. . . . The floor should slope two to three inches toward the drain." Ex. 34, N.J.A.C. § 12:100-8.7. The wet cleaning of sloped floors is standard construction practice. Ex. 32, Fahlstrom Dep. at 26-28. Floor drains are protected by deflector plates to help prevent the ricochet hazard. *Id.*; Ex. 6, Hart Dep. 3 at 133-34.

45. According to Hart, this provision does not make it impossible to open a range in Chicago, Ex. 6, Hart Dep. 3 at 128; the sloped floor and hose bib and drain requirements can be complied with, but at an additional cost. Ex. 26, Hart Dep. 2 at 123; Ex. 6, Hart Dep. 3 at 125-26. The slope of the floor is a structural element that Action Target does not install. Ex. 26, Hart Dep. 2 at 118. Hart does not know what that cost would be. Ex. 26, Hart Dep. 2 at 123; Ex. 6, Hart Dep. 3 at 126. It is possible that the cost of a HEPA vacuum and a drain/hose bib could cancel each other out. Ex. 6, Hart Dep. 3 at 127. No customer of Action Target has complained about this provision. *Id.* at 120. Ezell, Brown, Hespen, SAF, and ISRA have no personal knowledge regarding the technical aspect of this provision. Ex. 33, Stipulation. ISRA and SAF have not made any attempt

to assess, estimate, or evaluate the impact that this requirement would have on the viability or profitability of a range operating in Chicago. Ex. 8, Pearson Dep. at 82-83; Ex. 7, Versnel Dep. at 72-73.

46. The use of a floor drain and sloped floor to wet-clean a range floor is not prohibited anywhere. Ex. 16, Giordano Dep. at 234. Because a drain is required, the slope of the floor has a purpose. Ex. 17, Kramer Dep. at 284. As to additional costs of a sloped floor, Kramer did some "mental gymnastics" and came to the conclusion that the cost in an existing building would be somewhere around $20 a square foot. *Id.* at 285. For new construction, "building the floor with a slope costs a little bit more than having a level floor." *Id.*

E. **Sound limit: MCC § 13-96-1200(b)(2)**

47. Section 13-96-1200(b)(2) provides, in pertinent part, that "[t]he maximum noise emanating from the shooting range facility shall not be more than 55 dB when measured from a distance of 100 feet or more from the source, or 70 dB when measured from a distance of 10 feet or more from the source." The noise limitations for any business in the City are applicable only between 8:00 p.m. and 8:00 a.m., so the limitations in Section 13-96-1200(b)(2) would apply to firing ranges only if they operated after 8:00 p.m. Ex. 38, Schnoes Dep. at 23, 25.

48. The high levels of sound produced at shooting ranges often travel beyond the boundaries of the range property. Ex. 23, NRA Range Source Book, at I-6-3. According to Kevin Schnoes, a former Assistant Commissioner of the Department of Public Health, Section 13-96-1200(b)(2) prevents Chicago residents from being disturbed by noise that is outside of their control. Ex. 38, Schnoes Dep. at 38; *see also* Ex. 7, Versnel Dep. at 62-63 (testifying that the sound restriction could be beneficial in that it could prevent noise from emanating from the shooting range

and disturbing the public). According to the NRA, "[i]n most instances existing laws will specify a sound level for a particular land use." Ex. 23, NRA Range Source Book at 1-6-9; Ex. 15, KramerOne Rpt. at 9 ("It is not uncommon for communities to have noise statutes that limit sound levels. Occasionally these noise statutes include specific requirements for shooting range facilities."). In Lafayette, Indiana, "[t]he maximum noise that may escape the range into areas not controlled by the owner is forty (40) dB." Ex. 37, Lafayette Municipal Code § 4.13.090(A).

49.     It is unlikely that the sound emanating from a properly-designed shooting range would exceed the standard required in the Ordinance. Ex. 16, Giordano Dep. at 204. ISRA, SAF, and Action Target have not made any attempt to study, evaluate, or analyze this provision or the impact of this provision on the viability, income, or profit of a range in Chicago. Ex. 8, Pearson Dep. at 79-80; Ex. 7, Versnel Dep. at 60-61; Ex. 26, Hart Dep. 2 at 116. No actual or potential Action Target customers have complained about this provision. Ex. 26, Hart Dep. 2 at 117.

50.     Kramer and Giordano have a "philosophical" concern that gun ranges are subject to sound limits while other uses in a manufacturing district are not. Ex. 17, Kramer Dep. at 229; Ex. 16, Giordano Dep. at 203-04. Kramer does not know if it is possible to comply with the sound requirement; he would defer to an acoustical engineer. Ex. 17, Kramer Dep. at 230. Giordano does not consider himself a sound expert. Ex. 16, Giordano Dep. at 17. This provision does not make it economically infeasible to open a range. *Id.* at 213-14.

### F.     Sound absorbing materials: MCC §§ 13-96-1200(b)(2) and (b)(7)

51.     Section 13-960-1200(b) requires, in pertinent part:

(2)  The shooting range shall be provided with air-borne and structure-borne sound absorbing materials. Surface applied or suspended acoustical materials shall comply with Section 15-8-420. The materials shall be designed to permit easy cleaning and

access for periodic replacement; . . .

(7) floors, ceilings, and walls–the floors, ceilings, and walls of every shooting range shall be constructed of smooth non-porous materials to facilitate effective maintenance and cleaning and removal of lead particulate. . . .

52.     The purpose of this provision is to reduce the dangerous noise levels that can occur in gun ranges. Ex. 31, Fahlstrom Decl. ¶ 7.  This is especially important for employees at ranges who are exposed to high noise levels on a consistent basis.  *Id.*  According to Fahlstrom, this provision does not require that the shooting range facility be constructed of sound-absorbing materials; rather, the materials can be applied over the building's structure in certain areas to help reduce the noise levels.  *Id.*

53.     Employees and shooters are potentially exposed to noise hazards at indoor firing ranges where firearms discharge noise levels can exceed 140 dB sound pressure level.  Ex. 24, NIOSH Alert Apr. 2009, at 11; Ex. 23, NRA Range Source Book at I-6-3.  Several studies have shown that exposure to noise at gun ranges can cause health problems associated with hearing loss, particularly among employees and instructors.  Ex. 28, NIOSH Report, Jan. 2010, at 1.  Effective noise control measures are "imperative to reducing noise-induced hearing loss among firing range operators, employees, and users."  Ex. 24, NIOSH Alert Apr. 2009, at 16.  As a result, gun range guides recommend applying acoustical material to walls, windows, doors, ventilation ducts, and ceilings.  *Id.* at 17; Ex. 23, NRA Range Source Book at III-2-10; Ex. 36, U.S. Dept. of Energy, at 26.  Acoustical materials are designed to defuse and absorb sound and prevent it from being reflected back to the shooter.  Ex. 26, Hart Dep. 2 at 17.  The New Jersey Public Employees Occupational Safety and Health Act requires that "all reflecting walls . . . be covered with high efficiency sound absorbing material" and that the coverings "be designed to permit easy cleaning and access to the

acoustical material for periodic replacement." Ex. 34, N.J.A.C. § 12:100-8.6(b).

54.     No potential customer of Action Target has complained about this provision. Ex. 6, Hart Dep. 3 at 104. Ezell, Brown, Hespen, SAF, and ISRA have no personal knowledge regarding the technical aspects of this provision. Ex. 33, Stipulation. Kramer is not a sound engineer and would defer to a sound engineer on sound issues. Ex. 17, Kramer Dep. at 250-51.

**G.      Storage of firearms and ammunition: MCC § 13-96-1190(c)(2)(d)**

55.     Section 13-96-1190(c)(2)(d) states that "a shooting range facility shall include . . . if ammunition or firearms are stored, a magazine or hazardous storage facility appropriate for the type and amount of ammunition or firearms, as provided in rules and regulations promulgated by the police or fire department."

56.     Section 13-96-1190(c)(2)(d) advances the City's safety interest by allowing the police or fire department, based on their experience or knowledge, to promulgate rules and regulations for the storage of firearms and ammunition. Ex. 31, Fahlstrom Decl. ¶ 8. Large amounts of ammunition stored together may become combustible if ignited. *Id.*

57.     Hart is not aware of any rules and regulations, so he does not know what the police or fire department would require for storage at a particular range. Ex. 6, Hart Dep. 3 at 91. Because Hart has not seen any regulations, he does not know the cost of compliance with this provision, and does not know whether the cost would prohibit a range from opening. *Id.* at 94, 98. Hart is not qualified to construct or design rooms for hazardous classification, so he would not "weigh in" on the cost of compliance. *Id.* at 98. No actual or potential customer of Action Target has ever complained about this provision. *Id.* Ezell, Brown, Hespen, SAF, and ISRA have no personal knowledge regarding the technical aspect of this provision. Ex. 33, Stipulation.

22

58.     Kramer was "just issue spotting" when he listed this provision in his report.  Ex. 17, Kramer Dep. at 213-14.  His objection is an "exercise in trying to read the future" because the City's Police and Fire Departments have not yet promulgated any rules or regulations.  *Id.*  at 222.  He has not spoken with anyone about this provision and does not know what the additional cost of compliance with this provision would be.  *Id.* at 213-14, 226.   This provision does not make it impossible or economically infeasible to open or operate a gun range.  *Id.* at 224.  Giordano does not have the knowledge or information to opine on this issue.  Ex. 16, Giordano Dep. at 197.

**H.     Promulgation of rules by commissioner: MCC § 11-4-260(b)**

59.     Section 11-4-260(b) states that "The commissioner [of the department of health] is authorized to promulgate rules and regulations for the cleaning of, sound and air quality control at, and discharge of particulate matter and waste from shooting ranges and shooting range facilities."

60.     Gun ranges are highly regulated by federal, state, and local governments because of the potentially dangerous activity that occurs at there.   Ex. 16, Giordano Dep. at 247-48.  Government regulation is "a cost of doing business[.]"  Ex. 17, Kramer Dep. at 179; Ex. 16, Giordano Dep. at 303.  As of 2009, 24 states and 2 territories administered and enforced their own occupational safety and health programs.  Ex. 24, NIOSH Alert Apr. 2009, at 3.

61.     Hart testified that he does not know if the Commissioner has promulgated any rules, so he does not know that any such rules would actually impose any additional burden.  Ex. 6, Hart Dep. 3 at 72.  No customer of Action Target has complained about this provision.  *Id.* at 75.  This provision does not impact the design, construction, or installation of a range.  *Id.* at 76.  Ezell, Brown, Hespen, SAF, and ISRA have no personal knowledge regarding the technical aspect of this provision.  Ex. 33, Stipulation.

62.     Kramer deferred to Giordano on this topic.  Ex. 17, Kramer Dep. at 174-75.  Giordano agrees that someone should have the authority to establish new rules to address new health and safety concerns that are not addressed by federal regulations.  Ex. 16, Giordano Dep. at 187.  Giordano said his objection is "hypothetical" because he has seen regulatory conflicts in the past, but he is not sure it will happen here.  *Id.* at 178-79.  Because the Commissioner has not promulgated any regulations, this provision is not currently a problem.  Ex. 17, Kramer Dep. at 177.  Plaintiffs' objection is "guesswork" at this point.  *Id.* at 182.

## VII.    Business Operations

63.     The way a range is operated has "a very dramatic effect" on whether a range is safe. Ex. 16, Giordano Dep. at 52.  Even a properly designed range can become a health or safety hazard if it is not operated properly.  *Id.*  Operating a range safely is a very involved and continuously ongoing process.  *Id.* at 64.  According to the NRA, "[f]iring range safety implies (1) proper use of a range as it relates to the physical design; (2) continuous training (entry level and on-going) programs for users, instructors and supervisors; and (3) strict regulations on use coupled with strict enforcement."  Ex. 23, NRA Range Source Book at I-4.

### A.    Range patrons must be 18 years or older: MCC § 4-151-100(d)

64.     Under Section 4-151-100(d), "No person under the age of 18 shall be permitted in the shooting range facility.  The licensee shall require every shooting range patron to provide a driver's license or other government-issued identification showing the person's name, date of birth, and photograph."

65.     This requirement protects the safety of minors, as deadly weapons are accessible and routinely fired at shooting range facilities.  Ex. 22, Def.'s Resp. to Pls.' Interrog. at 6.  Additionally,

the prohibition permits patrons to use the range without interference from minors, and reduces the supervisory burden on both customers and range staff. *Id.* It is common to exclude children under age six from ranges. Ex. 17, Kramer Dep. at 123-24.

66.     Plaintiffs have not analyzed the economic impact of this provision on gun ranges or identified parents or children this provision would impact. Ex. 2, Ezell Dep. at 63; Ex. 3, Brown Dep. at 34-35; Ex. 4, Hespen Dep. at 50-52; Ex. 8, Pearson Dep. at 67-68; Ex. 7, Versnel Dep. at 38-39. No actual or potential customer of Action Target has complained about the age requirement provision. Ex. 26, Hart Dep. 2 at 50. This provision does not impact what Action Target would do involving gun ranges in Chicago. *Id.*

67.     This provision does not make it impossible to open a range. Ex. 17, Kramer Dep. at 124; Ex. 16, Giordano Dep. at 140. Kramer's and Giordano's concern is with the economic impact on a range of not allowing youth programs at ranges, customers to bring their children, or youths to work at a range, but they do not know how much revenue is generated from youth programming, how many patrons could not go to a range unless allowed to bring their children, or the impact of not permitting minors to work at a range. Ex. 17, Kramer Dep. at 124-27; Ex. 16, Giordano Dep. at 137-44. They have not studied the issue, compiled or reviewed relevant data, or discussed the provision with anyone. Ex. 17, Kramer Dep. 125-27, 129-30; Ex. 16, Giordano Dep. at 140-44. Giordano has "no figures to back" up his concern about parents not coming to a range and has "no idea" what the effect on the revenue stream would be. Ex. 16, Giordano Dep. at 141-42.

**B.      Operating hours**: **MCC § 4-151-090**

68.     Section 4-151-090 provides that "[s]hooting range facilities may operate only between the hours of 9 a.m. and 8 p.m. No person shall operate, or permit the operation, of a shooting range

facility during any other time."

69.     According to Rosemary Krimbel, the Commissioner of BACP, the restriction on the hours of operation is related to the impact of gun ranges on communities and neighborhoods as well as public health and safety.  Ex. 39, Krimbel Dep. at 143-44.  Crime is more frequent at night, and guns are often involved in crimes.  *Id.* at 146.  There are other business licenses that limit the hours of operation, including licenses for sidewalk cafes and outdoor patios, mobile foods, and liquor establishments.  *Id.* at 148-49.  Limiting the hours of operation of gun ranges in the City furthers public health, safety, and welfare by eliminating pedestrian or vehicular traffic associated with the range, and the related noise and disturbance that would take place at night.  Ex. 22, Def.'s Resp. to Pls.' Interrog. at 5.  It also reduces the number of hours that the CPD and other first responders would be called to a range in response to a firearm misuse or injury.  *Id.*

70.     Pearson is aware of other ranges that have hours of operation that are similar to those in this provision.  Ex. 8, Pearson Dep. at 65-66.  The only ranges that Hart identified that are open 24 hours a day are law enforcement ranges not open to the public.  Ex. 26, Hart Dep. 2 at 47.  According to Hart, public ranges usually have hours or 10:00 a.m. to 9:00 p.m. or 9:00 a.m. to 9:00 p.m.  *Id.* at 46-47.  Hart does not know anything about the profits or business that occur at a gun range after 9:00 p.m.  *Id.* at 48.  No potential Action Target customers in Chicago have mentioned the hours of operation restriction as a burden.  *Id.* at 45.  Plaintiffs have not done any sort of evaluation or made an attempt to quantify what kind of impact these hours of operation would have on the viability of a shooting range.  Ex. 2, Ezell Dep. at 61-62; Ex. 4, Hespen Dep. at 49-50; Ex. 8, Pearson Dep. at 64, 69; Ex. 7, Versnel Dep. at 33-35.

71.     This provision does not make it impossible to open a range.  Ex. 17, Kramer Dep. at

110. Giordano and Kramer did not study the impact of this provision on the income of shooting ranges or discuss it with any customers or potential range owners. Ex. 16, Giordano Dep. 121-22, 126; Ex. 17, Kramer Dep. at 107, 110. Kramer said that it was just his "guess" that the provision could impact the viability of ranges. Ex. 17, Kramer Dep. at 111. Their opinion is not that a range could not be profitable given this regulation, only that it will lose potential income. *Id.* at 107. It is possible that the costs of keeping a range open after 8 p.m. may exceed the income generated. *Id.* at 108; Ex. 16, Giordano Dep. at 123.

### C. Sales of firearms at gun ranges: MCC § 8-20-100(a)

72. Section 8-20-100(a) provides that "except as authorized by section 2-84-075, no firearm may be sold, acquired or otherwise transferred within the city, except through inheritance of the firearm."

73. Dr. Philip J. Cook is the ITT/Sanford Professor of Public Policy, Professor of Economics and Sociology, and Senior Associate Dean of the Sanford School of Public Policy at Duke University. Ex. 40, Cook Expert Rpt. at 1. He has studied firearm violence since 1975 and has published scholarly books and articles on a number of related topics, including the economic costs of gun violence, the illicit markets for guns, the consequences of weapon choice in robbery and assault, the influence of gun availability on gun use in crime, the use of guns in self-defense, and the effectiveness of gun control regulations. Ex. 40, Cook Expert Rpt., Ex. A at 1. Dr. Cook opines that the City's ban on the sale of firearms within the City, MCC § 8-20-100, "plausibly serves to promote public safety, and in particular to reduce gun use in violence." Ex. 40, Cook Expert Rpt. at 1.

74. Gun violence is a serious public health and safety problem that has social and economic consequences. Ex. 40, Cook Expert Rpt. at 1. In Chicago, there were 506 homicides in

27

2012, of which 87% were by gun. *Id.* at 2. According to Dr. Cook, "[t]he type of weapon used by a perpetrator of violent crime is an important determinant of whether the victim is killed." *Id.* at 5. That is, "whether the victim of an assault or robbery dies is not just a reflection of the offender's intentions. The type of weapons used by the offender in an assault or robbery has a causal effect on whether the victim lives or dies. If the weapon used is a firearm, the victim is much more likely to die than if the weapon is a knife or club." *Id.* at 6.

75.     According to Dr. Cook, "[t]he likelihood that a gun will be used in a crime, and thereby render the crime more lethal than it otherwise would be, is closely linked to the general availability of guns and especially handguns." Ex. 40, Cook Expert Rpt. at 6. In Chicago, "the relatively low prevalence of gun ownership and the tradition of gun emphasis in policing have made guns quite scarce 'on the street.'" *Id.* at 9. There are therefore high transaction costs for guns in the underground market. *Id.* As a result, "with the exception of some gang members, most criminals in Chicago currently lack a gun and have difficulty obtaining one." *Id.* By rendering sales and transfers of guns illegal, "the Chicago ordinance helps to maintain these transaction costs, which in turn, it is reasonable to suppose, depresses possession rates by criminals." *Id.* Accordingly, Dr. Cook opines that "[i]t is reasonable to suppose that the ban on gun sales at shooting ranges, as part of the broader ban on sales and licensed gun dealers within city limits, will have an effect on gun use in crime." *Id.*

76.     Sergeant Johnson, through his work with CAGE, is aware of instances where guns have been stolen from ranges and stores, or there were crimes, injuries, or other harms associated with ranges and stores in other jurisdictions. Ex. 21, Johnson Dep. at 162-63. Johnson testified that gun stores and gun ranges serve as a backdrop for illegal transfers of guns through the use of straw

purchasers. *Id.* at 35-38. Every gun shop has the potential to be a participant–whether willing or unwilling–in straw purchasing. *Id.* at 43. Based on his experience, Johnson estimates that straw purchasing happens at a high percentage of gun shops in the Chicagoland area. *Id.* at 44.

77.     The City has an interest in preventing the theft of large numbers of firearms and their subsequent dissemination into the illegal gun market. Ex. 22, Def.'s Resp. to Pls.' Interrog. at 7. There have been several break-ins at gun ranges and shops in the Chicagoland area in the last couple of years. Ex. 21, Johnson Dep. at 52. Reducing the incentives to keep guns on site can reduce the number of guns that actually are kept on site, and reducing the number of guns that are kept on site can reduce the likelihood that a large number of guns could be stolen from a shooting range and enter the illegal market in Chicago. Ex. 21, Johnson Dep. at 163-64; Ex. 22, Def.'s Resp. to Pls.' Interrog. at 7.

78.     In December 2011, 33 firearms were stolen from Deb's Gun Range in Hammond, Indiana. Ex. 41, News Releases at CITY 0633. In February 2011, 26 firearms were stolen in a break-in at Freddie Bear Sports, a Tinley Park, Illinois gun store. *Id.* at CITY 00634-000685. In May 2010, at least 21 firearms were stolen from the Harvey, Illinois police range. *Id.* at CITY 000702. In February 2011, 15 firearms were stolen from a Michigan gun store. *Id.* at CITY 000697. In March 2010, 20 firearms were stolen from a Wisconsin gun store. *Id.* at CITY 000701. In February 2012, more than 80 firearms were stolen from an Ohio gun store. *Id.* at CITY 000686. In December 2011, 43 firearms were stolen from a Roanoke Rapids, North Carolina gun store. *Id.* at CITY 000687. In November 2011, 90 firearms were stolen from a Pennsylvania gun store. *Id.* at CITY 000688. In August 2011, 22 firearms were stolen from a Henderson, Nevada gun store. *Id.* at CITY 000689. In July 2011, 19 firearms were stolen from a gun store in Raleigh, North Carolina.

*Id.* at CITY 000692.  In July 2011, 27 firearms were stolen from the Fort Irwin Army Post in Fort Irwin, California.  *Id.* at CITY 000693.  In April 2011, firearms were stolen from a Kentucky gun store.  *Id.* at CITY 000694.  In March 2011, 12 firearms were stolen from a Florida gun store, the second time in 18 months the store had been burglarized.  *Id.* at CITY 000695.  In December 2010, 73 firearms were stolen from a North Carolina gun store.  *Id.* at CITY 000698.  In August 2010, 58 firearms were stolen from an Ohio gun store.  *Id.* at CITY 000699.  In November 2011, a total of 17 firearms were stolen from two Lincoln, Nebraska gun stores.  *Id.* at CITY 000704.

79.    There are business models for gun ranges that do not require the sale of firearms, including private clubs, university ranges, and ranges focusing on training, and these models can be successful.  Ex. 17, Kramer Dep. at 133; Ex. 16, Giordano Dep. at 152;  Ex. 6, Hart Dep. 3 at 58-59; Ex. 8, Pearson Dep. at 11.  Ranges can generate income through the sale of ammunition, targets, classes, instruction, gun cleaning equipment, sporting clothing, gun cases, other gun accessories, collection of brass and lead, and renting lanes for practice.  Ex. 17, Kramer Dep. at 135-36; Ex. 16, Giordano Dep. at 155; Ex. 6, Hart Dep. 3 at 65.  ISRA operates a gun range that does not sell ammunition or sell or rent firearms; it covers its costs through an annual fee to use the range.  Ex. 8, Pearson Dep. at 11-12.

80.    The City's restriction on gun sales and transfers at gun ranges does not prevent Ezell, Brown, and Hespen from using a gun range; they can use their own guns or rent one from the gun range.  Ex. 2, Ezell Dep. at 10, 12; Ex. 3, Brown Dep. at 37-38; Ex. 4, Hespen Dep. at 15.  Ezell, Brown, Hespen, SAF, and ISRA have no personal knowledge regarding the technical aspect of this provision.  Ex. 33, Stipulation.  According to Hart, it is possible to open a range without having guns for sale.  Ex. 6, Hart Dep. 3 at 61.  Hart is aware of two new ranges that do not sell firearms—a

private range in McHenry, Illinois, and a public range in Bellevue, Nebraska. *Id.* at 58-59. Hart does not personally know how the sale of firearms impacts the bottom line of a business; he has not done any evaluation or study of whether a range can be profitable without the sale of firearms. *Id.* at 63, 66. This provision does not impact the design, construction, or installation of a range and therefore does not impact how Hart does his job for Action Target. *Id.* at 67.

81.     Kramer and Giordano do not know what percentage of gun range revenue comes from firearms sales because they did not evaluate or study the issue. Ex. 17, Kramer Dep. at 135, 138; Ex. 16, Giordano Dep. at 151. Kramer "just doesn't know" about the profitability of a gun range without the sale of guns. Ex. 17, Kramer Dep. at 137-38. Giordano "really couldn't [say] what the impact [of the prohibition on gun sales] would be [from an economic standpoint]." Ex. 16, Giordano Dep. at 159-60. Giordano knows of a commercial outdoor range that does not sell firearms and instead generates income from ammunition sales and gun rentals. *Id.* at 153-54.

**D.     Range master presence: MCC § 4-151-100(b)**

82.     Section 4-151-100(b) provides that "A range master shall be on duty during all operating hours of shooting range facility. Prior to permitting anyone to discharge a firearm, the range master shall ensure that no person is in the direct fire zone." A "range master" is "the individual charged with the responsibility of insuring that the range activities adhere to all rules and regulations for the health and safety of persons at the shooting range." MCC § 4-151-010. A range master is responsible: "(1) for the operation and maintenance of the shooting range; (2) to inspect all firearms and ammunition for safe functions and operation; (2) to ensure all firearms and ammunition at the shooting range facility are stored in compliance with all applicable laws and rules and regulations; and (4) to ensure that no firearms or ammunition which cannot be safely discharged

in the shooting range due to the range's design and construction are not discharged in the shooting range." *Id.* § 4-151-160.

83.     Hespen, who is a range safety officer at the ISRA range in Bonfield, testified that "sometimes people don't read [the rules] and sometimes people will forget certain things." Ex. 4, Hespen Dep. at 18. Chris Hart testified that he prefers a qualified safety program to minimize risks to gun range patrons, and that "a qualified range master to supervise" would be essential. Ex. 5, Hart Dep. 1 at 76, 183. Ezell, Brown, Hespen, SAF, and ISRA have no personal knowledge regarding the technical aspect of this provision. Ex. 33, Stipulation.

84.     This provision does not make it impossible to open a range in Chicago. Ex. 16, Giordano Dep. at 134-35. It is proper for the City to require a range master to be present during times when there is live fire; Kramer, Giordano, and Hart only object to the required presence of a range master when there is no live fire, and their only concern is with the additional cost to a range owner. Ex. 17, Kramer Dep. 114-15; Ex. 16, Giordano Dep. at 128-29; Ex. 6, Hart Dep. 3 at 52-53. They do not know what this additional cost would be; they did not study the issue or discuss it with anyone. Ex. 17, Kramer Dep. at 116, 121; Ex. 16, Giordano Dep. at 132, 134; Ex. 6, Hart Dep. 3 at 53. If live fire occurs during the entire time the range is open, there would be no additional cost to the range for complying with this provision. Ex. 6, Hart Dep. 3 at 56. This provision does not affect the design, installation, or construction of a range. Ex. 17, Kramer Dep. at 114.

E.     **Range patrons cannot leave with ammunition purchased at range: MCC § 4-151-170(b)**

85.     Section 4-151-170(b) provides that "A licensee may sell ammunition to a shooting range patron only for use at the shooting range. The licensee shall ensure that no shooting range

patron leaves the shooting range facility with any ammunition purchased from the licensee." Patrons can store unused ammunition at the range. MCC § 4-151-175(a)-(b) (allowing for storage area and storage of patron ammunition and firearms); MCC § 13-96-1190(c)(1) (providing for storage areas at shooting ranges); Ex. 17, Kramer Dep. at 168.

86.     The City has an interest in preventing the theft of ammunition from gun ranges as well as the theft of ammunition from gun range patrons when they leave the range. Ex. 22, Def.'s Resp. to Pls.' Interrog. at 7. The prohibition on the sale of ammunition for use outside of a gun range addresses governmental concerns regarding public safety caused by the theft, robbery, or diversion of ammunition to those not legally allowed to possess weapons or ammunition. Ex. 21, Johnson Dep. at 107. As with guns, straw purchasers can pass ammunition to those not entitled to possess it, and there is the risk of the theft of ammunition from gun ranges and gun range patrons. *Id.* at 107-08.

87.     ISRA and SAF have not made any attempt to study, evaluate, analyze, or estimate the impact of this provision on the viability, income, or profit of a range in Chicago. Ex. 8, Pearson Dep. at 77-78; Ex. 7, Versnel Dep. at 56-57.

88.     Kramer and Giordano do not know what percentage of gun range revenue is typically generated by ammunition sales for use outside the gun range; they have not studied the issue and base their opinion on observation and comments from gun range owners. Ex. 17, Kramer Dep. at 162-63; Ex. 16, Giordano Dep. at 270-71. Kramer was "just spotting an issue which may affect revenue, but [he doesn't] know for sure if it will." Ex. 17, Kramer Dep. at 170.

**F.     Deleterious impact standard: MCC § 4-151-030(f)**

89.     Section 4-151-030(f) provides that:

The commissioner [of business affairs and consumer protection] may deny an application for a shooting range facility license if the issuance or renewal of such license would have a deleterious impact on the health, safety or welfare of the community in which the shooting range facility is or will be located. A deleterious impact is presumed to exist whenever there have been a substantial number of arrests within 500 feet of the applicant's premises (measured from the nearest exterior wall of the premises) within the previous two years, unless the applicant has adopted a plan of operation that will provide reasonable assurance that the issuance of the license will not have a deleterious impact. . .

90.     This provision allows the Commissioner of BACP to consider factors or conditions not apparent on the face of an application for a shooting range license but which would make a particular location undesirable for a shooting range, such as a substantial number of arrests within 500 feet of the proposed site. Ex. 22, Defs.' Resp. to Pls.' Interrog. at 5. Many businesses operating in Chicago are subject to a "deleterious impact" provision, including businesses that sell liquor and businesses that have public way use permits. Ex. 39, Krimbel Dep. at 126; MCC § 4-60-040 (liquor license); MCC § 10-28-015 (public way use permits); MCC § 4-156-600 (indoor special event license).

91.     Under Section 4-151-030(f), if the Commissioner finds that an application should be denied under this subsection, the Commissioner must "notify the applicant and afford the applicant 20 days in which to submit a plan of operation," in which the applicant can include "conditions upon the applicant's operation of the premises that are useful or necessary to mitigate a deleterious impact, including . . . providing security personnel, restricted hours of operation, providing outdoor lighting, the display of signs, or any other reasonable restriction." The final ruling on an application is stayed until 35 days after the period in which the plan may be submitted has passed. MCC § 4-151-030(f). This situation often arises with bars. Ex. 39, Krimbel Dep. at 128. Additionally, regarding the "presumption" of a deleterious impact based on a "substantial number of arrests," the presumption

can be rebutted by the applicant's adoption of a "plan of operation that will provide reasonable assurance that the issuance of the license will not have a deleterious impact." MCC § 4-151-030(f); Ex. 39, Krimbel Dep. at 134-35. Any exercise of discretion by the Commissioner regarding the "deleterious impact" provision of the Ordinance is subject to appellate review by a third-party hearing officer. Ex. 39, Krimbel Dep. at 120-21, 124.

92. This provision does not make it impossible to open a range in the City. Ex. 6, Hart Dep. 3 at 49; Ex. 17, Kramer Dep. at 91-92; Ex. 16, Giordano Dep. at 106. ISRA has not done anything to evaluate this provision or determine what impact, if any, it would have on the viability of a shooting range in Chicago. Ex. 8, Pearson Dep. at 58-59. Neither Kramer nor Giordano discussed this provision with potential business owners or financial institutions, studied the issue, or did any research regarding the issue. Ex. 16, Giordano Dep. at 110; Ex. 17, Kramer Dep. at 94-96. Kramer "do[esn't] know enough about lending institutions to draw a conclusion" as to whether it would be possible to find a business owner given this requirement. Ex. 17, Kramer Dep. at 94-95.

## VIII. Action Target's potential customers

93. No potential customer has said they would have signed a contract with Action Target but for the provisions in the case. Ex. 26, Hart Dep. 2 at 131; Ex. 6, Hart Dep. 3 at 141. The Ordinance has not prevented Action Target from pursuing business in Chicago. Ex. 26, Hart Dep. 2 at 150.

94. Action Target identified certain parties as potential clients for a range in Chicago, including Jonathan Gordon ("Gordon"), Paul Kuczmierczyk ("Kuczmierczyk"), Peter J. Negro ("Negro"), Andre Queen ("Queen"), and Deon Robuck ("Robuck"). Ex. 42, Action Target's Ans. to Def.'s Interrog. at 4-5. Gordon has no plans to open a range and is not looking into it; he has no

money to put into a gun range. Ex. 43, Gordon Dep. at 58-59, 61, 65. Kuczmierczyk formed Boomstick in 2010 for the purpose of starting a shooting range and to sell firearms in the Chicago metropolitan area, and he is its sole officer and employee. Ex. 44, Kuczmierczyk Dep. at 15, 37-38. Kuczmierczyk has not completed his business plan, which calls for a range costing $12 million, has not raised any capital, and has not made the range his first priority. *Id.* at 32, 51, 54-56.

95.     Negro is the Chief Operating Officer employed by the Illinois Medical District ("IMD") Commission, which was interested in constructing a range only for use by law enforcement agencies operating within IMD. Ex. 45, Negro Dep. at 9, 11-12. IMD has not built the range because the Commission re-prioritized its operations in light of the other cost concerns of the Commission. *Id.* at 59. Andre Queen is the founder and executive director of Fidelity Security and Investigative Services ("Fidelity"). Ex. 46, Queen Dep. at 5. Queen wants to retrofit the basement space of Fidelity's location for use as a firing range, *id.* at 12, but the proposed range would not be a "commercial" range; it would instead only be used as a part of the various training programs offered by Fidelity pursuant to its state license. *Id.* at 34-35.

96.     Robuck wants to open a "boutique-style indoor range" that has ten lanes. Ex. 27, Robuck Dep. at 5, 16. Robuck found a property that meets the zoning requirements, and he is negotiating with the property owners, who are not very receptive to leasing their property for a range. *Id.* at 9. Based on information from other ranges operating outside of the City, Robuck believes a range would be a profitable venture, despite the City's regulations. *Id.* at 29-30. The range project is currently on the back-burner because Robuck is working on other projects. *Id.* at 27-28.

Date: December 5, 2013

Respectfully submitted,

STEPHEN R. PATTON,
Corporation Counsel for the City of Chicago

By:    /s/ Mary Eileen Cunniff Wells
       Assistant Corporation Counsel

Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
Mary Eileen Cunniff Wells
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-6975 / 7129 / 4216

Attorneys for Defendant