# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RHONDA EZELL, JOSEPH I. BROWN,  )
WILLIAM HESPEN, ACTION TARGET, INC., )
SECOND AMENDMENT FOUNDATION, INC., )
and ILLINOIS STATE RIFLE ASSOCIATION, )
           )
      Plaintiffs,   )
           )  Case No.: 10 CV 5135
v.           )
           )
CITY OF CHICAGO,     )
           )
      Defendant.  )

## PLAINTIFFS' L.R. 56(a)(3) STATEMENT OF UNDISPUTED MATERIAL FACTS

NOW COME the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and through undersigned counsel, and, for their Local Rule 56(a)(3) Statement of Undisputed Facts in Support of their F.R.Civ.P. 56(a) Motion for Summary Judgment, states as follows:

1. Plaintiff Rhonda Ezell still has interstitial lung disease, lupus, and is still awaiting a kidney transplant.  She is still on dialysis (Ezell Dep. 7, ln.17 – 8, ln.4).  She recently visited a gun range outside the City because she received a notice that the convicted felon who had burglarized her home had been released, and she wanted shooting practice so she could protect herself if the felon came to her house (Ezell Dep. 10, ln.6 – 11, ln.16).  She would consider it a burden if the only places ranges were allowed to open were unsafe areas (Ezell Dep. 89, ln.1-15).

2. Plaintiff Joseph I. Brown would teach youth proper shooting and safety procedures in a youth class in the City if a range were available.  He teaches the Junior League Club from the American Legion range in Morton Grove.  Typically there are sixteen kids in a class, from ages 13 to 20 (Brown Dep. 33, ln.7 – 34 ln.23).

3.      Brown's interest in this legal action is having a range in Chicago that he can go to in order to practice shooting.  He is aware this lawsuit was filed in 2010, and that the Seventh Circuit held in summer 2011 that the City must allow firing ranges.  He is aware that right around that time shortly after the City changed its law to technically allow firing ranges.  To his knowledge, since that 7th Circuit Court decision in 2011, there are no public ranges in Chicago available to him.  It is still his interest to have a range to visit in Chicago. (Brown Dep. 45, ln.24 – 47, ln.17).

4.      Plaintiff William Hespen became a plaintiff in this lawsuit because he wishes to patronize a shooting range in Chicago.  It is his understanding that in 2011, a Court decision held that the City must allow firing ranges.  He is unaware of any place in the City that he, as a member of the public, can go in the City to go practice at a firing range (Hespen Dep. 91 ln.5-17).  If, due to the restrictions that are being challenged in the lawsuit, people don't build firing ranges, *ergo* there are no firing ranges for him to visit in Chicago, he would consider that a burden on him (Hespen Dep. 95, ln. 5-10).

5.      Richard Pearson is the Executive Director of the Plaintiff Illinois State Rifle Association (Pearson Dep. p.3, ln.15-16).  ISRA wishes to operate a range in Chicago, and is considering building one (Pearson Dep. p.23, ln.4-11).  They have discussed a business plan, but cannot go forward because of all the requirements (Pearson Dep. p.24, ln.13-17).  There are approximately 121,000 FOID cardholders in Chicago (Pearson Dep. p.30, ln.21-22).  ISRA is waiting to see if the ordinances are changed before deciding if it is worthwhile to pursue a range in Chicago (Pearson Dep. p.42, ln.16 – p.43, ln.3).

6.      Pearson looked at Section 4-151-030(f) and determined the Commissioner could capriciously shut down a shooting range after someone has put millions of dollars into it, and

that is not acceptable (Pearson Dep. p.59, ln.20-24). It appears anything could be a "deleterious impact" if one chooses to make it that way (Pearson Dep. p.60, ln.18-20). He is not aware of any other range in the country that has to comply with zoning requirements such as in Section 4-151-120 (Pearson Dep. p.75, ln.2-5). ISRA is not interested in building a range in Chicago at this time because (1.) the ordinances all drive up the cost; (2.) the Commissioner has discretion to decide what "deleterious impact" is and shut down the range, especially when the number of arrests can be in the discretion of the police department (Pearson Dep. p.94, ln.17 – p.95, ln.24).

7.      A sloped floor is more difficult to do, more dangerous on which to operate, and could cause the accumulation of burnt powder which could cause a dangerous condition. You can't use water on the range; you have to use a HEPA explosion proof vacuum cleaner to clean it. He is not aware of any ranges in the country with a sloped floor (Pearson Dep. p.82, ln.4-21). There is always unburnt powder, and if it accumulates then a spark could cause a flash fire, which would be a deleterious impact on safety (Pearson Dep. p.108, ln.22 – p.110, ln.2).

8.      Chris Hart is the Midwest Territory Manager and Range Consultant for Plaintiff Action Target, Inc. (Hart Dep. p.6, ln.14-17; p.7, ln.2-4).

9.      Acoustical treatments are porous materials that absorb and diffuse sound to keep it from being reflected back to the shooter (Hart Dep. p.17, ln.19-23).

10.      Several of Hart's customers have ranges that operate outside of 9:00AM to 8:00PM, and he has had conversations with customers that would like 24 hour ranges to accommodate off-duty law enforcement or graveyard-shift workers (Hart Dep. p.32, ln.18 - p.33, ln.3).

11.      The distance restrictions are burdensome because it seems like there is a listed use on every street, so he would not know where to search for a spot that meets all distance

requirements (Hart Dep. p.66, ln.13 - p.67, ln.10). There are probably some, but it would be very limited (Hart Dep. p.68, ln.10-12).

12.     The noise restriction is burdensome because the range has to be in a manufacturing zone which has no sound limits, and he has customers in light industrial areas where the decibels are 70-80 dB (Hart Dep. p.80, ln.13 - p.81, ln.12).

13.     The noise restriction can be complied with, but by singling out ranges the City is forcing much greater costs on the range. A quiet conversation is 55 decibels. Requiring that of a range requires much more expensive engineering, construction and design (Hart Dep. p.82, ln.14 - p.84, ln.9). This burdens Action Target because it burdens their customers (Hart Dep. p.99, ln.12-20).

14.     As to the sloped floor requirement, if there was a second floor range, the floor probably would not be thick enough to be able to slope as required. The cost of retrofitting a regular floor to a sloped floor would be very expensive because one has to remove the entire floor (Hart Dep. p.126, ln.19 - p.127, ln.4).

15.     The sloped floor requirement would increase the cost of the equipment because the bullet trap would be taller and there would be more ceiling baffle coverage (Hart Dep. p.179, ln.22 - p.181, ln.8). A sloped floor with a floor drain can cause an accumulation of gunpowder and when dry can explode when ignited, such as with a bullet strike (Hart Dep. p.261, ln.8 - p.262, ln.19).

16.     As for the customer not being able to leave with unused ammunition, the range owner's choices are to repackage and resell it, which is not recommended, or to dispose of it, which is a waste and could be hazardous (Hart Dep. p.269, ln.2 - p.270, ln.21).

17.     Since the Seventh Circuit's ruling in 2011, neither Action Target nor anyone else has built a commercial indoor range in Chicago, and if someone else had built one he would have heard about it very quickly (Hart Dep. p.282, ln.24 - p.283, ln.23).

18.     Julianne H. Versnel is the Director of Operations for Plaintiff Second Amendment Foundation (Versnel Dep. p.3, ln.17-18).  SAF has 1700-1800 members in Chicago (Versnel Dep. p.5, ln.6-9).  SAF still has an interest in providing education and training in Chicago (Versnel Dep. p.13, ln.19-23).  She is not aware of any other range in the country that has a prohibition for those under 18 years old (Versnel Dep. p.41, ln.10-13).  She is not aware of any other range that has a sloped floor, and knows of no benefit to doing so (Versnel Dep. p.73, ln.14-20).

19.     Jonathan Gordon is the director of office leasing for a commercial real estate firm (Gordon Dep. 16, ln.12 – 17, ln.5).  He thinks a gun range is a great idea.  He would love a high end shooting club in the City and would pay a lot to be a member or an investor.  But it apparently cannot happen in Chicago because the restrictions are tough, so he can shoot when he is in a foreign country or Wisconsin (Gordon Dep. 13, ln.20 – 14, ln.4).

20.     He called Action Target because he wanted to learn about Chicago's range rules, because he thought it could be a profitable idea (Gordon Dep. 28, ln.23 – 29 ln.14).  He talked to Chris Hart, who sent him the ordinance, and then he learned that the ordinance was so stringent one could never open a gun range, so he dropped it (Gordon Dep. 35, ln.1-8; 37, ln.11-21).  One cannot open a range in Chicago, as he understands it is really difficult to do.  So he is not going to put his time and money towards such a project (Gordon Dep. 44, ln.5-12).  He believes that if the laws were not so stringent a firing range could probably be a profitable venture (Gordon Dep. 66, ln. 1-6).

21.     Paul Kuzmierczyk is the president of Boomstick, Inc. (Kuzmiercyzk Dep. p.4, ln.20-24). He incorporated it for the purpose of building a shooting range and firearms retailer in Chicago (Kuzmiercyzk Dep. p.15, ln.12–15). Since he is the only officer and lives in Chicago, he cannot get an FFL, so he cannot complete a business plan to get pricing on the items he would like to sell. The FFL application requires one to testify they are not violating any laws, and since one cannot sell firearms in Chicago, he cannot truthfully complete the application (Kuzmierczyk Dep. p.17, ln.17 – p.18, ln.23).

22.     After incorporating, he went to the SHOT Show in Las Vegas to look at possible inventory and range equipment, as well as the SHOT University by the National Shooting Sports Foundation (Kuzmiercyzk Dep. p.19, ln.12 – p.20, ln.4). His main goal was to educate the public about firearms and their safe use and recreational opportunities (Kuzmiercyzk Dep. p.24, ln.14-18). He received a quote from Action Target for both a 10 lane stationary range and a 10 lane tactical range (Kuzmiercyzk Dep. pp.25-27). He wanted to put two stationary ranges and one tactical range under the same roof (Kuzmiercyzk Dep. p.28, ln.6-11). His rough estimate for building the range and for inventory was just under $12 million (Kuzmiercyzk Dep. p.32, ln.15-21). He stopped looking after he realized there were very few, if any, places that would fit within the distance requirements.

23.     Since he is a real estate broker, he was able to look at the MLS and look for industrial properties near where people live, and everything was too close to a restricted use. There were no vacant lots large enough for his project. He searched the North Side and found no properties that would meet the requirements (Kuzmiercyzk Dep. p.41, ln.1 – p.43, ln.17). He still wishes to open a range in Chicago pending the outcome of the lawsuit, meaning the location restrictions and certain other provisions (Kuzmiercyzk Dep. p.60, ln.22 – p.61, ln.17). He plans

to offer youth programs and education, and considers that a part of profitability of the business (Kuzmiercyzk Dep. p.66, ln.10 – p.68, ln.4).

24.     Lorin Kramer testified for Kramer One, Inc.  He holds an architect license in eleven states, beginning in 1991 (Kramer Dep. p.15, ln.15-24).  His firm specializes in shooting ranges, and he does the design of the ranges (Kramer Dep. p.17, ln.22-24).  His responsibility is to protect life and health of people inside the range, so he designs ranges to meet building and other Codes, and in such a way that people will not get sick or injured (Kramer Dep. p.33, ln.20 - 34, ln.4).  This means designing the facility so that people do not get hit with a projectile, and protecting people's hearing and protecting them from lead exposure, if any.  He also makes sure the equipment will last, and that the facility is useable by people (Kramer Dep. p.35, ln.4 - p.36, ln.2).  If a client wanted something unsafe, he would refuse the request (Kramer Dep. p.36, ln.21-24).

25.     He took an NRA range design class in 1991 to become a range team technical advisor—a volunteer to assist the NRA when someone asks it questions about constructing a range—and performed that function from 1991-2009 (Kramer Dep. p.39, ln.3-7; p.59, ln.1-7).  He has visited between 100 and 200 ranges, and has designed firing ranges in 28 states (Kramer Dep. p.294, ln.19 - p.295, ln.9).  He has designed approximately 50 firing ranges, both indoor and outdoor (Kramer Dep. p.40, ln.20 – p.41, ln.15).

26.     The cost of building a range would start at $3,000,000.00 and go up to $20,000,000.00 before it started getting fancy, with the low end being if one had an existing building with not much modification needed (Kramer Dep. p.297, ln.11 – p.298, ln.13).  He helped manage seven private outdoor shooting ranges for a Sportsman's Club in the 1980's (Kramer Dep. p.45, ln.11 – p.47, ln.24).  He also had responsibilities for budgets, and for

reviewing revenues and profits for the Club (Kramer Dep. p.48, ln.1-7).  He has been involved in whether a customer's chosen location is a good site for them from a business perspective, such a visibility or accessibility to customers (Kramer Dep. p.53, ln.22 – p.54, ln.).  He has also been involved in zoning issues for customers, sometimes alone and sometimes through their attorneys (Kramer Dep. 55-56).  He also provides cost estimates for ranges (Kramer Dep. 57).

27.     Kramer uses the NRA Range Sourcebook and NIOSH guidelines, plus if  he is building a range for the government it may have its own rules (Kramer Dep. 61-62).  He also consults with his employee Jack Giordano, and various consulting engineers for equipment questions (Kramer Dep. 62-63).  He has designed many ranges where Action Target has installed the equipment, since Action Target is the largest manufacturer of range equipment of range equipment in the United States (Kramer Dep. 63-64).

28.     Kramer has never seen regulations such as in this case outside of Chicago (Kramer Dep. 314).  Kramer would object to Section 4-151-030(b) if the people who were supplying money to the business were required to have a FOID card could not participate because they lived out of state and were prohibited from getting one (Kramer Dep. 87).  He also takes issue with Section 4-151-030(f) since it allows that after a range opens anything that happens that is detrimental to the neighborhood could be considered a deleterious impact and the range will be shut down (Kramer Dep. 88-89).  He would have no way to design a range to meet that standard, and if the Commissioner denies a license or renewal it will be impossible to operate the range, and this ordinance makes it economically infeasible to open a range (Kramer Dep. 90-92).  He would find it unlikely, to the point of near impossibility, that someone would lend money to a project that they do not know if it is going to be open for the duration of the loan (Kramer Dep. 95).

29.     Limiting the hours of operation of a range limits the owner's potential income (Kramer Dep. 106).  Most ranges expand or contract heir hours based on the market which can vary from one range to another (Kramer Dep. 109-110).

30.     It is unreasonable to require a range master to be on the premises when there is no shooting going on, as per Section 4-151-100(b), as there is additional needless expense to the range owner to pay a skilled range master to do nothing (Kramer Dep. 114-15).  This is required even if there are people only in the parking lot, because that is part of the "shooting range facility" (Kramer Dep. 120).

31.     Section 4-151-100(d) – It is common to exclude kids under 6 from ranges, because they may lick the floor.  It is common for ranges to sponsor youth shooting classes, through Boy Scouts or junior rifle clubs.  Further, because those under 18 cannot be on the premises, they cannot even clean the toilets or fill the soda machine or work in the parking lot.  They cannot wait in the lobby while their parents shoot (Kramer Dep. 123-124).  Not allowing minors to shoot would have an economic impact on the range (Kramer Dep. 125).  It might also be considered a deleterious impact (Kramer Dep. 128). See also Giordano Dep. 136-38, 144-45.

32.     Gun sales are an integral part of the business plan of indoor commercial ranges.  Range usage fees will hopefully get the range owner to break even.  A range needs sales to be profitable (Kramer Dep. p.131, ln.19 – p.132, ln.4).  The profit also comes from sales of ammunition, accessories and targets (Kramer Dep. 135-36).  He knows of no commercial shooting ranges that do not have firearms sales (Kramer Dep. 134).  The lack of firearms sales could make a range unprofitable (Kramer Dep. 139).

33.     In other jurisdictions, gun ranges are considered a commercial use, and an accessory to the attached gun store. Generally, they are placed in commercial zones where there

is retail traffic, instead of manufacturing zones, since they are not manufacturing anything (Kramer Dep. 143).  Manufacturing districts are also not usually on arterial streets with lots of traffic that would see the range's sign as it drives by (Kramer Dep. 144).  The impact on a range is if it is not profitable because few people can see it (Kramer Dep. 145).

34.     As for Section 4-151-170(b), there is no way for a range owner to control policing what ammunition has been brought in and what is leaving.  There is no practical way for a range owner to comply.  Also, there is the issue of what the range owner is supposed to do with the ammunition left behind (Kramer Dep. 159-60).  Ammunition sales are also very important for the financial health of the range (Kramer Dep. 161).  He has been told by range owners that ammunition sales are a significant part of a range's revenue (Kramer Dep 162).  From observation, more than 50% of ammunition purchased at a range is not for use at the range, but to be taken home.  He has made these observations for the purpose of determining layouts for designing ranges and their retail areas (Kramer Dep. 164-66).  He has never seen a range without retail ammunition sales (Kramer Dep. 167).

35.     For Section 13-96-1160(a), it makes no sense to compel side doors behind the firing line or doors behind the bullet trap system to be armored.  One cannot get an armored door that is also an acoustic door, so the ordinance requires a more expensive door in those locations that is less effective (Kramer Dep. 188).  It is also needless to force the wall behind the bullet trap to be penetration-proof, since it is protected by the bullet trap (Kramer Dep. 189).  An armored door is $6000.00-$9500.00 more than a regular door, and up to $5000.00 more than an acoustic door (Kramer Dep. 193).  A penetration proof wall is approximately $200.00 per linear foot (Kramer Dep. 196).  The ordinance also requires penetration-proof walls, ceilings and floors in locations where bullets would not be.  In certain spots, like in the back where the ventilation

system is placed, it is impossible to make that spot penetration-proof, although required by the ordinance (Kramer Dep. 201-02).  It would be impossible to open a range with this restriction if placing an armored door instead of an acoustic door causes the range to violate the noise restrictions (Kramer Dep. 206).  In areas Kramer does not know how one would do so in an existing building (Kramer Dep.72).

36.     Section 13-96-1190(c)(2)(d) – there is no point to forcing range owners to have hazardous materials storage facilities for firearms and ammunition, as neither are hazardous materials (Kramer Dep. 208).  The "H" occupancy storage in relation to the rest of the building is going to be difficult to impossible to accomplish under the ordinances (Kramer Dep. 210, 213).  A magazine is a box to place materials about which you are concerned about an explosion.  This has nothing to do with firearms, as they are inert (Kramer Dep. 216).  It would only be useful for ammunition if it were being manufactured on-site.  Absent that, no one to his knowledge has ever used a magazine for ammunition storage (Kramer Dep. 217).  The police and fire departments may make rules for the specifics of that storage, but they cannot invalidate the hazardous storage or magazine requirement (Kramer Dep. 226).

37.     Sections 13-96-1200(b)(2) and (b)(7) – In the industry, all materials that stop sound are porous and rarely smooth.  But one section says surfaces have to be smooth and non-porous, and another says they have to stop sound (Kramer Dep. 238, 241).  One cannot comply by making the surfaces smooth and non-porous and then placing sound-absorbing materials on top of them (Kramer Dep. 242).  Suspending acoustical material from the ceiling would still be considered part of the ceiling (Kramer Dep. 247).  He is not aware of any soundproofing materials that are also smooth and non-porous (Kramer Dep. 250).

38.     Section 13-96-1210(d) – requiring separate ventilation systems for each range, then there is two times the cost of ventilation, and ventilation is a large portion of the range's construction costs, at least 15-20%, and maybe double that for an existing building, depending on the structure and parameters of that building (Kramer Dep. 254-55, 257).  This could be $60,000.00-70,000.00 more (Kramer Dep. 257).  Due to the cost of ventilation systems, this could push construction costs beyond the level of economic feasibility (Kramer Dep. 259).

39.     Section 13-96-1210(e) – A power supply from simultaneous loading of all motors would be hard on the power grid, and could even cause a grid failure, which would be a deleterious impact (Kramer Dep. 263-64).  The solution is not interlocking the systems, but the ordinance requires it (Kramer Dep. 265).  He has heard from a firing range HVAC installer in this area about interlocking systems causing power failures (Kramer Dep. 269).

40.     Sections 13-96-1220(b) and (c) – In the 1970's the industry standard for cleaning range floors was wet clean with a hose and mop to a floor drain.  But uncombusted gunpowder would build up at the floor drain.  If a spark occurs near the floor drain, the floor would explode.  So in the 1980's and 1990's, the industry abandoned the wet clean method and now uses a HEPA dry vacuum for range cleaning (Kramer Dep. 273-75).  He will not sign architectural drawings for a range with a floor drain because it is dangerous (Kramer Dep. 275).  NIOSH and NRA do not recommend floor drains due to possible bullet ricochet (Kramer Dep. 276).  An architect should refuse to sign plans for a range with a floor drain, which means a range will not receive a building permit and get built (Kramer Dep. 279).

41.     Requiring a sloped floor makes no sense without a floor drain and is just added cost, in that an existing floor slab has to be cut up, a floor drain installed and run to the sanitary

sewer.  Cutting up a level floor to insert a sloped floor will cost approximately $20.00 per square foot (Kramer Dep. 284-85).

42.     The City's regulatory scheme makes it difficult to open a firing range in the City (Kramer Dep. 292).  In a city like Chicago where there are so many people and a new concealed carry law, where people are going to need training for permits, one would think people would want to open the first firing range as a profit-maker, yet no one has (Kramer Dep. 301).  To a reasonable degree of certainty, the better business plan would be not to build a range in Chicago, due to the sum total of the restrictive ordinances, and build the range somewhere else (Kramer Dep. 302, 325-26).  He is not aware of any location where crime increased as a result of a gun range in that location (Kramer Dep. 303-04). The noise from gun ranges would not disturb the peace and quiet of neighbors (Kramer Dep. 306).

43.     To a reasonable degree of certainty, a firing range can exist in the City without having a negative impact on public health (Kramer Dep. 308) or public safety, and can exist and have a positive impact on public safety (Kramer Dep. 209).  The same is true if the range is in a manufacturing zone or a commercial zone (Kramer Dep. 309-310).

44.     Jack Giordano testified for KramerOne, Inc.  Besides his education and experience, he was the eastern region supervisor for the NRA's Range Technical Team (Giordano Dep. 18-19).  He helped develop the NRA's certification program for range safety officers, and was with that team until December 2012 (Giordano Dep. 19, 48).  He has worked for Kramer One since 2001 as a shooting range safety and health specialist (Giordano Dep. 20).  He performs risk assessments and investigates problems at ranges to help the range owners, and he works with architects designing  ranges to make sure they are designed in a safe manner that is compliant with state or federal regulations (Giordano Dep. 21-22).

45.     The NRA's Range Sourcebook is considered by professionals in the industry as the standard for shooting range development and design (Giordano Dep. 50).

46.     All the opinions in the Kramer One report are his opinions (Giordano Dep. 74). He has experience with regulations and ordinances regarding shooting ranges, but nothing like what is in Chicago's ordinances (Giordano Dep. 85).  He doubts it would be a prudent business venture to build a shooting range in Chicago under the current regulatory scheme.  This is based on his experience, and is more than speculation (Giordano Dep. 86).  There are so many restrictions and obstacles, it is probably the compilation of issues that makes it undesirable to try and open a range in Chicago (Giordano Dep. 88).

47.     Section 4-151-030(f) – It would be difficult for a range operator to control what someone may define as "deleterious impact."  Given the ordinance's language, it would be difficult for someone to make a determination whether it is advisable to try and open a range when something not under his control could cause him to lose his license, after he has been approved, constructed the range, and begun to operate it (Giordano Dep. 100-101).  There are people who take offense at others using guns, even if it is legal and in a proper environment.  He has seen situations where people in the community protest ranges because they don't like them and the government has the discretion not to renew the license (Giordano Dep. 103-04).  This ordinance is high on the list of "dealbreaker" ordinances because a government employee could give in to the complaints of a community that does not like gun ranges and revoke a license. That may be enough to convince someone thinking of building a range to not build one (Giordano Dep. 283-84).

48.     Section 4-151-090 is objectionable because most ranges are allowed to set their own hours, and even if there are hours restrictions, they are for shooting, and not for retail

operations, which are very important to the success of a range. Even the hours restrictions on shooting are for outdoor ranges for noise purposes. There is no purpose for the hours restriction in this case except to negatively impact the range. (Giordano Dep. 116-17).

49.     Section 8-20-100 – The model for shooting ranges is a shooting area with a retail area. He has never been to a range that did not have a firing range with gun, ammunition and accessory sales. Typically a shooting range is a very expensive operation from a utility and construction standpoint, and the daily range operation covers the expenses, and the sales are from where the range's profit derives. The profit margin is even higher on ammunition than on firearms. The sales ban would greatly impact someone's decision whether or not to build a range in the City (Giordano Dep. 147-48). Even if the customer can rent a firearm, they still have to go somewhere else to buy it, which is an undue burden on a business that may give the opinion it is not worth it to open a range in a location with such an ordinance (Giordano Dep. 158).

50.     Section 17-9-120 – It would be hard for someone thinking about opening a for-profit range in Chicago to look at the ordinance and want to build the range in an industrial area. Adding in schools, daycares, libraries, museums, hospitals greatly limits the number of locations where a range could be located (Giordano Dep. 165-66). He has talked to business owners who were thinking of opening ranges in other locations determined it would be detrimental to open a range in an industrial area (Giordano Dep. 168-69). There is no other reason to require a range to be placed in a manufacturing zone when it does not manufacture anything other than punitive (Giordano Dep. 171).

51.     Section 11-4-260(b) – When there are two separate regulatory agencies making regulations or ordinances about the same topic, there sometimes are conflicts. Everything in the MCC is covered under federal regulation, including sound control through OSHA, air quality

and discharge of particulate matter and waste through EPA. IT may be burdensome on the range owner to try and comply with both sets of regulations (Giordano Dep. 176). Also, since the Code provides that the Commissioner may design the regulations, someone opening a range does not know what the regulations are going to be. So someone will not know with which regulations they have to be in compliance prior to opening a range (Giordano Dep. 177).

52. Section 13-96-1200(b)(2) – Other businesses in manufacturing zones have no sound restrictions. Restricting sound levels at a range when it is mandated to be in an area with businesses that have no such restrictions is a burden (Giordano Dep. 203-04). The range is being singled out and having a burden put on them the City clearly does not think is necessary for other businesses in manufacturing zones (Giordano Dep. 208-09).

53. Sections 13-96-1200(b)(2) & (7) – Giordano has never seen smooth, non-porous sound-absorbing materials (Giordano Dep. 215). If one cannot find a such a material, then compliance is impossible (Giordano Dep. 216).

54. Sections 13-96-1220(b), (c) – From a health and safety perspective floor drains are not recommended on indoor ranges. The industry standard is clear on that (Giordano Dep. 229). There is a danger of bullet ricochet (Giordano Dep. 231). Also, washing particulate into a floor drain leaves unburned gunpowder accumulating in the floor drain, which can ignite and cause a flash fire or explosion. Also, washing particulate down a drain causes environmental issues (Giordano Dep. 231-33).

55. Section 4-151-170(b) – the range owner is being forced to police the ammunition, by counting bullets as they come in and counting customer's bullets when they leave, and figuring out if they are leaving with the same ones they came in with. It would be almost impossible to do that on an active range (Giordano Dep. 264-65). Also, it will cost the range

owner income because people will not buy as much ammunition.  If he were thinking of opening

and running a range in the City, he would have a big problem with the manageability of this

restriction (Giordano Dep. at 265-66).  It is not advisable to bar people from bringing their own

ammunition to the range, it makes the range unprofitable (Giordano Dep. 268).  He would not

want to leave his ammunition somewhere else; he would want to take it home with him

(Giordano Dep. 272).

      56.    Blowing the local power grid could be considered a deleterious impact (Giordano

Dep. 287).

      57.    There are indoor ranges in commercial areas other than Chicago, and they are not

a blight or detriment on the surrounding community (Giordano Dep. 289).  None of the

ordinances, if removed, would cause an increase in crime around the range (Giordano Dep. 291-

92). Ammunition and firearms sales restrictions would be high on the list of deterrences to

building a range in Chicago (Giordano Dep. 297).

      58.    Rosemary Krimbel is the Commissioner of the of Business Affairs and Consumer

Protection for the City (Krimbel Dep. 8).  As of September 24, 2012, there were no applications

for a shooting range license.  She does not know why.  If someone had applied, she would have

heard about it (Krimbel Dep. 26-27).  If a shooting range applicant cannot get a location to put a

shooting range that would pass muster with the Zoning Department, they will not get past square

one with the Business Affairs Department (Krimbel Dep. 38).

      59.    As to 4-151-030(b)(6), when coupled with 4-151-040, anyone who works at a

shooting range facility, whether handling firearms or not, whether the employee only works

concessions, or mops the floor, or parks cars, must have a FOID card (Krimbel Dep. 64-66).  She

does not know of any other business in Chicago (except for taxicab drivers pre-Katrina) where one must be an Illinois resident to work there (Krimbel Dep. 69).

60. Krimbel is aware of a handful of businesses subject to hours-of-operation restrictions. Usually it is because of "impact on community and neighborhood as well as public health and safety" (Krinbel Dep. 143-44). While she presumes that since there are shooting ranges in other cities there must be laws in those places regarding those ranges, she has no knowledge with how those other ranges operate, or their hours of operation, or how they get along with their neighbors in their communities (Krimbel Dep. 145). Any opinion on the effect of hours of operation of a shooting range and its effect on the community would be a guess, because she has not seen any studies (Krimbel Dep. 146). All she can say is more crime happens at night and guns are used in crime, and that it would be a problem if a criminal knew they could mug someone walking out of a range with a gun (Krimbel Dep. 146). This is absolute speculation on her part (Krimbel Dep. 146). She is not aware of any other city where having a shooting range open past 8:00PM caused a negative impact on public health and safety in that city (Krimbel Dep. 149).

61. As for 4-151-100(d), Krimbel agrees no one under 18 can be a patron of, or shoot a firearm at, a Chicago shooting range (Krimbel Dep. 151). She believes it is so shooters do not have kids running around the range unsupervised, but believes the ordinance is inartfully drafted (Krimbel Dep. 151-52). She has friends who taught their kids to hunt around 14-15 years old, and her own son took a shooting class at age 12 (Krimbel Dep. 152).

62. Krimbel is not aware of any empirical evidence that justifies or provides a basis for any of the ordinances discussed (Krimbel Dep. 163-64).

63.     Robert Fahlstrom is the Manager of Regulatory Review of the City's Department of Buildings.  (Fahlstrom Dep. p.7).  He is the City's disclosed witness to explain the government purpose of, and basis for, MCC 13-96-1200(b)(7) which requires the ceiling, floors and walls of the shooting range surface to be of smooth non-porous materials (Fahlstrom Dep. p.16; MCC).  The Ordinance also requires the floor be sloped ¼ inch per foot from the firing line to the bullet trap (MCC).

64.     Fahlstrom had not been to an indoor shooting range since he was a little kid, and since January 1, 2010, did not visit either the public shooting ranges in the Chicago area, nor the City's own firing ranges (Fahlstrom Dep. 22-23).  Other than documents he review for the deposition, he has no knowledge of firing ranges except that firearms are used there (Fahlstrom Dep. 22).

65.     Fahlstrom stated the purpose of the sloped floor requirement in 13-96-1200(b)(7) is to allow for wet cleaning of the floor surface which is sloped to a floor drain to collect lead particulate (Fahlstrom Dep. 24).  He states the basis is architectural standards and documents he reviewed from the Department of Energy, a military handbook, and NIOSH (Fahlstrom Dep. 15, 25, 44).

66.     Facilitating the removal of lead is the reason for the other provision of 13-96-1200(b)(7), which requires smooth non-porous surface materials (Fahlstrom Dep. 33).

67.     Lieutenant Kevin Johnson works for the Chicago Police Department in the Bureau Patrol, Third District (Johnson Dep. 9). He is not aware of any firing ranges that do not have a gun store as part of the business (Johnson Dep. 33).  Any law enforcement incidents involving a gun store involve tracing a firearm used in a crime to its point of purchase (Johnson Dep. 34).  Sometimes criminals would lie about being at a firing range in order to concoct an

excuse of why their gun may have been "stolen" (Johnson Dep. 35-37). Sometimes criminals with clean records act as "straw purchasers" for criminals who are ineligible to buy firearms (Johnson Dep. 38). He is not aware of criminal liability under State law for a gun shop owner who sells to someone who turns out to be a straw purchaser (Johnson Dep. 42). When this happens, the blame is with the criminal straw purchaser; the problem is not with the gun store (Johnson Dep. 44). Johnson is not aware of any occasion where a gun store was closed down, or an owner arrested, for knowingly selling a firearm to a straw purchaser (Johnson Dep. 46). He has no experience or study regarding the operation of a firing range (Johnson Dep. 72). He believes training with a firearm by a lawful person is always good, and is always a benefit regardless of the purpose, and for public safety, it is better for the firearm owner to be trained than not trained (Johnson Dep. 86).

68.     As to Section 4-151-170(b), which prohibits the sale of ammunition except for use at the range, the governmental purpose is public safety, because if there is ammunition at the range someone may try to steal it (Johnson Dep. 106), or someone who does not use all their ammunition may take the remainder and sell or give it to a criminal (Johnson Dep. 107-08). He is not aware of any studies or data of this happening (Johnson Dep. 109). All concerns regarding ammunition and firing ranges are hypothetical and speculation (Johnson Dep. 111).

69.     Short of the range owner selling a patron a specific amount of ammunition, and then looking over the patron's shoulder to make sure he is shooting only that specific amount of ammunition, there is no way for a range owner to know if a patron is leaving with different ammunition than with which he entered (Johnson Dep. 114). He does not know how, in practice, how Section 170(b) would be enforced by the range owner (Johnson Dep. 133-34). He is opposed to a range providing ammunition because if a bullet leaves the range it could be used in

a crime (Johnson Dep. 118). Other than that, he is opposed to the idea of a firing range because people may bring ammunition there, and the transport of ammunition risks public safety if they are involved in a car accident, theft or robbery (Johnson Dep. 119-21).

70.     Johnson believes the existence of gun ranges and the presence of firearms and ammunition will increase the possibility of theft, robbery, burglary or harm to the public. He has no empirical data or studies or research to support this belief (Johnson Dep. 122). He has no empirical data or studies or research regarding ammunition used in a crime that was stolen from a firing range patron, nor is he aware of any real-world examples of this happening (Johnson Dep. 125). His concerns about potential harms from crime are the same whether the bullet was purchased at a firing range or a Wal-Mart (Johnson Dep. 125). His concerns about a range patron being robbed of ammunition is not with the person who bought the ammunition, but with the speculation about what may happen if that person is the victim of a crime (Johnson Dep. 126). Someone wishing to use a firearm for self-defense has a greater ability to do so if they also have bullets for the firearm (Johnson Dep. 126-27).

71.     Johnson cannot speak at all from a safety perspective as to what a range owner is expected to do with unused ammunition that a range patron is forced to leave behind (Johnson Dep. 127). He cannot speak to safety concerns of a range owners reselling or disposing of unused ammunition (Johnson Dep. 133). He said a governmental purpose of refusing to allow range patrons to leave with purchased ammunition is like golfers not leaving a driving range with a bucket of balls they rented, though they would be allowed to leave with them if they purchased the balls (Johnson Dep 129-131). He has no knowledge of the economics of a range selling ammunition (Johnson Dep. 133).

72.     As to MCC 4-151-120, the distance restrictions as to other businesses, Johnson is the City's disclosed witness as to crime and gun-violence related issues (Johnson Dep. 136).  The governmental purpose of keeping firing ranges 500 feet away from each other is "to prevent the possibility of theft, robbery, shooting incidents as a result of weapons being either stored or transported to or from such location."  (Johnson Dep. 137.)  Basically, his opinion is "double the ranges, double the risk" (Johnson Dep. 138).  The risk is the same if the two ranges are 500, 250 or 1000 feet apart; the distance between the ranges does not matter (Johnson Dep. 140-41).  He is not aware of any empirical data, studies or statistics if two ranges are located 500 feet from each other, or regarding the topic of proximity of ranges to each other at all (Johnson Dep. 141).  As to not allowing firing ranges within 500 feet of a residential zone, the government purpose is public safety, the speculation that there could be crime or theft or robbery, and because he believes the risk is due to the range's existence, is the same regardless of where the range is located (Johnson Dep. 146-48).  He is not aware of any empirical data that placing a firing range 500 feet from a residential area causes or results in crime, theft, robbery, or public hazards (Johnson Dep. 148).

73.     Johnson's answers will be the same with regard to Section 120(c) because of shootings in America (Johnson Dep. 148-49).  As to not allowing firing ranges within 500 feet of certain other location, the government purpose is also public safety, the speculation that there could be crime or theft or robbery (Johnson Dep. 149).  He is not aware of any empirical data that placing a firing range 500 feet from certain other locations causes or results in crime, theft, robbery, or public hazards (Johnson Dep. 149).  This is all his opinion and speculation of what might happen (Johnson Dep. 149).  Like the other restrictions, the risk is due to the range's existence, and the distances from other locations does not matter (Johnson Dep. 151, 153).  No

matter where one puts a firing range, the public safety concern would equally exist (Johnson Dep. 159). The construction or operation of the range is irrelevant to his public safety concerns (Johnson Dep. 154-155). It is all speculative (Johnson Dep. 160). He is not aware of any other cities that restrictions on the locations of firing ranges or on the sale of ammunition at a range (Johnson Dep. 155-56). He is unaware of any real world examples where the location of a firing range resulted in an increase of risk to public safety or a criminal act (Johnson Dep. 161).

74. Since Johnson's deposition, the distance restrictions have been moved to MCC 17-9-120A-C, though with the exception of firing ranges being allowed to locate within 100 feet of each other, the content remains the same (MCC 17-9-120A-C).

75. Patricia Scudiero is the City's Zoning Administrator and the Managing Deputy Commissioner for the Bureau of Planning and Zoning (Scudiero Dep. p.8, ln.4-6). She is the City's disclosed witness for the topics of "the bases for enacting 4-151-120 (limiting firing ranges to manufacturing districts) and "the number and dispositions of inquiries and/or requests regarding whether a potential location for a gun range complies with the zoning laws of Chicago." (Scudiero Dep. p.4, ln.20 – p.5, ln.3) Firing ranges are labeled "special uses," and a permit must be obtained from the Zoning Board of Appeals ("ZBA"). The ZBA's criteria for issuing the special use permit are subjective (Scudiero Dep. p.14, ln.5-16).

76. Shooting ranges are required in manufacturing district because they have guns and ammunition and transportation of both, which could be conceived as having an impact on health, safety and welfare of surrounding individuals. This makes ranges "high impact" (Scudiero Dep. p.22, ln.12-19). Scudiero has no empirical evidence that firing ranges actually have that effect. Neither she nor anyone from her Department has researched other cities about

how they zone gun ranges. She has ever gone to, investigated or researched gun ranges for zoning purposes (Scudiero Dep. p.23, ln.1-24).

77.     Since July 6, 2011, only approximately three or four inquiries (give or take a couple) have come in from people looking to open a firing range and asking about relevant zoning issues (Scudiero Dep. p.28, ln.22 - p.29, ln.16). The phone calls were from people asking if they could open a firing range at a specific address (Scudiero Dep. p.31, ln.8-12). All were told no because the addresses were either not in manufacturing districts or they were located in an area that would violate the distance requirements (Scudiero Dep. p.34, ln.2-18). Noone was told they had picked an acceptable location (Scudiero Dep. p.36, ln.1-8).

78.     The governmental purpose of Section 120(A) (prohibiting firing ranges within 500 feet of each other) is speculative and not based on any data (Scudiero Dep. p.40, ln.22 - p.42, ln.22; p.55). The governmental purpose of Section 120(B) (prohibiting firing ranges within 500 feet of residential zones) is likewise speculative and not based on any data (Scudiero Dep. 44-45, 55). The governmental purpose of Section 120(C) (prohibiting firing ranges within 500 feet of various listed locations) is also speculative and not based on any data (Scudiero Dep. 48-49, 55). Scudiero has not received any complaints about negative impacts on the community caused by the Chicago Police Department ranges or any other private shooting range in the City (Scudiero Dep. 60-61).

79.     Steven Valenziano is the Assistant Zoning Administrator for the Bureau of Planning and Zoning for the Department of Housing and Economic Development (Valenziano Dep. p.6). He is the City's witness as to "the available locations in the City to locate a gun range" (Valenziano Dep. 27). As of September 28, 2012, 3386 acres, or 2.2% of the City's 148,161 acres could be used for a range (Valenziano Dep. 42-43). If a use listed in Section

120(C) opened since then, it would remove available area for a firing range (Valenziano Dep. 45). The map testified to by Valenziano is attached.

80. Kevin Schnoes is the Assistant Commissioner of the Permitting and Inspections Unit of the City's Department of Public Health (Schnoes Dep. 5, 7). The 55 decibel requirement for businesses starts at 8:00PM. There is no business other than gun ranges where the 55 decibel limit starts before 8:00PM (Schnoes Dep. 23-24). The noise ordinance is enforced by the City's police department. (Schnoes Dep. 21).

81. If a business is within a manufacturing district, no noise restriction is enforced (Schnoes Dep. 27). Only if a shooting range in a manufacturing zone has a noise above 55 decibels as measured at the edge of a contiguous area after 8:00PM would anything potentially be enforced (Schnoes Dep. 29). 55 decibels is equivalent to a conversational level (Schnoes Dep. 32, ln.17-20). Schnoes is not familiar with the decibel level from a bullet fired from a regular semi-automatic handgun (Schnoes Dep. p.34, ln.16-19).

82. The governmental purpose of the noise ordinance is to keep the peace; it is not a safety or hearing damage issue (Schnoes Dep. 38, ln.9-24). He is not aware of any governmental purpose for making shooting ranges the only business subject to a noise restriction before 8:00PM, and he is not aware of a governmental purpose for making shooting ranges the only business in manufacturing zones subject to a noise restriction (Schnoes Dep. 44, ln.4-15).

83. He is not aware of any airborne and structure-borne sound absorbing materials that are also smooth and non-porous (Schnoes Dep. 35, ln.9-12).

84. The City's disclosed witness as to alleged justifications for the firearms sales ban, Philip Cook, has no education regarding firearms, firing ranges or gun stores. He has no training or experience with the operation or business of gun stores (Cook Dep. 8-9).

85.     Cook describes his opinions as "plausible." (Cook Dep. 19.)

86.     Cook is aware that the murder rate in Chicago varies widely across its various neighborhoods (Cook Dep. 29).  The neighborhoods that are poorer or have well-organized criminal gangs have higher violence rates.  And there is a relationship to race or ethnicity (Cook Dep. 30).  The neighborhoods that were high in violence 20 years ago are often the same ones having high violence rates today (Cook Dep. 30).  This is because the same factors still exist: lack of education, poverty and joblessness (Cook Dep. 30, 36-37).  In a 1996-1997 study, Chicago had the highest prevalence of gang membership (Cook Dep. 34).  While Chicago has a higher murder rate than other cities, qualitatively it is not different, since the same socioeconomic patterns of violence exist elsewhere (Cook Dep. 31).  Currently the murder rate is around three times the national average, and was also so during the crack epidemic from 1984 through the early 1990's (Cook Dep. 32).  He considers gangs and lack of education causative factors of violence (Cook Dep. 38).

87.     There are no cities other than Chicago that ban gun sales (Cook Dep. 33).  He is not aware of any other large city where gun sales at firing ranges specifically are banned (Cook Dep. 78).  Short of banning gun stores, there is federal legislation which the City and/or State could supplement.  There is also an emphasis on firearm crimes by the police (Cook Dep. 48-49).  To a large extent, although not universal, criminals obtain their guns from the informal or underground markets (Cook Dep. 54).  Chicago's firearms sales ban is not going to eliminate gun violence in Chicago, either now or at any point in the future (Cook Dep. 57).  He is not aware of any research that Chicago's gun sales ban has caused any reduction in crime in Chicago (Cook Dep. 58).  It is plausible or possible that if there were gun sales, crime would increase

(Cook Dep. 58).  He is not aware of any statistics regarding firearm sales from shooting ranges in any other city (Cook Dep. 71).

88.     Cook has cited one federal study which reported 100,000 defensive gun uses per year, while a different research study concluded the number was 2.5 million defensive gun uses per year (Cook Dep. 75-76).  It is reasonably possible that someone would purchase a firearm at a firing range, train with that firearm, and that firearm might someday save that person's life (Cook Dep. 76-77).

89.     He is not personally concluding that there should be a ban on gun sales in Chicago (Cook Dep. 79).  He is not opining that the solution to the high rate of minority-on-minority homicide is to ban law-abiding people from being able to purchase firearms for self-defense.  Nor is he opining that the solution is to ban law-abiding people from selling firearms to other law-abiding people for self-defense purposes (Cook Dep. 89-90).  His opinion is that the existence of firearms increases the possibility that criminal will get ahold of them and do bad things with them (Cook Dep. 83).  It is also a logical possibility that the person the criminal is choosing to victimize will be able to defend herself with a firearm purchased, and trained with, at a range (Cook Dep. 84-85).

90.     It is common sense that in neighborhoods with violence, people will be afraid and want to move, and that property value will decrease and it will put a drag on economic development (Cook Dep. 105-06).  All the social costs in Chicago caused by gun violence are under a regime that bans gun purchases in the City by law-abiding citizens (Cook Dep. 111-12).  The same factors that cause the high murder rate in Chicago also cause the social costs involved (Cook Dep. 114).  The availability of guns in a jurisdiction does not have an effect on the volume or the rate of robbery or assault.  Therefore, whether a perpetrator has a gun or not, the same

number of robberies and assaults are going to take place (Cook Dep. 134-35, 148).  The main difference would be the type of robbery, instead of robbing a gas station a criminal may target an old lady on the street (Cook Dep. 135).  An increase in gun ownership would have no effect on the number of assaults, robberies and rapes (Cook Dep. 178).  If gun purchases were allowed in the City, and if there is a one-for-one transfer rate of firearm purchases in the City, where people are buying the same guns they would otherwise have bought in the suburbs, it will not have an effect on crime (Cook Dep. 207).  The idea that corrupt FFLs in the City will sell to criminals is speculation (Cook Dep. 212).

91.     For all Cook's statistics about guns and alleged resulting violence, whether or not a firearm is purchased by a law-abiding person in the City or in the suburbs would have no effect on crime (Cook Dep. 160).  He is not saying that the possibility that a gun dealer may be corrupt is a reason to maintain the City's ban on gun sales (Cook Dep. 162-63).  He is not testifying that because there are criminals in the City who would like to get their hands on guns, and because there are a small percentage of FFLs that might not follow the law, that justifies banning gun sales to all the law-abiding people in the City (Cook Dep. 204-05).  The greatest impact on reducing Chicago's murder rate would come from investing more in policing, if the judiciary took gun crimes more seriously, and to invest in the future and try to get kids to stay in school and graduate (Cook Dep. 221).  It would be desirable to undermine the gangs, maybe by giving the kids an attractive alternative to joining (Cook Dep. 222).

92.     Cook's theory that gun stores are harmful is indistinguishable from his general objection to guns. (Cook Dep. 157-60, 203). Likewise, Cook cannot distinguish the harms from gun sales at gun ranges from gun sales at any other location. *Id.* at 209; see also 59; 159-61).  Cook has no data at all regarding gun sales from, specifically, gun ranges. (Cook Dep.  71).

93.     Cook's theory that gun stores, at ranges or otherwise, would lead to increased crime, or that such crime on balance would outweigh the benefits of gun ownership, is merely a matter of pure speculation. (Cook Dep. 84-85; 211-12). Cook did not even purport to conduct any cost-benefit analysis. (Cook Dep. 92). He did, however, testify that the city had options to reduce gun violence well-short of a gun sales ban. (Cook Dep. at 47, 62).

WHEREFORE, the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, request this Honorable Court to grant Plaintiffs' F.R.Civ.P. 56(a) Motion for Summary Judgment, as well as any and all further relief as this Court deems just and proper.

Dated: December 5, 2013                    Respectfully submitted,


                                        By:  _____/s/David G. Sigale_____
                                               David G. Sigale



Alan Gura (Admitted pro hac vice)        David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC                   Law Firm of David G. Sigale, P.C.
105 Oronoco Street, Suite 305            739 Roosevelt Road, Suite 304
Alexandria, VA 22314                     Glen Ellyn, IL 60137
703.835.9085/Fax 703.997.7665           630.452.4547/Fax 630.596.4445
alan@gurapossessky.com                   dsigale@sigalelaw.com

**CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING**

The undersigned certifies that:

      1.      On December 5, 2013, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

      2.      Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.

                                    /s/ David G. Sigale
                                      Attorney for Plaintiffs

Alan Gura (Admitted pro hac vice)     David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC              Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405   739 Roosevelt Road, Suite 304
Alexandria, VA 22314                 Glen Ellyn, IL 60137
703.835.9085/Fax 703.997.7665     630.452.4547/Fax 630.596.4445
alan@gurapossessky.com             dsigale@sigalelaw.com