Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 1 of 100 PageID #:4351

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                         1

```
 1           IN THE UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                  EASTERN DIVISION

 4   RHONDA EZELL; JOSEPH I.    )

 5   BROWN; WILLIAM HESPEN;     )

 6   AUCTION TARGET, INC.;      )

 7   SECOND AMENDMENT           )

 8   FOUNDATION, INC.;          )

 9   and ILLINOIS STATE RIFLE   )

10   ASSOCIATION,               )

11              Plaintiffs, )

12      vs.                     ) CASE NO. 10-CV-5135

13   CITY OF CHICAGO,           ) Judge Virginia Kendall

14              Defendant. )

15           The deposition of RHONDA MICHELLE EZELL,

16   called for examination, taken pursuant to the

17   Federal Rules of Civil Procedure of the United

18   States District Courts pertaining to the taking of

19   depositions, taken before CHERYL E. NICHOLSON, CSR

20   No. 084-001932, a Notary Public within and for the

21   County of DuPage, State of Illinois, and a

22   Certified Shorthand Reporter of said state, at

23   Suite 1230, 30 North LaSalle Street, Chicago,

24   Illinois, 60602, on the 5th day of June, A.D. 2012,
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 2 of 100 PageID #:4352

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                             2

```
 1   at 2:36 p.m.

 2   PRESENT:

 3         LAW FIRM OF DAVID G. SIGALE, P.C.

 4         (739 Roosevelt Road, Suite 304

 5         Glen Ellyn, Illinois 60137) by:

 6         MR. DAVID G. SIGALE

 7         Tel. 630.452.4547

 8         Fac. 630.596.4445

 9         dsigale@sigalelaw.com

10             appeared on behalf of the Plaintiffs;

11         CITY OF CHICAGO

12         DEPARTMENT OF LAW

13         CONSTITUTIONAL AND COMMERCIAL LITIGATION

14         (30 North LaSalle Street, Suite 1230

15         Chicago, Illinois 60602-2580) by:

16         MR. WILLIAM MACY AGUIAR

17         ASSISTANT CORPORATION COUNSEL

18         Tel. 312.744.4216

19         Fac. 312.742.3925

20         waguiar@cityofchicago.org

21             appeared on behalf of the Defendant.

22

23   REPORTED BY:  CHERYL E. NICHOLSON, C.S.R.

24             CERTIFICATE NO. 084-001932
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 3 of 100 PageID #:4353

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                             3

```
 1              (WHEREUPON, the witness was duly

 2                  sworn or affirmed.)

 3       THE WITNESS:  Yes.

 4                  RHONDA MICHELLE EZELL,

 5  called as a witness herein, having been first duly

 6  sworn or affirmed, was examined and testified as

 7  follows:

 8                  DIRECT EXAMINATION

 9  BY MR. AGUIAR:

10       Q.    I'd like to ask the witness to please

11  state your full name for the record.

12       A.    Rhonda Michelle Ezell.

13       Q.    Good afternoon, Ms. Ezell.  My name is

14  William Aguiar.  I am one of the lawyers

15  representing the City of Chicago in the case of

16  Ezell v. City of Chicago, No. 10-C-5135, which is

17  currently pending in the United States District

18  Court for the Northern District of Illinois.  This

19  deposition is being taken pursuant to Rule 30 of

20  the Federal Rules of Civil Procedure.

21                  Ms. Ezell, do you recall having given a

22  deposition in this case before?

23       A.    Yes.

24       Q.    Have you given another deposition,
```



1 | between that one and today's deposition?

2 |     A.    No.

3 |     Q.    Since it's been some time since we last

4 | met and talked in a -- in a deposition context, I'd

5 | like to go over a couple of ground rules for you

6 | for today's proceeding.

7 |     The first is that if you don't

8 | understand a question that I ask, please let me

9 | know.  I will do the best I can to rephrase the

10 | question in a manner that you do understand.  If

11 | you answer my question, I'm going to assume you've

12 | understood it as I've asked it.

13 |     And I'm going to ask that you also not

14 | nod or shake your head in response to any of my

15 | questions.  The court reporter can only take down

16 | verbal responses, so you must actually audibly

17 | answer my questions.

18 |     If at any time you need a break, by all

19 | means, let me know, and I'll do the best I can to

20 | accommodate that request.  I only ask that you not

21 | request a break while there's a question pending.

22 |   MR. AGUIAR:  And, for the record, I have the

23 | deposition beginning at 2:36.

24 |



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 5 of 100 PageID #:4355

RHONDA MICHELLE EZELL                                          June 05, 2012
EZELL vs. CITY OF CHICAGO                                                  5

```
 1   BY MR. AGUIAR:
 2        Q.    Ms. Ezell, did you speak with anyone
 3   here?
 4              Strike that.
 5              Did you speak with anybody about your
 6   testimony here today?
 7        A.    No.
 8        Q.    You didn't speak with anybody at all?
 9        A.    No.
10        Q.    Okay.  Did you look at any documents to
11   prepare yourself for your deposition?
12        A.    No.
13        Q.    I'd like to spend a few minutes
14   confirming with you certain facts which you
15   provided during your prior deposition in this case.
16   I'll do the best I can to make this quick for you.
17              Do you still live at 1002 East Marquette
18   in Chicago?
19        A.    Yes.
20        Q.    Are you still unmarried?
21        A.    Yes.
22        Q.    Does your son, Darrell Williams, Jr.,
23   still live with you?
24        A.    No.
```



1        Q.     Do you live alone now?

2        A.     Yes.

3        Q.     How long have you lived alone?

4        A.     Oh, I can't remember.

5        Q.     Would it have been in the past year that

6    you started living alone?

7        A.     Yes.

8        Q.     Okay.  Does your son live near you?

9        A.     No.

10       Q.     Okay.  Does your son still live in

11   Chicago?

12       A.     Yes.

13       Q.     Okay.  Do you still have a driver's

14   license?

15       A.     Yes.

16       Q.     And do you still own a 2000 Dodge Neon?

17       A.     Yes.

18       Q.     Okay.  And do you still drive that car?

19       A.     Yes.

20       Q.     How often do you drive your car?

21       A.     As far as -- ?

22       Q.     On a weekly basis.  Do you drive your

23   car on a daily basis?

24       A.     No.



1        Q.     Okay.  Do you drive it twice a week?

2        A.     A few times more.

3        Q.     Okay.  A few times a week, you drive

4    your car?

5        A.     Yes.

6        Q.     Okay.  Not every day?

7        A.     No.

8        Q.     Okay.  And last time we met, you were

9    not employed.  Are you still not employed?

10       A.     Yes, I'm not employed.

11       Q.     Okay.  And do you still receive

12   disability?

13       A.     Yes.

14       Q.     Okay.  And the next couple questions

15   might be a little difficult.  I'll make them as

16   quick as I can for you.

17              Do you still have interstitial lung

18   disease?

19       A.     Yes.

20       Q.     And are you still -- do you still have

21   lupus?

22       A.     Yes.

23       Q.     And are you still awaiting a kidney

24   transplant?



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 8 of 100 PageID #:4358

RHONDA MICHELLE EZELL                              June 05, 2012
EZELL vs. CITY OF CHICAGO                                        8

1       A.      Yes.

2       Q.      Okay.  And you're on dialysis,

3   currently, as well?

4       A.      Yes.

5       Q.      Okay.  And are you still receiving

6   treatment for these conditions at the University of

7   Chicago Medical Center?

8       A.      Yes.

9       Q.      Okay.  And, I believe, last time we

10  spoke, you said you go there almost daily.  Is that

11  correct?

12      A.      Then, yes.

13      Q.      Okay.  What about today?

14      A.      Not as much as I used to.

15      Q.      Okay.  How often do you go to the

16  University?  University of Chicago Medical Center,

17  for treatments.

18      A.      Whenever I have appointments with my

19  specialists.

20      Q.      Okay.  About, approximately, how often

21  are those appointments?

22      A.      Well, there are so many specialists, I

23  don't -- I can't say.  I have a lung specialist,

24  nephrologists and kidney doctors, and I just can't



 1  say.  Just whenever I have an appointment.

 2       Q.    If you could.  I'm just asking you.

 3  This is an approximation.  On average, how many

 4  doctors' appointments do you have a week, on

 5  average, would you say?

 6       A.    It could be anywhere from two to.

 7       Q.    Two to, as in how many?

 8       A.    Not every week.  That's why I'm saying,

 9  they're spaced out.

10       Q.    I understand.

11       A.    So, one to two --

12       Q.    Okay.

13       A.    -- it could be.

14       Q.    Okay.  And does your son still take you

15  to your doctors' appointments?

16       A.    Yes.

17       Q.    Okay.  Do you ever go by yourself?

18       A.    Yes.

19       Q.    Okay.  And how do you get to your

20  appointments by yourself?

21       A.    I drive my car.

22       Q.    Okay.  In your last deposition, you

23  testified that in order to obtain a Chicago

24  Firearms Permit, you went to Fidelity Training for



1   your four hours of classroom instruction, and then

2   you went to G.A.T. Guns in Dundee, Illinois, to

3   receive the one hour of range training.  Do you

4   recall that?

5        A.    Yes.

6        Q.    Okay.  Since that trip to G.A.T. Guns in

7   Dundee for that one hour of training, have you been

8   to a firing range?

9        A.    Yes.

10       Q.    Okay.  Which firing range have you been

11  to?

12       A.    I went to Chuck's.

13       Q.    Chuck's Guns?

14       A.    Yes.

15       Q.    Where is that located?

16       A.    It's like 132nd and Indiana.  I'm not

17  quite sure of the number.

18       Q.    Okay.  When did you go to Chuck's Guns?

19       A.    A month ago.

20       Q.    And did you go there to fire, to

21  practice with your firearm?

22       A.    Yes, I went to practice with my firearm.

23       Q.    Did you go for any other purpose besides

24  that purpose?



RHONDA MICHELLE EZELL
EZELL vs. CITY OF CHICAGO

June 05, 2012
11

1     MR. SIGALE:  I'll object as to form of the

2  question.

3  BY MR. AGUIAR:

4     Q.   Did you go for any other purpose besides

5  practicing with your firearm?

6     MR. SIGALE:  I'm still objecting to the

7  question.

8  BY MR. AGUIAR:

9     Q.   You may answer.

10     A.   No.  I went to practice with my firearm

11  because I was scared.  I got a notice from the VINE

12  Department, telling me that the convicted felon

13  that had burglarized my home got out of jail, and I

14  just wanted to go and get a little practice,

15  because if this guy come to my house, I would be

16  able to protect myself.  (Witness crying.)

17     Q.   You said you had a -- a notice from

18  somebody?

19     MR. SIGALE:  Are you all right?

20     THE WITNESS:  Yes, I'm fine.

21  BY THE WITNESS:

22     A.   A notice from VINE.  I don't know what

23  it stands for.  The "Victim" something.

24     MR. SIGALE:  It's an acronym.  I don't know



1   what it stands for, either.

2   BY MR. AGUIAR:

3        Q.    VINE, V-I-N-E?   Okay.   From the -- ?

4   Was it from the City of Chicago?

5        A.    I don't know if it was from the City or

6   the state.

7        Q.    Okay.

8        A.    But they're in charge of the

9   penitentiary or something.   I don't know.

10       Q.    Okay.   So you went to Chuck's Guns, a

11  month ago, to practice with your firearm.

12       A.    Yes.

13       MR. SIGALE:   Off the record?

14       MR. AGUIAR:   Sure.

15             (WHEREUPON, a discussion was had off

16              the record.)

17  BY MR. AGUIAR:

18       Q.    Did you practice only with your own

19  firearm?

20       A.    Yes.

21       Q.    Did you try any other firearms while you

22  were there?

23       A.    No.

24       Q.    Okay.   How long were you at Chuck's Guns



```
 1   for?

 2        A.    About an hour.

 3        Q.    Did you work with a -- a firearms

 4   trainer while you were there?

 5        A.    No.

 6        Q.    So you shot all by yourself?

 7        A.    Yes.

 8        Q.    Okay.  Do you recall what time of day

 9   you went?

10        A.    No, not actually.

11        Q.    Was it before 8:00 a.m.?

12        A.    No.

13        Q.    Was it after 9:00 p.m.?

14        A.    No.

15        Q.    Okay.  So it was between 8:00 a.m. and

16   9:00 p.m.?

17        A.    Yes.

18        Q.    Okay.  Do you recall what day of the

19   week you went on?

20        A.    No, I do not.

21        Q.    Okay.  Did you have any difficulties?

22              Strike that question.

23              Did you have to schedule time at Chuck's

24   Guns before going out there?
```



```
 1        A.    No, I did not.

 2        Q.    So you just went there and showed up and

 3   asked to shoot your firearm?

 4        A.    Yes.

 5        Q.    Okay.  Did you have any problems getting

 6   into Chuck's Guns to -- to shoot your firearm?

 7        MR. SIGALE:  I'm going to object as to form of

 8   the question.

 9   BY MR. AGUIAR:

10        Q.    Did you have to wait a period of time

11   before you were allowed to fire your firearm at

12   Chuck's?

13        A.    A little bit.

14        Q.    Okay.  About how long did you have to

15   wait for?

16        A.    I can't remember all those small

17   details.

18        Q.    Okay.  Was it an inconvenience, to have

19   to wait a little bit?

20        A.    It's not.  It wasn't a big

21   inconvenience.  If -- if you're going to wait,

22   you're going to wait.  If you're not, you're just

23   going to leave.

24        Q.    Okay.  But you didn't mind waiting a
```



1 | little while in order to get to practice with your
2 | firearm?
3 |      A.    No.
4 |      Q.    Okay.
5 |      A.    That day, no.
6 |      Q.    Okay.  Have you been to any other firing
7 | range besides Chuck's, that one month ago, between
8 | your trip to G.A.T. Guns and as you sit here today?
9 |      A.    No.
10 |     Q.    Okay.  So just that one time?
11 |     A.    Yes.
12 |     Q.    Okay.  Have there been any other
13 | occasions since your trip to G.A.T. Guns and today
14 | that you wanted to go to a firing range to
15 | practice, but you were not able to?
16 |     A.    I would say yes.
17 |     Q.    Okay.  What?  What?  What were the
18 | circumstance behind not being able to go to the
19 | range when you wanted to?
20 |     A.    Well, you have the transport.  You have
21 | the firearm transportation ordinance.  That's --
22 | that's a problem.  I can't just get up and go
23 | anywhere all the time when I want.
24 |     Q.    I guess I want to take a step back for a



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 16 of 100 PageID #:4366

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          16

1   second.  You said there were -- I asked you if

2   there were occasions that you wanted to go to a

3   range, but you were not able to, and you said yes.

4        A.    Mm-hm.

5        Q.    Do you recall when that was?

6        A.    No.  I just have thoughts of wanting to

7   go practice.

8        Q.    Okay.

9        A.    That's all.

10       Q.    Okay.  So, just general thoughts that

11  you want to go practice, but you don't go?

12       A.    Right.

13       Q.    Okay.  And you said you don't go because

14  of the firearms transportation ordinance and

15  because you can't just get up and go when you want

16  sometimes?

17       A.    Yes.

18       Q.    Okay.  What about the firearms

19  transportation ordinance prohibits you from going

20  to practice at a range?

21       A.    The fact that they want you to have it

22  broken down, and with them saying that you're

23  really not supposed to take the firearm out of your

24  house.  Then how could you get it to your car?



 1   It -- it's a lot of stuff.  That's just too much.

 2        Q.    Have you read the firearms

 3   transportation ordinance?

 4        A.    I have not read the initial ordinance,

 5   but I've seen something on the Internet.

 6        Q.    Okay.  Did you happen to print that up?

 7        A.    No.

 8        Q.    Okay.  What did you see on the Internet?

 9        A.    It was -- it's the City of Chicago thing

10   on their Web site.  I think they have, like, a lot

11   of do's and don'ts.  Or -- yeah.

12        Q.    So you saw something on the City of

13   Chicago's Web site?

14        A.    I'm not sure it came from there, but I'm

15   saying I've -- I've read a lot of literature, and I

16   can't keep up with everything I've read on what Web

17   page.

18        Q.    Okay.  But you saw something which made

19   you believe that it would be burdensome to

20   transport your firearm to a firing range?

21        A.    Yes.

22        Q.    Okay.  And what about the ordinance made

23   it burdensome for you?

24        A.    The fact that they want you to break



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 18 of 100 PageID #:4368

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          18

 1   down a firearm, pack it, lock it, get it to a place

 2   safe, where you can get it to the range safe,

 3   without it being any problems or issues.  That's a

 4   lot to go through, to -- to go practice.

 5       Q.    When you say "get it to a safe place,"

 6   what do you mean by that?

 7       A.    Transportating (sic) back and forth.

 8       Q.    Okay.  Um --

 9       A.    Like, from my house to the gun range and

10   to the range, all in a broken-down state, locked in

11   the case, locked in the bag.  That's just a lot of

12   extra stuff.

13       Q.    Okay.  But you did that on a month ago,

14   when you went to Chuck's Guns.

15       A.    No, I didn't do that.

16       Q.    You didn't do that?

17       A.    No.

18       Q.    Okay.  How did you transport your gun to

19   Chuck's?

20       A.    It was locked in the case, locked in a

21   bag, in the trunk of the car.

22       Q.    And what?  And you don't believe that

23   was compliant with the firearms transportation

24   ordinance?



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 19 of 100 PageID #:4369

RHONDA MICHELLE EZELL                                   June 05, 2012
EZELL vs. CITY OF CHICAGO                                        19

1        A.     According to the Illinois State Police

2    pamphlet, it was.

3        Q.     Okay.  So you didn't believe you were in

4    any way, shape or form violating the law when you

5    did that?

6        A.     At that time, I was scared for my life,

7    considering a convicted felon is out of jail.  I

8    wasn't thinking about that at the time.  I was

9    thinking about my life.

10       Q.     I understand.  I'm saying that you

11   didn't do this before, though, when you were

12   thinking of going to the range?  You wouldn't have

13   done this before?

14       A.     When?

15       Q.     When you -- you said your thoughts are

16   going to the range, but you won't, because of the

17   firearms transportation ordinance.  You wouldn't

18   have transported your firearm in this prior, in

19   this manner, would you have?

20       A.     In what manner?

21       Q.     Locked in -- locked in a case and locked

22   in the trunk of your car.

23       A.     Yes, I will have it locked in the case

24   and locked in a bag in the trunk.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 20 of 100 PageID #:4370

RHONDA MICHELLE EZELL                              June 05, 2012
EZELL vs. CITY OF CHICAGO                                     20

1      Q.    Okay.  Are you challenging the firearm
2   transportation ordinance in your case that's
3   currently pending in the court?
4      A.    Yes.
5      Q.    You are?
6      A.    This?  I'm sorry.  Are you talking about
7   the Ezell v. Chicago case?
8      Q.    Yes.
9      A.    I don't know.
10      Q.    Okay.  You don't know whether you are
11   challenging the firearms transportation ordinance
12   in your case or not?
13      A.    I'm not sure.
14      Q.    Okay.  You also said you can't get up
15   and go every time you want to go to the range,
16   right?
17      A.    Yes.
18      Q.    What do you mean by that?
19      A.    Sometimes I don't feel good.
20      Q.    Okay.
21      A.    Health issues.
22      Q.    Okay.  Anything else that keeps you from
23   going to the range?
24      A.    No.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 21 of 100 PageID #:4371

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          21

1       Q.      But when you feel healthy, you can go to

2   the range?

3       A.      If I choose to, maybe.

4       Q.      Yeah.   Okay.   Miss Ezell, have you ever

5   worked at a firing range?

6       A.      Excuse me?

7       Q.      Have you ever worked at a firing range?

8       A.      No.

9       Q.      So you've never operated or managed one,

10  either, then?

11      A.      No.

12      Q.      Do you have any experience in designing

13  firing ranges?

14      A.      No.

15      Q.      And do you have any experience in

16  constructing firing ranges?

17      A.      No.

18      Q.      Okay.   Are you aware that in July 2011,

19  the City of Chicago enacted ordinances -- an

20  ordinance allowing gun ranges to actually operate

21  in the City of Chicago?

22      A.      Yes.

23      Q.      Okay.   And are you also aware that on

24  September 2011, the City enacted a second



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 22 of 100 PageID #:4372

RHONDA MICHELLE EZELL                          June 05, 2012
EZELL vs. CITY OF CHICAGO                                    22

 1   ordinance, which modified certain provisions of

 2   that July 2011 ordinance?

 3       A.    Yes.

 4       Q.    Have you read either of those

 5   ordinances?

 6       A.    I have not.

 7       Q.    Okay.

 8       MR. AGUIAR:  I'll do Ezell 1.

 9                 (WHEREUPON, a certain document was

10                 marked Ezell Deposition Exhibit No.

11                 1 for identification as of 6/5/12.)

12   BY MR. AGUIAR:

13       Q.    Ms. Ezell, I am handing you what the

14   court reporter has marked for me as Ezell Exhibit

15   No. 1.  These are your answers to the City's second

16   set of interrogatories to you.  If you would,

17   please, turn to the last page of this document.

18   And is that your signature, above where it's typed

19   "RHONDA EZELL"?

20       A.    Yes.

21       Q.    Okay.  Have you seen this document

22   before?

23       A.    I have signed it.

24       Q.    If you would, go back to the front page.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 23 of 100 PageID #:4373

RHONDA MICHELLE EZELL                               June 05, 2012
EZELL vs. CITY OF CHICAGO                                      23

1    Have you -- have you seen this document before?

2    You can take a moment.  Look at it, if you'd like.

3    Take as much time as you'd like, actually.

4          A.    I've seen it.

5          Q.    Okay.  Did you read it before signing

6    it?

7          A.    I did not read word for word.

8          Q.    Okay.  Did you review it before signing

9    it?

10         A.    Yes.

11         Q.    How did you review it?  What did you do

12   to review it?

13         A.    Scanned through.

14         Q.    Okay.  But you didn't read it word for

15   word?

16         A.    No.

17         Q.    Okay.  If you would, turn to the fifth

18   page of the document, please.

19         MR. SIGALE:  Has that one got a "4" on it?

20         MR. AGUIAR:  Yes.

21   BY MR. AGUIAR:

22         Q.    There, you'll see what is the City's

23   Interrogatory No. 4, which reads, "Identify all

24   locations in Chicago to which it would be



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 24 of 100 PageID #:4374

RHONDA MICHELLE EZELL                            June 05, 2012
EZELL vs. CITY OF CHICAGO                              24

1  burdensome for any individual Plaintiff, or any

2  Chicago resident who is a member of any Corporate

3  Plaintiff, to travel for purposes of using a

4  firearms range operated at that location, and

5  describe the basis and nature of the burden."

6          And I'd like to ask you to, please, turn

7  to the next page.  And the first paragraph on this

8  page is the last paragraph of your answer to that

9  question, and I have a couple questions for you

10 about the answer that's typed up, here.

11          The first sentence of this last

12 paragraph reads, "Every location within the City

13 limits is burdensome, due to the City's firearms

14 transport Ordinance and restrictions on hours of

15 operation."  And as we've just discussed a second

16 ago, are you saying that the City's firearm

17 transportation ordinance is burdensome on your

18 ability to go to a firing range anywhere within the

19 City of Chicago?

20     A.    Yes.

21     Q.    Okay.  But you don't know whether your

22 case is actually challenging the firearms

23 transportation ordinance?

24     MR. SIGALE:  Asked and answered.



```
 1   BY MR. AGUIAR:

 2        Q.    You can answer.

 3        A.    I said, I wasn't sure.

 4        Q.    Okay.  I believe you testified that you

 5   do have a case for your firearm.  Is that correct?

 6        A.    Yes.

 7        Q.    Okay.  That case has a lock on it?

 8        A.    Yes.

 9        Q.    And your -- your -- the trunk of your

10   car has a lock on it, correct?

11        A.    Yes.

12        Q.    And you were able to successfully use

13   those locks in your trip to Chuck's Guns about a

14   month ago?

15        A.    Yes.

16        Q.    Okay.

17              The second half of that first sentence

18   talks about restrictions on hours of operation.

19   How does the City's ordinance regarding hours of

20   operation burden your ability to go to a range

21   anywhere in the City of Chicago?

22        MR. SIGALE:  Objection.  Speculation.

23   BY MR. AGUIAR:

24        Q.    Assuming the range were to open in the
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 26 of 100 PageID #:4376

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          26

 1   City of Chicago.

 2        A.     There are no ranges in Chicago.

 3        Q.     Well, you're saying that; your complaint

 4   says that the hours of operation which the

 5   ordinance provides is a burden on your Second

 6   Amendment rights to go to a range, making it

 7   impossible for ranges to open in the City of

 8   Chicago.  So, I'm trying to find out, how do the

 9   laws that are stated in the City's ordinance do

10   that?  How do they burden your rights?  How does it

11   make it hard for you to go to a range?

12        MR. SIGALE:  I'm going to object.  Well, I'm

13   going to object to mischaracterization of what

14   Interrogatory 4 asks.

15        MR. AGUIAR:  It says, "Identify all locations

16   in Chicago to which it would be burdensome for any

17   individual Plaintiff . . . to travel for purposes

18   of using a firearms range operated at that

19   location, and describe the basis and nature of the

20   burden."  The response says "restrictions on hours

21   of operation."  Clearly, the answer says that the

22   hours of operation poses a burden on her ability to

23   travel to a firearms range.

24

1   BY MR. AGUIAR:

2        Q.    What I'm trying to get at and trying to

3   understand is, how do the hours of operation that

4   the ordinance provides burden you and make it

5   impossible for you to travel to a firing range?

6        MR. SIGALE:   I'm just going to object as to

7   form of the question.

8   BY MR. AGUIAR:

9        Q.    You may answer.

10       A.    Because depending on whenever you want

11  to go, you should just be able to go when you get

12  ready.  Some people may want to go in the day, some

13  people may want to go in the evening, some people

14  may want to go at nighttime.  I don't know what a

15  set time would be for many people in the City of

16  Chicago.

17       Q.    The City's ordinance currently allows

18  ranges, should they open in the City, to be open

19  from the hours of 8:00 a.m. until 9:00 p.m., Monday

20  through Sunday, every day of the week.  What

21  additional hours do you believe would be necessary

22  for that provision not to burden your

23  constitutional rights to go to a firing range?

24       MR. SIGALE:   Objection.  It's a legal



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 28 of 100 PageID #:4378

RHONDA MICHELLE EZELL                                        June 05, 2012
EZELL vs. CITY OF CHICAGO                                            28

1    question.

2          MR. AGUIAR:  I'm asking her what she believes,

3    I'm not asking her what the law is.

4          MR. SIGALE:  Your question was --

5          MR. AGUIAR:  What do you believe?

6          MR. SIGALE:  -- is necessary in order to not

7    be a constitutional.  Once you ask that, it's a

8    legal question.

9          MR. AGUIAR:  No, it's not.  I respectfully

10   disagree.  I'm asking the witness what she is here

11   saying, that she believes her constitutional rights

12   have been violated.  The court will make the

13   determination if those rights have in fact been

14   violated.  I'm asking her what she believes is

15   necessary for the City not to violate her rights,

16   what her personal belief is, not what the law will

17   end up being, as decided by the courts.

18   BY MR. AGUIAR:

19        Q.    So, what hours of operation do you

20   believe are required in order to not violate your

21   constitutional rights?

22        MR. SIGALE:  Yeah.  That's a legal

23   objection --

24



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 29 of 100 PageID #:4379

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          29

```
 1   BY MR. AGUIAR:

 2        Q.    You may answer.

 3        MR. SIGALE:  -- as to calling for a legal

 4   conclusion.

 5   BY MR. AGUIAR:

 6        Q.    You may answer the question.

 7        A.    It should be 24 hours.  People go to the

 8   gym when they want.  People go to do laundry when

 9   they want.  People should have access whenever they

10   want to go.

11        Q.    So, you believe that ranges should be --

12   to not violate your constitutional rights, a range

13   should be open 24 hours?

14        MR. SIGALE:  Same.

15   BY THE WITNESS:

16        A.    I believe the range should be available

17   for when you want to go.

18   BY MR. AGUIAR:

19        Q.    When you went to Chuck's Guns about a

20   month ago, you went between the hours of 8:00 a.m.

21   and 9:00 p.m., you testified to, correct?

22        A.    I did.

23        Q.    Okay.  And that didn't cause you any

24   problems, to go between those hours, did it?
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 30 of 100 PageID #:4380

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          30

 1       MR. SIGALE:  Objection to relevance.

 2            You can go ahead and answer, though.

 3   BY THE WITNESS:

 4       A.   I wasn't at the time.  Not concerning

 5   about hours.  I was concerned about my life.

 6   BY MR. AGUIAR:

 7       Q.   But you were able to get there during

 8   those time periods?

 9       A.   I went that day, yes.

10       Q.   Okay.  Let me ask you.  Why do you

11   believe a range should be open 24 hours a day?

12       MR. SIGALE:  Objection.  Asked and answered.

13   BY THE WITNESS:

14       A.   I believe the range should be open just

15   so that people can go when they get ready.  Maybe

16   24 hours is -- I'm not really saying 24 hours in

17   the day, but longer hours, where people can go

18   various times of the day.

19   BY MR. AGUIAR:

20       Q.   And you believe that 8:00 a.m. to 9:00

21   p.m., seven days a week, is not enough time?

22       A.   No, I don't.

23       Q.   Okay.  So what additional hours would

24   you say are necessary?



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 31 of 100 PageID #:4381

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          31

```
 1          A.    I can't say that.

 2          Q.    Okay.

 3          A.    I'm not an expert at operating a gun

 4     range.

 5          Q.    Okay.

 6          A.    I just think it should be a longer time.

 7          Q.    Okay.  Are you aware of anybody who

 8     wants to go to a range, who would not be able to

 9     make it to a range between the hours of 8:00 a.m.

10     and 9:00 p.m., seven days a week?

11          A.    I can't say that I do or I don't.

12          Q.    I'm asking as you sit here today.

13          A.    Excuse me?

14          Q.    As you sit here today, are you aware of

15     anybody who would want to use a range, but who

16     would be unable to use it between the hours of 8:00

17     a.m. and 9:00 p.m., seven days a week?

18          A.    I can't answer that, because I don't

19     know what people, what time people wants to go to

20     the range.

21          Q.    I'm asking you, though, not -- I'm

22     asking you, as you sit here right now, do you know

23     anybody?  Can you think of anybody you know of, who

24     wants to go to a range, but cannot, because a range
```



1    would be open between 8:00 a.m. and 9:00 p.m.?

2         A.   I can't answer that, because I don't

3    know people's scheduling.  I can't tell you if I

4    know if this person wants to go at this time or

5    they can't make it because of this time.

6         Q.   Has anybody ever --

7         A.   I don't.

8         Q.   Has anybody ever expressed to you the

9    fact that they would not be able to go to a range

10   because it would only be open between 8:00 a.m. and

11   9:00 p.m., seven days a week?

12        A.   No one has expressed that, because I

13   haven't.  I don't know of a range is open seven

14   days a week or something like that.

15        Q.   But no one's ever said to you, "I would

16   love to go to a range, but those hours would just

17   be too restrictive for me," or something like that?

18        A.   Not at the moment.

19        Q.   Thank you.

20        Let's turn to the second sentence in

21   that paragraph, which reads, "Additionally,

22   presumably any location where a Plaintiff or

23   member, who would have to store his or her firearm

24   outside of the City limits, could not obtain



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 33 of 100 PageID #:4383

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                            33

1   private vehicular transportation with a lockable

2   trunk to a firearms range with an indoor attached

3   parking facility" -- I'm going to stop there; I'll

4   finish -- "and any location to which it is unsafe

5   to travel, would be burdensome."  I want to start

6   with the part where it says about "a

7   Plaintiff . . . who would have to store his or her

8   firearm outside of the City limits."  Why do you

9   say that a plaintiff member would have to store the

10   firearms outside of the City?

11       A.    Because the City don't have concealed

12   carry, and they don't really want you transporting

13   your firearm from out your house.  They say you

14   can't take your gun out of the house.

15       Q.    What does that have to do with getting a

16   firearm to a range to practice with it?

17       A.    That's the part where they keep saying,

18   you have to keep the gun in the house, in the

19   transportation portion of it.

20       Q.    I'm sorry.  I don't understand what

21   you're saying.  Here, you're saying that it's

22   burdensome because people have to store their

23   firearms outside of the City limits.  Is that what

24   you're saying there?



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 34 of 100 PageID #:4384

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          34

 1        A.    Right.

 2        Q.    Okay.  Why do you have to store your

 3   firearms outside of the City limits?

 4        A.    If your firearm is outside of the City

 5   limits, then you don't have to worry about the City

 6   ordinance; but if your firearm is at your home

 7   where you live in the City, then you have to go

 8   through all that other stuff.

 9        Q.    But this question presumes this goes to

10   ranges that would be open in the City.  So, what

11   you're saying is, someone would store their firearm

12   outside of the City, to transport it back into the

13   City?

14        A.    No.

15        Q.    Okay.  So, what are you saying there?  I

16   just don't understand the response to this

17   question.  I'm trying to get at what your point is,

18   here.

19        A.    Let's see.  That due to the City's

20   firearm transportation . . . .  That answer is not

21   for gun ranges in the City, because there isn't

22   any.  It was pertaining to outside the City.

23        Q.    Okay.  Because what No. 4, the question,

24   asks in the prior, on the previous page, "Identify



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 35 of 100 PageID #:4385

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                           35

1   all locations in Chicago" --

2        A.    Okay.

3        Q.    -- "to which it would be burdensome for

4   any individual Plaintiff . . . to use a firearm at

5   that location."  So, you're telling me that

6   sentence does not go to ranges that would operate

7   in the City, those are ranges that are outside of

8   the City?

9        A.    No.  It goes with this one as well.

10       Q.    How?

11       A.    It says, in the City of Chicago.  It's

12  all a burden because of the ordinance itself.

13       Q.    Which ordinance?

14       A.    The transportation ordinance.  That.

15  That ordinance.

16       Q.    Okay.  So, you're saying that this whole

17  thing, this whole part, revolves around the

18  transportation ordinance?

19       A.    Yes.

20       Q.    Okay.  Do you know whether the -- the

21  City's transportation ordinance mirrors the, or is

22  like the, state one?  Do you know whether the state

23  has a transportation ordinance?

24       A.    There's an Illinois State Police



```
 1   pamphlet.
 2        Q.    Do you know whether there's a state
 3   statute which governs transportation of firearms?
 4        A.    I don't know who governs what.
 5        Q.    You don't?  Do you know?  Honestly, do
 6   you know whether there's a state statute governing
 7   the transportation of firearms?
 8        A.    State laws?
 9        Q.    Yes.  In addition to the City's
10   ordinance.
11        A.    I believe so.
12        Q.    Okay.  Have you ever read the state
13   ordinance, the state statute?
14        A.    I have not read a statute.  I've only
15   read that pamphlet from the Illinois State Police.
16        Q.    Okay.  Do you have that pamphlet?
17        A.    No.
18        Q.    Okay.  So, what I'm trying to -- and I
19   don't mean to beat the dead horse, so to speak --
20   what I'm trying to understand is, our question was,
21   identify the locations in the City that it would be
22   burdensome to travel to, right?  And asks you to
23   identify the nature of the burden.  And you're
24   saying, every location is burdensome, and part of
```



1  this is because people would have to store their

2  firearms outside of the City?

3      A.    People have to break their firearms down

4  and put them in a locked case to travel with.

5  That's a --  Breaking down portion of firearms is

6  extra.  That's a burden, there --

7      Q.    Okay.

8      A.    -- is what I'm saying.

9      Q.    And you're saying that leads people to

10  store their firearms outside of the City?

11      A.    No, I'm not saying it --

12      Q.    Okay.

13      A.    -- that way.  I'm saying, the burden

14  within itself is the transportation ordinance that

15  says that you have to do these things with your

16  firearm, as far as breaking them down.

17      Q.    Okay.  And that's what you meant by that

18  section?

19      A.    Yes.

20      Q.    And that's all you meant?  Is that all

21  you meant?

22      MR. SIGALE:  Objection as to form of the

23  question.

24



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 38 of 100 PageID #:4388

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          38

 1   BY MR. AGUIAR:

 2       Q.    You may answer.  Did you mean anything

 3   else, besides what you just said?

 4       MR. SIGALE:  I'm going to object, still, to

 5   the form of the question.  Are you talking about

 6   that sentence, that one line, or are you talking

 7   about the whole answer?

 8       MR. AGUIAR:  Mm-hm.

 9   BY MR. AGUIAR:

10       Q.    That one line.  That one sentence.

11       A.    That one line?  Yes.

12       Q.    Okay.

13            Okay.  Are you aware that the City

14   permits residents to have or store as many firearms

15   as they wish at their residence, provided they are

16   registered, if only one is operable in the home at

17   a time?

18       A.    Yes.

19       Q.    Okay.  You say, also, that it's

20   burdensome to travel to any location to which it is

21   unsafe to travel.  How does the City's ordinance

22   require you to travel to locations that are unsafe?

23       MR. SIGALE:  Objection.  It mischaracterizes

24   the answer.  And speculative.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 39 of 100 PageID #:4389

RHONDA MICHELLE EZELL                                       June 05, 2012
EZELL vs. CITY OF CHICAGO                                         39

1        MR. AGUIAR:  Well, the nature is, you're

2   saying that the ordinance provisions at issue make

3   it impossible to open ranges in the City, thereby

4   burdening Ms. Ezell's constitutional rights, so --

5   and no range has opened up yet, so we have to get

6   at why she believes that is the case.  What about

7   the ordinance has done that?  I'm entitled to

8   explore why she believes the City's ordinance is

9   creating a problem for ranges to open up in the

10  City, thereby burdening her rights.  She has said

11  that any location -- that it is a burden to travel

12  to any location to which it is unsafe to travel.

13  BY MR. AGUIAR:

14       Q.    My question is, why do you believe the

15  ordinance creates this burden?  Why do you believe

16  the ordinance makes you travel to any location or

17  would make you travel to any location to which it's

18  unsafe to travel?

19       A.    Because the City really don't want you

20  to take your gun out the house.

21       Q.    Where is the ordinance going to make you

22  travel to that's unsafe?

23       A.    If you're trying to go to --

24       MR. SIGALE:  Objection as to speculation.



```
 1   BY MR. AGUIAR:

 2        Q.    You may answer.

 3        A.    If you're trying to go to a range to

 4   practice, and the City doesn't want you to take

 5   your firearm out the house, then it's -- it's a lot

 6   that you have to do that's going to make that

 7   travel unsafe.

 8        Q.    Okay.  But this talks about "any

 9   location to which it is unsafe to travel," which

10   says there's a location which you believe is unsafe

11   to travel to.  What I'm trying to understand is,

12   why you believe the ordinance is going to require

13   you to go somewhere, create a burden for you, to go

14   somewhere it's unsafe.  Why do you think that's the

15   case?

16        MR. SIGALE:  I'm going to object as to vague

17   and speculative and the form of the question.

18   BY MR. AGUIAR:

19        Q.    Okay.  You may answer.

20        MR. SIGALE:  If you under --

21             Do you understand the question?  If not,

22   don't answer.

23   BY THE WITNESS:

24        A.    I don't understand that question.
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 41 of 100 PageID #:4391

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          41

  1   BY MR. AGUIAR:

  2        Q.    Okay.  You are saying, here -- I have

  3   asked you, in Interrogatory No. 4, to identify all

  4   locations in Chicago to which it would be

  5   burdensome for you to travel for purposes of using

  6   a firearms range operated at that location based in

  7   Chicago, and I ask you to describe the nature and

  8   basis of the burden.  You have said that "Every

  9   location within the City limits is burdensome,"

 10   first.  And then you said, "Additionally,

 11   presumably, any location where a Plaintiff or

 12   member, who would have to store his or her firearm

 13   outside of the City limits, could not obtain

 14   vehicular transportation with a lockable trunk to a

 15   firearms range with an indoor attached facility,

 16   and any location to which it is unsafe to travel,

 17   would be burdensome."  You are asserting in your

 18   answer that it is burdensome to travel to a

 19   location that is unsafe.  What I want to know is

 20   why you believe the ordinance is going to require

 21   you to go somewhere that is unsafe.

 22        MR. SIGALE:  I'm going to object as to

 23   speculation.

 24        MR. AGUIAR:  It's her answer.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 42 of 100 PageID #:4392

RHONDA MICHELLE EZELL                                June 05, 2012
EZELL vs. CITY OF CHICAGO                                      42

1        MR. SIGALE:   The form of the question.

2    BY MR. AGUIAR:

3        Q.    You may answer the question.

4        A.    I'm saying, it's unsafe to travel

5    because they don't want you to take your gun out

6    the house.  We have to do all these extra things to

7    break it down, get transportation, get there, back

8    and forth.

9        Q.    So, you're not -- correct me if I'm

10   wrong, then -- you're not saying in this answer,

11   then, that the ordinance is requiring you to go

12   somewhere to a particular place that's unsafe; it's

13   the whole process that you believe is unsafe?

14       A.    Yes, the process of the ordinance

15       Q.    Of breaking down your gun, putting it in

16   a case, and then putting it in your car and going

17   somewhere?  That process, you believe, is unsafe?

18       A.    (No response.)

19       Q.    Let me ask you this.  Are you asserting,

20   here, that the ordinance is making you go to an

21   unsafe place, an unsafe location, geographic spot?

22   Is that your assertion here?

23       A.    No, not that the ordinance is making me

24   go to an unsafe place.  It's unsafe to travel with



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 43 of 100 PageID #:4393

RHONDA MICHELLE EZELL                                        June 05, 2012
EZELL vs. CITY OF CHICAGO                                              43

1   your firearm, because the City says, keep it in the

2   house.

3        Q.    Okay.   Okay.   Let's look at No. 5, which

4   is on that same page.   In Interrogatory No. 5, you

5   say, "Identify all locations in Chicago to which

6   any individual Plaintiff, or any Chicago resident

7   who is a member of any Corporate Plaintiff, would

8   be unable to travel for purposes of using a

9   firearms range operated at that location, and

10   describe why that individual would be unable to

11   travel to that location."

12           Now, on the next page, if you flip the

13   page, in the second paragraph on this page is the

14   answer, the part of your answer that I'd like to

15   ask a couple questions about.   And, there, the

16   first sentence says, "Every location within the

17   City limits is impossible to access, due to the

18   City's firearms transport Ordinance, unless

19   Plaintiff stores his firearm outside of the City

20   limits, obtains private vehicular transportation

21   with a lockable trunk to a firearms range with an

22   indoor attached parking facility."

23           Again, so, what you're saying here is,

24   any spot in the City of Chicago would be impossible



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 44 of 100 PageID #:4394

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                            44

1   to access because of the City's transportation

2   ordinance?

3       A.    Yes.

4       Q.    Okay.   There's nowhere in the City you

5   can go at all because of the ordinance?

6       MR. SIGALE:   Objection.   Mischaracterizes the

7   answer and mischaracterizes testimony.

8       MR. AGUIAR:   I'm asking her a brand-new

9   question.

10  BY MR. AGUIAR:

11      Q.    There is nowhere in the City of Chicago

12  that you can go because of the transportation

13  ordinance?

14      A.    There isn't a range in Chicago.

15      Q.    And that's the nature of your case.

16  You're bringing a claim, saying that the ordinance

17  prohibits ranges from opening in the City of

18  Chicago.   And we're trying to get at why you

19  believe that that is so, and how that burdens --

20  how you believe that burdens your rights.   And the

21  question was, again, identify any location where

22  you'd be unable to travel for purposes of using a

23  firearms range, okay?   And you're saying, every

24  location is impossible to travel to because of the



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 45 of 100 PageID #:4395

RHONDA MICHELLE EZELL                          June 05, 2012
EZELL vs. CITY OF CHICAGO                              45

 1   transportation ordinance.  So --

 2       MR. SIGALE:  Objection.  Mischaracterization

 3   of the testimony, of the interrogatory answer.

 4   BY MR. AGUIAR:

 5       Q.   You may answer my question.

 6       MR. SIGALE:  The question is objected to on

 7   the form of the question.

 8       MR. AGUIAR:  I got that.

 9   BY MR. AGUIAR:

10       Q.   You may answer the question.

11       A.   Yes.

12       Q.   And, then, again, in the second line,

13   there, you say --

14            Well, let me back up for a second.

15            You say every location within the City's

16   limits is impossible to access, due to the City's

17   firearms transport ordinance, unless plaintiff

18   stores his firearm outside of the City limits.

19   And, again, this question goes to locations within

20   the City that you can't get to, or you wouldn't be

21   able to go to, because of the ordinance.  So, here,

22   you're saying that if you stored it outside the

23   City, you'd have a -- you'd be able to then go to a

24   range in the City; is that correct?



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 46 of 100 PageID #:4396

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          46

1      A.    It's the same.  I'm speaking of the

2   ordinance where you have to break down the firearms

3   in the City because they don't want you to take

4   them outside.

5      Q.    Okay.  But your answer seems to imply

6   that what you're saying, what you're saying --

7   correct me if I'm wrong, but what I see as what

8   you're saying, here, is, you can't go to any range,

9   any location within the City of Chicago that a

10  range may be, because of the City's transportation

11  ordinance, but that if you store a firearm outside

12  of the City, then you could go to a range in the

13  City.  Is that what you're saying, here, in the

14  first sentence?

15     A.    According to the ordinance, the City

16  doesn't want you taking your firearm outside your

17  home.

18     Q.    You believe that your -- you believe the

19  City's ordinance does not allow you to take your

20  firearm outside of your home?

21     A.    They said it's supposed to stay in your

22  home.

23     Q.    Again, I want to go back to this answer,

24  because you have that line, ". . . unless



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 47 of 100 PageID #:4397

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                             47

1   Plaintiff . . . stores his firearm outside of the

2   City limits."  I want to know why you believe that

3   somehow alleviates the burden that you would

4   otherwise have, by going to a range in the City of

5   Chicago.

6        A.    The City ordinance requires you to keep

7   your gun at home.  If a gun is stored outside the

8   City, you're outside the City limits, you don't

9   have to abide by the City rules.

10       Q.    But if you're going to be going to a

11  range within the City, you would be traveling

12  within -- to the City, and would presumably come

13  under the City's ordinance.

14       A.    The ordinance may change or something --

15       MR. SIGALE:  Objection.

16  BY THE WITNESS:

17       A.    -- if there's a range in the City.

18  BY MR. AGUIAR:

19       Q.    The ordinance may change?

20       A.    I don't know.  I'm saying, if there was

21  a range in the City of Chicago --

22       Q.    Okay.

23       A.    -- then I'm quite sure there wouldn't be

24  all those extra stuff to do.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 48 of 100 PageID #:4398

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          48

1       Q.      Why do you think that?

2       A.      Because it would be law.

3       Q.      When you say it would be law, what do

4   you mean?

5       A.      If a range opened, I'm quite sure they

6   will make laws where you travel back and forth that

7   are not as heavy as these, the ones are.

8       Q.      And what's your basis for saying that

9   there would be laws made like that?

10      A.      Because there's not one open yet.

11      Q.      Who would make these laws?

12      A.      Congress.  I don't know.

13      Q.      But you believe there would be laws

14  made?

15      A.      Yes.

16      Q.      Okay.  That's just your personal belief?

17      A.      Yes.

18      Q.      It says -- the last sentence of that

19  answer says -- "Further, health issues may limit

20  Plaintiff's ability to travel to certain

21  locations."  What locations wouldn't you be able to

22  travel to within the City to go to a firing range?

23      MR. SIGALE:  Objection.  Speculative.

24



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 49 of 100 PageID #:4399

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                            49

1    BY MR. AGUIAR:

2         Q.    She may answer the question.

3         A.    Depends on how far it is.

4         Q.    How far is too far for you to travel?

5         A.    I don't know the City dynamics or

6    numbers.

7         Q.    How many miles would it be too far for

8    you to travel?

9         MR. SIGALE:    Objection.    Speculation.

10   Foundation.

11        MR. AGUIAR:    I'm going to address your

12   objection, Mr. Sigale.    Your client is saying that

13   the City's ordinances are burdening her right to go

14   to a range because they make ranges impossible to

15   go to in the City.    I'm entitled to know how that

16   burden plays out.    How far is the -- she's saying,

17   for example, the zoning laws make it impossible for

18   ranges to locate throughout the City, making it

19   hard for her to get to a range.    I'm entitled to

20   know, How far is too far?, so it's not speculation.

21        MR. SIGALE:    It's very speculation.

22        MR. AGUIAR:    Well, it isn't.

23        MR. SIGALE:    We don't know the locations.    We

24   don't know the health issues.



1      MR. AGUIAR:  Well, because you're saying that

2   they can't open because of the ordinance.  That's

3   why.

4      MR. SIGALE:  Well, no.  I'm also saying it

5   because when I say it, when Ms. Ezell says, in the

6   answer, health issues may limit, we don't know what

7   health issues, we don't know what day, so we don't

8   know the extent of the health issues on that day,

9   we don't know the location we're talking about, we

10  don't know about rush hour or anything like that,

11  so there's --

12      MR. AGUIAR:  Okay.

13      MR. SIGALE:  -- a thousand variables that are

14  left open in your question, so that I get the right

15  to say speculative.

16      MR. AGUIAR:  I'm just addressing your

17  objection --

18      MR. SIGALE:  That's fine.

19      MR. AGUIAR:  -- for the record.

20      MR. SIGALE:  That's fine.

21  BY MR. AGUIAR:

22      Q.   Ms. Ezell --

23      MR. SIGALE:  So, now that we've done all

24  that . . . .



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 51 of 100 PageID #:4401

RHONDA MICHELLE EZELL           June 05, 2012
EZELL vs. CITY OF CHICAGO           51

1  BY MR. AGUIAR:

2     Q.   Ms. Ezell, you say, quote, "Further,

3  health issues may limit Plaintiff's ability to

4  travel to certain locations."  Would you tell me

5  what health issues that you're talking about there.

6     A.   Health issues?

7     Q.   Yes.  You say health issues may limit

8  your ability to travel to certain locations.  What

9  health issues may limit your ability to travel to

10  certain locations?

11     A.   My health issues as far as my lung

12  diseases, my kidney failure, my lupus and muscle

13  disease.

14     Q.   Anything else?

15     A.   Dialysis treatments.

16     Q.   All right.  You say they may limit.  So,

17  they could possibly limit your ability to travel?

18     A.   Yes.

19     Q.   Will they definitely limit your ability

20  to travel?

21     MR. SIGALE:  Objection.  Speculative.

22     MR. AGUIAR:  I'm asking her if they.  She says

23  they may.  I'm trying to understand what she means

24  by it may, here.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 52 of 100 PageID #:4402

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                         52

```
 1   BY THE WITNESS:

 2        A.    Some days, I fee good.  Some days, I

 3   don't.

 4   BY MR. AGUIAR:

 5        Q.    So that some days, you could go to a

 6   range?

 7        A.    If I'm healthy.

 8        Q.    You said that it "may limit" your

 9   "ability to travel to certain locations."  What did

10   you mean by certain locations?

11        A.    Certain locations could be anywhere,

12   because I don't know where the range is or where

13   would one be put in the City of Chicago.

14        Q.    Okay.  I'm going to ask you to assume

15   that one opens a mile from your home.  Would

16   that -- would you be able to go to that location?

17        A.    Yes.

18        Q.    How about five miles from your home?

19        MR. SIGALE:  Are we assuming that she -- this

20   is a day she feels good?  Is that the unspoken part

21   of your question?

22        MR. AGUIAR:  Yes, David.

23   BY THE WITNESS:

24        A.    If I'm feeling good, then, yes, if it's
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 53 of 100 PageID #:4403

RHONDA MICHELLE EZELL                                         June 05, 2012
EZELL vs. CITY OF CHICAGO                                              53

1 | within five miles.

2 | BY MR. AGUIAR:

3 |      Q.    How about ten miles?

4 |      MR. SIGALE:  Objection as to speculative.

5 | BY THE WITNESS:

6 |      A.    If I'm feeling good, yes.

7 | BY MR. AGUIAR:

8 |      Q.    Okay.  Are you aware of any location in

9 | the City of Chicago that you would not be able to

10 | travel to on a day that you feel good to go fire

11 | your firearm at a range?

12 |      MR. SIGALE:  Objection to the form of the

13 | question.  Speculative.

14 | BY THE WITNESS:

15 |      A.    I'm not going to be able to put a

16 | pinpoint on a certain location, but -- I'm just not

17 | going to be able to tell you what certain locations

18 | I won't be able to go to.

19 | BY MR. AGUIAR:

20 |      Q.    Do your health issues limit how far you

21 | can drive your car?

22 |      A.    Yes.

23 |      Q.    How so?

24 |      A.    Because I'm not able to drive far.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 54 of 100 PageID #:4404

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                            54

1    Q.    How far can you normally drive?

2    A.    I don't know.

3    Q.    How far have you driven, the last year?

4  What's the longest ride you've taken, the last

5  year?

6    A.    About 25 blocks.

7    Q.    How far away from your home is Chuck's

8  Guns --

9    A.    I don't know.

10    Q.    -- do you know?  How long does it take

11  you to get there?

12    A.    I don't know.

13    Q.    So, when you say, in your answer,

14  ". . . health issues may limit Plaintiff's ability

15  to travel to certain locations," you don't know,

16  you didn't have any specific locations in mind when

17  you said that?

18    A.    Because there was no specific place that

19  was given to ask me, can I go?

20    Q.    But you also didn't have specific

21  locations as to how far you could travel when you

22  wrote that.

23    MR. SIGALE:   Objection.

24



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 55 of 100 PageID #:4405

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                            55

    1    BY MR. AGUIAR:

    2        Q.    Meaning that you can go five miles, but

    3    not ten miles, something like that.

    4        A.    It wasn't written in that aspect.

    5        Q.    I'm sorry?  What did you say?

    6        A.    In that aspect, no.

    7        Q.    Okay.  So, you're just basing -- and

    8    correct me if I'm wrong -- you're just saying,

    9    basically, that health issues, the conditions we've

   10    talked about, could possibly limit your ability to

   11    travel to a location, depending upon where that

   12    location might be?

   13        A.    Yes.

   14        Q.    But you don't have any specific

   15    locations in mind when you say that?

   16        A.    Correct.

   17        Q.    If you would, please, turn to the page

   18    which has Interrogatory No. 8 on it.  In

   19    Interrogatory No. 8, we asked you to identify, for

   20    each provision of the ordinance which is challenged

   21    in your complaint, to identify "i) any burden

   22    imposed by that requirement on any person,

   23    including you, and ii) any attempt to comply, or

   24    any inquiry, evaluation, or analysis regarding



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 56 of 100 PageID #:4406

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          56

1 | potential compliance with those provisions," and in

2 | (a) through (i), we listed the different provisions

3 | that are being challenged in your complaint, and

4 | I'd like to go over with you some of your answers

5 | to those requirements.

6 | On the next page, on 8(a), which

7 | mirrors, in (a), we listed the provision that "all

8 | range managers, employees and 'applicants' be

9 | fingerprinted and have a Chicago Firearms Permit

10 | and an Illinois FOID card."

11 | And in 8(a), you said, "This restriction

12 | makes it unduly burdensome for those operating

13 | firing ranges to find attorneys, promoters,

14 | lobbyists, employees, and assistance from all other

15 | persons who fall under the definition of applicant

16 | yet do not live in Illinois, or who do not have a

17 | CFP for whatever reason, yet would perform work for

18 | or on behalf of the range."

19 | I believe you've testified, earlier,

20 | you've never operated a range.

21 | A.    Yes.

22 | Q.    Or owned a range.

23 | A.    Yes.

24 | Q.    Okay.  Did you speak with a firing range



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 57 of 100 PageID #:4407

RHONDA MICHELLE EZELL                               June 05, 2012
EZELL vs. CITY OF CHICAGO                                     57

1  operator before answering this question?

2        A.    No.

3        Q.    Okay.  So, what's your basis for saying,

4  then, that it would be unduly burdensome for people

5  to find attorneys, promoters, lobbyists, employees

6  and assistants?  How do you know that to be true?

7        MR. SIGALE:  I'm going to object to -- object

8  as to foundation.

9        MR. AGUIAR:  I'm asking for the foundation.

10 BY MR. AGUIAR:

11       Q.    How do you know that to be true?  Or --

12 let me rephrase the question -- what is your basis

13 for making that statement?

14       A.    If the people do not live in the City of

15 Chicago, then why would they have to go through all

16 that to get the -- the permits and the stuff like

17 that, the fingerprinting?

18       Q.    Do you have any personal knowledge of

19 anybody trying to hire an attorney, promoter,

20 lobbyist or employee in order to open a range?

21       A.    No.

22       Q.    Okay.  And you didn't speak with anybody

23 who was trying to hire an attorney, promotor,

24 lobbyist or employees or get assistance in opening



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 58 of 100 PageID #:4408

RHONDA MICHELLE EZELL                                         June 05, 2012
EZELL vs. CITY OF CHICAGO                                              58

 1   a range?

 2        A.    No, I did not.

 3        Q.    Okay.  So, is your basis for your

 4   answer, here, just, basically, the reading of the

 5   ordinance?

 6        A.    Excuse me?

 7        Q.    Is your basis for making this answer

 8   based -- is it based solely on reading of the

 9   ordinance?

10        A.    Yes.

11        Q.    Okay.  And, in (b), we listed the

12   requirement that ranges operate only between 8:00

13   a.m. and 9:00 p.m..

14             And, on 8(b), you said, "This

15   restriction unduly burdens those for whom the early

16   morning or late night are most convenient, or only,

17   times they can patronize the firing range, whether

18   due to work or other personal reasons.  It's also

19   unduly burdensome for people operating the range

20   who would otherwise have those persons as

21   customers."

22             What do you consider to be late night?

23        A.    What do I consider late nights?

24        Q.    Mm-hm.  Your answer says that it would



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 59 of 100 PageID #:4409

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          59

1    be a burden, it would be burdensome for those --

2        A.    Midnight, 1:00 in the morning.  That's

3    late night.

4        Q.    So you believe that people should be

5    allowed to go to a firing range at 12:00 a.m. or

6    1:00 a.m. in the morning?

7        MR. SIGALE:  Objection.  Asked and answered.

8    BY MR. AGUIAR:

9        Q.    You may answer.

10       A.    Yes.

11       Q.    Okay.  What about early morning?  What

12   do you consider to be early morning?

13       A.    5:00 a.m.

14       Q.    And do you believe that someone should

15   be allowed to go to a range at 5:00 a.m. if they

16   want to?

17       A.    Yes.

18       Q.    Okay.  As we've been discussing, ranges

19   are open seven -- ranges would be allowed to be

20   open seven days a week in the City of Chicago, from

21   8:00 a.m. to 9:00 p.m.  Does the fact that it's

22   open seven days a week change your answer at all?

23       A.    No.

24       Q.    Why not?



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 60 of 100 PageID #:4410

RHONDA MICHELLE EZELL                                      June 05, 2012
EZELL vs. CITY OF CHICAGO                                            60

1        A.     Because people should have the right to

2    go whenever they get ready.

3        Q.     Okay.  Do you know if Chuck's Guns is

4    open 24 hours a day, seven days a week?

5        A.     No, I do not.

6        Q.     Okay.  If you found out that it wasn't,

7    would you want to challenge Chuck's?

8        MR. SIGALE:  Objection.  Speculation.

9    Badgering.

10       MR. AGUIAR:  I'm not badgering the witness.

11       MR. SIGALE:  That's a badgering question.

12       MR. AGUIAR:  I respectfully disagree,

13   Mr. Sigale.  I'm trying to get -- she's saying that

14   your ordinance is unconstitutional, and I'm trying

15   to get at she went to a range at somewhere else

16   that may have -- that may have hours similar to

17   what the City has.  I want to know if that's

18   something which is a serious consideration.  I'm

19   getting at that.  My question was asked in a polite

20   manner.  It was not badgering at all.

21   BY MR. AGUIAR:

22       Q.     In the second sentence, there, you say,

23   it would also be "unduly burdensome for those

24   operating a range who would otherwise have those



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 61 of 100 PageID #:4411

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          61

1   persons as customers."  I'm looking at 8(b), right

2   there, the last sentence.  Did you talk to a range

3   owner or operator?

4        A.    No.

5        Q.    Okay.  So, then, how do you know it

6   would be burdensome for them, to have these people

7   as customers?

8        A.    This is based on the hours of the range?

9        Q.    Yes.  You say it would be unduly

10  burdensome for those operating a range, who would

11  other otherwise have those persons as customers.

12  How do you know that to be true?

13       A.    They're limited to their time to be

14  there.

15       Q.    So are you saying that there would be

16  more customers who would go other hours, that range

17  operators would have more business if people could

18  go at -- at other hours?

19       A.    Yes.

20       Q.    What's that based on?  Have you studied

21  it?

22       A.    No, I have not studied that.

23       Q.    Have you read about it?

24       A.    No.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 62 of 100 PageID #:4412

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                        62

1      Q.    Have you talked to a range owner about

2   it?

3      A.    No, I have not.

4      Q.    Okay.  So is it based just on your

5   personal opinion?

6      A.    Yes.

7      Q.    In 8(c), we listed the requirement that

8   range patrons be 18 years of age or older as

9   something you're challenging in your lawsuit,

10  and -- and you said, "The restriction

11  unconstitutionally prohibits the proper teaching

12  and training of firearm use and safety to youth,

13  whether through organized instruction or parental

14  guidance."

15          In your lawsuit, do you know whether you

16  are challenging that ordinance requirement that

17  requires a CFP, some kind of a CFP; to be at least

18  21 years of old unless they have a parental

19  signature, in which case, they can get it at 18?

20     A.    Ask that question again.

21     Q.    Certainly.  I -- that was a lot.

22          In your lawsuit, are you challenging the

23  ordinance provision which says that only those who

24  are over 21 years old can get a CFP unless they're

Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 63 of 100 PageID #:4413

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          63

1   over 18, with a parental signature?

2          A.     I'm not sure.

3          Q.     Okay.  The second sentence of your

4   answer to 8(c) says, "It is also unduly burdensome

5   for those operating a range who would otherwise

6   have those persons as customers."  And my questions

7   about this are much like my questions that we just

8   talked about a second ago.  Did you study?  Strike

9   that.  How do you know this to be true?  Did you

10  look at any studies?

11         A.     I haven't looked at any studies, no.

12         Q.     Did you look at any information at all?

13         A.     No.

14         Q.     Did you speak with any range owners or

15  operators?

16         A.     No.

17         Q.     Is it just your opinion?

18         A.     Yes.

19         Q.     Okay.  Let's look at 8(d), and I'll just

20  read it to you.  If you don't want to flip back, I

21  understand that, but you're more than welcome to do

22  that.

23         MR. SIGALE:  Yeah.  You can look on this one.

24



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 64 of 100 PageID #:4414

RHONDA MICHELLE EZELL                                      June 05, 2012
EZELL vs. CITY OF CHICAGO                                              64

```
 1    BY MR. AGUIAR:

 2        Q.    Yeah.   It says, "The requirement

 3    that" -- hold on a sec -- "The requirement that

 4    patrons possess a CFP and FOID card, unless they

 5    are receiving the one hour of CFP training," okay?

 6              The first sentence says, "This

 7    restriction unconstitutionally infringes on the

 8    rights of non-Illinoisans, as well as persons who

 9    live outside of Chicago."  That's the first

10    sentence of answer under 8(d).

11              Do you know of anybody outside of

12    Chicago who wants to get a CFP, but cannot get one,

13    as you sit here today?

14        A.    I don't know names, but people

15    frequently come here would like to have a permit

16    because they visit the City.

17        Q.    You know these people?  I'm asking you,

18    do you know anybody?  Personally, do you know

19    anybody who's ever said to you, "I want to get a

20    CFP, but I can't because I live in -- I don't live

21    in Chicago"?

22        MR. SIGALE:  Objection.  It's a

23    mischaracterization of the law.

24        MR. AGUIAR:  I'm not asking a legal question.
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 65 of 100 PageID #:4415

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                            65

1   I'm asking her if that's ever been said to her.

2        MR. SIGALE:   No one ever told you that?   No

3   one ever said that sentence to you?

4        MR. AGUIAR:   David, I'm asking the question,

5   thank you.

6   BY THE WITNESS:

7        A.   I'm quite sure it's been said.  I can't

8   pinpoint who.

9   BY MR. AGUIAR:

10       Q.   Someone has said that to you in the

11  past, that you can recall?

12       A.   I can't recall that.

13       Q.   Okay.

14            You also say, in the second sentence,

15  that "It also unconstitutionally infringes those

16  who as a result of the ordinances are unable to

17  patronize the firing range closest to them."

18            How does the requirement that you have

19  to have a CFP or FOID card infringe upon your right

20  to patronize a firing range close to you?

21       A.   Because there's no range in Chicago.

22       Q.   What you're claiming in your lawsuit,

23  Miss Ezell, is, the requirement that patrons

24  possess a CFP and a FOID card, unless they're



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 66 of 100 PageID #:4416

RHONDA MICHELLE EZELL                                June 05, 2012
EZELL vs. CITY OF CHICAGO                                      66

1   receiving the one hour of CFP training, makes it

2   impossible for a range to open in the City of

3   Chicago, thereby burdening your right to go to a

4   range.  I have asked you to identify in the

5   interrogatory any burden imposed by that

6   requirement on you, and what you've said is that

7   "It unconstitutionally infringes those who as a

8   result of the ordinance are unable to patronize the

9   firing range closest to them."  What I want to

10  understand is how this provision, this ordinance,

11  has that effect.  You've stated there is an effect

12  here.  I want to know how that effect comes to be.

13  I'd like you to explain it to me, if you can,

14  please.

15       A.    Because if you don't have a CFP, you're

16  not allowed to go to the range.

17       Q.    And how does that make it impossible for

18  a range to open in the City of Chicago?

19       A.    The ordinance makes it impossible to

20  open a range in Chicago.

21       Q.    And, again, I'm trying to understand

22  how.  What about that provision makes it impossible

23  for a range to open in the City of Chicago?

24       MR. SIGALE:  I object to the form of the



```
 1   question.  It's a mischaracterization of the

 2   lawsuit and the interrogatory.

 3        MR. AGUIAR:  Let's go back up to this

 4   interrogatory, then.  Let's make sure we have a

 5   clean record.

 6   BY MR. AGUIAR:

 7        Q.   I've asked you to identify any burden

 8   imposed by any requirement upon any person,

 9   including any plaintiff, or any actual or

10   anticipated customer of any plaintiff, imposed by

11   "(d) the requirement that patrons possess a CFP or

12   FOID card, unless they are receiving the one hour

13   of CFP training."

14             You've said in your response that that

15   provision, quote, ". . . unconstitutionally

16   infringes those who, as a result of the ordinance,

17   are unable to patronize the firing range closest to

18   them."

19             I'm trying to understand how the

20   requirement of law that you have to have a CFP and

21   a FOID card infringes on those who are -- they're

22   unable to patronize the firing range closest to

23   them.  How does that provision prevent someone

24   going to a range that's close to them?  I'm trying
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 68 of 100 PageID #:4418

RHONDA MICHELLE EZELL                              June 05, 2012
EZELL vs. CITY OF CHICAGO                                      68

1    to understand the connection.

2         MR. SIGALE:  That question has been asked and

3    answered.

4         MR. AGUIAR:  No, it has not been answered.

5    BY THE WITNESS:

6         A.    What was the question, again?

7         MR. SIGALE:  Can you read it back, please.

8         MR. AGUIAR:  I would like, David -- I'm

9    going to -- I'm -- please.  I respect that you're

10   trying to be helpful.  When she asks the question

11   of me, I will respond.  I will rephrase the

12   question.

13   BY MR. AGUIAR:

14        Q.    In 8, we asked for every provision of

15   the ordinance that you are challenging as being --

16   making it impossible for a range to open in the

17   City of Chicago.  We have asked you to

18   "identify . . . . any burden imposed by that

19   requirement upon any person" -- including you --

20   "or any actual or anticipated customer of any

21   Plaintiff."

22             One of those requirements that's being

23   challenged in the lawsuit as being unconstitutional

24   is the requirement that range patrons, people who



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 69 of 100 PageID #:4419

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                            69

1   want to go to the range, possess a CFP and a FOID

2   card, unless they are getting the one hour of

3   training required for the FOID card.  You said in

4   your answer that that provision

5   ". . . unconstitutionally infringes those who, as a

6   result of the ordinance, are unable to patronize

7   the firing range closest to them."  What I'm trying

8   to understand, here, and what's not clear from your

9   answer is, how this provision -- meaning, you have

10  to have a CFP and a FOID card -- make -- make

11  people unable to go to the firing range closest to

12  them?  How does it have that effect?

13        A.    What if the person doesn't live in

14  Chicago, but the range is close to them, on their

15  end, and they want to go there?

16        Q.    Okay.

17        A.    They don't have -- they don't live in

18  Chicago, so they probably won't get a Chicago

19  Firearm Permit.

20        Q.    So, you're saying that people who live

21  outside of the City, but who live close to a range

22  in the City, would be infringed because they

23  wouldn't be able to go to a range in the City

24  because they don't have a CFP?  Is that what you're



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 70 of 100 PageID #:4420

RHONDA MICHELLE EZELL                                      June 05, 2012
EZELL vs. CITY OF CHICAGO                                          70

1    saying?

2         A.    As well as asking for all the stuff to

3    be had in order to go to the range, the requirement

4    of the CFP to go to a range.

5         Q.    Okay.  But, here, you say "unable to

6    patronize the firing range closest to them."  Why

7    do you say "closest to them"?  What is the

8    relevance of that?

9         MR. SIGALE:  Objection.  Legal question.

10        MR. AGUIAR:  I'm asking her, her purpose.  Why

11   did she put that in here?

12        MR. SIGALE:  You asked her, "What's the

13   relevance?"  It's a legal question

14        MR. AGUIAR:  Relevance to her.  What is the

15   relevance of her answer?  Not the legal relevance.

16   BY MR. AGUIAR:

17        Q.    Why did you say it?

18        A.    I don't remember.

19        Q.    Okay.  I may come back to 8(d), but I'm

20   going to skip to 8(b), at the moment.

21             Could we go off the record for a second?

22                  (WHEREUPON, a discussion was had off

23                    the record.)

24        MR. AGUIAR:  Let's go back on the record.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 71 of 100 PageID #:4421

RHONDA MICHELLE EZELL                                      June 05, 2012
EZELL vs. CITY OF CHICAGO                                            71

1    BY MR. AGUIAR:

2         Q.    Ms. Ezell, in 8(e), we asked you about

3    the burden imposed by "the requirement that ranges

4    be located more than 500 feet from any other gun

5    range, residential district, school, day-care

6    facility, park, place of worship, alcohol retailer,

7    'children's activities facility,' library, museum,

8    or hospital," and you said, in your answer, "This

9    restriction unduly burdens those who operate a

10   range by eliminating virtually all locations in

11   Chicago, thus ensuring that, when combined with the

12   other City requirements for constructing and

13   operating a firing range, that one could never be

14   profitably opened and run in Chicago."

15              Have you looked at any map to determine

16   where a range could actually operate in the City of

17   Chicago?

18        A.    I have not.

19        Q.    Have you done anything to determine

20   where a range could actually locate in the City of

21   Chicago?

22        A.    No.

23        Q.    So, what is your assertion?  So, what is

24   the basis for your assertion that the zoning



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 72 of 100 PageID #:4422

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          72

1   requirements eliminate virtually all locations in

2   Chicago?

3        A.   Because there is a school, every corner.

4   There's a park.  There's a church.  There's a

5   hospital.  Everything that's named is in the

6   vicinity of each other, everywhere in the City.

7        Q.   And have you studied that?

8        A.   I don't have to study that.  I see it.

9        Q.   You've been all over Chicago, and you've

10  seen it?

11       A.   No, I have not been all over Chicago.

12       Q.   Okay.  That's why I'm asking, have you

13  studied it?

14       A.   No.

15       Q.   It's based on your personal observation?

16       A.   Yes.

17       Q.   Okay.  Of the areas that you've been to?

18       A.   Yes.

19       Q.   Okay.  And you have not been all over

20  the City of Chicago?

21       A.   No, I have not.

22       Q.   Okay.  You say that.  That these

23  requirements, when combined with the other City

24  requirements for constructing and operating a



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 73 of 100 PageID #:4423

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                      73

1   firing range, that one can never be profitably

2   opened and run in Chicago.  What does the location

3   of the range have to do with it being profitably

4   opened and run in Chicago?

5        A.    Because they don't want them next to

6   schools and churches and things of that nature.

7        Q.    What does it have to do with the profits

8   of a range, the profits that a range owner may get

9   from operating that range?

10       MR. SIGALE:  Objection as to speculative,

11  foundation.

12       MR. AGUIAR:  I'm asking her to tell me what

13  her answer is, here, to explain her answer to me.

14  BY THE WITNESS:

15       A.    That one could never be profitably

16  opened and run in Chicago?  Because the fact that

17  they don't want them next to any other businesses,

18  such as the churches, the schools and the park

19  facilities.

20  BY MR. AGUIAR:

21       Q.    How would that affect profitability of a

22  range?

23       A.    The range probably is not going to be

24  open if they don't want them there, because that's



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 74 of 100 PageID #:4424

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                           74

1  what the ordinance states.  The profitability comes

2  with people not coming.

3      Q.    So, I'm -- correct me if I'm wrong, but

4  are you saying that the City's range -- the

5  ordinance prohibits ranges from opening altogether,

6  thereby there would be no profits, and that's why?

7      A.    No, that's not what I'm saying.

8      Q.    Than what are you saying?  I'm trying

9  to -- I'm trying to understand why you think the

10  location restrictions that are in the City's

11  ordinance affect the profitability of a range.

12     A.    I don't know.

13     Q.    You don't know?

14     MR. SIGALE:  Not what she's answered.

15  BY MR. AGUIAR:

16     Q.    But your answer is, you don't know?

17     A.    What I said earlier.

18     Q.    And --

19     A.    Because of the City don't want them to

20  be next to the parks and schools and stuff like

21  that.

22     Q.    But how does that affect profitability?

23  That is my next question.  You say that the

24  restriction . . . ?  How does it affect



RHONDA MICHELLE EZELL
EZELL vs. CITY OF CHICAGO

June 05, 2012
75

1   profitability?

2        A.    Because it's not going to be open.   They

3   don't want one there, in no place.

4        Q.    So there'd be no profits?

5        A.    500?  No, it's not, if they don't want

6   it built within 500 feet of this and that and that.

7        Q.    Are you saying, then, that a range that

8   could open, that's not within 500 feet of any of

9   these different locations?  Would that be

10  profitable?  Could that be profitable?

11       A.    No, I'm not saying that.

12       Q.    Okay.  So, a range could be profitable

13  if it were allowed, if it could open in the City of

14  Chicago?

15       MR. SIGALE:  Objection as to speculation,

16  foundation.

17  BY MR. AGUIAR:

18       Q.    Ms. Ezell, you've said that the location

19  of a range, the restrictions on locations of a

20  range, make it one such that when in conjunction

21  with the construction requirements, make it so that

22  a branch can never be profitably run or owned in

23  the City of Chicago, so you're making the assertion

24  that these requirements make it -- the range --



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 76 of 100 PageID #:4426

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          76

1   unprofitable.

2        A.     To open in Chicago.

3        Q.     To open.  Okay.  But if a location could

4   be found in the City which satisfies these

5   requirements -- right? -- that is not within 500

6   feet of any of these places, are you saying that

7   that range would also not be profitable?

8        MR. SIGALE:  I'm objecting as to foundation

9   and speculation.

10  BY MR. AGUIAR:

11       Q.     You may answer.

12       A.     I'm not saying that.

13       Q.     Okay.  So that range could be

14  profitable?

15       MR. SIGALE:  Objection.  Foundation and

16  speculation.  Asking the same question.

17  BY MR. AGUIAR:

18       Q.     You may --

19       MR. AGUIAR:  That's not the same question.

20  BY MR. AGUIAR:

21       Q.     You may answer.

22       MR. SIGALE:  It's the same question.

23       MR. AGUIAR:  Mr. Sigale, I'd ask that you

24  please not comment.  The commentary has to stop.



RHONDA MICHELLE EZELL
EZELL vs. CITY OF CHICAGO

June 05, 2012
77

```
 1   This is an official proceeding.  It's not helpful.

 2   I'd ask that you please stop it.

 3   BY MR. AGUIAR:

 4       Q.    My question is that if a range could

 5   satisfy these requirements, the 500 feet

 6   requirement in (e), if it could locate on a piece

 7   of property that's not within 500 feet of any of

 8   these places, could that range be profitable?

 9       MR. SIGALE:  Objection.  Foundation and

10   speculation.

11   BY MR. AGUIAR:

12       Q.    You may answer.

13       A.    I'm not sure.

14       Q.    Okay.  You haven't studied or examined

15   range profitability issues, have you?

16       A.    No.

17       Q.    You haven't spoken to a range owner or

18   operator about profitability issues, have you?

19       A.    No.

20       Q.    Okay.  Let's look at 8(f).  There, the

21   challenge provision is "the requirement that

22   possessors of firearms possess a CFP, insofar as

23   this requirement bars range patrons from practicing

24   with or sampling different firearms, practicing the
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 78 of 100 PageID #:4428

RHONDA MICHELLE EZELL                                June 05, 2012
EZELL vs. CITY OF CHICAGO                                       78

1  use of firearms without purchasing and registering

2  a firearm, purchasing ammunition for self-defense,

3  or replacing older ammunition by firing at the

4  range and then departing with fresh replacements."

5  And in your response to 8(f), you know, at the end

6  of that first sentence, it says, ". . . also,

7  inhibits persons from exercising their Second

8  Amendment rights of firearms training and home

9  firearm possession."  How does the requirement of a

10  CFP, insofar as it bars you from doing certain

11  things at a range, interfere with your rights to

12  possess a firearm in your home?

13      A.    Because if you can't bring home

14  ammunition, then how would you be able to utilize

15  your firearm in the house?

16      Q.    You don't.  So, is it your position that

17  you cannot buy?  Is it your understanding that you

18  cannot buy ammunition in the City of Chicago?

19      A.    Say that again.

20      Q.    Is it your understanding that you are

21  prohibited under City law from purchasing

22  ammunition in the City of Chicago?

23      A.    Yes.

24      Q.    That's your understanding?  What if --



1   what if I told you, just presume for a moment, that

2   the law was not that; that the law said you could

3   buy ammunition in the City of Chicago?  Does that

4   change your answer?

5        A.    No.  They said you can't.  They wouldn't

6   want you to leave the gun range with it.

7        Q.    Okay.  And how does that -- how does

8   that impact your right to home firearm possession?

9        A.    If those were the only ammunition you

10  had left, and you was going to go home, then you

11  wouldn't -- the firearm would be useless, because

12  you wouldn't have any ammunition.

13       Q.    And you wouldn't -- you wouldn't be able

14  to go somewhere and purchase more ammunition before

15  going home?

16       A.    So, now, you're talking about driving

17  with your firearm in the car --

18       Q.    If you want.

19       A.    -- in the City of Chicago if the law is

20  passed, if a law is passed, some different form

21  or -- ?  You could buy ammunition anywhere.  I

22  don't know.

23       Q.    Doesn't your answer presume that the

24  range would actually have the ammunition you need



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 80 of 100 PageID #:4430

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                            80

 1   for your firearm?

 2        MR. SIGALE:   Objection.   Form of the question.

 3   BY THE WITNESS:

 4        A.    I'm sorry?

 5   BY MR. AGUIAR:

 6        Q.    You said that -- I believe you said, and

 7   correct me if I'm wrong -- that this ordinance

 8   provision impacts your rights to home firearm

 9   possession because you wouldn't have ammunition for

10   your weapon because you would use it at the range,

11   and then you'd have no ammunition at home, correct?

12        A.    (Witness nodded.)

13        Q.    Okay.   Doesn't it presume that the range

14   would actually carry the ammunition that you would

15   need for your firearm?

16        A.    They would carry ammunition.   But what

17   if you don't use all the ammunition you purchased,

18   and you want to take those home?

19        Q.    But would that leave you without any

20   ammunition for your firearm?

21        A.    It wouldn't leave you without

22   ammunition, but -- I'm not for sure, but I think

23   that they don't want you to take it with you.

24        Q.    But it wouldn't leave you without



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 81 of 100 PageID #:4431

RHONDA MICHELLE EZELL                          June 05, 2012
EZELL vs. CITY OF CHICAGO                            81

1   ammunition.  It just means that you wouldn't be

2   able to take what you purchased.

3       MR. SIGALE:  Objection.  Speculation.

4   Foundation.

5   BY MR. AGUIAR:

6       Q.    You may answer.

7       A.    You would have to use all the ammunition

8   up and, probably, go somewhere else and buy

9   ammunition.

10      Q.    Okay.  But you would have access to

11  ammunition for your firearm in the home?  You have

12  other ways of having ammunition for your firearm?

13      A.    Yes.

14      Q.    Do you happen to know any range

15  operators who would operate a range in Chicago, but

16  for the City's ordinance?

17      A.    No, I don't.

18      Q.    You assert in your complaint that the

19  City's gun range ordinance interferes with your

20  Second Amendment rights because it prohibits ranges

21  from opening in the City of Chicago.  I'd like for

22  you to explain to me how many ranges would have to

23  open in the City of Chicago for you to believe that

24  the ordinance is not interfering with your Second



 1 | Amendment rights.

 2 |     MR. SIGALE:  Objection.  Speculation.

 3 | Foundation.

 4 | BY MR. AGUIAR:

 5 |     Q.    I would like to know the contours of

 6 | what you believe would satisfy what you believe to

 7 | be your constitutional rights.

 8 |     A.    I can't put a number on how many ranges

 9 | the City should allow to be opened in the City of

10 | Chicago.

11 |     Q.    Okay.  You've never thought about how

12 | many you think would satisfy your needs?

13 |     A.    No.

14 |     Q.    Okay.  Have you ever thought about where

15 | you think these ranges should locate to satisfy

16 | your needs?

17 |     A.    I have not.

18 |     Q.    Okay.  I'm going to ask you to assume

19 | that a firing range opens on the North Side of the

20 | City of Chicago, all right?  Say, let's just say,

21 | pick a spot.  North Side, you know.  North of the

22 | Loop somewhere.  Would that alleviate in your mind

23 | the burden on your right to go to a range?

24 |     A.    It wouldn't alleviate it.  It would just



1  allow a range in the City.

2      Q.    Okay.  So, for you to feel better, you

3  need more than that one range?

4      MR. SIGALE:  Objection.  Speculation.

5  BY MR. AGUIAR:

6      Q.    I'm asking you what you believe, what

7  the contours of your rights are.

8      A.    Assuming a range be opened on the North

9  Side of Chicago would not alleviate the fact.

10     Q.    Okay.  So that one range wouldn't do it

11 for you?

12     A.    No.

13     Q.    Okay.  Why not?

14     A.    One range isn't enough.

15     Q.    Okay.  How many ranges, then?

16     A.    I don't know.

17     MR. SIGALE:  I'm just going to object to

18 foundation and speculation and the form of this

19 questioning.  These questions aren't relevant.

20     MR. AGUIAR:  And those objections are noted.

21 They do not prohibit the witness from answering the

22 questions.

23 BY MR. AGUIAR:

24     Q.    If you would, please, turn to Question



 1   No. 11.  Question No. 11.  There, the question

 2   reads -- or the interrogatory, I should say,

 3   says -- "As to the allegation in Paragraph 17 of

 4   the Amended Complaint that '[g]un ranges open to

 5   the public exist in virtually every major American

 6   city' -- end quote -- "identify all ranges in which

 7   such cities do not exist."  And you said, at the

 8   last, last line there, "As to the ten largest

 9   cities in America by population, this Plaintiff is

10   aware of none except Chicago."  I just want to know

11   what you looked at to make that determination.

12       A.    Because 49 states have a right to some

13   form of concealed carry.

14       Q.    No.  What I'm trying to understand is --

15       A.    That it doesn't have gun ranges?

16       Q.    Yeah.  That you made the assertion

17   that -- you said that all.  What you said, here,

18   is, "As to the ten largest cities by population in

19   the country," of all those ten, all have ranges but

20   the City.  I just want to know what you looked at

21   to make that determination.

22       MR. SIGALE:  Objection.  Mischaracterizes the

23   issue in the interrogatory answer.

24



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 85 of 100 PageID #:4435

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          85

1  | BY MR. AGUIAR:

2  |     Q.    Am I mischaracterizing your answer,

3  | here?

4  |     A.    Mm-hm.

5  |     Q.    How am I doing that?

6  |     A.    "As . . . ."

7  |     Q.    You said, quote:  "As to the ten largest

8  | cities in America by population, this Plaintiff is

9  | aware of none except Chicago."  I'm trying to

10 | understand what you did to make that assertion.

11 | Did you look at something?

12 |     A.    I do Google research, and every state in

13 | the United States of America has some form of

14 | carry, so I am quite sure they have gun -- gun

15 | ranges there.

16 |     Q.    Did you actually look up the ten largest

17 | cities in American population and look and see if

18 | they have ranges?

19 |     A.    I know that "identify of all cities in

20 | which such range does not exist" is Chicago.  It's

21 | us.

22 |     Q.    Okay.  True.  Right now, as of right

23 | now, there are no ranges open to the public in the

24 | City of Chicago, okay?  But you're saying that as



```
 1   to the other, the nine other largest cities, that

 2   you're not aware of any that don't have ranges.

 3   What I'm trying to understand is, how did you make

 4   that determination?

 5        A.    Because every state has some form of

 6   concealed carry or carry on their books, and I know

 7   they have ranges in their cities.

 8        Q.    How do you know they have ranges?  What

 9   did you do to make that determination?

10        A.    I just go by the fact that they have

11   forms of carry on their books.

12        Q.    Okay.  So, based on that, you're saying

13   they must have ranges?

14        A.    Yes.

15        Q.    Okay.  Nothing else?

16        A.    I can't recall and keep up with

17   everything I do.

18        Q.    Do you have any recollection --

19        A.    Sorry.

20        Q.    -- of looking up the -- whether there

21   are ranges in the nine other largest cities in

22   America?

23        A.    I can't recall.

24        MR. AGUIAR:  Okay.  At this time, I have no
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 87 of 100 PageID #:4437

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                        87

 1  further questions.  However, I am leaving your

 2  deposition open, pending receipt of additional

 3  discovery from your side, which we have propounded,

 4  which is due to us.  Depending upon what's in those

 5  interrogatories, we may reconvene your deposition,

 6  but we will address that at a later time, but I

 7  want the record to reflect that I'm keeping the dep

 8  open.  That said, I have not further questions at

 9  this time.

10      MR. SIGALE:  I'm going to ask a couple of you.

11  This deposition has four minutes left.  I'm going

12  to use those four minutes to ask you a couple

13  questions, okay?

14      MR. AGUIAR:  And I reserve the right to

15  respond, to --

16      MR. SIGALE:  If --

17      MR. AGUIAR:  -- ask follow-up questions.

18      MR. SIGALE:  If there's less than four, if

19  there's time remaining on it.

20      MR. AGUIAR:  You do not get the right to do

21  that.

22      MR. SIGALE:  I actually do.  I recall being

23  not -- having exactly the same treatment when I was

24  deposing Ms. Scudiero a year ago and there was a



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 88 of 100 PageID #:4438

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                           88

```
 1   time limitation.  I recall you asking your

 2   clarification questions and then shutting the door,

 3   so --

 4       MR. AGUIAR:  I remember -- I remember it

 5   differently.  I may be wrong, but I think you got

 6   some follow-up questions after that, but we can

 7   hash it out later.

 8                   CROSS-EXAMINATION

 9   BY MR. SIGALE:

10       Q.    Rhonda, I want to go back to this

11   Interrogatory No. 4, here, talking about where it'd

12   be burdensome.  4 and 5 was the same question or

13   the same answer, in part, talking about places

14   where it would be unsafe, travel being a burden.  I

15   want you to presume for the moment that the --

16   there's a section of the ordinance that was also

17   discussed, earlier, about it not being 500; about

18   it being more than 500 feet from another gun range,

19   residential district, school, day care, park,

20   church, library, museum, hospital, children's

21   activities facility, okay?  I also want you to

22   assume that there is a requirement, a separate

23   requirement, that a firing range must be located

24   only in an area zoned for manufacturing in the
```



RHONDA MICHELLE EZELL                         June 05, 2012
EZELL vs. CITY OF CHICAGO                              89

1   City, okay?  So, if you put those two together, and

2   if, as a result, the only place where a firing

3   range becomes allowed is in a very bad neighborhood

4   in Chicago that was unsafe to travel to, would that

5   be a problem for you, to go to that range?

6        MR. AGUIAR:  Objection as to form.  Vague and

7   ambiguous.

8   BY MR. SIGALE:

9        Q.   If you understand my question, you can

10  answer it.

11       A.   Yes.

12       Q.   Would you consider that a burden on your

13  ability to travel to a firing range, if the only

14  locations were in that bad, unsafe area?

15       A.   Yes.

16       Q.   And, obviously, if that hypothetical

17  doesn't come to pass, then that wouldn't apply; is

18  that fair to say?

19       A.   Yes.

20       Q.   All right.  Would you agree with the

21  general proposition that most businesses are in

22  business to make money?

23       MR. AGUIAR:  Objection.  Foundation.

24



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 90 of 100 PageID #:4440

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                            90

1    BY THE WITNESS:

2        A.    Yes.

3    BY MR. SIGALE:

4        Q.    And would you include a gun range in

5    that category of businesses that are in business to

6    make money?

7        MR. AGUIAR:    Same objection.

8    BY THE WITNESS:

9        A.    Yes.

10   BY MR. SIGALE:

11       Q.    Is it fair to say that a restriction on

12   how a, where a --

13            Strike that.

14            Would you agree that a restriction on

15   where a gun range might go, who can go to it, when

16   they can go to it, to the extent that that means

17   less people are going to go to the range, that that

18   would impact how much money a range might make?

19       MR. AGUIAR:    Objection.    Foundation and to

20   form.

21   BY THE WITNESS:

22       A.    Yes.

23       MR. SIGALE:    All right.    And that's all I've

24   got.



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 91 of 100 PageID #:4441

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          91

1          I'll give you a copy --

2      MR. AGUIAR:  I have one follow-up.

3      MR. SIGALE:  Okay.  Good.

4      MR. AGUIAR:  Just one.  Thank you.

5                  REDIRECT EXAMINATION

6  BY MR. AGUIAR:

7      Q.    Mr. Sigale just asked you about a range,

8  if it opened in a bad neighborhood, that would pose

9  a burden on you.  Do you remember that question

10 that he asked you?

11     A.    Yes.

12     Q.    And you did say that if a range were to

13 open in a bad neighborhood, that would be a burden

14 on you to go there, because it's in a bad

15 neighborhood?

16     MR. SIGALE:  I'm -- I'm just going to object

17 as to mischaracterization of my question and her

18 testimony.

19     MR. AGUIAR:  Okay.  Well, it's on the record.

20 I suppose it's on.  I'm asking her now just to, you

21 know, answer my question, here.

22 BY MR. AGUIAR:

23     Q.    What if a range could open in a good

24 neighborhood?  I'm going to ask you to assume that



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 92 of 100 PageID #:4442

RHONDA MICHELLE EZELL                                          June 05, 2012
EZELL vs. CITY OF CHICAGO                                              92

 1 | a range opened in a good neighborhood, one that
 2 | everybody considers to be good, that you
 3 | consider to be a good neighborhood, but it was, you
 4 | know, a 15-mile car ride for you.  Would that be a
 5 | burden on you?
 6 |     MR. SIGALE:  I'll object as to speculation.
 7 | BY MR. AGUIAR:
 8 |     Q.    You can answer.
 9 |     MR. SIGALE:  And, asked and answered.
10 |         Go ahead, Rhonda.  If you understand it,
11 | answer.
12 | BY THE WITNESS:
13 |     A.    If it was in a good neighborhood?
14 | BY MR. AGUIAR:
15 |     Q.    Yes.
16 |     A.    If I felt like going, even.  If my
17 | health permitted it that day, if I felt like going,
18 | I'd go.
19 |     MR. AGUIAR:  Okay.  That's all I have, David.
20 |     MR. SIGALE:  I'm going to ask one more, and
21 | I'll give you one more after that.
22 |     MR. AGUIAR:  Okay.
23 |
24 |



```
 1                     RECROSS-EXAMINATION

 2   BY MR. SIGALE:

 3        Q.    You're driving a 2000 Dodge Neon, is it?

 4        A.    Yes.

 5        Q.    Would you be -- the question about 15

 6   miles away, would you have the same answer if that

 7   car were in the shop or if that car was broken

 8   down?

 9        A.    No.

10        Q.    Why's that?

11        A.    Because I can't get on the bus.

12        Q.    Well, you could --

13        A.    It would be too far.

14        Q.    Okay.  If you could get on the -- let's

15   say the bus stop was nearby -- would you be able to

16   bring your firearm to the range?

17        A.    No.

18        Q.    What about if a firing range opened a

19   couple blocks away, but your car was in the shop?

20   Would you be able to go take your firearm to the

21   range?

22        A.    No.

23        Q.    The answer to the speculative question

24   about what happens if your car breaks down -- would
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 94 of 100 PageID #:4444

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                         94

1   your answer be the same for all the speculative

2   persons who don't own cars, or have cars in the

3   shop, or have -- would be unable to get a ride to

4   put their firearm in the trunk?

5        MR. AGUIAR:  Objection.

6   BY THE WITNESS:

7        A.    Yes.

8        MR. AGUIAR:  Objection as to foundation, form,

9   speculation.

10  BY MR. SIGALE:

11       Q.    You can answer.

12       A.    Yes.

13       MR. SIGALE:  Okay.

14       MR. AGUIAR:  I have nothing further.

15       MR. SIGALE:  Okay.

16            We'll reserve.

17            Thank you.

18       MR. AGUIAR:  Thank you, Ms. Ezell.

19            (Time noted:  4:42 p.m.)

20            FURTHER DEPONENT SAITH NAUGHT.

21

22

23

24



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 95 of 100 PageID #:4445

RHONDA MICHELLE EZELL                          June 05, 2012
EZELL vs. CITY OF CHICAGO                                  95

1   STATE OF ILLINOIS )

2                    ) SS.

3   COUNTY OF C O O K )

4           I, CHERYL E. NICHOLSON, a Notary Public

5   within and for the County of DuPage, State of

6   Illinois, and a Certified Shorthand Reporter of said

7   state, do hereby certify:

8           That previous to the commencement of the

9   examination of the witness, the witness was duly

10  sworn or affirmed to testify the whole truth

11  concerning the matters herein;

12          That the foregoing deposition transcript

13  was reported stenographically by me, was thereafter

14  reduced to typewriting under my personal direction,

15  and constitutes a true record of the testimony given

16  and the proceedings had;

17          That the said deposition was taken before

18  me at the time and place specified;

19          That I am not a relative or employee or

20  attorney or counsel, or a relative or employee of

21  such attorney or counsel for any of the parties

22  hereto, or interested directly or indirectly in the

23  outcome of this action.

24          IN WITNESS WHEREOF, I do hereunto set my



RHONDA MICHELLE EZELL                                   June 05, 2012
EZELL vs. CITY OF CHICAGO                                          96

1   hand of office at Chicago, Illinois, this 18th day

2   of June, A.D. 2012.

3

4

5

6                  Notary Public, DuPage County,

7                  Illinois

8                  My commission expires 04/21/14.

9

10  C.S.R. Certificate No. 084-001932.

11

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1                      I N D E X

 2                                           PAGE/LINE

 3   WITNESS:

 4   RHONDA MICHELLE EZELL

 5   Direct Examination by Mr. Aguiar.................3/8

 6   Cross-Examination by Mr. Sigale................88/8

 7   Redirect Examination by Mr. Aguiar.............91/5

 8   Recross-Examination by Mr. Sigale..............93/1

 9

10                    E X H I B I T S

11   NUMBER                                      MARKED

12   Ezell Dep. Exhibit No. 1(*)....................22/9

13

14        C E R T I F I E D   Q U E S T I O N S

15                       (None)

16

17     C O N F I D E N T I A L   P O R T I O N S

18                       (None)

19

20

21

22

23

24   (*) SEE:  Exhibit attached.
```



Case: 1:10-cv-05135 Document #: 233-1 Filed: 12/06/13 Page 98 of 100 PageID #:4448

RHONDA MICHELLE EZELL                                    June 05, 2012
EZELL vs. CITY OF CHICAGO                                          98

```
 1              DEPOSITION ERRATA SHEET

 2

 3  Our Assignment No. 343273

 4  Rhonda Ezell, et al. v. City of Chicago

 5

 6      DECLARATION UNDER PENALTY OF PERJURY

 7

 8           I declare under penalty of perjury that I

 9  have read the entire transcript of my Deposition

10  taken in the captioned matter or the same has been

11  read to me, and the same is true and accurate, save

12  and except for changes and/or corrections, if any,

13  as indicated by me on the DEPOSITION ERRATA SHEET

14  hereof, with the understanding that I offer these

15  changes as if still under oath.

16

17              Signed on the _____ day of

18

19           _____, 20___.

20

21

22

23      _____

24                  RHONDA MICHELLE EZELL
```



RHONDA MICHELLE EZELL                                  June 05, 2012
EZELL vs. CITY OF CHICAGO                                         99

```
 1 │              DEPOSITION ERRATA SHEET
 2 │  Page No._____Line No._____Change to:_____
 3 │  _____
 4 │  Reason for change:_____
 5 │  Page No._____Line No._____Change to:_____
 6 │  _____
 7 │  Reason for change:_____
 8 │  Page No._____Line No._____Change to:_____
 9 │  _____
10 │  Reason for change:_____
11 │  Page No._____Line No._____Change to:_____
12 │  _____
13 │  Reason for change:_____
14 │  Page No._____Line No._____Change to:_____
15 │  _____
16 │  Reason for change:_____
17 │  Page No._____Line No._____Change to:_____
18 │  _____
19 │  Reason for change:_____
20 │  Page No._____Line No._____Change to:_____
21 │  _____
22 │  Reason for change:_____
23 │  SIGNATURE:_____DATE:_____
24 │              RHONDA MICHELLE EZELL
```



```
 1                    DEPOSITION ERRATA SHEET

 2      Page No._____Line No._____Change to:_____

 3      _____

 4      Reason for change:_____

 5      Page No._____Line No._____Change to:_____

 6      _____

 7      Reason for change:_____

 8      Page No._____Line No._____Change to:_____

 9      _____

10      Reason for change:_____

11      Page No._____Line No._____Change to:_____

12      _____

13      Reason for change:_____

14      Page No._____Line No._____Change to:_____

15      _____

16      Reason for change:_____

17      Page No._____Line No._____Change to:_____

18      _____

19      Reason for change:_____

20      Page No._____Line No._____Change to:_____

21      _____

22      Reason for change:_____

23      SIGNATURE:_____DATE:_____

24                    RHONDA MICHELLE EZELL
```

