IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION


RHONDA EZELL, et. al.,      )
                            )
      Plaintiffs,           )
                            )
      -vs-                  )  No. 10 CV 5135
                            )
CITY OF CHICAGO,            )
                            )
      Defendant.            )


        The Deposition of WILLIAM EDWARD HESPEN taken

before Thomas A. Manno, C.S.R. and Notary Public,

pursuant to the Federal Rules of Civil Procedure, at

30 North LaSalle Street, Chicago, Illinois 60602,

Suite 1230, on June 13, 2012, at 1:30 p.m.


REPORTED FOR:

PATTI BLAIR COURT REPORTERS, P.C.

```
 1    APPEARANCES:

 2         THE LAW FIRM OF DAVID G. SIGALE, By
           Mr. David G. Sigale
 3         4300 Commerce Court
           Lisle, Illinois 60532
 4         Suite 300
           630-452-4547
 5
                Appearing on behalf of the Plaintiffs;
 6

 7         CORPORATION COUNSEL, By
           Mr. William Macy Aguiar
 8         30 North LaSalle Street
           Chicago, Illinois 60602
 9         Suite 1230
           312-744-4216
10
                Appeared on behalf of the Defendant.
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                     I N D E X

2

3     WITNESS:                                    PAGE:

4     William Edward Hespen

5

      (Exam. By Mr. Aguiar)                         4
6     (Exam. By Mr. Sigale)                        82
      (Further Examination by Mr. Aguiar)          95
7

8

9

      EXHIBITS:
10
      Exhibit No. 1                                 8
11    Exhibit No. 2                                 8
      Exhibit No. 3                                20
12    Exhibit No. 4                                78

13

14

15

16

17

18

19

20

21

22

23

24

64910eb3-acaf-48a3-8e04-6c84fafa0697

1           (Witness sworn.)

2           MR. AGUIAR:  I'd like to ask the witness to

3    please state his full name for the record.

4           THE WITNESS:  My name is William Edward Hespen,

5    H-E-S-P-E-N.

6           MR. AGUIAR:  Good afternoon, Mr. Hespen.  My

7    name is William Aguiar.  I am one of the lawyers

8    representing the City of Chicago in the case of Ezell

9    versus City of Chicago, No. 10 C 5135, which is currently

10   pending in the United States District Cour for the

11   Northern District of Illinois.

12          And let the record reflect this deposition is

13   being taken to Rule 30.

14                WILLIAM EDWARD HESPEN,

15   being first duly sworn, was examined and testified as

16   follows:

17                EXAMINATION

18                BY MR. AGUIAR:

19     Q.   Mr. Hespen, in this case you gave a deposition

20   on September 30th, 2010.

21          Do you recall that deposition?

22     A.   I recall giving a deposition.  I don't recall

23   all the details of it.

24          MR. SIGALE:  Bill, if you don't mind, if I can

1   interrupt.

2           I'm hoping it's not going to be an issue at

3   all, but there's a court imposed time limit on this

4   deposition, so I just want the record to reflect that

5   we're starting at 1:37.

6           MR. AGUIAR:  No problem.  Thank you,

7   Mr. Sigale.

8           MR. SIGALE:  Sure.

9       MR. AGUIAR:  Q.  Mr. Hespen, you just said that you

10  recall giving a deposition in this case, correct?

11      A.   Yes.

12      Q.   Have you given any depositions since that other

13  deposition?

14      A.   No.

15      Q.   Since it's been some time since your last

16  deposition, I'd like to go over with you a couple of

17  ground rules for today's proceeding.

18           The first, and I think most important, is that

19  if you do not understand a question that I ask you,

20  please let me know and I will do my best to rephrase the

21  question in a manner such that you do understand the

22  question.

23           If you provide an answer to my question, I'm

24  going to assume that you understood it as I've asked it.

1          It's also important that you not nod or shake

2    your head in response to one of my questions.  The court

3    reporter can only take down verbal responses, so you must

4    give an audible, verbal response to a question.

5          It's also important for the court reporter's

6    sake that we try not to speak over one another.  That

7    makes it very hard for the court reporter to taken down a

8    verbatim transcription of what happens here today.

9          So I'd ask that you allow me to finish my

10   question before answering, and I will afford you the same

11   courtesy when you're answering.

12         And also, if at any time you need a break, by

13   all means please let me know, and I will certainly

14   accommodate that request.  However, I just ask that you

15   not take a break while there's a question pending.

16         Do you know these ground rules for today?

17   A.    Yes, I do.

18   Q.    Excellent.

19         The next two questions are somewhat invasive,

20   and I apologize but I want to make the record clear.

21         The first is, have you taken any medications

22   today that would affect your ability to understand my

23   questions or to provide complete answers to them?

24   A.    No.

1      Q.   Are there any other reasons why you would not

2   be able to understand my questions or to provide complete

3   answers to them?

4      A.   No.

5      Q.   Excellent.

6           Prior to sitting for the deposition right now,

7   did you speak with anybody about your deposition here

8   today?

9      A.   Yes.

10     Q.   Who did you speak with?

11     A.   Mr. Sigale.

12     Q.   And when did you speak with Mr. Sigale?

13     A.   Last night.

14     Q.   Any other times you spoke with Mr. Sigale

15   about your deposition?

16     A.   Oh, not since the last September.

17     Q.   Now that would have been your last deposition?

18     A.   Yes.

19     Q.   Did you speak with anybody else about your

20   testimony here today?

21     A.   No.

22     Q.   Did you review any documents to prepare for

23   today's deposition?

24     A.   Yes.

1      Q.   What did you review?

2      A.   There was a document e-mailed to me about the

3  court case, and I reviewed that.

4      Q.   Do you know what that document was?

5      A.   No, I don't.  I don't have my laptop with.

6      Q.   Okay.  Do you recall what was in the document?

7      A.   A little, yes.

8      Q.   And what was that?

9      A.   Various questions pertaining to rules about how

10  these ranges were going to be organized, and what

11  documents or what information you needed in order to go

12  and use the range.

13      Q.   Would it have been the City's Gun Range

14  Ordinance that you looked at?

15      A.   Yes.

16      MR. AGUIAR:  Would you mark these as 1 and 2,

17  please?

18              (Documents marked as requested.)

19              (Documents tendered to the witness.)

20      I am handing you can what the court reporter

21  has marked for me as Exhibits 1 and 2.

22      MR. AGUIAR:  Q.  Are these the documents that you

23  looked at in preparation for today's deposition?

24      I'll represent to you that Exhibit No. 1 is the

1    City's Gun Range Ordinance which was enacted in July of

2    2011.

3            And Exhibit No. 2 is the City's amendment to

4    that ordinance that was enacted in September of 2011.

5    A.    This one for sure (indicating).  I'm pretty

6    sure this one was there, too.

7    Q.    So you looked at both 1 and 2 to prepare for

8    today's deposition?

9    A.    Yes.

10   Q.    Did you look at anything else, do you recall?

11   A.    No.

12   Q.    Now, since you're already given a deposition in

13   this case, we know a lot about your background already,

14   and I don't want to belabor those issues once again.

15           So I just want to go over a couple of things to

16   make sure they're still current, if that's okay.

17   A.    Um-hum.

18   Q.    The first is, do you still live at 5959 South

19   Kolmar Avenue in Chicago, Illinois?

20   A.    Yes, I do.

21   Q.    And at your last deposition, you testified that

22   you don't have any other residents; is that correct?

23   A.    That's correct.

24   Q.    And that you don't any other property anywhere

1   else; is that still true?

2         A.   Yes.

3         Q.   And at your last deposition which was, again,

4   on September 3rd 2010, you testified that you had just

5   retired from the Chicago Police Department, correct?

6         A.   Correct.

7         Q.   And have you had any other employment since

8   your retirement from CPD?

9         A.   No.

10        Q.   Still retired?

11        A.   Yes.

12        Q.   Okay.  Also, as of the date of your last

13  deposition, you testified that you had not yet obtained a

14  Chicago firearm's permit, or what we call a CFP.

15             Since your last deposition, have you obtained a

16  CFP?

17        A.   Yes.

18        Q.   Do you recall when you got that CFP?

19        A.   No.  I could look at it.  The date should be on

20  there.  You want me to...

21        Q.   Do you have your CFP with you?

22        A.   Yes.

23        Q.   If you would like to check your CFP for the

24  date, that would be great.  Thank you.

1          I assume you have no objection, Mr. Sigale.

2          MR. SIGALE:  No.

3          THE WITNESS:  That's when it expires

4   (indicating).

5               (Document tendered to Mr. Sigale.)

6          MR. SIGALE:  That's probably when you got it.

7          THE WITNESS:  That's when I applied for it.

8          MR. SIGALE:  Well, it's good for three years, I

9   believe.  So it's probably from that date.

10          MR. AGUIAR:  If you want to go off the record

11   for a second on that.  We can go off the record for a

12   second, if you'd like.

13          MR. SIGALE:  Yes.

14               (WHEREUPON, a discussion was had off the

15                record, after which the deposition

16                continued.)

17          MR. SIGALE:  Is there still a question pending

18   about when did he get it?

19          MR. AGUIAR:  Yes.  I'd like to know when he

20   obtained the CFP.  If he knows.

21          THE WITNESS:  I'd have to say September 16th.

22      MR. AGUIAR:  Q.  Of what year?

23      A.  Of last year, 2011.  Or I'm sorry.  No.

24      Q.  Would that have been 2010?

1      A.   It would be '10.

2      Q.   So on or about September 16th, 2010, you got

3  your CFP?

4      A.   Yeah, right.  Right.

5      Q.   When did you obtain your four hours of

6  instruction necessary to get a CFP that you recall?

7      A.   There was a place on Belmont Avenue.  A

8  security firm was offering it, but I don't remember.

9      Q.   Would it have been Fidelity Training?

10     A.   Yes.

11     Q.   And I'm assuming you did your one hour of range

12  training.

13     A.   Yes, I did.

14     Q.   And where did you do your range training?

15     A.   It was at a gun range up off of Rand Road near

16  Des Plaines, Illinois.  Rand Road is Route 12.  I don't

17  recall the name of the gun shop up there.

18     Q.   Would it have been Gat Guns?

19     A.   No.

20       MR. SIGALE:  Was it Maxon's in Des Plaines?

21       THE WITNESS:  Maxon's, yes.

22       MR. AGUIAR:  Thank you.

23    MR. AGUIAR:  Q.  Was Maxon's affiliated with

24  Fidelity, if you know?

1          MR. SIGALE:  I'm going to object as to

2     foundation, but if you know, you can answer.

3          THE WITNESS:  I assume they were.  This is

4     where the instructor had us go.

5     MR. AGUIAR:  Q.  So you went to Maxon's because the

6     people at Fidelity told you to go to Maxon's for your one

7     hour range training?

8          A.   Correct.

9          Q.   Since obtaining your CFP, have you registered

10    any firearms with the City of Chicago?

11         A.   No.

12         Q.   You don't have any firearms at all registered

13    with the City of Chicago currently?

14         A.   I have my duty weapons and several weapons when

15    I go hunting and that, yes.

16         Q.   Are those kept in the City of Chicago?

17         A.   Yes.

18         Q.   Are they registered with the City of Chicago

19    currently?

20         A.   Yes, they are.

21         Q.   Were they registered before you got your CFP?

22         A.   Yes.

23         Q.   Okay.  But since you've obtained your CFP, you

24    haven't registered any other firearms with the City of

Page 14

1   Chicago?

2          A.   No.

3          Q.   And since your last deposition, other than your

4   trip to Maxon's, have you been to any gun ranges?

5          A.   Yes.

6          Q.   Which gun ranges have you been to?

7          A.   The gun range affiliated with the Illinois

8   State Rifle Association.

9          Q.   And what range would that be?

10         A.   That's the range at Bonfield, Illinois.

11         Q.   Any other ranges you've been to since your last

12   deposition, besides Maxon's?

13         A.   No.

14         Q.   So just the one in Bonfield?

15         A.   Right.

16         Q.   And if I recall from your prior deposition, we

17   spoke at length about that range as well.

18              That is an outdoor range, correct?

19         A.   Yes, it is.

20         Q.   How often have you been to -- strike that.

21              How many times have you been to the range in

22   Bonfield, Illinois, since your last deposition, if you

23   know?

24         A.   I don't know the exact number.  I go out there

1    quite often.

2         Q.    I'm going to ask you just to estimate for me.

3              And I know it's not an exact number, but if you

4    had to say, once a week, twice a week, couple of times a

5    month?  How would you characterize your activity at the

6    range?

7         A.    Eliminating the cold weather in December,

8    January, February, I probably was out -- I've been to the

9    range at least three or four times since March.

10        Q.    Of this year?

11        A.    Yes.

12        Q.    And this is going to sound like a silly

13   question, but I assume that the purpose of your visits to

14   Bonfield was to train with your firearm.

15        A.    No.  I shoot in rifle matches out there.

16        Q.    So all of your trips to Bonfield were just to

17   shoot in matches?

18        A.    That, and I also am a range safety officer, so

19   I'll go out there and do several volunteer days a month.

20        Q.    With respect to the range safety officer

21   position, is this something new that you're doing since

22   your last deposition?

23        A.    Yes.

24        Q.    Okay.  When did you start doing that?

1       A.    Basically in March.

2       Q.    You say you've been there several times a month

3    for--

4       A.    Yes.

5       Q.    --purposes of this?

6       A.    Between shooting rifle matches and being an

7    RSO.

8       Q.    What are the responsibilities of a range safety

9    officer at the Bonfield range?

10      A.    Well, at each -- at the Bonfield range, we have

11   handgun positions.  We have high-power rifle positions.

12   We have 100 meter, 100 yard ranges.  We have a high-power

13   range going out to 300 yards, and we have a pistol range.

14            Each range has a set of rules, and a range

15   safety officer is supposed to be there make sure people

16   know about the rules and obey them.

17      Q.    Is there one range safety officer per each of

18   those locations you just described?

19      A.    No.  There's usually one range officer who will

20   routinely walk around to the different ranges and observe

21   the shooters.

22      Q.    Is there a set schedule for range safety

23   officers to be on the range to do that function?

24      A.    Usually from the time the range opens at 8:00

1    a.m. until it closes at sundown.

2        Q.   Was there any training you have to go through

3    to be a range safety officer?

4        A.   Yes.

5        Q.   What kind of training?  Could you describe it

6    for me?

7        A.   It's training provided by the National Rifle

8    Association.  It's a one-day class.  You listen to

9    lectures and then you take a test at the end.

10            If you pass the test, you got your range safety

11   officer's certificate.

12       Q.   When did you take the one-day class?

13       A.   I believe that was either at the end of

14   February or the first part of March.  I don't remember

15   the exact date on it.

16       Q.   Is it fair to assume that you passed the test

17   that day?

18       A.   Yes.

19       Q.   Are there any other qualifications you have to

20   have to be a range safety officer at the range in

21   Bonfield?

22       A.   No.

23       Q.   As part of being a range safety officer, do you

24   provide training to people, trying to use those ranges.

1       A.   No.   That's not the purpose of a range safety

2    officer.

3            The RSO's purpose there is to make sure the

4    rules are followed at each individual range.  They're

5    posted, but there's, you know, sometimes people don't

6    read them and sometimes people will forget certain

7    things.

8            And we're there not as policemen or anything

9    like that, but to advise them of the proper way to handle

10   their weapons and obey the range rules.

11      Q.   Okay.  Do you have any other role in operating

12   or managing the Bonfield range, other than being a range

13   safety officer?

14      A.   No.

15      Q.   As a range safety officer, who do you report to

16   at the range in Bonfield?

17      A.   That would be the chief range safety officer,

18   Michael Biggers.

19      Q.   Could you spell the last name, please?  If you

20   know.

21      A.   I have to look at his business card.

22            B-I-G-G-E-R-S.  Common spelling.  Make it Mike.

23   He uses Mike instead of Michael.

24      Q.   In going to the range in Bonfield, Illinois, do

1    you ever transport any of your firearms from your home in

2    Chicago to the range?

3        A.   Yes.

4        Q.   Do you ever have any difficulty in transporting

5    your firearms from your home in Chicago to the range in

6    Bonfield?

7        A.   No.

8        Q.   Do you have any current plan or intention to

9    open a firing range of your own?

10       A.   No.

11       Q.   Do you have any experience or training or

12   education in designing firing ranges?

13       A.   No.

14       Q.   Constructing them?

15       A.   No.

16       Q.   Any experience or education in operating or

17   managing one?

18       A.   No.

19       Q.   And other than your work as a range safety

20   officer in Bonfield, have you ever worked at a firing

21   range?

22       A.   No.

23       Q.   And forgive me, this is personal, but in terms

24   of being a range safety officer, I'm assuming it's a

1   volunteer position?

2       A.   Yes.

3       Q.   I'd like to turn your attention to what I've

4   marked as Exhibits 1 and 2.

5            Exhibit 1 is an ordinance enacted by the City

6   of Chicago in July of 2011, which allows firing ranges to

7   operate in the City of Chicago, but has certain

8   regulations regarding their existence and operation in

9   the City.

10           Exhibit 2 is an amendment to the July, 2011

11  ordinance, which was enacted in September of 2011.

12       Now, you said you reviewed them prior to today's

13  deposition, correct?

14       A.   Correct.

15       Q.   So, you're aware that the City has in fact

16  enacted these ordinances, and that ranges can legally

17  operate in the City of Chicago?

18       A.   Yes.

19           MR. AGUIAR:  We're on No. 3.

20                (Document marked as requested.)

21                (Document tendered to the witness.)

22       MR. AGUIAR:  Q.  Mr. Hespen, I'm going to hand you

23  what's been marked as Exhibit No. 3.  It's titled,

24  "Plaintiff William Hespen's Answers to Defendant City of

1    Chicago's Second Set of Interrogatories to Plaintiffs."

2              I'd like to ask you to take a look at the

3    document.  And my question is, have you seen this

4    document before?

5              And please take as much time as you want to

6    review it before you answer my question.

7                   (Brief pause.)

8         A.   Yes.

9         Q.   Would you please turn to the last page of the

10   document?

11             You will see where it says typed,

12   William Hespen, there's a handwritten signature above

13   that?

14        A.   Um-hum.

15        Q.   Is that your signature?

16        A.   Yes, it is.

17        Q.   Did you review these before signing them?

18        A.   Yes.

19        Q.   Have you reviewed them since signing them?

20        A.   I have.

21        Q.   And when was that?

22        A.   That would be last night.

23        Q.   In preparation for today's deposition?

24        A.   Correct.

1      Q.   That's another document you looked at as well,

2   in addition to the ordinances?

3      A.   Yes.

4      Q.   We're going to spend time going through some of

5   your answers in Exhibit No. 3.

6           Is it your contention that the City of

7   Chicago's Gun Range Ordinance and its amendment -- we'll

8   just called them the ordinance for purposes of today's

9   proceeding.

10          If I ever need to distinguish between the two,

11   I will let you know.  Otherwise, this is considered to be

12   the Range Ordinance.

13          Is there a contention that that ordinance

14   interferes with your Second Amendment rights?

15      A.   In a way it does, yes.

16      Q.   Describe for me why you think that.

17      A.   Well, it requires you to have basically an FOID

18   card, and you also need a Chicago Firearms Ordinance

19   certificate.  And from reading it, it also makes certain

20   restrictions on how you could transport your weapon.

21          If you don't have these items, well, how are

22   you going to end up getting your certificate?

23          You should be able to first go to a range and

24   at least learn how to fire that weapon.  And once you're

1    able to do that, then getting your certificate shouldn't

2    be a problem.  Your FOID card would come from the State.

3            That's really not a problem.  It's just a

4    matter of applying for it and going through the

5    background check.

6        Q.   Is there any other way that you believe that

7    the Gun Range Ordinance impacts your Second Amendment

8    rights?

9        A.   Well, it sort of -- the way I read it, it sort

10   of -- like I says, it kind of prohibits you from going

11   there and actually trying out different weapons to see

12   which ones would work for you.  It prevents you from

13   owning a weapon until you get that City firearms

14   certificate.

15           So, it doesn't really give you a chance to

16   learn, you know, about these firearms.  You're required

17   to have this first, but yet it's telling you you can't

18   shoot at a range unless you have an FOID card and your

19   Chicago firearms certificate and that.

20           And there's also other things about knowing how

21   to transport your weapon and that.

22           You should be able to go to a range and be able

23   to learn this at the range.  And then this way, you will

24   be able to go out and purchase your own weapon.

1      Q.   Are you aware of whether the ordinance actually

2   allows people who do not have a CFP to go to a range in

3   the City of Chicago to do the one hour of live range

4   testing in order to get a CFP?

5      A.   Could you repeat that one more time?

6      Q.   Certainly.  If you could turn to Exhibit No. 1

7   here for a second, Page No. 9.

8           And just for the record, I'm referring to

9   Section 4-151-100 (g) (2), which says, "Notwithstanding

10  Subsection (g) (1), a CFP shall not be required of a

11  shooting range patron while the shooting range patron is

12  receiving the one-hour firearms range training in

13  compliance with Section 8-20-120.

14          "This exception only applies for a one-time,

15  one-hour period.  While the shooting range patron is

16  receiving the range-training portion of the required

17  firearm safety and training course."

18          This provision therefore allows an individual

19  who does not have a CFP, but who wants to get a CFP, to

20  go to a range in the City of Chicago and get that one

21  hour of training necessary to get a CFP, correct?

22          Is that how you understand this provision to

23  read?  I'm just asking for your understanding.

24      A.   We're on Page 9, right?

1      Q.   Yes.  Right here, sir (indicating).

2      A.   So, basically, for that one-hour class, they'll

3  give you a break where you don't need a CFP to bring a

4  weapon.  But yet in order to have it in Chicago, you have

5  to have a CFP first to register it.

6      Q.   Well, I think we're talking about two separate

7  issues.

8           When I asked you how you believe the Gun Range

9  Ordinance impacts your Second Amendment rights, you

10  mentioned that -- if I'm not understanding you correctly,

11  please let me know.

12          I thought you said, how can you get your CFP if

13  you can't train in the City, because they don't let you

14  do that.

15          Is that what you said?

16      A.   That's basically what I said, yes.

17      Q.   And my point is that the actual ordinance says

18  that if you don't have a CFP, but you want a CFP, you can

19  go to that range in the City of Chicago, even though you

20  don't have the CFP, in order to get that one-hour

21  training to get the CFP.

22          Is that your understanding of (g)(2) as well?

23          MR. SIGALE:  Well, I'm going to object.

24          Mr. Hespen will be able to answer, but I'm just

1   going to object in that Mr. Hespen is not an attorney.

2          So I'll object as to foundation and I'll object

3   as to the document speaking for itself.

4          But you can answer, Mr. Hespen.

5          MR. AGUIAR:  And just for the record, I'm

6   asking his understanding.

7          THE WITNESS:  For that one-hour training, yes.

8   It apparently eliminates any of the other rules, but

9   that's for the one-hour training.

10          I would think a person who is going to purchase

11   a firearm will obtain more training than that.  And in

12   order to do that, you're going to have to have your CFP

13   first.

14      MR. AGUIAR:  Q.  Why don't we turn back to Exhibit

15   No. 3?

16          In the complaint in this case, the plaintiffs

17   have alleged that the City's Gun Range Ordinance,

18   certified provisions of the Gun Range Ordinance make it

19   impossible to open a firing range in the City of Chicago

20   or severely burden the right to open a range in the City

21   of Chicago.

22          And we've asked all the plaintiffs certain

23   questions called Interrogatories about your claims in

24   this case.

1            And I'd like to ask you to look at what is

2    Interrogatory No. 4, which would be on the fifth page.

3            There we asked to you identify all locations in

4    Chicago to which it would be burdensome for any

5    individual plaintiff, or any Chicago resident who's a

6    member of any corporate plaintiff, to travel for purposes

7    of using a firearms range operated at that location, and

8    describe the basis and nature of the burden, okay?  That

9    was the question.

10            And the remainder of what's on this page are

11    just the objections that have been made to the question.

12            But on the top of the next page, you provided

13    an answer to the question notwithstanding your

14    objections, and I want to talk to you a little bit about

15    your answer there.

16            You say in the first line that every location

17    within the City limits is burdensome due to the City's

18    Firearms Transport Ordinance and restrictions on hours of

19    operation.

20            Why do you believe that every location within

21    the City's limits is burdensome to travel to?

22        A.    There are certain parts of the City that are

23    not very safe to travel to.

24        Q.    Only certain parts?

1    A.   Yes.  Since no one knows where these ranges are

2    actually going to be, if they're put into a section of

3    the City that's dangerous, you're going to have some

4    people there that are going to be very hesitant to travel

5    there.

6    Q.   So it's the safety of the neighborhood where

7    the range would be located which makes it burdensome?

8    A.   Yes.

9    Q.   What if a range were to open in what is

10   considered a safe neighborhood?  Would that still be

11   burdensome?

12   A.   Well, it depends.  There's rules there

13   pertaining to transportation of your weapon.

14        I think it requires you to have your FOID card,

15   of course.  The weapon has to be unloaded, encased and

16   broken down in a non-functioning state.

17        A lot of people may have a problem with

18   breaking that weapon down into a non-functioning state.

19   Q.   I believe you testified earlier that when you

20   transport your firearms from your home in Chicago to the

21   range in Bonfield, that it doesn't cause you any

22   problems.

23        Wasn't that your testimony?

24   A.   That's true.

1     Q.   And doesn't the State also have a requirement

2  that the firearm be broken down and locked?

3     A.   No.

4     Q.   It does not?

5     A.   No.

6     Q.   Do you know what the State requirements are?

7     A.   There's basically three requirements that you

8  follow under the FOID Card Act.  One's under the Criminal

9  Code and the other one is under the Conservation Code.

10        The most restricted one is the Conservation

11  Code.  And that means your weapon is encased, unloaded,

12  and naturally you have your FOID card with.

13        Now, you could also transport your ammunition

14  in the same case.  The weapon is still unloaded.  It

15  doesn't say it has to be broken down in a non-functioning

16  state.

17        When I think of something being broken down,

18  I'm thinking it's going to be disassembled.

19     Q.   And so are you saying that the City's ordinance

20  regarding the transportation of firearms would burden

21  your ability to go to every location in the City of

22  Chicago where a range could located?

23     A.   Yes, it would, because there's a lot of

24  individuals who may not be experienced enough to break

64910eb3-acaf-48a3-8e04-6c84fafa0697

1    these weapons down.

2              When you start disassembling them, there's a

3    chance of losing parts.  There's a chance of not putting

4    it back together again.  Not everyone is, let's just say,

5    proficient in the disassembly or breaking a weapon down

6    in a non-functioning state.

7         Q.   I'd like to ask about you though, because this

8    is your answer to the Interrogatory.

9              Do you believe that complying with the City's

10   ordinance, if you've stated it correctly, would burden

11   your ability to go to a range in the City of Chicago,

12   wherever it may located?

13        A.   Yes, it would.  Certain areas of the City

14   being -- from my experience as a police officer, I would

15   not venture in there now that I'm a private citizen.

16        Q.   I'm talking about the Transportation Ordinance,

17   the transportation issue.

18             Would you able to comply with the

19   Transportation Ordinance in transporting your firearms to

20   locations within the City where a range could be located?

21        A.   As an individual?

22        Q.   Yes.

23        A.   Yes, I could.

24        Q.   Do you know whether your complaint in this case

1   actually challenges the constitutionality of the City's

2   Firearms Transportation Ordinance, as we're calling it?

3       A.   I would think it would.

4       Q.   You think it does?

5       A.   Yes.

6       Q.   Have you reviewed the complaint?

7       A.   Not entirely, but just the mere fact that the

8   part where you have to make that weapon in a

9   non-functioning state -- again, it could be hazardous to

10  a lot of other firearm owners if you're not experienced

11  in assembling and disassembling a weapon.

12          And then if you take it and you do it the wrong

13  way, you could have problems.

14      Q.   You also say in response to Interrogatory No. 4

15  that every location within the City is burdensome to

16  travel to because of the restrictions on hours of

17  operation.

18          How does the City's ordinance regarding the

19  hours of operation that a range can be open, which is

20  8:00 a.m. to 9:00 p.m. seven days a week, burdening your

21  ability to go to every location in the City of Chicago to

22  attend, to go to a firing range?

23          MR. SIGALE:   I just want to object to the form

24  of the question to the extent that you're reading that as

64910eb3-acaf-48a3-8e04-6c84fafa0697

1    the answer to No. 4, the question of which asked about

2    the burden to any individual plaintiff, or any Chicago

3    resident who is a member of a corporate plaintiff.

4            So to the extent you're asking that, my

5    objection is mischaracterizing the Interrogatory

6    answer.

7            To the extent that you're just asking him for

8    his opinion notwithstanding what it says here, then

9    that's fine.

10           MR. AGUIAR:  I'm asking the witness -- he has

11   said in response to the Interrogatory that every location

12   within the City's limits is burdensome.  And he says it's

13   burdensome because of the restrictions on hours of

14   operation.

15           I'm asking him why he said that in response to

16   the Interrogatory.

17           THE WITNESS:  Well, if you're working a certain

18   shift, that could prohibit you from getting to a range.

19           You still have a regular life to live and, you

20   know, if your range is only going to be open from 8:00

21   until 9:00, you may not be able to make it there during

22   those hours when you want to go or when you need to

23   practice.

24       MR. AGUIAR:  Q.  Has anybody ever told you that they

64910eb3-acaf-48a3-8e04-6c84fafa0697

1    would not be able to go to a range between the hours of

2    8:00 and 9:00 p.m. seven days a week?

3        A.    I never had conversations like that with

4    anyone.

5        Q.    Are you personally aware of anybody who would

6    not be able to go to a range between the hours of 8:00

7    a.m. and 9:00 p.m. seven days who want to go to a range?

8            MR. SIGALE:  I just want to object to the

9    extent that the question is supposed to be representing

10   the Ordinance.

11           The Ordinance says 9:00 a.m. and 8:00 p.m.,

12   not 8:00 to 9:00.  It's 9:00 to 8:00.  4151-090.

13           MR. AGUIAR:  I do stand corrected.  I had my

14   hours reversed.  It's 9:00 a.m. to 8:00 p.m. seven days a

15   week.

16   MR. AGUIAR:  Q.  Are you aware of anybody who would

17   want to go to a range during those hours, but would not

18   be able to go?

19       A.    No.  I can't think of anyone right now.

20           But then I haven't talked to a lot of people

21   who exactly tell me when they're able to go and shoot and

22   when they can't.

23       Q.    Would you personally be able to go to a range

24   if it was only open between 9:00 a.m. and 8:00 p.m. seven

1    days a week?

2         A.   I probably could.  But in my case, remember,

3    I'm retired.  If I was working a full-time job somewhere,

4    that could be a problem.

5         Q.   But again, in your position as you sit here

6    today, you'd be able to go?

7         A.   Yes.

8         Q.   What range hours do you believe would eliminate

9    burdensomeness that the Ordinance causes?

10        A.   I think the range could be open 24 hours a day.

11        Q.   Why do you think that?

12        A.   Well, there's people who work different shifts.

13   Take a policeman, for example.  I'm using that as an

14   example because I'm more familiar.  We used to work three

15   different shifts.  That would be days, evenings and

16   midnights.

17             Now, private citizens work the same type of

18   shifts.  You also have to sleep sometime.  So, you just

19   can't -- you work a midnight shift.  You come home.

20   You're going to sleep for at least, hopefully, eight,

21   nine hours before you have to go back to work.

22             So yes, it would be burdensome for a person

23   working a midnight to 8:00 shift, then coming home.  He'd

24   have to sleep.  And then by the time he got up, that

1    range would probably be closed.

2         Q.   Do you know of anybody who is in that position,

3    other than a CPD officer?

4              MR. SIGALE:  I'm just going to object as to the

5    form.  Are you asking him for names or are you asking him

6    for occupation?

7              MR. AGUIAR:  Whether he knows anybody.

8              MR. SIGALE:  Names.  Okay.

9              MR. AGUIAR:  I didn't ask for names, but

10   whether he knows anybody.

11        MR. AGUIAR:  Q.  We'll start with just, do you know

12   anybody?

13        A.   I know a couple of nurses who would have a

14   problem working with that.

15        Q.   Have any of these nurses expressed to you any

16   desire to go to a gun range?

17        A.   Yes.

18        Q.   Have they ever told you that the hours of

19   operation are burdensome for them?

20        A.   Well, we never got to discussing it that much.

21        Q.   So did they ever tell you that these hours of

22   operation would be burdensome for them?

23        A.   I said, we've never discussed the hours of

24   operation.  So I don't know.

1      Q.   So you don't know whether that would be a

2   burden for them?

3      A.   I would have to ask them if it was.  No.  I

4   don't know offhand.

5      Q.   Okay.  Do you know if these nurses work seven

6   days a week?

7      A.   No.  They...

8      Q.   No you don't know or no they don't?

9      A.   No.  I know they don't.  They work a

10  four-or-five-day work week.  It depends on what shift or

11  what section of the hospital they work in.

12     Q.   Are you aware of any ranges that are open to

13  the public that are open 24 hours a day?

14     A.   No.

15     Q.   In your prior deposition, you talked about a

16  number of different ranges you had gone to in prior

17  years.

18          Do those ranges all have hours of operation?

19     A.   Yes, they do.

20     Q.   So they were closed at certain points?

21     A.   Yes.

22     Q.   Do you happen to recall what those hours were,

23  offhand?

24     A.   Usually they're open in the morning around 8:00

1   or 9:00 o'clock and they're closed by sunset.

2       Q.   Let's move on to the last half of the first

3   paragraph on this page where you say that "Additionally,

4   presumably any location where a plaintiff or member who

5   would have to store his or firearm outside of the City

6   limits could not obtain private vehicular transportation

7   with a lockable trunk to a firearms range with an indoor

8   attached parking facility, and any location to which it

9   is unsafe to travel would be burdensome."

10          I want to focus on and any location to which it

11  is unsafe to travel language, for a moment.

12          How does the Ordinance require you to travel to

13  a place that's unsafe?

14      A.   Well, if they build a range in an area that's

15  not safe to go to, and you have no other range to go to,

16  then the Ordinance is more or less saying, if you want to

17  practice of if you want to maintain your ability with

18  that firearm, you have to go to this location.

19          So therefore, I would think that the ordinance

20  is more or less telling you it's either here or you don't

21  go practice.

22          And you should practice to be proficient with

23  your weapon if you're going to use it in a situation

24  where you might need it for self-defense or something

Page 38

1   like that.

2        Q.   Is it your position that the Ordinance would

3   require you to travel to an unsafe location?

4        A.   Yes.

5        Q.   Why do you believe that to be the case?

6        A.   Well, again, the Ordinance is -- they establish

7   where the ranges are, and if you want to practice, you

8   have no choice.  If you want to practice, you will have

9   to go to where the range is in the City.

10       Q.   Have you examined or studied where the

11  Ordinance will allow ranges to locate in the City of

12  Chicago?

13       A.   Briefly I reviewed it, but I didn't go into

14  detail.

15       Q.   What did you do to review that?

16       A.   Well, the way the Ordinance more or less

17  states, it's going to be a certain distance from schools,

18  churches, businesses that sell alcoholic beverages,

19  parks, I believe.

20            So it pretty well defines where or where not

21  that range could be built.

22       Q.   And how does that limitation lead to your

23  conclusion or your position that ranges can only locate

24  in bad neighborhoods or in places where it's unsafe to

Page 39

1    travel?

2         A.    Well, they're going to try to locate it so it

3    meets the Ordinance, and you're going to find a lot of

4    areas where you may have to go through these

5    neighborhoods in order to find a location, let's say in

6    an industrial area, where you might be able to set up a

7    range and that.

8         Q.    And what did you look at to determine that the

9    Ordinance will only allow ranges to open in these kinds

10   of places?

11        A.    I think I forget which -- it was one of these

12   that had a listing of where the ranges could be built or

13   where they could not be built.  I don't remember the

14   exact location, one of these files.

15        Q.    So you looked at the Ordinance?

16        A.    I believe it was an Ordinance.

17        Q.    And the Ordinance just said that it can't be

18   within so many feet of certain types of uses of property,

19   so to speak?

20        A.    Correct.

21        Q.    But you didn't go out and look at where that

22   physically would allow a range to be in the City of

23   Chicago?

24        A.    No.

1      Q.   You didn't look at a zoning map?

2      A.   No.

3      Q.   You didn't conduct a study or go out in the

4  field and look it up?

5      A.   No.

6      Q.   It's based solely on the statement that they

7  can't be within 500 feet of anything else -- of certain

8  types of things?

9      A.   Yes.

10     Q.   What do you consider to be a location to which

11  it's unsafe to travel?

12     A.   An area where there's a high crime rate, where

13  there's numerous people being injured, shot.

14         I would base it on the crime rate in that

15  particular area and how many, you know, people get

16  injured by the use of firearms, illegal use of firearms.

17     Q.   And again, it's your position that the

18  Ordinance only will allow that range to open in one of

19  those types of neighborhoods?

20     A.   By reading the restrictions on where it could

21  be, that's a good possibility.

22     Q.   But you don't know for sure if that's in fact

23  true?

24     A.   No.  No, I don't know for sure, because I

1   wouldn't be the one who they would inquire about as to

2   where they're going to build it.

3       Q.   So you don't know that a range could possibly

4   open in what you consider to be a low crime neighborhood.

5   You don't know.

6       A.   No.  I don't know.

7       Q.   And if a range were to open in a neighborhood

8   which did not meet the definition of what you call it to

9   be a place that's unsafe to travel, your right wouldn't

10  be burdened then, would it?

11          MR. SIGALE:  I'm sorry.

12          MR. AGUIAR:  I'll rephrase it.

13      MR. AGUIAR:  Q.  If a range were able to open in an

14  area which did not meet your definition of what's

15  considered unsafe, your rights wouldn't be burdened then,

16  would they?

17          MR. SIGALE:  I'm still going to object.  That

18  was the same question.  I'm going to object as to form of

19  the question.

20          MR. AGUIAR:  Do you understand my question?

21          THE WITNESS:  Could you re...

22          MR. AGUIAR:  Certainly.  That's what I'm here

23  for.

24      MR. AGUIAR:  Q.  You're saying that the Ordinance

Page 42

1    burdens your rights because it's going to force you to go

2    someplace where it's unsafe to travel.

3          I'm saying, if a range can locate in a

4    neighborhood where it's not unsafe to travel, which does

5    not meet the definition you gave me earlier of what's

6    considered unsafe, if a range could be in a safe

7    neighborhood, by your definition, there would be no

8    burden on your right as you expressed here; is that

9    correct?

10          MR. SIGALE:  I've got to object to the form of

11    question.  It mischaracterizes the Interrogatory answer.

12      MR. AGUIAR:  Q.  If a range could open in what you

13    consider to be a safe neighborhood, would you still

14    consider your Second Amendment right to be burdened?

15      A.   No.

16      Q.   Let's move to Interrogatory No. 8, which is in

17    Exhibit No. 3.

18          In Interrogatory No. 8, we've asked you for

19    each of the following requirements in the municipal code

20    challenged by plaintiffs, to identify and describe any

21    burden imposed by the requirement upon any person,

22    including any plaintiff or any actual or anticipated

23    customer of any plaintiff; and two, any attempt to comply

24    or any inquiry, evaluation or analysis regarding

1   potential compliance.

2            What I will do is walk through with you (a)

3   through (i), which are the provisions of the Ordinance

4   which are challenged in your complaint, and you answered

5   these questions.

6            I want to walk through and talk to you a little

7   bit about your answers, get a little bit more information

8   about them.

9            In (a), the first provision which is being

10  challenged is, "The requirement that all range managers,

11  employees and applicants be fingerprinted and have a

12  Chicago firearms permit and an Illinois FOID card."

13           And then on the next page, if you flip, we have

14  your answer.  And there you say, "This restriction makes

15  it unduly burdensome for those operating firing ranges to

16  find attorneys, promoters, lobbyists, employees and

17  assistance from all other persons who fall under the

18  definition of applicant, yet do not live in Illinois, or

19  do not have a CFP, for whatever reason, yet would still

20  perform work for or on behalf of the range."

21           What I'd like to know is, how do you know that?

22  How do you know that the restriction we're talking about

23  creates that burden?

24       A.   It says "employees" right there.

1           What if the person is nothing more than a

2    janitor?  Why would he need a CFP if he's not shooting or

3    not selling guns, but just cleaning up the place?

4           That would be a burden.  That would force this

5    manager, or whoever is running the business, to go out

6    and basically force his employees to get their FOID card,

7    get their Chicago firearms permit and that.  It doesn't

8    make any sense for that.

9       Q.   What I'd like to know is, how do you know that

10   to be true?

11          You testified that you've never owned a range,

12   correct?

13      A.   That's correct.

14      Q.   You've never opened a range?

15      A.   Correct.

16      Q.   Operated a range; is that correct?

17          So, how do you know that to be true?  Did you

18   speak with a range owner about this issue?

19      A.   No.

20      Q.   A range operator?

21      A.   No.

22      Q.   Is this basically your opinion?

23      A.   Yes.

24      Q.   And what is that opinion, based on just your

1    thoughts?

2         A.   I'm just thinking.  There's certain -- maybe

3    the manager, somebody, or a person actually selling the

4    firearms should have that.

5              But an employee who does nothing more than,

6    say, janitorial work, or maintenance in the building,

7    there's no reason to have FOID cards if he's not a

8    shooter or anything like that.  That would be hindrance

9    on his ability to get employment there.

10        Q.   But again, that's just your opinion--

11        A.   Yes.

12        Q.   --correct?

13             You don't know that it actually creates this

14   burden.  You haven't spoken with anybody who's told you

15   there's a burden.

16             MR. SIGALE:  I'm just objecting to the extent,

17   really, with any of the questions that are asked, that

18   you're asking him for legal opinions or legal

19   conclusions.

20             It sounds a lot like you're asking him for a

21   legal opinion about what the meaning of the Ordinance is,

22   which -- that's just how the questions are sounding to

23   me.

24             So I'm objecting to that extent.  Obviously

1    Mr. Hespen is not an attorney

2              MR. AGUIAR:  I disagree simply because he's

3    made a statement that the restriction creates a burden.

4              I'm asking him, how does he know that it does

5    that; what information has he looked at to determine that

6    it actually -- that this Ordinance provision is going to

7    cause this burden to occur.

8              Now, he said he hadn't spoken to a range

9    operator about that.

10      MR. AGUIAR:  Q.  Is that correct?

11      A.    Correct.

12      Q.    You haven't talked to a range owner about this

13   provision?

14      A.    Correct.

15      Q.    You yourself don't own or operate a range?

16      A.    That's correct.

17      Q.    So this is just based on your thoughts.  Strike

18   that.

19              You didn't look at any studies, any reports,

20   any other empirical information, correct?

21      A.    No.  It's my opinion.

22      Q.    It's your opinion.

23              And that's all it is is just your opinion?

24      A.    Yes.

1      Q.    Okay.

2            MR. SIGALE:  Again, I just want to object to

3  form.

4            MR. AGUIAR:  I'm just asking the basis for why

5  he said what he said.

6            MR. SIGALE:  I mean, it's the language of -- to

7  the extent you're asking him to interpret the language of

8  the Ordinance, I object in that he's not an attorney.

9            So with that said, he already answered the

10  question.

11            MR. AGUIAR:  Objection noted.  Let's move along

12  to 8(b).

13            And in (b), we list the second provision of the

14  Ordinance challenged in your complaint, which is, the

15  requirement that ranges operate only between 8:00 a.m.

16  and 9:00 p.m., which, as Mr. Sigale has thankfully noted,

17  that is incorrect.  It's 8:00 a.m. to 9:00 p.m.

18            MR. SIGALE:  It's the other way around.  It's

19  9:00 a.m. to 8:00 p.m.

20            MR. AGUIAR:  Thank you.  I'm tired today.

21  Strike that comment, please.

22            And in 8(b), you say -- if you want to flip to

23  the two pages after that.  The pages aren't numbered, and

24  I apologize.

1            Where it says 8 (b) here.  If you want to

2     follow along, there's your answer.

3            And it says, "This restriction unduly burdens

4     those for whom the early morning or late night are the

5     most convenient, or only times they can patronize a

6     firing range whether due to work or other personal

7     reasons."

8            Now, we've already discussed that you yourself

9     would not have a problem going to a range between those

10    hours that the Ordinance allows the range to be open,

11    correct?

12         A.   Correct.

13         Q.   The second sentence says, "It is also unduly

14    burdensome for those operating a range who would

15    otherwise have those persons as customers."

16            And again, my question is, how do you know that

17    that burden is created by the hours of operation?  What

18    is the basis for saying that?

19         A.   Basically your customers have to work their

20    range time around their home life and their job.  They

21    may not be able to get in there during these certain

22    hours.  So I think the range should be open 24 hours a

23    day.

24            Remember, the City is requiring you to be able

1   to be proficient with that weapon and know how to use it

2   before they're going to issue that permit.  So you gotta

3   have some time to go and practice.

4         Plus, once you get the permit, you should

5   maintain your ability to operate the weapon just in case

6   you need it for some form of self-defense.

7         A lot of people are not going to go to the

8   range just for, you know, casual target practice.

9   Q.   Well, here, I want to refocus for a second,

10  because here you're saying, again, "It is also unduly

11  burdensome for those operating a range who would

12  otherwise have those persons as customers."

13        In other words, I read that to mean -- and

14  correct me if I'm wrong -- that the operators of ranges

15  are missing out on potential customers, money, that they

16  could make.

17  A.   That's true.

18  Q.   And I want to know what's the basis for that.

19        Have you spoken to a range operator about this

20  problem?

21  A.   No.

22  Q.   A range owner?

23  A.   No.

24  Q.   Have you looked at any studies or reports which

1    would describe lost income based on the hours of

2    operation?

3        A.    No.

4        Q.    Again, would this just be your opinion?

5        A.    Yes.

6        Q.    Let's look at 8 (c).

7              For purposes of today, it's probably good if

8    you'd keep those two pages open to each other.  It will

9    make it easier for you.

10             8 (c), here's the Ordinance provision

11   challenging in your complaint, which requires that range

12   patrons be at least 18 years of age or older.

13             And in your response to that, you say that,

14   "The restriction unconstitutionally inhibits the proper

15   teaching and training in firearm use and safety to youth,

16   whether through organized instruction or parental

17   guidance."

18             I'd like to know, do you know of any youth who

19   wants to go to a firing range, people who are under the

20   age of 18 who want to go to a firing range?  Do you

21   personally know anybody?

22       A.    No.

23       Q.    The second sentence says, "It is also unduly

24   burdensome for those operating a range who would

1   otherwise have those persons as customers."

2           That's the same kind of language we just looked

3   at in response to 8 (b).

4           And again my same question is, what is the

5   basis for your saying that, here, that range operators

6   are going to lose potential customers based on this?

7       A.   Well, if they're restricted about the hours

8   that that range is going to be open, there may be some

9   customers that just can't fit into that category,

10  timeframe, and of course you're going to lose some

11  customers.

12      Q.   Again, this is tied to the 18 years old or

13  younger restriction.

14          Did you talk to any range operators about lost

15  business based on that restriction?

16      A.   No.

17      Q.   Any range owners?

18      A.   No.

19      Q.   Have you looked at any studies or reports--

20      A.   No.

21      Q.   --on that issue?

22      A.   No.

23      Q.   Any other empirical information?

24      A.   No.

1      Q.    Anything at all?

2      A.    It's my own opinion, I guess.

3      Q.    Okay.  Let's move along to 8 (d).

4            MR. SIGALE:  Would you mind if we take about

5  two minutes?

6            MR. AGUIAR:  Certainly.  Absolutely.

7                 (Brief recess.)

8            MR. AGUIAR:  Let's go back on the record.  And

9  for the record, I have 2:47 as the time.

10       MR. AGUIAR:  Q.  In 8 (d), we list the provision of

11  the Ordinance, which says that patrons of ranges must

12  have a CFP and an FOID card, unless they're receiving the

13  one hour of CFP training.

14            And you say that this provision

15  unconstitutionally infringes on the rights of

16  non-Illinoisans, as well as persons who live outside of

17  Chicago.

18            You live in Chicago, correct?

19       A.    Correct.

20       Q.    Has any non-Chicago resident told you that this

21  provision would burden their ability to go to a range in

22  the City?

23       A.    I haven't talked to anyone who lived out of the

24  State.

64910eb3-acaf-48a3-8e04-6c84fafa0697

1        I think that's what you're talking about --

2    somebody who lives out of the State of Illinois.

3        Q.   My first question was outside of the City of

4    Chicago.

5        A.   Oh, outside of the City of Chicago.

6        Q.   Has anybody outside of the City of Chicago told

7    you that this provision would make burden their ability

8    to go to a range in Chicago?

9        A.   I haven't talked to anybody.

10        Q.   Okay.  What about outside of Illinois?  Same

11    question.

12        A.   No.

13        Q.   In the second sentence you say that this

14    provision also unconstitutionally infringes on those who,

15    as a result of the Ordinances, are unable to patronize

16    the firing range closest to them.

17        I'd like for you to explain to me how this

18    Ordinance requirement, that you have to have a CFP and an

19    FOID card, would affect someone's ability to patronize

20    the range closest to them.

21        A.   You could have someone living right on the

22    border, and the range could be a matter of blocks from

23    their house.

24        If they don't have a Chicago firearms permit,

1    they wouldn't be allowed to transport their weapon into

2    the City, nor would they be allowed to legally shoot

3    there.

4         Q.   Is it your understanding that only Chicago

5    residents could have a CFP?

6         A.   I expect only Chicago residents.  Why would

7    they issue it to somebody in the suburbs?

8         Q.   So your answer then is based on an

9    understanding that only a Chicago resident could have a

10   CFP?

11        A.   Yes.

12        Q.   Let's assume for a moment, just for purposes of

13   today's deposition, that I told you that non-Chicago

14   residents could have a CFP.  I'm not talking

15   non-Illinois, but non-Chicago.  Someone who lives in

16   Illinois but outside Chicago, that that person could have

17   a CFP.

18             Would that change your answer?

19        A.   Only to the extent that he would first be

20   required to get that.

21             If he wants to go and practice shooting, and

22   he's closer to a range in the City of Chicago and he

23   doesn't have that, he still could not come into the City,

24   legally, with his weapon.  He would have to obtain a

1    Chicago firearms permit first.

2         Q.   And it's your position that you have a right

3    to -- you have a constitutional right to -- this is your

4    position -- that you have a constitutional right to go to

5    the firing range closest to you?

6         A.   Yes.  I think you should have that right.

7         Q.   It's a right that you're allowed to go to the

8    one closest to you, and there can be no infringement on

9    that right.

10        A.   I agree.

11        Q.   At all?

12        A.   At all.

13        Q.   No restrictions?

14        A.   No.

15             MR. SIGALE:  I'm just going to object to the

16   form of the question.

17        MR. AGUIAR:  Q.  Let's move on to the third

18   sentence.  It says, "It is also unduly burdensome for

19   those operating a range who would otherwise have those

20   persons as customers."

21             Again, that language mirrors what we've already

22   seen in response to 8 (b) and 8 (c), and my questions

23   will again be the same.

24             Have you spoken with any range operators about

1    the effect of this provision on their business?

2         A.    No.

3         Q.    Any range owners?

4         A.    No.

5         Q.    Looked at any studies?

6         A.    No.

7         Q.    Any articles or other kind of empirical

8    evidence?

9         A.    No.

10        Q.    It's just your opinion?

11        A.    Yes.

12        Q.    Okay.  You also say in the last sentence,

13   "It is likewise an unconstitutional burden on a person

14   who wishes to try out a firearm to determine if he/she

15   wishes to possess that certain firearm or firearms at

16   all."

17            How does the requirement that you have to have

18   a CFP and a FOID card create that burden?

19        A.    Well, not all firearms are good for every

20   individual.  There's certain calibers that may be a

21   burden to shoot properly.

22            So I would say a person should be able to go to

23   a range, be able to try, rent and try different firearms

24   whether it be semi-automatics, revolvers and whatnot, and

1    different calibers to find out what's right for them.

2           You might find -- well, I've seen this from

3    experience, that there's some people who will shoot let's

4    say a 45 ACP and can't hit anything with it, but they can

5    go down to a nine millimeter and do very well, because of

6    the recoil and whatnot on the weapon.

7           And that goes for also revolvers.  If you start

8    getting into higher calibers, like 50 caliber, 44 magnum,

9    41 magnum, stuff like that.

10     Q.   How does the CFP and FOID card requirement

11   cause that to happen?

12     A.   Well, a lot of people want to get a gun, but

13   before they actually want to go out and -- you have to

14   have an FOID card to make a purchase.

15     Q.   And that's a State requirement?

16     A.   That's a State requirement.  Of course.

17           But a lot of people would like to try it first

18   and not have to go out and go through the process of

19   obtaining these documents.  They may find out that, oh, I

20   don't want to shoot a gun.

21           So therefore, why force them to meet the

22   requirements first?  They should able to -- just like if

23   you went out and were looking for a different car.  You'd

24   go to a different dealer.  Take a test drive here.

1    I don't like it.

2           If you go try a Ford dealer, take a test drive

3    in a car, you might not like it.  You may wind up in a

4    Chevy dealer or Toyota or something like, and find what

5    you do like.

6       Q.   And it's your position that you have a

7    constitutional right to do that?

8       A.   Yes.  You should have freedom of choice.

9       Q.   Are you aware that you can't purchase firearms

10   in the City of Chicago?

11      A.   Yes, I am.

12      Q.   So even if someone were to be allowed to try

13   firearms at a range in Chicago, they wouldn't be allowed,

14   under the current law, to actually make that purchase

15   within the City of Chicago?

16      A.   That's correct.

17      Q.   And you think it's unconstitutional to require

18   someone to actually have a CFP, or to obtain that

19   one-hour CFP training first before being allowed to try

20   guns?

21      A.   Yes.  I think they should be able to try it

22   first and find out if they really want to own a weapon

23   and fire it.  They may not like it.

24           They may get out there and try a 38 special and

1    say, it's not for me.

2             But then they may try a 22 and they may like it

3    and say, yeah, I'll get this.  Then they can go through

4    the process.

5        Q.   Has anyone ever expressed to you that this

6    provision that we're talking about has caused a burden

7    that we're describing here?

8        A.   No.

9        Q.   Have you ever felt that burden personally?

10       A.   Rephrase that one.  How would I have felt this

11   burden?

12       Q.   Strike the question.

13            Let's move along to 8 (e).  There, we're

14   talking about--

15       A.   8 (a).

16       Q.   8 (e).  Sorry.

17            There we list the provision challenged in the

18   complaint that ranges be located more than 500 feet from

19   certain sensitive areas, we'll call them.

20            And in response to that, you say that this

21   restriction unduly burdens those who operate a range by

22   eliminating virtually all locations in Chicago.  Now

23   we've touched on this before a little bit.

24            How do you know that this provision eliminates

1   virtually all locations in Chicago?

2        A.   Well, some of the limitations are, you know,

3   you have to be so many feet from a school, or you have to

4   be such a distance from schools, churches, liquor

5   establishments.  You go down some of these streets and

6   it's hard to avoid it.

7             Churches...  It could be very difficult unless

8   you went into some industrial area somewhere to locate a

9   range.  That would be a reasonably easy convenience for a

10  person to get to.

11       Q.   Again, your statement is that it eliminates

12  virtually all locations in Chicago.

13       A.   Virtually, yes, it does.

14       Q.   And again, what do you -- are you basing that

15  solely on the language of the Ordinance?

16       A.   Yes.

17       Q.   You haven't actually gone out and made a

18  determination of where a range could actually locate in

19  the City of Chicago, a range which meets these

20  requirements?

21       A.   No, I haven't.  But then...

22            MR. SIGALE:  Just answer his question.

23            THE WITNESS:  No.

24       MR. AGUIAR:  Q.  So again, would it be your opinion

1    that the restriction eliminates virtually all locations

2    in Chicago?

3         A.   Yes.

4         Q.   When you say virtually all locations, you use

5    the word virtually.

6              Does that mean it could locate somewhere in the

7    City of Chicago?

8         A.   Possibly.

9         Q.   So there are possible locations in Chicago

10   where a range could locate then?

11        A.   It's a possibility; yes, there is.

12        Q.   Again, that's your opinion as well?

13        A.   Yes, it is.

14        Q.   Do you happen to know of anybody who wants to

15   own or operate, open a range in Chicago but cannot

16   because of the requirements that we are speaking about

17   here in 8 (e)?

18        A.   No.

19        Q.   Continuing on with the remainder of what you

20   say in the first sentence of 8 (e), you say that it

21   "eliminates virtually all locations in Chicago, thus

22   ensuring that when combined with the other City

23   requirements for constructing and operating a firing

24   range, that one could never be profitably opened and run

1   in Chicago."

2            I also want to talk to you about the basis for

3   that statement.

4            What do you know about the connection between

5   where a range can operate and its profitability?

6       A.   I really don't.

7       Q.   You've never studied it at all?

8       A.   No.

9       Q.   Or spoken with anyone about the location of a

10  range and its profitability?

11      A.   Correct.

12      Q.   In the last sentence, you say, "It likewise

13  burdens those who would patronize the range by limiting

14  the number of ranges, thus limiting the total number of

15  firing lanes available for customers, and the possibility

16  that customers will be able to get to the range or get

17  range time."

18           And again, what is the basis for saying that

19  the restrictions on where they can locate cause these

20  burdens?  Is it, again, just your opinion?

21      A.   Yes.

22      Q.   You've done no studies about that issue?

23      A.   Correct.

24      Q.   And you haven't spoken with anybody about that

1   either?

2        A.   Correct.

3        Q.   Let's look at 8 (f).

4             And there, we list the provision of the

5   ordinance challenged by the plaintiffs in the complaint

6   that "possessors of firearms possess a CFP, insofar as

7   its requirement bars range patrons from practicing with

8   or sampling different firearms, practicing the use of

9   firearms without purchasing and registering a firearm or

10  purchasing ammunition for self defense, or replacing

11  older ammunition by firing it at the range and then

12  departing with fresh replacements."

13            And in response, you say, among other things,

14  that this restriction inhibits the very purpose of

15  training.

16            How does the CFP requirement inhibit training?

17       A.   Well, you're requiring to have that, and you're

18  going to a range, and the range prohibits you from, you

19  know, purchasing new ammunition after you've shot off

20  your old, or if you don't have your CFP, then you can't

21  go to a range in Chicago and shoot legally.

22            So it places a burden -- a lot of people would

23  like to go to these ranges and experience shooting

24  different types of weapons.

1        Again, you're required to have the CFP.  If you

2   do not have the CFP, it puts a burden on you.  You can't

3   go to the range.

4        Q.   You're saying it inhibits the very purpose of

5   training.

6             Does it inhibit all training?

7        A.   Just about.  If you're going to own a firearm,

8   a majority of the people probably own it for home

9   protection, self defense.

10            They're not going to be, you know, shooting at

11  pistol matches or anything like that.

12            If you're going to own it for those reasons for

13  self defense and that, home protection, you should be

14  proficient with it.  And the only way you get proficient

15  is by going to a range and practicing with a weapon.

16       Q.   But would you agree with me that a person who

17  has a CFP could go to a range in Chicago and practice

18  with his or her firearm, and this provision does not

19  prohibit that from happening?

20       A.   What you're saying is, you have to have your

21  own firearm.

22            What if the individual wants to go test out

23  other firearms so he could make a purchase?

24            So, yes, it would be a burden on the

1    individual.

2         Q.   But you have to have a CFP, correct?  Strike

3    that question.

4              You also say that this restriction, 8 (f),

5    burdens home firearm possession.

6              How does this requirement burden home firearm

7    possession?

8         A.   We're talking the requirements for the CFP.

9         Q.   You're saying that the CFP -- we're talking

10   about ranges here.

11             You're saying that the CFP requirement bars

12   range patrons from practicing with or sampling different

13   times, or practicing with different firearms.

14             How does that burden home firearm possession?

15        A.   It doesn't allow you, when you go to a range,

16   to obtain different firearms to evaluate -- to practice

17   with and shoot.

18             You're more or less forced to either not have

19   your own firearm because you don't know what to buy, and

20   it puts a burden on the individual shooter who wants to

21   learn the proper, safety techniques as how to properly

22   shoot the weapon.

23        Q.   But you can't purchase firearms in the City of

24   Chicago, correct?

1    A.   That's correct.

2    Q.   So you have made the purchase outside the City

3 anyway, correct?

4    A.   Correct.

5    Q.   And in your experience, when you go to purchase

6 to -- you've purchased firearms before, haven't

7 you?

8    A.   Yes.

9    Q.   When you've purchased firearms, haven't you

10 been allowed to sample the firearm before you purchase

11 it?

12    A.   Not in all gun shops, no.

13    Q.   Approximately how many -- what kind of

14 percentage do you assign the number of gun shops that

15 allow you to sample firearms before purchasing them?

16    A.   If they--

17    Q.   In your experience?

18    A.   If they're connected to -- if the gun shop has

19 a range, and they have that particular firearm available

20 for rental, yes, you could rent it and test fire it.

21       A lot of gun shops are not connected with a

22 range.  So therefore you would be prohibited from

23 sampling, you know, test firing it before.

24       And they're not going to give you the

1    individual weapon.  You're going to have to have a

2    similar weapon.  Otherwise, if you shot the weapon that

3    you're going to purchase, then you change your mind, it

4    would no longer be a new weapon.  It would be considered

5    used.

6         Q.   You say a similar weapon.

7              So it's not the exact firearm you're going to

8    be purchasing?

9         A.   Right.

10        Q.   Let's skip along to 8 (h).

11             There we list the provision of the Ordinance

12   being challenged in your complaint that any range have a

13   maximum decibel level of 55 decibels emanating from

14   shooting ranges.

15             You say that this restriction unduly infringes

16   the ability to construct and operate a range in Chicago.

17             I believe you testified that you've never

18   constructed a range?

19        A.   Correct.

20        Q.   Have you ever designed a range?

21        A.   No.

22        Q.   Installed a range?

23        A.   No.

24        Q.   So what is the basis for your assertion that

1    this provision infringes the ability to construct and

2    operate a range in Chicago?

3         A.   We're talking about sound levels there.

4         Q.   Correct.  What's the basis for your saying that

5    it's actually going to infringe upon the construction and

6    operation of a range in Chicago?  How do you know that to

7    be true?

8         A.   If they're going to use -- if they're going to

9    use sound levels, and then if the range is constructed

10   properly, the noise never should leave the inside of the

11   range.

12        But if they just go by the level itself and

13   they say, oh, because it's above a certain decibel, then

14   they decide to cancel it just for that, I don't think

15   that would be right.

16        Q.   Again, is that your opinion?

17        A.   Yes.

18        Q.   Do you have any experience in soundproofing

19   matters?

20        A.   No.

21        Q.   Soundproofing for ranges?

22        A.   Soundproofing ranges?

23        Q.   Yes.

24        A.   No.

1      Q.   Have you ever measured the sound emanating from

2   a range before?

3      A.   Not from a range, no.

4      Q.   Have you looked at any studies about what would

5   be the -- what you believe to be the -- strike that

6   question.

7           Have you looked at any studies about what kind

8   of sound levels should be emanating from ranges?

9      A.   No.

10      Q.   Have you talked to any range operator or owner

11   about that issue?

12      A.   No.

13      Q.   Has anyone ever told you that this provision

14   infringes upon the right to construct and operate a range

15   in Chicago?

16      A.   It puts a restriction and allows someone to

17   say, well, if it's above this level, we're not going to

18   issue you a permit to build your range.

19      Q.   Have you had any conversations with anybody

20   where they expressed to you your frustration or some kind

21   of statement that this provision is making it hard for

22   them to open a range in Chicago?

23      A.   No.  That would be my opinion.

24      Q.   Moving along to 8 (i).

1          Here, we list the provision of the Ordinance

2    being challenged in your complaint that floors at a range

3    have to be constructed to slope at a minimum of a quarter

4    inch per foot from the firing line to the backstop/bullet

5    trap.

6          In response, you say that "The restriction

7    unduly infringes the ability to construct and operate a

8    range in Chicago especially attempting to retrofit a

9    structure previously built for a different purpose for a

10   range."

11         My question is going to be very similar to what

12   I just asked about the decibels.

13         You testified that you haven't constructed,

14   designed, installed a range?

15     A.   Correct.

16     Q.   So how do you know that the slope requirement

17   infringes upon the ability to construct and operate a

18   range?  Is it your opinion?

19     A.   I don't.  I don't know.

20     Q.   You don't know that--

21     A.   Right.

22     Q.   --to be true?

23     A.   That's correct.

24     Q.   With respect to any of the ranges that you have

1    visited in your lifetime, have any of those ranges had

2    restrictions on patrons using firearms of other patrons?

3         A.   No.  None that I could recall.

4         Q.   Have you ever used a firearm at a range that

5    was not your own?

6         A.   Yes.

7         Q.   Was that in connection with the purchase of a

8    firearm?

9         A.   No.

10        Q.   These ranges, are you aware of any protocols

11   they have in place when one patron wants to borrow or try

12   the firearm of another patron?

13        A.   To the best of my knowledge, as long as they

14   follow the range rules, whatever are set down for that

15   particular range, there's really no specific protocols.

16             They have to follow all the safe gun handling

17   rules.

18             If one individual wants to try out his,

19   whatever, revolver of another individual, just as long as

20   they maintain the range rules, that's fine.

21        Q.   And correct me if I'm wrong, but doesn't

22   everyone have to have an FOID card to even do that?

23        A.   No.

24        Q.   No?  You don't?

1       A.    Right.

2       Q.    It's your understanding that anybody can go off

3   the street into a range, and fire a weapon in a range,

4   and does not need an FOID card?  Is that your

5   understanding?

6       A.    He could be out of state, coming from, and

7   going to a range.  As long as he shows that he is from

8   let's say the State of Wisconsin or something like that,

9   yes, they would let him fire there.

10      Q.    Why do you say, as long he shows he's from a

11  state?  What do you mean by that?

12      A.    Because Illinois requires an FOID card.

13            But if you're a non-resident, you're not

14  required to have an Illinois FOID card.

15      Q.    So you're trying to say if someone from

16  Wisconsin comes into Illinois, goes to an Illinois range,

17  and fires a weapon, he does not need an FOID card to do

18  that?  That's your understanding?

19      A.    Yes.

20      Q.    If you could please turn back to Interrogatory

21  No. 5 -- or excuse me.  Turn to Interrogatory No. 5.

22            Now, we spent sometime talking about your

23  answers to No. 4, okay?

24            In No. 4, we asked you to identify all

1    locations in Chicago to which it would be burdensome to

2    travel, okay?

3              In 5, we ask you to identify any location in

4    Chicago to which you would be unable to travel.

5              Do you understand the distinction between the

6    two questions that were asked between 4 and 5?

7              One was where it would be burdensome, in 4.

8    And in 5, where you could not go, unable to travel, okay?

9    So there's two separate questions.

10             But your answer to No. 5 is similar to what you

11   said in No. 6.

12             I'm going to briefly walk through this with you

13   just for purposes of today's record.

14             If your answers are the same as what you said

15   to No. 4, you can let me know that, okay?  I don't want

16   to have you unnecessarily answer questions which are the

17   same, but if we need to, we will, okay?

18             I don't want you to feel that you don't have an

19   opportunity to answer the questions fully.

20             So, again, in No. 5, we're talking about

21   identification of locations where you would be unable to

22   travel.

23             And you say that, again, every location within

24   the City limits is impossible to access, correct?  That's

1    what you say there.

2            And again my question is -- and you say it's

3    due to the City's Firearms Transportation Ordinance.

4            Again, my question is, how does the

5    Transportation Ordinance make every location in the City

6    of Chicago impossible to travel to?

7    A.    Well, the Ordinance itself put a burden.

8            It requires you to have certain documents.  It

9    requires you to have that weapon broken down.  It also

10   puts requirements about ammunition and that --

11   requirements where it could be transported in your

12   vehicle.

13           I think it puts a burden on the individual

14   which would prohibit him, or her, from going to various

15   locations in the city.

16   Q.    You say various locations.

17           Do you mean some locations or all locations?

18   A.    All.

19   Q.    All?  Okay.

20           And it's your position that you are actually

21   challenging the constitutionality of the transportation

22   provision in your complaint?

23   A.    Yes.

24   Q.    Let's move along to, again, the second

1    sentence, where you say further, "Any location with the

2    restriction of hours of operation makes every location

3    impossible to access."  That's what you say there.

4           Again, we spoke at length about hours of

5    operation.

6           MR. SIGALE:  I want to object.  That's

7    misstating what the answer says.

8           MR. AGUIAR:  Okay.  The answer does say

9    further, "Any location with restrictions on hours of

10   operation and/or to which it is unsafe to travel would be

11   burdensome."

12          The question asked you whether you would be

13   unable to travel to a location.

14   MR. AGUIAR:  Q.  So, are you saying here that the

15   hours of operation burdens the ability to get to a range,

16   but doesn't make it unable to get to a range?

17       A.  I say it makes it -- it puts an additional

18   burden to get to these locations.

19       Q.  So it's a burden, but it doesn't make it

20   impossible?

21       A.  To a degree, it can.

22       Q.  How so?

23       A.  Well, if you're limited on what times you

24   could, you know, go to these ranges, you may not be able

1    to get to various ranges, depending on where they're

2    located in the City within this timeframe.

3         Q.   Again, but that's a burden -- you're saying

4    it's a burden.

5              Does it make it impossible?

6         A.   In some cases, it could make it impossible.

7         Q.   But again, not in your case?

8         A.   No.

9         Q.   And you're not aware of anybody who is actually

10   in that position, who has told you that they would go to

11   a range, but the hours make it impossible to go?

12             You haven't had that conversation with anybody,

13   have you?

14        A.   No.

15        Q.   Let's flip to No. 11.

16             There we ask you to your allegation in

17   Paragraph 17 of the complaint that, quote, "Gun ranges

18   open to the public exist in virtually every major

19   American city."

20             To identify all cities in which such ranges do

21   not exist.

22             And you answered, notwithstanding your

23   objections, that as to the 10 largest cities in America

24   by population, you're aware of none except Chicago.

```
 1              And my question to you is, how do you know

 2    that to be true?

 3         A.   Well, at one time I actually did a computer

 4    search on that, and I couldn't find, other than the City

 5    of Chicago, any large city that prohibited this.

 6              I also visited some cities.  I was in San Diego

 7    recently, and I found two gun ranges right in the city.

 8         Q.   Let me ask you this.

 9              When did you do this computer search?

10         A.   Oh, it was a while back.

11         Q.   The last year?

12         A.   I don't recall the date.

13         Q.   Would have been in the last year, if you know?

14         A.   I don't know.

15         Q.   Last five years?

16         A.   No.  It wasn't that long ago.

17         Q.   Okay.  And did you specifically search for the

18    10 largest cities in America by population?

19         A.   I just went by the 10 largest cities.

20         Q.   Okay.  So, you actually did a computer search?

21         A.   What I did was Google it.

22         Q.   Could I ask you why you did that?

23         A.   I was just interested to find out what cities

24    would allow you to actually go to the gun ranges in the
```

1  city and practice with a firearm.

2     Q.  Did you happen to keep a printout of that

3  search?

4     A.  No.

5        MR. SIGALE:  I'll just object to the form,

6  assuming he printed it out.

7     MR. AGUIAR:  Q.  Did you make a printout?

8     A.  No.

9        MR. AGUIAR:  Could we take a minute break?

10       MR. SIGALE:  Yes.

11       MR. AGUIAR:  It's 3:24.  I'll be right back.

12  I'm almost done.

13              (Brief recess.)

14       Let's go back on.  I just have a couple of more

15  questions and I'll be done.  What number are we on for

16  exhibits?

17       MR. SIGALE:  Exhibit 4.

18       MR. AGUIAR:  Mark that as 4, please.

19           (Document marked as requested.)

20    MR. AGUIAR:  Q.  Mr. Hespen, I'm going to hand you

21  what's been marked as Deposition Exhibit 4.

22           (Document tendered to The witness.)

23     A.  Okay.

24     Q.  It is a copy of the amended complaint filed in

1    this case.

2              Have you seen this document before?

3        A.    I think I have.

4        Q.    Okay.  When did you last see this document?

5        A.    I don't recall when I last seen it, but I'm

6    pretty sure I have.

7        Q.    You said in response to some of my questions

8    today that you believe in the complaint you are

9    challenging the provision of the City's Gun Range

10   Ordinance which governs the transportation of firearms.

11             I'd like for you to look through the complaint,

12   take as much time as you like, and let me know where in

13   the complaint that challenge is located.

14             MR. SIGALE:  I'm going to object on a few

15   grounds.

16             One, you're asking him for a legal opinion.

17             Two, you're asking him to read a document that

18   speaks for itself.  And I guess I can leave it at those,

19   and foundation.  So I'll leave it at those objections.

20             MR. AGUIAR:  Okay.  And I'll just respond for

21   the purposes of the record that Mr. Hespen is a named

22   plaintiff in this action.  This is his complaint signed

23   by you on his behalf as his attorney.

24             And I just want to know he has asserted that

1   that actually is a provision being challenged in this

2   case.

3              And I'd like to know where he believes that's

4   actually located in his complaint.

5              MR. SIGALE:  Well, I hear what you're saying,

6   but the fact is, that's a question better directed to me

7   than to the non-attorney plaintiff.  But having said

8   that...

9              MR. AGUIAR:  You may answer the question when

10  you're ready, Mr. Hespen.

11             THE WITNESS:  I'd have to re-read this whole

12  thing.

13             MR. AGUIAR:  Okay.  Why don't you take a few

14  minutes and read the complaint?

15             THE WITNESS:  The whole complaint?  All 14

16  pages?

17             MR. AGUIAR:  Let me short-circuit that for you

18  then, if you don't want to read the whole complaint.  Let

19  me change my question.

20             Let's turn to Paragraph 25, which is on Page 5.

21             Therein you list the provisions of the

22  Ordinance that are being challenged in this case.

23      MR. AGUIAR:  Q.  Where in there does it say that the

24  Gun Transportation Ordinance is being challenged?  Could

1   you just identify that for me, please?

2       A.   Okay.  Under No. 25, with all the restrictions,

3   anyone involved in any form, the way I interpret it, must

4   meet all these requirements before the range could open.

5       Q.   Okay.

6       A.   And if one individual doesn't, they could shut

7   down the range.

8       Q.   Okay.  My question is, you have said in your

9   Answers to Interrogatories, which we've gone over, that

10  the City's Ordinance regarding how you transport a

11  firearm impacts the ability to open a range in the City

12  of Chicago.

13           And I just want to know where, in Paragraph 25,

14  that is set forth.

15           MR. SIGALE:  I'm going to object to the form of

16  question and foundation.

17           MR. AGUIAR:  You can answer.

18           THE WITNESS:  You're talking about

19  transportation of a firearm.

20      MR. AGUIAR:  Q.  Correct.

21      A.   I don't see it in there.

22               (Brief pause.)

23           MR. AGUIAR:  Okay.  I have no further questions

24  at this time.

1          I am going to leave your deposition open,

2    because there are still outstanding discovery issues that

3    are pending, and those may necessitate re-opening your

4    deposition.

5          I don't know at this time that they will, but I

6    want to reserve the right to at least reconvene the

7    deposition in the event that the outstanding discovery

8    warrants doing that.

9          I have no further questions.

10          MR. SIGALE:  I've got some.

11               EXAMINATION

12               BY MR. SIGALE:

13    Q.   Mr. Hespen, as long as we got this Exhibit 4

14    here, can you turn to Page 13.

15          About halfway down the page is says, "Prayer

16    for relief."

17          Do you see that?

18    A.   Yes, I do.

19    Q.   All right.  Bill, just to confirm, you're not

20    an attorney, correct?

21    A.   Correct.

22    Q.   I'll represent to you that prayer for relief is

23    fancy lawyer talk for, this is what plaintiffs want,

24    okay?

1      A.    Okay.

2      Q.    And it says, "Plaintiffs request judgment be

3   entered in their favor and against defendant as follows.

4            "Number one.  An order preliminarily and

5   permanently enjoining defendant, its officers, agents"

6   dot, dot, dot -- I'll skip some of the parts, skip a

7   couple of lines -- "from enforcing Chicago municipal

8   code."

9            And then there's about four, five lines with

10  different code sections.

11           Do you see that?

12     A.    Yes.

13     Q.    And then you go four lines from the bottom at

14  the very end, and it says, "Or any other law as against

15  the ordinary operation and use of gun ranges open to the

16  public."

17           In your mind, as you sit here, if the

18  transportation law that Mr. Aguiar is representing, of

19  Section 090, isn't specifically listed in Paragraph 25,

20  but is a law that, as applied, would prohibit people from

21  using a firing range, would you consider that possibly as

22  covered under that Paragraph 1 there on the bottom of 13?

23     A.    I don't know.

24     Q.    Because you're not an attorney?

1      A.   Right.

2      Q.   Okay.  Mr. Hespen, you were a former police

3   officer.

4           And if I go to this Exhibit 1, Page 12,

5   8-20-010, and you see the part right under that where it

6   says the definition of lawful transportation?

7      A.   Okay.

8      Q.   Do you see that?

9      A.   Yes.

10      Q.   I'll want you to assume for purposes of this

11   question that Paragraph Sub 1 that starts with, "In

12   compliance with."  Doesn't apply.

13           Then you go to Sub 2 that says, "Who has a

14   valid FOID card, a CFP and firearm registration

15   certificate, if applicable; and the firearm is (i),

16   broken down in a non-functioning state; (ii), not

17   immediately accessible; and (iii), unloaded and in a

18   firearm case."

19           Did I read that correctly?

20      A.   Yes.

21      Q.   All right.  I want to stick with that

22   subparagraph, and I want to stick with the first little

23   Roman numeral one, "broken down in a non-functioning

24   state."

1          You talked a little bit about that, but I want

2    to you ask you, as someone who's been around firearms, if

3    nothing else, as a Chicago police officer, or employee of

4    the Chicago Police Department for -- 38 years?

5          A.   Yes.

6          Q.   What are the potential consequences of breaking

7    down and putting back together, reassembling, a handgun

8    incorrectly?

9          MR. AGUIAR:  Objection as to form and

10   foundation.

11         MR. SIGALE:  If you understand the question,

12   you can answer.

13         THE WITNESS:  Yes, I did.

14         MR. SIGALE:  Go ahead.  You can answer it.

15         THE WITNESS:  Well, an individual, unless he's

16   proficient and he's an active shooter, may only shoot his

17   gun a couple of times a year.  He may not have the

18   slightest idea how to break some of these weapons down.

19         If he attempts to, there's a good chance he

20   could damage the weapon, if he does it the wrong way;

21   lose parts; or put it back together wrong, which could be

22   detrimental next time he shoots it.

23         MR. SIGALE:  Q.  Detrimental to who?

24         A.   The shooter.

1    Q.   Putting it back together incorrectly, is that

2    something you're not going to find out until you try to

3    shoot it?

4    A.   Yes.

5    Q.   You could find out beforehand?

6    A.   In some cases you could do a function check on

7    the weapon.

8         If you're an experienced shooter, you would

9    probably know what that is.

10   Q.   What if you're not an experienced shooter?

11   A.   Then you probably wouldn't.  You might just put

12   it back together and not do anything with it until the

13   next time you go to the range to shoot it.

14   Q.   Or until the next time someone breaks into your

15   house?

16   A.   That's correct.

17        MR. AGUIAR:  Objection as to form.

18        MR. SIGALE:  I'm sorry.  Your answer was?

19        MR. AGUIAR:  Same objection.

20        MR. SIGALE:  Did he answer the question?

21        THE COURT REPORTER:  Yes.  "That's correct."

22        MR. SIGALE:  Oh, okay.

23        I'm going to skip to this little Roman two,

24   "not immediately accessible."

1        In fact, strike the question, because I'm going

2   to skip ahead to little Roman three, "unloaded and in a

3   firearm case."

4        Would you agree that part is pretty

5   self-explanatory?

6   A.   Yes.

7   Q.   So let's go back to little Roman two, "not

8   immediately accessible."

9        Do you own a vehicle?

10  A.   Yes, I do.

11  Q.   When you are transporting a firearm, where do

12  you put it to make it not immediately accessible?

13  A.   Well, if I have -- if I am using my pick-up

14  truck, I could put them in the bed of the pick-up.

15  Q.   Okay.

16  A.   And that would be definitely not immediately

17  accessible.

18  Q.   Okay.

19  A.   Or you could stick it in a firearms carrying

20  box in the extended cab portion.  That wouldn't be

21  accessible.

22  Q.   What if someone has not a pick-up truck, but

23  like a car?

24        MR. AGUIAR:  Objection, speculation.

1         THE WITNESS:  Put it in the trunk.

2     MR. SIGALE:  Q.  That would make it, in your mind,

3  not immediately accessible?

4     A.   Oh, definitely.

5     Q.   Okay.  What about if a person you know, to the

6  extent you know, or to the extent you have an opinion, a

7  lay opinion, what if a person who wants to go to a firing

8  range has a firearm at home, but doesn't have a vehicle

9  or access to a vehicle.  They don't have a car or a

10  pick-up truck.  They don't have a ride.

11         How is that person going to get the firearm to

12  the range to make it not immediately accessible?

13         MR. AGUIAR:  Objection, foundation.

14         THE WITNESS:  He's not.  You'd have to carry it

15  on your person.

16     MR. SIGALE:  Q.  So such a person could not

17  transport a firearm in such a way to make it immediately

18  inaccessible?

19     A.   Correct.

20         MR. AGUIAR:  Same objection.

21     MR. SIGALE:  Q.  Now, I want to you assume that

22  that's the case.  I want to ask you about that person who

23  doesn't have access to a vehicle, who doesn't have a

24  ride, doesn't have a vehicle of their own.

1          In that case, would it matter whether or not

2     the hypothetical shooting range that we're talking about

3     is five miles away or five blocks away?

4               MR. AGUIAR:  Objection to foundation.

5               THE WITNESS:  It wouldn't matter.

6          MR. SIGALE:  Q.  Why is that?

7          A.   He's not accessible to it.  He can't carry the

8     weapon there.

9          Q.   Why don't you assume for purposes of this

10    question that the way the Chicago law is written, that

11    the only place that you can actually carry a firearm that

12    does not qualify as completely broken down, not

13    immediately accessible, unloaded in the case -- well,

14    let's talk about only the immediately accessible part --

15    is in your house.

16         A.   Correct.

17         Q.   You've been a police officer.  You've enforced

18    the laws for quite a long time.

19              How do you leave your house to get the firearm

20    to the trunk of your car, or the cab of your pick-up

21    truck, in such a way that it's not immediately

22    accessible?

23         A.   According to the Ordinance, you're not.  You

24    have to carry it out there.  You have to hand-carry the

1   weapon to your vehicle from your house.  Once it's in

2   your hand, it's accessible.

3        Q.   And violating this Ordinance?

4        A.   That's correct.

5        Q.   And again, in that scenario, does it matter

6   whether or not the firing range that the person is

7   intending to go to is five blocks away, five miles away,

8   or all the way on the other side of town?

9             MR. AGUIAR:  Objection, foundation.

10            THE WITNESS:  It doesn't matter.  You're still

11  violating the Ordinance by having the weapon in your hand

12  to transport it to your vehicle.

13       MR. SIGALE:  Q.  Okay.  I want you to hypothetically

14  assume, for purposes of this question, that somehow you

15  got the firearm into your trunk, okay?

16       A.   Yes.

17       Q.   How would you get the firearm from your trunk

18  to the front door of the range without it being

19  immediately accessible to you?

20            MR. AGUIAR:  Objection, foundation.

21            THE WITNESS:  I can't think of any way where

22  you can do that.  The weapon would have to be

23  hand-carried from your vehicle to the range.

24            And by this Ordinance, it makes it immediately

1    accessible because it's in your hand.  So, he would be in

2    violation of the Ordinance.

3        MR. SIGALE:  Q.  And that's no matter where the

4    firearm range is in the City?

5        A.   That's correct.

6        Q.   Mr. Hespen, is it fair to say that you became a

7    plaintiff in this lawsuit because you wanted a place in

8    Chicago to go and practice at a firing range?

9        A.   Yes.

10        Q.   And is it your understanding that a year ago,

11    almost a year ago last summer, there was a Court decision

12    that said that the City has to allow firing ranges?

13        A.   Yes.

14        Q.   As you sit here today, are you aware of any

15    place in the City that you, as a member of the public,

16    can go in the City to go practice at a firing range?

17        A.   No.

18        Q.   I want to ask you one more question.  I just

19    want to clarify something.

20            Mr. Aguiar asked you about Interrogatory

21    Answers 4 and 5, but specifically he was looking at

22    No. 4.  I've actually just by chance turned to the page.

23    And the line of conversation involved the unsafe areas.

24            Mr. Aguiar and you were talking about, if a

1    range -- I'm paraphrasing.  But if a range was in an

2    unsafe area, that would be a burden for you to get to,

3    and you were, I believe, hypothesizing about other folks,

4    that it would be difficult, burdensome, for them to get

5    to the bad area as well.

6            Do you remember that part of the deposition?

7    A.   Yes.

8    Q.   Mr. Aguiar asked you that, if there were ranges

9    built in a safe area, obviously that people could

10   actually bring a firearm to, that that would alleviate

11   the Second Amendment concern.

12           Do you remember that question and answer?

13   A.   Yes.

14   Q.   When you answered that question, were you

15   referring to all Second Amendment concerns regarding this

16   Ordinance, or just that part regarding the unsafe area?

17   A.   About the unsafe area.

18   Q.   And if it turns out -- just to, I believe,

19   clarify a little bit what Mr. Aguiar was asking you.

20           If it turns out that based on the location

21   restrictions and all other things being acceptable, that

22   ranges could in fact be built in areas that would not be

23   considered unsafe.

24   A.   Yes.

1    Q.   That that would alleviate that concern for you?

2    A.   Yes.

3    Q.   Okay.  I just want to ask you one other thing.

4         Again, you know as a former police officer

5    enforcing laws, and as someone who fired weapons for many

6    years, you were testifying earlier when I was asking you

7    questions about how you could legally get a firearm to a

8    range in such a way that it was immediately inaccessible,

9    or not immediately accessible to you.

10        Do you remember that talk a few minutes ago?

11   A.   Yes.

12   Q.   And you testified how you couldn't because of

13   the issue of getting it to the car, getting it to the

14   range, et cetera, et cetera.

15        Do you remember that?

16   A.   Um-hum.  Yes, I do.

17   Q.   Okay.  I want you to assume, for purposes of

18   this question, that that is the quagmire that you're in,

19   that you have a firearm at home, and that with the

20   requirement of breaking it down and the requirement of,

21   somehow, of it being illegal to get it to your car or get

22   it to the range, okay?

23   A.   Yes.

24   Q.   Add to that the requirement of, you can't

1    borrow or rent a firearm from the range, okay?

2         A.   Okay.

3         Q.   What are you going to shoot?

4              MR. AGUIAR:  Objection, form and foundation.

5              THE WITNESS:  Well, if you can't legally bring

6    your weapon, you're not going to shoot anything.

7              MR. SIGALE:  Just a couple of more things,

8    Mr. Hespen.

9              And I understand, I think we're a little bit--

10             MR. AGUIAR:  I'm going to have some follow-up.

11             MR. SIGALE:  We're at the range but, you know,

12   if you've got a few follow-ups--

13             MR. AGUIAR:  And I will.

14             MR. SIGALE:  --that's all right.  I don't want

15   it to drag out all day, but a few minutes is fine.

16        MR. SIGALE:  Q.  You testified a few minutes ago

17   that your interest in this lawsuit is having a firing

18   range in Chicago that you can go to and practice

19   shooting, correct?

20        A.   Correct.

21        Q.   Your interest is not, as I believe you

22   testified earlier, about owning a range and operating a

23   range, et cetera, correct?

24        A.   Correct.

1     Q.   That's not -- you're not going to do that.  You

2  just want a place to go.

3     A.   That's correct.  I have no intention on owning,

4  operating or constructing a range.

5     Q.   If the evidence in this case shows that due to

6  the restrictions that are being challenged in the

7  lawsuit, that people don't build firing ranges, ergo

8  there are no firing ranges for you to go to, would you

9  consider that a burden on you?

10    A.   Yes.

11         MR. SIGALE:  I don't have anything further.

12         MR. AGUIAR:  I need one minute.  I'll be right

13  back.

14              (Brief pause.)

15              FURTHER EXAMINATION

16              BY MR. AGUIAR:

17    Q.   Mr. Hespen, you testified a moment ago, in

18  response to Mr. Sigale's questions, that you're not aware

19  of any ranges open in the City of Chicago.

20         Do you remember that?

21    A.   Yes.

22    Q.   Do you know of anybody who's applied to have a

23  firing range in the City of Chicago?

24    A.   No.

1       Q.   So you have no knowledge of whether anybody

2   actually has made an effort to do so?

3       A.   That's correct.

4           MR. AGUIAR:  I have no further questions.

5           MR. SIGALE:  Okay.  We'll reserve.

6               AND FURTHER DEPONENT SAITH NOT.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1    DEPOSITION OF:  William Edward Hespen
     DATE:  6/13/12
2    CASE:  Ezell, et. al. versus City of Chicago

3            C O R R E C T I O N   P A G E

4    I wish to make the following changes for the following
     reasons: (1) stenographic error, (2) clarification, or
5    (3) to state the fact.

6    PAGE:   LINE:

7    _____   _____    CHANGE: _____
                      REASON: _____
8
                      CHANGE: _____
9    _____   _____    REASON: _____

10   _____   _____    CHANGE: _____
                      REASON: _____
11
                      CHANGE: _____
12   _____   _____    REASON: _____

13   _____   _____    CHANGE: _____
                      REASON: _____
14
                      CHANGE: _____
15   _____   _____    REASON: _____

16   _____   _____    CHANGE: _____
                      REASON: _____
17
                      CHANGE: _____
18   _____   _____    REASON: _____

19   _____   _____    CHANGE: _____
                      REASON: _____
20
     (SIGNED): _____
21

22

23

24
```

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
    RHONDA EZELL, et. al.,    )
 4                            )
         Plaintiffs,          )
 5                            )
         -vs-                 )  No. 10 C 5135
 6                            )
    CITY OF CHICAGO,          )
 7                            )
         Defendant.           )
 8

 9              I, WILLIAM EDWARD HESPEN, state that I have

10   read the foregoing transcript of the testimony given by

11   me at my deposition on June 13, 2012, and that said

12   transcript, consisting of Pages 1 through 96, is a true

13   and accurate record of the testimony given by me at said

14   deposition except as I have indicated on the errata

15   sheets provided herein.

16

17   Please check one:

18   _____I made no corrections.

19   _____Number of errata sheets submitted.

20   _____
     WILLIAM EDWARD HESPEN
21

22   SUBSCRIBED and SWORN TO before me
     this _____ day of _____, 2012.
23

24   _____
     Notary Public
```

1   STATE OF ILLINOIS )
                      )  SS.
2   COUNTY OF C O O K )

3

4

5          I, THOMAS A. MANNO, C.S.R. and Notary Public,

6   do hereby certify that I reported in machine shorthand

7   the testimony held at the deposition of

8   WILLIAM EDWARD HESPEN taken on June 13, 2012, and that

9   this transcript is a true and accurate transcription of

10  my shorthand notes so taken to the best of my ability,

11  and contains all of the proceedings given at said

12  deposition.

13

14  _____
    THOMAS A. MANNO, C.S.R.,
15  No. 84-001174

16

17

18

19

20

21

22

23

24

```
 1          PATTI BLAIR COURT REPORTERS, P.C.
                   105 West Adams Street
 2                      25th Floor
                  Chicago, Illinois 60603
 3

 4   June 27th, 2012

 5   The Law Firm of David G. Sigale
     Mr. David G. Sigale
 6   4300 Commerce Court, #300
     Lisle, Illinois 60532
 7

 8   IN RE:  Ezell, et. al.
             Case No. 10 C 5135
 9           Taken: June 13, 2012
             Deponent:  William Edward Hespen
10

11   Dear Mr. Sigale:

12   The testimony in the above-entitled case has been
     transcribed, and since signature has been reserved,
13   please be advised that under the Federal Court rules, the
     witness has 28 days from the above date to read and sign
14   the transcript.

15   As provided by Federal Court rules, if after 28 days the
     witness does not read and sign the deposition, it will be
16   understood that signature is waived and the deposition
     may then be used fully as though signed.
17
     Thank you for your cooperation in this matter.
18
     Yours truly,
19
     Thomas A. Manno, C.S.R.
20
     CC:  Mr. William Macy Aguiar
21

22

23

24
```