Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 1 of 131 PageID #:4652

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                       1

1                 IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF ILLINOIS

3                        EASTERN DIVISION

4

5    RHONDA EZELL, JOSEPH I. BROWN,          )

6    WILLIAM HESPEN, ACTION TARGET, INC., )

7    SECOND AMENDMENT FOUNDATION, INC.,     )

8    and ILLINOIS STATE RIFLE ASSOCIATION,)

9                        Plaintiffs,        )

10   vs.                                    ) No. 10 C 5135

11   CITY OF CHICAGO,                       )

12                        Defendant.        )

13

14           The deposition of RICHARD PEARSON,

15   called for examination, taken pursuant to the Federal

16   Rules of Civil Procedure of the United States District

17   Courts pertaining to the taking of depositions, taken

18   before MARILYN T. LaPORTE, a Notary Public within and

19   for the County of Cook, State of Illinois, and a

20   Certified Shorthand Reporter of said state, at Suite

21   1230, Conference Room 1, 30 North LaSalle Street,

22   Chicago, Illinois, on June 12, 2012, at 11:03 a.m.

23

24



RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      2

```
 1   PRESENT:

 2        LAW FIRM OF DAVID G. SIGALE, P.C.,

 3        (739 Roosevelt Road, Suite 304,

 4        Glen Ellyn, Illinois  60137,

 5        630-452-4547), by:

 6        MR. DAVID G. SIGALE,

 7               appeared on behalf of the Plaintiffs;

 8

 9

10        OFFICE OF THE CORPORATION COUNSEL,

11        CITY OF CHICAGO,

12        (30 North LaSalle Street, Suite 1230,

13        Chicago, Illinois  60602,

14        312-744-7129), by:

15        MR. ANDREW W. WORSECK,

16               appeared on behalf of the Defendant.

17

18   ALSO PRESENT:

19   MS. ANNA FODOR,

20   City of Chicago Summer Clerk.

21

22

23   REPORTED BY:  MARILYN T. LaPORTE, CSR, RPR

24               CSR CERTIFICATE NO. 84-2095.
```



1                    (WHEREUPON, the witness was duly

2                    sworn.)

3                         RICHARD PEARSON,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6                         EXAMINATION

7    BY MR. WORSECK:

8         Q.    Good morning, Mr. Pearson.

9         A.    Good morning, sir.  How are you?

10        Q.    Good.  I'm doing well.  Good to see you

11   again.

12              Could you state, and spell your name for

13   the record, please?

14        A.    Richard Pearson, P-e-a-r-s-o-n.

15        Q.    And are you still the executive director

16   of the Illinois State Rifle Association?

17        A.    Yes, I am.

18        Q.    And you recall that we took your

19   deposition in the early fall, I believe, of 2010 in

20   this case?

21        A.    September of 2010 I believe.

22        Q.    We spent a lot of time talking about

23   your background, and your employment history, and

24   educational history.  I don't want to waste our time



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 4 of 131 PageID #:4655

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      4

 1  with that again today.

 2       A.    Nothing much has changed.

 3       Q.    All right.  So let me just ask you a few

 4  questions.

 5             Have any of your duties at the Illinois

 6  State Rifle Association changed since your prior

 7  deposition in this case?

 8       A.    No.  Just more of them.

 9       Q.    What new duties have you taken on?

10       A.    Well, they're not new duties, but it's

11  just busier and busier.

12       Q.    Have you had any outside employment since

13  your last deposition?

14       A.    No.

15       Q.    And if I refer to the Illinois State Rifle

16  Association as ISRA going forward today, you'll

17  understand that that's what I'm referring to?

18       A.    Yes.

19       Q.    As you sit here today, do you know how

20  many members of ISRA are Chicago residents?

21       A.    1260.

22       Q.    And does ISRA have any offices in Chicago?

23       A.    No.

24       Q.    Does it have any sort of physical presence



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 5 of 131 PageID #:4656

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      5

1   in Chicago?

2        A.    No.

3        Q.    We also talked a lot about the ISRA range

4   down in Bonfield the last time we were here.

5        A.    Yes.

6        Q.    Does ISRA have any shooting ranges that it

7   owns or operates other than the Bonfield complex?

8        A.    No.

9        Q.    And can you describe for me briefly again,

10  just so we have it on this record, the layout of the

11  Bonfield range complex in terms of the number of

12  ranges.  The types of ranges.  Distances.  Number of

13  shooting lanes, et cetera?

14       A.    We have seven ranges.  We have a pistol

15  range, which is divided down the center so it's known

16  as Range 1 and 2.

17            It has 48 firing positions that are active

18  on the range, and so 24 on each side.  I'm sorry.  And

19  then it has one position for siting and firearms.

20  When you attach them to, say a vice, so you can test

21  it for accuracy on each end.  So 50 places.

22            We have a high power range.  It's a 2 and

23  300 yard range, and it has 30 places.  We have a bench

24  rest range, and it has 12 benches and 12 places



1   between the two fire position shooting, and -- which

2   has been somewhat restricted, but that has 24 places

3   to shoot.

4           We have a 30 place 100-meter range.  We

5   have two shotgun traps with two positions per trap.

6   And we have an archery range, which is -- there's

7   several positions on it just depending what you want

8   to do.

9           Q.    Sure.  And all of these are outdoor

10  ranges; is that correct?

11          A.    Yes.  Uh-huh.

12          Q.    The personnel who work at the Bonfield

13  range, are they required to have any sort of licenses,

14  or certifications, or anything like that?

15          A.    Well, we have a range master, and he has a

16  range officer's certificate.  We have seven volunteer

17  range people now that we didn't have before, and they

18  all have a range officer's certificate.  And that's

19  all we have.

20          Q.    Is there anyone who would manage or staff

21  the ranges that would not need to have the range

22  officer's certificate?

23          A.    Only in case of a match.  You can -- you

24  have line officers who watch the range and report to



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 7 of 131 PageID #:4658

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                       7

```
 1   the range officer.

 2        Q.    And what does the range officer

 3   certificate entail?  What does one have to do --

 4        A.    You have to attend a class for at least

 5   nine hours.  Okay?

 6              And you go through all the safety items,

 7   different types of firearms, how they work, and so

 8   forth and so on.  So if someone has a problem, you can

 9   disable the firearm on the line.

10              A little bit about how to handle people.

11   General rules.  And then we have put -- we will put

12   our first class together of people for specific rules

13   for our range.

14        Q.    And why does ISRA require that the range

15   master and the volunteer range attendants have a range

16   officer certification?

17        A.    Well, because we want to maintain the

18   highest standards possible.

19        Q.    Standards as to safety?

20        A.    Safety standards, sure.

21        Q.    Any other safety standards?

22        A.    Well, I'm not sure they're standards, but

23   you have to have people there who are knowledgeable,

24   and who greet the members, and that sort of thing.
```



1      Q.     Why is it important to have knowledgeable

2   people who meet the highest safety standards working

3   on your ranges?

4      A.     Well, because we think that's the best way

5   to run a range.  Make it safe, and make it a pleasant

6   place to go.

7      Q.     Do any of the Bonfield ranges have

8   particular hours of operation?

9      A.     Ours, because it's an outdoor range, are

10  8:00 a.m. to dusk, and dusk is defined by the IDNR for

11  Kankakee County.

12          We use the hunting and fishing guide.  So

13  we have a third party that decides when dusk is.

14     Q.     What does that acronym stand for?  IDNR?

15     A.     Illinois Department of Natural Resources.

16     Q.     So they publish a book or a pamphlet?

17     A.     They publish a book every spring and fall.

18     Q.     And it tells you what time dusk is on each

19  day of the --

20     A.     Right.  Sunset actually.

21     Q.     Sunset?

22     A.     Yeah.

23     Q.     Why does the range have those particular

24  hours of operation?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 9 of 131 PageID #:4660

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                          9

 1      A.    Well, we chose to choose 8:00 a.m. because

 2  it is an outdoor range, and we have neighbors so we

 3  don't want to start before 8:00 a.m.

 4            And we have no lighting so we -- for the

 5  members, it is sunset.

 6      Q.    And what is the concern about the

 7  neighbors?

 8      A.    Well, we want to be the best neighbors we

 9  can be.  So, you know -- now, there's a caveat to

10  that.  If the police or military want to use the range

11  at night, they can do that.

12      Q.    But how does starting at 8:00 a.m. help

13  facilitate neighborly relations or --

14      A.    Well, because if you started at sunrise,

15  it be about what?  5:30 this morning.  You know, they

16  may not like to hear that much noise in the morning.

17  So we decided that we'd make it 8:00 a.m.

18      Q.    So the sounds of the shooting can be

19  disruptive to the neighbors?

20      A.    Yeah.  Right.

21      Q.    And that's why you limit your hours of

22  operation --

23      A.    Sure.

24      Q.    -- because you want to be accommodating to



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 10 of 131 PageID #:4661

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      10

1   the neighbors?

2        A.    Yeah.

3        Q.    Is there a reason why ISRA hasn't

4   installed lights so the range can be used past dusk?

5        A.    Yes.  We don't want to.  It's all

6   volunteer.  It's run by volunteers.  So that is a

7   problem, and we are in a relatively rural area.

8              And so the lighting disturbs the night

9   sky.  And, you know, most of us are also stargazers so

10  we don't want to mess that up.

11       Q.    Is it an issue as to you just wouldn't

12  have enough volunteers who would be willing to work at

13  night?  So that's why you haven't extended the hours?

14       A.    No.  Sound carries further at night, and

15  that sort of thing.

16             So that's why we're -- you know, we just

17  want to accommodate the neighbors, you know.  And most

18  afternoons the ranges are empty by 6:00 o'clock anyway

19  on a summer evening.

20       Q.    Does ISRA charge any sort of fees for use

21  of the range?

22       A.    Well, you have to be a member, and your

23  range fees are included in that.  It's an annual fee

24  for those 65 and over.  It is one-thirty a year, and



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 11 of 131 PageID #:4662

RICHARD PEARSON                                     June 12, 2012
EZELL vs. CITY OF CHICAGO                                      11

1  for those under 65 it's one ninety-five.

2           And for those under 65, they have two

3  workdays.  If they don't work the workdays, they're

4  charged an extra $80, or $40 per day I should say.

5       Q.   Are there any other fees that ISRA charges

6  in connection with the use of the range?  Say,

7  ammunition fees, or gun rentals, or anything like

8  that?

9       A.   No.  We don't sell ammunition, and we

10 don't rent firearms because we're not staffed to do

11 that, and we don't want to interfere with the regular

12 dealers around the area either.

13      Q.   Does ISRA make a profit from running its

14 ranges?

15      A.   Well, we're a not-for-profit organization,

16 and we take that to heart.

17      Q.   Does ISRA break even?

18      A.   Yeah.  We try to break even, yes.

19      Q.   You're not taking a loss on the ranges?

20      A.   No.

21      Q.   So even though you don't sell ammunition,

22 and you don't rent firearms, and you charge only an

23 annual fee to use the range, you're, at least,

24 breaking even on the range?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 12 of 131 PageID #:4663

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      12

1        A.    Right.  Uh-huh.

2        Q.    Do you know how close -- well, let me

3    think about how to ask this the right way.

4              Of the uses and buildings that surround

5    the range that are not ISRA property that -- so it

6    could be a neighbor house.  It could be a farm

7    building.  It could be something belonging to the

8    State of Illinois.  A park.  A gazebo.  What have you.

9    I'm just not familiar with the layout down there.  It

10   could be a store.  It could be a business.

11             How far away is the closest one of those

12   types of structures or uses to the ISRA range?

13       A.    From the property line, I would say it

14   would be 250 feet maybe.  That's a guess.

15       Q.    And what structure are you thinking of?

16       A.    It's a home.

17       Q.    A home?

18       A.    Yes.

19       Q.    And what's the closest point on the ISRA

20   property to that home?  Is it an actual shooting

21   range?

22       A.    It's just a property line.

23       Q.    Of the ISRA property?

24       A.    Right.  It's probably about 400 feet from



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 13 of 131 PageID #:4664

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    13

1   the closest range.  All those are estimates by the

2   way.

3        Q.    Sure.

4        A.    I'm just guessing.

5        Q.    Sure.  I think it's safe to say that

6   members using the range need to have a FOID card; is

7   that correct?

8        A.    Right.  Unless they're in training.

9        Q.    Are people 18 years or younger allowed to

10  shoot at the range?

11       A.    Yes, under supervision.

12       Q.    So they need to have an adult with them?

13       A.    Yes.

14       Q.    When someone like that is on the range, do

15  they receive any special supervision from the range,

16  or is it just left up to their adult companion to

17  supervise them on the range?

18       A.    Well, in their membership packet.  And

19  when they go through the orientation of the range,

20  they're reminded that if they bring somebody to the

21  range, that they are -- it's their responsibility, and

22  they have to supervise them closely, and they're not

23  to let them wander around.

24             They have to be within, we say arm's



1  length, but, you know.  So they can -- they have to be

2  right next to them all the time.

3      Q.    And you say that's in the ISRA membership

4  packet that talks about that?

5      A.    Yeah.  We go through that in the -- it's

6  actually the guest.  The guest part of the

7  orientation.

8            We now -- I don't know if we did this

9  before, but we require all new members to go through

10 an orientation now so that we don't have any problem

11 with the rules.

12     Q.    And I know we've been doing this a little

13 bit up to now, but just so the record's clear, if you

14 could wait for me to finish my question before you

15 start your answer.

16     A.    Oh, I'm sorry.  I didn't know I did that.

17     Q.    And I'll try to do the same.  There's been

18 a few times where we've talked over each other, and it

19 hasn't gotten out of control yet.

20           But just so that the transcript will be

21 nice and neat, that would be helpful.

22     A.    I'm sorry.

23     Q.    Has ISRA ever measured the decibel levels

24 generated by the discharge of guns on its shooting



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 15 of 131 PageID #:4666

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    15

1 | ranges?

2 |      A.    Yes.

3 |      Q.    And what were those results?

4 |      MR. SIGALE:  I'm just going to object as to the

5 | form.  Do you mean from a certain distance?

6 | BY MR. WORSECK:

7 |      Q.    Why don't you just tell me everything

8 | about the measurements?

9 |            Where they were taken.  When they were

10 | taken.  How many were taken.

11 |     A.    They were taken at the property lines, and

12 | they were about 68.  Except for the west property

13 | line, which has a highway next to it.  And it was so

14 | loud from the highway we couldn't measure the decibel

15 | levels of the firearms because it's a truck route.

16 |     Q.    When were these taken?

17 |     A.    Oh, my.  It must be 2006 or 2007 I'd say.

18 |     Q.    And why were they taken?

19 |     A.    We wanted to find out what the decibel

20 | level was.  We had a neighbor that asked us to do

21 | that, and we did it.

22 |     Q.    Did anything follow from these tests?

23 |     A.    Other than we were below what was

24 | required.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 16 of 131 PageID #:4667

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                            16

 1        Q.     ISRA didn't do anything after the testing

 2   to try to reduce sound levels?

 3        A.     We always are doing things to try to

 4   reduce sound levels.  We are today sound deadening --

 5   finishing sound deadening the Range 1, and next week

 6   we'll sound deaden Range 2.

 7               And I don't know if this was done when we

 8   talked before.  I'm sorry.  I don't remember.  But we

 9   sound deadened the hundred meter range.

10               So as money becomes available, we will do

11   that for all of our ranges.

12        Q.     And because these are outdoor ranges,

13   could you explain to me what one does on an outdoor

14   range to deaden the sound?

15        A.     Yeah.  There are two methods that you --

16   well, there's many methods, but there are two methods

17   that seem to be most effective.

18               The first one is the same people who do

19   the federal ranges here for acoustics.  What happens

20   is you put a -- you build a box, and the box has --

21   and they're like right next to each other like cement

22   blocks except they're huge.  Okay?

23               And they have four inches of rock wall in

24   them.  And on the front of that goes a cement board



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 17 of 131 PageID #:4668

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    17

1   with wood fiber in it, and in that particular method

2   it -- the sound goes into the board.  The porous

3   board.  It's very porous.  It looks like spaghetti.

4   Okay?  And it goes in there.  It's converted to heat,

5   and the heat is dissipated into the rock wall.

6            Okay.  The second method is a method using

7   a -- the product we're using is Pyrok, which, I think

8   is P-r-y-r-o-c-k.  It's a trade name.

9            And you spray that on, and it is actually

10  a fireproofing agent, but it has a side benefit of

11  being -- it's very porous so the sound is trapped in

12  the pores.  It works -- the problem is it doesn't work

13  with many frequencies as the other one does.

14           The other one absorbs all frequencies, but

15  it cuts it down substantially, and so we're

16  experimenting with that.  We don't know how it will

17  yet, but we're going to find out.

18       Q.    And you said you've done that as to three

19  of the ranges?

20       A.    We've done it at two.  The third range

21  will be done starting Monday.

22       Q.    And ISRA has undertaken these sound

23  deadening efforts on its own volition; is that

24  correct?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 18 of 131 PageID #:4669

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                     18

1          A.     Yes.

2          Q.     It wasn't required to do that by any

3    government body?

4          A.     No.

5          Q.     And is it fair to say that ISRA did this

6    in furtherance of its efforts to be a good neighbor,

7    and to reduce sound that would dissipate to the

8    surrounding community?

9          A.     Yes.

10         Q.     Are there any other reasons?

11         A.     It makes it more pleasant for the shooters

12   also, you know.  And other than that, there are no

13   other reasons that I can think of.

14         Q.     How much has ISRA spent on these sound

15   deadening efforts?

16         A.     Well, on the hundred meter range, it was

17   156,000 and change.

18                On this, the -- Pistol Ranges 1 and 2, I

19   anticipate the bill to be about 32,000.

20         Q.     And is the funding for these projects

21   coming out of the range -- strike that.

22                What's the revenue source for these?

23         A.     The range dues.

24         Q.     The range dues.  The same dues that pay



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 19 of 131 PageID #:4670

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                          19

1    for maintenance of the range itself?

2         A.    Yes.   Uh-huh.

3         Q.    So the range dues are -- strike that.

4               The member dues are sufficient to cover

5    not only the range operation but also these sound

6    deadening efforts?

7         A.    Right.

8         Q.    That, at least to date, have approximated

9    about $200,000?

10        A.    Oh, yes.

11        Q.    I don't know if I asked you this question

12   before when I was asking you about whether ISRA loans

13   out guns on the range, or sells ammunition, and you

14   told me one of the reasons why it doesn't do that is

15   because it doesn't want to compete with area stores or

16   what have you who do that kind of thing.

17              As part of their business, are there any

18   other reasons why ISRA does not rent guns on the

19   range?

20        A.    They have no facility to do it.  I should

21   tell you that when we have Boy Scouts, and things like

22   that, we have a set of 22 rifles they can use, and

23   that sort of thing.

24              So in a sense, we do loan out guns, but we



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 20 of 131 PageID #:4671

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                        20

1    don't charge for 'em because it's a Boy Scout required

2    thing.  So we want the proper equipment because most

3    of the time they didn't bring it.  Didn't bring the

4    proper equipment.

5         Q.    If ISRA wanted to loan out guns as a

6    routine matter to members of ISRA who are using the

7    range, what kind of structure or facility would they

8    need to build for that?

9         A.    Well, we would have to build a clubhouse

10   with a -- if we're going to keep the guns there

11   overnight, with a vault in it.

12        Q.    And why would you need the vault?

13        A.    Well, because the range is unattended.  I

14   mean, there's nobody on the premises.  But, you know,

15   the range master lives across the street about

16   300 yards away.  300 feet away.  So then he has a view

17   of the range, but he doesn't -- he's not right there.

18        Q.    And why wouldn't you want to leave the

19   guns unattended in a clubhouse?

20        A.    Why would I?

21        Q.    Why would you not -- when I was asking you

22   why you would put them in a vault, I think you said

23   they would be left unattended?

24        A.    Well, you never know who's going to walk



1  | by.  You know, you never know what's going to happen

2  | so you keep things secured.

3  |      Q.    So the fear is maybe they could be stolen?

4  |      A.    Sure.

5  |      Q.    Or someone could come in, a perfectly

6  | well-meaning person, and just accidentally use the gun

7  | and injure themselves or someone else?

8  |      MR. SIGALE:  I'll object as to speculation for

9  | that, but you can go ahead and answer.

10 | BY THE WITNESS:

11 |      A.    Well, there could also be damage in some

12 | way.  And the other thing is they should be in a

13 | humidity controlled area, and it's hard to do it in

14 | just a general building.

15 | BY MR. WORSECK:

16 |      Q.    Is there any other reason why ISRA does

17 | not sell ammunition on its ranges?

18 |      A.    Well, other than we don't want to compete

19 | with a lot of our firearm dealers.  They're very

20 | supportive of us, and so we kind of have a deal.  You

21 | sell the guns and ammo, and we'll give 'em a place to

22 | shoot.

23 |      Q.    Sure.  I believe this was true as of your

24 | prior deposition, and correct me if I'm wrong, and let



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 22 of 131 PageID #:4673

RICHARD PEARSON                                June 12, 2012
EZELL vs. CITY OF CHICAGO                              22

1   me know if anything's changed in the time period

2   between your deposition and today.

3            It's true that ISRA has never built a

4   shooting range, correct?

5        A.    Not an indoor range.

6        Q.    But it's built an outdoor range?

7        A.    The one we have is.  We've completely

8   changed it from the day we bought it.  I mean, so it

9   was leveled and rebuilt from the ground, and it's in

10  the same place but...

11       Q.    I remember that you said that you had

12  acquired a previously existing range, which is now the

13  Bonfield range.

14       A.    Right.

15       Q.    But I wasn't sure if you had inherited,

16  and had not changed it, or it sounds like you've done

17  a lot --

18       A.    No.  We change it constantly --

19       Q.    -- of tinkering.

20       A.    -- with different trends, and safety, and

21  maintenance.

22       Q.    So you have -- ISRA has built outdoor

23  ranges, but it has never built indoor ranges?

24       A.    No, that's correct.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 23 of 131 PageID #:4674

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    23

1        Q.      And ISRA has never operated an indoor

2    range?

3        A.      No.

4        Q.      Does ISRA want to operate a range in

5    Chicago?

6        A.      Yes.

7        Q.      Does it want to own a range in Chicago?

8        A.      Maybe.

9        Q.      Does it want to build a range in Chicago?

10       A.      We'd like to see one built.  It depends on

11   how it's done.  But it's a thought, yes.

12       Q.      And ISRA has not submitted an application

13   to the City of Chicago for a shooting range license,

14   correct?

15       A.      No.

16       Q.      Are you aware of anyone who has submitted

17   a shooting range license application to the City?

18       A.      No.

19       Q.      Can you tell me as much as you can about

20   ISRA's plans or intentions, whatever they may be at

21   this point in time, about building or operating a

22   shooting range in Chicago?

23       MR. SIGALE:  I'm going to object to the form of

24   the question.  Do you mean the law as it currently



1  stands, or do you mean like a wish list type of

2  question?

3  BY MR. WORSECK:

4      Q.    Under the existing Chicago regulation,

5  and assume that is the world we're operating in.

6      A.    Sure.

7      Q.    Just tell me everything you can.  I just

8  want to get a sense of what ISRA's thinking is as to

9  what it wants to do in Chicago with a shooting range.

10     A.    Well, we'd like to see a training facility

11 here.  If we have to do it, that's one thing.  If

12 somebody else does it, that's fine, too.

13         But our problem with that is we talked

14 about a business plan.  But with all the requirements

15 that are in the ordinance, and all the uncertainties

16 in the ordinance, we don't see how we can go forward

17 at this time.

18     Q.    You mentioned a training facility.  Are

19 you referring to a shooting range when you mention

20 that?

21     A.    Oh, yes.

22     Q.    So it would be a range in the sense of

23 having firing lanes, and then it would also have some

24 sort of training component like classrooms, or things



1  | like that?

2  |     A.    Yes.

3  |     Q.    Have you given any thought as to how big

4  | the building would be?  How many square feet?  That

5  | kind of thing?

6  |     A.    Well, I've thought about it.  That's sort

7  | of like a chicken and egg thought.

8  |           You know, you have to figure out how big

9  | it is to be economically viable.  So you have to have

10 | enough space, but you don't sort of want too much

11 | space, you know.

12 |           You have to figure out what the market's

13 | going to be.  So that's the kind of things you think

14 | about.

15 |     Q.    Have you come to any estimate?  You know,

16 | "I need 20,000 square feet?  I need 40,000?  I need

17 | 10,000"?

18 |     A.    Well, I would think we'd need in the

19 | neighborhood of 30,000 square feet.

20 |     Q.    Is it fair to say that's just an estimate

21 | you've come up with in your head?

22 |     A.    Yes.  That's a perfectly fair statement.

23 |     Q.    You haven't done any sort of analysis, put

24 | pen to paper in any sort of way, to come up with that



1  number?

2      A.    Well, I'm thinking about the number of

3  firing lanes, you know.

4            Then you have to back in all the expenses,

5  and see what that's going to turnout to be.  And all

6  the ongoing costs, which you have no idea what it's

7  going to be, or I have no idea what it's going to be.

8  So that's one of the problems.

9      Q.    Let me ask it this way.  Is there any

10 document that you have that in any way relates to the

11 size of your anticipated range?

12     A.    No.

13     Q.    How many firing lanes are you

14 contemplating at this point?

15     A.    Well, if I were to do it, if it was my

16 ideal, which we often don't get our ideals, I would

17 probably have at least 30 firing lanes.

18     Q.    And what other kinds of facilities would

19 you want on the property?

20     A.    We'd have to have storage facilities for

21 storage of material.  Classrooms, of course.

22           You have to have equipment rooms for the

23 ventilation.  Heating and cooling of the range, but

24 also ventilation of the range.  A HEPA filter system.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 27 of 131 PageID #:4678

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                       27

 1  | All that has to be contemplated.  It all takes space.
 2  |       Q.    How many classrooms would you like to
 3  | have?
 4  |       A.    Three.
 5  |       Q.    Has anyone generated any sort of
 6  | blueprints or architectural schematics for what a
 7  | proposed ISRA range in Chicago might look like?
 8  |       A.    No.
 9  |       Q.    Have you asked anyone to do that?
10  |       A.    No.
11  |       Q.    What kind of services would be offered at
12  | the range?
13  |       A.    Well, presently the only thing you could
14  | offer at the range would be Chicago Firearm Permit
15  | classes under the ordinance.
16  |       Q.    So it's your understanding that you would
17  | not be -- Chicago doesn't allow a range to operate for
18  | the purpose of having repeat customers come in a
19  | couple times a month and shoot for an hour or two at a
20  | time just for recreation or practice?
21  |       A.    No.  It has to be a Chicago Firearm Permit
22  | class.
23  |       Q.    Has ISRA given any thought to the fees it
24  | would charge at the range?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 28 of 131 PageID #:4679

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    28

1        A.    Well, that's the problem.  Not knowing the

2   costs, you have no idea what the fees would be.

3        Q.    Let's take a step back and talk about the

4   costs.

5             Does ISRA have any sort of estimate as to

6   what the construction costs would be for the range?

7        A.    Well, a firing lane and a range runs

8   roughly 4,000 to $4,500 in a normal situation, and

9   that's just for the material for the firing lane.

10  Okay?

11            You have to add to that filters.

12  Classrooms.  All the other things.  So you have to add

13  that in there.

14            And what kind of personnel.  What kind of

15  salaries you would have to provide because this would

16  probably have to be a range that would have employees.

17       Q.    Right now I just want to focus on

18  construction costs, not operating costs.

19       A.    Okay.  I'm sorry.  What the requirements

20  that are in there, like the sloping floor and all that

21  sort of business, I am not positive how that is -- how

22  much that's going to cost.  I don't know.

23       Q.    Aside from the figure of 4,000 to $4,500

24  per firing lane, is there any other figure that you



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 29 of 131 PageID #:4680

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      29

1  are able to pin on any particular component of

2  constructing the range?

3       A.    No.

4       Q.    And if you have 30 lanes, is it fair to

5  say that you would be spending at least $120,000 on

6  construction just for the lanes themselves?

7       A.    Just for the lanes themselves, right.

8       Q.    Do you have any sense for how much it

9  would cost to acquire a piece of property in Chicago?

10 Either buy it or lease it for operation of a range?

11      A.    I've looked at some buildings, you know,

12 and it seems to me that they're very high for what

13 they are.

14      Q.    What kind of prices have you seen?

15      A.    Oh, there's like -- one's like a

16 1,339,000, and you'd have to completely retrofit the

17 building.  I mean, it's high.

18      Q.    Does ISRA have a budget in terms of how

19 much it's willing to spend on land acquisition or

20 leasing?

21      A.    No.

22      Q.    Does ISRA have any sort of overall budget

23 relating to construction of the range?

24      A.    No.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 30 of 131 PageID #:4681

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      30

1       Q.    Has it tried to come up with one?

2       A.    No.

3       Q.    Is it fair to say that ISRA has made no

4    attempt to figure out how much it would cost to build

5    a range that complied with the various requirements in

6    the Chicago range ordinance?

7       A.    That would be correct.

8       Q.    Does ISRA want to build a new building

9    from scratch, or retrofit an existing building, or

10   does it have no preference one way or the other?

11      A.    Well, the preference would be which would

12   be the most efficient and cost effective way to do

13   that.

14      Q.    Is which way?

15      A.    On, I do not know that answer yet.

16      Q.    So you don't know if retrofitting is more

17   efficient than a new buildout?

18      A.    That's correct.

19      Q.    Has ISRA done any estimates as to what its

20   market might be for a Chicago range?

21      A.    Other than the fact that they're about

22   121,000 FOID cardholders in the city, and some percent

23   of those would want to get a CFP permit.  That's about

24   it.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 31 of 131 PageID #:4682

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                          31

1      Q.    So it hasn't done anything along the lines

2  of, "Well, if we opened a range in Chicago, we would

3  see 'X' customers per month or 'Y' customers per

4  year"?

5      A.    Correct.

6      Q.    And that would be a pretty important thing

7  to try to get your hands around before you actually

8  went forward on a project to build a shooting range?

9      A.    That is correct.

10     Q.    Has ISRA done anything to figure out how

11  many customers it would need on a monthly basis or

12  yearly basis to break even on a Chicago range?

13     A.    Well, the answer is you don't have the --

14  you can't get the cost down.

15          You don't have a -- I mean, you don't have

16  an understanding of what the cost would be.  So it

17  would be hard to come up with that figure.  So the

18  answer is, no.

19     Q.    So that's going to take us back again, I

20  guess, now to operating costs?

21     A.    Right.

22     Q.    Has ISRA done anything to figure out what

23  its -- to even estimate what its operating costs would

24  be for a Chicago range?



 1       A.     No.

 2       Q.     Has ISRA done anything to try to figure

 3   out how many employees it would have to hire to

 4   maintain a range in Chicago?

 5       A.     No.

 6       Q.     Aside from employees' salaries, what other

 7   components go into operating costs?

 8       A.     Taxes.  Utilities.  Building maintenance.

 9   Maintenance on the range equipment and the cost of

10   HEPA filters.  Changing those out.

11           The cost of cleaning equipment to clean

12   the range.  The books.  Materials.  The office

13   equipment it would take to do it, you know.

14       Q.     And is it fair to say that ISRA has not

15   done anything to try to figure out or even estimate

16   any of those individual cost components that you just

17   listed?

18       A.     Yes, that's true.

19       Q.     So if I can just sort of summarize your

20   testimony, and make sure I understand correctly, it

21   sounds like before ISRA would even seriously think

22   about moving forward with a range in Chicago, it would

23   first need to figure out its construction costs.

24   Would then need to figure out its operating costs.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 33 of 131 PageID #:4684

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      33

1           From there, then it could try to start to

2    figure out what kind of market it would need to be

3    able to tap into, and how many customers it would need

4    on a monthly or yearly basis, and relatedly what kinds

5    of fees it would have to charge in order to recoup

6    those costs, and ISRA doesn't have any idea about any

7    of that; is that fair?

8        A.    That is correct.

9        Q.    Has ISRA given any thought as to how it

10   would fund construction of a Chicago range?

11       A.    We have some money.

12       Q.    ISRA money?

13       A.    Yeah.  We'd have to borrow the rest.

14       Q.    Has ISRA talked to any lenders, or

15   bankers, or financial service providers?

16       A.    No.

17       Q.    Is that who you would seek a loan from, or

18   would you seek a loan from individuals?

19       A.    We would go to a bank.

20       Q.    But ISRA hasn't even approached a bank

21   yet?

22       A.    No.

23       Q.    Do you know what percentage of the

24   construction costs would be financed from a bank



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 34 of 131 PageID #:4685

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                     34

1 | versus paid for out of ISRA funds?

2 |     A.    I don't know what the construction costs

3 | are yet.  So the answer is, no.

4 |     Q.    You mentioned, I think, that there was a

5 | business plan generated in at least some form?

6 |     A.    Well, we're trying to think of what it

7 | would be, which would include all those things, but we

8 | have not done that.

9 |     You know, you have to think about all the

10 | components, and what it's going to be, and, you know.

11 | But we have not put anything on paper yet, no.

12 |     Q.    So there's no written document?

13 |     A.    No.

14 |     Q.    Who else at ISRA would be involved in this

15 | project in terms of making decisions?

16 |     A.    Well, we'd probably hire actually an

17 | outside consultant on this one.  We haven't done that

18 | or anything, but that's what we would have to do to

19 | make sure that we were right.

20 |     Q.    Has ISRA given any thought to who that

21 | outside consultant would be?

22 |     A.    Well, there are two or three.  But

23 | actually, no.

24 |     Q.    Who are the two or three that would be --



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 35 of 131 PageID #:4686

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      35

1      A.      There's a fellow in Texas I got an e-mail

2    from.  They're talking about a range in New York

3    there.

4           I would probably actually spend a lot of

5    time with Action Target who would be our primary

6    company that we would probably deal with.  I feel they

7    have the best understanding of it.

8      Q.      And there was a third company?

9      A.      I'm sorry?

10     Q.      And I think you said there might be a

11   third company?

12     A.      Oh, there might be.  Or go to the NRA

13   range plan, or the National Shooting Sports, and see

14   what they could do, you know.

15     Q.      Who at ISRA would be involved in this

16   range project in terms of deciding whether it's a good

17   idea?  Whether to move forward?

18     A.      Well, the entire board of directors would

19   eventually be involved with that, but we would have to

20   draw up a plan and present it to them.

21     Q.      Has the board composition changed since

22   your September 2010 deposition?

23     A.      Oh, I'm sure it has.  It changes every

24   year so...



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 36 of 131 PageID #:4687

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      36

1        Q.      How many members are on the board right
2    now?

3        A.      Boy, 18 right now I think.  That's a
4    maximum.

5        Q.      Has any sort of proposal, or resolution,
6    or what have you been presented to the ISRA board in
7    any way relating to a potential Chicago shooting
8    range?

9        A.      Only to let the board know that we're
10   exploring the idea.  Other than that, no.

11       Q.      So the board hasn't been called on to make
12   a decision as to anything that in any way relates to a
13   Chicago shooting range?

14       A.      No.

15       Q.      Has ISRA actually reached out to the two
16   or three outside consultants that it's thinking of and
17   said, "Hey, we might be interested in doing a Chicago
18   range.  Can you help us out?  Can you give us any
19   preliminaries?"  Anything like that?

20       A.      Well, like the cost per lane, I got that
21   from Chris Hart.  I mean, that's who we would talk to
22   would be Chris Hart.  He's the Action Target person
23   for the area here.

24       Q.      Have you talked to the Texas person at



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 37 of 131 PageID #:4688

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                        37

1   all?

2       A.    No.   I just got an e-mail from him.   I

3   didn't know he existed until a week ago so...

4       Q.    Do you still have that e-mail?

5       A.    Yeah.   I probably do.

6       MR. WORSECK:   David, I'd make a request for that

7   e-mail.

8   BY THE WITNESS:

9       A.    It had nothing to do with this range.

10  It's about a New York range, but I'll get it for you.

11  BY MR. WORSECK:

12      Q.    And aside from getting the cost per lane

13  estimate from Chris Hart, Action Target hasn't

14  provided any other information to ISRA regarding cost

15  components, or logistical issues, or construction

16  issues, or anything else relating to a potential

17  Chicago range?

18      A.    No.

19      Q.    Your communications with Chris Hart, were

20  they verbal, or were they through e-mail?

21      A.    Just verbal.

22      Q.    Now, I think it's fair to say, based on

23  some documents that your attorney's provided to us and

24  ISRA's responses to our Interrogatories, that ISRA has



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 38 of 131 PageID #:4689

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      38

1  had some dealings with some real estate agents in the

2  Chicago area?

3       A.    Well, we've asked a couple of them for

4  properties and to submit them to us, yes.

5       Q.    Can you just start at square one on that

6  topic?  Tell me how that came about, and how you found

7  out about these agents, and who talked to who first,

8  and just describe the course of dealing that you've

9  had with these agents?

10      A.    I think they came through Vic Quilici, our

11  corporate counsel.  Victor Quilici, Q-u-i-l-i-c-i.  Or

12  our corporate counsel.  I actually don't know where

13  they came from, but I think that's where they came

14  from.

15            Okay.  So what's the next part of it?  I'm

16  sorry.

17      Q.    So what happened next?

18      A.    We had got a list of properties.  I don't

19  remember how many there were.  You know, 10, 12 maybe.

20            And so when I looked at those, none of

21  them were very exciting.

22      Q.    When you say you looked at them, did you

23  physically go to those addresses?

24      A.    No.  I just got the realtor sheet.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 39 of 131 PageID #:4690

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                     39

1    Q.    You looked at it on the printout or the

2  Internet listing?

3    A.    Yeah.  Whatever they're listed on.

4    Q.    Do you know if the list of properties that

5  was provided to ISRA from these agents was a list that

6  complied with the City's zoning requirements for

7  shooting ranges?

8    A.    No.  That was one of the questions.

9    Q.    And what was the answer to that question?

10   A.    The answer to that -- I don't know if they

11 would comply.

12   Q.    Did ISRA ask the agents to confirm whether

13 or not these listings complied?

14   A.    No.

15   Q.    And the agents never said anything about

16 zoning compliance to ISRA?

17   A.    No.

18   Q.    So basically these agents provided a list

19 of properties to ISRA, and neither the agents nor ISRA

20 knows whether any of those properties comply with the

21 zoning for shooting ranges?

22   MR. SIGALE:  I just want to object as to form

23 for this line.

24        Are you referring to zoning of -- just the



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 40 of 131 PageID #:4691

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    40

1   manufacturing part, or are you referring to the 500

2   foot thing as well?

3       MR. WORSECK:  Any -- all of it.  Any zoning

4   requirements as to shooting ranges.

5   BY THE WITNESS:

6       A.    I don't know.  I mean, I just don't know.

7   BY MR. WORSECK:

8       Q.    What is the status right now of the

9   dialogue or the relationship between ISRA and these

10  real estate agents?

11          Are they actively continuing to look for

12  properties?  Have they stopped?  What's going on right

13  now?

14      A.    They stopped.

15      Q.    And why did they stop?

16      A.    Because we have to get this ordinance

17  figured out first.

18      Q.    Did ISRA ask them to stop?

19      A.    I didn't ask them to stop.  But since we

20  weren't able to find anything that was particularly

21  interesting, I think they just stopped.

22      Q.    What was it about the properties that were

23  provided to you that made them not particularly

24  interesting?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 41 of 131 PageID #:4692

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      41

1        A.    Well, it depends on the property.  But,

2   you know, some of them were just not suitable.  Too

3   small.

4              They're all old buildings, you know, that

5   would have to be retrofitted.  You would have to have

6   the building inspected before you even thought about

7   if because it might cost you more to repair the

8   building than to build a new one.  So you have those

9   things to think about.

10             Well, some were just too little, you know.

11  And the others I just wasn't -- we weren't -- I wasn't

12  sure about.  I don't know what anybody else thought,

13  but I wasn't sure about 'em.

14        Q.    Do you know if anyone at ISRA physically

15  looked at any of the properties that were provided in

16  the listings?

17        A.    No.

18        Q.    You mentioned just a minute ago that you

19  weren't going ahead with trying to find property

20  because you needed to get the ordinance figured out.

21  I think that's the phrase you used.

22        A.    Well, we needed the ordinance adjusted.

23        Q.    I just want to understand what you mean by

24  that.



1          Is it that you are still trying to figure

2    out what the ordinance means, and what it requires, or

3    are you trying to get the ordinance changed?

4          A.    The ordinance would have to be changed.

5          Q.    So as you sit here today, you have a good

6    understanding of what the current ordinance requires?

7          A.    Yes.

8          Q.    You just don't like some of those

9    requirements, and you're trying to change those

10   requirements?

11         A.    Yes.

12         Q.    So is it fair to say that you don't have

13   any intention of building a range under the current

14   ordinance?

15         A.    That would be correct.

16         Q.    Only if the Plaintiffs in this lawsuit

17   were to prevail, either completely or partially

18   getting some of the provisions changed?

19         MR. SIGALE:   Objection as to speculation.

20   BY MR. WORSECK:

21         Q.    Only in that situation would ISRA go back

22   to the drawing board, and see if it made sense to try

23   to pursue a range in Chicago?

24         MR. SIGALE:   Still objection as to speculation.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 43 of 131 PageID #:4694

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      43

1   BY THE WITNESS:

2        A.    It is speculation, but we would have to

3   see how it turned out.  But, you know, only then would

4   we do it, yes.

5   BY MR. WORSECK:

6        Q.    And so it's possible that even if

7   Plaintiffs won, ISRA still might not want to move

8   forward on the Chicago range?

9        MR. SIGALE:  Objection as to speculation.

10  BY THE WITNESS:

11       A.    Do I answer?

12       MR. SIGALE:  You can answer if you understand

13  the question.

14  BY THE WITNESS:

15       A.    Okay.  Yeah.  We might not want to.  It

16  depends on the conditions at the time.  You know,

17  we're looking into the future.

18  BY MR. WORSECK:

19       Q.    So -- strike that.

20       MR. WORSECK:  Is this a good time for a break,

21  David?  It's about five minutes to 12:00?

22       MR. SIGALE:  Yeah.  We can do that.

23       THE WITNESS:  A half hour, or 25 minutes, or

24  something?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 44 of 131 PageID #:4695

RICHARD PEARSON                                June 12, 2012
EZELL vs. CITY OF CHICAGO                              44

1          MR. WORSECK:  I'm flexible.  Half hour.

2    45 minutes.  Whatever you want.

3          MR. SIGALE:  Well, let's come back at 12:30.

4          MR. WORSECK:  Okay.

5                    (WHEREUPON, the deposition was

6                    recessed until 12:31 p.m.,

7                    this date.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 45 of 131 PageID #:4696

RICHARD PEARSON                                     June 12, 2012
EZELL vs. CITY OF CHICAGO                                      45

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4

5

6   RHONDA EZELL, et al.,                )

7                   Plaintiffs,          )

8   vs.                                  ) No. 10 C 5135

9   CITY OF CHICAGO,                     )

10                  Defendant.           )

11

12

13                   June 12, 2012

14                   12:31 p.m.

15

16           The deposition of RICHARD PEARSON resumed

17   pursuant to recess at Suite 1230, Conference Room 1,

18   30 North LaSalle Street, Chicago, Illinois.

19

20

21

22

23

24



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 46 of 131 PageID #:4697

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                       46

```
 1   PRESENT:

 2        LAW FIRM OF DAVID G. SIGALE, P.C.,

 3        (739 Roosevelt Road, Suite 304,

 4        Glen Ellyn, Illinois  60137,

 5        630-452-4547), by:

 6        MR. DAVID G. SIGALE,

 7                appeared on behalf of the Plaintiffs;

 8

 9

10

11

12        OFFICE OF THE CORPORATION COUNSEL,

13        CITY OF CHICAGO,

14        (30 North LaSalle Street, Suite 1230,

15        Chicago, Illinois  60602,

16        312-744-7129), by:

17        MR. ANDREW W. WORSECK,

18                appeared on behalf of the Defendant.

19

20

21

22

23   REPORTED BY:  MARILYN T. LaPORTE, CSR, RPR

24                CSR CERTIFICATE NO. 84-2095.
```



1          MR. WORSECK:  Back on the record.

2                       RICHARD PEARSON,

3    called as a witness herein, having been previously

4    duly sworn, was examined and testified further as

5    follows:

6                    EXAMINATION (Resumed)

7    BY MR. WORSECK:

8          Q.    Mr. Pearson, has anyone at ISRA had any

9    sort of communication with anyone at the City of

10   Chicago regarding a potential ISRA range in Chicago?

11         A.    No.

12         Q.    So no one at ISRA has reached out to any

13   City departments or City officials with questions, for

14   instance, about how to comply with the ordinance, or

15   what particular pieces of the ordinance mean or

16   require?

17         A.    No.

18         Q.    Are you aware of any pieces of property in

19   Chicago that have been considered by anyone as being a

20   potential site for a Chicago shooting range aside from

21   the property listings that we talked about this

22   morning that were supplied to ISRA from some real

23   estate agents?

24         A.    Well, I received an inquiry from a person



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 48 of 131 PageID #:4699

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      48

1  who had a piece of property that he and his brother

2  own.

3       Q.    Anything else?

4       A.    That was it.

5       Q.    And that person owns a piece of property

6  in Chicago?

7       A.    Yes.

8       Q.    And they -- what did they say to you?

9       A.    They just wondered if it would be possible

10 to use it for a shooting range.

11      Q.    And what was your response?

12      A.    It's too small.

13      Q.    Did they say anything about whether the

14 piece of property complied with the zoning

15 requirements governing shooting ranges?

16      A.    They have no idea.

17      Q.    Did they indicate that they were

18 interested in building a range, or they wanted to let

19 ISRA use this piece of property for a range?

20      A.    No.  They indicated they were interested.

21      Q.    Who was this person?

22      A.    Art Turner.

23      Q.    And there was another person?

24      A.    Well, it's his brother.  I don't know his



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 49 of 131 PageID #:4700

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    49

```
 1   brother's name.

 2        Q.    Do you remember the address of the

 3   property?

 4        A.    I could look it up.  I don't remember.

 5        Q.    Sure.

 6        A.    It is at 1843 South Pulaski Road, Chicago,

 7   60623.

 8        Q.    Is he an ISRA member, if you know?

 9        A.    I don't know.

10        Q.    Did he say anything else to you about his

11   plan or intent to build a shooting range in Chicago?

12        A.    No.  That was it.  He just wanted it to be

13   used for that.

14        Q.    When was this communication?

15        A.    When was the communication?

16        Q.    Ballpark it as best you can.

17        A.    Let me figure it out here.  5/14.

18        Q.    Of this year?

19        A.    May.  5/14/2012.

20        Q.    And is that an e-mail you're looking at?

21        A.    That's a text actually.

22        Q.    A text message?

23        A.    Yes.

24        Q.    Can you read the text message to me?
```



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 50 of 131 PageID #:4701

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      50

1        A.    You can look at it.

2        MR. SIGALE:  Can I see it first, please?  Okay.

3   BY THE WITNESS:

4        A.    It's actually his brother's building, but

5   I don't know his brother's name.  It's only 5,000

6   square foot on the ground floor.  It's not big enough.

7   Not a working elevator.

8   BY MR. WORSECK:

9        Q.    I'll just read this into the record so we

10  don't have to mess around.

11             But I'm looking at a text message on

12  Mr. Pearson's BlackBerry that he handed to me after

13  letting his attorney look at it, and it references, as

14  Mr. Pearson said, a May 14th, 2012, text message from

15  Art Turner, Sr., and it reads, "The address of my

16  brother's building is 1843 South Pulaski Road,

17  Chicago, Illinois, 60623.  Period.  15,000 square

18  feet.  Period."  And I lost it.

19       A.    It's 5,000 on a floor.

20       MR. WORSECK:  I don't know how to work this.

21  The screen just went black.

22       MR. SIGALE:  Three store -- 15,000 square feet.

23  Three --

24       MR. WORSECK:  Why don't I just finish reading it



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 51 of 131 PageID #:4702

RICHARD PEARSON                                June 12, 2012
EZELL vs. CITY OF CHICAGO                              51

1  for the record?

2       MR. SIGALE:  Three stories, 5,000 per floor.

3  BY MR. WORSECK:

4       Q.   So after the 15,000 square feet, "Three

5  stories.  5k per floor.  Period.  Nonworking elevator.

6  Period.  Sorry for the delay.  Period."

7       MR. SIGALE:  Rich, do you mind --

8  BY THE WITNESS:

9       A.   You can have it.  I don't know how to do

10 anything with that.  I'm not that good.  It's also in

11 the last two days decided not to ring anymore.  So I'm

12 pretty happy with that BlackBerry right now.

13      MR. SIGALE:  You can keep going.

14 BY MR. WORSECK:

15      Q.   Did you receive any other text messages

16 from Mr. Turner about this property?

17      A.   No.

18      Q.   So you had some oral conversations with

19 him?

20      A.   I ran into him in the hallway at the state

21 house.  That was it.

22      Q.   And then this was a follow-up message he

23 sent you with the details?

24      A.   Yes.  Uh-huh.



RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                        52

1      Q.    Do you know anything else about his

2   contemplated plans at this point?

3      A.    None.

4      Q.    Do you know if he's looking at any other

5   property in the city for building a shooting range?

6      A.    No.

7      Q.    Are you aware of any estimates that anyone

8   has done as to how much it would cost to build a

9   shooting range in Chicago for any client?  Not

10  necessarily for ISRA, but any sort of estimate that

11  anyone's done as to how much it would cost to build a

12  range in Chicago?

13     A.    No.

14     Q.    Has ISRA reached out to any attorneys to

15  help assist at building a range in Chicago?

16          Obviously you've got counsel who is

17  representing you in this lawsuit, and you're

18  challenging the shooting range ordinance in this

19  lawsuit.

20          But I'm asking about attorneys who would

21  be performing a different function for ISRA, and that

22  would be the function of helping ISRA get an

23  application in order, and get financing documents

24  executed and perfected, and get other certifications



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 53 of 131 PageID #:4704

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      53

1   and authorizations properly filled out, and what have

2   you.  All of which would be necessary to open a

3   shooting range business in Chicago.

4               So with that kind of attorney in mind, has

5   ISRA made any efforts to reach out to any kind of

6   attorney who would provide that kind of legal counsel?

7        MR. SIGALE:  You can answer yes or no.

8   BY THE WITNESS:

9        A.    I'm sorry?

10       MR. SIGALE:  You can answer yes or no.

11  BY THE WITNESS:

12       A.    No.

13  BY MR. WORSECK:

14       Q.    And has ISRA reached out to any

15  accountants to potentially assist it in connection

16  with applying for a shooting range license, and

17  getting shooting range financing, and otherwise

18  building a shooting range, and operating a shooting

19  range in Chicago?

20       A.    No.

21       Q.    And has ISRA reached out to any

22  consultants for any of those purposes?

23       A.    No.

24       Q.    To any expediters for any of those



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 54 of 131 PageID #:4705

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                       54

1    purposes?

2         A.    No.

3         Q.    To any promoters for any of those

4    purposes?

5         A.    No.

6         Q.    To any lobbyists for any of those

7    purposes?

8         A.    No.

9         Q.    So you don't know whether there are any

10   professionals out there who would be able to fulfill

11   any of those roles for ISRA?

12        MR. SIGALE:  I'm just going to object as to form

13   of the question and speculation.  If you understand

14   the question, you can answer.

15   BY THE WITNESS:

16        A.    I understand the question.  I don't

17   understand how to answer it.

18             Would you say that one more time, please?

19        MR. WORSECK:  Could you read it back, please?

20             (WHEREUPON, the record was read by

21             the reporter as requested.)

22        MR. SIGALE:  I'm just going to object as to

23   form.

24             Are you asking in light of the CFP FOID



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 55 of 131 PageID #:4706

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      55

1  requirement for such people, or are you just asking

2  are there -- does he know if there are people smart

3  enough or capable enough to do it?

4       MR. WORSECK:  Whether he knows if there's anyone

5  out there who's able to perform the function.

6       MR. SIGALE:  I think the question is ambiguous

7  in that regard.  If you understand it, you can answer

8  it.

9  BY THE WITNESS:

10      A.   Right.  I would have to say, no I guess.

11 BY MR. WORSECK:

12      Q.   And is it fair to say that you've made

13 no -- that ISRA has made no effort to figure out if

14 there are any of those professionals who have or don't

15 have FOID cards or CFP cards?

16      A.   No.

17      Q.   You just don't know the FOID status and

18 the CFP status as to any of those types of

19 professionals?

20      A.   No.

21      MR. WORSECK:  Let's mark this as Exhibit No. 1,

22 please.

23

24



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 56 of 131 PageID #:4707

RICHARD PEARSON                                           June 12, 2012
EZELL vs. CITY OF CHICAGO                                         56

```
 1                    (WHEREUPON, a certain document was

 2                    marked Pearson Deposition Exhibit

 3                    No. 1, for identification, as of

 4                    06/12/2012.)

 5    BY MR. WORSECK:

 6         Q.    Sir, you've just been handed Exhibit 1,

 7    which is the Amended Complaint in this lawsuit.

 8               Do you see that?

 9         A.    I do.

10         Q.    And have you seen this document before?

11         A.    Yes.

12         Q.    Can you turn to Page 5 of the exhibit?

13    Running from Page 5 to Page 7, do you see a series of

14    bullet points?

15         A.    Yes.

16         Q.    And each one of those bullet points cites

17    a provision or a couple of provisions of the Chicago

18    Municipal Code relating to gun range regulations?

19         A.    Yes.

20         Q.    And if you turn to Page 5 and look at the

21    first bullet point in this series of bullet points,

22    which is at the bottom of Page 5, it cites Chicago

23    Municipal Code Sections 5-151-010 and 4-151-030?

24         A.    Okay.
```



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 57 of 131 PageID #:4708

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      57

1        Q.    Has ISRA made any inquiry into whether it

2    can comply with those provisions?

3        A.    No.

4        Q.    Has it done any sort of analysis or study

5    as to whether it could comply with those provisions?

6        A.    No.

7        Q.    Are you aware of anyone else who has

8    evaluated whether they could or could not comply with

9    those provisions?

10       A.    No.

11       MR. SIGALE:  I'm just going to object as to form

12   of the question on that one.  Vague and ambiguous as

13   to the terms.  You answered it, though?

14   BY THE WITNESS:

15       A.    I said, no.

16       MR. SIGALE:  Okay.  That's fine.

17   BY MR. WORSECK:

18       Q.    Has ISRA had any communications with

19   anyone about these provisions?

20       A.    No.

21       MR. SIGALE:  You mean other than counsel?

22   BY MR. WORSECK:

23       Q.    Other than your counsel.

24       A.    No.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 58 of 131 PageID #:4709

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    58

1      Q.    If you could then turn to Page 6, and look

2   at the next bullet point in this series, and that

3   bullet point cites Chicago Municipal Code Section

4   4-151-030(f).

5           Do you see that?

6      A.    Yes.

7      Q.    Has ISRA made any attempt to evaluate this

8   provision?

9         MR. SIGALE:  I'm going to object to the form of

10   the question.  I mean, other than through legal

11   counsel, I don't know how you would evaluate this

12   provision.

13   BY MR. WORSECK:

14      Q.    Aside from communications with your

15   attorneys, has ISRA done anything to evaluate this

16   provision?

17         MR. SIGALE:  Same thing as to form of the

18   question, and vague and ambiguous as to the phrase

19   evaluate.  But if you understand it, you can answer.

20   BY THE WITNESS:

21      A.    No.

22   BY MR. WORSECK:

23      Q.    Has ISRA discussed this provision with

24   anyone?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 59 of 131 PageID #:4710

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                     59

1          MR. SIGALE:   Other than counsel?

2     BY THE WITNESS:

3          A.    No.

4     BY MR. WORSECK:

5          Q.    Has ISRA tried to determine what impact,

6     if any, this provision would have on the viability of

7     a shooting range in Chicago?

8          A.    Can I talk to my counsel for a second

9     because --

10         Q.    Can you answer the question?

11         MR. SIGALE:   You need to answer the question if

12    you can.

13    BY THE WITNESS:

14         A.    Well, the answer is ISRA hasn't.   I have.

15    Is that an answer?

16    BY MR. WORSECK:

17         Q.    That's an answer.

18         A.    Okay.  All right.

19         Q.    So what have you done?

20         A.    Well, I've looked at the -- particularly

21    at 4-151-030(f), and, you know, determined that the

22    Commissioner could capriciously shutdown a shooting

23    range after you've put millions of dollars in it, and

24    it's just not acceptable.



1      MR. SIGALE:  Before you ask another question,

2  was that just the bias -- the distinction you and

3  ISRA is, that was what you were going to want to ask

4  me about?

5  BY THE WITNESS:

6      A.    Right.  I'm the one that has to look at

7  this.

8      MR. SIGALE:  Well, you're here on behalf of ISRA

9  so...

10  BY THE WITNESS:

11      A.    Right.

12      MR. SIGALE:  Okay.  I just didn't know if we

13  needed to take a break.

14  BY THE WITNESS:

15      A.    No.

16      MR. SIGALE:  But go ahead, Andrew.

17  BY THE WITNESS:

18      A.    So anyway, you know, it looks to me like

19  anything could be a deleterious impact if you chose to

20  make it that way.

21  BY MR. WORSECK:

22      Q.    Have you done anything else?

23      A.    No.

24      Q.    So you haven't made any attempt to see or



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 61 of 131 PageID #:4712

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    61

1   even try to estimate how often the kind of conditions

2   would arise that would constitute a deleterious

3   impact, which would arise around Chicago at other

4   locations?

5       MR. SIGALE:  I'm just going to object, and maybe

6   ask it as a blanket question.

7           Should I assume that for all of these

8   questions you mean other than through counsel and

9   through litigation?

10      MR. WORSECK:  Yes.  Unless I'm specifically

11  asking for your communications with counsel, which I

12  don't know why I would, but I think that's a fair

13  assumption to read into all my questions.

14      MR. SIGALE:  Okay.

15  BY THE WITNESS:

16      A.   Well, the answer is there's no way for me

17  to tell that, you know.

18          You know, the events that would occur

19  around a place that I don't know where its location is

20  yet it's just not possible to tell.

21  BY MR. WORSECK:

22      Q.   And you haven't made any inquiries to the

23  City about what this provision might mean, or what

24  impact it might have?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 62 of 131 PageID #:4713

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      62

 1        A.    No.

 2        Q.    Are you aware of anyone else who has

 3   examined or evaluated this provision?

 4        A.    Yes.  What's the company called?

 5   Kramer Consulting?  Did they look at this?

 6        MR. SIGALE:  Oh, Mr. Pearson is referring to our

 7   disclosed expert.

 8   BY THE WITNESS:

 9        A.    Expert report.

10   BY MR. WORSECK:

11        Q.    So you're talking about the experts that

12   Plaintiffs have disclosed?

13        A.    Yeah.  Other than that, nobody.

14        Q.    And I'll just refer to them as the

15   experts.  Plaintiffs' experts.

16        A.    All right.

17        Q.    Have you had any communications with

18   Plaintiffs' experts?

19        A.    No.

20        Q.    Has anyone at ISRA had any communications

21   with Plaintiffs' experts?

22        MR. SIGALE:  To your knowledge.

23   BY THE WITNESS:

24        A.    No.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 63 of 131 PageID #:4714

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                     63

1   BY MR. WORSECK:

2       Q.    Have you known of Plaintiffs' experts

3   prior to their getting involved in this case?

4       A.    No.

5       Q.    Aside from counsel, have you discussed

6   Section 4-151-030(f) with anyone?

7       A.    No.

8       Q.    Is there any evidence or information that

9   you're aware of that provides some guidance, or hints,

10  ideas as to how the City of Chicago would interpret

11  and apply this provision?

12      A.    No.

13      Q.    You're not aware of any instances in other

14  contexts of regulating businesses in the city where

15  they applied a provision like this?

16      A.    No.

17      Q.    If you could move then to the next bullet

18  point, which cites Section 4-151-090, and it talks

19  about the hours of operation.

20            Has ISRA made any attempt to study or

21  evaluate the impact of this provision on the operation

22  of a range in Chicago?

23      A.    Well, ISRA being me, it would seem in a

24  city like Chicago that with second and third shift



 1  people, their hours might be somewhat restrictive.

 2          Q.    But has ISRA or you done any sort of

 3  evaluation or attempt to quantify what kind of impact

 4  these hours of operation would have on the viability

 5  of a shooting range in Chicago?

 6          A.    No.

 7          Q.    Are you aware of anyone else who's done

 8  anything like that?

 9          A.    No.

10          Q.    It's fair to say that second and third

11  shift people generally can't use the Bonfield range

12  given the hours of operation down there?

13          A.    Right.  And we have no lights.

14          Q.    Are you aware of any evaluation, or

15  examination, or estimate as to what kind of impact

16  this hours of operation requirement would have on the

17  profitability or viability of a shooting range in

18  Chicago?

19          A.    No.

20          Q.    Are you aware of any ranges elsewhere in

21  the country that -- aside from the Bonfield range,

22  which we've already talked about, that have an hours

23  of operation requirement similar to this one?

24          MR. SIGALE:  I'm just going to object as to



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 65 of 131 PageID #:4716

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    65

 1  vague and ambiguous as to the phrase similar.

 2              But to the extent you understand it, go

 3  ahead and answer it.

 4  BY THE WITNESS:

 5       A.    Please repeat it.

 6  BY MR. WORSECK:

 7       Q.    Sure.  Are you aware of any range

 8  elsewhere in the country that has hours of operation

 9  that are similar to the hours set forth in 4-151-090?

10       MR. SIGALE:  Same objection, but you can answer

11  if you understand.

12  BY THE WITNESS:

13       A.    Yes.

14  BY MR. WORSECK:

15       Q.    Can you list those for me?

16       A.    I think Chuck's Gun Shop in Riverdale and

17  Midwest Sporting Goods in Lyons would be the only two

18  I would know exactly.

19       Q.    And what are Chuck's hours as best you can

20  recall?

21       A.    Well, I don't know.  I think he opens at

22  10:00 or 11:00 and runs until 8:00 or 9:00.

23       Q.    And Chuck's has been a successful business

24  for a number of years, correct?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 66 of 131 PageID #:4717

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      66

1       MR. SIGALE:  Objection as to foundation and

2   speculation.  But if you know, you can answer.

3   BY THE WITNESS:

4       A.    Well, I would -- the answer's, yes.

5   They've been successful.

6   BY MR. WORSECK:

7       Q.    They've been operating for at least a

8   couple of decades if not a couple of generations?

9       A.    Yeah, since 1960.  Four decades and a

10  couple of years.

11      Q.    And the hours for Midwest?

12      A.    I don't know.  It seems to me about 10:00

13  to 9:00, or something like that.  I mean, I don't

14  really know their hours exactly, but I know that they

15  have hours.

16      Q.    Neither of those two locations accommodate

17  second and third shifts?

18      A.    No.

19      Q.    Are you aware of any information or

20  evidence indicating that a range in Chicago could not

21  be viable if it had to comply with the hours of

22  operation set forth in 4-151-090?

23      A.    No.

24      Q.    Are there any benefits to having these



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 67 of 131 PageID #:4718

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      67

1    hours of operation in a range operating in Chicago?

2         A.    The benefits to have the hours of

3    8:00 a.m. to 9:00 p.m.?

4         Q.    Yes.

5         A.    It cuts down on your staffing.  That's the

6    only benefit that I could see.

7         Q.    And then moving on to the next bullet

8    point, which cites Section 4-151-100(d).

9         A.    Okay.

10        Q.    It talks about barring range patrons under

11   the age of 18.

12              Have you made any attempt to evaluate, or

13   estimate, or study the impact that this requirement

14   would have on the operation of a shooting range in

15   Chicago?

16        A.    Well, the impact would be -- it's obvious

17   that anyone under 18 couldn't use the range.  And so

18   people who wanted to bring their families there for

19   recreation couldn't.

20        Q.    Have you made any attempt to estimate or

21   assess the impact that would have on the range's

22   ability to be a viable business in Chicago?

23        A.    No.  I have not.

24        Q.    Have you discussed that provision with



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 68 of 131 PageID #:4719

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                           68

1    anyone?

2         A.    Other than counsel, no.

3         Q.    Are you aware of anyone who has done any

4    sort of estimate, or evaluation, or analysis of the

5    impact that this requirement would have on the

6    viability or profitability of a range in Chicago?

7         A.    No.

8         Q.    Are you aware of any ranges elsewhere in

9    the country that have this requirement?

10        A.    No.

11        Q.    Are there any benefits from this

12   requirement that you can think of?

13        A.    No.

14        Q.    Are you aware of any information or

15   evidence that would indicate that a range in Chicago

16   could not be viable or profitable if it had to comply

17   with this requirement?

18        A.    No.

19        Q.    Are you aware of any estimate or

20   evaluation that anyone has done as to any specific

21   impact this provision would have on the profits of a

22   range?

23              For instance, this provision would lower

24   profits by 10 percent or 20 percent?  Anything like



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 69 of 131 PageID #:4720

RICHARD PEARSON                                        June 12, 2012
EZELL vs. CITY OF CHICAGO                                          69

 1   that?

 2        A.    No.

 3        Q.    Let me ask that question also for the

 4   preceding bullet point.  The one talking about the

 5   hours of operation.

 6             Are you aware of anyone who has done any

 7   sort of study, or analysis, or estimate as to what

 8   kind of specific impact the hours of operation

 9   requirements in the Chicago ordinance would have on

10   the income or profitability of a shooting range?

11        A.    No.

12        Q.    Moving then to the next bullet point,

13   which references Section 4-151-100(g)(1).

14             Do you see that?

15        A.    Yes, sir.

16        Q.    Have you done any analysis or estimate of

17   the impact that this provision would have, if any, on

18   the operation or viability of a shooting range in

19   Chicago?

20        A.    I'm not sure it's an analysis, but it

21   certainly appears it would cut down the number of

22   people coming from the suburbs, or Indiana, or

23   anyplace using the range, which would really cut into

24   your profits I would think.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 70 of 131 PageID #:4721

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                          70

1       Q.     But have you done any estimate or analysis

2   of this provision?

3       MR. SIGALE:  I'm just going to object as to form

4   and to foundation.

5   BY THE WITNESS:

6       A.     The answer's still, no.

7       MR. SIGALE:  And vague and ambiguus.  But I'm

8   sorry.  Did you already answer it?

9   BY THE WITNESS:

10      A.     Yeah.  The answer is, no.

11      MR. SIGALE:  Okay.  That's fine.

12  BY MR. WORSECK:

13      Q.     Are you aware of anyone who has made any

14  attempt to figure out how many people would be

15  excluded from being able to use the Chicago range by

16  virtue of Section 4-151-100(g)(1)?

17      MR. SIGALE:  I'm going to object as to form and

18  speculation.  But if you understand, you can answer

19  it.

20  BY THE WITNESS:

21      A.     Well, since there's about 1.4 million FOID

22  cardholders, and 120,000 live in the City of Chicago,

23  the other -- what is it?  1,260,000 would be excluded

24  from using the range.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 71 of 131 PageID #:4722

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    71

1              Plus, all the people in Indiana, which

2      would be pretty close to this.  So that's the only

3      thing I would have to say about that.

4      BY MR. WORSECK:

5              Q.    And you just did that math right here in

6      the room, right?

7              A.    Exactly.

8              Q.    So aside from that, you haven't done

9      anything else?

10             A.    Right.

11             Q.    Have you discussed this provision with

12     anyone?

13             A.    No.

14             Q.    Are you aware of any study, or estimate,

15     or analysis, or evaluation that anyone has done as to

16     what kind of financial impact or bottom line impact

17     this requirement would have on the viability of a

18     shooting range in Chicago or a range's income or

19     profits?

20             A.    No.

21             Q.    Are there any benefits from this

22     requirement that you can think of?

23             A.    None.

24             Q.    How many dues paying members are there of



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 72 of 131 PageID #:4723

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      72

1    ISRA roughly?

2         A.    Dues paying members of ISRA in general?

3         Q.    Yes.

4         A.    About 22,800.

5         Q.    And do you have any numbers as to how many

6    people use the Bonfield range, say, on a monthly basis

7    or annual basis?

8         A.    How many people use it?  The answer is

9    about 1740.

10        Q.    Per?

11        A.    Per year.  But they may use it multiple

12   times.  You know, we don't keep -- I mean, I can dig

13   it out.

14        Q.    So a small, probably less than ten percent

15   of ISRA members actually use --

16        A.    Well, that's because it requires a special

17   membership to use the range.  That's the reason for

18   that.

19        Q.    Okay.  How many ISRA members have the

20   range membership?

21        A.    1740.

22        Q.    So pretty much every ISRA member who has a

23   range membership uses the range?

24        A.    Yes.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 73 of 131 PageID #:4724

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      73

1      Q.    But only about ten percent of ISRA members

2   have the range membership?

3      A.    Yes.

4      Q.    And the funding of the range, is that

5   drawn from both the range membership fees and the

6   general membership dues?

7      A.    No.

8      Q.    It's drawn just from the range membership

9   fees?

10     A.    Correct.

11     Q.    So those fees we talked about earlier,

12  those were just for the range membership?

13     A.    Right.

14     Q.    And those are the only people that

15  essentially contribute money toward maintenance of the

16  range?

17     A.    True.

18     Q.    The average dues paying member, who is not

19  a range member, they pay some dues, but that money

20  does not go toward maintenance of the range?

21     A.    Correct.

22     Q.    Or funding the range?

23     A.    Yes.

24     Q.    We're on Page 7 now of Exhibit 1.  And



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 74 of 131 PageID #:4725

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                     74

1   moving on to the next bullet point, which is citing

2   Section 4-151-120, and that talks about the zoning

3   requirements in Chicago for a shooting range.  And

4   we've talked about this somewhat already in connection

5   with talking about the property search.

6            Are you aware of anyone who has done any

7   sort of study, or analysis, or tabulation of

8   properties in the city that would comply with these

9   zoning requirements?

10       A.    No.

11       Q.    ISRA hasn't done anything like that?

12       A.    No.

13       Q.    And you haven't done anything like that?

14       A.    No.

15       Q.    So you don't know what land is available,

16  or what land is not available in the city for a

17  shooting range pursuant to these zoning requirements?

18       A.    No.  Other than they have to be in an

19  industrial area.

20       Q.    But you don't know what percentage of the

21  land in the city satisfies these requirements?

22       A.    No.

23       Q.    Have you discussed this provision with

24  anyone aside from counsel?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 75 of 131 PageID #:4726

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      75

1    A.    No.

2    Q.    Are you aware of ranges anywhere else in

3  the country that comply with a set of zoning

4  requirements like these set out in 4-151-120?

5    A.    No.

6    Q.    Are you aware of anyone else who has made

7  any sort of attempt to find a piece of land in the

8  city that satisfies 4-151-120?

9    A.    No.

10   Q.    You can then move to the next bullet

11 point, which cites Section 8-20-110.

12        Have you discussed this provision with

13 anyone?

14   A.    No.

15   Q.    Have you or ISRA made any attempt to

16 estimate, or evaluate, or analyze the impact that this

17 requirement would have on the operation of a shooting

18 range?

19   A.    You said you or ISRA, right?

20   Q.    Right.

21   A.    Referring to me?  The answer is I have.

22 It seems that this would really confuse things,

23 particularly four, which is replacing old ammunition

24 by firing it at the range and then departing with



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 76 of 131 PageID #:4727

RICHARD PEARSON                                         June 12, 2012
EZELL vs. CITY OF CHICAGO                                          76

1   fresh replacements.

2            Sampling and using of different firearms

3   is something that people need to do.  A firearm.  Any

4   firearm.  But in this case, we're talking about

5   handguns, I guess, are like shoes.  They have to fit

6   each person, or they don't work right, and they hurt.

7   You can't do well with 'em.

8            So by being able to use different

9   firearms, different sized firearms, different caliber

10  firearms, different configurations of any possible

11  conception you can think of, people eventually find

12  something that suits them.  And by not doing this, it

13  prohibits all that.

14       Q.    But aside from this theory, which I

15  appreciate and I understand, have you or ISRA made any

16  attempt to estimate, or analyze, or evaluate the

17  impact that this requirement would have, or the set of

18  requirements would have, in Section 8-20-110 on the

19  ability of a shooting range to operate in Chicago?

20       A.    Well, other than me just thinking it would

21  severely cut down on a number of patrons you would

22  have, the answer is, no.  Nothing quantitative.

23       Q.    Are you aware of anyone anywhere who's

24  done any sort of analysis of that sort?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 77 of 131 PageID #:4728

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      77

 1        A.    No.

 2        Q.    So you're not aware of any estimate, or

 3   study, or evaluation that impacts the studies or

 4   evaluates the impact that 8-20-110 may or may not have

 5   on the income or profit of a shooting range in

 6   Chicago?

 7        A.    No.

 8        Q.    Or otherwise impacting the viability of a

 9   shooting range in Chicago?

10        A.    No.

11        Q.    Are you aware of any ranges in the country

12   that have similar requirements?

13        A.    No.

14        Q.    Then moving on to the next bullet point,

15   which cites Section 4-151-170, have you discussed that

16   with anyone?

17        A.    No.

18        Q.    Have you or ISRA made any attempt to

19   study, or evaluate, or analyze, or estimate the impact

20   that this provision would have on the viability, or

21   income, or profit of a shooting range in Chicago?

22        A.    Other than me thinking it would severely

23   limit the viability, the answer is, no.

24        Q.    Are you aware of anyone else who's done



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 78 of 131 PageID #:4729

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      78

1  that sort of analysis?

2        A.    No.

3        Q.    Are you aware of any ranges in the country

4  that have that kind of requirement?

5        A.    No.

6        Q.    Are you aware of any evidence or

7  information indicating that a range that needed to

8  satisfy that requirement could not operate in Chicago?

9        A.    I'm sorry?

10        Q.    Are you aware of any information or

11  evidence indicating that a range that had to comply

12  with Section 4-151-170 could not viably operate in

13  Chicago?

14        A.    No.

15        Q.    And I don't think I asked that question to

16  the prior bullet point so let me ask it now.

17              Are you aware of any evidence or

18  information indicating that a range that needed to

19  comply with Section 8-20-110 could not viably operate

20  in Chicago?

21        A.    No.

22        Q.    And moving on to the next bullet point in

23  the list, which cites Section 13-96-1200(b)(2), and

24  this talks about the decibel levels emanating from the



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 79 of 131 PageID #:4730

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      79

 1  range.

 2        A.    Okay.

 3        Q.    Have you discussed this provision with

 4  anyone?

 5        A.    Other than counsel, no.

 6        Q.    Have you or ISRA made any attempts to

 7  estimate, or assess, or evaluate the impact that this

 8  requirement would have on the operation, viability,

 9  income, or profit of a shooting range in Chicago?

10        MR. SIGALE:  I'm going to object as to form of

11  the question.  It's way too compound.

12        MR. WORSECK:  I'm just trying to streamline, but

13  I'll break it down if you want.

14        MR. SIGALE:  I know you're trying to streamline.

15  But, I mean, if he answers it yes, the answer doesn't

16  even help.  So can you break it down?

17  BY MR. WORSECK:

18        Q.    Mr. Pearson, are you aware --

19        MR. SIGALE:  Let him break it down.

20  BY THE WITNESS:

21        A.    Okay.

22  BY MR. WORSECK:

23        Q.    Have you or ISRA made any attempt to

24  evaluate, or assess, or estimate the impact of



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 80 of 131 PageID #:4731

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    80

1   13-96-1200(b)(2) on the ability of a shooting range to

2   operate in Chicago?

3        A.    Nothing quantitative.  Only my own thought

4   that that's a really severe requirement particularly

5   in an industrial area that has no requirements.

6        Q.    But nothing more than that?

7        A.    No.

8        Q.    Have you or ISRA made any attempt to

9   evaluate, or study, or estimate the impact of this

10  requirement on the income of a shooting range in

11  Chicago?

12       A.    Other than thinking that insulating a

13  range so highly that it would only emit a 55 decibel

14  limit would be very expensive.

15            It would cut down on, you know, the amount

16  of money a person could make because you'd have to

17  invest more money in a range to keep it that low.

18       Q.    Nothing more than that?

19       A.    No.

20       Q.    Have you or ISRA made any attempt to

21  assess the amount it would cost to satisfy this

22  particular requirement?

23       A.    No.

24       Q.    Have you or ISRA made any attempt to



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 81 of 131 PageID #:4732

RICHARD PEARSON                                            June 12, 2012
EZELL vs. CITY OF CHICAGO                                          81

1   study, or analyze, or assess, or estimate the impact

2   of this requirement on the overall profitability or

3   viability of a shooting range in Chicago?

4          A.    Other than me thinking it would be much

5   more expensive to do it this way, the answer is, no.

6          Q.    Are you aware of any evidence or

7   information indicating that a range that had to comply

8   with this requirement could not viably operate in

9   Chicago?

10         A.    No.

11         Q.    Are there any benefits that flow from this

12  requirement?

13         A.    None that I could see.

14         Q.    Are you aware of any ranges in the country

15  that meet a sound requirement similar to that set

16  forth in this section?

17         A.    No.

18         Q.    Then the last bullet point in our list

19  cites Section 13-96-1200(b)(7), and it talks about

20  the slope of the floors of the shooting range.

21               Have you discussed that provision with

22  anyone?

23         A.    No.

24         Q.    Have you or ISRA made any attempt to



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 82 of 131 PageID #:4733

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      82

1  estimate, or analyze, or assess the impact that this

2  requirement has on the operation of a shooting range

3  in Chicago?

4      A.    Well, only me looking at it thinks that

5  building a sloped floor is more difficult to do and

6  more dangerous to operate on because it is sloped, and

7  it could cause the accumulation of burnt powder, and

8  that sort of thing down range causing a dangerous

9  condition.

10          I mean, that's what I think this would do.

11  The answer is nothing quantitative.

12      Q.    Are you aware of any ranges in the country

13  that have this kind of slope requirement?

14      A.    No.  Most of the ranges are flat so they

15  can be vacuumed.  You can't use water on the range.

16  You'd have to use a HEPA explosion proof vacuum

17  cleaner to clean it.  This would make it hard to do

18  that.

19      Q.    Are you aware of any ranges in the country

20  that have any sort of sloped floor?

21      A.    No.

22      Q.    Have you or ISRA made any attempt to

23  assess, or estimate, or evaluate the impact that

24  this requirement would have on the viability or



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 83 of 131 PageID #:4734

RICHARD PEARSON                                           June 12, 2012
EZELL vs. CITY OF CHICAGO                                              83

1  profitability of a range operating in Chicago?

2        A.    Well, other than me thinking this

3  requirement would really be a nuisance, the answer is,

4  no.

5        Q.    Are you aware of anyone else who's done

6  that sort of thing?

7        A.    No.

8        Q.    Are you aware of any evidence or

9  information indicating that a range that had to comply

10  with this requirement could not viably operate in

11  Chicago?

12        A.    No.

13        Q.    Are you aware of any benefits that come

14  from this requirement?

15        A.    None.  Only liabilities.

16        Q.    Now, I just want to sum up things now that

17  we're at the end of our list of bullet points.

18              As we were walking through the list, you

19  gave me certain theories and views you had as to why

20  certain of these requirements were problematic.

21              But is it safe to say that you are not

22  aware, nor have you done yourself or ISRA has done

23  itself, of any study, or analysis, or estimate that

24  has in any way tried to quantify the costs associated



1  with complying with any of these requirements?

2        A.     Say it one more time.

3        Q.     Sure.

4        A.     It got to be long there for a minute.

5        Q.     You're not aware of any attempt that --

6  strike that.

7        You're not aware of any estimate, or

8  study, or analysis that in any way tries to quantify

9  the financial impact that the Chicago requirements

10  that we've just talked about in the list of bullet

11  points has or could have on the operation of a

12  shooting range in Chicago?

13        A.     No.

14        Q.     And I apologize if I asked this

15  previously, but did you or ISRA provide any

16  information or documents to the Plaintiffs' experts?

17        A.     No.

18        Q.     Have you seen the report that the

19  Plaintiffs' experts wrote?

20        A.     Yes.

21        Q.     And aside from counsel, have you discussed

22  that with anyone?

23        A.     No.

24        Q.     Has ISRA asked Action Target to do any



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 85 of 131 PageID #:4736

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      85

1  sort of analysis or evaluation of the various Chicago

2  requirements that are at issue in this lawsuit?

3       A.    No.

4       Q.    Do you know if anyone has asked

5  Action Target to do that?

6       A.    No.

7       Q.    You mentioned earlier Victor Quilici?

8       A.    Yes.

9       Q.    Am I saying his name correctly?

10      A.    Yes.

11      Q.    And he's a member of ISRA?

12      A.    Yes, he is.

13      Q.    You mentioned him in connection with these

14 property searches that some real estate agents were

15 doing?

16      A.    Yeah.  I believe he's the one that

17 suggested 'em.  I think.  I'm not sure of that, but I

18 think so.

19      Q.    Has he been doing anything else relating

20 to investigating opening a shooting range in Chicago

21 that you're aware of?

22      A.    No.

23      Q.    You would be the ISRA person who would be

24 most knowledgeable about any efforts that ISRA was



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 86 of 131 PageID #:4737

RICHARD PEARSON                                           June 12, 2012
EZELL vs. CITY OF CHICAGO                                           86

1   taking to investigate opening a range in Chicago?

2       A.    Correct.

3       Q.    I want to ask you about a couple of

4   e-mails here.

5       MR. WORSECK:  Would you mark this as Exhibit 2,

6   please.

7                   (WHEREUPON, a certain document was

8                   marked Pearson Deposition Exhibit

9                   No. 2, for identification, as of

10                  06/12/2012.)

11  BY MR. WORSECK:

12      Q.    Sir, you've just been handed Exhibit 2,

13  which is a two-page document that contains an e-mail

14  string, and it's Bates stamped ISRA 108 and 109.

15          And the first e-mail in the string is

16  dated August 23rd, 2011, the second e-mail is

17  August 24th, 2011, and then the last e-mail in the

18  string is also August 24th, 2011.

19          And I want to direct your attention to the

20  second e-mail in the string, which is -- actually, I

21  guess there's four e-mails in the string.  There's a

22  fourth one here.

23          I want to direct you to the 8/24/2011

24  e-mail timestamped 12:49 p.m. from Victor Quilici to



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 87 of 131 PageID #:4738

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      87

1  Matt Ochalski.

2         A.    Okay.

3         Q.    And it reads, in part, "Thanks Matt, I

4  will pass this on the our president," and I think

5  that's a typo, "and executive director.  As I noted in

6  our earlier talks, this is only at an inquiry stage,

7  and we cannot make any decision until we see how the

8  City Council acts on the revision to the ordinance

9  that I previously sent to you."

10           What decision is being referenced here?

11        A.    Probably the revision of the Chicago

12  ordinance.

13        Q.    Well, it talks about the revision, but it

14  says that we can't make a decision until we see what

15  the City Council does.

16           So I'm wondering what decision was at

17  issue there.

18     MR. SIGALE:  I'm just going to object as to

19  foundation and speculation.  You can answer if you

20  know.

21  BY THE WITNESS:

22        A.    Well, I don't know.  I'm guessing that

23  they're talking about the Chicago ordinance here.

24



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 88 of 131 PageID #:4739

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                          88

1  | BY MR. WORSECK:

2  |      Q.    But you don't know what decision he was

3  | talking about?

4  |            Whether it was a decision as to move on

5  | looking at some property, or if it was a decision to

6  | do something else?

7  |      MR. SIGALE:  Same objections as before.

8  | BY THE WITNESS:

9  |      A.    Well, I think he's talking about the

10 | decision on drawing this ordinance and revising this

11 | ordinance so it's usable.

12 |            I think that's the decision he's talking

13 | about.  That's the way I interpret it anyway.

14 | BY MR. WORSECK:

15 |      Q.    That's all you know about that?

16 |      A.    That's all I know.

17 |      Q.    Did you have any discussions with

18 | Mr. Quilici, or I should also add, with Mr. Don Moran

19 | in late August of 2011 about this topic?

20 |      MR. SIGALE:  Wait.  You can answer yes or no to

21 | that question.

22 |            Actually, it will be easier if you break

23 | it down.  You asked about two people.  It would be

24 | easier if you broke it down.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 89 of 131 PageID #:4740

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      89

```
 1        MR. WORSECK:  That's fine.
 2   BY MR. WORSECK:
 3        Q.    Did you discuss this topic with
 4   Mr. Quilici at all around August 24th of 2011?
 5        MR. SIGALE:  You can answer.
 6   BY THE WITNESS:
 7        A.    No.  I'm sorry.
 8        MR. SIGALE:  No.  Your answer's fine.  Go ahead.
 9   BY MR. WORSECK:
10        Q.    And what about with Mr. Moran?
11        A.    No.
12        Q.    Had you ever seen these e-mails until this
13   afternoon?
14        A.    Well, they probably came on my computer
15   along with the 7500 of 'em that I got but...
16        Q.    Is your address executive@isra.org?
17        A.    It is.
18        Q.    So you were forwarded the e-mail that was
19   initially sent from Mr. Quilici to Mr. Ochalski?
20        A.    Right.
21        Q.    And you don't recall doing anything?
22        A.    I probably glanced at it, and that was it.
23        MR. WORSECK:  Can you mark this as Exhibit 3,
24   please?
```



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 90 of 131 PageID #:4741

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      90

1              (WHEREUPON, a certain document was

2              marked Pearson Deposition Exhibit

3              No. 3, for identification, as of

4              06/12/2012.)

5    BY MR. WORSECK:

6         Q.    Sir, you've been handed Exhibit 3, which

7    is an e-mail Bates stamped ISRA 106, and it's a

8    September 19th, 2011, e-mail from Emilio Bartucci to

9    yourself and Don Moran?

10        A.    Correct.

11        Q.    And do you recall seeing this before?

12        A.    I have seen it before.

13        Q.    And I want to focus you on the second

14   paragraph of the e-mail.

15        A.    Yes.

16        Q.    In the first sentence -- well, I'll read

17   the first two sentences.  "Attached is a listing of

18   warehouses that I hand selected for you.  The

19   properties I have listed include the criteria you are

20   looking for."

21              And my question is what are the criteria

22   that you were looking for?

23        MR. SIGALE:  Objection as to foundation and

24   speculation.  But if you know the answer to that, you



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 91 of 131 PageID #:4742

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                          91

1   can answer.

2   BY THE WITNESS:

3        A.    Well, I think that we were looking for a

4   place to put the mobile shooting range indoors

5   actually is what we were thinking about.  That's as

6   far as it goes.

7   BY MR. WORSECK:

8        Q.    So these properties were not properties

9   that would be used to either retrofit or buildout a

10  new range, but to basically park a mobile range?

11       A.    Yeah.

12       Q.    And did you, or Mr. Moran, or ISRA make

13  any attempt to figure out if a mobile range is legal

14  in Chicago?

15       A.    Well, and I actually couldn't figure it

16  out.  I never did come up with a conclusion so...

17       Q.    So you did try to figure it out, but you

18  couldn't figure it out?

19       A.    I couldn't figure it out.

20       Q.    Does ISRA have any plans currently to

21  open, or operate, or manage a range in Chicago that

22  would essentially be a mobile range parked under a

23  roof?

24       A.    No.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 92 of 131 PageID #:4743

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                          92

1        Q.    Or that would use a mobile range in any

2    capacity?

3        A.    No.

4        MR. WORSECK:  Could you mark this as Exhibit

5    No. 4, please?

6                    (WHEREUPON, a certain document was

7                     marked Pearson Deposition Exhibit

8                     No. 4, for identification, as of

9                     06/12/2012.)

10   BY MR. WORSECK:

11       Q.    Sir, you've just been handed Exhibit 4,

12   which is a copy of ISRA's Responses to Defendant's

13   Second Request for Production of Documents to

14   Plaintiffs.

15            Do you see that?

16       A.    Yes.

17       Q.    Have you seen this before?

18       A.    Yes.

19       Q.    And I just want to ask you a few quick

20   questions.  If you can turn to Document Request No. 3.

21       A.    "All documents relating to"?

22       Q.    Yes.

23       A.    Okay.

24       Q.    And then turning on to the next page, it's



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 93 of 131 PageID #:4744

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      93

1  got ISRA's response, which starts off with a lot of

2  objections, but it ultimately -- it references, quote,

3  "information from Matt Ochalski and Emilio Bartucci,

4  and enclosed e-mails."

5          And my question is I just want to confirm

6  with you that aside from those documents that are

7  referenced here, ISRA has no other documents described

8  in Request No. 3?

9      A.    No.

10     Q.    And then the same question for Request

11 No. 5.  The response to No. 5 makes some objections,

12 and then it ultimately says, "as to 5(e), see

13 above-referenced real estate information.  Otherwise,

14 none."

15         So I just want to confirm that aside from

16 the real estate information that's referenced in this

17 answer, ISRA does not have any documents described in

18 Request No. 5?

19     A.    That's correct.  We do not have any

20 documents.

21     Q.    Earlier in the deposition, before we broke

22 for lunch, I was asking you some questions trying to

23 get a sense for what ISRA's plans are with respect to

24 a range in Chicago, and your answer was basically that



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 94 of 131 PageID #:4745

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                       94

1    ISRA is not moving forward on anything at this time

2    because it's trying to change the ordinance rather

3    than figure out a way to comply with the ordinance; is

4    that fair?

5           A.    That would be fair.

6           Q.    And what is it about the current ordinance

7    that makes ISRA not interested in trying to build a

8    range that complies with the current ordinance?

9           MR. SIGALE:  I'm just going to object as to the

10   form of the question.

11              But with that said, Rich, you can go ahead

12   and answer.

13   BY THE WITNESS:

14          A.    Well, okay.  Can I go ahead?

15          MR. SIGALE:  Yeah.  You can go ahead.

16   BY THE WITNESS:

17          A.    Well, the ordinance is complicated.  It

18   drives up the costs of building a range at every turn.

19              The fact that the Commissioner can decide

20   what a deleterious effect is and close the range down

21   at whatever he decides it's going to be, you know,

22   makes us extraordinarily hesitant, you know, to put

23   any money or any more effort in this.  So this is

24   settled.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 95 of 131 PageID #:4746

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                          95

1           The -- you know, I think about the

2    deleterious effects, and I've talked to -- you know,

3    it talks about the number of arrests in an area.

4    Well, the number of arrests in an area can be

5    generated by the police department.  What they want to

6    do.  They can make arrests, if they want to make

7    arrests, and have no convictions.  They can -- you

8    know, it's all on how you write reports.

9           And every police department in the country

10   does this.  It's not only the City of Chicago.  You

11   know, if they want to drive numbers, then they write

12   reports differently.

13           And so, you know, it is totally capricious

14   to -- and whoever develops the range, ISRA or anybody

15   else, is totally at the mercy of that.  You could

16   spend millions of dollars and be wiped out in a week,

17   and the City of Chicago would make you an offer of

18   ten cents on the dollar, and have a brand new range

19   for the police department, or something like that.

20           The ordinance is very scary, you know.  I

21   mean, I have never actually run into anything like

22   this before.  So it looks to me like it's just plain

23   prohibitive no matter which way -- how you turn it

24   around.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 96 of 131 PageID #:4747

RICHARD PEARSON                                        June 12, 2012
EZELL vs. CITY OF CHICAGO                                        96

1          It's prohibited from building.  Prohibited

2     from zoning.  Prohibited from the costs that you're

3     going to incur.  You are limited on how you can make

4     your money.  You have all kinds of problems that are

5     going to cause you problems, you know, along the way.

6          The other point, of course, is that just

7     because right now, you know, we'll say the ordinance

8     is changed.  The ordinance, you know -- the ordinance

9     can be redrawn again some other way.  So it's very

10    worrisome, you know.

11          I actually think that the ordinance is

12    designed to delay, or completely eliminate, or

13    restrict in some way the citizens of Chicago their

14    Second Amendment rights.

15          So it's just another way of getting at the

16    restriction of the Second Amendment in Chicago.

17    BY MR. WORSECK:

18          Q.    And everything you've just said, that's

19    based on your own review of the ordinance and your own

20    thinking?

21          A.    That's my own review, yeah.

22          Q.    But nothing more than that?

23          A.    No.

24          Q.    Would there ever be a point in time where



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 97 of 131 PageID #:4748

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      97

1   you would feel safe or ISRA would feel safe in

2   building a range in Chicago?

3           Assume that tomorrow Chicago enacted an

4   ordinance that had everything you wanted in it, and

5   maybe that's nothing.

6       A.    That's exactly what --

7       Q.    But assuming that there was an ideal

8   regulatory platform in Chicago, it would remain the

9   case that Chicago could change that the following day.

10      A.    That's true.

11      Q.    Would you ever feel at ease building a

12  range in Chicago?

13      A.    Only if the State of Illinois preempted

14  the ability of the City to regulate this.

15      MR. WORSECK:  That's all I have, David.

16      MR. SIGALE:  I have a few.  But before I begin,

17  let's take five minutes.

18      MR. WORSECK:  Okay.

19                (WHEREUPON, a recess was had.)

20      MR. SIGALE:  Back on the record.

21                    EXAMINATION

22  BY MR. SIGALE:

23      Q.    Rich, I want to clarify something that you

24  were talking about before.



1           When you were talking about a mobile

2 range, when exactly were you talking about -- when

3 exactly were you thinking of doing that?

4      A.     Well, that was one of our original ideas.

5      Q.     Okay.

6      A.     And so that was whenever it was started.

7 I don't know.

8      Q.     Okay. So you're referring to when the

9 lawsuit, the original Ezell complaint, was filed back

10 in July or August of 2010?

11      A.     Right. Right.

12      Q.     And you're referring to that period --

13 strike that.

14           Are you referring to that period when we

15 were doing the original round of depositions?

16           There was a preliminary injunction

17 hearing, and the Second Amendment Foundation was

18 working on bringing a blue line range to Chicago to do

19 the CFP training.

20           Is that all the same period that you're

21 talking about?

22      A.     Yes.

23      Q.     So was there a mobile range -- strike

24 that.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 99 of 131 PageID #:4750

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      99

 1            Was ISRA planning to bring a mobile range,

 2   or thinking about bringing a mobile range to Chicago

 3   after the Seventh Circuit's decision back in July

 4   of 2011?

 5       A.    No, before that.

 6       Q.    So I want to go back to this Exhibit 2.

 7   Strike that.  I'm sorry.

 8       MR. WORSECK:  I think you mean Exhibit 3.

 9       MR. SIGALE:  I do mean Exhibit 3.

10   BY MR. SIGALE:

11       Q.    That's Exhibit 3 where Emilio Bartucci

12   sends you and Don Moran an e-mail saying, "Here's a

13   list of warehouses," and it's dated September 19th,

14   2011.

15       A.    Okay.

16       Q.    Would this be after the time period after

17   the Seventh Circuit's decision after ISRA had stopped

18   thinking about bringing a mobile range to Chicago?

19       A.    Yes.

20       Q.    So is it fair to say then that the

21   warehouses referred to in this Exhibit 3 correspond to

22   what you were talking about at the beginning of your

23   deposition where you were looking at possible

24   locations to put an actual stationary brick and mortar



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 100 of 131 PageID #:4751

RICHARD PEARSON                              June 12, 2012
EZELL vs. CITY OF CHICAGO                           100

1    mobile range -- brick and mortar shooting range?

2         A.    Yes.

3         Q.    You had mentioned -- well, I want to

4    clarify.

5              To the best of your knowledge, how many

6    FOID cardholders are in the City of Chicago?

7         A.    121,000 at the moment.

8         Q.    To the best of your knowledge, if you

9    know, how many CFP holders are there in the City of

10   Chicago?

11        A.    Oh, I don't know.

12        Q.    Do you have any source of --

13        A.    Well --

14        MR. WORSECK:  Objection.  Calls for speculation.

15   BY THE WITNESS:

16        A.    Well, I would --

17   BY MR. SIGALE:

18        Q.    Let him make his objection.  Well, you

19   made your objection.

20             He made his objection.  You can answer if

21   you have any idea.

22   BY THE WITNESS:

23        A.    10,000.  I don't know.

24



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 101 of 131 PageID #:4752

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                           101

1   BY MR. SIGALE:

2        Q.    On what are you basing that?

3        A.    Well, I've heard figures from time to

4   time, but I haven't heard any recently that's the

5   problem.  I actually don't know.

6        Q.    If you know, very early in the deposition

7   you were talking about the sound deadening you were

8   doing on the outdoor range at Bonfield.

9        A.    Yes.

10       Q.    And you had mentioned that you did some

11  sound tests at the property lines.  And except for

12  the west line, you said that the tests came out to

13  68 decibels.

14             Do you recall testifying about that?

15       A.    Yes.

16       Q.    You made a comment, which was never asked

17  about, but I want to do it now.  You said that you

18  knew it was lower than what was required.

19             Do you recall saying that?

20       A.    Yeah.

21       Q.    So it's a two-part question.  Required by

22  who, and then what's the requirement you were

23  referring to?

24       A.    Well, there's a decibel limit requirement



1  out there, which is 68 at the property line, and ours

2  were below that.

3          And I believe that's a federal requirement

4  or some type.  I actually don't know.  I have to call

5  the range guys and ask them.

6      Q.    Which part do you need to ask them?

7      A.    About who makes that requirement.

8      Q.    Oh, whose requirement it is?

9      A.    Yes.  Whose requirement it is.  And it was

10 after that then that we decided we would do the sound

11 deadening to get it as low as we could.

12     Q.    Oh, do you know what -- have you done any

13 more sound testing since the --

14     A.    No.

15     Q.    I want to delve a little further into your

16 understanding of part of this -- of part of the

17 ordinances.

18         I want to talk a little further about this

19 requirement that you can't -- that the ordinance

20 prohibits the sale -- well, the rental of firearms

21 except for the one time one hour CFP class.

22     A.    Okay.

23     Q.    Now, you thought about this ordinance.

24 You -- strike that.



1          I want to get a little bit of background.

2   How long have you been involved with the ISRA range?

3          A.    Well, as a -- in some supervisory

4   capacity, probably since I was elected to the board.

5   I've been a range member since 1987 I believe.

6          But I was elected to the board, and then I

7   became the president in January of 1998.  Excuse me.

8   November 1998.

9          Q.    Did your -- what are your response -- I'm

10  sorry.  You've been the president of the board since

11  1998?

12         A.    No.  I became president in 1998.  I became

13  executive director after that.

14         Q.    Okay.  When did you become executive

15  director again?

16         A.    2004 or 2005.

17         Q.    What, if any, are your responsibilities

18  towards the range as executive director?

19         A.    I'm ultimately responsible for it.

20         Q.    Does that include --

21         A.    Everything.

22         Q.    How has that changed from when you were

23  the president in that period before you became

24  executive director?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 104 of 131 PageID #:4755

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                      104

1        A.     Well, I was ultimately responsible for it

2    then, but it was run by a board.  There was no

3    executive director.  And so it became a paid position,

4    and this is one of the things in my job description.

5        Q.     So when you were reviewing the Chicago

6    ordinance that's at issue now, can you speak in

7    general terms about what the restriction on the rental

8    of firearms other than for a one-hour class means

9    financially to a range?

10       MR. WORSECK:  Objection.  Speculation.

11   Foundation.

12   BY MR. SIGALE:

13       Q.     You can answer.

14       A.     Can I talk?

15       Q.     Yeah.  You can talk.

16       A.     Well, I know that for the people who do

17   commercial ranges, okay, that this is an important

18   area for them to make money.

19              How much they -- what percent of their

20   income, I don't know.  But I know that you have to

21   have the ammunition sales, the firearm rental, and so

22   forth and so on in there to make the whole thing work.

23   And if you don't, it won't work.

24       Q.     What do you mean it won't work?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 105 of 131 PageID #:4756

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    105

1      A.    You don't have enough money to make it go.

2      Q.    Rich, do me a favor.  I know that you're

3 looking at me because you're -- I'm talking to you,

4 and you're answering the questions.  Turn your chair a

5 little bit just so Marilyn can hear you better.

6      A.    Oh, sure.

7      Q.    Now, part of your other -- strike that.

8            Do you have any job responsibilities with

9 the ISRA as pertains to firearms laws?  Firearms

10 legislation?

11      MR. WORSECK:  Objection.  Vague.

12 BY MR. SIGALE:

13      Q.    If you understand my question, you can

14 answer.

15      A.    Repeat it, please.

16      Q.    Do you have any job duties as executive

17 director regarding firearm laws?  Firearm legislation?

18      A.    Yes.  I am the chief lobbyist for the

19 ISRA.

20      Q.    Can you explain what that means?

21      A.    That means that we write laws, support

22 laws, oppose laws, or review laws that have anything

23 to do with firearms.  Or actually with us, the

24 Department of Natural Resources also.



1      Q.    And that's been part of your job since you

2  became executive director in 2004?

3      A.    Yes.  And as president prior.

4      Q.    The City's restriction in their ordinance

5  about the loaning and rental of firearms, other than

6  for a one hour CFP class, have you figured in your

7  review of the ordinance how people, the would-be

8  customer, would get a firearm to the range?

9      A.    I have not been able to figure out how

10  they could legally get it to the range.

11      Q.    So in your review, what would be required?

12      A.    Well, the way I read the ordinance is

13  that, first of all, they can't legally get the firearm

14  in their house.  And if they have do get it in their

15  house, they can't get it out.

16      Q.    Can you explain --

17      A.    They can't even take it to their garage

18  without being in violation of the ordinance or any

19  part of their yard.  So they can't load the firearm in

20  the car.

21            They have to have a vehicle to transport

22  it.  It has to be locked away.  So they can't use

23  public transportation.  You can't ride a bicycle.  I

24  guess you could use a motorcycle.  It has a lockbox on



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 107 of 131 PageID #:4758

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                      107

1  it maybe.  So that would be very difficult.

2        If you have to disassemble a firearm in

3  transportation, that is a problem particularly if you

4  use revolvers.  They're very hard to assemble and

5  disassemble.  And it causes -- if they do get to the

6  range under -- and it's disassembled, then it takes

7  time to put it together, and the same thing with

8  moving it back home.

9        But it also makes the situation dangerous

10  for them because if you don't put it together right,

11  it won't work right.  And if it doesn't work right, it

12  becomes a problem.  It could be dangerous.

13        So that is one of the problems with the

14  ordinance.  As far as running a shooting range is,

15  customers can't get their firearms to you to use.  To

16  the range to use.  So that becomes a problem.

17        Q.    Would you think that that would impact a

18  potential range's customer base in Chicago?

19        MR. WORSECK:  Objection.  Calls for speculation.

20  BY MR. SIGALE:

21        Q.    You can answer.

22        A.    Well, if you're going to get arrested, the

23  answer is, yes.  So that's a problem.

24        Q.    To your knowledge, are people in



```
 1    Illinois -- strike that.

 2              To your knowledge, are people who do not

 3    live in Illinois eligible to get a FOID card?

 4         A.    Say that one more time.

 5         Q.    To your knowledge, are people who do not

 6    live in Illinois eligible to obtain a FOID card?

 7         A.    No.  It is illegal for them to have a FOID

 8    card.

 9         Q.    So am I correct in saying then that if the

10    Chicago ordinance prohibits anyone without a FOID card

11    from patronizing a range in Chicago, that that would

12    eliminate anyone who lives outside of Illinois as a

13    potential customer?

14         A.    Yes.

15         Q.    Now, as someone who has been -- strike

16    that.

17              At the bottom of Page 7 of the complaint,

18    which is Exhibit 1, and forgive me because you might

19    have fleshed this out a little bit, but I don't recall

20    it so I'm going to ask you perhaps again.  So I

21    apologize.

22              The final bullet point there regards

23    Section 13-96-1200(b)(7), it's the provision that

24    talks about the sloped floor, and you mentioned that
```



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 109 of 131 PageID #:4760

RICHARD PEARSON                                June 12, 2012
EZELL vs. CITY OF CHICAGO                                 109

1   it might be dangerous because -- well, I'll just ask

2   you to indulge me.

3           Why might that be a dangerous condition?

4       A.    Well, because the powder through the

5   vibrations would go toward the bottom end, and you

6   always have some unburnt powder.

7           And so the -- if it accumulates in any

8   area, and anything could ignite it, it could cause a

9   flash fire on the range.  And by it all trickling down

10  to one end over time, it could create an abundance of

11  powder that it could be a big problem.

12          Most ranges have a flat floor, and it

13  requires a HEPA explosion proof vacuum cleaner to

14  clean those.  You can't use water on them.  And the

15  only reason I could think to have a sloped floor would

16  be there would be a drain down there someplace.  And

17  if that happens, all that stuff would accumulate in

18  the drain.

19          And if you washed it down, and it dried

20  out, it would become flammable again.  It might change

21  the properties of the gunpowder to be more explosive.

22      Q.    And so is it fair to say then that this

23  Section 13-96-1200(b)(7) by itself potentially -- I'm

24  sorry.  Potentially creates a situation that would



1   potentially have a deleterious impact on the safety?

2        A.    Yes, absolutely.

3        Q.    Mr. Pearson, I don't want to be glib, and

4   I'm not trying to ask you in a glib fashion, but

5   Mr. Worseck asked you a bunch of times if you had done

6   cost analyses, and things like that about putting --

7   about ISRA building a firing range.

8             To your knowledge, based on your years of

9   experience in the firearm industry, let's say, is

10  building a firing range a cheap endeavor?

11       A.    No.

12       Q.    Do you have, excuse the pun, a range?

13  Even if you don't have exact numbers, do you have any

14  kind of idea what this kind of thing might cost?

15       MR. WORSECK:  Objection.  Vague.  By this thing,

16  you mean?

17       MR. SIGALE:  Building a firing range.

18       MR. WORSECK:  That complies with the

19  requirements, or in general?

20       MR. SIGALE:  Good question.  Let's just say in

21  general.

22  BY THE WITNESS:

23       A.    Well, your building costs are probably

24  going to run you, without the range equipment, $150 a



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 111 of 131 PageID #:4762

RICHARD PEARSON                             June 12, 2012
EZELL vs. CITY OF CHICAGO                            111

1   square foot anyway, and it may be more in the City of

2   Chicago because I very seldom deal with the City.

3   Okay.  So I'm sure it will be higher there.  Higher in

4   the city.  I'm sorry.

5   BY MR. SIGALE:

6        Q.    So 150 a square foot.  You had earlier

7   said that you thought 30,000 square feet would be

8   necessary?

9        A.    To make it viable.  If the ordinance was

10  gone, you could transport your firearm, yeah.

11       Q.    Right.  All other things being not a

12  factor.

13       MR. SIGALE:  I might not have anything else for

14  you, Rich.  Hold on one second.

15  BY MR. SIGALE:

16       Q.    Have you been to indoor firing ranges

17  before?

18       A.    Yes.

19       Q.    Approximately how many different ones

20  would you say?

21       A.    Oh, in the dozens anyway.

22       Q.    Dozens?  So at least 24?

23       A.    At least 24.

24       Q.    And all in Illinois?



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 112 of 131 PageID #:4763

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    112

1          A.    No.    All over the country.

2          Q.    To your knowledge, how many of the ones

3     that you went to didn't rent firearms to customers?

4          MR. WORSECK:    Objection.    Speculation.

5     Foundation.

6     BY THE WITNESS:

7          A.    I actually know that.    All the military

8     ranges that are indoor don't rent firearms to

9     customers.

10    BY MR. SIGALE:

11         Q.    Oh, I'm sorry.    Let me rephrase the

12    question.

13         A.    Okay.

14         Q.    And maybe it even changes the dozens

15    number.

16               How many indoor ranges opened to the

17    public have you been to?

18         A.    Probably 20.

19         Q.    And of those, to your knowledge, how many

20    of those do not rent firearms to customers?

21         MR. WORSECK:    Objection.    Speculation.

22    Foundation.

23    BY THE WITNESS:

24         A.    I believe they all rent firearms to



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 113 of 131 PageID #:4764

RICHARD PEARSON                                        June 12, 2012
EZELL vs. CITY OF CHICAGO                                        113

1  customers.

2  BY MR. SIGALE:

3       Q.    And is that answer based on your personal

4  observation at those facilities?

5       A.    Yes.

6       Q.    The ISRA range in Bonfield has -- you were

7  talking about how you have a number of firearms.  It

8  was 22 calibers I think you mentioned for the

9  Boy Scouts?

10      A.    Right.

11      Q.    What is the -- what does ISRA believe --

12 what is ISRA's belief regarding minors and firearms?

13      A.    Well, it depends entirely, not on the

14 chronological age of the child, but the mental age

15 actually, and I'm fine with it.

16           I mean, kids love to shoot.  If you teach

17 'em safety in the beginning, it stays with 'em.  You

18 know, so we have, I don't know -- this year we'll have

19 over a thousand Scouts at the range, and youth camps,

20 and all kinds of things that we do every year.

21           I mean, by the end of the year, we'll

22 probably have gone through two or -- actually about

23 with all the other camps, probably 3,000 kids we'll

24 have trained on firearms.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 114 of 131 PageID #:4765

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    114

1        Q.    Can you explain a little bit why you

2   believe it's -- why ISRA would want to teach safety to

3   the Scouts and other minors that come through?

4        A.    Well, to teach firearm safety and

5   marksmanship is what we're supposed to do.  So it's in

6   our charter.

7        Q.    Why would that be important?

8        A.    Well, we feel that teaching children to

9   use firearms, first of all, keeps them safe.  They

10  develop the proper attitude.  So they understand that

11  a firearm is a tool that's used for sport and

12  recreation.

13            It can be used for self-defense.  It's not

14  supposed to be an offensive weapon.  You're not

15  supposed to be a thug with a firearm.  You're supposed

16  to be responsible, and that's what we teach in a very

17  shortened form.

18       Q.    Sure.  If the restrictions that are being

19  challenged in the lawsuit were removed either

20  voluntarily or through a Court order, would ISRA,

21  again, look to open a range in Chicago?

22       A.    Yes.

23       Q.    And in doing so, would look to do -- would

24  ISRA then look to do the things that Mr. Worseck had



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 115 of 131 PageID #:4766

RICHARD PEARSON                                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                                    115

1  asked about?  Like put together a business plan?

2          A.    You'd have to.  You'd have to go to a

3  bank.  You better have a business plan.  A good

4  looking business plan.

5          Q.    And is it fair to say that the only reason

6  ISRA has not done so to this point is because of these

7  restrictions?

8          A.    Yeah.  These restrictions are so

9  extraordinary that there's nothing I feel that we

10  could do to make it work.

11          MR. SIGALE:  I don't have anything else, Andrew.

12          MR. WORSECK:  I just have a few follow ups.

13          MR. SIGALE:  Sure.

14                     FURTHER EXAMINATION

15  BY MR. WORSECK:

16          Q.    If the restrictions challenged in the

17  lawsuit went away, either voluntarily by the City or

18  by a Court order, you just said that ISRA would look,

19  again, at building a range in Chicago?

20          A.    Right.  We would go to the trouble of

21  doing business plans.  I can't say it would turnout,

22  but we would actually do the research.

23          Q.    So it's possible that even then ISRA might

24  decide not to go forward ultimately on a range?



```
 1        A.    Right.  Because it's like any other

 2   business, you know.

 3        Q.    It could still end up being too costly?

 4        A.    It could still be, right.  That's true.

 5        Q.    Are you aware of any instance in which

 6   gunpowder accumulating on the floor of a shooting

 7   range has ignited or otherwise?

 8        A.    Yes.

 9        Q.    When did that happen?

10        A.    When did it happen?  I know where it

11   happened.  I'm not sure I was there.

12        Q.    Tell me everything you know about it.

13        A.    All right.  There you go.  It was about --

14   it must have been about 1998.  The range, Darnall's

15   Shooting Range, in Bloomington, Illinois, had a flash

16   fire, and because of the unburnt powder on the range.

17             And the reason for that was that it hadn't

18   been vacuumed as it was supposed to have been.  A

19   spark or something happened, and ignited the -- I

20   wasn't there, but I guess it was quite exciting.

21        Q.    Is that the only instance that you're

22   aware of?

23        A.    No.  It's not the only instance.  There

24   was another one I know about.
```



1          But I do know that is one of the things

2    that the -- that you have to do in your standard

3    operating procedures of a shooting range.  You have to

4    vacuum it every day.

5          You can actually probably go for a week.

6    But if you vacuum every day, you don't have to worry

7    about it.

8      Q.    Are you aware of any range that had a

9    sloped floor meeting the requirements of the Chicago

10   ordinance that had gunpowder that ignited on the floor

11   of the range?

12     MR. SIGALE:  I'm going to object as to the form

13   of the question.

14          I believe he earlier said he doesn't know

15   of any ranges that had a sloped floor like that at

16   all.

17   BY THE WITNESS:

18     A.    Well, that was my answer.  I don't know of

19   any ranges that have a sloped floor.

20   BY MR. WORSECK:

21     Q.    And is it your testimony that the idea

22   behind a sloped floor is that you would wash it out

23   with water rather than vacuuming it?

24     A.    Right.



1    Q.    So the slope is designed to have the water

2    trickle down into a drain?

3    A.    Well, I would think that would be true.  I

4    mean, I've dealt with packing houses in the past, and

5    that sort of thing.  And so that's what they used it

6    for.  And also with hospitals in a couple of places.

7         So mixing water and gunpowder does not

8    work because the residue hardens, and then it can

9    become flammable again at some later point, but you

10   don't know where it went necessarily.

11   Q.    Are you aware of any instances of ranges

12   that clean their floor using water as opposed to a

13   vacuum where gunpowder accumulating on the floor or in

14   the drain ignited?

15   A.    I actually know of no ranges that use

16   water to clean 'em.  I mean, they all have to be

17   vacuumed first.  You can mop a range, but you have to

18   vacuum it first.  It must be vacuumed.

19   Q.    So the answer to my question is, no?

20   A.    I think it is, yes.

21   Q.    I think you said in response to

22   Mr. Sigale's question something along the lines of the

23   rental of firearms and the sales of ammunition is an

24   important source of income for shooting ranges?



1          A.    Yes, absolutely.

2          Q.    And that was based on --

3          A.    Oh, by reading from the National Shooting

4   Sports Foundation.  Reading articles.  That sort of

5   thing that talked about management of ranges.  I try

6   to read all the periodicals I can find on that even

7   though a lot of those periodicals deal with commercial

8   ranges.

9                And right now that doesn't apply to us.

10  But those things become sources of income.  Ammunition

11  sales.  Renting of firearms.  That sort of thing.

12         Q.    Any other sources for your view on that

13  other than reading literature?

14         A.    Well, I know that Chuck's Gun Shop rents

15  firearms.  I know that GAT Guns rents firearms.  I

16  know that Midwest Sporting Goods in Lyons rents

17  firearms.

18         Q.    But the fact that they rent firearms

19  doesn't tell you anything about how much money they

20  make from doing that; does it?

21         A.    No.  But it tells me that they want to do

22  it because they make money.

23         Q.    But you don't have any idea as to what

24  percentage of their income is derived from renting



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 120 of 131 PageID #:4771

RICHARD PEARSON                                          June 12, 2012
EZELL vs. CITY OF CHICAGO                                          120

```
 1   firearms or selling ammunition?
 2       A.    No.  I'm not privy to their financial
 3   statement.
 4       Q.    And does the literature you looked at say
 5   anything about that?  You know, on average an average
 6   gun store makes "Y" percent of its income through
 7   firearms rentals or ammunition sales?
 8       A.    Well, I think there may be national
 9   statistics on that, but I don't know them.  But the
10   National Shooting Sports Foundation probably would.
11       Q.    Are you aware of any Chicago resident who
12   has said that they think they would be unable to take
13   their gun to a range due to the City's transportation
14   requirements?
15       A.    No.
16       Q.    Going back to the sound reduction efforts
17   at the Bonfield range, I just want to make sure I have
18   this correct based on some answers you gave to
19   Mr. Sigale.
20            So you were saying that whatever
21   regulation is out there requires a maximum level of
22   68 decibels?
23       A.    Yeah.  At the property line.
24       Q.    At the property line.  And ISRA did some
```



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 121 of 131 PageID #:4772

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    121

1  testing, and the test results showed that they were

2  below that 68 decibel cap?

3      A.    Yes.

4      Q.    And even though they were already below

5  it, they still went ahead and did some -- additional

6  sound reduction efforts that you talked about at the

7  beginning of your deposition?

8      A.    Yes.

9      Q.    And the reason why they did those

10 additional efforts was because they wanted to

11 essentially be good neighbors and reduce sound as much

12 as they could?

13     A.    Right.  And it helps with the shooters,

14 too.

15     Q.    The shooters, too.

16     A.    The people who use the range.

17     Q.    And my last question goes back to the

18 e-mail that -- Exhibit 3, which is the e-mail talking

19 about the warehouses, and it references the criteria

20 you are looking for.

21          You clarified with Mr. Sigale that the

22 criteria did not have anything to do with trying to

23 locate a mobile range in Chicago because at that point

24 in time ISRA had stopped pursuing a mobile range



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 122 of 131 PageID #:4773

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    122

1    option in Chicago?

2        A.    That's correct.

3        Q.    So if it wasn't -- if the criteria didn't

4    pertain to a mobile range, what did the criteria

5    obtain to?

6        A.    It would have pertained to a permanent

7    brick and mortar range.

8        Q.    And what were the criteria that you were

9    looking for as to a permanent brick and mortar range?

10       A.    Well, first of all, a building that you

11   could retrofit.  That's the first thing.  And that you

12   could retrofit so it would be economically viable if

13   you knew what that was going to be.

14             So I guess that's it.  You have to figure

15   out where the locations would be.  It's problematic

16   that they have to be, of course, in industrial parks.

17       MR. WORSECK:  That's all I have.

18       MR. SIGALE:  I just want to clarify real quick.

19                    FURTHER EXAMINATION

20   BY MR. SIGALE:

21       Q.    Still looking at Exhibit 3, prior to this

22   e-mail, September 19th, 2011, you can look at it while

23   I'm pointing to it.

24       A.    Okay.



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 123 of 131 PageID #:4774

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    123

1       Q.     Had you spoken to Emilio Bartucci prior to

2    this e-mail?

3       A.     No.

4       Q.     Had you personally e-mailed, communicated

5    with him, or texted, or any other type of

6    communication?

7       A.     No.

8       Q.     So when Mr. Bartucci contacts you in this

9    September 19th, 2011, e-mail and says that -- include

10   the criteria you are looking for with regard to

11   properties, he was -- and warehouses he was sending

12   you, the part about criteria you are looking for,

13   those criteria didn't come from you?

14      A.     No.

15      Q.     So when you answered Mr. Worseck's

16   question a second ago, were you just presuming what

17   type of criteria ISRA would be looking for?

18      A.     Well, the criteria I think is that they

19   were in an industrially zoned area.  Other than that I

20   don't --

21      Q.     But my question is is were you just

22   presuming what type of criteria Mr. Bartucci would

23   have been looking for?

24      A.     Yes.



1    Q.    But it's not criteria based on some prior

2   conversation you personally had with him?

3    A.    No.

4    MR. SIGALE:  Do you have anything else?

5    MR. WORSECK:  No.

6    MR. SIGALE:  We'll reserve.

7    THE WITNESS:  You know, you asked me a question

8   in the beginning, and I didn't think --

9    MR. SIGALE:  Stop.  Stop.  Stop.  Do we need to

10  go back on the record?  Rich, do you need to clarify

11  something?

12   THE WITNESS:  Well, we can go on the record.

13  It's nothing bad.

14   MR. SIGALE:  All right.  We'll still reserve

15  signature, but go ahead.

16   THE WITNESS:  You asked me about the changes

17  that had been made, and you were referring to things

18  in general.

19        And one of the early questions in the

20  first deposition a long time ago you asked if I was an

21  Illinois certified firearms instructor, and the answer

22  then was no, and it is now yes.

23   MR. WORSECK:  Okay.

24



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 125 of 131 PageID #:4776

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                               125

1          THE WITNESS:  And the other one is that our

2    range has been inspected and certified by the

3    Department of Financial and Professional Regulation,

4    and the reason that's new is because I got the letter

5    Thursday.

6          MR. SIGALE:  Okay.

7          MR. WORSECK:  That's fine.  Thank you.

8          MR. SIGALE:  Thank you.

9               FURTHER DEPONENT SAITH NOT.

10         THE COURT REPORTER:  Counsel, will you be

11   ordering the transcript?

12         MR. WORSECK:  Yes.  I'll take an e-trans with

13   the exhibits, please.

14         THE COURT REPORTER:  Okay.  Thank you.

15   Mr. Sigale, would you like to order a copy of the

16   transcript?

17         MR. SIGALE:  I'll have to get back to you on

18   that.

19         THE COURT REPORTER:  Okay.  Thank you.

20

21

22

23

24



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 126 of 131 PageID #:4777

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                                    126

```
 1   STATE OF ILLINOIS    )

 2                        ) SS:

 3   COUNTY OF C O O K    )

 4               I, MARILYN T. LaPORTE, a Notary Public

 5   within and for the County of Cook, State of Illinois,

 6   and a Certified Shorthand Reporter of said state, do

 7   hereby certify:

 8               That previous to the commencement of the

 9   examination of the witness, the witness was duly sworn

10   to testify the whole truth concerning the matters

11   herein;

12               That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction and

15   constitutes a true record of the testimony given and

16   the proceedings had;

17               That the said deposition was taken before

18   me at the time and place specified;

19               That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in the

23   outcome of this action.

24               IN WITNESS WHEREOF, I do hereunto set my
```



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 127 of 131 PageID #:4778

RICHARD PEARSON                                        June 12, 2012
EZELL vs. CITY OF CHICAGO                                       127

1   hand of office at Chicago, Illinois, this 20th day of

2   June, 2012.

3

4

5                         Notary Public,

6                         Cook County, Illinois

7                         My commission expires 6/21/13.

8

9   CSR Certificate No. 84-2095.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 128 of 131 PageID #:4779

RICHARD PEARSON                                    June 12, 2012
EZELL vs. CITY OF CHICAGO                               128

1                          I N D E X

2    WITNESS                               EXAMINATION

3    RICHARD PEARSON

4         By Mr. Worseck                   3, 47, 115

5         By Mr. Sigale                    97, 122

6                        E X H I B I T S

7    NUMBER                                    PAGE

8    PEARSON DEPOSITION

9         Exhibit No. 1                        56

10        Exhibit No. 2                        86

11        Exhibit No. 3                        90

12        Exhibit No. 4                        92

13

14

15

16

17

18

19

20

21

22

23

24



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 129 of 131 PageID #:4780

RICHARD PEARSON                                      June 12, 2012
EZELL vs. CITY OF CHICAGO                                     129

```
 1              DEPOSITION ERRATA SHEET

 2

 3   Our Assignment No.345552

 4   Ezell v. City of Chicago

 5

 6         DECLARATION UNDER PENALTY OF PERJURY

 7

 8         I declare under penalty of perjury that I

 9   have read the entire transcript of my Deposition taken

10   in the captioned matter or the same has been read to

11   me, and the same is true and accurate, save and except

12   for changes and/or corrections, if any, as indicated

13   by me on the DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath.

16

17                     Signed on the _____ day of

18                     _____, 20___.

19

20   _____

21         RICHARD PEARSON

22

23

24
```



Case: 1:10-cv-05135 Document #: 233-4 Filed: 12/06/13 Page 130 of 131 PageID #:4781

**RICHARD PEARSON**        June 12, 2012
**EZELL vs. CITY OF CHICAGO**        130

```
 1                    DEPOSITION ERRATA SHEET
 2      Page No._____Line No._____Change to:_____
 3      _____
 4      Reason for change:_____
 5      Page No._____Line No._____Change to:_____
 6      _____
 7      Reason for change:_____
 8      Page No._____Line No._____Change to:_____
 9      _____
10      Reason for change:_____
11      Page No._____Line No._____Change to:_____
12      _____
13      Reason for change:_____
14      Page No._____Line No._____Change to:_____
15      _____
16      Reason for change:_____
17      Page No._____Line No._____Change to:_____
18      _____
19      Reason for change:_____
20      Page No._____Line No._____Change to:_____
21      _____
22      Reason for change:_____
23      SIGNATURE:_____DATE:_____
24                        RICHARD PEARSON
```



```
 1              DEPOSITION ERRATA SHEET

 2     Page No._____Line No._____Change to:_____

 3     _____

 4     Reason for change:_____

 5     Page No._____Line No._____Change to:_____

 6     _____

 7     Reason for change:_____

 8     Page No._____Line No._____Change to:_____

 9     _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23     SIGNATURE:_____DATE:_____

24                   RICHARD PEARSON
```

