1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4   RHONDA EZELL, JOSEPH I.        )

5   BROWN, WILLIAM HESPEN,         )

6   ACTION TARGET, INC.,           )   No. 10 CV 5135

7   SECOND AMENDMENT               )   Judge Virginia M.

8   FOUNDATION, INC., and          )   Kendall

9   ILLINOIS STATE RIFLE           )

10  ASSOCIATION,                   )

11                  Plaintiffs,    )

12       -vs-                      )

13  CITY OF CHICAGO,               )

14                  Defendant.     )

15

16       The continued deposition of CHRISTOPHER HART,

17  called for examination, taken pursuant to the

18  Federal Rules of Civil Procedure of the United

19  States District Courts pertaining to the taking of

20  depositions, taken before CAROL RAYMOND, CSR No.

21  84-001077, a Notary Public within and for the

22  County of DuPage, State of Illinois, and a

23  Certified Shorthand Reporter of said state, at

24  Suite 1230, 30 North LaSalle Street, Chicago,



1   Illinois, on the 14th day of June, A.D. 2012,

2   commencing at 10:00 a.m.

3   PRESENT:

4       LAW OFFICE OF DAVID G. SIGALE, P.C.,

5       (739 Roosevelt Road, Suite 304,

6       Glen Ellyn, Illinois 60137,

7       (630) 452-4547), by:

8       MR. DAVID G. SIGALE,

9           appeared on behalf of the Plaintiffs,

10

11      OFFICE OF CORPORATION COUNSEL,

12      CITY OF CHICAGO,

13      (30 North LaSalle Street, Suite 1230,

14      Chicago, Illinois 60602-2580,

15      (312) 744-4216), by:

16      MR. WILLIAM MACY AGUIAR,

17          appeared on behalf of the Defendant.

18

19

20

21

22

23   REPORTED BY:  CAROL RAYMOND, CSR,

24              CSR No. 04-001077



```
 1              (WHEREUPON, the witness was duly

 2               sworn.)

 3               CHRISTOPHER HART,

 4    called as a witness herein, having been first duly

 5    sworn, was examined and testified as follows:

 6                       EXAMINATION

 7    BY MR. AGUIAR:

 8         Q.    State your full name for the record.

 9         A.    Christopher Andrew Hart.

10         Q.    Good morning, Mr. Hart.  My name is Bill

11    Aguiar, and I am one of the lawyers representing

12    the City of Chicago in this case of Ezell versus

13    City of Chicago, No. 10 C 5135, pending in the

14    United States District Court of Illinois.

15              I would like the record to reflect that

16    this deposition is going to be taken pursuant to

17    Rule 30.

18              Mr. Hart, do you recall being deposed in

19    this case before on September 10, 2010?

20         A.    I do.

21         Q.    Have you given a deposition since that

22    last deposition?

23         A.    No.

24         Q.    Since it has been some time since your
```



 1  last deposition, I would like to review a couple of

 2  ground rules for today's proceedings.  The first

 3  and most important rule is, if you do not

 4  understand a question that I ask you, please let me

 5  know, and I will do my best to make sure that I get

 6  you a question that you do understand.  If you

 7  answer my question, I am going to assume that you

 8  understood it as I have asked it.

 9            It is also important for the purposes of

10  the record here today, that you refrain from

11  nodding or shaking your head in response to one of

12  my questions.  Your answers must be verbal.

13            It is also for the sake of the court

14  reporter, that we do not talk over one another.  So

15  I would ask that you let me finish my question

16  before you answer and I will afford you the same

17  accomodation when you are answering.

18            And, finally, if you need a break at

19  all, please let me know and I will, of course,

20  accommodate that request.  I only ask that you do

21  not ask for a break while there is a question

22  pending.  Do you have any questions about the

23  ground rules for today's proceeding?

24       A.    No.



 1      Q.   The next two questions are somewhat

 2  invasive, but it is just for the purpose of our

 3  record here.

 4           I would like to know if you have taken

 5  any medication that would affect your ability to

 6  understand my questions or to provide complete

 7  answers to them?

 8      A.   No.

 9      Q.   Are there any other reasons why you

10  would not be able to either understand my question

11  or provide full and truthful answers to them?

12      A.   No.

13      Q.   Great.  Did you speak with anybody about

14  your testimony here today?

15      A.   I spoke with my counsel.

16      Q.   Is that Mr. Sigale?

17      A.   Mr. Sigale.

18      Q.   When did you speak with Mr. Sigale?

19      A.   Yesterday.

20      Q.   And did you speak with anybody else?

21      A.   No.

22      Q.   Did you review any documents in

23  preparation for today's deposition?

24      A.   I read over my last deposition, most of



1   that.  I read the answers to interrogatories.  I

2   read our expert testimony on shooting ranges and I

3   believe that's all of the documents.

4        Q.    And when did you read these documents?

5        A.    Yesterday.

6        Q.    Since we have the benefit of your prior

7   deposition, I am not going to spend a lot of time

8   going over your background with you here today.

9        A.    Thank you.

10       Q.    No one wants to revisit all of that or

11  spend time doing that.  But I want to confirm a

12  couple of facts on your background for the purposes

13  of our record.

14              Are you still employed by Action Target?

15       A.    Yes.

16       Q.    And are you still the territory manager

17  for the Midwest?

18       A.    Yes.

19       Q.    And does that area still cover the

20  states of Minnesota, Wisconsin, Illinois, Missouri,

21  Kansas, Iowa, and Nebraska?

22       A.    Yes.

23       Q.    Does it cover any other states or

24  territories?



 1        A.    No.

 2        Q.    Are you still the Midwest range

 3   consultant as well?

 4        A.    Yes.

 5        Q.    Has there been any changes in your job

 6   responsibilities, as either territory manager or

 7   the Midwest range consultant, since your last

 8   deposition in this case?

 9        A.    No.

10        Q.    Does Action Target still have three

11   divisions, which are military, law enforcement, and

12   international?

13        A.    Yes.

14        Q.    And does the law enforcement division

15   still include civilian?

16        A.    Yes.

17        Q.    Have there been any structural changes

18   in Action Target since your last deposition?

19        A.    No.

20        Q.    Everything at Action Target is still the

21   same?  Still organized the same way?

22        A.    Still organized the same.

23        MR. AGUIAR:  I will start with Exhibit No. 1.

24



```
 1                  (WHEREUPON, a certain document was

 2                  marked Hart Deposition Exhibit No.

 3                  1, for identification, as of

 4                  6/14/12.)

 5    BY MR. AGUIAR:

 6        Q.    Mr. Hart, the court reporter has handed

 7    to you what I have marked as Deposition Exhibit No.

 8    1.  This is the Amended Complaint filed by the

 9    plaintiffs in this case, one of which is Action

10    Target.  Do you recognize this document?

11        A.    I do.

12        Q.    Have you seen it before?

13        A.    Yes.

14        Q.    When did you last see this document?

15        A.    I believe I read this last night.

16        Q.    This is one of the documents that you

17    reviewed in preparation for today's deposition?

18        A.    Yes.

19        Q.    Do you recall reading this before it was

20    filed with the court?

21        A.    I did.

22        Q.    It was filed on October 15, 2011?

23        A.    That's correct.

24        Q.    So you reviewed this before filing?
```



1          A.     Yes.

2          Q.     If you would please turn to paragraph 23

3    of the Amended Complaint.  Therein the plaintiffs

4    allege that on July 6, 2011, the City enacted a new

5    gun range ordinance.  And thereafter that ordinance

6    was further amended on September 8, 2011; do you

7    see where it says that?

8          A.     I do.

9          Q.     Have you read this July 2011 ordinance?

10         A.     Yes.

11         Q.     When did you last read that ordinance?

12         A.     Yesterday.

13         Q.     So that was another document that you

14   read in preparation for today's deposition?

15         A.     Correct, as well as the amendments to

16   the ordinance.

17         Q.     Had you read them before the Amended

18   Complaint was filed?

19         A.     Yes, I had.

20         Q.     Okay.  If you would please look at

21   paragraph 25, which is on the same page.

22         A.     Uh-huh.

23         Q.     Paragraph 25 alleges that the July 2011

24   ordinance in conjunction with the September 2011



1   ordinance, and for purposes of today's deposition I

2   will call it the Gun Ordinance, the two together,

3   unless I make a distinction between the two.

4       A.    Okay.

5       Q.    So we do not have to keep saying -- just

6   distinguishing between the two, unless it is

7   important for a specific question.  It says, the

8   gun range ordinance, that a variety of its sections

9   were to effectively prohibit ranges from opening

10  and operating by unjustifiably burdening their

11  construction, operation and use.  Then it says, In

12  the alternative, to the extent range construction,

13  operation and use might be technically feasible

14  under the ordinance, such construction, operation

15  and use is unjustifiably burdened by the challenged

16  provisions.  These include:  And then there is a

17  list and it goes on for approximately

18  two-and-a-half -- two pages of the gun range

19  ordinance.

20          Are there any other provisions of the

21  ordinance that you believe prohibited ranges from

22  opening and operating because they burden the

23  construction, operation and use of ranges that's

24  not listed in paragraph 25?



1        A.      There are.  One would be the transport

2    of firearms.

3        Q.      And any others?

4        A.      Any that would unduly impact range

5    business.

6        Q.      Do you have any in mind as sit here

7    today?

8        A.      Not off the top of my head.  The biggest

9    one is the transport clause, but there could be

10   other sections of the code that I have not seen

11   that affect ranges as well.

12       Q.      You have read both -- you just testified

13   that you have read both the July 2011 ordinance and

14   the amendment of September; correct?

15       A.      Correct.

16       Q.      And you did that last night?

17       A.      I did it last night and I read it

18   previously as well.

19       Q.      During that review, did any of the

20   provisions in those ordinances strike you as being

21   unduly burdensome on the opening or construction of

22   a range in the City of Chicago?

23       A.      All of the ones that we have listed in

24   here?



1      Q.      Anything that is beyond what is listed

2    in here?

3      A.      Beyond what is listed, no.

4      Q.      You would say the transition of

5    firearms you think burdens -- strike that.

6              Is it your position that the

7    transportation of firearms burdens the construction

8    of ranges?

9      A.      Burdens the construction -- more the use

10   of ranges.  No one will build a range if they

11   cannot transport a firearm to use it in the range.

12     Q.      But it does not actually burden the

13   construction itself of the range?

14     A.      No.

15   MR. AGUIAR:  Mark this as Exhibit No. 2.

16                  (WHEREUPON, a certain document was

17                   marked Hart Deposition Exhibit No.

18                   2, for identification, as of

19                   6/14/12.)

20   BY MR. AGUIAR:

21     Q.      Mr. Hart, you have been handed what I

22   have had marked as Deposition Exhibit No. 2.  This

23   is the Plaintiff Action Target Answers to

24   Defendant's Second Set of Interrogatories to



1    Plaintiffs.  You have seen this before?

2         A.    I have.

3         Q.    Is this what you reviewed last night?

4         A.    I did review it last night.

5         Q.    Okay.  If you would turn to the second

6    to the last page of the document.  And where your

7    name Chris Hart is typed and above there is a

8    signature.  Is that your signature?

9         A.    That is my signature.

10        Q.    You did sign this on February 14, 2012?

11        A.    Yes.

12        Q.    You reviewed this before you signed it?

13        A.    I did.

14        Q.    If you would turn to Interrogatory No.

15   8, which is halfway through the document here.

16   Interrogatory No. 8, the defendant has asked you to

17   identify and describe for each of the provisions

18   listed in your complaint that you're challenging,

19   in the prior paragraph that we looked at from the

20   complaint.  Any burden imposed by the requirement

21   upon any person, including any plaintiff or any

22   actual or anticipated customer of any plaintiff.

23   And to any attempt to comply or any inquiry,

24   evaluation, or analysis regarding potential



 1  compliance with the requirement of any person,

 2  including any plaintiff or any actual or

 3  anticipated customer of any plaintiff.

 4          And I am going to spend some time going

 5  through your answers to interrogatory No. 8 right

 6  now.  In A, which mirrors the allegations in the

 7  complaint that we talked about a second ago.  We

 8  ask you to identify and describe any burdens posed

 9  by the requirement that range managers, employees

10  applicants, be fingerprinted and have a Chicago

11  Firearms Permit and Illinois Firearms Owners

12  identification card.  Do you know whether Action

13  Target has ever been an applicant to the City for a

14  range?

15      A.    I do not believe so.

16      Q.    Does Action Target actually operate

17  ranges?

18      A.    No.  I will amend that.  We do operate

19  our own range for our employees and research

20  purposes.

21      Q.    Where is that range located?

22      A.    At our headquarters.

23      Q.    Where is that?

24      A.    3411 South Mountain Vista Parkway,



1    Provo, Utah.

2         Q.    Is that the only range that Action

3    Target owns?

4         A.    Correct.

5         Q.    And it is the only range that you

6    operate?

7         A.    Yes.

8         Q.    Is that range exclusively for the use of

9    Action Target employees?

10        A.    Employees as well as visitors under our

11   supervision.

12        Q.    So it is open to the public?

13        A.    No.

14        Q.    In fact, Action Target's business is to

15   design, install and construct ranges; correct?

16        A.    Yes.

17        Q.    How would you describe Action Target's

18   business?

19        A.    We help with the range design.  We also

20   offer firearm training through our law enforcement

21   partners.

22        Q.    And anything else?

23        A.    No.

24        Q.    Do you ever maintain ranges for people?



1        A.    No, it is typically done by outside

2   companies.   Although, we do some range repairs.

3        Q.    What kind of repairs do you do?

4        A.    Part replacements, retrofits of new

5   equipment.

6        Q.    Is it parts replacements?

7        A.    Parts replacements.

8        Q.    Are those parts that you install?

9        A.    Yes, only on our equipment.

10       Q.    Only your equipment.  You do not replace

11  parts for ranges that you did not install?

12       A.    Only if we are completely replacing it

13  with new equipment, the whole range.

14       Q.    You mentioned retrofitting?

15       A.    Yes.

16       Q.    You will go in, and what does that mean?

17       A.    We will take an existing range.  Once

18  the customer has gutted out all of the equipment,

19  we will install our equipment and basically create

20  a brand new range.

21       Q.    When you say gutted it out, what do you

22  mean by that?

23       A.    Removing and disposing of the existing

24  equipment.



1         Q.      And what kind of equipment are we
2    talking about?
3         A.      Bullet traps, ceiling baffles, shooting
4    stalls, target retrievers, ceiling baffles.
5         Q.      And anything else?
6         A.      Acoustic materials.
7         Q.      What do you mean by acoustic materials?
8         A.      Some ranges will have acoustical
9    treatments on the sides of the walls for
10   reverberation back to the shooter.
11        Q.      And that's considered to be equipment?
12        A.      It can be, depending on the scope of
13   work.
14        Q.      What do you mean by that?  Can you
15   describe that for me?
16        A.      Some customers will provide their
17   acoustical treatments, others we will provide it as
18   part of our package.
19        Q.      And how does the acoustical treatment
20   work?
21        A.      They are a porous material that is
22   designed to defuse and absorb sound and keep it
23   from being reflected back to the shooter.
24        Q.      And all that is going to happen here



```
 1   today, you are in the business of range design and
 2   installation and construction.  I am a lawyer and I
 3   am going to learn a lot from you today.
 4        A.    Good.
 5        Q.    That is what we will do here today.
 6        A.    I look forward to it.
 7        Q.    So if my questions seem somewhat
 8   elementary, I apologize, and I will learn what is
 9   going on here.
10             Does the acoustical treatment, line all
11   of the walls of the range or is it only in certain
12   spots?
13        A.    It can be either.  Whichever the
14   customer needs.  If it is a tactical range, it
15   could go all the way down range.  If it is fixed
16   range with the shooting stalls and no walking down
17   range, then it could be just to the firing line.
18   And it could be determined by the customer's budget
19   as well on how much they install.
20        Q.    Are there different ways of doing
21   acoustical treatment on the walls?
22        A.    There are.
23        Q.    What are the different ways you could do
24   it?
```



1        A.    You can place them directly on the wall.

2   You can fur it out an air gap.  You can do an air

3   gap with an acoustical fiberglass or sound

4   deadening inside of the air gap.  And you will find

5   that different acoustical companies have different

6   methods.

7        Q.    Now, does Action Target actually do the

8   acoustical work or do you like contract it out to

9   someone else?

10       A.    It is subbed out.  It is materials only.

11       Q.    When you say materials only, what do you

12  mean?

13       A.    Meaning, that we provide the materials

14  and install them.  We do not do the acoustical

15  design.

16       Q.    So a subcontractor actually does the

17  design and then you will just get the materials and

18  install them for them?

19       A.    Sometimes there is no design required.

20  The customer still wants just a small amount of

21  material and we will provide that.

22       Q.    I suspect we will be coming back to that

23  topic in a little while.  But I do not want to get

24  to far afield.  I want to return to where we were,



1   which is on your response to interrogatory 8-A.

2            In response to 8-A, you say and it is

3   two pages later in the interrogatories.  That this

4   restriction makes it unduly burdensome for those

5   operating fire ranges to find attorneys, promoters,

6   lobbyists, employees and assistance from all other

7   persons who fall under the definition of applicant,

8   yet do not live in Illinois or do not have a CFP

9   for whatever reason, it would still perform work on

10  behalf of the range.

11           What is your basis for saying that the

12  restriction makes it unduly burdensome under those

13  people?

14     A.    Many reasons.  The first would be that

15  it limits their potential help on the project to

16  only those people that reside in Illinois, as well

17  as those that can get a FOID card and those that

18  can have a CFP.

19           I, myself, being an out-of-state

20  contractor can have nothing to do with the range in

21  Chicago because of this requirement.

22           Also, if you could consider the entire

23  staff that would have to be disclosed would be

24  disclosed in such a permanent application to



 1   Chicago, it would be everyone from the janitor to

 2   the attorney to the people who are providing

 3   financing for the project.

 4       Q.    It is your position that you do not

 5   believe you would be able to work on a contract in

 6   Chicago because of the provisions under 8-A?

 7       A.    That is correct.  Nor many people in the

 8   industry, anyone that does not reside in Illinois,

 9   can obtain those permits.

10       Q.    Has that restriction kept you from

11   pursuing business in Chicago?

12       A.    I believe it will.  I do not know that

13   it has yet.

14       Q.    Have you continued to pursue business

15   opportunities in Chicago, despite the provision

16   which you believe limits your right?

17       A.    To the extent that customers have called

18   me and asked me about doing ranges in Chicago, and

19   most have said after reviewing the regulations, it

20   does not seem that it could be profitable with

21   these regulations.

22       Q.    You say customers have called you?

23       A.    Yes.

24       Q.    Have you at any time told a potential



```
 1   customer in Chicago that you would not be able to
 2   work on their range because of the restriction
 3   listed in 8-A?
 4        A.    I told them that I may not be able to.
 5        Q.    Okay.  Did you tell that to all of the
 6   customers?
 7        A.    No.
 8        Q.    Who have you told that to then?
 9        A.    The last few phones calls have been in
10   the last few months and I did not take down their
11   names.  Typically, they will call once and once
12   they find out how tough it is, they will decide to
13   do a range outside of the City.
14        Q.    Once they find out how difficult it is
15   to do a range, do you tell them it will be
16   difficult to do a range in Chicago?
17        A.    I do.  I point them towards the
18   regulations and ask them to read for themselves the
19   requirements.
20        Q.    Has any potential customer ever
21   complained to you that this provision is burdensome
22   on them?
23        A.    I believe Deon Roebuck did.  He said it
24   was tough to find a property that would meet the
```



1 | regulations.

2 |     Q.    Right now we are specifically asking

3 | about --

4 |     A.    8-A.

5 |     Q.    All of the my questions area about 8-A,

6 | which is the requirement that applicants -- that

7 | range managers, employees and applicants be

8 | fingerprinted and have a Chicago Firearms Permit

9 | and an Illinois FOID card?

10 |     A.    Yes.  Could you restate the question

11 | then?

12 |     Q.    Has any potential customer, or actual

13 | customer, ever complained to you that a compliance

14 | with the provision in 8-A is burdensome on them?

15 |     A.    I believe there is one mentioned from

16 | someone that called, if one of their employees had

17 | lost their FOID card or it had been revoked, the

18 | range could possibly be shut down.

19 |     Q.    Do you recall who that was?

20 |     A.    I do not.

21 |     Q.    When was that phone call?

22 |     A.    Some time in the last three months.

23 |     Q.    How many phone calls did you have with

24 | this potential customer?



1         A.    One.

2         Q.    Did you initiate the phone call?

3         A.    No.

4         Q.    Someone called you?

5         A.    Incoming phone call.

6         Q.    Did you keep a record of that call?

7         A.    No, I did not.

8         Q.    Okay.  What was the nature of the

9    inquiry -- strike that.

10              What was the nature of the opening phone

11   call?

12        A.    This gentleman had called in wanting to

13   do a range in Chicago and was wondering why they

14   are not any.  I pointed him towards the

15   regulations.

16        Q.    You pointed him to the regulations in

17   response to his question as to why there were not

18   any?

19        A.    I pointed him to the regulations in

20   general during the phone call.  I do not know if it

21   was in response to that question.

22        Q.    Okay.  Did he say anything else during

23   the phone call?

24        A.    He said that it seemed it would be very



1  difficult to do a range in Chicago or very costly

2  as well.

3       Q.    You said difficulty, did he say

4  impossible?

5       A.    No.

6       Q.    Did he say why he thought it was

7  difficult?

8       A.    He said the zoning requirements.  The

9  500-foot rule and the lack of available buildings

10 where he would like to build or where he said in

11 the City he would like to build.

12      Q.    And anything else?

13      A.    No.

14      Q.    Did he say why he thought it would be

15 costly?

16      A.    Well, 1), land is expensive.  We all

17 know that.  The retrofitting costs with providing a

18 sloped floor was another concern as well as the

19 sound.

20      Q.    And you said you mentioned the

21 provision, that managers, employees and applicants

22 must have a FOID card and a CFP?

23      A.    He mentioned the FOID.  I do not

24 remember the CFP.



1      Q.    If you know, the FOID card is a function

2    of state law; isn't it?

3      A.    Illinois State Police.

4      Q.    That's not something that is

5    administered by the City of Chicago?

6      A.    No.

7      Q.    May I ask you why you believe that the

8    provisions we're talking about in 8-A would apply

9    to you, as someone who would be potentially either

10   designing and installing or constructing a range?

11     A.    I believe that I would have to be

12   disclosed on any permit application, being the

13   range designer and the equipment provider.  And as

14   such without a FOID card, I would not be able to

15   work on the project.

16     Q.    Is that based on your reading of the

17   ordinance?

18     A.    Correct.

19     Q.    Other than the phone call that we just

20   talked about a second ago from the gentlemen who

21   called in, you said that was in the last couple of

22   months; correct?

23     A.    Correct.

24     Q.    Have you spoken with any other potential



1    or actual customer about the difficulty in

2    compliance with 8-A?

3         A.    No.

4         Q.    Just that one phone call?

5         A.    Correct.

6         Q.    Did you speak with anybody who currently

7    operates a range about this provision outside of

8    Chicago?

9         A.    Outside of Chicago?

10        Q.    Uh-huh.

11        A.    No.

12        Q.    So if I understand correctly, your basis

13   for your assertion that the provision in 8-A is

14   burdensome is, your reading of the ordinance and

15   that it would burden you, in that, you would not

16   able to participate in working on a range in

17   Chicago?

18        A.    Correct.

19        Q.    And your conversation with this one

20   gentleman three months ago?

21        A.    Yes.

22        Q.    And anything else that forms the

23   basis -- why you assert that there are restrictions

24   are unduly burdensome?



1        A.     It also bars anyone in our industry from

2    outside of the State to participate in a project in

3    Chicago.

4        Q.     And is it your -- that is based on your

5    understanding of reading the ordinance?

6        A.     Yes.

7        Q.     Is it based on anything else?

8        A.     Nope.

9        Q.     So from the ordinance you gleamed that

10   anybody outside of the State of Illinois would not

11   be able to work on a range in Chicago?

12       A.     Yes, because they cannot obtain a FOID

13   card if they are not an Illinois resident, which is

14   a requirement.

15       Q.     And it is your reading of the ordinance,

16   that people who are designing or installing or

17   constructing ranges would be governed by that

18   provision?

19       A.     I believe they would have to be

20   disclosed on the paperwork.

21       Q.     And that subsequently, they would have

22   to have the CFP and the FOID card?

23       A.     Yes.

24       Q.     Again, this is based on your reading of



1    the ordinance?

2         A.    Yes.

3         MR. AGUIAR:  Off the record for a second.

4              (WHEREUPON, a discussion was had off

5                the record.)

6    BY MR. AGUIAR:

7         Q.    Back on the record.  Is it safe to say,

8    that the restriction that we're talking about in

9    Section 8-A does not affect the design,

10   construction or installation of a range?

11        A.    As far as the provider that would be

12   providing the equipment, there are very few

13   companies that provide shooting range equipment in

14   the U.S.

15        Q.    I am simply actually just talking about,

16   it does not affect what would happen in

17   constructing a range?  It has nothing to do with

18   the actual construction itself?

19        A.    To be constructed, you have to get a

20   permit to build the range, correct.  Myself, as an

21   out-of-state provider, I would not be able to

22   provide that equipment, so it could not be

23   constructed.

24        Q.    It does not affect the design of a



 1    range?

 2        A.    No, not the design.

 3        Q.    You are saying it effects construction

 4    because you could not get the equipment you needed,

 5    in order to actually install and construct the

 6    range?

 7        A.    Correct.

 8        Q.    Would this provision cause you any

 9    concern in putting together a quote or a proposal

10    for a potential customer?

11        A.    I would advise them of it.

12        Q.    Have you advised anybody, besides the

13    gentleman that you spoke about?

14        A.    Just that one.

15        Q.    Okay.  Could we go back for a second.

16    We spoke about the gun range ordinance that was

17    enacted and then amended subsequently in September

18    of 2011.

19             When the gun range ordinance was first

20    passed in July, did you read it then?

21        A.    I did.

22        Q.    Did you maintain a copy of it?

23        A.    I did.

24        Q.    And it was amended again in September



1    2011, did you read it after its amendment?

2        A.    Yes.

3        Q.    Did you read it almost contemporaneous

4    with its passage?

5        A.    I think it was one day after the

6    passage.

7        Q.    After the passage, you had read it and

8    you knew what was required?

9        A.    Yes.

10       Q.    Let's move on to 8-B.  Therein we ask

11   you to identify the burden imposed by the

12   requirement ordinance that ranges only operate

13   between 8:00 a.m. and 9 p.m.  And as Mr. Sigale

14   pointed out yesterday, there was a typo and it

15   should read 9 a.m. --

16       MR. SIGALE:  9 a.m. to 8:00 p.m.  Yeah, I

17   think the error started with our complaint where we

18   typed it and then you wrote the interrogatories

19   based on that.

20       MR. AGUIAR:  We got it right for now.  That is

21   all that matters.

22       MR. SIGALE:  9 a.m. to 8:00 p.m.

23   BY MR. AGUIAR:

24       Q.    We are asking you to identify the



1   burdens there imposed by that requirement.  And in

2   response you say, This restriction unduly burdens

3   those for whom the early-morning or late night are

4   the most convenient, or only, times they can

5   patronage a firing range, whether due to work or

6   other personal reasons.  It is also unduly

7   burdensome for those operating a range who would

8   otherwise have those persons as customers.

9          It is my understanding from your prior

10  testimony that Action Target does not own ranges

11  accept for its own range in Utah?

12       A.    Yes.

13       Q.    Nor does it operate any other range?

14       A.    That's correct.

15       Q.    It has no plans currently to open a

16  range in Chicago?

17       A.    No.

18       Q.    So what is your basis for saying that

19  this restriction unduly burdens those for whom the

20  early-morning or late night are most convenient, or

21  only, times they can patronage the fire range?

22       A.    Because several others of my customers

23  have their ranges open at hours that extend beyond

24  this purview.  I also had recent conversations with



1    several customers that would like 24-hour ranges,

2    mostly to accommodate off-duty law enforcement or

3    those that work the graveyard shift.

4         Q.    Let's break it down for a second.  You

5    said there were several other customers who have

6    ranges that are open different hours?

7         A.    Yes.

8         Q.    Okay.  Where are those customers

9    located?

10        A.    The one that come to mind is Godfrey's

11   Indoor Range.

12        Q.    Where is that located?

13        A.    Junction City, Kansas.

14        Q.    And they are a client of Action Target?

15        A.    Yes.

16        Q.    What did you do for Godfrey's?

17        A.    We designed and built their indoor

18   range.

19        Q.    Did you do anything else for them?

20        A.    Followed up, parts and service.

21        Q.    And anything else?

22        A.    Future project, second range.

23        Q.    When did you do the work for Godfrey's?

24        A.    I believe it was 2009.



1      Q.     And what hours of operation do they

2    have?

3      A.     I do not recall their actual hours, but

4    the owner has told he has opened and stayed open

5    until the midnight for several special shoots for

6    his customers.  He will also stay after hours for

7    bachelor parties or special corporate parties.

8      Q.     So you do not know what his actual hours

9    of operation are?

10     A.     I do not.

11     Q.     But you think he just stays open for

12   certain events until midnight?

13     A.     Correct.

14     Q.     So I would assume, that he usually

15   closes some time before midnight and will stay open

16   until midnight to accommodate these special events?

17     A.     I think we could assume that.

18     Q.     Is Godfrey's open seven days a week?

19     A.     I do not know for sure.

20     Q.     Okay.  Do you know whether Junction

21   City, Kansas has any laws regarding the hours of

22   operation that a range could be open?

23     A.     Not that I am aware of.

24     Q.     Do you know if Kansas has any law



CHRISTOPHER HART                                     June 14, 2012
EZELL -vs- CITY OF CHICAGO                                     35

```
 1   regarding the hours ranges could be open?

 2        A.    I do not know.

 3        Q.    Junction City, you do not know or you do

 4   not think so?

 5        A.    I do not know.

 6        Q.    You do not know.  It should be clear.

 7              And any other ranges that come to mind

 8   when we talk about other customers who have

 9   different hours of operation?

10        A.    Yes, working on a project in McHenry.

11        Q.    Is that in Illinois?

12        A.    Yes.

13        Q.    What is that project?

14        A.    It is called the Herb Regan, H-e-r-b,

15   R-e-g-a-n.

16        Q.    And what kind of range is it?

17        A.    It will be a member's only range.

18        Q.    Indoor?

19        A.    Indoor.

20        Q.    How many shooting stalls will it have?

21        A.    No shooting stalls.

22        Q.    What does mean?

23        A.    It is a tactical range.  It is wide open

24   for competition and practice.
```



1    Q.    What stage are you in with the design or

2  construction or installation of the range?

3    A.    We have designed it and we're waiting

4  for the down payment and the contract to arrive.

5    Q.    You have not executed a contract yet for

6  it; have you?

7    A.    No.

8    Q.    How many shooters at one time will the

9  range be able to accommodate?

10    A.    It can accommodate 12, between the two

11  ranges.

12    Q.    There are two ranges there?

13    A.    There are two side-by-side.

14    Q.    What hours of operation is the Herb

15  Regan range going to be open?

16    A.    He would like it to be open 24 hours

17  with keycard access.

18    Q.    You said, he would like it to be.  What

19  do you mean by that?

20    A.    It has passed the City council approval.

21  I do not believe it is restricted in the

22  operational hours, but I would have to confirm that

23  with him.

24    Q.    So they had to go to the city council to



1    get a approval for the hours?

2        A.    Not for the hours, but for the range.

3        Q.    And why is that?

4        A.    It is a special use permit.

5        Q.    You do not know whether his application

6    for the special use included the hours of

7    operation?

8        A.    I do not know.

9        Q.    It is McHenry, Illinois or McHenry

10   County?

11       A.    McHenry, Illinois.

12       Q.    Do you know if McHenry has any

13   ordinances regarding the hours of operation that a

14   range could be open?

15       A.    I do not know.

16       Q.    Do you know whether the local ordinance

17   will allow the range to be open 24-hours a day?

18       A.    I do not know.

19       Q.    So it is just his hope to be open

20   24-hours a day with keycard access?

21       A.    He told me he plans to.

22       Q.    You do not know if he can actually do

23   that?

24       A.    I do not.



1        Q.      Any other customers come to mind?

2        A.      I was at a city council meeting in

3    Sandwich, Illinois.

4        Q.      Okay.

5        A.      Tuesday night.  And the range I am

6    working on was approved.  There were no conditions

7    on the operational hours.

8        Q.      You say you were before the city

9    council?

10       A.      Yes.

11       Q.      Do you know why you were before the

12   council?

13       A.      Because I am a range designer.  If they

14   had questions about the safety of the equipment or

15   layout, I was to respond under testimony.

16       Q.      So why was the whole matter before the

17   City council; do you know?

18       A.      Special use permit.

19       Q.      So Sandwich requires a special use

20   permit?

21       A.      Okay.

22       Q.      And what was the range being built in

23   Sandwich?

24       A.      What is the name?



1       Q.      Does it have a name?

2       A.      Graff guns.  G-r-a-f-f, guns.

3       Q.      Is that also going to be an indoor

4    range?

5       A.      Yes.

6       Q.      I suspect a lot of the ranges in

7    Illinois are indoor because of the weather?

8       A.      Yes.

9       Q.      And what kind of range is this, besides

10   being indoor?

11      A.      This is three ranges under one roof.

12   150 yard to 225 yard.

13      Q.      Are these tactical or stalls?

14      A.      One is tactical and the other two are

15   fixed.

16      Q.      And fixed is the stalls that are

17   installed?

18      A.      That's correct.

19      Q.      I am catching on.  And so it passed city

20   council without any restriction on the hours?

21      A.      That's correct.

22      Q.      Do you know whether the hours were an

23   issue before the city council?

24      A.      One of the residents that lives nearby



```
 1   brought up the question of the operational hours

 2   and he said he wants to have the option to open it

 3   up at any time to law enforcement who needs to use

 4   it.

 5       Q.    Who said that?

 6       A.    The owner who is proposing the special

 7   use permit.

 8       Q.    Do you know whether the application had

 9   any specific business hours listed in it?

10       A.    I do not know.  I have not seen the

11   application.

12       Q.    Do you know whether Sandwich, Illinois

13   had any restrictions of the hours that a range

14   could be open?

15       A.    I believe in the meeting the mayor said

16   they did not.

17       Q.    Do you know whether Sandwich has any

18   other types of ordinances or regulations governing

19   the operation of any kind of business, to which the

20   range would be applicable?

21       A.    I do not know.

22       Q.    So you do not actually know what the

23   hours of operation on this range are going to be?

24       A.    I do not.
```



1    Q.    Okay.  You do not know whether for

2  certain they are actually going to be allowed to be

3  open when they want to be?

4    A.    Well, there was no restriction in the

5  meeting and it did pass and there were no

6  restrictions on the hours.  He did indicate that he

7  would like to have it open at certain hours in the

8  night to certain groups and that's as far as it

9  went.

10    Q.    Okay.  Anything else?

11    A.    I was at a city council meeting last

12  week in the north suburbs.  I do not know that I

13  can disclose it because I am under a nondisclosure

14  agreement for that project, but it was approved by

15  the city council and the operational hours were

16  mentioned.

17    Q.    When you say a nondisclosure agreement,

18  who is that between?

19    A.    I cannot disclose that.  It is between

20  Action Target and one of our potential customers.

21    Q.    A potential customer?

22    A.    Yes.

23    Q.    When you say at a city council meeting,

24  that's here in Illinois?



1      A.    Yes.

2      Q.    That was when?

3      A.    Last Wednesday night, the 6th.

4      Q.    Could you tell me which city council?

5      MR. SIGALE:  I am going to advise him at this

6   time not to answer.  I have not seen the

7   nondisclosure agreement, and to the extent that I

8   have been told it is very restrictive, and I am not

9   going to ask Mr. Hart to put himself in a potential

10  trick bag here.  I think that limiting it -- I

11  think for now saying the north suburbs will -- if

12  it turns out -- I think Mr. Hart will agree if it

13  turns out that if the situation changes such that

14  he can disclose it, I will be happy to e-mail you

15  or something with the information and then I will

16  allow the answer to that question.

17      MR. AGUIAR:  Well, with respect to this whole

18  issue of this range or this project up in the north

19  suburbs, I understand that you may have signed a

20  nonclosure and I appreciate that you do not want to

21  be in violation of that, however, that is discovery

22  in this case, and I do not know if that is a bar of

23  actually getting discovery of that matter in this

24  case.



 1          For purposes of moving the proceeding

 2    along, what I will do will is, I will reserve my

 3    right to ask further questions about it at a later

 4    time and it may be that we may decide we want a

 5    protective order on this matter, that we will be

 6    free to talk about it.  I do not want to delay this

 7    proceeding any further about talking about it, but

 8    I reserve my right of going forward to further

 9    question about this matter; okay?

10          MR. SIGALE:  Yes.

11    BY MR. AGUIAR:

12          Q.    Any other ranges?

13          A.    That's it.

14          Q.    You also mentioned -- it has been some

15    time, but you mentioned potential customers talking

16    about this restriction?

17          A.    Yes.

18          Q.    Could you tell me which other customers

19    or potential customers have raised this restriction

20    as a burden on them being able to open a range?

21          A.    I think those are the only ones that we

22    have mentioned.

23          Q.    Okay.  So in terms of your potential

24    customers in Chicago that you have spoken with, no



1   one has raised with you the burden of the hours

2   restriction as an impediment in opening a range?

3        A.    No.

4        Q.    And would this provision have any impact

5   on you providing a quote or proposal to a potential

6   customer in Chicago?

7        A.    No.

8        Q.    And what you would do, has nothing to do

9   with the hours the ranges can be open?

10        A.    That's correct.

11        Q.    And the second sentence you say, It is

12   also unduly burdensome for those operating a range

13   would otherwise have those persons as customers.

14   What do you mean by that?

15        A.    Could you restate the question?

16        Q.    You say --

17        A.    Which part?

18        Q.    8-B.  In your answer, which is a couple

19   of pages later.

20        A.    Okay.

21        Q.    You say:  It is also unduly burdensome

22   for those operating a range who would otherwise

23   have those persons as customers?

24        A.    Yes, law enforcement, they work in three



1   shifts throughout the day.  Morning, afternoon and

2   graveyard.  And a lot of law enforcement will use a

3   range after hours, if they can or will contract to

4   do their training at a public range and even a

5   graveyard shift.

6        Q.    Has any potential customer raised this

7   issue with you, in terms of opening a range in

8   Chicago?

9        A.    No.

10       Q.    It is just your opinion, that would

11  could be an impediment to operating a range?

12       A.    In my experience across the midwest,

13  yes.

14       Q.    Speaking of your experience -- I am

15  going to assume here that you have been to all

16  kinds of ranges; is that correct?

17       A.    That's correct.

18       Q.    It is your job?

19       A.    Yes.

20       Q.    Okay.  And is it safe to assume, you

21  fired weapons at these ranges?

22       A.    I do, yes.

23       Q.    And is it part of your job to actually

24  go to other types of ranges, even the ones that you



 1   do not install, just to see what these ranges are

 2   like and how they operate?

 3        A.   Yes.

 4        Q.   In your experience, then, in terms of

 5   going out to ranges, either personally for your own

 6   benefit or as research as part of your job, do

 7   these ranges have normal business hours?

 8        A.   Yes, they do.

 9        Q.   Okay.   Describe what you have found in

10   the terms of hours of operation out there in the

11   marketplace for ranges?

12        MR. SIGALE:   I am just going to object as to

13   form.   If you're talking about the entire Midwest?

14   His entire territory?

15   BY MR. AGUIAR:

16        Q.   Just describe for me what you have found

17   going to the different ranges, either for your own

18   personal benefit or for part of your research --

19   describe what you have found in terms hours of

20   operation?

21        A.   Do you want to know public, law

22   enforcement or federal?

23        Q.   Public.

24        A.   Typically, the hours will be 10:00 to



1    9:00 or some will be 9:00 to 9:00.  Many times

2    seven days a week.  There are some ranges that host

3    competitions and they will stay open to 10:00 or

4    11:00 or 12:00 at night to complete those.

5        Q.    So typically ranges are open either --

6    in your experience that you have found, either

7    10:00 in the morning to 9:00 p.m. or 9:00 in the

8    morning to 9:00 p.m., seven days a week?

9        A.    Yes.

10       Q.    But some ranges are open a little later

11   to accommodate certain types of special events?

12   Like competitions or bachelor parties?

13       A.    Yes.

14       Q.    I am just paraphrasing what you said

15   before.  Are there any ranges that are open

16   24-hours a day, seven days a week that you have

17   been to?

18       A.    Many law enforcement ranges.

19       Q.    And these law enforcement ranges, are

20   they open to the public in your experience?

21       A.    No.

22       Q.    They are specifically for law

23   enforcement use only?

24       A.    Yes.



1      Q.    And is it safe to assume, it is done

2    because of what you just mentioned a few moments

3    ago, that the shift of the officers require the

4    ranges to be open 24-hours a day?

5      A.    Yes.  The demands of the firearms

6    training.

7      Q.    With respect to any ranges that you have

8    been to or you have worked on in the Midwest

9    region, do you happen to know what percentage of

10   their business is generated -- strike the question.

11          Are you aware of any private ranges --

12   commercial range that are open to the public that

13   are open after 9:00 p.m.?

14     A.    You know, I do not keep track of their

15   hours.  I know that I have been to several that

16   have, maybe for special events.

17     Q.    Okay.

18     A.    No, I do not.

19     Q.    Okay.  Would you happen to know anything

20   about the profits or business that occurs after

21   9:00 p.m. at these ranges?

22     A.    No.

23     Q.    Have you ever spoken with any range

24   owners or range operators about the amount of



```
 1   business that happens after 9:00 p.m.?
 2        A.    Yes, I have at Godfrey's in Kansas.  He
 3   does zombie shoots and will stay open late until
 4   12:00 p.m. -- 12 midnight.  His first night that he
 5   did it, he got 60 shooters to show up, which I
 6   believe must be profitable on a ten-lane range.
 7        Q.    What is a zombie shoot?
 8        A.    He does a zombie theme where people come
 9   dressed as zombies to shoot at zombie targets.  You
10   have seen cosmic bowling, the black lights, the
11   same idea.
12        Q.    Okay.  You do not happen to know what
13   percentage of his profits or business those zombie
14   shoots are, though, do you?
15        A.    I do not.
16        Q.    You are just assuming that is a lot of
17   money because of the quantity of the people that
18   show up?
19        A.    That's correct.
20        Q.    Have you ever looked at studies which
21   discuss the increment or profits earned from being
22   open after 9:00 p.m.?
23        A.    No.
24        Q.    Let's move along to the requirement
```



1    which is listed in 8-C, that range patrons be 18

2    years of age or older.  And in describing the

3    burden imposed by that, you say the restriction

4    unconstitutionally inhibits the proper teaching and

5    training of firearm use and safety to youth,

6    whether through organized instruction or parental

7    guidance.  Has any potential or actual customer

8    ever complained to you about this provision?

9        A.    No.

10        Q.    Have you ever discussed this provision

11    with any of your potential clients?

12        A.    No.

13        Q.    Is it safe to say, this provision does

14    not impact what you would do if you were to be

15    involved in a range in Chicago?

16        A.    Yes, that's correct.

17        Q.    Okay.  Again, I will ask you, based on

18    your experience as someone who has gone to ranges

19    both in your personal capacity and professionally

20    as part of your job, do you know if any of those

21    ranges, have any rules that prohibit those that are

22    under the age of 18 from using the range?

23        A.    I am not aware of any.

24        Q.    So all of the ranges that you have been



1   to, people under the age of 18 are allowed to fire

2   at them?

3        A.    I cannot say that because I have not

4   checked every range that I visit, but the majority

5   is.

6        Q.    Do you know what kind -- are there any

7   kind of safety protocols in place when you have an

8   underage shooter?

9        A.    Some ranges will require a parent or

10  guardian or an adult to accompany someone under 18.

11       Q.    Do all require that in your experience?

12       A.    No.

13       Q.    Only some?

14       A.    I believe only some.

15       Q.    Have you spoken to any range operators

16  or owners about the percentage of business they get

17  from the shooters under the age of 18?

18       A.    No, the national Shooting Sports

19  Foundation is the industry foundation for our

20  industry, and they do claim that family shooting is

21  one of the fastest growing segments of the shooting

22  sports, that's all I do know.

23       Q.    So other than that, you do not know

24  about the actual income that is derived from



1   shooters under the age 18 to any of the ranges that
2   you have been to?
3       A.    No.
4       Q.    That's not something you studied or
5   looked into?
6       A.    I have not studied it, no.
7       Q.    Let's turn to 8-D, and there we ask you
8   to identify the burdens caused by the requirement
9   that patrons possess a CFP and FOID card, unless
10  they are receiving one hour of CFP training.  And
11  here you say, that this restriction
12  unconstitutionally infringes on the rights of
13  non-Illinoisans, as well as persons who live
14  outside of Chicago.
15          Has any potential customer who wants to
16  put a range in Chicago ever complained to you about
17  this provision?
18      A.    No.
19      Q.    Have you ever raised this provision with
20  anybody who wants to open a range in Chicago?
21      A.    No.
22      Q.    Is it safe to say, this provision would
23  not impact what you would do in open a range -- or
24  excuse me, strike that.



1          In designing, installing and

2     constructing a range in Chicago?

3          A.    To the effect that we would need to

4     safety test the range.  We would not be able to

5     test fire, being, Utah residents, our company.

6          Q.    Any other burden?

7          A.    No.

8          Q.    And your belief is, you would not be

9     able to safety test the range based on your reading

10    of the ordinance?

11         A.    Correct.

12         Q.    Anything else?

13         A.    No.

14         Q.    Is safety testing of the range something

15    you always do in your business?

16         A.    No.

17         Q.    So under what circumstances do you

18    safety test the range?

19         A.    If there is an underlying circumstance,

20    maybe a ringing in a bullet trap or something that

21    needs to be adjusted or if there is a safety

22    concern, we will do a witness paper test.

23         Q.    So the safety test is not something you

24    normally do?



1        A.    Occasionally.

2        Q.    You do it only if there is a certain

3   reason to do it?

4        A.    Correct.

5        Q.    Has anybody besides Action Target ever

6   done a safety test on a range?

7        A.    There have been plenty of outside

8   contractors, not as subcontractors of us, but that

9   do safety tests.

10       Q.    Okay.

11       A.    It would affect the entire industry,

12  anyone that was a non-Illinois resident would not

13  be able to do a safety test.

14       Q.    But if there was someone in Illinois who

15  was working on a project who had a FOID card, that

16  person could conduct the safety test?

17       A.    Correct.

18       Q.    You would be able to actually observe

19  the safety test?

20       A.    Yes.

21       Q.    And nothing would prevent you from

22  evaluating the effect of the safety test?  What

23  happened when the person fired the firearm?

24       A.    Yes.



 1       Q.     So other than the burden you just spoke
 2   about based on the ordinance, is there any other
 3   basis for saying that it unconstitutionally
 4   infringes on the rights of non-Illinoisans?
 5       A.     No.
 6       Q.     I would like to know what the basis is
 7   for why you say, it also unconstitutionally
 8   infringes those who as a result of the ordinances
 9   are unable to patronize the firing range closest to
10   them.  What is the basis for your assertion?
11       A.     If someone lived on the very edge of the
12   Chicago city limits and the closest range to them
13   was in Chicago, they would not be able to utilize
14   that range.
15       Q.     Has anyone ever complained to you about
16   that?
17       A.     No.
18       Q.     Has any range operator -- potential
19   range operator or manager or owner, ever said
20   that's going to impact their ability to open a
21   range in Chicago?
22       A.     No.
23       Q.     The next sentence, it is also unduly
24   burdensome for those operating a range who would



1    otherwise have those persons as customers.

2              Again, I would like to know what your

3    basis for saying that is?  How do you know that it

4    would be burdensome on those operating a range

5    would have those people as customers?

6        A.    You are requiring them to have a FOID

7    card and CFP to shoot and utilize the range.  No

8    other range outside of Chicago requires a CFP to

9    use the range.  I think you are limiting that

10   person's customer base.

11       Q.    Would you restate that again?  I did not

12   quite get the last half of that.  Would you repeat

13   your answer?

14       A.    You are requiring people to have a FOID

15   card and a CFP to utilize the range.  The range

16   owner, you have now have limited his potential

17   market of customers by making that a requirement

18   versus all of the ranges outside of the city.

19       Q.    Have you looked at what the market would

20   be for people outside of Chicago to come in and use

21   Chicago ranges?  Have you studied that?

22       A.    We do not do market studies.

23       Q.    You do not actually know about the

24   number of people who actually live outside of



1    Chicago and come in and use the range?

2         A.    I do not.

3         Q.    Is it your understanding, that only a

4    Chicago resident could have a CFP?

5         A.    No.

6         Q.    So you believe that a non-Chicago

7    resident can have a CFP?

8         A.    A non-Chicago resident can have a CFP, I

9    believe, if you go through with the process.

10        Q.    But a non-Illinois resident cannot have

11   a CFP because they need a FOID card to have a CFP?

12        A.    That's correct.

13        Q.    So you do not know what the --

14   essentially, it would be people who live outside of

15   Illinois who could not use a Chicago firing range?

16        A.    Yes.

17        Q.    They would be prohibited?

18        A.    Yes.

19        Q.    You do not know anything about the

20   market for non-Illinoisans to come into Chicago and

21   use the Chicago range?

22        A.    Not Chicago specifically, but many other

23   markets -- ranges are tied to tourism.  Las Vegas

24   per se, there are tens of ranges that market to



```
 1    tourists in town where they can rent guns to go

 2    shoot and it is a big market.

 3         Q.    But you do not know if this market would

 4    exist in Chicago?

 5         A.    I would have to assume that it would

 6    with the number of tourists that are in the City,

 7    but, no, I do not.

 8         Q.    You have not studied it at all?

 9         A.    No, I have not studied it.

10         Q.    You do not do marketing?

11         A.    No.

12         Q.    So you do not know anything about what

13    the size of that base would be or what the profits

14    or income would be from that non-Illinoisan

15    customer base?

16         A.    I do not.

17         Q.    And has any potential customer of yours

18    expressed that this provision has this burden?

19         A.    Not that I can recall.

20         MR. SIGALE:  Just note an objection to the

21    form, but you answered.  It is fine.

22    BY MR. AGUIAR:

23         Q.    And let's look at last sentence of 8-D.

24         MR. SIGALE:  The answer to 8-D, right?
```



 1   BY MR. AGUIAR:

 2       Q.    Yes.  Where you say, It is likewise an

 3   unconstitutional burden on a person who wishes to

 4   try out a firearm to determine if he/she wishes to

 5   possess that certain firearm or firearms at all.

 6            What is your basis for saying that it

 7   causes this burden?

 8       A.    Under the current regulations, they are

 9   not able to rent a firearm to try it out before

10   they buy it.

11       Q.    Is that based on your reading of the

12   ordinance?

13       A.    No.

14       Q.    Anything else?

15       A.    No.

16       Q.    Has any potential or actual customer in

17   Chicago expressed to you that this provision causes

18   this burden?

19       A.    I believe one or two of the phone calls

20   I have had, they mentioned that they cannot rent

21   firearms and then the ammunition was another

22   concern, but we will talk about that.

23       MR. SIGALE:  Presumably.

24   BY MR. AGUIAR:



 1        Q.    You say one or two of the calls, do you
 2   recall who the calls were from?
 3        A.    I do not.
 4        Q.    Did you make documents of those calls?
 5        A.    I did not.
 6        Q.    When were those calls?
 7        A.    Somewhere in the past three or four
 8   months.
 9        Q.    Let's start with the first call.
10        A.    Yes.
11        Q.    You do not know who that person was?
12        A.    I do not.  I assume that they will call
13   back if they are interested and at that point I
14   would make a record of it.
15        Q.    Was it just one phone call with this
16   person?
17        A.    Yes.
18        Q.    And that person called you?
19        A.    Yes.
20        Q.    And what was the nature of their call?
21        A.    Again, they were asking why are there no
22   ranges in Chicago.  "What do I have to do to build
23   one?"  As I explained the regulations and pointed
24   them towards the regulations, these questions come



1  up.

2      Q.    And anything else?

3      A.    No.

4      Q.    Okay.  And in that call, that person

5  expressed that they would not be able to rent a

6  firearm and that would cause a burden?

7      A.    Yes.

8      Q.    How do they describe the burden to you?

9      A.    They described it, fire rental is

10  necessary for customers that do not have a firearm

11  and if you cannot rent one, how are they going to

12  shoot at your range.

13     Q.    Did this person state whether he or

14  she -- was it a he?

15     A.    I believe it is a he.

16     Q.    Did he say that he was in the industry?

17     A.    No, I do not recall.

18     Q.    Okay.  And did he say that provision

19  would prohibit him from opening a range?

20     A.    Not that I recall.

21     Q.    Okay.  And where did you leave it with

22  this person?

23     A.    I pointed him towards the regulations.

24  I told him to read up on them and call me back if I



 1   could help out.

 2       Q.    You did not dissuade him from opening a

 3   range in Chicago?

 4       A.    No.

 5       Q.    You did not tell him it was impossible

 6   to open up a range in Chicago?

 7       A.    No, I said it may not be profitable, in

 8   my opinion, with the regulations.

 9       Q.    You did not say it would be impossible?

10       A.    No, I did not.

11       Q.    What about the second phone call?

12       A.    It was some time around in the past

13   three or four months.  Same nature, an incoming

14   phone call.

15       Q.    And what did -- was it a he or she?

16       A.    It was a he.

17       Q.    What did he say in the phone call?

18       A.    He mentioned that he would like to open

19   a range and wanted to know what that required.

20       Q.    What did you tell him?

21       A.    I told him about the range regulations

22   and pointed him towards the document.

23       Q.    And anything else happen in this phone

24   call?



 1      A.    No.

 2      Q.    Have you heard back from this person?

 3      A.    I have not.

 4      Q.    Did that person express that this

 5 provision causes a burden?

 6      A.    Not that I recall.

 7      Q.    So he did not mention -- did he mention

 8 the ammunition?

 9      A.    I do not know if this one did.  I cannot

10 recall.

11      Q.    Because you said there were two phones

12 calls where someone said that the provision in 8-D

13 caused a burden.  So you had the first call.  So

14 the second call did not mention this provision as

15 being a burden?

16      A.    To be honest, I cannot recall between

17 the two exactly what points of the ordinance we

18 discussed.

19      Q.    Okay.  You are not sure if they actually

20 expressed a concern about the requirements of the

21 patron having a CFP and a FOID card?

22      A.    One did express the FOID.  I do not

23 recall between the two phone calls which person

24 talked about the ordinances.  I just know that it



CHRISTOPHER HART                                    June 14, 2012
EZELL -vs- CITY OF CHICAGO                                    64

```
 1   was discussed.

 2        Q.    You mentioned ammunition -- as

 3   Mr. Sigale pointed out, potentially we will get to

 4   the issue.  Let's get to the issue.

 5             So someone expressed to you a concern

 6   about the ammunition provision of the ordinance?

 7        A.    Yes.

 8        Q.    Just one person?

 9        A.    I believe just one of the two phone

10   calls.

11        Q.    One of the two we have been speaking

12   about?

13        A.    Yes.

14        Q.    Do you recall which phone call?

15        A.    I do not.

16        Q.    Whoever that was, what did they say

17   about the ammunition provision?

18        A.    I had to let them know that you could

19   not leave with ammunition from the store and they

20   thought that was odd.  An odd restriction.

21        Q.    Did they say it would burden their

22   ability to open a range in Chicago?

23        A.    No, I do not recall if they did.

24        Q.    Okay.  Was that the extent of your
```



1  conversation about the ammunition?

2      A.    Yes.

3      Q.    Did you say anything about the

4  ammunition provision?

5      A.    I believe that we discussed it.  I just

6  let him know that you could not leave the range

7  with any unfired ammunition.

8      Q.    You did not tell him that it -- strike

9  that.

10          Let's move along to subpart 8-E.

11  Therein we ask you to identify the burden caused by

12  what we will call the 500-foot requirement.  And

13  that is, ranges cannot be located within 500 feet

14  of certain sensitive areas, such as schools,

15  daycare facilities, parks and places of worship and

16  the like.  Are you familiar with that provision?

17      A.    Yes.

18      Q.    There you say, this restriction unduly

19  burdens those who would operate a range by limiting

20  virtually all locations in Chicago, thus ensuring

21  that combined with other City requirements for

22  constructing and operating a firing range, that one

23  could never be profitably opened and run in

24  Chicago.



 1              Has any potential or actual customer
 2    ever complained to you about this provision?
 3         A.    Deon Roebuck did.
 4         Q.    Any others?
 5         A.    No.
 6         Q.    Have you discussed it with any of your
 7    potential actual customers, this ordinance
 8    provision?
 9         A.    I have mentioned it to people on the
10    phone, the 500-foot requirement.
11         Q.    When you say you have mentioned it to
12    people on the phone, what do you mean by mentioned?
13         A.    In discussing the regulations and how to
14    build a range in Chicago, I mentioned that it does
15    have to be located 500 feet from any of these
16    places.
17         Q.    Have you told any of your potential
18    actual customers, that provision makes it
19    impossible to open up a range in Chicago?
20         A.    No.
21         Q.    Have you mentioned that it makes it
22    burdensome to open up a range in Chicago?
23         A.    Yes.
24         Q.    And why do you believe it is burdensome



1    to open up a range in Chicago?  Strike that.

2            Would do you believe it is burdensome to

3    open up a range in Chicago?

4        A.    Because in my time in Chicago, it seems

5    like there is a liquor store, a school, a library

6    or a museum or a hospital or a daycare on literally

7    every street in the City, you know, practically.  I

8    do not know where I would start to search for a

9    spot that satisfies each of these requirements in

10   terms of location.

11       Q.    And how often are you in Chicago on an

12   average?

13       A.    Two or three times a month.  Sometimes

14   just once a month.

15       Q.    Have you ever lived here?

16       A.    No.

17       Q.    Other than business trips, have you ever

18   spent time in Chicago?

19       A.    No, only business trips.

20       Q.    And have your business trips taken you

21   allover the City of Chicago?

22       A.    Allover.

23       Q.    Have you ever studied any, you know,

24   maps such as zoning maps of Chicago showing where



1    schools and other like entities are located?

2         A.    No, I have not.

3         Q.    Is it safe to say, you do not actually

4    know -- you have not looked at where a range would

5    locate in the City of Chicago?

6         A.    Yes.

7         Q.    So you do not know, as you sit here

8    today, whether there are locations in Chicago a

9    range could actually locate to?

10        A.    I believe there could be some.  My point

11   is, it is very limiting in where they could be

12   located.

13        Q.    And that is your opinion, based on your

14   business trips to Chicago and traveling throughout

15   Chicago?

16        A.    Yes, my observation of driving through

17   the City.

18        Q.    It is not based on any actual evaluation

19   of any kind of map or zoning information or the

20   like?

21        A.    No.

22        Q.    In fact, I believe you testified in the

23   last deposition that part of your job is not to get

24   involved with the zoning considerations; isn't that



1    true?

2          A.     That's true.

3          Q.     That's still true today?

4          A.     That's still true.

5          Q.     So for your customers, you do not get

6    involved in looking at zoning consideration as to

7    where a range could locate?

8          A.     No.

9          Q.     So it is safe to say, that this

10   provision does not have an impact on what your

11   function would be in terms of a range opening in

12   Chicago?

13         A.     No.

14         Q.     It is not safe to say that?

15         A.      It limits where my customers could place

16   a range, but in terms of the construction, yes,

17   correct.

18         Q.     So in terms of what -- regardless of

19   where your customers could locate in terms of what

20   you will do, once your customers have a location,

21   this has no impact on you?

22         A.      Specifically, the 500-foot rule?

23         Q.     Yes.

24         A.     Yes.



 1        Q.    No impact at all?  I am trying to get a

 2   clear record.

 3        A.    Ask me again.

 4        Q.    Let's get that right.

 5             So other than -- this provision concerns

 6   where your customers could locate a range; correct?

 7        A.    Yes.

 8        Q.    Once they find a location, this

 9   provision does not impact what you do in your job;

10   is that correct?

11        A.    Correct.

12        Q.    Thank you.  Let's talk briefly about the

13   provisions in 8-F.  And that is, the requirement

14   that possessors of firearms, possess a CFP and you

15   say it causes a burden.

16             Let's flip to your answer.  You say,

17   this restriction prohibits persons from trying

18   different types of firearms to determine what is

19   preferable for them, inhibits the very purpose of

20   training and limits the training's effectiveness,

21   and also inhibits persons from exercising their

22   Second Amendment Rights of firearms training and

23   home firearm possession.

24             I have already touched on it a little



1  bit.  Have any of your customers complained about

2  this provision in terms of impacting their ability

3  to open a range in Chicago?

4      A.    No.

5      Q.    Have you raised this provision with any

6  of your potential customers about opening a range

7  in Chicago?

8      A.    I do not believe so.

9      Q.    And are the burdens you identify in your

10  answer to 8-F, are those based on your reading of

11  the ordinance?

12      MR. SIGALE:  I just want to interject before

13  you answer that.  Chris, if you need to read the

14  question to 8-F before you answer the question or

15  look at the ordinance, feel free.

16  BY MR. AGUIAR:

17      Q.    Certainly.

18          Mr. Hart, would you like an opportunity

19  to again read again the provision in 8-F that is

20  being challenged and then your answer?

21      A.    Yes.

22      Q.    Certainly, take that time.

23      A.    I think what is confusing me is, F and G

24  are very similar in terms of rentals of firearms.



1   Restate your question.

2        Q.    Let's make it clear for the record.  In

3   8-F, we ask you to identify the burden caused by

4   the requirement of the ordinance that possessors of

5   firearms possess a CFP, insofar as the requirement

6   bars range patrons from practicing with or sampling

7   different firearms, practicing the use of firearms

8   without purchasing and registering a firearm,

9   purchasing ammunition for self-defense, or

10  replacing older ammunition by firing it at the

11  range and then departing with fresh replacements.

12             And then identifying the burdens, and I

13  have already read into the record what the first

14  sentence of 8-F says.  Have you had an opportunity

15  to read the answer to 8-F?

16       A.    Yes.

17       Q.    My question is similar to what I have

18  been asking you about other provisions.  Has any

19  potential or actual customer of Action Target who

20  wants to open a range in Chicago ever complain that

21  this provision causes a burden on their ability?

22       A.    No.

23       Q.    Have you discussed with any of your

24  potential or actual customers in Chicago this



1   provision?

2        A.    I believe I mentioned one of the phone

3   calls we talked about, how they cannot rent

4   firearms to anyone who does not have a FOID or CFP,

5   and there is no firearm rental.

6        Q.    And that was one of the phone calls we

7   spoke about earlier?

8        A.    Correct.

9        Q.    Outside of that phone call, there was no

10  discussion of this provision?

11       A.    Not outside of the phone call.

12       Q.    And is the basis for your answer that

13  this provision causes a burden, is that your read

14  reading of the ordinance?

15       A.    Yes.

16       Q.    Is it based on anything else?

17       A.    No.

18       Q.    All right.  Let's move on to 8-G.  And

19  in 8-G, we asked you to identify the burden caused

20  by the ordinance provision prohibiting the loaning

21  or renting of firearms, other than for a one-hour

22  class and/or prohibition on range patrons leaving

23  with ammunition sold by the gun range.

24             And in 8-G, you said these restrictions



CHRISTOPHER HART                        June 14, 2012
EZELL -vs- CITY OF CHICAGO                    74

```
 1   prohibit persons from trying different types of
 2   firearms to determine what is preferable to them,
 3   and also inhibits them from exercising the Second
 4   Amendment Right of home firearm possession, which
 5   is also unduly burdensome for those operating a
 6   range who would otherwise have those persons as
 7   customers.
 8             And, again, my question is:  Have you
 9   spoken with any of your actual or potential
10   customers about this provision?
11        A.   Just the one phone call that we
12   mentioned earlier that we discussed the prohibition
13   of firearm rental.
14        Q.   So outside of that one phone call, you
15   have not discussed this to any other potential or
16   actual customer?
17        A.   I might have discussed it with Deon
18   Roebuck.  I do not recall.  I believe we discussed
19   the regulations in its entirety.
20        Q.   Has anyone ever expressed to you,
21   besides that one phone call, that this provision
22   burdens their ability to open a range in Chicago?
23        A.   No.
24        Q.   And is the basis for your assertion that
```



1    this provision causes the burden listed here, your

2    reading of the ordinance?

3           A.    Yes.

4           Q.    Anything else that forms the basis for

5    your answer here?

6           A.    Restricting the rental of firearms, you

7    will force people to buy a firearm that they have

8    not tried out as a rental.  There are several

9    problems with that.  1.)  It depreciates in value

10   right after you shoot it for the first time.  The

11   second is, that it could be a gun that they cannot

12   handle and they would not be able to determine that

13   before purchasing it without the rental program.

14          Q.    And what you just said, is that based on

15   your experience?

16          A.    Yes.

17          Q.    Is it based on anything else?

18          A.    No.

19          Q.    Now, are you aware that the City of

20   Chicago does not currently allow the sale of

21   firearms?

22          A.    Yes.

23          Q.    Okay.  So even if the person tried a

24   firearm in Chicago, they would not be able to



 1   purchase it here?

 2         A.    Yes.

 3         Q.    In your experience in both your personal

 4   capacity and as a professional in the industry, who

 5   goes to ranges, are there any ranges which do not

 6   allow patrons to exchange firearms?

 7         A.    I have never seen a commercial range

 8   that does not either rent or sell firearms.

 9         Q.    So all of the ranges you have been to,

10   either sell firearms or rent them to people?

11         A.    Yes.

12         Q.    Do these ranges also allow individuals

13   to try each other's firearms out?

14         A.    That's what the rental is, yes.

15         Q.    I mean, two separate patrons come in to

16   a range and patron A wants to try patron's B

17   firearm, is that allowed?

18         A.    A personally owned firearm?

19         Q.    Yes.

20         A.    That's between the two customers,

21   typically that would be okay.

22         Q.    You have never seen a range that

23   prohibits that?

24         A.    No.



1      Q.     Have you been to -- strike that.

2             You said that the firing ranges that you

3    go to, a lot of them have stores within them?

4      A.     They all have stores.

5      Q.     If a person wants to purchase a firearm,

6    are they allowed to try it out before they actually

7    make the purchase?

8      A.     If there is a range on site.

9      Q.     And that has been your experience and

10   that is generally allowed?

11     A.     Yes.  That's why we consider it a

12   rental.  Is that what you are referring to?

13     Q.     Is that what you consider to be a

14   rental?

15     A.     When you pay to use the firearm before

16   you buy it, yes.

17     Q.     But people can come in and just rent a

18   firearm and just shoot it without any intention of

19   purchasing it all?

20     A.     Yes.

21     Q.     You could either rent it if you want to

22   try it out for purchase or you can just rent one

23   just for the sake of shooting, regardless of the

24   intention to purchase?



1       A.    Yes.

2       Q.    Are you aware of any gun store in the

3  Chicagoland area which does not allow patrons to do

4  either of those things that we just spoke of?

5       MR. SIGALE:  I will just object to the form of

6  the question.

7       THE WITNESS:  Can you restate the question?

8  BY MR. AGUIAR:

9       Q.    Certainly.  I am talking about, you have

10 been to -- have you been to any gun ranges in the

11 suburban Chicago area?

12      A.    Yes.

13      Q.    And they have stores within them;

14 correct?

15      A.    Yes.

16      Q.    And at those stores, are people allowed

17 to rent firearms for either purchase or just to

18 shoot with?

19      A.    Yes.

20      Q.    And is it safe to say, the prohibition

21 that we have been speaking about, does not impact

22 what you would do with respect to a range operation

23 in Chicago?

24      A.    Correct.



1      Q.    You say in the last half to answer 8-G,

2   that this provision is also unduly burdensome for

3   those operating a range who would otherwise have

4   those persons as customers.

5           Do you happen to know anything about the

6   amount of income or profit derived from the rental

7   of firearms?

8      A.    Not the profit specifically.  I do know

9   the reason most stores do it because it brings

10   their customers in to try it out again before they

11   buy it and many will take the price of the rental

12   off the purchase of the firearm to further

13   incentify customers.

14      Q.    So it is tied to the purchase of

15   firearms?

16      A.    Not in all cases because as we

17   discussed, it could be either rent-for-fun and

18   practice or rent for purchase.

19      Q.    Let's talk about the rent-for-fun part

20   only?

21      A.    Yes.

22      Q.    Do you happen to know anything about the

23   amount of income or profit which a range derives

24   from the rent-for-fun idea?



1        A.      Not profit specifically, only that they

2     require that they purchase the stores ammunition

3     for the rental firearm, so they will be making

4     money on the ammunition.

5        Q.      You do not know what percentage of their

6     business is derived from that activity?

7        A.      I do not.

8        Q.      Have you ever studied that at all?

9        A.      I have not.

10       Q.      Gone to any other research or data on

11    that?

12       A.      No.

13       Q.      8-H.  We asked you to identify burdens

14    caused by the requirement that the maximum decibel

15    level emanating from a shooting range not exceed 55

16    decibels, do you see that?

17       A.      I do.

18       Q.      In response you say, This restriction

19    unduly infringes the ability to construct and

20    operate a range in Chicago.  Why do you believe

21    this provision unduly infringes upon the ability to

22    construct and operate a range in Chicago?

23       A.      The first reason is the ordinance

24    requires that it be in a manufacturing zone.  From



1    what I read, the manufacturing zones have no set

2    sound limits.  They are exempt from sound.

3           The second is, that we have done some

4    sound studies, you know, very informal.  In fact, I

5    did one yesterday at the Skokie Police Department

6    and most of their readings are well over 55

7    decibels, if you are right at the other side of the

8    ball.

9           Most of my customers that have a light

10   industrial zoning have mentioned that the sound

11   limit is sometimes 70 decibels and sometimes it is

12   80.  Every city is different.

13        Q.    Anything else?

14        A.    No.

15        Q.    So the first thing you said is, that

16   ranges have to be in a manufacturing zone; correct?

17        A.    Correct.

18        Q.    And how does that make a range -- how

19   does the provision then, therefore, unduly infringe

20   upon the ability to construct a range in that area?

21        MR. SIGALE:  I am just going to object to the

22   form of the question.

23        THE WITNESS:  Can you restate it?

24   BY MR. AGUIAR:



1     Q.    Yeah.  You said -- the first thing you

2  said was that, the fact that ranges have to locate

3  in a manufacturing zone infringes upon the ability

4  to construct and operate a range in Chicago.  I

5  want to know why?

6     MR. SIGALE:  I am going to object as to

7  mischaracterizing his testimony.

8  BY MR. AGUIAR:

9     Q.    Okay.  Then let's start over again.

10         What did you mean when you mentioned the

11  manufacturing zone and how that makes this

12  requirement burdensome to operate a range in

13  Chicago?

14     A.    I feel it is burdensome because it is a

15  55 decibel limit for shooting ranges only, where

16  the rest of the entire manufacturing zone has no

17  limit, why a range is being singled out.

18     Q.    So if I am correct in what I am hearing,

19  you are saying it is unfair they have been singled

20  out from something else, not that it cannot be

21  complied with?

22     A.    It could complied with much thicker

23  walls, acoustical treatments.  You now have

24  incurred a bunch more costs for the end-user that



 1 | want to construct a range.

 2 |     Q.    But the fact it is in a manufacturing

 3 | zone, does not impact the ability to do that; does

 4 | it?

 5 |     A.    The ability --

 6 |     MR. SIGALE:  He was just about to ask you to

 7 | rephrase anyway.

 8 | BY MR. AGUIAR:

 9 |     Q.    You are saying that it can be complied

10 | with by doing certain things?

11 |     A.    Yes.

12 |     Q.    But the fact it is in a manufacturing

13 | zone, does not mean you cannot do those things?

14 |     A.    That's correct.

15 |     Q.    Just so I understand and forgive me if I

16 | am going over something you have already said.  You

17 | are saying that ranges have been singled out for a

18 | lower decibel than other things in a manufacturing

19 | zone and that makes it burdensome to construct and

20 | operate a range in Chicago?

21 |     A.    I believe that any decibel limit is

22 | burdensome to a range in a manufacturing zone.

23 |     Q.    I am trying to understand why it is

24 | burdensome.  If it can be done, how is there a



1    burden then?

2         A.    The burden is the construction layout

3    and cost.

4         Q.    What do you mean by that?

5         A.    To me the 55 decibel limit is extremely

6    low.  A quiet conversation in a room like this

7    would be above 55 decibels.  To contain that sound

8    would require much more expensive engineering,

9    construction, design.

10        Q.    But the fact that the range has to be in

11   a manufacturing zone doesn't impact that; does it?

12   What I am trying to get at, does the fact that a

13   range has to be in a manufacturing zone in any way

14   impact what has to be done inside that range to

15   make it comply with the City's ordinance?

16        A.    I am not sure I understand that

17   question.

18        Q.    Let's go at it a different way.  This is

19   going to happen.

20             There are things that you have to do

21   inside of a range -- we will get to -- to make it

22   comply with the 55 decibel requirement; correct?

23        A.    Yes.

24        Q.    Does the fact that a range has to be in



1   a manufacturing district make you do anything else?

2        A.    No.

3        Q.    Okay.  So the fact that you have to be

4   in a manufacturing zone, does not have an impact

5   itself on the compliance with the requirement of

6   the sound?

7        A.    No.

8        Q.    You are just saying the ranges have been

9   singled out unfairly, in your opinion, because

10  there is no other requirements on entities in

11  manufacturing zones?

12       A.    That's correct.

13       Q.    Let's just talk about soundproofing.  We

14  talked about it a little earlier today and it is

15  kind of educating me time.

16            Does Action Target do work involving

17  soundproofing?

18       A.    Only to the extent that we will provide

19  the materials and we do not guarantee the sound

20  decibel rating or the reduction.

21       Q.    If I remember correctly, you do not

22  actually do the design?

23       A.    Yes.

24       Q.    Does Action Target use a particular



1    company for the design?

2         A.    The customer will choose the company for

3    the design.

4         Q.    Do you provide a customer with a list of

5    companies that they could look at?

6         A.    We give them a sample of materials that

7    they could look to purchase and install and then we

8    sometimes send them to Troy Acoustics.

9         Q.    Where is Troy Acoustics located?

10        A.    Southern California.  Actually, they

11   just moved to Brunswick, Georgia, scratch that.

12        Q.    So I take it, you have worked with Troy

13   Acoustics before on projects?

14        A.    Yes.

15        Q.    Have you worked with other companies

16   that do soundproofing?

17        A.    Not me personally, but other people at

18   Action Target may have.

19        Q.    But not in any of the projects that you

20   have been involved in?

21        A.    No.

22        Q.    In terms of the number of projects you

23   have been involved in, how many involve

24   soundproofing issues?



1        A.    Very few.

2        Q.    Could you estimate to me how many that

3   is?

4        A.    Less than ten percent.

5        Q.    So in the ten percent of your -- excuse

6   me, in the 90 percent of your business

7   operations -- or excuse me, your customers, there

8   has been no soundproofing at all?

9        A.    No.

10       Q.    That you have installed?

11       A.    Can you restate?

12       MR. SIGALE:  I am just going to object as to

13   mischaracterization.  He said less than ten percent

14   and then you said 90.

15   BY MR. AGUIAR:

16       Q.    You said less than ten percent.  So I am

17   saying in, approximately, 90 percent of the cases

18   that you have worked on, there has been no

19   soundproofing?

20       A.    His point is, it would be less than 90.

21       Q.    Correct.

22       MR. SIGALE:  More than 90?

23       THE WITNESS:  Yes, more than 90.

24   BY MR. AGUIAR:



1       Q.      You said that when customers comes to

2    you wanting to do soundproofing, you provide them

3    with materials.  What do you provide them with?

4       A.      A acoustical treatment.

5       Q.      What is that?

6       A.      On the inside of the range.

7       Q.      What does that mean?

8       A.      We discussed it earlier.  It is porous

9    material to absorb or defuse the sound from

10   bouncing back to the shooter.  It is not for sound

11   transmission through the wall.

12      Q.      Any other materials?

13      A.      No.

14      Q.      Are there different ways to soundproof a

15   range?

16      A.      Yes.

17      Q.      Okay.  What are those different ways?

18      A.      You would have to ask an acoustical

19   engineer.

20      Q.      So you do not do that work?

21      A.      No.

22      Q.      Your job is simply to get the materials

23   in and install it as directed by the acoustical

24   engineer?



1      A.    I think I mentioned before, there is not

2   always an acoustical engineer.  It is customer

3   preference.

4      Q.    So have you had an occasion where a

5   customer simply said, I want to install some

6   soundproofing material and you just install it?

7      A.    Yes.

8      Q.    How often do you get an acoustical

9   engineer involved?

10     A.    I never have.

11     Q.    You never have?

12     A.    No.

13     Q.    Has anybody at Action Target?

14     A.    I assume so.

15     Q.    Okay.  So you said you have installed

16  this acoustical material before?

17     A.    Yes.

18     Q.    Could you describe for me how that takes

19  place?

20     A.    It will either be adhered to a sidewall

21  or screwed into the wood facia that is existing on

22  the range.

23     Q.    Are there any other options for the

24  installation of this material?



1      A.    Not that I am aware of.

2      Q.    Do you have to have a certain kind of

3  wall to adhere this to?

4      A.    I do not believe.

5      Q.    It could be adhered to concrete?

6      A.    Yes.

7      Q.    Drywall?

8      A.    It has to be -- the range needs to be

9  ballistic.  So typically it will have a concrete

10  sidewall.  Drywall would not be ballistic.

11      Q.    Let's backup a second.  All of the

12  ranges have to have ballistic walls?

13      A.    They should.

14      Q.    What does that mean?

15      A.    It is up to the customer in terms of

16  what they want to build.  We recommend that they

17  have concrete sidewalls or filled concrete block

18  walls.

19      Q.    But you are not required to?

20      A.    I do not know who would require it.

21      Q.    In terms of installing the material, I

22  think you said that it is up to the customer on how

23  much they want to install?

24      A.    We work with them and help them



 1  determine the appropriate amount for what they

 2  would like to spend and what type of coverage.  But

 3  we do not guarantee a sound decibel rating.

 4      Q.    Do you happen to know what the

 5  effectiveness of this material is when you install

 6  it?  Does it depend on how much of it you install?

 7      A.    It depends on the thickness of whether

 8  it was one or two inch and how it is adhered to the

 9  wall if there is an air gap.  There is an NRC

10  rating for the product that is dependent on all

11  three of those.

12      Q.    Could you walk me through what that all

13  means?  How that works in terms of what is the most

14  effective and what is the least effective?

15      A.    I cannot answer that.  I am not an

16  acoustical engineer, but in the product provided by

17  the manufacturer, there is typically a graph with a

18  NRC rating which, I believe, is a noise reduction

19  coefficient.

20      Q.    Have you looked at this graph?

21      A.    I have.

22      Q.    Do you recall what it says is the most

23  effective versus the least effective way to install

24  this?



1      A.    I believe the most effective is a

2  thicker material, which would typically be a two

3  inch instead of one inch, and it would be mounted

4  an air gap, you know, spaced away from the wall

5  with fiberglass batting behind.  I think that is

6  what is listed as the most effective.

7           Again, this is all just for reduction of

8  noise back to the shooter, not transmission through

9  the wall.

10     Q.    Okay.  This has nothing to do with --

11 what you are talking about, have any effect on the

12 emanation of the noise outside the range?

13     A.    I do not know that I could answer that.

14     Q.    You do not know?

15     A.    I do not.

16     Q.    You have never tested that at all?

17     A.    No.

18     Q.    So all of this soundproofing we have

19 talked about, has only to do with the noise that

20 bounces back to the shooter?

21     A.    Correct.

22     Q.    Has any customer ever come to you and

23 asked you to design or install a range where they

24 want to control the amount of noise emanating from



1    outside of the range?

2         A.    Yes.

3         Q.    When did that happen?

4         A.    It has happened many times and we do not

5    touch it.  We ask them to get in touch with an

6    architect or an acoustical engineer if they want to

7    meet a certain level.

8         Q.    Do you recall, approximately, how many

9    times customers have come to you and asked you to

10   look at controlling the emanation of noise from

11   inside of the range to outside of the range?

12        A.    Every customer discusses it.

13   Practically ever customer.  And I give them the

14   same information that we cannot guarantee it, we

15   are not acoustical engineers.

16        Q.    You do not design for it; do you?

17        A.    We do not.  That's all part of the

18   actual building design, not the range equipment.

19   And we do not design the building, we design the

20   range.

21        Q.    It is your position that making the

22   range -- strike that.

23              It is your position that controlling the

24   amount of noise inside of the range -- emanating



1   outside of the range, is an architectural issue,

2   not something that you are involved with at all?

3         MR. SIGALE:   I will just object to the extent

4   that it mischaracterizes his testimony.

5   BY MR. AGUIAR:

6         Q.    Please correct me if I am saying

7   something wrong.

8         A.    Could you restate the question?

9         Q.    Certainly.  I apologize.  You work with

10  ranges every day and I am getting educated right

11  now on this stuff and I am a little slow here.

12              If I understood correctly, and if I did

13  not, please let me know.  If someone comes to you

14  and says, we want to control the amount of noise

15  which will emanate from outside of the range --

16  from inside to outside of a range, you view that as

17  an architectural issue, not something as part of

18  what you do?

19        A.    Because we do not design the building.

20        Q.    So it is a building issue?

21        A.    It is.

22        Q.    It is not a range issue?

23        A.    We do not even construct the walls.

24        Q.    If I remember correctly from your prior



1  deposition, Action Target is simply in the business

2  of designing the range and selling the equipment

3  for the range; is that correct?

4      A.   Yes.

5      Q.   And maintaining the equipment and the

6  like?

7      A.   Yes.

8      Q.   But in terms of you, you do not pour

9  concrete for the floors?

10     A.   No.

11     Q.   You do not build the walls?

12     A.   No.

13     Q.   That's all something that's on the range

14  owner to deal with?

15     A.   Yes.

16     Q.   Have any of your customers, that you are

17  are aware of, taken measures to control the noise

18  emanating from inside of the range to outside of

19  the range?

20     A.   Not that I am aware of specifically.

21  Many have discussed it, but I do not know what has

22  been done.

23     Q.   That is not something that you would be

24  concerned with?



1      A.    My customer's concerns are my concerns.

2  It is nothing that I can control.

3      Q.    Just so I am clear, you never have been

4  involved in a proposal in which the noise emanating

5  from inside of the range to outside of the range

6  was something that you were concerned with or

7  worked with?

8      A.    Restate the question.

9      Q.    Certainly.  I want to confirm that none

10  of your proposals have ever dealt with the issue of

11  the noise emanating from inside the range to

12  outside the range?

13      A.    That's correct.

14      Q.    I am trying to get an understanding,

15  then, as to why you say that the restriction on the

16  55 decibel level infringes on the ability to

17  construct and operate a range.  I am trying to

18  understand what your basis is for saying that.  And

19  the reason why I am asking that is, that's not

20  something that Action Target or you do or you have

21  been involved in.  I am trying to understand why

22  you do believe that to be the case.  What have you

23  looked at?  What have you considered to make that

24  statement?



1       MR. SIGALE:  Well, I just want to object to

2    the mischaracterization of the interrogatory answer

3    which answers the question.  And I am just reading

4    from it about the burden imposed by the requirement

5    upon any person, including any plaintiff or any

6    actual or anticipated customer of any plaintiff.

7           So the interrogatory is not asking how

8    does this affect Action Target.  It is asking

9    action Target pretty much to speculate, how does

10   this affect anybody, and that's the question that

11   he was answering in this interrogatory.

12          So with that being said, Chris, if you

13   can answer the question.

14      THE WITNESS:  I will add that the 55 decibels

15   is lower than I have seen in any requirement.

16   BY MR. AGUIAR:

17      Q.    So you have seen requirements before?

18      A.    I have heard of requirements from

19   customers that they have been limited to 70

20   decibels in a light industrial zoning, but, again,

21   we do not get into zoning, so I do not see the

22   actual ordinances.

23      Q.    So customers have told you that they

24   have to comply with some ordinance or regulation or



1   law of some kind that requires them to limit the

2   sound emanating from the range to the exterior area

3   to 70 decibels?

4        A.    I cannot tell you what part of the range

5   it would, but I have heard of a 70 decibel rating.

6   It could be at the property line.

7        Q.    You do not know for sure?

8        A.    I do not know for sure.

9        Q.    Do you happen to know where these ranges

10  were located or customers?

11       A.    I do not.  I know I have spoken to

12  several that have mentioned it, but I cannot think

13  of any off the top of my head.

14       Q.    And have you worked on any ranges in

15  which this 70 decibel requirement was an issue?

16       A.    No.

17       Q.    You just heard it before?

18       A.    I just heard it.  I have been to several

19  city council meetings where there is no limit.

20       Q.    Okay.  You were aware of some where

21  there is a limit?

22       A.    I heard of some, yes.

23       Q.    Getting back to Mr. Sigale's point.  He

24  raised an objection to the question.  I just want



1   to clarify what I was asking.  You know

2   interrogatory 8, we have asked you to identify any

3   burden imposed by the requirement on any person,

4   including any plaintiff or any actual anticipated

5   customer of any plaintiff.  Action Target is the

6   plaintiff.

7           Action Target as the plaintiff said,

8   Unduly infringes the ability to construct and

9   operate a range in Chicago.

10          My first question is:  If you are not

11  involved in this -- strike the question.

12          If Action Target does not concern itself

13  with the sound emanating from inside of the range

14  to outside of the range, does this burden you?

15      A.    It burdens my customers, which is part

16  of the question.

17      Q.    Because it burdens your customers, it

18  burdens you?

19      A.    Action Target.  It could prevent a good

20  project moving forward due to cost.

21      Q.    Now, my question to you is:  How do you

22  know that it causes -- that it is infringing upon

23  the ability to construct and operate a range in

24  Chicago.  If Action Target is not involved in that



1  issue, how do you know it is causing an

2  infringement?

3       A.    I mentioned earlier the sound testing

4  that we have done, typically is well-above 55

5  decibels, and that alone makes me believe that it

6  is a burdensome requirement.

7       Q.    You say the sound testing that we have

8  done, what do you mean by that?

9       A.    We have taken decibel meters to several

10  ranges, we have constructed, and have taken

11  readings, and I do not know that I have seen one of

12  them that is under 55 from the three that I have

13  seen.

14       Q.    You have taken decibel meters to ranges

15  you have installed and constructed?

16       A.    Correct.

17       Q.    And where did you do the testing?

18       A.    One was --

19       MR. SIGALE:   Just going to object to the form

20  of the question.   Do you mean where did he go or do

21  you mean like property line versus firing line?

22  BY MR. AGUIAR:

23       Q.    I will ask him to describe it for me

24  then.   In these instances where you have taken the



1   decibel meter and what you have done with it?

2       MR. SIGALE:  I am still going to object to the

3   form of the question.

4   BY MR. AGUIAR:

5       Q.   Do you understand my question?

6       A.   I do.  The three locations were

7   Whistling Pines Gun Club in Colorado.  Range

8   Masters of Utah in Springville, Utah, and Get Some

9   Guns in Murray, Utah.  And from the documents that

10  I have seen, they took readings at different

11  distances from the range with different calipers

12  and recorded the decibels as well as the ambient

13  noise and the passing traffic.

14      Q.   Let's start with the Whistling Pines Gun

15  Club.  Were you involved in that project?

16      A.   No.

17      Q.   Did you conduct the sound testing at

18  that location?

19      A.   No.

20      Q.   Who did that testing; do you know?

21      A.   I would have to look at the document.  I

22  believe it was Lane Ashby.

23      Q.   Is that an Action Target employee?

24      A.   Yes.



CHRISTOPHER HART                                          June 14, 2012
EZELL -vs- CITY OF CHICAGO                                         102

1       Q.    Do you happen to know at the Whistling

2   Pines Gun Club, what this person did to test the

3   sound?

4       A.    You would have to read the document.  It

5   does describe how the testing was conducted.

6       Q.    Is testing for decibel levels something

7   that Action Target normally does?

8       A.    No.

9       Q.    Do you know why it was done in this

10  instance?

11      A.    As a baseline to give customers

12  expectations with different construction materials.

13      Q.    So was the test done before the range

14  was installed?

15      A.    No.

16      Q.    After?

17      A.    After.

18      Q.    Do you happen to know what the purpose

19  of doing it after the range was installed?

20      A.    That's the only way you can test a sound

21  because you cannot shoot a firearm in a range that

22  is not built.

23      Q.    If the range is already built, what is

24  the purpose of testing for the sound after the



 1  fact?

 2       A.    That is the whole point, so you could

 3  test the sound that is emanating from the building

 4  when a shot is fired.

 5       Q.    Is it for compliance with potentially a

 6  local ordinance or regulation or something?

 7       A.    No.

 8       Q.    Why would the owner want to know -- if

 9  the range is built and it is an operational range,

10  why would the range owner or manager or whoever,

11  want to know?

12       A.    I do not believe it was a range over

13  that conducted the test or wanted it.  I believe it

14  was just Action Target for internal use.

15       Q.    Just for your business purposes?

16       A.    I believe so.

17       Q.    It was not the range itself that wanted

18  this done?

19       A.    No.

20       Q.    Do you happen to know what the results

21  of that test were with respect to the noise

22  emanating from outside of the range?

23       A.    Between the three, I do not recall the

24  actual numbers.  I believe they were in 60s, but it



1   depends on the distance and what caliber was fired.

2   All three tests are completely different.

3        Q.    So the type of weapon being fired inside

4   of the range impacts the amount noise emanating

5   from inside the range to outside of the range?

6        A.    Yes.

7        Q.    As does the distance that person is from

8   the range itself?

9        A.    Yes.

10        Q.    And any other factors that go into how

11   much noise is heard from inside of the range to

12   outside of the range?

13        A.    Yes, any auxiliary noise that is not the

14   raping, could also trip the decibel reading and

15   give a higher reading than what the gun shot is.

16   For instance, passing traffic on a street.

17        Q.    So what you're saying is, if there is a

18   lot of traffic, that could create a higher decibel

19   level than what is actually being emanating from

20   inside of the range to outside of the range?

21        A.    Yes, I believe all three of tests showed

22   the ambient traffic noise was louder than a gun

23   shot on many of those distances taken.

24        Q.    So the ambient traffic noise caused the



1  decibel level to increase outside of the range?

2      A.    It was listed as a higher level than the

3  shot from inside of the range, yes.

4      MR. AGUIAR:  How about this?  It is 12:21,

5  why don't we take our lunch break and resume.

6      MR. SIGALE:  Sure.

7                      (Whereupon, a recess was had

8                       for lunch at 12:21 and resumed

9                       at 1:15.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4    RHONDA EZELL, et. al.,          )

5                    Plaintiffs,     )

6        -vs-                        )   No. 10 CV 5135

7    CITY OF CHICAGO,                )

8                    Defendant.      )

9

10                    6/14/12

11                     1:15

12

13          The deposition of CHRISTOPHER HART

14   resumed pursuant to recess at Suite 1230, 30 North

15   LaSalle Street, Chicago, Illinois.

16

17

18

19

20

21

22

23

24



```
 1   PRESENT:

 2         LAW OFFICE OF DAVID G. SIGALE, P.C.

 3         (739 Roosevelt Road, Suite 304

 4         Glen Ellyn, Illinois 60137,

 5         (630) 452-4547), by:

 6         MR. DAVID G. SIGALE,

 7            appeared on behalf of the Plaintiff;

 8

 9         OFFICE OF CORPORATION COUNSEL,

10         CITY OF CHICAGO,

11         (30 North LaSalle Street, Suite 1230,

12         Chicago, Illinois 60602-2580

13         (312)  744-4216), by:

14         MR. WILLIAM MACY AGUIAR,

15            appeared on behalf of the Defendant.

16

17

18

19

20

21

22

23   REPORTED BY:  Carol Raymond, C.S.R.

24   No. 84-04-001077
```



1              CHRISTOPHER HART,

2    called as a witness herein, having been previously

3    duly sworn and having testified, was examined and

4    testified further as follows:

5                   EXAMINATION (RESUMED)

6    BY MR. AGUIAR:

7         Q.    Mr. Hart, before we broke for lunch, we

8    were talking about your answer to interrogatory

9    8-H, when we asked you to describe the burden

10   caused by a requirement of a maximum decibel of 55

11   decibels emanating from the shooting range.  Do you

12   recall our discussion about that?

13        A.    Yes.

14        Q.    I just want to get us up to speed as to

15   where we are.  Am I correct, that your testimony

16   was that Action Target does not do anything for its

17   customers with regard to noise emanating from

18   inside of the range to outside of the range?

19        A.    Yes.

20        Q.    You consider that to be a

21   building/structural issue?

22        A.    Yes, because we do not design or

23   construct the walls for the building.

24        Q.    That would be incumbent upon the owner



1    to deal with that issue?

2         A.    Owner or architect.

3         Q.    And you, yourself, never dealt with that

4    issue at all?

5         A.    No.

6         Q.    And, again, correct me if I am wrong,

7    but you, yourself, have never done any sound

8    testing outside of a range to determine what the

9    noise emanating from inside of the range is to

10   outside of the range?

11        A.    No, I have.  I mentioned earlier that I

12   tested the Skokie Police Department yesterday.

13        Q.    Okay.  Let's talk about that for a

14   second, then.

15        A.    Okay.

16        Q.    Why were you testing sound at the Skokie

17   Police Department yesterday?

18        A.    Again, according to the nondisclosure, I

19   cannot divulge that.

20        Q.    Could you tell me anything about your

21   experience in Skokie yesterday?

22        A.    Yes, I have a very cheap app on my

23   phone, it is a decibel meter, so it is in no way

24   accurate, but I just wanted to get some basic



1   readings of the noise of inside of the range when I

2   was visiting.

3        Q.    From inside of the range?

4        A.    I did both the control room and outside

5   of the range sidewall in the garage.

6        Q.    And you were using an app and that is

7   short lingo for an application?

8        A.    Yes.

9        Q.    Like an iPhone application?

10        A.    Correct.

11        Q.    Do you know whether an iPhone

12   application is something that is customarily used

13   in testing decibel levels?

14        A.    I highly doubt it.

15        Q.    Other than what you did at the Skokie

16   Police Department yesterday, have you ever engaged

17   in testing of decibel levels emanating from inside

18   of the range to outside of the range?

19        A.    No.

20        Q.    Just that one time?

21        A.    Yes.

22        Q.    So would it be safe to assume, you never

23   used what is considered to be a decibel measure --

24   meter.  I do not know what the terminology would



1   be?

2        A.    A decibel meter.  I used one a few

3   months ago testing the range -- the sound inside of

4   a range, the bullet impact, but it was not inside

5   to outside as you asked about.

6        Q.    Okay.  You have used a decibel meter

7   before?

8        A.    Yes.

9        Q.    Just that one time?

10       A.    Yes.

11       Q.    Is there any special training that has

12  to be used to use a decibel reader?

13       A.    Not that I am aware of.

14       Q.    Obviously, I never used one either.

15            So you would not consider yourself an

16  expert in measuring sound from inside to outside of

17  the range?

18       A.    Not at all.

19       Q.    Is it your position, that it is

20  impossible for a range to comply with the provision

21  that we are talking about?

22       A.    No.

23       Q.    So it is possible to comply?

24       A.    I would imagine so.



1      Q.    Okay.  Is it your position it is

2   burdensome to comply?

3      A.    Yes.

4      Q.    Why do you believe it is burdensome to

5   comply with that provision?

6      MR. SIGALE:  I object, as asked and answered,

7   but go ahead.

8   BY MR. AGUIAR:

9      Q.    We were just saying, you believe it is

10  possible to comply, but that you believe it would

11  be burdensome.  I want to know why it is burdensome

12  to comply with the provision?

13     MR. SIGALE:  Same objection, but go ahead and

14  answer.

15  BY THE WITNESS:

16     A.    I believe the construction materials

17  required to keep that sound from going through the

18  wall at 55 decibels is more than any other range

19  that I have experienced.

20  BY MR. AGUIAR:

21     Q.    And any other reason?

22     A.    No.

23     Q.    So the burdensome is that you are

24  identifying, stands from a comparison to other



 1 | ranges; correct?

 2 |      A.     That's correct.

 3 |      Q.     In and of itself, do you believe that it

 4 | is burdensome?

 5 |      A.     The limit placed, as we mentioned in the

 6 | manufacturing zone, I do not believe it should be

 7 | singled out to a 55 limit if the other businesses

 8 | in that same zone do not have to comply.

 9 |      Q.     And we have discussed that?

10 |      A.     Yes, that's my only other --

11 |      Q.     Okay.  My point is, you are saying it is

12 | burdensome to comply because other ranges that you

13 | have been to, have not had to do that?

14 |      A.     Correct.

15 |      Q.     But my question goes, ignore the other

16 | ranges.  Is there -- what is the burden of an

17 | actually range owner complying with that provision?

18 | In other words, what would make it harder for them

19 | to do that?

20 |      A.     The cost of construction would certainly

21 | be higher to meet that 55 decibel limit.  I would

22 | also be worried that the commissioner at any time

23 | could shut down the range for any sound over 55

24 | decibels, even if it was not a gunshot.



1        Q.    Let's talk about the construction issue.

2   Do you know whether there are any buildings in

3   Chicago that are currently constructed that would

4   comply with this noise requirement?

5        A.    I would not be familiar with them, no.

6        Q.    You do not know if there are actually

7   any buildings which automatically comply?

8        A.    You would have to have an acoustical

9   engineer to talk about that.

10       Q.    It is possible there are already

11  buildings in Chicago that comply?

12       MR. SIGALE:  Just object as to speculation and

13  previous answers, but --

14  BY THE WITNESS:

15       A.    It could be possible.

16  BY MR. AGUIAR:

17       Q.    Okay.  You do not know one way or the

18  other?

19       A.    I do not.

20       Q.    Let's assume that a building that

21  someone wants to put a range in, if someone to test

22  the noise outside of the range, didn't comply, what

23  would it take -- do you know what it would to take

24  to make that structure comply?



1       MR. SIGALE:  I just object as to foundation

2   and speculation and form of the question.

3       MR. AGUIAR:  I asked him what he knew.  I am

4   saying for the record, I am making my response.

5       MR. SIGALE:  Right, but it is based on an

6   imperfect hypothetical, but to the extent you

7   understood it and you can answer.  Go ahead and

8   answer it.

9   BY THE WITNESS:

10      A.    No, I do not.

11  BY MR. AGUIAR:

12      Q.    Is that because you do not concern

13  yourself with the construction issues?

14      A.    I am concerned, but I do not have the

15  background to design a building.

16      Q.    Uh-huh.  So you do not know what it

17  would take to make a building comply?

18      A.    I know that.

19      MR. SIGALE:  Same objection as to form of the

20  question.  Foundation.  Speculation.  Go ahead and

21  answer.

22  BY THE WITNESS:

23      A.    I know that mass is required to stop

24  sound transmission generally in the industry which



1  would be thicker concrete walls or air gaps between

2  walls.

3  BY MR. AGUIAR:

4       Q.    Have you done any examination or any

5  studies or reports or any other kind of data as to

6  what it would cost to comply with this requirement?

7       A.    No.

8       Q.    Do you have any idea how much more

9  expensive it would be to do a range which would

10  comply with this provision and one you would do

11  which would not have to comply with this provision,

12  do you have any basis for that?

13      A.    No.

14      Q.    You never looked at how much it would

15  cost to actually construct a range that complied

16  versus one that does not need to comply?

17      A.    No.

18      Q.    Okay.  So it could be possible, then,

19  that the cost of compliance is minimal?  It is

20  possible?

21      MR. SIGALE:  I am just going to object as to

22  speculation and form of the question and the phrase

23  minimal is vague and ambiguous.  If you understand

24  it, you could answer.



1  BY THE WITNESS:

2       A.    I do not know.

3  BY MR. AGUIAR:

4       Q.    You have not looked at that issue?

5       A.    Correct.

6       Q.    Have any of the actual or potential

7  customers of Action Target ever expressed to you a

8  concern with complying with this provision of the

9  ordinance?

10      A.    No.

11      Q.    Have you ever discussed with any of your

12 potential or actual customers compliance of this

13 ordinance provision?

14      A.    I believe I discussed it with one of

15 those two phone calls we talked about earlier.  And

16 I just let them know it was a 55 decibel limit.

17      Q.    Did the person ask about it?

18      A.    No.

19      Q.    You volunteered the information?

20      A.    He asked what are the regulations and I

21 responded that it was a 55 decibel limit as one of

22 the regulations.

23      Q.    Is that all you said?

24      A.    Along with the other regulations, yes.



1        Q.      Is that all you said about the 55

2    decibel requirement?

3        A.      Yes.

4        Q.      Did that person respond in any way to

5    that statement?

6        A.      I do not recall.

7        Q.      Let's turn then to the last of the

8    provisions here.  In interrogatory 8-I, we asked

9    you to identify any burden imposed by the

10   requirement that floors at a range be constructed

11   to slope at a minimum of one-quarter inch

12   per foot from the firing line to the

13   backstop/bullet trap.

14            And in response you said, This

15   restriction unduly infringes the ability to

16   construct and operate a range in Chicago,

17   especially in an attempting to retrofit a structure

18   previously built for a different purpose for a

19   range.

20            Based on our conversation about the

21   sound requirement of 55 decibels, would the floor

22   of the range be something that would -- that Action

23   Target would be installing?

24       A.      No.



 1       Q.    Would that be considered a structural
 2  or, as you call it, an architectural issue as well?
 3       A.    Yes.
 4       Q.    You have never been asked -- strike
 5  that.
 6             So you have never engaged in a project
 7  where you actually worked on a floor of a range?
 8       A.    In some instances we do have to install
 9  a trench in an existing floor for our bullet trap,
10  but that is the only time.
11       Q.    What is involved in installing a trench
12  in the floor?
13       A.    Typically, the general contractor will
14  do it according to our drawings, which is just like
15  constructing the walls, but in some cases we have
16  had to do it with an existing building, actually
17  cut a trench in the floor and pour new concrete to
18  create the floor of the trench.
19       Q.    Is the trench located at the back of
20  range where the bullets end up?
21       A.    Located at the very front point of a
22  steel trap only.  If it is a rubber trap, you would
23  not have one.
24       Q.    And the location of this trap is where



1    in the range?

2         A.    Depends on the range layout.  It is

3    typically 23 feet from the back wall of the range.

4         Q.    Just curious why 23 feet?

5         A.    The bullet trap is 23-feet long with a

6    walk behind and all we have to do is to get the

7    leading edge of the lower plates below the surface

8    grade.

9         Q.    Do you design the trench?

10        A.    Our engineers they spec out on the size

11   of the trench.  I do not know if they design what

12   concrete.

13        Q.    Are those decisions left to the

14   construction company or some other entity?

15        A.    The general contractor or the architect

16   will typically do that.  We tell them our

17   requirements for size.

18        Q.    With respect to the actual work with the

19   floor, you leave that to the contractor or the

20   architect?

21        A.    Yes.

22        Q.    You only tell them what size you need

23   and they just take care of it?

24        A.    Correct.



1      Q.    Have any of your customers ever

2   requested a sloping floor before?

3      A.    No.

4      Q.    No?

5      A.    Never.

6      Q.    Have you ever been to a range that has a

7   sloping floor, that's like the one described in the

8   state's ordinance?

9      A.    No, I do not believe I have ever seen

10   one.

11      Q.    So all of the ranges you have been to is

12   a straight floor?

13      A.    Yes.

14      Q.    Have you ever read any literature or

15   manuals or studies or reports which discuss

16   straight floors versus sloping floors?

17      A.    No.

18      Q.    You have never seen that before?

19      A.    No.

20      Q.    Okay.

21      MR. SIGALE:   Do you mean outside of this case?

22   BY MR. AGUIAR:

23      Q.    Yeah, in general.  Outside of this case,

24   have you ever seen a guidebook, like a range



1   guidebook or a study or a report which talks about

2   sloping floors?

3       A.    I think there was -- I do not know if it

4   was the old NRA Range Source Book.  I do not know

5   if I can recall correctly, it might have had a

6   floor drain.  I do not know if there is a sloped

7   floor and that has since changed in the last decade

8   or so.

9       Q.    Explain the floor drain?

10      A.    It is a drain in the floor.

11      Q.    Just like a water drain?

12      A.    Yes.

13      Q.    You do not recall if they're talking

14   about sloping at all?

15      A.    I do not.  It has probably six or seven

16   years since I have seen those old books.

17      Q.    You said it has been updated in what

18   way?

19      A.    The industry standard is now not to do

20   floor drains, whereas 20 and 30 years ago, we used

21   to see them in old ranges.

22      Q.    You have already said that the floor is

23   not something that you or your company are

24   concerned with, except for the trench?



1        A.      Yes.

2        Q.      And you, yourself, have never had any

3    experience in working on the floor of a range,

4    except beyond the trench; is that correct?

5        A.      Define working?

6        Q.      Like laying the concrete or designing

7    the floor or how it is going to be designed?

8        A.      No, that's correct.

9        Q.      Okay.  Are you saying that it is

10   impossible to design a floor that has a slope

11   described in the state's ordinance?

12       A.      No.

13       Q.      Okay.  If the building were being built

14   new, would you agree that could be constructed?

15       A.      Yes.

16       Q.      Do you have any knowledge as to the cost

17   difference between installing a straight floor

18   verus a sloped floor?

19       A.      No.

20       Q.      Have you ever looked into that at all?

21       A.      No.

22       Q.      With a building that is already

23   constructed, is it your position that it is

24   impossible to slope the floor in a manner -- or



 1   strike that.

 2             To change the floor in a manner to have

 3   a slope that is called for in the city's ordinance?

 4        A.    I think it would depend on the building

 5   and whether it is a second floor range, a basement

 6   range.  There would be many factors.

 7        Q.    And is that based on something that you

 8   have read or is it just your from working in the

 9   field on these issues?

10        A.    Well, if it is a second floor range,

11   typically, a floor of a range will be eight inches

12   or ten inches thick if it is hollow core or solid

13   concrete.  Let's say it is 12 inches with a sloped

14   floor, I do not know how you could do that on an

15   existing second floor because your slope would

16   be -- it would slope more than there is material

17   for that floor.  Does that make sense?

18             If you have a 12-inch floor and you're

19   dropping down several inches over that 75 feet of

20   the shooting range distance, now you do not have

21   enough concrete, I assume, to support the floor of

22   the range.

23        Q.    And how do you know that to be true?

24        A.    This is my assumption with the



```
 1   construction methods in doing other second floor

 2   ranges.

 3       Q.    Okay.  But it is just your assumption,

 4   you do not know for sure if that's true?

 5       A.    That's correct.

 6       Q.    What if it is a first floor range in a

 7   building, would it be impossible to alter the floor

 8   such that it had a slope required by the ordinance?

 9       A.    I suppose you could.

10       Q.    Do you have any idea what it would cost

11   to alter a floor that is straight beneath to be

12   sloped?

13       A.    No.

14       Q.    You never looked into what it would

15   actually cost to do that?

16       A.    Why would I?  We do not do floors.

17       Q.    Has any potential or actual customer of

18   Action Target ever expressed to you that this

19   provision, that we're talking about, burdens their

20   ability to open a range?

21       A.    No.

22       Q.    Okay.  Have you ever discussed with any

23   potential or actual customer of Action Target this

24   is a requirement of the state's ordinance?
```



1        A.    Yes.

2        Q.    Who have you spoken to you about this

3   sloping requirement?

4        A.    The two phone calls that we have been

5   discussing.  I have mentioned that this is part of

6   the ordinances, that it has have the quarter-inch

7   slope per foot.

8        Q.    Did you mention it in both phone calls?

9        A.    Yes.

10       Q.    Did these people ask about it first?

11       A.    No.

12       Q.    You volunteered the information?

13       A.    They asked me what was required.

14       Q.    So you volunteered this piece of

15  information?

16       A.    Yes.

17       Q.    Did you say anything else about the

18  sloping floor requirement?

19       A.    I told them it was my opinion that it

20  would be very costly to retrofit an existing floor

21  to a sloped floor.

22       Q.    What is the basis for thinking it would

23  be very costly?

24       A.    Any time you remove an entire floor and



1 | change the slope, it is going to be a lot of
2 | construction because you have to jackhammer the
3 | entire floor out, I would assume.  I do not think
4 | there is a way you can cut the floor to slope.
5 |     Q.    So this is your assumption without -- do
6 | you have any basis that would actually have to
7 | happen?
8 |     A.    No.
9 |     Q.    This is just your assumption?
10 |     A.    Yes.
11 |     Q.    And you say it would be very costly.  Do
12 | you have any idea how costly?
13 |     A.    I do not.
14 |     Q.    You did not look into that at all?
15 |     A.    No.
16 |     Q.    It is just your assumption?
17 |     A.    Yes.
18 |     Q.    Did either of the individuals you spoke
19 | with have a response to your statement that it
20 | would be very costly to retrofit a floor?
21 |     A.    I do not recall.
22 |     Q.    Outside of the two phone conversations,
23 | you have not spoken with any of your potential or
24 | actual customers about the provision?



 1        A.    I think I mentioned it to Deon Roebuck.

 2   I do not recall his response.

 3        Q.    Did you mention it to Deon Roebuck in

 4   response to a question he had?

 5        A.    No, he asked what was necessary to build

 6   a range in Chicago.  So like the others, I

 7   expounded on what I knew about the ordinances.

 8        Q.    And beside informing Mr. Roebuck that

 9   this requirement existed, did you say anything else

10   about the requirement?

11        A.    No.

12        Q.    Did he have a response when you

13   mentioned the requirement?

14        A.    I do not recall.

15        Q.    You will be happy to know, we're going

16   to leave Interrogatory 8 for the moment.  You could

17   put that aside, if you would like.

18            We will return back to Exhibit 1.  We

19   will look at paragraph 35.  And in paragraph 35, if

20   you could read along with me, if you like.  The

21   allegation is that various qualified customers of

22   plaintiff Action Target, have expressed to Action

23   Target their desire to retain the company to

24   construct gun ranges within the city limits of



1  Chicago.  I want to stop there for a moment.  I am

2  curious, what is meant by "qualified"?

3       A.    We do not have a way to qualify our

4  customers, if they want to order, if they do order.

5  Whatever they need from us we provide in terms of

6  quotation information.

7       Q.    So what does the word qualified here

8  mean?  I am just curious, it is somehow describing

9  the customers of expressing interest to you.  So it

10  leads me to believe it is qualified versus

11  nonqualified?  That is my assumption.  I am curious

12  if that's what qualified means here, then?

13       A.    I do not believe a qualified customer is

14  one that wants to construct a range.

15       Q.    So it is just a simple desire to want to

16  do it, which makes them qualified?

17       A.    That makes them a potential customer.

18       Q.    So qualified here means potential?

19       A.    Yes.

20       Q.    They are synonymous?  It is like you are

21  saying, there are people that you draw some kind of

22  distinction between those of actually have, for

23  example, financing in place versus those who do not

24  have financing in place?  People having experience



 1 | in running versus those who do not have experience,
 2 | that's not what you are saying in paragraph 35?
 3 |     A.    They are one in the same to me.
 4 |     Q.    So it is just a mire expression of a
 5 | desire to do it, makes them a potential customer?
 6 |     A.    That's correct.
 7 |     Q.    Just curious, before you -- I am
 8 | assuming some potential customers get quotes or
 9 | proposals from you?
10 |     A.    Yes.
11 |     Q.    Before providing those quotes or
12 | proposals, do you make a determination as to
13 | whether the individual or company actually would
14 | qualify to open a range in the location that
15 | they're going to be trying to open it?
16 |     A.    No.  By qualified, what do you mean?
17 |     Q.    For instance -- for example, the city's
18 | ordinance, whether a person actually meets the
19 | definition of an applicant and actually can qualify
20 | to actually have a range in Chicago?  Do you make
21 | those kind of determinations before issuing a quote
22 | or a proposal?
23 |     A.    No.
24 |     Q.    Would you look at whether the person has



1   financing in place?

2        A.    No.

3        Q.    A business plan?

4        A.    No, they're coming to us for an

5   equipment estimate and that is what we provide.

6        Q.    Let's look at the second sentence of

7   paragraph 35.  Action Target is unjustifiably

8   inhibited from entering into these contracts, and

9   from supplying range equipment and supplies in

10  Chicago, owing to the ordinance complained of in

11  this action.

12            Has any potential customer told you that

13  they would have signed a contract with you, but for

14  the provisions of owing to issuance in this case?

15       A.    No.

16       Q.    Has any contact with a potential

17  customer that you had, gotten to the point where

18  you were entering into a contract with them?

19       A.    No.

20       Q.    And do you know whether that was because

21  of the City's ordinances?

22       A.    I do not.

23       Q.    All right.  Let's look back to the

24  interrogatories which are in Exhibit 2.  This time



```
 1  we will look at interrogatory No. 12.  And

 2  Interrogatory 12 -- if you want to read along.  I

 3  will not read it out loud.  This is what I would

 4  call a corollary to paragraph 35 of the complaint,

 5  that we were just looking at.  Wherein we ask you

 6  to identify the various qualified customers that

 7  you mentioned in your complaint.  And there you

 8  provide us with -- on the next page, a list of

 9  different entities that you have spoken with.  The

10  first one you mentioned is a company called

11  Boomstick, Inc.  Do you see that?

12       A.   Yes.

13       MR. AGUIAR:  Why don't we mark this as Exhibit

14  No. 3.

15                 (WHEREUPON, a certain document was

16                  marked Hart Deposition Exhibit No.

17                  3, for identification, as of

18                  6/14/12.)

19  BY MR. AGUIAR:

20       Q.   Mr. Hart, I have handed to what I had

21  the court reporter mark as Exhibit No. 3.  Do you

22  recognize this document?

23       A.   I do.

24       Q.   What is this document?
```



1          A.    This is a log of all my contacts with

2    Paul Kuczmierczyk from Boomstick.

3          Q.    I will spell it for the court reporter,

4    K-u-c-z-m-i-e-r-c-z-y-k.

5          MR. SIGALE:   It is Kuczmierczyk.

6    BY MR. AGUIAR:

7          Q.    We call him Paul K, if you want?

8          MR. SIGALE:   Call him Kuz.

9    BY MR. AGUIAR:

10         Q.    We can do a shorthand.  This is a log of

11   communication with him?

12         A.    Yes.

13         Q.    Does this log just encompass e-mails or

14   does this encompass more than that?

15         A.    It is phone calls, e-mails and meetings.

16         Q.    How was this generated?

17         A.    This is from our computer system.

18         Q.    Okay.  Does the computer system

19   automatically pull up the e-mails or do you have to

20   put them into a certain -- transfer them into this

21   document?

22         A.    I have to transfer them manually.

23         Q.    I assume, you have to enter the phone

24   calls manually?



1     A.    Yes.

2     Q.    And the meetings as well?

3     A.    Yes.

4     Q.    And where it says at the top of the

5  column, "own name", what does that refer to?

6     A.    That's the owner of the contact, which

7  would be the employee making the contact.

8     Q.    This reflects that you are the owner of

9  this contact?

10    A.    Yes.

11    Q.    Are there any communications which would

12  not be located within this document that you had

13  with Mr. Kuczmierczyk?

14    A.    Not that I believe.

15    Q.    I just wanted to know, is it your

16  practice, generally, if you have spoken on the

17  phone with someone to enter it into the system?

18    A.    Yes.

19    MR. SIGALE:  Off the record.

20         (WHEREUPON, a discussion was had off

21          the record.)

22  BY MR. AGUIAR:

23    Q.    So we were saying, it is your practice

24  to enter all of your meetings and telephone



1   conversations, e-mails into the system; correct?

2        A.    Yes.

3        Q.    I thought this would be an easy way to

4   talk about your communications with Boomstick.

5   When was your first contact with Boomstick?

6        A.    Let's look December 27, 2010.

7        Q.    And is that the information provided

8   above?

9        A.    Yes.

10        Q.    I was not in sure on to how read this.

11   I did not know if it was above or below.

12        A.    It looks like it is above.

13        Q.    And it starts out, Hello, Chris.  I am

14   sorry that it has been awhile since we last

15   communicated.  So that leads me to believe there

16   was a communication before December 27, 2010?

17        A.    It could have been he had made a phone

18   call.  I do not enter every single person that

19   calls in, just like these other phone calls we have

20   discussed.  Typically, if I think they are serious

21   and they will need further follow up, then I will

22   enter them into the system.

23        Q.    So the random caller would ask for

24   information, might not get entered into system?



1      A.    Yes.

2      Q.    So someone who calls back once or twice

3  probably will?

4      A.    Yes.

5      Q.    The initial caller who sounds serious to

6  you will probably get a contact or get entered into

7  the system?

8      A.    Yes.

9      Q.    That's just a judgment call based on

10  your experience in dealing with these people?

11      A.    Correct.

12      Q.    There was a communication before

13  December 27, 2010; correct?

14      A.    I looks like it, yes.

15      Q.    Do you recall what the first

16  conversation was about?

17      A.    I do not.

18      Q.    Okay.

19      A.    I imagine it would be just a first

20  contact about, I am interested in doing a range.

21      Q.    It would not have been you calling him

22  like a cold call?

23      A.    There was no way for me to call.  I

24  would not have known who he was before that.



1    Q.    It is true in your business, a cold call

2  would be hard to make anyway?

3    A.    Yes.

4    Q.    Did you ever cold call like law

5  enforcement agencies, and the like, that you know

6  have ranges?

7    A.    Yes.

8    Q.    Those cold calls you do make?

9    A.    There is a public record of those.

10   Q.    Do you ever cold call existing ranges?

11   A.    Yes, if they have an existing range

12  sometimes I will.

13   Q.    Okay.  Outside of those cold calls, you

14  do not make very often?

15   A.    No.

16   Q.    And Mr. Kuczmierczyk was not a cold

17  call?

18   A.    I do not believe so.

19   Q.    He says that the business plan is now up

20  and running.  Did you ever see his business plan?

21   A.    No.

22   Q.    Did you ever consult with him on it?

23   A.    No.

24   Q.    Do you know what his business plan was,



1  in general?

2       A.    By the quotes that I have submitted for

3  him, I believe it was a tactical indoor ranges.

4       Q.    Do you know where Mr. Kuczmierczyk

5  wanted to place these ranges?

6       A.    I believe he said he lived in Chicago

7  and he would like to put them in Chicago, but I

8  think he was also looking at the suburbs as an

9  option.

10      Q.    The date of the contact is December 27,

11 2010.  And at that time, the City did not allow

12 firing ranges within its borders?

13      A.    Yes.

14      Q.    Were you aware of it at that time?

15      A.    I heard that.

16      Q.    Did you advise Mr. Kuczmierczyk at any

17 time that the City did not allow ranges at that

18 point?

19      A.    I think I may have, I do not recall.

20      Q.    And the remainder of that first little

21 paragraph there, asks for a quote for a complete

22 indoor range.  What it would cost using the TCT,

23 ACS deluxe stalls with foldable rests, ballistic

24 glass, both chromed and regular, and the deluxe



 1   turning retrieve with the computer control, and he

 2   wants baffles and lighting.  Is that, in your

 3   experience, a common request for an indoor range?

 4        A.    Yes.

 5        Q.    With the TCT?

 6        A.    It is a type of bullet trap.

 7        Q.    ACS?

 8        A.    Air conveyor system.

 9        Q.    Is that different from ventilation?

10        A.    Yes.

11        Q.    How is it different?

12        A.    We do not actually use the ACS anymore.

13   We use a screw conveyor that takes all of the spent

14   lead to one collection center for recycling.

15        Q.    So you would have that in addition to a

16   ventilation system?

17        A.    Yes.

18        Q.    And, correct me if I wrong, but in your

19   prior deposition you testified you do not do

20   ventilation?

21        A.    Correct.

22        Q.    You subcontract that out?

23        A.    Yes.

24        Q.    To a company that is in Lake Park?



1        A.    Uh-huh.

2        Q.    What is that company called again?

3        A.    Cary's Small Arms Range Ventilation.

4        Q.    You have no role in the ventilation at

5   all?

6        A.    No, just to put them in touch with

7   Carey's, if they need it.

8        Q.    And Carey's does the installation?

9        A.    Yes.

10        Q.    It is complete hand-off thing for you?

11        A.    Yes.  There are subcontractors that we

12   do have a contract through us for ventilation, but

13   it is subbed out to Carey's.

14        Q.    What is a deluxe stall?  Is that

15   different than a standard stall?

16        A.    It is just a name, deluxe stall.

17        Q.    Like a brand?

18        A.    Sort of, yes.

19        Q.    Ballistic glass, is that for the stalls?

20        A.    Yes.

21        Q.    How far does the glass generally go down

22   a range?

23        A.    The stalls are 42-inches deep.

24        Q.    42-inches.  It is an open area?



1        A.     Yes.

2        Q.     What is a deluxe turning retrieve?

3        A.     It should be retriever.  The deluxe

4   turning retriever is a model of target system for

5   the range.

6        Q.     An then I believe that day you responded

7   to his request.  It looks like down below?

8        A.     Yes, it looks like it.

9        Q.     And you provided him with the

10  information that he needed?

11       A.     Yes.

12       Q.     And it looks like there is a series of

13  communications about the information that you

14  needed.  I want to -- I want to turn your attention

15  to -- on the second page here, the entry looks like

16  it is December 28, 2010, which is the next day.

17       A.     Uh-huh.

18       Q.     Attached is the complete estimate for

19  your range project, it reads.  So you did prepare a

20  quote for him?

21       A.     Yes.

22       Q.     Then at the end of this sentence you

23  say, this is definitely an upscale range package.

24  What makes it upscale?



CHRISTOPHER HART                                    June 14, 2012
EZELL -vs- CITY OF CHICAGO                                    142

1          A.    The ballistic glass stalls, the deluxe

2    retriever, and the total container trap, the TCT.

3          Q.    I am assuming because it is an upscale

4    package, it is more expensive than normal?

5          A.    It should be, yes.

6          Q.    About how much more expensive do those

7    three items make the project?

8          A.    Every project is different because of

9    dimensions and number of lanes.

10         MR. AGUIAR:   Let's move to Exhibit No. 4.

11                     (WHEREUPON, a certain document was

12                      marked Hart Deposition Exhibit No.

13                      4, for identification, as of

14                      6/14/12.)

15   BY MR. AGUIAR:

16         Q.    Mr. Hart, I have handed you what I have

17   had the court reporter mark as Exhibit No. 4.   Do

18   you recognize the document?

19         A.    I do.

20         Q.    You will note just for purposes of the

21   record, there are two documents here.   The first

22   two pages which say Boomstick, Inc. ten-lane range,

23   42-inch wide and the next one says, Boomstick,

24   Inc., 25 meter, ten-lane tactical range, 42-inch



 1   wide?

 2        A.    Yes.

 3        Q.    I have made that a group?

 4        A.    42 feet.

 5        Q.    Correct.  Sorry, that is 42 feet.  Are

 6   these the quotes that you submitted to

 7   Mr. Kuczmierczyk?

 8        A.    Yes.

 9        Q.    Why were there two quotes?

10        A.    I do not recall if he changed the range

11   design or if he just had -- maybe they were two

12   separate ranges, I do not recall, where one needed

13   different equipment, so there was a different

14   quote.  Actually, one is tactical and one is fixed,

15   so that would be the big difference.

16        Q.    I am just looking at the second page of

17   the first quote.  Then it says, exclusions, things

18   that are left out, I am assuming, that you do not

19   do?

20        A.    Yes.

21        Q.    And No. 3, is any required concrete

22   work.  What do you mean by that?

23        A.    That would be a trench for the bullet

24   trap or construction of sidewalls.



1          Q.    So the customer knows upfront, that they

2    will have to be responsible for any kind of

3    construction of concrete, such as walls or the

4    flooring?

5          A.    Correct.

6          Q.    And looking -- strike that.

7                Let's turn to page 4 of this document of

8    Exhibit 3 for a second.  It shows another

9    communication between you and Mr. Kuczmierczyk on

10   the 29th of December, which was right in time

11   with -- it is only two days after your initial

12   communications with him.  Then it seems that the

13   next communication is on January 31, 2011; is that

14   correct?

15         A.    Yes.

16         Q.    And here this looks like an e-mail; is

17   that correct?

18         A.    Which one?

19         Q.    The one --

20         A.    The 29th?

21         Q.    Well, December 29, 2010, which

22   communication is that?  The one above it?

23         A.    Yes.

24         Q.    Then there is the January 31, 2011



1   communication, and it says your name and it says

2   "auto".  Then it says, distributed copy of bid,

3   48456, is that a separate communication?

4        A.    That means I distributed a quote.

5        Q.    To the customer?

6        A.    Yes.

7        Q.    So the next communication is July 14,

8   2011; is that correct?

9        A.    Yes.

10       Q.    So between January 31st of issuing a

11  quote and July 14, 2001, you had no communication

12  with Mr. Kuczmierczyk at all?

13       A.    I believe what is not shown here is a

14  meeting that we had at the Shot Show in the Las

15  Vegas, I believe it would been January 2011.

16       Q.    So it would have been before you

17  distributed the bid, then?  The bid went out

18  January 31, 2011?

19       A.    And that's the reason I distributed the

20  bid because I just met with him.

21       Q.    So you met him at the Shot Show?

22       A.    Yes.

23       Q.    How long did you meet with him for?

24       A.    I believe we met at the show briefly and



1   I believe I took him to see a local range, provided

2   him with a rifle and ammunition and we tested out

3   the range.

4       Q.    Now, who arranged the meeting between

5   you and Mr. Kuczmierczyk in Vegas?

6       A.    I think I suggested it.

7       Q.    And that communication is not on here;

8   is it?

9       A.    Typically, if I am on the road, I do not

10  have assess to the system very easily and I will

11  not log items in unless I remember to log them when

12  I return to the office.

13      Q.    Would it surprise you, if you had a

14  phone call and you said to meet up at the Shot

15  Show.

16      A.    We actually met in person.  I do not

17  know if I suggested that we meet at the Shot Show

18  or if he showed up, but one of the two, but we did

19  meet at the show and meet after at the range.

20      Q.    Had you ever met him before?

21      A.    No.

22      Q.    How did you identify him?

23      A.    I think he had his business card.  The

24  Boomstick business card.  And we talked to hundreds



1 of people that week trying to do commercial ranges

2 and so once they found out he was in Chicago, they

3 probably passed him to me and the rest is history.

4      Q.    So you met at the Shot Show and you shot

5 at a range in Vegas?

6      A.    Yes.

7      Q.    Did Mr. Kuczmierczyk tell you what his

8 business plans were at that point?

9      A.    I believe we had spoken before about him

10 wanting to do a tactical in a fixed range, but I

11 cannot recall.  I did not know his business plans

12 per se.

13      Q.    And you did not know whether he wanted

14 to do one in Chicago or in the suburbs of Chicago?

15      A.    I know he lived in Chicago and he had

16 spoken about doing one in Chicago, as well as the

17 suburbs.  I think he was still deciding.

18      Q.    But the quotes you submitted to him,

19 were not in Chicago specific, versus suburb

20 specific.  It was just based on what he wanted in a

21 range?

22      A.    It is the same equipment for both, yes.

23      Q.    So the fact that it would be in Chicago

24 versus the suburbs, did not factor into what the



 1   quote would be?

 2        A.    Not at that time, no.  If we got to the

 3   contract phase it might change, especially if I had

 4   to use union labor and prevailing wage.

 5        Q.    So that would affect the cost of the

 6   project?

 7        A.    Yes.

 8        Q.    And anything else that would affect the

 9   cost, if it was in Chicago versus the suburbs?

10        A.    Certainly.  The building would make a

11   difference if it is a retrofit versus a new

12   building.

13        Q.    That's true anywhere?

14        A.    Yes.

15        Q.    Anything that is specific to Chicago as

16   opposed to anywhere that would make that quote

17   different?

18        A.    No.

19        Q.    Okay.  Looking at your communication on

20   July 14, 2011, it looks like you're checking in

21   with him.  You start with, how are things going?

22   Just checking to see if you are still working on

23   your range project.  Have you seen that Chicago is

24   now allowing shooting ranges due to our court case.



 1  But did you say, you have to abide by very

 2  restricted regulations that they impose.

 3          Did you ever tell Mr. Kuczmierczyk, what

 4  you meant by various restricted regulations?

 5      A.    I do not know if he ever responded.

 6  There is no record of it anyway.

 7      Q.    So there was never a further

 8  conversation or communication where you expressed

 9  what that meant?

10      A.    I do not know for sure.

11      Q.    Do you recall one?

12      A.    I do not.

13      Q.    Would that have been something that you

14  would have entered on your system?

15      A.    Unless I was on the road, I might have.

16  I do know -- I think he contacted me last week.  We

17  had a temp in the office and sent out e-mails under

18  my address checking in with old customers.  I think

19  I got a response from him last week.

20      Q.    What did he say last week?

21      A.    I think he said, he was deposed by the

22  City's attorneys.  And he said something about his

23  project and he would still like to do it in Chicago

24  or something to that effect.



1        Q.    Did you actually speak with him?

2        A.    No.

3        Q.    Just a message?

4        A.    Just an e-mail.

5        Q.    Okay.  Let's get back to this particular

6    e-mail.  The next line says, let me know if I could

7    help or if you given up the idea for now.

8              So you are still willing to help him

9    even if the range was going to be in Chicago?

10       A.    I could explain the regulations to him

11   and provide him with a copy, yes.

12       Q.    So you were still marketing your

13   services to people who wanted to do a range in

14   Chicago?

15       A.    That's correct.

16       Q.    So the ordinance did not prevent you

17   from still pursuing business in Chicago?

18       A.    No.

19       Q.    Flip to the next page.  The top of the

20   page says:  I am still looking primarily at the

21   close suburbs to the north.  That's what it says.

22   But will not completely rule out the City.  I

23   unfortunately will not be attending the Shot Show

24   this year.  Do you happen to know what that line is



1    about?

2         A.    Which part of it?

3         Q.    The whole first line?

4         A.    I am still looking primarily close to

5    the suburbs to the north, but will not completely

6    rule out the City.  I think he is telling me he is

7    still looking at both.

8         Q.    Is that in response to your e-mail on

9    July 14, 2011?

10        A.    I think what it is, if I look below

11   that, I copied both the incoming response which is

12   the top part, as well as my e-mail below which was

13   outgoing in the same copy and paste.

14        Q.    Got you.

15        A.    He is responding from my questions from

16   below.

17        Q.    This is reversed?

18        A.    Yes.

19        Q.    That's why I was confused.  And this

20   would have been 2012?

21        A.    Yes.

22        Q.    So between July 14, 2011 and January 6,

23   2012, you did not have any communication with

24   Mr. Kuczmierczyk?



1        A.    I do not believe so.

2        Q.    You had a subsequent conversation with

3    him -- well, he left you an e-mail last week?

4        A.    Yes.

5        MR. SIGALE:  Just for the record, I think you

6    guys have a copy of the e-mail already.

7        MR. AGUIAR:  Okay.

8        MR. SIGALE:  You should ask Rebecca, I

9    believe.

10       MR. AGUIAR:  Thank you for that.

11   BY MR. AGUIAR:

12       Q.    Do you know whether Boomstick --

13   Mr. Kuczmierczyk is proceeding with his plans to

14   open a range?

15       A.    Well, as of his e-mail last week, he

16   said he is still moving along.

17       Q.    You do not know any of the details of

18   that plan?

19       A.    I do not.

20       Q.    You do not know where he is going to

21   locate it?

22       A.    No.

23       Q.    Would it be safe to say, that you also

24   do not know whether the City' ordinances is causing



1   him an issue with respect to trying to open in the

2   City?

3       A.    I do not know.  Can we take a quick

4   break?

5       MR. AGUIAR:  This is a good time for a break.

6                   (WHEREUPON, a recess was had.)

7   BY MR. AGUIAR:

8       Q.    Back on.

9             Before we broke we were about to move

10  onto the next entry that is listed in your answer

11  to Interrogatory No. 12.  And that would be

12  Fidelity Investigative Training Academy.  And there

13  your list a quote of $46,800 for bullet trap and

14  ceiling baffles.  Do you see that?

15      A.    Yes.

16      MR. AGUIAR:  We are up to No. 5.

17                  (WHEREUPON, a certain document was

18                   marked Hart Deposition Exhibit No.

19                   5, for identification, as of

20                   6/14/12.)

21  BY MR. AGUIAR:

22      Q.    Mr. Hart, you have been handed what has

23  been marked as exhibit No. 5.  Do you recognize

24  this document?



1        A.      Yes.

2        Q.      And what is this?

3        A.      My contact with Fidelity Investigative

4    Training.

5        Q.      And did you compile this document?

6        A.      I did.

7        Q.      Did you do it in response to the City's

8    request for documents?

9        A.      Yes.

10       Q.      And does this document your contacts

11   with Fidelity?

12       A.      Yes.

13       Q.      Both phone, meeting and e-mail?

14       A.      Yes.  Although, I saw Andre Queen in

15   April of this year.  We met in person at a

16   conference in Wheeling.

17       Q.      I think we should take it in

18   chronological order for purposes of clarity.  It

19   looks like here that the first contact between you

20   and Fidelity would have been on October 18, 2010?

21       A.      Yes.

22       Q.      Is that correct?

23       A.      Yes, I believe -- well, that's a

24   meeting.  I am sure he called me before that to



1   come set up the meeting.

2          Q.    Who is he?

3          A.    It would have -- I think it was Joe

4   or -- I think it was Joe that called me first.

5          Q.    Joe Rodriguez?

6          A.    Yes.

7          Q.    Who is Joe Rodriguez?

8          A.    He is one of the employees at the store,

9   I believe.

10         Q.    And who is the other person you are

11  talking about?

12         A.    Andre Queen, I believe, is the owner of

13  the business, but I am not positive.

14         Q.    Do you happen to know what Fidelity is

15  in the business of doing?

16         A.    They do investigative training for

17  undercover investigators or private investigators.

18  They do martial arts and I believe they do some

19  firearm training.

20         Q.    Are they located within the City of

21  Chicago; if you know?

22         A.    Yes.

23         Q.    They are?

24         A.    On Belmont, I believe.



1      Q.    So you had a meeting on October 18,

2    2010?

3      A.    Yes.

4      Q.    It says you met and reviewed their space

5    for a range?

6      A.    Yes.

7      Q.    What do you mean by their space?

8      A.    They have a space in their basement for

9    a range.

10      Q.    Is that the facility on Belmont?

11      A.    Yes.

12      Q.    In Chicago?

13      A.    Yes.

14      Q.    So did they tell you what their plan

15    was?

16      A.    Just that they wanted to construct a

17    range for their business for training.

18      Q.    And in their basement?

19      A.    Yes.

20      Q.    Did they describe what kind of range

21    they wanted?

22      A.    This is a very basic range.  I think

23    they just want a functional range that they could

24    shoot.  So it would a bullet trap and ceiling



1   baffles.

2        Q.    That's basic?

3        A.    That's very basic.

4        Q.    Functional, though?

5        A.    Functional.

6        Q.    How many people could fire a weapon at

7   that range at one time?

8        A.    I do not recall the dimensions of the

9   range, so I could not tell you.

10        Q.    So you went and reviewed their space?

11        A.    Yes.

12        Q.    Was their space suitable for a range?

13        A.    Not ideal.  It is a little bit small,

14   but a short range could be constructed in that

15   space.

16        Q.    So it would meet your requirements for

17   installing equipment?

18        A.    As far as I remember, yes.

19        Q.    They contacted you in October of 2010,

20   at that time the City's ordinance did permit a

21   range in City of Chicago; is that your

22   understanding?

23        A.    Yes.

24        Q.    Did you advice them of that?



1    A.    I believe we had discussed it and they

2  said that they thought they were exempt because of

3  the training aspect of their business for private

4  security.

5    Q.    Would there have to be any work done on

6  their apace -- at the time that you looked at, not

7  now, but at the time you looked at, do you recall

8  whether the space they were looking at would have

9  required any work to make it suitable for your

10  equipment to be installed?

11    A.    I am sure there would be details that

12  were required.  I do not recall exactly what the

13  space looked like.  We had our ventilation company

14  look at it as well.

15    Q.    Were they there at that meeting that

16  day?

17    A.    No, I believe the week after they went.

18    Q.    Did you attend that meeting?

19    A.    No.

20    Q.    Do you happen to know what happened at

21  the ventilation meeting, we will call it?

22    A.    I believe, if I recall correctly, that

23  they got a price on a ventilation system.

24    Q.    Okay.  It looks like the next contact



1   was by telephone later that day, would that be

2   correct?

3        A.    Where it says, October 18th, out cores.

4   Which entry?

5        Q.    The second box down.

6        A.    Right here (indicating)?  Ophone.

7        Q.    Yes, ophone?

8        A.    Yes, that's actually how we log outbound

9   e-mails.  So this would be an e-mail.

10       Q.    Because the first one says, met and

11  reviewed this space for a range.  The next one

12  says, neither Joe nor Andre are in?

13       A.    Oh, I am sorry, this second box here

14  (indicating)?  That was a phone call.

15       Q.    You tried to call them?

16       A.    Yes.

17       Q.    What was that about?

18       A.    I think I just wanted to let them know

19  that I e-mailed the bid.  Actually, that was before

20  that.  I do not recall what I called them about

21  then.

22       Q.    Because the next box implies that there

23  is another communication, it says ocores?

24       A.    Outbound correspondence.



1      Q.      That would be an e-mail?

2      A.      Yes.

3      Q.      And it says, that you are working on the

4   range estimate and you have a few questions.  Would

5   that have been why you called him before?

6      A.      Probably, yes.

7      Q.      And then it looks like later that day

8   you submitted a bid?

9      A.      Yes.

10      MR. AGUIAR:  This is No. 6.

11                  (WHEREUPON, a certain document was

12                   marked Hart Deposition Exhibit No.

13                   6, for identification, as of

14                   6/14/12.)

15   BY MR. AGUIAR:

16      Q.      Mr. Hart, you have been handed what has

17   been marked as Exhibit No. 6.  Is this the quote

18   you submitted to Fidelity?

19      A.      Yes.

20      Q.      And this quote does not include the

21   ventilation.  I think my question was, this quote

22   did not include the cost of ventilation?

23      A.      No.

24      Q.      Again, if you look at the "exclusions,"



1   any required concrete work.  Is that the same as we

2   talked about with respect to the Boomstick quote?

3       A.    Yes.

4       Q.    Is that a standard provision in all of

5   your quotes, that you exclude the concrete work?

6       A.    Not all.  Only those that are

7   applicable, such as indoor ranges.

8       Q.    So if it is an indoor range, you exclude

9   the concrete work, but if it is not an outdoor

10  range you may not?

11      A.    We may not on an outdoor range.  It

12  depends on the equipment provided, whether it needs

13  concrete or not.

14      Q.    All indoor ranges might require concrete

15  work?

16      A.    Yes.

17      Q.    And you automatically exclude that from

18  your estimates?

19      A.    Yes.

20      Q.    Did anybody at Fidelity ever tell you

21  what the purpose of the range was?

22      MR. SIGALE:  Object.  Asked and answered.  You

23  can go ahead and say.

24



1  BY THE WITNESS:

2      A.    I believe it was training.

3  BY MR. AGUIAR:

4      Q.    Training of whom?

5      A.    Private investigators and security.

6      Q.    Did they ever mention that they wanted

7  to have a commercial use of the range, allow the

8  members of the public to come in and use the range?

9      A.    I am sure that would be a desire in the

10  future, but I do not recall if we discussed it at

11  all.

12      Q.    You do not recall if they expressed that

13  at all?

14      A.    I do not recall.

15      Q.    Flip to the next page.

16      MR. SIGALE:  Of which?

17  BY MR. AGUIAR:

18      Q.    Of Exhibit 5.  It looks after your

19  October 18th communication of the bid, the next was

20  November 9, 2010 communication?

21      A.    Yes.

22      Q.    And it looks like this is the estimate

23  for the ventilation?

24      A.    Yes.



1          Q.     Is that something that was forwarded to

2     you and forwarded to Fidelity?

3          A.     It was, correct, from Carey's.

4          Q.     Is that your standard procedure?

5          A.     No, it depends.  Sometimes they work

6     directly with the customer and sometimes they send

7     it to us if we have already had contact, they will

8     have us forward it on.

9          Q.     Then it looks like the next

10    communication was on December 20, 2011?

11         A.     Yes.

12         Q.     Do you recall any communications with

13    either Mr. Queen or Mr. Rodriguez between November

14    9, 2010 and December 20, 2011?

15         A.     No, I do not believe so.

16         Q.     Did they ever comment on your quote?

17         A.     I do not think they did.

18         Q.     You never heard any feedback on what you

19    submitted to them?

20         A.     Typically our customers either buy or we

21    do not hear from them for a long time.

22         Q.     So it was not unusual for Fidelity to

23    just never respond?

24         A.     Some customers can go for five years



 1  without hearing back and then they will buy from

 2  us.

 3       Q.    Some may never buy?

 4       A.    Some may never buy.

 5       Q.    It loose like the next entry is December

 6  20, 2011.  Is that a telephone conversation?

 7       A.    Yes, outbound phone call.

 8       Q.    I am learning here.  The "O" means

 9  outbound?

10       A.    That's correct.

11       Q.    And it sounds like it says, He may be

12  joining our lawsuit.  Has my information and

13  budgets from when visited, Rhonda Ezell is his

14  student?

15       A.    Yes.

16       Q.    Is that why Mr. Queen contacted you that

17  day?

18       A.    I contacted him.

19       Q.    I'm sorry.  You called him why?

20       A.    I think I was checking in on the quote.

21       Q.    You just were doing a follow-up call?

22       A.    I believe so.

23       Q.    What did Mr. Queen say about his

24  business plan?



 1        A.    He did not mention it.

 2        Q.    Okay.  He had no comment about your

 3   quote either?

 4        A.    I am pretty sure I asked if he got the

 5   ventilation quote, that is what I would ask and it

 6   was about a month after I sent it.  So it seems

 7   right, but I honestly do not recall the

 8   conversation.

 9        Q.    Correct me if I am wrong, but it looks

10   like it has been a year.  The prior contact was on

11   November 8, 2010.  This is December 20, 2011?

12        A.    A year and one month, yes.

13        Q.    So you were following up a year later?

14        A.    Yes.

15        Q.    Is that common for you to do?

16        A.    It is, even two or three years later we

17   will contact people we have not heard from just to

18   see what is going you.

19        Q.    You never know if they want to buy?

20        A.    Or we may be able to void their quote,

21   which means they are no longer interested and we do

22   not waste time contacting them again.

23        Q.    Makes sense.  So in that follow-up call,

24   Mr. Queen informed you that he may be joining the



1  lawsuit?

2      A.    Yes.

3      Q.    What did he say?

4      A.    I do not recall.  I think he mentioned

5  that he had talked to the Second Amendment

6  Foundation, but I do not know for sure what was

7  said.

8      Q.    Did he say anything else about his

9  communications with Second Amendment Foundation?

10     A.    Not that I recall.

11     Q.    Did he say anything else about the

12 lawsuit?

13     A.    I do not believe so.

14     Q.    What did you say in response to his

15 assertion that he may be joining the lawsuit?  Your

16 company is the named plaintiff in the case?

17     A.    Correct.  I do not know that I had a

18 response for him, that I can recall, but I

19 certainly would welcome it.

20     Q.    Was it news to you that he might be

21 joining the lawsuit?

22     A.    Yes.

23     Q.    Was anything else discussed in this

24 telephone conversation?



1        A.     Not that I can recall.

2        Q.     And, then, I believe you said you had a

3   further conversation with Mr. Queen in April of

4   this year?

5        A.     Yes.

6        Q.     And that was at a conference in

7   Wheeling?

8        A.     The ILEETA Conference.

9        Q.     What is that?

10       A.     I-L-E-E-T-A.

11       Q.     What does that stand for?

12       A.     International Law Enforcement Educators

13  and Trainers Association.  It is a law enforcement

14  conference.

15       Q.     Is that something that you regularly

16  attend?

17       A.     Every year.  We are a sponsor as well.

18       Q.     And Mr. Queen was at that conference?

19       A.     Yes, he stopped by my booth.

20       Q.     It was not a prearranged meeting, then?

21       A.     No.

22       Q.     What did you and Mr. Queen speak about

23  at the conference?

24       A.     I think I asked him about how the



1   project was coming along.  And he said, well, we're

2   being deposed.  And I believe that's all we talked

3   about.  I said, Well, I will see you around.

4        Q.    What did Mr. Queen tell you about him

5   being deposed?

6        A.    I do think he commented.

7        Q.    Did he talk about anything else, his

8   desire to open a range in his basement?

9        A.    I want to say that he alluded to the

10  fact that he is still trying.

11       Q.    Did he express to you any burdens or

12  complications or problems that he was having in

13  making the effort to open this range?

14       A.    No.

15       Q.    Did he make mention of the City's

16  ordinance about gun ranges?

17       A.    No.

18       MR. SIGALE:  I am just going to object as to

19  the form of the question.  You mean, during this

20  April thing or whenever?

21  BY MR. AGUIAR:

22       Q.    During this April thing.

23       A.    No.

24       Q.    Since Mr. Sigale opened the door, did



1    you ever have a conversation with Mr. Queen or

2    Mr. Rodriguez about the City's governing ordinance?

3         A.    I do not believe I ever did.

4         Q.    And then there you go.  Looking back

5    again at your answer to Interrogatory No. 12, the

6    next person or entity that you identify is Mike

7    Salapatas, S-a-l-a-p-a-t-a-s, and there you list

8    three quotes.  One for $1.51 million, one for

9    $639,000, and another for $232,000, indoor range

10   shoot house, simunition house?

11        A.    Simunition.

12        Q.    What is a simunition house?

13        A.    Non-line fire.  It is paint ball

14   markers.  Nonlethal firearms.

15        Q.    Like a paint ball range?

16        A.    For law enforcement, for force-on-force.

17        Q.    It is not like a --

18        A.    Not for fun.

19        Q.    It is not a recreational paint ball

20   facility?

21        A.    No.

22        MR. AGUIAR:  I think we are up to No. 7.

23

24



```
 1                    (WHEREUPON, a certain document was

 2                    marked Hart Deposition Exhibit No.

 3                    7, for identification, as of

 4                    6/14/12.)

 5   BY MR. AGUIAR:

 6       Q.    Mr. Hart, you have been handed what I

 7   marked as Exhibit No. 7.  Do you recognize this

 8   document?

 9       A.    I do.

10       Q.    Is this another compilation of your

11   communications at this time with Mr. Salapatas?

12       A.    Yes.

13       Q.    And did you prepare this document?

14       A.    I did.

15       Q.    And that was in response for the request

16   for documents?

17       A.    Yes.

18       Q.    To the best of your knowledge, does this

19   reflect your extent of your communications with

20   Mr. Salapatas?

21       A.    Yes.

22       Q.    The first entry on your sheet is on May

23   16th of 2011.  And it says -- if I am reading

24   right, it is an outbound phone call.  Which means
```



1    you called him?

2         A.    Yes.

3         Q.    Okay.  How do you know to call

4    Mr. Salapatas?

5         A.    I was most likely back.  Typically

6    people leave a message if I am busy or on the other

7    line, and I will go ahead call them back.

8         Q.    It is not that you had prior

9    relationship with him?

10        A.    No, I would not have been able to find

11   him.  Any commercial customer, there would be no

12   way to find him, unless they have a range.

13        Q.    You said you talked for 30 minutes.  He

14   is onboard with Carey's action, wants final

15   estimate to give to his investor.  Did

16   Mr. Salapatas explain to you what he was trying to

17   accomplish?

18        A.    I think he just talked about that he

19   wants to do a training range -- I think it was for

20   training and public use, but I am not positive.  I

21   know it was an indoor range.  A shoot house and a

22   simunition house.

23        Q.    Did he say where he wanted to place the

24   range?



 1        A.    I think he talked about both Chicago and

 2   the suburbs.

 3        Q.    So both locations were at issue?

 4        A.    I think he was considering both from

 5   what I remember.

 6        Q.    When it says onboard with Carey's/

 7   Action, what does that mean?

 8        A.    Typically, I think I would write that

 9   because he had talked about how he wants to do the

10   project with us.  You know, he feels -- he would

11   have told me that he is impressed with our

12   information or how we had helped him out, and he

13   said, yeah, I want to work with your group.

14        Q.    And so you talked for 30 minutes, and

15   within that 30 minutes he was onboard with you

16   guys?

17        A.    I think so.

18        Q.    He says he wants final estimates for his

19   investor.  Did he describe who the investor was?

20        A.    No.

21        Q.    Did he give you any information about

22   the investor?

23        A.    No, we do not inquire into financial

24   matters like that.



 1        Q.    Did he ever describe or share his

 2   business plan?

 3        A.    No.

 4        Q.    Did you ever discuss whether it would be

 5   a burden in placing a range in Chicago?

 6        A.    No.

 7        Q.    Did you discuss with him at all the

 8   City's ordinances, which as of this date would not

 9   have exited, this May 16, 2011?

10        A.    Yes.

11        Q.    You did not discuss with him putting a

12   range in Chicago in terms of -- strike the

13   question.

14             At this point, ranges are not allowed in

15   the City of Chicago.  Did you at any point mention

16   that to him?

17        A.    I do not know that I did.

18        Q.    Did he raise it with you?

19        A.    I do not believe so.

20        Q.    So when Chicago came up as a possible

21   location for a range, was there a discussion about

22   that location specifically?

23        A.    Well, he did not have a location.  He

24   was looking in cities, not locations.



 1        Q.    The city, in general?

 2        A.    The city in general, yes.

 3        Q.    You did not discuss the pros and the

 4   cons and burdens of placing a range in Chicago with

 5   him?

 6        A.    I do not recall.

 7        Q.    Okay.  It looks like the next entry was

 8   on May 27, 2011, and those would be distribution of

 9   the three bids that he requested; is that correct?

10        A.    Yes.

11        MR. AGUIAR:  No. 8.

12                    (WHEREUPON, a certain document was

13                     marked Hart Deposition Exhibit No.

14                     8, for identification, as of

15                     6/14/12.)

16   BY MR. AGUIAR:

17        Q.    Mr. Mart, I will hand to you what has

18   been marked as Exhibit No. 8.  My question to you

19   is:  I have compiled what looked like the three

20   quotes that you prepared for Mr. Salapatas.  Are

21   these, in fact, the three quotes?

22        A.    Yes.

23        Q.    And are these quotes specific to placing

24   the range in Chicago versus another location?



 1      A.    No.

 2      Q.    This is a general quote for what this

 3 would generally cost?

 4      A.    Yes.

 5      Q.    But that could change based on the

 6 location of the range?

 7      A.    Correct.

 8      MR. SIGALE:  Objection.  Speculation.  Go

 9 ahead and answer.

10 BY THE WITNESS:

11      A.    Correct.

12 BY MR. AGUIAR:

13      Q.    I am just curios, if you could turn to

14 the second quote, which is the Simulation

15 Room/House, which is different.  The other is

16 simunition.  Is this simulation?

17      A.    It should be simunition.  A simulator

18 has a video screen.

19      Q.    Okay.  Here there no exclusions listed,

20 unlike your other quotes.  Does simunition house

21 not require exclusions?

22      A.    It is built by another company.

23      Q.    So you do not build it?

24      A.    No.



1          Q.     Who builds it?

2          A.     Huf-Cor, H-u-f-C-o-r.

3          Q.     Do you install it?

4          A.     No.

5          Q.     So who prepared this quote then?

6          A.     I did.

7          Q.     If you do not -- how did you prepare the

8    quote?

9          A.     Usually we get a quote from the

10   subcontractor Huf-Cor, and they will give us an

11   estimate.

12         Q.     So you sub the whole work out?

13         A.     Yes.  We are just a distributor rep.

14         Q.     So if there were any exclusions, that

15   would be from Huf-Cor and not you?

16         A.     Yes.

17         Q.     You do not do the installation either?

18         A.     No.

19         Q.     Would there be a separate contract

20   entered with Huf-Cor?

21         A.     Yes.

22         MR. SIGALE:  Objection.  Give me second.  I

23   will object as to foundation and speculation, but

24   go ahead.



1    BY MR. AGUIAR:

2        Q.    Have you done simunition houses with

3    other clients?

4        A.    I have not.

5        Q.    Has Action Target?

6        A.    Yes.

7        Q.    Does Action Target always use Huf-Cor?

8        A.    They are our only provider.

9        Q.    So you use them?

10       A.    Yes.

11       Q.    Do you happen to know if contracts are

12   entered into with Huf-Cor directly or whether the

13   contract is with you and you just subcontract the

14   work and deal with it that way?

15       A.    It is purchased through Action Target

16   and we sub it out to Huf-Cor.

17       Q.    Then you pay Huf-Cor?

18       A.    The problem is, I do not know if we sold

19   many of these, so I cannot comment.

20       Q.    Okay.  And then if you turn to the next

21   page.

22       MR. SIGALE:  Of Exhibit 7?

23   BY MR. AGUIAR:

24       Q.    Yes.  It looks like after you -- on the



1   day you submitted the bid, you sent it to him --

2   looks like an outgoing correspondence in which you

3   state, you did not include the ventilation costs

4   and that you have to deal with Carey directly; is

5   that right?

6        A.    Yes.

7        Q.    Then it looks like the next

8   correspondence with Mr. Salapatas was on January 6,

9   2012; is that true?

10        A.    Yes.

11        Q.    You do not recall any communications in

12   that approximate seven-month time period?

13        A.    I do not believe so.

14        Q.    Did you get a response to your e-mail

15   asking if he was still interested in the project?

16        A.    I do not know if I did, I probably would

17   have entered it, but it is possible.

18        Q.    But as sit here today, you do not recall

19   any further communication with him?

20        A.    I do not recall.

21        Q.    And to suffice it to say, you do not

22   recall, that you -- strike that.

23              You did not discuss with him the City's

24   gun range ordinance?



 1        A.    I do not believe so.

 2        Q.    You did not make any statements about

 3   the ability to comply with the provisions of the

 4   gun range ordinance?

 5        A.    I do not recall if it was discussed or

 6   not.

 7        Q.    Okay.  Just curious, I will ask you to

 8   engage in a hypothetical with me on Mr. Salapatas's

 9   quote.  Assume Mr. Salapatas wants to proceed with

10   the project, and do so in the City of Chicago,

11   okay?  Would compliance with the City's ordinance

12   regarding the decibel level, would that change your

13   quoted amount to him?

14          MR. SIGALE:  I object as to foundation and

15   speculation, but you can answer the question if you

16   know.  Go ahead.

17   BY THE WITNESS:

18        A.    No.

19   BY MR. AGUIAR:

20        Q.    Because you do not do that stuff?

21        A.    Correct.

22        Q.    Same question with respect to the slope

23   of the floor.  Would that -- the requirement of the

24   slope of the floor, would that change the quote you



 1   made to Mr. Salapatas?

 2        A.    That certainly could change our

 3   equipment.

 4        Q.    Change your equipment?

 5        A.    Yes.

 6        Q.    How so?

 7        A.    The dimensions where the bullet trap is

 8   located is higher in respect to, in comparison to a

 9   flat floor.

10        Q.    How much higher?

11        A.    What is 75 divided by 4?  How many

12   inches?  It depends on the length of the range.

13   Honestly, if you have a quarter-inch of slope for

14   every foot, it depends on the range, how much

15   taller it will be at the bullet trap.

16        MR. SIGALE:  The answer is 18-and-a-quarter.

17   BY MR. AGUIAR:

18        Q.    What would that do to the quote?

19        A.    We would have to provide more ceiling

20   baffle coverage or a larger bullet trap, which

21   would increase the cost.

22        Q.    Would you have to do both?

23        A.    Possibly, yes.

24        Q.    Would you have to do either?



1        A.    I think there could be an instance where

2    you did not.

3        Q.    It is possible not to do either, but you

4    think you might have to do one or the other or

5    both?

6        A.    You do have to provide larger ballistic

7    coverage, you are covering more space.  My belief

8    is, you would in almost all cases.

9        MR. SIGALE:  The record is going to read what

10   I said before, but the answer to that question is

11   18-and-three quarters.

12       THE WITNESS:  You are a mathematician.

13       MR. SIGALE:  Well, apparently not on the first

14   try.  I could not leave that just sitting there.

15       MR. AGUIAR:  Dully noted.  Thank you.

16       MR. SIGALE:  All right.

17   BY MR. AGUIAR:

18       Q.    Let's look, for example, at the first

19   quote here, the one for the Fire Shoothouse.  If

20   this were in Chicago, and if Mr. Salapatas had to

21   comply with the quarter-inch slope requirement, how

22   much more would this quote be; do you know?

23       A.    This is not applicable.  This is not an

24   indoor range.



1      Q.     That changes that then.  Is the last

2   quote an indoor range?

3      A.     Yes.

4      Q.     All right.  This quote is for

5   $100,514.77.  The same question with respect to

6   that slope requirement.  In what way would that

7   change this quote?  Would it change this quote?

8      A.     Yes.

9      Q.     Okay.  In what way?

10     A.     It would increase either the height of

11  the ceiling baffle coverage or the height of the

12  bullet trap or both to make up that difference.

13     Q.     And the ceiling baffle system is listed

14  in middle of the page and that costs $215,000, is

15  that what you are talking about?

16     A.     Yes.

17     Q.     And the bullet trap is -- that is the

18  tactical ceiling baffle system.  And the next page

19  is a ballistic ceiling system?

20     A.     They are both the same, different

21  layouts.  There are two ranges on here.

22     Q.     Okay.  And the bullet trap is listed

23  where?

24     A.     Line item No. 1, and the first page,



```
 1   line item No. 1 on the second page?

 2        Q.    These are two separate ranges?

 3        A.    Correct.

 4        Q.    Let's talk about the first range.  How

 5   much would that potentially increase the cost of

 6   this quote?

 7        MR. SIGALE:  I'm sorry, I am going to object.

 8   The first range you are asking about is the

 9   tactical range.

10        MR. AGUIAR:  Correct.

11        MR. SIGALE:  Which, if I am not mistaken, is

12   not allowed under the ordinance anyway.  So it is

13   really a moot hypothetical.

14        MR. AGUIAR:  Okay.

15        MR. SIGALE:  But with that understood, that it

16   could not be built -- so if you are asking to

17   assume that it could be built and everything else

18   was the same, then I guess he can try to answer the

19   question.

20   BY MR. AGUIAR:

21        Q.    Yes.

22        A.    I could not tell you because it is not a

23   standard product.  Our standard bullet trap goes up

24   8'2".  It would be a custom product and I cannot
```



 1 | price out a custom product.
 2 |      Q.    So you do not know how much compliance
 3 | would cost then?
 4 |      A.    I do not.
 5 |      Q.    But you believe it would be more?
 6 |      A.    I know it would be more.
 7 |      Q.    But it is possible that it would not
 8 | cost anything more?
 9 |      MR. SIGALE:  I am going to object.  I think
10 | that mischaracterizes what he just said.
11 | BY THE WITNESS:
12 |      A.    I believe it would cost more.
13 | BY MR. AGUIAR:
14 |      Q.    Okay.  But I thought you said a minute
15 | ago, that it would be possible to actually comply
16 | without having to change the bullet trap or the
17 | baffle system?
18 |      A.    I do not know that you can.  Anytime you
19 | increase the ceiling height, you have more coverage
20 | needed.
21 |      Q.    And is that true, regardless of the
22 | floor that the range is located in, whether it is
23 | the basement, the first floor or the second floor?
24 |      A.    Yes.



1        Q.      And looking back at Interrogatory No.

2    12.  After Mike Salapatas, you reference your

3    answer to Interrogatory No. 1.  So let us take a

4    look back at Interrogatory No. 1.  And there, I

5    believe, is the fourth page of the document.  You

6    list ranges built in Chicago by Action Target.  And

7    then you list range proposals by Action Target in

8    Chicago.  And there we have -- there is listed

9    Boomstick, Fidelity, and Salapatas.  Beneath that

10   you say:  Numerous telephone and e-mail inquiries

11   that did not lead to proposals and for whom a

12   record was not made.

13          By that do you mean, people called you,

14   expressed an interest in a range and that was the

15   end of it?

16       A.      Yes.

17       Q.      Do you recall any of the people that

18   called you?

19       A.      I do not.

20       Q.      Do you recall, approximately, how many

21   of these phone calls or e-mails you got?

22       A.      From what time period?

23       Q.      From the passage of these ordinance to

24   the present day?



1       A.      Which would be July.

2       Q.      July 2011?

3       A.      I would guess there has been five total

4    in that time.

5       Q.      But you do not recall?

6       A.      I do not recall.

7       Q.      And two of those have been what we

8    discussed earlier?

9       A.      Yes.

10      Q.      So there are three other ones you just

11   also do not recall?

12      A.      I do not recall when.  I know that those

13   two we have discussed have been in the last three

14   or four months.

15      Q.      And the other three would have been

16   before that?

17      A.      Yes.

18      Q.      Do you recall anything about those

19   conversations with those people?

20      A.      I do not.

21      Q.      Do you recall if any of them expressed

22   that the gun range ordinance was making it

23   difficult or impossible to open a gun range in

24   Chicago?



1       A.    No.

2       Q.    Let's move along to the next part which

3  says:  Once for which a record was made were:  The

4  first one you list David Levy, L-e-v-y.  Zeus and

5  Company; do you see that?

6       A.    Yes.

7       MR. AGUIAR:  We are on No. 9.

8                  (WHEREUPON, a certain document was

9                   marked Hart Deposition Exhibit No.

10                  9, for identification, as of

11                  6/14/12.)

12  BY MR. AGUIAR:

13      Q.    Mr. Hart, you have been handed what has

14  been marked Deposition Exhibit No. 9.  Do you

15  recognize this document?

16      A.    I do.

17      Q.    What is this?

18      A.    It is e-mail chain between myself and

19  David Zeus -- David Levy, I'm sorry.

20      Q.    He was with Zues and Company?

21      A.    Yes.

22      Q.    Have all of your communications with

23  Mr. Zeus been by e-mail -- or Mr. Levy by e-mail?

24      A.    I believe so.



1      Q.    You do not recall ever speaking to him

2   on the phone?

3      A.    I cannot not say for you sure.  I think

4   it was all e-mail.  He could have called me once.

5      Q.    Do you recall ever meeting him?

6      A.    No, I never meet him.

7      Q.    This would be the extent of the records

8   that you're talking about in response to

9   Interrogatory No. 1?

10     A.    Yes.

11     Q.    And if I am not mistaken, I think we

12  have to go to back to start with the beginning of

13  your communication with him?

14     A.    That's correct.

15     Q.    It looks like the first communication

16  was on July 7, 2011; is that correct?

17     A.    July 7, 2011, you said?

18     Q.    Yes.

19     A.    Yes.

20     Q.    And prior to this communication, had

21  you -- did you know Mr. Levy?

22     A.    No.

23     Q.    Have you ever heard of Mr. Levy?

24     A.    He may have first contacted me with a



1   phone call.  I do not have a record of it, but it

2   would be very strange to just have an e-mail come

3   in like this.  I am assuming that we spoke on the

4   phone at least once.

5        Q.    Do you recall what that conversation was

6   about at all?

7        A.    I do not.

8        Q.    And in this e-mail Mr. Levy says to you,

9   Looks like the City of Chicago has finally come to

10  their senses about gun ranges within city limits.

11  And then he continues, that he has a large vacant

12  industrial building that would meet the few

13  requirements he has found online.  He wants to

14  explore the cost associated with building a range

15  that can have three lines, of what you suggest.

16  With respect to what you suggest, do you know what

17  he meant by that?

18       A.    In equipment.

19       Q.    Okay.  Had you told him what equipment

20  would be necessary before?

21       A.    I do not recall our conversation.

22       Q.    So when he wrote that, you do not know

23  what you suggested?

24       A.    Yes.



 1        Q.    And then your next communication was
 2   within the e-mail on Friday, July 8th which is
 3   above it?
 4        A.    It looks like it, yes.
 5        Q.    You do not recall calling him or
 6   anything?
 7        A.    I do not believe so.
 8        Q.    Before replying to his e-mail, did you
 9   do any research into what Zeus and Company is?
10        A.    No.
11        Q.    Or who Mr. Levy is?
12        A.    No.
13        Q.    In your response to Mr. Levy, the first
14   sentence is, They have only partially come to their
15   senses.  The new 25 pages of regulations for ranges
16   makes it almost impossible to legally build a range
17   in Chicago, and if it is possible, it will call --
18   I think you meant cost -- at least three times what
19   a normal range would cost.
20             At this point in time, it was simply
21   just the original ordinance that you were looking
22   at; correct?  This is July 8 of 2011?
23        A.    I believe so.  When was it changed?
24        Q.    September.  It was amended in September?



1      A.    Okay.

2      Q.    So you only had the first version of the

3  ordinance?

4      A.    That's correct.

5      Q.    You say it is almost impossible to

6  legally build a range in Chicago.  What do you mean

7  by that?

8      A.    The regulation such as the commissioner

9  can turn down a range at any time for any reason,

10  leads me to believe it would be almost impossible

11  to satisfy the City requirements.  The sound

12  decibel limit of 55 decibels is another concern.

13  And the location, where it can't be at this time

14  within 1,000 feet of any prohibitive use.

15      Q.    Is that all you meant when you said

16  that?

17      A.    Yes.

18      Q.    We have spoken about the location before

19  and the decibel level.  But now you are talking

20  about a commissioner can turn down an application

21  at any time, is that what you meant?

22      A.    Yes.

23      Q.    Why do you believe that to be the case?

24      A.    In reading the range regulations it says



 1   that there is a deleterious use clause, where the

 2   commissioner could determine any deleterious use

 3   and basically revoke the range's permit to operate.

 4   And in doing research and looking at what that

 5   means, I think that could be a myriad of things.

 6   From traffic, to noise, to a resonance.  There are

 7   a bunch of different things.

 8        Q.    Do you recall reading the ordinance in

 9   determining what an actual deleterious impact is

10   under the ordinance?

11        A.    Do I remember?

12        Q.    Do you recall reading the ordinance and

13   determining for yourself what a deleterious impact

14   would mean under the ordinance?

15        A.    At this time I just read that the

16   commissioner could turn it down for any deleterious

17   impact.  That's what I assumed it was.  Since that

18   time I have read more on it.

19        Q.    Since that time, what have you learned?

20        A.    That a deleterious impact could be

21   anything from noise, sound traffic, crime, anything

22   to that respect.

23        Q.    That's your understanding?

24        A.    Yes.



1       Q.      And then the next thing you say, and if

2   it is possible.  So, again, you are saying that it

3   could be possible to comply with the City's

4   ordinance?

5       A.      Yes.

6       Q.      That will cost at least three times

7   within the normal range of cost.  What is the basis

8   for you saying to Mr. Levy that it would cost three

9   times more than a normal range?

10      A.      I am thinking of the cost of the land

11  versus a normal range out in the suburbs.

12  Construction costs.  Unions.  The factors that

13  would be required here in the City.

14      Q.      Those are governed -- what you just

15  listed are not governed by the gun range ordinance;

16  are they?

17      A.      Well, it would in respect to sound

18  possibly or the sloping floor or the construction

19  of the building.

20      Q.      But the cost of the land, that is

21  something which is a cost of the land.  The gun

22  range ordinance does not control that?

23      A.      That's correct.

24      Q.      And the union costs are outside of the



1    requirements of the ordinance as well?

2        A.    Yes.

3        Q.    So we are down basically the

4    construction cost you were mentioning, and that was

5    the slope and requirement of the decibel -- the

6    compliance of the requirements of a decibel level;

7    correct?

8        A.    Yes.

9        Q.    And had you done -- what component of

10   the three times --

11       A.    I should add at this time, there was a

12   range master required for every three shooters,

13   which is something else we have discussed in the

14   past.

15       Q.    And how would that impact the cost of

16   constructing a range?

17       A.    The cost of operations.

18       Q.    So that goes to operations?

19       A.    Yes, operations.

20       Q.    It does not go to the cost of the range

21   itself?

22       A.    Not to construction, no.

23       Q.    So when you say it will cost three times

24   of your normal range of cost, if we take out an



1    issue of land, which we agreed is not something the

2    range ordinance governs, take out the union cost

3    you mentioned, we are down to the construction,

4    which you said was the slope of the floor and the

5    decibel requirements.  What component of that is

6    the three times?

7         A.    It is speculative on my part as to how

8    much more it would cost.

9         Q.    So when you wrote this, you did not

10   really know what it would cost?

11        A.    No.

12        Q.    You were just guesstimating, so to

13   speak?

14        A.    That's correct.

15        Q.    I am just curious in the next paragraph

16   when you say, for a ten-lane, 25-yard range, you

17   are looking around $450,000 fully installed with

18   the heating, only ventilation and the total

19   containment trap.  And then change it to a rubber

20   bullet trap and that drops $350,000.  Were you

21   quoting him a range in the City at that point?

22        A.    No, that's general equipment.

23        Q.    That is just general equipment?

24        A.    Anywhere, yes.



1      Q.    And with respect to what Action Target

2    would do, those numbers would not change if the

3    range were in the city?

4      A.    Except for the additional ceiling height

5    with the sloped floor, that's all that I can think

6    of.

7      Q.    Other than that, nothing else would

8    change?

9      A.    Correct.

10     Q.    And that, you can't really speculate on

11   at this point?

12     A.    I do know that it would require more

13   material, so it has to cost more, but, yes.

14     Q.    You do not know how much more?

15     A.    No.

16     Q.    It would depend on various factors?

17     A.    Yes, we have to develop an entirely new

18   height of bullet trap to accommodate that larger

19   height or adjust the ceiling baffles.

20     Q.    Have you ever done that before, where

21   you had to do those kind of adjustments?

22     A.    The custom trap, we may have.  Not to my

23   knowledge, I have not personally.  Ceiling baffles

24   we do it regularly where we have to add an extra



 1  row or another portion.

 2       Q.    That's not uncommon then to add

 3  additional ceiling baffles?

 4       A.    We have to add ceiling baffles to every

 5  project.  The difference is the increase in ceiling

 6  height, yes, we do have to add it from time to

 7  time.

 8       Q.    So you could do that in Chicago?

 9       A.    We could accomplish that.

10       Q.    And then it looks like if you turn to

11  the first page of Exhibit No. 9, the next

12  communication was on July 9th from Mr. Levy, saying

13  he will review the information and look at what

14  hoops the City is going to make range owners go

15  through.  And then after that the next

16  communication is not until January 6, 2012?

17       A.    That's correct.

18       Q.    Do you recall any communications between

19  July 9th and January 6th?

20       A.    I do not.

21       Q.    Okay.  And, again, you were just

22  checking in on the quote?

23       A.    Yes.

24       Q.    Or the e-mail?



1      A.    It looks like this date appears on many

2  of these where I took a whole day to e-mail past

3  customers, January 6th.

4      Q.    Did you ever send Mr. Levy an actual

5  quote that was beyond what was in this e-mail?

6      A.    No, not to my knowledge.

7      Q.    Then it looks like a couple of days

8  later Mr. Levy is e-mailed you saying he rented out

9  the building.  And then says, Chicago still sucks

10  when it comes to handguns.

11          Did you ever speak with Mr. Levy about

12  his e-mail on January 12th?

13      A.    No.

14      Q.    You did not call him back?

15      A.    I did not.

16      Q.    So this is the last communication?

17      A.    No, I believe he called me several

18  months ago when he was given a notice to be

19  deposed, I think.  And he was somewhat upset and I

20  told him that I had no control.

21      Q.    Did you talk with him about anything

22  else?

23      A.    No.

24      Q.    He did not discuss it with you at all,



1   his views on Chicago's gun range ordinance?

2        A.    No, he only mentioned that now he has to

3   hire or spend time with his attorney and spend

4   money to get this taken care of is what he said.

5        Q.    He did not say anything about compliance

6   with the gun range ordinance at all?

7        A.    No.

8        Q.    Turning back to Exhibit No. 2, which is

9   the Answers to Interrogatories.  The next person

10  listed is Deon, D-e-o-n, Roebuck, R-o-e-b-u-c-k,

11  who we have heard about before.

12       MR. AGUIAR:  And we are up to No. 10, I

13  believe.

14                    (WHEREUPON, a certain document was

15                    marked Hart Deposition Exhibit No.

16                    10, for identification, as of

17                    6/14/12.)

18  BY MR. AGUIAR:

19       Q.    Mr. Hart, the court reporter has handed

20  you what has been marked Exhibit No. 10.  Do you

21  recognize this document?

22       A.    Yes.

23       Q.    And this is another log of your

24  communications with Mr. Roebuck?



1          A.    Yes.

2          Q.    And, again, you prepared this?

3          A.    I did.

4          Q.    The first entry on this chart that you

5    provided is dated, December 1, 2011.  And then the

6    annotation says, Met last week at my hotel, he is

7    from the south side and would like to start a

8    shooting range, has other successful businesses.

9    You meet with Mr. Roebuck some time in that last

10   week of November?

11         A.    Yes, at the ITOA Conference in Oak

12   Brook.

13         Q.    The ITOA Conference?

14         A.    Yes.

15         Q.    What does that stand for?

16         A.    Illinois Tactical Officers' Association.

17         Q.    All these groups have so many acronyms.

18   I do not know how you keep them straight.  Do you

19   usually attend the ITOA?

20         A.    Every year.

21         Q.    Do you have a booth there as well?

22         A.    Yes.

23         Q.    Kind of a trade show?

24         A.    A law enforcement show.



1      Q.    Had you met Mr. Roebuck before?

2      A.    No.

3      Q.    So he approached your booth?

4      A.    I believe he called me that week and I

5  told him I was in town and he would be welcome to

6  come meet with me in my hotel if he would like.

7      Q.    So you met with him.  What was the

8  purpose of the meeting?

9      A.    He wanted to do a range in Chicago.

10     Q.    Was he specific about Chicago?

11     A.    Yes.

12     Q.    Not the suburbs?

13     A.    I believe he discussed the suburbs, but

14  he primarily wanted to go in Chicago.

15     Q.    Did he tell you where in Chicago he

16  wanted to put a range?

17     A.    No.

18     Q.    Did he tell you he had a location picked

19  out?

20     A.    No.

21     Q.    Did he have a business plan that you are

22  aware of?

23     A.    No.

24     Q.    Did he have any kind formulated plan



1    that you are aware of?

2         A.    He just said he wanted to do a range and

3    that's when we started talking about the

4    regulations.

5         Q.    So you talked with him about the

6    regulations in that meeting?

7         A.    Yes.

8         Q.    What was said about the regulations?

9         A.    I had mentioned the sound limitation,

10   the sloped floor.  I believe the FOID requirement

11   and the CFP requirement.  There might have been

12   some others, if I am forgetting.

13        Q.    What did you tell Mr. Roebuck about the

14   sound, the slope of the floor, the FOID requirement

15   and the others?

16        A.    I told him there would challenges.

17        Q.    Did you describe to him what those

18   challenges would be?

19        A.    No.

20        Q.    Did he ask?

21        A.    I do not recall.

22        Q.    At any point, did you tell him it would

23   be impossible to do a range in Chicago?

24        A.    No.



 1      Q.    Did you tell him it would be more

 2   expensive to do a range in Chicago?

 3      A.    Yes.

 4      Q.    Did you explain to him why it would be

 5   more expensive to do a range in Chicago?

 6      A.    I believe the construction would be more

 7   costly.

 8      Q.    Is that for the same reasons we have

 9   already discussed?

10      A.    Yes.

11      Q.    But, again, the only thing that would

12   impact your quote to him if you were doing, would

13   be potentially having to do the baffle ceiling or

14   the trap?

15      A.    Correct.  I was making reference to the

16   entire project cost, in my estimation.

17      Q.    That would include things that you do

18   not have any control over?

19      A.    Yes.

20      Q.    What did Mr. Roebuck say in response to

21   that?

22      A.    He seemed very confident that he could

23   make one work.

24      Q.    In addition to discussing the ordinance



1    and the challenges you described to him, did you

2    speak about anything else to Mr. Roebuck in that

3    meeting?

4         A.    I believe it was all about the range.

5         Q.    Did he reveal to you whether he had the

6    financing in place?

7         A.    I did not ask.

8         Q.    He did not offer that up?

9         A.    No, he had mentioned he owned several

10   businesses, and I think he may have alluded that

11   money was not a problem, but I am not sure.

12        Q.    Do you recall anything else about that

13   meeting?

14        A.    No, we ended the meeting and he said he

15   would call when he needed anything.

16        Q.    But as of that meeting, he was still

17   prepared to try to go forward with the range in

18   Chicago?

19        MR. SIGALE:   I will object it is based on

20   speculation as what he was prepared to do.

21        MR. AGUIAR:   Duly noted.

22   BY MR. AGUIAR:

23        Q.    It was your understanding, that in that

24   meeting, Mr. Roebuck was still going to proceed



1   with the attempt to put a range in Chicago?

2        MR. SIGALE:   I still object as to speculation.

3   You can answer if you know.

4   BY THE WITNESS:

5        A.   I know he did not give up on the idea.

6   BY MR. AGUIAR:

7        Q.   And the next entry it looks like is

8   dated December 1, 2011.  And it says it is

9   outgoing correspondence?

10       A.   Yes.

11       Q.   So later on that day -- so let me get

12  this straight, on December 1st you made the contact

13  entry; correct?

14       A.   The conference was the week before

15  Thanksgiving, so I probably filled all of this in

16  when I got back to the office, that's why it is all

17  the same day.

18       Q.   So the meetings are recorded in the

19  system on December 1st, and then that same day you

20  e-mailed him; is that correct?

21       A.   Yes.

22       Q.   It says in the text, Thanks for meeting

23  with me tonight, at the first line.

24       A.   Uh-huh.



1        Q.    So did you e-mail the very night you met

2   with him?

3        A.    You could see the date is November 11,

4   2011, that's the actual day of the meeting.

5        Q.    So you transferred it to your system on

6   December 1st?

7        A.    Yes.

8        Q.    Understood.  I am getting the hang of

9   it.  I am trying.

10             So on November 11th, he wrote you

11  saying, Thanks for the breakdown.  He wants to talk

12  more.  Then you respond by saying, Thanks for

13  meeting me tonight; is that correct?

14       A.    I believe so.

15       Q.    So based on that, it was your

16  understanding he was still moving forward?

17       A.    Yes.

18       Q.    On some level?

19       A.    That was my assumption.

20       Q.    It then it looks like you said, Thanks

21  for meeting me tonight.  I will be back in the

22  office on December 1st, but before then, let's get

23  some budget numbers together for a range and try to

24  get the Chicago range permit process started.



```
 1             What did you mean by, Let's get some

 2   budget numbers together?

 3        A.    I would try to get him some budgetary

 4   quotes.

 5        Q.    So you were going to do one of your

 6   normal quotes?

 7        A.    Or give him some numbers verbally over

 8   the phone or via an e-mail instead of a quote.

 9        Q.    And I do not think we discussed what

10   kind of range Mr. Roebuck was trying to open in

11   Chicago?

12        A.    He had mentioned he wanted to do a

13   public range.  Commercial range.

14        Q.    Did he say how many firing spots he

15   wanted?

16        A.    Not that I can recall.

17        Q.    Did he say what size of range?

18        A.    Typically 25 yards.  I do not know for

19   sure with his.

20        Q.    So you need that information before

21   preparing a quote?

22        A.    Yes.

23        Q.    Then you say, Try to get the Chicago

24   range permit process started.  What did you mean by
```



1  that?

2       A.    I wanted him to find out what he has to

3  do to apply.

4       Q.    Did you ever advise him as to what he

5  had to do?

6       A.    I just know he had to apply the $4,000

7  application fee and go through the process, you

8  know.  I believe that's what I told him.

9       Q.    Other than that, did you tell him

10  anything else?

11       A.    No.

12       Q.    The last line of that paragraph says:

13  That form will give us the information that the

14  City needs for a permit application, so we could

15  plan the range accordingly.  How would the form for

16  permit application help you plan the range

17  accordingly?

18       A.    I think I am assuming that it would have

19  any requirements on the application form in terms

20  of information from a manufacturer like us.  What

21  type of equipment will be used.  Does it satisfy

22  their requirements.

23       Q.    You did not know that to be the case?

24       A.    No.



 1        Q.     You are just assuming, that it would
 2   have been on there?
 3        A.     That's correct.
 4        Q.     And then -- I cannot tell from the
 5   e-mail chain, but it looks like -- the next contact
 6   is -- it looks like an e-mail from you to Deon
 7   asking if he had any further thoughts on doing an
 8   indoor shooting range.  Do you recall when you
 9   e-mailed him again?
10        A.     It looks like it has been like three
11   weeks since the meeting.  So what probably
12   happened, I had correspondence a few times and it
13   was December 1st probably with this e-mail that I
14   noticed that I had not logged it and that's when I
15   copied all of theme that day.
16        Q.     So some time after your last e-mail, you
17   e-mailed him again?
18        A.     I believe so.
19        Q.     Do you recall there being a conversation
20   with him between those two e-mails?
21        A.     I do not know.
22        Q.     And here you are affording him Carey's
23   Range Ventilation information.  Was that requested
24   by Mr. Roebuck?



1      A.    I do not know if it was requested.    I

2   typically send it to anyone without them asking.

3      Q.    That is like your standard business

4   practice?

5      A.    Every range needs a ventilation system,

6   so I send in all of the information.

7      Q.    And then the next entry is an incoming

8   correspondence.  And it says -- and this is from

9   Mr. Roebuck.  Saying, I actually had an intelligent

10  conversation with Stephanie at the City of Chicago.

11  First things first.  I have to locate a property in

12  an areas zoned M1, M2, or M3.  To answer your

13  question about opening an indoor range, "Heck,

14  yeah."

15          Did you ever speak with Mr. Roebuck

16  about his conversation with Stephanie at City Hall?

17      A.    Yes.

18      Q.    Then your next communication is an

19  outgoing correspondence from you to Mr. Roebuck

20  saying, Good to hear.  Let me know when you have

21  questions or if you need any help; correct?

22      A.    Yes.

23      Q.    Did you ever hear back from Mr. Roebuck?

24      A.    I think I might have gotten an e-mail



 1 │ from him last week.  Like I said, an intern
 2 │ e-mailed all of my past customers, and I cannot
 3 │ remember if I got a response back from him.  I know
 4 │ I got a call from him.  There was a call from him
 5 │ last week, and he just said he had been deposed or
 6 │ is being deposed and he said, Call me when you are
 7 │ in town and we will get a drink.  I have not done
 8 │ so.
 9 │     Q.    It looks like the next e-mail here is
10 │ from you, would that be right?
11 │     A.    January 5th?
12 │     Q.    Yes.
13 │     A.    Yes.
14 │     Q.    It looks like Mr. Roebuck wrote you a
15 │ again January 4th and you responded to that?
16 │     A.    Yeah.
17 │     Q.    And he said, I am still working with the
18 │ City to identify a location with the proper zoning.
19 │ I did not think this part of the process would be
20 │ the most challenging.  And then you wrote back,
21 │ could You give more details and why it is
22 │ challenging to find a suitable location, which part
23 │ of the zoning and range regulations are causing the
24 │ most difficulty?  Did you ever speak with



 1 | Mr. Roebuck about the policies having the zoning?

 2 |         A.    I do not believe so.  His response is

 3 | the next one down.  That would be an e-mail

 4 | response.

 5 |         Q.    You do not recall ever speaking with him

 6 | in person about it?

 7 |         A.    We have not met since that first

 8 | meeting.

 9 |         Q.    He wrote back that he was still focusing

10 | on certain properties, but some of the owners have

11 | rented space that possess an obstacle.  You do not

12 | know what he meant by that?

13 |         A.    I do not.

14 |         Q.    So you do not know the current status of

15 | Mr. Roebuck's attempts to open a range in Chicago?

16 |         A.    I think when he called last week, he

17 | said he is still trying, if I recall correctly, but

18 | I do not know the status of it.

19 |         Q.    He did not identify any particular

20 | problems he was having; if any?

21 |         A.    No.

22 |         Q.    He didn't mention a location he was

23 | trying to secure?

24 |         A.    I just told him I was being deposed this



 1 | week and that was the extent of our conversation.

 2 | He said, he would talk to me in the future.

 3 |      Q.    You have not had that conversation yet?

 4 |      A.    No.

 5 |      Q.    The next entity that you list in your

 6 | answer to Interrogatory No. 1, is Security

 7 | Dynamics.

 8 |      MR. AGUIAR:  If you could mark this as No. 11.

 9 |                 (WHEREUPON, a certain document was

10 |                  marked Hart Deposition Exhibit No.

11 |                  11, for identification, as of

12 |                  6/14/12.)

13 | BY MR. AGUIAR:

14 |      Q.    Ms. Hart, you have been handed what has

15 | been marked as Deposition Exhibit No. 11.  And,

16 | again, is this a compilation of your communications

17 | with Security Dynamics Corporation?

18 |      A.    Yes.

19 |      Q.    And you prepared this as well?

20 |      A.    I did.

21 |      Q.    The first entry is dated August 8, 2011.

22 | Would that have been the first day you had

23 | communication with someone from Security Dynamics?

24 |      A.    Yes.



1       Q.    The contact name is Scott Osantowski,

2   O-s-a-n-t-o-w-s-k-i.  The annotation however says,

3   Met with John Krupa, K-r-u-p-a, and Bill P, about

4   the range project in Chicago and also in the

5   suburbs.  Who are John Krupa and Bill P?

6       A.    John Krupa is one of our trainers and

7   Bill Provencher is with Carey's Ventilation.

8       Q.    So it does not mean you met just with

9   Mr. Krupa and Mr. Provencher?

10      A.    No, because I made this under Scott

11  Osantowski, he was part of the meeting.

12      Q.    Was anybody else present from Security

13  Dynamics?

14      A.    I believe we had one other person from

15  the company.  I do not know if he was with the

16  company or an investor.  I think he was the money

17  guy, though.  I do not remember his name.

18      Q.    How did this meeting come to take place?

19      A.    I believe that John Krupa set it up with

20  me and facilitated the meeting.

21      Q.    Do you happen to know how John Krupa

22  became involved with Scott Osantowski and Security

23  Dynamics?

24      A.    I just know they are friends.



1      Q.     So your recollection is that Mr. Krupa

2   came to you to participate in this meeting?

3      A.     I believe so.

4      Q.     And do you know why you were included in

5   that meeting?

6      A.     John only does business with us in terms

7   of ranges and training.   So we would be the first

8   one he would recommend to his friends.

9      Q.     So John does not work for Action Target?

10      A.     He is a subcontractor of ours for

11   training.

12      Q.     When you say for training, what do you

13   mean that?

14      A.     He does police training.   Firearms

15   training.

16      Q.     And do know why Bill Provencher was

17   there?

18      A.     For ventilation.

19      Q.     And who invited him to come along, do

20   you know?

21      A.     I did.

22      Q.     It says to meet with them about their

23   range project in Chicago, and also in the suburbs.

24   Did you know going into the meeting it was for a



1  project in Chicago and the suburbs?

2       A.   I do not know if I knew before the

3  meeting, but certainly during they expressed their

4  interest in doing one in Chicago as well as in the

5  suburbs, doing a chain.

6       Q.   So it would have been more than one

7  range?

8       A.   They hope, yes.

9       Q.   Did they say between Chicago and the

10 suburbs, which one they would do first?

11      A.   I do not recall.

12      Q.   Did they tell what kind of range they

13 wanted to do?

14      A.   I know they wanted both public and

15 police training use.

16      Q.   Did they say what kind of size or

17 anything else about the type of range it would be?

18      A.   I do not recall.

19      Q.   Did they say anything about that they

20 had obtained a location in Chicago?

21      A.   I do not believe so.

22      Q.   Had they been looking; do you know?

23      A.   I do not know.

24      Q.   How about in the suburbs, had they



1  identified a location in the suburbs that you know

2  of?

3        A.    I do not.

4        Q.    Had they identified a suburb they wanted

5  to go into?

6        A.    I do not know.

7        Q.    What did they tell you about their plans

8  in this meeting?

9        A.    I do not recall a lot, just that I think

10 they were planning on doing a joint facility, that

11 was both public and law enforcement training.

12       Q.    How long did the meeting last; do you

13 recall?

14       A.    It was probably 45 minutes.

15       Q.    When you learned they wanted to do a

16 range in the City of Chicago, did that bring about

17 a conversation about the City's ordinance?

18       A.    I do not recall if we talked about it.

19 We probably did because they do investigative

20 training and certification for security.  I assume

21 that they were exempt from that, but I am not sure.

22       Q.    Do you recall bringing up the City's

23 ordinances during this meeting?

24       A.    I may have.  I do not recall.



1        Q.    Do you recall any discussion about

2    compliance with the City's ordinance provisions?

3        A.    If I brought them up, I probably would

4    have talked about it.

5        Q.    You do not recall one way or the other?

6        A.    I assume I had to have, but I do not

7    know for sure.  I talk to most people about it.

8        Q.    Do you recall telling them that a range

9    in Chicago would be expensive?

10       A.    I probably did.

11       Q.    Do you have a recollection of that?

12       A.    I do not specifically, no.  Anyone that

13   I do talk to about the regulations, I tell them I

14   assume that it would cost more.

15       Q.    So based on your practice of talking

16   about it in that manner, you believe you would have

17   done in this conversation as well?

18       A.    Probably.

19       Q.    And if you had, it would have been the

20   same type of reasons why it is expensive?

21       A.    Yes.

22       Q.    As we have already have discussed during

23   today's deposition?

24       A.    Yes, the same.



```
 1        Q.    Do you recall any questions from

 2   Mr. Osantowski or associate, of whatever nature,

 3   about the expense of opening a range in Chicago?

 4        A.    I do not know that I recall discussing

 5   it.

 6        Q.    The next entry is September 26, 2011.

 7   And here it looks like you're touching base with

 8   them and asking them if they are still working on

 9   their range project.  The next sentence or it is a

10   question.  Did you get in touch with our attorney

11   about the Chicago range case?  Had you previously

12   informed Mr. Osantowski or suggested that he should

13   get in touch with your attorney?

14        A.    I believe during our meeting in

15   discussing our range relations -- if I remember, he

16   was trying to join -- he wanted to be part of the

17   case or try and build a range in Chicago and he

18   wanted the -- he wanted me to contact our counsel

19   about his desire.

20        Q.    Did Mr. Osantowski mention in that

21   meeting why he wanted to join the lawsuit?

22        A.    I do not know.

23        Q.    Did he bring it up with you?

24        A.    I do not recall.
```



1      Q.    But you recall talking about it during

2    the meeting?

3      A.    I am sure we spoke about it in the

4    meeting.  I do remember him asking me to contact

5    our attorney and see if he could help.

6      Q.    It looks like in your e-mail to

7    Mr. Osantowski, you're telling him to get in touch

8    with your attorney?

9      A.    That could have been.  I may have given

10   him David's number or possibly an e-mail.  I cannot

11   recall.

12     Q.    Do you know whether Mr. Osantowski ever

13   contacted your attorneys in this case?

14     A.    I would have to assume he did.  I think

15   he did from our conversation, but I do not know

16   what has transpired since then.

17     Q.    If you look down at the next entry, the

18   very next day, and it is an incoming e-mail from

19   Mr. Osantowski; is that correct?

20     A.    Yes.

21     Q.    He apologizes for the delay, saying he

22   is busy with several things.  And then he says,

23   We're plotting along in a positive direction and I

24   really do not like being stuck on the timelines of



 1  others.  Do you have any idea what he meant by

 2  that?

 3       A.    I do not.

 4       Q.    When you read that, do you recall what

 5  you interpreted that to mean?

 6       A.    Even now I look at it and wonder.

 7       Q.    Do you think that had something to do

 8  with his plans to proceed with a range in Chicago?

 9       MR. SIGALE:  Objection as to speculation, but

10  if you know, you could answer.

11  BY THE WITNESS:

12       A.    I do not know.

13  BY MR. AGUIAR:

14       Q.    The next line says, He will keep you

15  posted and hopefully he wants to get together in

16  October and give you the latest updates and

17  strategies.  Did you ever meet with him in October?

18       A.    No.

19       Q.    Then it looks like the next

20  communication is in November of 2011, where you

21  inform him that you are going to be in town and you

22  offered to help with this project.  Did you ever

23  hear from him after that?

24       A.    After November 3rd?



1        Q.      Yes.

2        A.      Yes.

3        Q.      When did hear from him after this?

4        A.      We met at the Shot Show and that was the

5   last time I saw him, I believe.

6        Q.      Did you arrange your meeting at the Shot

7   Show?

8        A.      No, John Krupa brought him by our house

9   that we rented.

10       Q.      Where is the Shot Show?

11       A.      Las Vegas.

12       Q.      Oh, that's right.  Thank you.

13               So you met with Mr. Osantowski in Las

14   Vegas?

15       A.      Yes.

16       Q.      And Mr. Krupa?

17       A.      Yes.

18       Q.      Was anyone else present?

19       A.      Just those two.

20       Q.      What did you discuss at that meeting?

21       A.      Honestly, I do not remember.  We had a

22   party at our house for the company and so there

23   were at least 100 people there.  I do not remember

24   talking about the project or anything.



1        Q.    Do you remember talking about the
2    Chicago range ordinance?
3        A.    I do not think so.
4        Q.    After meeting with Mr. Osantowski at
5    your house in Vegas, did you have any
6    communications with him after that?
7        A.    I think we met at the show the next day
8    at our booth and that's all I can recall.
9        Q.    At the show at the booth, how long did
10   you meet with him for?
11       A.    I do not know.  I met with a lot of
12   people that day.
13       Q.    Couple of minutes?
14       A.    A few minutes, yes.
15       Q.    Did you discuss this project at that
16   time?
17       A.    I do not recall.
18       Q.    Did you talk about the gun range
19   ordinance at all?
20       A.    Not that I can recall.
21       Q.    And then after meeting with him at the
22   actual show, have you spoken with him since then?
23       A.    I do not believe so.
24       Q.    So as of today, you do not know the



1   status of his plans to open a range either in

2   Chicago or in the suburbs?

3        A.    I do not.

4        Q.    And is it fair to say, you did not

5   prepare a quote for him?

6        A.    No.

7        MR. AGUIAR:  Off the record for second.

8             (WHEREUPON, a recess was had.)

9   BY MR. AGUIAR:

10       Q.    Back on the record.

11             Looking at your Answers to

12  Interrogatories, No. 1.  The next entry is Ben

13  Henke, H-e-n-k-e.  It says, this is listed under

14  one where a record was created; correct?

15       A.    I do not know.  Was there a record

16  created for him.

17       Q.    If there was, I do not have one?

18       A.    Then there was not one created for him.

19       Q.    I may be wrong, but I do not personally

20  have the record in my possession right now and

21  that's why I am asking the question?

22       A.    I do not believe a record was created

23  for him.

24       Q.    Did Mr. Henke contact you?



1      A.    Yes.

2      Q.    When did he do that?

3      A.    Oh, I do not recall.  It was some time

4   in the past year.

5      Q.    Do you why Mr. Henke contacted you?

6      A.    I wish had something to give you some

7   information.  I think -- well, obviously, he was

8   out of state with that number, but he had a

9   building in Chicago -- no, that's a different guy.

10  I do not know, honestly.

11     Q.    You do not recall anything about your

12  communications with Mr. Henke?

13     A.    I do not.  All I remember is writing

14  down his name and phone number and something about

15  a range in Chicago.

16     Q.    Do you recall speaking with him?

17     A.    I am sure I spoke to him.  He called me.

18     Q.    Did you have any further communications

19  beyond the first phone call, that you recall?

20     A.    I do not think so.

21     Q.    Do you recall speaking with Mr. Henke

22  about compliance with the City's ordinance?

23     A.    I might have.  Honestly, I do not

24  remember the conversation.

1      Q.    You have no specific recollection, as

2  you sit here, about the conversation you had with

3  Mr. Henke?

4      A.    That's true.  Only that he talked about

5  doing a range in Chicago and that's why I wrote

6  down his name and number for future reference.

7      Q.    The next name listed is Brian Kapnick,

8  K-a-p-n-i-c-k.  And there is a parenthetical

9  attached to his name saying, Thinks he has ideal

10  building in Chicago.

11          Do you recall making any written record

12  of your communications Mr. Kapnick?

13      A.    I do not know I did.  I am thinking I

14  wrote his name down under Ben Henke, just as a

15  record for future reference.

16      Q.    So you do not recall any kind of a

17  written record like we have looked at earlier from

18  Mr. Kapnick either?

19      A.    No, I remember searching for it for both

20  of these people and ended up I did not have one in

21  the system.

22      Q.    You had some slip of paper which had

23  their name and number on it?

24      A.    Yes, I had a notebook where I write down



1    all of my notes.  I am sure I wrote something like

2    Chicago and wrote their names under it.

3         Q.    Do you still have that notebook?

4         A.    I might somewhere in my desk.

5         Q.    If I may ask that the witness take a

6    look for that document.  And if you happen to have

7    it, if you could produce it.  If you have not

8    already, I would like that.

9         A.    Yes, if someone makes a formal request

10   for that.

11        MR. SIGALE:  Send me an e-mail, otherwise, I

12   will forget.

13        MR. AGUIAR: No problem.

14        MR. SIGALE:  We will take a look and see what

15   parts are responsive or whatnot.

16   BY MR. AGUIAR:

17        Q.    As you sit here today, do you recall

18   when Mr. Kapnick contacted you?

19        A.    Some time in the past year.  It might

20   have been last summer.  I am not exactly sure.

21        Q.    What do you recall of your

22   communications with Mr. Kapnick?

23        A.    I remember him saying something about he

24   has the perfect building for a range in Chicago.



1        Q.      Did he tell you where this building was?

2        A.      No.

3        Q.      Did he describe the building for you in

4    any way?

5        A.      Not that I can recall.

6        Q.      Did he mention that the building

7    complied with the -- what we call zoning

8    requirements of the gun range ordinance?

9        A.      I do not believe so.

10       Q.      He did not tell you that?

11       A.      He did not tell me that.

12       Q.      He did not tell you one way or the

13   other?

14       A.      I do not think so.

15       Q.      Did you ask any questions about this

16   ideal building?

17       A.      I do not recall what was said, honestly.

18       Q.      Did you have more than communication

19   with Mr. Kapnick?

20       A.      I think it was just the one where he

21   called and another one, and I just wrote down his

22   name and number in case I had to call him in the

23   future.

24       Q.      Do you know what the purpose of



 1  Mr. Kapnick's call was?  Did he tell you?

 2      A.    I know he wanted to put a range in the

 3  building.  I do not know if it was him directly or

 4  if he was looking for people to put a range in it.

 5      Q.    Did he ask for any information about the

 6  cost of installing such a range?

 7      A.    I do not recall.

 8      Q.    Did you ever send any information to

 9  Mr. Kapnick about range design or installation?

10      A.    I do not believe so.

11      Q.    The same question -- let's go back to

12  Mr. Henke, did you ever send him anything?

13      A.    I do not think so.

14      Q.    If you had said sent him something,

15  would you have created a written record?

16      A.    I probably would have.  Even searching

17  for it now, if I had sent them an e-mail, I do not

18  know how I would search for it without their e-mail

19  address.

20      Q.    Do you send out most of your requests by

21  e-mail?

22      A.    What type requests?

23      Q.    Your proposals are sent by e-mail?

24      A.    Yes, they are all sent by e-mail.



CHRISTOPHER HART                                      June 14, 2012
EZELL -vs- CITY OF CHICAGO                                     230

1        Q.    No regular mail?

2        A.    Very few.  Maybe a few a year, at the

3    most.

4        Q.    Do you recall anything else about your

5    communication with Mr. Kapnick that we have not

6    already discussed?

7        A.    I do not.

8        Q.    I am going to skip Mr. Gordon because I

9    believe I do have a copy of the written record of

10   that one, but I do not have it with me right at the

11   moment.  I will have to get to that in a moment.

12   But not to belabor things, but let's skip to No. 7

13   which is Peter Negro, N-e-g-r-o.

14        MR. SIGALE:  It is Negro.

15        MR. AGUIAR:  I was wondering.

16   BY MR. AGUIAR:

17        Q.    And Heather Tarczan, T-a-r-c-z-a-n,

18   there of The Illinois Medical District Commission,

19   No. 12.  I'm sorry, I made mistake.  No. 12 is not

20   the communications with Heather Tarczan at all.

21   Let's mark -- that's something else.  Let's put No.

22   12 aside for the moment and mark this as No. 13.

23

24



1                    (WHEREUPON, certain documents were

2                    marked Hart Deposition Exhibit Nos.

3                    12 & 13, for identification, as of

4                    6/14/12.)

5          MR. SIGALE:  We still will call this 12?

6          MR. AGUIAR:  Yes.

7     BY MR. AGUIAR:

8          Q.    Mr. Hart, the court reporter properly

9     handed to you what has been marked as Deposition

10    Exhibit 13, which appears to be the communications

11    between you and Heather Tarczan of the Illinois

12    Medical District Commission; is that correct?

13         A.    Yes.

14         Q.    And you compiled this as well?

15         A.    Yes.

16         Q.    And the first entry is on August 19,

17    2011.  It reflects there was a meeting and it says

18    there under the annotation, bill and I met with

19    them this week, we're building a seven-lane

20    tactical Capital LE Range.  It has to be completed,

21    done for grant for money by July 31, 2012.  So you

22    met with them prior to August 19th?

23         A.    No, I believe they had called me to set

24    up the meeting.



1      Q.      So you met on August 19th?

2      A.      Probably on August 19th or just before

3    that, if I had gotten back to the office to create

4    this.

5      Q.      They had called you?

6      A.      Yes.

7      Q.      Did you speak with them when they called

8    you?

9      A.      Yes.

10     Q.      What happened in that phone call?

11     A.      They told me they wanted to create an

12   indoor range in their building.

13     Q.      Where is the building located?

14     A.      I do not have it off the top of my head.

15   It is on Roosevelt, 2100 Roosevelt or something

16   like that.

17     Q.      What else was said during that initial

18   conversation?

19     A.      I think they wanted us to come out and

20   see the space.

21     Q.      An is that what you did on August 19,

22   2011?

23     A.      Yes.

24     Q.      Did the meeting occur at the location



1    where the range would be?

2         A.    Yes, it did.

3         Q.    And Bill Provencher?

4         A.    Yes.

5         Q.    That is the guy from Carey Ventilation?

6         A.    Correct.

7         Q.    And what happened at that meeting?

8         A.    We saw the range space and met with him

9    about what they wanted to accomplish and gave them

10   our recommendations for constructing the range and

11   layouts.

12        Q.    It says, seven-lane Tactical LE, Law

13   Enforcement?

14        A.    Yes, law enforcement.

15        Q.    So this would be a range specifically

16   for law enforcement personnel?

17        A.    Yes.

18        Q.    Would it be an exclusive law enforcement

19   range?

20        MR. SIGALE:  I will object to foundation and

21   speculation, but if you know, you can answer.

22   BY THE WITNESS:

23        A.    I do not know that.  I think it was

24   proposed for law enforcement training.  I do not



1   know what agencies would use it.

2   BY MR. AGUIAR:

3       Q.    And by tactical, that's one without the

4   stalls?

5       A.    Correct.

6       Q.    It mentions that it has to be completed

7   by July 31, 2012.  What did they tell you about

8   that?

9       A.    Grant money had to spent by then.

10      Q.    Did they tell you where the grant money

11  was coming from?

12      A.    I do not recall.

13      Q.    At that meeting, did you discuss

14  compliance with the City's gun range ordinance?

15      A.    I do not know that I did.

16      Q.    Did it come up; do you recall?

17      A.    I do not recall.

18      Q.    Did you inquire whether the property on

19  which they wanted to put the range actually met the

20  City's zoning requirements?

21      A.    You know, I do remember asking them

22  about the zoning ordinance and the response was,

23  they do not have to worry about that.

24      Q.    Did you inquire why?



1      A.    No.

2      Q.    Was that the end of the discussion about

3   zoning?

4      A.    I think so.  They were set on

5   constructing this range and nothing was going to

6   stop them.

7      Q.    That's not a concern of yours in your

8   business?

9      A.    It is a law enforcement purpose range,

10  so I did not think there was any concern.

11     Q.    Generally, you do not get involved in

12  the zoning any way?

13     A.    Correct.

14     Q.    You just -- the client comes to you and

15  this is where the range is going to go and that is

16  where you take it from there?

17     A.    That's correct.

18     Q.    Do you recall anything else happening at

19  this meeting on August 19, 2011?

20     A.    We meet with the engineers which was

21  Facilities Solutions Group, it looks like.  Talked

22  about the range and they wanted to see a range we

23  did at Elk Grove Village.

24     Q.    So the building facilities -- the



 1   building engineers are a group called Facilities

 2   Solutions Group?

 3        A.    I believe so.

 4        Q.    How many people were there for them?

 5        A.    There were two.

 6        Q.    They were at this meeting?

 7        A.    Yes.

 8        Q.    Do you recall who they were?

 9        A.    I do not.  One was named Bill Hertzel,

10   if it is there listed, but I do not know the other.

11        Q.    What was the nature of your

12   conversations with the people from Facilities

13   Solutions Group?

14        A.    I believe they were trying to figure out

15   how to do the ventilation and construction of the

16   range.

17        Q.    Did they have any specific concerns that

18   they expressed to you?

19        A.    The one major concern we all had, there

20   was an existing elevator that was in the way of a

21   range sidewall.

22        Q.    Did you discuss how that to resolve that

23   problem?

24        A.    We discussed different options, yes.



1      Q.    Was there a way to actually construct

2   the range without the elevator being a problem?

3      A.    According to us, yes.  They wanted to

4   keep it where it was, which impeded on our design.

5   So we did not come to an agreement at the time.

6      Q.    Did you subsequently come to an

7   agreement with them about that?

8      A.    No.

9      Q.    Why not?

10     A.    I think the project dropped off after

11  that.

12     Q.    The next communication looks like an

13  e-mail from you to Heather Tarczan.  I do not know

14  how you say that.  It looks like a follow-up e-mail

15  to Bill/Bob.  Is that Bill Provencher?

16     A.    Yes.

17     Q.    And Bob -- wait, wait.  Who are Bill and

18  Bob?

19     A.    It might --

20     Q.    Would Bill be Bill Hertzel from

21  Facilities Solutions Group?

22     A.    Yeah, it could have been bill and Bob,

23  yes.

24     Q.    Those are the two people --



1      A.    Because I would not be e-mailing Bill

2  Provencher directly like that.

3      Q.    It says that you were checking to see if

4  there are any questions after touring the Elk Grove

5  Village shooting range.  So after you toured the

6  facility on Roosevelt, you went to the shooting

7  range at Elk Grove Village?

8      A.    No, I think I created this after I got

9  back to the office.  Probably that's what is

10  spurring this on August 19th.  To create the record

11  was their tour of Elk Grove Village.

12      Q.    How soon after the meeting on Roosevelt

13  did people go to Elk Grove Village?

14      A.    I think it was several days or one week

15  later, between that time period.

16      Q.    Did you go to that tour?

17      A.    No.

18      Q.    Do you know who did go?

19      A.    Bill and Bob from Facilities Solutions

20  Group.  I do not know if Heather or Peter Negro

21  went.

22      Q.    It says that you were attaching the

23  range specifications that you sent to Heather and

24  Peter.  Did you prepare a quote for them?



1       A.    I believe I did.  The specifications

2   were a listing of specifications for the equipment

3   that they wanted.  So they could properly bid it

4   per Illinois law.  I do not know if I have a

5   written quote for that one or not.

6       Q.    How did you send them the specifications

7   then?

8       A.    We talked about what equipment it was

9   and I e-mailed the specifications.

10      Q.    And is that e-mail reproduced here?

11      A.    Yes.  So the e-mail on August 19th has

12  the attached specification.

13      Q.    But those are not reproduced here?

14      A.    No, I could get those.  I still have

15  them.

16      MR. AGUIAR:  I do not believe they have ever

17  been produced.  I have not seen them.

18      MR. SIGALE:  You have them.

19      MR. AGUIAR:  We do?

20      MR. SIGALE:  You need to ask Andrew when he

21  did the INDC deposition, they were exhibits.

22      MR. AGUIAR:  Were they produced by Action

23  Target or by Illinois Medical; do you know?

24      MR. SIGALE:  I am pretty sure by Illinois



1    Medical, but I am not 100 percent sure.

2         MR. AGUIAR:  If they were produced by Illinois

3    Medical, we might ask for them to be produced by

4    Action Target as well to make sure they are the

5    same.  I will check into that later and let you

6    know.

7         MR. SIGALE:  Put it in the same e-mail as the

8    notebook or whatever.

9         MR. AGUIAR:  Certainly.

10   BY MR. AGUIAR:

11        Q.    Then it looks like on August 23rd, you

12   spoke with Bill Hertzel at the Facilities Solution

13   Group?

14        A.    Yes.

15        Q.    They toured the range at Elk Grove

16   Village and they will get in touch with you if you

17   needed anything else.  Was that the substance of

18   your entire conversation?

19        A.    I believe so.

20        Q.    Did you talk anything about their plan

21   to open their range?

22        A.    No, I do not think he would even discuss

23   that.  He is the engineer.  He is more of the range

24   design.  The components of the ventilation and



1   such.

2       Q.    Did you speak with Mr. Hertzel about the

3   compliance with the City's range ordinance during

4   that conversation?

5       A.    No.

6       Q.    The next communication looks like is on

7   August 24th, where Heather Tarczan asks you about a

8   flash simulation lighting bar.  And then you

9   responded by saying, you do not offer one.  Then

10  after the next communication is October 14, 2011.

11  Do you recall having any communications with

12  anybody at the Illinois Medical District Commission

13  between October 14th and August 24th?

14      A.    I do not know.  It is possible that I

15  could have called and left a message for them, but

16  I do not believe there was any contact because I

17  was wondering why is it stalling.  I had not heard

18  back.

19      Q.    It looks like Ms. Tarczan in her e-mail

20  says, We are bit stalled on the project right now.

21  When you learned that, did you do anything about

22  that?

23      A.    There is nothing I can do.

24      Q.    Did you call her to discuss it all?



1        A.    I do not believe so.

2        Q.    The next communication is December 20,

3    2011.  And it looks like you are looking for an

4    update on their plan; is that correct?

5        A.    Yes.

6        Q.    Between October and December, did you

7    have any communication with anybody from Illinois

8    Medical District Commission?

9        A.    No.

10       Q.    And after December 20, 2011, did you

11   have contact with them at all?

12       A.    Yes, I stopped by last week when I was

13   in town and Heather was out to lunch.  Peter was

14   not in.  I left my card and catalog just to check.

15   The receptionist said they had not done the range.

16       Q.    Do you know was -- did anybody tell you

17   that the range was actually underway?

18       A.    No, the receptionist said, they did not

19   do the range.

20       Q.    That's all she said?

21       A.    Yes.

22       Q.    And any other communications with the

23   Illinois Medical District Commission about this

24   range?



1      A.    No.

2      Q.    Let's look very quickly at No. 12, the

3  one which was miss marked.  Do you recognize No.

4  12?

5      A.    I do not.  It is not part of my

6  interrogatory here.

7      MR. SIGALE:  This is --

8  BY THE WITNESS:

9      A.    I did create this.

10     MR. SIGALE:  Off the record.

11             (WHEREUPON, a discussion was had off

12              the record.)

13  BY MR. AGUIAR:

14     Q.    Mr. Hart, you have been handed again

15  what is marked Deposition Exhibit No. 12.  Do you

16  recognize this document?

17     A.    Yes.

18     Q.    What is this document?

19     A.    It is an e-mail log and phone log from

20  Jim Kerr at Commercial Range.

21     Q.    Who is Mr. Kerr?

22     A.    Honestly, I am not remembering.

23     Q.    Why don't you take a moment and look at

24  the document.  Let me know if that refreshes your



1    recollection.

2         MR. SIGALE:  This would be privileged, but I

3    will go off the record for a second.

4              (WHEREUPON, a discussion was had off

5                  the record.)

6         MR. AGUIAR:  Just for purposes of the record,

7    a question was pending that Mr. Sigale had a

8    privileged communication with his client.

9         MR. SIGALE:  I apologize.  I did not even

10   realize there was a question pending.  Can you

11   read the question?

12             (WHEREUPON, the record was read

13                  by the reporter.)

14        MR. AGUIAR:  "Do you recognize this document?

15   Who is Mr. Kerr?  I do not know."

16        And the purpose of my record is to make it

17   clear that there as a privileged communication that

18   occurred, that's fine.

19   BY MR. AGUIAR:

20        Q.    Did you have a chance to review Exhibit

21   No. 12?

22        A.    Yes.

23        Q.    Did you review -- excuse me.

24             So reviewing this document did refresh



1    your recollection?

2         A.    Somewhat, yes.

3         Q.    Who is Mr. Kerr, K-e-r-r?

4         A.    He must have been a gentleman that

5    wanted to do a range in Chicago from what it looks

6    like.  He was asking me about doing a Rock Solid

7    Range that would meet a Chicago's approval.

8         Q.    And was this e-mail the first

9    communication you had with him; that you recall?

10        A.    I believe it would have been.  It looks

11   like it by his annotation there, Hello, Chris, I

12   found you on the Action Target website.  That

13   should have been the first contact.

14        Q.    It looks like you responded to Mr. Kerr

15   on March 29, 2012 as well; is that correct?

16        A.    Yes.

17        Q.    Looking at your response which is on

18   Page 2, and what you say in the third sentence is,

19   What I can say is no one is close to doing a range

20   in Chicago, although people are working on it.

21   What people are you referring to?

22        A.    The other people that we mentioned in

23   this case that I have had contact with, where they

24   have collected proposals, but I do not believe that



 1  they have gone through the approval process.

 2       Q.     But you are not referring to anybody

 3  besides those people when you say that?

 4       A.     That's correct.

 5       Q.     And then the next sentence is talking

 6  about your status as a plaintiff in this case.  You

 7  are saying that you are attempting to strike down

 8  the existing Chicago shooting range regulations,

 9  which makes it impossible to build a commercial

10  range in the City.  Then you qualify it as almost

11  impossible, meaning that it could be possible?

12       A.     Correct.

13       Q.     And in terms of the almost

14  impossibility, you are speaking about in your

15  e-mail to Mr. Kerr, were you talking about the same

16  regulations that we have been talking about today?

17       A.     Yes.

18       Q.     When you say that in the next paragraph,

19  that you're attaching the Indoor Range Instruction

20  Kit to help get him started.  What is in the Indoor

21  Range Instruction Kit?

22       A.     It is basically a 50-page PDF document

23  that runs through our equipment options.  There are

24  some documents on proper ventilation systems and



1   there is also an interview with a commercial range

2   owner.

3        Q.    Is this instruction kit specific to any

4   particular jurisdiction?

5        A.    No, it is used all across the U.S.

6        Q.    So you do not tailor that to any

7   particular municipality or jurisdiction?

8        A.    Not at all.

9        Q.    If you look to the next page, the next

10  communication is on March 30th, it looks like; is

11  that correct?

12       A.    Yes.

13       Q.    I want to focus your attention on the

14  second to the last line where you say, We really do

15  need to speak on the phone or in person as to the

16  Chicago range regulations, and there it stops.

17  What did you mean by that line?

18       A.    Meaning, that it is very difficult to

19  explain the regulations via e-mail which is how we

20  have been corresponding.  I would much rather

21  discuss them over the phone than in person.

22       Q.    Had he sent you an e-mail or gotten in

23  touch with you in some manner, expressing some kind

24  of concern with the Chicago range regulations?



1        A.    I do not know.  I do not recall.

2        Q.    Is it possible that you were just

3   fronting the issue for him?

4        A.    Very likely.

5        Q.    It looks like on -- I am seeing that

6   this cut off?

7        A.    That is what it looks like to me.  None

8   of these sentences make sense.  It must be a

9   formatting issue.

10       MR. SIGALE:  What sentence?

11       THE WITNESS:  See this right here

12  (indicating), it is 12 lanes.  Actually, I probably

13  said 12 lanes at 25 yards and 12 lanes at 50 yards

14  because that's what it is.

15  BY MR. AGUIAR:

16       Q.    So this document is not complete from

17  what you are surmising from looking at it?

18       A.    I am guessing some of these sentences

19  are cut off because of the formatting issues.

20       Q.    So you do not know exactly what was

21  written here in its entirety?

22       A.    Not at this time, no.

23       Q.    Let's look at the next entry, it looks

24  like it is April 2nd of 2012; is that right?



 1          A.    Yes.

 2          Q.    And it says an outgoing phone call.  So

 3     you called him?

 4          A.    Yes.

 5          Q.    And it says you spoke for 45 minutes

 6     about doing the range in Chicago.  And then it

 7     says, has lots of ideas to automate point of sales

 8     systems for shooting range.

 9               What did you speak about during your

10     conversation with Mr. Kerr?

11          A.    I do not recall all the details.  I do

12     remember talking about his plans of automation of

13     ranges.  I think there was an Iphone app to

14     register and reserve time on the range.  He wanted

15     all of these systems to be tied together with

16     technology.

17          Q.    At any time, did Mr. Kerr talk about a

18     location for a range?

19          A.    I do not believe so.

20          MR. SIGALE:  Off the record.

21                    (WHEREUPON, a discussion was had off

22                     the record.)

23     BY MR. AGUIAR:

24          Q.    Back on the record.



```
 1            Mr. Hart, would you turn to the last
 2   page of the document.
 3       A.    Yes.
 4       Q.    We were speaking a minute ago about your
 5   e-mail on March 30, 2012 as not being complete.  I
 6   am looking at the last pay, is this a complete
 7   version of the e-mail?
 8       A.    This is.
 9       Q.    Okay.  Then let's turn here to that
10   second to the last paragraph where you say, We
11   really do need to speak on the phone or in person
12   as to Chicago range regulations are quite
13   restrictive on location and operation.
14            Again, do you recall whether this is you
15   just fronting the issue for him or is something in
16   response to a question he had?
17       A.    You have seen the entirety of our
18   conversation by e-mail.  I just wanted to talk
19   verbally instead of writing back and forth.
20       Q.    And did you speak with him about that on
21   April 2nd when you spoke, do you recall?
22       A.    We probably did discuss the regulations.
23       Q.    What did you talk about?
24       A.    I do not know in detail, but just like
```



1   the others, I would talk about what I thought were

2   restrictive ordinances.

3        Q.    Did Mr. Kerr say anything in response to

4   your discussion about the ordinances?

5        A.    I do not recall if he did or not.

6        Q.    At any time, did he tell you it would

7   make it hard for him to open a range in Chicago?

8        A.    I do not know that he did.

9        Q.    Do you know whether in any way he

10  expressed to you that those regulations were going

11  to somehow derail or postpone his plans to open a

12  range in Chicago?

13       A.    I do not have any indication.

14       MR. SIGALE:  Are you asking beyond the

15  language of th e-mail?

16       MR. AGUIAR:  We're in the conversation now on

17  April 2nd.

18       MR. SIGALE:  I'm sorry.

19  BY MR. AGUIAR:

20       Q.    If you look at the next entry, it is on

21  May 7, 2012.  And this looks like an e-mail from

22  Mr. Kerr to you; is that correct?

23       A.    Yes.

24       Q.    He says he as been watching the progress



1    of On-Target, what is that; do you know?

2         A.    Yes, it is a range that we just opened

3    in Crystal Lake.

4         Q.    And, again, Action Target is not the

5    owner of the range?

6         A.    No.

7         Q.    It is a range that you --

8         A.    Constructed.

9         Q.    -- constructed for them.  He says in the

10   next sentence -- next paragraph, I have been

11   reviewing the Chicago regulations, although I think

12   we could meet the requirements, making a profitable

13   business would impossible the way the regulations

14   are worded now.

15            Have you had any conversations with

16   Mr. Kerr about his assertion that it would be hard

17   to have a profitable business?

18        A.    I am sure he alluded to that in our

19   phone call.

20        Q.    Do you recall what he said during the

21   phone call?

22        A.    I do not.

23        Q.    And that predated this e-mail?

24        A.    Yes.



1       Q.    All right.  After the May 7, 2012

2   e-mail, did you have any further communications

3   with Mr. Kerr?

4       A.    Not that I can recall.

5       Q.    You do not know what the status of his

6   plans are to construct a range?

7       A.    I do not.

8       MR. AGUIAR:  We are on No. 14.

9                   (WHEREUPON, a certain document was

10                  marked Hart Deposition Exhibit No.

11                  14, for identification, as of

12                  6/14/12.)

13  BY MR. AGUIAR:

14      Q.    Mr. Hart, you have been handed what I

15  marked as Deposition No. 14.  These are a series of

16  e-mails between you and Jonathan Gordon who is

17  mentioned in your Answer to Interrogatory No. 1.

18  These I do not believe were produced by you.  I am

19  not quite sure who produced them, but do you recall

20  any communication with Mr. Gordon?

21      A.    It looks like we corresponded by e-mail.

22      Q.    Do you recall ever speaking to him in

23  person or over the telephone?

24      A.    Definitely not in person; over the phone



 1    he may have called me.

 2         Q.    You want to take a moment and look at

 3    No. 14, it might help refresh your recollection as

 4    to your dealings with Mr. Gordon?

 5         A.    I believe Jonathan Gordon was someone --

 6         MR. SIGALE:  Is there a question pending or

 7    was there just -- look at the e-mails and let me

 8    know when you are done.

 9    BY MR. AGUIAR:

10         Q.    Have you had a chance to look at No.

11    14?

12         A.    Yes.

13         Q.    Has it refreshed your recollection as to

14    your communication with Mr. Gordon?

15         A.    Somewhat.

16         Q.    What were those communications, to the

17    best of your recollection?

18         A.    I believe he called me asking about a

19    range in Chicago.  Must have been prior to March

20    5th.  I do not know who Curtis is.  There is an

21    e-mail to Curtis.

22         Q.    Are you looking at second page?

23         A.    Yes, that's prior e-mail.

24         Q.    And that would be a Curtis Bettiker,



1    B-e-t-t-i-k-e-r.  You do not know who that is?

2         A.    I do not recognize him, no.

3         Q.    In the middle of the page it looks like

4    you sent him some information?

5         A.    Yes.  For some reason I do not recognize

6    his name, but I did send that e-mail.

7         Q.    Let's look at the -- what you are saying

8    here is, you are giving the contact information for

9    guys you are telling them about.  He has built

10   several high-end ranges in the Chicago area.  Do

11   you happen to know who you are referring to in that

12   instance?  You are saying to Curtis confidential

13   information about the guys that you were telling

14   them about?

15        MR. SIGALE:  I am just going to clarify for

16   the record, this is Jonathan Gordon writing that.

17   BY MR. AGUIAR:

18        Q.    And it is referring to you?  Referring

19   about you?

20        A.    He is trying to set up a call with me

21   because i do not recall what this is.

22        Q.    Thank you for the clarification.  This

23   e-mail is a little confusing.

24        A.    What he did is, he copied and pasted my



CHRISTOPHER HART                          June 14, 2012
EZELL -vs- CITY OF CHICAGO                           256

1    signature from my e-mail, that's why it looks like

2    I wrote it because I have no recollection of this.

3         Q.    I am glad we clarified that, then.  So

4    we are saying that you recall Mr. Gordon being

5    someone who called you to talk about opening a

6    range in Chicago?

7         A.    Yes.

8         Q.    Do you recall anything about his plan or

9    what he was looking to do?

10        A.    I believe he wanted to open a commercial

11   range in the City.

12        Q.    Did he give you any specifications about

13   the range that he was hoping to open in the City?

14        A.    I do not believe so.  I do remember him

15   talking about an alderman.

16        Q.    Do you recall which alderman?

17        A.    I do not know which one.  He said he was

18   with friends with one of the alderman.

19        Q.    Did he say anything else about the

20   alderman?

21        A.    That he could maybe help him get it

22   approved.

23        Q.    Did he talk about a location he had in

24   mind for a range?



1          A.    No.

2          Q.    What kind of range he wanted to open,

3     besides the commercial range?

4          A.    No.

5          Q.    Did you have any further communications

6     with Mr. Gordon?

7          A.    Looks like I sent him an e-mail on March

8     5th.  Maybe that was after our phone call.  I

9     cannot recall.  I sent a copy of the Chicago range

10    ordinance and the subsequent amendment.

11         Q.    You are looking at the first page;

12    right?

13         A.    Yes.

14         Q.    And you referred him to the web page,

15    www.usakerry.com.  Then you say, Here is a good

16    basic breakdown of some of the crazy ones from a

17    blog following the case.  What did you mean by

18    that?

19         A.    I would have to see the web page to

20    recall, but I believe it was a blog -- a news blog

21    that had broken down some of the ordinances and

22    what they entail.

23         Q.    The City's ordinances?

24         A.    City's range ordinances.



CHRISTOPHER HART                                    June 14, 2012
EZELL -vs- CITY OF CHICAGO                                   258

```
 1        Q.    When you say "crazy ones," are you

 2   talking about ones that are difficult in your

 3   opinion to comply with?

 4        A.    I assume that's what I meant.

 5        Q.    Do you recall any other communications

 6   with Mr. Gordon?

 7        A.    I do not believe I had any others.

 8        Q.    Do you know the current status of

 9   Mr. Gordon's plans to open a range in Chicago?

10        A.    I do not.

11        MR. AGUIAR:  No. 15.

12                    (WHEREUPON, a certain document was

13                     marked Hart Deposition Exhibit No.

14                     15, for identification, as of

15                     6/14/12.)

16        THE WITNESS:  Could I correct the record.  The

17   Illinois Medical District Commission, the address

18   is 2100 West Harrison.  I had said Roosevelt

19   previously.

20   BY MR. AGUIAR:

21        Q.    Terrific.  Thank you for that.

22              Mr. Hart, you have been handed what we

23   marked as Deposition Exhibit No. 15.  Do you

24   recognize this document?
```



1        A.    Yes.

2        Q.    Is this the expert report submitted by

3   the plaintiff in this case?

4        A.    The expert report?

5        Q.    Is this one of the documents you

6   reviewed last night in preparation for today's

7   deposition?

8        A.    That's correct.

9        Q.    If you look at the last page, this

10  report was prepared by Lorin, L-o-r-i-n, Kramer,

11  K-r-a-m-e-r, and Jack G. Giordano, G-i-o-r-d-a-n-o,

12  and this report is dated March 16, 2012.

13            Did you ever speak with Mr. Kramer or

14  Mr. Girodano prior to March 16, 2012?

15       A.    Yes.

16       Q.    You did?

17       A.    Yes.

18       Q.    Was it in connection with this report?

19       A.    No, I did not even know they prepared

20  the report for this case.

21       Q.    So you knew Mr. Kramer and Mr. Giordano

22  before the report was prepared?

23       A.    Yes.

24       Q.    How do you know Mr. Kramer?



1      A.    They attend the NRA Range Development

2   Conferences and they are presenters.  We attend

3   every one of those conferences.

4      Q.    How often are those conferences held?

5      A.    Two or three times a year.

6      Q.    These two are always speakers at that?

7      A.    Typically, they are.  I believe Lorin

8   Kramer has not been to the last few I have gone to.

9      Q.    Can you approximate for me, how many

10  conferences you have been at with them?

11     A.    Me personally?  I have been to at least

12  four or five.

13     Q.    And over what time period did those four

14  or five occur?

15     A.    From 2007 until now.

16     Q.    Is that how you met Mr. Kramer and

17  Mr. Giordano?

18     A.    Yes.

19     Q.    So my question to is:  Did you in any

20  way provide them with information to use in this

21  report?

22     A.    No.

23     Q.    Did you speak to them about this report?

24     A.    No.



1      Q.    Have you spoken with them since this

2  report was prepared about the report?

3      A.    No.

4      Q.    So you just reviewed it last night for

5  the first time?

6      A.    I had not seen this document until last

7  night.

8      Q.    I wanted to ask you -- I want to go back

9  to the sloped floor for just a moment.  In your

10 experience in working in this industry and in

11 constructing and designing ranges, does the

12 existence of a sloped floor pose any potential

13 hazard, that you are aware of?

14     A.    Only when accompanied by a floor grade.

15     Q.    So a sloped floor with a drain can cause

16 a problem?

17     A.    The drain itself can cause a problem

18 which is the reason for the sloped floor, I assume.

19     Q.    How would the drain cause a problem?

20     A.    The accumulation of gunpowder.

21     Q.    Could remain in the drain?

22     A.    Yes.

23     Q.    What is the hazard?

24     A.    Gun powder when exposed out in the open



```
 1   is usually not explosive, but when it is

 2   concentrated in a small area, such as down a pipe

 3   or in high concentrations, it can became explosive.

 4        Q.    How would it become explosive in a pipe?

 5   I am assuming it is water that has washed down the

 6   drain?

 7        A.    Water would wash down and when it is

 8   wet, obviously, it cannot explode or catch on

 9   firer, a flash fire, but when it does dry out it

10   can become flammable again.

11        Q.    And what would be required to make it

12   flammable besides the dry out?

13        A.    It would to have some type of ignition,

14   I would assume.

15        Q.    And if it is in a pipe, how would there

16   be an ignition that you would know of?

17        A.    Certainly a bullet skip off the drain

18   cover or a deflector above the drain certainly can

19   cause that.

20        Q.    So if someone -- I am just trying to

21   understand.  If someone were to shoot a firearm and

22   to skim the top of the drain, that can cause a

23   spark that could cause an ignition within the

24   drain?
```



1       A.    Yes.

2       Q.    Is there another way there could be a

3  combustible problem with the gunpowder in the

4  drain?

5       A.    No, that's the only way I can think of.

6       Q.    Unless someone dropped a match down

7  there?

8       A.    Well, a unreasonable one, yes.

9       Q.    In your experience in working in this

10 industry, how often do bullets skim the drains,

11 have you ever seen that happen?

12      MR. SIGALE:   I am just going to object on

13 the -- it is too late.  I am going to object that

14 it assumes facts not in evidence.  The question

15 assumes that he knows of ranges with drains --

16 floor drains down by the bullet traps or down the

17 lane.  So I am objecting on that ground.

18 BY MR. AGUIAR:

19      Q.    Have you ever been to a range that has a

20 drain?

21      A.    Yes.

22      Q.    In any of your experiences going to

23 these ranges, have you ever seen a bullet skim the

24 top of a drain?



1        A.    I am typically not their when they are

2   shooting because I am inspecting downrange, so they

3   would be shooting while I am making my visits, no.

4        Q.    But you have been to ranges on your own?

5        A.    I have bullet impacts on the drain.

6        Q.    What do you mean by bullet impacts?

7        A.    Where a bullet has impacted and left an

8   imprint or left a piece of lead.  Many times when

9   there is a floor drain, there will be a deflector

10  in front and you could see bullet strikes on the

11  deflector.

12       Q.    You are looking at evidence showing a

13  bullet has hit this drain?

14       A.    That's correct.

15       Q.    So you have -- I guess evidence is

16  external, but you have indications that bullets

17  have hit drains before?

18       A.    Absolutely.

19       Q.    Would a slope that doesn't have a drain

20  pose the same kind of hazard?

21       A.    Only on a tactical range where it might

22  somewhat uneven for the people walking downrange.

23       Q.    So that would be a risk of injury to the

24  people on the range?



1        A.    Yes.

2        Q.    It would not be a flammable issue?

3        A.    No.

4        Q.    Other than the injury that someone can

5   incur on a tactical range from a sloped floor, is

6   there any other hazard posed by a sloped floor that

7   does not have a drain?

8        A.    No.

9        Q.    And just to sum up, in looking again

10  back at the complaint, paragraph 25, and the

11  provisions that are listed therein, the plaintiffs

12  are claiming, impact the ability to open a range in

13  the City of Chicago.  You have not engaged in any

14  kind of analysis of how much more expensive these

15  provisions make it to do a range in Chicago?

16       A.    No.

17       MR. AGUIAR:  Okay.  Give me one minute.  I

18  believe I have no further questions at this time.

19  However, I am, as I have done at the other

20  deposition, leaving the deposition open, there are

21  outstanding discovery responses due from the

22  plaintiffs.  And I expect we are going to get into

23  motion practice on those, to the extent that

24  further responses do come in, I reserve my right to



1   call the witness back to ask questions about those

2   responses.  I hope not to do that, but I reserve my

3   right.  I am leaving the dep open.  Reserve my

4   right to respond to any questions by Mr. Sigale.  I

5   am done at the moment.

6        MR. SIGALE:  With regard to keeping it open, I

7   reserve my right to object vociferously when that

8   occasion arises, if that occasion arises.

9                    EXAMINATION

10  BY MR. SIGALE:

11       Q.    Okay.  With that said, Chris, I want to

12  take you back to paragraph 25 of the complaint.

13  And the first bullet point at the bottom where we

14  are talking about the challenge ordinances.  And it

15  is actually on Page 6, the language that I care

16  about.  It is a section regarding sections 4-151

17  and -010, which is actually a definition section

18  and 4-151030.

19            Very early in the deposition you had

20  stated your belief that possibly you would wind up

21  in the category of "applicant", and thus barred

22  from participating because as an out-of-state

23  resident you could not get a FOID card which is a

24  requirement.  Do you recall that discussion?



1     A.    Yes.

2     Q.    Now, Action Target is not planning --

3  has no present plans to own a range; correct?

4     A.    That's correct.

5     Q.    In Chicago.  So I want you to make an

6  assumption that as it states in here, that

7  applicant includes attorneys, accountants,

8  consultants, expediters, promoters and lobbyists.

9  Were you referring to one of those categories when

10  you were testifying early in the deposition that

11  Action Target might find itself barred from

12  participation?

13     A.    Yes, under consultants.

14     Q.    Okay.  So you believe -- strike that.

15          So your understanding of the ordinance

16  is to the extent that Action Target would be a

17  consultant on the project that might have to be

18  disclosed in the application process.  The fact

19  that you do not have FOID card, would void you from

20  the process?

21     A.    Yes, and the fact that I cannot obtain a

22  FOID card.

23     Q.    Because your understanding is, that

24  non-Illinois residents are barred from doing so?



1      A.      That's correct.

2      Q.      There was a -- in the answers to

3  interrogatories -- now, I am going to Exhibit 2.

4  You have the answers to interrogatories.  You can

5  probably keep -- well, not that page.  Question 8,

6  and somewhere in the discussion, probably around

7  8-F, so the next page.  The requirement or the

8  restriction on replacing older ammunition by

9  firing it in the range and then departing with

10  fresh replacements.  What is your understanding

11  from your review of the ordinance of what the

12  effect of that part is?

13      A.      I think it would impact the safety of

14  those using the range.

15      Q.      Well, let me backup.  I will ask you

16  about that.  Let me backup one step.

17          Do you understand that restriction as

18  meaning, that someone who buys ammunition -- say, a

19  box of ammunition to use at the range, but when

20  they are done shooting at the range has not used up

21  all of the bullets -- let's say they have a

22  half-a-box of ammunition left over, what would they

23  be required to do with it?

24      A.      They definitely have to leave it at the



1    range.

2         Q.    So what is that -- now, the range owner

3    has a half-a-box of ammunition that the customer

4    had to leave behind -- and I want you to assume

5    that for purposes of this question.  What are the

6    options to the range owner to do with that half

7    empty box of ammunition?

8         MR. AGUIAR:  Objection.  Form and foundation.

9    BY MR. SIGALE:

10        Q.    You can answer if you understand the

11   question.

12        A.    He can repackage it for sale, which I

13   would not recommend.

14        Q.    Why is that?

15        MR. AGUIAR:  Objection.  Form and foundation.

16   BY THE WITNESS:

17        A.    He probably does not have insurance to

18   manufacturer ammunition or repackage it.  The other

19   thing is, you should never shot any ammunition that

20   you are not sure of or loading.  If have a box of

21   ammunition that has been open, all bets are off of

22   who produced it.  Where it came from.  How it is

23   loaded.  It is safety issue.  You can also choose

24   to dispose of the ammunition.



1      Q.    Is that -- in your experience, is that a

2    beneficial option?

3      MR. AGUIAR:  Objection.  Foundation.

4    BY THE WITNESS:

5      A.    No, it is not.

6    BY MR. SIGALE:

7      Q.    Why is that?

8      A.    Well, it is a waste of good ammunition

9    that could be fired and also disposing of it can be

10   hazardous and costly.

11     Q.    How so could it be hazardous?

12     MR. AGUIAR:  Objection.  Foundation.

13   BY MR. SIGALE:

14     Q.    To the extent you know?

15     A.    You got ammunition -- how do you

16   properly dispose of loaded rounds?  I do not know.

17   I do not know if there is a proper way to do so

18   according to the ATF.

19     Q.    ATF, Bureau of Alcohol, Tobacco and

20   Firearms?

21     A.    Yes.

22     Q.    You were asked a lot questions regarding

23   the various provisions of the ordinance and

24   Mr. Aguiar was asking you, are you basing your



1   answers on your reading of the ordinance, and you

2   said yes during that testimony.  That's a

3   paraphrase and you said yes.  Were you also basing

4   your answers, though, on experience in the

5   industry?

6        A.    Absolutely.

7        Q.    And your observation of ranges that you

8   have visited?

9        A.    Yes.

10        Q.    And was there training involved in your

11   career?

12        A.    Yes.

13        Q.    So your answers, if I am understanding

14   correctly, were not just words on page in a vacuum,

15   you were also drawing on these life experiences?

16        A.    I was drawing on my experience, plus the

17   hundreds of ranges that I visit every year.

18        Q.    Earlier you had talked about how all the

19   ranges that you go to have a store as part of it?

20        A.    Yes.

21        Q.    And then there was a part of the

22   conversation about -- if there is a range on the

23   site, then you could rent a firearm, and that

24   rental might be for enjoyment or trying it out and



1   that rental might be a prelude to a purchase?

2       A.     Correct.

3       Q.     I was unclear about something you said,

4   and I just want to clarify it.  In those situations

5   when you are renting and thinking of buying -- or,

6   well, let's restrict it to renting, thinking and

7   buying.  Are you renting the exact -- does the

8   owner rent out the exact firearm the person is

9   thinking of buying or do they rent out like the

10  same model?

11      MR. AGUIAR:  Objection to the form.

12      THE WITNESS:  Sounds the same.  Could you

13  restate the question?

14  BY MR. SIGALE:

15      Q.     Sure.  You had talked about earlier,

16  that once a firearm is fired, the value decreases

17  and it is not a new firearm anymore; is that right?

18      A.     Yes.

19      Q.     So what I am asking is, the ranges that

20  you go to where they rent firearms as a prelude to

21  purchasing the firearm, that 9 mil, I like that,

22  maybe I am thinking about buying it.  Let me try it

23  out.  Does the owner or the manager give them the

24  exact firearm to try out or do they give them a



 1   similar 9 mil of the same model, so that you are

 2   not ruining the newness of the one they want to

 3   buy, but they still try out --

 4        A.    They typically --

 5        MR. AGUIAR:  Objection.  Form and foundation.

 6   BY THE WITNESS:

 7        A.    They will typically rent from a rental

 8   firearm group in the case.  If they do not have a

 9   rental firearm that meets the needs of what the

10   customer wants, they may choose to take one off the

11   shelf that is brand new and they do a rental, if

12   that person ends up buying it, so be it.  It is

13   used now.  It can go either way.  Typically, a

14   dedicated a group of guns for rental and then give

15   you an identical when you want to purchase.

16   BY MR. SIGALE:

17        Q.    Okay.  Is it fair to say, Chris, that

18   part of your description is sales?

19        A.    That is my job description, yes.

20        Q.    So perhaps any potential -- like any

21   sales person who is trying to get customers,

22   sometimes they buy and sometimes they do not.  Does

23   the customer always tell you the reason why they do

24   not buy?



 1        MR. AGUIAR:  Objection.  Form.  Foundation.  I

 2   am going to throw it in, relevance.

 3   BY THE WITNESS:

 4        A.    Very few times do they tell us why they

 5   did not purchase.

 6   BY MR. SIGALE:

 7        Q.    So based on your experience, you have

 8   been working for Action Target for seven years, I

 9   think; is that right?

10        A.    Yes.

11        Q.    Mr. Aguiar was asking you questions

12   about, has anyone told -- various provisions of the

13   ordinance and discussing them, saying has anyone

14   told you that they are not building a range for

15   this reason or because of this ordinance or this

16   section or that section?  It is likely they would

17   not have told you that is the reason; is that

18   correct?

19        MR. AGUIAR:  Objection, form and foundation.

20   BY THE WITNESS:

21        A.    That's correct.

22   BY MR. SIGALE:

23        Q.    Okay.  And as we seen in some of these

24   e-mails threads and contact threads that are part



 1    of the evidentiary record of this deposition,

 2    sometimes they just do not call back?

 3         A.    That's correct.

 4         Q.    You testified earlier that floor drains

 5    on ranges are a potential safety hazard?

 6         A.    Yes.

 7         Q.    I believe you also testified earlier

 8    than that, like the NRA like before ten years ago,

 9    might have had floor drains in their design, but

10    phased them out because that's not the industry

11    standard anymore?  Am I saying that right?

12         A.    That's correct.

13         Q.    As to sloped floor, you testified how

14    with the floor drain that contributes to the hazard

15    and without a floor drain, it does -- the sloped

16    floor does not have a safety hazard?

17         A.    That's correct.

18         Q.    As you sit here, can you think of a

19    benefit having a sloped floor with no floor drain?

20         A.    No, I cannot think of a benefit.

21         Q.    And as you testified earlier with

22    regards to having to jackhammer the floor and the

23    added -- presumed added construction costs, you --

24    as you sit here today, would it be fair to say that



 1  your belief with regard to a sloped floor, no

 2  benefit, added costs?

 3       MR. AGUIAR:   Objection.   Form and foundation.

 4  BY MR. SIGALE:

 5       Q.    Is that a fair conclusion to derive from

 6  what you were testifying to?

 7       A.    That's correct.

 8       Q.    You have reviewed the ordinances that

 9  are being challenged in the complaint listing --

10  strike all of that.

11            The ordinances that are specifically

12  being challenged by a section number in the

13  complaint, you have reviewed them; correct?

14       A.    Yes, I have.

15       Q.    To the extent you know, how many ranges

16  does the City of Chicago own for the use by its

17  police force?

18       A.    I believe there are six.  Well, there

19  are two at the academy.  Six or seven, depending on

20  how you count.

21       Q.    Have you visited any of those ranges?

22       A.    I visited at least three of those.

23       Q.    Which ones?

24       A.    Area 5 which is 5555 West Grand.  1300



1  West Jackson and I have been to both of these

2  ranges at the academy.  I have made efforts to

3  visit two others, but have not made it inside of

4  the range because of personnel being off duty.

5          MR. AGUIAR:  I would like a continuing

6  objection to any questions regarding the CP ranges

7  on the grounds of relevancy.  Those ranges are

8  specifically by ordinance, grandfathered out of

9  compliance with these regulations because they

10  existed before these regulations went into

11  existence.  Therefore, a discussion of them is

12  wholly irrelevant.  So I will have a continuing

13  objection regarding anything to do the CPD ranges.

14  Proceed.

15  BY MR. SIGALE:

16          Q.    Okay.  The 5555 West Harrison, did I say

17  that right?

18          A.    Grand Avenue.

19          Q.    Are there -- you personally observed

20  that range?

21          A.    Yes.

22          Q.    Are there any sections of the ordinance

23  with regard to the challenge sections, in regards

24  to the bullet points in the complaint with which



1  the 5555 Grand police range is not in compliance or

2  would not be compliance, were it required to be in

3  compliance?

4      MR. AGUIAR:  I object to the form of the

5  question.  Insofar as some of these simply do not

6  apply to a CPD range.

7  BY MR. SIGALE:

8      Q.    You could answer the question?

9      A.    A quarter-inch floor slope.

10     Q.    Does it have that?

11     A.    I do not believe it does.  It looks like

12 a totally flat floor to me.

13     Q.    Any others that you recall offhand?

14     A.    It was certainly over the 55 BB because

15 it was hurting my ears just standing in the control

16 room.  I do not know where you would measure that

17 from.

18     Q.    Okay.  Any others?

19     A.    I did not look around the area to see if

20 it was within 500 feet --

21     Q.    Let's leave aside the zoning questions,

22 the manufacturing district and the 500 feet

23 restrictions.

24     A.    They certainly do use the range beyond



1   the hours of 8:00 a.m. and 9:00 p.m.  Well,

2   actually, switch it from 9 a.m. to 8:00 p.m.

3        Q.    Right, right.  My typo is coming back to

4   haunt all of us.  Any others that you recall from

5   your observations?

6        A.    I think that's it.

7        Q.    When did you visit that range?

8        A.    I made it by there last week.

9        Q.    Do you recall specifically what date?

10       A.    It was -- I think it was Wednesday.

11       Q.    So that would be about June 6th?

12       A.    I think it was June 6th.

13       Q.    The same question with regard to the

14   academy ranges that you visited.  Were they subject

15   to the requirements of the ordinance, what sections

16   would they not be in compliance with?  I am not

17   asking about the zoning parts.

18       A.    Okay.  The same, the floor slope, it is

19   a totally flat floor.

20       Q.    Both of them?

21       A.    I believe so.

22       Q.    Okay.

23       A.    One of them was shut down when I was

24   there for maintenance issues.  Ventilation, I



1    believe.

2         Q.    Okay.

3         A.    But the challenged regulations, I

4    believe those were the only ones.  Well, also the

5    500-foot rule because there is a school right next

6    to the academy.  I believe it is within 500 feet.

7         Q.    As you sit here today, do you recall any

8    other requirements of the ordinance beyond what is

9    in the challenged sections with which either the

10   5555 Grand or the two academy ranges would not be

11   in compliance with.  If you need to look at the

12   ordinance, that's fine as well.

13        A.    Where is the ordinance?

14        Q.    You do not have it as an exhibit?

15        A.    I do not, no.

16   MR. SIGALE:  Just strike the question.  I

17   believe I will leave that alone for now.  I will

18   take one minute and speak to my client.  I may have

19   nothing else.

20              (WHEREUPON, a recess was had.)

21   BY MR. SIGALE:

22        Q.    Back on.  Chris, I just have one more

23   little line of questioning for you and I think from

24   my perspective we are done here.



1           Could you state for the record the
2    ranges in the Chicagoland area -- in fact, I will
3    just even backtrack on that.  The ranges in
4    Northern Illinois that Action Target has built,
5    let's start with since July of 2011?
6        A.    Okay.  We did Kap Guns, and Loves Park.
7    We did On Target.
8        Q.    I'm sorry, I will ask you this about Kap
9    Guns and Love's Park and then I will ask you for
10   all the others.
11          Can you just give a couple of words as
12   to whether it is an indoor range or if it is a
13   commercial range?
14       MR. AGUIAR:  I will just object as to the
15   relevancy of these questions.
16   BY THE WITNESS:
17       A.    Cap guns is a commercial range, open to
18   the public.
19   BY MR. SIGALE:
20       Q.    Indoor or outdoor?
21       A.    Indoor range.
22       Q.    Okay.  Any others?
23       A.    On target is a large 24-lane range in
24   Crystal Lake.  Both pistol and rifle ranges.



1   Indoor, open to the public.  They also do law

2   enforcement training and civilian training as part

3   of their curriculum.

4            We did Bensenville PD, the police

5   department.  We did the Hanover Park Police

6   Department.  We did the Aurora Police Department.

7   We are doing this range in McHenry, that we are for

8   the contract for and it has not been built yet.

9   Then I got two more in the northern suburbs.  One

10  we have been working on in Skokie and the other I

11  cannot disclose, that we mentioned earlier.

12      Q.    Can you disclose the one in Skokie as

13  indoor or outdoor?

14      A.    All indoor.

15      Q.    Commercial?

16      A.    All commercial.

17      Q.    If I go back one more year to 2010

18  around the time the lawsuit was first brought,

19  roughly, July-something of 2010, are there

20  additional ranges that were built or --

21      A.    Additional law enforcement ranges.

22      Q.    Not commercial?

23      A.    Not commercial.

24      Q.    Okay.  To your knowledge, since the



 1 │ court's decision in July of 2011, whereby an

 2 │ Appellate Court known as the 7th Circuit made a

 3 │ ruling that Chicago had to allow firing ranges

 4 │ within the City limits at which time the City

 5 │ passed the ordinance that is being challenged here.

 6 │ How many commercial ranges has Action Target built

 7 │ in Chicago?

 8 │     MR. AGUIAR:  I will first object to the

 9 │ characterization of the 7th Circuit's decision and

10 │ that's it.

11 │ BY THE WITNESS:

12 │     A.   In the City of Chicago, zero.

13 │ BY MR. SIGALE:

14 │     Q.   Do you believe that if somebody else

15 │ were building a range in the City of Chicago, you

16 │ would have heard about it?

17 │     MR. AGUIAR:  Objection.  Foundation.

18 │ BY THE WITNESS:

19 │     A.   I would have heard about it very

20 │ quickly.

21 │ BY MR. SIGALE:

22 │     Q.   Have you heard of anything?

23 │     A.   I have not.

24 │     MR. SIGALE:  That's all I have.



1          MR. AGUIAR:  Just a couple of quick ones.

2                    FURTHER EXAMINATION

3   BY MR. AGUIAR:

4          Q.    Talking about the CPD ranges, you

5   mentioned that the ones you visited were not in

6   compliance with certain provisions of the

7   ordinance, were they applicable to those ranges?

8   You said, for instance, one of them would not have

9   complied with the sound requirements?

10         A.    Yes.

11         Q.    I think you mentioned that the sound was

12  hurting your ears from the operator's booth?

13         A.    Correct.

14         Q.    Did you actually measure the sound?

15         A.    No.

16         Q.    You do not know for a fact that it would

17  exceed?

18         A.    I know that the sound pressure level was

19  certainly hurting my ears, but, no, I do not know

20  know level.

21         Q.    Okay.  You also testified that you think

22  the ranges were open beyond the hours of operation

23  that are allowed by the city's ordinance for a

24  commercial range; correct?



1          A.      Yes.

2          Q.      Didn't you testify earlier, that it is

3     just common for law enforcement ranges to be open

4     extra hours to accommodate the shifts that law

5     enforcements typically work?

6          A.      Yes.

7          Q.      So what CPD is not out of the norm with

8     respect to law enforcement ranges that you are

9     aware of?

10         A.      That's right.

11         MR. AGUIAR: Nothing further.

12         MR. SIGALE:  Just one more, just to go to

13    Mr. Aguiar's decibel question.

14                      FURTHER EXAMINATION

15    BY MR. SIGALE:

16         Q.      Your understanding as a lay person, but

17    also using a decibel meter in the past, as you

18    testified before.  55 decibels, what noise level is

19    approximately 55 decibels?

20         A.       70 decibels is a normal conversation in

21    a room.  So 55 would certainly be under a normal

22    conversation voice.

23         Q.      The noise you were talking at the CPD

24    range in the control room, louder or softer or the



1   same as a normal conversation?

2        A.    It is quite a bit louder.

3        MR. AGUIAR:  One more follow up.

4                 FURTHER EXAMINATION

5   BY MR. AGUIAR:

6        Q.    You did not observe that noise outside

7   of the range itself; did you?  You were in the

8   operator's room; correct?

9        A.    It is in the basement, I could not be

10  outside of the wall of the basement.

11       Q.    So you were actually fairly close to the

12  range when you heard that?

13       A.    In the control room.

14       Q.    You were not actually outside of the

15  range area?

16       A.    That is correct.

17       Q.    You were not outside of the building?

18       A.    It was in a separate area of the range

19  basement, but yes --

20       Q.    You were not outside of the building?

21       A.    No.

22       Q.    You do not know what sound emanates from

23  outside of the range, you were actually inside of

24  the range area?



```
 1        A.    Yes.

 2        Q.    You did not test it?

 3        A.    Did not.

 4        MR. AGUIAR:   I am assume you are reserving?

 5        MR. SIGALE:  Yes.

 6        MR. AGUIAR:   I will order.  No rush.

 7        MR. SIGALE:  I will let you know if I am going

 8   to take a copy.

 9             FURTHER DEPONENT SAITH NOT.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



1  STATE OF ILLINOIS    )

2                       )  SS:

3  COUNTY OF DU PAGE    )

4           I, CAROL RAYMOND, CSR No. 84-001077, a

5  Notary Public within and for the County of DuPage,

6  State of Illinois, and a Certified Shorthand

7  Reporter of said state, do hereby certify:

8           That previous to the commencement of the

9  examination of the witness, the witness was duly

10 sworn to testify the whole truth concerning the

11 matters herein;

12          That the foregoing deposition transcript

13 was reported stenographically by me, was thereafter

14 reduced to typewriting under my personal direction

15 and constitutes a true record of the testimony

16 given and the proceedings had;

17          That the said deposition was taken

18 before me at the time and place specified;

19          That I am not a relative or employee or

20 attorney or counsel, nor a relative or employee of

21 such attorney or counsel for any of the parties

22 hereto, nor interested directly or indirectly in

23 the outcome of this action.

24          IN WITNESS WHEREOF, I do hereunto set my



1  hand of office at Chicago, Illinois, this 30th day

2  of June, 2012.

3

4

5

6

7          Notary Public, Cook County, Illinois.

8          My commission expires 6/9/2015.

9

10  CAROL RAYMOND, CSR No. 84-001077

11

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1                    I N D E X

 2    WITNESS                    EXAMINATION

 3      CHRISTOPHER HART

 4    By Mr. Aguiar              3, 108, 284, 286

 5    By Mr. Sigale              266, 285

 6             X E H I B I T S

 7    NUMBER                          PAGE/LINE

 8    Hart Deposition Exhibit No. 1        8/1

 9    Hart Deposition Exhibit No. 2        12/16

10    Hart Deposition Exhibit No. 3        132/15

11    Hart Deposition Exhibit No. 4        142/11

12    Hart Deposition Exhibit No. 5        153/17

13    Hart Deposition Exhibit No. 6        160/11

14    Hart Deposition Exhibit No. 7        170/1

15    Hart Deposition Exhibit No. 8        174/12

16    Hart Deposition Exhibit No. 9        187/8

17    Hart Deposition Exhibit No. 10       199/14

18    Hart Deposition Exhibit No. 11       213/9

19    Hart Deposition Exhibit No. 12       231/1

20    Hart Deposition Exhibit No. 13       231/1

21    Hart Deposition Exhibit No. 14       253/9

22    Hart Deposition Exhibit No. 15       258/12

23

24
```



1                    DEPOSITION ERRATA SHEET

2

3    Assignment No. 344414

4    Ezell vs. City of Chicago

5

6            DECLARATION UNDER PENALTY OF PERJURY

7

8            I declare under penalty of perjury that I

9    have read the entire transcript of my Deposition

10   taken in the captioned matter or the same has been

11   read to me, and the same is true and accurate, save

12   and except for changes and/or corrections, if any,

13   as indicated by me on the DEPOSITION ERRATA SHEET

14   hereof, with the understanding that I offer these

15   changes as if still under oath.

16

17                    Signed on the _____ day of

18                    _____, 20____.

19                    _____

20                    CHRISTOPHER HART

21

22

23

24



```
 1                    DEPOSITION ERRATA SHEET

 2     Page No._____Line No._____Change to:_____

 3     _____

 4     Reason for change:_____

 5     Page No._____Line No._____Change to:_____

 6     _____

 7     Reason for change:_____

 8     Page No._____Line No._____Change to:_____

 9     _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23     SIGNATURE:_____DATE:_____

24                    CHRISTOPHER HART
```



```
 1                   DEPOSITION ERRATA SHEET

 2     Page No._____Line No._____Change to:_____

 3     _____

 4     Reason for change:_____

 5     Page No._____Line No._____Change to:_____

 6     _____

 7     Reason for change:_____

 8     Page No._____Line No._____Change to:_____

 9     _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23     SIGNATURE:_____DATE:_____

24                   CHRISTOPHER HART
```

