Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 1 of 102 PageID #:5078

JULIANNE VERSNEL                                   June 11, 2012
EZELL vs. CITY OF CHICAGO                                      1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                      EASTERN DIVISION

 4

 5   RHONDA EZELL, JOSEPH I. BROWN,        )

 6   WILLIAM HESPEN, ACTION TARGET, INC., )

 7   SECOND AMENDMENT FOUNDATION, INC.,    )

 8   and ILLINOIS STATE RIFLE ASSOCIATION,)

 9                    Plaintiffs,          )

10   vs.                                   ) No. 10 C 5135

11   CITY OF CHICAGO,                      )

12                    Defendant.           )

13

14          The deposition of JULIANNE VERSNEL,

15   called for examination, taken pursuant to the Federal

16   Rules of Civil Procedure of the United States District

17   Courts pertaining to the taking of depositions, taken

18   before MARILYN T. LaPORTE, a Notary Public within and

19   for the County of Cook, State of Illinois, and a

20   Certified Shorthand Reporter of said state, at Suite

21   1230, Conference Room 1, 30 North LaSalle Street,

22   Chicago, Illinois, on June 11, 2012, at 9:40 a.m.

23

24
```



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 2 of 102 PageID #:5079

JULIANNE VERSNEL                                      June 11, 2012
EZELL vs. CITY OF CHICAGO                                         2

```
 1   PRESENT:

 2        LAW FIRM OF DAVID G. SIGALE, P.C.,

 3        (739 Roosevelt Road, Suite 304,

 4        Glen Ellyn, Illinois  60137,

 5        630-452-4547), by:

 6        MR. DAVID G. SIGALE,

 7               appeared on behalf of the Plaintiffs;

 8

 9

10

11

12        OFFICE OF THE CORPORATION COUNSEL,

13        CITY OF CHICAGO,

14        (30 North LaSalle Street, Suite 1230,

15        Chicago, Illinois  60602,

16        312-744-7129), by:

17        MR. ANDREW W. WORSECK,

18               appeared on behalf of the Defendant.

19

20

21

22

23   REPORTED BY:  MARILYN T. LaPORTE, CSR, RPR

24               CSR CERTIFICATE NO. 84-2095.
```



JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      3

```
 1                  (WHEREUPON, the witness was duly

 2                  sworn.)

 3                  JULIANNE VERSNEL,

 4    called as a witness herein, having been first duly

 5    sworn, was examined and testified as follows:

 6                       EXAMINATION

 7    BY MR. WORSECK:

 8         Q.    Good morning, Ms. Versnel.

 9         A.    Good morning.

10         Q.    Welcome back to Chicago.

11         A.    Thank you.

12         Q.    Just for the record, could you state and

13    spell your name, please?

14         A.    It's Julianne Versnel.  It's

15    J-u-l-i-a-n-n-e.  V-e-r-s-n-e-l.

16         Q.    And can you state your current title?

17         A.    Yes.  Director of operations for the

18    Second Amendment Foundation.

19         Q.    And do you recall being deposed in this

20    case, I guess, back in 2010 --

21         A.    Yes.

22         Q.    -- in connection with the initial version

23    of the complaint and the preliminary injunction motion

24    that the Plaintiffs filed?
```



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 4 of 102 PageID #:5081

JULIANNE VERSNEL                                      June 11, 2012
EZELL vs. CITY OF CHICAGO                                         4

1        A.    Yes.

2        Q.    We spent a lot of time in those

3   depositions going through your background and talking

4   about SAF.  I don't want to rehash that territory

5   today if we don't have to.

6             So I'll simply ask has anything about your

7   position as director of operations changed since your

8   prior depositions in this case in terms of general

9   duties, and things like that?

10       A.    No.

11       Q.    And the purposes and mission of SAF, the

12  Second Amendment Foundation, which I'll refer to as

13  SAF going forward, that's more or less the same; is

14  that correct?

15       A.    Yes.

16       Q.    And at your first set of depositions you

17  describe some other employment activities that you

18  had.

19             Do you recall that?

20       A.    Yes.

21       Q.    And have those changed since your last

22  deposition?

23       A.    No.

24       Q.    Have you taken on any additional



1  employment opportunities outside of SAF since your

2  last deposition?

3       A.   No.

4       Q.   I asked last time about how many members

5  SAF has in Chicago.

6            As you sit here today, do you have an idea

7  or an estimate as to how many members of SAF live in

8  Chicago today?

9       A.   Between 1700 and 1800.

10      Q.   Does SAF have any physical offices in

11  Chicago?

12      A.   No.

13      Q.   Aside from having members who live in

14  Chicago, does SAF have any other presence or

15  connection to Chicago?

16      MR. SIGALE:  Besides the lawsuit?

17      MR. WORSECK:  Right.  In terms of its

18  operations.

19  BY THE WITNESS:

20      A.   No.

21  BY MR. WORSECK:

22      Q.   You don't hold meetings in Chicago for

23  instance?

24      A.   Oh, yes.  We have held meetings in



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 6 of 102 PageID #:5083

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                        6

 1   Chicago.

 2        Q.    Can you describe the meetings that SAF has

 3   held in Chicago, let's say, since October 2010?

 4        A.    Let's see.  September 2010 we held our

 5   25th annual --

 6        MR. SIGALE:  September 2011, though, right?

 7   BY THE WITNESS:

 8        A.    Oh, September 2011.  Okay.  They all begin

 9   to blur.

10             Right.  2011.  Sorry.  We held our 26th

11   annual gun rights policy conference at the Chicago

12   Hyatt airport.  They begin to blur.

13   BY MR. WORSECK:

14        Q.    Sure.

15        A.    And we had about 600 people in attendance.

16   Say, a two and a half day conference.

17        Q.    Any other meetings or conferences?

18        A.    Not that I recall.

19        Q.    And that meeting having taken place in

20   September 2011, it's fair to say that that was after

21   the City had amended its ordinance to -- instead of

22   banning shooting ranges to allow shooting ranges

23   subject to regulation?

24        MR. SIGALE:  Just to be clear, I'm not trying to



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 7 of 102 PageID #:5084

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                        7

 1   be argumentative here.

 2              Are you asking her to confirm that

 3   September 2011 came after July 2011 in time?

 4        MR. WORSECK:  I will take that answer.  That's

 5   not what I asked.

 6   BY MR. WORSECK:

 7        Q.   Assuming that the City's ordinance was

 8   amended in July 2011, the September 2011 SAF

 9   conference in Chicago was after that amendment,

10   correct?

11        A.   Yes.

12        Q.   Was there any discussion or presentation

13   at the SAF conference in Chicago about the City's new

14   regulations for shooting ranges?

15        A.   I believe so.

16        Q.   Can you tell me, first of all, was that a

17   formal presentation, or was that sort of an informal

18   discussion?

19        A.   A formal presentation.

20        Q.   Who gave the presentation?

21        A.   It was given by lawyers.

22        Q.   Which lawyers?

23        A.   Alan Gura would have been one of them, and

24   anyone else I cannot -- I simply could not specific --



1  with certainty say who they were.

2        Q.    Are there any guesses that you have?

3        A.    Speculative.

4        Q.    That's fine.

5        A.    I can't remember for sure.

6        Q.    But you are sure that whoever the

7  additional presenters or speakers were that they were

8  attorneys?

9        A.    Yes.

10       Q.    There was no, for instance, range

11  manufacturer or range builder who was part of this

12  presentation?

13       A.    No.

14       Q.    Is it fair to say that the presentation

15  dealt with the legal parameters of this lawsuit, or

16  was it more of a technical discussion about building

17  shooting ranges, and requirements for shooting ranges,

18  and things like that?

19       A.    It was legal.

20       Q.    Do you recall if any of the specific

21  provisions of Chicago's range regulations were

22  discussed in the presentation?

23       A.    If the lawsuit -- let me rephrase that.

24  To discuss the lawsuit, one must discuss the



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 9 of 102 PageID #:5086

JULIANNE VERSNEL                                        June 11, 2012
EZELL vs. CITY OF CHICAGO                                          9

 1  parameters of the range ordinance.

 2      Q.    So that's, yes?  They were discussing some

 3  of the provisions of the ordinance?

 4      A.    Yes.

 5      Q.    Aside from that presentation, were there

 6  any other presentations at the conference relating to

 7  Chicago's new range regulations?

 8      A.    I don't recall.

 9      Q.    Was the conference open to non-SAF

10  members --

11      A.    Yes.

12      Q.    -- or was it limited?

13      MR. SIGALE:  Make sure he's finished his

14  question.  It's difficult for Marilyn to take both of

15  you talking at the same time.

16      THE WITNESS:  Sorry.

17      MR. SIGALE:  And that way you're sure of what

18  the question is.

19  BY MR. WORSECK:

20      Q.    I'm not going to ask you to try to recall

21  the names of specific people who might have been there

22  who weren't SAF members, but can you just describe the

23  kinds of people who would have been there if they

24  weren't SAF members?



1          MR. SIGALE:   I object to the form of the

2     question.   But if you understand it, go ahead and

3     answer.

4     BY THE WITNESS:

5          A.    Members of the general public who are

6     interested in the Second Amendment right.

7     BY MR. WORSECK:

8          Q.    Any other category of person?   Media, for

9     instance?   Legislators?   Other government officials?

10         A.    Yes.

11         Q.    Was there a written document that

12    accompanied the presentation about Chicago's new

13    shooting range regulations or -- let me just ask that

14    question first.

15         A.    No.

16         Q.    Was there an agenda for the conference

17    that would have referenced this presentation?

18              A summary that would have given a few

19    lines, a few sentences about what this presentation

20    would be about?

21         A.    No.

22         Q.    Was there an agenda?

23         A.    Yes.

24         Q.    Aside from an agenda, were there any other



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 11 of 102 PageID #:5088

JULIANNE VERSNEL                                        June 11, 2012
EZELL vs. CITY OF CHICAGO                                            11

1   documents used or distributed at the conference that

2   would have referenced this presentation?

3        A.   No.

4        Q.   Do you know if Chris Hart or anyone else

5   from Action Target was present at the conference?

6        A.   I don't recall him being there.

7        Q.   Were there any people at the conference

8   who were from other shooting range manufacturing

9   companies?  Meggitt, for instance, or any other

10  companies like that?

11       A.   Not to the best of my knowledge.

12       Q.   We talked about a few of these upcoming

13  topics, again, at your previous depositions, but I

14  just want to confirm that nothing has changed since

15  then.

16            Does it remain the case that SAF has never

17  built a shooting range?

18       A.   Yes.

19       Q.   And does it remain the case that SAF has

20  never operated a shooting range?

21       A.   Yes.

22       Q.   And does it remain the case that SAF has

23  never managed a shooting range?

24       MR. SIGALE:  I'm just going to object as to the



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 12 of 102 PageID #:5089

JULIANNE VERSNEL                                            June 11, 2012
EZELL vs. CITY OF CHICAGO                                            12

 1 | form of the question.

 2 |           I mean, SAF is an organization.  So are

 3 | you asking if the organization has never -- the

 4 | organization's never managed one, or are you asking if

 5 | Ms. Versnel has never managed one?

 6 |      MR. WORSECK:  The organization.

 7 | BY THE WITNESS:

 8 |      A.    And the last question specifically was

 9 | regarding?

10 | BY MR. WORSECK:

11 |      Q.    Management of shooting ranges.

12 |      A.    No.

13 |      Q.    And has SAF submitted an application to

14 | the City of Chicago under the City's new shooting

15 | range regulations --

16 |      A.    No.

17 |      Q.    -- seeking a license to operate a range?

18 |      A.    No.

19 |      Q.    And I think this is probably true, but

20 | correct me if I'm wrong.

21 |           You, yourself personally have never built

22 | a shooting range?

23 |      A.    No.  I have not.

24 |      Q.    Or operated a shooting range?



1        A.     No.  I have not.

2        Q.     Or managed a shooting range?

3        A.     No.  I have not.

4        Q.     Or submitted an application to the City of

5    Chicago for a shooting range in the city?

6        A.     No.  I have not.

7        Q.     Are you aware of anyone who has applied

8    for a shooting range license with the City of Chicago?

9        A.     No.  I have not.  No.  I am not.  Sorry.

10       Q.     Sure.  Does SAF want to build a shooting

11   range in Chicago?

12       A.     No.

13       Q.     Does it want to manage a shooting range in

14   Chicago?

15       A.     No.

16       Q.     Does it want to operate a shooting range

17   in Chicago?

18       A.     No.

19       Q.     We talked last time about how SAF had an

20   interest, or a desire, or what have you about

21   providing education and training in Chicago.

22              Does that remain the case?

23       A.     Yes.

24       Q.     And specifically does SAF have an



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 14 of 102 PageID #:5091

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                     14

1   intention or desire to provide training regarding

2   shooting of firearms?

3         MR. SIGALE:  I'm going to object as to the form

4   of the question.  If you understand it, go ahead and

5   answer.

6   BY THE WITNESS:

7         A.    I need it to be clarified, please.

8   BY MR. WORSECK:

9         Q.    Let me ask it this way.  If there were

10  shooting ranges that opened for business in Chicago,

11  would SAF like to have any role with respect to what

12  goes on in those ranges?

13        MR. SIGALE:  Object as to form.  If you

14  understand, go ahead.

15  BY THE WITNESS:

16        A.    I need you to be more specific, please.

17  BY MR. WORSECK:

18        Q.    Well, one of the things that goes on in a

19  shooting range is the discharge of guns at a target,

20  correct?

21        A.    Yes.

22        Q.    And there are often instructors at the

23  range who will help teach patrons how to do that

24  properly?



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 15 of 102 PageID #:5092

JULIANNE VERSNEL                                            June 11, 2012
EZELL vs. CITY OF CHICAGO                                              15

1      A.    Yes.

2      Q.    Is that something that SAF would like to

3  be involved in in Chicago?

4      A.    SAF is not interested in becoming shooting

5  instructors.

6      Q.    Is there any other task that SAF does have

7  an interest in performing or assisting in inside the

8  four corners of a shooting range?

9      A.    Yes.

10     Q.    And what are those?

11     A.    Education about Second Amendment rights.

12 Education about the core civil right of self-defense.

13 Education about safety.

14     Q.    Anything else?

15     A.    Just general historical Second Amendment

16 background.

17     Q.    And those are topics or subjects that the

18 SAF would like to teach about inside a shooting range?

19     A.    Yes.

20     Q.    For instance, in a classroom in a shooting

21 range?

22     A.    Yes.

23     Q.    Would the SAF have flyers, or pamphlets,

24 or handouts available at the shooting range?



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 16 of 102 PageID #:5093

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                    16

1              Is that something SAF would like to do?

2        A.    Yes.

3        Q.    Are there any other ways that SAF would

4    like to teach about these subjects to people at a

5    shooting range?

6              MR. SIGALE:  I object as to the form of the

7    question.  You mean in Chicago, or do you mean

8    anywhere?

9              MR. WORSECK:  Right.  In Chicago.

10   BY THE WITNESS:

11       A.    At this point that is all I can think of.

12   I may come up with something later.

13   BY MR. WORSECK:

14       Q.    Sure.  Does the SAF have any interest in

15   advising people about how to apply for a range license

16   with the City?

17       A.    No.

18       Q.    Does the SAF have any interest in advising

19   people on how to comply with the shooting range

20   requirements?

21             MR. SIGALE:  Object as to form.  If you

22   understand, go ahead.

23   BY MR. WORSECK:

24       Q.    I want to distinguish those from the



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 17 of 102 PageID #:5094

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      17

1  training requirement that individuals need to satisfy

2  to get a CFP in Chicago.

3       A.    Can you rephrase, please?

4       Q.    Sure.  Aside from the range training

5  requirement for individuals to get the four hours of

6  training, does SAF have any interest in advising, say,

7  range builders or range operators on how to comply

8  with the City's regulations governing the construction

9  and operation of a shooting range?

10      A.    I'm unclear how that is different from the

11  question you just asked me previously.

12      Q.    One set of Chicago requirements govern the

13  actual building of a shooting range.  A lot of

14  technical specifications, environmental

15  specifications, and the like.

16           Then they also discuss how that shooting

17  range would be operated.  Hours of operation.  What

18  kind of people can come in.  Those kinds of things.

19  That's the set of regulations I'm talking about.

20           Does SAF have any interest in advising

21  applicants, or range builders, or range owners, or

22  range operators on how to comply with that set of

23  requirements?

24      A.    No.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 18 of 102 PageID #:5095

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      18

1          MR. WORSECK:  Can I mark this as Exhibit 1,

2    please?

3                         (WHEREUPON, a certain document was

4                         marked Versnel Deposition Exhibit

5                         No. 1, for identification, as of

6                         06/11/2012.)

7    BY MR. WORSECK:

8          Q.    Ms. Versnel, you've just been handed a

9    copy of Exhibit 1, which is the Amended Complaint in

10   this lawsuit.

11               And I take it you've read through this

12   before at some point in time; is that correct?

13         A.    Yes.

14         Q.    Take as much time as you want right now to

15   look through it again, if you'd like.  But when you're

16   ready, I'm just going to focus on a few pages of the

17   document.

18               And you've brought your own copy I see out

19   of your folder there?

20         A.    Yes.

21         Q.    If you'll turn to Page 5 of Exhibit 1,

22   you'll see starting on the very bottom of Page 5, and

23   running through the end of Page 7, there's a series of

24   bullet points, and each bullet point cites a provision



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 19 of 102 PageID #:5096

JULIANNE VERSNEL                                                June 11, 2012
EZELL vs. CITY OF CHICAGO                                               19

1   or two of Chicago's new range ordinance.

2            Do you see that portion of the complaint?

3       A.    Uh-huh.

4       Q.    I'd like to focus your attention on the

5   bottom of Page 5.  The first bullet point.

6            That bullet point references Chicago

7   Municipal Code Sections 4-151-010 and 4-151-030?

8       A.    Yes.

9       Q.    And the complaint then reads, after citing

10  those provisions, "which require all range managers,

11  employees, and 'applicants' be fingerprinted and have

12  a Chicago Firearms Permit ('CFP') and an Illinois

13  Firearms Owners Identification Card, ('FOID')."

14           Do you see that running on to the top of

15  Page 6?

16      A.    Yes, I do.

17      Q.    Are you aware of any person or entity that

18  has tried to comply with that requirement?

19      MR. SIGALE:  I'm going to object to the form of

20  the question.

21           And by way of a little bit of more

22  explanation, I don't -- I think it's unclear how one

23  actually complies with this.  So I don't know if

24  you're asking if she knows anyone who has a CFP.  I



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 20 of 102 PageID #:5097

JULIANNE VERSNEL                                          June 11, 2012
EZELL vs. CITY OF CHICAGO                                            20

1  don't know if you're asking if she knows anyone that

2  ever got fingerprinted.  Anyone has a FOID card.

3          I don't know how you actually comply with

4  that.  So that's my objection.

5      MR. WORSECK:  Sure.

6      MR. SIGALE:  Over that objection, if you

7  understand the question, go ahead and answer it.

8  BY THE WITNESS:

9      A.    Are you asking me do I know of any

10  attorneys, accountants, consultants, expediters,

11  promoters, or lobbyists who have a Chicago Firearms

12  Permit and a FOID?

13  BY MR. WORSECK:

14      Q.    Well, I didn't ask you that, but do you

15  know the answer to that question?  The one you just

16  rephrased?

17      A.    No.

18      Q.    And to try to get back to my question, are

19  you aware of anyone, either an individual or an

20  entity, that has tried to meet these requirements that

21  we just looked at in the first bullet point on Page 5

22  in the Chicago ordinance who has attempted to have its

23  range managers, or prospective range managers,

24  prospective employees get the various approvals



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 21 of 102 PageID #:5098

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                     21

 1 | discussed in the first bullet point here?

 2 |       MR. SIGALE:  I'm, again, just going to object to

 3 | the form of the question.  I'm also going to object to

 4 | assuming facts not in evidence.

 5 |       But if you know someone like that, go

 6 | ahead and say so.

 7 | BY THE WITNESS:

 8 |     A.   At this moment, the way that the question

 9 | is phrased, based on the previous questions, no.

10 | BY MR. WORSECK:

11 |     Q.   Are you aware of any person or entity,

12 | excluding attorneys, your attorneys in this case

13 | obviously who have made arguments about this

14 | provision, but aside from your attorneys, are you

15 | aware of any person or entity that has expressed a

16 | criticism or a displeasure with this requirement?

17 |     A.   The Plaintiffs.

18 |     Q.   Aside from the Plaintiffs.

19 |     A.   No.

20 |     Q.   Are you aware of any study or analysis

21 | that has been done with respect to this requirement

22 | in terms of feasibility or cost that it would take

23 | to comply with the requirement?

24 |     A.   No.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 22 of 102 PageID #:5099

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      22

1    Q.    Do you have any idea of how much it would

2 cost to operate a range in Chicago that would comply

3 with this requirement?

4    MR. SIGALE:  I'm -- if you have an answer, go

5 ahead and answer.

6 BY THE WITNESS:

7    A.    Minimally, the cost would be the cost of

8 a FOID, the cost of the class to get the CFP, and the

9 cost of a search to find attorneys, accountants,

10 consultants, expediters, promoters, and lobbyists who

11 had those two items.

12 BY MR. WORSECK:

13    Q.    And I won't ask you to tell me what the

14 cost of getting a FOID or a CFP is, but those costs

15 are set forth in statutes and regulations, and we can

16 all figure out what those are.

17        As far as the search that you just

18 mentioned, do you have any idea about how much that

19 would cost to run that search?

20    MR. SIGALE:  I'm going to object as to

21 speculation.

22 BY THE WITNESS:

23    A.    I could only speculate.

24



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 23 of 102 PageID #:5100

JULIANNE VERSNEL                                June 11, 2012
EZELL vs. CITY OF CHICAGO                                   23

```
 1   BY MR. WORSECK:
 2        Q.    Your speculation is fine.  Your attorney's
 3   objected so the record will be what it is.
 4        A.    In my opinion, it would be both expensive
 5   in time and in monetary expenses to find the
 6   individuals who met these two requirements because
 7   it's a very limited field when one is looking for
 8   attorneys, consultants, expediters, promoters,
 9   lobbyists, partners, managers, et cetera.
10        Q.    Do you have any idea of how much time it
11   would take?
12        A.    No.  I do not.
13        Q.    Do you have any idea of how much money it
14   would take?
15        A.    No.  I do not.
16        Q.    Are there any other costs that you're
17   aware of that a person would incur, aside from the
18   cost of applying for and getting a CFP and applying
19   for and getting a FOID card, to be someone eligible
20   under this provision?
21             Well, let me ask it this way.  You
22   mentioned that you think there's a limited set of
23   people who would qualify to be an attorney for a
24   range, or to be a promoter, or a banker, or what have
```



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 24 of 102 PageID #:5101

JULIANNE VERSNEL                                          June 11, 2012
EZELL vs. CITY OF CHICAGO                                              24

1   you.

2          Say people who don't currently have CFP

3   cards or FOID cards are interested in tapping into

4   this new business opportunity.  So they want to go

5   out -- say there are attorneys in Chicago who want to

6   go out and CFPs and FOID cards so they can be eligible

7   to be a range attorney in Chicago.

8          Aside from the cost of getting the CFP and

9   the FOID card, are you aware of any other cost that

10  that kind of person would incur in order to be someone

11  who would be eligible to be hired by a range operating

12  in Chicago?

13     A.     The time requirements.

14     Q.     Aside -- okay.  For getting those two

15  licenses?  Is that what you're talking about?

16     A.     Yes.

17     Q.     Aside from the time and the money that it

18  would take that individual to get the licenses, are

19  you aware of any other costs?

20     A.     Not that I can bring to mind at this time.

21     Q.     Have you had any discussions with anyone

22  about this requirement in the first bullet point on

23  the bottom of Page 5 aside from your attorneys?

24     A.     With members of the general public.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 25 of 102 PageID #:5102

JULIANNE VERSNEL                                          June 11, 2012
EZELL vs. CITY OF CHICAGO                                             25

1       Q.    And what was discussed in those

2   conversations?

3       A.    The requirements that one have a CFP

4   and one have a FOID in order to participate in the

5   application to build a range.

6       Q.    Did the discussions touch upon any

7   difficulties or burdens associated with these

8   requirements?

9       MR. SIGALE:  I'm just going to object.  Do you

10  mean burden in a legal sense, or are you meaning it in

11  a lay sense?

12      MR. WORSECK:  In a lay sense.

13  BY THE WITNESS:

14      A.    In a general manner, yes.

15  BY MR. WORSECK:

16      Q.    Can you be any more specific?

17      A.    The permitting process to build a range in

18  Chicago is unique to the industry, and, therefore, a

19  topic of general conversation in the fact that it is

20  so spectacularly unique.

21      Q.    In your conversations, did anyone express

22  to you the view that this requirement was too

23  difficult to satisfy?

24      A.    In a general sense, yes.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 26 of 102 PageID #:5103

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      26

1        Q.    What do you mean by that?

2        A.    The provisions in Chicago's ordinance

3   concerning construction of shooting ranges --

4        Q.    I just want to stop you here and just

5   focus on this provision that we've been talking about.

6   The requirements to have a FOID and a CFP.

7        A.    By attorneys, accountants, consultants,

8   expediters, promoters, and lobbyists it limits the

9   possible individuals in the State of Illinois because

10  they are the only people who can get a FOID.

11       Q.    And is that a sentiment that people were

12  expressing to you, or is that just your view?

13       A.    A matter of general discussion.

14       Q.    Has anyone ever said to you, "I would

15  really like to build a range in Chicago, but I can't

16  because of the requirements regarding people

17  associated with the range operation or management

18  needing to have a FOID and/or a CFP card"?

19       A.    No.

20       Q.    Are there any benefits to requiring these

21  individuals to have a FOID and/or a CFP card?

22       MR. SIGALE:   I'm going to object as to the form

23  of the question.   You need to define who these people

24  are.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 27 of 102 PageID #:5104

JULIANNE VERSNEL                                          June 11, 2012
EZELL vs. CITY OF CHICAGO                                           27

1          MR. WORSECK:  The persons required to have a

2    FOID and/or a CFP card that we've been talking about.

3          MR. SIGALE:  Well, that's a broad list.

4          MR. WORSECK:  The list here on Page 6 of your

5    complaint.

6          MR. SIGALE:  So are you asking Ms. Versnel to go

7    down the list and answer as to each person listed in

8    the complaint, or do you have a specific person in

9    mind in your question?  A specific category of person

10   in your question?

11   BY MR. WORSECK:

12        Q.    My question is are there any benefits that

13   you can think of as to requiring any kinds of people

14   listed at the top of Page 6 in your complaint

15   requiring those people to have a FOID or a CFP card if

16   they're going to be associated with the ownership,

17   management, or operation of a shooting range?

18        A.    No.

19        MR. SIGALE:  That's fine.  Your answer's fine.

20   BY THE WITNESS:

21        A.    May I?  I need to amend that if I can.

22   The advantage would be they would be complying with

23   the law as it currently stands now.

24



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 28 of 102 PageID #:5105

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                        28

1   BY MR. WORSECK:

2        Q.     That's the only advantage you can think

3   of?

4        A.     That's the only advantage I could think

5   about.

6        Q.     Are you aware of any shooting range

7   operating anywhere else in the country that has a

8   requirement similar to this requirement that we've

9   been discussing regarding the licensing of people

10  associated with the shooting range?

11       A.     I am not aware of any city that has a

12  licensing requirement such as the Chicago Firearms

13  Permit for individuals who work in a shooting range.

14             I am not aware of any state that has a

15  requirement similar to the FOID for people to work at

16  shooting ranges.

17       Q.     And it's fair to say that you or the SAF

18  doesn't like this requirement?  You're seeking to have

19  it invalidated, correct?

20       MR. SIGALE:  I'm just going to object as to the

21  form of the question.

22             She's a Plaintiff in a lawsuit that's

23  challenging this provision as unconstitutional.  I

24  think it's self-evident she doesn't like it, but I



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 29 of 102 PageID #:5106

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                     29

1  can't tell if you're -- but my objection is as to

2  form.

3           I can't tell if you're asking as to

4  Ms. Versnel, or are you asking as to some

5  organizational platform?

6  BY MR. WORSECK:

7       Q.    Well, the SAF, as a Plaintiff in this

8  lawsuit, would like to have this provision regarding

9  the licensing of people associated with the shooting

10 range to be invalidated, correct?  That's what you're

11 seeking here?

12      A.    The licensing via the Chicago Firearms

13 Permit and the requirement of the FOID, yes.

14      Q.    Right.  The requirements of

15 Sections 4-151-010 and 4-151-030?

16      A.    Yes.

17      MR. SIGALE:  And I'm just going to object to the

18 extent you're asking about a document that speaks for

19 itself.

20 BY MR. WORSECK:

21      Q.    Would your view change as to the soundness

22 or appropriateness of this requirement if, say, for

23 instance, the NRA had a publication recommending or

24 supporting this kind of requirement?



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 30 of 102 PageID #:5107

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      30

1        MR. SIGALE:  Objection.  Speculation.  But you

2   can go ahead and answer.

3   BY THE WITNESS:

4        A.    No.

5   BY MR. WORSECK:

6        Q.    And what if Action Target was on board

7   with this kind of requirement, would that change your

8   view?

9        A.    No.

10        Q.    So is it fair to say your view on this

11  provision is a matter of belief and principle and

12  doesn't really turn on whether experts in the field

13  have a problem with the requirement?

14        MR. SIGALE:  I'm going to object as to the form

15  of the question.

16  BY THE WITNESS:

17        A.    I believe you asked me multiple things

18  in one question that I can't answer with one word.

19  BY MR. WORSECK:

20        Q.    Does your view on the soundness, or the

21  appropriateness, or the validity of the licensing

22  requirements that we've been talking about, the CFP

23  and FOID license requirements, does that depend on

24  what experts in the range field think, or is that a



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 31 of 102 PageID #:5108

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      31

1  matter of the SAF's belief about the soundness of

2  these requirements?

3       MR. SIGALE:  I'm going to object as to form of

4  the question.

5            You asked about validity and you asked

6  about appropriateness, and those are two sep -- your

7  question applies that they're synonyms, and they're

8  actually two very different things.  One, of course,

9  being an opinion.  And one, of course, being a legal

10 conclusion.

11 BY THE WITNESS:

12      A.    Can you split that into two questions,

13 please?

14 BY MR. WORSECK:

15      Q.    Yes.  Let me ask it this way.  Would SAF's

16 views on these requirements change in any way if

17 industry experts viewed the requirements as being

18 fine?

19      A.    No.

20      Q.    Focusing back on Page 6, the first bullet

21 point on that page, but it's actually the second

22 bullet point in the long list of bullet points, it

23 references Chicago Municipal Code

24 Section 4-151-030(f).



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 32 of 102 PageID #:5109

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      32

1              Do you see that?

2        A.    Yes, I do.

3        Q.    And that section talks about the

4   Commissioner having the authority to deny a range

5   application based on various grounds.

6              Do you see that?

7        A.    Yes, I do.

8        Q.    Based on your prior testimony today, I

9   assume it's safe to say that you're not aware of any

10  person or entity that has had to face that requirement

11  because no applications have been filed to your

12  knowledge; is that correct?

13       A.    Correct.

14       Q.    Have you had any discussions with anyone

15  aside from your attorneys about this requirement or

16  this provision of the ordinance?

17       A.    Yes.

18       Q.    Who did you have those with?

19       A.    Various individuals.

20       Q.    Can you recall any specific individuals?

21       A.    No.

22       Q.    What was discussed?

23       A.    The general nature of the requirements and

24  the potentially arbitrary and capricious nature by



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 33 of 102 PageID #:5110

JULIANNE VERSNEL                                        June 11, 2012
EZELL vs. CITY OF CHICAGO                                         33

 1 | which these could be invoked.
 2 |     Q.    Did you discuss Section 4-151-030(f) with
 3 | anyone who wanted to build a shooting range in
 4 | Chicago?
 5 |     A.    No.  To the best of my knowledge, no.
 6 |     Q.    Then if I can direct you down to the next
 7 | bullet point, which cites Section 4-151-090.
 8 |     A.    Yes.
 9 |     Q.    And that section talks about the hours of
10 | operation being between 8:00 a.m. and 9:00 p.m.?
11 |     A.    Yes.
12 |     Q.    Have you had any discussions with anyone
13 | who wanted to operate a range in Chicago about this
14 | requirement?
15 |     A.    No.
16 |     Q.    Are you aware of any analysis or estimate
17 | that has been conducted regarding the cost or expense
18 | associated with operating a range in Chicago that
19 | would have to comply with this hours of operation
20 | requirement?
21 |     A.    Not specifically.
22 |     Q.    Generally, what do you have in mind?
23 |     A.    Generally, these are very limiting hours
24 | in terms of shooting ranges because it restricts the



1    use and the potential customers of the range.

2          Q.    But you're not aware of any analysis or

3    study that's been done to determine, for instance, how

4    much profit would be lost because of these hours of

5    operation?

6          A.    Not in terms of the Chicago Municipal

7    Code, no.

8          Q.    Nothing that said, "Well, if they're open

9    between 8:00 a.m. and 9:00 a.m., we might expect 'X'

10   amount of patrons and 'X' amount of revenue.  But if

11   they were open, instead, 24 hours, we would have 'Y'

12   patrons and 'Y' revenue"?

13              You're not aware of anything like that?

14         A.    Not in terms of the Chicago Municipal

15   Code.

16         Q.    Are you aware of that kind of analysis as

17   to any other set of regulations?  Some other

18   jurisdiction?

19         A.    Not in terms of regulations, no.

20         Q.    Are you aware of any study or analysis

21   with respect to hours of operation in general, and

22   profitability, and cost associated with having certain

23   hours of operation?

24         A.    Yes.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 35 of 102 PageID #:5112

JULIANNE VERSNEL                                      June 11, 2012
EZELL vs. CITY OF CHICAGO                                        35

1        Q.     What is that?

2        A.     One is contained in the expert opinion.

3        Q.     Submitted in this case?

4        A.     Yes.

5        Q.     Aside from the expert report, is there

6   anything else you have in mind?

7        A.     Only anecdotal evidence.

8        Q.     Can you tell me what that is?

9        A.     Speaking with range owners.

10       Q.     Which range owners?

11       A.     Various range owners and the various

12   ranges I've been to.

13       Q.     Is it something that you've just kind of

14   done from time to time over the years as you've

15   visited various ranges?

16       MR. SIGALE:  I'm sorry.  I object to the form of

17   the question.  This being what?

18   BY MR. WORSECK:

19       Q.     Talking with range owners about

20   profitability and hours of operation.

21       A.     It's part of a general discussion of how a

22   range operates.

23       Q.     Did those discussions address profit or

24   cost estimates as they relate to hours of operation?



```
 1        A.     Not specifics.

 2        Q.     So these were just general discussions

 3   about the more hours that you're open, the more

 4   patrons you can have in, and the more money you might

 5   be able to make, but there's nothing breaking that

 6   down with any specificity; is that fair to say?

 7        A.     Yes.

 8        Q.     Have you had any of those discussions

 9   since the new Chicago regulations were enacted in July

10   of 2011?

11        A.     No.

12        Q.     Have you had any discussions on that topic

13   with the authors of the expert report that was

14   submitted in this case?

15        A.     No.

16        Q.     Have you had any discussions with the

17   authors of the expert report in this case?

18        A.     No.

19        Q.     Do you know if any of the Plaintiffs have?

20        A.     No.  I do not.

21        Q.     Do you know if anyone else at SAF has?

22        A.     To the best of my knowledge, no one has.

23        Q.     Are you aware of any benefits that come

24   with limiting hours of operation to 9:00 a.m. to
```

1   9:00 p.m.?

2        A.    No.  I am not.

3        Q.    If an industry expert said that they were

4   fine with having hours of operation between 8:00 a.m.

5   and 9:00 a.m., would that change your view or SAF's

6   view as to the validity of that requirement?

7        A.    No.

8        MR. SIGALE:  Objection as to form and

9   speculation.  You can go ahead and answer, though.

10  BY THE WITNESS:

11       A.    No.

12  BY MR. WORSECK:

13       Q.    Have you heard testimony or other evidence

14  from a City of Chicago person, say a police officer,

15  or someone involved with public safety, and they tried

16  to explain to you why this was a good requirement for

17  public safety, would that change your view?

18       A.    No.  It would not.

19       Q.    Then moving on to the next bullet point on

20  Page 6, which cites Section 4-151-100(d), and that

21  talks about limiting -- imposing an age requirement of

22  18 years of age in order to use the range?

23       A.    Yes.

24       Q.    Aside from your attorneys, have you



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 38 of 102 PageID #:5115

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      38

 1   discussed that provision with anyone?

 2        A.    In general discussions, yes.

 3        Q.    Who did you discuss that with?

 4        A.    Various people.

 5        Q.    Can you list them?

 6        A.    No, I can't.

 7        Q.    Have you discussed that requirement with

 8   anyone who wants to open a shooting range in Chicago?

 9        A.    No.  I have not.

10        Q.    Have you discussed that requirement with

11   anyone following the enactment of Chicago's range

12   regulations in July 2011?

13        A.    Yes.

14        Q.    Can you think of who you spoke with within

15   that timeframe?

16        A.    Again, general discussions about the

17   Chicago firearms range ordinance.

18        Q.    But this specific requirement for it being

19   18 years of age, can you recall discussing that with

20   anyone?

21        A.    Not specific individuals, no.

22        Q.    Are you aware of any study or analysis

23   estimating costs, profits associated with having an

24   18-year-old -- a requirement of 18 years of age versus



1  not having that requirement for a shooting range?

2      A.   I refer to the expert's report in that,

3  again, it limits the audience.

4      Q.   Aside from the expert's report, are you

5  aware of any other study or analysis on that issue?

6      A.   No, I'm not.

7      Q.   Do you, yourself have any estimate or idea

8  in your own mind about how much profit that's cutting

9  off?

10     A.   No.  I do not.

11     MR. SIGALE:  Objection as to foundation.

12  BY MR. WORSECK:

13     Q.   Have you, aside from your attorneys,

14  discussed the expert report with anyone?

15     A.   No.  I have not.

16     Q.   Are you aware of anyone who wants to

17  operate a range in Chicago but can't because of this

18  age requirement?

19     MR. SIGALE:  I'll object as to the form of the

20  question.  If you understand it, go ahead and answer.

21  BY THE WITNESS:

22     A.   No.  I am not.

23  BY MR. WORSECK:

24     Q.   I don't know if I asked you this question



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 40 of 102 PageID #:5117

JULIANNE VERSNEL                                      June 11, 2012
EZELL vs. CITY OF CHICAGO                                        40

1   as to the previous bullet point, but are you aware of

2   anyone who wants to open a range in Chicago but can't

3   because of the hours of operation requirement?

4       A.   No.  I am not.

5       Q.   Is there anyone else at SAF who would be

6   more knowledgeable or have more interaction with

7   prospective range operators in Chicago on these topics

8   other than yourself?

9            Are you the right person I should be

10  asking these questions to?

11      A.   I believe I'm the right person you should

12  be asking these questions to.

13      Q.   So the answer is, no?  There's no one else

14  who would be more knowledgeable on these issues?

15      A.   I don't believe so, no.

16      Q.   Are you aware of any benefits from having

17  an age requirement of 18 years?

18      A.   No.  I am not.

19      Q.   If an industry expert was of the view that

20  an 18 years of age requirement was fine, would that

21  change your view as to the validity of that

22  requirement?

23      MR. SIGALE:  Objection as to speculation.  It

24  assumes facts not in evidence.  You can go ahead and



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 41 of 102 PageID #:5118

JULIANNE VERSNEL                                      June 11, 2012
EZELL vs. CITY OF CHICAGO                                        41

1   answer, though.

2   BY THE WITNESS:

3        A.    No.  It would not.

4   BY MR. WORSECK:

5        Q.    And it's safe to say that your view

6   wouldn't change based on anything that a Chicago

7   police officer or other public safety official could

8   say about this provision?

9        A.    No.  It would not change.

10       Q.    Are you aware of any ranges elsewhere in

11  the country that have an 18 years of age cut off for

12  using their range?

13       A.    No.  I am not.

14       Q.    Moving to the next bullet point on Page 6,

15  the last one on that page, it cites

16  Section 4-151-100(g)(1) of the Chicago Municipal Code.

17       A.    Yes.

18       Q.    And it says that this provision, "forbids

19  any person who does not have a CFP and FOID card from

20  using a range, unless it is for the one hour CFP

21  training."

22             Aside from your attorneys, have you

23  discussed this provision with anyone?

24       A.    In a general nature, yes.



1       Q.      Have you discussed this provision with any

2    person who wants to operate a range in Chicago?

3       A.      No.   I have not.

4       Q.      Are you aware of any person who wants to

5    operate a range in Chicago being of the view that they

6    can't because of this CFP and FOID requirement for

7    range patrons?

8       A.      No.   I am not.

9       Q.      Aside from the expert report, are you

10   aware of any study, or document, or analysis that

11   talks about cost or profit issues related to this

12   requirement?

13      A.      No.   I am not.

14      Q.      If an industry expert was of the view that

15   this is a fine requirement, would that change your

16   view about its validity?

17      MR. SIGALE:   Objection as to form of the

18   question.   Speculative.   It assumes facts not in

19   evidence, and is vague and ambiguous as to the phrase

20   fine.

21          Having said that, if you understand the

22   question, you can answer it.

23   BY THE WITNESS:

24      A.      I forgot the question.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 43 of 102 PageID #:5120

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                    43

1        MR. WORSECK:  Could you read it back, please?

2                    (WHEREUPON, the record was read by

3                    the reporter as requested.)

4    BY THE WITNESS:

5        A.    No.

6    BY MR. WORSECK:

7        Q.    And your view on its validity wouldn't

8    change based on anything that a Chicago police officer

9    or other public safety official might say to you about

10   it?

11       MR. SIGALE:  Well, I make the same objections

12   as before, but I also want to make the objection that

13   I should have made the last time as well that validity

14   is a legal conclusion, and Ms. Versnel is not an

15   attorney, and its validity will ultimately be

16   determined by the Court.

17            But having said all that, if you

18   understand the question, go ahead and answer it.

19   BY THE WITNESS:

20       A.    No.

21   BY MR. WORSECK:

22       Q.    Are you aware of any person who would like

23   to patronize a shooting range in Chicago but believes

24   that the requirement of getting a FOID card and a CFP



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 44 of 102 PageID #:5121

JULIANNE VERSNEL                                        June 11, 2012
EZELL vs. CITY OF CHICAGO                                          44

1   card is too burdensome for them?

2          A.    Only in terms of general discussions.

3          Q.    You're not aware of any specific

4   individual who has said, "I cannot get a FOID card and

5   a CFP card.  But if I could, I would love to use a

6   range in Chicago"?

7          A.    I can't recall specific names, no.  It's a

8   topic of general conversation.

9          Q.    Do you believe that non-Chicago residents

10  have a Second Amendment right to use shooting ranges

11  in Chicago?

12         A.    Yes.

13         Q.    Are you aware of any non-Chicago resident

14  who has unavailable to them currently adequate

15  shooting ranges for them to exercise their Second

16  Amendment rights?

17         MR. SIGALE:  Objection.  Relevance.  You can go

18  ahead and answer it if you know.

19  BY THE WITNESS:

20         A.    There are many people who feel that they

21  do not have adequate range facilities and would like

22  to have opportunities to use ranges in more locations.

23  Be they residents of Illinois, or residents of Iowa,

24  or residents of California, or residents of Virginia.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 45 of 102 PageID #:5122

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                       45

 1   BY MR. WORSECK:

 2       Q.    Are you aware of anyone specifically that

 3   you can identify, other by name or by some other

 4   characteristic that you recall about this person, who

 5   is a non-Chicago resident and does not have adequate

 6   access to a shooting range currently, wherever they

 7   might live, to exercise their Second Amendment rights?

 8       MR. SIGALE:  Same objection as before.  You can

 9   go ahead and answer if you want.  If you know.

10   BY THE WITNESS:

11       A.    There are many individuals in many

12   locations who would like to have the opportunity to

13   exercise their Second Amendment rights at more

14   locations.  That would include areas in the City of

15   Chicago.

16   BY MR. WORSECK:

17       Q.    Can you tell me who those people are?

18       A.    Only general conversations.

19       Q.    So you can't tell me the name of any

20   particular person who has said something like that?

21       A.    No.  Not specifically, no.

22       Q.    Can you recall anything about any sort

23   of person who might have said something like that?

24       MR. SIGALE:  Objection as to the form of the



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 46 of 102 PageID #:5123

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      46

1   question.  Vague and ambiguous.

2   BY THE WITNESS:

3        A.    Not specifically at this time, no.

4   BY MR. WORSECK:

5        Q.    If you can turn to Page 7 of Exhibit 1,

6   we'll move on to the next bullet point, which is at

7   the top of that page, and that cites

8   Section 4-151-120, which talks about a prohibition on

9   ranges from locating 500 feet within -- from any other

10  gun range or various other types of uses that are

11  listed here on the page.

12            Do you see that?

13       A.    Yes, I do.

14       Q.    Aside from your attorneys, have you

15  discussed that requirement with anyone?

16       A.    Not that I recall at this time.

17       Q.    Aside from the expert report in this case,

18  are you aware of any document, or study, or analysis

19  addressing that requirement?

20       A.    No.  I am not.

21       Q.    Are you aware of anyone who wants to open

22  a range in Chicago but can't because of this

23  requirement?

24       A.    No.  I am not.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 47 of 102 PageID #:5124

JULIANNE VERSNEL                                          June 11, 2012
EZELL vs. CITY OF CHICAGO                                          47

1          Q.    Has anyone said anything to you -- strike

2     that.

3                Has any prospective range operator of a

4     Chicago range said anything to you about them being

5     unable to comply with this requirement?

6          A.    No.

7          Q.    Has SAF done anything to try to figure out

8     what parcels of land in the City of Chicago would

9     satisfy this requirement for operation of a shooting

10    range?

11         A.    Not that I recall at this time.

12         Q.    You were looking through some papers

13    there.  What were you looking through?

14         A.    I was just looking through the expert's

15    report.

16         Q.    Are there documents in your folder that

17    are not privileged that should be produced here in

18    response to the discovery request?  I'm just curious

19    as to what's in your folder.

20         A.    The Answers to the Interrogatories.  The

21    City ordinance.  The amendments to the City ordinance.

22    The expert's report and a copy of the deposition from

23    our first meeting.

24         Q.    Is it fair to say that those are documents



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 48 of 102 PageID #:5125

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      48

1  you reviewed in preparing for the deposition today?

2        A.    Yes.

3        Q.    Were there any other documents you

4  reviewed?

5        A.    No.

6        Q.    Do you know how much land is available for

7  a shooting range versus not available for a shooting

8  range in Chicago due to the zoning requirement in

9  Section 120?

10       A.    No.  I do not.

11       MR. SIGALE:  I'm just going to object as to

12 foundation.

13 BY THE WITNESS:

14       A.    Sorry.

15       MR. SIGALE:  No.  That's all right.

16 BY MR. WORSECK:

17       Q.    Are you aware of any benefits that come

18 from having this kind of zoning requirement?

19       A.    At this point in time, no, I'm not.

20       Q.    So in your view there's no benefit from

21 having a shooting range be 500 feet away from a

22 school?

23       A.    At this point in time, I am not.

24       Q.    So the answer is, no?  You're not aware of



 1 | any benefit that comes from having a shooting range

 2 | 500 feet away from a school?

 3 |      MR. SIGALE:  Objection.  Asked and answered.

 4 | She --

 5 |      MR. WORSECK:  I just think the answer is --

 6 |      MR. SIGALE:  At this time --

 7 |      MR. WORSECK:  It didn't meet the question.  I

 8 | think I know what you're saying, but I just want to

 9 | clarify for the record.

10 | BY THE WITNESS:

11 |      A.    At this point in time, I am not.

12 | BY MR. WORSECK:

13 |      Q.    Aware of any benefit?

14 |      A.    Aware of any benefit from having a

15 | shooting range restricted from this list.

16 |      Q.    From being 500 feet away from any of those

17 | listed uses?

18 |      A.    Yes.

19 |      Q.    And your view wouldn't change as to the

20 | validity of this requirement if an industry expert

21 | said that they thought it was a good idea?

22 |      MR. SIGALE:  I'm going to object as to form of

23 | the question.  Foundation.  Speculation.  Assumes

24 | facts not in evidence.  And, again, validity is a



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 50 of 102 PageID #:5127

JULIANNE VERSNEL                                          June 11, 2012
EZELL vs. CITY OF CHICAGO                                             50

 1   legal conclusion.

 2             With all that said, if you have -- you can

 3   answer the question as to the ultimate legal

 4   conclusion.

 5        MR. WORSECK:  No.  You're expressly saying she

 6   shouldn't answer it to the ultimate legal conclusion.

 7   So your objection is noted, and I'm asking for her

 8   view.

 9        MR. SIGALE:  Yeah.  I said if she has a view

10   about the legal conclusion, which is what your

11   question is, I said she can answer.

12        MR. WORSECK:  Her view will be what it is.  We

13   don't need to argue about whether it's a legal

14   conclusion or not.

15             She's taken a view as a Plaintiff in this

16   case, and that's what I'm asking her about.

17        MR. SIGALE:  Yeah.  But we're not arguing.  I

18   told her to answer the question.

19   BY THE WITNESS:

20        A.   Can you repeat the question, please?

21        MR. WORSECK:  Sure.

22   BY MR. WORSECK:

23        Q.   If an industry expert was of the mind that

24   this is a good requirement, sound requirement to have



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 51 of 102 PageID #:5128

JULIANNE VERSNEL                                  June 11, 2012
EZELL vs. CITY OF CHICAGO                                    51

1  ranges be 500 feet away from these listed uses, that

2  wouldn't change your view as to the requirement's

3  validity?

4      MR. SIGALE:  Same objections.  Go ahead and

5  answer if you can.

6  BY THE WITNESS:

7      A.   If an industry expert were to discuss this

8  with me specifically regarding the Chicago Municipal

9  Code and specifically discuss these entities, it might

10 change my mind.

11 BY MR. WORSECK:

12     Q.   How might it change your mind?

13     A.   Depending on what I saw and personally

14 interpreted from what I read.

15     Q.   I mean, what kind of things could be said

16 to you or read by you that would change your mind on

17 this requirement?

18     MR. SIGALE:  Objection as to speculation.  I'm

19 sorry.  Go ahead.  You can answer.

20 BY THE WITNESS:

21     A.   I don't know.  I haven't seen them.

22 BY MR. WORSECK:

23     Q.   And is there anything that a Chicago

24 police officer or other public safety official could



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 52 of 102 PageID #:5129

JULIANNE VERSNEL                                            June 11, 2012
EZELL vs. CITY OF CHICAGO                                             52

1   say to you to change your views on this requirement?

2        MR. SIGALE:   Objection as to speculation.

3   BY THE WITNESS:

4        A.    They might be able to present me with

5   information that might be able to convince me that

6   in this specific case this might be acceptable.

7   BY MR. WORSECK:

8        Q.    Do you have any idea of what that

9   information would look like at this point?

10       A.    No.   I do not.

11       Q.    Moving then to the next bullet point on

12  Page 7, which cites Section 8-20-110, it says that

13  provision, "prohibits the possession of a firearm

14  without a CFP, including the possession of firearms by

15  shooting range patrons other than a one-time, one hour

16  exemption for taking a class.   These provisions bar

17  individuals from (1) practicing with or sampling

18  different firearms, (2) practicing the use of firearms

19  without purchasing and registering a firearm, (3)

20  purchasing ammunition for self-defense, and (4)

21  replacing older ammunition, by firing it at the range

22  and then departing with fresh replacements."

23            Do you see that paragraph?

24       A.    Yes.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 53 of 102 PageID #:5130

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      53

1      Q.    Aside from your attorneys, have you

2   discussed this requirement with anyone?

3      A.    In a general manner, yes.

4      Q.    Are you aware of any person who would like

5   to open a shooting range in Chicago but can't because

6   of this requirement?

7      A.    No.

8      Q.    Has any prospective range operator, or

9   builder, owner said anything to you about their

10  inability to comply with this requirement?

11     A.    No.

12     MR. SIGALE:  I'm just going to object as to

13  form.  I don't know how you comply with this

14  requirement.

15     MR. WORSECK:  You operate a range.

16     MR. SIGALE:  I don't know how --

17     MR. WORSECK:  You're making sure that the people

18  who are in it comply with this requirement.

19     MR. SIGALE:  And then I'll object as to

20  speculation and foundation, but you can answer that

21  question.

22  BY THE WITNESS:

23     A.    I thought I did.

24     MR. WORSECK:  I think she answered the question.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 54 of 102 PageID #:5131

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      54

 1   BY MR. WORSECK:

 2        Q.    Aside from the expert report, are you

 3   aware of any document, or study, or analysis of this

 4   requirement?

 5        A.    Under the Chicago Municipal Code?

 6        Q.    Yes.

 7        A.    No.

 8        Q.    For Section 8-20-110.

 9        A.    No.

10        Q.    Are you otherwise aware, or do you have

11   any sense for how much it would cost, or how much

12   profit might be lost in operating a range that would

13   comply with this requirement?

14        A.    Since the provision bars individuals from

15   practicing with a firearm without purchasing and

16   registering, it prevents people interested in the CFP

17   from being in a classroom for more than an hour.  It

18   limits the audience, it limits the customer base, and

19   as such diminishes the income potential.

20        Q.    Right.  But are you aware of any estimates

21   done of how much income is lost?

22        A.    No, I'm not.

23        Q.    I understand the theory, but I'm just

24   wondering if there are any dollar amounts that have



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 55 of 102 PageID #:5132

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      55

1    been pinned on this that you're aware of.

2         A.    Not specific dollar amounts, no.

3         Q.    Are you aware of any range elsewhere in

4    the country that has a requirement like this one?

5         A.    No.

6         MR. WORSECK:  Let's take a short recess.

7         MR. SIGALE:  Okay.

8                   (WHEREUPON, a recess was had.)

9         MR. WORSECK:  Back on the record.  Would you

10   read back the last question and answer, please?

11                  (WHEREUPON, the record was read by

12                   the reporter as requested.)

13   BY MR. WORSECK:

14        Q.    Moving on to the next bullet point on

15   Page 7, it cites Section 4-151-170.

16             It says this provision, "prohibits the

17   loaning or renting of firearms, other than for a

18   one-hour class, and prohibits range patrons from

19   leaving with ammunition sold by the range."

20             Aside from your attorneys, have you

21   discussed this provision with anyone?

22        A.    In a general sense.

23        Q.    Are you aware of any range operator --

24   strike that.



1          Are you aware of any person who would

2     like to open a range in Chicago but can't because

3     they can't comply with this requirement?

4          A.    No, I'm not.

5          Q.    Has any person who would like to open a

6     range in Chicago said to you anything about this

7     requirement?

8          A.    No.

9          Q.    Aside from the expert report, are you

10     aware of any document, or study, or analysis that

11     discusses this requirement?

12          A.    Not as it has to do with the

13     Chicago Municipal Code.

14          Q.    Are you aware of any study, or document,

15     or analysis that talks in general about a requirement

16     restricting the loaning or renting of firearms at a

17     shooting range or a prohibition on range patrons from

18     leaving with ammunition sold by the range?

19          A.    It's a topic covered in NSSF's range

20     guide.

21          Q.    Are there any other documents?

22          A.    Off the top of my head, nothing that I can

23     recall specifically right now.

24          Q.    Do you have any estimate as to the cost or



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 57 of 102 PageID #:5134

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                       57

1    profit impact from this requirement on the operation

2    of a shooting range?

3         A.    Shooting ranges make a profit on the

4    renting of firearms in the normal course of business,

5    and they additionally make a profit on the sale of

6    ammunition in a general practice.

7         Q.    But you're not aware of any specific

8    numbers or estimates on profit that is pegged to this

9    requirement?  Chicago requirement?

10        A.    You mean loss of income?

11        Q.    Yes.  Any impact on profits.

12        A.    Not in terms of this specific

13   Chicago Municipal Code.

14        Q.    So you're not aware of anyone who said,

15   "This requirement is going to reduce profits by 'X'

16   amount"?

17        A.    No.

18        Q.    Would your views on this requirement

19   change in response to anything that an industry expert

20   could say?

21        A.    No.

22        Q.    Would they change in response to anything

23   that a Chicago police officer or other public safety

24   official could say?



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 58 of 102 PageID #:5135

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      58

1        A.    No.

2        Q.    Are you aware of any range elsewhere in

3  the country that has this kind of requirement or

4  restriction?

5        MR. SIGALE:  Are you referring to one, or the

6  other, or both?

7        MR. WORSECK:  I was just clarifying the

8  restriction.

9  BY MR. WORSECK:

10       Q.    Are you aware of any other range in the

11 country that, like 170, restricts the loaning or

12 renting of firearms or patrons from leaving with

13 ammunition that they purchase at the range?

14       A.    No.  Let me rephrase that, please.

15       Q.    Sure.

16       A.    I am aware of no range where the loaning

17 or renting of firearms does not occur.

18            I may be aware, may be aware of one range

19 where you can't take ammunition out of it.  I may be.

20       Q.    What range are you thinking of there?

21       A.    I'm thinking the Royal Hawaiian Shooting

22 Club in Honolulu, and I could be wrong.

23       Q.    No other ranges other than that one to

24 your knowledge?



 1        A.    Not to my knowledge.

 2        Q.    Do you have any idea as to why the

 3   Royal Hawaiian Shooting Club wouldn't allow its

 4   patrons to leave with ammunition purchased onsite?

 5        A.    I could only base that on educated

 6   speculation.  A number of their patrons are from Asia.

 7   Australia.  Chinese.  Japanese.  Indians.

 8              So they may restrict it.  They may because

 9   people don't have anything to do with it.  They would

10   have no further use for it, but that is speculation on

11   my part entirely since I'm not positive that's their

12   policy.

13        Q.    So these are essentially tourists who --

14        A.    Yes.

15        Q.    -- wouldn't be able to take it back home

16   because they can't use it in their home country, or

17   maybe you can't transport it on planes?  I'm not sure.

18              But it's basically a tourist clientele?

19   You think that's the rationale?

20        A.    Part of their clientele's tourists, yes.

21        Q.    Moving on to the next bullet point, which

22   cites Section 13-96-1200(b)(2), which requires a

23   maximum decibel level of 55db emanating from shooting

24   ranges.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 60 of 102 PageID #:5137

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      60

1           Then the complaint says, "which is lower

2    than many ordinary human conversations, ambient noise

3    from traffic, and numerous commercial uses permitted

4    within the city."

5           Aside from your attorneys, have you

6    discussed this provision with anyone?

7        A.    No.

8        Q.    Aside from the expert report, are you

9    aware of any document, or study, or analysis that

10   addresses this requirement?

11       A.    NSSF range rules.

12       Q.    I guess I'm asking are you aware of any --

13   aside from the expert report, are you aware of any

14   document, or study, or analysis that addresses the

15   Chicago requirement specifically?

16       A.    No.

17       Q.    And I think you were saying that NSSF

18   range rules do discuss in some fashion sound limits on

19   ranges?

20       A.    Yes.  Excuse me.  Just so you know, it's

21   capital N.  Capital S.  Capital S.  Capital F.

22       THE COURT REPORTER:  Okay.  Thank you.

23   BY MR. WORSECK:

24       Q.    Do you have any estimate or idea as to how



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 61 of 102 PageID #:5138

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      61

 1   much it would cost to build a range that would satisfy

 2   this requirement?

 3         A.    No.  I do not.

 4         Q.    Are you aware of any document that makes

 5   that kind of estimate?

 6         A.    No.  I am not.

 7         Q.    Would your view on this requirement change

 8   depending on what an industry expert might say about

 9   it?

10         A.    It might.

11         Q.    What factors would it depend on?

12         A.    The information --

13         MR. SIGALE:  Objection as to speculation, and

14   foundation, and assuming facts not in evidence.  You

15   can answer.

16   BY THE WITNESS:

17         A.    It would depend on what they showed me.

18   BY MR. WORSECK:

19         Q.    You just have to wait until you see it?

20   You can't tell me anything about what it might look

21   like, or what it might take to convince you as we sit

22   here today?

23         A.    No.

24         Q.    And might your views change based on



1  something said to you by a Chicago police officer,

2  or other public safety, or public health official in

3  Chicago?

4        A.    No.

5        Q.    Is there any reason why your view might

6  change based on what an industry expert would say

7  versus not changing based on what a Chicago official

8  might say?

9        A.    I can only surmise that an industry expert

10 would have a broader base knowledge and a larger pool

11 of information than someone who is just in Chicago.

12 That may be erroneous.

13       Q.    Are you aware of any benefits that come

14 from placing a noise limit on shooting ranges?

15       A.    Yes.

16       Q.    What are those?

17       A.    Safety.

18       Q.    Can you be more specific?  How is

19 safety --

20       A.    Hearing loss.

21       Q.    Anything else?  Any other benefits?

22       MR. SIGALE:  I'm just going to object to the

23 form of the question.  Can we clarify?

24             Are we talking about like on the range



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 63 of 102 PageID #:5140

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                     63

1  | itself, or are we talking this ordinance, which is
2  | about the outside of the range presumably like on the
3  | street?  Can you clarify what you're asking about?
4  | BY MR. WORSECK:
5  |      Q.    Let me start with the requirement here,
6  | which talks about noise emanating from a shooting
7  | range.
8  |            Are you aware of any benefits that come
9  | from placing a cap on the amount of noise emanating
10 | from a shooting range?
11 |      A.    Yes.
12 |      Q.    And what are those benefits?
13 |      A.    It doesn't disturb the general public.
14 |      Q.    Any other benefits?
15 |      A.    No.  But I can't speak to the specific
16 | decibel levels since I have no expertise regarding
17 | this specific number that's been put in here.
18 |      Q.    So you don't know if 55 decibels is too
19 | quiet or is -- let me ask that question --
20 |      MR. SIGALE:  I'm going to object.  You're going
21 | to rephrase anyway.  Go ahead.
22 | BY MR. WORSECK:
23 |      Q.    Do you have any reason for believing that
24 | 55 decibels is too quiet a noise level to ask ranges



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 64 of 102 PageID #:5141

JULIANNE VERSNEL                                                 June 11, 2012
EZELL vs. CITY OF CHICAGO                                              64

 1   to meet?

 2        MR. SIGALE:  I'm going to object as to asked and

 3   answered.  She already said she has no idea about the

 4   number.  You can answer it one more time.

 5   BY THE WITNESS:

 6        A.    In terms of the specific number emanating

 7   from the shooting ranges, I have no idea if this is

 8   more beneficial than another number.

 9   BY MR. WORSECK:

10        Q.    So it could be beneficial?

11        MR. SIGALE:  I'm going to object.

12   BY MR. WORSECK:

13        Q.    It's possible?

14        MR. SIGALE:  I'm going to object as to form of

15   the question, and it's speculative, and it's vague and

16   ambiguous.

17   BY THE WITNESS:

18        A.    I am not an expert on decibel levels.  I

19   have no knowledge base on decibel levels.  I just

20   don't have any knowledge base on it.

21   BY MR. WORSECK:

22        Q.    So it's possible that 55 decibels could be

23   a perfectly appropriate number to require ranges to

24   adhere to?



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 65 of 102 PageID #:5142

JULIANNE VERSNEL                                        June 11, 2012
EZELL vs. CITY OF CHICAGO                                          65

1        MR. SIGALE:  Objection.  Form of the question.

2   Speculation.  Don't speculate.  And it's been asked

3   and answered.

4              Don't speculate.  You either have

5   knowledge or you don't.

6   BY THE WITNESS:

7        A.    I don't know.

8   BY MR. WORSECK:

9        Q.    You don't know if it's possible?

10       MR. SIGALE:  I'm going to object.  Don't answer.

11       MR. WORSECK:  I'm asking if something's

12   possible.

13       MR. SIGALE:  Well, you know, there could be

14   people living on Mars, you know.  So if your

15   question's like that, then I'm objecting.

16       MR. WORSECK:  I'm not asking about people on

17   Mars.  I'm asking about a provision cited in the

18   complaint that this Plaintiff has signed on to.

19              And I'm simply asking if it's possible

20   that a range requirement of 55 decibels would be an

21   appropriate level to require of ranges operating in

22   the city.

23              And if it's not possible, then please tell

24   me why if it's not.  But if it is, then I'd just like



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 66 of 102 PageID #:5143

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      66

1   an answer to my question.

2        MR. SIGALE:  I'm not letting Ms. Versnel

3   speculate.  She already testified she doesn't know

4   about the -- she's not an expert.  Doesn't know about

5   the particular number.

6        MR. WORSECK:  That was in response to a question

7   about that.  Now I'm asking a different question.

8        MR. SIGALE:  Then I need you to go back and read

9   the actual question because -- can you read back the

10  actual question?

11                  (WHEREUPON, the record was read by

12                   the reporter as requested.)

13       MR. SIGALE:  Same objection.  I'm not -- if she

14  doesn't have knowledge about it, I'm instructing her

15  not to speculate on it.

16  BY THE WITNESS:

17       A.    I don't have knowledge about it.

18  BY MR. WORSECK:

19       Q.    So it's possible?

20       MR. SIGALE:  I'm going to instruct her --

21       MR. WORSECK:  This is a question that can be

22  answered.

23       MR. SIGALE:  I'm instructing --

24       MR. WORSECK:  I've asked her for her bases for



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 67 of 102 PageID #:5144

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      67

1   why this would be a bad requirement, and then she went

2   on to say that it actually could have some benefits by

3   reducing ambient noise in the community.

4           MR. SIGALE:  Well, then --

5           MR. WORSECK:  So I'm asking her is it

6   possible that this requirement --

7   BY THE WITNESS:

8           A.    That's not what I said.

9           MR. SIGALE:  Well, she said what she said.  She

10  said what's on the record.

11          So what she said is on the record.  She's

12  not an expert.  She already said that -- she's already

13  given her answer then.  I'm instructing her not to

14  answer further questions on this topic.

15          MR. WORSECK:  So the record's clear, you're

16  instructing her not to answer the question is it

17  possible that 55 decibels is an appropriate sound cap

18  to place on ranges operating in the City of Chicago?

19          MR. SIGALE:  I'm instructing her --

20          MR. WORSECK:  Yes or no, David?  Are you

21  instructing her not to answer that question that I

22  just read into the record?

23          MR. SIGALE:  I'm instructing her do not answer

24  it again.  She's answered it more than once already.



1      MR. WORSECK:  Well, the record will reflect that

2  she has not.

3      MR. SIGALE:  The record will reflect that she

4  has said over and over that she's not an expert and

5  doesn't know anything about the number.

6          And I've instructed her not to speculate

7  on things about which she doesn't have knowledge and

8  is not an expert.

9      MR. WORSECK:  You have instructed her not to

10  answer the question that I read into the record.

11          Now, unless you change your instruction,

12  we'll we move on, and we'll have a record that I can

13  take to the Judge.

14      MR. SIGALE:  Fine.  Fine.  I'm instructing her

15  not to answer that again so you can move on.

16  BY MR. WORSECK:

17      Q.    Are you aware of any reason why

18  55 decibels would not be an appropriate cap for a

19  range operating in Chicago?

20      A.    It may be an unrealistic goal, an

21  unrealistic number to be achieved based on the fact

22  that it's lower than ambient traffic noise and other

23  noises that are in commercial areas.

24      Q.    Well, aside from the possibility that it



 1  might be unrealistic, which apparently you now just

 2  testified to here, are you aware of any specific

 3  reasons or evidence showing that it is not realistic?

 4       A.    I am not an expert on sound.  I know very

 5  little about sound in terms of specific numbers.

 6            I have no knowledge of why 55 decibels

 7  would be a prudent maximum decibel level emanating

 8  from shooting ranges.

 9       Q.    And is it fair to say that you don't have

10  any knowledge as to why it would be -- well, strike

11  that.

12            You don't have any knowledge as to why it

13  would not be a prudent level?  You just don't know one

14  way or the other?

15            And for the record, you're looking at a

16  document in your folder.  What document are you

17  looking at?

18       A.    I'm looking at the expert's -- I have no

19  idea why a 55 maximum decibel level would be more

20  advantageous than a higher one based upon the

21  commercial uses permitted within the city.

22       Q.    And you have no idea -- strike that.

23            You don't have any specific evidence

24  indicating that it is not an appropriate level to



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 70 of 102 PageID #:5147

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                     70

1    require ranges to adhere to?

2         A.    I would have to refer to an NSSF and NRA

3    range document that I simply can't recall right now.

4    The range -- the suggested range.  Sound levels.  I

5    just don't recall them.

6         Q.    Aside from that document, is there any

7    other document you think indicates that this is not an

8    appropriate sound level to require?

9         MR. SIGALE:  I'm going to object as to

10   foundation and to speculation.

11   BY THE WITNESS:

12        A.    I don't know at this particular moment.

13   There's nothing I can specifically recall to mind.

14   BY MR. WORSECK:

15        Q.    Are you aware of anyone having done any

16   sort of sound tests in Chicago following the enactment

17   of the Chicago firing range ordinance in July of 2011?

18        A.    Sound tests that did what?

19        Q.    As to ambient noise.  As to average noise

20   in commercial districts.  As to any sort of sound

21   testing in the city.  External sound testing.

22        A.    Well, why would average --

23        MR. SIGALE:  Don't -- you either know it or you

24   don't.  Do you need it read back?



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 71 of 102 PageID #:5148

JULIANNE VERSNEL                                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                                    71

1   BY THE WITNESS:

2         A.    Yes, please.

3         MR. SIGALE:  Can you read the question back,

4   please?

5                    (WHEREUPON, the record was read by

6                    the reporter as requested.)

7   BY THE WITNESS

8         A.    No.

9   BY MR. WORSECK:

10        Q.    It's fair to say --

11        A.    Not at this time.

12        Q.    So it's fair to say that none of the

13  Plaintiffs did any sound testing in connection with

14  this lawsuit?

15        A.    I have absolutely no knowledge of whether

16  they did or they didn't.

17        Q.    Do you know if the experts who submitted a

18  report on behalf of Plaintiffs did any sound testing

19  in Chicago?

20        A.    I do not know.

21        Q.    Do you know if they did any sound testing

22  at all?

23        A.    I do not know.

24        Q.    Are you aware of any range elsewhere in



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 72 of 102 PageID #:5149

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                       72

1   the country that has a requirement that noise

2   emanating from the range be no louder than

3   55 decibels?

4        A.    No, I'm not.

5        Q.    Moving on to the last bullet point on

6   Page 7, which cites Municipal Code

7   Section 13-96-1200(b)(7), which requires that the

8   floors of the shooting range be constructed to slope

9   at a minimum of one-quarter inch per foot from the

10  firing line to the backstop backslash bullet trap.

11            Do you see that?

12       A.    Yes, I do.

13       Q.    Aside from your attorneys, have you

14  discussed that provision with anyone?

15       A.    Yes.

16       Q.    Who?

17       A.    General public.

18       Q.    Are you aware of any person who wants to

19  operate a shooting range in Chicago but can't because

20  of this requirement?

21       A.    No.

22       Q.    Has any person who wants to operate a

23  shooting range in Chicago said anything to you about

24  this requirement?



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 73 of 102 PageID #:5150

JULIANNE VERSNEL                                          June 11, 2012
EZELL vs. CITY OF CHICAGO                                              73

1        A.      No.

2        Q.      Aside from the expert report, are you

3    aware of any document, or study, or analysis done of

4    this requirement?

5        A.      I am not aware of another analysis of the

6    Chicago Municipal Code requirement 13-96-1200(b)(7).

7        Q.      Are you aware of any estimate done as to

8    how much it would cost to build a range that would

9    satisfy this requirement?

10       A.      No, I'm not.

11       Q.      Are you aware of any range elsewhere in

12   the country that has this requirement?  Well, strike

13   that.

14               Are you aware of any other range in the

15   country that has floors constructed in such a fashion

16   that they would satisfy this requirement?

17       A.      No, I'm not.

18       Q.      Are you aware of any benefits that come

19   from having this requirement?

20       A.      No, I'm not.

21       Q.      Would your views on the requirement change

22   possibly in response to something that an industry

23   expert might say about the requirement?

24       A.      Possibly.



1      Q.    You don't know what specifically that

2  information would be, but it's possible?

3      A.    I don't know what it specifically would be

4  since it goes against other knowledge that I do have.

5      Q.    And what knowledge is that?

6      A.    That this -- it's not safe to have it

7  sloped.  There are numerous reasons it's not safe to

8  have the floor sloped towards the bullet trap.

9      Q.    Can you list those reasons?

10     A.    Ventilation.  Excess gunpowder

11  accumulating in one spot.  Safety reasons.

12     Q.    Any other specific reasons aside from

13  gunpowder accumulation and ventilation issues?

14     A.    Safety issues, yeah.  Those are primary.

15     Q.    What are the safety issues?

16     A.    The gunpowder being able to accumulate in

17  a spot as opposed to dispersing in a more even level,

18  and the filters not being able to work quite as well.

19     Q.    And aside from those two --

20     A.    That's the extent of my knowledge on that.

21     Q.    What's the basis for that knowledge?

22     A.    Anecdotal and reading about ranges.

23     Q.    Have you discussed this topic with

24  the experts that Plaintiffs retained in the case?



1        A.     No.  I have not.

2        Q.     Could your views on this provision change

3    in response to anything that a City of Chicago

4    official might say about it?

5        A.     No.

6        Q.     Have you had any discussions with

7    Action Target about any of these provisions listed on

8    the bullet points between Pages 5 and 7 of Exhibit 1?

9        A.     No.

10       Q.     And you haven't discussed any of these

11   provisions with any other range manufacturers or

12   operators?

13       A.     No.  I have not.

14       Q.     Are you aware of any benefits that come

15   from this requirement?

16       A.     No, I'm not.

17       Q.     Are you aware of any specific pieces of

18   land in Chicago that anyone has been considering for

19   building a shooting range?

20       A.     No, I'm not.

21       Q.     Are you aware of any cost estimate as to

22   how much it would cost overall to build a shooting

23   range in Chicago that complied with all of the

24   requirements in Chicago's ordinance?



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 76 of 102 PageID #:5153

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      76

1          A.    No.  I am not.

2          Q.    Are you aware of any cost estimate as to

3    how much it would cost to build a range in Chicago

4    regardless of whatever specific requirements are in

5    the new Chicago range ordinance?

6          MR. SIGALE:  I'm going to object as to the form

7    of the question, and speculation, and foundation.

8    Vague and ambiguous.  If you understood it, go ahead

9    and answer.

10   BY MR. WORSECK:

11         Q.    Let me ask it this way.  Assume that the

12   provisions in the Chicago range ordinance that you're

13   challenging in this lawsuit didn't exist.

14              Do you have any idea as to how much it

15   would cost to build a range in Chicago?

16         A.    Not that I recall at this moment.

17         Q.    Are there any other Plaintiffs who might

18   have some knowledge on that?

19         A.    I couldn't speak to their particular

20   knowledge.

21         Q.    You're not aware of anyone having done a

22   study or an estimate as to how much it would cost to

23   build a range in Chicago assuming that these

24   challenged provisions did not exist?



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 77 of 102 PageID #:5154

JULIANNE VERSNEL                                           June 11, 2012
EZELL vs. CITY OF CHICAGO                                           77

1        A.    I have not seen an estimate, no.

2        Q.    So there's no estimate out there that

3    you're aware of that does kind of a comparison as to

4    how much it would cost to build a range in a world

5    where the Chicago ordinance requirements exist versus

6    a world where they don't exist?

7        MR. SIGALE:  I'm going to object as to the form

8    of the question and speculation.  There's different

9    sizes.  Different types of ranges.  It's -- it's

10   not --

11       MR. WORSECK:  Just any estimate of any sort of

12   range.

13       MR. SIGALE:  If you know.

14   BY THE WITNESS:

15       A.    Can you read the question back because I

16   think the question just got changed?

17                    (WHEREUPON, the record was read by

18                     the reporter as requested.)

19       MR. WORSECK:  I'll reask it.

20   BY MR. WORSECK:

21       Q.    Are you aware of any estimate or analysis

22   of how much it would cost to build a range in Chicago

23   in a world where the challenged provisions don't exist

24   versus a world where they do exist?



 1        A.    No.

 2        Q.    Have you or anyone else at SAF had any

 3   communications with anyone at the City, aside from me

 4   or other attorneys perhaps, regarding the requirements

 5   in the Chicago range ordinance?

 6        A.    No.

 7        Q.    Prior to filing the Amended Complaint,

 8   which is Exhibit 1, did SAF discuss any of the

 9   challenged provisions with any industry experts?

10        A.    I don't specifically recall.

11        Q.    Would you have been the person who would

12   have done so if any such conversations or

13   communications occurred?

14        A.    I believe so.

15        Q.    Has SAF ever received any information from

16   an industry expert, or a range operator, or a range

17   manufacturer relating to the requirements that are

18   challenged in this lawsuit?

19        A.    No.  Not that I recall.

20        Q.    Aside from the expert report in this case,

21   are you aware of any document written by anyone who is

22   a range expert, a range builder, a range manufacturer,

23   or a range operator that evaluates or analyzes, to any

24   extent, any of the challenged provisions in this



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 79 of 102 PageID #:5156

JULIANNE VERSNEL                                         June 11, 2012
EZELL vs. CITY OF CHICAGO                                         79

1   lawsuit?

2        A.    No, I'm not.

3        MR. WORSECK:  Can you mark this as Exhibit 2,

4   please?

5                    (WHEREUPON, a certain document was

6                    marked Versnel Deposition Exhibit

7                    No. 2, for identification, as of

8                    06/11/2012.)

9   BY MR. WORSECK:

10       Q.    Ms. Versnel, you've just been handed

11  Exhibit 2, which is the Plaintiff's Second Amendment

12  Foundation, Inc.'s Answers to Defendant City of

13  Chicago's Second Set of Interrogatories to Plaintiffs.

14            Do you see that?

15       A.    Yes.

16       Q.    And is it fair to say that you've seen

17  this document before?

18       A.    Yes.

19       Q.    I want to direct your attention to -- the

20  pages don't have a number, but I believe it's the

21  third page in.

22       MR. SIGALE:  I'm sorry.

23  BY MR. WORSECK:

24       Q.    The third piece of paper.



1    A.    It starts with --

2    Q.    Actually, Ms. Versnel, why don't you just

3  look at Exhibit 2 just so we're all clear?

4    MR. SIGALE:  Obviously it doesn't have page

5  numbers so is there a question number?

6  BY MR. WORSECK:

7    Q.    Yes.  I want to direct you to

8  Interrogatory No. 4.

9    A.    Okay.

10   MR. SIGALE:  Okay.

11  BY MR. WORSECK:

12   Q.    If you want to take a second to read the

13  interrogatory, and then read the response, please feel

14  free.

15        But I want to focus on the last paragraph

16  of the response, which comes after a bunch of legalese

17  objections and so forth.

18   A.    Yes.

19   Q.    And the first sentence of that last

20  paragraph of the response reads, "Every location

21  within the City limits is burdensome, due to the

22  City's firearms transport Ordinance and restrictions

23  on hours of operation."

24        And my question is how does the City's



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 81 of 102 PageID #:5158

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      81

1   requirements governing firearms transport make it

2   burdensome to utilize ranges in the city?

3        A.    The City of Chicago requires that for a

4   firearm to be transported within the City of Chicago

5   that it be broken down, it be put into a locked

6   container, and to be put into an accessible loca -- an

7   inaccessible closed location.

8             In my opinion, this would not be possible

9   to do if one was required to use public

10  transportation.

11            If one has a firearm that one keeps

12  outside of the City of Chicago and wanted to bring it

13  into the City of Chicago, the firearm would have to be

14  broken down, put into a locked container, and, again,

15  put into an inaccessible locked location, which,

16  again, is burdensome.

17            I, as a nonlawyer, am not quite sure how

18  the firearm gets out of one's home unless one's garage

19  is attached to one's home.

20            I'm not entirely clear how one can take

21  that firearm and transport it inside to a range given

22  the fact that the firearm is not supposed to leave the

23  locked, inaccessible container.

24            And as a layperson who shoots, I believe



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 82 of 102 PageID #:5159

JULIANNE VERSNEL                                      June 11, 2012
EZELL vs. CITY OF CHICAGO                                       82

1   that requiring a firearm to be continually broken down

2   is not a safe practice.

3              So we're talking about just the transport

4   in this paragraph?

5        Q.    Right.

6        A.    It's a transport issue.  It's the

7   restrictions on transport.

8        Q.    Assume that a person would be able to take

9   the firearm outside the four corners of their home, as

10  long as they're complying with the transportation

11  requirements, and that they can transport it all the

12  way to the parking lot of a shooting range, and take

13  it inside the range.  Assume all of that is legal

14  under the City's ordinance.

15             Would there, in your view, still be a

16  burden to the use of shooting ranges in Chicago by

17  virtue of the transportation requirement?

18       A.    The transportation requirement requires

19  the firearm be broken down.  It requires that the

20  firearm then be put into a locked box.  Then it

21  requires that the firearm be put into an inaccessible

22  location.

23             I don't know which part of that you're

24  taking away in your hypothetical.



1      Q.    Well, I would tend to dispute your

2   characterization of the ordinance, but I don't want to

3   get into an argument about what the ordinance requires

4   or doesn't require.

5           So I'm just asking you to assume -- I

6   might be wrong about this, but maybe the Plaintiffs

7   will prove that the City's wrong about this.

8           But just assume that the transportation

9   ordinance would allow you to carry a gun outside of

10  your front door as long as it's broken down, and

11  locked in a case, et cetera.  Put it in your trunk.

12  Put it in your car.  Drive to the range.  Get out of

13  your car.  Open up your trunk.  Get your case.  Go

14  into the range.

15          Assume all of that is lawful under the

16  City's transportation requirements.  If that is true,

17  is there any other reason why the City's

18  transportation requirements would be a burden on using

19  shooting ranges in Chicago?

20    MR. SIGALE:  I'm just going to object as to the

21  form of the question.

22          Your question still assumes it has to be

23  broken down, put into a locked case, and then put into

24  an inaccessible area?  Your question still assumes all



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 84 of 102 PageID #:5161

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      84

1   those things?

2        MR. WORSECK:  The question assumes you have to

3   comply with the ordinance, but I don't want to fight

4   about what that specifically requires.

5   BY MR. WORSECK:

6        Q.    So assume you can get from your house to

7   the inside of a range, one way or another, with your

8   gun.  Breaking it down, putting it in a box, and we

9   can fight about what the box is or not.

10            Assume you can get from your house to a

11  range with your gun, your personal gun that you want

12  to use at that range, are there any other burdens that

13  would be associated with transport in terms of a

14  person being able to use a shooting range in Chicago?

15       MR. SIGALE:  Do you mean beyond what she's

16  already said, or do you mean additionally?  I mean,

17  those are the same thing.

18            Do you mean beyond what she's already

19  said, or are you asking her to start over?

20  BY MR. WORSECK:

21       Q.    Did you understand my question?

22       A.    Well, I'd have to ask you a question to

23  understand.

24       Q.    Please do.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 85 of 102 PageID #:5162

JULIANNE VERSNEL                                      June 11, 2012
EZELL vs. CITY OF CHICAGO                                        85

1        A.    So you're saying that the gun has to be

2   broken down, and it has to be in a locked container,

3   but we're hypothetically saying that the third

4   container may or may not exist.

5              That inaccessible locked place where the

6   firearm is might -- you're taking that part away; is

7   that what you're doing?

8        Q.    If you want to think of it that way, I

9   suppose that's fine.  I don't think I'm taking it

10  away.

11             I think the ordinance allows for this, but

12  I think you disagree, and I don't want to fight about

13  this because I just don't think it's relevant to my

14  question.

15             So assume you can take your gun from your

16  house to the range.  You can get outside your door.

17  You can get inside the range with your gun.

18             Would there be any other problems

19  associated with transporting your firearm in Chicago

20  that would impact your ability to use a range in

21  Chicago?

22        A.    How about if you -- I believe that it

23  would impact it in addition to having to breakdown

24  your firearm, which I do not feel is safe to have that



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 86 of 102 PageID #:5163

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      86

1   constantly be done, and I cannot determine that one

2   could take any sort of public transportation to do

3   this.  I don't understand how somebody without a car

4   would be able to do this.

5        Q.   Aside from your belief and understanding

6   that you just described, are you aware of any person

7   in Chicago who has not been able to transport their

8   firearms about the city as a result of the Chicago

9   transportation requirements?

10       MR. SIGALE:  I'm going to object as to

11  foundation and speculation.  You can answer if you

12  know an answer to the question.

13            Do you need it read back, or do you know

14  the question?

15  BY THE WITNESS:

16       A.   The question's changed several times.

17       MR. SIGALE:  Why don't you go ahead and read the

18  current pending question, please?

19                      (WHEREUPON, the record was read by

20                      the reporter as requested.)

21       MR. SIGALE:  I also want to object on the

22  grounds that it assumes anybody is actually

23  transporting their firearm around the city.

24            But if you have an answer, Julianne, you



```
 1   can answer.

 2   BY THE WITNESS:

 3        A.   Well, I can't figure out where they've

 4   gone with the gun because we took shooting ranges out

 5   of the question.  You had it in one version of the

 6   question.

 7        MR. SIGALE:  Just the current pending question.

 8   If you have an answer, go ahead and do it.

 9   BY THE WITNESS:

10        A.   No.

11   BY MR. WORSECK:

12        Q.   You're not aware of any Chicago resident

13   who has wanted to take a gun on public transportation

14   and hasn't been able to because of the Chicago

15   transportation requirements?

16        MR. SIGALE:  I'm just going to object as to the

17   form of the question.

18             As to the strict language, Julianne, if

19   you have an answer, go ahead and answer.

20   BY THE WITNESS:

21        A.   No.

22   BY MR. WORSECK:

23        Q.   Are you aware of any specific locations

24   in the city, specific pieces of land, specific
```



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 88 of 102 PageID #:5165

JULIANNE VERSNEL                                June 11, 2012
EZELL vs. CITY OF CHICAGO                                    88

1   neighborhoods that it would be burdensome for a

2   Chicago resident to travel to to use a shooting range?

3       MR. SIGALE:  Objection as to foundation and

4   speculation.

5   BY THE WITNESS:

6       A.    From anecdotal information, there are many

7   locations in Chicago where it is not safe to travel.

8   BY MR. WORSECK:

9       Q.    Are there any specific ones that come to

10  mind?

11      A.    The South Side.  Downtown.  Many,

12  unfortunately, parts of the urban city.

13      Q.    Do you have a view as to how many ranges

14  would need to be up and running in Chicago for there

15  to be no constitutional burden, constitutional

16  infirmity with the Chicago's range ordinance?

17      A.    No.

18      Q.    So you can't say if it's five ranges

19  spread throughout the city would be enough?

20      MR. SIGALE:  Objection.  Asked and answered.

21  BY THE WITNESS:

22      A.    No.

23  BY MR. WORSECK:

24      Q.    Do you have a view as to whether those



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 89 of 102 PageID #:5166

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      89

1  ranges would need to be sort of evenly dispersed

2  throughout the city in order for the Chicago ordinance

3  to be constitutional?

4       A.    No.

5       Q.    Would it be okay, say, if all the ranges

6  were on the North Side?

7            Say that Chicago had ten ranges all on

8  the North Side, would that be a constitutional

9  problem?

10      MR. SIGALE:  I'm going to object to the extent

11  you're asking her for a legal conclusion.  She's not

12  an attorney.

13           It also assumes facts not in evidence and

14  is speculative.

15  BY THE WITNESS:

16      A.    If the ranges were not accessible to the

17  population at large, it would not take care of the

18  constitutional -- not cover their constitutional right

19  to exercise their Second Amendment rights in training

20  for self-defense.

21  BY MR. WORSECK:

22      Q.    So SAF doesn't have sort of a wish list in

23  terms of what it would like to see in Chicago in terms

24  of the number of ranges and the location of ranges?



1        A.    No.

2        Q.    Have any SAF members who live in Chicago

3   indicated that there are particular locations in

4   Chicago that it would be a burden for them to travel

5   to to use a shooting range?

6        A.    Anecdotally, yes.

7        Q.    How many SAF members have done that?

8        A.    Anecdotally a dozen.

9        Q.    Which locations have they identified as

10  being too burdensome to travel to within the city for

11  a shooting range?

12       A.    Areas that they felt were not safe areas.

13  I'm not from Chicago.  I can't name all the

14  neighborhoods.

15       Q.    Is there anything you can tell me about

16  those areas or those neighborhoods in terms of where

17  they're located?

18       A.    Geographically?

19       Q.    Right.

20       A.    Some of them I've heard spoken of are on

21  the South Side.

22       Q.    Any other locations?

23       A.    Not specifically.

24       Q.    Aside from indicating that they didn't



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 91 of 102 PageID #:5168

JULIANNE VERSNEL                                        June 11, 2012
EZELL vs. CITY OF CHICAGO                                          91

1   think it was safe to travel to these locations, were

2   there any other reasons that they mentioned as to why

3   it would be a burden to travel to those locations?

4        A.   No.

5        Q.   You said that these were anecdotal

6   indications or conversations.

7             What do you mean by that?

8        A.   People spoke to me about the new CFP

9   requirements and range requirements in a general sense

10  and indicated that they didn't feel that this was

11  going to meet their needs.

12       Q.   When did these conversations occur?

13       A.   Over a period of four or five months.

14       Q.   Taking place when?  What point in time?

15       A.   My estimate is from June or July of 2011

16  through maybe October of 2011.

17       Q.   Did any of these individuals indicate to

18  you their preferred locations?  Where they would like

19  to see ranges open in the city?

20       A.   Not that I recall.

21       Q.   Aside from the provisions in the Chicago

22  Code that are listed at pages -- in the bullet points

23  at Pages 5 to 7 of the Amended Complaint, are there

24  any other provisions in Chicago's range ordinance that



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 92 of 102 PageID #:5169

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      92

1   the SAF is challenging?

2        A.    In addition to Count I on Page 11, we are

3   also --

4        MR. SIGALE:  Are you challenging any other

5   specific parts of the ordinance I think is his

6   question.  Am I right?  That's your question?

7   BY MR. WORSECK:

8        Q.    Yeah.  We spent a lot of time talking

9   about the specific provisions cited on Pages 5 through

10  7, and we walked through each one of those

11  individually.

12            And I'm just wondering if there are any

13  other provisions in the Chicago range ordinance that

14  aren't in your complaint that the Plaintiffs

15  nonetheless have a problem with and are challenging in

16  this lawsuit?

17       MR. SIGALE:  I'll just object to the extent that

18  the complaint speaks for itself.

19            But to the extent you can answer, go ahead

20  and answer.

21  BY MR. WORSECK:

22       Q.    I don't want this to be an exam.  I'm just

23  asking to your knowledge.

24       A.    I understand.  There are no specific



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 93 of 102 PageID #:5170

JULIANNE VERSNEL                                        June 11, 2012
EZELL vs. CITY OF CHICAGO                                          93

1  points that I can recall at this time that are not

2  covered in the Amended Complaint.

3       MR. WORSECK:  David, I don't have any further

4  questions at this time, but I'm going to leave this

5  open pending the response that we're still waiting for

6  as to the City's most recent set of Interrogatories.

7       MR. SIGALE:  Yeah.  I mean, I'll just put on the

8  record what I told Bill Aguiar and probably told you

9  as well.  As soon as I got a spare minute, or maybe

10  even today if the second deposition doesn't go, I'll

11  get that over to you.

12            But there's two Interrogatories, which

13  we're just going to be okay to and a document response

14  where we're going to say that we have no additional

15  documents.

16            So you're making your record.  I'm just

17  putting that on the record.

18       MR. WORSECK:  The record will be what it is.

19       MR. SIGALE:  Anything else?

20       MR. WORSECK:  No.

21  BY THE WITNESS:

22       A.   I had talked to you about this.

23       MR. SIGALE:  Oh, yeah.  Let's -- we can go on

24  the record.



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 94 of 102 PageID #:5171

JULIANNE VERSNEL                                           June 11, 2012
EZELL vs. CITY OF CHICAGO                                            94

1        MR. WORSECK:  Sure.

2    BY THE WITNESS:

3        A.    Maybe we can go on the record on the

4    Interrogatories, which were --

5    BY MR. WORSECK:

6        Q.    You're talking about Exhibit 2 to the

7    deposition?

8        A.    Yes.

9        MR. SIGALE:  Yeah.  Ms. Versnel wanted to make a

10   statement, I guess, in the form of supplementing an

11   answer in the interrogatory.

12       MR. WORSECK:  Okay.

13   BY THE WITNESS:

14       A.    Okay.  As to Question No. 1, there was

15   someone who approached me in April, mid-April.

16       MR. SIGALE:  Of 2012?

17   BY THE WITNESS:

18       A.    Of 2012.  About building or retrofitting a

19   range.  I don't have any information on who they were,

20   and I referred them to Action Target.

21             I don't know who they are.  Who they were.

22   I was at the NRA convention in St. Louis.

23   BY MR. WORSECK:

24       Q.    And someone came up to you at the



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 95 of 102 PageID #:5172

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      95

1 | convention and said, "I'm interested in looking into

2 | this," and you referred them to Action Target?

3 |     A.    I just wanted to make that clear.  If

4 | somebody said they talked to me.  Yeah.  Somebody did,

5 | but I don't know who.  I have no idea who they were.

6 |            And then there was one other thing in

7 | here.  In looking this over again, I realized that I

8 | missed something.

9 |            Now I don't know.  Maybe I misread

10 | something.  Okay.  Then maybe I misread the question.

11 |     MR. SIGALE:  Okay.  We're good?

12 | BY THE WITNESS:

13 |     A.    Okay.  Yeah.  I misread something in it.

14 |     MR. SIGALE:  Do I have anything?  Give me one

15 | second.  No, I'm good.  We'll reserve signature.

16 |            FURTHER DEPONENT SAITH NOT.

17 |     THE COURT REPORTER:  Counsel, will you be

18 | ordering the transcript?

19 |     MR. WORSECK:  Yes.  I'll take an e-trans with

20 | the exhibits, please.

21 |     THE COURT REPORTER:  Okay.  Thank you.

22 | Mr. Sigale, would you like to order a copy of the

23 | transcript?

24 |     MR. SIGALE:  I'll have to get back to you on



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 96 of 102 PageID #:5173

JULIANNE VERSNEL                                        June 11, 2012
EZELL vs. CITY OF CHICAGO                                        96

1  that.

2          THE COURT REPORTER:  Okay.  Thank you.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 97 of 102 PageID #:5174

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                      97

```
 1   STATE OF ILLINOIS    )

 2                        ) SS:

 3   COUNTY OF C O O K    )

 4              I, MARILYN T. LaPORTE, a Notary Public

 5   within and for the County of Cook, State of Illinois,

 6   and a Certified Shorthand Reporter of said state, do

 7   hereby certify:

 8              That previous to the commencement of the

 9   examination of the witness, the witness was duly sworn

10   to testify the whole truth concerning the matters

11   herein;

12              That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction and

15   constitutes a true record of the testimony given and

16   the proceedings had;

17              That the said deposition was taken before

18   me at the time and place specified;

19              That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in the

23   outcome of this action.

24              IN WITNESS WHEREOF, I do hereunto set my
```



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 98 of 102 PageID #:5175

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                     98

1    hand of office at Chicago, Illinois, this 19th day of

2    June, 2012.

3

4

5                        Notary Public,

6                        Cook County, Illinois

7                        My commission expires 6/21/13.

8

9    CSR Certificate No. 84-2095.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 99 of 102 PageID #:5176

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                     99

```
 1                    I N D E X

 2  WITNESS                          EXAMINATION

 3  JULIANNE VERSNEL

 4       By Mr. Worseck                      3

 5

 6                  E X H I B I T S

 7  NUMBER                               PAGE

 8  VERSNEL DEPOSITION

 9       Exhibit No. 1                    18

10       Exhibit No. 2                    79

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 100 of 102 PageID #:5177

JULIANNE VERSNEL                                          June 11, 2012
EZELL vs. CITY OF CHICAGO                                          100

1                        DEPOSITION ERRATA SHEET

2

3    Our Assignment No. 345550

4    Ezell v. City of Chicago

5

6              DECLARATION UNDER PENALTY OF PERJURY

7

8              I declare under penalty of perjury that I

9    have read the entire transcript of my Deposition taken

10   in the captioned matter or the same has been read to

11   me, and the same is true and accurate, save and except

12   for changes and/or corrections, if any, as indicated

13   by me on the DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath.

16

17                         Signed on the _____ day of

18                         _____, 20___.

19

20   _____

21        JULIANNE VERSNEL

22

23

24



Case: 1:10-cv-05135 Document #: 234-1 Filed: 12/06/13 Page 101 of 102 PageID #:5178

JULIANNE VERSNEL                                    June 11, 2012
EZELL vs. CITY OF CHICAGO                                    101

```
 1  |              DEPOSITION ERRATA SHEET
 2  |  Page No._____Line No._____Change to:_____
 3  |  _____
 4  |  Reason for change:_____
 5  |  Page No._____Line No._____Change to:_____
 6  |  _____
 7  |  Reason for change:_____
 8  |  Page No._____Line No._____Change to:_____
 9  |  _____
10  |  Reason for change:_____
11  |  Page No._____Line No._____Change to:_____
12  |  _____
13  |  Reason for change:_____
14  |  Page No._____Line No._____Change to:_____
15  |  _____
16  |  Reason for change:_____
17  |  Page No._____Line No._____Change to:_____
18  |  _____
19  |  Reason for change:_____
20  |  Page No._____Line No._____Change to:_____
21  |  _____
22  |  Reason for change:_____
23  |  SIGNATURE:_____DATE:_____
24  |                 JULIANNE VERSNEL
```



```
 1                 DEPOSITION ERRATA SHEET

 2     Page No._____Line No._____Change to:_____

 3     _____

 4     Reason for change:_____

 5     Page No._____Line No._____Change to:_____

 6     _____

 7     Reason for change:_____

 8     Page No._____Line No._____Change to:_____

 9     _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23     SIGNATURE:_____DATE:_____

24                    JULIANNE VERSNEL
```

