1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4

5    RHONDA EZELL, JOSEPH I. BROWN,       )

6    WILLIAM HESPEN, ACTION TARGET,       )

7    INC., SECOND AMENDMENT FOUNDATION,   )

8    INC., and ILLINOIS STATE RIFLE       )

9    ASSOCIATION,                         )

10                   Plaintiffs,          )

11             vs.                        ) No. 10 C 5135

12   CITY OF CHICAGO,                     )

13                   Defendant.           )

14           The deposition of JONATHAN GORDON,

15   called for examination, taken pursuant to the

16   Federal Rules of Civil Procedure of the United

17   States District Courts pertaining to the taking of

18   depositions, taken before JOY ISBELL, CSR No.

19   084-003616, a Notary Public within and for the

20   County of Cook, State of Illinois, and a Certified

21   Shorthand Reporter of said state, at Suite 1230,

22   30 North LaSalle Street, Chicago, Illinois, on the

23   27th day of April, 2012, at 11:00 a.m.

24

ji

```
 1   PRESENT:

 2          LAW FIRM OF DAVID G. SIGALE, P.C.,

 3          (739 Roosevelt Road, Suite 304,

 4          Glen Ellyn, Illinois 60137,

 5          630-452-4547), by:

 6          MR. DAVID G. SIGALE,

 7              appeared on behalf of the plaintiffs;

 8

 9          CORPORATION COUNSEL,

10          CITY OF CHICAGO,

11          (30 North LaSalle Street, Suite 1230,

12          Chicago, Illinois 60602-2580,

13          312-744-4216), by:

14          MR. WILLIAM MACY AGUIAR,

15          Assistant Corporation Counsel,

16              appeared on behalf of the defendant.

17

18

19

20

21

22

23

24   REPORTED BY:  JOY ISBELL, CSR #084-003616
```

ji

```
 1                    (WHEREUPON, the witness was duly

 2                     sworn.)

 3                        JONATHAN GORDON

 4   called as a witness herein, having been first duly

 5   sworn, was examined and testified as follows:

 6                        EXAMINATION

 7   BY MR. AGUIAR:

 8        Q.    I'd like to ask the witness to please

 9   state his full name for the record.

10        A.    Jonathan Gordon.

11        Q.    Good morning, Mr. Gordon.  My name is

12   William Aguiar.  I'm an assistant corporation

13   counsel for the City of Chicago's law department.  I

14   am the lawyer defending the city in the case of

15   Ezell vs. City of Chicago, 10 C 5135.

16        MR. AGUIAR:  Let the record reflect that this

17   is the deposition of Jonathan Gordon, taken pursuant

18   to Rules 30 and 45 of the Federal Rules of Civil

19   Procedure.

20   BY MR. AGUIAR:

21        Q.    Mr. Gordon, have you been deposed before?

22        A.    I don't think so.

23        Q.    Okay.  Let me explain to you what's going

24   on here today.  You have been subpoenaed to give
```

ji



```
 1  testimony in the case of Ezell vs. City of Chicago.

 2  And we're here today to take down your recorded

 3  testimony.  There is a court reporter to, I think,

 4  your left who will be taking down verbatim what is

 5  said here today in this room.  I'll be asking you a

 6  series of questions to which you will give me

 7  answers.  At times Mr. Sigale, who is to your right,

 8  who represents the plaintiffs in this case, may make

 9  objections.  Those objections are for the record,

10  and you will still have to answer the questions

11  despite his objections.

12           Is Mr. Sigale representing you here

13  today?

14      A.    No.  I don't know who I'm particularly

15  representing.

16      Q.    Do you have a lawyer here today?

17      A.    No.

18      Q.    Okay.  So you're here by yourself?

19      A.    Yes.

20      Q.    Okay.  Before we begin the proceeding,

21  I'd like to go over with you a couple of ground

22  rules for today's deposition.  The first and most

23  important ground rule is, if you don't understand a

24  question that I ask, please let me know.  It's
```

ji



```
 1   important that you let me know you don't understand

 2   the question, and I will do the best I can to get

 3   you a question that you do understand.  If you

 4   answer the question, I'm going to assume you've

 5   understood it as I've asked it.

 6           The court reporter can only take down

 7   verbal responses.  This is not being videotaped, so

 8   you must answer verbally to every question that I

 9   ask.

10       A.    Okay.

11       Q.    You can't nod or shake your head.

12           It's also for the court reporter's sake

13   that we not speak over one another.  I'd ask that

14   you let me ask my question before you actually

15   respond.

16       A.    Okay.

17       Q.    And I will try my best not to speak over

18   you.

19           And, finally, if you need a break at any

20   time, let me know, and we'll be certainly happy to

21   get you a break.  I'd just ask that you not take a

22   break while there's a question pending.

23       A.    Okay.

24       Q.    Can we mark this as Exhibit No. 1.
```

ji



```
 1        A.    Who writes the questions?

 2        Q.    Mr. Gordon, during today's proceeding,

 3   I'm asking the questions.  I don't mean to be formal

 4   with you, but a deposition is my opportunity to ask

 5   you questions.  You're the witness.  It's not really

 6   common for you to ask me questions during a

 7   deposition.

 8        A.    Okay.

 9        Q.    The only question, if you don't

10   understand what I'm asking you and we're trying to

11   get to an understanding of that, that would be fine.

12   But for today's -- to answer your question just

13   generally, I'm asking the questions.

14        A.    Okay.

15                   (WHEREUPON, a certain document was

16                    marked Gordon Deposition Exhibit

17                    No. 1, for identification, as of

18                    4/27/12.)

19   BY MR. AGUIAR:

20        Q.    Mr. Gordon, I'm handing you what the

21   court reporter has marked as Deposition Exhibit

22   No. 1.  This is a subpoena directed to you from my

23   office for your testimony here today in this case.

24   I'd like to ask you to please turn to the document
```

ji



```
 1   rider which basically begins -- you found the

 2   document rider, Exhibit A.  I'd like to ask you to

 3   turn to page 4 of the document rider.  And on

 4   pages 4 through 8, we've asked you to bring certain

 5   types of documents with you here today.  If you

 6   would, please, take a moment and look at the

 7   document requests.

 8          My question to you will be, after you

 9   review the document request, whether you have

10   brought with you all the documents that you're aware

11   of in your possession that would be responsive to

12   these requests.

13          So why don't you take a moment and look

14   at the requests, if you don't mind.

15      MR. SIGALE:  Is there supposed to be something

16   after page 8?

17      MR. AGUIAR:  No.  That's where it ends I think.

18      MR. SIGALE:  Oh, okay.

19      MR. AGUIAR:  Actually, maybe you're right.

20      MR. SIGALE:  Well, I guess what's important is

21   what he received.

22          So, Mr. Gordon, you brought your original

23   that you received, right?  Is there something after

24   page 8?
```

ji



```
 1        THE WITNESS:  No.

 2        MR. SIGALE:  That's where it ends.  There's

 3   probably a song titled that.

 4   BY MR. AGUIAR:

 5        Q.    If you would continue reviewing, please.

 6        A.    What's the MCC?

 7        Q.    The Chicago Municipal Code.

 8        A.    Okay.  So I'm ready to answer.

 9        Q.    Okay.  Thank you.

10              Have you had a chance to review the

11   document requests which were attached to your

12   subpoena?

13        A.    Yes.

14        Q.    And did you conduct a search for any

15   documents that would be in your possession, custody,

16   or control that would be responsive to these

17   requests?

18        A.     I searched my e-mail account for Chris

19   Hart, Action Target and just threw the word "gun" in

20   there.  And I pulled up all the e-mails I have on my

21   work e-mail account.

22        Q.    Are you aware of any other location where

23   there may be documents, besides your e-mail that are

24   responsive to these requests in your possession or
```

ji



JONATHAN GORDON                                    April 27, 2012
EZELL v. CITY OF CHICAGO                                        9

 1   control?

 2        A.    I switched jobs six months ago.  But at

 3   the old job, if there would have been any e-mails,

 4   it was -- probably would have been the same thing,

 5   like one or two e-mails that didn't really say

 6   anything other than here's my contact info, you

 7   know, I'm curious to talk, you know, about a range.

 8        Q.    Where did you work six months ago?

 9        A.    Transwestern.

10        Q.    What does Transwestern do?

11              What's its line of business?

12        A.    Professional services firm.

13        Q.    When you say "professional services

14   firm," what does that mean?

15        A.    Commercial real estate firm.

16        Q.    And where is this Transwestern located?

17        A.    Madison and Wells.

18        Q.    Here in Chicago?

19        A.    Yeah.

20        Q.    Do you happen to have the street address

21   by any chance?

22        A.    200 West Madison.

23        Q.    And when you say "commercial real estate

24   firm," in what way is it a commercial real estate

ji



 1  firm?

 2          Does it sell the real estate?  Does it

 3  buy real estate?  Is it a broker?

 4      A.    It services people who use real estate.

 5      Q.    What kind of service does it provide?

 6      A.    All service lines of real estate.

 7      Q.    What do you mean by "services"?

 8          Do they actually -- are they like

 9  property managers?

10      A.    They have an aspect of the group that

11  does property management.

12      Q.    What other aspects do they do?

13      A.    They do development, they do lease

14  analysis, they do -- they help companies build green

15  office space.

16      Q.    Anything else that you can recall as you

17  sit here today?

18      A.    What?

19      Q.    Anything else you can recall as you sit

20  here today that they did besides what you already

21  talked about?

22      A.    No, they didn't do any of this stuff for

23  me or for a range.  It's just what they do as a

24  business.

ji



```
 1        Q.    That's what I'm saying.  I'm talking

 2   about what the business did.  That's all I'm asking

 3   you about.

 4        A.    It's a commercial real estate firm.  I

 5   mean ...

 6        Q.    Okay.  I understand that.  It's a very

 7   generic broad term.  I'm trying to understand what

 8   that encompasses.

 9        A.    Sure.  Really, that's a good sample of

10   the things they do.

11        Q.    Okay.  That's all I'm trying to get at.

12   I'm not as well versed in this as you are.  I'm

13   trying to understand what that does.

14        A.    Okay.

15        Q.    And you believe that there may possibly

16   be documents that would be responsive to the

17   subpoena on your e-mail at Transwestern, while you

18   were at Transwestern; is that correct?

19        A.    There is like -- of what you're asking

20   for like documents, there is nothing that even like

21   scratches the surface of this level of detail.  It

22   would have been like in -- it would have been the

23   same e-mail there, Chris, I hear you build ranges.

24   I'd love to hear about it, because I think it's an
```

ji



 1    interesting thing.

 2        Q.    Okay.  But what I'm saying is, there may

 3    be documents at Transwestern to which you don't have

 4    access right now that might be responsive; is that

 5    correct?

 6        A.    Sure.

 7        Q.    Okay.  Are you aware of any other

 8    location where there may be documents which would be

 9    responsive to the subpoena?

10        A.    No.

11        MR. AGUIAR:  Okay.  Would you mark this as

12    Exhibit No. 2.

13                    (WHEREUPON, a certain document was

14                     marked Gordon Deposition Exhibit

15                     No. 2, for identification, as of

16                     4/27/12.)

17    BY MR. AGUIAR:

18        Q.    Mr. Gordon, I'm handing you what's been

19    marked as Deposition Exhibit No. 2.  If you would,

20    please, take a moment and look at that for me.

21        A.    Okay.  I'm looking at it.

22        Q.    Okay.  Are these the documents that you

23    located that were responsive to the city's subpoena?

24        A.    Correct.

ji



1      Q.    Okay.  And you're not aware of any others

2    in your possession that would be responsive?

3      A.    I'm not.

4      Q.    Mr. Gordon, did you talk to anybody about

5    your testimony here today?

6      A.    I told my fiancee.

7      Q.    Other than your fiancee, have you talked

8    to anybody else about your deposition here today?

9      A.    Not really.

10     Q.    Okay.  You did speak with Mr. Sigale

11   prior to the beginning of today's deposition, didn't

12   you?

13     A.    I did.

14     Q.    Okay.  What did you and Mr. Sigale speak

15   about?

16     A.    I don't particularly think I'm the right

17   person to be here right now.  I've traded e-mails

18   with Chris Hart, talked to him once, but I haven't

19   scratched the surface on anything that has to do

20   with a gun range.  I think it's a great idea.  I

21   would love a high-end shooting club in the city.

22   And I would either pay a lot of money to be a

23   member, or I believe in the idea so much that I'd be

24   happy to write a check and be an investor.  But

ji



JONATHAN GORDON
EZELL v. CITY OF CHICAGO

April 27, 2012
14

1  apparently it's not going to happen.  It just can't

2  happen in Chicago, because I hear that the

3  restrictions are tough, so that's fine.  I can go

4  shoot when I'm in a foreign country or in Wisconsin,

5  or -- I'm not even that big of a marksman.  I've

6  shot a gun a couple times.

7      MR. SIGALE:  Can we just clarify for a second,

8  Mr. Gordon --

9      MR. AGUIAR:  Wait.  David, I'm asking.  You can

10  clarify when I'm done.  I'm going to clarify.  I

11  will clarify.

12  BY MR. AGUIAR:

13      Q.    Mr. Gordon, you just spoke -- was that

14  the substance of your conversation with Mr. Sigale

15  this morning?

16      A.    No, we didn't really have time to talk

17  about anything this morning.

18      Q.    Okay.  Well, let me back up then.

19          Before today's deposition, you did speak

20  with Mr. Sigale?

21      A.    Yes.

22      Q.    Okay.  I'd like to know what you guys

23  talked about, who said what to whom.

24      A.    We didn't really trade many words.  I

ji



 1  mean, I was just asking basic questions like who the

 2  people are in the room and kind of how this all came

 3  about and why I'm here.  I mean, I'm happy to help.

 4  I just don't know if I'm the right person to help.

 5       Q.    I understand.

 6             What did Mr. Sigale say in response to

 7  your questions about why you're here today and who

 8  the players are?

 9       A.    He didn't really have time to answer

10  them.  We were in and out of the room.  He told me

11  that -- he mentioned Rhonda and the other people

12  that are listed on the sheet, and that was about it.

13       Q.    Okay.  Is that the basic gist of your

14  conversation with Mr. Sigale this morning?

15       A.    Yes.

16       Q.    Okay.  Nothing else that you recall?

17       A.    No.

18       Q.    Did you review any documents in

19  preparation for today's deposition?

20       A.    Just this (indicating).

21       Q.    And you're handing --

22       A.    Subpoena.

23       Q.    Just the subpoena?

24       A.    Yeah.

ji



JONATHAN GORDON                                    April 27, 2012
EZELL v. CITY OF CHICAGO                                       16

```
 1        Q.    Okay.  Anything else?

 2        A.    I called you.

 3        Q.    Yes, to set up today's date, correct?

 4        A.    Yes.  And I asked you basic background

 5   questions.

 6        Q.    Okay.  Other than our conversation, you

 7   didn't look at any documents though?

 8        A.    No, I didn't look at any documents.

 9        Q.    Okay.  Mr. Gordon, are you currently

10   employed?

11        A.    Yes.

12        Q.    Where are you employed?

13        A.    Cushman & Wakefield.

14        Q.    And what line of work is Cushman &

15   Wakefield in?

16        A.    They're a commercial real estate firm.

17        Q.    And, again, could you describe for me

18   what kind of work that entails for Cushman &

19   Wakefield in general?

20        A.    They help people that own and invest and

21   use real estate.

22        Q.    When did you start with Cushman &

23   Wakefield?

24        A.    About six months ago.
```

ji



1      Q.    And what is your job title?

2      A.    Director.

3      Q.    Do you have a specific area that you're

4   director of?

5      A.    I work in office leasing.

6      Q.    And what types of things do you do in

7   office leasing?

8      A.    You help companies, you know, financially

9   benefit from the use of their office lease.  I

10  helped a group in the building, in this building,

11  negotiate the terms in their renewal with the

12  landlord.

13     Q.    Are you a licensed real estate agent?

14     A.    Correct.

15     Q.    Where are you licensed?

16     A.    State of Illinois.

17     Q.    How long have you been licensed for?

18     A.    Probably seven or eight years; maybe

19  longer.

20     Q.    Are you licensed anywhere else?

21     A.    No.

22     Q.    Are you a licensed real estate broker?

23     A.    I think now I am because of the new

24  requirements.

ji



JONATHAN GORDON
EZELL v. CITY OF CHICAGO

April 27, 2012

```
 1      Q.    Where are you licensed as a broker?

 2      A.    Illinois.

 3      Q.    Okay.  How long have you been licensed?

 4      A.    They may have gotten rid of the

 5 salesperson's license and made everyone take the

 6 broker's test.  I did that a few months ago.

 7      Q.    Okay.  And did you pass that test?

 8      A.    I passed that test.

 9      Q.    Okay.  But you don't know when you

10 actually got licensed?

11            It would have been in the last four or

12 five months?

13      A.    I would have renewed the license in the

14 last -- in 2012.

15      Q.    How long have you been in this line of

16 work?

17      A.    Seven or eight years.

18      Q.    Okay.  And before working at Cushman

19 Wakefield, were you with Transwestern?

20      A.    Correct.

21      Q.    How long were you with Transwestern?

22      A.    Seven years.

23      Q.    And while you were at Transwestern, what

24 did you do for them?
```

ji



```
 1      A.    The same thing I do at Cushman Wakefield.

 2      Q.    Okay.  And before working at

 3  Transwestern, did you work somewhere else?

 4      A.    I did.

 5      Q.    What did you do?

 6      A.    I was a residential mortgage broker.

 7      Q.    How long were you a residential mortgage

 8  broker for?

 9      A.    Two to three years.

10      Q.    And who did you work for?

11      A.    Sunrise Financial.

12      Q.    Where are they located?

13      A.    I don't know if they're located anymore.

14      Q.    Where were they located when you worked

15  for them?

16      A.    Bucktown.

17      Q.    That's in the City of Chicago?

18      A.    Correct.

19      Q.    Okay.  And what did you do as a

20  residential mortgage broker?

21      A.    Wrote mortgages.

22      Q.    Okay.  Was it exclusively residential?

23      A.    Yes.

24      Q.    Okay.  No commercial?
```

ji



 1      A.    No.

 2      Q.    Okay.  Before working for Sunrise

 3  Financial, did you have another position?

 4      A.    I was a student.

 5      Q.    Okay.  Where were you a student?

 6      A.    The University of Kansas.

 7      Q.    And were you obtaining your bachelor's

 8  degree?

 9      A.    Correct.

10      Q.    And did you graduate?

11      A.    Yes.

12      Q.    What year?

13      A.    2002.  The diploma might say 2003.

14      Q.    And why is that?

15      A.    I may have had one online class.

16      Q.    Okay.  That hung over to 2003?

17      A.    Correct.

18      Q.    And what was your major at the University

19  of Kansas?

20      A.    Journalism.

21      Q.    In any of your jobs since graduating from

22  the University of Kansas, have you been involved in

23  any firing ranges at all?

24      A.    How would I be involved?

ji



1      Q.    Did you manage any of them?  Strike that

2  question.

3            Did you provide services for any kind of

4  company that was trying to open or operate a firing

5  range?

6      A.    No.

7      Q.    Okay.  Did you work at any firing ranges?

8      A.    No.

9      Q.    Have you been to any firing ranges?

10     MR. SIGALE:  Objection as to vague and overly

11  broad.

12  BY MR. AGUIAR:

13     Q.    You can answer.

14     MR. SIGALE:  If you understand it.

15  BY THE WITNESS:

16     A.    Have I been to any firing ranges?

17  BY MR. AGUIAR:

18     Q.    Yes.

19     A.    I was at a firing range in Israel within

20  the last three years.

21     Q.    So it would be fair to say that in your

22  professional experience since graduating from

23  Kansas, you have not had occasion to deal with

24  firing ranges in a professional capacity?

ji



1       A.      Correct.

2       Q.      Okay.  And other than your visit to the

3   firing range in Israel, do you recall being at a

4   firing range in the past ten years?

5       A.      In the past ten years?  I don't believe I

6   have.

7       Q.      Okay.  In your current job with Cushman &

8   Wakefield, you work in commercial real estate,

9   correct?

10      A.      Correct.

11      Q.      Does that work ever spill over into

12  industrial uses of property?

13      A.      There are industrial brokers at Cushman &

14  Wakefield that specialize in industrial real estate.

15      Q.      But do you ever work in that area?

16      A.      Do I?  I would not.  I would bring on an

17  expert to help work with an industrial property.

18      Q.      And same question for manufacturing:  Has

19  your work ever involved manufacturing properties

20  before?

21      A.      It has not, and I would bring in an

22  expert in that area.

23      Q.      Have you had opportunity to work with

24  experts in industrial or manufacturing uses of

ji



1    property in your job at Cushman & Wakefield?

2        A.    That's really vague.

3        Q.    Has there been an instance where you felt

4    you needed to consult with an expert at Cushman &

5    Wakefield regarding either industrial or

6    manufacturing uses of property?

7        A.    I routinely talk to the industrial

8    brokers to like -- cause I'm friends with them and

9    because it's good business to know what they're

10   working on and for me to tell them what I'm working

11   on.  Like some office companies that I help with

12   office space have industrial space.

13       Q.    Do you go to the industrial people at

14   Cushman & Wakefield and ask for their advice and

15   counsel as to how to deal with those issues?

16       A.    Well, I would never deal with the issues.

17   I would just introduce them if there was an

18   opportunity.  But it hasn't happened.

19       Q.    Okay.

20       A.    We haven't closed any deals.

21       Q.    What about while you were with

22   Transwestern; you dealt with commercial real estate

23   there, correct?

24       A.    Yes.

ji



1     Q.    Did you ever deal with either

2  manufacturing or industrial real estate while you

3  were at Transwestern?

4     A.    I was friendly with all the employees

5  which included the industrial brokers, so I guess if

6  that's dealing with industrial real estate, then

7  sure.

8     Q.    But did you ever have a deal which

9  involved industrial manufacturing real estate?

10     A.    I sourced a deal for a printing company,

11  and then I had an industrial broker go do the deal

12  in Aurora.  They sort paper.

13     Q.    But you didn't do the deal yourself; you

14  just sourced it out to a colleague?

15     A.    I was copied on the e-mails, and I did

16  some quality control, but I don't really get

17  involved in the intricacies of industrial real

18  estate.

19     Q.    Okay.  Do you have a specific geographic

20  territory in which you do your work?

21     A.    The majority of the work is in the

22  central business district.

23     Q.    Of Chicago?

24     A.    Correct.

ji



1      Q.     Are there occasions when the work goes

2   outside of the central business district?

3      A.     Helping a company in Austin, Texas look

4   for office space.

5      Q.     Do you help companies find office space

6   outside of the central business district meaning the

7   suburbs or other parts of the city?

8      A.     If I choose to.

9      Q.     Have you with Cushman & Wakefield?

10     A.     I have not closed any transactions

11  outside of the central business district.

12     Q.     Okay.  What about while you were with

13  Transwestern; again, what was your geographic area

14  with them?

15     A.     I did over a hundred transactions at

16  Transwestern for people all over the country.

17     Q.     Okay.  So you closed deals all over the

18  country?

19     A.     The majority were in the Loop, the

20  central business district.

21     Q.     Were there any in the other areas of

22  Chicago besides the Loop?

23     A.     I'm sure they were everywhere.

24     Q.     Okay.  And the Chicago suburbs?

ji



JONATHAN GORDON                                              April 27, 2012
EZELL v. CITY OF CHICAGO                                                 26

1      A.     I helped a company in Naperville.

2      Q.     Okay.  In your job as a director with

3   commercial real estate, does your job require you to

4   ever consult with the Chicago Zoning Ordinance?

5      A.     If necessary I would.

6      Q.     Okay.  What kind of reasons would you

7   look at the Chicago Zoning Ordinance in general in

8   doing your job?

9      A.     I have no idea.  Maybe for city

10  incentives in the Loop to understand where the TIF

11  area is.

12     Q.     Do you ever determine what the zoning of

13  property is?

14     A.     No.

15     Q.     You've never looked at the Chicago Zoning

16  Ordinance and said, I think the property is zoned

17  this particular zoning classification?

18     A.     No, never done that.

19     Q.     Okay.  Have you ever used the city's

20  zoning maps?

21     A.     No.  I've seen them.

22     Q.     But you've never consulted them in your

23  line of work?

24     A.     I don't consult them?  How so?

ji



 1      Q.    You don't use them to further your job,

 2   to use in your job?

 3      A.    No.

 4                  (WHEREUPON, a certain document was

 5                  marked Gordon Deposition Exhibit

 6                  No. 3, for identification, as of

 7                  4/27/12.)

 8   BY MR. AGUIAR:

 9      Q.    Mr. Gordon, I'm handing you what the

10   court reporter has marked as Deposition Exhibit

11   No. 3.  I will let you know that these are the

12   responses by the plaintiff Action Target to the

13   City's second set of interrogatories.

14            Have you seen this document before?

15      A.    No.

16      Q.    Okay.  I'm going to ask that you turn to

17   what would be the third page of this document.

18   You'll see down at the bottom there's the No. 1, and

19   I'll read it into the record.  Are we on the same

20   page?  I think you need to flip one -- may I look at

21   this document again?

22      A.    Yes.

23      Q.    Yes; you went too far.  There you go.

24            David, are you with me?

ji



 1      MR. SIGALE:  Yes.  Go ahead.  You're on the

 2  bottom of page 3.

 3      MR. AGUIAR:  3.  Okay.

 4  BY MR. AGUIAR:

 5      Q.    There the City asked plaintiff Action

 6  Target, quote:  "Identify all communications

 7  involving any person or party, including any

 8  plaintiff or any actual or anticipated customer of

 9  any plaintiff, related to the potential or actual

10  retrofitting, construction, operation, and/or use of

11  a firearms range in Chicago, including any such

12  communications involving the City."

13          And then if you'll turn to the next

14  page --

15      A.    Okay.

16      Q.    -- in responding to that interrogatory,

17  Action Target stated:  "Numerous telephone and

18  e-mail inquiries that did not lead to proposals and

19  for whom a record was not made.  Ones for which a

20  record was made were -- and then they list a series

21  of names with numbers next to them.

22      A.    Okay.

23      Q.    If you look on the next page, No. 6, they

24  say Jonathan Gordan, and they provide a telephone

ji



```
 1   number, and then there's a parentheses, and in that

 2   parentheses says:  "Wants to do range in Chicago."

 3       A.    Okay.

 4       Q.    Do you have any present intention to own

 5   or operate a firing range in the City of Chicago?

 6       A.    No.

 7       Q.    Okay.  Did you ever have an intention or

 8   plan to own or operate a firing range in the City of

 9   Chicago?

10       A.    I was curious to learn about the rules.

11       Q.    What made you curious to learn about the

12   rules?

13       A.    I think it could be a profitable

14   operation.

15       Q.    What led you to think that you might want

16   to own or operate a range in the City of Chicago?

17             What was the genesis of the idea?

18       MR. SIGALE:  Objection as to mischaracterizing

19   his testimony.

20             Go ahead and answer, Mr. Gordon.

21   BY THE WITNESS:

22       A.    What's your question?

23   BY MR. AGUIAR:

24       Q.    What was the genesis of your idea to open
```

ji



1   or operate a range in the City of Chicago or become

2   more curious about it?

3       A.    I want to learn about all good business

4   ideas.

5       Q.    And what made you think that a gun range

6   in the City of Chicago would be a good business

7   idea?

8       A.    Well, there isn't one now, and any time

9   you can be the first one in on something, it's

10  probably a good idea to get in at the ground floor.

11      Q.    I'd like to understand what made firing

12  ranges pop into your head.

13            Was there an event?  Did you read

14  something?  Was there something which triggered the

15  idea to opening a firing range in the City of

16  Chicago that made you want to look into it?

17      A.    Well, I've been pheasant hunting once.

18      Q.    And how does that relate to wanting to

19  open a range?

20      A.    I don't know.  I enjoyed it.

21      Q.    When did you go pheasant hunting?

22      A.    I don't recall.

23      Q.    Was it in the last year?

24      A.    Probably within the last three years.

ji



 1      Q.    Okay.  What I'm trying to understand,

 2  Mr. Gordon, is one day you woke up supposedly and

 3  decided you wanted to look into opening a firing

 4  range in the City of Chicago or you wanted to find

 5  out more information, so to speak; is that right?

 6      A.    I probably always thought it was a good

 7  idea.  I still think it's a good idea.

 8      Q.    Was there an event?  Did you read

 9  something?  Was there something which triggered the

10  idea for you to move forward with trying to figure

11  it out?

12      A.    I remember when the newspaper said that

13  the City changed their rules.

14      Q.    And what did the newspaper article tell

15  you about it?

16      A.    I don't remember specifics.

17      Q.    Okay.  But was it that the City was now

18  allowing ranges to open in the city?

19      A.    It was that debate.

20      Q.    Okay.  And is that what led you to want

21  to look into opening a range?

22      A.    That's what led me to make a phone call

23  to Chris and say, you know, What's going on.

24      Q.    When you said "make a phone call to

ji



 1  Chris," who do you mean?

 2        A.    At Action Target.

 3        Q.    Would that be Chris Hart?

 4        A.    Correct.

 5        Q.    When did you make that phone call to

 6  Chris Hart?

 7        A.    I think you would probably know better

 8  than me.

 9        Q.    Actually I'm asking you.

10        A.    I don't know.

11        Q.    Okay.  Would it have been this year?

12        A.    I have called him; I called him this

13  year.  But it probably would have been around the

14  time that the newspaper article came out.

15        Q.    Before calling Mr. Hart, did you know

16  him?

17        A.    I still don't know him.

18        Q.    Then how did you come to call Mr. Hart?

19        A.    I searched the internet.

20        Q.    What kind of search did you run, do you

21  recall?

22        A.    I don't.

23        Q.    What were you looking for on the

24  internet?

ji



JONATHAN GORDON                                    April 27, 2012
EZELL v. CITY OF CHICAGO                                       33

```
 1        A.    I don't know.  I mean, I look up a

 2   hundred things, probably, an hour on the internet.

 3   So, I mean, I could have been reading an article

 4   about gun ranges in Chicago and then switched to the

 5   White Sox in the same thought.

 6        Q.    But what were you looking for when you

 7   were doing your search?

 8        A.    Well, I was just curious as to know what

 9   was going on with the gun range in Chicago.

10        Q.    Okay.  So you ran an internet search?

11        A.    Correct.

12        Q.    Okay.  And is that how you obtained

13   Mr. Hart's name?

14        A.    Correct.

15        Q.    Okay.  Did you look at --

16        A.    It could have been from an article.  I

17   don't know specifically how I got his name.

18        Q.    But you didn't know him before you

19   contacted him?

20        A.    I still don't know him.

21        Q.    Okay.  Did you know anybody who knew him?

22        A.    No.  I still don't.  I don't know anyone

23   that knows him.

24        Q.    So you cold-called him, so to speak?
```

ji



```
 1        A.    Correct.

 2        Q.    Okay.  Did you speak with Mr. Hart?

 3        A.    Yes.

 4        Q.    Okay.  And that conversation was sometime

 5   this year?

 6        A.    I've talked to him in 2012.  I also think

 7   I talked to him in 2011 or whenever that article

 8   came out.

 9        Q.    Okay.  Approximately how many times have

10   you spoken with Mr. Hart?

11        A.    Less than five.

12        Q.    Okay.

13        A.    Certainly less than ten.

14        Q.    When you first spoke with Mr. Hart, do

15   you recall what you said to him?

16        A.    No.

17        Q.    What was the general idea of your

18   conversation?

19              Why were you calling him?

20        A.    Chris, hi, Jonathan Gordon.  I'm reading

21   this newspaper article about gun ranges potentially

22   in the city.  That would be really cool.  It would

23   be even better if it was in River North by my house.

24   What's going on with that?
```

ji



 1      Q.    Okay.  And what did Mr. Hart say to you,

 2  do you recall?

 3      A.    I don't recall.  I assume he sent -- he

 4  e-mailed me a couple attachments that had the

 5  ordinance.  And then I either read the next day in

 6  the newspaper the ordinance was so stringent that

 7  you're never going to be able to open a gun range,

 8  and then I dropped it.

 9      Q.    Why don't we look at Exhibit No. 2

10  which -- where is Exhibit No. 2?  There we go.  It's

11  over here.

12            Mr. Gordon, if you look at Exhibit No. 2,

13  these are the documents you brought with you here

14  today.

15      A.    Okay.

16      Q.    The first looks like it's an e-mail from

17  Chris Hart --

18      A.    Right.

19      Q.    -- to Curt at c-a-r-o-l-o-g-y-i-n-c

20  dot-com and you.  The subject says Chicago Range

21  Regulations.  And there are, it looks like, appear

22  to be two attachments, one that says 7.28.11 Gun

23  Range Ordinance Amendment Proposal.

24      A.    Okay.

ji



1     Q.    And the second says Chicago Range

2  Ordinance 07, dash, 11.

3     A.    Okay.

4     Q.    Does this refresh your recollection as to

5  when you spoke with Mr. Hart for the first time?

6     A.    Well, this wouldn't be the -- I don't

7  know if this would be the first time.  I don't

8  know when the first time was.  I don't even know

9  when I -- if I double-clicked on these attachments.

10    Q.    Okay.  Do you recall what happened as a

11  result of your first conversation with Mr. Hart?

12          Was there any plan to talk again?

13    A.    Nothing happened as a result of my first

14  conversation or any of my conversations.

15    Q.    Well, how did you leave things with

16  Mr. Hart after you spoke with him for the first

17  time?

18    A.    Probably discouraged that it's probably

19  not going to happen, that, you know, no one is going

20  to open a gun range.  So I probably didn't think

21  about it again.

22    Q.    Did Mr. Hart discuss with you his

23  intentions to open a firing range?

24    A.    I don't think he is an owner-operator of

ji



 1   a firing range.  I don't think that's what he does.

 2       Q.   Did he discuss his plans to either build,

 3   retrofit, or construct a firing range in Chicago?

 4       A.   No.  I think he does that in other parts

 5   of the state or country.  I have no idea if he has

 6   specific plans to do it in Chicago.  I think it's

 7   like a nonstarter.

 8       Q.   I'm just trying to understand.  I'm

 9   trying to gather facts as to what was said in the

10   conversations.

11           So you spoke to him the first time.  You

12   called him out of the blue.  And you spoke about

13   wanting to open a firing range in Chicago.

14       A.   Okay.

15       Q.   Did Mr. Hart discourage you from doing

16   that?

17       A.   I don't think he like helped in one way

18   for or against.  I think it's just a really tough

19   thing to do because of these ordinances.

20       Q.   Is that what he told you though?

21       A.   No, he didn't have to.

22       Q.   Okay.  Where did you learn that from

23   then?

24       A.   Probably the Sun-Times.

ji



1      Q.    Okay.  And you knew that before you

2  called him?

3      A.    I don't know.

4      Q.    I'm trying to understand the time line of

5  how you communicated with Mr. Hart and how you

6  determined whether or not you wanted to proceed with

7  opening a range.  That's what I'm trying to get at

8  here.

9      A.    I have no personal financial means to

10  open a gun range.

11      Q.    Okay.  I understand.  Okay.  I'm just

12  trying to understand the process that went on.

13  Things happen in sequential order.  I'm trying to

14  understand how you first -- from when you first

15  called Mr. Hart to when you stopped talking to

16  Mr. Hart, I want to get an idea of what those

17  communications were and what was said.  That's all

18  I'm trying to do here.  Okay.

19          So my first question is:  You spoke to

20  Mr. Hart after doing an internet search, right?  And

21  you expressed to him, based on your testimony, an

22  interest in ranges in Chicago; is that correct?

23      A.    I don't think I have the answers that

24  you're looking for me to give you.  And there, like

ji



JONATHAN GORDON
EZELL v. CITY OF CHICAGO

April 27, 2012
39

1    I -- nothing came out of the conversation.  Like I'm

2    a curious guy.  If I can match supply with demand,

3    I'm curious to be interested in what's going on,

4    whether it's like widgets or a gun range.

5         Q.    Mr. Gordon, I appreciate that you're here

6    and you're trying to answer my questions; I really

7    do appreciate that.  What's happening here is I need

8    to understand the sequence of events, things -- A

9    comes before B, and then B comes before C, and then

10   you have D.  That's what I'm trying to do here.

11   Whether -- I don't want to get to Z yet.  I want to

12   go methodically through how this happened, what your

13   conversations were.  If you don't recall, that's

14   fine.  If you don't -- if there were no

15   conversations, that's fine.  I just need to know how

16   it played out.  Okay?  So what -- I'm just trying to

17   understand the sequence here.

18              You said you had five conversations with

19   him, no more than five I think is what you testified

20   to.  I want to understand what happened in each of

21   those conversations to the best that you can recall.

22   That's all I'm trying to do.

23              So you spoke with him first based on the

24   internet search.

ji



1          And I don't want to characterize your

2   testimony, but I believe you said that you expressed

3   interest in ranges to Mr. Hart; is that correct?

4          A.    I probably said, Tell me more about what

5   you do in building ranges.

6          Q.    And what did Mr. Hart say to you in

7   response?

8          A.    I don't remember.

9          Q.    Okay.  How did you leave the conversation

10  with Mr. Hart?

11         Did you make a plan to speak again?

12         A.    I doubt it.  But I'm happy to know that a

13  guy like that exists.  I think what he does is neat.

14         Q.    Okay.  But did he make a plan to call you

15  back?

16         A.    He's a professional salesman, so I would

17  hope that if he talked to me that, you know, he

18  would check in every six months.

19         Q.    Okay.  So you had that one phone

20  conversation.

21         And then what happened next?

22         A.    I wouldn't hold me to one.  It could have

23  been two.  I could have called him and then got

24  another call.  He could have called me back.  I

ji



1  don't know specifically if it was one or two or how

2  long we spoke.  But I pretty much have summed up

3  what I think we talked about.

4      Q.    That you expressed an interest in opening

5  a range --

6      A.    Sure.

7      Q.    -- or operating a range or something

8  about ranges.

9            And what did Mr. Hart tell you?

10     A.    That he does turnkey -- builds out

11  turnkey ranges.  He probably said, Look at my

12  website.  He probably said, I've done work for law

13  enforcement.

14            I probably looked at the website and

15  said, Wow, this is cool.

16     Q.    Did you go to the Action Target website?

17     A.    Yes, I have been to their website.

18     Q.    Okay.  Let's go back to Exhibit 2, the

19  documents you brought with you today.

20            On March 5, this is an e-mail from Chris

21  Hart to you, correct?

22     A.    On -- which one are we at?

23     Q.    We're on the first page of Gordon Exhibit

24  No. 2, page No. 1.

ji



JONATHAN GORDON                                    April 27, 2012
EZELL v. CITY OF CHICAGO                                       42

```
 1        A.    Okay.

 2        Q.    Actually, why don't we start with the

 3   second page of the document.

 4        A.    Okay.

 5        Q.    That is an e-mail from P. Curtis

 6   Bettiker, B-e-t-t-i-k-e-r.

 7              Who is P. Curtis Bettiker?

 8        A.    A friend.

 9        Q.    Okay.  Is he a colleague?

10        A.    He doesn't -- he's not a colleague.

11        Q.    Okay.  What line of work is Mr. Curtis

12   Bettiker in?

13        A.    He -- I don't know.  He's a friend.  He's

14   my age, a peer.

15        Q.    What kind of work is he in, do you know?

16        A.    He was in -- owned a tow truck.  I don't

17   know what he does now.

18        Q.    Okay.  Do you know whether Mr. Bettiker

19   has any experience in owning or operating a firing

20   range?

21        A.    None.

22        Q.    Okay.  The subject is re:  Chicago Rep.

23              Do you know what Chicago Rep means?

24        A.    I don't.
```

ji



1      Q.    Okay.  Below that it says on March 5,

2   2012 at 1:51 p.m., "Jonathan Gordon wrote," and then

3   it says:  "Curt, below is the contact info for the

4   guys I was telling you about."

5            And then beneath that is Chris Hart's

6   signature block.

7      A.    Yes.

8      Q.    And beneath that is your signature block.

9      A.    Correct.

10     Q.    Did Mr. Hart send you information?

11     A.    You saw that other e-mail where he

12   attached -- had some attachments.

13     Q.    Yes, but the prior e-mail is dated after.

14     MR. SIGALE:  No, it's not.

15     MR. AGUIAR:  March 5, 2012, 2:43 p.m.

16     MR. SIGALE:  March 5, 1:58 p.m.

17     MR. AGUIAR:  Yes.  The e-mail from Chris Hart

18   occurred after.

19   BY THE WITNESS:

20     A.    I would assume he sent me attachments the

21   first time I spoke to him.  And then when I spoke to

22   him in March, he probably sent me attachments again.

23   I don't know.  It would make sense.  He's trying to

24   sell his services.

ji



JONATHAN GORDON
EZELL v. CITY OF CHICAGO

April 27, 2012
44

 1   BY MR. AGUIAR:

 2       Q.    Were you considering working with

 3   Mr. Bettiker on opening a range or operating a range

 4   in the City of Chicago?

 5       A.    You can't open a range in Chicago.

 6       Q.    What is that based on?

 7       A.    From what I know from reading in the

 8   newspapers.  It's really difficult to do.  So I'm

 9   not going to go put all my man hours and my time and

10   money towards a project like this.  I'm not -- it's

11   not something that I'm doing or plan on even looking

12   into further.

13       Q.    My question is:  Did you and Mr. Bettiker

14   ever speak about opening a range?

15       A.    We, in bar conversation, he's a friend,

16   Oh, wouldn't it be great if there was a range in

17   Chicago.  And I said, you know, I talked to this guy

18   about a year ago.  I'd be happy to put you in touch

19   with him.

20       Q.    And is that what you were doing on this

21   e-mail?

22       A.    Well, that's what I did.  But I didn't

23   follow up.  I didn't say, How's it going, are you

24   still doing this?  Because I don't think there's a

ji



1  high probability of it happening.  I mean, I hang

2  out with a lot of outdoors men, and it's great

3  conversation, Is there ever going to be a range in

4  Chicago.

5      Q.    So other than the bar conversation you

6  had with Mr. Bettiker, you didn't have any other

7  conversations with him about opening a range in the

8  City of Chicago?

9      A.    We've talked about it being a great idea.

10     Q.    Besides talking about it, have you done

11  anything besides talking about it?

12     A.    No.

13     Q.    Okay.  There's no business plan, there's

14  no plans to move forward with the range?

15     A.    Correct.

16     Q.    On the second page of Exhibit No. 2,

17  looking at the middle section where it says, Curt,

18  and it starts:  "Below is the contact info for the

19  guys," you wrote that, correct?

20     A.    Uh-huh.  Yes.

21     Q.    And in the second paragraph you say:  "A

22  gun range would be extremely difficult to get

23  approved, as most interesting ideas like this are

24  not easy."

ji



1          What is that statement based on?

2     A.    I don't know.  It's like I feel like I

3 keep saying the same thing, and you keep asking me

4 more questions.

5     Q.    That's what I do.

6     A.    So where is the end point on this?

7     Q.    It's coming up.  But I'm here to ask you

8 questions.  This is important information to this

9 lawsuit.  And I recognize that you may not see it

10 that way, but it is important.  So I'm asking

11 relevant questions that go to the heart of the

12 matter.

13          So I'd like to ask you to focus and, to

14 again, let me know, when you wrote that sentence,

15 that first sentence, "a gun range would be extremely

16 difficult to get approved," what were you basing

17 that statement on when you wrote that?

18     A.    I don't know.  To me, it's like typical

19 just broker language.  I'm trying to sound

20 professional.  And rather than just say, If you want

21 to go ahead and waste a bunch of time on this, feel

22 free to go do it, I said it would be extremely

23 difficult to get it approved.

24     Q.    So you hadn't done any research to

ji



 1   determine how -- whether it could be approved?

 2       A.    Well, I read the newspaper article.  And

 3   I know it said some things like you can't be near a

 4   school or it can't be near where there was a crime.

 5   I don't know the details specifically.  I just know

 6   that it sounds difficult.

 7       Q.    Other than reading the newspaper article,

 8   did you look at anything else?

 9       A.    I have no idea.  If Chris e-mailed me an

10   attachment, I probably opened it and shut it.  I

11   probably didn't retain any information.

12       Q.    But as you sit here today, you recall the

13   newspaper article and that's it; is that correct?

14       MR. SIGALE:  I'm just going to object as to

15   form and mischaracterizing his testimony.

16   BY MR. AGUIAR:

17       Q.    Well, let me ask the question again.

18            "A gun range would be extremely difficult

19   to get approved, as most interesting ideas like this

20   are not easy."

21            You wrote that.  I want to understand why

22   you wrote that.  What led you to make that

23   statement?

24            You testified the newspapers articles

ji



 1  that you read, correct?

 2      A.    Yes.

 3      Q.    Anything else?

 4      A.    Probably.  I don't think it's fair to

 5  like make me say that the only thing that I heard

 6  about the gun range stuff was from one newspaper.

 7      Q.    Well, I'm asking you, do you recall

 8  anything else?

 9      MR. SIGALE:  If you don't remember anything

10  else as you sit here today --

11      MR. AGUIAR:  Mr. Sigale, this is my deposition.

12  You'll have your opportunity to ask your questions

13  at the end.

14  BY MR. AGUIAR:

15      Q.    I'm asking you:  Do you recall anything

16  else that you looked at which led you to make that

17  statement?

18      A.    I don't recall.

19      Q.    Okay.  The next sentence is:  "I have

20  some thoughts as to how to put the right team

21  together that could get this approved from a zoning

22  perspective."

23          What were your thoughts as to putting the

24  right team together?

ji



1      A.   To get a bunch of money and hire the best

2  attorneys, and maybe if anyone could do it, there

3  you go.

4      Q.   Did you have anybody in mind to be on

5  that team?

6      A.   No.  I would look at the top -- I would

7  take a list of the top best attorneys, and then I

8  would probably cross-reference who's done this type

9  of stuff.

10     Q.   But at the time you wrote this, you

11 didn't have anybody specific in mind?

12     A.   I don't recall.

13     Q.   You say at the end of the sentence:  "Get

14 this approved from a zoning perspective."

15          Were you concerned about zoning when you

16 wrote this?

17     A.   I have no idea.

18     Q.   You don't recall; is that fair?

19     A.   Fine.

20     Q.   Okay.  Because you're saying that you're

21 mentioning here that it had to be approved from a

22 zoning perspective.

23          What did you know about the zoning at the

24 time you wrote this?

ji



```
 1        A.    I think I just picked that word zoning.

 2   I assume there's a lot more than zoning that needed

 3   to get done for a gun range.

 4        Q.    At the time you wrote this, were you

 5   aware there were zoning regulations involving gun

 6   ranges?

 7        A.    There's like a thousand different

 8   recommendation -- you know, things that need to fall

 9   in line for a gun range.  From the newspaper article

10   it said that there were, you know, all these points,

11   can't be near a church, can't be near a school in --

12   I'm sure it can't be in land zoned for residential,

13   so I chose the word zoning.

14        Q.    So that's what you meant by zoning are

15   those kinds of regulations?

16        A.    Sure.  I mean, I would -- could

17   interchange, take out zoning and put restrictions.

18   I have no idea.

19        Q.    Okay.  The next sentence that you write

20   is:  "Even with the most well-connected people, it

21   still may be a long shot and very expensive."

22              What made you think it might be

23   expensive?

24        A.    Opening a business is expensive.
```

ji



JONATHAN GORDON                                    April 27, 2012
EZELL v. CITY OF CHICAGO                                       51

1      Q.    Had you looked at any studies about gun

2   ranges before you made that statement?

3      A.    I don't recall.

4      Q.    Okay.  Had you done any analysis as to

5   how much it would cost to open a firing range in

6   Chicago?

7      A.    No.

8      Q.    So you were just surmising that it would

9   be expensive?

10     A.    Correct.

11     Q.    If you would flip to page 1 of Exhibit

12  No. 2, this is that e-mail from Mr. Hart to you.

13  And that's Mr. Bettiker?

14     A.    Correct.

15     Q.    Okay.  And he attaches the Gun Range

16  Ordinance Amendment and the Chicago Range Ordinance.

17          Did you ask Mr. Hart to send these to

18  you, these documents?

19     A.    I don't know.

20     Q.    Do you recall how Mr. Hart came to send

21  those regulations to you?

22     A.    I had an initial conversation with

23  Mr. Hart around the time the newspaper article came

24  out saying that there were changes, et cetera.  And

ji



 1  then I had bar conversation that it would be great

 2  if there was a range in Chicago.  And I told Curt

 3  that I would put him in touch with Chris.

 4      Q.    Okay.  Do you know whether Mr. Bettiker

 5  contacted Mr. Hart?

 6      A.    I don't know.

 7      Q.    Okay.  So you don't know how Mr. Hart

 8  came to send this to you?

 9            It just appeared in your inbox?

10      A.    No.  I just told you that I was having

11  bar conversation about a gun range being a great

12  idea.  And I told Curt I would look into putting him

13  in touch with this guy Chris Hart.

14      Q.    Okay.  And did you?

15      A.    You can see in this e-mail right here

16  that Chris talked to Curt and myself and sent this

17  attachment.

18      Q.    All I'm seeing is an e-mail from Chris

19  Hart saying:  "Curt/Jonathan, attached are the

20  current Chicago range regulations."

21            I just want to know:  Did you ask him to

22  send this to you, or did he just send it to you?

23      A.    I probably said, Send me the information

24  you sent me the last time we spoke.

ji



1      Q.    Okay.  When you were working at your

2   prior place of employment?

3      A.    Correct.

4      Q.    Did you happen to open those attachments?

5      A.    I don't recall.

6                  (WHEREUPON, certain documents were

7                  marked Gordon Deposition Exhibit

8                  Nos. 4 and 5, for identification,

9                  as of 4/27/12.)

10   BY MR. AGUIAR:

11      Q.    Mr. Gordon, I am handing you what the

12   court reporter has marked as Deposition Exhibits

13   No. 4 and 5.

14                  I'll represent to you that No.4 is the

15   original gun range ordinance passed by the city

16   council which allows ranges to operate in the City

17   of Chicago.

18                  Deposition Exhibit 5 is an amendment to

19   that ordinance enacted, I believe, in September

20   of 2011, which modifies in some levels the

21   restrictions on ranges in the City of Chicago.

22                  Have you ever read either the gun range

23   ordinance or the amendment to that ordinance?

24      A.    I don't recall.

ji



1    Q.    Okay.  I want you to take a moment and

2    look at these.  Just skim through them, and let me

3    know if that refreshes your recollection as to

4    having ever seen these before.

5    A.    I didn't say I've never seen them.  I

6    said I don't recall if I've read them.

7    Q.    Have you seen these before?

8    A.    I don't know.  Is this what was attached

9    to those e-mails?  I don't know.

10   Q.    Do these look like the documents that

11   were attached to the e-mail sent by Mr. Hart?

12   A.    I have no idea.

13   Q.    You said you had read things about ranges

14   in that newspaper article you talked about, correct?

15   A.    Yes.

16   Q.    And from that newspaper article, you

17   identified there were certain restrictions on

18   ranges, correct?

19   A.    Yes.

20   Q.    Are you aware of any other types of

21   restrictions that are put on ranges in the City of

22   Chicago that were not mentioned in that newspaper

23   article?

24   A.    I don't know.  I have no idea.

ji



 1      Q.    Okay.  So you haven't studied the city's

 2 ordinances to determine what restrictions are

 3 actually placed on ranges?

 4      A.    I have not studied the city's ordinances.

 5      Q.    And, so, you have no -- scratch that.

 6            In this case, the plaintiffs are

 7 challenging a series of requirements that the city

 8 places on ranges in the City of Chicago.  I'm going

 9 to go through them one by one, the ones that are

10 being challenged in the lawsuit.  And I'm going to

11 simply ask you if you were aware that was a

12 restriction and how you were aware of it and whether

13 you've considered it.

14            The first is that the requirement that --

15      A.    Can I -- I'd prefer not to go through

16 this exercise with you.

17      Q.    Well, I'm sorry, I'm going to ask the

18 questions, and I'm going to do this as quick and

19 painless as I can, but it's relevant to the lawsuit

20 that I get an answer from you on the record.

21            The first is the requirement that all

22 range managers, employees, and applicants be

23 fingerprinted and have a Chicago firearms permit and

24 Illinois firearms owner's identification card.

ji



1          Were you aware that was a restriction?

2     A.    I don't know.

3     Q.    Okay.  Do you recall ever reading that?

4     A.    I don't know.

5     Q.    Okay.  The requirement that ranges

6  operate only between 8:00 a.m. and 9:00 p.m., were

7  you aware that was a requirement on ranges in the

8  City of Chicago?

9     A.    I don't know if I was aware of that.

10    Q.    Okay.  The requirement that range patrons

11 be 18 years of age or older, were you aware that was

12 a restriction?

13    A.    I don't know if I was aware of that.

14    MR. SIGALE:  I'm going to object to this

15 exercise as well.

16          You'll still have to answer, but I'm

17 objecting as well.

18 BY MR. AGUIAR:

19    Q.    Okay.  How about I read through them all,

20 and then you can let me know if any of them -- you

21 can stop me if any of them are things you were aware

22 of.

23    A.    Okay.

24    Q.    The requirement that patrons possess a

ji



1    CFP and a FOID card unless they are receiving the

2    one hour of permit training required by the

3    ordinance.

4              The next one is the requirement that

5    ranges be located more than 500 feet from any other

6    gun range, residential district, school, day care

7    facility, park, place of worship, alcohol retailer,

8    children's activities facility, library, museum, or

9    hospital.

10             Now, were you aware of that as a

11   requirement from your reading the newspaper article?

12       A.    I don't know what I was aware of.  I

13   don't know if I -- I never drilled down the details

14   like that.

15       Q.    Okay.  The next one is the requirement

16   that possessors of firearms possess a CFP.

17             The next one is a prohibition on the

18   loaning or renting of firearms other than for a

19   one-hour class and/or prohibition on range patrons

20   leaving with ammunition sold by the gun range.

21             The next is the requirement of a maximum

22   decibel level of 55 decibels emanating from shooting

23   ranges.

24             The next is the requirement that floors

ji



1   at a range be constructed at a slope of one-fourth

2   inch per foot from the firing line to the backstop

3   bullet trap.

4           Were you aware of any of those

5   requirements that the city places on range

6   operations in the City of Chicago?

7       A.    I don't know what I was aware of.

8       Q.    Okay.  You don't recall reading those

9   anywhere?

10      A.    I don't know what I was aware of.

11      Q.    Okay.  Did any of these factor into your

12  decision of whether to move forward with an

13  operation to open a range?

14      A.    No.

15      Q.    Okay.  Did you ever look for any

16  properties or real estate in which a firing range

17  could operate in the City of Chicago?

18      A.    I personally have never -- going to open

19  a range.

20                    (WHEREUPON, there was a short

21                    interruption.)

22  BY MR. AGUIAR:

23      Q.    I'm sorry, excuse me.

24      A.    I've never been a range owner, and you

ji



```
 1   keep asking me questions like I have a business plan

 2   to open a range.

 3       Q.    And you don't have the business plan?

 4       A.    I'm not -- I don't even want to be a

 5   range owner.  I'm not a range owner.

 6       Q.    Did you ever talk to anybody else about

 7   doing it besides Mr. Bettiker?

 8       A.    I was on a fishing trip with 15 guys.

 9   And I said, Oh, yeah, it would be really cool if

10   there was a range in Chicago.

11       Q.    Did anything come of that conversation on

12   the fishing trip?

13       A.    No.

14       Q.    It was just conversation?

15       A.    Just conversation.

16       Q.    Okay.  And what I'm trying to understand

17   is, you never examined in the City of Chicago where

18   a firing range could actually locate, did you?

19       A.    I don't know.  I mean, I could have

20   driven by vacant space in my neighborhood in River

21   North and thought, Wow, it would be really cool if

22   there was a fancy range right there.

23       Q.    But you didn't pull out the zoning map

24   and determine where a range could actually locate
```

ji



 1   pursuant to the zoning?

 2        A.    I don't recall.

 3        Q.    Okay.  Did you ever speak with anybody at

 4   the City of Chicago about your idea about ranges in

 5   the city?

 6        A.    I don't recall.

 7        Q.    You don't recall talking to any -- you

 8   don't know or you don't recall?

 9        A.    If I would have called the city, I assume

10   I would have been on hold or not been able to get to

11   the right person and never would have gotten the

12   information.

13        Q.    Do you recall making the phone call?

14        A.    I don't recall.

15              I've called the city about opening an ice

16   cream stand in Grant Park.  I don't recall if I ever

17   got any valid information over whether I could do

18   it.

19        Q.    Well, I'm not asking about ice cream.

20              You remember that.

21              Do you recall making any calls about gun

22   ranges?

23        A.    I don't recall.

24        MR. AGUIAR:  If you give me just five minutes,

ji



 1   I might be done.

 2              (WHEREUPON, a recess was had.)

 3       MR. AGUIAR:  Back on the record.  Just one

 4   final question.

 5   BY MR. AGUIAR:

 6       Q.    Do you have any present intention of

 7   moving forward with any kind of a plan to open a

 8   firing range in the City of Chicago?

 9       A.    No.

10       MR. AGUIAR:  I'm done.

11       MR. SIGALE:  Mr. Gordon, let me take a second

12   here.

13                          EXAMINATION

14   BY MR. SIGALE:

15       Q.    You know, if you were the tow truck

16   driver like Mr. Bettiker, I probably wouldn't be

17   asking this question, but you're in commercial real

18   estate, so I will.  You had mentioned in answer to

19   one of Mr. Aguiar's questions earlier that you

20   thought a firing range could be a profitable venture

21   in the city.  You called it a good business idea.

22              And then in further to that, you said,

23   Well, it would be good to be the first of anything,

24   which I suppose is a general business principle,

ji



1  huh?

2      A.    Yes.

3      MR. AGUIAR:   Objection to the form.

4  BY MR. SIGALE:

5      Q.    That's a general business principle --

6      A.    Correct.

7      Q.    -- you want to be the first?

8            And you also mentioned that you thought

9  it would be a cool idea.

10           Besides the fact that you thought it

11 would be cool and the thought of being the first

12 one, what made you think that a gun range would be a

13 profitable venture?

14     MR. AGUIAR:   Objection; asked and answered.

15 BY THE WITNESS:

16     A.    I think there's a lot of people in the

17 city that would go to a gun range to learn how to

18 safely handle a gun.

19 BY MR. SIGALE:

20     Q.    So, in other words, you talked about in

21 your business meeting supply with demand.

22           So it's your impression is that there's a

23 demand; is --

24     A.    Correct.

ji



1       Q.      -- that what you're talking about?

2               Okay.  And I'll just ask you to clarify

3    the issue, okay?  You made a comment earlier around

4    the time that you -- around the time of the

5    discussion when you were talking about your first

6    conversation with Chris Hart.

7               You said the ordinance was so stringent

8    it would never happen so you dropped it?

9       A.      Correct.

10      Q.      Okay.  Mr. Aguiar did ask you some

11   questions about it, as you know, but I just want to

12   make sure; for my peace of mind, I'm asking.

13              When you say that it's so stringent, you

14   also talked about, you know, it can't be near a

15   school, it can't be near a church, it can't be --

16   when you were talking when you made the comment

17   earlier, and I'm not going to ask the court reporter

18   to read it back, so I'm paraphrasing.

19              When you talked about it being so

20   stringent, were you strictly referring to it can't

21   be near this, it can't be near that, or was there

22   something else you were thinking of as well?

23      A.      No.  I wasn't thinking of anything

24   specific.  I just heard it's so stringent that it's

ji



    1  probably not going to happen, and then I checked

    2  out.

    3       Q.    Okay.  And the last thing I'm going to

    4  ask you, we'll call this the sauce for the gander

    5  question:  You received a subpoena in the mail -- it

    6  was Exhibit 1 -- or was it mailed to you, or did

    7  someone come and deliver it?

    8       A.    A Chicago police officer told my doorman

    9  at my building, and then the doorman called me and

   10  said that there was a Chicago police officer

   11  delivering me a summons or a subpoena, one of those.

   12       Q.    Okay.  I'm sure you enjoyed that phone

   13  call.

   14            But you called Mr. Aguiar after that?

   15       A.    Correct.

   16       Q.    And said, What's this about?

   17       A.    Correct.

   18       Q.    Can you just tell me what the

   19  conversation was between you and Mr. Aguiar, what

   20  did you say to him, what did he say to you?

   21       A.    I probably said, You probably got the

   22  wrong guy.  I am not -- I don't have the money or

   23  the time.  I'm just not involved in this.

   24            And I think he said, I'll try to, you

ji



JONATHAN GORDON                                    April 27, 2012
EZELL v. CITY OF CHICAGO                                       65

 1   know, make it as quick as possible, and, you know,

 2   we need you to come in.

 3       Q.    And that's pretty much it?

 4       A.    That's pretty much it.

 5       MR. AGUIAR:  I have two follow-ups, and then

 6   I'll be done.

 7       MR. SIGALE:  I'm not saying I'm done yet, but

 8   give me one second.

 9       MR. AGUIAR:  Well, you said that was the final

10   question, I think, before.

11       MR. SIGALE:  Yes, that's a bad habit.

12       MR. AGUIAR:  Don't usually jump the gun without

13   invitation.

14       MR. SIGALE:  Yeah, I should usually just be

15   more noncommittal about that.

16   BY MR. SIGALE:

17       Q.    You still believe that under the right

18   circumstances, if the laws weren't as stringent as

19   your impression is, that that would -- that a firing

20   range would still be a profitable venture?

21       A.    Not for me personally.  I don't have

22   money to invest in it.  But, yes.  Isn't there a

23   Beverly Hills gun club?

24       Q.    There probably is.  Okay.

ji



1           So not for you, but for an investor, your

2     belief is that as a commercial real estate

3     professional that if the laws weren't so stringent,

4     that someone could do it, it would be a profitable

5     venture?

6           A.    Probably.

7           Q.    Okay.  Is location a part of that?

8                 Is it the first rule of real estate?

9           A.    It's really getting too specific.  I've

10    never really put thought to that, that specific.

11    But I'm thinking of a high-end operation that costs

12    a lot of money.  It has nothing to do with like the

13    bigger picture, is it right or wrong or do we need

14    gun ranges or not.

15          Q.    Okay.  But in terms of any business, the

16    first rule is location, location, location?

17          A.    It depends who you're targeting for your

18    customers, but yes.

19          MR. SIGALE:  All right.  I'm going to leave it

20    there.  Thank you, Mr. Gordon.  I think Mr. Aguiar

21    said he had a couple more questions.

22          THE WITNESS:  Sounds good.

23          MR. AGUIAR:  Just a couple of follow-ups.  I

24    will make them quick.

ji



JONATHAN GORDON                                     April 27, 2012
EZELL v. CITY OF CHICAGO                                        67

```
 1                    FURTHER EXAMINATION

 2   BY MR. AGUIAR:

 3        Q.    Again, your belief that the laws are

 4   stringent is based on what you've read in the

 5   newspaper article, correct?

 6        A.    I don't know.  It's not based on anything

 7   specific.

 8        Q.    Okay.  It's not based on a review of the

 9   law itself?

10        A.    There's no strict factual; it's very

11   general.

12        Q.    So you didn't read the law yourself and

13   say, Wow, this is strict.

14              You just based it on what you've heard;

15   is that a fair assessment?

16        A.    I don't totally recall to drill it back

17   to like a specific eureka moment.

18        Q.    What I'm trying to get at is, your

19   assessment that the law is stringent is not a

20   conclusion that you made yourself; it's something

21   that you gleaned from a newspaper article; is that

22   correct?

23        A.    Well, I would have to read it and then

24   decide myself.
```

ji



JONATHAN GORDON                                          April 27, 2012
EZELL v. CITY OF CHICAGO                                           68

```
 1      Q.    But --

 2      MR. SIGALE:  I'm going to object as asked and

 3  answered.

 4  BY MR. AGUIAR:

 5      Q.    Did you review -- you didn't review the

 6  law and make your own assessment of the law.  You

 7  read a newspaper article and based your opinion on

 8  that article; is that correct?

 9      A.    I don't specifically recall.

10      Q.    Okay.  You testified in response to

11  Mr. Sigale's question that a lot of people in the

12  city would want to learn to safely handle a gun.

13            What is that based on?

14            Is that your opinion?

15      A.    I don't know.  I mean --

16      Q.    Well, you said that it would be a

17  profitable enterprise because a lot of people in the

18  city would want to learn to safely handle a gun.

19            What I'm asking you is what is your --

20  what is that based on?

21            Have you studied -- have you looked at

22  any studies about the number of people who would

23  want to learn to use a gun in the city?

24      A.    I've just -- it's my personal opinion.
```

ji



1      Q.    Okay.  And what I'm trying to get at is:

2  Did you look at anything to form that opinion, or is

3  it just something you think is true?

4      A.    It's something that I think is true.

5      Q.    Okay.  Similar question:  You said that

6  there was a demand for this kind of a place in the

7  City of Chicago.

8           Again, is that your opinion, or -- is

9  that your opinion that there is a demand?

10     A.    I mean, sure it's my opinion, but ...

11     Q.    Did you look at any studies to determine

12 whether there actually is a demand in the City of

13 Chicago?

14     A.    I did not.

15     Q.    Did you conduct any studies?

16     A.    I did not.

17     Q.    So what is your assessment that there is

18 a demand for this based on then?  Just your idea?

19     A.    Correct.

20     MR. AGUIAR:  Okay.  I have nothing further.

21     MR. SIGALE:  No.

22     MR. AGUIAR:  And with that, you're done.

23     MR. SIGALE:  You want to ask him if he wants

24 to --

ji



1      MR. AGUIAR:  I was going to.  I always do after

2   I'm saying you're done.

3          Mr. Gordon, under the rules under we

4   which all operate, you're given an opportunity to

5   review your deposition transcript for any kind of

6   corrections that need to be made.  It's called

7   either waiving signature or reserving signature.

8          If you waive that right, within so many

9   days of the transcript being produced by the court

10   reporter, your deposition is taken as it is.  No

11   further corrections can be made to it.

12          But if you reserve signature, you're

13   given a period of time after the court reporter

14   prepares the transcript to review it and to make

15   certain changes that you feel are necessary that are

16   permissible under the rules.

17          What would you like to do?

18     THE WITNESS:  I would be happy to review it.

19     MR. AGUIAR:  Okay.  Then I'll ask the court

20   reporter to please send a copy of the transcript to

21   Mr. Gordon with the usual customary letter that

22   accompanies the transcripts.

23               (WHEREUPON, discussion was had

24                off the record.)

ji



```
 1        MR. AGUIAR:  Let the record reflect that the

 2   witness has reserved signature.

 3                  FURTHER DEPONENT SAITH NOT.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

ji



```
 1   STATE OF ILLINOIS  )

 2                      ) SS:

 3   COUNTY OF C O O K  )

 4        I, JOY ISBELL, a Notary Public within and for

 5   the County of Cook, State of Illinois, and a

 6   Certified Shorthand Reporter of said state, do

 7   hereby certify:

 8        That previous to the commencement of the

 9   examination of the witness herein, the witness was

10   duly sworn to testify the whole truth concerning the

11   matters herein;

12        That the foregoing deposition transcript was

13   reported stenographically by me, was thereafter

14   transcribed under my personal direction and

15   constitutes a true, complete and correct record of

16   the testimony given and the proceedings had;

17        That the said deposition was taken before me

18   at the time and place specified;

19        That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in the

23   outcome of this action.         Joy K. Isbell

24                          CSR No. 084-003616
```

ji

```
 1                     I N D E X

 2   WITNESS                        EXAMINATION

 3   JONATHAN GORDON

 4         By Mr. Aguiar                    3

 5         By Mr. Sigale                   61

 6         By Mr. Aguiar                   67

 7

 8

 9

10                   E X H I B I T S

11   NUMBER                              PAGE

12   Gordon Deposition Exhibit No. 1        6

13   Gordon Deposition Exhibit No. 2       12

14   Gordon Deposition Exhibit No. 3       27

15   Gordon Deposition Exhibit No. 4       53

16   Gordon Deposition Exhibit No. 5       53

17

18

19

20

21

22

23

24
```

ji

```
 1              DEPOSITION ERRATA SHEET

 2   #332740

 3   RHONDA EZELL, et al.,                )

 4                  Plaintiffs,           )

 5          vs.                           ) No. 10 C 5135

 6   CITY OF CHICAGO,                     )

 7                  Defendant.            )

 8

 9        DECLARATION UNDER PENALTY OF PERJURY

10

11           I declare under penalty of perjury that I

12   have read the entire transcript of my Deposition

13   taken in the captioned matter or the same has been

14   read to me, and the same is true and accurate, save

15   and except for changes and/or corrections, if any,

16   as indicated by me on the DEPOSITION ERRATA SHEET

17   hereof, with the understanding that I offer these

18   changes as if still under oath.

19

20                       Signed on the _____ day of

21                       _____, 20____.

22                       _____

23                       JONATHAN GORDON

24
```

ji

```
 1                   DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3              _____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    SIGNATURE:_____DATE:_____

22               JONATHAN GORDON

23

24
```

ji



```
 1                 DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3              _____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    SIGNATURE:_____DATE:_____

22              JONATHAN GORDON

23

24
```

ji

