1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4

5    RHONDA EZELL, et al.,              )

6                    Plaintiffs,        )

7         -vs-                          ) No. 10 C 5135

8    CITY OF CHICAGO,                   )

9                    Defendant.         )

10

11           The deposition of PAUL KUCZMIERCZYK,

12   called for examination, taken pursuant to the Federal

13   Rules of Civil Procedure of the United States

14   District Courts pertaining to the taking of

15   depositions, taken before V. LINDA BOESCH, a Notary

16   Public within and for the County of DuPage, State of

17   Illinois, and a Certified Shorthand Reporter, CSR No.

18   84-3108, of said state, at Suite 1230, 30 North

19   LaSalle Street, Chicago, Illinois, on June 7, 2012,

20   at 10:10 a.m.

21

22

23

24



```
 1  PRESENT:

 2         LAW FIRM OF DAVID G. SIGALE, P.C.,

 3         (739 Roosevelt Road, Suite 304,

 4         Glen Ellyn, Illinois 60137,

 5         630-452-4547), by:

 6         MR. DAVID G. SIGALE,

 7         dsigale@sigalelaw.com,

 8             appeared on behalf of the Plaintiffs;

 9

10         OFFICE OF CORPORATION COUNSEL,

11         CITY OF CHICAGO,

12         (30 North LaSalle Street, Suite 800,

13         Chicago, Illinois 60602-2580,

14         312-744-7150), by:

15         MS. REBECCA A. HIRSCH,

16         rebecca.hirschalfert@ex.cityofchicago.org,

17             appeared on behalf of the Defendant.

18

19

20

21

22

23  REPORTED BY:  V. LINDA BOESCH, CSR No. 84-3108.

24
```



```
 1                          (WHEREUPON, the witness was duly

 2                          sworn.)

 3                          PAUL KUCZMIERCZYK,

 4     called as a witness herein, having been first duly

 5     sworn, was examined and testified as follows:

 6                          EXAMINATION

 7     BY MS. HIRSCH:

 8          Q.    Good morning.  Could you please state

 9     your name for the record?

10          A.    Paul Kuczmierczyk.

11          Q.    Good morning, Mr. Kuczmierczyk.

12          A.    You can just call me Paul.  Makes life

13     easier.

14          Q.    Thank you.

15                We are here today to take your deposition

16     in the case of Ezell v. City of Chicago, 10 C 5135.

17     And let me just talk about some ground rules before

18     we get started.

19                Are you represented by counsel here

20     today?

21          A.    No.

22          Q.    Okay.  Have you ever had your deposition

23     taken before?

24          A.    No.
```



1      Q.    Okay.  So, basically, I'm just going to

2  ask you questions.  Just answer them to the fullest

3  extent of your knowledge.  Please answer verbally

4  instead of nods or shakes of the head because the

5  court reporter can't get it down.

6            And please wait until I finish a question

7  before you answer so that she also doesn't have to

8  deal with interruptions.

9            And if there's anything you don't ask

10  (sic), just ask me to clarify it.  I mean, if you

11  don't understand.  And if you need any breaks, let me

12  know, okay?

13      A.    Yeah.

14      Q.    Paul, you received a subpoena for your

15  deposition, is that correct?

16      A.    Yes.

17      Q.    Okay.  And did you also receive a

18  subpoena on behalf of Boomstick, Inc.?

19      A.    I did.

20      Q.    Okay.  Are you here as a representative

21  of Boomstick, Inc.?

22      A.    I can be.  I am the only -- I'm the

23  President, CEO, Treasurer, Secretary, and

24  groundskeeper for Boomstick.



 1        Q.    Okay.  So you are the representative?

 2        A.    I am Boomstick.

 3        Q.    Okay.  That's what I thought.

 4              And I'm sorry.  Can you state your titles

 5   again at Boomstick?

 6        A.    Owner, CEO, I guess.  I'm the only person

 7   involved with Boomstick.

 8        Q.    Okay.  And did you conduct a search for

 9   any documents responsive to the requests in the

10   subpoena?

11        A.    I did, and I provided them on a thumb

12   drive.

13        MS. HIRSCH:  Okay.  For the record, let me

14   state that before you got here, Paul or Mr. K,

15   whatever you --

16        THE WITNESS:  Whatever is easiest.

17        MS. HIRSCH:  -- provided me with a thumb

18   stick -- is that what you're calling it?

19        THE WITNESS:  Thumb drive.

20        MS. HIRSCH:  -- thumb drive, with some

21   documents that are getting printed out, and you're

22   welcome to have copies of them.  I haven't seen them.

23   BY MS. HIRSCH:

24        Q.    And just to clarify, you gave me



1 permission to print the documents out, right?

2     A.    Yes.

3     Q.    Okay.  Thank you.

4     MR. SIGALE:  Shall we hold off then until the

5 documents get here or are they being printed as we

6 speak?

7     MS. HIRSCH:  I'm sorry.  Further clarification,

8 Mr. -- it's really hard for me not to say Mr. and

9 just go to "Paul" but I will.

10         Mr. Kuczmierczyk initially said that only

11 one document was responsive and it was his business

12 plan, and I did print that out and I will get another

13 copy done quickly.

14         This was all just right when he got here.

15     MR. SIGALE:  That's fine.

16     MS. HIRSCH:  But having looked at the file

17 trees, it looked like there may be some other

18 potentially responsive documents, and he gave me

19 permission to print those out.

20         I don't know that these are anything that

21 we are going to need to ask him about, so I would

22 rather get this going than wait.  And then see after

23 we're done, circle back around if there's anything I

24 need to ask about the documents.



1          But I'd rather just proceed.

2          MR. SIGALE:  Can I get a copy -- can we just

3    take a couple minutes and let me get a copy of the

4    business plan then, before I --

5          MS. HIRSCH:  Sure.

6          MR. SIGALE:  I assume you're going to ask about

7    it, so.

8          MS. HIRSCH:  I haven't even decided that yet,

9    but I'm happy to do that.  Let's take one moment.

10         MR. SIGALE:  Okay.  Thanks.  I guess we are

11   off.

12                    (WHEREUPON, there was a short

13                     interruption.)

14                    (WHEREUPON, the document was

15                     tendered to counsel.)

16         MR. SIGALE:  All right.  Thank you.

17         MS. HIRSCH:  Sure.  We can go back on the

18   record.

19   BY MS. HIRSCH:

20         Q.    Did you -- after you received the

21   deposition subpoena, did you speak with anybody?

22         A.    I called, to find out about the

23   rescheduled date, Andrew Worseck and yourself, a few

24   times.



1       Q.      Okay.

2       A.      And Mr. Sigale I spoke with when I first
3   got it to find out why I was deposed.

4       Q.      Okay.  And what did he tell you?

5       A.      Because I had contact with the Action
6   Target within the last five years.

7               Just caught me by surprise when I got it.
8   I'm like, huh?

9       Q.      Did you talk to Action Target after you
10  received it?

11      A.      No, ma'am.

12      Q.      Have you spoken to them at all after you
13  received the subpoena?

14      A.      I received an e-mail from Chris Hart two
15  days ago asking how my plans were going.  But that
16  was the gist of the e-mail and all that was in it.

17      Q.      Did you respond to him?

18      A.      I just told him that I was coming to the
19  deposition and maybe things would move forward
20  afterwards, but....

21              If needed, I can provide those e-mails.

22      Q.      Do you have other e-mails between you and
23  Action Target?

24      A.      Just the copy that I've seen both of you



1  have with the quotes.

2       Q.    Okay.  Where are you currently employed?

3       A.    Andco Management.

4       Q.    Okay.  And what's your role there?

5       A.    Vice President.

6       Q.    What is Andco Management?

7       A.    A property management company.

8       Q.    And what do you do for Andco?  What do

9  you not do?

10       A.    I don't mop.  It's a family-owned

11  business so my day-to-day activities change.  My

12  primary role is, basically, technology, IT, and --

13       Q.    I'm sorry.  I said I wouldn't interrupt.

14  What type of business is it?

15       A.    Real estate.

16       Q.    Real estate business?

17       A.    Yes.

18       Q.    Okay.  Does it buy, sell, lease

19  properties?

20       A.    We lease properties for third-party

21  owners.  The company itself does not own the

22  properties.

23       Q.    Okay.  So it's a property management

24  company?



1        A.     Yes, ma'am.

2        Q.     So now please continue on what your roles

3   are or what you do.

4        A.     Day-to-day this time of year is basically

5   just leasing and marketing.  Photographing which is

6   part of the marketing of the units, meeting clients.

7             Throughout the course of the year, I

8   handle most of our IT.  Every now and then some of

9   the maintenance stuff when our maintenance staff is

10  on vacation.

11       Q.     Where is this company located?

12       A.     4156 North Lincoln Avenue, Chicago,

13  Illinois.

14       Q.     And the properties, where are they

15  located or are they all in the City of Chicago?

16       A.     They are located in the City, from the

17  Gold Coast north to Andersonville and as far west as

18  Cicero and Addison.

19       Q.     Okay.  And approximately how many

20  properties do you have?

21       A.     Approximately 44 individual buildings.

22       Q.     And how many units does that --

23       A.     About 760.

24       Q.     Wow.  Okay.  Does Andco -- Andco Co.?



 1          A.      Andco just.

 2          MR. SIGALE:   I'm sorry.  How do you spell that?

 3          THE WITNESS:   A-N-D-C-O.

 4   BY MS. HIRSCH:

 5          Q.      Does Andco own any of the properties?

 6          A.      No.

 7          Q.      And do -- are you a licensed real estate

 8   agent or broker?

 9          A.      Managing broker.

10          Q.      Managing broker?

11          A.      Uh-huh.

12          Q.      Is that different than a regular real

13   estate broker?

14          A.      According to the Chicago Association of

15   Realtors.

16          Q.      I'm sorry.  Can you speak up a little?

17          A.      Yes, it is.  A managing broker is allowed

18   to operate an office whereas a regular broker can

19   just do sales and needs to be supervised by a

20   managing broker.

21          Q.      Okay.  So you can do the sales and manage

22   an office?

23          A.      And manage other people.

24          Q.      I see.  Okay.  Have you ever acted as a



1    broker for any sales in Chicago?

2         A.    I have in the past, yes.

3         Q.    When was that?

4         A.    The last time I had a deal that actually

5    closed, I believe I just had one in February that

6    should have closed like a year prior.

7         Q.    Okay.  Was that residential or commercial

8    property?

9         A.    It was residential.

10        Q.    Okay.  And prior to that?

11        A.    Assorted single-family homes and

12   condominium units.  All my real estate has been

13   residential with the exception of one -- or two mixed

14   use properties that were commercial on the ground

15   floor and residential above.

16        Q.    And when did you get your broker's

17   license?

18        A.    2003 or 2004, I believe.

19        Q.    Okay.  And is this through -- and, you

20   know, forgive me my ignorance on this, on this

21   subject matter, but do you work with Andco as a

22   broker or are you independent?

23        A.    The brokerage is through Lakeland, a

24   sister company of Andco.



1        Q.      "Lakeland"?

2        A.      Lakeland Realty Group, L-A-K-E-L-A-N-D.

3        Q.      Is that also a family-owned and operated

4   business?

5        A.      Yes.

6        Q.      Okay.  When did you graduate college?

7        A.      2002.

8        Q.      And is that when you started working

9   full-time for Andco?

10       A.      Shortly thereafter, yes.

11       Q.      Okay.  Did you say that Andco's business

12  is exclusively within the City limits of Chicago?

13       A.      Yes, it is.

14       Q.      And your broker services were as well?

15       A.      No.  I had one friend who -- where does

16  he live?  It's in Lake County.  I forget which town.

17  He insisted I help him, even though I advised him

18  against me working out there because I don't know the

19  area.

20       Q.      Okay.  So it was a one-time deal?

21       A.      I might have had a few other friends who

22  have asked, and I've tried to tell them to use

23  someone local, but....

24       Q.      In your business as either a broker or a



1  property management manager, do you ever have to

2  consult the Chicago Zoning Ordinance?

3       A.    Rarely.  Most construction is done by our

4  owners with their own contractors and architects.

5       Q.    Okay.  But you have on some occasions?

6       A.    A few occasions.  I dabbled in it.  I

7  wouldn't say I dove into the extreme detail of the

8  City Zoning Ordinance.

9       Q.    Do you remember what you were looking at?

10      A.    It was around the porch collapse and when

11 they were redoing the 100 pounds per square foot for

12 back porches, whereas interior only has to be 40.

13      Q.    Do you remember when that was,

14 approximately?

15      A.    I think it was 2004, 2005.

16      Q.    Okay.

17      A.    I hate remembering dates because it makes

18 me feel old now.

19      Q.    Don't even say that in this room.

20      A.    Sorry.

21      Q.    And when you consulted the Chicago Zoning

22 Code, do you have a copy of it or did you look for it

23 online?

24      A.    Online.



1          Q.      Okay.  Do you know -- do you have any

2    need to know the specific zoning districts that your

3    buildings are located in?

4          A.      Very rarely.  And when we do, we rely on

5    the expertise of an architect or someone who deals

6    with it on a day-to-day basis.

7          Q.      Okay.  When was Boomstick, Inc., first

8    incorporated?

9          A.      Late in 2009.

10         Q.      And what is its business?

11         A.      At the moment, nothing.

12         Q.      What was it incorporated for the purpose

13   of?

14         A.      To start a shooting range and firearms

15   retailer in the northern Chicago Metropolitan area.

16         Q.      I'm sorry.  You said shooting range

17   and....

18         A.      Firearms retail.

19         Q.      Are you the sole officer or employer?

20         A.      I am.

21         Q.      Does Boomstick have a business location?

22         A.      Nope.  The mailing address is my current

23   office at Andco Management, but just a mailing

24   address.



1        MS. HIRSCH:   Okay.   Can you mark that?

2        THE COURT REPORTER:   And you want it identified

3   with the witness' last name?

4        MS. HIRSCH:   Why don't you say "Boomstick."

5                          (WHEREUPON, a certain document

6                          was marked Boomstick Deposition

7                          Exhibit No. 1, for

8                          identification, as of

9                          06/07/2012.)

10  BY MS. HIRSCH:

11       Q.   The court reporter is handing you what's

12  been marked as Exhibit No. 1.

13            Do you recognize that?

14       A.   I do.

15       Q.   Is that your company?

16       A.   It is.

17       Q.   Okay.   And is this a current Web page?

18       A.   Basically, a place holder.  I don't know

19  if I would give it enough credit to call it a Web

20  page.

21       Q.   Okay.  Is there any content beyond this

22  place holder?

23       A.   No.  It's just an image.  It is the sole

24  content of Boomstickchicago.com.



 1      Q.     Okay.  Thank you.

 2             Is Boomstick currently active as a

 3  corporation?

 4      A.     No.

 5             Define what you mean by "active."

 6      Q.     I'm sorry.  Is it current with the

 7  Secretary of State as a --

 8      A.     Yes, we are.

 9      Q.     Okay.  Thank you.

10             But can you follow up on that?  When I

11  said "active" and you said "no," what did you mean?

12      A.     Because Boomstick wants to be a firearm

13  retailer and range, and since I am the only officer

14  and live in the City of Chicago, I cannot obtain a

15  Federal Firearms License because of my status as a

16  Chicago resident.

17             So I can't even complete the business

18  plan for Boomstick to get pricing on the items I

19  would like to sell.

20      Q.     The Federal Firearms License.

21      A.     Because of the Chicago ordinance.

22      Q.     Can you explain that to me?

23      A.     When you apply for the FFL, Federal

24  Firearms License, you need to testify on paper that



1  you are not violating any local laws, and since the

2  ordinance says that you are not allowed to sell

3  firearms or ammunition currently in Chicago, and

4  since I am only located in Chicago, I can't sign my

5  name on that piece of paper.

6            And I'm not going to falsify my address

7  on a federal document.

8      Q.    Do you have to be a -- you can't get --

9  just give me a second.  I want to understand you

10 correctly.

11           Is it your testimony that you cannot open

12 a shooting range or a firearms retail facility

13 anywhere because you are a resident of the City of

14 Chicago?

15     A.    At this moment, yes, cannot complete the

16 business plan which I would need in order to open any

17 type of business because without an FFL, no

18 distributors or manufacturers will disclose what my

19 price would be to purchase any of the inventory I

20 would need.

21     Q.    And you believe that you cannot obtain a

22 an FFL because you live in the City of Chicago?

23     A.    Yes, ma'am.

24     Q.    Okay.  When Boomstick, Inc., first



1  incorporated in late 2009, early 2010, can you tell

2  me what steps you took at that point to start the

3  business?

4        A.    It was incorporated with the help of

5  Brown, Udell, Pomerantz & Delrahim.

6        Q.    Is that a law firm?

7        A.    It is.

8        Q.    Okay.  Brown, Udell....

9        A.    U-D-E-L-L.  Pomerantz.

10       Q.    Okay.  And then what did you do next

11  after it was incorporated?

12       A.    After it was incorporated, I went to the

13  SHOT Show in Las Vegas --

14       THE COURT REPORTER:  I'm sorry.  "To the"?

15       THE WITNESS:  SHOT Show, S-H-O-T.  It stands

16  for Shooting, Hunting, and Outdoor Trade Show.

17  BY MS. HIRSCH:

18       Q.    When was that?

19       A.    That was January, 2010.

20       Q.    Okay.  For what purpose?

21       A.    To see what type of inventory I would

22  like to carry when Boomstick was open, look at

23  different range equipment such as that which Action

24  Target provides.



 1              And at the SHOT Show, they also have what
 2    the National Shooting Sports Foundation calls Shot
 3    University which is helping owners and retailers for
 4    business.  So it was also a learning experience.
 5         Q.    Did you speak with anyone from Action
 6    Target at that show?
 7         A.    I spoke with Chris Hart.
 8         Q.    Is that the first time you met him?
 9         A.    In person, yes.
10         Q.    You had spoken with him before?
11         A.    The e-mails referenced earlier about the
12    quotes for the range.  You --
13         Q.    Okay.  Let's backtrack.
14              When did you first talk to Action Target?
15         A.    Late 2009, right after Boomstick was
16    incorporated.
17         Q.    How did you hear about them?
18         A.    Google.
19         Q.    Did you contact any other -- Action
20    Target is a range constructor, is that correct?
21         A.    A supplier of range equipment and
22    construction, yes.
23         Q.    Okay.  Did you contact anybody else in
24    the same business?



```
 1        A.    I did not.

 2        Q.    Okay.  And it was Chris Hart that you

 3  communicated with?

 4        A.    Yes.

 5        Q.    Anybody else there?

 6        A.    I met two other gentlemen, but I don't

 7  recall their names.  They were not sales.  One was

 8  in -- I don't remember the right word.

 9              Basically, a shoot house.  Law

10  enforcement and military training ranges that you

11  actually walk through, which doesn't matter to my

12  business plan at the moment.

13              And another gentleman who's higher up

14  than Chris, but I don't recall his name.

15        Q.    Okay.  And when you said you met them,

16  this was in Las Vegas?

17        A.    I like shook hands on the floor of the

18  convention center.  That was it.

19        Q.    Okay.

20        A.    And I don't know if it needs to be of

21  record or not, but while in Vegas, Chris Hart and

22  myself went to a shooting range that Action Target

23  put in so I could see what types of stuff that they

24  actually -- finished product.
```



1     Q.    I was going to make a joke about what
2   happens in Vegas stays in Vegas, but....
3     A.    And it's now on the record.
4     Q.    What gave you the idea of starting a
5   company to operate a shooting range?
6     A.    I spent my whole life in Chicago and grew
7   up here, and my first experience with a firearm was
8   actually in college.  Go figure that a state
9   university in Illinois gave me a fully automatic
10  weapon for college credit.
11    Q.    I'm sorry.  Where was this?
12    A.    University of Illinois.
13    Q.    University of Illinois.  Champaign?
14    A.    Yes.
15    Q.    And explain how you got credit for that?
16    A.    Military Marksmanship was the name of the
17  class.  It was open to both ROTC and civilians.
18    Q.    And that was your first experience
19  with --
20    A.    With a real firearm, yes.
21    Q.    I take it you liked it?
22    A.    Just a bit.
23    Q.    So you pursued that interest in other
24  classes or going to ranges?



PAUL KUCZMIERCZYK            June 07, 2012
RHONDA EZELL -vs- CITY OF CHICAGO          23

1       A.     Not in other classes. After I graduated,

2 I was living in Lincolnwood with my parents. Bought

3 my first firearm which was a shotgun with the

4 intention of going hunting which didn't pan out for

5 several years, and just always liked shooting.

6         When my mother learned of it, she grew up

7 on a farm in Wisconsin. She ended up going shooting

8 with me. Just a fun pastime.

9         After having done it the first few times,

10 it was amazing how many people I had known my whole

11 life that had gone shooting, but I never knew had any

12 interest whatsoever.

13         Just because I find it an enjoyable

14 pastime, I figured it would be a good thing for the

15 City of Chicago to have since there is no exposure to

16 it, and everything that most people in Chicago ever

17 hear are guns are bad, guns are evil, guns kill

18 people. There's a whole other side to the firearms

19 industry.

20       Q.     Are you talking about the hunting side?

21       A.     Shooting sports, in general. Be it

22 hunting or competitive shooting. It's -- growing up

23 in Chicago, my own personal view was that only bad

24 people and police officers have guns.



 1            I'm neither, but I have a gun at my

 2   parents' house, but....

 3        Q.    And what gave you the idea, for lack of a

 4   better way of phrasing it, to actually start a

 5   business?

 6        A.    The Supreme Court cases, both Heller

 7   versus DC and then later, McDonald versus Chicago.

 8        Q.    Okay.  Can you explain that a little

 9   more?

10        A.    That the opportunity was now there that

11   there was a ruling on the books.

12        Q.    The opportunity for?

13        A.    For firearms to actually be acceptable in

14   the City.  The main goal in Boomstick when you can go

15   through the plan is to educate, basically, the public

16   about firearms and their safe use and the

17   recreational opportunities that they can offer to

18   people.

19        Q.    Okay.  We'll get back to your business

20   plan in a few minutes.  So --

21                        (WHEREUPON, a certain document

22                        was marked Boomstick Deposition

23                        Exhibit No. 2, for

24                        identification, as of



```
 1                          06/07/2012.)

 2                          (WHEREUPON, the document was

 3                          tendered to the witness.)

 4   BY MS. HIRSCH:

 5        Q.    Okay.  Paul, the court reporter has

 6   handed you what's been marked as Exhibit No. 2.

 7             Do you recognize this Exhibit?

 8        A.    I do.

 9        Q.    Okay.  Can you tell me what it is?

10        A.    It is a quote from Action Target for a

11   25-meter 10-lane tactical firing range.

12        MS. HIRSCH:  Okay.  Let's mark this one.

13                          (WHEREUPON, a certain document

14                          was marked Boomstick Deposition

15                          Exhibit No. 3, for

16                          identification, as of

17                          06/07/2012.)

18                          (WHEREUPON, the document was

19                          tendered to the witness.)

20   BY THE WITNESS:

21        A.    Although one thing on Exhibit 2, the date

22   printed is not the date that I received it.  When I

23   contacted Action Target for a quote to this effect,

24   it was not January 6, 2012.
```



 1          Oh, that's "Printed."  Never mind.  I

 2  don't read well.

 3  BY MS. HIRSCH:

 4      Q.    Okay.  We'll get back to when you asked

 5  for these or got them in a minute.

 6      A.    That's correct (indicating).

 7      Q.    You're looking at Exhibit No. 3?

 8      A.    Yes.  No. 3 has a date that seems to be

 9  correct.  December 28, 2010, for when I received both

10  of these.

11      Q.    Okay.  And just for the record, can you

12  say what Exhibit No. 3 is?

13      A.    Exhibit 3 is a quote from Action Target

14  for 10-lane range, shooting range.

15      Q.    Okay.  Now, did I understand you

16  correctly that you received both of these at the same

17  time?

18      A.    Yes.

19      Q.    Okay.  And that was in?

20      A.    On or about December, 2010.

21      Q.    Okay.  Did you ask for two different

22  quotes from Action Target?

23      A.    Yes, I did.

24      Q.    Okay.  And can you tell me why?



1        A.    The standard 10-lane range, Exhibit
2   No. 3, referenced here is for your traditional
3   shooting range where people who are shooting just
4   stand at a fixed firing line and shoot into the
5   backstop.

6              The tactical range allows for more
7   maneuverability when shooting for certain law
8   enforcement classes, tactical scenarios.  It has,
9   basically, more armor plating, more bullet
10  resistance -- not exactly the right word but conveys
11  the idea -- so that it doesn't need to be one solid
12  line.

13             You can move up and down the range with
14  different firearms.  More of a real world application
15  than just standing and plinking.

16        Q.    Are these -- I'm going to differentiate
17  it by saying 25-meter.  Is that the differential?

18        A.    It could be.  It's not set in stone.
19  That was just what distance I liked.

20        Q.    Is that when -- you said for law
21  enforcement personnel.  Is that a customer base that
22  you were hoping to get?

23        A.    Well, by "law enforcement," I meant the
24  tactical applications, both for actual law



1  enforcement and people who like that type of

2  shooting; tactical shooting matches.

3       Q.    Okay.  Now, were you interested in

4  opening potentially both kinds of ranges here or just

5  one and then another or you wanted to compare?

6       A.    With the business plan, there were

7  actually going to be two of the standard 10-lane

8  ranges and one of the 25-meter ranges in the same

9  facility.

10      Q.    All under one roof?

11      A.    Yes, ma'am.

12      Q.    Okay.  At the bottom of Exhibit No. 3,

13  which I believe is the standard 10-lane, there's a

14  price quotation, correct?

15      A.    Yes, ma'am.

16      Q.    Okay.  What's that number?

17      A.    $442,350.

18      Q.    Okay.  Now, putting aside the building

19  itself, is this the total cost for the build-out of

20  the range or are there other costs?

21      A.    There could be other costs.  This quote

22  includes the HVAC system, I believe.  Yeah, includes

23  the HVAC.

24            But then parts of the building would have



1  to be modified to accommodate the weight and

2  structure, slopes, that are required for the

3  construction, to the best of my knowledge.

4      Q.    Okay.  Do you have any idea how much

5  additional cost that would be?

6      A.    I don't know for certain.  I haven't

7  gotten to the point where I've spoken to an architect

8  about modifying or building to suit.

9      Q.    Okay.  And what about the -- sorry.  What

10 I'm trying to ask is does this include the inventory

11 such as, you know, the actual guns themselves or --

12     A.    Not at all.

13     Q.    -- bullets needed?

14     A.    Nothing.

15     Q.    Okay.  And you were also going to have a

16 retail part -- you desired to have a retail shop

17 under the same roof as well?

18     A.    Yes, ma'am.

19     Q.    Okay.

20     A.    As well as classroom facilities.

21     Q.    When you say "classroom facilities," do

22 you mean separate from any type of live training,

23 there would be a sit-down classroom where there would

24 be instruction?



1      A.    Yes.  It would be a full, sit-down

2  classroom, audiovisual aids, to instruct people in a

3  number of different programs offered by the National

4  Shooting Sports Foundation, the NRA has a bunch.

5           Most of those programs don't even involve

6  firearms being in the room.  The NRA does a lot of

7  safety classes for everyone, not focused on firearms,

8  but general awareness and safety that is lacking in

9  most of society, it seems.

10     Q.    Okay.  And now, switch to Exhibit No. 2.

11  Can you tell me the quote for the 25-meter tactical

12  range?

13     A.    At the time, $642,695.

14     Q.    Okay.  And is it correct to assume that

15  this also did not include the build-out that you were

16  talking about with the slopes or --

17     A.    Yes, ma'am.

18     Q.    -- the other costs or the inventory?

19     A.    Yes, ma'am.

20     Q.    Okay.  You desired to have three of

21  these?

22     A.    Yes.

23     Q.    Okay.  And why -- just for my curiosity,

24  why did you want to start on such a large scale?



1          A.    Go big or go home is my philosophy.    I

2    have been to other shooting ranges that have only had

3    ten shooting positions and sometimes the wait is over

4    two hours.

5               In the City of Chicago, I don't see

6    people willing to wait that long when they get

7    somewhere to do what they came to do.    Another reason

8    for three separate ranges as opposed to one long

9    range with multiple -- more than ten shooting

10   positions is if there is a class going on, so that

11   the class can be separated from either the general

12   shooting public or whatever other event may be going

13   on in a different range.

14         Q.    I see.   So, potentially, a range could

15   have 15 lanes or something, but you wanted to keep

16   two separate ten lanes -- nope -- yeah.

17               Did you have two standards?

18         A.    Yes, ma'am.   I had two ten and one

19   tactical in the original.

20         Q.    Okay.   Were these quotes what you had

21   expected?

22         A.    At the time I had no idea what to expect.

23   It was my first foray into shooting range

24   development.



1      Q.    Okay.  You did not, I believe you

2  testified earlier, contact anybody else?

3      A.    I did not.  Due to my initial research,

4  again Internet and Google search, I liked the product

5  that Action Target was offering.  They have done

6  quite a number of military installations and law

7  enforcement installations.

8           The other options that I found for

9  shooting ranges, I just preferred what Action Target

10 was building versus water-backed ranges or rubber

11 ranges, to name a few of the other technologies.

12     Q.    Okay.  Did you come up with an estimation

13 of how much upfront costs total this project was

14 going to --

15     A.    I came up with a rough estimate for

16 acquiring a building that I had in mind, the ranges,

17 what I was guessing at inventory which is really just

18 a wild guess because I have no way to get access to

19 the information I need to get the real numbers.

20     Q.    And what was that number?

21     A.    Just under $12 million.

22     Q.    Did you have a plan for how you were

23 going to raise this money?

24     A.    I know people.  I was going to meet with



1  venture capital firms and refine the business plan to

2  offer shares of stock to investors, probably on a

3  three- to five-year period before they're paid back.

4        Q.   Did you ever meet with any investors?

5        A.   One read the business plan over in an

6  e-mail.  We had a lunch.  He just told me that it

7  wasn't done.

8        Q.   When was that?

9        A.   That was January or February of this

10  year, I believe.  A friend of the family.  So it was

11  one of those kinds of lunches.  He just happens to be

12  in the venture capital industry.

13        Q.   I think you just mentioned that you had a

14  property in mind?

15        A.   I did.  In Lincolnwood, Illinois.  I

16  believe the address is 3701 West Lunt.

17        MR. SIGALE:  I'm sorry.  What was the address

18  again?

19        THE WITNESS:  I believe it's 3701 West Lunt.

20  BY MS. HIRSCH:

21        Q.   That's the town of Lincolnwood?

22        A.   Yes, ma'am.  I believe it's a village, if

23  that matters.  I don't know.

24        Q.   Do you know -- was the building for sale?



1     A.     It apparently still is, to the best of my

2  knowledge.

3     Q.     Were you planning on buying the building

4  or trying to lease it out?

5     A.     Buying.

6     Q.     Okay.  Do you know if a shooting range

7  would have been permitted under Lincolnwood's zoning

8  ordinances in that building?

9     A.     Most likely.  There was one slight issue.

10 It might have been three feet too close to a school.

11    Q.     Who did you speak to to find that out?

12    A.     The Chief of Police of Lincolnwood whose

13 name escapes me at the moment, and I don't remember

14 who I spoke with at Lincolnwood's Zoning Department.

15    Q.     But you did speak with someone at --

16    A.     I sat down with both of them, yes.  It

17 was maybe five minutes with each, but they told me

18 what to look for online and that it shouldn't be a

19 problem.

20          Lincolnwood already does have a firearms

21 retailer located on Devon Avenue.

22    Q.     What's the name of that?

23    A.     Shore Galleries.

24    Q.     Wanted to stir up some competition?



1        A.      Shore Galleries tends to cater mostly to

2    law enforcement.  If you don't know about it, you

3    don't know it's there.  It looks like an art gallery

4    which is, I believe, how it started back in the day.

5              But they do mostly only law enforcement

6    sales and just firearms.  They do not have a range.

7        Q.      How much -- do you know, what was the

8    cost of this property?

9        A.      The asking price when I was looking was

10   6 million.  Well, probably listed at 595.  But

11   rounding up, 6 million.

12       Q.      Did you make any offers on the property?

13       A.      I did not.

14       Q.      Do you know if the property is still

15   available?

16       A.      I'm not a hundred percent sure, but I

17   believe that it is.

18       Q.      Are you aware that before July, 2011, gun

19   ranges were prohibited within the City limits of

20   Chicago?

21       A.      Yes, I was.

22       Q.      But your plan was to always locate in

23   Lincolnwood?

24       A.      My plan was to locate in Lincolnwood or



1  one of the collar suburbs that actually touched the

2  City of Chicago because ranges were just flat out

3  prohibited in the City of Chicago.

4          Q.    Okay.  Let me --

5          MS. HIRSCH:  What time is your other dep?

6          MR. SIGALE:  I'm not doing that dep.

7          THE COURT REPORTER:  I'm going to go off.

8                          (WHEREUPON, discussion was had

9                          off the record.)

10                         (WHEREUPON, a certain document

11                         was marked Boomstick Deposition

12                         Exhibit No. 4, for

13                         identification, as of

14                         06/07/2012.)

15                         (WHEREUPON, the document was

16                         tendered to the witness.)

17  BY MS. HIRSCH:

18          Q.    Okay.  Paul, the court reporter has

19  handed you what's been marked Exhibit No. 4.

20          Can you just take a moment and read

21  through these?  And I apologize for the tiny print,

22  but that was how it was sent to us.

23          A.    E-mails between myself and Chris Hart of

24  Action Target.



1      Q.    And do you recognize these e-mails?

2      A.    Yes.  It's been a while but, yes, after

3  rereading them, I do.

4      Q.    Okay.  And without getting into any of

5  the specifics about the specifications for the

6  ranges, the proposals that you were seeking, I just

7  want to confirm.

8           It looks like this correspondence began

9  in late 2010 and there were some e-mails back and

10  forth on December 27, 28 of 2010.  Is that correct?

11      A.    Between the 27th and July 14th of 2011

12  are the range on the e-mails.

13      Q.    Okay.  Let's backtrack a bit.

14           There were several going back and forth

15  between December 27th, 28th, and 29th of 2010, is

16  that correct?

17      A.    Yes.

18      Q.    Okay.  And I believe that this must have

19  been when Chris Hart provided you with these

20  (indicating) initial quotes?

21      A.    Yes, ma'am.  And I'm sorry.  Apparently,

22  I was off on my dates that I told you Boomstick was

23  incorporated.  I thought it was a while ago.

24      Q.    Can you revise -- I'm sorry?



1          A.      When you asked me when Boomstick was

2   incorporated, I said late 2009.  It must have been

3   2010.  Because this was one of the first things I did

4   after incorporating, so my apologies.

5          Q.      Okay.  So it was actually late 2010?

6          A.      I believe so.

7          Q.      Okay.

8          A.      Okay.

9          Q.      So there's a gap after the end of 2010

10  and it looks to me -- well, there's one entry here

11  that says January 31st, 2011, and all it says is,

12  "distributed copy of bid."

13             Do you see that on Page 3?

14         A.      I do.

15         Q.      Did you request an additional copy of the

16  proposals or do you know what that reference is?

17         A.      It's referencing Exhibit 2.

18         Q.      So, previously, you had gotten Exhibit 3,

19  the proposal for a 10-lane standard range?

20         A.      Yes.

21         Q.      And approximately a month later, based on

22  some correspondence, Chris Hart provided you with the

23  second quote that's on Exhibit No. 2?

24         A.      Yes.



1      Q.     Thank you.

2             The next correspondence is an e-mail from

3   Mr. Hart in July of 2011.  Do you -- did you have any

4   contact with Mr. Hart, either e-mail, telephone, or

5   in person, between January and July of 2011?

6      A.     No, ma'am.  This is accurate for our

7   e-mail communication which is the only way I've

8   communicated with Mr. Hart, except when I was in

9   front of him in Las Vegas.

10     Q.     Okay.  And did you take any other steps

11  to further your plan for Boomstick, Inc., during this

12  time period?

13     A.     I was working on my business plan,

14  attempting to get information on what type of

15  inventory and what my costs would be.  That's when I

16  found out that I cannot get my FFL, Federal Firearms

17  License.

18     Q.     Okay.  And other than developing your

19  business plan, did you take any other steps?

20     A.     During that time frame, no.

21     Q.     Just to clarify, when I say "take other

22  steps," I mean to further your business of building,

23  owning, constructing a firing range?

24     A.     Not to the best of my knowledge.  This



1  has been an after work, side-type deal, so....

2        Q.    You still keep your day job?

3        A.    Yeah.  I kind of have to.

4        Q.    Okay.  If you can go back to Exhibit

5  No. 4, the bottom of Page 3, communication from

6  Mr. Hart on July 14th, 2011?

7        A.    Yep.

8        Q.    And in that e-mail, Mr. Hart informs you

9  "that Chicago is now allowing shooting ranges due to

10 our court case," and he states that "but... you have

11 to abide by very restrictive regulations that they

12 imposed," is that correct?

13       A.    Yes, ma'am.

14       Q.    Okay.  Did you -- were you aware that the

15 City allowed gun ranges before you received this?

16       A.    Very limitedly that they -- well, I'm

17 trying to think of a good way to phrase it.

18             I was aware that, technically, they were

19 allowing ranges but not in real life.

20       Q.    And how did you become aware of that?

21       A.    I get e-mails from probably at least ten

22 different gun groups, stating that "victory, sort

23 of."  Internet and mass communication from different

24 groups.



1      Q.    Okay.  Do you -- did you know whether the

2  specifications in the two proposals that Chris Hart

3  sent to you would meet the specifications in the

4  City's ordinance?

5      A.    I didn't know if they would or not.  I

6  stopped looking after I realized that there are very,

7  very few, if any, places that would fit with the

8  requirements of residential -- distance from

9  residential and child activity centers, which isn't

10 defined.

11     Q.    You're talking about the --

12     A.    The Chicago ordinance of where they can

13 be located.  It wasn't -- I didn't need to get into

14 whether the zoning part would work for the actual

15 architectural construction of the shooting range

16 because of the distances required by the initial

17 ordinance.

18           When it came out, I believe it was a

19 thousand feet from any residential, alcohol sales.

20 There were so many things, that I don't think that

21 actually exists in the City -- well, anywhere where

22 it could be profitable.

23     Q.    Is that your current understanding, that

24 it's within a thousand feet --



 1      A.    I believe they changed it to 500 now, but

 2  I haven't been following probably as much as I

 3  should.

 4      Q.    And you said -- how did you make this

 5  determination that it would be very few areas?

 6      A.    Since I am a real estate broker, I have

 7  access to the MLS, so I looked at properties that

 8  were available, commercial properties, mostly only

 9  looked at industrial zoned properties, that were near

10  where people live, and they were too far away.

11      Q.    What do you mean "too far away"?

12      A.    Or too close, rather, to something that

13  would be defined as residential, place of worship,

14  alcohol sales.

15      Q.    You did this research on your own?

16      A.    I did.

17      Q.    And this was online?

18      A.    It was with the MLS system.

19      Q.    Okay.  And these were for properties that

20  were currently available.  Do you mean for rent or

21  sale?

22      A.    For sale.

23      Q.    For sale.  Okay.  And did you look at any

24  vacant lots that might be available to build out?



1          A.     I didn't find any that would be large

2     enough to accommodate the three ranges.

3          Q.     You were looking specifically for your

4     process?

5          A.     For my project, not for anyone else.

6     Sorry.  I'm greedy.

7          Q.     Do you remember when you did this search?

8          A.     It would have been around the time of the

9     e-mail, but I don't remember an exact day.  Just when

10    news that ranges were sort of allowed in the City, it

11    would have been around that time.

12         Q.     And do you recall how many properties you

13    did find that would meet the qualifications?

14         A.     None.

15         Q.     You found none?

16         A.     None.  I only did search the North Side

17    of Chicago.  I didn't do a citywide search.  I just

18    did neighborhoods that I would like it to be on

19    because I'm familiar with them.

20         Q.     Can you tell me the parameters of what

21    you searched?

22         A.     I believe I went Lakeview, Lincoln Park,

23    North Center, Ravenswood which is kind of included in

24    North Center in the MLS and west from there.  Not



 1  quite as far west as O'Hare, though.

 2       Q.    Do you know what percentage of the City

 3  that area is?

 4       A.    I don't.

 5       Q.    Did you look at the south at all?

 6       A.    I did not.  I am not familiar enough with

 7  the South Side of the City of Chicago to know what's

 8  what.

 9       Q.    Did you look at anything -- let me look.

10  You said Lakeview, Lincoln Park, North Center,

11  Ravenswood, west.

12       A.    And well west from there.  I think the

13  furthest I went was Austin I might have cut my search

14  off at at the time.

15       Q.    Approximately what was the south bound --

16       A.    Approximately, probably would have been

17  North Avenue.  And I'm sorry for interrupting.

18       Q.    No, that's okay.  You understood what I

19  was trying to ask better than I could have phrased

20  it.

21            North Avenue?

22       A.    Approximately.  Well, from the Lake,

23  North Avenue basically to 90/94, following 90/94 up

24  as a boundary in some areas.



 1        Q.    And you limited your search to this area
 2   because this was where you were comfortable or what
 3   you were familiar with as far as --
 4        A.    What I'm familiar with.  It's the area I
 5   currently work in, I've grown up in.
 6        Q.    And that's where you would want to have
 7   your facility located?
 8        A.    Ideally.
 9        Q.    Okay.
10        A.    If it were to be Chicago, anyway.
11        Q.    Okay.  So have you ever read the City's
12   gun range ordinance that allows for gun ranges and
13   lists the specific requirements?
14        A.    I don't know that I've read the entire
15   thing in its entirety, to be repetitive.  I
16   definitely have read bits and pieces of it.
17              I may have read a firster version.  I
18   know it's been revised a few times since it first
19   came out.
20        Q.    Okay.  And do you remember where you read
21   parts of it?
22        A.    Online.  My generation.
23        Q.    Did you go to the --
24        A.    Possibly, the Illinois State Rifle



1  Association website.  It might have been an NRA

2  website.

3       Q.    So it wasn't the City's website?

4       A.    No.

5       Q.    It would have been portions on another

6  website?

7       A.    Yeah, copy and paste.  Some were court

8  documents that were copied, PDF files on other

9  website sites.

10      Q.    Did you talk to anyone at the City about

11 what potential -- what areas you might be able to

12 build a range?

13      A.    I did not.

14      Q.    Did you contact Action Target about --

15 after July -- let me just backtrack.

16            After July, 2011, Chris Hart sent you an

17 e-mail that looks like he was checking in on your

18 status and letting you know about the new gun range

19 ordinance in the City of Chicago, correct?

20      A.    Yes.

21      Q.    Okay.  Did you respond to him?

22      A.    If I did respond -- I don't recall if I

23 did or not.  If I did, I would have just said that

24 I'm still working on the business plan.  It's been a



1  work in progress for two years at this point.

2       Q.    You didn't ask him whether these

3  proposals would meet with the requirements of the

4  ordinance?

5       A.    No, I did not.  At the time I was still

6  thinking Lincolnwood, so it was sort of a nonissue

7  for me.

8       Q.    Do you know what the specification

9  requirements are in the Chicago ordinance?

10       A.    I know some of them off the top of my

11  head just that I recall from reading the ordinance.

12  I do not know all of them perfect.

13       Q.    Which ones do you recall?

14       A.    Outside of the building can only be a

15  noise level of 55 decibels.  I don't know what that

16  translates into in the real world.  I can't tell you

17  what 55 decibels sounds like.

18            And then the requirement about child

19  activity centers, places of worship, alcohol

20  distributors, that category.

21       Q.    The zoning category?

22       A.    Yes.

23       Q.    Are there any other construction

24  specifications that you recall?



1      A.      Nothing that popped out to me.  I do

2  remember when reading the first draft of the

3  ordinance right after it happened, that most of the

4  things, I just went, I was planning on doing that

5  anyway, so I didn't pay much attention to them.

6          I can't recall which exactly ones of

7  those they were.

8      Q.      When you say you "were going to do those

9  anyway," can you clarify?  Can you expand on that a

10  little bit?

11      A.      The idea behind Boomstick was to be a

12  state-of-the-art shooting facility.  So to build

13  above and beyond what at the time was normally

14  thought of as a shooting range.

15          Ranges that I have had experience with --

16  indoor ranges that I have had experience with, you

17  can tell that they are shooting ranges.  You can

18  smell that they are shooting ranges when you're in

19  there.

20          The Action Target range that I was at in

21  Las Vegas, it -- the air was cleaner that Las Vegas

22  outside air while people were shooting.

23          So that's what I was going for even

24  before Chicago had any ordinance relating to this,



1   just because to be a successful business in this day

2   and age, I believe you have to have a facility like

3   that.

4          So some of the requirements, I just

5   glanced over because I figured I would fall under

6   them just because I was overbuilding or going with

7   highest and best.

8      Q.    Back to Exhibit 4.  On the very last

9   page, the very last e-mail communication is

10  January -- it's either 6 or 8.

11                     (WHEREUPON, there was a short

12                     interruption.)

13  BY MS. HIRSCH:

14     Q.    Do you see that on the bottom of the

15  page?

16     A.    I do.

17     Q.    And -- sorry.  I cannot read that date.

18     A.    January 6th.

19     Q.    On the bottom.  It says from Chris Hart

20  to you on January 3rd, maybe?

21     A.    Yes.

22     Q.    Okay.  Bifocal contact lenses don't help

23  that much.

24          It says, "Good to hear, Paul.  Two



 1  questions."

 2        MR. SIGALE:  Is that a thing, bifocal contacts?

 3        THE WITNESS:  I was wondering the same thing

 4  when you said it.

 5        MS. HIRSCH:  Yes.  I'm wearing bifocal

 6  contacts.  We can take a break for a second.

 7                      (WHEREUPON, discussion was had

 8                      off the record.)

 9        MS. HIRSCH:  Okay.  Let's get back on.

10  BY MS. HIRSCH:

11        Q.    So "good to hear, Paul."  Sounds like

12  it's responding to you maybe saying that you were

13  still working on something?

14        A.    Hadn't given up.

15        Q.    Okay.  That must have been in response to

16  some communication that's not included?

17        MR. SIGALE:  Actually, let's go off one more

18  second.

19        MS. HIRSCH:  Okay.

20                      (WHEREUPON, discussion was had

21                      off the record.)

22  BY MS. HIRSCH:

23        Q.    As I was saying, this seems to be in

24  response to something because he says, "good to hear,



1  Paul."

2          Do you remember why you may have

3  contacted Chris Hart sometime in early January of

4  this year?

5      A.    It was probably me taking forever to

6  reply to the July 14th.  Because Boomstick is moving

7  so slowly, that it's got an e-mail account that I

8  check every couple of months.

9          There's nothing time-consuming or

10  relevant to being timely with Boomstick at the

11  moment.  So it's just not No. 1 priority.

12      Q.    Okay.  And do you remember what you might

13  have said to him?

14      A.    Probably that I'm still trucking along

15  with the business plan.  I may have, around that

16  time, probably had set up the meeting with the family

17  friend that works in venture capital.

18          So I might have let him know that I was

19  talking to someone who might be able to get me money,

20  which is the important part of getting Boomstick off

21  the ground.

22      Q.    Okay.  And I see that he offered to help

23  you look at properties or something when he was in

24  Chicago?



1        A.    Yes.

2        Q.    Is that an offer you took him up on?

3        A.    No, ma'am.

4        Q.    Have you had any further contact with

5    Chris Hart or anyone at Action Target since January

6    of this year?

7        A.    Just the e-mail I referenced earlier in

8    the deposition.  I believe I received it on June 1st

9    of this year.  Just asking how things were going.

10   Basically, the same text that is in the last e-mail

11   stated.

12            Chris, as a salesman, does follow up

13   periodically, just to keep his name out there and see

14   what's going on.

15       Q.    Do you have a copy of that e-mail?

16       A.    Possibly.

17       MS. HIRSCH:  For the record, the Deponent is

18   looking at his, I believe, e-mail account on his --

19       THE WITNESS:  E-mail accounts.  That's why this

20   might take a while.

21                      (WHEREUPON, there was a short

22                      interruption for the witness to

23                      look on his cell phone.)

24   BY THE WITNESS:



 1        A.    I don't have it on my phone.  I can

 2   provide it to Counsel.

 3   BY MS. HIRSCH:

 4        Q.    If you don't mind, if you can send a copy

 5   and --

 6        MS. HIRSCH:  Do you want to be on an e-mail or

 7   do you want me to forward a copy to you if I get

 8   anything?

 9        MR. SIGALE:  I got a feeling that Kuz was

10   planning on e-mailing both of us.

11        MS. HIRSCH:  Okay.

12        THE WITNESS:  Yes, I definitely will e-mail all

13   parties involved.

14   BY MS. HIRSCH:

15        Q.    Okay.  Thank you.

16              And did you respond to this latest

17   inquiry, the June whatever the day --

18        A.    I did last night or two days ago, just

19   saying that I'm going to be deposed in the Ezell case

20   today.

21        Q.    Did Chris respond to that e-mail?

22        A.    Not that I've seen yet but, again, I

23   don't check my e-mail that often for Boomstick.  So

24   he may have.  If he has, I will forward that as well.

PAUL KUCZMIERCZYK                                    June 07, 2012
RHONDA EZELL -vs- CITY OF CHICAGO                              54

1        Q.      Thank you.

2                Are you currently or periodically looking

3    for other properties in Lincolnwood or anywhere else

4    to locate a firing range?

5        A.      Periodically, yes, I do.  With my current

6    day job of property management, now is our busy

7    season so I go home and pass out.  Wake up and go

8    back to work.

9                So Boomstick, most of the stuff that has

10   happened with Boomstick since its inception have been

11   over the winter months, the slow months in real

12   estate, just because I can't neglect my current

13   occupation.

14       Q.      Okay.  And is it your intention to keep

15   this business plan going and to, you know, some day

16   have these firing ranges?

17       A.      Ideally, yes.  I would just transition

18   completely to owning and operating Boomstick and be

19   done with the real estate.

20       MS. HIRSCH:  Can we take a break?

21                        (WHEREUPON, a recess was had.)

22       MS. HIRSCH:  We can go back.

23                        (WHEREUPON, a certain document

24                        was marked Boomstick Deposition



1                          Exhibit No. 5, for

2                          identification, as of

3                          06/07/2012.)

4                          (WHEREUPON, the document was

5                          tendered to the witness.)

6   BY MS. HIRSCH:

7        Q.    Okay.   The court reporter has handed you

8   what's been marked Exhibit No. 5.   And do you

9   recognize this document?

10       A.    I do.

11       Q.    And what is it?

12       A.    It is the current business plan for

13  Boomstick, Incorporated.

14       Q.    Okay.   It has a date of February 1st,

15  2012, on it?

16       A.    Yes, ma'am.

17       Q.    Has it been changed since then?

18       A.    No, it has not.

19       Q.    And has this document -- when did you

20  first start creating this document?

21       A.    Shortly after the incorporation of

22  Boomstick.   Possibly, shortly before the

23  incorporation of Boomstick.

24       Q.    And has it been a continuous work in



1  progress?

2          A.     Yes.

3          Q.     Did you consult with any business people

4  about how to put together a business plan like this?

5          A.     No.   I did an online search of business

6  plans and the majority formatting of this came from

7  the National Shooting Sports Foundation.

8                 One of the documents on the flash drive

9  that you have is how to write a business plan for a

10 shooting range and a separate one for retail.  I

11 combined elements of both.

12         Q.     Okay.  On Page 5, it states that you

13 "seek to raise $12 million of equity capital" for

14 this venture, is that correct?

15         A.     Correct.

16         Q.     And today, how much have you raised?

17         A.     Nothing.  I have not pursued investors

18 yet because the plan is not complete.

19         Q.     Okay.  And are you -- after this busy

20 time for your other business, are you planning on

21 continuing to work on this and complete the plan?

22         A.     I'm planning on continuing trying to work

23 on it.  The holding point right now is I can't get my

24 numbers because of the FFL issue that I spoke of



 1  earlier.

 2        Q.    Okay.  And I see that on Page 6, under

 3  "Executive Summary" --

 4        A.    Yep.

 5        Q.    -- you reference this FFL issue?

 6        A.    Yes.

 7        Q.    Can you just go over that one more time

 8  for me?

 9        A.    Because I am a resident of the City of

10  Chicago, I cannot obtain an FFL because on the

11  paperwork from the government to obtain the Federal

12  Firearms License, you need to sign that you certify

13  that, to the best of your knowledge, it is legal for

14  you to sell firearms where you are, which it is not

15  in the City of Chicago.

16        Q.    Okay.  And you're interpreting that not

17  as where you would want to have your business but as

18  where you reside?

19        A.    Well, to apply for the FFL, I need to use

20  my current address.  And since I do not own a

21  business -- a property to locate Boomstick into, I

22  can't use that as the address.

23        Q.    Okay.  And why is the FFL needed for

24  pricing of firearms and ammunition?



PAUL KUCZMIERCZYK                                    June 07, 2012
RHONDA EZELL -vs- CITY OF CHICAGO                              58

1         A.    It's proprietary information that

2    manufacturers and distributors will only provide to

3    federal firearms licensees, those who have gone

4    through the application process and approved to be

5    involved in the transfer of ownership of firearms.

6         Q.    So there's really no source of this

7    information for people who haven't kind of already

8    got that license and are forging ahead?

9         A.    Not to the best of my knowledge.

10        Q.    Do you have any estimations of how much

11   the cost would be for this type of inventory for the

12   type of range that you are considering?

13        A.    My guesstimates are based on some

14   information that was probably proprietary that I

15   obtained at the SHOT Show.  People just thinking I

16   had an FFL because I was there.

17             I estimated about half a million in

18   firearms inventory and, roughly, another 2- to

19   250,000 in accessories; ammunition, targets,

20   holsters, carrying bags, ear muffs, shooting glasses

21   for the initial opening.

22        Q.    And is that calculated into the $12

23   million cost?

24        A.    It is.



1      Q.    Okay.  And did you also determine how

2   many Range Masters -- I'm going to use the wrong

3   word -- or trainers that you would need and employees

4   at your range?

5      A.    In my plan, just because it is going, in

6   my estimation, above and beyond, I would want every

7   employee to have at least their RSO, Range Safety

8   Officer certification.

9      Q.    Does that mean that they're authorized to

10  actually help -- what does the safety -- I'm sorry.

11  Say that again?

12     A.    Range Safety Officer, RSO.

13     Q.    Okay.  Explain to me what that is.

14     A.    Someone who would be responsible for the

15  range, point out if anyone is performing an unsafe

16  practice.  People don't often know when they sweep

17  themselves or others with a muzzle, not

18  intentionally, but I've even seen professionals do it

19  to themselves.

20          Someone who watches for that, someone who

21  can call a cease fire, someone who can address if

22  there is a malfunction with a firearm safely, address

23  the situation so that there are no injuries or damage

24  to property.



1       Q.    And you said that you would want to have

2   every employee have that officer certification?

3       A.    Ideally.  And how the business plan is

4   set up right now, yes, I would want every employee to

5   be at least an RSO if not a Chief Range Safety

6   Officer.

7       Q.    Okay.  And did you determine

8   approximately how many people would need to staff the

9   range on a given day?

10      A.    I haven't been able to get into that

11  because I haven't seen -- I haven't been able to

12  estimate how many people would be going through a

13  day.  I would need at least three, bear minimum, for

14  one of the 10-lane ranges to be open to have a safety

15  officer on range while the range has live firing

16  going on, and then --

17      Q.    Three per one range?

18      A.    No.  One per range, one per ten

19  positions.

20      Q.    Okay.

21      A.    In the current configuration.

22      Q.    Do you have any current plan to open a

23  range in the City of Chicago?

24      A.    Only -- depending the outcome of this



1  case, possibly.  At the moment, the thought is to

2  locate in Lincolnwood, Illinois.

3        Q.    What do you mean by "the outcome of this

4  case"?

5        A.    If some of the restrictions are changed

6  to make it easier or friendlier for a shooting range

7  to open up.  The issue I ran into when considering

8  Chicago after first knowing that Chicago was now, in

9  theory, allowing ranges were the locations of where I

10  would like to be located.

11        Q.    Okay.  So when you say "easier or

12  friendlier," you're talking about location?

13        A.    The distance to residential and the

14  definition of child activity center.  Also, some of

15  the other things in the ordinance about if an

16  employee of the range is ever convicted of anything,

17  that it could affect the range's operation.

18              It seemed like a bit of an undue burden

19  to bother thinking about dealing with.

20        Q.    I'm sorry.  That the provision of having

21  an employee that had been convicted of --

22        A.    And this was not from the City's website,

23  so it might be misinformation.  But that if an

24  employee of the range was arrested and there was a



1   list of different things, or possible felony, that

2   then the range could be shut down by the City due to

3   that.

4            I don't know if that is true or not.

5   Again, not everything on the Internet is true.  But

6   it just --

7       Q.   And would that provision -- let's say

8   that you could locate a range in your desired area in

9   the City.

10           Would that provision about the conviction

11  of an employee before you started building and doing

12  anything, prevent you from actually opening your

13  range?

14      A.   It wouldn't prevent, but it would

15  definitely be something that throughout the course of

16  operating the range, I can't control people outside

17  of work.  I can only control them so much when

18  they're at work.

19           A provision like that, where you can shut

20  down a business because one of their employees went

21  out and did something stupid... how many City

22  employees have been caught doing something?

23           It's unfair, in my estimation, to treat

24  any business to that effect.  As a businessperson, if



1  I found out one of my employees did do something like

2  this, I would probably terminate them to the best of

3  my ability, following the laws for termination.

4         But to have the whole business be shut

5  down or be sanctioned because of someone's actions

6  outside of work just isn't fair.  It isn't right.

7     Q.   Okay.  And that's your understanding of

8  what --

9     A.   From what I read.  And, again, it was not

10 off the City's website, so it might have been

11 interpreted by someone who posted it, but....

12    MS. HIRSCH:  Okay.  I think I'm done, David, if

13 you want to ask your questions.

14    MR. SIGALE:  Yeah.  Let me take a minute here.

15 I might not have anything at all.

16    THE WITNESS:  And I will e-mail you a copy of

17 everything that's on here (indicating).

18    MR. SIGALE:  Okay.

19    THE WITNESS:  How much did you print?  What do

20 I need to give him?

21    MS. HIRSCH:  I was going to provide him a copy.

22 I don't know.  Someone else is printing it, but if

23 you can just e-mail it to him, that's fine.

24    THE WITNESS:  Yeah.  Did you just take



1  everything?

2        MS. HIRSCH:  I got to check what somebody did.

3        THE WITNESS:  Okay.  Just so both sides have

4  the same thing.

5        MS. HIRSCH:  Oh, I think so.

6        THE WITNESS:  Okay.  I'll just e-mail you.

7  Probably several e-mails.

8                        EXAMINATION

9  BY MR. SIGALE:

10       Q.    Paul, you've been working on this

11 business plan, this Exhibit 5, for some time.

12             Fair to say?

13       A.    Yes, definitely.

14       Q.    And you had said some of this came from

15 like -- the information came from the NSSF website?

16       A.    Yes.

17       Q.    But, obviously, if there was something on

18 the NSSF website that you didn't like, you would have

19 removed it, correct?

20       A.    Could you rephrase as far as what you

21 mean didn't like?

22       Q.    Well, I mean, let's say there was

23 something on NSSF's -- strike it.  Let me just ask it

24 a little differently.



 1          A.     Sorry.  I just didn't understand.

 2          Q.     No, no.  It's my bad.

 3                 NSSF, National Shooting Sports

 4    Foundation, you said had information on their website

 5    about making a business plan for opening a range?

 6          A.     Yes.

 7          Q.     And you used that as a starting point to

 8    put this Exhibit 5 together?

 9          A.     I did.

10          Q.     Okay.  How much of the content in here

11    was cut and paste from NSSF?

12          A.     The table of contents, the very last page

13    which currently I believe is Page 14, which isn't

14    finished but just other parts that I need.

15                 The National Shooting Sports Foundation

16    documents were basically just an outline for what you

17    need, you know, what you will need to do, what

18    questions you need to answer.

19                 It was just a guide to get to the point

20    where you see if the business is even viable or

21    something you would like to pursue.

22          Q.     Okay.  So this Exhibit -- I'm sorry.

23    Page 7.  Is this something that you wrote or is this

24    something NSSF wrote and you just inserted Boomstick



1   into it?

2        A.     I wrote this.

3        Q.     You wrote this.  The third paragraph, I

4   want to ask you about it.  The paragraph that starts

5   with "Our primary market consists of males age 18 to

6   54."

7            Then it talks -- the next line starts

8   with talking about "the growing segment of women" who

9   are shooting, and then it says,

10                  "And offer programs for

11           youth participation and education

12           hosting events such as 'First

13           Shots' sponsored by the NSSF, as

14           well as inviting the Boy Scouts of

15           America and other youth groups..."

16        Now, that portion, you wrote that?

17        A.     I did write that.

18        Q.     Okay.  Is that -- did you add that in

19   there because of a belief that youth should be

20   exposed to shooting or as a profit issue or both --

21   or a combination of both?

22        A.     Primarily, it would have to be -- because

23   I believe that children -- younger people, people who

24   have no experience, should be exposed to it.



1      Q.    Why is that?

2      A.    It's America.  It's part of our

3   traditions since we began.  I was not exposed to

4   shooting as a child.  It's now one of my favorite

5   pastimes.  I just want to spread that to other

6   people.

7           Had I been shooting as a little kid, who

8   knows where I'd be right now.  Probably in Colorado,

9   shooting at something.

10     Q.    Did you put that -- did you also consider

11  that as part of the profitability estimate of the

12  business?

13     A.    It's definitely part of the

14  profitability.  With Boomstick -- when I first

15  dreamed up Boomstick, it wasn't just profits,

16  profits, profits.  It was I know that it took me

17  until I was 20 years old to fire a firearm and really

18  enjoyed it.  To expose just more people in Chicago.

19          The reason I didn't have any experience

20  with firearms, because I grew up in Chicago.  You're

21  just force fed guns are bad, guns are evil, only bad

22  people have guns, guns don't do anything good, guns

23  can't be fun.  Fun might be the wrong word here,

24  but....



1      Q.    So that paragraph, that portion about

2   youth participation, education, and so on, that's

3   something that's important to you?

4      A.    It is.  Which was actually -- I don't

5   know if I need to say this or not, but in doing the

6   business plan, it kind of became an issue at one

7   point because I had to figure out how to work it in

8   because I'm like, ahh, if we're letting the Boy

9   Scouts in here for free, how am I going to get people

10  to give me money?  So yeah, if I'm doing all this

11  free stuff....

12     Q.    So you were -- your plan was to -- your

13  plan, as you envisioned it here in this paragraph,

14  was that you would invite those groups free of

15  charge?

16     A.    If possible.  The First Shots program

17  that is referenced right before the Boy Scouts is

18  sponsored by the National Shooting Sports Foundation.

19  That is open to the participants.  There is no age

20  restriction on it.

21          What First Shots is is a range provides

22  the times, not free to the range, but people can come

23  and receive some instruction on the shooting sports,

24  background, an introduction.  Hence, "First Shots."



1      Q.    Okay.  You were talking, and it's in the

2  business plan, about having a retail portion of the

3  business?

4      A.    Yes.

5      Q.    Of the establishment?

6      A.    Yes.

7      Q.    I understand that the financials

8  aren't -- on Page 14, they are not fleshed out for

9  the reasons that you discussed earlier, but do you

10  have an idea about where sales would -- the role that

11  sales would have in the profitability of the

12  business?

13      A.    I don't, yet, because I don't have

14  access -- what I'm anticipating would be one of the

15  largest revenue generators for the range/retail would

16  be ammo sales, but I don't know what my cost to buy

17  the ammunition would be.

18          I can easily go to other ranges and

19  figure out what people will pay for it.  So I can

20  figure out what I can sell it for, but I have no idea

21  what I can buy it for, so I don't know if I'd be

22  making a penny or $5.

23      Q.    Okay.  What about loaning or renting

24  firearms to people; is that something that --



1        A.    That is -- sorry to cut you off.  That is

2   definitely that I would want Boomstick to do.  I know

3   the very first firearm I ever bought, I couldn't

4   shoot it before I bought it.

5              It didn't fit my hand.  And my hand is

6   scarred to prove it, after the first time I did take

7   it to a shooting range.  I would like to have a large

8   selection of rental firearms that if someone were

9   anticipating purchasing, especially if it's their

10  first handgun purchase, shooting it before they buy

11  it.

12             It's not -- firearms aren't something you

13  can easily return.  Oh, yeah, I've had it for a day

14  but have it back.  It's just due to the nature of

15  what it is.

16             So I would like to have consumers,

17  customers, and clients who come into the store make

18  the best possible informed decision as opposed to,

19  oh, Joe said I should buy a Springfield, but Bob said

20  I should get a Glock.  Basically, a test drive.

21        Q.   Do you see that as something that's

22  important for the consumer who's buying a handgun,

23  say, for self-defense?

24        A.    I do, especially if it's for self-defense



1  and not just something that's going to be used for

2  plinking.  If your goal is for self-defense, that's a

3  whole different level.

4            You are literally possibly taking your

5  life in your own hands.  You should make sure you're

6  comfortable with what tool you're going to use to

7  accomplish the job.

8       MR. SIGALE:  One more second, Paul.

9  BY MR. SIGALE:

10      Q.    I think this is about my last question or

11  questions.

12            I appreciate what you're talking about

13  here today about, you know, your enjoyment of

14  shooting, your exposure to it, your enjoyment as a

15  pastime.  It sounds like you feel strongly about it.

16            When you're going -- when you were

17  talking to that friend of the family who's a

18  potential investor, when you plan on talking to

19  future investors, are you planning on pushing the

20  cause, so to speak, or are you planning on pushing

21  the profit that could be made?

22      A.    It would depend on what type of investor

23  I'm talking to.  Just basic business strategy.  I

24  would love it if I could get all of my investors to



1  be people who feel the way I do for the cause of it.

2  And, yes, good there is some profit on the side.

3  Ideally, it would just be for the cause of educating

4  the public on the shooting sports.

5            But if it's someone who just cares about

6  bottom lines, then, obviously, that's what is going

7  to be pushed in any investment meetings to raise

8  capital.  Ideally, it would all be enthusiasts.  I

9  think that would make a much better group of

10  investors for this type of project.

11           But I'm trying to get 12 million.  I'll

12  take it where I can get it.

13      Q.    And then that means that it can be

14  anticipated that, at least on some level, the people

15  that you will be talking to will be expecting a

16  return on their money?

17      A.    Most definitely.

18      MR. SIGALE:  Okay.  I don't have anything else.

19      MS. HIRSCH:  I don't have anything else.

20      MR. SIGALE:  Okay.

21      MS. HIRSCH:  The court reporter is going to

22  have a transcript of your testimony here today, and

23  you can either wait and take a look at that, make

24  sure that everything she got down was accurate and



 1  then sign it.

 2          Or you can go ahead and just waive

 3  signature if you don't -- you think everything is all

 4  right.  It's your choose.

 5      THE WITNESS:  Can I ask what you guys would

 6  advise?

 7      MR. SIGALE:  Most people waive it.  You can't

 8  change your answer.  You can only change if --

 9      MS. HIRSCH:  If it's a typo.

10      MR. SIGALE:  Yeah.  You can't change red light

11  to green light but you can change, oh, I didn't say

12  bed.  I said red.  Stuff like that.

13      THE WITNESS:  Oh, okay.  I'll waive then.

14      MS. HIRSCH:  Okay.  Thank you.

15      MR. SIGALE:  I was just going to say, I'll let

16  you know if I'm going to order.  I don't know.

17      MS. HIRSCH:  Okay.  I would like just a regular

18  copy.  I don't need an electronic copy.

19          FURTHER DEPONENT SAITH NOT.

20

21

22

23

24



1  STATE OF ILLINOIS )

2                    )  SS:

3  COUNTY OF DU PAGE )

4          I, V. LINDA BOESCH, a Notary Public within

5  and for the County of DuPage, State of Illinois, and

6  a Certified Shorthand Reporter of said state, do

7  hereby certify:

8          That previous to the commencement of the

9  examination of the witness, the witness was duly

10 sworn to testify the whole truth concerning the

11 matters herein;

12         That the foregoing deposition transcript

13 was reported stenographically by me, was thereafter

14 reduced to typewriting under my personal direction

15 and constitutes a true record of the testimony given

16 and the proceedings had;

17         That the said deposition was taken before

18 me at the time and place specified;

19         That I am not a relative or employee or

20 attorney or counsel, nor a relative or employee of

21 such attorney or counsel for any of the parties

22 hereto, nor interested directly or indirectly in the

23 outcome of this action.

24         IN WITNESS WHEREOF, I do hereunto set my



1  hand of office at Chicago, Illinois, this 11th day of

2  June, 2012.

3

4

5

6

7          Notary Public, DuPage County, Illinois

8          My commission expires 8-14-2013.

9

10

11  CSR Certificate No. 84-3108.

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1                    I N D E X

 2  WITNESS                          EXAMINATION

 3  PAUL KUCZMIERCZYK

 4        By Ms. Hirsch                    3

 5        By Mr. Sigale                   64

 6

 7

 8                 E X H I B I T S

 9  NUMBER                          MARKED FOR ID

10  BOOMSTICK DEPOSITION

11        Exhibit No. 1                   16

12        Exhibit No. 2                   24

13        Exhibit No. 3                   25

14        Exhibit No. 4                   36

15        Exhibit No. 5                   54

16

17

18

19

20

21

22

23

24
```

