Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 1 of 330 PageID #:5332

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                          1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4

5   EZELL, et al.,                    )

6              Plaintiffs,            )        Case No.

7          vs.                        )        10-CV-5135

8   CITY OF CHICAGO,                  )

9              Defendant.             )

10

11          The deposition of LORIN D. KRAMER, called

12   as a witness herein for examination, taken pursuant

13   to the Federal Rules of Civil Procedure of the

14   United States District Courts pertaining to the

15   taking of depositions, taken before ELIA E. CARRIÓN,

16   CSR No. 084.004641, a Certified Shorthand Reporter

17   of said state, taken at 30 North LaSalle Street,

18   Suite 1230, Chicago, Illinois, on the 26th day of

19   September, 2013, at 9:36 A.M.

20

21

22

23

24



1    PRESENT:

2

3         LAW FIRM OF DAVID G. SIGALE, P.C.,

4         (739 Roosevelt Road, Suite 304,

5         Glen Ellyn, Illinois  60137,

6         Tel:  630.452.4547,

7         Fax:  630.596.4445,

8         dsigale@sigalelaw.com), by:

9         MR. DAVID G. SIGALE,

10            appeared on behalf of the Plaintiffs;

11

12        CITY OF CHICAGO, DEPARTMENT OF LAW,

13        (30 North LaSalle Street, Suite 1230,

14        Chicago, Illinois  60602,

15        Tel:  312.744.4216,

16        Fax:  312.742.3925,

17        waguiar@cityofchicago.org), by:

18        MR. WILLIAM MACY AGUIAR,

19        MS. MARY EILEEN WELLS,

20            appeared on behalf of the Defendant.

21

22

23   REPORTED BY:   ELIA E. CARRIÓN, RPR

24              C.S.R. CERTIFICATE NO. 084.004641.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 3 of 330 PageID #:5334

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                          3

```
 1                    (WHEREUPON, the witness was duly

 2                    sworn.)

 3                    LORIN D. KRAMER,

 4   called as a witness, having been first duly sworn,

 5   was examined and testified as follows:

 6                         EXAMINATION

 7   BY MR. AGUIAR:

 8        Q.    I'd like to ask the witness to please

 9   state his full name for the record.

10        A.    My name is Lorin, L-O-R-I-N; middle name

11   Dean, D-E-A-N; last name Kramer, K-R-A-M-E-R.

12        Q.    Good morning, Mr. Kramer.  My name is

13   William Aguiar.  I am joined by Mary Eileen Wells,

14   and together we represent the City of Chicago in the

15   case of Ezell v. City of Chicago which is currently

16   pending in the United States District Court for The

17   Northern Direct of Illinois and it's No. 10-C-5135.

18             Have you been deposed before?

19        A.    Yes.

20        Q.    When was your last deposition?

21        A.    Six or seven years ago.

22        Q.    Well, it's been sometime since your last

23   deposition; so I'm going to go over with you a

24   couple of ground rules for today's proceeding.  The
```



1   first and most important ground rule is that if you

2   do not understand my question, please let me know

3   and I will do the best I can to get you a question

4   that you do understand.  If you answer my question,

5   I'm going to -- I'm going to assume that you've

6   answered as I've asked it.

7              You have to refrain from nodding or

8   shaking your head in response to a question.  The

9   court reporter cannot take that down.  Your answers

10  must be verbal.

11             It's also important that we not speak

12  over one another, and it's also difficult for the

13  court reporter to take down.  So I will afford you

14  the courtesy of letting you complete your answer

15  before I move on to my next question, and I ask that

16  you give me the same courtesy and let me finish my

17  question before you've answered my question.

18             If at any time you need a break, by all

19  means let me know and I will certainly accommodate

20  that request.  I would just ask that you not request

21  a break while there's a question pending.

22             The next two questions that I have to ask

23  you are solely for purposes of today's record.

24             Have you taken any medications today that



LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                          5

1  would affect your ability to understand my questions

2  or to provide complete answers to them?

3        A.    No.

4        Q.    Are there any other reasons why you would

5  not be able to understand my questions or to provide

6  complete answers to them?

7        A.    No.

8        Q.    Did you speak with anybody regarding your

9  testimony here today?

10       A.    Yes.

11       Q.    Who did you speak with?

12       A.    Dave -- sorry.  David Sigale and Gerald

13  M. -- I'm sorry -- Jack Giordano.

14       Q.    When did you speak with Mr. Sigale?

15       A.    This morning.

16       Q.    Any other time?

17       A.    Yes.

18       Q.    And when would that have been?

19       A.    Throughout -- throughout preparing the

20  report.  Been speaking to him on and off for a year

21  and a half or more.

22       Q.    I understand.  I was asking specifically

23  for today's deposition.

24       A.    Oh, for today's deposition?



1      Q.     To prepare for today's deposition.

2      A.     I spoke to him this morning, and I spoke

3   to him yesterday.  I may have spoken to him last

4   week sometime as well.

5      Q.     When did you speak to Mr. Giordano about

6   today's deposition?

7      A.     I spoke to him this morning, and I spoke

8   to him the day of his deposition, which I believe

9   was last week.

10      Q.     Did you speak to him after his

11   deposition?

12      A.     Yes.

13      Q.     And what did Mr. Giordano tell you?

14      A.     He told me he made his flight, and he --

15      MR. SIGALE:  Hint, hint.

16   BY THE WITNESS:

17      A.     He told me that the deposition went the

18   full seven hours.  He told me that the ordinance had

19   changed some since we prepared our report and that

20   some of the things that were an issue in our report

21   may no longer be an issue.  That's about it.

22   BY MR. AGUIAR:

23      Q.     Did Mr. Giordano discuss with you the

24   substance of his testimony?



1      A.    No.

2      Q.    Did you ask him about the substance of

3  his testimony?

4      A.    No.

5      Q.    And you say you spoke with him this

6  morning as well?

7      A.    Yes.

8      Q.    And was that about today's deposition?

9      A.    It was not about specifics of the

10  deposition, but it was a:  "I'm going to the

11  deposition this morning."

12      Q.    Okay.  And, again, you didn't speak about

13  any substance?

14      A.    Not substance -- okay.

15      Q.    Did you speak about the substantive

16  issues in the case with Mr. Giordano this morning?

17      A.    Yes.  One issue.

18      Q.    And what was that issue?

19      A.    That issue had to do with -- one of the

20  items on our list in our report described

21  impenetrability of surfaces of the interior range,

22  and I described to him that in reviewing the

23  materials that I had that I discovered that there

24  were some impenetrability issues that I had not seen



1  in doing the report and didn't know whether they had

2  been added by changes in the ordinance.  And he did

3  not know either.

4      Q.   Other than that, any other issues you

5  talked about regarding the substance of your report?

6      A.   No.

7      Q.   Did you review any documents in

8  preparation for today's deposition?

9      A.   The -- the documents that I sent to you.

10 That whole pile that you asked for.  And then also

11 there were some subsequent depositions that I was

12 e-mailed by Mr. Sigale that I reviewed, and then

13 there were some ordinance revisions that I reviewed

14 and that was it.

15     Q.   Which depositions did you review?

16     A.   I have copies of those.

17     Q.   If you'd like to -- if you have them and

18 would like to let me know, that would be great.

19     MR. AGUIAR:  Mr. Sigale, do you have an

20 objection to that?

21     MR. SIGALE:  No.  I think in general I'll tell

22 you that he reviewed --

23     MR. AGUIAR:  Let him tell me.

24     MR. SIGALE:  That's fine.



1        MR. AGUIAR:  That way you're not testifying.

2        MR. SIGALE:  Just for the record, when he

3  references the documents he sent to you, it's the

4  documents that were forwarded to me that I forwarded

5  along to you.

6        MR. AGUIAR:  Thank you.

7        MR. SIGALE:  Uh-huh.

8  BY THE WITNESS:

9        A.    Well, they're depositions and some other

10 documents.  Those -- those are the ones.

11       MR. AGUIAR:  May I, Mr. Sigale?

12       MR. SIGALE:  Sure.  Real quick.

13       MR. AGUIAR:  Let the record reflect that the

14 witness has tendered to me transcripts of

15 depositions from Robert Fahlstrom,

16 F-A-H-L-S-T-R-O-M; the deposition of Steven

17 Valenziano, V-A-L-E-N-Z-I-A-N-O; Christopher Hart;

18 Tina Skahill, S-K-A-H-I-L-L.

19       In addition he's tendered to me defendant's

20 disclosures pursuant to Federal Rule of Civil

21 Procedure 26(a)(2)(C), dated June 25, 2013; a letter

22 to Mr. Sigale dated August 15, 2012; and the

23 affidavit of Kevin Schnoes, S-C-H-N-O-E-S.

24       MR. SIGALE:  And just for the record, the



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 10 of 330 PageID #:5341

LORIN D. KRAMER                                         September 26, 2013
EZELL vs. CITY OF CHICAGO                                               10

```
 1    letter to me is from you, or someone in your office,

 2    that you referenced.

 3         MR. AGUIAR:   From me.

 4         Can we start with No. 1.

 5                        (WHEREUPON, a certain document was

 6                        marked Kramer Deposition Exhibit

 7                        No. 1, for identification, as of

 8                        September 26, 2013.)

 9                        (WHEREUPON, the document was

10                        tendered to the witness.)

11    BY MR. AGUIAR:

12         Q.   Mr. Kramer, the court reporter has handed

13    you what I have marked as Exhibit No. 1.  This is a

14    request for production of documents issued by the

15    City to you for documents related to your expert

16    report.  Have you seen this before?

17         A.   Yes.

18         Q.   And have you produced the documents

19    requested herein?

20         A.   Yes.

21         Q.   You did a full search for all documents

22    which would have been responsive to this?

23         A.   Yes.

24         Q.   And they've all been produced?
```



```
 1        A.    Yes.

 2        Q.    Okay.   Thank you.

 3        MR. AGUIAR:   Exhibit 2.

 4                   (WHEREUPON, a certain document was

 5                   marked Kramer Deposition Exhibit

 6                   No. 2, for identification, as of

 7                   September 26, 2013.)

 8                   (WHEREUPON, the document was

 9                   tendered to the witness.)

10   BY MR. AGUIAR:

11        Q.    Mr. Kramer, you've been handed what the

12   court reporter has marked for me as Exhibit No. 2.

13             Do you recognize this document?

14        A.    Yes.

15        Q.    And what is this document?

16        A.    This document is the report that we

17   prepared, dated March 16, 2012, that we prepared for

18   Mr. Sigale.

19        Q.    Would you please turn to the last page of

20   the document.

21             And is that your signature above your

22   name?

23        A.    Yes.

24        Q.    Thank you.
```



1          I'd like to turn to page 9 of the report.

2     On page 9 your qualifications for providing the

3     opinions contained in this report are listed there,

4     are they not?

5          A.    Yes.  Yes.

6          Q.    If you would please take a moment and

7     review the qualifications on pages 9, 10, until the

8     top of 11 and let me know if all of the -- all of

9     your qualifications to provide the opinions you're

10    giving are listed there.

11         A.    These are all correct.

12         Q.    Okay.  And there's nothing missing from

13    your qualifications listed in the report?

14         A.    Not that I can think of.

15         Q.    Okay.  Why don't we start talking about

16    those qualifications.  Did you attend college?

17         A.    Yes.

18         Q.    Where did you attend college?

19         A.    Mercer County Community College, Trenton,

20    New Jersey.

21         Q.    Did you graduate?

22         A.    Yes.

23         Q.    And what year did you graduate?

24         A.    1979.



LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                      13

1          Q.     And what degree did you receive?

2          A.     An associate of science in architecture.

3          Q.     Did you have a minor?

4          A.     No.

5          Q.     Did you attend college and receive a

6     bachelor's degree?

7          A.     No.

8          Q.     Do you have any educational experience

9     beyond the associate's in science that you received

10    from Mercer state?

11         A.     Mercer County Community College.

12         Q.     Thank you.

13         A.     I have some credit hours at Arizona State

14    University.

15         Q.     And when did you receive those credit

16    hours?

17         A.     They would have been after 1979, and

18    probably the last credit hours would have been

19    around '81.

20         Q.     In what field did you receive those

21    credit hours?

22         A.     Architecture.

23         Q.     Is it fair to assume that the associate's

24    degree you received was a two-year program?



1     A.    Yes.

2     Q.    Okay.  You don't hold a degree in

3  accounting, do you?

4     A.    No.

5     Q.    You don't hold a degree in economics of

6  any kind?

7     A.    No.

8     Q.    You're not a certified public accountant?

9     A.    No.

10     Q.    You don't have an MBA?

11     A.    No.

12     Q.    Other than the credit hours you received

13  from ASU between '79 and '81, do you have any other

14  continuing education?

15     A.    Yes.

16     Q.    And what would that be?

17     A.    Because I'm a licensed architect, some of

18  the states I'm licensed in require continuing

19  education on an annual basis; so I do continuing

20  education.

21     Q.    And --

22     A.    And -- and that's every year.

23     Q.    Could you describe for me what kind of

24  continuing education courses you take.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 15 of 330 PageID #:5346

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        15

1          A.    They're required to be in health, safety,

2    and welfare.

3          Q.    That sounds like a pretty broad area.

4          A.    It is.

5          Q.    Is it as it only relates to construction

6    and design of buildings?

7          A.    As it relates to architectural services,

8    yes.

9          Q.    Okay.  And which states require it, if

10   you know?

11         A.    I -- I have a licensure in 11 states.  I

12   know aggregate what I need for continuing education

13   units, but I do not remember which states require

14   what.

15         Q.    You say you're licensed in 11 states.

16         Are those listed in your report on page 9

17   on to the top of page 10?

18         A.    Yes.

19         Q.    Okay.  Let's talk a little bit about

20   that, then.

21         Where were you first licensed?

22         A.    Arizona.

23         Q.    Okay.  And when was that?

24         A.    I believe it was September of 1991.



LORIN D. KRAMER                                          September 26, 2013
EZELL vs. CITY OF CHICAGO                                              16

1        Q.    And what did you have to do to become

2    licensed in Arizona as an architect?

3        A.    I had to take a nine-part exam and pass

4    that exam, all nine parts.  I had to have --

5    there -- there was an experience requirement.  I had

6    to work in an architect's office a certain minimum

7    number of years under a licensed architect.  They

8    would count your number of years of education in an

9    architectural school as years towards the total

10   number of years you had to have to sit for the exam.

11            That's what I remember.  1991 was long

12   enough ago there may have been other things, but

13   that's what I recall.

14       Q.    And you've held the license in Arizona

15   ever since '91?

16       A.    Yes.

17       Q.    No interruptions in your license?

18       A.    No.

19       Q.    And then you were licensed in other

20   states thereafter?

21       A.    Yes.

22       Q.    Did you have to go through the same

23   requirements in all those states in order to be

24   licensed there, or is it some kind of reciprocity



1  with Arizona?

2       A.    It's a combination of reciprocity and

3  state -- individual state requirements, and the

4  individual state requirements vary from state to

5  state.

6       Q.    Do you recall which states had

7  requirements beyond those of Arizona?

8       A.    I remember Washington State did.  That's

9  the one that comes to mind.  There may have been

10  others.

11       Q.    What additional things did Washington

12  State require?

13       A.    Washington State required an oral

14  interview that had to be conducted in Washington

15  State, and they also required a written exam.  And

16  that's all I recall.

17       Q.    May I ask why did you become licensed in

18  all the other states after Arizona?  Was there a

19  professional reason for that?

20       A.    Yeah.  Yes.

21       Q.    And what would that be?

22       A.    Our firm specializes in shooting ranges,

23  and I in particular am the person who does the

24  design of the shooting ranges.  And basically you



1    can't make a living just doing shooting ranges in

2    one state.  There just aren't enough shooting ranges

3    to do.

4              So we do them in a variety of states, and

5    I need licensure in the states that I'm doing the

6    architecture on those ranges.

7        Q.   Is that because you can't, as an

8    architect, work in those other states without a

9    license?

10       A.   You can't prepare construction documents

11   without a license, yes.

12       Q.   Okay.  And that's pretty much universal

13   in every state?

14       A.   Every state I know of.

15       Q.   So it's not uncommon for an architect to

16   be licensed in multiple states, then?  Is that

17   what --

18       A.   It's not uncommon.

19       Q.   Do you recall which other states may have

20   required a written exam besides Washington and

21   Arizona?

22       A.   I do not recall if there were any other

23   states.

24       Q.   And have you held the licenses in these



1   additional ten states the entire time since you've

2   received the license?

3       A.    Yes.

4       Q.    No interruptions in those licenses?

5       A.    No interruptions.

6       Q.    Okay.  And according to your

7   qualifications, you're currently a senior principal

8   at Kramer One; isn't that true?

9       A.    Yes.

10      Q.    And Kramer One is incorporated?

11      A.    Yes.

12      Q.    In which state?

13      A.    Arizona.  Kramer One is incorporated in

14  Arizona.  We do have foreign corporate status in

15  other states.  I -- I'm not clear whether you were

16  asking about that.

17      Q.    I was about to ask that.  You anticipated

18  me very well.

19      A.    I apologize.

20      Q.    Is Kramer One authorized to do business

21  in other states?

22      A.    Yes.

23      Q.    What other states?

24      A.    I'm probably not going to remember them



1   all.

2          Q.     Give me your best shot.

3          A.     My best shot is I know we're licensed in

4   Washington State at -- we have foreign corporate

5   status in Washington State.  Colorado.  That's all I

6   remember.

7          Q.     May I ask why Kramer One has status in

8   Washington State and Colorado but not the other

9   states in which you're licensed?  Is there a reason

10  for that?

11         A.     Washington State, we have foreign

12  corporate status because we've been working on

13  several projects in Washington State.

14                We have -- we have foreign corporate

15  status in Colorado because having foreign corporate

16  status in Colorado costs hardly anything.  And even

17  though we're not doing a project in Colorado right

18  now, it's just not worth discontinuing it for the

19  amount of money that we pay to have corporate status

20  in Colorado.

21         Q.     Okay.  Given the name of the company and

22  your last name, is it a fair assumption that you are

23  the principal shareholder of Kramer One?

24         A.     I am the principal shareholder of



1    Kramer One.

2         Q.    Are there other shareholders?

3         A.    Yes.

4         Q.    Do you know who they are?

5         A.    Yes.

6         Q.    Who are the other?

7         A.    The other -- the only other is Gerald M.

8    Cook, C-O-O-K.

9         Q.    And is Mr. Cook also a licensed

10   architect?

11        A.    Yes.

12        Q.    And is he also located in Arizona?

13        A.    Yes.

14        Q.    Did you found Kramer One with Mr. Cook?

15        MR. AGUIAR:  Let me strike the question.

16   BY MR. AGUIAR:

17        Q.    Did you found Kramer One?

18        A.    Yes.

19        Q.    Okay.  By yourself?

20        A.    You said "Kramer One"; correct?

21        Q.    Yes.

22        A.    Okay.  You didn't ask -- okay.  I'm going

23   to expand on this just to make it easy for you.

24   Kramer One started as a sole proprietorship in



```
 1   January of 1990.  Kramer One, Inc., is a corporation
 2   that started in January of 1994.  Kramer One, Inc.,
 3   includes Gerald M. Cook.  Kramer One was a sole
 4   proprietorship and did not include Gerald Cook.
 5        Q.   Thank you for that.
 6        A.   You're welcome.
 7        Q.   You just saved us a whole lot of going
 8   around.
 9             So in 1990 you started Kramer One as a
10   sole proprietorship?
11        A.   Yes.
12        Q.   Okay.  And you're based out of Arizona?
13        A.   Yes.
14        Q.   Okay.  And what type of work did
15   Kramer One do in 1990?
16        A.   1990 was before I had architectural
17   licensure.  I had architectural licensure in
18   September of 1991; so in 1990 I provided drafting
19   services to architectural firms.
20        Q.   And you could do that without a license?
21        A.   Yes.
22        Q.   Okay.  And what kind of drafting services
23   did you provide?  What kind of projects did you work
24   on?
```



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 23 of 330 PageID #:5354

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                         23

1      A.    All types of projects.  Primarily
2  commercial projects.  Very little residential.
3      Q.    What type of commercial projects?
4      A.    A lot of warehouses.  I think there may
5  have been some commercial buildings, office-type
6  buildings.  I think that there were some educational
7  facilities.  There were some shooting ranges.  There
8  may have been some historic preservation projects,
9  and they may have been residential.
10      Q.    And then you were licensed in September
11  of '91?
12      A.    Yes.
13      Q.    Did that change the type of work that
14  Kramer One was doing at that point?
15      A.    Yes.
16      Q.    And what type of work did you start doing
17  in September of '91 once you were licensed?
18      A.    I was providing architectural services
19  instead of drafting services.
20      Q.    And for a nonarchitect -- this is your
21  chance to educate me a little bit -- what's the
22  difference between "drafting services" and
23  "architectural services"?
24      A.    Each state licenses architects to make



1    certain decisions and provide plans and

2    specifications under their seal and signature, and

3    those plans are generally necessary in order to get

4    a building permit.

5         Q.    Okay.  Now, what's drafting services?

6         A.    Drafting services would be putting the

7    lines on the paper that the architect then looks at

8    and makes sure are correct before affixing their

9    seal and signature to the drawings.

10        Q.    Okay.  So the licensure allowed you

11   basically to make these your own --

12        A.    Yes.

13        Q.    -- officially.

14              Would that be a fair way to describe it?

15        A.    That would be fair.

16        Q.    So you become the architect of record for

17   the project?

18        A.    Correct.

19        Q.    And so starting September of 1991, were

20   you no longer working with other architectural

21   firms?  You're doing it on your own?

22        A.    I'm not sure I understand the question.

23        Q.    When you first started Kramer One, you

24   said you were providing services for other



1   architects.  And then when you became licensed you

2   had the ability to do your own.

3            So my question was:  Were you now having

4   your own clients, or were you still working with

5   other architectural firms?

6        A.    Both.

7        Q.    Both.

8            And from September of '91 until the

9   founding of Kramer One, Inc., in '94, what kind of

10  work did you work on as an architect?

11       A.    Primarily shooting range projects, some

12  industrial-type projects, some remodel of commercial

13  buildings, remodeling suites for strip shopping

14  centers, for example.  That's all I recall.

15       Q.    Not much residential?

16       A.    I don't think at that time I did any

17  residential.

18       Q.    Okay.  And then in 1994, Kramer One,

19  Inc., came to be.  How did that come into being?

20       A.    We started doing projects that were large

21  enough in scope that it made sense to become a

22  corporation instead of just be a sole

23  proprietorship.  Basically, we had legal advice that

24  we should become a corporation.



1      Q.    So at that point, were you already

2   working with Mr. Cook?

3      A.    Yes.

4      Q.    Was he your employee?

5      A.    No.

6      Q.    Was he your partner?

7      A.    No.

8      MR. SIGALE:  Just object as to foundation, to

9   the extent that it calls for a legal conclusion.

10     You can answer.  Go ahead.

11  BY THE WITNESS:

12     A.    Yeah.  I --

13  BY MR. AGUIAR:

14     Q.    When did Mr. Cook join you in the

15  practice?

16     A.    1994.

17     Q.    Okay.

18     A.    January of 1994.

19     Q.    Is that when you incorporated Kramer One,

20  Inc.?

21     A.    Yes.

22     Q.    Okay.  So before then were you working

23  with Mr. Cook in any way?

24     A.    Yes.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 27 of 330 PageID #:5358

LORIN D. KRAMER                                        September 26, 2013
EZELL vs. CITY OF CHICAGO                                            27

1          Q.     In what way?

2          A.     He was an architect.  I was a draftsman.

3    From -- starting in 1990 I was a draftsman.  I was

4    providing drafting services to Jerry Cook who was an

5    architect.

6                 Post that time is, is that I was

7    providing services to him occasionally and he was

8    providing services to me, but we were two completely

9    separate firms.

10         Q.     But in 1994 you joined forces?

11         A.     Correct.

12         Q.     Okay.  What type of practice does

13   Mr. Cook have?

14         A.     He does mostly commercial work, a lot of

15   warehouses, some retail, historic preservation.  He

16   does do some residential work.  He does not do

17   shooting ranges.

18         Q.     Has he ever done shooting ranges with

19   you?

20         A.     The only projects he's worked on that

21   have been shooting ranges is when I was the

22   architect of record and he was assisting me.

23         Q.     Does Kramer One have any employees?

24         A.     Yes.



1      Q.    How many?

2      A.    This is confusing; so I'm just going to

3  explain it.

4      Q.    That's fine.

5      A.    Kramer One, Inc., you know now is a

6  corporation that has two shareholders, myself and

7  Jerry Cook.  Jerry Cook has Cook Associates

8  Architects, Inc.  He is a shareholder and his wife

9  is a shareholder.

10           The two firms work so closely together on

11  a daily basis, that between the two firms, we have

12  five employees.

13     Q.    Okay.

14     A.    However, in terms of people who get W-2s

15  specifically from Kramer One, there are two people.

16     Q.    That would be you and Mr. Cook?

17     A.    No.

18     Q.    Who is the other employee, then?

19     A.    It is Jack Giordano.

20           Let me clarify.  When I say "employees,"

21  I'm counting Jerry Cook and myself as employees as

22  well in that count of five.

23     Q.    Certainly.  That would include Mr. Cook's

24  wife?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 29 of 330 PageID #:5360

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                         29

1        A.    No.

2        Q.    Oh, it does not?  Who are the --

3        A.    It does not include her.

4        Q.    Then who are the other employees of the

5    entity?

6        MR. SIGALE:  I'm sorry.  I just -- objection as

7    to form.

8    BY MR. AGUIAR:

9        Q.    Of either Kramer One or Mr. Cook's

10    organization.

11        A.    Okay.  Jerry Cook and myself, Jack

12    Giordano, and then Loon, L-O-O-N, and Chris.

13        Q.    Are either Loon or Chris architects?

14        A.    No.

15        Q.    What are their functions in the company?

16        A.    Chris is an office manager, and he's also

17    the one who tries to fix our computers when they die

18    on a routine basis.  And Loon is a draftsman.

19        Q.    Does Loon work with you on shooting

20    ranges?

21        A.    Rarely but he has.

22        Q.    So since 1994 you've been with

23    Kramer One, Inc.?

24        A.    Yes.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 30 of 330 PageID #:5361

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                          30

1     Q.    Okay.  Any other employment since 1994

2   besides Kramer One, Inc.?

3     A.    No.

4     Q.    Okay.  Before you formed Kramer One as a

5   sole proprietorship in 1990, what were you doing for

6   employment then?

7     A.    I was working in various architect

8   offices.

9           Are you looking for jobs all the way back

10  to when I was 16?

11    Q.    No, I'm not.  I was going to make this a

12  little clearer for you.

13    A.    Okay.

14    Q.    You received your associate's degree in

15  1979; correct?

16    A.    Yes.

17    Q.    Between 1979 and 1990, were you working

18  in architectural firms?

19    A.    Mostly.

20    Q.    Okay.  What else were you doing in that

21  time period?

22    A.    There was a period of time when I was

23  going to school part-time, and there was a period of

24  time -- I think during that same time frame -- that



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 31 of 330 PageID #:5362

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                         31

1  I was working for a blueprint firm.

2       Q.    But otherwise you were working in

3  architects' offices?

4       A.    I think I also had some part-time

5  employment in the 1980s as a firearm instructor.

6  We're talking a couple hours a week.

7       Q.    And so between 1979 and 1990, were all of

8  these various jobs in Arizona?

9       A.    Yes.

10      Q.    Okay.  Do you recall which architects'

11  offices you worked in?

12      A.    Associated Somerton Architects.

13            GSAS.  GSAS was bought by a firm, and I'm

14  blanking on the subsequent name.

15            Orcutt Winslow.

16      THE WITNESS:  And I'm afraid I'm not going to

17  be able to spell Orcutt for you.

18  BY THE WITNESS:

19      A.    James Abell, A-B-E-L-L.

20            I've remembered the firm that bought

21  GSAS.  It was DMJM.  And that's all I remember.

22  BY MR. AGUIAR:

23      Q.    While you were working in these various

24  architectural firms, were you working on gun ranges



1  at that point?

2       A.    No.  I was not working on shooting ranges

3  for the firms.

4       Q.    But you were working on them elsewhere?

5       A.    I was doing moonlight drafts -- drafting

6  on some shooting range projects.

7       Q.    And who would that have been for, if you

8  recall?

9       A.    I -- I recall some of the clients.  I do

10  not recall any of the licensed professionals at this

11  point.

12       Q.    Okay.  Do you recall approximately how

13  many ranges you were working on, on a moonlight

14  basis in this period of time?

15       A.    Up -- up -- between which dates are you

16  referr -- I mean, you're talking about before --

17       Q.    -- 1990.

18       A.    1990.

19       Q.    Correct.

20       A.    Okay.  Well, let's see.  I think there

21  were two.

22       Q.    Do you recall where those ranges would

23  have been located?

24       A.    Yes.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 33 of 330 PageID #:5364

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        33

1       Q.    And where?

2       A.    One was in Phoenix, Arizona; and the

3   other was in Mesa, Arizona.  Actually, just outside

4   the corporate limits of Mesa, Arizona.

5       Q.    Okay.  Let's talk about range design for

6   a few minutes, if we could.

7             As an architect, what role do you play in

8   the design of a shooting range?

9       A.    Are you referring to things that are

10  specific to a shooting range, or you're talking

11  about things that architects do on projects in

12  general as well?

13      Q.    Well, let's start with that.  Generally,

14  what does an architect do on a project?  Let's start

15  with that, and then we'll make it specific to

16  ranges.  So let's talk generally, broadly.

17            Let's get on the record:  What does an

18  architect do?

19      A.    Okay.  Let's see.  Architects are

20  licensed by the state to -- their responsibility is,

21  is to protect life and health of people inside the

22  built environment.  So they prepare drawings and

23  specifications of buildings that are intended to

24  meet the building code and various other codes.



1          And to the best of their knowledge and

2     experience, they design a building in such a way

3     that people aren't injured or get sick by being in

4     that facility.

5          Q.    And does that involve selecting building

6     materials?

7          A.    Yes.

8          Q.    Does it involve designing how many floors

9     a project may have?

10         A.    Yes.

11         Q.    What other kinds of things does that

12    involve in the design process?

13         A.    It would involve making sure that the

14    project meets accessibility codes so that people

15    with various disabilities can use the building.  It

16    would involve making sure that the building is

17    appropriately designed so that if there's a fire

18    people can exit the building and not get trapped

19    within the building.

20         Those are the things that are coming to

21    mind at the moment.  I'm sure there's probably

22    hundreds others, but that's what's coming to mind at

23    the moment.

24         Q.    Let's talk specifically about the firing



 1  ranges, then.

 2          What is involved in the design process

 3  for a shooting range?

 4      A.    Okay.  For an architect designing a

 5  shooting range, you're trying to protect the people

 6  within and without the structure from a safety

 7  perspective, which primarily means not being hit by

 8  a projectile.  You're trying to design the facility

 9  so that people do not get sick in the facility,

10  which means protecting their hearing, protecting

11  their health from exposure to lead, if lead

12  ammunition is going to be used on the range.  It

13  isn't always but it commonly is.

14          There would also -- in the safety realm

15  is, is making sure that -- well, I'm sorry.  That

16  doesn't apply to what an architect does.  I'm sorry.

17          While it's not a specific requirement, a

18  good architect would select equipment that has a

19  good life cycle cost so that it doesn't wear out and

20  fall apart in short order.  And the architect

21  would -- a good architect would design the facility

22  so that it is enjoyable and usable by the people,

23  that they can find spaces in it easily, that they

24  can find it from the parking lot, find the front



1   door to the facility.  That it's -- it's laid out so

2   it's usable.

3        Q.    And I'm assuming this to be true, but let

4   me know if it's not.  A lot of what you design for a

5   firing range is governed by what the client wants

6   for the range itself.  In other words, if they want

7   to have a concession stand, you design a concession

8   stand.  If they want a space to store guns, you

9   design that as well.  Would that be true?

10       A.    It would primarily be true.  Sometimes

11  clients want things that I, as a licensed

12  professional, have to tell them:  I'm sorry.  No, I

13  won't let you do that.

14            But for the most part, I try and make

15  the -- architects walk a fine line.  We have a

16  responsibility to the client to make sure that the

17  client's needs are met to the greatest extent we

18  possibly can.  We also have a responsibility to the

19  public to make sure that the public is -- their life

20  and health is being protected.

21            So if a client were to ask for something

22  that, in my professional judgment, is unsafe, I

23  would be obligated to tell my client no.  So the

24  client does not always win.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 37 of 330 PageID #:5368

LORIN D. KRAMER                              September 26, 2013
EZELL vs. CITY OF CHICAGO                              37

1        Q.    So there are times you have refused to

2   design something because you did not believe it was

3   safe?

4        A.    Yes.

5        Q.    Okay.  What kinds of things wouldn't you

6   design based on safety reasons?

7        A.    Based specifically on safety reasons

8   rather than health reasons?

9        Q.    How about both.

10        A.    The number one thing that we get into is,

11   is for law enforcement ranges, law enforcement

12   clients on indoor ranges commonly want to train on a

13   range where they're shooting lead and they're moving

14   forward and back on the floor as they shoot.  It's

15   our firm's position, my position -- and I also know

16   it's Jack's position -- that that is a problem from

17   a health standpoint and from an OSHA standpoint

18   because you're walking on a floor that has lead on

19   it.

20        We have clients all the time -- law

21   enforcement clients all the time who ask us to

22   design ranges to do that, and we tell them no.  And

23   so we lose a lot of business that way.

24        Q.    Anything else you can recall that you



```
 1   won't design or have chosen not to design because of
 2   a health or safety issue?
 3        A.   I had a client who asked that the retail
 4   space have one and only one door in and out from the
 5   outside because they wanted to control -- they
 6   wanted to make sure that everyone who left the
 7   facility they could watch them before they left the
 8   facility.  The construction code said that there had
 9   to be at least two remote exits in the facility, and
10   I had to inform the client, "No.  I'm sorry.  You're
11   going to have two exits.  You can't have what you
12   want."
13        Q.   Did you have to take any classes to
14   become proficient in how to design gun ranges?
15        A.   No.
16        Q.   So you didn't have any specific classes
17   at all which governed this area?
18        A.   I'm sorry.
19        THE WITNESS:  Could you read back the question,
20   please.
21   BY MR. AGUIAR:
22        Q.   Let me ask the question again.
23             Did you take any classes which were
24   specific to gun range design?
```



1        A.    Yes.

2        Q.    You did?  Which classes were those?

3        A.    I took a class with the National Rifle

4   Association to become a range technical team

5   advisor.

6        Q.    And when did you take that class?

7        A.    I believe it was 1991.

8        Q.    So it was right after you formed

9   Kramer One as a sole proprietorship?

10       A.    As a sole proprietorship?

11       Q.    Yes.

12       A.    Yes.  That would be true, yes.

13       Q.    Okay.  And how long did this class last

14  for?

15       A.    I believe it was around a week.  I don't

16  remember whether it was four days, five days, six

17  days, seven days, but in the vicinity of a week.

18       Q.    And was this a class for architects?

19       A.    No.  Or not specifically for architects.

20  I was the only architect in the room.

21       Q.    So this wasn't a class -- was this a

22  class specifically to teach architects how to design

23  ranges?

24       A.    No.  It was a class to teach people in



1  general how to design ranges, not architects in

2  specific.

3      Q.    Other than that class at the NRA, did you

4  take any classes to become proficient in gun range

5  design?

6      A.    No.

7      Q.    So how does one become proficient in gun

8  range design?  It would strike me that it seems to

9  be a very specialized type of building to construct.

10          So how do you gain that specialty?  How

11  do you go about learning what goes into a range and

12  what doesn't go into a range?

13      A.    You do it for a long time and make

14  mistakes and learn from your mistakes.

15      Q.    So it's a learn-as-you-go?

16      A.    Yes.

17      Q.    You say in your report that you've

18  designed gun ranges in 28 states?

19      A.    That sounds correct.  Yes.

20      Q.    Do you know how many gun ranges in total

21  you've designed in your career?

22      A.    No.

23      Q.    Ballpark?

24      A.    50, plus or minus 25.



1      Q.     So somewhere in the vicinity of 50, plus

2    or minus a couple?

3      A.     Yes.

4      Q.     That'd be a fair assumption?

5      A.     Yes.

6      Q.     Okay.  And that's in the course of your

7    career?

8      A.     Yes.

9      Q.     Okay.  Do you know how many of those have

10   been indoor ranges?

11     A.     Not really.

12     Q.     Have you worked on indoor ranges?

13     A.     Yes.

14     Q.     Outdoor ranges?

15     A.     Yes.

16     Q.     Can you give me an approximate breakdown

17   of how many ranges you've done indoor versus

18   outdoor?

19     A.     I would say more than half have been

20   outdoor, but I wouldn't be able to tell you whether

21   it's 55 percent outdoor, 60 percent outdoor, or

22   65 percent outdoor.

23     Q.     So just guessing?

24     A.     It's not 90 percent outdoor.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 42 of 330 PageID #:5373

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        42

1      Q.    But just guessing, a little more than

2   half?  Would that be a fair way to say it?

3      A.    Yes.

4      Q.    Okay.  And are the design requirements

5   for an outdoor range different from an indoor range?

6      A.    There are a lot of similar -- there are a

7   lot of similar things that you look at, but

8   they're -- not everything you look at is exactly the

9   same.  So it's -- I'm not exactly sure how to answer

10  that question.

11     Q.    I guess what I'm trying to get at is what

12  different things do you have to look at designing an

13  outdoor range versus what you do with an indoor

14  range?

15     A.    Well, you still have to consider safety.

16  You still have to consider health.

17           Some of the differences would be:  On an

18  outdoor range, bullet escapement from the range is a

19  much larger consideration than it is on an indoor

20  range because you don't have a built envelope around

21  the range.  Sound is a bigger issue on an outdoor

22  range than it is on an indoor range because, again,

23  you don't have an envelope enclosing the sound.  On

24  an outdoor range, you generally don't have to



1  consider a ventilation system.  On an indoor range

2  you do.

3          Outdoor ranges generally have lesser

4  requirements for lighting than on indoor ranges.

5  That's what comes to mind.

6      Q.    You just reminded me of a question I

7  wanted to ask you before.

8          You said before that one of the roles of

9  a good architect would be sometimes to select

10 equipment for the range?

11     A.    Yes.

12     Q.    Do you recall saying that?

13         But you don't always do that; is that

14 true?

15     A.    No, that wouldn't -- for me that would

16 not be true.  I've always selected the equipment for

17 the range.

18     Q.    So you would tell the client, Here's what

19 you need to put in your range, in terms of a

20 ventilation system, for example?

21     A.    I would tell the client, Here are your

22 options.  Here are -- here are your options, A, B,

23 C.  In this particular case, I recommend B over A or

24 C.  Is that all right?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 44 of 330 PageID #:5375

LORIN D. KRAMER                                       September 26, 2013
EZELL vs. CITY OF CHICAGO                                             44

1              Sometimes they say, A instead of B.  And

2    in a case like that, I suppose, if there's no major

3    objection on my part, we would go with A instead.

4         Q.   Okay.  Let's get back to the ranges

5    you've designed.

6              How many of the ranges you've designed

7    have been commercial for-profit ranges?

8         A.   Oh, I'm not sure.

9         Q.   But you've done some?

10        A.   I -- oh, yes.

11        Q.   Okay.

12        A.   I can tell you when I did the first one.

13   That I do remember.  That would have been around

14   1992 or '93.

15        Q.   And you've done some since then?

16        A.   Oh, yes.

17        Q.   But you can't tell me how many?

18        A.   No, not really.

19        Q.   Have you done any ranges which are

20   private clubs?

21        A.   Yes.

22        Q.   Any idea how many of those you've done?

23        A.   No, not really.

24        Q.   And have you designed any ranges which



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 45 of 330 PageID #:5376

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                      45

1   are law enforcement or government-agent ranges?

2        A.    Yes.

3        Q.    And how many of those have you done?  Do

4   you know?

5        A.    Not really, no.

6        Q.    Have you ever owned a range?

7        A.    No.

8        Q.    Owned an interest in a company that owns

9   a range?

10       A.    No.

11       Q.    Ever managed or operated a range?

12       A.    Yes.

13       Q.    When did you do that?

14       A.    In the 1980s for a period of around seven

15  years, I believe.  I was on the board of directors

16  of a not-for-profit club that operated a large

17  shooting range.

18       Q.    Are you talking about the Rio Salado,

19  S-A-L-A-D-O, Sportsman's Club?

20       A.    Yes.

21       Q.    Okay.  And the range you're talking about

22  is the Usery Mountain Shooting Range?

23       A.    Yes.

24       Q.    Okay.  You say you're on the board of



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 46 of 330 PageID #:5377

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        46

1    directors of that?

2         A.    Yes.

3         Q.    And according to your qualifications, you

4    were the president, the vice president, the

5    secretary, and the chief instructor?

6         A.    Not all at the same time, yes.

7         Q.    Thank you.  I was going to assume that,

8    but I thank you for clarifying that.

9               What role did you play in running the

10   range itself?

11        A.    Being on the board of directors, I was

12   one of the votes as is to change or leave in place

13   policies of the operations for the range.  I did not

14   deal with the day-to-day operation of the facility.

15   It was purely a -- a management role.

16        Q.    Was the Usery Mountain Shooting Range

17   open to the public?

18        A.    Yes.

19        Q.    And is the range the only thing that the

20   sportsman's club did?

21        A.    Well, it's ranges, plural.  There were

22   many of them.

23        Q.    How many ranges?

24        A.    I think at that time -- I believe there



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 47 of 330 PageID #:5378

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                    47

 1  were seven.

 2       Q.    And were they located in Mesa, Arizona?

 3       A.    Just outside of Mesa, Arizona.

 4       Q.    When you say "There were seven ranges,"

 5  were they all located at the same site?

 6       A.    Yes.

 7       Q.    So there's seven ranges on one location?

 8       A.    Yes.

 9       Q.    Okay.  And that was Usery Mountain

10  Shooting Range?

11       A.    Yes.

12       Q.    Okay.  I was confused for a second.  I

13  thought you were saying there were seven different

14  ranges in different locations that you-all were

15  running?

16       A.    No.

17       Q.    And when you say "There's seven ranges,"

18  is it fair to assume one was an outdoor range?

19       A.    All were outdoor ranges.

20       Q.    They're all outdoor ranges?

21       A.    You're -- you are talking about Rio

22  Salado Sportman's Club now?

23       Q.    Yes.

24       A.    Yes.



1        Q.    So in your role as a board member, did

2    you have any responsibility for the budget for the

3    club?

4        A.    Yes.

5        Q.    Okay.  You reviewed revenues and profits

6    and things like that?

7        A.    Yes.

8        Q.    Okay.  Did you actually put together the

9    budget for the club at any time?

10       A.    No.

11       Q.    You didn't design the range, did you?

12       MR. SIGALE:  Just object as to form.

13   BY THE WITNESS:

14       A.    Okay.  Well, there were ranges, plural.

15   Some of the facilities at Usery Mountain Park, I did

16   provide design services for.

17   BY MR. AGUIAR:

18       Q.    Okay.  What types of ranges?  Outdoor?

19       A.    Yes.

20       Q.    Okay.  How many ranges did you work on at

21   that facility?

22       A.    I believe three at least; may have been

23   more.

24       Q.    I think you testified that you were not



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 49 of 330 PageID #:5380

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                      49

1   involved in the day-to-day operation of the ranges

2   at Usery Mountain?

3        A.    That's correct.  I was not on the site on

4   a day-to-day basis directing things, yes.

5        Q.    But you're no longer with the sportsman's

6   club?

7        A.    That's correct.

8              Board of directors -- from a board of

9   directors, management standpoint, no.  I do still

10  provide design services to them.

11       Q.    But you're not involved in the operations

12  of the sportsman's club anymore?

13       A.    I am not.

14       Q.    Other than your work with the sportsman's

15  club we just spoke about, have you managed any other

16  ranges?

17       A.    No.

18       Q.    Have you designed a range to fit into an

19  existing structure?

20       A.    Yes.

21       Q.    Have you also done it where you've built

22  a new range from ground up?

23       A.    Yes.

24       Q.    How many ranges have you built or



1   designed which have gone into existing structures?

2        A.    I'm not sure.

3        Q.    Do you recall how many you built from the

4   ground up?

5        A.    Sorry.  No.

6        Q.    When you're designing a range for a new

7   building, you design both the range and the

8   building.  Would that be true?

9        A.    That would be true, yes.

10       Q.    Has there --

11       A.    That would be true the overwhelming

12  majority of the time.

13       Q.    Have there been occurrences where you've

14  only designed the range component of a new structure

15  and someone else designed the actual envelope in

16  which the range fit?

17       A.    Yes.

18       Q.    How often does that happen?

19       A.    Rarely.  It generally happens when you

20  have a public building.  It's a training facility

21  for more than just firearms, and the shooting range

22  is one small component of a much larger facility.

23  Then the architect who's doing the overall facility

24  usually designs the entire building, and I design



 1   the space inside that much larger facility.

 2        Q.    In designing a range for a customer, have

 3   you ever had any involvement in formulating that

 4   customer's business plan?

 5        A.    No.

 6        Q.    Do you ever review their business plans?

 7        A.    No.

 8        Q.    Do you ever have any role in preparing

 9   the operating plan for the range of your customer?

10        A.    Yes.

11        Q.    What role do you play?

12        A.    The primary role we play is OSHA

13   compliance documents.

14        Q.    And what does that mean?

15        A.    OSHA has certain standards that you have

16   to meet that are described in the Code of Federal

17   Regulations.  The ones that are of most concern to

18   shooting ranges are things that involve the lead on

19   the range, the lead standard.  There's a hearing

20   standard.  There's also a standard that has to do

21   with eye protection.

22             And our firm has the ability to put

23   together the documents that the client needs to make

24   sure that they have the appropriate paperwork and



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 52 of 330 PageID #:5383

LORIN D. KRAMER                                        September 26, 2013
EZELL vs. CITY OF CHICAGO                                              52

1   the appropriate system in place so they don't get in

2   trouble with OSHA.

3        Q.   So is that a design issue, or is that

4   just an additional service you provide to your

5   clients?

6        A.   It's an additional service.

7        Q.   And having deposed Mr. Giordano last

8   week, is he responsible for basically the OSHA

9   compliance issues?

10       A.   Yes.

11       Q.   Do you ever get involved in that?

12       A.   Other than to review his work before it

13   goes out, no.

14       Q.   Okay.  So, again, in terms of the

15   operating plan, you just review it for OSHA

16   compliance to help your clients out?  You don't look

17   at it for design issues?

18       A.   That's correct.

19       Q.   Do you ever consult with your clients on

20   the location of the ranges that they're trying to

21   build?

22       A.   Yes.

23       Q.   In what way?

24       A.   We'll look at -- they'll come -- it's



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 53 of 330 PageID #:5384

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                         53

1    common for them to come to us with a piece of

2    property that they want to put a range on, and they

3    want to know whether what they want to do will fit

4    on that piece of property.  It -- they will have an

5    existing building that they want us to take a look

6    at and let them know whether a range will fit in

7    this building and how much remodeling the building

8    will have to occur to put a range in it, whether

9    it's even practical.

10             Let's see.  Could you repeat the question

11   once again, please.

12        Q.   No.  I think you've answered what I was

13   asking --

14        A.   Oh, okay.

15        Q.   -- have you ever consulted on the

16   location?

17             Do you ever consult -- so it sounds like

18   you get involved as to whether the site they're

19   looking at actually can accommodate what they want

20   to put on it?

21        A.   Yes.

22        Q.   Do you ever get involved in the decision

23   of whether the site they're looking at is a good

24   business decision for them?



1        A.     I'm going to say yes.

2        Q.     Okay.  In what way?

3        A.     We have had times when someone has shown

4    us a site and has said, Hey, can we fit a range in

5    this existing building or on this existing piece of

6    property?  And we said, In our professional

7    judgment, it looks like you can; however, the

8    location you have is in a -- off of a back side road

9    where no one is going to easily be able to find you,

10   and we think you might want to reconsider.  This

11   property doesn't look like it has the right

12   visibility.

13             We've also said, Look, you're -- you're

14   on a highway where most of your traffic comes from

15   one side, and you've got no -- you've got a median,

16   no left-hand turn lane into this property.  It looks

17   like you've got bad access to this property.  Some

18   of those sorts of things.

19       Q.     So those aren't really design issues,

20   per se?

21       A.     That's correct.

22       Q.     Those are just more your interpretations

23   of what -- or your perception of what business they

24   could generate from that particular location?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 55 of 330 PageID #:5386

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        55

1        A.    That's correct.

2        Q.    Do you ever get involved in zoning

3   issues?

4        A.    Yes.

5        Q.    In what way do you get involved in

6   zoning?

7        A.    Commonly -- not always -- but commonly,

8   shooting ranges require a special-use permit.

9   That's part of the zoning process, and so we

10  commonly get involved in that.

11            Sometimes the property needs to be

12  rezoned, that is a property that looks like the

13  right property but it has the wrong zoning overlay

14  on it.  And we have rarely but occasionally got

15  involved in the rezoning process.

16       Q.    And what kind of involvement do you have

17  in rezoning or getting a special-use zoning permit?

18       A.    Generally, we work for a zoning attorney

19  who is processing the use permit or the rezoning.

20       Q.    So someone else files the application

21  with the municipality and shepherds through the

22  process.

23            You're just providing the background

24  information for that application?



```
 1         A.    That's generally true.  It's not always

 2    true.  Occasionally, you'll run into communities

 3    where they're small enough that the use permit

 4    process is simple enough that the client feels

 5    there's no need to hire a zoning attorney.  And in

 6    that case, sometimes we actually process the

 7    documents instead of the zoning attorney.

 8         Q.    And where have you done that?  Do you

 9    recall?

10         A.    Well, I don't recall everywhere, but I do

11    recall that the first indoor commercial range that I

12    did that I was the one who processed those

13    documents.

14         Q.    Do you ever provide testimony at a

15    hearing by a municipality in favor of a zoning

16    change or special-use permit application?

17         A.    If it -- we have been -- we have been

18    experts that have been called to testify on behalf

19    of the applicant.  Is that what you're referring to?

20         Q.    How about let's start with your client?

21         A.    Yes.

22         Q.    Have you ever provided testimony for a

23    client of yours in favor of either a zoning change

24    or a special-use zoning application?
```



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 57 of 330 PageID #:5388

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        57

1      A.    Yes.

2      Q.    Okay.  And you've provided expert

3  testimony on behalf of people who weren't your

4  clients -- design clients?

5      A.    I don't think so.

6      Q.    Okay.  That's what I was trying to

7  clarify.

8            You used the word "expert," and I wanted

9  to -- that meant something different to me.

10     A.    I understand.

11           Oh, I -- I apologize.  I missed one.  Is,

12 is I have provided testimony for Rio Salado

13 Sportsman's Club while I was on the board of

14 directors, and they weren't my client.  I was on the

15 board of directors.

16     Q.    I understand.

17     A.    That would be the exception.

18     Q.    And do you provide cost estimates for the

19 construction of a range?

20     A.    Yes.

21     Q.    And are the final costs, though,

22 determined by the general contractor who builds the

23 range?

24     A.    The architect provides a cost estimate.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 58 of 330 PageID #:5389

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                          58

1    The actual cost, unfortunately, no one really knows

2    until the project is complete and the owner sees the

3    final bill.

4         Q.    But you don't have any say in that, do

5    you?

6         A.    I do not.

7         Q.    Have you ever been a general contractor

8    on a range project?

9         A.    No.

10        Q.    On page 10 you reference your membership

11   in the National Rifle Association.

12              How long have you been a member of the

13   NRA?

14        A.    Sometime in the 1970s.

15        Q.    So sometime.

16              Are you aware that the NRA has filed suit

17   against the City of Chicago in a number of cases

18   challenging its gun ordinances?

19        A.    I am not.

20        Q.    You testified about the range technical

21   team a few moments ago.  Do you recall that?

22        A.    Yes.

23        Q.    What is the range technical team of the

24   NRA?



1      A.   The range technical team is a group of

2  volunteers who the NRA has access to when someone

3  is, is asking for assistance on evaluating an

4  existing range or evaluating a proposed site for a

5  future range.  NRA can send volunteers out to assist

6  and look at the -- at the location rather than

7  having to send paid employees out.

8      Q.   And I believe you testified you had to

9  be -- you had to go through a course to be on that

10  team?

11      A.   That's correct.

12      Q.   And you did this from 1991 to 2009?

13      A.   I know I started in 1991.  2009 sounds

14  correct.

15      Q.   It's on page 9, if you want to take --

16      A.   Okay.  It's -- then --

17      Q.   It's there.

18      A.   That would be better than my memory.  So,

19  yes, that's correct.

20      Q.   And you're also the range technical team

21  advisor for the western region?

22      A.   That's under "Past Certifications."  I am

23  not currently, but I was, yes.

24      Q.   Did you have to be specially certified to



```
 1   have that role?

 2        A.    That's an interesting question, and I

 3   don't know the answer to that.

 4        Q.    You were the supervisor.

 5              I'm just wanting to know:  Did you have

 6   to take any other classes to be a supervisor of this

 7   team?

 8        A.    I don't believe so.

 9        Q.    Okay.  Does the technical team write the

10   NRA range sourcebook?

11        A.    No.

12        Q.    Who writes that book, if you know?

13        A.    There have been several different

14   versions of that document over time.  The first

15   person to write that document was Richard C.

16   Whiting, W-H-I-T-I-N-G.  That is a superseded

17   version.  There have been several versions since

18   then.

19              And as far as I know, that's a

20   collaborative effort on -- and I'm not -- I have no

21   idea who those collaborators are on those subsequent

22   documents.

23        Q.    So you've never been a part of any team

24   which has drafted some or all of this range
```



1    sourcebook?

2         A.    That's correct.

3         Q.    Okay.  That leads me to my next question.

4               What resources do you look at in

5    designing a range?  Is the NRA sourcebook one of

6    them, for example?

7         A.    It is.

8         Q.    What other sources do you use in

9    determining how to design a range?

10        A.    There are a few documents that are put

11   out by NIOSH, N-I-O-S-H.

12        Q.    And what does that stand for?

13        A.    National -- the S and the H are safety

14   and health.

15        Q.    Would it be the national institute of

16   occupational --

17        A.    That's it.

18        Q.    National Institute of Occupational Safety

19   and Health?

20        A.    That's correct.  Thank you.

21        Q.    So you look at NIOSH, look at the range

22   sourcebook.

23              Any other sources you look at in

24   designing a range?



1        A.    Yes.   OSHA, Occupational Safety and

2   Health Administration.

3              Oh, you're looking for additional -- I'm

4   sor -- I apologize.   You're looking for additional

5   documents beyond that.

6              Those are the primary ones.   There are

7   some -- there are some institutions that have their

8   own specialized document.   For example, the military

9   has their own specialized document that is only

10  applicable to the armed services.   So for doing a

11  range for the military, we use their document.

12             Department of Energy has a document that

13  is for ranges that are Department of Energy ranges.

14  If we're doing a range for Department of Energy, we

15  use their document.   There are a number of those

16  documents that are specific to specific entities.

17             But in terms of general documents that we

18  use for pretty much all ranges, I think I've

19  described them to you.

20        Q.    In designing a range, do you consult with

21  any individuals besides the prospective range

22  owner -- or the range owner?

23        A.    Jack Giordano.

24        Q.    Okay.   Anybody else?



1      A.     For shooting range equipment, I will

2  generally consult with individual manufacturers of

3  the various types of equipment.  If we're dealing

4  with specific acoustic requirements, I will consult

5  with an acoustic engineer.  If we're dealing with

6  specific lighting requirements, I will consult with

7  an electrical engineer.

8             As an architect, the facility -- it's --

9  there are a number of consulting engineers that

10 architects use on all projects.

11            Do you want me to name all of those as

12 well?

13     Q.     I don't think that's necessary.

14     A.     Okay.

15     Q.     But you're not an engineer; correct?

16     A.     That's correct.

17     Q.     So you call the engineers to weigh in on

18 various things which you're not able to talk about,

19 like acoustics and things like that?

20     A.     That's correct.

21     Q.     Okay.  Have you ever designed a range

22 that was built by Action Target?

23     A.     I have designed ranges where

24 Action Target equipment was in the range and where



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 64 of 330 PageID #:5395

LORIN D. KRAMER                                        September 26, 2013
EZELL vs. CITY OF CHICAGO                                              64

1   they installed the equipment, but I've never

2   designed a range where Action Target was the general

3   contractor on the range.

4        Q.    Okay.  Do you know how many ranges you've

5   designed in which Action Target has supplied the

6   equipment or done the installation?

7        A.    No.  But Action Target, to the best of my

8   knowledge, is the largest manufacturer of range

9   equipment in the United States.  So many of our

10  ranges have had their equipment on.

11       Q.    And you said a second ago that you

12  actually call manufacturers to talk about equipment

13  for the ranges; right?

14       A.    Yes.  Commonly.

15       Q.    So have you spoken with Action Target

16  before about equipment for ranges?

17       A.    Yes.

18       Q.    Who have you dealt with at Action Target?

19       A.    They have a bunch of different regions.

20  The country is divided into regions for them.  So

21  depending on what area of the country I am, I talk

22  to the regional salesperson for that region, which

23  at this point I've probably talked to most of the

24  regional salespeople at some point.



1          They also have some technical people in

2     their office.  I've occasionally talked to their

3     technical people as well.  And on at least one or

4     two occasions, I've talked to the owners of the

5     company as well.

6          Q.   You say on page 9, again, that you have

7     spoken at 63 conferences for the NRA?

8          A.   Yes.

9          Q.   What topics have you generally spoken on

10    at the NRA conferences?

11         A.   The materials from the topics, the actual

12    PowerPoint presentations were in the materials that

13    I provided you.  So I'll try to remember what all of

14    them are, but there --

15         Q.   Well, why don't we short-circuit that for

16    a second.

17              Are all the topics on which you've given

18    these lectures -- are they all included in the

19    documents you sent to us?

20         A.   Yes.

21         Q.   There's nothing outside of those

22    documents that you're aware of?

23         A.   I -- I don't believe so.

24         Q.   Okay.  If I say I have those documents,



1  I've looked at them, and I'm aware of it, we won't

2  waste any of your time having you list them out here

3  today.

4        A.    Okay.   Thank you.

5        Q.    As long as I know I have the universe of

6  them.

7              On page 13 it says that you have not

8  given any expert testimony at depositions in the

9  past four years; is that true?

10        A.    That's correct.   With the exception of

11  what I'm doing now.

12        Q.    Okay.   Before the four-year period, had

13  you given any expert testimony or depositions?

14        A.    Yes.

15        Q.    Do you recall how many times you gave

16  expert testimony or depositions?

17        A.    No.

18        Q.    Do you recall what subjects on which you

19  gave such testimony?

20        A.    Most of the testimony would be related to

21  shooting ranges, and it's possible that all of it

22  was related.   At the moment I can't think of any

23  testimony that was not shooting range related.

24        Q.    Did you ever provide testimony in



1    court -- in a courtroom proceeding regarding

2    shooting ranges?

3         A.    Let's see.  Okay.  I -- I had one

4    occasion that I was in court, the lawyers talked,

5    and I did not have to actually testify.  So I assume

6    that doesn't count on your list.

7             I had another time when I testified

8    before a judge, but I believe that proceeding was

9    not court but was a -- I'm looking for the term

10   here -- a -- what's the word I'm looking for?  This

11   is -- where you have a -- where -- the term for when

12   you have the two parties sitting across the table --

13   a mediation.  That's what I'm looking for, a

14   mediation.

15             The judge was -- it was a judge

16   presiding, but it was a mediation not -- I don't

17   believe it was a court --

18        Q.    So it wasn't sworn testimony?

19        A.    Well, I got sworn in on it.

20        Q.    Okay.  Just what was that mediation

21   about, if you recall?

22        A.    That mediation was about an outdoor range

23   in Maryland.  And I believe it was called "Berwyn

24   Rod & Gun Club."  Berwyn, B-E-R-W-Y-N, I believe.



```
 1            And it had to do -- boy, I'm -- I'm --
 2    that's long enough ago I can't remember the
 3    specifics of what it was about.
 4         Q.    Have you ever given any testimony in
 5    opposition to a firing range or shooting range?
 6         MR. SIGALE:  Just object as to form of the
 7    question.
 8    BY MR. AGUIAR:
 9         Q.    Do you understand my question?
10         A.    Not completely.  When you say
11    "testimony," you're talking about written report or
12    raising my hand and being sworn in and --
13         Q.    Well, let's talk about the latter, then.
14            Have you ever given testimony at either a
15    public hearing or in court which would be contrary
16    to the interest of a shooting range, meaning it
17    should not go in, it should be closed out?
18         A.    I don't think so.
19         Q.    Okay.  Have you ever submitted any
20    documents or prepared any reports which would be
21    contrary to a gun range, such as location's bad or
22    it should be shut down?
23         A.    Yes.
24         Q.    It's not a safe place?
```



1    A.    Yes.

2    Q.    You have.  How often have you done that?

3    A.    A number of times.  I -- I couldn't put a

4  number on it.  But if -- if I had to estimate, I'd

5  estimate maybe a half a dozen times.

6    Q.    And just generally, what kinds of things

7  have led you to conclude that the gun range should

8  either not locate somewhere or to be shut down or

9  something along the line which would be contrary to

10  their interest?

11    A.    We've had times when we've been asked to

12  look at a bullet-escapement issue on an outdoor

13  range.  And we've looked at the issue, and we've

14  said, Yeah, there is an issue.  It looks like the

15  bullet did get out of here.

16        It looks like this is how the bullet got

17  out of here.  You need to correct that.  You need to

18  stop operating the way you're operating.  You need

19  to fix that problem.

20    Q.    So you provided this information when you

21  concluded that the range is not operating in a safe

22  manner, and you've recommended ways to make it

23  better?

24    A.    Correct.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 70 of 330 PageID #:5401

LORIN D. KRAMER                                      September 26, 2013
EZELL vs. CITY OF CHICAGO                                            70

1    MR. AGUIAR:  Go off the record for a second.

2              (WHEREUPON, discussion was had off

3              the record.)

4    MR. AGUIAR:  Let's go back on.

5  BY MR. AGUIAR:

6    Q.    Mr. Kramer, I'm referring to what's been

7  marked as Exhibit No. 2 here, the report in general.

8          Did you write this report?

9    A.    Yes.

10   Q.    Did anybody else write any parts of it?

11   A.    Jack Giordano participated.  It's been a

12  year and a half, and I don't remember whether the

13  participation involved him telling me which

14  keystrokes to make or whether he physically made the

15  keystrokes for his edits.

16   Q.    So he participated in the drafting of

17  this report in some manner.  You just don't recall

18  how?

19   A.    Correct.

20   Q.    Okay.  Do you recall any specific parts

21  you wrote of the report?

22   A.    Well, I wrote the initial draft.  Jack

23  participated in the editing of that draft.  So most

24  of this would be my work.



1    Q.    So you basically wrote it and he just
2    edited your work?

3    A.    Correct.

4    Q.    Okay.  And are all the opinions contained
5    in this report your opinions?

6    A.    Yes.

7    Q.    Do you have any opinions regarding the
8    City's gun range ordinances that are not contained
9    in the report?

10   A.    Yes.

11   Q.    Oh, you do.  What are those?

12   A.    There have been some -- subsequent to
13   this report, there have been some ordinance changes,
14   as I understand.  And those ordinance changes -- the
15   one that I saw is on page No. 6, Issue No. 13,
16   "shooting range enclosure construction."

17         Kind of a synopsis of this is, is that
18   I'm talking about things like locations of doors
19   that have armoring on it and such like that.
20   However, what this doesn't refer to is, is that the
21   ordinance refers to -- and I'm going to have to
22   paraphrase this because I don't have the ordinances
23   in front of me.

24         But to paraphrase is, is it says that the

1   surfaces of the enclosure that make up the range

2   need to be impenetrable to the ammunition you're

3   firing on the range if fired from 90 degrees to any

4   of those surfaces.

5            And the issue that I have with that is,

6   is normally in range design, the surfaces that need

7   to be impenetrable are the surfaces that could be

8   struck from gunfire from the location that you're

9   shooting the guns, not anyplace in the room.  So

10  theoretically, using what I -- my understanding of

11  the ordinance is, is there are places inside the

12  range that would have to be impenetrable that

13  generally in range design aren't impenetrable.  And

14  I'm not exactly sure, on particularly an existing

15  building, how you would even make them impenetrable.

16       Q.    And is this new opinion based on an

17  amendment to the ordinance?  Do you recall?

18       A.    I read portions of the most current -- to

19  the best of my knowledge -- the most current

20  ordinance last night, and I picked that up when I

21  read it.  What I don't know is, is whether that is

22  from a change to the ordinance subsequent to me

23  writing the report of March 16, 2012, or whether it

24  was in the original ordinance and I missed it.  I



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 73 of 330 PageID #:5404

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        73

1   don't -- there have been so many amendments to the

2   ordinance, I don't think I have the complete string

3   of what happened when.

4        Q.    Okay.  Other than that, regarding Issue

5   No. 13, which we'll talk about more in detail a

6   little bit later, do you have any other opinions on

7   the City's gun range ordinances that are not

8   contained in the report?

9        A.    No.

10       Q.    Okay.  In preparing the report, you

11   list --

12       MR. AGUIAR:  Strike that.

13   BY MR. AGUIAR:

14       Q.    On page 1 of the report, you list a

15   series of documents you looked at in preparing the

16   report.  Do you see where it says that?

17       A.    Yes.

18       Q.    The bullets?

19       A.    Yes.

20       Q.    Are those all the documents you reviewed

21   in preparing this report?

22       A.    Yes.

23       Q.    There's nothing else?

24       A.    Yes -- no, there is nothing else.



1        Q.    In the paragraph above those bullets, you

2    say, quote, "Prior to reviewing the amended

3    municipal code of Chicago, we had never seen

4    regulations pertaining to shooting range facilities

5    that were anywhere near as restrictive as those for

6    the City of Chicago," end quote.

7              So you have seen regulations in other

8    jurisdictions regarding gun ranges?

9        A.    Yes.

10       Q.    Which jurisdictions?

11       A.    Pima County, Arizona.

12       Q.    Anywhere else?

13       A.    That's the only one I can think of.

14       Q.    So Pima County, Arizona, is the only

15   municipality that you're aware of that has its own

16   gun range regulations?

17       MR. SIGALE:   I'm -- I'm just going to object as

18   to form.

19       Do you mean like a code section that's

20   specifically entitled "Gun Range Ordinance"?  Or do

21   you mean where gun ranges are even mentioned, like

22   in the zoning code or a regular business license

23   or -- I'm objecting to the form on that ground.

24



1  BY MR. AGUIAR:

2      Q.    Any regulations regarding the design,

3  construction, or operation of gun ranges?

4      A.    Okay.  Now, between the two of you, you

5  now have me confused; so let me try and clarify.

6  Zoning-wise, Pima County, Arizona, has a zoning code

7  for -- a zoning -- a section of their zoning code

8  that is for shooting ranges.

9      Q.    Anything else in Pima County that you're

10  aware of?

11      A.    No, not in Pima County.

12      Q.    Anywhere else that you've seen any kind

13  of regulations which govern the design,

14  construction, installation, location of zoning -- of

15  gun ranges?

16      A.    Not for zoning.  But King County,

17  Washington, has a business license section.

18  Shooting ranges are required to get a business

19  license.

20      Q.    Other than that, anything else?

21      A.    That's all I can think of.

22      Q.    Have you actually researched whether

23  there are any jurisdictions in the United States

24  that have any ordinance or regulations like any of



LORIN D. KRAMER                                      September 26, 2013
EZELL vs. CITY OF CHICAGO                                           76

1    the ones you cite in your report?

2         A.    No.

3         Q.    It is possible, then, that there may be

4    jurisdictions in the United States which actually do

5    have regulations governing the installation, design,

6    construction, location of gun ranges?

7         A.    Yes.

8         Q.    And indeed on pages 8 and 9 of your

9    report -- at the bottom of 8, top of 9 -- you

10   actually list some regulations that you've

11   encountered before?

12        A.    I'm sorry.  Where was this?

13        Q.    At the bottom of page 8.

14        A.    Okay.

15        Q.    It starts "For all 19 issues

16   identified..."

17        A.    Okay.

18        Q.    Here you identify certain regulations you

19   have encountered before; isn't that true?

20        A.    Okay.  Issue No. 4, where it's talking

21   about "limitations of operations," those weren't

22   specific regulations that I've seen.  It says "It is

23   not uncommon for outdoor shooting ranges to have

24   limitations on nighttime operations."  That wouldn't



1  be by -- I've not seen that by regulation.  What

2  I've seen that by is a condition of a special-use

3  permit.

4       Q.    Okay.  Okay.  All right.

5             Because you say you've never seen

6  regulations like the City of Chicago's, is it fair,

7  then, to say that you've never actually seen whether

8  a range, subject to these regulations, can actually

9  open up and be run as a viable business?

10      A.    Okay.  Could you --

11      Q.    Certainly.

12      A.    -- restate the question again?

13      Q.    Let me break it down for you.

14            You testified that you've never seen

15  regulations like this before?

16      A.    Yes.

17      Q.    My question is:  Because you've never

18  seen these regulations before, isn't it fair to say

19  that you've never actually seen or tested whether a

20  range, subject to these regulations, can actually be

21  opened and run as a business?

22      A.    That would be correct.

23      Q.    In the next sentence in paragraph 1, you

24  say, quote, "We doubt it would be a prudent business



```
 1   venture to construct a shooting range facility in

 2   the city of Chicago under the current regulations."

 3   I want to focus on the use of the word "doubt."

 4             I take that to mean that you aren't

 5   certain that the regulatory scheme implemented by

 6   the City of Chicago would actually make it imprudent

 7   to open a range?

 8        A.   Okay.  Could you restate that?  There --

 9   there were a sufficient number of negatives in

10   there, I'm not sure where I stand.

11        Q.   You say you "doubt it would be prudent";

12   correct?

13        A.   Correct.

14        Q.   Use of the word "doubt" implies to me

15   that you're not certain?

16        A.   That's correct.

17        Q.   Okay.  So you don't have any certainty --

18        A.   That's correct.

19        Q.   -- that these regulations will actually

20   prohibit a range from opening?

21        A.   That's correct.

22        Q.   So, again, you're just speculating that

23   it might not be prudent?

24        A.   Correct.
```



1      Q.    And I'm going to focus on the use of the

2    word "prudent" now.

3      A.    Okay.

4      Q.    I take prudent to mean wise.

5            Would you agree with that?

6      A.    Yes.

7      Q.    Okay.  So you're not saying here that it

8    would be impossible; just that it wouldn't be wise?

9      A.    That's correct.

10     Q.    Have you made any effort to calculate how

11   much additional cost the City's regulations would

12   add to a range?

13     A.    No.

14     Q.    Have you calculated or attempted to

15   calculate how much revenue these provisions could

16   actually cost a range owner?

17     A.    No.

18     Q.    So in actuality, you don't know whether

19   the City's regulatory scheme in application makes a

20   range either impossible or too expensive to operate

21   in the city?

22     A.    I don't know for certain.

23     MR. AGUIAR:  We're going to mark a couple

24   things all at once 'cause we're going to be using



1    these throughout the course of the deposition.

2        So I think this is No. 3.

3    BY MR. AGUIAR:

4        Q.    And I will explain to you what they all

5    are once I get them all marked.

6                    (WHEREUPON, a certain document was

7                    marked Kramer Deposition Exhibit

8                    No. 3, for identification, as of

9                    September 26, 2013.)

10                   (WHEREUPON, the document was

11                   tendered to the witness.)

12       MR. AGUIAR:  This is No. 4.

13                   (WHEREUPON, a certain document was

14                   marked Kramer Deposition Exhibit

15                   No. 4, for identification, as of

16                   September 26, 2013.)

17                   (WHEREUPON, the document was

18                   tendered to the witness.)

19       MR. AGUIAR:  And this is No. 5.

20                   (WHEREUPON, a certain document was

21                   marked Kramer Deposition Exhibit

22                   No. 5, for identification, as of

23                   September 26, 2013.)

24                   (WHEREUPON, the document was



1                       tendered to the witness.)

2    BY MR. AGUIAR:

3        Q.    Mr. Kramer, I've had the court reporter

4    hand you three documents that I have marked as

5    Exhibits 3, 4, and 5.  We're going to be using these

6    in our discussion of the substantive provisions of

7    the ordinance which you have issue with.  Let me

8    explain to you what these documents are, and I hope

9    I don't confuse you.  If I do, let me know.

10                     Exhibit 3 is a compilation of all of the

11   ordinance provisions that are cited in your report.

12   I printed them offline off of a publishing

13   corporation's Web page.  I will tell you this:  That

14   the latest changes made to the ordinance on

15   September 11, 2013, are not incorporated in the

16   Exhibit 3.  Okay?

17                     So what I provided to you in Exhibit 5 is

18   the ordinance that was enacted on September 11,

19   2013, so we can track the changes that way.  Okay?

20                     Are you with me so far?

21       A.    Yes.  I do have just one question:

22   Exhibit 3 -- was Exhibit 3 in place March 16, 2012,

23   when I did my report?

24       Q.    Parts of it were.  I'm about to explain



LORIN D. KRAMER
EZELL vs. CITY OF CHICAGO

September 26, 2013

82

1  to you why that's not exactly the whole answer here.

2  There were subsequent changes made to the ordinance

3  at the end of last year.  Those changes are

4  reflected in Exhibit 4; so we can track the changes

5  that were made subsequent to what you looked at.

6         So Exhibit 4 -- the changes are actually

7  found in Exhibit 3, but you won't be able to tell

8  that by looking at Exhibit 3 on its own.  Exhibit 4

9  shows you the changes; so we can track them a little

10  more closely.  I promise when we start talking about

11  this, it will be a little easier for you to follow.

12  Okay?

13      A.    Okay.

14      Q.    Let's dig in.  Let the fun begin.

15            Let's flip to page 2 of your report,

16  Exhibit 1.  The first issue you take -- the first

17  issue you identify is the definition of "applicant"

18  as contained in the City's code.  And you basically

19  state -- I'm going to paraphrase here -- that the

20  definition of applicant includes people who are

21  involved in the preparation of filing of the

22  application, including but not limited to any

23  attorney, accountant, consultant, expediter,

24  promoter, or lobbyist.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 83 of 330 PageID #:5414

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        83

1          And you say that this provides -- this

2     causes an impact on who can actually work on a

3     firing range in the city of Chicago.  Is that fair?

4          A.    Yes.

5          Q.    Okay.  Is that your objection to that

6     provision?

7          A.    Yes.

8          Q.    Okay.  Are you aware that since you wrote

9     this report the definition of applicant has changed?

10         A.    I was told that there have been changes

11    that affect this by David Sigale yesterday.

12         Q.    Okay.  Let's look at that, those changes,

13    for a second here.  On Exhibit 4 -- if you will turn

14    to the page that has No. 2 at the bottom, you will

15    see in the second paragraph -- you'll see

16    "applicant" in quotation marks.  That is the

17    definition of applicant that is now provided for in

18    the municipal code.

19         You will see that it says specifically:

20    "Applicant means any person applying for a license

21    issued under this chapter and any person who, No. 1,

22    is an officer, director, manager, managing member,

23    partner, general partner, or limited partner of an

24    entity seeking a license issued under this chapter;



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 84 of 330 PageID #:5415

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                         84

1    or, two, owns directly or indirectly through one or

2    more independent ownership entities 5 percent or

3    more of the interest or voting shares in an entity

4    seeking a license issued under this chapter; or,

5    three, is among the top three persons holding the

6    highest percentage of ownership in an entity seeking

7    a license issued under this chapter."

8              So the definition of applicant no longer

9    says anybody who's required to be disclosed under

10   Section 4-151-030(b).  Now, when you look at the

11   bottom of the page, 4-151-030(b), it says that -- in

12   the last sentence of (b):  "The application shall be

13   verified by oath or affidavit and shall include the

14   following statements and information:  One, in the

15   case of an individual, the name, date of birth,

16   residence address, current telephone number, and

17   social security number of the applicant.  In the

18   case of a partnership, limited partnership,

19   corporation, limited liability company, or other

20   legal entity, the date of its organization or

21   incorporation, the objects for which it was

22   organized or incorporated, and the name, residence

23   address, date of birth, and social security numbers

24   of any applicant."



1            So in that sense, would you agree with me

2    that applicant no longer requires the disclosure of

3    any information of anybody such as -- of an

4    attorney, an accountant, consultant, expediter,

5    promotor, or lobbyist?

6         MR. SIGALE:   I just want to object to the

7    extent you're asking the witness for a legal

8    conclusion.

9    BY MR. AGUIAR:

10        Q.    In light of --

11        MR. SIGALE:   But to the extent you can, go

12   ahead and answer.

13   BY THE WITNESS:

14        A.    Not being a lawyer but I -- that -- your

15   interpretation would match my interpretation is, is

16   that people like me, for example, are no longer on

17   that -- on the list of people who need the FOID card

18   and all of this other process.

19   BY MR. AGUIAR:

20        Q.    So does the amendment to the definition

21   of applicant and the disclosure requirements under

22   4-151-030(b) -- does that alter your opinion as to

23   whether this provision actually impacts the ability

24   to open a range in the city of Chicago?



```
1        A.    Am I entitled to ask a question?

2        Q.    Let me hear it first.

3        A.    Okay.  My -- my objection -- part of my

4   objection would be is, is I, as an architect

5   licensed in Illinois, under the -- when I wrote the

6   report in 2012 under that ordinance, my

7   interpretation of that ordinance was I could not

8   participate in that process.  The updated ordinance,

9   I now can participate in the process.

10            My question would be is, is the FOID card

11  still required of the applicants?

12       Q.    If you turn to the next page, (b)(6), the

13  top of the page, you will see that the applicant is

14  no longer required to provide a FOID card.  It

15  simply says "managers, range masters, and employees

16  CFP and FOID cards."  I will tell you that the CFP

17  requirement has been eliminated altogether.

18       A.    Okay.

19       Q.    But for purposes of what we're talking

20  about, the applicant no longer has to provide a FOID

21  card.  It's just the manager, the range master, or

22  any employees?

23       A.    Or employees.  Okay.  But the -- the

24  people who own the business, the people who are the
```



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 87 of 330 PageID #:5418

LORIN D. KRAMER                                          September 26, 2013
EZELL vs. CITY OF CHICAGO                                               87

 1   money people, don't need to have the FOID card?

 2       Q.    The applicant.   Whoever the applicant is

 3   no longer has to have --

 4       A.    Has to have the -- okay.   All right.   And

 5   so you understand where I was going with this:   My

 6   understanding is, is that the FOID card is only

 7   available to residents of the state of Illinois.

 8       Q.    Okay.

 9       A.    Is that -- is that --

10       Q.    Well, let's go on your assumption that's

11   true.

12       A.    Okay.   If my assumption is, is correct,

13   the only objection I can think of, under Issue

14   No. 1, is if the people who were the owners of the

15   business, supplying money to build this business,

16   could not participate because they had to have a

17   FOID card and they lived in Wisconsin or Indiana,

18   and they couldn't get a FOID card, that would bother

19   me.   But if that's not the case, if -- if the people

20   who have -- what is it? -- 5 percent or more -- all

21   of the things in the list for the applicant, if --

22   if FOID card is, is not part of that process, then

23   I -- I guess I don't have an objection.

24       Q.    Okay.   So that would eliminate your



 1   concern about Issue No. 1?

 2        A.    Yes.

 3        Q.    Okay.  Let's talk about Issue No. 2,

 4   which you have titled "License Verification."

 5   Therein, you take issue primarily with

 6   Section 4-151-030 Subpart F of the code.  And

 7   by defi -- and including in that definition of a

 8   shooting range facility contained in 4-60-010

 9   assuming -- no, that's not right.

10        No, that's true.  The definition of

11   issuance is 4-60-010.  Would you please describe for

12   me what your objection is to those provisions.

13        A.    My understanding is delete -- they list

14   what sorts of things are considered deleterious

15   impact.  And it's a whole long laundry list of all

16   kinds of things is, is that anything that is -- and

17   I'm paraphrasing this -- anything that is seen as

18   being detrimental to the neighborhood, to property

19   values, that occurs in that neighborhood, can be

20   considered a deleterious impact.

21        So you could -- as I understand, you

22   could theoretically open this range.  And weeks,

23   months later, you could have a rash of automobiles

24   being broken into, and the crime rate has increased



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 89 of 330 PageID #:5420

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                         89

1    in that neighborhood and that's considered

2    deleterious.  And the shooting range could wind up

3    being closed down because of that.

4         Q.   Let's correct one of those presumptions.

5    You said "It could be closed down."  If you look at

6    Exhibit 3 -- my apologies.

7         MR. AGUIAR:  Off the record.

8              (WHEREUPON, discussion was had off

9              the record.)

10   BY MR. AGUIAR:

11        Q.   If you would turn to the seventh page of

12   Exhibit 3.

13        MR. SIGALE:  There's pages on the -- oh.

14   BY THE WITNESS:

15        A.   Okay.  This is the page that the page

16   number is No. 3 and the first line on that says "fee

17   paid, period"?

18   BY MR. AGUIAR:

19        Q.   Correct.

20             I want to direct your attention to

21   Subpart F.  And it just says "The commissioner may

22   deny an application for a shooting range facility

23   license if the issuance or renewal of such license

24   would have a deleterious impact on the health,



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 90 of 330 PageID #:5421

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        90

1   safety, or welfare of the community in which the

2   shooting range facility is or will be located."

3            You were talking about a range being shut

4   down.  This gives her -- the commissioner the

5   authority to deny an application or to deny the

6   renewal of an application.

7            It doesn't give her the authority to shut

8   a range down, does it?

9        A.   I understand.  But not allowing the range

10  to be renewed effectively would result -- I'm

11  assuming if you cannot renew the license, that the

12  range will after that point wind up shut down.

13           You can't operate without the license;

14  correct?

15       Q.   That's correct.

16           Does this provision impact the design,

17  construction, or installation of a range?

18       A.   I would say it falls in the category

19  of -- I would have no idea how to design for this

20  provision.

21       Q.   What do you mean you have no idea how to

22  design for it?

23       A.   Well, if a client came to me and said,

24  This is one of the standards I have to meet, and I



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 91 of 330 PageID #:5422

LORIN D. KRAMER                                      September 26, 2013
EZELL vs. CITY OF CHICAGO                                            91

1   need you to design this range so that there will be

2   no deleterious impacts, I would throw my hands up in

3   despair and say, I have no idea how to design for

4   that.

5       Q.    It doesn't generally, though, go to what

6   walls you put up or what features you have in a

7   range, does it?

8       A.    No.

9       Q.    Okay.  The person would be wanting you to

10  design a range which would not cause a deleterious

11  impact in the community, and you wouldn't know how

12  to do that?

13      A.    I would not know how to do that.

14      Q.    Okay.  Are you saying that this provision

15  makes it impossible to open a range in the city of

16  Chicago?

17      A.    If -- if the commissioner denied the

18  application, it would, then, be impossible to open

19  that range because the commissioner denied the

20  application.

21      Q.    I'm just asking you:  Do you think it

22  makes it impossible in general to open a range in

23  the city of Chicago?

24      MR. SIGALE:  I just object as to form.



```
 1   BY MR. AGUIAR:

 2        Q.    Does it create an impossibility, in your

 3   opinion?

 4        A.    It does not -- does not cause an

 5   impossibility.

 6        Q.    Are you saying that this provision makes

 7   it economically infeasible to open a range in the

 8   city of Chicago?

 9        A.    Economically infeasible to open the

10   range.

11        Q.    Is that your -- is that --

12        A.    Was that your question is --

13        Q.    Yes.

14        A.    Okay.  I would say no.

15        Q.    Okay.  Are you saying that this provision

16   would make it unprofitable to run a range in the

17   city of Chicago?

18        A.    If -- if the range wound up not being

19   renewed and had to close, I -- I would say that that

20   would create an unprofitable situation.

21        Q.    But if the -- say the provision never

22   came into play with the range, would that -- would

23   the provision still have an impact on the

24   profitability of that range?
```



1      A.    Okay.  I'm not sure I understand the

2   question.

3      Q.    I'm trying to say that in general -- does

4   this provision -- if it's never -- if the

5   commissioner nev -- if the commissioner keeps

6   renewing a range's license, right, does the

7   existence of this provision alone impact the

8   profitability of a range?

9      A.    Well, if the commissioner does not deny

10  the application and continues to -- and they

11  continue to renew, then that sub -- subsection F is,

12  is not being applied.  And if it's not being

13  applied, then it -- then it would have no impact on

14  the range at all.

15     Q.    Okay.  So the existence of the provision

16  in and of itself doesn't affect profitability, only

17  if it's applied to a specific range and a range is

18  shut down because of it?

19     A.    Correct.  Shut down or not allowed to

20  open.

21     Q.    Well, if a range is not allowed to open,

22  there would never be a profit?

23     A.    It would not be profitable if it was not

24  allowed to open.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 94 of 330 PageID #:5425

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                         94

1    Q.   Okay.  You say in the last sentence of

2  Issue No. 2, quote, "It would be hard to find a

3  business owner or a lending institution that would

4  risk capital on a business venture that could be

5  closed for what is outside the business owner's span

6  of control."

7         Again, I want to focus on the language.

8  You say "It would be hard..."

9         You're not saying that it would be

10  impossible to find a business owner or a lending

11  institution, are you?

12    A.   I don't know about lending institutions,

13  but I would say for a business -- for a business

14  owner, I -- I don't think it's impossible to find a

15  business owner because there are lots of people who

16  want to go into business and lots of people willing

17  to take really high risks.

18    Q.   Let's talk about the lending institution,

19  then.

20         Are you saying it would be impossible to

21  find a lending institution to finance a range

22  operation in Chicago?

23    A.   I don't know enough about lending

24  institutions to draw a conclusion one way or



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 95 of 330 PageID #:5426

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                         95

1  another.  My -- based on my limited understanding of

2  lending institutions, I would find it unlikely, to

3  the point of near impossibility, that someone would

4  lend -- a lending institution would lend money on a

5  project that they don't know that it's going to be

6  open for the duration of the loan.

7         Q.    And that's based just on how you

8  understand financing works?

9         A.    Correct.

10        Q.    Okay.  Did you talk to any lending

11  institutions --

12        A.    No.

13        Q.    Let me ask it more completely.  I wasn't

14  done but I understand.

15              Did you talk to any lending institutions

16  about this question before you wrote the report?

17        A.    I did not.

18        Q.    Any since?

19        A.    No.

20        Q.    Did you look at any studies or reports as

21  to the practices of lending institutions?

22        A.    No.

23        Q.    Did you look at anything else regarding

24  lending institutions and their ability to lend money



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 96 of 330 PageID #:5427

LORIN D. KRAMER                                          September 26, 2013
EZELL vs. CITY OF CHICAGO                                               96

1   in these kind of circumstances?

2        A.    No.

3        Q.    So it's just based on your understanding

4   of financial institutions that lead you to this

5   conclusion?

6        A.    Yes.

7        Q.    Nothing else?

8        A.    Nothing else.

9        Q.    Has any potential or actual customer ever

10  complained to you about the existence of this

11  provision?

12       A.    No.

13       Q.    Have you spoken with anybody else besides

14  either Mr. Giordano or Mr. Sigale about this

15  provision?

16       A.    No.

17       Q.    Are you aware of any other types of

18  businesses in Chicago that are subject to a

19  provision like the one we're discussing today --

20  this provision?

21       A.    The deleterious impact provision?

22       Q.    Yes.

23       A.    I am not.

24       Q.    I'd like you to presume, for purposes of



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 97 of 330 PageID #:5428

LORIN D. KRAMER                                          September 26, 2013
EZELL vs. CITY OF CHICAGO                                              97

1   today's deposition, that what I'm going to tell you

2   right now is true:  That establishments which sell

3   liquor are subject to the exact same requirements as

4   gun ranges.  Okay?

5            Does that change your opinion as to

6   whether someone will open a range, or a lending

7   institution will actually lend money to a range to

8   open in the city of Chicago?

9       A.    I see liquor stores and shooting ranges

10  as two different types of businesses.  This may not

11  be a fair question to ask someone who's a Methodist.

12  I don't go to liquor stores, and liquor stores to me

13  are the wrong-side-of-the-tracks business.

14            I don't see shooting ranges that way.

15  I'm not sure that -- do you -- do you understand

16  what I mean by "wrong-side-of-the-tracks business"?

17      Q.    Well, it sounds like you're saying liquor

18  establishments are actually -- would have more of an

19  impact on a community than a range?

20      A.    That's exactly what I'm saying, yes.

21      Q.    Okay.

22      A.    More of an impact in a deleterious impact

23  standard, as opposed to -- I would think that a

24  shooting range could easily have a great positive



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 98 of 330 PageID #:5429

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                         98

 1  impact to a neighborhood.  But I'm assuming when you

 2  say "impact," you're referring to deleterious

 3  impact.

 4      Q.    That's exactly what I'm referring to.

 5  Okay.  Well, what if I told you that there are

 6  thousands of liquor licenses issued in the city of

 7  Chicago and must be thousands of establishments who

 8  sell liquor, and they are subject to the same

 9  deleterious impact requirements.  Okay?  And they

10  manage to open and thrive in the city of Chicago.

11          If they can be subject to the same

12  requirements and have more -- under your definition

13  of what's more deleterious -- should have more of a

14  fear of being shut down than a gun range, does that

15  impact your opinion as to whether someone would

16  actually want to open a range or someone would

17  actually want to finance a range in the city of

18  Chicago?

19      MR. SIGALE:  I'm going to object on foundation.

20  Speculation.  Incomplete hypothetical.  Assumes

21  facts not in evidence.

22      MR. AGUIAR:  I'm sure he's going to add I talk

23  too long.

24      MR. SIGALE:  No, no.  I'm good with it so far.



```
 1        MR. AGUIAR:  For the record, that was an

 2   attempt at humor.

 3   BY MR. AGUIAR:

 4        Q.    Do you understand my question,

 5   Mr. Kramer?

 6        A.    Could you repeat the question?

 7        Q.    All right.  Let's break it down then.

 8   All right.

 9             You testified in your opinion that

10   "Liquor establishments would likely have more of a

11   deleterious impact in a community than a firing

12   range"; is that true?

13        A.    That is true.  But just to clarify,

14   that's because who I am, a nondrinker.  I don't know

15   that that's necessarily a universally -- that that's

16   a universal way that people think about it.  It's

17   the way I, as an nondrinker, think about it.

18        Q.    Okay.  But you, as a person, think that a

19   liquor establishment would have more of a

20   deleterious impact than a range?  That's your

21   opinion?

22        A.    Yes.

23        Q.    Okay.  The point I'm getting at is:

24   You're saying that the liquor is more likely to
```



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 100 of 330 PageID #:5431

LORIN D. KRAMER                                        September 26, 2013
EZELL vs. CITY OF CHICAGO                                              100

1    cause a deleterious impact; right?  However, despite

2    that thousands of liquor establishments exist in the

3    city of Chicago.  They have been open.  They have

4    been run.  They have been successful despite the

5    fact that they're still subject to the same

6    deleterious-impact law that the ranges are.

7              Given that and your notion that liquor is

8    more likely to cause a problem than a range, does it

9    impact your opinion as to whether someone would be

10   willing to open a range in Chicago, or a financial

11   institution to lend money, despite this provision?

12        MR. SIGALE:  I'm just going to make all the

13   same objections before and add relevance to the

14   objection list.  This is so apples and oranges.

15   BY MR. AGUIAR:

16        Q.    Do you understand my question?

17        A.    I think I understand your question, and

18   my answer would be no.

19        Q.    It doesn't change your analysis?

20        A.    It does not.

21        Q.    Why?

22        A.    It doesn't change my analysis because the

23   person who is responsible for looking at the

24   deleterious impacts is not someone who enjoys



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 101 of 330 PageID #:5432

LORIN D. KRAMER September 26, 2013
EZELL vs. CITY OF CHICAGO 101

1   recreational shooting and is a nondrinker

2   necessarily.  I don't know who this person is, but I

3   don't know what their personal motivation is.

4           Liquor stores -- while I'm not a fan of

5   liquor stores, that doesn't mean that liquor stores

6   are a -- are a bad business.  I -- that's just a

7   personal thing from my standpoint.  I don't use

8   liquor stores.

9           I do use shooting ranges; so I think

10  shooting ranges are a good thing to have in the

11  community.  And a liquor store doesn't do anything

12  good for me at all.

13          I don't know how the commissioner feels.

14  If the commissioner is, is someone who is going:  I

15  like my whiskey, but I can't stand guns, then they

16  may see the shooting range -- the deleterious

17  impacts of the shooting range to be a problem to the

18  community and the liquor store with the busted

19  bottles out front to not be.

20      Q.    Have you done any kind of study as to

21  crime in and around bars in the city of Chicago?

22      A.    No.

23      Q.    Have you looked at neighborhood reactions

24  to bars opening up in and around Chicago



```
 1   neighborhoods?

 2        A.    No.

 3        MR. SIGALE:  I'm just going to object as to

 4   relevance as to this line of questioning.

 5        MR. AGUIAR:  That's fine.

 6   BY MR. AGUIAR:

 7        Q.    And this is just based on your perception

 8   of how this would be perceived by a business owner

 9   or a financial institution; correct?

10        A.    Yes.

11        Q.    It's not based on actual talking to

12   anybody about it?

13        A.    That's correct.

14        Q.    Nor is it based on any kind of studies or

15   research?

16        A.    That's correct.

17        Q.    Let's look at Issue No. 3.

18              Issue No. 3, you take issue with the

19   prohibition on the outdoor ranges; right?

20        A.    Yes.

21        Q.    I will tell you this -- and Mr. Sigale

22   can chime in if he'd like to -- the plaintiffs in

23   this case are not challenging the prohibition of

24   outdoor ranges in their complaint.
```



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 103 of 330 PageID #:5434

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                     103

1        A.    I understand.

2        Q.    Okay.  Let me ask you this:  How does the

3   elimination of Issue 3 from your report impact your

4   overall assessment of the City's regulatory scheme?

5        A.    If Issue No. 3 is, is not part of the

6   complaint, then it is -- it's not part of relevant

7   opinions to this particular case.

8        Q.    Okay.  Let's move along to Issue No. 4.

9   That involves the limitation on hours of operation.

10  And therein you're challenging Section 4-151-090,

11  which sets forth the hours of operation for a

12  shooting range facility between 9:00 A.M. and

13  8:00 P.M., and Section 4-151-010, which, again,

14  defines what a shooting range facility is.

15            Would you please describe to me what your

16  issue is with these provisions.

17       A.    It's -- it's common on outdoor ranges --

18  not universal -- but common on outdoor ranges to

19  limit nighttime hours because of the concern of

20  waking people up when they're sleeping.  But in an

21  indoor range where you've -- you're containing sound

22  on all sides and shouldn't have the same problem of

23  waking people up when they're sleeping in their

24  home, I guess I'm not understanding -- the advantage



1    of an indoor range is, is that you can operate

2    extended hours on an indoor range and it may not be

3    appropriate to operate extended hours on some

4    outdoor ranges.  So I guess I'm not following why

5    you would tell a range owner that he's got to shut

6    down at 8:00.

7              Wouldn't you leave the business market to

8    drive that?  I mean, I -- I can certainly see on a

9    Friday night, as an example, that there might be

10   some big advantages to being open till 10:00, as an

11   example.

12        Q.   Well, the first point of what you said

13   sounds like you're taking quarrel with the rationale

14   behind the ordinance; is that correct?

15        A.   That's correct.

16        Q.   Does the rationale supporting an

17   ordinance affect a business owner's decision to open

18   a range in the city of Chicago?  Isn't it just the

19   actual -- the hours that are lim -- the hours of

20   operation that would impact the range owner?

21        MR. SIGALE:  I'll object as to foundation and

22   speculation and argumentative.

23   BY THE WITNESS:

24        A.   Okay.  Could you repeat the question for



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 105 of 330 PageID #:5436

LORIN D. KRAMER                                   September 26, 2013
EZELL vs. CITY OF CHICAGO                                        105

1   me?

2   BY MR. AGUIAR:

3       Q.    Let's just break it out this way:  In the

4   first two sentences of the second paragraph where

5   you write:  "An ordinance limitation and hours of

6   operation for shooting ranges is typically a result

7   of a desire to control nighttime sound levels;

8   however, this would not be applicable to an indoor

9   shooting range where the sound levels are controlled

10  by the building envelope."

11            Therein you're basically taking -- you're

12  challenging the rationale supporting the City of

13  Chicago's limitations on the hours of a range;

14  right?

15      A.    Yes.

16      Q.    You don't understand why they did it?

17      A.    Correct.

18      Q.    Why they did it doesn't impact a range

19  owner's operation of his business, does it?

20      A.    That's correct.

21      Q.    Here are the hours, that's what impacts

22  the range owner?

23      A.    Correct.

24      Q.    So why they did it really isn't relevant



1  │  to someone's ability to open a range in the city of

2  │  Chicago, is it?

3  │       A.   No.  It would only be the hours of

4  │  operation that would affect the business, not the

5  │  why.

6  │       Q.   And, in fact, you don't know why the city

7  │  of Chicago did it, did you?

8  │       A.   I -- I have no idea.

9  │       Q.   You're not a member of city council?

10 │       A.   No.

11 │       Q.   You weren't consulted?

12 │       A.   No.

13 │       Q.   You don't know what the City's

14 │  articulated reasons for this rationale are, do you?

15 │       A.   I have no idea.

16 │       Q.   Okay.  So it's irrelevant?

17 │       A.   Correct.

18 │       Q.   What we're talking about is the actual

19 │  limitation between 9:00 A.M. and 8:00 P.M.?

20 │       A.   Yes.

21 │       Q.   And the last sentence you say "The

22 │  limitation of hours restricts the shooting range

23 │  facility's potential income"?

24 │       A.   Yes.



1        Q.    Is that your objection to the provision?

2        A.    Yes.

3        Q.    Okay.  Are you stating that a range that

4   can only be operated between 9:00 A.M. and 8:00 P.M.

5   will not be profitable because of those hours?

6        A.    No.

7        Q.    Are you simply saying that there will be

8   lost income by forcing the range to close at a

9   certain hour?

10       A.    Yes.

11       Q.    Do you know how much income can be

12   generated after the hour of 8:00 P.M.?

13       A.    No.

14       Q.    Have you studied it?

15       A.    No.

16       Q.    Looked at anything?

17       A.    No.

18       Q.    Isn't it possible that the number of

19   customers a range would get between 8:00 P.M. and

20   9:00 A.M. wouldn't justify the operation of the

21   business during those hours?

22       MR. SIGALE:  I'm just going to -- it's an

23   incomplete hypothetical.  It's speculation.  It's

24   foundation and I'm -- I know you're going to ask



1   your questions, but I'm just going to make a

2   standing objection to questions that start with

3   "isn't it possible."

4        MR. AGUIAR:  Well, I just want to make a

5   response on the record so it's there.  During an

6   expert deposition, part of what the other side

7   does -- in every expert dep I've ever been to -- is

8   to test the theories being put forth by the expert

9   by changing the facts that have been presumed by the

10  expert to facts which may or may not be true.  And

11  that's what generally happens.  So Mr. Sigale's

12  objection is taken, but I'm going to proceed with

13  these questions.

14  BY MR. AGUIAR:

15       Q.    So my question to you is, again:  You're

16  saying that there's additional revenue that can be

17  had after 8:00 P.M.; right?

18       A.    Yes.

19       Q.    Have you considered in that that there

20  may be costs affiliated with generating that extra

21  income which exceed the income that's actually

22  generated?  Isn't that possible?

23       A.    That is possible.

24       Q.    Meaning that it wouldn't be -- it would



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 109 of 330 PageID #:5440

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        109

1    make no business sense to be open past 8:00 P.M.?

2          A.    I would think that most indoor,

3    commercial ranges probably could not be profitable

4    if they were operate -- profitable, as in they're

5    spending more money for personnel than the number of

6    people coming through the doors to offset that, if

7    they're operating at, say, from 2:00 in the morning

8    to 4:00 in the morning; however, there's -- it would

9    seem to me that between 8:00 in the evening and,

10   say, 10:00 in the evening, I think there's a pretty

11   strong likelihood that that could be a profitable

12   time of the day.

13         Q.    You anticipate what I was actually going

14   to ask you next.

15               I was going to ask you:  What additional

16   hours do you believe would actually be profitable

17   for a range to be open?

18         A.    I don't actually know, and my experience

19   in watching ranges is they generally -- when they

20   don't have a prohibition on what their hours of

21   operation can be, that they operate at hours, expand

22   and contract those hours based on the market, and

23   wind up with hours that make sense for their

24   particular range and their particular location with



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 110 of 330 PageID #:5441

LORIN D. KRAMER                                          September 26, 2013
EZELL vs. CITY OF CHICAGO                                            110

1  their particular customer base and that that varies

2  quite widely from one facility to another.

3        Q.    But you haven't quantified or seen

4  studies which quantify the amount of revenue

5  generated after 8:00 P.M.?

6        A.    No.

7        Q.    Or before 9:00 A.M.?

8        A.    No.

9        Q.    Do you happen to know what percentage of

10  business occurs at a range after 8:00 P.M.?

11        MR. SIGALE:  I'm going to object as to form.

12  BY THE WITNESS:

13        A.    No.

14  BY MR. AGUIAR:

15        Q.    Have you looked at any studies?

16        A.    No.

17        Q.    Done any research?

18        A.    No.

19        Q.    Are you saying that the limitation on the

20  hours of operation makes it impossible to open a

21  range in the city of Chicago?

22        A.    No.

23        Q.    Are you saying that it makes it

24  economically infeasible to open a range in the city



1    of Chicago?

2           A.    I don't know.

3           Q.    Are you saying that a range in the city

4    of Chicago operating between 9:00 A.M. and 8:00 P.M.

5    could never be profitable?

6           A.    I don't know for sure.

7           Q.    It's just your guess that it might be?

8           A.    My guess is, is that it might be, yes.

9           Q.    That's just a guess?

10          A.    That's just a guess.

11          Q.    Let's move along to Issue No. 5.  And

12   therein you take challenge -- you challenge the

13   City's recordkeeping requirement at ranges contained

14   in 4-151-100(n).

15                I will tell you, if you turn to

16   Exhibit 5, page 5, you will see at the bottom of the

17   page Subpart N with all of those lines through it?

18          A.    Yes.

19          Q.    I will represent to you that, on

20   September 11, 2013, the City of Chicago city council

21   eliminated the recordkeeping requirement for ranges

22   that you cite in Issue No. 5.

23          A.    Yes, I see that.

24          Q.    Okay.  So no longer do ranges have to



1    keep the records specified in what used to be

2    Subpart N.

3          A.    Yes.

4          Q.    Okay.  So it's no longer a burden on a

5    range owner, is it?

6          A.    That's correct.

7          Q.    So I'm assuming, then, that you don't

8    have any objection to that?

9          A.    That's correct.

10         Q.    Okay.  How does the elimination of the

11   recordkeeping requirement affect your overall view

12   of the City's regulatory scheme regarding gun

13   ranges?

14         A.    It's -- that element is, is no longer a

15   portion of our objection.

16         Q.    Okay.  And does the elimination of

17   Subpart N make the city of Chicago a more attractive

18   place to open a range than it did before?

19         A.    Yes.

20         Q.    Okay.  How much more?

21         A.    I couldn't quantify that.  I don't know.

22         Q.    But you had a concern with Subpart N

23   before?

24         A.    Yes.



1        Q.     Okay.  How big a concern was Subpart N

2   for you before you learned it was removed?

3        A.     Pretty big.

4        Q.     Pretty big?  Was it your opinion before

5   Subpart N was removed from the ordinance that this

6   provision would make it impossible for someone to

7   open a range in the city of Chicago?

8        A.     Okay.  One second while I reread my notes

9   here.

10       Q.     Certainly.  Take your time.

11       A.     Okay.  My answer would be is, is I don't

12  know that it would be impossible, but it would be

13  extremely difficult because the shooting range

14  facility is, is more than just the shooting range;

15  it's the entire property.  And the recordkeeping

16  requirements would have required people who had

17  nothing to do with actual shooting to have to comply

18  with these recordkeeping requirements.  It seems

19  like that would be a very difficult thing to do.

20       Q.     So the elimination of a very difficult

21  thing to do from the regulatory scheme makes it more

22  attractive; correct?

23       A.     Yes.

24       Q.     A lot more attractive?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 114 of 330 PageID #:5445

LORIN D. KRAMER                                      September 26, 2013
EZELL vs. CITY OF CHICAGO                                          114

 1        A.    Yes, I would say so.

 2        Q.    Okay.  Let's move along to Issue No. 6.

 3              There you take issue with the City's

 4   requirement in 4-151-100(b) that a range master be

 5   present during all operations of the shooting range

 6   facility, not just when there's basically live fire

 7   going on; correct?

 8        A.    Yes.

 9        Q.    Okay.  Is it safe to say that this

10   requirement doesn't affect the design, installation,

11   or construction of a range?

12        A.    I would say that is safe to say, yes.

13        Q.    Okay.  So this isn't a design issue?

14        A.    This is not a design issue.

15        Q.    Are you objecting to the presence of a

16   range master when there is live fire going on?

17        A.    No.

18        Q.    Okay.  It's only when there's no live

19   fire if the range master has to be there?

20        A.    Correct, that's my objection.

21        Q.    And you say "It seems unreasonable to

22   require a range master to be on duty when there's no

23   shooting occurring."

24        A.    Yes.



1       Q.    Why is that?

2       A.    A range master is, is a specific job

3   description.  And, in fact, in the ordinance it

4   describes what sorts of things they need to do.  And

5   I'll just kind of paraphrase it, is that they're

6   responsible for the safety and the health of the

7   people who are on the range shooting.

8           So if you've taken this person who has

9   got a specific job description to make sure that the

10  people who are on the range shooting -- that their

11  safety and health is, is being taken care of -- if

12  they're doing something else somewhere else in the

13  facility, they're not doing what their job

14  description is.  So if there's no shooting going on

15  the range, why would you have someone staring at an

16  empty range, if you're -- you're paying for a body,

17  a skilled body, to basically twiddle their thumbs

18  and watch empty space.

19      Q.    So your concern, then, would be to the

20  additional cost to a range owner of having this

21  range master present when there's no live fire going

22  on?

23      A.    Yes.

24      Q.    Okay.  Do you have any idea what the



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 116 of 330 PageID #:5447

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        116

1   additional cost would be to the range owner to

2   comply with this requirement?

3        A.    No.

4        Q.    Have you made any effort to study that or

5   evaluate it?

6        A.    No.

7        Q.    Has any potential or actual customer ever

8   complained to you about this provision?

9        A.    No.

10        Q.    Other than speaking with Mr. Sigale or

11   with Mr. Giordano, have you spoken with anybody else

12   about this provision?

13        A.    No.

14        Q.    You're just identifying an area where

15   there may be additional cost to a range owner?

16        A.    Additional cost with no benefit

17   associated to the cost, yes.

18        Q.    Let's talk about the benefit issue.

19              Isn't it possible that the range master

20   could be assigned other duties while the live

21   fire -- while there's no live fire going on?

22        A.    Well, range master is a job description

23   of a certain function; so if they're not doing that

24   function, then they have a different job description



1   when they're doing the different function.

2        Q.    But what we're saying is that the

3   range master -- a range could hire a range master

4   and, again, give him the job title range master, and

5   when there's live fire going on, he is on the range

6   doing that, but when there's no live fire, he is,

7   for example, you know, cleaning the range?

8        A.    Well, if -- if the range master is not

9   doing range master functions, it would be my

10  interpretation that at that point, despite the fact

11  that you have a body, you don't have a range master.

12  You have -- that body is doing something other than

13  being a range master.

14       Q.    But the ordinance could be read, though,

15  that the range master is a range master when -- the

16  range master is present at all times during the

17  facility being operated.  He's only doing the

18  range master function when there's live fire.

19            He can be -- he can do other things when

20  there's no live fire going on, can't he?

21       MR. SIGALE:  I guess to the extent that we're

22  getting into a legal conclusion,

23  statutory-interpretation argument, I'm going to

24  object to it.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 118 of 330 PageID #:5449

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                    118

1      But to the extent you can answer the question,
2   go ahead and answer it.
3   BY MR. AGUIAR:
4      Q.    Let's assume that the ordinance, when it
5   says "range master" -- when there's live fire, the
6   range master functions as a range master; but if
7   there's no live fire going on, he's free to do other
8   things.  Only when there's live fire does he put on
9   his range master hat.
10     A.    Then I would say that in those times when
11  he is taking off his range master hat you don't have
12  a range master anymore.
13     Q.    But he is still qualified to be a
14  range master.  And if live fire opens up, then he
15  can be a range master.  He still has the ability to
16  do the job.  He's still qualified to be the
17  range master.  He's just doing something else at
18  that moment.
19     A.    So you're saying the City of Chicago
20  statute says that you need to have someone who has
21  the job description of being a range master, but
22  they don't necessarily have to do their job.
23     Q.    That's not what I'm saying.  I'm not
24  saying what the ordinance is.  I'm saying let's



1   presume for a second that a range hires a

2   range master.

3          And when there's live fire going on, he

4   is doing the range master duties, and he still has

5   the ability to perform those functions when there's

6   live fire -- if live fire were to pop up again.  But

7   when it's not actually happening, he can go clean

8   the range, he can go sell Coca-Cola, he can do other

9   things if there's no live fire going on.

10       A.    Okay.  Well, for me, during those other

11  times, I would say that you don't have a

12  range master during those times.  You have a body

13  that -- a person who has more than one job

14  description.  And they're doing range master duties

15  when they're doing range master duties.  If they're

16  doing something else during that period of time, you

17  don't have a range master during that time, or at

18  least that's the way I would interpret it.

19       Q.    So your position is that if you're a

20  range master, you're only a range master?

21       A.    If you're a range master, you should be a

22  range master.  You shouldn't be playing Donkey Kong;

23  you shouldn't be filling the soda machine; you

24  shouldn't be talking on the phone to your



1   girlfriend; you should be the range master.

2        Q.    Even if there's no live fire going on?

3        A.    Well, right now the ordinance says

4   whether you have live fire or not, you have to have

5   a range master.

6        Q.    Correct.

7        A.    So my interpretation of the ordinance is,

8   is you have to have someone watching what's going on

9   in the range whether or not there's anybody on the

10  range.

11       Q.    Okay.

12       A.    That -- that -- and I -- I may be wrong

13  in that interpretation, but that would be my

14  interpretation of the ordinance.

15             And -- and further, if I might, is, is

16  that my understanding is, is that this applies when

17  someone is on -- not just in the range but on the

18  range facility.  So if you've got people still left

19  over out in the parking lot, you have to have a

20  range master.  So if I'm reading this literally, by

21  law the last person who can leave the property is

22  the range master because everyone else has got to be

23  gone off the property before the range master is

24  entitled to not be a range master anymore.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 121 of 330 PageID #:5452

LORIN D. KRAMER                           September 26, 2013
EZELL vs. CITY OF CHICAGO                          121

1       Q.    Okay.   Rather than spending any more

2   time, 'cause I know we're running slow here -- we're

3   not going to go into what this means at this point.

4   I'm going to let that go for the moment.   Just I

5   don't want to waste any more time.

6           The fact of the matter is you haven't

7   quantified what the additional cost would be?

8       A.    That's correct.

9       Q.    Are you saying this provision makes it

10  impossible to open a range in the city?

11      A.    No.

12      Q.    Are you saying that it makes it

13  economically infeasible to open a range?

14      A.    I don't know that it's economically

15  infeasible.

16      Q.    You don't know one way or the other?

17      A.    I don't know one way or the other, no.

18      Q.    You haven't studied it?

19      A.    No.   Unh-unh.

20      Q.    And are you saying that this provision

21  would make a range unprofitable?

22      A.    I don't know that it would make your

23  range unprofitable.

24      Q.    'Cause you don't know what the actual



1   cost is?

2        A.    I don't know what the cost is; so I -- I

3   couldn't make a guess as to whether it would make

4   the range unprofitable.

5        Q.    And you don't know conversely whether the

6   range master being present could provide a benefit

7   economically to the range either?

8        A.    Okay.  Could you repeat that question?

9        Q.    I'm just curious.  You're saying that you

10  don't know what the cost would be to having the

11  range master, except that it would be initial cost.

12  You don't know what it is.

13        But you don't know conversely whether

14  having the range master present at all times could

15  potentially have some kind of economic value to the

16  range?

17        A.    Okay --

18        MR. SIGALE:  Object as to speculation and form

19  of the question.

20        But to the extent you can answer --

21  BY THE WITNESS:

22        A.    I'm a little confused now.

23        Are we talking about the existence of a

24  range master period, or are we talking about the



1  existence of a range master when no shooting is

2  going on?  I'm a little bit confused as to what

3  you're specifically asking.

4  BY MR. AGUIAR:

5       Q.    Why don't we just withdraw the question.

6       A.    Okay.

7       Q.    Let's move along to Issue No. 7, "Age

8  Requirements."

9             There you're taking issue with

10 Section 4-151-100 Subpart D, which prohibits anybody

11 under the age of 18 years of age from being at a

12 shooting range facility; correct?

13      A.    Correct.

14      Q.    And what's your objection to this

15 provision?

16      A.    Well, it's -- it's multi -- multipart

17 here.  One of my objections is, is normally in the

18 shooting range industry, it's common on indoor

19 ranges to -- common but not universal -- to

20 exclude -- and I say this in the second-to-last

21 paragraph.  "Shooting ranges are commonly used by

22 children over the age of 6."

23            Under -- 6 and under it's not un -- not

24 universal but it's not uncommon to prohibit that age



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 124 of 330 PageID #:5455

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                      124

1  group from being on indoor ranges.  There -- because

2  of the potential health effects of people who have a

3  tendency to roll on the ground and lick themselves

4  all over.

5       It is common to have youth programs:

6  Boy Scouts, junior rifle clubs, those sorts of

7  things, and you've excluded all of those from --

8  that age group from being able to use the facility.

9  So that would be one of my objections.

10       And then the other objection is, is that

11  this is not just -- as I understand it, this is not

12  just a prohibition on minors using -- actually

13  shooting on the shooting range.  It's them being on

14  the premises at all.  So you can't have a

15  17-year-old janitor cleaning the toilets, for

16  example, or filling the soda machine or cleaning the

17  parking lot or coming with their parents and waiting

18  out in the lobby while the parents shoot or any of

19  those things.  You just -- if you're under 18, you

20  can't be on the property at all.

21       Q.    So are you asserting that not allowing

22  minors under 18 makes it impossible to open a range

23  in the city of Chicago?

24       A.    No.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 125 of 330 PageID #:5456

LORIN D. KRAMER                          September 26, 2013
EZELL vs. CITY OF CHICAGO                             125

```
 1         Q.    It sounds like you're asserting --
 2   correct me if I'm wrong -- that not allowing minors
 3   under 18 has an economic impact on a range?
 4         A.    Yes.
 5         Q.    Okay.  Let's talk about -- you mentioned
 6   first the youth shooting programs.
 7               Those would be prohibited at the ranges
 8   in the city of Chicago?
 9         A.    That's my understanding.
10         Q.    Do you happen to know how much revenue is
11   generated by youth shooting programs at ranges?
12         A.    I do not.
13         Q.    Have you studied it at all?
14         A.    No.
15         Q.    You don't know what percentage of revenue
16   is generated from youth shooting programs?
17         A.    I do not.
18         Q.    So you don't know for certain that the
19   prohibition on the youth shooting programs in the
20   city of Chicago would actually have an economic
21   impact on a range?
22         A.    I do not know.
23         Q.    You talked about customers who couldn't
24   bring their children to the range, did you not?
```



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 126 of 330 PageID #:5457

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        126

```
 1        A.    Yes.
 2        Q.    Do you know how many customers of ranges
 3   actually bring their children to the range with
 4   them?
 5        A.    I do not.
 6        Q.    Have you ever studied it?
 7        A.    I have not.
 8        Q.    Have you seen any data on it?
 9        A.    I have not.
10        Q.    So you don't know for certain how many
11   people actually bring kids to ranges?
12        A.    I do not.
13        Q.    Do you know how many customers would not
14   come to a range if they couldn't bring their
15   children with them?
16        A.    I do not.
17        Q.    You haven't studied it?
18        A.    I have not.
19        Q.    Seen research data?
20        A.    I have not.
21        Q.    Okay.  So you don't know what impact
22   these people -- meaning people who can't bring their
23   children to the range and won't come because they
24   can't bring their children to the range -- would
```



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 127 of 330 PageID #:5458

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        127

1  have on the income generated at a range?

2       A.    That's correct, I do not know.

3       Q.    You haven't studied it?

4       A.    I have not.

5       Q.    Made an effort to quantify it?

6       A.    I have not.

7       Q.    Again, it's just something you identified

8  as a potential revenue issue for a range?

9       A.    That's correct.

10      Q.    But not based on anything concrete?

11      A.    That's correct.

12      Q.    You talked about workers under the age

13 of 18.

14            And you're saying that this provision

15 would prohibit people under the age of 18 from

16 performing other services at a range, such as

17 filling the Coke machine or providing janitorial

18 services; right?

19      A.    That's my understanding.

20      Q.    And are you asserting that that would

21 have an economic impact on the range?

22      A.    I don't know that it would.

23      Q.    Okay.  You certainly haven't studied it?

24      A.    I have not.



1    Q.    Then what's the objection, then?  Why do

2  you object to -- why is that a basis for objecting

3  to this provision, then?

4    A.    It -- it just -- I -- I can understand if

5  you want to have some sort of age limitation on the

6  people who are actually shooting on the range.

7  Although, as I've already stated, I have a little

8  problem with the number 18 instead of a lower

9  number.  I understand the idea of having an age

10 limitation on people who are actually going to be in

11 the range itself, but this is a prohibition on the

12 entire range facility.

13         I mean, my read of this is, is if you

14 have someone who -- if you have a 17-year-old who

15 comes to pick up their parents at the range and

16 drives into the parking lot, that's a violation and

17 might even be considered a deleterious impact.

18    Q.    That's your reading of the ordinance?

19    A.    That's my reading of the ordinance, yes.

20    Q.    Okay.  Are you saying, though, that not

21 allowing people to -- not allowing 17-year-olds to

22 work at the range would have an impact on the

23 financial condition of the range in any way?

24    A.    The only way I would see it could have an



1    impact on the financial -- the finances of the range

2    is, is that if the example I gave of the 17-year-old

3    coming into the parking lot was considered a

4    deleterious impact that added up and added -- added

5    up to being an eventual nonrenewal of the license.

6    That would obviously have a major financial impact

7    to the facility because they're now closed.  But

8    that would be the only example I could think of.

9          Q.    Okay.  Has anyone ever told you they

10   wouldn't open a range in the city of Chicago because

11   of the prohibition on people under the age of 18

12   from being on a facility?

13         A.    No.

14         Q.    Other than your conversations with

15   Mr. Sigale or Mr. Giordano, have you discussed this

16   with anybody else?

17         A.    No.

18         Q.    Getting back to the point about people

19   might be upset they can't bring their kids to the

20   range with them, isn't it possible that customers

21   will simply just leave the kids at home or with a

22   babysitter and come to the range anyway?

23         MR. SIGALE:  Same standing objection as to

24   what's possible.



1   BY THE WITNESS:

2        A.    I suppose it's possible.

3   BY MR. AGUIAR:

4        Q.    The point is that you just don't know how

5   the customer base in the city of Chicago will react

6   to this provision?

7        A.    I have no idea.

8        Q.    And you have made no effort to study that

9   or research it or anything like that?

10       A.    I -- I don't know how I could research it

11  because there are no indoor, commercial ranges in

12  the city of Chicago to study how the patrons work in

13  the menial task; so...

14       Q.    You haven't done any market research or

15  anything like that?

16       A.    No.

17       Q.    Okay.

18  MR. AGUIAR:  Off the record for a second.

19                 (WHEREUPON, discussion was had off

20                 the record.)

21                 (WHEREUPON, the deposition was

22                 recessed until 1:24 P.M.,

23                 September 26, 2013.)

24  MR. AGUIAR:  Let's get back on the record.



1              LORIN D. KRAMER,

2    called as a witness herein, having been previously

3    duly sworn and having testified, was examined and

4    testified further as follows:

5                   EXAMINATION (Resumed)

6    BY MR. AGUIAR:

7         Q.    Before lunch we were going through the

8    different issues you have with the City's gun range

9    ordinances, and we left off on No. 8.  No. 8 is

10   found on page 4 of your report, which is Exhibit

11   No. 2.  There you take challenge with the City's

12   prohibition on the sale of firearms within the

13   city -- strike that -- as it applies to gun ranges.

14              We don't allow gun sales in the city, and

15   you're saying that affects gun ranges; correct?

16        A.    Yes.

17        Q.    Okay.  Would you explain to me what your

18   objection is to that provision.

19        A.    Firearm sales are generally an integral

20   part of the business plan of indoor, commercial

21   ranges.  Generally, what happens is, is the -- the

22   hope is that the range use fees you collect -- if

23   you're lucky, you'll break even on the operation of

24   the range with those fees.



 1            But you need other things, like sales in

 2    your retail area, to actually be profitable at the

 3    location.  And firearm sales is generally an

 4    integral part of the retail sales.

 5        Q.    So you're asserting that the prohibition

 6    on the sale of firearms affects the revenue

 7    generation of a range?

 8        A.    That's correct.

 9        Q.    And, therefore, might make a range --

10    you're not saying it would make it unprofitable;

11    you're saying it wouldn't generate a profit?  Is

12    that what you're saying?

13        A.    No.  I -- I would say that the lack of

14    firearm sales could make the overall profit of the

15    range be unprofitable.

16        Q.    Let me try that a different way just for

17    a second.

18            If a range does not sell guns, in your

19    opinion could it never break even?

20        MR. SIGALE:  I'm objecting as to form.

21    BY THE WITNESS:

22        A.    I don't know the answer to that.

23    BY MR. AGUIAR:

24        Q.    You call it "the general business model."



1   I'm going to focus on the word "general."  You also

2   said, "It's generally part of the business plan," a

3   moment ago.

4        A.    Uh-huh.

5        Q.    When I hear the word "general," that says

6   to me that it's not always the case that it's part

7   of the business plan or that it's always part of the

8   business model.

9              Is that why you use the word "general"?

10       A.    Yes.

11       Q.    So you're aware of instances where

12  there's a business model which does not call for the

13  sale of firearms?

14       A.    Yes.

15       Q.    And what are those models?

16       A.    Law enforcement -- indoor law enforcement

17  facilities, I've never known one to do -- to sell

18  firearms.  Private clubs.  It's common for private

19  clubs to not sell firearms.  University or -- or

20  collegiate facilities generally do not sell

21  firearms.  I wouldn't say "always don't sell

22  firearms" but generally don't sell firearms.

23       Q.    Any other models you can think of that

24  don't call for the sale of firearms?



1        A.    Not off the top of my head.  Ah,

2   military.  Military would be another one.

3        Q.    And you say that you don't know of any

4   commercial shooting range facilities that do not

5   have firearm sales; is that correct?

6        A.    That's -- that's correct.

7        Q.    Did you conduct any research or look at

8   any other information to confirm that there aren't

9   any commercial ranges that don't sell firearms?

10       A.    The only research I've done is, is by

11  observation of the ranges that I've been to.  The

12  commercial -- indoor, commercial ranges that I've

13  been to -- all of the ones that I'm aware of that

14  currently exist in the country -- that I've been

15  to -- do have firearm sales, but I've not been to

16  every indoor commercial range in the country.

17       Q.    So, again, it is possible there might be

18  some which don't sell firearms?

19       A.    I suppose it's possible.

20       Q.    You just don't know because you haven't

21  been to every range?

22       A.    That's correct.

23       Q.    Okay.  Do you happen to know what

24  percentage of revenue comes from the sale of



1    firearms at a range?

2         A.    I do not.

3         Q.    Did you look at any rese -- do any

4    research to determine that?

5         A.    No.

6         Q.    Okay.  Have you attempted to evaluate or

7    study whether a range could be profitable without

8    the sale of firearms?

9         A.    Since I don't know any indoor, commercial

10   ranges that don't sell firearms, I -- I have nothing

11   to study; so I guess the answer is, is no.

12        Q.    Okay.  Well, I also was asking:  Have you

13   tried to look at a business model for a range

14   without having firearm sales to see whether that

15   range could actually be profitable or not?

16        A.    No.

17        Q.    So you did nothing like that at all?

18        A.    No.

19        Q.    You say, "The profit comes from other

20   fees, such as the sale of firearms."

21              What other fees are you talking about

22   there, besides the sale of firearms?

23        A.    Besides the sale?  There would be sale of

24   ammunition, sale of accessories, sale of targets.  A



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 136 of 330 PageID #:5467

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                       136

1   lot of ranges would have classes and sell

2   instruction.  There are probably some others, but

3   those are the ones that immediately come to mind.

4        Q.    The Chicago ordinance does allow for

5   ammunition sales, does it not, at the range?  Do you

6   know?

7        A.    At -- I do not know.

8        Q.    Okay.

9        A.    I know this has been something that's

10  been discussed and batted around, and I'm -- I'm --

11  okay.  I'm going -- and my recollection is, is, is

12  that -- that that is one of my issues in here, and

13  I'm doing it from memory without looking at it.  But

14  my recollection is that you can purchase ammunition

15  to consume on the range, but you can't take it home,

16  I think.

17       Q.    That's correct.

18       A.    Okay.

19       MR. SIGALE:  You don't actually have to do it

20  from memory.  I mean, if you need to --

21       THE WITNESS:  I -- I can look it up?

22       MR. SIGALE:  Yeah, you can look it up.

23  BY MR. AGUIAR:

24       Q.    You were correct.



1        A.    Okay.

2        Q.    Okay.   But --

3        MR. SIGALE:   Yeah.   But I'm -- I mean, you

4    know, not make this a guessing game.   Yeah, if you

5    need to refer to a document, refer to the document.

6    But just say for the record what document you're

7    looking at so we know that you're referring to

8    something.

9    BY MR. AGUIAR:

10       Q.    But you were correct that -- you have the

11   provision correct.   My point is, is that the City of

12   Chicago allows ammunition sales, it allows sales of

13   accessory items, it allows sales of -- you can buy

14   targets there.   Nothing bars that.

15            Nothing bars classes or instructions at

16   ranges; correct?

17       A.    Correct.

18       Q.    So my question would be, then, is it your

19   opinion that the sale of those things -- would that

20   be enough to generate profit for a range, or do they

21   absolutely need the gun sales as well?

22       A.    I've never known an indoor commercial

23   range not to have firearm sales.   I don't know what

24   percentage of their total profit is firearm sales.



1    I don't know if you drop that component out, which I

2    believe is a major component, whether ranges could

3    still be profitable with the remaining things, like

4    accessories and ammunition and, et cetera.  I

5    don't -- I don't know that you could be profitable.

6    I just don't know.

7         Q.    Is it safe to say that you haven't

8    studied that?

9         A.    It is safe to say.

10        Q.    And you haven't seen any literature on

11   that at all?

12        A.    I have not seen any literature on it.

13        Q.    Has any potential or actual customer ever

14   told you they would not open a range in the city of

15   Chicago if they could not sell firearms?

16        A.    No.

17        MR. SIGALE:  Just going to object as to form on

18   that question.

19   BY MR. AGUIAR:

20        Q.    Other than speaking with either

21   Mr. Sigale or Mr. Giordano, have you spoken with

22   anybody else about this provision?

23        A.    About the provision on firearm sales, no.

24        Q.    Correct.



1        So are you saying that the prohibition on

2   the sale of firearms at gun ranges makes the gun

3   range impossible to open in the city of Chicago?

4        A.    I wouldn't say "impossible," no.

5        Q.    Are you saying that makes it economically

6   infeasible?

7        A.    It could make it economically infeasible.

8        Q.    But you don't know for certain that it

9   would?

10        A.    I do not know for certain.

11        Q.    And are you opining that the lack of

12   firearm sales at gun ranges would make a range

13   unprofitable?

14        A.    That's my opinion is, is that the lack of

15   firearm sales could make a range unprofitable.

16        Q.    Again, that's just a possibility;

17   correct?

18        A.    That's correct.

19        Q.    You don't know for certain that it would?

20        A.    I have no examples to compare it to; so I

21   don't know that it would.

22        Q.    And you've done no research to try to

23   determine whether it would?

24        A.    I have not done any research.



LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        140

1        Q.    Okay.    Let's move along to Issue No. 9.

2   There you take issue with the location in which a

3   range can locate in the city of Chicago.  There are

4   two location issues at play in Issue No. 9.

5             The first is that it cannot be within

6   500 feet of another licensed shooting range

7   facility, residentially zoned property, a school,

8   daycare facility, library, museum, or hospital.  And

9   the second one is that they can only be located in a

10  manufacturing district with special-use approval.

11            I will tell you before we start talking

12  about this provision that there has been a revision

13  to the ordinance.  If you would turn in Exhibit 4 to

14  the last page, which is page 10 -- I'm looking at

15  Section 17-9-0120.  This is the requirement of you

16  can't be within so many feet of other existing -- of

17  certain kinds of uses.

18            It used to be found in 4-151-120, but it

19  was moved here for clarity purposes.  In addition to

20  moving it to the -- to this part of the ordinance,

21  if you look at the first Subpart A, 17-9-0120(a), it

22  says that "Shooting ranges may not be located in any

23  of the following areas or locations within 100 feet

24  of another existing shooting range."  So in other



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 141 of 330 PageID #:5472

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        141

1   words, the city council has reduced the distance

2   allowed between shooting ranges from 500 to

3   100 feet.

4          That said, would you please explain to me

5   what your objection is to the requirements of the

6   ordinance with respect to location.

7      A.    Could I ask a question before I answer

8   that question?

9      Q.    Let's hear it.

10     A.    But I -- I just want to get a

11  clarification.  The 17-9-0120, which now describes

12  the distances.

13     Q.    Uh-huh.  Yes.

14     A.    That used to be described under a

15  different section.

16         It has now been eliminated from that

17  section?  We don't have two sections that have

18  conflicting information?

19     Q.    No, we do not.  4-151-120 has been moved.

20     A.    And no longer exists in the old --

21     Q.    Now it's here.

22     A.    Thank you.

23     Q.    And the only change was the change in the

24  distance between the shooting ranges.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 142 of 330 PageID #:5473

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                      142

1       A.    Okay.  Thank you for that.  I just wanted

2   to make sure I understood completely.

3       Q.    I'm glad you asked.

4       A.    Okay.  Could you --

5       Q.    I'm just curious --

6       A.    I -- I'm sorry.  I interrupted; so could

7   you repeat your original question for me?

8       Q.    I would like you just to articulate for

9   me what your objection is to the location

10  restrictions contained in the Chicago ordinance.

11      A.    Okay.  Let's see.  In my report here,

12  I -- I, of course, describe the distances which have

13  now changed as they relate to in between shooting

14  ranges.  I understand that.

15          I described that the shooting ranges are

16  constructed and operated in such a manner that the

17  activities are fully enclosed -- 'cause we are

18  talking about indoor ranges.  We have -- are not

19  talking about outdoor ranges, only indoor ranges --

20  and that they're fully enclosed and separated from

21  other activities in the community, you know, whether

22  they be a baseball diamond or a convenience store or

23  what have you.  So prohibiting shooting range

24  facilities to share the same neighborhood with other



1 uses seems odd because all of the shooting activity

2 is, is confined within the shooting range proper.

3       Generally when it comes to location of

4 shooting ranges that I see in other jurisdictions

5 is, is shooting ranges are considered a commercial

6 endeavor. It seemed kind of similar to a -- a gun

7 store, gun shop sort of thing. It's in -- the

8 shooting is basically an accessory use to the gun

9 shop, if you will.

10       And so they're generally located in their

11 areas where you would expect there to be a lot of

12 retail traffic, as opposed to places where you have

13 manufacturing, 'cause of course, as far as I can

14 tell, the range would not be manufacturing anything.

15 It just seems odd to put it in a manufacturing

16 district when there is no manufacturing.

17       The other problem that I see with

18 manufacturing districts is, is manufacturing

19 districts are not always but often located in areas

20 that are not on arterial streets with a high amount

21 of traffic. Your best advertising, of course, is,

22 is the sign out in front of your place that lots of

23 people see driving to and from work. If you're in

24 the back of some building in a warehouse district,

Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 144 of 330 PageID #:5475

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        144

```
 1    you don't have a lot of people driving by it.  It's
 2    not necessarily an easy place for the retail
 3    consumer to come from -- come to.
 4           So that's -- that's kind of a -- in a
 5    nutshell my explanation.
 6       Q.    Okay.  Let's break that down for a
 7    second.  Okay?  Going back to what you said about
 8    the restrictions being odd.  You used the word
 9    "odd."
10           And you went on to describe how gun
11    ranges can be compatible with other commercial uses,
12    like other -- like gun stores, for example, which we
13    don't have.  But if we did, they would -- you said
14    they would be compatible.
15           It sounded to me like, when you were
16    saying that part of your answer, you were just
17    offering another rationale -- or a different
18    rationale as to why they should be allowed next to
19    these other commercial uses?
20       A.    I would say that'd be accurate.
21       Q.    Okay.  That, regardless of the
22    rationale --
23       MR. AGUIAR:  Strike that.
24
```



1    BY MR. AGUIAR:

2         Q.    That's just a rationale.  That doesn't

3    have an impact --

4         MR. AGUIAR:  Strike that.

5    BY MR. AGUIAR:

6         Q.    What you're doing, it sounds like, is

7    quarrelling with the city council's determination

8    that they should be somewhere else; whereas, what

9    we're trying to get at here is what is the impact on

10   the range owner.

11        A.    I understand.  The impact on the range

12   owner would be if they're located in a location that

13   is inferior, when it comes to access and traffic

14   count in front of their store -- their business,

15   that that will create a situation where they will be

16   less profitable because there are fewer people who

17   are going to drive by and say, Aha, a shooting

18   range.  I should go there some day.  If you're

19   located in a place that's hard to get to or hard to

20   find, fewer people are going to show up because they

21   have trouble finding your place.

22        Q.    So, again, it sounds like your objection

23   has to do with the range's ability to generate

24   revenue based on its location?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 146 of 330 PageID #:5477

LORIN D. KRAMER                              September 26, 2013
EZELL vs. CITY OF CHICAGO                                  146

1      A.    Yes.

2      Q.    Is that a fair assessment?

3      A.    I would say that's a fair assessment.

4      Q.    Okay.  Have you done anything to study

5   the manufacturing areas in the city of Chicago?

6      A.    I have not.

7      Q.    Have you studied what lands are available

8   in the city of Chicago to locate a range on?

9      A.    I have not.

10      Q.    So you know nothing about street access

11   or exposure in those areas?

12      A.    I do not.

13      Q.    You say that fewer people are likely to

14   go to the range if it's in manufacturing; is that

15   correct?

16      A.    I think what I said was "Fewer people are

17   likely to go to a range that's hard to find."  I

18   don't know that I specifically said "manufacturing

19   district."

20      Q.    And do you know whether a range located

21   in a manufacturing district in the city of Chicago

22   would be hard to find?

23      A.    I do not.

24      Q.    It's 'cause you haven't studied the city



1  of Chicago's districts?

2        A.     That's correct.

3        Q.     Is it your position that a range located

4  in a manufacturing district could never successfully

5  operate?

6        A.     No.

7        Q.     And it's not your -- is it your position

8  that the location restrictions contained in the

9  ordinance make it impossible to open a range in the

10  city of Chicago?

11        A.     I would say no.

12        Q.     What about make it economically

13  infeasible to open a range?

14        A.     I don't know what all the manufacturing

15  districts in Chicago look like.  If I did know, it's

16  a possibility that I might look at it and say, It

17  doesn't look to me like any of these locations would

18  be economically infeasible to build a range.  But as

19  I don't know what all of those districts look like,

20  I guess my short answer has to be that, no, I don't

21  know for sure it won't.

22        Q.     And is it your opinion that a range in a

23  manufacturing district in the city of Chicago

24  couldn't be profitable?



1     A.    No, it's not my position.

2     Q.    Has anyone ever told you they would not

3  open a range in the city of Chicago because of the

4  location restrictions contained in the ordinance?

5     A.    No.

6     Q.    Other than speaking with either

7  Mr. Sigale or Mr. Giordano about this provision, has

8  anyone else ever -- have you ever discussed this

9  with anybody else?

10     A.    No.

11     Q.    So your objection to the location is

12  based on your perception that the manufacturing

13  districts would not be visible enough to attract

14  customers?

15     A.    Yes.  That and a shooting range is not a

16  manufacturing facility; so it seems odd to put it in

17  a manufacturing district when it's not a

18  manufacturing use.

19     Q.    But, again, that's you taking issue with

20  the city council's determination that it is

21  compatible.  That doesn't affect the business owner?

22     A.    That's correct.

23     Q.    Okay.  Let's move along to No. 10.  Here

24  you take issue with Section 4-151-170(a) involving



1    the rental of firearms.  And before we get going on

2    this one, let's turn to -- let's look at Exhibit 5,

3    page 5.

4              At the bottom of the page, you'll see the

5    beginning of 4-151-170.  And flip the page, you'll

6    see Subpart A.  And this is the most recent

7    amendment to the provision.

8              And it provides that, quote, "A licensee,

9    manager, range master, or employee may provide a

10   firearm for use at a shooting range facility to a

11   shooting range patron for the patron's use at the

12   shooting range; provided that no firearms shall be

13   provided to a shooting range patron if the shooting

14   range patron does not have a valid FOID card or a

15   valid CCL, if required to have one."  And there's

16   been other language which has been stricken out

17   here.  In other words, the city council has now

18   allowed for ranges to rent firearms to their

19   patrons.

20             Do you agree that your concern regarding

21   the issue of the rental of firearms has been

22   eliminated by the city council amendment of

23   Section 4-151-170(a)?

24        A.   Okay.  If I'm understanding this



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 150 of 330 PageID #:5481

LORIN D. KRAMER                                        September 26, 2013
EZELL vs. CITY OF CHICAGO                                            150

1    correctly -- and you -- please correct me if I'm not

2    understanding it correctly.  If I'm an Illinois

3    resident with a FOID card or a valid CCL, then I can

4    rent a firearm at the facility.  But I, Lorin

5    Kramer, who is from Arizona and can't get an

6    Illinois FOID card and, I believe, cannot get an

7    Illinois CCL, I could not rent a firearm at this

8    facility; is that correct?

9         Q.    I'm taking the language on its face, and

10    that's what I'm asking you to do because that's what

11    you did when you looked at the ordinance in the

12    first place.  It says "If the shooting range patron

13    does not have a valid FOID card or valid CCL, if

14    required to have one."

15         A.    Yeah.  And that's where my confusion is.

16         Q.    Well, if you look at the plain language,

17    if you're not required to have one --

18         MR. SIGALE:  Well, okay, now we're getting into

19    legal -- now we're getting into legal conclusions,

20    and we're getting into a legal conclusion about an

21    amendment to an ordinance that in all fairness was

22    passed two weeks ago.  So I'm going to suggest to

23    the witness that you answer it both ways.

24         THE WITNESS:  Okay.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 151 of 330 PageID #:5482

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                    151

1      MR. SIGALE:  If you're able to -- in the

2   instance that you do need a FOID card or a CCL and

3   in the instance that you don't.

4   BY THE WITNESS:

5      A.   Is that acceptable to you?

6   BY MR. AGUIAR:

7      Q.   Well, I would say first of all --

8      MR. SIGALE:  Unless Counsel is willing to clear

9   up whether or not an Arizona resident visiting a

10  Chicago range, should one ever exist, needs a FOID

11  card or a CCL to rent a firearm.

12     THE WITNESS:  A firearm.

13     MR. SIGALE:  But I'm going to -- I'm going to

14  submit that I bet you're not sure either.

15     MR. AGUIAR:  It's not that I'm not sure.  It's

16  that I am not going to go on the record making

17  statements about what this absolutely means and have

18  it hauled into court and said, Counsel for the City

19  said this is what it means.  I am not going to be

20  responsible for future lawsuits which would arise

21  from my mouth.

22     MR. SIGALE:  All right.  Fair enough.

23     MR. AGUIAR:  But let me say this --

24     MR. SIGALE:  Fair enough.  But I'm going to



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 152 of 330 PageID #:5483

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        152

1  make an objection to all this, then, so long as this

2  is all apparently very new and confusing and no

3  one's willing to go on the record and say what it

4  all means.  So there.  I've said my piece.

5       MR. AGUIAR:  Let me say this for the record,

6  that this ordinance was passed on September 11,

7  which is -- what? -- 15 days ago.  Counsel was aware

8  of this ordinance well over a month ago; so you've

9  had sufficient time to consider this provision or at

10 least be made aware of it.

11 BY MR. AGUIAR:

12      Q.    That said, you looked at the other

13 ordinance and made a determination as to whether --

14 you know, what you thought the impact of that was

15 based on your own reading of the ordinance, didn't

16 you?  The prior version of this prohibition, you

17 read it and made a determination that it

18 precluded -- that it made it hard to open a range in

19 the city of Chicago, did you not?

20      A.    The conclusion that I came to is, is the

21 ordinance, as existed when I wrote my report on

22 March 16, 2012 -- that that ordinance prohibited

23 firearms rental.

24      Q.    And you did that based on your own



1   reading of the ordinance?

2       A.    Yes.

3       Q.    Okay.  Let's do it this way:  How do you

4   read this provision as it stands right now?  What's

5   your interpretation of it?

6       A.    My interpretation is, is I don't know.

7   I'm not sure what that means.  When I'm not sure

8   what that means, usually the way I do it is, is I

9   play the conservative route and assume the most

10  restrictive interpretation of it.

11          And the most restrictive interpretation

12  would be that someone who is outside of the state of

13  Illinois can't rent a firearm on a Chicago range.

14      Q.    Okay.  Let's just take, for example --

15  let's assume that that's the right interpretation,

16  that a court interprets it that way and that you're

17  right.

18          You would agree, though, however, that

19  the restrictions on rental of firearms -- which you

20  said was a complete prohibition before; correct?

21      A.    Correct.

22      Q.    But now -- again assuming your

23  interpretation to be correct -- that at least at a

24  minimum, Illinois residents can rent firearms from



1    ranges; correct?

2         A.    Correct.

3         Q.    How does that impact your opinion in this

4    case?

5         A.    Well, let me back up.  Illinois residents

6    with either a FOID card or a CCL.

7         Q.    But they're still now is allowed to have

8    rental of firearms to those people?

9         A.    To those people, yes.

10        Q.    How does that impact your opinion?

11        A.    Well, I guess my opinion would be is, is

12   something that allows some people to rent firearms

13   is better than an absolute prohibition against

14   allowing anyone to rent firearms, but it's -- it's

15   far from what I would expect.  I would expect that

16   people who want to rent firearms can go to the

17   facility and rent firearms.  And, ironically, this

18   is a facility that I could design but can't go in

19   and rent a firearm and shoot on.

20        Q.    Assuming your interpretation to be

21   correct?

22        A.    Correct.

23        Q.    Have you done any research as to what

24   percentage of revenue is generated at ranges by



LORIN D. KRAMER
EZELL vs. CITY OF CHICAGO

September 26, 2013

155

1  people who live outside the state?

2       A.    No.

3       Q.    Any studies, any research which shows

4  that kind of information?

5       A.    No.

6       Q.    Any personal experience with that?

7       A.    Personal experience would be limited to

8  observation of the ranges that I've been to.

9       Q.    But not getting involved in the

10  management or operations of those ranges?

11       A.    That's correct.

12       Q.    So you don't know what percentage of

13  revenue is generated by people loaning -- by renting

14  firearms from the range who live outside the state?

15       A.    That's correct.

16       Q.    So you can't opine as to what impact that

17  would have on a range trying to open in the city of

18  Chicago?

19       A.    Other than to opine that it's my opinion

20  that not allowing firearms rental to people who are

21  from out of state would decrease the revenue of that

22  range.

23       Q.    But you don't know by how much?

24       A.    I do not know by how much.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 156 of 330 PageID #:5487

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        156

1        Q.    And you haven't studied it?

2        A.    I have not studied it.

3        Q.    And you're not aware of any literature on

4    that point?

5        A.    That's correct.

6        Q.    Okay.  Now, let's assume that the

7    ordinance, when you read that second part, "if

8    required to have one," means that if you're not

9    required to have one -- meaning you live outside the

10   state, therefore you can't get -- you're not allowed

11   to have a FOID card or a CCL, but they'll allow you

12   to rent one; right?  Let's assume that's what it

13   means.  How does that impact your opinion?

14       A.    Well, the way it would impact my opinion

15   is, is that my objection under Issue No. 10 has now

16   gone away.

17       Q.    And let's assume that it goes away.

18   Okay.  Let's assume that's how it happens.

19             How does that impact your overall opinion

20   of the City's ordinances regarding gun ranges?

21       A.    Well, for that specific provision, that

22   specific provision is no longer a problem to opening

23   ranges in the city of Chicago.

24       Q.    But your overall opinion is that the





1    regulatory scheme makes ranges hard to open; right?

2         A.    Yes.

3         Q.    How does the elimination of Issue 10 from

4    that regulatory scheme impact your overall view of

5    our scheme?

6         A.    It gets better, not worse.

7         Q.    How much better?

8         A.    Oh, I couldn't quantify how much better.

9         Q.    When you wrote this report, did you view

10   the inability to rent a firearm from the range as an

11   important or a significant problem?

12        A.    Yes.

13        Q.    So if that second interpretation which we

14   just talked about were true, we've eliminated a

15   significant hurdle.  Would you say that's true?

16        A.    Well, "significant" may be hard to

17   define, but, yeah, I -- I suppose.  I -- I don't

18   know.  Significant is maybe a little bit of a

19   sliding scale as is, is to what significant is.

20   I -- I would say it is not an insignificant --

21        Q.    Okay.

22        A.    -- change.

23        Q.    And I think you testified earlier that

24   "Firearms rental is a source of revenue generation



1    for the range"?

2          A.    That's correct.

3          Q.    Do you have any idea how much income is

4    generated from rental of firearms at a range?

5          A.    I do not.

6          MR. SIGALE:  Object as to form.

7    BY MR. AGUIAR:

8          Q.    You don't know?

9          A.    I -- I do not.

10         Q.    You ever studied that at all?

11         A.    I have not.

12         Q.    Are you aware of any literature on that

13   point?

14         A.    No.

15                    (WHEREUPON, discussion was had off

16                    the record between Mr. Aguiar and

17                    Ms. Wells outside the hearing of

18                    other counsel and the court

19                    reporter.)

20   BY MR. AGUIAR:

21         Q.    Let's move along to Issue No. 11.  And in

22   Issue No. 11, you identify Section 4-151-170(b) as

23   being problematic.  That section can be found in

24   Exhibit 3.  I apologize this does not have some page



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 159 of 330 PageID #:5490

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        159

1   numbers on it.

2          Do you want me to find it for you?  Let

3   me do that for you.

4        A.    Yes, please.

5        Q.    Again, my --

6        A.    I think I slipped past it.

7        Q.    Again, my apologies.  The version I used

8   with Mr. Giordano had page numbers on the bottom.  I

9   don't know how this was copied the wrong way.  Here

10  it is.

11       A.    Okay.  Thank you.

12       Q.    4-151-170(b) says that "A licensee may

13  sell ammunition to a shooting range patron only for

14  use at the shooting range.  The licensee shall

15  ensure that no shooting range patron leaves the

16  shooting range facility with any ammunition

17  purchased from the licensee."

18          Would you please explain for the record

19  what your objection is to this provision?

20       A.    Well, among things:  From a recordkeeping

21  standpoint, I'm not sure even how you would be able

22  to control -- you have people who are shooting on

23  the range.  As I understand, they are allowed to

24  bring their own ammunition with them or they can



 1   purchase ammunition at the range.

 2           Now, the ammunition they brought with

 3   them -- as I understand, whatever ammunition they

 4   haven't expended, they can take that home.  But the

 5   ammunition they purchased in the facility, they

 6   can't take that home.  What they haven't expended,

 7   they have to leave.  So how you keep control of

 8   that -- I -- I have no idea how you're going to keep

 9   control of that.  That just sounds like a major

10   nightmare.

11           And then you've got the issue of this

12   ammunition that has not been shot but has to stay at

13   the location.  Can't -- can't be taken home.  What

14   does the range do with it?  I -- they've -- you

15   know, do they store it indefinitely?  Do they -- I

16   don't know what happens to that.

17           I -- I don't know how you handle that

18   situation.  It just -- it just seems like a major

19   night or -- nightmare that you've put the range

20   owner in the position of having no practical means

21   to monitor this and comply.

22       Q.    Are those your only objections to this

23   provision?

24       A.    Well, let me just check.



LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        161

1        Q.    By all means.

2        A.    Okay.  I also -- I also objected because

3   the ammunition sales is, is that -- like firearm

4   sales.  If you have firearm sales, they're

5   presumably not only going to shoot on the range, but

6   they're going to take the firearm with them.  They

7   may shoot at some other range, take it home with

8   them, go hunting with it, whatever they're going to

9   do.

10            Same thing with the ammunition is, is

11   that the ammunition is, is -- is something that --

12   the ammunition sales are important for the financial

13   health of the facility.  They're going to sell

14   ammunition -- hopefully, they're going to sell

15   ammunition not only that is consumed on the range,

16   but they're going to sell ammunition that the patron

17   is going to take home with them; in other words,

18   sell more ammunition than is actually used at the

19   range.

20            And it looks like that's about it.

21        Q.    Okay.  Let's take the last part of that

22   first.

23        A.    Okay.

24        Q.    Ammunition sales:  Can you agree with me



LORIN D. KRAMER                              September 26, 2013
EZELL vs. CITY OF CHICAGO                                  162

1   that the ordinance does allow for ammunition sales?

2        A.    In the limited way that we've described

3   is, is that it allows ammunition sales to patrons

4   for use on that facility.

5        Q.    Okay.  That's allowing sales of some

6   kind?

7        A.    Yes.

8        Q.    Okay.  You talked about the sale of

9   ammunition being an important revenue generator for

10  a range?

11       A.    Yes.

12       Q.    What is that based on?

13       A.    It's based on having gone to ranges and

14  seeing that they're selling lots and lots of

15  ammunition.

16       Q.    Do you happen to know what percentage of

17  revenue at a range is generated by ammunition sales?

18       A.    I do not know a percentage, but I have --

19  at some point in time, one or more range operators

20  has told me that it's a significant percentage.

21       Q.    But you didn't do any study of that

22  before you wrote the report?

23       A.    That's correct.

24       Q.    Did you look at any study -- did you look



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 163 of 330 PageID #:5494

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        163

1  at any studies or any other literature about what

2  percentage of revenue's generated from ammunition

3  sales?

4      A.    I did not.

5      Q.    So your assertion is based just on your

6  observations and by these comments by range owners?

7      A.    That's correct.

8      Q.    Nothing else?

9      A.    Nothing else.

10     Q.    Okay.  Let's break it down a little bit

11 further.  You mentioned that "Customers would come

12 in to the range to buy ammunition for use not at the

13 range but elsewhere"?

14     A.    Yes.

15     Q.    Okay.  Do you happen to have any idea as

16 to what percentage of revenue those people would

17 constitute?

18     A.    Okay.  I'm not sure I understand.

19     Q.    Does ammunition sales in general -- we're

20 talking about in general.  I'm breaking it down into

21 a little subset.  We're talking about people who

22 don't want to shoot at this range.  They don't like

23 the range.  They don't care about it.  They just go

24 in there to buy the ammunition and walk away and go



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 164 of 330 PageID #:5495

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                    164

1   do what they want to do wherever they want to do it.

2          Do you happen to know what percentage of

3   business those people generate for a range?

4       MR. SIGALE:  Object as to form and speculation

5   and foundation.

6       Go ahead and answer if you can.

7   BY THE WITNESS:

8       A.    Okay.  I don't know a percentage, but I

9   would -- based on my observations, I would estimate

10  the percentage to be more than 50 percent; that is,

11  the majority of ammunition would not be shot at the

12  facility but be taken home.

13  BY MR. AGUIAR:

14      Q.    And what's that based on?

15      A.    Observing shooting ranges that I've been

16  to and where the ammunition is going.  Some of it is

17  going with the patron onto the range, but a larger

18  percentage of it is going in a shopping bag and

19  going out to the vehicle and out with them.

20      Q.    When you say "observation," what do you

21  mean?  Do you sit at a range for hours at a time and

22  watch this transpire, or is it when you're walking

23  into the range and doing something and then walking

24  back out, you happen to observe certain things?  I'm



1   just curious what type of observation you're talking

2   about here.

3        A.    Well, some ranges -- because I design

4   ranges, I try and keep track of what happens at

5   ranges 'cause it helps me design a range, in terms

6   of traffic flow through the facility.  Some ranges I

7   have done as you described is, is sit or stand there

8   for hours watching what's going on in the facility.

9   Most ranges would be more a simple observation while

10  I happen to be there on the premises.

11       Q.    Okay.  In the former category when you

12  actually go there and stand there for hours and

13  observe what's going on, are you specifically

14  looking at ammunition sales for people who are

15  walking out and the shopping bag or those who are

16  taking it to the range and shooting on the range?

17  Are you actually looking for that kind of

18  information?

19       A.    Not often but I have.

20       Q.    I'm just curious.

21             Why would you be looking for that

22  information?  Does it impact range design?

23       A.    It impacts -- the layout of retail sales

24  is, is that if you have ammunition that is going to



1    be used inside of the range, the ideal thing is, is

2    for the ammunition to be very close to the entrance

3    of the range, commonly maybe at the range master's

4    desk where the rental firearms often are.  If, on

5    the other hand, you're selling ammunition and that

6    ammunition is, is something that is going to be

7    purchased as a retail sale and taken home and not

8    shot on the facility, then you don't really want the

9    ammunition back near the gun rentals and the

10   range master; you want it on the shelf as part of

11   the retail sales.

12          So we've observed that for -- you know,

13   you really need to -- you really need to have

14   ammunition in two places in most indoor, commercial

15   ranges.  You need a small quantity of ammunition

16   that's used for people who have been shooting on the

17   range and suddenly find they run out and they need

18   an extra box of ammunition so that they don't have

19   to go all the way out in the retail sales and do a

20   transaction and then come all the way back into the

21   range.

22          But the majority of the ammunition

23   doesn't need or doesn't want to be there.  It wants

24   to be on the shelf in large quantities where people



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 167 of 330 PageID #:5498

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        167

1   can make their retail purchase and go home and not

2   even go into the range.

3        Q.    But that's because the range owner has

4   decided to sell ammunition as a retail product, not

5   for -- specifically to use on the range?  That's why

6   it's set up that way?

7        A.    I assume so, but I have -- I've never

8   seen an indoor commercial range that didn't have

9   retail sales of ammunition.  They -- all of them

10  I've seen do that.

11       Q.    And the City is allowing retail sales;

12  it's just limiting where it can be used?

13       A.    That's my understanding.

14       Q.    You made reference to the storage of

15  unused ammunition; right?

16       A.    Yes.

17       Q.    Why don't we turn to Exhibit 5, page 6,

18  and Item No. 4-151-175 Subpart A, which says that "A

19  licensee may provide an area at the shooting range

20  facility for the storage of ammunition or firearms

21  owned by the licensee or shooting range patrons";

22  correct?

23       A.    Yes.

24       Q.    That's what it says?



1      A.    Yes.

2      Q.    So the ordinance allows a patron who buys

3  ammunition from the range owner, doesn't shoot all

4  that ammunition in one occurrence, can store it and

5  come back to that range and use it again?

6      A.    And use it again --

7      Q.    At that --

8      A.    -- at that range.

9      Q.    At that range.

10          It allows for that, doesn't it?

11     A.    That's my understanding.

12     Q.    Okay.  And isn't it possible, then, that

13  that could create customer loyalty?  A patron is

14  going to continuously frequent that range because

15  that's where their ammunition is, and they're going

16  to keep going to that range and generate income for

17  that range owner?

18     MR. SIGALE:  Objection as to speculation and

19  foundation.

20  BY MR. AGUIAR:

21     Q.    Isn't it?

22     MR. SIGALE:  You can answer if you can.

23  BY MR. AGUIAR:

24     Q.    Isn't it possible?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 169 of 330 PageID #:5500

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        169

1      A.     I would say that -- my opinion:  It's
2   equally possible with the possibility of annoying
3   the customer because they can't take the ammunition
4   home with them; so they decide to go someplace else.
5      Q.     The question is you just don't -- we
6   don't know one way or the other?
7      A.     We don't know.
8      Q.     Either way is possible?
9      A.     I would say that's true.
10     Q.     It's all hypothetical?
11     A.     It would also be true that it could be
12  completely neutral, and it would neither ingratiate
13  or annoy the patron.  It would be a neutral thing.
14     Q.     So the impact on ammunition sales is at
15  this point hypothetical?
16     MR. SIGALE:  Object as to form.
17  BY THE WITNESS:
18     A.     Okay.  And I'm not sure I understand the
19  question.
20  BY MR. AGUIAR:
21     Q.     Okay.  You didn't conduct any studies or
22  know of any information which shows what percentage
23  of sales ammunition account for at a range?
24     A.     No.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 170 of 330 PageID #:5501

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        170

1    Q.    Okay.  You don't know what percentage of

2    a range owner's business are firearm sales?  I

3    mean -- excuse me -- ammunition sales?

4    A.    No.

5    Q.    And you haven't studied how this might

6    impact customer reactions to a range?

7    A.    I have not.  I've never known of a range

8    that didn't -- I've never known of an indoor

9    commercial range that didn't sell ammunition; so

10   there's no way for me to gauge customer reaction to

11   a system that requires you to keep the ammunition

12   on-site.

13   Q.    Okay.  So you didn't do any market

14   research as to what effect this regulation would

15   have on customer use of a range?

16   A.    No.

17   Q.    So you were just spotting an issue which

18   may affect revenue, but you don't know for sure that

19   it will?

20   A.    That's correct.

21   Q.    Have you studied what it would cost a

22   range owner to offer -- if the ordinance allowed

23   it -- to offer ammunition for purely retail sales,

24   not for use on the site?



1      MR. SIGALE:  Objection.  Form.  Vague.

2  BY MR. AGUIAR:

3      Q.    If the ordinance permitted purely retail

4  sales of ammunition, meaning you could walk away

5  with it and not have to shoot it at the range, you

6  don't know -- or do you know? -- what the cost of

7  providing that retail service is to a range?

8      A.    What the cost is of them purchasing

9  ammuni -- them purchasing ammunition wholesale to

10 sell it retail?  I --

11     Q.    Correct.  I'm talking about to offer

12 something for sale is going to cost the business

13 some money, to be able to offer that product?

14     A.    Correct.

15     Q.    You know, Banana Republic doesn't sell

16 sweaters for free.  They have a cost involved in

17 selling their sweaters.

18     A.    Yes.

19     Q.    A range would have costs affiliated with

20 selling ammunition; correct?

21     A.    Yes.

22     Q.    You don't happen to know what those costs

23 are, do you?

24     MR. SIGALE:  I'm just going to object as to



 1   form.

 2        Are you asking the wholesale cost of a box of

 3   ammunition?  And if so, I'm going to object as to

 4   form and vague, since there's lots of types and lots

 5   of brands and so on and so forth.

 6        MR. AGUIAR:  I'm just asking him if he knows of

 7   what costs are involved in offering those kind of

 8   sales to the public are.

 9        MR. SIGALE:  Then I'm still objecting as to

10   form and vague --

11        MR. AGUIAR:  Okay.

12        MR. SIGALE:  -- if you're not talking about the

13   box -- are you talking about advertising? marketing?

14        MR. AGUIAR:  My question would be --

15        MR. SIGALE:  I'm saying why I think the

16   question is vague.

17   BY MR. AGUIAR:

18        Q.   Can you answer my question?

19        A.   I would say the cost would be is, is

20   you'd have the wholesale cost of purchasing the

21   product, any shipping associated with that.  You'd

22   have the cost of shelf space to put it there.  You'd

23   have the associated costs of -- whatever costs there

24   were for building the building, whatever percentage



 1 | cost is related to the area that you're storing --
 2 | that you're displaying the ammunition.
 3 |        Q.    Okay.  Are you saying that the --
 4 |        A.    I'm sorry.  I should add one other -- you
 5 | also have the cost of the personnel to do the
 6 | register to sell the ammunition.
 7 |        Q.    Okay.  Are you saying that the City's
 8 | ordinance regarding ammunition sales makes it
 9 | impossible to open a range in the city of Chicago?
10 |        A.    No, I wouldn't say "impossible."
11 |        Q.    Are you saying that makes it economically
12 | infeasible to open a range in the city?
13 |        A.    I wouldn't know whether it's economically
14 | infeasible.
15 |        Q.    Okay.  That's because you haven't studied
16 | what percentage of ammunition sales account -- you
17 | haven't studied the issue?  Is that why?
18 |        A.    That's correct.  I don't know what
19 | percentage of their income would ordinarily come
20 | from ammunition sales.  And so not knowing that, I
21 | don't know whether not having that revenue would put
22 | them past the tipping point where they were no
23 | longer profitable.
24 |        Q.    And, again, are you opining that the



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 174 of 330 PageID #:5505

LORIN D. KRAMER                          September 26, 2013
EZELL vs. CITY OF CHICAGO                              174

1   ordinance on ammunition sales would make a range

2   unprofitable?

3        A.    I don't know whether it would be

4   unprofitable.

5        Q.    Again, 'cause you haven't done -- you

6   haven't done any studies?

7        A.    That's correct.

8        Q.    Let's move along to Issue No. 12.  There

9   you take issue with Section 11-4-260 Subpart B which

10  authorizes the commissioner of business affairs and

11  consumer protection to promulgate rules and

12  regulations regarding the cleaning of, sound and

13  quality control at, and the discharge of particulate

14  matter and waste from shooting range facilities;

15  correct?

16       A.    Yes.

17       Q.    Would you explain to me what your

18  objection is to that provision.

19       A.    Okay.  I can explain generically, but I

20  do need to state that this would have been one of

21  the items that would come from Jack Giordano's area

22  of expertise.  He's the one who's expert on these

23  things as opposed to me.  I can speak generically to

24  it.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 175 of 330 PageID #:5506

LORIN D. KRAMER                                          September 26, 2013
EZELL vs. CITY OF CHICAGO                                             175

1      Q.    He did the same thing at his deposition

2   with certain issues regarding you.

3      A.    I'm hoping that on Issue No. 12 he did

4   not lateral that one to me.

5      Q.    I'm pretty sure he didn't.

6      A.    Okay.

7      Q.    But let me ask it this way:  Do you

8   consider yourself qualified to give the opinion

9   contained in Issue 12?

10      A.    Not as qualified as Jack Giordano is.

11   Generically, as -- as an architect who has to deal

12   with a whole lot of rules and regulations, it is

13   always a problem -- always -- it is often a problem

14   when you have two different entities who promulgate

15   rules about the same subject and they are not

16   affiliated with each other so that you wind up with

17   two sets of standards that differ and are sometimes

18   mutually exclusive.  So, generically, I can speak to

19   it as -- if you have OSHA regulations, as an

20   example -- which the range is subject to whether or

21   not the City of Chicago thinks they should be

22   subject to.

23          If the City of Chicago is also

24   promulgating their own regulations that are a



1    parallel -- are a parallel to the OSHA regulations

2    but don't match exactly, you can have regulatory

3    conflict between those two sets of regulations.

4         Q.    So your objection is to the potential for

5    a conflict of regulations between what the City may

6    enact versus what OSHA has?

7         A.    Correct.

8         Q.    Okay.  Do you know whether the

9    commissioner has exercised her authority under the

10   ordinance to promulgate any rules and regulations?

11        A.    I do not know.

12        Q.    If I were to tell you right now that the

13   commissioner has not promulgated any rules and

14   regulations to date, does that impact your opinion

15   in any way?

16        A.    Well, it impacts my opinion to date.

17   That means right now there would be no conflict

18   under Issue No. 12, if the commissioner has

19   promulgated -- has not promulgated any rules;

20   however, that opinion could change in the future

21   depending on what rule -- depending on if and what

22   rules the commissioner might promulgate.

23        Q.    So just to make sure I'm clear on this,

24   as of right now, if someone came in to open a range



1   in the city of Chicago, because there are no

2   regulations promulgated right now, Issue 12 wouldn't

3   be an issue for that range owner?

4        A.    That's correct.

5        Q.    It's only if the commissioner exercised

6   her authority that you foresee a problem?

7        A.    That's correct.

8        Q.    And isn't it possible that whatever rules

9   and regulations she may choose to promulgate in the

10  future would be consistent with OSHA?

11       A.    That's possible.

12       Q.    And if that were to be the case, there

13  would be no conflict to be resolved?

14       A.    That's correct.

15       Q.    And Issue 12 would disappear?

16       A.    Well, it disappears as long as the

17  status quo remains the same and we didn't have a

18  future situation where there was a conflict.

19       Q.    But for the range owners in existence at

20  that point, there would be no conflicts for them

21  coming to the city and opening a range?

22       A.    Opening a range, that statement would be

23  correct.

24             But would it not be true that the



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 178 of 330 PageID #:5509

LORIN D. KRAMER                                          September 26, 2013
EZELL vs. CITY OF CHICAGO                                            178

1   commissioner could promulgate a rule that created a

2   conflict for a range that was already open?  And I'm

3   asking that as a question 'cause I don't know the

4   answer to that.

5        Q.   But that's another concern you're

6   identifying?

7        A.   Yes.

8        Q.   Okay.  Would you agree with me that all

9   businesses are to some extent a risky venture?

10       A.   Yes.

11       Q.   And that one of the risks inherent in

12  opening a business is the thought that the

13  government, whether it be local, state, or federal,

14  may enact a regulation which impacts how you do

15  business?

16       A.   Yes.  It's a never-ending source of

17  concern for all of us business owners.

18       Q.   Of any kind, not just range owners?

19       A.   Correct.  Architectural firms as well.

20       Q.   So the fact --

21  MR. AGUIAR:  Off the record.

22            (WHEREUPON, discussion was had off

23            the record.)

24



 1 | BY MR. AGUIAR:

 2 |     Q.    So the fact that there may be regulations

 3 | in the offing is something that any business owner

 4 | should expect or should at least be aware of the

 5 | possibility?

 6 |     A.    I wouldn't say "expect," but I would

 7 | agree with be aware of the possibility.

 8 |     Q.    And that's just a cost of doing business?

 9 |     A.    It is a cost of doing business, an

10 | unfortunate cost.

11 |     Q.    But, again, that applies to all

12 | businesses?

13 |     A.    It may apply to all businesses.

14 |     Q.    Have you ever heard of the phrase

15 | "grandfathering"?

16 |     A.    I have heard of the phrase

17 | grandfathering.

18 |     Q.    Well, I'm going to just give you a

19 | definition that I'm going to throw out there.  When

20 | a law is passed, oftentimes the municipality or

21 | state or federal government can say, This only

22 | affects businesses going forward.  If you're already

23 | in existence, you don't have to comply with the new

24 | regulation.  It's only for going forward; so if



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 180 of 330 PageID #:5511

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                       180

1   you're already in existence, you're exempt.

2   Grandfathering.

3           Isn't it possible that if the

4   commissioner were to promulgate rules and

5   regulations, that she could grandfather in all of

6   the businesses -- all the ranges that are already in

7   existence, whatever rule she puts going forward?

8       MR. SIGALE:  Objection as to what is possible.

9   Foundation and speculation and incomplete

10  hypothetical.

11          To the extent you can answer, go ahead.

12  BY THE WITNESS:

13      A.    My answer would be -- okay.  Please

14  repeat the question for me.  I -- I have an answer,

15  but I want to make sure I'm answering it correctly.

16  BY MR. AGUIAR:

17      Q.    As of right now, there are no rules and

18  regulations promulgated; correct?

19      A.    Correct.

20      Q.    And your concern is purely based on the

21  potential for a conflict; correct?

22      A.    Yes.

23      Q.    And what I'm saying is that the other

24  side of that is, it's possible either that she's



1   going to enact regulations that are consistent with

2   OSHA, therefore no conflict, or that, if she were to

3   enact regulations, she may grandfather in whatever

4   range is already in existence?

5        A.    That's a possible -- I understand the

6   scenario you're describing, but that doesn't

7   necessarily alleviate the problem.  And the reason

8   it doesn't is, is that OSHA, as an example -- OSHA

9   is not -- OSHA is not required to grandfather

10  things, and so OSHA could change regulations.

11            And if OSHA changes regulations and the

12  City of Chicago has -- or I'm sorry -- the

13  commissioner has regulations that originally matched

14  the -- either didn't exist or ma -- let's say they

15  matched the OSHA regulations; and the commissioner

16  kept those regulations in force, but OSHA changed

17  their standards to a standard that conflicted with

18  the grandfathered standards of the City of Chicago,

19  or the commissioner, could that not create a -- an

20  issue, then?

21       Q.    I'm asking the questions today.

22       A.    Understood.

23       Q.    But to get to what you're saying is, you

24  and I, for the last five minutes, are engaging in a



```
 1    conversation about hypothetical conflicts,

 2    hypothetical grandfathering.

 3              The fact of the matter is, no regulations

 4    have been promulgated yet; so we don't know if there

 5    would -- if they ever will be promulgated or whether

 6    there ever would be a conflict if they were?

 7         A.    That's correct.

 8         Q.    So this is all guesswork?

 9         A.    Yes.

10         Q.    Okay.  Are you saying that this potential

11    conflict would make it impossible to open a range in

12    the city of Chicago?

13         A.    It could.

14         Q.    But you just don't know?

15         A.    We don't know.

16         Q.    Because there's no regulations?

17         A.    That's correct.

18         Q.    And we don't know if there ever will be?

19         A.    That's -- well, I don't know whether

20    there will be, yes.

21         Q.    Are you saying that it'd make it

22    economically infeasible to open a range in the city

23    of Chicago?

24         A.    Well, if it turns out that it's
```



1   impossible because of rule conflict, then it would

2   be economically infeasible because you can't do it.

3       Q.    And your position presumes that there's

4   no mechanism under any law to solve the conflict --

5   or resolve the conflict?

6       MR. SIGALE:  Just object as to form.

7   BY THE WITNESS:

8       A.    I'm not sure I -- I'm not sure I

9   understand the question.

10  BY MR. AGUIAR:

11      Q.    No.  Okay.  Let me break it down for you,

12  then.

13          You're saying there may be a conflict if

14  she were to promulgate regulations and they were to

15  be in conflict with OSHA regulations.

16          So now we have a conflict; right?  And

17  you're saying that might make it impossible to open

18  a range.  Inherent or presumed within that whole

19  idea is the concept that there's no mechanism or way

20  to resolve the conflict between these hypothetical

21  regulations and OSHA regulations.

22          In other words, if there was a way to

23  actually resolve the conflict, a range would no

24  longer be impossible?



LORIN D. KRAMER
EZELL vs. CITY OF CHICAGO

September 26, 2013

184

1    A.    Yes, that would be correct.

2          I'm going to have to add to that.  That

3    would be correct, assuming that there was nothing

4    about the rules put together by the commissioner

5    that made it -- somehow made it impossible for the

6    range.  I'm -- I'm making that assumption, that the

7    commissioner has not set a rule that makes it

8    impossible for the range to be opened.

9    Q.    Okay.

10   A.    If we assume that, then my statement is,

11   is correct.

12   Q.    Okay.  Let's move along to Issue No. 13,

13   which we talked about what feels like hours and

14   hours ago.  This is the shooting range enclosure

15   construction issue.

16         Oh, can we just back up for a second.

17   Back to Issue 12.  Just one final question.

18         In terms of this whole issue of the

19   regulatory conflict, would you defer this to

20   Mr. Giordano?

21   A.    Yes.

22   Q.    Okay.  He's the expert in this area?

23   A.    He -- he is the expert, yes.

24   Q.    So you would agree with whatever he had



1    to say on the matter?

2         A.    I would have to presume so.  I mean, I've

3    never known Jack to say something completely off and

4    whacky, so yes.

5         Q.    Okay.  Now let's move on to No. 13.

6               This, again, involves shooting range

7    enclosure construction.  And this involves

8    Section 13-96-1160(a).

9               Actually, if you hand me Exhibit 3, I

10   will find it for you.  Thank you.  Save you the

11   trouble.  There you go.

12        A.    Thank you.

13        Q.    Okay.  Would you mind explaining for me

14   what your objection is to this provision.

15        A.    Okay.  Let me clarify is, is I have an

16   exhi -- I have an objection that is in the report

17   dated March 16, 2012.  I also described a second

18   objection in the beginning of these depositions.

19               Do you want me to address them one at a

20   time or together or how?

21        Q.    Why don't we list what your objections

22   are.  Let's go through the ones that you've actually

23   identified in your report.

24        A.    Okay.  What I identified in the report



1    is, is that in the enclosure requirements, the

2    enclosure requirements -- the enclosure requirements

3    talk about the surfaces of the range being

4    penetration-proof, and penetration-proof being

5    something where a direct-fired projectile is not

6    going to penetrate the envelope.  We have,

7    theoretically, six sides to our building -- our

8    range:  We have floor, we have roof, ceiling.  We

9    have two side walls.  We have a wall behind the

10   bullet trap, and we have a wall behind the shooters.

11           The regulation says that five of those

12   six surfaces need to be, quote/unquote -- I'm just

13   going to use the term "penetration-proof."  But the

14   wall behind the shooter, that sixth surface -- the

15   wall behind the shooter only needs to be

16   ricochet-proof -- I think that's the term in the

17   ordinance -- ricochet-proof rather than

18   penetration-proof.

19           The -- what I had described in my report

20   is, is -- the issue you get into is, is with doors.

21   They talk about doors that are in the

22   penetration-proof -- penetration-proof walls.  You

23   don't have walls -- I'm sorry.

24           You don't have doors in either the



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 187 of 330 PageID #:5518

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                       187

1    ceiling surface or the floor surface, of course.

2    It's only the walls.  So we're talking about three

3    of the walls:  the walls behind the bullet trap, the

4    two side walls.  Those are penetration-proof walls,

5    and the statute says that those doors need to be

6    armored.

7              The issue that I have is, is that in

8    placing armored doors inside of a range, you place

9    armored doors in locations where you're concerned

10   about direct bullet strike.  And the walls behind

11   the bullet trap system are protected by the

12   bullet trap system.  So putting an armored door

13   there doesn't make any real sense because it's not

14   subject to bullet strike; it's behind the

15   bullet trap system.

16             Also is, is -- your ordinance says that

17   from the firing line -- from the firing line to the

18   rear, those side walls, if you have doors in them,

19   those need to be penetration-proof as well.  If you

20   have doors from the firing line to the bullet trap

21   system on those side walls having doors that are

22   penetration-proof would be very important.

23             In my personal recommendation, I wouldn't

24   recommend having doors at all, let alone



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 188 of 330 PageID #:5519

LORIN D. KRAMER                                      September 26, 2013
EZELL vs. CITY OF CHICAGO                                          188

1    penetration -- I would just recommend not having

2    doors.  Certainly, if you did have doors, they would

3    certainly -- they should be penetration-proof.  But

4    doors that are behind the firing line or behind the

5    bullet trap system, making them penetration-proof,

6    from a range-design standpoint makes no sense.

7            It gets further complicated because, in

8    the world of doors, you can get doors that are

9    armored -- are penetration-proof, you can get doors

10   that are acoustically rated; but, to the best of my

11   knowledge, you cannot get a door that is both

12   simultaneously.  So a door that is behind the

13   bullet trap system, for example -- it might be

14   desirable to have that door be an acoustic door for

15   other reasons that are in your statute, and now you

16   can't do it because you're required to put in a

17   penetration-proof door at that location.  So you're

18   get -- you're putting in a more expensive door that

19   is less effective than the acoustic door.

20           So that -- that was the first issue.

21   Q.    That's the one in the report?

22   A.    In the report.

23   Q.    Okay.  Before we get to the one that's

24   not in the report -- 'cause that's a lot of



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 189 of 330 PageID #:5520

LORIN D. KRAMER                                   September 26, 2013
EZELL vs. CITY OF CHICAGO                                       189

1  information, and clearly I'm not a range expert.  So

2  let's break that down.  And bear with me when we

3  talk about -- I might get some terminology wrong.  I

4  hope you'll correct me here.

5          Your first thing you talked about was

6  requiring the doors behind the bullet trap to be

7  armored.

8          You're saying that's an unnecessary

9  expense?

10      A.    Yes.

11      Q.    Because the bullet trap will stop bullets

12  from going forward, and there's no need to have that

13  door be penetration-proof?

14      A.    Because the door can't be struck 'cause

15  there's a bullet trap system in front of it.

16      Q.    Is your objection only to making the door

17  armored, or is it making the whole wall armored?

18      A.    Both.

19      Q.    Okay.  So it's to both.

20          And is it your interpretation the

21  ordinance requires the whole wall and the door to be

22  armor-proof?

23      A.    Yes.

24      Q.    So your objection isn't that it's



1   necessarily wrong to do it, it's just that it's a

2   cost that's not necessary?

3         A.    Yes.  With the added caveat of there may

4   be reasons under other provisions of this code where

5   you're going to need an acoustic -- the door behind

6   the bullet trap system to be acoustically rated, and

7   now you're not going to be able to do it because

8   this provision requires you to armor the door and

9   you can't get an acoustic door in an opening that

10  you have to have an armored door in.

11        Q.    And have you studied whether doors that

12  can be armored can also be acoustical?

13        A.    Yes.

14        Q.    And can they be?

15        A.    They cannot.

16        Q.    They're not -- not enclosed?

17        A.    The last time -- the last time I looked

18  at this, which is -- this point maybe a couple of

19  years is, is there was no such thing as a door with

20  an armor rating, a ballistic rating also having an

21  acoustic rating simultaneously.

22        Q.    You said that "The ordinance may require

23  the rear door -- the door behind the bullet trap to

24  be acoustical."



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 191 of 330 PageID #:5522

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                    191

1            It's not required that that door be

2     acoustic, though?

3          A.    That's correct.

4          Q.    It's just that you may want to do that?

5          A.    You have certain requirements in terms of

6     acoustic sound ratings at distances.  And in order

7     to meet those ratings, you may need to put an

8     acoustic door in the opening to get that rating --

9     that measurement.

10         Q.    Again, but we don't know.  That all

11    depends upon the configuration of the range, how

12    long it is, those kinds of issues?

13         A.    It'd be a site-specific, project-specific

14    situation, yes.

15         Q.    So you're just identifying a potential

16    issue, not one that you know that would definitely

17    exist?

18         A.    Correct.

19         Q.    Okay.  So let's get back to the -- let's

20    leave aside the potential need to make that rear --

21    the door behind the bullet trap acoustical, which

22    may or may not happen.  Let's talk about just

23    armoring the wall in the door behind the bullet

24    trap.



1              Is there always a door behind the bullet

2    trap?

3         A.    It depends on the bullet trap system.

4    Many bullet trap systems require a door behind the

5    bullet trap system but not all.  There are some

6    bullet trap systems where you do not need a door

7    behind the bullet trap system.

8         Q.    If a range owner were to select a bullet

9    trap system that did not require a door, how much

10   cheaper would that make it to armor the back wall

11   than a bullet trap system that required a back door?

12   You follow me?

13        A.    I'm going to have to answer your question

14   in two parts.  I'm sorry.

15        Q.    Did you follow my question?

16        A.    I did follow your question, but there's a

17   little wrinkle in here.  The bullet trap systems

18   that are on the market today that don't require a

19   door out the back -- I'm not sure, based on other

20   provisions of this ordinance, that those types of

21   bullet trap systems would be permitted on city of

22   Chicago ranges.  So it's possible that any range

23   that's built in the city of Chicago would have to

24   have a door behind the bullet trap system.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 193 of 330 PageID #:5524

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        193

1      Q.    Let's presume, for purposes of our

2   discussion right here, that the bullet trap systems

3   that don't require a rear door can be used.  Let's

4   just assume that they can be.

5          How much more money does the addition of

6   a door in the systems which require one in armoring

7   that door cost?  Is it the same cost and it's just a

8   door, or does the door make it that much more

9   expensive?

10     A.    Okay.  Let -- let me give you the spread.

11  A regular commercial door, not acoustical, not

12  armored, would be in the range of $500 to $1,000 a

13  door.  An acoustic door, not armor-rated, just an

14  acoustic door would be in the range of $5- to $7,000

15  a door.  An armored door, not acoustically rated, of

16  course -- an armored door would be in the range of

17  $7- to $10,000 a door.

18     Q.    So we're talking a couple thousand

19  dollars more?

20     A.    Well, if you're going --

21     MR. SIGALE:  No, no, no.  Object as to form.

22  BY MR. AGUIAR:

23     Q.    I'm sorry.  So --

24     A.    If you're going from --



1       MR. SIGALE:  Wait.  Is there a --

2   BY THE WITNESS:

3       A.    -- no door to a ballistic door, it would

4   not be a couple thousand dollars; it would be

5   $10,000.

6   BY MR. AGUIAR:

7       Q.    But if you're going from -- if you're

8   choosing between an acoustic door and an armored

9   door, it's a couple thousand dollars?

10      A.    Then it would be a few thousand dollars.

11      Q.    Okay.  So then your issue is with the

12  cost of doing this?

13      A.    Are we speaking, now, specifically behind

14  the bullet trap system?

15      Q.    Correct.

16      A.    Yes.  Okay.  Yes, I would say that this

17  is a cost issue.

18      Q.    Okay.  And, of course --

19      A.    Modified with what -- the discussion that

20  we had about if you're in a specific situation where

21  an acoustic door is needed to meet other provisions

22  of this ordinance.  That would be my modifier is,

23  is -- that would be another potential issue.

24      Q.    And, of course, the cost that would be



1  incurred would be dependent in part upon how big the

2  range was to armor plate the rear wall in a

3  three-lane range, I'm presuming, would be less than

4  it would cost to do a six-lane range?

5       A.    Okay.  Let's back up because I think you

6  have a little -- a little bit of a terminology

7  issue.

8            The -- the doors -- the doors need to be

9  armored.  The back wall needs to be

10 penetration-proof.

11      Q.    Okay.

12      A.    But not necessarily armored and probably

13 not armored.

14      Q.    Okay.

15      A.    Generally -- I'll -- I'll give you an

16 example is, is a common situation where the wall is,

17 is -- if it's a concrete wall or a fully grouted

18 masonry wall, that would be generally a

19 penetration-proof wall, but it would not be an

20 armored wall.

21      Q.    So you're complaining about the door?

22      A.    I'm complaining about the door and the

23 penetration-proof aspect of the wall behind the

24 bullet trap system.



1      Q.    Okay.  So let's break it down.  We talked

2   about the door and how much it would cost to armor

3   plate the door.

4      A.    Yes.

5      Q.    Now, to make the rear wall behind the

6   bullet trap penetration-proof, how much more

7   expensive would that be?

8      A.    That -- I'm -- obviously, I'm estimating

9   here.  If we're talking about going into an existing

10  building -- if we're talking about going into an

11  existing building, we're talking about building

12  another wall.  We're probably talking about building

13  another wall inside the existing wall.

14         That other wall that we're building might

15  be -- I'm going to estimate -- maybe $200 a linear

16  foot of length of that back wall.

17     Q.    That's just a guesstimate?

18     A.    It -- it's an architectural estimate,

19  which means it's a conceptual budget estimate, as

20  opposed to a final contractor's cost.

21     Q.    Let's talk about -- the next issue raised

22  were the doors behind the firing line that are not

23  on the rear wall but are on the side walls.

24     A.    Yes.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 197 of 330 PageID #:5528

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        197

1      Q.    And your reading of the ordinance says

2   those must be armored as well?

3      A.    That's correct.

4      Q.    Okay.  Assuming that to be true, would

5   there be --

6      MR. AGUIAR:  Strike that.

7   BY MR. AGUIAR:

8      Q.    Do there have to be doors on the side

9   walls behind the firing line?  Is that something you

10   normally design?

11      A.    It -- it depends.  It's a

12   facility-specific situation.  You have to have --

13   somewhere you have to have doors to get in and out

14   of this facility, and you can't use the door behind

15   the bullet trap system because the bullet trap

16   system is in the way of getting to that door.

17          So you're going to have to have -- at a

18   minimum you're going to have to have at least one

19   door that is either on the back wall or one or the

20   other side wall.  Depending on the configuration of

21   the building, particularly if it's an existing

22   building, from an exiting standpoint under the

23   building code, you may have no choice but to put it

24   out one of the side walls.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 198 of 330 PageID #:5529

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                    198

1          If you were designing the range from

2    scratch and this was a requirement you had to design

3    for -- from scratch, the architect, if they were

4    halfway smart, would take great pains to make sure

5    that the exit door was in the back wall where it

6    doesn't need to be armored.  You don't always have

7    that option on an existing building.

8          Q.    So just to kind of summarize what you're

9    saying, in a new construction a good architect will

10   put the door on the back wall and avoid the whole

11   armoring thing in the first place?

12         A.    Yes.

13         Q.    Therefore this wouldn't be a concern?

14         A.    Yes.

15         Q.    Or doesn't have to be a concern?

16         A.    Correct.

17         Q.    But an existing building, it may be that

18   you have no choice but to put that door on the side

19   and, therefore, armor it?

20         A.    Yes.

21         Q.    But we don't know until we see the space?

22         A.    That's correct.

23         Q.    So whether that's actually a real problem

24   or not is purely site-specific?



 1        A.    That's correct.

 2        Q.    And, therefore, it may never arise?  It

 3   may, it may not?

 4        A.    In the selection -- in the selection of

 5   what buildings are appropriate, it would in my mind

 6   be -- one of the governing factors is, is whether

 7   you would include or exclude a particular building

 8   as a potential site to put the range.

 9        Q.    But that would just be one factor they

10   would consider?

11        A.    One of many, yes.

12        Q.    Because it could be a fabulous location

13   and they've got to spend a little more to armor the

14   door, but the location is worth the extra money?

15        A.    That's a possibility.

16        Q.    Okay.  Let's move on to your nonincluded

17   problem.

18        MR. SIGALE:  Do you mind if we take two

19   minutes?

20        MR. AGUIAR:  No.

21               (WHEREUPON, a recess was had.)

22        MR. AGUIAR:  Let's go back on.

23   BY MR. AGUIAR:

24        Q.    Let's handle Issue 13, "part deux," as



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 200 of 330 PageID #:5531

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        200

1   Mr. Sigale described it.  You said you had another

2   concern about this provision that's not in your

3   report.

4        A.    Yes.

5        Q.    And what is that concern?

6        A.    Under the same Section 13-96-1160,

7   "Enclosure Requirements," Subpart A, it looks like,

8   it talks about -- in there about how the enclosure

9   needs to be penetration-proof for the heaviest

10  caliber of ammunition used on the firing range fired

11  point blank into the enclosure at 90 degrees to the

12  surface.

13        If I'm interpreting this correctly, what

14  this is saying is, is -- again, going back to our

15  six-sided enclosure for the range:  We have floor,

16  we have some sort of ceiling, we have two side

17  walls, we have a wall behind the bullet trap, and we

18  have a wall behind the shooter.  The wall behind the

19  shooter is, is the one surface of the six surfaces

20  that is exempted from the penetration-proof portion

21  of the ordinance.

22        Dealing with the other five surfaces,

23  if -- if I'm reading this correctly, this says that

24  no matter where you're standing, if you shoot



1    90 degrees into one of these other five sides,

2    wherever you have shot needs to be

3    penetration-proof.  What it doesn't allow for is --

4    you don't have people standing anywhere in the range

5    shooting.  You don't have, for example, someone

6    standing behind the bullet trap system shooting at

7    the ceiling because that's not where the people are

8    who have the guns.  The people are at the firing

9    line.

10              Conventionally in shooting ranges, the

11   way it's designed, in terms of the penetration-proof

12   nature of the enclosure, is, is the facility is set

13   up so that if you have someone standing at the

14   firing line from 90 degrees to the right, 90 degrees

15   to the left towards -- down range towards the

16   shooting range, and straight up, straight down, and

17   towards the shooting range, that entire spherical

18   area from where you are with the firearm should be

19   penetration-proof if it's struck by a projectile

20   from that location.

21              The effect of the ordinance as it's

22   written right now is if it's requiring it to be

23   penetration-proof if you're 20 feet down range where

24   you're not supposed to be with a gun and shoot



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 202 of 330 PageID #:5533

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        202

1   straight up in between the steel baffle plates and

2   hit the floor or ceiling structure above, which in a

3   normal range would not be penetration-proof, it's

4   also allowing that if you are behind the firing

5   line -- let's say you're 12 feet behind the firing

6   line near the back wall -- it's got to be

7   penetration-proof for a bullet shot straight up in

8   the air from that location.

9          And on -- normally on a range, it would

10  not be.  Not only would it not be, I don't know how

11  it even could be, because at the back wall is where

12  the ventilation system is introduced and no one

13  makes a penetration-proof diffuser for a ventilation

14  system.

15      Q.    So your objection would be that this is

16  an additional cost that is unnecessary?

17      A.    Not only additional cost that is

18  unnecessary, in some aspects of it, I'm not even

19  sure as a design professional how I could accomplish

20  it.

21      Q.    But that's based on your interpretation

22  of the ordinance?

23      A.    Correct.  I would be glad to be corrected

24  that my interpretation is wrong.



1      Q.     And this was not included in your report
2    why?
3      A.     I'm not sure.  I -- I didn't look back --
4    well, I didn't have any way to look back and figure
5    out the history of this is, is that this provision
6    that I'm looking at right now, the 13-96-1160 in
7    Exhibit 3 -- the first time I saw this exhibit was a
8    copy that Mr. Sigale gave me last night.  That was
9    the first time I noticed this; so I don't know
10   whether this has been a change to the ordinance, and
11   that's -- and I haven't seen it before, or whether I
12   missed it when I was preparing the report that is
13   dated March 16, 2012.
14      MR. SIGALE:  Just for the record, what he's
15   talking about is anticipating that you were going to
16   be using this as an exhibit.  I let him look at my
17   copy of Giordano's from his dep last week.
18   BY MR. AGUIAR:
19      Q.     So you just don't know whether this was
20   in here before or whether it's been added and you
21   didn't see it?  You didn't know about it.
22      A.     That -- that's correct.
23      Q.     Okay.  Well, from my understanding -- and
24   I'm not saying I'm right on this -- I think this has



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 204 of 330 PageID #:5535

LORIN D. KRAMER                              September 26, 2013
EZELL vs. CITY OF CHICAGO                                   204

1  always been in there, but I might be wrong.  I don't

2  know of any ordinance change which brought this in.

3          Well, because it wasn't in the report, I

4  can't say that I'm fully prepared to actually ask

5  questions about this at this time.

6      MR. AGUIAR:  It hasn't been disclosed to us; so

7  I reserve my right to object to any inclusion of

8  this in any part of the case hereinafter.  And any

9  question I may try to ask about it at this time, I

10 would say is not a waiver of that objection at this

11 time.

12 BY MR. AGUIAR:

13     Q.   So, again, you're saying that this

14 requires the whole entire place to be

15 penetration-proof basically?

16     A.   With the exception of the wall behind the

17 shooters.

18     Q.   Okay.  And that's just based on your

19 interpretation of this?

20     A.   Yes.

21     Q.   Okay.  And if your interpretation happens

22 to be incorrect or there's another way to read this,

23 would that still be a problem for you?

24     A.   Well, presuming what it really means --



1    if the interpretation is when you have people

2    standing at the firing line and firing the guns down

3    range -- the way the range is supposed to be used,

4    of course -- that all of the surfaces that the

5    bullet has a possibility of striking -- those

6    materials have to be penetration-proof if they were

7    struck at a 90-degree angle, then I don't have a

8    problem.

9         Q.    Okay.  Assuming that the last

10   interpretation you gave -- assuming that that is

11   correct -- the correct reading of this --

12        A.    Refresh my memory as to which -- "the

13   last interpretation."

14        Q.    The one in which you said -- the one in

15   which you said that basically only those areas, if

16   you're standing behind the firing line and

17   shooting -- and you're shooting at a 90-degree

18   angle, only those areas which could potentially be

19   hit have to be penetration-proof.

20             And which you wouldn't have a problem

21   with that?

22        A.    I understand, yes.

23        Q.    Okay.  Assuming that to be the proper

24   interpretation of this sentence, are you saying that



1    as a whole Section 13-96-1160(a) -- are you saying

2    that that provision makes it impossible to open a

3    range in the city of Chicago?

4         A.    Not if we -- not as long as the

5    acoustic -- potential acoustic issues in other

6    sections are met without having to put an acoustic

7    door in a location that we're required to put an

8    armored door.

9         Q.    Okay.  Assuming that to be true, this

10   doesn't make it impossible to open a range?

11        A.    That's correct.

12        Q.    Do you know whether it makes it

13   economically infeasible to open a range?

14        A.    I don't think so.

15        Q.    Okay.  Would it make a range

16   unprofitable?

17        A.    Assuming that we don't have way more

18   doors than I think that they're likely to have, then

19   I don't know that it would make it unprofitable.  If

20   there were a lot more doors than I think there are

21   going to be in here, it could raise the construction

22   cost to the point that it might be past the tipping

23   point in terms of profitability.

24        Q.    So the long term -- the cost of putting



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 207 of 330 PageID #:5538

LORIN D. KRAMER                                          September 26, 2013
EZELL vs. CITY OF CHICAGO                                            207

1  in those doors, if there were more doors than you

2  think are necessary, the cost of those doors upfront

3  would impact the profitability of a range down the

4  road forever?

5       A.   It would impact the construction cost of

6  the facility; and, of course, the profitability is

7  based on having to pay off what it cost to construct

8  the facility.

9       Q.   And is it your position that a range

10  could never recoup those costs through operation?

11      A.   No.

12      Q.   It's possible?

13      A.   It's -- it's possible it could.

14      Q.   We just don't know one way or the other?

15      A.   We don't know one way or the other, yes.

16      Q.   Let's move along to Issue 14, which is

17  "Ammunition or Firearms Storage," and there you're

18  challenging Section 13-96-1190 Subpart (c)(2)(d).

19      MR. SIGALE:  It's the next page.  You got it.

20      MR. AGUIAR:  And have you had a chance to

21  review that provision in Exhibit 3?

22      A.   Yes.

23      Q.   Would you explain for the record what

24  your objection to this provision is, please.



1        A.      Well, it states that "If ammunition or

2   firearms are stored, that a magazine or

3   hazardous-storage facility appropriate for the type

4   and amount of ammunition or firearms, as provided in

5   rules and regulations promulgated by the police or

6   fire department."  So let me start with "magazine or

7   hazardous storage."

8                First off, so that you know, hazardous

9   storage -- to an architect hazardous storage has

10   some specific meaning to it.  Under building codes,

11   hazardous storage is a specific occupancy type and

12   it's an occupancy type that has nothing to do with

13   firearms or ammunition.

14               And I'm referring to -- you know, that

15   the building code lists under "hazardous" what

16   things fall under hazardous.  And small arms

17   ammunition and firearms are not on that list.  There

18   are other things that are on that list.

19        Q.      Such as?

20        A.      Many things.

21        Q.      Like what?

22        A.      Flammable substances, like if you're

23   storing gasoline, as an example.  If you were

24   storing explosives -- dynamite blasting caps would



LORIN D. KRAMER                               September 26, 2013
EZELL vs. CITY OF CHICAGO                                    209

1   be an example.  If you get over certain quantities

2   of things like motor oil, over certain quantities --

3   I believe, over certain quantities of tires are on

4   that list.

5          So there -- there's just a very long

6   shopping list of things that are -- that cause you

7   to fall under a hazardous classification.

8      Q.    Do you happen to know whether the city of

9   Chicago's building code has any kind of definition

10  of hazardous storage facility?

11     A.    I do not.

12     Q.    Okay.  So continue.  You were talking

13  about what a hazardous storage facility for an

14  architect means.  You were describing that.

15     A.    Yes.  So under a hazardous storage

16  facility, it has specific construction code

17  implications in terms of the built environment that

18  that, quote/unquote, "hazardous material" is located

19  in.  And those are very significant requirements and

20  are not -- those very significant requirements don't

21  seem to directly be reflected in the rest of the

22  ordinance, which causes me confusion.  Any architect

23  looking at this and seeing that they had to

24  provide -- if they needed to provide a hazardous



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 210 of 330 PageID #:5541

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        210

1   storage facility, that's going to mean to them there

2   is -- there's an H occupancy sort of place for the

3   storage.

4           And that's going to create problems

5   because the H occupancy storage being associated

6   direct -- in direct proximity to the rest of the

7   business is going to be somewhere between difficult

8   and impossible to do under the building code.

9           And then did you also want me to deal

10  with magazine?

11      Q.   Let's stay on hazardous storage for a

12  second.

13          But you don't know what the building code

14  in Chicago requires with respect to hazardous

15  storage?

16      A.   I haven't specifically looked at the City

17  of Chicago's building code.  I have looked at -- the

18  model building code in the United States is the

19  International Building Code and the International

20  Fire Code and NFPA, and I'm familiar with those.

21      Q.   So you're basing the use of --

22      MR. AGUIAR:  Strike the question.

23  BY MR. AGUIAR:

24      Q.   You said you didn't look and see if the



1  building code has a definition of hazardous storage

2  facility?

3       A.    The Chicago building.

4       Q.    Correct.

5       A.    Yes.

6       Q.    You didn't look?

7       A.    I did not.

8       Q.    Okay.  And you don't know whether it has

9  any requirements for what a hazardous storage

10  facility -- how it must be constructed?

11       A.    That's correct.

12       Q.    So you're basing your view of a hazardous

13  storage facility based on other municipalities'

14  definition of what a hazardous storage facility

15  would be?

16       A.    Yes.

17       Q.    Okay.  So it's possible that Chicago's

18  code requires something different?

19       A.    That's possible.

20       Q.    And it's also possible that it doesn't

21  have anything in there at all?

22       A.    I would be shocked but I suppose it's

23  possible.

24       Q.    Okay.  I don't know.  I'm just asking



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 212 of 330 PageID #:5543

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        212

1  you.  I mean --

2      A.    It -- it would be -- it -- frankly, it

3  would be inconceivable to me that the third-largest

4  city in the United States would have no section in

5  their construction code dealing with how you treat

6  the built environment when it comes to hazardous

7  materials.

8      Q.    Okay.  I don't know.  I'm just throwing

9  it out there.  I don't --

10      A.    But -- right.

11      Q.    You don't know, as you sit here today,

12  whether what you're talking about as being required

13  for these is actually required in the city of

14  Chicago?

15      A.    That's correct.

16      Q.    Or whether, even if the City does define

17  this, whether it modifies it for a gun range?

18      A.    That would be true.  Now, my assumption

19  is, is all the things we're talking about right now

20  have to do with hazardous storage still.  Is that --

21      Q.    Yes.  We're only on hazardous storage

22  right now.

23            And your objection is that it would be

24  costly to construct one of these?



1          A.      More than costly is, is that I -- I would

2    have to review more specifically in the building

3    code.  I have done facilities that had hazardous

4    storage in them.  But doing hazardous storage that

5    is associated with an occupancy type that is use --

6    doing retail sales in a shooting range -- there are

7    certain things under the code where you can't put

8    certain things together.

9          And it may be impossible under the code

10   to put the two uses that we're talking about, that

11   is hazardous storage and the rest of the shooting

12   range facility -- it may be under the code

13   impossible to put them together in the same

14   building.

15         Q.      But you don't know for certain?

16         A.      I do not know for certain.

17         Q.      That would require more research?

18         A.      It would.

19         Q.      And you haven't done that research?

20         A.      I have not.

21         Q.      Okay.  You're just issue spotting here,

22   in other words?

23         A.      Correct.

24         Q.      Okay.  And you don't know what the



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 214 of 330 PageID #:5545

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                     214

1  additional cost would be even if it -- if it could

2  be done, what the cost would be?

3      A.    No, I do not know what the additional

4  cost would be.

5      Q.    Okay.  Let's talk about the magazine for

6  a second.

7           What's your objection to the use of a

8  magazine, 'cause you're given the option of a

9  magazine or hazardous storage facility?

10     A.    Let me just state is, is that I find part

11 of this confusing because we're lumping -- in this

12 Subsection D, we have "ammunition or firearms

13 stored" and we also have "a magazine or hazardous

14 storage."  From that -- my strict reading of this

15 is -- is, is that ammunition storage could be

16 handled through a magazine or hazardous storage and

17 firearms could be handled through a magazine or

18 hazardous storage.

19          But while my strict interpretation of

20 what -- that's my strict interpretation of what that

21 says, but I have to say that's so illogical that I'm

22 wondering whether my strict interpretation is

23 completely off base.

24     Q.    Well, your strict interpretation gives



1    options; correct?

2         A.    Yes.

3         Q.    Okay.  Let's talk about the magazine.

4               What's your objection to the use of a

5    magazine for storage of ammunition or firearms?

6         A.    Well, when it comes to firearms, it --

7    I'm not supposed to do this, but could you have me

8    define a magazine?

9         Q.    What's your understanding of what a

10   magazine is?

11        A.    Okay.

12        Q.    You analyzed this provision; correct?

13        A.    Yes.

14        Q.    And you said there's an objection to it?

15        A.    Yes.

16        Q.    Okay.  And you did that based on what you

17   thought a magazine meant?

18        A.    Correct.

19        Q.    When you wrote this, what did you think a

20   magazine meant?

21        A.    Okay.  Just as hazardous storage is

22   something that is described under the building code,

23   a magazine is described under the building and the

24   fire code.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 216 of 330 PageID #:5547

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        216

1        Q.    Within the city of Chicago?

2        A.    I don't know for the city of Chicago.

3        Q.    You're talking in general terms?

4        A.    In general terms.

5        Q.    In places you've looked before?

6        A.    In places I've looked before, yes.

7        Q.    Okay.  So let's go on the general

8   knowledge you have.

9        A.    General knowledge.  A magazine is a box

10  or container, if you will, that is designed --

11  typically, it's something that has some sheet metal

12  and some wood walls to it, and it is designed so

13  that if you have an -- components in it that you're

14  concerned about there being some kind of explosion

15  with, that those components are contained within

16  this box and that the box will not become shrapnel

17  in a bomb, but it does afford some protection to --

18  in a fire to keep the components from spreading all

19  over the place.

20            A magazine, under that very loose

21  definition, would have no connection whatsoever to

22  firearms because firearms are completely inert.  In

23  a -- in a fire they just sit there and get hot.

24            A magazine -- generally under the code --



1   what the code says is, is -- I'm talking now about

2   International Building Code, International Fire

3   Code, and NFPA, which is National Fire Protection

4   Association.  Under those codes, small arms --

5   assembled small arms ammunition does not need to be

6   kept in a magazine, but some of the components that

7   go into making up the ammunition when they are not

8   yet assembled into ammunition such as the gunpowder

9   and the primers, those, over certain quantities, do

10  need to be stored in magazines under the

11  aforementioned codes.

12          So the magazine is generally -- in my

13  industry is, is something that, if you were

14  manufacturing ammunition on-site or you were selling

15  components to the public for hand loading, for

16  reloading of ammunition, you would have a magazine

17  on-site to store powder and a separate magazine

18  on-site for the storing of primers, assuming that

19  you had a sufficient quantity to be lumped in the

20  category that you needed that.

21          I never heard of anyone doing a magazine

22  to store ammunition.  And for firearms it -- it's --

23  winds up being completely illogical because you're

24  talking about something completely inert, and we're



1  talking -- a magazine is, is meant to deal with

2  something that is affected by being in a fire.  And

3  the handgun, like I say, in a fire it just gets hot.

4       Q.   So it doesn't sound like you're saying

5  necessarily that the City of Chicago is creating, by

6  use of the magazine, something that's impossible to

7  comply with; you're saying that they've created a

8  requirement which in your opinion is unnecessary?

9       A.   Yes.

10      Q.   Okay.  So the City of Chicago decided for

11 whatever reason that magazine -- they wanted some

12 sort of magazines, and you're just saying, I don't

13 see why you need that?

14      A.   Yes.

15      Q.   Okay.  What's the cost of a magazine?

16      A.   A cost of a magazine is -- I -- it

17 depends on the size of a magazine, but I would say

18 that generally magazines would be -- on the small

19 side might be $500 and on the large side might be

20 $5,000.

21      Q.   And once you pay for a magazine, you own

22 it; right?

23      A.   Yeah.  I've never heard of anyone rent --

24 I suppose you might be able to rent a magazine, but



1  I've never heard of anyone renting a magazine.

2      Q.    And there's no continuing cost of

3  maintaining a magazine?  Once you buy it, you --

4  it's like a suitcase, in general terms?

5      A.    It would be slightly better than a

6  suitcase because I have to replace my suitcase on a

7  regular basis, but the American Tourister gorilla

8  could not destroy a magazine.

9      Q.    Magazines, in other words, have a very

10  long shelf life?

11      A.    Measured in decades, yes.

12      Q.    Okay.  So once the business owner were to

13  purchase it, they own it for the life of the

14  business most likely?

15      A.    I would think.

16      Q.    Okay.  So what the City is doing is

17  putting a cost of anywhere from $500 to $5,000,

18  approximately, on a range owner who wants to store

19  either firearms or ammunition?

20      A.    Yes.  Assuming that the interpretation I

21  gave that the range owner has a choice of picking a

22  magazine or hazardous storage for both firearms and

23  ammunition.

24      Q.    Okay.  Assuming that to be true, again,



LORIN D. KRAMER
EZELL vs. CITY OF CHICAGO

September 26, 2013

220

 1   all we're saying is up front you've got to invest

 2   anywhere from $500 to $5,000 in a magazine?

 3       A.    Yes.   I -- I do want to qualify -- one

 4   thing, though, is, is that I'm realizing that when I

 5   say "$500 to $5,000," I'm talking about a typical

 6   indoor commercial shooting range.   I'm suddenly

 7   realizing that we're talking about a magazine that

 8   is large enough -- a magazine or magazines that are

 9   large enough to contain all of the firearms in the

10   facility and all of the ammunition in the facility,

11   which is a whopping, honking, big magazine.

12            It's a bigger magazine than I've dealt

13   with before.   You're just talking about a volume of

14   product that's more than I normally see put in a

15   magazine.

16       Q.    But that would be dependent upon what

17   product or inventory the range actually had in its

18   possession?

19       A.    Yes, that would be true.   But bear in

20   mind that normally a magazine would have components

21   for reloading, that is powders and primers, which

22   would be a fairly small amount of volume.   If you're

23   talking about ammunition and you're only talking

24   about the ammunition that you're selling to patrons



1  who are shooting on the range, which would be the

2  least quantity of ammunition we would be talking

3  about, that by volume is, is quite a bit larger than

4  what I was referring to in a magazine size.

5          So my -- all I'm saying is, is my numbers

6  of $500 to $5,000 are probably -- in this case, are

7  going to be well low of the mark.

8      Q.    But, again, that depends upon what

9  they -- we don't know what the cost is until they

10 actually have the inventory in their hands.

11         Then we know what kind of magazines they

12 need?

13     A.    Yes.

14     Q.    Let's turn to the second part of

15 Subpart D where it says "As provided in rules and

16 regulations promulgated by the police or fire

17 department."  Do you see where it says that?

18     A.    Yes.

19     Q.    Are you aware of whether either the

20 police or the fire department have promulgated any

21 rules or regulations regarding the storage of

22 ammunition or firearms?

23     A.    I am not aware if they have promulgated

24 any regulations.



1      Q.    So we don't know what they're actually

2   going to require yet, if anything?

3      A.    That's correct.

4      Q.    So, again, this is an exercise in trying

5   to read the future?

6      A.    Yes.

7      Q.    Again, you're issue spotting this --

8      A.    Well, that issue and the -- the issue

9   of -- I -- I have an issue with requiring firearms

10  to be stored in a container that was designed to

11  deal with explosive things, when a firearm isn't an

12  explosive thing.

13     Q.    But, again, you're quarrelling with the

14  City of Chicago's judgment to put them in there;

15  right?  You don't think it's necessary?

16     A.    I don't think it's even logical.

17     Q.    But, again, you're quarreling with the

18  logic of city council.  What we're talking about is

19  whether it makes it impossible to open a range.

20     A.    And it doesn't make it --

21     MR. SIGALE:  I'm going to object.  That might

22  be your question, but that's not -- that isn't fully

23  the issue in this case but -- so I'll object to your

24  form.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 223 of 330 PageID #:5554

LORIN D. KRAMER                           September 26, 2013
EZELL vs. CITY OF CHICAGO                              223

1   BY MR. AGUIAR:

2       Q.    You are quarrelling with the city

3   council's rationale of putting firearms in a

4   magazine?

5       A.    Yes.

6       Q.    Okay.

7       MR. SIGALE:   Wait.   I'm sorry.   I'm going to

8   object to form.

9       Are the plaintiffs objecting to the rationale,

10  or is Mr. Kramer during this colloquy objecting to

11  the rationale?

12      MR. AGUIAR:   I'm talking to him, the witness,

13  about his position in this case.

14  BY THE WITNESS:

15      A.    Okay.   I disagree with the city council's

16  judgment that firearms ought to be in a magazine, a

17  device that is designed to deal with explosive

18  substances.

19  BY MR. AGUIAR:

20      Q.    But do you dispute that they have the

21  ability to make that kind of judgment call?

22      A.    No.

23      Q.    It's their judgment?

24      A.    Yes.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 224 of 330 PageID #:5555

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        224

1        MR. SIGALE:  Well, I'm going to object to the

2    extent that they have the right -- I'm going to

3    object as to form because they have the right until

4    it becomes unconstitutional, and then they don't

5    have the right.  So if you're ask -- so if the

6    question is in general does the city council have

7    the right to make decisions -- but to the extent

8    you're asking him a legal conclusion, then I'm

9    objecting.  So I object to that and to the form of

10   the question.

11       MR. AGUIAR:  Okay.

12   BY MR. AGUIAR:

13       Q.    But you're opining that doing so makes it

14   impossible to open a range in the city of Chicago?

15       A.    No.

16       Q.    Okay.  Does it make it economically

17   infeasible to open a range in the city of Chicago?

18       A.    I would doubt that it would make it

19   economically infeasible.

20       Q.    And would requiring storage in a magazine

21   make a range unprofitable?

22       A.    Probably not.

23       Q.    And, again, we just don't know because

24   there are -- as we know today, there are no rules or



1    regulations regarding this provision?

2         A.    With the exception of Subsection D.

3         Q.    Yes.  Which says "as provided in rules

4    and regulations promulgated by the police or fire

5    department."

6         A.    Yes.  But it also says that -- that

7    ammunition or firearms -- okay.  "If ammunition or

8    firearms are stored, a magazine or a hazardous

9    storage facility appropriate" -- blah, blah, blah,

10   et cetera.  So this is saying that it's not -- as

11   I'm understanding it -- it's not up to the police or

12   fire department to decide whether ammunition and

13   firearms need to be stored under one of these two

14   methods.  They do under this regulation have to be

15   stored under one of these two methods.

16        Q.    Then how do you read the second half of

17   this:  "as provided in the rules and regulations

18   promulgated by the police or fire department"?

19        A.    The way I would read that is, is the

20   specific makeup of the hazardous storage is --

21   specific makeup of the magazine could be up to those

22   two departments.

23        Q.    Okay.  So they would have a say in -- as

24   to how it's stored:  If you have this much



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 226 of 330 PageID #:5557

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        226

1   ammunition, you need this type of facility; if you

2   have this many guns, it needs to be this kind of a

3   facility or a magazine.  That's what you're saying?

4        A.    Yes.  But as I'm understanding it, the

5   police and the fire department don't have the choice

6   to null Subsection D and say, No, you don't need a

7   magazine or hazardous storage to store firearms and

8   ammunition.  It's just the rules of specifically

9   what -- what that storage consists of would be up to

10  them.

11       Q.    But what they would decide would impact

12  the cost?

13       A.    Yes.

14       Q.    Okay.  And we don't know what that'll be?

15       A.    That's correct.

16       Q.    Has anyone told you that they would not

17  open a range in the city of Chicago because of the

18  storage requirement?

19       A.    No.

20       Q.    Other than speaking with Mr. Sigale or

21  with Mr. Giordano, have you spoken with anybody else

22  about this provision?

23       A.    No.

24       Q.    Let's move along to Issue No. 15.  In



1    Issue No. 15, you take issue primarily with

2    Section 13-96-1200 Subpart (b)(2), which if you turn

3    to Exhibit 4, since you wrote this report, that

4    provision has been amended.

5        A.    Okay.

6        Q.    And Exhibit 4, page 9, will show you the

7    changes that have been made.  If you would take a

8    moment, why don't you read -- on page 9 you'll see

9    where it says 13-96-1200.

10       A.    Uh-huh.

11       Q.    And then (b)(2) is listed there.

12       A.    Okay.

13       Q.    Things that are crossed out are now out

14   of the ordinance, and things that are underlined

15   have been included in the ordinance.  Why don't you

16   take a moment and look at that before we start

17   talking about it.

18             (Witness looks at document.)

19   BY THE WITNESS:

20       A.    Okay.

21   BY MR. AGUIAR:

22       Q.    You'll see that one of the changes in the

23   ordinance eliminates the language, quote, "into

24   contiguous areas," in the second sentence.  And I



1  believe you raised a concern about that in your

2  report, challenging it because it was not defined.

3  So it's been eliminated.

4          And then the other change is that the

5  sound requirement has been relaxed.  "The maximum

6  noise emanating from the shooting range facility

7  shall not be more than 55 decibels, when measured

8  from a distance of 100 feet or more from the source,

9  or 70 decibels when measured from a distance of

10  10 feet or more from the source."  It used to just

11  be 59 decibels period.  You see that change?

12      A.    Uh-huh.  Yes.

13      Q.    Which means now from the source it can be

14  70 decibels up to 99 feet from the -- or from

15  between 10 and 99 feet.  If it's past 100, it has to

16  be 55.  Do you see that?

17      A.    Yes.

18      Q.    Okay.  Do these changes alter your

19  objection to this provision?

20      A.    Well, my concern about the definition of

21  "contiguous areas" and what that means -- obviously,

22  that's no longer a concern because contiguous areas

23  does not -- is not a part of this sound ordinance;

24  so there would be that.



1              I guess the -- the thing that I still see

2    is, is -- it's my understanding that in

3    manufacturing districts -- that in manufacturing

4    districts during daytime hours, up -- up to

5    8 o'clock in the evening, that manufacturing

6    districts have no limit on the sound that can be

7    produced, with one exception, shooting ranges.

8    Everything else in a manufacturing district can be

9    as noisy as it wants to be up to 8:00 in the

10   evening.  After 8:00 in the evening, they have

11   restrictions.

12             But up to 8:00 in the evening, no

13   restrictions.  But yet a shooting range, an indoor

14   shooting range, does have restrictions that nothing

15   else in the manufacturing district has, and I -- I

16   guess I have a philosophical problem with that.

17        Q.    Okay.  You have a philosophical problem.

18             You even call it "unreasonable"?

19        A.    Yes.

20        Q.    Again, it sounds to me like you're

21   disputing why something was meant by the city of

22   Chicago.

23             You're challenging why is this this way;

24   correct?



1          A.    I would say so, yes.

2          Q.    Okay.  Are you saying that this provision

3    makes it impossible to open a range in the city of

4    Chicago?

5          A.    I don't know.  The -- the distances --

6    the numbers that they have:  55 decibels at 100 feet

7    and 70 decibels at 10 feet -- I've never done

8    measurements outside of existing indoor shooting

9    facilities, and I don't know whether those are

10   numbers that are practical to achieve.

11         Q.    Do you have any experience with respect

12   to measuring sound levels?

13         A.    Yes.

14         Q.    What kind of experience do you have?

15         A.    I've measured sound levels on outdoor

16   ranges.

17         Q.    Okay.  I think you said earlier in the

18   deposition that you don't deal with acoustical sound

19   issues generally -- or you will consult with an

20   engineer on those issues?

21         A.    I -- yes.  I consult with an acoustic

22   engineer on specific detail things, yes.

23         Q.    And wouldn't compliance with this

24   provision necessarily involve dealing with an



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 231 of 330 PageID #:5562

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        231

1   acoustical engineer?

2        A.    Because of the numbers we're talking

3   here, if I were doing a project with these numbers,

4   I would absolutely hire an acoustic engineer, yes.

5        Q.    Okay.  So would you say this is outside

6   your realm of normal experience, in terms of what

7   you normally do with the range?

8        A.    In terms of achieving specific numbers,

9   55 decibels at 100 feet, 70 decibels at 10 or more

10  feet --

11       MR. SIGALE:  I think it's vice versa.

12       THE WITNESS:  I'm sorry.  Did I read that the

13  wrong way?  55 decibels measured at 100 feet -- yes,

14  I think I said it right.  55 decibels measured at

15  100 feet, 70 decibels when measured at a distance of

16  10 feet.

17       MR. AGUIAR:  That's right.

18       MR. SIGALE:  I thought it was 55 in a lesser

19  and 70 in a greater.

20       THE WITNESS:  If you're 10 feet away, you're

21  allowed to be --

22       MR. AGUIAR:  -- noisier.

23       THE WITNESS:  -- noisier than if you're getting

24  further away.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 232 of 330 PageID #:5563

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        232

1    MR. SIGALE:  Okay.  Okay.  I guess it's just

2    getting a long day.

3    THE WITNESS:  And just to briefly add to the

4    humor is I think you got it backwards when we were

5    talking last night as well.

6    MR. SIGALE:  We -- I probably did.  I don't

7    know.

8    THE WITNESS:  Yes.  No, I -- I under -- I

9    understood what it meant.

10   BY THE WITNESS:

11   A.    But I'm sorry.  I've lost -- I've lost

12   your question now.

13   BY MR. AGUIAR:

14   Q.    I'm just saying that because you would

15   necessarily involve a sound or acoustical engineer

16   in designing for this provision, do you have the

17   experience to actually weigh in on this level --

18   this sound-level limit?

19   A.    My level of expertise is such that I can

20   generally look at numbers and pick one of three

21   categories:  One, I don't think we're going to have

22   any trouble meeting this standard; two, I'm not sure

23   about this; and, three, I can't see how we can

24   possibly meet this standard.  If it's Situation



1    No. 1, I don't need an acoustic engineer.  If it's

2    Situation 2 or 3, I do need an acoustic engineer.

3    This is a Situation 2 or 3.

4         Q.    Okay.  So you would call somebody in?

5         A.    I would.

6         Q.    Okay.  And you would defer to their

7    judgment on this issue?

8         A.    Yes.

9         Q.    Okay.  And in your report -- again, I

10   want to just go back to this.  What you say in your

11   report sounds like the city council has singled out

12   firing ranges for something.  That doesn't seem

13   fair.  Again, I'm totally putting that in my own

14   words.

15         But is that the basic gist of what you're

16   saying there?

17        A.    Yes.  I guess is my -- my position that

18   if manufacturing -- if there are a variety of uses

19   that the city council has deemed as being

20   appropriate manufacturing districts and all of those

21   uses save one, shooting ranges, don't have sound

22   restrictions in a manufacturing district, then why

23   has shooting ranges been singled out -- that there

24   are sound restrictions for shooting ranges when



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 234 of 330 PageID #:5565

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        234

1  nothing else in a manufacturing district has such a

2  restriction?

3       Q.    But, again, what you're doing is you're

4  questioning the judgment of city council; right?

5       A.    Yes.

6       Q.    You're not actually opining as to whether

7  this provision can actually be complied with?

8       A.    That's correct.

9       Q.    Okay.  And, again, you would defer on

10 that question to a sound engineer?

11      A.    I would.

12      Q.    Okay.  So you don't know whether

13 compliance of this is possible?  You don't know?

14      A.    Yes, I do not know whether it's possible.

15      Q.    And you don't know whether it's

16 economically feasible to comply with this provision?

17      A.    I do not know whether it's economically

18 feasible.

19      Q.    And you don't know whether this provision

20 would affect the profitability of a range?

21      A.    If the range can't be built, then the

22 range can't possibly be profitable.

23      Q.    Correct.  But assuming the range can be

24 built, are you -- you don't know whether this would



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 235 of 330 PageID #:5566

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        235

1    affect profitability?

2        A.    That's correct.

3        Q.    Okay.  And you haven't done any research

4    into what the cost of compliance with this provision

5    would be?

6        A.    No.

7        Q.    Haven't looked at any studies or anything

8    like that?

9        A.    No.

10       Q.    Other than conversations with Mr. Sigale

11   or Mr. Giordano, have you discussed this provision

12   with anybody else?

13       A.    I have not.

14       Q.    So no one's told you they would not come

15   here because of this provision?

16       A.    No.

17       MR. AGUIAR:  Off the record for a second.

18              (WHEREUPON, discussion was had off

19              the record.)

20       MR. AGUIAR:  Let's go back on.

21   BY MR. AGUIAR:

22       Q.    Let's move along to Issue No. 16.

23              And there you're challenging or saying or

24   taking exception to Provision 13-96-1200 Subpart



1   (b)(7) and Subpart (b)(2); correct?

2        A.    Yes.

3        MR. SIGALE:  I'm sorry.  I'm really torn

4   whether to do this, but I would probably just as

5   soon ask the question.  So I'm going to ask you off

6   the record real quick.

7                  (WHEREUPON, discussion was had off

8                  the record.)

9   BY MR. AGUIAR:

10       Q.    Let's move along to Issue 16.  And,

11  again, I think I just said we're looking at

12  Section 13-96-1200 (b)(7) and (b)(2).  You can look

13  at them in Exhibit 3 'cause those, I don't believe,

14  were changed.

15       A.    Okay.

16       Q.    Or at least the provisions -- the parts

17  that are relevant were changed.

18                  (WHEREUPON, discussion was had off

19                  the record.)

20  BY MR. AGUIAR:

21       Q.    And in your report you say that these two

22  provisions create a conflict with one another.

23  Would you explain to me what the conflict is.

24       A.    Okay.  What we've got identified here is



not just a city of Chicago problem; it's an industry-wide problem. The problem we have here is, is that the City of Chicago has tried to put this in an ordinance, which now means that the individual licensed professionals don't have an opportunity to make a judgment as -- as to how to handle this conflict.

The conflict that we've got is, is that from an environmental -- environmental lead standpoint, I -- I understand where this is coming from. From an environmental lead standpoint, people who deal with the management of lead want the surfaces to be smooth and nonporous because that makes them easier to clean. The people who deal with sound, which is a different set of statutes, they want materials that reduce sound reflection in the room.

It happens that in the industry that materials that stop sound reflection are all materials that are porous and are rarely materials that are smooth. And the reason that is -- is, is the way you stop sound reflection is the sound is, is carried in the air; so you have to have -- to stop sound reflection or limit sound reflection, you

1    have to have a material that the air will penetrate.

2    If the air will penetrate it, it's going to be

3    porous.  That's just the way it works.

4            So on the one hand, your or -- one

5    section of your ordinance is saying that the

6    surfaces all have to be smooth, nonporous surfaces.

7    Other sections say that you need to deal with sound

8    reflection, and both of those are good goals.

9    Generally what we do in the industry is we make

10   value judgments in the surfaces.

11           So I'm going to give you some examples.

12   This may be somewhat dangerous, but I'll give you

13   examples of what I would do.  The floor -- I would

14   make the floor something easy to clean.  And the

15   reason that I would do that is, is because the

16   surface that gets the majority of the lead on it is

17   going to be the floor; so I would make that a

18   surface.

19           I would err towards cleaning for lead,

20   smooth, nonporous as much as possible.  And I would

21   forget about making it acoustic.  I would not, for

22   example, put carpet on the floor of a range.  That

23   would be a bad idea.

24           On the walls behind the shooter, there



1   shouldn't be lead in that location.  So I would tend

2   to make that acoustic material, which by its very

3   nature would not be smooth and would not be

4   nonporous.  It would be something that is an

5   acoustic product which is going to be porous and

6   probably not smooth.

7            On the surfaces of the walls going down

8   range, that becomes kind of a fielder's choice.  And

9   on the surfaces of the ceiling where the

10  baffle plates are, that also becomes a value

11  judgment.  But the effect of the ordinance as

12  written, if you have to have all of the surfaces

13  that you're dealing with being smooth and nonporous,

14  you're not going to have any acoustic material in

15  there to cut down on the sound reflection in the

16  range.

17       Q.    Okay.  Well, let's start with the concept

18  that there is a conflict here.  Okay?  Subpart

19  (b)(2) says, "The shooting range shall be provided

20  with airborne and structure-borne sound-absorbing

21  materials"; correct?

22       A.    Correct.

23       Q.    It says "provided with."

24            Are you interpreting that to mean that



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 240 of 330 PageID #:5571

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        240

1   the walls all have to be soundproof?

2         A.    No.   What I'm interpreting that -- and to

3   make sure we're clear on this is, is that it's --

4   sorry.   Could you refer me to the subsection you

5   just referred to again?

6         Q.    (b)(2).

7         A.    (b)(2).

8         Q.    I'm up here.

9         A.    Okay.   Thank you.   It refers to

10  "providing airborne and structure-borne

11  sound-absorbing materials."   To start with,

12  structure borne is not an issue in my Issue No. 16

13  that we're talking about.   It's the airborne that is

14  the issue.

15        Q.    And why is that the issue?

16        A.    From a sound-control standpoint, you have

17  two different things that you're trying to deal

18  with.   You're trying to control sound that leaves

19  the range and goes in adjacent spaces or the

20  neighborhood.   That's a structure issue.   A

21  structure-borne, if you will -- that structure borne

22  is not actually terminology that I would -- tended

23  to use, but that's -- that's sufficient for this.

24              The airborne -- that is the sound



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 241 of 330 PageID #:5572

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        241

1   reflection off the wall that comes back and makes it

2   loud for the people who are inside the shooting

3   facility.  So structure borne would protect the

4   people outside the facility; airborne would protect

5   people inside the facility.

6             The way to stop structure-borne sound is

7   through the mass of the wall.  And whether that

8   surface is smooth and nonporous or porous or what

9   have you, it's mass that does the job.  And so we

10  don't have a problem here.

11        Q.   Okay.

12        A.   It's the reflected sound that becomes an

13  issue.  And my read of the statute is, is that it's

14  saying that the surfaces inside that range need to

15  be smooth, nonporous surfaces.  And if they're

16  smooth, nonporous surfaces, then I don't have any

17  place to put any material to cut down on sound

18  reflection inside the range.

19        Q.   Okay.  Well, (b)(7) says that "Floors

20  ceilings, and walls -- the floors, ceilings, and

21  walls of every shooting range shall be constructed

22  of smooth, nonporous materials to facilitate

23  effective maintenance and cleaning and removal of

24  lead particulate."



1          You're saying that everything on those

2    walls has to be smooth, nonporous?  That's your

3    reading of the ordinance?

4          A.    Yes.

5          Q.    Okay.  Isn't it possible the ordinance

6    can be read, though, that as long as you construct

7    the floor, ceilings, and walls of smooth, nonporous

8    materials, whatever you put on them doesn't have to

9    be smooth, nonporous, meaning you could apply

10   sound-absorbing materials that aren't nonporous to

11   those smooth, nonporous walls?

12         A.    I couldn't interpret it that way.

13         Q.    Why not?

14         A.    I -- I just -- it doesn't seem to read

15   that way to me.  I mean, if --

16         Q.    Does it --

17         A.    If -- if that's the intent, I think

18   someone needs to rewrite this; so...

19         Q.    But it doesn't say -- it says "The floor,

20   ceilings, and walls shall be constructed of smooth,

21   nonporous materials."  It doesn't say that the

22   entire surface has to be smooth, nonporous; you

23   can't put something on it which isn't smooth,

24   nonporous.



1      A.    Well, it goes on further to say "They

2   shall be constructed of smooth, nonporous materials

3   to facilitate effective maintenance and cleaning and

4   removing of lead particulate."

5           If the surface to be cleaned is buried

6   underneath acoustic material, how am I going -- how

7   is having a cleanable material going to help me?  I

8   can't even get to it.

9      Q.    In your opinion how much airborne,

10  sound-absorbing materials are necessary in a range?

11  How would you go about putting them in a range?

12  Where are they located?  Are they on every wall?

13  Explain to me what you interpret that to mean.

14      A.    Okay.

15      Q.    I want to know -- you have an objection

16  to airborne materials?

17      A.    Yes.

18      Q.    And you're saying they can't be used

19  because of the floor, ceilings, and walls must be

20  smooth, nonporous; right?

21      A.    Yes.

22      Q.    I just want to back up for a second and

23  find out:  How would you go about providing

24  airborne, sound-absorbing materials?  Where would



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 244 of 330 PageID #:5575

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                    244

1    they be located in the range?  How would you go

2    about configuring them?

3         A.    Okay.

4         Q.    Let's start with the basics.

5         A.    Okay.  As I -- I would put

6    sound-absorbing material on the walls behind the

7    shooter.  I would put them on the side walls behind

8    the firing line.  I would put them on the ceiling,

9    at least behind the firing line and maybe on the

10   ceiling forward of the firing line.

11             And I might, but not always, put -- most

12   often I would not put them on the walls that are

13   down range, and I would never put them on the floor.

14        Q.    Now, when you talk about putting the

15   materials on the wall, are you talking about

16   covering the entire wall with the materials?  Is

17   that what you do?

18        A.    That's typically -- well, the entire

19   portion of the wall that I described as being the

20   portion of the walls that we would put the material

21   on.

22        Q.    Okay.

23        A.    So, yes, the entire portion with the

24   exception of openings, such as windows, doors,



1  ventilation grills, those sorts of things, yes.

2       Q.    So it goes on every aspect of those walls

3  except for the openings?

4       A.    Generally, yes.

5       Q.    The ordinance Subpart (b)(2) in the next

6  sentence that we've been looking at says

7  "Surface-applied or suspended acoustical materials

8  shall comply with Section 15-8-420," meaning you can

9  have suspended acoustical materials, meaning they're

10 not actually applied to the walls.

11           Are you familiar with those?

12      A.    Well, when I see "surface-applied or

13 suspended materials," -- my assumption with the

14 suspended was they were talking suspended from above

15 not suspended from the wall.

16           Like the ceiling system in this room is

17 an acoustical lay-in ceiling tile system that is

18 suspended below the floor structure that's above

19 that.

20      Q.    Okay.  Can you comply with that to

21 suspend the acoustical materials from the ceiling?

22      A.    Let's see.  Okay.  This says "floors,

23 ceilings, and walls."  I would interpret that this

24 suspended acoustic ceiling system that we have in



1   this room is the ceiling in the room, and it is

2   suspended, but it's still the ceiling.  So if I'm

3   suspending something below the roof structure, it is

4   still part of the ceiling.

5          Q.    Now, I'm not a construction person, so

6   bear with me.

7                Isn't it possible, if we use this room as

8   an example, that you can suspend the ceiling such

9   that it doesn't take up the entire area of the room

10  such that it's only -- it comes in maybe 2 feet on

11  each side; therefore, you have exposed ceiling, then

12  you have the suspended beneath it, and that the

13  ceiling ceiling is smooth, nonporous, and then you

14  have your acoustical materials suspended from the

15  ceiling?

16         A.    My interpretation of the ordinance would

17  be that, in the example that you've given, is, is

18  the ceiling that is the structure of the floor above

19  would have to be smooth, nonporous and the suspended

20  ceiling below that that is pulled away from the

21  walls at some distance would also have to be smooth,

22  nonporous because both are ceilings.

23         Q.    But technically it wouldn't be "the

24  ceiling"; it would just be suspended acoustical



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 247 of 330 PageID #:5578

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                       247

1  material?

2       A.    They would both be -- under normal

3  construction terminology, they would both be

4  ceilings.  You can have more than one ceiling.

5       Q.    But you're interpreting the ordinance

6  that way?

7       A.    I'm interpreting the ordinance in -- I'm

8  interpreting the ordinance as an architect would

9  interpret an ordinance that has to deal with floors,

10  walls, and ceilings in the built environment, yes.

11       Q.    So you would not consider a suspended --

12  let me change my hypothetical.

13            What if the ceiling -- say this is one

14  ceiling that's all smooth, nonporous.  And in the

15  middle of the room, they suspended, 2 feet by

16  2 feet, a piece of acoustical material.

17            Would you still consider that to be

18  ceiling?

19       A.    It would, under the construction code, I

20  believe, be counted as part of the ceiling.  It

21  would have to comply with the sections of the

22  building code that applied to ceilings.

23       Q.    And do you know whether that's true in

24  the city of Chicago?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 248 of 330 PageID #:5579

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                     248

1       A.      I've not read the City of Chicago's

2   building code.

3       Q.      Okay.  So you don't know that to be a

4   fact in the city?

5       A.      That's correct.

6       Q.      Okay.  You're just assuming that to be

7   the case?

8       A.      I'm assuming that based on model building

9   codes, yes.

10      Q.      So is it your position anything which is

11  suspended from the ceiling is considered ceiling?

12      A.      No.

13      Q.      So when does it become a ceiling then?

14      A.      Well --

15      Q.      Wouldn't --

16      A.      Using this room as an example, you

17  described to me that there is a -- this is an

18  Internet router that's plugged into the ceiling over

19  here?  Is that what you had described that as being?

20      Q.      Yes.

21      A.      Okay.  That would not be considered a

22  ceiling.

23      Q.      Why not?

24      A.      It's suspended from the ceiling, but it's



LORIN D. KRAMER                                      September 26, 2013
EZELL vs. CITY OF CHICAGO                                         249

 1   not the ceiling.

 2        Q.    What if that were a piece of acoustical

 3   soundproofing suspended from the ceiling?  Would

 4   that piece of acoustical material be considered

 5   ceiling?

 6        A.    If it was suspended vertically?

 7        Q.    Just hung on a little string and hung

 8   down.

 9        A.    That's an interesting question, and I

10   don't know the answer to that.  I would have to go

11   and -- and read the code.  That -- that's -- I --

12   you have me curious.

13        Q.    Okay.

14        A.    That's a good one.  I don't know.

15        Q.    Okay.  Or if, say -- this is going to

16   make for a wonderful record.  I'm holding a piece of

17   paper.  I'm holding it parallel to the table we're

18   sitting at.

19             If there were four -- and say I wanted to

20   suspend this from the ceiling; right?  And I put

21   four little connection points in each corner; right?

22   And I held it up to the ceiling, and I hooked it up

23   to the ceiling that way; so it's suspended from the

24   ceiling but hooked by four different little pieces.



1   Would that be considered part of the ceiling?

2        A.    Yes.

3        Q.    Why?

4        A.    Under the building code.  I --

5        Q.    Why does that become ceiling?

6        A.    I don't know.  It's just how they define

7   it.

8        Q.    Who's "they"?

9        A.    The international building council.

10       Q.    Yet if I turned it this way and hung it

11  by a string from the ceiling, that would not be

12  considered ceiling?

13       A.    I don't know whether it would be.  You --

14  you -- that particular example where it's hung

15  vertically -- I don't know the answer to your

16  question.  It's a very interesting question.

17       Q.    Are you aware of any soundproofing

18  materials that are smooth and nonporous?

19       A.    I am not.

20       Q.    I think you testified earlier that you're

21  not a sound engineer?

22       A.    That's correct.

23       Q.    And do you generally defer on these

24  issues to a sound engineer?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 251 of 330 PageID #:5582

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        251

1      A.    Yes.

2      Q.    Did you do any research into whether

3   there are soundproofing materials -- excuse me --

4   airborne sound-absorbing materials?

5      A.    Could I go back to my last answer quickly

6   here?

7      Q.    Sure.

8      A.    I just realized when you said "defer to

9   an acoustic engineer," I do defer to the acoustic

10  engineer.  But one of the things I've discovered

11  with acoustic engineers is, while they understand

12  sound reflection, they don't understand things like

13  cleaning for lead and damage to acoustic material by

14  being struck by a bullet.  And so while an acoustic

15  engineer might recommend XYZ product, is, is that I

16  would want to look at that product and say yes or no

17  as is to whether it's an acceptable product to put

18  in a shooting range environment.

19     Q.    Did you do any research into whether

20  there are soundproof materials that are smooth and

21  nonporous?

22     A.    Yes.

23     Q.    When did you do that research?

24     A.    Within the past two weeks.



1          Q.    In preparation for today's deposition?

2          A.    Yes.

3          Q.    But not at the time you wrote your

4    report?

5          A.    That's correct.

6          Q.    And what did your research unveil?

7          A.    My research was limited to making two

8    phone calls, one each to two acoustic engineers that

9    I've used in past projects, one of which turned out

10   to be retired.  And so, therefore, I could not get

11   ahold of him.

12          And the other of which I asked a simple

13   generic question:  I said, "Have you ever heard of a

14   smooth, nonporous acoustic panel?"  And his response

15   was, "No."

16          Q.    Other than that phone call, did you do

17   anything else?

18          A.    No.

19          Q.    Have you ever heard of something called

20   "VICTREX"?

21          A.    I read -- one of the depositions I read

22   had a reference to VICTREX.  I had not heard of it

23   before, and I know nothing about the product.

24          Q.    Okay.  You didn't do any research into



1  it?

2      A.    No.

3      Q.    Okay.  And have you ever heard of

4  something called "acoustical tiles" that are smooth

5  and nonporous that are used in, like, recording

6  studios?

7      A.    I have never heard of -- no.  I've --

8  I've never heard of smooth, nonporous acoustic

9  treatment.

10     Q.    And other than speaking with either

11 Mr. Sigale or Mr. Giordano about this provision,

12 have you spoken to anybody else about this

13 provision?

14     A.    Well, I tried to two -- call the two

15 acoustic engineers and spoke to one of them.

16     Q.    Other than that conversation and the ones

17 you've had with counsel or with Mr. Giordano,

18 anybody else?

19     A.    No.

20     Q.    Has anybody told you they would not open

21 a range because of this provision?

22     A.    No.

23     Q.    Let's move on to Issue No. 17.  Here you

24 take issue with Section 13-96-1210 (d).  And that



1    is, I believe, on the next page or next couple pages

2    of Exhibit 3.  And there the requirement is:  "Where

3    a shooting range facility contains multiple shooting

4    ranges, each shooting range shall be provided with a

5    separate ventilation and exhaust system"; correct?

6         A.    Yes.

7         Q.    And what's your objection to this?

8         A.    Well, as stated in my report, is, is that

9    there are very significant costs associated with the

10   range ventilation system.  So if you have a

11   situation where you have -- let's say you have a

12   range where you've got two shooting bays, or rooms,

13   each with four shooting positions in it.  That could

14   easily be accommodated with one ventilation system

15   for both range -- ranges.

16             But if you're building a separate

17   ventilation system for each range, then you have two

18   times the cost for the ventilation system.  And the

19   ventilation system is a very large portion of the

20   cost associated with construction of the range.

21        Q.    What percentage of cost is a ventilation

22   system for a range?

23        A.    I'd say that the ventilation system --

24   ventilation systems are on the order of -- I would



1  say that we're in the vicinity of 15 to 20 percent

2  of the cost of the facility.  If it's going in an

3  existing building, it could easily be higher than

4  the 15 or 20 percent number.  It could be double

5  that.

6      Q.    Okay.  Let's start with the premise that

7  the ordinance says "Where a shooting range facility

8  contains multiple shooting ranges, each shooting

9  range shall be provided with a separate ventilation

10 and exhaust system."

11         So it's only when there are multiple

12 ranges that this is required; correct?

13     A.    Correct.

14     Q.    So if a range -- if there's only one

15 range in the facility, it's one system?

16     A.    Correct.

17     Q.    So a range owner potentially could,

18 rather than opening, as you say here a -- you talk

19 about "two shooting range rooms of four shooting

20 lanes each."

21         That will have additional costs for

22 separate ventilation for the second room; right?

23 That's your position?

24     A.    Right.  That's correct.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 256 of 330 PageID #:5587

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        256

1    Q.    But isn't it possible that the owner

2    could do one range of eight lanes and only have to

3    have one ventilation system?

4    A.    Depends on the build.  The reason it

5    depends on the building is, is that if you're going

6    in an existing building, there are going to be

7    columns and bearing walls where they are.  And those

8    columns and bearing walls are going to limit how

9    wide your range can be.

10            So if you're in a situation where the

11   owner decides they need eight positions, you don't

12   want a row of columns in the center of your range.

13   That's a bad idea.  So instead of building one

14   eight-position range, the -- he's going to build, in

15   this example, two, four-position ranges:  one on one

16   side of the column grid, and one on the other side

17   of the column grid.

18   Q.    But we don't know if that will arise

19   because we haven't been presented with that yet?

20   A.    This -- this section would only apply to

21   ranges where they have a particular situation where

22   they wind up with multiple bays.

23   Q.    And only if the range owner decides to

24   proceed with eight lanes instead of just four, for



LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        257

1   example?

2        A.    Yes.

3        Q.    So, again, we just don't know if this is

4   actually going to become applicable because we don't

5   know where a range owner may try to locate their

6   range and what the parameters of that facility would

7   be -- or the building would be?

8        A.    That's correct.

9        Q.    And, again -- not again, but with respect

10  to new construction, that'd probably be less of an

11  issue, wouldn't it be?

12       A.    With new construction, it would generally

13  be less an issue because you just wouldn't build

14  two, four-position ranges, using my original

15  example, because that's not a cost-effective way to

16  build things.

17       Q.    Okay.  You say that the exhaust system

18  would cost approximately $65- to $70,000 on --

19       A.    I believe I say "$60- to $70,000 more."

20       Q.    Okay.

21       A.    Yes.

22       Q.    Is that the cost of putting in the second

23  exhaust system?

24       A.    Yes.



1      Q.    Okay.  So how did you come up with that

2   cost?

3      A.    The way I came up with that cost...  I

4   don't remember whether I looked at past projects and

5   put numbers together from past projects or whether I

6   called Bill Provencher at Carey's Heating & Air

7   Conditioning and said, Okay, here are two scenarios.

8   Tell me how much Scenario A is, Scenario B is, and

9   then did the math to figure out the difference.  I

10   don't remember which one of those methods I used.

11      Q.    Did you keep any work papers as to how

12   you got that number?

13      A.    No.

14      Q.    And you don't recall specifically what

15   you did?

16      A.    No, I don't -- I don't remember which of

17   those -- those would have been the only two methods

18   I would have had to come up with that number, and I

19   don't recall which one of those two methods I used.

20      Q.    Are you opining that this provision makes

21   a range impossible to open in the city of Chicago?

22      A.    No.

23      Q.    Are you saying that it makes it

24   economically infeasible?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 259 of 330 PageID #:5590

LORIN D. KRAMER                                      September 26, 2013
EZELL vs. CITY OF CHICAGO                                          259

1        A.      Ventilation systems are very expensive;

2    so in some situations, it could push the cost of

3    construction to a point where it was not

4    economically feasible to work.

5        Q.      And that would be if the range owner

6    decided to select a site which required him to have

7    two separate ranges with two separate ventilation

8    systems?

9        A.      Yes, that's correct.

10       Q.      That range owner could also decide to

11   move on to a different location?

12       A.      Assuming they could find another location

13   that didn't have that problem, that would be

14   correct.

15       Q.      Are you saying that this provision makes

16   it unprofitable to open a range in the city of

17   Chicago -- excuse me -- or would make a range

18   unprofitable in the city of Chicago?

19       A.      If it -- if it drove up the cost of

20   construction -- it -- it could theoretically drive

21   the cost of construction up to a point where the

22   range would not be profitable.

23       Q.      So you're saying that a $65- to $70,000

24   increase in cost could not be recouped over the life



1    of the business of a shooting range?

2         A.    I suppose that's completely possible,

3    that it might not be recouped, yes.  There are also

4    the operating costs as well.  The operating costs

5    get to be greater when you have two -- the two

6    separate systems as well.

7         Q.    But you don't opine upon that in your

8    report?

9         A.    You're correct.

10        Q.    What's your basis for saying that a $65-

11   to $70,000 construction cost up front could not be

12   recouped over the life of a business?

13        A.    Well, there is -- there is some point

14   where you have a certain amount of capital expense.

15   You also have your operating expenses.  And when you

16   mash all that together and work it out over time,

17   it -- it either works out mathematically that you

18   make a profit and you stay in business or you lose

19   money and you go out of business.

20             At some point you add enough money to the

21   construction cost of the project that those initial

22   numbers, when they add up, you don't make enough

23   money off of your operation to be profitable; you're

24   in the negative.  If you're in the negative long



1    enough, you go out of business.

2        Q.    I understand why that would come to be.

3            My question is:  What's the basis for

4    saying that this particular cost could potentially

5    have that effect?

6        A.    As opposed to some other cost, you're

7    saying?

8        Q.    Correct.

9        A.    There's -- there's no difference between

10   this cost and some other cost.

11       Q.    Okay.  So you're not saying that this

12   particular cost is going to have this effect?  It

13   could be any cost?

14       A.    Correct.

15       Q.    It's also possible the cost could not

16   have an impact on long-range profitability of the

17   range?

18       MR. SIGALE:  I'll just repeat my standing

19   objection to hypothetical possibilities.

20       MR. AGUIAR:  Thank you.

21   BY THE WITNESS:

22       A.    Well, it would have an impact because

23   anything that you had to spend additional money for

24   is, is going to have an impact on your bottom line.



1   BY MR. AGUIAR:

2       Q.    But in terms of being able to become

3   profitable and to recoup these costs, it's possible

4   they could?

5       A.    It -- it's possible over time that you

6   could be profitable with or without spending the

7   $60- to $70,000 extra on the ventilation system.  It

8   would just take you -- in this theoretical example,

9   it would take you longer to reach profitability.

10      Q.    But you don't have any information one

11  way or the other as to how this would play out?

12      MR. SIGALE:  I'm just going to object as to

13  form.

14  BY MR. AGUIAR:

15      Q.    You don't know, as we sit here today,

16  what impact this would have on the -- whether a

17  business could be profitable or not?  You just don't

18  know one way or the other?

19      A.    No.  All I know is, is from the

20  mathematical end is, is that if you spend more money

21  on construction, then it takes you longer to become

22  profitable because you have to offset that money

23  that you have spent.

24      Q.    All I'm saying is you have done no



1   research and have no studies which say that this

2   particular type of cost might have that impact down

3   the road?

4        A.   No.

5        Q.   And forgive me if I asked you this

6   already, but I'm tired and it's late.

7             Have you spoken with anybody about this

8   provision other than Mr. Sigale and Mr. Giordano?

9        A.   No.

10       Q.   So no one's told you they would not come

11  to Chicago because they have to have two separate

12  systems if they have two separate firing ranges in

13  the same facility?

14       A.   No.

15       Q.   Issue No. 18.  Here you take issue with

16  Section 13-96-1210(e) which says that "The supply

17  and exhaust systems shall be electrically

18  interlocked to turn on each system at the same

19  time."

20            And here you're saying that "They are

21  generally staged to prevent their both drawing peak

22  power load simultaneously"; correct?

23       A.   Yes.

24       Q.   And then you say "A power supply from



1    simultaneous loading of all motors would be hard on

2    the power grid; could even result in a localized

3    power grid failure."

4         A.    Yes.

5         Q.    So what you're pointing out, it seems to

6    me, is that our requirement could have an effect on

7    the city of Chicago's power grid?

8         A.    Yes.   That and I would sort of assume

9    that it would be considered a deleterious impact if

10   every time they went to fire up the ventilation

11   system the neighborhood went black.   I -- I would

12   think that that would be a concern for the

13   neighborhood.

14        Q.    Isn't it possible again --

15        MR. AGUIAR:   Mr. Sigale's going to --

16        MR. SIGALE:   Yeah.   I'll just say my objection

17   again.

18        MR. AGUIAR:   Even though every expert dep does

19   this.

20   BY MR. AGUIAR:

21        Q.    You're saying that if this caused a power

22   grid failure every time they fire it up, it would

23   cause a deleterious impact.

24             And that could lead to problems; right?



1   That's your concern?

2        A.    That -- that would be a concern, yes.

3        Q.    Isn't it possible, though, that something

4   like that happened every time they flipped the

5   switch, they would find a way to fix the system, as

6   opposed to finding a deleterious impact and not

7   renewing the license?

8        A.    Well, the -- the range owner doesn't have

9   the ability to fix the sys -- the -- the fix to the

10  system is, is to stage the exhaust and the supply

11  air into the unit so they do not come on

12  simultaneously.  They can't do that because of this

13  provision.  That -- that's the solution to the

14  problem.

15       Q.    So you're presuming that the commissioner

16  is going to find a deleterious impact because the

17  range was complying with the ordinance requirements

18  and causing a blackout?  That's your presumption?

19       A.    That was my assumption in that statement,

20  yes.

21       Q.    So it's based on the idea that a range

22  that's just complying with the ordinance, doing

23  nothing wrong, and they caused these power problems,

24  the commissioner's going to say, You're responsible



1    for complying with the ordinance, deleterious

2    impact, you're out of business?  That's your

3    presumption?

4        MR. SIGALE:  I'm going to object as to the form

5    of the question, and it's very argumentative, which

6    I'll give you half a pass on because it is late

7    but --

8    BY MR. AGUIAR:

9        Q.    But is that your presumption?

10       A.    Well, if I were in a position where I was

11   routinely getting phone calls from hacked-off

12   neighbors because their power goes down once a day

13   when the range is, is turned on, I think I would --

14   if I was the one who held the switch on the

15   deleterious impact sort of thing, I would be marking

16   black marks on the list for that.

17       Q.    Okay.  You would be?

18       A.    I -- I would be.  I -- I think that would

19   be human nature.  If you're getting a lot of phone

20   calls complaining about something, I -- I would

21   think that you would take note of that.

22       Q.    But presumed within that would be the

23   idea that the commissioner is going to hold the

24   range accountable for something that they have done



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 267 of 330 PageID #:5598

LORIN D. KRAMER                                  September 26, 2013
EZELL vs. CITY OF CHICAGO                                      267

1   because they're complying with the City ordinance;

2   right?

3          A.     That is part of my presumption, yes.

4          Q.     Okay.

5          A.     Yes.

6          Q.     And, again, this doesn't go to the cost

7   of opening a range, does it?  Or does it?

8          A.     That's an interesting question, and I'm

9   not sure I know the answer to that.  And the reason

10  I don't know the answer to that is, is because I

11  deal with a limited number -- two -- ventilation

12  companies that know what they're doing when it comes

13  to ventilation systems for shooting ranges because I

14  know they understand how to do it.  And both of them

15  stage their systems so that they do not come on

16  simultaneously.

17          What I don't know is, is that -- would

18  they do a system that is different from their

19  standard system, that is one where they both come on

20  simultaneously?  If -- if they won't, then I -- I

21  don't know how to get the ventilation system

22  designed correctly, 'cause there are no more experts

23  left.

24          Q.     But you don't know that to be the case,



1   as you sit here today?

2        A.    That's right.

3        Q.    In your report you don't identify any

4   additional cost to the range owner to comply with

5   this provision, do you?

6        A.    And the costs are unknown because I've

7   never done a system that was interlocked the way the

8   ordinance is described.  I don't know who would do

9   that; so I don't know what the cost would be.

10       Q.    But you don't identify it as an issue in

11  your report, do you?

12       MR. SIGALE:  Objection.  Objecting to the form,

13  use of the pronoun.  What's the "it"?

14  BY MR. AGUIAR:

15       Q.    You don't refer to anything to do with

16  cost in your report, do you?

17       MR. SIGALE:  Oh.

18  BY THE WITNESS:

19       A.    For issue 18?

20  BY MR. AGUIAR:

21       Q.    Correct.

22       A.    That's correct.

23       Q.    And have you done any research into the

24  city of Chicago's power grid?



1      A.    No.

2      Q.    So you don't know whether it would have

3  an impact on the power grid?

4      A.    I do not know that it would have an

5  impact on the power grid.

6      Q.    So this is just speculation?

7      A.    This is speculation based on some

8  experience.

9      Q.    What experience is that?

10     A.    Experience is -- I am aware of --

11  you're -- you've heard the name Bill Provencher from

12  Carey's Heating & Air Conditioning who is -- I

13  believe, is, is located in the Chicago metroplex

14  area.  He is one of the people who specializes in

15  ventilation systems.  He is also one of the people

16  who has spoken at NRA range conferences before on

17  ventilation.

18          And I know from speaking with him and

19  from hearing him at conferences is, in the days

20  before he really learned how to do a ventilation

21  system correctly, he had done systems where the

22  supply and exhaust air sides were not staged but

23  were interlocked to come on simultaneously.  And I

24  know that he has said that he had several episodes

Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 270 of 330 PageID #:5601

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        270

1  where he knocked the power grid out for the

2  neighborhood before he learned, oh, we shouldn't do

3  this.

4       Q.    But that's based on what he said at this

5  conference?

6       A.    That's correct.

7       Q.    You've done no research of your own?

8       A.    Other than talking to him.

9       MR. SIGALE:  I'm going to object.  I'm going to

10 object because going to a conference and listening

11 to a speaker qualifies; so...

12 BY MR. AGUIAR:

13      Q.    Well, I'm saying research of your own

14 besides that?

15      MR. SIGALE:  Okay.  Besides that.

16 BY THE WITNESS:

17      A.    Besides that?  Yes.  Okay.  Not besides

18 that.

19 BY MR. AGUIAR:

20      Q.    But, again, you know nothing about the

21 city of Chicago's power grid?

22      A.    That's correct.

23      Q.    You don't know what the capabilities are

24 of that power grid, do you?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 271 of 330 PageID #:5602

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        271

1      A.    That's correct.

2      Q.    We're a city that has very tall

3  buildings, do we not?

4      A.    Yes.

5      Q.    We have the Willis Tower which is the

6  tallest building in North America --

7      A.    Yes.

8      Q.    -- at least it was until the

9  Freedom Tower.

10           And are you aware of blackouts at the

11  Willis Tower that they caused based on their power

12  systems?

13     A.    I have no idea whether they've had

14  blackouts or not.

15     Q.    Because you haven't looked at it?

16     A.    That's correct.

17     Q.    So you have no idea whether this actually

18  would have any truth in application in the city of

19  Chicago?

20     A.    That would be true.

21     Q.    Has anyone ever told you they would not

22  open a range in the city of Chicago because of this

23  provision?

24     A.    No.



LORIN D. KRAMER
EZELL vs. CITY OF CHICAGO

September 26, 2013
272

1    Q.    Are you saying that this makes it

2  impossible to open a range in the city of Chicago?

3    A.    No.

4    Q.    Are you saying it makes it economically

5  infeasible to open a range in the city of Chicago?

6    A.    Because I don't know what the costs are

7  associated with doing a ventilation system that

8  applies to this, I guess I can't say for sure

9  whether it would make it economically infeasible

10  'cause I -- I only know costs associated with doing

11  a system that is staged, not interlocked.  I don't

12  know what the system costs would be for interlocked.

13    Q.    So you can't opine one way or the other?

14    A.    No, I can't.

15    Q.    And is the same true for whether this

16  thing makes a business unprofitable?

17    A.    Yes, that would be true; I would not know

18  whether it would make the business unprofitable.

19    Q.    And you're not an electrician; right?

20    A.    No.

21    Q.    You've never worked for a power company?

22    A.    That's correct.

23    Q.    Never dealt with a power grid failure

24  before?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 273 of 330 PageID #:5604

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        273

1          A.     I'm sorry?

2          Q.     Never had to address a power grid

3     failure?

4          A.     Had to address a power grid failure.

5          Q.     In terms of you went out and investigated

6     it and figured it out and fixed it?

7          A.     Oh, in that terms, no.

8          Q.     All right.  Let's move along to Issue

9     No. 19.  Here you're taking issue with 13-96-1220(b)

10    and (c).  And would you please explain to us what

11    your objection is to this provision.

12         A.     Okay.  I'm just going to briefly give you

13    a very short history on this because I think I know

14    where this provision comes from.  And from a history

15    standpoint, back in the 1970s, the recommendation

16    was to wet-clean range floors and to hose and mop to

17    a floor drain.

18              The problem with that is, is over time we

19    discovered that what happens is the -- when you

20    shoot the -- there's gunpowder involved in the

21    process of shooting.  Not all of that gunpowder is

22    combusted.  Some of the gunpowder leaves the muzzle

23    of the gun and winds up on the floor.

24              That uncombusted gunpowder we call "green



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 274 of 330 PageID #:5605

LORIN D. KRAMER                                        September 26, 2013
EZELL vs. CITY OF CHICAGO                                            274

1   powder."  That's the terminology in the industry.

2   When you mop all that stuff or hose all of that

3   stuff down to a floor drain, the floor drain

4   starts -- the trap of the floor drain starts to get

5   filled up with this uncombusted powder.  And small

6   amounts over time eventually start becoming large

7   amounts.

8        The problem with modern smokeless

9   powder -- in the old days of black powder, which

10  we're generally not using on indoor ranges -- when

11  that gets wet, it is no longer a combustible.  It's

12  basically inert forever.  Smokeless powder, on the

13  other hand, is not that way.  It is -- it getting

14  wet does not mean that it is no longer combustible.

15       When you build up green powder in a floor

16  drain, that -- if -- if -- let me back up.

17       If you have uncombusted powder and it's

18  sitting in the open on a surface and it gets ignited

19  through spark, it will combust rapidly out in the

20  open.  And while it may be a little scary, it is

21  generally nondangerous.

22       On the other hand, if you take that

23  material and you put it into a floor drain, you now

24  have an enclosed space.  And what has happened on



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 275 of 330 PageID #:5606

LORIN D. KRAMER                                        September 26, 2013
EZELL vs. CITY OF CHICAGO                                            275

1    enough ranges that the industry has changed their

2    mind on the issue of floor drains is spark has been

3    dropped down into a floor drain by some means:  a

4    repair with a -- just something has caused a spark

5    to go down in a floor drain.  And the floor has

6    blown up, which is clearly not a good thing, having

7    shrapnel of concrete and floor drain flying into the

8    air.

9            So the industry back in, I would say --

10   I'm going to estimate late '80s, early '90s --

11   changed its mind that wet mopping is, is not the

12   preferred way of cleaning the floor.  Wet mopping or

13   hosing is not the preferred method for cleaning the

14   floor of an indoor range.  The preferred method is

15   to use a HEPA vac, a dry method with a HEPA vac,

16   which alleviates the problem that I've just

17   described.

18           So my issue here with the floor drain --

19   you probably can see where I'm going with this --

20   is, is that the industry says, Don't do a floor

21   drain.  And as a licensed professional architect, I

22   will not put my seal or signature on a set of

23   drawings that's got a floor drain on an indoor range

24   because I consider it dangerous.



1          There are also some other things in here
2     I've described in terms of -- floor drains can be
3     deflection hazards and things like that.
4     Generally -- for the most part, I don't tend to
5     worry about those because in my mind, if you don't
6     have a floor drain, I don't have to worry about a
7     bullet deflecting off of a floor drain.  And it's my
8     position -- and I know it's currently NIOSH's
9     position, and it's also NRA's position -- you should
10    not have floor drains on an indoor range.
11         Q.    But the NRA sourcebook, up until last
12    year, did include floor drains, did it not?
13         A.    That's correct.  Their -- their policy --
14    their -- if you had called them on the phone and
15    asked them, Should I have floor drains on the range?
16    they would say, No, don't put a floor drain on your
17    range.  The actual document, the NRA range
18    sourcebook -- I was about to say years, but it was,
19    I think, well over a decade before they got around
20    to actually changing it to match their policy.
21         Q.    So anybody who did not call the NRA
22    directly but instead got the sourcebook -- which I
23    think you testified is, like, one of the sources you
24    use in designing a range?



1        A.    Correct.

2        Q.    -- would have opened the book and see

3   that floor drains are acceptable, up until the

4   version of last year?

5        A.    Up until the newest version of the

6   sourcebook, which was -- I believe you're right, it

7   was 2012.

8        Q.    That's what Mr. Giordano testified to.

9        A.    I think he -- yes, I'm sure he's correct

10  on that.

11       Q.    But let's leave that aside for a second.

12             What you're identifying are safety

13  concerns; correct?

14       A.    Yes.

15       Q.    Okay.  But the city council of Chicago

16  has through legislation made the determination that

17  they prefer a different method of doing this;

18  correct?

19       A.    I -- I assume.  I -- I -- I don't know

20  the rationale for asking for a floor drain but...

21       Q.    But through the ordinances, they've

22  spoken that they prefer a different method of

23  cleaning?

24       A.    That's correct.  I -- you -- you have



1   refreshed my memory.  That's correct.  They said

2   they prefer a wet method.

3        Q.    Yes.

4        A.    I -- I do remember that now.

5        Q.    Yeah, that's what I saw in the ordinance.

6        A.    Yeah.  Uh-huh.

7        Q.    And that's what you're saying is not

8   safe?

9        A.    Correct.

10        Q.    That, again, is a safety issue.

11              It doesn't really go to whether a range

12   can be constructed in the city of Chicago, does it?

13        MR. AGUIAR:  Let me strike the question.

14   BY MR. AGUIAR:

15        Q.    Are you saying that compliance with the

16   City's provisions is technically infeasible?  You

17   can't comply with it?

18        A.    Maybe.

19        Q.    Why "maybe"?

20        A.    I believe that the city of Chicago, like

21   most cities in the United States, will require a

22   building permit to build this facility.  They will

23   also require documents, specifically drawings and

24   specifications, to be prepared by licensed



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 279 of 330 PageID #:5610

LORIN D. KRAMER                                      September 26, 2013
EZELL vs. CITY OF CHICAGO                                          279

1  professionals, like licensed architects such as

2  myself.

3          Any licensed architect who knows what

4  they should and shouldn't be doing in terms of this

5  floor-drain-on-indoor-ranges issue, should refuse to

6  prepare documents and affix their seal and signature

7  to those documents if it has a floor drain on it.

8  And if you can't get licensed professionals to

9  prepare the drawings, then you're not going to be

10  able to get a building permit and not be able to

11  build the range.

12      Q.    It's your opinion that an architect

13  shouldn't sign off on a floor drain?

14      A.    That's correct.

15      Q.    But you're not saying that's the law?

16  There's no law that says an architect can't sign off

17  on a floor drain?

18      A.    That's correct.

19      Q.    So there may be architects out there

20  who --

21      MR. AGUIAR:  Strike that.

22  BY MR. AGUIAR:

23      Q.    Have you surveyed architects to determine

24  whether they would ever sign off on a floor drain?



1      A.    No.

2      Q.    Okay.  So there may be architects out

3  there who think a floor drain is just dandy?

4      A.    It's possible.

5      Q.    And they would sign off on the range?

6      A.    It's possible.

7      Q.    And if the City requires it, wouldn't

8  that lead an architect to say, Well, the city's

9  requiring it; so, therefore, it must be okay, I'm

10  going to sign off on it?

11      A.    It wouldn't me but it might someone else.

12      Q.    Okay.  The bottom line is you just don't

13  know, as you sit here today, whether there are --

14  whether there are no architects who won't sign off

15  on this?

16      A.    That's correct.

17      MR. SIGALE:  Just going to object to the form.

18  BY MR. AGUIAR:

19      Q.    And if an architect were to sign off on

20  it and get the building permit -- and they get a

21  building permit, there would be no concern; then

22  compliance is technically possible?

23      A.    Okay.  I think I need you to rephrase the

24  question.



1      Q.    Certainly.  It's getting late in the day.

2      A.    Yeah, I -- I didn't -- sorry.

3      Q.    You were expressing a concern that it

4  would be difficult to get a building permit because

5  no architect would sign off on a floor drain.

6           Wasn't that what you said?

7      A.    I -- I think I said, "No architect should

8  sign off on a floor drain."  But yes.  Okay.

9      Q.    But so some may?

10     A.    Yes.

11     Q.    And if an architect signs off on it, then

12  the range can proceed?  The range can get a building

13  permit and proceed with construction?

14     A.    They -- yes.  They could -- they could

15  proceed with construction, yes.

16     Q.    So technical compliance with these two

17  provisions is possible?

18     A.    It may be possible.

19     Q.    And the only thing you see standing in

20  the way is whether an architect would sign off on

21  it?

22     A.    No.  The other thing I would see is, is

23  that if an OSHA inspector who is knowledgeable about

24  shooting ranges and had researched the literature



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 282 of 330 PageID #:5613

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        282

1  with NIOSH documents and, et cetera -- they might

2  cite the range for having a floor drain.  I'm not

3  saying they would but they could.

4       Q.    Is there an OSHA regulation that says you

5  cannot have a floor drain?

6       A.    No.

7       Q.    So what would be the basis for citing the

8  range, then?

9       A.    It would be based on safety.

10       Q.    But there's no regulation which says you

11  can't do it that way?

12       A.    The regulations that OSHA have are very

13  broad.  The regulations that OSHA has under the Code

14  of Federal Regulations, the term "shooting range"

15  does not appear in them at all.  But they do deal

16  with things like are you do -- are you doing

17  something that is unsafe for the people who are in

18  the facility?

19            If an OSHA regulator were to pull out the

20  standards that NIOSH puts together, which is

21  materials that they have access to that they can

22  look at, they might look at that and they might go,

23  Okay, in your hazard assessment, you did not

24  identify that you have a floor drain.  It -- it



```
 1   would be unlikely that OSHA would cite, but it would

 2   not be impossible that OSHA could cite.

 3        Q.    Again, you just don't know?

 4        A.    That's correct.

 5        Q.    You also mention in your report that the

 6   sloping of the floor has no benefit if there's no

 7   floor drain; correct?

 8        A.    Yes, I believe that's correct.

 9        Q.    But here the City requires a drain; so

10   sloping of the floor has a benefit?

11        A.    I can see that that's a logical

12   extrapolation, yes.

13        Q.    'Cause you need to have it go -- the

14   water needs to go down into the drain, and the slope

15   helps that happen; correct?

16        A.    Yes.  To be -- to be fair about it,

17   though, is, is when it comes to floor drains, not --

18   in the construction industry, not all floor drains

19   are at the bottom of a sloped floor.  Sometimes the

20   floor is level, and you have a floor drain.

21             I'll give you an example.  Toilet rooms,

22   for example, it's not uncommon to have a floor drain

23   in a toilet room and the floor to be level and the

24   janitor just mops to the drain.  So the -- having a
```



1    floor drain -- you could have a functional floor

2    drain without sloping the floor.  But sloping the

3    floor without a floor drain wouldn't make any real

4    sense.

5         Q.    But we require it.  As I said earlier, we

6    require the drain; so it makes sense to have one.

7    Or does it make having one make no sense?  Does that

8    make sense?

9         A.    No.  I'm -- I'm --

10        Q.    We require a drain; so the slope of the

11   floor has a purpose, in other words?

12        A.    Correct.  I would agree with that

13   statement.

14        Q.    Okay.  You say, "It adds additional

15   construction cost."  What did you mean by that?

16        A.    Well, obviously, there's the cost -- if

17   you're building -- if you're building in an existing

18   building, as an example, is -- if you're putting a

19   floor drain in where there isn't a floor drain,

20   you're going to have to saw cut up the existing slab

21   and put the floor drain in and run the floor

22   drain -- pay for the floor drain, run the floor

23   drain through whatever interceptor there is into the

24   sanitary sewer.  That all has money involved with



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 285 of 330 PageID #:5616

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        285

1   it.

2          The sloping floor -- if you're building a

3   sloping floor in a new building, one -- one that

4   doesn't exist, building the floor with a slope costs

5   a little bit more than having a level floor.  If

6   you're building a floor that is a sloped floor in a

7   building that already has a level floor, you've got

8   to saw cut and jackhammer out the entire floor.

9   You've got to dig down, and you've got to recast a

10  new floor that is sloped at the quarter inch per

11  foot that is in the ordinance.  And that's done over

12  a fairly large area 'cause you're talking sloping

13  the entire floor.  So there's a fair amount of money

14  associated with that.

15      Q.    Have you done anything to estimate what

16  that would actually be?

17      A.    I've done some mental gymnastics with it,

18  and I've come to the conclusion that, if you're in

19  an existing building, I would expect that the cost

20  would be somewhere in the vicinity of $20 a square

21  foot.

22      Q.    And why isn't that in your report?

23      A.    Because I did that after the report.  I

24  did that about two weeks ago.



LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        286

1        MR. AGUIAR:  Again, I renew my assertion that

2    anything not in the report, we will maintain our

3    objection to being used as evidence in this case, as

4    having not been disclosed properly to us prior to

5    the deposition.

6        MR. SIGALE:  Well, you know, I'm --

7        MR. AGUIAR:  I'm just reserving my rights,

8    David.

9        MR. SIGALE:  Well, no.  I'm just going to

10   reserve that our witness disclosure specifically

11   stated that he would testify regarding what was in

12   his report and what was discussed at the deposition.

13   And especially since there's multiple issues

14   regarding these ordinances that have only come about

15   in the last couple of weeks, you know, it seems like

16   this -- everything seems to -- about this seems to

17   be ebbing and flowing and constantly shifting.  So

18   your objection's noted but...

19       MR. AGUIAR:  And just for the record, I just

20   want to make one more statement in response to that.

21   This provision has not been altered since this range

22   ordinance was enacted back in 2011.

23       MR. SIGALE:  This one hasn't; but, I mean, half

24   of them have.  And, you know, everything has been --



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 287 of 330 PageID #:5618

LORIN D. KRAMER                               September 26, 2013
EZELL vs. CITY OF CHICAGO                                  287

1  virtually everything has been shifting about this

2  case since -- since this ordinance -- the gun range

3  ordinance in its collective state was first enacted.

4      MR. AGUIAR:  Okay.  Well, we've made our

5  record.

6  BY MR. AGUIAR:

7      Q.    And how did you come to $20 a foot?

8      A.    $20 a foot is, is that -- you'd have the

9  saw cutting and the demolition of the concrete slab,

10  the removal of the existing concrete slab, the earth

11  work to dig down so that you can get a depressed

12  slab, the recasting of a new concrete slab where the

13  old concrete slab is.  What I did not count in is in

14  some cases the building might require underpinning

15  of the foundations.  That would be costly, but I

16  made the assumption that that would not be the case

17  in this situation.

18          I also made the assumption that we were

19  talking about something that was slab on grade, not

20  an elevated floor.  If it's an elevated floor, the

21  cost would go way up.

22      Q.    You said, "mental gymnastics."

23          So what do you mean by mental gymnastics?

24  Just in your head?



1    A.    Based on my knowledge of past projects

2  I've done and construction costs associated with

3  doing various parts of those is -- you know, I -- I

4  have an idea right off the top of my head is, is how

5  much it costs to cast a slab and how much it costs

6  to -- to, you know, dig holes.  And so you just put

7  those numbers together, and it's not a lot of math.

8    Q.    But that's just an estimate in your --

9    A.    It is.  It's a -- it's a conceptual

10  budget estimate not a contractor's cost.

11    Q.    Again, it's just based on your experience

12  in the past?  It's not based on any additional

13  research you did into the cost of doing this?

14    A.    That's correct.

15    Q.    Are you saying that these ordinances make

16  it impossible to open a range in the city of

17  Chicago?

18    A.    I would say the sum total of these

19  ordinances --

20    Q.    I meant the floor drain and the slope.

21    A.    Oh, the floor drain.  Okay.

22       This would make it impossible for me to

23  work on the project; so Kramer One would not be

24  working on this project.  Would it make -- I can't



1 | really speak for other architectural firms; so I
2 | don't -- I don't know whether it would be
3 | impossible.
4 |     Q.    Are you saying that it would make a range
5 | economically infeasible?
6 |     A.    If they can't get design documents, can't
7 | get a building permit, and can't construct, it would
8 | be economically infeasible.  But saving that, no, it
9 | wouldn't -- I don't think it would be economically
10 | infeasible.
11 |     Q.    And assuming that they can open a range,
12 | are you saying that this would make a range
13 | unprofitable?
14 |     A.    If they got the range open, I would say
15 | that this would not make it unprofitable, assuming
16 | OSHA did not keep hitting them with fines, which I
17 | doubt they would.
18 |     MR. AGUIAR:  I'm going to take five minutes to
19 | look a couple of things over and we'll come back and
20 | then finish up and then we'll be hopefully done.
21 |     MR. SIGALE:  Well, I mean, I've got a few
22 | questions also; so...
23 |     MR. AGUIAR:  Well, I assumed.  I need five
24 | seconds.



```
 1              (WHEREUPON, a recess was had.)

 2   BY MR. AGUIAR:

 3        Q.    Mr. Kramer, we've gone through all of the

 4   issues that you've identified in your report as you

 5   believe may cause or make it difficult to open a

 6   range in the city of Chicago; right?

 7        A.    Yes.

 8        Q.    And you'd agree with me that, on a number

 9   of provisions, the city council has taken actions

10   which have either repealed the provisions altogether

11   or have modified them in a way which you agreed with

12   me eliminate the concern?

13        A.    That's correct.  There are some like

14   that.

15        Q.    Okay.  How does the elimination of -- I

16   believe to be -- Issue 1 -- let's just go through

17   them.  Issue 1 has been eliminated.

18              And you said, "As long as it's being read

19   a certain way, it may not pose a problem"?

20        A.    Yes.  As -- as I recall, my only question

21   on that is, is whether out-of-state people -- I'm

22   sorry.  No.  I --

23        Q.    No. 1, I think you're fine with?

24        A.    All right.  I am fine with.  I'm thinking
```



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 291 of 330 PageID #:5622

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                     291

1   about a different one.  I apologize.

2        Q.    No. 3 isn't even in the case?

3        A.    Yes.

4        Q.    No. 5 has been eliminated?

5        A.    Yes.

6        Q.    No. 9 has been modified with respect to

7   the distance between firing ranges in the city of

8   Chicago?

9        A.    Yes.

10        Q.    It's been lessened?

11        A.    Correct.

12        Q.    No. 10, assuming that it's -- that people

13   who live out of state do not need a FOID card to

14   shoot at a range, you would agree has been

15   eliminated?

16        A.    Correct.

17        Q.    The sound-level limits have been lessened

18   in Issue 15?

19        A.    Yes, that's correct.

20        Q.    Given that that brings the total to at

21   least six provisions which have either been

22   modified -- 1, 3, 5, 9, 10, and 15 -- that have been

23   either eliminated altogether or modified in a way

24   that lessens the restrictions, how does that impact



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 292 of 330 PageID #:5623

LORIN D. KRAMER                                          September 26, 2013
EZELL vs. CITY OF CHICAGO                                              292

1    your overall opinion on the City's regulatory

2    scheme?

3         A.    That the -- the changes that were made do

4    not have a detrimental impact to opening a range,

5    and the changes that were made lessened some of the

6    burden on someone who would want to open a

7    facility -- open an indoor range facility in the

8    city of Chicago.

9         Q.    And is it still your opinion, though,

10   that the City's regulatory scheme makes it difficult

11   to open a range in the city of Chicago?

12        A.    Yes.

13        Q.    And is that based on the reasons we've

14   discussed here today?

15        A.    Yes.

16        Q.    And based on the research and the

17   information you've collected to date in forming

18   those opinions?

19        A.    Yes.

20        Q.    Okay.  And, again, these are just your

21   perceptions as to how the ordinance may affect a

22   potential gun range from opening up?  You don't know

23   for certain that it actually has the impact you're

24   thinking it may have?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 293 of 330 PageID #:5624

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                    293

1       A.   I believe that would be a correct

2   statement.

3       Q.   Okay.

4       MR. AGUIAR:  I have nothing further for right

5   now.  I reserve the right to ask further questions

6   based on what Mr. Sigale may ask.

7       MR. SIGALE:  Well, just for the record here,

8   I'll give -- well, I'll give a little leeway 'cause

9   I'm a nice guy, but we're at seven hours and

10  15 minutes right now.  And that's including --

11  that's not -- not including the breaks.  So we're

12  already 15 over, unless your math's different than

13  mine.

14      MR. AGUIAR:  We took a lunch break and that's

15  not included.

16      MR. SIGALE:  I'm not including that.

17      MR. AGUIAR:  I don't believe -- well, we

18  started at 9:40.

19      MR. SIGALE:  I got 9:35 but...

20      MR. AGUIAR:  Okay.  It's only 5:14 right now.

21      MR. SIGALE:  Yeah.

22      MR. AGUIAR:  So I believe that we had

23  40 minutes lunch break.  That's a half hour.  We're

24  only a half hour over.



1    MR. SIGALE:  I went 9:35 to 11:05, 11:15

2  to 12:40, 1:15 to now.  That comes out to seven

3  hours and 15 minutes.  If it's seven hours and ten

4  minutes, it doesn't really change what I'm saying

5  but...

6    MR. AGUIAR:  Well, while you're asking

7  questions, I'm going to do the math just to be

8  certain.

9    MR. SIGALE:  Go ahead.

10    MR. AGUIAR:  But thank you.  Why don't you go

11  ahead so we don't delay this any further.

12                     EXAMINATION

13  BY MR. SIGALE:

14    Q.    Mr. Kramer, how many firing -- how

15  many --

16    MR. SIGALE:  Strike that.

17  BY MR. SIGALE:

18    Q.    How many firing ranges would you say that

19  you've visited in total, in your adult life, let's

20  say?

21    A.    You're referring to all firing --

22    Q.    All.

23    A.    -- all firing ranges?  I don't know.

24  I -- I could estimate.



 1      Q.    Is it more than 50?

 2      A.    Oh, definitely.

 3      Q.    More than 100?

 4      A.    Probably.

 5      Q.    Okay.  More than 200?

 6      A.    I would guess it's between 100 and 200.

 7      Q.    Okay.  And you've designed ranges, you

 8  said, in 28 states, you said; right?

 9      A.    Yes.

10      Q.    Do you have an idea how much ranges

11  you've designed total --

12      A.    No.

13      Q.    -- in your career?

14      A.    Oh, probably -- probably less than 100

15  and probably -- it's -- I would think it would have

16  to be more than 50 and less than 100.

17      MR. AGUIAR:  I have an objection to asked and

18  answered.  I believe I asked that question already,

19  and he gave an answer already.

20      MR. SIGALE:  Oh, well, it was a long time ago;

21  so...

22  BY MR. SIGALE:

23      Q.    Counsel asked you before, you know, a lot

24  of questions about is it possible this and is this



1  possible and that possible.  And he asked you, Is it

2  possible to take the gun range regulations as they

3  exist and be a thriving business?  I'm paraphrasing

4  a little.

5          And I believe you said -- the record will

6  show what you said -- but I believe the answer was,

7  "Yeah, it's possible."

8          Is it also possible that with the

9  regulations the way they are, that a gun range, even

10 if it does open, is not going to thrive and will, in

11 fact, go out of business?

12      A.    I would say it's possible, yes.

13      Q.    To your knowledge, how many

14 open-to-the-public commercial indoor gun ranges

15 exist within the city of Chicago limits right now?

16      A.    Well, my understanding, that number is

17 zero.

18      Q.    Is it also possible that with the

19 regulations in place the way they are, that there

20 will never be a gun range that could open under

21 those conditions?

22      A.    That's certainly possible.

23      Q.    How much does a gun range cost to build,

24 nerve mind to staff and operate day to day, but to



1   build?

2        A.    Like a lot of things, that can be quite

3   variable.  I'll give you some rough rules of thumb

4   is, is that I would expect that an indoor shooting

5   range in a major metropolitan area would probably

6   start at about a $3 million investment and could go

7   up to a $20 million investment before it started

8   getting really fancy.  And like a lot of things, in

9   a really fancy who can guess what the upper limit

10  is.

11       Q.    Okay.  The $3 million investment -- let's

12  stick with the low end of your scale.

13             What's that $3 million for?

14       A.    $3 million would be assuming that you

15  have an existing building, and you don't have to

16  build the building, and the building is relatively

17  usable, doesn't require a lot of remodeling to the

18  building.  You've already got a parking area in it.

19  You're buying a lot of range equipment, putting in a

20  lot of impenetrable partitions, building retail

21  space, and classroom space, and those sorts of

22  things.

23             And my number would also include things

24  like professional fees for architects and engineers



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 298 of 330 PageID #:5629

LORIN D. KRAMER                          September 26, 2013
EZELL vs. CITY OF CHICAGO                              298

 1   to design the facility.

 2        Q.    In your example, what drives that up to,

 3   say, the $20 million range?  Just same thing but

 4   bigger scale or something else?

 5        A.    A larger facility would cost more money.

 6   A facility that you're putting in an existing

 7   building where you have to do extensive remodeling

 8   to the facility, instead of it's pretty close to

 9   what you need to start.  Building a building from

10   scratch where now you have to build the entire

11   building, having to deal with adding utilities to an

12   area that doesn't have all of the utilities you

13   need.

14            And probably the most major of those

15   would be the first one I described, which is size,

16   going from a fairly small range to a fairly large

17   range.

18        Q.    Fairly small to fairly large in terms of

19   firing lanes, what does -- how do you -- how would

20   you categorize that from small to large?  What's --

21        A.    Smallest indoor commercial range I've

22   ever designed was four positions.  The smallest

23   indoor range -- commercial indoor range that I've

24   ever personally been on is 36 positions.



1      Q.    I'm sorry.

2            That's the largest or the smallest?

3      A.    The largest I've personally been on --

4  indoor commercial range -- is 36 shooting positions.

5      Q.    The four-lane one that you mentioned a

6  second ago, what was that, then?

7      A.    That was an indoor range for a rural

8  location.  It -- it was never built.  It was only

9  designed.  And that was for a location in Hereford,

10  Arizona, which has got a population that's in four

11  figures, sub 10,000 population.

12      Q.    So what about a population like Chicago,

13  which has roughly 3 million people, last I ever

14  heard?

15      A.    It would seem unreasonable -- it would

16  seem unreasonable to go through the process to build

17  in an area as big as Chicago and only build four

18  positions.  If a client asked me my opinion of how

19  many positions they should be looking at, I would

20  say that they probably should start with eight or

21  ten positions at a minimum.  And in terms of the

22  total number of positions, someone came to me and

23  said, We want to build a 40-position range in

24  Chicago, if they can get through the process, I



1   suspect you would have the clientele to justify 40

2   positions.

3        Q.    And that's based on -- and that opinion

4   is based -- to a reasonable degree of certainty,

5   based on your knowledge of firing ranges in other

6   major metropolitan cities?

7        A.    It's based on a combination of that, and

8   other major metropolitan areas have more than one

9   range already.  So if you have more than one range

10  already, you start thinking about, okay, if you have

11  one, 15-position range over here and nearby you have

12  another 10-position range and over here you have an

13  18-position range, for that metropolitan area, you

14  have to start adding up the total number of

15  positions of all the facilities.

16             If you have a major metropolitan area

17  that has zero shooting lanes in it, then if there

18  were a -- one and only one range in it, it should

19  have a way lot of positions, like 40.

20             I'm not saying that's necessarily the

21  most efficient thing.  But if you only have one, you

22  better have a whole lot of positions.

23        Q.    And, you know, you've been asked a lot of

24  questions about profitability of ranges.



1          To your knowledge, are the ranges that

2    you've gone to in other cities -- are they

3    profitable?

4         MR. AGUIAR:   Objection.   Foundation.

5    BY THE WITNESS:

6         A.    To the best of my knowledge, they are.   I

7    have known of some ranges that have -- I have known

8    of some ranges that the owner has gone bankrupt, but

9    those facilities, more often than not, are bought by

10   a second party and operated as a successful venture.

11   BY MR. SIGALE:

12        Q.    I see.  And would you think that in a

13   city like Chicago where there are so many people --

14   in fact, there's a brand new concealed carry law

15   where people are going to need permits for

16   training -- or training for permits, that someone

17   looking to make a profit would like to be the first

18   person to open one in an area where there otherwise

19   was none before?

20        A.    It seems to me that that would be a very

21   good business strategy.

22        Q.    And, yet again, to your knowledge, there

23   are none here?

24        A.    As far as I know, in the city of Chicago,



1   there are no indoor commercial shooting ranges.

2        Q.    Even though the ordinance that -- in

3   fact, your initial report was partly based on, was

4   passed in July of 2011?

5        A.    That's correct.

6        Q.    Collectively speaking, the issues that

7   you've spoken about here in your deposition today

8   and that you've talked about in your report, given

9   the dollar investment that you're talking about for

10  building such a range -- to a reasonable degree of

11  certainty, do you see these issues that you've

12  talked about as being a -- for lack of a better

13  phrase, too much of a risk, such that it would deter

14  people from opening a shoot -- trying to open a

15  shooting range here in Chicago?

16       MR. AGUIAR:  Objection.  Foundation.

17  BY THE WITNESS:

18       A.    I would say that my feeling is, is the

19  sum total of the ordinances are restrictive enough

20  that I would think that the better business plan

21  would be to not build in the big city of Chicago but

22  build your range someplace else.

23  BY MR. SIGALE:

24       Q.    Of the ones that --



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 303 of 330 PageID #:5634

LORIN D. KRAMER                                           September 26, 2013
EZELL vs. CITY OF CHICAGO                                                303

1          MR. SIGALE:  Strike that.

2    BY THE WITNESS:

3          A.    And that -- and that includes the fact

4    that the city of Chicago has a lot of people.  I --

5    I would think you would be better off going to a

6    place that has less people and less restrictions.

7    BY MR. SIGALE:

8          Q.    You have read some of the other

9    depositions of some of the witnesses that the City

10   has put forth in this case; is that correct?

11         A.    Yes.

12         Q.    And you've read where they list, as a

13   justification for these -- a governmental purpose,

14   if you will, of these restrictions is safety and --

15   public safety and crime deterrents.

16         Do you recall reading that through the

17   various depositions?

18         A.    I think I do.

19         Q.    Notably from the police officials and, I

20   believe, Commissioner Krimbel from the business

21   affairs department.

22         Are you aware of any locations where

23   there are ranges that you're familiar with where

24   crime has increased as a result of the gun range



1   being in business in that location?

2        A.    No.

3        MR. AGUIAR:  I'm just going to object to the

4   question to the extent that he's referencing

5   testimony by the city officials.  This witness has

6   testified he has no experience in the city of

7   Chicago whatsoever.

8   BY THE WITNESS:

9        A.    Okay.  The answer to your question is no.

10       MR. AGUIAR:  And an additional objection:

11  Outside the scope of his expert report.

12  BY MR. SIGALE:

13       Q.    Are you familiar --

14       MR. SIGALE:  Strike that.

15  BY MR. SIGALE:

16       Q.    Do you recall reading at all the

17  deposition of a gentleman named "Kevin Schnoes."

18       A.    Yes.

19       MR. AGUIAR:  Objection.  That was not one of

20  the ones he identified this morning.  He identified

21  reading an affidavit of Kevin Schnoes.  The

22  deposition is not in here.

23  BY MR. SIGALE:

24       Q.    Well, whether you did or didn't, I want



1    you to assume for purposes of the question I'm going

2    to ask you.  Okay?  You say you do recall reviewing

3    it, whether it was printed or whether you read the

4    whole thing or whatever.

5           I want you to assume for purpose of the

6    question that Mr. Schnoes testified that the purpose

7    of the noise restrictions that are imposed on a

8    firing range are as he described it:  "peace and

9    quiet and not disturbing residents."  "Residents,

10   NTS."  Okay?

11        A.    Okay.

12        Q.    Based on your experience in designing

13   ranges and going to shooting ranges, would a

14   shooting range that you designed in the middle of a

15   manufacturing zone -- would you expect that range to

16   just -- from a noise standpoint, to disturb the

17   peace and quiet of neighboring zoned areas?

18        MR. AGUIAR:  Objection because the witness has

19   testified he does not know anything about Chicago

20   manufacturing districts and has not looked into it.

21   So no foundation.

22   BY THE WITNESS:

23        A.    Okay.  Could you repeat the question,

24   please?



```
 1   BY MR. SIGALE:

 2        Q.    Based on your experience designing

 3   ranges, going to shooting ranges --

 4        MR. SIGALE:  Leave that.  But I'll rephrase the

 5   question.

 6   BY MR. SIGALE:

 7        Q.    Would you expect that the shooting range,

 8   from a noise standpoint, would disturb the peace and

 9   quiet of neighboring persons' --

10        MR. AGUIAR:  Same.

11   BY MR. SIGALE:

12        Q.    -- structures?

13        MR. AGUIAR:  Same objection.

14   BY THE WITNESS:

15        A.    I -- I would expect that it would not

16   disturb the peace and quiet of neighbors.

17   BY MR. SIGALE:

18        Q.    As I believe you mentioned earlier, gun

19   ranges do exist in commercial areas; correct?

20        A.    Yes.

21        Q.    You're familiar with areas where shooting

22   ranges are not isolated from the rest of society,

23   but they're right smack dab in the middle of it;

24   correct?
```



1          A.     Yes.

2          Q.     And they coexist peacefully, let's say?

3          A.     Yes.

4          Q.     And they coexist quietly?

5          A.     Yes.  My assumption is you are talking

6     about indoor --

7          Q.     Indoor.  I am --

8          A.     -- ranges, as opposed to outdoor ranges.

9          Q.     -- I am talking about indoor.

10         A.     Yes.  So, with that qualification, then

11    the answer is yes.

12         Q.     Okay.  And would you expect that -- would

13    you expect that answer to be emphasized if indeed a

14    shooting range in a manufacturing zone has this kind

15    of -- has the kind of noise restriction that has

16    been talked about where no other business in a

17    manufacturing zone has such a restriction?

18         MR. AGUIAR:  Objection.  Foundation.

19    BY THE WITNESS:

20         A.     I'm not sure I understood the question.

21    BY MR. SIGALE:

22         Q.     Okay.  You testified a minute ago that

23    you would not expect, from a noise standpoint, a

24    shooting range in a manufacturing zone to disturb



1    its neighbors?

2        A.    Yes.

3        Q.    Is that answer emphasized by the fact

4    that, according to the law that you've reviewed, no

5    other business in a manufacturing zone has a noise

6    restriction at all?

7        A.    It would certainly seem to me if no

8    businesses in a manufacturing zone, with the

9    exception of shooting ranges, have a noise

10   restriction -- it would seem to me that it's likely

11   that manufacturing zones are in a place where the

12   City of Chicago sees noise during the daytime hours

13   as not being an issue even if it exists.  Okay?  So

14   a shooting range -- the shooting range may be one of

15   the quietest things in the manufacturing district.

16       Q.    How --

17       MR. SIGALE:  Strike that.

18   BY MR. SIGALE:

19       Q.    Is it your opinion, based on your

20   experience designing ranges, visiting ranges -- is

21   it your opinion, to a reasonable degree of

22   certainty, that a shooting range can exist in the

23   city of Chicago without having a negative impact on

24   public health?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 309 of 330 PageID #:5640

LORIN D. KRAMER                                        September 26, 2013
EZELL vs. CITY OF CHICAGO                                            309

1        A.    Yes.

2        Q.    Is it your opinion, to a reasonable

3   degree of certainty, that a shooting range can exist

4   in the city of Chicago and not have a negative

5   impact on public safety?

6        A.    Yes.

7        Q.    Is it your opinion, to a reasonable

8   degree of certainty, that a shooting range can exist

9   in the city of Chicago and have a positive impact on

10  public safety?

11       A.    Yes.

12       Q.    Now, I'm asking you those questions with

13  regard to -- those same questions that I asked you,

14  would you answer that same way if I said a shooting

15  range in a manufacturing zone, that it would have

16  a -- they could exist in a manufacturing zone

17  without a negative impact on public health or

18  safety?

19       A.    Yes.  My answer would be yes to all of

20  the questions that you asked if you added the

21  stipulating factor that it's in a manufacturing

22  district.

23       Q.    What if I make the stipulating factor a

24  commercial district?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 310 of 330 PageID #:5641

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        310

1        A.    My answers would still be the same.

2        Q.    Going back to the world of possibilities,

3    Counsel asked you sometime ago if a range, if it was

4    open later than 8:00 P.M., that -- is it possible

5    would it not have enough customers to make it

6    worthwhile to be open 8:00 P.M. to 9:00 A.M.

7              Do you recall --

8        A.    I --

9        Q.    -- kind of that area of questioning?

10       A.    I do recall that.

11       Q.    Is it also possible, then, that there

12   would be plenty of customers from 8:00 P.M. to

13   9:00 A.M. and that the range would thrive during

14   those later hours?

15       A.    Yes, it's certainly possible.

16       Q.    And even if we're not necessarily

17   talking, you know, 2:00 in the morning, but we're --

18   I don't know -- talking till midnight, let's say,

19   that the range would do just fine servicing the

20   customers during those hours?

21       A.    That's very possible.

22       Q.    To the extent you know, why do shooting

23   ranges allow those under 18 to shoot firearms,

24   presumably with some sort of supervision?



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 311 of 330 PageID #:5642

LORIN D. KRAMER                                        September 26, 2013
EZELL vs. CITY OF CHICAGO                                            311

 1        MR. AGUIAR:   Objection.   Relevance.

 2   BY THE WITNESS:

 3        A.    Shooting tends to be a family activity.

 4   And as a family activity, that usually means not

 5   only parents go but the children go as well.

 6   BY MR. SIGALE:

 7        Q.    So in general, it would be good for

 8   business to allow minors with proper supervision to

 9   be present in the range?

10        A.    Yes, I believe so.

11        Q.    You were talking earlier about the

12   ammunition issue and the restriction on leaving the

13   range with the ammunition.

14             The Johnson dep was part of that pile,

15   wasn't it?

16        MR. AGUIAR:   Nope.

17        MR. SIGALE:   Johnson dep is not in there?

18        MR. AGUIAR:   Nope.

19        MR. SIGALE:   All right.

20   BY MR. SIGALE:

21        Q.    All right.   I want you to assume, for

22   purposes of my question, that a Lieutenant Johnson

23   testified that the purpose of not allowing

24   ammunition to leave the range was:   A, someone might



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 312 of 330 PageID #:5643

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        312

1   steal it; and, B, that someone might buy it and then

2   act as a straw purchaser and sell it on the street.

3   Okay?

4        A.    Uh-huh.

5        MR. SIGALE:  Page 106 to 109 of that

6   deposition, by the way, when you object and say that

7   I'm misstating it.

8   BY MR. SIGALE:

9        Q.    To your knowledge, from your experience

10  designing ranges, going to ranges, going to

11  conferences, have you heard of these issues

12  happening elsewhere?

13       MR. AGUIAR:  I'm going to object to the extent

14  this information was not in the report and not

15  relied upon by the witness in forming his opinion.

16  BY THE WITNESS:

17       A.    The answer to your question is no.

18  BY MR. SIGALE:

19       Q.    Okay.  Last question, I think.  Counsel

20  asked you about the -- talking about the ventilation

21  system -- it was your Issue 17, I think it was --

22  about having multiple ventilation systems, and "Is

23  it possible to be profitable, notwithstanding the

24  additional $65- to $70,000 cost?"  And your response



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 313 of 330 PageID #:5644

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                       313

1   was that "Well, maybe, but it'll take longer."

2              You recall that --

3      A.    I do recall.

4      Q.    -- discussion?

5              Is it fair to say, based on your

6   experience in designing ranges, that, to a degree of

7   certainty, that if -- that money that a range owner

8   has to spend on additional HVAC systems means less

9   money to spend on marketing and product, et cetera?

10     A.    I would assume so.

11     Q.    Would you say that more so than just more

12  money to spend means more money to make up to break

13  even, that -- in fact, that there are things that

14  the money otherwise could be spent on that could

15  affect the success of the firing range, such as

16  marketing or advertising?

17     A.    That's entirely possible.

18     MR. SIGALE:  Okay.

19     MR. AGUIAR:  I have a couple follow-ups.

20     MR. SIGALE:  Sure.

21                  FURTHER EXAMINATION

22  BY MR. AGUIAR:

23     Q.    Mr. Kramer, Mr. Sigale and I have both

24  asked you questions about whether these ordinances



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 314 of 330 PageID #:5645

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        314

1   make a range profitable or unprofitable.  We've both

2   done that to you today.  And you've answered mine

3   that it's possible that a range could be profitable.

4   And in response to Mr. Sigale's questions, you said,

5   "It might not be profitable."

6           The fact of the matter is, you just don't

7   know, as you sit here today, how this is going to

8   shake out, do you?

9        A.    I do not know whether the range would be

10   profitable or not profitable.

11       Q.    And that's because you have never seen

12   these ordinances actually work in application

13   before?

14       A.    That's correct.

15       Q.    So you just don't know?

16       A.    Yeah.  That -- the only example I have of

17   the ordinances that are here are for the city of

18   Chicago.  And since my understanding is there are

19   currently no ranges in the city of Chicago, there's

20   nothing to observe; so, yes.

21       Q.    And do you know anything about people who

22   may have applied to the City of Chicago to open a

23   range?

24       A.    I do not.



1      Q.    And I think you testified earlier that

2   you haven't spoken to anybody who actually has

3   contemplated opening a range in the city of Chicago?

4      A.    That's correct.

5      Q.    So you just don't know what effect these

6   ordinances are having in application yet?

7      A.    That's correct.

8      Q.    So, again, as Mr. Sigale and I both have

9   gone back and forth, it's speculation at this point

10  what impact these ordinances have, if any?

11     A.    Yes, it's speculation.

12           Now, you know, the ordinance has been

13  around a while, and I understand that even though

14  it's been around a while there are no ranges yet.  I

15  don't know why there aren't ranges, but one of the

16  reasons could be is, is because people are having

17  trouble getting through the process.

18     Q.    It could also be that we have a really

19  bad economy right now?

20     A.    That's possible.

21     Q.    We just don't know?

22     A.    That's correct.

23     Q.    You talked a minute ago about the number

24  of lanes that would be required for a range to



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 316 of 330 PageID #:5647

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        316

1   actually succeed, the 4 versus the 32.

2           Do you remember that conversation?

3       A.   Yes.  Although, I would hesitate to use

4   the word -- I hope I didn't use the word "required."

5   I think I may have used the word -- something like

6   recommended.  I -- I don't know that there's any

7   specific requirement as, as to how many lanes you

8   can or should have.

9       Q.   I was getting to that point.  I wanted to

10  clarify.

11          Certainly nothing would prohibit a solo

12  practitioner or proprietor from saying, I want to

13  open a four-lane range.  I want to be an exclusive

14  clientele.  And given that I'll be the first

15  range -- or one of the few ranges in the city of

16  Chicago -- depending on when he does it -- that I'm

17  going to have a built-in, you know, rock-solid

18  client base, 'cause, you know, I'm exclusive.  I'm

19  very good at what I do.

20          Nothing says that can't work?

21      A.   That's true.

22      Q.   So the number of lanes doesn't

23  necessarily indicate a level of success?

24      A.   The number -- a number of lanes would be



1    a major factor in putting together a business plan

2    to figure out what your profit and loss is.

3         Q.    But certainly four lanes can be

4    successful?

5         A.    I've actually not seen a -- I don't

6    believe I've ever seen a four-lane indoor commercial

7    range; so I have no way of judging whether that

8    could be successful, 'cause I haven't seen one done.

9    But I -- I would allow that -- I don't see any -- I

10   don't see anything that tells me that:  Wait a

11   minute.  There's a reason why four lanes cannot

12   possibly work.

13        Q.    Okay.  So we just don't know?

14        A.    We don't know.

15        Q.    You said a second ago that your

16   feeling -- I'm using the word "feeling"

17   specifically.  I think that's the word you used --

18   is that the ordinance is restrictive enough to

19   dissuade people from building ranges in the city of

20   Chicago.

21        Do you recall saying that in response to

22   Mr. Sigale's question?

23        A.    That sounds correct.

24        Q.    Again, this is just your feeling?  It's



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 318 of 330 PageID #:5649

LORIN D. KRAMER                          September 26, 2013
EZELL vs. CITY OF CHICAGO                              318

1  not based on any actual research you've done?

2       A.    That's correct.

3       Q.    It's just based on a reading of the

4  ordinances and your perception of how they may

5  impact people?

6       A.    Correct.

7       Q.    Same thing about the question about

8  customers after 8:00 P.M. and the allowance of

9  people under the age of 18.  I'm going to lump them

10  together for purposes of getting us out of here.

11         Again, you just don't know about what

12  additional revenue could be generated from them?

13  You've done no studies and done no research to know

14  what the revenue stream is from those hours after

15  8:00 and minors under 18?

16       A.    That's correct, and I believe that was my

17  previous testimony.

18       Q.    I just wanted to clarify.

19         And just finally, talking about

20  ammunition leaving the range, and Mr. Sigale

21  referenced the testimony of Kevin Johnston.

22       MR. SIGALE:  Johnson.

23       MR. AGUIAR:  Thank you.

24       MR. SIGALE:  Uh-huh.



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 319 of 330 PageID #:5650

LORIN D. KRAMER                                September 26, 2013
EZELL vs. CITY OF CHICAGO                                    319

1   BY MR. AGUIAR:

2       Q.    Do you have any familiarity with the

3   level of crime in the city of Chicago?

4       A.    No.

5       Q.    Any familiarity with the gun crime in the

6   city of Chicago?

7       A.    No.

8       Q.    Do you have any familiarity with the

9   city's gang problems?

10      A.    No.

11      MR. AGUIAR:  I have nothing.

12      MR. SIGALE:  You know what?  I'm sorry.  I

13  actually got a couple.  I got to get them and you

14  might have a couple of follow-up questions.

15                 FURTHER EXAMINATION

16  BY MR. SIGALE:

17      Q.    You identified 19 issues in your report.

18  You talked about a supplemental kind of half issue

19  to one of them.  I think it was No. 14.  And then

20  there are some issues that are no longer issues

21  or -- like the No. 3 outdoor range issue never was

22  an issue, at least not for us.

23           Of the ones that remain -- and I'll show

24  you a report if you need to thumb through it -- are



1   there issues that you identify that you say more

2   than any other, no reasonable person would build --

3   would put $3 million or more into a shooting range

4   with this restriction on the books?  Are there one

5   or more, more than the others -- kind of the peaks

6   rather than the valleys, let's say -- where you

7   would say that?

8        MR. AGUIAR:  I'm just going to object to the

9   question to the extent that that's not how the

10  report has been presented to the City of Chicago,

11  and that's not an opinion contained in the report.

12  BY THE WITNESS:

13       A.    Okay.  So you want me to prior --

14  prioritize which of these 19 I see as the most

15  critical -- the most problematic?

16  BY MR. SIGALE:

17       Q.    Yes.  And understanding, of course, it's

18  not 19 anymore.  It's something around the lines of

19  14 or something.

20       A.    Okay.

21       Q.    But of the remaining ones --

22       A.    And what I -- what I'm going to do

23  because it's late in the day and my brain is only

24  firing on a certain number of -- I'm going to go



1    through all 19.  Some of these probably have dropped

2    out.  So I may name something that I see as being

3    critical, but it's no longer an issue because it's

4    dropped off.  Is that fair for me to do?

5         Q.    Well, I'll help you.  1's not an issue?

6         A.    Okay.

7         Q.    So 2 is still an issue?

8         A.    Okay.  I would consider 2 one of the

9    important issues, one of the big issues.

10        Q.    One of the big issues that would deter

11   someone from putting $3 million or more into trying

12   to open a range?

13        A.    Correct.

14        Q.    Three is not an issue?

15        A.    Skip 3.

16        Q.    Five's not an issue anymore?

17        A.    Five's not an issue.

18             I would not say that No. 4 is one of the

19   most critical issues.

20             Number -- No. 6 is a pain in the neck,

21   but I wouldn't say it's one of the most critical

22   issues.

23             Seven -- I'm going to take 7 as being one

24   of the critical issues on this.



1          No. 8, I would say, is one of the

2    critical issues.

3          No. 9 is a pain-in-the-neck issue but not

4    necessarily a critical issue.

5       Q.    Does that presuppose that someone can

6    find a space to do it?

7       A.    That does presuppose that.  I -- I have

8    no idea what and where these properties are.  I'm

9    making the assumption that there's sufficient number

10   of properties to pick from that you can actually

11   find a site.

12      Q.    If that presumption isn't true and there

13   isn't, in fact, been any place that anyone has

14   identified as being able to build --

15      A.    Then Issue No. 9 would become a critical

16   issue, then.

17      Q.    Ten's not an issue anymore?

18      A.    Ten's not an issue anymore.

19            Eleven --

20      Q.    Eleven is altered; so it's --

21      A.    Eleven is altered.  And I'm going to call

22   11 a critical issue because the whole recordkeeping

23   issue of trying to controlling ammunition and such,

24   I -- I just don't even know how -- if I were



1   operating a range, I would look at that and yank my

2   hair out.

3        Q.    So Counsel asked you earlier about, you

4   know, the customers and would the customers maybe

5   come back, and they'd be loyal because their

6   ammunition is still, you know, at the place and they

7   got to come finish their box and whatnot.  And maybe

8   they'd care and maybe -- you know, maybe they

9   wouldn't.

10           But for the owner, you're saying that

11   would be -- that would not be a neutral issue?

12        A.    That would not be a neutral issue to me.

13   That -- that would -- that -- if I were trying to

14   open a range, that would drive me nuts, No. 11.

15        Q.    Okay.

16        A.    Issue 12 may or may not become critical.

17        Q.    Okay.

18        A.    And I just don't know.

19           The shooting range enclosure, No. 13,

20   that would be on a site-by-site basis.  So I guess I

21   would have to say overall that's not necessarily a

22   critical issue, but it's going to exclude some

23   properties from being something you can look at,

24   based on where you're trying to put doors in this



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 324 of 330 PageID #:5655

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                       324

1    thing.

2          Q.    Okay.

3          A.    Let's see.  Ammunition or firearms

4    storage, that's a pain-in-the-neck issue, not

5    necessarily a critical issue.

6          Q.    Okay.

7          A.    Issue No. 15, which is sound-level

8    limits --

9          Q.    And just to make this easy, if you

10   just -- if you look at the last couple pages, if

11   there are any that you do identify --

12         A.    Okay.

13         Q.    Just if you --

14         A.    Well, sound-level limits might become

15   critical if an acoustic engineer said, I don't know

16   how we're going to achieve the numbers that are in

17   the statute.

18         Q.    Okay.

19         A.    Assuming that the -- a -- an acoustic

20   engineer says, Hey, I can do it, then it's not a

21   critical issue.

22         Q.    Okay.

23         A.    The shooting range surface treatment,

24   that's a conflict.  And -- I mean, I want to say



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 325 of 330 PageID #:5656

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        325

1  it's a critical issue because I don't know how to

2  design to it, but I suppose if the City of Chicago

3  found a way of resolving the conflict I'd pointed

4  out, then it wouldn't be a critical issue anymore.

5        Q.    Okay.

6        A.    The Issue 17 shooting range ventilation

7  and 18 for ventilation -- 17 is a pain in the neck

8  but not a critical issue.

9              And 18, assuming that you can find

10 someone who will design a workable ventilation

11 system that is interlocked, then it's not a critical

12 issue.  If you can't get someone to actually design

13 a system to meet this statute, then it's a critical

14 issue.

15       Q.    Okay.

16       A.    And No. 19 to me is, is a critical issue.

17       Q.    Because the city -- if I'm understanding

18 what you said earlier, the City's basically

19 mandating that you put a fire hazard in the range?

20       A.    That they're -- yeah.  They're mandating

21 something that I find to be unsafe.

22       Q.    Okay.  Is it your opinion, to a

23 reasonable degree of certainty, that cumulatively

24 the issues in your report have effectively prevented



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 326 of 330 PageID #:5657

LORIN D. KRAMER                                          September 26, 2013
EZELL vs. CITY OF CHICAGO                                              326

1   anyone from putting a range in Chicago?

2        A.    Well, I don't know if they've

3   specifically done it, but I -- I would think that

4   someone who knows something about business and knows

5   something about shooting ranges and looks at this

6   ordinance would be scared enough that they'd say,

7   No, I'm not going to do this.

8        MR. SIGALE:  Okay.  All right.  Mr. Aguiar

9   might have some questions for you.

10       MR. AGUIAR:  I have a couple, then I'm going to

11  get you out of here.

12                  FURTHER EXAMINATION

13  BY MR. AGUIAR:

14       Q.    Again, all the issues you just went

15  through again, this is based on your reading of the

16  ordinance?

17       A.    Correct.

18       Q.    And it's not based on any specific

19  research you've done into any of the issues

20  related -- that are identified in your report?

21       A.    Yes.  As modified by some specifics in my

22  testimony where I did state that I had done some

23  research.

24       Q.    But besides those specific little areas,



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 327 of 330 PageID #:5658

LORIN D. KRAMER                          September 26, 2013
EZELL vs. CITY OF CHICAGO                              327

1   it's based solely on your reading of the ordinance

2   and your perception as to how it may impact

3   somebody?

4        A.    Correct.

5        Q.    It's not based on actual conversations

6   with anybody about this ordinance?

7        A.    That's correct.

8        Q.    And you've done no market research and

9   made no inquiries as to what the practical impact of

10  these regulations have had on anybody to date?

11       A.    That's correct.

12       Q.    And you know nothing about anybody trying

13  to open a range in the city of Chicago?

14       A.    That's correct.

15       MR. AGUIAR:  I have nothing further.

16       MR. SIGALE:  We'll go ahead and waive

17  signature.

18            FURTHER DEPONENT SAITH NOT.

19

20

21

22

23

24



1  STATE OF ILLINOIS )

2                    )  SS:

3  COUNTY OF C O O K )

4

5          I, ELIA E. CARRIÓN, a Certified Shorthand

6  Reporter of said state, do hereby certify:

7

8          That previous to the commencement of the

9  examination of the witness, the witness was sworn to

10 testify the whole truth concerning the matters

11 herein;

12

13         That the foregoing deposition transcript

14 was reported stenographically by me, was thereafter

15 reduced to typewriting under my personal direction

16 and constitutes a true record of the testimony given

17 and the proceedings had;

18

19         That the said deposition was taken before

20 me at the time and place specified;

21

22         That I am not a relative or employee or

23 attorney or counsel, nor a relative or employee of

24 such attorney or counsel for any of the parties



Case: 1:10-cv-05135 Document #: 234-4 Filed: 12/06/13 Page 329 of 330 PageID #:5660

LORIN D. KRAMER                                    September 26, 2013
EZELL vs. CITY OF CHICAGO                                        329

1   hereto, nor interested directly or indirectly in the

2   outcome of this action;

3

4           IN WITNESS WHEREOF, I do hereunto set my

5   hand of office at Chicago, Illinois, this 14th day

6   of October, 2013.

7

8

9

10  C.S.R. Certificate No. 084.004641.

11

12

13

14

15

16

17

18

19

20

21

22

23

24



800.211.DEPO (3376)
EsquireSolutions.com

LORIN D. KRAMER                          September 26, 2013
EZELL vs. CITY OF CHICAGO                              330

```
 1              EXAMINATION

 2    WITNESS                           PAGE

 3   LORIN D. KRAMER

 4        BY MR. AGUIAR                  3

 5        BY MR. AGUIAR                 131

 6        BY MR. SIGALE                 294

 7        BY MR. AGUIAR                 313

 8        BY MR. SIGALE                 319

 9        BY MR. AGUIAR                 326

10

11           E X H I B I T S

12                              PAGE/LINE NO.

13   Kramer Deposition Exhibit No.  1      10/6

14   Kramer Deposition Exhibit No.  2      11/5

15   Kramer Deposition Exhibit No.  3      80/7

16   Kramer Deposition Exhibit No.  4      80/14

17   Kramer Deposition Exhibit No.  5      80/21

18

19

20

21

22

23

24
```

