Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 1 of 314 PageID #:5662

JACK J. GIORDANO                                        September 20, 2013
EZELL vs. CITY OF CHICAGO                                              1

1           IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4    RHONDA EZELL, et al.,          )

5              Plaintiffs,          )

6         vs.                       ) Case No. 10 C 5135

7    CITY OF CHICAGO,               )

8              Defendant.           )

9

10

11          The deposition of JACK J. GIORDANO,

12   called for examination pursuant to the Rules of

13   Civil Procedure for the United States District

14   Courts pertaining to the taking of depositions,

15   taken before WENDY A. KILLEN, CSR Number 84-003772,

16   a Certified Shorthand Reporter in the State of

17   Illinois, at 30 North LaSalle Street, Suite 1230,

18   Chicago, Illinois, on September 20, 2013, at the

19   hour of 9:42 a.m.

20

21

22

23

24



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 2 of 314 PageID #:5663

JACK J. GIORDANO                                        September 20, 2013
EZELL vs. CITY OF CHICAGO                                               2

1        PRESENT:

2             LAW FIRM OF DAVID G. SIGALE, P.C., by

3             MR. DAVID G. SIGALE, ESQUIRE

4             739 Roosevelt Road, Suite 304

5             Glen Ellyn, Illinois  60137

6             (630) 452-4547

7             dsigale@sigalelaw.com

8                 On behalf of the Plaintiffs;

9

10            CITY OF CHICAGO

11            DEPARTMENT OF LAW, by

12            MR. WILLIAM MACY AGUIAR, ESQUIRE

13            30 North LaSalle Street, Suite 1230

14            Chicago, Illinois  60602

15            (312) 744-4216

16            waguiar@cityofchicago.org

17                 On behalf of the Defendant.

18

19

20

21

22

23   Reported by:  Wendy A. Killen, CSR

24   License No.:  084-003772



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 3 of 314 PageID #:5664

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                            3

```
 1              (Whereupon, the witness was duly

 2                   sworn.)

 3                   JACK J. GIORDANO,

 4   having been first duly sworn, was examined and

 5   testified as follows:

 6                   EXAMINATION

 7   BY MR. AGUIAR:

 8       Q.   I would like to ask the witness to please

 9   state his full name for the record.

10       A.   Jack J. Giordano, G-i-o-r-d-a-n-o.

11       Q.   Good morning, Mr. Giordano.  My name is

12   William Aguiar and I am one of the lawyers

13   representing the City of Chicago in the case of

14   Ezell versus City of Chicago, Number 10 C 5135,

15   currently pending in the United States District

16   Court for the Northern District of Illinois.

17              I would like to start by asking you have

18   you been deposed before?

19       A.   Yes.

20       Q.   And when was your last deposition?

21       A.   I think probably about a year ago.

22       Q.   So it's been a little bit of time?

23       A.   Yeah.

24       Q.   As I always do, I'm going to review some
```



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 4 of 314 PageID #:5665

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                           4

1   ground rules for today's proceedings.

2       A.   That's fine.

3       Q.   The first and most important is if you

4   don't understand a question that I ask, if you

5   would please let me know.  I will do the best I can

6   to get you a question that you do understand.

7           If you answer my question, I'm going to

8   assume that you have answered it as I've asked it.

9   Please refrain from nodding your head or shaking

10  your head in response to a question.  The court

11  reporter can't take that down.

12      A.   I understand.

13      Q.   Answers must be verbal.

14          It's also important that we not speak over

15  one another.  That makes it very hard for the court

16  reporter to take that down as well.  I would ask

17  that you let me ask my question before you answer

18  and I will let you finish your answer before I ask

19  the next question.

20          If at any time you need to take a break

21  today, just let me know.  I'm more than happy to

22  accommodate that.  I just ask that you not take a

23  break while there is a question pending.

24      A.   That's fine.



1      Q.    The next two questions I ask simply for

2   purposes of today's proceeding and the record.

3           Have you taken any medications today that

4   would affect your ability to understand my

5   questions or to provide complete answers to them?

6      A.    No, I have not.

7      Q.    Are there any other reasons why you would

8   not be able to understand my questions or to

9   provide complete answers to them?

10     A.    No, there's not.

11     Q.    Did you speak with anybody regarding your

12  testimony here today?

13     A.    Yes.

14     Q.    Who did you speak with?

15     A.    Mr. David Sigale.

16     Q.    When did you speak with Mr. Sigale?

17     A.    Last night.

18     Q.    Anybody else?

19     A.    Maybe just Mr. Kramer from my company.

20     Q.    And when did you speak with Mr. Kramer?

21     A.    Throughout the entire process of this

22  project that we are working on with our client.

23     Q.    When you say project, you mean writing the

24  expert report?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 6 of 314 PageID #:5667

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                            6

1    A.    That's correct.

2    Q.    Specifically, though, to prepare for

3 today's deposition, did you speak with Mr. Kramer?

4    A.    I spoke to him last night briefly on the

5 telephone.

6    Q.    And what was the substance of your

7 conversation with Mr. Kramer?

8    A.    It was a result of my review of additional

9 documents that I had received, which I just had an

10 opportunity to read on the airplane coming to

11 Chicago.

12    Q.    And what additional documents did you

13 receive?

14    A.    I received the updated or amended

15 substitute ordinance.

16    MR. SIGALE:  The one that was passed on 9/11.

17    MR. AGUIAR:  Okay.

18    THE WITNESS:  I received that.

19    MR. SIGALE:  9/11/13.

20    THE WITNESS:  I received the new Christopher

21 Hart deposition.  I would imagine this is the

22 newest deposition that was prepared subsequent to

23 our report being written.

24    MR. AGUIAR:  Let the record reflect that he has



 1  tendered the transcript from August 20th of 2013?

 2       THE WITNESS:   Commissioner Rosemary Krimbel's

 3  deposition, Robert Fahlstrom's deposition,

 4  Lieutenant Kevin Johnson's deposition, and Chief

 5  Tina -- I guess it's Skahill's deposition.

 6  BY MR. AGUIAR:

 7       Q.   That's correct.

 8            When did you receive these documents?

 9       A.   I received them -- I guess it was one day

10  prior to me leaving, so it would be two days ago.

11       Q.   These were provided to you by Mr. Sigale?

12       A.   Mr. Sigale e-mailed them to my firm and my

13  boss e-mailed them to me.

14       Q.   You kind of anticipated my next question.

15  So you reviewed these documents to prepare for

16  today's deposition?

17       A.   That's correct.

18       Q.   Did you review any other documents to

19  prepare for today's deposition?

20       A.   Yes.

21       Q.   What else did you review?

22       A.   I would have to look at my notes.  Last

23  year I reviewed I guess the initial -- well, some

24  of the depositions.  I reviewed Christopher Hart's



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 8 of 314 PageID #:5669

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                            8

1    deposition.  I don't have the dates.  I reviewed

2    Rhonda Ezell's deposition, Julianne Versnel.

3        Q.   Mr. Giordano, if I can interject for a

4    second, did you review those to prepare for today's

5    deposition or did you review those to prepare the

6    report?

7        A.   To prepare the report I believe, but I'm

8    really not too clear on that, whether I received

9    those depositions, because initially -- this was a

10   long time ago.  Initially we received the

11   ordinance.  And I believe that our report was based

12   solely on the ordinance and had nothing to do with

13   the depositions.

14           I think I may have received the

15   depositions subsequent to our report because I

16   believe these depositions were supposed to have

17   taken place quite a while ago and they never did.

18       Q.   Okay.  So you looked at those depositions

19   after you received the ordinance and prepared your

20   report?

21       A.   I believe so.

22       Q.   And I believe you produced those to us on

23   a CD; is that not true?

24       A.   Any of the depositions I had reviewed are



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 9 of 314 PageID #:5670

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                           9

 1   on the CD, yes.

 2      Q.   I guess my question just is did you look

 3   at them to get ready for today?

 4      A.   No, I haven't.  I looked at them once and

 5   that was it.

 6      Q.   Okay.  That's all I was trying to clarify,

 7   that you didn't actually look at them last to get

 8   ready for today.

 9      A.   No.  These are the ones I looked at on the

10   airplane yesterday.

11      Q.   Did you review your report to prepare for

12   today?

13      A.   Yes, I did.

14      Q.   Anything else besides the report and the

15   documents you talked about earlier this morning?

16      A.   No.

17   MR. AGUIAR:  Let's start with Number 1.

18                        (Whereupon, Giordano Deposition

19                         Exhibit No. 1 was marked for

20                         identification.)

21   BY MR. AGUIAR:

22      Q.   Mr. Giordano, it might be easier for

23   today's proceeding if you put aside the papers you

24   brought with you today for the moment just because



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 10 of 314 PageID #:5671

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          10

1   we are going to have paper flying.

2       MR. SIGALE:  If he wants you to look at a

3   paper, he'll give you paper to look at.

4       MR. AGUIAR:  Let's put these here for right

5   now.

6       MR. SIGALE:  That's fine.

7           If there's a document for some reason,

8   like you get asked a question and there is a

9   document you need to refer to for whatever reason,

10  of course, you'll be able to do that.

11      THE WITNESS:  I understand.

12      MR. SIGALE:  But for now, until that happens,

13  let's just stick with the documents he wants you to

14  look at.

15      THE WITNESS:  That's fine.

16  BY MR. AGUIAR:

17      Q.   Before we introduce this document, I do

18  want to review something.  The documents you

19  brought today, those have been produced to the City

20  in response to our request that you produce the

21  documents that you have looked at and relied upon

22  in formulating your opinions here today?

23      A.   That's correct.

24      Q.   There is nothing that you have in your



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 11 of 314 PageID #:5672

JACK J. GIORDANO                            September 20, 2013
EZELL vs. CITY OF CHICAGO                                  11

1    possession either here or in New Jersey that you

2    looked at, relied upon, which has not been

3    disclosed to the City?

4         A.    That's correct.

5         Q.    That said, let's start with Exhibit

6    Number 1.

7              Mr. Giordano, do you recognize Exhibit

8    Number 1?

9         A.    Yes, I do.

10        Q.    What is Exhibit Number 1?

11        A.    This is the report that myself and

12   Mr. Kramer prepared for our client commenting on

13   the shooting range ordinance.

14        Q.    I am going to start at the back end of the

15   document, so if you would please turn to Page 11 of

16   the report.

17        A.    Got it.

18        Q.    There in the middle of the page it says

19   qualifications, Mr. Jack J. Giordano?

20        A.    That's correct.

21        Q.    Are the qualifications set forth here in

22   the document true and correct to the best of your

23   knowledge?

24        A.    Yes.  It was a long time ago and there's



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 12 of 314 PageID #:5673

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                                12

1  probably an additional certification that I

2  received subsequent to this being submitted and

3  that is not listed on here, but other than that,

4  yes, it is.

5      Q.   What would that certification be that's

6  not here?

7      A.   I'm now a certified occupational hearing

8  conservation specialist.

9      Q.   Could you please explain to me in layman's

10 terms what that is?

11     A.   A hearing conservation specialist is

12 somebody who has been trained to develop hearing

13 conservation programs when it's required by OSHA

14 and also to administer certain parts of the program

15 and to train employees with regard to the OSHA

16 requirements which would require training in

17 certain circumstances when people are exposed to a

18 certain amount of noise.

19     Q.   And are these programs that you've worked

20 to develop, are they all exclusive to firing

21 ranges?

22     A.   Only firing ranges, yes.  Like I said,

23 that's a recent certification.  We've been working

24 on developing programs, but we have not to this



1  date developed any programs for clients yet.

2      Q.    When you say you were certified, who

3  certified you?

4      A.    The Council for Accreditation of

5  Occupational Hearing Conservationists.

6      Q.    Are they a national organization?

7      A.    Yes.

8      Q.    You said you were trained.

9            Did they provide the training?

10     A.    Yes.

11     Q.    And how long was the training?

12     A.    Three days.

13     Q.    Where was it?

14     A.    It was at the OSHA Training Institute in

15  New Jersey given at the University of Medicine and

16  Dentistry of New Jersey.

17     Q.    Do you have to take a test to become

18  certified?

19     A.    Yes, you do.

20     Q.    That test is taken at the end of the

21  course?

22     A.    That's correct.

23     Q.    I assume you passed on the first try?

24     A.    I did.



JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          14

1       Q.    What types of courses or subject matters

2    do you cover in this type of a program?

3       A.    All regulatory information, what the

4    regulations are, which would be the OSHA Hearing

5    Conservation Amendment, which is included in the

6    disc that I provided to you, audiograms, reading

7    audiograms, actually conducting audio metric

8    testing, which is hearing tests, sound levels,

9    stuff like that.

10      Q.    Okay.  Did any part of this course you

11   took involve the design of ranges to help with

12   hearing conservation?

13      A.    The course I took had nothing to do with

14   shooting ranges.  That's just a general industry

15   type of certification.  It had nothing to do with

16   shooting ranges.  Although, the information that I

17   learned in this course and will subsequently use in

18   my work, will be exclusive to shooting ranges.

19      Q.    Let's backtrack a little bit.

20      A.    Sure.

21      Q.    Let's start with a very basic question.

22          Did you attend college?

23      A.    Yes, I did.

24      Q.    Where did you go to college?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 15 of 314 PageID #:5676

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          15

1        A.    John Jay College of Criminal Justice in

2    New York City.

3        Q.    Did you graduate from John Jay College?

4        A.    Yes, I did.

5        Q.    When did you graduate?

6        A.    1978.

7        Q.    Did you receive a bachelor's degree?

8        A.    Yes, I did.

9        Q.    What was that bachelor's degree in?

10       A.    Criminal justice.

11       Q.    Did you have a minor?

12       A.    Not an official minor, but my unofficial

13   minor was psychology.

14       Q.    So you took a lot of classes in

15   psychology?

16       A.    I did.

17       Q.    Have you had any education beyond college?

18       A.    Do you mean undergraduate work, graduate

19   work?

20       Q.    Yes.  Did you do any graduate work?

21       A.    No.  However, my additional education

22   would be classes that I have attended, training

23   programs I've attended, and so on.

24       Q.    We will get to that in a second if that's



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 16 of 314 PageID #:5677

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                           16

1   okay.  I want to just close the loop here.

2       A.    Sure.

3       Q.    Just to clarify, you are not an economist?

4       A.    No.

5       Q.    You don't hold an MBA?

6       A.    No.

7       Q.    Do you have any experience in finance or

8   accounting?

9       A.    Nope.

10      Q.    Now, you said you had other coursework.

11            Could you describe what other educational

12  courses you've taken after leaving John Jay College

13  and graduating?

14      A.    The courses that are listed in the back of

15  this report would be included in that list.

16  However, there's quite a long list of courses that

17  I have attended and that's one of the reasons why I

18  wanted to have that list with me and I don't have

19  it with me.

20      Q.    You are talking about your complete

21  curriculum vitae?

22      A.    That's correct.  I wouldn't be able to

23  recite each one.  It's quite an extensive list.

24      Q.    How about this, we are going to get a copy



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 17 of 314 PageID #:5678

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                                17

1  and we may revisit what courses you have actually

2  attended professionally.

3      A.   Okay.

4      Q.   Can you give me a flavor for the subject

5  matters of the courses you've taken?

6      A.   Most of them are firearm and shooting

7  range related.  I have taken some sound level

8  measurement courses at a sound meter company that

9  provides training which I have attended on

10  acoustics and measurement of sound.  Although I

11  don't consider myself a sound expert, I have taken

12  that course.

13          Other courses that I would have attended

14  that maybe would not be directly related to

15  firearms or shooting ranges, I'm trying to think.

16  Of course, investigators' courses, I've taken the

17  investigators' training course, which I think may

18  be listed on -- yes -- investigators' training

19  course when I worked for the New York City

20  Department of Investigations -- actually, I worked

21  for the New York Office of the Inspector General,

22  which was a division of the Department of

23  Investigations.

24          I took an additional training course at



1   John Jay College of Criminal Justice unrelated to

2   my degree, which was crime scene investigations.

3          I took a course given through the

4   International Association of Bomb Technicians and

5   Investigators, which was Advanced Explosives and

6   Terrorist Activities, which is not related to --

7   directly related to firearms or shooting ranges.

8          Those probably would be the only courses

9   that I could recall off the top of my head that are

10  not directly related to shooting ranges or

11  firearms.

12      Q.   Let's talk about the course you've taken

13  regarding shooting ranges.

14      A.   Okay.

15      Q.   Shooting range is a broad topic.

16      A.   Yes.

17      Q.   Can you break that down for me in terms of

18  what types of courses, maybe the subject matter

19  that you've taken regarding shooting ranges, such

20  as construction or soundproofing or what have you?

21      A.   One of the requirements of the Range

22  Technical Team, which we haven't talked about yet

23  or discussed, I was the eastern region supervisor

24  for the National Rifle Association's Range



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 19 of 314 PageID #:5680

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      19

1    Technical Team.  That team was put together in

2    1991.

3              One of the requirements was that we would

4    attend -- I believe it was one week and possibly --

5    I would have to take a look -- it may have been two

6    weeks of training; one week given at the

7    Whittington Center in Raton, New Mexico, and a

8    certain portion of that training was given at the

9    U.S. Olympic Training Center in Colorado Springs,

10   Colorado.  That was directly related to and the

11   subject matter of the entire course was shooting

12   range issues, whether it be design issues,

13   operational issues, safety issues, health issues,

14   and so on.

15             The other training I have attended that

16   would be directly related to shooting ranges would

17   be certified range safety officer training.

18   Actually, the members of the team I was associated

19   with through the NRA was assembled.  We actually

20   developed part of the program that eventually

21   became the National Rifle Association's

22   certification for range safety officers.  So we

23   kind of developed that program while I was on that

24   team.



1          Other than that shooting range related

2    training, I guess my -- no.  Armor school would not

3    be directly related to shooting ranges.  I'm trying

4    to think.  I guess that would be the formal

5    education I had as far as shooting range design,

6    operation, and development.

7          Q.    Okay.  Well, again, let's try to back up a

8    little bit here.

9          A.    Sure.

10         Q.    You are currently employed at Kramer One?

11         A.    Yes.

12         Q.    What work does Kramer do?

13         A.    Kramer One is an architecture and planning

14   firm.  They specialize in the design and planning

15   of shooting ranges.

16         Q.    How long have you been with Kramer One?

17         A.    Can I take a look at my notes here?  I

18   have dates and that kind of stuff in here which I

19   really don't remember off the top of my head.

20         I started with Kramer One in 2001.

21         Q.    And what is your title with Kramer One?

22         A.    Shooting range safety and health

23   specialist.

24         Q.    And what are your responsibilities as a



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 21 of 314 PageID #:5682

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                    21

1    shooting range safety and health specialist?

2         A.   It could be compared to an industrial

3    hygienist that works specifically with shooting

4    ranges.  I deal with safety issues that may result

5    from the use of shooting ranges, as well as health

6    issues that may result as a result of utilizing

7    shooting ranges.

8         Q.   When you say safety issues, what do you

9    mean by that?

10        A.   Well, there are consequences that can

11   result sometimes unfavorably when you don't use a

12   shooting range properly or it may not be designed

13   properly.  My basic duty or my primary duty with

14   Kramer One is to assist range operators in risk

15   management issues, avoiding those undesirable

16   consequences, and also unfortunately investigating

17   issues that may occur that are undesirable, whether

18   it be an injury, an illness, a bullet escapement

19   from a range, property damage, and so on.

20        Q.   Is that because ranges can be dangerous

21   places if they are not run properly?

22        A.   Oh, yes.

23        Q.   I don't want to put words in your mouth.

24   It sounds like your job is to go to a range and do



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 22 of 314 PageID #:5683

JACK J. GIORDANO                                        September 20, 2013
EZELL vs. CITY OF CHICAGO                                              22

1   this risk assessment or to investigate problems

2   which may have occurred at a range and help the

3   range owners do a better job or fix the problems

4   that are occurring; is that right?

5        A.   That's correct.  And also, as part of the

6   design process, my involvement would be working

7   with the architect to assure that the facility is

8   designed and that we understand what the client

9   wants in a facility and to make sure it can be

10  utilized the way they would like it to be within

11  the parameters necessary for it to be a safe

12  environment.

13           And also, from a regulatory standpoint, my

14  other duty would be to assure that the client would

15  be able to operate that facility in accordance with

16  any of the federal regulations or state regulations

17  that may be applicable to the operation, which

18  would be OSHA, EPA, sometimes Clean Water Act,

19  stuff like that.

20       Q.   Because there are a lot of regulations

21  which do govern ranges at the federal level?

22       A.   There are regulations that would be

23  applicable to the shooting range operation.  In the

24  industry there are a lot of shooting ranges that



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 23 of 314 PageID #:5684

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      23

1    the operators are unaware of how the federal

2    regulations apply because the federal regulations

3    are -- in the regulations, shooting ranges aren't

4    mentioned.  So my job is to identify which

5    regulations would apply to the operation, not

6    necessarily the facility itself, but the shooting

7    range operation, and to educate and to assure that

8    the shooting range operator is in compliance with

9    those regulations.

10          For example, with the Hearing Conservation

11   Program, that's a federal regulation.  So part of

12   my duties with Kramer One would be to assure that

13   the shooting range operator understands that

14   program and can be in compliance with it.

15       Q.   Would it be fair to say there are a fair

16   number of federal regulations, which although they

17   don't specifically mention ranges, apply to range

18   operation?

19       A.   Absolutely.

20       Q.   So you do get involved in the design of

21   ranges?

22       A.   Yes.

23       Q.   In addition to actually going to ranges

24   that already exist and helping them, for lack of a



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 24 of 314 PageID #:5685

JACK J. GIORDANO                              September 20, 2013
EZELL vs. CITY OF CHICAGO                                    24

1    better phrase, do a better job?

2         A.    That's correct.

3         Q.    Do you actually do the design yourself?

4         A.    No, I do not.

5         Q.    You are not an architect, are you?

6         A.    I am not.

7         Q.    You are not an engineer?

8         A.    No.

9         Q.    So how do you get involved in the design

10    process?  Who involves you?

11        A.    My boss involves me.

12        Q.    Is that Mr. Kramer?

13        A.    Mr. Kramer, yes.

14        Q.    How many employees does Kramer One have?

15        A.    Right now I am not 100 percent sure.  I

16    work from home.  Mr. Kramer is one of two principal

17    architects in the firm.  You would have to ask

18    Mr. Kramer.  I'm not sure how many employees we

19    have right now.

20        Q.    So you would work with Mr. Kramer or

21    another architect in your firm?

22        A.    I just work with Mr. Kramer.  He is the

23    shooting range guru in the firm, so I work just

24    with Mr. Kramer.



JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          25

1        Q.    And he's based in Arizona?

2        A.    Scottsdale, Arizona, that's correct.

3        Q.    And you are in New Jersey?

4        A.    That's correct.

5        Q.    And does Kramer One work in those two

6    jurisdictions only or elsewhere?

7        A.    No.  We work all over the country.

8        Q.    So you said a second ago you don't design

9    the range itself?

10       A.    Myself, I do not.

11       Q.    You just give input as to what things

12   should be in the design?

13       A.    That's correct.

14       Q.    Almost like a consultant; is that a fair

15   description?

16       A.    Now, are you speaking of the firm or me

17   personally?

18       Q.    You personally?

19       A.    No.  I'm an employee.  It's similar as a

20   consultant.  I would be consulted.  Mr. Kramer

21   would say what do you think of this, does this fit,

22   is it what OSHA would want to see or EPA, what do

23   you think about this issue.  So yes, I would be

24   like a consultant, but I work for Kramer One, so



1  I'm an employee.

2      Q.   You are like his resource on safety and

3  health issues?

4      A.   That's correct.

5      Q.   Do you ever get involved in issues that

6  involve construction?

7      A.   Sometimes I will attend maybe a punch list

8  meeting or meeting with the client to determine

9  what the construction or what the design will

10 consist of.  This is more in a programming stage

11 where we would get together with the client and

12 discuss what the intended facility, future facility

13 might look like.  I may attend meetings like that.

14 I'm not sure if that's what you mean by

15 construction.

16     Q.   Pretty much.

17          Do you concern yourself with things like

18 the thickness of the walls, the types of

19 ventilation systems, those kinds of things, things

20 about the construction of the ranges itself?

21     A.   Personally, myself, I do not.  That's

22 Mr. Kramer's job.  He's the architect.

23     Q.   You are, again, just focused on the safety

24 and health issues?



1      A.    That's correct.

2      Q.    Making sure the range as designed by

3   Mr. Kramer comports with whatever laws may apply to

4   that range?

5      A.    That's correct.

6      Q.    And to make sure it's a safe range?

7      A.    Correct.

8      Q.    So, again, you said a second ago you are

9   not a soundproofing expert, so you don't get

10  involved in soundproofing issues?

11     A.    Personally, myself, sometimes I do get

12  involved in those issues from a safety and health

13  standpoint, not from really an acoustic standpoint,

14  because there are other issues that may overlap.

15     Q.    Tell me how they may overlap.  I'm just

16  curious.

17     A.    I personally in most circumstances would

18  not recommend the use of certain acoustic materials

19  on shooting ranges because it leads to health

20  issues.  And the fact that it's very difficult to

21  clean that type of product, which mostly always is

22  a porous material that can collect the particulates

23  that can be harmful on shooting ranges.

24          So me, personally, and really from the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 28 of 314 PageID #:5689

JACK J. GIORDANO                              September 20, 2013
EZELL vs. CITY OF CHICAGO                                      28

1   firm's point of view, we very rarely would suggest

2   or spec soundproofing materials inside of a

3   shooting range for that reason.

4        Q.   But you don't get involved in the actual

5   design, whether to put it in or not; you just

6   advise as to this may have a health concern and

7   that's it?

8        A.   That's typically the client's decision,

9   whether they want to use it or not; not our

10  decision.  We would make recommendations whether to

11  use it or not to use it.  In my experience with the

12  firm, most of the times we say we would recommend

13  not to use it.

14       Q.   So you only get involved in things like

15  soundproofing to the extent it impacts health or

16  safety?

17       A.   That's correct.

18       Q.   You don't get involved in terms of what it

19  costs to do it?

20       A.   I do not.  Mr. Kramer would.  If a client

21  said I would like to use it and they ask Mr. Kramer

22  for a cost estimate on how much would it cost to do

23  it, he certainly would be involved in that.

24       Q.   Again, that's not your responsibility?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 29 of 314 PageID #:5690

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          29

1      A.    That's not my responsibility, no.

2      Q.    Along those same lines, do you ever get

3   involved in a client's business plan, reviewing the

4   business plan?

5      A.    I do not.

6      Q.    When you go to an existing range, do you

7   ever get involved in, again, the business or

8   operating plan of that range?

9      A.    When you say operating plan, could you

10  clarify what you mean by operating plan?

11     Q.    I probably used that term loosely and

12  thank you for clarifying that.

13          Business plan, do you get involved in how

14  much projected profit they are going to have, how

15  much revenue they bring in?

16     A.    I do not, no.

17     Q.    You are, again, just focused on health and

18  safety?

19     A.    That's correct.

20     Q.    When you say you are a health specialist,

21  is that limited to things like the lead particulate

22  that is dispelled when the guns are fired or is it

23  broader than that?

24     A.    It's a little more broad than that.  I



1    will explain and I will try and clarify it because

2    I know a lot of this information may not be

3    familiar to you.

4              As we mentioned before, there are certain

5    consequences that can result from using a shooting

6    range.  And what we hope the consequence is is you

7    fire the gun, the bullet hits the target, and stops

8    in the backstop or bullet trap and there's no

9    injury and no illness occurring because of that

10   firearm discharge.

11             So we have an issue of injury, which is a

12   safety issue, and also the issue of illness that

13   can occur when that firearm is discharged.  So my

14   job is to see that there's no injury either on or

15   off the range and there's no illness.  That's where

16   the health comes in.

17             And you are correct, the particulates that

18   are expelled from a firearm, not only lead, but

19   there are other particulates that are dispelled

20   that are very dangerous and can be very poisonous,

21   again, it's a risk management issue on how to

22   control that discharge from the firearm, whether it

23   be from an engineering standpoint, a ventilation

24   system, or from a personal hygiene standpoint, how



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 31 of 314 PageID #:5692

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      31

1   to clean your hands, how to clean the floor, stuff

2   like that.

3       Q.   So as the health specialist, do you get

4   involved in what choices a client makes in terms of

5   how they deal with those issues or in terms of a

6   health perspective?

7       A.   Yes.

8       Q.   You don't get involved in terms of it's a

9   cost perspective?

10          Like they have two options to clean the

11  lead and you are advising them as to the cost;

12  that's their decision?

13      A.   That would be their decision.  But, of

14  course, I would have to consider what the client

15  would be capable of doing.  Even from an

16  architectural standpoint, of course, you would

17  never recommend to a client to do something that

18  you know they couldn't afford to do unless that was

19  the only option.  And from a health perspective,

20  there usually is more than one way to acceptably

21  deal with an issue.  I hope that's clear.

22      Q.   That is.  My question probably wasn't as

23  clear, but you did a nice job in clearing it up for

24  me.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 32 of 314 PageID #:5693

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                    32

1          I'm just trying to get to the point of,

2   again, you look at things from the health and

3   safety perspective?

4       A.    That's correct.

5       Q.    And cost doesn't come in unless you have

6   an awareness that there are different options and

7   you tell them the costs?

8       A.    That's correct.

9       Q.    And then they make the choice from there?

10      A.    That's entirely correct.

11      Q.    Okay.  You said there are usually multiple

12  options available to address multiple health and

13  safety concerns?

14      A.    That's correct.

15      Q.    I am assuming they have different ranges

16  of cost?

17      A.    Yes.

18      Q.    In other words, you can have a Cadillac or

19  you can have a Hyundai?

20      A.    Exactly.

21      Q.    And, again, that's Mr. Kramer's job, to

22  really deal with the client on those issues, or do

23  you get involved in that as well?

24      A.    It would depend if it was a -- if it were



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 33 of 314 PageID #:5694

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          33

1  a health issue that was not a design issue, it

2  would be my job.  In other words, if it were me

3  telling a client they need to clean their range

4  with a certified HEPA vacuum, that would be my job,

5  not Mr. Kramer's job.

6       But if it were that I identified that a

7  ventilation system on a range was inappropriate, it

8  would be Mr. Kramer's job to decide what would be

9  appropriate and then give an estimate of what that

10 cost would be to make that appropriate.

11     Q.   Understood.

12          Before you worked at Kramer One, you were

13 employed by the Port Authority?

14     A.   That's correct.

15     Q.   You were a law enforcement officer for the

16 Port Authority of New York and New Jersey Police?

17     A.   That's correct.  I was a police officer,

18 yes.

19     Q.   How long were you with the Port Authority?

20     A.   17 years.

21     Q.   And what were your general

22 responsibilities as an officer for the Port

23 Authority?

24     A.   General police duties, patrol function.  I



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 34 of 314 PageID #:5695

JACK J. GIORDANO                                  September 20, 2013
EZELL vs. CITY OF CHICAGO                                        34

 1   was on a lot of different teams and details.  I

 2   spent a lot of time teaching at the police academy.

 3        Q.   Just curious for today's deposition, the

 4   Port Authority, can you just describe what the

 5   jurisdiction of the Port Authority is?

 6        A.   The Port Authority of New York and New

 7   Jersey is a bistate agency which polices interstate

 8   bridges, tunnels.  The World Trade Center was our

 9   jurisdiction.  The PATH system, the Port Authority

10   Trans Huts and train system, all of the ports in

11   New York and New Jersey, the seaports, interstate

12   tunnels, Lincoln Tunnel, Holland Tunnel.

13        Q.   The bridges?

14        A.   The bridges, yes, the interstate bridges,

15   George Washington, Staten Island Bridges.  I think

16   I got everything in there.  And the airports, all

17   of the three major airports.

18        Q.   So pretty wide jurisdiction?

19        A.   Yes.  Our jurisdiction, as far as our

20   police powers, we were state police in both states,

21   New York and New Jersey.

22        Q.   So you could work in either state?

23        A.   That's correct.

24        Q.   Cross the borders and not have any



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 35 of 314 PageID #:5696

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                       35

1    jurisdictional issues?

2        A.    Correct.

3        Q.    Separate and apart from the New York and

4    New Jersey Police Departments?

5        A.    Right.  It was a separate agency, separate

6    police department, yes.

7        Q.    I wanted to clarify that for today.

8        A.    Okay.

9        Q.    On Page 11 of your report, you list a

10   series of assignments you had while you were at the

11   Port Authority, including Emergency Services Unit?

12       A.    That's correct.

13       Q.    Special Weapons Team, Special Weapons

14   Maintenance Officer, and Explosive Device Detection

15   Team?

16       A.    That's correct.

17       Q.    Were you assigned to specific teams for a

18   period of time and then relegated back to general

19   duties or are these things you did throughout your

20   career at the Port Authority?

21       A.    These were duties that I may have been

22   assigned to and I really can't give you a date when

23   I was assigned to them.  But once you are assigned

24   to it, that's basically what you do in addition to



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 36 of 314 PageID #:5697

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          36

 1  your regular duties, unlike, say, the New York City

 2  Police Department who has a dedicated explosive

 3  detection team or a bomb squad.  We didn't have

 4  that.  We performed those duties in addition to our

 5  patrol function.

 6          So once I received that training, I

 7  performed that function, but it was in addition to

 8  my regular patrol function.

 9      Q.   Okay.  Did any of the assignments involve

10  firing ranges?

11      A.   Yes.

12      Q.   Which ones?

13      A.   The police academy.

14      Q.   That's not listed here, though, is it?

15      A.   It should be.

16          Adjunct firearms instructor, police

17  armorer, range safety officer with the Port

18  Authority Police at the end.  It's on the copy you

19  gave me.

20      MR. SIGALE:  Same paragraph, just the next

21  line.

22  BY MR. AGUIAR:

23      Q.   I was talking about the prior sentence.

24  That's why I was confused.  I'm talking about the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 37 of 314 PageID #:5698

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          37

 1   prior sentence.

 2           So the second sentence was an additional

 3   assignment you had about being at the Port

 4   Authority for 14 years as an adjunct firearms

 5   instructor?

 6        A.   Yes.

 7        Q.   It's a separate assignment?

 8        A.   Separate assignment from what?

 9        Q.   The confusion set in because I was talking

10   about the ones listed in the prior sentence.

11        A.   Okay.

12        Q.   And you included your work as an adjunct

13   as another assignment; is that correct?

14        A.   That's correct.

15        Q.   Okay.  Is that the only one which involved

16   firing ranges?

17        A.   Yes.

18        Q.   What were your responsibilities as adjunct

19   firearms instructor at the academy?

20        A.   Providing primary training for recruits,

21   providing in-service training for active members of

22   the force.  My assignments in that duty was to

23   maintain range safety as a range safety officer, to

24   maintain firearms as a police armorer.



1      Q.    What is a police armorer?

2      A.    A police armorer is like a gunsmith in a

3   police department to make sure their firearms work

4   properly and make sure they function safely.

5      Q.    Did any part of your responsibility with

6   the Port Authority involve construction of ranges?

7      A.    I am pausing here because we were in a

8   unique situation and my answer will be no with an

9   explanation or no with an addition.

10          Our initial shooting range that I was

11   first assigned to was in the B-6 level of the World

12   Trade Center.  The range was designed by the firm

13   who designed the World Trade Center.  And that

14   company knew a lot about skyscrapers, but they

15   didn't know anything about shooting ranges.

16          So they gave us a range that wound up

17   causing illness to a lot of the people that worked

18   there, including the range master who became very

19   ill because of exposure to lead.  And once it was

20   determined that the reason was that the facility

21   wasn't designed properly or wasn't adequate, it was

22   decommissioned and we shut that building down.

23          Now, I did have a little bit of input into

24   the design of the new facility, not much.  It was



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 39 of 314 PageID #:5700

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          39

1    very, very minimal.  And that's why I say no with

2    that little caveat.

3         Q.   Just curious, what input did you have, do

4    you recall?

5         A.   We may have been asked where should the

6    classrooms be, what do you need.  It was

7    programming stuff.

8         Q.   You were the client, basically what is it

9    you need?

10        A.   We were the client.

11        Q.   You were just giving them what your wish

12   list was so to speak?

13        A.   That's exactly right.

14        Q.   Were any of the ranges you instructed at,

15   whether it was one in the World Trade Center or the

16   one you mentioned, the new one that was built, were

17   they open to the public?

18        A.   No.

19        Q.   Used for only --

20        A.   Could you repeat that question again?

21        Q.   Were either of the ranges you just spoke

22   about, the one in the World Trade Center or the one

23   that was built subsequent, were they ever open to

24   the public?



1      A.    No.

2      Q.    Used only for police?

3      A.    That's correct.

4      Q.    Moving on, you mention that you served as

5    the director and principal firearms instructor of

6    the Eastern Firearms Academy in Hillsborough,

7    New Jersey, from 2001 to 2003?

8      A.    That's correct.

9      Q.    Did you do this while you were employed by

10   the Port Authority?

11     A.    No.   That was after I retired.

12     Q.    And what is the academy?

13     A.    That was a division of the Hillsborough

14   Outdoor Sports Center.  It was basically a shooting

15   school.

16     Q.    Saying it was a school, it wasn't a range

17   open to the public?

18     A.    The Eastern Firearms Academy was a school

19   that was located in a sporting goods facility that

20   included an indoor shooting range that was open to

21   the public.

22     Q.    So your school just used the facility to

23   teach firearms?

24     A.    I was an employee of the Eastern Firearms



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 41 of 314 PageID #:5702

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      41

1 | Academy and we used that range to do our training,

2 | yes.

3 |     Q.   Did you have to apply to be a student at

4 | the academy?

5 |     A.   Yes.

6 |     Q.   Were there certain requirements you had to

7 | meet to be a student of the academy?

8 |     A.   The only requirement that we had I believe

9 | was that you had to sign an affidavit that you had

10 | never been arrested, there was no reason that you

11 | could not handle a firearm, stuff like that.

12 |     Q.   Like a background check, so to speak?

13 |     A.   We didn't do a background check.  It was a

14 | questionnaire with an affidavit that you are

15 | attesting to the fact that there is nothing that

16 | would prohibit you from handling a firearm.

17 |     Q.   So, again, you just used this public range

18 | for your academy to teach people; is that a fair

19 | way to say it?

20 |     A.   Not quite, no.  It wasn't my academy.  I

21 | was an employee of the Hillsborough Outdoor Sports

22 | Center.  The academy was part of the Hillsborough

23 | Outdoor Sports Center.  It was operated like a

24 | separate entity, but it was the Hillsborough



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 42 of 314 PageID #:5703

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          42

1  Outdoor Sports Center.  So it was all one

2  operation.

3        Q.    That's where I was getting confused for a

4  second.

5        A.    Okay.

6        Q.    It says you planned and developed and

7  conducted basic and advanced civilian law

8  enforcement and security officer firearms training

9  programs?

10       A.    That's correct.

11       Q.    What percentage of the programs that you

12  planned or developed or taught were civilian?

13       A.    A very large percentage.  Most of the work

14  we did was civilian training.

15       Q.    What were your roles as director of this

16  academy?

17       A.    I was in charge of the entire program.  I

18  was in charge of any additional instructors that we

19  had working with us at one time -- I think we were

20  up to five instructors -- I would do scheduling,

21  programming, program management.  I was registering

22  participants.  I don't know if I left anything out.

23       Q.    Were you ever involved in making budgets

24  for the academy?



1      A.    That was part of my duty, yes.

2      Q.    Was it just for the academy part of the

3   operation?

4      A.    Just for the academy part of the

5   operation, not the range itself.

6      Q.    Would you do things like profit

7   projections and things like that?

8      A.    No.

9      Q.    And did you have any say into the design

10  of the range that you worked at?

11     A.    No.   The range was existing.

12     Q.    And while you were there, you didn't

13  recommend any changes to the range based on your

14  experience as a police officer?

15     A.    I recommended -- if I can back up a little

16  bit?

17     Q.    Sure.

18     A.    At that time I was acting as a safety and

19  health specialist with the National Rifle

20  Association.  Basically that started in 1991 as a

21  Range Technical Team advisor.  So at that time, I

22  was familiar with different issues that I did bring

23  to the attention of the range.  Certain of the

24  issues that I -- they were safety and health



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 44 of 314 PageID #:5705

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                            44

1    issues, which I did advise the range operator to

2    consider, which they did, and most of my

3    suggestions were implemented.

4           So that's as far as my involvement in how

5    the range was operated other than when I was

6    actually the range officer with a class.  That

7    would be the extent of my input into how the range

8    was operated.

9        Q.    Did your input just involve, again, health

10   and safety issues?

11       A.    That's correct.

12       Q.    It didn't involve design issues?

13       A.    No.

14           Can I just back up one second on that last

15   question?

16       Q.    Certainty.

17       A.    The only design issue that it may have

18   involved from a construction standpoint or from a

19   structure standpoint was my suggestion to remove a

20   bench that caused a safety issue, if you can call

21   that construction.  I'm talking about a shelf that

22   was built into the wall.  That's about it.

23       Q.    But, again, the genesis was safety?

24       A.    That's correct.



JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      45

1     Q.    What were the hours of operation for the
2   Eastern Firearms Academy?
3     A.    It wasn't a 24-hour operation.  It was in
4   operation when we had a class.  It was operated
5   certain days during the week when we had certain
6   events going on.  We conducted a lot of retired law
7   enforcement training.
8          In the State of New Jersey, you are
9   required to attend a certain amount of training in
10  order to keep your firearm and continue to carry
11  your firearm.  We conducted that training, so that
12  was say three times a week.  We gave classes maybe
13  once or twice a week.  And that fluctuated
14  depending on how many people were registered for
15  courses.  We added courses.  We deleted courses.
16  We did have night courses and I believe the range
17  was open until 10:00 p.m.
18    Q.    So the range had business hours?
19    A.    It had business hours, yes.
20    Q.    When did it open, do you recall?
21    A.    It was either 9:00 a.m. or 10:00 p.m.  I'm
22  not really 100 percent sure.
23    Q.    But it definitely had an opening and
24  closing?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 46 of 314 PageID #:5707

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                        46

1       A.   Yes.  9:00 a.m. or 10:00 a.m. I think.

2       MR. SIGALE:  You did, yeah.

3       THE WITNESS:  I said 10:00 p.m.  It was

4   9:00 a.m. or 10:00 p.m.  I'm not sure when the

5   opening time was.

6   BY MR. AGUIAR:

7       Q.   But it closed at 10:00 p.m.?

8       A.   I'm pretty sure it closed at 10:00 p.m.

9       Q.   And the range was a profitable range to

10  the best of your knowledge?

11      A.   No, it was not.

12      Q.   It was not profitable?

13      A.   It's no longer there.

14      Q.   When did it go out of business?

15      A.   In 2003.

16      Q.   Is that why you left?

17      A.   That's why I left.

18      Q.   You said a moment ago you are a member of

19  the NRA?

20      A.   I am a member of the NRA, yes.

21      Q.   How long have you been a member of the

22  NRA, if you recall?

23      A.   Maybe since I was 18 years old I think.

24      Q.   Are you aware that the NRA has sued the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 47 of 314 PageID #:5708

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          47

1    City of Chicago in various lawsuits over its gun

2    range ordinances and other gun-related ordinances?

3         A.   Not really.

4         Q.   You say that you were on the NRA Range

5    Technical Team.  You've referenced that before.

6         A.   Yes.

7         Q.   Let's talk about that.

8              What is the NRA Range Technical Team?

9         A.   In 1991, the National Rifle Association

10   assembled a group of individuals nationwide,

11   including Alaska and Hawaii, who had experience in

12   the shooting range industry.  My experience came

13   from the police department.  That's why I was

14   recommended for the team.

15             They provided training and we developed a

16   program that was designed to assist range

17   operators, existing range operators, and also to

18   assist other people who would like to build ranges

19   in getting ranges built and getting them built

20   correctly.

21        Q.   How big was this technical team?

22        A.   I really can't comment on how many were

23   initially assigned.  There were I'm sure at least

24   one person per state represented on the team.  I



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 48 of 314 PageID #:5709

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          48

1    know now it's much more than that.  There are more

2    than -- I know there are a lot more people involved

3    in that program than there were back then.

4            I left that program, by the way.  That's

5    another change on this resume.  I'm not a current

6    member of that program.  I retired from that in

7    December of 2012.

8            But to my knowledge, there were 73 or so

9    Range Technical Team advisors at that time when I

10   left and that's an estimate.  I'm not 100 percent

11   sure if that's correct.  At the time when I left, I

12   was the eastern region supervisor of that program.

13       Q.   So this was a program established by the

14   NRA to assist owners or prospective owners of

15   ranges in getting their operations running?

16       A.   That's correct.  We also assisted in a lot

17   of -- there was a lot of metamorphosis that

18   occurred in the program since its inception in

19   1991.  But we kind of assisted anybody who was

20   interested in range safety and range issues.

21           So an entity, say your office, contacted

22   the NRA and said we have a range in our

23   jurisdiction and we have some issues with it, we

24   would like to know if that range is being operated



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 49 of 314 PageID #:5710

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          49

1   properly, if there is anything that we can do to

2   improve it.  And as long as we had the acceptance

3   and approval of the range, we would go out and

4   assist you in determining whether that range was

5   being operated properly.  We would offer

6   suggestions on how changes could be made to make

7   sure it's operated properly, safely, whether it be

8   operational suggestions or engineering suggestions.

9        So in that regard, that was the other

10  service that the team was providing, and to my

11  knowledge, still provides.

12       Q.   Just so I understand, in '91 this team was

13  formed?

14       A.   That's correct.

15       Q.   And together you put together the

16  guidelines by which you all go out and do your jobs

17  or you advised range owners throughout the country?

18       A.   We developed the guidelines of the

19  operation of the team.  The standards that we

20  adopted were the standards that had already been

21  written in the National Rifle Association's Range

22  Manual.  At the time it was referred to as the

23  Range Manual.  Now it's referred to as a Range

24  Sourcebook.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 50 of 314 PageID #:5711

JACK J. GIORDANO                               September 20, 2013
EZELL vs. CITY OF CHICAGO                                    50

1          At the time and currently, the Range

2   Manual at that time and the Range Sourcebook now,

3   is basically considered by professionals in the

4   industry as the standard for shooting range

5   development, design and development.

6          Q.   But it has no effective law?

7          A.   It has no effective law.  It's not a code.

8   As a matter of fact, there is even a section of the

9   book that says it is not a code.

10         NRA is not a regulatory agency.  It's

11  basically a compilation of suggestions and

12  guidelines that have been found in the industry to

13  be successful.

14         Q.   So in other words, basically the NRA

15  technical team acts as consultants to range owners?

16         A.   That's exactly right.  As a matter of

17  fact, before a Range Technical Team advisor is

18  assigned to a case or is allowed to work on a case,

19  a consultant agreement is transferred between the

20  client and the NRA before someone is even assigned

21  to a case.  So that's a good definition of what a

22  Range Technical Team advisor would be, kind of a

23  consultant, yes.

24         Q.   Were you compensated for your job on the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 51 of 314 PageID #:5712

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          51

 1  Range Technical Team?

 2      A.    No.   That was a voluntary position.

 3      Q.    Does the NRA collect a fee for its

 4  services from range owners, do you know?

 5      A.    They did at the time.   That has changed

 6  since the inception of the program.   Also, at one

 7  time there was a fee.   At one time it was cost

 8  recovery.

 9           I do not believe there is a fee right now.

10  I'm not 100 percent sure.   That may have changed

11  only last year.   I'm not 100 percent sure of that.

12  Actually, it's on the NRA's website.   It would be

13  easy to find out.   I really don't know.

14      Q.   I think you testified you had two weeks of

15  training before you were put on the Technical Team;

16  is that correct?

17      A.   Being put on the Technical Team involved

18  the training.   I think I testified to the fact that

19  I wasn't sure if it was one week or two weeks, but

20  there was training involved.

21      Q.   And just, again, what were the topics of

22  training that you had to go through to be on this

23  Technical Team?

24      A.   It was range operation, range design.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 52 of 314 PageID #:5713

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          52

1   There were OSHA issues, safety issues, health

2   issues.  It involved all different types of ranges.

3   It just wasn't one specific type of range.  It was

4   outdoor ranges, indoor ranges, shotgun ranges,

5   archery ranges, high-power rifle ranges, silhouette

6   ranges.  So it ran the gamut of all of the types of

7   ranges that we typically see in the United States.

8        Q.   You said operational issues.

9             What does that mean?

10       A.   The way a range is operated has a very

11  dramatic effect on whether a range is safe or not

12  safe or healthy or not healthy.  So even a properly

13  designed range can become a health or safety hazard

14  if it's not operated properly.

15       Q.   So your focus was on, again, health and

16  safety issues?

17       A.   That's correct.  Although, as a Range

18  Technical Team advisor, we did make recommendations

19  regarding design issues also in that regard.  I

20  don't necessarily or typically do that now in my

21  capacity as a health and safety specialist with

22  Kramer One.  But back then, our clients were

23  looking for that type of information and we did

24  provide the type of information.  We did not design



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 53 of 314 PageID #:5714

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                  53

1    ranges, but we did make suggestions on different

2    design features, again, based on health and safety

3    issues that they may want to consider incorporating

4    in the type of range that they were considering

5    building or if they had an existing range, maybe an

6    engineering feature that may assist them in

7    managing the risk that may be associated with the

8    activity they were conducting.

9        Q.    Okay.  Going back to the top paragraph, it

10   says you are an EPA-certified lead inspector/lead

11   risk assessor?

12       A.    That's correct.

13       Q.    How long have you been certified, do you

14   recall?

15       A.    I'm going to look at my notes here.  I

16   became certified in 2009.

17       Q.    What did you have to do to become

18   certified?

19       A.    That is an OSHA/EPA certification that

20   requires 40 hours of training.

21       Q.    And who provides the training?

22       A.    It's the OSHA Academy, OSHA Training

23   Institute, and that was held at the University of

24   Medicine and Dentistry in New Jersey.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 54 of 314 PageID #:5715

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          54

1      Q.   And, again, there is an exam you have to

2   take after the course?

3      A.   There is a state exam that has to be

4   taken.  There is a course exam that has to be taken

5   after you take the course.  There is also a state

6   exam you have to take to become licensed.

7      Q.   And you took both exams and passed?

8      A.   That's correct.

9      Q.   Did you have to do anything to maintain

10  your certification?

11     A.   Yes.  You have to be recertified every two

12  years.

13     Q.   So I assume you have been recertified?

14     A.   Yes.

15     Q.   Once?

16     A.   That's correct.

17     Q.   Your second one is probably coming up

18  soon?

19     A.   It's coming up in November, yes.

20     Q.   And your certification isn't specific to

21  gun ranges, is it?

22     A.   It is not.

23     Q.   It's lead in general?

24     A.   No.  Actually, it's specific to lead paint



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 55 of 314 PageID #:5716

JACK J. GIORDANO                                      September 20, 2013
EZELL vs. CITY OF CHICAGO                                             55

1    issues.  That's a certification that I wanted

2    because I wanted to be able to take the information

3    that is included in that certificational program

4    and apply it to shooting ranges.

5              I am not involved in the lead paint

6    testing industry or the construction industry, but

7    I've used the information that I've learned through

8    that certification and applied it.  A lot of it

9    overlaps because lead is lead.  I only apply what

10   I've learned in that certification to shooting

11   ranges.

12        Q.   So, again, just to clarify, your

13   certification is only in lead-based paint?

14        A.   The certification is dealing with

15   lead-based paint, right, that's correct.

16        Q.   But you use it in your range work?

17        A.   That's correct.

18        Q.   How does it apply?

19        A.   Assessing risk as far as health on an

20   indoor range, or an outdoor range for that matter,

21   would kind of overlap or be very similar to the way

22   you would assess risk if you walked into say a

23   housing unit and tried to determine where the lead

24   was that could become -- that a person could be



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 56 of 314 PageID #:5717

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                           56

 1   exposed to and cause an overexposure issue.

 2          So there were a lot of overlapping details

 3   in that program, in that course, that I have

 4   brought to my knowledge base for use in the

 5   shooting range industry, along with the testing

 6   procedures.  The testing procedures are the same,

 7   whether it be a swipe sampling or as far as lead

 8   abatement procedures, air sampling, stuff like

 9   that.

10          There is an overlap of procedural issues

11   which are all covered in regulation how certain

12   things need to be done, which overlap from the one

13   industry to the next.

14      Q.   Okay.  Let's turn to the next page,

15   Page 12 of Exhibit 1.  I just want to go through

16   very quickly some of the things on here because I

17   want to get to the substance of your report in a

18   few minutes.

19      A.   Sure.

20      Q.   At the top of the page you list a series

21   of roles you played with the NRA?

22      A.   Correct.

23      Q.   Again, these all concern instruction and

24   safety and health issues, right?



1     A.   Yes.  Sure.

2     Q.   None involve construction of a range,

3  design of a range, or management of a range, do

4  they?

5     A.   The chief range safety officer

6  certification requires knowledge of operating a

7  range, of how a range should be operated safely.

8  It has nothing to do with designing a range, but it

9  does have to do with range operational issues.

10     Q.   You are talking specifically about how

11  people actually use the range --

12     A.   That's correct.

13     Q.   -- when you say operations?

14     A.   That's correct.

15     Q.   You are not talking about business

16  operations?

17     A.   No.  That's correct.

18     Q.   Again, it says you are a certified lead

19  inspector for the New Jersey Department of Health?

20     A.   That's correct.

21     Q.   And that's the certification we spoke

22  about a few moments ago?

23     A.   That's correct.

24     Q.   The next three items you list for



1   certifications involve the State of New York

2   Department of Investigations.  You took a training

3   course at John Jay College of Criminal Justice.

4   You took a course in crime scene investigations.

5      A.   Correct.

6      Q.   Then you had the International Association

7   of Bomb Technicians and Investigators, which is a

8   course in advanced explosives and terrorist

9   activities?

10      A.   Right.

11      Q.   Again, I think you testified earlier none

12   of these involved ranges?

13      A.   That's correct.

14      Q.   Looking down the bottom of the page, it

15   said you received in May 2002 a tribute of

16   appreciation from the United States EPA for

17   assistance in development of Best Lead Management

18   Practices Program?

19      A.   That's correct.

20      Q.   In terms of that, did that specifically

21   relate to ranges or is it lead paint?

22      A.   No, no.  That was specifically related to

23   ranges.

24      Q.   Okay.  Did you develop this program by



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 59 of 314 PageID #:5720

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          59

1  yourself?

2      A.    No, I did not.

3      Q.    Who else was on it with you?

4      A.    We were basically an overview group, the

5  Range Technical Team.  We were basically critiquing

6  a document that the EPA eventually published, which

7  is the -- is it listed there?

8      Q.    Yes.

9      A.    Well, Best Lead Management Practices for

10 Lead on Outdoor Shooting Ranges is the actual title

11 of the document that they produced.  We had, as a

12 team -- when I say as a team, it was primarily the

13 three supervisors of the Range Technical Team,

14 along with the employees of the NRA at the range

15 department as a group of about five or six of us

16 who had input in review.  Basically it was a peer

17 review of the document that the EPA was intending

18 on publishing and that's how we received that.

19     Q.    So you weren't hired by the EPA to develop

20 this program?

21     A.    No.

22     Q.    The NRA with which you were affiliated did

23 basically a commentary on what EPA produced and

24 then they appreciated your work and gave you a



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 60 of 314 PageID #:5721

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                            60

1   tribute of appreciation for that?

2       A.   That's correct.

3       Q.   Okay.  You say they published it?

4       A.   They published it, yes.

5       Q.   And I think you said this was involving

6   lead on outdoor shooting ranges?

7       A.   That's correct.

8       Q.   It did not involve indoor ranges at all?

9       A.    It did not.  The only aspect of indoor

10  ranges that it may have an impact on would be the

11  removal of the lead that is on the indoor range.  I

12  am not even 100 percent certain.  It may have

13  mentioned recycling of lead on indoor ranges, but

14  I'm not 100 percent sure on that.

15      Q.   On Page 13, it says in August of 2004 you

16  were recognized by the Marshals Service for

17  assistance in presenting a safety and health

18  program to approximately 125 Deputy US Marshals in

19  Dallas?

20      A.   That's correct.

21      Q.   Was that also done in conjunction with

22  your work with the NRA, if you recall?

23      A.   No, it was not.  The NRA didn't have

24  anything to do with that.  As far as I remember,



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 61 of 314 PageID #:5722

JACK J. GIORDANO                                          September 20, 2013
EZELL vs. CITY OF CHICAGO                                                  61

1  the Marshals Service contacted me personally.  The

2  Marshals Service paid all of my expenses.  I wasn't

3  paid for that presentation, but they paid all of my

4  expenses.  I don't believe the NRA was involved in

5  that.

6            Now, the reason why I did it, of course,

7  was probably due to the fact that I had a lot of

8  experience with the NRA Range Technical Team and

9  this is what I was doing at the time.  But it was

10 not an NRA-sponsored event or anything like that.

11      Q.   Again, you say safety and health program.

12 So it was related specifically to those issues

13 only?

14      A.   Yes.  And that's a general statement

15 because a lot of safety and health issues may

16 include design questions and design issues also.

17 For instance, in my presentations I talk about the

18 safety of keeping all the projectiles on the range.

19 Well, there are many ways that you keep projectiles

20 on your range.  Some of them may include

21 engineering features, so we always have to bring up

22 the engineering issues.

23            Of course, I didn't teach people how to

24 design ranges in this class, in this presentation,



1    but I do point out that certain engineering

2    features may be necessary or certain range

3    operators may want to consider certain engineering

4    features to deal with certain health or safety

5    issues.

6         Q.   So, again, you only bring up the

7    engineering issues or design issues as they relate

8    to health and safety issues?

9         A.   That's correct.

10        Q.   Again, you are not advising them as to

11   what the cost is business-wise, what is better for

12   their business model, nothing like that?

13        A.   No.  That's correct.

14        Q.   In June of 2005 and April of 2011, it

15   looks like you gave the same lecture, if I'm not

16   mistaken?

17        A.   Very similar lecture.  I think maybe the

18   United States Marshals Service lecture may have

19   been more specific to their operation.  Yes, it was

20   very similar.  You have copies of all of those

21   presentations.  They were all very similar.

22        Q.   And I did see those in your documents.

23   Thank you for producing them.

24             Let's flip down to your publications in



1  the last ten years.  I'm curious on the third one

2  down, an article called the Four Es of Range

3  Development and Safety.

4       A.    Right.

5       Q.    What are the four Es you're talking about?

6       A.    We have come up with an easy way for a

7  range operator to remember how they maintain safety

8  and health.  And it's through the implementation of

9  the four Es.

10      Q.    What are those?

11      A.    Evaluate the activity that you are

12  planning to conduct or evaluate the existing

13  facility to decide what activities can safely be

14  conducted.

15           Then there is engineer, which mean you

16  want to engineer the facility to enable the

17  facility to accommodate the type of activity that

18  you've decided you want to conduct through your

19  evaluation process.  There's educate, which is a

20  very important component of maintaining safety on

21  any shooting range.

22           We usually discuss how we educate people

23  on shooting ranges, how we educate the surrounding

24  community, which is also important, and how we



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 64 of 314 PageID #:5725

JACK J. GIORDANO                                   September 20, 2013
EZELL vs. CITY OF CHICAGO                                         64

1   educate the operators themselves of the shooting

2   ranges to make sure the ranges are operated

3   properly.

4          And then there is enforcement to make sure

5   that all of the rules and regulations that have

6   been developed through the three prior Es to make

7   sure that those rules and regulations or procedures

8   are enforced to maintain safety and health.

9       Q.   It sounds like from what you have been

10  saying this morning that to operate a range safely

11  is a very involved process?

12      A.   I agree with that.

13      Q.   You agree with that?

14      A.   Yes.

15      Q.   And a continuously ongoing process?

16      A.   That's exactly right.

17      Q.   The next three things under your

18  publications, it looks like a three-part series.

19          Would I be right about that?

20      A.   Yes, you are right.

21      Q.   And it looks like these deal solely with

22  OSHA regulations and exposure to lead?

23      A.   That's correct.

24      Q.   Nothing else besides lead exposure?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 65 of 314 PageID #:5726

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                              65

1      A.    I know you have copies of those articles

2    and I believe it was just devoted to lead exposure.

3    This was not a safety article.  This was only lead

4    and OSHA regulations.

5      Q.    On Page 14 when you talk about your past

6    four years of expert deposition testimony, you

7    mention that you were an expert in a case involving

8    a range suicide?

9      A.    That's correct.

10     Q.    What were the facts of that case very

11   briefly, if you recall?

12     A.    An individual went into the facility.  It

13   was a public firearms range.  They rented a

14   firearm, they went on the range, and they committed

15   suicide.

16     Q.    What testimony did you provide in that

17   case?

18     A.    Safety and health issues, operational

19   issues, stuff like that.

20     Q.    What's the substance of your testimony,

21   that the suicide was caused by something or other

22   or facilitated by the range in some way?

23     A.    I couldn't recall the exact questions that

24   were asked or the answers that I gave.  But I was



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 66 of 314 PageID #:5727

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      66

1    an expert witness for the defendant obviously.

2              It was the defendant's position or the

3    shooting range operator's position that they did

4    everything possible that they could have done, and

5    it was not really their lack or -- what word am I

6    looking for?  It wasn't a fact that they were

7    operating at a low level of care that caused that

8    to happen.

9              That was basically the crux of my

10   testimony, how they operated, what level of care

11   they were operating at, was it the way ranges are

12   typically operated, stuff like that.

13        Q.   So your opinion was that the range was

14   actually operating consistent with what would be

15   normal procedures?

16        A.   That's correct.

17        Q.   Do you know how the case was resolved?

18        A.   I do not, no.

19        Q.   Did you ever provide testimony in court?

20        A.   I did not.

21        Q.   Have you ever been an expert in any other

22   case besides this one case?

23        A.   Yes, I have.

24        Q.   What cases were those, if you recall?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 67 of 314 PageID #:5728

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          67

1      A.    I have a list.

2      Q.    Is it on your CV?

3      A.    No, it's not.  It's right here.  It's here

4    somewhere.  There you go.

5         MR. AGUIAR:  David, do you want to see it?

6         MR. SIGALE:  I was given it actually last

7    night.  Go ahead if you want to make copies or

8    something.

9         THE WITNESS:  As you can see, since 1991 --

10   it's not a very extensive list because that's not

11   really the work that I do.  Sometimes we are forced

12   into it.

13        MR. AGUIAR:  Rather than spend any time with me

14   reading this, I will read this on the quick lunch

15   break we are going to take and I'll come back to

16   this at another time.  I don't want to delay.  I

17   want to look at this a little bit more closely.

18        MR. SIGALE:  Sure.  There's only two on there I

19   think that actually involve litigation.  Most of it

20   is just public hearings and stuff.

21        MR. AGUIAR:  That's why I want to take a look

22   at it real quick.

23        MR. SIGALE:  Whatever.

24



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 68 of 314 PageID #:5729

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      68

1    BY MR. AGUIAR:

2        Q.    Mr. Giordano, have you ever owned a firing

3    range?

4        A.    No, I have not.

5        Q.    Owned a company that owns a firing range?

6        A.    No.

7        Q.    Been a business manager or financial

8    officer of a range?

9        A.    No.

10       Q.    Ever attempted to open a range, but

11   abandoned that attempt?

12       A.    No.

13       Q.    Do you have any other experience, whether

14   educational or professional, that you believe

15   qualifies you to provide the opinions contained in

16   your report other than what we have already

17   discussed here today?

18       A.    I think you need to rephrase that

19   question.  I really didn't understand it.

20       Q.    I'm trying to get to whether you believe

21   you have other experience, whether it's

22   professional or educational, which qualifies you to

23   provide the opinions you are going to give today

24   other than what we have already talked about today.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 69 of 314 PageID #:5730

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                           69

1          Is there anything else out there that I

2    should know about which makes you qualified to say

3    what you are saying in this case?

4          Does that make sense?

5          A.   Nothing other than what you already know

6    from this experience that's in this report and my

7    other experience that I can tell you about.  Once I

8    have the copy of my CV, I will be able to explain

9    the other types of programs I have been in, the

10   other experience I have been to, the other training

11   courses I have been involved with, all dealing with

12   either firearm or shooting ranges.

13        Q.   So there are other things on that CV

14   that --

15        A.   That we haven't talked about.

16        Q.   -- do inform your ability to make these

17   opinions?

18        A.   Yes.

19        MR. AGUIAR:  We will revisit that later.  Now

20   might be a good time to take a quick two-minute

21   break.

22        MR. SIGALE:  Why don't we do that?

23                    (Whereupon, a break was taken.)

24



```
 1   BY MR. AGUIAR:

 2       Q.   I'm going to hold off on looking at the

 3   CV, which was sent to me by facsimile, and your

 4   list of other expert testimonies until after our

 5   lunch break.  I don't want to delay anything by

 6   looking through them at this point.

 7       A.   That's fine.

 8       Q.   Let's look at your report, which is

 9   Exhibit 1.  Let's get to the fun of it.

10            Did you write this entire report?

11       A.   I had input into the report.  Actually,

12   Mr. Kramer is the one that physically sat down and

13   typed it.

14       Q.   So you didn't write this?

15       A.   I did not physically write the report.

16       Q.   When you said you had input into the

17   report, did you have input into all areas of the

18   report or only certain parts of the report?

19       A.   Certain parts of the report that dealt

20   with safety and health issues.

21       Q.   Can you identify for me which portions of

22   the report that would be?

23       A.   Okay.  I remember having some input in

24   Issue 4.
```



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 71 of 314 PageID #:5732

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                  71

1          Before I continue, I would like to clarify

2      or qualify the answer I just gave you where I said

3      that only with safety and health issues.  There are

4      also issues that are listed in the report that I

5      can remember Mr. Kramer and I discussing and

6      deciding on what to write regarding those issues.

7      So it may not just be safety and health issues,

8      but, as I recall, I know we had a discussion about

9      Issue Number 4.

10         Q.   Any issue which you had input, let's list

11     those out.

12         A.   Definitely Issue Number 6, definitely

13     Issue Number 7, definitely Issue Number 8,

14     definitely Issue Number 9, definitely Issue Number

15     10, and definitely Issue Number 11, definitely

16     Issue Number 12; not Issue Number 13, not Issue

17     Number 14.

18          I had input into Issue Number 15.  I

19     remember discussion on Issue Number 16; not Issue

20     Number 17, not Issue Number 18.  I definitely had

21     input into Issue Number 19.

22         Q.   Okay.  Thank you for doing that.  I

23     appreciate that.  The reason I asked you to do that

24     is because there are experts who are using the same



1  report and I want to identify, if at all, if it's

2  even possible or if it's true, whether you are only

3  opining on certain issues as opposed to Mr. Kramer

4  or if you're both opining on all issues?

5       A.   Okay.

6       Q.   So is it a fair statement then based on

7  what we just did, that exercise, that you are not

8  opining or providing an opinion on Issue 1?

9       A.   Yes.

10      Q.   Issue 2?

11      A.   I do remember having a discussion with

12 Mr. Kramer on Issue Number 2.

13      Q.   Well, my question now is a little

14 different than it was before.  Let me clarify it.

15           Before we went through and identified the

16 issues you had input on.

17      A.   Right.

18      Q.   And those you did not have input on.

19      A.   Right.

20      Q.   Now I'm taking it to the next step and

21 saying for the ones you did not have input on, I

22 made the logical leap that you are not providing an

23 opinion on that particular issue.

24      A.   Okay.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 73 of 314 PageID #:5734

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          73

1        Q.    And that's what I'm trying to get at now.

2        A.    I see.

3        Q.    Let's go back to Issue 1 and make sure we

4   are on the same page.

5        A.    Okay.

6        Q.    Are you going to be providing an opinion

7   in this case on Issue 1 which is the applicant

8   credential requirement?

9        A.    Oh, yes, definitely.

10       Q.    So you are providing an opinion on that

11  issue?

12       A.    Yes.

13       Q.    Even though you had no input into what

14  Mr. Kramer wrote here?

15       A.    Let me just review this.

16             I just reviewed the first sentence here

17  and although I do believe that my opinion on this

18  issue or our opinion on this issue -- I can't speak

19  for Mr. Kramer -- I believe that this issue has

20  been addressed in the new ordinance.

21       Q.    We will get to that in a moment.

22       A.    Okay.

23       Q.    Let's try this a different way.  Let's go

24  at this a different way.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 74 of 314 PageID #:5735

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      74

1          You signed this report, did you not?

2     A.    I did.

3     Q.    And before you signed it, did you read it?

4     A.    Yes, I did.

5     Q.    And do you agree with everything that's

6   stated in this report?

7     A.    Yes, I do.

8     Q.    And are all of the opinions expressed in

9   this report your opinions?

10     A.    Yes.

11     Q.    Okay.  So even though you didn't have

12   input into certain issues, you agree with what

13   Mr. Kramer wrote on those issues?

14     A.    I agree with what he wrote based on my

15   experience and his experience and our discussion on

16   the issues, even though I may not have had direct

17   input into what he wrote.  We certainly discussed

18   the issues, but I may not have had input into what

19   he wrote.  Is that more clear?

20     Q.    Yes.

21          For the issues which you did not have

22   input, did you make any suggestions to Mr. Kramer

23   as to things you would add or delete from what he

24   wrote?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 75 of 314 PageID #:5736

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          75

1      A.   I may have.  I really don't remember.  I

2   mean I can tell you that I definitely did not have

3   any suggestions, although we probably did discuss

4   it on the shooting range surface treatment, which

5   would be Issue Number 16.  I remember discussing

6   that, but I don't think I made any suggestions.

7           When you say input, I'm taking input to

8   mean I didn't write part of that paragraph.  It was

9   discussion between Mr. Kramer and myself to

10  determine what would go in that paragraph.

11     Q.   Let's backpedal.  This is very confusing

12  because, again, we have two experts with one

13  report.

14          I'm trying to determine here are there

15  issues on which you are going to provide expert

16  testimony --

17     A.   Yes.

18     Q.   -- and there are issues which Mr. Kramer

19  is going to provide expert testimony?

20     A.   That's correct.

21     Q.   And does that mean you are going to

22  provide testimony on the whole report, as is he, or

23  are there issues that are yours and issues that are

24  his?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 76 of 314 PageID #:5737

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                           76

1        A.   Well, there are certain issues I don't

2   feel qualified to address in this report that

3   Mr. Kramer is qualified to address.  I'm sure he is

4   going to feel the same way when it gets to be

5   certain issues that I would be qualified to answer

6   and he may not be qualified to answer.

7             Again, he is the architect.  I'm the

8   safety and health specialist.  But there is a lot

9   of overlap.  That's one of the reasons why it

10  becomes a little confusing.  Some safety issues

11  might also be engineering issues, where it may be a

12  safety issue, but Mr. Kramer would be more suited

13  to answer a question on engineering features than

14  me, but it is a safety issue.  Our collaboration on

15  the report reflects that, yes, it's a safety issue,

16  Mr. Kramer made some engineering suggestions that

17  he would be qualified to answer, but that we

18  discussed because it was a safety issue.

19       Q.   Okay.  So in other words -- and I don't

20  want to put words in your mouth, so correct me if

21  I'm wrong.

22             There are certain issues which he is the

23  expert on, but you agree with his opinion, but you

24  are not qualified to actually give the expert



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 77 of 314 PageID #:5738

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                    77

1    opinions yourself?

2        A.    That would be a good way to express it,

3    yes.

4        Q.    Are the ones that Mr. Kramer is the expert

5    on, you read his stuff, agreed with it, but you

6    don't feel you are qualified to actually give the

7    opinion yourself, are those the ones which you list

8    as not having provided input on a few moments ago?

9        A.    Could we go through that list again really

10   quick?

11       Q.    Sure.

12       A.    Did I say Number 1?

13       Q.    You said Number 1.

14       A.    I'm going to have to change that and say

15   that I feel I would be qualified as it's written

16   here.  I am under the understanding that this may

17   have changed.  But as it is written here in our

18   report, I would feel qualified to render an opinion

19   based on my position as a safety and health

20   specialist or to give an opinion on Number 1.

21       Q.    Let's go through them from this angle

22   based on how you described it.

23            Which of these issues do you not believe

24   you are qualified to provide an opinion on based on



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 78 of 314 PageID #:5739

JACK J. GIORDANO                                     September 20, 2013
EZELL vs. CITY OF CHICAGO                                            78

1  your experience?

2      A.   Okay.  That's a better way to do it.

3           Issue Number 13, Issue Number 17, Issue

4  Number 18, I think that would be it.

5      Q.   So I am going to go ahead and try to

6  create a clean record here.  Let's hope we get this

7  right.

8      MR. SIGALE:  Did you say 16?

9      THE WITNESS:  I don't think I did.  Let me

10  look.

11      MR. SIGALE:  I just want to know if I heard you

12  right, that's all.

13           What numbers did he say in his last

14  answer?

15                     (Whereupon, the record was read

16                      as requested.)

17      MR. SIGALE:  That's fine.

18      THE WITNESS:  Issue Number 16 is an issue that

19  I would be able to comment on.

20  BY MR. AGUIAR:

21      Q.   I'm going to try to clean this up.  Let's

22  hope we get this right.

23           You testified that this report was a

24  collaboration of you and Mr. Kramer?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 79 of 314 PageID #:5740

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     79

1      A.    That's correct.

2      Q.    And you had input into Issues 4, 6, 7, 8,

3   9, 10, 11, 12, 15, 16, and 19, and you did not have

4   input as to what was written on 1, 2, 3, 5, 13, 14,

5   17, and you are not sure about 18; is that correct?

6      A.    I don't think it is.  It all depends on

7   what your definition of input is.  I think I had

8   input -- I believe I had input into the entire

9   report, every issue, except that certain issues I

10  don't feel that I would be qualified to give a

11  correct answer or an expert answer in.

12          I know for a fact that we discussed every

13  one of the issues.  Although, my input may have

14  been Mr. Kramer saying this is what I am -- well,

15  first of all, we were presented with the ordinance

16  and we both read the ordinance, the initial

17  ordinance, and we both collaborated on which issues

18  would be in this report.  So in that respect, I had

19  input into the entire report, every issue, because

20  we both took that ordinance apart and said which

21  parts of this ordinance do we have a concern with

22  and do we feel are not reasonable.

23          So we took each of those out individually.

24  We did this individually, not collaboratively, not



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 80 of 314 PageID #:5741

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                  80

1   together.  And then we collaborated and said this

2   issue, this issue, this issue.  We basically both

3   came up with the same issues.  I don't really

4   recall if there was any conflict there.  But once

5   we had our list, then we determined what we were

6   going to discuss or how we were going to present

7   our concern with that particular ordinance, with

8   that particular statute.

9         So from that regard, I had input into

10  every one of these, but I may not have had direct

11  input into the language that went into the response

12  to each issue.  I certainly had input as far as my

13  opinion to Mr. Kramer.  But, again, he was the one

14  who actually put it to paper.  This was phone to

15  phone, let's talk about this, and that's how we did

16  it.

17      Q.   Mr. Kramer wrote the report?

18      A.   He wrote the report himself, that's

19  correct.

20      MR. SIGALE:  I just wanted to make the

21  objection that when you read the list a couple of

22  questions ago, Mr. Giordano specifically said

23  earlier that he had input into Number 2, which you

24  left out of your list there.  That's all I was



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 81 of 314 PageID #:5742

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          81

1  going to say.

2      MR. AGUIAR:  Thank you.  The record will show

3  that I'm sure.

4      MR. SIGALE:  Sure.

5  BY MR. AGUIAR:

6      Q.   After Mr. Kramer wrote the report, you

7  reviewed the report?

8      A.   That's correct.

9      Q.   And did you make any changes to the report

10  before it was submitted?

11     A.   Not that I can recall.

12     Q.   You didn't believe there was anything that

13  needed changing or taking out or added to the

14  report?

15     A.   No, I did not.

16     Q.   You just said that you don't believe

17  you're qualified to provide an issue on the issues

18  on Number 13, 17, and 18?

19     A.   That's correct.

20     Q.   Those would be Mr. Kramer?

21     A.   That's correct.

22     Q.   And you don't anticipate providing

23  testimony at trial on any of those three issues?

24     A.   That's correct.



1       Q.    Before we move on, you said you were

2   provided with the ordinance.

3             Who provided it to you?

4       A.    Mr. Kramer.

5       Q.    Do you know who provided it to Mr. Kramer?

6       A.    I think it was forwarded to me through

7   Mr. Kramer and initially from Mr. Sigale.

8       Q.    All you received was the ordinance itself?

9       A.    Initially, yes, I believe, that's the

10  case, yes.

11      Q.    And, indeed, on Page 1 of your report, the

12  documents you reviewed in preparing the report are

13  listed there, are they not?

14      A.    On which page, Page 1?

15      Q.    Page 1.

16      A.    I'm sorry.  Yes.  That's correct.

17      Q.    And you reviewed all of those documents

18  before you worked with Mr. Kramer on this report?

19      A.    That's correct.

20      Q.    Nothing else?

21      A.    Nothing else.

22      Q.    Let's talk about the first paragraph for a

23  second.

24      A.    Sure.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 83 of 314 PageID #:5744

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          83

1      Q.   You say in I think the fourth sentence,

2   quote, prior to reviewing the amended municipal

3   code of Chicago, we had he never seen regulations

4   pertaining to shooting range facilities that were

5   anywhere near as restrictive as those for the City

6   of Chicago, end quote.

7           So you have never seen regulations like

8   the City's anywhere else?

9      A.   That's correct.

10     Q.   Have you done any research as to whether

11  there are any jurisdictions which have any kind of

12  regulations similar to what the City of Chicago

13  has?

14     A.   I have not.

15     Q.   So it is possible that there may be a

16  municipality out there which has something similar

17  to what the City of Chicago has?

18     A.   It's possible.

19     Q.   You didn't actually look to confirm that?

20     A.   Did not.

21     Q.   Let's look at Page 8 and 9 of your report

22  at the bottom real quick.

23     A.   Got it.  8 or 9?

24     Q.   Bottom of 8 and on to Page 9.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 84 of 314 PageID #:5745

JACK J. GIORDANO                              September 20, 2013
EZELL vs. CITY OF CHICAGO                                      84

1      A.    Okay.

2      Q.    And there you list some requirements that

3  you are aware of that are existing in other

4  jurisdictions?

5      A.    That's correct.

6      Q.    And this is based on the jurisdictions in

7  which you have actually done business?

8      A.    Maybe that we have actually done business

9  as well as ranges that we have visited in our

10  capacity as Range Technical Team advisors and

11  members of the National Rifle Association's Range

12  Conference Training Staff.  We didn't talk about

13  that.

14      Q.    Okay.  But, again, these are the ones you

15  know about based on your experience?

16      A.    That's correct.

17      Q.    But not based on exhaustive research

18  across the country?

19      A.    No.  That is correct.

20      Q.    Because you have actually never seen

21  regulations like the City of Chicago's before --

22  and that's your testimony, right?

23      A.    That's correct.

24      Q.    Is it fair to say then that you have never



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 85 of 314 PageID #:5746

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      85

1    actually seen whether a range subject to these

2    restrictions or regulations can be open and run as

3    a viable business?

4         A.    That's correct.

5         Q.    And you have really no experience with

6    these type of regulations one way or the other?

7         MR. SIGALE:   I'm just going to object as to

8    form.

9         THE WITNESS:   It's kind of general.  I have

10   some experience with regulations, ordinances, that

11   specifically pertain to shooting ranges, but

12   nothing like what we have seen in this ordinance.

13   BY MR. AGUIAR:

14        Q.    I should have been more specific.

15             You have no experience with a regulatory

16   scheme like the City of Chicago one way or the

17   other?

18        A.    That's correct.

19        Q.    I should have been more specific.

20             In the next sentence you say, and I'll

21   quote it again, quote, we doubt it would be a

22   prudent business venture to construct a shooting

23   range facility in the City of Chicago under the

24   current regulations.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 86 of 314 PageID #:5747

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                           86

1          I want to draw your attention to the use

2     of the word doubt.  You use the word doubt.  So I

3     take that to mean you aren't certain that the

4     City's regulatory scheme would make it imprudent to

5     open a range in Chicago; is that true?

6          A.    That's true.  It's our opinion.

7          Q.    You don't know for sure that it would; you

8     just doubt it?

9          A.    That's correct.

10         Q.    Again, I'm going to use a word Mr. Sigale

11    is not going to like.

12              You are speculating?

13         A.    Because of our experience and how many

14    ranges we've visited throughout the country, I

15    think it's maybe a little more than speculation.

16    It's more based on what we've seen in our personal

17    experience.  I don't know if speculation is a good

18    word to use.

19         Q.    But you don't know?

20         A.    I don't know, no.

21         Q.    And what is the basis for your doubt that

22    it would be a prudent business venture?

23         A.    Our personal experience and our review of

24    the ordinance.



1        Q.    Anything else?

2        A.    I'm not really sure I understand what

3   you're asking.

4        Q.    You say you doubt it would be a prudent

5   business venture.

6              Why do you doubt it?

7        A.    Based on the ordinance and what is

8   required or the restrictions that are present in

9   the City of Chicago currently.

10        Q.    And that's it?

11        A.    In accordance with the ordinance that we

12   have reviewed and even -- well, in accordance to

13   what is in our report, let's put it that way.  It's

14   my understanding that there have been several

15   revisions which may change that opinion.  But until

16   I know that, I'll base my opinion on what's in my

17   report and not even what's in the updated or the

18   amended ordinance.

19              So based on what's in my report, I would

20   say yes, that the fact that I doubt that it would

21   be a prudent business venture for somebody to open

22   a range here is based on the issues that are

23   addressed in my report.

24        Q.    Okay.  Let's talk about the issues that



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 88 of 314 PageID #:5749

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          88

1  you identify in your report just very broadly here.

2     A.    Okay.

3     Q.    There are 18 issues, right?

4     A.    Right.

5     Q.    18 different ordinances, so to speak, or

6  issues that you're saying make it hard.

7          Are you saying that they each

8  independently make it imprudent to open a range or

9  is it them as a collection that make it hard to

10 open a range?

11    A.    It's probably a collection.  If there were

12 one obstacle that were listed in this new ordinance

13 that a range operator would have to overcome, it

14 probably wouldn't be a big deal.  But being that

15 there are so many obstacles and so many issues,

16 it's probably fair to say that it is a compilation

17 of issues that may make it undesirable for an

18 individual to try and open a range.

19    Q.    You said that there have been amendments

20 to the ordinance since you wrote your report?

21    A.    That's my understanding.  I have only seen

22 some, but I understand that there have been more.

23    Q.    We will go through them today together.

24    A.    Okay.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 89 of 314 PageID #:5750

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          89

1      Q.   But it's your testimony that based on what

2   those changes are and what's been eliminated or

3   altered, that may alter your opinion?

4      A.   Absolutely.

5      Q.   And it may make it more prudent -- not

6   make it prudent, but make it less imprudent to open

7   a range?

8      A.   Right.   The changes may make it less

9   difficult or less desirable for somebody to open a

10  range.   That's correct.

11         I'm sorry.   I said less desirable.   I

12  meant to say more desirable.   The changes may make

13  it more desirable for someone to open a range.

14     Q.   I was about to say something.   I'm glad

15  you got there first.

16         Let's focus on the word prudent for a

17  second.   I take the word prudent to mean wise.

18  Would you agree with that?

19     A.   That's correct.

20     Q.   So you're not saying that it would be

21  impossible to open a range in the City of Chicago

22  on these regulations, are you?

23     A.   No, I am not.

24     Q.   You are just saying it wouldn't be wise?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 90 of 314 PageID #:5751

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          90

1      A.   That is correct.

2      Q.   Or prudent?

3      A.   That is correct.

4      Q.   Have you made any effort to calculate how

5   much additional cost compliance with these

6   regulations would add to a range?

7      A.   I do not do cost estimation, so I would

8   not have done that, no.

9      Q.   Have you calculated how much revenue these

10  provisions could possibly cost a range owner?

11     A.   I have not.

12     Q.   So is it fair to say that you don't know

13  and haven't calculated what the financial impact of

14  these regulations would be on a range owner,

15  whether it would be additional cost or lost

16  revenue?

17     A.   Ask me that question again.

18     Q.   Certainly.  I can understand why you want

19  that asked again.

20          Based on your testimony you just gave us,

21  is it fair to say that you don't know as you sit

22  here today what the financial impact would be on a

23  range owner, whether it be in terms of additional

24  cost caused by the regulations or lost revenue



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 91 of 314 PageID #:5752

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          91

1  opportunities caused by the regulations?

2          Is that true?  You haven't quantified it?

3      A.   I cannot quantify it, no.  I do have an

4  opinion on whether it would cause a financial

5  impact based on my experience, but I cannot

6  quantify it, no.

7      Q.   You haven't tried to?

8      A.   I have not tried to personally, no.

9      Q.   So you don't know as you sit here today

10 whether actually in application these regulations

11 make ranges too expensive to open and operate in

12 the City of Chicago?

13     A.   Ask me that question again.

14     Q.   Certainly.

15          As you sit here today, based on what you

16 have just testified to, you actually don't know

17 whether these regulations when put into application

18 with a range owner make a range too expensive to

19 operate in the City?

20     A.   I don't think there could be a situation

21 where -- I'm tied up a little bit with too

22 expensive.  You're implying it would be

23 unreasonably expensive to open up a range because

24 of the ordinances?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 92 of 314 PageID #:5753

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          92

1      Q.   Is that your position, that these

2   regulations make it too costly to open a range in

3   the City of Chicago?

4      A.   It may make it more costly.  It may not

5   make it prudent from an operational standpoint.

6   When I say operational, now I'm talking about what

7   type of profit the range is going to make.  Each

8   ordinance would affect a different part of that

9   opinion.

10         Ask your question again and then I will

11   answer it.  I promise.

12      Q.   Let me think if I can go about this a

13   different way.

14      A.   Okay.

15      MR. AGUIAR:  Would you read back his answer,

16   please?

17                        (Whereupon, the record was read

18                         as requested.)

19      MR. AGUIAR:  That helps.

20   BY MR. AGUIAR:

21      Q.   What I'm trying to get at is you don't

22   know as you sit here today whether the City's

23   regulations make a range cost prohibitive?

24      A.   No, I do not know.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 93 of 314 PageID #:5754

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                              93

1      MR. AGUIAR:  Let's get into the actual

2   provisions.  The fun begins.  David and I have done

3   it how many times now?

4      MR. SIGALE:  50.

5      THE WITNESS:  50?

6      MR. SIGALE:  I don't know.

7      MR. AGUIAR:  Can we mark things all at once

8   just to make things easy?

9                      (Whereupon, Giordano Deposition

10                      Exhibit No. 2-4 were marked for

11                      identification.)

12   BY MR. AGUIAR:

13      Q.   Mr. Giordano, I have handed you what the

14   court reporter has marked as Exhibits 2, 3, and 4.

15   These are going to be the tools we are going to use

16   to discuss the issues that you've identified in

17   your report.  Let me give you a brief explanation

18   as to what these are.

19          Exhibit 2 are copies of the ordinances

20   that you take issue with in your report.  Now, I

21   will tell you that these are published by American

22   Legal Publishing Corporation.  They don't update

23   their ordinances as soon as the City Council acts

24   here.  It takes them a while to get it into their



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 94 of 314 PageID #:5755

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          94

1  books.  So some changes made to these ordinances

2  are here.  Some are not.

3         So to help us with that, I have handed you

4  Exhibit 3, which are changes that were made to the

5  ordinance on the date -- well, they were introduced

6  on December 12, 2012.  These changes are actually

7  reflected in Exhibit 2, but I'm going to use this

8  to help us understand what's been changed.

9         Exhibit 4 is the ordinance which you said

10  you reviewed in preparation for today's deposition.

11  These are the changes which were made on

12  September 11th of this year.  These changes are not

13  tracked on Exhibit 2.

14         Do you have a question?

15     A.   Is that to say this is not the ordinance

16  we reviewed?  This is an ordinance with changes

17  that I have not seen?

18     Q.   You saw these.

19     A.   Okay.

20     MR. SIGALE:  Exhibit 4 is the 9/11/13 changes,

21  correct?

22     MR. AGUIAR:  Yes.

23  BY MR. AGUIAR:

24     Q.   They are just not in the published version



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 95 of 314 PageID #:5756

JACK J. GIORDANO                              September 20, 2013
EZELL vs. CITY OF CHICAGO                                    95

 1   yet.  Does that make sense?

 2        A.    I understand.

 3        Q.    I just wanted to give you an overview as

 4   to what these are because we are going to use the

 5   three of them together either to track the change

 6   or to just see what's actually been changed, but

 7   not put in the official reports yet.

 8            Let's talk about Issue Number 1.  Here you

 9   take issue with the City's definition of applicant,

10   correct?

11        A.    Correct.

12        Q.    And its impact on who has to be disclosed

13   on an application to obtain a shooting range

14   license, correct?

15        A.    Correct.

16        Q.    I will tell you that since you wrote the

17   report, this definition of applicant has been

18   changed?

19        A.    I understand that, yes.

20        Q.    Were you aware of that before you came

21   here today?

22        A.    Yes, I was.

23        Q.    Let's turn to Exhibit 3 and I'm going to

24   draw your attention to Page 2.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 96 of 314 PageID #:5757

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      96

1      A.    I have a blank page here.  Is that

2  correct?

3      Q.    Are you kidding me?

4            Oh, that was my very diligent secretary

5  making a copy because there was a water mark on the

6  back of the page, which is something City Council

7  does.  It's actually numbered at the bottom.  Good

8  catch, though.

9            Let's review the change here.

10           Before we do that, have you seen this

11  change before?

12     A.    I believe this is a copy of what I have

13  reviewed.  Yes, I did see this change.

14     Q.    So in Issue 1 of your report you take

15  issue with applicant because it includes any person

16  in connection with the preparation of filing of the

17  application, including, but not limited to, any

18  attorney, accountant, consultant, expediter,

19  promoter or lobbyist, and these people are required

20  to provide a CFP and FOID card number?

21     A.    That's correct.

22     Q.    Just to summarize your position -- and

23  tell me if I'm wrong -- your position is that this

24  is unreasonable because it would preclude a large



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 97 of 314 PageID #:5758

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          97

1    number of people from actually working on a range

2    application because they wouldn't have CFP and FOID

3    cards?

4        A.    That's correct.

5        Q.    Did I fairly state your objection?

6        A.    Yes.

7        Q.    Let's look again at Exhibit 3.  You will

8    see that applicant -- right there.  You have it.

9        A.    Oh, okay.

10       Q.    Applicant has been changed.  The

11   definition does no longer say anyone who is

12   required to be disclosed pursuant to Section

13   4-151-030, Part B, and instead it says makes any

14   person applying for a license issued under this

15   chapter and any person who, number one, is an

16   officer, director, manager, managing member,

17   partner, general partner or limited partner of an

18   entity seeking a license issued under this chapter,

19   or, two, owns directly, or indirectly through one

20   or more independent ownership entities, five

21   percent or more of the interest or voting shares in

22   an entity seeking a license issued under this

23   chapter, or, three, is among the top three percent

24   holding the highest percentage of ownership in an



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 98 of 314 PageID #:5759

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          98

1  entity seeking a license under this chapter.

2      A.    Correct.

3      Q.    So you would agree that if you look down

4  under 4-151-030, Subpart (b), with regards to the

5  application, it says at the last sentence the

6  application shall be verified by oath or affidavit

7  and shall include the following statements or

8  information:  One, in the case of an individual,

9  the name, date of birth, residence address, current

10  telephone number, and Social Security number of the

11  applicant; in the case of a partnership, limited

12  partnership, corporation, limited liability company

13  or other legal entity, the date of its organization

14  or incorporation, the objects for which it was

15  organized or incorporated, and the name, residence

16  address, date of birth, and Social Security numbers

17  of any applicant.

18          Would you agree then that the concern you

19  expressed in Issue Number 1 has been resolved by

20  the City of Chicago?

21      A.    Yes.

22      Q.    So Issue 1 is no longer an issue?

23      A.    That's correct.

24      Q.    So it no longer has any deleterious



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 99 of 314 PageID #:5760

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          99

1    impact -- I shouldn't use that phrase.

2            It doesn't have any negative impact on the

3    ability of someone to open a range in the City of

4    Chicago in your opinion?

5        A.   It's hard for me to say that.  What I will

6    say is that our concern was that qualified

7    consultants -- we were looking at it from a

8    consultant architect firm standpoint -- would have

9    been omitted because we would not be obviously

10   eligible for the documents that were required to

11   work on that project.

12           So as far as I'm concerned, our concern as

13   a firm, as Kramer One, would have been addressed

14   and I have no other opinion on how the current

15   ordinance was amended, but it certainly would

16   resolve my concern of the requirement in the

17   previous version that a consultant would have to

18   have the FOID card and all of that.  I would no

19   longer have a concern about Issue Number 1

20   personally.

21       Q.   Okay.  Let's move along then to Issue

22   Number 2.

23           In Issue Number 2 you take issue with the

24   City's Ordinance Number 4-151-030(f), which says



1  that the Commissioner may deny -- I'm going to

2  paraphrase here -- may deny the issuance or renewal

3  of a license or revoke a license if the

4  Commissioner deems that it would be a deleterious

5  impact to the community?

6      A.   Correct.

7      Q.   And deleterious impact is defined in the

8  ordinance?

9      A.   Correct.

10     Q.   Would you just state for me what your

11 objection to that provision is?

12     A.   It would be difficult for a range operator

13 to have control over what someone might identify as

14 deleterious impact.  For example, if a range

15 operator opened up a shooting range and say the

16 crime statistics for burglaries went up in the

17 neighborhood and the burglaries were a result of

18 people breaking into the cars of his patrons in the

19 street, it's hard for a range operator to make a

20 determination -- it would be hard for the range

21 operator to operate or to -- what's the word I'm

22 looking for?  It's beyond his scope of control.  It

23 would be beyond the range operator's or the owner

24 of the business's scope of control in certain

Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 101 of 314 PageID #:5762

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        101

 1   circumstances.

 2          So I think that I understand the intent of

 3   this issue and I am sure it also applies to other

 4   businesses in the community.  But I think it's

 5   written in a manner that would make it difficult

 6   for someone that is interested in opening up a

 7   range to make a determination whether it would be

 8   advisable under these circumstances being that

 9   something that is not under his control may cause

10   him to lose his application or to lose his license

11   in the future, especially after the application was

12   already approved, the construction was built, and

13   he was in operation.

14          So although I understand the intent and I

15   understand the purpose, it may be a fact that

16   somebody may say, well, if I open up a range and

17   invest a large quantity of money and crime

18   increases in the neighborhood, I may lose my

19   business, so maybe I want to think about building

20   the range somewhere else where this type of an

21   issue would not be hanging over the owner's head,

22   so to speak.

23      Q.   So, again, your concern is that it would

24   potentially dissuade a business owner from opening



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 102 of 314 PageID #:5763

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          102

1    a range?

2         A.    Correct.

3         Q.    Because there would be uncertainty as to

4    whether he or she would be able to keep that

5    license if they actually got it in the first place?

6         A.    That's right.

7         Q.    Based on conditions outside of their

8    control?

9         A.    Exactly.

10        Q.    You mentioned a second ago -- you're doing

11   a very good job of anticipating me -- that there

12   are other businesses that are subject to this

13   provision.

14             What if I told you that establishments

15   licensed to sell liquor, both retail and in a bar

16   situation, are subject to the same exact provision,

17   would that change your opinion at all?

18        A.    No.

19        Q.    Why not?

20        A.    Like I said, I understand the intent of

21   the ordinance.  The intent is to preserve the

22   community.  But, again, because of the issue, we

23   have to face reality and understand that this is

24   not just a -- not just a business.  This is not a



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 103 of 314 PageID #:5764

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        103

1  bowling alley.  It's not a bar.  It's a shooting

2  range.

3          In this industry -- and I've been involved

4  in a lot of cases where people take offense at

5  people using guns, even if it's legal and even if

6  it's done in a legal environment, in a proper

7  environment.  So you are subjecting a business that

8  may be under fire improperly or erroneously to a

9  procedure that may cause them to lose their

10 license.

11         I can give you an example.  I won't give

12 you a specific example of a case I've worked on,

13 but there are many.  I will use an outdoor range as

14 an example.  We have had many cases in the past all

15 over the country where residents surrounding the

16 shooting range will either bring suit or file

17 complaints on a regular basis against shooting

18 ranges that they just don't want in their

19 community.  It's just that they don't like

20 shooting, they don't like guns, and they don't want

21 a shooting range there.  That happens very

22 frequently.

23         In a situation like this, we have a

24 situation where it would be up to a bureaucratic



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 104 of 314 PageID #:5765

JACK J. GIORDANO                                 September 20, 2013
EZELL vs. CITY OF CHICAGO                                      104

1   person in the government to say, well, we have X

2   number of complaints about this shooting range, so

3   we are not going to renew their license.  That

4   could be very detrimental to any shooting range,

5   whether it be here or in any other state,

6   especially if there is a provision that would

7   require or that would allow a person to revoke a

8   license because of those complaints that may not

9   even be founded.

10          So we have to be careful.  As I said, I

11  understand the intent, but we have to be careful

12  with this type of business that we're in.

13      Q.    First of all, you mentioned that you had

14  examples from outdoor ranges?

15      A.    That's right.

16      Q.    The City of Chicago does not currently

17  allow outdoor ranges?

18      A.    I understand that.

19      Q.    Do you have any examples of indoor ranges

20  where this has happened?

21      A.    I have an example of a case that I worked

22  on personally where an indoor range was denied an

23  application because of anti-gun, quote/unquote,

24  feelings of a city council, which is kind of



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 105 of 314 PageID #:5766

JACK J. GIORDANO                        September 20, 2013
EZELL vs. CITY OF CHICAGO                                105

1    similar.  And actually that went up to the Superior

2    Court of the State of New Jersey.

3         It would be a similar situation where if

4    that range were granted an application to finish

5    their project and their project opened and they had

6    a provision similar to this and there were anti-gun

7    feelings in the surrounding community that would

8    allow revocation of a license based on complaints

9    from the surrounding community, we may have a

10   situation where somebody might say that might not

11   be good for me, that might not be a healthy

12   environment for me to open my business.

13        Q.   So, again, you are saying that it --

14        A.   And that was an indoor range.

15        Q.   It would be a concern for a range owner?

16        A.   Correct.

17        Q.   But it doesn't prohibit them from opening

18   a range?

19        A.   No, it does not.

20        Q.   They would still be free to do that?

21        A.   That's correct.

22        Q.   You have been to Chicago before, correct?

23        A.   Yes.  I have been to Chicago before.

24        Q.   Are you aware -- and I don't know the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 106 of 314 PageID #:5767

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                            106

 1   exact number, so take what I'm saying for purposes

 2   of today's questions as true -- there are thousands

 3   of liquor licenses in the City of Chicago.

 4          That's not a far stretch, is it, do you

 5   think, based on the size of Chicago?

 6      A.   I couldn't tell you a number, but I

 7   wouldn't doubt it.

 8      Q.   And they are subject to the same exact

 9   requirements as shooting ranges?

10      MR. SIGALE:  I'll just object to foundation.

11   BY MR. AGUIAR:

12      Q.   Assume for purposes of my question they

13   are subject to the same exact requirements as a

14   shooting range that we're talking about here today.

15          Couldn't you see a circumstance where a

16   bar owner would be subject to the same kind of

17   neighborhood complaints and adverse neighbor

18   reaction to their bar being in the neighborhood?

19      MR. SIGALE:  I'm just going to object as to

20   foundation and speculative.

21      THE WITNESS:  I do not.  The reason is is it's

22   an entirely different subject, an entirely

23   different matter.

24          Certainly I understand that this provision



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 107 of 314 PageID #:5768

JACK J. GIORDANO                                     September 20, 2013
EZELL vs. CITY OF CHICAGO                                           107

1    applying to a bar, if the bar owner continually got

2    complaints that people were stumbling on the

3    sidewalk and messing up the neighborhood, making a

4    lot of noise, that that would be grounds for

5    revocation of a license if he didn't operate his

6    facility properly.  But I do not believe that he

7    would be viewed or subject to the same -- I'll use

8    the word political, or maybe I should use the word

9    emotional dislike, of that particular business just

10   because it's a shooting range where guns were

11   involved.  And, again, based on personal

12   experience, I've seen this happen in a lot of

13   different cases.

14          So I do think there is a big difference

15   between an ordinance like this applying to a bar or

16   any other business that may have a deleterious

17   impact on the community and a shooting range for

18   that reason, that it's going to be viewed

19   differently by the public in the first place before

20   it even opens the door.

21       Q.   Again, that's just based on your

22   experience dealing with firing ranges?

23       A.   That's exactly right.

24       Q.   You have no experience in dealing with



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 108 of 314 PageID #:5769

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      108

1  bars or establishments that sell alcohol?

2      A.   I do not.

3      Q.   You haven't studied what impact

4  neighborhood concerns may have on a bar's ability

5  to get or maintain a license, have you?

6      A.   I have not.

7      Q.   So you don't know, for example, whether a

8  bar owner actually faces the same kind of concerns

9  you are expressing with respect to firing range

10 owners?

11     MR. SIGALE:  I'm -- never mind.  If you can

12 answer, go ahead and answer.

13 BY MR. AGUIAR:

14     Q.   In other words, you have no basis for

15 asserting what bar owners actually face in terms of

16 neighborhood resistance?

17     A.   No, I don't, not personally, not a

18 personal account, right.

19     Q.   And you have haven't studied it?

20     A.   I have not.

21     Q.   So you are basically assuming something

22 about bars and bar owners and neighborhoods that

23 have bars, that it's just based on your own

24 personal ideas?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 109 of 314 PageID #:5770

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                              109

1      A.   That's a fair statement.

2      Q.   Okay.  So you don't actually know whether

3   a bar owner faces the same problems as a gun range

4   owner may face within the neighborhood; you don't

5   know for certain?

6      A.   I don't know for sure.  That's a fair

7   statement.

8      Q.   And, again, you said this might dissuade

9   an owner, but doesn't prohibit them, correct?

10     A.   That's correct.

11     MR. SIGALE:  I guess I'm just going to --

12     MR. AGUIAR:  There's no question pending.

13     MR. SIGALE:  I'm going to retroactively object

14  to form as to the previous question.

15     MR. AGUIAR:  Okay.

16  BY MR. AGUIAR:

17     Q.   You say in the last sentence of Issue

18  Number 2, and I quote, it would be hard to find a

19  business owner or lending institution that would

20  risk capital on a business venture that could be

21  closed for its outside the business owner's span of

22  control?

23     A.   Correct.

24     Q.   Has any business owner ever told you that



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 110 of 314 PageID #:5771

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                            110

1    he would not risk capital in the City of Chicago

2    based on this particular provision?

3        A.    No.   That's just an opinion.

4        Q.    Have you spoken to any lending

5    institutions of any kind and been told that they

6    would not risk capital on a range in the City of

7    Chicago because of this provision?

8        A.    I have not.

9        Q.    Again, that's just based on your opinion?

10       A.    That's correct.

11       Q.    And you didn't study the issue at all?

12       A.    I did not.

13       Q.    It's not based on some research or

14   something?

15       A.    No.

16       Q.    And is it safe to say that Issue Number 2

17   doesn't really affect the design or construction of

18   a range?

19       MR. SIGALE:   I will just object as to

20   foundation and speculation.

21       MR. AGUIAR:   I'm asking him his opinion.

22       MR. SIGALE:   I will object as to form then.

23   BY MR. AGUIAR:

24       Q.    Is it your opinion that Issue 2 has an



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 111 of 314 PageID #:5772

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          111

1   impact on design or construction of a range?

2       A.   It might.

3       Q.   How so?

4       A.   From a sound issue.  It might also from

5   a --

6       Q.   How from a sound issue?

7       A.   Well, I mean the design is going to

8   require obviously that we protect the surrounding

9   community somehow from gunfire sound, so that would

10  be a deleterious impact.  If I opened up a shooting

11  range and I left the windows open and the sound was

12  emitted into the streets, obviously that would be a

13  deleterious impact.

14          So the proper design of the shooting range

15  or designing the shooting range in a manner that

16  will encase the sound inside the shooting range is

17  a design issue and that would be affected by this

18  ordinance or if it were in an existing building.

19  It's very likely if a range were to be built in

20  Chicago, it's going to be built in an existing

21  building, not a new building, so it would be an

22  issue.

23      Q.   Why do you say that it would be built in

24  an existing building and not a new building?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 112 of 314 PageID #:5773

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      112

1          What's your basis for saying that?

2     A.    Well, there's not really a lot -- I'm sure

3    there -- and this is an assumption on my part.

4    There is probably not a lot of real estate in this

5    area to build a new building within the City

6    limits.   That's, again, an assumption on my part.

7     Q.    You haven't studied what land is available

8    in the City of Chicago?

9     A.    No.

10    Q.    You have done nothing to evaluate --

11    A.    No.

12    Q.    -- anything about land in the City?

13    A.    I have not.

14    Q.    So that's just your thoughts?

15    A.    That's my thoughts.

16    Q.    Okay.   You are not aware of whether

17   buildings can be demolished and rebuilt in another

18   way, like an existing structure can be knocked down

19   and built for new use?

20          You don't know anything about that either,

21   do you?

22    A.    I'm aware that that can be done.

23    Q.    But you are not aware of whether the City

24   ordinances allow for that or not?



1      A.   I do not, no.

2      Q.   Doesn't the City already have noise

3  regulations which govern ranges?

4      A.   Yes.

5      Q.   And we're going to talk about those later

6  today?

7      A.   Correct.

8      Q.   In designing a range to be in the City,

9  you would advise your client to comply with the

10  City's noise regulations regarding ranges?

11      A.   We are going to talk about the

12  requirements in the regulation, but that would be a

13  part of the design feature in the range to make

14  sure we contain --

15      Q.   That you comply with the ordinance,

16  whatever that ordinance may be?

17      A.   Whatever that ordinance may be and if it's

18  possible, yes.

19      Q.   Okay.  So in designing the range, you

20  already would be trying to comply with whatever the

21  City of Chicago has set forth for sound, so Issue

22  Number 2 doesn't really make you do anything extra

23  than what you already would have been doing anyway?

24      A.   From a sound standpoint, that's correct.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 114 of 314 PageID #:5775

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         114

1      MR. AGUIAR:  Could we go off the record for

2    just a second?

3                          (Whereupon, a discussion was had

4                           off the record.)

5    BY MR. AGUIAR:

6       Q.    Let's move on to Issue 3.

7       A.    Okay.

8       Q.    Here you take issue with the City's

9    prohibition of outdoor ranges.

10      MR. SIGALE:  If we want to move this along,

11   Issue 3 isn't a part of the complaint.

12      MR. AGUIAR:  I was actually going to say that

13   as well.

14   BY MR. AGUIAR:

15      Q.    So Issue Number 3 is not being raised by

16   the Plaintiffs in the case.

17          Are you aware of that?

18      A.    I am.

19      Q.    So you are not going to be providing any

20   testimony on Issue Number 3 at trial in this case,

21   are you?

22      A.    No, I am not.

23      MR. SIGALE:  See, that's moving and grooving.

24      MR. AGUIAR:  Off the record.



1                    (Whereupon, a discussion was had

2                    off the record.)

3    BY MR. AGUIAR:

4        Q.    Mr. Giordano, just flip back to Issue 3

5    for one quick second.  Mr. Sigale just said it's

6    out of the case.  It's never been in the case.

7            Does the fact that this is not being

8    challenged by the Plaintiffs affect your overall

9    opinion in this case at all?

10       A.    No, it doesn't.

11       Q.    In Issue Number 4, you are challenging

12   Sections 4-151-090 and I believe 010, but it's

13   really 090.

14           If you flip in Exhibit 2 to Page 12 at the

15   bottom, the right-hand side -- I numbered them for

16   us.

17       A.    Got it.

18       MR. SIGALE:  I just want to be clear that to

19   the extent you were referencing his report about

20   4-151-010 and 4-151-090, I think that's what you

21   were doing, 4-151-010 is the definition section,

22   which is why it was referenced in Issue 4 and

23   there's also reference throughout.

24



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 116 of 314 PageID #:5777

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        116

 1   BY MR. AGUIAR:

 2       Q.   And you are referring to 4-151-010 simply

 3   because it defines what a shooting range facility

 4   is, correct?

 5       A.   Yes.

 6       Q.   The actual requirement that you are

 7   challenging, though, the crux of it is found in

 8   4-151-090, which says that shooting range

 9   facilities may operate only between the hours of

10   9:00 a.m. and 8:00 p.m.?

11       A.   Correct.

12       Q.   And part of your concern is that a

13   shooting range facility includes more than just the

14   range itself; it includes the surrounding areas?

15       A.   As far as your definition, yes.

16       Q.   Would you explain to me why you believe

17   this provision is objectionable?

18       A.   It limits the operator's or the owner's

19   ability to basically develop his own hours of

20   operation.  Now, we do see in the industry a lot of

21   ordinances that restrict shooting range hours of

22   operation, but normally it's shooting range itself,

23   shooting range proper; in other words, it's

24   discharge of firearms between certain hours, not



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 117 of 314 PageID #:5778

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        117

1   necessarily the hours the facility can be open.

2           Most shooting ranges have an accessory use

3   of retail and that's very important to the success

4   in this industry of a shooting range.  So to tell

5   an operator of a retail store that they can only be

6   open until 8:00 p.m. may be undesirable for that

7   individual.

8           Now, getting specific to this ordinance,

9   those ordinances that we do see in the industry,

10  for the most part, from what I have ever seen, are

11  directed toward outdoor ranges where the sound is

12  emitted into the atmosphere and the surrounding

13  community.

14          Up to this point, the purpose of

15  ordinances of this type are to avoid a deleterious

16  impact to the surrounding community, whereas on an

17  indoor range, the design will allow us to keep the

18  sound inside the building or inside the range

19  itself, the range envelope.  So I can't see a

20  purpose other than a negative impact on a range

21  operator or owner for an ordinance like this

22  limiting the hours of operation.

23  Q.   So you were engaging in a weighing of the

24  purpose of why you have this versus what detriment



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 118 of 314 PageID #:5779

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      118

1  it may have to the owner and his business?

2      A.    Say that again.

3      Q.    It sounds like you were just weighing the

4  detriment that this regulation has on a potential

5  business owner --

6      A.    Correct.

7      Q.    -- versus what purposes the City would

8  have behind enacting this, correct?

9      A.    Yes.

10     Q.    You were just doing that a little bit,

11 weren't you?

12     A.    Yes.

13     Q.    And you identified that in your experience

14 you have only ever seen these ordinances with

15 outdoor ranges and it's an attempt to control

16 noise, correct?

17     A.    That's correct.

18     Q.    And those are other jurisdictions beyond

19 the City of Chicago?

20     A.    That's correct.

21     Q.    You don't actually know what the

22 legislative purpose was behind this ordinance, do

23 you?

24     A.    No, I don't.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 119 of 314 PageID #:5780

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                119

1       Q.    So can't really weigh the City Council's

2   decision here because you don't know what their

3   actual purpose was in enacting this?

4       A.    That's correct.

5       Q.    So the fact that you've seen it elsewhere

6   in terms of why you've seen it elsewhere really

7   isn't relevant to the question we are talking about

8   here today?

9       A.    Right.

10      Q.    Let's go back to the first part of your

11  answer talking about the impact on retail

12  activities that are going on when there's no live

13  fire.

14      A.    Correct.

15      Q.    Or past a certain hour I should say.

16          You are saying that the hours are too

17  restrictive because it doesn't allow for enough

18  time to do retail sales; is that your point?

19      A.    Well, it wouldn't allow the discretion of

20  the owner to keep his business open whenever they

21  would like to keep it open until.  It does not just

22  apply to the retailer.  It would also apply to the

23  shooting range in this case because the shooting

24  range is an indoor shooting range and I don't



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 120 of 314 PageID #:5781

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        120

 1  understand the purpose of not allowing that

 2  business to operate past 8:00 p.m. when there may

 3  be patrons that want to shoot between 8:00 and

 4  10:00.

 5          So maybe I don't understand this Council's

 6  reasoning for that particular ordinance.  I'm

 7  basing that on what I've seen in the past, which is

 8  usually due to sound concerns.

 9      Q.   Again, you are focusing on the purpose.

10          Let's talk about the actual effect of this

11  on the business.

12      A.   Well, the effect on the business would be

13  the retail -- in this case, because of the

14  definitions, the retail establishment, if we look

15  at the facility as two separate entities, the

16  shooting range and the retail establishment that

17  should be attached to it, neither of those

18  facilities would be able to operate past 8:00 p.m.

19          And, again, the way I'm looking at this

20  from a sound issue, there really wouldn't be a

21  reason why the shooting range wouldn't be able to

22  operate any later than 8:00 p.m. if it's based on

23  sound, and certainly there wouldn't be a reason why

24  the retail establishment wouldn't be allowed to



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 121 of 314 PageID #:5782

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        121

```
 1   operate past 8:00 p.m.
 2        Q.   Again, you're focusing on the purpose and
 3   the reasons.
 4        A.   That's right.
 5        Q.   Let's talk about the finances.
 6        A.   Okay.
 7        Q.   You are stating that the hours restricts
 8   potential income?
 9        A.   Right.
10        Q.   That's your point?
11        A.   That's right.
12        Q.   Are you stating that a range can be
13   operated between -- hold on.  Strike the question.
14             Are you stating that a range that can only
15   be operated between 9:00 a.m. and 8:00 p.m. will
16   not be profitable because of this provision?
17        A.   No.
18        Q.   So you don't know whether a range operated
19   between the hours of 9:00 a.m. and 8:00 p.m. could
20   be profitable in the City?  You don't know?
21        A.   No, I do not know.
22        Q.   You didn't study that issue?
23        A.   I did not.
24        Q.   You didn't talk to anybody about it before
```



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 122 of 314 PageID #:5783

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        122

1    you formulated your opinion here?

2        A.    No.

3        Q.    Do you know how much potential income is

4    lost because of the restricted hours between

5    9:00 a.m. and 8:00 p.m.?

6        A.    I don't have the number, no.

7        Q.    You made no effort to quantify that

8    number?

9        A.    I have not.

10       Q.    So, again, this is just your assumption

11   that because the hours are limited, there would be

12   less income?

13       A.    That's correct.

14       Q.    It doesn't mean they wouldn't be

15   profitable?

16       A.    That's correct.

17       Q.    And isn't it possible that the number of

18   customers a range would get between 8:00 p.m. and

19   9:00 a.m. wouldn't justify the range being kept

20   open later --

21       MR. AGUIAR:  I'm just asking if it's possible.

22       MR. SIGALE:  I haven't said anything.

23       MR. AGUIAR:  I thought you were going to.  Let

24   me start over again.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 123 of 314 PageID #:5784

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      123

1  BY MR. AGUIAR:

2     Q.   It's possible, isn't it, that the number

3  of customers a range would get between 8:00 p.m.

4  and 9:00 a.m. would not justify keeping the range

5  open any additional hours because they would get

6  few customers, yet have a large operating expense?

7     MR. SIGALE:   I will object as to speculation

8  and foundation.

9        Go ahead and answer if you can.

10 BY MR. AGUIAR:

11    Q.   It's possible?

12    A.   It's possible, sure, as that would be

13 possible for any business, not just a shooting

14 range.

15    Q.   Have you done any research into the City

16 of Chicago as to how it regulates other businesses?

17    A.   I have not.

18    Q.   So you don't know whether the hour

19 limitations are consistent with any other

20 businesses in the City of Chicago?

21    A.   I do not.

22    Q.   Correct me if I'm wrong, but I think you

23 testified earlier about this also has a problem

24 because the range itself might close down at a



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 124 of 314 PageID #:5785

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         124

 1  certain time, but there might be retail activities

 2  which could occur outside of there which would

 3  bring in revenue, correct?

 4      A.    Correct.

 5      Q.    Do you happen to have any knowledge of

 6  what percentage of sales occur at a range after the

 7  range itself closes, but the retail is still open?

 8          Have you ever looked into those issues?

 9      MR. SIGALE:   I'm just going to object as to

10  form, and to the extent it's a hypothetical, it's

11  an incomplete hypothetical.

12  BY MR. AGUIAR:

13      Q.    Do you understand my question?

14      A.    I understand your question.  But my answer

15  is going to be I am not aware of any associated

16  retail establishments that have separate closing

17  times.  I'm not aware of any facilities that do

18  that in my experience.

19          I'm not aware of any shooting range

20  facilities that close the range at a certain hour

21  and operate their retail establishment later hours

22  if that's what you're asking.

23      Q.    So they do run --

24      A.    Typically they run simultaneously.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 125 of 314 PageID #:5786

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                    125

1    Q.   Okay.  And so does the City's?

2    A.   That's right.

3    Q.   So you can do retail the entire time the

4  range is open?

5    A.   That's right, but it's limited to

6  8:00 p.m.

7    Q.   Have you ever been to ranges where there

8  are operating hours, but they actually close?

9    A.   Yes, all the time.

10   Q.   You testified to one which actually did

11  the same thing, right?

12   A.   Right.  I worked there.

13   Q.   They closed at 10:00 p.m.?

14   A.   I think it was 10:00 p.m.

15   Q.   And they opened at 9:00 or 10:00 a.m.; you

16  couldn't recall?

17   A.   That's correct.

18   Q.   Hours not too dissimilar from what's here,

19  would you agree?

20   A.   Not too dissimilar; couple hours.

21   Q.   You said you've been to ranges frequently

22  that open and they close?

23   A.   Absolutely.

24   Q.   That's not uncommon?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 126 of 314 PageID #:5787

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          126

1      A.    That's not uncommon.   That's actually more

2  common than not.

3      Q.    Is it your opinion that Issue 4 makes it

4  impossible to open a range in the City of Chicago?

5      A.    No.

6      Q.    Again, no one told you they would not open

7  a range in the City of Chicago because of the

8  limitation on the hours of operation, did they?

9      A.    No.

10      Q.    And you have conducted no studies or seen

11  any studies which discuss potential income or

12  revenue generated after 8:00 p.m.?

13      A.    I have not.

14      Q.    Let's go to Issue Number 5.

15            In Issue Number 5 you challenge the City's

16  regulation in 4-151-100, Subpart (n), about

17  recordkeeping requirements for entry into the

18  facility?

19      A.    Correct.

20      Q.    And that incorporates the definition of a

21  shooting range facility in Section 4-151-010?

22      A.    Correct.

23      Q.    Let's look at Exhibit 4, Page 5.

24      A.    Got it.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 127 of 314 PageID #:5788

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      127

1     Q.    This is the ordinance enacted by the City

2   Council on September 11th and you will see that

3   Subpart (n) has been stricken out, meaning it has

4   been eliminated.

5     A.    Okay.

6     Q.    So I'm telling you as you sit here today

7   that Subpart (n) is no longer a requirement on a

8   gun range owner.

9           Based on that, is it your opinion still

10   that Subpart (n) somehow has an impact on gun range

11   ownership operations in the City of Chicago?

12     A.    No.  My opinion has changed.

13     Q.    And that is that no longer has an impact?

14     A.    That's correct.

15     Q.    Great.  I'm glad we can agree.

16           How does the elimination of this

17   requirement impact your overall opinion about the

18   City's regulatory scheme regarding gun ranges?

19           It makes it let burdensome?

20     A.    Yes.

21     Q.    How much less burdensome?

22     A.    A lot less burdensome.

23     Q.    That's because why?

24     A.    Because now the owner or operator doesn't



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 128 of 314 PageID #:5789

JACK J. GIORDANO                              September 20, 2013
EZELL vs. CITY OF CHICAGO                                    128

1  have to keep the records that were required in the

2  old ordinance or the deleted ordinance.

3       Q.   Let's move along to Issue Number 6.

4            In Issue Number 6, you take issue with the

5  City's ordinance in Section 4-151-100, Subpart (b),

6  which states that, quote, a range master shall be

7  on duty during all operating hours of shooting

8  range facility.

9       A.   Correct.

10      Q.   Would you explain to me why you have an

11  objection to this provision?

12      A.   Well, in this case actually it also

13  involves the City's definition of a shooting range

14  facility because the shooting range facility

15  encompasses the entire facility.  Say we have a

16  business and the business includes a shooting range

17  and a retail store and the shooting range goes down

18  for repair or it goes down to have the bullet trap

19  maintained or it goes down to have lead removed

20  from the bullet trap, which in certain cases,

21  depending on the equipment, could take several

22  days, could take several hours.

23           We don't see a necessity or we think it

24  would be burdensome upon the range owner to be



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 129 of 314 PageID #:5790

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        129

1  required to have a range master present when there

2  are no firearms being discharged or no patrons or

3  nobody using that shooting range, quote/unquote,

4  proper.  That's our opinion.

5      Q.  Okay.  Let's break that down a little bit.

6  Okay?

7      A.  Okay.

8      Q.  Let's see if we can agree on this.

9      A.  Sure.

10     Q.  Do you agree that at least during times

11 when there is live fire going on that it is proper

12 for the City to require a range master to be

13 present?

14     A.  Absolutely.

15     Q.  So you don't have any problem with that?

16     A.  I don't have any problem with that.

17     Q.  And isn't it possible that the hours in

18 which live fire is occurring may be coterminous

19 with the opening and closing of the range, meaning

20 live fire -- let's take the time limits that we

21 just talked about a second ago.  The range opens at

22 9:00 a.m., live fire begins at 9:00 a.m., the range

23 closes at 8:00 p.m., live fire ends at 8:00 p.m.

24     A.  Right.



JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                    130

1        Q.    If a range were to operate in that way,

2    wouldn't you agree with me that the firing range

3    owner would not incur any additional cost in having

4    a range master present because you agree with me

5    that one should be present during all hours of live

6    fire?

7        MR. SIGALE:   I'm just going to object as to

8    form.   The hypothetical can't exist, so I'm

9    objecting.

10           It's physically impossible to have no one

11   on the facility until the instant that the door

12   opens to the public.   People have to be there

13   before it opens.   People have to be there after it

14   closes, whether it's the manager, the owner,

15   whatever.   Someone has got to be somewhere on the

16   premises.

17           You looked at me when I said incomplete,

18   so I'm just explaining my objection more.   But my

19   objection is is that hypothetical can't exist.

20       MR. AGUIAR:   Well, that's my hypothetical and

21   we are going to have it exist.   It's my fantasy and

22   I'm living in it.

23       THE WITNESS:   Based on the fact that --

24



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 131 of 314 PageID #:5792

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        131

1   BY MR. AGUIAR:

2       Q.   Well, let me restate it.  Let's restate

3   it.

4       A.   Okay.

5       Q.   Again, range hours are 9:00 to 8:00.

6            Live fire at a range could exist between

7   9:00 and 8:00?

8       A.   Correct.

9       Q.   And, therefore, a range master would be

10  required that whole entire time, correct?

11           And you don't have a problem with that,

12  you don't have a problem with the range master

13  being required during that whole time of live fire?

14      A.   I have no problem with a range master --

15  with the City requiring the presence of a range

16  master during live fire, that's correct.  That

17  would be a correct statement.

18           Your hypothetical is assuming both the

19  retail and shooting range are operating

20  simultaneously.

21      Q.   Correct.  That's exactly right.

22      A.   That's right.

23      Q.   If that's true, there is no potential

24  additional cost to a range owner to have the range



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 132 of 314 PageID #:5793

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         132

1   master present?

2       A.   No.

3       Q.   But it's your position that if, in fact,

4   there are times that a shooting range facility is

5   open, but there is no live fire, it's unreasonable

6   to require a range master to be there during those

7   times?

8       A.   That's correct.

9       Q.   Have you done anything to quantify what

10  additional cost it would be to a range owner to

11  have a range master present during those times

12  where there's no live fire going on?

13      A.   I have not.

14      Q.   Isn't it possible that during those times

15  when there is no live fire going on that a range

16  master could be tasked by the business owner who is

17  doing other functions at the range such as serving

18  Coca-Cola?

19      A.   It's possible.

20      Q.   So if the range master is serving that

21  function during those non-live fire times, there

22  would be no additional cost to the business owner

23  because the business owner is having the range

24  master serve another function?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 133 of 314 PageID #:5794

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                              133

1      A.    That may or may not be true being that the

2   ordinance also requires a certain amount of

3   training that would be above and beyond what a

4   Coca-Cola server would have.  So, therefore, I am

5   making an assumption that the range master is going

6   to be paid a little bit more than a Coca-Cola

7   server would be paid.  So that may not entirely be

8   true.

9      Q.    Well, I used Coca-Cola server just as an

10   example.

11      A.    I understand.

12      Q.    There are other jobs that the range master

13   could potentially do which would be equivalent to

14   what he would earn as a range master?

15      A.    That's correct.

16      Q.    And there are jobs which he might do which

17   he earns more than someone doing Coca-Cola serving,

18   for example?

19      A.    Sure.  I understand.

20      Q.    My point is that there is a way for the

21   business owner potentially to use the range master

22   during non-live fire time, which either doesn't add

23   additional cost or the additional cost is reduced

24   by him doing other functions?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 134 of 314 PageID #:5795

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        134

1      A.    That's correct.  I agree with that.

2      Q.    Does your assertion that this provision

3    seems unreasonable, did it derive from your looking

4    at any study?

5      MR. SIGALE:  I'm sorry.  Are we still talking

6    about Issue Number 6?

7      MR. AGUIAR:  Yes.

8      THE WITNESS:  No.

9    BY MR. AGUIAR:

10     Q.    Does it derive from any independent

11   research you've done?

12     A.    No.

13     Q.    From conversations you've had with

14   anybody?

15     A.    No.  Well, maybe between myself and

16   Mr. Kramer, but that's about it.

17     Q.    But no one has said to you that this

18   provision makes it hard or impossible to open a

19   range in the City of Chicago?

20     A.    No.

21     Q.    It's just your thoughts on the provision?

22     A.    Our opinion, right, based on our prior

23   experience.

24     Q.    And is it your opinion that this provision



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 135 of 314 PageID #:5796

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     135

1  makes it impossible to open a range in the City of

2  Chicago?

3        A.    No, it does not.

4        Q.    Again, you have not quantified what that

5  additional cost may be?

6        A.    We have not quantified it -- I have not

7  quantified it.

8        Q.    Do you know if Mr. Kramer has?

9        A.    I do not know if he did or not.

10        Q.    But you certainly have no opinion on that?

11        A.    No.

12        MR. AGUIAR:  I think at this point we should

13  conclude Issue 6 for the moment.  We are past

14  12:30.  Let's take a quick lunch break and come

15  back and tackle Issue 7.  Is that okay?

16        THE WITNESS:  That's fine.

17        MR. AGUIAR:  How much time would you like for

18  lunch, Mr. Giordano?

19        THE WITNESS:  Whatever you usually do is fine.

20        MR. AGUIAR:  David, it's your pleasure.  Any

21  thoughts on what you want to do?

22        MR. SIGALE:  Let's take the hour.  How about we

23  be back here at 1:30?

24                    (Whereupon, a break was taken.)



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 136 of 314 PageID #:5797

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        136

1   BY MR. AGUIAR:

2       Q.   Let's move on to Issue 7 in your report,

3   which is Exhibit 1.

4       A.   I have it.

5       Q.   In issue 7 you identify Section

6   4-151-100(d) of the City's ordinance as being a

7   problem in opening a range, correct?

8       A.   Correct.

9       Q.   And 4-151-100(d) prohibits anyone under

10  the age of 18 from being permitted in the shooting

11  range facility?

12      A.   Correct.

13      Q.   Would you just explain for the record what

14  your objection of that provision is?

15      A.   Well, again, this goes back to your

16  definition of shooting range facility.  Well, first

17  of all, it would preclude someone, say a minor

18  under the age of 18, if you want to call that a

19  minor, from learning to shoot.  It would preclude

20  people with children from coming into the retail

21  store because that's considered part of the

22  facility.

23           It will have an impact on the people that

24  visit that facility.  So it's detrimental to the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 137 of 314 PageID #:5798

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                  137

 1    owner because they are losing that amount income

 2    that they would have if people were allowed to go

 3    in there with their kids.

 4        Q.   Anything else?

 5        A.   A lot of activities could be run that

 6    wouldn't be able to be run, junior shooting

 7    programs.  That's about it.

 8        Q.   Okay.  You mentioned that it precludes

 9    minors from learning to shoot?

10        A.   Right.

11        Q.   That really --

12        A.   I understand where you're going.

13        MR. SIGALE:  Let him finish it.

14    BY MR. AGUIAR:

15        Q.   Let me get there.

16             It does get to a point where we are

17    getting into a rhythm with each other, so it's

18    understandable.  But it's better if I do ask the

19    question first.

20             It really doesn't go to the economics,

21    does it?

22             That goes more towards educating young

23    people about guns and safe firearm issues, doesn't

24    it?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 138 of 314 PageID #:5799

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                              138

1      A.   It could.  But the economics involved

2   would be the inability to run junior shooting

3   programs, the inability to offer junior shooting

4   firearms training, the inability to be able to

5   allow Boy Scout groups that come in and rent the

6   facility to learn how to shoot 22-caliber rifles,

7   which they do for a merit.  There is a Boy Scouts

8   of America Merit Badge Program, an official BSA

9   Merit Badge Program, where Boy Scouts would learn

10   how to shoot and earn a merit badge for

11   marksmanship.  It would preclude that entire group

12   of people from the range, and that may be a

13   financial burden on the owner.

14      Q.   Have you done any research into what

15   percentage of revenue is generated from such youth

16   shooting programs that you have just identified?

17      A.   I have not.

18      Q.   Do you have any information at all about

19   what percentage of revenue is generated by such

20   programs at ranges?

21      A.   I have not.

22      Q.   So, again, it's just your idea or thought

23   that this is one revenue stream which isn't being

24   allowed?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 139 of 314 PageID #:5800

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      139

1      A.    Right.

2      Q.    We don't know how much revenue is actually

3   generated from those?

4      A.    That's correct.

5      Q.    And you don't know whether it might

6   actually be the case that to run such programs may

7   cost the range more than they bring in in the

8   programs?

9            You don't know whether that's true or not?

10     A.    I don't know whether that's true or not.

11     Q.    Are you asserting or opining that not

12   being able to host the youth shooting programs

13   makes it impossible to open a range in the City?

14     A.    No, I am not.

15     Q.    Are you saying that its absence makes it

16   economically infeasible to open a range in Chicago?

17     A.    No.

18     Q.    Are you saying or opining that without a

19   youth shooting ability, a range cannot be

20   profitable in the City of Chicago?

21     A.    No.

22     Q.    Leaving aside the youth shooting programs

23   which you've described for me, are you asserting or

24   opining that not allowing minors under 18 makes it



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 140 of 314 PageID #:5801

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                    140

1   impossible to open a range in the City?

2        MR. SIGALE:  I'll object as to form.

3   BY MR. AGUIAR:

4        Q.   There's the idea that you could have a

5   youth shooting program which comes in which is

6   organized like the Boy Scouts versus a 17-year-old

7   who wants to come in and learn how to shoot a gun.

8             My question to you is are you asserting

9   that not allowing minors under 18 makes it

10  impossible to open a range in the City?

11       A.   It doesn't make it impossible, but

12  precluding an entire group of people, in my

13  opinion, may impact the ability for that source of

14  income.  It's not impossible to open a range under

15  those circumstances, no.

16       Q.   You haven't done anything to study, again,

17  what income would come from shooters under the age

18  of 18 at a range?

19       A.   I have not.

20       Q.   Have you spoken with any prospective range

21  owners in the City of Chicago or who would open in

22  the City of Chicago who won't open in the City

23  because of this ordinance provision?

24       A.   No.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 141 of 314 PageID #:5802

JACK J. GIORDANO                                     September 20, 2013
EZELL vs. CITY OF CHICAGO                                          141

1      Q.    Other than talking to Mr. Kramer and your

2   attorneys about this provision, have you had

3   conversation about this ordinance with anybody

4   else?

5      A.    No.

6      Q.    You raised a second ago a question whether

7   people with minor children, meaning the parent

8   wants to use the range and they just bring the

9   child so they can actually use the range, those

10  people would be dissuaded from going to a range

11  because they couldn't bring the kids?

12     A.    That's correct.

13     Q.    Again, are you asserting or opining that

14  not allowing minors under those circumstances makes

15  it impossible to open a range in the City of

16  Chicago?

17     A.    Not impossible, but it is detrimental to

18  the owner.

19     Q.    And it's detrimental why?

20     A.    Because he's losing that source of income.

21  The person would have gone if the minor was

22  allowed, but they didn't go because the minor was

23  not allowed.  I have no figures to back that up.

24     Q.    I was just going to ask whether you have



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 142 of 314 PageID #:5803

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          142

1   looked at any studies or research or have done any

2   studies or research of your own which quantify the

3   number of customers who would be dissuaded from

4   going to a range because they can't bring their

5   minor child along?

6        A.   I have no numbers of how many times that

7   happens.  I know it does happen.  It just happened

8   to friend of mine not too long ago.  I know it

9   happens, but I have no idea what the numbers are.

10        Q.   So you don't know what the effect on the

11   revenue stream would be?

12        A.   I have no idea.

13        Q.   Nor do you know how many people actually

14   would be in that affected area, meaning if they

15   have minor children they can't go to the range?

16        A.   Right.  I do not know, no.

17        Q.   And it's possible there are people who

18   have minor children who will still go to the range

19   without their child?

20        A.   That's correct.

21        Q.   And they will make other arrangements for

22   the child to be cared for while they are shooting

23   at the range?

24        A.   That's correct.



1    Q.   You also mention in your report the

2  ordinance precludes any services being provided to

3  the shooting range facility by workers under the

4  age of 18?

5    A.   Correct.

6    Q.   That's in the last paragraph.

7         This would include services not related to

8  firearms?

9    A.   Correct.

10   Q.   And you believe that's also an impediment

11  to opening a range in Chicago?

12   A.   It could be, yes.

13   Q.   So are you saying that not allowing

14  workers under 18 regardless of what they are doing

15  at the range makes a range impossible?

16   A.   No, I'm not.

17   Q.   Are you saying it makes it economically

18  infeasible?

19   A.   No.

20   Q.   Or that a range that only allowed workers

21  over 18 would be unprofitable?

22   A.   No.

23   Q.   Again, it's just an idea you had about how

24  this ordinance may affect a business owner?



1      A.   That's correct.

2      Q.   It's not based on any study or research?

3      A.   That's correct.

4      Q.   Either that you've looked at or did

5  yourself?

6      A.   Correct.

7      Q.   Do you have any idea what percentage of

8  workers in ranges across the country are under the

9  age of 18?

10      A.   I do not.

11      Q.   Do you have any idea how much money is

12  saved by hiring workers under the age of 18 as

13  opposed to those over the age of 18?

14      A.   I do not.

15      Q.   And isn't it possible -- I'm going to use

16  an example here -- there's a janitorial job that

17  pays minimum wage, that the age of the person doing

18  that janitorial job at the range would be

19  irrelevant if the job itself pays minimum wage and

20  the owner would have to pay the same wage to the

21  17-year-old as he would have to pay the

22  21-year-old?

23      A.   That would be a fair statement, yes.

24      Q.   So there would be no economic impact from



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 145 of 314 PageID #:5806

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        145

1  the City's regulation on that particular range

2  owner?

3      A.   That's correct.

4      Q.   Let's move on to Issue 8.

5      A.   Could we go back to that issue one more

6  time?  Is it okay?

7      Q.   I haven't asked you a question, but if

8  there is something you want to add, let's have it.

9      A.   I would like to add that one of the issues

10  that I have with this ordinance is that it may

11  preclude workers under the age of 18 beyond the

12  control of the range operator.  An example would be

13  a pizza delivery boy, somebody providing a service

14  from an outside contractor or outside company that

15  has an under 18 worker, which would be a violation

16  of the ordinance, but would be beyond the control

17  of the person running the business or that owns the

18  business.

19          So that would be another concern that I

20  would have because it would be a violation if an

21  outside -- if a pizza delivery boy came into the

22  facility to deliver a pizza for lunch to the

23  workers, that would be a violation of the

24  ordinance.  It's kind of beyond the control of the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 146 of 314 PageID #:5807

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                              146

1    operator.

2        Q.   And have you done anything to quantify the

3    financial impact of such a circumstance on the

4    range?

5        A.   No.

6        Q.   And do you know whether there would be a

7    financial impact on the range?

8        A.   I do not know if there would or not.  I'm

9    assuming probably not.

10       Q.   And do you know whether the City of

11   Chicago would actually enforce this provision if a

12   pizza delivery boy rang the bell of a range and

13   walked into the receptionist and delivered the

14   pizza and walked out?

15           Do you have any knowledge of the City's

16   enforcement actions at all on these issues?

17       MR. SIGALE:  I'm just going to object as to

18   foundation, speculation.

19       THE WITNESS:  I really couldn't answer that.

20   It would be a violation of -- in my opinion, it

21   would be a violation of the ordinance.  Whether it

22   would be enforced or not, I have no idea.

23   BY MR. AGUIAR:

24       Q.   Again, you don't know whether it would



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 147 of 314 PageID #:5808

JACK J. GIORDANO
EZELL vs. CITY OF CHICAGO

September 20, 2013
147

1    have a financial impact?

2        A.    I do not know.

3        Q.    Issue 8, do you want to move on to that?

4        A.    Sure.

5        Q.    In Issue 8 you take issue with Section

6    8-20-100 of the City's ordinance?

7        A.    Correct.

8        Q.    And that provision -- I'm going to

9    paraphrase here -- does not allow for the sale of

10   firearms in the City of Chicago, correct?

11       A.    Correct.

12       Q.    Would you please explain to me what your

13   objection to 8-20-100 is?

14       A.    The foundation of that opinion is based on

15   something that we've already discussed, the fact

16   that the model for shooting ranges in this country

17   is a shooting range with an associated retail

18   establishment.  Out of all of the commercial

19   shooting ranges that I've been at, I have never

20   been to a shooting range personally that does not

21   have firearm sales, ammunition sales, all of the

22   accessory items that would go along with firearms

23   and ammunition to support their business.

24            Typically what happens in the industry is



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 148 of 314 PageID #:5809

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        148

1   that a shooting range is a very costly operation

2   from a utility standpoint and from a construction

3   standpoint, but the income that's derived from the

4   use of that facility typically would cover the

5   expenses of running the facility and then you have

6   the retail establishment, which is where the profit

7   margin is.

8            So if we restrict the type of sales,

9   specifically firearm sales -- a lot of people go to

10  ranges with the intent of buying a firearm -- you

11  are greatly restricting the profitability of a

12  facility.

13           I know we are going to get into

14  ammunition, but the same thing would apply to

15  ammunition even more greatly so than firearms

16  because there is a higher profit margin on

17  ammunition than there is on firearms.

18           So I think this would greatly impact

19  someone's decision on whether or not to go ahead

20  and build a facility in the City because right off

21  the bat they can see, well, we are not going to be

22  allowed to sell firearms.  That's going to greatly

23  impact our ability, first of all, to attract new

24  customers and also to make the profit on the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 149 of 314 PageID #:5810

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                149

1    firearms.

2        Q.    Okay.  We have a lot to discuss on this

3    one, so I'm going to try to do this in some logical

4    order.

5        A.    A step at a time.

6        Q.    I just want to revisit that you testified

7    you never owned a range?

8        A.    That's right.

9        Q.    You've never managed a range?

10       A.    That's correct.

11       Q.    You have never been involved in the

12   business side of a range?

13       A.    No.

14       Q.    Do you have any knowledge of what

15   percentage of revenue is generated generally by a

16   commercial range from the sale of firearms?

17       A.    My knowledge in this area comes from

18   speaking with numerous range owners and operators

19   throughout the country during my Range Technical

20   Team advisor work and also during my teaching at

21   the range conferences.  At each range conference we

22   typically had between 50 and 100 participants.  A

23   large percentage of the participants were range

24   owners and operators, a lot of them were commercial



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 150 of 314 PageID #:5811

JACK J. GIORDANO                            September 20, 2013
EZELL vs. CITY OF CHICAGO                              150

1   range owners and operators.

2           So from discussions, from conversations,

3   from me sitting in on other presenters'

4   presentations, I can safely say that although I

5   don't have a number what percentage of firearm

6   sales is the profit for a typical shooting range, I

7   can say without a doubt that the shooting range

8   itself is not a real money maker; it's the retail

9   area that's the money maker.

10          If we start to limit, especially in the

11  area of firearms and ammunition, if we limit the

12  ability of the operator to offer those products for

13  sale, it's going to be very unlikely that somebody

14  would say, well, okay, this is an idea that we

15  might consider.

16          The comments I'm making, I can't back them

17  up with a number.  I can't say, well, they are

18  going to lose X number of dollars a year if they

19  don't sell firearms or they are going to lose X

20  number of dollars a year if they don't sell

21  ammunition.  But based on my conversations and

22  personal experience, that's my opinion.

23     Q.   That, again, comes from talking to range

24  owners?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 151 of 314 PageID #:5812

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        151

1      A.    That's exactly right.

2      Q.    And you haven't looked at any studies or

3  research on this issue?

4      A.    I have not.

5      Q.    And you haven't conducted any studies or

6  research of your own?

7      A.    I have not.

8      Q.    Have you determined in any way whether a

9  range can be profitable without the sale of

10 firearms?

11     A.    I have never studied that.  I don't have

12 any data on that.  But as I said before, I have

13 never been to a commercial range or been associated

14 with a commercial range that didn't have the sale

15 of firearms or ammunition.

16     Q.    Exactly.  So my question is have you

17 studied whether a range could be successful without

18 a firearm component?

19     A.    I have never conducted a study in that

20 regard, no.

21     Q.    And you didn't look at any research on

22 that point?

23     A.    No.

24     Q.    You say in your report the general



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 152 of 314 PageID #:5813

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         152

1   business model.  When you use the word general,

2   that implies to me as a reader that there are other

3   business models that are out there.

4        Are you aware of other business models

5   that don't allow for sale of guns?

6        A.   Certain ranges are developed or built

7   under the firearms training business model where

8   it's more of a school, a training facility.  They

9   usually in that situation would not sell firearms.

10  They probably would sell ammunition because that's

11  still something that's going to be a consumable

12  product that's necessary for the use of the

13  facility.

14       But no, that would be one of the instances

15  where I wouldn't expect or wouldn't be surprised if

16  there were no retail establishment associated with

17  a range because the range is not -- it's a

18  different purpose.  It's a different business

19  model.  The business model is firearms training.

20  That's our product that we're selling, firearms

21  training.

22       Q.   So there are other models out there that

23  could be used?

24       A.   That's right.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 153 of 314 PageID #:5814

JACK J. GIORDANO                              September 20, 2013
EZELL vs. CITY OF CHICAGO                                    153

1      Q.    Those models, to your knowledge, can be

2   successful?

3      A.    Yes.

4      Q.    What about outdoor ranges, do they usually

5   sell firearms?

6      A.    Commercial ranges sometimes do.  Most of

7   the outdoor ranges that you see are private clubs

8   and they do not.  But I have been to commercial

9   outdoor ranges that do sell ammunition and

10  firearms.

11     Q.    Are there commercial outdoor ranges that

12  don't sell firearms that you're aware of?

13     A.    It depends what you are calling -- what

14  your definition of a commercial outdoor range is

15  because I know of several ranges that are operated

16  by -- like county ranges and stuff like that,

17  municipal ranges, where it's -- I don't know if you

18  would consider that a commercial range or not.

19  It's not a club, but it's open to the public.

20     Q.    Exactly.

21     A.    But it's not run by a private individual.

22  It's run by an entity.  Offhand, I'm not saying

23  that they don't exist, but offhand I can't think of

24  any commercial -- yes, I can.  I do know of a



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 154 of 314 PageID #:5815

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          154

1   commercial outdoor range -- I'm not too sure if it

2   still exists, but I was involved in a project with

3   that range that only rented firearms.  They did not

4   sell firearms.  But their business model was they

5   got their money from the ammunition sales and the

6   rental of firearms, but they did not sell firearms.

7       Q.    Again, you segued into where I was going

8   next.  Very good.

9       A.    Okay.

10      Q.    In here you also say in the third

11  sentence, quote, the profit comes from other fees

12  such as sale of firearms.  We talked about the sale

13  of firearms.

14          What other fees that you are aware of do

15  range owners derive profit from?

16      A.    Where are you reading from?

17      Q.    Issue 8, the third sentence, it says the

18  profit comes from other fees such as sale of

19  firearms.

20      A.    I don't know if fees is a good word.

21      Q.    Well, what did you mean by fees then?

22      A.    We meant by fees other sources maybe,

23  other sources of income.

24      Q.    And sale of firearms --



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 155 of 314 PageID #:5816

JACK J. GIORDANO                                        September 20, 2013
EZELL vs. CITY OF CHICAGO                                            155

1    A.    One source.

2    Q.    -- is one source of income?

3    A.    Right.

4    Q.    What are the others?

5    A.    It's any product, whether it be consumable

6  or non-consumable, that would be associated with

7  sporting goods, the use of a gun range, whether it

8  be gun cleaning equipment, ammunition certainly.

9  That's a really big one.

10        It could range from -- it could include

11  sporting clothing, gun cases, holsters.  It could

12  run the gamut of any kind of sporting product that

13  the owner might decide he wants to sell.

14    Q.    Okay.  Let's go over a couple of those

15  things then.

16    A.    Sure.

17    Q.    We are going to talk about ammunition

18  later obviously or pretty quickly.

19    A.    Okay.

20    Q.    But you will agree with me that on

21  ammunition that the City does allow ranges to sell

22  ammunition, there is a restriction as to whether

23  ammunition can leave the site, correct?

24        Do you agree that's what the ordinance



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 156 of 314 PageID #:5817

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        156

1  does?  It says the range can sell ammunition to

2  someone at the range, but that the ammunition

3  cannot leave -- their unused ammunition cannot

4  leave the range?

5      A.   Well, after reviewing the updates to the

6  ordinance and several things, I'm a little confused

7  about that.  I think that something may have

8  changed that may change my opinion on that.  I

9  don't know if it's appropriate for me to ask you.

10     Q.   No.  We will get to that.

11          Why don't we come back to ammunition when

12 we get there?

13     A.   Okay.

14     Q.   Let's just assume for purposes of my

15 question that some ammunition sales are allowed at

16 ranges.

17          The ordinance does regulate that on some

18 level?

19     A.   Right.

20     Q.   But the ordinance does not prohibit the

21 other types of things, other services, that a range

22 could offer?

23     A.   I understand that.

24     Q.   Such as sporting clothes?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 157 of 314 PageID #:5818

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      157

1      A.    Right.

2      Q.    Or gun cleaning equipment?

3      A.    Right.

4      Q.    That stuff can be sold, right?

5      A.    I understand that, yes.

6      Q.    So there are other sources of revenue that

7  can come at the range; it's just the sale of

8  firearms is just prohibited?

9      A.    That's correct.

10     Q.    And you mentioned the rental of firearms?

11     A.    Correct.

12     Q.    We will get to that in a second as well.

13           But if I were to tell that you the

14  ordinance has been amended to allow for firearm

15  rental in the City of Chicago, does that change

16  your opinion as to the impact of not allowing

17  firearm sales?

18     A.    Not necessarily.  A lot of people travel

19  to a shooting range with an associated retail

20  establishment for the purpose of purchasing a

21  firearm.  It would be I think an undue burden on a

22  range owner that is allowed to rent firearms.  I

23  understand there are changes which we are going to

24  talk about on that.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 158 of 314 PageID #:5819

JACK J. GIORDANO
EZELL vs. CITY OF CHICAGO

September 20, 2013

158

1    For a person to go in and say I am not

2  really sure what type of firearm I want, can I rent

3  one of your firearms, and he rents him the firearm

4  and they like it, but now they have to go somewhere

5  else to buy it because they are not allowed to sell

6  it.

7    So I think that would be an undue burden

8  on a business that may persuade or give somebody

9  the opinion that it might not be a good idea under

10  those circumstances to open a range in that

11  location with an ordinance like that.

12    Q.   But that owner you just described, he

13  still had the person come into his store?

14    A.   Correct.

15    Q.   They rented the weapon, tried it out, so

16  they got the revenue from the rental?

17    A.   Correct.

18    Q.   Presumably they probably bought ammunition

19  used at the range?

20    A.   Right.

21    Q.   And got the profit from the use of the

22  ammunition?

23    A.   Correct.

24    Q.   So they did generate some revenue for that



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 159 of 314 PageID #:5820

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          159

1  person coming in?

2       A.   Oh, yes.

3       Q.   All they didn't get was the sale of the

4  firearm?

5       A.   That's correct.

6       Q.   That went someone else?

7       A.   That's correct.

8       Q.   Do you know whether that would make it

9  economically infeasible to open the range at all?

10      A.   You are discussing it as a matter of

11 economic feasibility.  I'm not an economist.  I'm

12 not a business person.  But I'm looking at it as in

13 the reality of talking to people that own ranges

14 and talking to people that are thinking of building

15 ranges, which, of course, we had a lot of people

16 that are thinking of building ranges in range

17 conferences over the years that I've instructed, I

18 would be hard pressed to think that a person like

19 that would consider opening up a gun store slash

20 shooting range under the business model that we are

21 discussing here, which would be a for-profit,

22 retail slash gun range operation if they weren't

23 allowed to sell firearms.

24           So from an economic standpoint, I really



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 160 of 314 PageID #:5821

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        160

1  couldn't tell you what the impact would be.  Just

2  from a standpoint of the type of ranges that I've

3  been to and the type of people that I've talked to,

4  I would be surprised if somebody would look at that

5  ordinance and say, well, okay, I can live with

6  that, I can live with not selling firearms.

7      Q.   That's under the general best model of a

8  commercially for-profit range?

9      A.   That's correct.

10      Q.   It's not under the model you described

11  before, like a firearms training academy or

12  something?

13      A.   That's correct.

14      Q.   And you don't know then whether rental of

15  firearms and sale of ammunition alone versus

16  allowing the sale of firearms, whether that would

17  provide enough income for a range to survive; you

18  don't know that?

19      A.   Rephrase that question because I didn't

20  understand it.

21      Q.   Certainly.

22          You don't know whether rental of firearms

23  and sale of ammunition alone provides enough

24  supplemental income to the range to allow it to



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 161 of 314 PageID #:5822

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        161

1   survive; you don't know that?

2       A.   No, I don't.

3       Q.   And have you spoken to anybody who told

4   you they would not open a range in Chicago because

5   they can't sell firearms?

6       A.   I did not.

7       Q.   Are you aware of anybody who said they

8   would not open a range in Chicago because they

9   cannot sell firearms?

10      A.   I have not.

11      Q.   Again, this is just based on your

12  experience dealing with range owners and the fact

13  that most ranges sell firearms?

14      A.   That's correct, most commercial ranges.

15      Q.   Thank you.

16           Let's move on to Issue Number 9.  You take

17  issue with the fact that the City of Chicago has

18  restricted the location of firearm ranges to

19  manufacturing districts and to not within so many

20  feet of certain uses in the City?

21      A.   Correct.

22      Q.   Which include residential-owned

23  properties, schools, daycare facilities, libraries,

24  museums, hospitals.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 162 of 314 PageID #:5823

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        162

1        I will tell you that since you have

2   written your report, the ordinance has been

3   amended.  It's been two ways.  First, the

4   prohibition on the number of feet for so many

5   districts is no longer found in 4-151-120.  It's

6   now found in the zoning code.  The provision itself

7   has just been moved out of that chapter into a

8   zoning chapter.

9        A.   Okay.

10       Q.   If you flip to Exhibit 3, last page of

11  that, Page 10, you will see that this is where it

12  got moved to.  Basically that's just a chapter

13  move.

14       A.   I see.

15       Q.   The other change has been that in

16  17-9-0120(a) the ordinance was amended back in

17  December to only restrict shooting ranges to be

18  within 100 feet of another existing shooting range.

19  It used to be 500 feet.

20       A.   Okay.

21       Q.   So now you can have shooting ranges closer

22  together.

23            With those changes being said, what is

24  your objection to this provision?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 163 of 314 PageID #:5824

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      163

1        MR. SIGALE:  I'm sorry.  Are you asking with

2    the change of moving it from Chapter 4 to

3    Chapter 17?

4        MR. AGUIAR:  No.  That was just an FYI.

5        MR. SIGALE:  So really your question is

6    changing 500 to 100 for shooting ranges?

7        MR. AGUIAR:  Let's back it up then.

8    BY MR. AGUIAR:

9        Q.   In Issue 9 you list restricted location as

10   an objection to the ordinance.  And these are the

11   provisions we are talking about, the ones I just

12   referenced, being in a manufacturing district and

13   not being within so many feet of other types of

14   uses.

15           What is your objection to these

16   provisions?

17       A.   Repeat that one more time.

18       Q.   I just want you to explain to me why you

19   think it's improper for the City to limit ranges to

20   manufacturing districts and not to allow them

21   within so many feet of other uses?

22       MR. SIGALE:  I am going to object to the extent

23   it's a compound question and, therefore, it might

24   be difficult to answer.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 164 of 314 PageID #:5825

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        164

1   BY MR. AGUIAR:

2       Q.   You can break out if you want.  There are

3   two different components.

4       A.   Can we talk about the change first?  Why

5   don't you ask me about the change first?

6           Well, I don't want to ask myself

7   questions.

8       MR. SIGALE:  I spend all day doing that.

9       MR. AGUIAR:  Hold on.

10  BY MR. AGUIAR:

11      Q.   Let's just take it by the way you wrote it

12  here.

13      A.   Okay.

14      Q.   I kind of wanted you to put it in your own

15  words before we did that, but let's just do it this

16  way then.

17          17-9-0120 says that shooting ranges may

18  not be located in any of the following areas or

19  locations.  It lists three separate subparts.  I'm

20  looking at the ordinance now.  One of those

21  provisions was amended in December.  It used to be

22  500 feet of another existing shooting range and now

23  it's just 100 feet.

24          Prior to the change to 100 feet, what was



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 165 of 314 PageID #:5826

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        165

1    your objection to this provision?

2         A.   It's greatly going to limit the number of

3    locations, first of all, that a shooting range

4    would be able to operate in.  Getting back to that

5    commercial range model or business model, a

6    for-profit commercial range, when it's restricted

7    to industrial areas -- and this is based on, again,

8    my opinion based on personal experience and

9    knowledge of shooting ranges that are successful

10   and that may not be successful, including the one I

11   used to work at, which was in an industrial area or

12   a small industrial park -- it's less -- what's the

13   word I am trying to use?

14         It would be hard for somebody who is

15   thinking about building a range to look at that

16   ordinance and say, well, do I really want to open

17   up a -- do I really think opening up a range in an

18   industrial area of Chicago is a good idea from a

19   profitability standpoint.  That's my problem with

20   it, with the industrial area.

21         Adding in schools, daycare facilities,

22   libraries, museums, and hospitals is greatly

23   limiting the number of locations where a person

24   would be able to put a shooting range or a



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 166 of 314 PageID #:5827

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          166

1    commercial range.  That would be my objection.

2        Q.    Okay.  The objection that you stated in

3    your report, has that changed at all by the fact

4    that the City now allows ranges to be within

5    100 feet of another, not within 500?

6        A.    Slightly.  It would change it slightly

7    because if another range were going to open, it

8    probably would be within 100 feet, so I don't think

9    that would be an issue.

10       Q.    So you don't think that's a problem at

11   all?

12       A.    I don't think that's a problem.

13       Q.    Your objection is limited to the 500 feet

14   of the other areas that are listed in the

15   ordinance, plus the relegation to manufacturing

16   districts?

17       A.    That's correct.

18       Q.    You said that it limits the number of

19   locations that a range can go, correct?

20       A.    Yes.

21       Q.    How familiar are you with the City of

22   Chicago geographically?

23       A.    Not very.

24       Q.    How familiar are you with the zoning of



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 167 of 314 PageID #:5828

JACK J. GIORDANO                                   September 20, 2013
EZELL vs. CITY OF CHICAGO                                       167

1    the City?

2        A.    Not familiar at all.

3        Q.    Have you ever studied the City's

4    manufacturing districts?

5        A.    I have not.

6        Q.    Have you ever seen a map that shows the

7    manufacturing districts of the City of Chicago?

8        A.    I have not.

9        Q.    Do you have any idea how much land is

10   actually zoned for manufacturing in the City of

11   Chicago?

12       A.    No.

13       Q.    Have ever studied or looked at or been

14   told how much land is zone manufacturing and meets

15   the requirements of 17-9-0120, which is the feet

16   distance?

17       A.    No.

18       Q.    So as you sit here today, you have

19   absolutely no idea whatsoever how much land is

20   actually available in the City of Chicago?

21       A.    Correct.

22       Q.    So you can't tell me as you sit here today

23   whether there actually is sufficient land available

24   for someone to open up a range in the City?



1      A.    Correct.

2      Q.    You talk about locations best suited for

3  indoor shooting range facilities are in commercial

4  districts with good street access and exposure.

5           Do you know anything about the street

6  access and exposure of manufacturing districts in

7  the City of Chicago?

8      A.    I do not.

9      Q.    So it's possible that they actually could

10  have good street access and exposure?

11     A.    That's correct.

12     Q.    Have you conducted any studies or seen any

13  research or studies which talk about whether

14  customers of a range will actually go to that range

15  if it's in a manufacturing district versus a

16  commercial district?

17     A.    I haven't done any studies, but from

18  personal experience in talking to people, again,

19  through the work that I've done with NRA at the

20  range conferences, I've talked to people who are

21  thinking of opening ranges.  We have discussed the

22  fact that they would not open a range in an

23  industrial district because people they have talked

24  to, whether it be in a business plan or in their



1    studies that they have conducted, have determined

2    that it would be detrimental for their business to

3    be in certain industrial areas.  Of course, that's

4    restricted to the geographic location that they

5    were discussing; not the City of Chicago.

6        Q.    None of those were in the City of Chicago?

7        A.    In my recollection, they may have been,

8    but not to my knowledge, no.

9        Q.    Has any potential range owner ever

10   complained to you about this regulation?

11       A.    No.

12       Q.    Other than your conversations with

13   Mr. Kramer, and I'm assuming Mr. Sigale, about this

14   provision, have you spoken about this provision

15   with anybody else?

16       A.    No.

17       Q.    And isn't it possible that because the

18   City of Chicago currently does not have a

19   commercial firing range that regardless of where it

20   lands in the City of Chicago, that it would have an

21   immediate customer base?

22       A.    It's possible.

23       MR. SIGALE:  I was just going to object as to

24   foundation and speculation.  You answered it.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 170 of 314 PageID #:5831

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        170

1    That's fine.

2         THE WITNESS:  It's possible.

3    BY MR. AGUIAR:

4         Q.   It's possible.

5              And you are not opining that this

6    provision, or these provisions I should say, make

7    it impossible to open up a range in the City of

8    Chicago?

9         A.   It wouldn't make it impossible.

10        Q.   And you are not opining that these

11   provisions would make a range economically

12   infeasible?

13        A.   No.  But, again, it would be my opinion

14   that it would be less attractive to an investor or

15   a person that's thinking about opening up a range

16   if they were restricted to industrial areas.  It

17   wouldn't be impossible.

18        Q.   And that opinion, is it based on

19   conversations with investors?

20        A.   It's based on conversations with other

21   shooting range operators and other prospective

22   shooting range owners, not in the City of Chicago.

23        Q.   In other jurisdictions?

24        A.   That's correct.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 171 of 314 PageID #:5832

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                              171

1    Q.   In Issue 9 you say that to place ranges --

2    basically I'm going to paraphrase -- in

3    manufacturing districts, you call it punitive,

4    correct?

5    A.   That's correct.

6    Q.   Again, like we discussed with the

7    limitation on the hours of operation, that goes to

8    legislative intent, doesn't it?

9    MR. SIGALE:  Objection, foundation,

10   speculation.

11   BY MR. AGUIAR:

12   Q.   You are saying it's punitive to do that.

13        Are you saying there that the City of

14   Chicago did this somehow as a punitive measure to

15   punish range owners who want to operate?

16   A.   Well, my opinion is what other purpose

17   would there be to say a shooting range can only go

18   in a manufacturing district when they are not a

19   manufacturing company.

20        Same with if you said a bowling alley has

21   to go in a manufacturing district where people may

22   not want to travel to to go bowling, it's kind of

23   the same thing; although, this is a little

24   different because it's a retail establishment also,



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 172 of 314 PageID #:5833

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          172

1   the model that we're looking at.

2        Q.   But, again, you are not a member of City

3   Council in the City of Chicago?

4        A.   No, I am not.

5        Q.   As you sit here today, you don't know what

6   the governmental purpose the City has articulated

7   for why it has put ranges in a manufacturing

8   district?

9        A.   That's correct.

10       Q.   You are just saying it's punitive because

11  that's your assessment of what it is?

12       A.   That's correct.

13       Q.   Let's turn to Issue Number 10 in your

14  report.  Here you take issue with Section

15  4-151-170, Subpart (a), and this involves the

16  rental of firearms at a firing range.

17            I would like you to know that in the

18  ordinance passed on September 11th of this year,

19  this section was amended.

20       A.   I am aware of that.

21       Q.   That is on Page 6 of Exhibit 4.

22       MR. SIGALE:  It's on Page 4 of Exhibit 4, isn't

23  it?

24       MR. AGUIAR:  Page 6 of Exhibit 4.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 173 of 314 PageID #:5834

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        173

1      THE WITNESS:  Exhibit 4?

2      MR. SIGALE:  Oh, I'm looking at Exhibit 3.  I'm

3  sorry.

4      THE WITNESS:  So was I.

5  BY MR. AGUIAR:

6      Q.   So you had a chance to review this

7  provision before you came in today?

8      A.   I did.

9      Q.   And you will now say that there's no

10  longer a limitation on needing a CFP -- and I will

11  tell you that's because the City has eliminated the

12  requirement that Chicago firearm owners have their

13  own identification card -- and nor is it limited to

14  people only obtaining the one hour to get that CFP.

15      A.   I understand that.

16      Q.   It allows for the rental of firearms to

17  any shooting range patron provided that the person

18  has a FOID card or a valid CCL, which is a carry

19  license, if required to have one.

20          So would you agree with me that the

21  concern you've articulated in Issue 10 has been

22  eliminated?

23      A.   That's right.

24      Q.   So it's no longer a problem in your mind?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 174 of 314 PageID #:5835

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         174

1      A.    That's right.

2      Q.    And the revenue stream that would be

3   available for firearms rental is now available?

4      A.    That's correct.

5      Q.    How does that impact your overall view of

6   the City's regulation?

7      A.    How does it impact my overall view of the

8   regulations?

9      Q.    Yes.

10     A.    This regulation makes it less burdensome

11  on a person trying to operate a shooting range in

12  the City of Chicago, the elimination of that

13  regulation.

14     Q.    So it makes it easier to run a range in

15  the City of Chicago?

16     A.    It would make it easier to make a profit,

17  right?

18     Q.    So therefore, it makes it more attractive?

19     A.    That's correct.

20     Q.    And, again, you haven't done any research

21  into what percentage of revenue is generated by the

22  rental of firearms at a range?

23     A.    That's correct.

24     Q.    For the moment I'm going to skip over



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 175 of 314 PageID #:5836

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        175

1   Issue 11, ammunition sales, because I know you

2   identified that there was some confusion over the

3   ordinance.  Before we go there, I want to take a

4   moment to review the ordinance to make sure that we

5   have it right before I start asking questions about

6   it.

7        A.   Okay.

8        Q.   So we are going to move on to Number 12

9   for right now.

10       A.   Okay.

11       Q.   Here you take issue with Section 11-4-260,

12  Subpart (b)?

13       A.   Correct.

14       Q.   And I believe that is found in Exhibit 2

15  on Page 18.

16       A.   Got it.

17       Q.   And this allows the, quote, Commissioner

18  is authorized to promulgate rules and regulations

19  for the cleaning of, sound and air quality control

20  at, and discharge of particulate matters and waste

21  from shooting ranges?

22       A.   Correct.

23       Q.   Would you please explain to me what your

24  objection is to that provision?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 176 of 314 PageID #:5837

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         176

1      A.   When we have two separate entities, two

2  separate regulatory entities developing guidelines

3  or regulations or ordinances governing the same

4  topics, we sometimes have conflicts.  I have seen

5  that happen a lot.

6           Everything we have discussed in the

7  existing municipal code is already covered under

8  federal regulation, which would be applicable in

9  the City of Chicago, which would cover the

10  exposure -- let me see.  It regulates the cleaning

11  of sound control through OSHA, air quality control

12  through EPA, and the discharge of particulate

13  matter and waste through EPA at firing ranges.

14  Although, the regulations do specifically say

15  firing ranges, these regulations do apply and would

16  apply to any shooting range in Chicago.

17           So it's a jurisdictional overlap issue

18  where we do see a lot of conflicting regulations.

19  So it may be burdensome on the range operator to be

20  required to follow both sets of regulations, even

21  though one may conflict with the other.  That's my

22  concern.

23      Q.   Okay.

24      A.   If I may add, that concern to a person



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 177 of 314 PageID #:5838

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        177

1    that's thinking of opening a range may be, well,

2    okay, first of all, this is very general and it

3    doesn't say what the regulations will be.  It says

4    the person can design what those regulations will

5    be, which we don't know what they are.

6              A person that wants to a open range

7    doesn't know what the regulations are going to be,

8    whereas the federal regulations that are already in

9    existence -- and I'm sure the state environmental

10   regulations which are already in existence in

11   Chicago, or in Illinois rather -- would apply to

12   the shooting range.  So we have an uncertainty here

13   of what regulations we may have to be in compliance

14   with if we are to open up a range.

15             Let me also add that compliance with these

16   types of regulations may not be inexpensive.  So

17   that is definitely an issue or concern to somebody

18   who is thinking about opening up a range.

19             My opinion may change or may have changed

20   if I saw what these regulations that the

21   Commissioner is going to initiate were.  But as far

22   as I know, this is in the future.

23        Q.   That's my point exactly.

24             As of right now, you are not aware of any



1  regulations that have been promulgated by the

2  Commissioner, are you?

3      A.   No.

4      Q.   So you don't know what those regulations

5  are?

6      A.   That's correct.

7      Q.   So you don't know as you sit here today

8  whether there actually would be a conflict or not?

9      A.   I don't know if would be there.

10     Q.   And you don't know whether it would be any

11 more expensive to comply with that provision than

12 what they already have to spend to comply with

13 OSHA, EPA, and other things?

14     A.   I don't know that for a fact, no.

15     Q.   In essence, you're launching an objection

16 to something which hasn't happened yet?

17     A.   That's right.

18     Q.   It's a hypothetical objection at this

19 point as of right now?

20     A.   It's a hypothetical objection based on

21 past experience.  Again, I've seen this actually

22 happen where an entity that develops an ordinance

23 that is in direct conflict with other regulations,

24 so I mean it's not just based on an idea or I am



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 179 of 314 PageID #:5840

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        179

 1   not pulling an idea out of the air.  It's based on

 2   my past experience that this does happen.  I'm not

 3   saying it will happen here.  I'm saying it can

 4   happen.  So that may be something that should be

 5   addressed.

 6        Q.   But, again, it hasn't happened?

 7        A.   It hasn't happened to my knowledge.

 8        Q.   So whether there actually is a conflict is

 9   just guesswork at this point?

10        A.   That's right.

11        Q.   And are you saying that based on this

12   guesswork that a range owner will not open in the

13   City of Chicago because of it?

14        A.   Well, if I read this ordinance and I could

15   see that the Commissioner is authorized to

16   promulgate rules and regulations for the cleaning

17   of, sound and air quality control at, and discharge

18   of particulate matter and waste from shooting range

19   facilities, I might be a little concerned and say,

20   well, what are those regulations that will be

21   promulgated, how is that going to affect my

22   business in the future.

23             I know about OSHA.  I know about EPA.  I

24   know about NIOSH.  I know about all of the other



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 180 of 314 PageID #:5841

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          180

 1   agencies that may affect my operation, but I don't

 2   know about this.  It may be an unknown that

 3   somebody may say that's too risky, what's going to

 4   be promulgated that I'm going to have to comply

 5   with in the future.

 6          And, again, yes, you are right, it's a

 7   hypothetical, but I guess it gets to purpose, what

 8   the purpose is of the regulation.

 9      Q.   But purpose doesn't go to whether it makes

10   it possible to open a range or not, does not?

11      A.   No.

12      Q.   Why this was enacted has nothing to do

13   with whether a range can open, function, and turn a

14   profit, does it?

15      A.   No, it does not.

16      MR. SIGALE:  That last question was just about

17   the specific ordinance that says the Commissioner

18   has authority, right?

19          That last question wasn't about the

20   hypothetical things that may be passed, correct?

21      MR. AGUIAR:  No.  It was basically --

22          Read back my question, please.

23                      (Whereupon, the record was read

24                       as requested.)



1        MR. AGUIAR:  He made a reference to I don't

2    know what the purpose of this provision is.  And I

3    said, well, regardless of why this was enacted, why

4    the Commissioner was granted this authority is

5    irrelevant to whether it would impact whether

6    someone could open a range or not.

7        MR. SIGALE:  Just as long as we are agreeing

8    this was 11-4-260(b), if that's the case, then --

9        MR. AGUIAR:  Yes, it was.

10        MR. SIGALE:  -- I'm content.

11   BY MR. AGUIAR:

12        Q.   And your answer would be the same that you

13   gave before, correct, that the purpose why City

14   Council gave this authority to the Commissioner is

15   irrelevant to whether a range could open, function,

16   and turn a profit?

17        A.   Correct.

18        Q.   Would you agree with me that if anybody

19   opens a business, regardless of what it is, is

20   always subject to potential further legislation

21   which may affect their business operations?

22        A.   That's true.

23        Q.   So whether you open a 7-11, a firing

24   range, or a Toys R Us, some municipality could come



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 182 of 314 PageID #:5843

JACK J. GIORDANO                            September 20, 2013
EZELL vs. CITY OF CHICAGO                                 182

1   along and enact an ordinance which affects how you

2   operate your business?

3       A.    That's correct.

4       Q.    And businesses survive every day under

5   that kind of environment?

6       A.    That's correct.

7       Q.    So a firing range could open and still be

8   subject to that kind of potential for future

9   regulation or control by the municipality?

10      A.    That's correct.

11      Q.    Like any other business?

12      A.    That's correct.

13      Q.    And in prior cases, you said that there

14  have been conflicts between municipal regulations

15  and OSHA, EPA things?

16      A.    That's right.

17      Q.    How have those been resolved?

18      A.    They haven't been resolved.

19      Q.    They haven't been?

20      A.    The issues that I've dealt with -- I can

21  give you an example.  In New Jersey, we have PEOSH,

22  which is the Public Employees Occupational Safety

23  and Health Unit of the Department of Labor.  New

24  Jersey is a state plan state, as is Illinois.  So



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 183 of 314 PageID #:5844

JACK J. GIORDANO                    September 20, 2013
EZELL vs. CITY OF CHICAGO                        183

1  they are authorized to promulgate their own rules

2  and regulations specific to shooting ranges above

3  and beyond what OSHA requires.  And there are some

4  conflicts there.  Also, with EPA regulations,

5  there's some conflict there.  It has not been

6  resolved.  The conflicts still exist.

7          So it's up to the range operator to be in

8  compliance with both sets of regulations, whether

9  it's more costly or, in my opinion, sometimes less

10  safe than it would be if there were one set of

11  regulations that we were following that covered the

12  issues properly.

13     Q.    Something you just touched on I was going

14  to ask you about is a range owner who is subject to

15  conflicting regulations could certainly seek

16  recourse --

17     A.    Sure.

18     Q.    -- with US EPA or OSHA?

19     A.    Right, or the City I would assume.

20     Q.    Or the City.  Exactly.

21     A.    Right.

22     Q.    And have you ever heard the term

23  grandfathering?

24     A.    Yes.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 184 of 314 PageID #:5845

JACK J. GIORDANO                         September 20, 2013
EZELL vs. CITY OF CHICAGO                              184

1        Q.    Since we're playing hypotheticals, let's

2   play another one.

3        A.    Okay.

4        Q.    Isn't it possible that if the Commissioner

5   were to promulgate rules and regulations that she

6   would grandfather in any range that is in existence

7   already from these new rules and regs?

8        MR. SIGALE:  I'm just going to object.  I don't

9   like hypotheticals as much as you do, so I'm

10  objecting.

11       MR. AGUIAR:  I understand.  But this whole

12  thing is hypothetical because we have no regs yet.

13  BY MR. AGUIAR:

14       Q.    Let's keep playing hypotheticals.

15             So it's possible that the Commissioner

16  could grandfather in existing ranges?

17       A.    It's possible.

18       Q.    Have you heard of other instances that

19  municipalities have grandfathered in businesses or

20  uses of property --

21       A.    Yes.

22       Q.    -- from new regulations?

23       A.    Yes, I have.

24       Q.    It's not an uncommon thing that happens?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 185 of 314 PageID #:5846

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     185

1       A.    It's not uncommon at all.  It's even

2    happened with shooting ranges.

3       Q.    Where?

4       A.    For a lot of sound ordinances, shooting

5    ranges are grandfathered.

6       Q.    And that's probably because it would

7    probably be too expensive or burdensome on a range

8    owner to comply with the regulations with an

9    existing structure?

10       A.    Correct.

11       Q.    That's one of the reasons you can have

12    that?

13       A.    Right.

14       Q.    It is possible that the Commissioner, if

15    she chose to exercise her authority under this

16    provision, would enact regulations which are

17    completely consistent with OSHA and don't create

18    conflicts?

19       A.    That's possible, sure.

20       Q.    Isn't it possible, again, that issues

21    could arise -- and you know more about this stuff

22    than I do.  I will give you that.

23            But isn't it possible that an issue could

24    arise that EPA and OSHA do not address, but that



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 186 of 314 PageID #:5847

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        186

1    the City believes needs to be addressed, and that

2    the Commissioner would promulgate a regulation to

3    address that condition?

4         A.    Absolutely.

5         Q.    And the Commissioner should have that

6    authority to address new conditions that come up

7    that aren't otherwise addressed by the federal

8    regulations; would you agree with that?

9         MR. SIGALE:  I am going to object.  It calls

10   for a conclusion.

11   BY MR. AGUIAR:

12        Q.    In terms of range safety and health, if

13   the Commissioner were to come upon an issue which

14   jeopardized health and safety that is not addressed

15   by a federal regulation dealing with cleaning,

16   sound, air quality control, and discharge of

17   particulate matter, if she were to come across

18   issues that aren't addressed as to health and

19   safety, shouldn't she have the authority to address

20   them?

21        A.    Which Commissioner are we talking about?

22        Q.    It's defined elsewhere in the ordinance.

23   I don't know which Commissioner, but whichever

24   Commissioner would have authority to enact this.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 187 of 314 PageID #:5848

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      187

1           Someone should have the authority to say

2     we are having a rule to address this new health and

3     safety concern that's not addressed by federal

4     regulations?

5           A.    That's correct.  I agree with that.

6           Q.    And just to put a nice bow on this, has

7     anybody ever talked to you or complained about this

8     provision before?

9           A.    No.

10          Q.    Other than your conversations with

11    Mr. Kramer, and I'm assuming Mr. Sigale, have you

12    discussed this provision with anybody else?

13          A.    No, I have not.

14          Q.    You didn't look at any studies or research

15    in writing Issue 12 in your report?

16          A.    No, I did not.

17          MR. AGUIAR:  Can we go off the record for a

18    second?

19                        (Whereupon, a discussion was had

20                         off the record.)

21    BY MR. AGUIAR:

22          Q.    Let's look at Issue 13.  This involves a

23    challenge to Section 13-96-1160, Subpart (a).

24          Now, I believe you testified earlier in



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 188 of 314 PageID #:5849

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        188

1  the deposition that you do not believe you are

2  qualified to provide expert opinion on this

3  particular issue?

4      A.   That's correct.

5      Q.   And this deals, again, with how the walls

6  of the inside of the range are coated, correct?

7           Am I putting it incorrectly?

8      A.   Yes, you are.

9      Q.   I used the wrong word to describe coated?

10     A.   The requirement to be impenetrable to

11  bullets?

12     Q.   Correct.

13     A.   Well, no, that's not -- what was your

14  question again?

15     Q.   What were you going to say?

16     A.   The reason why I feel that I'm -- the

17  reason I feel I would not be comfortable discussing

18  this is because it gets into the cost of additional

19  armor plating, the fact that that would be

20  overburdensome.  I'm not qualified to talk about

21  that, but Mr. Kramer is.  So I think it would be

22  easier for him to address those issues.

23     Q.   Mr. Kramer wrote Issue Number 13, correct?

24     A.   Correct.



1      Q.    And you did read it before it was

2   submitted?

3      A.    Yes, and we discussed it.

4      Q.    What did you discuss with Mr. Kramer about

5   Issue 13?

6      A.    The entire paragraph.  We discussed the

7   fact that this is going to put additional

8   requirements that we do not normally see on

9   shooting ranges and the fact that it's not

10  typically done on indoor shooting ranges.  We both

11  discussed the fact that that issue needed to be

12  addressed.

13     Q.    You said earlier when you first got the

14  ordinance from Mr. Kramer, you both sat down

15  separately and looked at the ordinance and picked

16  out provisions you thought were problematic?

17     A.    Right.

18     Q.    Was this one of the ones that you

19  identified?

20     A.    I can't be certain whether it was one I

21  identified or one he identified.

22     Q.    But you did discuss with Mr. Kramer this

23  provision and why it's problematic?

24     A.    That's correct.



1      Q.    And did you have any input into the

2   reasons why or did you just agree with Mr. Kramer's

3   analysis?

4      A.    I agreed with his analysis.

5      Q.    None of this originated with you?

6      A.    No.

7      Q.    What knowledge do you have, because you

8   did talk to Mr. Kramer, about why this provision,

9   separate and apart from the cost, is problematic?

10     A.    Because it requires additional armor

11   plating that we do not normally see on ranges.  If

12   you can just give me a second to read it, I will

13   see if I can pick up on anything else.

14          Basically that areas of a shooting range

15   that are not normally required to be impenetrable

16   to bullet strikes in the ordinance would be

17   required to be impenetrable to bullet strikes.

18     Q.    And what areas are those?

19     A.    Doors into the shooting range behind the

20   firing line would need to be in the rear wall to

21   avoid armor plating the door.  We do not normally

22   put doors on the rear wall.

23          Doors behind the bullet trap -- and this

24   is a design issue.  Again, Mr. Kramer would be able



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 191 of 314 PageID #:5852

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        191

1  to address that, doors behind the bullet trap

2  required for servicing.  Many types of bullet trap

3  systems would need to be armor plated.  Those doors

4  are not typically armor plated or not typically

5  impenetrable to bullet strikes because there's

6  impenetrable range equipment in between the firing

7  line and that door.  That would, of course,

8  increase the cost of construction, which, again, I

9  don't feel I am qualified to talk about, but I

10  agree with that fact.

11      Q.   Let me just ask a couple quick questions

12  about this.

13      A.   Sure.

14      Q.   The ordinance exempts from being armor

15  plated the rear wall behind the firing line,

16  correct?

17      A.   Correct.

18      Q.   And you just said that there normally are

19  no doors on the rear wall; is that correct?

20      A.   Correct.  So to avoid armor plating that

21  door, which would normally be on the right or the

22  left, it would be on the side, it would have to be

23  placed on the rear wall.

24      Q.   So we are talking just behind the firing



1  line right now?

2      A.    That's correct.

3      Q.    The sidewalls have to be armor plated

4  according to your reading of the ordinance?

5      A.    Correct.

6      Q.    The rear wall does not?

7      A.    Behind the fire line, correct.

8      Q.    Behind the shooter?

9      A.    That's right.

10      Q.    What you are saying is the doors would

11  normally be where in a range; behind the shooter or

12  to the sides of the shooter, behind the firing

13  line?

14      A.    My memory of our discussion of this is a

15  little sketchy.  Typically the doors are on the

16  sides, but I have been in ranges where doors are in

17  the back.  This is an issue that I think Mr. Kramer

18  should address that I don't think I should address.

19      Q.    So you are just saying I have no knowledge

20  of this pretty much, no personal knowledge of this

21  provision and how it impacts a range?

22      A.    Well, just that one sentence.  I know

23  there is a design issue there that I would rather

24  not comment on because it is a design issue.  He is



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 193 of 314 PageID #:5854

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                193

1  the architect, he is the designer; not me.

2      Q.    And you have no knowledge about the design

3  issue at all?

4      A.    Not this particular issue, right.

5      Q.    What about the door behind the bullet

6  trap, is that the same issue; that's Mr. Kramer's

7  issue, not your issue?

8      A.    Well, I'm familiar that that portion of

9  our opinion is that that door is not typically

10 armor plated.  But according to the regulation, it

11 would have to be armor plated because the rear wall

12 would not be exempt from being impenetrable to

13 bullet strikes.

14     Q.    Okay.

15     A.    That's my understanding.

16     Q.    Okay.  And that's just an issue of cost?

17     A.    Wait a minute.

18          When a door has to be armor plated when it

19 typically would not have to be armor plated, it's

20 an issue of cost.  Again, this gets into design.  I

21 would feel more comfortable if Mr. Kramer addressed

22 that issue.

23     Q.    I'm just going to ask a couple of cleanup

24 questions.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 194 of 314 PageID #:5855

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                       194

1        A.    Sure.

2        Q.    You are not saying that this provision

3   makes it impossible to open a range in the City of

4   Chicago, are you?

5        A.    No.

6        Q.    You are not saying that it makes it

7   economically infeasible to open a range in the City

8   of Chicago, are you?

9        A.    No.

10        Q.    And you are not saying that this provision

11   would make a range necessarily unprofitable?

12        A.    No.

13        Q.    And, again, you don't know what the

14   additional costs would be to a range owner to

15   comply with this provision?

16        A.    I do not personally, no.

17        Q.    One other thing.  You said you have seen

18   ranges where the door behind the firing line is on

19   the rear wall behind the shooter?

20        A.    That's correct.

21        Q.    And this may be a design and you may punt

22   it, but a range could be designed to have the door

23   on the rear wall, wouldn't it?

24        A.    To my knowledge, yes, it can.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 195 of 314 PageID #:5856

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          195

1      Q.   And have you ever in your experience seen

2   a door behind the bullet trap that is, in fact,

3   armor plated?

4      A.   Not to my knowledge.

5      Q.   You have never seen that?

6      A.   Not that I can remember, no.

7      Q.   What about the wall behind the bullet

8   trap, is that ever armor plated?

9      A.   The entire envelope, as far as walls go,

10  are usually impenetrable, but I'm going to punt

11  that off to Mr. Kramer.  That's a design question,

12  a design issue, and I would feel more comfortable

13  if he answered.

14     Q.   Because you don't have any knowledge of

15  it?

16     A.   That's right.

17     Q.   Let's move along to Issue Number 14, which

18  is ammunition or firearms storage.  Here you

19  challenge the City's provision in 13-96-1190,

20  Subpart (c)(2)(d), and that can be found in

21  Exhibit 2, Page Number 21.

22          Would you please explain your objection to

23  this provision of the ordinance?

24     A.   I believe this is one of the issues that I



1   said Mr. Kramer would handle.

2       Q.   Number 14?

3       A.   I believe so.  This is a fire code issue.

4       Q.   I only had you down as Numbers 13, 17, and

5   18.

6       A.   I believe Number 14 should also be

7   included in that.

8       Q.   Again, this involves the storage of

9   ammunition or firearms at the range?

10      A.   Correct.

11      Q.   I am going to ask some of the same basic

12  questions I asked about the last provision just for

13  the purposes of today's record.

14          So, again, when you were sent the

15  ordinance by Mr. Kramer and you independently

16  looked at it, did you raise a concern with this

17  provision on your own?

18      A.   Again, I can't recall which ones I raised

19  and which ones he raised.  What I do recall is

20  mostly we both raised the same concerns, but I

21  can't remember which one, who did what.

22      Q.   And Mr. Kramer wrote this part of the

23  report?

24      A.   That's correct.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 197 of 314 PageID #:5858

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        197

1        Q.    But you reviewed it and said you joined in

2   what's stated herein?

3        A.    Correct.

4        Q.    But you, as you sit here today, do not

5   believe that you have the knowledge or information

6   to actually opine as to the opinions stated herein?

7        A.    Correct.

8        Q.    You just believe from your own experiences

9   that this sounds right?

10       A.    Correct.

11       Q.    Because you consider this to be a fire

12  issue?

13       A.    It's a design issue because the designs

14  for the different types of classification of space

15  would be different and they are governed by

16  different codes, which I'm not familiar with.

17       Q.    Do you recall having any input at all into

18  what was stated here in the report in Issue 14?

19       A.    I don't believe I had any input into

20  what's actually written, just discussion, but not

21  input into what actually was written.

22       Q.    Was it more you just -- and, again, if you

23  recall -- Mr. Kramer said here's what I believe and

24  you said that sounds right?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 198 of 314 PageID #:5859

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          198

 1        A.    Right.

 2        Q.    That's pretty much how it went?

 3        A.    Correct.

 4        Q.    And just looking at Exhibit 2, the

 5   provision itself, it's Subpart (c)(2)(d), which is

 6   on the right-hand side.

 7        A.    Got it.

 8        Q.    Well, 2 says the shooting range facility

 9   shall include the following uses.  And D says if

10   ammunition or firearms are stored in magazine or

11   hazardous storage facility appropriate for the type

12   and amount of ammunition or firearms as provided in

13   the rules and regulations promulgated by the police

14   or fire department.

15             So a necessary component of this

16   requirement would be regulations promulgated by

17   police or fire as you read it?

18        A.    Correct.

19        Q.    And as you sit here today, are you aware

20   of any rules or regulations promulgated by the

21   Chicago Police or Fire Department regarding storage

22   of firearms or ammunition?

23        A.    No, I am not.

24        Q.    Again, to put the proverbial bow on this



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 199 of 314 PageID #:5860

JACK J. GIORDANO                                        September 20, 2013
EZELL vs. CITY OF CHICAGO                                            199

1   one, other than your conversations with Mr. Kramer

2   and/or Mr. Sigale, have you spoken about this

3   provision with anybody else?

4        A.    I have not.

5        Q.    So no one has told you that they would not

6   open a firing range in the City of Chicago because

7   of the storage requirements?

8        A.    No.

9        Q.    And you've done no studies and conducted

10  no research into whether this provision makes it

11  impossible to open a range in the City of Chicago?

12       A.    No.

13       Q.    Or whether it make it economically

14  infeasible?

15       A.    No.

16       Q.    Or whether this provision would impact a

17  revenue source for the range?

18       A.    No.

19       Q.    Moving right along, let's talk about sound

20  level limits in Issue Number 15.

21            There it appears you are taking a

22  challenge predominantly with Section

23  13-96-1200(b)(2), which can be found on Page 22 of

24  Exhibit 2.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 200 of 314 PageID #:5861

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          200

1          Now, I will tell you that since you wrote

2    your report, that particular provision has been

3    amended.  The correct language is actually found in

4    Exhibit 2.  But if you care to look at how it was

5    amended, we can turn to Exhibit 3 and that is on

6    Page 9.

7          You will see that the sound control

8    requirement has been modified.  It says that the

9    noise emanating from the shooting range to areas

10   outside of the shooting range facility are subject

11   to Chapter 8-32, Sections 8-32-010 through and

12   including 8-32-170.  What's been stricken out is

13   the shall be in compliance with.

14          You will also note that in the next

15   sentence the language that you mention in your

16   report into contiguous areas has been stricken and

17   there has been an amendment to the decibel numbers

18   that are allowable.  It says now the maximum noise

19   emanating from the shooting range facility shall

20   not be more than 55 decibels when measured from a

21   distance of 100 feet or more from the source or 70

22   decibels when measured from a distance of 10 feet

23   or more from the source.

24          Were you aware of this change before you



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 201 of 314 PageID #:5862

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          201

1   came to today's deposition?

2       A.   I was aware there was a change, but I was

3   not aware of this specific change.

4       Q.   Okay.  Clearly what's going on is the into

5   contiguous areas, which you complain about as being

6   undefined, has been eliminated?

7       A.   Right.

8       Q.   And what they have done is they have

9   created more leeway in the ordinance.  It used to

10  be you couldn't have decibels more than 55

11  anywhere.  Now what they've said is 55 decibels has

12  to be -- it can't be more than 55 if you are 100

13  feet from the source, but it can be 70 decibels if

14  you're basically 10 feet to 99 feet from the

15  source.

16           Do you see how I'm reading that ordinance

17  that way?

18           If you want to take a moment, you can read

19  it.

20      A.   What's the definition of the source?  Is

21  it the exterior wall of the facility?

22      Q.   From the source, yes, that would be from

23  where the facility starts, the wall of the

24  facility.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 202 of 314 PageID #:5863

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          202

1      A.   Not the property line?

2      Q.   It says from the source.

3      A.   The source of the noise might be the

4  firearm.

5      Q.   Well, it says the maximum noise emanating

6  from the shooting range facility.  That would be

7  the facility itself.

8      A.   So it may be the property line.

9      Q.   If that's part of the facility, yes.

10     A.   Well, in the City's definition, that

11 includes the parking lot, it includes the whole

12 property, so it would be from the property line?

13     Q.   From the property line.

14     MR. SIGALE:  Is there a question?

15     MR. AGUIAR:  He's reviewing it.

16 BY MR. AGUIAR:

17     Q.   Mr. Giordano, once you've had a chance to

18 review it and you feel comfortable with the

19 ordinance, I will start asking some more questions.

20 You just let me know when you're ready.

21     A.   Okay.

22     MR. AGUIAR:  We'll take two minutes while he is

23 reading the ordinance.

24                    (Whereupon, a break was taken.)



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 203 of 314 PageID #:5864

JACK J. GIORDANO                    September 20, 2013
EZELL vs. CITY OF CHICAGO                          203

 1   BY MR. AGUIAR:

 2       Q.    You've had a chance, Mr. Giordano, to

 3   review the amendment that was made in December to

 4   this provision?

 5       A.    Yes, I have.

 6       Q.    As I said earlier, your objection to

 7   contiguous areas as being not defined has been

 8   removed, correct?

 9       A.    Correct.

10       Q.    Would you agree with me that the ordinance

11   relaxes the noise regulation with respect to

12   shooting ranges?

13       A.    Somewhat, yes.

14       Q.    It used to be 55 decibels, period?

15       A.    Correct.

16       Q.    Now it's only 55 decibels if you are

17   100 feet away from the source, which would be the

18   property line of the range facility, or if you are

19   between 10 and 99 feet, it's 70 decibels?

20       A.    Correct.

21       Q.    Does this amendment affect your objection

22   to this provision?

23       A.    Actually, I guess the answer to that would

24   have to be no.  And the reason being is that other



1  businesses and manufacturing districts have no

2  restriction to -- no sound restrictions.  And the

3  shooting range would have a sound restriction.

4          It is unlikely that the sound emanating

5  from a properly-designed shooting range would

6  exceed this standard.  However, if you did a sound

7  test within 10 feet from the source and your

8  reading was 70 decibels or greater, I guess it

9  would be difficult to determine, and in a

10  manufacturing district I bet it would even be

11  difficult to take a test like that because the

12  ambient sound would be greater than 70 decibels,

13  but it would not be able to be determined if it was

14  coming from the range or not.

15          I think my objection would be that

16  restricting sound levels at a shooting range when

17  it's mandated to be in an area that is specifically

18  zoned with businesses that have no restrictions

19  would be a burden.

20      Q.   Let's back up for a second there.  Let's

21  talk about your experience in sound testing since

22  it seems like it was years ago.  We talked about

23  your experience.

24          Do I recall you correctly testifying that



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 205 of 314 PageID #:5866

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          205

1   you've engaged in sound testing for ranges?

2       A.   I have engaged in sound testing on ranges;

3   not in my official capacity, but in training

4   capacities.

5       Q.   Okay.  So you have some experience with

6   it?

7       A.   A little bit.

8       Q.   But it's not something you do in your

9   day-to-day functions?

10      A.   No, it's not.

11      Q.   It's not something you have done in your

12  day-to-day functions?

13      A.   That's correct.

14      Q.   So you've had some experience, but you

15  wouldn't say you are an expert in the area of

16  measuring sound?

17      A.   That's correct.

18      Q.   You said a second ago that if a range is

19  designed properly, it would likely just comply with

20  this provision anyway; is that correct?

21      A.   Correct.

22      Q.   So, again, if a range owner does what you

23  believe a range owner should do, this provision

24  should not pose any problem whatsoever; is that



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 206 of 314 PageID #:5867

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          206

1   correct?

2       A.    Theoretically, yes.

3       Q.    That's based on the recommendations you

4   would make to your client?

5       A.    That's correct.

6       Q.    And you are making an assertion that the

7   ordinance is objectionable because other uses in

8   the manufacturing district that you are asserting

9   don't have to comply with this kind of a

10  requirement?

11      A.    Correct.

12      Q.    But isn't that more of a fairness question

13  as opposed to impact on the ability to own and

14  operate a business?

15      A.    It would be an additional burden on that

16  business operator, an additional regulation or

17  additional requirement that they would have to

18  meet, which, as I said, they probably would meet,

19  but it would be required that they meet it.

20      Q.    I'm talking vis-a-vis other uses.  Let's

21  assume it's a widget factory.  Let's go to

22  hypothetical land.

23            Your position is that the range has to

24  comply with the noise requirement in that district



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 207 of 314 PageID #:5868

JACK J. GIORDANO                                      September 20, 2013
EZELL vs. CITY OF CHICAGO                                          207

1  that the widget factory doesn't have to comply

2  with?

3       A.   Correct.

4       Q.   It makes it unfair to the range.

5            But if you have two ranges that are

6  opening in the district, they both have to comply

7  with it, correct?

8       A.   Correct.

9       Q.   So it's not like one range is getting an

10 advantage over another range?

11      A.   Correct.

12      Q.   All range owners have to comply with it?

13      A.   That's correct.

14      Q.   And the range owner might not want to

15 operate the widget factory and vice-versa, correct?

16      A.   Right.

17      Q.   So the fact that one has to comply with

18 something different from the other really doesn't

19 affect each other's compliance; are you following

20 me?

21      MR. SIGALE:   I'm just going to object as to

22 form.

23 BY MR. AGUIAR:

24      Q.   Do you follow me?



1      A.    Somewhat.

2      Q.    Okay.  What I'm trying to get at is you

3   are saying it's not fair almost that the ranges are

4   almost being penalized with an extra restriction

5   not on other businesses, right?

6            Is that what you're saying?

7      A.    Well, it's an unnecessary burden.  So I am

8   just maybe phrasing it a little differently.

9      Q.    Clearly, in your opinion, the City doesn't

10  make other businesses do this, so why should a

11  range?

12     A.    Right.

13     Q.    It's an unnecessary restriction because we

14  don't really seem to care about it?

15     A.    Correct.

16     Q.    Am I putting it correctly?

17     A.    Rephrase your --

18     Q.    Basically you are saying that the City

19  doesn't require any other business in the

20  manufacturing district, but ranges have been

21  singled out.  Because we are only singling out

22  ranges, we are putting a burden on them that we

23  clearly don't think is necessary for other

24  businesses?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 209 of 314 PageID #:5870

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         209

1       A.   I guess so.  I guess that would be a good
2    way to put it.
3       Q.   I apologize it took me a while to get
4    there, but we've been at this for a while.
5       A.   I know.
6       Q.   I'm going to represent to you a set of
7    facts that I'm going to ask you to assume to be
8    true.  Whether or not they are true is something
9    that the lawyers will fight about later.
10      A.   Okay.
11      Q.   You will see that noise is subject to the
12   requirements of Chapter 8-32?
13      A.   Right.
14      Q.   I'm going to ask you to assume that the
15   City department responsible for enforcing noise
16   regulations has interpreted Chapter 8-32 to apply
17   in manufacturing districts only between the hours
18   of 8:00 p.m. and 8:00 a.m., meaning that they don't
19   cite businesses in a manufacturing district for
20   noise that violates Chapter 8-32 between the hours
21   of 8:00 a.m. and 8:00 p.m.
22      MR. SIGALE:  I'm sorry.  I'm going to object as
23   to foundation.
24           Who interpreted?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 210 of 314 PageID #:5871

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     210

1      MR. AGUIAR:  Kevin Schnoes' deposition.

2           I'm just saying assume this to be true.

3   If you heard me, I said we will fight about whether

4   this was actually said or not.

5      MR. SIGALE:  Okay.  I'm happy to do that, but

6   Kevin Schnoes said as long as it's within the

7   manufacturing district, it's not enforced, it's

8   being the noise restriction.  So he interprets

9   every other location as only kicking in after

10  8:00 p.m. and manufacturing districts not at all.

11     MR. AGUIAR:  Okay.  Well, that makes my

12  hypothetical even better.

13     MR. SIGALE:  Okay.

14  BY MR. AGUIAR:

15     Q.  I was going to do it a little differently,

16  but I will put in the facts that Mr. Sigale has

17  just said that he read from Mr. Schnoes'

18  deposition.

19     MR. SIGALE:  Just for the record, I'm looking

20  at about Pages 25 to 29 of his October 2, 2012

21  deposition.

22     MR. AGUIAR:  What I was doing was using that

23  deposition in conjunction with language from an

24  ordinance as well.  I was doing them together.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 211 of 314 PageID #:5872

JACK J. GIORDANO                         September 20, 2013
EZELL vs. CITY OF CHICAGO                              211

1   BY MR. AGUIAR:

2      Q.   Let's assume that Mr. Schnoes, who is

3   responsible for enforcing City noise regulations,

4   says they do not enforce the noise regulations in

5   manufacturing districts, meaning that if a range is

6   in a manufacturing district, under his statement

7   the ordinance requirements wouldn't be enforced.

8           Does that change your opinion as to

9   whether this provision actually affects an ability

10  to open and operate a range in the City of Chicago?

11     A.   It makes me a little confused, but maybe

12  it would -- if the range operator knew that there

13  was an ordinance that was not going to be enforced,

14  maybe he wouldn't be concerned about the ordinance.

15          If it were me, I would be a little

16  concerned about what happened after Mr. Schnoes

17  retired and who took his place and what their

18  opinion was.  So I guess my question is if the

19  regulations aren't enforced in a manufacturing

20  district and a shooting range is required to be in

21  a manufacturing district, why does that ordinance

22  exist.

23     Q.   Well, let's take a different approach

24  then.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 212 of 314 PageID #:5873

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     212

1         The different approach would be say that

2    they interpreted Chapter 8-32 as only applying to

3    manufacturing districts between the hours of

4    8:00 p.m. and 8:00 a.m.  That's how they've

5    interpreted the ordinance.  Let's assume that to be

6    the case.

7         Ranges in the City of Chicago are limited

8    to the hours of 9:00 a.m. to 8:00 p.m., meaning

9    that they are not ever going to be within the

10   timeframe that the noise regulations would be

11   enforced.

12        Does that change your opinion at all?

13        A.   I guess then it would not have any

14   effect -- it would not have any direct effect on a

15   person's ability or decision-making process to have

16   a concern about the sound being emitted from the

17   range under those circumstances, if what you say is

18   the way it would be.

19        Q.   And, again, we are playing hypotheticals

20   here.

21        A.   Exactly.

22        Q.   I'm not making any statements of law or

23   policy here.  I just want to make that very clear

24   for the record.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 213 of 314 PageID #:5874

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         213

1          Are you saying that this provision makes

2   it impossible to open a range in the City of

3   Chicago?

4          A.   No.

5          Q.   Are you saying that compliance with this

6   provision -- actually, strike that.

7          I think you testified that compliance with

8   this provision wouldn't necessarily be impossible?

9          A.   No.  That's correct.

10         Q.   Because people who follow your

11  recommendations would be in compliance anyway?

12         A.   That's correct.

13         Q.   Are you saying that compliance with this

14  provision makes it economically infeasible to open

15  a range?

16         A.   No, I'm not.

17         Q.   Are you opining that this provision makes

18  a range an unprofitable exercise?

19         A.   No.

20         Q.   Other than your conversations with

21  Mr. Kramer and/or Mr. Sigale about this provision,

22  have you spoken with anybody else about this

23  provision?

24         A.   No.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 214 of 314 PageID #:5875

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        214

1      Q.   Have you conducted any research or

2   conducted any studies into this provision?

3      A.   No.

4      Q.   Let's move along to Issue Number 16.   In

5   this provision you are challenging the provisions

6   in Sections 13-96-1200(b)(7) and (b)(2)?

7      A.   Correct.

8      Q.   And those are found on Pages 22 and 23 of

9   Exhibit Number 2.

10         It seems that you are saying -- and

11   correct me if I'm wrong -- that there is a conflict

12   here --

13      A.   Here.

14      Q.   -- between (b)(2) and (b)(7) because

15   (b)(2) requires that the shooting range shall be

16   provided with airborne and structure-borne

17   sound-absorbing materials and that (b)(7) says that

18   floors, ceilings, and walls of every shooting range

19   shall be constructed of smooth, nonporous materials

20   to facilitate effective maintenance and cleaning

21   and removal of lead particulate?

22      A.   Correct.

23      Q.   I believe your assertion is that there are

24   no sound-absorbing materials that are smooth and



1   nonporous?

2       A.   Not that I'm familiar with.  I have never

3   seen -- and, again, I don't spec sound-absorbing

4   materials.  That's something that Mr. Kramer does.

5   He's the architect.  But I have never seen any

6   smooth, nonporous, effective sound-absorbing

7   materials.

8       Q.   I believe you testified earlier in the

9   deposition -- and the transcript will say what it

10  says, but I wrote this down specifically when you

11  said it early on -- that sound-proofing materials

12  are, quote, mostly, always a porous material.  I

13  recall you using that language.

14          Do you recall saying that?

15      A.   I don't, but I may have said that.

16      Q.   Because the use of the adjective mostly

17  implies to me -- implied to me at the time that you

18  said it that you were aware of at least some

19  soundproof materials which may be nonporous.

20          Does that ring a bell at all to you?

21      A.   I may have used that phrase maybe not

22  meaning that, but I cannot recall seeing any

23  sound-absorbing materials that are utilized on

24  shooting ranges that are smooth and nonporous.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 216 of 314 PageID #:5877

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         216

1   Smooth and nonporous is not a good sound-absorbing

2   material.

3       Q.   When you say it's not a good one, could it

4   be one?

5       A.   It could be I guess.  I have never seen

6   any smooth, nonporous sound-absorbing materials,

7   but it could be.  We are just pointing out that

8   that's a conflict.  I don't think it's going to

9   affect whether you use them or not.  The cost, I

10  have no idea.

11      Q.   Okay.  So you are saying there is a

12  conflict there, but are not saying it's impossible

13  to comply with the provision, are you?

14      A.   To my knowledge, again, being that I don't

15  have a knowledge of any smooth, nonporous

16  sound-absorbing materials, it may not be possible

17  to comply with it if we can't find any

18  sound-absorbing materials that would be required

19  that would be smooth and nonporous.

20           What I'm saying is maybe being that I

21  don't typically spec that type of material, that

22  Mr. Kramer might be more knowledgeable about the

23  types of materials that are available, that would

24  be sound-absorbing materials that are typically



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 217 of 314 PageID #:5878

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        217

 1   used on shooting ranges.

 2        Q.    Let's get to that for a second here.

 3             What is your experience dealing with

 4   soundproofing materials and soundproofing a range

 5   in particular?

 6        A.    When you say what's my experience, could

 7   you expound on that or clarify that?

 8        Q.    Have you ever designed a soundproofing

 9   system for an indoor range?

10        A.    I have never personally, no.

11        Q.    Have you ever done research into the

12   different types of soundproofing materials that are

13   available in the market?

14        A.    I probably have done that years ago.  I

15   can remember clients requesting for me to suggest

16   different types of sound-absorbing materials and I

17   may have done that.  But to be honest, I don't

18   remember what companies I recommended or what

19   material I recommended.  But I can say that I

20   probably have done that, yes.

21        Q.    You said years ago, right?

22        A.    Yes.

23        Q.    Can you give me a ballpark as to how long

24   ago that would have been?



1        A.    Anywhere from 1991 to now.

2        Q.    Okay.  Do you recall looking into

3    soundproofing materials in the past five years?

4        A.    No.

5        Q.    Ten?

6        A.    Maybe, yes.

7        Q.    So somewhere between five and ten years is

8    the last time you recall generally looking into

9    this?

10        A.    That's correct.

11        Q.    Is it possible that in that period of time

12    that there have been developed some soundproofing

13    materials that are smooth and nonporous?

14        A.    It's possible.

15        Q.    Would you consider it part of your daily

16    responsibilities as your job to deal with

17    soundproofing issues?

18        A.    Typically, no.  I think I stated earlier

19    that me, personally, my personal opinion, and I

20    think the opinion of our firm, is that we usually

21    don't recommend the use of sound-absorbing

22    materials on a range for health reasons and

23    housekeeping reasons.

24        Q.    And you articulated that earlier today,



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 219 of 314 PageID #:5880

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                  219

 1  right?

 2      A.    That's correct.

 3      Q.    And the same reasons you said earlier are

 4  the same reasons you are saying right now?

 5      A.    Exactly.

 6      Q.    In making your objection to this

 7  provision, did you look at any studies?

 8      A.    No.  Just personal knowledge.

 9      Q.    Okay.  You didn't look at any reports or

10  conduct any studies, do any research?

11      A.    No.

12      MR. SIGALE:  Objection as to form.

13          Studies, research as to what?

14  BY MR. AGUIAR:

15      Q.    As to whether there are soundproofing

16  materials that are smooth and nonporous?

17      A.    I have not.

18      Q.    Or whether it's possible to comply with

19  this ordinance despite the conflict you may think,

20  that you didn't do any research, go online or look

21  at any books or studies to see how this could work?

22      A.    I did not.

23      Q.    This is just based on what you have seen

24  in the field?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 220 of 314 PageID #:5881

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        220

1      A.    That's correct.

2      Q.    Other than your conversations with

3   Mr. Kramer and/or Mr. Sigale about this provision,

4   have you spoken with anybody about this?

5      A.    No.

6      Q.    We were talking about whether there were

7   any soundproofing materials that are nonporous.

8            Have you ever heard of something called

9   Victrex?

10      A.    I haven't.

11      Q.    Have you ever heard about acoustical tiles

12   that are smooth and nonporous that are used in

13   recording studios?

14      A.    No.  I've heard of acoustical tiles, but I

15   am not too sure of the effectiveness of smooth,

16   nonporous acoustical tiles.  I really couldn't

17   comment on that.

18      Q.    Do you know whether they exist?

19      A.    I don't know whether they exist or not.

20      Q.    And are you basing your opinion about

21   these two provisions being in conflict on the

22   notion that soundproofing materials have to be on

23   every ceiling, floor, and wall of the range?

24      A.    No.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 221 of 314 PageID #:5882

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        221

1        Q.    It's based on the fact that they have to

2    be in there at all on some level?

3        A.    Correct.

4        Q.    In fact, you wouldn't expect that

5    soundproofing materials would be on every floor,

6    ceiling, and wall, would you?

7        A.    No.   That's correct.

8        Q.    That would be uncommon?

9        A.    It would be uncommon and probably unsafe.

10       Q.    From a health perspective?

11       A.    And a safety perspective.  Sound-absorbing

12   materials on the floor of an indoor range is a bad

13   idea.  We've seen that happen.

14       Q.    Again, you know nothing about the cost of

15   compliance with this provision I think you said?

16       A.    That's correct.

17       Q.    You did no research into what it would

18   cost to comply?

19       A.    No.

20       Q.    You don't know what effect this would have

21   on the economic feasibility of constructing a

22   range?

23       A.    I do not.

24       Q.    You have no knowledge as to what effect



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 222 of 314 PageID #:5883

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        222

1   this would have on the profitability of a range?

2        A.   That's correct.

3        Q.   So you are not necessarily opining that

4   the cost of compliance would prohibit range

5   construction in Chicago, are you?

6        A.   No.

7        Q.   Let's turn to Issue Number 17 in your

8   report.

9             Now, I understand from your prior

10  testimony that this is one of those issues which

11  you do not believe you have the expertise to really

12  opine about; is that correct?

13       A.   That's correct, yes.

14       Q.   You would punt this to Mr. Kramer?

15       A.   That's correct.

16       Q.   That said, I do want to ask a couple of

17  questions about it.

18            Again, as I asked before, do you recall in

19  looking at the ordinance for the first time whether

20  this was raised by you or by Mr. Kramer?

21       A.   I do not remember.  I know this would

22  definitely have peaked my interest because it

23  involved range ventilation and that's something I

24  get into from a health perspective.



1    Q.   If it peaked your interest and you would

2    be involved in it, why do you assert that you are

3    not the person to talk to about this?

4    A.   Because the issue is that there is a cost

5    analysis involved with this separate ventilation

6    and exhaust systems rather than single ventilation

7    systems for multiple ranges that I have no

8    knowledge of and Mr. Kramer would be knowledgeable

9    about.

10    Q.   So the whole crux behind Issue Number 17

11    is cost?

12    A.   Cost and probably -- yes, that's cost.

13    Q.   So it would be cost?

14    A.   That's correct.

15    Q.   And that's not your thing?

16    A.   That's correct.

17    Q.   Are we all set?

18    A.   Yeah.   There may be another issue.   My

19    involvement on ventilation systems is does the

20    ventilation system meet the required movement of

21    air.   Mr. Kramer is how do we do that and what does

22    it cost.   This is how do we do that and what does

23    it cost and that's not my expertise.

24    Q.   Do you recall what information you



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 224 of 314 PageID #:5885

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                              224

1  provided to Mr. Kramer, if any, about Issue

2  Number 17?

3      A.   Probably not much.  I'm sure it was

4  discussed.  I know I reviewed it.  I know I agreed

5  with it.  But that's about it.

6      Q.   But, again, because the concern relates to

7  cost -- and it's only cost?

8      A.   That's correct.

9      Q.   -- you defer to Mr. Kramer on that?

10      A.   That's correct.

11      Q.   There is nothing improper from your

12  perspective of requiring separate ventilation and

13  exhaust systems; that's not necessarily wrong, it's

14  just the issue again is cost?

15      A.   Correct.

16      Q.   Other than Mr. Kramer and Mr. Sigale, have

17  you spoken with anyone else about this provision?

18      A.   No.

19      Q.   And I'll just ask the follow-up questions.

20           Are you asserting that Section

21  13-96-1210(d) makes it impossible to open a range

22  in Chicago?

23      A.   I don't know enough about the topic to

24  make an opinion on that.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 225 of 314 PageID #:5886

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          225

1      Q.    And would your answer be the same if I

2   asked that question with respect to economic

3   feasibility of opening a range?

4      A.    Yes, it would be.

5      Q.    And profitability?

6      A.    Yeah.   It probably would be the same.   I

7   don't know enough about that topic to make an

8   educated answer on that.

9      Q.    That would be Mr. Kramer?

10      A.    That's correct.

11      Q.    Let's move along to Issue 18.

12          I believe, again, this is one of the

13   issues which you identified Mr. Kramer as being the

14   person to answer the questions?

15      A.    This is a design issue and he's the person

16   to speak to about that.

17      Q.    Just for the record, Issue 18 at issue is

18   Section 13-96-1210(e), which deals with

19   interlocking shooting range ventilation systems?

20      A.    Correct.

21      Q.    Again, do you recall when you were first

22   forming your report in this case whether you raised

23   this issue or Mr. Kramer did?

24      A.    I don't recall that.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 226 of 314 PageID #:5887

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        226

1       Q.    Mr. Kramer wrote Issue 18, though?

2       A.    Yes, he did.

3       Q.    Did you provide him with any information

4   for Issue 18?

5       A.    Probably not.  Probably just review.

6       Q.    Okay.  Did you, yourself, do any studying

7   into this requirement requiring a ventilation

8   system be interlocking?

9       A.    No.

10      Q.    Did you talk to anybody about it?

11      A.    I did not.

12      Q.    And no one has expressed to you that they

13  would not open a range in the City of Chicago

14  because of this provision?

15      A.    No.

16      Q.    In Issue 18, the report seems to basically

17  say that this requirement could have an effect on

18  the power grid of the City of Chicago?

19      A.    Correct.

20      Q.    There's no issue of cost raised in

21  Issue 18, is there?

22      A.    No.

23      Q.    So no one is asserting that this provision

24  is going to make it more expensive to open a range



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 227 of 314 PageID #:5888

JACK J. GIORDANO                                      September 20, 2013
EZELL vs. CITY OF CHICAGO                                          227

1    in Chicago?

2         A.    No.

3         Q.    You are just asserting a concern for the

4    power grid?

5         A.    It's a technical issue that we identified.

6         Q.    And it's just, again, a concern for the

7    power grid?

8         A.    That's correct.

9         Q.    It's not a concern for the range owner

10   himself?

11        A.    That's correct.

12        Q.    Again, just follow-up questions, you are

13   not asserting that Section 13-96-1210(e) makes it

14   impossible to open a range in Chicago?

15        A.    No.

16        Q.    Or that it makes it economically

17   infeasible?

18        A.    That's correct.

19        Q.    Or that it makes a range possibly

20   unprofitable?

21        A.    That's correct.

22        Q.    Again, you would not consider yourself to

23   be qualified to actually address this issue?

24        A.    Correct.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 228 of 314 PageID #:5889

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          228

1      Q.    And you punt to Mr. Kramer?

2      A.    Exactly.

3      MR. AGUIAR:    Off the record for a second.

4                          (Whereupon, a discussion was had

5                           off the record.)

6  BY MR. AGUIAR:

7      Q.    Issue 19 is a challenge to Sections

8  13-96-1220(b) and 1220(c) and those can be found in

9  Exhibit 2 on Page 27.

10     A.    Got it.

11     Q.    In 1220(b), the relevant portion says the

12 shooting range shall have a hose bibb installed

13 with backflow protection that complies with the

14 rules and regulations promulgated by the Department

15 of Water Management?

16     A.    Correct.

17     Q.    And 1220(c) says floor drains installed at

18 the backstop slash bullet trap shall collect lead

19 and other hazardous waste materials in a separate

20 drainage system to an approved collection device or

21 treatment system that is in compliance with all

22 applicable local, state, or federal laws or

23 standards?

24     A.    That's correct.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 229 of 314 PageID #:5890

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        229

1       Q.    And would you please explain what your

2   objection is to this provision?

3       A.    Okay.    There are several stages of this.

4   Some of the stages apply or would have issue with

5   design and construction cost issues that Mr. Kramer

6   can address.    The safety and health issues I can

7   address.    So we both have a lot of input in this

8   section.

9           My objection would be that currently from

10  a health and safety standpoint floor drains are not

11  recommended on indoor shooting ranges.    The

12  industry standard is pretty clear on that.

13  Something that I read in the most recent

14  depositions -- and I think it was Mr. Fahlstrom --

15  I'm not really 100 percent sure.

16          Was it Fahlstrom?    Was that the name?

17      MR. SIGALE:    There was a Fahlstrom.

18      THE WITNESS:    Building department or something?

19      MR. AGUIAR:    That's Mr. Fahlstrom.

20      THE WITNESS:    Okay.    He mentioned reference

21  to -- when he was asked where that provision in the

22  ordinance came from, he mentioned NIOSH documents,

23  NIOSH shooting range documents.    The document he is

24  referring to is a 1976 NIOSH document that at the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 230 of 314 PageID #:5891

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          230

1  time was the industry standard and it was standard

2  practice in the industry to put floor drains on

3  indoor ranges.

4        Since that time, NIOSH has published

5  subsequent documents that do not mention the use of

6  floor drains.  They mention specific ways to clean

7  floors.

8        Prior to 19 -- I just need to check my

9  notes for a date.  Actually, prior to 2012, the

10  National Rifle Association's Range Sourcebook also

11  had floor drains listed as a suggestion for indoor

12  ranges to help with cleaning floors.

13        Since the new addition of -- did I say

14  before 2012?

15  BY MR. AGUIAR:

16     Q.   Yes.

17     A.   Let me back up.

18        Prior to 2012 -- and I'm not sure of the

19  date, but I know it was probably within the last at

20  least six or seven years -- the National Rifle

21  Association's opinion and our opinion as a firm is

22  that it's undesirable to have floor drains on a

23  range.  Right now the industry standard is not to

24  have floor drains on a range.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 231 of 314 PageID #:5892

JACK J. GIORDANO                                        September 20, 2013
EZELL vs. CITY OF CHICAGO                                            231

1          Now, there are several issues with floor

2     drains.  We will start with the safety issue, the

3     bullet deflection issue.  Bullets can hit the floor

4     of a range.  When a bullet hits the floor of a

5     range and it's a smooth surface, a hard smooth

6     surface, as most indoor ranges are, the bullet

7     typically will rise several inches and follow the

8     contour of the floor and hit the bullet trap.

9          Bullets don't bounce like rubber balls.

10    The ballistic characteristics of a bullet are a

11    little different.  So if the bullet happens to hit

12    a floor drain, it would be very unpredictable where

13    the bullet would go and it could actually be

14    directed back toward the shooter or up into the

15    ceiling or wherever; certainly not where it's

16    supposed to go.  So that's a safety portion of it.

17         I guess this would be also a safety issue.

18    When you wash particulate into a floor drain, the

19    particulate is not only going to contain lead and

20    other particulate that is part of the bullet

21    itself, but it's also going to contain unburned gun

22    powder.  A certain percentage of the gun powder in

23    a cartridge is unburned when it leaves the gun and

24    that accumulates on the floor.  If that product is

1    washed down a floor drain and the floor drain

2    happens to dry out, which if there is a trap in the

3    floor drain, it will dry out, it can ignite and

4    cause a flash fire or an explosion.

5           When it's compressed inside of a pipe like

6    that or inside of a drainage system, it would most

7    likely explode and not burn.  Flash fires are not

8    uncommon on indoor ranges.  I even gave you a disc

9    that has a surveillance video of a flash fire

10   occurring on a range.  So those are the two primary

11   issues.

12          There is a secondary issue which is maybe

13   not really affected here, but it's an environmental

14   issue.  We've had multiple -- and I will backtrack

15   again a little bit.  One of the reasons why the

16   opinion of the industry has changed on the issue of

17   floor drains is because the type of floor drains

18   were never really addressed in any of the standards

19   that we had prior.  We had seen a lot of dry well

20   type floor drains where you are actually washing

21   particulate into a dry well.

22          You still have the same safety hazards,

23   which would be the bullet deflection and flash fire

24   hazard, but now you also have an environmental



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 233 of 314 PageID #:5894

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        233

1   regulation violation, which would be washing that

2   particulate into the ground.  So there are many

3   issues dealing with floor drains that we would

4   object to requiring a range to have a floor drain.

5         Now, there is also an associated cost and

6   construction considerations when you talk about

7   sloping floors and that would be more suited to

8   Mr. Kramer's testimony.

9       Q.    That was a lot of information, which is

10  good, but let me try to break that down a little

11  bit.  Bear with me as I try to get my hands around

12  that information.

13        You are raising health and safety

14  issues --

15      A.    That's correct.

16      Q.    -- saying that there is a better way to do

17  it?

18      A.    Correct.  A better way and most definitely

19  a less costly way.

20      Q.    Let's keep with the safety and health for

21  the moment.

22      A.    Okay.

23      Q.    Again, your focus is on health and safety

24  saying this is not the best way?



1        A.    Correct.

2        Q.    You are not aware of any law that

3   prohibits the use of floor drains in ranges, are

4   you?

5        A.    We've had -- and me personally -- have had

6   numerous conversations with US EPA on this issue.

7   It would depend on the type of drainage system that

8   would be incorporated, whether it be a violation of

9   the Resource Conservation Recovery Act to have a

10  floor drain in a range.  But it could be a

11  violation depending on the type of drain.

12       Q.    But if the right type of drain is used, it

13  wouldn't be a violation?

14       A.    That's correct.

15       Q.    So there is --

16       A.    From an environmental standpoint.

17       Q.    Other than that, are you aware of any

18  other laws which prohibit the use of floor drains?

19       A.    No.

20       Q.    So it hasn't been prohibited anywhere?

21       A.    No.

22       Q.    You say it's no longer the industry

23  standard?

24       A.    Correct.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 235 of 314 PageID #:5896

JACK J. GIORDANO                                     September 20, 2013
EZELL vs. CITY OF CHICAGO                                           235

1      Q.    But simply because something isn't the

2    industry standard doesn't necessarily make it

3    wrong, does it?

4      A.    No.

5      Q.    In fact, you mentioned that the NRA prior

6    to 2012 actually still included the use of floor

7    drains as a way to clean lead, correct?

8      A.    It was still contained in the Range

9    Sourcebook because it had not been updated since --

10   I have to look at my notes -- 1998.  So from 1998

11   to 2012, there were no updates to the Range

12   Sourcebook.  That was still in the Range

13   Sourcebook.  However, the opinion of the Range

14   Department had changed prior to 2012.

15     Q.    When did it change?

16     A.    As I think I testified to, I can't recall

17   whether it was five years ago, seven years ago.

18   But it was some number of years ago where this

19   topic came up and it was discussed at the NRA Range

20   Department level between the Range Technical Team

21   advisors, the employees of the NRA Range

22   Department.

23          We basically had discussions with

24   US EPA, reviewed certain incidents that had



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 236 of 314 PageID #:5897

JACK J. GIORDANO                                      September 20, 2013
EZELL vs. CITY OF CHICAGO                                          236

1   occurred regarding flash fires and range

2   explosions.

3       Q.   But the Range Department at the NRA you

4   said changed its mind years before the actual

5   technical changes were made to the Sourcebook?

6       A.   Correct.

7       Q.   So is it fair to assume that if the NRA

8   didn't change the Sourcebook, which is what you

9   said before was the one that everyone uses in

10  ranges --

11      A.   That's correct.

12      Q.   -- is it fair to assume that it wasn't

13  considered to be that major of a change that

14  required a revision to the Sourcebook?

15      MR. SIGALE:   I'll object as to foundation and

16  speculation.

17  BY MR. AGUIAR:

18      Q.   If you know, if you know.

19      A.   I think it was a major change.  I can't

20  speak to the process or -- see, I was not an

21  employee of the NRA, so I'm not sure of why a

22  revision wasn't made.  But the Range Department

23  certainly knew of the issues.  I can't speak to why

24  it wasn't changed.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 237 of 314 PageID #:5898

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         237

1        Q.   But certainly you would agree that there

2   were Sourcebooks out there up until 2012 which said

3   floor drains are just fine?

4        A.   That's correct.

5        Q.   And if you look at our ordinance here on

6   Page 27, flip to Page 28, you'll see in parentheses

7   it says added COUN. J 7/6/11.

8             That means that this was added to the

9   journal, enacted in 2011, which would have been

10  before the NRA changed its Sourcebook?

11       A.   That's correct.

12       Q.   So you are raising safety and health

13  concerns at the moment?

14       A.   Correct.

15       Q.   We will get to cost in a second.

16            Are you saying that the fact that the City

17  requires the floor drain and the hose bibb, that

18  that alone, leaving cost aside, would prevent or

19  preclude a person from opening a range in the City

20  of Chicago?

21     MR. SIGALE:   I'll object as to foundation and

22  speculation.

23  BY MR. AGUIAR:

24       Q.   I'm asking you what your opinion is.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 238 of 314 PageID #:5899

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         238

1          Is it your opinion that the safety and

2    health issues alone would be enough to dissuade

3    somebody from opening a range in Chicago?

4          Is that your opinion?

5     A.    No, I don't think so.  You would not be

6    able to incorporate the floor drain without

7    incurring that extra expense.

8          So even though I'm not, I feel, qualified

9    to discuss what it would cost, if it could be done,

10   where it could be done, where it could not be done,

11   from a construction standpoint or from a range

12   design standpoint, I think it would be unfair to

13   say, well, yeah, a range can do this from a health

14   and safety standpoint without considering the fact

15   that it may be a considerable increase in cost of

16   construction to do it.

17   BY MR. AGUIAR:

18    Q.    I'm trying to break out the opinion here.

19   I'm trying to say is it your opinion that a

20   potential range owner would see the requirement of

21   floor drains and say that's unsafe, I don't care

22   about the cost, I'm not opening a range because I

23   don't want to have floor drains; is that your

24   opinion?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 239 of 314 PageID #:5900

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        239

1      A.    Not necessarily, no.

2      Q.    So you don't necessarily believe that the

3  health and safety issue would scare aware a

4  potential range owner in and of itself?

5      A.    No.   That's correct.

6      Q.    It's only when you add in the cost?

7          The health and safety really doesn't go to

8  whether someone would actually open the range; it's

9  just something you are noting that might not be

10  best practices?

11      A.    Well, I would have to say that if I were a

12  person that was opening up a range and I was aware

13  that a floor drain would be a health and safety

14  issue and it was required that I do that, if I had

15  some type of recourse to appeal the fact that I

16  have to do that, maybe I would want to do that,

17  because I certainly wouldn't open up a range

18  knowing once I opened the door it's unsafe or may

19  lead to a flash fire.

20          So maybe my answer to your question is it

21  depends on ultimately if I would be forced to put

22  in a floor drain when I knew it wasn't safe or the

23  right thing to do.

24      Q.    Have you spoken to anybody about this



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 240 of 314 PageID #:5901

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      240

1  provision besides Mr. Kramer or Mr. Sigale?

2       A.   I have not.

3       Q.   So no one has ever expressed to you that

4  they wouldn't do it because of the safety issue?

5       A.   No.  That's correct.

6       Q.   Let's bring in cost for a second.  Let's

7  go to cost.

8       A.   Okay.

9       Q.   Now, you said that's Mr. Kramer's area of

10 responsibility?

11      A.   That's correct.

12      Q.   And you don't feel qualified to provide

13 testimony on that issue?

14      A.   Correct.

15      Q.   I do want to ask something about the

16 answer here.

17           As I read Issue 19, I see nothing in here

18 except for the last sentence which talks about the

19 cost.

20      A.   Right.

21      Q.   And only refers to the sloping of the

22 floor?

23      A.   Correct.

24      Q.   And you are saying sloping of a floor



1   surface is beneficial when it is a method of

2   draining the floor to a floor drain?

3       A.   Correct.

4       Q.   Which the City requires?

5       A.   Exactly.

6       Q.   So it is beneficial in the City's scheme?

7       A.   Yes.

8       Q.   And it's actually necessary?

9       A.   Right.

10      Q.   You say it has no benefit and adds

11  additional construction costs when the floor has no

12  floor drains, but we would require them?

13      A.   Right.

14      Q.   So it would be a cost, but it would be a

15  necessary cost?

16      A.   Correct.

17      Q.   But you don't know, A, whether there

18  actually would be a cost, do you, to slope a floor?

19      A.   Yes.  There would definitely be an

20  additional cost.  I don't know what that cost is.

21  Mr. Kramer and myself have discussed it.

22           He will know what the additional cost

23  would be, but I have no idea what the additional

24  cost would be.  Our conversation may have been this



1   is going to be much more costly.  I don't even know

2   what the factor would be, but we had that

3   discussion.

4        Q.   And the information came from Mr. Kramer?

5        A.   The information, yes, and whether it would

6   be feasible to even do it in certain situations, as

7   in like an existing building, if it would be

8   possible to do in an existing building.

9             So there may be situations where it would

10  not be possible to do it in certain applications.

11       Q.   And you don't have information about that?

12       A.   No, I do not.

13       Q.   Mr. Kramer would have that information?

14       A.   That's correct.

15       Q.   And you don't know what the cost of

16  operating a HEPA-rated explosion-proof vacuum is,

17  do you?

18       A.   The cost of operating it or the cost of

19  purchasing it?

20       Q.   What's the cost of purchasing?

21       A.   Yeah.  I'm familiar with HEPA vacuums.

22       Q.   Are you familiar with the cost of a HEPA

23  vacuum?

24       A.   They can run anywhere from one -- maybe



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 243 of 314 PageID #:5904

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                    243

1    $800 to $25,000.  There is a wide range of cost.

2         Q.    How many HEPA vacuums would a range need?

3    Is there some per lane --

4         A.    No.  One.

5         Q.    One?

6         A.    Yeah, one.

7         Q.    So it's not like you need one for three

8    lanes and another one for the other three lanes?

9         A.    No.

10        Q.    How often do HEPA vacuums need to be

11   maintained or cleaned?

12        A.    I'm not familiar with the maintenance

13   procedure on a HEPA vac.  I would assume that each

14   individual manufacturer is going to have their own

15   requirements on maintenance.

16        Q.    But do you know whether they have to be

17   maintained?

18        A.    Oh, yes.

19        Q.    Do they need to be cleaned?

20        A.    I would imagine they do need to be

21   cleaned.  I do know they need to be emptied.  Each

22   manufacturer is going to have their own

23   requirements and I am not familiar with those

24   requirements.



1      Q.   At all?

2      A.   No.

3      Q.   You've never cleaned one or maintained

4  one?

5      A.   I've never cleaned one or maintained one.

6      Q.   So you have no idea what the cost would

7  be?

8      A.   Not to clean or maintain it, no.

9      Q.   Do you have any idea what the lifespan of

10  a HEPA vacuum is?

11         I know that my Hoover at home has like

12  a -- it seems to have a one-year lifespan.

13      A.   No.

14      Q.   No, you don't?

15      A.   I don't know.  But I would imagine that

16  like the Hoover, it depends on how much you use it.

17      Q.   Are you saying that these provisions make

18  it impossible to open a range in the City of

19  Chicago?

20      A.   No.

21      Q.   Are you saying that it makes it

22  economically infeasible to open a range in the City

23  of Chicago?

24      A.   No.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 245 of 314 PageID #:5906

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        245

1      Q.   Are you saying that these provisions would

2  make a range an unprofitable exercise in the City

3  of Chicago?

4      A.   No.

5      MR. AGUIAR:  We are going to come back to that

6  one issue we skipped, but I want to get through a

7  few more things and I want to take a five-minute

8  break so I can review something.  Then we'll wrap

9  it up with that one provision.

10      THE WITNESS:  Sure.

11                      (Whereupon, Giordano Deposition

12                       Exhibit No. 5 was marked for

13                       identification.)

14  BY MR. AGUIAR:

15      Q.   Mr. Giordano, I'm handing you what's been

16  marked as Exhibit Number 5.  I will represent to

17  you that this is an excerpt from one of the

18  documents you provided to us from your 2011

19  conference.

20      A.   That's correct.

21      Q.   Do you recognize this document?

22      A.   Yes, I do.

23      Q.   I've attached Page 19 from that

24  presentation from 2011.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 246 of 314 PageID #:5907

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                246

1      A.    Uh-huh.

2      Q.    And this looks like the page from that

3  document?

4      A.    Yes.

5      Q.    I want to direct your attention to the

6  middle of the page where it says, quote, OSHA

7  regulations impact your operation in many ways.

8  The regulations will dictate the type of ladder you

9  must use to change light bulbs, the type of toilet

10 seat you must have in your lavatories, the type of

11 safety glasses you must utilize, the type of

12 hearing protection you must utilize, and many other

13 areas.

14     A.    Correct.

15     Q.    I took that to mean that ranges generally

16 are used to high regulation; would you agree with

17 that?

18     A.    Yes.

19     Q.    Down to the point where they are talking

20 about what type of toilet seat you have?

21     A.    Well, I mean that would apply to any

22 business, not just a shooting range, those

23 regulations that I am discussing here.  I'm saying

24 that OSHA regulations impact your operation in many



1   ways.  They impact everybody's business in many

2   ways.  This is not specific to shooting ranges.

3   The presentation is specific to shooting ranges.

4          But I'm trying to get across to the

5   participants that it's not just the lead issue you

6   have to be concerned about.  It's what type of

7   ladder you use, what type of hearing protection,

8   what type of eye protection.  The reason I say that

9   in my presentation is because a lot of people hear

10  the word OSHA and think immediately about lead.

11  Well, OSHA goes way further than lead.  It

12  regulates almost everything you do, even the type

13  of cleaner you use to clean the sink.

14         So the point I'm trying to get across here

15  is that the business itself from a regulatory

16  standpoint has a lot to consider, not just lead.

17      Q.   Okay.  Early in the deposition I think

18  when we first started this morning I believe you

19  agreed with me when I said that a range can be a

20  dangerous place if not operated properly?

21      A.   Absolutely.

22      Q.   And because of that, ranges can expect to

23  have lots of regulations governing how they operate

24  their business?



JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        248

1      A.    Absolutely.

2      Q.    So any range owner who goes into a range

3   has got to expect that they are going to be

4   regulated very carefully because of the dangerous

5   activity -- potentially dangerous activity that

6   goes on there?

7      A.    That's correct.  I can agree with that.

8      Q.    Anybody who is going into buying a range

9   is buying into the fact that they are going to be

10  carefully regulated by the government?

11     A.    That's right.

12     Q.    Whether it be federal, state, or local?

13     A.    Correct.

14     Q.    That's not uncommon?

15     A.    No, it's not uncommon.

16     Q.    It's expected?

17     A.    That's exactly right.

18                    (Whereupon, Giordano Deposition

19                     Exhibit No. 6 was marked for

20                     identification.)

21  BY MR. AGUIAR:

22     Q.    Mr. Giordano, I have handed you what's

23  been marked as Exhibit 6.

24          Do you recognize this document?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 249 of 314 PageID #:5910

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         249

1       A.   Yes.

2       Q.   Is this the curriculum vitae that we

3  talked about earlier today?

4       A.   Yes, it is.

5       Q.   I've had a chance to review this.  I

6  pretty much believe we've covered most of your

7  experiences that are relevant in today's

8  proceedings.

9       A.   Okay.

10       Q.   The one thing I did want to draw your

11  attention to is Page 2, under additional training

12  appointments.

13       A.   Yes.

14       Q.   1991, this is where you talk about being

15  appointed to the Range Technical Team as a Range

16  Technical Team advisor?

17       A.   Correct.

18       Q.   You talk about two training programs you

19  attended?

20       A.   Correct.

21       Q.   And there was some question whether there

22  was one or two?

23       A.   That's right.

24       Q.   And now we know there were two, correct?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 250 of 314 PageID #:5911

JACK J. GIORDANO                               September 20, 2013
EZELL vs. CITY OF CHICAGO                                     250

1      A.   Yeah.   The question wasn't whether there

2  was one or two.   Actually, this is one program that

3  was divided into two separate locations I believe.

4  It was a long time ago and I don't quite remember.

5  The question was whether it was one week or

6  two weeks or one week or ten days.   I really don't

7  recall that.   I thought it had that information

8  here, but it does not.   I can't recall whether it

9  was one week or ten days.   That is where I am

10  lacking in my remembrance of it.

11      Q.   It talks about an extensive training

12  program in range design at both locations?

13      A.   Correct.

14      Q.   Can you describe for me what they meant by

15  range design?

16          Was it, again, from a health and safety

17  perspective?

18      A.   Primarily from a health and safety

19  perspective and reviewing at the time the Range

20  Manual -- it was referred to as the Range Manual at

21  that time -- basically reviewing the

22  recommendations in the Range Manual so we would

23  have the knowledge to make recommendations on

24  design features, engineering features, primarily



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 251 of 314 PageID #:5912

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        251

1   dealing with safety and health issues to clients,

2   to range operators.

3       Q.   Again, not specific to construction

4   issues, the things which we have been deferring to

5   Mr. Kramer?

6       A.   That's correct.  What features should be

7   included, but not how to do it or what it's going

8   to cost, very basic.

9       Q.   Almost because you have to know what the

10  features are so you can actually assess the health

11  and safety features?

12      A.   That's correct.

13      Q.   Not necessarily how to install them or

14  design them?

15      A.   That's correct.

16                          (Whereupon, Giordano Deposition

17                          Exhibit No. 7 was marked for

18                          identification.)

19  BY MR. AGUIAR:

20      Q.   Mr. Giordano, I'm handing you what's been

21  marked as Exhibit Number 7.  You tendered this to

22  me earlier today.

23      A.   Yes.

24      Q.   These are additional cases in which you



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 252 of 314 PageID #:5913

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                              252

1  have given expert testimony?

2      A.   Yes.

3      Q.   A fair number of them appear to be

4  testimony at public hearings regarding proposed

5  indoor shooting ranges?

6      A.   That's right.

7      Q.   Most of them appear to be in or around

8  New Jersey?

9      A.   Correct.

10     Q.   What kind of testimony did you give

11 generally in those cases?

12     A.   Health and safety issues typically.  And I

13 can say definitely that each one of the -- let me

14 see.  The first one, two, three, four, and five of

15 these public hearings I was testifying on behalf of

16 the National Rifle Association's Range Department

17 as a Range Technical Team advisor.  And to be

18 honest, we really never knew what the questions

19 were or concerns that were going to be raised.  We

20 were typically there as a friend of the court to

21 answer safety and health-related questions or

22 design-issue questions that the community board or

23 public hearing or city council might have with

24 regard to the operation or the construction of a



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 253 of 314 PageID #:5914

JACK J. GIORDANO                        September 20, 2013
EZELL vs. CITY OF CHICAGO                                253

1   shooting range.

2        Q.   Were you brought there by the range owner?

3        A.   Yes, at the range owner's request.

4        Q.   So you weren't summoned by the

5   municipality to provide testimony?

6             It didn't originate with them?

7        A.   I am checking because in some cases that

8   does happen, but not in these cases that I just

9   referred to, not the first one, two, three, four,

10  or five; not the first five cases, no.

11       Q.   Let's talk about the one in Pennsylvania,

12  West Lampeter Township.

13       A.   Yes.

14       Q.   That was a Planning Commission hearing

15  regarding an existing outdoor shooting range?

16       A.   Yes.

17       Q.   Were you there on behalf of the range

18  owner?

19       A.   No.  I was there on behalf of a developer

20  who was developing property next to a shooting

21  range.

22       Q.   And what testimony did you provide in that

23  case?

24       A.   Again, it was safety and health-related



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 254 of 314 PageID #:5915

JACK J. GIORDANO                                      September 20, 2013
EZELL vs. CITY OF CHICAGO                                           254

1    testimony that was -- the City Council had a

2    concern about a housing development being permitted

3    to be built next to a shooting range.  They had

4    some safety issues and concerns with that

5    occurring.  I was there as a client of the

6    developer, the property developer, who was

7    developing these residences -- it was a residential

8    development -- to answer the questions of the

9    council regarding safety issues with that

10   relationship between the range and the developer.

11        Q.   What about the case in Prince Georges

12   County, Maryland, there you were in a Circuit Court

13   of Maryland arbitration hearing?

14        A.   That was the National Rifle Association

15   Range Technical Team again.  That was at the

16   request of the range operator.  Again, safety and

17   health issues regarding an old railroad line that

18   had been turned into a hiking trail that paralleled

19   a shooting range and there were safety issues that

20   the -- I guess this would have been the county had

21   regarding the relationship between the shooting

22   range and that walking trail.

23        Q.   And was your testimony in favor of

24   allowing those two uses to exist together?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 255 of 314 PageID #:5916

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         255

1      A.   It's a little bit of a complicated

2   situation.   In this case I had made recommendations

3   prior to this court case on how to prevent bullets

4   from deflecting.   We had determined -- I had

5   determined that bullets were deflecting out of this

6   range onto this hiking trail because bullets were

7   found on the hiking trail.   Deflecting bullets on

8   an outdoor range off of a backstop or a ground

9   surface is not uncommon.   So I made recommendations

10   to alleviate that issue.

11           The county basically gave the range an

12   ultimatum.   They gave them a list of engineering

13   features that they would have been remembered or

14   that they were required to adopt and to construct,

15   which, in my opinion, would have had no effect on

16   the bullet deflection issue.

17           So the litigation was in regards to the

18   range being forced to do certain things that I

19   didn't feel in my professional opinion were

20   necessary to alleviate the bullet deflection issue.

21      Q.   In Portland, Maine, you were involved in a

22   civil case involving safety and design issues at an

23   existing outdoor range?

24      A.   That's correct.   That was a case where I



1    was there, again, on behalf of the National Rifle

2    Association to give testimony -- I'm trying to

3    remember.  This was an outdoor range and, again, it

4    was a bullet deflection issue.  A neighboring

5    resident directly downrange of the backstop of this

6    range was involved in a lawsuit against the range.

7    Basically it was a trespass lawsuit where they said

8    your bullets are coming on my property and that was

9    the issue.

10        Q.   Were the bullets coming on the property?

11        A.   Yes, they were.  They were deflecting off

12   the backstop.

13        Q.   So there was a design flaw?

14        A.   It was a -- I guess you could say that.  I

15   guess you could say it was a design flaw.  It was a

16   case where I was called in to make recommendations

17   on how we could prevent that from happening and

18   those were additional engineering features that

19   would stop that type of thing from occurring.

20        Q.   In Mount Vernon, Washington you gave

21   expert testimony in a county hearing involving

22   safety issues of a proposal range facility?

23        A.   Yes.

24        Q.   Who were you there on behalf of?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 257 of 314 PageID #:5918

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          257

1      A.    I believe this was a Kramer One case.    We

2  were hired by -- to be honest, I'm not really sure

3  who the client was.    We may have been hired by the

4  county.    The county had hired us.

5           If my recollection is correct, the county

6  was proposing a county range on county property and

7  there was a citizens group, a residential group in

8  a neighboring area who objected.    And I was called

9  in to a hearing to answer questions on, again, the

10  safety of a range in close proximity or in a

11  certain proximity to a residential area.

12      Q.    Now, was Kramer One doing the design of

13  this range?

14      A.    To my knowledge, this range never went

15  into the design phase.    I am really not sure of

16  where it is in the system right now.    This was

17  quite a number of years ago.    As far as I know,

18  they were planning on using us as a design firm to

19  do this, but it never got done.

20      Q.    The New Jersey case you list next seems to

21  involve a firearms training activity?

22      A.    That's correct.

23      Q.    That's not related to ranges, is it, like

24  the use of a range?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 258 of 314 PageID #:5919

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        258

1      A.   Yes.

2      Q.   Oh, it is?

3      A.   Yes.

4      Q.   What happened in that case?

5      A.   In this case a New Jersey state trooper

6  was injured on a firing range while they were

7  training.  And I was called in by the plaintiff,

8  the state trooper's attorney, to be an expert on

9  the operational and range features that contributed

10 to his injury.

11     Q.   Did you opine that the range features did

12 contribute to the injury?

13     A.   Yes.

14     Q.   What was the flaw which led to the injury

15 that you identified?

16     A.   To my recollection, there were actually

17 several flaws.  The one that I think I opined that

18 actually resulted in the injury was there were

19 columns on the range that were supporting an

20 overhead baffle system that were not properly

21 shielded from bullet deflection.  And a bullet

22 deflected back to the shooter and the person was

23 hit right in the forehead with a bullet.

24     Q.   That's not pleasant.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 259 of 314 PageID #:5920

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        259

1          And finally the last case you list here is

2    in Ottawa, Illinois?

3        A.   Correct.

4        Q.   And this is the case of People versus

5    Buffalo Range?

6        A.   That's right.

7        Q.   And it regards range safety issues?

8        A.   That's right.

9        Q.   Who were you retained by in that case, the

10   range owner or the people?

11       A.   Range owner.  That was a case where the

12   county was alleging that bullets were escaping from

13   a specific range on this range facility.  They had

14   multiple ranges on this facility.  There was

15   actually in effect an injunction against the use of

16   this range at the time of this case, which I'm not

17   sure if it even is resolved at this point.

18          But my testimony was geared toward one

19   specific -- let me back up.  I did a range

20   evaluation on this range prior to the testimony in

21   court.  So there was a written report given to the

22   range owner and operator.  I'm a little foggy on

23   the details, but my testimony basically was

24   relating to the report that I had done.  And the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 260 of 314 PageID #:5921

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        260

1   specific questioning was about one specific range.

2   My opinion was that the bullets were not escaping

3   from that range and going into the area where the

4   county was alleging that the bullets were going.

5          Actually, I made an opinion that they were

6   coming from somewhere else where there were

7   actually hunting blinds and tree stands in an area

8   where hunters were shooting into this area.  That

9   was my opinion.

10     Q.    It sounds like from what you've told me

11  your experience in giving expert testimony is that

12  but for the New Jersey case where you identified

13  there was a range flaw, you have generally given

14  testimony that the range procedures that are in

15  place are safe and fine; is that generally correct?

16     A.    In these particular cases -- I mean

17  obviously these aren't the only cases I've worked

18  on.  These are only the cases that resulted in some

19  type of expert testimony.  As I said, that's not my

20  job.  My job is a safety and health professional.

21     Q.    I am just talking about cases in which

22  you've given expert testimony?

23     A.    Yes, except for the New Jersey State

24  Police range, everything was -- well, no.  I'll



1  take that back.  The Portland, Maine case, I

2  identified issues that needed to be addressed

3  because bullets were escaping the range.  The other

4  ones didn't really involve a range.  They didn't

5  involve -- I mean they didn't involve an active

6  range.  Well, these cases -- rephrase your

7  question.

8      Q.   Well, in the first five cases where you

9  gave testimony at the public hearings, you were

10 testifying in favor of the range going in?

11     A.   No.  I am testifying on behalf of the

12 range operator or the client that hired me; not in

13 favor of the range going in.  I'm answering

14 questions fairly and honestly so both sides can

15 make a determination on whether the range should go

16 in or not.

17     Q.   Fair enough.  But you were there in

18 support of the applicant?

19     A.   I was there --

20     Q.   You were brought there been by the

21 applicant?

22     A.   I was brought there by the applicant.  I

23 take issue with the statement in support of the

24 applicant because that's not the way I work and



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 262 of 314 PageID #:5923

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        262

1   that's not what I do.  So I would be there to opine

2   on the issue at hand hired by the client, yes,

3   brought there by the client.  If the client happens

4   to be the range operator, that's my client, but I

5   am not there to opine in his favor.

6       Q.   I didn't mean to imply that you would

7   somehow not tell the truth in favor of your client.

8   Please don't take it that way.  I just wanted to

9   make the point that you appeared at these hearings

10  at the behest of the range owner --

11      A.   Range owner, that's correct.

12      Q.   -- to answer questions.

13      A.   That's correct.

14      Q.   In the additional cases, in the Portland,

15  Maine case and the New Jersey case, those are the

16  two cases in which you actually found problems with

17  the range as it was being operated?

18      A.   In the cases that I have presented

19  testimony.

20      Q.   Yes.

21      A.   There are many cases that I have worked on

22  that did not require any testimony where I've

23  either been hired by an entity other than the range

24  operator, and even in cases where I have been hired



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 263 of 314 PageID #:5924

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     263

1   by the range operator, found that the procedures or

2   the facilities were not being operated properly or

3   not designed properly.

4        MR. AGUIAR:  Can we just take a couple minutes

5   so I can look over the last issue?

6        THE WITNESS:  Absolutely.

7        MR. AGUIAR:  Can we take five minutes, David?

8        MR. SIGALE:  Sure.

9                      (Whereupon, a break was taken.)

10  BY MR. AGUIAR:

11       Q.   Let's address the last issue from your

12  report, which we've bypassed.  That's Issue 11

13  found on Page 5.

14       A.   Okay.

15       Q.   There you say you challenge Section

16  4-151-170(b)?

17       A.   Correct.

18       Q.   And that can be found on Page 16 of

19  Exhibit 2.

20       MR. SIGALE:  Off the record.

21       MR. AGUIAR:  Sure.

22                      (Whereupon, a discussion was had

23                       off the record.)

24



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 264 of 314 PageID #:5925

JACK J. GIORDANO                    September 20, 2013
EZELL vs. CITY OF CHICAGO                        264

 1  BY MR. AGUIAR:

 2      Q.   Issue 11, you take issue again with

 3  4-151-170(b).  And that provision on Page 16 of

 4  Exhibit 2 says that a licensee, meaning licensee of

 5  a range, may sell ammunition to a shooting range

 6  patron only for use at the shooting range?

 7      A.   Correct.

 8      Q.   The licensee shall ensure that no shooting

 9  range patron leaves the shooting range facility

10  with any ammunition purchased from the licensee?

11      A.   Right.

12           What page are you looking at; 16?

13      Q.   16.

14           Do you see where it says that?

15      A.   Yes.

16      Q.   And you are challenging this provision as

17  unreasonable why?

18      A.   Most shooting ranges have ammunition

19  sales.  I understand that this provision allows

20  ammunition sales, but only for use in a facility

21  which would actually bring with it a bunch of

22  different issues that may be undesirable.  And they

23  are all listed in the report, which would include

24  how do I police that as a range operator, do I have



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 265 of 314 PageID #:5926

JACK J. GIORDANO                                                 September 20, 2013
EZELL vs. CITY OF CHICAGO                                                       265

1   to count bullets when people come in to find out

2   how many they have with them when they come into my

3   range, and then assure that they leave with the

4   same number, and how do I know if those are the

5   ones that I sold them or those are the ones they

6   brought in.  That could be very unmanageable.

7   That's one issue.

8          It would be quite -- I would say almost

9   impossible to police that type of a regulation on

10  an active shooting range, especially an active

11  shooting range.

12         Secondly, if I'm not allowed to sell the

13  ammunition to people that want to buy it and take

14  it home with them, of course, I'm losing out on

15  that income that won't be there.  It may reduce the

16  amount of ammunition people buy even for use on the

17  range because if I know that I'm planning on firing

18  150 rounds of ammunition and I have to buy 200

19  rounds because that's the way it's sold, I may only

20  buy 100 rounds and not shoot the additional 50.

21  You can see my point.  I believe it would be

22  unmanageable.

23         It definitely would be something that if I

24  were thinking about building a range or running a



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 266 of 314 PageID #:5927

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          266

1  range or operating a range in the City of Chicago,

2  I would have a real big problem with that.  Even

3  from just from the manageability, not even from the

4  cost factor, but for the manageability factor, how

5  could I do that.

6         How could I ensure that the people leaving

7  are only leaving with the ammunition that they

8  brought with them unless I didn't allow people to

9  bring ammunition into the facility in the first

10 place?  So I just think it's unmanageable.  It's a

11 burden that I think -- I know I'm not supposed to

12 consider that other ordinance, but it's a burden

13 that I think would cause a person that was thinking

14 about building a range to say I don't see how I

15 could do that.

16     Q.   Has anybody told you that they have read

17 this provision and said I'm not opening a range in

18 Chicago because I'm not going to bother myself with

19 policing ammunition?

20     A.   No.

21     Q.   Have you done any research into whether

22 that would happen?

23     A.   No.

24     Q.   Have you conducted any studies?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 267 of 314 PageID #:5928

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                   267

1      A.   No.

2      Q.   It's just your thought?

3      A.   It's my opinion based on my prior

4  experience and what is generally done in the

5  industry and what's generally done is if a gun

6  store has an associated shooting range, the gun

7  store sells the ammunition, the patron goes into

8  the shooting range and shoots whatever they want

9  and they either go buy some more or they leave with

10  whatever is left over.  I don't know of any

11  circumstances on a commercial shooting range where

12  people are not allowed to take the ammunition that

13  they buy home with them.

14      Q.   So the fact that you haven't seen it

15  before doesn't mean that someone won't want to

16  comply with that provision?

17      A.   That's a possibility I guess.

18      Q.   So you never seen a circumstances where

19  someone has tried that and then said I better

20  reverse this because it's not working?

21      A.   No.  I never have.

22      Q.   So you really don't know how it would play

23  out in application?

24      A.   In application, no.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 268 of 314 PageID #:5929

JACK J. GIORDANO                                        September 20, 2013
EZELL vs. CITY OF CHICAGO                                            268

1     Q.    Again, you don't know whether there is

2  somebody out there who might be willing to do this

3  policing or come up with a system which works?

4     A.    That's correct.

5     Q.    Or be willing to say you can't bring your

6  own ammunition, you have to use my ammunition?

7     A.    I can comment on that because there are

8  facilities that require the use of certain types of

9  ammunition.  From the input that I get from the

10  owners of those facilities, it is not advisable to

11  do that.

12          We see that a lot recently with ranges

13  being open that are attempting to use only

14  lead-free ammunition on the range.  I've gotten

15  several phone calls from range operators saying

16  that it's becoming a point where the business is

17  not profitable, they can't figure out why, and I

18  attribute it to the fact that they are only

19  allowing people to use non-lead ammunition and

20  people don't want to use non-lead ammunition.

21          So from my personal experience, I can see

22  where requiring that people only use your

23  ammunition might be detrimental to their business.

24     Q.    But your example was based on the fact



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 269 of 314 PageID #:5930

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      269

1   that the range owner was insisting on a non-lead

2   bullet?

3       A.    That's correct.

4       Q.    It wasn't based on someone using standard

5   ammo which has lead in it?

6       A.    No.  It wasn't based on that.  It was

7   based on the fact that the individuals were

8   required to buy the ammunition from them.  And

9   basically what it comes down to is there are a lot

10  resources, a lot of places to buy ammunition.  If a

11  person wants to buy a certain type of ammunition

12  and you may not have that ammunition, they would

13  want to bring their own.

14      Q.    But your hypothetical or your situation

15  was that the range was trying to only enforce or

16  only trying to use --

17      A.    In that particular example, yes.

18      Q.    So if someone doesn't want to use non-lead

19  based bullets, they are not going to go to that

20  range anyway, are they?

21      A.    That's right.  No, they won't.

22      Q.    And those who are going there probably

23  would be a fewer number than they would otherwise

24  get if they used lead-based?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 270 of 314 PageID #:5931

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          270

1        A.    That's correct.

2        Q.    So it was the choice to go lead-free, so

3   to speak, which caused the problem; would you

4   agree?

5        A.    Yes.  But, again, I was injecting the fact

6   that I've also heard of ranges that have experience

7   with people that have run ranges that have tried

8   the you can only use my ammunition, for whatever

9   reason, and that doesn't seem to work very well.

10            People want to bring their own ammunition.

11   They want to buy their ammunition where they want

12   to buy it and that could be -- again, this is a

13   hypothetical, just like your hypothetical -- that

14   could be a detriment to the business.

15        Q.    But you don't know for sure?

16        A.    I don't know for a fact and I can't give

17   you any figures and numbers of what it would not

18   bring in or what it would bring in.

19        Q.    Haven't studied it and looked at it?

20        A.    I have not.

21        Q.    Seen any studies, looked at any studies?

22        A.    No.

23        Q.    Do you happen to know generally what

24   percentage of revenue are generated from ammunition



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 271 of 314 PageID #:5932

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      271

 1  sales?

 2      A.    I do not know a number.  I do know that

 3  the profit margin on ammunition is higher than it

 4  is on firearms.  I couldn't give you a number.  I

 5  couldn't give you a number.  But it would be I

 6  think very detrimental to a range operator if they

 7  were not allowed to sell the ammunition to the

 8  person and have them take the ammunition home with

 9  them.  Again, that's my opinion.  Based on those

10  studies or numbers, it's just my opinion.

11      Q.    Again, this isn't a cost issue; this is a

12  revenue issue?

13      A.    It will not cost the range operator more

14  to do that.  It is a loss-of-revenue issue.

15      Q.    But as you pointed out, the section does

16  allow the sale of ammunition?

17      A.    Correct.

18      Q.    It just has to be used at the facility and

19  you can't leave with it?

20      A.    Correct.

21      Q.    Would you turn in Exhibit 4 to Page 6?

22      A.    Okay.

23      Q.    Section 4-151-175, which is titled Storage

24  of Firearms or Ammunition, Subpart (a) says a



1  licensee may provide an area at the shooting range

2  facility for the storage of ammunition or firearms

3  owned by the licensee or shooting range patrons

4  provided that the licensee shall not provide

5  storage for ammunition or a firearm if the owner of

6  such firearm or ammunition does not have a FOID

7  card or CCL if required to have one.

8       A.    Right.

9       Q.    Would you agree then that the City is

10  allowing a person to go to a firing range, buy

11  ammunition, not shoot all of the ammunition, and

12  then can store the remaining ammunition at the

13  facility for their future use?

14      A.    If that's what the provision says, I guess

15  that's what can be done.  I don't know if anybody

16  would do that.  I know I wouldn't want to leave my

17  ammunition somewhere else.  I would want to take it

18  home with me.  But I guess it's a possibility.

19      Q.    You said it's a revenue concern.

20            People would be more inclined to buy the

21  ammunition knowing they are not going to lose it?

22      A.    It's hard for me to say.

23      Q.    But it's possible?

24      A.    I don't know what it's going to cost the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 273 of 314 PageID #:5934

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                              273

 1  range operator to construct a facility that will

 2  allow him to store -- basically you are talking

 3  about lockers or a locker room.  Is that practical?

 4  I don't know.

 5       Q.   Let's leave the cost out of it for a

 6  second.

 7            You know profit is revenue minus cost?

 8       A.   Right.

 9       Q.   I'm leaving profit and cost out.

10            Let's talk about just revenue generation

11  because that's what you said was the problem.

12       A.   Right.

13       Q.   Here the City has provided a way for a

14  patron to actually go buy the ammunition, use some

15  of it, and store the remainder at the range.

16            Doesn't that somehow alleviate some of the

17  concern you have for revenue there because that

18  patron is no longer faced with the consequence of

19  if I go to this range and don't shoot it all, I'm

20  throwing money down the tubes, or there is going to

21  be ammunition that can't be reused because it's

22  been opened and I don't know where it came from.

23            Doesn't that alleviate some of those

24  concerns potentially?



1    A.    This doesn't seem like a logical way to

2    address that issue to me.

3    Q.    I'm not asking if it was logical.  I'm

4    just asking you does it alleviate the concern

5    potentially?

6    A.    I guess if the patrons were willing to buy

7    ammunition and leave it there for their use on the

8    range, I guess it would, yeah, I guess it would.

9    Q.    And isn't it a possibility that this could

10   have a positive impact on a range owner's revenues?

11         I'll give you this situation.  There are

12   two ranges in the City of Chicago you can shoot at.

13   Let's say that happens.  The patron goes to one

14   range, shoots half of whatever ammunition they buy,

15   and stores the rest there.  There is a chance they

16   will go back to that range to shoot the remainder

17   of their ammunition and the range owner will not

18   only get the additional fees for the time on the

19   range, got the ammunition sale, but is developing

20   some kind of customer relationship with this

21   person.  If they store their stuff there, this is

22   now my range, this is where I go.  The same way I

23   go to the same Target because it's my Target or my

24   Stop-n-Shop or whatever.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 275 of 314 PageID #:5936

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     275

1        So these ordinances together could lead to

2   better customer relations and revenue for a range

3   owner; it's possible?

4        A.    I guess it's possible.

5        Q.    Isn't it possible that range patrons will

6   actually use all of the ammunition that they

7   actually purchase at the range while they are there

8   to shoot?

9        MR. SIGALE:  Again, I'm going renew my

10  objection as speculative to all questions that

11  start with isn't it possible.

12        With that said, feel free to answer if you

13  can.

14  BY MR. AGUIAR:

15        Q.    Just so you know, we are in an expert

16  deposition.  I understand his objections, but what

17  I'm doing is testing your theories, which is what

18  we do in these depositions.

19        A.    Re-ask me the same question.

20        Q.    In your experience, have people gone to

21  firing ranges, bought ammunition, and shot the

22  entire amount they purchased in that one time they

23  are there?

24        A.    Sure.



1       Q.    Would you say that most people who

2    purchase ammunition to shoot at the range shoot

3    through their purchase?

4       A.    I couldn't say that.

5       Q.    Do a fair number?

6       A.    I would imagine.  I couldn't give you a

7    percentage.  I guess a lot of people do.

8       Q.    But it does happen?

9       A.    Sometimes I don't, but, yeah, I guess a

10   lot of people do.

11      Q.    But there are times you do?

12      A.    There are times I do.

13      Q.    Those people would not have the concern of

14   unused ammunition that you cite in your report?

15      A.    Correct.

16      Q.    Because they would have used it all?

17      A.    Right.

18      Q.    Do you have any idea or knowledge of what

19   percentage of ammunition sales happen at a range to

20   someone who isn't a range patron?

21      A.    No.

22      Q.    You don't know?

23      A.    I don't know.

24      Q.    You did nothing to try to figure that out



JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      277

 1 | at all?
 2 |     A.    No.
 3 |     Q.    So the flip of that question would be you
 4 | don't know how much revenue a range owner loses by
 5 | not being able to sell to non-users of the range?
 6 |     A.    I do not.
 7 |     Q.    Are you opining that this provision makes
 8 | it impossible to open up a range in the City of
 9 | Chicago?
10 |     A.    No.
11 |     Q.    Are you opining that it makes it
12 | economically infeasible to open a range in the City
13 | of Chicago?
14 |     A.    No.
15 |     Q.    Are you opining that it makes the range
16 | unprofitable in the City of Chicago?
17 |     A.    Not necessarily, no.
18 |     Q.    Have you spoken with anybody about this
19 | provision besides Mr. Kramer or Mr. Sigale?
20 |     A.    No.
21 |     Q.    So no one has told you that they would not
22 | come to the City of Chicago and open a range
23 | because they can't sell ammunition to non-users of
24 | the range?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 278 of 314 PageID #:5939

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      278

1      A.    No.

2      Q.    Or that their users of the range can't

3  leave the ammunition?

4      A.    Ask me that again.

5      Q.    Certainly.

6            Or that users of the range cannot leave

7  with ammunition they purchased, but didn't use, on

8  the range?

9      A.    Start from the beginning, though.

10     Q.    Are you saying that someone wouldn't open

11 a range in the City of Chicago because users of the

12 range who purchased ammunition could not leave the

13 range with what they didn't use on the range?

14     A.    No.  Nobody has ever told me that.

15     Q.    It took couple times, but we got there.

16           Mr. Giordano, throughout today's long

17 deposition -- and I want to say I appreciate your

18 time and your attention today.  I know it's been a

19 long day -- we've determined that a number of the

20 provisions that you have cited in your report are

21 no longer problems?

22     A.    Correct.

23     Q.    For example, the applicant credential

24 issue, that's out.  The outdoor range prohibition



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 279 of 314 PageID #:5940

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          279

1  wasn't even in the case in the beginning, but it's

2  in your report.  The recordkeeping requirement has

3  been eliminated.

4         The location of the range vis-a-vis

5  another range has been minimized.  You can now rent

6  firearms at a range in the City of Chicago.  The

7  sound requirement has been lessened.

8         In addition to that, for example, we've

9  talked about the interlocking systems and how

10  that's an issue for the power grid, not for the

11  range owner?

12     A.    Right.

13     Q.    Those provisions taken as a whole, when

14  they are taken out of the equation, now they are

15  not a problem, how do all of those things being

16  removed affect your opinion about the City's

17  regulatory scheme regarding ranges?

18     A.    It certainly makes it less burdensome on

19  somebody who might be considering opening a range

20  in Chicago.  However, there still are some concerns

21  that, in my opinion, can be addressed in the

22  ordinance that are still in effect or haven't been

23  addressed that would make it a lot more

24  range-operator friendly.  And in my opinion, there



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 280 of 314 PageID #:5941

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                    280

1   are still some issues that are considerable and may

2   cause a person that would like to build a range in

3   Chicago from actually going ahead with a project

4   like that.

5           So it certainly has been an improvement or

6   helpful and made it less burdensome, but I still

7   think there are a few issues that are still

8   existing that would make it, again, difficult for

9   somebody to -- I won't say difficult for them to

10  make a decision, but would make them really have to

11  consider hard whether they really wanted to open up

12  a range in Chicago, whether it really would be in

13  their best interests to open it in the City of

14  Chicago.

15     Q.   And, again, you testified that you haven't

16  quantified the cost of what these regulations would

17  be?

18     A.   That's correct.

19     Q.   You don't know whether it actually would

20  be more expensive to open a range?

21     A.   That's correct.

22     Q.   You don't know whether the hits on revenue

23  we've identified would actually be hits on revenue?

24     A.   Correct.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 281 of 314 PageID #:5942

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        281

1      Q.   And you are not opining that these

2    regulations together with the seven issues we just

3    identified a second ago being removed make it

4    impossible to open up a range in Chicago?

5      A.   No.   From a possibility standpoint, it's

6    not impossible, no.

7      Q.   And you don't know whether it's

8    economically feasible or not?

9      A.   I do not.

10     Q.   Or that that range subject to these

11   regulations would be profitable?

12     A.   Correct.

13     Q.   And the fact that there are currently no

14   ranges in the City of Chicago, you don't think that

15   would entice a range owner to come here and want to

16   be the first to establish themselves and get a

17   foothold and be excited to do it?

18     MR. SIGALE:   I'm going to object to foundation.

19          If you can answer, answer.

20     THE WITNESS:   Whenever somebody is looking at

21   building a range, of course, it would be benefit if

22   there were no ranges in the area.

23   BY MR. AGUIAR:

24     Q.   Because they would have all of the



 1  business?

 2      A.    That's right.

 3      MR. AGUIAR:   I think I am finally out of

 4  questions for the moment.   I reserve the right to

 5  ask any follow-ups based on what Mr. Sigale may ask

 6  you.

 7                        EXAMINATION

 8  BY MR. SIGALE:

 9      Q.    Mr. Giordano, I'm probably going to wind

10  up asking this very haphazard and jumping around,

11  so just stay with me.   Okay?

12      A.    I'll try.

13      Q.    Issue Number 2 of your report talked about

14  how you have an issue about how the Commissioner of

15  Consumer and Business Affairs has the discretion to

16  revoke or deny the renewal of a license if there is

17  a deleterious impact on the community.

18          Do you recall that?

19      A.    Yes, I do.

20      Q.    And I guess using the scale from zero to

21  ten where zero is no issue at all and ten being a

22  really big issue, a deal breaker, where does

23  Number 2 fall on that scale in your opinion?

24      A.    Well, although I testified to the fact



1   that it wouldn't -- this issue, Issue Number 2,

2   license revocation would not make it -- the

3   existence of that regulation would not make it

4   impossible to open a range, this would be very high

5   on that scale because basically on the whim of a

6   political or a -- not a political --

7        Q.   Government employee?

8        A.   An employee of the City could make a

9   decision based on certain complaints and this is

10  information that he received out of the depositions

11  that the deleterious impact may not necessarily be

12  based on physical attributes of the community, but

13  may just be based on complaints.

14          My knowledge of what happens in the

15  shooting range industry is that there is a

16  political component or emotional component that is

17  unlike any other type of activity we see in this

18  industry.  So I think a person that runs a shooting

19  range would be more likely to suffer the

20  consequences of people who just don't like guns or

21  just don't like gun ranges making complaints which

22  would result in a revocation of a license to

23  operate under this provision.

24          So in my opinion, it would be a very

Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 284 of 314 PageID #:5945

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         284

1   serious issue, probably either a nine or a ten on

2   that scale because this would make or break my

3   business.  And after investment of a considerable

4   amount of money, I wouldn't want something hanging

5   over my head that would say, well, if the people in

6   the community decide they don't like guns and they

7   want me out of here, all they have to do is start

8   making complaints and if they give enough

9   complaints, I'm going away.  I'm not saying that

10  that would happen, but according to the provision,

11  it could happen.

12        So that may just be enough for a person

13  that would be considering to build a range not to

14  build one.

15     Q.   I know there are different kinds of

16  ranges.  There are a no-frills, a few lanes,

17  chintzy paint, just basic, there's a lane and

18  there's a target downrange and so on, versus a

19  really high-end, upscale, almost like a club.

20        Do you have an idea, even if you can give

21  some kind of range -- excuse the pun -- talking

22  about one of the no-frills kind, what's the kind of

23  cost that goes into one of these places?

24     MR. AGUIAR:  Objection, foundation.  He



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 285 of 314 PageID #:5946

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          285

1  testified he doesn't do any cost estimating for

2  ranges.

3  BY MR. SIGALE:

4      Q.   To the extent that you still might know

5  overall what something might cost?

6      MR. AGUIAR:  Same objection.

7      MR. SIGALE:  I understand.

8      THE WITNESS:  That actually is my answer.  I

9  don't do cost estimations.  I really can't give you

10  a cost.  What I can tell you is through my

11  experience, regardless of whether it's a no-frills

12  range or a top-of-the-line shooting resort,

13  shooting range construction is not inexpensive.

14  It's much more expensive than typical construction.

15      I can't give you numbers.  Mr. Kramer

16  would certainly be able to speak about what an

17  estimate would be for a person to consider what

18  they would spend on a no-frills range as opposed to

19  to a high-end range.  But my knowledge is based on

20  the fact that shooting ranges require certain types

21  of equipment and the equipment is relating to

22  health and safety.

23      It also requires a certain type of

24  construction which relates to health and safety.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 286 of 314 PageID #:5947

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                           286

1   Those methods and that equipment is not

2   inexpensive.  So it's an expensive endeavor.  It's

3   not an inexpensive endeavor to build a shooting

4   range regardless of where it is.

5   BY MR. SIGALE:

6       Q.   So what are we talking about for a

7   no-frills one; 100 grand?

8       MR. AGUIAR:  Same objection, no foundation.

9       THE WITNESS:  We are speaking about probably

10  not hundreds of thousands of dollars, but most

11  likely millions of dollars to build an indoor

12  shooting range.  It's not an inexpensive endeavor.

13  BY MR. SIGALE:

14      Q.   So you might not be able to give specifics

15  and Mr. Kramer can testify to that.  But based on

16  your experience, you do know enough to know that

17  it's a seven-figure investment?

18      A.   That's correct.

19      MR. AGUIAR:  Same objection, foundation.

20          Go ahead.

21      THE WITNESS:  In most cases.  Like I said, it's

22  going to vary.  It will vary from location to

23  location.  If varies what type of building it is.

24  It varies what type of range you want.  Although I



1   can't give you a number, I don't do that, I don't

2   do cost estimate, I'm familiar enough with the work

3   that I do that it's not an inexpensive endeavor.

4   BY MR. SIGALE:

5       Q.    Let's look ahead to Page 8 of your report,

6   Issue 18.  I'm going to read from it.  The

7   ventilation system for shooting ranges is a very

8   high-power user.  Power spike from simultaneous

9   loading of all motors would be hard on the power

10  grid and could even result in a localized power

11  grid failure.

12          And counsel eloquently pointed out that

13  that is not, in fact, a revenue thing, that's a

14  power grid thing, that's just the City power grid.

15          As long as we've been talking

16  hypotheticals all day, could blowing the local

17  power grid be considered a deleterious impact?

18      MR. AGUIAR:  Objection, foundation.

19      THE WITNESS:  I would imagine it's a

20  possibility.

21  BY MR. SIGALE:

22      Q.    There was a discussion earlier -- and I

23  can't even remember how you got into the

24  discussion -- but it had to do with the laws could



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 288 of 314 PageID #:5949

JACK J. GIORDANO                                          September 20, 2013
EZELL vs. CITY OF CHICAGO                                                288

1    be one thing when a range opens and then what

2    happens if the laws change and how does that impact

3    the business.

4         Counsel said, well, isn't it possible that

5    businesses survive and thrive even with a change in

6    the law.  Do you remember that topic?

7         A.   I remember that, yes.

8         Q.   As long as we are doing the hypotheticals,

9    isn't it also possible that when the laws change

10   after a business has already been existing that

11   that business could suffer and go out of business?

12        A.   I guess that's possible also.

13        Q.   Isn't it also possible that that business

14   might feel the need to leave town rather than

15   submit to the legislative change?

16        A.   I would imagine that that's possible also.

17        Q.   Look at your report on Page 4, Issue 9.

18        A.   Page 4?

19        Q.   Yeah, Issue 9.

20        A.   Okay.

21        Q.   I don't think you were asked this, but

22   this last paragraph of Issue 9, why are indoor

23   shooting range facilities a commercial use

24   compatible with other commercial uses?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 289 of 314 PageID #:5950

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          289

1      A.   Because typically they are a commercial

2   operation and they involve retail and it's

3   advantageous for those facilities to be located

4   with other commercial uses.

5      Q.   For maximum viability and success of the

6   business?

7      A.   That's correct.

8      Q.   And are you familiar with indoor shooting

9   ranges that are in commercial areas obviously

10  elsewhere other than Chicago?

11     A.   Yes.

12     Q.   And to your knowledge, are those indoor

13  ranges a blight or detriment to the neighboring

14  community?

15     A.   No, they are not.

16     Q.   Do you deal with zoning issues and

17  location issues?

18     A.   Not from a zoning standard, only from a

19  safety standard.  Sometimes I'm called upon to

20  evaluate -- and typically this happens with outdoor

21  ranges -- to evaluate a proposed piece of property

22  to determine from a safety standpoint whether it's

23  feasible to place a range there.  But not from a

24  zoning standpoint, I don't get involved in zoning



```
 1    issues.
 2       Q.   Okay.  And if I were to tell you that as
 3    of a year ago that about of the 148,161 acres of
 4    Chicago property that two percent, 3,386 acres,
 5    which also doesn't exclude streets and curbs, were
 6    manufacturing districts such that it was even
 7    remotely possible to put a range there, so two
 8    percent of the City area.
 9            Does that -- I guess for lack of a better
10    phrase, does that affect at all the opinion in the
11    middle paragraph of Issue 9 that prohibiting
12    shooting range facilities to share the neighborhood
13    with other uses, even though those uses would be
14    ineffective, is punitive?
15       MR. AGUIAR:  I am going to object to the extent
16    that, number one, Mr. Sigale may have been
17    misstating information about available land in the
18    City of Chicago that ranges can be located on, and,
19    number two, this witness has testified he does not
20    get involved in zoning issues and has not studied
21    prior to today anything about the City of Chicago
22    manufacturing districts or land in which ranges
23    could locate in the City, and, three, I think we've
24    testified that legislative intent in terms of being
```



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 291 of 314 PageID #:5952

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     291

 1   punitive has no impact whatsoever on whether

 2   something has a cost impact or a revenue impact.

 3          I'm done.

 4   BY MR. SIGALE:

 5      Q.   You can answer the question.

 6      A.   Could you ask the question again?

 7      Q.   Probably not.  Just go ahead and strike

 8   it.  That's fine.

 9          Of the issues that you've talked about

10   today in this report, not counting the ones that

11   since you made this report have been repealed or

12   amended, such that issues really aren't issues

13   anymore, are there any of the ordinances that you

14   take issue with as listed in this report where

15   removing that restriction in your mind, in your

16   experience as a police officer and a

17   safety-certified inspector, et cetera, et cetera,

18   with the shooting ranges, are there any of the

19   ordinances in your report that are still at issue

20   that if removed you would expect crime to increase?

21      MR. AGUIAR:  Objection to the form.

22   BY MR. SIGALE:

23      Q.   You can answer.

24      A.   No.  I don't think any of these



1   ordinances, whether they exist or are removed,

2   would have any effect on crime near the range.

3        Q.   Are there any -- and if you need to look

4   through it again, that's fine as well.

5             Are there any ordinances that you still

6   take issue with as of today, factoring in those

7   that are no longer issues, where removing them

8   might actually improve public safety?

9        MR. AGUIAR:  Again, objection as to the

10  relevancy of the question.

11       THE WITNESS:  I mean the only issue I can think

12  of would be the fact that it is a shooting range,

13  they're going to offer -- to my knowledge of the

14  subject and this whole case -- is that they are

15  going to provide training for concealed carry

16  licenses.

17            It certainly is my understanding that when

18  good guys have guns, the bad guys go away, so to

19  speak.  So I would imagine hypothetically it could

20  be that -- and it would depend on where the range

21  is and what the crime rate currently is, which I

22  couldn't tell you, I don't know, but it could

23  actually be a hypothetical that if the range were

24  put in and people who lawfully were carrying



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 293 of 314 PageID #:5954

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        293

 1  firearms were going in and out, the bad guys may go
 2  away to go somewhere else.  I don't know.  It's a
 3  hypothetical.  But that's the only effect that I
 4  could think of.
 5  BY MR. SIGALE:
 6      Q.   And is that example based on observations
 7  or experience in other areas?
 8      A.   It's not based on shooting ranges
 9  necessarily, but certainly there are a lot of
10  studies and statistics which I would not be able to
11  recite, but that I've certainly looked at over the
12  years that correlate the concealed carry laws with
13  reduction in violent crime.
14          So I think that it wouldn't be a far reach
15  to say, well, if you have a high concentration of
16  people carrying concealed firearms legally that
17  have been trained to use them at this facility,
18  that you are not going to get an influx of bad guys
19  in that area because it's going to be known that
20  the people going in and out are likely armed.
21  Whether they are or not, that probably would be the
22  perception.  Again, that's just my observation and
23  opinion.
24      Q.   Okay.  You testified much, much earlier



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 294 of 314 PageID #:5955

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         294

1   that you were working at that Eastern Firearms

2   Academy until 2003 when it closed?

3       A.    That's correct.

4       Q.    Why did it close, if you know?

5       A.    I do know.  They weren't doing well.  They

6   couldn't make any money.  They were in a location

7   that nobody knew where they were.  They were in a

8   small industrial park in Hillsborough, New Jersey,

9   which is a pretty rural area.  It's a distance off

10  a main highway.  But nobody actually knew it was

11  there.

12          I used to have customers come in all the

13  time and say I've been living in this town for

14  15 years and I never knew this range was here.  So

15  they just couldn't make it.  I knew I was in

16  trouble when my paychecks started to bounce.  They

17  finally went out of business.

18      Q.    So on that score then -- and this I guess

19  ties in to the earlier discussion about Issue 9 and

20  the location -- that a shooting range business in

21  many ways is like any other business?

22      A.    Of course.

23      Q.    I think this is about the last thing I've

24  got for you, Mr. Giordano.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 295 of 314 PageID #:5956

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        295

1          We were talking about Issue 16.  It's on

2    Page 7 of your Exhibit 1.  The apparent conflict

3    between 1200(b)(7) and 1200(b)(2), the

4    sound-absorbant material, that also has to be

5    smooth and nonporous?

6          A.   Correct.

7          Q.   And you testified that you are not aware

8    of any such material existing that is both sound

9    absorbant and smooth and nonporous?

10         A.   Correct.

11         Q.   And it's fair to say probably that since

12   Mr. Kramer is the one that penned or typed this

13   report, that if Mr. Kramer was aware of such a

14   material, that this Issue 16, he probably wouldn't

15   have written it or at least would have written it

16   differently; is that fair to say?

17        MR. AGUIAR:  Objection, foundation.

18        THE WITNESS:  I agree with that, yes.

19   BY MR. SIGALE:

20         Q.   Because if there was a material, then this

21   report might say airborne sound-absorbing materials

22   are not smooth, nonporous materials, comma, unless

23   the applicant was willing to buy product A, B, C.

24          But it doesn't say that, does it?



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 296 of 314 PageID #:5957

JACK J. GIORDANO                           September 20, 2013
EZELL vs. CITY OF CHICAGO                                296

1      A.   No, it doesn't.

2      Q.   Assuming for purposes of this question

3   that you and Mr. Kramer are correct and admitting

4   that if you're wrong and there is something out

5   there to go buy, then this issue probably goes away

6   because there's no conflict, a range owner would

7   just be forced to go buy product A, B, C, correct?

8      A.   Correct.

9      Q.   But assuming for purposes of this question

10  you're right, then there's no way for an applicant

11  or a would-be gun range owner to comply with both

12  laws; is that fair to say?

13     A.   Yes.   There is a conflict, so yes.

14     Q.   It would be impossible for that person to

15  build a range complying with both laws?

16     A.   Correct.

17     MR. AGUIAR:   I had an objection to foundation.

18     THE WITNESS:   Sorry.

19          Correct.

20  BY MR. SIGALE:

21     Q.   I would like you to go through this one

22  more time.   I had asked you the -- I hate the

23  zero-to-ten scale.   I think it goes back to my days

24  doing injury work.   I hate that scale.   But I did



 1  use it earlier, so I'll stick with it.

 2          Zero is really no big issue at all and ten

 3  is a major issue, a deal breaker issue, if you

 4  will.  We talked about that.  I asked you that in

 5  the context of Issue 2.  We already talked about

 6  it.

 7          Of the issues that are still actually

 8  issues here, are there any other issues in this

 9  report that you would put on the same level as from

10  zero to ten as you did with Issue 2 where I think

11  you called it a nine or a ten?

12          Are there any other issues remaining in

13  this report that you would put on that same level?

14      A.   I think the ammunition sales, discounting

15  the hypotheticals of people being willing to leave

16  their ammunition and all that, would be a very

17  high, a nine or a ten, on that list, and the gun

18  sales probably would be about a seven on the list

19  as far as a shooting range operator not being

20  allowed to sell firearms.

21          The other issues that were very high on

22  the list actually were taken care of, so that's a

23  good thing.  The regulatory conflict may be an

24  issue.  And the only reason is because we are not



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 298 of 314 PageID #:5959

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     298

1  sure what the Commissioner is going to promulgate

2  and we don't know what type of an impact that would

3  have.

4        Let me just mention that although I have

5  never been involved in any situations where new

6  laws have been developed or implemented that would

7  put a shooting range out of business, I might want

8  to say in a very similar situation -- I am familiar

9  with several instances where shooting ranges were

10 made aware of regulations that they were not aware

11 of and were forced out of business because of

12 regulatory issues.

13       So it's a very realistic concern that a

14 regulation might be promulgated that would put a

15 range out of business.  Again, I have personal

16 experience with regulatory issues where ranges

17 weren't aware of certain regulations and when they

18 were made aware by the regulatory agencies of what

19 the regulation was, it was unfeasible or impossible

20 to come into compliance with those regulations and

21 they would go out of business.

22    Q.   Is it also fair to say Issue 9,

23 restrictive location, would be very high on that

24 list to the extent that someone couldn't find a



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 299 of 314 PageID #:5960

JACK J. GIORDANO                          September 20, 2013
EZELL vs. CITY OF CHICAGO                                299

1   location to operate it or operate it properly?

2       MR. AGUIAR:  Objection, foundation.

3       THE WITNESS:  Location is important to any

4   business regardless of what business it is.  Again,

5   a shooting range should be considered a commercial

6   operation, not an industrial manufacturing plant or

7   an industrial operation.  It's a commercial

8   operation.  So I feel that that would be high on

9   the left, location.

10          If we're going to push a commercial

11  business into an area that's not really designed to

12  accommodate commercial businesses, I feel

13  personally -- again, I haven't done any studies --

14  but I feel that that would be detrimental to that

15  business from a profitability standpoint.

16          Let me see if there's anything else.

17  BY MR. SIGALE:

18      Q.   We've got a few minutes left.  I'll let

19  Mr. Aguiar ask if he's got anything else.  I will

20  obviously let you finish your answer to my

21  question.

22      A.   The other issues, which I have not talked

23  about, I am not sure how high they would be on the

24  list because I'm not going to really discuss that.



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 300 of 314 PageID #:5961

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        300

1     Q.    The ones you said let Mr. Kramer talk

2   about that?

3     A.    That's correct.

4           There are others that would be on that

5   list, but they would be on the low scale of the

6   list and I don't think they would have a very

7   significant impact on somebody's decision-making

8   process.

9           Again, when we first got here very early

10  in the deposition, it's a cumulative situation

11  where you have a number of regulations.  Some are

12  high on the list.  Some are low on the list

13  combined.  It's an issue that should be dealt with

14  because I think it's going to have a detrimental

15  effect on the decision making of a person that is

16  considering building a range in Chicago.

17     MR. SIGALE:  Okay.  Well, I'll leave it there.

18     MR. AGUIAR:  I have a couple of follow-ups.

19     MR. SIGALE:  Okay.

20     MR. AGUIAR:  Let's get you out of here.

21                 FURTHER EXAMINATION

22  BY MR. AGUIAR:

23     Q.    You identified Issue Number 2, which was

24  the Commissioner's ability to look at deleterious



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 301 of 314 PageID #:5962

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                      301

1  impact in deciding whether to grant a license or to

2  not renew one?

3      A.    Correct.

4      Q.    You said it would be a nine or a ten --

5      A.    Correct.

6      Q.    -- in terms of a problem for a protective

7  owner?

8      A.    Correct.

9      Q.    But you are saying that without having

10  talked to anybody who has looked at this and

11  decided not to open a range because of it?

12      A.    No.  That's just based on my prior

13  experience with ranges and the type of situation

14  that they get into with the surrounding

15  communities.

16      Q.    But you have not done any studies and

17  talked to anybody in Chicago about this?

18      A.    I have not.

19      Q.    Or anybody who wants to open in Chicago?

20      A.    No.

21      Q.    Issue 12, which was the regulatory

22  conflict, that could happen if the Commissioner

23  were to decide to exercise her authority to

24  promulgate regulations and those regulations



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 302 of 314 PageID #:5963

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        302

 1   potentially would conflict with something that's

 2   already out there.

 3            Are you saying that any type of business

 4   that is subject to potential regulations in the

 5   offing would never be a proper or a prudent

 6   business venture?

 7        A.   No, I'm not.

 8        Q.   But you are saying ranges would be?

 9            Ranges are separate?  Ranges are a

10   different kind of a beast?

11        A.   Well, I'm not aware of an ordinance that

12   would apply to all of the businesses, only to the

13   shooting range business.  So I would suppose that

14   if there were a similar ordinance that would apply

15   to other businesses, they would be in the same

16   situation as a shooting range.

17        Q.   But didn't we agree earlier that at any

18   time a municipality could enact an ordinance which

19   affects businesses or impute a Commissioner -- I

20   think David called her an employee -- a

21   Commissioner, someone in the department level --

22        MR. SIGALE:  I think I said government employee

23   or something like that.

24



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 303 of 314 PageID #:5964

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                         303

```
 1   BY MR. AGUIAR:
 2       Q.   Something like that.
 3            -- and view that person with authority to
 4   promulgate regulations.
 5            That can happen at any time to any
 6   business owner?
 7       A.   That's correct.
 8       Q.   So you just don't know in business, do
 9   you?
10       A.   I guess not.
11       Q.   And wouldn't you agree that to some level
12   all business ventures are risky on some level?
13       A.   Oh, sure.
14       Q.   Like who would have thought Borders would
15   be out of business by now, right?
16       A.   That's right.
17       Q.   The fact it is we just never know in
18   business what changes are coming down the pike, do
19   we?
20       A.   That's correct.
21       Q.   And that is just a cost of doing business?
22       A.   That's correct.
23       Q.   On Issue Number 9, I just noticed this and
24   I don't know why I missed it before.  In the last
```



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 304 of 314 PageID #:5965

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                          304

1   paragraph you say indoor shooting range facilities

2   are a commercial use compatible with other

3   commercial or industrial uses.

4           So you are saying that they are compatible

5   with industrial uses?

6      A.   Well, we have a lot of ranges that are

7   located in industrial parks.  I guess it could be

8   located in an industrial park.  It's not the most

9   favorable location, but it could be compatible with

10  the industrial use.

11     Q.   So it can be?

12     A.   That's right.

13     Q.   Mr. Sigale was talking about that range in

14  New Jersey from hours and hours ago where you

15  worked?

16     A.   Right.

17     Q.   He asked some questions about why that

18  failed and you mentioned that part of it was

19  because of location?

20     A.   Right.

21     Q.   But you have no idea as you sit here today

22  whether that area in New Jersey where that range

23  was located is in any way compatible to sites in

24  the City where ranges could locate consistent with



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 305 of 314 PageID #:5966

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     305

1    the ordinance requirements?

2         A.    No.

3         Q.    You never studied it?

4         A.    I never studied it.

5         Q.    So comparing what happened because of the

6    location in New Jersey really isn't necessarily

7    applicable to what could happen in Chicago?

8         A.    No.   That's correct.

9         Q.    Issue Number 16, that's the one about the

10   shooting range surface treatment.

11            Mr. Sigale asked you some questions about

12   Mr. Kramer's work on this provision?

13        A.    Correct.

14        Q.    Do you happen to know what research

15   Mr. Kramer did before he wrote this?

16        A.    I do not.

17        Q.    You stated that some of the provisions in

18   here are on the low scale and I believe you said --

19   the transcript will bear me out one way or the

20   other -- that they really don't have much of an

21   impact.

22            Would you identify for me which ones those

23   are?

24        MR. SIGALE:   I just want to object to the



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 306 of 314 PageID #:5967

JACK J. GIORDANO                                  September 20, 2013
EZELL vs. CITY OF CHICAGO                                        306

1   extent that it mischaracterizes.  I believe he said

2   that -- you followed that up by talking about

3   cumulative effect.  Again, the record will say what

4   it says.

5           Go ahead and answer.

6   BY MR. AGUIAR:

7       Q.   But you think some of them are on the low

8   scale?

9       A.   Right.  On face value, an individual item

10  may be on the low scale, but cumulatively all of

11  them together are a concern.  Some of the ones that

12  individually might be on the low scale in my

13  opinion are range master's presence, age

14  requirements.

15          From what I've learned today and the

16  changes that were made and the statements that were

17  made by counsel for the -- for the state?  County?

18      Q.   City?

19      A.   -- City, Issue Number 15, sound level

20  limits, may be on the low scale now.

21      Q.   And that's assuming my hypothetical is

22  correct?

23      A.   That's correct.

24      Q.   Or I should say the assumptions I provided



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 307 of 314 PageID #:5968

JACK J. GIORDANO                                        September 20, 2013
EZELL vs. CITY OF CHICAGO                                              307

1  you with, assuming those to be true, you would put

2  them on the low scale?

3      A.   That's correct.

4           Shooting range surface treatment may be

5  one as long as there is not truly a conflict that

6  could not be resolved and somebody was forced to do

7  something that was impossible to do obviously.

8           The other ones I really can't comment on.

9  I guess that would be it.

10     MR. AGUIAR:  Mr. Giordano, I have no further

11 questions.

12     THE WITNESS:  Thank you.

13     MR. AGUIAR:  Thank you so much.

14     THE WITNESS:  You're welcome.  My pleasure.

15     MR. SIGALE:  Are you ordering?

16     MR. AGUIAR:  Yes.  I think we should.  We have

17 summary judgment due in a month.

18     MR. SIGALE:  All right.  I'll take a copy,

19 which means I'm going to reserve.

20          Do you know what that means?

21     THE WITNESS:  No.

22     MR. SIGALE:  It means we are going to get --

23          We can go off the record.

24



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 308 of 314 PageID #:5969

JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        308

1              (Whereupon, a discussion was had

2                off the record.)

3     FURTHER DEPONENT SAITH NOT.

4          (The deposition concluded at

5          5:43 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1                    CERTIFICATE OF OFFICER

 2

 3           I, WENDY A. KILLEN, a Certified Shorthand

 4   Reporter of the State of Illinois, do hereby

 5   certify:

 6

 7           That previous to the commencement of the

 8   examination of the witness, the witness was duly

 9   sworn to testify the whole truth concerning the

10   matters herein;

11

12           That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony

16   given and the proceedings had;

17

18           That the said deposition was taken before

19   me at the time and place specified;

20

21           That I am not a relative or employee or

22   attorney or counsel, nor a relative or employee of

23   such attorney or counsel for any of the parties

24   hereto, nor interested directly or indirectly in
```



1   the outcome of this action.

2

3          IN WITNESS WHEREOF, I do hereunto set

4   my hand at Chicago, Illinois, this 2nd of October,

5   2013.

6

7   _____

8          Certified Shorthand Reporter

9          CSR Certificate No. 84-003772

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Case: 1:10-cv-05135 Document #: 234-5 Filed: 12/06/13 Page 311 of 314 PageID #:5972

JACK J. GIORDANO                                September 20, 2013
EZELL vs. CITY OF CHICAGO                                     311

1                    I N D E X

2    WITNESS                              EXAMINATION

3    JACK J. GIORDANO

4          By Mr. Aguiar......................3, 300

5          By Mr. Sigale........................282

6

7

8

9

10

11

12               E X H I B I T S

13   NUMBER                          MARKED FOR ID

14   Giordano Deposition Exhibit

15         No. 1...................................9

16         No. 2..................................93

17         No. 3..................................93

18         No. 4..................................93

19         No. 5.................................245

20         No. 6.................................248

21         No. 7.................................251

22

23

24



1              DEPOSITION ERRATA SHEET

2    Assignment Number 471425

3    Ezell vs. City of Chicago

4

5           DECLARATION UNDER PENALTY OF PERJURY

6

7              I declare under penalty of perjury that I

8    have read the entire transcript of my Deposition

9    taken in the captioned matter or the same has been

10   read to me, and the same is true and accurate, save

11   and except for changes and/or corrections, if any,

12   as indicated by me on the DEPOSITION ERRATA SHEET

13   hereof, with the understanding that I offer these

14   changes as if still under oath.

15

16   Signed on the _____ day of

17   _____, 2013.

18

19   _____

20           JACK J. GIORDANO

21

22

23

24



1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24              JACK J. GIORDANO



JACK J. GIORDANO                                    September 20, 2013
EZELL vs. CITY OF CHICAGO                                        314

```
1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24              JACK J. GIORDANO
```

