1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4  RHONDA EZELL, JASON I. BROWN, )

5  WILLIAM HESPEN, ACTION TARGET,)

6  INC., SECOND AMENDED          )

7  FOUNDATION, INC., AND ILLINOIS)

8  STATE RIFLE ASSOCIATION,      )

9                  PLAINTIFFS,   )

10          -VS-                  ) NO. 10 CV 5135

11  CITY OF CHICAGO,             )

12                  DEFENDANT.   )

13

14

15               DEPOSITION OF

16          COMMISSIONER ROSEMARY KRIMBEL

17               CHICAGO, ILLINOIS

18               SEPTEMBER 24, 2012

19

20

21  ATKINSON-BAKER, INC.
   COURT REPORTERS
22  (800) 288-3376
    www.depo.com
23
   REPORTED BY:  CHERYL LYNN MOFFETT, CSR NO. 084-002218
24  FILE NO. A60976D

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                     EASTERN DIVISION

4   RHONDA EZELL, JASON I. BROWN, )

5   WILLIAM HESPEN, ACTION TARGET,)

6   INC., SECOND AMENDED          )

7   FOUNDATION, INC., AND ILLINOIS)

8   STATE RIFLE ASSOCIATION,      )

9                   PLAINTIFFS,  )

10              -VS-             ) NO. 10 CV 5135

11  CITY OF CHICAGO,              )

12                  DEFENDANT.   )

13          Deposition of COMMISSIONER ROSEMARY KRIMBEL,

14  taken on behalf of the Plaintiff, at 30 North LaSalle

15  Street, Suite 1230, Chicago, Illinois, commencing at

16  10:07 a.m., on Monday, September 24, 2012, before Cheryl

17  Lynn Moffett, CSR No. 084-002218.

18

19

20

21

22

23

24

```
 1                      A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3   LAW OFFICES OF DAVID G. SIGALE, P.C.

 4   BY:  MR. DAVID G. SIGALE

 5   739 Roosevelt Road, Suite 304

 6   Glen Ellyn, Illinois  60137

 7   (630) 452-4547

 8

 9   FOR THE DEFENDANT:

10   LAW OFFICES OF CORPORATION COUNSEL

11   BY:  MR. ANDREW WORSECK

12   30 North LaSalle Street, Suite 800

13   Chicago, Illinois  60602

14   (312) 744-7129

15                              *   *   *

16

17

18

19

20

21

22

23

24
```

```
 1                        I N D E X

 2  WITNESS:  COMMISSIONER ROSEMARY KRIMBEL         PAGE

 3  EXAMINATION

 4  BY MR. SIGALE                                      6

 5  BY MR. WORSECK                                   174

 6  BY MR. SIGALE (further)                          174

 7                        EXHIBITS

 8                        PLAINTIFF'S

 9  NUMBER                 DESCRIPTION              PAGE

10  NO. 1      CURRENT ON-LINE COPY OF THE ORDINANCE  61

11

12                        DEFENDANT'S

13  NUMBER                 DESCRIPTION              PAGE

14                         (NONE)

15

16     QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER

17                         (NONE)

18

19           INFORMATION TO BE SUPPLIED

20                         (NONE)

21                       *   *   *

22

23

24
```

```
 1                    P R O C E E D I N G S

 2                        (WHEREUPON, the witness was duly

 3                        sworn.)

 4            MR. WORSECK:  We're producing here today

 5   Commissioner Krimbel both subject to the individual

 6   notice that you served on particular 30(b)(6) topics that

 7   we have previously designated in prior correspondence.

 8   For the record, those are Topics 2, 3, 4, 5, 6, 12, 13,

 9   17 and 18 subject, of course, to limitations dictated by

10   the court, most notably regarding the legislative process

11   of the gun range ordinance as well as additional

12   limitations set out in Mr. Aguire's correspondence of

13   August 15 and May 31 of this year.

14            MR. SIGALE:  All right.  Well, if we get to a

15   topic or something like that that you think is covered by

16   something, let me know.  We'll go off the record and talk

17   about it.

18            MR. WORSECK:  Sure.  I would just ask to the

19   extent you're asking the commissioner questions subject

20   to the individual notice versus the 30(b)(6) notice that

21   you make that clear on the record.

22            MR. SIGALE:  Okay.  And my understanding is I'm

23   doing the -- and you're talking about the individual

24   notice I sent over on May 25th or thereabouts.  My intent
```

1  was to proceed according to the 30(b)(6) notice, but I

2  see in the individual one there's a couple topics listed

3  here.  So, yes, it's possible, I suppose.  Okay.  Noted.

4          Was that the statement?

5          MR. WORSECK:  Yes.

6              COMMISSIONER ROSEMARY KRIMBLE,

7  called as a witness herein, having been first duly

8  sworn, was examined and testified as follows:

9                      EXAMINATION

10                  BY MR. SIGALE:

11     Q.   Good morning.

12     A.   Good morning.

13     Q.   My name is David Sigale.  I represent the

14  plaintiffs in the case of Rhonda Ezell, et al, versus

15  City of Chicago.  Can you state your name and spell your

16  last name for the record?

17     A.   Rosemary Krimbel, K-r-i-m, as in Mary, B, as in

18  boy, e-l.

19          MR. SIGALE:  Let the record reflect this is the

20  deposition of Rosemary Krimbel.  It's taken pursuant to

21  notice with the date agreed upon by the parties.  It is

22  taken pursuant to the Federal Rules of Civil Procedure

23  and any applicable local rules of the Northern District

24  of Illinois.

1   BY MR. SIGALE:

2       Q.    Ms. Krimbel, have you given -- and it's going

3   to be Commissioner Krimbel, is that correct?

4       A.    Correct.

5       Q.    Okay.  Well, Commissioner, have you given a

6   deposition before?

7       A.    Yes.

8       Q.    Okay.  When was the last one that you gave?

9       A.    About two and a half to three years ago.

10      Q.    Okay.  I suspect that you're going to be

11  familiar with the ground rules that I'm going to mention,

12  but I'll mention them anyway just to hopefully make

13  things go a little faster and a little smoother today.

14            Cheryl here is taking down everything everybody

15  is saying.  She can only take down out loud verbal

16  statements.  She cannot take down non-verbal gestures

17  such as head shaking and hand gestures.  And maybe the

18  biggest culprit, uh-huh.  So please keep everything out

19  loud and verbal.  Okay?

20      A.    Okay.

21      Q.    It's also very difficult for Cheryl to take

22  down more than one person talking at a time.  There will

23  be times when you'll probably know what my question is

24  going to be even before I'm done asking it, but I'm going

1  to ask that in all circumstances you wait until I'm done

2  asking my question before you answer.  And I in turn will

3  try to wait until you're done answering before asking my

4  next question.  Okay?

5       A.   Okay.

6       Q.   Okay.  If there is something that I ask that

7  you do not understand, please let me know and I will

8  rephrase it.  If you answer a question that I ask here

9  today, it's going to be presumed for purposes of the

10 record that is being made that you understood the

11 question that I asked and that that is the question you

12 are answering.  So, again, if there is something I say

13 that you do not understand, please let me know and I will

14 rephrase it.  Okay?

15      A.   Okay.

16      Q.   And if you need to take a break let me know.

17      A.   Okay.

18      Q.   Commissioner, you are currently the

19 Commissioner of Business Affairs and Consumer Protection

20 for the City of Chicago, is that true?

21      A.   That is correct.

22      Q.   Okay.  Are you the commissioner or are you the

23 acting commissioner?  I know I saw a couple references to

24 acting.  I don't know if that acting moniker is still

1   there.

2       A.   I am the commissioner.

3       Q.   Okay.  Since Business Affairs and Consumer

4   Protection is a mouthful, if I refer to that department

5   as BACP, can we agree that that's what we're talking

6   about?

7       A.   Yes, we can.

8       Q.   Thank you.

9            Commissioner, how long have you been the

10  commissioner of BACP?

11      A.   Since June 9 of 2011.

12      Q.   And earlier I had mentioned the difference

13  really, if any, if only in title of acting commissioner

14  and commissioner.  Is June 9, 2011 when you became the

15  commissioner or were you acting commissioner as of

16  June 9, '11?

17      A.   I was acting commissioner from about May 13th I

18  believe until June 9 when I was approved by City Council

19  at which point I became the commissioner.

20      Q.   Commissioner, what is the highest level of

21  education you've completed?

22      A.   JD, law school.

23      Q.   And that was from University of Chicago,

24  correct?

1      A.   No.

2      Q.   Oh, it wasn't?

3      A.   It was not.

4      Q.   Oh.

5      A.   It's from Chicago Kent College of Law.

6      Q.   Oh, it was from Kent.  Okay.

7      A.   Yes.

8      Q.   Another reason you can't believe everything you

9  read on the internet.

10          What year did you receive your JD from Chicago

11 Kent?

12     A.   1990.

13     Q.   And your undergraduate?

14     A.   Elmhurst College, 1987.

15     Q.   And that's the Elmhurst College that's in

16 Elmhurst, Illinois or is there another one?

17     A.   That is the only Elmhurst College.

18     Q.   And you received a BA?  BS?  Both?

19     A.   BS.

20     Q.   In what?

21     A.   Business administration.

22     Q.   Okay.  The internet had that part right, just

23 so you know.

24     A.   Thank you.

 1      Q.   Were you employed anywhere before becoming the

 2   acting commissioner in May of 2011?

 3      A.   Yes.

 4      Q.   Okay.   I guess let's just start out of law

 5   school.

 6      A.   Okay.

 7      Q.   Where were you employed out of after law

 8   school?   The first place.

 9      A.   United States District Court for the Northern

10   District of Illinois, two years.   Judicial law clerk for

11   William T. Hart, the Honorable William T. Hart.

12      Q.   That was H-a-r-t, correct?

13      A.   H-a-r-t, yes.   No E.   There was another William

14   Hart.   That was until 1992.   In 1992 I then joined Schiff

15   Hardin, which at the time was Schiff, Hardin & Waite.   I

16   was there until 1999 at which point I came to the City of

17   Chicago where I worked in the law department.   And I was

18   in the law department of the City of Chicago until 2006

19   when I moved to the Department of Consumer Services as a

20   general counsel for the department.   In 2009, the

21   Department of Consumer Services merged with the

22   Department of Business Affairs becoming BACP, and I

23   retained my position as general counsel then over BACP.

24   And then in 2011, Mayor Rahm Emanuel appointed me

1    commissioner of the department.

2        Q.   And what kind of -- let's go back to Schiff

3    Hardin.  What type of work did you do there?

4        A.   I started out in antitrust litigation for two

5    years, and then environmental litigation and basically

6    general litigation.  I also did intellectual property

7    litigation, mainly Robinson patent cases.  And I think

8    that's the major part, but it's mostly litigation.

9              MR. SIGALE:  Can we go off one second?

10                           (WHEREUPON, a discussion was had

11                             off the record.)

12   BY MR. SIGALE:

13       Q.   The City of Chicago law department.  Was there

14   any particular area of the law that you were -- any

15   department within the law department?

16       A.   Yes.  When I came to the City of Chicago it was

17   to work with Susan Herdina, and the name of the division

18   I believe at the time was regulatory litigation.  It was

19   a bigger name than that.  To be honest, I forget the

20   complete name.  It was like aviation and regulatory

21   litigation maybe.  And basically I did affirmative

22   litigation.  I represented the city in suing people.  So

23   I represented the city as plaintiff.

24       Q.   Okay.

1      A.    And then I also did environmental litigation.

2  That division did environmental litigation.

3      Q.    Okay.

4      A.    And that division did change names I think once

5  or twice during the seven years I was there.

6      Q.    But it was -- regardless of the name changes,

7  it was the one division?  And, thank you, that was the

8  word I was tripping over.

9      A.    Yes.

10     Q.    But that was one division you were working in

11 until you became general counsel in the consumer service

12 department?

13     A.    Correct.

14     Q.    Okay.  And in the consumer -- strike that.  In

15 consumer services, that department from '06 to '09 as

16 general counsel, what types of job duties did you perform

17 there?

18     A.    I handled all of the labor issues, negotiation,

19 rules and regulations.  Also handled any legal issues

20 working through various ways to implement projects

21 legally in compliance with the MCC, Municipal Code of

22 Chicago.

23     Q.    Okay.  When it merged with the Department of BA

24 becoming BACP in 2009 until you were appointed

1  commissioner in 2011, so that '09 to mid 2011 time frame,

2  did your job description change at all after the merger?

3      A.   The only thing that changed is I also added

4  performance measures.  I redesigned the divisions within

5  the department at the time of the merge and created a

6  unified performance measure matrix for the new

7  department.

8      Q.   Can you explain a little?  Like performance

9  matrix, what that means.

10     A.   Performance measures and a performance measure

11 matrix.  Performance measures are goals or guidelines and

12 descriptions of what we do and what we strive to do.  So,

13 we set up targets and goals.

14          So, for an example, a simple performance

15 measure might be how long does it take to issue a

16 particular type of license.  And we might say that that

17 should be looking at all of the protocols and parts it

18 should take no more than three to five days.  So we put a

19 target of three to five days, and then we measure that

20 every single month to see if we're below or above that

21 target.  And as we see things going below or above then

22 we make adjustments of our protocols to our management

23 procedures.  The matrix is just simply the spreadsheet if

24 you will is a simple way of putting it in which every

1   measure that we measure in the department is placed.

2       Q.   Okay.   Okay.   So these performance measures,

3   just to clarify for myself, this wasn't about like

4   internally performance measures such as be on time and

5   fill out your time sheets and all that stuff, it's

6   actually about how they do their job?

7       A.   Correct.   It's a management tool.   It is not a

8   labor tool.

9       Q.   Okay.   And then in 2011 when you became the

10  commissioner, how did the -- strike that.

11          Rather than asking how things changed I should

12  just ask you what do you do as the commissioner?   So

13  that's what I'm asking.

14      A.   As commissioner, I oversee the department

15  including all five of its divisions which would be the

16  licensing of businesses including liquor licenses and

17  public place of amusement licenses.   I also oversee the

18  public vehicle division which licenses all of the taxis,

19  livery, charter, sightseeing, ambulances, medicars and

20  jitneys in the City of Chicago, which is about 14,000

21  licenses.   I also oversee the cable division which

22  manages and negotiates cable franchise agreements with

23  the three cable franchisees in the City of Chicago, which

24  would be Comcast, Wide Open West and RCN.

1          I also oversee the enforcement division which

2    does investigations and enforcements of all of the

3    municipal codes, specifically those codes found in

4    Chapters 2 and 4 of the municipal code, Chapter 4 being

5    the licensing section or chapter and Chapter 2 being the

6    authorizing ordinances for the departments, specifically

7    2-25 of the municipal code which is the authorizing or

8    enabling ordinance for my department, and that includes

9    our consumer protection duties and responsibilities.

10          We also oversee over 20,000 complaints per year

11   in all of those areas as well as field and outreach and

12   education division to businesses and consumers.

13          Q.   Okay.  So, somewhere in there did I -- am I

14   picking up right that the five divisions are licensing?

15          A.   Uh-huh.

16          Q.   Cable, public vehicles, enforcement and

17   outreach and education?

18          A.   That would be correct.  Those would have been

19   the five divisions.

20          Q.   Now, and I should have asked this before, your

21   department operates out of what address?

22          A.   City Hall, eighth floor.  We have other

23   locations as well, but that's where the administrative

24   headquarters are for the department.

1    Q.   Okay.  Is it -- strike that.  How hands on are

2  you with these five divisions?  I mean do you look at

3  licenses of businesses yourself?

4         MR. WORSECK:  Objection, vague.

5         THE WITNESS:  I don't micro manage my deputies.

6  There's a deputy in charge of each division, but each

7  deputy will come to me on a daily basis if there is an

8  issue or a question as to whether or not something should

9  or should not be done.  I spend most of my day making

10 decisions.

11 BY MR. SIGALE:

12   Q.   Okay.  And I'm sorry, those decisions that you

13 spend most of the day making, are those decisions of

14 questions or issues raised by the deputies?  Is that what

15 you meant?

16   A.   That is correct.

17   Q.   Okay.

18   A.   Often it's just prioritizing or following up or

19 making sure certain agenda items are completed in a

20 timely manner or that they have project plans in place to

21 get them done in a timely manner.

22   Q.   Okay.  Who is the deputy commissioner then of

23 the licensing division?

24   A.   Joy Adelizzi, A-d-e-l-i-l-z-z-i.

1        Q.   Okay.  I'll just ask for all them.  Public

2   vehicles, who's the deputy.

3        A.   Rupal, R-u-p, as in Peter, a-l, Bapat,

4   B-a-p-a-t.

5        Q.   And cable?

6        A.   Jim McVane, M-c, as in Victor, a-n-e.

7        Q.   And enforcement?

8        A.   Ron Calicchio, C-a-l-i-c-c-h-i-o.

9        Q.   Outreach and education?

10       A.   That position is vacant as of the moment.

11       Q.   Okay.  Now, you had mentioned fielding

12   complaints, but that's not a division, you just --

13       A.   There's a prosecution division.  Division is

14   not the right word.  There's a section called

15   prosecutions which handles all ANOV, Administrative

16   Notices of Violation, written by the enforcement division

17   at the Department of Administrative Hearings.

18       Q.   That's what you meant by complaints.  You meant

19   complaints against --

20       A.   Businesses.

21       Q.   Businesses or residents that violate the

22   ordinances.  You did not mean people complaining about

23   the department?

24       A.   Correct.

1      Q.   20,000 was a lot, but there's a lot of people

2  living in the city.

3      A.   No, about 12,000 of those are cab complaints

4  that we prosecute.

5           MR. WORSECK:   People never complain about city

6  departments themselves.

7  BY MR. SIGALE:

8      Q.   My mistake.

9      A.   Sorry.

10     Q.   All right.  So, you have the prosecution

11 section.

12     A.   And there is an adjudications section.

13     Q.   Let me stick a little while longer here with

14 this licensing division that you said Miss Adelizzi -- am

15 I saying that right?

16     A.   Correct, Adelizzi.

17     Q.   Adelizzi is the deputy commissioner.

18          A business, somebody wants to start a business,

19 they apply for a license.  It gets turned in to the

20 licensing division.  They fill out an application for a

21 business license, and somebody would turn it in to the

22 licensing division?  Is that right?

23     A.   Not exactly.

24     Q.   Okay.  What did I get wrong?

1    A.   Well, there were up until May 117 different

2  license types.  After May there are now 49 license types.

3  Someone who would like to open a business and have it

4  licensed would come in to discuss it with a business

5  consultant who would then create an application.

6    Q.   Oh, okay.

7    A.   Often someone will come in for a specific

8  license type and in sitting down find out that's not the

9  license type they should get and, therefor, we always

10 make them go through a consultant first to make sure that

11 they are getting the correct license type.

12        That said, you can also get a license on-line

13 if you're getting a city license.

14    Q.   What constitutes --

15    A.   A general business license or limited business

16 license.

17    Q.   So, somebody drops off not one of these simple

18 basic business licenses that they can do on-line, but

19 someone comes into the division -- is that also at City

20 Hall eighth floor?

21    A.   Yes, it is.

22    Q.   Someone comes in with a business license

23 application, says, "Hey, I worked this up on my own, I

24 want to turn this in," whoever is there will say, "Okay,

1    but you need to meet with one of our consultants to make

2    sure you did it right"?

3         A.    Not exactly.

4         Q.    No?

5         A.    They would meet with a consultant and we'd try

6    to the best of our ability have that consultant stay with

7    that business until the licensing is complete.  The

8    consultant would review the application and then it would

9    be submitted.  There's a number of processes and

10   protocols following once we receive the application, and

11   the processes and protocols are different for every

12   single license type.

13            So, for instance, some licenses must be

14   approved or inspected by the fire department must approve

15   it before the license issues.  Some must have the health

16   department do an inspection and approve it before the

17   license issues.  So, each type of license has a different

18   protocol.

19        Q.    Okay.

20        A.    And a different inspection protocol, if it has

21   an inspection protocol.  There's also other issues such

22   as zoning which has to be reviewed.

23        Q.    Okay.  With all of this that you're talking

24   about, and, Commissioner, we know we're here to talk

1   about at some point today we're going to get to firing

2   ranges, but I'm trying to keep this a little bit general

3   at first.

4           Not the on-line simple applications.  Let's

5   stick to the ones then at a minimum where the people have

6   to come in and they're going to meet with someone and

7   there's processes.  Is Joy Adelizzi hands on with all of

8   that or are these various consultant tasks performed by

9   people below Ms. Adelizzi on the totem pole?

10          MR. WORSECK:  Objection, vague.

11          THE WITNESS:  Joy oversees the licensing

12  division which contains a number of employees.  The

13  process goes through those employees and would bubble up

14  to Joy only if they needed some direction.

15  BY MR. SIGALE:

16      Q.   Okay.  Okay.  But someone who, say -- and I

17  hope this is a good example because I don't know, maybe

18  it's one of the on-line ones, but somebody wants to open

19  a hat store.

20      A.   That's an on-line store.  That would be a

21  limited business.  Try restaurant.

22      Q.   Okay, a restaurant.  Can they also sell hats?

23  Just kidding on that.

24      A.   Actually I think they could.  In fact, many of

 1  them do now that I think about it.

 2      Q.    So, someone wants to open a restaurant then.

 3  The consultants work them through the process, they've

 4  got to meet, make sure the area they want is zoned for a

 5  restaurant, the fire department makes sure the ovens are

 6  up to code, the vents and what not.  Whatever the

 7  processes are, if that consultant is able to or that

 8  employee consultant is able to work them through the

 9  process, then, in theory, Miss Adelizzi never needs to

10  get involved?

11      A.    That is correct.

12      Q.    And then in kind of jumping forward with that,

13  it's also in that scenario likely that you don't need to

14  get involved?

15      A.    That is correct.

16      Q.    Okay.  And the on-line business applications,

17  the simple ones, like my hat store, you probably would

18  never get involved with that either?  Is that fair to

19  say?

20      A.    That would be fair to say on the application

21  end, correct.

22      Q.    Is there an end that you -- oh.

23      A.    If there is an enforcement or a problem with

24  the business that got a license on-line.

1      Q.   Okay.   Are you familiar with what I'm going to

2  call the Chicago Range Ordinance but for which I'm

3  referring to, and of course, I've got a copy here if you

4  want to see it but I'm just asking the question first,

5  the amendments and rewrites of this Chicago Firearm

6  Ordinance that was passed on July 6 of 2011 that allowed

7  firing ranges in the city under certain conditions and

8  that was later amended in September of 2011, are you

9  familiar with that ordinance?   And I'm collectively

10  referring to the whole thing as the range ordinance or

11  the ordinance.

12      A.   Correct.   I believe it's called the shooting

13  range license, and I'm having difficulty with the word

14  familiar because I don't know if I would say I'm

15  familiar.   I have 117 different license types to be

16  familiar with, but I am as familiar with that license

17  type as I am with many of the other license types.   Some

18  license types I'm more familiar with than others.

19          MR. WORSECK:   David, just for the record as you

20  know the amendment that you spoke of dealt not only with

21  amendments to the licensing provisions of the municipal

22  code but also provisions in the building code, the

23  firearms ordinance in Chapter 8 of the code.   So there

24  were a lot of amendments to a lot of different businesses

1    and pieces of different chapters and sections throughout

2    the code.  Some of those were in the licensing provisions

3    in Chapter 4 and, of course, we're producing the

4    commissioner only on a limited set of topics in the

5    30(b)(6) notice.

6    BY MR. SIGALE:

7         Q.    That's fine, and the answer to the question

8    might be, well, I'm only familiar with it as it pertains

9    to licenses and if that's the case, that's the case.  But

10   I'm just asking -- the question really was a broader one,

11   whether you're familiar with the existence of this

12   ordinance.

13        A.    I'm familiar with the existence of the shooting

14   range license ordinance.

15        Q.    Okay.

16        A.    I am not familiar with all of the gun laws in

17   the City of Chicago.

18        Q.    Okay.  In general, if somebody comes to the

19   licensing division of the BACP and they say, "I want to

20   open a firing range in the city," taking a stab that's

21   not one of the simple licenses that you were referring to

22   that gets done on-line, is that true?

23        A.    That is correct.

24        Q.    So, that person needs to come into the

1  licensing division and most likely sit down with one of

2  the consultants you described earlier.  Is that also

3  true?

4      A.   That is correct.

5      Q.   Now, are you aware as you sit here of any

6  person who has -- I'll ask it in two parts.  As you sit

7  her, are you aware of anyone who actually has submitted

8  an application to open a firing range, commercial,

9  private firing range in the City of Chicago?

10     A.   I am not aware of any pending application for a

11 shooting range license.

12     Q.   Are you aware of -- that's fair, but are you

13 aware of any accepted or rejected, therefor they wouldn't

14 be pending, are you aware of any accepted or rejected

15 applications for a shooting firing range within the City

16 of Chicago?

17     A.   I am not aware that anyone has applied.  Okay.

18     Q.   And it's fair to say as you sit here that you

19 don't know why people haven't -- why nobody has applied?

20         MR. WORSECK:  Objection, calls for speculation.

21 BY MR. SIGALE:

22     Q.   Is that true or --

23     A.   Personally I really don't know why.

24     Q.   Okay.  Okay.  And I don't mean to be

 1  presumptuous.  Maybe you asked about it or something like

 2  that.  And, Commissioner, obviously you as better than

 3  most of the witnesses in litigation know, I'm not asking

 4  you for communications with counsel.  So that's not what

 5  I'm getting at.  But perhaps for some other reason you

 6  took it upon yourself to look into the issue or anything,

 7  but as you sit here the fact is to your knowledge nobody

 8  has applied, you're not aware of any reason why not?

 9          MR. WORSECK:  Same objection.

10          THE WITNESS:  I'm not aware that anyone has

11  applied and I have no idea why no one has.

12  BY MR. SIGALE:

13      Q.   Okay.  If someone had applied for one, would

14  you necessarily have heard about it?

15      A.   Probably I would have, yes.

16      Q.   Okay.  And why do you say that?

17      A.   Because it is a relatively newish license.  And

18  whenever a new license type is created, the first few

19  licenses that issue generally get reviewed to be sure

20  that all the processes that we've put into place to issue

21  that license is working for the issuance of that license.

22      Q.   Okay.

23          THE WITNESS:  Before you start your next

24  question may I ask for a break?  I'm out of water.

1          (WHEREUPON, a break was had in the

2          proceedings.)

3   BY MR. SIGALE:

4       Q.   I'll ask you.  If we have to talk about it off

5   the record we will, but the sections of the ordinance

6   that regard licensing of firing ranges, did you

7   participate at all in writing them?

8          MR. WORSECK:  Objection.  David, you're asking

9   for a question that delves into the legislative process

10  that produced the ordinance and otherwise gets into the

11  formulation and construction and division of the

12  ordinance.  As you know, the court has ruled that those

13  kinds of questions and that kind of subject matter is not

14  relevant to the case and sustained the city's objections

15  to that line of discovery.  So, I'm going to instruct the

16  witness not to answer that question.

17         MR. SIGALE:  Yes, but I don't think I'm getting

18  into the topic just by asking if she was a part of that.

19         MR. WORSECK:  You're asking if she participated

20  in a process that the court has said that is out of

21  bounds.

22         MR. SIGALE:  Yes, but I don't think unless I

23  ask questions about the details of.  If the answer to

24  that is yes, I think until I get into the --

1          MR. WORSECK:  One of your lines of inquiry on

2    this topic was the names of people who participated.

3          MR. SIGALE:  You know, withdraw the question.

4    That's fine.  That's fine.

5    BY MR. WORSECK:

6       Q.   Commissioner, can you describe for me your

7    experience, if any, with firearms?

8          MR. WORSECK:  Objection; relevance, vague.

9          THE WITNESS:  I'm not sure how to answer, I'm

10   sorry.

11   BY MR. SIGALE:

12      Q.   No, that's --

13      A.   I have certainly held guns.  My brother-in-law

14   is a cop.  I have friends who hunt.  So, I, you know,

15   know a bit about guns.  Have I ever physically shot a gun

16   myself?  Possibly, but it would have been a long time

17   ago.  I'm trying to remember if I actually shot because I

18   have gone hunting.  But, again, as I say, it was a very

19   long time ago.

20      Q.   Is that, when you say maybe you shot one a long

21   time ago, is that the same hunting that maybe it was a

22   long time ago?

23      A.   Yes.  And I actually think I can amend that and

24   say I did not shoot a gun at that time.  I just was with

1    the hunting party, but I wasn't shooting because I wasn't

2    able to get my card.

3         Q.   Oh, your FOID card?

4         A.   Whatever it was called at the time.  I don't

5    believe it was called a FOID card at the time.

6         Q.   Okay.

7         A.   But it might have been.

8         Q.   I'm sorry.  Are you referring to like a hunting

9    license or are you referring to like a state firearm

10   card?

11        A.   A state firearm card.

12        Q.   Okay.  Anything else on that?

13        A.   I don't think so.

14        Q.   Okay.  Have you ever been to a firing range?

15        A.   No.

16        Q.   And let me -- I think it's clear based on the

17   previous topic I just asked about that you've never fired

18   a firearm at a shooting range.

19        A.   Correct, I have not.

20        Q.   Just to clarify, have you ever physically been

21   inside one for any reason?

22        A.   I don't remember if I have.  And I state that

23   because I have very dear friends who are shooters and I

24   know I have picked them up or dropped them off at

1  shooting ranges, but I don't think I've actually gone

2  into the shooting range.

3     Q.   Do you remember which ranges, what the names of

4  the ranges or the cities when you would drop the people

5  off?

6     A.   The western suburbs.

7     Q.   Whether in anticipation of the new range

8  ordinance or for any other reason, have you done any

9  studying of any type with regard to the structure or

10 operation of firing ranges?

11    A.   No.

12    Q.   Do you have any knowledge of firing ranges

13 whatsoever other than the fact that firearms are used

14 there?

15         MR. WORSECK:  Objection, vague.

16         THE WITNESS:  Other than what my friends tell

17 me about them, no.

18 BY MR. SIGALE:

19    Q.   Okay.  Well, that's -- sorry.  I write way

20 slower than I talk.

21         Now, when you say your only knowledge of them

22 would come from what your friends say, are these the

23 friends you were referring to that use them?

24    A.   Yes.  These are my friend who are gun

1  enthusiasts.

2      Q.   And in general what kinds of things have they

3  said to you regarding firing ranges?

4          MR. WORSECK:  Objection; vague, overbroad.

5          THE WITNESS:  Just that they enjoy it and it's

6  fun and they've been to a number of different ones and

7  they've gone on trips where they have games and they

8  think it's a really fun activity.  And I will say that I

9  think they mostly say that to me because they try to get

10  me to go.

11  BY MR. SIGALE:

12      Q.   Oh, okay.  Okay.  These statements that you

13  said your friends have said to you, is this in the

14  context of a long time ago when you would be dropping

15  them off and picking them up or is this since July of

16  2011 when the range ordinance was passed?

17      A.   Well, they are still my friends and they are

18  still gun enthusiasts.

19      Q.   Okay.

20      A.   Have they tried to get me to a gun range since

21  July of 2001?  I don't believe so.

22      Q.   And you haven't had conversations with them

23  about the topic since July of 2011?

24      A.   I have not had conversations with my friends

 1   about the Chicago Shooting Ordinance, no.

 2       Q.   Have you had conversations with anyone, not

 3   your attorneys, regarding shooting ranges since the

 4   Shooting Range Ordinance, if you want to call it that,

 5   was passed?

 6           MR. WORSECK:   Objection, vague.

 7           THE WITNESS:   Could you restate the question?

 8   BY MR. SIGALE:

 9       Q.   Sure.   Other than your attorneys, because I'm

10   not asking for anything privileged, have you had

11   conversations with anybody regarding the shooting range

12   ordinance since it was passed in July of 2011?

13       A.   Yes.

14       Q.   Okay.   Who would that be?

15       A.   Joy Adelizzi would be one person I would have

16   discussed it with.

17       Q.   And is that -- strike that.   Were those

18   conversations to discuss, say, the implementation for the

19   process for this new license or something else?

20       A.   Correct.   It would be discussions as to how it

21   would be implemented.

22       Q.   Okay.   I guess that would be a good segway to

23   go there as to how it would be implemented.   So, let's

24   springboard from that.

1              You're aware that the shooting range ordinance

2  was amended in September of 2011?  Yes or no?

3       A.   That rings a very vague bell.

4       Q.   And it does appear, and I'll go into more

5  specifics in a little bit, but I'll just represent to you

6  and, Drew, you'll say if I'm wrong, that part of the

7  amendments in September of 2011 did involve the licensing

8  process.  So, when I ask you questions about

9  implementing, I'm referring to after September 2011.  So,

10 I'm referring to the shooting ordinance in its current

11 form.

12      A.   Okay.

13      Q.   Okay.  So, how then would the shooting range

14 ordinance be implemented in your department?

15      A.   Well, someone -- I'm unclear if you're asking

16 how the implementation was put in place or how it is

17 implemented.  It's easier to answer the former because

18 that follows the ordinance requirement.  The later is

19 more difficult because no one's actually applied.

20      Q.   Okay.  Fair enough.  So, let's talk about the

21 former then.

22      A.   All right.

23      Q.   The ordinance is passed, this new license type

24 is created, shooting ranges are now theoretically

1  available whereas before they were not available.  So,

2  what happened in your department when that --

3      A.   So, the first thing that happens when a new

4  license type is passed is Joy would go through the

5  requirements set forth in the ordinance for what needs to

6  happen in order for a license to issue.  In a very

7  simplistic way, the way licensing works is there are

8  certain requirements, and we just set up a line of little

9  toggles.

10          So if requirement one is met, we flip that

11  switch.  Requirement two, we flip that switch.  When all

12  the switches are flipped we issue the license.  So what

13  we do when a new license type is created is figure out

14  what switches have to be flipped.  Health inspection;

15  yes.  You know, fire inspection; yes.  Whatever

16  department inspections.

17          And then once we figure out what the

18  requirements are that must be met before the license

19  issues then we must figure out how to put those

20  requirements into our system.  We have a computer system

21  which needs to have programming.  For instance, if there

22  is an inspection that has to be done by the health

23  department, then the computer must be programmed that

24  that health inspection must occur before this license

1    issues.  And the computer won't issue until that health

2    inspection occurs or at least is entered into the system

3    as having occurred by the health department.

4         Notifications may need to be sent out.  So the

5    process for sending out those notifications and to whom

6    they go must also be put into the programming of the

7    computer.  And then the various types of information that

8    must be gathered and collected from the licensee before

9    the license issues, all those documents have to be

10   created.  And if there are steps that have to be done

11   internally, such as fingerprinting or criminal history,

12   then those toggles have to be put into the system so that

13   internally they can be flipped before the license issues.

14        And then once we figure out all the steps and

15   then we integrate the steps and requirements into our

16   database and our business process, then we're ready to

17   go.  Some licenses need a zoning -- in fact, every

18   license needs a zoning review.  And that's a huge big

19   piece of most licensing.  So, that has to be figured out

20   and programmed into the computer.

21        Q.   So, is the zoning a condition precedent, if you

22   will, to getting the license, getting a location that

23   passes zoning for whatever business this is.

24        A.   Zoning is the condition precedent for every

1  single license.

2      Q.   Okay.  Go back going back to my pretend hat

3  store example.  Well, we'll say restaurant.

4      A.   Okay.

5      Q.   So, someone can't just come in and say --

6      A.   I live on the 18th floor of a residential

7  building and I want to open a restaurant here.  No, you

8  cannot.  It violates zoning.

9      Q.   Well, "I have a dream to be a restaurateur.

10  I'd like to get a business license to open a restaurant."

11  Before that license would ever issue, the city would say,

12  "Well, where do you plan on putting it?"

13      A.   Yes.

14      Q.   Is that correct?

15      A.   All licensing actually revolves around location

16  because zoning is so important a part of it.

17      Q.   In my restaurant example is it even

18  theoretically possible for someone to come in and say, "I

19  have a dream of being a restaurateur, I want to open up

20  this hat themed restaurant.  And I know who I'm going to

21  hire and everything, and I've got who's going to do the

22  lighting and the electrical and all that stuff."  Through

23  this process that you're describing of getting the

24  license with the toggles and the check lists and all that

1    and flipping the switches, would you be allowed, my

2    hypothetical restaurateur be allowed to, say, get

3    everything else done and then just get hung up at the end

4    on where the zoning is or is zoning kind of the first

5    thing that gets dealt with?

6         A.    Zoning is, I would say, always the first thing

7    that gets dealt with.

8         Q.    Okay.  So, going to --

9         A.    Because, and I'll sort of --

10        Q.    Please.

11        A.    -- be a little clearer on that.  Because if the

12   zoning doesn't pass, nothing else matters.

13        Q.    Okay.  So hypothetically speaking, and let's

14   talk specifically firing ranges for a minute here.  Okay?

15   If somebody can't get a location for a firing range

16   because it doesn't -- in my hypothetical they can't find

17   a spot to operate it that would pass muster with zoning,

18   that person, that potential applicant wouldn't get past

19   square one with your department?  Is that fair to say?

20        A.    That is correct.

21        Q.    Okay.  That applicant, the way that the whole

22   city process works, would they go to zoning first to find

23   out if their location passes muster, and then only if it

24   does would they come to your department?  Or do they come

1  to your department with a possible location and then

2  either get told, "Well, you've got to go talk to zoning

3  down the hall first," or would the consultant, say, do

4  his own check there?  Do you understand the question?

5      A.   I think I do.

6      Q.   Okay.

7      A.   The person would have a location in mind and

8  would come to BACP.  We have two people on staff at BACP

9  who can do zoning review.  Their location and the purpose

10 for what they want to use that location would be roughed

11 out on an application and checked by those two people

12 before it went the next step.  They could determine

13 whether or not the zoning was proper or not proper for

14 that particular license type based on the location given

15 by checking the zoning maps.  They are allowed to review

16 the zoning and let us know whether or not the process can

17 continue, but they cannot make zoning decisions.  They

18 can only review the zoning.  Does that distinction make

19 sense?

20     Q.   It sounds like you're saying they can look it

21 up and give a preliminary answer of yes, this might work

22 or, no, you're not going to be able to put your dynamite

23 factory in the middle of a residential neighborhood.

24     A.   Correct.  It's very simple black and white most

1    of the time for zoning and they can say yes or no, but

2    sometimes zoning can be a little bit more complicated

3    than just simple black and white.  It either is a

4    residential or it's not residential because there are

5    planned manufacturing districts.

6        Q.    Sure.

7        A.    There are, you know, a number of different

8    types of special service areas.  So there's a lot of more

9    finesse that goes into the zoning decision.  But the

10   reviewers in my department can pretty much say yea or

11   nay.  But if it gets more complicated than that, if it's

12   in a planned manufacturing district or a special service

13   area then they may send you up to zoning because they'll

14   want the zoning administrator or someone in the zoning

15   division of the building department --

16                        (Clarification requested by the

17                          reporter).

18            I'm sorry.  Zoning used to be its own

19   department, and then it became part of another

20   department.  I think it's Housing and Economic

21   Development but it may be Buildings now, I don't know.  I

22   don't know what department it's part of, but I know who

23   the people are who do the zoning.

24       Q.    You mean the two people on staff that do the

1  zoning?

2      A.   No, no, no, no, no.   There's a zoning

3  administrator and there are -- I don't know the exact

4  number, but there are at least 10 or 15 people who do

5  zoning.

6      Q.   Okay.

7      A.   And I just don't know which department they

8  reside in specifically, but we'd have to kick it up to

9  them if the decision was necessary because it was a gray

10  area.

11      Q.   And you're reffering to Commission Scudiero

12  and her staff?   Is that who you were referring to that it

13  would be kicked up to?

14      A.   Correct.   I'm not sure if Patty's title is

15  commissioner or not.   I think she's the zoning

16  administrator, I don't think she's the commissioner.   She

17  resides in a department that already has a commissioner.

18      Q.   Oh.

19      A.   And I just don't know if that department is

20  Buildings or Housing and Economic Development.   I don't

21  know.   We changed.

22      Q.   I called her commissioner when I deposed her

23  last year.

24          MR. WORSECK:   She might have been promoted at

 1  that time.

 2          The commissioner was saying it was a

 3  reorganization.

 4  BY MR. SIGALE:

 5      Q.   I guess I'll find out.

 6      A.   We lost a few commissioner titles.

 7      Q.   Well, at any rate, the two people on your staff

 8  that do the zoning reviews, are they the same -- well,

 9  strike that.  Right now as of today who are those two

10  people?

11      A.   Tony Graphio and Liz Adolfie.

12      Q.   A-d-o-l-f-i?

13      A.   A-d-o-l-f-i-e.

14      Q.   And how long have those two -- strike that.

15  Have those two people been there since September of 2011

16  doing the zoning tasks?

17      A.   Yes.

18      Q.   Their reviews, would those be considered part

19  of the application process or would those be considered

20  part of a pre-application inquiry for lack of a better

21  phrase?

22      A.   Depends on the license type.

23      Q.   Well, let's say firing ranges for which you

24  testified earlier that to your knowledge nobody has

 1 | applied.

 2 |     A.    I would have to hazard a guess since no one has

 3 | applied that they would probably not sign off on the

 4 | zoning for a shooting range license without going up to

 5 | the zoning department.

 6 |     Q.    Okay.

 7 |     A.    And asking them to sign off on it.

 8 |     Q.    Okay.    I appreciate that.    Probably would have

 9 | been a question also, but specifically what I'm asking is

10 | when somebody comes in and -- strike that.    The

11 | hypothetical shooting range entrepreneur that comes in

12 | and says, "Well, I want to open a shooting range and I

13 | want to put it here," and then your two zoning people

14 | look at it and say should this, excuse the pun, this is

15 | all very new, we're going to send you tow zoning, would

16 | the inquiry be considered starting an application or

17 | would that be some kind of non-application inquiry?

18 |         MR. WORSECK:    Objection, vague.

19 | BY MR. SIGALE:

20 |     Q.    If you understand what I'm asking you.

21 |     A.    Theoretically.

22 |     Q.    Sure.

23 |     A.    Since it has not occurred, my presumption would

24 | be that someone who would come in with a location for a

1  shooting range license would be sent for a review by Liz

2  or Tony.  And if it looked like it was going to be okay

3  they would then say, "This looks okay.  Go ahead and

4  continue with the process, but don't issue until it's

5  signed off on by zoning," and they'd kick it upstairs and

6  ask zoning to sign off on it because it is such a new

7  license.

8      Q.   Let me ask this a different way, and it's

9  probably I'm assuming my fault.

10     A.   Okay.

11     Q.   You had said to your knowledge nobody's made an

12  application for a shooting range in the city.

13     A.   Correct.

14     Q.   A private commercial one.  I'm not talking

15  about police department ranges or federal training

16  facilities or anything, I'm just talking about private

17  commercial entrepreneurs if you will.  Are you also

18  saying that to your knowledge nobody has even come in

19  inquiring about it and gotten as far as asking Tony or

20  having Tony or Liz do a location review?

21         MR. WORSECK:  Objection, calls for speculation.

22 BY MR. SIGALE:

23     Q.   If you know.

24     A.   I don't know.  I have a vague recollection that

 1  we did have an inquiry, but I don't know.

 2     Q.   Okay.  And, again, the type of inquiry that

 3  would involve Liz or Tony doing a check?

 4     A.   No.  An inquiry, when I say an inquiry it could

 5  be a phone call to the department that someone answered a

 6  question, or it could be someone stopping by and asking a

 7  question about it.  Any time someone inquires about a

 8  license, whether it goes to application or not, because

 9  if you recall I earlier said the application is

10  customized and created for every applicant.

11     Q.   Sure.

12     A.   But when someone comes in and inquires,

13  depending upon whom they inquire with, then that would go

14  into the computer.

15     Q.   Okay.

16     A.   So, for instance -- I feel like I'm teaching

17  you everything about licensing.  Someone comes in and

18  inquires to open a restaurant at a specific address and

19  they talk with a business consultant, the business

20  consultant puts the address into the computer.  Maybe

21  they ask the zoning people, maybe they don't, maybe some

22  questions are asked, maybe they're not, it goes into our

23  computer as an inquiry.

24     Q.   Okay.

1    A.   Then what would happen is after a certain

2  period of time the computer automatically scrapes all the

3  inquiries out that didn't issue, and then our enforcement

4  people will go out and see are they operating the

5  business and they just didn't go through with the

6  licensing.

7    Q.   Okay.

8    A.   So, that's why an inquiry would be in the

9  computer.

10    Q.   Okay.

11    A.   But it has to get past just a phone call.  A

12  phone call wouldn't go in.

13    Q.   Let me back up a bit just to make sure.  I want

14  to make sure the terminology I'm understanding with you.

15    A.   And I want to also make it clear that I'm not

16  sure there was an actual inquiry, but when I use the term

17  injury I do mean that there's been an entry into the

18  computer.

19    Q.   Okay.  When you say that to your knowledge no

20  one has applied, what is the definition of applied as

21  you're using it versus, say, an inquiry that otherwise

22  gets entered into the computer and maybe gets scraped

23  away later or whatever?

24    A.   Its statused in the computer as APP, applied,

1  as opposed to INQ, inquired.

2      Q.   And what has to happen physically to get that

3  APP status versus INQ?

4      A.   An application has to have been generated,

5  given to the presumptive applicant.  They must then fill

6  it out and return it, and then it is now in applied

7  status.

8      Q.   Got it.

9      A.   You got it faster than I did.

10     Q.   So, to see if that compliment actually was

11 warranted, nobody to your knowledge has actually turned

12 in a completed application that someone in your -- that

13 in the licensing division generated?

14     A.   That is correct.

15     Q.   Okay.  No one's gotten that far, and the

16 inquiry stage that you said maybe there was one, maybe

17 there wasn't, that could encompass everything from --

18 everything up to that point including that division

19 generating an application that never came back?

20     A.   Yes, that's possible.

21     Q.   Okay.

22     A.   That is possible.

23     Q.   Okay.  Now, in terms of whether there was an

24 inquiry or not, is that something I would need to ask Joy

1   Adelizzi to confirm, to get confirmation of that?  Or is

2   there somebody else in the licensing division as there is

3   just asking a records technician to look through the

4   computer or something?

5           MR. WORSECK:  Objection, vague.

6   BY MR. SIGALE:

7       Q.   If you know.

8           MR. WORSECK:  Calls for speculation.

9   BY MR. SIGALE:

10      Q.   Sure.  If you know.

11      A.   There's a number of ways you would be able to

12  find that out.  You could ask anyone who has access to

13  the computer to look it up.

14      Q.   Okay.

15      A.   Presumably they won't unless you have a good

16  purpose for asking that question, but that doesn't mean

17  they wouldn't.  You could also make a FOIA request for

18  all documents in INQ status in the licensing database for

19  a shooting range license.

20      Q.   Would that INQ entry, if it exists, would it

21  have like the person's name, contact information, any

22  other pertinent information regarding the inquiry?

23      A.   It will have the location, and it may or may

24  not have other information.

1     Q.   Okay.  But at a minimum it's going to have the

2  person's name and maybe a phone number?

3     A.   Not necessarily.

4     Q.   Oh.

5     A.   Not necessarily.  It should, okay?  It should,

6  but it is the location that keys things up.  Without the

7  location nothing starts in the computer.

8     Q.   Okay.

9     A.   So, it may or may not have the further

10  information.  There are lots of different ways an inquiry

11  could start to become in INQ status within the database,

12  and more often than not most of the time it will be the

13  name of the person who inquired, but not always.

14     Q.   Okay.

15     A.   Okay.

16     Q.   All right, Commissioner.  I guess plowing ahead

17  in what for me is a stream of consciousness we might as

18  well talk about the topics that you've been disclosed

19  that you're going to talk about today.  Now, are you

20  familiar with the topics that you've been disclosed that

21  you're going to talk about today?

22     A.   I believe I need to have my memory refreshed as

23  to what those topics are if you will.

24     Q.   Okay.  Fair enough.

1        Let's go off the record for one second.

2                        (WHEREUPON, a break was had in the

3                        proceedings.)

4  BY MR. SIGALE:

5        Q.    Let's go back on.  During the break we just had

6  counsel conferred and agreed that in addition to the

7  topics listed in the Rule 30(b)(6) notice for which

8  Commissioner Krimbel is here today to talk about Topic 22

9  is also on that list.  It's titled by the city

10 Applications for a Firing Range.  Obviously we've been

11 talking about that somewhat already, but just to clarify

12 that that's also on the list.

13        Okay.  Commissioner, we're at the point where I

14 was going to refresh you as to what you are here to talk

15 about, and then I'll dive into it.  I only have the one

16 copy of the letter.  It's got some of my notes

17 incorporating later e-mails and things like that,

18 changing names and what not of witnesses.  It's no big

19 deal for me to show this.  There's no secrets in here or

20 anything

21        So I'm going to show you this.  I'm not going

22 to mark it as an exhibit, I'm just showing you for

23 reference or refreshing recollection, but you are listed.

24 To start with, we might as well start there, bases

1    supporting 4-151-030(b)(6)

2         MR. WORSECK:  David, if you're going to show

3    this to the witness and ask questions about it I'm going

4    to ask that it be marked as an exhibit.

5         MR. SIGALE:  Well, then do you have a spare

6    copy of it then?  Because I don't want my handwritten

7    markings marked as an exhibit.

8         MR. WORSECK:  I have a copy.  I mean this is

9    your deposition.  You should have brought copies to share

10   with the witness if you don't want the copy you have to

11   be shared with the witness.

12        MR. SIGALE:  Well, I'll tell you what.  I will

13   read what the topic is without showing it to the witness.

14   And if she wants to look at a copy, I'll let you show her

15   one if you have it then.

16   BY MR. SIGALE:

17      Q.   So the first thing I want to talk about is

18   what's Topic 2 on the Rule 30(b)(6) list, which is bases

19   supporting 4-151-030(b)(6).  I'm not going to ask if you

20   know off the top of your head what that is, but --

21        MR. WORSECK:  David, can I also ask do you have

22   a copy of the notice, the 30(b)(6) notice that you

23   issued?

24        MR. SIGALE:  Probably.  I just have the one so

1  we have to take a break and make a copy.  I do have it

2  here.  Do you want to see it?

3          MR. WORSECK:  No, I have it, but I think it

4  will probably be helpful to mark it as an exhibit.

5  Asking the witness questions about ordinance sections

6  that you're simply going to cite by their number is going

7  to be sort of confusing.

8          MR. SIGALE:  I'm not just going to cite them by

9  the number.  I'm going to look at the ordinance, but the

10  30(b)(6) notice doesn't do anything more than say the

11  same ordinance number.

12  BY MR. SIGALE:

13      Q.   Commissioner, is it fair to say that me just

14  listing an ordinance section you don't know off the top

15  of your head what those various sections say?  Is that

16  correct?

17      A.   That is correct.  I do not have the licensing

18  code memorized.

19      Q.   Okay.  Fair enough.  So, you would need to --

20  you would want a copy of the ordinance itself to take a

21  look at?

22      A.   That is correct.

23      Q.   If we're going to talk about it.  Okay.

24          Commissioner, my goal, as ill-fated, as it

1   might be in hindsight, was to try not to -- was to kill

2   as few trees as possible.  I, through the course of this

3   case, have managed to come across about 15 copies of this

4   ordinance.  So I figured rather than make more copies I

5   would reuse what we have.  If counsel has an objection,

6   we'll I guess mark them and kill them, but I'm going to

7   show you what has been previously marked as Hespen

8   Deposition Exhibit No. 1 and Hespen Deposition Exhibit 2.

9   This is, I'm going to represent to you, the ordinance of

10  July 6, 2011 and its amendment that was passed on

11  September 28, 2011.

12          MR. WORSECK:  David, actually Hespen Exhibit 1

13  doesn't contain the dates through which this is current,

14  so it's not clear without spending a lot of time reading

15  through each provision whether this reflects all the

16  amendments or simply the first iteration.  Hespen

17  Exhibit 2 is not, as you represented, the September 2011

18  amendments, but the July 2011 amendments.

19          MR. SIGALE:  No, no, no.  I'm sorry.  Exhibit 1

20  there is the original iteration passed on July 6 of 2011.

21  The amendments on that is Exhibit 2 was introduced on

22  July 28 of 2011 but was not passed until September of

23  2011.  And those are to my knowledge the only amendments.

24  So what you're looking at, what you're looking at, this

1  document, Exhibit 1 as amended by Exhibit 2, is the sum

2  total of the ordinance that exists.

3      MR. WORSECK:  Okay.  And, again, Exhibit 2 is

4  at best is a July 2011 introduction.  It does not reflect

5  what actually was passed in September 2011.  It may be

6  the same, it may have been altered as it went through the

7  process.  I can't tell you as I sit here today again

8  without looking at everything in here that that was the

9  case.  But Exhibit 2 does not reflect, it's not even

10  dated passed July 2011.  It does not reflect what was

11  necessarily passed in September of 2011.

12      Q.   Okay.  Well, with that objection made I mean

13  your co-counsel agrees that this is what it is because

14  this is their exhibits from their deposition.  So, if it

15  turns out that they are two different things then we'll

16  deal with that, but this was, collectively speaking, your

17  all exhibit.

18      MR. WORSECK:  David, I'm not going to sit here

19  and --

20      MR. SIGALE:  Okay.

21      MR. WORSECK:  I mean I have no reason to think

22  you're not being accurate to the best of your

23  understanding, but I was not sitting in on that

24  deposition with Mr. Hespen, I don't know what kind of

 1   questions my counsel was asking, I was not there for my

 2   counsel's description of these documents.

 3           MR. SIGALE:  Okay.

 4           MR. WORSECK:  So, we're going to leave it at

 5   what these documents reflect on their face.

 6           MR. SIGALE:  Okay.  Fair enough.

 7   BY MR. SIGALE:

 8       Q.   So, the first thing that we're going to talk

 9   about is in Hespen Exhibit 1, 030(b)(6) which shows up on

10   Page 3.  Now, Commissioner, if you want to read the

11   thing, if you want to look through more, by all means,

12   but I'm just telling you that Page 3, (b)(6) then I'll go

13   even further and say that on Exhibit 2, Hespen Exhibit 2,

14   the bottom of that page, (b)(6).  So actually you can

15   look at this Exhibit 1 for context, but the exact

16   language that we're at issue about that I'm representing

17   we're at issue about is at the bottom where your pinky is

18   on Exhibit 2.

19       A.   Okay.  030(b)(6) we're talking?

20       Q.   030(b)(6).

21       A.   Okay.

22       Q.   Now I'm going to ask you a broad question to

23   start about it.  And if you need to look it over or

24   whatever before answering, that's fine.  But the

1  plaintiffs are challenging that requirement specifically

2  as to -- strike that.

3          Plaintiffs are challenging that requirement.

4  You're listed as the witness who will tell me the bases

5  supporting that requirement, so --

6          MR. WORSECK:  David.

7  BY MR. SIGALE:

8      Q.   My question is to you what are the bases

9  supporting the inclusion of that requirement?

10         MR. WORSECK:  Strike that.

11         Actually I will say for the record the phrase

12  bases the city is interpreting, and this has been set out

13  in correspondence, is the city interprets that word as

14  meaning the governmental purposes or interests served by

15  the provision.

16         MR. SIGALE:  That's fair enough.

17         THE WITNESS:  I hate to be bitchy, but this is

18  one of my pet peeves.  I'm trying to figure out what CFP

19  stands for, and according to the ordinance in front me it

20  is defined as it is under 84010.  And when you go back

21  over there to that, it is, of course, not defined.

22  BY MR. SIGALE:

23      Q.   CFP stands for Chicago Firearms Permit.

24      A.   Okay.

1          MR. WORSECK:  That's correct.

2          THE WITNESS:  All right.  Thank you.

3  BY MR. SIGALE:

4     Q.   Which is the permit that one must obtain under

5  the ordinances that were passed following the McDonald

6  versus Chicago case in 2010 that someone must possess if

7  he wishes to possess a firearm in their residence.

8     A.   Okay.  So now that I know that, I'm looking at

9  that.

10         So, you are asking me why the phrase federal

11 firearms license was removed?

12    Q.   No.

13    A.   Oh.  Okay.

14    Q.   What I'm asking you is the basis by which I

15 mean the governmental purpose is as good a way to phrase

16 it as anything.

17    A.   What would be the governmental?

18    Q.   Purpose.

19    A.   Sorry.  Purpose for requiring the applicant,

20 manager or employees of a shooting range to have a

21 Chicago Firearms Permit and a FOID card, federal owner

22 ID?

23    Q.   Firearm owner's identification.

24    A.   Firearm owner's identification.  Thank you.

1          Okay.  For the same reason I would presume that

2   the owner or manager, owner/manager of a liquor license

3   would need to have a state permit for -- I can't remember

4   what it's called, so forgive me here, but all the

5   employees who handle the liquor behind a bar needs to

6   have certain training.  They give a certificate for that.

7   So it's the same type of thing.

8          I would presume you're handling guns.  The

9   ownership should have whatever is necessary to be able to

10  deal with guns, same as in a bar someone who's handling

11  liquor has to have the state permitted training, I wish I

12  could remember the name of it, I apologize, for handling

13  liquor.  Same concept.

14     Q.   Okay.  Is there any distinction made in the

15  ordinance?  And, again, if you need to look it over look

16  it over, that's fine.

17     A.   I know.

18     Q.   Is there any distinction made about whether or

19  not the applicant, manager or employee is actually going

20  to handle a firearm or be anywhere near a firearm in the

21  business?

22          MR. WORSECK:  Objection, vague.

23  BY MR. SIGALE:

24     Q.   Do you understand the question?

1     A.   What you are asking me is whether or not, and

2  stop me if I have this wrong, is whether or not the

3  ordinance requires that this applicant, manager or

4  employee handle firearms in order to mandate that they

5  have a CFP and FOID card or whether they need a CFP and

6  FOID card regardless of whether they actually touch

7  firearms?

8     Q.   The latter.

9     A.   The latter.  Well, I don't know the answer to

10  that off the top of my head.  And if you'll give me a

11  moment I could read it and give you an opinion of what I

12  think, but I'm not sure that's what you want.

13         MR. WORSECK:  David, I think I'm going to jump

14  in here and hand the witness the different documents

15  reflecting various stages of the ordinance.  It's

16  confusing.  You've got strikeouts and mark throughs and

17  what have you in these documents.  I've got a copy of the

18  ordinance reflecting all current amendments.  I'm going

19  to make a copy of this and have it introduced as an

20  exhibit because, otherwise, I think this is going to get

21  way too confusing for the witness.

22         MR. SIGALE:  Can I see it first?

23         MR. WORSECK:  You can see it after I make

24  copies of it.  I have got highlighting on here that I

1  don't think will show up on the copies I don't think I

2  want you to take a look at, but I was hoping that you

3  would have done this for your deposition.

4  　　　　　MR. SIGALE:  I don't have, just as long as

5  we're talking about it, I don't have that, and that being

6  the document that you have.

7  　　　　　MR. WORSECK:  Well, it's available on-line on

8  the city's web site.

9  　　　　　MR. SIGALE:  Well, I mean these are the copies

10  that have been used in every deposition until now, so I

11  felt comfortable using the same documents we've been

12  consistent with.  Also, I mean, you know, no disrespect

13  to the commissioner, but she is your witness on these

14  topics, so I didn't know that was going to be the first

15  time she was going to be looking through it.

16  　　　　　MR. WORSECK:  This isn't the first time, but

17  when you're asking 30(b)(6) questions designating

18  provisions of an ordinance as the topics and then you're

19  handing the witness two incomplete documents that have

20  strike throughs and markups and use that for the basis of

21  your question I simply said it can be confusing for the

22  witness.  I don't want the witness to be confused.

23  　　　　　MR. SIGALE:  I don't want to get into it.

24  That's fine.  If you have a cleaner copy of the ordinance

1    I'm happy to switch and use it if it will make things

2    easier.  I don't care.

3                              (WHEREUPON, a break was had in the

4                               proceedings.)

5            MR. SIGALE:  Okay.  If anything comes up that

6    raises an issue with it I will let you know, otherwise

7    I'm fine going with this.  And I'd be happy to switch to

8    it for all future depositions.  Let's mark this as

9    Krimbel Deposition 1.

10                             (WHEREUPON, Krimbel Exhibit No. 1

11                              was marked for ID.)

12           MR. WORSECK:  David, I'm going to ask that we

13   have copies of those two that you showed the witness be

14   marked as well.

15           MR. SIGALE:  Okay.

16           MR. WORSECK:  We can do that later.

17           MR. SIGALE:  Sure.

18           THE WITNESS:  Oh, yes, I'm probably going to

19   need those too.

20   BY MR. SIGALE:

21       Q.   The Hespen 1 and 2?

22       A.   Yes.

23       Q.   Sure.

24       A.   Because there's a lot of cross references to

```
 1   other sections.

 2           MR. WORSECK:  Everything in Exhibit 1

 3   synthesizes these two documents.  So to the extent that

 4   we're changing the strike throughs and the text and those

 5   kinds of things, this is the entire ordinance as it

 6   exists today with all --

 7           THE WITNESS:  Can we go off the record for a

 8   moment?

 9           MR. SIGALE:  Yes.

10                       (WHEREUPON, a discussion was had

11                        off the record.)

12   BY MR. SIGALE:

13       Q.   Obviously if you need to cross reference or if

14   it will aid your review, Hespen 1 and 2, by all means do

15   so.  The only thing I ask is that you say that that's

16   what you're looking at.  Otherwise, we're going to assume

17   that you're looking at this brand spanking new Krimbel

18   No. 1.  Okay?

19       A.   Okay.

20       Q.   All right.  So now we're back on

21   4-151-030(b)(6).

22       A.   Got it.

23       Q.   And we were at the question specifically of

24   does the ordinance distinguish in demanding the CFP and
```

1  FOID cards of the applicant, manager and employees

2  whether or not said applicants, managers or employees are

3  going to be handling firearms at all?

4       A.   My review indicates that it does not.

5       Q.   Okay.  So, hypothetically speaking at the

6  hypothetical shooting range that we both agree doesn't

7  exist at this time, the girl who works the snack bar

8  would be required to have a CFP and a FOID card?

9       A.   Actually not.

10      Q.   Not?  Tell me why.

11      A.   Because it does not state that the applicant,

12 the manager and the employee must have a CFP and a FOID

13 card, it merely states that the application shall be

14 verified by both affidavit and shall include the

15 following statements and information, one piece of which

16 is the applicant's, manager's and employee's CFP and FOID

17 card numbers.

18           That could be interpreted as the applicant,

19 manager and employee CFP and FOID card numbers if they

20 have one, because no where does it say they must have

21 one, at least not in my quick read.  Sorry, guys.

22           And please point out to me if I've missed

23 something, but I don't believe I have.

24           MR. WORSECK:  Can we go off the record for a

 1    second?

 2              MR. SIGALE:  Sure.

 3                        (WHEREUPON, a discussion was had

 4                         off the record.)

 5    BY MR. SIGALE:

 6         Q.   Are we back on?

 7              MR. WORSECK:  Sure.

 8         Q.   Commissioner, it sounds like you are going to

 9    want to amend your answer.

10              THE WITNESS:  Yes.

11    BY MR. SIGALE:

12         Q.   Go ahead.

13         A.   I stand by my answer as far as the questioning

14    is concerned for 4151-030(b)(6).  However, my counsel has

15    told me there's also a 4151-04O which states that, "No

16    license shall issue under the chapter if the applicant,

17    the manager or any employee is under 21 years of age, has

18    ever been convicted of a felony," if I can just yada,

19    yada, yada down to D, "Does not possess a valid CFP and

20    an Illinois FOID card."

21              So, if you combine this particular section with

22    030(b)(6) I would say that the applicant, the manager or

23    any employee must possess a CFP and an Illinois FOID

24    card, which means if there is a concession and presuming

1  that the employee who works that concession is an

2  employee under the definition of this, because having

3  that pointed out to me there may be other qualifications

4  in here for areas within the place that might not define

5  them as employee, but without being hypertechnical I

6  would say, yes, the concessionaire woman would need to

7  have a CFP or an Illinois FOID card.

8      Q.   Okay.   Regardless of whether or not she handles

9  firearms in her duties at the concession stand?

10     A.   Correct.

11     Q.   Okay.   And unless you --

12         MR. WORSECK:   David, I'm sorry.   Before you get

13  too far into your question I want to object to the line

14  of questions to the extent that it presumes that a food

15  concession would be allowed within a shooting range under

16  the ordinance.

17         THE WITNESS:   That was sort of what I was

18  trying to explain as an employee.   That's okay.

19  BY MR. SIGALE:

20     Q.   Okay.   The guy who mops the floor.   Same thing?

21     A.   Same thing.

22     Q.   Okay.

23     A.   Yes.

24     Q.   And we're in agreement, at least your reading

1    of this, that if you go to Page 2 of this document that

2    employee, which is the top line --

3         A.    There it is defined.

4         Q.    Means a person employed to work at and who is

5    located at a shooting range facility, and I don't see

6    anything in regard there to the type of work that that

7    employee would do.

8         A.    Well, then you have to go to the definition of

9    a shooting range facility which is further down on the

10   page, and that is the premises on which the shooting

11   range is located including all building structures,

12   parking areas and other associated improvements located

13   on the premise.  A shooting range facility includes any

14   shooting range facility operated or managed by members

15   or -- no.  So sticking by the concessionaire and the

16   janitor they need to have a CFP or a FOID card.

17        Q.    And I don't mean to be glib here, Commissioner,

18   obviously, but that also includes then the parking valet?

19        A.    Possibly, yes.

20        Q.    Is the possibly assuming that there's a parking

21   area?

22        A.    Correct.

23        Q.    Is that what you meant by possibly?

24        A.    Yes.

1        MR. WORSECK:  And assuming a valet service.

2        MR. SIGALE:  Well, agreed.  If there is a

3   parking area and if there is an employee working as a

4   valet, you would agree that that parking valet regardless

5   of whether they even step foot inside the facility, the

6   building, they would be required to have a CFP and a FOID

7   card?

8        A.    Correct.  It appears to me that anyone who is

9   within range of a --

10       Q.    Range?

11       A.    Firearm.

12       Q.    Oh, okay.

13       A.    Not within range of a range but within range of

14   a firearm under this ordinance would require a CFP and a

15   FOID card.

16       Q.    Okay.  What is the governmental purpose in

17   requiring the hypothetical concession girl and the

18   parking valet and the janitor and the other employees who

19   don't handle firearms at all to require both a CFP and a

20   FOID card from them?

21       MR. WORSECK:  Objection, hypothetical.

22       THE WITNESS:  I would state that while an

23   employee or the various examples that you gave may not

24   regularly handle a firearm because of the type of place

1  in which they are working that they should have some

2  working knowledge of firearms, and a CFP and a FOID card

3  I presume would give them that because I'm presuming that

4  they're going to be around and possibly handle firearms.

5       Q.   Okay.  And that's -- okay.

6       A.   Would you like a theoretical example?

7       Q.   No, no.  Is that the only purpose?

8       A.   I don't know if that's the only purpose, but

9  that's the purpose that I see when I read this.

10      Q.   Okay.  Are you aware that in order to attain an

11 Illinois FOID card you must be an Illinois resident?  Are

12 you aware of that?

13      A.   No, I am not.

14      Q.   Okay.  I want you to presume for the purposes

15 of the next questions that that is, in fact, true, and

16 that only Illinois residents can obtain a FOID card.

17      A.   Okay.

18      Q.   You'd agree with me then that it would follow

19 that only Illinois residents would be allowed to work at

20 a shooting range in the city?  Is that correct?

21      A.   That would appear to be the case.  And when I

22 say that would appear I'm presuming there is no provision

23 whatsoever in here for any discretion to waive or exempt

24 anyone.

1      Q.   Not the way I read it under 040, but if you

2  have -- if you want to see if you have a different

3  understanding or something, feel free by all means.

4      A.   No, I'll go with your presumption for purposes

5  of this deposition.  That's fine with me.

6      Q.   Okay.  Just asking.  Truly don't know the

7  answer here.  Is there any other business operating in

8  the City of Chicago where you have to be a state resident

9  to work there?

10          MR. WORSECK:  If she knows you're asking?

11          MR. SIGALE:  Of course to the extent she knows.

12          THE WITNESS:  I am not sure.  There was at one

13  point in time you had to have an Illinois driver's

14  license in order to operate a public passenger vehicle in

15  the City of Chicago, and we licensed some 10,000 of

16  those.  But I believe that that was amended to allow any

17  state's license after Katrina because we had an influx of

18  people coming up from Louisiana who were willing and able

19  to drive cabs, so we amended it at that point.  But prior

20  to that amendment you had to have an Illinois driver's

21  license and an Illinois driver's only, which I presume

22  you can only get if you were a resident.  So that's an

23  example that comes to my mind.  There may be others.

24

1   BY MR. SIGALE:

2       Q.   What was the purpose of that?

3            MR. WORSECK:  Objection, beyond the scope.

4            THE WITNESS:  I'm presuming that the purpose

5   behind that was because when it was drafted an Illinois

6   driver's license is what most of -- is what would have

7   normally been what you'd need, and no one thought that it

8   was exclusionary because the majority or the presumption

9   would have been that these are all Illinois residents who

10  drive Chicago cabs.  And, indeed that was the case up

11  until Katrina.  So, it probably was just there.

12      Q.   Okay.

13      A.   Because they needed them to have a driver's

14  license, and they needed to describe what that driver's

15  license was.

16      Q.   Okay.  Commissioner, these next set of

17  questions also go to the (b)(6) requirement, but I'm

18  going to ask you to go on a little bit of a twisty road

19  with me.  Okay?  You'll agree with me that 30(b)(6)

20  requires, among its other requirements, that it requires

21  the applicant's CFP and FOID card numbers.

22      A.   I'm sorry.  You're talking about 151 30(b)(6)

23  as opposed to the deposition 30(b)(6)?

24      Q.   Or the vitamin which is what I always think of

1   when I say B6.

2       A.   I'm sorry.  So 30(b)(6) of this ordinance.

3   Your question again?

4       Q.   I just want to direct you to applicants,

5   managers and employees CFP FOID card number.  And you see

6   the part where it says applicants?

7       A.   Uh-huh.

8       Q.   I want to take you back to Page 1 of this

9   document.

10      A.   Okay.

11      Q.   And I want you to look at the definition of

12  applicant and see if I'm reading it right.  It means any

13  person who is required to be disclosed pursuant to

14  section 4-151-030(b).

15      A.   Correct.  That is what it says.

16      Q.   If we go back to Page 3 and we go to B, and

17  you'll agree that B has --

18      A.   B is big.

19      Q.   B has ten subsections.

20      A.   I think it has more than that, but yes.

21      Q.   Well, ten numbered subsections.  It's just Page

22  3 and 4.

23      A.   Okay.

24      Q.   And then it goes to C.

1      A.    Okay.   Not counting the A and B of four as a

2   subsection.   It's okay.

3      Q.    And B1 requires, I'm just going to read this.

4   It's lengthy, but I'm going read it anyway.   So, sorry in

5   advance.

6           "In the case of an individual, the name, date

7   of birth, resident address, current telephone number and

8   social security number of the applicant, name of the

9   partnership, limited partnership, corporation, limited

10  liability company, or other legal entity, the date of its

11  organization or incorporation, the objects for which it

12  was organized or incorporated.   The name, resident

13  address, date of birth, and social security numbers of

14  any person owning directly or beneficially any percentage

15  of ownership therein, provided, however, that if the

16  partnership, limited partnership, corporation, limited

17  liability company or other legal entity is publically

18  traded on an exchange within the meaning of the

19  Securities Exchange Act of 1934.   The names, resident

20  addresses, social security numbers, dates of birth and

21  percentage of interest of the three members who own the

22  highest percentage of interest therein or any other

23  members who own a five percent or greater interest

24  therein and, where applicable, the names, resident

1  address, date of birth and social security numbers of all

2  principal officers or directors.  The entity as a

3  manager, managed limited liability company.  The names,

4  resident addresses, dates of birth and social security

5  numbers of all managers, and the name and current

6  telephone number of any authorized agent."

7          That's not the end, but I'm going to stop there

8  for a second.

9          MR. WORSECK:  David, I just want to clarify

10 that I grant you that was a long laborious provision to

11 read, but there were a few errors in your recitation of

12 that provision, so the document speaks for itself.

13          MR. SIGALE:  Oh, okay.

14          MR. WORSECK:  I don't think they were material.

15          MR. SIGALE:  Okay.

16          MR. WORSECK:  I don't want to ask you to read

17 it again.

18 BY MR. SIGALE:

19     Q.  I would agree.  Yes, please don't ask me to

20 read it again.

21          Going back to 30(b)(6) where it says the

22 applicant's CFP and FOID card numbers, which requires

23 them, of course, to have a CFP and a FOID card, going

24 back to Page 1 it says, "Applicant is any person who is

 1   required to be disclosed."  And then we get to the

 2   majority of this B1.  It says that, "Any individual,

 3   anyone who owns a corporation that wants to own a range

 4   regardless of the percentage even a publicly traded

 5   company has to disclose the three highest people anyone

 6   who owns 5 percent interest, all managers of an LLC

 7   including its agents."  Let's just stop there.

 8        A.   Sure.

 9        Q.   All those people have to have a CFP or a FOID

10   card?

11        MR. WORSECK:  I'm going to object to the extent

12   you're asking for a legal interpretation of the

13   ordinance.

14   BY MR. SIGALE:

15        Q.   Would you agree that B1 requires all those

16   people to be named?

17        A.   Yes, I would agree with that.

18        Q.   And you would agree that under the definition

19   of applicant that all those people fit within the

20   definition of applicant as people required to be

21   disclosed?

22        A.   I would agree that that is -- sorry.

23        MR. WORSECK:  Same objection.  David, I just

24   want to note for the record that plaintiffs have

1    propounded discovery asking questions about the meaning

2    of this provision and we've provided answers to that.

3    So, I just want to note that for the record.

4              THE WITNESS:  Yes, I would agree that arguably

5    any of these people would need to have a FOID or a CFF

6    card in order for a license to issue.

7    BY MR. SIGALE:

8        Q.   Is there any distinction between whether or not

9    these people listed in B1, and I'm just talking about the

10   section that I've read, plan to handle a firearm or not

11   handle a firearm?

12       A.   There would be no indication, no.

13       Q.   Is there any indication -- is there any

14   distinction about whether the people that are required to

15   be listed in this section, the B1 that I read, even

16   intend to ever go to the premises or to the shooting

17   range facility?

18       A.   No.

19       Q.   Okay.  What's the governmental purpose of

20   requiring all those people to have a CFP and an Illinois

21   FOID card?

22             MR. WORSECK:  Objection, asked and answered.

23             THE WITNESS:  Well, I will say two things which

24   I think might help.

1  BY MR. SIGALE:

2       Q.   Okay.

3       A.   Number one, this is a fairly standard provision

4  in a lot of our licenses whereas corporations, limited

5  liability companies, all sorts of various legal entities

6  we ask not just for information about the entity itself

7  but the people behind the entity, and often we ask for

8  information about the shareholders.  In this particular

9  case they're asking that they have FOID or CFPs.

10      Q.   FOID and.

11      A.   FOID and CFP, sorry.  But this is a pretty

12  standard provision in other licenses where we ask that

13  the people behind the corporation or behind the legal

14  entity to have some accountability or knowledge, and I

15  wish I could give you a very specific example because

16  that would make it easier, but this is fairly common

17  language.

18      Q.   The B1 part that I've read so far is pretty

19  common?

20      A.   Pretty common.  It's written various different

21  ways, but basically, yes.  So, for instance, when we're

22  calculating who owns a taxi, clearly no individual owns a

23  medallion.  Well, of 6785, only 300 individuals do.

24  They're usually owned by legal entities, but when we are

1   calculating whether or not you own a license we use the

2   individual names of the shareholders, stockholders,

3   managers, or officers of the entity that holds the

4   medallion.  So when we're calculating that you need a

5   certain percentage of this or that we calculate your

6   ownership of interest in the medallions by the number of

7   medallions in which you have ownership in the entity of.

8   So it's fairly standard.

9        Q.   What else -- let's use your taxi cab example.

10  What else do you require then of these people other than

11  that they say who they --

12       A.   Well, it depends upon the license type.  So,

13  for some license types, the shareholders of a corporation

14  may need to be fingerprinted.  They certainly will need

15  to give us their social security number.  We may run a

16  criminal history check on the shareholder of the

17  corporation.  It depends on the license type, but every

18  single license type that has this particular type of

19  language where we're trying to get to the individuals,

20  there is something that is required of that individual in

21  the corporate or legal entity that we would require of if

22  it was just a person who owned it.

23       Q.   Okay.

24       A.   As opposed to any legal entity.

 1      Q.   Okay.

 2      A.   That's how it works.

 3      Q.   So, and I'm sorry if you've already answered

 4  this, but I'm going to ask you to indulge me.

 5      A.   Sure.

 6      Q.   With regard to the requirement that the people

 7  that we've talked about so far in B1 have a CFP and which

 8  basically means go through fingerprinting, training,

 9  firearm training, classroom training, range training

10  which is ironically what we're all doing here today,

11  what's the purpose of requiring all those people whose

12  names that they own any part of a company, a corporation,

13  an LLC, to have all that?

14          MR. WORSECK:  Objection to the extent you

15  mischaracterized the set of people who be would required

16  to be disclosed under B1.  The list speaks for itself.

17          THE WITNESS:  Based upon my licensing

18  experience I would say that this particular ordinance was

19  drafted so anyone who is involved in the ownership in any

20  way knows what they're getting into and that they are

21  familiar with guns, yes.  That would be how I understand

22  that.

23  BY MR. SIGALE:

24      Q.   Okay.

1    A.   So, for instance, you wouldn't want a foreign

2  investor or a kid or someone who knows nothing about guns

3  whatsoever owning a shooting range.

4    Q.   Okay.  So, I mean if, let say, we -- strike

5  that.

6         Let's say one would go along with the

7  requirement, say, of the manager and the employees who

8  are going to handle firearms having those things.  Let's

9  hypothetically say that if one was to go along with that

10 the person who owns five percent in a publically traded

11 company that happens to buy a range, what's the purpose

12 of requiring that they know about firearms as well as the

13 people who are actually going to be there know something

14 about firearms?

15   A.   Is it more than five percent?  Is there a

16 percentage?  Often there's a percentage in this.

17   Q.   The percentage of interests are the three

18 members who own the highest percentage of interest and

19 any other members who own five percent or greater.

20   A.   Okay.

21   Q.   So, that would cover this.

22   A.   So what would be the purpose of them?  I would

23 have to use an analogy to a restaurant license.  I mean

24 we make people who work in restaurants as well as people

1  who own restaurants get a sanatorium, I may be

2  pronouncing that wrong.  Not sanitation and it's not a

3  sanatorium.  It's a course that you must take to learn

4  about food handling so that you don't become Typhoid

5  Mary, and we make the owners of restaurants do that as

6  well as the employees and managers of restaurants.  So,

7  because, again, you don't want people handling food which

8  could start, you know, an outbreak of Ebola unless they

9  know what they're doing.  So it's the same kind of

10 concept.

11      Q.   Okay.  Anything else?

12      A.   No, that's good.

13      Q.   Let's read the rest of B1.

14      A.   Okay.

15      Q.   "And in all cases the name, address, and a

16 brief description of any work performed by any person in

17 connection with the preparation and filing of the

18 application, including but not limited to any attorney,

19 accountant, consultant, expeditor, promoter or lobbyist."

20          MR. WORSECK:  Did you have a question there?

21          MR. SIGALE:  I just want her to look up at me

22 that she read the provision.

23          THE WITNESS:  Oh, sorry.

24

1  BY MR. SIGALE:

2     Q.   You would agree that in requiring those people

3  to have their name, address and description of work

4  listed that those people are required to be disclosed on

5  030B?

6          MR. WORSECK:   I'm going to object again to the

7  extent that you're asking for a legal conclusion as to

8  what the ordinance legally requires, and I would submit,

9  and again this is set out in our discovery answers, that

10 an applicant is not the same as an attorney, accountant,

11 consultant, expediter or lobbyist that is being retained

12 by the applicant simply for the purpose of helping

13 process an application.

14          THE WITNESS:   You know, and if I may add, I'm

15 not so sure that the people in B1 would be defined as

16 applicants.   It specifically says 30B, which is sort of

17 unusual.   If it meant to say 30 B1 through 10 it would.

18 It says B.   And B really is just calling the applicant,

19 is defining the type of applicants there are, and it says

20 that the following information has to be provided.   So

21 I'm not quite sure that every one in B1 would be

22 considered an applicant for purposes of having to get a

23 FOID card or a CFP, not that I don't think it would be a

24 good or bad idea to do so.   I think it would be a good

 1    idea if you're going to own something like this that you

 2    know something about it.  But that said I'm not so sure

 3    that it would be interpreted that way, nor have we

 4    interpreted it that way.

 5            And, again, we are talking theoretically here

 6    because no one's actually applied.  And if someone

 7    applied then we'd have to look at this and determine

 8    whether or not they would need to get a FOID card or a

 9    CFP.  So it's very difficult to make these kinds of

10    distinctions with, might I say, any licensing ordinance.

11    And might I say the liquor licensing ordinances are 60

12    pages and very complicated.  This one's actually a bit

13    simplistic for the subject matter.

14            MR. SIGALE:  Can we go off the record for a

15    second?

16            MR. WORSECK:  Sure.

17                        (WHEREUPON, a break was had in the

18                         proceedings. )

19    BY MR. SIGALE:

20      Q.   I want to make sure I understand this right.

21    And if I don't you'll please correct me.  It's my

22    understanding that you're reading this, at least this

23    back section of B1, that I'm wrong.  That attorneys,

24    accountants, consultants, expeditors, promoters or

1  lobbyists are not included in the definition of applicant

2  and thus are not required to have a CFP and a FOID card.

3  Am I?

4      A.    That is how I am reading it.  And I will tell

5  you that when an applicant comes in for any license our

6  mode and our direction within my department is whatever

7  it takes to issue the license.  So, depending upon the

8  circumstances and the situation, okay, we will try our

9  very, very best to issue a license.

10         Now, sometimes that may mean an interpretation

11  this way or that way, so the same ordinance might get

12  interpreted one way for one person and another way for

13  another person so that they both can get licenses.  We

14  wouldn't block somebody from getting licensed based upon

15  a hyperlegal or hypertechnical definition.  And I don't

16  mean that to say that we take liberties.  We don't.  But

17  I think that you could read this a number of ways as you

18  could just about any ordinance that I deal with on a

19  daily basis.  And because you can read and interpret

20  ordinances a number of ways, we always attempt to

21  interpret it in a way that issues the license.

22         So, it's hard to answer your question.  What

23  I'm trying to point out is it's very difficult to answer

24  your question because I don't have an applicant in front

1    of me.  But would they absolutely have to?  Are you

2    wrong, am I right?  Am I wrong and you're right?  I don't

3    know because I don't have an applicant to look at.

4         Q.   Okay.  So, hypothetically --

5         A.   Okay.

6         Q.   -- someone comes in and says, "I want to open a

7    firing range and I want to do it here, this location."

8    And pretend for purposes of this hypothetical that zoning

9    is not an issue, okay, that this location actually works

10   and so on for zoning purposes.  They say, "You know what?

11   I've got an Indiana attorney and, therefor, the Indiana

12   attorney can't get a FOID card.  And so I guess I'm

13   screwed as to this project, aren't I, because my attorney

14   can't get a, you know, I got to list my attorney's name

15   and he can't get a FOID card, so I guess that means I'm

16   out?"

17             MR. WORSECK:  Objection, hypothetical.  Calls

18   for speculation, asked and answered.

19             THE WITNESS:  I would be shocked if anyone in

20   my department said that.  No employee at the consultant

21   level would be able to say, "Oh, that's fine, we'll waive

22   that."  Nobody could do that.  But they also would never

23   say to an applicant, "Oh, there's no way."  What they

24   would do is bump it up to their supervisor and say,

1  "Here's the issue.  Is there a way?"

2       Q.   Okay.  So again --

3       A.   And if the supervisor couldn't, it might bump

4  up to Joy.  Sometimes it jumps all the way up to me.

5       Q.   Okay.  So, in my hypothetical it bumps all the

6  way up to you?

7       A.   The department's job is to help you get

8  licensed.  We're not there to stop licenses from issuing.

9  We're there to help people get licensed.  So, we would do

10 what we can to help a person who had an Indiana attorney

11 get licensed.

12      Q.   Okay.  So, 040 says that the applicant, manager

13 or employee has to have a CFP and a FOID card or the

14 license doesn't get issued.  Going back to the twisting

15 windy road, applicant arguably covers attorneys,

16 promotor, lobbyist, expeditors, consultants unless you're

17 telling me it doesn't and I'm way off base because,

18 again, not only are you the witness disclosed here, but I

19 mean you're also an attorney, you know, with experience

20 and I mean that's why I'm asking you.

21      A.   If you are presenting --

22           MR. WORSECK:  Sorry, Commission.  I just want

23 to jump in here with an objection.  Same objections

24 regarding legal interpretation.  The commissioner is here

1  in her capacity as commissioner, and that's what she's

2  been designated for.  So she's obviously ready to give

3  her understanding and interpretation and thoughts about

4  how it might be interpreted in the forest, but in terms

5  of if you're asking for a binding legal conclusion then I

6  would object.

7  BY MR. SIGALE:

8      Q.   Well, what I'm asking in the context of, and I

9  don't mean to go astray here, but is it fair to say that

10  in reviewing the municipal code and the licensing rules

11  and what not you bring your legal training and experience

12  to the table in those interpretations?  You don't turn

13  off the fact that you're an attorney and have legal

14  training when you're doing this stuff, correct?

15      A.   How about if I state it this way.

16      Q.   Okay.

17      A.   If someone came in for this license and

18  everything was in order, the location was fine, we don't

19  have any issues with zoning, everything was good and the

20  only thing that might stop it from issuing is the fact

21  that their attorney is in Indiana, we would have three or

22  four people in my office trying to figure out how to have

23  that not stop it.  And if that meant we have to go to the

24  law department and ask them to give us a written opinion

1  so we could issue it, then we would do that.  If it meant

2  that we'd have to go to city council and say, "Hey,

3  listen.  This is meeting 99.08 percent of what you want

4  here, okay, and the only thing stopping it is this and

5  nobody can get around it, can we amend it," then that's

6  what we would do.

7        It would be a discussion of a lot of people and

8  it's really factually based and based on circumstances.

9  So, it's really hard to answer.  I'm not trying to be

10  difficult, but it's very difficult to answer a

11  theoretical question because there are steps in the

12  process and there are avenues to help people to get a

13  license.  And if that were stopping it, we'd figure out

14  what would have to happen.  And if what would have to

15  happen to issue it couldn't happen then it couldn't

16  happen, but if it could we would do whatever was in our

17  power to make it happen.

18     Q.   And you're including amending -- getting

19  someone to amend the ordinance as part of it if it could

20  happen?

21     A.   I cannot amend an ordinance, but I can request

22  that an ordinance be attended and I can request that it

23  be amended for and give the reason why I think it should

24  be.

1  Q. What you just told me that whole last answer if

2 I substitute attorney with accountant, would your answer

3 be the same?

4  A. Sure. You want to substitute any of these last

5 six occupations at the bottom of 30 B1.

6  Q. Same answer?

7  A. Same answer.

8  Q. Okay.

9  A. Sure. We want to help you get licensed.

10 That's what we do.

11  Q. Okay. I think that that's probably a decent

12 place to stop for now then if we're going to take a

13 break, and then the only question is what time we're

14 coming back.

15   MR. WORSECK: It's quarter to 1:00 right now.

16 How much time would you like, Commissioner?

17   THE WITNESS: I brought my sandwich so I can

18 sit and eat in your office.

19   MR. WORSECK: I can be done in a half hour and

20 we can come back here.

21   MR. SIGALE: Half hour is fine.

22   MR. WORSECK: 1:15?

23   MR. SIGALE: Yes.

24

```
 1                         (WHEREUPON, a break was had in the

 2                          proceedings and continues as

 3                          follows at 1:25 p.m.)

 4

 5              A F T E R N O O N   S E S S I O N

 6   BY MR. SIGALE:

 7        Q.    I wanted to go back to this Topic 2 just for a

 8   second.

 9        A.    Topic 2 is 30B6?

10        Q.    Yes, 30B6.  And I just wanted to follow up on

11   something I'd asked you before.  I'd asked you what you

12   thought the governmental purpose was for requiring, you

13   know, people who, you know, are maybe five percent owners

14   of a public corporation using that as one example of q

15   requirement in the ordinance to have the CFP and the

16   FOID, and you made an analogy to the restaurateur who you

17   wanted them to, you know, know how to use the food or

18   whatever.  But I don't think I asked you beyond the

19   analogy if you had anything specific of why you felt the

20   five percent owner of the company or the manager of the

21   LLC who wasn't necessarily even going to ever go to this

22   shooting range would need to have these licenses.  Is

23   there anything concrete or is it all -- is it more in the

24   theoretical or hypothetical?
```

1          MR. WORSECK:  Objection, vague to the extent

2    you're using argumentative terms about the witness' prior

3    testimony.

4          THE WITNESS:  To the extent that this ordinance

5    is five percent or more than five percent that language

6    is common in a number of other ordinances.  So the

7    analogy would hold in other places as well as this.

8          So if, for instance, you know, someone opens a

9    restaurant needs to have a food safety certificate of

10   some sort, take a course.  It just follows along the same

11   type of logic.  You want people that are licensed and who

12   are operating a business in the City of Chicago to be

13   successful and to be good at what they do and have some

14   knowledge.  And, therefor, you make certain requirements.

15         There's also a five percent or more than

16   five percent requirement in our ethics code.  If I, for

17   instance, should own more than five percent of any

18   corporation, I would have to reveal it.  It's just the

19   number they use.

20   BY MR. SIGALE:

21      Q.   Okay.  We had talked before about the possible

22   differing points of view about whether or not the last

23   people listed in 30B1, attorney through lobbyist, were

24   covered under the definition of applicant.  Do you see

1    that as a differing point of view with regard to the

2    other people in B1 that we talked about?  In other words,

3    the five percent or greater person that's listed in B1,

4    five percent or greater interest of a publically traded

5    company that needs to be listed, do you consider them an

6    applicant under the definition or not?

7          MR. WORSECK:  Objection to the extent you're

8    calling for a legal conclusion.

9          THE WITNESS:  You know what?  As I look at this

10   and as I apply my experience in licensing and other

11   licensing ordinances, I cannot tell you for sure that the

12   people that are listed in B1 are the applicant versus the

13   people listed in B, because B1 seems to be referring --

14   it says, "The application shall be verified by oath or

15   affidavit and shall include the following statements and

16   information."

17         So it's asking for the following.  B1 is

18   listing the statement and information that they need,

19   whereas B is simply saying if the applicant's an

20   individual it's an individual, if it's a partnership then

21   the applicant, the person who's a partner.  If it's a

22   company or, you know, a corporation then the applicant.

23   You know, we always try to get to the person.  So, I'm

24   not sure I could agree with you, but again...

1  BY MR. SIGALE:

2      Q.   Okay.  So going back to the conversation we

3  were having before, and I don't want to --

4      A.   Which one?

5      Q.   Right before the break, right before we took a

6  break.  And I don't want to ask Cheryl to have to read

7  the whole thing back, but it was the conversation about

8  if the only thing holding it up was the attorney I'd go

9  to whoever and talk to whoever and do what we had to do

10  and get this thing issued.

11      A.   Sure.

12      Q.   However possible.  That discussion.  I'm

13  paraphrasing, of course.

14      A.   Okay.

15      Q.   But I want to ask that question regarding the

16  middle people or the remainder of B1.  If somebody comes

17  in and says, you know, "I'm an attorney," let's say, "And

18  I have a client who wants to open a range," I'm speaking

19  about the hypothetical attorney with the hypothetical

20  client, "I want to open a range, but, you know, there's a

21  guy who owns five percent of the company and he's out of

22  state so he can't possibly get a FOID card, what do we do

23  here?"  The discussion that we had before regarding the

24  attorneys and accountants through lobbyists, et cetera.

1    Would that hold true to that situation as well?

2            MR. WORSECK:   Objection to the extent you're

3    calling for a legal conclusion and calling for

4    speculation.

5    BY MR. WORSECK:

6        Q.   I'm not asking you for a legal conclusion, I'm

7    asking you as to procedure.

8        A.   As far as the procedure is concerned?

9        Q.   Right, that's what I'm asking.

10       A.   If there was some thing or some fact of all of

11   the facts that are involved in the issuance of any

12   license that is stopping the license from issuing and

13   that's the only reason that the license is not issuing,

14   then we would have a little confab and try to figure out

15   if there was a way around it, around to do it.  And if

16   there was no way around it our next step would be to go

17   to City Council and say, "Hey, you know, we can't issue

18   this license because this is in the way."

19           And we have -- we've done that in the past.

20   Sometimes they enact ordinances and you look at them and

21   you go, "Oh, wait, that won't work," and you go back and

22   they fix it.  It happens a lot.  You'd be surprised.

23       Q.   Okay.

24       A.   I shouldn't have said that, but it's true.

1    Q.   Without naming names or anything like that can

2 you give an example of what you're talking about?

3    A.   Sure.   Absolutely.   We had a filling station

4 license which talked all about benzine and gasoline.

5 Well, we now have C and G licenses or fuels.   We have

6 filling stations that are electrical, and so we had to go

7 back and amend that ordinance so we can license all of

8 those, otherwise they wouldn't have been able to be

9 licensed.

10        Another example would be somebody who wanted to

11 open up a particular business under a specific license

12 type where that specific license type required a bathroom

13 on premise unless the -- there were very specific steps

14 to waive whether you needed that bathroom.   And when you

15 read the ordinance and you looked at it, it was rather

16 clear what the rationale was for when you would waive the

17 requirement for bathroom or not.   And this particular

18 licensee fell into that, but these particular steps

19 didn't apply to him.   So we can go around and fix that.

20 So we did something like that so we could issue that

21 license.

22    Q.   What type of business was that?

23    A.   That was, again, a filling station

24 interestingly.

1    Q.   Okay.

2    A.   Two different filling stations.  It happened to

3  be the filling station because the filling station is a

4  very old license and it just, you know, it was updated.

5  Had to be updated.

6    Q.   Is that what kind of happened with regard to

7  the example you gave before, the Katrina refugees that

8  came up here to drive cabs?

9    A.   Exactly.  We had to amend the ordinance in

10  order to allow them to drive cabs and it was the right

11  thing to do.

12    Q.   Right, but I'm asking were you involved in that

13  process?

14    A.   When you say was I involved, that's hard

15  because --

16    Q.   Yes, let me rephrase it.

17    A.   And I don't know that I can answer that because

18  at the time of Katrina I was in the law department.  So

19  if I was involved I was involved as a lawyer, so I'm not

20  going to answer it.

21    Q.   I guess --

22    A.   Sorry.

23    Q.   I mean the licensing department, is that

24  something that came about because a bunch of refugees

1    went to get taxi licenses and were told they couldn't

2    because they didn't have Illinois licenses and somebody

3    in licensing had to -- or BACP had to go start the

4    process to get that changed?

5        A.   Correct.

6        Q.   Okay.

7        A.   And I think I can say that at that particular

8    time Consumer Services was my client, one of my clients

9    when I was in the law department, so they called the law

10   department and said, "What do we do?"

11       Q.   Okay.  The next topic you were listed as

12   talking about --

13       A.   I'm only laughing because if each topic takes

14   as long as the last one we're going to be here 'til

15   midnight tonight.

16       Q.   I certainly hope not.

17       A.   Thank you.

18       Q.   But it stays within the 30s, we just go to

19   030D.

20       A.   Okay.  The applicant and I'm assuming that

21   means --

22                      (Clarification requested by the

23                        reporter).

24              It says the applicant an, a-n, every manager of

1    the shooting range facility shall submit to

2    fingerprinting by the department.  I'm assuming that the

3    an, a-n, the third word of that sentence, is a-n-d and

4    it's a typo, which you often also find in minutes and

5    codes and ordinances.  And sometimes those mistyped and

6    typos make sense, and that throws everybody for a loop.

7    They say, "It can't mean that.  What?  Are they crazy?"

8             No.  Sorry.  It's an art form.

9        Q.   Well, let me ask you if bare bones the way that

10   it's written, assuming an is and, what's the governmental

11   purpose of requiring this?

12       A.   We require fingerprinting on a number of our

13   licenses.  It's mainly to do a criminal history report on

14   someone to find out more information about the applicant.

15       Q.   Okay.

16       A.   And you're looking basically for, you know,

17   felonies or things that would be picked up by

18   fingerprinting not necessarily in your own state.

19       Q.   I want you to assume for purposes of the next

20   question that applicant is defined as broadly as I'm

21   suggesting that it is defined.

22       A.   Okay.

23       Q.   Is there a governmental purpose that you see to

24   requiring the entity that wants the range, that wants the

 1   license to having their attorney fingerprinted?

 2            MR. WORSECK:  Objection, vague.

 3            THE WITNESS:  No, I do not see, and I will save

 4   you some time, a governmental purpose to having the

 5   attorney, accountant, consultant, expeditor, promoter or

 6   lobbyist necessarily fingerprinted in any licensing

 7   scheme.

 8   BY MR. WORSECK:

 9       Q.   You said necessarily.  You gave me that

10   qualifier which means I've got to ask another question.

11   So what do you mean by necessarily?

12       A.   Well, as I said earlier, licensing really is

13   somewhat of an art and some other step in the process

14   might flag.  Some of the ordinances say you need to have

15   all of these specific things and it has a catchall on it.

16   I don't know, nor do I think this one does -- it does.

17   "And/or anything else the Commissioner may require."

18   That's a catchall that's in some of the licenses.  So

19   when I say necessarily, that would qualify it.

20            So, let's say, for instance, I had a situation

21   where there was enough circumstantial evidence that what

22   I have is a straw buyer or an inappropriate applicant,

23   then I my require something more of that particular

24   applicant.  Now whether I would require their accountant

1  or their attorney to be fingerprinted, I doubt it.  We

2  have a hard enough time getting shareholders of

3  corporations to get fingerprinted and CEOs of large

4  corporations, but they do.

5      Q.   Okay.  So, when applying the purpose that you

6  had stated before, and again interpreting applicant as

7  broadly as I suggest it can be, you'd see, therefor, a

8  governmental purpose in fingerprinting the five percent

9  owner of the publically traded corporation?

10          MR. WORSECK:  Objection, vague and asked and

11  answered.

12          THE WITNESS:  Oh absolutely the five percent

13  shareholder I don't think I'd have any issues with.  I

14  thought we were referring in that previous question to

15  the attorney, accountant, consultant, expeditor, promotor

16  or lobbyist.

17  BY MR. SIGALE:

18      Q.   I was, now I'm on a different question.

19      A.   Because in that group that seems a little more

20  tenuous.  But the 5 percent or more owner, absolutely.  I

21  don't have any problems with that.

22      Q.   Okay.  Can you give an example of a situation

23  where fingerprinting the five percent owner or the

24  minority partner of the partnership or anyone listed in

1   B1, I mean I'll just make it broader, lead to the city

2   discovering a problem or denying a license?

3           MR. WORSECK:   Objection; vague, calls for

4   speculation.

5   BY MR. SIGALE:

6       Q.   I'm not asking you to speculate, I'm asking you

7   if you know of an example.

8       A.   You're asking me, I want to be sure I'm

9   answering this correctly, you're asking me if I know of

10  any specific example where an attorney, accountant,

11  consultant --

12      Q.   The other people listed in B1.

13      A.   Oh, had to --

14      Q.   Where fingerprinting revealed something that

15  caused the city to --

16      A.   Yes, I do.

17      Q.   Can you give an example?

18      A.   Yes.   The City of Chicago Municipal Ordinance

19  has four different and diverse ordinances regarding court

20  ordered child support, and we often pick up people who

21  didn't pay their child support when we run the

22  fingerprints.   And I have to tell you that that's

23  sometimes very upsetting when you see a CEO of a major

24  corporation that you really want to license and we have

1   to sit him down and tell him, "You better pay your child

2   support because our laws don't allow us to license you."

3       Q.   Is that with regard -- I'm in agreement with

4   you on the child support issue.  Are you saying that that

5   child support provision that you just mentioned applies

6   to someone trying to get a shooting range license as

7   well?

8       A.   Yes, it would.  The court ordered child -- now,

9   you have to be very specific here.  It's court ordered

10  child support.  It's actually a very -- court ordered

11  arrearage I believe it is, but it's a very specific type

12  of child support.  It means you're really, really behind

13  in your child support.  Okay?  And that would stop

14  anybody from getting a license of any kind in the City of

15  Chicago.  It would stop the City of Chicago from entering

16  into a contract with anybody.  It would stop any employee

17  from being employed by the City of Chicago.  Our child

18  support is very broad.  So, yes, you can toss that one in

19  there too.

20      Q.   Is that --

21      A.   Sorry.

22      Q.   To the extent you know, who's limited by that?

23      A.   What do you mean who's limited?  Who could owe

24  child support and still get a license?  Nobody.

```
 1        Q.   No, I mean if a major corporation -- I
 2   understand with the CEO, but I'm talking about the
 3   minority five percent shareholder owes child support.  Is
 4   that going to be enough for the City to deny the license
 5   to --
 6        A.   It could be, yes.  It could be, absolutely.
 7   Normally what would happen -- I can only think of one
 8   time where that actually did happen.
 9        Q.   What was that?
10        A.   In which case that particular person I believe
11   was put on a payment plan.  Or -- was he put on a payment
12   plan or did -- you know, I think what happened is they
13   ended up taking him off the corporation and putting
14   someone else on, yes, because it was blocking a major
15   business startup.  Yes.  Yes.  Stuff happens.
16        Q.   Anything else about the requirement of 30D
17   that --
18        A.   Is that the fingerprint one?
19        Q.   That's the fingerprint one.
20        A.   No.
21        Q.   The next thing you were listed to talk about
22   was 030F.
23        A.   Okay.
24        Q.   I want you to assume for purposes of these
```

1  questions that commissioner in the first line of F is

2  you.

3       A.   Yes, the commissioner in the first line is me.

4  But often when they use the term commissioner they really

5  mean the department.

6       Q.   Okay.  Well, we'll talk -- okay, that's fine.

7  We'll talk about that.  But you do understand the

8  commissioner, and I don't mean you --

9       A.   My title, yes.

10      Q.   Commissioner of BACP.

11      A.   Okay.

12      Q.   Which at this point in time is you.

13      A.   That is correct.

14      Q.   Okay.  So, I guess the first question back to

15 your comment is when you say it really means the

16 department, what do you mean by that?

17      A.   Well, it's not like I deny it.  I mean I have

18 to sign the letter denying it, but the department reviews

19 everything and brings it to me.  And then I'm the one who

20 signs the denial, though sometimes my deputy commissioner

21 signs my name and initials it.

22      Q.   And that's okay under department policy?

23      A.   It is.

24      Q.   Okay.  You had mentioned, and it feels like a

1   long time ago, I'm sorry, so let me see if I got it

2   right. It says, "The commissioner may deny an

3   application." But based on what you were saying -- did

4   you read F? I'd like to --

5      A. I saw that it's the deleterious impact

6   provision.

7      Q. You are familiar with what that provision says?

8      A. I'm familiar with deleterious impact and I know

9   what deleterious impact means. It's a term of art that

10   we use in licensing and in the municipal code.

11      Q. Okay. Do me a favor. Read the first paragraph

12   of F and then just let me know when you're done.

13      A. "The Commissioner may deny an application --

14      Q. Oh, I'm sorry, Commissioner. You don't have to

15   the read it out loud. I just --

16      A. Sorry. That will make Cheryl feel better.

17         Just the first paragraph, correct?

18      Q. Just the first paragraph.

19      A. Okay. I'm good.

20      Q. We earlier talked about the process at the

21   licensing division of the BACP. The consultants, if they

22   have a problem, it gets kicked up to the deputy

23   commissioner. If the deputy commissioner has an issue or

24   a problem or a concern it gets bumped up to you.

1    A.   Correct.  There's actually a supervisor in

2  there too, but that's okay.  In the chain of command

3  consultants then there's senior consultant supervisor,

4  senior consultant/supervisor, then deputy commissioner,

5  and then me.

6    Q.   Okay.

7    A.   And there might depending upon the type of

8  license also be an assistant commissioner tucked in

9  there.  There's a chain of command.

10    Q.   Okay.

11    A.   It's like the military.

12    Q.   The provision of F that talks about -- 030F

13  which talks about the commissioner denying an application

14  for a shooting range if the issuance or renewal, so the

15  initial license or the renewal of the license, would have

16  a deleterious impact on health, safety or welfare of its

17  community.  Does that decision get made along the same

18  chain of command as you have generally been discussing

19  today or is this a decision that would, say, be beyond

20  the authority, let's say, of a consultant?

21    A.   This would be more akin to the zoning decision

22  where they would review it and then they would say, "Oh,

23  this looks like there could be a deleterious impact.

24  Let's gather this information and take it up."  And then

1  they would want somebody else to find out and say, "No,

2  the facts that they found aren't deleterious impact."  So

3  it would have to be some factual piece of information

4  would have to raise a flag to the consultant that there

5  might be a deleterious impact.

6      Q.   If I understand from before, this issue, 030F,

7  would almost certainly get bumped up to Ms. Adelizzi and

8  then to you if nothing else because shooting range

9  facilities are, currently at least, a novelty within the

10 City of Chicago?

11      A.   For that reason alone it probably would be.

12 But in other licenses where there are deleterious impact

13 provisions, it would still probably be bumped up simply

14 because I don't think anyone would have the authority to

15 deny a license based upon what's in front of them if the

16 only thing that they're denying it on is deleterious

17 impact.  That's something they would need to discuss.

18      Q.   Okay.  Specifically with regard to shooting

19 ranges, has there been any discussion in your office, in

20 your department, about what deleterious impact means, how

21 the terms is defined, how it -- leave it there for now.

22      A.   Specifically in regards to this license?

23      Q.   To shooting range licenses, yes.

24      A.   I don't believe I recall a discussion in the

 1   department in licensing regarding this particular

 2   ordinance or any of the provisions because, again, we've

 3   never had an applicant.

 4           MR. WORSECK:  And just for the record, David,

 5   as you know, the ordinance does set out certain

 6   parameters and criteria and definitions for deleterious

 7   impact, so I'm presume you're asking the commissioner for

 8   further fleshing out beyond what's already in the

 9   ordinance as to that phase.

10   BY MR. SIGALE:

11      Q.   No, as long as you're answering specifically

12   there is a, you just read it commissioner, there is a

13   presumption for when a deleterious impact exists.  I

14   don't believe it says it's the only type instance where

15   one can be found, but I'll ask you about that.  And then,

16   of course, there's other things in there that are cross

17   referenced so to speak that aren't defined in here.  So

18   to my next question, though --

19      A.   Okay.  Did I answer your last question?

20      Q.   I think so.

21      A.   All right.  We just aren't geeky and sit around

22   and talk about licenses without an applicant.

23      Q.   I understand that, but what I'm asking is

24   specifically is when this gets passed in July of 2011 or

1  if this part was changed at all in September of 2011, but

2  at this point at the latest was there any kind of

3  department meeting or even with you and Ms. Adelizzi, am

4  I saying that right?

5      A.   Yes.

6      Q.   To say, "Okay.  Well, new type of license, new

7  kind of requirement, it's got a deleterious impact

8  language in there, so let's talk about what that's going

9  to mean when the applications come in?"

10      A.   Sure.

11      Q.   Was there a discussion like that?

12      A.   Yes.  Every time a new license is issued or

13  approved by city council when we go through that process

14  that I earlier described of setting up the protocols and

15  the business process for issuing the license and

16  programming the computer, we do sit down and try to

17  figure out what types of questions need to go on that

18  information, what type of information do we need to get

19  in order to answer these requirements or to be sure that

20  it falls within the parameters set out for us by city

21  council.

22      Q.   Is deleterious impact or lack of a deleterious

23  impact one of the switches to toggle, though, in the

24  programming?

1    A.   Deleterious impact is -- it is not -- well,

2  it's not a toggle in the same way as a pass

3  inspection/didn't pass inspection, but deleterious impact

4  would be one of the toggles, if you will, in that we

5  would have to put in any application or location that was

6  chosen a couple of questions or we have our internal

7  people do a couple of things to determine whether or not

8  this is going to be an issue or not.  And what they would

9  probably do in this particular case is they would have

10 their location, they'd just pull all the calls of service

11 for that location.

12    Q.   I'm sorry?  All the calls for?

13    A.   All the calls for service.  Calls for service.

14 That is another term of art, but it describes calls made

15 to 911 regarding a location.  Every call that's made to

16 911 is geo coded so you can tie it to a location.

17        We also might have said all calls to 311.  311

18 might be calls like rats or garbage or fly dumping.  So,

19 we might pull either one or both depending upon what we

20 thought made the most amount of sense look at the zoning

21 that applied to a particular licensing scheme.  And that

22 would get pulled.  And where we have the ability to pull

23 all that that would be something that we call and that

24 would be all together on the application.

1    Q.    Is that the only check that would be done on

2  your end for deleterious impact?

3    A.    The number one -- there are probably 20

4  different things that you might look at for deleterious

5  impact.

6    Q.    Okay.

7    A.    So, it's hard for me to -- I mean we'd look

8  at -- calls for service would be the number one.

9    Q.    Okay.

10   A.    And it's calls for service typically.

11 Community calls, 311, that would be another element of

12 whether or not there was deleterious impact.  Complaints

13 to the department.

14        I'm trying to think what other things there

15 might be that would -- see, what you have to do with

16 these requirements for licenses is you have to address

17 them in such a way that you know whether or not it can be

18 flagged or not basically.  So, for instance, if we said

19 to the consultant, you know, if someone comes in for this

20 type of license, and deleterious impact is probably in I

21 don't know the exact number, but it's a handful.  You

22 might say when someone applies for the license one of the

23 things you must do, and it's on the check list and it

24 would be in the computer, is pull the calls for service

1    or call CPD and see if this is on a watch list or this

2    location is a problem or whatever.

3         Q.   Let me interrupt you for one second.

4         A.   Sure.

5         Q.   And then I want to go to the others.  When you

6    say you can pull the calls for service to a certain

7    location, do you mean the address or do you mean like the

8    neighborhood?

9         A.   No, the address.  It's in a geocode so we

10   can -- calls for service are narrowed down to I'm trying

11   to remember what the name is of the smallest geographical

12   unit.  It's quartile, q-u-a-r-t-i-l-e.  It's a geo

13   quartile or quarrel.  I'm not sure I'm using the right

14   term, but it's like four blocks.

15        Q.   So that's as small a sample as you can get?

16        A.   Yes, I believe the calls which are received

17   would be in a four-block geocode.

18        Q.   Okay.  I'm sorry.  I want to make sure I am

19   clear.  So you're saying that you can pull the calls for

20   service --

21        A.   We request the police to give us the calls for

22   service.

23        Q.   To a certain geo quartile as opposed to -- if

24   that's the right term.

```
 1        A.    If that's the right term.  I am not positive,

 2   but it is definitely a geo coded location.

 3        Q.    As opposed to 4286 Racine or something like

 4   that?

 5        A.    No, we give the police the actual address, and

 6   then they'll pull it by that address.  The computer

 7   pulls -- you put the address into the computer, the

 8   computer then pulls whatever that geo code is that's

 9   coded to that address in the computer.  That happens

10   behind the scenes.

11        Q.    All right.

12        A.    I was trying to be more helpful.  I guess I

13   made it more difficult, sorry.

14        Q.    No, no.  Thank you.  I appreciate it.

15        A.    And just so we're clear, those aren't the only

16   things you would look at for deleterious impact.

17        Q.    That's what I wanted to get back to.

18        A.    As long as you're going to get back to it

19   I'll --

20        Q.    No, I'm back to it now.  Calls for service

21   complaints to --

22        A.    311.

23        Q.    311 calls, complaints to BACP.  Is that the

24   department you were referring to?
```

1      A.    Yes.  We might also look at egress and ingress

2  as far as sanitation, garbage.  Density of the

3  neighborhood.

4      Q.    What does that mean?

5      A.    Density of the neighborhood is are we

6  surrounded by highrises so there's a lot of people or is

7  there one guy living in a shack within two miles of the

8  place.  You know, I don't know.  That's what I mean by

9  density.  Your occupation density.

10      Q.    Okay.  You would also look at churches,

11  schools, day care centers within a certain number of

12  feet.  You'd look at the pathways.  So, for instance, if

13  there is a day care that backed up next to something that

14  you are licensing and kids could come and go without ever

15  walking by whatever it is you were licensing that wasn't

16  supposed to be accessible to children, then that would be

17  one thing.  If it was right next door so the children

18  would have to walk by it all the time, then that would be

19  another thing.  You look at all those factors to see if

20  there's a delirious impact, and those factors are all

21  listed.  So, we don't just pull them out of our butt.

22      Q.    Where are they listed?

23      A.    In the deleterious impact rules and

24  regulations.

1    Q.   Okay.  Where would I find those?

2    A.   On our website.

3    Q.   On the City of Chicago's a web site?

4    A.   I believe so, yes.

5        MR. WORSECK:  Is that your understanding?  I

6   have never found it.  Off the record for a second.

7                    (WHEREUPON, a discussion was had

8                     off the record.)

9        THE WITNESS:  There's lots of information as to

10  what's deleterious impact and lots of examples.

11  BY MR. SIGALE:

12   Q.   Okay.

13   A.   Like I say, it's a term of art that we use.

14   Q.   So then if I -- but if I go further and, you

15  know, if you don't know the various elements or factors

16  that could be delirious impact off the top of your head

17  that's fine.

18   A.   Oh, good.

19   Q.   But if you do know, that would be better.

20   A.   I don't know off the top of my mind.  I've

21  given you some of what I can remember.

22   Q.   The deleterious impact, this is the middle of

23  03OF, "A deleterious impact is presumed to exist whenever

24  there has been a substantial number of arrests within

1   500 feet of the applicant's premises within the last

2   previous two years."

3           To your knowledge, is that one of the factors

4   listed?

5           MR. WORSECK:  Objection, just to the extent

6   that you didn't recite the provision in whole, just

7   partially.

8           THE WITNESS:  I believe that is a much narrower

9   definition of deleterious impact because my understanding

10  of deleterious impact is not arrests but calls.  So, you

11  might call from that geographical location the police a

12  hundred times and none may get arrested.  But this says a

13  substantial number of arrests.  This is going to be much

14  more difficult to deal with deleterious impact, and it's

15  going to take my department much more work because we're

16  not only going to have to collect the calls for service,

17  we're going to have to get the number of arrests from the

18  police, and they aren't necessarily geo coded.

19  BY MR. SIGALE:

20      Q.   This also says a deleterious impact is presumed

21  to exist whenever.  I'm interpreting that and I'm asking

22  you not as necessarily an attorney, although we both know

23  it's hard to turn off, but in your capacity as

24  commissioner.

1    A.    Uh-huh.

2    Q.    That presumption doesn't mean that this should

3 be the only definition of deleterious impact for this

4 ordinance, it just means that it should be presumed that

5 if this happens, but all this other stuff might still

6 apply.  Is that how you look at it?

7    A.    That's how I would read it to be honest with

8 you.  I would never let one sentence like that stop

9 something, and I would not let that be the definition

10 solely of a deleterious impact.  If I was looking at a

11 location, and I don't mean to ramble here, but if I was

12 looking at a location and there were not a substantial

13 number of arrests within 500 feet which would presume it,

14 I would still look at everything else.  That doesn't mean

15 there wouldn't be a deleterious impact in the community.

16 If this location were surrounding by baby care centers,

17 you know, I would be very concerned.

18    Q.    Well, sure, although I'll represent to you for

19 purposes of this topics that under the ordinance that's

20 not allowed anyway.

21    A.    Oh, that's good.  How about churches?  Are

22 there a lot of churches?

23    Q.    No.

24    A.    Because those are both very dangerous places.

1    Q.  Oh, they allow churches, they don't allow

2 firing ranges?

3    A.  Oh, okay.  That was a good call on their part.

4    Q.  Well, it's one of the issues that's also at

5 issue but I don't think with you today.

6    MR. WORSECK:  Correct.

7 BY MR. SIGALE:

8    Q.  Do you have off the top of your head a

9 definition of substantial number of arrests?  Is that a

10 term --

11    A.  A number?

12    Q.  The phrase substantial number of arrests.  Is

13 that, to your knowledge, is there a definition of that?

14    A.  No.

15    Q.  Okay.

16    A.  And when I say no it's none that I know of.

17    Q.  Okay, fair enough.

18    A.  Let's be clear about that.  For all I know

19 somewhere in the code it says substantial means six.

20 It's very possible.

21    MR. WORSECK:  David, you know, as you know,

22 just for the record, you asked that question of us and we

23 tendered an interrogatory answer listing some of the

24 factors that would go into play in determining if there

1  was a substantial number of arrests.

2          MR. SIGALE:  I know, but I'm asking the witness

3  if she knows.

4  BY MR. SIGALE:

5      Q.    Do you know is there a definition for

6  deleterious impact that you're aware of?

7      A.    Yes.

8      Q.    And what's that?

9      A.    I don't know it.  I know it exists.  If you

10  search of the city's web site I'm sure it's there.  But,

11  yes, deleterious impact is probably defined somewhere in

12  the deleterious impact ordinance, or the public nuisance

13  ordinance I think.

14      Q.    Okay.  If I tell you that one of the

15  definitions looks like under 4-60-10 is an adverse effect

16  on the value of any property and increased risk of

17  violations of law or a risk of substantial increase in

18  noise, litter, or vehicular congestion --

19      A.    That sounds about right.

20      Q.    Okay.

21      A.    That would be a deleterious impact upon a

22  neighborhood, yes.  So much more succinct.

23          MR. SIGALE:  I'm sorry.  Let's go back off one

24  second.

1          (WHEREUPON, a discussion was had

2              off the record.)

3  BY MR. SIGALE:

4      Q.   Again, Commissioner, I hope you don't think I'm

5  trying to be glib here as opposed to I guess

6  conversational.  030 F basically gives you unfettered

7  discretion, if I'm reading this right, it gives you the

8  unfettered discretion to deny the new license or renewal

9  of a shooting range license if you find that there would

10  be a deleterious impact in that location.

11          MR. WORSECK:  Objection to the extent you're

12  calling for a legal conclusion and to the extent that the

13  word unfettered is argumentative and to the extent you

14  mischaracterized the ordinance.

15          THE WITNESS:  The paragraph does say may.  So,

16  that would be discretionary on my part.  It does not say

17  shall.

18  BY MR. WORSECK:

19      Q.   Okay.  And ultimately the -- not only is it

20  your discretion to deny the license or grant the license,

21  thus the main part of that first sentence, but I read

22  this that you also have the discretion to find whether a

23  deleterious impact exists or not.

24          MR. WORSECK:  Same objections.

1  BY MR. SIGALE:

2      Q.   Maybe it's part and parcel, but it seems like

3  it's all.

4      A.   Okay.  So, F, the second paragraph in

5  particular does talk about deleterious impact.  The first

6  one talks about the presumption, a deleterious impact is

7  presumed to exist.  It is a discretionary paragraph

8  because it says the commissioner may deny.  That said,

9  there is no exercise of discretion that I have that's not

10  overseen in some way by an appellate process, and that

11  appellate process is internal.

12      Q.   You're not referring to the court system then,

13  you're referring to what?

14      A.   You have an administrative right to appeal.

15  Normally if I deny the issuance of a license, for

16  whatever reason, presumably for a reason that's in the

17  code, and I'm not being glib, if I were to do something

18  stupid like deny a license that I shouldn't have and it's

19  clear that I shouldn't have then it wouldn't matter no

20  matter what license I denied.  Whenever a license is

21  denied then the person is given an administrative hearing

22  internally with a right to review that decision before

23  you ever get to a court of law.

24      Q.   Who's that administrative hearing in front of?

1    A.   It is in front of an administrative hearing

2  officer in our adjudication unit on the eight floor in

3  the courtroom in 805.

4    Q.   That's one of the divisions or sections --

5    A.   It's a section of the department.

6    Q.   Of the enforcement division of the department?

7    A.   Yes.

8    Q.   Okay.  It sounds like, and tell me where I'm

9  wrong, that then the internal appeal is handled by

10 employees of yours.

11   A.   No.  The hearing officer is an independent

12 third party.

13   Q.   Got it.  Thank you.

14   A.   Sorry.  And the hearing is defended by the law

15 department which is not an employee that works for me.

16 And, so, these are law department attorneys who defend or

17 prosecute that internal review.

18   Q.   Okay.  Do you have any idea as you sit here how

19 substantial number of arrests is defined?

20        MR. WORSECK:  Objection, asked and answered.

21        MR. SIGALE:  Indulge me.  I'm sorry, I don't

22 think I asked it that way, but if I did, sorry.

23        THE WITNESS:  There is no number, there is no

24 fixed number if that's what you mean.

1   BY MR. SIGALE:

2       Q.   Is there any fixed range?

3       A.   You know, substantial is substantial.  You

4   know, you can't -- you've got to put that in context, you

5   know.  You put a number in front of me and if I've got,

6   you know, 50 littering of paper cups, people are arrested

7   for it, I don't know if that would be as -- that might be

8   substantial where one arrest for a murder rape and

9   dismemberment would be substantial.  So you can't put a

10  number to it.  You've got to look at quality as well as

11  quantity.  I would take one dismemberment over a hundred

12  paper cup droppings.

13      Q.   Right, but can I --

14      A.   What's a substantial number?

15      Q.   No, no.  So, if you get a 91 -- if you ask the

16  police to do a geo quartile call for service report and

17  you find out that there was a rape, murder, dismemberment

18  four blocks away last year does that make the shooting

19  range a deleterious impact on the community?

20          MR. WORSECK:   Objection, hypothetical

21  speculation.

22          THE WITNESS:   I have to answer not necessarily

23  because it says it's presumed to exist when a substantial

24  number of arrests.  First of all, there has to be an

 1   arrest, not just a murder, rape, dismemberment.  But if

 2   there was an arrest, you need to look at the arrest

 3   record, you look at the circumstances, you look at

 4   everything to determine whether one of those is a

 5   substantial number of those or do we need another one of

 6   those?

 7   BY MR. SIGALE:

 8        Q.   Right.  But as we talked about before

 9   deleterious impact could go beyond this one presumption?

10        A.   Sure, of course it could.  There's lots of

11   factors that could be taken into account.  Here they seem

12   to have called out this one factor, but they narrowly

13   defined it as arrests, not just calls for service.  And

14   you also have to remember that any call that I make

15   regarding whether or not it's a substantial number of

16   arrests is going to be tested by a third-party hearing

17   officer.  So, it's not like I'm going to pull this out of

18   my butt.

19        Q.   No, no.  And I hope not.

20        A.   I hope not either.

21        Q.   But I also acknowledge that you're not going to

22   be the commissioner forever, and, you know, the person

23   who comes in after you might very well do that.  So, I'm

24   more concerned at the moment -- I mean I'm asking your

1   understanding and your interpretation, A, because you're

2   listed as a witness on this but, B, also because of your

3   title.  But I understand that somebody else might come

4   along and say, you know, say something different.  But it

5   is what it is.

6        A.   You know.  Exactly.

7        Q.   We're here today.

8        A.   Exactly.  It is what it is, and there's an

9   entire process to reign it in.

10       Q.   So you're saying that using the definition of

11  deleterious impact it looks to me like you have the

12  discretion to review or to deny a license if you decide

13  there's a risk of a substantial increase in noise, litter

14  or vehicular congestion, i.e., traffic.

15       A.   Possibly.  Possibly.  I mean it looks to me, I

16  read this as I can look at all the factors and make a

17  decision.  And whatever factors I look at I would have

18  the list them all out in the -- I'm denying you for

19  deleterious impact because the following; bomb, boom,

20  bomb, bomb, bomb.  I find all these things.  And then it

21  will get reviewed by an independent third party.

22       Q.   But the review by an additional third party,

23  i.e., this third party independent administrative hearing

24  officer would come after the denied applicant probably

1    filed papers to demand a hearing?

2        A.   Usually in the denial letter it tells you

3    exactly how much time you have and where to file, but you

4    just have to write a letter saying, "I want to appeal

5    it," I don't remember if it's 10 days or 20 days, and to

6    show up on a certain time and date.

7        Q.   But it's additional time and costs to the

8    applicant, correct?

9            MR. WORSECK:   Objection, calls for speculation.

10           THE WITNESS:   Well, I think as a matter of

11   course that if a license of any type is denied and it has

12   to be appealed and then it issues after appeal then there

13   is additional time lost.

14   BY MR. SIGALE:

15       Q.   Okay.   Do you have an idea whether generally or

16   specifically because you looked it up or someone told you

17   or something about the cost of constructing and operating

18   a shooting range?

19           MR. SIGALE:   Objection, beyond the scope.

20           THE WITNESS:   No.   I do not.

21   BY MR. SIGALE:

22       Q.   Okay.   What about a restaurant?   If somebody

23   was constructing from the ground up a restaurant and

24   putting in walls, we can agree starting up a new business

 1  can be an expensive endeavor, correct?

 2      A.   We can agree on that.  And we can agree that

 3  there are various costs involved.  And one of the reasons

 4  why zoning is always up front is because we try not to

 5  have people spend money or even sign and commit

 6  themselves to leasing space to open their business up

 7  until they've checked with zoning.  We get that message

 8  out at much as we can and, yet, we sometimes have issues

 9  where someone has signed a five-year lease to open up a

10  store in a location where they will never be able to open

11  that type business up because of the zoning.  So that's

12  why zoning is always first and foremost so that the

13  applicants don't expend money unnecessarily.

14      Q.   Can you give me another example of a business

15  that is subject to a deleterious impact requirement or

16  that description such as we're talking about with the

17  range ordinance?

18      A.   Sure.  Public places of amusement license.  I

19  would put public places in there.  A license where

20  there's -- who else has a deleterious impact?  Some

21  liquor licenses.  Not all but some.

22      Q.   Let's stick with night clubs for a second.

23      A.   Public place of amusement.  It's PPA license.

24      Q.   And does the PPA also have -- is there a clause

1    in the ordinance, is there an ordinance that says that

2    the commissioner can deny or revoked or refuse to renew

3    the license if a deleterious impact exists?

4          MR. WORSECK:  Objection, beyond the scope.

5          THE WITNESS:  To be honest with you I don't

6    have it in front of me, but there is a still a

7    deleterious impact review or requirement in that

8    ordinance and it's probably phrased in a similar if not

9    the same way.  But I would have to look at the PPA

10   license ordinance as well as any other ordinances that

11   have it.  There's a handful of them.  PPA is the one that

12   comes to mind.  It's the quickest.

13   BY MR. SIGALE:

14       Q.   Would you agree with me, again if I'm wrong,

15   just tell me.

16       A.   Uh-huh.

17       Q.   When I'm reading 30F, 030F, it says, "The

18   commissioner can deny the application for the shooting

19   range license if it's issuance or renewal would have a

20   deleterious impact on the health, safety, or welfare of

21   the community."

22       A.   Uh-huh.

23       Q.   Is there any provision in there as to cause or

24   control the shooting range facility's owners?

```
 1        A.    Yes.

 2              MR. WORSECK:  Objection vague.

 3              THE WITNESS:  Yes.  Sorry.

 4   BY MR. SIGALE:

 5        Q.    There is.  Can you tell me where?

 6        A.    Where it talks specifically about if I do

 7   determine that there is a deleterious impact then I

 8   should deny it unless they can prove by clear and

 9   convincing evidence that they've devised a, quote, plan

10   of operation, end quote.  And, again, plan of operation

11   is another term of art in licensing.  Plan of operation

12   is something that we often -- deleterious impacts come up

13   all the time with bars, taverns because you have your

14   neighborhood tavern in your residential neighborhood.

15   And the neighbors, they're pissed.  Sorry.

16        Q.    That's all right.

17        A.    They're upset because they're coming out and

18   urinating on the sides of their house next door to the

19   bar and they're throwing their garbage out front and

20   vomiting on the curb or on top of their car.  That's a

21   deleterious impact, by the way, if all those things are

22   happening in a community on a regular basis because of a

23   bar.

24              So, we will say to the owner, "Can you mitigate
```

1  this in some way?"  And they'll enter into what we call a

2  plan of operation.  They'll get a bouncer, they'll get a

3  body guard.  They'll get someone to shoo people away who

4  are congregating out front who shouldn't be.  Maybe if

5  there's a motor cycle gang that goes to that bar a lot

6  they'll make sure that they don't rev their engine before

7  they leave at 2:00 o'clock in the morning and that they

8  quietly disassemble.  So there are lots of different ways

9  you can put into a plan of operation.  Maybe they open a

10  little early.  Maybe they hire more people.  Maybe they

11  put on some screens of some sort.  I mean there's a lot

12  of things that an owner of a business can do to mitigate

13  a deleterious impact.  Maybe they clean up every night

14  before they go home.

15      Q.   So, you interpret the deleterious impact

16  requirement, and I guess I'm meaning generally as opposed

17  to the shooting range.

18      A.   Sure.

19      Q.   But in general you're interpreting your

20  discretion with regard to the deleterious impact as to a

21  deleterious impact that that business causes or allows to

22  happen?  Is that right?

23          MR. WORSECK:  Objection, vague, and they teach

24  whole courses in law school on the concept of causation.

1    I just don't know what you're asking.

2           MR. SIGALE:  Really?  Law school?  It was a

3    long time ago.  So, you know.

4           MR. WORSECK:  Legal foundation is a very

5    relevant conversation.  You know as well as me.

6    BY MR. SIGALE:

7        Q.   I'll reread Palsgraf, you're laughing, when

8    we're done here.  In the meantime, let me give you a

9    hypothetical.

10       A.   Okay.

11       Q.   Four blocks away from the facility that you're

12   talking about that you're considering there's a lot of

13   jaywalkers, and because it happens to be right near the

14   police station a lot of them get arrest.

15       A.   Okay.

16       Q.   A shooting range facility applied to have its

17   review, but there's a substantial number of arrests

18   within 500 feet.  So maybe it's not four blocks away,

19   maybe it's however far away, 500 feet.  If I read this

20   correctly, and tell me if I'm wrong, there's a

21   presumption that this person's shooting range has a

22   deleterious impact on the neighborhood because it's

23   500 feet away and a lot of jaywalkers are getting picked

24   up.

1          MR. WORSECK:  Objection; argumentative,

2    mischaracterizes both the ordinance and the prior

3    testimony.

4    BY MR. SIGALE:

5       Q.   Well, I'm asking you, Commissioner, is that --

6       A.   I'll tell you on that set of theoretical facts,

7    if that was presented to me here's what I would do.  I

8    would look at all of those arrests for jaywalking.  And

9    if they were all occurring within a time span that was

10   the time span at which the shooting range closed, then I

11   might be able to say to the shooting range, "Hey, listen.

12   When your people leave they're flooding out into the

13   street and they're jaywalking."

14          I don't know, but I would look at it and see if

15   there was something the business could do to mitigate

16   that if that were a problem.  At this point in time I

17   would not consider jaywalking a problem, but I might

18   consider it a problem if it was occurring at 3:00 o'clock

19   in the morning and I had some shootings or gang activity

20   in that area, in which case I might consider arrests for

21   jaywalking more serious.  It's really very difficult when

22   we talk about theoretical about because you have to look

23   at everything.

24       Q.   Right, but all I can do at the moment is look

1  at the law the way it exists.  In the example you were

2  giving though, the jaywalkers, were they the gang members

3  and the shooters?

4      A.   I don't know because I don't have an applicant

5  and I don't have a substantial number of jaywalking

6  arrests in front of me.  But if in your example I did,

7  those would be the kinds of things I would like at.  I

8  mean I look at a lot of things.

9      Q.   Okay.

10     A.   It's hard.  I don't like having discretion.

11 It's very difficult.  You really need to analyze things.

12 There's a lot of things.

13     Q.   So, what you're saying is that when it comes to

14 this deleterious impact issue you would look at all the

15 factors that are involved and kind of make a judgment

16 call?

17     A.   Exactly.  It would be a judgment call.

18     Q.   Including as to whether or not whatever the

19 problem is is actually something caused by the business

20 that you're reviewing?

21     A.   Correct.  And let's even take it a step

22 farther.  Let's say that your shooting range is on one

23 corner, your jaywalker is over here, and there's a school

24 for jaywalkers on the other side of it.  I would not

 1   presume that the arrests for jaywalking was the result of

 2   the shooting range.  I would probably think that that's

 3   more a problem of the school for jaywalkers than it is

 4   for the shooting range.  So I wouldn't necessarily be

 5   able to tie those together.  And it wouldn't be the range

 6   that was causing the problem deleterious impact, it might

 7   be this school for jaywalking.

 8       Q.   All right.  Well, let's stick with the

 9   Blackberry School for Jaywalkers for a second.

10       A.   We're really getting kind of ludicrous, and I

11   don't mean to be glib, but I'm just...

12       Q.   The deleterious impact is presumed to exist.

13   So, what I'm saying is if there was a commissioner who

14   wasn't, say, as reasonable as you seem to be, I don't see

15   in here the, at least with the substantial number of

16   arrests provision, I don't see that discretion written in

17   here, and I'm asking if you do.  Not withstanding the

18   fact that you say you would look at all the circumstances

19   and stuff, but just looking at that middle paragraph

20   about the substantial number of arrests I see a

21   presumption and I don't see, "Well, I'm going to look and

22   see if it's from the jaywalker's school or not."  Do you

23   see different?

24       A.   I do.

1           MR. WORSECK:  Objection, mischaracterizes the

2    testimony.  I mean the whole question boils down to

3    whether substantial number of arrests exists only then do

4    you have the presumption of a deleterious impact.  And

5    the commissioner has already testified that a substantial

6    number of arrests is a question that she needs to look at

7    on a case-by-case basis.  And X number of arrests from

8    one kind of an offense doesn't mean that it would be a

9    substantial number of arrests or a different kind of

10   offense may arise to a substantial number.

11          THE WITNESS:  I think the point that I'm trying

12   to make is you're picking a sentence out within a

13   three-paragraph subsection, actually four paragraphs if

14   you include that, and it's all taken in context.  You

15   just can't pull that sentence out.  I mean I would look

16   at everything here.

17           This sentence tells me I should be looking at

18   the impact that this particular business has on the

19   health, safety and welfare of the community.  I should

20   also be looking at whether or not a plan of operation can

21   be devised to lessen that impact.  It says there's a

22   presumption if there's a substantial number of arrests,

23   but it doesn't say that presumption is not rebuttal.  So,

24   there are a lot of things here that should be looked at

1  to make that determination.

2          There's also something in the third paragraph

3  about the possibility or necessity to mitigate any

4  impact.  So there's a lot of stuff crammed into here.  So

5  that one sentence that you're looking at is just one of

6  many things that one looks at before one has to exercise

7  your discretion.  And before I exercise my discretion, it

8  would have be a lot of information in front of me, not

9  just a substantial number of arrests.  Does that make

10  sense to you?

11  BY MR. SIGALE:

12     Q.  Yes.  Can you tell me how you would as you sit

13  here today --

14     A.  And, again, I've got to go back to this

15  definition of deleterious impact from 4-60-010 which, by

16  the way, if you go to the end it says to do that.  It's

17  another one of those cross references that drives me

18  crazy.

19     Q.  An adverse effect on the value of any property.

20  An increased risk of violations of law or a risk of a

21  substantial increase in noise, litter or vehicular

22  congestion.  So, I want to stick with adverse effect on

23  the value of any property.

24     A.  Okay.

1      Q.    I know that with shooting ranges that --

2   hypothetical.  Let's stick to another example.  The PPA

3   is it?

4      A.    PPA, public place of amusement.

5      Q.    In your experience, how does deleterious impact

6   get defined, if indeed, there's been an occasion ever to

7   define it, with regards to the -- or applied I should

8   say, with regards to the adverse effect on the value of

9   any property?

10         MR. WORSECK:  Objection, beyond the scope of

11  the notice.

12  BY MR. SIGALE:

13     Q.    Do you understand what I'm asking?

14     A.    Yes.  You're asking how I would determine

15  whether or not the value of property plummeted as a

16  causation, a causative effect of the shooting gallery, or

17  shooting facility being open there.

18         MR. WORSECK:  You were asking about PPA, is

19  that correct?

20         THE WITNESS:  Oh, PPA.  I'm sorry.

21  BY MR. SIGALE:

22     Q.    That I guess would be the next question.

23     A.    Same thing.  You're asking whether or not a

24  licensed establishment that has a deleterious impact

1 requirement within it how I would determine if the value

2 of the property --

3      Q.   If it has an adverse affect on the value of any

4 property, how do you apply that phrase?

5      A.   Well, adverse would mean to me that the

6 property values you have dropped.

7      Q.   Okay.

8      A.   You go to Zillo, you go to Google.  There's

9 lots of ways to find out if the -- lots of various

10 reports.

11     Q.   Sure.  In your past experience, though, has

12 there been a percentage requirement or it is just case by

13 case?  Do you look at the economy as a whole?  How has

14 that worked in the past if, indeed, you've had the

15 occasion to?

16          MR. WORSECK:  David, can I have a standing

17 objection to question about PPA licenses?  It's beyond

18 the scope.

19          MR. SIGALE:  Well, sure.  It's the only thing I

20 have to compare it to at the moment.  That's fine.  Your

21 objection is noted.

22          THE WITNESS:  I'm sorry.  Where is the part

23 about the value?

24

1   BY MR. SIGALE:

2       Q.    I had to go look it up in 4-60-010 because it's

3   not in the shooting range ordinance, it's referenced.

4       A.    I see.  Thank you.  Because my -- what I'm

5   looking at is whether or not that is to deny an

6   application.  "The issuance or renewal," because that

7   would be something that would be relevant to a renewal I

8   would think because in order to show that a licensed

9   establishment has an adverse impact on property values it

10  would have to have been there.  So it would only come up

11  I would think on a renewal.

12      Q.    Okay.

13      A.    You would look at that.  And normally -- let's

14  see if I can make this easier for you.  Okay.

15  Deleterious impacts are usually brought to us by the

16  community.  We don't go out and try to find them.  So, if

17  a licensed establishment has a deleterious impact

18  provision in it, what happened is you notify the

19  community where this is going to open up.  And then

20  they'll come to us if they think there will be a

21  deleterious impact, and then they'll tell us why they

22  think there would be.  The same thing for a renewal if it

23  was part of the renewal process.

24      Q.    And when those members of the community who

1   don't like night clubs or shooting ranges, say, you know,

2   call up your office, your department and say, "Well, you

3   know, my property value is dropping down because all

4   these people are dancing at night or there's people with

5   guns."  To the extent there's been past experience with

6   that factor of deleterious impact, does that -- how is

7   that complaint taken?  Is it taken at face value?  "Wow,

8   they say their property value is dropping.  I guess it

9   must be."  Or is further inquiry made to see whether or

10  not --

11       A.   We will sometimes have what's called a

12  deleterious impact hearing, the rules for which should be

13  on-line if you look at deleterious impact.  And we'll

14  have a hearing.  And we'll have a party, neutral, again

15  an administrative hearing officer, listen to the evidence

16  and it will be decided on evidence.  If I issued or don't

17  issue license a license because somebody did or didn't

18  like the place, that would make a very complicated

19  licensing scheme and it would be almost impossible to

20  license anything because everybody doesn't like

21  something.

22       Q.   But if understand what you said before, in

23  theory you could deny or refuse to renew a license

24  because you didn't like the place and leave it to the

 1   admin hearing afterwards reverses you so to speak then,

 2   okay, so be it.  And I don't mean you-you, I mean whoever

 3   the commissioner is.

 4        A.   I understand.  So, what you are saying is if an

 5   unreasonable person decided within the position of

 6   commissioner and that person denied a license because

 7   they didn't like this type of licenses, period, and they

 8   could use this ordinance to figure out a way to deny it,

 9   even though they were wrongful, then that would force the

10   person to go into an appeal?  That would be the case with

11   just about any license that my department issues.  An

12   unreasonable person could do that if they were in my

13   position, which is why I should hope that Mayor Rahm

14   Emanuel would only appoint reasonable people because it

15   is a powerful position.

16        Q.   And having said all that, when you say an

17   unreasonable person could denied and everything, do you

18   literally mean that or do you mean anything with a

19   deleterious impact?

20        A.   No, I mean anything, literally.

21        Q.   Okay.  Okay.  But with regards to the

22   deleterious impact clause, if an unreasonable

23   commissioner, let's say, were going to use that as an

24   excuse, there's a limited number of business licenses

1    that have deleterious impact sections of their

2    requirements.  Is that true?

3        A.   Correct.  The deleterious impact requirement is

4    not in every single license type.

5        Q.   Okay.

6        A.   Though, can I just -- but for that last

7    discussion with any commissioner who is so unreasonable

8    to deny licenses without evidence in front of them

9    wouldn't be a commissioner for very long, no matter who

10   the mayor was.

11            MR. WORSECK:  Nor the commissioner who violated

12   the clear terms of city ordinances governing the issuance

13   of licenses.

14            THE WITNESS:  Yes.  That's the type of thing

15   we're talking about.

16   BY MR. SIGALE:

17       Q.   Last question or a couple of questions and I

18   want to move on to the next thing.

19       A.   Okay.

20       Q.   Do you have experience with, and I know it

21   wouldn't be with a shooting range because of all the

22   reasons we talked about, but a MMA or some other type

23   with a deleterious impact clause?

24       A.   Oh, you mean PPA?

1      Q.   Sorry, not mixed marshal arts.  That might be a

2  PPA too.

3      A.   Could be.

4      Q.   Where somebody has said to you or you've heard

5  about it from, say, your deputy, "Well, so and so says

6  that they don't want to put all this money into this

7  business if someone can just decide it's got a delirious

8  impact and then not renew their license," and then

9  suddenly they put all this money into it.  Has that

10  situation come up, either complaints from business owners

11  or concerns raised by would be business owners?

12          MR. WORSECK:  Objection, beyond the scope.

13          THE WITNESS:  No, it really hasn't.  My

14  experience as a business owner before I became a lawyer

15  and dealing with business owners now, you put your money

16  out there and you open your business and you don't know

17  if you're going to last for six months to a year, period.

18  So, there is no such thing as a sure shot when you're

19  opening up a business.

20      Q.   Oh, sure, but what I'm asking you is has anyone

21  specifically raised that concern besides the winds of the

22  economy?

23      A.   No.

24      Q.   Okay.

1      A.    And there's lots of reasons for a business to

2  go under beside the winds of the economy.

3      Q.    Understood.   I just wanted to raise that whole

4  discussion, but I was just asking if anyone has raised

5  that discussion with that deleterious impact as a

6  deterrent for not trying at all.

7      A.    No.   The number one reason that people complain

8  about licensing ordinances is how much time it takes to

9  get licensed.

10     Q.    Okay.

11     A.    Other than that, if I license them in five days

12 or ten days it's always not fast enough.

13     Q.    Okay.   That was 30F.   So, the next one is

14 4-151-090.

15     A.    Hours of operation?

16     Q.    Yes.   I would ask you if you had a chance to

17 read the ordinance -- read that section of the ordinance

18 but I think it's only two lines, right?

19     A.    Correct, and I have read it.

20     Q.    What is the governmental purpose in limiting

21 the hours of operation to those times?

22     A.    There are, again, a handful of licenses that

23 have hour restrictions on their operation.   And mainly

24 this would also go to impact on community and

1    neighborhood as well as public health and safety.

2        Q.   Okay.  When I asked you earlier, much earlier,

3    about if you had done any studies or reading about

4    shooting ranges, either in anticipation of the

5    requirements or once the ordinances were passed, so,

6    okay, these are the new rules, I think you had said you

7    didn't.

8        A.   That's correct.

9        Q.   Okay.  I just want to -- I'm going to follow up

10   real quick with that.  Are you familiar from any source

11   regarding the operation of shooting ranges in other

12   cities?

13           MR. WORSECK:  Objection, vague.

14           THE WITNESS:  Other than hearsay, which would

15   all be I suppose.

16   BY MR. SIGALE:

17       Q.   Right.

18       A.   I'm only aware of one fact regarding other

19   cities, and I believe that is New York that has these

20   shooting range ordinances of some type that they recently

21   enacted.  But I'm not sure if that was New York or New

22   Jersey.  I'm most confused by it, and I lived in New York

23   ten years.

24       Q.   Isn't New Jersey New Yorker's favorite suburb?

1        A.    No.   We have different names for New Jersey.

2   That's not suburbanite.

3        Q.    Do you have any knowledge of the specifics of

4   this shooting range ordinance?

5        A.    No, I do not.   The only thing I can tell you is

6   that I am aware of the fact that there are other cities,

7   and I think it was New York or New Jersey who has an

8   ordinance for a shooting range.   Clearly I am aware of

9   shooting ranges because I have friends that shoot.

10       Q.    So you're making a presumption that because

11  there are shooting ranges in other cities there must be

12  some laws regarding them in those cities?

13       A.    Yes.

14       Q.    But in terms of like how they operate in terms

15  of hours of operation, in terms of how they get along,

16  let's say, with the rest of the community, whether

17  they're good neighbors or not so to speak in other

18  cities, you don't have any knowledge regarding that, is

19  that right?

20       A.    I'm not familiar with anything like that.

21       Q.    So, let's go back to this hours of operation

22  requirement dash 090.   I'd asked you about the government

23  purpose and you mentioned community and neighborhood.

24  What --

1      A.   Public safety as well.  Public health welfare

2  and safety.

3      Q.   Those were two things you said, though, right?

4      A.   Yes.

5      Q.   Let me ask you first about community and

6  neighborhood.  You had first mentioned a handful of

7  licenses with these restrictions.  And with regard to

8  shooting ranges in specific, if you know, what's the

9  effect one way or the other on community and neighborhood

10  of limiting the hours of operation?

11     A.   I can only make a guess because I haven't seen

12  any studies, but I do know a few facts having dealt with

13  licensing and hours of operation, which the hours of

14  operations is only an issued for certain businesses, is

15  that crime tends to happen more at night than it does

16  during the daytime hours.  And I'm going to just leap

17  right here and say that guns are involved in crimes.

18          And I don't know to be honest with you if the

19  new ordinance for guns since McDonald, I know that it

20  used to be back when my friends shot as a hobby they used

21  to have to take their guns completely apart to transport

22  them.  I don't know if that's still the case in the City

23  of Chicago.  But if it isn't, then having a gun that's

24  fully functional after 8:00 p.m. in any neighborhood

1    would be a problem if everybody knows that at 8:05 they

2    can go get a gun by mugging somebody walking out of the

3    facility.

4         Q.   Okay.  But what you just said I want to be

5    clear that's speculation on your part, is that true?

6         A.   Oh, absolutely.  Absolutely speculation on my

7    part, but it's based upon my experiences in licensing

8    having dealt with hours of operation.  I will tell you

9    that there are certain aldermen who, if they had their

10   way, this entire town would roll up its streets at 9:00

11   p.m. and nothing would be open after that.  Nighttime is

12   more dangerous than daytime.  But Constitutionally unless

13   I have a good governmental reason, okay, and we do have

14   limitations on hours for those businesses that impact

15   public health and safety.  And specifically those would

16   be liquor licenses and certain food licenses, and, it

17   appears, gun ranges.

18        Q.   But, again, and I just want to be clear, that

19   any reason that you would have why a shooting range might

20   have a negative impact on public health and safety would

21   be speculation on your part?

22             MR. WORSECK:  Objection, mischaracterizes the

23   testimony.

24             THE WITNESS:  Certainly since there's no

1  shooting range facility in the City of Chicago at the

2  moment all the presumptions that are made when you would

3  exact an ordinance to license the facility are

4  presumptions, but they're based upon facts.

5  BY MR. SIGALE:

6      Q.   Okay.  But other than the facts of crime

7  happens more at night and guns are sometimes involved in

8  crime, beyond that it's speculation?

9          MR. WORSECK:  Objection, mischaracterizes the

10 testimony.

11         THE WITNESS:  I am only telling you what my

12 presumption is based upon looking at this ordinance and

13 based upon my experience in licensing.

14 BY MR. SIGALE:

15     Q.   Okay.  What types of food licenses are limited?

16     A.   Sidewalk cafes and outdoor patios.  Sidewalk

17 cafes must be closed by I think midnight.  They started

18 out closing at 11:00 but that was amended actually last

19 year to allow them to stay open until midnight.  Mobile

20 foods cannot operate between 2:00 a.m. and 5:00 a.m.

21 Again, that's another license type where you gather

22 crowds in a tight area.

23         What else has hours of operation?  I think

24 there's one other.  Of course, well, liquor licenses they

1  are 2:00 a.m. and 4:00 a.m. licenses.  There's a laundry

2  late hour license.  You know, your self-service

3  laundromat where there's no attendant.  There are some

4  restrictions on the hours of those, but I think we lifted

5  those in the recent licensing ordinance in lieu of

6  putting in a 30-day camera loop for security.  So those

7  are the ones that come to mind.

8      Q.   Okay.  Just to be clear so I know I've asked

9  it, you're not aware of any other city where having a

10  shooting range open past 8:00 p.m. caused a negative

11  impact on public health and safety of that city?

12     A.   I am not aware of that.

13     Q.   Okay.  The next topic that you're listed for is

14  100D, and that is on Page 10 of Krimbel Exhibit 1.

15  You're looking at it.  Go ahead and look at it and let me

16  know when you're done.

17     A.   Okay.

18     Q.   What is the -- first of all, you'll agree --

19  strike that.

20         Do you read this ordinance the way I do which

21  says no one under the age of 18 is allowed in the

22  shooting range facility regardless of whether they're

23  there to handle or shoot a firearm or not?

24     A.   I do not read it that way, and I'll tell you

1  why.  Because I'm reading it within context.  And if you

2  read the second sentence, it refers to specifically to

3  the shooting range patrons.  So I'm presuming that no

4  person under the age of 18 shall be permitted as a patron

5  in a shooting range facility.  That said, the other part

6  of your question whether they're accompanied by an adult

7  or not, that you would be correct on.

8      Q.   Okay.

9      A.   But it does look to me like a 16-year-old could

10 be selling popcorn if there was a concession stand.

11     Q.   Well, okay.

12     A.   Because, again, you're reading it in the

13 context of that whole paragraph.

14     Q.   That's fine, but I want to go back to Page 2.

15 They say that on Page 10, but go to Page 2 where shooting

16 range facility is defined as public or private shooting

17 range and the premises on which it's located includes all

18 the buildings, structures, parking areas and other

19 improvements.  So, even in context it doesn't look like

20 anyone under 18 shall be even permitted on the grounds,

21 even in the parking lot, much less on a firing lane.

22         MR. SIGALE:  I'm going to object to these

23 questions to the extent you're calling for a legal

24 conclusion.

1        THE WITNESS:  I'm not sure I read it that way.

2   I think that's a pretty onerous way to read this.  D

3   specifically is referring to patrons of the shooting

4   range facility.  Clearly you cannot bar someone from the

5   age of 18 from walking across a parking garage or a

6   parking area.  It seems to me, I mean to me when I look

7   at this it's referring to a patron because, again, you've

8   got to take it in the context of the paragraph.

9   BY MR. SIGALE:

10      Q.   Okay.  Well, let's take it in the context of

11  the paragraph.  Do you take the context to mean no one

12  under the age of 18 could be a patron of the range, which

13  means no one under the age of 18 could fire a firearm at

14  the range?

15      A.   That is what I would say is what this stands

16  for, yes.

17      Q.   What is the governmental purpose of barring

18  anyone under the age of 18 from using a firearm at a

19  firing range?

20      A.   I'm going to have a harder time with that one,

21  but I'm presume it's because they do not want children

22  and guns in the same place.  They don't want children

23  running around while guns are being fired.  They don't

24  want children in the vicinity.  If you have, you know, a

1  patron who is 25 and has a three-year-old and a

2  five-year-old with them, I don't know if you want them

3  running around while somebody's shooting a gun.  That

4  said -- so I can understand that.  I could see that that

5  would be dangerous for the children to be in a shooting

6  range unless there's someone who's supervising them so

7  that they can't be harmed.  But that said, I will give

8  you this:  I believe 4151-100D is inartfully drafted

9  because it seem clear to me that the purpose of it is to

10  not have kids running around unsupervised.

11      Q.   Okay.

12      A.   But, again, as a person who knows a lot of

13  hunters you start teaching your kid around sometime

14  around the age 14, 15 how to fire a rifle if you're going

15  to go hunting, and that's a good place for them to learn.

16  So you might want to draft that a little bit differently,

17  but I understand what they're doing.

18      Q.   And are you also familiar with the idea that

19  there are ranges that have youth classes?

20      A.   I am not aware of ranges that have youth

21  classes, but I do know that in another state that I lived

22  in they did have classes in shooting.  In fact, my own

23  son took a shooting class when he was 12, so I'm well

24  aware of the fact it's okay to teach a young person how

1  to shoot a gun property.

2      Q.   Okay.  If you had done that for all them we'd

3  be done by now.

4      A.   Sorry.  If you'd ask less theoretical

5  questions.

6      Q.   I can only ask theoretical because, like you

7  said, nothing exists yet.

8           Number 12.  I guess we've already covered that.

9  The enforcement of the sections that we've already talked

10 about, the various code sections, is there anything

11 beyond what we've -- in terms of how you would enforce

12 them?  You're listed as the witness for this.

13     A.   Okay.

14     Q.   I guess I've so far been asking you questions

15 regarding the issuing of the license in the first place

16 and how you would interpret the various ordinances in

17 determining whether to issue a license when someone comes

18 in for an application.  So, now I want to talk to you

19 about the enforcement of it.  And I guess the only way

20 we've really talked about enforcement, and tell me if I'm

21 wrong, is when we were talking about how -- we were

22 talking about the deleterious impact and the renewal in

23 the context that might come up in terms of someone asking

24 for a renewal and there might be some enforcement on

1   that.  But beyond that, have we already discussed what

2   the enforcement process is in the context of everything?

3   Somebody applies --

4            MR. WORSECK:  David, since you're starting a

5   hypothetical there I want to jump in here to clarify the

6   record.  Topic 12 asks for testimony on enforcement of

7   the enumerated sections in the ordinance that were

8   enumerated in the preceding topics of the 30(b)(6) notice

9   and we, of course, only disclosed Commissioner Krimbel as

10  to some of those.  So we're producing her to talk about

11  enforcement of those particular provisions that were

12  enumerate in the ordinance, not to talk generally about

13  all matters relating to enforcement of all of the various

14  licensing requirements in the gun range ordinance.

15           MR. SIGALE:  I'm going to be asking

16  Commissioner Krimbel regarding the enforcement of the

17  sections listed above that you disclosed her about and

18  that she's already testified to as opposed to asking her

19  to testify about enforcement, about provisions that we

20  haven't talked about at all because she's not the

21  witness.  And I'm asking her about it in the context,

22  unless you understand something different, that BACP has

23  an enforcement division.  And I'm assuming that when,

24  although we know the danger of that, but I am going on

1    the basis that when I ask for the enforcement of said

2    section such things would happen in the enforcement

3    division.

4            THE WITNESS:  All right.  I can jump in and

5    tell you what I think.  I believe I'm a 30(b)(6) witness

6    regarding licensing of and the licensing ordinances and,

7    therefor, I can testify very easily on the licensing

8    ordinances and how this particular license ordinance fits

9    in with the schemata of all the licensing and along with

10   our business process.  Part of licensing is also license

11   enforcement, so I could talk to you, if my attorney feels

12   it's proper, about the enforcement of licensing in a

13   general way to explain to you how we enforce licensing,

14   which is different than enforcement.  License

15   enforcements are a very specific type of enforcement, and

16   I could explain to you how that works.

17           MR. SIGALE:  Is that your understanding?

18           MR. WORSECK:  Within the limited topics that we

19   talked --

20           MR. SIGALE:  That you've already otherwise

21   disclosed here already about and that we've talked about

22   already.  Okay.

23           THE WITNESS:  Let me explain licensing

24   enforcement to you.

1  BY MR. SIGALE:

2      Q.   That would be fantastic.  Thank you.

3      A.   You're welcome.  Licensing enforcement.  Does

4  it have a license or doesn't it?  If it does, okay.  We

5  go in and make sure that all the requirements are met

6  that they're supposed to in their standard of operations

7  and how they're supposed to operate, their operating

8  procedures.  Fine.

9          That is a very small, small part of licensing

10  enforcement.  The majority of licensing enforcement is

11  they don't have a license but they're operating.  That is

12  licensing enforcement, and that is what the enforcement

13  does more than anything else.

14          If you recall earlier I had said people come in

15  and they might be in inquiry status in our computer, and

16  the computer every month scrapes those inquires out that

17  never went to application or licensing.  They'll go check

18  to see if those entities are operating without a license.

19  So, when they find somebody who's operating without a

20  license, the standard method of enforcement is called a

21  cease and desist, and they would issue a cease and

22  desist.

23          So, in the context of this particular license

24  and the context of licensing enforcement as my department

1    handles that, if they saw a shooting range facility

2    operating that was not licensed, they would issue a cease

3    and desist order.  And then that cease and desist order

4    would sometimes be accompanied by an A-N-O-V or ANOV,

5    Administrative Notice of Violation, which might subject

6    to person to a fine.  But the C and D order would be

7    entered into the systems and it would automatically then

8    kick over to the police department, and the police

9    department would check and see if they were operating

10   after they were ordered to cease and desist operating

11   without a license.  So, if they get one of those, they

12   normally come in and get their license.  That's licensing

13   enforcement.

14          If they do not come in and get their license

15   and they continue to operate unlicensed, then they may be

16   arrested for violating the cease and desist order, and

17   that is licensing enforcement in a nutshell.  Can I go

18   home now?

19          MR. WORSECK:  It's not up to me.

20          MR. SIGALE:  If you hadn't been disclosed under

21   five other topics I'd say yes, but --

22          Can we go off for one second?

23                    (WHEREUPON, a discussion was had

24                     off the record.)

1   BY MR. SIGALE:

2       Q.    Somebody comes to you and says, "You know,

3   there's a shooting range operating," and I don't mean

4   you, I mean your department.  Someone comes to BACP and

5   says, "Well, there's this shooting range there, but, you

6   know, I thought those places were supposed to close at

7   8:00 o'clock, and I heard people and I saw people walking

8   out of there at 10:00 o'clock and I thought I heard some

9   pops."

10      A.    Uh-huh.

11      Q.    They have a license.  Presume they have a

12  license.

13      A.    Okay.

14      Q.    What happens?

15      A.    The police would be called.  My people do not

16  work at 8:00 p.m.

17      Q.    They come in the next day, though.  So, you

18  wouldn't just --

19      A.    The police would be called if they were

20  operating after 8:00 o'clock.  The police have the

21  authority to enforce licensing ordinances.  And as such,

22  if a call came in to me on my cell phone I would

23  immediately patch it through to the police and say, "Hey,

24  these guys are operating past 8:00 o'clock.  Go check it

1  out," and the police would come.

2      Q.    Would that be the same for all the other

3  topics, whether I fill in the blank of they're open past

4  8:00 o'clock with I saw someone who looks like he's 14

5  coming out of the place?  You would send the police over

6  to investigate that too or --

7      A.    Well, now you're talking more of along the

8  lines of a consumer complaint.  I saw somebody coming out

9  there who looked 14.  You know, if I received that

10  type of a complaint presumably from a consumer or a

11  citizen, then we would ask them to sign an affidavit to

12  that effect.  We'd ask them, "How do you know that they

13  were, you know, 14?"  And more likely than not what we

14  would do is if the person seemed like a credible person

15  and gave us some description that made us think that

16  maybe there are kids going into this place then we would

17  probably do a referral to police or we'd more likely than

18  not would send our own people out during the day after

19  school hours but before our investigators, and our

20  investigators work until 6:45 so they're around after

21  school, and we'd have them drop in after school a few

22  times to see if they saw kids over there.

23          And we'd also ask if they had any logs or if

24  they had any records of who's there and check those out

1  too.  We might do things like that.  But, you know, if I

2  had to send my investigators out every time somebody said

3  they saw something, you know.

4      Q.   Okay.  I hear you.  The consumer complaints,

5  though, let's say that it turns out that it's true.  Is

6  that something -- is that a cease and desist letter

7  handled by your office?  Is it revoke the license with a

8  hearing procedure?  How does it --

9      A.   Okay.  There's a number of different things

10  that could happen.  Number one, you could write an

11  administrative Notice of Violation and you could have the

12  citizen be the witness who would testify.  You can do

13  that.  And that's probably what you would do the first

14  time that happened.  If it happened again, I'm going to

15  tell you what would happen since, again, we're talking

16  theoretical here.  I will tell you what would happen if

17  we find somebody selling cigarettes to a minor.  That's

18  somewhat analogous, right?

19      Q.   Okay.

20      A.   Okay.  Let the record reflect he shrugged yes.

21      Q.   Lawyers.  Okay.

22      A.   So, if someone, you know, we get a call this

23  gas station is selling cigarettes to kids, we would then

24  set up some type of under cover investigation.  We might

1  send the police out, we might do some type of sales to

2  minor investigation.

3       Q.   Okay.

4       A.   And the more I think this through it's probably

5  what we would do here because in order to do a sale of

6  minor investigation we need a minor, and there are

7  programs which provide us with minors for cigarette

8  sales.  So, an investigator would go with a 15-year-old

9  and they'd walk into a store or they'd walk to that gas

10  station and the kid would try to buy a pack of cigarettes

11  and the investigator would lag behind close enough to

12  watch the transaction.  And if the transaction occurred

13  then the minor and the investigator would leave the

14  premise.  The minor would be secured so he'd be safe and

15  the investigator would go back in and they would cite

16  them with an Administrative Notice of Violation.

17          Now, if we have three of those in two years we

18  would then immediately move for a revocation hearing.

19  And then we would bring in as evidence at that revocation

20  hearing the fact that there were multiple previous

21  violations presuming that those violations are proven at

22  an administrative hearing of sales of tobacco to minors.

23  So if I'm going to translate that to a shooting range if

24  someone were to tell me that, I suppose we might then do

1   the same type of --

2       Q.   Okay.  And then if the license is revoked

3   there's a procedure for appeal?

4       A.   Absolutely.  There's a complete revocation

5   procedure that would be our adjudication process.  But,

6   again, we need evidence.  It's not easy to revoke a

7   license, so you don't do it on somebody's say or

8   something.  You have to prove it.

9       Q.   Okay.  Anything else to say regarding

10  enforcement?

11      A.   No.

12          MR. WORSECK:  Objection, vague.

13          THE WITNESS:  No, I don't think so.  I think

14  that gives you enough information to understand how we

15  enforce.

16  BY MR. SIGALE:

17      Q.   Okay.  And have there been any internal

18  discussions at BACP how this process would either be the

19  same or different for shooting ranges versus any other

20  type of licensee?

21      A.   No.  We would treat this the same way we'd

22  treat any other license type.  And when I say any other

23  license type, I should be more specific.  The same way

24  we'll read any other regulated or specialty license type.

1    Q.   Okay.  It's either going to be a quick one or

2  it's going to be a long one.

3        The question is, the topic is, Commissioner,

4  the empirical evidence relied upon by you as bases for

5  enacting the challenge sections in plaintiff's pending

6  amended complaint of the gun range ordinance.  Now, the

7  challenge section of the gun range in the plaintiffs

8  pending amended complaint of the gun range ordinance for

9  purposes of today are the sections of the ordinance we've

10 discussed?.

11        MR. WORSECK:  David, I just want to be clear,

12 clarify for the record that the scope of this is as

13 limited in correspondence I noted at the onset of the

14 deposition.  There was a lot of back and forth in

15 particular during discovery about empirical evidence,

16 what that means and what that entails, and that's been

17 hashed out in the court.  So we'll providing the witness

18 subject to those limitations.

19 BY MR. SIGALE:

20    Q.   Okay.  This might be real easy, though,

21 Commissioner.  Are you aware as you sit here of any

22 empirical evidence that justifies or provides a basis for

23 enacting the sections, the code sections that we've

24 talked about today?  I can break it down by section if

 1    that will help.

 2         A.   No.   I will answer no.

 3         Q.   Okay.   The next topic is the defining of

 4    deleterious impact and substantial number of arrests.

 5    So, check, unless you have something to add to that that

 6    as you're sitting here you're saying, "Aw, he should have

 7    asked about that.   I could have told him."

 8              MR. WORSECK:   Objection.

 9              THE WITNESS:   I think you've pretty much

10    covered it.

11    BY MR. SIGALE:

12         Q.   The next topic, and this is next to the last

13    topic, so there's a tunnel and light.   To the extent we

14    haven't talked about it, I want to dig a little just to

15    make sure.   The review and consideration of applications

16    pursuant to CMC, Chicago Municipal Code?

17         A.   MCC.

18         Q.   You said it MCC.   I saw CMC somewhere,

19    4-151-030.   So we're back to that whole section.

20         A.   The whole B6 section there.   Well, not B6, just

21    that whole license application and procedures.

22         Q.   Yes.

23         A.   Got it.

24         Q.   You know, this might be a good time if you

1   might want to take like a five-minute break or something

2   like that or a couple minutes.

3               I'll take a five-minute break.

4                           (WHEREUPON, a break was had in the

5                            proceedings.)

6   BY MR. SIGALE:

7       Q.    All right.  For the record, there's two topics

8   left, and if I can skip ahead and do the second one

9   first.  Topic 22, the number and disposition of

10  applications to build and/or open a gun range filed with

11  the city.  That number is?

12      A.    Zero.

13      Q.    Therefor, to use our favorite word today, the

14  disposition of any such applications would be

15  theoretical?

16      A.    Correct.

17      Q.    Okay.  So then we go back to Number 18, the

18  review and consideration of applications pursuant to MCC

19  4-151-030.  And we talked about this somewhat earlier,

20  but I want to clarify a few things, ask a few things.

21  And I think that from my part, unless I have any

22  followups to any theoretical questions by your counsel, I

23  think we'll be done pretty soon.

24      A.    Okay.

1      Q.   Somebody comes in and says, "I want to build a

2    shooting range at this location," and assume zoning is

3    not an issue.

4      A.   Okay.

5      Q.   They're going to -- this isn't an easy on-line

6    one like the hat store that I don't want to do anymore,

7    but it's a little more complicated.  It's a novelty.

8    They're going to get a consultant, correct?

9      A.   They will sit down with a business consultant

10   in the business center at BACP.

11     Q.   Now, earlier we had talked about the

12   applications getting bumped up, maybe to a supervisor

13   level, maybe skipping that and going to the deputy

14   commissioner, Ms. Adelizzi y.  And then maybe probably

15   all the way up to you.

16     A.   Very possibly.

17     Q.   Okay.  Is that bump up going to be, at least in

18   the beginning with the shooting ranges, is that going to

19   be automatic or is it that -- is it possible that the

20   consultant is going to say, "Oh, this is actually pretty

21   easy," gets it done, gets it out to the various

22   departments.  030, somewhere in here it says that the

23   license has to be sent out to zoning and building and

24   what not.  Is that possible or is it more likely that at

1  least in the beginning that it's going to wind up getting

2  bumped to you?

3          MR. WORSECK:  Objection, asked and answered.

4          THE WITNESS:  It's possible.  And if you'd like

5  I'll give you a specific example.  The most recent

6  license type that was issued where we actually had a real

7  applicant, and we're not talking hypotheticals or

8  theoretically, was the produce merchant license.  And I

9  thought that I might see that one because that one is a

10  little touchy because it's on the public way and it's an

11  experimental type of license, and those all came in and

12  were clean.  And all they did was knocked on my door and

13  said, "We just issued 12 of them."  So there is a very

14  good possibility that -- and the reason they will tell me

15  that is that I'll be the one who gets calls about it if

16  it's a problem.

17          So if it's a clean someone walks in and meets

18  all the criteria and there was nothing to discuss, it

19  will just issue and someone will knock on my door and

20  say, "Hey, we just issued our first shooting range

21  facility."  Congratulations.  And I would be like,

22  "Great.  Good to know."  And then I'll also know if any

23  calls come in that, "Yes, I have a license."  We tend to

24  celebrate the first license that we issue of every type

1    when we get one.

2        Q.    Okay.  Sounds good.

3            Forgive me if I asked you this.  I don't think

4    I did.  I had asked you before about basically limiting

5    anyone from out of state from being a part of a shooting

6    range because they can't get a FOID card, and I asked you

7    if there's any other business that that happened.  And we

8    talked about taxi cab drivers before Katrina and how it

9    said Illinois license and now it doesn't.  That you see

10   is there a governmental purpose for keeping people who

11   don't live in Illinois from owning, even in part, a

12   shooting range in the city?

13           MR. WORSECK:  Objection, asked and answered.

14           THE WITNESS:  There might be.  There might be.

15   I can in my mind come up with a scenario where we would

16   not want somebody from New York opening up a gun range

17   here and being a remote owner.  That's reasonable.  That

18   would be a reasonable thing.

19   BY MR. SIGALE:

20       Q.    Why would it be reasonable?

21       A.    For the same reason that you wouldn't

22   necessarily want an absent landlord, because it's

23   something where you'd want them to have a real live

24   active interest in it because when we see problems in

1    licenses or licensees or businesses it's often because

2    you have an absent owner, someone who really doesn't

3    care.  They're just taking the money out of it and

4    they're not paying any attention to the operation.

5         Q.   Is that regardless whether or not there are

6    good people actually running it day-to-day?

7         A.   Well, no.  You know, you look at the -- what

8    you asked, and stop me if I'm wrong because maybe I'm

9    answering the wrong questions here, but you asked is

10   there any governmental reason why you wouldn't want

11   someone from out of state owning a business in Illinois?

12        Q.   Owning it, right.

13        A.   And my answer would be that on some license

14   types you'd want the ownership to be active ownership and

15   not passive ownership because you want to be able to have

16   access and availability for service if necessary.  So you

17   might want somebody to be a resident of the state.

18        Q.   Okay.

19        A.   Or certainly you'd want them within, what is

20   it, a hundred mile bubble of federal court?  I don't

21   really remember those rules anymore.

22        Q.   You had mentioned New York as your example of

23   the absentee owner.  Is your analysis regarding that the

24   same if, say, the owner lives in Munster, Indiana?

1          MR. WORSECK:  Objection; vague, hypothetical,

2  beyond the scope.

3          THE WITNESS:  Not if I was doing the analysis

4  where it's not an active owner.  I'm not quite sure where

5  Munster is.  Could we use something like Hammond or

6  Whiting because it's right over the border?

7  BY MR. SIGALE:

8      Q.   Sure, either.

9      A.   Where, you know, they could be, you know,

10  living in Hammond as their personal residence and then

11  have a business just over the border in Illinois, and

12  then they'd be a very active owner.  So, it would be

13  different.

14      Q.   And --

15      A.   But there may be reasons, depending upon the

16  license type, and, again, I think I stated this earlier,

17  I don't know if we have that restriction on other

18  licenses.  The example that came to my mind was that

19  particular taxi ordinance, but there may be other license

20  types where there is a requirement that you have an

21  Illinois driver's license or you have an Illinois

22  something or other in order to have the license.  I don't

23  really know as I sit her and speak, so I can certainly

24  find out.

1          But there might be a reason why you'd want

2     someone to be an Illinois state resident or have Illinois

3     certification of some sort before you would allow them to

4     do a business.  For instance, like a day care center.  A

5     day care center in the City of Chicago has to be licensed

6     by both the State of Illinois as well as by the City.

7     Now, I don't know what the state's criteria is, but the

8     state criteria might require that you be an Illinois

9     resident to operate a day care in Illinois in which case

10    it would by default also be a requirement for us.

11         Q.   Sure.

12         A.   And we have a number of different license types

13    that are licensed by both the state and the city, so it

14    could be something like that.  So, could be comity.

15    C-o-m-i-t-y, sorry.

16         Q.   And just to be clear so I know I've asked the

17    question, you're not aware of any specific instances

18    regarding shooting ranges somewhere, obviously that isn't

19    Chicago, where the fact that a part owner lived outside

20    of that state caused a problem in the neighborhood or

21    community with regard to that shooting range?  Is that

22    true?

23         A.   It's true.

24         Q.   Okay.  Are you aware of any instances where

1    someone has come to BACP, whether to you specifically or

2    you heard about it from one of the people under you,

3    complaining of a problem with a shooting range existing

4    somewhere in the city?  And obviously for purposes of

5    this question I'm not talking about a private commercial

6    range, but any kind of shooting range.  A City of Chicago

7    police range or like a private security type range, but

8    they complained to you because, you know, they're

9    consumers and you're who they would think to go to for

10   protection.  Do you know what I'm asking?

11       A.    You're asking me if I've ever received any

12   complaints related to the gun ranges of any type whether

13   private, public, commercial or otherwise?

14       Q.    Perfect.

15       A.    No.

16       Q.    Okay.

17       A.    I have not.

18       Q.    And just to clarify when you answer you have

19   not, are you speaking for you individually or are you

20   speaking for you the department, BACP?

21       A.    I'm speaking for the department.

22       Q.    As well as yourself then?

23       A.    Yes.

24       Q.    Okay.

1    A.    Yes.   If a complaint came in, as I say we get

2  20,000 complaints a year, but if a complaint came in on a

3  gun range of any sort, they would immediately let me

4  know.   That would be considered a biggy and unusual.

5         MR. SIGALE:  Drew, I don't know if you have any

6  questions.   I'm going to thumb through this really quick

7  here, but otherwise I think I'm done.

8         MR. WORSECK:  Why don't you thumb through and

9  let us know when you're done.   I might have one or two

10  quick ones.

11         MR. SIGALE:  No, I think we've covered all the

12  topics pretty well.   Okay.   Commissioner, I'm set.

13         Do you have anything else?

14         MR. WORSECK:  You're finished?

15         MR. SIGALE:  I'm done.

16                       EXAMINATION

17                  BY MR. WORSECK:

18    Q.    I think just two quick questions, Commissioner.

19  Is it fair to say your testimony here today was given

20  based on the best of your knowledge and recollection as

21  you sit here today?

22    A.    Yes.

23    Q.    And is it possible that there could be

24  governmental purposes or interests served by the

1  provisions you talked about today that you either don't

2  recall as we sit here today or that you are, perhaps, not

3  even aware of?

4       A.   Oh, absolutely.

5            MR. WORSECK:   That's all I have.

6                      EXAMINATION (further)

7                        BY MR. SIGALE:

8       Q.   Sorry.   I have a new question.

9            Is there anything that would refresh your

10  recollection as to any governmental purposes that as you

11  sit here today that you may not be aware of?

12            MR. WORSECK:   Objection, vague.

13            THE WITNESS:   I can't think of anything that

14  would refresh my recollection, but I can tell you that of

15  the 117 different license types I am not involved in the

16  actual drafting and enacting of them.   I am involved in

17  the operational impact after they are enacted.   So, to

18  the extent that city council has reasons beyond my

19  knowledge, there is nothing that would refresh my

20  recollection as to what those reasons might be.

21       Q.   Okay.   Fair enough.

22            If I wanted -- is there anything else that --

23  with regard to the topic of governmental purposes

24  regarding only the sections of the ordinance that we've

1  talked about today, is there anybody else I should be

2  speaking to other than city council members --

3         MR. WORSECK:  Objection; vague, calls for

4  speculation.

5  BY MR. SIGALE:

6      Q.   -- to ascertain any additional government

7  purposes.

8         MR. WORSECK:  Beyond the scope.

9         THE WITNESS:  Not to my knowledge.

10         MR. SIGALE:  Okay.  Thank you.  Thank you,

11  Commissioner.

12               (Ending time - 3:54 p.m.)

13      *   *   AND FURTHER DEPONENT SAITH NOT   *   *

14

15

16

17

18

19

20

21

22

23

24

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                      EASTERN DIVISION

 4  RHONDA EZELL, JASON I. BROWN, )

 5  WILLIAM HESPEN, ET AL.,        )

 6                     PLAINTIFFS, )

 7             -VS-                 ) NO. 10 CV 5135

 8  CITY OF CHICAGO,               )

 9                     DEFENDANT.   )

10         I, COMMISSIONER ROSEMARY KRIMBEL, hereby

11  certify that I have read the foregoing transcript of the

12  testimony given by me at my deposition on September 24,

13  2012, and that said transcript constitutes a true and

14  correct record of the testimony given by me at said

15  deposition except as I have so indicated on the errata

16  sheets provided herein.

17  COMMISSIONER ROSEMARY KRIMBEL

18  _____

19  No corrections (Please initial)_____

20  Number of errata sheets submitted _____ pages

21  SUBSCRIBED AND SWORN TO BEFORE ME

22  This _____ day of _____, 2012

23  _____

24  NOTARY PUBLIC
```

1  STATE OF ILLINOIS )

2                    ) SS:

3  COUNTY OF C O O K )

4        I, CHERYL LYNN MOFFETT, Certified Shorthand

5  Reporter No. 084-002218 in and for the County of Cook and

6  State of Illinois, do hereby certify that I caused to be

7  reported in shorthand and thereafter transcribed the

8  foregoing transcript of proceedings.

9        I further certify that the foregoing is a true

10  and correct transcript of my shorthand notes so taken as

11  aforesaid; and, further, that I am not counsel for nor in

12  any way interested in the outcome thereof.

13        I further certify that this certificate

14  applies to the original signed IN BLUE and certified

15  transcripts only.  I assume no responsibility for the

16  accuracy of any reproduced copies not made under my

17  control or direction.

18

19

20        IN TESTIMONY WHEREOF, I have hereunto set my

21  hand this 14th day of November, 2012.

22

23  _____

24  CHERYL LYNN MOFFETT