1                IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF ILLINOIS

3                       EASTERN DIVISION

4

RHONDA EZELL, JOSEPH I.      )
5   BROWN, WILLIAM HESPEN,       )
ACTION TARGET, INC.,         )
6   SECOND AMENDMENT             ) Case No. 10 CV 5135
FOUNDATION, INC.,            )
7   and ILLINOIS STATE RIFLE     )
ASSOCIATION,                 )
8                                )
                Plaintiffs,  )
9                                )
10     vs.                       )
                                 )
11  CITY OF CHICAGO,             )
                                 )
12                Defendant.   )

     The 30(b)6 deposition of ROBERT FAHLSTROM,

13  called for examination pursuant to the Rules of

14  Civil Procedure for the United States District

15  Courts pertaining to the taking of depositions,

16  taken before Janice Smith, Registered Professional

17  Reporter and a notary public within and for the

18  County of Cook and State of Illinois, at 30 North

19  LaSalle St., Suite 1230,Chicago, Illinois, on

20  September 27, 2012, at the hour of 1:30 p.m.

21

ATKINSON-BAKER COURT REPORTERS, INC.
22  800-288-3376
www.depo.com
23  Reported by: Janice Smith, RPR
License No.: 084-001346
24  File No. A609993

 1    APPEARANCES:

 2        LAW FIRM OF DAVID G. SIGALE, P.C.
          BY:  DAVID G. SIGALE, ESQ.
 3        739 Roosevelt Road, Suite 304
          Glen Ellyn, IL 60137
 4        630.452.4547 (Tel.)
          630.596.4445 (Fax)
 5        Dsigale@sigalelaw.com
          www.sigalelaw.com

 6
          Appeared on behalf of the Plaintiffs;
 7


 8
          CITY OF CHICAGO, DEPT. OF LAW
 9        BY:  REBECCA ALFERT HIRSCH, ESQ.
          30 North LaSalle St.
10        Suite 1230
          Chicago, Illinois  60602
11        (312) 742-0260

12        Appeared on behalf of the Defendant.

13

14

15

16

17

18

19

20

21

22

23

24

```
1                    I N D E X
2    WITNESS                          EXAMINATION

     ROBERT FAHLSTROM
3
       By Mr. Sigale                      Pg. 4
4                                         Pg. 50

5
       By Ms. Hirsch                      Pg. 50
6

7

8

9                  E X H I B I T S
     NUMBER                          MARKED FOR ID
10
     Deposition Exhibit
11
         No. 1                           Pg. 19
12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    (Whereupon, the witness was

 2                     duly sworn.)

 3                ROBERT FAHLSTROM,

 4    called as a witness herein, was examined and

 5    testified as follows:

 6                     EXAMINATION

 7    BY MR. SIGALE:

 8        Q.    Would you state your name and spell

 9    your last name for the record?

10        A.    Last name for the record, Fahlstrom; F,

11    as in Frank, a, h, as in Henry, l, s, as in Sam,

12    t, as in Tom, r-o-m, as in Michael.

13        Q.    And first name is Robert?

14        A.    Yes.

15             MR. SIGALE:  Let the record reflect

16    this is the deposition of Robert Fahlstrom.  It is

17    taken pursuant to a notice pursuant to Federal

18    Rule of Civil Procedure 30(b)6, with the date

19    agreed upon by the parties.

20                It is taken pursuant to all

21    applicable rules of the Federal Rules of Civil

22    Procedure and any applicable local rules of the

23    Northern District of Illinois.

24
```

1    BY MR. SIGALE:

2        Q.    Mr. Fahlstrom, have you given a

3    deposition before?

4        A.    Yes.

5        Q.    When was the last one you gave?

6        A.    To the best of my knowledge, maybe 4 or

7    5 years ago.

8        Q.    Was that in the capacity that you are

9    here today, as with regard to your employment with

10   the Department of Buildings, or some other type of

11   matter?

12       A.    It was with the Department of

13   Buildings.

14       Q.    Okay.

15       A.    Slightly different office.

16       Q.    Okay.  And you were just a witness in

17   that case as well?

18            MS. HIRSCH:  Object.  Just a witness.

19   BY MR. SIGALE:

20       Q.    Well, you weren't a party in the case?

21       A.    No, then I would have been just a

22   witness.

23       Q.    Okay.  Well, since that was sometime

24   ago, hopefully it are will make things go a little

1  faster and a little smoother.  Let me give you

2  some ground rules.

3           First, Janice here is taking down

4  everything everybody says.  She cannot take things

5  like head shaking, hand gestures; maybe the

6  biggest culprit, uh-huh or um-hmm.  So please keep

7  everything out loud and verbal, okay?

8       A.    Okay.  No problem.

9       Q.    It is also very difficult for Janice to

10  take down more than one person talking at a time.

11  There is probably going to be times when you are

12  going to know what my question is even before I am

13  done asking it.  But I ask in all circumstances

14  that you wait until I am done asking my question

15  before you answer.  I, in turn, will try to wait

16  until you are done answering before I ask another

17  question.  Okay?

18       A.    Not a problem.

19       Q.    Okay.  If for any reason I ask a

20  question that you do not understand, let me know

21  and I will rephrase it.  If you answer a question

22  that I ask you here today, it is going to be

23  presumed for purposes of the record that is being

24  made that you understood the question that I was

1    asking and that that was the question you are

2    answering.  So again, I am not here to trick

3    anybody or anything like that.  If I say something

4    that doesn't make sense or you don't understand,

5    let me know and I will rephrase the question.

6    Okay?

7        A.    Okay.

8        Q.    And if you need to take a break, let me

9    know.

10        A.    Not a problem.

11        Q.    Excellent.  So with all that said,

12    you -- as I alluded to before, you are currently

13    employed by the City of Chicago?

14        A.    Yes.

15        Q.    In the Department of Buildings?

16        A.    Yes.

17        Q.    As we sit here now, what is your

18    position with the Department of Buildings?

19        A.    Manager of Regulatory Review.

20        Q.    How long have you held that position?

21        A.    Six years.

22        Q.    And what is your job description as the

23    Manager of Regulatory Review?

24        A.    I manage the department that writes

1   building code and ordinances for the Department of

2   Buildings.  Does technical research, policy

3   development, special inspections.  That would be

4   the main things that we do.

5              Oh one other.  I'm sorry.

6   Personally manage the Trade Licensing Division

7   too.

8       Q.    Indulge me.  I write slower than most

9   people talk.  The first thing you said was that

10  you managed the department that writes --

11      A.    Let me rephrase.  The bureau within the

12  Department of Buildings that writes building code

13  or ordinances generated by the department.

14      Q.    Okay.  All right.  And let me -- strike

15  that.

16              What is the address of your office?

17      A.    120 North Racine Avenue.  Chicago

18  60607.

19      Q.    And is that the office of the

20  Department of Buildings or is that some separate

21  office?

22      A.    The the Department of Buildings has two

23  separate offices.  One of them is at 121 North

24  LaSalle Street, ninth floor.  That is primarily

1    the place from where building permits are issued.

2    That is the Building Permit Department.

3                    The office at 120 North Racine is

4    where the building inspectors and related

5    administration services and so forth are housed.

6         Q.    Okay.  And how long have you been

7    employed by the Department of Buildings?

8         A.    Let me see.  Since about September, I

9    think it was, 15th of 2000 or 2001.

10        Q.    And what was your initial title with

11   the Department of Buildings?

12        A.    Supervising Architect.

13        Q.    And what was your job description at

14   that time?

15        A.    Performing plan reviews, building

16   permits, triaging drawings that came in or permit

17   documents that came into the department for

18   completeness and accuracy, and assisting in the

19   management and administration of a program at that

20   time known as the Customized Review Process.

21        Q.    What was that?

22        A.    Reviewing very large permit projects

23   that required special -- that paid a fee to the

24   Department for the services.  They received in

1  turn outsourced reviews from third-party vendors,

2  architectural firms and engineers.  This made the

3  process faster and perhaps more user friendly.

4            And I helped to manage any

5  meetings, serve as the contact person, coordinate

6  all of the reviews.  I was the point source of

7  communication.

8       Q.   Okay.  And how long did you -- strike

9  that.

10           How long were you employed as a

11  supervising architect for the Department?

12      A.   Give me a moment.

13           Until -- a number chronologically.

14  Until about January of 2003.

15      Q.   And what did you do after- -- strike

16  that.

17           What did you do starting in January

18  of 2003?

19      A.    I was promoted at that time to a

20  manager in the Department of Construction in

21  permits.  At that time the Department of Buildings

22  was split into two entities to facilitate

23  improvements to the permit process.  The

24  Department of Buildings was inspections, building

1    inspections.

2              The Department of Construction and

3    Permits was for building permits.  This was done

4    to facilitate faster building permit issuance.

5              I was promoted a manager for

6    that department at that time.  I managed the

7    project -- going to sound a little redundant.  I

8    managed the project managers, which was a group of

9    about nine people who took in permits and screened

10   them.

11        Q.    Okay.  And how long did you have that

12   position?

13        A.    For about six months.

14        Q.    Okay.

15        A.    I was then promoted to Assistant

16   Commissioner for the Department of Construction

17   and Permits, managing the satellite offices or

18   what we call neighborhood residential permit

19   centers.  That was a group of about 12 plan

20   reviewers and administrative staff who manned at

21   that time four separate offices, three of which

22   were located in different neighborhoods in

23   Chicago.

24              So it was decentralizing the permit

1    process to allow people to go on to a neighborhood

2    office instead of having to come down to downtown

3    Chicago to get their permits.  Was a popular

4    program at the time.

5         Q.   And how long did you do that?

6         A.   Up until about February, March of 2006.

7         Q.   And is that the time you became manager

8    of Regulatory Review?

9         A.   Right.  I was promoted again to the

10   Manager of Regulatory Review.

11        Q.   And Mr. Fahlstrom, is it Mr. Fahlstrom

12   or is it -- is there like a title?

13        A.   No.  Mr. Fahlstrom is fine.

14        Q.   Okay.  I didn't -- like Commissioner,

15   or something.  If you had a title, I would be

16   happy to defer.

17             What is the highest level of

18   education you have completed?

19        A.   Master's degree at the University of

20   Illinois in Chicago in architecture.  It is called

21   an MR degree.

22        Q.   What year did you receive that?

23        A.   1985.

24        Q.   And your undergraduate work?

```
 1        A.     Master -- a bachelor of arts at the

 2   University of Illinois at Chicago in architectural

 3   history.

 4        Q.     And what year did you receive that?

 5        A.     That would have been -- I believe like

 6   1982.

 7        Q.     Other than -- strike that.

 8               Did you review any documents in

 9   preparation for your deposition here today?

10        A.     Yes.

11        Q.     Okay.  Can I ask what you reviewed,

12   please?

13        A.     Some of the documents that were used in

14   preparing the ordinance.

15        Q.     I'm sorry.  Let's be clear so we make

16   sure we are all on the same page.

17               When you say "the ordinance," you

18   are referring to?

19        A.     The shooting range ordinance or those

20   portions of it prepared by the Department of

21   Buildings.

22               MS. HIRSCH:  I just want to -- just to

23   go on the record now and just state that

24   pursuant -- that this deposition should be taken
```

1    pursuant to the guidelines that were set out on

2    discovery, which is that we are not going to be

3    probing what led to the passage of the ordinance

4    and Mr. Fahlstrom's personal involvement in that

5    or the Department of Buildings's involvement in

6    that.

7                    You can ask him about the bases and

8    everything, but I just want to, sense this is --

9    he opened that door, I just want to make sure that

10   I am going to be objecting to that.

11                   MR. SIGALE:  Well, that is all fine and

12   good, but if he reviewed documents and whatnot, I

13   mean I am going to be allowed to ask what they are

14   and --

15                   MS. HIRSCH:  I will also go on record

16   and say any documents that he reviewed were

17   documents that were produced in this case.

18                   MR. SIGALE:  Okay.  Then it should be a

19   very quick line of inquiry then.

20                   MS. HIRSCH:  Okay.

21   BY MR. SIGALE:

22       Q.    Mr. Fahlstrom, I see that you have a

23   black two or three ring binder there.  Are those

24   the documents that you are referring to?

1        A.    No.  This is just my personal manual

2  that I carry with me to take notes and so forth.

3  It is like my planner.  That is all.  I mean has

4  no relevancy to this at all.

5        Q.    Okay.  That is fine.

6               Do you recall then specifically

7  what documents you reviewed?

8        A.    Department of Energy guidelines for

9  shooting facilities or ranges.  National Institute

10  of Health and Safety, which is NIOSH.  Took a

11  brief look at some of their recommendations for

12  shooting ranges.

13        Q.   I want to just ask this real quick and

14  I will ask it on the record, but it might be a

15  question that your counsel might wind up

16  answering.

17               I am under the impression that

18  regardless of whatever you reviewed and whatever

19  involvement you might actually wound up having

20  with some of the parts of the shooting range

21  ordinance, which was of course backed by the fact

22  that you managed the department that does that,

23  you are actually disclosed as a witness on one

24  discreet topic, which is municipal code of Chicago

1    section 13- 96-1200-B-7, which you might not have

2    seen this document, but counsel would recognize as

3    topic 11 on our 30(b)6 deposition notice.

4              Is that -- is that everyone's

5    understanding here, or are there more topics that

6    Mr. Fahlstrom is going to be testifying about that

7    I haven't been --

8              MS. HIRSCH:  To the extent I understand

9    your question, is he being produced in response to

10   your 30(b)6 on that one topic alone, which is the

11   ordinance provision that you just cited to, yes.

12   That is correct.

13             MR. SIGALE:  Okay.

14             MS. HIRSCH:  That is the scope that we

15   will keep this deposition to.

16   BY MR. SIGALE:

17       Q.   All of that was a very long winded way

18   to say you are here just to talk about one thing.

19   Mr. Fahlstrom, other than -- strike that for a

20   second.

21             You had mentioned, I had asked you

22   about documents you reviewed in preparation.  You

23   talked about the Department of Energy guidelines.

24   You talked about NIOSH.  I just want to make sure

1  if there were any others or not.

2      A.    Another one was the Military Handbook

3  for Shooting Range.  Something, a title like that.

4      Q.    Okay.  Anything else?

5      A.    That is about all I can think of.

6      Q.    Okay.  Other than your attorneys and

7  other than anyone you might have had conversations

8  with with regard to the actual drafting of the

9  ordinance in question, okay?  So I am not asking

10  about any alderman or anything that you had

11  conversations with, did you have any discussions

12  with anyone regarding shooting ranges from a

13  building permit construction point of view prior

14  to July of 2011?

15          MS. HIRSCH:  Excluding anything having

16  to do with the ordinance, correct?  With the

17  actual -- as you just said.  Okay.  And I just

18  want to ask are you asking him in his individual

19  capacity?

20          MR. SIGALE:  I am asking him in his

21  individual capacity.

22          MS. HIRSCH:  You are free to answer

23  this.  I just want to say for the record that, you

24  know, it is not going to be city testimony, but as

1  an individual you can answer that.  If you

2  understand it.

3        THE WITNESS:  I am not sure I

4  understand the question..  or exactly the

5  parameters of which -- which is outside of the

6  ordinance itself that I have any discussions about

7  this with anybody?

8  BY MR. SIGALE:

9    Q.    Let me back up and I will rephrase it,

10  make sure that we are all on the same wavelength

11  here.  Okay?

12              I am not going to be asking you

13  questions regarding any participation you might

14  have had regarding the writing of that ordinance.

15  Seems to me maybe you did, but I am not going to

16  ask you about it, okay?  So maybe if

17  hypothetically there was participation, maybe you

18  spoke to some aldermen, maybe you spoke to their

19  staff, maybe you spoke to someone in the city

20  legal department, okay?  But I am not asking you

21  about those kind of political-type conversations.

22  You also probably spoke to counsel here, but I am

23  not asking you about those either, okay?

24              So what I am asking you is if you

1    had any conversations with anybody else regarding

2    the permitting or construction of shooting ranges

3    prior to July of 2011, and prior to July 6 of

4    2011?

5        A.    Why is- it is hard to remember back

6    accurately that date.

7        Q.    Sure.

8        A.    Specifically what was going on that

9    date, this is outside of the ordinance itself.

10   No.  I would not have had any discussions with

11   anybody about this.

12       Q.    I want to mark this, we will call it

13   Fahlstrom No. 1.

14                     (Whereupon, Fahlstrom

15                      Deposition Exhibit No. 1 was

16                      marked for I.D. as of

17                      09/27/2012.)

18   BY MR. SIGALE:

19       Q.    Mr. Fahlstrom, Exhibit 1 is an exhibit

20   of what I will call one of the versions of the

21   ordinance, the shooting range ordinance.  And

22   really all I care about for purposes of today, for

23   which I believe your counsel and I are in

24   agreement, is that section 13-96-1200-B-7 is

1  accurately written out in the document that I have

2  given you, as opposed to the document that I am

3  giving you is wrong.  But it is not.  So that is

4  the-- that is the section that-- is that your

5  understanding, that that is the subsection you are

6  here to testify about today?

7      A.    Yes.

8      Q.    Okay.  What is your experience with

9  shooting ranges?  And let me break that down a

10 little bit.  With going to them, have you ever

11 been to one?

12     A.    Yes.

13     Q.    When was the last time you have been to

14 one?

15     A.    Give me a moment.  I just want to

16 reconstruct it.

17     Q.    Sure.

18     A.    About 2004.  Are you asking about an

19 indoor or outdoor shooting range?

20     Q.    The question actually was just shooting

21 ranges, in 2004 were you at an indoor or outdoor?

22     A.    Outdoor.

23     Q.    Where was the outdoor range you were

24 at?

1          MS. HIRSCH:  I would just like to state

2     an objection, probably an ongoing objection.  I

3     will just state it to this line of questioning for

4     his individual experience going to shooting ranges

5     versus 30(b)6 on the basis of the city's

6     ordinance.  And I would repeat that objection as

7     long as this line of questioning is going on.

8          MR. SIGALE:  Okay.  That is noted.

9          THE WITNESS:  It was a Camp McCage

10    (phonetic) one in Wisconsin, which is a Boy Scouts

11    camp.  I can't give you the exact town that it is

12    adjacent to, but it is about 75 miles maybe west

13    of Green Bay, Wisconsin.  And I was accompanying

14    my son to Boy Scout camp and they had a shooting

15    range.

16    BY MR. SIGALE:

17         Q.    Did you fire at the shooting range?

18         A.    I assisted the rank master on keeping

19    an eye on all the young shooters.

20         Q.    Have you been to an indoor shooting

21    range?

22         A.    Not since I was a little kid.

23         Q.    Do you have any experience or study

24    outside of the documents you earlier mentioned for

1  today's deposition, do you have any experience or

2  study with the structure of firing ranges?

3      A.   Professionally speaking?

4      Q.   Yes.

5      A.   No.

6      Q.   Personally, I mean nonprofessional

7  basis.  That would be a hobby, I guess, or

8  something?

9      A.   No.

10     Q.   Other than the documents that you read

11 in preparation for today, do you have any

12 knowledge of firing ranges at all, other than the

13 fact that firearms are used there?

14          MS. HIRSCH:  Objection.  Vague.  Go

15 ahead and answer if you understand.

16          THE WITNESS:  No.

17 BY MR. SIGALE:

18     Q.   So, really this is just to clarify for

19 purposes of the record.  If the last time that you

20 were in an indoor firing range is as a little kid,

21 it is fair to say that since 2010, we will say

22 January 1, 2010, that you have not visited any of

23 the firing ranges that are commercial private

24 ranges in the Chicago area?

1          A.    No.

2          Q.    Is that a true statement?

3          A.    That is absolutely true.  Yes.  No, I

4    have not visited.

5          Q.    Also to clarify, since January 1, 2010,

6    that means you have not visited any of the City of

7    Chicago's own ranges, such as the police ranges

8    or the police academy range, true?

9          A.    Right.  That is correct.  I have not

10   visited any shooting ranges.

11         Q.    Okay.  Now Mr. Fahlstrom, the party --

12   I am going to refer to it, it is 1200-B-7, but I

13   am going to refer to it as the ordinance for

14   purposes of today.

15         A.    Okay.

16         Q.    I understand that it is one subsection

17   of a very large document that is also referred to

18   commonly as an ordinance, and I am also aware that

19   each individual section can be referred to as an

20   ordinance.  But since you are here just to talk

21   about 1200-B-7, I am going to refer to that as the

22   ordinance.

23         A.    Okay.

24         Q.    We are on the same page with that?

1   A.  We are on the same page.

2   Q.  And if I slip, it will just be to call

3 it 1200-B-7, but either way.

4     Mr. Fahlstrom, the part of 1200-B-7 or

5 the ordinance that -- where the plaintiffs have an

6 issue with that is relevant to you today is the

7 second half.  And if you could look at that, look

8 at that and see if I am reading it correctly.

9      "The floors of the shooting range

10 shall be constructed to slope at a minimum of

11 one-fourth inch, parenthesis, one-quarter inch,

12 per foot from the firing line toward the back stop

13 bullet trap.

14   A.  Okay.

15   Q.  Did I read that accurately?

16   A.  Yes, you did.

17   Q.  What is the governmental purpose of

18 that requirement?

19   A.  The governmental purpose, technical, if

20 you will, purpose of that requirement is to allow

21 for wet cleaning of that concrete floor surface

22 which has been pitched or sloped to a floor drain

23 to collect lead particulate in a safe -- in the

24 safe as possible manner.

1    Q.    And to your knowledge, what is --

2    strike that.  To the extent you know, what is the

3    empirical evidence that concludes that this

4    requirement is safe?

5    A.    Empirical knowledge would be that

6    document that were written on the subject of how

7    you do the cleaning and you design proper shooting

8    facilities recommended this slope for the floor

9    surface at that point.

10            The other empirical knowledge was

11   that the preferred method of cleaning the floor

12   surface then is to use a wet cleaning method, a

13   wash down versus dry cleaning methods.

14   Q.    The documents that you were referring

15   to would be what?

16   A.    Well, for instance the Department of

17   Energy document.  Then the NIOSH documents.  And

18   there were others, but I can't remember them.  I

19   don't recall specifically which ones they were at

20   this time.

21   Q.    Is the answer that you just gave me, is

22   that for the -- the sloped floor issue, or is that

23   for the wet cleaning issue as well?

24   A.    It is for the wet cleaning -- the wet

1    cleaning is technically tied into the reason that

2    you have got a sloped floor.  You have got a

3    sloped floor so that the water will pitch and run

4    by gravity to a floor drain that is located at the

5    other end of the shooting range, the target area

6    by the bullet trap going to the drain by gravity

7    and allow for the maximum clean-up, if you will,

8    the best technical clean-up of that floor area

9    where you are not going to be airborne

10   particulate, lead particulate.  It is the

11   preferred method.

12        Q.    So the documents that you are talking

13   about, you were referring to them as the support

14   for both categories that you were talking about?

15        A.    Right.

16        Q.    Sloped floor and wet cleaning?

17        A.    Right.

18        Q.    And just to be clear, your testimony on

19   that topic is, just so -- I am not trying to put

20   words in your mouth here.  Your testimony on this

21   topic is 100 percent based on these documents that

22   you referred to?

23             MS. HIRSCH:  I am going to object.

24   Mischaracterizes his previous testimony.

1      MR. SIGALE:  That is why I am asking,

2   to clarify.

3   BY MR. SIGALE:

4      Q.    You can answer.

5      A.    The use, do you mean for the quarter

6   inch per foot?

7      Q.    Right.  Right.

8      A.    It is based on the recommendations

9   contained in those documents, yes.  And it is also

10  contained on what I would call building --

11  building industry standards or practices within

12  the architectural profession, the building

13  profession, which is when you have got, I will try

14  not to say it too fast so you can keep up with me

15  writing.

16     Q.    I already lost you.  Building industry

17  something.

18     A.    Building industry standards and

19  practices, almost rule of thumb, if you will.

20  When you have sloped surfaces and you want to

21  provide a minimum drainage, the bare minimum so

22  that it actually drains effectively, throughout

23  the industry a quarter of an inch per foot is an

24  accepted standard.

1          For instance for roofs, roofs that

2     are flat.  The minimum slope that you are going to

3     provide is going to be a quarter of an inch per

4     foot.

5          Q.    Okay.  When you say -- when you are

6     talking a second ago with the building practices

7     and standards, was all that to just explain the

8     quarter inch part?  The quarter inch per foot

9     part?

10         A.    Yes.

11         Q.    Are you aware, as you sit here today,

12    whether or not the Chicago Police Department

13    ranges, and there is six of them, have sloped

14    floors such as required in the ordinance?

15         A.    No, I am not aware.

16         Q.    What about the one at the Chicago

17    Police Academy?

18         A.    No.  No.

19         Q.    Just let me finish the question.

20         A.    I'm sorry.

21         Q.    No, no.  We are all doing it.

22              With regard to the Chicago Police

23    Academy range, which is at 1300 West Jackson, are

24    you aware whether or not that range has a sloped

1   floor such as is required in the ordinance?

2       A.    No.  I am not aware.

3       Q.    Okay.  Is your answer the same if I ask

4   you about the ranges at the Federal Reserve Bank

5   at 230 South LaSalle Street?

6       A.    No, I know nothing about those ranges.

7       Q.    What about the Postal Inspector range

8   at 743 South Canal Street?  Do you know the answer

9   to that?

10      A.    Again, no, I have no idea.

11      Q.    So let me ask, so I've got it on the

12  record here:  The Customs and Border Protection

13  Range, 610 South Canal Street, do you know if that

14  one has a sloped floor like the ordinance?

15      A.    No, I do not.

16      Q.    What about the one at 899 Upper Express

17  Drive, which is the Air Marshall's range?

18      A.    No.  I do not.

19      Q.    And just one more.  4420 South Tripp

20  Avenue, the Brinks range?

21      A.    No.  I do not.

22      Q.    Don't know if it has a sloped floor

23  like that?

24      A.    Don't know if it has a sloped floor.

1    Q.   Okay.  Are you aware of any problems or

2  complaints from the community or complaints from

3  anyone say who works there such as a policeman

4  or something, or security guards at some of the

5  other ranges, of problems that are caused by lead

6  particulates or any other reason because there is

7  not a sloped floor?

8           MS. HIRSCH:  Lack -- objection.  Lack

9  of foundation.  We don't know whether there is a

10  sloped floor or not.

11  BY MR. SIGALE:

12    Q.   I want to assume for purposes of the

13  question that there is not a sloped floor on the

14  ranges that I have mentioned.  Have you, as the

15  manager of the regulatory review at the Department

16  of Buildings, or in any of the previous capacities

17  that you were employed there, have you heard any

18  complaints from anybody of problems caused by lack

19  of a sloped floor at those places?

20           MS. HIRSCH:  Objection.  This is vague

21  and it calls for speculation.  To the extent that

22  you know that a complaint-- you know, you even

23  know the answer that a complaint was specific to

24  the lack of sloped floor and there was a problem,

 1   go ahead.

 2           THE WITNESS:  What I would say is if a

 3   complaint was generated, I wouldn't know anything

 4   about it.  Those complaints would go to the

 5   Department of Environment of the City of Chicago,

 6   to their Lead Inspection Division.  They wouldn't

 7   come to the Department of Buildings and they

 8   certainly wouldn't come to my division within the

 9   Department of Buildings.

10   BY MR. SIGALE:

11       Q.   Okay.  So the short answer is if there

12   was one you wouldn't know about it?

13       A.   No.  I wouldn't know at all.

14       Q.   Okay.

15       A.   Totally out of the loop.

16       Q.   Okay.  But I'm sorry --

17           MS. HIRSCH:  You build it.

18   BY MR. SIGALE:

19       Q.   But you said such a complaint would go

20   to the Department of Environmental?

21       A.   The Department of Environment.  I

22   believe that department is no longer in existence,

23   but it -- previously it would have gone to the

24   Department of Environment.  They have a lead

1   inspection division that handles lead-related

2   problems.

3        Q.   Who would take care of that now?

4        A.   You know, I'm sorry, I don't honestly

5   know who is handling those functions.  It might be

6   the Chicago Department of Health that is handling

7   them.  I believe some of those inspectors were

8   sent over to that department to assist.  The

9   Department of Environment was kind of broken into

10  pieces and different people were assigned to

11  different departments.  I am sorry I can't give

12  you a specific answer.  I just don't know.

13       Q.   That is okay.

14             One second, Mr. Fahlstrom.

15       A.   Not a problem.

16       Q.   If you could look at the first part of

17  1200-B-7 where it says, "The floor ceilings and

18  walls of every shooting range shall be constructed

19  of smooth, nonporous materials."

20       A.   Okay.

21       Q.   "To facilitate effective maintenance

22  and cleaning and removal of lead particulate."

23             Now I could ask you the

24  governmental purpose of that first part, and I

1    guess I will, but I am going to ask it in the

2    sense of is there a governmental purpose beyond

3    what stated, which is facilitating effective

4    maintenance and cleaning and removal of lead

5    particulate?

6         A.    No.

7         Q.    That is the reason?

8         A.    That is the reason.

9         Q.    What is in there.  Okay.

10             Can you name for me some airborne

11   and structure borne sound absorbing materials that

12   are smooth and nonporous?

13        A.    There are acoustical tile products that

14   are coated with, say, vinyl and so forth that are

15   used in restaurants.

16        Q.    I'm sorry, can you say that again?

17        A.    There are acoustical tile-type products

18   that are used in restaurants that are smooth and

19   nonporous.

20        Q.    What types of -- what products are

21   those?

22        A.    Well, I believe the trade name, at the

23   time that I, you know, would inspect for, look

24   for, would have been Vicretex, would be one.

1    Q.    Can you spell that?

2    A.    V-i-c-r-e-t-e-x.  I don't know if it is

3    still manufactured.

4    Q.    And this Vicretex is smooth and

5    nonporous, yet sound absorbing?

6    A.    I am not familiar enough with the

7    product to notice sound absorption

8    characteristics.  Just that I saw it being used in

9    suspended ceilings and had an acoustical tile kind

10   of a backing to it, so I assume it had some sound

11   absorbing characteristics.

12   Q.    Okay.  Any others that you can think

13   of?

14   A.    No.  No.  Not right now.

15   Q.    Okay.  And again I am not trying to

16   misstate you or anything like that, but this

17   Vicretex you were talking about, were you aware

18   whether it was both airborne and structure borne

19   sound absorbing?

20   A.    No, I don't know.

21   Q.    Okay.  And then just to be clear so I

22   know I have asked the question, are you aware of

23   any other materials that are both smooth and

24   nonporous while also being airborne and structure

1    borne sound absorbent?

2         A.    No.   That doesn't mean they are not out

3    there.   I am just not aware of them right now.

4              MS. HIRSCH:   David, can you direct me

5    to where subsection 7 talks about soundproofing or

6    what was the term you were just using?

7              MR. SIGALE:   Airborne and structure

8    borne.

9              MS. HIRSCH:   Airborne and structure

10   borne.

11             MR. SIGALE:   Sound absorbing.

12             MS. HIRSCH:   Where are you pulling that

13   language from?

14             MR. SIGALE:   That is 1200-B-2.

15             MS. HIRSCH:   He already testified he

16   doesn't really know, but for purposes of the

17   record it is beyond the scope of the deposition.

18             MR. SIGALE:   Well, just so my position

19   is clear, I guess just to respond to that, not to

20   make a thing of it, but I mean if he is testifying

21   as to the section that something is required and I

22   am permitted to inquire whether that in

23   conjunction with another requirement actually

24   exists, so it is not -- I am not --

1          MS. HIRSCH:  You can ask him his own

2     personal knowledge.  Again --

3          MR. SIGALE:  Well, he is the disclosed

4     witness, so I am asking him his personal knowledge

5     because he is the witness, but I am also

6     presumably asking it in his capacity as the

7     disclosed witness for the city.

8          MS. HIRSCH:  For subsection 7, yes.

9     Correct.

10          MR. SIGALE:  For subsection 7.

11          MS. HIRSCH:  Correct.

12          MR. SIGALE:  Give me a second, Mr.

13     Fahlstrom.  I thought I had it right on the tip of

14     my tongue here.

15     BY MR. SIGALE:

16     Q.   Mr. Fahlstrom, are you familiar with

17     any studies or reports concluding that floor

18     drains in a shooting range such as at the end of a

19     firing lane are actually a safety hazard?

20     A.   No.

21     Q.   Depending, of course, on the content of

22     such study or report, might your opinion that you

23     expressed earlier change?

24          MS. HIRSCH:  Objection.  I'm sorry.  I

1    thought you were done.  Change, pause.  Go ahead.

2    BY MR. SIGALE:

3         Q.    If you were to see those, any such

4    reports or studies?

5              MS. HIRSCH:  Objection.  Calls for

6    speculation.

7    BY MR. SIGALE:

8         Q.    You can answer.

9              MS. HIRSCH:  You can answer.

10             THE WITNESS:  Well, from a technical

11   point of view, any protuberances into the floor

12   surface of the space are supposed to be protected

13   with deflective lights in the design of shooting

14   ranges.  So that hazard is supposed to be

15   mitigated by other design safety features.

16   BY MR. SIGALE:

17        Q.    It sounds like what you are just saying

18   there, though, is that you are aware then that

19   floor drains can be a hazard in a shooting range

20   then.  I mean I am not trying to be glib.

21             MS. HIRSCH:  That is not the way you

22   phrased the question before.  So if he gave you a

23   different answer, it is because it is a different

24   question.

 1          THE WITNESS:  Again, the literature on

 2    the subject talks about protuberances,

 3    protrusions, protuberances, call them what you

 4    were -- what you will, and some of the literature

 5    that I remember, floor drains were talked about,

 6    and they are supposed to be protected with floor

 7    deflector plates or other means to deflect a

 8    bullet away into the bullet trap area.  So that is

 9    technically what is recommended.

10    BY MR. SIGALE:

11      Q.    Okay.  Is a sloped floor only

12    beneficial, then, if there is a floor drain to

13    slope it towards?  In other words -- let me

14    rephrase the question.

15              Based on your prior testimony, are

16    you saying that the whole purpose of requiring the

17    sloped floor is to slope it towards this floor

18    drain, or is there some other purpose for having

19    the sloped floor that you haven't mentioned?

20      A.    To the best of my knowledge, again with

21    the information, the sources, the technical

22    sources that were reviewed that recommended the

23    sloped floor, no other reason was given for

24    sloping it, but I can remember it would have had

1    anything to do with some other safety feature or

2    whatever except for sloping to a floor drain,

3    providing positive drainage.  There may be

4    something else that I don't know about, but I

5    don't know what that is.

6         Q.    Well, just so I made my record clear,

7    if indeed some other purpose does pop up,

8    obviously there is a duty to supplement and I

9    reserve the right to talk to Mr. Fahlstrom again

10   later if indeed such other purpose is disclosed.

11            Let me go back to my earlier question,

12   though, that I don't think got answered.  I think

13   we wound up on a tangent.

14            Your opinion -- strike that.  Your

15   statements regarding the governmental purpose of

16   the sloped floor as connected to this floor drain

17   and the empirical evidence that you talked about,

18   might your conclusions change if you were to

19   review reports or studies showing that floor

20   drains in a firing lane are a hazard?

21            MS. HIRSCH:  Objection.  Calls for

22   speculation.  Go ahead and answer.

23            THE WITNESS:  I don't know.  I would

24   have to review the report and the technical

1    literature.

2                    Again, as I have stated, everything

3    that I read that was regarding floor drains in the

4    firing range was, they are if they protrude, are

5    to be protected.  As I sit here right now, I am

6    not quite sure why they would be a hazard if they

7    were properly protected.  There is different

8    expertise that is out there.

9    BY MR. SIGALE:

10        Q.    So depending on the content of such

11   studies or reports, your conclusion might change?

12        A.    Again, I would have to -- I would have

13   to read it and see and understand it and know who

14   authored it and what their purpose and agenda was

15   and so forth, to take a look at that, yeah, to

16   consider it.  I would consider it.

17        Q.    Okay.  Fair enough.  Same question with

18   regards to the wet cleaning method for a firing

19   lane.  If I were to present studies or reports

20   that show that that is not the preferred method of

21   cleaning a range, cleaning the firing lane of the

22   range, would you consider that information as

23   well?

24                    MS. HIRSCH:  Objection.  Calls for

1    speculation.  Facts not in evidence.

2             THE WITNESS:  Again same answer.  Yes,

3    could be considered.  All the literature that we

4    reviewed emphasize that the wet cleaning method

5    was preferred, and specifically some of the OSHA

6    related documents were very strong on that point.

7    BY MR. SIGALE:

8        Q.    Okay.  Are you familiar with a

9    HEPA-rated explosion proof vacuum?

10       A.    I have never used it.

11       Q.    Are you familiar with it?

12       A.    Have I heard of it?

13       Q.    Yes.

14       A.    There was -- I can't remember the

15   document, tell you the documents that it was in.

16   There was some discussion that that could be an

17   alternate method.  Not the preferred method, but

18   an alternate method; that that might be one way

19   of, you know, providing a dry cleaning.

20       Q.    Okay.  To your understanding, with the

21   wet cleaning method of a firing lane, what happens

22   to the lead particulates and gun powder when the

23   wet cleaning method is used?

24       A.    It is collected in the floor drain.

1   The floor drain has its own separate drainage

2   system, separated from other drainage, what we

3   call DWV, drainage waste and vent systems, the

4   plumbing that would be in the building.  For

5   instance your bathroom drains, you have got hand

6   sinks, you know, a kitchenette, something like

7   that that would be in there that would not drain

8   into the same drain.  It would go into a

9   filtration system, possibly into a collection

10  basin system.  Similar but to say triple oil basin

11  system that is used in a garage, and then it could

12  be periodically cleaned out and the lead removed

13  safely.  The two systems don't intermix.

14      Q.    I guess I will ask, since we have been

15  talking now for a little bit of a while, you

16  earlier mentioned the Department of Energy docs

17  and the NIOSH docs?

18      A.    Right.

19      Q.    Since we have been talking about the

20  other topics, however, has your memory been

21  refreshed as to any other documents you might have

22  read?

23      A.    At the time?  When would I have read

24  the documents?

1    Q.   The question originally was in

2   preparation for the deposition, but at any time?

3        MS. HIRSCH:  And I will just state I

4   will object to any time that might have been for

5   recommending and putting into place anything to do

6   with the ordinance, so just --

7        MR. SIGALE:  Well, no.  I am not

8   allowed to ask him what he did with that or who he

9   talked to or if he wrote the ordinance.  But if

10  indeed he had a conversation with Alderman

11  So-and-So and read some report, I am allowed to

12  ask him about the report as part of the basis of

13  his knowledge for testifying here.

14       MS. HIRSCH:  Yeah, but see the thing is

15  to distinguish between when he did that.

16       MR. SIGALE:  Well, if it will make this

17  thing go easier --

18       MS. HIRSCH:  Okay.

19       MR. SIGALE:  -- I can break it down

20  into in preparation for this deposition at and at

21  any time in the past, and we will leave it at

22  that.

23  BY MR. SIGALE:

24       Q.   So I will ask it two ways then:  Has

1  your memory been refreshed as to any other

2  documents you reviewed in preparation for today's

3  deposition other than the Department of Energy

4  docs and the NIOSH documents?

5      A.   Well, there is also the military

6  handbook.  Right.

7      Q.   I wrote that somewhere.  No, you did

8  say that.  Where did I write it?  Wrong page.  You

9  did say that.  Military handbook, NIOSH docs and

10  Department of Energy guidelines.

11          Any other documents as you sit here

12  in light of all this talking we have done, has

13  your memory been refreshed as to anything else you

14  have read for today?

15      A.   Now that I think about it, I briefly

16  looked at a portion, I believe, of what were the

17  Canadian shooting range ordinances or guidelines,

18  but they appear to be very incomplete.  And they

19  were like scattered pages.  And that is all.  It

20  wasn't a complete review of the documents.  A

21  document.  I don't think it was- it was just a

22  couple of pages from it.

23      Q.   Okay.  So now, without asking you why

24  you read it or who you spoke to after reading it

1    or what you did with it after you read it,

2    regarding the topics in B-7, 1200-B-7 --

3        A.    Uh-huh.

4        Q.    -- in addition to the documents you

5    already talked about, have you read at any point

6    in time any other documents regarding those --

7    regarding the topic in that ordinance?

8        A.    I can't remember all the documents that

9    were reviewed, but the NRA handbook was reviewed.

10   I believe it was the 2007 edition.  I am not

11   completely -- I can't completely remember the

12   edition.  There were various military manuals from

13   a couple of the armed services, I believe, the

14   Navy, possibly the Marine Corp, too.

15            There are other supporting technical

16   documents not pertinent necessarily to this

17   subject matter under discussion but to other

18   technical areas, ASHRAE, the ASHRAE code

19   pertaining to shooting ranges and so forth.

20       Q.    I don't want to muddy the waters.  Let

21   me just stick to the topic at hand, which would be

22   1200-B-7.

23       A.    Okay.

24       Q.    So --

1      A.     Then I would say the NRA handbook.

2   This is going all the way back in time, the NRA

3   handbook, several military manuals.  There may

4   have been some other -- there probably were some

5   other smaller codes and ordinances.  I don't

6   really remember exactly specifically what they

7   were at the time and what their names were.

8      Q.     Okay.  Again, this is one of those

9   things I just want to ask to make sure it was

10  clear and I asked it.

11             I asked you earlier if you had any

12  professional experience or study with firing

13  ranges.  You said no?

14     A.     No.

15     Q.     I just want to be clear.  So there was

16  no experience, say, working privately as an

17  architect where you designed a range, correct?

18     A.     No.  No experience.

19     Q.     You didn't work for, say, another

20  suburb or something before the city where firing

21  ranges would have been -- permitting firing ranges

22  would have been an issue?

23     A.     No.  I did work for another suburb

24  before the city, but I didn't review shooting

1  ranges.

2      Q.    What suburb was that?

3      A.    City of Evanston.

4      Q.    Okay.  When did you work for Evanston?

5      A.    Approximately about March of 1992 to

6  September 11, 2001.

7      Q.    That is when you left to take the City

8  of Chicago job?

9      A.    Yes.

10      Q.    My guess is your resignation kind of

11  flew under the radar that day?

12      A.    Yeah, that was an interesting day.

13      Q.    Okay.  But no shooting range permit

14  construction issues or anything like that in

15  Evanston?

16      A.    Well, Evanston was modernizing its

17  police department and there was going to be a

18  shooting range that was in there.

19      Q.    Okay.

20      A.    But that was not really something that

21  was reviewed.  The technical issues, you know,

22  were not -- I was looking at other issues at that

23  time.

24      Q.    Okay.  Have you for any reason

 1   reviewed, and I am only asking pertaining to

 2   1200-B-7, okay, the requirements in there, have

 3   you or -- strike that.

 4                   Have you looked to the requirements

 5   of other cities, whether in Chicago or outside of

 6   Chicago or anywhere else, to compare the

 7   requirements like that and what they do?

 8        A.    Are you talking currently or at what

 9   point in time, I guess I would ask?

10        Q.    At any point in time?

11        A.    At any point in time?  Yes, there was

12   looking at some ordinances outside of Chicago.

13        Q.    When was that?

14        A.    That was back at the time the ordinance

15   was drafted.

16                   MS. HIRSCH:  I just want to --

17                   MR. SIGALE:  I am not going to ask him

18   why he did it or who he talked to about it.  I am

19   just asking, what other cities.

20                   THE WITNESS:  And I am not sure I have

21   got them all.  Possibly I think Houston, Texas.

22   Indianapolis, possibly.  That is about all I can

23   really remember and answer you accurately as to

24   what cities.  There were also some states, but I

1  can't remember the states.

2      Q.    Okay.  Is it your recollection that

3  they had a similar requirement to 1200-B-7 or no?

4      A.    The only one I could answer halfway

5  accurately in memory about that would be Houston,

6  Texas.  It was a very short ordinance, so I don't

7  think they had that requirement.

8      Q.    Well, Mr. Fahlstrom, I have done my

9  best to be thorough, but ultimately there is only

10  so much you can ask about four sentences.  So I am

11  going to ask you as kind of a catchall before I

12  thank you for your time today.  That is with

13  regards to the governmental purposes and the -- I

14  am calling them empirical evidence for them, have

15  you mentioned all of it as you know it as you sit

16  here today?

17      A.    As -- yeah, as I know it, yes.  I have

18  mentioned it.

19      Q.    Okay.  Thank you for your time.

20      A.    Thank you.

21          MS. HIRSCH:  I have one question.

22          MR. SIGALE:  I was just thanking him

23  for his time.  I didn't say he could go.

24  Everybody was getting up.

```
 1                          EXAMINATION
 2   BY MS. HIRSCH:
 3        Q.    Just a quick follow-up on what
 4   Mr. Sigale just asked you.  Can you actually
 5   repeat the way he phrased it?
 6                         (Whereupon, the question was
 7                          read, as requested.)
 8   BY MS. HIRSCH:
 9        Q.    Okay.  Mr. Fahlstrom, is it possible
10   that there is empirical evidence or other
11   documents or studies or other ordinances that may
12   support the wet cleaning and slope of the floor
13   for gun ranges that you personally are not aware
14   of?
15        A.    Absolutely.
16              MS. HIRSCH:  That is all.
17              MR. SIGALE:  I have just one quick one.
18                    EXAMINATION (continued)
19   BY MR. SIGALE:
20        Q.    But you will also agree that it is
21   possible that there are studies concluding the
22   opposite, that sloped floors are not -- that floor
23   drains are not safe and sloped floors are not
24   preferred and wet cleaning is not preferred that
```

1   you are unaware of as you sit here today; is that

2   true?

3       A.    I am unaware of them, but they could

4   certainly exist.

5               MR. SIGALE:  Okay.  Okay.

6                 Before we close the deposition I

7   will just repeat that if other governmental

8   purposes or empirical evidence pops up, that I

9   reserve the right to talk to -- on this discreet

10  topic, I reserve the right to talk to Mr.

11  Fahlstrom further on those, that additional

12  purpose or evidence or whatever it is.  So with

13  that said, if you want to reserve or waive --

14              MS. HIRSCH:  We will reserve.

15      * * * FURTHER DEPONENT SAYETH NOT * * *

16

17

18

19

20

21

22

23

24

```
 1   STATE OF ILLINOIS      )
                            ) ss:
 2   COUNTY OF C O O K      )

 3        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 4                    EASTERN DIVISION

 5
     RHONDA EZELL, JOSEPH I.    )
 6   BROWN,   WILLIAM HESPEN,   )
      ACTION TARGET, INC.,      )
 7       SECOND AMENDMENT       )
      FOUNDATION, INC.,         ) Case No. 10 CV 5135
 8   and ILLINOIS STATE RIFLE   )
      ASSOCIATION,              )
 9                              )
                 Plaintiffs,    )
10                              )
       vs.                      )
11                              )
                                )
12   CITY OF CHICAGO,

13              Defendant.

14

15        I, ROBERT FAHLSTROM, being first duly

16   sworn, on oath say that I am the deponent in the

17   aforesaid deposition taken on September 27, 2012;

18   that I have read the foregoing transcript of my

19   deposition, and affix my signature to same.

20                  _____
                         ROBERT FAHLSTROM
21
     Subscribed and sworn to
22   before me this        day
     of                  , 2012.
23

24   Notary Public
```

1    STATE OF ILLINOIS        )

2                             )    SS:

3    COUNTY OF C O O K        )

4         I, Janice Smith, a notary public within and

5    for the County of Cook County and State of

6    Illinois, do hereby certify that heretofore,

7    to-wit, on September 27, 2012, personally appeared

8    before me, at 30 North LaSalle St., Suite 1230,

9    Chicago, Illinois, ROBERT FAHLSTROM, in a cause

10   now pending and undetermined in the United States

11   District Court for the Northern District of

12   Illinois.

13        I further certify that the said ROBERT

14   FAHLSTROM was first duly sworn to testify the

15   truth, the whole truth and nothing but the truth

16   in the cause aforesaid; that the testimony then

17   given by said witness was reported

18   stenographically by me in the presence of the said

19   witness, and afterwards reduced to typewriting by

20   Computer-Aided Transcription, and the foregoing is

21   a true and correct transcript of the testimony so

22   given by said witness as aforesaid.

23        I further certify that the signature to the

24   foregoing deposition was reserved by counsel for

1  Defendant, and that there were present at the

2  deposition the attorneys hereinbefore mentioned.

3        I further certify that I am not counsel for

4  nor in any way related to the parties to this

5  suit, nor am I in any way interested in the

6  outcome thereof.

7        IN TESTIMONY WHEREOF:  I have hereunto set

8  my hand and affixed my notarial seal this 2nd day

9  of November 2012.

10

11

12        _____

13        Notary Public, Cook County, Illinois

14

15

16

17

18

19

20

21

22

23

24