1         IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2             EASTERN DIVISION

3 RHONDA EZELL, JOSEPH I. BROWN,   )
  WILLIAM HESPEN, ACTION TARGET,   )
4 INC., SECOND AMENDMENT          )
  FOUNDATION, INC., and ILLINOIS   )
5 STATE RIFLE ASSOCIATION,        )
                         ) No. 10 CV 5135
6             Plaintiffs,   )
                         )
7      vs.                  )
                         )
8 CITY OF CHICAGO,          )

9             Defendant.

10       The discovery deposition of LIEUTENANT

11 KEVIN JOHNSON, called by the plaintiff for

12 examination pursuant to a Federal Rule 30(b)(6)

13 notice, and pursuant to the Rules of Civil Procedure

14 for the United States District Courts pertaining to

15 the taking of depositions, taken before Devan J.

16 Moore, a certified shorthand reporter within and for

17 the County of Cook and State of Illinois, at Suite

18 1230, 30 North LaSalle Street, Chicago, Illinois, on

19 the 20th day of November 2012.

20

  ATKINSON-BAKER, INC.
21 COURT REPORTERS
  (800)288-3376
22 www.depo.com

23 FILE NO.: A60AE55

24

1    APPEARANCES:

2        THE LAW FIRM OF DAVID G. SIGALE, P.C., by
         MR. DAVID G. SIGALE
3        739 Roosevelt Road
         Suite 304
4        Glen Ellyn, IL  60137
         (630)452-4547
5            for the plaintiffs;

6        ASSISTANT CORPORATION COUNSEL, by
         MR. ANDREW WORSECK
7        30 North LaSalle Street
         Suite 1230
8        Chicago, IL  60602
         (312)744-7129
9            for the defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                        I N D E X
Witness:                                      Page
LIEUTENANT KEVIN JOHNSON
        Examination by:
               Mr. Sigale                     4, 169
               Mr. Worseck                    161




                  E X H I B I T S
Number                                        Page
Johnson Deposition Exhibit No. 1              61


          C E R T I F I E D   Q U E S T I O N S
Page                                          Line
None.
```

```
 1
 2                      (Witness sworn.)
 3                LIEUTENANT KEVIN JOHNSON,
 4    called as a witness herein, having been first duly
 5    sworn, was examined and testified as follows:
 6                   EXAMINATION
 7                   BY
 8                   MR. SIGALE:
 9        Q    Can you state your name and spell your last
10    name for the record, please.
11        A    Lieutenant Kevin Johnson, J-o-h-n-s-o-n.
12        MR. SIGALE:  Let the record reflect that this
13    is the deposition of Lieutenant Kevin Johnson as
14    taken pursuant to a Federal Rule 30(b)(6) notice to
15    the defendant City of Chicago.
16                And Lieutenant Johnson has been
17    designated as a witness on certain topics,
18    specifically referring to the 30(b)(6) Notice
19    Topic 8.  And I guess in part -- we'll find out how
20    much of a part -- Topic 7.
21                It is taken pursuant to the date that
22    has been agreed upon by the parties.  It is taken
23    pursuant to all applicable Rules of the Federal Rules
24    of Civil Procedure, and any Local Rules that are
```

1   applicable from the Northern District of Illinois.

2   BY MR. SIGALE:

3       Q    Lieutenant Johnson, have you given a

4   deposition before?

5       MR. WORSECK:  David, just before you get into

6   the meat of the deposition I just want to state on

7   the record as well, your representations regarding

8   the scope of this deposition are by and large

9   correct.

10                  I just want to note for the record

11  that the topics in the 30(b)(6) notice have

12  subsequently been discussed between the parties, and

13  certain restrictions and limitations and further

14  elucidation of the topics have been discussed between

15  the parties and agreed to between the parties.

16                  So subject to that line of colloquy,

17  we're producing Lieutenant Johnson on the topics that

18  you mentioned.

19      MR. SIGALE:  Okay.  And obviously if an issue

20  comes up with regard to a specific line of inquiry or

21  something, we can deal with that.  I'm just happy

22  that it's on the record that I said something that

23  was correct.

24  BY MR. SIGALE:

1      Q    Lieutenant Johnson, have you given a

2  deposition before?

3      A    Yes.

4      Q    How many times would you say?

5      A    I'd say maybe 2 or 3 times.

6      Q    When was the last one?

7      A    A while ago, regarding a gun legislation I

8  believe.

9      Q    Would that be in the Benson lawsuit?

10     A    I believe so.

11     Q    I think it's called now the Illinois

12  Retailers lawsuit or something, but I think everyone

13  still knows it as the Benson case.

14            Do you know when you were deposed in

15  the Benson case?

16     A    I can't recall offhand.  It was maybe a

17  year or 2 ago.

18     Q    I'm going to ask you a little bit about

19  that.  But, first, since it's been a couple of years

20  since you've given a deposition, let me give you a

21  couple of ground rules to hopefully make this go a

22  little faster, a little smoother.  Okay?

23            Devan is here.  She's taking down

24  everything everybody says.  She can only take down

1   out loud verbal responses.  She cannot take down

2   things like hand gestures or head shaking and, maybe

3   the biggest culprit, things like "mm-hmm" or

4   "uhn-uhn".  So please keep everything out loud and

5   verbal.  Okay?

6               It's also very difficult for Devan to

7   take down more than one person talking at a time.

8   There will probably be times when you're going to

9   know what my question is even before I'm done asking

10  it.  I'm going to ask that in all circumstances you

11  wait until I'm done asking the question before you

12  answer.  I in turn will try to wait until you're done

13  answering before asking my next question.  Okay?

14      A    Understood.

15      Q    If for any reason you don't understand a

16  question that I ask you here today, please let me

17  know, and I will rephrase it.  If you do answer a

18  question that I ask you here today it's going to be

19  presumed, for purposes of the record that's being

20  made, that you understood the question that I asked

21  and that that is the question you are answering.

22              So, again, if for any reason I don't

23  make sense or whatever and you don't understand my

24  question, let me know and I will rephrase it.  Okay?

1     A    Okay.

2     Q    If you need to take a break, let us know.

3     A    Okay.

4     Q    Lieutenant, you are currently employed by

5 the City of Chicago?

6     A    Yes, the City of Chicago, Chicago Police

7 Department.

8     Q    Just for clarity sake, is your paycheck

9 from the City of Chicago or from the Chicago Police

10 Department?

11     A    From the City of Chicago.

12     Q    How long have you been employed by the City

13 of Chicago?  How long have you worked for the Chicago

14 Police Department?

15     A    Almost 22 years.

16     Q    Have you worked for the City of Chicago in

17 any other department or has it always been the police

18 department?

19     A    It has always been with the police

20 department.

21     Q    For purposes of today, if it happens to

22 come up, do you understand that if I mention about

23 you working for the City or you working for the

24 police department, we understand that we're actually

1    talking about the same thing?

2         A    Agreed.

3         Q    Agreed?  Okay.

4              Your current rank is lieutenant.

5    That's a recent promotion?

6         A    Yes.  That is correct.

7         Q    When did you get promoted to lieutenant?

8         A    September 1st, 2012.

9         Q    Congratulations.

10        A    Thank you.

11        Q    Is there a particular division or

12   department within the police department that you're

13   assigned to?

14        A    Yes.  I'm assigned to Bureau Patrol, the

15   3rd District.

16        Q    What does that cover?

17        A    That covers the 3rd District in Chicago.

18   It covers from approximately 59th Street, 5900 South

19   to approximately 7500 South, from the Lakefront to

20   approximately State Street.

21        Q    As a lieutenant in the Bureau of Patrol in

22   the 3rd District, what would you say your job duties

23   are?

24        A    My permanent assignments are District

1    Station Supervisor, which is formally known as a

2    Watch Commander.  Also, I serve as a field

3    lieutenant.

4         Q    Let's stick with the first one first.  As

5    watch commander, how would you describe your job

6    duties in the watch commander part?

7         A    I'm responsible for individual officers

8    going out on the beat, operations within the district

9    during my particular watch, the assignments, duties,

10   incidents, and missions.

11        Q    Is it more of an admin type of duty, or is

12   it like you're the manager basically making sure

13   everything is going...?

14        A    It's more of a manager function.

15        Q    And the field lieutenant part?

16        A    The field lieutenant part is directing

17   field operations within the district during that

18   particular watch.  Making sure that the sergeants and

19   police officers are doing their assignments and

20   duties and responding to calls for service.

21        Q    Does this usually require you to spend your

22   days in the 3rd District headquarters, or are you out

23   on the streets as well?

24        A    It alternates different from day to day due

1    to the requirements of manpower.  I alternate from

2    the field to within the station.

3        Q    Where is the station located?

4        A    7040 South Cottage Grove.

5        Q    Prior to your recent promotion to

6    lieutenant you were a sergeant?

7        A    That is correct.

8        Q    How long did you hold that position?

9        A    I was promoted to the rank of sergeant in

10   August of 1998 until my promotion to the rank of

11   lieutenant on September 1st, 2012.

12       Q    Was that also in the 3rd District?

13       A    No.

14       Q    Where were you a sergeant?

15       A    Per my promotion to sergeant I was assigned

16   to the 15th District.

17       Q    Where is that located?

18       A    It's currently located on -- the new

19   building is on Madison and (inaudible).  I never

20   served in the new building.  I served in the old

21   building, which is located on West Chicago Avenue.

22       THE REPORTER:  Did you say "Madison and Lotus"?

23       THE WITNESS:  Not Lotus.  What street is it on?

24   I haven't been over there.

1      THE REPORTER:  I just thought I heard you say

2  "Lotus".

3      THE WITNESS:  Madison and Waller.  I believe

4  it's in that area.  That's the new building.  The old

5  building is located on Chicago and Lorel, L-o-r-e-l.

6  BY MR. SIGALE:

7      Q    That's where you worked out of since 1998

8  until recently moving to the 3rd District?

9      A    No.

10     Q    Okay.

11     A    Approximately in 2001 I was assigned to the

12  Organized Crime Division.

13     Q    Let me back up one second.  At Chicago and

14  Lorel, that's the old building?

15     A    Yes.

16     Q    Is that where you were working when you got

17  the promotion?

18     A    No.

19     Q    When did you work out of Chicago and Lorel?

20     A    In August of '98.

21     Q    Until when?

22     A    I can't recall the exact date.  Sometime in

23  early 2001, I believe.

24     Q    And you were saying that you got reassigned

1    to Organized Crime?

2         A    Yes.

3         Q    Is that a unit?

4         A    It's a bureau now.  It was a division, an

5    Organized Crime Division.

6         Q    When were you in the Organized Crime

7    Division?

8         A    From early 2001 until my promotion to the

9    rank of lieutenant.

10        Q    Was the Organized Crime Division operating

11   out of a different address?

12        A    Yes.

13        Q    Where was that?

14        A    Homan Square Police Facility.

15        Q    I understand that we're talking about a

16   12-year span, but at the time that you were promoted

17   what were your job duties in the Organized Crime

18   Division?

19        A    At the time that I was promoted to the rank

20   of lieutenant?

21        Q    Yeah.

22        A    Immediately prior to my promotion to

23   lieutenant?

24        Q    Yeah.  But I'm sorry.  Let me back up.

1              The move to the Organized Crime

2   Division, was also a promotion?

3        A    No.  That was a lateral move.

4        Q    Were you a sergeant from August of '98

5   through September of 2012?

6        A    That's correct.

7        Q    Just prior to the promotion to lieutenant

8   you were with the Organized Crime Division.  And what

9   was your job description at that time?

10        A    I held a number of assignments there.  My

11   first assignment I was assigned to the DEA Task

12   Force.

13        Q    DEA?

14        A    Yes, the DEA Task Force.  I was also

15   assigned to the Heroin Task Force.  I was then

16   assigned as sergeant in the Narcotics section.  I was

17   the supervising sergeant of the CAGE Team, the

18   Chicago Anti-Gun Enforcement Team.

19        Q    It sounds like from what you were saying

20   that these weren't all at the same time?

21        A    That's correct.

22        Q    Just prior to your promotion to lieutenant

23   what was your assignment?

24        A    I was a supervising sergeant of the Chicago

1    Anti-Gun Enforcement Team.

2         Q    How long did you have that assignment?

3         A    From April of 2008 until my promotion to

4    the rank of lieutenant in 2012.

5         Q    Just so I've got it, was Narcotics right

6    before that?

7         A    Yes.

8         Q    How long did you have that?

9         A    I'd say maybe about a year estimate.

10        Q    Before that you were on the Heroin Task

11   Force?

12        A    Yes.

13        Q    That was probably about April of '07

14   roughly, I understand.  When did that start?

15        A    The Heroin Task Force?

16        Q    The Heroin.

17        A    The Heroin Task Force was a brief task

18   force.  It lasted maybe about 6 months.  The rest of

19   the time I was with the DEA.

20        Q    So about 5 years with the DEA Task Force?

21        A    No.

22        Q    I guess maybe I skipped something.  You

23   started with Organized Crime in early 2001; right?

24        A    No -- I'm sorry.  I was there, yes.

1  Correct.  I lost track of the years.

2      Q    Math's not my strong subject, but I thought

3  I had that right.  So the DEA Task Force about 5

4  years, '01 to '06?

5      A    Yes.

6      Q    I guess we might as well work ourselves

7  backwards.  Because it's going to be -- I've got a

8  feeling it's going to wind up being the most

9  relevant.  Let's talk about this CAGE Team.

10     A    Yes.

11     Q    What was that?

12     A    The Chicago Anti-Gun Enforcement Team.

13  Primarily the assignment was to investigate illegal

14  firearms trafficking in the city of Chicago, the

15  state of Illinois, and also nationwide.

16     Q    That's what the team did; correct?

17     A    Yes.

18     Q    As supervising sergeant, what was your role

19  with that?

20     A    To supervise the investigators and

21  officers.  To ensure that the investigation was

22  conducted and complete.

23     Q    Do you mind if I call it the CAGE Team?  We

24  that know it's on the record what it means, but I

1    like CAGE.  It's much shorter.  That's probably why

2    they wrote it that way.

3                Was it strictly a law enforcement-type

4    position?  You've got investigators and officers out

5    in the field and you're making sure they're doing

6    their job and that they're doing their

7    investigations; or was there any kind of liaison work

8    or presentations or anything like that that was part

9    of your job?

10        MR. WORSECK:  Objection.  Vague.

11   BY MR. SIGALE:

12        Q    If you understand what I'm asking -- you

13   can answer if you understand what I'm asking.

14        A    Presentations for non-law enforcement?

15        Q    For anybody.  Were you required to liaise

16   with superiors in other divisions or to the chief of

17   police?  Were you required to speak on this to other

18   law enforcement or even non-law enforcement?

19        A    Yes.  As part of our job we were able to

20   speak to -- liaison with other agencies, the Illinois

21   State Police, various law enforcement departments,

22   ATF.

23        Q    That's all from a law enforcement

24   standpoint; correct?  Contacting ATF -- I'm maybe

1    watching too much TV.

2              But we have this investigation going

3    here, and maybe something's come up in another

4    jurisdiction and I need to liaise with another

5    department to further this investigation.  Is that

6    the kind of thing you're talking about?

7        A    Yes.  And to add to that, we also

8    participated in community meetings when required to

9    speak about handgun violence.

10       Q    Let me switch gears just for a question or

11   2, and then I'll come back to this CAGE topic.

12             As a lieutenant -- and I understand

13   that it has only been a couple of months -- but are

14   you still doing any work with this CAGE unit, or CAGE

15   Team; or new gear, new job, and you're separated from

16   that now?

17       A    I'm separated from it now.  They have a new

18   supervisor.

19       Q    These community meetings about handgun

20   violence, are these something that people on your

21   team would go and talk at, or was that a task that

22   you largely had?

23       A    That was primarily my task.

24       Q    I'm asking this question, I guess, in broad

                                                      18

1    strokes because I'm sure that you spoke at a number

2    of these community meetings.  True?

3        A    Yes.

4        Q    I'm asking in broad strokes what the topics

5    of these meetings were.  I understand handgun

6    violence in the community.  But I mean, more

7    specifically, what were the topics usually discussed

8    at these meetings?

9        A    Basically the only topic that I would have

10   addressed is primarily handgun violence and illegal

11   guns in the streets.  We also participated in the

12   City of Chicago's Gun Buyback Program.

13       Q    "We", does that mean you, or does that mean

14   the team?

15       A    The team.

16       Q    Was that another task that fell on you or

17   did that get delegated to somebody else?

18       A    That fell on us.

19       Q    I'm sorry?

20       A    That fell on us in cooperation with other

21   City agencies and departments.

22       Q    Is that a task that fell on you, Lieutenant

23   Johnson -- then Sergeant Johnson -- or is it a task

24   that got delegated to another officer on the team?

1        A    We all participated.  Myself, and the team,

2   along with other CPD agencies and City of Chicago

3   employees.

4        Q    Lieutenant, I hope you don't take anything

5   that I'm talking about here -- specifically what I'm

6   going to ask you -- as me trying to be glib or naive

7   or anything.  We're just making a record, and I'm

8   just trying to make sure I get the questions asked.

9   Okay?

10       A    I understand.

11       Q    When you're talking at these community

12  meetings about illegal guns and guns in the streets

13  and violence and whatnot, is this basically the same

14  thing that we see on the news, like gang warfare,

15  drug deals, things like that?

16       MR. WORSECK:  Objection.  Vague.

17  BY MR. SIGALE:

18       Q    You can answer if you understand the

19  question.

20       A    I don't understand the question.

21       Q    When you're talking about guns in the

22  streets at these community meetings and the illegal

23  guns and whatnot -- strike the question.

24            Let me just ask you: When you're

1  talking at these meetings about illegal guns, guns in

2  the streets, can you be more specific about what

3  you'd be talking about in these meetings.

4      A    It would really depend on what the

5  community is looking for and what kind of questions

6  they're asking.  We would provide some information.

7  We would answer some of their questions as well.

8              But primarily what we wanted to really

9  come across to them was illegal firearms in homes or

10  in a person's hands or gun violence, lost or stolen

11  weapons.

12     Q    Are these community meetings that the team

13  would organize or the department would organize, or

14  are these community meetings that were already taking

15  place and you were invited to speak at them and

16  basically lend an informed voice?

17     A    These meetings were already organized.  We

18  did not set them up ourselves.  They were already

19  organized, and we would just be a participant in the

20  meetings.

21     Q    Someone would contact you from that

22  community and ask if you could come over there?

23     A    Yes.

24     Q    How often would these community meetings --

1    well, strike that.

2                      How often would you be speaking at one

3    of these community meetings?

4         A     It was very rare.  Very rare.

5         Q     It was?  Okay.  How many times a year?

6         A     I figured maybe once.  Twice a year, at the

7    most.

8         Q     So maybe from '08 to a couple of months

9    ago, somewhere like 5 to 8 of these meetings in 4

10   years?

11        A     That would be a fair approximation, yes.

12        Q     Were these meetings usually called because

13   of something that had happened in that community,

14   like if there was a shooting in that community or

15   some violent incident; and the community would say,

16   We've got to have a meeting and let's have someone

17   come in?  Do you know?

18        A     I think maybe there have been a couple that

19   were led by the community that wanted to respond to

20   some gun violence, and they wanted an answer, What we

21   do?

22        Q     What about the others?

23        A     The others were probably part of a larger

24   presentation conducted by the department.

1     Q     By the police department?

2     A     Yes.

3     Q     So some of these community meetings the

4  department would organize, and you'd be asked as a

5  representative of the CAGE Team to go talk at.  And

6  some of them the community would organize in response

7  to some incident, and you would be asked as part of

8  the CAGE Team to go talk to them?

9     A     Let me just clarify it.  We would always be

10  directed by the department.  We wouldn't

11  self-initiate anything.

12     Q     Some of these community meetings -- I

13  understand that we're only talking a handful or a

14  couple handfuls at most.  But you're saying that some

15  of them the community would organize and contact the

16  department, and then they'd contact you.  And some of

17  them the department would organize and contact you?

18     A     That would be correct.

19     Q     Again, not to be glib, but is it fair to

20  say that none of these community meetings that you

21  ever spoke at involved the topic of firing ranges?

22     A     That's correct.

23     Q     Are there any of these meetings where it

24  actually came up as a topic for conversation?  One of

1    the community members at the meeting would bring it

2    up as a topic, and then it would kind of spiral into

3    a discussion about it?

4        A    Not that I'm aware of.

5        Q    I'll just ask this: You were with this team

6    in April of '08 roughly, the CAGE Team.  Did you have

7    anything to do, you or your team, with the topic of

8    firing ranges while you were a supervising sergeant

9    there?

10       A    With the specific topic of the firing

11   ranges?

12       Q    Yeah.

13       A    No.

14       Q    I'm asking that question -- I understand

15   that you and the other officers on the CAGE team

16   would be required to go to a range at least once a

17   year to qualify; is that true?

18       A    As part of our qualifications in terms of

19   department qualifications you're talking about?

20       Q    As a police officer, yes.

21       A    Yes.

22       Q    Other than that, other than having to go to

23   a range personally to re-certify or to practice, your

24   work didn't involve firing ranges at all?

1      A     That's correct.

2      Q     And that's true even since firing ranges

3   became legal in the city, technically speaking,

4   private commercial firing ranges, in July of 2011?

5      A     Can we go back?  Is it possible to go back

6   for a second to address that issue?

7      Q     Of course.

8      A     A part of our investigations dealing with

9   CAGE would also include straw purchasing, illegal

10   transfer of firearms, investigations.  These are

11   criminal investigations dealing with firearms

12   trafficking.

13              There have been some of our

14   investigations resulting from persons alleging a loss

15   or a theft coming to or from a firing range, which

16   were all outside of the city of Chicago.  So, yes, to

17   answer your question, we did deal with aspects of

18   firing ranges.

19      Q     Thank you.  I will come back to ask you

20   about that as well.

21              But other than that -- and I'll ask

22   you more about that in a little bit -- if a firing

23   range somehow became a part of that particular

24   investigation.  But in general that would be the only

1    time your job would involve a firing range?

2        A    That would be correct.

3        Q    Let me skip back a little earlier with your

4    career in the OC Division, Organized Crime.  It looks

5    like from 2001 when you started with it to April

6    2008, roughly, when you joined the CAGE Team, it

7    looks like your task forces, your assignments all

8    involved drugs.  Is that fair to say?

9        A    Drugs were a part of it; but it also

10   included weapons firearms.

11       Q    With Narcotics, Heroin, and DEA?

12       A    Yes.

13       Q    Was that ancillary to the drug

14   investigation?  For example, you have a tip that

15   someone's got heroin in a house.  You bust in.

16   There's heroin, but there's also firearms.  Is that

17   what you mean; or was part of your assignment

18   specifically geared towards firearms?

19       A    They were ancillary to the narcotics.

20       Q    Like the hypothetical that I was describing

21   a minute ago?

22       A    That would be correct.

23       Q    In that ancillary scenario, when you come

24   across a firearm that you know or suspect is illegal,

1   when you conduct a raid on the heroin dealer, did you

2   do any of the investigations regarding that firearm

3   or was that turned over to the CAGE team?

4       A    That was turned over to the CAGE team.

5       Q    So your unit would keep the drug portion,

6   and the CAGE Team would handle the firearm portion?

7       A    That's correct.

8       Q    I guess I'm asking when you were with the

9   CAGE Team, if you think there's a weapon somewhere

10  and you do a raid and you find weapons, but you also

11  find a quantity of marijuana, let's say, does that

12  get handed over to the DEA Force?

13      A    No.

14      Q    Do you investigate both?

15      A    We make an arrest -- let me just get a

16  clarification.  You're asking if -- would you repeat

17  the question.

18      Q    Probably not, but I'll try.

19             You had said when you were on the

20  earlier task force that if you do a raid on a heroin

21  dealer and you find a weapon that you think is

22  illegal, you'd give that portion of the investigation

23  over to the CAGE unit, the CAGE Team?

24      A    Yes, sir.

1   Q    I'm just asking when you were on the CAGE

2  team, was the reverse true?

3   A    If they required further investigation, it

4  would go over to them.  But all contraband and

5  narcotics would be inventoried and then processed on

6  as part of the court case.

7            If they felt that there was a need to

8  further investigate, that would be handled by

9  Narcotics or some other element of the department.

10   Q    I wasn't suggesting that you did the raid

11  and you take the firearms and you say, It's your

12  lucky day with that pot because that's not us.  I've

13  got that.

14   A    Understood.

15   Q    I want to try and keep this brief, but I

16  want to at least have the whole thing.

17            If you've been with the department I

18  guess for 22 years, we've gone about 14 or 15 of

19  them, just by your years as a sergeant.  What were

20  you doing before that?

21   A    I was a patrol officer.

22   Q    From when to when?

23   A    1991 until my promotion to sergeant in '98.

24   Q    Any particular area that you were a patrol

1    officer in?

2        A    The majority of my career was spent in the

3    Englewood District.

4        Q    Where else did you spend time?

5        A    A brief time in the 6th District.

6    Approximately maybe about 3 months in the 6th

7    District, and about the same in the 18th District.

8        Q    Just briefly, where is the 6th District?

9        A    It was on 85th and Green.  That building

10   has since been sold.

11       Q    And the 18th District?

12       A    It was on Chicago Avenue and LaSalle.  And

13   it is also now being torn down and destroyed.

14       Q    When you said you spend majority of your

15   time as a patrol officer in Englewood, was that where

16   you were assigned in August of '98 when you became

17   promoted as sergeant?

18       A    Yes.  And that building was located at 6120

19   South Racine, which has also since been relocated.

20       Q    But then that's where it was?

21       A    Yes.

22       Q    Was there a district for that?

23       A    7th.

24       Q    What's the highest level of education that

 1    you've completed?

 2        A    I have obtained by Bachelor of Science in

 3    Criminal Justice in Loyola, University of Chicago?

 4        Q    Loyola Chicago?

 5        A    Yes.

 6        Q    When did you receive that?

 7        A    That would be in May of 1989.  I'm a

 8    current student at Northwestern University.

 9        Q    For your master's?

10        A    Master's.

11        Q    In any particular topic?

12        A    In public policy and administration.

13        Q    Very nice.  When do you expect to complete

14    that?

15        A    I have 4 classes left.  So hopefully with

16    the promotion soon I'll find time to go back.

17        Q    Let's go back to that topic that you had

18    raised earlier.  You had said that sometimes during

19    your law enforcement investigations -- I'm

20    paraphrasing -- with the CAGE Team, sometimes a

21    firing range might play into an investigation

22    involving -- you were talking about straw purchasing

23    and thefts.  Let's talk about that.

24              First of all, how many times did that

1  happen?

2      A    The exact number of instances when it

3  happened?

4      Q    Let me ask you this: Is it fair to say that

5  not all of your investigations involved a firing

6  range in any way?

7      A    Yes.

8      Q    In your time on the CAGE Team, the 4 years,

9  4-and-a-half years roughly, how many would you say

10  did, where a firing range was involved in any way?

11      A    Can we get a definition on firing ranges?

12  Because there's firing ranges and the gun stores.  A

13  lot were actually combined or pretty much the same

14  entity.

15      Q    Let me ask it this way first:  To your

16  recollection, did any of these incidents involve a

17  firing range where there wasn't gun sales involved --

18  not involved, but there wasn't gun sales also

19  available on the premises?

20      A    Not that I'm aware of.

21      Q    Whatever incidents you're about to tell me

22  that I'm going to ask you about, they all involved,

23  in some ancillary way, a firing range and a gun shop

24  under the same roof?

1      MR. WORSECK:  Objection.  Vague.

2      THE WITNESS:  I don't understand.

3  BY MR. SIGALE:

4      Q    I'm going to ask you in more detail about

5  some of these incidents that you're thinking of when

6  you raised the topic.  I asked you how many of them

7  involved just a firing range.  And I mean "involved",

8  I mean in whatever ancillary way.  Maybe something

9  happened near there or whatever.

10              I asked you if any of them involved in

11  any way a building where there was just a firing

12  range and no gun sales available.  You said, no.

13              I'm just asking kind of the opposite

14  of that to clarify that whatever incidents you're

15  thinking of, however a firing range played into it,

16  was all places where a firing range and gun sales

17  were available under the same roof?

18      A    Just as a clarification, are you asking was

19  there an incident at a specific location that was a

20  firing range only?

21      Q    Yeah, involving in any way.

22      A    But a firing range only?

23      Q    Yeah.

24      A    I'm not aware of any locations that are

1    firing range only.

2         Q    All of the locations that you're aware of

3    have firing ranges, and they also sell firearms as

4    part of the same business?

5         A    Yes, that's been my experience.

6         Q    How many incidents do you recall where a

7    firing range had any part of the incident?

8         A    The firing range itself or the actual gun

9    store, which they're connected?

10        Q    For purposes of this question let's just

11   assume that it's one business under one roof.  Okay?

12        A    Okay.

13        Q    In fact, I'll just say firing range/gun

14   store.  Okay?

15        A    Okay.

16        Q    How many incidents do you recall in the

17   almost 4-and-a-half years where in any way, shape, or

18   form a firing range had anything to do with the

19   incident -- a firing range/gun store?

20        A    The way you've presented the question, it

21   would almost be all of them because they're

22   connected.  The gun store and firing range would be

23   the same facility.

24                    Whereas, if we're doing a firearm

1    investigation, then part of the investigation would

2    call for us to obtain where this firearm was

3    purchased, which would lead us back to the gun store

4    where the original purchase took place.

5         Q    Are all of the incidents that you're

6    thinking of, did they involve the gun store portion

7    of the business?

8         A    All of them would.  At some point all of

9    them would because we would receive information

10   regarding where this particular firearm was

11   purchased.

12        Q    With that said, how many such incidents?

13        MR. WORSECK:  As best you can recall.

14        THE WITNESS:  Hundreds.

15   BY MR. SIGALE:

16        Q    Can you give me an example of one of the

17   incidents that you're thinking of?

18        A    I'll give you a hypothetical -- well, not a

19   hypothetical, but a scenario that usually came about.

20              A gun would be recovered by Chicago

21   Police Officers in Chicago.  This gun is inventoried

22   or found or used in a crime.  And as such, the gun is

23   recovered and inventoried by the Chicago Police

24   Department.

1    Our job as the CAGE team would be to

2  pull that particular inventory.  Run the identifier

3  for that weapon to determine who was the original

4  purchaser of that weapon, in order to find out how

5  that weapon made it out into the streets illegally.

6    As part of that investigation we would

7  run records to find out who purchased the weapon and

8  what have you.  Once we've determined that

9  information we will contact the purchaser, the

10  original purchaser listed on the gun.  If they're

11  available within a geographical area, we would ask

12  that person, How did this weapon come out to the

13  streets of Chicago?  How did it end up in someone

14  else's hands.

15    There have been scenarios where you've

16  had an individual who stated, I went to the gun

17  store, the gun range, to shoot and I forgot I left

18  the gun in the car; or I let someone else use my car,

19  and the gun was in the car, and I don't know where

20  the gun is at; I think the gun has been stolen; I

21  don't remember where I left it.

22    You'll have some individuals who will

23  say during the course of the investigation, I went to

24  go shoot or I was going to go shoot and the gun ended

1    up...

2              And during the course of the

3    investigation we found out that this gun has been

4    trafficked and put out into the street, whether they

5    straw purchased it for someone or illegal transferred

6    it to someone.

7         Q    In that scenario the only connection to a

8    gun store is that, A, the person obviously bought it

9    somewhere; correct?

10        A    Yes.

11        Q    When you go to them and say, Hey, how did

12   your gun wind up in this gang banger's hands to

13   commit this crime in the streets, they would say, Oh,

14   it must have been stolen when I went to go shooting?

15   Is that basically it?

16        A    Yes.  But on the reverse of that, they've

17   used it as a deception.  Whereas, they said that they

18   were going to shoot or they said they were at the gun

19   store, and they used that as the place to do the

20   actual illegal transfer of the weapon.  They used the

21   gun store backdrop or firing range backdrop to be an

22   alibi for what they really did.

23        Q    Let me just follow up with that.  In the

24   scenario that you just said, I just want to clarify

1    what you just said.

2              You're saying they use the firing

3    range or the gun store as a backdrop.  In that

4    scenario -- and I'm just asking you to clarify your

5    scenario, okay? -- were you saying that the gun

6    store/firing range was just a cock and bull story to

7    say why they had their gun out and what might have

8    happened to it; or are you saying that they literally

9    used the firing range or gun store as a hand-off

10   location?

11       A    I'd say that we've had some instances where

12   they've used it as a hand-off location.

13       Q    How would that scenario play out?  Again, I

14   don't mean to be glib or naive, but we're making a

15   record.  How would that scenario play out?

16       A    We would conduct the investigation.  We

17   would debrief the person, interview.  And then find

18   out -- sometimes more often than not -- find out what

19   really happened.  They will tell you exactly what

20   happened.

21       Q    That's what I'm asking you.  In that

22   scenario what really happened?

23       A    In that scenario they went to the gun store

24   to buy the gun.  Straw purchased it for someone else.

1    Then that's how they explained where the transfer

2    took place.

3                    A lot of times with firearm

4    investigations you'll have people who will use the

5    gun stores to -- how can say this?  They'll use the

6    gun stores or the firing ranges to assist in the

7    firearm trafficking.

8        Q    Right.  Someone who is able to purchase

9    firearms goes and buys the firearms, and then gives

10   it over to the person who really wants it, who is

11   otherwise ineligible to obtain a firearm?

12       A    That would be correct.

13       Q    That's what a straw purchaser basically is;

14   right?

15       A    Yes.

16       Q    Are they really dumb enough to do it at the

17   gun store?

18       A    Yes.

19       Q    Really?  Okay.  How often does that happen?

20       A    It's a high percentage of instances like

21   that.

22       Q    It obviously hasn't happened in Chicago,

23   not since 2008 at least, because there aren't any gun

24   stores in Chicago.  So where is this happening?

1    A    Primarily in gun stores that surround the

2    Chicagoland area.

3    Q    These are obviously official

4    investigations.  There's reports and things like

5    that.  I'm certainly not asking you to compromise any

6    open investigations, but specifically where has this

7    taken place?

8         MR. WORSECK:  I'm going to object to the extent

9    that you're asking for law enforcement investigative

10   information that would be protected by that privilege

11   or other law enforcement-type privileges,

12   inner-agency communication privileges.  Things of

13   that nature.

14   BY MR. SIGALE:

15   Q    Are there any of these occurrences that

16   you're talking about where the case is closed; thus,

17   it's no longer an open investigation?

18   A    I'm sure that some of the cases are closed.

19   But for me to speak or on any specific one, I

20   wouldn't be sure right now without the case or court

21   docket information in front of me.

22   Q    Can you answer me this:  Are you talking

23   about 1 or 2 ranges -- I'm sorry.

24              None of this involved the firing range

1   portion of the business at all?  This is all the gun

2   shop portion; correct?

3       A    Correct.

4       Q    Unless you're suggesting they meet in the

5   firing range portion to do the trade-off.  Are you

6   suggesting that, or do they meet out in the back

7   alley or something and do it?

8       A    There have been various instances.  I can't

9   speak on what happens inside of the stores, but

10  outside of the stores we've had investigations that

11  have led us outside of the store.  Also in dealing in

12  terms of theft from those stores, we've been a part

13  of those investigations as well.

14      Q    Let's get to the theft part later.  Let's

15  stick right now to the straw purchaser part which, by

16  the way, not to be glib, but that's illegal; correct?

17      A    That's correct.

18      Q    It violates, I assume, State law as well as

19  Federal law; correct?

20      A    That would be correct.

21      Q    To your knowledge, has a straw purchaser

22  ever been charged and/or convicted as say an

23  accessory to homicide because they straw purchased

24  for someone who used a firearm in a shooting?

1      A     Yes.

2      Q     So it's not just a slap on the wrist, straw

3  purchasing?  It's a serious offense with serious

4  consequences if they're caught?

5      A     That is very correct.

6      Q     Are you aware of what percentage of the

7  total firearm sales -- strike that question.

8            Are some of the incidents that you're

9  thinking of, the scenarios involving straw

10  purchasers, when you say they're taking place outside

11  of the city limits, that's Cook County?  Some of them

12  are in Cook County?

13      A     Yes.

14      Q     Do you know what percentage of the total

15  firearm sales in Cook County turn out to be by these

16  illegal straw purchasers?

17      A     I couldn't say offhand.  I wouldn't have

18  those statistics.

19      Q     Would you expect it to be a high number or

20  a low number?

21      A     Again, I couldn't say.  I couldn't

22  speculate.

23      Q     To your knowledge, is there liability for

24  the gun shop if a straw purchaser purchased -- and I

1   mean criminal liability, not civil liability.  Not

2   like in a lawsuit for damages by a victim's parent or

3   something.  But criminal liability for a gun shop

4   that sells to a straw purchaser who winds up handing

5   off the firearm or selling it to someone who uses it

6   in a crime?

7      A   I can't really say.  That would be under

8   the ATF's jurisdiction.

9      Q   What about under State law, so far as you

10  know?

11     A   Not that I'm aware of.

12     Q   When you're talking about these straw

13  purchasers -- and, again, I'm not asking for open

14  investigation information or whatever.  To be honest

15  with you, I'm not aware of privileges of this sort,

16  but for now I'll let it go.  If I need further

17  information, we'll deal with it.

18          Are you talking about a small number

19  of shops where this is happening, or is this

20  happening like at every gun shop in the Chicagoland

21  area?

22     A   Are you speaking of my experience with

23  every gun shop in the Chicagoland area?

24     Q   Yeah.

1    A    Let me see if I understand the question.

2  You're asking is it my experience that straw

3  purchasing happens at every gun shop in the

4  Chicagoland area that I've had contact with?

5    Q    Yeah, or are there a couple of problem

6  shops or something like that?

7    MR. WORSECK:  Objection.  Vague.

8    MR. SIGALE:  If you understand the question.

9    MR. WORSECK:  Answer to the best that you

10  understand the question, if you understand it.

11    THE WITNESS:  I think every gun shop has the

12  potential to be a victim participating whether

13  willing or unwilling in the straw purchasing.

14  BY MR. SIGALE:

15    Q    Sure.  The potential because straw

16  purchasers buy firearms, and these places sell

17  firearms?

18    A    Yes.

19    Q    I understand that.  But I'm talking about

20  in your experience actually happening, not the

21  potential to happen.

22    A    Is the gun shop involved in the straw

23  purchasing?  Is that what you're asking?  I don't

24  understand.

1     Q   No.  In your scenario a straw purchaser

2 goes into a gun shop and buys a firearm legally

3 because they're able to do it, and then they go and

4 illegally transfer it illegally to somebody else who

5 isn't allowed to have one, and then goes and commits

6 a crime with it.  Hopefully not, but obviously

7 sometimes they do; right?

8     A   Yes.  That's correct.

9     Q   I'm not talking about potential, but I'm

10 talking about in actuality in your experience.  Based

11 on your experience in the CAGE Team, is this straw

12 purchasing -- does it happen at all of the gun shops

13 in the Chicagoland area or even a high percentage, or

14 is your experience that this issue is limited to a

15 couple of problem stores?

16     A   It happens in a high percentage of gun

17 shops in the Chicagoland area.

18     Q   We can agree, I think, that when this

19 happens, the problem isn't with the gun store, per

20 se.  The problem is with the straw purchaser who goes

21 and acts illegally with the firearm after he legally

22 purchases it.  Is that fair?

23     A   Yes.

24     Q   When you say that every gun shop is

1    potentially a victim of this straw purchasing because

2    they sell firearms and straw purchasers sell

3    firearms, you're basically saying that in the same

4    vein as all banks are potentially robbery victims

5    because all robbers steal money and banks have money?

6    It's basically the same analogy?

7        MR. WORSECK:  Objection.  Vague.

8        THE WITNESS:  I think that's somewhat

9    oversimplifying it.

10               Because the gun stores have firearms

11   on the premises, there is a high potential for straw

12   purchasing along with theft of these weapons from

13   persons either leaving or going to the gun range or

14   the gun stores.

15               Also, there have been a large number

16   of break-ins at these gun stores in recent months.

17   It would have the same analogy as a bank.  You're

18   correct.  Because the bank has money, there's a bank

19   robbery.  You have a gun store, and there can be guns

20   that are stolen from a gun store.

21       Q    If a criminal wants a firearm, they've got

22   to go to a gun store.  If they want to purchase a

23   firearm, they've got to go to a gun store to purchase

24   it, if they're going to be a straw purchaser?

1       A      Whether directly or indirectly, yes.

2       Q      How many of these incidents that you're

3    talking about in 4-and-a-half years involved the gun

4    shop knowingly selling to a straw purchaser after in

5    the course of your investigation you investigated and

6    found out that the gun shop knowingly was selling to

7    that purchaser?

8       A      I wouldn't have access to that information.

9       Q      How come?

10      A      ATF would investigate individual gun

11   stores.

12      Q      What about anecdotally that you found out?

13      A      I can't speak on that, a federal

14   investigation.

15      Q      What I'm asking is are you aware of any

16   incidents where even through the grapevine at the

17   department that the feds closed this gun shop down or

18   they arrested this gun shop owner because he

19   knowingly sold to a straw purchaser?  Are you aware

20   of anything like that?

21      A      The only investigation that I can think of

22   was prior to my involvement with CAGE there was an

23   investigation into Chuck's, a gun store out in

24   Riverdale.

1      Q    For just the type of scenario -- the type

2   of hypothetical I'm mentioning?

3      A    It was close to it.  But I can't speak on

4   whether Chuck's was found liable.  I wasn't a part of

5   that investigation.

6              You're asking me just grapevine

7   information?

8      Q    Yeah, that is what I'm asking.

9      A    I can't prove or disprove.

10     Q    In any event, Chuck's is still around;

11  correct?

12     A    Yes, that's very correct.

13     Q    In all of the incidents that you're

14  thinking, of all of the crimes involving a firearm

15  where part of your investigation led you even

16  tangentially to a gun shop, you're not aware as you

17  sit here of any prosecutions of any gun shops for

18  knowingly selling to a straw purchaser; and,

19  anecdotally, you're only aware of the one

20  investigation.  Is that fair to say?

21     A    That's correct.

22     Q    The other scenario that you mentioned --

23  and I'll ask you if there are more, but let me get to

24  this one -- was firearms being stolen from a firing

1    range -- not a firing range, but from a gun shop.

2    There was a break-in or something like that at the

3    gun shop.  That was the other scenario that I think

4    you had mentioned so far.

5                    Again, obviously that didn't happen

6    in -- well, strike that.

7                    Has that happened in Chicago, the

8    break-in at a firing range?

9         A    There are no firing ranges in Chicago.

10        Q    There's no public commercial ranges, but

11   there are police ranges and other private

12   security-type ranges in the city?

13        A    There are police ranges in Chicago.

14        Q    Sure.  But there are other official ranges.

15   Federal training ranges.  Brinks has a range.

16   There's other examples, but they're all for

17   government use.

18        A    Within the city of Chicago?

19        Q    Yeah.

20        A    Private Security has a range in the city of

21   Chicago.

22        Q    Suffice it to say that, yes, some exist.

23                    Are you aware of any break-ins at any

24   firing range in the city of Chicago regardless of

1    what --

2         A    Obviously not because I wasn't aware of any

3    ranges.

4         Q    You didn't know that they exist?

5         A    Other than the police department.

6         Q    And there have been no break-ins or thefts

7    of firearms from the police department ranges;

8    correct?

9         A    That's correct.

10        Q    I guess it would sound like I'm making a

11   joke when I say that.  But we probably all know what

12   happened in Harvey, so I've got to ask the question.

13        A    Understood.

14        Q    In your experience, all of the break-ins at

15   firing ranges -- I keep saying that -- the break-ins

16   at gun stores happen outside of the city limits;

17   correct?

18        A    Yes.

19        MR. WORSECK:  David, is this a good time to

20   take 5 minutes?

21        MR. SIGALE:  Sure.

22        MR. WORSECK:  We've been going for about an

23   hour and a half.

24                         (Whereupon, a brief recess was

1                          taken.)

2   BY MR. SIGALE:

3       Q    Lieutenant, I want to segue for one second.

4   I came across your name in something called the Gun

5   Violence Resource Guide.  Is this news to you?

6       A    Yes.

7       Q    I only have it on PDF.

8       MR. WORSECK:  For the record, plaintiff's

9   counsel is showing the witness a document that he has

10  pulled up on his I-Phone.

11      MR. SIGALE:  Yeah, I e-mailed it to myself when

12  I found it on Google.  John F. College of Criminal

13  Justice Gun Violence Resource Guide.

14  BY MR. SIGALE:

15      Q    It's 7 pages.  Not you.

16      A    That's great to know.

17      Q    Kevin Johnson, Sergeant, Chicago Anti-Gun

18  Enforcement Team, Organized Crime Division, Chicago

19  Police Department.  It has your e-mail address, which

20  I won't read into the record.  It says, Expertise:

21  Gun Tracing and Law Enforcement.

22      A    That's correct.

23      Q    Other than what we are talking about

24  today -- or I'm sorry.  Strike that.

1          Other than what we have talked about

2     today so far, what is gun tracing?

3          A    As part of our assignment with CAGE we

4     would obtain information on the firearms -- basically

5     make, model, caliber, serial number -- off of the

6     weapon, and input that information into ATF's E-Trace

7     database.

8          Q    Is that basically what we've been talking

9     about, that in the course of an investigation you

10    come across a firearm and you've got to try and track

11    it down?

12         A    Exactly.

13         Q    That's really all I wanted to ask you about

14    this.  I'd be happy to show it to you later.  There's

15    lots of resources.

16              I think my last question to you before

17    the break was any thefts or break-ins at gun shops

18    had to be outside of the city limits.

19         A    Yes.

20         Q    How many would you say in the 4-and-a-half

21    years you were with CAGE?

22         MR. WORSECK:  Just to clarify, are you asking

23    how many of his investigations involved guns that

24    were stolen from a store or a range, or how many

1    stores or ranges have been broken into or have had

2    guns stolen from them?

3    BY MR. SIGALE:

4        Q    I was asking about how many break-ins at

5    ranges or at gun shops.

6        A    Just for clarification, in the Chicagoland

7    area, statewide, or national?

8        Q    Let's start with the Chicagoland area.

9        A    In the last couple of years there have been

10   several.

11       Q    Can you be more specific than "several".

12       A    I really can't go into a lot of detail

13   because it's still an ongoing criminal investigation

14   with some of the parties that are still being

15   adjudicated in court.

16       Q    I was just asking more for a number as

17   opposed to "several", if you know.

18       MR. WORSECK:  If you know.  Don't speculate.

19   Don't guess.  I'll note for the record that the City

20   has produced specific documents relating to various

21   incidents.

22       THE WITNESS:  I didn't want to go into a number

23   because they're still ongoing matters.

24   BY MR. SIGALE:

1     Q    I just need to know if "several" is 3 or if

2  "several" is 20.

3     A    More than 10.

4     Q    More than 10?

5     A    Yes.

6     Q    More than 10, less than 25?

7     A    Yes, in the Chicagoland area.

8     Q    As long as we're already between 10 and 25,

9  is it like 15?  Is it 20?

10     MR. WORSECK:  I think the lieutenant is

11  comfortable with the range that he gave.  I think

12  that's definitely enough.

13  BY MR. SIGALE:

14     Q    Let me ask this last one about the topic:

15  Is it closer to 10 or closer to 25?

16     MR. WORSECK:  If you feel comfortable.  If you

17  don't...

18     THE WITNESS:  I don't want to give any hard

19  numbers.  I don't feel comfortable.

20  BY MR. SIGALE:

21     Q    Is the last couple of years like 2010 or is

22  it since you joined the CAGE unit -- the CAGE team?

23     A    2010.

24     MR. SIGALE:  Can we go off the record for a

```
 1   second?

 2                    (Whereupon, a discussion was had

 3                     off the record.)

 4   BY MR. SIGALE:

 5       Q    The final answer for today is somewhere

 6   between 10 and 25; correct?

 7       A    Correct.

 8       Q    What about statewide?  How many additional

 9   ones are you thinking about?  That can't be your open

10   investigation, or can it?

11       MR. WORSECK:  I just want to clarify, David.

12   It doesn't have to be just CPD's open investigation.

13   If CPD has knowledge of an investigation being

14   conducting by someone else, that entity is entitled

15   to its privileges.

16                    CPD may have knowledge of that by

17   virtue of being a partner or an associated law

18   enforcement entity, but it's not like CPD is free to

19   testify about ongoing investigations that others are

20   conducting.

21       MR. SIGALE:  Right.  But to the extent that

22   Lieutenant Johnson is going to testify on this

23   topic -- like you've noted, you've already sent me

24   information on some -- a few, I guess.  I'm at least
```

1  going to ask it so I'm not surprised here or

2  anything.

3  BY MR. SIGALE:

4      Q    Since 2010, that you're aware of, how many

5  break-ins or thefts from gun shops are you aware of

6  statewide, not including the ones that you've already

7  referenced in the earlier question about the

8  Chicagoland area?

9      A    I can't give you a hard number on that.

10     Q    Can you give me a range?

11     A    4 or 5 that I can think of.

12     Q    The other thing you mentioned was

13  nationally.  To the best that you can answer, how

14  many additional national ones are you aware of that

15  are in addition to the ones that you've already

16  referenced?

17     A    That I'm personally aware of?  As to my

18  personal knowledge of them?

19     Q    Yeah.

20     A    I don't want to guess on it only for the

21  simple fact that there are a lot of investigations

22  that officers conduct whereas the gun was taken from

23  a gun shop in Florida or the gun was taken and

24  diverted from a train somewhere in Minnesota.  I

1    wouldn't have access to those hard numbers.

2              There were hundreds of cases.  1 case

3    out of 10 may have 2 guns that were stolen out of

4    state.  And that wouldn't be under my jurisdiction,

5    direct jurisdiction.  It would be part of the ATF

6    Task Force's investigation.

7         Q    Is it fair to say that the answer to that

8    question is you don't know?

9         A    Yes.  I can't be for certain and give you a

10   certain number.

11        Q    We had earlier talked about straw

12   purchasers.  I asked whether or not it was everywhere

13   or in the Chicago area -- because that's what we were

14   focused on -- or whether there were a couple of

15   problem stores.

16              You had said at some point -- and I'm

17   paraphrasing of course -- that every gun shop in the

18   Chicagoland area was a potential victim of a straw

19   purchaser by virtue of the fact that straw purchasers

20   purchase firearms and firearm stores sell firearms.

21              Is that answer basically the same with

22   regards to the topic of break-ins?  Are there a

23   couple of shops in your experience that seem to get

24   hit or is every shop a potential victim because

1    people looking to steal guns are going to go look at

2    gun stores to do it?

3         A    I don't understand the question.

4         Q    The incidents that you're thinking of, are

5    they happening to -- or have they happened mainly to

6    a small number of shops or all over the Chicagoland

7    area?

8         MR. WORSECK:  Objection.  Vague.

9              If you understand.

10        MR. SIGALE:  I thought that was one was okay.

11   BY MR. SIGALE:

12        Q    If you understand it.

13        A    There have been a small number of stores,

14   but there are a small number of stores in the

15   Chicagoland area.

16        Q    Is that a way of saying all of them or is

17   that a way of saying there aren't many, but even

18   within that there's a small subset that seems to get

19   hit?

20        A    There's a small subset that have been hit.

21        Q    Is that because the small subset is in a

22   particular geographic area or, to your knowledge, are

23   they doing something stupid like not locking the

24   doors or having a sidewalk sale or something?

1      A    I can't speculate on what their security

2   practices are.

3      Q    Does the small subset seem to be

4   geographically related?

5      MR. WORSECK:  Objection.  Vague.

6      THE WITNESS:  I don't understand the question.

7   Geographic in what way?

8   BY MR. SIGALE:

9      Q    The locations of the small subset, is it

10  geographically limited to one area of the Chicagoland

11  area or is the small subset geographically diverse?

12     A    Diverse.

13     Q    To the extent that you can answer -- and,

14  again, I'm not asking for open investigation

15  information right now.  Is there some common thread

16  between the small subset -- strike that.

17              Is there some common thread connecting

18  the small subset that has been robbed or broken into?

19     MR. WORSECK:  Objection.  Vague.

20     THE WITNESS:  Other than them having firearms

21  on the premises, no.  I can't find any corollary

22  between them.

23  BY MR. SIGALE:

24     Q    Or even some commonality, like all of the

1    gun shops in the small subset are in the middle of a

2    block or next to an alley or some other common

3    characteristic?

4         A    None that I'm aware of.

5         Q    Can you quantify at all the small subset

6    that you're talking about?  Is it 2?  Is it 10?  Is

7    it 5?

8         A    In the direct Chicagoland Metropolitan

9    area?

10        Q    Yeah, that's what all of these questions

11   have been about.

12        A    I would say 3 that I can think of offhand.

13        Q    You said there aren't that many in the

14   Chicagoland area, gun shops in general.  To your

15   knowledge, how many are total in the Chicagoland

16   area?

17        A    I couldn't tell you offhand.

18        Q    I guess what I was asking is if you had any

19   kind of quantity in mind when you said there's a

20   small number of gun shops in the Chicagoland area,

21   what your definition of small number was?

22             Again, I'm not asking you to consult

23   Google Maps or anything.  I'm just asking if you know

24   offhand what you meant by "small number"?

1    MR. WORSECK:  To your best understanding.

2  Don't speculate.

3    THE WITNESS:  Are we agreeing that we're

4  talking about the major Chicago Metropolitan area?

5  BY MR. SIGALE:

6    Q    Why don't you define the term for me, and

7  then go ahead and answer the question according to

8  your definition.

9    A    The suburbs contiguous to the city of

10  Chicago.

11    Q    For example, Aurora would not be a part of

12  the Chicagoland Metropolitan area in your definition?

13    A    That's correct.  But Riverdale would be.

14    Q    Using that definition, how many gun shops

15  are there?

16    MR. WORSECK:  To your best knowledge.

17    THE WITNESS:  It's an estimate.  We're

18  basically going to include Hammond being a part of

19  the Chicago Metropolitan area.  If we're just doing a

20  geographic location to Chicago, we'll include Hammond

21  and Merriville.

22         I'd say maybe about 20 being

23  contiguous and readily accessible to Chicago

24  residents.

1          MR. SIGALE:   I'm going to mark this as Johnson

2     Deposition Exhibit No. 1.

3                              (Whereupon, Johnson Deposition

4                               Exhibit No. 1 was marked for

5                               identification.)

6     BY MR. SIGALE:

7          Q     Lieutenant, I've handed you what I've

8     marked for identification as Johnson Deposition

9     Exhibit No. 1.  I'll submit to you that what this is,

10    is it's a partial printout from a Web site that lists

11    the Municipal Code of Chicago.  This is the cover

12    page of Chapter 4-151.

13                         Page 2 just skips ahead to ultimately

14    what we're really here to talk about, at least in

15    large part, the bottom half of the page, 4-151-170.

16    I want to read that just for the record so it's all

17    clear that we're talking about the same ordinance.

18    Okay?  Let me know if I read it wrong.

19         A     Okay.

20         Q     4-151-170A, "A licensee -- referencing a

21    business owner who wants to open a firing range who

22    gets a business license to do so -- shall not provide

23    or otherwise give a shooting range patron a firearm

24    for the patron's use at the shooting range, except

1   that the licensee may provide a firearm to a shooting

2   range patron only for the purchase of receiving the

3   1-hour range training required for ACFP.  All such

4   firearms provided to the shooting range patrons shall

5   be registered pursuant to Section 8-20-140."

6           Let's assume for purposes of this

7   discussion that whatever firearms we're going to talk

8   about would be properly registered.  Okay?

9       A    Okay.

10      Q    B, "A licensee may sell ammunition to a

11  shooting range patron only for use at the shooting

12  range.  The licensee shall ensure that no shooting

13  range patron leaves the shooting range facility with

14  any ammunition purchased from the licensee."

15      A    Yes.

16      Q    Those are the main 2 that we're here to

17  talk about today.  I want to stick with "A" for a

18  second about providing or giving a shooting range

19  patron a firearm, which has the effect of not

20  letting --

21          If you'll agree with me on this that

22  the effect of this Section 170A is that a firing

23  range is not allowed to loan or rent a firearm to a

24  customer except for getting this 1-hour CFP training?

1   A    That would be correct based on your

2   statement.

3   Q    What is, to your -- strike that.

4        What is the governmental purpose of

5   not allowing a firing range to loan or rent a firearm

6   to a customer except for the 1-hour CFP training?

7   A    The only governmental purpose would be a

8   possible public safety issue.

9   Q    Can you be more specific?

10  A    Theft of a firearm.

11  Q    By who?

12  A    Basically someone coming in the store with

13  a criminal purpose and a criminal intent removing the

14  firearm from the store.

15  Q    Someone holding up the gun store and

16  stealing that firearm?

17  A    Someone having a gun in that store, and the

18  person who just takes the gun and leaves.

19  Q    I'm sorry.  Can you repeat that.

20  A    Say an individual comes in the store with

21  criminal intent --

22       Are we agreeing that the gun store is

23  loaning the person a gun or putting a gun in the

24  person's hand.

1     Q    Either loaning or renting.  Sure.

2     A    Once that gun is physically given to that

3 individual and that individual just all of a sudden

4 turns around and leaves the facility with that

5 weapon, that gun is out there in the streets.  That

6 would be a public safety issue.

7     Q    Is that the only scenario that you're

8 thinking of in terms of public safety?

9     A    That's the primary issue.  That's the most

10 important thing, public safety; the safety of the

11 community.

12     Q    Somebody goes in pretending to be a

13 customer saying, Hey, I'd like to rent a firearm for

14 an hour or I'd like to loan one.  And then the gun

15 range proprietor says, Okay, sign here, Let me see

16 your identification and whatnot.  Gives the guy the

17 firearm, who then proceeds to leave the gun range

18 with it?

19     A    Yes.

20     Q    In the Chicagoland area, as you've

21 described it earlier, contiguous -- it's in the

22 record what you've described it as -- how many times

23 has that happened since you've been on the CAGE unit,

24 the CAGE Team?

1    A    I can't speak of a hard number here in

2  Chicago, but I've been aware of cases like that

3  happening in other states where a firearm has been

4  stolen from the gun store, physically taken from the

5  gun store.  People left with the weapon.

6    Q    So people posing as customers, renting the

7  firearm, and leaving the store with it?

8    A    Yes.

9    Q    Can you give me some specific examples?

10    A    That's about as specific as I can get.

11    Q    Basically anecdotal evidence that you've

12  heard of it happening in other states?

13    A    Or as part of our investigations the guns

14  have been recovered in Chicago from other states.

15  They were originally purchased in other states, and

16  they ended up being recovered in Chicago.

17         As part of our investigation we would

18  trace the gun back to its original purchase location.

19  There have been instances where the gun was taken

20  from a gun store or a gun range in another state.

21    Q    Not a straw purchaser, but someone who

22  literally stole it from -- literally walked out of

23  the door with it posing as a customer in another

24  state and then the firearm made its way to Chicago?

1          A     That would be correct.

2          Q     To the best that you can answer this

3    question -- and this is Lieutenant Johnson saying

4    this quote, unquote.  Okay?

5                The scenario that I just described has

6    happened, to the best of my knowledge, blank times in

7    the past blank years?

8          A     To my personal knowledge, I'd say within

9    the last -- in my experience with the CAGE Team I've

10   read at least a minimum of 5 cases.

11         Q     In the last 5 years, 4-and-a-half years?

12         A     Yes.

13         Q     To your knowledge from these incidents how

14   do people do it?  I mean they've got to give I.D. to

15   get the firearm in the first place.  It seems like a

16   silly crime.

17                When you walk out of the door with a

18   firearm, the range owner or the shop owner or

19   whatever, is on the phone in 30 seconds saying,

20   Someone just walked out of the door with a gun,

21   Here's his name, Swing by and I'll give you his

22   driver's license photo.

23         A     I can't speak on what other states do in

24   terms of their I.D. requirements in gun stores in

1    other states.

2        Q    I'm just talking in general.  Do you know

3    how the people actually got away with this?

4        A    Some states are less restrictive than the

5    State of Illinois in terms of firearm policy.

6        Q    In these cases do you know what states the

7    firearms were stolen from?

8        A    We have the trace information.  We would

9    know, yes.  We would have access to that information.

10   I couldn't tell you offhand.

11                   There are some states where the gun

12   stores are actual convenient stores.  In Mississippi

13   it may be Joe's Bake Shop & Guns.  It depends on the

14   state and what their rules and requirements are in

15   terms of if there's any identification required to

16   handle weapons.

17       Q    To the extent that it doesn't compromise an

18   open investigation, are you able to get information

19   on these cases that you're talking about and give

20   them to your counsel?

21       A    It's still part of an ongoing ATF

22   investigation.

23       Q    ATF would have that info?

24       A    Yes.  My only responsibility is to Chicago

1    Police Department.  It doesn't directly affect us.

2    Those cases would be a part of the ATF.

3        Q    I just want to be clear.  Of these 5 cases

4    that you're talking about, how many of them involve

5    actually a crime that was committed in the city of

6    Chicago with one of these firearms?

7        A    Could you define "crime".

8        Q    A criminal act involving a firearm.

9        A    The firearms that we trace are firearms

10   that were recovered by the Chicago Police Department,

11   whether they're used in a crime or not.  Our primary

12   entry point is a firearm that is recovered by the

13   Chicago Police Department.

14       Q    Let's start there.  How many of the 5 cases

15   that you're talking about involved a firearm

16   recovered by the City of Chicago Police Department.

17       A    All of them.

18       Q    These aren't just stories that you read

19   about on the Web or on some like newsletter or

20   whatever; these involve firearms from Chicago?

21       A    Correct.  They were recovered in Chicago.

22   They didn't originate in Chicago.  They were

23   recovered in Chicago, just to be clear.

24       Q    When you mentioned before that the

1    governmental purpose was possible public safety as to

2    why a gun range owner is not allowed to rent firearms

3    to a customer, is that the only situation that you're

4    talking about?

5         A     In terms of public safety?

6         Q     Yeah.

7         A     Along the lines of public safety you also

8    have the potential issue of theft or robbery of the

9    actual gun store or the gun range since they're

10   storing weapons at that location.

11        Q     Again, not to be glib, but are you aware of

12   in the United States how many firearm shops there

13   are?

14        A     I can't speak on that.

15        Q     If you know, is it in the hundreds,

16   thousands?

17        A     How many actual gun stores?

18        Q     Yeah.  I'm not even talking about, let's

19   say, Wal-Mart selling rifles.

20        A     Which they do.

21        Q     Yeah, they do.  Let's talk about dedicated

22   brick and mortar firearm stores.

23        MR. WORSECK:  Objection.  Vague.

24        THE WITNESS:  In the United States?

1

2    BY MR. SIGALE:

3        Q    In the United States.

4        A    I wouldn't have that information.

5        Q    Do you have any idea, again, if it's in the

6    thousands, 10 thousands, hundreds?

7        A    I couldn't put a number on it, Counsel.

8        Q    If I were to ask you what percentage of

9    them have ever been robbed of their firearms, you

10   wouldn't be able to tell me that percentage either?

11       A    That would be correct.  I would not be able

12   to tell you.

13       Q    Would you be able to tell me since you've

14   been involved in the CAGE Team how many firearm

15   stores in the Chicagoland area that you're aware of

16   have been broken into and robbed?

17       A    I think we touched on this earlier.  But

18   there are a number of them that have been broken into

19   in the Chicagoland area from 2010 up to now.

20       Q    We did.  I'm sorry.  Thank you.

21            Are you aware of any hard data or

22   research or statistics on the topic of firearms

23   stolen from firearm ranges?

24       MR. WORSECK:  Objection.  Vague.

1

2  BY MR. SIGALE:

3      Q    If you understand it.

4      A    No.

5      Q    Basically all we've been talking about

6  today so far I think is incidents that you're

7  personally aware of; correct?

8      A    Correct.

9      Q    I'm asking are you aware of any data or

10  studies that some other researcher did or something

11  involving thefts of firearms from gun stores?

12      A    I'm not aware of any hard data that I can

13  immediately speak on.  Again, that would be on the

14  national level.  That would have to be referred to

15  ATF.

16      Q    I guess the point of the question is

17  whether or not, hypothetically speaking, ATF did a

18  study that you read?

19      A    Not that I'm aware of.

20      Q    Let me ask it both ways so I'm clear.

21           I'm asking whether or not you're aware

22  of any studies or data or research regarding the

23  theft of firearms from firearm stores, or firearm

24  stores/gun ranges, A, by a pretend customer who

1   borrows a firearm and walks out of the door with it

2   or, B, someone who breaks into the shop like after

3   hours with a brick or something like that?

4           A     I'm not aware of any data.

5           Q     In either scenario?

6           A     In either scenario.  That's correct.

7           Q     Do you have any personal experience or

8   study regarding the operation of firing ranges?

9           MR. WORSECK:  Objection.  Vague.

10          THE WITNESS:  No, I do not.

11  BY MR. SIGALE:

12          Q     The ordinance, Section 170A, bans the

13  rental or loaning or otherwise providing -- I can't

14  really think of what else it would be other than

15  renting or loaning -- providing a range patron a

16  firearm to use at the range except for when they get

17  the 1-hour training required for a CFP; correct?

18          A     Correct.

19          Q     What is to prevent the would-be robber in

20  the scenario that you mentioned earlier from going in

21  and saying, I need a firearm, I want to get a CFP,

22  You've got to sign me up for the class?  What's to

23  stop that would-be thief from posing as a CFP class

24  attendee and getting the firearm and walking out of

1   the door with it?

2       A    I don't understand the question.

3       Q    You said it is a thing of public safety.

4   You talked about 2 scenarios.  I think -- and correct

5   me if I'm wrong -- those are the only 2 that you're

6   talking about: either someone breaking into the gun

7   range and stealing a firearm or someone with a

8   criminal intent posing as a customer renting or

9   loaning a firearm and then walking out of the door

10  with it?

11      A    Yes.

12      Q    Correct me if I'm wrong, but those are the

13  only 2 examples of public safety that we're talking

14  about today; is that right?

15      A    Under the provision of this ordinance,

16  yes -- or section.

17      Q    Sticking with the scenario of someone

18  posing as a customer, but with criminal intent, going

19  in and borrowing or renting a firearm and then

20  walking out of the door with it as a justification

21  for banning the rental to everybody;

22              What is to stop that would-be criminal

23  from just pretending to be someone who is taking a

24  CFP class, or who wants to take the CFP class, from

1    getting their hands on the firearm and walking out of

2    the door with it?

3        A    In that scenario, nothing.

4        Q    In essence, it's the same thing.  It's the

5    same potential problem.  It's just a different cover

6    story.  Correct?

7        MR. WORSECK:  Objection.  Vague.

8        THE WITNESS:  Can I ask a question?  Are you

9    asking if the person comes into the store pretending

10   to have a CFP or has a CFP?  Are they pretending to

11   get one or do they actually have one when they come

12   into the hypothetical store?

13   BY MR. SIGALE:

14       Q    My question is, unless you read this

15   ordinance differently than do I, the only people who

16   can get their hands on a range-owned firearm is

17   someone who is taking the CFP class?

18       A    Hypothetically, wouldn't that information

19   be available?  Wouldn't that person's information be

20   available if they present a CFP card?

21       Q    You don't have the CFP card.  That's the

22   point.

23       A    Okay.  Thank you.

24       Q    I don't have a CFP.  I go into a gun range

 1    and say, Hey, I want to get the certification to get

 2    the CFP.  Give me a firearm.  I want to take the

 3    1-hour range training.  Okay?

 4          A    Okay.

 5          Q    That person has the exemption under 170A to

 6    get their hands on a range-owned firearm; correct?

 7          A    Correct.

 8          Q    In fact, under this they're the only people

 9    that are able to get their hands on a range-owned

10    firearm; correct?

11          A    Correct.

12          Q    Going back to the scenario that you were

13    talking about before in other states let's say, where

14    somebody goes into a firearm shop and pretends to be

15    a range patron and says, Can you rent me a firearm?

16    They get their hands on one, and then they walk out

17    of the door with it; correct?

18          A    Correct.

19          Q    Under 170A isn't it exactly the same issue,

20    but just a different cover story?  Now the would-be

21    criminal isn't a would-be range patron; now that

22    criminal is a would-be CFP certifier?

23          MR. WORSECK:  Objection.  Vague.

24    Argumentative.

1

2    BY MR. SIGALE:

3        Q    Do you understand what I'm asking?

4        A    I think I do.  I think I understand, but

5    it's being phrased in a different way.  Is there one

6    basic question that you're asking or is it 2?

7        Q    No, it was one question.  Isn't it the same

8    concern?  When you're talking about people going to

9    other states and pretending to be a customer for the

10   purpose of maliciously stealing a firearm, isn't it

11   the same issue?

12                  Only now instead of the person going

13   into a range in Chicago and saying, I'm a would-be

14   customer, Give me a firearm; now don't they just say,

15   I want to take a class, Give me a firearm?

16       MR. WORSECK:  Same objections.

17       THE WITNESS:  The way you've phrased it, I

18   agree.  I see where you're coming from with that.

19   It's reasonable to do so.  They could do that.  It

20   could be a cover for -- whether it's in Florida or in

21   Illinois, it's the same cover.

22   BY MR. SIGALE:

23       Q    So banning everybody from renting a firearm

24   doesn't really serve that purpose because the

1  criminal just has to come in and give a different

2  cover story?

3       MR. WORSECK:  Objection.  Vague.

4  Argumentative.

5  BY MR. SIGALE:

6       Q    Correct.

7       A    There's still a public safety issue that

8  has to be considered.  If the one individual is going

9  to commit a crime or is going to actually inspect or

10 handle a weapon, that means weapons are still on site

11 at this location.  There's still a greater public

12 safety issue where the citizens of Chicago have to be

13 protected somewhat.

14            If this person takes that gun from

15 here and uses it in a crime in Chicago or uses it in

16 a crime leaving the store, then what public safety

17 purpose did it serve to have the store have the

18 weapons there?

19      Q    I hear you.  My question is that

20 firearms -- even under the ordinance firearms are

21 going to be on the premises if for no other reason

22 than to loan them to would-be CFP certifiers;

23 correct?

24      A    Agreed.

1     Q   If somebody can just walk in and commit the

2  crime that you're talking about by stealing a firearm

3  by pretending to be wanting a CFP class and using

4  that cover story as a way to get their hands on a

5  firearm, then what's the purpose of banning everybody

6  else from renting a firearm?  I mean, firearms are

7  already there for the CFP people.  So what's the

8  point of banning everybody from renting one?

9     A   It still goes back to the issue of overall

10  public safety.  There are weapons in a facility that

11  a person with criminal intent would potentially

12  target to either take the weapon by force from the

13  store or from the persons handling weapons in the

14  store.

15     Q   But those firearms are there anyway?

16     A   Yes.

17     Q   They're either there from the people for

18  the CFP class or they're there because people somehow

19  bring their own.

20        We know that firing ranges are legal,

21  and we know that under this ordinance renting

22  firearms to people for a CFP class are legal;

23  correct?

24     A   Correct.

1      Q    At a bear minimum there are going to be --

2  well, we hope at the end of this court case there are

3  going to be firing ranges with firearms on the

4  premises; correct?

5      MR. WORSECK:  Objection.  Speculation.  Vague.

6      MR. SIGALE:  I hope I'm not speculating that

7  there will be firing ranges someday.

8  BY MR. SIGALE:

9      Q    Even under the law as it exists now,

10  technically speaking, firearm ranges with firearms on

11  the premises are allowed to exist; correct?

12     A    That is correct.

13     Q    Those firearms exist on the premises

14  because they are allowed to be loaned or rented to

15  CFP people, CFP class takers; correct?

16     A    Correct.

17     Q    If somebody has a criminal motive and wants

18  to rob a firearm from a firing range, they can go in

19  and pretend to be a CFP class taker and walk out with

20  a firearm, correct, hypothetically speaking?

21     A    Hypothetically, yes.

22     Q    They could?

23     A    Yes.

24     Q    If somebody wanted to break into a firearms

1    range after hours -- which we'll agree is a criminal,

2    illegal act; correct?

3        A    Yes.

4        Q    If somebody wanted to break into a firing

5    range and steal firearms under the law as it

6    currently exists, in theory, they would still be able

7    to do that because firing ranges with firearms in

8    them are technically allowed to exist; correct?

9        A    Correct.

10       Q    With that being true, what is the

11   governmental purpose of banning the rental of those

12   firearms that are already there in the firing range

13   that's already there to other customers?

14       A    I don't see a direct governmental purpose

15   for banning inside based on the scenario that you've

16   presented.

17       Q    Right.

18       A    But there still is an overriding public

19   safety issue that must be considered.  With those

20   weapons being either in someone's hands or stored at

21   that location, there is always the potential of

22   theft, burglary, robbery.

23       Q    There's always the potential.  But, again,

24   outside of the potential you're not aware of any

1    studies or data regarding actual thefts from ranges;

2    correct?

3        A    That's correct.

4        Q    By "theft" I mean the person walking in and

5    out with a firearm or the person breaking in with a

6    brick through the window after hours.  Correct?

7    You're not aware of any data or studies or anything

8    regarding either of those scenarios?

9        A    Correct.

10       Q    Everything we're talking about -- strike

11   that.  Everything you're talking about.  Because I'm

12   just asking the questions.

13              Everything you're talking about is

14   hypothetical or potential; correct?

15       MR. WORSECK:  Objection.  Vague.

16       THE WITNESS:  That's correct.  We've been

17   discussing hypotheticals and scenario.

18   BY MR. SIGALE:

19       Q    What is the hypothetical or scenario where

20   a firing range that exists in a specific location

21   that has firearms on the premises to rent or loan to

22   CFP class takers -- okay -- well, strike that.  I'm

23   going to ask you a hypothetical here.

24       A    Okay.

1    Q    It's not allowed under the ordinance -- and

2    at some point we've got to talk about that.  But it's

3    not allowed under the ordinance for 2 firing ranges

4    to be within 500 feet of each other.  I don't know if

5    you know that.  I hope you do because you're here to

6    talk about it today.

7              I want you to pretend for purposes of

8    this that through some grandfather clause or whatever

9    that there are 2 firing ranges right next to each

10   other.  Okay?

11   A    Okay.

12   Q    They're on the same block in the middle of

13   the block, and the only thing separating them is a

14   walkway or something.  But, otherwise, they're right

15   next to each other.

16   A    Yes.

17   Q    Because the owners of these particular

18   hypothetical ranges are buddies, they have exactly

19   the same security systems.  They have exactly the

20   same construction in the building, the same layout.

21   Okay?

22   A    Okay.

23   Q    The buildings are made of exactly the same

24   material.  Okay?

1      A     Okay.

2      Q     One of these ranges in my hypothetical is

3  allowed, under 170A, only to rent or loan a firearm

4  to a would-be CFP class taker.  Okay?

5      A     Okay.

6      Q     Next door, for reasons that can only exist

7  in a hypothetical, gun range/gun shop owner Number 2,

8  he's allowed to rent firearms to the public.  They

9  show property I.D. or whatever; but they're allowed

10 to sell or rent to anyone not just CFP holders.

11 Okay?

12     A     Okay.

13     Q     I want you to presume that the 2 gun ranges

14 have exactly the same number of guns on the premises.

15 Okay?

16     A     Okay.

17     Q     Everything about them is the same: the

18 building, the layout, the security, the number of

19 firearms, and the location.  Okay?

20     A     Okay.

21     Q     Under your public safety purpose what is

22 the benefit to public safety, in terms of potential

23 theft, in either scenario you're talking about -- a

24 pretend customer or a break-in -- what is the

1  governmental purpose of restricting Range A to only

2  renting firearms to would-be CFP class takers?

3      MR. WORSECK:  Objection.  Hypothetical.  A

4  extremely long, convoluted question.  Vague.

5      MR. SIGALE:  I don't know if it was that

6  convoluted.

7  BY MR. SIGALE:

8      Q    Did you understand the question?

9      MR. WORSECK:  I'm guessing it takes up 3 pages

10  of the transcript.  But if the witness understands

11  the question, he can answer.

12     THE WITNESS:  Could you repeat the last

13  question.

14  BY MR. SIGALE:

15     Q    What is the governmental purpose as you've

16  described it, with public safety and thefts, in 2

17  ways, right -- what's the purpose, from a public

18  safety standpoint, of restricting Range A to renting

19  only to would-be CFP class takers?

20     MR. WORSECK:  Same objections.

21     THE WITNESS:  In both scenarios there are still

22  weapons on the premises; correct?

23  BY MR. SIGALE:

24     Q    There's the exact same number of weapons on

1    the premises.

2        A    The public safety issue has not been

3    absolved.  Whether it's 5 weapons or 500, if weapons

4    are on a location there is a potential for theft,

5    burglary, and robbery.  It has not changed.

6        Q    So in that hypothetical who the range owner

7    can rent to is not a factor?

8        A    That's irrelevant.

9        Q    Let's move to B.

10       MR. SIGALE:  Actually, do you mind?  I want to

11   take 5 now.

12       MR. WORSECK:  Sure.

13                      (Whereupon, a brief recess was

14                       taken.)

15   BY MR. SIGALE:

16       Q    Lieutenant, I spoke a bit too soon.  I said

17   I wanted to move on to 170B, but I've got a few more

18   questions on 170A.

19                In your experience as a police

20   officer -- and I mean the whole 21 years -- would you

21   say that it is better for public safety if a person

22   who is going to posses a firearm knows how to use it

23   or doesn't know how to use it?

24                I mean lawfully, like a lawful person

1   who is going to posses a firearm, if they're trained

2   and skilled in its use or they're not, which is

3   better for public safety?

4        MR. WORSECK:  Objection.  Vague and beyond the

5   scope.

6        MR. SIGALE:  You can answer.

7        MR. WORSECK:  If you can.  If you understand

8   the question.

9        THE WITNESS:  Training is always good.

10  Training is always a benefit regardless of the

11  purpose.  If it's training by a lawful citizen, then

12  training is a benefit.

13  BY MR. SIGALE:

14       Q    For public safety it's better for the

15  citizenry, if they're going to posses firearms, to be

16  trained as opposed to not being trained; true?

17       A    Yes.

18       Q    As a police officer for more than 2 decades

19  and spending almost 5 years on that CAGE Team you're

20  familiar that there are many different types of

21  firearms; correct?

22       A    Yes.

23       Q    Even limiting it to handguns, to the

24  discussion of handguns, there's many different types;

1    correct?

2         A    Yes.

3         Q    By "many different types", among them they

4    come in many different sizes?

5         A    That's correct.

6         Q    Some are more powerful than others.  Is

7    that fair to say?

8         A    Yes.  Various calibers.

9         Q    Also, the more powerful the firearm, that

10   means the more powerful the discharge and the more

11   the kickback on the shooter; correct?

12        A    In terms of the user or the actual weapon

13   itself?

14        Q    Both.

15             The firearm kicks back more depending

16   on how large the caliber is that it's shooting, and

17   that impacts too the person holding it; correct?

18        A    It's been my professional experience in

19   handling firearms and shooting firearms that it

20   really depends on factors such as stance, grip, and

21   sighting.  Where the kickback may affect some people

22   or may not depends on the way that you're handling

23   the weapon.

24        Q    Does it also depend on the physical build

1  of the shooter?

2       A     To a small extent it has been my experience

3  in police training that there are police officers who

4  are of various shapes and sizes that fire weapons.

5  The level of kickback or recoil that they may

6  experience is based on the individual person as

7  opposed to the actual weapon.

8       Q     Okay.

9       A     There may be a small officer who handles a

10  weapon.  If they put the weapon in a proper stance

11  and sight and do everything they've been trained to

12  do in terms of their firearms qualifications, the

13  kickback would be minimal.  It depends on the stance

14  and training.

15      Q     We're back to that.  Obviously for police

16  officers the more you're trained with a firearm the

17  better off you are?

18      A     Yes.

19      Q     That's not only true for the officer, but

20  that's also true for the public as well?

21      A     I would agree with that.

22      Q     Would you agree that for various -- and I'm

23  not talking about police officers -- let's limit this

24  question to civilians.

1          Would you agree that various size

2   handguns -- let's stick to handguns also -- various

3   size handguns are better suited for various people of

4   physical builds than others?

5        MR. WORSECK:  Objection.  Vague.  Beyond the

6   scope.

7   BY MR. SIGALE:

8        Q    Do you understand the question?

9        A    I understand the question, but I can't

10  speak to that.  That becomes an issue of personal

11  preference and choice by an individual.

12       Q    How does one -- strike that.

13            Do you agree that one figures out what

14  their personal preference is and what their choice is

15  by trying various firearms and seeing which one is

16  best suited for them?

17       MR. WORSECK:  Same objection.  It's a

18  hypothetical.  It calls for speculation.

19  BY MR. SIGALE:

20       Q    You can answer if you understand the

21  question.

22       A    I can't speak to that.  I can only speak to

23  my personal experience as a member of the Chicago

24  Police Department, and we're given specific weapons

1  in which to shoot and qualify with.  We don't have a

2  wide array of purchasing whatever we want and using

3  those weapons as duty weapons.  I can only speak to

4  the fact that there are a limited amount of weapons

5  that we're actually familiarized with.

6       Q     How many different types would you say that

7  an officer has to choose from?

8       A     A rough estimate?

9       Q     Yeah.

10      A     Handguns only or we talking carbines, or

11  anything else?

12      Q     No, just handguns.

13      A     There's only a few, a limited amount.

14  Maybe 3 or 4 brands.  And maybe about, estimating,

15  about 5 calibers; 5 to 6 calibers.  It's a limited

16  pool of weapons.

17      Q     Does that mean there's 5 or 6 choices or

18  does that mean there's about 18 to 24 choices?

19      A     A total would 18 to 24 choices within brand

20  and calibers.

21      Q     So each brand has a variety of calibers,

22  and then there's a few different brands?

23      A     Only the ones that are authorized by the

24  Chicago Police Department, yes.

1     Q    A new officer on the force, how is it

2   determined which one they get as their duty firearm?

3       MR. WORSECK:  Same objections.  David, I'm

4   giving you a little rope here, but now you're getting

5   into a line about the police officer qualifications.

6   That's not in the scope of the topic.

7       MR. SIGALE:  I'm not asking about his

8   qualifications.  I'm asking how is it determined

9   which firearm a police officer gets as their duty

10  firearm.

11      MR. WORSECK:  You're asking about the police

12  department's policies and practices on officer

13  training, qualifications, and weapons choice.  All of

14  that is beyond the topic.

15      MR. SIGALE:  Actually I am just specifically

16  asking about weapons choice, and it is actually the

17  topic.

18      MR. WORSECK:  The topic talks about 170 of a

19  shooting range ordinance that governs shooting ranges

20  for civilian use.

21      MR. SIGALE:  Right.

22      MR. WORSECK:  There's no way that this line of

23  question is relevant to that.  It's beyond the scope

24  of the topic.

1    MR. SIGALE:  I want to know out of the 18 to 24

2  choices how did Lieutenant Johnson pick which firearm

3  that he has.

4    MR. WORSECK:  I know you want to know, but it's

5  irrelevant.

6    MR. SIGALE:  It's very relevant.  The ordinance

7  prohibits civilians from trying out firearms before

8  they have to purchase it.  I would like to know how

9  Lieutenant Johnson, your witness on this topic, wound

10  up with the firearm he has or how an officer winds up

11  with the firearm they have out of 18 to 24 choices

12  that they have to choose from.

13           I want to know if he picks it out of a

14  hat or if a superior chooses it for them, or if there

15  is some process that an officer goes through to

16  decide which firearm is best for them.  It is very

17  relevant.  He's your witness.

18    MR. WORSECK:  You have yet to explain how it's

19  relevant aside from saying you want to know the

20  answer to the question.

21    MR. SIGALE:  I told you.  The ordinance

22  prohibits the average work-a-day person from trying

23  out a firearm to see what's good for them before they

24  have to buy it.

1              Your officer, your witness, had 18 to

2   24 choices apparently of what firearm he wound up

3   with as his duty -- I keep saying "duty firearm" --

4       THE WITNESS:  Just for clarification, you asked

5   how many are available.  I didn't have a choice.  You

6   asked me how many are available.

7   BY MR. SIGALE:

8       Q    Well, then, this is the question.

9       A    Then you asked me about what the current

10  recruits have right now.  I can't speak on that

11  because I don't work in the education and training

12  division.  I'm not exactly your best witness in

13  speaking on what the current policies are.

14              I came on the Chicago Police

15  Department 21 years ago.  Those things have changed

16  since then, within 21 years.  I'm not the best person

17  to speak on that.

18      Q    Let's switch gears for a second and go off

19  the comment that you just made, that there might be

20  18 to 24 different firearms, but you didn't get a

21  choice.

22      A    I have a choice, but you're asking me about

23  a recruit that's coming on the police department now.

24      Q    Let me ask you 22 years ago?

1       A    What choices did I have?

2       Q    How was that choice made?  Did you make the

3  choice or did someone make it for you?

4       A    It's made for you.  We're given directions

5  and ordered by the police department of

6  duty-authorized weapons.

7       Q    Right.  But how many authorized weapons

8  were there?  "Duty weapon", that's the phrase that I

9  was looking for.  Thank you.

10            How many different authorized possible

11  duty weapons were there for you to choose from?

12       A    I can't recall the exact number.

13       Q    Was it 18 to 24 or was it like 3?

14       A    There were a smaller number back then, if

15  that helps any.

16       Q    When you speak at the community -- you're

17  on this CAGE Team.  Would you say that for public

18  safety it is important for a member of the public, if

19  they're going to posses a firearm, that they posses a

20  firearm that is suited for that person?

21       MR. WORSECK:  Objection.  Vague.

22       THE WITNESS:  I can't speak on what public

23  preference would be.  I can't make a recommendation

24  on what the public should or should not have in terms

1  of firearm purchasing choices.

2      MR. SIGALE:  Let me rephrase it.  I'm not

3  talking about their purchasing choices.

4

5  BY MR. SIGALE:

6      Q    170A, one of the effects of it, as you

7  heard me say to Mr. Worseck a moment ago, is that by

8  banning the rental or loaning of firearms, that means

9  that somebody who doesn't wish to leave the city has

10  no ability to try out a firearm before they purchase

11  it because the only firearm that they're allowed to

12  try is the one given to them for the CFP course for

13  an hour; correct?

14      A    Correct.

15      Q    So that means that if they want to stay

16  within the city, they are not allowed to sample or

17  try out a firearm to see if that's a good firearm for

18  them?

19      A    Within the city.

20      Q    So somebody who lives in the city -- if

21  somebody says, Well, I've never owned a firearm

22  before; I don't know what's a good one for me; I want

23  to try out a few to see what's a good size and what

24  feels good in my hand, et cetera, et cetera, they'd

1    have to leave the city?

2         A     Currently, yes.

3         Q     What I'm asking you is from a matter of

4    public safety would you say that it is better for

5    public safety or worse for public safety if the

6    firearm-owning civilian in the city possesses a

7    firearm that is suited for that person?

8         MR. WORSECK:  Objection.  Vague.

9         THE WITNESS:  I still don't understand your

10   reference to being suited for.  What firearm is being

11   suited for someone?

12   BY MR. SIGALE:

13        Q     Suited for.  It's not too powerful for

14   them.  It's not to big for them.  The grip fits in

15   their hand well.  They're able to draw and shoot

16   comfortably.

17        A     I'm not being facetious, but it's not like

18   buying a pair of shoes.  There are mechanics involved

19   in dealing with weapons.

20        Q     Okay.

21        A     For something to be suited for someone,

22   it's not a matter of being suited.  It's a matter of

23   having a purpose.  What is the purpose of the weapon?

24   A 12-gauge shotgun isn't suited for most people, but

1    they are used for purposes in hunting.

2             Guns don't fit.  You have to use the

3    mechanics and training in which to operate the

4    weapon.  It's not a matter of suiting.  It's a matter

5    of operation.  Did that make any sense?

6        Q    Would you say, though, that is important

7    for the person who is going to posses that firearm

8    and possibly, but hopefully never, shoot someone with

9    it might have to aim at someone -- would you say that

10   for that person there is a difference in the

11   different sizes and calibers and power of the

12   firearm, that one might be better, one might feel

13   more comfortable with one size weapon than another?

14       MR. WORSECK:  Objection.  Vague.

15   BY MR. SIGALE:

16       Q    Are you just saying that you can give them

17   whatever firearm just as long as they practice long

18   enough with it, then they'll be fine?

19       A    If I understand your question, the average

20   citizens, they can use most firearms.  With training

21   and direction and instruction most firearms could be

22   used, regardless of caliber, by anyone.

23       Q    Used?  You mean someone can literally pick

24   it up, point it, and pull the trigger?

1      A     Not all of them.  Not everyone.

2      Q     What do you mean?  Not everyone what?

3      A     There's different trigger pulls in

4  different weapons.  For example, a Desert Eagle, a

5  .50 caliber Desert Eagle, if a young woman were to

6  pick up that gun, she might be hard-pressed to

7  actually pull that trigger to use it.

8      Q     Devan, for example (indicating) -- and

9  Devan, for all I know, goes to the range every week.

10  I have no idea.  Devan might feel more comfortable

11  with, say, a .22 than a .50 caliber Desert Eagle;

12  correct?

13      A     That's correct.

14      Q     Because the size is smaller, and the

15  trigger pull is easier.  In that split-second moment

16  when you actually need it, it would be easier for her

17  to use to defend her safety?

18      A     That is correct.

19      Q     Okay.

20      A     In that same context, if Devan was trained

21  by the U.S. Military and they gave her a weapon, a

22  larger weapon -- say a .223 carbine, or a rifle, or

23  even a Barrett sniper rifle -- with the proper

24  training she'll be able to operate that same weapon

1    depending on training.

2         Q    Let's pretend that the hypothetical

3    civilian here is not military trained and just wants

4    a firearm so that if someone breaks into their house

5    they might be able to defend themselves.  Okay?

6    Under the law here, 170A, they have no opportunity

7    within the city to see what firearm might be good for

8    them?

9         A    That's correct.  Under the provisions of

10   the ordinance as its written, yes.

11        Q    The only firearm that that person -- if

12   they don't have the means to leave the city or if

13   they don't have the desire to leave the city, the

14   only firearm that person is ever going to try prior

15   to getting their CFP is just the one they get for the

16   class?

17        A    Under the provisions of the ordinance as

18   you've presented it, that is correct.

19        MR. WORSECK:  Objection to the extent the

20   question presumes that only one weapon would be used

21   in the class.

22   BY MR. SIGALE:

23        Q    Is it your understanding that you can use

24   multiple firearms during this 1-hour class, if you

1   know?

2         A    No, I don't.

3         Q    You would agree that Line 2 of the

4   ordinance, Section A says, "The licensee may provide

5   a firearm"; correct?

6         A    As it's listed, yes; as it's written.

7         Q    After obtaining the CFP if this

8   hypothetical civilian doesn't desire or can't leave

9   the city, then they can't try out a firearm at all;

10  correct?

11        A    I don't understand the question.

12        Q    If they already have a CFP, short of

13  leaving the city there's nothing in the law that

14  allows them to rent or try a firearm out at all?

15  Because they already have the CFP, so they're not

16  eligible for the class anymore?

17        A    I don't understand.

18        Q    The only people that can be provided or

19  given a firearm at a shooting range is someone who is

20  taking the CFP class.  Would you agree with that?

21        A    Yes.

22        Q    Once they have their CFP they don't need to

23  take a class anymore?

24        A    That's correct.

1    Q    So they don't fall under this exception of

2  someone who is taking a CFP class?

3    A    That's correct.

4    Q    Which means that person, if they go to a

5  firing range and say, I'd like to try out a firearm

6  because I'm thinking of buying one, I have my CFP,

7  Can I borrow a firearm or Can I try that one or Can I

8  rent that one, the answer is; Well, under the law,

9  no, you can't?

10    MR. WORSECK:  Object to the extent that it

11  calls for a legal conclusion.

12  BY MR. SIGALE:

13    Q    Is that correct from this reading of the

14  ordinance?

15    A    I don't understand.  Has that person left

16  the city to try out the gun?

17    Q    No, they're in a range --

18    A    In the city of Chicago?

19    Q    They're in the city of Chicago.

20    A    The way the ordinance is currently written,

21  that's correct.

22    Q    That person would have to leave the city if

23  they wanted to try out various firearms before making

24  a purchase?

1      A     That would be an option available to them,

2    yes.

3      Q     Going back to the hypothetical -- we were

4    talking about Devan (indicating) in the hypothetical,

5    but we'll take Devan out of it.  We'll just make it a

6    hypothetical female civilian.

7      A     Yes.

8      Q     Would you say that it's better for public

9    safety if she is able to determine before buying a

10   .50 caliber Desert Eagle whether or not she can

11   actually use it safely?

12     A     It is better for public safety?

13     Q     Yes.

14     A     It's my understanding that the ordinance

15   was written in terms of personal safety as opposed to

16   public safety.

17     Q     You're talking about that the purpose of

18   this is public safety; correct?

19     A     And you're speaking of the issue of her

20   weapon choice and preference.  It's personal safety.

21     Q     Right.  But would you agree for public

22   safety that it would be better if she -- when we were

23   talking about training being beneficial -- that if

24   indeed she has to fire on someone and she has a

1   firearm, that she's actually able to handle and

2   control, and that the shot isn't going to go wild and

3   maybe hit someone else?

4       MR. WORSECK:  Objection.  Vague.

5   Argumentative.  Incomplete hypothetical.

6   BY MR. SIGALE:

7       Q   Do you understand the question?

8       A   Not really.

9       Q   Earlier we were talking about the

10   hypothetical female civilian who didn't have military

11   training and how a .22 might be more suited for her

12   than a .50 caliber Desert Eagle because of its size

13   and the power, and it would be easier for that person

14   to handle; correct?

15       A   Correct.

16       Q   Would you say that it is more or less

17   beneficial that this hypothetical woman know that

18   information and try these firearms out before

19   actually just purchasing one and maybe purchasing the

20   wrong one?

21       A   Yes.

22       MR. WORSECK:  Same objections.

23   BY MR. SIGALE:

24       Q   What is the public benefit, what is the

1    governmental purpose of not allowing that woman to do

2    so?

3         MR. WORSECK:  Objection.  Argumentative.

4    Vague.

5         THE WITNESS:  The governmental issue is public

6    safety.  Her choice and preference of firearm

7    purchasing is a personal safety issue.

8    BY MR. SIGALE:

9         Q    Isn't she a member of the public?

10        A    True.

11        Q    If the point of this is that if someone

12   breaks into her home then she, as a member of the

13   public, would be best able to defend herself and

14   maybe not shoot herself in the foot or shoot the

15   ceiling or shoot someone standing behind the would-be

16   assailant when that person breaks in, or someone out

17   on the street or something, and it's beneficial for

18   her to know in advance if that .50 caliber eagle or

19   the .22 is going to be better suited for her safety

20   and her ability to defend herself;

21             What is the governmental purpose of

22   prohibiting her from figuring that out before she's

23   forced to buy a firearm?

24        MR. WORSECK:  Same objections.

1      THE WITNESS:  I still believe that the public

2  safety issue remains in having weapons maintained

3  that can be stolen or burglarized at a location.  If

4  there's a number --

5              Are you speaking of like a large

6  number of weapons?  In this hypothetical is there a

7  large number of weapons?

8  BY MR. SIGALE:

9      Q    A large number of weapons where?  I'm

10  sorry.

11      A    You said to try out various makes and

12  models.  Wouldn't you require a large number of

13  weapons?  Wouldn't that be a number of weapons?  I

14  don't understand.

15      Q    Say this hypothetical civilian, she wants

16  to try out 4 or 5 to see what fits her hand good and

17  what feels comfortable when she shoots it.

18      A    I don't think there's a governmental

19  purpose.

20      Q    Of prohibiting her from trying those out?

21      A    Yes.

22      Q    Just to be clear -- and then I'll move on

23  to the next thing -- you're not aware of any data or

24  studies or statistics or research that says the

1   contrary; correct?

2       A    That's correct.

3       Q    170B says that -- and I'm just reading it

4   off of here.  And you tell me if I'm reading it

5   wrong.  Okay?

6       A    Yes.

7       Q    "The licensee may sell ammunition to a

8   shooting range patron only for use at the shooting

9   range.  The licensee shall ensure that no shooting

10  range patron leaves the shooting range facility with

11  any ammunition purchased from the licensee."

12               Did I read that correctly?

13      A    Yes, you did.

14      Q    In fact, I'm pretty sure that it's now

15  twice that I've read it, but it was a long time ago

16  it feels like.

17               What is the governmental purpose of

18  the restrictions in this section of the ordinance?

19      A    It comes to a public safety issue again.

20      Q    Is it the same public safety issue that if

21  there's ammunition on the premises, someone might

22  steal the ammunition?

23      A    Yes.

24      Q    When you talk about public safety, the same

1  thing -- and I'm not trying to put words in your

2  mouth -- is that the only public safety concern that

3  you're referring to?

4      A    The only one that I'm concerned with is

5  theft, robbery, diversion of ammunition where someone

6  is basically taking --

7              Say hypothetically someone buys

8  ammunition or ammunition is provided at that

9  location.  If this person doesn't use all of the

10  ammunition, where does the ammunition go?  Do they

11  keep it?  Do they take it to somewhere else?  Do they

12  take it out of the store?  That would be a public

13  safety issue, if they hand this ammunition to someone

14  else who is not supposed to have a weapon.

15      Q    Let's leave aside the issue of theft or a

16  break-in into the range.  Okay?  That's basically the

17  same as, Well, there's theft concerns if there's

18  firearms on the premises; and if someone wants to

19  steal firearms, maybe they'll break into a range or a

20  gun shop.  The ammunition concern with regard to that

21  is exactly the same as the firearm concern; correct?

22      A    Yes.

23      Q    Your concerned that someone might -- almost

24  like a straw purchaser argument, I suppose, with

1    regard to the other thing -- that someone might go

2    into a range and buy ammunition; shoot some and not

3    shoot all of it; and then walk out and do something

4    nefarious with it.  That's the concern basically?

5         A    Based on the way you've presented it, yes.

6         Q    I wasn't presenting it.  I thought that was

7    just what you said?

8         A    Based on the way you've presented it, I

9    would agree with you, with your statement.

10        Q    So that's the public safety concern then?

11        A    Yes.

12        Q    Someone might break in and steal ammunition

13   or someone might go in and legally buy the

14   ammunition, but then give it to some criminal or sell

15   it to a criminal?

16        A    Correct.

17        Q    I asked you a question about studies and

18   data and research regarding that happening with

19   regard to firearms.  Let me ask you the same question

20   with regard to ammunition.

21             Are you aware of any research or

22   studies or empirical data that someone buying

23   ammunition at a gun store and then reselling it to a

24   criminal is a problem, is an actual occurrence and a

1    problem?

2        MR. WORSECK:  Objection.  Vague.

3        THE WITNESS:  I'm not aware of any data or

4    studies regarding ammunition.

5    BY MR. SIGALE:

6        Q    In your experience as a police officer are

7    you aware of this happening?  I don't mean to be

8    glib.  But can ammunition be traced in the same way

9    that a firearm can be?

10       A    There is current technology being conducted

11   by ATF and other states regarding ballistic evidence

12   and shell casing, tracing, micro stamping, emerging

13   technology.

14              I'm not a firearms expert when it

15   comes to ballistics.  But there is available

16   technology being used by other law enforcement

17   agencies regarding micro stamping and ballistic

18   matching and tracing.

19       Q    Are you aware of instances where a firearm

20   has been used in a crime and the bullet has been

21   traced back to a firing range or a gun shop?

22       A    The bullet or the shell casing.

23       Q    I guess either.

24       A    To the shop itself?

1    Q    Yeah.

2    A    The gun can be traced back to the shop.

3 The bullet cannot be traced back to an individual

4 shop.  Not to my knowledge.  I'm not aware of any

5 such technology currently existing.

6    Q    Just for the record to be clear, the same

7 question with regard to a shell casing: Can that be

8 tracked down to the point of sale?

9    A    Again, I'm not aware of any current

10 technology.

11    Q    Let me just ask this to make sure that the

12 record is clear:  Are you aware of actual instances

13 where ammunition used in a crime was traced back to a

14 particular point of sale?

15    A    I'm not aware of any.

16    Q    As far as you know, you're not even aware

17 if the technology exists that do so?

18    A    Again, I'm not aware of such technology.

19    Q    The concern that if there's ammunition in a

20 range that it might be stolen or later used

21 nefariously, that's speculative; correct?

22    MR. WORSECK:  Objection.  Vague.

23    THE WITNESS:  Correct.

24         This is all hypothetical; correct?

1    BY MR. SIGALE:

2        Q    Except for the questions about, Are you

3    aware of any actual real world incidents.

4        A    Okay.  Understood.

5        Q    But, yeah.  I mean, that's fine.  I'll

6    rephrase the question or reask it a different way.

7                 Your concern about ammunition being

8    stolen from a range during a break-in or purchased

9    legally at a range and used nefariously later, maybe

10   by a later purchaser on the street or something, this

11   is all hypothetical and speculation; correct?

12       A    As far as the range goes, yes.

13       Q    What about a gun shop?

14       A    They have stolen weapons and ammunition

15   from a gun shops.

16       Q    But whereas you know -- it sounds like --

17   or you've been able to ascertain in certain instances

18   that a certain firearm was purchased at a certain

19   location, you can't do the same thing with a bullet

20   or a shell casing?

21       A    That's correct.  I'm not aware of such

22   technology.  I don't want to speak regarding firearms

23   that I know of.

24       Q    A straw purchaser who purchases a firearm

1    in Florida and gives it to someone with a criminal

2    motive who brings it here to Chicago and uses it in a

3    crime -- you know what?  Strike the hypothetical.

4                    Someone who breaks into a gun shop in

5    Florida -- steals a firearm from it during the night,

6    breaks through the window or whatever -- and gives it

7    to someone or sells it to someone who winds up using

8    it here in a crime in Chicago, you might be able to

9    know that that firearm was stolen from that location

10   in Florida.

11                   But you have no way of knowing if the

12   shell casing that was used in that crime came from

13   the same break-in Florida or whether it was or

14   purchased at a Wal-Mart in Montana?

15        A    That is correct.  And just to be clear,

16   there are people who do their own reloading of

17   ammunition.

18        Q    That's actually not allowed under the

19   ordinance, but it's not an issue in this case?

20        A    But other states can.

21        Q    Other states can.  Okay.

22                   How is the firing range owner supposed

23   to know or ensure that the ammunition that the person

24   leaving the range with is purchased there or at the

1    range or is their own that they've brought in?  How

2    are they supposed to know that?

3         MR. WORSECK:  Objection.  Speculation.

4         THE WITNESS:  I don't know the individual

5    implementation of ordinance in terms of actual --

6              We're speaking in a hypothetical;

7    correct?  Are you asking my opinion on how they

8    should be able to do it or how do I think they should

9    be able to do it?  Neither of which I can really

10   speak on.

11   BY MR. SIGALE:

12        Q    Okay.  I'm sitting here trying to think,

13   what's the difference?  But there's no difference?

14        A    No.

15        Q    If somebody walks in with a box of bullets,

16   okay, and they go to the range and they buy the same

17   brand of bullets, okay, do you have any idea as you

18   sit here how the range owner is supposed to know

19   whether or not the ammunition the person is leaving

20   with is from the box that they walked in with or the

21   new box?

22        MR. WORSECK:  Objection.  Speculation.

23   BY MR. SIGALE:

24        Q    As you sit here, do you know any way?

1      A    No, other than giving them a precise amount

2  of ammunition and requiring them to use that specific

3  amount of ammunition from that box.  So basically

4  whatever the store would provide to them,

5  hypothetically of course -- if the store gives them

6  20 rounds to shoot, ensure that they shoot those 20

7  rounds right there under the direction of the

8  instructor at that location.

9      Q    If someone with no criminal record, who has

10  a FOID card and who has a CFP, wants to go to the

11  range, the way that this 170B is to be complied

12  with -- and I'm not trying to be glib -- but they can

13  only buy their ammunition in increments of 20, and

14  someone has to be looking over their shoulder to make

15  sure that they actually shoot all 20?  Is that the

16  way?

17      MR. WORSECK:  Objection.  Speculation

18  argumentative.  Mischaracterizes the testimony.

19      MR. SIGALE:  That's why I'm asking the

20  question.

21  BY MR. SIGALE:

22      Q    You can answer if you know.

23      A    I just think that the way you've presented

24  the question, that's the only way you could account

114

1    for it.  You asked basically, How would they be able

2    to do it?  I was just giving you a possible option of

3    how they might be able to do it.

4        Q    Under that scenario it would require the

5    range owner to basically micro manage the use of

6    every patron --

7        MR. WORSECK:  Same objections.

8    BY MR. SIGALE:

9        Q    -- to make sure that if they come in with

10   50, they better use those?  Then, Okay, you can leave

11   with this half a box.  But if you buy this box, you

12   better shoot them all; or, We can only sell it to you

13   in small increments, and we've got to watch you to

14   make sure that if you buy 20, you're not shooting 19

15   and pocketing the last one.

16            It sounds like that kind of micro

17   managing is the only way.  Is that basically what

18   we're talking about here?

19       MR. WORSECK:  Same objections.

20       MR. WITNESS:  It becomes a level of

21   responsibility.

22   BY MR. SIGALE:

23       Q    For who?

24       A    For both.  I believe -- and I won't

1  actually quote it -- that it's called the Responsible

2  Gun Owners Ordinance.  So it's inherent that there is

3  a level of responsibility on all parties to

4  participate in this ordinance.

5      Q    Doesn't that responsibility really

6  translate to people have a responsibility not to

7  break into a range and steal ammunition or people

8  have a responsibility not to take their ammunition

9  and sell it on the street to gang bangers?  Isn't

10 that really the responsibility?

11     MR. WORSECK:  Objection.  Vague.

12     THE WITNESS:  I think everyone has a

13 responsibility, whether it be the person who is

14 looking to buy the gun, the person who is instructing

15 him on how to use the gun.  Everyone has a

16 responsibility who is participating in this

17 ordinance.

18 BY MR. SIGALE:

19     Q    I'm just talking about the ammunition for

20 right now, and the idea that every single bullet has

21 to be accounted for.

22              Isn't the personal responsibility,

23 say, that if you do something wrong with a bullet --

24 like shoot someone with it improperly -- that you

 1    face the consequences?  Isn't that the personal

 2    responsibility that the gun ordinance is talking

 3    about?

 4         MR. WORSECK:  Objection.  Vague.  It

 5    mischaracterizes the ordinance.  It's argumentative.

 6    BY MR. SIGALE:

 7         Q    Again, I'm not trying to be glib.  To some

 8    extent, this is the kind of conversation that if I

 9    wasn't in a deposition, I'd be having the same

10    conversation with someone at a bar over a beer

11    talking about this.

12              But, I mean, isn't that really what

13    the personal responsibility is supposed to be about,

14    Guns can be dangerous, Use them responsibly, Don't

15    commit crimes with them?

16         A    Yes.

17         Q    Isn't that a pretty big burden to place on

18    a range owner under criminal penalty to make sure

19    that every range patron is accounting for every

20    single bullet that they might purchase at a range or

21    might walk in with?

22         A    No.

23         MR. WORSECK:  Objection.  Speculation.  It's a

24    hypothetical.

1    BY MR. SIGALE:

2         Q    Why is it not?

3         A    Because there's a public safety issue.  It

4    goes back to the issue of public safety.  This range

5    owner could potentially provide ammunition that could

6    be used in a crime to murder or harm someone in the

7    city.  If that one bullet gets out there, if that one

8    bullet is taken from that location and that bullet is

9    used to murder someone, then where was the point of

10   origin?  It was that store.

11        Q    Which, again, there's no way that you're

12   aware of to actually show that; correct?

13        A    Correct.  Short of a criminal investigation

14   and there's an admission that, I obtained this

15   ammunition from this location, in a handwritten

16   statement.

17        Q    But you would agree, if you know, that

18   under the ordinance if you want to go to a range and

19   use a firearm in the first place, you can't just buy

20   ammunition.

21             If you're buying it to use at the

22   range, even if that's just your cover story, you

23   still need to have a CFP and an I.D. to give to the

24   range owner; correct?

1      A    Correct.

2      Q    If that firearm -- if that bullet gets

3  tracked, if somehow the range knows, they still would

4  know who took the bullet; correct?

5      MR. WORSECK:  Objection.  Argumentative.  It

6  mischaracterizes the testimony.  Speculation.

7  Hypothetical.

8      THE WITNESS:  I can't speak for the individual

9  range owner's liability and responsibility.  That's a

10  little bit beyond my purview.

11  BY MR. SIGALE:

12      Q    But suffice it to say that there are

13  criminal penalties for a violation of that section of

14  the ordinance?

15      A    Yes.

16      Q    Other than what you've already said, are

17  there any other ways that you can think of that a

18  range owner could ensure that the box of ammunition

19  that the person is walking out with is not the one

20  that they came in with, or that they're leaving with

21  the same number of bullets that they walked in with?

22      A    Again, I can't speak on how the individual

23  range -- the hypothetical range owner would set up an

24  conduct his business.  That's outside of my purview.

1      Q    Hypothetically someone walks into a range

2   with, from their own house, 50 bullets out of 100

3   bullet box.  They shoot those.  They go to the range

4   owner or the manager behind the counter or whatever

5   and say, I need more ammunition; I'm still shooting.

6   They buy another box of a hundred.  Okay?  They shoot

7   60 of them, and then they're done.  They've got to

8   go, whatever.  They're tired.

9               They walked in with 50 bullets, but

10  they only have 40 left.  Okay?  They shot 50 that

11  they walked in with.  And then they bought a box of a

12  hundred, shot 60 more.  So now they have 40 left of

13  the new box.  So they actually have fewer bullets

14  than they walked in with.

15              What's the public safety hazard of

16  allowing that person who has actually walked in with

17  ammunition and is leaving with less ammunition from

18  leaving the range with the ammunition they came in

19  with -- or leaving the range with the remainder of

20  that box that they purchased?

21       MR. WORSECK:  Objection.  Hypothetical.

22  Argumentative.  Speculation.

23       THE WITNESS:  In truth, the public safety issue

24  has already been violated by the fact that because

1    this range existed at this location they felt

2    compelled to bring ammunition, transport ammunition

3    from one location down to this range.  They could be

4    involved in a car accident, theft, robbery and that

5    ammunition that they were bringing down for the

6    purpose of shooting is taken from them.

7                    Again, public safety is now at risk.

8    Because this range exists, now they're bringing

9    ammunition down there.  They haven't even made it to

10   the store yet.  Now they're bring ammunition and

11   transporting ammunition.  Whether legally or

12   illegally remains to be seen.

13   BY MR. SIGALE:

14        Q    Obviously that's a hypothetical; correct?

15        A    As they all are.

16        Q    Not all of them.  Some of them I've asked

17   you about specific incidents that you're aware of,

18   but this particular one is a hypothetical; correct?

19        A    That's correct.

20        Q    Lieutenant, it sounds like that's an

21   argument for why you would be opposed to the

22   existence of firing ranges because their existence

23   means that people would go to them, and their

24   existence means that there are firearms at them, and

1   maybe in the realm of speculation something bad might

2   happen.

3                   It sounds like that's what you're

4   saying.  I'm just trying to ask if I'm hearing you

5   right?

6       A    I have no personal anonymity towards any

7   lawful business within the city of Chicago.  As a

8   public servant I'm sworn to uphold and protect

9   private and professional businesses and persons in

10  the city of Chicago.  I will defend and support

11  anything going on in the city of Chicago.

12                  However, if you're asking me will gun

13  ranges and the presence of ammunition and firearms

14  increase the possibility of theft, burglary, or

15  robbery, or harm to the public, yes.  There is that

16  potential.

17      Q    Again just with that, like the other stuff

18  that we've been talking about today, you don't have

19  any empirical data or studies or research to support

20  that?  This is just your hypothetical opinion?

21      MR. WORSECK:  Objection.  Vague.  It

22  mischaracterizes the testimony.

23      THE WITNESS:  Correct.

24  BY MR. SIGALE:

1    Q    Let's go back to my hypothetical and stick

2  with that specifically.  A law abiding person with a

3  FOID card, and a CFP, and a valid I.D. card goes into

4  a range with 50 bullets remaining of a box from home.

5  They didn't get into a car accident or get car jacked

6  or drop the bullets in the street on the way there.

7               They make it to the range safely.

8  Shoot their 50 bullets, and then shoot 60 more from a

9  box that they bought, leaving 40.  That person, that

10  law abiding person, walks out of the door with 10

11  fewer bullets than they walked in with.

12    A    Okay.

13    Q    The difference is that those 40 bullets

14  happen to be bought at range as opposed to the

15  Wal-Mart.

16    A    Okay.

17    Q    What is the public safety hazard from that

18  person?

19    MR. WORSECK:  Objection.

20  BY MR. SIGALE:

21    Q    And assume also, for purposes of the

22  hypothetical, that the guy likewise manages to get

23  home safely.  Okay?

24    MR. WORSECK:  Objection.  Vague.  Hypothetical.

1   BY MR. SIGALE:

2       Q    What's the public safety concern from that

3   person?

4       A    The same that existed when they bought the

5   existing rounds to the range.

6       Q    Which really doesn't seem to be a problem

7   with him.  It seems to be a problem with the

8   existence of the bullets.  Is that fair to say?

9       A    The range owner or the person using the

10  ammunition?

11      Q    I thought we were talking about the person

12  who was bringing the bullets there and then bringing

13  fewer bullets home.

14      A    Whether it's 40 or 50 rounds, the potential

15  for crime or the potential of being a victim of crime

16  still exists.  It still remains whether that

17  ammunition was purchased at the range or they brought

18  it there.

19      Q    That potential seems to stem from the

20  existence of the bullets as opposed to any criminal

21  tendencies of the patron?

22      A    The patron could be a victim of crime.  He

23  may not have any criminal tendencies.  However, they

24  may be a victim of crime.

1    Q    Again, you're not aware of any studies,

2    empirical data, research that talks about ammunition

3    used in a crime that was stolen from a firing range

4    patron; correct?

5    A    That's correct.

6    Q    Are you aware of any personal -- I

7    understand that ranges don't exist in Chicago to the

8    public.  But whether from the outskirts or whatever,

9    are you aware of any real world examples of people

10   who've had ammunition stolen from them that they were

11   taking to or from a firing range and that ammunition

12   later got used in a crime?

13   A    Not that I'm aware of.

14   Q    You would agree that the danger, the

15   potential danger, that you're talking about is

16   exactly the same regardless of the source of the

17   bullets; correct?

18   A    That's correct.

19   Q    So where he gets that bullet, whether he

20   buys it at a Wal-Mart or he buys it at the range, the

21   potential horrors that you're talking about are the

22   same in your example regardless of where they were

23   purchased?

24   A    Correct.

1    Q    That's especially true if we're talking

2    about the same type of bullet in the first place;

3    right?

4    A    Correct.

5    Q    If a guy walks in with a certain amount of

6    bullets for a firearm and purchases the same to keep

7    shooting with that same firearm, then even the

8    bullets are exactly the same.  So that has no impact

9    on your example either; correct?

10   A    Correct.

11   Q    Your concern about the shooting range

12   patron leaving with the ammunition to take it home

13   and use it in the event -- hopefully never -- but in

14   the event of self-defense, your concern even then

15   isn't with the person who bought the firearm -- or

16   bought the ammunition.

17        But, again, it's with the speculative

18   what might happen to them if they are a victim of

19   crime or robbed of those bullets; correct?

20   A    Correct.

21   Q    Because, again, not to be glib, you would

22   agree that if someone has a firearm in their home and

23   someone breaks in and they are going to need a

24   firearm for self-defense, their ability to defend

1    themselves is increased at least somewhat if they

2    have bullets for the firearm; correct?

3         A    That would be correct.

4         Q    Under the ordinance 170B let's say somebody

5    is following the ordinance -- and leaving the debate

6    over the feasibility or the wisdom of it for another

7    topic.  But somebody is following the law, the range

8    owner.  Okay?

9                   So somebody purchases a box of a

10   hundred.  They shoot 60, and their arms are tired or

11   they've got to leave or whatever.  Under the

12   ordinance they've got to leave the ammunition there

13   at the range; correct?

14        A    Correct.

15        Q    What is the range owner supposed to do with

16   it?

17        MR. WORSECK:  Objection.  Speculation

18   hypothetical.

19        THE WITNESS:  I can't say, Counsel.

20   BY MR. SIGALE:

21        Q    Can you speak at all from a safety concern

22   of what should be done with it?

23        MR. WORSECK:  Same objections.

24        THE WITNESS:  No.

1

2    BY MR. SIGALE:

3        Q    Do you recommend that the range owner just

4    take all of these bullets that have been turned in

5    and resell them to other patrons?

6        MR. WORSECK:  Objection.  It calls for

7    speculation.

8        THE WITNESS:  I can't make any recommendations.

9    BY MR. SIGALE:

10       Q    Would you consider that safe?

11       A    I don't understand the question.

12       Q    If the range owner takes all of these

13   bullets that have just been turned in and resells

14   them.

15       A    Would it be safe for who, Counsel?

16       Q    Patrons at the range, the re-purchaser?

17       A    All bullets are safe if they're not in a

18   gun.

19       Q    So your answer to that is that a resold

20   bullet is otherwise the same as a bullet -- a new

21   bullet out of a box?

22       MR. WORSECK:  Objection.  Argumentative.  It

23   mischaracterizes the testimony.  Speculative.

24       MR. SIGALE:  I'm asking.

1    THE WITNESS:  That's really beyond my scope.

2  I'm not a ballistics expert.

3  BY MR. SIGALE:

4    Q    Is there a governmental purpose other than

5  what you've already said -- that the existence of

6  bullets means that somebody might commit a crime with

7  a bullet -- to prohibiting people from keeping an

8  item that they legally purchased?

9            I mean, they bought these bullets with

10  their own money.  It's their property.  And they're

11  being told, You can't keep it.  Is there a

12  governmental purpose other than the existence of

13  bullets means the existence of potential crime for

14  saying that to people?

15    MR. WORSECK:  Objection.  Argumentative.  It

16  mischaracterizes the testimony.

17    THE WITNESS:  There is a governmental purpose.

18  I don't want to be facetious, but it's almost the

19  same theory of if you golf.  You go to a range.  You

20  bring golf clubs to practice at the range.  These are

21  your golf clubs.  The range for a fee provides you

22  golf balls to use at the range.

23            Say you buy a bucket of hundred and

24  you only hit 50 golf balls, you will not remove the

1    other 50 golf balls to use at your own convenience

2    and take them home.  You would leave those golf balls

3    at the range; correct?

4        Q    Isn't there a difference between renting a

5    bucket of balls and purchasing a box of ammunition?

6        A    But you're renting a firearm.

7        MR. WORSECK:  Objection.  It calls for a legal

8    conclusion.

9    BY MR. SIGALE:

10       Q    Well, I'm not renting a firearm.  I'm not

11   allowed to rent a firearm.  But that's a difference

12   topic.

13       A    Under speculation you'll be renting.

14   You're just using the bullets.

15       Q    Let's make your hypothetical, though, an

16   actual comparison.  Let's say I go to the golf range,

17   to the driving range, and I don't rent a bucket of

18   balls.  Let's say I go to the Pro Shop and I purchase

19   50 balls because I've got no concern for money.  If

20   I'm going to the driving range, I want to be

21   practicing with titleists.  Okay?

22              None of that statement was true.  But

23   let's assume it was, and I go and I hit 25 of my 50

24   titleists.  I'm allowed to leave the driving range

1    with the 25 balls that I've purchased but haven't

2    used; correct?

3         A    Correct.

4         Q    In fact, in theory, if I can figure out

5    which balls are mine, I can go down to the other end

6    of the driving range and get my 25 balls back;

7    correct?

8         A    Correct.

9         Q    That I did use?

10        A    Correct.

11        Q    Because I purchased it as opposed to

12   renting them; correct?

13        A    Correct.

14        Q    You would agree -- well, strike that.

15             If you're aware, have there been court

16   decisions in the city of Chicago or the courts that

17   say you have a constitutional right to go to a

18   driving range?

19        A    I don't understand the question.

20        Q    I don't mean to be glib.

21        MR. WORSECK:  You're being glib, David.  You're

22   being quite glib.

23        MR. SIGALE:  This is an example.

24   BY MR. SIGALE:

1      Q    There's a difference, you would agree,

2  between going to a golf range, a gold course or a

3  driving range, which I'll submit to you has not been

4  said by the court to be a constitutional right; and

5  training with a firearm, which the courts have said

6  there is.  You would agree that there's a

7  differences?

8      A    There is a constitutional right to go to a

9  driving range.  You're free to go anywhere in this

10 country.  You're free to go to a business.

11     MR. WORSECK:  David, I'm going to object.

12     MR. SIGALE:  I'll leave the topic.  That's

13 fine.

14     MR. WORSECK:  Lieutenant Johnson is not here as

15 a witness on what is and what is not allowed

16 constitutionally with respect to golf conduct in the

17 United States.

18     MR. SIGALE:  That's fine.

19     THE WITNESS:  Okay.

20     MR. SIGALE:  But I agree with you in theory.

21 It's a free country.  If I want to go golfing --

22 which I don't.  But if I did, I should be allowed to

23 golf.  But as far as court decisions go, I'll agree

24 to just withdraw the question.  I won't put you

1    through that, Lieutenant.

2         THE WITNESS:  Okay.

3    BY MR. SIGALE:

4         Q    Just to clarify, you're not here to speak

5    as to the safety concerns or hazards of reselling or

6    disposing of ammunition.  Is that fair to say?

7         A    That's correct.

8         Q    If there is an expert that says that it is

9    actually unsafe to resell ammunition under the

10   scenario that we're talking about and hazardous

11   potentially to dispose of bullets that can't be

12   resold -- if there is an expert that says that, you

13   don't have any knowledge to speak to those topics;

14   correct?

15        A    That's correct.

16        Q    Just to ask a question to clarify, you have

17   no knowledge as a witness here today about the

18   economics of a firing range as it pertains to the

19   rental or sale of firearms or ammunition; correct?

20        A    That's correct.

21        Q    You have no knowledge regarding those

22   topics?

23        A    No knowledge at all.

24        Q    Specifically speaking, other than the kind

1    of speculative ideas that you said earlier, you don't

2    know in practice how 170B would be enforced by the

3    range owner; correct?

4        A    That's correct.

5

6    BY MR. SIGALE:

7        Q    Okay.  That just leaves the one topic --

8        MR. WORSECK:  David, before you jump into that,

9    can I ask if you have a guesstimate as to time?  If

10   you think that you're going to be a while, I'd say

11   let's take a 5-minute break.

12       MR. SIGALE:  Let's go off the record for a sec.

13                         (Whereupon, a discussion was had

14                          off the record.)

15                         (Whereupon, a brief recess was

16                          taken.)

17   BY MR. SIGALE:

18       Q    Lieutenant, you have been offered as a

19   witness on one more part of the ordinance.  I'm just

20   going to read it to you because I only have the one

21   copy of the ordinance.  I'll tell you that I'm

22   reading from Rosemary Kringle Deposition Exhibit 1

23   (phonetic), which is a copy of the shooting range

24   licensing restrictions.

1          Its' Section 4-151-120.  It says, "No

2   premises licensed under this chapter may be located

3   as measured from property line to property line

4   within 500 feet of, A, another premises licensed as a

5   shooting range facility, B, any zoning district zoned

6   for residential use including a planned development

7   that authorizes such residential use; or, C, any

8   school, daycare, facility, park, place of worship,

9   any premises licensed for the retail sale of liquor,

10  children's activity facility, library, museum, or

11  hospital."

12       A    Understood.

13       MR. SIGALE:  In fact I'm just going to do this:

14  I'm going to show you my markings, my notes from

15  Chapter 4-151.  I'll just put it here, so that if the

16  witness wants to refer to it, he can.

17  BY MR. SIGALE:

18       Q    Lieutenant, you have been offered as a

19  witness to discuss the governmental purpose of

20  4-151-120 --

21       MR. WORSECK:  David, I'm just going to object.

22  To clarify again, he's being offered to speak to the

23  governmental purpose or purposes in so far as they

24  relate to crime and gun violence.

1          There were other purposes supporting

2     the zoning restriction that other witnesses have

3     talked about, but Lieutenant Johnson is here to talk

4     about crime and gun violence-related purposes based

5     on his knowledge and training as a police officer.

6          MR. SIGALE:  Okay.

7          MR. WORSECK:  I just want to be clear that the

8     scope is limited.

9          MR. SIGALE:  Let me ask the lieutenant.

10    BY MR. SIGALE:

11         Q    Is that your understanding of your

12    testimony as to 4-151-120?

13         A    Yes.

14         Q    So unless some ancillary topic somehow is

15    brought up during the course of our discussion,

16    that's fine.  We'll talk about that.  Okay?

17         A    Okay.

18         Q    I guess we should start by talking about

19    Letter A, 120A, that says they're banned within 500

20    feet of another shooting range facility.

21         A    Yes.

22         Q    What's the governmental purpose of that

23    from your perspective within what your -- in fact,

24    just strike the question.

1          We all understand that it's on the

2   record from what perspective you're here to offer

3   with regard to governmental purpose.  Can we agree

4   that when I say, What is the governmental purpose and

5   I'm asking you the question, that I'm asking the

6   question with regard to the scope that we've now

7   covered a couple of times, so that I don't have to

8   repeat it each time, that it's limited to this topic?

9   Is that okay?

10       A    Okay.

11       MR. WORSECK:  Do you understand what he's

12   saying?

13       THE WITNESS:  I understand what he's saying.

14       MR. WORSECK:  That's fine.  I'm not going to

15   object every time you use the phrase "governmental

16   purpose" with that clarification.

17   BY MR. SIGALE:

18       Q    With regard to Section 120A what is, from

19   your perspective, the governmental purpose?

20       A    The governmental purpose would be the fact

21   that the restriction would prevent the possibility of

22   theft, robbery, shooting incidents as a result of

23   weapons being either stored or transported to or from

24   such location.

1    Q    Again, you'll agree that under the

2  ordinance shooting ranges are allowed to exist?

3    A    Yes.

4    Q    What, if any -- what is the increased

5  public safety hazard as you see it from having 2

6  within 500 feet of each other?

7    A    The way it's presented under 120A that

8  would require more than one.  Therefore, with one

9  there is always an inherent public safety concern.

10 Now you've just increased it or multiplied that

11 potential because there's 2.

12   Q    By 2?

13   A    Yes, minimally 2.

14   Q    A minimum of 2 ranges you mean?

15   A    Yes.

16   Q    Basically you're saying double the ranges,

17 double the risk?  Is that basically what you're

18 saying?

19   A    It can be characterized as that, yes.  I'll

20 accept that characterization.

21   Q    You'll agree that subject to the rest of

22 the ordinance a gun range could in theory open within

23 basically every thousand feet, correct, as long as

24 it's not otherwise violating the location

1    restrictions; correct?

2        A    That's a little bit outside of my scope.

3              You're asking me about the ordinance

4    as it's currently written or a proposed changed

5    ordinance?

6        Q    No, I mean as it's currently written.  It's

7    banned from being within a 500-foot radius from each

8    other -- or a 500-foot distance from each other;

9    correct?

10       A    Correct.

11       Q    If 2 ranges open 750 feet from each other,

12   that would not violate that section of the ordinance;

13   correct?

14       A    Correct.

15       Q    But under that scenario your concern about

16   the potential for something bad to happen would still

17   exist; right?  Because there's 2 ranges.  They're

18   just 250 feet further apart from each other; correct?

19       A    Correct.

20       Q    My question is, I understand what you're

21   expressing -- regardless of whether I agree with it,

22   I understand what you're expressing about, Well, if

23   there's 2 ranges, that means there's 2 chances for

24   something to happen.

1          I'm asking what is the increased -- if

2    any, what is the increased risk of saying that they

3    can't be within 500 feet of each other?  What

4    difference does that make, if any?

5         MR. WORSECK:  Objection.  Vague.  Compound.

6    BY MR. SIGALE:

7         Q    Do you understand the question?

8         A    No.

9         Q    If the existence of 2 ranges means the

10   existence of 2 potential problems, as you described

11   it earlier -- your testimony is what it was -- is

12   there an increase in that potential harm if the 2

13   ranges are located 400 feet apart versus if they're

14   located a thousand feet apart?

15        A    An inherent threat to public safety remains

16   whether it's 500, 250, or a thousand feet.

17        Q    So it makes no difference?  It's the mere

18   existence of the ranges that creates the harm as you

19   see it?

20        A    The potential harm, yes.

21        Q    The distance between the 2 ranges doesn't

22   really matter, does it?

23        MR. WORSECK:  Objection.  It mischaracterizes

24   the testimony.

1        MR. SIGALE:  I'm asking.

2        THE WITNESS:  Yes.

3   BY MR. SIGALE:

4        Q    I'm sorry.

5        A    It does -- I'm sorry.  Can you repeat the

6   question again.

7        MR. SIGALE:  Can you read back my question.

8                         (Whereupon, the record was read

9                          as requested.)

10       THE WITNESS:  No, it doesn't.

11   BY MR. SIGALE:

12       Q    Let's move to -- strike that.

13            You're not aware as we sit here of any

14   studies, empirical data, statistics that say there's

15   an increased risk of harm or danger or catastrophe if

16   2 ranges are located within 500 feet of each other?

17       A    That's correct.  I'm not aware of any data.

18       Q    Are you aware of any data, studies,

19   research, statistics regarding the topic of proximity

20   of firing ranges to one another at all?

21       A    No, I am not.

22       Q    Obviously it's not an issue that you've had

23   to deal with in your capacity as a Chicago police

24   officer?

1      A    That is correct.

2      Q    Let's talk about B -- I'm sorry -- Section

3  120B.  Is there any governmental purpose other than

4  the one that you've already expressed?

5      A    This is beyond my scope.  It's a zoning

6  issue, and I'm not qualified to speak on zoning.  If

7  I'm correct, we're talking about 120B, and it's

8  asking for zoning.

9      Q    It says, "Firing ranges cannot be within

10  500 feet"?

11      A    120B speaks on zoning; correct?

12      Q    No.  Look at the top.  "No premises

13  licensed under this chapter may be located as

14  measured from property line to property line within

15  500 feet of --

16      A    Zoning district, residential use.

17      Q    Correct.  "Or planned development that

18  authorizes residential use."  So those 2 things.

19      A    Okay.

20      Q    Other than what you've already stated, is

21  there a governmental purpose to the restrictions in

22  120B?

23      MR. WORSECK:  Objection.  Vague.

24  BY MR. SIGALE:

1      Q      If you understand what I'm asking.

2      A      The only governmental purpose is for public

3   safety.

4      Q      But specifically how?

5      A      Am I making the assumption that this

6   district is zoned for residential use including a

7   planned development?  Is this property vacant, or is

8   the property currently being occupied for residency?

9      Q      In my hypothetical -- well, it's not really

10   a hypothetical.  120B, the way I look at it for my

11   question, this zoned residential could actually have

12   residences on it; or it might just be some vacant

13   land that nobody has built the residences yet.

14      A      But it is zoned for residential use.

15      Q      "Any zoning district zoned for residential

16   use, including a planned development that authorizes

17   such residential use."

18               So it's zoned residential.  My

19   question asked either/or because the ordinance

20   doesn't specify where there are actual residences or

21   not.  It just says if it's zoned.  It could be a

22   desert.  But if it's zoned residential, then it's

23   banned under 120B, within 500 feet.  That's the way

24   I'm asking the question.

1      A    Based on the way you've presented it, I

2  cannot answer that question because I'm not

3  authorized to speak on what may be residential use or

4  not.

5      Q    Let me ask this question 2 ways: Firing

6  ranges are banned within 500 feet from property line

7  to property line of any zoned district zoned for

8  residential use.  Okay?

9      A    Okay.

10     Q    Let me stop right there.

11          Would the governmental purpose be

12  different, as you sit here, whether or not that area

13  zoned for residential use is actually developed with

14  residences or if it's vacant, but just zoned for

15  residential?

16          Restricting firing ranges from coming

17  within 500 feet of that zone, that district, does the

18  governmental purpose change in your mind depending on

19  whether or not the district is actually developed or

20  not?

21     A    No.

22     Q    What is the governmental purpose of not

23  allowing firing ranges to be built within 500 feet of

24  a district that's zoned residential?

1      A     Because of the nature that it is being

2   zoned for residential use, that means there's a plan

3   or an idea to place residential property upon it.

4      Q     Assume for purposes of my question that it

5   is developed.  If you said that it doesn't make a

6   difference, then just assume for purposes of this

7   question that it is already developed.  There's

8   already houses, say, in this district.

9      A     Then it becomes a public safety issue.

10     Q     How does it become a public safety issue?

11     A     Theft, robbery, burglary.  Someone

12  attempting some type of theft from the store or from

13  the gun range or one of the patrons at the gun range.

14  Weapons are stolen, weapons are used.  There's a

15  presence of weapons and ammunition, which is an

16  inherent public safety issue.  And there's a

17  potential for theft or loss.

18     Q     This public safety issue that you just

19  mentioned, in your mind is it the same public safety

20  issue if the range is located 750 feet away?

21     MR. WORSECK:  Objection.  Vague.

22     THE WITNESS:  Yes.

23  BY MR. SIGALE:

24     Q     A thousand feet from the property line, the

1    same concern?

2        A    There's always a potential for crime.

3        Q    Is the public safety concern as you're

4    describing it the same regardless of where that range

5    is put?

6        A    I think it's more that the public safety

7    issue is heightened in a residential location.

8        Q    What if it's not in it?  What if it's 500

9    feet away?  Assume for purposes of the question that

10   you can't build a range in a residential zoned area.

11   M1, M2, M3, those are the only zones you can build

12   in.

13              If there's not a question of anyone

14   actually building a range in a residential area, at

15   least not in this hypothetical -- actually not really

16   in this lawsuit that I can recall off the top of my

17   head.  No one is saying, We're building one in a

18   neighborhood.  So assume for this hypothetical that

19   that's not the issue.  Okay?

20       A    Okay.

21       Q    With that said, is the public safety danger

22   that you're talking about the same as you see it,

23   whether that range is 500 feet or 750 feet away?

24       A    Yes.

1    Q    How is it different?

2    A    It's the same.

3    Q    It's the same 500 and 750 feet away?

4    A    Yes.

5    Q    Is it the same a thousand feet away?

6    A    Yes.

7    Q    Is it the same regardless of where I put

8  it?

9    A    Yes.

10    Q    The public and safety concerns that you

11  were talking about a minute ago that you were

12  referencing, the one that we just said is the same

13  whether you put it at 500 feet from the residential

14  area, 750, a thousand, wherever, it's the same risk;

15  that's based on just the mere existence of the firing

16  range as somewhere where people fire guns and there's

17  firearms on the premises.  Correct?

18    A    Along with persons transporting weapons,

19  potentially transporting weapons, to or from this

20  location.

21    Q    That's why the concern is the same

22  regardless of where it's located because wherever

23  it's located people will be transporting or there

24  will be firearms being used on the premises; correct?

1      A      That's correct.

2      Q      The public safety concerns that you're

3  talking about, are they the same public safety

4  concerns that we've been talking about this whole

5  afternoon, the potential -- the speculation that

6  potentially there could be crime or theft or robbery?

7      A      That is correct.

8      Q      And you're not aware of any data, research,

9  statistics --

10     A      Empirical data?

11     Q      -- empirical data -- I don't know how it's

12  different from regular data, but we'll say both --

13  that concludes that putting a firing range within 500

14  feet of a residential zoned area causes or results in

15  crime or theft or robbery or public hazards?

16     A      That's correct.

17     Q      In general if I ask you the same thing,

18  questions with regard to C, 120C, is the answer going

19  to be the same?

20     A      Even more so.

21     Q      Why even more so?  Just because there's

22  more of them?

23     A      Well, no, in light of what's been going on

24  in recent events in this country.  You've had

1    shootings in schools.  You've had shootings at places

2    of worship.  Now you're placing firearms directly in

3    those areas if this wasn't on here.  So I think that

4    in terms of public safety this is a necessary thing.

5         Q    Let's start at the beginning.

6              The public safety concern that you're

7    talking about is the same public safety concern for

8    120C that you've been talking about all afternoon,

9    the speculative potential for theft or robbery or

10   acts of crime; correct?

11        A    Correct.

12        Q    You're not aware of any specific empirical

13   data, research, studies linking or showing a

14   causation between firing ranges within 500 feet of

15   these different types of uses in 120C and an increase

16   in public safety hazards; correct?

17        A    That's correct.

18        Q    All of this is just your opinion and

19   speculation of what potentially might happen;

20   correct?

21        A    That's correct.

22        Q    Your opinion that a firing range located

23   within 500 feet -- well, strike that.

24              Your opinion that the existence of

1    firing ranges potentially might lead to these

2    terrible things -- because, again, it's not even

3    about distance really, it's just about their

4    existence -- your answer would be the same regardless

5    of the security that was put into the firing range?

6        MR. WORSECK:  Objection.  Vague.  It calls for

7    speculation.  Hypothetical.

8    BY MR. SIGALE:

9        Q    Do you understand the question?

10       A    Can you define "security"?  Physical

11   security?  A human?  Electronic?

12       Q    Is there a measure of security that could

13   go into a firing range that you would say as you sit

14   here, Okay, that's good, There won't be any resulting

15   crime or theft or robbery happening at this place?

16       A    I can't speak on that.  I'm only a sworn

17   police officer for law enforcement.  That would be

18   more of a loss prevention or security management

19   issue.  I can't speak on it.

20       Q    To the extent that you're here to talk

21   about the government purpose of these restrictions,

22   that's what I'm asking you as.

23            So the answer is, I guess -- if I ask

24   you is there any amount of security or any level of

1    security measures that a firing range could take that

2    in your mind would eliminate the public safety

3    concern, your answer would be you don't know?

4        A    Correct.  I'm not a licensed security

5    consultant for the State of Illinois.  Therefore, I

6    cannot speak on best practices for private security.

7        Q    With regard to 120C, similar to I asked

8    about 120A or 120B, does the distance from these uses

9    even matter or is it just the existence of the firing

10   range, period --

11       MR. WORSECK:  Objection.  Vague.

12   BY MR. SIGALE:

13       Q    -- that causes the public safety concerns

14   that you've mentioned today?

15       A    Subject to the existence.

16       Q    For 120C, just like 120A and B that we've

17   talked about, in your mind as you sit here there is

18   no difference public safety-wise between whether or

19   not that firing range is located 500 feet away, 250

20   feet away, 750 feet away, 2,000 feet away; it's the

21   same; correct?

22       MR. WORSECK:  Same objection.

23   BY MR. SIGALE:

24       Q    You can answer.

1    A    Under C, the locations, does the distance

2  matter?

3    Q    Yeah.

4    A    Yes.

5    Q    Why does the distance matter?

6    A    You would have weapons within direct

7  proximity of a school, daycare facility, park, play

8  of worship.

9    Q    That's what I'm asking.  Is the public

10  safety concern reduced or eliminated if the range is

11  750 feet away?

12    MR. WORSECK:  In compared to...?

13    MR. SIGALE:  500 or 499.

14    THE WITNESS:  Based on the scenario, no.

15  BY MR. SIGALE:

16    Q    Again, the scenario is, as you've described

17  the public safety concern, is there a difference --

18  does putting the range a thousand feet away from one

19  of these uses in 120C, does that reduce or eliminate

20  the public safety concern as opposed to 499 feet?

21    A    I can't say whether it reduces or totally

22  eliminates it.  I can't speak on that.

23    Q    In your mind does it do one of them, or you

24  don't know?

1      A     Any ordinance as it stands with regard to

2  120C is good.  I'm sorry.  I'm not trying to be

3  difficult.

4      Q     You're fine.  That, I've gathered.

5            But what I'm asking you is, the public

6  safety concern that you've described -- and indeed it

7  sounds like it's the same public safety concern that

8  you've been addressing all afternoon; correct?

9      A     That's correct.

10     Q     For 120A and B you said the distance

11 doesn't matter; it's the mere existence of the firing

12 range that causes the concern?

13     A     Correct.

14     Q     I'm asking is 120C any different?

15     A     No, no different.

16     Q     As you're testifying today about this

17 public safety governmental purpose that you're saying

18 the potential for harm and crime and theft and

19 robbery, that potential is the same whether the

20 firing range is 250 feet away, 500 feet, a thousand

21 feet or any other distance; correct?

22     A     Based on the scenario presented, it has to

23 be some distance.  It has to be some measured

24 distance.  I'm not qualified to speak on what

1    distance it should be, but there has to be some

2    distance.  There has to be some space between the

3    presence of weapons, ammunition anywhere near or

4    around a residence, school, park, play of worship.

5    There has to be some measurable distance, but not a

6    line that's drawn arbitrarily.

7         Q    But you can't say that 500 feet is any

8    better or worse than any other distance as you sit

9    here today; correct?

10        A    I'll say in my personal opinion the further

11   the better.

12        Q    Specifically speaking, you can't say that

13   500 feet is better or worse than any other distance;

14   correct?

15        A    That's correct.  I don't know of any study

16   or empirical data to support that.

17        Q    Just to be clear, your public safety

18   concern as it regards to 120, all of it, A, B and C,

19   has nothing to do with the construction or operation

20   of the range itself; correct?

21        MR. WORSECK:  Objection.  Vague.

22        THE WITNESS:  No, I have no concern.

23   BY MR. SIGALE:

24        Q    How a range is constructed or operated does

1    not have an impact on the public safety concern that

2    you've been testifying to today; correct?

3         A    Could you be more specific in terms of the

4    construction.  Are you talking about the construction

5    of the building?

6         Q    Yeah.  The construction, the layout, how

7    it's operated.  You're saying public safety

8    concern --

9         A    It remains regardless.

10        Q    More to the point, your testimony is that

11   it's the same regardless?

12        A    Yes.

13        MR. SIGALE:  Lieutenant, I'm just going to take

14   a minute or 2 here, but I think I might be about

15   done.  Okay?

16        THE WITNESS:  Okay.

17                    (Whereupon, a brief pause was

18                     taken.)

19   BY MR. SIGALE:

20        Q    Are you aware of any other cities, whether

21   it's cities in the Chicagoland area or cities

22   anywhere in the United States, that have location

23   restrictions on firing ranges?

24        A    I can't speak on it.  I'm not aware of any.

1    Q    What about cities -- strike that.

2             What about cities, whether in the

3    Chicagoland area or say anywhere in the United

4    States, that ban the sale of ammunition except for

5    use in the range as it is in 170B?  Are you aware of

6    any other restrictions like that anywhere else?

7    A    No, I'm not aware of any.

8    Q    Can you speak to any ordinances in any city

9    in the United States, including in the Chicagoland

10   area, regarding restrictions on the sale of

11   ammunition or conditions on the sale of ammunition?

12   A    No, I cannot.

13   Q    The same question with regard to the

14   renting or loaning of firearms.  Are you aware of any

15   ordinances in any cities in the United States,

16   including in the Chicagoland area, that restrict or

17   limit or ban the rental or loaning of firearms?

18   A    I'm not aware any.

19   Q    Are you aware of any ordinances in any

20   cities in the United States, including in the

21   Metropolitan Chicagoland area, regarding in any

22   way -- other than Chicago -- regarding in any way the

23   rental or loaning of firearms at a firing range?

24   A    I'm not aware of any.

1    Q    As you sit here today, would that be useful

2  to you if you did have that information, if you were

3  aware of how other cities restrict or condition the

4  loaning or renting of firearms in a firing range?

5  Would that be helpful information for you?

6        MR. WORSECK:  Objection.  Vague.

7        THE WITNESS:  Yes.

8  BY MR. SIGALE:

9    Q    The same question with regards to

10  ordinances regarding the sale of ammunition.  Would

11  that be helpful if you had information regarding

12  ordinances in other cities in the United States?

13        MR. WORSECK:  Objection.  Vague.

14        THE WITNESS:  Any new information would be

15  helpful.

16  BY MR. SIGALE:

17    Q    Your answer to that would be the same with

18  regards to these location restrictions in 120A, B, or

19  C?

20        MR. WORSECK:  Same objection.

21        THE WITNESS:  Yes.

22  BY MR. SIGALE:

23    Q    You're not aware of any evidence, anecdotal

24  or empirical or otherwise, regarding any increases in

1    crime or public safety hazards as a result of any of

2    the firing ranges of any of the CPD locations;

3    correct?

4         A    Correct.  I'm not aware of any.

5         Q    That includes the police academy as well,

6    the range there -- or the ranges there; correct?

7         A    That's correct.

8         Q    You've testified a lot today about the

9    governmental purpose with regards to public safety

10   and the speculative potential of the increase of

11   crime and robbery and theft, et cetera?

12        A    That's correct.

13        Q    Assuming that under the law a firing range

14   would have to exist somewhere in the city for the

15   public, okay, is there any location in the city to

16   put it where those -- that you feel you could put it

17   where those public safety concerns would not exist?

18        MR. WORSECK:  Objection.  Vague.  It calls for

19   speculation.

20        THE WITNESS:  I can't recommend a location.

21   It's beyond my scope.

22   BY MR. SIGALE:

23        Q    I just want to clarify.  "Beyond the scope"

24   is more of an Andrew phrase.

1    A    I'm sorry.  I mean the scope of my

2   employment as a Chicago Police lieutenant.

3        MR. WORSECK:  He's not a range siting expert.

4   BY MR. SIGALE:

5        Q    Is it your opinion that no matter where in

6   the city you put a firing range the public safety

7   concerns as you've addressed them today would still

8   exist?

9        A    Yes.

10       Q    In equal measure?

11       MR. WORSECK:  Objection.  Vague.

12       THE WITNESS:  Can you define "equal measure".

13  BY MR. SIGALE:

14       Q    That no matter where you put a range -- a

15  firing range -- in the city open to the public, the

16  public safety concern as you've talked about it today

17  would exist equally the same wherever you put it?

18       A    That's correct.

19       Q    If I have to put a range -- well, not I.

20  If someone is going to build a range somewhere in the

21  city, if there were the rental of firearms or the

22  loaning of firearms to customers, the public safety

23  concerns as you've described them would exist equally

24  no matter where in the city you put the range?

1      MR. WORSECK:  Objection.  Vague.

2      THE WITNESS:  That's correct.

3  BY MR. SIGALE:

4      Q    If a firing range were going to be built

5  somewhere in the city, the public safety concern as

6  you've described it would exist equally no matter

7  where you put the range if people were allowed to

8  purchase ammunition at the range.  Is that a true

9  statement?

10      MR. WORSECK:  Objection.  Vague.

11      THE WITNESS:  No.

12  BY MR. SIGALE:

13      Q    Why would that be different?

14      A    Under the ordinance it's saying how if it's

15  near a residential school care, it would increase

16  that possibility, the potential increases for other

17  to be harmed, for the public to be harmed.

18      Q    If the range is allowed to sell ammunition

19  and someone walks out with a box of ammunition?

20      A    Yes.

21      Q    Is that still speculative?

22      A    It's all speculative.

23      Q    Again, just to clarify, you're not aware of

24  any data, research, empirical data, studies that say

1    that allowing the sale of ammunition at a firing

2    range increases a risk to public safety depending on

3    the location of the range; is that true?

4        A    That's correct.

5        Q    Are you aware of any real world examples,

6    whether through investigations -- again, I'm not

7    asking for open investigations, but what you can talk

8    about, or grapevine, or right over the bulletins, or

9    whatever -- where an increase to public safety

10   happened or some criminal act occurred because of the

11   location of a firing range?

12       A    I'm not aware of any.

13       MR. SIGALE:  I don't think I have anything

14   else.  Do you have anything?

15       MR. WORSECK:  Yeah, I've got a couple.

16                    EXAMINATION

17                    BY

18                    MR. WORSECK:

19       Q    Lieutenant Johnson, the word "speculative"

20   has been thrown around a little bit here this

21   afternoon, and I just want to clarify the record.

22            I think there were questions a few

23   times asking whether or not it's speculative as to

24   whether certain harms and injuries and crimes

1    associated with gun ranges would occur in Chicago if

2    ranges were allowed -- strike that -- if ranges were

3    built in Chicago.  Do you remember that line of

4    questioning?

5         A    Yes, I do.

6         Q    When you said that it was speculative that

7    those things might occur, you were saying that

8    because no ranges currently exist in Chicago.  So we

9    haven't actually been able to see in practice whether

10   those things would happen with those ranges; correct?

11        A    That's correct.

12        Q    But you're not speculating that those kinds

13   of crimes and injuries are associated with the

14   storage and use of guns and ammunition at gun ranges

15   and gun stores; correct?

16        A    That's correct.

17        Q    You're familiar with many examples that you

18   talked about today where guns were stolen from

19   ranges, guns were stolen from stores, crimes or

20   injuries associated with existing ranges and stores

21   in other jurisdictions took place; is that right?

22        A    That's correct.

23        Q    It's that wealth of knowledge that's the

24   basis for your testimony that there would be crimes

1    and injuries and harms associated with the provisions

2    of the shooting range ordinance that we've been

3    talking about today in the city of Chicago?

4         A    Yes.

5         Q    I want to direct you back to Section 170A,

6    which we were talking about earlier.  That is the

7    section that talks about how a CFP applicant can

8    borrow or loan or rent a gun from a shooting range

9    for the 1-hour CFP class.  Aside from that, general

10   range patrons are not allowed to borrow or rent guns

11   at a shooting range.

12               Do you remember that testimony?

13        A    Yes.

14        Q    Even though a shooting range may decide to

15   keep guns on site to loan out to the CFP class

16   takers, would you agree that by restricting general

17   patrons from being able to borrow or rent guns at the

18   range, that the incentive for that range to keep a

19   larger number of guns on site is reduced?

20        MR. SIGALE:  Objection as to speculation.

21        THE WITNESS:  I agree.

22   BY MR. WORSECK:

23        Q    I believe it's your testimony that by

24   reducing the incentives to keep guns on site you can

1    reduce the number of guns that actually are kept on

2    site?

3        MR. SIGALE:  Again, objection as to

4    speculation.

5        THE WITNESS:  I agree.

6    BY MR. WORSECK:

7        Q    By reducing the number of guns that are

8    kept on site you reduce the likelihood that a large

9    number of guns could be stolen from the shooting

10   range and enter the underground gun market in

11   Chicago?

12       MR. SIGALE:  Objection.  Foundation.

13   Speculation.

14       THE WITNESS:  I agree.

15   BY MR. WORSECK:

16       Q    Again, on this topic of a CFP class taker

17   in the shooting range taking the 1-hour CFP range

18   training course, would you agree that because that

19   person will be taking a course and will be presumably

20   under the direct instruction of a trainer, that that

21   person would be less likely to steal a gun from the

22   range than a person who is not taking a class under

23   the direct instruction of a trainer?

24       MR. SIGALE:  Objection.  Foundation.

1    Speculation.

2        THE WITNESS:  I agree.

3    BY MR. WORSECK:

4        Q    Counsel asked you a lot of questions on

5    this issue of sampling, civilians wanting to sample

6    different types of guns and things like that;

7    different makes and models, sizes and calibers, and

8    what have you.

9              Isn't it the case that the purpose of

10   Section 170 is not designed to keep people from

11   sampling or trying out different kinds of guns.  It's

12   designed to reduce the number of guns that would be

13   kept at a range and related crime and public safety

14   threats that are associated with the number of guns

15   that are kept at a range?

16       MR. SIGALE:  I'm going to object as to

17   foundation and speculation.  Isn't that asking him

18   about the legislative intent?

19       MR. WORSECK:  I'm asking him about the purpose.

20   We've been talking about purposes all day.

21       MR. SIGALE:  It's foundation.  It's

22   speculation.  It completely mischaracterizes any

23   testimony that's been given for 4 hours.

24              But go ahead.

1      THE WITNESS:  Yes, it does.

2    BY MR. WORSECK:

3      Q    Even though there might theoretically be

4    some benefit to a civilian being able to sample

5    different firearms or try out different firearms,

6    that individualized benefits of that particular

7    person will be outweighed by the broader public

8    safety threats that come about as a result of having

9    large numbers of guns or any number of guns stored on

10   site at a shooting range?

11     MR. SIGALE:  Objection.  Speculation.

12   Foundation.

13     THE WITNESS:  I agree.

14   BY MR. WORSECK:

15     Q    Directing you to Section 120, which we were

16   talking about just at the end of Counsel's

17   questioning, the 500-foot provision in Section 120.

18            I just wanted to make sure.  I believe

19   you said that the further a shooting range is from

20   either another shooting range or a residential

21   district or any of the uses set out in 120C -- for

22   instance, a school or daycare facility, et cetera --

23   the further that the range is from those types of

24   places the better?

1          MR. SIGALE:  I'll object as to

2    mischaracterizing his testimony.

3          THE WITNESS:  I agree.

4    BY MR. WORSECK:

5          Q    The reason that it's better to be further

6    away from those various uses and places is that the

7    further away you are the less chance there is that

8    any crime or gun injury or gun violence associated

9    with the range would spill over and impact those

10   various places?

11         MR. SIGALE:  Objection as to foundation and

12   speculation.

13         THE WITNESS:  I agree.

14   BY MR. WORSECK:

15         Q    So it's better for a range to be 500 feet

16   away from a house than right next to it?

17         A    Correct.

18         Q    Because that buffer zone reduces the chance

19   that any crime or violence would spill over and

20   impact the house?

21         MR. SIGALE:  Objection.  Foundation.

22   Speculation.

23         THE WITNESS:  I agree.

24   BY MR. WORSECK:

1    Q    In that sense, distance does matter to

2  public safety even though the fact that you might

3  have 1 range or 2 ranges or 5 ranges in the city

4  doesn't change the fact that you're going to have a

5  public safety risk associated with each additional

6  range you add.

7              That may be constant in the sense that

8  you're always going to have a risk associated with a

9  range, but there actually is a public safety benefit

10  to increase the buffer zones between those ranges and

11  the various uses set out in Section 120?

12      MR. SIGALE:  I'm going to object on foundation

13  and speculation.

14      THE WITNESS:  I agree.

15  BY MR. WORSECK:

16      Q    If 2 gun ranges were located right next to

17  each other, it would be easier or more likely for a

18  thief to walk off with guns from both of those ranges

19  than if those ranges were separated by 500 feet?

20      MR. SIGALE:  I'll object as to foundation and

21  speculation.

22      THE WITNESS:  I agree.

23      MR. WORSECK:  That's all I have.

24

```
1                    FURTHER EXAMINATION

2                    BY

3                    MR. SIGALE:

4        Q    Just to clarify, Lieutenant, all of the

5   questions that Mr. Worseck just asked you about all

6   of these potential secondary effects, they're all

7   still speculative in your mind; correct?

8        A    Correct.

9        Q    Between my questions and Mr. Worseck's

10  questions, there's still no empirical data that

11  you're aware of or statistics or research showing

12  that putting a firing range any distance from a

13  certain other use increases or decreases the

14  secondary effects you described earlier; correct?

15       A    That's correct.

16       Q    I want to clarify this, Lieutenant, because

17  I really don't want to leave it hanging there.  You

18  aren't suggesting as we sit here today that the

19  broader idea of the collective good is more important

20  than one citizen living in the city from being able

21  to successfully be able to train herself to defend

22  her safety; correct?

23       MR. WORSECK:  Objection.  Vague.

24       THE WITNESS:  Isn't that more a philosophical
```

1    question?

2    BY MR. SIGALE:

3        Q    It's really just going off of what

4    Mr. Worseck asked you.  Mr. Worseck asked you if it

5    was more important for the broad collective.

6        MR. WORSECK:  Objection.  It mischaracterizes

7    the record.

8        MR. SIGALE:  Can we go back and find that

9    question.

10                        (Whereupon, a discussion was had

11                         off the record.)

12   BY MR. SIGALE:

13       Q    I just want to clarify, Lieutenant, that

14   Mr. Worseck asked you about certain examples that you

15   gave earlier, and your testimony on those examples is

16   already there, but I might as well ask.

17                There aren't any other examples of

18   public safety secondary effects as you've been

19   talking about today that you feel at liberty to talk

20   about but haven't today, is there?

21       A    No.

22       Q    Again, with regards to the incidents that

23   you're talking about, those are either based on your

24   personal experience or anecdotes that you came across

1   in the course of being a police officer; correct?

2        A     That's correct.

3        Q     But those anecdotes, you don't know what

4   percentage of the total firing ranges or the total

5   gun shops we were talking about, with the examples

6   you talked about earlier -- you're not aware of what

7   percentage of the total number of gun shops in the

8   United States that represent those anecdotes;

9   correct?

10       MR. WORSECK:  Objection.  Asked and answered.

11  Beyond the scope of the cross.

12       THE WITNESS:  Yes.

13  BY MR. SIGALE:

14       Q     Or what percentage of patrons, those

15  wrongdoers represented out of the total number of

16  people that patronized a gun shop or a firing range;

17  correct?

18       MR. WORSECK:  Same objection.

19       THE WITNESS:  That's correct.

20  BY MR. SIGALE:

21       Q     You would agree, I hope, that the majority

22  of citizens in Chicago are law abiding; correct?

23       MR. WORSECK:  Objection.  Vague.  Speculation.

24       MR. SIGALE:  Based on 22 years in the police

1    department.

2         MR. WORSECK:  Same objections.

3         THE WITNESS:  I wouldn't want to

4    mischaracterize the citizens of Chicago in any way,

5    positive or negative.  Basically that's my opinion of

6    the citizens of Chicago.

7    BY MR. SIGALE:

8         Q    I'm just asking if you believe, for the

9    most part, that they're law abiding?

10        MR. WORSECK:  Same objections.  Irrelevant.

11   BY MR. SIGALE:

12        Q    You don't know?

13        A    I can't answer that question.  I'm a sworn

14   public servant to the city of Chicago, to give

15   service to those citizens whether they're law abiding

16   or not.

17        Q    Yeah, but you investigate them and arrest

18   them also; correct?

19        A    Correct.  And we also provide service to

20   them as well when they're sick or injured or need

21   assistance.

22        MR. WORSECK:  David, you're assuming that CPD

23   is perfectly capable of detecting all crime that

24   occurs, and then being able to assess how many people

1    in the city commit those crimes versus how many

2    people don't. That's a crazy question. It's beyond

3    the scope of the topic, and it's not relevant to the

4    case.

5       MR. SIGALE: His governmental purpose is this

6    potential crime by the mere existence of these places

7    and these items.

8       MR. WORSECK: And he's testified as to his

9    basis for thinking that crimes are gong to occur.

10    Whether or not that's committed by 1 percent of the

11    populace or 99 percent of the populace simply is

12    irrelevant.

13       MR. SIGALE: To get his state of mind, I think

14    it is relevant. But if he says that he can't say,

15    I'll just leave it at that.

16          Okay. Lieutenant, thank you so much

17    for coming in today.

18       THE WITNESS: No problem. Thank you.

19       MR. WORSECK: We'll reserve signature.

20          FURTHER DEPONENT SAITH NAUGHT. . .

21

22

23

24

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3   RHONDA EZELL, JOSEPH I. BROWN,   )
    WILLIAM HESPEN, ACTION TARGET,   )
4   INC., SECOND AMENDMENT           )
    FOUNDATION, INC., and ILLINOIS   )
5   STATE RIFLE ASSOCIATION,         )
                                     ) No. 10 CV 5135
6                     Plaintiffs,    )
                                     )
7        vs.                         )
                                     )
8   CITY OF CHICAGO,                 )

9                     Defendant.

10          This is to certify that I have read the

11  transcript of my deposition taken on the 20th day of

12  November 2012 in the foregoing cause, and that the

13  foregoing transcript accurately states the questions

14  asked and the answers given by me, with the changes

15  or corrections, if any, made on the Errata Sheet(s)

16  attached hereto.

17

18

                        _____
19                      LIEUTENANT KEVIN JOHNSON

20                      This _____ day
                        of _____ 2012.
21

22

23

24

1  STATE OF ILLINOIS    )
                        )    SS:
2  COUNTY OF COOK       )

3          I, Devan J. Moore, a certified shorthand

4  reporter in and for the County of Cook and State of

5  Illinois, do hereby certify that LIEUTENANT KEVIN

6  JOHNSON was first duly sworn to testify the whole

7  truth, and that the above deposition was recorded

8  stenographically by me and was reduced to typewriting

9  under my personal direction, and that signature was

10 reserved.

11         I further certify that the said deposition

12 was taken at the time and place specified and that

13 the taking of said deposition commenced on the 20th

14 day of November 2012 and was completed the same day.

15         I further certify that, THE LAW FIRM OF

16 DAVID G. SIGALE, P.C., MR. DAVID G. SIGALE, 739

17 Roosevelt Road, Suite 304, Glen Ellyn, IL, appeared

18 as attorney for the plaintiffs; that ASSISTANT

19 CORPORATION COUNSEL, MR. ANDREW WORSECK, 30 North

20 LaSalle Street, Suite 1230, Chicago, IL, appeared as

21 attorney for the defendant.

22         I further certify that I am not a relative

23 or employee or attorney or counsel of any of the

24 parties, or a relative or employee of such attorney

1    or counsel, or financially interested directly or

2    indirectly in this action.

3

4

5                    _____

6                    Devan J. Moore
                     CSR License No. 084-004589

7

8                    This 7th day
                     of December 2012.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24