1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  RHONDA EZELL, JOSEPH I. BROWN,
    WILLIAM HESPEN, ACTION TARGET, INC.,
4  SECOND AMENDMENT FOUNDATION, INC.,
    and ILLINOIS STATE RIFLE ASSOCIATION,

5

6          Plaintiffs,

    vs.                        No. 10 CV 5135
7

    CITY OF CHICAGO,
8

          Defendant.
9  _____/

10     The discovery deposition of PATRICIA SCUDIERO,

11  called for examination, taken pursuant to the

12  provisions of the Code of Civil Procedure and the

13  Rules of the Supreme Court of the State of Illinois

14  pertaining to the taking of depositions for the

15  purpose of discovery, taken before Barbara K.

16  Krasne, CSR No. 84-004651, a Notary Public within

17  and for County of Cook, State of Illinois, and a

18  Certified Shorthand Reporter of said state, at 30

19  North LaSalle Street, Suite 1230, Chicago, Illinois,

20  on the 5th day of October, A.D. 2012, at 10:05 a.m.

21  ATKINSON-BAKER, INC.
    COURT REPORTERS
22  (800) 288-3376
    www.depo.com
23  File No.: A609AC2

24

```
 1   PRESENT:

 2       LAW OFFICE OF DAVID G. SIGALE, P.C.

 3       739 Roosevelt Road, Suite 304

 4       Glen Ellyn, Illinois 60137

 5       (630) 452-4547

 6       dsigale@sigalelaw.com

 7       By: DAVID G. SIGALE, ESQUIRE

 8            appeared on behalf of Plaintiff

 9
         DEPARTMENT OF LAW
10
         CONSTITUTIONAL and COMMERCIAL LITIGATION
11
         30 North LaSalle Street, Suite 1230
12
         Chicago, Illinois 60602-2580
13
         (312) 744-4216
14
         waguiar@cityofchicago.org
15
         By: WILLIAM MACY AGUIAR, ESQUIRE,
16
              appeared on behalf of Defendant
17

18

19

20

21

22

23   REPORTED BY:  BARBARA K. KRASNE, RPR, CRR

24                 CERTIFICATE NO. 84-004651
```

```
 1                            INDEX

 2

 3  WITNESS                                      PAGE

 4  PATRICIA SCUDIERO

 5    Direct Examination by Mr. Sigale            4

 6    Cross-Examination by Mr. Aguiar            74

 7    Redirect Examination by Mr. Sigale        81

 8

 9

10                          EXHIBITS

11  NUMBER                 DESCRIPTION           PAGE

12  Exhibit 1    PRINTOUT OF ORDINANCE 4-151-120   37

13

14

15

16

17     (EXHIBIT NOT ATTACHED - RETAINED BY MR. SIGALE)

18

19

20

21

22

23

24
```

1    Thereupon:

2                    PATRICIA SCUDIERO

3              Was called as a witness and, having been

4    first duly sworn and responding, "I do," was

5    examined and testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. SIGALE:

8        Q.   Can you state your name and spell your

9    last name for the record, please.

10       A.    Patricia Scudiero, S-C-U-D as in David

11   I-E-R as in Richard O.

12              MR. SIGALE:  Let the record reflect this

13         is the deposition of Patricia Scudiero.  It is

14         taken pursuant to I guess two notices, one an

15         individual notice that I had sent over to city

16         council to talk to Ms. Scudiero and also with

17         regard to a federal Rule 30(b)6 deposition

18         notice where Ms. Scudiero was disclosed as the

19         designated witness on a couple topics.

20              MR. AGUIAR:  Let the record reflect that

21         those topics are Number 7 which reads, "The

22         bases for enacting CMC Section 4-151-120" and

23         Topic No. 23 which reads, quote, "The number and

24         disposition of inquiries and/or requests

1    regarding whether a potential location for a gun

2    range complies with the zoning laws of Chicago,"

3    end quote.

4         Mr. Sigale, I would request that since

5    this deposition is a combined deposition of

6    30(b)6 and a general notice that you do your

7    best to specify which questions are directed

8    towards the witness as either individual

9    questions or questions which are being asked

10   pursuant to 30(b)6.

11        MR. SIGALE:  I'll try to the extent they

12   do not overlap.  But I think, in any event, Ms.

13   Scudiero is here in her capacity as -- in her

14   employment capacity.  So I think it's all going

15   to blend together.

16        MR. AGUIAR:  To the extent we need to

17   clarify, we'll clarify.

18        MR. SIGALE:  That's fine.

19        MR. AGUIAR:  Okay.

20   BY MR. SIGALE:

21     Q.   Ms. Scudiero, I know you and I spoke.  It

22   feels like a long time ago.  It was probably a

23   couple years ago by now.  Have you given a

24   deposition since then?

1      A.   Yes, I have.

2      Q.   You have?  Okay.  When was the last time

3  you gave a deposition?

4      A.   In April of this year.

5      Q.   Was that in the context of your

6  employment, one of your employment capacities with

7  the City of Chicago, or something else?

8      A.   It was in my capacity as the city zoning

9  administrator.

10      Q.   Okay.  Well, you might be familiar with

11  what I'm going to say next.  But just to make sure

12  we're all clear and good, I'm going to give you a

13  few ground rules to hopefully make this go a little

14  faster and a little smoother.  Okay?

15          Barbara here is taking down everything

16  everybody says.  She can only take down out loud

17  verbal responses.  She cannot take down non-verbal

18  answers such as hand gestures, head shaking and

19  maybe the biggest culprit, uh-huh or uh-uh.  So

20  please keep everything out loud and verbal.  Okay?

21      A.   I understand.

22      Q.   Great.  It's very difficult for Barbara to

23  take down more than one person talking at a time.

24  There will probably be times when you are going to

1   know what my question is even before I'm done asking

2   it but I ask that in all circumstances you please

3   wait until I'm done asking my question before you

4   answer and I in turn will try to wait until you're

5   done answering before asking my next question.

6   Okay?

7       A.   I understand.

8       Q.   Okay.  If at any time you do not

9   understand a question that I ask you, which is

10  entirely possible, it might not make sense,

11  whatever, please let me know and I will rephrase it.

12  If you do answer a question that I ask here today,

13  it's going to be presumed for purposes of the record

14  that's being made that you understood the question

15  that I asked and that that is the question you're

16  answering.  So again if for some reason you don't

17  understand the question, let me know and I'll

18  rephrase it.  Okay?

19      A.   I understand.

20      Q.   And if you need to take a break, let me

21  know.

22      A.   Okay.

23      Q.   Ms. Scudiero, you are employed with the

24  City of Chicago; correct?

1    A.    Yes.

2    Q.    What is your job title or titles as you

3    sit here today?

4    A.    I am the city's zoning administrator and I

5    am the managing deputy commissioner for the Bureau

6    of Planning and Zoning.

7    Q.    Since the last time that we spoke, which

8    was -- Since the last time that we spoke -- I'm

9    trying to look up the date here.

10           MR. AGUIAR:  Off the record.

11           (Thereupon, a discussion was had off the

12       record.)

13           MR. SIGALE:  Back on.

14   BY MR. SIGALE:

15   Q.    September 29th of 2010.  I thought it was

16   '09.  But, at any rate, have your job duties

17   changed?

18   A.    No.  Since September 2010 my job duties

19   have not changed at all other than a department

20   merger.  But the duties have remained exactly the

21   same.

22   Q.    As Mr. Aguiar was alluding to before we

23   started, I don't want to make a big thing of it, but

24   if you could just briefly recap for me what was the

1    merger that maybe your title has changed even if the

2    description of your job duties has not.

3        A.   Simply a new department was created.  The

4    department is called Housing and Economic

5    Development with an acronym DHED.  The Department of

6    Housing and Economic Development was the merger of

7    three different departments, housing, community

8    development and planning and zoning.  Those three

9    departments are three bureaus in the new department

10   and I manage the Bureau of Planning and Zoning in

11   the new department.

12           MR. SIGALE:  Off the record for a second.

13           (Thereupon, a discussion was had off the

14       record.)

15           MR. SIGALE:  Let's go back on.

16   BY MR. SIGALE:

17       Q.   Ms. Scudiero, did you review any documents

18   in preparation for today's deposition?

19       A.   Yes, I did.

20       Q.   What did you review?

21       A.   I reviewed some of the interrogatory

22   questions that the city provided to you.

23           MR. AGUIAR:  I think you mean answers.

24           THE WITNESS:  Answers, sorry.  Excuse me.

1   BY MR. SIGALE:

2       Q.   Anything else?

3       A.   No, sir.

4       Q.   Okay.  Since the last time we spoke back

5   in September of 2010, have you since been to a

6   firing range?

7       A.   No, I have not.

8       Q.   Have you studied or reviewed or had any

9   other personal experience with either the structure

10  or operation of a firing range?

11      A.   No, I have not.

12      Q.   Since the last time we've spoken, then

13  Chicago had a complete ban on firing ranges within

14  the city limits.  Now you would agree that the

15  ordinances have changed and now technically shooting

16  ranges are allowed in the city limits; correct?

17      A.   That is correct.

18      Q.   Where in the city are firing ranges

19  allowed?  And just so we're clear, I might wind up

20  using, as I probably have already, used the phrase

21  shooting range and firing range interchangeably but

22  for purposes of today they mean the same thing.

23  Okay?

24      A.   I understand.

1          MR. AGUIAR:  I'm just going to object to

2     the question that's been asked to the extent

3     you're asking her in her capacity -- Strike the

4     objection.

5          The objection is the city has produced

6     Mr. Valenziano as a 30(b)6 on that topic.  So

7     she's is not going to answer that question as a

8     30(b)6 witness.  She's answering it in her

9     individual capacity.  So I want that

10    clarification on the record.

11  BY MR. SIGALE:

12    Q.    Okay.  From a zoning perspective, where

13  are firing ranges allowed in the city?

14    A.    Pursuant to the zoning code, firing

15  ranges, shooting ranges are permitted in M1, M2 and

16  M3 districts as special uses.

17    Q.    Please refresh for me special uses versus

18  a regular use in the manufacturing districts.

19    A.    We use the term as of right.  So if a use

20  is permitted as of right, it means that the zoning

21  classification that is in place permits the use with

22  no other permissions required.  When something

23  requires a special use, the only body that can issue

24  a special use is the Zoning Board of Appeals.

1          As the city zoning administrator I don't

2   have the authority to issue a special use.  I can

3   issue a special use application to the applicant and

4   the applicant would then file that with the Zoning

5   Board of Appeals and request a hearing in request of

6   that permit.

7      Q.   And I'm sorry.  In that regard what is

8   your participation in the process?

9      A.   The applicant normally would come to my

10  office and request a denial and an application.  The

11  denial meaning it's not permitted -- the use,

12  whatever it may be, is not permitted as of right but

13  requires the special use.

14          I'm authorized to issue a denial.  The

15  denial is attached to the application for the

16  special use and the special use is submitted to the

17  staff of the Zoning Board of Appeals for processing

18  and public hearing.  At the time of the public

19  hearing the Zoning Board of Appeals requires a

20  recommendation from the office of the zoning

21  administrator as to the criteria set forth in the

22  code and a recommendation is given to the zoning

23  board in writing for every special use application.

24          MR. SIGALE:  You know, Bill, as we're

```
 1        sitting here it occurs to me that as to your

 2        earlier objection it might just make more sense

 3        if we just make a standing presumption that if

 4        I'm not asking the question about either her

 5        background or about the two specific topics in

 6        here, either 4-151-120 or the number or

 7        disposition of inquiries, that it's in her

 8        individual capacity and that the only questions

 9        that would go to 30(b)6 would be questions on

10        those two topics.  That way it's clear for the

11        record.  That way you don't have to object every

12        time.  Is that fair?

13             MR. AGUIAR:  That's totally fair.

14             MR. SIGALE:  Okay.

15   BY MR. SIGALE:

16      Q.   Why are firing ranges a special use in the

17   manufacturing district versus an of right?

18             MR. AGUIAR:  Objection, lack of

19        foundation.  You can answer if you know.

20             THE WITNESS:  There are a number of uses,

21        use categories in the zoning code that require

22        special uses.  And in most of the cases, if not

23        all of the cases that require a special use, the

24        city council in enacting the ordinances wanted
```

1   an additional transparent public process in

2   place.  And the special use process is a public

3   hearing.  So they wanted a public hearing in

4   place to be able to discuss whether or not that

5   use would be permitted.

6   BY MR. SIGALE:

7   Q.   So from a zoning perspective there is this

8   hearing, the Zoning Board of Appeals hearing.  What

9   types of things are factored into whether or not the

10  firing range would be considered acceptable as a

11  special use?

12  MR. AGUIAR:  Objection, lack of

13  foundation.  Ms. Scudiero is not part of the

14  Zoning Board of Appeals and can't speak for that

15  board.

16  But you can answer to the extent you have

17  an opinion on that.

18  THE WITNESS:  The zoning code clearly has

19  outlined criteria that the Zoning Board of

20  Appeals must make in determining whether a

21  special use is applicable for that area or not.

22  The criteria is many.  I can't state them all.

23  But some of the criteria is impact on the

24  community, characteristics of the community,

1      increase of traffic, increase of deleterious

2      impact.  There are many others.  I can't state

3      them all for you.

4  BY MR. SIGALE:

5      Q.  So to the extent you know, it would appear

6  that in this special use hearing and the Zoning

7  Board of Appeals making this decision about whether

8  or not this -- for purposes of today was a firing

9  range -- would be allowed in a certain location in

10  an M1 or M2 or M3 district, these criteria are more

11  subjective than is this a firing range, are firing

12  ranges allowed in an M1, M2 or M3, are they looking

13  to build in an M1, M2 or M3?  Is that fair?

14      MR. AGUIAR:  Objection as to form.  You

15      can answer.

16      THE WITNESS:  It is fair.

17  BY MR. SIGALE:

18      Q.  To the extent you know, what, if anything,

19  of the Zoning Board of Appeals' consideration in

20  this regard -- And I'll ask this not just for a

21  firing range but I guess all special use.  The

22  process is the same for any type of special use; is

23  that correct?

24      A.  Yes, it is.

1      Q.   Okay.  Are there objective criteria at all

2  in the Zoning Board of Appeals special use permit

3  hearing process?

4          MR. AGUIAR:  Objection as to form and as

5     to foundation.  You can answer.

6          THE WITNESS:  Can you be more specific?

7  BY MR. SIGALE:

8      Q.   Yes.  I mean as an example, what type of

9  building are you looking to build -- business are

10 you looking to open, is it allowed in this district,

11 are they actually looking to build in that district?

12 That would be an objective category.  I mean does

13 the business fit the zoning area and is it allowed?

14         Are there any other objective factors that

15 a special use applicant is required to show in the

16 course of the ZBA hearing process?

17         MR. AGUIAR:  Objection as to form.  You

18    may answer.

19         THE WITNESS:  To my knowledge, no.

20 BY MR. SIGALE:

21     Q.   So just to sum up, a firing range gets the

22 application, the denial and the special use

23 application, from you or your office I'm assuming;

24 right?  It doesn't all -- They don't all march to

1    your office but it's the bureau or -- The applicant

2    would go to the Bureau of Zoning and Planning and

3    somebody would issue them a denial; is that right?

4         A.    We have a process set up and, yes, we have

5    a Zoning Board of Appeals desk and zoning reviewers.

6    So it would not be specifically with me but there

7    would be a staff member, yes.

8         Q.    Okay.  So it's possible then that when

9    somebody who wants to open a firing range comes into

10   your office to the special use desk, the ZBA

11   application desk, gets their denial, gets their

12   application and goes to the hearing that if the

13   people on the Zoning Board of Appeals just for

14   whatever reason are opposed to firing ranges, that

15   they subjectively can deny the special use permit?

16             MR. AGUIAR:  Objection, calls for

17        speculation.  You may answer.

18             THE WITNESS:  The Zoning Board of Appeals

19        members are charged with following their

20        criteria in the code for decision making and

21        hearing all matters in front of them pursuant to

22        that.

23   BY MR. SIGALE:

24        Q.    Okay.  So in theory they're supposed to --

1   they're supposed to discharge their duties

2   evenhandedly but given the fact that it's subjective

3   criteria the possibility exists that it might not be

4   even-handed?

5           MR. AGUIAR:  Objection, calls for

6       speculation.  You may answer.

7           THE WITNESS:  I can't speak for their

8       decisions on every matter.

9   BY MR. SIGALE:

10      Q.   Okay.  Why, to the extent you know, are

11  firing ranges limited to M1, M2 or M3 districts?

12          MR. AGUIAR:  I'm going to object to the

13      extent that city council has determined that

14      ranges are restricted to M1 and M2, M3 districts

15      and only they know why they did that.

16          To the extent Ms. Scudiero has an opinion

17      as to why they should be limited, that's a

18      separate question.  The second question, I have

19      no objection to.  The first one I kind of do

20      have an objection to because that would be a

21      city council question.  Only they can say why

22      they did what they did.

23          MR. SIGALE:  Well, she might know.  I mean

24      she might say I don't know, you have to ask

1     them.  But she might know so --

2          MR. AGUIAR:  And again --

3          MR. SIGALE:  Then the question of should,

4     it would be a different question, as you noted.

5          MR. AGUIAR:  And again the first question

6     will get into legislative intent, which has been

7     barred by Magistrate Judge Denlow in this case.

8     So I object to that question.

9          MR. SIGALE:  Well --

10         MR. AGUIAR:  Again, if you want to ask why

11    from a zoning perspective it makes sense to put

12    them in MI, M2, M3, I have to no problem with

13    that question.

14         MR. SIGALE:  Well, I'll ask --

15         MR. AGUIAR:  But to ask why city council

16    did something, this witness cannot testify to

17    that and that's outside the scope of what Judge

18    Denlow said you could get into.

19         MR. SIGALE:  I'm going to ask anyway

20    because I don't think that it was covered by all

21    the previous things.

22  BY MR. SIGALE:

23     Q.   So are you going to take counsel's

24  direction and not answer that question?

1          MR. AGUIAR:  Can you please restate the

2     question?

3          MR. SIGALE:  I'd have to ask to read it be

4     back.

5          (Thereupon, the above-referenced material

6     was read by the reporter.)

7          THE WITNESS:  I'm going to take my

8     counsel's advice and not answer the question.

9          MR. SIGALE:  All right.  Again, I still

10    don't know whether or not I need to certify a

11    question.  But just to note my objection to the

12    objection, I will.

13         MR. AGUIAR:  And I'll like to add a second

14    objection to the question.  Your complaint does

15    not challenge the restriction on ranges to M1,

16    M2, M3 zoning classifications.  You have only

17    raised in your complaint the 4-151-120

18    restriction so to speak.  Just an additional

19    objection.  So it's outside the bounds of your

20    complaint.  Just noting it for the record.

21         MR. SIGALE:  Okay.  I don't know that

22    that's an objection but --

23         MR. AGUIAR:  It's a relevancy objection.

24         MR. SIGALE:  Okay.  I take it back, then.

1      That is an objection.

2    BY MR. SIGALE:

3      Q.   Do you have any knowledge or opinion as

4    you sit here today why firing ranges should be

5    limited to M1, M2 or M3 zoning districts?

6      A.   Normally the way the zoning code works is

7    uses are placed in use categories -- in zoning

8    classifications depending on the impact that their

9    use will have on surrounding communities.  There is

10   a number of intents in the zoning code.

11         Basically Page 1 of the zoning code, that

12   talks about characteristics of communities and the

13   health and safety and welfare of communities as the

14   number one purposes of zoning in the City of

15   Chicago.  So any time something goes into a zoning

16   classification, the thought process is first and

17   foremost to protect its residents from whatever

18   impact.

19         The M district is a manufacturing

20   district, as you know, and it's the district that in

21   most cases is farthest away from people's homes,

22   school children, churches, various activities.  The

23   M district, if you look throughout the city, M

24   districts are the farthest away from residential

1    districts.  And, therefore, the purpose of the

2    zoning code is maintained by putting any use that

3    could have an impact on the residential communities

4    the furthest away from it.

5        Q.   To the extent you know, what is it about

6    firing ranges -- Strike that.

7             To the extent you know, what is the impact

8    of a firing range that requires it to be placed in a

9    manufacturing district?

10            MR. AGUIAR:  Object to the form.  You may

11       answer.

12            THE WITNESS:  Guns are involved in firing

13       ranges.  Ammunition is involved in firing

14       ranges.  There is transportation of guns and

15       ammunition involved with firing ranges and

16       certainly it could be conceived as an impact on

17       the health, safety and welfare of individuals

18       surrounding that.  Therefore, the use is

19       considered high impact.  And like other issues

20       -- like other uses that are high impact, the M

21       district affords sort of a distance away from

22       the residential communities in most areas of the

23       city.

24

```
 1   BY MR. SIGALE:

 2       Q.   Okay.  Since we last spoke, I guess that

 3   was two years ago, are you aware of any empirical

 4   evidence that firing ranges actually have that

 5   impact or is that speculative on your part?

 6       A.   I know of no data.

 7       Q.   Have you or has someone in your bureau at

 8   your direction sought information from other cities

 9   that zone gun ranges as to how they do it?

10       A.   No.

11       Q.   Is it true that you still have not ever

12   gone to or investigated gun ranges for zoning

13   purposes?

14           MR. AGUIAR:  Objection, asked and

15       answered.  One of your first questions was did

16       she go to a gun range since the last deposition.

17           MR. SIGALE:  Did I ask you?  Okay.

18   BY MR. SIGALE:

19       Q.   Well, let me rephrase then.  Have you

20   investigated through any type of research through

21   any means I guess gun ranges for zoning purposes?

22           MR. AGUIAR:  Objection, asked and

23       answered.  You may answer.

24           THE WITNESS:  No.
```

BY MR. SIGALE:

Q.    I asked you a minute ago specifically if you had sought information from other cities regarding how they zone gun ranges, if at all.  But now I'm going to ask you, regardless of whether you sought the information, are you otherwise familiar with how other cities zone for gun ranges?

MR. AGUIAR:  Objection as to form.  You may answer.

THE WITNESS:  No, I'm not.

BY MR. SIGALE:

Q.    Just to clarify something maybe that Mr. Aguiar said, you are not part of the Zoning Board of Appeals; is that true?

A.    That is correct.

Q.    Okay.  Do you have any, for lack of a better word, input as to how the ZBA makes their decisions?

MR. AGUIAR:  Objection as to form.  You can answer.

THE WITNESS:  The zoning code requires that the office of the zoning administrator provide the Zoning Board of Appeals chairman with a recommendation on all special use

1     applications in writing prior to the hearing.

2     My office gives the chairman, Jonathan Swain, a

3     recommendation in writing before every meeting

4     on every special use of what the department and

5     the zoning -- the zoning administrator's office

6     a determination on all of them.  That is the

7     only input that the office has other than having

8     members of staff down at the meeting in case the

9     Zoning Board of Appeals have questions, the

10    members have questions.

11 BY MR. SIGALE:

12    Q.    Okay.  The recommendation, the written

13 recommendation that goes to the ZBA chairman prior

14 to their meeting --

15    A.    That is correct.

16    Q.    -- is it based on the same criteria that

17 you had mentioned earlier, the subjective criteria

18 about deleterious impact and impact on community and

19 traffic and whatnot?  Is it the same?

20    A.    The recommendation that we provide the

21 Zoning Board of Appeals is based on in some cases

22 the surrounding community.  It is based on the

23 criteria set forth in the zoning code.  But the

24 criteria set forth in the zoning code is set forth

 1    for the members of the Zoning Board of Appeals to

 2    make their decision.  Our recommendation is based on

 3    that as well as a site visit and any other

 4    information that we can gather from the community.

 5              In some cases special use applications are

 6    required for drive-thrus.  So our staff will go to a

 7    site and see how the proposed drive-thru special

 8    permit application would work.  So our

 9    recommendations are based on fact-finding and the

10    zoning code.

11        Q.   Is there always a site visit?

12        A.   Yes.

13        Q.   Okay.  But in the end it's still based on

14    that subjective criteria of impact on community as

15    opposed to objective criteria such as is this

16    business allowed as a special use or is this

17    business allowed in an M1, for example, district, do

18    they want to build this kind of business, is this

19    location an M1 district?  It's beyond that, correct?

20              MR. AGUIAR:  I'm going to object.  Are you

21         talking about the ZBA decision or the

22         recommendation given by the office of the zoning

23         administrator?

24

1  BY MR. SIGALE:

2      Q.   I'm sorry.  The recommendation.

3      A.   If I understand the question correctly,

4  the recommendation from the office of the zoning

5  administrator is based on the criteria set forth in

6  the code and the site visit and gathering that

7  happens from that.

8      Q.   Okay.  I guess what I'm trying to get at

9  and what I want to make sure I got clear here is

10  earlier you had talked about the criteria that the

11  ZBA uses in determining whether a special use shall

12  be allowed.  You had talked about impact on

13  community and traffic and deleterious impact.  Are

14  those the same criteria from the zoning code that

15  you're talking about or are those separate criteria

16  that they use in their hearing than the ones you put

17  forth in your recommendation?

18      A.   It's the same criteria.

19      Q.   Okay.  So when you said before that the

20  ZBA has many criteria that it uses in its hearing to

21  make its ultimate decision, those criteria that you

22  named, those are from the zoning code?

23      A.   That is correct.

24      Q.   Moving to this Topic 23 of the 30(b)6

1    notice.  I'm just switching gears for a minute here.

2    The exact question is, "The number and disposition

3    of inquiries and/or requests regarding whether a

4    potential location for a gun range complies with the

5    zoning laws of Chicago."

6              You are the disclosed witness on that

7    topic.  So the first thing I'll ask you is to your

8    knowledge have there been any inquiries to your

9    office or your bureau from someone who is looking to

10   open or potentially open a firing range and zoning

11   issues related to that?

12       A.   Yes.  There have been inquiries made to

13   the office regarding the zoning of sites.

14       Q.   Okay.  Am I correct that these inquiries

15   came on or after July 6th of 2011 which is when the

16   shooting range ordinance was passed by the city

17   council?

18       A.   I don't have a record of the specific

19   dates but I can tell you that the ordinance was in

20   place and the criteria was in place and the

21   inquiries were responded to based on the ordinance.

22       Q.   Okay.  How many such inquiries would you

23   say came in?

24       A.   I don't have the exact number.  It was

1  likely three or four but I don't have the exact

2  number.

3       Q.   Okay.  But whatever that exact number is,

4  a handful would probably describe it pretty well;

5  correct?

6            MR. AGUIAR:  Objection as to form.  You

7       can answer.

8            THE WITNESS:  I would say probably more

9       than three and I really can't tell you exactly

10      how many more.

11 BY MR. SIGALE:

12      Q.   Okay.  But not twenty?

13      A.   No, not twenty.

14      Q.   Okay.  More than ten or are we really just

15 talking like three give or take a couple?

16      A.   I would say three give or take a couple.

17      Q.   Okay.  Did these inquiries -- Strike that.

18           Were these people that called in or people

19 that came in personally or both?

20      A.   To my knowledge, they called.

21      Q.   Called, phone calls.  Did you take any of

22 the phone calls yourself?

23      A.   No, I did not.

24      Q.   Would they have gone to a particular

1  person or a particular desk or section in the

2  bureau?

3      A.   No.  They were general calls that came to

4  our line.  We have a number of people who answer the

5  general phone number and are capable of answering

6  informal zoning questions.

7      Q.   So to your knowledge were all the

8  inquiries general type questions or were any of them

9  more specific than that?

10     A.   We get about two thousand phone calls a

11  week --

12     Q.   Okay.

13     A.   -- asking about zoning classifications and

14  we direct people to our website on how to use it to

15  find out what the zoning classification is.  To my

16  knowledge they were very informal, as most of them

17  are.  You know, can I put a hot dog stand on this

18  corner?  So most of it is walking the participant

19  that calls the office through our very wonderful

20  system that we have set up so they can check the

21  zoning themselves on a particular address.  So in

22  most cases that's to my knowledge what the phone

23  calls were.

24     Q.   So the phone calls that you're talking

1   about, the three give or take a couple regarding

2   firing ranges, to your knowledge were they of the

3   can I put a firing range at 3200 South Racine, if

4   that's even a real intersection, or were any of them

5   more in depth?

6           MR. AGUIAR:  I'm going to object to the

7       form of the question.  You can answer.

8           THE WITNESS:  It is my understanding that

9       the phone calls were I would like to put a

10      firing range at 3200 South Racine, to use the

11      address that you gave as an example, can I do

12      it?  As most of the phone calls we receive are.

13  BY MR. SIGALE:

14      Q.   Sure.

15      A.   Yes.  I mean, so I don't take that as

16  being anymore specific than any other phone call

17  that we receive regarding zoning.

18      Q.   Okay.  Do you know what the dispositions

19  of those phone calls were?  Were they all we have a

20  wonderful website that you can use to check that

21  yourself or was there any research even if it was

22  looking it up on a computer and answering the

23  question for the person, if you know?

24      A.   I should clarify for the record that we

1   never just send people to the website.  We walk them

2   through it so that we're making sure we see the same

3   thing they're seeing on the phone.  So if they are

4   at a computer we will say are you at a computer?

5   You can go to our site and we walk them through it.

6   So we go to our site at the same time, check the

7   zoning for them so they're seeing the same thing we

8   are.

9           In many instances the people that are

10  calling are calling about multiple addresses.  So we

11  want to ensure that they know what they're doing to

12  check the next address or the next eight addresses

13  that they have to locate their business somewhere.

14  So we'll get them through the stages.  We'll tell

15  them go to www.cityofchicago.org, go to the city's

16  web page for zoning and planning.  You know, we'll

17  walk them through it to make sure that they are

18  seeing on their computer the same thing we are

19  seeing and that they learn how to do the search.

20          So in every instance, whether it be for a

21  firing range or other, the person on the phone is

22  going to get an answer of, yes, it's zone B or C or

23  M and, yes, you can put your business there or, no,

24  you cannot or, yes, you need a special use, you

1    know.  So they will get all of that information

2    after the phone call is concluded.

3         Q.   Okay.  And if I can deduce from the

4    conversation we've had to this point, somebody that

5    calls in and asks the question I want to build a

6    range at 3200 South Racine, can I do it, and the

7    person who answers the phone at the Bureau of Zoning

8    and Planning -- Am I saying that right?

9         A.   Planning and Zoning.

10        Q.   -- Planning and Zoning would say, okay, if

11   you're near a computer let me look it up and we'll

12   do it together, and at the end of the day there is

13   going to be two possible answers.  One is, no,

14   because it's not in a manufacturing district, an M1,

15   M2 or M3, or maybe because while this is an

16   allowable district it's a special use so you would

17   still need to go through the ZBA appeal process or

18   hearing process.  Am I correct, those are the only

19   two possible answers with regard to firing ranges?

20        A.   That's correct.

21        Q.   Okay.  So to the extent you know, of the

22   calls that came in, how many of them -- And let me

23   preface I know that even the number of total calls

24   is non-specific.  So when I say how many of them, if

1    you could answer in whatever way you could best

2    describe it.  How many of them were told no and how

3    many of them were told maybe but?

4        A.   It's my understanding that they were all

5    told no.

6        Q.   So all of these inquiries all gave

7    addresses that were not in an M1, M2 or M3 district

8    or zoning area?

9        A.   That is correct.  They were either not in

10   an M district or if they were in an M district the

11   staff knows that there is an ordinance because they

12   have a zoning code in front of them that has some

13   sort of other criteria attached to it that they need

14   to check as well.

15       Q.   Are you referring to a 4-151-120?

16       A.   I'm talking about the distance

17   requirement.  If that's the code citation, yes, I

18   am.

19       Q.   Okay.  We're going to get into that in a

20   little bit.  But, yes, counsel will agree with me

21   that that is the distance requirement.

22            So the people that answer the phone are

23   familiar with that requirement as well?

24       A.   People that answer the phone are familiar

1    with distance requirements on different uses, yes.

2         Q.   Okay.  So when they, the people on the

3    phone, are looking up an address and getting past

4    the basic question of whether the address is in an M

5    district or some other district, are they able to

6    find on their computer whether or not the location

7    would otherwise comply with the distance requirement

8    from the other uses or do they have to go to some

9    other source?

10        A.   They can find it out just like the public

11   can.  There is a measuring tool on our city's

12   website and they can click on the location and they

13   can then click on any other locations surrounding it

14   and they know the criteria, the 500-foot criteria.

15   They can do the measurement right there for the

16   constituent asking.

17        Q.   Do you know the percentage of these

18   inquiries -- And again it's to the best you know.

19   Okay.  Do you know the percentage of these inquiries

20   that were told no because, well, you picked a

21   district that isn't an M district or, well, you're

22   right, it's an M district but we have got this other

23   distance requirement and this doesn't comply?

24        A.   I don't know the percentage.

1    Q.   Just to be clear, you're not aware of

2    anybody who's called your office -- and by "your

3    office" I mean the Bureau of Planning and Zoning --

4    saying I'd like to put a firing range at this

5    location and getting an answer of, well, that's an

6    okay spot but you've got to still go through this

7    process?

8        A.   I'm not aware of any of those.

9        Q.   Okay.  Is a record made of these

10   inquiries?

11       A.   There is no record of the inquiries.  Like

12   I said earlier in my testimony, we're getting

13   probably eighteen hundred phone calls a month.

14       Q.   Okay.  I didn't know if --

15       A.   I mean a week.

16       Q.   I didn't know if because firing ranges

17   were, you know, novel, you know, since the last year

18   or for some other reason that maybe a record was

19   being made of those as opposed to hot dog stands or

20   clothing stores or something.  But, okay, the answer

21   is, no, they're the same as every other phone call?

22       A.   That is correct.  They're the same as

23   every other phone call.

24       Q.   Okay.  Are you aware as you sit here

1   whether any of these calls or inquiries that you

2   were discussing were repeat inquiries, like the same

3   person calling back and saying, okay, how about this

4   spot?

5       A.   I don't -- I wouldn't have any

6   recollection of that or knowledge of that.

7       Q.   Okay.  Well, let's talk about that

8   distance requirement.

9           MR. AGUIAR:  Dave, if you're going to move

10      to a new topic, can I take a two second break?

11          MR. SIGALE:  Two seconds is pretty short

12      but sure.

13          (Thereupon, a recess was had.)

14          MR. SIGALE:  Let's go back on.

15          MR. AGUIAR:  Thank you.

16          MR. SIGALE:  But even as we're going back

17      on, we're going to wind up off because I'm going

18      to ask you to mark this as Exhibit 1, Scudiero

19      Deposition Exhibit 1.

20          (Thereupon, Deposition Exhibit 1 was

21   marked for identification.)

22   BY MR. SIGALE:

23      Q.   Ms. Scudiero, I've handed you what is

24   labeled Scudiero Deposition Exhibit 1.

1      A.   Yes.

2      Q.   I'm going to represent to you that it is a

3   printout from the city's website.  It's not.  It's a

4   link from the city's website from amlegal.com.  But

5   it is a printout of an ordinance from the municipal

6   code of Chicago.  And I ask if you could look at

7   that to yourself and let me know when you're done.

8      A.   Okay.

9      Q.   This is 4-151-120 MCC.  Is this Exhibit 1

10  the distance requirements that you were referring to

11  earlier as pertaining to shooting ranges?

12     A.   Yes, it is.

13     Q.   Okay.  Just if I refer to it -- I might

14  refer to it long hand with the dashes.  I might just

15  refer to it as Section 120 or something like that.

16  But you understand that this Exhibit 1 is what I'm

17  talking about?

18     A.   Okay.  I understand.

19     Q.   Okay.  Just for the record here, this

20  ordinance prohibits a shooting range from being

21  located within 500 feet, presumably measured, from

22  nearest property line to nearest property line; is

23  that correct?

24     A.   It doesn't have to be presumed.  It reads,

1    "As measured from property line to property line."

2         Q.   But it's the nearest property lines to

3    each other, correct, not the far one, the west end

4    of one and the east end of the other?  It's the

5    closest property lines?

6         A.   Yes.  It's always the closest property

7    lines.

8         Q.   Okay.  "Within 500 feet of (A) another

9    premises licensed as a shooting range facility, (B),

10   any zoning district zoned for residential use,

11   including a planned development that authorizes such

12   residential use, or, (C), any school, daycare

13   facility, park, place of worship, any premises

14   licensed for the retail sale of liquor," children's

15   activity facility, "children's activities facility,

16   library, museum or hospital."

17         With the slight correction I made of

18   myself, did I read that accurately?

19         A.   Yes, you did.

20         Q.   Okay.  Just starting with the basic

21   question, let's start with (A), 120 (A).  And as way

22   of background, you are disclosed as the witness to

23   talk about the bases which I think we'll agree has

24   been defined as the reasons or justifications or

1    governmental purpose or purposes, as the case may

2    be, supporting Section 120.

3            So just looking at (A), what is the

4    governmental purpose to restricting a shooting range

5    facility from being within 500 feet of another

6    shooting range facility?

7        A.    There is or could be an impact on, you

8    know, two ranges that have combustible materials on

9    site within proximity of one another.  There could

10   also be an impact for the gathering of criminal

11   activity near places that guns and ammunition are

12   being transported, as a safety measure.  I think

13   that pretty much sums it up.

14       Q.    The first impact that you mentioned, is or

15   could be impact that you mentioned about two ranges

16   having combustible material near each other, is that

17   a speculative impact or is it based on evidence?

18           MR. AGUIAR:  I'm going to object to the

19       form of the question as to what you mean by

20       speculative and evidence.

21   BY MR. SIGALE:

22       Q.    Are you aware of any empirical evidence or

23   data supporting the conclusion that two ranges near

24   each other could have this negative impact vis-a-vis

1    combustible material?

2         A.    I'm aware of no data.

3         Q.    So then the impact, the combustible

4    material impact I'll call it, is speculative?

5              MR. AGUIAR:  Objection as to form.  You

6         may answer.

7              THE WITNESS:  The Chicago Fire Department

8         I believe has issue with the location of

9         shooting range facilities within 500 feet of

10        another.

11   BY MR. SIGALE:

12        Q.    Because of this combustible material

13   impact that you mentioned?

14        A.    That is my understanding.

15        Q.    Okay.  But as you sit here today you're

16   not aware of any empirical data supporting their

17   issue either; correct?

18        A.    I am not aware of any data.

19        Q.    Okay.  So again the issue then to your

20   knowledge is speculative, this could be a problem?

21   It's speculating, correct?

22        A.    Yes.

23        Q.    The criminal activity impact was really

24   kind of hashed out a couple years ago.  But let me

1    ask if since then -- Because at the time there was

2    no data to support that.  It was speculative as of

3    we'll say the first of October 2010.  Since then are

4    you aware of any data that supports the conclusion

5    that criminal activity increases or even exists

6    because of having two firing ranges within 500 feet

7    of each other?

8         A.   I'm aware of no data.

9         Q.   So once again the potential criminal

10   activity impact is speculative as well; is that

11   true?

12            MR. AGUIAR:  Objection as to form.  You

13        may answer.

14            THE WITNESS:  Yes.

15            MR. AGUIAR:  That was based on her

16        knowledge as she sits here today; correct?  You

17        asked based on her knowledge?  Is that what you

18        asked?

19            MR. SIGALE:  Well, yes, yes.

20            MR. AGUIAR:  Okay.  That's fine.  Just to

21        clarify.

22            MR. SIGALE:  I'm sorry.  Is that a

23        capacity question or is that -- Are you --

24            MR. AGUIAR:  I just want to know if the

1     question was based on her knowledge there is no

2     data?  Is that what your question was?

3          MR. SIGALE:  Right.  All these questions

4     are based on your knowledge as you sit here

5     today.  But you're the designated witness on

6     this topic.  So if somebody else would know

7     about it, I would presume that that would be

8     offered.

9  BY MR. SIGALE:

10     Q.   All right.  Let's move to 120 (B).  What

11  is the governmental purpose for restricting a firing

12  range from being within 500 feet of a zoning

13  district zoned for residential use including a

14  planned development that authorizes residential use?

15     A.   The reasoning is much the same but it also

16  goes to purpose number one of the zoning code which

17  is to the health, safety and welfare of the

18  residents.

19     Q.   And the inference is that somehow having a

20  firing range within 500 feet of a residential zoning

21  district or a planned development authorizing

22  residential use would have a negative impact on

23  health, safety and welfare of residents?  Am I

24  taking the proper inference from that?

1      A.   You are taking the proper inference in

2  that same reasoning for any situation where there

3  could be a criminal activity gathering, movement of

4  guns and ammunition, a residential district should

5  be kept the farthest away from those premises.

6      Q.   Is that all encompassed -- Strike that.

7           Is that basically the same as what we were

8  talking about under 120 (A), what I was labeling the

9  criminal activity impact?  You are talking about the

10 same thing?

11     A.   I am talking about the same thing.

12     Q.   Okay.  Am I correct then that just like

13 for 120 (A) that when I apply it to 120 (B) there is

14 no data that you're aware of that such a criminal

15 activity impact would actually occur?

16     A.   I'm aware of no data.

17     Q.   So just like for 120 (A), the idea that a

18 firing range within 500 feet of a residential zoning

19 area, or authorized residential zoning area, would

20 have a negative impact as you described it is

21 speculative?  Fair to say?

22          MR.MR. AGUIAR:  I'm going to object to the

23     form of the question as speculative.

24          THE WITNESS:  I'll give you the same

```
 1      answer.  Yes.
 2   BY MR. SIGALE:
 3      Q.   Okay.  You're aware now, and if you
 4   weren't before September 28th of 2010 if you
 5   remember you certainly are aware of it now, that in
 6   other cities firing ranges are located in all sorts
 7   of areas, that mobile ranges like trailers are
 8   brought into parking lots in hotels and Wal-Mart's
 9   and other type places; correct?
10      A.   I am not aware of any of those.
11      Q.   You're not.  Okay.  And that goes to what
12   we were talking about a little earlier, that you
13   don't know how other cities zone gun ranges;
14   correct?
15      A.   I have answered that question.  That is
16   correct.  I do not know.
17      Q.   Okay.  Have you fully told me what the
18   governmental purpose is for 120 (B)?
19      A.   Yes, I have.
20      Q.   Okay.  So then we move to 120 (C) which
21   has a lot more subparts to it because there is a lot
22   of businesses named.  Is the governmental purpose
23   for 120 (C) the same as you stated for 120 (B) or is
24   it at all different?
```

1        A.    It's different.

2        Q.    Okay.   What of it is different?

3        A.    If you look at (C) or read (C), you'll

4    notice that there is a common theme with most of the

5    activities named, which is assembly.   In almost

6    every category there there is some form of assembly,

7    meaning multitudes of people gathering, whether it

8    be to worship, to go to school, to, you know, get

9    health care.   So there are large numbers of people

10   assembling for a specific purpose and in some cases

11   children being involved in those assembly areas.

12   And much to the same purpose of (A) and (B), (C)

13   gets more intense in that it brings in the assembly

14   of multiple people.

15       Q.    Okay.   So I understand then the thread of

16   why these -- why someone might have written 120 (C)

17   to list these particular businesses versus -- or

18   these particular, for lack of a better word,

19   businesses.   But with regard to the governmental

20   purpose for restricting firing ranges from being

21   within 500 feet of any of them, is the governmental

22   purpose -- And you have named two so far.   I called

23   them the criminal activity impact and the

24   combustible materials impact.   Is the governmental

1    purpose the same as one or of those -- one or both

2    of those for 120 (C) or is it different?

3        A.   The governmental purpose is similar to (A)

4    and (B) in reference to (C).

5        Q.   Okay.  So you would list for 120 (C) both

6    the combustible material impact and the criminal

7    activity impact?

8        A.   Yes, I would.

9        Q.   Okay.  Ms. Scudiero, I'm only asking this

10   because you're the witness sitting here and you're

11   the one that's been disclosed.  And I don't mean to

12   sound glib.  But earlier you had said that the

13   combustible material issue had to do with two firing

14   ranges that were near each other that might have

15   combustible material.  What in 120 (C) is a firing

16   range going to be near such that there is the

17   combustible material possible impact?

18       A.   One of the issues with (C) is liquor.  So

19   certainly if there is alcohol near a range there is

20   the possibility of some combustible situation there.

21   But it is also the firing range itself.  There could

22   be the possibility of any number of things, a gun

23   being discharged improperly or something happening

24   at the range that could cause some sort of implosion

1    of sorts and the 500-foot distance from those places

2    of assembly creates a buffer to keep those areas far

3    enough away from any activity that could be harmful.

4        Q.   Okay.  So the same questions as before.

5    Going to this combustible material impact as I'm

6    labeling it, and as you've described it in your

7    testimony, so I don't need to rehash it, is there

8    any data that you're aware of to support that the

9    negative possibilities that you mentioned are

10   actually more likely to happen?

11       A.   I know of no data.

12       Q.   So you would agree as before that it's

13   speculative on your part?

14           MR. AGUIAR:  Objection as to form.  You

15      may answer.

16           THE WITNESS:  Yes.

17   BY MR. SIGALE:

18       Q.   And what I've labeled the criminal

19   activity impact as you've described in your

20   testimony already, I don't need to rehash, but just

21   to make the record clear, is there any data to

22   support that having firing ranges within 500 feet of

23   any of the businesses listed in 120 (C) would

24   increase criminal activity?

```
 1        A.   I'm not aware of any data.

 2        Q.   So just like with the other (A) and (B),

 3   this is speculative?

 4             MR. AGUIAR:  Objection as to form.  You

 5       can answer.

 6             THE WITNESS:  Yes.

 7             (Thereupon, a recess was had.)

 8             MR. SIGALE:  Can you please read back my

 9       last question and answer?

10             (Thereupon, the above-referenced material

11   was read by the reporter.)

12   BY MR. SIGALE:

13        Q.   Ms. Scudiero, are you aware -- Strike

14   that.

15             Have you ever heard of the phrase "coming

16   to the nuisance"?

17        A.   No, I have not.

18        Q.   Okay.  It's a legal term of art generally

19   defined as when somebody moves next door to

20   something that bothers them or nearby to something

21   that bothers them and then complains that the thing

22   is there.

23             MR. AGUIAR:  I'm just going to object.  I

24       don't know if that's the actual definition but
```

1    we are going to go with what Mr. Sigale is

2    saying for purposes of today's deposition that's

3    what that means.

4         MR. SIGALE:  I'm paraphrasing.  I don't

5    think that's how Black's Law Dictionary would

6    describe it but --

7         MR. AGUIAR:  We'll go with what you

8    described for purposes of today's dep.

9         MR. SIGALE:  You can go with that.

10  BY MR. SIGALE:

11      Q.   If you know, hypothetically speaking let's

12  say that the firing range is approved by the Zoning

13  Board of Appeals as a special use in an M1, M2 or M3

14  district.  Okay?

15      A.   Okay.

16      Q.   And that it opens up and, you know, builds

17  or retrofits its building, constructs what it needs

18  to construct and opens for business.  Okay?  And one

19  of the uses in 120 (C) wants to move within 500 feet

20  of that firing range.

21          From a zoning perspective then what

22  happens to that firing range?

23          MR. AGUIAR:  Objection, calls for

24      speculation.  You may answer.

1        THE WITNESS:  From a zoning perspective if

2     that firing range is legally licensed to be in

3     its location, nothing would happen to the firing

4     range.  It would be allowed to continue to

5     operate under its existing license.

6  BY MR. SIGALE:

7    Q.   What about from the perspective of 120

8  (C)?

9        MR. AGUIAR:  Objection as to form.  I

10    don't know what you mean.

11  BY MR. SIGALE:

12    Q.   What happens to that firing range when one

13  of the uses in 120 (C) wants to open its business

14  within 500 feet of the firing range?  And there is

15  really only three possibilities.  That the new

16  business would be told no, you can't go there

17  because there is a firing range there, or, okay, you

18  can open there, phone call to mister firing range

19  owner, sorry, you've got to close down, or new

20  business go ahead and open, firing range you're

21  grandfathered in because you were already here.  The

22  way I see it those are the only three possibilities.

23  So what would happen?

24        MR. AGUIAR:  Objection as to form and

1          speculation.  You may answer.

2              THE WITNESS:  Well, since we don't have a

3          licensed firing range in the city today and

4          haven't had the situation occur, I don't know

5          what the process would be.  I mean I don't know.

6   BY MR. SIGALE:

7      Q.   Okay.  Who would I -- Again, you're asked

8   because you're sitting here and you're the disclosed

9   witness on this.  So is there somebody else I should

10  be asking for the answer of what would happen in

11  that circumstance?

12             MR. AGUIAR:  Objection.  If you are asking

13         her if someone has knowledge, that's one thing.

14         But asking her what should be disclosed is a

15         separate question.  Are you asking her who might

16         have knowledge about this?  Is that your

17         question?

18             MR. SIGALE:  Yes.  I didn't ask who you

19         might disclose as a witness.  I'm asking her who

20         I should talk to to get an answer to that

21         question.

22             MR. AGUIAR:  All right.

23             THE WITNESS:  Certainly it would be

24         possible to speak to someone who has say so over

```
 1        Chapter 4 of the municipal code, which is the
 2        licensing code.  But at this time, like I said,
 3        we don't have a firing range in Chicago that's
 4        licensed so we haven't had the instance occur.
 5   BY MR. SIGALE:
 6        Q.   So that's something -- So if I wanted to
 7   get a better answer to that hypothetical, maybe
 8   Rosemary Krimbel at BACB would be the one to talk
 9   to?
10             MR. AGUIAR:  Objection, calls for
11        speculation.  You may answer.
12   BY MR. SIGALE:
13        Q.   If you know.
14        A.   She's in charge of licensing premises so
15   she may have an answer for you.
16        Q.   Okay.  But as you sit here you don't know
17   the answer?
18        A.   I do not.
19        Q.   Okay.  Would you agree as a generality
20   that someone sinking a lot of money into opening a
21   firing range, that's a pretty big gamble if somebody
22   doesn't know the answer to that question?
23             MR. AGUIAR:  Objection as to form and
24        speculation and foundation.
```

```
 1              THE WITNESS:  I can't answer that
 2      question.
 3   BY MR. SIGALE:
 4      Q.   Okay.  Let me see if I can rephrase it
 5   just to ask it a little better even though the
 6   answer might be the same.
 7              Would you agree that it's pretty risky for
 8   someone to put a lot of money into opening a firing
 9   range business if they don't know whether or not
10   they'll be shut down if one of the other uses in 120
11   (C) decides to open up within 500 feet?
12      A.   The answer is the same.  I don't know.
13      Q.   What empirical evidence are you aware of,
14   if any, supporting the number 500 in the 500-foot
15   distance requirement?
16              MR. AGUIAR:  Objection as to form.  You
17      may answer if you can.
18              THE WITNESS:  I'm not aware of any
19      empirical data, to use your words.
20   BY MR. SIGALE:
21      Q.   With regard to distance restrictions for
22   firing ranges from other types of businesses, and
23   we'll say the ones that are listed in (A), (B) and
24   (C), residential zones, authorized residential
```

1   zoning districts, other shooting ranges, all the

2   uses in 120 (C), are you aware of any empirical data

3   supporting any distance restriction?

4           MR. AGUIAR:  Objection as to form.  You

5       may answer.

6           THE WITNESS:  In regards to shooting

7       ranges, I'm not aware of any data.

8   BY MR. SIGALE:

9       Q.   And just for the record, Ms. Scudiero, I'm

10  going to ask the question.  It might sound the same

11  but I'm going to ask it a little more specific.

12  Okay?

13      A.   Okay.

14      Q.   Even if the answer winds up being the

15  same.  Are you aware of any empirical data

16  supporting any distance requirement for keeping a

17  shooting range from any of the uses or zoning

18  districts, as the case may be, in Section 120 along

19  the lines of if you allow a shooting range within X

20  feet of these uses the negative impacts will occur?

21          MR. AGUIAR:  Objection as to form and

22      asked and answered.  You can answer.

23          THE WITNESS:  I'm not aware of any.

24

1    BY MR. SIGALE:

2        Q.    Okay.  I know I asked you before about

3    zoning requirements in other cities regarding firing

4    ranges.  Regarding distance requirements of firing

5    ranges as pertaining to other types of uses, are you

6    aware of any distance requirements in other cities

7    that have firing ranges?

8            MR. AGUIAR:  Objection, asked and answered

9        to the extent you have already talked about her

10       knowledge of zoning requirements in other

11       municipalities.  You may answer.

12           THE WITNESS:  I'm not aware of any.

13   BY MR. SIGALE:

14       Q.    The two sections that effect the locations

15   of firing ranges, one is Section 120; correct?

16       A.    That is correct.

17       Q.    And then the other is, for lack of a

18   better phrase I'm going to call it the use tables

19   that restrict firing ranges to M1, M2 or M3.  Is

20   that the other requirement for where a firing range

21   can be located in the city?

22       A.    If I understand your question correctly,

23   you're asking me if the section of the firing range

24   ordinance, which is Title 17, use table, and M1, M2,

1  M3, puts restrictions on where firing ranges can go?

2  The answer is yes.

3      Q.   Okay.  Those are the two -- Those are the

4  two ordinances that govern where a firing range can

5  be located; correct?  Is there any others that you

6  know of?

7      A.   I'm not aware of any others.

8      Q.   Okay.  The one for the use table that

9  is -- What did we say, it was Chapter 17, the use

10  tables, M1, M2, M3?

11     A.   The zoning code is Chapter 17 of the

12  municipal code; yes.

13     Q.   Okay.  So that's part of the zoning code.

14  That's clearly a zoning restriction, a zoning issue.

15  My question is, just to clarify here, this

16  Section 120, this Exhibit 1, do you consider this a

17  zoning restriction?

18         MR. AGUIAR:  Objection as to the relevance

19      of the question.

20         MR. SIGALE:  The relevance is you had said

21      earlier that my earlier question was asked and

22      answered when I asked about distance

23      restrictions and you said it was already asked

24      and answered to the extent I asked about her

1    knowledge of zoning in other cities.  I don't

2    consider 120 a zoning issue but I could be

3    wrong.  That's why I'm asking.

4  BY MR. SIGALE:

5       Q.   Is this Section 120 a zoning restriction?

6            MR. AGUIAR:  Well, whether you consider it

7       to be a zoning restriction, the witness has

8       testified that this impacts where a range can go

9       and her people when they get inquiries about

10      potential locations for firing ranges consider

11      this in giving out the answer to the people who

12      call in.  So that impacts where a range can go.

13      So whether it's in the zoning code or not isn't

14      a relevant question.  She can answer the

15      question.  I'm just saying that it's irrelevant.

16           MR. SIGALE:  Okay.  So your objection is

17      relevance but you can answer.

18           THE WITNESS:  So we have a number of uses

19      in the City of Chicago zoning code where there

20      is a reference to or a fallback on the licensing

21      code.  The two departments, Business License

22      Affairs and Housing and Economic Development,

23      are linked in terms of licensing.  We do many

24      license checks for zoning for that department

1    and actually have trained personnel in their

2    department that do zoning checks.  So the

3    departments are linked.

4         This code, Chapter 4, is the licensing

5    code that has the location restrictions.  But my

6    staff has been fully trained on these

7    restrictions as well as other uses in the zoning

8    code where there are distance requirements.  So

9    that is part of the check that they do for

10   constituents that either call or come in

11   inquiring about many uses.  And they have the

12   capability through the tools on the zoning code

13   to do the measurements and various other things

14   to determine whether or not this section of the

15   code has been met.

16        So while this is not the zoning code,

17   Chapter 4 is not the zoning code, that is

18   Chapter 17, there still is, you know, a process

19   that the city has established for shooting

20   ranges and various other activities in the city

21   that have distance requirements put in them.

22 BY MR. SIGALE:

23   Q.   Okay.  To your knowledge none of what I

24 labeled a handful of inquiries regarding firing

1 ranges made in phone calls to your bureau, none of

2 them resulted in a denial and an application for the

3 Zoning Board of Appeals; correct?

4     A.    That is correct.

5     Q.    Just so I'm absolutely clear, nobody

6 otherwise came into the bureau in person and

7 received a denial and an application for ZBA appeal?

8     A.    To my knowledge no one has received a

9 denial and an application for a -- for a special use

10 for a firing range.

11    Q.    Okay.  Last time we talked, again I know a

12 couple years ago, I asked you a number of questions

13 regarding the Chicago Police Department ranges, the

14 police academy range.  I don't know if you remember

15 those discussions.  But since that time, since

16 September 28th or 29th of 2010, has your bureau

17 received or are you aware to any other bureau or

18 department of complaints made by the community

19 regarding negative impacts of the Chicago police

20 ranges on the surrounding community?

21    A.    I'm not aware of any complaints that my

22 bureau or department has received.

23    Q.    Okay.  We also spoke of a number of

24 private firing ranges that were not Chicago police

1    but nonetheless were firing ranges that exist in the

2    city but are not open to the public.  A couple

3    examples are 230 South LaSalle Street, which is the

4    Federal Reserve Bank, 610 South Canal Street, which

5    is customs and border protection, and 743 South

6    Canal Street, which is for the postal inspectors.

7            The locations that I've mentioned or any

8    others that you're aware of, has your bureau

9    received any complaints from the surrounding

10   community regarding negative impacts of those firing

11   ranges on that community?

12           MR. AGUIAR:  I'm going to object to the

13      relevance of the question.  You may answer.

14           THE WITNESS:  I'm not aware of any

15      complaints that my bureau or department would

16      have received regarding those.

17   BY MR. SIGALE:

18      Q.   And just to be clear, any address within

19   the city, are you aware of a complaint from the

20   community saying there is a firing range at X

21   location and it's having a negative impact on our

22   community?

23      A.   I'm not aware of any complaints.

24      Q.   Okay.  One of your assistant

1  commissioners, Mr. Valenziano, was deposed a few

2  days ago.  It came up as proffered by the city that

3  there are approximately 1,900 parcels of property in

4  the City of Chicago that meet the requirements of

5  Sections 17-5-207, the use tables in the zoning

6  code, and 4-151-120, the distance requirements,

7  Exhibit 1, we are talking about of the Chicago

8  municipal code.  I asked Mr. Valenziano if he knew

9  how many parcels of property there were total in the

10 City of Chicago and he did not know.  I'm asking if

11 you know.

12     A.   Are you asking me if I know how many total

13 parcels there are in the City of Chicago?

14     Q.   Yes.

15     A.   I do not know.

16     Q.   Do you have any ballpark estimate of how

17 many parcels are in the City of Chicago?

18          MR. AGUIAR:  Objection.

19          THE WITNESS:  I do not know.

20          MR. AGUIAR:  Objection, calls for

21    speculation.  You may answer.

22          THE WITNESS:  I do not know.

23 BY MR. SIGALE:

24     Q.   Are you aware of the 1,900 parcels that

1    were disclosed as complying with both those

2    requirements how many would be commercially

3    practical or feasible to build a firing range on?

4            MR. AGUIAR:  Objection, lack of

5        foundation.  You may answer.

6            THE WITNESS:  I'm not aware of 1,900

7        parcels and I'm not aware of how many would be

8        applicable for that commercial activity.

9    BY MR. SIGALE:

10       Q.  Is that because nobody has asked you the

11   question or is that because you looked into it but

12   were unable to come up with an answer?

13           MR. AGUIAR:  Objection, relevance and

14       form.  You may answer.

15           THE WITNESS:  I've not been asked to look

16       at how many parcels would be applicable for this

17       use.

18   BY MR. SIGALE:

19       Q.  Okay.  When you say "applicable," you mean

20   that as narrower than technically allowed under

21   17-5-207 and 4-151-120?

22       A.  I don't understand what you just asked me.

23       Q.  Okay.  There is really kind of two issues.

24   Can you under the law put a range in a location, and

1   then beyond that would one put a range in a certain

2   location?  So when I asked of the 1,900, do you know

3   how many are commercially practical, you said no.

4        A.   I said I didn't know of the 1,900.

5        Q.   Right.

6        A.   And I didn't know the practicality of it.

7        Q.   And the reason you don't know the

8   practicality of it is because nobody has asked you

9   the question or asked you to look into it before;

10   true?

11       A.   That is correct.

12         MR. SIGALE:  I don't have more than one

13      copy of this, Bill.  I have the original from

14      Mr. Valenziano and then I have the other copy

15      you gave me.

16        MR. AGUIAR:  Let the record reflect that

17      Mr. Siegel is showing the witness the Exhibit 1

18      from Steven Valenziano's deposition,

19      V-A-L-E-N-Z-I-A-N-O.  Are you marking it as an

20      exhibit to her deposition as well?

21        MR. SIGALE:  No.  I'm just referring to

22      it.  I mean that's why it's already been

23      previously marked.

24

1   BY MR. SIGALE:

2       Q.   Ms. Scudiero, I'm going to represent to

3   you that Valenziano Deposition 1 is a map of the

4   city that was created at the direction and

5   insistence of Mr. Valenziano.  Okay?

6       A.   Okay.

7       Q.   If we look at this map -- Well, strike

8   that.  Have you ever seen this document before?

9       A.   I have not.

10      Q.   Okay.  So with regard to -- and I'm just

11  asking you to read the map for a second -- the red

12  areas, if you look at the legend at the bottom,

13  "potential area for shooting range facility,

14  3,386 acres within M zoning districts."  Then you

15  look up at the map and you see that there are

16  certain areas in red.  Did I read that correctly?

17      A.   Yes, you read it correctly.

18      Q.   And there are red areas on the map.  Do

19  you have any information one way or the other to

20  confirm or deny the accuracy of this map?

21      A.   I have no reason to confirm or deny the

22  accuracy of this map.

23      Q.   Okay.  And if you could just look at the

24  map for a second.  This is what we call a shot in

1   the dark but you're here so I'll ask you.  If you

2   could look at the areas in red on the map.

3       A.   Okay.

4       Q.   Are there any areas in red on the map that

5   as you're looking at it you would say either, well,

6   no, you can't actually put a shooting range there

7   or, B, no one in their right mind would put a

8   shooting range there?

9           MR. AGUIAR:  Objection, speculation, lack

10      of foundation.  You can answer.

11          THE WITNESS:  I would have no way of

12      knowing that by looking at the map that you

13      provided me, Mr. Siegel.

14  BY MR. SIGALE:

15      Q.   Okay.  Well, here is what I'm going to do:

16  I'm going to go off the record.  I'm going to take a

17  couple minutes.  I'm going to go through my notes

18  here and I might have no other questions and I might

19  have a few at most.  If I'm scraping this hard

20  inside my head, I can't have too many more. So let's

21  take a couple minutes and I'll look through things.

22          MR. AGUIAR:  I always have the right, of

23      course, to ask a couple of follow-up questions.

24          MR. SIGALE:  Of course.  And I reserve the

1   right to follow up to the follow ups.

2          MR. AGUIAR:  And we'll just keep following

3     up to the follow ups.

4          MR. SIGALE:  Let's go off the record then

5     for a couple minutes.

6          (Thereupon, a discussion was had off the

7     record.)

8          MR. SIGALE:  Let's go back on.

9   BY MR. SIGALE:

10     Q.   Ms. Scudiero, earlier we were talking

11  about the Zoning Board of Appeal process and how

12  part of that process was that your bureau would make

13  a recommendation to the zoning board before the

14  hearing as to the proposed special use and how it

15  fit with the criteria and the zoning code.  Do you

16  remember that?

17     A.   I do remember it.

18     Q.   Okay.  Two quick questions on it.  The

19  recommendation, is that from you directly or is that

20  from somebody in your office?

21     A.   The recommendation is from me.

22     Q.   You personally?  Okay.  One of the things

23  you had mentioned, one of the criteria you had

24  mentioned in making your report, was -- I take it

1    back.  One of the criteria you said the Zoning Board

2    of Appeals uses in its criteria from the zoning

3    code, which you had said was the same criteria you

4    apply in making your recommendations, is deleterious

5    impact.

6              Are you using the definition of

7    deleterious impact which is defined in MCC4-60-010

8    which is, quote, "An adverse effect on the value of

9    any property, an increased risk of violations of

10   law, or a risk of a substantial increase in noise,

11   litter or vehicular congestion," end quote?  Is that

12   the definition of deleterious impact you're applying

13   when you're making your recommendation and to your

14   knowledge whether the Zoning Board of Appeals is

15   making its considerations or is there a different

16   definition that is being used?

17        A.   I am not using the licensing code

18   definition of deleterious impact, which I believe is

19   used for the deleterious impact ordinance that

20   exists in the City of Chicago.  I'm using the

21   Webster definition of deleterious impact and I --

22   The term, I do not believe deleterious is actually

23   used in the zoning code.  It is described as impact

24   on traffic, safety, welfare and various other

1   things.  I do not have the zoning code in front of

2   me to give you the section and state the actual

3   criteria there.  But I use the term deleterious

4   broadly.

5       Q.   Okay.  Is there any particular reason that

6   you use it broadly and not as defined in the

7   licensing code?

8       A.   I'm charged with enforcing and

9   administering the zoning code and the term is not

10  used in the zoning code.  I'm not referencing that

11  section of the licensing code in my case study of

12  each and every special use application that comes in

13  front of the board and requires my recommendation.

14  I'm looking at the zoning code and also looking at

15  any impact that there would be on the surrounding

16  community before my recommendation is issued.

17      Q.   Can you give me an example -- and I'm not

18  asking for the business's name or the proposed

19  business owner's name -- where you recommended

20  against a special use because of safety concerns,

21  safety issues causing a deleterious impact as you

22  defined the term?

23      A.   Sure.

24           MR. AGUIAR:  Objection as to relevance.

1       You may answer.

2               THE WITNESS:  Yes, I can.  Actually I

3       recommended against a Donut shop drive-thru that

4       was to be directly located adjacent to a

5       residential home.  In fact, the turning range

6       and the squawk box for the Donut shop would be

7       about 16 feet away from the side entrance to a

8       single-family home.  That to me had a

9       deleterious impact on that single-family home

10      owner and I asked the Zoning Board of Appeals to

11      deny the special use or I gave them a negative

12      recommendation for the special use for the

13      drive-thru for that Donut shop.

14   BY MR. SIGALE:

15      Q.   Okay.  Can you give me an example where,

16   as you described it before, the criminal activity

17   impact, as I labeled it, where because of that you

18   made a negative recommendation to the zoning board

19   for a special use application?

20      A.   Yes.  There was special use application

21   for a pawn shop that was to be located near -- you

22   know, obviously in a residential community or near a

23   residential community.  And the representatives that

24   applied for the pawn shop license, you know, made

1    their application properly.

2            But when we visited the site we felt that

3    -- I felt that the area would be impacted by --

4    could be impacted quite possibly by people that were

5    going into the pawn shop and regular business people

6    but that it could be -- there could be a possibility

7    heaven for some negative element to be either

8    watching the people walking in or hanging out on the

9    outside.

10           When I did the site visit there was quite

11   a number of people just hanging out on the corner

12   sort of just mulling about standing around doing

13   absolutely nothing.  But it seemed to be that a pawn

14   shop in that area, special use for a pawn shop in

15   that area, could possibly lead to more negative

16   activity for the area, the residents' community that

17   was directly behind it.

18      Q.   And using that example, and again Ms.

19   Scudiero, I don't mean to be glib or anything, but

20   when you did your site visit did you actually

21   witness any negative impact or was it just the

22   number of people on the outside?

23           MR. AGUIAR:  Objection to the use of

24       negative impact.  The pawn shop hadn't located

1    there yet so how could there be a negative

2    impact caused by it?

3  BY MR. SIGALE:

4    Q.   I'm sorry.  When you did your site visit,

5  do you mean there was no business there yet but

6  there were just a lot of people on the corner?

7    A.   When I did my site visit there were a

8  number of businesses in existence there that were

9  already bringing a significant amount of people to

10  the area, whether positive or negative.  The zoning

11  code says that the traffic, traffic in general,

12  doesn't mean car traffic, but the amount of people

13  in the area can be increased and that it could be a

14  negative impact on the community.

15         So when I went out to the site and did my

16  site visit it was obvious -- obviously the pawn shop

17  was not located there yet because they didn't have

18  permission to be there.

19    Q.   Right.

20    A.   But the area -- the area already was quite

21  congested with people.  And this business locating

22  there in my opinion could exacerbate that issue.

23    Q.   Okay.  So it wasn't about the type of

24  people necessarily or criminal activity, it was

1    about if this pawn shop becomes popular than you're

2    going to have a lot more foot traffic in this area

3    where there is already a lot of foot traffic?  Does

4    that sound right?

5         A.    Sounds right.

6         Q.    Okay.  Did the ZBA allow that pawn shop,

7    by the way?

8         A.    The decision hasn't been reached yet.

9         Q.    Oh, it's a pending matter?

10        A.    It is.

11        Q.    Okay.  Do you know off the top of your

12   head how children's activity facility is defined?

13             MR. AGUIAR:  Objection.  Defined where?

14   BY MR. SIGALE:

15        Q.    I believe Mr. Valenziano referred to the

16   zoning code.

17        A.    Children's activities facility is defined

18   both in the licensing code and the zoning code as a

19   place where children under 17 gather.  And there is

20   a specific reference in there that it is not a

21   daycare center, it is not a school and it is not

22   state mandated but it is a facility that could be

23   for parties, for educational purposes and various

24   others.  I don't know the exact definition more than

1   that, Mr. Sigale.

2       Q.   When we were talking about 120 (C) and we

3   were talking about empirical evidence regarding

4   purposes and stuff like that, you were incorporating

5   within your answer all the definitions that you knew

6   of children's activity facility; correct?

7       A.   That is correct.

8           MR. SIGALE:   Okay.  At the probable risk

9       of kicking myself later, I can't think of

10      anything else.  So do you have any questions,

11      Bob?

12          MR. AGUIAR:   I do have some follow-up

13      questions.

14                          CROSS-EXAMINATION

15  BY MR. AGUIAR:

16      Q.   Ms. Scudiero, do you recall the line of

17  questions that Mr. Sigale asked you about inquiries

18  to your department regarding the propriety under the

19  zoning ordinance of certain properties for gun

20  ranges?

21      A.   Yes, I do remember.

22      Q.   And you provided Mr. Sigale with the

23  number of inquiries and instances of those inquiries

24  to the best of your recollection; is that correct?

1      A.   Yes, I did.

2      Q.   That recollection is as you sit here

3  today?

4      A.   Yes.

5      Q.   Is it possible there may have been other

6  inquiries that you're not recalling as you sit here

7  today?

8      A.   Absolutely.

9      Q.   Okay.  But as of today you have given him

10  the best you can?

11      A.   Yes, I have.

12      Q.   Okay.  Do you remember the line of

13  questions regarding what we'll call coming to the

14  nuisance?

15      A.   Yes, I do.

16      Q.   Okay.  That involves Mr. Sigale's

17  hypothetical if a range is licensed and operating on

18  a location and one of the uses who is prohibited

19  under 4-15-120 wants to locate within 500 feet of

20  the range.  That was the basis of his hypothetical.

21  Do you remember that?

22      A.   I do remember that.

23      Q.   Okay.  I believe it was your testimony

24  that it was not your understanding that the range

 1   would lose its license simply because another use

 2   which is prohibited to be within 500 feet wants to

 3   locate within 500 feet?

 4        A.   That's correct.

 5        Q.   Okay.  You're not aware of any process by

 6   which a license would be stripped from the range

 7   because of that inquiry or request by another type

 8   of use?

 9        A.   I'm not aware of any process in place.

10        Q.   Mr. Sigale asked you some questions about

11   the basis for the 500-foot distance between ranges

12   and the uses listed in 4-151-120.  Do you recall

13   those questions?

14        A.   Yes.

15        Q.   My question is does the zoning code have

16   any other -- put restrictions on any other types of

17   uses?

18        A.   Yes.

19        Q.   Can you describe some of those for me,

20   please?

21        A.   Sure.  There is the adult use restriction,

22   which is one thousand feet from either the like

23   business, residential district or churches, places

24   of worship.  There is the hair salon restriction

```
 1   which is a thousand feet from each other.  A hair
 2   salon, nail salon, barber shop, beauty parlor,
 3   cannot be located within a thousand feet of another
 4   like business.  There is the restriction on bank --
 5   bank tellers, automatic ATM machines.  Same
 6   restriction of a thousand feet I believe.  I may be
 7   missing some but --
 8        Q.   That was the best you can recall?
 9        A.   Yes, it is.
10        Q.   Okay.  But there may be others in the
11   zoning code as well?
12        A.   There may be others in the zoning code as
13   well.
14        Q.   Those could be in other codes as well but
15   zoning looks at them in determining the propriety of
16   a location?
17        A.   That's correct.
18        Q.   Okay.  In looking at 4-151-120, Mr. Sigale
19   asked you a series of questions regarding the
20   governmental purposes supporting this particular
21   ordinance provision.  Do you recall those questions?
22        A.   I do recall them.
23        Q.   Okay.  You did testify that there is a
24   criminal activity impact which you say supports the
```

1   reason why we have 4-151-120?

2           MR. SIGALE:  I'm just going to object.

3       Criminal activity impact was my shorthand label

4       for it.  It's her testimony as to what that --

5       What was included within my label is, you know,

6       what the record is.

7   BY MR. AGUIAR:

8       Q.   Well, incorporating Mr. Sigale's

9   description based on your testimony, prior

10  testimony, do you recall those questions and

11  answers?

12      A.   Yes, I do.

13      Q.   Okay.  Is it your understanding that the

14  criminal activity impact is a concern of the CPD,

15  the Chicago Police Department?

16          MR. SIGALE:  I just object as to

17      foundation and speculation.

18  BY MR. AGUIAR:

19      Q.   Is that your understanding?

20      A.   That is my understanding.

21      Q.   Okay.  And as you sit here today you're

22  not aware of what empirical evidence or antidotal

23  evidence or experience evidence the Chicago Police

24  Department may have which supports these

1   restrictions in 4-151-120; is that correct?

2        A.   That is correct.

3        Q.   Okay.  So it could be that the Chicago

4   Police Department has information which supports the

5   governmental interest supporting 4-151-120?

6        A.   That is correct.

7        Q.   But you're not aware that --

8             MR. SIGALE:  I'm going to object to that

9        previous question as speculative and based on

10       foundation.  But go ahead.

11  BY MR. AGUIAR:

12       Q.   But it's possible that the CPD has

13  information that you're not aware of?

14       A.   It is possible they have information that

15  I'm not aware of.

16            MR. AGUIAR:  Okay.  This is not a

17       question.  I'm not done questioning but I just

18       want to let you know, Mr. Sigale, that based on

19       Ms. Scudiero's testimony on this issue the city

20       may amend its 30(b)6 designation to include a

21       representative of the Chicago Police Department

22       to provide answers to your questions about the

23       evidence supporting the criminal activity impact

24       that we have spoken about today or we may amend

1       our answer to interrogatory Number 7 to your

2       supplemental set of interrogatories to include

3       an individual who has knowledge of this

4       information.  I'm just letting you know that on

5       the record here today.

6             MR. SIGALE:  Okay.  As soon as possible

7       would be appreciated, but I do understand.

8             MR. AGUIAR:  I understand.

9             MR. SIGALE:  I hear what you're saying.  I

10      was about to ask if you were done.

11            MR. AGUIAR:  I might be.  Hold on.

12   BY MR. AGUIAR:

13      Q.   I just want to clarify the record on some

14   things.  I'm not sure if it's clear but I want to

15   make sure it's clear.

16            In talking about your recommendation to

17   the Zoning Board of Appeals that you make in your

18   capacity as zoning administrator, you mentioned part

19   of that recommendation involves your analysis of

20   what would be a deleterious impact caused by the

21   proposed use.  Do you recall that?

22      A.   I do recall that.

23      Q.   That was your testimony?

24      A.   Yes.

1      Q.   I just want to clarify.  The word

2 deleterious is not, in fact, used in the criteria

3 that the zoning code asks you to look at in making

4 that recommendation; is that correct?

5      A.   That is correct.

6      Q.   And you were using the word deleterious?

7      A.   I am using the word, yes.

8      Q.   Okay.  Am I correct that the word

9 deleterious in your use is based in part on the

10 criteria that is listed in the zoning code pursuant

11 to which the ZBA makes its determination?

12      A.   That is correct.

13      Q.   Okay.  And the word deleterious is not

14 tied to the deleterious impact ordinance that the

15 city otherwise has?

16      A.   That's correct.

17           MR. AGUIAR:  I have nothing further at

18      this time.

19           MR. SIGALE:  Okay.  I do have some

20      follow-ups.

21                     REDIRECT EXAMINATION

22 BY MR. SIGALE:

23      Q.   Ms. Scudiero, I want to again -- We all

24 want to make sure the record is clear.  Mr. Aguiar

1    brought up the coming to the nuisance line of

2    questions that I had asked earlier and I had posited

3    the hypothetical that you got a licensed firing

4    range up and operating after construction,

5    retrofitting, whatever it has to do, but going

6    through the rigmarole of getting that business up

7    and running.  A business or use I should say that's

8    part of the 500-foot restriction in 120 (C) comes to

9    your office, says it wants to locate within a

10   location that happens to be within 500 feet of that

11   range.  And I said that I only saw three

12   possibilities for what would happen.  Either that

13   new business, that new use, would be told, sorry,

14   you can't go here because then you would be within

15   500 feet of that range.  Two, the range would be

16   told, sorry, I know you're up and running but you've

17   got to go because this other use wants to locate

18   within 500 feet.  Or, three, the new use would be

19   told you can come in and the range would be told,

20   well, you're grandfathered into that location so you

21   can both stay there.  I didn't see any other -- I

22   didn't see any other possibilities and I asked you

23   if you knew which of those three would happen and

24   you said no.  Do you remember saying that?

1      A.    I do.

2      Q.    Okay.  It sounded like Mr. Aguiar was

3   asking you questions along the lines that would

4   indicate a different answer, that you do have an

5   idea of what would happen in that.  So I just want

6   to clarify for purposes of this record.

7          With regard to that hypothetical and those

8   three choices, do you know or do you not know what

9   would happen in that hypothetical?

10          MR. AGUIAR:  I want to object to the

11      extent my questions were whether the witness was

12      aware of any procedures or processes by which

13      that range would be stripped of its license and

14      she said she wasn't aware of that.  But that's

15      my objection.  You can proceed.

16          THE WITNESS:  So you asked me two

17      different questions and I answered I wasn't

18      aware of any process in place for stripping a

19      place of a license.  And you asked me if I knew

20      what the answer would be if one of these uses

21      described in 4-151-120 came in after a gun range

22      was licensed and it was within 500 feet of it

23      and I said that we don't have a current shooting

24      range facility so we have no information of what

1     would happen.  And then you asked me

2     hypothetically what I thought would happen and I

3     answered I don't know because I don't know what

4     would happen.

5   BY MR. SIGALE:

6       Q.   Okay.  You mentioned some of the

7   businesses with other distance restrictions.  Adult

8   uses was one.  You mentioned another one I don't

9   recall offhand.  But are you aware -- If I take that

10  hypothetical and I -- Strike that.

11          My hypothetical, if I substitute shooting

12  ranges, which, of course, would make it a

13  hypothetical because we'll agree there are no

14  shooting ranges, commercially public shooting ranges

15  in Chicago --

16      A.   Okay.

17      Q.   -- but I substitute some business that

18  actually does exist in the city.  Let's say adult

19  uses or any other one you can think of with a

20  distance restriction.  Can you think of instances

21  where my hypothetical actually has come to pass and

22  if so what has the result been?

23      A.   Yes.  To answer your question, yes, I can

24  think of situations where it has occurred and, yes,

1    I can tell you what has occurred in those situations

2    with another use, not a shooting range.  The

3    currently licensed business is allowed to continue.

4    They're currently licensed.  And if the use that was

5    coming in where there was a distance requirement

6    required a license and the city had knowledge or the

7    department had knowledge about that license, that

8    license would be denied for the new business trying

9    to locate within a thousand feet of the existing

10   business if there was a license restriction in

11   place.

12        Q.   Okay.  So you have an adult bookstore in a

13   location, a church wants to open 800 feet away.  The

14   church will be told no?

15        A.   If the church comes to the City of Chicago

16   -- Well, strike that.

17             That's not actually what you asked me.

18   You asked me if another business came in.  So if you

19   have an adult bookstore and another adult bookstore

20   comes in, the second business would be denied.

21        Q.   Okay.

22        A.   If you have an adult bookstore and within

23   a thousand feet of it a residential condominium was

24   to be built, there would be no prohibition from that

1   residential condominium being built within a

2   thousand feet of an adult bookstore.

3       Q.   And if I can extrapolate, then in addition

4   to the residential development being told, okay, you

5   can build here, the adult business is also told you

6   can stay as well?

7       A.   The currently licensed business?

8       Q.   The currently licensed business.

9       A.   Is allowed to maintain their current

10  license.

11      Q.   Okay.  Are you aware -- What about the

12  other types of uses?  Strike that.

13           120 (C) -- So let's keep talking about the

14  adult uses for a minute.  In 120 (C), are any of the

15  uses in 120 (C) also -- they also factor in the

16  distance restriction for adult uses?

17      A.   I believe -- it could be more but I

18  believe at least the school and daycare facility and

19  children's activities facility are.  But I cannot

20  speak for the rest of them.

21      Q.   Okay.  So same question then as before.

22  So the adult use that's already licensed and already

23  up and running, if a school or a daycare facility or

24  a children's activity facility, which has a number

1   of possible businesses that fall in that category,

2   want to locate 700 feet from an already existing

3   adult use, what happens?

4       A.   I don't think I've had that instance

5   happen in my time here so I don't know.  I don't

6   know.  And I don't want to speculate on it because

7   some of those -- some of those uses don't require

8   licensing.  So those people may not even come to the

9   city and ask if they can locate there.  So we would

10  have no knowledge of their existence.

11      Q.   Oh, you mean they might just be up and

12  running?

13      A.   Yes.  For instance, a church doesn't

14  require a license.

15      Q.   So let me again -- I'll just ask it to

16  make sure I'm clear.  So that church that doesn't

17  require a license just gets a building, puts a cross

18  on the roof or something and now we're a church?

19      A.   Yes.

20      Q.   When they go to the city and say, hey,

21  we've got this church here but, you know, our

22  parishioners are complaining that there is this, you

23  know, adult bookstore.  You know, and we took a tape

24  measure or whatever and it's 700 feet.  I understand

1   it's a big tape measure.  We've got it 700 feet

2   away.  Do something about that.  Do you know what

3   would happen?

4           MR. AGUIAR:  Objection, calls for

5       speculation.

6           THE WITNESS:  I don't know what would

7       happen.

8   BY MR. SIGALE:

9       Q.   Okay.  And you're not aware of any similar

10  instances of something like that occurring?

11      A.   I'm not.

12      Q.   Okay.  And I think in the previous line of

13  questions I asked you if you know who I should ask

14  and I think the answer was no and then we maybe

15  speculated about Ms. Krimbel.  Same answer with

16  regard to these questions?

17      A.   Yes, it would be the same answer.

18          MR. SIGALE:  Okay.  I don't have anything

19      further.

20          MR. AGUIAR:  I'm done.  We reserve.

21          THE REPORTER:  Copies, anything?

22          MR. SIGALE:  I'm going to have to let you

23      know.

24          MR. AGUIAR:  I'll wait to hear from him.

1     (Thereupon, the deposition was concluded at

2     12:40 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4  RHONDA EZELL, JOSEPH I. BROWN,
   WILLIAM HESPEN, ACTION TARGET, INC.,
5  SECOND AMENDMENT FOUNDATION, INC.,
   and ILLINOIS STATE RIFLE ASSOCIATION,

6
           Plaintiff,
7
   vs.                               No. 10 CV 5135
8
   CITY OF CHICAGO,
9
           Defendant.
10 _____/

11

12

13          I hereby certify that I have read the

14 foregoing transcript of my deposition given at the

15 time and place aforesaid, consisting of Pages 1 to

16 91, inclusive, and I do again subscribe and make oath

17 that the same is a true, correct and complete

18 transcript of my deposition so given as aforesaid,

19 and includes changes, if any, so made by me.

20

21                              _____

22                              Ms. Patricia Scudiero

23 SUBSCRIBED AND SWORN TO before me

24 this _____ day of _____, A.D. 2012

```
 1   STATE OF ILLINOIS      )
                            ) SS:
 2   COUNTY OF COOK         )

 3          .

                    I, BARBARA K. KRASNE, a Notary Public
 4   within and for the County of Cook, State of
     Illinois, and a Certified Shorthand Reporter of the
 5   said state, do hereby certify:

 6                  That previous to the commencement of the
     examination of the witness, the witness was duly
 7   sworn to testify the whole truth concerning the
     matters herein;

 8
            That the foregoing deposition transcript
 9   was reported stenographically by me, was thereafter
     reduced to typewriting under my personal direction
10   and constitutes a true record of the testimony given
     and the proceedings had; That the said deposition
11   was taken before me at the time and place specified;

12          That I am not a relative or employee or
     attorney or counsel, nor a relative or employee of
13   such attorney or counsel for any of the parties
     hereto, nor interested directly or indirectly in
14   the outcome of this action.

15          IN WITNESS WHEREOF, I do hereunto set my
     hand and affix my seal of office at Chicago,
16   Illinois, this 28th day of October, 2012.

17

18                             Notary Public,

19

20                             Cook County, Illinois

21

22

23   C.S.R. Certificate No. 84-004651

24
```