1            IN THE UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4    RHONDA EZELL, JOSEPH I. BROWN,    )

5    et al.,                          )

6                  Plaintiffs,        )

7             vs.                     ) No. 10 CV 5135

8    CITY OF CHICAGO,                 )

9                  Defendant.         )

10   The 30(b)6 Deposition of City of Chicago,

11   by and through STEVEN VALENZIANO, called for

12   examination, taken pursuant to the Federal Rules of

13   Civil Procedure of the United States District Courts

14   pertaining to the taking of depositions, taken

15   before DANA L. SHAPIRO, CSR No. 84-3597, a Notary

16   Public within and for the County of Cook, State of

17   Illinois, and a Certified Shorthand Reporter of said

18   state, at Suite 1230, 30 North LaSalle Street,

19   Chicago, Illinois, on the 2nd day of October, A.D.

20   2012, commencing at 1:05 p.m.

21              ATKINSON-BAKER, INC. COURT REPORTERS

22                    800-288-3376

23                    www.depo.com

24                    ABI File No. A609AC1

```
 1   PRESENT:

 2        LAW FIRM OF DAVID G. SIGALE, P.C.,

 3        (739 Roosevelt Road, Suite 304,

 4        Glen Ellyn, Illinois 60137,

 5        630-452-4547), by:

 6        MR. DAVID G. SIGALE,

 7             appeared on behalf of the Plaintiffs,

 8

 9        CORPORATION COUNSEL,

10        (30 North LaSalle Street, Suite 1230,

11        Chicago, Illinois 60602,

12        312-744-4216), by:

13        MR. WILLIAM MACY AGUIAR,

14             appeared on behalf of the Defendant.

15

16

17

18

19

20

21

22

23

24   REPORTED BY:  DANA L. SHAPIRO, CSR No. 84-3597.
```

1          (WHEREUPON, the witness was duly

2          sworn.)

3               STEVEN VALENZIANO,

4  called as a witness herein, having been first duly

5  sworn, was examined and testified as follows:

6                    EXAMINATION

7  BY MR. SIGALE:

8     Q.    Can you state your name and spell your

9  last name for the record, please.

10     A.    Steven Valenziano, V-a-l-e-n-z-i-a-n-o.

11     MR. SIGALE:  Let the record reflect this is the

12  deposition of Steve Valenziano.  It is taken

13  pursuant to Federal Rules of Civil Procedure 30(b)6

14  notice.

15     MR. AGUIAR:  May I just correct the record.

16  This is the deposition of the City of Chicago

17  pursuant to Rule 30(b)6.  Mr. Valenziano is the

18  designated witness on that topic, which is quote,

19  the available locations in the City to locate a gun

20  range, end quote.  Just being specific.

21     MR. SIGALE:  Okay.  But this still is the

22  deposition of Steve Valenziano.

23     MR. AGUIAR:  As the City's designated witness

24  on this 30(b)6 topic.

```
 1   BY MR. SIGALE:
 2        Q.    Mr. Valenziano, for whatever reason that
 3   you are here, this deposition is going to be taken
 4   pursuant to the Federal Rules of Civil Procedure and
 5   any applicable rules of the Northern District of
 6   Illinois.
 7             Have you given a deposition before,
 8   Mr. Valenziano?
 9        A.    Yes.
10        Q.    When was the last time you have given
11   one?
12        A.    I believe it was about a year and a half,
13   two years ago, a year and a half ago, I think.
14        Q.    Was that in connection with your
15   employment at the City of Chicago or some other
16   reason?
17        A.    With my employment with the City.
18        Q.    It's been a little bit of time so let me
19   give you a couple of ground rules to make things go
20   a little faster and smoother.  Okay?
21        A.    Okay.
22        Q.    Dana here is taking down everything
23   everybody says.  She can only take down out loud
24   verbal responses.  She cannot take down things like
```

1  hand gestures, head shaking and maybe the biggest

2  culprit uh-huh and uh-huh.  Please keep everything

3  out loud and verbal.  Okay?

4       A.    Okay.

5       Q.    It's also very difficult for Dana to take

6  down more than one person talking at a time.

7  There's going to be times when you are going to know

8  what my question is before I'm done asking it.  I

9  please ask that in all circumstances you wait until

10 I'm done asking my question before you answer, and I

11 in turn will try and wait until you are done

12 answering before asking another question.  Okay?

13      A.    I will try.

14      Q.    Thank you.

15            If for any reason you don't understand a

16 question that I'm asking you here today, please let

17 me know and I will rephrase it.  If you answer a

18 question that I ask you, it's going to be presumed

19 for purposes of the record that is being made that

20 you understood the question that I was asking and

21 that that's the question you are answering.  So

22 again, if for some reason I don't make sense or you

23 don't understand the question for any other reason,

24 let me know and I will rephrase it.  Okay?

```
 1        A.     Okay.

 2        Q.     If you need to take a break, let me know.

 3   Mr. Valenziano, are you currently employed?

 4        A.     Yes.

 5        Q.     With the City of Chicago?

 6        A.     Yes.

 7        Q.     What department do you work with?

 8        A.     I'm with the Department of Housing and

 9   Economic Development.

10        Q.     Any particular section or unit or

11   division of that department?

12        A.     I'm with the Bureau of Planning and

13   Zoning.

14        Q.     What's your job title there, sir?

15        A.     Assistant zoning administrator.

16        Q.     The zoning administrator, is that Ms.

17   Gutierro?

18        A.     Yes.

19        Q.     Patricia Gutierro?

20        A.     Yes.

21        Q.     How long have you been assistant zoning

22   administrator?

23        A.     Since January of this year, 2012.

24        Q.     Is that because you just started working
```

1  for the City or is that because your bureau or

2  department got moved over to some other department

3  and merged or something and this is a new position?

4       A.    It's because I was -- I was audited for

5  my position because I was doing work beyond what my

6  title was and the work I was doing was that of the

7  assistant zoning administrator and so I was awarded

8  that title.

9       Q.    Okay.  What was your title before

10 assistant zoning administrator?

11      A.    My position title was a project -- was a

12 coordinating planner 1, and I had an unofficial

13 title of director of zoning -- of ordinance

14 administrator -- director of zoning administration.

15 I'm sorry.  But this coordinating planner 1 was the

16 official title.

17      Q.    Was that also with the bureau of planning

18 and zoning for the Department of Housing and

19 Economic Development?

20      A.    Yes, it was for a time because I got that

21 title when we split off.  We have been splitting and

22 combining over the last few years.  But I was

23 department of zoning and land use planning was when

24 I was -- I had the coordinating planner 1 title

1   before that, but that specific director of zoning --

2   of ordinance administration was under that previous

3   department and then transferred over to Department

4   of Housing and Economic Development, and then that's

5   when I was given the title of assistant zoning

6   administrator.

7        Q.   So your -- you had the coordinating

8   planner 1 position with the zoning and land use

9   planning department and then you had it for a time

10  when you -- when it transferred to housing and

11  economic development?

12       A.   Yes.  I don't know when.  I can't recall

13  when the department merged again when the Department

14  of Zoning and Land Use Planning merged with the

15  Department of Community Development, which then

16  became Department of Housing and Economic

17  Development.  But I carried that title over into

18  that department, and then in 2012 -- at the end of

19  2011 is when I had my position audited and then was

20  given the title at the beginning of this year, 2012

21  in the new department completely.

22       Q.   Okay.  Coordinating planner 1 ended in

23  December of 2011.  When did it start?

24       A.   In January of 1999.

1      Q.     How long did you say you have been

2  employed with the City altogether?

3      A.     Since I believe it's April of 1990.

4      Q.     I have got to go back further.  Before

5  you were a coordinating planner 1 with at the time I

6  guess it would be the zoning and land use planning

7  department to start, how were you employed by the

8  City?

9      A.     Before that?

10      Q.     Before the coordinating planner 1 started

11  in January of '99.

12      A.     You want me to work backwards.

13      Q.     I'm working backwards.

14      A.     Before 1999 I was a city planner 5 with

15  the Department of Planning and Development.

16      Q.     How long did you do that?

17      A.     From 19 -- I think it was July of 1993

18  until December of 1998.

19      Q.     Before that?

20      A.     Then before that I was a city planner 3

21  again with the Department of Planning and

22  Development from, I don't recall if it was January,

23  but I believe it was -- we will say it was January

24  of 1992 until that July of 1993 and then --

1    Q.    Before that?

2    A.    Prior to that I was a city planner 1 with

3  the Department of Planning from I believe again it

4  was April of 1990 until January -- December of '91.

5  I think that all works out chronologically.

6    Q.    Is that when you started with the City,

7  April of 1990?

8    A.    Yes.

9    Q.    What are your job duties as an assistant

10 zoning administrator, i.e., your current position?

11   A.    I supervise and -- I supervise a staff of

12 20 to 25 people ranking everywhere from plan

13 examiners to landscape planners, project

14 coordinators in various licensing and zoning review.

15 I also supervise and manage the zoning board of

16 appeals and the staff for that unit.  I attend the

17 zoning board monthly.  I attend the committee on

18 zoning and -- has a new name, committee on zoning

19 and building -- I can't remember what the name is.

20 Now it's a brand new name.  Buildings and landmarks.

21        I appear at meetings, either committee

22 meetings or neighborhood meetings on behalf of the

23 department.  I perform zoning opinions for, which

24 are -- they are documents people ask for opinion

1  pertaining to a certain aspect of their development

2  or the use they want to put in place in a particular

3  district.  I will answer -- give department's

4  opinion on those situations.

5           I also am involved in the writing of the

6  recommendations and presentation of recommendations

7  to the zoning board and to the committee on zoning.

8  Then just the day-to-day operations of the -- of

9  that division, which is the ordinance administration

10 division.  So any questions that come up regarding

11 zoning review for building permits, sign permits,

12 administrative adjustments, any cases for special

13 use or variation that go before the zoning board.  I

14 represent the department for the zoning

15 administrator on appeals matters at the zoning board

16 of appeals where applicants or people are appealing

17 the decision of the zoning administrator.  I don't

18 know.  It's varied.  It's really a large number of

19 things.  I think everything from signing off on

20 vacation days to, you know, figuring out parking

21 credits.  And then I also am involved with other

22 departmental policy and planning procedures and

23 goals.

24      Q.    A lot.

1      A.    Yes.

2      Q.    You had said something, I missed the

3  first half of it, but it ended with ordinance

4  division.

5      A.    It's ordinance administration division,

6  which is like within our bureau we divide it up into

7  there is a plan development division.  The deal is

8  strictly with plan developments.  Then there is a

9  planning division which deals with larger planning

10  issues.  There is a sustainable I think they are

11  called sustainable development division which is

12  dealing with everything from green roofs to urban

13  farming and so on.  Then there is a historic

14  preservation division.  There is different divisions

15  within that bureau and I head up the largest of the

16  divisions.

17          But as again through my job title and

18  just my experience and expertise with the zoning

19  code and with the -- with land use planning over a

20  number of years, I have been involved with many

21  different aspects of planning with the Department of

22  Planning and Economic Development and even into my

23  current position.  So I'm called in to lend my

24  opinion or advice or support on various land use

1    plans and plan developments, you know, a lot of

2    different things that happen within that bureau.

3          Q.    I am sorry.  I want to be clear.  Are you

4    the assistant zoning administrator of the bureau or

5    of one of the divisions in the bureau or is the

6    bureau --

7          A.    I'm the assistant zoning administrator

8    for the City.  There is -- even -- there is a zoning

9    administrator and then my title is assistant zoning

10   administrator.

11         Q.    You are like the No. 2 in the whole

12   department?

13         A.    In that bureau I guess technically.

14   There is only one zoning administrator in the City,

15   and the zoning administrator only has one assistant

16   zoning administrator for the entire city.  All

17   zoning matters if -- they come through the zoning

18   administrator for final decisions.  Our examiners

19   they administer the ordinance.  That's why they are

20   under ordinance administration division.  They know

21   the ordinance and they have to review plans,

22   building permit plans or sign permit applications.

23   They have to review those to make sure they are in

24   compliance with the zoning ordinance.  If there is

 1   some kind of a question or if there is a decision or
 2   something doesn't fit neatly into that ordinance,
 3   it's the zoning administrator who has the final say
 4   on if that meets the ordinance, how it meets the
 5   ordinance or how the ordinance would be applied or
 6   interpreted to whatever matter it is, whatever
 7   issue.  She can then delegate that responsibility to
 8   me which she does on a daily basis for certain
 9   things she can't handle.  There is so many things
10   that come through.
11        Q.    Sure.  My question is, I guess I'm sorry
12   I'm getting a little bit lost in the whole structure
13   of the -- you have the Department of Housing and
14   Economic Development?
15        A.    Yes.
16        Q.    Within that is the Bureau of Planning and
17   Zoning?
18        A.    Correct.
19        Q.    You are the assistant zoning
20   administrator of that bureau or one of the
21   divisions?
22        A.    I'm the head of the division of ordinance
23   administration.
24        Q.    Thank you.

1      A.     Okay.

2      Q.     Okay.

3      A.     My title is assistant zoning

4  administrator.  Patty has two titles.  She is the

5  head of that bureau as a managing deputy

6  commissioner, I believe it is.  But she has also the

7  title of zoning administrator.  The zoning ordinance

8  gives certain duties and responsibilities and

9  authorities to the zoning administrator that are

10 separate from being the managing deputy commissioner

11 of an entire bureau.  Again, the City only has one

12 zoning administrator.  The Department of Buildings

13 calls on the zoning administrator to make

14 determinations and decisions.  The Department of

15 Business Affairs and Consumer Protection, they call

16 on the zoning administrator to make certain

17 decisions and determinations in regards to zoning.

18 I'm sorry it's confusing, but that's the way it is.

19     Q.     It's fine.  I really didn't want to get

20 hung up on this.  I apologize.  It seems like

21 everyone else I have talked to there is a department

22 with a number of divisions and they work for one of

23 the divisions in some capacity or other.  The only

24 part I'm getting hung up on is where this bureau

1  fits in.

2      A.    The department has three bureaus, there

3  is a housing bureau, there is an economic

4  development bureau and then there is a planning and

5  zoning bureau.  Each bureau has a managing deputy.

6  So there is the commissioner and then there is a

7  managing deputy over each of the three bureaus.

8  Patty is the one -- that's the managing deputy

9  that's over the Bureau of Planning and Zoning.

10           Within the Planning and Zoning there are

11  separate divisions.  There is the historic

12  preservation division, there is a planning

13  development division, there is a planning division,

14  and there is the ordinance administration division.

15  Now, everything that we do in our bureau has some

16  aspect of the zoning ordinances involved in it.  So

17  she is also the City's zoning administrator.  She

18  kind of heads that whole thing.

19           Now, I as the assistant zoning

20  administrator am directly over that ordinance

21  administration division because there is other

22  things like keeping the maps, keeping the files for

23  zoning amendments and other things that pertain

24  particularly and specifically to the administration

1  and maintenance of the zoning ordinance.  So I'm

2  over that, overseeing that operation.  But the

3  zoning administrator like I'm saying has a larger

4  function citywide really.

5      Q.    I don't want to get hung up over a whole

6  bunch of divisions and departments that don't exist

7  anymore or that got merged into other things.  But I

8  will ask you, when you were a coordinating planner 1

9  and you said you were unofficially the director of

10 zoning administration for those I guess 12 years

11 almost.  How did your job duties differ from what

12 you do now?

13     A.    Well, let me correct you.  I was only the

14 director of zoning ordinance administration or

15 ordinance administration from 2009 until 2011

16 because that's when I was with that Department of

17 Planning and Zoning that which became -- I'm sorry.

18 Department of Zoning and Land Use Planning.  The

19 names have changed so much.  Then we became

20 Department of Housing and Economic Development.

21 From that 2009 time when I went from what was then

22 Department of Planning and Development, which then

23 split.  Okay.  My division, which I was in the

24 zoning division, with the Department of Planning and

1  Development went over to this new department.  From

2  that time that's when I held -- I was a coordinating

3  planner 1 officially like if you look at my

4  paycheck, but my title was, if you looked at my card

5  and what that was recognized as, was the director of

6  ordinance administration, which is basically where

7  we had kind of the same responsibilities in that

8  division.  So that kind of -- that really kind of

9  blended over into assistant zoning administrator.

10           I picked up so many responsibilities when

11 I went to that new department, the Department of

12 Zoning and Land Use Planning.  That's why they

13 changed my title on paper to director.  A lot of

14 those things I picked up those other

15 responsibilities, which that's why I asked for the

16 audit to be done by the department of personnel to

17 say look, come in, here's what I do on a day-to-day

18 basis, on a monthly basis.  Here's all of my

19 responsibilities.  Here's the people I supervise.

20 That's much more than what a coordinating planner 1

21 should be doing.  Therefore they said you are right,

22 and they scratched out coordinator planner 1 and

23 recommended I guess the assistant zoning

24 administrator title because I was really performing

1    all of those functions.  That's what was between

2    that period of 2009 to the end of 2011.  2012 I

3    became that.

4        Q.    From -- before 2009 from '99 to '09, I'm

5    just -- I guess I'm more strictly what are the job

6    duties of a coordinating planner 1?

7        A.    They can vary as they did for me.  I mean

8    from -- again, I audited every time that I -- not

9    every time.  Probably the last three times I got a

10   promotion or a change in my title I asked to be

11   audited because the job that I was doing was greater

12   than what the job title was supposed to encompass.

13            Coordinator planner 1 is supposed to

14   supervise a small number of staff.  Coordinator

15   planner 1 is supposed to do -- make representation

16   for the department and be a surrogate of the

17   commissioner at certain meetings and neighborhood

18   meetings and things like that, which I did.

19   Coordinating planner 1 is supposed to be involved in

20   large scale planning projects doing analysis of land

21   use and things like that, which I did.  But then as

22   I -- from 1999 I used to have somebody that was

23   actually from 1993 when I became a planner, city

24   planner 5 I had a supervisor who had that

1   coordinating planner 1 title above me, and then he

2   moved up to assistant commissioner so then that's

3   when I asked to be audited and I got the

4   coordinating planner 1 title and I had a couple of

5   people that I supervised.

6          Then we began work with the Mayor's

7   zoning reform commission which I was a part of, but

8   my assistant commissioner and the zoning

9   administrator at the time were the two main guys

10  running that.  So I took on more responsibilities of

11  my old supervisor because he really was not there

12  most of the time in the office with us because he

13  was in the Mayor zoning reform position.  I

14  participated in that as well, the Mayor zoning

15  forming commission.

16         When he went on in 2004 or '05 to become

17  the acting zoning administrator because the zoning

18  administrator retired, there was -- again, I took on

19  all of his responsibilities as assistant

20  commissioner, and again was not awarded any title so

21  I just, you know, was coordinating planner 1.  I did

22  all of the functions of the assistant commissioner

23  which was I had a staff of four or five.  I made

24  recommendation to the zoning board, I did site

1  planning and land use planning studies, a multitude

2  of things.  That's why when I got to that point in

3  2009 where we switched departments I started saying

4  I'm -- I keep getting more responsibilities.  I

5  should be compensated.  The coordinating planner 1 I

6  think I surpassed what the coordinating planner 1 is

7  supposed to be in somewhere in the early 2000s when

8  my boss at that time became the acting zoning

9  administrator.

10      Q.    On paper, what was a city planner 5?  I

11  understand probably you mentioned for all of your

12  promotions that you asked for the audit because you

13  were essentially doing the job of the -- above you

14  anyway.  I get that.  On paper what did a city

15  planner 5 do?

16      A.    City planner 5 kind of it's the highest

17  level of the city planner positions besides then you

18  go into the coordinating planner positions.  That

19  you are doing kind of higher level analysis and

20  planning.  You may supervise some staff on a, you

21  know, project by project basis, you know, you don't

22  actually maybe have a staff, but you may supervise

23  them on their work when you are not supervising them

24  on their time off and other things, which is another

1  part of being a coordinating planner 1 and being

2  assistant zoning administrator as you move up

3  assistant administrator or assistant commissioner

4  you start also managing people's time and their, you

5  know, time off and edits and things like that.  It's

6  a whole other level.  That city planner 5 you are

7  doing high level analysis of things.  You are doing

8  a lot of -- a lot more involved work, but you are

9  not doing a true what the city would consider a

10 supervise position where you are actually

11 supervising people in their personnel issues.

12      Q.    What about city planner 3 on paper, what

13 is that?

14      A.    That's kind of mid-level planner.  You

15 are doing again a lot of data gathering analysis for

16 land use issues, and, you know, it's been a long

17 time since I did that.  It's mid-level planning

18 position.

19      Q.    I suppose city planner 1 is the lowest

20 level data gathering and analysis?

21      A.    Yes.

22      Q.    It's the scut work of the Department of

23 Planning and Development if you will?

24      MR. AGUIAR:  I'm going to object the word scut.

1   BY THE WITNESS:

2        A.    It's an entry level planners position and

3   that's where I was, I was entering.  As that as a

4   coordinating planner 1 I did a tremendous amount.  I

5   created a whole survey system.  When I was working

6   on or working involved with the creation of the plan

7   manufacturing districts for the City of Chicago at

8   the time, which was very new.  I created a survey

9   system to go out and survey all of the industrial

10  properties and businesses in the City of Chicago.

11  And I did at least two-thirds of the city like that

12  on my own.  And was involved in the writing and

13  creation of the code orders of Industrial

14  Opportunity Reports and the original creation of the

15  Industrial Code Orders of the City.  I mean it was

16  an entry level position, but it was pretty involved

17  as well.

18       Q.    Well, you did all of this when you were a

19  city planner 1?

20       A.    That's as a city planner 1 that's how I

21  came in.

22       Q.    I thought you said coordinating planner

23  1?

24       A.    I did.  I meant city planner 1.

1    Q.    Okay.  What is the highest level of

2  education you have completed?

3    A.    Bachelor's of Science -- Bachelor's of

4  Science, BS degree, in geography with an emphasis in

5  urban economics from Northern Illinois University.

6    Q.    What year did you receive that degree?

7    A.    In 1987 or 1988.  1988. Sorry.  I'm

8  trying to remember.

9    Q.    Next question, Mr. Valenziano, is, do you

10 have any experience with firing ranges?  By which I

11 mean have you ever been to one?

12   MR. AGUIAR:  I'm going to object to the

13 question.  It's outside of the scope of 30(b)6.  How

14 is that relevant to the available locations of the

15 City to locate a gun range?

16   MR. SIGALE:  Are you asking me a question or

17 are you just objecting?

18   MR. AGUIAR:  I'm objecting.

19   MR. SIGALE:  I'm allowed to ask the witness

20 about his background.  This is a relevant background

21 question.  It's what the issue of the case is.  So

22 unless you are ordering him not to answer, I would

23 like an answer.

24   MR. AGUIAR:  I'm not going to instruct him not

1   to answer the question, but I'm going to be mindful

2   of the fact the topic here is the available

3   locations in the City to location a gun range.  My

4   objection is relevancy to your question.

5   BY THE WITNESS:

6        A.    What was the question?

7   BY MR. SIGALE:

8        Q.    Do you have any experience with firing

9   ranges?  The specific question I think was if you

10  have been to them.

11       A.    I have been to a gun range.

12       Q.    How long ago?

13       A.    Several years.

14       Q.    Indoor or outdoor?

15       A.    Outdoor.  Only outdoor.

16       Q.    In any of your either education in urban

17  development or any of the work experience, do you

18  have any experience or study with the structure of

19  firing ranges?

20       MR. AGUIAR:  Objection, relevance.  You may

21  answer.

22  BY THE WITNESS:

23       A.    I don't understand the question though.

24  Do I have experience with --

1  BY MR. SIGALE:

2      Q.    The structure of firing ranges, how they

3  are built.

4      A.    No.

5      Q.    What about the operation of one?

6      MR. AGUIAR:  Objection, relevance.  You may

7  answer.

8  BY THE WITNESS:

9      A.    Through my education or anything, no.

10  BY MR. SIGALE:

11      Q.    Work experience?

12      A.    No, I do not.

13      MR. AGUIAR:  Off the record.

14              (WHEREUPON, a discussion was had off

15              the record.)

16      MR. AGUIAR:  Back on the record.

17      MR. SIGALE:  Off for one second.

18              (WHEREUPON, a discussion was had off

19              the record.)

20      MR. SIGALE:  Let's go back on.

21  BY MR. SIGALE:

22      Q.    Mr. Valenziano, I don't mean to sound

23  glib if I do.  Okay.

24      A.    Okay.

1      Q.     You are here, to my understanding, to

2  talk about the topic available locations in the City

3  to open a range.  Range being firing range as

4  opposed to I don't know one with cows and ropes and

5  stuff I guess.  Is that your understanding of why

6  you are here today?

7      A.     Yes.

8      MR. AGUIAR: Again, the City is producing

9  Mr. Valenziano pursuant to topic 19 in your Rule

10  30(b)6 notice of deposition.

11      MR. SIGALE:  You have yours handy.

12      MR. AGUIAR:  I will read it.  Quote, The

13  available locations in the City to locate a gun

14  range, end quote, as opposed to a cow range as

15  Mr. Sigale pointed out earlier.

16  BY MR. SIGALE:

17      Q.     Let's go ahead and mark this.  I have --

18  this was provided to me by Mr. Aguiar I think

19  sometime yesterday evening.

20      MR. AGUIAR:  Sometime in the afternoon.

21      MR. SIGALE:  Afternoon.  I don't know what it

22  is.  We will mark it as Valenziano No. 1.

23                  (WHEREUPON, a certain document was

24                  marked Valenziano Deposition Exhibit

1          No. 1, for identification, as of

2          10/2/12.)

3     MR. AGUIAR:  For clarity of the record, the

4  document Mr. Sigale has marked as Exhibit No. 1 is

5  stamped City 708.

6  BY MR. SIGALE:

7     Q.    Mr. Valenziano, I have shown you what's

8  marked as Valenziano Deposition Exhibit No. 1.  Have

9  you seen this document before?

10     A.    Yes.

11     Q.    Did you create this document?

12     A.    Yes, I had it created.

13     Q.    You had it created.  Someone named Luis,

14  L-u-i-s, Monterrubio, two R's actually made it; is

15  that right?

16     A.    I instructed Luis Monterrubio to make the

17  map, and to -- as to how I wanted him -- what I

18  wanted him to show and what to do in creating the

19  map, yes.

20     Q.    Did you verify that he did what you

21  wanted him to do, that this Exhibit No. 1 is in fact

22  how you intended it to look?

23     A.    Yes, I did.

24     Q.    The bottom right corner, that box in the

1  bottom right corner says date saved, September 28,

2  2012.  That was last Friday if I'm not mistaken.

3      A.    Yes.

4      Q.    Is that when this was made?

5      A.    That's when it was finalized.

6      Q.    Were there stages then?  I mean like

7  drafts so to speak before the final version?

8      A.    The previous draft of this had the street

9  grid in that made it harder to read, so I had him

10 remove that.  It showed a bunch -- it would have

11 been a grid over this that made it harder to read.

12     Q.    I'm going to read to you from a document

13 that your attorney forwarded over to me also I guess

14 yesterday afternoon, same e-mail with some pdf

15 attachments.

16     MR. AGUIAR:  Mr. Sigale, may I interrupt.

17 Would it be easier if I made a copy so you can mark

18 it as an exhibit.

19     MR. SIGALE:  I don't think I need to.  Thank

20 you.  If it comes to that we will take a minute.

21 BY MR. SIGALE:

22     Q.    The -- what I'm looking at is some

23 supplemental interrogatory answers from your

24 attorney.  It references specifically I believe the

1  information in this map, and talks about the

2  requirements of section 17-5-207 of the Municipal

3  Code of Chicago.

4          Are you familiar with that code section?

5      A.   Yes.

6      Q.   Is that -- to help it along, is that the

7  code section that says the firing ranges have to be

8  in a manufacturing district?

9      A.   It's the use table for the manufacturing

10  districts and tells that they are allowed in the M1,

11  the M2, M3 zoning districts if reviewed and approved

12  as a special use.

13      Q.   I'm sorry.  What was the last half?

14      A.   If they are reviewed and approved through

15  the special use procedures that are set up in

16  section 17-13-0900.  Yes, that's the use table

17  section.

18      Q.   Then it references 4-151-120.  Is that

19  your -- to your understanding, is that the section

20  that says that a firing range has gone to be located

21  at least 500 feet from a variety of other uses?

22      A.   Yes.

23      Q.   Are you familiar with what those uses are

24  as you sit here or would you need to look at

```
 1   something?

 2        A.    I'm generally familiar with it, yes.

 3        Q.    Okay.

 4        MR. SIGALE:  Let's go off for a second.

 5                    (WHEREUPON, a certain document was

 6                    marked Valenziano Deposition Exhibit

 7                    No. 2, for identification, as of

 8                    10/2/12.)

 9   BY MR. SIGALE:

10        Q.    Valenziano Deposition Exhibit No. 2 is a

11   printout of a specific section, specific ordinance

12   of the Municipal Code of Chicago 4-151120.  It was

13   actually kindly provided by counsel.  Is this the

14   ordinance that you are -- you said you were

15   generally familiar with regarding the location

16   restrictions for a firing range?

17        A.    Yes.

18        Q.    In creating the map that's Deposition

19   Exhibit No. 1, you took into account, true, the

20   requirements of section 17-5-207, the use tables

21   that restricted firing ranges to an M1, M2, and M3?

22        A.    Yes.

23        Q.    You did or did not take into account the

24   requirements of 4-151-120?
```

1      A.    I did take the distance requirements of

2 that section into account.

3      Q.    How did you define children's activities

4 facility in 120C in using that to create this map,

5 this Exhibit 1?

6      MR. AGUIAR:   I'm going to object to the word

7 define.  You may answer.

8 BY THE WITNESS:

9      A.    Well, the Department of Business Affairs

10 and Consumer Protection keeps a record of licenses

11 for children's activity facilities, and so we had

12 that data to create a layer, data layer from.

13 BY MR. SIGALE:

14      Q.    I'm sorry.  Let me go back and ask you

15 that a little deeper.  It sounds like then you for

16 all of the things in 120C, you probably followed the

17 same procedure?

18      A.    No.  Some of the -- the City's GIS

19 system, their geographic system that we use the City

20 maintains, the Department of Information and

21 Technology maintains different layers across the

22 City.  There is a layer that shows schools, there is

23 a layer that shows places of worship.  There is a

24 layer for libraries, museums and hospitals or

1  different layers.  So that we just use the City's

2  official that's the -- our zoning layer is on that

3  same system.  So we use the City's official system

4  of data layers to come up with some of the

5  information.  Some of the information we had to

6  geo-code the liquor licenses.  For instance, a place

7  that premises license for retail sale of liquor.

8  Again, that came from information from the

9  Department of Business Affairs and Consumer

10 Protection.

11      Q.    Were you saying before that with these --

12 except for sounds like children's activities

13 facility and liquor license, at least with those two

14 you had to go to BACP, Bureau of --

15      A.    It's the Department of Business.

16      Q.    Business Affairs and Consumer Protection.

17      MR. AGUIAR:  Great acronym though.

18 BY MR. SIGALE:

19      Q.    But the others where they -- I want to be

20 clear.  I'm sorry.  The others that you were talking

21 about, schools, places of worship, for example, that

22 you said different layers were across the city.

23 Were all of these though centrally accessible at

24 the -- through the zoning department?

1        A.    Yes, in the fact that they -- we have the

2    department -- the bureau -- the Department of

3    Housing and Economic Development in general and

4    other departments have access to use these layers in

5    creating, I mean there is a street layer.  There is

6    a curb layer.  There is all different kinds of

7    layers of data, spatial data that are out there.

8    You can turn them on and turn them off.  Zoning we

9    maintain -- the bureau of planning and zoning

10   maintains the zoning layer.  So we update that and

11   tell the Department of Information and Technology,

12   you know, it's updated and ready to be released.

13   But it's all on this arcgis is the name of the

14   system.  Arcmap or arcgis.  It's the one system that

15   the City uses.  And the Department of Information

16   and Technology maintains all of those layers and

17   keeps them updated from the various departments that

18   provide that information so that you can do these

19   types of spatial analyses.

20        Q.    In other words, to find out where schools

21   are, you don't need to send somebody over to the

22   Department of Education to say, "Hey, give me a map

23   of where all of your schools are."  You are able to

24   access it using the bureau of -- using the bureau

1  computers or division of zoning computers by logging

2  into this gis map?

3      A.    Yes, you would log -- enter into this

4  system, and then you would just if you wanted to

5  find schools you would look for that school layer

6  and you can turn it on, turn it off so they light up

7  or they are turned off.

8      Q.    So you didn't need to go to 14 different

9  places, it was all accessible right from your

10 office?

11     A.    Correct.

12     Q.    Except for children's activity facility?

13     A.    Yes.

14     Q.    And liquor licenses?  Or I'm sorry.

15 Liquor sales licenses?

16     A.    Retail sales.

17     Q.    Any others that you needed to go to BACP

18 or somewhere else?

19     A.    I don't believe so.  I believe it was

20 that.  We had to I guess geo-code those, which is

21 again a process that the system that the arcgis

22 system does.  If you enter the data into, if you

23 tell it to geo-code it will replace the information

24 then on to a layer that you can then turn on and off

1  in your map.

2      Q.    Okay.  So was this -- this was also

3  something that was still accessible from your

4  office?

5      A.    I mean we had to request it from DBACP an

6  acronym for them.  We had to request the information

7  from their system, which is just a data -- which

8  would have the address of their application or

9  permit number or license numbers, things like that,

10 but then you take the address and it's a process

11 that's known as geo-coding that's done through the

12 arcgis mapping system that then you can create.  We

13 didn't have to go out and go to every site or

14 anything like that.  We had a database that was

15 given to us.  Then we take the database and we put

16 it -- map it.  The mapping system basically will map

17 it for you once you put it into the proper format

18 and geo-code.

19     Q.    So the -- when I say to you, how did you

20 define children's activity facility in doing your

21 map, the answer is well, you didn't, you -- it's

22 however BACP defined it, and then they sent you over

23 the geo-coded data.  I'm probably still saying that

24 wrong.  Is that essentially right?

1        MR. AGUIAR:  Objection to form.  You may

2    answer.

3    BY THE WITNESS:

4        A.     Essentially that's right.  If you are

5    licensed as a children's activity facility, then you

6    are in the database as having that type of license

7    which is defined term in the ordinance and so, yes,

8    DBACP would say as defined as that you need this

9    type of license, and then they gave us that

10   information.

11   BY MR. SIGALE:

12       Q.     Okay.  So going back to this -- I'm

13   sorry.  Well, okay.  Looking at this Exhibit 1.

14   This is accurate then as of the date it's made,

15   correct, to your knowledge?

16       A.     Yes, to my knowledge, yes.

17       Q.     If a license is granted, say I'm looking

18   over on this red area, kind of middle of the page

19   between 5th and 47th Street on the west edge?

20       A.     Yes.

21       Q.     Someone plops a liquor store in the

22   middle of it tomorrow, this map gets changed with

23   regard to the red potential area for a shooting

24   range facility; is that correct?

1      A.    Yes.

2      Q.    Is there a reason on this map -- you have

3  got to forgive me, I'm kind of digging a little bit

4  here just because this map is kind of new to me

5  here.  The topic really is available locations to

6  open a gun range.  Okay.  As of September 28 at

7  12:19 p.m., the answer to that question is the red

8  spots on this map; is that true?

9      A.    Yes.

10     Q.    Then there is all of this gray that

11  encompasses business, commercial business, other

12  manufacturing districts or other manufacturing

13  district areas, PMDs or planned manufacturing

14  districts, which you will agree firing ranges are

15  not allowed in, correct, PMDs?

16     A.    Correct.

17     Q.    Then downtown districts.  All of the

18  gray, firing ranges are not allowed; is that

19  correct?

20     A.    I guess that's not correct because the

21  red areas fall within the gray areas because the

22  gray are these different zoning districts.  So M

23  districts are represented in the gray.  So the red

24  areas just by the fact that they are only shooting

1  ranges are only allowed in -- that's why that

2  section 17-5-0702, that's why we reference that

3  because shooting ranges are only allowed in

4  manufacturing districts.

5          So some of these gray areas are

6  manufacturing districts.  It's like there is a red

7  layer on top of a gray area.  Do you understand what

8  I'm saying?

9     Q.    I understand that spatially speaking if I

10  can lift up the red I would see gray underneath.

11  Just looking at it one dimensionally where something

12  is either red or it's gray, in all of the gray areas

13  ranges are not allowed; is that true?

14     A.    Looking at it that way, yes, that's true.

15     Q.    How come you put the gray on the map at

16  all then?

17     A.    I wanted to see the -- I wanted to

18  compare the areas where you can do a shooting range,

19  a commercial shooting range, which is a business, to

20  the other areas of the city where you can do

21  business.  So the things that are not colored, the

22  white areas we will say are parks, they are

23  residential districts, it's primarily what they are

24  forest preserves and things like that where you

1    can't -- you are not going to do any type of

2    business.  I wanted to see, look at this, the red

3    areas is right based on the two sections of the

4    ordinance that tells you where you can do them

5    that's where the red is.  The gray is where you can

6    do business basically in the City of Chicago, where

7    you can operate a business in the City of Chicago.

8    That's why I was looking at it spatially also

9    because underneath that red you can do business in

10   the city, business or business use in the City of

11   Chicago.

12        Q.    If you weren't put in a red area someone

13   chose not to put a firing range, but instead chose

14   to put a liquor store or video game store or

15   whatever other kind of business then presumably it

16   might be allowed there as well?

17        A.    Correct.

18        Q.    I want to use as an example to ask you

19   about this little square strip somewhere around 75th

20   and Kedzie.  I think that's where it comes out to.

21   The red on the map looks like it's directly

22   adjacent.  I mean it's abutting a white area.

23        A.    Correct.

24        Q.    So for this specific spot, this little

1  75th and Kedzie part of the neighborhood, do you

2  know specifically what happens to be there, and if

3  so, why it's red there when it looks like it's white

4  right next to it?

5      MR. AGUIAR:  I'm going to object to the extent

6  this map is a greatly reduced size of the map.  It

7  could be if it's blown up to a larger size that this

8  might not look the way you are talking about.  It

9  looks like this on this size of a map.  I'm going to

10  object to the extent you are assuming something

11  about the existence of what exists in fact based

12  upon a much reduced version of the map.

13  BY MR. SIGALE:

14      Q.    Okay.  I appreciate the edification, but

15  it sounds like then the answer to my question would

16  be that the reason it looks like you can put a range

17  there when it looks like it's next to the white is

18  because this map isn't to scale or something.  Is

19  that in fact the answer because this map -- because

20  of the size of this map it might not be as it

21  appears?

22      A.    It's a represent -- yes, it's a

23  representation of where these areas are.  If you had

24  a blow up of that specific area and you would be

1    able to see, if we turned on the buffer layers that

2    we use, you would be able to see, you know, what's

3    adjacent to it.  I couldn't tell you what's adjacent

4    to it.

5         Q.    What's a buffer layer?

6         A.    Based off of the -- I guess I shouldn't

7    call it a buffer layer.  500 foot buffer from the

8    property lines of these places where you have to

9    maintain a 500 foot distance.

10        Q.    That's something you can do on your

11   computers when you are creating this map?

12        A.    That's -- you ask the map to put 500 foot

13   buffer on that layer.

14        Q.    So I can assume then without making an

15   ass of you and me that even though it looks like the

16   red here in the 75th and Kedzie spot looks like it's

17   directly abutting a white area, that because of the

18   way you programmed your computer that there is a 500

19   foot buffer in there even if the scale is too small

20   for me to see it?

21        A.    You could assume that, yes.

22        Q.    It looks like one would be able to just

23   to clarify in case it turns out it's a typo 3,386

24   acres within M districts where a range could be

1    built?  That's the red area that's represented; is

2    that accurate?

3         A.    Yes.

4         Q.    Out of a combined total in Chicago of

5    148,161 acres; is that correct?

6         A.    That's as correct as I know from the map,

7    yes.

8         Q.    Do you know what percentage of space in

9    the City that that leaves for firing ranges?

10        A.    I don't know based off of those two

11   numbers.  I don't know exactly.  I can tell you

12   though that the 3,386 acres excludes streets, alleys

13   and expressways.  Whereas this greater number

14   148,161 acres is just taking the City's boundary and

15   saying how much land is in that boundary.

16             So I don't know of a percentage of actual

17   usable land that that is offhand.  I did ask Luis to

18   run a number taking streets and alleys and

19   expressways out of the entire City's area.  But what

20   he's showing here is actually true and correct

21   because what that legend is representing is that

22   black line which runs around the entire edge of the

23   City and excludes these small areas, forest

24   preserves and a couple of cemeteries, couple of

1   suburbs, that the area contained within that black

2   line is 148 plus acres -- 148,000 plus acres.  I

3   don't know what that percentage is of that in total.

4       Q.    Do you know what percentage of the white

5   area is actually land versus streets, curbs?

6       A.    I do not know offhand.

7       Q.    Even in generalities do you?

8       A.    No.

9       Q.    Are there any other components in this

10  map other than complying with the land use table and

11  this 4-151120 or are those the only variables that

12  you plugged into the system to make this map?

13      A.    Those are the only variables that I

14  plugged in.  I mean I then excluded the streets and

15  alleys.  If a property were so small that it, you

16  know, where these buffers come in they are arcs.  If

17  you came down to where you had a small triangular

18  piece of property you couldn't even do something on,

19  I would exclude that from my calculation because

20  it's unusable.  What I tried to do is take out

21  unusable lands like streets and alleys, expressways,

22  and I guess, like I said, at the very edges maybe

23  where these arcs would come together and leave

24  little points of land that nobody could really

1    build, probably unbuildable.  Just to reduce the

2    overall area where gun ranges potentially could go

3    to something more accurate.

4        Q.    Okay.

5        A.    I tried to give you the most conservative

6    number.

7        Q.    Earlier you had agreed that if one of

8    these -- one of these other uses in 120 C tomorrow

9    wound up in, you know -- opened up in one of these

10   red areas, that that would affect the total amount

11   of red area, it would actually render at least for

12   that section of the map, it would render it

13   incorrect or no longer valid, correct, because the

14   data would change?

15       A.    The data would change and it would remove

16   some area, yes.

17       Q.    If you know, let's look again at this

18   area between 35th Street and Pershing Road on the

19   western border of the city there.  Let's say a

20   shooting range were to open in that spot, somewhere

21   in that red.  300 feet away a library wanted to open

22   or a museum wanted to open, okay, what happens then?

23   Does somebody go to the shooting range and say

24   sorry, somebody is opening up 250 feet away so you

1  are going to have to close down or do they tell the

2  other use -- other proposed use 250 feet away,

3  sorry, you can't open there because there is a

4  shooting range within 500 feet?

5      MR. AGUIAR:  I'm going to object as this being

6  outside of the scope of the 30(b)6 topic.  He's here

7  to talk about the available locations in the city to

8  open a gun range.  That's fair afield of that

9  question.  You are asking him to opine about what

10  business decision or whatever the City would make

11  about that scenario.  He is not prepared to testify

12  about that today.  That's outside of the topic.  I'm

13  going to instruct him not to answer that question.

14  I'm sorry.

15  BY MR. SIGALE:

16      Q.   Are you taking counsel's advice and

17  refusing to answer the question?

18      A.   Yes.

19      MR. SIGALE: I'm still really not sure I need to

20  actually certify a question, but I will do it anyway

21  just to note my objection to the objection.

22      MR. AGUIAR:  I would like to note for the

23  record Ms. Guiterro will be here on Friday and that

24  will be more appropriately asked of her which is

1   more in line with her deposition.

2       MR. SIGALE:  I might.  Mr. Valenziano is here

3   to talk about available locations.  And if he's only

4   here to talk about available locations as of

5   September 28, 2012 at 12:19 p.m., then I guess for

6   what that's worth then okay, we will talk about the

7   map.  But I think that I'm allowed to ask about

8   available locations as things that might affect

9   available locations tomorrow.

10      MR. AGUIAR:  I don't disagree about available

11  locations tomorrow.  Your question was a range

12  already exists, another type of a use wants to come

13  in, what's -- how does the City handle that

14  situation.  That doesn't go to whether the range

15  location itself is proper, which is what he's here

16  to testify about, not about what the City does in

17  terms of that scenario, that hypothetical.

18      MR. SIGALE:  I think he certainly has the

19  expertise.  I think it's within the topic.

20      MR. AGUIAR:  We will agree to disagree.

21      MR. SIGALE:  We will agree to disagree.

22      MR. AGUIAR:  Makes life so much easier.

23  BY MR. SIGALE:

24      Q.   It's been disclosed to me somewhere that

1  there are 1900 approximately parcels of property in

2  the City of Chicago that meet the requirements of

3  both section 17-5-207 the land use tables and

4  4-151-120, the location, the distance restrictions

5  in your Exhibit 2.  Did that number come from you,

6  the 1900 parcels?

7      A.    Yes.

8      Q.    It did.  Out of how many parcels total in

9  the City of Chicago?

10     A.    I don't know.

11     Q.    Do you have a ballpark?

12     A.    No, I do not.

13     Q.    How do I find that information out?  Is

14 that something you can find on your computer system

15 or do I need to ask somebody else in some other

16 department or something?

17     A.    I mean it's -- the parcel layer is on the

18 computer system, so that number is out there.  I was

19 looking at the number of parcels that fall in these

20 red areas though where you can do a shooting range

21 based on the two sections of municipal codes that

22 were cited.

23     Q.    It sounds like that with the punch of a

24 computer key, you could answer the question how many

1  parcels total are there in Chicago?

2      A.    I think it's more than a punch of a

3  computer key, but yes.

4      Q.    Using your computer system, that's

5  something that you can -- you can find out?

6      A.    Yes.

7      MR. SIGALE:  I would like to know the answer to

8  that.  Is that something that can be found out

9  before Ms. Guiterro comes here on Friday?

10     MR. AGUIAR:  You can make a proper request.  As

11 you know, Judge Denlow said the City is not required

12 to produce information to you that doesn't already

13 exist, doesn't have already generated.  We are not

14 required to create things for you.  Just we

15 create -- we do create them we have to provide them

16 to you.  If we haven't done it we don't have to

17 provide it to you.  Make a request and we will take

18 it under consideration.

19     MR. SIGALE:  I will say so I'm not leaving it

20 hanging, I don't think I'm asking anyone to create

21 anything.  I'm asking someone to punch in the

22 computer a couple computer keys and pull up a

23 number.  I think that's something -- I think that's

24 something that's already created in the computer

1    system and then it's just a matter of punching the

2    right couple keys to pull the number up.  But I will

3    make the request.

4         MR. AGUIAR:  Please put it in writing after the

5    deposition.  I just disagree with that, but again we

6    would agree to disagree.

7    BY MR. SIGALE:

8         Q.    Of the approximately 1900 total parcels

9    that are theoretically feasible to place a firing

10   range in Chicago, do you know as you sit here how

11   many are commercially available?

12        A.    No.

13        Q.    Do you know how many are -- strike that.

14              You had testified earlier when you were

15   doing the map that when you were eliminating the

16   spots from the red that you were -- if you looked at

17   a parcel, for example, and you decided well, this is

18   too small or comes right to a point or it's -- it's

19   not really feasible for anything to be there, that

20   you eliminated it, correct?

21        A.    Yes.

22        Q.    Okay.  Was there any other considerations

23   that you took in this -- in making this map and

24   making specifically the red spaces that any other

1   judgment calls or type of judgment calls that

2   something wasn't commercially practical to place a

3   range in so you didn't include it?

4        A.    Streets and alleys and expressways.  I

5   had those excluded.  There was one spot that was

6   down on the southeast side on south Chicago Avenue

7   where south Chicago and Anthony come together that

8   is a gray area so that it is zoned properly for it,

9   but it's -- if you look at that intersection where

10  if you take the buffers from the residential and the

11  liquor and everything else, it leaves you

12  essentially with street.  That's all you have left.

13       Q.    You have to build it in the middle of the

14  road?

15       A.    Exactly.  That's why I had streets and

16  alleys and expressways excluded because you are not

17  going to be building in the middle of the road

18  anywhere.  Those were the -- like the little edge

19  pieces that you discussed, the points that you just

20  had mentioned, the buffer areas that are in the

21  ordinance, the 500 foot distance areas and streets,

22  alleys and expressways are what I took into

23  consideration to reduce that number of potential

24  areas for a gun range to what's conservatively a

```
 1   more conservative estimate.
 2        Q.    But just so I'm clear here for the
 3   record.  No other type of considerations along the
 4   lines of nobody would ever build a gun range, would
 5   want to build a gun range there because this
 6   neighborhood is bad or this area nobody would want
 7   to travel to it or anything like that?
 8        A.    No.
 9        Q.    No such considerations?
10        MR. AGUIAR:  I want to object to the form.  You
11   may answer.
12   BY THE WITNESS:
13        A.    No other conversations like that in that
14   manner.
15        MR. SIGALE:  Can we go off the record for a
16   second.
17                   (WHEREUPON, a discussion was had off
18                    the record.)
19   BY MR. SIGALE:
20        Q.    Mr. Valenziano, give me one more minute.
21   Your counsel and I had a conversation while we were
22   off the record a minute ago.  Is it your
23   understanding that that's your understanding of why
24   you are here, how this map got created and what the
```

1  different colors on this map mean?

2      A.    Yes.   I was asked to determine based on

3  the two sections of the Municipal Code, which I

4  have cited, to determine where you can do --

5  establish a gun range within the City of Chicago.

6  That's what the red on there shows.

7      Q.    Other than the gis map and the layers and

8  whatnot and the judgment calls you described about

9  the little tiny point parcel points and the one

10 where they would have had to build it in the middle

11 of the street, that's the sum total of what went

12 into this map, this Exhibit 1?

13     A.    Yes.

14     Q.    I keep thinking that there's more I want

15 to ask you, but I think I'm going to have to save it

16 for Ms. Guiterro.  So I'm going to look at my notes.

17     MR. SIGALE:  Do you have any questions?

18     MR. AGUIAR:  Are you going to conclude at this

19 moment?

20     MR. SIGALE:  I'm going to take a minute to make

21 sure I have got nothing else.

22     MR. AGUIAR:  I will let you conclude before I

23 do anything.

24              (WHEREUPON, a recess was had.)

1    MR. SIGALE:  Let's go back on.

2  BY MR. SIGALE:

3    Q.    Mr. Valenziano, just to I guess follow up

4  on an earlier question.  The areas in red on this

5  map while they -- these are the areas that are

6  technically available to build a range given the

7  restrictions of the various ordinances, correct?

8    A.    Correct.

9    Q.    You did no independent investigation as

10 to whether or not any of the areas marked in red

11 would be commercially desirable to place a range; is

12 that true?

13    MR. AGUIAR:  Objection, asked and answered.

14 You may answer.

15 BY THE WITNESS:

16    A.    I did not -- yes, I didn't check to

17 see -- repeat the question.  I'm sorry.

18 BY MR. SIGALE:

19    Q.    I think I asked before whether he did

20 anything to eliminate if something was undesirable.

21 Now I'm asking if he did anything to see if they

22 were desirable.

23 BY MR. SIGALE:

24    Q.    Did you -- you did not do any independent

1  investigation as to whether any of the areas in red

2  would be commercially practical or desirable to

3  place a range; is that true?

4      A.    That's true.  I did not do that.

5      Q.    You have no knowledge or opinion beyond

6  the two ordinances that you plugged into the

7  computer system and the couple little exceptions you

8  made before that you explained before whether or not

9  for other reasons a firing range might be prohibited

10 in that location, in a certain location; is that

11 true?

12     MR. AGUIAR:  Objection as to form.  You may

13 answer.

14 BY THE WITNESS:

15     A.    I guess if you could simplify the

16 question.  You are saying -- simplify it, please.

17 BY MR. SIGALE:

18     Q.    Sure.  Sorry.  If there were another

19 reason why a firing range might not be permitted as

20 a certain location that's in red, you wouldn't know

21 about that as long as it complied with the two

22 ordinances that you were plugging in data for; is

23 that true?

24     A.    Yes.

```
 1        Q.    I think the last little line of

 2   questioning, Mr. Valenziano.  By way of background,

 3   recently maybe a week ago it feels like months by

 4   now, Ms. Crimble from the BACP was sitting where you

 5   are sitting, actually she was in that seat.  She was

 6   telling me how it's kind of the department's, you

 7   know, philosophy, so to speak, to help businesses,

 8   you know, get built and accommodate the license

 9   applications and whatnot, you know, to help, if we

10   can help a business, we the department can help a

11   business get its license and get going, that's what

12   we want to do.  So with that -- with that philosophy

13   in mind, that framework has been explained to me,

14   how static is this map?

15        MR. AGUIAR:  Objection as to form.  What do you

16   mean by static?

17   BY MR. SIGALE:

18        Q.    I mean we have made a point of saying

19   that, you know, it's good basically as of September

20   28 of 2012 at 12:19 p.m. But if a liquor store plops

21   down in the middle of one of these red areas, things

22   obviously change.  Red areas suddenly become gray.

23   So with, you know, new businesses coming into the

24   City and license applications coming in all of the
```

1  time presumably, I mean how long should this map be

2  good for?  How long is the shelf life, so to speak,

3  of this map?

4      MR. AGUIAR:  Objection as to form and calling

5  for hypothetical.  You may answer.

6  BY THE WITNESS:

7      A.    I mean I would -- I don't know what an

8  answer to that would be.  The converse is true as

9  well.  If a liquor store closes or one of the points

10 that we took the 500 foot distance changes, I mean

11 more can open up.  It can fluctuate.  It's like, you

12 know, the zoning map itself is not set in stone.

13 Yes, I don't know.  I don't know what the life -- I

14 couldn't give you a good estimate as to the life of

15 this area that's on this map today.

16     MR. SIGALE:  Okay.  Thank you, Mr. Valenziano.

17 Unless I have any follow ups to any of what your

18 counsel asks you I don't have anything further.

19     MR. AGUIAR:  I have one or two.

20                  EXAMINATION

21 BY MR. AGUIAR:

22     Q.    Mr. Valenziano, would you please look at

23 your Deposition Exhibit No. 1, which is the map, and

24 down on the bottom the legend area, a number is

1    provided for the City of Chicago boundary in acres.

2    A number is given in acres for the red area.  A

3    number is not given for the gray area on the map.

4    In creating this map did you actually calculate what

5    the acreage is of the area in gray?

6         A.    Yes, I did.

7         Q.    Do you know what that number is?

8         A.    It's roughly 32,000 acres.

9         Q.    Does that include or exclude streets,

10   alleys and the like?

11        A.    That would be excluding the streets and

12   alleys and the expressways.

13        MR. AGUIAR:  I have nothing further.

14        MR. SIGALE:  No, I'm fine.  Thank you.

15        MR. AGUIAR:  We reserve.

16             FURTHER DEPONENT SAITH NOT.

17

18

19

20

21

22

23

24

```
1   STATE OF ILLINOIS    )

2                        ) ss:

3   COUNTY OF  COOK      )

4

5

6

7           I, the undersigned, declare under penalty

8   of perjury that I have read the foregoing

9   transcript, and I have made and corrections,

10  additions, or deletions that I was desirous of

11  making; that the foregoing is a true and correct

12  transcript of my testimony contained therein.

13       EXECUTED this_____day of_____.

14  20_____, at_____,_____.

15                   (City)      (State)

16

17

18

19

20

21

22

23  _____

24       STEVEN VALENZIANO
```

```
 1              CERTIFICATE OF OFFICER

 2

 3

 4          I, DANA L. SHAPIRO CSR No. 84-3597, a

 5   Certified Shorthand Reporter of said state, do

 6   hereby certify:

 7          That previous to the commencement of the

 8   examination of the witness, the witness was duly

 9   sworn to testify the whole truth concerning the

10   matters herein;

11          That the foregoing deposition transcript

12   was reported stenographically by me, was thereafter

13   reduced to typewriting under my personal direction

14   and constitutes a true record of the testimony given

15   and the proceedings had;

16          That the said deposition was taken before

17   me at the time and place specified;

18          That I am not a relative or employee or

19   attorney or counsel, nor a relative or employee of

20   such attorney or counsel for any of the parties

21   hereto, nor interested directly or indirectly in the

22   outcome of this action.

23

24
```

1              IN WITNESS WHEREOF, I do hereunto set my

2    hand of office at Chicago, Illinois, this 7th day of

3    November, 2012.

4

5

6

7

8

9

10              DANA L. SHAPIRO, CSR No. 84-3597.

11

12

13

14

15

16

17

18

19

20

21

22

23    (WHEREUPON the witness reserved his signature.)

24

```
1                        I N D E X

2   STEVEN VALENZIANO                    EXAMINATION

3   BY MR. SIGALE                            3

4   BY MR. AGUIAR                            57

5

6

7                    E X H I B I T S

8   DEPOSITION EXHIBIT              MARKED FOR ID

9   Deposition Exhibit No. 1           27

10  Deposition Exhibit No. 2           31

11       (EXHIBITS RETAINED BY COUNSEL.)

12

13

14

15

16

17

18

19

20

21

22

23

24
```