1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4   RHONDA EZELL, JOSEPH I. BROWN,    )

5   et al.,                          )

6                  Plaintiffs,       )

7             vs.                    ) No. 10 CV 5135

8   CITY OF CHICAGO,                 )

9                  Defendant.        )

10        The 30(b)6 Deposition of City of Chicago,

11  by and through KEVIN SCHNOES, called for

12  examination, taken pursuant to the Federal Rules of

13  Civil Procedure of the United States District Courts

14  pertaining to the taking of depositions, taken

15  before DANA L. SHAPIRO, CSR No. 84-3597, a Notary

16  Public within and for the County of Cook, State of

17  Illinois, and a Certified Shorthand Reporter of said

18  state, at Suite 1230, 30 North LaSalle Street,

19  Chicago, Illinois, on the 2nd day of October, A.D.

20  2012, commencing at 10:40 a.m.

21             ATKINSON-BAKER, INC. COURT REPORTERS

22                  800-288-3376

23                  www.depo.com

24                  ABI File No. A609AC1

```
 1  PRESENT:

 2       LAW FIRM OF DAVID G. SIGALE, P.C.,

 3       (739 Roosevelt Road, Suite 304,

 4       Glen Ellyn, Illinois 60137,

 5       630-452-4547), by:

 6       MR. DAVID G. SIGALE,

 7           appeared on behalf of the Plaintiffs,

 8

 9       CORPORATION COUNSEL,

10       (30 North LaSalle Street, Suite 1230,

11       Chicago, Illinois 60602,

12       312-742-0260), by:

13       MS. REBECCA ALFERT HIRSCH,

14           appeared on behalf of the Defendant.

15

16

17

18

19

20

21

22

23

24  REPORTED BY:  DANA L. SHAPIRO, CSR No. 84-3597.
```

```
 1              (WHEREUPON, the witness was duly

 2              sworn.)

 3                    KEVIN SCHNOES,

 4   called as a witness herein, having been first duly

 5   sworn, was examined and testified as follows:

 6                    EXAMINATION

 7   BY MR. SIGALE:

 8        Q.    Please state your full name and spell

 9   your last name for the record, please.

10        A.    Kevin Schnoes, S-c-h-n-o-e-s.

11        MR. SIGALE:  Let the record reflect this is the

12   deposition of Kevin Schnoes taken pursuant to a

13   Federal Rule 30(b)6 notice and disclosure with the

14   date agreed upon by the parties.  It's taken

15   pursuant to all applicable rules of the Federal

16   Rules of Civil Procedure and any applicable local

17   rules of the Northern District of Illinois.

18   BY MR. SIGALE:

19        Q.    Mr. Schnoes, have you given a deposition

20   before?

21        A.    Yes.

22        Q.    When was the last time?

23        A.    It's been a few years.  I can't remember

24   the last one, but four or five years ago.
```

1  Q. Was that deposition in the context of

2 your employment with the City of Chicago or some

3 other context?

4  A. With the City.

5  Q. It's been a little while then so let me

6 give you a few rules for today, hopefully make this

7 go faster and smooth here.  Dana is here.  She is

8 taking down what everybody says.  She can only take

9 down out loud verbal responses.  She cannot take

10 down head shaking, hand gestures and maybe the

11 biggest culprit uh-huh or uh-huh.  Please keep

12 everything out loud and verbal.

13  A. Sure.

14  Q. It's also very difficult for Dana to take

15 down more than one person talking at a time.  There

16 is probably going to be times when you are going to

17 know what my question is even before I'm done asking

18 it.  But I ask in all circumstances you wait until

19 I'm done asking my question before you answer, and I

20 in turn will try to wait until you are done

21 answering before asking another question.  Okay?

22  A. Okay.

23  Q. If for any reason you do not understand a

24 question that I ask you, please let me know and I

```
 1   will rephrase it.  If you answer a question that I
 2   ask you here today, it's going to be presumed for
 3   purposes of the record that is being made that you
 4   understood the question I was asking and that that's
 5   the question you were answering.  So again if for
 6   any reason a question doesn't make sense, whatever,
 7   if you don't understand my question, let me know and
 8   I will rephrase it.  Okay?
 9        A.    Okay.
10        Q.    If you need to take a break, let me know.
11        A.    Sure.
12        Q.    Mr. Schnoes, you are employed by the City
13   of Chicago?
14        A.    Correct.
15        Q.    With the Department of Public Health?
16        A.    Correct.
17        Q.    What's the office address that you work
18   out of?
19        A.    333 South State Street, Suite 200.
20        Q.    Zip code over there?
21        A.    60604.
22        Q.    You are the assistant commissioner?
23        A.    Correct.
24        Q.    Who is the commissioner?
```

1      A.      Dr. Bechara Choucair.  I can spell it.

2      Q.      I need definitely.

3      A.      Her first name B-e-c-h-a-r-a, last name

4   C-h-o-u-c-a-i-r.

5      Q.      C-h-o-u --

6      A.      C-h-o-u-c-a-i-r.

7      Q.      I don't want to sound, you know,

8   disrespectful or anything during this.  Do you go by

9   commissioner or Mr. Schnoes or do you go by the

10  title?

11     A.      I usually go by Kevin, my first name.

12  I'm fine with that.

13     Q.      Okay.  You are here to talk about -- I

14  want to -- I'm going to talk about some

15  background -- strike all of that.

16          You probably are aware you are here to

17  talk about a specific topic.  I'm going to be asking

18  you some background questions, but I want to skip

19  ahead a second.  Are you familiar with the topic

20  that you are here to talk about?

21     A.      Yes.

22     Q.      I'm curious if you know why you are here

23  testifying about it and not say Dr. Choucair?  Is

24  the topic like a particular area of expertise of

1   yours or are you just you are available today and

2   Dr. Choucair isn't or something?

3       A.    It's my understanding to testify about

4   noise and enforcement of noise, and my unit is

5   responsible for enforcing the noise ordinance,

6   portions of the noise ordinance.

7       Q.    I'm sorry?

8       A.    Portions of the noise ordinance.

9       Q.    What unit are you in charge of?

10      A.    Permitting and inspections.

11      Q.    How many units are in the Department of

12  Public Health?

13      A.    I don't know the exact number.

14      Q.    Does that mean it's a lot?

15      A.    Correct, it's a lot.

16      Q.    The permitting and inspection unit of

17  which you are in charge handles noise issues?

18      A.    Correct.

19      Q.    How long have you been employed with the

20  City of Chicago?

21      A.    Just under 11 1/2 years.

22      Q.    All with the Department of Public Health?

23      A.    Formerly with the Department of

24  Environment.

1     Q.    When were you with the Department of

2 Environment?

3     A.    Through the end of 2011.  It was

4 dissolved after the end of 2011.

5     Q.    Did it get merged into DPH or something?

6     A.    The various parts of Department of

7 Environment went different directions.  My unit went

8 to the Health Department.

9     Q.    Just as of January of this year then?

10     A.    January 1, correct.

11     Q.    So the whole time then with -- you were

12 with the City of Chicago you were then with the

13 Department of Environment until December of last

14 year and then since then you have been over in DPH?

15     A.    Correct.

16     Q.    So if it's been 11 1/2 years.  So you

17 started about what 2001?

18     A.    Correct, 2001.

19     Q.    Walk me through, if you don't mind, what

20 was the first position that you held with the

21 Department of Environment.

22     A.    First position was director of planning,

23 research and development.

24     Q.    You had that title from 2001 to?

1      A.      2001 until 20 -- approximately 2005.

2      Q.      What was the job description as director

3 of research planning development?

4      A.      Basically in our solid waste unit at the

5 Department of Environment, I managed the tank, air

6 and hazardous materials sections.

7      Q.      Did that include noise issues as well?

8      A.      Correct, it did.

9      Q.      2005 --

10      A.      2005 I became assistant commissioner at

11 the Department of Environment basically doing the

12 same operations though.

13      Q.      You held that title until 2011 --

14      A.      Actually in 2009, I became deputy

15 commissioner, again conducting the same operations.

16 It was all within the same unit at the Department of

17 Environment.

18      Q.      I'm sorry.  Was research planning and

19 development a unit?

20      A.      Correct.  No, that's the title actually.

21 The unit it was in was actually over there it was

22 called permitting and enforcement.

23      Q.      So in 2009 when you became the deputy

24 commissioner, it was also of that permitting and

1   enforcement unit?

2        A.    Correct.

3        Q.    Same job description though essentially?

4        A.    Yes.

5        Q.    You were in that position for how long?

6        A.    Through the end of 2011.

7        Q.    With regard to your new position over at

8   the Department of Public Health, I did ask you if

9   they handled noise issues, and you answered that,

10  but otherwise is it pretty much the same job

11  description as you were doing for the last 11 such

12  years over at the Department of Environment?

13       A.    Pretty much the same.

14       Q.    Let me back up even a little bit further.

15  What's the highest level of education you have

16  completed?

17       A.    Master's.

18       Q.    Where did you receive that?

19       A.    Illinois Institute of Technology.

20       Q.    Any particular subject?

21       A.    Environmental management.

22       Q.    When did you receive that?

23       A.    2001.

24       Q.    Where did you complete your undergraduate

```
 1  work?
 2        A.    Illinois State.
 3        Q.    Was that a BA or BS?
 4        A.    BS.
 5        Q.    In what?
 6        A.    Geology.
 7        Q.    When did you receive that?
 8        A.    1988.
 9        Q.    Kind of begs the question I guess what
10  were you doing between 1988 and I guess 1999 or so,
11  right?
12        A.    After ISU I went to some grad school
13  after ISU at Northern Illinois University, but
14  decided to get a job then.
15        Q.    Okay.  Where were you employed?
16        A.    Prior to the City of Chicago I was at
17  Camp, Dresser and McKee.
18        Q.    Camp?
19        A.    Dresser.
20        Q.    Dresser?
21        A.    And McKee.  They are an environmental
22  consulting firm.
23        Q.    Where are they located?
24        A.    Here in Chicago.
```

1    Q.    How long did you work for them?

2    A.    For them I was just a year there, 2000 to

3  2001.

4    Q.    What did you do there?

5    A.    I was a project manager/geologist doing

6  environmental investigations.

7    Q.    You left there to take the -- strike

8  that.

9          It would appear then that you were

10 working there while you were receiving your

11 Master's?

12   A.    Yes, actually I was.  Yes.

13   Q.    Where were you employed before that?

14   A.    Company called Tetra Tech.

15   Q.    T-e-t-r-a, T-e-c-h?

16   A.    Correct.

17   Q.    Where are they at?

18   A.    In Chicago here.

19   Q.    They also --

20   A.    Environmental consulting, correct.

21   Q.    How long did you work there?

22   A.    From 1991 to 2000.

23   Q.    You left there to take the Camp Dresser

24 job?

1     A.     Yes.

2     Q.     Did you do basically the same type of

3  work?

4     A.     Correct, environmental consulting,

5  investigations.

6     Q.     I guess I might as well fill in that

7  little gap.

8     A.     That was the time at Northern.  Then the

9  little gap from '88 I did a couple years at grad

10  school at Northern Illinois University.

11     Q.     You are correct what you said earlier

12  that you are here to talk about noise.  Have you --

13  on a professional level you have been dealing with

14  noise issues ever since you started with the City?

15     A.     Correct.

16     Q.     What about during the pre-city time, Camp

17  Dresser, Tetra Tech did you have to deal with noise

18  issues then?

19     A.     Not really, no.

20     Q.     Was your -- the education that you

21  mentioned at Illinois State and IIT, were noise

22  issues part -- strike that.

23            Did you take any course work regarding

24  noise issues while you were?

1      A.      Yes, at IIT I did.

2      Q.      Can you describe?

3      A.      They were OSHA-type classes that involved

4  a number of OSHA related issues, noise being one of

5  them and a variety of other OSHA related issues.

6  That was an example of one of the classes there.

7      Q.      It was like one of a variety of OSHA type

8  issues you were learning about?

9      A.      Correct.

10     Q.      During the course of your employment with

11  the City, what percentage of your time would you say

12  you spend dealing with noise issues?

13     A.      It would vary, but on average I would say

14  5 to 10 percent of my time is spent on noise issues.

15     Q.      Have you had any, for lack of a better

16  phrase, continuing ed or anything like that or post

17  Master's education or anything like that

18  specifically regarding noise issues?

19     A.      We do an annual OSHA refresher training.

20  As part of that training we typically cover a

21  variety of issues, but one of them being noise.

22     Q.      In what context does it come up in those

23  classes?  How to measure it or safety or -- I will

24  let you tell me.

1    A.    Measurement, safety, preventative

2 measures, personal protective equipment where

3 employees can wear to minimize noise.  Things along

4 those lines.

5    Q.    In the course of your work, is there a

6 source material that you rely upon as whether it's

7 some sort of OSHA manual or anything else?

8    A.    I do have reference books from school and

9 such.  I can't think of them off the top of my head,

10 but certainly books and our ordinance actually too.

11    Q.    I'm sorry.  Were you -- did you say that

12 the reference books you were talking about were like

13 back from school?  Did I hear that right or wrong?

14    A.    Primarily back from school, yes.  Yes.

15    Q.    Then you referenced, excuse the pun, the

16 ordinance.  And anything else?

17    A.    Certainly information on the internet.

18    Q.    Any particular sites?

19    A.    None that I can think of at this point.

20 OSHA.  OSHA would certainly be one of them though.

21 In addition to the OSHA, the Code of Federal

22 Regulations is another one.

23    MR. SIGALE:  Let's mark this as Schnoes Exhibit

24 No. 1.

1          (WHEREUPON, a certain document was

2          marked Schnoes Deposition Exhibit

3          No. 1, for identification, as of

4          10/2/12.)

5   BY MR. SIGALE:

6      Q.    Mr. Schnoes, I'm going to represent to

7   you that Exhibit No. 1 that you have been handed is

8   just a copy of part of I guess it's chapter 13 of

9   the Municipal Code of Chicago.  Specifically it is

10  the section of that chapter that discusses shooting

11  ranges.

12     A.    Correct.

13     Q.    You are disclosed to talk about

14  13-96-1200B2.  That section is on page 4.  It looks

15  like you already have it.

16     A.    I'm there, yes.

17     Q.    Chapter -- strike that.

18          Line two of this I wish I thought to

19  bring this chapter, but hopefully you know it or at

20  least I will ask you.  Chapter 8-32 noise and

21  vibration control.  Is that the ordinance you were

22  referring to before when you mentioned the written

23  sources that you rely upon?

24     A.    Yes.

1    Q.    It says the maximum noise.  The next line

2  says, "The maximum noise emanating from the range

3  facility into contiguous areas shall not be more

4  than 55 decibels."  Do you see that there?

5    A.    Yes.

6    Q.    How is contiguous areas defined in this

7  ordinance -- in this section, if you know?

8    A.    Typically contiguous means the next

9  adjacent property or public way.

10    Q.    That measurement takes place what, at the

11  property line?

12    A.    Correct, typically at the property line.

13    Q.    What's typically used by your department

14  to measure that?

15    A.    We have calibrating sound meters.

16    Q.    Any particular brand or model number or

17  anything that you use?

18    A.    I can't think of it off the top of my

19  head at this point but there is.

20    Q.    So obviously then it's a big difference

21  regarding emanating noise whether or not the

22  shooting range, which is of course what we are

23  talking about today, is say in a strip mall type

24  location versus say the middle of a big empty field

1 that's privately owned, correct?

2     A.    Can you restate that again.

3     Q.    Sure.   The noise -- if the noise

4 requirement -- strike that.

5         If the noise measurement is taken at the

6 property line, then it wouldn't make a difference if

7 the shooting range or the firing lanes, the noise,

8 if the range is say in the middle of a strip mall

9 type location versus you have a big empty lot, an

10 acre, let's say, and the range is right smack dab in

11 the middle of it and it's privately owned?

12     A.    Correct.   There certainly could be issues

13 because you are farther from the source of the

14 noise.

15     Q.    How did the City arrive at 55 decibels as

16 the requirement?

17     A.    It was actually stated in the orders

18 before I even got there, so I don't know the exact

19 history on why it was decided upon 55.

20     Q.    Who would know the answer to that?

21     A.    I don't know.

22     MS. HIRSCH: I'm going to object to the extent

23 you are asking, you know, how the 55 was arrived at.

24 If you want to get at what the 55, what purpose that

1  serves or how it's measured, that's fine, but I mean

2  how it's arrived at is a matter of legislation.

3       MR. SIGALE:  It might be that the best

4  explanation of how the purpose is served might be

5  determined by someone who knows how it got arrived

6  at, so that's why I was asking.  I don't think it

7  matters since he doesn't know.

8       MS. HIRSCH:  But I think there may be a little

9  confusion in that he doesn't know how that actually

10 got into the ordinance, but I think if -- that he

11 does know why 55 is used in the code and everything.

12 So I'm trying to clarify.  I think it was the way

13 you phrased the question maybe.  Maybe we can help

14 just to extent I think he might have some

15 information.

16 BY MR. SIGALE:

17      Q.   Let's see if we can rephrase it and work

18 our way around to it.

19      MS. HIRSCH:  Okay.

20 BY MR. SIGALE:

21      Q.   Correct me if I'm wrong, but shooting

22 ranges are not the only place that you are going to

23 see 55 decibel requirement; is that true?

24      A.   That's true.

1    Q.    We could speculate I suppose in this case

2  as to whether 55 decibels exists here because it got

3  plugged in from the other parts of the noise

4  ordinance, whether someone, some alderman

5  specifically wanted it or just because it got cut

6  and paste, but -- and you wouldn't know the answer

7  to that question, correct?

8    A.    Correct.  The ordinance was written

9  before.

10    Q.    In fact, to Ms. Hirsch's point, I'm not

11 even asking if you know about the writing of the

12 ordinance.  What I am asking more is if you are

13 aware why in general then 55 would be used versus

14 any other number?

15    A.    Correct.  55 decibels is usually equated

16 to an average conversational level of noise.

17    Q.    Okay.  Mr. Schnoes, let me go back a

18 little bit.  You had said that about 5 to 10 percent

19 of your time is spent on noise issues?

20    A.    Correct.

21    Q.    What type of noise issues do you have to

22 confront in your position as assistant commissioner?

23    A.    Most of the noise issues that are

24 directed to my unit are typically complaint driven

1  through our 311 system.  It can pertain to a variety

2  of sources.  It could be as an example a resident

3  complaining about a large or not even large, but a

4  noise source adjacent to them, might be a commercial

5  or industrial source.  They are saying it's too

6  loud.  It's disturbing their peace after hours.  We

7  will go out there and take measurements typically in

8  that regard.

9        If it's a specific source that we can

10  identify, we are out there with our noise meters.

11  Conversely the ordinance is also written where you

12  don't have to take a noise reading you can do it if

13  it's above an average conversational level

14  subjective measure.

15      Q.    I don't mean to sound glib, but are you

16  saying that if a resident calls 311 at 2:00 in the

17  morning that the bar down the street seems really

18  loud and she can't sleep, that literally there is a

19  public health employee with a sound meter ready to

20  run out there and check?

21      A.    There is not actually.  The way the noise

22  ordinance is now in Chapter 832 that's now enforced

23  by the police department using the example you

24  mentioned, a bar, entertainment, that's now enforced

1   by the police department.

2       Q.    The police will go out there at 2:00 a.m.

3   with a sound meter?

4       MS. HIRSCH:  Objection, outside of the scope of

5   his --

6       MR. SIGALE:  I don't know it's outside.  That's

7   what I'm asking.

8   BY MR. SIGALE:

9       Q.    You said --

10      MS. HIRSCH:  If you know.

11  BY MR. SIGALE:

12      Q.    -- with a sound meter.  Again, I'm not

13  trying to be glib.  I understand that if the police

14  go out and it's really rowdy and the band is playing

15  loud and you can hear it down the block and there is

16  glass breaking and so on and so forth and you can

17  hear that down the block, then you are assuming it's

18  over a conversational level?

19      A.    Correct.

20      Q.    Is that pretty much when the police, if

21  you know, when the police get called at 2:00 a.m.

22  for noise complaints, is that pretty much the --

23  they are using the subjective standard?

24      A.    Correct.

1     Q.    You guys are like 9:00 to 5:00 or such

2   your department?

3     A.    7:00 to 5:00.

4     Q.    You are going out there -- strike that.

5           Give me an example of when you guys would

6   go out there with your noise meters.

7     A.    Correct.  When we take noise measurements

8   it's typically in relation to a mechanical

9   stationary source.  A good example is

10  air-conditioners.  Could be a commercial, industrial

11  or even a residential air-conditioner. We will go

12  out and take readings, but to actually document a

13  violation we have to take the readings after 8:00

14  p.m., which is when the noise ordinance hours take

15  effect.  Noise hours is from 8:00 p.m. through the

16  noise hours until 8:00 a.m.  Right now we will have

17  staff on from 7:00 to 5:00.  If we have a complaint

18  we need to follow up on we shift the hours of one of

19  our employees so they can be out there after 8:00

20  p.m. to take a noise measurement.

21    Q.    I'm sorry.  I want to make sure I'm clear

22  here.  The 55 decibel for businesses kicks in at

23  8:00 p.m.?

24    A.    Correct.

1      Q.    Is there any business -- type of business

2 that kicks in before 8:00 p.m.?

3      A.    No.

4      Q.    Mr. Schnoes, I'm going to represent to

5 you because I only have one --

6      MS. HIRSCH:  I --

7      MR. SIGALE:  I haven't asked a question.

8      MS. HIRSCH:  If you are going to be using a

9 document.

10     MR. SIGALE:  I'm not using a document.  I'm

11 reading the document.

12     MS. HIRSCH:  Okay.

13     MR. SIGALE:  I'm specifically reading it

14 because I don't have more than one copy of this

15 printout.

16 BY MR. SIGALE:

17     Q.    I'm going to represent to you that the

18 shooting range ordinance in general, and I'm

19 specifically referring to and I'm asking you to

20 assume this for purposes of this question because,

21 like I said, I only have one copy of this.  I don't

22 assume you have memorized the shooting range

23 ordinance.

24     A.    I have not.

1    Q.    Section 4151-090 requires that shooting

2  range facilities can only operate between 9:00 a.m.

3  and 8:00 p.m.

4    A.    Okay.

5    Q.    To the extent that this noise ordinance,

6  1396-1200 requires that the maximum noise emanating

7  from the shooting range facilities into contiguous

8  areas shall not be more than 55 decibels, and

9  assuming that that requirement pertains to operating

10  hours, would that therefore make a shooting range

11  the only business in the City of Chicago subject to

12  a noise restriction prior to 8:00 p.m.?

13    A.    No.  We don't have any restrictions prior

14  to 8:00 p.m.

15    Q.    Are you saying that then there is no

16  noise -- as long as a shooting range is open between

17  9:00 a.m. and 8:00 p.m., there is no noise

18  restriction on that shooting range?

19    A.    There is nothing in the noise ordinance

20  we would enforce to -- in that window of time that

21  you are talking about there.

22    Q.    Correct.  By the noise ordinance, you are

23  talking about chapter 8-32 of the Municipal Code of

24  Chicago?

1    A.    Correct.

2    Q.    I'm looking at B2 that -- I'm sorry.  I'm

3  looking at 13-96-1200B2 that says that the noise

4  shall be in compliance with chapter 8-32, but then

5  goes on to say that the maximum noise, and this

6  is -- I'm reading from here.  You tell me if I'm

7  reading it wrong.  "The maximum noise emanating from

8  the shooting range facility into contiguous areas

9  shall not be more than 55 decibels."  It appears to

10  me and I'm asking you because you appear not only to

11  be the expert on, that's kind of the cherry on the

12  sundae, you seem to be an expert on this topic, you

13  are the disclosed witness on this topic, you are the

14  one I have to ask this to.

15        I see a conflict there.  I see that it

16  has to be in compliance with the noise ordinance,

17  which appears not to apply to a business closing at

18  8:00 p.m. at all and then the next sentence implies

19  that nonetheless it is still not able to be more

20  than 55 decibels.  I'm asking if you can explain

21  that apparent conflict to me.

22    MS. HIRSCH:  Just want to object.  It calls for

23  any kind of legal conclusion.

24  BY THE WITNESS:

1    A.    What I would say the way I would enforce

2  this I would enforce the 55 decibels that's

3  mentioned in the gun ordinance can we call it, I

4  would enforce that after 8:00 p.m.

5    Q.    So pre-supposing that a shooting range

6  has to be closed at 8:00 p.m., then the noise

7  ordinance 1200B2 would never kick in?

8    A.    I would not see it kicking in if the guns

9  ordinance or the gun range stops at 8:00 p.m.

10    Q.    I want to ask you about one other thing

11  along this line.  I don't know.  I want you to

12  presume for purposes of this next question that

13  shooting ranges are limited to manufacturing or

14  industrial areas --

15    A.    Okay.

16    Q.    -- zoning wise.

17    A.    Okay.

18    Q.    What is the noise restriction on

19  businesses in manufacturing areas in general?

20    A.    As long as it's within the manufacturing

21  district, it's not enforced.  It's only enforced

22  once you get into the contiguous or outside of the

23  manufacturing district.

24    Q.    So in other words, a dynamite factory in

1   the middle of a manufacturing zone, that the noise

2   doesn't spread beyond the manufacturing zone has no

3   noise restrictions?

4        A.    Correct.

5        Q.    Whereas that same dynamite factory on the

6   end of a manufacturing zone where the noise bleeds

7   over into a commercial area, that might make you

8   guys go out with your meters to see if at the zoning

9   dividing line to see whether or not it crosses a

10  certain decibel level?

11       A.    That's a potential scenario we would

12  investigate.

13       Q.    Is that a 55 limit or is that something

14  else?

15       A.    It's typically a 55 limit. Again, ours

16  is focused on a mechanical stationary sources.

17  That's what we enforce right now. If a

18  manufacturing district has, and I will use the

19  air-conditioner, a big industrial air-conditioner in

20  it, we would not take any readings within the

21  manufacturing district. If we are at the zoning

22  boundary into a commercial, residential area and

23  took a reading there above 55 decibels, they

24  potentially could be in violation.

 1      Q.      Presumably --

 2      A.      They would only be in violation after

 3  8:00 p.m.

 4      Q.      Presumably what you just said, those two

 5  factors after 8:00 p.m. and only if it bleeds over

 6  to the boundary line of zoning manufacturing over to

 7  something else, those rules would presumably apply

 8  to shooting ranges, correct?  Assuming for purposes

 9  of my question that they are limited to

10  manufacturing districts?

11      A.      Correct.

12      Q.      Mr. Schnoes, I'm sorry if I'm -- feel

13  like I'm doing this half hazard.  I want to back up

14  a little bit.  Do you have any experience personally

15  with firing ranges?

16      MS. HIRSCH:  Objection, relevancy.

17  BY MR. SIGALE:

18      Q.      You can still answer.

19      A.      I have been to them, yes.

20      Q.      You have been to them?

21      A.      Yes.

22      Q.      When was the last time?

23      A.      It's been quite awhile, 15 years.

24      Q.      Indoor or outdoor?

1      A.     Indoor.

2      Q.     Where was that?

3      MS. HIRSCH:  Objection.  I won't keep doing it.

4  This whole line is objected to on relevancy for the

5  record.

6  BY THE WITNESS:

7      A.     Where I grew up.  Down towards Lockport,

8  Illinois is where I grew up.

9  BY MR. SIGALE:

10     Q.     Okay.  And not to beat the horse to

11 death, but is this something you went to once or is

12 this -- was this an activity back 15 years ago you

13 used to do periodically or regularly?

14     A.     It wasn't routinely, but, you know,

15 couple times a year maybe.

16     Q.     Do you have any experience or study with

17 the structure of firing ranges?

18     A.     No.

19     Q.     What about with the operation of a firing

20 range?

21     A.     No experience with it.

22     Q.     Any study or anything?

23     A.     No study either.

24     Q.     I'm not trying to be glib.  Other than

1  the fact that one goes there and one shoots

2  firearms, do you know anything about firing ranges?

3      A.    No.

4      Q.    This next question is kind of specific.

5  I know your attorney is going to be kind of watching

6  over me here with this one, but I'm going to ask you

7  about conversations regarding B2 that you have had.

8  I'm not asking you about conversations you had with

9  your attorney.  I'm not asking about conversations

10 that you might have had regarding the proposed --

11 the drafting.  We spoke earlier about, you know, do

12 you know how 55 came about.  You said you didn't.

13 I'm not asking if say any alderman contacted you

14 before the passage of the ordinance or anything like

15 that.  Okay?

16     A.    Okay.

17     Q.    Just for the record, this -- the date

18 actually that it was passed was July 6 of 2011.

19 Okay?

20     A.    Okay.

21     Q.    Have you had -- what you just talked

22 about with enforcement and whatnot and the

23 discussion we were having.  Have you had

24 conversations with anyone regarding the enforcement

1  of 1200B2?

2       A.    No.

3       Q.    Not Dr. --

4       A.    Choucair.

5       Q.    -- Choucair?  Not any sub-ordinance, if

6  you will, in your department, no conversations at

7  all?

8       A.    None to my knowledge, no.

9       Q.    Then again just to make sure I have asked

10  the question.  That would include conversations say

11  with people from other departments who might say

12  hey, people might be applying to try to open a

13  shooting range.  Now with this new law, you know, we

14  need to talk about noise issues with you, anything

15  like that?

16       A.    None.

17       Q.    You had mentioned before that 55 decibels

18  is equated to an average conversation level of

19  noise?

20       A.    Correct.

21       Q.    How is that measured?  How do you know

22  that?

23       A.    Through some of the reference material

24  that I mentioned previously.

1      Q.    Are you familiar then -- strike that.

2            Are you aware whether 55 decibels is or

3    is not harmful to the human ear?

4      MS. HIRSCH:   Objection.

5    BY THE WITNESS:

6      A.    Only based on what's in the reference

7    material.  I don't recall reading anything that says

8    it's harmful to the human ear.

9    BY MR. SIGALE:

10     Q.    Okay.  Are you familiar through any of

11   your reading or education or study what exposure at

12   what decibel is harmful to the human ear?

13     A.    I am.  But it's also based on duration of

14   exposure.  I would have to get site reference

15   material for that potential damage to a human ear or

16   something.  A jet engine at one minute could

17   certainly be more harmful than an air-conditioner

18   for five minutes.  It's based on the decibels and

19   the duration of the exposure.

20     Q.    You mentioned the industrial

21   air-conditioners.  What decibel are they at?

22     A.    I would have to reference it actually.  I

23   don't have it off the top of my head.

24     Q.    I'm assuming it's more than 55?

1    A.    It is more than 55.

2    Q.    Again, if I understand you correctly, it

3  would seem that would actually be a hard question to

4  answer because your decibel reading would be

5  affected by how far away from the air-conditioner

6  you were, correct?

7    A.    Correct.

8    Q.    So standing right next to it might be,

9  I'm making up a number because I have no idea, 100,

10  then you get 50 feet away and it's 55?

11    A.    Correct.

12    Q.    It's your understanding that limited

13  exposure is less harmful than prolonged exposure?

14    A.    There is certainly information to

15  indicate that, yes.

16    Q.    Are you familiar as you sit here with the

17  decibel level from a fired bullet from say -- from a

18  regular semi-automatic handgun?

19    A.    I do not.

20    Q.    Let me shift gears for a bit and move to

21  the bottom there of B2.  Actually the third line

22  from the bottom.  It says, "The shooting range shall

23  be provided with airborne and structure born sound

24  absorbing materials."

1            Do you see that?

2      A.    I do.

3      Q.    I want you to skip ahead a page to page 5

4  where you are subsection 7 where it says, "The

5  floor, ceilings and wall of every shooting range

6  shall be constructed of smooth non-porous

7  materials."

8      A.    I see that.

9      Q.    My question for, are you aware of any

10  smooth non-porous materials that are also airborne

11  and structure born sound absorbing materials?

12      A.    I am not.

13      Q.    Let me use -- go back to your example

14  with the air-conditioner, the industrial

15  air-conditioners.

16      A.    Okay.

17      Q.    I also assume that we have to be dealing

18  with a post 8:00 p.m. time frame?

19      A.    Correct.

20      Q.    We have to be dealing with either a

21  non-manufacturer -- an area of the city that's not

22  zone manufacturing or is zone manufacturing but is

23  really close to the border of some other zoned area?

24      A.    Correct.

1      Q.     Okay.

2      A.     Okay.

3      Q.     So your office -- your department I

4  should say gets a phone call that in the middle of a

5  commercial district there is an industrial sized

6  air-conditioner going and that thing is so loud, my

7  baby is crying all of the time.  I can't hear myself

8  think.  So you go out there with your meter and sure

9  enough it's more than 55 decibels?

10     A.     Okay.

11     Q.     What do you do at that point?

12     A.     If there is a potential violation, we can

13 issue a citation to the owner of the source, and

14 that's ultimately then heard at administrative

15 hearings.

16     Q.     Where if they are found responsible they

17 might be fined let's say?

18     A.     Correct, administrative hearings is a

19 fine.

20     Q.     Anything else or is that pretty much the

21 procedure?

22     A.     That's the procedure.  If the noise

23 source continues, we may go out there again and

24 issue another citation.  And ultimately if the

1 citation doesn't address the problem, if the owner

2 doesn't address the problem it continues, there is

3 other enforcement actions my unit can take.

4     Q.    Like what?

5     A.    We have what's called summary abatement

6 orders.  It's ordering the owner to abate the source

7 of the noise.

8     Q.    So eventually after a few citations, you

9 can tell them to shut off the air-conditioner?

10     A.    That's -- shut it off or as I mentioned

11 abate the noise.  They could maybe put up a shield

12 around it to deflect the noise.  That would be a

13 potential abatement practice.  Ultimately we are

14 looking to stop the source of the noise from the

15 potential -- the citizen that you just mentioned

16 that called.

17     Q.    So in such a circumstance, the business

18 owner says, "You know, look, it's the middle of

19 July.  I don't know what to do."

20     Is there anyone in your department that

21 can help them with what to do or is it more along

22 the lines of look, that's not -- that's not our

23 department.  Our department is to enforce this.  You

24 have got to go figure out what you are going to do

1  about it?

2      A.    Our procedure is we are the enforcer.  We

3  don't tell them how to abate the problem.  We tell

4  them they need to abate the problem.

5      Q.    So 1200B2 I want to stick to the sound,

6  the first half, the sound part, not the second half

7  with the soundproofing and stuff.

8      A.    Okay.

9      Q.    What is the government purpose or

10 purposes of restricting the shooting range to a 55

11 decibel emanation?

12     A.    It's ultimately to allow the residents of

13 Chicago to enjoy their homes, their peace time,

14 whatever you want to call it, and not be disturbed

15 by things that are outside of their control.

16     Q.    Anything else?

17     A.    No.

18     Q.    So I mean I'm -- I could just leave it

19 there.  I'm going to at least ask the question.  So

20 as far as the City sees it as represented by you the

21 disclosed witness on this topic, it's not a safety

22 issue or a hearing damage issue, it's a breach of

23 the peace, peaceful peace and quiet type issue?

24     A.    That's how we view it, yes.

1    Q.    Are you familiar with noise requirements

2  on firing ranges in other municipalities whether or

3  not they are outside, just outside of the Chicago

4  area or outside of the Chicago city limits or out of

5  state?  Are you familiar at all?

6    A.    No, I'm not.

7    Q.    The question that normally comes right

8  after what are the government purposes is do you

9  have any empirical evidence to support this

10 requirement for a governmental purpose.  It seems to

11 me, correct me if I'm wrong, that saying you want

12 residents to enjoy their homes and not be disturbed

13 and enjoy their peace and quiet isn't really an

14 empirical evidence type of issue, it seems

15 subjective.  Is that fair to say?

16    MS. HIRSCH: I'm going to object.  I think you

17 are mischaracterizing his previous answer as being

18 the basis for it, not just the rationale not what --

19 not the technical, the reliance on the technical

20 specifications in there and why they have it.  We

21 would have to read it back for me to be clear on

22 that.  I'm sorry.  Sorry.  Lost it.

23 BY THE WITNESS:

24    A.    Can you restate the question again.

1  BY MR. SIGALE:

2      Q.    Let's back up a step so I'm sure I'm

3  absolutely clear.

4      A.    Okay.

5      Q.    I asked you the governmental purpose of

6  the 55 decibel requirement.  You said, I'm

7  paraphrasing, it allows residents to enjoy their

8  homes in peace times and not be disturbed, correct?

9      A.    Correct.  Yes.

10     Q.    Then I asked you further, is there a

11 hearing damage type issue or is it merely breach of

12 the peace and peace and quiet issue, and you had

13 answered, no, it's not a hearing damage issue, it's

14 a peace and quiet and peaceful enjoyment issue is

15 how you see it, how you see it, correct?

16     A.    That's how I see it, yes.  That's how we

17 based our enforcement.

18     Q.    With other types of businesses?

19     A.    With other types of businesses and noise

20 sources, yes.

21     Q.    Are there empirical -- so I'm clear I

22 asked the question.  Are there any other

23 governmental purposes that you are aware of?

24     A.    Not to my knowledge.

1    Q.    So with that said, whether or not one

2  resident is bothered by noise from an adjacent

3  business or item --

4    A.    Yes.

5    Q.    -- is subjective, correct?  The next-door

6  neighbor might not be disturbed at all?

7    A.    I would agree.  We have had past

8  experiences like that.

9    Q.    Do you know -- for that purpose, do you

10  know I guess I'm asking this for -- 55 is used in

11  other contexts.  I'm more asking about those

12  contexts rather than -- rather than the shooting

13  range ordinance.  Are you aware of any empirical

14  evidence that at 55 -- or above 55 decibels, people

15  are more likely to get disturbed?

16    A.    I would say the higher the decibel

17  reading, the more likely it is that a person will be

18  disturbed.

19    Q.    That's more common sense than

20  subjectivity, correct?

21    A.    I'm not sure if I'm understanding your

22  question actually.  But the higher the decibel

23  reading, the more annoyed the person is typically.

24    Q.    Okay.  Just so I'm clear that I'm asking.

1  You are not -- when you are saying that to me, you

2  are not citing a book --

3       A.    I'm not.

4       Q.    -- or a study?

5       A.    I'm not citing a book or study.

6       Q.    That's the common sense, the louder

7  something is the more likely that somebody nearby

8  might be bothered by it?

9       A.    Correct.  Also based on past experience I

10  would say in enforcing our noise ordinance.

11       Q.    By that same token, you probably get

12  complaints about noise where you get out there and

13  it turns out it's really not that loud, but --

14       A.    Definitely.  We have gone on noise

15  complaints and have not documented a violation.

16  It's not been that loud to warrant an enforcement

17  action.

18       Q.    I want you to assume for purposes of this

19  next question, Mr. Schnoes.  Thank you.  Ms. Hirsch

20  might have some other questions for you, but I'm

21  about done.

22       A.    Okay.

23       Q.    If she asks you, I might have to follow

24  up.  That's how this all works.

1      A.    Okay.

2      Q.    I would say in general we are getting

3  close to done here.

4            I want you to assume for purposes of this

5  next question that notwithstanding what you have

6  told me about how you would interpret it because you

7  might not always be the assistant commissioner of

8  unit at the Department of Public Health, you could

9  move on to even bigger and better and somebody else

10 takes your spot.  Okay?

11     A.    Okay.

12     Q.    So I want you to assume for purposes of

13 this next question that notwithstanding what you

14 said before about that the noise enforcement doesn't

15 kick in until after 8:00 p.m., and notwithstanding

16 the fact that unless it bleeds over, that

17 manufacturing businesses are exempt from the noise

18 ordinance.  I want you to assume notwithstanding all

19 of that that this line in B2, "The maximum noise

20 emanating from the shooting range facility into

21 contiguous areas shall not be more than 55 decibels"

22 nonetheless is going -- is to be enforced.

23     A.    Okay.

24     Q.    Okay?  Not just after 8:00 p.m., not just

1    in a manufacturing -- not just if it's outside of a

2    manufacturing district, but 100 percent it applies?

3        A.    Okay.

4        Q.    Are you aware as you sit here of a

5    governmental purpose in making shooting ranges the

6    only business in the City of Chicago subject to a

7    noise ordinance prior to 8:00 p.m.?

8        A.    No.

9        Q.    Assuming that it's not bleeding over into

10    a non-manufacturing zoned area --

11        A.    Okay.

12        Q.    -- do you see any governmental purpose of

13    making shooting ranges the only business in a

14    manufacturing zone subject to a 55 decibel limit?

15        A.    No.

16        MR. SIGALE:   I don't have anything else.   If

17    you have questions.

18        MS. HIRSCH:   I don't have any questions.

19        MR. SIGALE:   You are all done.   Reserve or

20    waive?

21        MS. HIRSCH: We will reserve.

22             FURTHER DEPONENT SAITH NOT.

23

24

```
 1   STATE OF ILLINOIS   )
 2                       ) ss:
 3   COUNTY OF  COOK     )
 4
 5
 6
 7          I, the undersigned, declare under penalty
 8   of perjury that I have read the foregoing
 9   transcript, and I have made and corrections,
10   additions, or deletions that I was desirous of
11   making; that the foregoing is a true and correct
12   transcript of my testimony contained therein.
13        EXECUTED this_____day of_____.
14   20_____, at_____,_____.
15                    (City)        (State)
16
17
18
19
20
21
22
23   _____
24            KEVIN SCHNOES
```

```
 1                 CERTIFICATE OF OFFICER

 2

 3

 4          I, DANA L. SHAPIRO CSR No. 84-3597, a

 5  Certified Shorthand Reporter of said state, do

 6  hereby certify:

 7          That previous to the commencement of the

 8  examination of the witness, the witness was duly

 9  sworn to testify the whole truth concerning the

10  matters herein;

11          That the foregoing deposition transcript

12  was reported stenographically by me, was thereafter

13  reduced to typewriting under my personal direction

14  and constitutes a true record of the testimony given

15  and the proceedings had;

16          That the said deposition was taken before

17  me at the time and place specified;

18          That I am not a relative or employee or

19  attorney or counsel, nor a relative or employee of

20  such attorney or counsel for any of the parties

21  hereto, nor interested directly or indirectly in the

22  outcome of this action.

23

24
```

1          IN WITNESS WHEREOF, I do hereunto set my

2     hand of office at Chicago, Illinois, this 7th day of

3     November, 2012.

4

5

6

7

8

9

10          DANA L. SHAPIRO, CSR No. 84-3597.

11

12

13

14

15

16

17

18

19

20

21

22

23     (WHEREUPON the witness reserved his signature.)

24

```
 1                       I N D E X

 2   KEVIN SCHNOES                      EXAMINATION

 3   BY MR. SIGALE                          3

 4

 5

 6

 7                   E X H I B I T S

 8   DEPOSITION EXHIBIT              MARKED FOR ID

 9   Deposition Exhibit No. 1            16

10       (EXHIBITS RETAINED BY COUNSEL.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```