1          IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4

5   RHONDA EZELL, JOSEPH I. BROWN,    )

6   WILLIAM HESPEN, ACTION TARGET,    )

7   INC., SECOND AMENDMENT            )   No. 10 CV 5135

8   FOUNDATION, INC., and ILLINOIS    )

9   STATE RIFLE ASSOCIATION,          )

10                Plaintiffs,         )

11       vs.                          )

12  CITY OF CHICAGO,                  )

13                Defendant.          )

14

15          The deposition of PHILIP COOK, called for
    examination, taken pursuant to the Federal Rules of
16  Civil Procedure of the United States District Courts
    pertaining to the taking of depositions, taken
17  before NICOLE SCOLA, CSR No. 084-004524, a Notary
    Public within and for the County of DuPage, State of
18  Illinois, and a Certified Shorthand Reporter of said
    state, at Suite 1230, 30 North LaSalle Street,
19  Chicago, Illinois, on October 29, 2013, at 9:09 a.m.

20

21
    ATKINSON-BAKER, INC.
22  COURT REPORTERS
    (800)288-3376
23  www.depo.com
    FILE NO.: A70B7C2
24

```
 1    PRESENT:

 2

 3         LAW FIRM OF DAVID G. SIGALE, P.C.,

 4         (739 Roosevelt Road, Suite 304,

 5         Glen Ellyn, Illinois  60137,

 6         630-452-4547), by:

 7         MR. DAVID G. SIGALE,

 8              appeared on behalf of the Plaintiffs;

 9

10         CITY OF CHICAGO,

11         (30 North LaSalle Street, Suite 1230,

12         Chicago, Illinois  60602,

13         312-742-7034), by:

14         MS. REBECCA HIRSCH,

15              appeared on behalf of the Defendant.

16

17

18

19

20

21

22

23    REPORTED BY: NICOLE M. SCOLA, CSR, RPR,

24              C.S.R. Certificate No. 84-4524.
```

```
 1                    (WHEREUPON, the witness was duly

 2                    sworn.)

 3                         PHILIP COOK,

 4    called as a witness herein, having been first duly

 5    sworn, was examined and testified as follows:

 6                         EXAMINATION

 7    BY MR. SIGALE:

 8         Q.    Can you state your name and spell your

 9    last name for the record, please?

10         A.    Philip Cook, it's C-o-o-k.

11         MR. SIGALE:  Let the record reflect this is the

12    deposition of Philip Cook.

13    BY MR. SIGALE:

14         Q.    Philip is with one L, correct?

15         A.    It is.

16         MR. SIGALE:  It is taken pursuant to all

17    applicable rules of the federal Code of Civil

18    Procedure and the local rules of the Northern

19    District of Illinois.

20    BY MR. SIGALE:

21         Q.    Dr. Cook, is it?  Professor Cook?  What

22    do you prefer?

23         A.    Professor Cook is fine.

24         MS. HIRSCH:  Can I just say for the record that
```

1    Dr. Cook is here from out of town, and he has a

2    7 o'clock flight.  So we would just like to make

3    sure that he gets out in time to catch that flight.

4    It is the last flight out, so I'm hoping we can wrap

5    things up by 4:00, 4:30.

6        MR. SIGALE:  All right.  Well, that ruins my

7    long lunch plans, but...

8        MS. HIRSCH:  Hopefully, well before that,

9    David.

10   BY MR. SIGALE:

11       Q.    Professor Cook, have you given a

12   deposition before?

13       A.    I have.

14       Q.    Okay.  How many times have you been

15   deposed?

16       A.    I have been deposed three times:  Once

17   two years ago and then a couple of times quite a

18   long time ago.

19       Q.    Okay.  The one a couple years ago, was

20   that also representing the City of Chicago?

21       A.    It was, yes.

22       Q.    Or on behalf of the City of Chicago?

23       A.    Yeah.

24       Q.    That was in the case that was, at the

```
 1    time, called Benson vs. City of Chicago; is that

 2    correct?

 3         A.    Yeah.  It was the Illinois Association of

 4    Firearms Retailers.

 5         Q.    Oh, by the time you got deposed, the name

 6    had been changed already?

 7         A.    Yes.

 8         Q.    Okay.  And I'll just represent to you

 9    that that's actually the same lawsuit, but the

10    caption did get changed.

11              And that's -- the last time you were

12    deposed was that case on September 28th of 2011?

13         A.    Yes, that's right.

14         Q.    All right.  Well, let me give you a

15    couple ground rules, hopefully make this go a little

16    faster, a little smoother.  You might have heard

17    them a couple years ago, but I'll just go over them,

18    okay?

19         A.    Okay.

20         Q.    Nicole is here taking everything down

21    everybody says.  She can only take down out loud,

22    verbal responses.  She cannot take down things like

23    head gestures, head shaking, maybe the biggest

24    culprit, uh-huh and unh-unh.  So please keep all of
```

1   your responses out loud and verbal, okay?

2       A.    Okay.

3       Q.    Also, it is very difficult for Nicole to

4   take down more than one person talking at a time.

5   There will probably be times when you're going to

6   know what my question is even before I'm done asking

7   it, but I'm going to ask that in all circumstances,

8   you wait until I'm done asking the question before

9   you answer, and I, in turn, will try to wait until

10  you're done answering before asking my next

11  question, okay?

12      A.    Okay.

13      Q.    If for any reason you do not understand a

14  question that I'm asking you, please let me know and

15  I will rephrase it.  It is quite likely that I will

16  ask questions that don't make sense or the meaning

17  is unclear.  So if, indeed, that's the case -- I'm

18  not here to trick anybody, so if that's the case,

19  please let me know and I'll rephrase it.

20          If you do answer a question that I ask

21  you here today, it is going to be presumed for

22  purposes of the record that's being made that you

23  understood the question that I asked you and that

24  that is the question you're answering.

```
 1              So, again, if it doesn't make sense or

 2    whatever, please let me know, okay?

 3         A.    Okay.

 4         Q.    And if you need to take a break, let me

 5    know.

 6         A.    Okay.

 7         Q.    All right.  In the interest of trying to

 8    move this a little bit quicker, I was given by

 9    counsel for the City a 31-page curriculum vitae or

10    CV dated September 19, 2013.

11              Are you aware of the document?

12         A.    Yes.

13         Q.    Has anything changed between September 19

14    and today's date, regarding your CV?

15         A.    Nothing very important.

16         Q.    Okay.  You are the ITT/Terry Sanford,

17    S-a-n-f-o-r-d, professor of public policy studies at

18    Duke University?

19         A.    Yes.  ITT/Sanford professor of public

20    policy at Duke University.

21         Q.    Okay.  You received your bachelor of arts

22    at Michigan in '68 and a Ph.D. in economics at

23    Berkeley in '73, correct?

24         A.    Yes.
```

1   Q. Any education specifically regarding

2 firearms?

3   A. During that period of time?  I took no

4 coursework on firearms.

5   Q. And since then?

6   A. No.  I haven't taken any coursework or

7 training programs on the use of firearms or the

8 design of firearms.

9   Q. Okay.  Same question but with regard to

10 firing ranges?

11   MS. HIRSCH:  I'd just like to object as vague

12 and ambiguous.

13 BY MR. SIGALE:

14   Q. If you understand the question, again.

15   A. I've been to a firing range once with an

16 instructor, and that's it, in terms of anything like

17 formal instruction.

18   Q. How long ago did you visit a firing

19 range?

20   A. It was perhaps 25 years ago.

21   Q. Okay.  But that one visit, it sounds like

22 that was -- that the purpose of that one visit was

23 actually just to -- to shoot a few rounds with a

24 firearm; is that correct?

1      A.      That's right.

2      Q.      Okay.  Same questions, education or

3   training-wise, with regard to gun sales?

4      MS. HIRSCH:  Objection, vague and ambiguous,

5   overbroad.

6   BY MR. SIGALE:

7      Q.      If you understand the question.

8      A.      I'm sorry, I don't understand what you

9   mean.

10      Q.      Okay.

11      A.      What kind of course work might you have

12   in mind?

13      Q.      Oh, I was really asking the question as

14   broadly as possible.

15              Any training or education with regard to

16   the operation -- operation of a gun store?

17      A.      Not about the operation of a gun store,

18   no.

19      Q.      Okay.  Any education or training with

20   regard to the -- for lack of a better word, the --

21   the ownership or running of a gun store from a

22   business perspective, not the nuts and bolts

23   operating it, but from a business model perspective?

24      A.      No.  I've had no training like that.

1      Q.    Now, obviously, you're -- Professor Cook,

2  you're -- you've been disclosed in this case, and

3  the main reason you're here today is to talk about

4  firearms, but is that -- is that your main topic of

5  expertise?

6      MS. HIRSCH:  Objection, vague, ambiguous,

7  overbroad.  Firearms expertise?  I don't even think

8  he's been produced as a firearms expert -- as a

9  firearms expertise.  I don't even know what you're

10  asking.

11  BY MR. SIGALE:

12     Q.    Well, you're being -- you're being

13  disclosed specifically to discuss -- well, I'll

14  read -- let's just do this:  This is Exhibit 1.

15              (WHEREUPON, a certain document was

16              marked Cook Deposition Exhibit

17              No. 1, for identification, as of

18              10/29/2013.)

19  BY MR. SIGALE:

20     Q.    Professor, you've been handed Cook

21  Deposition Exhibit 1.

22          Do you recognize the document?

23     A.    Yes, I do.

24     Q.    Okay.  And this is your report that you

1    submitted to the City of Chicago in this case and

2    which was -- I'll represent to you was subsequently

3    submitted to me, of course, or how would I have it.

4           So that's correct, this is your report

5    from -- that you submitted in this case?

6        A.    Yes, I believe so.

7        Q.    And on page 11, that would be your

8    signature or a photocopy of your signature, correct?

9        A.    Exactly.

10       Q.    Okay.  So if I'm looking to page 1 of

11   this report, section Roman III:  "I have been asked

12   to opine on whether the restrictions on firearms

13   sales in the City of Chicago's Municipal Code,

14   8-20-100, serve the goal of enhancing public

15   safety."

16          To your understanding, does that

17   accurately reflect what you were asked to do in this

18   case?

19       A.    Yes, it does.

20       Q.    Okay.  To your understanding, has --

21   since you wrote this Exhibit 1 -- I'm sorry, when

22   did you write this Exhibit 1, if you know?

23       A.    I don't know exactly when I submitted it.

24   Did I --

1    MS. HIRSCH:  For purposes of helping this

2    along, it was September 27.

3    MR. SIGALE:  That might be the date that

4    Professor Cook gave it to you; is that what you're

5    saying?

6    MS. HIRSCH:  (No audible response.)

7    BY MR. SIGALE:

8    Q.    Was this written contemporaneously with

9    when you submitted it to the City, or has -- was --

10   was all or part of this written previously?

11   A.    This testimony is similar to the

12   testimony that I gave in the previous case that --

13   the Illinois Association of Firearms Retailers.  It

14   has been updated, and it was edited to reflect the

15   facts of the current case.

16   Q.    Okay.  Okay.  Are there any -- other than

17   updating, are there any significant changes

18   between -- can -- if I call it the Retailers case,

19   can we just -- is that a -- is that a shorthand that

20   we'll all know what we're talking about?

21   A.    That's fine.

22   Q.    Okay.  Good.  Since the report in the --

23   you wrote the report in the Retailers case, you just

24   said a second ago you updated it for -- for this

1    case, were there any significant changes between the

2    Retailers report and this report in terms of -- in

3    terms of your conclusions?

4         MS. HIRSCH:  Just object on relevance.

5    BY THE WITNESS:

6         A.    So this report omits parts that were

7    included in the previous report that had especially

8    to do with the carrying of guns.  And there is a --

9    some new material, but the basic conclusions, to the

10   extent that they overlap, are the same.

11   BY MR. SIGALE:

12        Q.    Okay.  Looking at the second paragraph on

13   page 1 of the report, the part that says:  "I am

14   being compensated at a rate."  That paragraph?

15        A.    Yes.

16        Q.    Okay.  I don't care about that.  I assume

17   that you don't work for free.

18             But I want to go to the next paragraph --

19   or next sentence:  "I have testified as an expert in

20   three other cases in the last four years:"  The

21   Woolard v. Sheridan case, which is out in Maryland;

22   Kachalsky v. Cacace, C-a-c-a-c-e, out in New York;

23   and then, of course, the Retailer's case.

24             What did you testify to in Woolard?  What

1   was the opinion that you were offering in the

2   Woolard case?

3        MS. HIRSCH:  Objection, relevance.

4   BY THE WITNESS:

5        A.    So I think the shorthand answer is that

6   in both the Maryland case and the New York case, my

7   testimony was similar to what you're seeing here, in

8   terms of explaining the damage that guns do and what

9   role they play in violence, and also discussing the

10  importance of gun markets and the availability of

11  guns in determining gun use in crime.

12  BY MR. SIGALE:

13       Q.    Okay.  Well, let's -- I appreciate that

14  that was the shorthand version or the summary.

15            But Woolard and Kachalsky, they both

16  dealt with may issue concealed carry permits,

17  correct?

18       MS. HIRSCH:  Objection, just to the extent

19  you're asking him about legal conclusions or legal

20  theories.

21       MR. SIGALE:  Well, he opined in the case.  I'm

22  just asking if he knows what the cases were about.

23  BY THE WITNESS:

24       A.    That -- I'm sorry, I did not review my

1   testimony before coming here, so that sounds right,

2   but I am not positive.

3   BY MR. SIGALE:

4       Q.    You said that you testified in those

5   cases as to the -- the damage that guns do in those

6   cases.  You're referring to, by criminals?

7       A.    That's right.  The social costs of gun

8   violence, why the type of weapon matters when it's

9   in an assault or a robbery, for example.  Very much

10  the same material that is in the report before you.

11      Q.    Okay.  And that was basically the gun

12  versus a knife versus -- or a lead pipe discussion;

13  is that basically right?

14      A.    Yeah.  That is part of it, and then,

15  also, trying to understand the social costs that are

16  associated.

17      Q.    Okay.  And we're going to talk more in

18  depth about that while we're here today, but the --

19  I think in sum, you're talking about social costs,

20  as you described it, in terms of medical costs and

21  fear of violence and things like that, correct?

22      A.    Those are both included as part of social

23  costs.

24      Q.    Okay.

1    A.    Yes.

2    Q.    And I'm sorry, I could ask Nicole to go

3    back and answer it, but it's probably easier if you

4    just indulge me.

5          You said you testified in Woolard and

6    Kachalsky regarding the damage that guns do, as you

7    just described or we just described in sum.  And

8    there was another main topic that you said you

9    testified about in those cases.

10   A.    Well, I think the other main topic is the

11   availability of guns.  That also -- and how that

12   influences gun use in crime, so that that also is a

13   topic in this report.

14   Q.    Okay.  Okay.  So I could ask you about it

15   now, but it will be the same thing that we're going

16   to talk about more in depth if I'm going through

17   this report; is that right?

18   A.    Yes.  I think that's fair to say.

19   Q.    All right.  You -- and you -- if I'm

20   moving down to Roman II on this page 1, it says:

21   "The opinions that I articulate in this report are

22   based on my review of numerous studies published in

23   scientific peer-reviewed journals and books."  And

24   you reviewed the plaintiff's second amended

 1    complaint in this case.

 2            Is any of the opinions that you're going

 3    to have today based on your own research?

 4        A.    Yes, it is.

 5        Q.    Okay.  Is there a reason that that's not

 6    stated here in this Roman number II?

 7        A.    No particular reason.  But when I say

 8    "numerous studies published in scientific

 9    peer-reviewed journals and books," I am including my

10    own.

11        Q.    Okay.  Now, the next sentence -- I'm

12    sorry, the last sentence of this paragraph says:  "I

13    anticipate reviewing additional materials as they

14    become relevant and available and reserve the right

15    to amend my report, opinion, and testimony as

16    necessary."

17            Since you wrote this report and submitted

18    it and your counsel says that that was at the --

19    towards the end of September, so about a month ago,

20    have you reviewed any other additional materials

21    that you deem relevant and available?

22        A.    I'm sorry to be slow to respond on this.

23    I am in the middle of writing a book on gun

24    violence, and so I've been reading a great many

1    articles.  But I don't believe that there is

2    anything that has come up that would influence or

3    elaborate on the testimony that I gave here.

4         Q.    So lots of other material that's become

5    available, but none that's relevant for today's

6    discussion?

7         A.    I -- yes.  I think that's correct.

8         Q.    Okay.  And it says -- the last part of

9    that last sentence says:  "And reserve the right to

10   amend my report, opinion, and testimony as

11   necessary."

12            As you sit here today -- and if you need

13   to look through your report before we -- before you

14   answer the question, that's fine.

15            Are you -- since you wrote this report or

16   submitted it a month ago, has your report or opinion

17   been amended at all?

18        A.    No.  I would just stay with the current

19   report.

20        Q.    All right.  Professor Cook, are you an

21   attorney at all?

22        A.    No.

23        Q.    Do you have any legal training?

24        A.    No.

1    Q.    Okay.  Well, I'm going to move down now

2   to this Roman III.  And I guess start going through

3   the opinions that you're being offered to present

4   one at a time.

5         The second paragraph of Roman III:  "It

6   is my opinion that this ban on the sale of firearms

7   within the City" -- City of Chicago, correct?

8    A.    Yes.

9    Q.    All right.  And I assume whenever through

10  this report that you're saying "City," that's

11  shorthand for City of Chicago, correct?

12   A.    Yes.

13   Q.    -- "plausibly serves to promote public

14  safety, and in particular to reduce gun use in

15  violence."

16        Forgive me if this sounds elementary, but

17  it promotes public safety how?

18   A.    By public safety in this case, I am

19  referring to the -- in the first place, to the

20  injuries caused by gunfire, and that would include

21  both assaults and also self-inflicted wounds, as

22  well as accidents.

23        Beyond that, there is also an

24  understanding of public safety to include crime and

1    the use of guns to threaten, in a -- in the course

2    of a robbery or an aggravated assault, for example.

3    And that would also be included under this

4    understanding of public safety.

5        Q.    Okay.

6        A.    And then I would take a third step and

7    also want to include a general sense of security

8    that people have in living in their neighborhood.

9    And something that might be affected, for example,

10   by the sound of gunfire at night or the concern

11   about stray bullets, that could lead them to want to

12   keep their children inside, for example.

13       Q.    How many times have you been to Chicago?

14   Is this the first time?  A hundred?

15       MS. HIRSCH:  Objection, relevance.

16   BY THE WITNESS:

17       A.    I don't know.  Probably 30 times.

18   BY MR. SIGALE:

19       Q.    Okay.  Typically -- typically, say, for

20   work conferences or sightseeing or for research?

21       A.    It is almost always work one way or

22   another, either research or a conference.

23       Q.    Well, okay.  But that's -- of the 30, how

24   many were for work as, like, conferences and the

```
 1   like and how many were for research?

 2        MS. HIRSCH:  I'm just -- same objection,

 3   relevance.

 4   BY THE WITNESS:

 5        A.   Well, just for the sake of an estimate,

 6   it might be half and half.

 7   BY MR. SIGALE:

 8        Q.   Okay.  So you've come here about 15 times

 9   to do research?

10        MS. HIRSCH:  Objection, mischaracterizes his --

11        MR. SIGALE:  Well, he said about half -- I --

12   I -- 15 is half of 30, so...

13        MS. HIRSCH:  He said "for the sake of" --

14   BY MR. SIGALE:

15        Q.   Well, okay.  So for the sake of

16   estimating, about 15 times for research?

17        A.   That's the best estimate I can give

18   you --

19        Q.   Fair enough.

20        A.   -- right now.

21        Q.   When was the last time you were in the

22   City for research purposes?

23        MS. HIRSCH:  Same objection, relevance.

24   BY THE WITNESS:
```

1    A.    I'm sorry, I would have trouble giving

2  you anything accurate on that.  I travel every other

3  week somewhere.  I -- I can't -- I can't tell you

4  the specifics --

5  BY MR. SIGALE:

6    Q.    Fair enough.  I'm not asking you the --

7  for the -- I mean, if you happen to know it off the

8  top of your head, that would be great, but was it

9  within the last five years?

10    A.    Certainly in the last five years, yeah.

11    Q.    Okay.

12    A.    And in the last year.

13    Q.    In the last year, you were here for

14  research?

15    A.    And by "research," just to be clear, I

16  mean working with other scholars and collaborating

17  with them.  So this is not doing research on Chicago

18  but with people who live in Chicago.

19    Q.    Okay.  Of the approximately 15 times that

20  you've been in Chicago for research with the proviso

21  that that was an estimate, how many of those times

22  were you here for research where the subject of the

23  research was Chicago itself or the people of

24  Chicago?

1    MS. HIRSCH:  Objection, overbroad, lack of

2  relevance.

3  BY THE WITNESS:

4    A.    Let's say three times.

5  BY MR. SIGALE:

6    Q.    And as best as you can narrow down, when

7  was the last time?

8    A.    On a Chicago-specific project, it would

9  have been 2004.

10    Q.    And what was the purpose -- what was the

11  subject of the -- strike that.

12        What was the topic of the research?

13    A.    The topic was -- the research that led to

14  the publication of the article in The Economic

15  Journal published in 2007.  So it was an opportunity

16  to meet with Sudhir Venkatesh and to talk to him

17  about our project but also to go into the field.

18    Q.    Okay.  Now, Mr. Venkatesh, he wrote a

19  book, right, about how he spent a year talking to

20  gang members on the South Side, same gentleman?

21    A.    Yes.  He's written a number of books, and

22  at the time, he was writing a book on the

23  underground economy.

24    Q.    Okay.  So you said you came here in

```
 1   2004...

 2         A.    Again, my best guess.

 3         Q.    Approximate.

 4               So close to a decade ago?

 5         A.    Uh-huh.

 6         Q.    You came here, you said you went -- you

 7   came here to talk to Mr. Venkatesh, but you also

 8   said about going in the field.

 9               Did you go into the field that trip?

10         A.    Yes.  We -- he introduced us to one of

11   the sources that he was working with in the

12   ethnographic research that he was doing, and he

13   showed us around the neighborhoods that he was

14   working in.

15         Q.    And if you recall, was that on the

16   South Side?

17         A.    It was, yes.

18         Q.    What about the time before that, when did

19   you come here to do research when the subject was

20   Chicago or the people of Chicago?  You said there

21   were three times.

22         A.    Well, that's -- again, my best guess,

23   that project had a number of different pieces to it,

24   and I believe we met a couple of other times to talk
```

1    about it.  We had the -- I was with -- working with

2    a coauthor Jens Ludwig during that time who lives

3    here.

4         Q.    Jens Ludwig is here, too?

5         A.    Yes.  He's -- his current appointment is

6    at the University of Chicago.

7         Q.    Okay.  But both of those other visits

8    were also for this project, this 2007 -- what became

9    the 2007 Economic Journal article?

10        A.    Yes.

11        Q.    Okay.  In 2004, roughly, when you came

12   here for the research you described, to your

13   knowledge, did Chicago have a home handgun ban in

14   place?

15        A.    It had a partial ban in place.  It goes

16   back to 1992.

17        Q.    And the partial part you're referring to

18   is about a grandfather clause; is that correct?

19        A.    Yes.

20        Q.    Or if your --

21        A.    And law enforcement.

22        Q.    Law enforcement.

23        A.    Uh-huh.

24        Q.    But for -- you're aware that for anybody

1    else that didn't meet one of those exceptions, there

2    was a home handgun ban in place in Chicago in 2004,

3    correct?

4         A.    Yes.

5         Q.    Have you -- strike that.

6               Are you aware that that home handgun ban

7    has since ended?

8         A.    Yes.

9         Q.    Do you know when that was?

10        A.    2010.

11        Q.    Have you come out here for research since

12   then?

13        A.    No, I haven't.

14        Q.    Okay.

15        A.    I'm sorry, let me correct that.  I have

16   not come here for research on -- specifically on

17   Chicago.

18        Q.    Thank you.  I didn't mean to leave that

19   as vague.

20               You have been here for other purposes

21   since then?

22        A.    Yes.  Yeah.  And in the spirit of the

23   whole truth, I should say I actually am associated

24   with a project on ChicagoNow, but our meetings have

1    not been in Chicago.

2         Q.    What's the topic of ChicagoNow?

3         A.    So we are following up that old study.

4         Q.    You're talking about the Venkatesh 2007

5    Economic Journal?

6         A.    Exactly.  Yeah.

7         Q.    So you've had some initial meetings but

8    haven't done any actual research, or have some

9    people done the research already?

10        A.    So the data are not yet available.

11        Q.    Okay.  I'm sorry, I don't mean to be

12   glib.  Is the data not available because you can't

13   say it, or is the data not available because the

14   research hasn't been done yet?

15        A.    The first stage is a survey, and we have

16   not conducted the survey yet.

17        Q.    Okay.  So these have been planning

18   meetings or -- so to speak?

19        A.    That's correct.

20        Q.    And is there any hope or expectation of

21   what the research is going to show?  What is the

22   purpose of the follow-up?

23        A.    During much of my career in working on

24   gun violence, I've been interested in how criminals

1    obtain guns.  And this project is a continuation of

2    that research program.

3         Q.    I'm sorry, so is the purpose of this

4    follow-up research to go ask these people that you

5    interviewed back when about whether or not they have

6    firearms, and if so, where they got them?

7         MS. HIRSCH:  I just want to state an objection

8    to this line of questioning about this other project

9    just to say that it's beyond the scope of what he's

10   here for today.

11   BY THE WITNESS:

12        A.    We will not talk to the people that --

13   that Sudhir Venkatesh talked to before.  So it will

14   be a new set of interviews with different people.

15   BY MR. SIGALE:

16        Q.    But is that one of the ultimate

17   objectives, to find out if they have firearms, and

18   if so, where they got them?

19        A.    Yes.

20        Q.    So you're familiar, to kind of shorthand

21   it myself, that there are different parts of Chicago

22   with, say, different levels of public safety

23   concerns?

24        MS. HIRSCH:  Objection, vague and ambiguous.

```
 1    BY THE WITNESS:

 2         A.    I know the murder rate differs widely

 3    across different neighborhoods of Chicago, yes.

 4    BY MR. SIGALE:

 5         Q.    And based on your knowledge, can you

 6    elaborate on that?  Are there -- what particular

 7    areas might be worse than others?

 8         MS. HIRSCH:  Objection, beyond the scope.

 9    BY THE WITNESS:

10         A.    So I know that my friends who live in

11    Hyde Park feel relatively safe.

12    BY MR. SIGALE:

13         Q.    Okay.

14         A.    But beyond that, I can't give you a

15    geography of violence.

16         Q.    Are you aware from any source what

17    differentiates those neighborhoods that have, say,

18    a -- I called it a higher pubic safety concern, you

19    said murder rate, from other neighborhoods that are

20    less so in that regard?

21         MS. HIRSCH:  Objection, calls for speculation,

22    vague and ambiguous.

23         MR. SIGALE:  I just asked if he knows.

24
```

1    BY MR. SIGALE:

2        Q.    But if you don't, you don't.

3        A.    The topic actually has been studied

4    probably since the 1920s in Chicago.  And so it is

5    certainly part of the literature in criminology.

6        Q.    Okay.

7        A.    And, you know, the findings are not

8    surprising, but the neighborhoods that are poorer,

9    for example, have higher violence rates.  The

10   neighborhoods that have well-organized criminal

11   gangs have higher violence rates.  And there's also

12   a relationship to race and ethnicity.

13       Q.    Anything else?

14       A.    Well, I think that's enough.  There --

15   there are -- I suppose the other thing that should

16   be said is that neighborhoods that are high in

17   violence -- or were high in violence 20 years ago

18   are often the same ones that are high in violence

19   today.

20       Q.    To what do you attribute that?

21       A.    Well, to some extent, it's because the

22   same factors persist, the underlying factors of lack

23   of education or poverty and the associations of

24   that, the joblessness.

1    Q.    And is this -- you mentioned about

2  Chicago being studied since the 1920s, I guess the

3  Al Capone days, I guess.

4         Is Chicago unique in that regard, or is

5  this pretty much a recipe in any larger city?

6    A.    The basic socioeconomic patterns of

7  violence are similar to what you would find in other

8  cities.  The -- Chicago tends to be relatively high

9  in terms of violence rates.  But it is not

10 qualitatively different.

11   Q.    But quantitatively different?

12   A.    In the spectrum of city violence rates,

13 Chicago is usually towards the upper end.  Not at

14 the top by any means.

15   Q.    There have actually been years when it

16 has been at the top, though; is that correct?

17   MS. HIRSCH:  Objection, lack of foundation.

18   MR. SIGALE:  Again, if he knows.

19 BY THE WITNESS:

20   A.    Yeah, I don't know that.

21   MS. HIRSCH:  Lack of foundation.

22 BY THE WITNESS:

23   A.    I'd be surprised if it were true.

24

1  BY MR. SIGALE:

2      Q.    Okay.  But we can -- at least for

3  purposes of today, we can agree it's near the top?

4      A.    Yes.

5      Q.    Okay.  When you say Chicago is on the

6  upper end and then I used the word "quantitatively,"

7  are you referring to the 1920s?  Are you referring

8  to today?  Are you referring to historically for the

9  last 90 years, or are there certain times that

10 you're referring to?

11     A.    Currently, the Chicago murder rate, for

12 example, is about three times the national average.

13 It's not that different than what it was, you know,

14 20 years ago during the crack epidemic, for example.

15 I actually don't know the deep history of this.

16     Q.    And this -- again, just trying to

17 clarify, the crack epidemic that you're referring to

18 was around the early '90s?

19     A.    Nationwide, the crack epidemic was 1984

20 until the early '90s.  So that was the period that

21 seemed to catch many cities around the country.

22     Q.    So when you say that Chicago -- the

23 murder rate, you're saying, is three times the

24 actual average?

1    A.    Currently.

2    Q.    Currently.

3          And it's not that much different than it

4    was 30 years ago, you're referring to 20 to 30 years

5    ago during that crack epidemic from --

6    A.    Yeah.  That it remains high --

7    Q.    Okay.

8    A.    -- as it has been.

9    Q.    Are you aware of any other major cities

10   that ban firearm sales?

11   A.    There are no cities that ban handgun

12   sales right now in the United States.

13   Q.    You mean except for Chicago?

14   A.    Well, Chicago doesn't.  I mean -- oh, ban

15   sales as opposed to possession?

16   Q.    I did mean sales, yeah.

17   A.    I am not aware of any other cities.

18   Yeah.

19   Q.    And yet -- and kind of doing this

20   organically because we're -- we're still on page 1

21   of the report, but at some point, we're going to get

22   to it before you have to leave for your plane.

23          And yet, you say Chicago's murder rate is

24   three times the national average.  Is that because

1   Chicago has a higher level of criminal gangs and

2   joblessness and poverty than these other places?

3       A.    One thing that stands out about Chicago

4   is the presence of gangs and -- and in one analysis

5   that we did from data collected in 1996 and 1997,

6   for example, of people arrested in -- in the 22

7   cities, Chicago had the highest prevalence of gang

8   membership, either current gang membership or people

9   saying they had once belonged to a gang but didn't

10  previously.

11          The only city that was close was

12  Los Angeles in that study, but far higher than other

13  cities.

14      Q.    So when I was asking you earlier about

15  what the murder rate in Chicago is attributed to,

16  you talked about the poor, criminal gangs, you

17  talked about race and ethnicity, lack of education,

18  joblessness -- I was going to say poverty, but I

19  guess that's the same thing as the poor.

20          So since you mentioned Chicago has the

21  highest prevalence of gang membership, looking to

22  the other factors, I guess sticking to poverty for a

23  second, does Chicago have more of it than other

24  major cities?

```
 1        MS. HIRSCH:  Objection, calls for speculation.
 2   BY THE WITNESS:
 3        A.    I -- yeah.  I can't report on the
 4   relative standing in Chicago on the socioeconomic
 5   dimensions.
 6   BY MR. SIGALE:
 7        Q.    What about lack of education?
 8        MS. HIRSCH:  Same objection.
 9   BY THE WITNESS:
10        A.    Yeah.  I don't know how it compares with
11   the -- with Los Angeles or with New York City.
12   BY MR. SIGALE:
13        Q.    Joblessness --
14        MS. HIRSCH:  Same --
15   BY MR. SIGALE:
16        Q.    --  is the unemployment rate in Chicago
17   more or less than the other -- than the other major
18   cities that you're comparing to?
19        MS. HIRSCH:  Same objection.  Also beyond the
20   scope.
21   BY THE WITNESS:
22        A.    Yeah, I don't know.
23   BY MR. SIGALE:
24        Q.    Okay.  I really hate to go there.  It's
```

1    not politically correct, but you mentioned it, I'll

2    ask it.

3              Race and ethnicity, does Chicago have

4    more of a certain race and ethnicity that is -- at

5    least correlates, I'm not saying causation, but

6    correlates with higher crime rates than other major

7    cities?

8         MS. HIRSCH:   Same objection.

9    BY THE WITNESS:

10        A.    Again, this would require a more detailed

11   understanding of the data than I have about where in

12   the spectrum from Detroit to New York to LA, Chicago

13   lands.

14   BY MR. SIGALE:

15        Q.    So you don't know?

16        A.    I don't know.

17        Q.    Okay.  So of all the factors that you

18   named that contribute to higher crime rates, the one

19   that you know as you sit here that's different is

20   that Chicago has a higher prevalence of gang

21   membership?

22        A.    That fact stands out about Chicago, and

23   the question I was answering before was what

24   differentiates the neighborhoods within Chicago, and

```
 1   my answer was that the neighborhoods that have

 2   perpetually high violence rates are neighborhoods

 3   that also have a high level of poverty, low

 4   education and tend to be minority almost internally.

 5   So it was that kind of comparison rather than a

 6   comparison across cities.

 7         Q.    No.   That's why I was following up and

 8   asking you across cities.

 9         A.    Yeah.   So if you want to describe the

10   pattern within Chicago, it's my understanding it

11   follows those socioeconomic patterns.

12         Q.    Of the -- of -- strike that.

13               Of the factors that you listed when I

14   earlier asked you to compare parts of Chicago and

15   you talked about poverty, joblessness, lack of

16   education, race and ethnicity and criminal gangs,

17   which of those would you say are causative rather

18   than merely correlative between their existence and

19   the existence of high crime rates?

20         MS. HIRSCH:   Objection, vague and ambiguous.

21   BY MR. SIGALE:

22         Q.    If you understand the question.

23         A.    So I think that gangs --

24         MR. SIGALE:   Sometimes I'm freezing in this
```

1    room and sometimes -- I'm sorry, go ahead.

2    BY THE WITNESS:

3        A.    Okay.  I believe gangs have a causative

4    influence on the amount of violence.  I believe that

5    education also has a causal influence.  And, in

6    fact, the evidence is really quite strong on -- on

7    that -- on both of those issues.

8             For example, in education, the states

9    that raise the minimum leaving age have experienced

10   a reduction in the crime for those cohorts that were

11   affected.

12            So the -- I think that if Chicago could

13   find a way to extend schooling across the board,

14   that that would reduce the amount of crime and

15   violence that was associated with -- with that

16   particular problem.

17   BY MR. SIGALE:

18       Q.    Would you say that those two factors are

19   causative for why Chicago has a murder rate, at

20   least for the last 30 years, that's three times the

21   national average?

22       A.    So I should say I have not done a study

23   comparing Chicago to other cities in terms of the

24   influence of socioeconomic factors on their murder

1   rate.  And so I can't give you any kind of

2   systematic answer to that question.

3          I -- again, I don't know where Chicago

4   stands on the dimensions of -- the socioeconomic

5   dimensions, but I am confident that they stand very

6   high on the gang dimensions.

7      Q.   I'm sorry, are you saying that you're

8   confident, then, that that's one of the causes, or

9   are you just saying that there appears to be a high

10  correlation?

11     A.   We know from work that has been done on

12  gangs in other cities that gang membership increases

13  criminal activity.  And I think that those studies

14  have been persuasive in terms of saying that that's

15  causal in the sense that a kid that joins a gang

16  increases his criminal activity during the time he's

17  a member of a gang and then it drops back after he

18  leaves.

19     Q.   Okay.  And I assume that we're talking

20  about to the extent where, you know, certain cities

21  have experimented with just trying to make gang

22  membership itself illegal; I'm -- we're talking

23  about other criminal acts, correct, violent -- we're

24  talking about violence, correct?  That membership in

1   a gang -- that people who are in a gang increase

2   their criminal violence activities and then it drops

3   off, you're saying, after they leave the gang?

4        A.   Yes.  Violence and other types of

5   criminal activity.

6        Q.   Okay.  Okay.  If you have -- if you know,

7   the murders in Chicago, I guess we'll say over the

8   last 30 years -- I mean, let's go with that, that

9   seems to be as far back as you know in terms of

10  research -- how much of that was committed by gang

11  members?

12       MS. HIRSCH:  Objection, calls for speculation,

13  beyond the scope.

14  BY THE WITNESS:

15       A.   So, first of all, I think that nobody

16  knows for sure what the answer is to that because it

17  would require that there be a successful police

18  investigation, and in many of the murders in Chicago

19  and elsewhere, the investigations are not successful

20  in identifying a suspect.

21            The supplementary homicide reports and

22  the police department do sometimes report on the

23  percentage of murders that they consider to be

24  gang-related in some fashion.

BY MR. SIGALE:

Q.    Okay.

A.    And as I recall, the number in Chicago is around 40 percent.

I think that there are other questions that one could ask.  And it would be interesting, like, how many of the murders are committed by gang members, which is a different issue than how many are gang-related.

Q.    Can you elaborate?

A.    Well, if a kid who is a member of a gang is given a gun to protect himself while he's dealing drugs and then he gets into a beef about his sister and shoots another guy, it's not gang-related, but it is a gang member, and the reason the shooting occurred in a sense is because he was part of the gang and he got the gun.

Q.    Well, I understand you're not an attorney, but I'll -- are you familiar at all with the concepts of proximate cause versus what's called but-for cause?

A.    I can say that I'm not able to give a definition of the differences.

Q.    Okay.  Proximate cause, an example of

1    that would be that I'm fiddling with my radio dial

2    and I rear-end Ms. Hirsch's car.

3            But-for cause would be that I was driving

4    too slow and missed the red light, and if I hadn't

5    missed that red light, I would have gone through the

6    intersection sooner and I would have never been on

7    that same street with Ms. Hirsch in the first place.

8    And but for that red light, I would have never even

9    run into Ms. Hirsch at all.

10           What you're really saying is that if --

11   in your example with the gangbanger and the beef

12   with his sister -- about his sister, is that, but

13   for the fact that -- in your hypothetical, but for

14   the fact that he was able to obtain a firearm

15   illegally, he would have never had the firearm in

16   the first place to get into that beef and use it; is

17   that basically what you're saying?

18      MS. HIRSCH:  I just want to object to the

19   extent that it's calling for some type of legal

20   conclusion about but-for causation, and also to the

21   extent it mischaracterizes what he just said.  I

22   know you're asking him, but...

23   BY THE WITNESS:

24      A.    So I think that the -- the -- that that

1    is what I meant to convey, is that if the boy had

2    not been part of the gang, it would have been more

3    difficult for him to obtain a gun.  Whether that

4    would have been entirely ruled out, no.  I mean, he

5    might have found a gun in an alley somewhere or who

6    knows.

7    BY MR. SIGALE:

8         Q.    Right.  Because we're speculating about

9    it.

10        A.    Right.

11        Q.    He might have -- might have found the gun

12   in his grandma's attic because it was his grandpa's

13   relic from the war or something, right?  I mean, we

14   could make up any kind of hypothetical as to how

15   someone did or didn't get their hands on a firearm,

16   correct?

17        A.    Yes.  We can make up hypotheticals, and

18   certainly obtaining the gun that is kept at home is

19   one possibility.

20             But in Chicago, many of the teenagers who

21   are members of gangs will obtain their guns from the

22   gang itself.

23        Q.    Where do the gangs get their guns from,

24   then?

1    A.   I don't know the answer to that.

2    Q.   Okay.

3    A.   I wish I did.  So do the police.

4    Q.   Well, sure.  But what we can be sure of

5 is they're not getting their guns from gun stores in

6 Chicago, correct?

7    A.   We can't be sure of that except in other

8 cities.  Now, in Chicago, since there are no gun

9 stores --

10    Q.   I don't mean to be glib, but we can be

11 sure in Chicago?

12    A.   No.  I think that's quite reasonable.

13    Q.   But in other -- is there research on this

14 point?

15    A.   About obtaining -- I mean, gang members

16 can obtain guns from dealers in a variety of ways.

17 And in other cities, they would be doing that.

18    Q.   Well, they might be doing it?

19    A.   And they might be doing it in Chicago, as

20 well.  I don't know.  Just -- they'd have to leave

21 the City limits.  And we speak to that in that 2007

22 article.

23    Q.   Are you aware from your research or from

24 reviewing other people's research, short of banning

1  gun stores, are there measures that could be put in

2  place to eliminate or reduce the possibility that,

3  say, a gang member would get ahold of a gun they

4  shouldn't have, say, ultimately from a gun store?

5      MS. HIRSCH:  Objection, beyond the scope of

6  what he's offered here today.  It also calls for

7  speculation.

8  BY THE WITNESS:

9      A.   So I believe it's possible that the State

10  or the City could supplement the federal regulation

11  of a gun dealer and that that would be helpful, but

12  I'm sure it would not be 100 percent effective at

13  stopping straw purchases or stopping the possibility

14  of a burglary of the gun store that would result in

15  some of the stock being taken or even that would

16  stop the possibility of a corrupt clerk operating in

17  the store.

18  BY MR. SIGALE:

19      Q.   Again, we're talking -- when -- strike

20  that.

21          When you're talking about the corrupt

22  clerk, the other possibilities, I mean, those are

23  hypotheticals, correct?  Those are just ways that we

24  can imagine that someone might get their hands on a

1    firearm illegally?

2         A.    Yes.   They are hypotheticals, but they

3    happen.  We know that they happen.  It's been

4    documented by criminal investigations, by ATF.

5         Q.    Now, you mentioned, I believe, earlier in

6    that Retailers testimony -- and I'll ask you to

7    elaborate a little bit -- that Chicago police has a

8    focus on gun crimes or policing gun possession or

9    trafficking.

10              Do you recall talking about that the last

11   time you were deposed?

12        MS. HIRSCH:  Objection, lack of foundation.

13   BY THE WITNESS:

14        A.    I don't necessarily recall talking about

15   it during the deposition, but I'm willing to talk

16   about it.

17   BY MR. SIGALE:

18        Q.    Okay.  You talked about that Chicago

19   has -- I guess at least in the recent past, has --

20   in the last 20 years has increased expenditures on

21   policing; is that true?

22        MS. HIRSCH:  I just want to state for the

23   record, you're reading off of a computer right now.

24   Are you reading his deposition testimony?

1    MR. SIGALE:  Yes.

2    MS. HIRSCH:  Okay.  Because we don't have that

3  in front of us, and I don't know if you're --

4    MR. SIGALE:  I'm not asking him page --

5    MS. HIRSCH:  -- characterizing it -- you're not

6  going to introduce it as an exhibit, so I just

7  wanted to state that you are reading off that to us

8  and summarizing it with your own spin on it.

9    MR. SIGALE:  Okay.  Well, that's why I'm asking

10 him to elaborate.  So...

11 BY THE WITNESS:

12   A.    So the gun emphasis policy for the

13 Chicago police goes back apparently to the 1950s.

14 And it has been a tradition that the department has

15 thought that it was important to get guns -- illicit

16 guns off the street, that they've given a priority

17 to that within the department.  And that -- as far

18 as I know, that continues today.

19 BY MR. SIGALE:

20   Q.    When you said earlier that the City could

21 supplement federal regulations, you mean by passing

22 additional laws regarding the sale of firearms?

23   A.    So the City -- I think what we were

24 talking about was the regulation of gun dealers.

1    Q.    Correct.

2    A.    And a number of states regulate gun

3    dealers, and in that sense, they have the

4    possibility of supplementing the federal regulation.

5    Q.    Okay.  The City or the State of Illinois

6    could do that?

7    A.    As far as -- certainly the State could.

8    As far as I know, the City could, also.

9    Q.    Okay.  And --

10   A.    Of course, it would require the kind of

11   legislation that does not exist now.

12   Q.    Well, it doesn't exist because there's no

13   firearm dealers to regulate?

14   A.    Right.  So in -- in principle, then the

15   additional regulation could -- could hold the

16   dealers to a higher standard and -- in principle.

17   Q.    Okay.  So in principle, short of banning

18   firearm dealers in the City, there could be --

19   there's federal regulation, correct?  There could be

20   additional State regulation where they feel that

21   something additional might be needed, correct?

22   A.    Yes.

23   Q.    There is a focus on policing, right, an

24   emphasis on firearm crimes by the police, correct?

1     A.     There is a focus on firearm crime and on

2  illicit carrying.

3     Q.     Okay.  Which you might be aware that

4  whole carrying scheme, for lack of a better word, is

5  all about to change due to a state law that recently

6  was passed, correct?

7     A.     Yes.  I understand it will change.

8     Q.     Okay.  So you understand, as you sit here

9  today, that whereas until very recently, Chicago had

10  a ban on carrying firearms outside their home,

11  correct?

12     A.     Yes.

13     Q.     -- that that is going to change because

14  the state law now says that with a license, people

15  can, and that will preempt the City of Chicago's ban

16  which, in fact, is actually now repealed.

17            Do you understand in general that that's

18  how it's going to be working in Illinois starting

19  soon?

20     MS. HIRSCH:  I just want to object to that,

21  that he understands the preemption issue.

22     MR. SIGALE:  That's fine.  If he does, he does.

23  BY THE WITNESS:

24     A.     Yes.  I think I understand that that's

```
 1   what's going to happen.

 2   BY MR. SIGALE:

 3       Q.    Okay.  Okay.  In any -- how long have you

 4   been doing research involving firearms?

 5       A.    So I started doing research on firearms

 6   in about 1975.  So 38 years.

 7       Q.    And how much of the -- how much of the

 8   research did you conclude in favor of either firearm

 9   rights or firearm usage?

10       A.    I don't understand the question.

11       Q.    Sure.  Well, for example, you have a

12   conclusion that -- you're being asked to opine in

13   this case or you are opining in this case that

14   banning firearm sales in Chicago enhances public

15   safety?

16       A.    Yes.

17       Q.    I'm asking, is there -- have you had your

18   name on any research since you've been doing

19   firearms research, I guess starting 38 years ago,

20   where the conclusion was in favor of people using

21   firearms or possessing firearms?

22       MS. HIRSCH:  I'd like to just object to the

23   characterization of opinions about the contribution

24   of guns to public safety as a -- in favor of
```

1   using -- or in favor or against.  That kind of

2   goes -- goes a step beyond characterizing what he's

3   testifying to.

4   BY THE WITNESS:

5       A.   So a great deal of the research that I've

6   done is simply descriptive.  So it's in effort to

7   find out the patterns of gun ownership, the patterns

8   of gun use, how the markets work that support

9   that -- to evaluate different kinds of regulations.

10          And I would hope that the advocates and

11  the policymakers would find that kind of information

12  useful across the board in the sense that it is

13  useful to be well-informed before you attempt to

14  move ahead on any kind of policy frontier.

15          But, of course, I am not entirely naive,

16  and I understand that my work sometimes has been

17  used by advocates that unlike myself have a clear

18  political position on -- and so I would say that the

19  most notable finding that I have, the one that

20  probably has gotten the most attention, that was not

21  what was seen as hostile to those who support gun

22  control was an article I published in the Journal of

23  the American Medical Association in 2000.  That was

24  an evaluation of the Brady Act.  And that evaluation

1   found that the Brady Act had not reduced homicide or

2   gun homicide.

3          And, of course, it was the crowning

4   achievement of the gun control movement, so that

5   this was harmful to their interest to be told that

6   as far as I could tell based on the evidence, it did

7   not have a significant effect.

8   BY MR. SIGALE:

9       Q.    And in a nutshell -- I don't need the

10  whole thing of that paper, but in a nutshell, why

11  didn't the Brady Act reduce homicide?

12      A.    Well, the focus of the paper was whether,

13  not why.

14      Q.    Oh.

15      A.    It was on the question about what

16  difference had it made to particular outcomes,

17  suicide and homicide.  And so I am glad to speculate

18  about why it was ineffective, and I have in print on

19  a number of occasions.

20      Q.    Okay.  Well, let me ask you, then, that

21  question second and this question first:  In a

22  nutshell, what led you to conclude -- what were the

23  factors that led you to conclude that the Brady Act

24  didn't reduce homicide?

1    MS. HIRSCH:  I just want to object that this is

2   beyond the scope of what he's testifying here today

3   to.

4   BY THE WITNESS:

5    A.   So we did a statistical analysis of the

6   trajectory of murder rates in the 50 states.  It

7   turned out that the Brady Act had a direct effect

8   only in the states that were not already requiring a

9   background check of some kind, and some of the

10   states were.

11        And so we compared the states that were

12   not directly affected by the Brady Act in terms of

13   their trajectory of murder with the states that had

14   to change as a result of the Brady Act.

15        And the prediction, if the Brady Act is

16   effective, then you expect the states that adopted

17   the restrictions for the first time as a result of

18   the act, would have experienced a reduction in their

19   homicide rate, relative to the states that did not

20   change.

21   BY MR. SIGALE:

22    Q.   And that didn't happen?

23    A.   And that did not happen.

24    Q.   Okay.  So then you said you speculated as

1    to why in print.  So what was the why?

2        A.    My speculation has been that it was

3    because the Brady Act did not regulate all gun

4    transactions.  It only regulated the sales by

5    federal licensees.

6            And so we know that to a large extent,

7    although not universally, criminals obtain their

8    guns from the informal market or the underground

9    market.

10           So that's, I think, the loophole in the

11   Brady Act that undercut its effectiveness and led to

12   an interest in expanding to a universal background

13   check.

14       Q.    So earlier we were talking about the

15   murder rate in Chicago being three times the

16   national average, and we were talking about the

17   various correlative and possible, a couple of what

18   you believe are causative factors of that.  And you

19   had mentioned in -- that you're aware of no other

20   city other than Chicago that bans firearm sales,

21   with -- obviously with very limited exception.

22           But you're not sitting here saying that

23   the law enforcement that is buying -- that is

24   allowed to buy firearms are committing the crimes,

1    correct?  You're not saying that?

2        A.    I'm sorry, I don't understand.

3        Q.    Law enforcement is allowed to buy a

4    firearm; is that correct?

5        A.    I see.  I am not saying that.

6        Q.    You're not saying that the cops are out

7    committing the crimes with the guns they're allowed

8    to legally buy?

9        A.    Not often.

10       Q.    Maybe a little, too, but in general,

11   right, not very.

12             In the other cities, the other major

13   cities where firearms are allowed to be purchased or

14   allowed to be sold and purchased, obviously with

15   regulation, and the murder rate is approximately a

16   third of that in Chicago, to your knowledge, the

17   murders that are being committed, the violent crime

18   that's being committed in those places, are they

19   being committed with the firearms that are being

20   legally purchased by the legal user and purchaser?

21       MS. HIRSCH:  Objection, vague and ambiguous.

22             If you understand that.

23   BY THE WITNESS:

24       A.    I think the question was what is the

1    source of the firearms that are being used to commit

2    murder in cities outside of Chicago?

3    BY MR. SIGALE:

4        Q.    I guess that's the yang to the yin of my

5    question, but, yes.  Sure.

6        A.    And --

7        Q.    Where are the people that are the

8    criminals in those other cities, where are they

9    getting their firearms?

10       A.    So --

11       MS. HIRSCH:  I just said if you know.  Sorry.

12   All I said was if you know.

13   BY THE WITNESS:

14       A.    Well, let me give you an academic

15   response, which is that I recently analyzed a survey

16   of state prisoners and estimated based on their

17   responses that if they had used a gun in the crime

18   that put them in, then what was the source of that

19   gun.

20            And 14 percent of them gave an answer

21   that was compatible with the possibility that they

22   purchased it at a dealer.  I mean, a few of them

23   said that they got it at a gun show, but that could

24   be a dealer.  They got it at a pawnshop, that could

1   be a dealer.

2   BY MR. SIGALE:

3       Q.    So the other 86 percent, where did they

4   get it?

5       A.    86 percent -- so the other 40 percent

6   said they got it from family and friends in informal

7   exchanges of various kinds; 30-some percent said

8   that they basically got it on the street or they got

9   it from the underground economy.  That would be my

10  characterization of what sources they were

11  describing.

12      Q.    Okay.

13      MS. HIRSCH:  You want to maybe take just a

14  bathroom break.

15      MR. SIGALE:  Yeah, fine.

16              (WHEREUPON, a short recess was

17              had.)

18  BY MR. SIGALE:

19      Q.    Professor Cook, you're not claiming, as

20  you sit here, that Chicago's firearm sales ban is

21  going to either now or at any point in the future

22  eliminate gun violence in Chicago; is that true?

23      A.    That is true, yes.

24      Q.    In fact, can you point to any research

1    that says that the gun sales ban is a causative

2    factor of any reduction in crime in Chicago?

3        A.    I don't know of any research that is

4    directly on that point that has that conclusion.

5        Q.    So the answer's no?

6        A.    It's no, if you -- if you mean an

7    evaluation of the ban in Chicago affecting crime

8    outcomes in Chicago, I do not know of any.

9        Q.    In fact, it's fair to say that gun

10   sale -- strike that.

11             That legal -- strike that.  I'll get

12   there.

13             Are you saying, as you sit here, that if

14   legal gun sales were allowed in Chicago, that the

15   murder rate would increase?

16       A.    My testimony is that that is a plausible

17   outcome.

18       Q.    It's possible?

19       A.    Based on what we know about guns and

20   violence, I would say, yes, it's possible, and that

21   it is a reasonable prediction.

22       Q.    Okay.  Well, first, let me ask you if you

23   can say with any degree of certainty how much you

24   think it might increase?

1          A.     I am not able to do a prediction of that

2     kind.  And, you know, of course, in the first place,

3     we need to specify exactly the change that you're

4     talking about.

5          Q.     Well, for purposes of this case, if there

6     are firing ranges in the City for people to practice

7     and train and they're also allowed to purchase a

8     firearm at that range where they train, subject, of

9     course, to all the federal and state laws that are

10    in place for such things, that's what I'm referring

11    to.

12         A.     I see.  So I am not in the position to

13    give a quantitative prediction about that and only

14    that it seems -- as I say, it is a reasonable

15    prediction that it would increase homicide by

16    providing guns to people who otherwise would not

17    have them.

18         Q.     But that's a possible -- you're saying

19    that is a possibility?

20         A.     Yeah, that's right.  It is a possibility

21    and a reasonable possibility.

22         Q.     Okay.  Why is it a reasonable

23    possibility?

24         A.     What we know about --

1  Q.   And I'm sorry, I don't mean to cut you

2  off.  Let me reask the question.  You'll still

3  probably give the same answer.

4       But what is your basis for saying that

5  it's a reasonable possibility?

6  A.   I think it's a reasonable possibility

7  because we know that the gun dealers are a source of

8  guns used in crime.  And they're a source not only

9  in the sense that they provide guns legally to some

10 people who then go on and use them in crime, but

11 also that some of the gun dealers or the employees

12 of gun dealers are corrupt.  And that certainly it

13 is also true that when there is a gun dealer with an

14 inventory of guns, that's subject to burglary and

15 theft in some other fashion.

16      So it creates a new point source of guns

17 that is convenient and located within the City

18 limits and would provide the possibility to -- to

19 arm criminals who otherwise might find it more

20 difficult.

21 Q.   But everything you just said is in the

22 category of possibility, correct?

23 A.   So what I was saying was based on

24 documentation provided by ATF, that their

1  investigations of criminal activity associated with

2  gun trafficking identifies corrupt dealers as an

3  important source of the guns that are trafficked.

4  And that, of course, there are also documentation

5  associated with theft and with straw purchases and

6  so forth.

7          So all of this is not only a logical

8  possibility, but it happens in cities that have

9  dealers.

10     Q.    And what's those cities' responses if

11  that happens?  If there's a crooked dealer who is

12  selling guns he shouldn't sell, what's the response?

13     MS. HIRSCH:  Objection, calls for speculation,

14  beyond the scope.

15     MR. SIGALE:  I'm asking --

16     MS. HIRSCH:  Vague and ambiguous.

17     MR. SIGALE:  Okay.

18  BY MR. SIGALE:

19     Q.    But I'm only asking you about the

20  information -- to follow up on the information

21  you're providing me.  So if you know.

22     A.    In some cases, there have been, of

23  course, efforts by ATF or state regulators to shut

24  down gun dealers, and sometimes they have been

1    successful.  But it is proven difficult in the

2    courts to permanently shut down a dealer, even one

3    that is a known source of guns to criminal activity.

4    And the federal law in this case is weak, and the

5    capacity to regulate is weak on the part of ATF.

6              So there's a variety of cases where a

7    dealer who is seen as a real problem in a community

8    has been targeted for regulatory enforcement, and it

9    was -- you find them five years later, they're still

10   in business or the wife is now in business at the

11   same location with her FFL.  It turns out that --

12   that it is -- that regulation is difficult and

13   dilute in this area.

14        Q.    So what the solution is, I suppose, in

15   those limited instances is better policing, better

16   regulation, correct?

17        A.    I think that having more regulatory

18   capacity certainly would help and having clear laws

19   that would shut down corrupt dealers and careless

20   dealers would also help.

21        Q.    Well, but by definition, corrupt dealers

22   are already violating the law, correct?  I mean,

23   that's basically what you're meaning by corrupt?

24        A.    That's right.  By corrupt, I mean that

1    they are selling guns under the counter without the

2    appropriate paperwork, for example, or they're

3    allowing -- well, that would be the most common.

4        Q.    Okay.  So it's not -- in that limited

5    instance, and I'm just sticking with this example,

6    what's needed isn't more laws because they're acting

7    illegally already; they're already breaking a law.

8    What they need is a good dose of policing and

9    punishment for their illegal actions, correct?

10       A.    It seems like it would be possible in

11   some of these cases to shut down the dealers.  All I

12   can say is what I've read of the track record,

13   especially on federal enforcement, is that it has

14   been difficult.

15       Q.    But even with these examples that you say

16   have taken place, to the extent they've taken place

17   in certain places, wherever they've taken place,

18   their murder rate is, at most, about a third of

19   Chicago's; is that correct?

20       A.    No.  The one-third is the comparison

21   between Chicago and the rest of the country.  So

22   there are a number of cities that have higher murder

23   rates than Chicago.  Some have lower.  And, of

24   course, if we're talking about the entire nation,

```
 1    we're also talking about the suburbs and rural

 2    communities and everything else.

 3         Q.    Well, just for an example --

 4         A.    But there are a number of cities right

 5    now that have a higher murder rate than Chicago.

 6         Q.    What are some of them?

 7         A.    New Orleans, Washington D.C., Detroit,

 8    just for starters, but there are a number of others.

 9         Q.    And to the extent you know, what are the

10    causative factors of that, of the high murder rate

11    in those cities?

12         MS. HIRSCH:  Objection, calls for speculation

13    and it's also beyond the scope.

14         MR. SIGALE:  Well, I mean, I just want to

15    respond to this very quickly, and obviously, you can

16    make all the objections for the record and I can't

17    stop it, nor am I asking you to stop, but I will say

18    that when he's giving an opinion about public

19    safety, I think that his opinions regarding the

20    public, whether they be here or other places, and

21    safety, whether they be here or other places, for

22    comparison purposes is within the scope of what

23    we're talking about today.

24              I'm just putting that on the record.
```

```
 1    I'm -- your objection is your objection.

 2        MS. HIRSCH:  Yeah.  I don't need to explain

 3    them.

 4    BY MR. SIGALE:

 5        Q.    So...

 6        A.    I mean, let me say just in response to

 7    that, that I am not providing a comprehensive

 8    opinion on public safety but only on the role of

 9    guns.

10             And it is true that there are other

11    factors that influence the violence rate.  And so

12    gun violence is -- the combination of violence and

13    guns -- it's cities where you have a lot of both

14    that you have a high violence rate.

15        Q.    Okay.  So to the extent you can talk

16    about those other cities, New Orleans, Washington

17    D.C. -- because Washington D.C. has extremely strict

18    handgun regulations, as well, correct?

19        A.    Yes, it does.  Uh-huh.

20        Q.    And Detroit, are you referring to the

21    current Detroit that seems to be kind of in

22    shambles, according to the newspapers, or are you

23    referring to some prebankruptcy version of Detroit?

24        A.    The answer is both.  During the Vietnam
```

1    era, Detroit had one of the highest murder rates in

2    the country, and it still does.

3         Q.    So let's stick with Detroit then for a

4    second.  What are the causative factors -- to the

5    extent you know, if you don't, you don't -- why

6    there's a high murder rate in Detroit?

7         A.    I think Detroit for a long time has

8    suffered from just the same kinds of factors that

9    we've been talking about, the socioeconomic

10   disadvantage and the lack of resources for an

11   effective policing that would certainly help.

12        Q.    So if I go back to earlier -- oh, I'm

13   still on the same page -- joblessness, lack of

14   educational opportunities, poverty, those -- those

15   are present in, say, Detroit, correct?

16        A.    Yes, they are.  They remain high.

17        Q.    What about criminal gang activity?

18        A.    I don't think I know the answer to that.

19   Detroit is not a city that showed up -- that gets

20   mentioned in discussions of cities that have a high

21   gang problem.  And I don't know for sure.

22        Q.    I'm sorry, it is or isn't?

23        A.    Is not.

24        Q.    Is not?

1    A.    Yeah.

2    Q.    What about -- forgive me if you already

3  mentioned it, but what about drug use or drug

4  trafficking, is that also something that is a

5  correlation of high violence?

6    A.    Well, I would be willing to go a step

7  farther and say open-air drug markets are one nexus

8  for violent crime.  And so cities that have that

9  are -- have a real liability when it comes to that.

10   Q.    Is that -- is that related to or --

11 strike that.

12       Is that related to the prevalence of

13 criminal gangs in a geographic area or just a

14 coincidence?

15   A.    When gangs exist, they often control drug

16 dealing.

17   Q.    Okay.

18   A.    But they're not necessary in order to

19 have a city that has a lot of drug dealing.  It can

20 be done without organized gangs.

21   Q.    What about Chicago?  Does Chicago have

22 drug trafficking?

23   A.    I'm sure it has drug trafficking and

24 it -- it -- and that the gangs are influential.

1       Q.    Was that something that was borne out or

2   discussed in the 2007 Venkatesh project?  Again, I'm

3   calling it the Venkatesh project; I know that there

4   was more than one person involved.

5       A.    So we did not spend a lot of time looking

6   at the drug markets since the focus of the research

7   was on guns in that case.  It did come up in some of

8   the interviews, the relationship between drug

9   dealing and gun dealing.

10       Q.    What was the relationship?

11       A.    The relationship was that the gangs that

12   dealt drugs apparently were not dealing guns.  And

13   what Sudhir Venkatesh's informants told him was that

14   there was not much money in dealing guns and that it

15   created a real problem for them with the police.

16       Q.    So the implication being, is that if

17   these drug games -- drug gangs just stuck to dealing

18   drugs and stayed off the radar as far as guns went,

19   they had a better chance of being left alone?

20       A.    Yes.  Again, I think it reflects the

21   priority that the Chicago police give to guns

22   specifically.  And so the belief on the part of some

23   gang members was that if they got into this second

24   line of business of selling guns, it would open up

1  the door to a crackdown by the police.

2      Q.   So to the extent you know, what are the

3  gang members shooting each other about?

4      MS. HIRSCH:  Objection.  Beyond the scope,

5  calls for speculation.

6  BY THE WITNESS:

7      A.   So the -- gang members shoot each other

8  for all kinds of reasons, unfortunately, and also

9  other people who are not gang members.  Sometimes

10  there are kind of gang-oriented conflicts that have

11  to do with territory that might be connected to

12  their commercial interests in drug dealing.

13  BY MR. SIGALE:

14      Q.   In other words, they might be shooting

15  each other to protect their drug turf and make sure

16  no other rival gang infringes on their drug turf?

17      A.   Certainly that happens sometimes, yeah.

18  That is apparently not the bulk of murders committed

19  by gang members.

20      Q.   Okay.  What's -- I'm sorry if you already

21  said it and it glanced passed me, what's the bulk of

22  it then?

23      A.   I mean, the bulk of it is just the

24  problem of having young men and boys that have guns

1   and they get into arguments with each other about

2   all kinds of things, and so that -- or they're

3   seeking revenge for some previous altercation that

4   they had.

5        Q.   All of this stuff that we're talking

6   about like it's a -- some kind of just different way

7   of life or, you know, something that's like a story

8   in a movie or something like that, all of this stuff

9   we're talking about is illegal, correct?  The drug

10  trade, the shooting at each other to protect drug

11  turf, the shooting at each other because they get

12  into arguments and they have, you know -- they have

13  a gun, all of that is illegal, correct?

14       A.   I think that list, yes, all that would be

15  illegal in Chicago anyway.

16       Q.   Is there anywhere in America where that

17  would be legal?

18       A.   Well, in Florida with the

19  stand-your-ground laws, I'm not sure what's illegal

20  these days.

21       Q.   Okay.  All right.  So with the possible

22  limited exception of that, and I really don't -- I

23  don't know if you were leading to the George

24  Zimmerman thing, I truly don't want to get into that

70

1    today -- but short of defensive gun uses, at a bare

2    minimum, shooting at a drug rival or a gang rival

3    because you don't like their colors or they're on

4    your turf or the act of dealing drugs, all of that

5    is pretty much illegal everywhere, correct?

6        A.    Yes.

7        Q.    Is it -- isn't it also reasonable --

8    strike the question.

9             All right.  You talked about the

10   possibilities that exist if a gun range is allowed

11   to exist and sell firearms out of the establishment.

12            Are you aware of any statistics regarding

13   sales from gun ranges in any other city?

14       A.    No, I'm not.

15       Q.    What is a defensive gun use?

16       A.    A defensive gun use is not a legal term.

17       Q.    No.  I know it's not.

18       A.    And certainly if you're asking about how

19   that term has been used in the social science

20   literature by Gary Kleck and David Hemenway and

21   others, what they're referring to is, in answer to a

22   question that has been asked on the survey, which

23   is, have you used a gun to defend yourself or others

24   maybe in a specified time period.

1      But their -- based on the answers, and

2  this is something that we can talk about, there's

3  a -- no presumption that what they say in response

4  to that question is necessarily a legal act.

5      Q.   I'm sorry, I think we're getting a little

6  afield of what my question was, which is, what is --

7  to the extent you know, what is a defensive gun use?

8      A.   Right.  So as I say, in this kind of

9  literature based on surveys that I've done, the

10  population surveys, the answer is that -- it's the

11  responses that are generated from questions about --

12  to the individual saying, have you used a gun to

13  defend yourself or your property or other people.

14      Q.   Okay.  So to your understanding, does a

15  defensive gun use as you've just described it, does

16  that involve actually firing the gun or does it

17  involve also -- strike that.  I'll just ask that

18  question.

19      Does it involve actually firing the gun,

20  or it doesn't count?

21      A.   No.  It does not necessarily involve

22  firing the gun.

23      Q.   It could involve merely showing a

24  would-be attacker that you have a gun and the attack

1     stops at that point?

2           A.    Yes.   That would be included.

3           Q.    Would it also be included -- I'm just

4     trying to make sure I understand it.   I'm -- someone

5     breaks into your house, you call down the stairs, I

6     don't know who you are but I have a gun.   The

7     attacker decides it's not worth it because, you

8     know, the attacker may or may not have one, but

9     besides not wanting to get into a gunfight, there

10    may be other houses maybe that they've got a better

11    shot -- excuse the pun -- so they leave?

12          MS. HIRSCH:   Just to clarify, are you talking

13    about from his own definition of what a defensive

14    gun use is?   I mean --

15          MR. SIGALE:   It's not his definition, I don't

16    believe.   I believe it's the sociological definition

17    that he described earlier.

18          MS. HIRSCH:   Okay.   So you're asking what his

19    understanding of it is?

20          MR. SIGALE:   Well, yeah.

21          MS. HIRSCH:   Based on whatever factors he has?

22    Okay.

23    BY THE WITNESS:

24          A.    I mean, that's certainly something that

1  could be included in the definition.  Defensive gun

2  use, it doesn't necessarily require that you show

3  the gun, or that's up to the researcher.  Right.

4  Since this is entirely a research -- a creation of

5  the research process.

6  BY MR. SIGALE:

7      Q.    Well, my hypothetical doesn't even really

8  require the homeowner have a gun.  They just need to

9  yell down the stairs, I have a gun.  Kind of like

10  putting a sign that says beware of dog on the fence

11  even if they really don't have a dog.

12          But I'm just -- I'm asking from the

13  generalized definition of it -- I understand you're

14  saying, well, it depends on the researcher.  But I'm

15  asking, in terms of what qualifies as a defensive

16  gun use, is there a generally accepted, this

17  qualifies and this doesn't?

18      A.    Well, I think defensive gun use is a

19  creation of the survey process, and it is

20  operationally defined however the researcher decides

21  to define it.  So you can certainly decide that

22  there doesn't actually need to be a gun and you're

23  still going to use that as a possibility.

24      Q.    Okay.

1      A.    As far as I know, those instances were

2   not -- have not been counted in the surveys that

3   have been done, but I'm not positive of that.

4      Q.    So to your knowledge, they involve

5   instances either when a would-be victim either

6   showed the gun or used the gun in defense?

7      A.    Or used the gun or indicated -- yeah.  I

8   mean, there have been instances -- for example, one

9   case that I remember where somebody was lying in bed

10  and they heard a noise in the hall and so they got

11  their gun out and fired through their bedroom door,

12  but they never actually saw anybody, and then they

13  reported that as a defensive gun use.  So it was not

14  necessary to actually see the attacker or know that

15  one existed.

16     Q.    I'll assume in that example the person

17  lived alone and knew that nobody else would be in

18  the hallway.

19     A.    Yeah.  But it might have been an animal

20  or something.  Anyway, yeah.

21     Q.    Okay.  And you wrote in December of 2000

22  in the article Gun Control that researchers Kleck

23  and Mertz -- or Kleck and Gertz listed two and a

24  half million self-defense uses each year based on a

1    telephone survey.

2           Do you recall that?

3      A.    I've reported that result in a number of

4    articles.  I am not sure about that one.

5      Q.    And that you wrote with Ludwig and

6    Hemenway in 1997 that it would appear that use of

7    guns in self-defense against criminal predation

8    occurs approximately 100,000 times a year.

9           You recall writing that?

10     A.    The 100,000 number comes from the

11   National Crime Victimization Survey.

12     Q.    That's a federal database, right?  That's

13   a federal survey?

14     A.    It is, yeah.

15     Q.    So as long as we're talking what's

16   reasonably possible and we're coming up with

17   possibilities of what might happen if firearm ranges

18   were allowed to likewise sell firearms, that someone

19   might get their hands -- a bad guy might get somehow

20   their hands on a firearm and use it for something,

21   it is also reasonably possible that someone will

22   train with a firearm and purchase a firearm and that

23   it might some day save their life.  Is that also

24   possible?

1        MS. HIRSCH:  Objection, incomplete

2   hypothetical.

3   BY THE WITNESS:

4        A.    I think that's possible, sure.

5   BY MR. SIGALE:

6        Q.    Is it reasonably possible?

7        A.    That there would exist cases like that?

8        Q.    Yeah.

9        A.    Over an extended period of time, yes.

10       Q.    Okay.  And I understand there's a

11  disparity between 100,000 uses and 2.5 million uses.

12  I understand there's a disparity there.

13            So even using the number you put in from

14  your 1997 study that you later repeated in this 2000

15  article that you probably used other places, as

16  well, to the extent you know, has that number, your

17  number, held steady or has it increased or...

18       MS. HIRSCH:  Objection, that's not his number.

19       MR. SIGALE:  Well, it is his number, actually,

20  from -- it's his published number from '97.

21       MS. HIRSCH:  Okay.

22       MR. SIGALE:  Yeah.  '97.

23  BY THE WITNESS:

24       A.    So that number, I believe, has declined

1    over time, along with the general decline in violent

2    crime.

3    BY MR. SIGALE:

4        Q.    And this is nationwide?

5        A.    Yes.  It is the National Crime

6    Victimization Survey.

7        Q.    Okay.  And this includes in the other

8    cities in America where gun sales are allowed?

9        A.    Yes.  It is a nationally representative

10    sample.

11        Q.    Okay.  I asked you if -- I want to make

12    sure I clarified this.  I asked you before whether

13    or not you're aware of any other -- I think I said

14    large American city where gun sales are banned, and

15    you said no.

16            Are you aware -- just so I make sure I've

17    asked it.  Are you aware of any other large American

18    city where gun sales at firing ranges specifically

19    are banned?

20        A.    I am not aware of that.

21        Q.    Okay.  You mentioned earlier that -- I

22    asked you a question about whether or not you've

23    done any research and come up with conclusions that

24    favored firearm rights and firearm use, and you had

1    said -- before talking about the JAMA Brady Act

2    article, you mentioned that, well, your job isn't --

3    you know, other people might use your results for

4    their own purposes, but basically you're just doing

5    the research and putting the results out there.

6            And I'm paraphrasing a little bit, but do

7    you recall that discussion?

8        A.    When I'm working as a scholar, I am very

9    careful to try to report accurately my findings.

10       Q.    Okay.  And I just want to clarify today,

11   is that in your opinion what you're doing today?

12   Are you here advocating for -- strike that.

13           Are you here today with the conclusion

14   that there should be a ban on gun sales in Chicago?

15       A.    No.  That is not my personal conclusion.

16       Q.    Okay.  You're saying, basically, I've

17   been asked to come here to -- no.  Strike it.  I'm

18   not going to rephrase what they want to -- what they

19   want to ask you to come here for.

20                  (Short pause.)

21   BY MR. SIGALE:

22       Q.    As part of the framework of your

23   research, specifically that involving firearms, is

24   it important to keep abreast, let's say, of legal

1    decisions, court decisions that involve firearms, or

2    does it not really play a part in what you do?

3        A.    In some cases, I have paid closer

4    attention than others.

5        Q.    Okay.

6        A.    But I'm not a legal scholar.

7        Q.    Okay.  Fair enough.  But you're aware,

8    then, perhaps, of the 2008 District of Columbia vs.

9    Heller decision?

10       A.    Yes.

11       Q.    Are you aware of the -- well, strike

12   that.  Let's make sure we have a clear record here.

13            And specifically, the ruling by the

14   Supreme Court in that case that firearm ownership

15   for lawful purposes, including self-defense, was an

16   individual, constitutionally-protected right?

17       A.    Yes.

18       Q.    Are you aware, also, of the 2010

19   McDonald vs. City of Chicago case which took that

20   ruling and applied it as to city and state

21   governments?

22       A.    Yes.

23       Q.    Okay.  And are you aware of the

24   7th Circuit Court of Appeal's opinion, Moore vs.

1    Madigan that said that individuals have a

2    constitutional right to carry a firearm in public

3    for self-defense?

4         A.    I'm not aware of the name of the case,

5    but I was aware there was a 7th Circuit decision

6    with that effect.

7         Q.    Moore vs. Madigan, so for your next

8    project you know.

9              Are you aware of the 7th Circuit's ruling

10   in this particular case that you're here testifying

11   about today from 2011 that people have a

12   constitutional right to train at a range with a

13   firearm for purposes of promoting their ability of

14   self-defense?

15        A.    I really don't know anything about that

16   decision.

17        Q.    Okay.  That pretty much summed it up.

18        A.    Okay.

19        Q.    So are you here -- you know, your page 2,

20   Roman IV, A, 1, about gun violence that occurs in

21   America, and certainly, it does, are you here today

22   advocating that at least as far as Chicago goes,

23   that law-abiding people should be banned from being

24   able to purchase firearms in the City because of the

1   gun violence that's referenced here on page 2?

2       A.    I did not intend my report to advocate

3   for a particular policy.

4       Q.    I'm sorry, I'm not asking about your

5   report.  I'm -- I'm asking about as you sit here

6   right now.  Are you advocating that the law-abiding

7   people of Chicago should be banned from being able

8   to sell and purchase firearms because there's gun

9   violence in America?

10      MS. HIRSCH:  Objection, relevance.  Objection,

11  he just said it's not about his report, so it's

12  beyond the scope what he's -- personal, you know,

13  viewpoints are --

14      MR. SIGALE:  No, I'm asking about his testimony

15  as he sits here today, whether or not it appears

16  here or not.

17      MS. HIRSCH:  He just -- asked and answered.  He

18  said it wasn't in his report.

19  BY MR. SIGALE:

20      Q.    Okay.  Well, then I'll ask the first

21  question -- then fine.  I'll ask that second

22  question first or whatever.

23          Is your report -- is your report

24  advocating that the law-abiding people of Chicago

1  should be banned from selling or purchasing firearms

2  for self-defense because there's gun violence in

3  Chicago or in America?

4      A.   The report has as -- I think what is its

5  principal conclusion that the ban is serving a

6  reasonable purpose, which is to improve the public

7  safety of the City.

8      Q.   Okay.

9      A.   This is not, in my world, enough to reach

10 a conclusion one way or another, but it is my

11 testimony in this case.

12         Let me elaborate.  I'm not reaching a

13 conclusion about the policy.  I'm simply saying it

14 has this plausible result in having increasing, you

15 know...

16     Q.   Because -- I guess going back to earlier,

17 that it's possible that if there is -- there are

18 firearms being sold that bad guys might get their

19 hands on them and do bad things with them?

20     A.   Yes.  It increases the possibility that

21 individuals will use a gun to commit a crime.

22 And -- that would not otherwise have occurred.

23     Q.   And that goes back to the -- the but-for

24 argument we were having before, where the gang

1  member who only has a firearm because he's in a gang

2  and the gang gave it to him, when he gets into an

3  altercation with his sister, or whatever, well, now

4  he's got a firearm to use that if he wasn't in the

5  gang, he wouldn't have had access to it?

6      A.    Yeah.  I think it's useful to have

7  examples like that in mind.  That's certainly one

8  possible example.

9      Q.    Okay.

10     A.    I would not say we want to limit the

11 discussion to gang members, you know, or the

12 scenarios of that sort.

13     Q.    Well, no.  Not every criminal in Chicago

14 belongs to a gang; is that -- has your research

15 been --

16     A.    Even in Chicago, that's --

17     Q.    Even in Chicago.

18     A.    In fact, it's only 20 percent of those

19 who are arrested in the City.

20     Q.    And we'll leave politicians out of the

21 equation, so we'll say street criminals.

22           But going back to the discussion about if

23 it's possible that a criminal will somehow get their

24 hands on a gun illegally from a gun store or a gun

```
 1    range store and use it to commit a bad act, it's

 2    also possible that the person that they're choosing

 3    to stick up will have also purchased a firearm from

 4    a range that they had trained at and they were able

 5    to successfully defend themselves.

 6              So that's possible, as well, too, right?

 7         A.    I think that's a logical possibility.

 8         Q.    Okay.  Professor, I admit I'm not sure

 9    where to go with this topic, so I'm just going to

10    raise it and we'll see where it goes.  Okay.

11              Page 3, Roman -- No. 2:  "Homicide is not

12    evenly distributed across the American population,

13    but highly concentrated among youthful minority

14    males."

15              And in that -- in that minority group,

16    84 percent -- 15- to 34-year-old minority males,

17    homicide is the leading -- well, it's "the leading

18    cause of death for blacks, and the second-leading

19    cause of death for Hispanic males," and collectively

20    "84% of homicides are committed with guns."

21              Do you --

22         A.    Yes.  Those are national figures.

23         Q.    As it pertains to this case, the banning

24    of firearms, the banning of illegal firearm sales
```

1    and specifically at firing ranges, I'm asking you,

2    what do I make of that statistic?

3        MS. HIRSCH:  Objection, vague and ambiguous

4    question.

5    BY MR. SIGALE:

6        Q.    If you understand.

7        A.    So the first two points are in effort to

8    establish a very general conclusion which -- and

9    that conclusion is that firearms violence is a

10   serious problem nationwide, as it is in Chicago.

11   And it's a problem worthy of public attention and

12   the attention of government agencies and our

13   legislatures.

14            And so the first point is simply that a

15   great many people die as a result of gun violence or

16   are injured.  And the second point is that the

17   effect of that in the case of homicide is to

18   increase disparities across racial and sex and age

19   groups.

20            Now, whether those disparities are seen

21   as a problem or not to -- worthy of public attention

22   depends on your values, but certainly many people in

23   the public health community believe that the large

24   disparities, for example, between blacks and whites,

1   is something that is worthy of public attention.

2   And this kind of violence exacerbates those

3   disparities.

4        Q.    I'm sorry, "this" being?

5        A.    The gun violence.

6        Q.    I see.

7              And to your knowledge, how many of

8   these -- actually, strike it.

9              To your knowledge, for these homicide

10  victims that are minority age 15 to 34 that receive

11  the high concentration of homicide rates, what

12  percentage of them, if you know, are committed by a

13  minority, as well?

14       A.    Most of them are committed by minorities.

15  I can't give you the exact statistic, nor can anyone

16  else.

17       Q.    Are you able to say how many of the

18  firearms that were used in the 84 percent of the

19  homicides of minority males age 15 to 34 in 2010,

20  looks to be the year you're reporting about here --

21       A.    Okay.

22       Q.    -- was the gun purchased legally by the

23  shooter?

24       A.    I don't know about whether the gun was

```
 1   purchased legally.  It's only a fraction, perhaps

 2   one in seven were purchased from a dealer.

 3       Q.    By the shooter or purchased legally --

 4   purchased by someone and then illegally trafficked

 5   or straw -- a strawman episode or something like

 6   that?

 7       A.    So the study that I did, again, the

 8   national survey of people incarcerated for gun

 9   crime, found that one in seven had acquired the gun

10   directly from the dealer.  Directly.

11       Q.    So that tracks about with the 84 percent.

12   So about 84 percent got it some other way?

13       A.    Probably 86 percent.

14       Q.    86.  Okay.  One in seven.

15       A.    Very close.  Yeah.  And that would just

16   be a coincidence if it came out the same.

17       Q.    Oh, okay.

18       MS. HIRSCH:  Yeah.  That number is --

19       THE WITNESS:  Yeah.

20       MS. HIRSCH:  -- a different number.

21   BY MR. SIGALE:

22       Q.    And while I certainly agree -- I just

23   want to make sure I'm clarifying for the record

24   here.
```

1          While I certainly agree with you it's a

2     topic worthy of public attention, you're not

3     advocating that the -- or you're not testifying here

4     today that the solution to that problem is to ban

5     law-abiding people from being able to purchase

6     firearms for self-defense?

7          A.     No.  My report does not include a

8     statement like that.

9          Q.     And your report isn't concluding and

10    you're not testifying here today that the solution

11    to the high minority homicide concentration, as

12    listed in this paragraph, is to ban law-abiding

13    people from following the law and selling firearms

14    to other law-abiding people for self-defense

15    purposes in the City; is that correct?

16         A.     So let me just say that there is no one

17    solution, and certainly this report is not talking

18    about the solution to violence or gun violence.  It

19    is only talking about the particular role of guns in

20    violence and how that has the effect of intensifying

21    violence and increasing the death rate.

22              So I would not ever want to be cited as

23    saying that I felt one or the other of the many

24    approaches we can take to reduce violence is the

1   solution.  And certainly, this report does not say

2   anything like that.

3        Q.    Okay.  So, I'm sorry, just to clarify for

4   my question, you're not listing in your report and

5   you're not testifying here today that the solution

6   to this minority homicide rate problem, and it is,

7   but you're not testifying or reporting that the

8   solution to that is to ban law-abiding people from

9   selling firearms to other law-abiding people for

10  self-defense purposes?

11       MS. HIRSCH:  Objection, asked and answered.

12  BY THE WITNESS:

13       A.    So the conclusion of the report is that

14  the regulation on the firing range is going to

15  plausibly reduce the amount of gun violence in the

16  City.

17  BY MR. SIGALE:

18       Q.    So are you testifying that -- that this

19  is going to be -- that a ban on law-abiding people

20  operating and selling firing ranges -- firearms to

21  law-abiding people is going to solve this minority

22  homicide problem?

23       MS. HIRSCH:  Objection, asked and answered.

24       MR. SIGALE:  I don't believe I've gotten an

1    answer, so I want to make sure I have it.

2        MS. HIRSCH:  You have.  He's stated he's not

3    advocating one position or another, as far as the

4    solutions that may solve.

5        MR. SIGALE:  Well, then it's a yes or no

6    question, then.

7    BY THE WITNESS:

8        A.    So -- and I would have to be more of a

9    logician than I am to know whether the answer is yes

10   or no, but I -- the point is that I was not asked to

11   say whether I supported any particular policy, nor

12   did I say whether I supported any particular policy.

13   BY MR. SIGALE:

14       Q.    Okay.  Okay.

15       A.    So is that a no?  I don't know.

16       MS. HIRSCH:  I don't remember the way it was

17   phrased.

18   BY MR. SIGALE:

19       Q.    So your report does not support the

20   policy of banning firearm sales and firing ranges by

21   law-abiding people to law-abiding people?

22       MS. HIRSCH:  Objection, asked and answered for

23   the third time.

24

1    BY MR. SIGALE:

2        Q.    Your report is not -- your report is not

3    supporting that policy, true?

4        A.    I -- what my report does is to discuss

5    one of the consequences of that ban or -- or -- or

6    removing that ban.  So it is a fairly narrow

7    statement of my opinion in that respect.  It does

8    not begin to encompass the overall costs and

9    benefits of this law.

10       Q.    Okay.  Well, for all of the -- we can

11   agree that of all the minority homicide victims in

12   Chicago, none of them were murdered with a firearm

13   that was legally purchased at a gun store or a gun

14   range in Chicago?

15       A.    Yes.  That's almost certainly the case.

16       Q.    Okay.

17       A.    Yeah.

18       Q.    All right.  Let's talk about this

19   subparagraph 4 here that is titled:  "The medical

20   costs of gun violence are substantial, but

21   constitute only a fraction of the overall social

22   costs."

23       A.    Yes.

24       Q.    In the second paragraph of this -- you

1    know, let's go to the first paragraph.  I just want

2    to ask you where the dollar amounts came from in the

3    first paragraph.

4        A.    Well, that's a reasonable question, but

5    the answer is complicated.  We needed to have

6    sources of data on the number of gunshot wounds that

7    were treated, the acute care costs of treating them

8    and also the lifetime cost of treating them.

9             And we had different sources of data.

10   Some states provided data that was useful for some

11   aspects of this; some states for others.  And we did

12   the best that we can in generating this estimate to

13   combine the different sources of information on, for

14   example, hospital discharge studies that have been

15   done, or particular studies of the long-term

16   consequences of gunshot injury that paralyzed the

17   victim or caused traumatic brain injury where the

18   costs continue to be incurred 30 years later in many

19   of these cases.

20            So if you read the article, you'll see

21   that it was quite an elaborate estimation exercise.

22   And that this is intrinsically difficult to get at

23   this number.

24       Q.    Do you have any -- from this study, are

1   there any statistics or any findings regarding

2   the -- well, if I go to the second paragraph of

3   this, it says there were 439 gun homicides in

4   Chicago in 2012.

5           It also says that using a nationwide kind

6   of statistic, you have about 2634 -- going to

7   page 4, top of page 4 -- nonfatal gunshot injuries

8   being treated in the emergency room.

9           Do you see where I'm reading from?

10  A.    Yes, I do.

11  Q.    All right.  So you got -- and obviously,

12  that's an estimate because the -- you're kind of

13  using that five cases per homicide as kind of an

14  average, correct?

15  A.    That's right.  Nationwide, there are five

16  assault cases resulting in a nonfatal gunshot wound

17  for every assault case that end in a gunshot wound

18  that is fatal.

19  Q.    Okay.  Of those -- so you're talking --

20  2634 plus 439 is 3,073.  Well, I'm sorry, I -- I'm

21  going to back up a step.

22          Your medical costs, does that include the

23  homicides or does that just include the 2634 --

24  A.    Oh, it -- I'm sorry.  It includes the

1    homicides --

2         Q.    It is --

3         A.    -- that were treated, yeah.  Some of the

4    people who were treated then died.

5         Q.    Okay.  Does it -- is there a certain

6    number that needs to be removed, like, from those

7    who were shot dead on the street and all they did

8    was call the coroner?  Does some indeterminant

9    number need to be removed from that 439 for these

10   purposes, or is that the 439 gun homicides that were

11   treated at a hospital and, say, they died on the

12   table or something?

13        A.    Right.  No.  I understand the point.  It

14   is possible that there are 1 or 200 cases that did

15   not receive any treatment.

16        Q.    All right.  So we're talking 2900 -- 28,

17   2900 to 3,073, if we add everybody into the total,

18   correct?

19        A.    I'm sorry, I -- I believe that the 2634

20   includes the gun homicides.

21        Q.    Okay.  439 times 5.  Okay.  So that makes

22   sense.  All right.  So 2634.

23              And maybe it's as low as 2400 or so

24   because some of the gunshot homicide victims may not

1    have ever made it to a hospital.

2              So my question to you is ultimately, now

3    that we're kind of on the same page with the

4    numbers, do you have any way of knowing how many of

5    these people were innocent victims?  They were

6    either mugging victims?  They were bystanders during

7    a drive-by?  Somebody broke into their house and

8    shot them?

9              Do you have any way of knowing, as you

10   sit here, how much of that 2634 was people in that

11   category versus a drug deal goes bad and a couple

12   drug dealers shoot each other on the street or one

13   gang member gets into a thing with another gang

14   member?

15       A.    I certainly don't have that as part of

16   this estimation of the medical costs, and I would

17   say that it is probably impossible to do the sorting

18   that you're suggesting into people who are innocent

19   and people who are guilty of something.  I mean, I

20   just don't know how you would go about doing that.

21       Q.    And just to be clear, when this record

22   gets put in front of a court -- I'm not saying

23   anyone deserves to be shot and murdered on the

24   street, but I was merely asking if you had -- if

1    your data had delineated those categories.

2           Will the medical costs go down if someone

3    in this total who is an innocent victim is -- has a

4    defensive gun use with a gun they purchased and

5    trained with and was able to fend off the mugging or

6    the robbery and, therefore, they don't have to go to

7    a hospital with a gunshot wound?  Is it -- is it

8    reasonable that that person's -- that the medical

9    cost total will go down?

10     A.    Let me give a longer answer to that

11    question than I had before.

12          So years ago, Gary Kleck and a coauthor

13    did a study about the use of guns in self-defense in

14    cases that were reported in the National Crime

15    Victimization Survey over a number of years.  And it

16    was a study that included something like ten years

17    of data that they brought together, so it had an

18    impressive sample size.

19          And they were then able to compare the

20    outcomes of cases where the victim who -- the

21    respondent that reported using a gun with cases

22    where the victim reported using a knife or running

23    away or using some other means of self-defense.

24          And based on that study, which I have

1    looked at carefully, there is no particular

2    advantage to using a gun; that is, the people who

3    said they used a gun after they were assaulted or in

4    the course of the robbery to defend themselves did

5    not have better outcomes than people who used a

6    knife or who used another type of weapon.

7            And I will say that, but -- it's probably

8    the best evidence we have on this question.  The

9    proviso that I think is important in this is that

10   the National Crime Victimization Survey does not

11   include victims who were killed, for obvious

12   reasons.  They are not available to report to the

13   surveyor.

14       Q.    Right.

15       A.    But for the great bulk of victims of

16   assaults and robberies who survived and live to tell

17   the story, so to speak, then their data allows us to

18   do this kind of comparison.

19       Q.    I don't mean to be glib, but what kind of

20   knives?  Like, the big Crocodile Dundee kind -- I'm

21   dating myself -- from, "That's not a knife."  But

22   for, like, a switchblade, you know, or a Swiss army

23   butcher knife?  Is there any --

24       A.    Yeah.  The victimization survey does not

1    ask detailed questions about the design of the

2    knife, so we don't know.

3         Q.    But when you're saying -- when you're

4    saying there that the finding there was for those

5    people that the out -- the outcome wasn't any better

6    for having a gun than a knife, what you're --

7    another way of saying that is that their

8    self-defensibility worked equally well for having a

9    knife than a gun?

10        A.    On average, yeah.

11        Q.    Does the City of Chicago allow people to

12   carry knives around?

13        A.    I don't know the answer --

14        Q.    Okay.

15        A.    -- to that.

16        Q.    Do you know one way or the other whether

17   since the McDonald decision in 2010 which struck

18   down the home handgun ban in Chicago, did firearm

19   ownership in Chicago increase?

20        A.    I do not know the answer to that.

21        Q.    Okay.  You said crime -- well, strike

22   that.

23             And forgive me if you already said this,

24   but has -- statistically speaking, violent crime in

1    Chicago, what's the trend been in the last, I guess,

2    five years since the Heller decision?  Has violent

3    crime increased?  Decreased?  Stayed flat?

4         A.    The murder rate in Chicago has been

5    fairly flat for the last five years, if we include

6    2013.

7         Q.    Sure.

8         A.    Except for last year where it jumped up a

9    bit.  So it was higher than it had been, but now it

10   seems to have dropped back down.

11        Q.    What about violent crime in general,

12   outside of murder?

13        A.    I don't know about other types of violent

14   crime.

15        Q.    What about nationally?  Do you know?

16        A.    Yeah.  Nationally, we have had a

17   long-term reduction in violence, starting in 1993.

18   So over the last 20 years, there has been a dramatic

19   reduction.  And it's been not only for murder, but

20   the murder rate is now half of what it was in 1993

21   or less.  But also for robbery.  And it's probably

22   true for assault, too, but it's hard to measure

23   assault.

24        Q.    So I'm sorry, you're saying it has

1    decreased or --

2        A.    Dramatically decreased for the last

3    20 years.

4        Q.    Has firearm ownership increased,

5    decreased or stayed flat during the same time?

6        A.    Firearms ownership had peaked around 1980

7    and has been going down overall since then.  Very

8    recently, the -- that is in 2012 and 2013, there

9    might have been an uptick in that long-term downward

10   decline, but it's hard to say.  And we have at least

11   three different polls that have those kind of time

12   series, and they don't necessarily agree with each

13   other.

14       Q.    Okay.

15       A.    I think they all agree that there was

16   this peak around 1980 and that there has been a

17   decline in the percentage of households that have at

18   least one gun.

19       Q.    What about the number of guns overall?

20       A.    So that is one of my favorite topics, but

21   the bottom line is that we have no idea.

22       Q.    Okay.

23       MR. SIGALE:  You're looking at your watch.

24       MS. HIRSCH:  Just curious.  I'm fine.

```
 1              Are you fine?
 2         THE WITNESS:  Yes.
 3    BY MR. SIGALE:
 4         Q.    Page 4, the first full paragraph talks
 5    about what you describe as the other social costs of
 6    firearm violence.
 7              You talk about weapons, screening in
 8    schools, like metal detectors, and public buildings.
 9    People leaving the City for -- well, leaving
10    whatever community it -- I guess, you're -- are you
11    writing about Chicago in this paragraph, or are you
12    writing about in general?
13         A.    I'm sorry, this is the first paragraph or
14    the second --
15         Q.    First full paragraph.
16         A.    Okay.
17         Q.    "The medical costs are only a
18    fraction..."
19         A.    Right.  This is kind of a universal
20    truth.  It certainly would apply to Chicago.
21         Q.    So you talk about then, if I'm applying
22    this to Chicago, that schools get -- and public
23    buildings get metal detectors, people leave the City
24    or at least leave their neighborhood and move to --
```

1    do they leave the City, or do they just go to other

2    parts of the City?

3        A.    Either one of those is certainly

4    possible.  Moving to the suburbs is a possibility.

5    The original source on this, I think I better not

6    say since I'm not confident of the original study.

7    Certainly, it could be checked, but I think that the

8    testimony that was provided by Jens Ludwig was about

9    leaving the city.

10       Q.    Are you aware as you sit here how much

11   that is -- whatever he's referring to in this

12   paragraph -- or you're referring to in this

13   paragraph, how much different is that from the

14   migration rates from the city for any other reason?

15       A.    Right.  So the study that was done

16   originally by Julie Cullen and Steven Levitt was

17   trying to estimate the effect of crime on -- of

18   migration or on -- on migration patterns where the

19   thought experiment was to say controlling for

20   everything else that might be influencing migration

21   patterns, what additional difference does crime

22   make.

23            And then when you focus specifically on

24   homicide, then that's where the estimate comes from

1    that we're using -- used in our book that we

2    published in 2000, and which is 70 people leave per

3    homicide on the average -- I mean leave the city.

4        Q.    How many leave for other reasons?

5        A.    Well, that -- of course, people come and

6    go for all kinds of reasons.  These -- you know, in

7    the last 20 years, the population of New York City

8    has been increasing and the population of Chicago

9    has been going down a bit, and that can be for

10   reasons of jobs, it can be -- certainly a concern

11   about the school system, it could be a variety of

12   other factors about the quality of life leaving the

13   City compared to the alternative.

14           As is so often the case, there are a

15   variety of causes.

16       Q.    You write:  "The threat of gun violence"

17   "in some neighborhoods" -- "is in some neighborhoods

18   an important disamenity, causing residents to be

19   fearful and take special precautions to protect

20   themselves and their children."

21           What special precautions are you

22   referring to?

23       A.    Journalistic accounts sometimes focus on

24   this.  People say, I don't let my child play outside

1    after 4 o'clock in the afternoon.  In extreme cases,

2    they might stay away from windows when they're

3    inside the house.  There was one case I remember of

4    a mother who said her child slept in the bathtub

5    because she felt it gave him some protection against

6    stray bullets.

7         Q.    Are you --

8         A.    But the great reason -- the great

9    mechanism for defending yourself is to move, if you

10   can.

11        Q.    Everything you said before moving, when

12   you say "journalistic accounts," do you mean, like,

13   stories in the newspaper?

14        A.    I mean stories in the newspaper where

15   reporters have interviewed people on this.  So they

16   kind of flesh out the situation.

17        Q.    Okay.  "That threat depresses property

18   values and puts a drag on economic development."

19             Are you -- is there specific findings

20   regarding that, or is that more common sense?

21        A.    Well, it is common sense, but there also

22   has been specific studies that had been done on that

23   issue.  There have been several studies in New York

24   City, for example, to understand the effect of

1  declining crime rates, their -- on property values

2  in Manhattan.

3          And, of course, the answer is, there's

4  been a dramatic decline in crime and violence and a

5  dramatic increase in property values, but economists

6  at NYU have been able to analyze the connection

7  between the two of them.

8      Q.    I'm sorry, have or have not?

9      A.    Have.

10     Q.    Okay.

11     A.    And so I think that there has been that

12  kind of analysis trying to understand the effective

13  neighborhood violence on property values and housing

14  values.  There's research done on -- more

15  internationally about the role of violence in

16  discouraging investment in particular communities.

17         But that, again, is common sense.

18     Q.    So if people feel safer, they're more

19  likely to come to an area?

20     A.    They're more likely to come, they're more

21  likely to invest, to start a business, yeah.

22     Q.    Again, as far as the City of Chicago

23  goes, none of the social costs were incurred because

24  people purchased firearms at a firearm store or a

1    firing range in the City of Chicago?

2         A.    As far as I know.  I don't know what was

3    happening before 1982, so perhaps there's some guns

4    left over from those days.

5         Q.    The perhaps some guns are left over from

6    those days, is that -- is that really the cause of

7    the dollars and the social costs you're writing

8    about in this report?

9         A.    No.  I think that that is going to be a

10   small effect.  I just am not willing to say it's

11   zero without knowing more.

12        Q.    Okay.  As far as being able to purchase

13   firearms legally for self-defense, whether it's at a

14   store or a fire -- gun shop or a firing range, is

15   there a social benefit to people feeling more secure

16   in their ability to protect themselves and be safe?

17        A.    If you're asking for my personal opinion

18   about this, you know, I certainly believe that

19   people's individual values are relevant and that

20   should be treated respectfully.  Would I necessarily

21   think they're making a good judgment?  The answer is

22   no.

23        Q.    Why is that?

24        A.    I might have the sense that people do not

1   understand the liability of having a handgun in

2   their home.  And it's easy to imagine defending

3   themselves against an intruder, for example, but

4   maybe not so obvious imagining all of the things

5   that can go wrong if you have a handgun in the

6   house, which turn out to be more frequent overall.

7          So the gun gets used in suicide, the gun

8   gets used in domestic violence, the gun gets taken

9   away by the teenage kid who takes it to school or

10  uses it some other way.  A gun gets picked up by a

11  five-year-old used to shoot his little brother.  I

12  mean, there's a great many risks that are associated

13  with a gun that are perhaps less vivid and less

14  imaginable than the intruder scenario.

15     Q.   Well, are there statistics on what you

16  just said, or is it more in the journalistic -- I

17  forget the phrase you used earlier.

18     A.   Uh-huh.

19     Q.   I mean, you read a story in the newspaper

20  and you say, oh, well, yeah, that happened.

21     A.   Yeah, in all of those, there are

22  systematic studies.  There's, for example, an

23  extensive study of domestic violence by Jacquelyn

24  Campbell at Johns Hopkins University with a finding

1    about the role that guns play in domestic violence

2    and quantifying the likelihood somebody would end up

3    dead as a result of domestic violence if there's a

4    gun as compared with if there isn't.

5         Q.   Well, is there a conclusion regarding

6    whether or not that someone is the abuser or the

7    victim?

8         A.   Mostly, it's the woman.  And in most

9    cases, it's the victim.

10        Q.   So that would go down reason -- that --

11   it would be reasonable to think that that would go

12   down if women were able to purchase a firearm and

13   train on it and be able to defend themselves?

14        A.   Well --

15        Q.   When drunk husband or ex-husband or

16   ex-boyfriend tries to break in the door at 2:00 in

17   the morning and doesn't give a crap about the

18   restraining order that the wife is holding?

19        MS. HIRSCH:  Just object.  Calls for

20   speculation.  It's an incomplete hypothetical with a

21   lot of varying factors, and it's also beyond the

22   scope of what you're testifying to.

23             But if you have an opinion...

24   BY THE WITNESS:

 1          A.     Yeah.   I think we can imagine the husband

 2   and wife duelling with each other as the right

 3   answer to domestic violence, but I don't believe it

 4   is.   I think we would probably be better off to

 5   remove the gun in the first place.

 6                And -- and --

 7   BY MR. SIGALE:

 8          Q.     Well, but --

 9          A.     -- certainly the number of fatal gun

10   accidents and nonfatal gun accidents in the home is

11   something that has been quantified, so we know about

12   that.

13                We have a pretty good idea about the

14   sources of guns to criminals and to users that often

15   involve removing them from the home, including some

16   of the rampage shootings.   So...

17          Q.     But one of the solutions there -- the

18   solution there, going to that last one and -- the

19   solution isn't banning law-abiding people from being

20   able to purchase firearms for self-defense; it's

21   better mental health care, it's better parenting,

22   it's better policing, it's better judicial system

23   that if someone gets a restraining order that it

24   might actually have some teeth behind it, rather

1    than, you know, not being worth the paper it's

2    written on.  I mean --

3        MS. HIRSCH:  Are you asking a question?

4    BY MR. SIGALE:

5        Q.    Would you agree?  I mean, those are

6    all -- those are all possible solutions to these

7    problems, or at least partial solutions to these

8    problems.

9        A.    They sound good as partial solutions.  As

10   I said before, I don't see that there's one single

11   solution to any of these problems.

12             And I would also say that the U.S., the

13   mental health problem, the domestic violence

14   problem, the drug abuse problem, all of those are

15   much more deadly than they are in Europe or Canada

16   or in places where there's far fewer guns.  So it's

17   not that removing the guns is the only answer.  But

18   the fact that there are guns in the home raise the

19   stakes on all of these things.

20       Q.    What -- sticking with this paragraph --

21   first full paragraph on -- well, whatever, the whole

22   section on costs.  Let's say -- and I'm making it --

23   strike the question.

24             The medical costs that you list in 2012

1    in Chicago and the other costs, the fear costs,

2    currently all exist under a regime that bans the

3    purchase of firearms by law-abiding citizens in the

4    City; is that correct?  All of this is taking place

5    while that's the legal situation?

6        A.    Yes.  That's my understanding.  That's

7    what I believe.

8        Q.    So other than the fraction that you

9    mentioned earlier of guns maybe laying around since

10   before 1982, legally purchased firearms that were

11   purchased in the City of Chicago is not the cause of

12   these costs that you write about in this report?

13       A.    I think that's fair to say, yes.

14       Q.    If I were able to -- well, not I.  I

15   wouldn't be able to do it.

16            But if the police were able to completely

17   eliminate the gang problem in Chicago -- if the

18   police were able to wipe out the gang problem in

19   Chicago, whether putting them all in jail or

20   convincing them to change their ways or whatever,

21   what effect would that have on these costs?

22       MS. HIRSCH:  I just want to object that it's a

23   hypothetical.  It's an impossible hypothetical, to

24   use one of your objections.

1          Go ahead.

2     BY THE WITNESS:

3          A.    Yeah.  I -- I expect that it would reduce

4     the amount of gun violence, and so it would reduce

5     certainly the medical costs and the -- all of the

6     other consequences of that.

7               Although, I'd want to hear more about

8     your scheme for eliminating gangs --

9     BY MR. SIGALE:

10         Q.    Well, unfortunately, it involves

11    suspending other constitutional rights.

12              But if there was a way to do it, would

13    you expect that it would greatly reduce these costs?

14         A.    My guess, and certainly this is just not

15    based on anything like a study, but my guess is the

16    answer is it would be substantial.  It could be

17    20 percent.  I don't know.

18         Q.    I'm sorry, could be what?

19         A.    It could be 20 percent.  Who knows.

20         Q.    When we were talking earlier, much

21    earlier, about Chicago having three times the murder

22    rate than the national average and I asked you why

23    that is, and we talked about poverty and gangs and

24    lack of education and joblessness and, for whatever

1    reason, the high concentration among minorities, is

2    that -- are those the same factors that are the

3    cause of these costs?

4        A.    In a mechanistic sense, yes, the costs

5    are simply a multiple of the number of gunshot

6    injuries.

7        Q.    And the gunshot injuries are caused by

8    the factors that we're talking about?

9        A.    Right.  That these are, for the most

10   part, assault cases and...

11       MR. SIGALE:  Nicole, let's go off one second.

12              (WHEREUPON, discussion was had off

13               the record.)

14   BY MR. SIGALE:

15       Q.    I want to go to this paragraph on page 4

16   about the social costs.

17              The third line -- the third line says --

18   the end of the third line, you're talking about a

19   contingent-valuation survey where you say to

20   survey -- surveyees, would you vote for a program to

21   reduce gun violence by 30 percent in your community

22   and it will entail a specified increase in their

23   taxes.

24              First of all, what's the specified

1    increase?

2        A.    The specified increase in their taxes was

3    different for different respondents.  So we

4    randomized.

5        Q.    What did you ask in the poorest

6    neighborhoods?

7        A.    It was -- we were asking them, for

8    example, $50, $100 or $200 is, I believe, the three

9    numbers we started with.  And which number was

10   included in the question was a matter of a random

11   draw.  So it had nothing to do with whether they

12   were poor or rich, what neighborhood they lived in.

13            So the goal was to trace out the demand

14   curve, if you will, for safety.

15       Q.    Well, I'm sorry, I just want to make sure

16   I understand this.  So when you're saying it's

17   randomized, do you mean some people in the South

18   Side might have got asked, would you pay $500, and

19   people on Lake Shore Drive might have got asked if

20   they would pay 20?

21       A.    It was based on three numbers, 50, 100 or

22   200, but, yes, the South Side respondent might get

23   the 200 by chance, the upscale respondent might get

24   the lower number.

1    Q.    And would you say that you got more of

2    a -- you got more of a positive response from the

3    rich neighborhoods than the poor?

4    A.    Yes.  The -- other things equal, the

5    likelihood the respondent would say, yes, I'd vote

6    for the increase with the respondent's income.

7    Q.    And ironically enough, the people who

8    live in those neighborhoods experience less crime on

9    average to begin with?

10   A.    They do, yes.  But they place obviously a

11   great value on their personal safety and the safety

12   of their children.

13   Q.    When they're being asked this survey

14   question, they're being asked this survey question

15   knowing there's no such program, correct?

16        And just by way of comparison, you know,

17   election time, you might get asked to vote for a

18   specific bill or a specific referendum that you know

19   is going to increase your taxes and might have

20   benefits for the schools or community or whatever it

21   is, but you know that you're voting for referendum

22   or Proposition 22 or whatever it is.

23        But when you were doing your survey,

24   there was no specific actual proposition or program

1   that existed at that time, correct?

2       A.    That's correct.  It was hypothetical.

3       Q.    So the respondents knew that they weren't

4   actually being asked to put forth any money,

5   correct?

6       A.    That's correct.

7       Q.    And did you ask people about their income

8   levels when you did the survey?

9       A.    We did.

10      Q.    You did?

11            So you knew whether or not the person you

12  were asking, would you pay $200, actually had $200?

13      A.    We knew their income level, which might

14  be a different issue.

15      Q.    Well, okay.  And I don't mean to be glib,

16  but sometimes when you do surveys, the -- at the

17  end, you get asked, like, some -- you get asked some

18  categorization questions, for lack of a better word,

19  and one of them is, is your income, you know, under

20  50, 50 to 60, 60 to 75.

21            Is that the kind of income information

22  you're talking about?

23      A.    Yes.

24      Q.    Okay.  Did you do any -- so you asked a

1    survey question that would say, how much would it

2    reduce by 30 percent?  Did you ask people what would

3    you pay to reduce it by an additional 30 percent?

4         A.   No.  We did not ask that.

5         Q.   So, like, from 100 to 70, for example,

6    100 percent to 70 percent, basically?

7         A.   Right.  Yeah.  It was just a single

8    hypothetical, a 30 percent reduction from whatever

9    it is now in your community.

10              And then we asked a follow-up question,

11   but it did not change -- did not change the

12   30 percent.  It had changed the price, in effect.

13        Q.   So your research, this survey didn't take

14   into account any, like, diminishing returns, what

15   would people pay for the additional reduction in

16   crime?

17        A.   Right.  We only ask about 30 percent.

18        Q.   Okay.  Is -- in your opinion, is data

19   regarding diminishing marginal returns, is that

20   important in getting information like this?

21        A.   Well, in this specific case, I think the

22   question is -- that you're asking is whether we then

23   offered to reduce the crime rate by 60 percent

24   instead of 30 percent, would that be worth twice as

1    much?  Is that your question or --

2         Q.    No.  I'm asking -- I mean, I suppose

3    that's one possibility, but I'm just asking whether

4    there was any question whether or not in doing a

5    survey of that type, getting data such as -- for the

6    further reductions and how much people would be

7    willing to pay, whether or not that's important?

8         A.    I think it would be interesting.  Ours

9    was the first study that asked anything like this

10   ever, so it was a beginning.  There's more that

11   could be done.

12        Q.    How many people were surveyed in this?

13        A.    I'm sorry.  I'm not confident of the

14   number.  It was over a thousand, but I don't

15   remember exactly.

16        Q.    How many said no?

17        A.    I'd have to go look at the report.

18   Certainly, there were some people that refused to

19   respond, which there always is in a survey.

20        Q.    I don't mean -- okay.  But refused to

21   respond isn't the same thing as no?

22        A.    Oh, who said no in -- okay.  We asked --

23        Q.    No, no.  Not no, I'm not going to take

24   your silly survey; I mean, no, I'm not willing to

1   pay to reduce the violence in my community by

2   30 percent?

3        A.    Got it.  Got it.

4              Okay.  So there was a range depending on

5   what price we offered them, and at $50, 25 percent

6   said no, at $200, it was up to something like

7   35 percent.  So the higher price, unsurprisingly,

8   produced more -- more noes.

9        Q.    What were the noes based on?  They don't

10  care about crime, or they don't have the money?

11       A.    That they didn't think it was worth it to

12  them given the amount of money that was involved.  I

13  don't know.  We didn't -- we did not explore that

14  question.  We didn't say, how could you possibly say

15  no to reduce -- so...

16       Q.    Okay.  And did you explore why they said

17  yes?

18       A.    No.

19       Q.    So it was just a yes, no -- dollar

20  amount, yes/no question?

21       A.    Right.

22       Q.    Okay.

23       A.    And then we related the pattern of yeses

24  and noes to their circumstances.

1      Q.    And on average, the more money they were

2  being asked to pay, the less they would be willing

3  to pay it, and the richer they were and presumably

4  could afford it, the more likely they would be

5  willing to say sure?

6      A.    Yes, that's right.  Those were two

7  patterns, and another one is if they had children,

8  they were more likely to say yes.

9      Q.    Okay.  So this national valuation of

10 24 billion for 30 percent reduction, that's based

11 solely on adding up the dollar -- so you take the

12 survey -- surveyees who said yes and add up the

13 dollar value of what they would be willing to pay,

14 some of them were 50, some of them were a hundred or

15 200 and adding that all together and that's where

16 you got the 24 billion?

17     A.    The $24 billion is based on the demand

18 curve that we estimated.  So what we're selling to

19 them is a 30 percent reduction in gun violence, and

20 what we know from the experiment, which is some of

21 them were offered a higher price than others, that

22 the higher the price, the fewer of them are going to

23 say yes.

24            And so that in a cost-benefit framework,

1  then the way you estimate the benefit for something

2  like this would be to look at the area underneath

3  the demand curve.  And so you can think about it

4  geometrically, but that's the way it's done.

5      Q.    And does that factor in the noes, or does

6  that just basically factor in the yeses?

7      A.    It takes into account the -- the

8  likelihood of saying no at different prices.  So

9  that's what it does.

10     Q.    So is it one of the conclusions that 25

11 to 35 percent of survey respondents experienced no

12 social cost at all?

13     A.    No.  We did not push it beyond the yes/no

14 for the price we gave them and then a follow-up

15 question which gave them a different price.

16     Q.    What was --

17     A.    But we never asked them, would you take

18 this if it were given to you?

19     Q.    What was the follow-up price?

20     A.    If they said yes the first time, then the

21 second time we doubled it.

22     Q.    Oh.

23     A.    And if they said no the first time, the

24 second time we halved it.  So that provided

1    additional information in this demand curve,

2    although -- well, I won't go into the

3    technicalities.

4            But we never asked your question, as I

5    understand it, which is, would you support this if

6    it were paid for by the federal government, so it

7    costs you nothing; or would you support it if it

8    were free, and some people, who knows, might say, I

9    like gun violence; I want to keep it in my

10   neighborhood.

11      Q.    Well, and you don't know how many of the

12   people, the 25 to 35 percent that said no said no

13   for exactly that reason, that they're perfectly fine

14   with the level of gun violence in their community?

15      A.    I do not know that.  I don't know -- the

16   technical term is the willingness to pay.  I don't

17   know their willingness to pay for a 30 percent

18   reduction in gun violence.

19      Q.    Okay.

20      A.    And, of course, the question described

21   how we were going to accomplish that, so it was --

22   involved, I don't remember exactly, but some kind of

23   police action.

24            So it could be that some people would not

1   like that intervention, and so they would say zero.

2       Q.   Okay.  And you do believe in the concept,

3   the economic concept of diminishing marginal

4   returns, that people, once you start -- the more

5   that you -- the more you have in percentage, the

6   less people are willing to pay for it, the less

7   value they would get from it, correct?

8       A.   That's not exactly the concept of

9   diminishing marginal returns, which is usually a

10  production concept.  But if you're asking about this

11  particular case in terms of personal safety and the

12  safety of the family and community, I would not want

13  to make any confident statement about what the whole

14  demand curve looks like.

15          Some odd things happen, for example, near

16  zero, so if we were asking people about 100 percent

17  reduction in gun violence, they might put a very

18  high value on that, even proportionally more than

19  they did for the 30 percent reduction.

20      Q.   Did you do that research or --

21      A.   We did not, but this is a result from a

22  large field of study called behavioral economics.

23      Q.   Okay.

24      A.   That has generated several Nobel prizes.

1      Q.    Okay.  And is that a question of how much

2    would you pay to eliminate 100 percent, or is this a

3    question of how much would you pay to eliminate 30?

4    Well, how much more would you pay to eliminate

5    another 30?  How much would you pay to eliminate

6    another 30?  How much would you pay to reduce -- to

7    get rid of that last 10?  How much more would you

8    pay?  You didn't do that research, though?

9      A.    We did not, no.

10      Q.    Do you know of anyone who has?

11      A.    No.  No.  This -- this study has not been

12    replicated, let alone extended.

13      MR. SIGALE:  Let's take that break we were

14    talking about.

15                    (WHEREUPON, the deposition was

16                    recessed until 1:00 p.m.,

17                    this date.)

18

19

20

21

22

23

24

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF ILLINOIS

 3                   EASTERN DIVISION

 4

 5   RHONDA EZELL, JOSEPH I. BROWN,   )

 6   WILLIAM HESPEN, ACTION TARGET,   )

 7   INC., SECOND AMENDMENT           )   No. 10 CV 5135

 8   FOUNDATION, INC., and ILLINOIS   )

 9   STATE RIFLE ASSOCIATION,         )

10                  Plaintiffs,       )

11        vs.                         )

12   CITY OF CHICAGO,                 )

13                  Defendant.        )

14

15                  October 29, 2013

16                    1:12 p.m.

17

18         The deposition of PHILIP COOK resumed

19   pursuant to recess at Suite 1230, 30 North LaSalle

20   Street, Chicago, Illinois.

21

22

23

24
```

```
 1    PRESENT:

 2

 3         LAW FIRM OF DAVID G. SIGALE, P.C.,

 4         (739 Roosevelt Road, Suite 304,

 5         Glen Ellyn, Illinois  60137,

 6         630-452-4547), by:

 7         MR. DAVID G. SIGALE,

 8              appeared on behalf of the Plaintiffs;

 9

10         CITY OF CHICAGO,

11         (30 North LaSalle Street, Suite 1230,

12         Chicago, Illinois  60602,

13         312-742-7034), by:

14         MS. REBECCA HIRSCH,

15              appeared on behalf of the Defendant.

16

17

18

19

20

21

22

23    REPORTED BY: NICOLE M. SCOLA, CSR, RPR,

24              C.S.R. Certificate No. 84-4524.
```

```
 1                    PHILIP COOK,

 2   called as a witness herein, having been previously

 3   duly sworn and having testified, was examined and

 4   testified further as follows:

 5                    EXAMINATION (Resumed)

 6   BY MR. SIGALE:

 7       Q.   Page 4 of this report.  And this issue

 8   that you're talking about, this is regarding gun

 9   crime, for lack of a better phrase, correct?

10       A.   The -- yes, the survey focused on gun

11   crime.

12       Q.   I mean, because accidents are just

13   accidents, right?  You don't have a survey for that?

14       A.   We did not ask about accidents.

15       Q.   Okay.  And same thing for suicide,

16   correct?  That's not part of this survey?

17       A.   Right.  Yeah.  It's not.

18       Q.   Okay.  And as far as suicide goes, people

19   commit suicide with all sorts of instrumentalities,

20   correct?

21       A.   Yes.

22       Q.   Rope, pills, jumping off a building.  I

23   mean, virtually anything, correct?

24       A.   Yeah.  The -- guns are about half of all
```

1   suicides in the U.S.

2        Q.   Okay.  But the fact that someone -- the

3   fact that someone has a firearm available is just

4   one possible cause of why someone commits suicide,

5   correct?

6        A.   Yes.  It's most likely going to influence

7   the likelihood that the suicide attempt is

8   successful.

9        Q.   Well, are you aware of statistics

10  regarding suicide -- suicides who fail on the first

11  attempt but succeed on later attempts?

12       MS. HIRSCH:  Objection, beyond the scope.

13  BY THE WITNESS:

14       A.   There have been a number of studies of

15  people who have attempted suicide, including

16  attempting suicide in a way that would ordinarily be

17  fatal, such as jumping off the Golden Gate Bridge,

18  and the answer is most of them don't try again.

19  BY MR. SIGALE:

20       Q.   What's "most"?

21       A.   Well, in the 500 in the Golden Gate

22  Bridge, my memory is it's something like -- I mean,

23  most of them.  I don't know.  A great majority.  I

24  don't remember the statistic.

1        Q.    All right.  And I can show it to you,

2    Rebec.  I'm not going to pull up the whole thing.

3              But when you testified in the Retailers

4    case, you were talking about suicide on page 96, and

5    you said, quote:  I mean, so suicide is yet another

6    example of a social phenomenon that has many

7    different causes, and the types of weapons that are

8    readily available to people who are inclined to

9    suicide is just one of those possible causes, end

10   quote.

11             Would you agree, is that still a true

12   statement?

13        A.    Yes.

14        Q.    Okay.  On page 5, paragraph or section B,

15   you talk about the:  "Guns are intrinsically more

16   lethal than other commonly available weapons."

17             Now, again, in talking about this

18   section, as far as Chicago is concerned, this has

19   nothing to do with firearms purchased legally from a

20   legal gun store or gun range in Chicago because

21   those things don't exist, correct?

22        A.    But it's simply a generic statement about

23   weapon instrumentality, regardless of the source.

24        Q.    You write your -- skip ahead for a moment

1    to the middle of page 6, where you say:  "My

2    conclusion is that whether the victim of an assault

3    or robbery dies is not just a reflection of the

4    offender's intentions."

5            How much of it is the offender's

6    intentions?

7        A.    I think that's hard to quantify, but what

8    we know is that intentions are often ambiguous in --

9    when there's an altercation, and even in a robbery

10   where there's no clear intent, no clear plan.  And

11   the -- the observation is very often the assailant

12   will fire the gun, wound the victim but then not

13   follow up to make sure that they're dead.

14           So what we have is a situation then where

15   they, by firing the gun at the victim, have created

16   the possibility of killing them.  They apparently

17   were willing to kill them, but they weren't

18   determined to kill them, as evidenced by the fact

19   that they don't then finish off the victim with the

20   second shot to the head or whatever the gruesome

21   details might be.

22           So that's the situation.  That is --

23   getting your hands on intention is often very

24   difficult.  We see altercations that reflect this

```
 1    kind of ambiguous intent.  And that then is

 2    especially important in terms of the actual

 3    lethality of the first blow, whether it's going to

 4    be lethal or not.

 5         Q.    What about the first blow?  I'm sorry.

 6         A.    The first blow, for example, the first

 7    shot, the first cut with a knife, the --

 8         MS. HIRSCH:  He said lethality.

 9         MR. SIGALE:  Oh, lethality.  Thank you.

10    BY THE WITNESS:

11         A.    It should be said that one of the studies

12    that I cite, the Wells and Horney study in

13    Criminology actually does attempt to determine

14    intention through after-the-fact interviews with the

15    criminal.

16              So there is at least one example where

17    that was tried.  But I think it's going to be very

18    difficult in practice.

19    BY MR. SIGALE:

20         Q.    All right.  Give me a second here.

21              In some respects, you -- I don't know how

22    good your memory is going back a couple years, but

23    you might feel a little bit of déjà vu at certain

24    points during this, I suppose.
```

1      On page 5 in the middle here, the last --

2  the middle of this paragraph 1 or sub 1, you write:

3  "The goal of separating guns from criminal violence

4  is somewhat distinct from the goal of reducing

5  overall rates of criminal violence."

6      What's that mean?

7  A.    It is perhaps not the clearest wording,

8  but what I mean is that a program that had no effect

9  on the volume of criminal violence but reduced gun

10  use, would have a social payoff to it, not to

11  mention a public health payoff.

12      So that you can -- certainly, you could

13  imagine reducing gun violence by reducing overall

14  violence rates, but you could also imagine reducing

15  gun use in violence without changing the amount of

16  violence.  And both of those would be a good thing.

17  Q.    You said in this 2011 testimony, and I'm

18  referring to page 72 for --

19  MS. HIRSCH:  You don't have a copy of this?

20  MR. SIGALE:  No.  I just have the 250-page copy

21  you gave me.

22  MS. HIRSCH:  I just want to state just for the

23  record that when you're reading out his statements

24  of what he said without the question beforehand,

1    it's -- you know, I don't have the context, and I'm

2    not sure that Dr. Cook can recall the context of his

3    statement.

4              So, you know, to the extent that

5    there's -- there's something that's necessary to

6    understand, but if you're saying, do you still agree

7    with this statement, it might be in answer to a

8    specific question, I'd just like to state that

9    objection.

10         MR. SIGALE:  Okay.  And if he says he can't

11   tell or whatever, then we'll go from there.

12   BY MR. SIGALE:

13         Q.    You stated:  The availability of guns in

14   a jurisdiction does not have an effect on the volume

15   or the rate of robbery or assault.

16         A.    Yes.

17         Q.    Would you still agree with that

18   statement?

19         A.    I do.

20         Q.    Okay.  So -- so your belief is -- or

21   findings or conclusions, that if a -- whether or not

22   a perpetrator has a firearm or not, that this -- the

23   same number of robberies and assaults are going to

24   take place?

1     A.    Yes.

2     Q.    And the only difference is, is whether or

3     not the criminal is using a firearm or not?

4     A.    Well, I wouldn't say that's the only

5     difference.  It could, also, change the mix.  For

6     example, in robbery, it would definitely change the

7     mix of targets.  If there were fewer guns, there

8     would be less commercial robbery.

9     Q.    What do you mean, "less commercial

10    robbery"?

11    A.    Well, most commercial robberies,

12    robberies of gas stations or convenient stores

13    are -- and let alone banks, are committed with guns.

14    And if the robber doesn't have a gun, then it is

15    less likely that they'll take on a difficult target

16    like a commercial place.

17          So I'm only saying that's not the only

18    change.

19    Q.    Okay.  So the -- what you're saying is,

20    is that if the robber doesn't have a firearm, they

21    might not go rob a gas station, but they still might

22    go mug an old lady in an alley instead?

23    A.    Yes.

24    Q.    They'll commit a crime; they'll just

1    commit a different crime?

2        A.    The overall pattern is that the robbery

3    rate is unaffected by the availability of guns.

4        Q.    So put another way, reducing the amount

5    of firearms in a jurisdiction does not reduce the

6    number of crimes committed in that jurisdiction?

7        A.    Would not reduce the total amount of

8    violence.  Violent crime.  I believe that it would

9    have some effect on the burglary rate.

10       Q.    What would have -- oh, why is that?

11       A.    Because I did a study of burglary which

12   found that when there are more guns in the

13   neighborhood, there are more burglaries.  So there's

14   a positive relationship between them.  But for

15   robbery and assault and rape, there doesn't appear

16   to be a relationship one way or another.

17       Q.    Do you have -- are you aware of any

18   studies where criminals say -- I'm paraphrasing --

19   if I had a choice of where to break into a place

20   where the people had a gun or the people didn't have

21   a gun, which one they would break into?

22       A.    Sure, yeah.  I've read kind of

23   ethnographic studies and prison interviews and that

24   kind of thing.

1    Q.    And what's the...

2    A.    Well, some of them say they try to avoid

3    occupied homes or homes -- that they worry about

4    getting shot if they're breaking in, and so they

5    carry a gun themselves to prepare for that, is one

6    response.

7          But there's also -- I remember one

8    interview with a robber that said -- or with a

9    burglar who said that he likes to operate in

10   neighborhoods where there are a lot of guns because

11   of the payoff.  You know, he steals guns, then he

12   can fence them easily and turn them into cash.

13         So it can --

14   Q.    But --

15   A.    -- go either way.

16   Q.    But that was one story; you said that was

17   one guy?

18   A.    Yeah.  You were asking about

19   interviews --

20   Q.    Oh, no, no.  But I'm saying, you said

21   you're aware of studies where it sounds like most of

22   the people say if the person is armed, I'll move on

23   to a house where I don't think they are?

24   MS. HIRSCH:  Sorry, that mischaracterized what

1    he said; he didn't use the word "most."

2    BY MR. SIGALE:

3         Q.    What did you say regarding those studies?

4         A.    I said that there's a variety of opinions

5    that you get when you interview people who commit

6    burglary from time to time.  Some of them indicating

7    that, of course, they worry about encountering an

8    armed householder.  And -- but others or even the

9    same saying that they understand the value of being

10   able to steal a gun.

11             And one response to the concern about

12   encountering an armed householder is for themselves

13   to carry a gun.  Another response is to avoid that

14   house or to change the time that they burglarize it.

15   But, you know, if you -- anyway...

16        Q.    It runs the gamut?

17        A.    It runs the gamut, so I have greater

18   faith in my statistical studies of actual behavior

19   in this case.

20        Q.    I'm sorry, what's the statistical --

21        A.    So the statistical pattern is that as the

22   county gun prevalence changes, the burglary rate

23   changes in the same direction.  So if the gun

24   prevalence increases in a county, then the burglar

1    rate tends to go up, controlling for other things

2    that are changing.

3         Q.    Like what?  Controlling for what?

4         A.    We, in that particular study, were

5    controlling basically for things that were changing

6    over time, generally in -- in the large counties

7    that were the top 200 counties.  So we were

8    interested in -- we held the identity of the county

9    constant with the changes over time that were over

10   and above the general change that was happening in

11   crime rates or burglary rates.  So that was the --

12   the technique.

13           But we also did the study of the -- using

14   the National Crime Victimization Survey, looking at

15   individual reports on burglaries and relating those

16   to the number of guns in the neighbor -- in the

17   county.

18        Q.    Have burglaries gone up in Chicago since

19   2010?

20        A.    I have no idea.

21        Q.    When we're -- when you're writing on

22   page 5, this paragraph 2 or subsection 2, you start

23   by saying:  "In two seminal articles, Franklin

24   Zimring provided systematic evidence."

1    And then going on to the second sentence:

2   "Zimring drew on crime data from Chicago to show

3   that case-fatality rates in attacks are a multiple

4   of those in knife attacks..."

5    When -- Zimring wrote these articles

6   in '68 and '72, correct?

7    A.   Yes.

8    Q.   Okay.  Do you know whether or not the

9   causes of these criminal attacks, the root causes of

10  these criminal attacks were the same in '68 to '72

11  as we've been talking about, you know, over the last

12  30 years of Chicago, the poverty, the lack of

13  education, the joblessness, gangs?

14    Was that prevalent in Chicago back in the

15  late '60s, early '70s?

16    A.   It was, yes.  All of those.

17    Q.   Do you have any knowledge whether or not

18  firearm sales were legal, either at gun stores or

19  gun ranges in Chicago during this period Zimring was

20  writing about?

21    A.   I don't know the legal regime.  I think

22  that it was legal to own a handgun, as far as I

23  know.

24    Q.   Okay.

1      A.    I don't know about the log of whether

2  there sales or whether there were dealers.

3      Q.    Were the -- were the numbers in the '68

4  to '72 study -- how did they compare to the murder

5  numbers in Chicago over the last 30 years?

6      A.    I don't know what they were.  I mean, it

7  was -- at that time where -- homicide rates were

8  increasing very rapidly throughout the country,

9  so -- but I don't know the actual counts or rates

10  during that period.

11      Q.    You wrote earlier in this report in

12  talking about social costs that there was, I

13  think -- I could just go back and look, it was

14  somewhere on page 3 -- five gunshot cases for every

15  gun homicide -- I assume gun homicide, correct?

16      A.    Yes.  Yeah.

17      Q.    Okay.  Same thing back in '68 to '72,

18  when Zimring was writing his studies?

19      A.    He did not make that estimate at the

20  time.

21      Q.    Did anyone -- or do you not know one way

22  or another whether or not it was the same ratio?

23      A.    So I think I was probably the first one

24  to make that estimate, and I published it in a study

1    in 1985, and that was based on a variety of data

2    sources.

3           We did not, at that time, have the

4    one-stop shopping that you have right now with the

5    NEISS survey of emergency rooms. So I was looking

6    at five or six different sources to understand the

7    likelihood that somebody would die if they were shot

8    in an assault situation. And looking at the early

9    1980s, in that period, I found essentially the same

10   ratio that we have today.

11       Q.    Okay.  No effect given better medical

12   care on the likelihood that someone will die versus

13   not, is that true, or is there an effect?

14       A.    The medical literature certainly says

15   that there have been great strides made in the

16   quality of trauma care, and starting from an

17   emergency response to initial treatment and going on

18   from there. And so there is a belief that for a

19   victim in particular circumstances, that there has

20   been improvement in survival probability.

21          But it is very hard to see it in the

22   data. And that's -- looking at the overall picture

23   in this.

24          It could be that the guns have become

1    more powerful and the -- in which we know to be

2    true.  Larger caliber and higher velocity, and

3    that the result has been to cancel out whatever

4    gains there were medically.

5         Q.    So if you got a 5:1 ratio for gunshot

6    injuries versus gunshot homicides, what's the ratio

7    for knife attacks?  And by knife, I know that --

8    again, déjà vu, I know that you were asked about ice

9    picks a couple years ago, so I'll just use any --

10   when I say knives, I mean any sharp instrument.

11        A.    Well, I think for knives especially, it's

12   important to understand what the universe is because

13   a lot of people might receive a very superficial cut

14   in the course of a knife attack and not get any kind

15   of medical treatment.

16             But what Zimring found in the 1968 study

17   was that for assaults that resulted in medical

18   treatment, that the ratio -- the death rate was five

19   times higher for gun attacks than it was for knife

20   attacks.

21             My guess is there were a lot more knife

22   attacks that just wouldn't have entered into the

23   picture at all.

24        Q.    Well, there's also gunshot victims that

1    don't go to the hospital, either, correct?

2        A.    There are, yeah.  There are a few of

3    them.  But we have pretty direct evidence that that

4    is a rare event.

5        Q.    But you don't know what those numbers

6    are?

7        A.    No.  I mean, you could look at the

8    studies done by John May and David Hemenway.  They

9    were interviewing people in jails who had been shot,

10   and they were asked, what'd you do?  And almost all

11   of them, 83 percent perhaps, said they got medical

12   treatment.

13       Q.    Okay.  Forgive me if I already asked you

14   this, but what -- what effect does intent have on --

15   on these ratios; in other words, someone going out

16   with a gun, are they more likely to have the intent

17   to kill their victim?  Does it have no effect?

18   Does -- are they using a gun to scare but then

19   decide they need to kill the person?  Do they shoot

20   the person, and the reason they don't put a kill

21   shot to the head, for example, is because they think

22   that the first bullet already did the job?

23            I mean, do we -- do you know these

24   things?

1          A.     It is something that I have not done a

2     lot with.  I did do a study of robbery and murder in

3     two cities where I looked at the detailed police

4     accounts of the sequence of events leading up to the

5     murder, and that provided some kind of idea that

6     often the robbers had no idea what they were going

7     to do once they got into the encounter and then got

8     carried away one way or another.  But it is

9     speculative, I think it is fair to say.

10          The one study that attempted to measure

11     intent directly was the Wells and the Horney study,

12     where they actually did ask prisoners who had --

13     about violent encounters they had been in, and they

14     asked them about what sort of weapon they had and

15     what was their intention when they used it.

16          Q.     All right.  So that's this:  "Weapons

17     effects and individual intent to do harm" cited in

18     footnote 13 on page 6.  Is that the same study --

19          A.     Yes.

20          Q.     -- or something different?

21          A.     Yes.  That's the one.

22          Q.     Is this crime data limited to robberies

23     or apparent robberies or --

24          A.     I'm sorry, which crime data?

1    Q.   Well, either -- I -- the -- well, let's

2    go with your data, the 2010, 5:1 ratio.  Is that

3    limited to robberies or does that also include

4    where -- one gang member shooting at another gang

5    member and the point is to kill that gang member?

6    A.   The 5:1 ratio is for the U.S. as a whole.

7    Q.   Okay.

8    A.   And it incorporates nonfatal gunshot

9    wounds resulting from criminal assault as well as

10   criminal homicide.  So it would be the average over

11   all different kinds of circumstances.

12   Q.   So it would be all-inclusive?

13   A.   Yes.

14   Q.   Whatever the reason that someone decided

15   to go shoot someone with a gun, it would be included

16   in that total?

17   A.   Whatever the reason, as long as the

18   people collecting the data thought it was a criminal

19   circumstance, yes.

20   Q.   And if I -- to make sure I understand

21   this -- this section, and I might have some more

22   specific questions about it as we move on, but

23   ultimately, the point of this topic, this sub --

24   this section of your report is, but for the crime

1   being committed with a gun, the injuries might be

2   less?

3        A.   Yes --

4        MS. HIRSCH:  Just object.

5        THE WITNESS:  Oh, sorry.

6        MS. HIRSCH:  I'm sorry, I just want to object

7   to the use of the phrase "but for."

8   BY THE WITNESS:

9        A.   Yeah.  The point is, if a gun is used,

10  then the -- in a robbery, then the likelihood that

11  the victim will die is greatly increased.  If a gun

12  is used in an assault or a suicide attempt, the

13  likelihood that the victim will die is greatly

14  increased, as compared with a similar attack with

15  another type of weapon.

16  BY MR. SIGALE:

17       Q.   And in all these -- again, it might sound

18  elementary, but, again, in all these gun crimes,

19  they involve someone, a criminal, using a firearm in

20  an illegal manner to commit an illegal act; fair to

21  say?

22       A.   I think it's, by and large, correct,

23  yeah.  Certainly, the act is illegal, or certainly

24  most likely, the act is illegal.

1    Q.    And just to make clear, what we're

2  talking about here with this instrumentality and

3  whatnot, whether or not the perpetrator has a gun or

4  not isn't going to change the amount of crime that's

5  committed?

6    MS. HIRSCH:  Is that a question?

7  BY MR. SIGALE:

8    Q.    Correct?

9    A.    The general prevalence of guns in the

10  community is not going to affect the volume of

11  violent crime.  That's my finding.

12    Q.    You say -- you wrote this paper called

13  Robbery Violence in 1987 that was published in the

14  Journal of Criminal Law & Criminology, yes?

15    A.    Yes.

16    Q.    And it's from there, apparently,

17  additionally perhaps this Wells and Horney -- Horney

18  is H-o-r-n-e-y, by the way -- article, that you say

19  in the middle -- roughly the middle of page 6:

20  "Every additional 1,000 gun robberies added 4

21  robbery murders to a city's total, while an

22  additional 1,000 nongun robberies added just one."

23    So three additional murders?

24    A.    Yes.

1      Q.      How many gun robberies were committed in

2   Chicago, if you know, let's say in 2012?

3      A.      Oh, I don't know.  Yeah.

4      Q.      Do you know for any particular year,

5   including, I guess, '87, the year you wrote the

6   article?

7      A.      No.

8      Q.      How did the findings -- how did you come

9   up with this -- strike that.  I don't want to sound

10  pejorative.

11         How did you reach this conclusion, then,

12  that you wrote about in this sentence?

13     A.      Well, I knew at that time, in the sense

14  that I had the data, the number of robberies by

15  weapon type for over 40 cities for a number of

16  years.

17     Q.      Okay.  So it was basically just --

18     A.      I didn't memorize the number, if

19  that's --

20     Q.      No, no, no, that's fine.  But basically,

21  then, what you did is, you took the number of

22  robberies and the number of murders and compared

23  them over, I guess, nationally?

24     A.      Well, I compared them for a number of

1    cities.  So every city for which I could get data on

2    the robbery count broken down by whether it was a

3    gun or non-gun, and also get data on robbery murder.

4    And in each case, I needed it for a number of years

5    because I was doing an analysis of what the -- how

6    they were changing over time.

7            And what I found was as robbery rates

8    goes up, the robbery murder rate goes up.  But the

9    increase depends on whether the -- the mix of

10   weapons that are being used in the robberies.

11       Q.    All right.  Do you have -- we talk

12   about -- strike that.

13          We've talked about intent here.  Do you

14   know how many of the -- on average, we're talking

15   about, of the four additional ones per a thousand

16   gun robberies where there wasn't the intent all

17   along to kill the victim after robbing him?

18          It could be for -- I mean, we've been

19   kind of speculating, you know, about different

20   scenarios today.  I mean, the scenario could have

21   been, I want to make sure he doesn't go to the cops,

22   I want to make sure he doesn't try to get revenge, I

23   want to make sure he doesn't snitch on me to his

24   gang buddies who are going to come after me.  It

1  could be anything.

2          So do you know of the four, on average,

3  additional ones, how many of them there wasn't the

4  intent to kill the victim all along after robbing

5  him?

6      A.    I don't know directly on these.  All I

7  know is that there was a close correlation between

8  the overall volume of robbery and the number of

9  people who died.

10     Q.    So statistically?

11     A.    Yeah.  And that it was tied to the weapon

12 type in the way I show.

13          And I would say, as long as we're having

14 a conversation at this level of generality, that

15 sometimes the intention is determined by the weapon

16 type rather than the reverse.  So I think that the

17 decision, if that's what it is, to kill the victim

18 might be made because the person is holding a gun in

19 their hand, too, and has the means of doing that

20 quickly and without any particular effort.

21     Q.    Okay.

22     A.    But when I look at the robbery reports

23 from Miami and Atlanta where cases resulted in

24 murder, it certainly looked like a lot of those

1   cases, that the robbers did not go into it with an

2   idea they were going to kill the victim.  And then

3   one of them, there was usually several, got the

4   notion of escalating the encounter.  So it --

5        Q.    I'm sorry, can you repeat that?

6        A.    The point being that this idea of intent

7   is a very difficult one to get your hands on.  It's

8   not as if intent is unambiguous.  Quite the

9   contrary.  Often in these violent

10  testosterone-loaded encounters, the intent shifts

11  with the dynamics of the encounter and is influenced

12  by all kinds of things.  What's the interaction

13  among the robbers, for example, or what kinds of

14  weapons they have, what kind of response they get

15  from the intended victim.

16            So the -- you know, it's, even in

17  principle, hard to talk about what intent means in

18  these circumstances.

19       Q.    When you did this back in '87, did you do

20  any studies -- strike that.

21            -- did you collect any data as to whether

22  or not the gun robberies were committed with guns

23  that were originally legally purchased by the

24  shooter?

1          A.     That was not part of that study, no.

2          Q.     Is it possible or is it even perhaps

3     likely, reasonable, whatever adjective that you care

4     to put on it, that when you say a thousand gun

5     robberies add four robbery murders to the total,

6     that you take a thousand more crimes and that there

7     are going to be four people who just want to kill

8     their victim.

9               I mean, it's -- you know what I'm saying,

10    it's a .04 of the total or .4 of the percent of the

11    total; I mean, is that significant, or is that just

12    what -- is that what you would expect to find when

13    you're talking about a thousand extra crimes?

14         A.     I don't think we would expect to find

15    anything in particular about intent.  What we know

16    is that a number of those robberies resulted in the

17    victim being shot, if they were gun robberies.  But

18    this is just the four out of a thousand where the

19    victim actually died.

20              And so who knows.  I mean, there may have

21    been a number of cases that are -- where there was a

22    notion of inflicting damage to the victim.

23         Q.     And is it -- you say the non-gun

24    robberies added just one murder.  And the non-gun

1   robberies, are those all knife robberies or could

2   they include finger-in-a-pocket robberies?

3           I don't mean to be glib, but you know

4   what I'm saying.

5       A.    No, no.  It's an interesting point,

6   actually, since what we call a gun robbery is what

7   was classified by the police as being a gun robbery,

8   which means the victim said it was a gun robbery.

9           Anyway, there are knife robberies, there

10  are robberies with blunt objects, there are

11  strong-arm robberies that involved nothing more than

12  personal force, so all of those.

13      Q.    So I mean, on -- I guess I'm asking you

14  as the -- the scientist on this, the social

15  scientist who does -- looks at this data, I'm

16  looking at this sentence here, and I see three

17  additional murders out of 2,000 crimes.  And I'm

18  not -- you know, I feel bad for those three

19  statistical people, but it's three people.

20          Is that -- am I -- is this significant,

21  or is there another way I'm supposed to be looking

22  at this?

23      A.    Well, I think that it's significant in

24  the sense that it's one reason why people are so

1   worried about being robbed, is the possibility that

2   they'll be killed or severely injured.  It's one

3   reason why the robbery is always seen as the kind of

4   quintessential urban crime, the thing that keeps

5   people in the suburbs, because it's an attack by a

6   stranger that is difficult to avoid and because it

7   has this potential of doing great harm to the

8   victim.

9          So, you know, the fact that in those

10   days, something over a thousand people were killed

11   in robberies a year, did we worry about that, sure.

12   I think that we worry about not only those thousand

13   people but also we worry about people moving to the

14   suburbs.

15      Q.    And, again, you know, as we move from

16   section to section, these are the same crimes that

17   we've been talking about all along that are

18   primarily motivated by poverty, lack of education,

19   joblessness, correct?

20      A.    Yeah.  I think you're putting words into

21   my mouth.

22      Q.    I don't want to do that.

23      A.    I don't to give a complete account of the

24   causes of crime.  That is a very difficult and long

1    conversation.

2         So I think there are environmental causes

3    of crime, there's personal and personality causes of

4    crime, there's systemic causes of crime.  And so I

5    would not want to be nailed down and say, well, this

6    is the list, it has these five things in it.

7         Q.    Okay.  Well, I mean --

8         A.    Again, my testimony is only on the role

9    of guns.  It's not on this whole universe of crime

10   and crime causation.

11        Q.    Okay.  Let's back it up, then, a step.

12             Much, much earlier, I asked you about why

13   you think Chicago has three times the murder rate on

14   national -- than the national average.  And that's

15   when we talked about these topics, gangs, the

16   correlation of race and ethnicity and the murder

17   rate, lack of education, joblessness, poverty.

18             With regard to these gun robberies that

19   we're talking about here on page 5 and 6 of the

20   report, are there -- are -- do some of those causes

21   that we talked about with regard to the murder rate

22   not apply or do they all still play a part?

23        A.    I mean, my interest was why some

24   murders -- or some robberies convert into a murder.

1    That was the issue.  So, again, I'm not speculating

2    about why robbery occurs.  But only why, in,

3    fortunately, very rare circumstances, the robbery

4    ends in the death of the victim.  And so one

5    powerful explanation for that is the type of weapon.

6         Q.    Is that a -- would you call that a

7    correlation or a causation?

8         A.    I certainly intended it as a causation.

9    But if that same robber in that same circumstance

10   had had a different weapon, there would have been a

11   different outcome.

12            Now, that's not always going to be the

13   case, but given the overall statistical picture of

14   this very close correlation between gun murders and

15   gun robberies, on the one hand, and non-gun murders

16   and non-gun robberies on the other, it creates a

17   clear statistical picture that murder is just the

18   occasional by-product of a robbery and that

19   by-product is much more likely to occur if there's a

20   gun.

21        Q.    And where these guns come from before

22   they ultimately wind up in the robber's hand is not

23   a part of your study?

24        A.    Not a part of that study, no.

1      Q.    And are you saying either in your report

2  or as you testify here today that these robbery --

3  these gun robbery numbers would be higher if

4  law-abiding people were able to purchase firearms

5  from law-abiding sellers at a gun store or a gun

6  range?

7      A.    I believe that to be true.  I think that

8  if the prevalence of gun ownership in Chicago

9  increased, then it would be generally easier for

10  criminals use -- dangerous people to obtain guns,

11  and that would translate into a greater gun use in

12  crime.

13      Q.    What about the number of robberies,

14  period?

15      A.    I don't think it would have an effect on

16  the number of robberies.

17      Q.    So just like before when you testified

18  pursuant to somewhere in this report -- oh, "The

19  goal of separating guns from criminal violence is

20  somewhat distinct from the goal of reducing overall

21  rates of criminal violence," because removing guns

22  from the equation doesn't reduce the amount of

23  crime, it just results in a different type of crime,

24  that if -- you're saying that if more people -- more

1    law-abiding people were able to purchase firearms,

2    that more criminals would have the possibility of

3    getting their hands on firearms and that wouldn't

4    increase the number of gun -- of robberies, it would

5    increase the number of robberies that are gun

6    robberies; is that basically correct?

7         A.    Yeah.   I was with you for some of that

8    statement and not all of it.   But the basic point is

9    if the prevalence of gun ownership increased in

10   Chicago and guns were more readily available, then

11   the likely consequence is going to be that violent

12   crime will be more likely to involve guns.   And

13   that's true for robbery, that's true for assault.

14   So the percentage of robberies and assaults with

15   guns would go up.

16        Q.    Does that -- so does that matter one way

17   or another for purposes of what you just said,

18   whether or not the law-abiding people are purchasing

19   from a law-abiding seller in the gun range in

20   Chicago or buying it from a law-abiding seller, gun

21   range in the neighboring suburbs?

22        A.    I don't think that if there's a

23   one-for-one substitution, it matters, no.   You know,

24   so if the same person buys the same gun in the

1  suburbs, that's going to have the same effect if

2  they're keeping it in Chicago.

3      Q.    So people who are allowed to -- so

4  let's -- strike that.

5          Assume that law-abiding people are

6  allowed to go purchase a firearm in the suburbs,

7  whether it's at a gun range in the suburbs or a gun

8  store in the suburbs.

9      A.    Right.  Which they are.

10     Q.    They are allowed to do that.

11         If they were instead buying them at the

12  firearm store that -- or firearm section of the gun

13  range that's eventually allowed to open in Chicago,

14  does that impact these findings one -- your opinions

15  one way or the other?

16     A.    You know, again, if the hypothetical is

17  that it's just a one-for-one substitution, I don't

18  see that it matters.  But what we're really talking

19  about is a situation that's unlikely to produce a

20  one-for-one substitution.  If you make guns more

21  readily available by selling them inside the City

22  limits, then that might make some difference for --

23  in terms of gun prevalence.

24         But the other thing you do is create a

1  new point source of illegal guns so that if you have

2  a dealer, whether they're located in a shooting

3  range or anywhere else, you have the possibility of

4  those guns going directly into crime in a variety of

5  ways, including the fact that a dealer may be

6  corrupt rather than law-abiding and there may be the

7  possibility of a burglary of that stash of guns.

8         So there -- to specify that we're talking

9  about law-abiding sellers and law-abiding buyers is

10  a hypothetical that's not found in the real world.

11  And I think that's --

12     Q.    So when we're talking about this, are you

13  operating under the assumption that if firearms are

14  allowed to be sold in Chicago, that some or all of

15  these firearm dealers are going to be, to use your

16  word, corrupt?

17     A.    I think if you had 50 firing ranges open

18  up in Chicago, you might very well have a variety of

19  corrupt practices that would occur as a result of

20  that, either by individual clerks or by the owner.

21  And it certainly is not a situation where I would

22  just assume that everybody is going to play by the

23  rules.  We don't see that with other FFLs around the

24  country.  I don't know why we would in Chicago.

1    Q.    As you sit here today, are you testifying

2    that that is a reason to maintain the ban, because

3    if the ban is lifted, that some of the people might

4    not play by the -- a variety of people, as I think

5    you said, might not play by the rules?

6         MS. HIRSCH:  Objection.  It's beyond the scope.

7    He's already testified that he is not testifying one

8    way or the other in support of or against the ban.

9    He's reporting data and conclusions drawn from that

10   data.

11        But go ahead.

12   BY THE WITNESS:

13        A.    Yeah.  I mean, that's what I was going to

14   say.  I'm testifying on the public safety

15   consequences, which may well be seen as relevant to

16   the question of public interest and having a ban

17   like this, but that's not part of my testimony.

18   BY MR. SIGALE:

19        Q.    So just to be clear so I have this on the

20   record, you're not testifying that the ban should be

21   maintained because if it's not, some of the dealers

22   might not play by the rules?  That's not -- you're

23   not saying that here today, correct?

24        A.    Correct.  I am not offering an opinion

```
 1   of -- about the ban itself.

 2        Q.    Okay.  You testified earlier that Chicago

 3   has about three times the national average of

 4   murders --

 5        A.    Yes.

 6        Q.    -- than -- what about gun robberies?

 7        A.    I don't know the answer to that.

 8        Q.    Do you know one way or the other that

 9   it's higher or -- if it was equal, I suppose you

10   would know that, but do you know whether or not it's

11   higher or lower?

12        MS. HIRSCH:  I'm sorry, just for clarification,

13   it's a vague question.  Are you asking about

14   robberies with guns, or are you asking about theft

15   of guns?

16        MR. SIGALE:  No.  I was referring to robberies

17   where the perpetrator is using a gun.

18        MS. HIRSCH:  Okay.  I just want to make sure

19   everybody is on the same...

20   BY THE WITNESS:

21        A.    Yeah.  I'm sorry, I don't know the

22   robbery statistics in Chicago.

23   BY MR. SIGALE:

24        Q.    Okay.  I want to go to page 7 of this
```

163

1    report, and I want to look at this first full

2    paragraph that says I -- I'm sorry, strike that.

3              "In particular, I (together with Jens..."

4        A.    Yes.

5        Q.    "Ludwig) conducted an analysis of

6    residential burglary using data from the" NCVS "and

7    other sources, and found that the burglary rate and

8    gun-theft rate increased in direct relation to the

9    prevalence of firearm ownership in the county."

10             Now, you write after that:  "The

11   connection is apparently due to the fact that guns

12   are profitable 'loot,' so that burglaries in

13   gun-rich areas are more profitable."

14             Isn't it possible that the reason why the

15   gun theft rate increases in relation to the

16   prevalence of firearm ownership is because if you

17   break into a home in that county, you're more likely

18   to find a firearm?

19        MS. HIRSCH:  Objection, calls for speculation.

20   BY THE WITNESS:

21        A.    That connection is the basis of my last

22   sentence there.  Yes.  I do think that that's the

23   most likely causal explanation.  It is that in

24   counties where there's a lot of guns, it is more

1    likely that a burglary will include a gun than if

2    it's in a county that has few guns.

3    BY MR. SIGALE:

4        Q.    Because there's more likelihood you're

5    going to break into a home, it's not going to have a

6    firearm because the firearm ownership is low?

7        A.    That's right.  But it should be said that

8    some burglaries seem to be motivated by advance

9    knowledge of the fact that there's a gun in the

10   home.  And so that the only thing that's stolen is

11   the gun, for example.  But I think by and large,

12   that's not the case.

13       Q.    That's what I'm trying to figure out, and

14   I don't know if you know the answer from your

15   research or review.

16            A burglar breaks into a home, the

17   burglar -- the county might -- you might think, oh,

18   everyone's got a gun in this area.  But you don't

19   know whether or not the homeowner is -- actually has

20   one, and you certainly don't know if the homeowner

21   is going to have one and it's going to wind up

22   pointed at your belly when you get in through the

23   window.

24            In those circumstances, are people still

1    breaking into the houses?

2         A.    The circumstance of having a lot of guns

3    in the county?

4         Q.    The circumstance of where someone's got

5    a -- the area, they know or believe that the

6    county -- the area, the county, the geographic area,

7    whatever, that a lot of the homeowners have guns.

8         A.    Yes.  That results in more break-ins.

9         Q.    Despite the fact that the burglar doesn't

10   know whether or not the homeowner is going to be

11   pointing that gun at the guy as soon as the -- the

12   burglar, as a soon as he gets in through the window?

13        A.    Well, most burglars that are -- are

14   careful about that, and some of them carry guns

15   themselves so that they're prepared.  But the answer

16   is, yes, despite that fact.

17        Q.    So are there less -- again, if you know,

18   until 2010 it was forbidden in Chicago with very

19   limited circumstance to have a handgun in the home.

20   Were there fewer burglaries in Chicago until 2010 as

21   compared to other places?

22        MS. HIRSCH:  Objection, beyond the scope.

23   BY THE WITNESS:

24        A.    So, as always, we are not saying that

1    guns are the only thing that causes burglary.  They

2    are an attractive of part the loot in case a burglar

3    does steal a gun and has the opportunity to steal a

4    gun, and that's rewarding because guns are easily

5    fenced at high prices, and so it struck me as

6    plausible that that's -- that's what's going on.

7            But as I say, we're not trying to

8    understand the totality of the causes of burglary.

9    We're only interested in this question about how

10   burglary rates relate to the prevalence of gun

11   ownership.

12           And the way we did the study -- well, we

13   did it several different ways, but one way we did it

14   was to actually look at how, for example, things

15   changed in Cook County over a period of time.  It

16   wasn't just Cook County, it was 200 large counties.

17   BY MR. SIGALE:

18       Q.    Okay.

19       A.    And in each case, what we were interested

20   in was as the gun prevalence fluctuated over time in

21   those counties, what happened to the burglary rates.

22           Some counties, year in and year out, have

23   high burglary rates and some have low, but we were

24   interested in the changes over time and how that

1  related to the prevalence of gun ownership.

2          And what we found is, as prevalence

3  increased, then burglary rate increased and --

4  compared to what was going on in the national

5  average, and it went the other way, then we also got

6  that pattern.

7      Q.    Is it possible that as -- that prevalence

8  of firearms increased because the community, for

9  whatever reason, became more affluent and they had

10  more money or jewelry or valuables in the house and

11  decided to buy a gun to protect themselves and it is

12  the money and the valuables that drew the burglars

13  and not the firearm?

14      A.    Yeah.  I think that's an interesting

15  question, but we did control for the average income

16  in the county.  I mean, it -- it was maybe not

17  perfect, but we tried to get at that.

18      Q.    How would you do that?

19      A.    Just using the data from the census

20  bureau on average income.

21          The other thing we did was to use the

22  National Crime Victimization Survey which asks

23  extensive questions about individual households.

24  And so we included a separate analysis, but it had

1    the same finding.  Again, the controlling for all

2    the characteristics of the household and other

3    characteristics of the county, like income, the

4    prevalence of gun ownership in the county had a

5    direct effect on the probability that that household

6    would report having been burglarized.

7        Q.   What about in -- were these just in urban

8    areas that you did these studies?

9        A.   They were larger counties.  So we were

10   looking at the 200 counties in the U.S. that had the

11   largest population.

12       Q.   So did you do any in -- were any of these

13   counties in central or southern Illinois where

14   historically gun ownership is very prevalent?

15       A.   I can't say for certain how many counties

16   in Illinois are in the top 200.  My guess is

17   Champaign-Urbana is, but I'm not sure of that.  I'd

18   have to look back at --

19       Q.   If it is, it's only because of the

20   college.  It's not because of the town.

21       A.   Is that right?  Okay.  I'm sorry.  I

22   don't know.

23       Q.   Okay.  So I want to stay with this for a

24   second.  How do you control for the fact that all

1   other -- that all other things being equal, that

2   some communities just have more money than others --

3   other communities?

4        A.    So as I say, we could control for that in

5   the study that used the National Crime Victimization

6   Survey by actually using the response about family

7   income and controlling for that.  So the National

8   Crime Victimization Survey has an item on family

9   income, and we know what the individual's income is.

10            And then we could also control for

11  county-level characteristics where there are census

12  data on average incomes in the county.

13       Q.    Did you do all of Cook County or just

14  Chicago?

15       A.    We used county-level data, so all 200

16  that we were looking at were county level.

17       Q.    Okay.  So there were parts -- so you

18  included parts of Cook County that -- where people

19  did have firearms and parts --

20       A.    Where it was legal, yes.  Of course,

21  there are firearms everywhere in Cook County.

22       Q.    And you found -- and how were the

23  comparisons, say, between, say, the South Side of

24  Chicago and places outside of Chicago and Cook

1    County?

2        A.    So the analysis that we were doing was at

3    the county level, so we were using -- remember,

4    there's two studies:  One used the 200 counties, and

5    in that study, we were using the overall burglary

6    rate in the county.  And then characteristics of the

7    county, like, the gun prevalence and average income

8    and that sort of thing.

9        Q.    So kind of -- as a collective?

10       A.    Yeah.  Just --

11       Q.    So --

12       A.    How many people live in this county, what

13   percent of them own a gun, what's the average

14   income, what's the race and sex.

15       Q.    Okay.  So you could -- so your study

16   would have kind of lumped together, for lack of a

17   better phrase, if all the burglaries were happening

18   on the south side of Chicago but in the north part

19   of Cook County, like, say, Wilmette where there was

20   a lot of money and a lot of people legally owned

21   firearms, that data would have looked like there's a

22   lot of guns in this county and there's a lot of

23   burglaries in this county and they're connected?

24       A.    Yes.

1        Q.     Okay.

2        A.     That's right.  It did lump everything

3    together within Cook County.  But that was that

4    study, and then we did the other study of individual

5    households that did not do the lumping, so...

6        Q.     I'm sorry, which --

7        A.     It's in the same publication.

8        Q.     I've already forgotten.  Which

9    publication are we talking about?

10       A.     It was published in 2003 on burglary.

11       Q.     Is that listed somewhere in here?

12       A.     Yes.

13       Q.     Oh.  Guns and Burglary, Cook and Ludwig?

14       A.     Yes.

15       Q.     And what was this individual -- what was

16   this individual household study?

17       A.     So that was using the National Crime

18   Victimization Survey, and in that, you get reports

19   from individuals, something like 50 or 60,000

20   households across the U.S. that are supposed to be

21   representative of the entire nation.

22       Q.     Okay.

23       A.     And one thing they report is whether or

24   not there has been a burglary in the last six

1    months.

2         Q.    Okay.

3         A.    And that can then be put together with

4    household characteristics, and we had a very long

5    list of characteristics of who lived there --

6         Q.    Well, one of them apparently was income,

7    right?

8         A.    One of them was income.

9         Q.    Was one of them whether or not there was

10   a gun in the house?

11        A.    No, no.  They don't ask that question in

12   the national crime survey.

13             So what we did, though, was to have the

14   county level, we knew what county they lived in, and

15   so that we could then use our estimate of the

16   county-level gun ownership rate.

17        Q.    Okay.

18        A.    And so if they lived in Boston, then, you

19   know, it's a very low number, 12 percent or

20   something; if they live in Phoenix, it's 60 percent,

21   and everything in between.

22        Q.    Okay.  But, again, if the NCVS is

23   surveying people from -- I don't know if you know

24   the individual towns around here in Cook County, but

```
 1   I'll -- the North Shore, very well-off area, and
 2   you're using whether or not they've been burglarized
 3   and they've got plenty of money, and then you're
 4   looking to the gun statistics as a county as a whole
 5   where different parts of Cook County might have the
 6   guns, you're kind of putting those two bits of data
 7   together to draw the conclusion, correct?
 8        A.    Yeah.  I think the county-level measure
 9   of gun prevalence is imprecise, and it doesn't
10   define exactly the neighborhood notion that might be
11   relevant to a burglar's calculation, but it's the
12   best that's ever been done.
13        Q.    Okay.
14        A.    But it's certainly true, you know, if
15   you're in Cook County there's fewer guns than if
16   you're in Tupelo, Mississippi.  The burglars know
17   that, everybody knows that.
18        Q.    There's fewer guns in Cook County than in
19   Tupelo?
20        A.    Yes, yes.
21        Q.    But, again, there's -- but even in Cook
22   County, at least, you know, until -- the law is
23   going to be all changing in the next few months, but
24   for the recent past, at least, different parts of
```

174

1    Cook County would have had more than others because

2    in Chicago, most everything was banned, whereas in

3    the rest of Cook County, most everything wasn't?

4         A.    Right.   It makes some difference, but not

5    much.   The -- outside of Chicago and Cook County,

6    the -- our measure of gun prevalence is a little bit

7    higher but not much.

8         Q.    The bottom of page 6, you've got the

9    Section C and C, 1:  "Guns used in crime are

10   obtained from a variety of sources."

11             At the bottom of page -- well, not the

12   footnote part of page 7, but the bottom of the text

13   of page 7, you say that there was a 2004 survey of

14   inmates where 14 percent of first-time convicts

15   are -- first-time prison convicts, 14 percent

16   obtained from a dealer or gun show.  Most obtained

17   their guns -- 86 percent obtained their guns from

18   some other source.

19             And you spoke about that very early on in

20   the deposition.

21        A.    Yeah.

22        Q.    Is there evidence one way or another,

23   from your research, whether or not having a firearm

24   turns a noncriminal into a criminal, or do criminals

1    go out seeking guns to commit their crimes; in other

2    words, someone already has the intent to commit a

3    crime, now they're just going out and looking for

4    that gun to make sure they are able to do it?

5         A.    I can give an indirect answer to that.

6    Most criminals don't have guns.  And a lot of them,

7    if they are asked, say they have some interest in

8    getting one.

9              But if you look at the drug use

10   forecasting data, for example, people arrested in

11   Chicago, and this was in the late '90s, only

12   20 percent said they had a gun.  And almost that

13   many said that they would like to have a gun but it

14   would take them a long time to find one.  But they

15   were all, at least suspected of being criminals.

16   That's why they were arrested.

17        Q.    Well, in going back to your earlier

18   testimony, it's -- these people -- these criminals,

19   whether they have a gun or not, they're going out to

20   commit a crime?

21        A.    Right.

22        Q.    So the gun might be their instrument of

23   choice in some instances, and so they'd go out

24   looking for one or hoping they could get their hands

1    on one but -- strike the question.

2            And then at the bottom of page 8, you

3    write in the text part of page 8 -- you actually

4    write about what we've been talking about, meaning I

5    inadvertently skipped ahead.

6        MS. HIRSCH:  I encourage you to do so.

7        MR. SIGALE:  Yeah.  I know.  I know.

8        MS. HIRSCH:  Just joking around.

9    BY MR. SIGALE:

10       Q.    Towards the bottom of page 8, you write:

11   "My research has investigated this hypothesis,

12   finding that the prevalence of ownership has little

13   or no effect on rates of assault, robbery, or rape."

14           Now, you argue -- you say that -- in

15   response to the sentence before -- I don't mean to

16   be confusing, especially for the record, but in

17   response to the idea that "widespread gun ownership

18   has" "socially beneficial effects as a deterrent to

19   crime," you say that you don't believe that.

20           But then you go on to say:  "I conclude

21   that an increase in gun ownership has on balance

22   neither a deterrent effect on violent crime, nor

23   does it augment violence rates."

24       A.    Yes, yeah.

1    Q.   Can you -- can you explain that -- that

2    last little bit there:  "Nor does it augment

3    violence rates"?

4    A.   Well, it's commonplace for people to say

5    guns cause violence, and I'm not one of those

6    people.

7    Q.   Okay.  So you're saying that the increase

8    in gun ownership, if it doesn't deter violent crime

9    and it doesn't increase violent crime, then it seems

10   to have no effect?

11   A.   Right.  On the volume of assaults,

12   robberies and rape.

13        It may, of course, cause very specialized

14   crimes like an assault on a president.

15   Q.   But leaving that --

16   A.   Or a mass shooting, something like --

17   yeah.

18   Q.   But leaving instances that are what we'll

19   call outliers, right, because while we can, you

20   know, all point to newspaper articles and while we

21   can, you know, speculate about the crazy people,

22   that's really not what your research is about,

23   correct?

24   A.   Yeah.  I'm just saying here that if you

1    look at the standard FBI statistics on the amount of

2    assault or robbery, then you do not find a

3    systematic relationship to gun prevalence.

4        Q.    But, again, it is possible, in fact,

5    reasonably possible, that someone who is --

6    possesses a firearm and is trained in its use, will

7    be able to use that as a -- in a defensive gun use

8    against one of these would-be rapists or robbers?

9        A.    There are success stories like that, yes,

10   but it is not causing the volume of violent crime to

11   decrease.  There is a possibility.  It does not get

12   reflected in the overall statistic.

13       Q.    Okay.  In your 2006 study, you -- you're

14   citing to, I guess, The Social Costs of Gun

15   Ownership in the Journal of Public Economics with

16   yourself and Mr. Ludwig.

17            You wrote:  "On average, a 10 percent

18   increase in the prevalence of gun ownership

19   increased the homicide rate by about 2 percent."

20            What are the -- what's the basis for that

21   statement?

22       A.    We had, again, data on the 200 largest

23   counties.  We had that data for a number of years.

24   And we related, using regression analysis, the

1   homicide rate for 100,000 people as the dependent

2   variable to the prevalence of gun ownership in the

3   county, and we did that using my usual indicator of

4   the prevalence of gun ownership.  So...

5        Q.    Well, moving on to page 9.

6        A.    Okay.

7        Q.    All right.  So you -- in some respects,

8   this is material we've already talked about.

9             You talk about Mr. Venkatesh's

10  ethnographic work, which I think was what he wound

11  up writing the book about -- it seems to -- I seem

12  to recall that -- where he went and interviewed and

13  hung out with gang members on the South Side for, I

14  thought about a year or so?

15       A.    Well, again, he has several books.

16       Q.    Oh, so this --

17       A.    And he has done a number of different

18  studies in the same neighborhood.

19       Q.    Oh, okay.  So --

20       A.    So he did write a book about the

21  underground economy, generally, and we joined him to

22  just focus on guns --

23       Q.    Oh, okay.  So --

24       A.    -- in particular, for that study.

1    Q.   Okay.  I'm with you.  Same --

2    A.   Yeah.  I mean, I think you're right

3  about, you know, he had gang leader for a day, you

4  know, and there's been --

5    Q.   Oh, yeah.  I remember that.

6         Again, forgive me if we seem to be

7  covering similar ground, but this page 9 talks about

8  criminals, gang members, robbers, prostitutes, drug

9  dealers, people active in the presumably illegal gun

10  trade.

11         And you talk about how people -- these

12  criminal -- this criminal element values guns, yet

13  doesn't really know how to go about getting one.

14  And their difficulty in getting one.

15    A.   Yes.

16    Q.   And yet, again, Chicago has on three

17  times the national average murder rate as -- and

18  while you might not know exactly how Chicago

19  compares to other cities, you -- you understand that

20  there are gun robberies in the City of Chicago,

21  correct?

22    A.   I think it is about 40 percent -- in the

23  year we looked at it, about 40 percent of the

24  robberies were with guns.

1    Q.    What year was that?

2    A.    So that was -- it would have to be a

3 guess, but it was probably about ten years ago.

4    Q.    All right.  So early 2000s?

5    A.    Yes, yeah.

6    Q.    And there's no reason to think that

7 number's gone down to zero?

8    A.    No.

9    Q.    Okay.

10    A.    No.

11    Q.    Okay.  So how is that reconciled?

12 There's gun robberies in the City, the murder rate

13 is three times the national average, and yet, here

14 is this study where criminals want guns, apparently

15 can't get them and don't know how to get them.

16         So did Mr. Venkatesh just interview the

17 wrong criminals, or is it a couple lucky criminals

18 with firearms committing all the murders and gun

19 robberies?  I mean, how is -- how do you reconcile

20 that?

21    A.    Well, first of all, with respect to the

22 question of was he simply talking to the incompetent

23 criminals or whatever --

24    Q.    Right.  Right.

1          A.     -- we have backup for his findings.  And

2     one source of backup is the survey that was done by

3     the federal government, department of justice, of

4     people arrested in Chicago in the late '90s, and

5     they were asked in a survey format after being

6     immunized, or whatever the right term is, did they

7     own a gun and would they like to own a gun and how

8     difficult would it be for them to obtain one.

9               So we know from that that only 20 percent

10    of them said they had a gun.  And that about that

11    many said they would like to have a gun but that it

12    would be difficult for them to find it.

13              So in a general way, that supported

14    Venkatesh's findings.

15              Another source of support is with respect

16    to the fact that a majority of robberies are not

17    committed with a gun.  And through the years, my

18    study of robberies say if you're going to commit a

19    robbery, you're far better off to use a gun because

20    you can take on bigger targets, you're more likely

21    to be successful in control of the situation and you

22    can get in and out quickly on the basis of it.

23              And yet -- and I'm sure the robbers know

24    that, but most of them don't use guns.  And they

1    don't have guns along the way.

2           So there's something going on out there

3    that he was tapping into in terms of his demography

4    which is the scarcity of guns in Chicago.  Now, it's

5    not just in Chicago.  Other cities have a similar

6    pattern.  But he was able to then provide additional

7    detail.

8           My only conclusion for Chicago, which I

9    think is responsive to your question is that if guns

10   were more readily available, the murder rate would

11   be still higher, and it's because relatively few

12   criminals have guns.  It is surprising in Chicago

13   the -- things are as good as they are, if that's --

14       Q.    To the tune of an extra three per

15   thousand gun robberies or three per thousand

16   robberies?

17       A.    I'm sorry?

18       Q.    You said the murder rate would be higher

19   if more criminals had guns, and I'm asking whether

20   or not it's tieing back into that where it's an

21   increase of four murders per thousand gun robberies

22   versus one murder for non-gun robberies?

23       A.    Yes.  That would be my prediction.  If

24   the robbers in Chicago substituted guns for other

1    weapons, then the robbery murder rate, in

2    particular, would go up in proportion.

3         Q.    I'm going to represent to you that as of

4    about the end of August of this year, okay, I was

5    told by a news source when I was having a discussion

6    about this with, that there were 305 murders in

7    Chicago as of that date this year.

8         A.    Okay.

9         Q.    Now, the newspaper may bear it -- bear

10   out a slightly different number, but I think at a

11   minimum, that's pretty close.

12        A.    Uh-huh.

13        Q.    What percentage of that, based on your

14   research or your review, would you expect that of

15   that 305, were murders during a robbery?

16        MS. HIRSCH:  Objection, calls for speculation.

17   BY THE WITNESS:

18        A.    And it does -- I would have to speculate

19   because I don't have the actual statistics, which

20   the Chicago Police Department should have.  But I

21   would expect it's on the order of 10 percent and

22   perhaps less.

23   BY MR. SIGALE:

24        Q.    And the other 90-plus percent?

1    A.    It would be other felonies, but it would

2  primarily be altercations of various kinds,

3  organized or unorganized.

4    Q.    Okay.  I guess moving on to page 10 --

5  yeah.  There's only 11 pages of this report and most

6  of page 11 is empty space and a signature, so we're

7  doing great.

8    MS. HIRSCH:  Okay.  Good.  I didn't know if you

9  were moving on from this to something else.

10    MR. SIGALE:  I might.

11    MS. HIRSCH:  That would be great.  I really

12  appreciate trying to get him out of here at the

13  latest at 4:00.

14    MR. SIGALE:  Well, it's not even 3:00, so we

15  might get that wish.

16              (WHEREUPON, a short recess was

17              had.)

18  BY MR. SIGALE:

19    Q.    Going on to 10, page 10, Section B:  "The

20  ban on dealers eliminates one direct source of crime

21  guns."

22              You testified earlier that it's been your

23  findings that various FFLs and firearm dealers are,

24  to use your word, corrupt and sell illegal -- and

```
 1   sell firearms illegally, yes?

 2        A.    Yes, uh-huh.

 3        Q.    Illinois has requirements for the sale of

 4   firearms, correct?

 5        A.    Yes.  There are regulations on sale.

 6        Q.    First of all, to purchase one, you need

 7   to obtain a FOID card, a firearms owner's ID card?

 8        A.    Yes.

 9        Q.    And are you familiar with what it takes

10   to get one of those?

11        A.    Not in detail, no.

12        Q.    Are you familiar with, at least in

13   general terms, you need to pass a background check,

14   and in submitting an application to the state

15   police, they're going to do a background check on

16   you and make sure you're not disqualified from

17   owning a firearm?

18        A.    Yes.

19        Q.    And that to purchase a firearm from a

20   dealer in Illinois, you need to have that FOID card?

21        A.    Yes, uh-huh.  That's my understanding.

22        Q.    And the FFL, the dealer, needs to go --

23   follow various federal and state regulations in

24   order to complete that transaction, correct?
```

1      A.     Right.

2      Q.     So at least in theory, except for the

3   criminal element of the FFL world, it should be

4   law-abiding dealers following the rules, selling to

5   law-abiding purchasers who have qualified under

6   federal and state law, correct?

7      A.     I would not accept the characterization

8   law-abiding for the universe of people who are not

9   disqualified.

10     Q.     Okay.

11     A.     In fact, we did a study of people

12  indicted or arrested for murder in Chicago and found

13  out that only 40 percent of them were disqualified

14  as a result of their criminal record.  The other

15  60 percent were not.

16     Q.     Because, what, they hadn't been caught

17  doing a crime before?

18     A.     Oh, they had been caught lots of times,

19  but -- in many cases, but they had not been

20  convicted of a felony, which is the requirement.

21     Q.     Ah.  Ah.  So they had been arrested for

22  committing crimes, it was even believed or assumed

23  they had committed the crime in question, but they

24  weren't convicted in court?

1    A.    That's right.  Or they had been convicted

2    of a misdemeanor, or they have five drunk driving

3    arrests.  You know, there's -- that doesn't

4    disqualify you.  So to say that simply because you

5    can qualify that you are law-abiding is a big jump.

6    Q.    Okay.  Fair enough.  But at a minimum,

7    you're law-abiding enough to be qualified to

8    purchase under the state law?

9    A.    Yes.  You don't have -- you don't have a

10   disqualifying condition that is known to the

11   authorities.

12   Q.    You reference a lawsuit that was filed in

13   roughly 1998 where the City of Chicago sued a number

14   of firearms dealers?

15   A.    Yes.

16   Q.    Do you know how that lawsuit turned out?

17   A.    Well, I think that that and all of those

18   lawsuits brought by cities were eventually thrown

19   out.  Although, I'm not 100 percent sure.

20   Certainly, the Congress adopted a law a few years

21   later which said that the manufacturers and

22   distributors and so on would not be liable under a

23   broad range of circumstances for the distribution of

24   guns that was basically lawful.  So the civil

```
 1    liability was taken off the table to a large extent

 2    by the federal immunization.

 3         Q.    Now, you -- you're, right in the middle

 4    of your report on page 10, citing the Wintemute and

 5    Wright study, that back in 1998, at least, quote:

 6    "1.2 percent of dealers accounted for 57 percent of

 7    all guns that were submitted by law enforcement

 8    agencies for tracing to the National Tracing Center

 9    of ATF," unquote?

10         A.    Yes.

11         Q.    The tracing took place when law

12    enforcement wanted to try and trace a firearm that

13    had been used in a crime and try and trace where it

14    had come from, correct?

15         A.    That's right.  The goal was to trace it

16    to the first retail sale in most cases.

17         Q.    But it was a firearm that had been used

18    in a crime, correct?

19         A.    Not always.  Sometimes it would be guns

20    that were obtained by other means.  So it's not

21    necessarily that they were connected to a specific

22    crime.

23         Q.    Well, what's the other means?  What do

24    you mean?
```

1       A.      That it could be, for example, that

2   somebody turned in a gun to them, and that in cities

3   that had a policy of tracing all guns that they got

4   ahold of, that they might include a trace on that.

5       Q.      Well, okay.  But is that worthy of

6   mention in the study, in the Wintemute study?  I

7   mean, are they really -- they're not just tracing

8   the firearms that are turned in pursuant to buy-back

9   programs and the government is curious about where

10  it came from?

11      A.      The motivation for the study was

12  definitely the link between guns that are submitted

13  for tracing and crime.

14      Q.      So 57 percent of all guns submitted by

15  law enforcement for tracing to the ATF because those

16  guns were used in a crime, were tracked to

17  1 percent -- 1.2 percent of dealers; is that fair to

18  say?

19      A.      I would remove that because they were

20  used in a crime.  I don't think we know that.

21      Q.      So some of these --

22      A.      But most of them probably were suspected

23  of being used in a crime or were picked up from

24  somebody who was carrying them illegally or in

1   some --

2       Q.    Okay.  So you're saying that some

3   indeterminant percentage of this 57 percent were

4   firearms that were just being requested for tracing

5   as a matter of routine?

6       A.    If the city has -- is religious about

7   tracing all of the guns that it obtains by any

8   source.

9       Q.    Well, this was nationwide, so do we know

10  what cities, if any, that we're talking about for

11  purposes of this discussion?

12      A.    Yeah.  I mean, the -- the data set

13  includes the identification of the cities, and

14  cities differ widely according to what percentage of

15  guns they trace.

16      Q.    So as you sit here right now, do you know

17  how much or what percentage of this 57 percent were

18  firearms that were used or suspected of being used

19  in a crime versus firearms that were asked to be

20  traced as a matter of routine because the city is,

21  as you say, religious about learning the origin of

22  firearms that comes into its hands?

23      A.    I don't know the percentage.  I just

24  wanted to say that I wouldn't make a blanket

1    assertion under oath that they were all crime guns.

2         Q.    All right.  Fair enough.  1.2 percent of

3    dealers, and that's across the country?

4         A.    Yes.

5         Q.    Were this 1.2 percent concentrated

6    somewhere?

7         A.    Well, they would be concentrated

8    somewhat, sure.  It's not a uniformed distribution.

9    They're going to be concentrated, for one thing, in

10   cities that are religious about tracing guns, and so

11   that's going to matter, but also the areas that have

12   higher crime rates.  Gun crime rates, that would

13   matter.  But --

14        Q.    So most likely larger cities?

15        A.    Yes, yeah.  I think that that is fair.

16        Q.    And larger cities that, on average --

17   well, let me back -- let me strike that.

18             So fair to say, the more gun crime, the

19   more likely that local law enforcement is going to

20   want a gun traced back to its source?  And make a

21   tracing request?

22        A.    Yeah.  I don't know that that analysis

23   has ever been done.  I know during the Clinton

24   administration, there was an effort to get cities to

1    start tracing guns.

2        Q.    Used in crimes or in general?

3        A.    Just that it should become a general

4    practice to trace the guns that were confiscated by

5    police for whatever reason or became -- but they had

6    some success in doing that, but it stopped short of

7    being universal.

8              But let me just throw something in here

9    which might be helpful to the conversation, and that

10   is, mostly what we're seeing here with this very

11   high concentration is that some gun dealers sell a

12   lot more guns than others.  So if you were to ask

13   what percentage of all guns is being sold by that

14   top 1.2 percent of dealers, the answer would be a

15   high percentage.  It might be as many as 50 percent.

16             So this result about the -- what seems

17   like a remarkable concentration is to a large extent

18   due to simply because most of the guns being sold

19   are being sold by a relatively few large dealers.

20        Q.    So this isn't -- so this sentence in this

21   report isn't an indictment, let's say, of these

22   1.2 percent of dealers; it's just more likely that

23   if they're selling more firearms, that more firearms

24   might wind up the subject of trace requests?

1      A.     Yeah.    That's right.    So as a first-order

2  response, that's correct.

3           So then Garen Wintemute and I went ahead

4  and did a much more detailed study of dealers in

5  California.   So this was not a national study, but

6  we did it in California where they have better data

7  than anywhere else.   And there, we found out that

8  among these large dealers, there are some that have

9  a much higher percentage of their guns traced than

10  others.

11      Q.     Is that a correlation, or is that

12  attributable to some causative factor?

13      A.     Well, we analyzed it, and, you know, we

14  found some patterns that were systematic.   For

15  example, pawnshops are more likely to sell guns that

16  get traced than are other kinds of dealers.   So

17  licensed dealers who bought pawnshops are especially

18  at risk for selling guns that end up being traced.

19           And we found some other patterns, but I

20  think the main thing that we discovered was that

21  among the large dealers, there appear to be some

22  that are much more involved with a criminal

23  population or supplying a criminal population.

24           That's stops short of saying that they

1    are corrupt.

2         Q.    Though, that appears to be the

3    implication?

4         A.    Well, it raises the question about what's

5    going on, but we certainly did not have a case

6    against them, simply based on this.  All we had was

7    a pattern that seems like it would be useful to

8    investigate further and see what is going on.

9         Q.    All right.  This lawsuit back in 1998 in

10   Chicago was a result of something called Operation

11   Gunsmoke, correct?

12        A.    Yes, uh-huh.

13        Q.    And you're not privy to the information

14   of how the 12 FFLs that were chosen for the

15   undercover sting operation were chosen, correct?

16        A.    Well, I have read that they were chosen

17   systematically.

18        Q.    I'm sorry, what do you mean,

19   "systematically"?

20        A.    They were chosen as dealers that had --

21   where the police suspected that they were involved

22   in selling to criminals.

23        Q.    Okay.  Okay.  So the police went after

24   the -- the alleged bad guys as opposed to this being

1    some random sample?

2         A.    Yes, yes.  That was my understanding.

3         Q.    And as I think you were saying earlier

4    but I'll just ask the question, the fact that a gun

5    is traced to an FFL isn't proof that the FFL did

6    anything wrong, correct?

7         A.    That's correct, yeah.

8         Q.    What other variables would you want to, I

9    guess, control for to figure out whether or not

10   this -- these 1.2 percent of dealers are corrupt

11   versus some other factor?

12        A.    I think you -- you would have to do an

13   investigation, you know, just a traditional

14   regulatory enforcement investigation.  So I don't

15   think you'd ever have a court case based on the kind

16   of statistical analysis we were doing.

17        Q.    Would you agree with the statement that

18   if someone is going to ever need to use a firearm

19   for a defensive gun use, to defend themselves

20   against some kind of criminal attack, that they'd be

21   more likely to need it in areas where there is

22   statistically more crime?

23        MS. HIRSCH:  Objection.  Beyond the scope.

24   BY THE WITNESS:

1      A.    I think that as I understand your

2  hypothetical, that that makes sense that the

3  likelihood of being attacked, other things equal,

4  would be influenced by the overall level of assault

5  in the community.

6  BY MR. SIGALE:

7      Q.    And that all other things being equal,

8  banning gun sales in those areas makes it less

9  likely that that person will be able to defend

10 themselves in the case of that criminal attack?

11     MS. HIRSCH:  Objection, incomplete

12 hypothetical.

13 BY THE WITNESS:

14     A.    The ban on gun sales possibly has some

15 effect on the prevalence of gun ownership and

16 carrying.  I think what most -- most of the attacks

17 or assaults are going to be in public places, and so

18 it's not just that you have a gun but that you

19 actually have it readily available at the time that

20 this occurs.

21          But I would not agree with you in terms

22 of your -- your ability to defend yourself against

23 the attack.  I think what we learned from the study

24 that Gary Kleck did with, I think, his graduate

1    student or something was that there are a variety of

2    ways of defending yourself against an attack, other

3    weapons that can be used and simply running away or

4    reasoning with the person.  And that using a gun for

5    that purpose has no advantage statistically.

6              So I would not agree that you are left

7    without any means of defending yourself.

8    BY MR. SIGALE:

9        Q.    Well, for example, was it the City or the

10   Chicago police that said in case of an attack, you

11   should put your finger down your throat and make

12   yourself vomit, would you equate that, for example,

13   with having a firearm in case of an attack?

14       MS. HIRSCH:  I'm sorry, can you repeat that?  I

15   must have missed what you were saying.

16       MR. SIGALE:  Can you read it back.

17                  (WHEREUPON, the record was read by

18                   the reporter.)

19       MS. HIRSCH:  I'm going to just object on vague

20   and ambiguous grounds as far as what that question

21   is actually asking.

22              But if you understand it, go ahead.

23   BY THE WITNESS:

24       A.    Right.  I don't know how many instances

1    the National Crime Victimization Survey of someone

2    who defended themselves by sticking their finger

3    down their throat, I think that was nil.

4          So, again, based on the thousands of

5    cases that Kleck looked at, you can compare using a

6    gun with using a knife with using a variety of other

7    means.  And you might end up being less confident

8    that a gun is the right way to go.

9          I mean, of course, introducing a gun into

10   the situation can be helpful as another weapon.  It

11   could also make things worse.  It certainly

12   escalates the situation.

13   BY MR. SIGALE:

14        Q.    It could escalate the situation.  It

15   could also cause the attacker to get the hell out of

16   there?

17        A.    Yes.

18        Q.    Whether for self-preservation or to go

19   find what he considers a better target, but for

20   whatever reason, correct?

21        A.    That's right.  Or else he might get out

22   of there to get his own gun and come back and shoot

23   you, so there's lots of different scenarios that are

24   possible.

1             But, again, looking at the kind of

2 statistical analysis that we have on this, you -- it

3 is not at all clear that this is the right way to

4 go.

5        Q.     Okay.   But -- strike that.

6             The first thing you mention in the Kleck

7 study -- and the Kleck study talked about two and a

8 half million gun uses a year, correct?

9        A.     Yeah.   I -- in terms of the self-defense

10 study in comparing the different types of

11 self-defense, I am not referring to the famous study

12 from 1995 that found 2.5 million uses.   I'm

13 referring to a subsequent study that he did with a

14 coauthor who I believe his last name is Tarok, it's

15 a Korean name.

16             So that's the one where he took ten years

17 of National Crime Victimization Survey and looked

18 for the cases where there was a violent

19 confrontation, and -- and the respondent who was

20 reporting this then had a chance to talk to the

21 interviewer about what they did following the attack

22 or the confrontation.

23             And a few of them drew a gun, I mean,

24 that was their response, and maybe even used it.

1  Others drew a knife or some other type of weapon or

2  they ran away or they did -- I mean, they did a

3  variety of things.  And he compared the subsequent

4  injury rates.

5       Q.   Of who?  The victim?

6       A.   The victim.

7            So -- and -- which he thought was the

8  outcome we really care about.  It's kind of the --

9  after the defensive gesture, what happens to the

10 intended victim.  And that's where we had the

11 statistics that would say if you look at the

12 likelihood of serious injury to the intended victim

13 or the likelihood of minor injury, there's the

14 different types of self-defense that are not

15 distinguishable from each other.  You can't say a

16 gun has a clearer advantage over a knife, over other

17 means, et cetera.

18      Q.   So according to this study, you're saying

19 that it's unclear whether or not it'll -- the victim

20 will do any better or any worse?

21      A.   Either way, that's right.  Yeah.

22      Q.   But a little bit now, we're talking about

23 apples and oranges because the firearm that the

24 intended victim has for self-defense, would you

1    characterize that as a crime gun?

2        A.    No.  I don't know why it would be a crime

3    gun, but --

4        Q.    The crime gun is -- well, I'm looking at

5    your report, page 10 about banning dealers

6    eliminating -- "eliminates one direct source of

7    crime guns," and the crime gun would be the gun that

8    the would-be robber or attacker would use, correct?

9        A.    Yes.

10        Q.    Okay.  So you're saying -- your

11    conclusion, basically, and I think it's kind of

12    throughout, is all other things being equal,

13    eliminating this source of firearms makes it harder

14    for a criminal to get a gun?

15        A.    Yes.

16        Q.    And the fact that it also makes it more

17    difficult for a law-abiding person to get a gun

18    isn't really a factor in your conclusions here?

19        A.    I do not talk about it in my report

20    directly.  I do talk about the consequences of

21    having a greater or lesser prevalence of gun

22    ownership.

23        Q.    And that would be --

24        A.    In the conversation we were just having,

1    I was responding to a question you had asked me.

2        Q.    Sure.  But what you were talking about

3    prevalence, that's like the burglary studies you

4    were talking about earlier today?

5        A.    Yes, yes.  Also the studies of robbery

6    and the general conclusion that says that the volume

7    of violence is not affected by the prevalence of gun

8    ownership.

9        Q.    Oh, right.  The type of violence might

10   change, but the volume and rate of violence stays

11   the same?

12       A.    Right.

13       Q.    Again, it seems to all kind of blend

14   together, but I think I'm asking this a different

15   way:  Are you -- or I'm asking a different question,

16   I should say.

17            Are you testifying as you sit here that

18   because Chicago has criminals who would --

19   apparently some of whom apparently would like to get

20   their hands on a gun if they could, and because

21   there is -- it appears to me from page 10, a very

22   small amount percentage of FFLs that might not

23   follow the law, that that justifies banning gun

24   sales within the City to all the law-abiding people

1    in the City?

2         A.    That is not my testimony, no.

3         Q.    Okay.  You're not saying that?

4         A.    No.

5         Q.    Okay.

6         A.    No.  I -- I don't speak one way or

7    another to whether the law is justified.

8         Q.    Once again, I don't mean this to sound

9    glib, do you have an understanding of why you are

10   here, and I mean are you here in purely social

11   scientist mode to talk about data, or do you have

12   some other understanding of what your testimony is

13   supposed to be about today?

14        MS. HIRSCH:  I just want to put my objection on

15   the record to the extent you're asking him to make

16   any type of, you know, conclusions or thoughts about

17   the -- you know, how it's legally characterized,

18   what he's doing, you know, what an expert report and

19   anything that it can be used for is.

20             So as far as, like, trying to put it into

21   some type of category, I just object to the extent

22   that he might not know -- understand litigation in

23   that sense.

24        MR. SIGALE:  Okay.

1    BY THE WITNESS:

2         A.    I mean, my understanding is that there

3    was some interest on the part of the defense in

4    exploring the public safety effects of the current

5    ban on gun sales and shooting ranges.  And so I was

6    glad to discuss that.

7    BY MR. SIGALE:

8         Q.    Okay.  To your understanding, towards

9    what end?

10        A.    I assumed that they felt that it would

11   help them win the lawsuit.  Presumably.  Otherwise,

12   they would not pay me.

13        Q.    All right.  You've summed up the expert

14   witness field quite nicely.

15              More specifically than just winning, do

16   you have an understanding -- do you have an

17   understanding of towards what end you were being

18   asked to come here and talk about the data you found

19   and the report you wrote?

20        A.    Nothing other than that.  I -- that it --

21   relevant material for -- for the argument that the

22   defense is putting forward.  They were not asking me

23   nor have I done an overall evaluation of this

24   particular ordinance.  So I am not in a position to

1    speak about it even if I were asked to.

2          Q.    A little earlier, we were talking about

3    gun -- firearm purchases being legal in the suburbs,

4    and you were talking about a one-for-one -- I don't

5    know if you said transfer rate or if that's my

6    phrase -- talking about one-for-one sample that

7    there's not going to be much of a difference.  That

8    if you were allowed to sell firearms in the City and

9    it's for all intents and purposes the same firearm

10   to the same person that would otherwise have gone

11   and bought it in the suburbs, you're not going to

12   see much of an effect on anything, correct?

13         A.    I believe that's right.

14         Q.    So is the only difference -- I want to

15   make sure I'm understanding it all -- in your mind,

16   then, is the only difference between the fact that

17   if firearms are -- if gun stores are -- or gun

18   stores as part of gun ranges are allowed in the

19   City, that the only difference between that and the

20   firearms that they can already go buy in the suburbs

21   is that there's the possibility that someone might

22   break into the gun range and steal the guns?  Is

23   that the only difference?  And that it's somewhere

24   closer to do it?

1      A.    I believe what I was saying before is

2  that there are other effects, as well.  And

3  including that it then would become a convenient

4  possibility that the dealer is corrupt or the clerks

5  are corrupt and become an attractive point source to

6  criminals in Chicago --

7      Q.    Well --

8      A.    -- because it's geographically handy,

9  because, you know, there it is.  And in Venkatesh's

10  research, the importance of geography was very

11  strong.

12      Q.    Was very what?

13      A.    Very prominent in terms of his

14  conversations with the criminals who were -- and

15  underworld figures in the news who were saying, you

16  know, I never leave the neighborhood, I don't know

17  my way around another neighborhood, I'm scared, so

18  being local turns out to matter quite a bit, it

19  would appear, to some of these.

20          The other thing is that if you open, you

21  know, 50 shooting ranges and hence 50 new dealers in

22  Chicago, it is not at all clear that that has no

23  effect on gun sales to Chicago residents.

24      Q.    Well, no.  I would assume it would have

1   some effect on sales to Chicago residents.  But I'm

2   talking about illegal firearms.

3           You have no way of knowing as you sit

4   here whether the hypothetical FFL that might sell

5   firearms out of a shooting range in Chicago is any

6   more corrupt or has any more likelihood to have

7   corrupt employees than any other firearm dealer

8   anywhere else, correct?

9       A.    No.  There's no direct evidence.  We

10  don't have a...

11      Q.    Okay.  So the -- there is no evidence

12  that the firearm dealer that they're already going

13  to in the suburbs, for example, is any more or less

14  likely to be, to use your word, corrupt than any

15  hypothetical dealer that might open up in Chicago?

16      A.    I mean, I have no reason to say one way

17  or another, right.

18      Q.    Because you deal in statistics, correct,

19  and percentages?

20      A.    I often do.

21      Q.    Okay.

22      A.    But, also, we just haven't seen what this

23  new regime might look like in Chicago and how

24  well-regulated it is, and what -- we have no

1    experience.

2        Q.    So if there's no basis to believe that

3    any particular hypothetical dealer -- firearm dealer

4    in Chicago is corrupt any more than in the universe

5    of FFLs nationwide, then really aren't what we're

6    talking about is the fear that criminals will rob

7    the FFL, rob the gun range, rob the gun store and

8    it's just a closer place for them to do it?

9        MS. HIRSCH:    I just want to object to the

10   extent you're mischaracterizing his former testimony

11   that that's the only thing he's talking about as far

12   as the increase.

13       MR. SIGALE:    Well, that's what I'm asking

14   about.

15       MS. HIRSCH:    Okay.  Well, it didn't sound like

16   a question.

17   BY THE WITNESS:

18       A.    Yeah.  No.  I believe having a new outlet

19   for straw purchases and under-the-counter sales is

20   quite possibly going to result in increased corrupt

21   transactions in the City.

22            What's the likelihood, well, I don't

23   know.  But what we're talking about is not just a

24   single isolated gun range but an ordinance that if

1  it's changed, we'll presumably produce a number of

2  them, and all of a sudden, there would be a new

3  world where there were a number of gun dealers

4  around the City.  We just don't know what that

5  situation is going to look like.

6  BY MR. SIGALE:

7      Q.    Well, isn't that a -- isn't that a

8  one-for-one exchange, also?  If, indeed, it turns

9  out that there is an FFL that is corrupt in the

10 City, then criminals will just go to that dealer

11 instead of the one in the suburbs that they're

12 presumably going to now because, again, criminals

13 are somehow getting guns in the City somehow despite

14 the -- a ban on sales, so they're getting them from

15 somewhere?

16     A.    Some criminals are getting them.  Most

17 criminals aren't.  And I think you're

18 mischaracterizing what it means to be corrupt.  It's

19 not like some gun dealers hang out a sign in their

20 front window that says, we are corrupt, come one,

21 come all.

22     Q.    No.  That would be stupid.

23     A.    So it is rather that there is some

24 personal connections that produce under-the-counter

1    sales for certain customers who know the clerk or

2    who have somebody to vouch for them, and those

3    connections are going to be easier to make with

4    Chicago criminals if we're talking about a local

5    FFL.

6         Q.    We're speculating on that, though,

7    correct?

8         A.    Yes.  I suppose it's speculation.  But it

9    strikes me as how things work.

10             Also, the one-for-one sale exchange is

11   your term, not mine.  I just want to be clear about

12   that.

13        Q.    I probably was just butchering the phrase

14   you were using earlier, so I apologize.

15        A.    I was not making that as a prediction

16   about what would happen.  Quite the contrary.

17        Q.    Well, if I'm looking here at page 11 of

18   your report, and I'm getting to the end of the

19   report, sadly perhaps not to the end of the

20   questions; I will want to go through some stuff,

21   just take a couple-minute break and go through a few

22   things.

23             But I do want to look at the last

24   paragraph of this report.  And it's kind of what you

1    talked about before.  You said you do not believe

2    that Chicago crime guns were purchased at FFLs in

3    the suburbs.  Apparently "only 12 percent were

4    confiscated within 3 years of the initial purchase

5    and were originally purchased in Cook County."

6            And you said the reason is, is because

7    the people, like Mr. Venkatesh's sources, don't

8    leave their own neighborhood?

9        A.    Yes, uh-huh.

10       Q.    All right.  If you know, if they're not

11   getting them from the suburbs and they're not

12   getting them from the people in Chicago because

13   they're -- until recently, they were even banned

14   from having them, where are they getting them from?

15       A.    There's at least two different questions.

16   One is what is the immediate source of the gun to a

17   robber, for example.  And the other is where was it

18   sold first, that retailer.

19            And we actually have a pretty good idea

20   of what the answer is to the second question about

21   where it ultimately comes from.  So, you know,

22   there's a large percentage that come from Downstate

23   Illinois.  There's been a traditional pipeline from

24   the deep South of guns coming up into Chicago, for

1    example, and, of course, there's guns coming in from

2    Gary and a variety of places.

3           So the first retail sale is quite --

4    quite diffuse, but in terms of the transaction that

5    arms the criminal, the final transaction, that is

6    often a gun that is already in circulation within

7    Chicago.  And so it's already made a transition into

8    some kind of underworld situation or it's in

9    somebody's home and they borrow it or rent it from

10   their brother or it belongs to the gang and so

11   forth.

12          So there's a wide variety of transactions

13   that can produce that final step that leads to the

14   gun crime.  And a lot of that is very local -- I

15   mean, guns that have become local.  They were stolen

16   from someone's household, they were borrowed from

17   some brother.  You know, it's a complicated

18   situation.

19       Q.    So it -- it goes without saying, although

20   I'm going to say it anyway, that the gun crime that

21   we're talking about in Chicago has nothing to do or

22   virtually nothing to do with retail purchases at

23   licensed gun stores or gun ranges in Chicago that

24   don't exist, correct?

1          A.     That sounds right, yeah.

2          Q.     And it sounds like they even have -- the

3     gun crime has little to do, according to the middle

4     of page 11 of your report, from the FFLs in the

5     suburbs for -- because apparently the criminals

6     don't or can't get there to buy the guns, anyway?

7          A.     Right.  So within Cook County, maybe

8     one-eighth.

9          Q.     Say again?

10         A.     I'd say the Cook County, as a source,

11    does provide about one-eighth of the guns that move

12    quickly in crime...

13         Q.     Is that the 12 percent --

14         A.     Yeah, the 12 percent, yeah.

15         Q.     -- that's referenced there?

16         A.     Uh-huh.

17         MR. SIGALE:  I'm going to tell you what, I

18    don't know where we are on time.  I know we are

19    under seven, we are probably at six and a half or

20    something.  But I'm going to take a couple-minute

21    break, going to look through my notes.  Might be

22    about done, okay?

23         MS. HIRSCH:  Thank you.

24                   (WHEREUPON, a short recess was

1                          had.)

2    BY MR. SIGALE:

3         Q.    Let me ask these questions as they pop in

4    my head, Professor.

5              On page 10 of your report, you were

6    talking about the FFLs and the 1.2 percent and you

7    were talking how, you know, that doesn't necessarily

8    mean that these 1.2 percent are crooked, it just

9    means that they -- there's other factors that, like,

10   they sell a higher-than-average percentage of the

11   firearms total, so it's more likely that they would

12   be traced?

13        A.    Yes.  Yeah.  That's a big one.

14        Q.    Are there any other -- that you know of

15   or that have been pointed out by anyone else, any

16   other omitted variables that affect this statement?

17        A.    Well, there's no omitted variable.  This

18   is simply a descriptive fact.  It -- we -- then the

19   question is how do you interpret it.

20        Q.    Okay.

21        A.    And, of course, the real interest is in

22   being able to document the existence of careless or

23   corrupt dealers in the mix, and the question being

24   how important are they.

1          But this is, as far as I know, a correct

2     statement of 1998 -- the situation in 1998.

3          Q.    All right.  Same question for the study

4     on -- we might have talked about it a little bit,

5     but I'll ask it specifically.

6          The survey that was talked about on

7     page 4 of your report, the social costs survey?

8          A.    Yes.  Okay.

9          Q.    Were there any omitted variables, whether

10    you saw them in retrospect or whether someone else

11    pointed it out in some other writing, let's say,

12    that would affect the results of this survey, this

13    study?

14         MS. HIRSCH:  Objection, vague and ambiguous.

15    BY THE WITNESS:

16         A.    I mean, I think that the study was done

17    by a reputable company, NORC, the national

18    organization for -- what is it?  Anyway, N-O-R-C

19    assists the University of Chicago and use the

20    state-of-the-art approach to contingent evaluation

21    in most respects.  If we had had a larger budget, we

22    could have done a better job in certain respects.

23    BY MR. SIGALE:

24         Q.    Like what?

1      A.    We could have interviewed people in

2  person instead of on the phone, and there is some

3  thought that that improves the quality of the

4  responses.  Although, even that is controversial.

5      Q.    Anything else?

6      A.    No.  I think it is as -- it has passed

7  the test of time.

8      Q.    Now, obviously, you talked about it in

9  more detail earlier, so I don't want you to have to

10 rehash that.

11     A.    Okay.

12     Q.    The NC -- National Crime victim --

13     A.    Victimization Survey.

14     Q.    -- survey, that's the telephone survey

15 that -- it's also a telephone survey you had talked

16 about earlier, or is that done in writing?

17     A.    No.  That's the national survey conducted

18 by the U.S. Department of Census and has been every

19 six months since 1973.  It is a very large --

20     Q.    Is that in writing?  On the Internet?

21 Over the phone?

22     A.    It is, for the most part, face-to-face.

23     Q.    Oh, okay.

24     A.    They may follow up in some cases on the

1    phone.

2        Q.    All right.  To the best of your

3    knowledge, they do not ask whether or not they have

4    used their -- a firearm to deter a crime without

5    having to use the firearm; is that correct?

6        A.    The sequence of questions is that they

7    first ask people in a variety of ways whether they

8    had been a victim of a crime.  If they report being

9    a victim of a crime where there was a confrontation,

10   then they are asked what they did.

11            And so in the course of responding to

12   that question, which has some more detail to it,

13   they have the option of talking about self-defense

14   uses.  And so that's where it comes up.  If they

15   say, yes, my house was broken into while I was there

16   or they said, you know, somebody mugged me while I

17   was on the street, then they're invited to talk

18   about their responses.

19       Q.    Okay.  But specifically, is there ever --

20   is there a question about whether or not they have

21   deterred a crime with a gun they own without having

22   to use the gun?

23       A.    There is no -- no question like that.  So

24   the -- when -- in responding to the question about

1    did they defend themselves or attempt to respond to

2    the attack, they can say what they were going to

3    say.  You know, if they say that they had a gun and

4    they used it, then that would come up.

5        Q.    Would you agree that a homicide defendant

6    in the State of Illinois is more likely to have a

7    felony conviction than the average person in the

8    State of Illinois?

9        A.    Yes.

10       Q.    And do you believe that that's a true

11   statement for the City of Chicago, as well?

12       A.    Yes.

13       Q.    I think I want to end on this, Professor:

14   You testified earlier -- we talked much, much

15   earlier about factors that you believe influence or

16   have a causative or at least a high correlative

17   effect on the murder rate in Chicago and why it's

18   higher than the national average.

19             I'm thinking of how to phrase this.

20             Based on your research, and given the

21   fact that firearm sales, for example, are -- well,

22   not for example, firearm sales are banned with very

23   limited exception, what would you do that you

24   believe would have the greatest impact on reducing

1    the murder rate in Chicago?

2        MS. HIRSCH:  Objection, relevance, beyond the

3    scope.

4    BY THE WITNESS:

5        A.    Yeah.  It's fun to think about.  I'm not

6    sure what superpowers you're giving me in this

7    scenario.

8    BY MR. SIGALE:

9        Q.    All real-world superpowers.

10        A.    I think that certainly an investment in

11    police -- in prudent policing, a larger force would

12    pay off.  I think that there's -- actually, the --

13    it would be nice if the judiciary would cooperate

14    more and take gun carrying seriously, more seriously

15    than they do.  That would be useful.

16        Q.    You mean illegal gun carrying?

17        A.    Yes.  Illegal gun carrying.  So I would

18    see that as something that is likely to make some

19    difference.

20            But, you know, the main thing is to try

21    to invest in the future and to see whether it's

22    possible to get the kids to stay in school and to

23    graduate.  And there's a lot of ideas about how to

24    do that, and I have some connection to several

1    projects.  I would see that as hopeful over the long

2    term.  It's not going to solve any problems in the

3    next year, but eventually, it will.

4            Anyway, I guess I'm not quite using my

5    superpowers in that scenario, but...

6        Q.    And would you say that -- forgive me,

7    maybe you said it.  Maybe I asked this specifically.

8    It feels like a long time ago.

9            In this superpower scenario, what role --

10   what role would doing something about gangs play?

11       A.    Well, I think it would be very desirable

12   to undermine the power of the gangs, but I don't

13   know how to do that.  I don't know what the -- even

14   the first step would be, except to give the kids

15   some alternative, some attractive alternative, but

16   whether that's possible to take that on directly, I

17   don't know.  But if you could do it, I think it

18   would be helpful.

19       MR. SIGALE:  All right.  I don't know if you

20   have any questions.

21       MS. HIRSCH:  We have to go, so we're done.

22   We're good.

23       MR. SIGALE:  Okay.  Professor Cook, I

24   appreciate it.

1          Signature?

2     MS. HIRSCH:  We'll reserve signature.

3     MR. SIGALE:  We'll order.

4     THE COURT REPORTER:  Would you like a copy?

5     MR. SIGALE:  I just need e-trans.

6     MS. HIRSCH:  E-trans only.

7          FURTHER DEPONENT SAITH NOT.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    I N D E X

 2

 3   WITNESS                      EXAMINATION

 4                                Page    Line

 5   PHILIP COOK

 6    Mr. SIGALE                    3      7

 7

 8

 9                 E X H I B I T S

10   Cook Deposition              Page    Line

11        Exhibit No. 1...............  10    16

12

13

14

15

16

17

18

19

20

21

22

23

24
```

224

```
 1                 DEPOSITION ERRATA SHEET

 2

 3    Assignment No. A70B7C2

 4              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 5                     EASTERN DIVISION

 6    RHONDA EZELL, JOSEPH I. BROWN,    )
      WILLIAM HESPEN, ACTION TARGET,    )
 7    INC., SECOND AMENDMENT            )   No. 10 CV 5135
      FOUNDATION, INC., and ILLINOIS    )
 8    STATE RIFLE ASSOCIATION,          )
                      Plaintiffs,       )
 9         vs.                          )
      CITY OF CHICAGO,                   )
10                    Defendant.        )

11

12          DECLARATION UNDER PENALTY OF PERJURY

13           I declare under penalty of perjury that I

14    have read the entire transcript of my Deposition

15    taken in the captioned matter or the same has been

16    read to me, and the same is true and accurate, save

17    and except for changes and/or corrections, if any,

18    as indicated by me on the DEPOSITION ERRATA SHEET

19    hereof, with the understanding that I offer these

20    changes as if still under oath.

21                    Signed on the _____ day of

22                    _____, 20___.

23                    _____

24                    PHILIP COOK
```

```
 1   STATE OF ILLINOIS )

 2                     )  SS:

 3   COUNTY OF DU PAGE )

 4          I, Nicole Scola, a Notary Public within

 5   and for the County of Cook State of Illinois, and a

 6   Certified Shorthand Reporter of said state, do

 7   hereby certify:

 8          That previous to the commencement of the

 9   examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12          That the foregoing deposition transcript

13   was reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony given

16   and the proceedings had;

17          That the said deposition was taken before

18   me at the time and place specified;

19          That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in the

23   outcome of this action.

24          IN WITNESS WHEREOF, I do hereunto set my
```

1    hand and affix my seal of office at Chicago,

2    Illinois, this 8th day of November, 2013.

3

4

5              Notary Public, Cook

6              County, Illinois.

7              My commission expires 6/29/2015.

8

9

10   C.S.R. Certificate No. 084-004524.

11

12

13   Signature Requested

14

15

16

17

18

19

20

21

22

23

24