# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**RHONDA EZELL, et al.,**                )
                                          )     **Case No. 10 CV 5135**
                                **Plaintiffs,**     )
                                          )
           **v.**                         )     **Hon. Virginia M. Kendall**
                                          )
**CITY OF CHICAGO,**                       )
                                **Defendant.**     )


# DEFENDANT'S RESPONSE IN OPPOSITION TO
# PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT


Mardell Nereim
William M. Aguiar
Andrew W. Worseck
Rebecca Alfert Hirsch
Mary Eileen Cunniff Wells
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 742-0260

Attorneys for Defendant

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................1

ARGUMENT...................................................................................................................2

I.      **Plaintiffs Fail to Demonstrate that The Ordinance is a De Facto Ban Subject to "Near-Strict" Scrutiny**................................................................2

II.     **Plaintiffs' Challenge to the City's Ban on Gun Sales Has Already Been Determined**...............................................................6

III.    **Plaintiffs Are Not Entitled to Summary Judgment on Any of the Individual Provisions**.........................................................8

      A.     **Noise Regulations**.........................................................................9

      B.     **Zoning Regulations**.....................................................................11

      C.     **Ammunition Sales**.......................................................................15

      D.     **Deleterious Impact Standard**.......................................................17

      E.     **FOID Card Requirements**............................................................20

      F.     **Age Restriction**...........................................................................22

      G.     **Hours Restriction**........................................................................24

      H.     **Range Master Presence**...............................................................26

      I.     **Sloped Floor and Floor Drain Requirements**.................................27

      J.     **Promulgation of Environmental Rules**...........................................29

      K.     **Sound-Proofing Requirement**.......................................................30

      L.     **Ballistic-Proof Walls and Doors**...................................................32

      M.     **Ammunition Storage**....................................................................33

      N.     **Ventilation Requirements**.............................................................34

**IV.     Plaintiffs' First Amendment Challenge Has No Merit**.......................................................36

**CONCLUSION**.................................................................................................................................38

# TABLE OF AUTHORITIES

## Cases

*Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990 (7th Cir. 2004)....................................1

*DiMa Corp. v. Town of Hallie*, 185 F.3d 823 (7th Cir. 1999)....................................26, 29

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999)....................................37

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)....................................1, 2, 3, 8, 14

*Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198 (1st Cir. 2002)....................................37, 38

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012)....................................18

*Illinois Ass'n of Firearms Retailers, et al v. City of Chicago*, - -F. Supp. 2d - -, 2014 WL 31339 (N.D. Ill. Jan. 6, 2014)....................................3, 7

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)....................................3, 37

*Jones v. Griffith*, 870 F.2d 1363 (7th Cir. 1989)....................................7

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)....................................8, 18

*Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013)....................................27, 33

*Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)....................................14

*Lossman v. Pekarske*, 707 F.2d 288 (7th Cir. 1983)....................................3

*North Avenue Novelties, Inc. v. City of Chicago*, 88 F.3d 441 (7th Cir. 1996)....................................12

*NRA v. BATF,* 700 F.3d 185 (5th Cir. 2012)....................................24

*New York v. Ferber*, 458 U.S. 747 (1982)....................................23

*NRA v. McCraw*, 719 F.3d 338 (5th Cir. 2013)....................................24

*People v. Zerillo,* 189 N.W. 927 (Mich. 1922)....................................18

*Piszczatoski v. Filko*, 840 F. Supp. 2d 813 (D. N.J. 2012)....................................19

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992)......................................................27, 33

*Richards v. County of Yolo*, 821 F. Supp.2d 1169 (E.D. Cal. 2011)................................18

*Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180 (1997)........................................29

*United States v. Decastro,* 682 F.3d 160 (2d Cir. 2012)..................................................8

*United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991)....................................................1

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010)..................................................8, 9

*United States Natl Bank of Oregon v. Independent Ins. Agents of America, Inc.*,
      508 U.S. 439 (1993).....................................................................................7

*United Transp. Union–Ill. Legis. Bd. v. Surface Transp. Bd.*, 169 F.3d 474 (7th Cir. 1999)..........31

*Wisconsin Right to Life v. Schrober,* 366 F.3d 485 (7th Cir. 2004).................................7

*In re Willett*, 544 F.3d 787 (7th Cir. 2008)......................................................................31

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir.2013).....................................................18

**Statutes, Ordinances, and Rules**

430 ILCS § 65/2...............................................................................................................20

Chicago Mun. Code § 4-144-010......................................................................................7

Chicago Mun. Code § 4-151-010, *et seq*.....................................15-18, 20-22, 25, 33

Chicago Mun. Code § 8-20-100......................................................................................6, 7

Chicago Mun. Code § 8-32-010, *et seq*.........................................................................9, 10

Chicago Mun. Code § 11-4-260........................................................................................29

Chicago Mun. Code § 13-96-1160, *et seq*..........................9, 10, 27, 30-32, 34, 36

Chicago Mun. Code § 15-4-985.......................................................................................33

Chicago Mun. Code § 17-1-0501, *et seq*.......................................................................13

Chicago Mun. Code § 17-5-0207........................................................................11, 14, 15

Chicago Mun. Code § 17-9-0120........................................................................11, 14, 15

Fed. R. Evid. 702........................................................................................................5

**INTRODUCTION**

It is well-settled that before the Court determines the applicable level of scrutiny to apply to regulations challenged under the Second Amendment, it must first determine the extent to which any right to keep and bear arms for self-defense is actually burdened. *See Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011). In moving for summary judgment, Plaintiffs dodge this crucial step, and the reason is evident: they cannot prove any burden whatsoever. Although Plaintiffs scatter conclusory and hyperbolic protestations of "terrible" and "extreme" burdens throughout their brief, they fail to provide any meaningful discussion, much less any factual support, for how the challenged provisions do, in fact, impose any measurable burden on their constitutional right to train and maintain firearm proficiency at gun ranges. Worse still, while Plaintiffs' brief begins with nine pages of facts cut and pasted from their Local Rule 56.1(a)(3) Statement of Undisputed Facts, they fail to incorporate any citations to the evidence in their argument, and instead merely deliver sweeping generalities without reference to the factual record. This failure is reason enough to deny summary judgment. *See, e.g.*, *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) (when plaintiff fails to support argument with citations to record, court "will not root through the ... documents ... to make his case for him"); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in [the record]").

At most, Plaintiffs' evidentiary support consists almost exclusively of the speculative testimony of their two proferred experts, Mr. Kramer and Mr. Giordano. Neither of these individuals has expertise on the economic feasibility of firing ranges and, for the most part, they could only "issue spot" on hypothetical, future concerns with the City's regulations that "may or may not be an issue." Plaintiffs' substitution of these musings for concrete evidence of a constitutional

infringement runs afoul of the rules of evidence and should be rejected. Even if the Court considers Mr. Kramer and Mr. Giordano's unqualified opinions, however, they are woefully insufficient to establish, as a matter of law, that each challenged provision of the Ordinance is unconstitutional.

Because Plaintiffs have not produced evidence that the Ordinance's reasonable regulations impact Plaintiffs' Second Amendment rights in any tangible way, the inquiry can stop here, and Plaintiffs' motion should be denied. Even assuming the regulations did impact Plaintiffs' rights, they do so, at most, at the margins of the right in a minimal way, and therefore are "more easily justified," *Ezell*, 651 F.3d at 708, a standard the City amply satisfies with its robust record of testimony, documents, industry standards, and studies, as well as common sense. *See* Defendant's Local Rule 56.1(a) Statement of Material Facts ("Def. SOF") and Defendant's Response to Plaintiffs' Statement of Undisputed Facts ("Def. Resp. SOF"), incorporated herein. Plaintiffs conveniently turn a blind eye to the undisputed record evidence supporting the City's position, blithely stating that the City has no legitimate justifications for *any* of the challenged regulations. Plaintiffs reach their faulty conclusion only by ignoring the undisputed record evidence. When the evidence is, in fact, properly considered, it is beyond doubt that the City has a strong interest in protecting its citizens from the known dangers of firing ranges and that the Ordinance is reasonably calculated to combat these dangers. For all of these reasons, discussed fully below, Plaintiffs' motion for summary judgment should be denied.

## ARGUMENT

**I.  Plaintiffs Fail to Demonstrate that The Ordinance is a De Facto Ban Subject to "Near-Strict" Scrutiny.**

Without providing any analysis or rationale, Plaintiffs simply assume that the heightened

scrutiny applied by the Seventh Circuit in *Ezell* applies, across the board, to all of the regulatory provisions they challenge. *See* Pls.' Mem., p. 1. They are flat wrong. As discussed in the City's Memorandum of Law In Support Of Its Motion For Summary Judgment ("City's Memorandum" or "City Mem."), pp. 5-9, a "severe burden" produces more scrutiny than a "modest burden" which "may be more easily justified." *Ezell*, 651 F.3d at 708. The Seventh Circuit's statement that "a more rigorous showing than that in *Skoien* should be required, if not quite 'strict scrutiny,'" was based on the fact that at that time, the City banned all firing ranges from operating in Chicago but required range-training as a prerequisite to the exercise of the constitutional right to possess a handgun in the home for self-defense. *Id. See also Illinois Ass'n of Firearms Retailers, et al v. City of Chicago*, --F. Supp. 2d - -, 2014 WL 31339, *9-10 (N.D. Ill. Jan. 6, 2014) (finding City-wide ban on firearm sales "serious burden" on right to acquire gun for self-defense, and thus applying heightened scrutiny). The City now allows gun ranges to operate, and it no longer requires residents to obtain range-training as a condition of possession. As a result, the Seventh Circuit's statement that something akin to strict scrutiny should be used no longer applies to this case.

To the extent Plaintiffs try to shoehorn this case into *Ezell*-level scrutiny by contending the Ordinance operates as a *de facto* ban on shooting ranges, that claim lacks merit. Besides a passing reference to the claim, *see* Plf.' Mem., p. 1, Plaintiffs do not develop the argument whatsoever, much less make a showing that the Ordinance itself is the reason no firing ranges have yet opened in the City. *See, e.g., Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) ("elementary principles of legal causation [ ] are as applicable to constitutional torts as common law torts. . ."); *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983) (plaintiff cannot recover in § 1983 claims without establishing causation in fact). Plaintiffs simply have no evidence that it is impossible for all would-

be ranges to open, much less evidence showing that the Ordinance actually prevented even one single individual, who had the desire, means, and ability to construct and operate a range, from doing so.

None of the individual Plaintiffs in this case have anything more than an interest in opening or operating a firing range in the City. Def. SOF ¶¶ 1-3. SAF has never built, operated, or managed a shooting range and has no interest in doing so. *Id.*, ¶ 5. ISRA operates an outdoor range in Bonfield, Illinois, but it has never operated an indoor range and has only talked about opening a possible range in Chicago, but taken no concrete steps to do so. *Id.*, ¶ 6. None of the individuals Action Target identified as having an interest in opening a range took any real steps, or were in a financial position, to move forward with their plans. *Id.*, ¶¶ 93-94. For example, Mr. Gordon and Mr. Kuczmierczyk testified that they did not have the capital to put into opening a range, and had not completed any business plans. *Id.*, ¶ 94. Mr. Robuck testified that he had found a location that met the zoning requirements, but he had problems negotiating the lease with the property owners and has put the project on the back-burner. *Id.*, ¶ 96. And Mr. Queen, the owner of Fidelity Security and Investigative Services, testified that he wanted to retrofit the basement space of Fidelity to offer private training programs to security officers pursuant to its state license. *Id.*, ¶ 95. None of these, or any other, witnesses support Plaintiffs' theory that the Ordinance prevented a firing range from opening. And even assuming a few individuals decide that it is too costly or inconvenient for *them* to proceed, it does not mean that the City's regulations have made it impossible for *all* would-be operators to proceed.

Nor do Plaintiffs' preferred experts help with this claim. Neither Mr. Giordano nor Mr. Kramer has experience with or expertise in the business operation of firing ranges. Def. SOF ¶ 10. Mr. Giordano primarily advises ranges about safety issues and is not involved in the design,

4

construction, or business plan of a range whatsoever. *Id.* Mr. Kramer is an architect and an expert in range design, but has no experience with formulating or reviewing a range's business plan. *Id.* Accordingly, because they lack the requisite knowledge and expertise to opine on matters regarding the business or economics of a range, and because their opinions are not based on sufficient facts or data, they do not qualify as expert witnesses regarding the economic feasibility of a range under FED. R. EVID. 702, and their opinions should therefore be disregarded.

Even if their opinions are considered, they opine only that the Ordinance "might" make it impossible; they do not actually know that it would be impossible, or even imprudent, to open a firing range in the City. Def. SOF ¶ 11. Mr. Kramer testified that it is his "perception" that the Ordinance may affect a potential gun range from opening up, but "he does not know for certain that it actually has the impact [he is] thinking it may have." *Id.* Mr. Giordano testified that he "does not actually know whether a range subject to the Ordinance could be open and run as a viable business. *Id.* Neither of them tied their opinions to any studies, investigation, or actual numbers, nor did they speak with any individuals who actually wanted to open a range in Chicago. *Id.* Thus, Plaintiffs' experts offer nothing more than pure speculation on whether the Ordinance makes it impossible to open a range.

There are many other possible factors that could have contributed to the lack of a shooting range being built in the City in the last two years, including high start-up costs and the unfriendly economic climate. Range construction is exceedingly expensive no matter the specific regulations: it can begin at about $3 million, and could go up to $20 million "before it started getting really fancy." Def. SOF ¶ 24. And not only are the start-up costs high, but the risky nature of the business makes finding financing especially difficult. Mr. Hart testified that he had been involved in over 30

capitalization deals outside of Chicago, but that all of them were denied because of the high risk. *Id.*, ¶ 25. Plaintiffs produced no evidence that any other individual had the capital or means to build a firing range. And the economy has not been favorable to established businesses over the last few years, much less to new ones without an established market. Plaintiffs do not even attempt to discount these factors; indeed, Mr. Kramer admits that the bad economy could be the reason that no firing range has opened since the ban was lifted. *Id.*, ¶ 11.

In sum, Plaintiffs have produced no direct or reliable evidence showing that the City's regulations actually thwarted the plans of any ready, willing, and able range owner or operator, much less that they "effectively prohibit" firing ranges from opening in Chicago. To the extent Plaintiffs seek judgment on this claim, it should be denied.

## II. Plaintiffs' Challenge to the City's Ban on Gun Sales Has Already Been Determined.

Plaintiffs devote a large portion of their memorandum to challenging the constitutionality of the City's ordinance banning the sale and transfer of firearms. Pls.' Mem., pp. 12-16. Both Plaintiffs' Amended Complaint and the arguments in their memorandum make clear that they challenge this ban broadly, not solely in the context of banning sales at gun ranges. Because this issue has, for all practical purposes, already been decided,[1] there is no reason for the Court to wade into the merits here.

As the Court is aware, on January 6, 2014, Judge Chang declared Chicago Mun. Code § 8-20-100(a) (prohibiting gun sales and transfers) and § 17-16-0201 (prohibiting construction and operation

___

[1] The City filed a motion to stay all further proceedings in this case on January 24, 2014, based on the fact that the City will be enacting new regulations affecting sales, transfers, and potentially other aspects of the Ordinance that affect Plaintiffs' claims in this case. That motion remains pending before the Court.

of gun stores) unconstitutional under the Second Amendment. *See Illinois Ass'n of Firearms Retailers,* 2014 WL 31339 at *16. The City chose not to appeal that decision and, on January 14, Judge Chang stayed the effect of the judgment for six months in order to provide the City sufficient time to adequately consider, draft, support, and enact appropriately-tailored regulations.

Accordingly, although the provisions technically remain on the books for the next few months while the City enacts new legislation permitting gun sales and transfers, the constitutionality of the provisions Plaintiffs challenge has already been decided, and there is no need for the Court to decide it again. Furthermore, because there are not yet regulations taking its place, Plaintiffs' challenge to §8-20-100(a) as applied to gun ranges cannot be determined. At this point, while it is certain that § 8-20-100 and § 4-144-010 will be replaced by regulations permitting gun sales, it is uncertain what the regulations will be and whether they will, in fact, allow gun sales at gun ranges. Therefore, until the regulations are enacted, there exists only a hypothetical legal issue that is not appropriate for judicial resolution. "A court's opinion on hypothetical statutes . . . would be difficult to characterize as anything but advisory." *United States Natl Bank of Oregon v. Independent Ins. Agents of America, Inc*., 508 U.S. 439, 447 (1993). The jurisdictional requirements of Article III ensure that "resources of the federal judiciary are not expended on advisory opinions and hypothetical disputes." *Wisconsin Right to Life v. Schrober,* 366 F.3d 485, 488 (7th Cir. 2004). *See also Jones v. Griffith*, 870 F.2d 1363, 1366 (7th Cir. 1989) (dispute "must have ripened into a legal case before a federal court can act; the case must not lie merely in the future").

Even assuming *arguendo* that the new regulations continued to prohibit sales at gun ranges, the provisions Plaintiffs challenge here will be repealed and replaced with different ones, at which time Plaintiffs will have to amend their complaint if they choose to mount an attack on the new

regulations. For these reasons, there is nothing for the Court to decide on this issue at this time, and Plaintiffs' motion on these claims should be denied. To the extent the Court decides to reach this issue, however, the City incorporates its arguments set forth in its memorandum in support of its summary judgment. *See* Def.'s Mem., pp. 28-31.

## III.    Plaintiffs Are Not Entitled to Summary Judgment on Any of the Individual Provisions.

Because this case does not involve a categorical prohibition on protected Second Amendment activity, the Ordinance's provisions are "more easily justified." *Ezell*, 651 F.3d at 708. Just how much more easily depends on the "the relative severity of the burden and its proximity to the core of the right." *Id*. at 709. As discussed, Plaintiffs have not shown that the Ordinance's zoning, construction, and day-to-day business regulations affect the "core" of their Second Amendment rights, much less have they substantiated their allegations that the regulations burden their rights with any real proof.

Even if the regulations place some minimal constraints on the construction and day-to-day operations of firing ranges, they burden only the margins – not the core – of Plaintiffs' right to possess firearms for self-defense or to train with firearms to maintain proficiency. Thus, they are, at most, subject to an intermediate level of scrutiny. *See, e.g., United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) *(*applying intermediate scrutiny to categorical exclusion of domestic violence misdemeanants from gun ownership); *United States v. Decastro,* 682 F.3d 160, 166 (2d Cir. 2012) (federal regulation governing transportation of firearms not subject to heightened scrutiny because it imposed only a "marginal, incremental or even appreciable restraint on the right to keep and bear arms"); *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012) (intermediate scrutiny applies to regulations that burden but do not ban Second Amendment rights).

The City does not concede that intermediate scrutiny is the appropriate standard; however, for purposes of this motion, the City applies that standard. Regulations are valid under Second Amendment intermediate scrutiny so long as they are "substantially related to an important government objective." *Skoien*, 614 F.3d at 641.

### A.    Noise Regulations

Plaintiffs ask the Court to hold § 13-96-1200(b)(2), which sets the maximum noise emanation level from a firing range at 55 dB when measured 100 ft away from the facility (or 70 dB if within 10 ft), unconstitutional as a matter of law. Tellingly, Plaintiffs do not claim that protecting the public from dangerous noise levels or loud disturbances serves no legitimate governmental purposes, nor could they, as these potential harms are well-documented. *See* Def.s' Mem., p. 21; Def. SOF ¶¶ 48, 53. Rather, Plaintiffs contend only that § 13-96-1200(b)(2) violates their Second Amendment rights because firing ranges are the only businesses subject to noise restrictions between 6:00 a.m. and 8:00 p.m., and because other businesses operating in manufacturing districts are exempt from all noise level requirements. Pls.' Mem., pp. 11-12; Def. SOF Ex. 15, p. 7. In other words, Plaintiffs' sole point of contention is that firing ranges are (allegedly) treated differently than other businesses. Not only is this claim entirely unrelated to any infringement of the Second Amendment, but it is also simply untrue.

Section 13-96-1200(b)(2) clearly states that "the noise emanating from the shooting range to areas outside of the shooting range facility are subject to Chapter 8-32, Sections 8-32-010 through and including 8-32-170, Noise and Vibration Control." Section 8-32-150 provides that any noise source not specifically addressed in the section (and firing ranges are not), the noise limitations apply only between 8:00 p.m. and 8:00 a.m. MCC § 8-32-150. Furthermore, the provision exempting

9

sounds within the boundaries of manufacturing districts – § 8-32-170(h) – would also apply. Kevin Schnoes, the City's former Assistant Commissioner for Public Health, also testified that, like all noise regulations in the City, § 13-96-1200(b)(2) applies only from 8 p.m. to 8 a.m. Def. SOF ¶ 47. Plaintiffs attempt to discount his testimony by arguing that "Schnoes's enforcement philosophy is not law"; rather, it is "the police wielding noise meters who are responsible for enforcing the restrictions." Pls.' Mem., p. 12. But, as discussed above, it is, in fact, the law. Far from merely representing one individual's personal philosophy, Schnoes, in his capacity as assistant head of the department charged with designing and crafting the City's noise restrictions, was explaining the law *as written*. And that law unambiguously provides that firing ranges are subject to all of the provisions of Chapter 8-32, and thus enjoy all of the same exclusions as other businesses.

Thus, because shooting ranges are treated like all other businesses, and because shooting ranges can operate only between 9 a.m. and 8 p.m., § 13-96-1200(b)(2) places *no* burden on Plaintiffs or a potential range owner. Certainly Plaintiffs have presented no evidence of burden. They even admit that, if the restriction applied, "it is unlikely" that the noise levels would exceed the 55dB limit, and this issue is only a "philosophical" concern. Def. SOF ¶¶ 49-50. And Plaintiffs do not contend that this provision makes it economically infeasible to open a range. *Id.*, ¶ 50. Without a showing that the provision impacts their Second Amendment rights in any way, Plaintiffs are not entitled to summary judgment. Furthermore, even if there were proof of some minimal burden, § 13-96-1200(b)(2) easily satisfies means-ends scrutiny. As set forth in the City's Memorandum, this provision is designed to protect against the documented harms of dangerous noise levels that can occur not only within the interior of the shooting range, but also those that travel outdoors and beyond the shooting range property. *See* Def.'s Mem., p. 21. As a result, maximum

noise emanation levels are commonly used to protect the general public from hazardous range noise and also ensure that individuals in surrounding areas are not disturbed by consistent, loud noises out of their control. *Id*. Thus, to the extent a shooting range was located near a manufacturing district's border, or allowed to be open beyond 8:00 p.m., these commonsense noise protections would be in place, just as they are for any other business. For these reasons, this provision is easily justified, and Plaintiffs are not entitled to summary judgment.

## B. Zoning Regulations

Plaintiffs offer no evidence that sections 17-5-207 and 17-9-0120 of the Chicago Zoning Ordinance ("CZO") impermissibly burden their Second Amendment rights by making it impossible for a range to locate in Chicago. Neither Plaintiffs nor their experts have made any effort to determine what properties in Chicago meet the requirements of those sections. Def. SOF ¶¶ 21-22. Instead, from the map prepared by the City's Department of Housing and Economic Development ("DHED"), Plaintiffs surmise that only 2.2% of the land in Chicago is available for a firing range. Pls.' Mem., p. 17. But that calculation is inaccurate because it includes land that is unavailable for commercial or business use by anyone. It is based on a total City acreage of 148,161, which *includes* streets, alleys, and expressways, as well as all land that is zoned residential. Def. SOF ¶ 14 & Ex. 18. Under the CZO, no business or commercial ventures of *any kind* can locate on residential property, MCC § 17-2-0207, and it is undisputed that those ventures cannot locate on a street, alley, or expressway. *Cite*. As a result, Plaintiffs' representation that only 2.2% of Chicago is available for gun ranges compares apples to oranges.

The proper analysis looks at how much land available for commercial and business use is available to gun ranges. The City's map shows that approximately 32,000 acres in the City

(excluding streets, alleys, and expressways) are zoned for business, commercial, and manufacturing uses. Def. SOF ¶ 14 & Ex. 18. DHED, after additionally excluding properties which it determined in its judgment to be too small to be usable for a range, determined that of the total 32,000 acres available for business, commercial, and manufacturing uses, 3,386 acres of property meet the requirements of sections 17-5-0207 and 17-9-0120. Def. SOF ¶¶ 13-14. Thus, approximately 10.6% of land in the City that is zoned for business, commercial, and manufacturing uses, which translates into approximately 1,900 parcels of property, meets the City's requirements. *Id.*, ¶ 14. This percentage is considerably larger than that approved by the Seventh Circuit in *North Avenue Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445 (7th Cir. 1996), which upheld against a First Amendment challenge certain zoning restrictions that left only one to three percent of land available in Chicago for adult uses.

Plaintiffs present no evidence demonstrating that any of the properties comprising the 10.6% of land are insufficient. Def. SOF ¶¶ 21-22. To the contrary, a potential customer of Plaintiff Action Target testified that he found a property that complied with the zoning requirements.[1] *Id.*, ¶ 21. Plaintiffs likewise have no evidence that it would be economically infeasible to open and operate a range in a manufacturing district. *Id.*, ¶¶ 21-22. Indeed, Chris Hart, on behalf of Action Target, and Mr. Giordano, both testified that gun ranges are actually *compatible* with industrial or manufacturing uses. *Id.*, ¶ 19. Plaintiffs have therefore failed to offer any evidence that the Ordinance's zoning requirements have any impact at all, much less burden the ability of a range to open in Chicago. For

---

[1] Plaintiffs state that Zoning Administrator Scudiero testified that all who inquired about a potential location for a firing range were told that the location did not meet the zoning requirements. Pls.' Mem. at 17. But Scudiero only recalled receiving approximately three inquiries after the zoning regulations were enacted. Pls.' SOF ¶ 77.

this reason alone, their claim fails.

But even if there were a burden, the City's zoning regulations easily pass constitutional scrutiny. The City has a substantial interest in protecting public safety and residential communities and preventing harm. The purposes of the CZO include "promoting the public, health, safety and general welfare," § 17-1-0501, "protecting the overall quality of life for residents and visitors," *id.* § 17-1-0502, "protecting the character of established residential neighborhoods," *id.* § 17-1-0503, and "maintaining orderly and compatible land use and development patterns," *id.* § 17-1-0508. Because ranges necessarily involve the use of firearms and ammunition – and their transportation to and from – the City classifies ranges as a high impact use. Def. SOF ¶¶ 15-16. And the CZO places all high intensity uses in manufacturing districts, which are typically located significant distances from residential and attendant uses. *Id.*, ¶ 16. In addition, lead residue, if not properly contained, can spread beyond the range to surrounding areas and harm humans if the range is in populated areas. *Id.*, ¶ 20. To protect public health and the City's residential communities, the City allows firing ranges to locate only in manufacturing districts as a special use. *Id.*, ¶¶ 15-16. Even Plaintiffs and their experts concede that ranges are suited for manufacturing and industrial districts. *Id.*, ¶ 19. Thus, § 17-5-0207 is substantially related to an important interest of the City.

Preventing lead exposure by requiring that ranges locate at least 500 feet from residential uses and other uses such as schools, libraries, churches, and establishments serving alcohol and 100 feet from other shooting ranges ensures that ranges do not operate in manufacturing districts that might happen to be near residential areas and places where large numbers of people congregate. Def. SOF ¶¶ 15-17. Evidence also demonstrates that ranges may attract criminal activity due to the presence of firearms and ammunition. *Id.*, ¶ 18. Moreover, even Plaintiffs' experts concede that

ranges, if not operated properly, pose a risk of fire or explosions. *Id*., ¶ 20. The City, by placing ranges at least 500 feet from these sensitive areas, many of which are places where children congregate, and 100 feet from one another, has therefore reduced the likelihood that any possible negative effects from ranges will affect those areas. *Id*., ¶ 17.

Plaintiffs fail to evaluate sections 17-5-0207 and 17-9-0120 under *any* level of constitutional scrutiny. They instead assert that "the City can only zone ranges on account of secondary effects," borrowing from cases in which the courts evaluated zoning regulations under the First Amendment. Pls.' Mem., pp. 17-18.[2] Even if the Court looks to First Amendment law requiring "the government to supply actual, reliable evidence to justify restricting protected expression on secondary public-safety effects," *id.* (citing *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002)), the City's evidence more than justifies its zoning requirements for shooting ranges. The CZO is written to keep intense uses far from residential areas or places where large groups of civilians congregate, and Scudiero's testimony that a firing range is a "high impact" use and therefore correctly placed in manufacturing district is supported by Plaintiffs and their experts who agree that gun ranges can be dangerous places. Def. SOF ¶¶ 15-16, 23. Moreover, the National Institute for Occupational Health and Safety ("NIOSH") opines that shooting ranges can pose environmental risks for surrounding

---

[2] At the outset, the Seventh Circuit in *Ezell* may have looked to First Amendment jurisprudence in determining the standard of review to apply to ordinances which implicate the Second Amendment, but it did not hold that First Amendment law automatically governed the Second Amendment. *See, e.g.*, *Ezell*, 651 F.3d at 708 (court "distill[s] . . . First Amendment doctrine and extrapolate[s] a few general principles to the Second Amendment context"). And although the court did analogize to First Amendment doctrine in evaluating the strength of the City's justifications for the now-repealed prohibition on firing ranges, the court did not expressly adopt it. *See id.* at 709.

areas due to the potential for contamination of the surrounding buildings, ground, and waterways if lead-contaminated air is released from the range. *Id.*, ¶ 20. NIOSH also states that escaping lead can become aerosolized and present dangers to humans if the range is located in a populated area. *Id.* Sergeant Kevin Johnson of the Chicago Police Department, who was with Chicago's Anti-Gun Enforcement Team from 2008 to 2012, testified based on his experience in investigating illegal firearms trafficking in Chicago that shooting ranges provide opportunities for theft of guns from gun-owners who transport firearms and ammunition to and from the range. *Id.*, ¶ 18. And there have been several instances in the past four years in which large caches of firearms were stolen directly from ranges and gunstores in the Chicagoland area. *Id.*, ¶ 78. Based on this evidence, the City's zoning requirements pass any "secondary effects" review.

Finally, Plaintiffs posit that the City's zoning requirements are no longer justified because as of approximately April 2014, residents who obtain a concealed carry permit from the State of Illinois will be able to carry firearms in non-manufacturing areas and within 500 feet of many of the uses listed in section 17-9-0120. Pls.' Mem., p. 20. But Plaintiffs confuse the issue. It is one thing for those citizens who obtain a concealed carry permit to carry firearms for use in self-defense, but it another thing all together to place a range at which firearms are discharged in large numbers on a daily basis next to sensitive areas in light of the safety and environmental concerns outlined above. Plaintiffs' argument therefore fails. Because Plaintiffs have not shown any burden on the ability of gun ranges to locate within Chicago caused by the City's regulations, and in light of the myriad justifications for them, Plaintiffs' challenge to §§ 17-5-0207 and 17-9-0120 should be denied.

### C. Ammunition Sales

Plaintiffs contend that § 4-151-170(b), which provides that a range may sell ammunition to

a shooting range patron only for use at the shooting range, burdens their Second Amendment rights for two reasons: (1) because access to ammunition itself is a protected Second Amendment right; and (2) because the provision is impossible to comply with, thus making it impossible for a range to locate in Chicago. Plfs.' Mem., pp. 22-23. But just like the other provisions Plaintiffs challenge, they fail to produce any evidence demonstrating that § 4-151-170(b) has any such effect.

Plaintiffs' broad and unsupported attack on the provision as infringing the right to acquire ammunition is a red herring. Even if the right to acquire ammunition is protected under the Second Amendment, it is neither here nor there, because the City allows licensed retailers to sell ammunition in the City. § 4-151-170(b) does not in any way intrude on residents' ability to buy ammunition from those vendors. The provision merely regulates ammunition sales at one particular point source – ranges – and then only to prevent patrons from leaving with ammunition they purchased at the range. Patrons remain free to buy (and use) as much ammunition as they desire while at the range, and it expressly permits a range to store a patron's ammunition for later use.

Plaintiffs cite to a newspaper article quoting a member of City Council, wondering how range owners could comply with this provision by keeping ammunition bought at the range separate from that brought in to the range by a patron, as "evidence" of the "terrible" burden imposed by this "impossible task." Pls.' Mem., p. 22. But hearsay statements contained in a newspaper article are not evidence, nor is a random statement by a member of City Council during deliberations, especially when the provision was, in fact, voted on and *approved* by City Council as a whole. And despite Plaintiffs' heated rhetoric about the difficulty of ensuring compliance with this provision, it is far from a monumental task to make note of the ammunition purchased at the range and then determine how much of that ammunition remains unused after the patron has finished his live-fire shooting.

16

Plaintiffs also argue that the provision will negatively affect a range's profitability and therefore preclude ranges from opening in Chicago, but this assertion lacks any basis in the record. Plaintiffs and their proffered experts do not know nor have they studied or examined what percentage of a range's profit is derived from sales of ammunition not used on site and, assuming that such sales are an integral part of a range's business, what volume of sales is necessary to make a range a viable concern. Def. SOF ¶¶ 87-88. Indeed, Plaintiffs' expert testified that he was "just spotting an issue that may affect revenue," but that he did not know for sure if it would. *Id.*, ¶ 88. Plaintiffs simply have no competent evidence that this provisions a range owner's ability to run a range, either economically or logistically.

And even if there were a burden, the City has an important public safety interest in ensuring that ammunition bought at a range by a qualified person is not later given or sold to a criminal who cannot lawfully possess ammunition. Def. SOF ¶ 86. Stopping such "straw purchases" of ammunition prevents ammunition from falling into criminal hands and therefore assists the City in its efforts to reduce gun violence. Moreover, not allowing a patron to leave a range with ammunition bought there reduces the likelihood that the patron will be targeted for theft of the ammunition. *Id.*, ¶ 86. Thus, § 4-151-170(b) substantially furthers these interests, and Plaintiffs' claim – based on nothing more than "issue spotting" – fails.

### D. Deleterious Impact Standard

Plaintiffs challenge § 4-151-030(f), which permits the City's Commissioner of Business Affairs and Consumer Protection to deny an application for a shooting range license if the issuance or renewal of such license would have a "deleterious impact" on the health, safety, or welfare of the community in which the shooting range facility is or will be located. Borrowing from First

Amendment law, Plaintiffs argue that this regulation gives the commissioner unbridled discretion, which acts as an impermissible "prior restraint" on their Second Amendment rights. Pls.' Mem., p. 24. Plaintiffs' argument fails for several reasons.

First, Plaintiffs cite no cases supporting their theory that the prior restraint doctrine is applicable to the Second Amendment context; the only case they do rely on, *People v. Zerillo*, 189 N.W. 927, 928 (Mich. 1922), is neither a prior restraint case, nor is it persuasive authority given that it is a nearly one-hundred year old state law decision. Indeed, while the Seventh Circuit has not addressed the issue, other federal courts that have done so have soundly rejected it. *See, e.g.*, *Woollard v. Gallagher*, 712 F.3d 865, 883 n.11 (4th Cir. 2013) (rejecting import of First Amendment's prior restraint doctrine into Second Amendment jurisprudence and upholding firearm licensing scheme); *Hightower v. City of Boston*, 693 F.3d 61, 80 (1st Cir. 2012) ("unbridled discretion" as a prior restraint challenge to revocation of carry permit rejected); *Kachalsky*, 71 F.3d at 91-92 (rejecting prior restraint theory; "[w]e are hesitant to import substantive First Amendment principles wholesale into Second Amendment jurisprudence"); *Richards v. County of Yolo*, 821 F. Supp.2d 1169, 1176 (E.D. Cal. 2011) (same).

Moreover, the regulation does not vest the commissioner with unbridled discretion: it sets forth the deleterious impact standard found in other City licensing schemes, and is also subject to administrative (and then judicial) review, thus providing safeguards for applicants who believe the commissioner acted outside the scope of her discretion. Def. SOF ¶ 91. *See also Woollard,* 712 F.3d at 883 n. 11 (plaintiffs' claim that the "good-and-substantial reason" standard for granting firearm license gave state "virtually unbridled and absolute power to deny permits" would fail even if standard were applied); *Kachalsky,* 71 F.3d at 92 (prior restraint claim would fail in any event;

"Plaintiffs' claim is not that the proper cause requirement is standardless; rather, they simply do not like the standard—that licenses are limited to those with a special need for self-protection."); *Piszczatoski v. Filko*, 840 F. Supp. 2d 813, 831-32 (D. N.J. 2012) (even assuming prior restraint framework applied, handgun permit law did not vest officials with uncontrolled discretion).

And Plaintiffs' complaint with this provision is hypothetical only: they worry that it *could* dissuade financial lenders or potential owners from opening a range due to the uncertainty of having a business license approved. Pls.' Mem., p. 25. They have no evidence supporting this speculative theory, however. Plaintiffs' experts admit they did not discuss this issue with any financial institutions or potential business owners, nor did they rely on any studies, reports, or data in reaching their conclusion. Def. SOF ¶ 92. No potential range owner has been denied a license on this basis. And there is no shortage of liquor stores open in the City, despite being subject to this same standard. *Id*., ¶ 90. Plaintiffs are not entitled to absolute certainty in every step of the license application process, and this provision is not unconstitutionally burdensome.

Finally, the regulation would survive the applicable level of scrutiny even if Plaintiffs had shown some burden on their Second Amendment rights. This provision's purpose is to allow the commissioner to make an informed decision to deny a firing range license based on factors that are not in the license application but, based on the commissioner's knowledge and experience, would have a negative impact on the neighborhood, the residents, and the range itself. *Id*., ¶ 90. For example, it is possible that the chosen location is in a high crime neighborhood that cannot sustain another high impact business; because the Chicago Police Department does not review license applications, the commissioner would be the gatekeeper able to protect that neighborhood. For the same reasons, this standard is used by the City for other license applications such as public way

permits and sales of alcoholic beverages. *Id.*, ¶ 90.

### E.    FOID Card Requirements

Plaintiffs contend that the Ordinance unconstitutionally burdens the rights of hypothetical out-of-state firing range patrons: (1) by requiring range patrons to possess valid Illinois Firearm Owners Identification ("FOID") cards (§ 4-151-100(g)(1)); and (2) by requiring that all owners and employees of firing ranges possess FOID cards (§ 4-151-030(6)). Pls.' Mem., pp. 26-27. Neither of these claims has merit.

As an initial matter, Plaintiffs grossly misrepresent the requirements for nonresidents wishing to patronize a shooting range and rent or borrow firearms while at the facility. FOID cards are *not* required for out-of-state residents to do this. Section 4-151-100(g)(1) provides that anyone possessing or discharging a firearm at a firing range must have a valid FOID card, *if required to do so* under Illinois law. *See* § 4-151-100(g)(1). And Illinois law does not require nonresidents to have a FOID card. Rather, 430 ILCS 65/2 provides that "the provisions of this Section regarding the possession of firearms . . . do not apply to nonresidents while on a firing or shooting range recognized by the Department of State Police (65/2(b)(7)," nor do they apply to "nonresidents who are currently licensed or registered to possess a firearm in their resident state (65/2(b)(10)." The same is true with respect to firearm rentals. Like § 4-151-100(g)(1) above, § 4-151-170 permits the rental of firearms for use at the shooting range, and requires a FOID card *only if the individual is otherwise required to have one*. MCC § 4-151-170(a). Under Illinois law, the same exemptions for nonresidents exist for rentals or firearm transfers. *See* 430 ILCS 65/3 (a-15)(9) (transfer restrictions do not apply to any individuals exempt under 430 ILCS 65/2).

Plaintiffs likewise misconstrue the requirements for ownership. While § 4-151-030(6)

requires that all managers, range masters, and employees working at the range possess FOID cards, the provision was amended on September 11, 2013 to remove the FOID requirement for owners. Def. SOF, Ex.14. Thus, because out-of-state residents are not required to have FOID cards to possess, use, discharge, or rent firearms while visiting a Chicago shooting range, nor are out-of-state residents required to have FOID cards to own a range within Chicago, Plaintiffs' argument on these issues is baffling and of no consequence.

Furthermore, Plaintiffs' challenge to § 4-151-030(b)(6)'s requirement that all employees of the range possess valid FOID cards is unsupported by evidence. Plaintiffs do not assert, nor is there any evidence, that the inability to hire out-of-state employees would burden range owners' ability to hire qualified employees, negatively impact a range's profitability, or prevent anyone from exercising their constitutional right to use and train at a firing range. Rather, Plaintiffs present the dubious argument, on behalf of fictional nonresidents, that these nonresidents have constitutionally protected rights to work at ranges located within the City. Not only does this "right to work" argument have nothing to do with the Second Amendment, but Plaintiffs have no standing to make it. All of the individual Plaintiffs live in Illinois, and none of the representatives from the out-of-state entities testified that they either desired to work at a firing range in Chicago, or knew of specific individuals who desired to do so. This speculative claim does not present a real controversy for the Court to address.

And even if Plaintiffs *had* produced evidence of even one single nonresident actually burdened by this provision, it is amply supported by legitimate governmental purposes. Plaintiffs acknowledge that it is "of course reasonable to make sure that persons who will be handling firearms are allowed to possess them under State law," Pls.' Mem., p. 26, but argue that the provision serves

no function as to employees who do not handle firearms. But the City does not have the ability or the duty to micro-manage on a day-to-day basis which employees will be coming in to contact with firearms, and it is not hard to imagine that any employee working at a range will, at some time or another, come in contact with, move, store, or otherwise handle firearms. In addition, employees will be in proximity, and presumably have access, to the stockpile of firearms and ammunition stored at the range. As a result, the criminal history and mental illness background checks required to obtain a FOID card serve real protections, even if these safeguards are unrelated to firearm proficiency: They ensure that individuals who work on site at a range and come in contact with firearms meet these minimum state law requirements. This provision is thus justified by legitimate purposes and summary judgment on this claim should be denied.

### F. Age Restriction

Plaintiffs have made no showing, in fact or law, that they are entitled to judgment on § 4-151-100(d), which prohibits anyone under the age of 18 from entering the shooting range facility. The crux of Plaintiffs' argument is that this provision would cause the range to lose business by excluding revenue derived from adults who cannot visit a range without their minor children and from youth programming, and also would "impact" adults who cannot teach their children about self-defense. Pls.' Mem., p. 28. But Plaintiffs once again produce *no* evidence showing how § 4-151-100(d) would actually impact a shooting range's profitability. There is certainly no evidence that this provision makes it impossible or even unprofitable to operate a range; to the contrary, Mr. Hart testified that this provision would not impact what Action Target would do involving gun ranges in the City. Def. SOF ¶¶ 66-67. Neither of Plaintiffs' experts studied the issue, gathered any data regarding the impact of prohibiting minors from the range, or calculated the potential loss of

revenue.  *Id*., ¶ 67.  All of the individual Plaintiffs are over 18, and none of them testified that this provision would impact their ability to use a range in Chicago to train and maintain firearm proficiency.  *Id*., ¶ 66.  Nor does the regulation impact an adult's ability to teach their children about self-defense, any more than the state law requirements for gun ownership and use, which also preclude minors.  Short of actually bringing their children to the range, Plaintiffs are free to teach their children about self-defense in any manner consistent with state and federal law.

And, even if Plaintiffs had produced actual evidence that this provision burdens their Second Amendment rights, it is easily justified by the important governmental interests in ensuring the proper supervision and care of minors in the hazardous setting of a shooting range.  *Id*., ¶ 65.  Minors are a vulnerable segment of the population, and the City has substantial interests in protecting them from the potential dangers of lead exposure and firearm accidents.  *See New York v. Ferber*, 458 U.S. 747, 756-57 (1982) ("It is evident . . . that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling . . . even when the laws have operated in the sensitive area of constitutionally protected rights.").  Lead exposure is especially dangerous to children six and younger because lead is toxic to the brain and can cause permanent damage.  Def. SOF ¶ 23.  And children are more susceptible to ingesting lead particles by touching contaminated surfaces and transferring them to their mouths.  *Id*.  Because lead contamination can extend beyond the firing lanes themselves, and because patrons will be entering the facility with firearms that can be accidentally dropped or left laying on counters or other surfaces, it is commonsense to prohibit minors from the facility entirely.

Plaintiffs cavalierly posit that all minors will be "properly supervised by licensed persons" and thus it is "impossible for the City to defend" the provision.  Pls.' Mem., p. 28.  This unsupported

(and dangerous) assumption only serves to underscore the City's justification for the provision. There is no way to adequately ensure that minor children will, in fact, be properly supervised while at the range; even the most well-meaning adults can be unaware of the potential exposure risks of lead to young children, or become distracted and not pay proper attention. Thus, because the risks are so high, the City has legitimately chosen to add this extra layer of protection and shield minors from the potential dangers of firearms. Furthermore, Ms. Krimbel's testimony that she took her own child to a shooting class at age 12 is irrelevant. Her own personal opinions or decisions have no bearing on the City's official position with respect to the safety of its citizens, and her anecdotal testimony hardly makes Plaintiffs' case that the provision unconstitutionally infringes the Second Amendment as a matter of law.

Moreover, while Plaintiffs conclude that this provision fails under any level of scrutiny, Pls.' Mem., p. 28, the law proves them wrong. Age-based firearm safety measures are so rooted in history that some courts have questioned whether they even fall within the scope of the Second Amendment at all. *See, e.g., NRA v. McCraw*, 719 F.3d 338, 347-49 (5th Cir. 2013) (age-based restrictions on access to and use of firearms enacted to safeguard public are "part of a succession of 'longstanding prohibitions' that are likely outside the scope of the Second Amendment"). At the very least, courts have held that these historically recognized safety measures pass intermediate scrutiny. *Id*. at 349; *see also NRA v. BATF,* 700 F.3d 185, 204 (5th Cir. 2012) (federal law preventing federally-licensed gun dealers from selling firearms to anyone under age of 21 constitutional; historical evidence of longstanding tradition of "age-and-safety based restrictions on the ability to access firearms").

### G.    Hours Restriction

Section 4-151-090 allows shooting ranges to be open seven days a week, from 9:00 a.m. to

8:00 p.m. Plaintiffs contend that this provision unconstitutionally burdens their Second Amendment rights because "they would like to be able to go to a range whenever they like," and because they speculate that there are individuals who would never be able to patronize a range between these hours. Pls.'s Mem., p. 28. Plaintiffs do not claim, however, nor do they have any evidence, that this provision makes it impossible, or even unprofitable, to open a range in the City. Def. SOF ¶ 71. Mr. Kramer merely "guess[es]" that it will cut into the revenue stream, and admits that the costs affiliated with keeping the range open late at night might even exceed the income generated. *Id*.

Nor do Plaintiffs have any evidence showing that the regulation actually burdens Plaintiffs' right to train at a shooting range. Being open 11 hours a day, 7 days a week provides ample opportunity to practice and maintain proficiency with firearms. No individual Plaintiff testified that he or she would be unable to visit a range between these hours, and Plaintiffs' own witnesses confirm that most shooting ranges have operating hours consistent with the City's regulations. Def. SOF ¶ 70. Plaintiffs' unfounded assumption that there are people who would never be able to use a range because of the hours restrictions strains credulity. The fact that Plaintiffs would prefer that shooting ranges be permitted to operate 24 hours a day for the convenience of potential patrons is not evidence showing that this provision burdens – much less substantially burdens – any of the Plaintiffs' Second Amendment rights.

Even if Plaintiffs could show that § 4-151-090 burdened the profitability of ranges or individuals' ability to use a range during their preferred hours, the City has strong justifications for it. The City limits the hours of operation of many types of business establishments to reduce pedestrian and vehicle traffic and disturbances at night. Def. SOF ¶ 69. The hours limitation also reduces the number of hours that Chicago police officers or other first responders would be called

to a firing range in response to a firearm misuse or injury. *Id.* Moreover, it helps protect the safety of the range patrons because they are more likely to be targeted for theft of their firearms and ammunition later at night. *Id.* These safety goals amply justify the City's restrictions on the operational hours. *See, e.g., DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 830-31 (7th Cir. 1999) (upholding regulation of adult bookstore operating hours where plaintiff had no evidence of impact on profits and municipality showed interest in preventing secondary effects such as crime and decreased property values).

### H.  Range Master Presence

In seeking judgment on § 4-151-100(b)'s requirement that "[a] range master shall be on duty during all operating hours of the shooting range facility," Plaintiffs state, without any factual or legal support, that it is a "useless burden." Pls.' Mem., p. 29. Because Plaintiffs cannot show that the provision is either useless, or a burden, summary judgment should be denied.

Conceding that a range master is important for the overall safe operation of a firing range, Plaintiffs contend that requiring the range master to be present during all operating hours of the range, instead of only the hours the shooting range is actually in use, is an unconstitutional burden on their right to keep and bear arms. Pls.' Mem., p. 29. But Plaintiffs' dispute with this provision never extends beyond the theoretical. Plaintiffs do not maintain that it makes it impossible or economically infeasible to open a range in the City. Def. SOF ¶¶ 83, 84. They have no idea what the additional costs (if any) would be, *id.*, nor do they proffer evidence showing that firing ranges typically are open for any appreciable time when the firing ranges are not in use. Hypothetically, a firing range may include a snack bar or gathering place that stays open a little later than the range itself, but even so, the extra cost for a range master being present during these times would be

minimal. Such additional costs, to the extent they even exist, hardly burdens Plaintiffs' Second Amendment rights to train at a range. *See, e.g.*, *Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013) ("Indeed, the fact that the licensing regime makes the exercise of one's Second Amendment rights more expensive does not necessarily mean that it 'substantially burdens' that right."); *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992) ("The fact that a law which serves a valid purpose . . . has the incidental effect of making it more difficult or more expensive to [exercise the right] cannot be enough to invalidate it.").

Furthermore, this provision does indeed serve a very useful function, ensuring that the day-to-day operations of the range are supervised in the proper manner to minimize accidents and other health risks. Because range masters are responsible for ensuring safe handling of firearms by employees and patrons, and ensuring that the range is in compliance with all applicable safety regulations, their presence is key to the range's overall safety. Def. SOF ¶¶ 63, 82. The importance of the range master's functions do not evaporate merely because the firing range may not be technically in use. If people are otherwise gathered at the facility, they may choose not to follow the rules and use the range anyway. *Id.*, ¶ 83. Furthermore, accidents can occur in other areas of the shooting range facility, or during clean up, and the range master is uniquely qualified to handle these situations. These commonsense reasons support having a range master present at all times the shooting range facility is open, and Plaintiffs have simply not shown any infringement of their Second Amendment rights, much less entitlement to judgment on this provision.

## I.     Sloped Floor and Floor Drain Requirements

Plaintiffs' challenge to the cleaning methods incorporated in § 13-96-1200(b)(7) (requiring that the range floors slope at a minimum of 1/4 inch per foot); and §§ 13-96-1220(b) and (c)

(requiring that the firing range have a hose bib with backflow protection and floor drains installed at the bullet traps to collect lead and other hazardous materials in a separate drainage system) fails. Plaintiffs claim that these provisions violate the Second Amendment because the wet-cleaning method is both "extremely expensive" and mandates a dangerous method of cleaning. Pls.' Mem., pp. 29-30. Neither of these statements prove true.

With respect to Plaintiffs' claim that the wet cleaning method is "extremely expensive," Mr. Kramer speculated that building a sloped floor may cost "a little more than having a level floor," and he estimated the costs of adding a sloped floor to an existing building might be around $20 per square foot. Def. SOF ¶ 46. But he also acknowledged that there are additional costs associated with the use of *any* cleaning method – including the HEPA vacuum method that Plaintiffs prefer – and these costs may "cancel each other out." Def. SOF ¶ 45. Indeed, Plaintiffs did not produce any evidence showing that a sloped floor and floor drain actually cost more than other cleaning methods, much less that they are prohibitively expensive. Furthermore, Plaintiffs agree that it is technically possible to comply with this provision, *id.* at ¶ 45, and while Mr. Kramer stated that he personally would not sign off on plans including this cleaning method, *id.*, such testimony does not satisfy Plaintiffs burden of showing that the provision is unconstitutional on its face.

Plaintiffs' argument that the wet cleaning method is unconstitutional because it has recently been deemed unsafe by certain industry stalwarts likewise misses the mark. As discussed in Defendant's Memorandum, while the industry recognizes both wet and dry methods of cleaning, the U.S. Department of Energy Gun Range Manual states that "wet cleaning is preferred when floor drains are available." Def. SOF ¶ 44, Ex. 36, p. 20. And when a range is cleaned with the wet method, multiple industry sources all  recommend or require a sloped floor to help the water collect

lead particles and flow towards the drain. Def. SOF ¶ 44. Simply because the HEPA vacuum cleaning method might now be preferred by some in the industry as a safer cleaning method does not render the City's regulation an unconstitutional infringement on Second Amendment rights. Indeed, wet cleaning with a sloped floor and floor drain remains the recommended cleaning method by other industry sources. Def. SOF ¶ 44. Where there is sound evidence supporting the City's chosen method, it does not matter that one of many trade groups may now disagree, and the Court is not to determine which method is the safest. *See, e.g., Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 211 (1997) (government not required to prove that it is correct "as an objective matter"; court is "simply to determine whether the [applicable standard] is satisfied," and it can be met even when one can "draw[] two inconsistent conclusions from the evidence"); *DiMa Corp.,* 185 F.3d at 831 (plaintiff's expert evidence was "irrelevant" on summary judgment, because court's task was not to "discover the objective truth," but only to ensure that there was "some evidence" supporting the town's conclusions).

Plaintiffs have no evidence that these cleaning methods burden their Second Amendment rights in any manner – either by increased cost, or by curtailing their ability to access and use the range by employing an "unsafe" cleaning method. Plaintiffs' challenge to this provision should be denied.

**J.      Promulgation of Environmental Rules**

Plaintiffs challenge § 11-4-260(b), which allows the City's relevant commissioner to promulgate rules and regulations regarding the cleaning of, sound and air quality control at, and discharge of waste from shooting ranges. Plaintiffs' sole reason for challenging this provision is that it *may* cause a "regulatory conflict" between local and federal environmental laws, such as those

promulgated by the EPA or OSHA.  Pls.' Mem., p. 30.  No City regulations, however, have been promulgated, and Plaintiffs admit that this is a "hypothetical objection" based on past experience, and they are not sure it would even occur.  Def. SOF ¶ 62.  Thus, this claim is pure conjecture and not ripe for adjudication.  Even assuming the commissioner promulgated rules, however, and further assuming those rules conflicted with federal laws, Plaintiffs have produced no evidence showing how this "regulatory conflict" would, in fact, pose any burden on their Second Amendment rights.

Plaintiffs also summarily dismiss the City's interest in providing a mechanism for the commissioner to promulgate such rules, as necessary, because there is "no public interest in the extra layer of regulation."  Pls.' Mem., p. 30.  Plaintiffs' claim is both unsupported and absurd: It is an obvious, and important, function of the City's  building commissioner to have the authority to enact regulations to address future public health or environmental concerns as they arise.  Def. SOF ¶ 62. Allowing local governments the ability to craft rules relating to, and addressing, particularized issues of local concern that broad, federal laws cannot address, certainly serves the public interest.  Even Plaintiffs' own experts agree that ranges are highly regulated by federal, state, *and local* governments because of the potentially dangerous activity that occurs there.  *Id*., ¶ 60.  Plaintiffs' criticism of this provision is wholly without merit and, in any event, comes nowhere near to entitling Plaintiffs to summary judgment.

### K.  Sound-Proofing Requirement

Plaintiffs next disingenuously attack two of the Ordinance's provisions as creating contradictory requirements that are impossible to comply with at the same time.  Pls.' Mem., p. 31. Section 13-96-1200(b) requires the range to be constructed of smooth, non-porous materials.  Section 13-96-1200(b)(2) then requires ranges to have airborne and structure borne sound absorbing material

suspended or applied. According to Plaintiffs, because sound absorbing materials are, by definition, porous, it is not possible to comply with both provisions simultaneously.

Plaintiffs have manufactured a claim where none exists. Far from demanding that the firing range be constructed of *both* porous and nonporous materials, § 13-96-1200(b)(2) requires only that the sound-absorbing materials be "applied or suspended;" in other words, applied *to* or suspended *over* the otherwise nonporous building materials. This commonsense reading of the provision's plain language is consistent with industry recommendations for applying accoustical material to walls, windows, doors, ventilation ducts, and ceilings, *see* Def. SOF ¶ 53, as well as the City's own departmental interpretation. *Id.*, ¶ 52. Courts must defer to an agency's interpretation of a statute so long as it is "a reasonable construction of the statute." *United Transp. Union–Ill. Legis. Bd. v. Surface Transp. Bd.*, 169 F.3d 474, 476 (7th Cir. 1999). In contrast, nothing in the provision's plain language supports Plaintiffs' overly-broad interpretation that "the City requires both at the same time." Pls.' Mem., p. 31. Instead, Plaintiffs' illogical interpretation is at odds with the well-settled principle of statutory construction that courts "are obliged to read statutory provisions at issue in such a way as to avoid a conflict between them if such a construction is possible and reasonable." *In re Willett*, 544 F.3d 787, 792 (7th Cir. 2008). Not only is it possible to comply with these two provisions together, but Plaintiffs' expert admits as such: "Kramer testified he designs different parts of the range as non-porous for cleaning (where there will be live fire) and makes other portions sound-absorbent (where there [sic] not be particulate discharge)." Pls.' Mem., p. 31. Yet, Plaintiffs ignore this common practice in order to fabricate an additional challenge to the Ordinance. Plaintiffs do not challenge the need or the cost of suspending sound-absorbing materials in certain areas over otherwise nonporous walls, nor do they present any evidence supporting such a challenge. This

31

entire claim has no merit whatsoever.

### L. Ballistic-Proof Walls and Doors

MCC § 13-96-1160(a) requires that, except for the rear walls, "[e]nclosure walls, floors, ceiling assemblies, doors and opening protective assemblies for the shooting range shall be designed and constructed with materials and assemblies sufficient to stop all bullets or projectiles from penetrating beyond the shooting range enclosure." Plaintiffs concede that ballistic walls generally serve important safety goals of protecting against stray bullets, but summarily state that this provision places unjustified additional costs on the range owner because it is unnecessary to require ballistic-proof materials on areas not likely to receive bullet strikes, or that are already protected by bullet traps. Pls.' Mem., p. 31.

Plaintiffs do not produce any evidence substantiating their claim that this provision makes it impossible or economically infeasible to open or operate a range. Nor do Plaintiffs have any evidence of what the additional costs might be. Mr. Kramer raises additional costs only as a potential issue, and then could only guess that the cost of an armor-plated door would be around $7,000 to $10,000, and the cost of making the rear wall behind the bullet trap "maybe $200 a linear foot of length of the back wall." Def. SOF ¶ 32. Considering the fact that range construction is already an extremely expensive endeavor that can run between $3 million and $20 million (*id*., ¶ 24), the incremental costs of armor-plating side walls and doors is insignificant. And the City's requirement is not extraneous. It serves the very valid safety interest of protecting exposed areas in the event of an errant bullet strike, shoddy wall construction, or bullet trap failure. *Id*., ¶ 28. It therefore provides an added layer of safety for patrons, employees, and those who may be entering or leaving the range.

When measured against the safety goals this provision serves, any minimal increased costs (especially where Plaintiffs have failed to quantify them) are easily justified. *See, e.g.*, *Kwong,* 723 F.3d at 167-68; *Casey*, 505 U.S. at 874. Summary judgment should be denied on this claim.

## M.    Ammunition Storage

Plaintiffs challenge § 13-96-1190(c)(2)(d), which provides that either the police or fire department will issue rules and regulations specifying the exact storage requirements for firearms and ammunition at ranges. According to Plaintiffs' theory, this provision "mistakenly has labelled firearms and ammunition as hazardous materials . . . and then has compelled an expensive storage system that serves no purposes." Pls.' Mem., p. 31.

Once again, Plaintiffs are attempting to create an issue with the Ordinance where none exists. Section 13-96-1190(c)(2)(d) works in concert with § 4-151-175(b), which provides that "[f]irearms shall be stored separately from ammunition. Storage of firearms and ammunition shall comply with an approved safety plan pursuant to Section 4-151-110, Section 15-4-985, and any applicable rule or regulation."[3] The police and fire departments have not yet promulgated rules and regulations, however, and Plaintiffs concede that they therefore do not know what the requirements or cost of compliance will be. Def. SOF ¶¶ 57, 58. Indeed, Mr. Kramer concedes that he was just "issue spotting" when he identified § 13-96-1190(c)(2)(d) in his report and it was an "exercise in trying to read the future." *Id.*, ¶ 58. As a result, Plaintiffs' claim is premature and not ripe for adjudication.

---

[3]  Section 4-151-110 provides that "[e]very application for a license under this chapter must be accompanied by a safety plan," approved by the Superintendent of Police in consultation with the executive director of emergency management and communications and the fire commissioner. MCC § 4-151-110(a). The safety plan shall provide, inter alia, "protocols for the safe display of and storage of firearms and ammunition" *Id.* § 4-151-110(b). Under § 15-4-985, the "fire commissioner is authorized to promulgate rules and regulations for the storage of ammunition at shooting range facilities."

And even if Plaintiffs' claim were ripe, they fall far short of proving that § 13-96-1190(c)(2)(d) burdens their Second Amendment rights. Plaintiffs have produced no evidence demonstrating that compliance with § 13-96-1190(c)(2)(d) is impossible and, in fact, concede otherwise. Def. SOF ¶ 58. Plaintiffs likewise fail to produce any evidence showing that compliance with § 13-96-1190(c)(2)(d) makes a range cost-prohibitive. Neither Plaintiffs nor their experts know or made any effort to determine what the cost of compliance is or whether that potential cost would keep interested range owners from pursuing a range in Chicago. *Id.* Plaintiffs have therefore not demonstrated that § 13-96-1190(c)(2)(d) imposes a burden whatsoever on their Second Amendment rights.

Finally, even if there were a burden, the regulation would be justified. The theft of guns and ammunition at ranges and their subsequent use in criminal activity is common, Def. SOF ¶ 78, and the City has an important interest in preventing theft from ranges. Moreover, storing large amounts of ammunition is a fire and explosion risk, and the City has an important interest in preventing this too. *Id.*, ¶ 56. Section 13-96-1190(c)(2)(d) substantially advances that interest by allowing the police and fire departments to promulgate rules and regulations for the storage of firearms and ammunition. *Id.* Summary judgment on this claim should be denied.

### N. Ventilation Requirements

Plaintiffs challenge two of the City's ventilation requirements: (a) MCC § 13-96-1210(d), requiring that each shooting range have a separate ventilation and exhaust system; and (b) MCC § 13-96-1210(e), requiring that the supply and exhaust systems be electrically interlocked to turn on at the same time. First, Plaintiffs contend that the separate ventilation requirement increases the construction costs of building a shooting range facility if that facility houses multiple ranges. Pls.'

Mem., p. 31-32. But Plaintiffs fail again to substantiate these additional costs. Mr. Hart could only guess what those costs might be. Def. SOF ¶ 36. And, while Mr. Kramer "estimates" that it would be approximately $65,000-$70,000, he could not recall the basis for that estimate. *Id.*, ¶ 37. In any event, this incremental cost would only apply to a shooting range facility that has more than one shooting range. This would occur only in the rare case a range was built in a pre-existing building where the configuration precluded putting all of the desired shooting lanes in one room; thus, this provision can be planned around with new construction and many existing buildings. *Id.*

Even if Plaintiffs had concrete proof of an increased financial burden, however, such burden is readily justified when considering the paramount role adequate ventilation systems play in protecting the health of range employees and users. Exposure to lead and other toxic fumes and particulates is one of the most significant health hazards in an indoor range. Def. SOF ¶ 23. Lead particulate is released into the air from the primer detonation, the powder combustion, and the lead portion of the bullet. *Id.* Numerous studies have documented elevated blood lead levels in firing range employees and instructors. *Id.* Proper ventilation systems are essential to minimize this health risk: According to NIOSH, ventilation is "the most important engineering control for protection against primary lead exposure in indoor firing ranges." SOF ¶ 35; *see also* Def. SOF ¶ 35, Ex. 29 ("The supply and exhaust air system is critical to the operation of an indoor range and the health of building inhabitants."). Indeed, Action Target would not even consider constructing a range without a quality ventilation system. Def. SOF ¶ 36. And requiring separate ventilation systems for each range helps prevent "the circulation of contaminated air to other areas of the building." *Id.*, ¶¶ 34-35. Mr. Hart agrees that "it is good to have a separate [ventilation] system for each range bay[.]" *Id.*, ¶ 36.

Next, Plaintiffs criticize the interlocking ventilation system requirement because it could lead to a power spike which could "result in a localized power grid failure." Pls.' Mem., p. 32; Def. SOF Ex. 15, p. 8. This frivolous challenge is based on a purely hypothetical and unlikely contingency that is easily dismissed. Mr. Kramer admits that he was only speculating as to the possibility of a power grid failure, that he has no knowledge or expertise with power grids in general (or Chicago's in particular), and has "no idea" whether this would actually have an impact in Chicago. Def. SOF ¶ 42. Not only is this potential issue pure conjecture, but it also has no impact on Plaintiffs' Second Amendment rights to use shooting ranges whatsoever.

Furthermore, § 13-96-1210(e)'s requirement that the supply and exhaust systems be electrically interlocked to turn on together serves a very real safety function – it helps eliminate the "human error" factor of turning one system on without the other, which can result in unsafe air quality. Def. SOF ¶¶ 34, 39. Health organizations and industry guidelines recommend interlocking exhaust systems for this very reason: "Exhaust and supply fans should be interlocked so that all fans operate at the same time during active range use." *Id.*, SOF ¶ 40; *see also* Ex. 29 ("Supply and exhaust fans must have control interlocks to ensure simultaneous operation."). In fact, Plaintiffs concede that "[i]nterlocking is standard practice in the industry." *Id.*, ¶ 40; *see also* Ex. 15, p. 8. Plaintiffs knowingly chose to ignore their own testimony on this issue in order to support their faulty conclusion, and they are not entitled to summary judgment.

## IV.    Plaintiffs' First Amendment Challenge Has No Merit.

Finally, Plaintiffs seek summary judgment on their claim that the Ordinance violates their First Amendment right to offer and receive firearm training. In support of their motion, Plaintiffs rely on two rather uncontroversial principles: first, that "teaching and learning" can be protected by

the First Amendment, and second, that "demonstrative and experiential conduct" can be protected forms of expression. Pls.' Mem., p. 32. Plaintiffs then extrapolate from these general principles to land at the illogical conclusion that the First Amendment should therefore protect the act of firing guns at gun ranges for the purposes of training. *Id*., p. 33.

As the City showed in its motion for summary judgment, Plaintiffs' First Amendment claim fails for several reasons. As an initial matter, not one court has held that the act of shooting a gun for practice or training is protected speech under the First Amendment, and there is no basis to do so here: Plaintiffs have no evidence that they intend to convey a specific message or protected expressive activity through the act of target practice. *See Gun Owners' Action League, Inc. v. Swift,* 284 F.3d 198, 210-12 (1st Cir. 2002) ("No court has recognized target shooting as a constitutionally protected form of expression."). Plaintiffs' reliance on *Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) in this respect is misplaced. *Edwards* did not hold that gunfire, even during a firearms training session, was expressive activity protected by the First Amendment. Rather, it held that "speech . . . on a categorically public issue, the proper method of safely carrying a concealed handgun" was protected speech, *see id*. at 247, and that the plaintiff stated a First Amendment claim against the threat of discipline if he continued to engage his "speech in teaching the concealed handgun safety course," *id*. at 248.

Furthermore, the Ordinance does not prohibit live-fire training, or for that matter any form of verbal or expressive conduct regarding firearms education, training, or advocacy. Thus, even assuming that the act of firing a gun were protected speech, Plaintiffs cannot show that the Ordinance itself actually prevents Plaintiffs from engaging in this conduct. *See, e.g., Jones,* 856 F.2d at 993 (causation required for any constitutional tort claim). And finally, even further assuming,

*arguendo*, that the Ordinance somehow impacted Plaintiffs' First Amendment rights, it is a content-neutral law that, for all of the reasons discussed above, survives intermediate scrutiny. *See Gun Owners' Action League,* 284 F.3d at 212 (law that prohibited shooting at targets depicting human images was constitutional even if fell under First Amendment's scope because it was content-neutral and satisfied intermediate scrutiny). Plaintiffs have no evidentiary or legal support for their novel First Amendment claim, and granting judgment in their favor would require the Court to expand the First Amendment beyond its recognized scope. Accordingly, the Court should deny Plaintiffs summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court deny Plaintiffs' motion for summary judgment in its entirety and grant Defendant all other relief the Court deems just and appropriate.

Stephen R. Patton
Corporation Counsel City of Chicago


By:    /s/ Rebecca Hirsch    
       One of Its Attorneys

Mardell Nereim
William M. Aguiar
Andrew W. Worseck
Rebecca Alfert Hirsch
Mary Eileen Cunniff Wells
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 742-0260
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I, Rebecca Hirsch, an attorney, hereby certify that on this, the 7th day of March, 2014, I caused a copy of the forgoing **Defendant's Response in Opposition to Plaintiffs' Motion For Summary Judgment** to be served via electronic notification on:

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street
Suite 405
Alexandria, VA 22314
Fax No. 703-997-7665

David G. Sigale
Law Firm of David G. Sigale, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL
Fax No. 630-596-4445

/s/ Rebecca Alfert Hirsch