# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RHONDA EZELL, JOSEPH I. BROWN,    )
WILLIAM HESPEN, ACTION TARGET, INC.,    )
SECOND AMENDMENT FOUNDATION, INC.,    )
and ILLINOIS STATE RIFLE ASSOCIATION,    )
    )
        Plaintiffs,    )    Case No.: 10 CV 5135
    )
v.    )
    )
CITY OF CHICAGO,    )
    )
        Defendant.    )

## PLAINTIFFS' RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

NOW COME the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action

Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, by and

through undersigned counsel, and in response to Defendant's F.R.Civ.P. 56(a) Motion for

Summary Judgment, state as follows:

Dated: March 7, 2014        Respectfully submitted,


        By:      /s/David G. Sigale
            David G. Sigale

Alan Gura (Admitted pro hac vice)    David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC    Law Firm of David G. Sigale, P.C.
105 Oronoco Street, Suite 305    739 Roosevelt Road, Suite 304
Alexandria, VA 22314    Glen Ellyn, IL 60137
703.835.9085/Fax 703.997.7665    630.452.4547/Fax 630.596.4445
alan@gurapossessky.com    dsigale@sigalelaw.com

## TABLE OF CONTENTS

Table of Authorities .................................................................................................... iii

Introduction............................................................................................................... 1

Statement of Facts .................................................................................................... 2

Summary of Argument............................................................................................... 11

Summary Judgment Standard .................................................................................... 12

Argument.................................................................................................................... 13

Level of Scrutiny ……………………………………………………………………….. 13

Zoning Restrictions

I.      Restricting Firing Ranges to Manufacturing Zones Only By Special Use Permit, By
        Itself and Coupled With the Other Location Restrictions, Effectively Eliminates Any
        Location Where a Firing Range Could Be Feasibly Operated ....................................... 14

Construction Requirements

II.     The Requirement of Ballistic-Proofing All Walls and Doors is Unnecessary and
        Unduly Burdensome ............................................................................................. 19

III.    The Ventilation Requirements Are Unduly Burdensome and Do Not Serve a
        Governmental Purpose ......................................................................................... 20

IV.     The Sloped Floor and Floor Drain Requirements are Unsafe and Unnecessary,
        and Make it Near Impossible to Open and Operate a Firing Range in Chicago ............. 20

V.      Targeting Gun Ranges as the Only Land Uses Subject to Noise Limits Prior
        to 8:00 PM, and the Only Businesses in Manufacturing Zones Subject to Noise
        Limits At All, Plainly Violates the Constitution ............................................................. 21

VI.     The Firearms and Ammunition Storage Requirements Are Unnecessarily
        Burdensome ......................................................................................................... 23

VII.    The Commissioner of Business Affairs's Ability to Promulgate Rules, Including
        Those that Conflict with Laws from Other Regulatory Bodies, Unconstitutionally Chills
        Anyone Who May Think of Trying to Open a Firing Range in the City ........................ 24

i

VIII.    Barring Patrons Under the Age of 18, Even with Adult Supervision, Serves
         No Governmental Purpose. ............................................................................... 24

IX.      The Hour Restrictions Are Unconstitutional .................................................... 26

X.       The City's Ban on Firearms Sales at Firing Ranges Prevents Ranges From
         Opening and Violates Plaintiffs' Second Amendment Rights Both Facially
         and As-Applied to Them ................................................................................. 27

XI.      Requiring a Range Master at the "Shooting Range Facility" When There is No
         Live Fire is a Burdensome and Needless Mandate ........................................... 33

XII.     The Restrictions on Ammunition Sales Create an Unconstitutional Burden on
         Range Owners and Individuals ......................................................................... 33

XIII.    The Commissioner of Business Affairs's Unbridled Discretion to Deny or
         Revoke a Firing Range's Business License Unconstitutionally Chills Anyone
         Who May Think of Trying to Open a Firing Range in the City........................... 35

XIV.     The City's Requirement that Patrons Have a FOID Card Unjustifiably Bans
         All Qualified Possible Patrons from Out of State .............................................. 37

XV.      The City's Requirement that Owners and Employees Have a FOID card
         Unjustifiably Bans All Qualified Possible Employees from Out of State ...................... 37

XVI.     The Challenged Range Ordinance Provisions Violate Plaintiffs' First Amendment
         Right to Offer and Receive Training ............................................................... 39

Conclusion. ........................................................................................................................ 41

## TABLE OF AUTHORITIES

**Cases**

*Alameda Books, Inc. v. City of Los Angeles*,
631 F.3d 1031 (9th Cir. 2011) ................................................................. 15, 19

*Andrews v. State*,
50 Tenn. 165 (1871) ....................................................................... 29

*Annex Books, Inc. v. City of Indianapolis*,
624 F.3d 368 (7th Cir. 2010) ............................................................. 17, 27

*Bellotti v. Baird*,
443 U.S. 622, 633 (1979) ……………………………………………………… 25

*Dearth v. Holder*,
893 F.Supp.2d 59 (D.D.C. 2012) .................................................... 30

*DiMa Corp. v. Town of Hallie*,
185 F.3d 823 (7th Cir. 1999) ……………………………………………….. 27

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................. 13, 24, 29, 30

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) ......................................................... 40

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ................................................... *passim*

*Fitzsimmons v. Best*,
528 F.2d 692 (7th Cir. 1976) ……………………………………………… 12

*Goulart v. Meadows*,
345 F.3d 239 (4th Cir. 2003) ......................................................... 40

*Gresham v. Peterson*,
225 F.3d 899 (7th Cir. 2000) ......................................................... 15

*Holder v. Humanitarian Law Project*,
130 S.Ct. 2705 (2010) ................................................................. 39

*Horina v. City of Granite City*,
538 F.3d 624 (7th Cir. 2008) ....................................................... 15, 17

*Illinois Association of Firearms Retailers v. City of Chicago*,
  1:10-CV-4184 (N.D.IL) ……………………………………………………... 2, 11, 27, 28

*In re Gault*,
  387 U.S. 1, 13 (1967) …………………………………………………………... 25

*Kachalsky v. County of Westchester*,
  701 F.3d 81 (2d Cir. 2012) …………………………………………………….. 35

*Kent v. Dulles*,
  357 U.S. 116 (1958) ......................................................................................... 36

*Keyishian v. Board of Regents*,
  385 U.S. 589 (1967) ......................................................................................... 39

*King v. Preferred Technical Group*,
  166 F.3d 887 (7th Cir. 1999) .......................................................................... 13

*Lakewood v. Plain Dealer Pub. Co.*,
  486 U.S. 750 (1988) ......................................................................................... 36

*Martin v. Harrington & Richardson, Inc.*,
  743 F.2d 1200 (7th Cir. 1984) ........................................................................ 30

*McDonald v. City of Chicago*,
  130 S.Ct. 3020 (2010) ............................................................................... 28, 30

*Mintz v. Mathers Fund, Inc.*,
  463 F.2d 495 (7th Cir. 1972) …………………………………………………... 12

*Moore v. East Cleveland*,
  431 U.S. 494 (1977) ......................................................................................... 14

*Moore v. Madigan*,
  702 F.3d 933 (7th Cir.2012) ................................................................. 13, 17, 30

*Mosby v. Devine*,
  851 A.2d 1031 (R.I. 2004) ............................................................................... 36

*New Albany DVD, LLC v. City of New Albany*,
  581 F.3d 556 (7th Cir. 2009) ..................................................................... 17, 19

*NRA v. McGraw*,
  719 F.3d 338 (5th Cir. 2013) ……………………………………………… 25, 26

iv

*NRA v. BATF*,
   700 F.3d 185 (5th Cir. 2012) ………………………………………………….. 25

*People v. Zerillo*,
   189 N.W. 927 (Mich. 1922) ........................................................................... 36

*Poller v. Columbia Broadcasting System*,
   368 U.S. 464 (1962) ……………………………………………………… 12

*R.V.S., L.L.C. v. City of Rockford*,
   361 F.3d 402 (7th Cir. 2004) .................................................................. 15, 19

*Reliable Consultants, Inc. v. Earle*
   517 F.3d 738 (5th Cir. 2008) ........................................................................ 30

*Renton v. Playtime Theatres, Inc.*,
   475 U.S. 41 (1986) ........................................................................................ 15

*Richmond Newspapers v. Virginia*,
   448 U.S. 555 (1980) ...................................................................................... 29

*Schad v. Mt. Ephraim*,
   452 U.S. 61 (1981) ...................................................................................14, 16

*Schneider v. State*,
   308 U.S. 147 (1939) ...................................................................................... 16

*Schubert v. DeBard*,
   398 N.E.2d 1339 (Ind. Ct. App. 1980) ......................................................... 36

*Shuttlesworth v. Birmingham*,
   394 U.S. 147 (1969) ...................................................................................... 36

*Staub v. City of Baxley*,
   355 U.S. 313 (1958) ................................................................................. 35, 36

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957) ...................................................................................... 39

*Teixeira v. County of Alameda*,
   2013 U.S. Dist. LEXIS 128435 (N.D. Cal. Sept. 9, 2013) ....................... 30, 31

*Turner Broadcasting System v. FCC*,

v

520 U.S. 180 (1997) ............................................................................ 21

*United States v. Chafin*,
    423 Fed. Appx. 342 (4th Cir. 2011) ................................................ 31

*United States v. Marzzarella*,
    614 F.3d 85 (3rd Cir. 2010) ............................................................ 29

*United States v. O'Brien*,
    391 U.S. 367 (1968) ........................................................................ 41

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) ................................................... 12, 13

*United States v. Virginia*,
    518 U.S. 515 (1996) ........................................................................ 19

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ........................................................... 40

*Weinberg v. City of Chicago*,
    310 F.3d 1029 (7th Cir. 2002) ........................................................ 36

*Winter v. Minn. Mut. Life Ins. Co.*,
    199 F.3d 399 (7th Cir. 1999) .......................................................... 12

## Statutes, Rules and Ordinances

18 U.S.C. § 922(q)(2)(B)(ii) ...................................................................... 18

430 ILCS 66/40 ......................................................................................... 38

430 ILCS 66/65(b) ..................................................................................... 18

Fed.R.Civ.P. 56(c) ..................................................................................... 12

Fed.R.Civ.Proc. 30(b)(6) ........................................................................... 22

MCC § 11-4-260(b) ................................................................................... 24

MCC § 13-96-1200(b)(2) ........................................................................... 23

MCC § 13-96-1200(b)(7) ................................................................ 7

MCC § 13-96-1160(a) .................................................................... 19

MCC § 13-96-1210(d) .................................................................... 20

MCC § 13-96-1210(e) .................................................................... 20

MCC § 13-96-1220(b) .................................................................... 20

MCC § 4-151-010 .......................................................................... 33

MCC § 4-151-100(b) ...................................................................... 33

MCC § 4-151-030(b)(6) .................................................................. 38

MCC § 4-151-030(f) ....................................................................... 37

MCC § 4-151-090 .......................................................................... 22

MCC § 8-32-170(h) ........................................................................ 22

N.C. Gen. Stat. § 14-415.12(a)(4) ................................................... 40

**Other Authorities**

B. Abbott, *Judge and Jury: A Popular Explanation of the
Leading Topics in the Law of the Land* (1880) .............................................. 24

Fran Spielman, *Law Allows Gun Ranges In City but Under Rigid Conditions*, Chicago Sun-
Times, July 6, 2011, available at http://www.suntimes. comlnews/politics/6371489-418/law-
allows-gun-ranges-in-city-but-under-rigid-conditions.html
(last visited Dec. 5, 2013) ......................................................... 34

L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*,
38 Wm. & Mary L. Rev. 1311 (1997) ......................................... 35

*Some Considerations on the Game Laws* (1796) ...................... 29

Thomas Jefferson, *Writings of Thomas Jefferson* (P. Ford ed. 1895) ......................... 30

## **INTRODUCTION**

Defendant's Motion for Summary Judgment must be denied because the facts and law in this case support Plaintiffs' pending Motion for Summary Judgment instead. Defendant's Motion is yet another example of the City's historical attitude towards the Second Amendment: there is crime in Chicago, so we can do anything we want, even deny constitutional rights to law-abiding citizens. The only way anything on this topic has changed is when a Court forces the City to change. Defendant's Motion asks the Court to rubber-stamp its restrictions regardless their fundamental unfairness or effect on Chicago's residents who have been waiting for a very long time to have somewhere to go in the City for essential firearms training. Now that the State mandates such training to obtain a permit under the Firearms Concealed Carry Act, that need is even more urgent.

On July 6, 2011, the Seventh Circuit effectively struck down Chicago's firing range prohibition for violating the Plaintiffs' fundamental Second Amendment rights to gain and maintain firearm proficiency, and, considering the City's live-fire range training requirement to obtain a Chicago Firearms Permit ("CFP"), the right to keep handguns for lawful purposes including self-defense. The CFP requirement is since repealed, but as noted the concealed carry training requirement has filled that void.

Rushing to beat the Seventh Circuit's ruling (and missing by a matter of hours) the City repealed its formal firing range ban, but replaced it with a labyrinthine set of requirements and restrictions intending and, in any event, achieving the same result. Two and a half years later, no firing ranges open to the public exist in Chicago. Plaintiffs amended their Complaint to address the new *de facto* prohibition, and fortunately, over the intervening years and as recently as

1

September 11, 2013, some of the provisions challenged by Plaintiffs have been repealed. But what provisions remain of Chicago's range ordinance still cannot remotely satisfy the City's burden in this case, as spelled out by the Seventh Circuit. The time has arrived to complete the task of bringing Chicago into compliance with the Second Amendment, at least on the subject of gun ranges, and enabling, finally, the citizens of the nation's third-largest city to access this important Second Amendment right.

## STATEMENT OF FACTS

Though Plaintiffs incorporate their Statement of Additional Facts herein, they assert the following :

1.      On January 6, 2014, the City's ban on the sale, transfer and acquisition of firearms was ruled unconstitutional by Judge Chang in *Illinois Association of Firearms Retailers v. City of Chicago*, 1:10-CV-4184.

2.      Plaintiff Rhonda Ezell still has interstitial lung disease, lupus, and until recently was awaiting a kidney transplant and was on dialysis (Ezell Dep. 7, ln.17 – 8, ln.4) (Fortunately, Ezell recently received her kidney transplant).  She recently visited a gun range outside the City because she received a notice that the convicted felon who had burglarized her home had been released, and she wanted shooting practice so she could protect herself if the felon came to her house (Ezell Dep. 10, ln.6 – 11, ln.16).

3.      Plaintiff Joseph I. Brown's interest in this legal action is having a range in Chicago that he can go to in order to practice shooting.  To his knowledge, since that 7th Circuit Court decision in 2011, there are no public ranges in Chicago available to him (Brown Dep. 45, ln.24 – 47, ln.17).

2

4.     Plaintiff William Hespen became a plaintiff in this lawsuit because he wishes to patronize a shooting range in Chicago.  It is his understanding that in 2011, a Court decision held that the City must allow firing ranges.  He is unaware of any place in the City that he, as a member of the public, can go in the City to go practice at a firing range (Hespen Dep. 91 ln.5-17).

5.     Richard Pearson is the Executive Director of the Plaintiff Illinois State Rifle Association (Pearson Dep. p.3, ln.15-16).  ISRA wishes to operate a range in Chicago, and is considering building one (Pearson Dep. p.23, ln.4-11).  They have discussed a business plan, but cannot go forward because of all the requirements (Pearson Dep. p.24, ln.13-17).

6.     ISRA is dissuaded from building a range in Chicago at this time because (1.) the ordinances all drive up the cost; (2.) the Commissioner has discretion to decide what "deleterious impact" is and shut down the range, especially when the number of arrests can be in the discretion of the police department (Pearson Dep. p.94, ln.17 – p.95, ln.24)

7.     Chris Hart is the Midwest Territory Manager and Range Consultant for Plaintiff Action Target, Inc. (Hart Dep. p.6, ln.14-17; p.7, ln.2-4).  Since the Seventh Circuit's ruling in 2011, neither Action Target nor anyone else has built a commercial indoor range in Chicago, and if someone else had built one he would have heard about it very quickly (Hart Dep. p.282, ln.24 - p.283, ln.23).

8.     Julianne H. Versnel is the Director of Operations for Plaintiff Second Amendment Foundation (Versnel Dep. p.3, ln.17-18).  SAF has 1700-1800 members in Chicago (Versnel Dep. p.5, ln.6-9).  SAF still has an interest in providing education and training in Chicago (Versnel Dep. p.13, ln.19-23).

9.      Jonathan Gordon talked to Chris Hart about opening a range in Chicago, who sent him the ordinance, and then Gordon learned that the ordinance was so stringent one could never open a gun range, so he dropped it (Gordon Dep. 35, ln.1-8; 37, ln.11-21).

10.     Paul Kuzmierczyk is the president of Boomstick, Inc. (Kuzmiercyzk Dep. p.4, ln.20-24).  He incorporated it for the purpose of building a shooting range and firearms retailer in Chicago (Kuzmiercyzk Dep. p.15, ln.12–15).  Since he is the only officer and lives in Chicago, he cannot get an FFL, so he cannot complete a business plan to get pricing on the items he would like to sell.  The FFL application requires one to testify they are not violating any laws, and since one cannot sell firearms in Chicago, he cannot truthfully complete the application (Kuzmierczyk Dep. p.17, ln.17 – p.18, ln.23).

11.     Lorin Kramer has never seen regulations such as in this case outside of Chicago (Kramer Dep. 314).  He also takes issue with Section 4-151-030(f) since it allows that after a range opens anything that happens that is detrimental to the neighborhood could be considered a deleterious impact and the range will be shut down (Kramer Dep. 88-89).  He would have no way to design a range to meet that standard, and if the Commissioner denies a license or renewal it will be impossible to operate the range, and this ordinance makes it economically infeasible to open a range (Kramer Dep. 90-92).

12.     Gun sales are an integral part of the business plan of indoor commercial ranges. Range usage fees will hopefully get the range owner to break even.  A range needs sales to be profitable (Kramer Dep. p.131, ln.19 – p.132, ln.4).  The profit also comes from sales of ammunition, accessories and targets (Kramer Dep. 135-36).  He knows of no commercial shooting ranges that do not have firearms sales (Kramer Dep. 134).  The lack of firearms sales

4

could make a range unprofitable (Kramer Dep. 139).

13.     In other jurisdictions, gun ranges are considered a commercial use, and an accessory to the attached gun store. Generally, they are placed in commercial zones where there is retail traffic, instead of manufacturing zones, since they are not manufacturing anything (Kramer Dep. 143). Manufacturing districts are also not usually on arterial streets with lots of traffic that would see the range's sign as it drives by (Kramer Dep. 144). The impact on a range is if it is not profitable because few people can see it (Kramer Dep. 145).

14.     As for Section 4-151-170(b), there is no way for a range owner to control policing what ammunition has been brought in and what is leaving. There is no practical way for a range owner to comply. Also, there is the issue of what the range owner is supposed to do with the ammunition left behind (Kramer Dep. 159-60). Ammunition sales are also very important for the financial health of the range (Kramer Dep. 161). He has been told by range owners that ammunition sales are a significant part of a range's revenue (Kramer Dep 162).

15.     The City's regulatory scheme makes it difficult to open a firing range in the City (Kramer Dep. 292). In a city like Chicago where there are so many people and a new concealed carry law, where people are going to need training for permits, one would think people would want to open the first firing range as a profit-maker, yet no one has (Kramer Dep. 301). To a reasonable degree of certainty, the better business plan would be not to build a range in Chicago, due to the sum total of the restrictive ordinances, and build the range somewhere else (Kramer Dep. 302, 325-26). He is not aware of any location where crime increased as a result of a gun range in that location (Kramer Dep. 303-04). The noise from gun ranges would not disturb the peace and quiet of neighbors (Kramer Dep. 306).

5

16.     To a reasonable degree of certainty, a firing range can exist in the City without having a negative impact on public health (Kramer Dep. 308) or public safety, and can exist and have a positive impact on public safety (Kramer Dep. 209). The same is true if the range is in a manufacturing zone or a commercial zone (Kramer Dep. 309-310).

17.     Other businesses in manufacturing zones have no sound restrictions. Restricting sound levels at a range when it is mandated to be in an area with businesses that have no such restrictions is a burden (Giordano Dep. 203-04). The range is being singled out and having a burden put on them the City clearly does not think is necessary for other businesses in manufacturing zones (Giordano Dep. 208-09).

18.     From a health and safety perspective floor drains are not recommended on indoor ranges. The industry standard is clear on that (Giordano Dep. 229). There is a danger of bullet ricochet (Giordano Dep. 231). Also, washing particulate into a floor drain leaves unburned gunpowder accumulating in the floor drain, which can ignite and cause a flash fire or explosion. Also, washing particulate down a drain causes environmental issues (Giordano Dep. 231-33).

19.     If a shooting range applicant cannot get a location to put a shooting range that would pass muster with the Zoning Department, they will not get past square one with the Business Affairs Department (Krimbel Dep. 38).

20.     Any opinion on the effect of hours of operation of a shooting range and its effect on the community would be a guess, because she has not seen any studies (Krimbel Dep. 146).

21.     Krimbel agrees no one under 18 can be a patron of, or shoot a firearm at, a Chicago shooting range (Krimbel Dep. 151). She believes it is so shooters do not have kids running around the range unsupervised, but believes the ordinance is inartfully drafted (Krimbel

Dep. 151-52). She has friends who taught their kids to hunt around 14-15 years old, and her own

son took a shooting class at age 12 (Krimbel Dep. 152).

22.     Krimbel is not aware of any empirical evidence that justifies or provides a basis

for any of the ordinances discussed (Krimbel Dep. 163-64).

23.     Robert Fahlstrom is the Manager of Regulatory Review of the City's Department

of Buildings. (Fahlstrom Dep. p.7). He is the City's disclosed witness to explain the

government purpose of, and basis for, MCC 13-96-1200(b)(7) which requires the ceiling, floors

and walls of the shooting range surface to be of smooth non-porous materials (Fahlstrom Dep.

p.16; MCC). The Ordinance also requires the floor be sloped ¼ inch per foot from the firing line

to the bullet trap (MCC). Other than documents he review for the deposition, he has no

knowledge of firing ranges except that firearms are used there (Fahlstrom Dep. 22).

24.     Lieutenant Kevin Johnson works for the Chicago Police Department in the

Bureau Patrol, Third District (Johnson Dep. 9). He is not aware of any firing ranges that do not

have a gun store as part of the business (Johnson Dep. 33).

25.     All concerns regarding ammunition and firing ranges are hypothetical and

speculation (Johnson Dep. 111). Short of the range owner selling a patron a specific amount of

ammunition, and then looking over the patron's shoulder to make sure he is shooting only that

specific amount of ammunition, there is no way for a range owner to know if a patron is leaving

with different ammunition than with which he entered (Johnson Dep. 114). He does not know

how, in practice, how Section 170(b) would be enforced by the range owner (Johnson Dep. 133-

34).

26.     Johnson believes the existence of gun ranges and the presence of firearms and

ammunition will increase the possibility of theft, robbery, burglary or harm to the public. He has

no empirical data or studies or research to support this belief (Johnson Dep. 122). He has no

empirical data or studies or research regarding ammunition used in a crime that was stolen from

a firing range patron, nor is he aware of any real-world examples of this happening (Johnson

Dep. 125). His concerns about potential harms from crime are the same whether the bullet was

purchased at a firing range or a Wal-Mart (Johnson Dep. 125).

27. He is not aware of any empirical data, studies or statistics if two ranges are

located 500 feet from each other, or regarding the topic of proximity of ranges to each other at all

(Johnson Dep. 141). As to not allowing firing ranges within 500 feet of a residential zone, the

government purpose is public safety, the speculation that there could be crime or theft or

robbery, and because he believes the risk is due to the range's existence, is the same regardless

of where the range is located (Johnson Dep. 146-48). He is not aware of any empirical data that

placing a firing range 500 feet from a residential area causes or results in crime, theft, robbery, or

public hazards (Johnson Dep. 148).

28. As to not allowing firing ranges within 500 feet of certain other location, the

government purpose is also public safety, the speculation that there could be crime or theft or

robbery (Johnson Dep. 149). He is not aware of any empirical data that placing a firing range

500 feet from certain other locations causes or results in crime, theft, robbery, or public hazards

(Johnson Dep. 149). This is all his opinion and speculation of what might happen (Johnson Dep.

149). Like the other restrictions, the risk is due to the range's existence, and the distances from

other locations does not matter (Johnson Dep. 151, 153). No matter where one puts a firing

range, the public safety concern would equally exist (Johnson Dep. 159). The construction or

operation of the range is irrelevant to his public safety concerns (Johnson Dep. 154-155). It is all speculative (Johnson Dep. 160).

29.     Since July 6, 2011, only approximately three or four inquiries (give or take a couple) have come in from people looking to open a firing range and asking about relevant zoning issues (Scudiero Dep. p.28, ln.22 - p.29, ln.16). The phone calls were from people asking if they could open a firing range at a specific address (Scudiero Dep. p.31, ln.8-12). All were told no because the addresses were either not in manufacturing districts or they were located in an area that would violate the distance requirements (Scudiero Dep. p.34, ln.2-18). Noone was told they had picked an acceptable location (Scudiero Dep. p.36, ln.1-8).

30.     The governmental purpose of Section 120(A) (prohibiting firing ranges within 500 feet of each other) is speculative and not based on any data (Scudiero Dep. p.40, ln.22 - p.42, ln.22; p.55). The governmental purpose of  Section 120(B) (prohibiting firing ranges within 500 feet of residential zones) is likewise speculative and not based on any data (Scudiero Dep. 44-45, 55). The governmental purpose of  Section 120(C) (prohibiting firing ranges within 500 feet of various listed locations) is also speculative and not based on any data (Scudiero Dep. 48-49, 55).

31.     As of September 28, 2012, 3386 acres, or 2.2% of the City's 148,161 acres could be used for a range (Valenziano Dep. 42-43).

32.     Kevin Schnoes is the Assistant Commissioner of the Permitting and Inspections Unit of the City's Department of Public Health (Schnoes Dep. 5, 7).  The 55 decibel requirement for businesses starts at 8:00PM. There is no business other than gun ranges where the 55 decibel limit starts before 8:00PM (Schnoes Dep. 23-24).

33.     If a business is within a manufacturing district, no noise restriction is enforced

9

(Schnoes Dep. 27). Only if a shooting range in a manufacturing zone has a noise above 55 decibels as measured at the edge of a contiguous area after 8:00PM would anything potentially be enforced (Schnoes Dep. 29). 55 decibels is equivalent to a conversational level (Schnoes Dep. 32, ln.17-20). He is not aware of any governmental purpose for making shooting ranges the only business subject to a noise restriction before 8:00PM, and he is not aware of a governmental purpose for making shooting ranges the only business in manufacturing zones subject to a noise restriction (Schnoes Dep. 44, ln.4-15).

34. The neighborhoods that are poorer or have well-organized criminal gangs have higher violence rates. And there is a relationship to race or ethnicity (Cook Dep. 30). The neighborhoods that were high in violence 20 years ago are often the same ones having high violence rates today (Cook Dep. 30). This is because the same factors still exist: lack of education, poverty and joblessness (Cook Dep. 30, 36-37).

35. Chicago's firearms sales ban is not going to eliminate gun violence in Chicago, either now or at any point in the future (Cook Dep. 57). He is not aware of any research that Chicago's gun sales ban has caused any reduction in crime in Chicago (Cook Dep. 58).

36. Cook has cited one federal study which reported 100,000 defensive gun uses per year, while a different research study concluded the number was 2.5 million defensive gun uses per year (Cook Dep. 75-76). It is reasonably possible that someone would purchase a firearm at a firing range, train with that firearm, and that firearm might someday save that person's life (Cook Dep. 76-77).

37. According to the Illinois Department of Natural Resources, minors, including those under 16, may obtain a hunting license, though all hunters born after 1980 must present a

10

safety certification. See http://www.dnr.illinois.gov/hunting/Documents/HuntTrapDigest.pdf at p.8.

38.     Minors (17 and under) may also hunt as an "apprentice" with a parent, grandparent or guardian with a hunting license (*Id*.). Minors (20 and under) do not need a FOID card to hunt as long as they are with a parent, guardian or responsible adult who has a FOID card. *Id*. at p.10.

## SUMMARY OF ARGUMENT

The City has enacted a suffocating regimen of construction and operation restrictions and requirements that are not placed on virtually any other business. These restrictions are placed even though there are no secondary effects of shooting ranges beyond the imaginary and speculative. Therefore, it can only be concluded that the City is discriminating against shooting ranges, which its residents have a fundamental right to patronize, strictly for the content of its business, *i.e.*, that firearms are used there. Beyond a phony "if-then" argument along the lines of "if guns exist, then there will be crime and thefts and robberies," an argument completely unsupported by any real world occurrence, or any data or statistics, there is absolutely no reason for treating firing ranges different than any other commercial enterprise in the City. Further, another Court in this District has recently rejected exactly these arguments in striking down the Defendant's ban on firearms sales and transfers. The logic applied in the *Illinois Association of Firearms Retailers* case fits squarely into this matter.

It is clear Plaintiffs have been harmed in their ability to open and operate and/or patronize a firing range in the City. In the two-plus years since the range ban was struck down, no one has applied for a license to open a range, and only a handful of people have even asked about the

zoning feasibility, all of whom were told no. Defendant's claim that Plaintiffs have not met their

burden because no one is poised to open up a range is particularly disingenuous when no one can

even get a location approved, and everyone has testified that the restrictions are such that no one

wants to put their money in a range in Chicago given the regulatory scheme.

Therefore, Defendants have not met, and cannot meet, the burden of heightened scrutiny

against which the restrictions must be analyzed. The Defendant claims its restrictions can be

supported based on nothing more than "logic and data." *United States v. Skoien*, 614 F.3d 638,

642 (7th Cir. 2010). In reviewing the record, Defendant has neither. Summary judgment for

Defendant must be denied.

## SUMMARY JUDGMENT STANDARD

". . . [S]ummary judgment is appropriate only if it appears that 'there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"

*Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir. 1976) (citing F.R.Civ.P. 56(c); quoting *Poller v.

Columbia Broadcasting System*, 368 U.S. 464 (1962)).

"As a procedural matter, granting summary judgment, while a drastic remedy, is a

wholesome one where applicable to the circumstances. It is never warranted except on a clear

showing that no genuine issue as to any material fact remains for trial. If the pleadings and proof

in the form of depositions, affidavits and admissions on file disclose that no real cause of action

or defense exists, the court may determine there is no issue to be tried and may grant a summary

judgment." *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972).

In evaluating a summary judgment motion, the court focuses on whether any material

dispute of fact exists that would require a trial. *Winter v. Minn. Mut. Life Ins. Co.*, 199 F.3d 399,

408 (7th Cir. 1999). In making this determination, the court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999).

## ARGUMENT

Level of Scrutiny

"In *Skoien* [The Seventh Circuit] we said that the government had to make a 'strong showing' that a gun ban was vital to public safety—it was not enough that the ban was 'rational.' 614 F.3d at 641. Illinois has not made that strong showing—and it would have to make a stronger showing in this case than the government did in *Skoien*, because the curtailment of gun rights was much narrower: there the gun rights of persons convicted of domestic violence, here the gun rights of the entire law-abiding adult population of Illinois." *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012).

In *Ezell*, after discussing the two-step means-end analysis used for determining whether an infringement on the Second Amendment is constitutional, the Court applied "not quite 'strict scrutiny'" to the City's firing range ban. *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011). This was partly because the City conditioned firearms possession on range training – now the State is doing the same thing with the Firearms Concealed Carry Act. Thanks to the City's stifling restrictions, the residents of the largest city in the State cannot train for self-defense or to obtain the concealed carry permit. Nothing has changed. Plaintiffs are still "the 'law-abiding, responsible citizens' whose Second Amendment rights are entitled to full solicitude under *Heller*. . . " *Id.* And they still do not have a range they can patronize in the City. The Seventh Circuit applied intermediate scrutiny to domestic violence misdemeanants in *Skoien*, and has

13

repeatedly noted that a higher level of scrutiny must be applied to law-abiding citizens (*See Moore*, *Ezell*). The same near-strict scrutiny applied by the Seventh Circuit earlier in this case must be applied again now.

<u>Zoning Restrictions</u>

I.    **Restricting Firing Ranges to Manufacturing Zones Only By Special Use Permit, By Itself and Coupled With the Other Location Restrictions, Effectively Eliminates Any Location Where a Firing Range Could Be Feasibly Operated.**

"The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities. But the zoning power is not infinite and unchallengeable; it 'must be exercised within constitutional limits." *Schad v. Mt. Ephraim*, 452 U.S. 61, 68 (1981) (quoting *Moore v. East Cleveland*, 431 U.S. 494, 514 (1977) (Stevens, J., concurring)). "[W]hen a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest." *Id*. at 68. The City's permission of firing ranges is illusory if, by zoning, there is no place to actually locate a range. The City cannot eliminate ranges *via* zoning. It cannot zone ranges to target them as-such, because ranges are constitutionally protected. And the City can only zone ranges on account of secondary effects—if any. Chicago's gun range zoning scheme violates every relevant legal principle.

As of September, 2012, only 2.2% of the land in Chicago was not prohibited from the possibility of opening a firing range. This is an unconstitutionally small percentage, especially given that Zoning Commissioner Scudiero testified that every single person who asked about a chosen location for a firing range was told their selection would violate the Zoning Ordinance. Scudiero Dep. p.34, ln.2-18. The City is allowed to properly zone, "[b]ut the alternative must be

more than 'merely theoretically available'—'it must be realistic as well.'" *Horina v. City of Granite City*, 538 F.3d 624, 635 (7th Cir. 2008) (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)).  Likewise, the City claims there are 1900 parcels possible, but the City does not state the total number of parcels, and does not mention the extremely limited portion of the City where a range could possible locate (*See* Defendant's Exh. 19).

Mindful that the Seventh Circuit, in this case, held that First Amendment doctrine should guide the development of Second Amendment doctrine, it is useful to note how zoning fares under the First Amendment when governments claim that First Amendment-protected uses must be restrictively zoned for their alleged harm. Recently, the Ninth Circuit helpfully summed up the state of the law:

> [T]he test for the constitutionality under the First Amendment of a dispersal ordinance relating to adult businesses remains that prescribed in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).  We have encapsulated that test recently as follows: First, we must determine whether the regulation is a complete ban on protected expression. *Renton*, 475 U.S. at 46.  Second, we must determine whether the county's purpose in enacting the provision is the amelioration of secondary effects.  *Id.* at 47.  If so, it is subject to intermediate scrutiny, and we must ask whether the provision is designed to serve a substantial government interest, and whether reasonable alternative avenues of communication remain available. *Id.*

*Alameda Books, Inc. v. City of Los Angeles*, 631 F.3d 1031, 1040 (9th Cir. 2011) (parallel citations omitted); *see R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402 (7th Cir. 2004). As applied to gun ranges, the relevant test would be "more rigorous" than intermediate "if not quite 'strict scrutiny.'" *Ezell*, 651 F.3d at 708.

While adult establishments are acknowledged to have adverse secondary effects, there are no such secondary effects caused by gun ranges—and certainly, none that would justify the types

15

of zoning restrictions the City enforces. The City's witnesses to a person all testified that there was no data to support any supposition that gun ranges would be harmful. The City developed no evidence regarding the interaction of gun ranges, specifically, and residential districts, schools, day-care facilities, parks, places of worship, alcohol retailers, "children's activities facilities," libraries, museums, or hospitals—the various land uses whose presence, under the city's zoning ordinance, makes gun ranges impossible to locate. Nor has the City developed any evidence that would justify restricting gun ranges to manufacturing zones.

"Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." *Schad*, 452 U.S. at 69-70 (quoting *Schneider v. State*, 308 U.S. 147, 161 (1939)). *Schad* disposed of the government's unfounded claim that its alleged purpose automatically trumped plaintiff's constitutional rights:

> Mount Ephraim contends that it may selectively exclude commercial live entertainment from the broad range of commercial uses permitted in the Borough for reasons normally associated with zoning in commercial districts, that is, to avoid the problems that may be associated with live entertainment, such as parking, trash, police protection, and medical facilities. The Borough has presented no evidence, and it is not immediately apparent as a matter of experience, that live entertainment poses problems of this nature more significant than those associated with various permitted uses; nor does it appear that the Borough's zoning authority has arrived at a defensible conclusion that unusual problems are presented by live entertainment.

*Schad*, 452 U.S. at 73.

Likewise, there is no "defensible conclusion that unusual problems are presented by" firing ranges. Indeed, this is exactly what the Seventh Circuit concluded in this case, when it

noted: "[t]he City maintains that firing ranges create the risk of accidental death or injury and attract thieves wanting to steal firearms. But it produced no evidence to establish that these are realistic concerns. . ." *Ezell*, 651 F.3d at 709.

Nothing has changed since then. Aside from the Seventh Circuit's reaffirmation of this concept in *Moore*, where it noted: "Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety. It has failed to meet this burden." *Moore*, 702 F.3d at 942. This follows a line of Seventh Circuit cases such as *Annex Books, Inc. v. City of Indianapolis*, 624 F.3d 368 (7th Cir. 2010), where the Court affirmed a preliminary injunction against the city's restrictions on hours of operation for bookstores, which "did not produce any measurable benefit." *Id*. at 760. In another adult bookstore closure ordinance, the Seventh Circuit stated,

> Anyway, if an adult bookstore located 200 feet from a church attracts thieves, won't a bookstore located 1,500 feet from a church do the same? Maybe the City's concern is for the worshippers, who may become the thieves' targets when video buyers are unavailable. But if that's so, the City needs some evidence that thefts from passers by are a serious problem--and a more severe problem for outlets near churches than for outlets father away.

*New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556 (7th Cir. 2009).

The City's witnesses in this case have provided nothing better to this Court. Such unsupported conjecture is "verboten in the First Amendment context," *Horina*, 538 F.3d at 633, and in *Ezell* the Seventh Circuit made clear the same rule applies to attempted abridgements of the Second Amendment. "That is why the government has the burden of showing that there is evidence supporting its proffered justification for its speech restriction when asserting that the restriction survives the time, place, and manner analysis." *Id*.

Indeed, beginning this month Illinois residents will be carrying handguns throughout many areas of Chicago, well within 500 feet of any of the gun range zoning impediments, and even inside many of the areas that trigger gun range zoning restrictions—notably, residential districts, alcohol retailers, and places of worship.[1] For Chicago to restrict firing ranges to the point of virtual elimination on specious public safety grounds ignores the new constitutional landscape in Illinois and Chicago. At a minimum, there is no reason the residents of Chicago cannot exercise their fundamental right to train with a firearm at a gun range located in any area they are already allowed to carry them, loaded and ready for use.

It is clear that with no evidentiary support for the proposition that the gun range zoning ordinance ameliorates any supposed secondary effects, this Court should employ strict scrutiny and strike down these provisions. However, even were the Court to find there were secondary effects, the restrictions would fail the required "more rigorous" than intermediate scrutiny standard.

In this case, there is no connection between the secondary effects being offered and the activity of firearms training at a firing range. In part, this is because there are no actual secondary effects to connect. But also, even if the Defendant's speculations were taken at face value, there is no evidence that forcing firing ranges to keep distances from other businesses, or placing them in manufacturing zones, will remove or even alleviate robberies or other crime. In fact, it is Defendant's witnesses' contentions that the mere existence of firing ranges with guns and bullets will somehow lead to crime and mayhem, and that their location does not matter.

---

[1] While licensed handgun carrying will not be allowed in schools, it will be allowed in school zones. 18 U.S.C. § 922(q)(2)(B)(ii). Additionally, concealed firearms will be permitted in parking areas. 430 ILCS 66/65(b).

Just as in the *New Albany DVD* case, if the alleged secondary effects exist regardless, then there is no reason to restrict a firing range's location. The Seventh Circuit required this in *R.V.S., L.L.C.* when it stated:

> [S]imply stating that an ordinance is designed to combat secondary effects is insufficient to survive intermediate scrutiny. The governmental interest of regulating secondary effects may only be upheld as substantial if a connection can be made between the negative effects and the regulated speech. In evaluating the sufficiency of this connection, courts must 'examine evidence concerning regulated speech and secondary effects.' *Alameda Books*, 535 U. S. at 441. According to the *Alameda Books* plurality, the evidentiary requirement is met if the evidence upon which the municipality enacted the regulation 'is reasonably believed to be relevant for demonstrating a connection between [secondary effects producing] speech and a substantial, independent government interest.' 535 U. S. at 438 (internal quotations omitted).

*R.V.S.*, 361 F.3d at 408; *cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) (intermediate scrutiny "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation").

The zoning restrictions are not constitutional, and Defendant's Motion for summary judgment must be denied.

Construction Requirements

## II. The Requirement of Ballistic-Proofing All Walls and Doors is Unnecessary and Unduly Burdensome.

As described by Plaintiffs' experts, MCC § 13-96-1160(a), which requires armor plating unexposed doors, and making all walls penetration-proof, even if they are not to be exposed to bullets, is an unjustified burden and cost on the range owner. It does not promote safety, and forces thousands of dollars in extra costs on the range owner, which, in combination with the other unnecessary and costly requirements, contribute to the *de facto* impossibility of opening a

19

range. The City offers no justification for this restriction, and to the extent it tries to offer one, that justification is unsupported by the evidence and thus cannot satisfy constitutional scrutiny.

**III.    The Ventilation Requirements Are Unduly Burdensome and Do Not Serve a Governmental Purpose.**

MCC § 13-96-1210(d) mandates separate ventilation and exhaust systems for each range, and since ventilation is a large portion of the construction costs, adding multiples of this cost could make the construction of a range unaffordable. At a minimum, it will greatly increase construction costs. The City claims this is for air quality, and of course Plaintiffs share that concern, but the City cannot meet its burden of establishing a close fit between the requirement and any offered public interest. See Ezell, 651 F.3d at 708-09.

Also, as to MCC § 13-96-1210(e), which mandates electrically interlocking supply and exhaust systems, Kramer testified this would burden the power grid, and could even cause a grid failure. The City downplays it, and says a grid failure will affect everyone, but like the other requirements in this section, the City has mandated a poorly thought-out, needless and dangerous imposition that can only harm the range and its patrons, and does nothing for the public interest. It too fails constitutional scrutiny.

**IV.    The Sloped Floor and Floor Drain Requirements are Unsafe and Unnecessary, and Make it Near Impossible to Open and Operate a Firing Range in Chicago.**

In MCC § 13-96-1220(b) and (c), the City insists on requiring standards which are no longer in use by the firing range industry, but which are unsafe and could result in an explosion, as testified to by Chris Hart of Action Target, and both Lorin Kramer and Jack Giordano of Kramer One. Kramer testified he would not sign architectural drawings for a range with a floor drain, because it is dangerous. To add to this, the requirement is extremely expensive, eliminates

20

many of the existing buildings in Chicago from the possibility of being retrofitted for constructing a range, and is at best useless.

This is not a matter of aesthetic preference or a policy judgment between two competing yet equally valid options; the City is mandating a dangerous method of cleaning that has not been used since the 1970's. That is not a close fit to any governmental interest. *See Ezell*, 651 F.3d at 708-09. In *Turner Broadcasting System v. FCC*, 520 U.S. 180 (1997), in considering certain federal statutes the Supreme Court held that the "question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress." *Id.* at 211. Here, the conclusion is based on old information and leads to unsafe practices, which is patently unreasonable.

The City may be insisting on this requirement because it failed to consult with knowledgeable people prior to enacting the ordinance and therefore does not know the difference, but that does not make it right, and the City's regulatory authority cannot be allowed to extend this far, any more than it can mandate that shooting take place with the lights out to save power. The Court cannot allow the City to impose such a misguided regulation, as the burden, cost, and hazard do not pass any level of heightened constitutional scrutiny.

**V.      Targeting Gun Ranges as the Only Land Uses Subject to Noise Limits Prior to 8:00PM, and the Only Businesses in Manufacturing Zones Subject to Noise Limits At All, Plainly Violates the Constitution.**

Noise is noise. It either interferes with neighboring land uses, or it does not. It is one thing to subject gun ranges to the same noise restrictions applied against other land users—quite another to discriminate against gun-range noise while allowing a cacophony of other, equal or greater urban noise at the same times and places. Chicago's noise control attack on gun ranges

fails even rational basis review. It cannot remotely survive under Second Amendment review. The City has tweaked its gun range noise restrictions since July 6, 2011, but currently, firing ranges may not have a decibel level above 70dB measured ten feet away from their outer wall, and 55dB when measuring more than 100 feet away. The City's Rule 30(b)(6) noise control witness, Assistant Commissioner for Public Health Kevin Schnoes, testified that 55 db relates to an average conversational level, Schnoes Dep., p. 32 1. 17-20, and that no business is subject to a noise restriction prior to 8:00PM. Per MCC § 4-151-090, firing ranges are required to close at 8:00PM. Therefore, for no discernable reason, firing ranges are the only business subject to a noise restriction in the City prior to 8:00PM.

Making matters worse, MCC § 8-32-170(h) specifically exempts businesses in manufacturing zones from noise restrictions. But firing ranges are restricted to manufacturing zones (*see* discussion *infra*). Therefore, firing ranges are the only business in manufacturing zones subject to noise restrictions.

Incredibly, Schnoes, the City's designated noise witness, testified he has no idea what kind of noise level emanates from the firing of a gun. Schnoes Dep., p.34, In. 16-19. He also testified that there is no governmental purpose in singling out gun ranges for noise enforcement prior to 8:00PM, and within manufacturing districts. Schnoes Dep., p.44. in.4-15. But while Schnoes testified that he would not enforce any noise ordinance against a business prior to 8:00PM, or where the noise does not bleed over from a manufacturing zone to a different type of neighboring zone at a level higher than 55 dB, Schnoes's enforcement philosophy is not law— and the noise law is enforced not by Schnoes, but as he explained, by the police wielding noise meters. Schnoes Dep., p.21, In. 15-23.

There is no point belaboring the obvious: the gun range ordinance's noise restrictions are irrational, and the City cannot possibly meet its heightened scrutiny burden needed to sustain them.

Additionally, MCC § 13-96-1200(b)(2) and (b)(7) creates two contradictory requirements with which range owners cannot comply. Simply put, there are no smooth non-porous materials that are also sound-absorbing. All sound-absorbing materials are porous, or they do not absorb sound. Three of Plaintiffs' witnesses testified as such, and the best the City can offer is "maybe there is such a material." There is not. Kramer testified he designs different parts of the range as non-porous for cleaning (where there will be live fire) and makes other portions sound-absorbent (where there not be particulate discharge). The City requires both at the same time; it is an impossible task. Ironically, this issue alone means that a would-be range owner will be unable to comply with the range ordinance. Therefore, these contradictory requirements must be struck down.

## VI. The Firearms and Ammunition Storage Requirements Are Unnecessarily Burdensome.

Likewise, MCC § 13-96-11 90(c)(2)(d), which mandates a hazardous storage facility or a magazine for firearms and ammunition storage, is a needless expense with which it may be impossible to comply. According to Chris Hart, Lorin Kramer and Jack Giordano, the City mistakenly has labelled firearms and ammunition as "hazardous materials," as if they are explosives, and then has compelled an expensive storage system that serves no purpose. This contributes to the other unnecessary construction expenses that drive up the cost to the point of infeasibility. There is no justification thus far offered beyond speculative harm, and none can be

offered that passes near-strict scrutiny.

## VII. The Commissioner of Business Affairs's Ability to Promulgate Rules, Including Those that Conflict with Laws from Other Regulatory Bodies, Unconstitutionally Chills Anyone Who May Think of Trying to Open a Firing Range in the City.

MCC § 11-4-260(b) allows the Commissioner of Business Affairs and Consumer

Protection to create rules for the cleaning, sound, air quality, discharge of particulate matter and

waste from a shooting range. However, as testified to by Jack Giordano, these issues are already

the subject of federal regulations, with which the range owner obviously must comply. Allowing

a City official to make potentially contradictory rules on these subjects puts a large burden on the

range owner who invests millions of dollars into a range expecting one set of standards and then

potentially has to comply with two contradictory regulatory schemes. It is needlessly

burdensome, and there is no public interest in the extra layer of regulation.

<u>Business Operation Requirements and Restrictions</u>

## VIII. Barring Patrons Under the Age of 18, Even with Adult Supervision, Serves No Governmental Purpose.

"No doubt, a citizen who keeps a gun or pistol under judicious precautions, practises in

safe places the use of it, and in due time teaches his sons to do the same, exercises his individual

right." *Heller*, 554 U.S. at 619 (quoting B. Abbott, *Judge and Jury: A Popular Explanation of the*

*Leading Topics in the Law of the Land* 333 (1880)). With proper supervision, the shooting sports

are perfectly safe and wholesome for young people, and have been traditionally throughout our

nation's history. Plaintiff Brown is a youth shooting instructor, and it is well within the business

plan of many gun ranges to accommodate youth programs.

According to the Illinois Department of Natural Resources, minors, including those under

24

16, may obtain a hunting license, though all hunters born after 1980 must present a safety certification.  *See* http://www.dnr.illinois.gov/hunting/Documents/HuntTrapDigest.pdf at p.8. Minors (17 and under) may also hunt as an "apprentice" with a parent, grandparent or guardian with a hunting license (*Id.*).  Minors (20 and under) do not need a FOID card to hunt as long as they are with a parent, guardian or responsible adult who has a FOID card.  *Id.* at p.10. Whatever the City's concerns about gangbanging youths with illegal firearms committing crimes, there is a completely different side to the story in the form of family traditions, and the responsible teaching of safety and respect for firearms.  To the Chicago City Council, apparently, they are all the same.

Even Commissioner Krimbel, the City's disclosed witness on the topic of the barring those under the age of 18 years, even with adult supervision, testified that she sees the purpose of the Ordinance as making sure little kids are not running around without supervision, and that, at best, the Ordinance is inartfully drawn for trying to achieve that purpose.  The Commissioner's own son took a shooting class at age 12, and her hunter friends taught their children at 14 or 15.

"A child, merely on account of his minority, is not beyond the protection of the Constitution. As the Court said in *In re Gault*, 387 U.S. 1, 13 (1967), 'whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone.'" *Bellotti v. Baird*, 443 U.S. 622, 633 (1979) (striking down parental-notification for abortion statute).  Though those rights are not unlimited, it is, in short, impossible for the City to defend an ordinance where its defending witness is not sure why it exists, admits it is not well written, and has personal experience of the actual usefulness of Plaintiffs' position.

The Defendant cites to *NRA v. McGraw*, 719 F.3d 338 (5th Cir. 2013) and *NRA v. BATF*,

25

700 F.3d 185 (5th Cir. 2012), but those cases dealt with the conduct of 18-20 year old minors purchasing firearms from a federal firearms dealer for public carry. *McGraw*, 719 F.3d at 347. Notably, the law at issue in *McGraw* did not otherwise prevent minors from possessing and using guns for self-defense. *Id.* at 348.

Here, the conduct at issue is range training under the supervision of an adult, which teaches proper use and safety. It is the exact opposite of the governmental concern in *McGraw* and *BATF*; namely, minors with firearms in public. Given the conduct affected in this case, and the public benefits of proper use and safety training, the ordinance does not serve a close fit to any governmental purpose.

Whether from the perspective of the range owners who will lose business if parents are not allowed to come to the range to teach their children about self-defense, or the organizations who would run youth classes, or the parents or minors themselves, there is no point to barring youths who are properly supervised by licensed persons from participating in firearms training at a range. Under any level of scrutiny, this ordinance fails.

## IX. The Hour Restrictions Are Unconstitutional.

Restricting hours of operation serves no purpose and prohibits people without regular schedules from exercising Second Amendment rights. Multiple witnesses testified that they would like to be able to go to a range whenever they like, and pointed out that there are people such as graveyard shift workers and off-duty policemen who would be unable to patronize a range between the restricted hours of 9:00AM and 8:00PM. Krimbel testified that only a handful of businesses have hours restrictions, and that is due to an impact on health and safety. Krimbel also testified that any opinion about shooting ranges on this topic would be a guess, because she

knows of no studies, and assumes that because more crime happens at night that means the range will be a public hazard after 8:00PM.

This is pure speculation, and Krimbel admits as much. It plainly fails the standards required to justify hours-of-operation restrictions on businesses that enable the exercise of fundamental rights. *See Annex Books*. The Defendant cites to *DiMa Corp. v. Town of Hallie*, 185 F.3d 823 (7th Cir. 1999), but that decision allowed restrictions on adult bookstores to counter secondary effects. As shown in this case, however, there are no secondary effects with gun ranges. To obstruct the exercise of a constitutional right, the City must have more than guesswork and speculation. It may be the market dictates certain hours of operation, but the City is not allowed to force it on the range for no actual reason. This restriction cannot meet constitutional scrutiny.

**X.      The City's Ban on Firearms Sales at Firing Ranges Prevents Ranges From Opening and Violates Plaintiffs' Second Amendment Rights Both Facially and As-Applied to Them.**

The business model for modern gun ranges requires that ranges be able to sell firearms and ammunition. *See*, *e.g.* Kramer Dep. p.131, ln. 19 - p.132, ln.4. Indeed, it is only logical that consumers purchase firearms at the place where they are able to meaningfully sample them, and gain instruction and proficiency in their use. Banning gun sales generally, and at gun ranges in particular, is unconstitutional.

On January 6, 2014, Judge Chang struck down the sales and transfer ban as unconstitutional in *Illinois Association of Firearms Retailers v. City of Chicago*, 1:10-CV-4184, Doc.238 (N.D.IL 2014). The Court held: "[U]nder MCC § 8-20-100, any new would-be gun owners cannot exercise their right to acquire a gun for self-defense within Chicago itself. This is

27

a serious burden on that right." *Id.* at p.20. "And under *Ezell*'s heightened review, which is "not quite strict scrutiny," the City bears the burden of establishing a strong public-interest justification for its ban on gun sales and transfers." *Retailers*, 1:10-CV-4184, Doc.238 at p.20. "To carry its burden, the City must establish a 'close fit' between the sales-and-transfer ban and the actual public interest it serves, and prove that the public's interests are strong enough to justify 'so substantial an encumbrance on individual Second Amendment rights." *Id.*

Judge Chang then reviewed the City's three preferred justifications for the ban: (1) restrict criminals' access to licensed dealers; (2) restrict gun acquisition in the illegal market, and (3) eliminate gun stores from Chicago, which are dangerous in themselves and cannot be safely regulated. *Id.* at p.21. Interestingly, Phillip Cook was also a witness for the City in that case. The Court found that any burden the City hoped to place on criminals also got placed on the law-abiding (*Id.* at p.25), and that was unacceptable. Ultimately, Judge Chang found the ordinances at issue "substantially overinclusive and do not pass muster under *Ezell*'s rigorous scrutiny." *Id.* at 33.

The City's attitude towards gun stores carries over to this case. The City called federally licensed firearms dealers part of "a chronically-diseased regime that is fundamentally broken," (*Id.* at p.30), and that gun stores are "cache[s] just waiting to be raided." *Id.* Of course, the evidence in this case is that all these horror stories are speculative and not backed up by any data, but they provide a clear window into the City's motivations in this case, which tracks the home handgun possession ban struck down in *McDonald* and the range ban struck down in this case. Whatever the City claims its justifications are in this case, in reality the prime goal is making sure a range never opens within the City limits.

28

From a logical standpoint, there is no justification to allowing gun stores (as the City must now do) while banning them in gun ranges, which is where people would be the most likely to makes sure the firearm they buy is the best fit for them. However, since the Defendant appears to want to maintain the sales ban in whatever context it can, Plaintiffs will discuss why the firing range ban on the sale of firearms is likewise unconstitutional.

Obviously, if there is a right to "keep and bear" arms, there must be some right to acquire arms, not just manufacture them at home. "The right to keep arms, necessarily involves the right to purchase them. . ." *Andrews v. State*, 50 Tenn. 165, 178 (1871). "What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece. . .?" *District of Columbia v. Heller*, 554 U.S. 570, 583 n.7 (2008) (quoting *Some Considerations on the Game Laws* 54 (1796)). "[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). And while "laws imposing conditions and qualifications on the commercial sale of arms" may be presumptively constitutional, *Heller*, 554 U.S. at 626, that hardly means that the government may entirely prohibit the selling of guns:

> In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*.

*United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3rd Cir. 2010). "Our citizens have always

been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Thomas Jefferson, 6 *Writings* 252-53 (P. Ford ed. 1895); *see also Dearth v. Holder*, 893 F.Supp.2d 59, 69 (D.D.C. 2012), *appeal pending*, No. 12-5305 (D.C. Cir. filed Sept. 27, 2012) (right to purchase firearm is a corollary to right to possess firearm for self-defense).

In *Heller*, neither the D.C. Circuit nor the Supreme Court bothered to engage in any balancing test or other extended analysis before striking down Washington, D.C.'s ban on the possession of functional firearms for self-defense, as that law literally contradicted a "core" aspect of Second Amendment rights. "Both *Heller* and *McDonald* [*v. City of Chicago*, 130 S. Ct. 3020 (2010)] suggest that broadly prohibitory laws restricting the core Second Amendment right. . . are categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) (citations omitted); *see also Moore* (striking down prohibition on bearing arms without regard to means-ends standard of scrutiny).

A complete ban on firearms sales, whether at firing ranges or otherwise, must meet the same fate. "[R]estricting the ability to purchase an item is tantamount to restricting that item's use." *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008); *cf. Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984) ("imposing liability for the sale of handguns, which would in practice drive manufacturers out of business, would produce a handgun ban by judicial fiat in the face of the decision by Illinois to allow its citizens to possess handguns.").

Even the wrongly decided case of *Teixeira v. County of Alameda*, 2013 U.S. Dist. LEXIS 128435 (N.D. Cal. Sept. 9, 2013), *appeal pending*, No. 13-17132 (9th Cir. filed Oct. 21, 2013) upholding a 500 foot distance from "sensitive areas" requirement for gun stores, is instructive

here on that point, as *Teixeira* distinguished itself from both *Ezell* and *Moore* on grounds that it did not involve a total ban, only a regulation. *Id*. at *21 *22. To be sure, *Teixeira* reached the absurd conclusion that the Second Amendment does not secure the selling of firearms, by citing to the Fourth Circuit's unpublished opinion in *United States v. Chafin*, 423 Fed. Appx. 342 (4th Cir. 2011). But *Chafin* does not necessarily support that holding. In that case, the defendant asserted that the Second Amendment protects "the sale of a firearm to an unlawful user of drugs,"—very far from the issues in *Teixeira* and here—and he did "not point[] this court to any authority" for the proposition that there exists a right to sell firearms. *Id*. at 344. To the extent the Fourth Circuit did not locate such authority itself, *id*., respectfully, that court missed a few sources. *See supra*.

Plaintiffs do not claim that gun stores are beyond regulation, whether as part of a firing range or otherwise. Churches and bookstores, too, must be built to code, and comply with constitutionally-adequate zoning requirements. They can be regulated for the adverse secondary effects of noise, pollution, traffic, *etc*. But a blanket prohibition on gun sales is beyond constitutional limitations. Because there is a right to buy and sell firearms, Defendant's gun sales ban violates the Second Amendment.

Even were the Court to apply some means-ends level of scrutiny to the gun sales ban generally, or to its extension against, specifically, gun ranges, the ordinance would fail. *Ezell* mandates that either strict scrutiny or near-strict scrutiny be employed, as "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end." *Ezell*, 651 F.3d at 708. Plaintiffs' experts have testified that gun sales are a large part of the economic

31

viability of a firing range, so Ezell's "not quite strict scrutiny" standard, at a minimum, would apply. Of course, banning gun sales severely impacts the core Second Amendment rights of responsible, law-abiding citizens.

Gun stores, like firing ranges, have no adverse secondary effects. In the adult bookstore context, for example, the stores are regulated not for their content but for adverse secondary effects. The same is true in the Second Amendment context. Contrary to Defendant's witnesses' arguments, baseless fear of speculative harm is not an adverse secondary effect. Guns are sold all over the United States, at hardware stores, sporting goods stores, Wal-Mart, and many other places. Gun stores do not pollute or otherwise degrade a neighborhood, and it is one of the few businesses where both the buyer and seller undergo stringent background checks.

Defendant's alleged expert admitted that his entire theory that gun stores are harmful is indistinguishable from the general objection to guns. Cook Deposition, p. 157-60, 203. Likewise, the Defendant's alleged expert admitted that he could not distinguish the harms from gun sales at gun ranges from gun sales at any other location. *Id*. at 209, 1. 3-9; see also p. 59, 1. 5-17; p. 159, 1. 16 - 160, 1. 2. "[I]f you have a dealer, whether they're located in a shooting range or anywhere else, you have the possibility of those guns going directly into crime in a variety of ways, including the fact that a dealer may be corrupt rather than law-abiding and there may be the possibility of a burglary of that stash of guns." *Id*. at 161, 1. 1-7.

In fact, the City's alleged expert had no data at all regarding gun sales from, specifically, gun ranges. Cook Dep., p.71, ln. 9-14. And indeed, the very theory that gun stores, at ranges or otherwise, would lead to increased crime, or that such crime on balance would outweigh the benefits of gun ownership, was merely a matter of pure speculation. *Id*. at p.84, ln.22 - p.85, ln.

32

7; *Id.* at p.211, ln.23 - p.212, ln. 12.  The City's alleged expert did not even purport to conduct

any cost-benefit analysis.  *Id.* at p.92, ln.2-9.  He did, however, testify that the City had options

well-short of a gun sales ban.  *Id.* at pp.47, 62.

Yes, it is entirely possible that someone could steal guns from a gun store, or that some

corrupt gun store employee would violate the law.  But this debate is over.  The possession of

guns is protected by the Constitution, whether the City and its alleged expert agrees or not.  The

City's role is not to like or agree with *Heller* and *McDonald*, but to follow those decisions, and

the fundamental rights that they declare operate here.

**XI.     Requiring a Range Master at the "Shooting Range Facility" When There is No
          Live Fire is a Burdensome and Needless Mandate.**

MCC § 4-151-100(b) requires a range master to be present whenever there are people at

the "shooting range facility."  This is defined by MCC § 4-151-010 to encompass the entire

property, including the parking lot.  While Plaintiffs have no problem with requiring a

rangemaster when there is live fire, this ordinance requires a range master before the range

opens, and after it closes, and actually requires the rangemaster to be the last one to leave, for as

long as someone is even in the parking the rangemaster must be present.  Perhaps this is not what

the City intended, but under the letter of the law this is the absurd result.  Further, the City has

had ample opportunity to fix this, and has not. It is a useless burden that cannot withstand near-

strict scrutiny and must be enjoined.

**XII.    The Restrictions on Ammunition Sales Create an Unconstitutional Burden on
          Range Owners and Individuals.**

Since individuals have the right to acquire firearms as an inherent corollary of the right to

keep and bear functional arms, and as individuals enjoy the right to attain and maintain

33

proficiency with their firearms through live-fire range training, it follows that individuals enjoy the right to acquire ammunition for self-defense purposes. The reasoning of the *Retailers* ruling by Judge Chang is also applicable here.

Also, for the range owner, who has a corollary right to sell firearms and ammunition, this restriction is not only a deprivation of constitutional rights but is a logistical nightmare, that cannot be policed and unfairly dooms the range owner to eventual failure. This is a restriction where even an unintentional violation can cause the range to be labeled a "deleterious impact" and thus have its licensed revoked or not renewed. It requires the range owner to micromanage every patron's shooting, and somehow identify and police every bullet coming into and out of the range. This is an impossible task, and it is ultimately setting the range owner up to fail, especially given the Commissioner's almost complete discretion in determining whether or not a range's existence is having a deleterious impact on the surrounding neighborhood, as discussed below.

Even the City Council wondered out loud how a range owner could possibly comply. *See* Fran Spielman, *Law Allows Gun Ranges In City but Under Rigid Conditions*, Chicago Sun-Times, July 6, 2011, available at http://www.suntimes.com/news/politics/6371489-418/law-allows-gun-ranges-in-city-but-under-rigid-conditions.html (last visited Dec. 5, 2013). The burden is terrible and the consequences more so, especially since the best justification anyone can offer is that a range patron may get into a car accident and/or robbed with purchased ammunition, or the range patron could hypothetically be a straw man and give or sell the ammunition to a criminal. However, Second Amendment rights include the right to ammunition for the protected firearms, and the imaginations of the City witnesses cannot be enough to justify

34

burdening a fundamental right. Illinoisans have the right to bear arms in and out of their homes for self-defense, and they have the right to train at a firing range for that purpose. The ammunition requirement flies in the face of this, in many ways even more egregiously than the unconstitutional firearms sales ban. It cannot survive near strict scrutiny or any other heightened level.

**XIII.  The Commissioner of Business Affairs's Unbridled Discretion to Deny or Revoke a Firing Range's Business License Unconstitutionally Chills Anyone Who May Think of Trying to Open a Firing Range in the City.**

"Possibly the Second Amendment can best be understood to incorporate a common law rule against prior restraints." L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*, 38 Wm. & Mary L. Rev. 1311, 1384 (1997). "[T]he rule against prior restraints offers a sound meaning [for the Second Amendment]." Id. at 1402.

It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official -- as by requiring a permit or license which may be granted or withheld in the discretion of such official -- is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms. *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (striking down ordinance prohibiting union recruitment without permit from mayor).

The Second Amendment secures "freedoms which the Constitution guarantees." *Id*. To be sure, other Circuits that have afforded the Second Amendment less protection than has the Seventh Circuit have rejected the application of prior restraint doctrine to the Second Amendment on the theory that it is limited to the First Amendment and inapposite, *see*, *e.g. Kachalsky v. County of Westchester*, 701 F.3d 81, 91-92 (2d Cir. 2012), but both claims are

erroneous.  As to the first claim, prior restraint doctrine, as suggested by *Staub*, has been applied

outside the First Amendment, *see*, *e.g.*, *Kent v. Dulles*, 357 U.S. 116, 128-29 (1958).  Indeed, the

use of prior restraint doctrine to safeguard the right to bear arms dates at least to 1922, when

Michigan's Supreme Court struck down a state law leaving to a Sheriff's discretion the licensing

of handgun possession by immigrants.  "The exercise of a right guaranteed by the Constitution

cannot be made subject to the will of the sheriff."  *People v. Zerillo*, 189 N.W. 927, 928 (Mich.

1922).  "The [provision] making it a crime for an unnaturalized, foreign-born resident to possess

a revolver, unless so permitted by the sheriff, contravenes the guaranty of such right in the

Constitution of the State and is void." *Id*. at 929; *see also Mosby v. Devine*, 851 A.2d 1031, 1050

(R.I. 2004); *Schubert v. DeBard*, 398 N.E.2d 1339, 1341 (Ind. Ct. App. 1980).

Making the allowance of a shooting range contingent on the unbridled discretion of the

Commissioner of Business Affairs and Consumer Protection is a prior restraint on Second

Amendment rights forbidden by the Constitution.  Commissioner Krimbel described herself as

reasonable, and testified to an internal appeal process.  "This presumes the [Commissioner] will

act in good faith and adhere to standards absent from the ordinance's face. But this is the very

presumption that the doctrine forbidding unbridled discretion disallows."  *Lakewood v. Plain*

*Dealer Pub. Co.*, 486 U.S. 750, 770 (1988).

Again employing the First Amendment context, the Seventh Circuit has held "[t]he

Supreme Court has noted that 'a law subjecting the exercise of First Amendment freedoms to the

prior restraint of a license, without narrow, objective, and definite standards to guide the

licensing authority, is unconstitutional.'" *Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir.

2002) (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-51 (1969)).  Here, the

Commissioner can deny a new or renewal application, or revoke a license, if the issuance or renewal would have a deleterious impact on the health, safety or welfare of the community, and the deleterious impact is presumed if within 500 feet of the premises there are a "substantial number of arrests," which is undefined.  MCC § 4-151-030(f).  In another section, "deleterious impact" means "an adverse effect on the value of any property, an increased risk of violations of law, or a risk of a substantial increase in noise, litter, or vehicular congestion."

This is as murky and arbitrary as it gets. This is especially because (1.) all that is required is that any property value decreases, by apparently any amount; (2.) the entire defense by the City is based on the unsubstantiated claim of an increased risk of crime; and (3.) the increased risk of noise, litter and/or vehicle congestion does not even require the range be the cause, the idea of an "increased risk" is by itself undefined and arbitrary, and denying a range a license or renewal because of increased traffic would punish a range for being successful.  None of this meets constitutional muster.  Moreover, the City could put any range out of business merely by arresting people, with or without probable cause, and for any transgressions no matter how detached from any concerns related to firing ranges.

**XIV.  The City's Requirement that Patrons Have a FOID Card Unjustifiably Bans All Qualified Possible Patrons from Out of State.**

To the extent Defendant is arguing this issue, while the September 11, 2013 revisions allows for firearms rentals, the necessity of a FOID card to do so—which is unavailable to individuals residing out-of-state--renders out of state residents unable to rent firearms, assuming they would ever be allowed to patronize the range at all.  This rule was arbitrary, and served no purpose whatsoever, even before passage of the Illinois Firearms Concealed Carry Act, which

expressly allows for the licensing of non-residents to carry functional handguns for self defense, and allows even unlicensed non-residents to travel through the state with concealed, loaded handguns. 430 ILCS 66/40.

## XV.    The City's Requirement that Owners and Employees Have a FOID card Unjustifiably Bans All Qualified Possible Employees from Out of State.

Likewise, to the extent Defendant is arguing this issue, when originally passed, MCC § 4-151-030(b)(6) required that employees possess both a CFP and FOID card. While the CFP requirement was repealed as of September 11, 2013, the FOID card requirement still exists. The Chicago ordinance thus means that no one from out of State can work at a Chicago firing range. This is true whether the would-be employee is handling firearms, concessions, or a mop.

There is no justification for this - the ordinance does not even allow for the out-of-stater to demonstrate a different license or other type of proficiency with firearms, even if that is the governmental purpose. Further, there is no requirement in the FOID Card Act that one have firearms proficiency. Indeed, while one must have no disqualifying criminal record or history of mental illness to obtain a FOID card, firearms proficiency is not a requirement, as it will be with the new concealed carry license. It of course is reasonable to make sure that persons who will be handling firearms are allowed to possess them under State law, but as to all other employees it serves no function.

Further, there are many people who live out of state, even just across the border, who have much proficiency with firearms and an applicable state license. To prohibit them from even working at a Chicago firing range is arbitrary, if not discriminatory, and serves no governmental purpose, especially when Commissioner Krimbel testified that the presumed purpose is to ensure

the employee has a working knowledge of firearms.

Finally, there is no purpose to requiring anyone involved with the ownership of a firing range, regardless of whether they are going to handle firearms or not, regardless of whether they are merely the 5% owner of a corporation, to obtain a FOID card. If three people own the corporation, and the third person owns only 1%, that person also falls under the umbrella of this restriction. Additionally, to the extent that corporate shareholder resides out of state, they are barred from obtaining a FOID card and thus barred from opening a range in the City. The City's justification, that people who own ranges (even 5% of them) should have knowledge of firearms, simply does not meet constitutional scrutiny. And like with employees, it is a needless and useless requirement because firearms proficiency is not a factor in obtaining a FOID card.

## XVI. The Challenged Range Ordinance Provisions Violate Plaintiffs' First Amendment Right to Offer and Receive Training.

The Supreme Court has long recognized that teaching and learning are protected by the First Amendment. *See*, *e.g.*, *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom"); *Sweezy v. New Hampshire*, 354 U.S. 234, 249-50 (1957) (plurality) ("right to lecture. . . could not be seriously debated," and noting that "teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding").

One week before the Supreme Court decided *McDonald*, the High Court decided *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010). *Holder* considered the question of whether Congress could ban, as material support for terrorist organizations, "plaintiffs' speech to [terrorist] groups [that] imparts a 'specific skill' or communicates advice derived from

'specialized knowledge.'" *Id.* at 2724. Rejecting the government's arguments that such training and educational efforts were merely conduct with some communicative aspects, *id.*, the Court nonetheless upheld, under strict scrutiny, a prohibition on the provision of material support "in the form of speech" to designated terrorist organizations, *id.*: "direct training" in "specific skills" of advocacy, and "teach[ing]" how to "present claims" for relief. *Id.* at 2729.

Of course, teaching and learning, the conveyance and receipt of knowledge, are not limited to advocacy or expression. "Even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001) (citations omitted). And protected teaching includes demonstrative and experiential conduct, not strictly oral conversation. For example, "instructing children on the topics of geography and fiber arts is a form of speech protected under the First Amendment." *Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir. 2003). As is the provision of hands-on gun training. *See Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999). In *Edwards*, a police officer asserted a valid First Amendment claim challenging his punishment for teaching a handgun safety class, completion of which was required for individuals wishing to obtain state permits to carry guns. "[T]he form of the [officer's] speech, presumably verbal as well as some written instruction accompanied by physical demonstrations. . . was entitled to protection." *Edwards*, 178 F.3d at 247. Indeed, because the speech concerned "a categorically public issue, the proper method of safely carrying a concealed handgun, knowledge of which is a prerequisite to obtaining a state permit. . . it occupies the highest rung of the hierarchy of First Amendment values.:" *Id.* (citation omitted). The class at issue, like Defendant's, involved firing at a gun range. N.C. Gen. Stat. § 14-415.12(a)(4).

Even if the gun training and range use were merely conduct, the range ban's impact on gun education would nonetheless constitute a First Amendment violation. Because the range ban and associated laws undeniably burden expression, the laws can only survive if they are within the constitutional power of the Government; if [they] further[] an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

As shown *supra*, at least the outright prohibition on selling firearms is beyond the City's power, thus failing *O'Brien* at the first prong. And even if the other regulations may fall within some power of the government—the ability to zone, for example—and are not directly related to the suppression of gun training—a debatable, and disputed point—the contested range regulations are not "essential to the furtherance" of any legitimate government interest. They do, however, have a more than incidental impact on the First Amendment rights of people to obtain range training, as they make the operation of gun ranges impossible and, indeed, in some cases, outright bar classes of people (out of state residents, individuals younger than 18) from accessing the training at all. Defendant claims the First Amendment is not implicated in this case, but the Defendant is wrong. On this basis, summary judgment must be denied for the Defendant.

## <u>CONCLUSION</u>

The City can try and blame people's finances, or lack of desire, or anything else for the lack of firing ranges within the City limits, but the evidence shows ranges are being built elsewhere, that everyone who has asked the City's Zoning Department about a possible location

has had it rejected, and that the restrictions have acted as a complete deterrent to anyone thinking about opening a range in the City. This is not chance, and it is not the winds of fortune of a market economy. This was by design. Almost three years after this case started, the City is still thumbing its municipal nose at the Supreme Court (*Ezell*, 651 F.3d at 712), but now it is also thumbing its municipal nose at the Seventh Circuit. The Defendant's Motion for summary judgment must be denied.

WHEREFORE, the Plaintiffs, Rhonda Ezell, Joseph I. Brown, William Hespen, Action Target, Inc., Second Amendment Foundation, Inc., and Illinois State Rifle Association, request this Honorable Court to deny Defendant's F.R.Civ.P. 56(a) Motion for Summary Judgment, and to grant Plaintiffs any and all further relief as this Court deems just and proper, including the granting of Plaintiffs' concurrent Motion for Summary Judgment.

Dated: March 7, 2014                    Respectfully submitted,


                              By:    ___/s/David G. Sigale_____
                                         David G. Sigale

Alan Gura (Admitted pro hac vice)        David G. Sigale (Atty. ID# 6238103)
Gura & Possessky, PLLC                   Law Firm of David G. Sigale, P.C.
101 N. Columbus Street, Suite 405        739 Roosevelt Road, Suite 304
Alexandria, VA 22314                     Glen Ellyn, IL 60137
703.835.9085/Fax 703.997.7665            630.452.4547/Fax 630.596.4445
alan@gurapossessky.com                   dsigale@sigalelaw.com

## <u>CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING</u>

The undersigned certifies that:

     1.     On March 7, 2014, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

     2.     Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.


                                   /s/ David G. Sigale
                                     Attorney for Plaintiffs


| | |
|---|---|
| Alan Gura (Admitted pro hac vice) | David G. Sigale (Atty. ID# 6238103) |
| Gura & Possessky, PLLC | Law Firm of David G. Sigale, P.C. |
| 105 Oronoco Street, Suite 305 | 739 Roosevelt Road, Suite 304 |
| Alexandria, VA 22314 | Glen Ellyn, IL 60137 |
| 703.835.9085/Fax 703.997.7665 | 630.452.4547/Fax 630.596.4445 |
| alan@gurapossessky.com | dsigale@sigalelaw.com |