**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EZELL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 10-CV-5135** |
| **v.** | ) | |
| | ) | **Judge Virginia M. Kendall** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S LOCAL RULE 56.1(B)(3) RESPONSE
TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND
LOCAL RULE 56.1(B)(3)(C) STATEMENT OF ADDITIONAL FACTS
REQUIRING THE DENIAL OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendant City of Chicago (the "City"), by its counsel, Stephen R. Patton, Corporation Counsel of the City of Chicago, hereby submits, pursuant to Local Rule 56.1(B)(3), its Response to Plaintiffs' Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment.

**Introductory Statement**

The purpose of Local Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"); *see also Phillips v. Quality Terminal Servs., LLC.*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) ("Opinion, suggested inferences, legal arguments, and conclusions are not the proper subject matter of a [Local Rule 56.1] statement. Including legal arguments . . . is wholly improper, redundant, unpersuasive and irksome; in short, it advances neither the interests of the

parties nor of th[e] court.") (citations omitted).  In assessing a motion for summary judgment, a court may only consider admissible evidence.  *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citation omitted).  This means that testimony used in support of a motion for summary judgment must be based on personal knowledge, *see, e.g., Joseph P. Caulfield & Assocs., Inc. v. Litho Prods., Inc.,* 155 F.3d 883, 888 (7th Cir. 1998) (testimony "that was necessarily speculative and lacking in foundation" is "insufficient" at summary judgment), and hearsay statements made during a deposition do not constitute adequate evidentiary support for a factual proposition, *see Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial . . . except that affidavits and depositions . . . are admissible in summary judgment proceedings to establish the truth of what is attested or deposed") (citations omitted).  Many of Plaintiffs' purported facts fly in the face of the clear mandate of Local Rule 56.1 and lack support in admissible evidence.  As the Court disfavors motions to strike, Defendant addresses its objections to the admissibility or effect of Plaintiffs' evidence in its responses below.

### Response

1.     (1) Plaintiff Rhonda Ezell still has interstitial lung disease, lupus, and is still awaiting a kidney transplant. She is still on dialysis (Ezell Dep. 7, ln.17 – 8, ln.4).[1]  (2) She recently visited a gun range outside the City because she received a notice that the convicted felon who had burglarized her home had been released, and she wanted shooting practice so she could protect herself if the felon came to her house (Ezell Dep. 10, ln.6 – 11, ln.16).  (3) She would consider it a burden if the only places ranges were allowed to open were unsafe areas

---

[1] Defendant has numbered the sentences in certain paragraphs of Plaintiffs' Statement of Facts for ease of reference in responding.

(Ezell Dep. 89, ln.1-15).

**Response:** Defendant does not dispute the first two sentences. Regarding the third

sentence, Defendant does not dispute that Ezell testified that she would consider it a "burden" if

gun ranges could only open in "unsafe areas," but Defendant objects to that assertion to the

extent it is a legal argument. Defendant also objects to the statement to the extent it suggests that

gun ranges may only open in "unsafe areas." Ezell has not studied Chicago zoning maps or done

any analysis to determine what properties in the City comply with the Ordinance's location

requirements, Defendant's Statement of Material Facts ("Def. SOF") ¶ 21 (citing Ex. 2, Ezell

Dep. at 71),[2] and thus does not have the personal knowledge to testify to this issue. *See* Fed. R.

Evid. 602 (a "witness may not testify to a matter unless evidence is introduced sufficient to

support a finding that the witness has personal knowledge of the matter"); *Stagman v. Ryan*, 176

F.3d 986, 995 (7th Cir. 1999) ("statements outside the affiant's personal knowledge or statements

that are the result of speculation or conjecture or merely conclusory do not meet" the

requirements of Rule 56(e)).

2. Plaintiff Joseph I. Brown would teach youth proper shooting and safety

procedures in a youth class in the City if a range were available. He teaches the Junior League

Club from the American Legion range in Morton Grove. Typically there are sixteen kids in a

class, from ages 13 to 20 (Brown Dep. 33, ln.7 – 34 ln.23).

**Response:** Defendant does not dispute that Brown expressed an interest in teaching

youth shooting classes in Chicago and that he currently teaches Junior League Club in Morton

---

[2] Defendant's Exhibits ("Ex.") 1-46 were previously filed with Defendant's December 5
summary judgment submission. (Dkt. 225-228.) Plaintiffs' Exhibits ("Pls.' Ex.") 1-18 were
previously filed with Plaintiffs' December 5-6 summary judgment submission. (Dkt. 233-36.)

Grove. Defendant disputes this paragraph to the extent it suggests Brown's interest in teaching a youth class is anything more than an interest. Def. SOF, Ex. 3, Brown Dep. at 34-35.

3. Brown's interest in this legal action is having a range in Chicago that he can go to in order to practice shooting. He is aware this lawsuit was filed in 2010, and that the Seventh Circuit held in summer 2011 that the City must allow firing ranges. He is aware that right around that time shortly after the City changed its law to technically allow firing ranges. To his knowledge, since that 7th Circuit Court decision in 2011, there are no public ranges in Chicago available to him. It is still his interest to have a range to visit in Chicago. (Brown Dep. 45, ln.24 – 47, ln.17).

**Response:** Undisputed.

4. (1) Plaintiff William Hespen became a plaintiff in this lawsuit because he wishes to patronize a shooting range in Chicago. (2) It is his understanding that in 2011, a Court decision held that the City must allow firing ranges. (3) He is unaware of any place in the City that he, as a member of the public, can go in the City to go practice at a firing range (Hespen Dep. 91 ln.5-17). (4) If, due to the restrictions that are being challenged in the lawsuit, people don't build firing ranges, ergo there are no firing ranges for him to visit in Chicago, he would consider that a burden on him (Hespen Dep. 95, ln. 5-10).

**Response:** Defendant does not dispute the first three sentences. Regarding the fourth sentence, Defendant does not dispute that Hespen testified that the lack of gun ranges in the City is a "burden" on him, but Defendant objects to this sentence to the extent that it makes legal arguments and suggests that the lack of gun ranges in the City results from the restrictions challenged in the lawsuit.

5.     (1) Richard Pearson is the Executive Director of the Plaintiff Illinois State Rifle Association (Pearson Dep. p.3, ln.15-16).  (2) ISRA wishes to operate a range in Chicago, and is considering building one (Pearson Dep. p.23, ln.4-11).  (3) They have discussed a business plan, but cannot go forward because of all the requirements (Pearson Dep. p.24, ln.13-17).  (4) There are approximately 121,000 FOID cardholders in Chicago (Pearson Dep. p.30, ln.21-22).  (5) ISRA is waiting to see if the ordinances are changed before deciding if it is worthwhile to pursue a range in Chicago (Pearson Dep. p.42, ln.16 – p.43, ln.3).

**Response:**     Defendant does not dispute the first and fourth sentences.  Defendant does not dispute that ISRA has considered opening a range in Chicago, but Defendant disputes the second, third, and fifth sentences to the extent they suggest ISRA would in fact go forward with plans to open a gun range in Chicago if the regulations in this case were eliminated.  Def. SOF ¶ 6 (citing Ex. 8, Pearson Dep. at 43, 115-16).

6.     (1) Pearson looked at Section 4-151-030(f) and determined the Commissioner could capriciously shut down a shooting range after someone has put millions of dollars into it, and that is not acceptable (Pearson Dep. p.59, ln.20-24).  (2) It appears anything could be a "deleterious impact" if one chooses to make it that way (Pearson Dep. p.60, ln.18-20).  (3) He is not aware of any other range in the country that has to comply with zoning requirements such as in Section 4-151-120 (Pearson Dep. p.75, ln.2-5).  (4) ISRA is not interested in building a range in Chicago at this time because (1.) the ordinances all drive up the cost; (2.) the Commissioner has discretion to decide what "deleterious impact" is and shut down the range, especially when the number of arrests can be in the discretion of the police department (Pearson Dep. p.94, ln.17 B p.95, ln.24).

**Response:** Defendant does not dispute that Pearson made these statements in his deposition, but Defendant objects to the first and second sentences as legal argument and speculation. *See Cady*, 467 F.3d at 1060. Regardless, Defendant disputes that "the Commissioner could capriciously shut down a shooting range" and that "anything could be a 'deleterious impact'." MCC § 4-151-030(f); Def. SOF ¶ 91 (citing Ex. 39, Krimbel Dep at 120-21, 124, 134-35). Defendant does not dispute the third sentence. Regarding the fourth sentence, Defendant does not dispute that ISRA has stated that it is not interested in building a range in Chicago at this time because of the restrictions on gun ranges, but Defendant disputes the sentence to the extent that it suggests that ISRA has produced evidence regarding the costs of the regulations in the Ordinance, Def. SOF ¶ 6 (citing Ex. 8, Pearson Dep. at 30), that the Ordinance drives those costs up, Def. SOF ¶ 26 (citing Ex. 8, Pearson Dep. at 84), or that the Commissioner has unbridled discretion to determine what constitutes a "deleterious impact." MCC § 4-151-030(f); Def. SOF ¶ 91 (citing Ex. 39, Krimbel Dep at 120-21, 124, 134-35).

7.    (1) A sloped floor is more difficult to do, more dangerous on which to operate, and could cause the accumulation of burnt powder which could cause a dangerous condition. (2) You can't use water on the range; you have to use a HEPA explosion proof vacuum cleaner to clean it. (3) He is not aware of any ranges in the country with a sloped floor (Pearson Dep. p.82, ln.4-21). (4) There is always unburnt powder, and if it accumulates then a spark could cause a flash fire, which would be a deleterious impact on safety (Pearson Dep. p.108, ln.22 – p.110, ln.2).

**Response:** Defendant does not dispute that Pearson made these statements at his deposition, but Defendant objects to these statements because Pearson has no personal

knowledge regarding the technical aspects of this provision. Def. SOF ¶ 45 (citing Ex. 33,

Stipulation). Defendant further disputes the first sentence because it is vague and ambiguous as

it is not clear to what sloped floors are being compared. Defendant disputes the second sentence.

Def. SOF ¶ 44 (citing, *e.g.*, Ex. 28, NIOSH Report, Jan. 2010, at 3). Defendant does not dispute

the third sentence, except to the extent that it suggests that there are no ranges in the country with

a sloped floor. *See* Def. SOF ¶ 44. Defendant objects to the last sentence because it is vague and

ambiguous and includes a legal conclusion. *See Cady*, 467 F.3d at 1060.

8.      Chris Hart is the Midwest Territory Manager and Range Consultant for Plaintiff

Action Target, Inc. (Hart Dep. p.6, ln.14-17; p.7, ln.2-4).

**Response:**      Undisputed.

9.      Acoustical treatments are porous materials that absorb and diffuse sound to keep it

from being reflected back to the shooter (Hart Dep. p.17, ln.19-23).

**Response:**      Undisputed.

10.      Several of Hart's customers have ranges that operate outside of 9:00AM to

8:00PM, and he has had conversations with customers that would like 24 hour ranges to

accommodate off-duty law enforcement or graveyard-shift workers (Hart Dep. p.32, ln.18 - p.33,

ln.3).

**Response:**      Undisputed.

11.      The distance restrictions are burdensome because it seems like there is a listed use

on every street, so he would not know where to search for a spot that meets all distance

requirements (Hart Dep. p.66, ln.13 - p.67, ln.10). There are probably some, but it would be very

limited (Hart Dep. p.68, ln.10-12).

**Response:** Defendant does not dispute that Hart made these statements in his deposition, but Defendant objects to the first sentence as legal argument. Defendant also objects to both sentences because Hart is not qualified to testify regarding the location restrictions in the Ordinance under Federal Rules of Evidence 602 or 702. Def. SOF ¶ 21 (citing Ex. 6, Hart Dep. 3 at 138; Ex. 26, Hart Dep. 2 at 66-67.)

12.     The noise restriction is burdensome because the range has to be in a manufacturing zone which has no sound limits, and he has customers in light industrial areas where the decibels are 70-80 dB (Hart Dep. p.80, ln.13 - p.81, ln.12).

**Response**: Defendant does not dispute that Hart made this statement and that he has customers in light industrial areas where the decibels are 70-80 dB, but Defendant objects to remainder of this statement as a legal conclusion.

13.     (1) The noise restriction can be complied with, but by singling out ranges the City is forcing much greater costs on the range. (2) A quiet conversation is 55 decibels. (3) Requiring that of a range requires much more expensive engineering, construction and design (Hart Dep. p.82, ln.14 - p.84, ln.9). (4) This burdens Action Target because it burdens their customers (Hart Dep. p.99, ln.12-20).

**Response:** Regarding the first sentence, Defendant does not dispute that the noise restriction can be complied with, but Defendant objects to the remainder of the sentence as lacking foundation. Def. SOF ¶ 49 (citing Ex. 26, Hart Dep. 2 at 116). Defendant disputes that a "quiet" conversation is 55 decibels. Pls.' Ex. 17, Schnoes Dep. at 32. Defendant disputes the third and fourth sentences. Def. SOF ¶ 49 (citing Ex. 26, Hart Dep. 2 at 116-17; Ex. 16, Giordano Dep. at 204.)

14.     As to the sloped floor requirement, if there was a second floor range, the floor probably would not be thick enough to be able to slope as required. The cost of retrofitting a regular floor to a sloped floor would be very expensive because one has to remove the entire floor (Hart Dep. p.126, ln.19 - p.127, ln.4).

**Response:**     Defendant does not dispute that Hart made these statements at his deposition. Defendant objects to the first sentence as speculative and because "probably" renders the statement vague and ambiguous. Defendant objects to the second sentence as speculation and because "very expensive" is vague and ambiguous. Def. SOF ¶ 45 (Ex. 26, Hart Dep. 2 at 123; Ex. 6, Hart Dep. 3 at 126).

15.     The sloped floor requirement would increase the cost of the equipment because the bullet trap would be taller and there would be more ceiling baffle coverage (Hart Dep. p.179, ln.22 - p.181, ln.8). A sloped floor with a floor drain can cause an accumulation of gunpowder and when dry can explode when ignited, such as with a bullet strike (Hart Dep. p.261, ln.8 - p.262, ln.19).

**Response:**     Undisputed, with the clarification that the second sentence indicates that this is only a possibility.

16.     As for the customer not being able to leave with unused ammunition, the range owner's choices are to repackage and resell it, which is not recommended, or to dispose of it, which is a waste and could be hazardous (Hart Dep. p.269, ln.2 - p.270, ln.21).

**Response:**     Disputed. Def. SOF ¶ 85 (citing MCC § 4-151-175(a)-(b); *id.* § 13-96-1190(c)(1)).

17.     Since the Seventh Circuit's ruling in 2011, neither Action Target nor anyone else

has built a commercial indoor range in Chicago, and if someone else had built one he would have heard about it very quickly (Hart Dep. p.282, ln.24 - p.283, ln.23).

**Response:** Undisputed.

18.     Julianne H. Versnel is the Director of Operations for Plaintiff Second Amendment Foundation (Versnel Dep. p.3, ln.17-18). SAF has 1700-1800 members in Chicago (Versnel Dep. p.5, ln.6-9). SAF still has an interest in providing education and training in Chicago (Versnel Dep. p.13, ln.19-23). She is not aware of any other range in the country that has a prohibition for those under 18 years old (Versnel Dep. p.41, ln.10-13). She is not aware of any other range that has a sloped floor, and knows of no benefit to doing so (Versnel Dep. p.73, ln.14-20).

**Response:** Undisputed.

19.     (1) Jonathan Gordon is the director of office leasing for a commercial real estate firm (Gordon Dep. 16, ln.12 – 17, ln.5).  (2) He thinks a gun range is a great idea.  (3) He would love a high end shooting club in the City and would pay a lot to be a member or an investor.  (4) But it apparently cannot happen in Chicago because the restrictions are tough, so he can shoot when he is in a foreign country or Wisconsin (Gordon Dep. 13, ln.20 – 14, ln.4).

**Response:** Defendant does not dispute the first three sentences.  Regarding the fourth sentence, Defendant does not dispute that this was Gordon's testimony and that he shoots when he is in a foreign country or Wisconsin, but Defendant objects to it as argumentative, speculative, and lacking a foundation.  *See, e.g., Joseph P. Caulfield & Assocs., Inc.*, 155 F.3d at 888 (testimony "that was necessarily speculative and lacking in foundation" is insufficient at summary judgment).

20.     (1) He called Action Target because he wanted to learn about Chicago's range

10

rules, because he thought it could be a profitable idea (Gordon Dep. 28, ln.23 – 29 ln.14).  (2) He

talked to Chris Hart, who sent him the ordinance, and then he learned that the ordinance was so

stringent one could never open a gun range, so he dropped it (Gordon Dep. 35, ln.1-8; 37, ln.11-

21).  (3) One cannot open a range in Chicago, as he understands it is really difficult to do. (4) So

he is not going to put his time and money towards such a project (Gordon Dep. 44, ln.5-12).  (5)

He believes that if the laws were not so stringent a firing range could probably be a profitable

venture (Gordon Dep. 66, ln. 1-6).

**Response:**        Defendant does not dispute the first and fifth sentences.  Defendant does

not dispute that Gordon spoke with Chris Hart, who sent Gordon the Ordinance, but Defendant

objects to the second and third sentences as speculative and lacking a foundation.  Defendant

disputes the fourth sentence to the extent it suggests that the regulations at issue in this case are

the reason Gordon "is not going to put his time and money towards" a range in Chicago.  Def.

SOF ¶ 85 (citing Ex. 43, Gordon Dep. at 58-59, 61, 65).

21.        (1) Paul Kuzmierczyk is the president of Boomstick, Inc. (Kuzmiercyzk Dep. p.4,

ln.20-24).  (2) He incorporated it for the purpose of building a shooting range and firearms

retailer in Chicago (Kuzmiercyzk Dep. p.15, ln.12–15).  (3) Since he is the only officer and lives

in Chicago, he cannot get an FFL, so he cannot complete a business plan to get pricing on the

items he would like to sell.  (4) The FFL application requires one to testify they are not violating

any laws, and since one cannot sell firearms in Chicago, he cannot truthfully complete the

application (Kuzmierczyk Dep. p.17, ln.17 – p.18, ln.23).

**Response:**        Defendant does not dispute the first and second sentences.  Defendant

disputes the third and fourth sentences to the extent they suggest that the Ordinance prevented

Kuzmierczyk from opening a range. Def. SOF ¶ 85 (citing Ex. 44, Kuczmierczyk Dep. at 32, 51, 54-56).

22.	(1) After incorporating, he went to the SHOT Show in Las Vegas to look at possible inventory and range equipment, as well as the SHOT University by the National Shooting Sports Foundation (Kuzmiercyzk Dep. p.19, ln.12 – p.20, ln.4). (2) His main goal was to educate the public about firearms and their safe use and recreational opportunities (Kuzmiercyzk Dep. p.24, ln.14-18). (3) He received a quote from Action Target for both a 10 lane stationary range and a 10 lane tactical range (Kuzmiercyzk Dep. pp.25-27). (4) He wanted to put two stationary ranges and one tactical range under the same roof (Kuzmiercyzk Dep. p.28, ln.6-11). (5) His rough estimate for building the range and for inventory was just under $12 million (Kuzmiercyzk Dep. p.32, ln.15-21). (6) He stopped looking after he realized there were very few, if any, places that would fit within the distance requirements.

**Response**: Defendant does not dispute the first five sentences. Defendant disputes the final sentence to the extent it suggests that Kuzmiercyzk did not move forward with his gun range plans because of the location restrictions in the Ordinance, Def. SOF ¶ 85 (citing Ex. 44, Kuczmierczyk Dep. at 32, 51, 54-56), and objects to the sentence because it is not clear what "places" means, meaning Defendant does not know if it refers to all locations where a gun range could locate, all locations for sale, or available locations suitable for the large-scale range Kuzmierczyk envisioned. Pls.' Ex. 8, Kuczmierczyk Dep. at 42-44. To the extent it suggests there are "very few, if any" locations for a range to locate, Defendant disputes the sixth sentence. Def. SOF ¶ 14 (citing Ex. 18, Valenziano Dep. at 47-48).

23.	(1) Since he is a real estate broker, he was able to look at the MLS and look for

industrial properties near where people live, and everything was too close to a restricted use. (2) There were no vacant lots large enough for his project. (3) He searched the North Side and found no properties that would meet the requirements (Kuzmiercyzk Dep. p.41, ln.1 – p.43, ln.17). (4) He still wishes to open a range in Chicago pending the outcome of the lawsuit, meaning the location restrictions and certain other provisions (Kuzmiercyzk Dep. p.60, ln.22 – p.61, ln.17). (5) He plans to offer youth programs and education, and considers that a part of profitability of the business (Kuzmiercyzk Dep. p.66, ln.10 – p.68, ln.4).

**Response:** Defendant does not dispute that Kuzmiercyzk is a real estate broker and has access to the MLS, but objects to the remainder of the first sentence as vague because "everything" is not defined, so Defendant does not know if Plaintiff means all industrial properties for sale, all properties for sale that would be large enough for Plaintiff's purported project, etc. Defendant does not dispute the second sentence. Defendant disputes the third sentence to the extent it suggests that Kuzmiercyzk did not move forward with his gun range plans because of the Ordinance. Def. SOF ¶ 85 (citing Ex. 44, Kuczmierczyk Dep. at 32, 51, 54-56). Defendant disputes the fourth sentence to the extent it suggests Kuczmierczyk had a completed business plan for a gun range. *Id.*

24. Lorin Kramer testified for Kramer One, Inc. He holds an architect license in eleven states, beginning in 1991 (Kramer Dep. p.15, ln.15-24). His firm specializes in shooting ranges, and he does the design of the ranges (Kramer Dep. p.17, ln.22-24). His responsibility is to protect life and health of people inside the range, so he designs ranges to meet building and other Codes, and in such a way that people will not get sick or injured (Kramer Dep. p.33, ln.20 - 34, ln.4). This means designing the facility so that people do not get hit with a projectile, and

protecting people's hearing and protecting them from lead exposure, if any. He also makes sure the equipment will last, and that the facility is useable by people (Kramer Dep. p.35, ln.4 - p.36, ln.2). If a client wanted something unsafe, he would refuse the request (Kramer Dep. p.36, ln.21-24).

> **Response:** Undisputed.

25. He took an NRA range design class in 1991 to become a range team technical advisor—a volunteer to assist the NRA when someone asks it questions about constructing a range—and performed that function from 1991-2009 (Kramer Dep. p.39, ln.3-7; p.59, ln.1-7). He has visited between 100 and 200 ranges, and has designed firing ranges in 28 states (Kramer Dep. p.294, ln.19 - p.295, ln.9). He has designed approximately 50 firing ranges, both indoor and outdoor (Kramer Dep. p.40, ln.20 – p.41, ln.15).

> **Response:** Undisputed.

26. The cost of building a range would start at $3,000,000.00 and go up to $20,000,000.00 before it started getting fancy, with the low end being if one had an existing building with not much modification needed (Kramer Dep. p.297, ln.11 – p.298, ln.13). He helped manage seven private outdoor shooting ranges for a Sportsman's Club in the 1980's (Kramer Dep. p.45, ln.11 B p.47, ln.24). He also had responsibilities for budgets, and for reviewing revenues and profits for the Club (Kramer Dep. p.48, ln.1-7). He has been involved in whether a customer's chosen location is a good site for them from a business perspective, such as visibility or accessibility to customers (Kramer Dep. p.53, ln.22 – p.54, ln.). He has also been involved in zoning issues for customers, sometimes alone and sometimes through their attorneys (Kramer Dep. 55-56). He also provides cost estimates for ranges (Kramer Dep. 57).

**Response:** Undisputed.

27.     Kramer uses the NRA Range Sourcebook and NIOSH guidelines, plus if he is building a range for the government it may have its own rules (Kramer Dep. 61-62). He also consults with his employee Jack Giordano, and various consulting engineers for equipment questions (Kramer Dep. 62-63). He has designed many ranges where Action Target has installed the equipment, since Action Target is the largest manufacturer of range equipment of range equipment in the United States (Kramer Dep. 63-64).

**Response:** Undisputed.

28.     Kramer has never seen regulations such as in this case outside of Chicago (Kramer Dep. 314). Kramer would object to Section 4-151-030(b) if the people who were supplying money to the business were required to have a FOID card could not participate because they lived out of state and were prohibited from getting one (Kramer Dep. 87). He also takes issue with Section 4-151-030(f) since it allows that after a range opens anything that happens that is detrimental to the neighborhood could be considered a deleterious impact and the range will be shut down (Kramer Dep. 88-89). He would have no way to design a range to meet that standard, and if the Commissioner denies a license or renewal it will be impossible to operate the range, and this ordinance makes it economically infeasible to open a range (Kramer Dep. 90-92). He would find it unlikely, to the point of near impossibility, that someone would lend money to a project that they do not know if it is going to be open for the duration of the loan (Kramer Dep. 95).

**Response:** Defendant does not dispute that Kramer made these statements, but Defendant objects to these statements because they are speculative, lack a foundation, and to the

extent they are purported expert opinions, they are not based on any facts or data, as required by Rule 702. Def. SOF ¶¶ 11, 92 (citing Ex. 17, Kramer Dep. at 78-79, 94-96, 315, 327).

29.     (1) Limiting the hours of operation of a range limits the owner's potential income (Kramer Dep. 106).  (2) Most ranges expand or contract heir hours based on the market which can vary from one range to another (Kramer Dep. 109-110).

**Response:**     Defendant does not dispute that Kramer expressed the opinion in the first sentence, but Defendant objects to this opinion because it is not based on sufficient facts or data as required by Rule 702.  Def. SOF ¶ 71 (citing Ex. 17, Kramer Dep. at 107, 110-11).  Defendant does not dispute the second sentence to the extent that it is limited to the ranges with which Kramer is personally familiar.

30.     (1) It is unreasonable to require a range master to be on the premises when there is no shooting going on, as per Section 4-151-100(b), as there is additional needless expense to the range owner to pay a skilled range master to do nothing (Kramer Dep. 114-15).  (2) This is required even if there are people only in the parking lot, because that is part of the "shooting range facility" (Kramer Dep. 120).

**Response:**     Defendant does not dispute that Kramer made these statements, but Defendant objects to the statements as speculative, lacking a foundation, and asserting a legal conclusion.  Def. SOF ¶ 84 (citing Ex. 17, Kramer Dep. at 116, 121).

31.     (1) Section 4-151-100(d) – It is common to exclude kids under 6 from ranges, because they may lick the floor.  (2) It is common for ranges to sponsor youth shooting classes, through Boy Scouts or junior rifle clubs.  (3) Further, because those under 18 cannot be on the premises, they cannot even clean the toilets or fill the soda machine or work in the parking lot.

16

(4) They cannot wait in the lobby while their parents shoot (Kramer Dep. 123-124). (5) Not allowing minors to shoot would have an economic impact on the range (Kramer Dep. 125). (6) It might also be considered a deleterious impact (Kramer Dep. 128). See also Giordano Dep. 136-38, 144-45.

**Response:** Defendant does not dispute the first, second, third, and fourth sentences. Defendant does not dispute that Kramer expressed the opinion in the fifth sentence, but Defendant objects to the opinion as speculative, lacking a foundation, and not based on sufficient facts or data. Def. SOF ¶ 71 (citing Ex. 17, Kramer Dep. at 124-27). Defendant does not dispute that Kramer expressed the opinion in the sixth sentence, but Defendant objects to the sixth sentence as speculative and asserting an unsupported legal conclusion. *See Malec*, 191 F.R.D. at 584.

32. (1) Gun sales are an integral part of the business plan of indoor commercial ranges. (2) Range usage fees will hopefully get the range owner to break even. (3) A range needs sales to be profitable (Kramer Dep. p.131, ln.19 – p.132, ln.4). (4) The profit also comes from sales of ammunition, accessories and targets (Kramer Dep. 135-36). (5) He knows of no commercial shooting ranges that do not have firearms sales (Kramer Dep. 134). (6) The lack of firearms sales could make a range unprofitable (Kramer Dep. 139).

**Response:** Defendant does not dispute that Kramer made these statements and Defendant does not dispute the fifth sentence. Defendant disputes the remaining sentences to the extent they suggest a range needs gun sales to be economically viable. Def. SOF ¶ 79 (citing Ex. 17, Kramer Dep. at 133; Ex. 16, Giordano Dep. at 152; Ex. 6, Hart Dep. 3 at 58-59; Ex. 8, Pearson Dep. at 11). Moreover, Defendant objects to the remaining sentences to the extent

Kramer's opinions are not based on sufficient facts or data. Def. SOF ¶ 81 (citing Ex. 17, Kramer Dep. at 135, 137-38).

33.     (1) In other jurisdictions, gun ranges are considered a commercial use, and an accessory to the attached gun store. (2) Generally, they are placed in commercial zones where there is retail traffic, instead of manufacturing zones, since they are not manufacturing anything (Kramer Dep. 143). (3) Manufacturing districts are also not usually on arterial streets with lots of traffic that would see the range's sign as it drives by (Kramer Dep. 144). (4) The impact on a range is if it is not profitable because few people can see it (Kramer Dep. 145).

**Response:**     Defendant disputes the first and second sentences to the extent they suggest gun ranges are always considered a commercial use and are incompatible with industrial use. Def. SOF ¶ 19 (citing Ex. 16, Giordano Dep. at 304; Ex. 6, Hart Dep. 3 at 139). Defendant further objects to these statements because they are vague and ambiguous, as the "other jurisdictions" are not defined, and "generally" and "not usually" are vague terms. Regarding the third sentence, Defendant does not dispute that Kramer made this statement, but does object to this statement because Kramer is not qualified to opine on Chicago zoning matters. Def. SOF ¶ 22 (citing Ex. 17, Kramer Dep. at 146-47). Finally, Defendant does not dispute that Kramer expressed the opinion regarding "the impact on a range" in the fourth sentence, but Defendant objects to it as vague, speculative, and lacking a foundation. *Joseph P. Caulfield & Assocs.,* 155 F.3d at 888.

34.     (1) As for Section 4-151-170(b), there is no way for a range owner to control policing what ammunition has been brought in and what is leaving. (2) There is no practical way for a range owner to comply. (3) Also, there is the issue of what the range owner is supposed to

do with the ammunition left behind (Kramer Dep. 159-60). (4) Ammunition sales are also very important for the financial health of the range (Kramer Dep. 161). (5) He has been told by range owners that ammunition sales are a significant part of a range's revenue (Kramer Dep 162). (6) From observation, more than 50% of ammunition purchased at a range is not for use at the range, but to be taken home. (7) He has made these observations for the purpose of determining layouts for designing ranges and their retail areas (Kramer Dep. 164-66). (8) He has never seen a range without retail ammunition sales (Kramer Dep. 167).

**Response:** Defendant does not dispute that Kramer expressed the opinions in the first four sentences, but Defendant objects to these opinions because Kramer is not qualified to opine on the impact of this provision on the economic viability of a range and that his opinions are based on sufficient facts or data. Def. SOF ¶¶ 10, 88 (citing Ex. 17, Kramer Dep. at 14, 45, 49, 162-63, 170). Defendant further objects to Kramer's opinions that there "is no way" or "no practical way" for a range order to comply with this provision because they are speculative and lacking a foundation. *Joseph P. Caulfield & Assocs.*, 155 F.3d at 888. Regarding the fifth sentence, Defendant does not dispute that this was Kramer's testimony, but Defendant objects to the fifth sentence as hearsay. *Smith v. Potter*, 445 F.3d 1000, 1009-10 (7th Cir. 2006) (hearsay statements improper on summary judgment). Defendant does not dispute the sixth, seventh, and eighth sentences.

35. (1) For Section 13-96-1160(a), it makes no sense to compel side doors behind the firing line or doors behind the bullet trap system to be armored. (2) One cannot get an armored door that is also an acoustic door, so the ordinance requires a more expensive door in those locations that is less effective (Kramer Dep. 188). (3) It is also needless to force the wall behind

the bullet trap to be penetration-proof, since it is protected by the bullet trap (Kramer Dep. 189). (4) An armored door is $6000.00-$9500.00 more than a regular door, and up to $5000.00 more than an acoustic door (Kramer Dep. 193). (5) A penetration proof wall is approximately $200.00 per linear foot (Kramer Dep. 196). (6) The ordinance also requires penetration-proof walls, ceilings and floors in locations where bullets would not be. (7) In certain spots, like in the back where the ventilation system is placed, it is impossible to make that spot penetration-proof, although required by the ordinance (Kramer Dep. 201-02). (8) It would be impossible to open a range with this restriction if placing an armored door instead of an acoustic door causes the range to violate the noise restrictions (Kramer Dep. 206). (9) In areas Kramer does not know how one would do so in an existing building (Kramer Dep.72).

      **Response:**     Defendant disputes the first, third, and sixth sentences. Def. SOF ¶ 28 (citing Ex. 31, Fahlstrom Decl. ¶ 4); *id.* ¶ 30. Defendant does not dispute the fourth and fifth sentences. Defendant does not dispute that Kramer made the statement in the second sentence, but Defendant objects to the second sentence because "less effective" is not defined and therefore the statement is vague and ambiguous. Defendant does not dispute that Kramer made the statements in the seventh, eighth, and ninth sentences, but Defendant objects to them as speculative and lacking a foundation. Def. SOF ¶ 32 (citing Ex. 17, Kramer Dep. at 191).

      36.     (1) Section 13-96-1190(c)(2)(d) - there is no point to forcing range owners to have hazardous materials storage facilities for firearms and ammunition, as neither are hazardous materials (Kramer Dep. 208). (2) The "H" occupancy storage in relation to the rest of the building is going to be difficult to impossible to accomplish under the ordinances (Kramer Dep. 210, 213). (3) A magazine is a box to place materials about which you are concerned about an

explosion. (4) This has nothing to do with firearms, as they are inert (Kramer Dep. 216). (5) It would only be useful for ammunition if it were being manufactured on-site. (6) Absent that, no one to his knowledge has ever used a magazine for ammunition storage (Kramer Dep. 217). (7) The police and fire departments may make rules for the specifics of that storage, but they cannot invalidate the hazardous storage or magazine requirement (Kramer Dep. 226).

**Response:** Defendant does not dispute that magazines are used for explosive materials and that firearms are inert. Defendant does not dispute that Kramer made these statements, but Defendant objects to the remaining statements as speculative and lacking a foundation. Def. SOF ¶ 58 (citing Ex. 17, Kramer Dep. at 213-214, 222, 226). Defendant further objects to the final sentence as an unsupported legal conclusion.

37. (1) Sections 13-96-1200(b)(2) and (b)(7) - In the industry, all materials that stop sound are porous and rarely smooth. (2) But one section says surfaces have to be smooth and non-porous, and another says they have to stop sound (Kramer Dep. 238, 241). (3) One cannot comply by making the surfaces smooth and non-porous and then placing sound-absorbing materials on top of them (Kramer Dep. 242). (4) Suspending acoustical material from the ceiling would still be considered part of the ceiling (Kramer Dep. 247). (5) He is not aware of any soundproofing materials that are also smooth and non-porous (Kramer Dep. 250).

**Response:** Defendant does not dispute the first and last sentences. Defendant disputes the remaining sentences. MCC § 13-96-1200(b)(2) (requiring that the sound-absorbing materials be "applied or suspended"); Def. SOF ¶ 52 (citing Ex. 31, Fahlstrom Decl. ¶ 7).

38. (1) Section 13-96-1210(d) - requiring separate ventilation systems for each range, then there is two times the cost of ventilation, and ventilation is a large portion of the range's

construction costs, at least 15-20%, and maybe double that for an existing building, depending on the structure and parameters of that building (Kramer Dep. 254-55, 257). (2) This could be $60,000.00-70,000.00 more (Kramer Dep. 257). (3) Due to the cost of ventilation systems, this could push construction costs beyond the level of economic feasibility (Kramer Dep. 259).

**Response:** Defendant does not dispute that ventilation is at least 15-20% of the range construction costs, but otherwise objects to the first sentence as speculative. Def. SOF ¶ 37 (citing Ex. 17, Kramer Dep. at 255-57). Defendant does not dispute that Kramer expressed the opinions in the second and third sentences, but Defendant objects to the opinions that the cost of an additional ventilation system "could be" $60,000-70,000 and that the cost of an additional ventilation system "could" push construction costs beyond the level of economic feasibility as speculation and lacking a foundation. Def. SOF ¶ 37 (citing Ex. 17, Kramer Dep. at 258). Defendant also disputes this statement to the extent it suggests that Section 13-96-1210(d) always requires multiple ventilation systems in a range facility. Def. SOF ¶ 37 (citing Ex. 17, Kramer Dep. at 255-57).

39.     (1) Section 13-96-1210(e) - A power supply from simultaneous loading of all motors would be hard on the power grid, and could even cause a grid failure, which would be a deleterious impact (Kramer Dep. 263-64). (2) The solution is not interlocking the systems, but the ordinance requires it (Kramer Dep. 265). (3) He has heard from a firing range HVAC installer in this area about interlocking systems causing power failures (Kramer Dep. 269).

**Response:**     Defendant does not dispute that Kramer expressed the opinions in this statement, but Defendant objects to the opinions because Kramer is not qualified to opine on this issue and his opinion is not based on sufficient facts or data as required by Rule 702. Def. SOF ¶

42 (citing Ex. 17, Kramer Dep. at 272-73, 269-71). Defendant further objects to this statement as vague and lacking the specificity required to determine whether the "facts" in the statement are disputed. Defendant also objects to the first sentence because "be hard" is vague and ambiguous, "could even cause a grid failure" is speculative, and the final portion of the sentence regarding the "deleterious impact" is a legal conclusion. Regarding the second sentence, assuming "the systems" refer to a range's supply and exhaust systems, Defendant does not dispute that Section 13-96-1210(e) requires that the systems be interlocked to turn on at the same time. Defendant objects to the remainder of the second sentence as vague and ambiguous. Defendant objects to the final sentence as hearsay. *Smith*, 445 F.3d at 1009-10.

40.　　(1) Sections 13-96-1220(b) and (c) - In the 1970's the industry standard for cleaning range floors was wet clean with a hose and mop to a floor drain. (2) But uncombusted gunpowder would build up at the floor drain. (3) If a spark occurs near the floor drain, the floor would explode. (4) So in the 1980's and 1990's, the industry abandoned the wet clean method and now uses a HEPA dry vacuum for range cleaning (Kramer Dep. 273-75). (5) He will not sign architectural drawings for a range with a floor drain because it is dangerous (Kramer Dep. 275). (6) NIOSH and NRA do not recommend floor drains due to possible bullet ricochet (Kramer Dep. 276). (7) An architect should refuse to sign plans for a range with a floor drain, which means a range will not receive a building permit and get built (Kramer Dep. 279).

**Response:**　　Defendant does not dispute the first sentence. Defendant disputes the second and third sentences to the extent they suggest that that gunpowder always builds up at floor drains and the floor would always explode if there is a spark near the floor drain; Defendant does not dispute that these are possible occurrences. Defendant disputes the fourth sentence.

Def. SOF ¶ 44 (citing sources recommending or requiring the use of wet cleaning). Defendant

does not dispute the fifth sentence. Defendant disputes the sixth sentence. Def. SOF ¶ 44

(citing Ex. 28, NIOSH Report, Jan. 2010, at 3 (recognizing wet sweeping as an acceptable

method of cleaning)). Defendant disputes the seventh sentence. Def. SOF ¶ 44 (Ex. 32,

Fahlstrom Dep. at 24).

41.     Requiring a sloped floor makes no sense without a floor drain and is just added

cost, in that an existing floor slab has to be cut up, a floor drain installed and run to the sanitary

sewer. Cutting up a level floor to insert a sloped floor will cost approximately $20.00 per square

foot (Kramer Dep. 284-85).

**Response:**     Defendant objects to the first sentence as internally contradictory, and

therefore incapable of being determined to be disputed or undisputed, as well as argumentative.

Defendant does not dispute the second sentence.

42.     (1) The City's regulatory scheme makes it difficult to open a firing range in the

City (Kramer Dep. 292). (2) In a city like Chicago where there are so many people and a new

concealed carry law, where people are going to need training for permits, one would think people

would want to open the first firing range as a profit-maker, yet no one has (Kramer Dep. 301).

(3) To a reasonable degree of certainty, the better business plan would be not to build a range in

Chicago, due to the sum total of the restrictive ordinances, and build the range somewhere else

(Kramer Dep. 302, 325-26). (4) He is not aware of any location where crime increased as a result

of a gun range in that location (Kramer Dep. 303-04). (5) The noise from gun ranges would not

disturb the peace and quiet of neighbors (Kramer Dep. 306).

**Response:**     Regarding the first sentence, Defendant does not dispute that Kramer

expressed this opinion, but Defendant objects to the opinion because it is not based on sufficient facts or data. Def. SOF ¶ 11 (citing Ex. 17, Kramer Dep. at 315, 327). Defendant does not dispute that no one has opened a gun range in Chicago yet, and that there is a new concealed carry law in Illinois, but objects to the remainder of the second sentence as unfounded speculation. Defendant does not dispute that Kramer expressed the opinion in the third sentence, but Defendant objects to the opinion because Kramer is not qualified to opine on the business or economics of a range, Def. SOF ¶ 10 (citing Ex. 17, Kramer Dep. at 14, 45, 49, 51), and because he did not base the opinion or sufficient facts or data, Def. SOF ¶ 11(citing Ex. 17, Kramer Dep. at 78-79, 292-93). Defendant does not dispute the fourth sentence. Defendant objects to the fifth sentence as vague because it is not clear what ranges the sentence refers to, and to the extent the sentence states that gun ranges generally do not disturb neighbors, Defendant disputes it. Def. SOF ¶ 48 (citing Ex. 23, NRA Range Source Book, at I-6-3).

43.     To a reasonable degree of certainty, a firing range can exist in the City without having a negative impact on public health (Kramer Dep. 308) or public safety, and can exist and have a positive impact on public safety (Kramer Dep. 209). The same is true if the range is in a manufacturing zone or a commercial zone (Kramer Dep. 309-310).

**Response:**     Defendant does not dispute that Kramer expressed these opinions, but Defendant objects to the opinions because they are not based on sufficient facts or data and because Kramer is not qualified to testify on matters of public health or safety or zoning. Def. SOF ¶¶ 10-11 (citing Ex. 15, KramerOne Rpt. at 9-10). Defendant also objects to the statements as speculative, lacking a foundation, and vague and ambiguous because it is not clear what firing ranges the statements refer to, as well as what constitutes a "negative impact" or a "positive

impact."

44.     Jack Giordano testified for KramerOne, Inc. Besides his education and experience, he was the eastern region supervisor for the NRA's Range Technical Team (Giordano Dep. 18-19). He helped develop the NRA's certification program for range safety officers, and was with that team until December 2012 (Giordano Dep. 19, 48). He has worked for Kramer One since 2001 as a shooting range safety and health specialist (Giordano Dep. 20). He performs risk assessments and investigates problems at ranges to help the range owners, and he works with architects designing ranges to make sure they are designed in a safe manner that is compliant with state or federal regulations (Giordano Dep. 21-22).

     **Response:**     Undisputed.

45.     The NRA's Range Sourcebook is considered by professionals in the industry as the standard for shooting range development and design (Giordano Dep. 50).

     **Response:**     Undisputed that the NRA's Range Sourcebook is considered by professionals as a guide for shooting range development, but disputed to the extent it suggests that the NRA Sourcebook is *the* industry standard and that other industry sources are not consulted by professionals in the industry.  Def. SOF ¶ 29 (citing Ex. 17, Kramer Dep. at 61-62; Ex. 6, Hart Dep. 3 at 153).

46.     (1) All the opinions in the Kramer One report are his opinions (Giordano Dep. 74).  (2) He has experience with regulations and ordinances regarding shooting ranges, but nothing like what is in Chicago's ordinances (Giordano Dep. 85).  (3) He doubts it would be a prudent business venture to build a shooting range in Chicago under the current regulatory scheme.  (4) This is based on his experience, and is more than speculation (Giordano Dep. 86).

(5) There are so many restrictions and obstacles, it is probably the compilation of issues that makes it undesirable to try and open a range in Chicago (Giordano Dep. 88).

**Response:** Defendant does not dispute the first sentence. Defendant does not dispute that Giordano has experience with regulations and ordinances regarding shooting ranges, but Defendant objects to the remainder of the second sentence as vague and ambiguous because it is not clear what "nothing like what is in Chicago's ordinances" means, though Defendant does not dispute that that was Giordano's testimony. Defendant does not dispute that Giordano expressed the opinions in the third and fifth sentences, but Defendant objects to those opinions because Giordano is not qualified to make these opinions and did not base them on sufficient facts or data. Def. SOF ¶¶ 10-11 (citing Ex. 16, Giordano Dep. at 83-86). Defendant objects to the fourth sentence as vague and ambiguous because it is not clear to what "this" refers, but if it is his opinion regarding the economic viability of a range in Chicago, it is disputed. Def. SOF ¶ 11 (citing Ex. 17, Kramer Dep. at 78-79).

47. Section 4-151-030(f) - (1) It would be difficult for a range operator to control what someone may define as "deleterious impact." (2) Given the ordinance's language, it would be difficult for someone to make a determination whether it is advisable to try and open a range when something not under his control could cause him to lose his license, after he has been approved, constructed the range, and begun to operate it (Giordano Dep. 100-101). (3) There are people who take offense at others using guns, even if it is legal and in a proper environment. (4) He has seen situations where people in the community protest ranges because they don't like them and the government has the discretion not to renew the license (Giordano Dep. 103-04). (5) This ordinance is high on the list of "dealbreaker" ordinances because a government employee

could give in to the complaints of a community that does not like gun ranges and revoke a license. (6) That may be enough to convince someone thinking of building a range to not build one (Giordano Dep. 283-84).

**Response:** Defendant does not dispute that Giordano expressed the opinions in the first and second sentences, but Defendant objects to those opinions because Giordano is not qualified to offer the opinions and did not base them on sufficient data or facts. Def. SOF ¶ 92 (citing Ex. 16, Giordano Dep. at 110). Defendant does not dispute the third and fourth sentences. Defendant does not dispute that the fifth and sixth sentences accurately reflect Giordano's testimony, but Defendant objects to the sentences as speculative and to the extent they make a legal conclusion regarding what constitutes a "deleterious impact" under section 4-151-030(f).

48. (1) Section 4-151-090 is objectionable because most ranges are allowed to set their own hours, and even if there are hours restrictions, they are for shooting, and not for retail operations, which are very important to the success of a range. (2) Even the hours restrictions on shooting are for outdoor ranges for noise purposes. (3) There is no purpose for the hours restriction in this case except to negatively impact the range. (Giordano Dep. 116-17).

**Response:** Defendant does not dispute that Giordano expressed the statement in the first sentence, but Defendant objects to the first sentence as lacking a foundation. To the extent the first sentence is Giordano's opinion, Defendant disputes that the opinion is based on any facts or data. Def. SOF ¶ 71 (citing Ex. 16, Giordano Dep. at 121-22). Defendant does not dispute the second sentence to the extent that it states that one of the purposes of hours restrictions on outdoor ranges is to prevent noise from the range from disturbing neighbors. Defendant disputes the third sentence. Def. SOF ¶ 69 (Ex. 39, Krimbel Dep. at 143-44).

49.     Section 8-20-100 – (1) The model for shooting ranges is a shooting area with a retail area. (2) He has never been to a range that did not have a firing range with gun, ammunition and accessory sales.  (3) Typically a shooting range is a very expensive operation from a utility and construction standpoint, and the daily range operation covers the expenses, and the sales are from where the range's profit derives.  (4) The profit margin is even higher on ammunition than on firearms.  (5) The sales ban would greatly impact someone's decision whether or not to build a range in the City (Giordano Dep. 147-48).  (6) Even if the customer can rent a firearm, they still have to go somewhere else to buy it, which is an undue burden on a business that may give the opinion it is not worth it to open a range in a location with such an ordinance (Giordano Dep. 158).

**Response:**     Defendant does not dispute that the first sentence accurately reflects Giordano's testimony, but Defendant objects to the first sentence as lacking foundation and to the extent "the model" suggests that the *only* model for a shooting range is with a retail area.  Def. SOF ¶ 79 (citing Ex. 17, Kramer Dep. at 133; Ex. 16, Giordano Dep. at 152; Ex. 6, Hart Dep. 3 at 58-59; Ex. 8, Pearson Dep. at 11).  Defendant does not dispute the second sentence. Defendant does not dispute that Giordano made the statement in the third sentence, but Defendant objects to the third sentence to the extent that "typically" and "very expensive" are vague and ambiguous terms and that the sentence lacks a foundation.  Defendant does not dispute the fourth sentence.  Defendant does not dispute that Giordano expressed the opinion in the fifth sentence, but Defendant objects to this opinions because Giordano did not base his opinion regarding the economic impact of this provision on ranges on sufficient facts or data.  Def. SOF ¶ 81 (citing Ex. 16, Giordano Dep. at 151, 159-60).  Defendant does not dispute that Giordano

expressed the statement in the sixth sentence, but Defendant objects to it as speculative and to the extent it is a legal conclusion.

50.     Section 17-9-120 – (1) It would be hard for someone thinking about opening a for-profit range in Chicago to look at the ordinance and want to build the range in an industrial area. (2) Adding in schools, daycares, libraries, museums, hospitals greatly limits the number of locations where a range could be located (Giordano Dep. 165-66).  (3) He has talked to business owners who were thinking of opening ranges in other locations determined it would be detrimental to open a range in an industrial area (Giordano Dep. 168-69).  (4) There is no other reason to require a range to be placed in a manufacturing zone when it does not manufacture anything other than punitive (Giordano Dep. 171).

**Response:**     Defendant does not dispute that Giordano expressed these opinions, but Defendant objects to the opinions in this statement because Giordano is not qualified to opine on zoning matters, Def. SOF ¶ 10 (citing Ex. 15, KramerOne Rpt. at 10-11), and did not base his opinions on sufficient facts or data, Def. SOF ¶ 22 (citing Ex. 16, Giordano Dep. at 166-67). Defendant also objects to the third sentence as inadmissible hearsay, *Eisenstadt,* 113 F.3d at 742, and the fourth sentence as unintelligible and without support.  Defendant does not dispute that Giordano expressed the statements in the third and fourth sentences.

51.     Section 11-4-260(b) – (1) When there are two separate regulatory agencies making regulations or ordinances about the same topic, there sometimes are conflicts.  (2) Everything in the MCC is covered under federal regulation, including sound control through OSHA, air quality and discharge of particulate matter and waste through EPA.  (3) IT may be burdensome on the range owner to try and comply with both sets of regulations (Giordano Dep.

176).  (4) Also, since the Code provides that the Commissioner may design the regulations, someone opening a range does not know what the regulations are going to be.  (5) So someone will not know with which regulations they have to be in compliance prior to opening a range (Giordano Dep. 177).

**Response:**    Defendant does not dispute the first sentence.  Defendant does not dispute that the second sentence accurately reflects Giordano's testimony, but Defendant objects to the second sentence as vague and ambiguous because it is not clear what "[e]verything in the MCC is covered" means.  Defendant does not dispute that Giordano expressed the opinions in the third, fourth, and fifth sentences, but Defendant objects to the opinions because they are speculation and not based on sufficient data or facts.  Def. SOF ¶ 62 (citing Ex. 17, Giordano Dep. at 187; Ex. 17, Kramer Dep. at 177).

52.    (1) Section 13-96-1200(b)(2) – Other businesses in manufacturing zones have no sound restrictions.  (2) Restricting sound levels at a range when it is mandated to be in an area with businesses that have no such restrictions is a burden (Giordano Dep. 203-04).  (3) The range is being singled out and having a burden put on them the City clearly does not think is necessary for other businesses in manufacturing zones (Giordano Dep. 208-09).

**Response:**    Defendant disputes the first sentence to the extent it states that businesses other than gun ranges in manufacturing zones are not subject to sound restrictions.  MCC § 8-32-150; Pls.' Ex. 17, Schnoes Dep. at 27-28.  Defendant does not dispute that Giordano expressed the opinions in the the second and third sentences, but Defendant objects to them because they lack a foundation to the extent they assert legal conclusions.

53.    Sections 13-96-1200(b)(2) & (7) – Giordano has never seen smooth, non-porous

31

sound-absorbing materials (Giordano Dep. 215). If one cannot find a such a material, then compliance is impossible (Giordano Dep. 216).

**Response:** Defendant does not dispute the first sentence. Defendant disputes the second sentence. Def. SOF ¶ 52 (citing Ex. 31, Fahlstrom Decl. ¶ 7).

54. Sections 13-96-1220(b), (c) – (1) From a health and safety perspective floor drains are not recommended on indoor ranges. (2) The industry standard is clear on that (Giordano Dep. 229). (3) There is a danger of bullet ricochet (Giordano Dep. 231). (4) Also, washing particulate into a floor drain leaves unburned gunpowder accumulating in the floor drain, which can ignite and cause a flash fire or explosion. (5) Also, washing particulate down a drain causes environmental issues (Giordano Dep. 231-33).

**Response:** Defendant disputes the first and second sentences. Def. SOF ¶ 44 (citing industry sources recommending floor drains). Defendant does not dispute the third and fourth sentences. Defendant disputes the fifth sentence to the extent it states that washing particulate down a drain *will* cause environment problems; Defendant admits that washing particulate down a drain *may* cause environmental issues.

55. Section 4-151-170(b) – (1) the range owner is being forced to police the ammunition, by counting bullets as they come in and counting customer's bullets when they leave, and figuring out if they are leaving with the same ones they came in with. (2) It would be almost impossible to do that on an active range (Giordano Dep. 264-65). (3) Also, it will cost the range owner income because people will not buy as much ammunition. (4) If he were thinking of opening and running a range in the City, he would have a big problem with the manageability of this restriction (Giordano Dep. at 265-66). (5) It is not advisable to bar people from bringing

their own ammunition to the range, it makes the range unprofitable (Giordano Dep. 268).  (6) He would not want to leave his ammunition somewhere else; he would want to take it home with him (Giordano Dep. 272).

**Response**:  Defendant does not dispute the sixth sentence.  Defendant does not dispute that Section 4-151-170(b) requires ranges to ensure that no shooting range patron leaves the shooting range facility with ammunition purchased at the range, but Defendant objects to the remainder of the statements—Giordano's opinions—because they are vague and not based on sufficient facts or data.  Def. SOF ¶ 88 (citing Ex. 16, Giordano Dep. at 270-71).

56.    Blowing the local power grid could be considered a deleterious impact (Giordano Dep. 287).

**Response:**  Defendant does not dispute that Giordano made this statement, but Defendant objects to this statement because it is vague, speculative, and asserts a legal conclusion.  Def. SOF ¶ 92 (citing Ex. 16, Giordano Dep. at 110).

57.    (1) There are indoor ranges in commercial areas other than Chicago, and they are not a blight or detriment on the surrounding community (Giordano Dep. 289).  (2) None of the ordinances, if removed, would cause an increase in crime around the range (Giordano Dep. 291-92).  (3) Ammunition and firearms sales restrictions would be high on the list of deterrences to building a range in Chicago (Giordano Dep. 297).

**Response:**  Defendant does not dispute that Giordano made the statement in the first sentence, but Defendant objects to the first sentence because "commercial areas other than Chicago" is lacking the specificity for Defendant to determine whether the statement is disputed, and "blight" and "detriment" are vague and ambiguous terms.  Defendant does not dispute that

Giordano expressed the opinion in the second sentence, but Defendant objects to the opinion because Giordano is not qualified to express an opinion on public safety in Chicago, Def. SOF ¶ 10 (citing Ex. 15, KramerOne Rpt. at 10-11), and because he did not base the opinion on sufficient facts or data. Defendant does not dispute that Giordano expressed the opinion in the third sentence, but Defendant objects to Giordano's opinion expressed in the third sentence as speculative and not based on sufficient facts or data, and also as vague and ambiguous because it is not clear what "high on the list" means and to whose "list" the opinion refers. Def. SOF ¶ 11 (citing Ex. 17, Kramer Dep. at 327).

58.     Rosemary Krimbel is the Commissioner of the of Business Affairs and Consumer Protection for the City (Krimbel Dep. 8). As of September 24, 2012, there were no applications for a shooting range license. She does not know why. If someone had applied, she would have heard about it (Krimbel Dep. 26-27). If a shooting range applicant cannot get a location to put a shooting range that would pass muster with the Zoning Department, they will not get past square one with the Business Affairs Department (Krimbel Dep. 38).

**Response:**     Undisputed.

59.     As to 4-151-030(b)(6), when coupled with 4-151-040, anyone who works at a shooting range facility, whether handling firearms or not, whether the employee only works concessions, or mops the floor, or parks cars, must have a FOID card (Krimbel Dep. 64-66). She does not know of any other business in Chicago (except for taxicab drivers pre-Katrina) where one must be an Illinois resident to work there (Krimbel Dep. 69).

**Response:**     Undisputed.

60.     Krimbel is aware of a handful of businesses subject to hours-of-operation

restrictions. Usually it is because of "impact on community and neighborhood as well as public health and safety" (Krinbel Dep. 143-44). While she presumes that since there are shooting ranges in other cities there must be laws in those places regarding those ranges, she has no knowledge with how those other ranges operate, or their hours of operation, or how they get along with their neighbors in their communities (Krimbel Dep. 145). Any opinion on the effect of hours of operation of a shooting range and its effect on the community would be a guess, because she has not seen any studies (Krimbel Dep. 146). All she can say is more crime happens at night and guns are used in crime, and that it would be a problem if a criminal knew they could mug someone walking out of a range with a gun (Krimbel Dep. 146). This is absolute speculation on her part (Krimbel Dep. 146). She is not aware of any other city where having a shooting range open past 8:00PM caused a negative impact on public health and safety in that city (Krimbel Dep. 149).

**Response:**    Undisputed, except that Krimbel stated that she was speculating about the impact of the hours of operation and that her speculation was based on her licensing experiences concerning hours of operation requirements in the past, and that it was "speculation" because there is no shooting range in the City of Chicago.  Def. SOF, Ex. 39, Krimbel Dep. at 147-48.

61.    As for 4-151-100(d), Krimbel agrees no one under 18 can be a patron of, or shoot a firearm at, a Chicago shooting range (Krimbel Dep. 151). She believes it is so shooters do not have kids running around the range unsupervised, but believes the ordinance is inartfully drafted (Krimbel Dep. 151-52). She has friends who taught their kids to hunt around 14-15 years old, and her own son took a shooting class at age 12 (Krimbel Dep. 152).

**Response:**    Undisputed.

62.     Krimbel is not aware of any empirical evidence that justifies or provides a basis for any of the ordinances discussed (Krimbel Dep. 163-64).

**Response:**     Undisputed,

63.     Robert Fahlstrom is the Manager of Regulatory Review of the City's Department of Buildings. (Fahlstrom Dep. p.7). He is the City's disclosed witness to explain the government purpose of, and basis for, MCC 13-96-1200(b)(7) which requires the ceiling, floors and walls of the shooting range surface to be of smooth non-porous materials (Fahlstrom Dep. p.16; MCC). The Ordinance also requires the floor be sloped ¼ inch per foot from the firing line to the bullet trap (MCC).

**Response:**     Undisputed, although Defendant notes that Section 13-96-1200(b)(7) requires the floors, ceilings, and walls of every shooting range "be *constructed* of smooth non-porous materials."  MCC § 13-96-1200(b)(7).

64.     (1) Fahlstrom had not been to an indoor shooting range since he was a little kid, and since January 1, 2010, did not visit either the public shooting ranges in the Chicago area, nor the City's own firing ranges (Fahlstrom Dep. 22-23).  (2) Other than documents he review for the deposition, he has no knowledge of firing ranges except that firearms are used there (Fahlstrom Dep. 22).

**Response:**     Defendant does not dispute the first sentence.  Defendant disputes the second sentence to the extent it suggests that Fahlstrom did not have any knowledge of gun ranges or did not consult any documents regarding gun ranges prior to preparing for his deposition testimony.  Def. SOF ¶ 29 (citing Ex. 32, Fahlstrom Dep. at 15-17, 45-46).

65.     (1) Fahlstrom stated the purpose of the sloped floor requirement in 13-96-

1200(b)(7) is to allow for wet cleaning of the floor surface which is sloped to a floor drain to collect lead particulate (Fahlstrom Dep. 24). (2) He states the basis is architectural standards and documents he reviewed from the Department of Energy, a military handbook, and NIOSH (Fahlstrom Dep. 15, 25, 44).

**Response:** Defendant does not dispute the first sentence, although the full quote is that the purpose is "to collect lead particulate in a safe–in the safe as possible manner." Pls.' Ex. 12, Fahlstrom Dep. at 24. Defendant does not dispute the second sentence, but Fahlstrom testified that he also looked at other building industry standards and practices, the NRA handbook, and other municipal codes and ordinances. Pls.' Ex. 12, Fahlstrom Dep. at 27, 45-46.

66. Facilitating the removal of lead is the reason for the other provision of 13-96-1200(b)(7), which requires smooth non-porous surface materials (Fahlstrom Dep. 33).

**Response:** Undisputed.

67. (1) Lieutenant Kevin Johnson works for the Chicago Police Department in the Bureau Patrol, Third District (Johnson Dep. 9). (2) He is not aware of any firing ranges that do not have a gun store as part of the business (Johnson Dep. 33). (3) Any law enforcement incidents involving a gun store involve tracing a firearm used in a crime to its point of purchase (Johnson Dep. 34). (4) Sometimes criminals would lie about being at a firing range in order to concoct an excuse of why their gun may have been ☐stolen" (Johnson Dep. 35-37). (5) Sometimes criminals with clean records act as ☐straw purchasers" for criminals who are ineligible to buy firearms (Johnson Dep. 38). (6) He is not aware of criminal liability under State law for a gun shop owner who sells to someone who turns out to be a straw purchaser (Johnson Dep. 42). (7) When this happens, the blame is with the criminal straw purchaser; the problem is

not with the gun store (Johnson Dep. 44).  (8) Johnson is not aware of any occasion where a gun store was closed down, or an owner arrested, for knowingly selling a firearm to a straw purchaser (Johnson Dep. 46).  (9) He has no experience or study regarding the operation of a firing range (Johnson Dep. 72).  (10) He believes training with a firearm by a lawful person is always good, and is always a benefit regardless of the purpose, and for public safety, it is better for the firearm owner to be trained than not trained (Johnson Dep. 86).

**Response:**     Defendant does not dispute the first, second, fourth, fifth, sixth, and ninth sentences.  Defendant disputes the third sentence as the cited deposition testimony does not support the statement.  Defendant also disputes that the seventh sentence accurately reflects Lieutenant Johnson's testimony.  Lieutenant Johnson agreed with the statement that "when [straw purchasing] happens, the problem isn't with the gun store, per se.  The problem is with the straw purchaser who goes and acts illegally with the firearm after he legally purchases it."  Pls.' Ex. 13, Johnson Dep. at 44.  As to the eighth statement, Defendant does not dispute that Lieutenant Johnson was not aware of any occasion where a gun store was closed down or the owner arrested for knowingly selling to a straw purchaser, but he testified that he would not have access to that information because the Bureau of Alcohol, Tobacco and Firearms investigates individual gun stores.  Pls.' Ex. 13, Johnson Dep. at 46.  As to the final sentence, Lieutenant Johnson testified that "training is always good" if a person is going to possess a firearm.  Pls.' Ex. 13, Johnson Dep. at 86.

68.     (1) As to Section 4-151-170(b), which prohibits the sale of ammunition except for use at the range, the governmental purpose is public safety, because if there is ammunition at the range someone may try to steal it (Johnson Dep. 106), or someone who does not use all their

ammunition may take the remainder and sell or give it to a criminal (Johnson Dep. 107-08). (2) He is not aware of any studies or data of this happening (Johnson Dep. 109). (3) All concerns regarding ammunition and firing ranges are hypothetical and speculation (Johnson Dep. 111).

**Response:** Defendant does not dispute the first and second sentences. Defendant disputes the third sentence. Def. SOF ¶ 76 (citing Ex. 21, Johnson Dep. at 162-63.)

69. (1) Short of the range owner selling a patron a specific amount of ammunition, and then looking over the patron's shoulder to make sure he is shooting only that specific amount of ammunition, there is no way for a range owner to know if a patron is leaving with different ammunition than with which he entered (Johnson Dep. 114). (2) He does not know how, in practice, how Section 170(b) would be enforced by the range owner (Johnson Dep. 133-34). (3) He is opposed to a range providing ammunition because if a bullet leaves the range it could be used in a crime (Johnson Dep. 118). (4) Other than that, he is opposed to the idea of a firing range because people may bring ammunition there, and the transport of ammunition risks public safety if they are involved in a car accident, theft or robbery (Johnson Dep. 119-21).

**Response:** Defendant disputes that the first sentence accurately reflects Lieutenant Johnson's testimony, Pls.' Ex. 13, Johnson Dep. at 114, and also objects to the first sentence as speculation. *Id.* at 114-15; 119; 133-34. Defendant does not dispute the second sentence. Defendant does not dispute that the concerns expressed in the third and fourth sentences are among the reasons that Lieutenant Johnson stated that ranges providing ammunition present a public safety issue.

70. (1) Johnson believes the existence of gun ranges and the presence of firearms and ammunition will increase the possibility of theft, robbery, burglary or harm to the public. (2) He

has no empirical data or studies or research to support this belief (Johnson Dep. 122). (3) He has no empirical data or studies or research regarding ammunition used in a crime that was stolen from a firing range patron, nor is he aware of any real-world examples of this happening (Johnson Dep. 125). (4) His concerns about potential harms from crime are the same whether the bullet was purchased at a firing range or a Wal-Mart (Johnson Dep. 125). (5) His concerns about a range patron being robbed of ammunition is not with the person who bought the ammunition, but with the speculation about what may happen if that person is the victim of a crime (Johnson Dep. 126). (6) Someone wishing to use a firearm for self-defense has a greater ability to do so if they also have bullets for the firearm (Johnson Dep. 126-27).

**Response:** Defendant does not dispute sentences one, two, and three. Defendant disputes the fourth sentence to the extent the phrase "potential harms from crime" is vague and ambiguous and mischaracterizes Lieutenant Johnson's testimony. Pls.' Ex. 13, Johnson Dep. at 125. Defendant disputes the fifth sentence to the extent it suggests Lieutenant Johnson's concerns are speculative. *Id.* at 162-63. Defendant does not dispute that the sixth sentence accurately reflects Lieutenant Johnson's testimony, but Defendant objects to it as vague and speculative.

71. (1) Johnson cannot speak at all from a safety perspective as to what a range owner is expected to do with unused ammunition that a range patron is forced to leave behind (Johnson Dep. 127). (2) He cannot speak to safety concerns of a range owners reselling or disposing of unused ammunition (Johnson Dep. 133). (3) He said a governmental purpose of refusing to allow range patrons to leave with purchased ammunition is like golfers not leaving a driving range with a bucket of balls they rented, though they would be allowed to leave with them if they

purchased the balls (Johnson Dep 129-131).  (4) He has no knowledge of the economics of a range selling ammunition (Johnson Dep. 133).

**Response:**     Defendant disputes the first and second sentences to the extent they suggest that Lieutenant Johnson cannot speak from a "safety perspective" or speak to "safety concerns" regarding what range owners do with unused ammunition, Def. SOF ¶ 76 (citing Ex. 21, Johnson Dep. at 162-63), but Defendant does not dispute it to the extent it states that Lieutenant Johnson is not an expert in ammunition disposal.  Defendant does not dispute that Lieutenant Johnson compared section 4-151-170(b) to a golf course renting golf balls, but otherwise objects to the sentence as vague and speculative.  Defendant does not dispute the fourth sentence.

72.     (1) As to MCC 4-151-120, the distance restrictions as to other businesses, Johnson is the City's disclosed witness as to crime and gun-violence related issues (Johnson Dep. 136).  (2) The governmental purpose of keeping firing ranges 500 feet away from each other is to prevent the possibility of theft, robbery, shooting incidents as a result of weapons being either stored or transported to or from such location." (Johnson Dep. 137.)  (3) Basically, his opinion is "double the ranges, double the risk" (Johnson Dep. 138).  (4) The risk is the same if the two ranges are 500, 250 or 1000 feet apart; the distance between the ranges does not matter (Johnson Dep. 140-41).  (5) He is not aware of any empirical data, studies or statistics if two ranges are located 500 feet from each other, or regarding the topic of proximity of ranges to each other at all (Johnson Dep. 141).  (6) As to not allowing firing ranges within 500 feet of a residential zone, the government purpose is public safety, the speculation that there could be crime or theft or robbery, and because he believes the risk is due to the range's existence, is the same regardless of

where the range is located (Johnson Dep. 146-48).  (7) He is not aware of any empirical data that placing a firing range 500 feet from a residential area causes or results in crime, theft, robbery, or public hazards (Johnson Dep. 148).

**Response:**     Defendant does not dispute the first three sentences, except to the extent that the second sentence suggests that this is the *only* governmental purpose.  Pls.' Ex. 13, Johnson Dep. at 137.  Defendant disputes the fourth sentence as misstating Lieutenant Johnson's testimony, and also objects to it as vague and ambiguous.  Pls.' Ex. 13, Johnson Dep. 140. Defendant does not dispute the fifth sentence.  Regarding the sixth sentence, Defendant does not dispute that one of the government purposes behind Section 17-9-0121-B is public safety, but disputes the remainder of the sentence.  Pls.' Ex. 13, Johnson Dep. at 146.  Defendant does not dispute the seventh sentence.

73.     (1) Johnson's answers will be the same with regard to Section 120(c) because of shootings in America (Johnson Dep. 148-49).  (2) As to not allowing firing ranges within 500 feet of certain other location, the government purpose is also public safety, the speculation that there could be crime or theft or robbery (Johnson Dep. 149).  (3) He is not aware of any empirical data that placing a firing range 500 feet from certain other locations causes or results in crime, theft, robbery, or public hazards (Johnson Dep. 149).  (4) This is all his opinion and speculation of what might happen (Johnson Dep. 149).  (5) Like the other restrictions, the risk is due to the range's existence, and the distances from other locations does not matter (Johnson Dep. 151, 153).  (6) No matter where one puts a firing range, the public safety concern would equally exist (Johnson Dep. 159).  (7) The construction or operation of the range is irrelevant to his public safety concerns (Johnson Dep. 154-155).  (8) It is all speculative (Johnson Dep. 160).  (9) He is

not aware of any other cities that restrictions on the locations of firing ranges or on the sale of ammunition at a range (Johnson Dep. 155-56).  (10)  He is unaware of any real world examples where the location of a firing range resulted in an increase of risk to public safety or a criminal act (Johnson Dep. 161).

**Response:**     Defendant disputes the first sentence.  Pls.' Ex. 13, Johnson Dep. at 148. Defendant disputes the second, fourth, and eighth sentences to the extent they suggests that the governmental purposes and Lieutenant Johnson's opinions are based on "speculation."  Pls.' Ex. 13, Johnson Dep. at 162-63.  Defendant does not dispute the third sentence.  Defendant disputes the fifth and sixth sentences because "the risk" and "the public safety concern" are not defined, and Lieutenant Johnson testified that the distance does matter to public safety concerns.  Pls.' Ex. 13, Johnson Dep. at 151-54.  Defendant does not dispute that the seventh sentence accurately reflects Lieutenant Johnson's testimony, but Defendant objects to it to the extent that "operation of the range" is vague and ambiguous.  Defendant does not dispute the ninth and tenth sentences.

74.     Since Johnson's deposition, the distance restrictions have been moved to MCC 17-9-120A-C, though with the exception of firing ranges being allowed to locate within 100 feet of each other, the content remains the same (MCC 17-9-120A-C).

**Response:**     Undisputed.

75.     Patricia Scudiero is the City's Zoning Administrator and the Managing Deputy Commissioner for the Bureau of Planning and Zoning (Scudiero Dep. p.8, ln.4-6). She is the City's disclosed witness for the topics of "the bases for enacting 4-151-120 (limiting firing ranges to manufacturing districts) and "the number and dispositions of inquiries and/or requests regarding whether a potential location for a gun range complies with the zoning laws of

43

Chicago." (Scudiero Dep. p.4, ln.20 – p.5, ln.3) Firing ranges are labeled "special uses," and a permit must be obtained from the Zoning Board of Appeals ("ZBA"). The ZBA's criteria for issuing the special use permit are subjective (Scudiero Dep. p.14, ln.5-16).

**Response:**     Defendant does not dispute all but the last sentence, which mischaracterizes Scudiero's testimony.  Pls.' Ex. 14, Scudiero Dep. at 14.

76.     (1) Shooting ranges are required in manufacturing district because they have guns and ammunition and transportation of both, which could be conceived as having an impact on health, safety and welfare of surrounding individuals.  (2) This makes ranges "high impact" (Scudiero Dep. p.22, ln.12-19).  (3) Scudiero has no empirical evidence that firing ranges actually have that effect.  (4) Neither she nor anyone from her Department has researched other cities about how they zone gun ranges.  (5) She has ever gone to, investigated or researched gun ranges for zoning purposes (Scudiero Dep. p.23, ln.1-24).

**Response:**     Defendant does not dispute the first two sentences.  Defendant does not dispute that the third sentence accurately reflects Scudiero's testimony, but Defendant objects to it to the extent "effect" is vague and ambiguous.  Defendant does not dispute the fourth and fifth sentences.

77.     Since July 6, 2011, only approximately three or four inquiries (give or take a couple) have come in from people looking to open a firing range and asking about relevant zoning issues (Scudiero Dep. p.28, ln.22 - p.29, ln.16). The phone calls were from people asking if they could open a firing range at a specific address (Scudiero Dep. p.31, ln.8-12). All were told no because the addresses were either not in manufacturing districts or they were located in an area that would violate the distance requirements (Scudiero Dep. p.34, ln.2-18). Noone was told

they had picked an acceptable location (Scudiero Dep. p.36, ln.1-8).

**Response:** Defendant does not dispute this paragraph, but notes that the date range is July 6, 2011, through the date of Scudiero's deposition, October 5, 2012, and that Scudiero testified that she did not take the phone calls herself, that her department receives about 2000 calls a week, and that there may have been other inquiries that she did not recall. Pls.' Ex. 14, Scudiero Dep. at 29-30, 75.

78.     (1) The governmental purpose of Section 120(A) (prohibiting firing ranges within 500 feet of each other) is speculative and not based on any data (Scudiero Dep. p.40, ln.22 - p.42, ln.22; p.55). (2) The governmental purpose of Section 120(B) (prohibiting firing ranges within 500 feet of residential zones) is likewise speculative and not based on any data (Scudiero Dep. 44-45, 55). (3) The governmental purpose of Section 120(C) (prohibiting firing ranges within 500 feet of various listed locations) is also speculative and not based on any data (Scudiero Dep. 48-49, 55). (4) Scudiero has not received any complaints about negative impacts on the community caused by the Chicago Police Department ranges or any other private shooting range in the City (Scudiero Dep. 60-61).

**Response:** Defendant does not dispute the first three sentences to the extent they state that Scudiero was not aware of any empirical data supporting Sections 120(A)-(C). Defendant does not dispute the fourth sentence.

79.     (1) Steven Valenziano is the Assistant Zoning Administrator for the Bureau of Planning and Zoning for the Department of Housing and Economic Development (Valenziano Dep. p.6). (2) He is the City's witness as to "the available locations in the City to locate a gun range" (Valenziano Dep. 27). (3) As of September 28, 2012, 3386 acres, or 2.2% of the City's

148,161 acres could be used for a range (Valenziano Dep. 42-43).  (4) If a use listed in Section

120(C) opened since then, it would remove available area for a firing range (Valenziano Dep.

45). The map testified to by Valenziano is attached.

    **Response:**    Defendant does not dispute the first three sentences.  Defendant does not

dispute the fourth sentence to the extent it states that if a use listed in Section 120(C) opened, it

could affect the area available for a firing range, but Defendant objects to the sentence as

speculative and vague.

    80.    (1) Kevin Schnoes is the Assistant Commissioner of the Permitting and

Inspections Unit of the City's Department of Public Health (Schnoes Dep. 5, 7).  (2) The 55

decibel requirement for businesses starts at 8:00PM.  (3) There is no business other than gun

ranges where the 55 decibel limit starts before 8:00PM (Schnoes Dep. 23-24). (4) The noise

ordinance is enforced by the City's police department. (Schnoes Dep. 21).

    **Response**:    Defendant does not dispute the first sentence to the extent it states that

Kevin Schnoes was the Assistant Commissioner of the Permitting and Inspections Unit of the

City's Department of Public Health at the time of his deposition.   Defendant does not dispute the

second and fourth sentences.  Defendant disputes the third sentence to the extent it suggests that

the limitations in Section 13-96-1200(b)(2) would apply to firing ranges before 8:00 p.m.   MCC

§§ 8-32-170(h), 8-32-150; Def. SOF ¶ 47 (citing Ex. 38, Schnoes Dep. at 23, 25).

    81.    (1) If a business is within a manufacturing district, no noise restriction is enforced

(Schnoes Dep. 27).  (2) Only if a shooting range in a manufacturing zone has a noise above 55

decibels as measured at the edge of a contiguous area after 8:00PM would anything potentially be

enforced (Schnoes Dep. 29).  (3) 55 decibels is equivalent to a conversational level (Schnoes

Dep. 32, ln.17-20). (4) Schnoes is not familiar with the decibel level from a bullet fired from a regular semi-automatic handgun (Schnoes Dep. p.34, ln.16-19).

**Response:** Defendant disputes the first sentence. Pls.' Ex. 17, Schnoes Dep. at 27-28. Defendant does not dispute the remaining sentences.

82. (1) The governmental purpose of the noise ordinance is to keep the peace; it is not a safety or hearing damage issue (Schnoes Dep. 38, ln.9-24). (2) He is not aware of any governmental purpose for making shooting ranges the only business subject to a noise restriction before 8:00PM, and he is not aware of a governmental purpose for making shooting ranges the only business in manufacturing zones subject to a noise restriction (Schnoes Dep. 44, ln.4-15).

**Response:** Regarding the first sentence, Defendant does not dispute that this was Schnoes testimony, but Defendant disputes this sentence to the extent it suggests that this is the *only* purpose of the noise ordinance. Defendant disputes the second sentence to the extent it suggests that shooting ranges would be subject to a noise restriction before 8 p.m., Def. SOF ¶ 47 (citing Ex. 38, Schnoes Dep. at 23, 25), or that shooting ranges are the only businesses in a manufacturing zone subject to a noise restriction, Pls.' Ex. 17, Schnoes Dep. at 27-28.

83. He is not aware of any airborne and structure-borne sound absorbing materials that are also smooth and non-porous (Schnoes Dep. 35, ln.9-12).

**Response:** Undisputed.

84. The City's disclosed witness as to alleged justifications for the firearms sales ban, Philip Cook, has no education regarding firearms, firing ranges or gun stores. He has no training or experience with the operation or business of gun stores (Cook Dep. 8-9).

**Response:** Undisputed.

85.     Cook describes his opinions as "plausible." (Cook Dep. 19.)

**Response:**     Defendants dispute this statement as mischaracterizing the cited testimony.

Pls.' Ex. 18, Cook Dep. at 19.

86.     Cook is aware that the murder rate in Chicago varies widely across its various neighborhoods (Cook Dep. 29). The neighborhoods that are poorer or have well-organized criminal gangs have higher violence rates. And there is a relationship to race or ethnicity (Cook Dep. 30). The neighborhoods that were high in violence 20 years ago are often the same ones having high violence rates today (Cook Dep. 30). This is because the same factors still exist: lack of education, poverty and joblessness (Cook Dep. 30, 36-37). In a 1996-1997 study, Chicago had the highest prevalence of gang membership (Cook Dep. 34). While Chicago has a higher murder rate than other cities, qualitatively it is not different, since the same socioeconomic patterns of violence exist elsewhere (Cook Dep. 31). Currently the murder rate is around three times the national average, and was also so during the crack epidemic from 1984 through the early 1990's (Cook Dep. 32). He considers gangs and lack of education causative factors of violence (Cook Dep. 38).

**Response:**     Undisputed.

87.     There are no cities other than Chicago that ban gun sales (Cook Dep. 33). He is not aware of any other large city where gun sales at firing ranges specifically are banned (Cook Dep. 78). Short of banning gun stores, there is federal legislation which the City and/or State could supplement. There is also an emphasis on firearm crimes by the police (Cook Dep. 48-49). To a large extent, although not universal, criminals obtain their guns from the informal or underground markets (Cook Dep. 54). Chicago's firearms sales ban is not going to eliminate gun

violence in Chicago, either now or at any point in the future (Cook Dep. 57). He is not aware of any research that Chicago's gun sales ban has caused any reduction in crime in Chicago (Cook Dep. 58). It is plausible or possible that if there were gun sales, crime would increase (Cook Dep. 58). He is not aware of any statistics regarding firearm sales from shooting ranges in any other city (Cook Dep. 71).

**Response:** Undisputed.

88.     (1) Cook has cited one federal study which reported 100,000 defensive gun uses per year, while a different research study concluded the number was 2.5 million defensive gun uses per year (Cook Dep. 75-76).  (2) It is reasonably possible that someone would purchase a firearm at a firing range, train with that firearm, and that firearm might someday save that person's life (Cook Dep. 76-77).

**Response:** Defendant does not dispute the first sentence.  Defendant does not dispute the second sentence, but objects to it as vague and speculative.

89.     (1) He is not personally concluding that there should be a ban on gun sales in Chicago (Cook Dep. 79).  (2) He is not opining that the solution to the high rate of minority-on-minority homicide is to ban law-abiding people from being able to purchase firearms for self-defense. (3) Nor is he opining that the solution is to ban law-abiding people from selling firearms to other law-abiding people for self-defense purposes (Cook Dep. 89-90). (4) His opinion is that the existence of firearms increases the possibility that criminal will get ahold of them and do bad things with them (Cook Dep. 83). (5) It is also a logical possibility that the person the criminal is choosing to victimize will be able to defend herself with a firearm purchased, and trained with, at a range (Cook Dep. 84-85).

**Response:** Defendant does not dispute the first sentence. Defendant disputes the second and third sentences to the extent they fail to acknowledge Dr. Cook's testimony that "there is no one solution[.]" Pls.' Ex. 18, Cook Dep. at 89. Defendant does not dispute the fourth sentence, but Dr. Cook's testimony was that his opinion is that the sale of firearms "increases the possibility that individuals will use a gun to commit a crime . . . that would not otherwise have occurred." Pls.' Ex. 18, Cook Dep. at 83. Defendant does not dispute the fifth sentence.

90. (1) It is common sense that in neighborhoods with violence, people will be afraid and want to move, and that property value will decrease and it will put a drag on economic development (Cook Dep. 105-06). (2) All the social costs in Chicago caused by gun violence are under a regime that bans gun purchases in the City by law-abiding citizens (Cook Dep. 111-12). (3) The same factors that cause the high murder rate in Chicago also cause the social costs involved (Cook Dep. 114). (4) The availability of guns in a jurisdiction does not have an effect on the volume or the rate of robbery or assault. (5) Therefore, whether a perpetrator has a gun or not, the same number of robberies and assaults are going to take place (Cook Dep. 134-35, 148). (6) The main difference would be the type of robbery, instead of robbing a gas station a criminal may target an old lady on the street (Cook Dep. 135). (7) An increase in gun ownership would have no effect on the number of assaults, robberies and rapes (Cook Dep. 178). (8) If gun purchases were allowed in the City, and if there is a one-for-one transfer rate of firearm purchases in the City, where people are buying the same guns they would otherwise have bought in the suburbs, it will not have an effect on crime (Cook Dep. 207). (9) The idea that corrupt FFLs in the City will sell to criminals is speculation (Cook Dep. 212).

50

**Response:**     Defendant does not dispute the first, second, fourth, fifth, seventh, eighth, and ninth sentences.  Defendant disputes the third and sixth sentences because they do not accurately reflect the cited testimony.  Pls.' Ex. 18, Cook Dep. at 114, 135.

91.     (1) For all Cook's statistics about guns and alleged resulting violence, whether or not a firearm is purchased by a law-abiding person in the City or in the suburbs would have no effect on crime (Cook Dep. 160).  (2) He is not saying that the possibility that a gun dealer may be corrupt is a reason to maintain the City's ban on gun sales (Cook Dep. 162-63).  (3) He is not testifying that because there are criminals in the City who would like to get their hands on guns, and because there are a small percentage of FFLs that might not follow the law, that justifies banning gun sales to all the law-abiding people in the City (Cook Dep. 204-05). (4) The greatest impact on reducing Chicago's murder rate would come from investing more in policing, if the judiciary took gun crimes more seriously, and to invest in the future and try to get kids to stay in school and graduate (Cook Dep. 221). (5) It would be desirable to undermine the gangs, maybe by giving the kids an attractive alternative to joining (Cook Dep. 222).

**Response:**     Defendant disputes the first, second, third, and fourth sentences as mischaracterizing the cited testimony.  Pls.' Ex. 18, Cook Dep. at 160, 162-63, 204-05, 221. Defendant does not dispute the fifth sentence.

92.     (1) Cook's theory that gun stores are harmful is indistinguishable from his general objection to guns. (Cook Dep. 157-60, 203).  (2) Likewise, Cook cannot distinguish the harms from gun sales at gun ranges from gun sales at any other location. *Id.* at 209; see also 59; 159-61).  (3) Cook has no data at all regarding gun sales from, specifically, gun ranges. (Cook Dep. 71).

**Response:** Defendant disputes the first and sentences as micharacterizing the cited testimony. Pls.' Ex. 18, Cook Dep. at 59,157-61, 203, 209. Defendant does not dispute the third sentence.

93. (1) Cook's theory that gun stores, at ranges or otherwise, would lead to increased crime, or that such crime on balance would outweigh the benefits of gun ownership, is merely a matter of pure speculation. (Cook Dep. 84-85; 211-12). (2) Cook did not even purport to conduct any cost-benefit analysis. (Cook Dep. 92). (3) He did, however, testify that the city had options to reduce gun violence well-short of a gun sales ban. (Cook Dep. at 47, 62).

**Response:** Defendant disputes all of these sentences as mischaracterizing the cited testimony. Pls.' Ex. 18, Cook Dep. at 47, 62, 84-85, 92, 211-12.

## LOCAL RULE 56.1(B)(3)(C) STATEMENT OF ADDITIONAL FACTS REQUIRING THE DENIAL OF SUMMARY JUDGMENT IN PLAINTIFFS' FAVOR

Defendant hereby asserts the following additional facts that require the denial of Plaintiffs' Motion for Summary Judgment.

1. Those facts asserted in Def. SOF ¶ 1.

2. Those facts asserted in Def. SOF ¶ 2.

3. Those facts asserted in Def. SOF ¶ 3.

4. Those facts asserted in Def. SOF ¶ 5.

5. Those facts asserted in Def. SOF ¶ 6.

6. Those facts asserted in Def. SOF ¶ 9.

7. Those facts asserted in Def. SOF ¶ 10.

8. Those facts asserted in Def. SOF ¶ 11.

9. Those facts asserted in Def. SOF ¶ 13.

10.    Those facts asserted in Def. SOF ¶ 14.

11.    Those facts asserted in Def. SOF ¶ 15.

12.    Those facts asserted in Def. SOF ¶ 16.

13.    Those facts asserted in Def. SOF ¶ 17.

14.    Those facts asserted in Def. SOF ¶ 18.

15.    Those facts asserted in Def. SOF ¶ 19.

16.    Those facts asserted in Def. SOF ¶ 20.

17.    Those facts asserted in Def. SOF ¶ 21.

18.    Those facts asserted in Def. SOF ¶ 22.

19.    Those facts asserted in Def. SOF ¶ 23.

20.    Those facts asserted in Def. SOF ¶ 24.

21.    Those facts asserted in Def. SOF ¶ 25.

22.    Those facts asserted in Def. SOF ¶ 26.

23.    Those facts asserted in Def. SOF ¶ 28.

24.    Those facts asserted in Def. SOF ¶ 29.

25.    Those facts asserted in Def. SOF ¶ 30.

26.    Those facts asserted in Def. SOF ¶ 32.

27.    Those facts asserted in Def. SOF ¶ 34.

28.    Those facts asserted in Def. SOF ¶ 35.

29.    Those facts asserted in Def. SOF ¶ 36.

30.    Those facts asserted in Def. SOF ¶ 37.

31.    Those facts asserted in Def. SOF ¶ 39.

32.     Those facts asserted in Def. SOF ¶ 40.

33.     Those facts asserted in Def. SOF ¶ 42.

34.     Those facts asserted in Def. SOF ¶ 44.

35.     Those facts asserted in Def. SOF ¶ 45.

36.     Those facts asserted in Def. SOF ¶ 46.

37.     Those facts asserted in Def. SOF ¶ 47.

38.     Those facts asserted in Def. SOF ¶ 48.

39.     Those facts asserted in Def. SOF ¶ 49.

40.     Those facts asserted in Def. SOF ¶ 50.

41.     Those facts asserted in Def. SOF ¶ 52.

42.     Those facts asserted in Def. SOF ¶ 53.

43.     Those facts asserted in Def. SOF ¶ 56.

44.     Those facts asserted in Def. SOF ¶ 57.

45.     Those facts asserted in Def. SOF ¶ 58.

46.     Those facts asserted in Def. SOF ¶ 60.

47.     Those facts asserted in Def. SOF ¶ 62.

48.     Those facts asserted in Def. SOF ¶ 63.

49.     Those facts asserted in Def. SOF ¶ 65.

50.     Those facts asserted in Def. SOF ¶ 66.

51.     Those facts asserted in Def. SOF ¶ 67.

52.     Those facts asserted in Def. SOF ¶ 69.

53.     Those facts asserted in Def. SOF ¶ 70.

54.     Those facts asserted in Def. SOF ¶ 71.

55.     Those facts asserted in Def. SOF ¶ 78.

56.     Those facts asserted in Def. SOF ¶ 79.

57.     Those facts asserted in Def. SOF ¶ 81.

58.     Those facts asserted in Def. SOF ¶ 82.

59.     Those facts asserted in Def. SOF ¶ 83.

60.     Those facts asserted in Def. SOF ¶ 84.

61.     Those facts asserted in Def. SOF ¶ 85.

62.     Those facts asserted in Def. SOF ¶ 86.

63.     Those facts asserted in Def. SOF ¶ 87.

64.     Those facts asserted in Def. SOF ¶ 88.

65.     Those facts asserted in Def. SOF ¶ 90.

66.     Those facts asserted in Def. SOF ¶ 91.

67.     Those facts asserted in Def. SOF ¶ 92.

68.     Those facts asserted in Def. SOF ¶ 93.

69.     Those facts asserted in Def. SOF ¶ 94.

70.     Those facts asserted in Def. SOF ¶ 95.

71.     Those facts asserted in Def. SOF ¶ 96.

72.     Krimbel stated her "speculation" regarding the hours of operation provision in the

Ordinance was based on her licensing experiences concerning hours of operation requirements in

the past, and that it was "speculation" because there is no shooting range in the City of Chicago.

Ex. 39, Krimbel Dep. at 147-48.

73.     In preparing for his deposition, Fahlstrom reviewed the Department of Energy Guidelines, NIOSH recommendations, a military handbook for shooting ranges, the 2007 edition of the NRA handbook, and other smaller codes and ordinances  Pls.' Ex. 12, Fahlstrom Dep. at 14-15, 17, 44-46.  Fahlstrom testified that these documents provide empirical support for the conclusion that the sloped-floor requirement is safe.  *Id.* at 25-27.

74.     Lieutenant Johnson testified that he was not aware of any occasion where a gun store was closed down or the owner arrested for knowingly selling to a straw purchaser because he would not have access to that information because the Bureau of Alcohol, Tobacco and Firearms investigates individual gun stores.   Pls.' Ex. 13, Johnson Dep. at 46.


Date: March 21, 2014                     Respectfully submitted,

                                         STEPHEN R. PATTON,
                                         Corporation Counsel for the City of Chicago

                                         By:     /s/ Mary Eileen Cunniff Wells
                                                 Assistant Corporation Counsel


Mardell Nereim
Andrew W. Worseck
William Macy Aguiar
Rebecca Alfert Hirsch
Mary Eileen Cunniff Wells
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-6975  / 7129 / 4216

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I, Mary Eileen Cunniff Wells, an attorney, hereby certify that on this, the 21st day of March, 2014, I caused a copy of the foregoing **Defendant's Local Rule 56.1(b)(3) Response to Plaintiffs' Statement of Undisputed Material Facts and Local Rule 56.1(B)(3)(C) Statement of Additional Facts** to be served via electronic notification on the following counsel of record:

Alan Gura                          David G. Sigale
Gura & Possessky, PLLC             Law Firm of David G. Sigale, P.C.
101 N. Columbus Street             739 Roosevelt Road
Suite 405                          Suite 304
Alexandria, VA 22314               Glen Ellyn, IL 60137


/s/   Mary Eileen Cunniff Wells